IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **MATTHEW JOHNSON**, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 3:19-cv-2310-E |
| | § | *CAPITAL CASE* |
| **LORIE DAVIS**, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| | § | |
| Respondent. | § | |

---

**Petition for a Writ of Habeas Corpus**

---

This is a death penalty case.

David R. Dow
Texas Bar No. 06064900
University of Houston Law Center
4604 Calhoun Rd.
Houston, Texas 77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131
Email ddow@central.uh.edu

Jeffrey R. Newberry
Texas Bar No. 24060966
University of Houston Law Center
4604 Calhoun Rd.
Houston, Texas 77204-6060
Tel. (713) 743-6843
Fax (713) 743-2131
Email jrnewber@central.uh.edu

*Counsel for Matthew Johnson, Petitioner*

i

## Table of Contents

Table of Exhibits……………….. ................................................................................ v

Petition for a Writ of Habeas Corpus ................................................................. 1

Jurisdiction……………. .......................................................................................... 1

Prior Proceedings……... ......................................................................................... 1

Claims for Relief…………….................................................................................. 3

I.     Johnson was deprived of the effective assistance of counsel in the
       sentencing phase of his capital murder trial in violation of the Sixth
       and Fourteenth Amendments to the United States Constitution. .................... 3

       A.     The legal standard ................................................................................ 3

       B.     Trial counsel failed to conduct a reasonable sentencing
              investigation, failed to prepare for and conduct expert
              testimony, and failed to present important expert testimony to
              explain the availability of mental health care ...................................... 8

              1.     Prevailing professional norms ..................................................... 8

              2.     Trial counsel's performance fell below prevailing
                     professional norms. ...................................................................... 13

       C.     Trial counsel's failure to conduct a reasonable sentencing
              investigation prejudiced Johnson: the totality of the mitigating
              evidence "might well have influenced the jury's appraisal" of
              Johnson's moral culpability. ............................................................... 14

              1.     The mitigating testimony presented at trial .............................. 14

              2.     The lay testimony that would have been presented had
                     trial counsel conducted a reasonable sentencing
                     investigation in accordance with prevailing professional
                     norms in place at Johnson's trial. ............................................. 15

                     a.  Introduction ....................................................................... 15

                     b.  Early childhood ................................................................. 16

c. Elementary school drug and alcohol abuse .......................... 20

d. Middle school legal troubles and crack cocaine hits the neighborhood .......................................................................... 21

e. Teenage crack addiction and PCP use ................................. 22

f. Johnson's depression and addiction take hold ...................... 23

g. Prison:  five years sober ...................................................... 26

h. Sobriety in the free world (2009-11) ................................... 27

i. Financial problems and relapse ............................................ 28

j. Decline leading up to crime ................................................. 30

3.  The expert testimony explaining the impact of Johnson's social history that would have been presented but for trial counsel's deficiency. ................................................................... 32

a. Factors affecting childhood ................................................. 34

i.  Home environment .......................................................... 34

ii. Social environment .......................................................... 37

b. Social and cultural factors impacting adulthood ................. 39

i.  Personal and family life ................................................... 39

ii. Social environment .......................................................... 43

D.  Counsel's failure to properly prepare for and conduct Dr. Roache's testimony ................................................................... 45

1.  Relevant facts ........................................................................ 45

2.  Trial counsel's lack of preparation resulted in their failure to elicit testimony to explain Johnson's addiction ................... 49

a. Testimony explaining addiction is a disease was not effectively elicited. .............................................................. 50

           b.  Testimony explaining the ramifications of repeated drug use on developing brains was not elicited......................51

    3.     Trial counsel failed to provide Dr. Roache with materials necessary to tailor his testimony to Johnson's intoxication and addiction...............................................................................52

    4.     Trial counsel's ineffectiveness prejudiced Johnson in that jurors did not hear evidence that would likely have changed their answers to the special issues. .............................57

  E.    Counsel's failure to hire an expert to explain the lack of availability of mental health care and substance abuse treatment

    1.     Trial counsel failed to explain the difficulty of accessing mental health care and substance abuse treatment. .................59

    2.     The State portrayed Johnson's inability to secure treatment as a failure to take advantage of readily available opportunities. ...............................................................59

    3.     Trial counsel should have presented testimony from Dr. King Davis or a similarly qualified expert....................................61

II.   Johnson's death sentence is arbitrary, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, because the punishment is based on the jury's answer to the unconstitutionally vague and unreliable future dangerousness special issue .............................70

  A.    The future dangerousness special issue is unconstitutionally vague and fails to narrow the class of death-eligible defendants.........70

  B.    Evidence now confirms that predictions of future dangerousness are inherently unreliable........................................................74

  C.    Evidence demonstrates that Johnson's jury was wrong. .......................81

III.  Because the State was not required to prove that there were not sufficient mitigating circumstances to warrant sentencing him to death, Mr. Johnson's death sentence runs afoul of the provisions to the Fifth, Sixth, Eighth, and Fourteenth Amendments.........................................82

    A.    The relevant law .................................................................... 82

    B.    A jury's finding that there are not sufficient mitigating
           circumstances to warrant sentencing a defendant to life in
           prison instead of death is one that must be made for a Texas
           defendant to be sentenced to death ......................................... 83

    C.    The state court's opinion denying Johnson relief constitutes an
           unreasonable application of clearly established federal law. ............. 84

IV.    The jury in Johnson's case was misled, if not lied to, in violation of
       *Simmons v. South Carolina*, thereby violating Johnson's rights under
       the Eighth and Fourteenth Amendments. ......................................... 85

V.    Johnson's death sentence is unconstitutional because it is arbitrary,
       being based more on race and geography than the egregiousness of the
       crime for which he was convicted. ................................................ 88

    A.    Introduction ......................................................................... 88

    B.    U.S. Supreme Court precedent requires the death penalty not be
           applied arbitrarily. ................................................................ 90

    C.    Nevertheless, the death penalty continues to be applied
           arbitrarily across the United States. ........................................ 91

    D.    Specifically, Texas's death penalty scheme is unconstitutional
           because it results in arbitrary death sentences. ......................... 95

          1.    Race ........................................................................ 96

          2.    Geography .............................................................. 97

    E.    Conclusion ............................................................................ 98

Conclusion and Prayer for Relief ............................................................. 99

Verification ............................................................................................... 100

Certificate of Service .............................................................................. 100

**Table of Exhibits**

Exhibit 1          Affidavit of Daphne Johnson

Exhibit 2          Affidavit of Alma Johnson

Exhibit 3          Affidavit of Anthony Johnson

Exhibit 4          Affidavit of Stetron Mills

Exhibit 5          Affidavit of Timothy Johnson

Exhibit 6          Affidavit of Michael Henry

Exhibit 7          Affidavit of Lashan Mills

Exhibit 8          Affidavit of Anthony Grimes

Exhibit 9          Affidavit of Courtney Johnson

Exhibit 10         Affidavit of Hazel Johnson

Exhibit 11         Affidavit of Francis Wilson

Exhibit 12         Affidavit of Makayi Johnson

Exhibit 13         XLC records

Exhibit 14         Affidavit of Dr. Celeste Henery

Exhibit 15         Affidavit of Dr. John Roache

Exhibit 16         Affidavit of Dr. King Davis

Exhibit 17         Juror notes

Exhibit 18         Chart

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**MATTHEW JOHNSON**,            §
                               §
              Petitioner,       §
                               §
      v.                        §        No. 3:19-cv-2310-E
                               §        *CAPITAL CASE*
**LORIE DAVIS**, Director,       §
Texas Department of Criminal    §
Justice, Correctional Institutions §
Division,                       §
                               §
              Respondent.       §

---

**Petition for a Writ of Habeas Corpus**

---

Petitioner Matthew Johnson asks this Court to issue a writ of habeas corpus

and grant him relief from his unconstitutional death sentence.

## Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 2241(d) because Johnson

was convicted in the 363rd District Court of Dallas County, Texas. Subject matter

jurisdiction is conferred by 28 U.S.C. § 2254.

## Prior Proceedings

On June 4, 2012, the trial court appointed Catherine Bernhard to represent

Johnson during his trial. C.R. 29.[1] The trial court subsequently appointed Kenneth

---

[1] Citations to the Clerk's Record of Johnson's trial appear herein as C.R.
[page number]. Citations to the Reporter's Record appear as [volume number] R.R.

1

Weatherspoon and Nancy Mulder to represent Johnson. The guilt phase of Johnson's trial began on October 28, 2013. 44 R.R. 16. The State rested its case on October 30, 2013. 46 R.R. 42. The defense did not present any witnesses during the guilt phase, and Johnson was convicted of capital murder of Nancy Harris, by setting her on fire during the course of a robbery, that same day. 46 R.R. 69.

The punishment phase began on October 31, 2013. 47 R.R. 13. Both sides presented closing arguments on November 7. On November 8, the jury returned with a verdict, unanimously answering "yes" to the first special issue (i.e. the future dangerousness issue)[2] and "no" to the second special issue (i.e. the mitigation special issue).[3] 53 R.R. 4-7. By operation of law, Johnson was sentenced to death on November 8, 2013. 53 R.R. 7-8; see also Tex. Code. Crim. Proc. art. 37.071 § 2(g).

The Texas Court of Criminal Appeals (CCA) affirmed his conviction and sentence on November 18, 2015. *Johnson v. State*, No. AP-77,030, 2015 WL 7354609 (Tex. Crim. App. Nov. 18, 2015). The Supreme Court denied Mr. Johnson's petition

---

[page number].

[2] This special issue asks the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071 § 2(b)(1); see also 53 R.R. 4.

[3] This special issue, which the jury answers only if it unanimously answers the first special issue in the affirmative, asks the jury to determine "[w]heter, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence should be imposed." Tex. Code Crim. Proc. art. 37.071 § 2(e)(1); see also 53 R.R. 6.

for a writ of certiorari on June 27, 2016, which is the date his sentence became final. *Johnson v. Texas*, 136 S. Ct. 2509 (2016).

Before his sentence became final, Mr. Johnson properly filed an application for state habeas corpus relief on May 28, 2015, while his direct appeal was pending. On September 11, 2019, the CCA denied Mr. Johnson relief in his state habeas proceeding. *Ex parte Johnson*, No. WR-86,571-01, 2019 WL 4317046 (Tex. Crim. App. Sept. 11, 2019).

**Claims for Relief**

I.   **Johnson was deprived of the effective assistance of counsel in the sentencing phase of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.**

A.   **The legal standard**

In determining whether trial defense counsel were ineffective in failing to adequately investigate and present available mitigating evidence during sentencing, this Court must apply the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the defendant first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In evaluating a claim that counsel failed to adequately investigate, *Strickland* states "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

3

Second, the defendant must satisfy the prejudice requirement by showing there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

This test is not outcome determinative. The *Strickland* Court itself expressly rejected an "outcome-determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Id.* at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694. Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard.[4]

Texas juries are required to answer two "special issues." The special issues are questions that the jury must answer either "yes" or "no." Depending upon how

_____

[4] In *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), the Fifth Circuit recognized that the prejudice prong imposes "a lower burden of proof than the preponderance standard." *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990). Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard." *Id.*; s*ee also Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n.18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

these questions are answered, the trial court sentences the defendant to either life or death.

The first special issue a Texas jury is required to answer is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071, § 2(b)(1). The jury is required to answer the second special issue only if it answers "yes" to the first special issue; that issues asks "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment … rather than a death sentence be imposed." *Id*. art. 37.071, § 2(e)(1). If the jury answers the first special issue "yes" and the second special issue "no," the trial court must impose a sentence of death. *Id*. art. 37.071, § 2(g). For any other combination of answers—including the inability of the jury to unanimously agree on an answer for any question—the trial court must assess a sentence of life in prison. *Id*. In light of these standards governing the sentencing decision in Texas, the question in this case is whether there is a reasonable probability that, absent counsel's errors, the jury would have answered the mitigation special issue differently or not at all. *See Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003) (relevant question is whether the totality of evidence "would have affected the sentencing decision of at least one juror").

As it must, the CCA uses the same analytical framework for reviewing the prejudice prong of an ineffective assistance claim in the punishment phase of a Texas capital trial. As the court explained in *Ex parte Gonzales*:

> [T]he applicant must show that counsel's performance prejudiced his defense at trial. In order to satisfy this prong, an applicant must show there was a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. Texas' capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances. It asks the jury to answer a mitigation issue. We have adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Ex parte Gonzales*, 204 S.W.3d 391, 393-94 (Tex. Crim. App. 2006) (citations omitted). In making the prejudice inquiry, the court "consider[s] the totality of the evidence, 'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].'" *Id*. at 398 (citing *Wiggins v. Smith*, 539 U.S. 510, 536 (2003)). A habeas applicant will be deemed to have suffered prejudice from his counsel's failure to locate and present mitigating evidence whenever the evidence presented to the habeas tribunal, "taken as a whole, 'might well have influenced the jury's appraisal' of the applicant's moral culpability." *Gonzales*, 204 S.W. 3d at 399 (quoting *Wiggins*, 539 U.S. at 538).

From 2000 to 2005, the Supreme Court decided three cases to address effective representation at the sentencing phase of a capital trial. *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). This trio of decisions addressed death penalty cases

6

tried in the 1980's, and the Supreme Court held in each instance that the clearly established law of *Strickland* mandated a finding of ineffective assistance of counsel. These cases have considerably clarified the "clearly established law" applicable to capital cases adjudicated in state court after *Strickland*. The following principles are inherent in *Strickland* and its progeny:

**Performance:**

- Capital defense is sufficiently specialized and regulated to have a national standard, reflected both in the Eighth Amendment and the ABA Guidelines. *Rompilla*, 545 U.S.at 387; *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 396.

- While there is no set of per se rules or a checklist for capital representation, defense counsel must—in every case—engage in a thorough social history investigation. *Porter v. McCollum*, 558 U.S. 30, 39 (2009).  The ABA Guidelines are evidence of the "well-defined norms" of the national standard for mitigation investigation. *Rompilla*, 545 U.S. at 387; *Wiggins*, 539 U.S. at 524-25.

- Termination of mitigation investigation is only appropriate in the context of an informed decision, after a thorough investigation. *Rompilla*, 545 U.S. at 395 (O'Connor, J., concurring); *Wiggins*, 539 U.S. at 527-28.

- The fact that counsel performed some, or even extensive investigation, does not preclude a finding of deficient performance with respect to further investigation they reasonably should have done under the circumstances. *Rompilla*, 545 U.S. at 388-89; *Wiggins*, 539 U.S. at 527, 534.

- Federal courts, even under the deferential scheme of AEDPA, should scrutinize claims of strategy in light of a close reading of the record and a state court finding of strategic purpose for an omission should be disregarded if it cannot withstand such scrutiny. *Wiggins*, 539 U.S. at 526-27.

**Prejudice:**

- Prejudice ensues whenever the totality of the mitigating evidence "might well have influenced the jury's appraisal" of the defendant's moral culpability. *Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398.

- The operative question is whether there is a reasonable probability that one juror would have voted differently. *Wiggins*, 539 U.S. at 537.

- When assessing prejudice from counsel's error or omissions, reviewing courts must look at all of the mitigating evidence in the aggregate, including the evidence adduced at trial and the evidence adduced in post-conviction proceedings. *Wiggins*, 539 U.S. at 536; *Williams*, 529 U.S. at 397-98.

- Courts should not focus on trial counsel's post-trial statements regarding whether they would have used the mitigating evidence adduced in post-conviction proceedings; the relevant inquiry is whether a competent attorney would have introduced it. *Wiggins*, 539 U.S. at 535.

- The failure to discover mitigation undermines the outcome even in highly aggravated cases. The failure to provide any context or explanation for an aggravated case may render the proceeding unreliable. The idea that considerable aggravation is a per se bar to finding prejudice is no longer viable after *Williams* and *Rompilla*, both of which were highly aggravated cases.

- Prejudice inures even if the omitted evidence does not rebut the State's case for death eligibility. *Williams*, 529 U.S. at 398.

- Courts must look at all consequences that would have flowed from competent performance, including the impact on the work of expert witnesses. *Rompilla*, 545 U.S. at 392-93.

- When assessing prejudice federal courts need not make the state-law evidentiary findings that would have been at issue at sentencing, courts merely evaluate the totality of the evidence adduced at trial and in the habeas proceedings. Thus, a petitioner can use reliable hearsay to prove prejudice. *Wiggins*, 539 U.S. at 536.

**B.    Trial counsel failed to conduct a reasonable sentencing investigation, failed to prepare for and conduct expert testimony, and failed to present important expert testimony to explain the availability of mental health care.**

**1.    Prevailing professional norms**

The American Bar Association's revised *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, published in 2003,

articulate professional norms for capital defense counsel. Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1027 (2003) [hereinafter ABA Guidelines]. The Supreme Court has long referred to the ABA's guidelines as "guides to determining what [performance] is reasonable." *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688); *see also Rompilla*, 545 U.S. at 387 & n.7 (2005). The State Bar of Texas has likewise issued guidelines that "articulate the statewide standard of practice for the defense of capital cases" in Texas, the nation's most active death penalty state. State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel*, reprinted in 69 Tex. Bar J. 966, 967 (2006) [hereinafter SBOT Guidelines].

These guidelines provide that the "core" defense team that lead capital defense counsel should immediately assemble upon appointment includes at least one mitigation specialist and one fact investigator. ABA Guidelines, Guideline 10.4(C), at 999; SBOT Guidelines, Guideline 10.1(B), at 970. "Lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with [the ABA] Guidelines and professional standards." ABA Guidelines, Guideline 10.4(B), at 999; SBOT Guidelines, Guideline 10.1(A), at 970. Counsel's duty to use his or her team to conduct a thorough sentencing phase investigation is well established:

> The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel "sit idly by, thinking that investigation would be futile." Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed

> decisions, and counsel cannot be sure of the client's competency to
> make such decisions, unless counsel has first conducted a thorough
> investigation with respect to both phases of the case.

ABA Guidelines, Guideline 10.7 comment., at 1021; SBOT Guidelines, Guideline

11.1(A), at 971 ("Counsel at every stage have an obligation to conduct thorough and

independent investigations relating to the issues of both guilt and penalty.").

As the Guidelines make clear, an adequate presentation of the mitigating

evidence that outlines a capital defendant's life history regularly requires the

utilization of a combination of expert and lay testimony. As mandated by the

Guidelines, trial counsel should consider presenting:

> Expert and lay witnesses along with supporting documentation (e.g.,
> school records, military records) to provide medical, psychological,
> sociological, cultural or other insights into the client's mental and/or
> emotional state and life history that may explain or lessen the client's
> culpability for the underlying offense(s) . . . or otherwise support a
> sentence less than death . . . .

ABA Guidelines, Guideline 10.11(F)(2).  The use of expert testimony to present such

information can prove to be invaluable, depending on the details of the defendant's

background.

Finally, the Texas Court of Criminal Appeals' decision in *Ex parte Gonzales*,

204 S.W.3d 391 (Tex. Crim. App. 2006), is another source from which professional

norms in Texas may be discerned. Gonzales's capital murder trial occurred in 1997.

*Gonzales*, 204 S.W.3d at 393. After trial, post-conviction counsel discovered, through

interviews with Gonzales's family, that Gonzales had been physically and sexually

abused as a child. *Id*. at 394. Although Gonzales's trial counsel had interviewed

both Gonzales's mother and sister about Gonzales's background—the latter of whom

10

even testified at punishment to Gonzales's difficult childhood and his borderline

mental retardation—Gonzales's counsel never specifically inquired into whether

Gonzales had been abused with these potential witnesses and thus did not present

evidence of abuse at sentencing. *Id*. at 394-95. The CCA held that this failure to

investigate and inquire into the subject of abuse when interviewing the client and

relevant witnesses fell below an objective standard of reasonableness for Texas

capital trial counsel in 1997 and rendered trial counsel's mitigation investigation

unreasonable.[5] *Id*. at 397.

---

[5] Judge Cochran wrote a concurring opinion, in which she expanded upon the professional norms in place in Texas capital sentencing proceedings in 1997:

> The underlying message of *Summerlin* [*v. Schriro*, 427 F.3d 623 (9th Cir. 2005)] is that defense counsel must fully investigate any and all potential mitigating circumstances in his client's background which might conceivably persuade a jury not to impose the death penalty. The failure to investigate will not be excused simply because the defendant failed to mention such evidence himself. Indeed, under *Rompilla v. Beard*, defense counsel may be required to investigate potential mitigating facts even when the defendant is "uninterested in helping" or is "even actively obstructive" in developing a mitigation defense.

> Under both current Supreme Court standards and Texas statutes, defense counsel has a constitutional duty to seek out all of the "circumstances of the offense, the defendant's character and background, and [any evidence that lessens] the personal moral culpability of the defendant[.]"…Like a doctor, defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic. Such topics might include:

> - Childhood accidents and injuries;
> - Trips to the emergency room;
> - Serious illnesses at any time;
> - Physical abuse to the defendant or any other member of the family;

At the time of Johnson's 2006 trial, the prevailing professional norms had long required counsel to conduct a thorough mitigation investigation. *See Porter*, 558 U.S. at 39 ("It is unquestioned that under the prevailing professional norms at the time of Porter's [1988] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'") (quoting *Williams,* 529 U.S. at 396 (2000).

Counsel's duty to conduct a reasonable sentencing phase investigation "is not discharged merely by conducting a limited investigation…." *Lambright v. Schriro*,

---

- Any sexual abuse to the defendant or any other member of the family;
- Size of the immediate family, and a history of the physical, educational, and emotional background of each member;
- The defendant's relationship with and attitudes toward every member of the family;
- Drug or alcohol use or abuse by himself and any or all members of the family;
- Any mental health treatment of any member of the family, including the defendant;
- The cohesiveness of the family;
- The family's standard of living and living conditions;
- Any and all available school records;
- Any record of learning disabilities;
- Childhood and adult social relationships with members of the same and opposite sex;
- Any marriage, divorce, children, step-children, or surrogate family relationships, and their positive or negative influence upon the defendant;
- Any and all awards, honors, or special accomplishments, as well as any and all convictions, arrests, expulsions or suspensions from school, job firings, etc.;
- Any and all traumatic experiences; …

*Ex parte Gonzales*, 204 S.W.3d 391, 400-01 (Tex. Crim. App. 2006) (Cochran, J., concurring).

490 F.3d 1103, 1120 (9th Cir. 2007). Counsel must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial." *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006).

> **2.   Trial counsel's performance fell below prevailing professional norms.**

During the punishment phase of trial, trial counsel presented lay testimony from Johnson's wife, in-laws, and former coworkers to provide some insight into Johnson's struggle with addiction throughout his adult life. However, the explanation of how Johnson came to suffer from such a devastating addiction—and specifically how a seven-year-old child finds himself experimenting with drugs—was noticeably lacking. With that hole in counsel's case, the State was able to capitalize on the misleading fact that Johnson grew up in a home with two working parents. This wholesome childhood, as presented by the State, painted Johnson as a drug addict without context. As a result, the jury had no good reason to question Johnson's own responsibility for his addiction.

Trial counsel also failed to present expert testimony to contextualize the independent facts from lay witnesses by explaining the larger social and cultural frameworks in which Johnson grew up and lived his adult life. Had trial counsel called an expert such as Dr. Celeste Henery, the jury would have learned about the social and cultural aspects informing Johnson's personal and familial life and the broader social environment in which he was raised; the economic, racial, and gendered challenges to his identity and social mobility; and the environments that contributed to his lifelong struggle with addiction and depression.

Johnson's drug use, both in the hours before he killed Nancy Harris and in years before, was bound to play a significant role in his defense. Trial counsel was aware of this and hired an addiction expert, Dr. John Roache, for the punishment phase presentation. However, trial counsel failed to properly prepare for that Dr. Roache's testimony. As a result, Dr. Roache was underutilized by the defense and left vulnerable to impeachment by the State. Further, trial counsel failed to hire an expert to explain why their client was unable to secure drug treatment. Such an expert could have explained to the jury that Johnson's inability to secure effective treatment was due to a combination of factors outside his control, including financial barriers to treatment, state legislation, and certain cultural issues.

**C.    Trial counsel's failure to conduct a reasonable sentencing investigation prejudiced Johnson: the totality of the mitigating evidence "might well have influenced the jury's appraisal" of Johnson's moral culpability.**

**1.    The mitigating testimony presented at trial**

Trial counsel's punishment phase presentation focused heavily on Johnson's struggle with drug addiction throughout his adult life. Aside from Johnson himself, only Timothy Johnson, his older brother, was capable of testifying to Johnson's childhood growing up in East Garland. The remaining lay witnesses—consisting primarily of former coworkers, Johnson's wife, and his in-laws—provided an odd combination of testimony consisting either of stories of Johnson's drug-induced episodes or claims that they were not aware Johnson used drugs. *Compare* 50 R.R. 116-17 (recalling trying to find Johnson inside a crack house), *with* 49 R.R. 153-54 (stating she was not aware Johnson used drugs). This combination of witnesses had

two negative effects. First, it appeared that counsel called witnesses, such as Johnson's former co-workers, who did not actually know Johnson very well.  Second, counsel failed to tell the story of how Johnson came to be addicted to drugs. Because counsel did not adequately present evidence of Johnson's childhood, the State was afforded the opportunity to argue, "[H]e came from a good family. They took him to church. They were hard working parents." 52 R.R. 26. Indeed, throughout the trial, Johnson was portrayed by the State as an inherently devious person, who emerged from an otherwise wholesome family and neighborhood.

> **2.     The lay testimony that would have been presented had trial counsel conducted a reasonable sentencing investigation in accordance with prevailing professional norms in place at Johnson's trial.**

The following social history was readily available to trial counsel and should have been presented during the punishment phase of Johnson's capital trial.

### a.     Introduction

In the days following Johnson's crime, his wife, Daphne, called Parkland Hospital several times to check on Nancy Harris. Unable to get information on Harris's condition, Daphne drove to the hospital, but hospital staff refused to let her see Harris because she was not a family member. Daphne went to the hospital to apologize to Harris on Johnson's behalf because she knew that her husband would have apologized himself if he could have. She also wanted to tell Harris and her family that the Johnson she knew and loved—a sober Johnson—would never have done anything to harm her. Exhibit 9 (Affidavit of Daphne Johnson) at para. 37.

### b.  Early childhood

Johnson was born in 1975 to Ulrich and Alma Johnson, who were married in 1958. They had their first child, Anthony, in 1966, followed by Timothy in 1971, and, finally, Johnson in 1975. Alma and Ulrich also raised Cheryl Mills, Alma's niece, from about 1965 to 1986. Exhibit 2 (Affidavit of Alma Johnson) at paras. 2-3.

Johnson was a quiet child and seemed to have difficulty expressing himself. "It was as if he could not find the words to share how he was feeling."  Exhibit 3 (Affidavit of Anthony Johnson) at para. 9. Johnson's mother "did not pay too much attention to how quiet [Johnson] was as a young child, though." Instead, she "just assumed he did not want to talk to [her]." Exhibit 2 at para. 8.

In 1977, when Johnson was about two years old, Alma and the boys moved to a small house in Rowlett, near her sister and mother. Exhibit 2 at paras. 8-9, 11; Exhibit 4 (Affidavit of Stetron Mills) at para. 2. Ulrich did not move with them to Rowlett because he and Alma were separated at the time—likely due to his gambling problem. Exhibit 2 at para. 9; Exhibit 3 at paras. 10-11; Exhibit 4 at para. 2. Alma left Ulrich several times as a result of his gambling addiction, only to reconcile and get back together. Exhibit 3 at para. 10. Indeed, about a year after Alma and the boys moved to Rowlett, she and Ulrich got back together and he rejoined the family. *Id.* at para. 11.

In Rowlett, Johnson, who was under the age of six, and his older brothers and cousins, who lived next door, had "freedom" to do "what [they] wanted and go where [they] wanted to go. [They] walked around Rowlett without [their] parents knowing

where [they] were, often leaving [their] neighborhood in the afternoon and not returning home until late at night." Exhibit 4 at para. 4. Johnson also spent time with other relatives that would visit Rowlett for family gatherings. At one such family gathering, when Johnson was about five years old, an eleven-year-old cousin bullied Johnson into performing oral sex on him in front of the other cousins. When Johnson complied, the cousin urinated in Johnson's mouth, humiliating him. Exhibit 3 at para. 11; 49 R.R. 50-51.

Around 1980, not long after Johnson was sexually abused by his older relative, the Johnsons moved away from Rowlett to a house on June Street in East Garland. They lived there until around 1987, when they moved to another house in the same neighborhood, on Curtis Street, where Alma continues to reside. Exhibit 5 (Affidavit of Timothy Johnson) at para. 6; Exhibit 2 at para. 9.

Those who knew Ulrich knew him to be a heavy drinker—few saw him without a beer in his hand. Some viewed him as an alcoholic. Exhibit 1 at para. 9; Ex. 6 (Affidavit of Michael Henry) at para. 8. Alma disapproved of Ulrich's drinking, so she made him do it outside. "I did not want our children or grandchildren to see alcohol in the house," she recalled. Exhibit 2 at para. 6. After Ulrich retired, he drank beer in the garage in the evening and also bootlegged alcohol out of the trunk of his car. Alcohol was not for sale in Garland at that time the time, so Ulrich sold beer to friends and neighbors who did not want to drive to Dallas to buy it. *Id.* at para. 6.

Ulrich was also a gambler, who at times blew his entire paycheck, leaving the family with no money to pay the bills. *Id.* at para. 5; Exhibit 3 at para. 10. Alma and Ulrich fought constantly about his gambling habit, which "placed a lot of strain on [their] marriage." Exhibit 2 at para. 7; Exhibit 3 at para. 10; Exhibit 7 (Affidavit of Lashan Mills) at para. 6. Alma knew that Ulrich was from a family of gamblers. His father and all eight of his brothers shared the habit. Alma remembered how, within two minutes of Ulrich getting together with his family, they would take out the dice and start to play cards. Exhibit 2 at para. 4.)

Ulrich's gambling not only disrupted the family's ability to provide for their basic needs, it was also dangerous. One night, Ulrich was shot by a disgruntled gambler. *Id.* at para. 5. But Ulrich was in the throes of his addiction and continued to gamble anyway.

Alma was known to insist that Ulrich and her sons keep their vices outside of the home, in the streets. Exhibit 2 at paras. 6, 10; Exhibit 5 at para. 15. While she was rigid in her prohibition of alcohol, drugs, or gambling in the house, she was "not very concerned" with what happened outside her home. Exhibit 2 at para. 10; Exhibit 5 at para. 15. As Tim recalls, "Our mother was unconcerned with what my brothers and I did so long as we did not 'bring trouble into the house." Exhibit 5 at para. 15.

Because Alma worked during the day while Ulrich slept and Ulrich worked at night while Alma slept, Johnson was looked after by his older siblings. Exhibit 3 at para. 14. This created problems because both of Johnson's older brothers, Anthony

and Tim, were both heavily into drugs and involved in criminal activity throughout most of Johnson's childhood. As a result, Johnson was left largely unsupervised while he was at home and had no supervision when he was outside running the streets.

The neighborhood where Johnson grew up was known for having "a lot of drug users and others engaged in criminal activity." *Id.* at paras. 14-15. Still, Alma maintained her hands-off approach to parenting. *Id.*; Exhibit 5 at para. 7. When Johnson was five or six years old, he had the same 10 p.m. curfew that Anthony and Tim had. Exhibit 2 at para. 10; Exhibit 5 at para. 7.

Johnson had few friends outside of his siblings and cousins, Exhibit 2 at para. 8; Exhibit 3 at para. 9; Exhibit 6 at para. 6; Exhibit 8 (Affidavit of Anthony Grimes) at para. 5; Exhibit 9 (Affidavit of Courtney Johnson) at para. 4, but when he was about six years old, he met Michael "Mike Mike" Henry, a kid from the neighborhood who would become Johnson's best friend for years to come. Exhibit 2 at para. 10; Exhibit 6 at para. 3. Like Johnson, Mike Mike was quiet. Although they did not speak of it often, Johnson and Mike Mike bonded over their shared problems: Mike Mike too had an addict for a father and generally very little supervision. Exhibit 6 at paras. 6-7. Mike Mike remembered that Johnson seemed depressed as a child, as if he always had something on his mind; how Johnson often hung his head and slouched his shoulders and stared off into space for long periods of time. *Id.* at para. 7.

19

### c.    Elementary school drug and alcohol abuse

Johnson's older cousins and other older kids from the neighborhood introduced him to marijuana when he was just seven years old. Much like he did with his brothers and cousins as a young child, Johnson gave into the peer pressure from the older kids. After that, Johnson smoked marijuana several times a week, if not every day.

The consequences of Johnson's childhood drug use extended beyond intoxication. At the age of seven, Johnson found himself buying marijuana from neighborhood drug dealers nearly three times his age. One such dealer was Arthur Miller, who was known to "shoot up heroin and walk around the neighborhood at night stealing from people." Exhibit 3 at para. 15. On one occasion, Miller propositioned young Johnson during a drug deal to give him oral sex in exchange for marijuana. Johnson complied for a moment but the situation did not feel right and he quickly left. 49 R.R. 47-48. In a strange twist, Miller would later have a child with Cheryl, Johnson's cousin, with whom Johnson shared a room. Exhibit 3 at para. 15; Exhibit 2 at para. 9; Exhibit 5 at para. 14.

As an adult, Johnson mentioned the sexual abuse to his wife and sister-in-law, but then quickly shut down when they tried to talk to him about it. Exhibit 1 at para. 14; Exhibit 9 at para. 7. Looking back, several people closest to Johnson were not surprised that he had been sexually abused, as they believed it may have been a factor in the shame, depression, and addiction that they witnessed in Johnson throughout his life. Exhibit 3 at para. 16; Exhibit 1 at paras. 13-16; Exhibit 9 at

para. 7. Daphne even believed that Johnson's family knew about the sexual abuse that Johnson suffered, but never talked about it "because black families usually keep that kind of stuff hushed up." Exhibit 1 at para. 16.

At the age of ten, Johnson and Mike Mike started drinking beer a few times a week "to catch a buzz." Exhibit 6 at para. 10. By the time Johnson was in his early teens, he, his cousins, and Mike Mike were drinking on a daily basis. *Id.* at para. 12; Exhibit 4 at para. 8. Their drink of choice was Thunderbird or Mad Dog 20/20, both of which are cheap, fortified wines with alcohol contents upwards of twenty percent. Exhibit 6 at para. 12; Exhibit 4 at para. 8. They got the Thunderbird for a dollar per bottle from neighborhood bootleggers, who did not hesitate to sell to the kids.

### d.   Middle school legal troubles and crack cocaine hits the neighborhood

By middle school, Johnson's drug use began to catch the attention of his mother as well as the police. After five years of Johnson smoking marijuana, Alma finally began to notice his bloodshot eyes when he would come home. Exhibit 2 at paras. 14, 16. When Alma asked Johnson about the drug use, he did not respond and went to his room.

Around this time, the police started to bring Johnson home for trouble he got into outside the house. On one occasion police caught Johnson smoking marijuana with Mike Mike; another time he gave the police a fake name; and yet another time Johnson and Mike Mike stole their teacher's car and took it for a joy ride until it ran out of gas. Each time the police told Alma that she needed to teach Johnson a lesson

or else he was going to jail the next time they caught him. In each case, Alma failed to act. Exhibit 2 at para. 15.

Around this same time, crack cocaine hit Johnson's East Garland neighborhood "like a tidal wave." "Suddenly it was just as cheap and easy to get as marijuana." As a result, many of the people in the neighborhood, including Johnson's older friends and family members, started to use crack cocaine and PCP. Exhibit 8 at para. 7. One cousin, Willie Mills, ran a PCP drug house and was the one responsible for introducing many of Johnson's friends and family members to the drug. As Johnson's cousin Stetron remembers, "Everything changed after we started using crack and PCP. Everyone using it suddenly was plotting and scheming to find money for their next fix, chasing a high they would never again experience." Exhibit 4 at para. 9; Exhibit 6 at para. 13.

### e.   Teenage crack addiction and PCP use

Like many of those closest to him, Johnson eventually started using crack cocaine and PCP when he was in his late teens. He and Mike Mike smoked crack together a couple times a month. Mike Mike preferred to smoke "primos"— marijuana with a small amount of crack—because he did not want to be like his junky father. Johnson smoked straight crack, which made him act aggressive, crazy and paranoid: a far cry from the quiet and depressed Johnson of elementary school days. Exhibit 6 at para. 15; Exhibit 8 at paras. 7-8. While some of his friends and family had some control over their crack or PCP use, Johnson quickly became addicted and would routinely disappear for days at a time on crack binges.

At nineteen, Johnson married Daphne Johnson, his high school sweetheart. They met in elementary school and began dating in middle school. Exhibit 1 at para. 6. Early in their marriage, Daphne was aware that Johnson smoked marijuana and drank beer, but she was did not know about the severity of Johnson's drug and alcohol abuse. This was in part because Johnson kept his smoking and drinking to only outside the home—much like he had learned to do as a child in his parents' home. *Id*. at para. 19.

### f.   Johnson's depression and addiction take hold

By the mid-1990s many of Johnson's closest friends and family members began to realize his drug problem was serious. Exhibit 2 at para. 16; Exhibit 3 at para. 22. Anthony first realized how bad Johnson's addiction was when he received a panicked call from Mike Mike sometime around 1994 saying that Johnson was "acting crazy." Anthony "knew the situation must be serious if Mike Mike was panicked about how Matt was acting." Johnson had smoked "sherm"—a joint dipped in liquid PCP. When Anthony got to the house, he found Johnson hog-tied on the bed and "flailing around like a fish on land." Johnson was "acting so crazy" that Anthony decided not to untie him. Anthony had stopped at the store on the way to Mike Mike's to pick up a carton of milk because his friends had once given him milk to calm him down when he had a bad experience with PCP. Anthony gave Johnson some milk and he started to calm down a few minutes later. Anthony untied his brother, took him home, and put him to bed. Exhibit 3 at para. 22. A few years after

23

this incident, Mike Mike, Johnson's lifelong friend, would be convicted of capital murder and sentenced to life in prison. Exhibit 6 at para. 17.

Around 2000, Daphne also noticed Johnson's drug use started to get much worse. Exhibit 1 at para. 20. He started to go on weeklong crack binges, then quit for several weeks, and then binge again. That pattern continued for the next few years, getting increasingly worse as the binges became more frequent. At a time when they were desperate for money, Daphne began to dread the days Johnson would get paid because she knew he was going to take his check to buy drugs as soon as get off of work and disappear for days on a drug binge. *Id*.

When Johnson would disappear on long binges, he would often call Daphne as he walked aimlessly around Garland. Daphne remembered that Johnson would be so high that he would "either talk nonsense or leave the phone on so [Daphne] could hear him walking around in the background." At first Daphne was angered by the calls, but as Johnson's drug abuse worsened Daphne was so concerned about his safety that the calls became a sense of relief since "it meant that he was at least alive, even though he was high out of his mind somewhere." *Id*. at para. 21.

In 2002, Johnson used his employee insurance plan to get treatment for mental health and substance abuse treatment at Green Oaks Hospital. Unfortunately, his insurance covered less than two weeks of treatment. Daphne's mother, Hazel, remembered driving with Daphne to Green Oaks to pick up Johnson. "Matt was highly stressed about having to leave the treatment center. Seeing Matt so sad that day made [Hazel] mad that he was being forced to leave

24

because he did not have the money to stay." Just as Johnson had feared, he relapsed shortly after leaving the facility. Ex. 10 (Affidavit of Hazel Johnson) at paras. 6-7; Exhibit 2 at para. 17.

After a lifetime of heavy drinking and smoking, Ulrich died of cancer in 2003. Johnson had become closer to Ulrich in the final months of his life because he drove Ulrich to his various doctor's appointments, which gave them time to talk and connect. Johnson hardly knew how to talk to his father, but as time went on Daphne noticed that Johnson seemed happy after spending the day with him. Johnson took Ulrich's death hard. Daphne recalls, "I had never seen Matt cry the way he did after his father died." Exhibit 1 at para. 9.

Ulrich's death was a wake-up call for Anthony, Tim, and Johnson. With their father gone, they understood that they were now responsible for taking of Alma, as Ulrich had told them. They decided they would enroll at Eastfield Community College to learn a trade. Anthony went first, then Tim and Johnson followed a few years later. Anthony and Tim studied Heating, Ventilation, and Air Conditioning (HVAC). Johnson took courses in Automotive Body Repair, hoping to emulate the success that Daphne's father had in the business. Exhibit 5 at paras. 21-22; Ex. 9 at para. 9; Exhibit 10 at para. 5. Anthony earned his HVAC license but Tim and Johnson eventually dropped out, unable to escape the grip of their addictions. Exhibit 5 at paras. 21-22.

Soon, Johnson's addiction reached new levels of desperation. He began stealing steaks from the grocery store and trading them for drugs. Exhibit 3 at para. 28.

### g.    Prison: five years sober

In summer 2004, both Tim and Johnson were sentenced to prison. Tim received a forty-year sentence for assault of a public servant. Exhibit 5 at para. 23. Just a couple months later, Johnson was arrested and sentenced to five years for a robbery he committed while high on drugs. Exhibit 1 at para. 22; Exhibit 3 at para. 30; Exhibit 5 at para. 23; Exhibit 2 at para. 19; Exhibit 10 at para. 7. Johnson was housed at the Middleton Unit in Abilene, Texas. Daphne and their two daughters visited Johnson about three times a year, and they talked on the phone as often as they could. Johnson wrote letters to his family "constantly." Those five years were by far Johnson's longest period of sobriety in his life at that point. As time went on, Daphne started to notice that Johnson was "more upbeat" and began taking initiative by enrolling in classes at the Unit. "He especially enjoyed a class on parenting, which he took twice." Johnson started to become more engaged in his conversations with Daphne and gave suggestions when Daphne was having problems with their daughters. He felt guilty that he was not able to earn money for the family while he was incarcerated, so he used his time to "look for various resources that could help [his] family while he was gone, such as organizations that assisted working families with their utility bills and churches that assisted families that had a parent or spouse in prison." Exhibit 1 at para. 22.

26

Over time, Johnson began to sober up and become the person that his family and friends cared so much about. Across the board, friends and family recall that Johnson was like a completely different person when he was sober. He was kind, generous, and trustworthy. He was a loving husband, father, and uncle. Exhibit 2 at para. 19; Exhibit 9 at para. 8; Exhibit 3 at para. 25; Exhibit 11 at paras. 8-9; Exhibit 10 at para. 11. After five years of sobriety, Johnson carried these positive characteristics with him into the free world.

### h.      Sobriety in the free world (2009-11)

"When [Johnson] was released from prison in 2009, he was determined to stay sober and get his life back on track." Exhibit 3 at para. 30. His depression was still there, but it was not as apparent as it was before prison, and he found healthy ways to cope. Exhibit 1 at para. 23. When Johnson started to feel down or sad, he dealt with it by working out or going fishing. Exhibit 1 at para. 23; Exhibit 3 at para. 31. He started to look "fit and healthy." Exhibit 3 at para. 31. His relationship with Daphne was strong; they had their third daughter, Matduxx. Both Johnson and Daphne had jobs—Daphne at Target and Johnson at Meineke Car Care. Johnson did well at Meineke and quickly was promoted from the mechanic's pit to the office. On the weekends, he mowed lawns to earn extra money for the family. Even when there were no lawns to mow, Johnson found other odd jobs, like working as a handyman for an elderly woman who lived in North Garland. Exhibit 1 at para. 23; Exhibit 3 at para. 31.

During this time, Johnson repeatedly told Daphne he needed to make up for the years he was gone by providing for her and their daughters. Exhibit 1 at para. 23. Makayi, Johnson's oldest daughter, remembers she loved having her dad at home. Even if it was just watching "SpongeBob SquarePants" together, they enjoyed being around each other. Johnson tried to be the best role model he could be to the girls under the circumstances. He was honest with them about how devastating drugs can be, and encouraged them to talk to him "if anyone ever tried to peer-pressure [the girls] into doing drugs." Exhibit 12 (Affidavit of Makayi Johnson) at paras. 2-3.

Johnson's relationship with Alma got stronger as well. He began going to church with her, and even served as an usher on Sundays. Those closest to him noticed that his mind was clear and he was doing much better generally. Exhibit 1 at para. 23; Exhibit 2 at para. 19; Exhibit 3 at paras. 30-32. As Anthony puts it, "For a while, we thought Matt was going to be okay." Exhibit 3 at para. 32.

### i.    Financial problems and relapse

In 2011, Johnson and Daphne bought their first house. Exhibit 3 at para. 32; Exhibit 1 at para. 24; Exhibit 11 at para. 4. Daphne was hesitant to buy the house, despite their newfound financial stability, because she worried how the added financial pressure would affect Johnson's depression and drug use. But, Johnson wanted their daughters to have a yard to play in, so Daphne went along. Just as the bills started to pile up, Daphne lost her job at Target, and she struggled to find work after that. She had to go to the local Urban League office to get help paying

28

their electric bill. Exhibit 1 at para. 24. Daphne's Aunt Francis helped out with the bills when she could, and she even sold Johnson and Daphne her 1998 Jeep Cherokee for a cheap price. Exhibit 11 at para. 4. As the financial pressure continued to build, Johnson began to drink again, and started to isolate himself from Daphne and their daughters. Exhibit 1 at para. 25; Exhibit 9 at para. 11.

While Johnson's depression and alcohol abuse had come back in full force, he had not yet fallen back into drugs. That changed in October 2011, when the financial pressures became too much for him to handle. Daphne remembers well the day Johnson relapsed:

> In the fall of 2011, when it started to get colder, I told Matt that our daughters needed winter coats and I suggested that we go to Friendship House, a local charity, to get free coats. Matt did not want our daughters to have to get free coats; he wanted to buy coats for the girls himself. Matt was reluctant to accept charity in the past. I remember how he did not even want to accept baby clothes my friend had given me for Matduxx because he wanted to buy the clothes himself. For a long time, Matt was almost obsessed with the idea that, as the man of the house, he needed to take care of his family without the help of others. When Matt started to get upset the night I mentioned the winter coats, I tried to calm him down by saying that we did not need to go to the charity for free coats, but Matt suddenly left the house. Even though he told me he was going to the store and would be right back I knew that he was going to the drug house as soon as he left.  That was the night Matt relapsed on drugs.

Exhibit 1 at para. 27. Not long after, Anthony also witnessed the early stages of Johnson's relapse. He found Johnson, apparently high on drugs, in the middle of the street outside of Derrick Mills' house, screaming about breaking their brother Tim out of prison. Anthony did his best to calm Johnson, as he had done in the past, and the police allowed him to take Johnson home. Exhibit 3 at paras. 33-34.

### j.    Decline leading up to crime

Johnson's decline was rapid after the relapse. Exhibit 3 at para. 36. He stopped bathing, shaving, and fixing his hair. Exhibit 1 at para. 28. He no longer attended family gatherings. More than anything, Johnson was ashamed. Exhibit 3 at para. 3; Exhibit 10 at para. 9. Within a month, Johnson was fired from his job at Kwik Kar Lube after stealing from the owner one night while high on crack. After sobering up, Johnson attempted to return the items and apologize to the owner. Nevertheless, the owner pressed charges and fired Johnson.

Daphne's Aunt Francis recalls getting a phone call from Johnson asking her to come over to his house and get the keys to the Jeep because he was about to sell it for drug money. Francis did not believe Johnson would sell the Jeep so she did not go pick it up. About a week later, she found out Johnson had sold the Jeep for $200 and used the money to buy drugs. Johnson was ashamed of himself, and Francis was disappointed in his actions, but that event also made her realize just how bad Johnson's addiction was. Exhibit 11 at para. 6.

Over the next several months, Johnson's behavior would become more desperate. However, no one believed Johnson would do something to physically harm someone else. Rather, his behaviors were more self-sabotaging—like selling the Jeep for drug money. Exhibit 11 at para. 6; *see also* Exhibit 8 at para. 11. As Anthony states, "If I thought for one second that Matt was capable of harming others, I would have tried to get him involuntarily committed to a drug treatment center." Exhibit 3 at para. 37. Daphne held a similar sentiment.  She knew Johnson

needed help, but did not think he was an immediate threat to himself or others. Many times she flipped through the phone book and called various drug treatment centers, trying to find a place that would take Johnson. But, each center wanted to know whether Johnson was going to harm himself, Daphne, or their daughters. Because the answer was "no," the centers refused to admit Johnson. "Looking back, [Daphne] cannot help but believe that [their family] would have been better off if [she] would have just lied and told them that he was a danger to himself or his family so that they would not have a choice but to treat him." Exhibit 1 at para. 30.

In January 2012, Johnson found a job at XLC Services. Exhibit 13 (XLC Records). Johnson would not stay long, however. In April of that year, Daphne answered a call from Johnson to hear him screaming and other people talking to him in the background. She would come to learn that Johnson was having a drug-induced outburst in the parking lot of a Garland convenience store. The police took Johnson to Presbyterian Hospital, where he had to be strapped down to a bed because he was so erratic. Doctors treated him for drug-induced psychosis, but released him later that same day. Despite the fact that staff had Johnson strapped to a bed just hours before, their only drug treatment referral consisted of giving Johnson a handout on substance abuse and a list of local treatment centers. Exhibit 1 at para. 32.

After that incident, Daphne encouraged Johnson to talk to his supervisors at XLC Services about his addiction and ask them for help finding treatment. Rather than help Johnson find treatment, XLC suspended his employment, telling him that

he could return only after he had cleaned up. *See* Exhibit 13 at 15, 17. This was a devastating blow to the family to lose Johnson's income and still be left without treatment options. In Daphne's mind, this event was Johnson's breaking point. Exhibit 1 at para. 34.

Just one month after Johnson's drug-induced psychosis and failed attempt to find treatment following his brief stay at Presbyterian Hospital, he committed the instant offense on the heels of a serious drug binge. Exhibit 1 at para. 36. The night before the crime, Johnson had been seen at Anthony's wedding reception. Anthony and others were surprised to see him in attendance because he had been avoiding family gatherings for so long. Exhibit 3 at para. 38. Throughout the night, various family members spoke with Johnson about his relapse and tried to encourage him in his recovery.  But, the family encouragement was not enough for Johnson's very serious addiction. Johnson was seen drinking at the party, but he left sometime around midnight. Later, Anthony saw Johnson return to the party for a few more drinks around two o'clock in the morning, but then he left again. No one in Johnson's family saw him again that night. Later that morning Johnson committed the crime that led to his being sentenced to death. *Id.* at paras. 38-39.

### 3. The expert testimony explaining the impact of Johnson's social history that would have been presented but for trial counsel's deficiency.

Dr. Celeste Henery is an anthropologist and scholar holding a postdoctoral fellowship in the Department of African and African Diaspora Studies at the University of Texas at Austin ("UT").  She received her doctoral degree in

Anthropology from UT with a doctorial portfolio in African Diaspora Studies and

Black life.  Dr. Henery's research focuses on the success and failure in the lives of

Black men and Black masculinity and has extensive experience is conducting

interviews and analyzing life histories, as well experience researching and

analyzing social, political, and cultural histories to contextualize and explain

human behavior and cultural practices.  Exhibit 14 (Affidavit of Dr. Celeste Henery)

at paras. 3-4. Had Dr. Henery been retained to testify at the punishment phase of

Johnson's trial, she could have educated the jury about the following. *Id.* at para.

37.)

From childhood through his adult years, Johnson used drugs as a coping

mechanism for early sexual abuse, his emotional isolation, and the violences of

everyday life that accompany economic and racial disenfranchisement. His

childhood home provided little supervision, guidance or emotional investment,

which could have acted as antidotes to his early sexual abuse and drug use. *Id.* at

para. 10.

Growing up in the 1980s and 1990s in the midst of the crack economy,

Matthew confronted economic, racial, and gendered challenges to his identity and

social mobility similar to many low-income, urban, African-American males.

Johnson's best intentions to start a family, be a good provider, and lead a clean life

were continuously compromised by environments that contributed to his lifelong

struggles with addiction and depression, at the same time they constrained his

ability to access and receive consistent or adequate care. These broader social and

cultural forces played a central role in Johnson's derailing of his own life, and the destruction of another. *Id.* at para. 11.

### a.   Factors affecting childhood

### i.   Home environment

Johnson's parents' marriage and co-habitation included extensive fighting, addiction, and uninvolved parenting. The couple's "hands-off" approach included a loosely enforced curfew and a basic expectation for their children to attend school, but otherwise offered little emotional support or time investment in Johnson. By contrast, Johnson experienced two instances of sexual abuse while circulating with older males and without responsible adult supervision. These experiences created feelings of fear, anger, and depression that Johnson struggled with. These early violations of his personal boundaries and sense of safety, as well as his drug use, went unknown and unaddressed by his parents or other adults. *Id.* at para. 13.

The generational differences between Alma and Ulrich and their children are significant and manifested in two predominant ways. Exhibit 14 at para. 14. The first was their emphasis on work rather than education. Alma and Ulrich grew up in rural Texas and in large, poor families. As African Americans raised in the era of Jim Crow and segregation, their educational opportunities as well as their economic and geographic mobility were limited. Neither of Johnson's parents nor his immediate family members achieved more than a high school degree. As of 2009, only eighteen percent of African Americans aged twenty-five to twenty-nine had obtained a bachelor's degree compared to the national average of approximately

thirty percent; moreover the numbers for African Americans have not raised over the last twenty years whereas they have for two groups—Asian and white Americans. Higher education remains economically inaccessible for many African Americans, and is often not within the purview of low-income African American's family or community experience. The Johnsons did not reinforce the value of an education or attempt to encourage Johnson to pursue one. *Id.* at para. 15.

The second and related generational difference is what the literature on African-American culture terms as "Black Respectability." This ongoing cultural ethos in African-American communities centers around the ideas, values, and practices of hard work, personal responsibility, religious faith, dignified self-presentation, and community survival; it also is anchored in notions of male leadership in institutions such as marriage and the role of men as strong providers, responsible fathers and husbands. Although Ulrich spent little time with Johnson, he embodied and modeled Respectability to the degree that he played the traditional patriarchal head of household and provider roles.  This message was absorbed by all three of his sons but especially Johnson, who built his identity around his ability to provide for his family. Alma also supported the ideal of the respectable home by running her family's domestic life, while working full-time, and mandating that Ulrich keep his substance use and addiction outside of the family home. This practice also meant that she turned a blind eye to the problems that plagued her husband and her children's lives. In addition, Alma gravitated to religion and started attending a Baptist church to end her substance use during

35

Johnson's adolescence.  Her turn to religion suggests how Respectability and its religious ethos influenced how she and other African Americans use churches as primary help-seeking institutions. Her turn to religion in lieu of professional chemical dependency treatment also was consistent with how she later responded to Johnson's problems. In these ways, the architecture of Black Respectability informed the Johnsons' parental practices and was the template for the identity and roles Johnson built his life around. *Id.* at para. 16.

In the context of this family environment, Johnson's childhood and teen drug use went unaddressed and occurred alongside substance use in his family. Both parents drank and smoked.  Ulrich also had a gambling addiction for which he never received treatment.  Both of Matt's brothers, Anthony and Tim, had drug addictions, as did his cousins. Johnson hid his sexual abuse and drug use from his parents, as did Tim, who was aware of the abuse but never sought help from a responsible adult. *Id.* at para. 17.

Research suggests that secrecy within African-American families around abuse and mental health problems are factors in African Americans' delayed help-seeking. The literature also suggest that diminished masculine pride as well as cultural mistrusts around psychotherapy and its practitioners play a role in African Americans either not receiving or delaying care for sexual abuse. The addiction problems in Johnson's family, across generations, mostly went unattended to both by family members and by professional caregivers. *Id.* at para. 18.

## ii.    Social environment

Johnson circulated freely as a child in East Garland and accessed marijuana and alcohol before crack arrived in the neighborhood at the end of the 1980s. Sociological research documents how structural economic shifts, such as the loss of manufacturing jobs, led to high unemployment rates in inner cities during this period and increased racial and economic marginalization of African-American men; these economic and employment conditions incentivized young African-American men's participation in the drug economy. Exhibit 14 at pata. 19.

The 1985–86 National Narcotics Intelligence Consumers Committee Report documents that crack cocaine was available in Dallas and other major US cities by 1986. Residents suggest that by the late 1980s, PCP and crack were available in East Garland. Ethnographic accounts of the rise of the crack economy in inner cities document the violence that emerged around the drug economy and its detrimental impact on all residents.

Johnson and others also noted the shift away from the sociality of Black Respectability, previously discussed, which included older Black men playing dominos outside and children playing on the streets, into robbery, shooting deaths, and a climate of fear. In his teen years, Johnson witnessed both of his brothers get involved with the drug economy as dealers and users. Tim had a crack addiction and was incarcerated at nineteen years old. Two of Johnson's cousins were murdered. Although Johnson and his peers experienced economic and racial

disenfranchisement before this period, the drug economy and its violence deeply impacted Johnson and his choice-making. Exhibit 14 at para. 20.

Johnson came of age in shifting representations of African-American men and standards of masculinity that impacted his sense of self-worth and behavior. In a social world increasingly dominated by images of gangsters, hip-hop stars, and athletes, Johnson failed to meet masculine norms that emphasized toughness, reputation, capital acquisition, and sometimes violence. Exhibit 2 at para. 21.

Acting as a counterpoint to Respectability, Reputational practices are often deployed by African-American males who lack institutional status and the social capital to achieve respect through traditional means, such as an education, formal employment, a good wage, and nuclear family. Reputational practices involve participation in the informal economy, social dominance, and sometimes violence. Johnson was impacted by the presence of this masculine model built around reputation at the same time that he distanced himself from it. As a more sensitive and quiet child, who also felt depressed, Johnson self-isolated and intensified his drug use as an adolescent and teen. His sensitivity and shorter stature, which may have contributed to his victimization as a child, frustrated Johnson who was not a great athlete and did not embody the toughness of his brothers or peers. He masked his depression and anger with drug use. Sitting on the periphery of these local norms and masculine ideals, Johnson bonded with other young men, like Michael Henry ("Mike Mike"), who shared Johnson's feelings of isolation and their friendship revolved around their substance use. Exhibit 14 at para. 22.

Virtually unsupervised and lacking adult support throughout his childhood, Johnson's behavior went unaddressed by his parents, even when police brought him home suggesting that he needed more parenting or he would wind up incarcerated. Johnson's brother Tim, who had attempted to look after him, was also addicted to crack, and was incarcerated when Johnson was fifteen years old. Given the over-representation of African-Americans in jails and prisons and the large numbers of inmates with drug abuse problems, it is not uncommon for African-American men like Johnson to receive treatment for their substance use and mental health for the first time in the criminal justice system. Johnson's drug use, first marijuana and drinking as a young child, and then PCP and crack during his teen years, led to behavior for which he incurred several juvenile offenses and an adult probation lasting through 2000. Exhibit 14 at para. 24.

**b.   Social and cultural factors impacting adulthood**

**i.   Personal and family life**

At the same time that Johnson's crack use turned into addiction, he stabilized his life as an adult through the identity and role of provider. Consistent with masculine ideals of Black Respectability, Johnson built a sense of worth by providing for his wife and later for his children. Having opted out of working in the illicit drug economy, Johnson sought a respectable path, marrying Daphne Johnson, at nineteen. Both Johnson and Daphne's childhood experiences of their parents' relationships, as well as their own, bonded them and they built their marriage around the nuclear and patriarchal models within which they were raised. Like

39

many African-American women, Daphne worked outside of the home but nonetheless valued the traditional model of male breadwinner. Daphne's father was the principal income earner and following his death, Daphne's mother, Hazel, and her children struggled to get by. Johnson was aware of her family's struggles following her father's death. This not only left a lasting impression on Johnson to take care of Daphne, but affirmed his provider identity and reinforced his duty to financially support their family. Although Johnson's addiction was destructive to their relationship, it was likely familiar since Daphne's father had struggled with addiction. This familiarity, imprinted early in her life, may have contributed to her ability to tolerate his behavior. Their shared history and models of a Respectable family, reinforced Johnson's identity and role playing as a provider. Exhibit 14 at para. 25.

Fatherhood was also an important identity and role for Johnson. He was affected by his father's presence as well as the absences of fathers in his peers' households growing up. He had his first experience of parenting when he moved in with his girlfriend Amy Armstrong and her two children at age seventeen. He had his first child, Makayi, with Daphne in 1998. In January of 2002, Johnson and Daphne had a second daughter, Deja, and chose to have a third child after Johnson's release from prison in 2009 to begin of a new chapter in their life together. Mattduxx was born on August 23, 2010. Providing for them emotionally as well as economically was central to his self-esteem and masculine identity. By contrast to his own father, Johnson participated in his daughters' daily lives by

playing with them and taking them to school and extracurricular activities. Johnson's drug addiction, his periods of incarceration, and his inability to make a consistent living wage were challenges that he faced, but ones that did not disallow him experiencing his role and identity as father as a duty.  Exhibit 14 at para. 26.

The greatest impediment to Johnson's options in life and his capacity to provide for his family was his unaddressed drug addiction. His drug use and dependence intensified in his early twenties.  The forms of Respectability he practiced—his performance of a good son and provider and dignified man— disappeared. In general, Johnson was considered a kind, trustworthy, and generous person, who helped others and was well-groomed. When Johnson used crack, his reserved and polite demeanor shifted into aggressive and chaotic behavior that included stealing to purchase drugs. He did not bathe, comb his hair, or wear clean clothes. Moreover, he often had little, if any, memory of his actions, belying his strong sense of personal responsibility. Friends and family members consistently noticed these changes as a sign of his drug use. *Id.* at para. 27.

Compounding Johnson's drug use was his untreated depression. Johnson experienced feelings of depression as a child, but it was during his adulthood and treatment for chemical dependency at a Green Oaks in 2002 that his severe depression was professionally documented.  His depression and drug use often intensified in periods when he could not provide for his family, as well as when his father died in 2003. Following his father's death, Johnson experienced not only a

period of grief but of increased pressure to fulfill his father's final desire to provide for their mother and families.  Exhibit 14 at para. 28.

Depression often ensues when their performance fails to provide desired outcomes, such as financial or interpersonal ones. Johnson experienced feelings of inadequacy and failure and often coped with these feelings by bingeing on drugs, which perpetuated a cycle of depression and drug use. Johnson's inability to provide winter coats for his children as the emotional breaking point that led him to relapse in October of 2011, following seven years of sobriety. Exhibit 14 at para. 29.

For much of their marriage, Daphne did not realize the severity of Johnson's depression or addiction. She held the prevalent belief among African Americans that depression was a personal weakness and a question of willpower.  A 1996 national survey on clinical depression conducted by the Mental Health American found that sixty-three percent of African Americans believed that depression was a personal weakness, compared with the average of fifty-four percent.  The same study found that only thirty-one percent of African Americans believed that depression was a "health problem." Daphne's frustration with his depression and drug use and real need to take care of their children resulted in significant fighting between the couple. *Id.* at para. 30.

Although many of Johnson's family members were aware of his depression and substance use at various points in his adult life, they took no direct action to get him professional help before 2012.  African Americans face numerous barriers to accessing and receiving services for mental health problems. The 1996 Mental

42

Health America survey found that denial (forty percent), embarrassment (thirty-eight percent), lack of knowledge of treatment (seventeen percent), and lack of money/insurance (twenty-nine percent) were all cited as barriers to the treatment of depression among African Americans. The scholarship on African-American mental health corroborates these findings citing socio-cultural and structural effects including but not limited to: cultural mistrusts amongst African Americans of health care systems and providers, stigma, inadequate resources, religious orientations, and others. Exhibit 14 at para. 31.

### ii.     Social environment

One of the main structural challenges Mathew faced to live a sober and productive life was his trouble accessing care. Johnson's own efforts to seek help were constrained by his inability to afford and access services. The relationship between economics and the cost of accessing service is a barrier to African Americans who in 2010 had some of the highest rates of poverty of any racial group in the U.S. Johnson's longest period of sobriety overlapped with his five-year incarceration, which was a drug and alcohol-free environment. He did not receive chemical dependency courses or therapy during this time. Prior to that, Johnson had received treatment during his probation in his twenties and again in 2002 at Green Oaks Hospital and Summer Sky. He had insurance at the time and checked himself into Green Oaks, where he stayed for ten days of treatment for polysubstance dependency (cocaine, alcohol and marijuana).  Johnson was adamant

about receiving more care and was transferred to another rehabilitation program at Summer Sky, where he participated in a 28-day program. Exhibit 14 at para. 32.

Following his extended incarceration and relapse in late 2011, Johnson searched for treatment options without success, lacking the resources to pay for them. Neither Johnson nor Daphne were insured at that time. *Id*. at para. 33.

Johnson also faced structural challenges to finding employment and an adequate income to support his family. His job at Sanden International from 1996 to 2002 was his longest period of employment and ended when he was fired for too many missed days of work related to his drug use. Johnson's unaddressed addiction consistently played a role in his inability to hold down work. His education level limited the scope of viable employment options and wages, and this scope narrowed when he was released from prison with a felony record.  A study conducted by sociologist Devah Pager in 2003 illustrates the major barriers job-seekers with a criminal record face, and that African Americans are disproportionately impacted due to racial discrimination. Johnson's record also disabled him from living with his family in Section 8 government-subsidized housing following his release from prison. Exhibit 14 at para. 34.

Johnson's challenges in finding employment and securing his family intersected with his challenge to stay sober. Following his incarceration, Johnson moved in with his mother in East Garland. Eventually, he and Daphne moved to North Garland. The close proximity to his old environment and his familiarity with it meant that he was familiar with the individuals and spaces where he could access

44

drugs. This proximity facilitated his bingeing after his relapse in 2011. Johnson would have faced significant challenges maintaining his sobriety in the same environment where his drug addiction originated. Exhibit 14 at para. 35.

### D. Counsel's failure to properly prepare for and conduct Dr. Roache's testimony

#### 1. Relevant facts

Trial counsel recognized the key role of addiction in Johnson's case when they filed an ex parte motion for funding to retain an addiction expert in late April 2013, about six months before Johnson's trial began. CR at 859-922. Specifically, trial counsel recognized that Johnson's "drug use has implications for [his] state of mind at the time of the offense as well as mitigation in punishment." *Id*. at 859. As trial counsel stated in their funding motion for an addiction expert, "[a]n addiction expert is necessary to help explain the significance and implications of Defendant's drug usage." *Id*. at 860. The court granted trial counsel's motion to retain Dr. Roache as their addiction expert. *Id*. at 923.

Drug use and addiction can be difficult topics for lay people to understand because they clearly involve some elements of an affirmative act on the user's part to take the drugs, while at the same time affecting and being affected by elements outside the user's control, such as his genetics, social development, and brain structure and function. Indeed, more than half—seven out of twelve—of the seated jurors in this case expressed opinions in their questionnaires indicating that they either did not understand the nature of addiction, or they did not consider resulting intoxication as mitigating. For example, three jurors indicated that they did not

45

believe, or had serious doubts, that addiction was a disease. Five jurors indicated on their questionnaires that they may not consider intoxication as mitigating punishment in most cases.  In light of these opinions, trial counsel were well-aware that some members of Johnson's jury would be challenged to truly understand the nature and implications of Johnson's drug use and addiction based on their current understanding, making the proper preparation and use of their addiction expert, Dr. Roache, vitally important to their punishment phase presentation.

Johnson's lead trial counsel, Ms. Bernhard, formally retained Dr. Roache, a psychopharmacology expert, in May 2013 to provide testimony regarding the effects of drug addiction on behavior and mental state. Exhibit 15 (Affidavit of Dr. John Roache) at para. 6. Roache subsequently reviewed materials provided to him by Bernhard, including some of Johnson's medical and jail records, police reports, and two videotaped police interrogations of Johnson. *Id*. at para. 7. Ms. Bernhard also relayed some of Johnson's life history information to Dr. Roache informally in discussion, but she did not provide records to substantiate that information. *Id*.

In addition to these materials, Dr. Roache requested additional information that he believed would be useful in developing his opinions which he did not receive. For example:

- Trial counsel prevented Dr. Roache from interviewing Johnson even after Dr. Roache informed them that it was important for him to do so, as it could help him identify issues that may enhance the impact of his testimony by tailoring it to Johnson specifically. Exhibit 15 at para. 8.

- Trial counsel did not allow Dr. Roache to view an in-store video of Johnson at the time of the incident that Dr. Roache knew existed. *Id*.

- Trial counsel failed to answer Dr. Roache's inquiries for specific details regarding Johnson's actions leading up to the incident, which he explained to trial counsel could be important. *Id.*

- Trial counsel failed to provide Dr. Roache with Johnson's social history and development information—whether through a social history report by the mitigation specialist; through reports, affidavits, or interviews with Johnson's family and friends; or through observing the trial testimony of Johnson's family and friends—despite Dr. Roache informing them of its importance to his evaluation and testimony. *Id.* at para. 9.

Indeed, Dr. Roache felt that trial counsel was not giving him the "full story or facts of the case" leading up to his testimony. Exhibit 15 at para. 8.

Dr. Roache was called to testify as a defense expert on November 5, 2013, during the punishment phase of Johnson's trial. *Id.* at para. 10. Right before he took the stand, trial counsel showed Dr. Roache, for the first time, a short excerpt of a video of Johnson being transported in the back of a police car after being arrested on May 20, 2012, the day of the murder. *Id.* The clip Dr. Roache viewed had no audio. *Id.* Because he was only shown a snippet of the video and was about to take the witness stand, he did not feel he had enough time to contextualize and reflect upon its significance or develop a fully-informed opinion of it. *Id.*

Bernhard elicited almost no testimony from Roache on direct examination that was tailored to Johnson. Indeed, Bernhard neither asked Roache to opine about Johnson individually, including his drug use and his addiction, nor did she establish how Roache could form those opinions based on the materials he reviewed. Yet Bernhard knew or should have known that these topics would come up during the State's cross-examination. Significantly, the State's questioning of Dr. Roache during the Rule 705 hearing (which occurred before his testimony) made clear the

47

avenues it would take to call Dr. Roache's opinions and credibility into question. 50 R.R. 12-26. For example, during that hearing, the State pointed to the fact that Roache had not interviewed Johnson or his family members, and that he had not viewed the in-store video, when formulating his opinions. 50 RR 13-14, 17-18, 23.

Ms. Bernhard's failure to address Roache's opinions and their bases on direct examination left him exceedingly vulnerable on cross-examination to the State's argument that his opinions were not well-founded and his credibility was consequently suspect. Further, had trial counsel provided Dr. Roache with these materials in the first place, as he requested, then the State would have had to focus its cross-examination efforts on the substance of Dr. Roache's testimony rather than simply pointing out what information trial counsel withheld from him.

Had trial counsel properly prepared themselves and Dr. Roache for his testimony, then Dr. Roache could have testified, for example, that Johnson's demeanor around the time of the incident—evidenced in part by the in-store video that the State used to call his opinion that Johnson was intoxicated into question— indicated to him that Johnson was acting with a single-minded, goal-directed purpose without regard for consequence, as would be common for relapsing individuals who are intoxicated. Exhibit 15 at para. 17. If Ms. Bernhard had proactively addressed Dr. Roache's professional opinions and allowed him to explain, in detail, how he developed them and how the evidence and information supported it, such testimony would have helped refute the State's inferences on cross examination that Dr. Roache did not have an adequate basis for his opinion.

Instead, because Dr. Roache did not have the full complement of information and therefore could not directly address the in-store video when asked by the State about it, the State was permitted to bolster its theory that Johnson was not intoxicated during the incident by pointing to the video.

**2.   Trial counsel's lack of preparation resulted in their failure to elicit testimony to explain Johnson's addiction.**

The repercussions of trial counsel's failure to prepare—and their resulting failure to effectively present—Dr. Roache's trial testimony were varied and wholly avoidable.  Specifically, trial counsel's failed to ask appropriate questions to proactively present Dr. Roache's testimony and expert opinions in a way that ensured the jury would be able to understand them. As a result, Dr. Roache's direct examination testimony was reduced to generalized, bulky answers to broad questions that likely did not assist the jury in understating Johnson's addiction issues. Had trial counsel properly prepared Dr. Roache and themselves for direct examination, trial counsel could have elicited helpful, necessary testimony about addiction and the effects of repeated drug use on the structure and function of the brain.  Proactive, developed questioning on these topics during Dr. Roache's direct examination would have not only provided the jury with much-needed information to better understand Johnson and his actions, it also would have limited the avenues available to the State to challenge Dr. Roache's expertise and opinions.

49

### a. Testimony explaining addiction is a disease was not effectively elicited.

Although Dr. Roache provided some testimony on direct examination calling addiction a "disorder" and a "condition," trial counsel failed to elicit testimony from Dr. Roache explaining how and why addiction is considered a disease. Dr. Roache also provided some lengthy, undirected testimony explaining the addiction process in response to trial counsel's broad, undirected question, "what is addiction?" *See id*. at 30-31. That is, trial counsel failed to ask Dr. Roache specific, straightforward follow up questions that would have allowed him to break down the complex topic of addiction in a way the jury could easily understand.

Had trial counsel asked the appropriate questions, Dr. Roache could have provided the jury with information and statistics necessary to put the scale of addiction into context. For example, in 2013, an estimated 21.6 million people in the United States over the age of twelve had been classified with substance dependence or abuse within the previous year. Exhibit 15 at para. 22. This accounts for more than eight percent of the population over age twelve. Such statistics would have helped jurors simultaneously appreciate the prevalence of addiction and understand that Johnson's addiction should not be considered a common or unremarkable affliction.

Addressing these topics early in Dr. Roache's direct examination would have helped trial counsel lay the necessary groundwork to understand the even more complex discussions about addiction and its effects on Johnson to come.

            **b.**      **Testimony explaining the ramifications of repeated drug use on developing brains was not elicited.**

Dr. Roache provided some testimony about the effects of addiction and drug use on the brain during his direct examination. However, like his testimony explaining and defining addiction, Dr. Roache's testimony about the effects on the brain was largely undirected and, given its complexity, likely difficult for lay people like the jurors to understand as presented. *See, e.g.*, 50 R.R. 31, 38-40. Perhaps because they were not prepared to address these complex elements of Dr. Roache's testimony, trial counsel failed to ask him questions that could have helped Dr. Roache explain the concepts to the jury in an understandable way.

Dr. Roache could have opined about the effects of Johnson's drug use and addiction on his brain function and development.  Notably, Johnson was smoking marijuana regularly in elementary school, was drinking alcohol to the point of intoxication throughout his childhood and teenage years, and was using crack cocaine regularly by the time he was of legal drinking age. Exhibit 15 at para. 30; *see also* 49 R.R. at 8-10.

Dr. Roache could have explained to the jury that this level of regular drug use beginning at such a young age likely affected Johnson's brain, which was still in the process of developing and would be until he entered his mid-twenties. Exhibit 15 at para. 30. That is, Johnson's brain developed under the influence of marijuana, alcohol, and cocaine until reaching its full maturity when he was in his mid-twenties. *Id*. at para. 31.

### 3.   Trial counsel failed to provide Dr. Roach with materials necessary to tailor his testimony to Johnson's intoxication and addiction.

Trial counsel's failure to provide Dr. Roache with materials he requested to help form his opinions also had serious consequences at trial. For example, their failure left Dr. Roache vulnerable to the State's obvious and simplistic argument that Dr. Roache's opinions were not well-founded or trustworthy. Their failure also made it difficult for Dr. Roache to sufficiently tailor his opinions and testimony to Johnson—a necessary step in explaining to the jury that Johnson's drug use should be a mitigating factor reducing his moral culpability. Had trial counsel provided Dr. Roache with Johnson's social history information, access to Johnson, and the in-store video evidence as he requested, he could have provided additional testimony on several important topics, including: genetics and addiction generally, and in Johnson's case specifically; socialization and addiction generally, and in Johnson's case specifically; common contributing factors to relapse generally, and in Johnson's case specifically; and the fact that Johnson's behavior in the in-store video did not affect his opinion that Johnson was intoxicated at the time of the incident. Significantly, with the additional information, Dr. Roache would have been able to provide testimony specifically tailored to Johnson.

Had Dr. Roache been provided with information about Johnson's social history as he requested, Dr. Roache would have been able to inform the jury about the significance Johnson's extensive family history of drug abuse and addiction. Exhibit 15 at para. 34. For example, Johnson's father appeared to be a "functional

alcoholic" who maintained a job but also drank heavily when not working.  This

provides clear evidence of that Johnson had a parental history of addictive behavior.

*Id.* Moreover, both of Johnson's older brothers and many of his cousins also had

problems with alcohol and illicit substance abuse. *Id.* Thus, Johnson was likely born

with a vulnerability to addiction. *Id.* Given his addiction issues and the role

intoxication played in this incident, evidence that Johnson was likely genetically

vulnerable to addiction would have been important for the jury to hear.

Trial counsel failed to explicitly address the effect drug use can have on an

addict's behavior during Dr. Roache's examination at trial. Specifically, trial counsel

failed to illicit testimony from Dr. Roache that would have helped jurors better

understand the causes and implications of extreme behaviors addicts often

experience. Exhibit 15 at para. 40. For example, during periods of sobriety, addicts

will exhibit some capacity for sober-minded self-control. *Id*. at para. 41. But under

the influence of drugs, the addict's emotions become unchecked and his impulse

control is disinhibited. *Id*. As a result, the intoxicated individual does things he

would not normally do. *Id.* Such cycles of erratic or volatile moods may be common

in addicts. *Id*.

At trial, Dr. Roache provided some testimony referencing relapse in

response to trial counsel's questions about addiction treatment options. *See* 50 R.R.

41-44. He also testified that addiction is a chronically relapsing condition, and that

relapse is not uncommon. *Id*. But trial counsel did not elicit any testimony

regarding common risk factors for an addict's relapse, much less seek any testimony

tailored to Johnson's experiences with relapse. Had trial counsel provided Dr. Roache with Johnson's social history information, such as information about Johnson from family and friends, and allowed Dr. Roache to hear from Johnson directly about his experiences, Dr. Roache could have identified the role common risk factors for relapse played in Mr. Johnson's own relapse. *Id.* at para. 43.

Dr. Roache also could have highlighted for the jury how Johnson's drug use escalated after his relapse—a common occurrence when addicts experience relapse. Exhibit 15 at para. 47. After relapsing, Johnson's stress regarding finances continued to increase, and that stress was now exacerbated by his escalating pattern of drug use.  This led Johnson to steal from his employer.  As Dr. Roache could have explained, the fact that Johnson admitted his guilt and naïvely believed his employer would somehow understand provides a clear demonstration of his poor insight and self-control as he struggled between continuing his drug use and wanting to be a good man. After losing that job, Johnson's pattern of drug use escalated further to include PCP and methamphetamine, which undoubtedly explains the psychotic episode he experienced in April 2012.

Trial counsel failed to elicit on direct examination Dr. Roache's opinion regarding whether Johnson was intoxicated at the time of the incident.  After Dr. Roache opined in response to leading questioning on cross examination that Johnson was intoxicated at the time of the incident, the State attempted to call that opinion into question based on the fact that he had not viewed the in-store video or interviewed Johnson. Exhibit 15 at para. 57. Because trial counsel failed to question

54

him about his opinion—even on redirect examination—Dr. Roache had no opportunity at trial to provide the jury with an explanation of the bases for his opinion. Further, because trial counsel withheld relevant evidence and information from Dr. Roache, they left his opinions exceedingly vulnerable to an easy attack by the State on cross. Significantly, if Dr. Roache had been provided the withheld evidence and information, his opinion regarding Johnson's intoxication at the time of the incident would not have changed. *Id*.

For example, the circumstances leading up the incident support Dr. Roache's opinion that Johnson was intoxicated. Johnson reported that he did not want to attend a family gathering the night before because he felt like a failure since he was unemployed, hooked on drugs, and not taking care of his family. Exhibit 15 at para. 58. Despite feeling this way, Johnson attended his brother's party, where he continued to feel bad about himself. *Id*. Johnson drank alcohol at the party before borrowing some money from a cousin that was supposed to be used to fix his broken car. *Id*. But in his alcohol-intoxicated state and depressed mood, Johnson instead used the money to smoke crack cocaine until 4 a.m. because he just "wanted to get high" to feel better. *Id*.

Afterwards, as he was walking home, Johnson stopped at his brother's house, but the party was over and all was quiet.  Exhibit 15 at para. 59. Johnson found a bottle of moscato, a sweet white wine, on his brother's patio, which he drank before smoking a used cigarette and taking a Xanax around 5 a.m. *Id*. Johnson felt alone, detached, and unworthy, and given all his failures, he simply did not know what to

55

do. *Id*. Indeed, the only thing he could think about was recapturing "that feeling" that he got from crack cocaine. *Id*. As Dr. Roache could have explained, Johnson's feelings at that time were unsurprising. With feelings of despair and emotional pain, an addict's thoughts invariably go to seeking escape through drug-induced euphoria, and in this case, Johnson was no different. *Id*. at para. 60.

These feelings motivated Johnson to figure out some way to get what he felt he needed—money to buy more crack cocaine.  Exhibit 15 at para. 60. He did not have a weapon to use to get money, but he saw some lighter fluid and an empty water bottle on his brother's patio. *Id*. With the one-track, goal-directed mind of an addict automatically responding to his brain reward circuit, Johnson's only thought was that he could use those items to threaten a store clerk, rob a store, and get money for drugs. *Id*. Similarly, Johnson walked into the store with a singular purpose to use the lighter fluid to threaten the clerk and get money for drugs. *Id*. at para. 61. With this goal-directed purpose, he walked straight to the cash register and, when the clerk came up to stop him, he poured the lighter fluid on her according to his plan. According to Johnson, he flicked the lighter as a threat to get what he wanted from her, and the actual ignition of the fire was a neglectful accident. *Id*. While Johnson understood that the fire was lit and that she was burning when he left the store, he did not have the cognitive flexibility to deviate from his original plan in his emotionally detached state. *Id*. That is, Johnson automatically followed through on his plan by getting out of the store with the money. *Id*. Dr. Roache could have explained to the jury that, in his opinion, the in-

56

store video showed Johnson's relatively automatized actions to follow through with his single-minded purpose. *Id*.

As Dr. Roache could have told the jury if he had been given the chance, a full review of the in-car video of Johnson being transported to the police station showed that Johnson's presentation in that video was consistent with the expected behavior of an addict coming down from a cocaine binge who had given up on his life.

Had trial counsel provided Dr. Roache with the relevant information about the time leading up to and during the incident, and had they asked the appropriate questions, Dr. Roache could have highlighted for the jury evidence from trial that supported his conclusion that Johnson was intoxicated at the time of the incident.

### 4. Trial counsel's ineffectiveness prejudiced Johnson in that jurors did not hear evidence that would likely have changed their answers to the special issues.

If trial counsel had been prepared to examine Dr. Roache and provided Dr. Roache with all the relevant evidence and information, they could have elicited testimony that would have allowed jurors to realize how deep-seated and difficult to overcome Johnson's addiction issues were, and how Johnson's actions on the day of the incident were attributable to his intoxication and addiction—both of which would constitute mitigating circumstances reducing his moral culpability. They also would have better understood that removing Johnson from an environment allowing easy access to drugs—like by sending him to prison—would probably prevent him from posing a future danger. Because hearing such testimony would have changed jurors' answers to one, if not both, special issue questions, Johnson

was prejudiced by trial counsel's failure to clearly present this evidence to the jury. As a result, trial counsel's deficient conduct created "a probability sufficient to undermine confidence in" the outcome of his trial, and Johnson's sentence should be overturned. *See Porter*, 130 S. Ct. at 455-56 (quoting *Strickland*, 466 U.S. at 693-94.)

### E.   Counsel's failure to hire an expert to explain the lack of availability of mental health care and substance abuse treatment

During the punishment phase of trial, counsel presented various witnesses to describe Johnson's struggle with drug addiction throughout his adult life. Trial counsel attempted to make Johnson's addiction a focal-point of their punishment phase presentation by supplementing the testimony of family and friends with an expert to provide a general overview of addiction. However, counsel overlooked a critical point that goes to the heart of Johnson's moral culpability: his inability to secure drug treatment. With defense counsel unprepared to address the issue, the State easily portrayed Johnson as a man who not only "chose" drugs, but also chose not to seek treatment. Had trial counsel retained an expert to address the accessibility of mental health care and substance abuse treatment in Texas during the relevant time period, then the jury would have been informed that Johnson's failure to secure treatment was due to a combination of factors outside of his control, including financial barriers, state legislation, and certain cultural issues. Trial counsel's failure to address Johnson's culpability, or lack thereof, with regard to seeking and securing treatment for his addiction constituted deficient

58

performance and prejudiced Johnson's punishment phase presentation in violation
of his applicable state and federal Constitutional rights. As a result, Johnson's
death sentence should be vacated so that a jury may be given an accurate account of
Johnson's struggle with addiction and his sincere attempts to treat the disease that
took root when he was only seven years old.

> **1.    Trial counsel failed to explain the difficulty of accessing
> mental health care and substance abuse treatment.**

The vast majority of the defense punishment phase case at trial dealt with
Johnson's struggle with drug addiction throughout adulthood. For example,
Johnson's wife, Daphne, took the stand and described numerous drug-induced
incidents throughout their marriage. Similarly, their family members took the
stand to share their own stories about Johnson's drug-induced episodes, periods of
sobriety, and relapses. However, counsel neglected to address the glaring question
of why Johnson was not able to secure treatment for his addiction. Considering the
importance in this case of the jury fully understanding the disease of addiction and
the challenges that come with it, trial counsel's failure to explain the availability, or
lack thereof, of mental health care and substance abuse treatment fell below the
prevailing norms for capital trial counsel. *See Strickland*, 466 U.S. at 688.

> **2.    The State portrayed Johnson's inability to secure
> treatment as a failure to take advantage of readily
> available opportunities.**

The State capitalized on counsel's failures by consistently framing Johnson's
ongoing addiction as his failing to take advantage of readily available opportunities.
Over the course of the punishment phase, the State pushed this narrative by

making three main points. First, the State successfully argued that Johnson personally failed to secure substance abuse treatment through publicly-funded providers. Specifically, Johnson did not seek services from the centers listed on a handout provided to him by Presbyterian Hospital following his April 2012 drug-induced psychosis. During the punishment phase, the State called Lisa Parker to testify regarding her experience with Johnson at Presbyterian Hospital in April 2012. Parker was a social worker in the emergency room and regularly dealt with intoxicated or mentally ill patients. 48 R.R. 188-90. After recounting her experience with Johnson, Parker testified that it was Presbyterian Hospital's protocol to provide intoxicated patients with a list of substance abuse treatment services upon discharge, and that, on occasion, she had helped patients locate and secure treatment. *Id.* at 200-01, 209-10. Among the services she discussed was NorthSTAR Behavioral Health Authority, which she claimed "accept[s] people who are not funded or . . . are uninsured." *Id.* at 210. When Johnson and his wife took the stand later in the punishment phase, the State continued to harp on Johnson's failures during its cross examinations. In each case, the State implied that Johnson's failure to secure treatment was due to a lack of effort. 49 R.R. 97-98, 234.

Second, the State highlighted that Johnson's employer, XLC Services, gave him an opportunity to return to work if he completed a drug rehabilitation program following his April 2012 drug-induced psychosis. However, Johnson did not complete such a program, and shortly thereafter committed the crime for which he now faces the death penalty. Notably, the State placed the blame firmly on

60

Johnson's shoulders, asserting "It's not [XLC's] responsibility to get you [treatment]." 49 R.R. 94.

Finally, the State asserted Johnson did not seek other treatment services, such as those offered by certain charitable organizations. For example, the State noted in cross examination of both Johnson and his wife that certain services such as the Salvation Army and county hospitals may have offered free services to address Johnson's addiction problem. In each case, Johnson and his wife confirmed that they had not sought treatment from those organizations. 49 R.R. 96-97, 234.

With these three points, the State created a narrative of Johnson simply lacking the desire to beat his addiction. Indeed, at closing the State argued, "[Johnson] had every opportunity to get help. [He] didn't want it. [He] chose drugs." 52 R.R. 53. However, with the current state of mental health care and substance abuse treatment in Texas, the jury deserved to know that that simply was not the case.

### 3. Trial counsel should have presented testimony from Dr. King Davis or a similarly qualified expert.

Had trial counsel presented the testimony of Dr. King Davis, or a similarly qualified expert, the defense could have countered the State's portrayal of Johnson's failure to seek treatment as well as provided additional context for the jury to explain how the inaccessibility of treatment exacerbates addiction.

Dr. King Davis is currently professor emeritus of Mental Health Policy at Virginia Commonwealth University School of Social Work, as well as for the Institute for Urban Policy Research at The University of Texas at Austin. Ex. 16

(Affidavit of Dr. King Davis) at para. 1. Dr. Davis holds a Ph.D. in Social Welfare Policy, Finance, and Planning from Brandeis University. For nearly four decades, Dr. Davis taught undergraduate and graduate courses in social work, psychiatry, and public policy departments at various universities and medical schools, including Virginia Commonwealth University, The University of Texas at Austin, and University of Virginia School of Medicine. *Id.* at Attachment A. He served as Commissioner of the Virginia Department of Mental Health, Mental Retardation, and Substance Abuse Services from 1990 to 1995 and Executive Director of The Hogg Foundation for Mental Health at The University of Texas at Austin from 2003 to 2008. *Id.* at para. 3. Dr. Davis has published extensively on the topic of mental health care policy, including the accessibility of such care for minority populations. *Id.* at para. 5. Had Dr. Davis been retained to testify at the punishment phase of Johnson's trial, he could have educated the jury about the following.

Over the years, mental health policy studies have made clear that African American and other minority populations have comparatively low chances of accessing mental health care and substance abuse treatment, particularly in Texas. The key variables explaining this lack of service are a combination of financial barriers, the difficulty of obtaining adequate health insurance, state policies, and low health literacy, which often culminate in delayed help-seeking behavior in minority populations.  Johnson's failure to access mental health and substance abuse treatment in the 2000s and 2010s was a function of all of these issues. *Id.* at para. 8.

Access to mental health care and substance abuse treatment has been difficult for many Texans suffering from mild to moderate depression and substance abuse since around 2000. Exhibit 16 at para. 9. At the most basic level, cost has controlled the access to care for many. Mental health care and substance abuse treatment can be costly for those who do not carry health insurance, particularly in Dallas, where private mental health care is often cost-prohibitive and far exceeds the ability of lower income populations to pay out of pocket. *Id.* at para. 10. While Johnson had health insurance through his employer Sanden International from 1997 to 2002 and through his job at Classic BMW from March to July 2004, he lost coverage when he was terminated from those positions.  Johnson did not carry private insurance prior to, between, or after those jobs. 49 R.R. 212. Johnson's lack of private insurance is a circumstance that was not uncommon in Texas at that time. Over the past decade, Texas has had more individuals without private health insurance than any other state. Between 2000 and 2015, an estimated 22 percent of the Texas population—more than 5.4 million people—lacked health insurance. The majority of the uninsured were Latino and African American. Even for those who had private insurance covering mental health and substance abuse treatment, the coverage for long-term residential care was often limited and payment for services could be denied if the condition was pre-existing. *Id.* at para. 11.

One alternative to expensive private services for Johnson would have been to seek state-supported services delivered by local community mental health authorities. However, in 2003, the Texas Legislature passed a comprehensive law

that greatly curtailed the availability of these services. *Id.* at para. 12. With House

Bill 2292, the Texas Legislature established that patients could qualify for state-

supported services only if they met one of three "priority" diagnoses: (1)

schizophrenia, (2) clinical depression, or (3) bipolar disorder and other psychoses.

In effect, the creation of "priority" diagnoses severely limited the pool of patients

who qualified for free services. The new legislation required individuals with non-

"priority" mental health diagnoses to obtain care in the private sector by paying out

of pocket for treatment, purchasing insurance, or finding a charitable source to pay.

Thus, beginning in 2003, individuals with a diagnosis of mild to moderate

depression accompanied by substance abuse or anxiety—as was the case for

Johnson—would have been denied services at the local level, given a low priority, or

put on very lengthy waiting lists, in accordance with state law. *Id.* at para. 13.

Notably, the treatment center referenced by State's witness Lisa Parker,

NorthSTAR Behavioral Health Authority, was the exact type of state-supported

service that was curtailed by House Bill 2292. In spite of the fact that it had been

ten years since such services had been available to someone like Johnson, the State

was able to claim that Johnson failed to secure such treatment—and, this was done

without pushback from trial counsel.

Had trial counsel hired Dr. Davis, or a similarly qualified expert, the defense

could have accurately explained to the jury the situation Johnson was faced with:

public services simply were not an option. As Dr. Davis states, "Without insurance,

the financial means to pay out of pocket, or a 'priority' diagnosis under House Bill

64

2292, Johnson would have been left with few opportunities to access mental health or substance abuse treatment." Exhibit 16 at para. 15.

Aside from paying for services out of pocket, one might argue that there were two alternative ways for Johnson to access care. However, both alternatives were woefully inadequate. For some uninsured Texans, incarceration in a local jail or perhaps a state prison may have provided access to mental health services, but only in the most severe cases. Prison-based mental health care is severely hampered by the short supply of well-trained mental health and substance abuse professionals, particularly psychiatrists, throughout the country. This was certainly the case for Texas, which ranked third-highest in the nation in the shortage of professional mental health manpower in the 2000s and 2010s. In fact, while Johnson was in prison, his unit did not have a substance abuse treatment or education program in place. Such services could have been helpful to him while spending nearly five years in a secured environment. Exhibit 16 at para. 16.

Alternatively, it was also possible for someone to access care by coming before a judge in a mental health court or being arrested by a police officer with crisis intervention training while displaying symptoms of mental illness. In such a case, a person might be provided services in lieu of a jail sentence. To some extent, this is what occurred when Johnson was arrested during a serious psychiatric emergency in April 2012. Police requested an emergency admission and evaluation, which was completed at Presbyterian Hospital. In this instance, Johnson's psychiatric symptoms were determined to be related to drug ingestion and he was released

65

later that same day; this, despite the fact that hospital workers were forced to strap Johnson down to the bed only hours before. Upon discharge, the only referral that the hospital provided was a written list of potential sources of care.  Again, it is worth noting here that Johnson would not have been eligible for the "free" public services that the State asserted were included on that list.  Exhibit 16 at para. 17.

Beyond the fact that Johnson was not eligible for the listed public services, the list provided by Presbyterian Hospital was problematic for another reason: Johnson's lack of "health literacy." Johnson and his wife called many of the treatment centers from the list provided by Presbyterian Hospital but were unable to secure care. This result is not uncommon for people with their low level of "health literacy." Research indicates that there is a relationship between (1) the level of knowledge and understanding of mental illness, and (2) help-seeking behavior, help-utilization, and confidence in helping others to obtain health care, including mental and substance abuse, as early as possible after the onset of symptoms. This research shows the higher the level of health literacy, the greater the recognition of need, help-seeking behavior, and actual utilization of services.  Often, those in situations similar to Johnson's lack a substantive understanding of the nature, symptoms, and eventual costs of their addiction. Moreover, they are not well positioned to recognize the type of treatment needed or how one might go about securing such treatment. In light of this, it is not surprising that Johnson and his wife failed to secure treatment from the list of providers they received at Presbyterian Hospital; nor is it surprising that Johnson did not effectively secure

care from charitable organizations or a county hospital as the State suggested. Exhibit 16 at para. 18.

As Dr. Davis notes, the fact that Presbyterian Hospital simply gave Johnson a written referral list exposes its misunderstanding of his addiction and lack of health literacy. Based on his circumstances, Johnson needed a more guided approach. For example, Johnson would have been far-better served by a peer mentor program, which would have provided him with a mentor to help monitor his recovery efforts and manage his cravings that, without help, would lead him back to drug use and activities designed to get money for more drugs. Peer mentor programs have proven to be quite effective. The Association of Persons Affected by Addiction (APAA), for example, is one of the most prominent of such programs, and opened in Dallas in 1998. The APAA is staffed entirely by persons who are themselves in recovery, and focuses on coaching and mentoring addicts.  Their services include assistance with housing, employment, criminal justice issues, health, nutrition, and family relationships—the majority of which Johnson, as many other addicts, struggled with.

Ultimately, Johnson's low health literacy made it unlikely that he would be able to access and benefit from care without more guidance from the referring hospital and/or treatment center. Exhibit 16 at paras. 19-20. \

All of the above resulted in Johnson's failure to access care from an established treatment center for much of his adult life. This is referred to as "delayed help-seeking behavior," and is found to be common among those with low

health literacy, especially in African American and other racial minority populations. Studies have shown that such delayed help-seeking sometimes can exceed thirty years post-onset of symptoms. This failure to access care often results in the mental health and substance abuse issues in question becoming normalized, chronic, and disabling. *Id.* at para. 21.

Studies documenting these findings indicate that African Americans are more likely to seek care from friends and family, churches, or the legal system than from traditional treatment centers.  Studies also indicate that African Americans are more likely than other races to rely on these sources for help. Delayed help-seeking or reliance on family and friends tends to exacerbate symptoms and increase severity of the mental health or substance abuse issue, which often results in some form of behavior that brings the person into contact with the legal system. Such insufficient treatment can also result in "self-medication" by using alcohol or other substances. Exhibit 16 at paras. 22-23.

This is especially important to note in Johnson's case because trial testimony and post-conviction affidavits indicate that Johnson relied heavily on family and friends to deal with his mental health and substance abuse issues. For example, at trial, multiple members of Daphne Johnson's family testified that Johnson regularly confided in them about his addiction when he was coming down from a high. 50 R.R. 93-97, 101-04, 113-20, 122-24. Johnson confirmed this in his own testimony. 49 R.R. 17. Additionally, Johnson testified that, at times, he believed he could handle his addiction on his own. *Id.* at 71. At other times, he turned to employers for help. *Id.*

at 77-78. Johnson's older brother, Anthony Johnson, states that he attempted to provide care for Johnson in the late 1990s and early 2000s, but to no avail.  Exxhibit 3 at para. 28.  Anthony Johnson attempted to do the same for his other brother, Timothy Johnson, reaching the same result. *Id.* at para. 20. Just one week before the crime, Johnson attempted to turn himself in to the Garland Police without having committed a crime because he needed help for his addiction. 50 R.R. 122-24. Johnson's methods for dealing with mental health and substance abuse issues are not uncommon for people who are not able to access affordable treatment. These methods are not only ineffective, but they likely worsened Johnson's disease.

Johnson's delayed help-seeking behavior appears to have resulted in a pattern of self-medication, potentially based on the underlying depression reported in his medical records. The behavior also proved detrimental to his employment, family relationships, and own well-being. Involvement in mental health and substance use services would have provided Johnson with a greater sense of the risk of loss that his behaviors produced.  However, there were a number of barriers to access to such treatment that Johnson was not able to overcome. Exhibit 16 at para. 24.

Ultimately, Dr. Davis concludes that Johnson's inability to seek, access, or consistently utilize mental health and substance abuse treatment in the early 2000s and 2010s is not surprising.  Due to financial barriers, the difficulty of obtaining adequate health insurance, state legislation, low health literacy, and delays in help-seeking, it was not uncommon for dually-diagnosed behavioral disorders, such as

serious substance abuse and mental health issues, to go untreated at that time. While lack of treatment undoubtedly affects individuals differently, the fact remains an individual's ability to secure help at that time was usually beyond his control and often bound by cultural pathways. *Id*. at para. 24.

Trial counsel's failure to present evidence on the current state of mental health care and substance abuse treatment in Texas not only shortchanged Johnson's own mitigation presentation, it also allowed the State to rely on faulty assumptions about the availability of care which proved detrimental to Johnson's punishment phase case. Had the jury been made aware that Johnson's ability to secure treatment was heavily influenced by factors outside his control—including factors of State law, the very entity seeking his death—there is a reasonable likelihood that at least one juror would have voted to spare Johnson's life.  Accordingly, Johnson's death sentence should be vacated.

**II.   Johnson's death sentence is arbitrary, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, because the punishment is based on the jury's answer to the unconstitutionally vague and unreliable future dangerousness special issue.**

**A.   The future dangerousness special issue is unconstitutionally vague and fails to narrow the class of death-eligible defendants.**

Article 37.071, section 2(b)(1) of the Texas Code of Criminal Procedure is unconstitutionally vague in that it fails to define any of the key terms in the first special issue. As a result, "[j]urors are left to comprehend [these terms] so broadly that a death sentence would be deemed warranted in virtually every capital murder

case." ABA Death Penalty Due Process Review Project, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report* at viii (September 2013).

The Supreme Court has long held that juror discretion must be channeled in capital cases. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (citing *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam) ("Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must by suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."). In *Godfrey v. Georgia*, the Court held that a state's aggravating factors must not be defined in such a way that people of ordinary sensibilities could find that nearly every murder met the stated criteria. *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980). Yet given that there is *some* probability (no matter how small that probability might be) that anybody, including any convicted murderer, will commit future acts of violence, the Texas future dangerousness question facially runs afoul of *Godfrey*.

In order to avoid the arbitrary and capricious imposition of the death penalty struck down in *Furman*, states must narrow the class of death-eligible defendants "by providing specific and detailed guidance to the sentencer." *McCleskey v. Kemp*, 481 U.S. 279, 303 (1987) (internal citations and quotation omitted); *see also Maynard v. Cartwright*, 486 U.S. 356, 362 (1988) ("Since *Furman*, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing

71

the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.").

While the first special issue is not presented to the jury until the punishment phase of trial, the jury must find a defendant is a future danger for that defendant to be sentenced to death. Indeed, before the jury begins considering mitigating evidence, it must first answer the future danger issue in the affirmative. Accordingly, the future danger special issue is a factor in determing whether a Texas defendant is eligible for a death sentence and therefore must narrow the class of death-eligible defendants.

Texas does not statutorily define the key terms in the first special issue. Rather, the terms are left to be interpreted according to their ordinary meaning. *See Druery v. State*, 225 S.W.3d 491, 50-9 (Tex. Crim. App. 2007). Absent a statutory definition to the contrary, the term "probability" is reasonably understood to mean some "likelihood of the occurrence of any particular form of an event." *Granviel v. State*, 552 S.W.2d 107, 117 n.6 (Tex. Crim. App. 1976); *see also Jurek v. State*, 522 S.W.2d 934, 945 (Tex. Crim. App. 1975) (Odom, J., dissenting) ("The statute does not require a particular degree of probability but only directs that some probability need be found."). But likelihood is not a narrowing concept. There is a likelihood anyone who purchases a lottery ticket will win the lottery, despite the fact the likelihood is small. As a matter of ordinary language, therefore, the answer to the future dangerousness question will always be yes, and for that reason, the question does not serve a narrowing function.

Neither is the degree of violence specified. "Criminal acts of violence" could reasonably range from capital murder all the way down to simple assault. *See* Christopher Slobogin, *Capital Punishment and Dangerousness*, *in* Mental Disorder and Criminal Law: Responsibility and Competence 119, 121, 125 (Robert E. Schopp et al. eds., 2009) (questioning what qualifies as "dangerousness" and "criminal acts of violence"). This absence of statutory definition proved to be problematic for Johnson's jurors. During their punishment phase deliberations, the foreman sent a note to the court which read, "What does criminal acts of violence mean?" Exhibit 17 (Juror Notes) at 2. Despite the jurors' apparent confusion over what, in fact, the first special issue was asking of them, the trial court simply stated that the jury had "all the law and evidence to which [it was] entitled" and instructed them to continue deliberations. *Id.* at 1. Essentially, Johnson's jury was asked to determine whether there is *any* likelihood that Johnson might commit *any* act of violence in the future that poses a continuing threat to society.

Psychiatrists, however, are unable to completely rule out the possibility of *any* person committing future acts of violence, much less a person who was just convicted of a violent crime. *See* Michael L. Radelet & James W. Marquart, *Assessing Nondangerousness During Penalty Phases of Capital Trials*, Alb. L. Rev. 845, 849 (1989-90) ("Predictions of violent behavior are difficult because the probabilities considered in the prediction are conditional. That is, each of us, given certain circumstances, might engage in violent behavior in the future; thus, each of us has a non-zero probability of killing another."). Even when predictions are based

on actuarial data, which are now considered to be slightly more accurate than clinical determinations, a defendant's risk of committing future acts of criminal violence is phrased in terms of non-zero probabilities. *See, e.g.*, Laura S. Guy, et al., Assessing Risk of Violence Using Structured Professional Judgment Guidelines, J. Forensic Psychol. Prac., May 2012, at 272 ("[Mental Health Professionals] are encouraged to communicate level of risk using categorical levels of low, moderate, and high.").

The fact that every person has a non-zero probability of committing future acts of violence shows that the first special issue fails to narrow the class of death-eligible defendants. Moreover, the fact that any capital defendant is found *not* to be a future danger is evidence that the determination is based on caprice rather than reason. In Johnson's case, the fact that this dubious determination had to be made beyond a reasonable doubt before the jury was presented with the mitigation special issue limited the jury's ability to give full consideration to evidence that might serve as a basis for a sentence less than death. *See Tennard v. Dretke*, 542 U.S. 274, 278 (2004) ("It is not enough simply to allow the defendant to present mitigating evidence to the sentence. The sentence must also be able to consider and give effect to that evidence in imposing the sentence.").

**B.    Evidence now confirms that predictions of future dangerousness are inherently unreliable.**

The Supreme Court sanctioned the modern-era Texas death penalty statute through its opinion issued in *Jurek v. Texas*, 428 U.S. 262 (1976). The *Jurek* Court found that predicting future dangerousness, while "difficult," was still possible.

74

*Jurek*, 428 U.S. at 274. As mentioned above, seven years later, the Court was still not convinced that testimony about future dangerousness was sufficiently unreliable to run afoul of the Eighth Amendment. *Barefoot*, 463 U.S. at 899. In upholding the future dangerousness inquiry, however, and, with it, the constitutionality of the Texas death penalty statute, the Court depended upon "first generation" evidence on the reliability of prediction of future dangerousness. *Cf.* John Monahan, *The Prediction of Violent Behavior: Toward a Second Generation of Theory and Policy*, 141 Am. J. Psychiatry 10, 10 (1984). We are well past that first generation of evidence, and it is now clear the factual and theoretical foundations on which *Barefoot* rested have been entirely eroded. Over the last generation, hundreds of capital defendants have been labeled future dangers by juries, and new evidence demonstrates unequivocally that these predictions are, in fact, entirely unreliable.

Specifically, an actuarial study of Texas inmates convicted of capital murder found that the expected rates of violence would be very low for a prisoner convicted of capital murder serving a life sentence with an average duration of forty years. The overall likelihood of inmate-on-inmate homicide would be only 0.2 percent, and the likelihood of an aggravated assault on a correctional officer would be only 1 percent. *See* Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. Crim. L. & Criminology 1251, 1261, 1264 (2000). These data suggest not only that bona fide

cases of future dangerousness are infrequent, but also that it is virtually impossible to predict future dangerousness with any degree of scientific accuracy.

Sentencing a defendant to death because of a prediction about what he might do in the future violates the Eighth and Fourteenth Amendments because the sentence is being imposed for a future act, rather than for something the defendant has already done.  But as fundamentally, the  problem with the future dangerousness inquiry as providing the sole basis for sentencing a capital murder defendant to death is the number of false positives generated by that inquiry. Empirical research unequivocally reveals that predictions of future dangerousness wrongly identify non-dangerous defendants as dangerous. A recent study focused on 155 Texas inmates in whose capital murder trials experts had testified for the State on the issue of the defendant's propensity to commit future acts of violence. John F. Edens et al., *Predictions of Future Dangerousness in Capital Murder Trials: Is it Time to "Disinvent the Wheel?,"* 29 Law & Hum. Behav. 55, 61 (2005). Of these 155, 65 had been executed by the time of the study, 42 were on death row, and 48 had had their death sentences reduced. *Id.* Of the 155, none committed homicide in prison and only 5.2 percent committed a serious assaultive act. *Id.* at 62. The overwhelming majority had only minor disciplinary infractions, and over 20 percent had none at all. *Id.* at 62-63; *see also* Brittany Fowler, *A Shortcut to Death: How the Texas Death-Penalty Statute Engages the Jury's Cognitive Heuristics in Favor of Death*, 96 Tex. L. Rev. 379, 383 (2017).

76

Another study examined 92 former Texas death row prisoners whose sentences had been reduced and were therefore living in the general prison population. The behavior of these 92 former death row inmates was compared to the behavior of other capital murder defendants who had been sentenced to life at their trials. The study demonstrated that the supposed future dangers "were not a threat to the institutional order" and indeed had a lower rate of assaultive institutional misconduct than defendants not deemed to be a future danger. In fact, the rate of violent misconduct in prison among former death row inmates was lower than the rate among the general prison population as a whole. *See* James W. Marquart, Sheldon Ekland-Olson & Jonathan Sorensen, *Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 Law & Soc'y Rev. 449, 464 (1989). Further, 12 of these 92 former death row inmates were eventually released, and of those dozen, only one committed an act of violence while in free society. *Id.* at 465.

To be sure, the studies mentioned above focus almost exclusively on behavior in prison. Although Texas law construes "the future dangerousness special issue to ask whether a defendant would constitute a threat 'whether in or out of prison,'"[6]

---

[6] The Supreme Court's decision in *Buck* seems to suggest the Court believes the relevant inquiry should be whether an inmate will commit future acts of violence in prison. *See Buck*, 137 S. Ct. at 776 ("Buck's prior violent acts had occurred outside of prison, and within the context of romantic relationships with women. If the jury did not impose a death sentence, Buck would be sentenced to life in prison, and no such romantic relationship would be likely to arise. A jury could conclude that those changes would minimize the prospect of future dangerousness."); *see also* Sheri Lynn Johnson, *Buck v. Davis From the Left*, 15 Ohio St. J. Crim. L. 247, 252-53 (2017).

*Coble v. State*, 330 S.W.3d 253, 268, studies tracking the future behavior of previously death-sentenced inmates outside of prison are all but nonexistent. This is, of course, because very few inmates who are sentenced to death ever re-enter free society. Nevertheless, the only studies of this type of which Counsel is aware demonstrates that defendants who are sentenced to death and later released to free society are not a danger to society. A study released in 1989 tracked the 558 inmates who had their death sentences commuted as a result of the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972). James W. Marquart & Jonathan R. Sorensen, *A National Study of the Furman-Commuted Inmates: Assessing the Threat to Society from Capital Offenders*, 23 Loy. L.A.L. Rev. 5, 14 (1989). Of the 558, 239 had been paroled and entered free society by the time the study concluded. *Id.* at 23. Of these 239, only thirteen – 5.4 percent – committed future acts of violence. *Id.* at 24 (including those parolees who committed murder, rape, robbery, and aggravated assault). Of these 239, 188 had been sentenced to death for murder. *Id.*[7] *Only one parolee of this group of 188 committed another murder before the end of the study. Id.* Only six of the 188 committed any violent offense. *Id.*; *see also* Sorensen & Pilgrim, *supra*, at 1254-55 (2000).

Joan Cheever's study reached a similar conclusion. Joan Cheever, Back from the Dead (Wiley 2006). Cheever located 322 men who were released from death row following the Supreme Court's decision in *Furman*. Just more than ten percent (36) went back to prison for an act of violence; three were convicted of murder. There can

---

[7] The other fifty-one parolees had been sentenced to death for rape.

be no doubt that a legitimate aim of the criminal justice system is to prevent convicted felons from committing additional violent acts, but when the false positives surpass the true positives by a ratio of 99 to 1, the system is quintessentially unreliable, and that unreliability violates the Eighth Amendment.

Two critical studies analyzing capital juries' abilities to predict a defendant's future dangerousness have been recently released and confirm the findings of these earlier studies. The first of these considered a sample of 72 male federal capital defendants whose trials involved a jury determination on the issue of future violence. Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223, 233-34 (2009). In these 72 cases, jurors found 38 defendants would not be a future danger and 34 would. *Id.* at 234. Yet the rates of future violence of the two groups were virtually identical. *Id.* at 236 (Table 3). Jurors' predictions of future violence in these cases were wrong 97% of the time. *Id.* at 240; *see also* Edmondson, *supra*, at 910-11.

The second of these more recent studies was released in 2013 and focused on 115 Oregon inmates who had been convicted of capital murder and sentenced either to life or death. Thomas J. Reidy, Jon R. Sorensen & Mark D. Cunningham, *Probability of Criminal Acts of Violence: A Test of Jury Predictive Accuracy*, 31 Behav. Sci. L. 286, 292 (2013). Oregon adopted the Texas capital sentencing scheme, and so Oregon jurors must decide whether there is a probability a defendant would commit future acts of violence before he can be sentenced to death.

*Id.* at 291. Jurors had found 78 of these defendants would be a future danger and 37 would not. *Id.* at 296. Of the 78, only 50 were sentenced to death. *Id.* at 298. The rates at which these two groups – i.e., the 78 whose jurors found they would commit future acts of violence and the 37 whose jurors found they would not – committed future violent acts were identical, 5.9 incidents per year per 100 inmates. *Id.* In other words, Oregon jurors, like Texas and federal jurors, cannot predict which inmates would commit future acts of violence. *See also* Edmondson, *supra*, at 908-10.

In *Barefoot*, the Supreme Court reached the decision to permit experts to testify about a defendant's propensity to be dangerous in the future because it was not persuaded that such predictions are "entirely unreliable"; indeed, the justices seem to have believed that such predictions are accurate approximately one-third of the time. *See Barefoot*, 463 U.S. at 900-01 & n.7. However, studies of Texas death row inmates' behavior conducted since *Barefoot* was decided entirely undermine the factual predicate of *Barefoot* and reveal that predictions of future dangerousness are wrong in more than 95 percent of cases. *See* Jessica L. Roberts, Note, *Futures Past: Institutionalizing the Re-Examination of Future Dangerousness in Texas Prior to Execution*, 11 Tex. J.C.L. & C.R. 101, 121 (2005).[8]

---

[8] For additional scholarship since *Barefoot* confirming the overwhelming consensus that predictions of future dangerousness are grossly inaccurate and produce frequent false positives, see Mark David Albertson, *Can Violence Be Predicted? Future Dangerousness: The Testimony of Experts in Capital Cases*, 3 Crim. Just., Winter 1989, at 18 (describing consensus among experts that predictions are mostly inaccurate); William W. Berry III, *Ending Death by Dangerousness: A Path to the De Facto Abolition of the Death Penalty*, 52 Ariz. L.

**C.      Evidence demonstrates that Johnson's jury was wrong.**

Johnson has committed no violent acts while incarcerated. His impeccable disciplinary record demonstrates that he poses no threat to guards or fellow inmates. The jury's prediction that he posed a future danger has proved to be inaccurate. Because Johnson's sentence is based on a factual inaccuracy, it should be vacated.

In *Johnson v. Mississippi*, 486 U.S. 578 (1988), the jury found an aggravating circumstance based on a defendant's prior conviction; when that conviction was reversed after the death sentence had been imposed, the Court vacated the

---

Rev. 889, 907 (2010) ("The incontrovertible scientific evidence demonstrates that future dangerousness determinations are, at best, wildly speculative."); Stephen P. Garvey, *"As the Gentle Rain from Heaven": Mercy in Capital Sentencing*, 81 Cornell L. Rev. 989, 1031 (1996) ("Unfortunately, our power to predict future dangerousness seems on a par with our power to predict next months' weather."); Steven G. Gey, *Justice Scalia's Death Penalty*, 20 Fla. St. L. Rev. 67, 118 (1992) ("No jury has the power to ascertain with 100 percent certainty the future actions of the defendant, yet Texas requires the jury to do just that."); Jeffrey L. Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 Wm. & Mary Bill Rts. J. 345, 371-72 (1998) ("the use of the 'future danger' aggravating factor as a tool for determining who receives the death penalty is highly suspect. … Even ignoring the potential unreliability of testimony from mental health professionals, every first-degree murder defendant reasonably could be found to be a future danger because he has been convicted of murder."); Grant Morris, *Defining Dangerousness: Risking A Dangerous Definition*, 10 J. Contemp. Legal Issues 61, 85 (1999) (explaining mental health professionals' "grave doubt" about predictions of dangerousness); Irene Merker Rosenberg, Yale L. Rosenberg & Bentzion S. Turin, *Return of the Stubborn and Rebellious Son: An Independent Sequel on the Prediction of Future Criminality*, 37 Brandeis L.J. 511, 519 (1998-99) ("a substantial body of literature suggests that prophecy of this sort is a very speculative business, resulting in massive inclusion of persons who would not, in fact, engage in the predicted anti-social behavior"); Christopher Slobogin, *Dangerousness and Expertise*, 133 U. Pa. L. Rev. 97, 110-11 (1984) (describing false positive rates as high as 92 percent).

sentence. In *Johnson*, later developments revealed that Johnson's death sentence was unreliable and arbitrary because it was "predicated, in part, on a … judgment that is not valid now, and was not valid when it was entered…." *Id.* at 585 n.6. Johnson's sentence is also predicated on an assessment that has proved invalid.

III.   **Because the State was not required to prove that there were not sufficient mitigating circumstances to warrant sentencing him to death, Mr. Johnson's death sentence runs afoul of the provisions to the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

A.   **The relevant law**

The Supreme Court has clearly established the principle that a criminal defendant is entitled to a jury finding beyond a reasonable doubt of all facts exposing him to his punishment. "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.*" Jones v. United States*, 526 U.S. 227, 243 n.6 (1999). Through the Fourteenth Amendment, the Supreme Court applied this rule to state crimes in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the defendant was convicted of the second-degree felony of possession of a prohibited weapon, but he was then sentenced to a term of years available only to those convicted of a first-degree felony based on the trial court's finding that his purpose for possessing the weapon was to intimidate another on the basis the victim's race. *Apprendi*, 530 U.S. at 492. The *Apprendi* Court held that because Apprendi's sentence was outside the prescribed range for second-degree offenses, the finding of racial animus was "the

functional equivalent of an element of a greater offense." *Id.* at 494 n.19. *Apprendi* holds that the jury must make all necessary findings that authorize the punishment that the defendant ultimately receives.

Two years later, in *Ring v. Arizona*, 536 U.S. 584 (2002), the Court applied the holding of *Apprendi* to the findings that make convicted murderers death-eligible. The *Ring* Court held that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to 25 both." *Ring*, 536 U.S. at 609.

> **B.    A jury's finding that that there are not sufficient mitigating circumstances to warrant sentencing a defendant to life in prison instead of death is one that must be made for a Texas defendant to be sentenced to death.**

Article 37.071 of the Texas Code of Criminal Procedure mandates that when a defendant is found guilty after being tried for a capital offense where the state seeks a death penalty, there must be a separate sentencing proceeding. Tex. Code Crim. Proc. art. 37.071, § 2(a)(1). If, and only if, the jury returns an affirmative finding to the future dangerousness special issue, it must then determine whether there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole rather than a death sentence. *Id.* at § 2(e)(1). This issue is commonly referred to as the mitigation special issue. Only if the jury returns an affirmative finding on the future dangerousness question and a negative finding on the mitigation special issue will the court sentence the defendant to

death. *Id.* at § 2(g). If the jury returns a negative finding on the future

dangerousness question or an affirmative finding on the mitigation question, or is

unable to answer either of these questions, the court will then sentence the

defendant to life imprisonment without parole. *Id.*

A negative finding on the mitigation question is a necessary finding for a

death sentence in Texas to be sustained. Absent a negative finding on that special

issue, a defendant cannot be sentenced to death. While Article 37.071 correctly

recognizes the State has the burden of proof on the future dangerousness question,

it fails to do so with respect to the mitigation special issue. In so doing, the statute

runs afoul of *Ring* because a negative finding on the mitigation special issue is an

element of a death sentence in Texas.

**C.    The state court's opinion denying Johnson relief constitutes an
unreasonable application of clearly established federal law.**

Johnson raised a handful of issues relevant to this claim on direct appeal.

Most relevant to this claim, in issue fifty-seven, Johnson argued that the state's

death penalty scheme violates due process protections of the U.S. Constitution

because it does not require the state to prove, beyond a reasonable doubt, that the

correct answer to the mitigation special issue is "no." Appellant's Br. at 140-41,

*Johnson v. State*, No. AP-77,030 (Tex. Crim. App. Aug. 18, 2014). The Court of

Criminal Appeals, denied relief, stating that it had previously rejected the

argument in past cases and that Johnson did not persuade the court to revisit the

issue. *Johnson v. State*, No. AP-77,030, 2015 WL 7354609, at *36 (Tex. Crim. App.

Nov. 18, 2015).

The opinion in which the CCA had previously rejected the argument was the one it handed down in *Blue v. Sate,* 125 S.W.3d 491 (Tex. Crim. App. 2003). In *Blue,* the court ruled that under Article 37.071, there is "no authorized increase in punishment contingent on the jury's finding on the mitigating special issue." *Blue,* 125 S.W.3d at 501. The court reasoned a jury's finding on mitigation only occurs after the State has proven elements of capital murder beyond a reasonable doubt, and by the time the mitigation issue reaches the jury, the prosecution has already demonstrated a defendant's eligibility for a death sentence and a negative answer on mitigation cannot increase the authorized punishment. *Id*. However, an affirmative answer to the future dangerousness question by itself cannot sustain a death sentence. For a Texas defendant to be sentenced to death, the jury must not only answer the "yes" to the future dangerousness special issue, it must also answer "no" to the mitigation special issue. Both a yes answer to the first special issue and a no answer to the second are elements of a death sentence. As such, the CCA's opinion in Johnson's direct appeal proceeding and in *Blue* is an unreasonable application of federal law.

**IV.   The jury in Johnson's case was misled, if not lied to, in violation of *Simmons v. South Carolina*, thereby violating Johnson's rights under the Eighth and Fourteenth Amendments.**

The court's charge to the jury during the punishment phase of Johnson's trial instructed the jury that it could not return an answer of "no" on the first special issue or an answer of "yes" on the second special issue unless ten or more of the jurors agreed to such an answer. 52 R.R. 4-6. Had the jury returned an answer of

85

"no" on the first special issue or a "yes" answer to the second special issue, Johnson would have been sentenced to life imprison rather than to death. Tex. Code. Crim. Proc. art. 37.071, § (2)(g).

The trial court's instruction to the jury was false.  Under Texas law, ten votes are not required for a capital defendant to be sentenced to life rather than death. Rather, if even a single juror had voted "no" on the first special issue or "yes" on the second special issue, Johnson would have been sentenced to life in prison. *See id.* ("If the jury … is unable to answer any issue submitted under Subsection (b) or (e) of this article [(because either ten or twelve jurors do not agree)], the court *shall sentence the defendant to confinement in the Texas Department of Criminal Justice for life imprisonment without parole*.") (emphasis added).

The Eighth Amendment forbids misleading jurors.  In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the Supreme Court held that when a defendant's future dangerousness is at issue and state law prohibits his release on parole, due process requires that the sentencing jury be told he is ineligible for parole. *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994).  The core principle of *Simmons* is that reliability in capital sentencing and due process demand that jurors understand the true range of punishment and their actual authority and power.  This principle is abridged when jurors are lied to, particularly when that lie causes a juror who would have otherwise insisted on a life sentence to accede to a death sentence.

A feature of American jurisprudence—one broadly understood by the public—

86

is that when a jury is unable to agree on a verdict, a mistrial may be declared and a new trial held. *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *Downum v. United States*, 372 U.S. 734, 735 (1963). Because this option is both costly and cumbersome, the law expects that jurors will enter into their deliberations able to be swayed in their opinions. *Allen v. United States*, 164 U.S. 492, 501 (1896). A reasonable juror should feel the weight of the instructions from the trial court and, consistent with their convictions, attempt to avoid an impasse.

In a capital case, the shadow of a mistrial understandably looms larger. Jurors cannot help but be aware of those cases' more involved procedures, improved safeguards, and greater expense. They experience first-hand the cxare taken by the State and the defense to select from the venire twelve jurors suitable for the high stakes of a capital trial. They are told to expect—and they usually sit through—a long trial with copious amounts of evidence and lengthy testimony from lay and expert witnesses alike. They are led to believe that distinguished and doubtlessly high-priced experts form a wide range of disciplines are not only available to testify but relevant to the trial's outcome.

In this setting, a reasonable juror would be loath to force a mistrial, especially at that stage of the proceedings when the defendant's culpability already had been agreed to. But while the guilt/innocence phase of a capital trial tracks the public's understanding of the criminal law in that acquittals and convictions have to be unanimous, the penalty phase does not. Moreover, after being informed by the court that ten (not twelve) votes are necessary to answer the special issues in a way that

favors a life sentence, it would be passingly strange for a juror to conclude that fewer than ten such votes would achieve the very same result. Texas's sentencing scheme not only denies jurors information about the effect of their vote but, by omission, invites them to assume that the consequence for failure to reach agreement pursuant to the 10-12 Rule is a costly mistrial, regardless of any one juror's belief that a life sentence is appropriate.

**V.   Johnson's death sentence is unconstitutional because it is arbitrary, being based more on race and geography than the egregiousness of the crime for which he was convicted.**

### A.   Introduction

At this very moment, our country is finally beginning to realize what some have understood for far too long: people are treated differently by our criminal justice system because of their race. George Floyd cried, "I can't breathe" as he was killed by a white police officer. Breonna Taylor was shot in her own bed by three white police officers who, months later, have yet to be charged. A white father, who is a retired investigator for the local district attorney's office, and his son killed Ahmaud Arbery while he was on a jog but escaped being charged for his death for over two months until video of the killing was released. Jacob Blake was left partially paralyzed after being shot by the police seven times in the presence of his three sons. Spurred on by these current events, protests have erupted throughout the nation demanding an end to police brutality against persons of color.

These recent events are not aberrations, but are instead indicative of a systemic problem. A 2015 county-level study found "a significant bias in the killing

of unarmed black Americans relative to unarmed white Americans, in that the probability of being black, unarmed, and shot by police is about 3.49 times the probability of being white, unarmed, and shot by police on average."[9] An August 2019 study found that between 2013 and 2018, black men were about 2.5 times more likely than white men to be killed by police.[10]

While addressing police brutality is a necessary first step, we know that even if we are able to eliminate this scourge of our criminal justice system, we will not have reached the point where defendants of color are treated equally. Police brutality is currently the most visible manifestation of racial injustice, but that injustice is not inflicted only by the police. Rather, it permeates throughout the criminal justice system.

Specifically, for Mr. Johnson we know that persons of color are sentenced to death at a disproportionate rate, especially when they are convicted of killing a white person. Since 2000, fifty-three black defendants whose victims included at

---

[9] Radley Balko, *There's overwhelming evidence that the criminal justice system is racist. Here's the proof.*, Wash. Post, June 10, 2020, https://www.washingtonpost.com/graphics/2020/opinions/systemic-racism-police-evidence-criminal-justice-system/ [https://perma.cc/J8F7-PC4D] (quoting Cody T. Ross, *A Multi-Level Bayesian Analysis of Racial Bias in Police Shootings at the County-Level in the United States, 2011-2014*, PLOS ONE, Nov. 5, 2015, https://journals.plos.org/plosone/article?id=10.1371%2Fjournal.pone.0141854 [https://perma.cc/GL3Y-BMKW]).

[10] Balko, *supra* note 1 (citing Frank Edwards, Hedwig Lee, & Michael Esposito, *Risk of being killed by police use-of-force in the U.S. by age, race/ethnicity, and sex*, prisonpolicy.org, Aug. 2, 2019, https://www.prisonpolicy.org/scans/police_mort_open.pdf [https://perma.cc/BL7Q-PPXV]).

least one white person have been sentenced to death in Texas whereas only seven white defendants whose victims included at least one black person have been sentenced to death. Exhibit 18 (identifying the races of Texas defendants sentenced to death since January 1, 2000 and the races of their victims). Because Mr. Johnson's death sentence is due at least in part to his being a black man who killed a white woman in Dallas County instead of solely the egregiousness of the crime for which he was convicted, his death sentence is arbitrary and therefore violates his rights pursuant to the Eighth Amendment.

### B.   U.S. Supreme Court precedent requires the death penalty not be applied arbitrarily.

Over forty years ago, the Supreme Court briefly suspended imposition of the death penalty throughout the United States. *See Furman v. Georgia*, 408 U.S. 238, 239-40 (1972) (per curiam). As Justice Stewart noted, the death penalty, at that time, was applied in an arbitrary manner. *Id.* at 310 (Stewart, J., concurring) (observing the death penalty was wantonly and freakishly imposed). Four years later, the Court validated the newly enacted capital punishment statutes of a few states—including those of Georgia and Texas—which appeared to include safeguards against the arbitrary and capricious application of the death penalty which the *Furman* Court held to be unconstitutional. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) ("*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."). While capital juries

90

would enjoy some discretion in reaching their determinations regarding sentencing, under the new statutes, it appeared this discretion would be "controlled by clear and objective standards so as to produce non-discriminatory application." *Id.* at 198 (citation omitted). Accordingly, the plurality in *Gregg* supposed juries' decisions no longer would suffer from a lack of guidance and narrowing considerations as to which defendants should receive the death penalty, and this, in turn, would do away with the arbitrariness which *Furman* found constitutionally intolerable. *Id.* at 206-07.

As noted above, on the same day that it issued its opinion approving of Georgia's newly enacted death penalty statute, the Court approved of Texas's new statute, believing that it would "guide[] and focus[] the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." *Jurek v. Texas*, 428 U.S. 262, 274 (1976).

### C. Nevertheless, the death penalty continues to be applied arbitrarily across the United States.

As Justice Breyer has recently observed, the manner in which the death penalty is currently applied appears to suffer from the same problem noted by the *Furman* Court: it "seems capricious, random, indeed, arbitrary." *Glossip v. Gross*, 135 S. Ct. 2726, 2764 (2015) (Breyer, J., joined by J. Ginsburg, dissenting). While the egregiousness of the crime of which he was convicted should be the primary factor determining whether a defendant is sentenced to death, as Justice Breyer noted, egregiousness does not appear to actually play this role. *Id.* at 2760 (citing

John J. Donohue III, *An Empirical Evaluation of the Connecticut Death Penalty System Since 1973: Are There Unlawful Racial, Gender, and Geographic Disparities?*, 11 J. Empirical Legal Stud. 637 (2014)). A recent study, cited by Justice Breyer, found that out of 205 instances in which Connecticut law made the defendant eligible for a death sentence, that state's courts imposed a death sentence in twelve of them and only nine were sustained. Donohue, *supra*, at 641. Pursuant to the study's metrics, only one of the nine was a defendant who should be considered to be among the "worst of the worst." *Glossip*, 135 S. Ct. at 2760; Donohue, *supra*, at 678. The behavior of the eight others was no worse than the behavior of at least thirty-three other defendants who had not been sentenced to death. *Glossip*, 135 S. Ct. at 2760; Donohue, *supra*, at 678-79.

While the egregiousness of the crime does not appear to affect the application of the death penalty, factors that should not affect its application, such as race and geography, often do. *Glossip*, 135 S. Ct. at 2760.

Death row's racial disparity, noted above, results from a racial hierarchy. John Blume, Theodore Eisenberg, and Martin T. Wells, *Explaining Death Row's Population and Racial Composition*, 1 J. Empirical L. Stud. 164, 167 (2004). "Black defendants who murder white victims receive the death sentences at the highest rate; white defendants who murder white victims at the next highest rate; and black defendants who murder black victims at the lowest rate." *Id.* As Bryan

Stevenson has stated, "We've used the death penalty to sustain racial hierarchy by making it primarily a tool to reinforce the victimization of white people."[11]

A report to the House and Senate judiciary committees cited by Justice Breyer in his *Glossip* dissent confirms this. *See Glossip*, 135 S. Ct. at 2760-61 (citing GAO, Report to the Senate and House Committees on the Judiciary: Death Penalty Sentencing 5 (GAO/GGD-90-57, 1990) (reporting that 82% of the 28 studies conducted between 1972 and 1990 ground that race of victim influences capital murder charge or death sentence, a "finding . . . remarkably consistent across data sets, state, data collection methods, and analytic techniques")). An additional study cited by Justice Breyer reported that "taking all possibly explanatory variables into account, those suspected of killing whites were 3.42 times as likely to receive a death sentences as those suspected of killing blacks." Steven F. Shatz & Terry Dalton, *Challenging the Death Penalty with Statistics:* Furman*, McCleskey*, and a *Single County Case Study*, 34 Cardozo L. Rev. 1227, 1246-47 (2013).

The disproportionate use of the death penalty in America against black defendants accused of killing white victims is well-documented. One of the cruelest examples is that of George Stinney. In 1944, Stinney, a black child who was only fourteen years old at the time, was sentenced to death after having been convicted of the murders of two white girls. Kathleen M. Bure, Coram Nobis *and* State v.

---

[11] Corey G. Johnson, *Bryan Stevenson on Charleston and Our Real Problem with Race*, The Marshall Project (June 24, 2015), https://www.themarshallproject.org/2015/06/24/bryan-stevenson-on-charleston-and-our-real-problem-with-race [https://perma.cc/7JYR-8WEJ].

*Stinney: Why South Carolina Should Revitalize America's Legal "Hail Mary,"* 68 S.C.L. Rev. 917, 927 (2017). After a two-hour trial in which Stinney's attorney failed to call witnesses or attempt to cast doubt of the prosecution's case, it took an all-white jury less than ten minutes to convict Stinney of a crime, which we now know he did not commit. *Id.* at 928. On April 24, 1944, the 14-year-old was sentenced to death by electrocution. *Id.* On June 16, 1944—less than three months after his arrest—Stinney was executed. *Id.* Too short to fit properly in the electric chair, it was reported he sat on a copy of the Bible while he was executed.[12]

Race is not the only factor which should not play a role in determining whether a defendant is sentenced to death but does. Geography also plays a role an impermissible role in the application of the death penalty in America. Specifically, the imposition of the death penalty depends heavily on the county in which a defendant is tried. *Glossip*, 135 S. Ct. at 2761 (citing Robert J. Smith, *The Geography of the Death Penalty and its Ramifications*, 92 B.U.L. Rev. 227, 231-32 (2012)).

Since issuing his opinion in *Glossip*, Justice Breyer has continued to sound the alarm that factors such as race and geography continue to play an unconstitutional role in determining which capital murderers will receive a death sentence. *See, e.g.*, *Reed v. Louisiana*, 137 S. Ct. 787, 787 (2017) (Breyer, J.,

---

[12] Loulla-Mae Eleftheriou-Smith, *George Stinney Jr: Black 14-year-old boy exonerated 70 years after he was executed*, Independent (Dec. 18, 2014), https://www.independent.co.uk/news/world/americas/george-stinney-jr-black-14-year-old-boy-exonerated-70-years-after-he-was-executed-9932429.html [https://perma.cc/85RY-K9BP].

dissenting from the denial of certiorari) ; *Sireci v. Florida*, 137 S. Ct. 470, 471 (2016) (Breyer, J., dissenting from the denial of certiorari); *Tucker v. Louisiana*, 136 S. Ct. 1801, 1801 (2016) (Breyer, J., joined by J. Ginsburg, dissenting from the denial of certiorari); *Boyer v. Davis*, 136 S. Ct. 1446, 1446 (2016) (Breyer, J., dissenting from the denial of certiorari).

### D.   Specifically, Texas's death penalty scheme is unconstitutional because it results in arbitrary death sentences.

While *the Jurek* Court believed that Texas's post-*Furman* death penalty scheme cured the defect identified in *Furman*, i.e. that the death penalty was used in an arbitrary and capricious manner, the problem identified in *Furman* was, in fact, not and still has not been eliminated because race and geography continue to play impermissible roles in determining which Texas defendants who commit capital crimes will be sentenced to death. The *Jurek* Court upheld Texas's statute after concluding that the state's narrowing of death-eligible crimes "provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." *Jurek*, 428 U.S. at 276. This judgment has not withstood the scrutiny of later cases. *See, e.g.*, *Penry v. Johnson* (*Penry II*), 532 U.S. 782 (2001); *Penry v. Lynaugh* (*Penry I*), 492 U.S. 302 (1989). The current operation of Texas's capital punishment system is similarly impermissible.

In 2013, 1,151 murders were committed in Texas.[13] And yet, only eight death

---

[13] Tex. Dep't Pub. Safety, *Index Crime Analysis 2013*, https://www.dps.texas.gov/crimereports/13/citCh3.pdf [https://perma.cc/5G86-VEJW].

sentences, Johnson being one of them, were assessed by Texas juries that year.[14] Within these statistics, however, one finds at work factors that have no place in the "evenhanded, rational, and consistent imposition of death." *Jurek*, 428 U.S. at 276.

### 1.    Race

Since 2000, 294 people have been sentenced to death in Texas. Exhibit 18. 117, or approximately 40% of these 294 are black; 92 or approximately 31% are white. *Id.* These numbers are disproportionate when compared to the population of our state; white people make up 78.7% of Texas's population and black people make up only 12.9% of the state's population.[15]

One study examined the influence of race in Harris County capital cases from 1992 to 1999. Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 Hous. L. Rev. 807, 809 (2008). The study showed that while the county's district attorney's office tended to seek death sentences against black and white defendants at the same rate, this was accomplished only by seeking death against black defendants who committed murders that were less egregious than the

---

[14] Tex. Dep't Crim. Just., *Offenders on Death Row*, https://www.tdcj.state.tx.us/death_row/dr_offenders_on_dr.html [https://perma.cc/YM3S-ATAX] (last visited June 25, 2020). This list does not reflect that Albert Love was also sentenced to death in 2013 because Mr. Love has subsequently been moved off of death row, having been granted a new trial at which the State will not seek death. Dean Wetherbee, *Waco man won't face death penalty in capital murder retrial*, Fox44News.com (June 9, 2020), https://www.fox44news.com/news/local-news/waco-man-wont-face-death-penalty-in-capital-murder-retrial/ [https://perma.cc/3FDC-5HT5].

[15] United States Census Bureau, QuickFacts: Texas, https://www.census.gov/quickfacts/fact/table/TX/PST045219 [https://perma.cc/ETD5-W3XX] (last visited June 25, 2020).

ones committed by white defendants against whom death was sought. *Id.* at 838-39.

The Dallas County District Attorney's Office—i.e. the office which prosecuted Mr. Johnson was sentenced to death—has a particularly egregious history of treating people differently on account of their race. *See Miller-El v. Cockrell*, 537 U.S. 322, 334-35 (2003).

As the studies cited by Justice Breyer in *Glossip* make clear, it is not only the race of the victim that is determinative of whether that defendant is sentenced to death, but also the race of the victim. The data makes clear this trend hold true in Texas. 53 black defendants whose victims were white have been sentenced to death in Texas since 2000 whereas only ten white defendants whose victims were black have been sentenced to death during that same period. Exhibit 18. Further, a disparity is evident even putting the race of the offender aside. A total of 121 defendants were sentenced to death whose victims were of race(s) other than white compared to the 167 offenders who victim(s) consisted of at least one white person. *Id.* The Harris County study cited above confirmed that, in Harris County, those convicted of killing a white victim were more likely to receive a death sentence than those convicted of killing a black victim. Phillips, *supra*, at 839.

## 2.    Geography

Since 1976, 1,114 defendants have been sentenced to death in Texas.[16] Only four counties out of the 254 – Harris, Dallas, Bexar, and Tarrant – account for

---

[16] Tex. Dep't Crim. Justice, *Total Number of Offenders Sentenced to Death from Each County*, https://www.tdcj.texas.gov/death_row/dr_number_sentenced_death_county.html

almost 50% of these defendants. *Id*. Harris county alone accounts for 297 of these death sentences (almost 27%), and Dallas county alone accounts 108 of them (almost 10%). *Id*.

This geographic distribution remains relatively unchanged if one focuses only on the 294 defendants sentenced to death since 2000. Harris county alone accounts for 67 (almost 25%) defendants on Texas's death row sentenced since 2000, Dallas for 36 (almost 13%), Tarrant for 28 (almost 10%), and Bexar for 22 (almost 8%).

### E. Conclusion

In *Jurek* and in *Gregg*, the Supreme Court considered whether impermissible arbitrariness in capital sentencing resulted from prosecutorial discretion to choose those cases in which a death sentence would be sought. *Gregg*, 428 U.S. at 199; *Jurek*, 428 U.S. at 274. The Court determined that this decision-making served to remove defendants from the risk of death and did not violate the U.S. Constitution, provided the "decision to impose [a death sentence was] guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Gregg*, 428 U.S. at 199.

The experience of the last forty-four years has shown that the practical consequence of prosecutorial discretion has not been to narrow the field of death eligible defendants to the most serious and heinous cases. As our data shows, prosecutorial discretion results in a disproportionate number of black defendants being sentenced to death and a disproportionate number of defendants whose

---

(last visited June 18, 2020).

victims are white being sentenced to death. These death sentences are due more to the races of the defendants and victims than the egregiousness of the murders from which they resulted. It also strains credulity to believe that Texas's four most populous counties—where almost 50% of Texas's post-1976 death-row cases originated—have had as many heinous crimes within their geographical limits as have Texas's 250 remaining counties. Far more likely, factors such as ideology, experience litigating capital cases, and resource availability exert significant influence on prosecutors' decisions to seek the death penalty in these four counties.

## Conclusion and Prayer for Relief

WHEREFORE, Petitioner Matthew Johnson prays that this Court:

1.    Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional sentence of death;

2.    If necessary to resolve disputed factual issues, schedule an evidentiary hearing during which Johnson may present evidence in support of his claims;

3.    Grant such other relief as law and justice require.

Respectfully submitted,

s/ David R. Dow                               s/ Jeffrey R. Newberry

David R. Dow                                   Jeffrey R. Newberry
Texas Bar No. 06064900                 Texas Bar No. 24060966
University of Houston                       University of Houston
Law Center                                       Law Center
4604 Calhoun Rd.                           4604 Calhoun Rd.
Houston, Texas 77204-6060          Houston, Texas 77204-6060
Tel. (713) 743-2171                         Tel. (713) 743-6843
Fax (713) 743-2131                         Fax (713) 743-2131

*Counsel to Matthew Johnson, Petitioner*

99

## Verification

I, Jeffrey R. Newberry, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set forth in this Petition are true.

s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry


## Certificate of Service

I certify that on September 11, 2020, a copy of the foregoing pleading was electronically served on counsel for Respondent, Garrett Greene, via an email to garrett.greene@oag.texas.gov.

s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry