IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MATTHEW LEE JOHNSON, §
         Petitioner, §
 §    Civil Action No. 3:19–cv–02310–E
v. §   *DEATH PENALTY CASE*
 §
BOBBY LUMPKIN, §
Director, Texas Department §
of Criminal Justice, §
Correctional Institutions Division, §
         Respondent. §

## RESPONDENT'S ANSWER WITH BRIEF IN SUPPORT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

GARRETT GREENE*
Assistant Attorney General
State Bar No. 24096217

* Counsel of Record

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936–1400

*Counsel for Respondent*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................III

ANSWER ...........................................................................................................1

JOHNSON'S ALLEGATIONS.............................................................................1

STATEMENT OF THE CASE .............................................................................2

STATEMENT OF FACTS ...................................................................................3

I.      FACTS RELATING TO GUILT/INNOCENCE....................................3

II.     FACTS RELATING TO PUNISHMENT ..............................................7

        A. THE STATE'S FUTURE DANGEROUSNESS EVIDENCE ...................7

            1. CRIMINAL HISTORY........................................................................8

            2.VIOLENT AND DISRUPTIVE BEHAVIOR IN WHILE INCARCERATED 17

        B. THE DEFENSE'S CASE IN MITIGATION..................................20

            1. JOHNSON'S CHILDHOOD, RELATIONSHIPS, AND EARLY LIFE..........21

            2. DRUG USE AND DEPRESSION .........................................23

            3. MURDER OF NANCY HARRIS AND REMORSEFULNESS.........................27

            4. JOHNSON'S LOW RISK TO OTHERS WHILE INCARCERATED.............30

        C. THE STATE'S REBUTTAL...........................................................31

ARGUMENT......................................................................................................31

        A. *STRICKLAND* STANDARD UNDER AEDPA.........................................35

        B. TRIAL COUNSEL CONDUCTED A REASONABLE INVESTIGATION INTO
        JOHNSON'S SOCIAL HISTORY.......................................................37

            1. STATE HABEAS PROCEEDINGS .........................................40

            2. THE DEFENSIVE STRATEGY .............................................41

            3. THE MITIGATION INVESTIGATION ....................................41

            4. TRIAL COUNSEL WERE NOT DEFICIENT. ...................................42

5. EVEN ASSUMING TRIAL COUNSEL WERE DEFICIENT, JOHNSON IS UNABLE TO PROVE PREJUDICE GIVEN ALL THE AGGRAVATING EVIDENCE BEFORE THE JURY AND THE DOUBLE-EDGED NATURE OF HIS SOCIAL HISTORY AND DRUG USE EVIDENCE. ............................................. 59

C. TRIAL COUNSEL PROPERLY PREPARED FOR DR. ROACHE'S TESTIMONY. ................................................................................................ 62

D. TRIAL COUNSEL CONSULTED WITH AN EXPERT REGARDING THE UNAVAILABILITY OF MENTAL HEALTH CARE AND SUBSTANCE ABUSE TREATMENT. ....................................................................................... 69

II.    JOHNSON'S CLAIMS CHALLENGING TEXAS'S DEATH PENALTY STATUTE ARE FORECLOSED BY PRECEDENT. ....................................................... 72

A. THE FUTURE DANGEROUSNESS SPECIAL ISSUE IS NOT UNCONSTITUTIONALLY VAGUE .................................................... 72

B. NO CLEARLY ESTABLISHED FEDERAL LAW REQUIRES THAT TEXAS'S MITIGATION SPECIAL ISSUE BE ASSIGNED A BURDEN OF PROOF. .......... 77

C. THE TRIAL COURT WAS NOT REQUIRED TO INSTRUCT THE JURY THA A "NO" VOTE BY A SINGLE JUROR ON THE FIRST SPECIAL ISSUE, OR A "YES" VOTE  BY A SINGLE JUROR ON THE SECOND SPECIAL ISSUE, WOULD RESULT IN A LIFE SENTENCE INSTEAD OF DEATH. ....................... 79

III.   JOHNSON FAILS TO SHOW HE WAS SELECTIVELY PROSECUTED. ........... 83

IV.    THIS COURT SHOULD DENY JOHNSON'S REQUEST FOR AN ......................... EVIDENTIARY HEARING. .......................................................................... 88

CONCLUSION .......................................................................................... 90

# TABLE OF AUTHORITIES

## Cases

*Aguilar v. Dretke*, 428 F.3d 526 (5th Cir. 2005) .......................................... 81, 85

*Alexander v. Johnson*, 211 F.3d 895 (5th Cir. 2000) .................................. 83, 91

*Alexander v. McCotter*, 775 F.2d 595 (5th Cir. 1985) ...................................... 45

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ............................................ 78, 79

*Avila v. Quarterman*, 560 F.3d 299 (5th Cir. 2009) ........................................ 79

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ............................................................ 76

*Bible v. Stephens*, 640 Fed. Appx. 350 (5th Cir. 2016) .................................... 77

*Bible v. Stephens*, 2014 WL 5500722 (S.D. Tex. Oct. 30, 2014) ...................... 77

*Blue v. Thaler*, 665 F.3d 647 (5th Cir. 2011) .................................. 79, 80, 82, 83

*Bobby v. Van Hook*, 558 U.S. 4 (2009) .............................................................. 39

*Broadnax v. Lumpkin*, 987 F.3d 400 (5th Cir. 2021) ........................... 80, 82, 88

*Brown v. Thaler*, 684 F.3d 482 (5th Cir. 2012) ................................................ 58

*Busby v. Dretke*, 359 F.3d 708 (5th Cir. 2004) ........................................... 81, 85

*Clark v. Johnson*, 202 F.3d 760 (5th Cir. 2000) .............................................. 34

*Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007) .................................. 46, 58

*Coleman v. Thompson*, 501 U.S. 722 (1991) ......................................... 76, 81, 85

*Cullen v. Pinholster*, 563 U.S. 170 (2011) .................................................. Passim

*Day v. Quarterman*, 566 F.3d 527 (5th Cir. 2009) .......................................... 44

*Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) .............................. 51, 54, 58

*Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App. 2007) ............................... 75

*Druery v. Thaler*, 647 F.3d 535 (5th Cir. 2011) ................................................. 79

*Ex parte Hood*, 304 S.W.3d 397 (Tex. Crim. App. 2010) ................................... 74

*Ex parte Johnson*, 2019 WL 4317046 (Tex. Crim. App. Sept. 11, 2019) . Passim

*Ex parte Nelson*, 137 S.W.3d 666 (Tex. Crim. App. 2004) ......................... 81, 85

*Gardner v. Davis*, 779 F. App'x 187 (5th Cir. 2019)...................... 47, 50, 53, 56

*Granados v. Quarterman*, 455 F.3d 529 (5th Cir. 2006)................................. 79

*Green v. Johnson*, 116 F.3d 1115 (5th Cir. 1997) ........................................... 43

*Gregg v. Georgia*, 428 U.S. 153 (1976) ....................................................... 87, 89

*Gregory v. Thaler*, 601 F.3d 347 (5th Cir. 2010) ........................................... 37

*Hardy v. Cross*, 565 U.S. 65 (2011) ............................................................... 32

*Harrington v. Richter*, 562 U.S. 86 (2011) ............................................... Passim

*Hinton v. Alabama*, 571 U.S. 263 (2014) ....................................................... 43

*Hopkins v. Cockrell*, 325 F.3d 579 (5th Cir. 2003) ....................................... 58

*Hughes v. Dretke*, 160 F. App'x. 431 (5th Cir. 2006)................................. 77, 87

*Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005) ........................................... 83

*Hughes v. Johnson*, 191 F.3d 607 (5th Cir. 1999) ......................................... 76

*In re U.S.*, 397 F.3d 274 (5th Cir. 2005) ......................................................... 88

*Johnson v. Cockrell*, 306 F.3d 249 (5th Cir. 2002) .................................... 62, 76

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ................................................. 77

*Johnson v. State*, 2015 WL 7354609 (Tex. Crim. App. Nov. 18, 2015) .. 2, 7, 74, 78

*Jones v. United States*, 527 U.S. 373 (1999)................................................... 83

*Jurek v. Texas*, 428 U.S. 262 (1976)............................................................... 75

*Kansas v. Cheever*, 571 U.S. 87 (2013)..........................................................56, 64

*Kernan v. Hinojosa*, 136 S. Ct. 1603 (2016)........................................................32

*Knowles v. Mirzayance*, 556 U.S. 111 (2009).....................................................37

*Ladd v. Cockrell*, 311 F.3d 349 (5th Cir. 2002) ..................................................61

*Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997) .............................57

*McCleskey v. Kemp*, 481 U.S. 279 (1987)..............................................87, 88, 89

*McDonald v. Johnson*, 139 F.3d 1056 (5th Cir. 1998) ......................................90

*Milton v. Procunier*, 744 F.2d 1091 (5th Cir. 1984) ........................................75

*Mitchell v. Epps,* 641 F.3d 134, 143 (5th Cir. 2011)............................50, 53, 56

*Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984)...............................................45

*Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) ....................................................33

*Norman v. Stephens*, 817 F.3d 226 (5th Cir. 2016)..........................................90

*Paredes v. Quarterman*, 574 F.3d 281 (5th Cir. 2009).....................................76

*Pippin v. Dretke*, 434 F.3d 782 (5th Cir. 2005)..................................................68

*Porter v. McCollum*, 558 U.S. 30 (2009) .............................................................59

*Prystash v. State*, 3 S.W.3d 522 (Tex. Crim. App. 1999)..................................55

*Pulley v. Harris*, 465 U.S. 37 (1984) ....................................................................75

*Rhoades v. Davis*, 914 F.3d 357 (5th Cir. 2019)..................................................54

*Rhoades v. State*, 934 S.W.2d 113) (Tex. Crim. App. 1996)..............................54

*Riley v. Cockrell*, 339 F.3d 308 (5th Cir. 2003)............................................39, 60

*Ring v. Arizona*, 536 U.S. 584 (2002)............................................................78, 79

*Roberts v. State*, 220 S.W.3d 521 (Tex. Crim. App. 2007)................................79

*Rompilla v. Beard*, 545 U.S. 374 (2005) ...................................................... 39, 59

*Rowell v. Dretke*, 398 F.3d 370 (5th Cir. 2005) ......................................... 79, 80

*Russeau v. State*, 291 S.W.3d 426 (Tex. Crim. App. 2009) ........................ 74, 75

*Saldano v. State*, 232 S.W.3d 77 (Tex. Crim. App. 2007) ................................ 75

*Scheanette v. Quarterman*, 482 F.3d 815 (5th Cir .2007) ................................ 79

*Schriro v. Landrigan*, 550 U.S. 465 (2007)................................................. 90, 91

*Simmons v. South Carolina*, 512 U.S. 154 (1994).......................................... 82

*Sprouse v. Stephens*, 748 F.3d 609 (5th Cir. 2014) ................................... 75, 79

*Strickland v. Washington*, 466 U.S 668 (1984). ............................................. 40

*Teague v. Lane*, 489 U.S. 288 (1989)........................................................... 80, 82

*Thompson v. Davis*, 916 F.3d 444 (5th Cir. 2019)........................................... 79

*Tigner v. Cockrell*, 264 F.3d 521 (5th Cir.2001) ............................................. 76

*Turner v. Quarterman*, 481 F.3d 292 (5th Cir. 2007) ..................................... 75

*United States v. Armstrong*, 517 U.S. 456 (1996) .......................................... 86

*United States v. Greene*, 697 F.2d 1229 (5th Cir. 1983).................................. 87

*United States v. Hoover*, 727 F.2d 387 (5th Cir. 1984) ................................... 87

*United States v. Reedy*, 393 Fed. Appx. 246 (5th Cir. 2010)........................... 90

*United States v. Sparks*, 2 F.3d 574 (5th Cir. 1993) ....................................... 86

*United States v. Webster*, 162 F.3d 308 (1998) ............................................... 86

*Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001)................................. 34, 63, 70

*Vasquez v. Thaler*, 389 F. App'x 419 (5th Cir. 2010) ..................................... 61

*Wayte v. United States*, 470 U.S. 598 (1985) .................................................. 86

*White v. Thaler*, 522 F. App'x 226 (5th Cir. 2013) ........................................... 87

*Wiggins v. Smith*, 539 U.S. 510 (2003) ...................................................... 39, 59

*Williams v. Taylor*, 529 U.S. 362 (2000) .................................................... 33, 59

*Wong v. Belmontes*, 558 U.S. 15 (2009) ................................................... Passim

*Woodford v. Visciotti*, 537 U.S. 19 (2002) ................................................. 34, 35

*Woods v. Etherton,* 136 S. Ct. 1149 (2016) ..................................................... 37

*Woods v. Whitley*, 933 F.2d 321 (5th Cir.1991) ............................................... 90

*Young v. Davis*, 835 F.3d 520 (5th Cir. 2016) ................................................. 82

## Statutes

28 U.S.C. § 2254 ............................................................................. 1, 32

28 U.S.C. § 2254(d) .................................................................... *Passim*

28 U.S.C. § 2254(e) .................................................................... *Passim*

## Rules

Tex. R. Evid. 609(a) .......................................................................... 48

Tex. R. Evid. 705(a)–(b) ..................................................................... 67

## ANSWER

Petitioner Matthew Lee Johnson was convicted and sentenced to death for murdering seventy-six-year old Nancy Harris by setting her on fire while he was robbing or attempting to rob her. Johnson now challenges his presumptively valid capital murder conviction and death sentence by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent denies all of Johnson's assertions of fact except those supported by the record or admitted herein. The Director respectfully requests that Johnson's petition be denied with prejudice and that he be denied a certificate of appealability.

## JOHNSON'S ALLEGATIONS

The Director understands Johnson to assert the following claims for relief:

1.   His trial counsel were ineffective in the sentencing phase of his trial because:
     a.   they failed to conduct a reasonable mitigation investigation and did   not adequately present Johnson's social history through lay and expert witnesses;
     b.   they failed to adequately prepare and present expert testimony; and
     c.   they failed to hire an expert to explain Johnson's lack of available mental health care and substance abuse treatment prior to the murder.

2.   His death sentence is arbitrary because his punishment is based on the jury's answer to the unconstitutionally vague and unreliable future dangerousness special issue.

3.   His death sentence is unconstitutional because the Texas capital punishment scheme does not assign the mitigation special issue a burden of proof.

1

4.   His death sentence is unconstitutional because the trial court failed to instruct the jury that a "No" vote by a single juror on the first special issue, or a "Yes" vote by a single juror on the second special issue, would result in a life sentence instead of death.

5.   His death sentence is arbitrary and unconstitutional because he was prosecuted on the basis of race and geography.

Pet. Writ Habeas Corpus (Pet.) at 3–99.

## STATEMENT OF THE CASE

Johnson was convicted and sentenced to death for capital murder in a judgment entered on November 8, 2013. Clerk's Record (CR) 4526–30. The Texas Court of Criminal Appeals (CCA) affirmed Johnson's conviction and sentence on direct appeal. *Johnson v. State*, No. AP-77,030, 2015 WL 7354609 (Tex. Crim. App. Nov. 18, 2015) (not designated for publication); *cert. denied, Johnson v. Texas*, 136 S. Ct. 2509 (2016). Johnson filed a state application for writ of habeas corpus raising nine claims for relief. 1 State Habeas Clerk's Record (SHCR) at 20–178. After holding an evidentiary hearing, the trial court entered findings-of-fact and conclusions-of-law recommending that relief be denied. 2 SHCR at 872–1003. The CCA issued an order adopting some of the trial court's findings and conclusions, providing additional reasoning related to some of his claims, and denying habeas relief based on the adopted findings and

2

its own review.[1] *Ex parte Johnson*, 2019 WL 4317046 at *1–3. This petition follows.

## STATEMENT OF FACTS

### I.   Facts Relating to Guilt/Innocence

On direct appeal, the CCA provided the following summary of the facts of Johnson's capital crime:

> Harris was a longtime employee of a Fina Whip–In convenience store located in Garland. On Sunday, May 20, 2012, Harris opened the store at 7:00 a.m. Videotape from the store's surveillance cameras showed [Johnson] entering the store a few minutes later, carrying a cigarette lighter and a bottle containing what was later determined to be lighter fluid.

> [Johnson] walked around the sales counter into the employees—only area where Harris was standing. He poured the fluid over Harris's head, demanded money, and stood immediately behind her as she attempted to open the cash register. While Harris struggled with the register, [Johnson] took two cigarette lighters from a display on the sales counter and two packages of cigarettes from an overhead dispenser. He also attempted to remove Harris's ring. When it did not come off, [Johnson] licked his fingers, used the moisture to lubricate the ring and Harris's finger, and worked the ring off.

> When Harris opened the register, [Johnson] moved in front of her, put the cash tray on the counter, and took all of the cash and some of the coins. Seconds later, outside of camera range, something on the employee-side of the register burst into flames. The videotape's next frames showed Harris, on fire from her shoulders upward, running from behind the sales counter to a nearby sink.
> Meanwhile, [Johnson] calmly walked out of the store. On his

---

[1] The CCA rejected finding 7.12 relating to Johnson's claim concerning the limited categories of evidence a capital jury may find mitigating to warrant a life sentence. *Ex parte Johnson*, No. WR-86,571-01, 2019 WL 4317046, at *2–3 (Tex. Crim. App. Sept. 11, 2019) (not designated for publication).

way, he stopped at a display rack near the front door, selected some candy, and put it in his pockets.

Harris leaned over the sink, attempting to extinguish the flames. When that attempt failed, Harris removed her burning shirt and dropped it on the floor, but her brassiere remained on fire. As Harris leaned over the sink again, flames from the still-burning shirt ignited her pants leg. She was unable to extinguish the flames. Still on fire, she made her way out of the store and began screaming for help.

Police officer Billy Coffey testified that he and another officer, Anthony Simon, were near the Whip-In at the time of the offense. When they saw flames and movement inside the store, they rushed to investigate. They reached the Whip–In's parking lot just as Harris, who was on fire, stepped out of the store's front door. Coffey put out the flames by spraying Harris with a fire extinguisher. Coffey testified that Harris told Officer Simon that a man had robbed her and poured something on her. She described the perpetrator to Simon as a heavy-set black male who was wearing blue jeans and a t–shirt.

William Crews, a Garland Fire Department firefighter and paramedic, testified that he treated Harris at the scene after a police officer flagged down his ambulance. He observed first, second, and third degree burns on Harris's face, shoulders, abdomen, upper arms, and legs. She was in a lot of pain, "very worried," and repeating, "Help me, help me, help me," and "Help me, help me, please."

Crews stated that Harris was able to give her name and medical history. She remained conscious and able to speak during the trip to the hospital, although her airway began to close due to swelling from the burns.

Harris was alert but still in a great deal of pain and emotional distress when she arrived at Parkland Hospital's emergency department. Because of her rapidly closing airway, emergency room staff quickly intubated Harris and placed her on a ventilator. Before she was intubated, Harris told police officer Larry Wilson that a heavy-set black male with short dark hair and a chubby face had

4

entered the store and demanded money from her. Harris said that the man had taken the money, poured an unknown substance on her, and set her on fire.

Shortly after Officers Coffey and Simon came to Harris's aid, police dispatch began receiving calls from residents of the neighborhood behind the Whip-In. The calls concerned the activities of a man generally matching Harris's description of the person who had robbed and set her on fire. Three of the residents, Jim Medley, Ken Marecle, and Lawrence Denson, testified at trial about their encounters with the man, whom Marecle and Denson identified as [Johnson].

Medley stated that the Whip-In was located about half a block away from his house, across an alley. At approximately 7:30 a.m. on the day of the offense, Medley went outside to investigate why his dog was barking. He saw police cars, heard sirens, found the gate to his rear driveway open, and noticed that his garbage can had been moved. Medley, who was not a smoker, also saw an opened cigarette pack and a broken, never–lit cigarette lying in his driveway. The cigarette pack itself was missing two cigarettes. When Medley put the cigarettes in his garbage can, he saw an unfamiliar light-colored, short-sleeved t-shirt inside the receptacle. About two houses away, Medley saw a shirtless black man pushing a bicycle in the opposite direction.

Marecle testified that between 7:00 and 7:30 a.m. on the day of the offense, his adult daughter saw a man on their back porch. The man left the back porch, heading around the side and toward the front of the house. When Marecle opened his front door slightly to investigate, he saw [Johnson] standing on the front porch. [Johnson] was wearing pants and black–rimmed glasses, but no shirt. [Johnson]'s eyes "were really wide and big."

[Johnson] repeatedly said that he needed help and then tried to force his way into Marecle's house. Marecle shouldered [Johnson] out of the doorway and into the courtyard, where the two men struggled. [Johnson] pushed Marecle to the ground, took Marecle's glasses, and ran away. Marecle, whose arms were skinned during the altercation, described [Johnson]'s behavior in fighting as

"irrational," but stated that he did not notice the smell of alcohol on [Johnson].

Between 7:00 and 8:00 a.m. on the day of the offense, Denson saw [Johnson] trying to enter the side gate to Denson's property. When Denson confronted him, [Johnson] approached with his arms out, saying, "Man, I'm in a bad way." Denson felt wary of [Johnson] and told him to "get his bad way out of my yard." [Johnson] continued to approach Denson, but fled when Denson's 28–year–old male friend walked outside. [Johnson] had not seemed intoxicated to Denson.

Police officers established a perimeter around the neighborhood. Roughly an hour after the offense, Officer Rafael Perez spotted [Johnson], who ran when he saw the officer. Perez apprehended [Johnson] following a foot chase. Officer Coffey assisted Perez with handcuffing [Johnson]. After being handcuffed, [Johnson] asked them, "What took you so long[?] Y'all are getting slow." A search of [Johnson]'s pockets yielded Harris's ring, a used cigarette lighter, two new cigarette lighters, coins, and approximately seventy-six dollars in bills.

Perez described [Johnson]'s demeanor as "real passive." It seemed to Perez that [Johnson] "wanted to start a conversation like nothing happened or what's going on, kind of like, really nothing. Like—to him, it was [as if] nothing was going on." Perez testified that he frequently dealt with intoxicated people and that [Johnson] had not seemed intoxicated to him.

Coffey transported [Johnson] to jail in a squad car equipped with a video camera that recorded [Johnson]'s speech and behavior during the trip. [Johnson] tried to engage Coffey in conversation. He asked, "What am I being booked for, man?" When Coffey said that [Johnson] had been arrested for attempted capital murder, [Johnson] asked, "Attempted capital murder of who [sic]?" [Johnson] also asked Coffey if the officer was "a family man" and whether the officer was "Coffey or Perez." When Coffey did not respond to [Johnson]'s questions, [Johnson] stated, "I can tell you everything, man. I can tell you what you want to know." A few minutes later, [Johnson] stated that he had been waiting for the police and that they came because [Johnson] wanted them to.

6

Coffey testified that [Johnson] did not seem intoxicated during the trip to the jail. He noted that [Johnson] did not smell of alcohol or have slurred speech. Instead, it seemed to Coffey that [Johnson] was coming down from an adrenaline rush or was possibly fatigued as a result of running from Officer Perez.

Dr. John Hunt, a physician who treated Harris at Parkland Hospital's Burn Unit, testified that Harris had sustained burns to over forty percent of her body, with the burns to her upper body ranging from second- to fourth degree in severity. Harris's medical team advised her family that, given Harris's age and the severity and extent of her injuries, she would not survive. Harris, who had previously executed a do-not-resuscitate order, died on May 25, 2012, after being removed from life support. Dr. Tracy Dyer, the medical examiner who performed the autopsy, testified that Harris's injuries were consistent with flame burns and concluded that her death was a homicide caused by thermal injury.

The State also presented evidence concerning the results of DNA and other forensic testing conducted on samples obtained during the investigation of Harris's death. Most of the test results tended to link [Johnson] to the offense, when considered in conjunction with other evidence admitted at the guilt-innocence phase.

The defense did not call any witnesses at the guilt–innocence phase of trial, and the jury convicted [Johnson] of capital murder as alleged in the indictment.

*Johnson*, 2015 WL 7354609, at *1–4 (internal footnotes omitted).

## II.   Facts Relating to Punishment

### A.   The State's future dangerousness evidence

As an initial matter, the jury was presented with significant evidence during the guilt/innocence phase of trial that Johnson was a future danger. Namely, the jury saw surveillance video of Johnson walking into the

7

convenience store, pouring lighter fluid on Nancy Harris, robbing her, setting her on fire, and calmly walking away while Harris was burning to death. 44 RR 49; SX #16–17; 54 RR 30–31.[2]

Additionally, at punishment, the State presented evidence of Johnson's criminal history and bad behavior while in prison.

### 1.    Criminal history

In 1993, Johnson lived with Amy Armstrong and three of her children. 47 RR 35–37. At the time, Johnson was Armstrong's boyfriend. 47 RR 36. He was seventeen and she was twenty-three. 47 RR 38. Johnson was good to Armstrong's children, but over time, he and Armstrong started fighting. 47 RR 37, 39. Johnson "put his hands on [Armstrong]" and would grab her and hit her. 47 RR 40. Armstrong fought back. 47 RR 40, 68.

On one occasion, after a fight, Armstrong left the apartment and went to a friend's apartment upstairs. 47 RR 41. She left her two-year-old daughter downstairs. 47 RR 41. While Armstrong was gone, Johnson took Armstrong' two-year-old and left. 47 RR 41. He eventually returned, and he and Armstrong reconciled. 47 RR 42.

---

[2] "RR" refers to the reporter's record of the proceedings in Johnson's capital-murder trial, cause number F12–23749. "SX" refers to the State's exhibits admitted at trial. All exhibits for Johnson's trial can be found in exhibit volumes 54–57 of the reporter's record.

The last straw for Armstrong was when, during yet another fight, Johnson hit Armstrong while she was holding her daughter. 47 RR 42. Her daughter "caught the back part of his hand." 47 RR 42. When Johnson left, Armstrong locked him out and refused to let him back in her apartment. 47 RR 42. She called the police and told them what had happened. 47 RR 44. Johnson returned after the police left, but Armstrong refused to let him in. 47 RR 45. She told him that their relationship was over. 47 RR 46. Johnson banged on the door and threatened to kick it in. 47 RR 46. He threatened to beat her "behind." 47 RR 70, 75. Armstrong barricaded the door and blocked the windows with mattresses and a bunk bed. 47 RR 46, 51. She turned off the lights and waited in the hallway with a gun that belonged to Johnson. 47 RR 47, 70. "And then [Johnson] went around and set my patio on fire." 47 RR 46. Armstrong saw the flames and went outside. 47 RR 50. She shot at Johnson as he ran away. 47 RR 50–51, 73. Then she put out the fire. 47 RR 50–51.

On September 8, 1993, Dallas Police Officer Eric Hagen was dispatched to Armstrong' apartment. 47 RR 21. When he arrived, Armstrong was "extremely agitated and upset" but would not let Hagen inside. 47 RR 22. Hagen walked around to the back porch of the ground–floor apartment. 47 RR 23, 26. He looked over the fence and saw "a burned piece of wood and burned patio carpet." 47 RR 24. It appeared someone had tried to set the carpet on fire. 47 RR 26.

9

On November 9, 1993, Garland Police Investigator Berry Oliver was on routine patrol when he saw Johnson walking down the street smoking a joint. 47 RR 101, 104–07. When Johnson saw Oliver, he attempted to conceal the joint by "stick[ing] it down the back of his neck and then [he] immediately start[ed] trying to get into the trunk of the car[.]" 47 RR 104–05. Oliver stopped Johnson and patted him down. 47 RR 105. He found the joint "between [the] coat and [the] shirt [Johnson was wearing]," and he found a bag of marijuana inside a towel that Johnson was carrying. 47 RR 105, 107. Oliver arrested Johnson for possession of marijuana and an outstanding warrant. 47 RR 105, 108. Johnson pleaded guilty and received six months' probation. 47 RR 109–10; SX #167. His probation was subsequently revoked, and he was sentenced to thirty days in jail. 47 RR 110; SX #167.

On July 23, 1994, Garland Police Officer Blaine Ralston—while on routine patrol—ran a license plate check on a black four-door Cadillac to see if there were any outstanding warrants. 47 RR 116–17. There was an outstanding warrant on the vehicle, so Ralston attempted to initiate a traffic stop. 47 RR 117–18. He activated his red and blue lights, but the vehicle did not stop, it "just continue[d] to roll down the road." 47 RR 118. Ralston could see there were two people in the vehicle. 47 RR 118. The female driver made eye contact via the rear-view mirror. 47 RR 118, 120. Ralston activated his siren, but the vehicle still did not stop. 47 RR 119. The vehicle ran a stop sign. 47 RR 119. Ralston

could see the male passenger motioning for the driver to ignore Ralston. 47 RR 120–21. The vehicle "started to slow roll" at which point Johnson jumped out and ran toward a house, ignoring commands to stop. 47 RR 122–23. Johnson tried but was unable to open the front door of the house. 47 RR 123. Ralston and his partner apprehended him. 47 RR 123–24. He told the officers "he had told [the driver, his wife Daphne Johnson] to continue to go and not stop because he had warrants for his arrest." 47 RR 125. Johnson was later convicted of evading arrest and given one year of probation. 47 RR 127–28; SX #168. His probation was subsequently revoked, and he was sentenced to 180 days in jail. 47 RR 128; SX #168.

On August 7, 1995, Garland Police Officer M.G. Clark was dispatched to locate Johnson. Johnson's sister–in–law, Courtney Johnson, had called in and reported Johnson of aggravated assault with a deadly weapon. 47 RR 132–33; 47 RR 143; SX #169. Clark located Johnson after a tip revealed his location; he arrested for outstanding warrants and aggravated assault. 47 RR 133–37. At the jail, Johnson threatened Clark, so Clark filed a retaliation case against Johnson. 47 RR 138–40. Johnson was later convicted of the aggravated assault and sentenced to ten years in prison, probated for five years. 47 RR 140–41; SX #169. The retaliation charge was no billed. 47 RR 144.

On October 9, 2002, Garland Police Officers Clay Lacey and Gary Steadman responded to a hit-and-run call. 47 RR 147, 155. By the time the

11

officers arrived at the scene, "the person in the car was getting out." 47 RR 148–49. The officers searched the area and eventually found Johnson and apprehended him. 47 RR 150–51, 155–57. Johnson repeatedly ignored the officers' commands to get on the ground. 47 RR 157–58. Eventually, the officers tackled Johnson and arrested him for evading arrest. He was later convicted of the offense and sentenced to seventy-five days in jail. 47 RR 158–61; SX #170.

On June 14, 2004, Digna Salmeron was in her truck preparing to leave for work when she heard a knock on the window. 47 RR 182, 191. The man stated he was sick and needed to use a phone to call an ambulance. 47 RR 183. Scared, Salmeron told the man she did not have a phone. 47 RR 183–84. The man "just went at [her]." 47 RR 184. He tried to force his way into the truck. 47 RR 184, 191. The man eventually wrestled the keys away from Salmeron and threw her into the yard. 47 RR 186. He then started the truck and left. 47 RR 186. He later wrecked Salmeron's truck, rendering it inoperable. 47 RR 186. Salmeron could not fully identify the person, except that he was a big and strong black man. 47 RR 189, 192–93.

Garland Police Officer Matthew St. Clair was dispatched as backup on the call regarding the carjacking of Salmeron's truck. 47 RR 188, 197. When he arrived to the area, another officer had located the stolen vehicle and "was in the midst of a . . . high speed vehicle pursuit through some neighborhoods." 47 RR 166–67. The driver—Johnson—"lost control and wrecked out and struck a

12

wall, some parked cars in a driveway, and the corner of a house." 47 RR 168, 170. Johnson got out and attempted to flee on foot. 47 RR 170. He was eventually taken into custody. 47 RR 171–72. Johnson was convicted of robbery, sentenced to five years in prison, and assessed a $1,500 fine. 47 RR 175–76; SX #171. He was also convicted of evading arrest, sentenced to a year in state jail, and assessed an additional $1,500 fine. 47 RR 175–76; SX #171.

On September 13, 2004, Garland Police Lieutenant John Spera responded to "a family disturbance call." 47 RR 78–79. "[T]here was a suspect there attempting to kick the door in and there was also a protector order on him." 47 RR 79–80. The complainant was Daphne Johnson. 47 RR 80. Daphne told police that Johnson "had told her he was coming over to get some money and that he would kick in the door if he had to." 47 RR 84. Footprints were visible on the door. 47 RR 85. There were two children in the apartment at the time. 47 RR 87. Johnson was convicted of violation of a protective order and sentenced to 330 days in jail. 47 RR 97; SX #166.

The State also presented evidence of a theft committed by Johnson against his former employer. David Contente owned Kwik Kar Oil and Wash in Mesquite. 48 RR 157. Johnson worked for him in December 2010, performing state inspections and helping out in the shop. 48 RR 158–61. He later became a cashier. 48 RR 161, 183. Johnson worked ten hours a day, five days a week. 48 RR 180. He was reliable and was given a set of keys to the business. 48 RR 162,

13

164. However, Johnson did not handle conflict well. 48 RR 163. "He was too rigid, in our rules, you know." 48 RR 163.

On November 14, 2011, Johnson called Contente at 5:00 a.m. 48 RR 163–64. Johnson "said [Contente] needed to come down to the store so he could talk to [Contente] and that he had done a bad thing." 48 RR 164. Contente went to his computer and tried to access the surveillance cameras at the store, but the camera was blacked out. 48 RR 165, 166; SX #175–178. Contente "went to the police department and asked a policeman to go down there with" him. 48 RR 170. He "thought the worst." 48 RR 171. The police went with Contente to the store. 48 RR 171. There, he discovered that three state inspection booklets, $325 in cash, and a monitor were missing. 48 RR 172–73. The inspection booklets and the cash were taken from the safe. 48 RR 172–73. The booklets are valued at $2100. 48 RR 172. Footage from surveillance cameras showed Johnson in the store earlier that morning and that Saturday night. 48 RR 174; SX #173, 174. Johnson was arrested. 48 RR 178. The monitor was returned but the inspection booklets and cash were not. 48 RR 175, 178; SX #174.

On April 15, 2012, at 5:30 a.m., Johnson was brought to the emergency room by Dallas police and paramedics. 48 RR 190–91, SX #188. He was handcuffed, "highly agitated," and "somewhat combative." 48 RR 194. He was in a substance-induced psychosis. 48 RR 202–03. It took eight or nine people to hold Johnson on the bed. 48 RR 194. He had to be placed in a body net, a four-

point restraint that lays over the patient and attaches to the bed. 48 RR 194–95. The more the staff tried to hold Johnson down, the more agitated it made him. 48 RR 195. Johnson stated, "I hope they're getting this on TV, God is watching all of this, XLT and divorce is a bad thing, and I'm going to grab your gun." 48 RR 197. Once Johnson was medicated he calmed down. 48 RR 198. He reported that he had been smoking crack cocaine, ice, and marijuana laced with PCP. 48 RR 198. He did not report any mental health concerns. 48 RR 199–200, 208. As part of hospital protocol, Johnson would have been offered information and resources regarding drug treatment. 48 RR 200–01, 205, 208–09.

On the morning of April 26, 2012, Carina Pinzon was working as a housekeeper at the Express Inn in Garland. 48 RR 101. She was cleaning one of the rooms and left the door propped open with her cart. 48 RR 102. When she was cleaning the bathroom, a man moved her cart and entered the room. 48 RR 102–03. Pinzon turned around when the man touched her shoulder. 48 RR 103–04. He said something to her in English, but she did not understand him. 48 RR 103. She asked if he needed something. 48 RR 103. At that point, she noticed that the zipper on his pants was down. 48 RR 104, 108. Pinzon explained, "[H]e had his penis outside and that's when [she] got scared." 48 RR 104. The man's penis was erect. 48 RR 108. The man tried to grab her hand. 48 RR 105. Pinzon threw a bucket of water at him, pushed him, and ran away. 48 RR 105. She ran to the office, and her manager called the police. 48 RR 105–06.

15

Garland Police Officer Mark Mendoza was dispatched to the Express Inn. 48 RR 117–18. There, he spoke with Pinzon and got a description of the suspect. 48 RR 119. He then talked with the manager to see whether the suspect was a guest at the motel. 48 RR 119. The manager gave him some names and Mendoza went to those rooms. 48 RR 120. Johnson was one of the suspects. 48 RR 120. Mendoza recognized Johnson from a prior arrest. 48 RR 120. Johnson allowed Mendoza into his motel room, which smelled of marijuana. 48 RR 121, 129. Mendoza noticed that Johnson's clothes were wet. 48 RR 121, 123. Johnson told Mendoza that he had been smoking crack all night, but he did not appear intoxicated. 48 RR 121, 123, 130. Mendoza asked if Johnson had anything illegal in his room. 48 RR 122. Johnson advised that he "probably had a crack pipe or something somewhere in the room." 48 RR 122. Mendoza asked Johnson about the incident with Pinzon. 48 RR 122. Johnson told him that "he was just trying to drop off some towels to the room." 48 RR 122. Pinzon confirmed Johnson was the man who had exposed himself to her. 48 RR 124. Johnson was not arrested, but he was issued a criminal trespass warning and ordered to leave the motel. 48 RR 124–25.

Mendoza testified that he had previously arrested Johnson on May 31, 1994. Mendoza and his partner were dispatched to the scene of a man and woman fighting on the side of the road. 48 RR 111–12. Upon arrival, the officers separated Johnson and the woman. They seated Johnson in the patrol car and

16

proceeded to check for outstanding warrants. 48 RR 112–13. When officer Mendoza opened the door to notify Johnson that he would be arrested on a warrant, Johnson "came charging out of the back [of the] squad car, like trying to get away" and the officers "began wrestling with him." 48 RR 113. Johnson put up "a pretty good struggle." 48 RR 114. He bit Mendoza on the arm; he also bit the other officer so hard that the bite went through the officer's watch. 48 RR 114. Johnson later pleaded guilty to resisting arrest. He was sentenced to twelve months' probation. 48 RR 115–16; SX #189. His probation was revoked, and he was sentenced to 365 days in jail. 48 RR 116; SX #189.

### 2.   Violent and disruptive behavior in while incarcerated

Carlton Jenkins was incarcerated with Johnson at the Rudd Unit for two months in 2005. 47 RR 201, 203, 238. They were bunkmates. 47 RR 202. At first, Johnson and Jenkins had "a decent relationship." 47 RR 205. Jenkins testified that Johnson "stopped going to work . . . [and] was confined to the housing unit then." 47 RR 207. Several times, Johnson was not able to buy groceries at the commissary. 47 RR 210. Jenkins shared some of his food with him. 47 RR 211. But the bunkmates' relationship eventually changed. 47 RR 214. Jenkins saw Johnson sitting on the head of his bed, which is a sign of disrespect. 47 RR 214. Johnson's "demeanor went south." 47 RR 215. Johnson "quit school, too." 47 RR

216. He "was on confined housing." 47 RR 216. Jenkins tried to talk to Johnson but "[i]t went bad." 47 RR 219.

On July 25, 2005, it "was GI day"—where "everybody cleans the dorm." 47 RR 220. "[E]verybody cleans the dorm." 47 RR 220. Afterwards, Johnson "was sitting on [Jenkins'] bunk." 47 RR 222. Jenkins told Johnson that they needed to talk because he wanted Johnson to stop disrespecting him. 47 RR 223, 247. The men went to the back of the dorm. 47 RR 223, 248. There, "[Johnson] assaulted [Jenkins]. He swung at [him]." 47 RR 223. He hit Jenkins in the head. 47 RR 224. The men "sort of grabbed each other[.]" 47 RR 224. They separated when they thought a guard was approaching. 47 RR 225. Then, they "went back and then [they] fought some more." 47 RR 225. Johnson grabbed Jenkins below his knees and flipped him, causing Jenkins' head to hit the concrete floor. 47 RR 226, 233. Jenkins's head was "split" open. 47 RR 227. He was bleeding; "[t]here was blood everywhere." 47 RR 227–28. Jenkins was transferred to another unit to receive medical treatment. 47 RR 230. The injury to his head required nine staples. 47 RR 230–31; SX #172. Jenkins also suffered bruising from blows to his face and head. 47 RR 232. Johnson was sent to solitary confinement. 47 RR 230.

Ashley Villegas worked for a year as a correctional officer with the Texas Department of Criminal Justice (TDCJ) at the Price Daniel Unit in Snyder, Texas. 47 RR 256–57. Villegas worked the overnight shift from 9:00 p.m. to 5:00

a.m. This required she walk the unit and count the inmates every two hours. 47 RR 260, 262. On February 14, 2006, when she arrived at Johnson's cell during her 1:00 a.m. count, she "noticed the offender having one arm up on his door and the other arm on his penis masturbating and looking at [her] and smiling like with a grin. . . as if he thought it was funny." 47 RR 263–64. Villegas testified that Johnson was "known as. . . a high profile inmate so that means that all the officers knew who he was, but not in a good way, because they had also written disciplinary reports on him too." 47 RR 271.

 Jennifer Pyburn was a detention officer at the Lew Sterrett Jail. 48 RR 134. At one time, Johnson was under her supervision. 48 RR 137. Once when Pyburn was escorting Johnson to a visit, he turned around "and he was like, I ought to just pull you in here, which is like the visitation door." 48 RR 145. Johnson "didn't say it in a mean - - mean way[.]" 48 RR 145. He was smiling. 48 RR 145. Johnson later apologized. 48 RR 155.

On another occasion, Pyburn observed an interaction between Johnson and another detention officer when Johnson was disrespectful. 48 RR 147–48. The officer told Johnson the shower he was supposed to be cleaning was not clean enough. 48 RR 147. Johnson told her that was the way he cleaned it. 48 RR 147–48. When Pyburn instructed Johnson how to clean the shower, he told her that they "do not pay him enough to clean the shower." 48 RR 149.

19

Melodye Nelson, a twenty-five-year veteran of TDCJ, testified as an expert on the prison system in Texas. 48 RR 18. She testified generally about the types of facilities, number of inmates and guards statewide, and how inmates are classified within the system. 48 RR 32–77.

She also testified that TDCJ maintains some records of inmates' disciplinary infractions. 48 RR 36. Records of minor infractions are not maintained; they are shredded. 48 RR 36. Minor infractions include; being out-of-place, giving things to another inmate, failing to obey a direct order, not going to school, etc. 48 RR 38. Often, verbal confrontations between the inmate and a guard do not result in a disciplinary case. 48 RR 38. Nelson testified that death row inmates have been involved in assaults on other inmates, assaults on staff, sexual misconduct, possession of contraband, possession of weapons, possession of drugs, and possession of cell phones. 48 RR 47. Nelson showed the jury some weapons she had confiscated from inmates over the years—made from materials like cardboard, parts of a typewriter, screws, and pencils. 48 RR 59–62.

## B.     The defense's case in mitigation

The defense presented testimony from Johnson and others regarding his upbringing, drug use, depression, and his remorsefulness about the offense. The defense also put on testimony that Johnson would be a low risk to others while incarcerated.

### 1.   Johnson's childhood, relationships, and early life

Johnson testified that his parents were married. 49 RR 46, 90. His mother worked during the day, and his father worked at night. 49 RR 46. They took him to church and taught him right from wrong. 49 RR 90. Johnson has two brothers, Anthony and Timothy. 49 RR 47. Anthony went into the military. 49 RR 47. Timothy "has been in prison half his life." 49 RR 47.

When Johnson was five years old, a cousin "put his penis" in Johnson's mouth and "peed in" it.[3] 49 RR 50. Johnson's cousins and uncle laughed at him. 49 RR 50. When he was eight, the family friend he bought drugs from fondled him. 49 RR 48. Johnson testified that the friend "pulled [his] penis out and wanted to suck it." 49 RR 48. Johnson "let him do it for a little while, but then [he] knew that wasn't right." 49 RR 48. Johnson told the friend to stop. 49 RR 48–49. Johnson still bought drugs from the friend; he used the fondling incident "to hold over [the friend's] head." 49 RR 49. Johnson threatened to tell about the abuse and the man "gave [him] what [he] wanted." 49 RR 49.

Johnson testified that when he dated Amy Armstrong they fought and argued. 49 RR 53–54. He admitted that he hit Armstrong, but he qualified that he "didn't just hit her enough just to really hurt her, but just enough to make

---

[3] Johnson testified that he never said anything about childhood sexual abuse prior to telling trial counsel. 49 RR 90–91. He never mentioned it during previous incarcerations or when he was hospitalized because he thought it "was irrelevant at the time." 49 RR 91.

her stop hitting" him. 49 RR 53. Johnson testified he threw the burning log on her patio so that she would come outside and let him in since he had "nowhere to go." 49 RR 54.

Johnson was married to Daphne Johnson, and the two had three daughters. Johnson and Daphne started dating when he was fifteen years old and married when they were eighteen. 49 RR 52, 55. Johnson admitted that he used to hit Daphne. 49 RR 55. But he claimed he never hit her enough to "hurt her, just enough to back her off." 49 RR 57.

When Johnson was in eleventh grade he dropped out of school. 49 RR 46. He was never placed in special education classes, but he was in "basic classes." 49 RR 91. Johnson took courses in auto body technology at Richland College. 49 RR 91. He testified that he learned at a slow pace but did not have a learning disability. 49 RR 92.

Daphne Johnson testified that she was Johnson's wife. 49 RR 184. When they married, they were immature. 49 RR 186. They struggled financially, they did not communicate well, and their arguments got physical. 49 RR 186. Daphne did not remember reporting to police that Johnson had made threatening phone calls. 49 RR 219. She did not remember her sister filing an aggravated assault charge against Johnson. 49 RR 220.

##### 2.   Drug use and depression

Johnson worked at a company called Sanden for about five years, from 1997 until 2002. 49 RR 58. He started on the assembly line, but was promoted four times, all the way to repairman. 49 RR 59. He was eventually fired because he missed too many days of work. 49 RR 58–59. At the time, he was using drugs on the weekends and "it carried on until the Mondays and Tuesdays[.]" 49 RR 59. After he was fired, Johnson checked himself into Green Oaks Hospital to be treated for drug abuse. 49 RR 59. He was there for a week and was diagnosed with depression. 49 RR 60. After Green Oaks, he was sent to Summer Sky in Stephenville for further inpatient treatment. 49 RR 60. Johnson spent 35 days at Summer Sky. 49 RR 60. He "wasn't ready [to leave], but [his] insurance ran out." 49 RR 61. He spent a week in a halfway house, then he returned home to his wife. 49 RR 61. Upon returning home, he stayed sober for a few weeks, but he then went back to using crack and marijuana and drinking alcohol. 49 RR 61–62.

Johnson testified that he was under the influence when he stole Salmeron's truck and "coming down off of [drugs]" during the theft of the Kwik Kar's money and inspection books. 49 RR 118 He testified that he did not remember the incident with Pinzon. 49 RR 118. Johnson confirmed his criminal history. 49 RR 100–08. He testified that every time he has been in trouble, it was because of drugs and depression. 49 RR 99–100. The first time he spoke

23

with Daphne after the present offense, he "couldn't remember what [he] had done." 49 RR 80. He claimed that had he not been under the influence of drugs or alcohol, he would not have robbed Nancy Harris. 49 RR 37.

Daphne first became aware of Johnson's drug use after his grandmother died. 49 RR 187. He "would go off on bingers" and disappear for a day or two. 49 RR 188. Johnson would get physical with Daphne when he was high. 49 RR 198. She also testified that Johnson suffered from depression, and that it became more frequent after the Kwik Kar incident. 49 RR 209–10. She testified that Johnson was "an awesome father" to their three daughters. 49 RR 192.

Johnson's older brother, Timothy, testified about their family and their history of drug use. All three brothers used drugs. 50 RR 74. Timothy was aware that Johnson used drugs at a young age. 50 RR 73. Timothy was present during one fight between Johnson and Daphne. 50 RR 80–81. Johnson tried to slap Daphne. 50 RR 81. Timothy intervened, and he and Johnson "had a fight—a tussle." 50 RR 81. In Timothy's opinion, Johnson was intoxicated at the time because "he was big and I'm smaller and I handled him - - I mean, real easy." 50 RR 82.

Johnson's mother-in-law, Hazel Johnson, testified that Johnson is a good person and a good father. 50 RR 88, 90, 92. In the month before the offense, Johnson was stressed and depressed. 50 RR 93–94. Daphne's aunt, Frances Wilson, testified she learned that Johnson had a drug problem about five years

24

after he and Daphne were married. 50 RR 100. She started talking to him about it in 2011. 50 RR 101–02. Johnson was depressed, and Wilson worried that he would harm himself. 50 RR 103. Wilson was not aware of any physical abuse between Johnson and Daphne. 50 RR 100. Daphne's sister Courtney Johnson testified Johnson and Daphne's relationship was "a normal relationship, just like any other married couple would have." 50 RR 111–12

A week before the instant offense, Courtney went with Johnson to the Garland Police Station when he asked them to "lock him up" because he was on drugs and wanted to avoid getting into trouble. 50 RR 123. Without any active warrants, the police did not arrest him. 50 RR 124.

Valerie Braziel is Johnson's daughter Matduxx's godmother. 50 RR 166, 69. They met in 2009 after Johnson's release from prison. 50 RR 169–70. Since that time, they have become friends. 50 RR 170. In the time leading up to the murder, Johnson was withdrawn and Braziel felt as though he was depressed. 50 RR 174. Braziel had no idea that he was a drug addict. 50 RR 174. She was not aware of any domestic violence between Johnson and Daphne. 50 RR 173.

Pharmacologist Dr. John Roache testified as an expert regarding illegal drugs and addiction. 50 RR 27. Dr. Roache described the drugs that Johnson used. Cocaine is a stimulant. 50 RR 33. It increases wakefulness and vigilance and produces feelings of intense euphoria and motivation. 50 RR 34. Marijuana is a plant and a mild hallucinogen. 50 RR 34. Phencyclidine, or PCP, is a

25

hallucinogen. 50 RR 35. A PCP user feels "superhuman empowered." 50 RR 35. It can also produce "psychotic like effects, where you can have hallucinations, paranoia, and extreme agitation." 50 RR 35. Methamphetamine or "ice," is a stimulant, which produces effects similar to cocaine. 50 RR 35. Xanax is a benzodiazepine. 50 RR 36. It is a sedative and used to treat anxiety. 50 RR 36.

Roache testified addiction is "a learning process that happens with repeated use of drugs of abuse." 50 RR 30–31. Commonly, an addict will use multiple chemical substances. 50 RR 37. This is referred to as poly-substance dependence or poly-substance abuse. 50 RR 37. When an individual is under the influence, he may be more impulsive. 50 RR 37. "[T]he addict becomes more driven for the immediate consequences of the drug experience and less thoughtful or conscientious or cognitively decisive out longer-term consequences." 50 RR 37–38. Often, addicts have relapses after periods of sobriety. 50 RR 43.

Roache conceded that when Johnson checked himself into the hospital in 2002, he was depressed because he was unable to quit using drugs. 50 RR 44. Indeed, the discharge instructions indicate "The patient was profoundly depressed because of his inability to stop doing drugs, and having observed his many losses, including job, family, financial, and clearly self[-]esteem." 50 RR 53; DX #22. Roache testified that while incarcerated prior to trial, Johnson was

not diagnosed with depression, but with poly-substance abuse and substance-induced mood disorder. 50 RR 45.

Although Roache did not review the surveillance video of this offense, he opined Johnson was intoxicated at the time he committed the offense. 50 RR 45. Roache did not think it was "necessary[]" to review the surveillance video. 50 RR 45–46.

### 3.    Murder of Nancy Harris and remorsefulness

Johnson testified he was released from prison in July 2009 and relapsed in October of 2011. 49 RR 11. He started smoking crack and "ice." 49 RR 11. At first, it was only on weekends. 49 RR 12. He was still paying his bills. 49 RR 12. His relapse was "devastating." 49 RR 16. It made him lazy, and he fell into a deep depression. 49 RR 16. He stayed home in the dark and "just was embarrassed, ashamed." 49 RR 16.

On the night before the offense, Johnson went by himself to his brother Anthony's wedding reception. 49 RR 19. He stayed for about an hour. 49 RR 24. Everybody was happy and having a good time, but Johnson felt like he was in his own "personal hell." 49 RR 19–20. Because he had missed so much work due to his drug use, Johnson had lost his job. 49 RR 20. He also felt ashamed of his clothes and hair. 49 RR 22.

Johnson went home, ate dinner, then walked back to the party. 49 RR 25–26. He told his cousin that he messed up his car when he put gas mixed with water in the tank. 49 RR 26–28. The cousin gave him $30 and suggested how to fix it. 49 RR 27–28. Johnson was drunk, so he used the money "to get high." 49 RR 28. For the next several hours, Johnson "[c]ontinued to smoke, sell a little bit, smoke, sell a little bit, smoke." 49 RR 28. He also had some Xanax to use when it was time to return home to babysit his daughter. 49 RR 29.

At about 6:00 a.m., Johnson walked back to his brother's house. 49 RR 30. He found a bottle of wine on the patio and drank the whole thing. 49 RR 30. He "wanted money. . . [and] wanted to get high on crack." 49 RR 30. He saw a plastic water bottle. 49 RR 30. He put lighter fluid in it. 49 RR 30. He was "[j]ust going to take it and scare the person." 49 RR 30. He planned to "[p]our it on her." 49 RR 30. It was going to be a "scare tactic." 49 RR 31. Although he did not remember having a lighter, he acknowledged he would have had to have one to smoke crack. 49 RR 32.

Johnson walked across the street to the Whip–In. 49 RR 31. He wanted to get the money and leave. 49 RR 32. He did not intend to set Harris on fire. 49 RR 31. Johnson testified that he walked in and "saw a lady." 49 RR 33. Johnson walked behind the counter. 49 RR 33. Harris followed him and told him he was not supposed to be there. 49 RR 33. When she got close to him he "just poured the fluid over her head" and she "started trembling." 49 RR 33.

28

Johnson told Harris to open the cash register because he wanted the money. 49 RR 33. While she was opening the register, he took a lighter and some cigarettes. 49 RR 33. He did not remember taking Harris's ring. 49 RR 33–34. Harris opened the register and moved away. 49 RR 34. Johnson took the money. 49 RR 34. He warned Harris to stand back because he had a lighter. 49 RR 34. She moved toward him and he "flipped [the lighter] once to try to scare her but that didn't stop her." 49 RR 34. Harris reached across him again. 49 RR 34. It "spooked" Johnson so he flicked the lighter "again, twice, hoping that she would move back." 49 RR 34. That is when Harris's clothes ignited. 49 RR 35. Johnson was not thinking. 49 RR 35–36. He was intoxicated; he had smoked nearly $100 worth of crack, consumed alcohol, and had taken a Xanax. 49 RR 36. He did not think to help Harris once she was on fire. 49 RR 36.

Johnson "knew [he] had [done] a bad thing, so [he] just. . . ran." 49 RR 41. He ran and hid in some bushes and smoked a cigarette. 49 RR 41. He "got tired of laying in those bushes, so when [he] came out, that's when [he] saw the police car parked at the end of the street." 49 RR 40–41. Johnson started running, and when he got tired, he sat on a porch and waited for the police. 49 RR 41.

Johnson remembered "tussling" with Marecle but did not remember his encounter with Denson. 49 RR 41. He remembered stealing a bicycle. 49 RR 41–42. He testified he thought the ride to the police station was "very short. It was

29

like I just closed my eyes and opened my eyes and I was there." 49 RR 42. When

he was in the patrol car, he did not understand what he had done. 49 RR 43.

Johnson testified that the reason he set Harris on fire was because she

was coming at him. 49 RR 120. Johnson acknowledged that when he was

arrested, he only told police that he had consumed cocaine and two beers prior

to the offense. 49 RR 120. He did not mention the bottle of wine or the Xanax

because "it was irrelevant. [He] was intoxicated." 49 RR 120.

Johnson expressed remorsefulness about the crime, stating that he felt

"like the lowest scum of the earth. . . [b]ecause [he] hurt an innocent woman."

49 RR 38. He told the jury he felt "disgusted" at himself. 49 RR 7. He also asked

Harris's family for forgiveness and "mercy." 49 RR 39. Johnson even went to far

as to say he felt like he deserved to die for what he had done. 49 RR 39.

### 4.    Johnson's low risk to others while incarcerated

Dr. Jonathan Sorensen testified that he conducted an actuarial analysis

to determine the probability that Johnson would be violent in prison. 51 RR 22,

27; DX #25. Sorensen opined that Johnson "will fare better than the average

incoming capital offender." 51 RR 30; DX #26. The factors that decreased

Johnson's risk of violence included: his age; his educational level; a lack of a

disruptive group or gang affiliation; his prior prison behavior and classification

level; and the fact that he would be serving a sentence of life without the

possibility of parole. 51 RR 30–31, 38, 42, 44. The factors that increased Johnson's level of risk included: his prior incarceration; his prior assaults while incarcerated; and the fact that his capital murder involved a contemporaneous robbery. 51 RR 45–46, 20–51.

James Aiken, a prison consultant who has never worked in a Texas prison, testified that Johnson "fares low on the factors of providing unusual risk to staff, inmates, or the general public." 51 RR 58, 60, 61; DX #27.

## C.   The State's rebuttal

The CCA summarized the State's rebuttal evidence as follows:

> In its punishment rebuttal case, the State played a police dashcam video. The State had already published the in-store video of the offense to the jury during the guilt phase. The in-store video was silent and in black-and-white. Among other things, it showed Harris rushing out the front door after trying and failing to extinguish the fire while she was inside the store.
>
> The dashcam video was in color and accompanied by audio. It showed Harris outside the store, still on fire and screaming for help as an officer arrived and used his fire extinguisher to put out the fire. The jury also heard testimony about the week of physical pain Harris suffered in the hospital and her awareness of her impending death.

*Ex parte Johnson*, 2019 WL 4317046, at *2.

## ARGUMENT

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). AEDPA "requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'" *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016) (per curiam) (alteration in original). State court adjudication, in turn, requires review under § 2254(d). *Richter*, 562 U.S. at 98–99. This section "imposes a highly deferential standard of review for evaluating state court rulings and demands that state court decisions be given the benefit of the doubt," *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam) (quotation omitted) (per curiam)), and "is limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Under § 2254(d), relief may not be granted unless the state court adjudication (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court, (2) "'involved an unreasonable application of' such law," or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Richter*, 562 U.S. at 100 (quoting § 2254(d)(1)–(2)) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A state court decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent yet reaches an opposite result. (*Terry*)

32

*Williams*, 529 U.S. at 405–06. A state court unreasonably applies clearly established federal law if it correctly identifies the governing Supreme Court precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. To analyze unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision[] and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102. Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree" on the correctness of the state court's decision. *Id.* at 101 (quotation omitted).

Further, it is the state court's "ultimate decision" that is to be tested for unreasonableness and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Indeed, state courts are presumed to "know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And, even if the state court's decision lacks reasoning, § 2254(d) applies and must be overcome by the inmate. *Richter*, 562 U.S. at 98.

AEDPA also provides that state court factual findings "shall be presumed to be correct" unless an inmate carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1). This presumption is "especially strong" where, as here, the state trial judge and the state habeas

33

judge are one and the same. *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000); *see also* 44 RR 1; 2 SHCR at 538. "The presumption of [factual] correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

## I. The CCA Reasonably Rejected Johnson's Claims That Trial Counsel Were Ineffective in the Sentencing Phase.

Johnson asserts that his trial counsel were ineffective in conducting the sentencing phase of his trial. Pet. at 3–70.Specifically, he claims counsel were deficient in three ways. First, Johnson argues that his trial counsel failed to conduct a reasonable sentencing investigation. He faults counsel for not calling certain witnesses. And for the witnesses that counsel did call, Johnson suggests that they did not present enough information from them in the form of trial testimony. *Id.* at 15–43.

Second, Johnson argues that his trial counsel failed to properly prepare one of their called experts—Dr. Roache. *Id.* at 45–57. Johnson challenges trial counsel's decision not to allow Dr. Roache to interview him; he also takes issue with several other strategic decisions by his counsel relating to Dr. Roache— including not giving him a copy of Johnson's social history and not eliciting testimony from him to explain Johnson's drug addiction. *Id.* at 49–52.

34

Lastly, Johnson claims that trial counsel failed to hire an expert who would have explained how Johnson lacked mental health care and substance abuse treatment options prior to the murder. *Id.* at 59–61. Johnson claims that such an expert could have "countered the State's portrayal" of his failure to seek treatment, in addition to adding "context for the jury to explain how the inaccessibility of treatment exacerbates addiction." *Id.* at 61.

Johnson asserts that he was prejudiced by each of trial counsel's alleged deficiencies. But Johnson raised these ineffective assistance of trial counsel (IATC) claims during state habeas review—resulting in an evidentiary hearing where habeas counsel elicited testimony from several witnesses, including Johnson's trial team. *See* 1 SHCR at 36–41; 62–122; *see also generally* State Habeas Reporter's Record (SHRR). Johnson's claims were all denied. Johnson's present petition fails to show the CCA's decision denying him relief on these claims was unreasonable pursuant to 28 U.S.C. § 2254(d)(1)–(2). Thus, for the following reasons, Johnson's IATC claims must fail—and any requested relief by him should be denied.

## A.    *Strickland* standard under AEDPA

The familiar two-prong standard by which an IATC claim is weighed is set forth in *Strickland*. That is, to establish that counsel performed ineffectively, Johnson must show both that his attorneys' performance was deficient, and the

35

deficient performance prejudiced his defense. 466 U.S. at 687. Furthermore, because a convicted defendant must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Id*. at 697.

To establish that counsel's performance was constitutionally deficient, a convicted defendant must show that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In so doing, a convicted defendant must overcome a strong presumption that trial counsel's conduct fell within a wide range of reasonable professional assistance, and every effort must be made to eliminate the "distorting effect of hindsight." *Id*. at 689.

Nevertheless, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 692. To establish that he has sustained prejudice, Johnson "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id*. That requires a "substantial," not just "conceivable," likelihood of a different result. *Richter*, 562 U.S. at 112. Moreover, when evaluating prejudice, a reviewing court must "consider all the relevant evidence that the jury would have had before it if [the petitioner] had

36

pursued a different path—not just the . . . evidence [the petitioner] could have presented, but also the . . . evidence that almost certainly would have come in with it." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009).

Because Johnson's IATC claims were adjudicated on the merits by the state court, they must be reviewed under the "doubly deferential" standards of both *Strickland* and § 2254(d). *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing *Pinholster*, 563 U.S. at 190); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Such claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). In reviewing these claims, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standards, but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. In other words, the question to be asked in this case is not whether counsel's actions were reasonable, but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*. at 105.

### B.   Trial counsel conducted a reasonable investigation into Johnson's social history.

Johnson faults his trial counsel for failing to call several lay witnesses—and one expert witness—to testify about his social history during the punishment phase of trial. Specifically, he complains that these witnesses could

37

have explained "how Johnson came to suffer from" addiction and "how a seven-year[-]old child finds himself experimenting with drugs." Pet. at 13, 15–45. However—as shown below and throughout this pleading—trial counsel thoroughly investigated Johnson's social history, including his childhood and drug use. In fact, much of the testimony proffered in Johnson's petition is cumulative of what had already been presented to the jury. And even when Johnson puts forth more detailed testimony than what was at his trial, he fails to show that such testimony would have made a difference.

"Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and in the ultimate determination of whether the death penalty is an appropriate punishment." *Riley v. Cockrell*, 339 F.3d 308, 316 (5th Cir. 2003) (citation omitted). But *Strickland* does not require counsel "to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003). "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). To establish prejudice Johnson must that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

38

Further, contrary to Johnson's assertions, Pet. at 8–13, the Supreme Court has rejected the notion that the American Bar Association (ABA) Guidelines are an "inexorable command with which all capital defense counsel must fully comply" to be constitutionally effective. *Bobby v. Van Hook*, 558 U.S. 4, 17 (2009) (per curiam) (internal quotation marks omitted). The same is true of all state and private organization rules. Indeed, they are "free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Id.* (quotation omitted).

To be sure, the Supreme Court's decisions in *Strickland*, (*Terry*) *Williams*, *Wiggins*, and *Rompilla* all refer approvingly to the ABA Guidelines as a source for prevailing norms of practice. But these guidelines are not law. As the Court explained in *Strickland*:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like [] are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

*Strickland*, 466 U.S. at 488–89 (citations omitted).

39

### 1.    State habeas proceedings

Johnson challenged his trial counsel's investigation into his social history during state habeas review. 1 SHCR at 74–122. As part of his claim, Johnson attached several affidavits from lay witnesses. 1 SHCR at 320–91. He also included an affidavit from Dr. Celeste Henery. 1 SHCR at 239–59. Additionally, at the ensuing evidentiary hearing, Johnson called several of these same witnesses. Some of these witnesses had testified at his trial; some had not.

Ultimately, the trial court concluded that Johnson's trial counsel were not constitutionally ineffective on this point and that Johnson had not shown deficiency or prejudice. 2 SHCR at 972–73 (¶¶2.194–2.200). The CCA agreed. *Ex parte Johnson*, 2019 WL 4317046, at *3. In coming to this conclusion, the trial court reasoned that trial counsel conducted a thorough social history investigation. 2 SHCR at 933 (¶¶2.6–2.11). Further, the court noted that almost all of the testimony presented by Johnson in the state habeas proceeding was either cumulative of what had been presented at trial, speculative, or both. 2 SHCR at 934–92. Lastly, the court noted that the double-edged nature of the social history evidence, coupled with all the aggravating factors in Johnson's case, precluded a finding of prejudice. 2 SHCR at 932 (¶2.3), 933 (¶2.10–2.11), 972 (¶2.198). Johnson fails to show this decision was unreasonable. Rather, it is wholly supported by the record.

40

## 2. The defensive strategy

Johnson's trial counsel testified at the state habeas hearing. The defensive theory at the guilt phase of trial was that Johnson did not intend to kill Nancy Harris, as that was the best theory available. 3 SHRR 52, 59. Johnson's state of intoxication, if any, at the time of the offense was not a primary theme. 3 SHRR 60. The guilt-phase goal was "to get a possible lesser included—the lesser included of murder." 3 SHRR 198. The trial team presented evidence of addiction as part of the story but was "not trying an addiction case." 3 SHRR 61, 88, 172. The primary theme in the punishment phase was remorse, and trial counsel felt they had remorse "in spades." 3 SHRR 61, 173.

## 3. The mitigation investigation

The trial team's mitigation specialist—Brendan Ross—testified at the hearing. 4 SHRR 6. Ross prepared a social history for Johnson and provided it to the attorneys. 4 SHRR 34. She testified that the social history in Johnson's case was "quite voluminous." 4 SHRR 61. She met with Johnson's wife—Daphne Johnson, Johnson's mother—Alma Johnson, and other family members many times and a in frequent contact with the attorneys. 4 SHRR 62. Her role was to find witnesses and speak with them—and she spoke with almost everyone she was able to find. 3 SHRR 51, 129–30. She explained her method of conducting a mitigation investigation as "I just go until I can't go anymore," and she felt she

41

did that in this case. 4 SHRR 10, 65. Ross found that, for the most part, Johnson's family members were not good historians. 4 SHRR 64.

Ross would meet with prospective witnesses in person, by phone, and would sometimes attempt unannounced visits at homes. 4 SHRR 49–50. When she would attempt an unannounced visit, "doors were not opened." 4 SHRR 49–50. Despite her efforts, Ross "didn't feel like there was much mitigation" in Johnson's case. 4 SHRR 54–55. Johnson was not bullied. 4 SHRR 55. He was not brutalized. 4 SHRR 55. He grew up in a two-parent household. 4 SHRR 55. Moreover, she felt that the surveillance video of Johnson setting Harris on fire "was insurmountable." 4 SHRR 55. Still, Ross compiled a complete social history and sent it to Johnson's trial counsel. 4 SHRR 33–34.

### 4.   Trial counsel were not deficient.

Indeed, after a thorough mitigation investigation, trial counsel's strategy during punishment was remorse, not addiction. *See* 3 SHRR 71–72; *see also* Statement of the Facts, Section (II)(B)(3), *supra*. Trial counsel's selection of witnesses that would testify to support this defensive theory is the kind of "paradigmatic example" of strategic choice the case law counsels against second-guessing. *Cf. Hinton v. Alabama*, 571 U.S. 263, 275 (2014) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually

42

unchallengeable.'"( quoting *Strickland*, 466 U.S. at 690)). In fact, such decisions by counsel are "virtually unchallengeable." *Strickland*, 466 U.S. at 689–90; *see Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997) ("A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."). What is more, Johnson's counsel conducted—and presented—a robust mitigation investigation that included aspects of Johnson's childhood and his struggle with drug use. *See* Statement of the Facts, Section II(B)(1)–(2), *supra*. For these reasons, Johnson fails to show deficiency on the part of trial counsel relating to their mitigation investigation.

Still, Johnson claims that trial counsel should have done more to explain the "context" surrounding Johnson's drug addiction. Pet. at 13, 15–45. Johnson presents his preferred pathway for trial counsel's punishment case through the same affidavits he presented in state court. *See* DE 21-1–12, 14;[4] Pet. at 15–45. But in light of the record evidence of trial counsel's reasoned and meaningful mitigation investigation, Johnson's argument that counsel simply should have done *more* fails to entitle him to the relief he seeks. More than that, the testimony Johnson presents in his petition is cumulative of what was presented

---

[4] Johnson's attached affidavits will be referred to as "DE 21" followed by a dash indicating the specific exhibit within the ECF document. For example, Johnson's Exhibit 1 will be referenced as "DE 21-1."

at trial, unreliable, and, in some cases, harmful to him. Johnson's attached affidavits are addressed in turn.

"[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). Furthermore, the presentation of witness testimony is essentially strategy and, thus, within trial counsel's domain. *Alexander*, 775 F.2d at 602. A petitioner must overcome a strong presumption that his counsel's decision in not calling a particular witness was a strategic one. *Murray v. Maggio, Jr.*, 736 F.2d 279, 282 (5th Cir. 1984).

Daphne Johnson—Johnson's wife—testified at Johnson's punishment trial. *See* DE 21-1. The state habeas court was presented with her affidavit and found it to be cumulative and contradicting. 2 SHCR at (¶¶2.91–2.108). This determination was reasonable. As reflected in the record, Daphne Johnson's affidavit is clearly cumulative. For instance, Daphne states that—had she been asked—she would have testified: she knew Johnson since they were in the fifth grade; they started out as friends but began dating when they were in middle school; and they got married in 1994 when they were both nineteen years old.

44

DE 21-1 (¶5–6). But that all but mirrors her trial testimony. *See* 49 RR 184–85. Similarly, Daphne's affidavit mentions Johnson going on drug binges. DE 21-1 (¶20). But trial counsel asked her about Johnson's drug binges, and she described them for the jury. 49 RR 188–89. Similarly, Daphne's testimony in her affidavit concerning letters between her and Johnson, and Johnson's purchasing of winter coats for their girls, is cumulative. *Compare* DE 21-1 (¶¶22, 27) *with* 49 RR 193–95, 212–13. Johnson fails to show trial counsel were ineffective for not eliciting such testimony. *See Belmontes*, 558 U.S. at 22 (holding that adding cumulative evidence to "what was already there would have made little difference"); *Coble v. Quarterman*, 496 F.3d 430, 436–37 (5th Cir. 2007) (counsel not ineffective for failing to present witnesses that "would have presented testimony already provided by other witnesses").

Johnson's mother Alma Johnson, DE 21-2, did not testify at Johnson's trial. She had heart surgery three weeks before trial and was at home on bedrest. 3 SHRR 77; 5 SHRR 12–13, 42–43. She would have been able to testify only by deposition. DE 21-2 (¶22). When it became apparent that she would be unable to testify, trial counsel decided not to call her. 3 SHRR 78. Moreover, trial counsel did not find her to be a good historian. 3 SHRR 185. The state habeas court was presented with her affidavit and found that it was not compelling, in part, because her depiction of Johnson's harsh discipline was contradicted by other affidavits in the record. 2 SHCR at (¶2.39). This was

45

reasonable. *See* 21-5 (¶7) (Timothy Johnson—Johnson's brother—describing the punishment for a curfew violation as simply being locked out of the house). Further, her affidavit reflects  that she would have disagreed with the notion of Johnson having a hard childhood. For instance, her affidavit states that she disciplined Johnson, set a curfew, and prohibited alcohol and gambling in the house. *See* DE 21-2 (¶¶6, 10–11). Beyond that, in light of Johnson and other members of his family testifying, her testimony would have been cumulative. Trial counsel's "decision not to present cumulative evidence." *Gardner v. Davis*, 779 F. App'x 187, 193 (5th Cir. 2019), *cert. denied,* 140 S. Ct. 842 (2020).

Johnson's brother Anthony Johnson, DE 21-3, did not testify at trial. However, he did testify at Johnson's state habeas hearing. The state habeas court found his testimony to generally be that Johnson had a "poor but otherwise unremarkable childhood." 2 SHCR at 942 (¶2.56). Further the state habeas court found that much of Anthony's affidavit was speculative and full of hearsay. 2 SHCR at 943–44 (¶¶2.63–.64). Anthony was discharged from the Navy under less-than-honorable conditions and was later arrested for murder. 6 SHRR 58, 62–63. However, in some ways he was a good role model for Johnson. 6 SHRR 63. Still, the trial team chose not to call Anthony because they "felt he would be absolutely hostile and not have much information to offer in exchange for. . . his hostility." 3 SHRR 151; 4 SHRR 67. Anthony was angry with Johnson at the time of trial and blamed him for their mother's health problems.

46

3 SHRR 152. Trial counsel was concerned that his hostility would come across to the jury if he testified as a witness. 3 SHRR 152. More than that, the trial team determined that Anthony's testimony would not support the notion that Johnson had a hard childhood. In fact, Anthony reported that their "childhood was great, Mom was always there, [and] went to all the games." 3 SHRR 185. Indeed, Johnson's mitigation specialist held the view that Anthony's position was that he had a good upbringing with two parents and had nothing to complain about. 4 SHRR 69. Even in Johnson's state habeas hearing, Anthony held the opinion that he and Johnson had good childhoods. 5 SHRR 16. Johnson fails to show that trial counsel's decision not to call Anthony was deficient.

Stetron Mills, Johnson's cousin, DE 21-4, did not testify at trial or in the state habeas hearing. The state habeas court considered his affidavit and found that Mill's affidavit was speculative, and that he was in prison at the time of Johnson's trial. SHCR at 966–67 (¶¶2.164–.169). Mills's affidavit appears to support the idea that Johnson was introduced to marijuana at around the age of seven. DE 21-4 (¶7). But other than that, his affidavit is not necessarily helpful to Johnson. Indeed, large portions of his testimony do not even involve Johnson. *See* DE 21-4 (¶¶4, 5, 9, 13). Further, Mills was in prison at the time of Johnson's trial. DE 21-4 (¶13). Had he testified, he would likely have been impeached with one or more felony convictions. *See* Tex. R. Evid. 609(a). Johnson fails to show trial counsel were deficient for not calling Mills.

47

Johnson's brother Timothy Johnson, DE 21-5, testified at Johnson's punishment trial. He also testified at the state habeas hearing. The state habeas court found that Timothy Johnson's testimony was speculative, hearsay, and would not have changed the outcome of Johnson's trial. 2 SHCR at 969 (¶¶2.170–.181). Before trial, Johnson's mitigation specialist reached out to Timothy in two letters while Timothy was in TDCJ custody—but Timothy did not respond. 4 SHRR 46–48. Trial counsel felt that Timothy's testimony was valuable because he was "a little more honest" about the parenting style under which Johnson and his brothers grew up. 4 SHRR 68. For instance, Timothy explained at trial that Johnson kept to himself as a child, that the family did not talk about their feelings, and that Johnson used marijuana at a young age. 50 RR 72–75. Johnson fails to show how Timothy's affidavit adds anything to this testimony or would have furthered any defensive theme. To the contrary, at the state habeas hearing, Timothy testified that he never saw Johnson using crack or PCP. Instead, he only saw Johnson "high" three or four times. 4 SHRR 250–51. Johnson has not shown trial counsel were deficient for not eliciting additional testimony from Timothy Johnson.

Michael Henry, Johnson's best friend, DE 21-6, did not testify at trial. However, he testified at the state habeas hearing. The state habeas court found that Henry's affidavit was not compelling, in part because the last time Henry saw Johnson was in 2000. 2 SHCR at 963 (¶2.139). Ultimately, after reviewing

48

all of Henry's proffered testimony, the state habeas court found that trial counsel were not deficient for not presenting Henry as a witness. SHCR at 962–65 (¶¶2.137–.151). Trial counsel's mitigation specialist reached out to Henry by mail because he was in prison. 4 SHRR 43–44. Henry expressed his willingness to help Johnson, but trial counsel decided not to call him. This was due in large part to Henry's own conviction for capital murder. 3 SHRR 186; 4 SHRR 45. At the state habeas hearing, Henry acknowledged that he had two capital murder convictions—one for killing a man and a woman, and one for killing a child under six. 4 SHRR 204–05. Trial counsel was wary of the State making a "birds of a feather" argument and did not feel that Henry's testimony would have been beneficial to Johnson. 3 SHRR 187; *see also Gardner*, 779 Fed. App'x. at 193; *Mitchell*, 641 F.3d at 143. Further, both Henry's affidavit and his state habeas hearing testimony are not helpful to Johnson in any meaningful sense. For instance, according to his affidavit, the last time Henry saw Johnson was in 2000. DE 21-6 (¶17). And while Henry testified that, as a child, Johnson seemed "down," "quiet," and "preoccupied," he also acknowledged that there were times when Jonson was happy. 4 SHRR 177, 198. Johnson fails to show trial counsel were ineffective for not calling Henry.

Lashan Mills, DE 21-7, is Johnson's cousin. She did not testify at trial or at the state habeas hearing. The state habeas court found that Mills's proffered testimony was speculative and that she failed to show up for a meeting with the

49

defense. 2 SHCR at 960 (¶¶2.123–.126). Indeed, Johnson's mitigation specialist contacted and met with Mills. 4 SHRR 52. However, Mills proved to be unreliable by not showing up for a meeting with the attorneys. 4 SHRR 69. Mills's unreliability forecloses a finding of deficiency on the part of trial counsel. *See Dowthitt v. Johnson*, 230 F.3d 733, 749 (5th Cir. 2000) ("[C]ounsel's actions here would be characterized as reasonable trial strategy because they attempted to investigate Dowthitt's background and were thwarted by uncooperative potential witnesses").

Anthony Grimes, one of Johnson's friends, DE 21-8, did not testify at trial. However, he testified at the state habeas hearing. The state habeas court found that Grimes's proffered testimony did not reveal any material, new information. 2 SHCR at 939 (¶¶2.43–.46). And Johnson makes no mention of how Grimes's testimony would have added any context to his drug addiction. In fact, Grimes never saw Johnson doing crack cocaine. Instead, the most he could say was the he saw Johnson "smoking weed." 5 SHRR 57. Johnson has not shown trial counsel were deficient for not calling Grimes to testify.

Courtney Johnson, DE 21-9, was Johnson's sister-in-law and testified at Johnson's punishment trial. The state habeas court considered her proffered testimony and found a myriad of contradictions between her affidavit and trial testimony. 2 SHCR at 945–51 (¶¶2.68–.78). This is supported by the record. Courtney Johnson proved to be a bad witness, lacking in credibility. It is unclear

50

how having her testify more would have helped Johnson's jury contextualize the circumstances surrounding his drug use. For instance, she seemingly surprised trial counsel with her testimony during Johnson's punishment phase when she appeared to lie about going to the Kwik Kar the day Johnson go fired. 55 RR 120–21. She also denied calling the police and alleging that Johnson had pointed a gun at her. 50 RR 126–27. Even more, several statements in her affidavit contradict her trial testimony. For example, at trial, when asked about Johnson's personality, she said "[m]ost of the time he's happy and outgoing, just likes to be outside—I mean, positive person." 50 RR 113. But in her affidavit, she claims that "[a]s long as I have known [Johnson] he has been very quiet and one to stick to himself." She also stated in her affidavit that Johnson is a "loner." DE 21-9 (¶¶4–5). Johnson fails to show trial counsel were deficient for not presenting more testimony from Courtney Johnson.

Hazel Johnson, Johnson's mother–in–law, DE 21-10, testified at Johnson's punishment trial. The state habeas court considered her affidavit and found it to be cumulative of her trial testimony, as well as containing information harmful to Johnson. 2 SHCR at 959–60 (¶¶2.119–.122). Indeed, the record reflects that Hazel Johnson's affidavit is cumulative of her trial testimony. *See generally* DE 21-10. For instance, at trial, she generally testified that she had a close relationship with Johnson, that he had a good personality, that he was stressed about money, and that he is a good person that she loved.

51

50 RR 90–98. She also testified that her father had a problem with drug addiction, and that she saw and spoke with Johnson when he was high. 50 RR 91–93. In fact, the only new testimony she appears to provide is that Johnson stole things from her house. DE 21-10 (¶3). Evidently, trial counsel were able to keep that from the jury. *See Gardner*, 779 F. App'x at 193; *Mitchell*, 641 F.3d at 143. Thus, Johnson fails to show trial counsel were deficient for failing to elicit more testimony from Hazel Johnson.

Frances Wilson, DE 21-11, was Daphne Johnson's aunt and testified at Johnson's punishment trial. The state habeas court found that Wilson's affidavit was cumulative of her trial testimony and full of hearsay. 2 SHCR at 959 (¶¶2.113–.118). Her affidavit is also cumulative of her trial testimony. At trial, Wilson testified generally that she knew about Johnson's drug problem, noticed signs of depression in 2011, was concerned that Johnson might commit suicide  tried to help Johnson but did not have funds, and that Johnson loved his daughters and was a good father. 50 RR 99–109. In comparison, her affidavit shows generally that she encouraged Johnson to stop using drugs and that she was financially and emotionally supportive of him. DE 21-10 (¶¶3–7). Johnson has not shown that trial counsel were deficient in failing to elicit this cumulative testimony. *See Belmontes*, 558 U.S. at 22.

Makayi Johnson, DE 21-12, was Johnson's daughter and did not testify at trial. In her affidavit she states that she wanted to testify at Johnson's trial

"to talk about what he means to our family—that I want him to live so he can be there for me as I grow up." And that she "wanted to tell the jury that" her dad "is not a bad person, even though he did a terrible thing." DE 21-12 (¶6). The state habeas court found that trial counsel abided by Johnson's wishes in not calling his daughters to testify and that they were not deficient for not calling Makayi. 2 SHCR at 962 (¶¶2.135–.136). Indeed, trial counsel considered calling Johnson's daughters, but Johnson opposed it. 3 SHRR 154. Trial counsel's following of Johnson's wishes in this regard does not result in ineffective assistance. *See Dowthitt*, 230 F.3d at 748 (holding trial counsel may not be held ineffective for honoring his client's wishes that his family members not be interviewed or called to testify at trial as long as the client made an informed decision). The state habeas court also found that, to the extent Johnson claims that Makayi should have been allowed to testify about her love for him and her desire for him to live, such testimony is irrelevant to Johnson's own moral blameworthiness for robbing and murdering Nancy Harris by setting her on fire and leaving her to burn to death. *See* SHCR at 961 (¶2.129) (citing *Rhoades v. State*, 934 S.W.2d 113, 126) (Tex. Crim. App. 1996) (ruling that photographs of the defendant which depict a cheerful early childhood are irrelevant because such evidence has no relationship to his conduct). *But see Rhoades v. Davis*, 914 F.3d 357, 367 (5th Cir. 2019) (noting that photographs from defendant's childhood were relevant to defendant's character at the

penalty phase of his capital murder trial, but refusing to reach the question of whether Supreme Court precedent clearly establishes a specific legal rule requiring the admission of the photographs). Further, evidence that depends on mere sympathy or emotional response should not be considered in the jury's determination of the defendant's deathworthiness. *Prystash v. State*, 3 S.W.3d 522, 534 (Tex. Crim. App. 1999). In other words, the state habeas court found that trial counsel were not deficient for failing to offer inadmissible evidence in this regard. *See* 2 SHCR at 961 (¶¶2.129–.133). In the end, Johnson fails to show that trial counsel were deficient for failing to call Makayi Johnson.

Lastly, Johnson claims that trial counsel should have called expert such as Dr. Celeste Henery, DE 21-14 (affidavit of Dr. Henery), to talk about the significance of Johnson's social history. Pet. at 13. Johnson asserts that such expert testimony could have been used to "contextualize" and explain "the larger social and cultural frameworks in which Johnson grew up and lived his adult life." Pet. at 13, 32–43. But Johnson glosses over the record evidence reflecting trial counsel's retention of a similar expert—Dr. Kristi Compton. Dr. Compton was available to testify as a social historian or in a similar role. 3 SHRR 183; CR 4555–57. She was prepared to "discuss the psychological significance" of Johnson's history. 6 SHRR 130. Trial counsel provided Dr. Compton with everything they thought was relevant, including Johnson's medical records, jail records, and police interviews. 6 SHRR 130–31. However, trial counsel

ultimately chose not to call Dr. Compton to testify. 3 SHRR 86. At the state habeas hearing, counsel explained that this was part of her strategy for keeping the State's expert—Dr. Proctor—off the stand:

> Timothy Proctor was sitting in the front row and had been there throughout the punishment phase with his boxes of records that he had reviewed. I know he testifies very well in front of juries, and his testimony can be very damaging to the Defense. And I had a very intense, heated conversation with Dr. Compton and Brendan Ross in the hallway about whether or not it—we get more out of putting Compton on than we could lose by them putting Proctor on. Because we had the belief, nobody ever said so, but we had the belief that if we didn't put on Compton, the State wasn't going to put on Proctor. And we were ultimately right in that.

3 SHRR 154–55. This was sound strategy. As discussed in more detail below, Dr. Proctor's testimony would have been extremely damaging to Johnson. *See* Argument, Section I(C), *infra*. Trial counsel was not deficient for attempting to avoid it. *Gardner*, 779 F. App'x at 193; *Mitchell*, 641 F.3d at 143. Indeed, nothing in Dr. Henery's affidavit undermines trial counsel's explanation for refraining from presenting a social historian or other experts who had interviewed Johnson. *See* Argument, Section I(C), *infra*. In other words, had Dr. Henery testified at Johnson's trial, it would have led to the kind of rebuttal testimony trial counsel was attempting to avoid. Specifically, offering Dr. Henery's testimony would have allowed Dr. Proctor to interview Johnson—opening the door to Dr. Proctor's damaging testimony. Indeed, Dr. Henery interviewed Johnson. And that interview was an "essential" part in forming the "basis of"

55

her expert opinion. DE 21-14 (¶8); *See also infra* I(C); *Kansas v. Cheever*, 571 U.S. 87, 94 (2013) ("When a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him."; *Lagrone v. State*, 942 S.W.2d 602, 611 (Tex. Crim. App. 1997) ( allowing trial courts to "order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, *or plans to introduce*, its own future dangerousness expert testimony")(emphasis added).

This is not a case where trial counsel did not consult with a social historian at all. In fact, the social history expert trial counsel retained appeared adequately qualified to opine on matters of forensic psychology—even when compared to the expert Johnson proffers now. *Compare* CR 4555–57 (Dr. Compton's CV indicating she has Ph.D. in Clinical Psychology) *with* DE 21-14 (¶¶2–3) (Dr. Celeste Henery has a Ph.D in Anthropology). Johnson has not shown trial counsel were deficient for not calling Dr. Celeste Henery or a similar expert.

To be sure, some of the information contained in Johnson's attached affidavits may provide greater detail in some respects than the evidence present in the trial record. Still, as shown above, and contrary to Johnson's assertions, the evidence presented at trial travels much the same pathways and reaches

56

the same end—giving context to the circumstances leading to Johnson's murder of Nancy Harris. And Johnson's contention that there was other evidence that could have been presented—or that counsel should have focused more on Johnson's social circumstances or the genesis of his drug use—fails to establish deficient performance. *See Coble*, 496 F.3d at 436–37 (holding that a "desire to have a specific defense theory presented does not amount to ineffective assistance on federal habeas review"); *Dowthitt* 230 F.3d at 743 ("We must be particularly wary of argument[s] [that] essentially come[ ] down to a matter of degrees."). Moreover, because most—if not all—of the evidence Johnson provides now was presented at his trial his claim on this point fails. *See Belmontes*, 558 U.S. at 22; *Coble*, 496 F.3d at 436–37.

Even more, both in assessing counsel's strategy and prejudice, this Court must consider the evidence that counsel sought to avoid and that surely would have been elicited by the State during cross-examination. *See Strickland*, 466 U.S. at 699; *Belmontes,* 558 U.S. at 20. For instance, most of Johnson's proffered testimony relates to his upbringing and drug use—the kind of evidence trial counsel cannot be found deficient for avoiding. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (finding counsel's decision to not offer evidence of a defendant's troubled, impoverished, and disadvantaged background to be reasonable because the evidence was "double-edged" in that it "might suggest [that he], as a product of his environment, is likely to continue to be dangerous

57

in the future" (citation and internal quotation marks omitted)); *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003) ("As for the alcohol and drug abuse, this Court has repeatedly denied claims of ineffective assistance of counsel for failure to present 'double edged' evidence where counsel has made an informed decision not to present it.").

Johnson's assertions of deficiency on the part of trial counsel are fundamentally different from those in which the Supreme Court has found deficient performance. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (with a month to prepare before sentencing the attorney "had only one short meeting with [the defendant] regarding the penalty phase. He did not obtain any of [his] school, medical, or military service records or interview any members of [his] family"); *Rompilla*, 545 U.S. at 389 (finding deficient performance when defense lawyers failed to "to look at a file he kn[ew] the prosecution w[ould] cull for aggravating evidence . . . when the file [was] sitting in the trial courthouse, open for the asking"); *Wiggins*, 539 U.S. at 516–19 (trial counsel wholly failed to prepare a social history and ignored serious issues that required further investigation); *Williams*, 529 U.S. at 395 ("[T]rial counsel did not begin to prepare for [the punishment] phase of the proceeding until a week before the trial[,] .. . failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood, *not because of any strategic calculation* . . . [failed to] introduce

58

available evidence that [he] was 'borderline mentally retarded" and otherwise ignored readily available evidence.) (emphasis added).

As a result, Johnson fails to prove deficiency on the part of trial counsel for failing to adequately conduct a mitigation investigation. Nor can he show that the state court's decision regarding his claims was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(1)–(2).

> **5.  Even assuming trial counsel were deficient, Johnson is unable to prove prejudice given all the aggravating evidence before the jury and the double-edged nature of his social history and drug use evidence.**

Beyond his habeas evidence being cumulative of testimony already presented at his trial, Johnson is unable to prove prejudice stemming from the alleged deficiencies of trial counsel during the punishment phase. *See Riley*, 339 F.3d at 315.

Here, Johnson fails to balance his purportedly new evidence against all the aggravating evidence, including the brutal nature of the crime he committed. *See Belmontes,* 558 U.S. at 20; *Strickland*, 466 U.S. at 695. In other words, the sheer brutality of his crime, coupled with the aggravating evidence in his case prevents him from proving he was prejudiced by counsel's alleged

59

deficiencies. *See Vasquez v. Thaler*, 389 F. App'x 419, 428 (5th Cir. 2010) ("Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime."); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) (citing *Strickland*, 466 U.S. at 698) (recognizing when "evidence of future dangerousness" is "overwhelming. . . it is virtually impossible to establish prejudice"). As noted above, the aggravating evidence in Johnson's case was powerful. At the point of the punishment proceedings, the jury had seen surveillance video of Johnson dousing Nancy Harris in lighter fluid, robbing her, setting her on fire, and calmly walking out of the convenience store while Harris was burning to death and pleading for her life. 44 RR 49; SX #16–17; 54 RR 30–31. Additionally, the jury was presented with Johnson's extensive criminal history, which included instances of domestic violence, aggravated assault, fleeing from law enforcement, biting police officers, exposing his erect penis to a female hotel worker, and theft. *See* Statement of the Facts, Section II(A)(1), *supra*. Further, the jury heard of Johnson's violent and disruptive behavior while incarcerated where he split an inmate's head open, masturbated in front of a female guard, and threatened a detention officer. *See* Statement of the Facts, Section II(A)(2), *supra*. They also saw dashcam video of Harris burning alive, screaming and pleading for help. *See* Statement of Facts, Section II(C). Additionally, the jury heard testimony about how much pain Harris was

60

in at the hospital while suffering from severe burns for several days before she died. *See* Statement of the Facts, Section II(C), *supra*.

What is more, even if counsel had focused more on Johnson's social history and drug use, it is not clear that it would have aroused any more sympathy from the jury. *Pinholster*, 563 U.S. at 201 ("The new evidence relating to Pinholster's family—their more serious substance abuse, mental illness, and criminal problems—is also by no means clearly mitigating, as the jury might have concluded that Pinholster was simply beyond rehabilitation."). And even had a jury found increased evidence of Johnson's social history and drug use to be more mitigating than trial counsel's theme of remorse, such evidence would have been double-edged. *See Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) ("[A]ny evidence about Johnson's. . . abusive childhood, and drug and alcohol problems. . . could all be read by the jury to support, rather than detract, from his future dangerousness").

In the end, Johnson has not shown that the state court's decision regarding this claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Nor has he shown that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(1)–(2). Further, he has failed to rebut the presumptively correct factual determinations underlying the adjudication by

61

clear and convicting evidence. 28 U.S.C. § 2254(e)(1); *Valdez*, 274 F.3d at 948 n.11. For these reasons, this claim should be denied.

### C. Trial counsel properly prepared for Dr. Roache's testimony.

Johnson claims that trial counsel failed to prepare for and conduct the punishment phase testimony of Dr. Roache. Pet. at 45–58; DE 21-15. Specifically, Johnson takes issue with trial counsel's decisions to: (1) not to allow Dr. Roache to interview him; (2) not give Dr. Roache a copy of his social history; and (3) not elicit testimony to explain Johnson's addiction. Pet. at 49–52. Johnson raised this claim during state habeas review, and it was denied. 1 SHCR at 36–41. The state habeas court found no deficiency on the part of trial counsel in addition to finding that Johnson was not prejudiced. 2 SHCR at 912 (¶¶1.1–1.3). The CCA agreed. *Ex parte Johnson*, 2019 WL 4317046, at *3. Specifically, the state habeas court found trial counsel used sound strategy in (1) not allowing Dr. Roache to interview Johnson; (2) not providing Dr. Roache a copy of Johnson's social history; and (3) in presenting Dr. Roache's testimony. *See* SHCR at 912–20 (¶¶1.7–.39). Johnson fails to show this determination was unreasonable as it is supported by the record.

First, Johnson takes issue with trial counsel's decision not to allow Dr. Roache to interview him. Pet. at 46, 48. But trial counsel's decision not to allow Dr. Roache to interview Johnson was a strategic choice. Indeed, trial counsel did not hire Dr. Roache to diagnose Johnson or to testify about whether or not

he was intoxicated at the time of offense. 3 SHRR 90. Instead, trial counsel's strategy was to use Dr. Roache to "educate" the jury on addiction. 3 SHRR 156.

> I did not want anybody to interview [Johnson], because I didn't' want the State to bring in their expert to interview [him]. Because they would have brought in Dr. Proctor, who would have said he wasn't addicted, he's just a psychopath, or whatever he wanted to call him.

3 SHRR 101. Trial counsel told Dr. Roache that she "had legal strategy reasons" for not wanting him to interview Johnson. 3 SHRR 160. Indeed, trial counsel's strategy proved to be a wise one. Had Dr. Roache interviewed Johnson, the State would have been able to have had him examined by one of their experts. *See Cheever*, 571 U.S. at 94. In fact, the State had noticed Dr. Proctor as an expert in forensic psychology. CR 4471. At the state habeas hearing, Dr. Proctor previewed what his testimony would have been like at Johnson's trial—had Dr. Roache interviewed Johnson—by opining that Johnson had antisocial personality disorder. 7 SHRR 33.[5] As for psychopathy, Johnson scored a 26 out of a possible 40 on the Hare psychopathy checklist. The cutoff is 30. 7 SHRR 39. Compared to other inmates, that puts Johnson in the 67th percentile for psychopathy. 7 SHRR 39. Dr. Proctor "wouldn't say [Johnson] has psychopathy," but noted that, "it is an elevated score" that "highlights numerous antisocial

---

[5] Dr. Proctor was unable to interview Johnson until April 9, 2018, in connection with the state habeas hearing. When state habeas counsel had Johnson interviewed, the State rehired Dr. Proctor. *See* 7 SHRR 15, 71.

personality traits, which are consisted with antisocial personality disorder." 7
SHRR 40.

But because of trial counsel's strategic choice, Dr. Proctor did not get to
interview Johnson at the time of trial. *See* 7 SHRR 14–15 (Dr. Proctor stating
he "didn't have access to [Johnson] because the defense did not put on an expert
witness in mental health who had evaluated him"). As a result, none of this
testimony was presented to the jury.

Especially damaging to Johnson would have been Dr. Proctor's testimony
undercutting the link between Johnson's drug use and violence:

> [Johnson's] criminal behavior is not solely driven by his drug
> use. His antisocial personality drives a lot of the decisions he makes,
> in terms of breaking rules, thrill seeking, need for stimulation,
> being bored, being willing to take actions that are potentially
> harmful to himself or other, including substance abuse.

7 SHRR 43. In other words, according to Dr. Proctor, some of Johnson's behavior
is related to his substance abuse disorder, but not all of it is. 7 SHRR 116–17.
This testimony would have been credible to a jury and harmful to Johnson's
case. Indeed, the fact that Johnson's rule breaking behavior has continued
despite his substance abuse remission due to incarceration supports Dr.
Proctor's opinion that Johnson's behavior is driven by more than drug use. 7
SHRR 163–64. Indeed, state habeas counsel were not effective in rebutting Dr.
Proctor's testimony with their own expert. *See* 8 SHRR 55, 66–69. This, despite
the fact that the state habeas counsel's expert had a two-month recess to rebut

64

Dr. Proctor. See 7 SHRR 3, 5 (Dr. Proctor testifying on August 2, 2018); 8 SHRR 3, 7 (Dr. Rosenstein testifying on October 18, 2018). In light of this, trial counsel's decision to avoid Dr. Proctor's testimony rather than attempt to rebut it seems even more prudent. Johnson fails to rebut the presumption that trial counsel acted with sound strategy in not having Dr. Roache interview Johnson. Johnson's claim on this point fails.

Second, Johnson complains that trial counsel were ineffective for failing to give Dr. Roache a copy of his social history and for not letting him view a copy of the police car video. Pet. at 47. Regarding the social history, trial counsel explained her strategy during the state habeas hearing:

> I wasn't asking him to diagnose [Johnson], and I wasn't asking him to talk about whether or not he was intoxicated at the time of the offense. I was asking him to explain the diagnoses that we already had in the records.

> We had a very unique situation in this case, and this is why I made the decision not to put somebody who had interviewed him. Because we had medical records that were, like, I think, a month or two before the offense that diagnoses addiction, that diagnose depression records made before [Johnson] had any kind of motivation to exaggerate or lie about his symptoms. So, I thought that was—that was a gift. That was a gold mine, because that enabled me to get addiction and depression out without actually having somebody come in and talk to [Johnson]. And that way—we could keep the State from talking to [Johnson].

3 SHRR 102–03. Trial counsel also explained that she is always "reluctant to turn over the social history to experts because I like it to be compiled with the good, the bad, and the ugly." 3 SHRR 159. She noted that if she gives a social

history document to an expert then she is "basically giving it to the State." 3 SHRR 159; *see also* Tex. R. Evid. 705(a)–(b). Thus, she preferred to orally tell her experts information. 3 SHRR 159. Indeed, trial counsel gave Dr. Roache an oral summary of Johnson's social history, including that he had "been using drugs from a very early age, that his family used drugs, that he had relatives who were addicted, and a father who was an alcoholic." 3 SHRR 105. Again, Johnson fails to show trial counsel was constitutionally deficient in utilizing this presumptively sound strategy. Further, Johnson's claim that trial counsel did not allow Dr. Roache to view an in-store video of Johnson at the time of the incident is not supported by the record. Pet. at 46; DE 21-15 (¶7). Trial counsel testified that had Dr. Roache wished to see the in-store video of the offense taking place, she would have allowed him to see it. 3 SHRR 100. The trial court found her testimony credible, 2 SHCR at 918 (¶1.32), and Johnson fails to undermine that determination with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are virtually unreviewable by the federal courts." *Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005). (internal quotation marks and citations omitted).

Lastly, Johnson argues that trial counsel were ineffective for failing to elicit testimony explaining Johnson's addiction. Pet. at 49–52. But the record refutes this claim. Trial counsel testified that she wanted to get Dr. Roache "off

the stand pretty quickly." 3 SHRR 172. Not only did Dr. Roache have a flight to catch, but trial counsel felt that his testimony was "kind of dry and academic." 3 SHRR 172. And she "didn't really feel the jury responding to it." 3 SHRR 172. Thus, she did not go into more detail "on a lot of things." 3 SHRR 172. Indeed, the testimony presented by Dr. Roache during the state habeas hearing was exceedingly academic:

> Okay. So it's—this is the same sort of clay model of the brain with the red arrows you're still seeing there. But because these—the brain—the neurocircuits of the brain are interconnected, there are other areas of the brain that are involved and activated as part of the overall pattern of brain-reward-motivated behavior and what's called executive control circuits.
>
> ***
>
> So what's involved in this process is you have the inhibitory control from the higher cortical centers, the prefrontal cortex, and through—and that's called the PFC—and the anterior cingulate gyrus.
>
> ***
>
> That's the orbital frontal cortex, OFC. And the area of the brain termed SCC—I'm blanking on that what that stands for at that moment—but that's subcortical, subconscious, sort of the urge or impulse. And then there's memory learning circuits that are important, and that's the amygdala and hippocampus. And that's shown on the diagram as A-m-y-g and H-i-p-p. And those are—in trying—the brain, trying to decide should I or shouldn't I, you know, in any moment in time is getting inputs from all these different brain areas in either activating or inhibiting the go or no-go.

5 SHRR 97–98. It is unclear from Johnson's petition how such testimony would have helped the jury understand Johnson's addiction any better than the lay witnesses trial counsel presented. What is more, during his trial testimony, Dr. Roache referred to Johnson having antisocial personality disorder. *See* 50 RR

14, 47–48, 55. This further prompted trial counsel to "get him off the stand." 3 SHRR 175.

Setting all that aside, addiction was not the primary defensive theme in Johnson's punishment trial—remorse was. *See* Argument, Section I(B)(2), *supra*. In fact, most of Johnson's criminal history is comprised of assaultive offenses, not drug offenses. *See* 49 RR 100–08; Statement of Facts, Section II(A)(1)–(2), *supra*; 6 SHRR 164–67.[6] Given the dearth of drug-related offenses on Johnson's record, remorse was an equally—if not more—appropriate defensive theme than addiction was. To that end, Johnson's claim that counsel should have focused more on addiction fails to rebut their presumptively valid trial strategy.

Beyond that, Johnson fails to show any prejudice resulting from trial counsel's alleged deficiencies in preparing and eliciting testimony from Dr. Roache. *See* Argument, Section I(B)(5), *supra*. That is because the evidence of Johnson's drug use and addiction is cumulative, double-edged, and fails in light of the overwhelming aggravating evidence in this case. *See* Argument, Section I(B)(5), *supra*.

---

[6] In the litany of encounters Johnson had with law enforcement, the record shows Johnson was only charged with possession once, and it was marijuana. *See* 49 RR 102; Statement of Facts, Section II(A)(2), *supra*. Nowhere does the record reflect Johnson was ever in possession of crack cocaine or PCP when encountered by police.

Johnson has not shown that the state court's decision regarding this claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Nor has he shown that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(1)–(2). Further, he has failed to rebut the presumptively correct factual determinations underlying the adjudication by clear and convicting evidence. 28 U.S.C. § 2254(e)(1); *Valdez*, 274 F.3d at 948 n.11. For those reasons, this claim should be denied.

### D.   Trial counsel consulted with an expert regarding the unavailability of mental health care and substance abuse treatment.

Finally, Johnson urges that trial counsel were ineffective for failing to hire an expert to explain how Johnson lacked treatment options for his mental health and substance abuse issues. Pet. at 59–61. He posits that trial counsel should have called Dr. King Davis, DE 21-16,[7] or a similar expert to testify to this effect. Pet. at 61–70. Again, Johnson raised this claim during state habeas review. 1 SHCR at 62–74. He was denied relief. 2 SHCR at 931 (¶1.87); *Ex parte Johnson*, 2019 WL 4317046, at *3. In reviewing Dr. Davis's affidavit, the state

---

[7] Dr. Davis's witness statement contains no statement that he would have testified if asked. DE 21–6. Accordingly, this statement fails to support a claim of IATC. *Day,* F.3d at 538.

habeas court found that Dr. Davis's proffered testimony did not further trial counsel's selected and strategic theme of remorse. 2 SHCR at 930 (¶1.79). Further, Dr. Davis's affidavit had key omissions relating to Johnson's access to drug treatment, undercutting his credibility; and even if he had testified, such testimony would not  have made a difference in light of all the aggravating circumstances in Johnson's case. 2 SHCR at 930 (¶¶1.81–.88). This decision was reasonable based on the record.

Trial counsel talked to Dr. Roache about testifying regarding treatment availability. 3 SHRR 161. But as mentioned above, during Dr. Roache's testimony, trial counsel made the strategic choice to get him off the stand quickly. Further, the defensive them was remorse, not addiction. 3 SHRR 60–61. Johnson fails to show how Dr. Davis's affidavit would have furthered trial counsel's chosen theme. *See* DE 21-16; Pet. at 59–70.

But the most glaring problem with Dr. Davis's affidavit is that it ignores the fact that Johnson went to inpatient drug and alcohol treatment. For example, Johnson testified that he went to inpatient treatment at Summer Sky. 50 RR 60–61. This appears nowhere in Dr. Davis's affidavit, *see generally* DE 21-16, despite the fact that a "Summer Sky Certificate" is plainly part of the materials Dr. Davis reviewed. *See* DE 21-16 at 47. Further, Dr. Davis does not appear to acknowledge Johnson's probation history and its requirements. *See generally* DE 21-16. Indeed, in July of 1999, Johnson had to attend Alcohol

Anonymous meetings and undergo outpatient treatment per the terms and conditions of his felony probation. SX #169; 55 RR 166. Thus, it is evident from the record that between Summer Sky and felony probation, Johnson had drug treatment opportunities that Dr. Davis fails to acknowledge and that would have undermined his testimony.

Putting all that aside, Johnson is unable to prove prejudice. After all, the aggravating evidence in this case was powerful. And the brutality of Johnson's crime was evident from surveillance video showing him setting Harris on fire; with her burning to death and screaming for help while Johnson calmly walked away. Dr. Davis's testimony regarding the size of the uninsured population, general levels of health literacy, and the impact of HB 2292, would not likely have swayed the jury from sentencing Johnson to death after seeing and hearing such evidence. *See* DE 21-16. In other words, there is no reasonable probability that, but for counsel's alleged unprofessional errors, the result of Johnson's punishment proceeding would have been different. *Strickland*, 466 U.S. at 694.

In the end, Johnson has not shown that the state court's decision regarding his IATC claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Nor has he shown that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the

71

state court proceedings. 28 U.S.C. § 2254(d)(1)–(2). Further, he has failed to rebut the presumptively correct factual determinations underlying the adjudication by clear and convicting evidence. 28 U.S.C. § 2254(e)(1). Accordingly, these claims and any requested relief should be denied.

## II.    Johnson's Claims Challenging Texas's Death Penalty Statute Are Foreclosed by Precedent.

Johnson's next set of claims take aim at the constitutionality of Texas's death penalty statute. Specifically, Johnson argues that: (1) the future dangerousness special issue is vague; (2) the mitigation special issue lacks a burden of proof; and (3) Texas's "10-12" rule misleads jurors. Pet. at 70–85. But because clearly established federal law forecloses Johnson's claims, his requested relief should be denied.

### A.    The future dangerousness special issue is not unconstitutionally vague

Johnson asserts that Texas's future dangerousness special issue—Article 37.071, Section 2(b)(1) of the Texas Code of Criminal Procedure—is unconstitutionally vague because it fails to define the terms "probability" and "criminal acts of violence." Pet. at 70–82. Johnsons raised this claim on direct appeal. Johnson's Br. at 140. He also raised it on state habeas. 1 SHCR at 164–68. On state habeas review, the CCA held that Johnson's claim on this point was procedurally barred, because it had been raised and rejected on direct

72

appeal. *Ex parte Johnson*, 2019 WL 4317046, at *2 (citing *Ex parte Hood*, 304 S.W.3d 397, 402 n.21 (Tex. Crim. App. 2010)). On direct appeal, the CCA held that they had previously considered—and rejected—Johnson's argument relating to Article 37.071 and overruled his point of error. *Johnson*, 2015 WL 7354609, at *36. In like manner, Johnson's claim fails here, as it is foreclosed by both state and federal law.

Johnson argues that the term "probability" is so vague that it fails to serve a narrowing function on the class of people who will be found to be a future danger. Pet. at 72. Namely, he argues that the ordinary meaning of the term "probability" will lead to the answer to the future dangerousness question "always" being yes. Pet. at 72. But the CCA has repeatedly rejected this argument. *See, e.g.*, *Russeau v. State*, 291 S.W.3d 426, 434 (Tex. Crim. App. 2009) (holding that the trial court did not violate the defendant's due process rights in failing to define "probability," where the defendant argued that, "in common usage, the term 'probability' can mean 'any possibility'" and "'a juror would have been compelled to answer the first special issue 'yes' if [he was] convinced that there was even the remotest probability of future violence by appellant'"). Similarly, Johnson's claim that the term "criminal acts of violence" is unconstitutionally vague has been rejected. "The phrase 'criminal acts of violence', as used in the first special issue, is not unconstitutionally vague and need not be defined for the jury." *Russeau*, 291 S.W.3d at 434 (citing *Saldano v.*

73

*State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007) and *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007)); *see also Milton v. Procunier*, 744 F.2d 1091, 1095 (5th Cir. 1984) ("Under Texas law, these terms are sufficiently common that their definition is not required in a jury charge under the capital murder statute.").

Indeed, the future dangerousness special issue in the Texas capital punishment scheme has been repeatedly upheld by the Supreme Court against similar challenges. *See Jurek v. Texas*, 428 U.S. 262, 274–76 (1976); *see also Pulley v. Harris*, 465 U.S. 37, 49 n.10 (1984) (stating that Texas's punishment issues are not impermissibly vague because they have a "common sense core of meaning"). The Fifth Circuit has likewise repeatedly rejected claims complaining that these terms were not defined. *Sprouse v. Stephens*, 748 F.3d 609, 622–23 (5th Cir. 2014) (citing *Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. 2007)); *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (finding that the terms used in the future dangerousness special issue "'have a plain meaning of sufficient content that the discretion left to the jury [is] no more than that inherent in the jury system itself'") (citation omitted); *Hughes v. Johnson*, 191 F.3d 607, 615–16 (5th Cir. 1999). Johnson does not attempt to distinguish his case from the well-settled precedent above.

As a corollary to this adjudicated claim, Johnson argues that *Barefoot v. Estelle*, 463 U.S. 880 (1983) should be overturned. Pet. at 74–80. But this claim

74

was not presented to the state court; thus, it is unexhausted and procedurally defaulted. 1 SHCR at 164–68. Johnson does not argue cause or prejudice for the default or prejudice resulting from the alleged violation of federal law. Nor does he demonstrate that failure to consider this claim will result in a fundamental miscarriage of justice. Pet. at 74–80; *see Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Thus, Johnson's claim is procedurally barred from federal habeas review. Still the Fifth Circuit has repeatedly declined other invitations to revisit the validity of *Barefoot*. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002); *Tigner v. Cockrell*, 264 F.3d 521, 526-27 (5th Cir.2001) ("We decline Tigner's invitation to undercut *Barefoot*, because to do so on collateral review would constitute a new rule in violation of *Teague's* non-retroactivity principle"). And Johnson cites no compelling case law indicating that this Court should hold any differently. Pet. at 74–80. Beyond being barred, Johnson's claim on this point should be denied.

In like manner, Johnson's argument relating to *Johnson v. Mississippi*, 486 U.S. 578 (1988), Pet. at 81–82, is unexhausted and procedurally defaulted, as he did not present it in state court. 1 SHCR at 164–68. Even so, this claim is equally unavailing. Essentially, Johnson appears to argue that a court should re-evaluate his future dangerousness based on his post-trial behavior. Pet. at 81–82. But this claim runs counter to the non-retroactivity principle of *Teague*. Indeed, Johnson points to no Supreme Court case holding that a death-row

75

inmate is entitled to another future dangerousness determination several years after sentencing. *See Hughes v. Dretke*, 160 F. App'x. 431, 437 (5th Cir. 2006) (finding that reasonable jurists would not debate whether the denial of relief would be appropriate when an inmate argues that "post hoc proof of good behavior in prison and a defendant's advanced age are sufficient reasons to set aside a jury verdict"); *see also Bible v. Stephens*, 640 Fed. Appx. 350, 355 (5th Cir. 2016)(unpublished) (concurring with the district court's holding that there is no clearly established law entitling a death–row inmate to another future dangerousness determination after his sentencing and that to require such an evaluation would be creating a 'new rule' of constitutional law") (quoting *Bible v. Stephens*, No. 4:13-CV-200, 2014 WL 5500722, at *10 (S.D. Tex. Oct. 30, 2014)). Put plainly, because Johnson's claim on this point is both procedurally barred and *Teague*–barred, any requested relief should be denied.

In the end, Johnson fails to show that the state court's decision denying his vagueness claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). Accordingly, this claim and any requested relief by Johnson should be denied.

**B.    No clearly established federal law requires that Texas's mitigation special issue be assigned a burden of proof.**

Next, Johnson argues that Article 37.071 of the Texas Code of Criminal Procedure violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002),[8] because the statute fails to assign the State a burden of proof regarding the mitigation special issue. Pet. at 82–85. He raised this claim on direct appeal, Johnson's Br. at 138–39, and his point of error was overruled. *Johnson*, 2015 WL 7354609, at *36; *see, e.g, Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007). His claims should fare no better in this federal forum.

Johnson's claim that Texas's capital punishment scheme violates the Constitution because the mitigation special issue does not allocate a burden of proof has been rejected by the Fifth Circuit. *See Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005) ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof.").

---

[8] In *Apprendi*, the Supreme Court held the Sixth Amendment and due process require: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. The Court thus invalidated as a violation of the Fourteenth Amendment a New Jersey state hate crime statute that authorized an increase in the defendant's maximum prison sentence based on the judge's finding by a preponderance of evidence that the defendant acted with the purpose to intimidate the victim based on particular characteristics of the victim. *Id.* at 491–93. The Supreme Court relied on *Apprendi* in *Ring* to overrule part of Arizona's capital sentencing scheme, which had provided that trial judges determine the presence or absence of aggravating factors required by Arizona law for imposition of the death penalty. *Ring*, 536 U.S. at 609.

Since *Rowell* was decided, the Fifth Circuit has repeatedly held that claims regarding the failure to assign either party the burden of proof on the mitigation special issue are meritless. *See Thompson v. Davis*, 916 F.3d 444, 462 (5th Cir. 2019); *Blue v. Thaler*, 665 F.3d 647, 668 (5th Cir. 2011); *Druery v. Thaler*, 647 F.3d 535, 546 (5th Cir. 2011); *see also Avila v. Quarterman*, 560 F.3d 299, 315 (5th Cir. 2009) (the Fifth Circuit observing that it is "bound by" its precedent on this issue).

And while Johnson asserts that the CCA's determination runs counter to *Apprendi*, 530 U.S. 466, and *Ring*, 536 U.S. 584, Pet. at 82–85, the Fifth Circuit has "expressly rejected that argument." *Sprouse*, 748 F.3d at 623; *see also Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir .2007) ("We have specifically held that the Texas death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances."); *Granados v. Quarterman*, 455 F.3d 529, 536 (5th Cir. 2006) (nothing that while "the [S]tate was required to prove beyond a reasonable doubt every finding prerequisite to exposing [the defendant] to the maximum penalty of death. . . a finding of mitigating circumstances *reduces* a sentence from death, rather than *increasing* it to death.") (emphasis added).

In fact, Johnson's requested relief would require this Court to extend Supreme Court case law to require that the Texas mitigation issue be assigned

a burden of proof. Pet. at 84–85. That is something non-retroactivity forbids. *See Broadnax v. Lumpkin*, 987 F.3d 400, 415 (5th Cir. 2021) (stating federal courts are prohibited from making new rules of criminal procedure in habeas corpus review of final state convictions) (citing *Teague v. Lane*, 489 U.S. 288, 299–310 (1989)); *Rowell*, 398 F.3d at 378. Johnson's arguments fall flat when faced with the case law. The CCA's denial of this claim was reasonable and federal habeas relief should be denied.

### C. The trial court was not required to instruct the jury that a "No" vote by a single juror on the first special issue, or a "Yes" vote by a single juror on the second special issue, would result in a life sentence instead of death.

In Johnson's final challenge to Texas's death penalty statute, he attacks what "is commonly known as the '10-12' rule." *Blue*, 665 F.3d at 669 (citations omitted). Essentially, he argues that he trial court violated the Eighth and Fourteenth Amendments by failing to instruct the jury that a "No" vote by a single juror on the first special issue, or a "Yes" vote by a single juror on the second special issue, would result in a life sentence instead of death. Pet. at 85–88.

As an initial matter, this claim is procedurally defaulted and precluded from federal habeas review. Johnson raised this claim on state habeas. 1 SHCR at 152–58. The CCA found that it was procedurally barred because Johnson should have raised it on direct appeal. *See Ex parte Johnson*, 2019 WL 4317046,

at *2 (citing *Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004)). The Texas rule procedurally barring claims that should have been, but were not, raised on direct appeal is an adequate and independent ground barring federal habeas review of the claim. *See Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005); *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004). Johnson does not attempt to argue cause for the default or prejudice resulting from the alleged violation of federal law. Nor does he demonstrate that failure to consider this claim will result in a fundamental miscarriage of justice. Pet. at 85–88; *see Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Thus, Johnson's claim is procedurally barred from federal habeas review.

In addition to being procedurally defaulted, the state habeas court denied this claim on the merits. 2 SHCR 992–95 (¶6–6.17). And Johnson fails to show that this decision was unreasonable. *See Busby v. Dretke, 359 F.3d 708, 721* n.14 (5th Cir. 2004) ("That the state habeas court also invoked a procedural bar as an alternative basis to deny relief does not deprive the state of the benefit of AEDPA's deferential standard."). Indeed, Johnson's claim on this point plainly runs counter to the case law. For instance, Johnson premises his arguments on *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994), which held that when "the alternative sentence to death is life without parole. . . due process plainly requires that [the defendant] be allowed to bring [parole ineligibility] to the jury's attention by way of argument by defense counsel or an instruction from

the court." Nowhere in Johnson's petition does he allege that the jury was unaware that he would be given life without parole if he did not receive the death penalty. In fact, the record would refute such a claim if raised. *See* CR 4514 ("You are instructed that the punishment for the offense of capital murder is either confinement in the Institutional Division of [TDCJ] for life without parole or death."). Instead, Johnson attempts to expand the limited holding in *Simmons* to be a blanket challenge to Texas's "10-12" rule. Again, that is something this Court cannot do. *See Broadnax*, 987 F.3d at 415; *Teague*, 489 U.S. at 299–310; *Blue*, 665 F.3d at 669. Indeed, Johnson cites no clearly established federal law—as stated by the Supreme Court—holding the Fourteenth Amendment's Due Process Clause requires capital sentencing juries at the time of his capital murder trial to be informed of the impact of a single holdout juror on any of the Texas capital sentencing special issues. In fact, there is none. *See Young v. Davis*, 835 F.3d 520, 528 (5th Cir. 2016) ("[T]he Supreme Court has never suggested that *Simmons* requires informing jurors of the consequences of a breakdown in deliberations").

To the contrary, the Supreme Court has implicitly rejected Johnson's argument. *See Jones v. United States* 527 U.S. 373, 382, 119 (1999) (holding the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the

81

effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death). And the Fifth Circuit has expressly rejected similar challenges in their denial of a certificate of appealability (COA). *See Blue*, 665 F.3d at 669 (rejecting an Eight Amendment challenge to the Texas's 10-12 rule); *Hughes v. Dretke*, 412 F.3d 582, 594–95 (5th Cir. 2005) (rejecting a Fourteenth and Eighth Amendment challenge to Texas's 10-12 rule and noting "no clearly established federal law calls into doubt the Texas death penalty statute"); *Alexander v. Johnson*, 211 F.3d 895, 897–98 (5th Cir. 2000) (holding the *Teague* non-retroactivity doctrine precluded applying such a rule in a federal habeas context).

In the end, Johnson's claim challenging Texas's 10-12 rule is (1) procedurally barred by an independent and adequate state law ground; (2) barred by the *Teague* non-retroactivity principle; and (3) without merit. Even if it can be heard on the merits, Johnson fails to show the state court's decision denying this claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). Accordingly, this claim and any requested relief by Johnson should be denied.

82

### III.   Johnson Fails to Show He Was Selectively Prosecuted.

In the final portion of his petition, Johnson argues that Texas's death penalty scheme is unconstitutional because it results in "arbitrary" death sentences that are based more on race and geography than the egregiousness of the crime. Pet. at 95–99. Namely, he complains that "prosecutorial discretion results in a disproportionate number of black defendants whose victims are white being sentenced to death" and "four counties out of [ ] 254" account for half of Texas's death sentences. Pet. at 98–99. But this claim is procedurally barred and foreclosed from federal review. Additionally, the new pieces of evidence Johnson attaches in support of this claim cannot be introduced in this forum. But even setting all that aside, Johnson fails to show that the decisionmakers in his case acted with a discriminatory purpose.

First, this claim is procedurally defaulted. Johnson raised this claim on state habeas. 1 SHCR at 169–78. The CCA found that it was procedurally barred because Johnson should have raised it on direct appeal. *See Ex parte Johnson*, 2019 WL 4317046, at *2 (citing *Ex parte Nelson*, 137 S.W.3d at 667); *see also Aguilar*, 428 F.3d at 535; *Busby*, 359 F.3d at 719. Johnson does not attempt to argue cause for the default or prejudice resulting from the alleged violation of federal law. Nor does he demonstrate that failure to consider this claim will result in a fundamental miscarriage of justice. Pet. at 95–99; *see Coleman*, 501 U.S. at 750. Thus, Johnson's claim is procedurally barred from federal habeas

83

review. In addition to being procedurally defaulted, the state habeas court denied this claim on the merits. 2 SHCR 998–99 (¶9–9.11). And Johnson fails to show that this decision was unreasonable. *See Busby* at 721 n.14.

Because his claim was also denied on the merits, Johnson's attached DE-18 (identifying the races and counties of Texas defendants sentenced to death since January 1, 2000, and the races of their victims), Pet. at 90, is barred from consideration by *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "Th[e] backward-looking language [of § 2254(d)] requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the same time i.e., the record before the state court. . . .Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did." *Pinholster*, 563 U.S. at 182. To this end, Johnson cannot prove that the state court unreasonably adjudicated exhausted claims with arguments and evidence that were not presented in state court. Similarly, several of the studies Johnson cites were not presented on state habeas, and thus not part of the record before the state court. *See* Pet. at 89 n. 9, 10; Pet. at 96 n. 14.[9]

---

[9] The Director has attempted to note which pieces of evidence are barred under *Pinholster* in Johnson's present pleading. However, to the extent this list is not exhaustive of all the newly presented evidence contained in Johnson's petition, the Director asserts that any and all evidence not presented in state court is foreclosed from consideration in this proceeding and reserves the right to argue as much in future pleadings.

That said, even considering DE-18, Johnson's claim fails. To demonstrate selective prosecution, Johnson must show that the prosecution "'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). This requires a showing (1) that "similarly situated individuals" outside the protected group were not prosecuted, and (2) that the decision to prosecute was "invidious or in bad faith, in that it rests on such impermissible considerations as race, religion, or the desire to prevent his exercise of his constitutional rights." *United States v. Webster*, 162 F.3d 308, 333–34 (1998) (citing *United States v. Sparks*, 2 F.3d 574, 580 (5th Cir. 1993)).

Further, "the defendant must rebut the presumption that the government made its decision to prosecute in good faith and in a nondiscriminatory manner." *Webster*, 162 F.3d at 334. Indeed, "[t]he decision to prosecute one person instead of another is a proper exercise of executive discretion . . . and [the courts are] 'both reluctant and restricted in any review of prosecutorial decisions.'" *United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984) (citations omitted). "Thus, a defendant 'bear[s] a very heavy burden in demonstrating invidious purpose which invades or overrides that prosecutorial discretion.'" *Hoover*, 727 F.2d at 389 (quoting *United States v. Greene*, 697 F.2d 1229, 1235 (5th Cir. 1983)).

Johnson's claim is rooted in what he perceives to be disparities in how the death penalty is sought based on factors such as race and geography. Pet. at 95–99. He asserts that the discretion afforded to prosecutors has resulted in a system in which the death penalty is arbitrarily sought throughout the state of Texas. But the existence of discretion alone does not "render[ ] the capital sentences imposed arbitrary and capricious." *McCleskey v. Kemp*, 481 U.S. 279, 307 (1987) (quoting *Gregg v. Georgia*, 428 U.S. 153, 199 (1976)). Beyond that, Johnson's references to case studies and statistics, Pet. at 95–99, fails to show that "the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey*, 481 U.S. at 292 (emphasis in original); *see also White v. Thaler*, 522 F. App'x 226, 235 (5th Cir. 2013) (explaining that a defendant could not prevail in an equal protection claim challenging the imposition of the death penalty because he could not show evidence of racial discrimination in his particular case); *Hughes*, 160 F. App'x at 436 (petitioner presented no direct evidence that conviction obtained as a result of racially discriminatory practice). This is true even where some of the defendants Johnson points to were charged with murder, because "sharing a charge alone does not make defendants 'similarly situated' for purposes of a selective prosecution claim." *In re U.S.*, 397 F.3d 274, 285 (5th Cir. 2005); *see also Broadnax*, 987 F.3d at 414 ("Broadnax's proffered view of 'similarly situated,' by invoking broad generic commonalities such as racial characteristics and crimes charged, would render comparisons essentially

86

meaningless.'"). And Johnson's arguments concerning geographic discrepancies in the application of the death penalty are equally unavailing. Constitutionally prohibited arbitrariness does not occur merely because "[t]he capability of the responsible law enforcement agency can vary widely." *McCleskey*, 481 U.S. at 307 n. 28.

The decision to prosecute capitally is a complex decision involving many 3factors, including the manner and circumstances of the crime, and the nature of aggravating and mitigating evidence. *Cf. McCleskey*, 481 U.S. at 294 ("[T]he Constitution requires that [a jury's] decision [to impose the death penalty] rest on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense.").

Here, the fact of the matter is simple. When he murdered Nancy Harris in the course of committing or attempting to commit a robbery, [Johnson] committed an act for which the United States Constitution and [Texas] laws permit imposition of the death penalty." *McCleskey*, 481 U.S. at 297; *see also Gregg*, 428 U.S. at 226 (White, J., concurring) ("[O]ne of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder.")). To that end, Johnson's reference to cases where some defendants of a difference race or county did not receive the death penalty fails to prove the "exceptionally

clear proof" of discrimination required by *McCleskey*. *McCleskey*, 481 U.S. at 297. That is especially true in Johnson's case, which presents a particularly dreadful display of depravity. For instance, Johnson points to no defendant of a different race or county who poured lighter fluid on a seventy-six-year old woman, robbed her, set her on fire, and then calmly walked away while she burned to death—screaming in agony. Put plainly, to say that the boundless brutality of Johnson's crime serves to set him apart from any other purportedly "similarly situated" defendant of a different race or county is an understatement. As such, Johnson has failed to show that he was selectively prosecuted or that the death penalty was pursued against him arbitrarily. Any relief on this claim should be denied.

## IV.   This Court Should Deny Johnson's Request for an Evidentiary Hearing.

To the extent Johnson's prayer for relief is construed as a request for an evidentiary hearing, it should be denied. Pet. at 99. "[I]f the record refutes applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474–75 (2007). Even where no factual findings have been made by a state court, a district court does not abuse its discretion in refusing to grant an evidentiary hearing if there are sufficient facts before it to make an informed decision regarding the merits of a claim. *McDonald v. Johnson*, 139 F.3d 1056,

1060 (5th Cir. 1998). To be entitled to a hearing, a petitioner must show that there is "a factual dispute which if resolved in [his] favor would entitle him to relief." *Norman v. Stephens*, 817 F.3d 226, 235 (5th Cir. 2016) (citation omitted). With regard to Johnson's adjudicated claims, additional factual development would not be relevant to claims reviewed under § 2254(d)(1). *Pinholster*, 563 U.S. at 181 (limiting review under § 2254(d)(1) to "the record that was before the state court").

Further, this Court should not grant an evidentiary hearing for any claims that are procedurally barred. *See Woods v. Whitley*, 933 F.2d 321, 323 (5th Cir.1991) (holding that "[n]o evidentiary hearing is required" if a prisoner is unable to satisfy the cause and prejudice standard for overcoming a procedural bar); *see also United States v. Reedy*, 393 Fed. Appx. 246, 247 (5th Cir. 2010) (same). And  Johnson fails to show that  any evidence would indicate that but for any constitutional error, no reasonable fact finder would have found him guilty, or that there are insufficient facts before this Court to address the merits of his claims. *See* 28 U.S.C. § 2254(e)(2); *Landrigan*, 550 U.S. at 474–75.

Finally, for the reasons discussed throughout this pleading, there are "sufficient facts" presently before this Court to make an "informed decision." Therefore, Johnson fails to show that further factual development would entitle him to relief.

89

**CONCLUSION**

For the foregoing reasons, the Director respectfully requests that this Court deny Johnson's petition for federal habeas relief, deny his requests for an evidentiary hearing and discovery, and sua sponte deny a COA. *See Alexander*, 211 F.3d at 898 (explaining that a district court has the power to sua sponte deny a COA without prior briefing and argument by counsel).

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

/s/ Garrett Greene
GARRETT GREENE
Assistant Attorney General
*Counsel of Record*
State Bar No. 24096217

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1400
garrett.greene@oag.texas.gov

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that, on April 9, 2021, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system. The electronic case filing system sent a "Notice of Electronic Filing" to lead counsel, who has consented in writing to accept this Notice as service of this document by electronic means:

Jeffrey Robert Newberry
University of Houston Law Center
4604 Calhoun Road
Houston, TX 77204-6060
jrnewber@central.uh.edu

David R. Dow
University of Houston Law Center
4604 Calhoun Road
Houston, TX 77204-6060
ddow@central.uh.edu

/s/ Garrett Greene
GARRETT GREENE
Assistant Attorney General

91