REPORTER'S RECORD

VOLUME 26 OF 57 VOLUMES

TRIAL COURT CAUSE NO. F12-23749-W

COURT OF CRIMINAL APPEALS NUMBER:  AP-77,030

THE STATE OF TEXAS              :            IN THE 363RD JUDICIAL

VS.                            :            DISTRICT COURT OF

MATTHEW LEE JOHNSON            :            DALLAS COUNTY, TEXAS

**INDIVIDUAL VOIR DIRE**

\* \* \* \* \* \* \* \* \* \* \*

On the 27th day of August, 2013, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Joe Clayton, Judge Presiding, sitting for the Honorable Tracy Holmes, held in Dallas, Dallas County, Texas:

Proceedings reported by machine shorthand computer assisted transcription.

```
 1  A P P E A R A N C E S:

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
          Crowley Criminal Courts Building
 3        133 North Riverfront Boulevard
          Dallas, Dallas County, Texas 75207
 4        Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
          MS. ELAINE EVANS, A.D.A., SBOT # 24032880
 6        MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724

 7             FOR THE STATE OF TEXAS;

 8

 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
          P.O. Box 2817
11        Red Oak, Texas 75154
          Phone:  972-617-5548
12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13        325 North St. Paul Street, Suite 2475
          Dallas, Texas 75201
14        Phone:  214-922-0212

15  MS. NANCY MULDER, Attorney at Law, SBOT # 00792971
          2214 Main Street
16        Dallas, Texas 75201
          Phone:  214-764-7246
17
               FOR THE DEFENDANT.
18

19

20

21

22

23

24

25
```

1                        **INDEX VOLUME 26**

2  August 27th, 2013                                  PAGE  VOL.

3  INDIVIDUAL VOIR DIRE:

4  Proceedings......................................... 5   26

5  PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

6  KRISTIN BURGESS           7                             26

7  Venireperson challenged by the State................. 29  26

8  Challenge granted.................................... 29  26

9  PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

10 YOLANDA CORNELIUS         33                 63         26

11 Venireperson 868A, Yolanda Cornelius, qualified...... 76  26

12 PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

13 STEPHEN SMITH             80                 111        26

14 Venireperson challenged by the Defense.............. 137  26

15 Challenge granted.................................... 138  26

16 PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

17 ADAM FORBES              141                175        26

18 Venireperson 905A, Adam Forbes, qualified........... 196  26

19 Venireperson 909A, Ronnie Harris, excused........... 199  26

20 Reporter's Certificate.............................. 200  26

21

22                        **ALPHABETICAL INDEX**

23 PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

24 KRISTIN BURGESS           7                             26

25 YOLANDA CORNELIUS         33                 63         26

1                          **ALPHABETICAL INDEX**

2    PROSPECTIVE JUROR   STATE VOIR DIRE   DEFENSE VOIR DIRE      VOL.

3    STEPHEN SMITH              80                 111              26

4    ADAM FORBES              141                 175              26

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                    THE BAILIFF:  Do you want me to go ahead and
 3   bring her in?
 4                    THE COURT:  Bring her in.
 5                    THE BAILIFF:  All rise.
 6                    THE COURT:  Have a seat, Ms. Burgess.
 7                    VENIREPERSON:  Thank you.
 8                    THE COURT:  Be seated.
 9                    How are you this morning?
10                    VENIREPERSON:  I'm good.
11                    THE COURT:  Good.
12                    VENIREPERSON:  I'm a little nervous, but I'm
13   good.
14                    THE COURT:  Well, don't be.  Nobody is going to
15   be giving you a hard time.
16                    VENIREPERSON:  I understand.
17                    THE COURT:  Let me introduce you to some of the
18   people here -- well, all the people that are involved in the
19   jury selection today.
20                    Sitting between you and I is Darline LaBar.
21   She's our court reporter, and it's her job to have an accurate
22   record of everything that transpires here today and every day
23   that we're here.  And this is our sixth week, I believe.  So
24   you can see it takes awhile.  We probably have maybe three more
25   weeks.
```

```
 1                    Sitting over here representing the State is
 2     Andrea Moseley.
 3                    MS. MOSELEY:  Good morning.
 4                    THE COURT:  Elaine Evans.
 5                    MS. EVANS:  Good morning.
 6                    THE COURT:  And Rocky Jones.
 7                    MS. JONES:  Good morning.
 8                    THE COURT:  Sitting over here representing the
 9     Defendant is Kenneth Weatherspoon.
10                    MR. WEATHERSPOON:  Good morning.
11                    THE COURT:  Catherine Bernhard.
12                    MS. BERNHARD:  Good morning.
13                    THE COURT:  And this is the Defendant, Matthew
14     Johnson.
15                    I'm Joe Clayton.  I'm a Senior District Judge,
16     and I'm hearing the jury selection in this case this week.
17                    Do you recall back on June 21st when you came
18     down with the -- the large group of people?
19                    VENIREPERSON:  Yes.
20                    THE COURT:  You were in the morning group.
21     There was another group that size in the afternoon.  You were
22     put under oath at that time.  Do you recall that?
23                    VENIREPERSON:  Yes.
24                    THE COURT:  All right.  You're still under that
25     oath, and as long as you're involved in this process, you'll
```

```
 1   continue to be under that oath.

 2                   This case is scheduled to be tried by Judge

 3   Holmes, beginning on October 28th and may last as long as two

 4   weeks.  Does that cause you any scheduling problems?

 5                   VENIREPERSON:  As of right now, no.

 6                   THE COURT:  Okay.  Good.  Have you seen anything

 7   about this case on TV or read anything about it in the

 8   newspaper or heard anybody talk about it?

 9                   VENIREPERSON:  No.

10                   THE COURT:  Okay.  Did you have an opportunity

11   to go over your questionnaire and the information pamphlet we

12   gave you?

13                   VENIREPERSON:  Yes.

14                   THE COURT:  Okay.  They'll be asking you

15   questions about those.  Each side has 45 minutes to visit with

16   you, and the State will go first.  And Andrea will be with you

17   this morning.

18                           KRISTIN BURGESS,

19   was called as a venireperson by the parties, and after having

20   been first duly sworn, testified as follows:

21                        STATE VOIR DIRE EXAMINATION

22   BY MS. MOSELEY:

23        Q.    Good morning.

24        A.    Good morning.

25        Q.    Let me tell you, I understand why you're nervous.  I
```

1  get it.  Sitting in that chair with everybody looking at you is

2  not an easy spot to be in, but I do want to kind of reiterate

3  what the Judge said and try to get you to relax as much as

4  possible.  There aren't any right or wrong answers today.

5  Obviously, we know a lot about you from having filled out the

6  questionnaire, and we're just going to talk about some of that

7  and some of your feelings in an effort really -- the goal here

8  is to try to figure out which 12 people are best suited to

9  serve on this jury and be able to give both the State of Texas

10  and the Defense a fair trial.  And we recognize that because

11  the death penalty is a potential outcome in this case, that

12  people have really strong feelings about the death penalty.

13  That's one of those things that's hotly debated in the

14  community.

15          And so when you came down here in June, you saw

16  there were lots of other people.  And you may not know it, but

17  that afternoon we brought down that same number of people --

18  more people than that same number who also filled out the

19  questionnaire.  We know that it sometimes takes a thousand

20  people from the community to get 12 jurors seated and qualified

21  on this kind of case, because of the death penalty.

22          And I can tell from reading your questionnaire

23  that you have some serious reservations about the death penalty

24  and how you feel about it.  If you're like most of the jurors

25  we talk to, you hadn't given a lot of thought to the death

1  penalty until you came down here in June and the Judge told you

2  what the charge was and that that was a possibility.  We asked

3  you to fill out the questionnaire.  So I'm going to give you an

4  opportunity today to tell us, you know, more about how you feel

5  about it.  And in the end, the real question is going to be

6  whether this is something that you can do because the State of

7  Texas is not going to put any juror in the position of serving

8  on a capital murder trial if it's going to be something that

9  would violate their conscience or wear at their insides over

10  time.  So we know we need 12 jurors who can fairly consider the

11  evidence and base their verdict and their decision in the

12  penalty phase, if we should get there, whether this is a life

13  without parole or a death sentence, based on the law and the

14  evidence and set aside their personal feelings.  So we know a

15  lot of people can't do that.

16          So I want to talk to you a little bit about your

17  questionnaire this morning.  You told us in Question Number 1,

18  the very first question, I don't feel that I'm in a position of

19  determining life or death for an individual.  It's difficult to

20  think I could have that kind of power over someone, but I also

21  believe that we live in a world where people do wrong and the

22  consequences of sin, our wrong, is death.  And you told us in

23  Question 2, you don't feel the death penalty should ever be

24  imposed.  Is that -- do you still feel that way today?

25          A.    Yeah, pretty much.

```
 1        Q.    Where -- where are your concerns about the death

 2   penalty rooted?

 3        A.    I guess the idea of there are some people that have

 4   been convicted and killed that were innocent, and so there's

 5   always that possibility.  That -- I guess that's part of the

 6   main reason, and I mean, it's just not an easy thing to decide

 7   to -- for me -- you know, that a person would decide someone

 8   else's death.

 9        Q.    Sure.  Sure.  We've had jurors tell us that they

10   believe that the death penalty should never be imposed, and

11   that for them personally, it's not a process that they could

12   participate in without causing harm to their conscience.  Do

13   you kind of feel that way?

14        A.    I don't really know.  Because as much as I'm against

15   it, I would not necessarily want to choose that and I would

16   probably -- you know, I would struggle with coming up with that

17   decision if I was in that position.  And I -- you know, the

18   afterthought if that was the actual decision, I don't know how

19   I would feel -- I mean, it would be on my mind --

20        Q.    Okay.

21        A.    -- that that was that choice.

22        Q.    Okay.

23        A.    Yeah.

24        Q.    On page 2, we asked you if you had any moral,

25   religious, or personal beliefs that would prevent you from
```

1  returning a verdict which would result in the execution of

2  another human being, and you didn't check yes or no.  I guess

3  you were undecided at that point because you said, I think this

4  is hard to answer without being in an actual position to do so.

5  If it was the only option, then, yes, because there's life in

6  prison, too.  The person can still be punished without being

7  put to death.  Tell me what you meant there.

8       A.    Well, my -- I mean, I believe -- I believe in God

9  and I believe in Christ and I believe, you know, that we are

10  sinners and we are punished for our sins, but God is the

11  ultimate judge of that kind of thing.  So me deciding someone's

12  death is like I'm just as human and as sinful as anyone else.

13  I don't think that my religious beliefs or my personal beliefs

14  really -- I mean, that comes into play, but I don't know if it

15  would necessarily prevent me from returning a verdict of

16  execution.  But the knowing that there is another option,

17  that's where I would probably want to lean towards because that

18  is the other option instead of actual death.

19       Q.    Okay.  And your personal feelings would cause you

20  coming -- coming into this process to be leaning toward the

21  life without parole?

22       A.    Right.  Yeah, like I would -- you know, since there

23  are the two options, it's kind of like I don't -- my personal

24  beliefs, my religious beliefs would want to go that direction,

25  but if that -- you know, it doesn't stop me from the other

```
 1   side, also, but --
 2        Q.   Okay.  The last question on page 2, we asked you if
 3   you thought that murder committed during the course of
 4   attempting or -- an intentional murder caused during the course
 5   of committing or attempting to commit the offense of robbery is
 6   a capital offense in which the death penalty may be imposed.
 7   Do you agree?  And you said yes.  And then you said, I don't
 8   have a problem with them imposing the death penalty, just
 9   doesn't mean I would want to choose that as the final sentence.
10   If a person is truly guilty, they pay the consequences, just
11   doesn't have to be death even though it is imposed.  What does
12   that mean?
13        A.   When I read this these, I kind of went, this is what
14   I answered.  I -- well, I -- I'm -- I'm not sure if I --
15   reading back, I go, did I even understand what I -- you know,
16   what I was reading or writing.  The State of Texas, you know,
17   has the capital -- death penalty.  I don't know that I would
18   want to bring -- you know, have that as the option --
19        Q.   Okay.
20        A.   -- personally.  I just --
21        Q.   If you were -- if you were able to -- let's say
22   we -- we christened you King of Texas today or Queen of Texas
23   today, you would -- you would abolish the death penalty in
24   Texas?
25        A.   I -- probably, yes.
```

1      Q.   For all cases?  You wouldn't -- you wouldn't find it

2   to be a proper sentence under any circumstances?

3      A.   I would -- no, I would hope not, no.

4      Q.   Okay.  Let's talk then about -- because I -- I

5   certainly understand where you're coming from.  And like I

6   said, that's -- that's why we have so many people involved in

7   this process, because as I told you before, the State of Texas

8   is not going to insist that any of its citizens participate in

9   this particular type of trial, if it's going to be something

10  that causes them consternation internally.

11              And obviously, you served your civic duty by

12  coming down here in June and filling out this questionnaire and

13  then coming back today and letting us kind of delve into all of

14  your personal feelings, so I appreciate that.  You know, there

15  are -- there are some people that this just isn't the best kind

16  of case for them to serve on.

17              I'll give you an easier example.  We have

18  high-rises down here in downtown Dallas, and I think those

19  windows need to be cleaned, but I am terrified of heights.

20  Don't strap me to that little chair and send me up to the 70th

21  floor and ask me to clean the windows.  That's a job not for

22  me.  That's a job I'm glad somebody else has, but it's not

23  something that I could do.  And I -- I recognize that with

24  death penalty cases and cases in which the death penalty may be

25  the outcome, it's not the job for everybody.

1          So I want to tell you now, just to kind of lay

2   my cards on the table, we have decided -- the District

3   Attorney's Office and my boss, Craig Watkins, has decided that

4   we are seeking the death penalty in this case against Matthew

5   Lee Johnson.  So it's not a fictional person or just something

6   you see on TV.  It's a real human being who has family that

7   cares about him.  He puts his pants on just like you and I do

8   every day, one leg at a time.

9          We believe that we have the type and quality and

10  quantity of evidence that is going to lead a jury to convict

11  Matthew Johnson of capital murder.  We also believe that in the

12  punishment phase of the trial we have the type and quality and

13  quantity of evidence that will lead a jury to believe that he

14  is, in fact, going to be a continuing threat to society.  Our

15  evidence will require the jury to answer Special Issue Number 1

16  yes, and we also believe that the evidence will show that

17  there's nothing sufficiently mitigating to warrant a life

18  sentence, so the jury would answer Special Issue Number 2 no.

19  A guilty verdict, a yes to Special Issue 1 and a no to Special

20  Issue 2 would leave the Judge with no option but to sign a

21  death warrant for Matthew Johnson.  And at some day in the

22  future, he would be taken to Huntsville and he would be

23  strapped to a gurney, a needle would be inserted into his arm,

24  and he will receive lethal injection.  He will be executed for

25  the crime.

```
 1              And you'll know if you participate in this, if
 2   you're a juror in this case, that you had a hand in that -- in
 3   that ultimate decision and that ultimate solution.  You may be
 4   sitting at home with your family one day and see come across
 5   the news that today is the day that Matthew Lee Johnson is
 6   going to be executed.  Only you can tell us whether that's a
 7   process that you can participate in without doing harm to your
 8   conscience.
 9              And I know it's hard to -- to say absolutely one
10   way or the other, but you can see why it's so important now for
11   the State of Texas and for the Defendant to have 12 jurors who
12   can tell us absolutely, I can participate in that process,
13   or -- or, I don't think I can.  Where do you find yourself?
14       A.    As much -- it makes me nervous, because a couple of
15   years ago I was chosen to be on a jury for a murder case here,
16   actually.  The next day when we were called in, we were let go
17   because of some issues, but it made me very nervous, even at
18   that point, and the death penalty was not on the board -- the
19   table.  But at the same time, when I hear about how many people
20   are so like not interested in being on the jury and it is --
21   it's inconvenient in some ways, I also -- if I was on that
22   side, if I was a Defendant, I would want people that were
23   willing to stand up and make a decision, you know, and -- and
24   have -- that were serious and really took it seriously and knew
25   that -- the importance of the situation.  I would hope that I
```

1  would, you know, be able to have a judgement that was unbiased

2  and -- and, you know, if a person is really guilty, then they

3  need to be punished, but if they were not guilty, I would hope

4  that I would be able to assess, understanding the law and

5  everything else.

6            I find it fascinating and interesting and I am

7  kind of interested in the process, but at the same time, it

8  does still make me nervous to have -- you know, to be in a

9  position to come up with that -- that decision.

10     Q.   If you're sitting at home and you see that news

11  story come across, is that something that's going to wear on

12  you, if you -- if you know you participated in that?

13     A.   It would definitely come into -- you know, it would

14  be in my thoughts.  I definitely would feel that I would have

15  not gone into it lightly, and that I would have prayed about it

16  and thought about it and discussed about it enough that all of

17  us had to make that decision together, that we truly as 12

18  people truly believed that that was the best outcome.

19     Q.   Let me -- let me -- I mean, I'm going to be honest

20  with you and tell you that it -- it does concern me to some

21  degree that you come into the process and that you tell us

22  today that you're putting yourself in the seat of the

23  Defendant.  Have you considered it from the victim's family's

24  standpoint?

25     A.   Yes.  Yes.

1        Q.    And you recognize that they also --

2        A.    And that --

3        Q.    -- are entitled --

4        A.    -- and if the Defendant is truly guilty, then, yes,

5  that -- that person needs -- needs, you know, the best

6  judgement.

7        Q.    Let me ask you this.  Is your -- I'm just going to

8  put you in a hypothetical situation.  Let's say that there's no

9  doubt in your mind as a juror that the person on trial is

10  guilty of capital murder.  You're convinced beyond a reasonable

11  doubt that the person is guilty of the crime of an intentional

12  murder committed during the course of a robbery.

13        A.    I'm sorry.  I'm sorry, I missed the first part,

14  that -- when I came into the jury, I knew?

15        Q.    No.  Let me --

16        A.    Sorry, sorry.

17        Q.    -- let's put you -- let's put you past the first

18  part of the trial.  The State has presented its evidence and

19  you believe beyond a reasonable doubt that the person on trial

20  is guilty of an intentional murder committed during the course

21  of a robbery.  Is your mind at that point open to the -- the

22  possibility of a death sentence?

23        A.    I don't know.  I -- I want to say no, but, I -- I

24  don't really know.

25        Q.    It seems to me -- and again, there is no right or

```
 1   wrong answer.  How you feel about this doesn't make you a good

 2   citizen or a bad citizen.  I -- I get the impression you would

 3   have been a fantastic juror on a murder case.  You're going to

 4   be thoughtful and considerate of the evidence, and I appreciate

 5   that.  I just -- I don't want you to end up in October sitting

 6   on a jury where the State of Texas stands up after the guilty

 7   verdict and says, we're entitled to 12 jurors who can fairly

 8   consider the -- the death sentence and -- and base their

 9   verdict not only on their personal feelings but on the evidence

10   and the law.

11        A.   Uh-huh.

12        Q.   And I get the feeling that that's something you

13   can't guarantee me you're going to be able to do.

14        A.   I've never been put in that position to know yes or

15   no.  You know, I want to be able to say yes or no, but I -- I

16   don't really know.  I'm -- I'm -- I don't know.

17        Q.   Okay.  And -- and, again, I know that this is a -- a

18   touchy subject.  But you can see where I'm coming from --

19        A.   Yes, absolutely, absolutely.

20        Q.   -- so we're communicating.  If I understand your

21   answer, this is something you're just not going to know until

22   you're there.  You can't guarantee me that you would be able to

23   base your verdict even in the punishment phase only on the

24   evidence and the law and that your personal opposition to the

25   death penalty won't play a part?
```

```
 1        A.    Well, I think it's -- I believe I can decide like
 2   based on the law -- is someone guilty based on the law.  The
 3   punishment, I think, is where -- like I don't know the law that
 4   if someone is found guilty they have to be put to death.  I
 5   don't think I understand that.  If that's the -- if -- if this,
 6   then this is the only option, then I do have a problem with
 7   that.
 8        Q.    Okay.
 9        A.    But like understanding the law and saying, hey, this
10   person did this, this is what the law says, then, yeah -- I
11   mean, regardless of what my personal feelings are, if the law
12   says this, that's what I have to go by.
13        Q.    Okay.
14        A.    But it's -- I think it's the sentencing part which
15   would be the -- if they are found guilty because of this, well,
16   if this is the only option, that's I think where I would be the
17   most --
18        Q.    Okay.  Then let's -- let me explain the process to
19   you a little bit and see if we don't -- we don't get somewhere
20   with that -- at least clear some things up in your mind.
21   Obviously, in the first part of the trial the State of Texas
22   has to prove somebody guilty beyond a reasonable doubt.
23        A.    Uh-huh.
24        Q.    Now, we don't have a definition of what beyond a
25   reasonable doubt is.  It is whatever it means to you.  Whenever
```

1  you're satisfied that all reasonable doubt has been excluded,

2  then the verdict has to be guilty under your oath.  Now, that

3  doesn't mean beyond all possible doubt, and there are people

4  who tell us, when we're talking about the death penalty and

5  we're talking about a sentence that cannot be undone, you're

6  going to have to prove to me absolutely 100 percent with no

7  doubt that the person is guilty before I could find somebody

8  guilty of capital murder, knowing the death sentence may be an

9  option.  And that's not the law.  The law is that I have to

10  exclude all reasonable doubt.  How do you feel about that?

11       A.    Fine.  I mean, I -- if that's -- I'd have to take

12  all the evidence into consideration and make sure that there's

13  no possibilities outside of that.  I mean --

14       Q.    Are you going to require us to prove to you beyond

15  all possible doubt to 100 percent certainty that the offense

16  was committed by the person on trial before you could find them

17  guilty?

18       A.    No, I don't think so.

19       Q.    Okay.  If the jury finds someone guilty of capital

20  murder, there are only two possible sentences.  One is life

21  without the possibility of parole, which you've told us in your

22  questionnaire is what you feel is the appropriate sentence.

23       A.    Uh-huh.

24       Q.    Or the death sentence.  And you're not going to be

25  as a juror asked to vote life or death.  It doesn't work that

1    way.  Not does he deserve life or does he deserve the death

2    penalty.  But there's a process by which that decision is made.

3                  The first part of the process is this Special

4    Issue Number 1, and -- and the State of Texas would have to

5    prove Special Issue Number 1 beyond a reasonable doubt.  We

6    have to prove whether there's a probability that the Defendant

7    would commit criminal acts of violence that would constitute a

8    continuing threat to society.  So looking forward, we have to

9    bring evidence that would convince the jury more likely than

10   not -- not a hundred percent again, not absolutely, but that

11   more likely than not the Defendant would commit criminal acts

12   of violence that would constitute a continuing threat to

13   society.  We sometimes call that the future danger issue.

14        A.    Uh-huh.

15        Q.    We have a saying in the law that a person is not

16   executed for -- necessarily for just the crime they committed,

17   but for what they're going to do more likely than not in the

18   future.  Does that make sense?

19        A.    Yes.

20        Q.    And you told us -- if we could go to page 3.  The

21   first question on that page is Number 11:  Do you think there

22   are some crimes which call for the death penalty solely because

23   of their severe facts and circumstances, regardless of whether

24   or not the person has committed prior violent acts?  And you

25   said no, no one has to commit another violent act before

1   committing a crime.  Tell me what you're thinking there.

2        A.    Well, because you don't necessarily have to have a

3   series of crimes committed before you do something, so it's not

4   that -- and you can still do a violent act without having ever

5   done anything else.

6        Q.    Sure.  Everybody has their first one --

7        A.    Uh-huh.

8        Q.    -- right?

9        A.    And it could be just as, you know, big or, you know,

10  whatever, so --

11       Q.    Right.

12       A.    -- I don't think there is a progression necessarily.

13       Q.    Okay.  And I'll tell you, when we come to that

14  question, in Special Issue Number 1, the law says that the

15  State can prove that to a jury based solely on the crime

16  itself -- the crime they've just convicted them of, the capital

17  murder.  A jury can look to those facts and say, anybody who's

18  capable of committing that offense, that -- whether it be so

19  heinous or so vile, whatever the jury sees in it, if you are

20  capable of committing that, you will more likely than not be

21  the kind of person who is going to commit criminal acts of

22  violence that constitute an ongoing threat.  Does that make

23  sense?

24       A.    Yes.

25       Q.    So the jury can answer Special Issue Number 1 yes,

1  based solely on that, without regard for any other evidence.

2  Does that make sense?

3       A.    Yes.

4       Q.    Do you believe that that -- that you could answer

5  Special Issue Number 1, based solely on a particular set of

6  facts?

7            MS. BERNHARD:  Your Honor, I'm going to object

8  to that as a commitment question.

9            THE COURT:  Sustained.

10      Q.    (BY MS. MOSLEY)  Well, let me ask you this then.  Do

11  you -- do you think there's ever a chance that the State could

12  prove what someone more likely than not will do in the future?

13      A.    No.  But can you prove what someone would do in the

14  future?  No.

15      Q.    I mean, you've told us there's no proof that just

16  because they do bad once, they would do it again.  It's

17  possible?

18      A.    Uh-huh.

19      Q.    But not certain.  And that was your answer in

20  Question Number 12.  And you recognize that in Special Issue

21  Number 1 the burden is on the State of Texas to prove more

22  likely than not what someone will do in the future.  And I have

23  to do that beyond a reasonable doubt, in order for an answer

24  yes to be the jury's answer.  And you're telling me you really

25  don't think that's possible.  That's looking into a crystal

1  ball and it's not possible to prove that?

2      A.   Well, I don't think it's possible -- like you can't

3  prove that that person is going to, but it is likely, like

4  depending on what -- you know, there are -- I mean, it's -- you

5  can't prove that someone is going to do something.

6      Q.   Can I prove --

7      A.   You can speculate, but -- I guess if you use the

8  reasonable doubt, yeah, I could see that, because you just --

9  you know, some people are just -- you can't -- I don't know.

10  But, yeah, you can't prove -- you can't prove that someone is

11  going to do something --

12      Q.   Right.

13      A.   -- for sure, but --

14      Q.   Do you believe I can prove what someone will more

15  likely than not do?

16      A.   Yeah, probably.  Yes.

17      Q.   Okay.  And what kind of information do you think is

18  important in that -- in that question?  I mean, what -- how do

19  I go about that?

20      A.   Well, when you -- if you were to bring up stuff like

21  past activities or whatever, then that would be more of a

22  leaning -- like, yeah, this person is not a safe person to be

23  around other people, and they have a tendency to do things that

24  are not -- that could be against someone else or whatever --

25  make bad choices, that kind of thing.

1        Q.    And you'll see that in Special Issue Number 1, it

2   doesn't say that they're -- that it's more likely than not that

3   the Defendant would commit another murder or a sexual assault

4   or a robbery or kidnapping.  It just says criminal acts of

5   violence that would constitute a continuing threat to society.

6              Now, by the time you get here, you've already

7   found the Defendant guilty of capital murder --

8        A.    Uh-huh.

9        Q.    -- which means the best they can do is life without

10  parole in the -- in the prison.

11       A.    Uh-huh.

12       Q.    So -- and when we talk about society, we're talking

13  about even prison society.  Do you think that there is a

14  possibility that people can be violent even in prison?

15       A.    Oh, yes.

16       Q.    Do you believe that the people inside the

17  penitentiary, whether they're inmates or guards or people

18  visiting their loved ones or teachers and preachers, deserve a

19  level of protection from those who would do violence to them?

20       A.    Yes.

21       Q.    And so in Special Issue Number 1, the State of Texas

22  has the burden of proof beyond a reasonable doubt, not a

23  hundred percent, beyond a reasonable doubt, that it's more

24  likely than not, not maybe, not possibly, not I'm afraid he

25  might, but more likely than not they would commit criminal acts

 1  of violence that constitute a continuing threat even in prison

 2  society.  Does that make sense?

 3       A.    Yes.

 4       Q.    That's the question that the State of Texas has

 5  decided separates those who receive the life sentence from

 6  those who receive the death sentence.  If you can be safely

 7  incarcerated in the penitentiary without fear that you're going

 8  to be a continuing threat, then the life sentence is the proper

 9  sentence.  If the answer to Special Issue Number 1 is yes, then

10  we move one step closer to the death penalty.

11            And you're telling me that you do believe --

12  initially you told me, no, I couldn't prove that, but now

13  you're telling me you believe it is possible to prove that

14  beyond a reasonable doubt?

15       A.    Yes, I believe you could, especially after you have

16  already proven beyond a reasonable doubt that they've committed

17  the crime.

18       Q.    And in the punishment phase there's the ability for

19  both sides, if they choose -- and certainly the State of Texas

20  to prove -- to bring more evidence as it relates to what the

21  proper punishment should be, but that that -- that question can

22  be answered by the jury solely on the facts of the first -- the

23  first part of the trial -- the -- the guilt/innocence phase of

24  the trial.

25       A.    Uh-huh.

1    Q.    That was a really long pause.

2    A.    Sorry --

3    Q.    And, again, no right or wrong answers, but you --

4    you're now telling me that you believe it's possible that I

5    could prove that to you?

6    A.    (Shakes head up and down.)  I think so, yes.

7    Q.    If the answer to Special Issue Number 1 is yes, then

8    the jury would go to Special Issue Number 2.  And there's no

9    burden of proof on either side on Special Issue Number 2.  That

10   is for the jury, and I'll -- we'll go through it -- to take

11   into consideration all of the evidence they've heard in both

12   parts of the trial, both the guilt/innocence phase and the

13   punishment phase, including the circumstances of the offense,

14   the Defendant's character and background, and the personal

15   moral culpability of the Defendant, and ask themselves whether

16   there's something in the evidence that is sufficiently

17   mitigating to warrant a life sentence instead of the death

18   sentence.

19             Now, this is -- this is the question where the

20   jurors' internal beliefs and personal beliefs may -- may play a

21   part in their decision because you can see I don't have to

22   prove anything.

23   A.    Right.

24   Q.    And the Defense doesn't have to prove anything.

25   This is the jurors' opportunity, once again, to look at the

1    evidence and decide whether a life sentence is more proper than

2    a death sentence.  But it has to be based on the evidence and

3    not your personal opposition to the death penalty.  And you --

4    you can see why Special Issue Number 2 would be the issue that

5    would concern the State of Texas as it relates to you as a

6    juror about whether you would be able to set aside your

7    feelings about the death penalty and look solely to the

8    evidence to answer this question, right?

9        A.    Yes.

10        Q.    Because it is more subjective than anything else

11    we've done.  Thus far, you look to the evidence, and you said

12    it would be an easy -- not easy, but easier for you to decide

13    guilty or not guilty, because that's an evidence issue?

14        A.    Uh-huh.

15        Q.    And Special Issue Number 1, did I prove it or did I

16    not makes that a pretty straightforward issue.  But in Special

17    Issue Number 2, you have to look at everything you heard and

18    decide whether there's something sufficiently mitigating.  When

19    we say sufficiently mitigating circumstance or circumstances,

20    we're talking about something in the evidence.  And some people

21    tell us, you know what, the fact that it's a living, breathing

22    human being that we're talking about executing, in and of

23    itself is sufficiently mitigating to me.  Like you've said, God

24    is the one that makes the decision about life or death.  I'm

25    not one to make that decision.  And the fact that someone is a

1  living human being is a sufficiently mitigating circumstance to

2  warrant a life sentence to me.  Do you feel like that?

3       A.    Yes.  Yes.

4       Q.    When it comes right down to it, looking at Special

5  Issue Number 2, will you always answer Special Issue Number 2

6  yes so that the life sentence is imposed versus the death

7  sentence?

8       A.    Yes.

9       Q.    I appreciate you -- you telling me that.

10               MS. MOSELEY:  And that's all I have, Judge.

11               THE COURT:  All right.  We'll take a short

12  break.  If you will, just step outside the door, please, ma'am.

13               (Venireperson excused from courtroom.)

14               THE COURT:  The State have a motion?

15               MS. MOSELEY:  Yes, Your Honor, we would

16  challenge this juror.

17               (Venireperson challenged by the State.)

18               THE COURT:  Granted.

19               (Challenge granted.)

20               (Venireperson returned to courtroom.)

21               THE COURT:  Ms. Burgess, you're going to be

22  excused.

23               VENIREPERSON:  Okay.  Thank you so much.

24               THE COURT:  Thank you very much.  We appreciate

25  your time.

```
 1                VENIREPERSON:  I figured my tears probably.

 2                MS. MOSELEY:  We'll see you on another one.

 3                VENIREPERSON:  All right.  Thank you so much.

 4                MS. EVANS:  Thank you.

 5                (Venireperson excused from courtroom.)

 6                THE BAILIFF:  All rise.

 7                (Venireperson brought into courtroom.)

 8                THE COURT:  Have a seat right there, Ms.

 9   Cornelius.

10                Everyone, be seated.

11                How are you this morning?

12                VENIREPERSON:  I'm good, Judge.  Thank you.

13                THE COURT:  Good.  Thank you.

14                Let me introduce you to the people that are

15   participating in the process here today.  They all know who you

16   are, so it's -- I'm sure you won't remember all these names,

17   too, but, at least I'll introduce you.

18                VENIREPERSON:  Okay.

19                THE COURT:  Between you and I is Darline LaBar.

20   She's the court reporter, and it's her job to take down

21   everything that's said today and have an accurate record of

22   what transpires here this morning.  And we all get in a habit

23   of nodding yes and nodding no -- well, she can't hear a nod,

24   so --

25                VENIREPERSON:  Okay.
```

```
 1                    THE COURT:  -- I'm going to need you to speak up
 2    when you're answering the questions.
 3                    Sitting over here representing the State of
 4    Texas is Andrea Moseley.
 5                    MS. MOSELEY:  Good morning.
 6                    THE COURT:  And Elaine Evans.
 7                    MS. EVANS:  Good morning.
 8                    THE COURT:  And Rocky Jones.
 9                    MS. JONES:  Good morning.
10                    THE COURT:  Over here representing the Defendant
11    is Kenneth Weatherspoon.
12                    MR. WEATHERSPOON:  Good morning.
13                    THE COURT:  Catherine Bernhard.
14                    MS. BERNHARD:  Good morning.
15                    THE COURT:  And Nancy Mulder.
16                    MS. MULDER:  Good morning.
17                    THE COURT:  And this is the Defendant, Matthew
18    Johnson.
19                    VENIREPERSON:  Good morning.
20                    THE COURT:  And I'm Judge Joe Clayton.  I'm a
21    Senior District Judge hearing this capital jury selection.
22                    The case will be tried by Judge Holmes -- Tracy
23    Holmes.  This is in her court.  She's handling her regular
24    docket down the hall while we're doing this.  We're in the
25    sixth week at this time, so you can see if she did all this,
```

```
 1   her regular docket would get bogged down.

 2                   Do you recall being brought in on June the 21st

 3   with the big group and being sworn in?

 4                   VENIREPERSON:  Yes, sir.

 5                   THE COURT:  Okay.  You were put under oath at

 6   that time, and you're still under that oath and you will remain

 7   under that oath as long as you're involved in this process.

 8                   Just for your information, there was another

 9   group, the same size, came in in the afternoon.  So it takes a

10   lot of folks to pick a capital murder jury.  So that's why we

11   have a lot of people, and that's why we're in the sixth week at

12   this point.

13                   VENIREPERSON:  Yes, sir.

14                   THE COURT:  This case is set to begin trial on

15   October the 28th and may last as long as two weeks.  Does that

16   cause you any scheduling problems?

17                   VENIREPERSON:  No, sir.

18                   THE COURT:  Okay.  Have you seen anything on TV

19   or read anything in the paper or heard anything discussed about

20   this case?

21                   VENIREPERSON:  No, sir.

22                   THE COURT:  All right.  Did you have an

23   opportunity to read the information -- the pamphlet we gave you

24   and also go over your questionnaire?

25                   VENIREPERSON:  Yes, sir.
```

```
 1                    THE COURT:  They'll be asking you questions
 2  about it.
 3                    All right, Andrea.
 4                         YOLANDA CORNELIUS,
 5  was called as a venireperson by the parties, and after having
 6  been first duly sworn, testified as follows:
 7                    STATE VOIR DIRE EXAMINATION
 8  BY MS. MOSELEY:
 9       Q.   Good morning, Ms. Cornelius.  Thank you for being
10  here.  I know you're a busy lady.  You've got other things you
11  probably need to be doing, but I appreciate you giving us your
12  time this morning.
13                    I'm going to tell you a little bit about why
14  we're here and what we're going to do today.  I have 45 minutes
15  to talk to you.  Maybe it won't take that long, let's hope.
16       A.   Okay.
17       Q.   And the Defense, obviously, has the same amount of
18  time.  And our goal today is just to kind of feel you out, get
19  you to tell us how you feel about the death penalty, how you
20  feel about serving as a juror in a case where the death penalty
21  may be the ultimate decision, and really just kind of let you
22  tell us whether you believe you could be a fair juror to both
23  sides in this case.
24                    We know jurors have strong feelings about the
25  death penalty, citizens do.  You've told us your husband
```

```
 1   doesn't believe in the death penalty, right?

 2        A.    Right.

 3        Q.    So you got it in your own home, the -- the

 4   conversation about the death penalty.  So we give everybody and

 5   the law requires us, in fact, to talk to everybody individually

 6   about this.  You know, you've served on a jury before, correct?

 7        A.    Yes, ma'am.

 8        Q.    So we had this big group of people and the

 9   prosecutor and the Defense talked to you all as -- all as a

10   group.  Obviously, we do this a lot different because we're

11   talking about the death penalty.

12        A.    Yes, ma'am.

13        Q.    And as I went through your questionnaire, I can tell

14   you, I come out -- come out of it going, I don't know how Ms.

15   Cornelius feels about the death penalty.  You told us that your

16   religious and personal beliefs fluctuate on whether -- sitting

17   in judgement of a human being and on returning a verdict which

18   would result in the execution of someone, as well.  So have you

19   had some time to kind of think about it a little bit more?

20        A.    Yes, ma'am.  I mean, I'm just on the fence about it.

21   My background is law enforcement, so obviously, it kind of --

22   it changes.  You know, if it has anything to do with law

23   enforcement, children, older people, and the person has

24   blatantly, intentionally, you know, committed this heinous

25   crime, then, yes, I am for it.
```

1          Q.    But for you, it's not so much being either a

2    proponent or an opponent of the death penalty, it's going to

3    depend on the circumstances of the evidence?

4          A.    Absolutely.  It's going to depend on the facts.

5          Q.    Right.  And -- and so then I'm -- then I think I'm

6    clear.  You served on a jury before, and you didn't have any

7    personal moral problems with sitting in that case?

8          A.    No, ma'am.

9          Q.    In other words, rendering a verdict -- we have

10   people that tell us that, my religion tells me I can't sit in

11   judgement.  That's not where you come from?

12         A.    No, ma'am.

13         Q.    For you, it's all going to be about the evidence and

14   the -- the proof in the trial?

15         A.    Yes, ma'am.

16         Q.    And if you're convinced that a person is guilty of

17   an offense, you've got no problems finding somebody guilty?

18         A.    Yes, ma'am.

19         Q.    If you don't think they're guilty of the offense,

20   you don't have any problem finding them not guilty?

21         A.    Yes, ma'am.

22         Q.    If you believed that the State has done its job of

23   proving that the death penalty is the proper verdict in

24   punishment, you're okay with that?

25         A.    Yes, ma'am.

1      Q.    And if you believe that we haven't done it and the
2  life sentence is the proper sentence for capital murder, you
3  are okay with that?
4      A.    Yes, ma'am.
5      Q.    Okay.  Then we'll kind of talk -- I -- I appreciate
6  that.  Now I'm clear.
7      A.    Okay.
8      Q.    Now, the one thing that I do want to ask you about
9  since your husband is opposed to the death penalty, he doesn't
10 think we should ever use it; is that fair?
11     A.    Well, we talked about it just recently because I was
12 coming here today.  And I found out more information.  You
13 know, he stated that the Bible, you know, indicates thou shalt
14 not kill, but then he came back and stated that the Bible also
15 says that the laws have to be upheld.  So it sound like talking
16 to him, that he's similar to what I am.
17     Q.    Okay.
18     A.    Okay.
19     Q.    So he's not as opposed as you may have initially --
20     A.    Right.  Right.
21     Q.    I only ask you that because you know the Judge has
22 told that you this trial is scheduled to start October 28th and
23 last a couple of weeks, which is getting close to Thanksgiving
24 and the holidays.  I imagine your family gets together for the
25 holidays?

1          A.    Yes, ma'am.

2          Q.    And it could be a pretty uncomfortable situation if

3    you have to come home and tell somebody in your family that's

4    opposed to the death penalty that you participated in this

5    process, but that's not going to be an issue for you?

6          A.    No, ma'am.

7          Q.    You seem like a pretty strong lady.  You'd just tell

8    them, I did my job?

9          A.    Yes, ma'am.

10          Q.    Okay.  Okay.  Then let me -- let me talk to you

11    about the trial process itself.  The first part of the trial,

12    in any criminal trial, is the guilt/innocence phase.  And we're

13    going to go through some of these things pretty quickly.

14    Because of your law enforcement background and because you've

15    been a juror, you've heard all of these things before.

16               A person is presumed innocent until the State

17    proves guilt beyond a reasonable doubt.  As Matthew Lee Johnson

18    sits here today, can you presume him innocent?

19          A.    Yes, ma'am.

20          Q.    Because I haven't brought any evidence.

21          A.    Right.

22          Q.    The burden is always on the State of Texas to bring

23    the evidence in a case to prove guilt.  The Defendant does not

24    have to prove anything at all.  He doesn't have to prove he's

25    innocent of the charge, right?

1        A.    Yes, ma'am.

2        Q.    When we say beyond a reasonable doubt, I don't know

3   how long ago it was you served on a jury, but we don't have a

4   definition of beyond a reasonable doubt.  It is whatever it

5   means to you.

6        A.    Okay.

7        Q.    What we do know is I don't have to prove it beyond

8   all possible doubt because I would submit to you, Ms.

9   Cornelius, I couldn't prove anything to you beyond all possible

10  doubt unless you saw it with your own eyes.

11       A.    Yes, ma'am.

12       Q.    And you'd be a witness, not a juror if that were the

13  case.  So we do have to exclude all reasonable doubt about the

14  person's guilt, but if we do that, the jurors' job would be to

15  find the person guilty.  Does that make sense?

16       A.    Yes, ma'am.

17       Q.    It's the highest burden we have in law, and it

18  should be, because we're talking about taking someone's freedom

19  and potentially their life.

20       A.    Yes, ma'am.

21       Q.    The Defendant in any criminal case has the right not

22  to testify, the right to remain silent under the Fifth

23  Amendment.  If a defendant chooses not to testify, and you're a

24  juror on the case, you would be instructed by the Judge that

25  you can't consider his silence, you can't think about it, talk

1    about it, refer to it for any reason whatsoever.  Your job as a

2    juror would be to look to the evidence you did hear and

3    determine whether the State proved its case.  If we did, then

4    he's guilty, whether or not he testifies.  And if we didn't,

5    he's not guilty, whether or not he testifies.  Does that make

6    sense?

7         A.   Yes, ma'am.

8         Q.   So you can't hold it against a defendant if he

9    chooses not to testify.  You also can't say, well, he did

10   choose to testify, so I'm going to give him some points for

11   that.  If a defendant chooses to testify, you judge their

12   credibility like you would all of the other witnesses and weigh

13   their testimony in with the other evidence.  Does that make

14   sense?

15        A.   Yes, ma'am.

16        Q.   If you're on a jury and a defendant chooses not to

17   testify, could you afford them that Fifth Amendment and not

18   hold it against them?

19        A.   Yes, ma'am.

20        Q.   Okay.  That right -- we're going to skip ahead just

21   for one quick second -- that right also applies in the

22   punishment phase of a trial.  A defendant doesn't have to

23   testify in their own punishment phase.  And, again, the jury

24   would be instructed to disregard that silence.  Could you do it

25   even in the punishment phase?

1      A.    Yes, ma'am.

2      Q.    Okay.  The charge is capital murder.  And as you

3   probably know, that means an intentional murder, not an

4   accident, not self-defense, not defense of a third person, not

5   a mistake.  We're not talking about someone who is insane at

6   the time of the offense.  Someone who decided they were going

7   to cause the death of a person and did what it took to meet the

8   result.  I meant to cause the death.  Does that make sense?

9      A.    Yes, ma'am.

10     Q.    So let me give you a quick example.  If I shoot

11  Elaine in the head and she's laying down bleeding and I walk

12  out of the courtroom and tell somebody I just shot Elaine and

13  left her dead, that was an intentional murder, was it not?

14     A.    Yes, ma'am.

15     Q.    Versus let's say that Elaine has made me mad.  She's

16  just -- she's just irritated me, and I shoot her in the leg to

17  hurt her, keep her from running away, and she bleeds to death.

18  Do you think that's the same kind of an intent?  Do you think

19  my mind-set was the same?

20     A.    So you're saying that you shoot her in the leg, and

21  she bleeds to death?

22     Q.    Right.  Do you think I intended to cause her death

23  or -- I mean, I'm still guilty of murder.  Let's get it

24  straight.  I'm still responsible for the crime, because I

25  should have known she would die, or that there was a good

1  chance she would by shooting her, but do you think that intent

2  is the same as shooting her in the head?

3      A.   I guess in my opinion it's in the leg, and I would

4  say no.

5      Q.   Right.  So -- so I only bring those two things out

6  when I'm trying to explain to you -- when we talk about

7  intentional, an intentional murder, that means it was your goal

8  to cause the death.

9      A.   Yes, ma'am.

10     Q.   Not -- right.  Now, I don't have to -- to say I'm

11 about to kill you for you to know that it was my intent, right?

12 How do you remember what someone's intent is?

13     A.   Well, I guess if the gun is placed to my head, you

14 know, then I'm under the impression that you are going to kill

15 me, or you have the intentions to kill me.

16     Q.   So your actions?

17     A.   Right.

18     Q.   Maybe where the -- where the injury is located could

19 tell somebody.  I guess what I'm getting at is I don't have to

20 sit down and write a note that says, I am about to kill Elaine,

21 I want her dead, for you to be able to look at the

22 circumstances of the crime and determine what my intent was.

23     A.   Yes, ma'am.

24     Q.   Okay.  It's not very often that we get evidence of

25 somebody just telling it before it happens.  So you can look at

1    the surrounding circumstances.  It -- and it's not enough that

2    it be that intentional murder for it to be capital.  It has to

3    be that intentional murder, plus an aggravating circumstance.

4    Killing a police officer in the line of duty is a capital

5    murder.  Killing a person -- intentionally killing a person

6    during the course of committing another felony is a capital

7    murder.  You're familiar with that, are you not?

8         A.    Yes, ma'am.

9         Q.    I know you work in the Federal system, and so those

10   rules and laws are a little bit different --

11        A.    Yes, ma'am.

12        Q.    -- than our state laws.

13        A.    Yes, ma'am.

14        Q.    But as we're talking about capital murder here, my

15   job would be to prove beyond a reasonable doubt that the murder

16   was intentionally committed during the course of committing or

17   attempting to commit a robbery.  That's the allegation.

18        A.    Yes, ma'am.

19        Q.    And if I do that, then -- and the jury is convinced

20   beyond a reasonable doubt, the verdict is guilty of capital

21   murder, and then we would go into the punishment phase.  And

22   there are only two possible punishments for capital murder,

23   life without parole, or the death penalty.

24             Before we move into how we decide which of those

25   two is the proper sentence, I want to talk one more time about

1  witnesses.  And I told you that if a defendant chooses to

2  testify, their testimony is judged like all the other

3  witnesses.  That goes for any witness.  It would be improper,

4  as you can imagine, for a juror -- even someone with a law

5  enforcement background like yourself -- to say they're going to

6  believe or disbelieve a witness before they hear their

7  testimony.  In other words, if a police officer comes in

8  wearing their uniform and swears to tell the truth, the whole

9  truth, and nothing but the truth, the jury still has to wait

10 until they hear the witness testify before they decide whether

11 the witness is actually truthful.

12      A.   Yes.

13      Q.   I know you -- you certainly have respect for police

14 officers, I would imagine, based on what you do for a living.

15      A.   Yes, ma'am.

16      Q.   But you recognize that they're human beings.  When

17 they take off their uniform, some lie, some tell the truth, and

18 you can't tell the difference until you hear them?

19      A.   Yes, ma'am.

20      Q.   Could you wait until you hear all the witnesses

21 before you decide whether they're truthful, how much weight to

22 give their testimony?

23      A.   Yes, ma'am.

24      Q.   It sounds like a silly question.  I mean, we asked

25 you on page 5 if you believe police officers are more likely to

1  tell the truth than the average person.  And you said, I sure

2  hope so, but I know there are dishonest people in every

3  profession.  So you've -- you hit it right on the head.

4              When we go into the punishment phase of a

5  capital murder trial, the person -- the best they can do is

6  life without the possibility of parole in prison, right?

7        A.    Yes, ma'am.

8        Q.    And so that's, under the law, the -- the presumptive

9  sentence.  In other words, the jury, kind of like in the first

10 part of the trial where you presume them innocent until I prove

11 otherwise, in the second part of the trial, you presume that

12 the life sentence is the proper sentence, until I bring enough

13 evidence to convince you in Special Issue Number 1 that the

14 person will be a future threat to society before you talk about

15 the death penalty.  Does that make sense?

16       A.    No.  Say that again.

17       Q.    Okay.  So you know you have the presumption of

18 innocence in the first part of the trial?

19       A.    Yes.

20       Q.    When you go into the second part of the trial,

21 there's a presumption that the life sentence is the proper

22 sentence.

23       A.    Okay.

24       Q.    And once again, I have a burden of proof.  I have to

25 prove otherwise before we get to the death sentence, okay?

1      A.    Okay.

2      Q.    And we're going to do that starting out with Special

3  Issue Number 1.  Special Issue Number 1 says that I have to

4  prove beyond a reasonable doubt, same burden as in the first

5  part of the trial --

6      A.    Uh-huh.

7      Q.    -- that it is more likely than not -- that's what

8  probability means there -- more likely than not, that the

9  person you've just convicted of capital murder will commit

10 criminal acts of violence that would constitute a continuing

11 threat to society.

12     A.    Okay.

13     Q.    So we're going to look not at just what he did in

14 the first part in the capital murder, but look forward and say,

15 is this the type of person who's going to be a continuing

16 threat to society.

17     A.    Okay.

18     Q.    Because the State of Texas has decided that that's

19 where we separate those who should receive the death sentence

20 from those who should receive the life sentence.  If you're not

21 going to be a continuing threat to society, then the life

22 sentence is the proper sentence.  You see?

23     A.    I understand.

24     Q.    Okay.  So a lot of people don't know that coming in.

25 Most people -- most lawyers in this building don't know that

1  that's how we get there.  So you're never going to be asked to

2  vote does he deserve the life sentence or does he deserve a

3  death sentence.  Well, what do you think is the proper

4  sentence?  You're going to instead look again to the evidence,

5  look to this table to bring to you sufficient evidence to prove

6  that the person you've convicted will more likely than not

7  commit criminal acts of violence in the future that will

8  constitute a continuing threat.

9            So let's talk about what that means.  I told you

10  that probability means more likely than not.  It doesn't mean

11  absolutely will or certainly will.  It doesn't mean maybe or

12  probably.  It's more than maybe or probably.

13     A.    Okay.

14     Q.    More likely than not commit criminal acts of

15  violence, and it does -- the legislature didn't tell us what

16  that means.  It's going to mean whatever it means to you.

17     A.    Uh-huh.

18     Q.    But you could tell, they could have said that the

19  defendant will commit another murder.  But they didn't do that.

20  Some jurors tell us that, you know, if I hauled off and hit

21  Elaine as hard as I could in the face, that that would be a

22  criminal act of violence.  Some tell us that maybe even just

23  spitting on a prison guard in the right circumstance could be a

24  criminal act of violence, but it's going to be whatever it

25  means to you.

```
 1                 Using your common sense, you can tell that I
 2    don't get to pull out a crystal ball, look into the future, and
 3    go, here is the person you just convicted committing X crime,
 4    right, or X act?  So you're really looking at all of the
 5    evidence that you've heard to determine whether this is the
 6    type of person, the character perhaps of person who will more
 7    likely than not commit criminal acts of violence in the future.
 8    Does that make sense?
 9         A.    Yes.
10         Q.    And it's not just any criminal act of violence.
11    It's criminal acts of violence, plural, acts, of violence that
12    would constitute a continuing threat to society.  So you might
13    think, you know, that a particular -- maybe if I kicked Elaine
14    as hard as I could, that would be an assault, legally, if it
15    hurt.  I'm sure it would hurt, because I'm wearing kind of
16    pointy toe shoes.  That would be an assault under the law, but
17    it might not rise to the level of being a criminal act of
18    violence that would constitute a continuing threat.
19                 When we say society, we've already decided the
20    best they can do is prison for the rest of their life, right?
21         A.    Right.
22         Q.    It's the best they can do.  So when we say society,
23    can you see how that would encompass even prison society?
24         A.    Okay.  Yes.
25         Q.    Right.  Guards who work in there, other inmates.
```

```
 1   You know, we've got counselors and ministers and teachers and
 2   nurses and doctors, people who come to visit their loved ones.
 3   Have you ever visited a prison?  Have you ever been inside a
 4   prison?
 5        A.   I mean, I've worked at a prison.
 6        Q.   You have?
 7        A.   But -- yes, yes.
 8        Q.   So you know that there's movement among the
 9   prisoners.  They have access to each other.  They have access
10   to guards --
11        A.   Yes.
12        Q.   -- counselors?
13        A.   Yes.
14        Q.   And obviously prison officials can't control all
15   violence, can they?
16        A.   No.
17        Q.   So do you believe that the people inside prison
18   deserve protection from someone who would commit criminal acts
19   of violence against them?
20        A.   Yes, ma'am.
21        Q.   So -- so when we say society, we're talking about
22   even prison society.
23        A.   Okay.
24        Q.   Wherever the person finds them self.
25        A.   Okay.
```

1    Q.    A lot of people tell us, Ms. Cornelius, that you're

2  talking about predicting the future, and that's not something I

3  believe could ever be done.  How do you feel about that?  Do

4  you believe that it is possible for a juror to -- to make that

5  decision based on the evidence, whether someone is going to be

6  a continuing threat?

7    A.    You know, we can't -- well, me personally, I can't

8  say what the person is going to do in the future, but you can

9  look at the background and the facts of it.  So, me personally,

10  I -- you know, I can't say, yes, they will, or, no, they won't,

11  but I think that the weighing factor is their background.

12    Q.    To decide more likely than not --

13    A.    Right.

14    Q.    -- what they -- what they would --

15    A.    Yes.  Yes or no.

16    Q.    But you believe that it is possible through evidence

17  to decide beyond a reasonable doubt what someone more likely

18  than not will do in the future?

19    A.    Yes.

20    Q.    Okay.  Okay.  Absolutely.  If I had to prove

21  absolutely 100 percent what would happen, nobody could do that.

22    A.    Yes.

23    Q.    The law says that you can look solely to the facts

24  of the crime for which you've convicted the Defendant to decide

25  the answer to Special Issue 1.

```
 1        A.    Okay.

 2        Q.    I'll give you a simple -- I think a simple

 3   illustration.  Let's say that one of the pilots in the 9-11

 4   attacks survived when they ran the plane into the twin towers.

 5        A.    Uh-huh.

 6        Q.    Let's say one of them survived and never had

 7   committed any violent act in the past at all.  A jury in that

 8   capital murder trial could, I believe, look solely to the facts

 9   of the crime they committed and say anybody capable of that,

10   will more likely than not be a future threat to society,

11   wherever they are.  Does that make sense?

12        A.    Yes.

13        Q.    So you can look solely to the facts that --

14        A.    Okay.

15        Q.    -- you convicted them of --

16        A.    Okay.

17        Q.    -- but that's not always going to be enough.  The

18   State still has a burden of proof.  I tell you that because you

19   can't say just because someone is convicted of capital murder,

20   because they were capable of committing a capital murder,

21   they're always going to be a future threat, right?

22        A.    Yes.

23        Q.    Because then we wouldn't need Special Issue Number

24   1.  We'd just say you're convicted of capital murder, death

25   penalty it is.
```

1    A.    Right.

2    Q.    Right?  So you still have to look to the evidence to

3 answer Special Issue Number 1.  And if after you hear all of

4 the trial, all of the evidence in the first part of the trial,

5 and the punishment phase of the trial more evidence can be

6 presented -- will be in all likelihood presented by the State

7 of Texas and maybe the Defense -- they have the option, if they

8 choose, to present evidence.  After hearing all of that, if you

9 think we didn't prove it, if you believe that the Defendant

10 will not be the type of person who would commit criminal acts

11 of violence in the future, then you answer that no.  And then

12 the life sentence is the proper sentence.

13    A.    Yes.

14    Q.    And I gather, based on your answers earlier, that

15 you don't have any problem with someone getting a life

16 sentence, if that's the proper sentence for capital murder?

17    A.    No, I don't.

18    Q.    And if you answer Special Issue Number 1 yes, that

19 the State proved it beyond a reasonable doubt, then you answer

20 that yes, and you move then to Special Issue 2.

21    A.    Okay.

22    Q.    Okay.  You don't ever get to Special Issue Number 2,

23 if the answer to Special Issue Number 1 is no.

24    A.    Okay.  It stops at that point.

25    Q.    It stops at that point because the law says if

```
1   you're not going to be a future threat to society, then the
2   life sentence is the proper sentence, the trial is over, then
3   you all go home, we go home, the Defendant goes to prison for
4   the life sentence.  If you say, yes, I believe that the State
5   has proven it, then we move to Special Issue 2.  My job is over
6   now.
7        A.   Okay.
8        Q.   And I told you the Defendant never has to prove
9   anything, right?  The Defense doesn't have to prove that the
10  Defendant won't commit criminal acts of violence.  It's my job
11  to prove more likely than not he will.
12            But in Special Issue Number 2, the jury's job is
13  not over.  What Special Issue Number 2 -- and it's a -- it's a
14  wordy thing.  The legislature put in all these words that
15  nobody understands, so I'll try to simplify it.  The jury is
16  going to be required to go back and one more time look at all
17  of the evidence.  Kind of through different eyes now, because I
18  don't have to prove anything.  The other parts I have had a
19  burden.
20            Now you look at everything, and ask yourself if
21  there's anything in the evidence, anything about the
22  circumstances of the offense, maybe who the victim is, maybe
23  who -- you know, how the crime was committed, was there a
24  relationship between them, all of those things about the
25  offense, look at the Defendant's character and background, if
```

```
 1   there's evidence about that.  Criminal history, lack of
 2   criminal history.  Family history, anything you heard in the
 3   evidence about that.  Look at the personal moral culpability of
 4   the Defendant.  And you may or may not have evidence of that.
 5   But if you hear anything in the evidence that you believe is
 6   sufficiently mitigating -- and when we say mitigating, the law
 7   will tell you that that is anything that may lessen the
 8   Defendant's moral blameworthiness, moral responsibility for the
 9   crime.  Anything that in your mind in the evidence would
10   warrant a life sentence rather than the death sentence.
11        A.    Okay.
12        Q.    Okay.  So this you can see is a lot more subjective
13   than anything you've done before, to this point.  Before,
14   you're going did the State prove it, yes or no.  Did the State
15   prove this, yes or no.  Now you have to go back and kind of
16   reconsider everything.  And we sometimes call this the safety
17   net question.  Because this is the jurors' opportunity to make
18   sure that the death sentence is the proper sentence.
19        A.    Okay.
20        Q.    Nobody is going to tell you what is or isn't
21   mitigating to you.  Some people say that, you know, severe
22   childhood abuse, sexual abuse, physical abuse could be
23   mitigating to them.  Some people say, you know, drug or alcohol
24   addiction could be mitigating to them.  Other people would say
25   that's aggravating to me, or I don't look at that as mitigating
```

1   or aggravating, that doesn't do anything.  So it's going to be

2   whatever it is to you personally.  And all of the jurors have

3   to do that examination of the evidence.

4                    But if there is something that in your mind is

5   sufficiently mitigating to warrant a life sentence, then this

6   is the -- this is the vehicle by which that gets done.

7        A.    Okay.

8        Q.    Nobody in a capital murder trial, not one juror will

9   walk out of the process without having had the opportunity to

10  make sure that the death sentence was proper in the evidence.

11  Now, it's not a person -- a juror's opportunity to go, well, I

12  don't like the death penalty, personally got problems with it,

13  religious, personal, or otherwise, so I'm always going to say

14  there's something mitigating, right?

15       A.    Uh-huh, yes.

16       Q.    Because that would be improper.  It has to be based

17  on the evidence that you heard.

18       A.    Okay.

19       Q.    But that's where it comes in for you, I think, and

20  saying under the right circumstances, under the proper set of

21  facts, looking at circumstances of the offense, character and

22  background, personal moral culpability, some cases should get a

23  life sentence and some cases should get a death sentence,

24  right?

25       A.    Yes.

1      Q.   So you're not one of those people who's going to

2   always answer yes or always answer no before you've heard

3   anything?

4      A.   No.  I have to hear the facts.

5      Q.   Okay.  As we -- as we've gone through this, I think

6   you can see that there's a real process --

7      A.   Oh, yes, it is.

8      Q.   -- by which we -- we get to the ultimate decision

9   about someone receives a life sentence or a death sentence.

10      A.   Yes, it is.

11      Q.   And there's never an automatic answer.  You can tell

12   in Special Issue Number 2, I imagine, that it's going to have

13   to be something pretty darn mitigating because what we're

14   talking about is a bad guy by the time we get here or a bad

15   gal -- someone who has intentionally caused a person's death in

16   the course of committing a felony offense, robbery, and

17   somebody that you believe will more likely than not pose a

18   threat to people even in the penitentiary.

19      A.   Yes.

20      Q.   But if you heard something that you believe

21   warranted sending them to prison anyway, you could do that?

22      A.   Yes.

23      Q.   Even though you believed they're going to be a

24   threat to the people inside?

25      A.   So you're saying -- okay, that -- can I send them to

```
 1  prison for life?
 2      Q.    Right.
 3      A.    Even though I feel like that they would be a threat
 4  to the people in the prison?
 5      Q.    Right, because by the time we get to 2, you've
 6  already said yes to 1.
 7      A.    Right.
 8      Q.    So that's why I say it would have to be something
 9  pretty sufficiently mitigating, not -- we all have something
10  mitigating about us, right?
11      A.    Right.
12      Q.    Grew up in a single parent household, maybe that's
13  not the best of circumstances, maybe that's mitigating.  The
14  question is, is it sufficiently mitigating.
15      A.    Okay.
16      Q.    Right?
17      A.    Yes.
18      Q.    Could you answer that yes if you heard something
19  that in your mind told you was the proper sentence to give the
20  life sentence?
21      A.    Yes.
22      Q.    There's just a couple of other things I want to go
23  through.  Do you have any questions about the process here --
24      A.    No.
25      Q.    -- as we've gone through it?  Okay.  Then there's a
```

```
 1  couple of things I -- I was curious about your background.  You

 2  are and have been a drug and alcohol counselor?  Treatment --

 3       A.    I am.

 4       Q.    -- substance abuse?

 5       A.    Yes.

 6       Q.    For parolees or for inmates?

 7       A.    It's for inmates.  I was working on the inside doing

 8  treatment on the inside, and so now I'm working on the outside

 9  for inmates that have been released from prison.  They're in

10  the community in halfway houses.

11       Q.    Okay.  And the prison -- y'all don't have parole

12  anymore in the Federal system?

13       A.    No, we don't.

14       Q.    I have to plead ignorance.

15       A.    1987, I think, it was abolished.

16       Q.    Okay.  That's what I thought.  But you have some

17  similar -- we don't call it parole, but they're still

18  supervised --

19       A.    Oh, yes.

20       Q.    -- under release, so you're part of that?

21       A.    I'm under -- once they're -- they're still under our

22  custody, but they're doing six months -- up to six months in

23  the community --

24       Q.    Okay.

25       A.    -- in the halfway house --
```

1      Q.    Got you.

2      A.    -- through a transitional phase.

3      Q.    And that's when you're working with them?

4      A.    Yes.

5      Q.    We asked you on page 10 about your feelings about

6   drugs or alcohol, and you obviously have vastly more experience

7   than any of the other jurors that we've talked to.  You

8   understand that if someone voluntarily gets themselves

9   intoxicated on drugs or alcohol, that they're still legally

10  responsible for the crime they commit?

11     A.    Yes.

12     Q.    You can't say, I got -- otherwise, we'd all just get

13  really drunk or high and go do whatever we wanted.

14     A.    Right.

15     Q.    In Question Number 65, we told you that evidence of

16  intoxication may be considered in mitigation of punishment.

17  That may be evidence that you would hear in a trial for capital

18  murder, and the jury would then have to decide -- each juror

19  would decide what they -- whether they found that mitigating or

20  not and whether or not it was sufficiently mitigating to them.

21     A.    And that's in number -- Special Issue Number 2?

22     Q.    Sure.

23     A.    Okay.

24     Q.    Yes, because otherwise, the evidence of intoxication

25  is really not relevant, right?

 1          A.    Right.

 2          Q.    Whether you're guilty or not, whether you'll be a

 3    continuing threat to society based on our evidence.

 4    Intoxication, however, may be an issue to consider in Special

 5    Issue 2, if it's in evidence.

 6          A.    Yes.

 7          Q.    You're not -- I gather by this that you wouldn't

 8    automatically answer Special Issue Number 2 one way or the

 9    other if you heard evidence that someone was intoxicated at the

10    time?

11          A.    That I wouldn't just --

12          Q.    Automatically --

13          A.    -- automatically say yes or no?

14          Q.    Right.

15          A.    Oh, no.

16          Q.    Okay.  Because, you know -- and I'm just feeling you

17    out with your background.  In Question Number 66, we asked you:

18    Would a person's use of drugs or alcohol at the time of the

19    offense automatically prevent you from assessing the death

20    penalty?  And you said, no, it should only be considered.  And

21    that's what the law would entail, that there's never an

22    automatic answer.

23                We do sometimes get people who tell us, you

24    know, if there's evidence that somebody was intoxicated at the

25    time, I'm always going to say no to Special Issue Number 1 or

```
 1  always going to say yes to Special Issue 2, and that's not
 2  proper.
 3       A.    Right.
 4       Q.    Because you have to weigh all the evidence.
 5       A.    Right.
 6       Q.    And that's how you feel.  You'd weigh it all?
 7       A.    Yes, ma'am.
 8       Q.    You'd have to consider it because it's in the
 9  evidence like everything else in the evidence?
10       A.    Yes, ma'am.
11       Q.    Okay.  On page 3 you used a term that I have to
12  admit, I haven't -- I may not be familiar with.  I want to see
13  what you meant by it.  Question Number 16.  You asked whether
14  the death penalty is a deterrent to other criminals.  And you
15  said sometimes, but if a person is defiant, they will commit
16  their crimes at any cost.  Some criminals believe they will not
17  get caught or they are above the law.  Grandiose mentality.
18  Tell me what that means, grandiose.
19       A.    It's just those individuals that feel like they are
20  above the law, that they won't get caught, you know, they can
21  do whatever they want to do.
22       Q.    Sure.
23       A.    So that's what that means.
24       Q.    I'm sure you've encountered people like that in your
25  many years of dealing with prisoners.
```

 1        A.    Yes, ma'am.

 2        Q.    I want to talk to you a little bit about remorse.

 3  And you mentioned that a couple of times in your questionnaire

 4  that that's important, and I'll tell you a lot of people -- a

 5  lot of jurors have told us that remorse is one of those things,

 6  if the person who committed the crime is remorseful, that

 7  that's telling to them in answering these questions.

 8  Obviously, remorse can only come from the person who is feeling

 9  it.

10        A.    Uh-huh.

11        Q.    And I've told you that a defendant has a right not

12  to testify.   If a defendant chooses not to testify, the jury

13  may never have any information directly about whether someone

14  is remorseful for their crime.

15        A.    Right.

16        Q.    And if they don't, then that's not an issue to be

17  considered because it's just not in the evidence.   Are you

18  going to require at any time, either in the first part of the

19  trial or the second part of the trial, for the Defendant to

20  testify about -- you know, testify that they're not going to be

21  committing any future violent acts or testify that they deserve

22  a life sentence before you answer these?

23        A.    No.   I'm just looking at the facts.

24        Q.    Looking at what is in evidence?

25        A.    Right.

1       Q.   Okay.  And you recognize that it's always the State

2  of Texas who has the burden of proof?

3       A.   Yes, ma'am.

4       Q.   The Defense -- this team right here, they're great

5  lawyers.  They could sit there and do crossword puzzles the

6  entire trial, and that would be legally acceptable.  They

7  won't, but -- but the point is, that you always look to me to

8  do -- to carry the burden.

9       A.   That's right.

10      Q.   To do the heavy lifting, it's my job.

11      A.   Yes, ma'am.

12      Q.   Do you have any questions for me?

13      A.   No, ma'am.

14      Q.   Do you feel like this is a process you could

15 participate in, and in the event that the verdict results in a

16 death sentence -- I didn't tell you that the jury is the final

17 decision maker on this.  And an answer of yes to Special Issue

18 1 and no to Special Issue 2, leaves the Judge with no choice

19 but to sign a death warrant, basically.  He doesn't get -- or

20 she, it will be a female judge at trial -- doesn't get to look

21 at it and go, I disagree, I don't think they came to the right

22 conclusion and change it.

23      A.   Yes, ma'am.

24      Q.   Could you participate in a process that might result

25 in the execution of Matthew Lee Johnson?

```
 1        A.    Yes, ma'am.

 2              MS. MOSELEY:  That's all I have, Judge.  Thank

 3   you.

 4              THE COURT:  All right.

 5                   DEFENSE VOIR DIRE EXAMINATION

 6   BY MR. WEATHERSPOON:

 7        Q.    Ms. Cornelius, my name is Kenneth Weatherspoon, and

 8   along with Catherine Bernhard and Nancy Mulder, we represent

 9   the Defendant, Matthew Lee Johnson.

10              And I wanted to reiterate what Ms. Moseley told

11   you, that at this point there's no such thing as a right answer

12   or a wrong answer.  We just want to know how you feel, what's

13   really in your heart that will help us comprise a fair and

14   impartial jury.

15              And I want to start off by telling you that

16   those of us sitting at this table by no means ever think you'll

17   be called on to decide whether the death penalty is appropriate

18   in this case.  We do not believe Matthew Lee Johnson will be

19   found guilty, so just because we've spent a lot of time talking

20   about it, because that's the way the process is, I don't want

21   you to think that we think that's where we'll be, because we

22   don't, okay?

23        A.    Yes, sir.

24        Q.    Now, there are a couple of things in your

25   questionnaire that kind of caught my attention, and I want to
```

1   talk to you about it for a second.  One of the first things is

2   the very -- well, the second to the last page on page 18.

3        A.   Okay.

4        Q.   Question 139:  How would you feel about being chosen

5   as a juror in this case?  And you said:  I really wouldn't want

6   to do it.  Tell me -- tell me why.  Tell me what you're

7   thinking.

8        A.   Well, I mean, at this point, as you can see, it's a

9   hundred and something questions.  And to be honest, at this

10  point I was ready to go.  And I mean, you know, it was a lot

11  answering all of these questions -- I mean, to be honest.  And

12  as you can see, as I got to the end, I didn't explain anything

13  because I was tired and I was ready to go.  So -- but, you

14  know, I don't have a problem if I am selected.

15       Q.   Okay.  I just -- I just --

16       A.   Yeah.

17       Q.   -- wanted to clear that up.

18            The second thing that caught my attention is --

19  if you turn to page 16.

20       A.   Uh-huh.

21       Q.   Question 121.

22       A.   Okay.  Uh-huh.

23       Q.   List three men and women who are publicly known --

24  who are known -- list three men and women who are publicly

25  known who you most respect.

```
 1        A.    Yes.

 2        Q.    Okay.  And one of them you put Craig Watkins.

 3        A.    Uh-huh, yes.

 4        Q.    They work for Craig Watkins.

 5        A.    Yes.

 6        Q.    So you understand why that might cause me concern?

 7        A.    Okay.

 8        Q.    If -- if you think that their boss is making the

 9  right decisions and the decisions he makes are good decisions

10  and sound decisions --

11        A.    Uh-huh.

12        Q.    -- then that might affect you and you might say,

13  well, if Craig Watkins thinks that this case is a death penalty

14  case, then it must really be a death penalty case.

15        A.    Okay.  And those are not my -- my thoughts.  I have

16  not researched all of his cases or this, that, and the other.

17  I'm just going by him in the community.  It doesn't have

18  anything to do with his office.  It has something to do with

19  his position.  So I have not researched to see if his office,

20  you know, have -- have adequately assessed their cases or this,

21  that, and the other.  It was him personally.  It didn't have

22  anything to do with his office.

23        Q.    Well, when you say him personally, have you ever met

24  him personally?

25        A.    No, sir.
```

```
 1        Q.    So what -- what was it about him that brought you to
 2   that conclusion?
 3        A.    Well, you know, I grew up in -- in Dallas.  And to
 4   be honest with you, he's the very first black District
 5   Attorney.  You know, I hear positive things about what he's
 6   doing in the community, so it doesn't have anything to do with
 7   his office.
 8        Q.    Have you -- have you ever testified in court before?
 9        A.    No.
10        Q.    Okay.  So your feelings about Mr. Watkins, who all
11   of us respect, but your feelings about Mr. Watkins will not
12   play any part in this case?
13        A.    No.  I don't even know him.  I haven't met him.
14        Q.    Okay.  Now, in your questionnaire, you said that you
15   spent quite a few years working out at Seagoville.
16        A.    Yes.
17        Q.    Okay.  Were you -- was your position always the same
18   out in Seagoville?
19        A.    No.  I started out as an officer.  I was in case
20   management, and then I got into drug treatment.
21        Q.    Okay.  And -- and what led you to pursue that line
22   of career, drug treatment?
23        A.    Well, I started out being in law enforcement, went
24   to high school, had decided I wanted to be an attorney, but I
25   changed my mind.  But I stayed in that field.  So it's just
```

```
 1   something that I wanted to do.
 2        Q.   And was there any specific thing that -- that drove
 3   you into the field of drug counseling, or was it just something
 4   that was --
 5        A.   Oh, no, trying to help those that -- that would like
 6   to make positive changes in their lives -- to be an instrument
 7   in that.
 8        Q.   When you -- when you worked at Seagoville, did
 9   you -- did you counsel any of the inmates one-on-one, or was it
10   always in a group setting?
11        A.   Both.
12        Q.   Okay.  So you did counsel inmates one-on-one?
13        A.   Yes.
14        Q.   Okay.  And I noticed in your questionnaire when it
15   talked about do you think an individual convicted of capital
16   murder could be rehabilitated -- let me find that.  I think it
17   is on --
18        A.   I think I said, yes.  That was one of the one, two,
19   three.
20        Q.   Yes.
21        A.   I don't know what page it's on.
22        Q.   It's on page 6.
23        A.   Okay.
24        Q.   Page 37 --
25        A.   Oh, page --
```

1      Q.    Excuse me, page 6, Question 37?

2      A.    36?  Page 6?

3      Q.    Page 6, Question 37.

4      A.    Oh, okay.  Oh, okay.  Uh-huh.

5      Q.    Okay.

6      A.    Which is 36 I'm thinking.  37 -- okay, I got you.

7      Q.    Yeah.

8      A.    I thought 37 was similar.

9      Q.    In -- in your experience -- well, let me rephrase

10  the question.  When you were working in Seagoville, was there

11  any classification of inmate that you would not counsel?  And

12  what I mean by that is no matter what offense they were in

13  there for, if that individual sought drug counseling, would you

14  or would the facility allow you to counsel them, or were there

15  some inmates that even though they may seek counseling, the

16  facility or you individually said no, I don't want to counsel?

17      A.    I couldn't do that, no.  I had to counsel

18  individuals that were in the drug program.  It doesn't matter

19  what type of offense that they had, if it was a sex offense,

20  down to bank fraud.

21      Q.    So would it be fair to say that you -- you -- did

22  you ever have occasion to counsel inmates who were incarcerated

23  for violent offenses?

24      A.    Oh, yes.

25      Q.    Okay.

1      A.    Uh-huh.

2      Q.    And did you ever counsel any of them one-on-one?

3      A.    Yes.

4      Q.    And was your goal always the same with every inmate?

5      A.    Yes.

6      Q.    And what was that goal?

7      A.    Well, just to try to, you know, hopefully be an

8 instrument to them in terms of making positive changes in their

9 lives while they were in prison and while they were outside of

10 prison, just -- just being that person.  Now, everybody don't

11 want to change, so I realize that.

12      Q.    And -- and there are some inmates in Seagoville who

13 are there for very, very lengthy sentences; is that correct?

14      A.    That's correct.

15      Q.    And did you ever counsel any of them?

16      A.    Well, the drug program -- the only thing about the

17 drug program, those are normally individuals.  Their sentences

18 are probably under five years, so I'm not really dealing with

19 the individuals with lengthy sentences.  And Seagoville is a

20 low level institution, so you wouldn't find too many inmates

21 there doing, you know, more than 15 or 20 years.

22      Q.    And, you know, when you said that, I -- I kind of

23 chuckled because all of us in the legal profession, when you

24 refer to 10 or 15 years as not lengthy --

25      A.    Well, I'm saying for that facility -- now, if I'm in

1  a penitentiary, that's a little bit different.  But I'm at a

2  low level institution, so that's why I said that.  It's for

3  that particular institution.

4       Q.    Okay.  But now -- and I'm going to move on.  I'm not

5  going to quibble with you, but doesn't -- isn't there now a

6  section of Seagoville that handles the 10-year mandatory

7  minimum drug offenders with drug charges?

8       A.    The 10-year minimum?

9       Q.    Yeah.

10      A.    Which --

11      Q.    People -- people who are sentenced on drug

12  offenders -- on drug offenses where they start off with a

13  minimum of 10 years?

14      A.    Yes, but they could have started out at a higher

15  level institution, and they transferred down to a lower level

16  institution.

17      Q.    Okay.  Do you believe drug counseling works?

18      A.    Yes.

19      Q.    Do you believe it's something that facilities should

20  offer to the inmates?

21      A.    Yes.

22      Q.    And during the times when you counseled inmates, did

23  you all have occasion to just talk about life in general?

24      A.    Oh, yes.

25      Q.    Okay.

1    A.    Uh-huh.

2    Q.    And based on your experiences, you believe that no

3    matter what the offense is, that individuals can change?

4    A.    Yes.

5    Q.    Now, if you look on page 3 --

6    A.    Uh-huh.

7    Q.    -- Question 14.

8    A.    Okay.

9    Q.    It says:  If you believe in using the death penalty,

10    how strongly on a scale of 1 to 10 do you hold that belief?

11    And you put 4.

12    A.    Uh-huh.

13    Q.    Explain to me how you arrived at that number.

14    A.    You know, it was kind of in the middle, you know,

15    and as -- as you read my responses, you know, it goes either

16    way.  It fluctuates.

17    Q.    So you -- you would -- yeah, you use the word

18    "fluctuates."

19    A.    Uh-huh.  Quite a bit.

20    Q.    Quite a bit.  So you would -- you would -- would it

21    be fair to say that you would have an open mind to a life

22    sentence and an open mind to a death sentence?

23    A.    Yes.

24    Q.    Now -- now, let me detour just a second.

25    A.    Okay.

```
 1        Q.    Do you know anyone who works in the Garland Police

 2   Department?

 3        A.    No.

 4        Q.    Anyone who works in the Dallas Police Department?

 5        A.    No.

 6        Q.    Anyone who works in the Garland Fire Department?

 7        A.    No.

 8        Q.    Anyone who works in the Dallas police -- excuse me,

 9   Dallas Fire Department?

10        A.    No.

11        Q.    Anybody who works in the Texas Department of

12   Criminal Justice?

13        A.    No.  I mean, it could have been someone when I went

14   to college, but, you know, I haven't talked to him since I left

15   college -- over 25 years ago, so, no.

16        Q.    Did you ever -- in the course of your professional

17   life, did you ever go to any seminars or conventions where you

18   might have interacted with people from the Texas Department of

19   Criminal Justice who worked as drug counselors in TDC?

20        A.    No.

21        Q.    Okay.

22        A.    No.

23        Q.    Give me just a second.

24        A.    Okay.

25        Q.    You indicated that you take blood pressure
```

 1  medication?

 2       A.    Yes.

 3       Q.    Okay.  Would it be any problem sitting in the

 4  courtroom -- I know in the pamphlet it describes the breaks we

 5  take.  Do you think the medication would cause any problem?

 6       A.    No.

 7       Q.    Okay.  I'm going to read you a list of names, and if

 8  you recognize any of these names, just let me know.

 9       A.    Okay.  Are they working for a certain -- in a

10  certain area or something?

11       Q.    No, these are civilians.

12       A.    Oh, okay.  Okay.

13       Q.    Scott Harris, Elizabeth Harris, Chris Harris,

14  Kenneth Marecle, Amy Marecle, Michael Frank, Anna Lunceford,

15  Jim Medley, Lawrence Denson, Jonas Lucht, Greg Mansell, Carina

16  Pinzon, Digna Salmeron, Kelly Keeton, Daphne Johnson, Sherry

17  Ann Clark, Amy Armstrong, Anthony Johnson, Alma Johnson,

18  Courtney Johnson, David Williams, Danny Mullins, David

19  Contente, Gioconda Verdaguer, Donald Dunlap, Johnny Wright,

20  Monica Cajas, Michael Crosby, Roxanne Luttrell, Robbie Denmark,

21  Quinlen Minor, Margaret Tatum, Jim Bertucci, Greg Mansell, John

22  Harris, Timothy Proctor, Carlton Jenkins, Durian Allen, Gene

23  Gathright, Manuel Turner, Andre Howard, Kenneth Lewis, or

24  Sheldon Henry?

25       A.    No, I don't recognize any of those individuals.

1      Q.    Okay.  I wanted to go back to one thing Ms. Moseley

2   was asking you, just to make sure I heard something correctly.

3      A.    Uh-huh.  This is Ms. -- Ms. Moseley?  Okay.

4      Q.    Yeah, this is --

5      A.    Okay.

6      Q.    When she was talking about the special issues, you

7   told her that even after you found someone guilty of an

8   intentional murder on capital murder and you found Special

9   Issue Number 1 yes, that you could still keep an open mind to a

10  life sentence; is that correct?

11     A.    Yes.

12     Q.    Okay.  I have two final questions.

13     A.    Okay.

14     Q.    First question I have is:  The trial starts the day

15  after your birthday, so you sure you want to have gone out and

16  had a good time --

17     A.    Yeah, I noticed that.

18     Q.    -- so you --

19     A.    Y'all noticed it, too, huh?

20     Q.    You going out -- you sure you're going to have a

21  good night's sleep before the --

22     A.    This is on a Monday?  It starts on a Monday?  Yes, I

23  don't -- you know, obviously don't drink or don't do all those

24  other things, so -- so, yes.

25     Q.    Okay.  I wanted to make sure.

```
 1        A.    Okay.

 2        Q.    And -- and lastly, now, Ms. Jones here --

 3        A.    And that's -- okay, Ms. Jones.

 4        Q.    You all are soros, so she -- she comes in wearing

 5   her little pin as a member of Delta Sigma Theta --

 6              MS. JONES:  You noticed my little cup.

 7        A.    So you picked up on that, too, huh?

 8        Q.    (BY MR. WEATHERSPOON)  I picked up on that, too.

 9   That's not going to influence you, is it?

10        A.    No.  I'm sure Ms. Jones is here to do her job, and,

11   you know, as well as -- as you all are here to do a job, so,

12   no, that don't have -- you know, us being a part of the same

13   sorority don't have anything to do with it.

14        Q.    Okay.

15        A.    The facts.

16        Q.    Okay.  Do you have any questions you'd like to ask

17   of me?

18        A.    No, sir.

19        Q.    Okay.  Thank you very much.

20        A.    Thank you.

21              THE COURT:  All right.  I need you -- you can

22   leave your paperwork right there.

23              VENIREPERSON:  Oh, leave my paperwork?

24              THE COURT:  I need to you step outside the door

25   there for a minute.
```

```
 1                          VENIREPERSON:  Oh, okay, don't take my

 2   paperwork.

 3                          (Venireperson excused from courtroom.)

 4                          THE COURT:  868A, Ms. Cornelius.  Does the State

 5   have a challenge?

 6                          MS. MOSELEY:  No, Your Honor.

 7                          THE COURT:  Does the Defense?

 8                          MR. WEATHERSPOON:  No, Your Honor.

 9                          THE COURT:  All right.  She will become Number

10   32.

11                          (Venireperson 868A, Yolanda Cornelius,
                              qualified.)
12

13                          THE COURT:  Bring her back in.

14                          (Venireperson returned to courtroom.)

15                          THE COURT:  Mrs. Cornelius, you're going to be

16   on the panel from which the jury will be selected.  We'll

17   probably be another maybe three weeks before we get there, but

18   you will be called.  We need to take your picture because as

19   many people as we're going to be going through, when it comes

20   time for them to make their strikes, it helps them to see a

21   picture with the information.

22                          VENIREPERSON:  Okay.

23                          THE COURT:  As soon as your picture is taken,

24   you can be excused.  Remember the instructions you've been

25   given.  You're still under those same instructions.
```

```
 1                    VENIREPERSON:  Yes, sir.

 2                    THE COURT:  Thank you.

 3                    (Venireperson excused from courtroom.)

 4                    (Recess.)

 5                    THE BAILIFF:  All rise.

 6                    (Venireperson brought into courtroom.)

 7                    THE COURT:  Mr. Smith, have a seat right there.

 8                    Be seated.

 9                    Mr. Smith, everyone here knows who you are, and

10     they know a lot about you because they've read your

11     hundred-page questionnaire or however long it is.  But let me

12     introduce you to the people that are participating today.

13                    Sitting between you and I is Darline LaBar.

14     She's the court reporter, and it's her job to take down an

15     accurate record of everything that happens here -- that happens

16     here today.  So when you're asked a question, I need you to

17     speak up so everyone can hear you, because she can't hear a

18     nod.  So -- and we all get in a habit of nodding yes and

19     nodding no, but that won't work this morning.  We need a yes

20     and a no.

21                    VENIREPERSON:  I understand.

22                    THE COURT:  Okay.  Over here representing the

23     State is Andrea Moseley.

24                    MS. MOSELEY:  Good morning.

25                    VENIREPERSON:  Good morning.
```

```
 1                 THE COURT:  Elaine Evans.

 2                 MS. EVANS:  Good morning.

 3                 VENIREPERSON:  Good morning.

 4                 THE COURT:  And Rocky Jones back in the back.

 5                 VENIREPERSON:  Good morning.

 6                 MS. JONES:  Good morning.

 7                 THE COURT:  And here representing the Defendant

 8  is Nancy Mulder.

 9                 MS. MULDER:  Good morning.

10                 VENIREPERSON:  Good morning.

11                 THE COURT:  And Catherine Bernhard.

12                 MS. BERNHARD:  Good morning.

13                 THE COURT:  And Kenneth Weatherspoon will

14  probably be coming in.  And this is the Defendant, Matthew

15  Johnson.

16                 VENIREPERSON:  Good morning.

17                 THE COURT:  I'm Joe Clayton.  I'm a Senior

18  District Judge handling the jury selection in this capital

19  murder case.  This case will be tried by Judge Holmes, Judge of

20  the 363rd Court.  And she's handling her regular docket while

21  this process goes on.  We're now starting our sixth week, so

22  you can imagine what her regular docket would look like if she

23  didn't do anything for eight or nine weeks, which is what it

24  will take us to finish it.

25                 Do you recall being brought down on June 21st, I
```

```
 1  believe, at the big panel?

 2              VENIREPERSON:  I do.

 3              THE COURT:  Sworn in at that time?  Just for

 4  information only, there was -- you were in the morning group.

 5  There was another group that same size that afternoon.  So

 6  we've had a lot of people being involved in the process, and --

 7  but we need that many people in a capital case because it's

 8  different.  The process is different than any other cases that

 9  we have in our system.

10              This case is going to be tried by Judge Holmes

11  beginning on October the 28th and will last approximately two

12  weeks.  Does that cause you any scheduling problems?

13              VENIREPERSON:  No.

14              THE COURT:  Okay.  Have you read anything about

15  this case in the newspaper, seen anything on TV, or heard

16  anybody talk about it?

17              VENIREPERSON:  I have not.

18              THE COURT:  All right.  You've had plenty of

19  time to go over your questionnaire and the information

20  pamphlet, and they will be asking you some questions about

21  those items as they begin.  Each side has 45 minutes, and I

22  will let the State begin.

23              Elaine.

24              MS. EVANS:  Thank you, Your Honor.

25                      STEPHEN SMITH,
```

1  was called as a venireperson by the parties, and after having

2  been first duly sworn, testified as follows:

3                    STATE VOIR DIRE EXAMINATION

4  BY MS. EVANS:

5      Q.    Mr. Smith, I know you just told the Judge that you

6  don't have any scheduling conflicts that would prevent you

7  during the time period that we're talking about for this trial.

8  I appreciate that.  That's not been the case with every juror.

9  You know, sometimes life comes up and you got to deal with

10  things during those times that we have scheduled and allotted

11  for this trial.

12              I do see in your questionnaire, however, that

13  you talk about a little bit of a concern with your work

14  schedule and being away from your store for a prolonged period

15  of time.  Anything about that, if you were to sit and serve as

16  a juror in this case, that you think would take away from your

17  service as a juror if you were asked to serve?

18      A.    No.  The only concern I had was that if I were away

19  for a protracted period was that I might be replaced at the

20  current position that I'm -- not -- not my position and title,

21  but at my position at another location, which would not be

22  desirable for me.

23      Q.    Absolutely.  I get that.  I don't like change at all

24  so I get that.  Do you think that that would be a concern of

25  yours such that it would be weighing on your listening to and

1  evaluating the evidence in this case and your deliberations, or

2  do you think that it's something that you would be able to set

3  aside and listen to the facts and the evidence in this case if

4  you were asked to serve?

5       A.    It wouldn't be a distraction.  I could perform my

6  duties.

7       Q.    Great.  And it's just two weeks.  And we say two

8  weeks.  It could be a little bit less.  We never know how long

9  a jury is going to deliberate, so we say -- allot two weeks.

10  And you would be able to give it your full attention?

11       A.    I would.

12       Q.    Okay.  Thank you.  With that, I'll explain to you

13  that the lawyers from both sides -- this is our only

14  opportunity to talk to the jurors.  It's our only opportunity

15  to talk to you about your thoughts and feelings on the

16  principles of law that may come up in a case like this.  It's

17  our only time to talk to you about your thoughts and feelings

18  on the death penalty.  And so with that said, we just are

19  asking for honest answers here today.  There are no right or

20  wrongs.  Obviously, the 12 people that would sit and serve on

21  the jury would then take an additional oath, and that oath

22  would be that they're required under the law to render a true

23  verdict based on two things and two things only, and that's the

24  law and the evidence that they hear in the case.  And that's

25  the same basis for which the verdict has to be reached in the

1  punishment phase, as well.

2              And the reason for that is we have jurors that

3  come in here -- I don't know if you remember how many people we

4  had down there the morning you came in on the panel, but every

5  seat was practically filled.  Recall that?

6        A.    I do.

7        Q.    Same number of people came down in the afternoon,

8  and the reason for that is we've got jurors with such strong

9  feelings one way or another that sometimes their feelings are

10 so strong that they won't be able to listen to and evaluate the

11 evidence and render a true verdict just based on the law and

12 the evidence as they see it because their personal feelings get

13 in the way.

14             Now, we asked you a lot of questions about how

15 you felt about stuff before we explained to you the law, the

16 process, and how it would apply if you were to sit and serve as

17 a juror.  I think in looking at your questionnaire that I get

18 from your questionnaire that you obviously have strong feelings

19 in favor of the death penalty, but by the same token, when we

20 ask you on page 3, Question Number 18 -- we asked you:  What

21 would be important to you in deciding whether a person received

22 a death sentence, rather than a life sentence in a capital

23 murder case?  And you say, I would have to weigh the

24 circumstances.  And to me, that says that you'd have to weigh

25 the evidence that you hear in front of you and apply that to

1    the law as it's given to you.  Is that what you're saying?

2         A.    That's an accurate assessment.

3         Q.    Okay.  And that's what I got from that, and it's

4    perfectly fine.  Nobody is going to ask you to change your

5    feelings and beliefs.  Obviously the State is entitled to a

6    fair trial, and the Defense is entitled to a fair trial, and so

7    the jurors that come in here and have automatic answers or

8    responses -- in other words, in the punishment phase, that they

9    will always answer these questions in such a way that a life

10   sentence is going to result because they have such strong

11   feelings against the death penalty, that they'd never do it,

12   they don't believe in it, they're not assessing it, they're not

13   going to be able to give a fair trial to the State if they

14   can't consider the death penalty as a viable option.

15              Now, by the same token, again, you got those

16   jurors that feel so strongly that show me a death that occurred

17   and show me that it was this Defendant that did it, and I don't

18   even need to have a punishment phase because I'm going to

19   automatically answer these questions in such a way that the

20   Defendant receive a death sentence.  Well, I think you can see

21   that that's not appropriate either because that's not giving

22   the Defense a fair trial.  Do you understand what I mean by

23   that?

24        A.    I do, and I would agree with that.

25        Q.    Okay.  Perfect.  And I see where just because you're

1    in favor of the death penalty, you also see on page 2 that

2    you -- Question Number 3, that you do agree that a life

3    sentence, rather than a death penalty, would be appropriate

4    under the proper circumstances, depending on the case; is that

5    correct?  Question Number 3?

6         A.    That's true, also.

7         Q.    Okay.  And so we just want to feel you out first and

8    make sure that you're one of those that's kind of right down

9    the road, you'll let the facts, the circumstances of the

10   offense in the guilt/innocence phase and the punishment phase

11   be your guide, be your road map.  There are no automatics.

12   There are no automatic answers.  It's -- it's a process.  And

13   the jurors in going through the process, as long as they abide

14   by their oath and render a verdict based on the law and the

15   evidence alone, you'd be doing your job and doing what your

16   oath requires.

17              Let's talk a little bit about that process.  In

18   the first phase of the trial, the capital murder case, even

19   though the State is seeking the death penalty, is really just

20   like any other case in terms of the rights a criminal defendant

21   has, because it doesn't matter if we're talking about a DWI

22   case down in misdemeanor court or we're talking about this

23   capital murder where the State is seeking death, the Defendant

24   has certain rights that in order to be qualified to sit and

25   serve as a juror, the jurors would then have to be able to

1   understand those rights and agree to follow the law as it's

2   given to them regarding those rights.

3                    First and foremost is that while the Defendant

4   sits here today, he has the presumption of innocence.  Just

5   because of the fact that he's been indicted for the offense of

6   capital murder is evidence of absolutely nothing.  As he sits

7   here today, he's not guilty.  And that's because you haven't

8   heard any evidence presented to you, right?

9        A.    That's correct.

10       Q.    It's the State's job and our job alone to prove to

11  you beyond a reasonable doubt that the Defendant is guilty of

12  an offense.  And unless and until that happens, then that

13  presumption of innocence will always remain.  And so my

14  question to you is:  Would you be able to afford this Defendant

15  his presumption of innocence unless and until we do our job in

16  proving the case?

17       A.    I would be able to do that.

18       Q.    Okay.  You know, some jurors tell us, well, you know

19  what, to get to this point where you're seeking the death

20  penalty, you know, where there's smoke, there's got to be some

21  fire, can you understand where that's improper under the law to

22  think like that?

23       A.    I do.

24       Q.    All right.  And you wouldn't do that?

25       A.    No, I would not.

1      Q.    Okay.  In addition to that, I talk about it's the

2   State's burden and our burden alone.  The Defense table over

3   here, they could simply work crossword puzzles if they chose

4   to.  They're not going to do that.  They're good lawyers.

5   They're going to come in here and do their job, but you can

6   never look to the Defense table to produce any evidence to you,

7   bring any witnesses to you.  They don't even have to

8   cross-examine the witnesses the State brings because it's our

9   job -- a job -- we do the accusing.  We better be the ones

10  doing the proving -- the State of Texas better, not the Defense

11  table.

12              Now, they may do those things.  They may bring

13  evidence.  They may bring witnesses, but they're not required

14  to.  And the jurors, if they're qualified to sit and serve,

15  would never shift the burden over to this table to produce or

16  do anything.  Would you be able to just hold the State to --

17  that it's our burden and never shift it over here to this

18  table?

19      A.    As I understand it, that's what I would hold, is the

20  State responsible for the evidence.

21      Q.    Absolutely.  And if we fail in our proof, then the

22  verdict has to be not guilty to capital murder, and you could

23  do that?

24      A.    I could do that.

25      Q.    All right.  Now, whenever I say the burden of proof

```
 1    is on the State, it's always our burden to prove it to the
 2    jurors beyond a reasonable doubt.  Now, of course, that doesn't
 3    have -- we have a lot of legal definitions out there, but the
 4    law doesn't define what beyond a reasonable doubt means.  It's
 5    whatever it means to each individual juror.  So whatever it
 6    means to you.  I can tell you what it's not.  It's not
 7    100 percent certainty.  It's not beyond all possible doubt,
 8    because as you might imagine, to believe something to that
 9    heightened degree, you'd probably have to see it with your own
10    eyes, would you not?
11          A.    I would agree with that.
12          Q.    Okay.  And so that's why it's just beyond any
13    reasonable doubt.  Could you hold the State to just beyond a
14    reasonable doubt?
15          A.    I could.
16          Q.    All right.  Additionally, the Defendant has a Fifth
17    Amendment right not to testify.  I'm sure you've heard of the
18    Fifth Amendment.  I don't recall if you watch some of the legal
19    shows on TV, but it's something we're all familiar with,
20    because you got it out on the streets.  If the Defendant is
21    approached by a police officer, they could say, no, I plead the
22    Fifth, I don't want to talk to you right now.  Well, the same
23    holds true in this courtroom.  It's his decision and his
24    decision alone whether or not to testify.  And, of course, he
25    can have the advice of his counsel, telling him, you know what,
```

1  the State failed in their proof, so why in the world would you

2  get on the stand and start talking because it was their job and

3  they failed, so you don't need to do that.  Or it could be that

4  a defendant doesn't speak well in public or is afraid that

5  they'll incriminate themselves or just don't want to be cross

6  examined.  There could be a whole host of reasons why a

7  defendant chooses not to testify.  And because of those

8  reasons, what the law would say is, if you were to sit and

9  serve as a juror in this case, if a defendant chooses not to

10 testify, you can't take that circumstance and use it as

11 evidence of anything, because it means nothing, right?

12       A.   That's correct.

13       Q.   We don't know why it's not.  The same would hold

14 true in the punishment phase.  You cannot require the Defendant

15 to testify.  Say, for example, in Special Number 1, no, I'm not

16 going to ever commit any more future crimes.  Or you can't

17 require a defendant to testify so that you know whether or not

18 he feels remorse or his moral culpability of the Defendant in

19 Special Issue Number 2.  It's just the evidence you hear,

20 whatever that is in the punishment phase, as well, because you

21 can never at any point in the trial require the Defendant to

22 testify.  Can you do that if you were to sit and serve as a

23 juror, give the Defendant his Fifth Amendment right?

24       A.   I could.

25       Q.   All right.  You wouldn't hold it against him if he

1  chose not to?

2      A.    I would not.

3      Q.    Okay.  Now, we have obviously witnesses that would

4  come in to testify, and I think you get right to the point.

5  Sometimes we have police officers testify.  What the law says

6  is that all witnesses have to start out the same.  It doesn't

7  matter if they are a priest, a prostitute, a police officer

8  that's highly decorated, you know, that comes in here with all

9  sorts of insignia and things on their uniform.  They're all

10  held to the same standard until you start hearing what they

11  have to say, and then it's the jurors' job to judge their

12  credibility and say, yep, I believe what they're telling me or,

13  no, I don't, or I believe some of what they're telling me and

14  part of it I don't.  But you have to wait is what the law says,

15  until you hear what they have to say, not simply by virtue of

16  somebody walking in here in a uniform, would you say, yep, I'm

17  automatically going to believe this person and find them to be

18  more credible.  And I think you get that.

19          On page 5, Question Number 32, we ask you if

20  police officers are more likely to tell the truth.  And you say

21  no.  I believe that most people in all walks of life generally

22  live truthful lives.  One would hope, but obviously no bells

23  and whistles go off in that witness stand if somebody is not

24  being honest with the jurors.  It's your job to determine their

25  credibility, but could you wait, regardless if they're a police

1  officer or who they are, to hear what they have to say before

2  you start judging their credibility?

3      A.    I could do that.

4      Q.    All right.  Now, as you know, this is a capital

5  murder trial.  What a capital murder is, is an intentional

6  killing.  And here, we're talking about in the course of a

7  robbery.  There could be other types of capital murders, such

8  as an intentional killing of a child under the age of 10 or an

9  intentional killing of a police officer in the line of duty or

10  intentional killing of two or more people in the same

11  transaction.  But for purposes here, we're talking about an

12  intentional killing in the course of a robbery.

13            Now, let me give you a hypothetical situation.

14  And by intentional, the person meant to do exactly what they

15  set out to do, all right?  So in other words, if I turned to

16  Andrea just all of a sudden and I don't like the way she looked

17  at me, so I pulled out my gun and shot her 16 times right here

18  at the counsel table, do you think you could determine by my

19  actions what I intended to do?

20      A.    If I witnessed it, yes, I could.

21      Q.    Okay.  So we can look to a person's actions to

22  determine what their intent is.  Obviously, shooting her 16

23  times at this close point range, I would be intending to cause

24  her death, or you could see that from my actions.  And so we're

25  going to be talking about an intentional killing.  We're not

1  talking about something where it was an accident or a mistake

2  or where self-defense would be applicable, or because of mental

3  disease or defect the Defendant didn't know the difference

4  between right and wrong.  We're talking about somebody who

5  meant to do and set out to do what they did, intentional

6  killing.

7                    Now, by that, some jurors say, well, wait a

8  minute, if it was premeditated.  I'll tell you, we don't have

9  premeditated murder here in Texas.  We don't make a distinction

10  under the law, because obviously, intent can be formed like

11  this.  And you can look and determine whether or not somebody

12  kind of planned it out or, you know, took the weapon with them

13  or whatever it is they're using to cause death, but there is no

14  distinction.  Do you get that?

15      A.   I get that.

16      Q.   All right.  And so let me give you a hypothetical

17  situation.  Let's say in our indictment -- and I'll tell you

18  that the State of Texas is required to prove -- just like a

19  checklist -- each and every thing in that indictment, no matter

20  how insignificant -- or some jurors call things, well, that's a

21  technicality they got off on.  There are no technicalities.

22  It's got to be exact -- exactly the way we allege it, no

23  discrepancy.

24                    So let's say our indictment says capital murder,

25  an intentional killing in the course of a robbery.  Let's say

1    in this hypothetical situation that I'm giving you that you

2    were to sit and serve as a juror in that case and the State of

3    Texas proves that intentional killing.  You believe that the

4    Defendant's intent was to cause the death of the victim and you

5    believe it was this Defendant that did it and that they did it

6    exactly like we said it did, so the intentional killing, but

7    you heard no evidence of a robbery happening at this time that

8    the intentional killing took place.  In fact, you heard

9    evidence that it was really a sexual assault going on at the

10   time the intentional killing was done.  Now, is that exactly

11   like we alleged it in our indictment?

12        A.    No.

13        Q.    All right.  And so the jurors in following their

14   oath, no matter how distasteful it may sound and no matter the

15   fact that I'm going to be looking for a new job since I got it

16   completely wrong, obviously, I didn't read what I was supposed

17   to be doing and prove it before I got in there, because that's

18   a big discrepancy.  Would you agree?

19        A.    I would agree.

20        Q.    Now, the jurors would be required, following their

21   oath, to find the Defendant what, as it relates to capital

22   murder, if we fail in our proof?

23        A.    If you fail in your proof, then I can't render a

24   verdict of guilty.

25        Q.    Right.  It would be not guilty, wouldn't it --

1       A.    It would.

2       Q.    -- of capital murder?

3       A.    That's correct.

4       Q.    Now, you may be able to consider a lesser offense,

5  you know, because say the jurors believe, like I said, beyond a

6  reasonable doubt that that intentional killing occurred.  You

7  may be allowed to consider that lesser offense of murder, but

8  it would no longer be capital, because capital murder has to be

9  the intentional killing plus that aggravating factor, which we

10  lopped off and didn't prove.  So you're right, not guilty as to

11  capital murder.  And you said you could do that --

12      A.    I could.

13      Q.    -- if we failed?  Now, taking that hypothetical a

14  step further, let's say that we did fail and the jurors came

15  back and said that it's murder.  The death penalty would no

16  longer be on the table.  Life without parole would no longer be

17  on the table.  It would be a punishment range.  Anywhere from

18  five to 99 years or life is what the legislature has set out

19  for the offense of murder because as you might imagine, there's

20  a whole different set of ways and circumstances, as you talk

21  about in your questionnaire, for which a murder could be

22  committed.  And you don't have to sit and think, you know, as

23  you sit here today, well, I'd give five on this type of murder

24  and 40 on this type of one or life on this type of one.  The

25  question really is, if after hearing everything in the case,

1  all the evidence, if you thought that five was the right

2  sentence to give, based on the case and the information you

3  heard in that case, would you be able to consider and assess a

4  sentence of five years for the offense of murder, if you

5  thought it was the right thing to do?

6      A.   I could perform as instructed by law what needed to

7  be deliberated in this evidence in this case.

8      Q.   Okay.  And -- and that's exactly what I'm asking

9  you, if you'd be able to follow the law as it's given to you.

10 And the life sentence, by the same token, if you heard facts

11 and circumstances in the case that led you to believe that life

12 was the right sentence or the proper sentence, could you then

13 consider and assess a life sentence for the offense of murder?

14     A.   I could.

15     Q.   All right.  Now, moving along, let's say that you

16 find the Defendant guilty of the offense of capital murder.

17 I'll tell you at that point in time that the Defendant is

18 sitting squarely on a sentence of life without parole because

19 that's the best he can possibly do.  There are only two

20 possible punishments for the offense of capital murder, and

21 that's life without parole -- and that means exactly like I

22 said -- it's without parole -- or the death penalty.  And you

23 know in this case obviously the State is seeking the death

24 penalty.

25          My boss, Craig Watkins, has decided that we are

1    seeking the death penalty against Matthew Lee Johnson.  It's

2    not something he's still talking about or thinking about, or we

3    may change our mind about.  It's our goal at the end of the day

4    to present the evidence to the jurors, and we think we have the

5    type and the quality and the quantity of evidence that's going

6    to cause the jurors to have no other choice than following

7    their law -- following the law and abiding by their oath but to

8    render a verdict of guilty on the offense of capital murder for

9    Matthew Lee Johnson.  And once that happens, the jurors would

10   move into the punishment phase.  And, again, we believe we have

11   the quality and the quantity and the type of evidence that

12   would lead the jurors to answer these special issues in such a

13   way, yes and no, such that a death sentence will result.  The

14   Judge would have no choice based on those answers of yes and no

15   but to issue a death warrant for this man -- you know, a

16   living, breathing human being, puts on his pants every day just

17   like you and I.  He's got family that loves him.  Some jurors

18   tell us that, wow, you know, given that we're talking about a

19   real situation here, not just my beliefs sitting at home, you

20   know, armchair quarterback, what I see on the news, this is a

21   little much for me.  How do you feel about participating in

22   this process?

23        A.    I could perform the duties that you're requesting of

24   me.

25        Q.    Okay.  And -- and I get that from your

1 questionnaire.  It's just something we have to ask everybody,

2 because some people sit here and they kind of say, wow, this is

3 kind of daunting, or I couldn't do it.  And I get that you take

4 it very seriously, that it is your civic duty to sit and serve

5 as a juror, if you're a proper juror in this type of a case.

6 And it sounds like you're able to listen to the facts and the

7 evidence as presented to you and do just that.

8             Let's talk about the process when you get to the

9 punishment phase and how that operates.  So, again, let's say

10 guilty of capital murder.  Obviously, we wouldn't need a

11 punishment phase, or we wouldn't need any special issues if

12 simply because somebody was guilty of the offense of capital

13 murder, death penalty was automatic and that was the end

14 result.  We've got two possible punishments, and I'll tell you

15 that just as this Defendant sits here today and as he will at

16 his trial, have the presumption of innocence, and it's our job

17 to prove that he's guilty, the Defendant in the punishment

18 phase, the law says is presumed that the proper punishment is

19 life without parole.  I'll tell you the way the distinction is

20 made, is we don't execute people based on the offense that

21 they've committed for what they've done.  It's forward looking.

22 Special Issue Number 1 is forward looking.  You look to the

23 future to say what they're more likely than not going to do in

24 the future.  That's how we separate those individuals that

25 receive a death sentence versus those that can simply serve

1  life without parole.  Does that make sense?

2        A.    It does.

3        Q.    Did you know that there was that distinction prior

4  to coming here today?

5        A.    I don't think about it very often, but I'm certainly

6  understanding of what you're saying.

7        Q.    Got you.  I'll tell you, most lawyers in this

8  building, and myself included, before -- you know, beginning

9  the process and doing these types of cases, didn't get that

10  that was the distinction.  And so there are no automatics.

11  Obviously, just because you find the Defendant guilty of

12  capital murder, the jurors would then hear additional evidence.

13  And the law says you can consider just simply the facts of the

14  offense for which you found the Defendant guilty of in

15  answering Special Issue Number 1, if it helps you to answer

16  whether more likely than not this Defendant is going to commit

17  criminal acts of violence that would constitute him being a

18  continuing threat to society.  And I think you recognize that.

19              We asked you that question -- even though, once

20  again, you didn't know what we were asking you, whenever we

21  asked you on page 3, Question Number 11:  Do you think there

22  are some crimes which call for the death penalty solely because

23  of their severe facts and circumstances, regardless of whether

24  or not the guilty person has committed prior violent acts?  And

25  you say, yes.  Yes is sufficient.  Because sometimes -- you

```
 1  know, if you've got an individual that goes into an elementary
 2  school and kills 26, you know, innocent children, then that
 3  might be the type of case where the jurors say, hey, you know
 4  what, in answering Special Issue Number 1, yeah, I think that
 5  tells me enough about that person and that individual's
 6  character to believe that he's going to commit criminal acts of
 7  violence in the future that are going to constitute a
 8  continuing threat.  Yeah, this person is going to be a future
 9  danger based on that offense I found him guilty of.  Does that
10  make sense?
11       A.    It does.
12       Q.    The distinction is, though, no matter how tasteless
13  or how much you think somebody deserves a death sentence
14  because of the offense you heard, it's not automatic.  You must
15  look to Special Issue Number 1 and answer it in relation to
16  that, based on all the evidence you hear.  And I think you
17  would do that; is that fair to say?
18       A.    I would do that.
19       Q.    Let's talk about Special Issue Number 1 and what
20  exactly it means.  And it says whether there is a probability.
21  The law does define that, and it's just simply more likely than
22  not.  Now, it's our job to prove Special Issue Number 1 to you
23  again beyond a reasonable doubt because remember, the Defendant
24  is sitting on life without parole and that's presumed to be the
25  proper punishment.  So unless and until we prove the more
```

1  likely than not that this Defendant is going to commit criminal

2  acts of violence that are going to constitute him being a

3  continuing threat to society, your answer to that is no, the

4  trial stops, and the Defendant receives life without parole,

5  because we reserve it for those people that are going to be a

6  future danger.

7           So in looking at that, more likely than not is

8  what probability means, the Defendant would commit criminal

9  acts of violence.  Now, criminal acts of violence is something

10 that the law doesn't define.  It's whatever it is to you as a

11 juror, whenever you hear it.  You don't have to sit here and

12 say right now, well, this would be sufficient for me or this

13 would not.  I can tell you that some jurors tell me that if I

14 were to punch Andrea in the face right now, that they would

15 consider an assault -- assaultive contact to be a criminal act

16 of violence to them.  Other jurors tell us that sometimes

17 spitting on a guard may be enough for them.  But it's whatever

18 it is to you.  Criminal acts of violence that will constitute a

19 continuing threat to society.

20          Now, society, if you remember, we talked about

21 if the Defendant is found guilty of capital murder -- and you

22 wouldn't even be looking at these obviously if you had found

23 the Defendant not guilty of capital murder.  If he's found

24 guilty of capital murder, the best he can possibly do is life

25 without parole.  And so where are we talking about his society

```
 1  being?

 2         A.    Within the confines of his incarceration.

 3         Q.    Absolutely.  Prison society.  Can you contemplate or

 4  see where prison would be a society, as well, and those

 5  individuals working and visiting and inmates who are trying to

 6  do their time peacefully also deserve protections, just like

 7  you and I do from having somebody being violent towards them?

 8         A.    I agree that they do.

 9         Q.    Okay.  Because obviously, you've got doctors,

10  nurses, you've got prison guards, you've got other family

11  members visiting those inmates, and those inmates trying to do

12  their times -- time peacefully, and that's why we separate

13  those out, those that are not going to do their time peacefully

14  and they're going to be a future danger even in prison or

15  wherever the Defendant finds himself.

16              And so in looking at that, you've got to

17  determine whether or not we prove it to you more likely than

18  not that the Defendant is going to be a future danger.  We kind

19  of shorten it a lot of times.  I've already told you if the

20  answer to that is no, the trial stops, it's life without

21  parole.  However, if you find that the Defendant is going to be

22  a future danger, that, yes, they're going to commit criminal

23  acts of violence that cause them to be a continuing threat to

24  society, your job is not over.

25              At that point in the trial, you would have
```

 1  already found that the Defendant committed an intentional

 2  killing in the course of a robbery -- guilty of capital murder,

 3  right?  You would have already found that this person is going

 4  to be a future danger, more likely than not that we had proven

 5  that to you beyond a reasonable doubt.  So this may be the type

 6  of person or an individual that you don't really want to come

 7  into contact with and you don't think they're very desirable,

 8  but the jurors are not ever going to be asked to go back there

 9  and vote on what somebody is deserving of or not deserving of.

10  You don't go back there and check yes, death or yes, to life,

11  or no to the death penalty, or no to life.  It's still based on

12  the answers to these questions.

13              And so there still are no automatics.  Just

14  because this person is an intentional killer and they did so in

15  the course of a robbery and just because you find that they're

16  going to be a future danger, your job is not over.  You would

17  have to look -- your -- your duty under the law is going to be

18  to consider everything you heard again as it relates to Special

19  Issue Number 2.  Sometimes we call this the safety net, because

20  a lot of times jurors kind of felt strapped.  There was

21  something in the evidence, something about it that they wanted

22  to be able to say because, you know, you could be bound by your

23  oath based on the law and the evidence you hear to find a

24  defendant guilty and to find that they're a future danger, but

25  there may be something about that case.  And, you know, you may

1    hear 10,000 cases dealing with the offense of capital murder to
2    which you don't hear anything sufficiently mitigating or that
3    lessens the Defendant's role such that a life sentence should
4    result in -- Special Issue Number 2 is calling you to do.  But
5    in those 9,999 cases you don't hear anything, there could be
6    that one case where you do hear something based on the evidence
7    that causes you pause to find it to be mitigating, to lessen
8    the Defendant's role, or his moral culpability, and then you
9    may find that that thing that you found to be mitigating is
10   sufficiently mitigating, such that a life sentence is going to
11   be more appropriate than a death sentence.
12            And so what Special Issue Number 2 is asking you
13   to do is at that point in the trial, no matter what you've
14   already done and decided at that point, you have to take
15   everything into consideration again, everything in the
16   guilt/innocence phase, everything in the punishment phase,
17   including the circumstance of the offense, the Defendant's
18   character and background, personal moral culpability of the
19   Defendant, and then determine whether or not there is a
20   sufficient mitigating circumstance or circumstances that would
21   warrant you giving him a life sentence rather than death.
22            And so as you sit here today, you don't have to
23   decide what is going to be mitigating or going to lessen a
24   Defendant's role in your mind or what would be mitigating --
25   sufficiently mitigating enough to you to say that somebody who

1  has done an intentional killing in the course of a robbery,

2  somebody who's going to be a future danger even in prison, now

3  deserves a life sentence because, would you agree that person

4  is going to be a pretty bad person if you've already found

5  those things?

6      A.   Right.

7      Q.   You don't have to decide it as you sit here right

8  now.  I'll tell you that some jurors tell us that they would

9  consider and sometimes think things such as childhood abuse,

10  sometimes intoxication at the time of the offense, sometimes

11  upbringing, education level, those types of things may be

12  mitigating to them, depending on what they hear and the

13  circumstances of the case.  But what you may find or what a

14  juror may find to be mitigating to them may make it worse or

15  may make it aggravating to another juror, such as that

16  intoxication at the time of the offense.  Some people may say,

17  no, they made that choice, they knew what happens whenever they

18  do that, and so I think that that makes it worse.  And so, no,

19  I don't find it mitigating, much less to be sufficiently

20  mitigating to make this life.  And that's perfectly fine.

21          All that Special Issue Number 2 is requiring you

22  to do is not turn a blind eye to any of the evidence you hear.

23  You can't, you know, close your ears off or turn your back to

24  any evidence you hear.  Special Issue Number 2 is requiring you

25  to consider everything again, just consider it.  You don't have

 1   to find it's mitigating, but you've got to then categorize it

 2   as the evidence you hear and say was there anything mitigating.

 3   And if you find something mitigating, then look to that

 4   mitigating stuff and say, well, but does it rise to the level

 5   of being sufficiently mitigating to me?  Could you do that?

 6        A.    It was very wordy, but, yes.

 7        Q.    It is.

 8        A.    Mitigating circumstances present themselves at the

 9   time, so if that presents itself at the time, then, yes, I

10   could evaluate those circumstances and make an accurate

11   decision.

12        Q.    And you would know it when you heard it, right?

13        A.    Exactly.

14        Q.    And that's all the law is asking you to do.  And so

15   could you answer yes to Special Issue Number 2, such that a

16   life sentence would then result, if you thought it was the

17   right thing to do based on the evidence you heard because you

18   heard something that was sufficiently mitigating in your mind?

19        A.    I could do that.

20        Q.    All right.  By the same token, if you don't hear

21   anything, could you then answer no to Special Issue Number 2,

22   such that a death sentence would result?

23        A.    I could do that, also.

24        Q.    All right.  Now -- and so just to clarify what we're

25   talking about, the importance of waiting, because remember when

 1  we first started talking, we talked about this is a process.

 2  Your mind cannot be foreclosed to a life sentence.  Your mind

 3  cannot be foreclosed to a death sentence until you get to the

 4  very end of the trial.  And you're not done until you consider

 5  Special Issue Number 2, right?

 6          A.    That's correct.

 7          Q.    And so as you sit here today, would you be able to

 8  keep an open mind until you carry it through that entire

 9  process and not find just because somebody is guilty of capital

10  murder, I'm automatically going to answer or always going to

11  answer these questions in such a way that yes, I find them a

12  future danger, and no, I don't find anything sufficiently

13  mitigating, or are you going to keep an open mind and base your

14  answer on the evidence?

15          A.    I can wait and review all evidence until the very

16  conclusion and make a decision based on all evidence that I've

17  heard.

18          Q.    And that's the important thing to remember.  There

19  are just really no automatics in this process, and I can give

20  you an example of what we're talking about.  And it's not like

21  any case that we've got here in this courthouse or any case

22  I've ever heard them try.  But I think it kind of outlines what

23  I believe that you can certainly do based on everything you're

24  telling us today, what's in your questionnaire, but I just want

25  to highlight the importance of you don't really know until you

1  hear it.

2            Let's say the jurors were asked -- you were

3  sitting on a case where you found the Defendant guilty of

4  capital murder.  And in that capital murder, you hear that the

5  Defendant went into a house, ambushed the homeowner, shot him

6  16 times, and took a bag of money off the coffee table and

7  hightailed it out of there.  An intentional killing in the

8  course of a robbery, right?

9        A.    Right.

10       Q.    Because that money was taken.  And so that does have

11 the intentional killing plus something else factor to it.  So

12 by your vote -- by your oath, you would have to find, based on

13 the law and the evidence, that the Defendant is guilty of

14 capital murder.  But moving into the punishment phase, let's

15 say you heard or the jurors heard additional evidence.  You

16 find out that that Defendant went in and killed the neighbor.

17 That was the neighbor that he ambushed.  And not only was he

18 the neighbor, but he was the drug dealing neighbor that was

19 poisoning the entire neighborhood, poisoning the children in

20 that neighborhood with heroin.  In fact, not only was he doling

21 it out -- the victim that he went in and ambushed and killed,

22 not only was he doling it out to all the kids in the

23 neighborhood, but -- the heroin that he sold and got the

24 Defendant's own daughter hooked on caused her death.  She died

25 from a heroin overdose as a result of what this victim had been

1    selling to her.  He'd called -- the Defendant had called the

2    police time and time again asking them to do something about

3    this.

4              Now, obviously, you can't take the law into your

5    own hands and have vigilante justice.  So clearly, he's still

6    guilty of capital murder.  But can you see how that individual,

7    whenever you're looking at it in relation to Special Issue

8    Number 1, if he took care of the one person that he had a

9    problem with, this person that nobody else could stop him from

10   dealing out the drugs, and that his -- in all effects, killed

11   his own daughter, can you see how you might look at Special

12   Issue Number 1 a little differently about them being a future

13   danger?

14        A.   Well, I think that's a great example of a mitigating

15   circumstance.

16        Q.   Could be.

17        A.   And I can still listen to all the evidence,

18   consider, indeed, mitigating circumstances, and make a decision

19   based on the evidence.

20        Q.   Okay.  Because you might hear, as well, that that

21   money that was taken off the coffee table, he didn't use it for

22   his own benefit or profit, but he donated it to drug awareness

23   groups so that other teenagers won't get hooked on the same

24   problem that his daughter ended up dying from.  And so you're

25   right, that could be an illustration of a mitigating example,

1   something that could be mitigating and may rise to be the --

2   the level of sufficiently mitigating to jurors such that a life

3   sentence should result rather than death.  And also, jurors

4   could find, as it relates to Special Issue Number 1, that just

5   because that individual was found guilty of capital murder,

6   doesn't mean he's going to more likely than not commit criminal

7   acts of violence in the future that are going to constitute him

8   being a continuing threat.

9           However, some jurors could say, well, you know

10  what, he kind of has it out for drug dealers and then we heard

11  evidence that he has this tattoo, "death to all drug dealers,"

12  because he really got into this after his daughter was dead, so

13  there are other drug dealers in prison.  So that may cause you

14  to answer yes to Special Issue Number 1, but like you

15  suggested, that still may be mitigating, if he's never had so

16  much as a traffic ticket and then he did this offense, that

17  might be sufficiently mitigating to make it life.  It's just

18  the importance is and the illustration is you've got to wait

19  until you hear what you've heard?

20          THE COURT:  You've got five minutes.

21          MS. EVANS:  Thank you, Judge.

22     Q.    (BY MS. EVANS)  And we asked you in the

23  questionnaire, before we told you what we were talking about,

24  Question Number 39, page 6.  In Question Number 37, first of

25  all, we're asking you:  Do you think a person convicted of

1  capital murder can be rehabilitated in prison?  And you say,

2  no, that's not the point.  Remorse does not undo the crime.

3  And you're right, it doesn't undo the crime, but I'll tell you

4  sometimes remorse, wherever that evidence could come from --

5  remember, you can't require the defendant to testify.  But if

6  you heard evidence of remorse from whatever source, remember as

7  it relates to Special Issue Number 2, the law would require you

8  to consider it.

9            Now, in your mind that may not be mitigating,

10 because as you say, it doesn't undo the crime.  But could you

11 at least consider it if you heard it in the evidence?

12    A.    I would consider any evidence.

13    Q.    Any evidence.  Thank you.  And then as it relates to

14 Question Number 39, this question, you probably will see now

15 goes directly to what we're asking in Special Issue Number 2.

16 Some people feel genetics, circumstances of birth, upbringing,

17 and environment should be considered when determining the

18 proper punishment of someone convicted of a crime.  What do you

19 think?  And you say, no, it does not influence the carriage of

20 justice as it pertains to the law.  Do you now see where this

21 question is kind of going to the types of stuff you may hear in

22 the evidence as it relates to Special Issue Number 2?

23    A.    Yes.

24    Q.    And would you consider all the evidence you hear and

25 not close a blind eye to any of it, even though you may not

```
 1   find it mitigating after you consider it?

 2        A.    Yes.

 3        Q.    Okay.  And that's evidence from whatever source it

 4   comes from.  And if you don't hear anything, if you don't hear

 5   any evidence, you know, you still got to do your job, because

 6   your job is not done until you consider Special Issue Number 2.

 7   But if you don't hear anything, then obviously the answer to

 8   that would be no --

 9        A.    Correct.

10        Q.    -- correct?

11             I just have one other question, and that is that

12   your brother-in-law was a Dallas Police Officer for a large

13   number of years.  And we certainly thank him for his service.

14   Is there anything about the fact that he was a Dallas Police

15   Officer that would cause you to feel obligated to either find a

16   defendant guilty or to answer these questions in such a way

17   that a death sentence would result?  Would it impact you or

18   influence you in any way, given the fact that your

19   brother-in-law was a Dallas Police officer for so long?

20        A.    No.  I believe he served with distinction for every

21   person in this city.

22        Q.    Okay.  So his job was just to -- whatever was going

23   on, see that justice was done, however that may turn out.

24        A.    And he did it better than most.

25        Q.    I think that that's -- what -- what is his name?
```

```
 1        A.    Ronnie Hale -- Ronald Gene Hale.

 2        Q.    Okay.

 3        A.    He's got a famous name in Dallas.

 4        Q.    Yes, yes, I certainly recognize it.

 5        A.    I think you would.

 6        Q.    Absolutely.  And so it sounds like to me, given that

 7   relationship, you would still be able to render a true verdict

 8   on the law and the evidence and you would not consider anything

 9   regarding your relationship with him in reaching your verdict?

10        A.    No, I would carry out my duty as he always carried

11   his out, with integrity and -- and the utmost respect.

12        Q.    Absolutely.  And we appreciate that, and that's all

13   that this process is requiring.  And I'll tell you, some jurors

14   can't be quite so middle of the road, down the road fair and

15   consider everything that they hear and that's why we ask you

16   all these strange questions.  Do you have any questions for me?

17        A.    I don't.

18        Q.    All right.

19              MS. EVANS:  Pass the juror.

20              THE COURT:  Nancy.

21              DEFENSE VOIR DIRE EXAMINATION

22   BY MS. MULDER:

23        Q.    Good morning, Mr. Smith.

24        A.    Good morning.

25        Q.    Once again, my name is Nancy Mulder, and I'm going
```

1  to be asking you some questions on behalf of our client,

2  Matthew Johnson.

3           First of all, you know, there's a reason we have

4  you all fill out the questionnaire before we explain to you

5  what the law is, and that's so we can find out basically what

6  your feelings are with regard to crimes, specifically murder

7  and the death penalty.  And so I'm not -- I don't want -- I'm

8  not going to ask you questions about whether or not, you know,

9  with regard to explaining the law.  I want to talk about more

10  about your feelings.

11      A.    Okay.

12      Q.    And if that would come into play in your

13  interpretation or application of the law.  Let me ask you this.

14  You -- you had mentioned in -- in your questionnaire with

15  regard to a pro -- a protracted absence from work may cause you

16  to be moved to another location; is that right?

17      A.    That's true.

18      Q.    Okay.  Would two weeks be a protracted loss for you?

19      A.    Could be.

20      Q.    Okay.  During that time would you -- you know, on

21  breaks call -- you know, need to call the office, text, be in

22  touch with them if you were on the jury?

23      A.    No, I don't think so.  And, again, I don't want to

24  be selfish about it, because I think the point I'm trying to

25  make is that if you saw where I listed I work, there are many

```
1   locations in the Dallas area, and I work at a very high volume
2   location.
3        Q.   Okay.
4        A.   And me being out for a couple of weeks would
5   necessitate somebody filling in, or just flat out being
6   reassigned there.  I don't want to leave that -- that location.
7        Q.   Uh-huh.
8        A.   And so I would hope that they would reserve a spot
9   when I got back.
10       Q.   Uh-huh.
11       A.   But that was my honest answer about wishing not to
12  be away from work for two weeks.
13       Q.   Absolutely.  Absolutely.  And I totally understand
14  that.  If the case were to go longer -- two and a half weeks,
15  possibly three weeks -- we don't anticipate that -- but then,
16  you know, when you're in trial, there's a lot of things you
17  can't anticipate.  Would you agree that the longer the trial
18  went on, it would increase your concern about being
19  transferred?
20       A.   No.  I think if I'm selected to be a juror in this
21  trial, that it will have to be accepted by my superiors, that
22  I'll be gone for the necessary time.  So I don't anticipate
23  being distracted.  It's just my -- my wish --
24       Q.   Okay.
25       A.   -- not to be selected.
```

1     Q.    And I hear you say that you don't anticipate being

2  distracted, but unfortunately, that also tells me that it could

3  be a distraction for you.

4     A.    It could be, but I don't think any more than anybody

5  else being distracted from family and work, serving on a

6  protracted jury.

7     Q.    There's always a possibility in a death penalty case

8  of sequestration, meaning that the jury, once deliberating in

9  guilt/innocence and/or punishment, you would be holed up in a

10  hotel at night.  You wouldn't have your cell phone.  You

11  couldn't call home or anything until the jury deliberations

12  were over.

13         Do you -- and I understand -- I understand that

14  it may not -- that you don't feel it would interfere with your

15  deliberations or interpretation of the evidence or the law,

16  but -- you can see how my concern might be that you may want

17  to, you know, hasten the deliberations in an effort to try and

18  get back to work?

19     A.    I don't see where that's a concern of mine because I

20  have no control over the length of the trial.  That's for the

21  judge and the process.

22     Q.    Well, the jury deliberations are up to the jury, how

23  long you all -- how long the 12 people deliberate.

24     A.    Okay.

25     Q.    So that's my concern.

1      A.    I can't imagine taking more than a few days to

2  deliberate unless there's some other issues in the trial that

3  should be settled in the trial.

4      Q.    Well, jury deliberations can last however long.  And

5  obviously, my concern would be that the longer it went on, the

6  more concern you would have about missing work and lead you to

7  want to in some way hasten the deliberations.

8      A.    Okay.  So I'm clear, I would not hasten my

9  deliberation to get back to work or home sooner.

10      Q.    Okay.

11      A.    The reason I'm called up here is because it's my

12  civic duty to do so.  I would prefer not to --

13      Q.    Uh-huh.

14      A.    -- be on a jury for anything, but I understand that

15  it is my civic duty, and if I'm called to do it, I can do it.

16      Q.    Well, actually you have -- and I just want to make

17  this clear.  You've actually already fulfilled your civic duty

18  by coming down on June 21st and filling out the lengthy

19  questionnaire and by also being here today.  But you have

20  absolutely fulfilled your civic duty.

21      A.    Then with your leave, I'll start the rest of my day.

22      Q.    Unfortunately, it's not up to me.  It's up to the

23  Judge.  And also, you know, the fact that we're sitting here

24  talking about the death penalty, the way the process works,

25  it's really kind of putting the cart before the horse.

 1  Honestly, we over here at this table don't even think we'll

 2  ever get to these special issues because it's -- it will be our

 3  argument and expectation that Matthew Johnson is not guilty of

 4  capital murder.  So that's where we're coming from.  But the

 5  fact that we're sitting here talking about this doesn't mean

 6  that -- you know, that anybody thinks he's guilty of capital

 7  murder.  Do you understand what I mean?

 8        A.    I do.  And I wish you luck.

 9        Q.    Well, thank you.  Luck with --

10        A.    I wish you luck with your case.  There's nothing

11  palatable about this in any way, shape, or form for me.

12        Q.    I'm sorry, there's nothing --

13        A.    There's nothing palatable about anything in this

14  case.

15        Q.    And there shouldn't be.  I mean, if somebody wanted

16  to be on the jury, obviously there would be something wrong

17  with that person because this is obviously a very important

18  case.  But a lot of people come in and say, you know what,

19  based on my experience, whether they've had experience with law

20  enforcement or have had close contact with it, they come in and

21  say, you know what, if we're at the point where the State is

22  seeking the death penalty, he's got to be guilty of something

23  at this point.

24        A.    And if that's what you're leading me to want to

25  believe, because it's not.

```
 1        Q.    No, no, I'm -- a lot of people come in here and --
 2   and feel that way, that if we're going through this entire
 3   process, that at this point he's got to be guilty of something.
 4        A.    I can only speak for myself.
 5        Q.    Then that's -- and I want to know how you feel.
 6        A.    I'm trying to illustrate it as best I can for you.
 7        Q.    Go ahead.
 8        A.    I didn't understand the question you had for me
 9   there.  You stipulated a lot of people have different opinions,
10   and I obviously have my own opinion.  If you're asking if I'm
11   prejudiced by any of the procedures at this point, no, I'm not.
12        Q.    No, I wasn't asking you for prejudice.  I'm asking
13   you how you feel.
14        A.    About what?  With regard to what?
15        Q.    With regard to whether or not at this point because
16   that we're at this -- in this process, that Matthew Johnson has
17   to be guilty of something?
18        A.    No, I don't feel that at all.
19        Q.    Okay.  I wanted to ask you about your questionnaire.
20   With regard to the first page, I think you have your
21   questionnaire with you.  Your answer to Question Number 1:
22   Punishment should fit the crime.  I believe in an eye for an
23   eye, and justified legal retribution.  That's the very first --
24   right where it says death penalty on the first page.
25        A.    The first page?
```

```
 1        Q.    Yes, sir.  Question Number 1.  I know it's hard to
 2   see.
 3        A.    Got it.
 4        Q.    Okay.
 5        A.    I'm looking beyond that information, sorry.
 6        Q.    That's all right.  Punishment should fit the crime.
 7   I believe in an eye for an eye and justified legal retribution.
 8   What I take that to mean is that you feel that the death
 9   penalty -- that the purpose for the death penalty is to punish
10   someone for a very serious and sometimes heinous crime.
11        A.    That's a fair statement.
12        Q.    Okay.  So for you, the death penalty is more about
13   justice for the victim and the victim's family.  Is that how
14   you feel?
15        A.    No, that's not what I said at all.  I feel like that
16   statement stands on it own.  The punishment should fit the
17   crime.  I believe in an eye for an eye and justified legal
18   retribution -- legal retribution.
19        Q.    Well, describe for me what retribution is in your
20   mind -- what it means.
21        A.    I don't know how to expand more about that than what
22   I just answered for the -- for the question.
23        Q.    Okay.  And that's -- what I take it to mean is that
24   it's a punishment, a revenge for a person's crime?
25        A.    I didn't use the word "revenge" anywhere in here.
```

 1       Q.   No, you didn't.  And that's why I asked you to tell

 2   me what you were thinking with retribution.  I take retribution

 3   to mean revenge or punishment, and I'm trying to figure out if

 4   that's how you feel.

 5       A.   Okay.

 6       Q.   Is that how you feel?

 7       A.   Well, I think if there's a -- a crime that's

 8   committed that warrants the death penalty, then the death

 9   penalty should be enforced for that crime.  I'm not going to

10   lead anything else more into that.  I don't believe that you

11   should go out and just say, you killed that person, so I'm

12   going to kill you.  You killed that person, I'm going to kill

13   you.  I think everybody has within the law, the right to stand

14   against their accuser.  But if the accusation is proven, then

15   the death penalty is justified.

16       Q.   No, I'm just trying to figure out and get to your

17   feelings about the death penalty because I took it to mean, as

18   you stated before, that you view the death penalty as a

19   punishment for the offense of capital murder.

20       A.   And you wouldn't think that that's a punishment?

21       Q.   What I think doesn't matter.

22       A.   You just said it mattered.

23       Q.   No, I'm -- I'm trying to get at what you think with

24   regard to --

25       A.   No, you're trying to lead me into a certain form of

1  conversation that I'm not comfortable with.

2        Q.    Well, let me look at some of the other answers you

3  gave.  For example, on page Number 2, Number 7:  The best

4  argument for the death penalty.  The victim was not afforded a

5  debate or consideration.  And your answer to Number 8:  The

6  best argument against the death penalty is not shared by me.

7  And what I'm getting at is that, since I take it to mean, you

8  view the death penalty as a punishment for crime, and -- in

9  your own words, that a victim was not afforded any debate or

10  consideration, and you don't even -- can't even -- you do not

11  share any argument against the death penalty; would you agree

12  that you lean toward the death penalty?

13        A.    I've stipulated that.

14        Q.    I'm sorry?

15        A.    I've stipulated that I lean towards the death

16  penalty.

17        Q.    All right.  Now, in that regard -- let me ask you

18  this, Mr. Smith.  Did you play sports in high school?

19        A.    Yes.

20        Q.    What did you play?

21        A.    Football, track, basketball.

22        Q.    I played field hockey myself.  I'm from a small town

23  in Illinois originally.  We were the only public school in our

24  field hockey -- you know, all those schools we played were the

25  private schools in St. Louis that -- the girls that went to

1  school there were private and it was very wealthy families.

2  And we always felt when we went over there that -- that the

3  umpires weren't necessarily fair to us, even though they're

4  supposed to be.  Do you understand what I'm saying?

5        A.    I heard what you said.

6        Q.    Okay.  Do you understand what I'm saying?

7        A.    I heard what you said, that you didn't think the

8  umpires were fair to you.

9        Q.    Right.  Did you ever --

10       A.    I don't understand the correlation that you're

11 making, no.

12       Q.    Did you ever experience that playing football?  Did

13 you ever go to an away game and experience what you considered

14 to be, you know, somebody having home team advantage?

15       A.    Yes.

16       Q.    Okay.  You can understand my concern, based on how

17 you lean toward the death penalty, that I feel like you're

18 giving the State a home team advantage.

19       A.    That's why I'm here.  There's no question about

20 that.

21       Q.    And I'm sorry, what's why you're here?

22       A.    I would be a great juror for the prosecution.

23       Q.    Okay.

24       A.    Not so much for you.

25       Q.    Okay.  And why not for me?

```
 1        A.    Because I favor the death penalty.

 2        Q.    Okay.

 3        A.    And I'm not an attorney, but I'm also an intelligent

 4  person so I can infer that that would be your point.

 5        Q.    That -- that is exactly my point.

 6        A.    Well, of course, it is.

 7        Q.    Yes.

 8        A.    But my brief answers, I think, stand on their own.

 9        Q.    Okay.

10        A.    There's no reason to expound upon a quick answer.

11        Q.    Well, I do feel like there's a reason to expound

12  upon them because I want to kind of dig around a little bit and

13  see a little bit more about how you feel, okay?

14              Now, you know, a lot of people who are very much

15  pro prosecution or pro death penalty in these kinds of

16  situations say, you know what, if I have found somebody guilty

17  of an intentional killing during the course of a robbery and

18  I've gotten to Special Issue Number 1, they come in and tell us

19  that there's always -- they will always find that there is a

20  probability that a defendant would commit criminal acts of

21  violence in the future simply because they convicted them of

22  capital murder.  Do you agree?  Is that how you feel?

23        A.    You've asked me two different questions.

24        Q.    Okay.  Do you agree?

25        A.    With which statement?
```

1       Q.    Yes.  That --

2       A.    I'm asking you what statement are you asking me if I

3  agree with.

4       Q.    All right.  What I'm asking you is this.  Some

5  people come in here and tell us that if they've convicted

6  somebody of capital murder, they're always going to find that

7  there's a probability that the Defendant is a future danger.

8       A.    Okay.  I recognize that you believe that people feel

9  that way.

10       Q.    And people come in here and tell us that.

11       A.    Okay.

12       Q.    Truly, they do.  And I believe you really feel that

13  way, too.

14       A.    I also believe that if you present evidence to me

15  that convinces me one direction or another, that I can make a

16  very informed decision and render a verdict that will support

17  one way or the other.

18       Q.    Okay.  So you would need us to present evidence to

19  you with regard to whether or not the Defendant is a future

20  danger, if you convict him of capital murder?

21       A.    Not necessarily.  But I do need to hear evidence if

22  I'm going to be sitting in judgement, regardless of where it

23  comes from.

24       Q.    Okay.

25       A.    And I would also be able to render a fair verdict

1    and decision based on what I have heard in evidence.

2         Q.    Mr. Smith, are you angry with me?

3         A.    No.

4         Q.    You seem a little terse.

5         A.    No, I'm just answering you very directly.

6         Q.    Okay.

7         A.    All right.  And you're leading me in directions to

8    change the feelings that I have, and I'm not -- and I'm not on

9    trial.  I'm merely answering questions to the best of my

10   ability.  And I'm not going to change my answer to you, if

11   it -- if it need -- if there's not a different answer.

12        Q.    No, sir, and I'm not trying to change how you feel.

13   I know there is no way I can do that.  There is absolutely no

14   way I can change the way you feel.  I truly understand that.

15               What I'm getting at is -- I'm trying to

16   understand how you truly feel about these issues and how they

17   will affect your interpretation and application of the law.

18   That is honest to God what I'm trying to do.

19        A.    And that's very fair, and I can work within your --

20   your fair questioning.

21        Q.    Okay.  Now follow me with this.  Because you lean

22   toward the death penalty, because you're pro prosecution, I

23   think you are like those other people who come in and say, you

24   know what, if I have convicted somebody of capital murder, that

25   person in my mind is always going to be a future danger.  Do

125

```
 1  you understand what I'm saying?
 2       A.   I heard it, but I don't agree with that.
 3       Q.   Okay.  What is it that you don't agree with?
 4       A.   Well, you've basically laid out the fact that I've
 5  never admitted to, and that is that just because there is a
 6  trial for murder and the answer is always going to be, well, if
 7  the guy is guilty, he's guilty and -- and should be put to
 8  death.
 9       Q.   Well, no, no --
10       A.   There are no mitigating circumstances.  I haven't
11  heard one bit of evidence of anything in this trial yet.
12       Q.   No, no, no, and I'm not talking about -- I'm
13  bringing it down to the different special issues.  And I'm not
14  talking about mitigation or -- or whether -- and -- and a jury
15  never goes back and votes life or death.  It's simply answering
16  the special issues, and I'm on Special Issue Number 1.
17       A.   Okay.  Then I'm going to take a moment and look at
18  it --
19       Q.   Okay.
20       A.   -- and read what it is that you're reading.  Whether
21  there is a probability that the Defendant would commit criminal
22  acts of violence.  Okay.  You're asking me to consider whether
23  in -- in incarceration they would continue to be a threat.
24       Q.   Correct.
25       A.   Okay.  So I understand that that is one of the
```

1  special issues, but what are you asking me at this point in

2  relation to how I feel about that special issue?

3       Q.    What I'm asking you is this.  Because the offense of

4  capital murder is the intentional killing of someone during a

5  robbery, it wasn't an accident, the victim didn't do anything

6  to -- you know, there was no struggle over the gun or anything

7  like that, the Defendant is not insane or retarded in any way,

8  because you can't seek the death penalty against people who are

9  sufficiently insane or have an I.Q. under 70.  Capital murder

10 is the specific intent to kill, meaning he had the goal to go

11 in and kill someone and did what he had to do to make that

12 happen.

13           So my question is this.  So that is -- if you've

14 convicted somebody of an intentional killing during the course

15 of a robbery, a lot of people come in and say, you know what,

16 if I've convicted him of that, then in answering Special Issue

17 Number 1, I'm always going to find that that person is a future

18 danger simply because they were convicted of intentionally

19 killing someone during the course of another felony.

20      A.    Okay.  I'm telling you right now that I don't share

21 that belief.

22      Q.    Okay.  Okay.

23      A.    And I thought I said it from the beginning.  Thus my

24 frustration in this conversation.

25      Q.    Okay.  Well, I just need you to bear with me.

Darline King LaBar, Official Reporter

```
 1        A.    I'll need to.  I'll have to.  I have no choice.

 2              MS. EVANS:  Your Honor, at this point I think

 3   I'm going to have to object that counsel stop badgering.  He's

 4   answered three times over regarding Special Issue Number 1.

 5              THE COURT:  I understand.  Let's see if we can

 6   move on.

 7        Q.    (BY MS. MULDER)  Mr. Smith, let me ask you this, and

 8   I know that you understand that the State has the burden of

 9   proof to prove each and every element of the offense.  I know

10   Ms. Evans gave you the hypothetical regarding, you know, if the

11   State alleged it was murder during the course of a robbery, but

12   it turns out during the trial they're able -- they're only able

13   to prove it was some other felony like a sex assault, the only

14   just verdict in that case would be not guilty.  And you

15   understand that?

16        A.    I do.

17        Q.    If there were no lesser-included offenses to

18   consider, that would mean that the Defendant would get off on a

19   technicality.  And some people say, you know what, if I truly

20   believed beyond a reasonable doubt that he intentionally killed

21   someone during the course of another felony, I'm going to vote

22   guilty, even if the State didn't prove what that other felony

23   was.  For me, another felony was good enough.  How do you feel?

24        A.    As I said earlier, I will do what is required of me

25   by law, as outlined by this case.  I will not take into my own
```

128

1  hands, well, they didn't really convince me otherwise, so I'm

2  going to vote a different way.  So to clarify, if it's put

3  before me to either convict or acquit based on the evidence,

4  then I will use those criteria only and the evidence.

5       Q.    So in that situation you're telling me that you

6  could let somebody you believe committed an intentional murder

7  during the course of another felony, you could let them walk

8  out of here if there were no other lesser-included offenses to

9  consider?

10       A.    As dictated by the law, that's all I can be required

11  to do.

12       Q.    And you feel okay with that?

13       A.    Well, of course.

14       Q.    Okay.  Now, as Ms. Evans said, if there are

15  lesser-included offenses -- for example, sometimes in capital

16  murder a lesser-included offense is just intentional murder.

17  Committing a murder in the state of Texas is if you knowingly

18  or intentionally cause the death of someone by a specific

19  manner and means.  And I just wanted to make sure you

20  understood that regular murder -- regular murder is also an

21  intentional killing.  It wasn't an accident.  It wasn't

22  reckless.  It wasn't under duress.  It wasn't self-defense.  Do

23  you understand that?

24       A.    I know the distinction that you're making, yes.

25       Q.    Okay.  Now, a lot of people come in and tell us, you

 1  know what, if I convicted somebody of an intentional murder,

 2  there is no way I could consider and give a minimum sentence of

 3  five years.  How do you feel?

 4       A.   I'm going to follow the directive of the law, and I

 5  will vote accordingly on what I'm able to vote on.

 6       Q.   Well, and I understand you'd follow the law, but

 7  remember, I told you that I wanted to know how you felt about

 8  things.  How do you feel about that?

 9       A.   How about do I feel about what?

10       Q.   Considering and giving a minimum of five years for

11  an intentional murder.

12       A.   If that's what I can give, then that's what I would

13  give.

14       Q.   Well, there's a whole range of punishment, minimum

15  of five, you can do 10, 20, 30, 40, 50, 60, up to 99 years or

16  life.  And some people say -- and I just want to know if you

17  feel this way -- if I've convicted him of an intentional

18  murder, there is no way I could ever consider and give a

19  minimum five-year sentence.

20       A.   I can't answer that.

21       Q.   Okay.  Some people say that's just not enough.

22       A.   They're entitled to their opinion.

23       Q.   How do you feel?

24       A.   It's not relevant.

25       Q.   Well, unfortunately, it actually is.  I do need to

1  know how you feel about it.

2       A.   Okay.  What I feel is that within the constraints of

3  the law and what I'm charged to do, I will make a decision

4  based on -- on the evidence and give what I can give.  If it's

5  150 years and that's what I feel like I can give, I'll give it.

6  If it's only five, then I'll give five, if I feel that that

7  verdict is guilty.

8       Q.   Okay.  What I'm getting at is this.  There's an

9  entire range of punishment, as we've discussed, five to 99 or

10 life.  It's my interpretation that -- that you couldn't really

11 consider and give a minimum of five years because that's just

12 not enough?

13            MS. EVANS:  Your Honor, I would object again.

14            THE COURT:  I believe it's asked and answered.

15      Q.   (BY MS. MULDER ) I know Ms. Evans, with all due

16 respect to the -- to the State, gave you the example of, oh,

17 the father whose daughter died of a drug overdose and, you

18 know, went and killed the drug dealer and took the money which

19 is technically capital murder, but then he donated the money

20 and he may hate drug dealers.  Would you agree that's a pretty

21 extreme example?

22      A.   I just took it as an example.  Is that the case or

23 are we talking about something different?

24      Q.   No, we're not allowed to talk about this case.

25      A.   And yet we've talked a lot about it --

 1     Q.   No.

 2     A.   -- in hypotheticals.

 3     Q.   We've --

 4     A.   Fair enough?

 5     Q.   Fair enough.  Fair enough.  What I'm getting at is

 6 this.  Somebody who is pro death penalty, pro prosecution,

 7 can -- in examining -- now I'm moving on to Special Issue

 8 Number 2.

 9     A.   Good, a movement.

10     Q.   Mr. Smith, do you feel like I'm trying to trick you

11 or something?

12     A.   Yes.

13     Q.   I'm not.  I'm trying to get at how you really feel

14 in the advocation of the law.  You've told us you're pro death

15 penalty, you're pro State, how could somebody like that really

16 sit and listen in Special Issue Number 2 to mitigation, any

17 mitigation that may or may not be presented and really consider

18 it and give life without parole?

19     A.   That's a fair question.  Here's a very fair, honest

20 answer, because I'm an honest person and a fair person, and if

21 there are mitigating circumstances, then I would consider it.

22 When you talk about the fact that I am pro death penalty, you

23 act as though -- or you're implying to me very clearly that I'm

24 some sort of a -- you know, a lobbyist for the death penalty.

25 I'm not.  The question put to me was very simply are you in

```
 1   favor of the death penalty, and I do believe, yes, that in

 2   cases of certain instances, the death penalty is warranted.  I

 3   don't lobby for it.  I don't enjoy the thought of it.

 4       Q.   Mr. Smith, that's -- I'm not implying that you lobby

 5   for it.  But you've testified here in court that -- that you

 6   are pro death penalty, that you lean toward the death penalty,

 7   and that you are a great prosecution juror, right?  You

 8   remember saying that?

 9       A.   I don't remember.  We could ask her to read it back,

10   if that's exactly what I said.  But I'll reiterate for you and

11   clarify, if I need to.  I do support, in some cases, the death

12   penalty.

13       Q.   Okay.  My question is this.  Based on your answers

14   in the questionnaire and your feelings about the death penalty,

15   it seems like there is no --

16       A.   No gray area?

17       Q.   No, that there is no way for you -- that you would

18   really listen to or consider mitigating -- mitigating evidence

19   and answer Special Issue Number 2.

20            MS. EVANS:  Your Honor, I would object to,

21   again, arguing with the juror.  If she would just ask a

22   question.

23            THE COURT:  Rephrase, and you've got 10 minutes.

24            MS. MULDER:  Yes, sir.

25       Q.   (BY MS. MULDER)  Let me ask you this.  Can you
```

133

1  presume that life is the -- that life without parole is the

2  appropriate punishment in a capital murder case?

3       A.    Can I presume that it is?

4       Q.    Correct.

5       A.    It could be, in some mitigating circumstances.

6       Q.    The law actually states that life without parole is

7  the presumed appropriate punishment for people convicted of

8  capital murder.  Understanding that, would it be fair to say

9  that you disagree with that?

10      A.    There's not a foundation for that comment.  In

11 relation to what?  I've heard no evidence of any trial.  I know

12 why I'm here, because there is a -- a conviction and a trial,

13 but I've heard no evidence about it, nor could I make a blanket

14 statement about any particular case just based on -- on a

15 presumption that -- that death to all people who kill people.

16 That's not what I'm saying at all.

17      Q.    I understand that.  I just need you to -- to just

18 try and understand my question.

19      A.    I want to.

20      Q.    The presumption in the law is that life without

21 parole is the appropriate punishment.

22      A.    For what?

23      Q.    For capital murder.

24      A.    Okay.  Thank you.

25      Q.    Fair to say that you disagree with that presumption?

```
 1        A.    Not in every circumstance, no.

 2        Q.    Okay.  Okay.

 3              (Discussion between counsel.)

 4        Q.    (BY MS. MULDER)  In light of the fact that you lean

 5   toward the death penalty, and I'm not saying that's right or

 6   wrong, I'm just trying to get out your feelings on it.  That's

 7   what you've told us, you lean toward the death penalty.  In

 8   light of that, if you convict somebody or a defendant of an

 9   intentional killing during the course of a robbery -- I'm going

10   back to Special Issue Number 1, if you would -- whether there's

11   a probability that the Defendant would commit criminal acts of

12   violence that would constitute a continuing threat to society,

13   since you lean toward the death penalty, you would agree with

14   me that the State -- it's not going to take a lot for them --

15   well, let me rephrase that.

16              Even if they didn't prove it to you beyond a

17   reasonable doubt, if they just proved it by a preponderance,

18   you would answer Special Issue Number 1 yes?

19        A.    No.

20        Q.    Okay.

21        A.    If you convince me of something.

22        Q.    I'm sorry?

23        A.    If you convince me of something and there -- there

24   is reasonable evidence to -- to sway me, then do so.

25        Q.    Okay.
```

```
 1        A.    But I don't answer black and white and yes and no.
 2        Q.    Well, unfortunately, to be qualified to sit on the
 3   jury, we kind of need to pin you down on your opinions about
 4   certain things.
 5        A.    Okay.  If you ask me direct questions, I'll ask
 6   (sic) your direct questions.  If you want to lead me in one
 7   direction or another to make your point, then you may not
 8   always get the answer you want to hear.  And I'm sorry.
 9        Q.    Well, Mr. Smith, some people come in here and say,
10   you know what -- I'm moving on to Special Issue Number 2
11   again -- in order for me to answer Special Issue Number 2,
12   that, yes, life imprisonment without parole is -- that there
13   are mitigating circumstances sufficient to answer Special Issue
14   Number 2 yes, that I would need the Defense to bring me that
15   mitigating evidence.  Would you need that?
16        A.    You need to present evidence to me to sway me one
17   way or the other.
18        Q.    I do.  That's -- that's what you're saying?
19        A.    That is what I said.
20        Q.    Okay.  So you do need the Defense to bring you
21   evidence regarding mitigation --
22        A.    Well, or --
23        Q.    -- in a hypothetical case?
24        A.    -- or I need the information to come from somewhere
25   in the proceedings, which I've just been a part of.
```

```
 1          Q.    Okay.

 2          A.    So, you know, if -- if I'm going to formulate an

 3   opinion about something, I need to have evidence about it.

 4          Q.    Uh-huh.  And so you would need the Defense to

 5   provide you with mitigating evidence?

 6          A.    Or I might ascertain something that I've heard from

 7   the prosecution, also.

 8          Q.    Uh-huh.  Some people come in and say, you know what,

 9   for me to consider mitigation, I need to hear from the

10   Defendant.  I need to hear about his upbringing, about his

11   past.  Do you feel that way?

12          A.    If some people feel that way, I can understand why

13   they might feel that way.

14          Q.    Do you feel that way?

15          A.    No.

16          Q.    Okay.  Okay.  Thank you, Mr. Smith.

17                THE COURT:  All right, Mr. Smith.  I need you to

18   step outside the door there for just a minute.

19                VENIREPERSON:  Okay.

20                THE COURT:  You can leave your paperwork right

21   there.

22                (Venireperson excused from courtroom.)

23                THE COURT:  896A, does the State have a

24   challenge?

25                MS. EVANS:  Your Honor, the State has no
```

```
 1  challenges.  We believe him to be qualified.  The point that
 2  Defense counsel just tried to make, there's a case directly on
 3  point that I believe the Court has in front of it, that simply
 4  requiring the Defense to bring evidence as it relates to
 5  Special Issue Number 2 is not causable, so long as they don't
 6  require the Defendant to testify.  And here this juror also
 7  said that the evidence needs to come from somewhere.  He didn't
 8  specify where, but even if he was requiring them to bring
 9  evidence as it relates to Special Issue Number 2, so long as
10  it's not the Defense, case law says that's not causable and he
11  hasn't said anything else to indicate he can't follow the law.
12  In fact, quite the contrary.  We believe he's qualified.
13            THE COURT:  Does the Defense have a motion?
14            MS. MULDER:  Yes, Your Honor.  At this point,
15  the Defendant -- or I'm sorry, the potential juror is very
16  antagonistic toward the Defense.  He has a bias against the
17  Defense.  He stated clearly on the record that he leans toward
18  the death penalty, that he is pro death penalty, and that he
19  would be a great juror for the prosecution.  In that regard, we
20  certainly argue that he cannot be fair to the Defendant.
21            (Venireperson challenged by the Defense.)
22            THE COURT:  He stated on the record that he
23  leans toward the death penalty, that he's a great juror for the
24  prosecution, not for the Defendant, and he would require the
25  Defendant to present evidence on future dangerousness, so I'm
```

138

```
 1  going to grant the challenge.
 2                  (Challenge granted.)
 3                  (Venireperson returned to courtroom.)
 4                  THE COURT:  Mr. Smith, I'm going to excuse you.
 5  Thank you very much for coming down.
 6                  VENIREPERSON:  Thank you.
 7                  THE COURT:  Have a good day.
 8                  All right.  We'll stand in recess until
 9  1 o'clock.
10                  (Recess.)
11                  THE BAILIFF:  All rise.
12                  (Venireperson brought into courtroom.)
13                  THE COURT:  Have a seat right there, Mr. Forbes.
14                  Be seated.
15                  How are you this afternoon?
16                  VENIREPERSON:  I'm doing well, sir.  Thank you.
17                  THE COURT:  Good.  Let me introduce you to folks
18  around here.  They all know who you are, because they've had an
19  opportunity to read your questionnaire, and you don't have a
20  clue who any of us are.
21                  So I'll start out with the young lady between
22  you and I is Darline LaBar.  She's the court reporter, and it's
23  her job to have an accurate record of everything that
24  transpires here today.  And so when you're asked a question, I
25  need you to answer a yes, no, whatever, because she can't hear
```

```
 1  a nod, and we all get in the habit of nodding yes and nodding

 2  no.

 3                  VENIREPERSON:  Yes, sir.

 4                  THE COURT:  I need you to be -- be -- speak out.

 5                  Over here representing the State is Andrea

 6  Moseley.

 7                  MS. MOSELEY:  Good afternoon.

 8                  THE COURT:  Rocky Jones.

 9                  MS. JONES:  Good afternoon.

10                  THE COURT:  And Elaine Evans is sitting back

11  behind them.

12                  MS. EVANS:  Good afternoon.

13                  THE COURT:  Over here is Kenneth Weatherspoon.

14                  MR. WEATHERSPOON:  Good afternoon.

15                  THE COURT:  Catherine Bernhard.

16                  MS. BERNHARD:  Good afternoon.

17                  THE COURT:  And Nancy Mulder.

18                  MS. MULDER:  Good afternoon.

19                  THE COURT:  And this is the Defendant, Matthew

20  Johnson.

21                  I'm Joe Clayton.  I'm a Senior District Judge

22  hearing this capital murder jury selection for Judge Tracy

23  Holmes who will try this case.  She's handling her regular

24  docket.  We're in Week 6 of this, so you can imagine what her

25  docket would look like if she had taken 6 weeks that we have
```

1   here.  Her docket would be a mess.  So I'm doing this, and

2   she's having her regular docket.

3              Do you recall coming down on June 21st when the

4   big panel came down and being put under oath at that time?

5              VENIREPERSON:  Yes, sir.

6              THE COURT:  All right.  You're still under that

7   oath, and as long as you're involved in the process, you will

8   continue to be under that oath, okay?

9              VENIREPERSON:  Right.

10             THE COURT:  Judge Holmes is scheduled to start

11  this trial on the 28th of October, and it may last as long as

12  two weeks.  Does that cause you any scheduling problem?

13             VENIREPERSON:  No, sir.

14             THE COURT:  Okay.  Have you heard anything on

15  TV, read anything in the newspaper, or heard any conversation

16  about this case?

17             VENIREPERSON:  No, sir.

18             THE COURT:  All right.  Did you have -- well, I

19  saw you reading them, so I know you've had an opportunity to

20  read the questionnaire --

21             VENIREPERSON:  Yes, sir.

22             THE COURT:  -- to refresh yourself and also the

23  information pamphlet which gives you some of the terminology

24  that you'll hear and a little bit about the process.  Each side

25  has 45 minutes to visit with you, and the State will go first.

```
 1              And Elaine may begin.

 2              MS. MOSELEY:  Andrea.  Thank you, Judge.

 3              THE COURT:  Oh, Andrea, yes.

 4                     ADAM FORBES,

 5  was called as a venireperson by the parties, and after having

 6  been first duly sworn, testified as follows:

 7              STATE VOIR DIRE EXAMINATION

 8  BY MS. MOSELEY:

 9      Q.    Mr. Forbes, thank you for being here this afternoon

10  and being on time.  As you can tell, this courthouse can be a

11  pretty busy place --

12      A.    Yes.  Yes, ma'am.

13      Q.    -- but I'm glad you were able to -- to find your way

14  to us on time today.  I'm going to just give you a little

15  bit -- maybe something to relax you.  This isn't a test.

16  Nobody is going to be asking you anything that's going to be

17  graded at the end or anything like that.  There are really no

18  right or wrong answers.  Because we're talking about a case, a

19  trial which may result in the death penalty, we bring all of

20  the potential jurors down individually and talk to them one at

21  a time.  It's really, under the law, your opportunity and your

22  only opportunity for you to tell us how you feel about the law.

23  In the end, while we're certainly curious about how you feel,

24  the main reason we're curious about that is because we want to

25  know how, if at all, it would affect your ability to follow the
```

1    law and sit as a juror in a capital case because the 12 jurors

2    who sit in these chairs for the trial -- and it actually won't

3    be these exact chairs, we're down the hall in another

4    courtroom, but it looks just exactly same -- the 12 jurors who

5    sit in these chairs will have to take an oath that they will

6    listen to the evidence, and in reaching their verdicts in the

7    case, base their verdict only on the evidence they heard in the

8    trial and the law as the Judge gives it to them.

9              And we know a lot of people have such strong

10   feelings about the death penalty in particular that those

11   feelings sometimes interfere with their ability to follow the

12   law.  And I'm not saying it will for you, but I'm telling you

13   why we go through this process, because you're probably

14   thinking an hour and a half I got to listen to lawyers talk to

15   me.  And that's the reason really, so just relax.  This is

16   going to be just our opportunity to kind of have a conversation

17   about some of the issues, some of the laws that come up in

18   these types of cases.

19             And so you know, we can't talk at all about this

20   particular case or any of the facts involved in this particular

21   case.  That would be improper at this time.  So anytime I'm

22   talking to you about a trial or about a defendant, know that

23   we're talking in general terms hypothetically, okay?

24        A.    Yes, ma'am.

25        Q.    The first thing I wanted to kind of point out, as

1  I'm going through your questionnaire, it looks to me like

2  you're one of those jurors who believes -- supports the death

3  penalty in an appropriate case, but also recognize that in some

4  cases, the life sentence is the more proper sentence.

5       A.   Yes, ma'am.

6       Q.   Is that fair?

7       A.   Yes, ma'am.

8       Q.   You told us that it's appropriate in some cases, but

9  in other cases you would agree that a life sentence might be

10 more appropriate?

11      A.   Yes, ma'am.

12      Q.   And what we're looking for is jurors who can kind of

13 keep an open mind to both the life sentence and the death

14 sentence in the event of a conviction for capital murder, and

15 wait until they've heard all of the evidence and heard all of

16 the law before they decide which one is the appropriate

17 sentence in this case.  And we'll talk more about the process

18 and how we get there, but I do want to tell you up front that

19 at no time is a jury going to be sent back to deliberate and

20 asked to vote who thinks he deserves a life sentence or who

21 thinks he deserves a death sentence.  You probably figured that

22 out by reading those instructions, that it -- that it's really

23 a process that we get to that and it's related solely to these

24 special issues that we'll address more in detail.  But it's not

25 ever about what someone deserves.

```
 1                  When we're sitting at home and watching the news

 2  and we see a -- you know, last night the police -- the news is

 3  reporting that last night the police responded to a call and

 4  there were, you know, 24 children murdered in an elementary

 5  school and everybody instantly -- not everybody, but a lot of

 6  people go, that's a death penalty case, that's a case a guy

 7  should be executed for that crime, he doesn't deserve to live.

 8       A.    Uh-huh.

 9       Q.    But you can see now how our system is set up such

10  that what someone does or doesn't deserve really doesn't play a

11  role?

12       A.    Right.

13       Q.    I tell you that because on page 2, of course, you

14  know, I recognize when we ask the jurors to fill out these

15  questionnaires, we don't tell y'all what the law is, right?

16       A.    Right.

17       Q.    Y'all don't know anything about Special Issues 1 and

18  2.  We're just asking you about your feelings.  And on page 1,

19  Question Number 10, we -- we told you that an intentional

20  murder committed during the course of attempting to commit or

21  committing the offense of robbery is a capital offense for

22  which the death penalty may be imposed.  Do you agree?  And I

23  just realized that we have a question mark where we shouldn't.

24  Interesting.

25                  Your answer is, that individual had no regard
```

1  for life or property and should not deserve to live when he

2  forcefully took another life.

3      A.    Uh-huh.

4      Q.    And now you see that while that may be how you feel,

5  and nobody is going to quibble with your personal feelings,

6  that's not how the law is going to separate --

7      A.    Right.

8      Q.    -- those who receive life versus those who receive

9  death?

10     A.    Right.

11     Q.    Let's talk then about the process.  Have you ever

12  been a juror?

13     A.    No, ma'am.

14     Q.    So a lot of this you will have learned in your

15  government classes and -- and through school and probably just

16  watching the television and legal programs, but our trials are

17  tried in two parts.

18     A.    Okay.

19     Q.    The first part of the trial is related specifically

20  and only to did the crime occur the way the State alleged the

21  crime to have occurred and is the person on trial the one that

22  committed the crime.

23     A.    Okay.

24     Q.    Okay.  Only about is he guilty or not guilty of that

25  particular charged offense.  So in the first part of the trial

```
 1   you're not going to hear things about a person's background or
 2   about -- much about the victim or the Defendant or character or
 3   anything like that.  It's going to be focused solely on that
 4   one issue, that one snapshot, if you will.
 5                    And in a criminal trial in any case in the
 6   United States a defendant is presumed to be innocent until the
 7   State proves he's guilty, right?
 8        A.    Yes, ma'am.
 9        Q.    You're nodding your head.
10        A.    Yes.
11        Q.    That's not new to you.  That means, you know, while
12   we may think somebody had -- you know, maybe they did something
13   to get themselves here, they must have done something, where
14   there's smoke there's fire.  All of those thoughts are --
15   really while we wouldn't recognize it as such are really
16   violating that person's presumption of innocence.  Can you see
17   why?
18        A.    Yes, ma'am.
19        Q.    So as a juror, you would have to set all of that
20   aside and recognize that until the State proves with credible
21   evidence guilt beyond a reasonable doubt, that presumption of
22   innocence stays with the Defendant.
23        A.    Correct.
24        Q.    Can you follow that law --
25        A.    Yes, ma'am.
```

```
 1       Q.   -- and presume Matthew Lee Johnson innocent as he
 2  sits here today?
 3       A.   Yes, ma'am.  I -- I mean, I think that -- that's his
 4  right.  I mean, no one says -- I mean, it's just, I guess,
 5  preponderance and just say, yeah, we think so.  I mean, you
 6  have to prove it unless -- you can't prove it, then --
 7       Q.   Right.
 8       A.   -- then I will.
 9       Q.   And if you had to vote right now if he's guilty or
10  not guilty, you would have to vote not guilty because you
11  haven't heard any evidence.
12       A.   Right.
13       Q.   And you brought up a point about, you know,
14  preponderance, or whatever.  And our burden of proof is beyond
15  a reasonable doubt.
16       A.   Right.
17       Q.   It's not beyond all possible doubt, but it is beyond
18  a reasonable doubt, which is the highest burden we have in law.
19  It should be, you would agree?
20       A.   Yes, ma'am.
21       Q.   We're talking about taking away somebody's liberty,
22  their freedom, and maybe potentially their life?
23       A.   Yes.
24       Q.   So that burden is a high burden, but it's not going
25  to require the State to prove beyond all possible doubt or to a
```

 1   hundred percent certainty because that's a burden we could

 2   never meet.

 3                   You told us and -- and the reason I wanted to

 4   talk to you about the presumption of innocence is because you

 5   told us in your questionnaire one thing that I thought was

 6   interesting.  It's the first time anybody has said this in

 7   our -- at least so far in our questionnaires.  On page 7,

 8   Question Number 41, we asked if you agreed with the statement

 9   that it's better that 10 guilty people go free than 1 innocent

10   man be convicted.  You said, no, which many people say.  But

11   then you wrote in:  It's hard to answer why the innocent man

12   will be in a position to be convicted.

13        A.    Uh-huh.

14        Q.    And you can see how that is kind of going against

15   the presumption of innocence a little bit?

16        A.    Uh-huh.

17        Q.    But you're telling us today that you understand that

18   a person is presumed innocent until the State proves otherwise?

19        A.    Right.

20        Q.    And you don't have any problem following that law

21   and giving that presumption of innocence to the Defendant on

22   trial?

23        A.    No, ma'am.

24        Q.    Okay.  No, you don't have any problem?

25        A.    Oh, no, I don't have any problem.

```
1         Q.    Okay.

2         A.    Right.  I mean, I can explain that.

3         Q.    Yeah, tell me what you meant.

4         A.    Yeah, I -- you know, it's only -- it's just kind of

5   like how I grew up or so because if you're with like a bunch of

6   bad folks who are doing bad things, but you're sitting back,

7   but they're like, kind of guilty by association --

8         Q.    Right.

9         A.    -- I guess, and if you're hanging around -- I mean,

10  it's kind of like, I guess -- like why are you hanging out with

11  those people if you know that they're doing wrong, but you

12  don't want any part of it.

13        Q.    Right.

14        A.    So it's kind of like keeping a good mind on the

15  company that you keep.

16        Q.    Okay.  Well, my mamma always used to say, if you lie

17  down with dogs, you wake up with fleas.

18        A.    Right.

19        Q.    It's kind of the same thing, and that's what you're

20  talking about?

21        A.    Yes, ma'am.

22        Q.    So -- so you recognize in a courtroom that we're

23  talking about the State having to bring the evidence?

24        A.    Right.

25        Q.    Okay.  We have to prove everything, as I told you,
```

1    that's alleged in our indictment.  The indictment is not any

2    evidence of guilt, but it does tell us what we have to prove to

3    the jury to -- to be entitled to a guilty verdict and it lets

4    the Defendant know what charge he's been -- that he's facing.

5         A.    Right.

6         Q.    So in a capital murder case -- and a capital murder

7    case is the only case for which the death penalty is ever even

8    an option.

9         A.    Uh-huh.

10        Q.    I'll talk to you a little bit about the difference

11   between a capital murder and a plain old murder.  I hate to say

12   a regular murder or a plain murder, but it is different from a

13   capital murder.

14             In a capital murder what we're talking about is

15   an intentional murder.

16        A.    Uh-huh.

17        Q.    That means that it was the person's goal to cause

18   the death of the individual, not to hurt them and they died

19   anyway.  In other words, you know, you shoot somebody in the

20   leg to keep them from chasing you, but they die of blood loss.

21   That's not an intentional murder because an intentional murder

22   is meaning to cause the death of the person.  It's not

23   self-defense or defense of a third person because that's a

24   defense -- a complete defense to a crime.  It's not because you

25   were insane at the time, because of mental disease or defect,

1    you didn't know what you were doing was wrong.  It is forming

2    the intent to carry out the actions to cause the death.

3          A.    Uh-huh.

4          Q.    And that's what we're talking about when we talk

5    about capital murder, that kind of an intentional murder.  But

6    that's not enough even for capital murder.  For capital murder,

7    it has to be an intentional murder, plus some other aggravating

8    circumstance.  We're talking about committing an intentional

9    murder during a robbery in this case.  So I'll focus on that,

10   although there are other ways to commit capital murder.

11   Killing a police officer in the line of duty is one way, but

12   just keep in mind when we're talking about capital murder,

13   we're talking about that intentional killing in the course of a

14   robbery.

15         A.    Uh-huh.

16         Q.    Okay?  You see the difference between that and

17   regular murder?

18         A.    Yes, ma'am.

19         Q.    And in capital murder, if you're convicted of

20   capital murder, there's only two possible punishments, life

21   without the possibility of parole, which means just that.  We

22   used to have life where you could be eligible for parole at

23   some point in the future.  Not anymore.  It is life without

24   parole or the death sentence.

25         A.    Okay.

1          Q.    And as I told you, to get a conviction for capital

2   murder, we have to prove the case to the jury and bring

3   credible evidence to convince the jury of all of those

4   elements, that it was an intentional murder, and that it was

5   committed during the course of committing or attempting to

6   commit a robbery.  If we fail to do that -- if we come to

7   trial, and let's put you on a hypothetical jury, we come in to

8   trial and all of our witnesses testify, sure enough, the person

9   on trial is the one that killed the victim and they did it

10  intentionally, no question, but you don't hear any evidence

11  about a robbery, your verdict on capital murder would have to

12  be not guilty, right?

13         A.    Yes, ma'am.

14         Q.    Why is that?

15         A.    It would go back to what you said.  It's just a

16  plain murder, and no, you know, secondary aggravating offense.

17         Q.    Because I didn't prove the second aggravating

18  offense.  The fact that I allege it isn't enough.  I've got to

19  bring the proof.

20         A.    Uh-huh.

21         Q.    So in this case, if the jury finds the person not

22  guilty, as they would be required to do of capital murder, they

23  may have an option of a lesser sentence -- a lesser conviction

24  of murder -- plain old murder we talked about.  So if the jury

25  believes that I did prove murder beyond a reasonable doubt and

```
 1  that's one of the options given to them in the charge, they
 2  could convict the Defendant of murder.  Then we wouldn't be
 3  talking about life -- life without parole or the death
 4  sentence.  We would be talking about a range of punishment,
 5  anywhere from five years in prison up to life in prison -- life
 6  with parole.  And the jury could listen to all of the evidence,
 7  and in the punishment phase, they get to hear about all that
 8  other stuff, the background stuff, criminal history or lack
 9  thereof, character, maybe, all of that stuff, and decide where
10  in that punishment range the proper punishment lay --
11      A.   Uh-huh.
12      Q.   -- right?  So if you're on that jury and you convict
13  somebody of murder, instead of capital murder, can you keep
14  your mind open to that full range of punishment anywhere from
15  five to life?
16      A.   Yes, ma'am.
17      Q.   And if you thought five was the appropriate sentence
18  after hearing everything, could you give a five-year sentence
19  for murder?
20      A.   Yes, ma'am.
21      Q.   And the same with the life sentence?
22      A.   Yes, ma'am.
23      Q.   If you thought it was appropriate?
24      A.   Yes, ma'am.
25      Q.   Okay.  Then I want to talk a little bit more about
```

```
 1  some of the other principles.  I got off track a little bit.

 2  That seems to be happening to me.  Cold medicine.

 3          A.   All right.

 4          Q.   I'm going to use that as my excuse today.

 5                    So I told you we have the presumption of

 6  innocence and the State has the burden of proof and you always

 7  look to us.  A defendant never has to prove they're innocent of

 8  a crime.  They also never have to testify.  And you probably

 9  knew that was coming.  The Fifth Amendment, we hear about it

10  all the time.  A person has the right to remain silent.  The

11  prosecutor can't call the Defendant to the stand and say, let's

12  hear your side of the story.

13          A.   Uh-huh.

14          Q.   Jurors naturally want to hear both sides of the

15  story, but in criminal trials oftentimes they don't hear both

16  sides of the story.  And the law would tell the jury if a

17  defendant chooses not to testify for whatever reason, they

18  would be instructed that they can't consider the Defendant's

19  silence for any reason at all.

20          A.   Right.

21          Q.   They have to just look to the evidence that they did

22  hear in the trial and not consider the fact that he didn't

23  testify.  Could you do that?

24          A.   Yes, ma'am.

25          Q.   And disregard the silence because you won't know why
```

1   the person chose not to testify.

2        A.    Right.

3        Q.    And the jury's job always is to judge the evidence

4   and not speculate about the things they didn't hear.

5        A.    Right.

6        Q.    And you don't have any concerns being able to afford

7   the Defendant that Fifth Amendment privilege?

8        A.    No, ma'am.  I think that's an important one that we

9   should all -- no, I think it's important.  You shouldn't self

10  incriminate yourself.

11       Q.    And we all have that because in the end, remember,

12  again, you're always looking back to me.  Either I can do the

13  job or I can't.

14       A.    Right.

15       Q.    Either I can carry the burden or I can't.

16            That Fifth Amendment privilege applies in the

17  punishment stage of a trial, as well, any trial -- whether it's

18  a theft of a bicycle, all the way up to a capital murder.  And

19  a jury can never put a burden on the Defendant to testify in

20  their own case.

21            In a -- in a capital murder trial, they can't

22  require the Defendant to get on the stand and say, I'll never

23  commit another criminal act my whole life.  And they can't

24  require the Defendant to get up there and beg for mercy and ask

25  for a life sentence.  You just, again, have to look to the

1  evidence you do hear and not concern yourself with whether or

2  not the Defendant testified.

3        A.    Okay.

4        Q.    If a defendant chooses to testify, nobody can stop

5  him, and his testimony in a trial, whether in the

6  guilt/innocence phase or in the punishment phase, would be --

7  the jurors would be required to view that testimony just as

8  they would any other witness's testimony and decide whether to

9  believe it or not believe it, believe some, all, or none of it.

10  Does that make sense?

11       A.    Yes, ma'am.

12       Q.    And could you do that?

13       A.    Yes, ma'am.

14       Q.    Then let's talk about the punishment phase.  I'm

15  going to put you on -- again, on the jury.  You've convicted

16  the person of an intentional killing during the course of a

17  robbery, capital murder.

18            Now we're moving into the punishment phase of

19  the trial, and I told you before, this is where you can hear

20  all kinds of other evidence.  The State of Texas still has a

21  burden of proof in the punishment phase of a capital trial.  So

22  you know how we have the presumption of innocence in the first

23  part of the trial, that's gone now because I've done my job and

24  he's been found guilty.

25            In the second part of the trial, we have a

 1  presumption in the law that the life without parole sentence is

 2  the proper sentence, unless and until I can prove otherwise.

 3      A.    Okay.

 4      Q.    Okay.  So -- so think about that second part of the

 5  trial kind of like that first part.

 6      A.    Okay.

 7      Q.    The presumption is that a life sentence is the

 8  proper sentence.

 9            In the State of Texas, we're going to separate

10  those who receive the life sentence from those who receive the

11  death sentence with Special Issue Number 1 and whether or not

12  they're going to be a continuing threat to society.

13            Our legislature has decided that if a defendant

14  who is convicted of capital murder can be safely incarcerated,

15  someone who is going to go to the penitentiary and more likely

16  than not will behave themselves and not cause a threat to

17  anybody in the penitentiary, those people should receive a life

18  sentence, if that's the sufficient sentence to protect society.

19  If, however, the State can prove beyond a reasonable doubt that

20  more likely than not the person that's been convicted of

21  capital murder will continue to commit criminal acts of

22  violence that constitute a continuing threat to society, those

23  are the people that the State is going to subject to the death

24  penalty.  Does that make sense?

25      A.    Yes, ma'am.

```
 1        Q.    So it's not about what you deserve, and it's really
 2   not even all about what you've done.  It's looking forward
 3   about what you're more likely than not going to do in the
 4   future.  Do you think that that's as good a way as any of
 5   separating those who should receive a life sentence versus
 6   those who shouldn't?
 7        A.    I think it's sufficient.
 8        Q.    Let's talk a little bit about the terms.  You see
 9   there it says probability, and I see you're an auditor.  I'm
10   going to be real honest and tell you, I don't know exactly what
11   that is, but I think it probably has something to do with
12   numbers?
13        A.    Yes, ma'am.
14        Q.    Okay.  So -- now you got lucky.  So when -- when I
15   say probability, a lot of people who deal with numbers say, you
16   know, there's such a thing as a five percent probability or a
17   10 percent probability.
18        A.    Right.
19        Q.    That's not what the law is talking about here.  When
20   we say probability, we're saying more likely than not.
21        A.    Okay.
22        Q.    Okay.  So it's not maybe, it's not possibly, it's
23   not it could happen, it's more likely than not, and I have to
24   prove this beyond a reasonable doubt.
25        A.    Uh-huh.
```

```
 1        Q.    More likely than not that the Defendant would commit
 2   criminal acts of violence.  They don't tell us what those
 3   criminal acts are.  In other words, the legislature didn't say,
 4   Texas, you're going to have to prove that another murder is
 5   going to happen or that a robbery is going to happen, or a
 6   sexual assault is going to happen in the future.  It just says
 7   that you're going to have to prove it's more likely than not
 8   the person that's been convicted will commit criminal acts of
 9   violence, whatever that means to the juror.  And that's going
10   to be up to you to decide, but it is the types of criminal acts
11   of violence that will constitute a continuing threat to
12   society.
13              When we say society, remember, where are we when
14   we get here?  We're in the punishment phase.
15        A.    Yes, ma'am.
16        Q.    Which means the best the Defendant can do is life
17   without parole --
18        A.    Correct.
19        Q.    -- right?
20        A.    Yes, ma'am.
21        Q.    So when we're talking about society, we're talking
22   about even prison society.
23        A.    Yes, ma'am.
24        Q.    Have you ever visited a penitentiary?
25        A.    No, ma'am.
```

```
 1        Q.    But you certainly know we have inmates kind of

 2  congregating and socializing, and moving about one another?

 3        A.    Yes, ma'am.

 4        Q.    We're not talking about everybody stays in a cell

 5  all day long by themselves.  We have prison guards that work

 6  inside.  We have nurses and teachers and doctors, people who

 7  come to visit their loved ones.

 8        A.    Uh-huh.

 9        Q.    That's kind of a society within our society, would

10  you agree?

11        A.    Yes, ma'am.

12        Q.    Do you believe that the people inside those walls,

13  whether they be visitors or professionals or other inmates,

14  deserve a level of protection from someone who would more

15  likely than not commit acts of violence against them?

16        A.    Yes, ma'am.

17        Q.    So when we're talking about Special Issue Number 1,

18  that's the society we're talking about.  Wherever the Defendant

19  finds himself is our society in Special Issue 1.

20        A.    Okay.

21        Q.    So we're not just talking about you and me, but

22  people inside the prison walls.  And, again, burden on me to

23  prove that beyond a reasonable doubt.

24               Now, you know, we're not lucky enough to be able

25  to pull up a crystal ball.
```

1          A.    Uh-huh.

2          Q.    And, you know, wave my hands over it and look into

3    the future.  So you recognize it's not something I have to

4    prove will absolutely happen?

5          A.    Right.

6          Q.    How do you think -- what do you think would be

7    important in deciding what someone is more likely to do in the

8    future?

9          A.    That's hard to -- it's hard to predict someone --

10   it's hard to -- you know, if we've already -- if we're in the

11   punishment phase and we've already said that the Defendant is

12   guilty, it's hard to -- it's hard to predict and hard to tell

13   the specific mental change that's happened between the actual

14   crime and where we find ourselves now.  They could have, you

15   know, had a come to Jesus meeting and they're a completely

16   different person.  In that case, I would think that they're

17   actually a benefit to the penitentiary and not, you know,

18   executed.  So it's hard to -- it's hard to really get a gauge

19   on who they are now.  So I would really say that that would

20   be -- really a deciding factor is who -- like who are they now?

21         Q.    How do you -- how do you think you would know that?

22         A.    I don't know if you can.  I mean, it's -- it's --

23   it's hard to really predict because I mean, we watch movies and

24   stuff and all of those people are actors and they act like a

25   certain thing.  It's hard to prove that.  As a juror, you would

```
 1  have to really feel some level of sincerity from the defending
 2  side that this person is now a changed man or woman and I guess
 3  wouldn't commit a crime, and that they are, you know, safe, I
 4  guess for lack of a better term.  I guess their past history,
 5  how they grew up, where they grew up, past criminal activity
 6  would come into play, because if they've had several come to
 7  Jesus meetings over their life and say, I'll never do that
 8  again, but they do it again, that could be a lack of
 9  credibility on this come to Jesus.
10       Q.   Right.  So do you believe that Special Issue Number
11  1, do you believe that it is possible for the State to prove
12  that beyond a reasonable doubt with evidence?  Do you think
13  it's possible to answer that question what someone would more
14  likely do in the future?
15       A.   Nothing is impossible.  I think it's definitely
16  possible.  It would definitely be -- I think that's probably a
17  really hard one to predict the future.  I'm not -- I'm not a
18  mind reader or I don't predict the future, but I am an
19  open-minded person to listen to all sides, so -- and I -- you
20  know, I have people who visit folks in prison who just -- you
21  know, I'm a Christian and try to share the gospel with them and
22  try and just be a friend to them when they might not have any
23  friends, so I do have a special heart for people who visit
24  prisons and I want to keep them safe, but if -- that's a really
25  hard one.
```

163

```
 1         Q.    Have you -- have you ever heard of someone talking
 2    the talk but not walking the walk?
 3         A.    Yes, ma'am.  Yeah, that was -- that was something
 4    that a couple of my friends say is a common term to people who
 5    are about to like get out.  You know, that they talk the talk,
 6    but when they leave the penitentiary, they are not walking the
 7    walk.
 8         Q.    And do you -- do you or the people you're talking
 9    about that are -- that are ministering to inmates, incarcerated
10    individuals, do y'all ever have any contact with them after
11    they are released?
12         A.    Yes, ma'am.
13         Q.    And that follow-through?
14         A.    Yes, ma'am.
15         Q.    And so you recognize that -- that sometimes all the
16    talk isn't necessarily sincere talk?
17         A.    Right, but a lot of times it is.
18         Q.    Sure.  It's certainly possible.
19         A.    Yeah.  I'm a big -- I'm -- I would say that I'm more
20    of a fan of rehabilitation, because I -- you know, Jesus gave
21    us a second chance, so I think that.
22         Q.    Sure, absolutely.  Absolutely.
23         A.    Right.
24         Q.    Tell me, as it relates to Special Issue 1 -- and I
25    want to make sure that I understood your answer because you
```

```
 1  said nothing is impossible.

 2       A.    Right.

 3       Q.    And obviously, when we're talking about seating

 4  jurors over here, we're going to need 12 people who recognize

 5  that it is possible --

 6       A.    Right.

 7       Q.    -- for that to be proven with evidence?

 8       A.    Right.

 9       Q.    That you're not telling me that it's impossible for

10  me to do my job?

11       A.    Right.  It's not impossible.  I think it's very

12  possible.

13       Q.    Okay.

14       A.    So --

15       Q.    Okay.  And you recognize that the Defense has no

16  burden at all on Special Issue Number 1.

17       A.    Okay.

18       Q.    They don't have to prove to you -- to the jury that

19  he's not going to be a continuing threat.

20       A.    Okay.

21       Q.    It's my responsibility to prove that the answer is

22  yes.

23       A.    Okay.

24       Q.    And if I fail in that, the answer would be no, and

25  then the life sentence would be the proper sentence.
```

```
 1        A.    Correct.

 2        Q.    If, however, I answer -- or the jury answers yes to

 3   Special Issue Number 1, then and only then would we move to

 4   Special Issue 2.

 5        A.    Okay.

 6        Q.    So now -- once we get to Special Issue 2, we've

 7   found the Defendant guilty of capital murder and we've found

 8   that more likely than not he's going to constitute that

 9   continuing threat.

10        A.    Okay.

11        Q.    Only then do we get to Special Issue 2, and I'll

12   tell you now, my job is done.  I've presented all of the

13   evidence I have to present.  And it's the jury's job to take

14   into consideration all of the evidence, look at everything

15   again, look at the circumstances of the offense.  There, you

16   might have information about who the victim was, whether

17   there's a relationship between the Defendant and the victim,

18   how the crime was committed, all of those things, the

19   Defendant's character and background, if there's evidence in

20   front of you about that.

21        A.    Uh-huh.

22        Q.    And the personal moral culpability of the Defendant,

23   if that's in evidence.  And I'll tell you, you sound to me like

24   a person who remorse is going to be very important to.  And

25   I'll submit to you and tell you that unless the Defendant
```

1  testifies in a capital trial, you're probably not going to hear

2  anything about remorse.

3       A.    Right.

4       Q.    Because the law is not going to allow, for instance,

5  me to take the stand and tell that you that Rocky feels real

6  bad about what she did --

7       A.    Right.

8       Q.    -- because the only way I could know that is by

9  talking to her.

10      A.    Right.

11      Q.    So if a defendant chooses not to testify, you may

12 not have that evidence of remorse --

13      A.    Right.

14      Q.    -- or change or acceptance of God and all of the

15 things that you've talked about.

16      A.    Uh-huh.

17      Q.    But you look at the evidence you do have.

18      A.    Uh-huh.

19      Q.    And the law is going to require you to look at

20 everything again and ask yourself whether you heard something

21 in the evidence that convinced you that the life sentence is

22 the proper sentence --

23      A.    Right.

24      Q.    -- over the death sentence.  Okay.  And it may be --

25 you know, some people tell us horrible childhood physical or

1  sexual abuse may be mitigating to them.  Intoxication at the
2  time of the offense may be mitigating to them.  Other people
3  say, you know, intoxication is aggravating to me because you
4  chose to put yourself in that situation, and I'm not going to
5  find that mitigating at all.  And that's okay, because nobody
6  is going to tell the jurors what is or isn't mitigating.
7       A.   Right.
8       Q.   But if you hear something that in your mind is
9  sufficiently mitigating to warrant a life sentence, then you'll
10 answer that yes.
11      A.   Okay.
12      Q.   Now, I want to point out to you that by the time we
13 get to Special Issue Number 2, when we're talking about whether
14 we're going to give a life sentence to somebody, you're talking
15 about giving a life sentence to someone that you believe more
16 likely than not will constitute a threat to prison society.
17      A.   Okay.
18      Q.   Right?  Because we've already answered yes to
19 Special Issue 1.
20      A.   Right.  Yes, ma'am.  Yes, ma'am.
21      Q.   Can you see a situation where you would answer --
22 and I'm not asking you what it is.  Don't -- I'm not trying to
23 get into what you think is mitigating or not mitigating.  But
24 can you ever see a situation where you would sentence someone
25 to life, answer Special Issue 2 yes, knowing that they're going

```
 1   to be a threat, even to the people that you're talking about,
 2   your friends who visit in the penitentiary?
 3        A.   Sure.  I think -- I don't know -- I guess the simple
 4   answer would be just yes, that -- I'll just stick with yes.
 5        Q.   Okay.  Okay.  You'll just stick with yes?
 6        A.   Yeah.
 7        Q.   If you -- if you saw something that made you think
 8   it was the right thing, even though you know they're going to
 9   be dangerous?
10        A.   I don't know.  I kind of feel like that's kind of a
11   little bit of a trick question.
12        Q.   What do you mean?  Tell me -- I'm certainly not
13   trying to trick you.
14        A.   Yeah.  No, I will -- I will walk you through what
15   I'm thinking.  By answering yes, I don't want to say the
16   special issue is kind of pointed, but Special Issue Number 2,
17   I'm sorry, is kind of pointed, but it is kind of pointed.  It's
18   like a -- you know, well, hey, like you answered yes, so that
19   kind of means that you should, you know, put him to death.
20   That -- that's just kind of how I feel in this situation.
21        Q.   If you answer yes to Special Issue 1 --
22        A.   I feel like I'm almost being directed to the death
23   penalty --
24        Q.   Uh-huh.
25        A.   -- in Special Issue 2.  If that's -- I mean, if
```

1  that's its intention, I -- then I guess if I answered yes to

2  Special Issue Number 1, then I don't think that it would be

3  correct to put him -- put him or her life without parole in the

4  penitentiary, if I think that they're going to be a harm.

5      Q.    Okay.  Then I just -- and that's kind of what I was

6  trying to get at.  And I want to make sure that you and I are

7  on the same page.

8      A.    I think we are now.

9      Q.    You only get to Special Issue 2 if you've answered

10  yes to Special Issue 1.

11      A.    Right.

12      Q.    Because if you answer no that, the trial is over.

13      A.    Right.

14      Q.    So you've found the person guilty of capital murder

15  and now you believe and answered yes to 1 --

16      A.    Right.

17      Q.    -- that you believe he's going to be more likely

18  than not a threat even in prison.

19      A.    Well, then I would want to keep him or her away

20  from, you know, the people that I know who serve the prisoners,

21  nurses, doctors, etcetera.

22      Q.    Okay.  So the -- the law would require you --

23  obviously, if that was the end-all, be-all, we wouldn't need

24  Special Issue 2.

25      A.    Right.

1      Q.   We just said future danger, we're done, trial is

2  over.  But we have Special Issue 2, and Special Issue 2 would

3  necessitate the jurors, again, looking at everything to

4  determine whether there is anything that would warrant a life

5  sentence --

6      A.   Okay.

7      Q.   -- instead.

8      A.   So in Special Issue 1, am I just looking at the

9  trial and the evidence I saw in the trial, and then Special

10  Issue 2, then I get everything else?

11      Q.   No, you'll have all of it.  I guess, procedurally

12  here how it goes.  First part of the trial --

13      A.   I think I'm mixed up on the procedure a little bit.

14      Q.   Okay.  Then let me explain.  The first part of the

15  trial is guilt/innocence.  All the evidence will be related to

16  that.

17      A.   Right.

18      Q.   The jury hears everything about the crime itself.

19      A.   Okay.

20      Q.   They come back after deliberating their verdict.  If

21  they say guilty of capital murder, we move into the punishment

22  phase.

23      A.   Okay.

24      Q.   Then all the evidence is presented on the punishment

25  phase.

```
 1        A.    Okay.

 2        Q.    Everything that would relate to Special Issue 1 and

 3   2.

 4        A.    Okay.

 5        Q.    All -- the State goes first, presents evidence.

 6   Defense can, if they choose to, present evidence.  We might

 7   have more evidence after that.  They might have more, but it

 8   goes in that order.

 9        A.    Okay.

10        Q.    Once all the evidence is done, the jury would be

11   given the instructions, which is Special Issue 1 and 2, along

12   with some other instructions.  They would go back to the jury

13   room and start out asking Special Issue Number 1, did the State

14   prove it.

15        A.    Right.

16        Q.    And then they answer that.

17        A.    Uh-huh.

18        Q.    And then they go right into Special Issue 2.  And

19   both the answer -- if the answer is no to Special Issue 1, then

20   you're done.

21        A.    Right.

22        Q.    You come in, you tell the Judge, we've reached a

23   verdict.

24        A.    Uh-huh.

25        Q.    If, however, the answer is yes, all 12 jurors agree
```

1  that more likely than not to be a future threat, then they

2  would talk about Special Issue 2.

3       A.   Okay.

4       Q.   And everybody looks at everything one more time.

5       A.   So it's more of like a dig deeper kind of thing,

6  second look, check your work.

7       Q.   Yeah, it's -- well, it's a second look because it's

8  asking a different question now, because I don't have to prove

9  anything there.  Remember, I had a burden of proof on Special

10 Issue 1.

11      A.   Uh-huh.

12      Q.   And if I do my job and prove that, you're by your

13 oath bound to say yes to Special Issue 1.

14      A.   Okay.

15      Q.   If I prove it.

16      A.   Right.

17      Q.   Special Issue 2 is your own eyes looking at

18 everything one more time --

19      A.   Okay.

20      Q.   -- to see if there's anything that says to you, I

21 should do -- I should do a life sentence instead of a death

22 sentence.

23      A.   Okay.

24      Q.   Okay.  It might help you to know that the law

25 says -- and that's not going to be the case in this situation,

```
 1  in this case -- but the law says there is something that is
 2  sufficiently mitigating by law, and that's mental retardation.
 3      A.    Okay.
 4      Q.    So even if someone commits a horrible, heinous
 5  capital murder, and even if they're more likely than not going
 6  to be a future threat, if they are mentally retarded and -- an
 7  I.Q. of 70 or less --
 8      A.    Okay.
 9      Q.    -- they absolutely have sufficiently mitigating
10  circumstances, and they'll never be subject to the death
11  penalty.
12      A.    Okay.
13      Q.    Does that make sense?
14      A.    Yes, ma'am.
15      Q.    But other than that, it's up to the jury --
16      A.    Okay.
17      Q.    -- to hear the evidence and decide if there's
18  anything there.  And I'm just asking you once you've found
19  somebody guilty of capital murder and once you've found that
20  they will more likely than not pose a threat to the people
21  inside the penitentiary --
22      A.    Uh-huh.
23      Q.    -- is your mind even open at all to a life sentence
24  for someone like that?
25      A.    Open, yes.
```

```
 1        Q.    Okay.

 2        A.    I mean, I think to be on the jury in the situation,

 3   you have to have an open mind to a lot of things.  And -- so I

 4   would say that there are -- for me to say that I would -- once

 5   I get to Special Issue 2, like death penalty, that would be

 6   incorrect.  I think that there are -- I don't know them yet,

 7   but I think there could be circumstances where -- by looking at

 8   Special Issue 2, I could say, well, yes, a life sentence would

 9   work.

10        Q.    Okay.  Okay.  And I just want to make sure that we

11   were clear on where that was.  So you -- you could, if the

12   circumstances presented themselves, if you found something

13   sufficiently mitigating, you could answer that yes knowing that

14   a life sentence would be imposed and knowing that the person

15   would go to prison instead, even though they're going to be a

16   threat?

17        A.    I could say, yes.

18        Q.    Okay.  Okay.  And I think I am about out of time.  I

19   just want to make sure I don't have anything -- just really

20   quick, your aunt was murdered by her boyfriend, and I see you

21   mentioned that a number of times in your questionnaire.

22        A.    Yes, just in response to the questions.

23        Q.    Sure.  Is there anything about that that is going to

24   affect your view of the evidence or deliberations in this case

25   at all, or could you set that aside and look only at the
```

175

```
 1  evidence?
 2       A.   I was fairly young when it happened, so I really
 3  don't know a lot about it.  I just know that it happened, so --
 4       Q.   Do you know if he was tried or --
 5       A.   I --
 6       Q.   -- what happened to him?
 7       A.   -- I didn't -- I didn't keep up with it.  I didn't
 8  ask my mom about it.  Because it was my mom's sister, there was
 9  just -- didn't ask.
10       Q.   So it shouldn't affect you in this trial?
11       A.   No, ma'am.
12       Q.   Okay.
13            MS. MOSELEY:  Okay.  That's all I have, Judge.
14  Thank you.
15            THE COURT:  Okay.  Who is going over here?
16            MS. BERNHARD:  That will be me.
17            THE COURT:  Okay, Catherine.
18                 DEFENSE VOIR DIRE EXAMINATION
19  BY MS. BERNARD:
20       Q.   Mr. Forbes, again, my name is Catherine Bernhard,
21  and I'm going to have a few questions for you about some of
22  these same issues that Ms. Moseley just finished talking to you
23  about, obviously, because at this table we have a slightly
24  different take of some of these things.
25       A.   Right.
```

1          Q.   I want to start out by saying that even though we

2     spend a lot of time talking about the death penalty and the

3     special issues, I don't want you to get the impression that we

4     think at this table that you're ever going to be called on to

5     answer those special issues.

6          A.   Okay.

7          Q.   Because it's our position over here that if you end

8     up as a juror in this case, you're not going to find Matthew

9     Johnson guilty of capital murder and you will never be called

10    on to answer those special issues.

11         A.   Okay.

12         Q.   But the way the process is set up, we have to

13    address those kind of things now and then spend a lot of time

14    talking about the death penalty because that's what makes this

15    case unique from most of the other different cases.

16         A.   Okay.

17         Q.   But I don't want you to think that we for some

18    reason think it's a foregone conclusion that you're ever going

19    to be reaching those special issues.

20         A.   Okay.

21         Q.   I did have some questions about some of your answers

22    on the questionnaire.

23         A.   Okay.

24         Q.   If you'll turn to page 3, Question Number 12, where

25    we ask or we tell you the death penalty is reserved for those

1  Defendants that are such a threat to society that even

2  incarceration does not remove the probability of future violent

3  acts.

4       A.   Uh-huh.

5       Q.   And we asked you if you agree or disagree, and you

6  said you agreed.  And then you said, bad company corrupts good

7  character.

8       A.   Uh-huh.

9       Q.   Even if the murder was unintentional, the person has

10 the capacity to do it again and should not endanger other

11 lives.

12      A.   Right.

13      Q.   And I know we ask you these things before we tell

14 you what the law is --

15      A.   Right.

16      Q.   -- and the way we do this.  But what -- tell me what

17 you were thinking when you wrote that.

18      A.   Yes.  So I guess when I answered this, I was under

19 the impression that the -- the Defendant was already

20 incarcerated, meaning that he would be -- he or she would be

21 surrounded by others like he or she, meaning that if this

22 person -- I'm just going to take you through the whole train of

23 thought that I probably went through.

24      Q.   Okay.

25      A.   That he or she is now incarcerated with others like

178

1    he or she, meaning that -- I mean, I don't know anything about

2    the general prison population, whether certain people are

3    separated from others of less violent crimes.  I don't really

4    know.  But in my train of thought, I guess they're all just in

5    the same area perhaps, that if this person just -- this person

6    murdered somebody else, that means that people of more violent

7    crimes could perhaps influence this person, the Defendant, the

8    subject meaning that, you know, even though that their crime

9    was unintentional, like you mentioned accidentally shot in the

10   leg, why they shot in the leg, I didn't really think about

11   that, but why -- like why were they shooting that person in the

12   leg, why -- like why was that -- the situation that happened,

13   meaning that -- they obviously murdered somebody, meaning the

14   capacity is there, that if there are people who could influence

15   them to do other crimes within the prison system, that could be

16   a possibility.

17        Q.   So your thinking was that if a person goes to

18   prison, they're going to be around other bad people and they

19   may end up worse?

20        A.   Right.  That's -- that was the train of thought that

21   I had because the capacity is already there to -- to commit a

22   crime.  I mean, everyone is an individual, not everyone is

23   persuaded as easily.  But just thinking that some people can be

24   persuaded to commit crimes within the prison system, and -- and

25   therefore endanger other lives just because of the persuasion.

1        Q.    Okay.  But you also -- on page 6 you say -- when we

2    ask on Question Number 37, do you think that a person convicted

3    of capital murder can be rehabilitated in prison, and you said,

4    yes.  So you think it's also possible that somebody can go to

5    prison and come out better, I guess for lack of a better way to

6    put it?

7        A.    I think so, because I've experienced it through a

8    friend as someone who was put in prison for a specific crime,

9    he went in and met with him and just really explained to him

10   just the love of Christ.  He came out and this guy is leading

11   Bible studies, leading other people to Christ, just because he

12   went to prison and encountered someone who ministered and cared

13   for him and loved him.  I -- I think it's highly improbable

14   that that guy now will commit a crime.

15       Q.    Okay.

16       A.    So I --

17       Q.    You finished?

18       A.    So I definitely think that rehabilitation is

19   possible.

20       Q.    Okay.  So going to prison doesn't make you into a

21   worse person necessarily?

22       A.    Correct.

23       Q.    Okay.  What purpose do you think the death penalty

24   serves -- let me just ask you that.

25       A.    I - let me think about that for a second.

```
 1        Q.    Okay.
 2        A.    I don't want to say anything stupid.  I will say
 3  that the death penalty serves its purpose when required,
 4  meaning that if we're at that point and we're considering the
 5  death penalty, then this person might be capable of doing
 6  something else that would require the death penalty again,
 7  meaning that if we impose the death penalty on somebody, that
 8  it could be a benefit to society -- the society of America or
 9  prison -- or the prison system.
10        Q.    Okay.
11        A.    Yeah.
12        Q.    So basically you're saying that you're -- you're
13  basically in agreement with the way we have set up the process
14  and -- and how we decide who gets the death penalty and who
15  gets life without parole?
16        A.    Yes, ma'am.
17        Q.    That it's that danger of -- of are you a threat to
18  the future?
19        A.    Yes, ma'am.
20        Q.    Or are you going to be a threat in the future?
21        A.    Right, the -- I am in favor of the death penalty,
22  but I am in favor of rehabilitation.
23        Q.    Okay.
24        A.    It seems a little flip-floppy, but I believe in the
25  power of rehabilitation.  I do think that there are people when
```

1  in the situation of committing a crime, they're like, oh, my

2  gosh, I can't believe I did that, and turn away from that act.

3  Also think that there are people who commit the crime just out

4  of pure ill intent and have no just remorse about it.  And it's

5  hard to prove that, you know, with -- with what Ms. Moseley

6  said that the Defendant doesn't have to testify, we'll never

7  know whether he or she is remorseful unless, you know,

8  unless -- you know, unless it's told to the jury.  So I am in

9  favor of how the system is set up --

10      Q.    Okay.

11      A.    -- in short.

12      Q.    Okay.  And you understand that the system presumes

13  that for somebody convicted of capital murder --

14      A.    Uh-huh.

15      Q.    -- which like we've been talking about, we're

16  talking about an intentional murder in the course of a robbery,

17  not an accident, not an unintentional murder, not something

18  that was self-defense, not something that was defense of

19  property, you know, somebody that intended to kill and did so,

20  that they've committed that offense and they've done that or

21  that intentional murder in the course of committing the offense

22  of robbery?

23      A.    Uh-huh.

24      Q.    The law, as we have it set up in Texas, presumes

25  that for that guilty capital murderer, life without parole is

182

 1  the appropriate sentence.

 2        A.    Okay.

 3        Q.    Do you agree with that?

 4        A.    Yes, ma'am.

 5        Q.    Okay.  And it's only the people that can -- that the

 6  State can prove beyond a reasonable doubt that there's a

 7  probability that they're going to be a threat in the future,

 8  that are even subject to the possibility of a death penalty?

 9        A.    Correct.

10        Q.    And do you agree with how that -- how that is?

11        A.    Yes, ma'am.

12        Q.    Now, Ms. Moseley talked with you a little bit about

13  this, and I just kind of want to go back and revisit this.  And

14  I want you to assume with me that you're on a hypothetical

15  capital murder jury.

16        A.    Okay.

17        Q.    Not this case, because we can't really talk about

18  the facts of this case and say, well, how would you vote if we

19  showed you this.

20        A.    Right.

21        Q.    But assume you're on a hypothetical capital murder

22  jury.

23        A.    Okay.

24        Q.    You and 11 other Defendants (sic) have found beyond

25  a reasonable doubt that the person is guilty of capital murder.

1          A.    Okay.

2          Q.    And I'm going to backtrack just a little bit and

3    talk to you a little bit about the burden of proof.  You've

4    never served on a jury before, have you?

5          A.    Correct.

6          Q.    There are several different burdens of proof that we

7    have in the legal system.  When somebody sues somebody over

8    money, even if it's millions upon millions of dollars, the

9    burden of proof in that case is by a preponderance of the

10   evidence.

11         A.    Okay.

12         Q.    And that just means you tip the scales, 51 percent

13   to 49 percent or whatever that is.  That's the burden of proof

14   that would apply in that type of case.  There is a higher

15   burden of proof referred to as clear and convincing evidence.

16         A.    Okay.

17         Q.    That's the type of burden that would apply if the

18   State was trying to take away someone's children, terminate

19   their parental rights.

20         A.    Okay.

21         Q.    That would require more evidence than a

22   preponderance of the evidence.  Do you think that's as it

23   should be?

24         A.    Yes, ma'am.

25         Q.    And that would require clear and convincing

1   evidence, but proof beyond a reasonable doubt is higher even

2   than that.  It is the highest burden that we have anywhere in

3   the legal system.

4        A.    Okay.

5        Q.    And we don't really have a definition for that.

6   It's whatever it means to each individual juror.

7        A.    Okay.

8        Q.    But we can tell you that we know it's the highest

9   burden.  It's not a hundred percent proof, but it's proof

10  beyond all reasonable doubt.

11       A.    Okay.

12       Q.    So you and 11 other jurors have found somebody

13  guilty of intentional capital murder -- that's been proven to

14  you beyond a reasonable doubt.

15       A.    Okay.

16       Q.    You get to the punishment phase, you hear more

17  evidence, and let's assume that then the State proves to you

18  and the 11 other jurors that there is a probability or that the

19  State proves to you beyond a reasonable doubt that there is a

20  probability that the person would commit criminal acts of

21  violence that would constitute a continuing threat to society.

22       A.    Okay.

23       Q.    So at that point you're dealing with somebody that

24  would -- that's a pretty bad guy.  He's guilty of capital

25  murder, and he's going to be a continuing threat to society.

1      A.    Okay.

2      Q.    You get to Special Issue Number 2 at that point,

3  because the only way you ever get to Special Issue Number 2 is

4  if you've answered Special Issue Number 1 yes.

5      A.    Right.

6      Q.    And can you fairly consider a life sentence at that

7  point, if you find sufficient mitigating evidence or

8  circumstances?

9      A.    To warrant life without parole?

10     Q.    To warrant life without parole instead of the death

11  penalty.

12     A.    Like I mentioned before, I think that it is possible

13  to -- if we get to Special Issue 2, to say, well, now that we

14  look at this piece, that, yes, life without parole could be

15  appropriate.

16     Q.    Okay.  Because some people come down here and they

17  say, look, if somebody is guilty of capital murder and they're

18  going to be a threat to society, then that's -- that's about

19  all I need to know.  That person is getting the death penalty.

20     A.    Right.

21     Q.    But you're telling me that's not how you feel?

22     A.    That is not how I feel because I -- as an auditor, I

23  want to be absolutely sure, so I think Special Issue 2 is

24  appropriate in the fact that it makes you absolutely sure what

25  you're saying.

1      Q.    Okay.

2      A.    And so by -- by double checking, you are saying,

3 well, now that we've looked at everything twice, we've heard

4 something, we've looked at it, you know, repeatedly, if, I

5 guess everything checks out, and say, we still think that he or

6 she is a continued threat, then, yes, the death penalty.  But

7 if there's something that we do find, well, wait, we didn't

8 think about it this way or we didn't see it this way, then I

9 could -- I could reasonably say that, yeah, a life without

10 parole could be levied at that point.

11      Q.    Okay.  I want to just kind of point out some other

12 things about Special Issue Number 2 in mitigation.

13      A.    Okay.

14      Q.    Mitigation can be very broad.  It is basically

15 anything that to you says this should be a life sentence

16 instead of the death penalty.

17      A.    Okay.

18      Q.    And it's also something that's very unique to each

19 individual juror.

20      A.    Okay.

21      Q.    Would you agree with that?

22      A.    Yes, ma'am.

23      Q.    And jurors do not have to agree on what is

24 mitigating in a case in order to answer that question in the

25 same way.

```
1        A.    Okay.

2        Q.    Do you understand that?

3        A.    Yes, ma'am.

4        Q.    I mean, it's a little different from the other

5   issues and the other questions that are called upon because you

6   don't have to be unanimous as far as what you think is

7   mitigating in a particular case.

8        A.    Okay.

9        Q.    And, for instance, one juror could come in and say,

10  you know, well, there was drug abuse and -- and a horrible

11  childhood in this case, and I think that's mitigating.  And

12  another juror could say, well, I don't think that's mitigating.

13  I think that's maybe even aggravating, but I think the fact

14  that the Defendant took the stand and told us that he was

15  remorseful and that he had changed his ways and I believed him

16  and I believe that's mitigating.

17       A.    Uh-huh.

18       Q.    Even though they do not agree on what is mitigation,

19  they can both answer that question in the same way.

20       A.    Right.

21       Q.    Do you see that?

22       A.    Yes, ma'am.

23       Q.    So the law does not require jurors to agree on

24  specifically what they think is mitigating in any given case.

25       A.    Yes, ma'am.
```

1      Q.    It's just up to each individual juror to make their

2  own subjective assessment as to whether they think there is

3  sufficient evidence to warrant a life sentence rather than a

4  death.

5      A.    Okay.

6      Q.    And would you agree that that's much more of a

7  subjective question than the other questions that you're asked

8  in a -- in a criminal trial?

9      A.    I suppose so, yes, ma'am.

10     Q.    I mean, it's not like a checklist that you --

11     A.    Right.

12     Q.    -- did -- did they prove it beyond a reasonable

13  doubt.

14     A.    Right.

15     Q.    Yes or no based on the facts?

16     A.    Uh-huh.

17     Q.    It's according to each individual juror, do you

18  think there's something that calls for a life sentence rather

19  than the death penalty.

20     A.    Yes, ma'am.

21     Q.    Based on what you've heard in the case.

22     A.    Yes, ma'am.  I think some -- I think if that was the

23  situation, I think some people's opinions could be kind of

24  unreasonable.  Like, well, I liked his hair, so I think it's --

25  you know, like that, whatever.  But I do think that there are

1  reasonable things that mean differently to other people that

2  could mitigate that situation.

3       Q.   Okay.  And you see that's how a little more

4  subjective than --

5       A.   Yes, ma'am.

6       Q.   -- discussing something like, well, did they prove

7  the light was red or was it green kind of thing?

8       A.   Yes, ma'am.

9       Q.   Because in a lot of ways, the answer to Special

10 Issue Number 2 is going to be up to each individual juror's

11 personal moral judgement and -- and response to the evidence.

12 Would you agree?

13      A.   Yes, ma'am.

14      Q.   And some people may not even be able to articulate

15 what it is they find that's mitigating.

16      A.   Right.

17      Q.   Do you think that's -- that happens?

18      A.   I think that's possible, yes, ma'am.

19      Q.   Do you think their opinion should still be entitled

20 to respect?

21      A.   Yes, ma'am.  I mean, I think -- even if people maybe

22 cannot articulate correctly how they feel, I do believe that

23 everyone's opinion is valued equally, regardless of how well

24 you speak or how much schooling you went to.

25      Q.   Okay.  Do you have any questions of me or any of us

```
 1   at this point?

 2         A.    No, ma'am, I don't believe so.

 3         Q.    Okay.  I'm going to -- let me ask you this.  Do you

 4   know anybody who works for the Dallas Police Department?

 5         A.    I don't believe so.

 6         Q.    Garland Police Department?

 7         A.    I don't believe so.

 8         Q.    Dallas Fire Department?

 9         A.    I don't believe so.

10         Q.    Garland Fire Department?

11         A.    I don't believe so.

12         Q.    How about the Texas Department of Criminal Justice,

13   the prison system?

14         A.    No, ma'am, not to my recollection.

15         Q.    Now, you said that people at your church do some

16   prison ministry, but you personally have not done that?

17         A.    Correct.

18         Q.    Okay.  Do you know anybody who works for the Dallas

19   Sheriff's Department -- Dallas Sheriff's Department?

20         A.    No, ma'am.

21         Q.    How about Parkland Hospital?

22         A.    Possibly some nurses, but I -- I think there's like

23   seven hospitals in Dallas.  I know some nurses, so --

24         Q.    Okay.

25         A.    -- there's probably one that I know that works at
```

```
 1  Parkland.
 2       Q.   Anything about knowing that person that would affect
 3  you if that person were to be a witness?
 4       A.   No, ma'am.  I don't believe that relationship is
 5  strong enough to --
 6       Q.   You don't know them that well?
 7       A.   Right.
 8       Q.   I'm going to read a list of civilian names and just
 9  stop me if you think you know any of these people, because it's
10  kind of a lengthy list.
11       A.   Okay.
12       Q.   Scott Harris, Elizabeth Harris, Chris Harris,
13  Kenneth Marecle, Amy Marecle, Michael Frank, Anna Lunceford,
14  Jim Medley, Lawrence Denson, Jonas Lucht, Greg Mansell, Carina
15  Pinzon, Digna Salmeron, Kelly Keeton, Daphne Johnson, Sherry
16  Ann Clark, Amy Armstrong, Anthony Johnson, Alma Johnson,
17  Courtney Johnson, David Williams, Danny Mullins, David
18  Contente, Gioconda Verdaguer, Donald Dunlap, Johnny Wright,
19  Monica Cajas, Michael Crosby, Roxanne Luttrell, Robbie Denmark,
20  Quinlen Minor, Margaret Tatum, Greg Bertucci, Greg Mansell,
21  John Harris, Timothy Proctor, Carlton Jenkins, Durian Allen,
22  Gene Gathright, Manuel Turner, Andre Howard, Kenneth Lewis, or
23  Sheldon Henry?
24       A.   None of those names ring a bell.
25       Q.   None of those names ring any bells.
```

```
 1              Let me make sure I'm not forgetting to ask you

 2    about something.  How would you feel about being a juror in a

 3    death penalty case?

 4        A.    I think that it would be an honor, a great way to

 5    serve the city, kind of do my civic duty, I guess.

 6        Q.    Let me just tell you that you've fulfilled your

 7    civic duty just by showing up and subjecting yourself to our

 8    questions.

 9        A.    Right.

10        Q.    So, you know, it's no reflection on your civic duty

11    or your -- your citizenship whether you become juror not, so we

12    appreciate you just being here and taking the time to fill out

13    the questionnaire and answering our questions.

14              There was one other thing that I wanted to ask

15    you about on your questionnaire, page 6 --

16        A.    Okay.

17        Q.    -- Question Number 39 --

18        A.    Okay.

19        Q.    -- we asked -- or we tell you:  Some people feel

20    genetics, circumstances of birth, upbringing, and environment

21    should be considered when determining the proper punishment of

22    someone convicted of a crime.  What do you think?  And you

23    said, no, crime is crime, no matter where you came from.

24        A.    Right.

25        Q.    Do you see now that we've kind of explained to
```

```
 1   you -- the law to you, how that --

 2        A.    Uh-huh.

 3        Q.    -- is really directed at Special Issue Number 2?

 4        A.    Right, I can see that.

 5        Q.    Okay.  And so those -- are those things that you

 6   could take into consideration in assessing punishment?

 7        A.    Yes.

 8        Q.    I mean, certainly not as to whether somebody is

 9   guilty or not.

10        A.    Right.

11        Q.    They don't have anything to do with that, but they

12   may be things that you would have to consider at least in

13   assessing punishment?

14        A.    Yes, ma'am.

15        Q.    And you could do that?

16        A.    Yes, ma'am.

17        Q.    And you don't have any questions?

18        A.    No, ma'am.

19        Q.    Let me look at page 10 of the questionnaire, Number

20   65.

21        A.    Okay.

22        Q.    When we talk about voluntary intoxication is not a

23   defense to an offense in Texas.

24        A.    Okay.

25        Q.    And you agreed with that.  And then we tell you that
```

1  the law in Texas further provides that evidence of intoxication

2  may be considered in mitigation of punishment.  And you said

3  you did not agree with that law.

4        A.    Right.

5        Q.    Do you think now that we've explained the process,

6  that that's something that you could consider?

7        A.    So I guess that would be more pointed at Special

8  Issue 2 --

9        Q.    Special Issue Number 2.  And I'm not saying you have

10  to consider it mitigating or not mitigating.

11        A.    Right.

12        Q.    But you could consider it if you heard evidence of

13  something?

14        A.    Me personally, that -- like you said, Special Issue

15  2 is kind of like the subjective.  That's not something that I

16  would see as like, well, he or she was intoxicated during the

17  crime.  That wouldn't mitigate for me.

18        Q.    Okay.  But you could take it into consideration,

19  just like all the evidence in the case?

20        A.    I -- yes, as a juror, I would hear all the evidence

21  and weigh it equally, I suppose.  But like I said, like by

22  saying that someone -- I guess it kind of goes under my own

23  personal values.  I'm not a drinker.  I don't consume alcohol.

24  I don't think that by saying because I was drunk, I did this.

25  I don't think that that is -- I don't think that's wise.

195

```
 1        Q.    Okay.

 2        A.    I don't think that's a wise defense because --

 3        Q.    Well, it's not a defense to an offense in Texas.

 4        A.    Okay.  But it could be used --

 5        Q.    But it is something that a juror could consider in

 6   punishment.

 7        A.    Yeah, I would weigh that person's opinion equally to

 8   other people.  I wouldn't have that opinion.

 9        Q.    Okay.  I think that is about all the questions I

10   have for you.

11        A.    Okay.

12        Q.    And I thank you for your time.

13        A.    All right.  Thank you very much.

14              THE COURT:  I want you to step out the door just

15   a minute.  You can leave all your paperwork right there.

16   There's a door right there, I need you to step out in the

17   hallway.

18              VENIREPERSON:  Okay.

19              (Venireperson excused from courtroom.)

20              THE COURT:  905A, does the State have a

21   challenge?

22              MS. MOSELEY:  No, Your Honor.

23              THE COURT:  Does the Defense have a challenge?

24              MS. BERNHARD:  No, Your Honor.

25              THE COURT:  All right.  He becomes Number 33.
```

```
 1                    (Venireperson 905A, Adam Forbes, qualified.)

 2                    (Venireperson returned to courtroom.)

 3                    THE COURT:  Mr. Forbes, you're going to be on

 4  the panel from which the jury is going to be selected.  We're

 5  qualifying 48 people, and it will probably take us another two

 6  to three weeks and you'll be notified.  We need to get your

 7  picture.

 8                    VENIREPERSON:  Okay.

 9                    THE COURT:  When the attorneys go back to make

10  their strikes --

11                    VENIREPERSON:  How's my hair?

12                    THE COURT:  Yeah, make sure your hair is parted

13  in the right place.

14                    VENIREPERSON:  All righty.

15                    THE COURT:  But that will give them a picture to

16  put with the information so they can recall it better.

17                    VENIREPERSON:  Okay.

18                    THE COURT:  Okay.  And he'll take your picture,

19  and as soon as you have done that, you're excused.  Remember

20  the instructions you've been given.  You're under them still.

21                    VENIREPERSON:  All right.  Thank you for having

22  me.  I appreciate it.

23                    THE COURT:  Okay.

24                    (Venireperson excused from courtroom.)

25                    THE COURT:  Did Mr. Harris ever get here?
```

```
 1                    MS. MOSELEY:  I assume he did, Judge, because I
 2    don't see a questionnaire over here.
 3                    (Off the record.)
 4                    THE BAILIFF:  All rise.
 5                    (Venireperson brought into courtroom.)
 6                    THE COURT:  Mr. Harris, have a seat right there.
 7                    VENIREPERSON:  Okay.
 8                    THE COURT:  Be seated.
 9                    How are you this afternoon?
10                    VENIREPERSON:  Doing fine, sir.
11                    THE COURT:  Fine.  Let me introduce you to the
12    people that are sitting around here.  Of course, they all know
13    who you are because they've had the benefit of your
14    questionnaire that is rather lengthy.
15                    Sitting between you and I is Darline LaBar.
16    She's the court reporter, and it's her job to take down an
17    accurate record of everything that happens here today, so I
18    need to remind you that when you're asked a question, I need
19    you to answer it either yes or no or whatever is appropriate
20    because she can't -- she can't hear a nod.  And we all get in
21    the habit of nodding yes and no, but we have to have you to
22    speak out this time.
23                    Sitting over here representing the State of
24    Texas is Andrea Moseley.
25                    MS. MOSELEY:  Good afternoon.
```

```
 1                    THE COURT:  Rocky Jones, and behind is Elaine
 2   Evans.
 3                    MS. JONES:  Good afternoon.
 4                    THE COURT:  Over here is Kenneth Weatherspoon.
 5                    MR. WEATHERSPOON:  Good afternoon.
 6                    THE COURT:  Drew a blank.  Catherine Bernhard.
 7                    MS. BERNHARD:  Good afternoon.
 8                    THE COURT:  Nancy Mulder.
 9                    This is the Defendant, Matthew Johnson.
10                    I'm Joe Clayton.  I'm a Senior District Judge --
11   and I'm acting like a Senior District Judge on the
12   introductions.  And I'm hearing the capital murder jury
13   selection in this case.
14                    This case will be tried by Judge Holmes in the
15   363rd District Court.  It's scheduled to begin on October the
16   28th and may last as long as two weeks.  Does that cause you
17   any scheduling problems?
18                    VENIREPERSON:  Yes, sir.
19                    THE COURT:  It does.  All right.  What problems
20   does it cause you?
21                    VENIREPERSON:  I'm self-employed.  I'm it.
22                    THE COURT:  I understand.
23                    VENIREPERSON:  I'm CEO, chief, and janitor.
24                    THE COURT:  Yeah.  We have -- we have a lot of
25   that same, but unfortunately, that's not a legal excuse.
```

```
 1                    VENIREPERSON:  No.

 2                    THE COURT:  What kind of work do you do?

 3                    VENIREPERSON:  I'm an engineer, design engineer.

 4  I do all the engineering for several small companies.  I'm the

 5  only engineer.

 6                    THE COURT:  Okay.

 7                    MS. JONES:  Your Honor, I believe that we will

 8  probably have a discussion to agree --

 9                    THE COURT:  Okay.  Y'all are agreeing to excuse?

10                    MS. BERNHARD:  (Nods head.)

11                    MS. JONES:  Yes, Your Honor.

12                    THE COURT:  All right.  We'll let you go to

13  work.  That was quick.  Leave your paperwork right there.

14                    VENIREPERSON:  That's fine.

15                    THE COURT:  And you're excused.

16                    (Venireperson 909A, Ronnie Harris, excused.)

17                    VENIREPERSON:  Okay.  Thank you, sir.

18                    THE COURT:  Thank you very much.  Go out right

19  there and take a right.

20                    (Venireperson excused from courtroom.)

21                    (Recess of proceedings.)

22

23

24

25
```

```
 1                      Reporter's Certificate

 2  THE STATE OF TEXAS:

 3  COUNTY OF DALLAS:

 4       I, Darline King LaBar, Official Court Reporter in and for

 5  the 363rd District Court of Dallas County, State of Texas, do

 6  hereby certify that the above and foregoing volume constitutes

 7  a true, complete and correct transcription of all portions of

 8  evidence and other proceedings requested in writing by counsel

 9  for the parties to be included in the Reporter's Record, in the

10  above-styled and numbered cause, all of which occurred in open

11  court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if any,

14  admitted by the respective parties.

15       WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16  on the 21st day of February, A.D., 2014.

17

18

19
                        \s\Darline LaBar
20                      DARLINE KING LABAR
                        Official Court Reporter
21                      363rd Judicial District Court
                        Dallas County, Texas
22                      hpdkfaith@msn.com
                        (214) 653-5893
23

24
    Certificate No:  1064
25  Expiration Date:  12/31/2014
```