1              REPORTER'S RECORD

2            VOLUME 36 OF 57 VOLUMES

3         TRIAL COURT CAUSE NO. F12-23749-W

4      COURT OF CRIMINAL APPEALS NUMBER:  AP-77,030

5 THE STATE OF TEXAS          :          IN THE 363RD JUDICIAL

6 VS.                         :          DISTRICT COURT OF

7 MATTHEW LEE JOHNSON         :          DALLAS COUNTY, TEXAS

8

9

10       **SPECIAL HEARING AND INDIVIDUAL VOIR DIRE**

11

12

13

14

15                    * * * * * * * * * * *

16

17

18

19

20     On the 16th day of September, 2013, the following

21 proceedings came on to be heard in the above-entitled and

22 numbered cause before the Honorable Tracy Holmes, Judge

23 Presiding, held in Dallas, Dallas County, Texas:

24     Proceedings reported by machine shorthand computer

25 assisted transcription.

```
 1  A P P E A R A N C E S:

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
            Crowley Criminal Courts Building
 3          133 North Riverfront Boulevard
            Dallas, Dallas County, Texas 75207
 4          Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
         MS. ELAINE EVANS, A.D.A., SBOT # 24032880
 6       MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724
         MS. CHRISTINE WOMBLE, A.D.A., SBOT # 24035991

 7
                FOR THE STATE OF TEXAS;
 8

 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
            P.O. Box 2817
11          Red Oak, Texas 75154
            Phone:  972-617-5548
12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13          325 North St. Paul Street, Suite 2475
            Dallas, Texas 75201
14          Phone:  214-922-0212

15  MS. NANCY MULDER, Attorney at Law, SBOT # 00792971
            2214 Main Street
16          Dallas, Texas 75201
            Phone:  214-764-7246

17
                FOR THE DEFENDANT.
18

19

20  ALSO APPEARING:

21      Senior District Judge Joe Clayton

22

23

24

25
```

**INDEX VOLUME 36**

September 16th, 2013                                    PAGE   VOL.

SPEICAL HEARING AND INDIVIDUAL VOIR DIRE:

Proceedings.......................................... 5    36

Agreement panel is qualified and continue........... 11   36

Venireperson 1217A, Brandon Runkel, excused......... 12   36

Venireperson 1268A, Cody Flores, excused............ 12   36

Venireperson 1270A, Deborah Sterling, excused....... 12   36

Venireperson 1293A, Marlin Thompson, excused........ 12   36

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| CHRIS CASTILLO | 16 | 57 | 36 |

Venireperson 1234A, Chris Castillo, excused......... 75   36

Venireperson 1260A, Taylor Williams, excused........ 77   36

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| RACHEL SMITH | 80 | | 36 |

Venireperson 1300A, Rachel Smith, excused........... 100  36

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| GERALD DAVIS | 104 | | 36 |

Venireperson 1267A, Gerald Davis, excused........... 109  36

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| JUSTIN LOPEZ | 113 | 146 | 36 |

Venireperson challenged by the Defense.............. 152  36

Challenge granted................................... 152  36

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| SCOT McCOMAS | 156 | 186 | 36 |

1   Venireperson 1331A, Scot McComas, qualified......... 189   36

2   Reporter's Certificate............................. 191   36

3

4                              **ALPHABETICAL INDEX**

5   PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE      VOL.

6   CHRIS CASTILLO            16                   57           36

7   GERALD DAVIS            104                                36

8   JUSTIN LOPEZ            113                  146           36

9   SCOT McCOMAS           156                  186           36

10  RACHEL SMITH            80                                36

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              (Judge Joe Clayton takes the bench.)

 3              THE COURT:  Be seated.

 4              MR. WEATHERSPOON:  Good morning.

 5              THE COURT:  Good morning.

 6              MS. MULDER:  Good morning.

 7              MS. MOSELEY:  Good morning.

 8              THE COURT:  Y'all can be seated.  Sorry.

 9              I'm here to try to explain a misunderstanding.

10    And to do that, I'm going to tell you a little bit about me so

11    you can see why I'm so shocked.  Then I'm going to address the

12    day in question.

13              I first went on the County Court At Law bench in

14    Smith County in 1989.  The perception in Smith County at that

15    time was that people were not treated equally in the courts in

16    Smith County.  So I set out to change that perception, at least

17    as it applied to my court, because that's all I could control.

18              One instance that came to mind as I thought

19    about this charge against me, or allegation, which I think is a

20    misunderstanding, was a case that I had fairly early on -- a

21    number of cases I had fairly early on in the County Court At

22    Law.  They were bootlegging cases.  And it became evident to me

23    that all the defendants being brought before me were black.  I

24    started giving the minimum fines.  Another one was brought in,

25    and it had a substantially -- substantial amount of beer
```

1  involved, and I gave the minimum fine.  My prosecutor was not

2  happy and said something.  In open court I said, it's become

3  apparent to me that the only people you're bringing before this

4  court as bootleggers come from the African-American community

5  and all the bootleggers in Smith County are not in the

6  African-America community.  Until I see a white face, they're

7  going to continue to get minimum fines, the defendants.

8              I then moved over to the District bench.  I had

9  an opponent in the Democratic primary.  He was a former

10  Assistant U.S. Attorney, former District Attorney, and had been

11  a long-time criminal defense lawyer.  His name was Weldon

12  Holcomb.  Some of y'all may have heard of him.  I think he was

13  honored by the criminal defense bar with some award.

14              I had overwhelming support in the

15  African-American community, and I beat him.

16              At that time in Smith County you had court

17  coordinators and assistant coordinators.  There was a

18  difference in pay.  And as in most courthouses, and I assume

19  the same as here, court coordinator was held in higher respect

20  than an assistant coordinator.  When -- after I moved to the

21  District bench, my court coordinator got married and left.

22  That gave me an opportunity to make a change that I wished to

23  do.  I hired a former secretary of mine as the court

24  coordinator, but I took the court coordinator salary and the

25  assistant court coordinator salary and put them in the pot and

```
 1   divided them in half.  I then appointed my newly hired
 2   coordinator as a civil coordinator.  I appointed what was my
 3   assistant coordinator as my criminal coordinator.  My criminal
 4   coordinator was an African American.  She was a good friend.  I
 5   had -- I had hired her when I had a coordinator leave in the
 6   County Court At Law.  We had worked with her in the County
 7   Clerk's Office and she was very efficient and did an excellent
 8   job, and so I had my coordinator approach her and see if she
 9   would be interested in working with us and she was and she did.
10   And she was -- we all worked well together as a team.
11           Also, when I was on the District bench, I had
12   three staff members in my office.  One of our District Judges
13   decided she wanted all of her court files in her office, rather
14   than in the District Clerk's Office.  So all of the District
15   Judges had their files in their offices.  An assistant district
16   clerk that worked with us, who was also African-American, so
17   two out of three of my employees or people that worked with us
18   were African-American.
19           I tell you this so you can hopefully see that
20   the last thing I ever expected to be called was a racist.
21           On the day in question last week, if I recall
22   correctly, we had a short morning.  I think we had one and two
23   that -- one of them had vacation planned or something and --
24   anyway, we had a short morning and all of you all left, and I
25   visited with the bailiffs about the sleepers.  We'd had a
```

1  number of people that had been sleeping off and on during the

2  course of the trial.  The sleepers were not of any particular

3  race.  There were white people, there were African Americans,

4  and people would come in and sit in the back row.  Some of the

5  bailiffs would move to the back row and sleep.  And I visited

6  with the bailiffs about it, and they said it's awfully hard to

7  stay awake because it's so boring.  It's the same thing every

8  day, basically the same questions, and they have a hard time

9  staying awake.  And I can appreciate that because it does get

10  kind of boring, because it is repetitious.

11           Then I think that I went to lunch and I came

12  back early.  And I think Catherine was in the courtroom.  And

13  my recollection is that I asked her first why she went to

14  U-Mass to college, and she said she wanted to be where there

15  was some snow, if I recall.  And that she had planned on

16  transferring to Emory, but she liked U-Mass and stayed there.

17  Then I said, I think -- I don't think it's good that your

18  Defendant is sleeping, particularly when they're discussing

19  Special Issue Number 2, because remorse is one of the things

20  that's always brought up in Special Issue Number 2.  She said,

21  I understand, we try to keep him awake, but he doesn't get much

22  sleep in the jail.  And I understand that.  And I think I said

23  then, I said, I understand.  I looked up and three asleep at

24  the same time yesterday afternoon.  And I think I added, it's

25  hard to stay -- you sit there awhile, and it's -- a long time

 1   and it's hard to stay awake.  And my recollection that was

 2   pretty much the end of the conversation, but I don't --

 3                   Catherine, what did you hear?  I'm not sure what

 4   you heard.

 5                   MS. BERNHARD:  Judge, what I heard was after you

 6   made the comment about the three people sleeping, you said,

 7   Spoon was the only one that wasn't.  And the other three people

 8   that had been mentioned were all African-American.

 9                   THE COURT:  I don't recall that at all.

10                   MS. BERNHARD:  And then what I heard was that

11   you went on to say that if they sit still long enough, they

12   always fall asleep.

13                   THE COURT:  What I was -- what I was referring

14   to, if you sit still long enough, was my conversation with

15   these bailiffs, which was like an hour before our conversation,

16   that if they sit there long enough, they got sleepy.  And I

17   understand that.  I would have said -- I don't recall

18   mentioning Spoon at all.

19                   It's been evident people were sleeping during

20   the trial.  In fact, your table would make notice of some

21   people in the courtroom that were sleeping.

22                   Judge Ovard got on me for not waking -- stopping

23   and having people awakened, but I didn't want to embarrass

24   anybody.  But at no time did I intend, nor do I -- did I make a

25   racial comment that was meant to be racial.

1              In fact, Spoon earlier had come up and told me

2    that -- and I took it complimentary, and I think it was

3    complimentary, that I'd been attentive and paying attention.

4    And I said, well, I think that's my job.  And he made the

5    comment, well, all of you don't do that, or all of them don't

6    do that.  Well, if I was looking through a racial prism, I

7    could have said, well, Spoon said all of us white judges that

8    are picking these capital murders are not paying attention and

9    staying awake, but that wasn't what he said and that wasn't

10   what I heard.

11             I think what I'm saying is, from my perspective

12   I said one thing and you heard something different.  It's a

13   misunderstanding.  Because I certainly did not and have not

14   made any racial connotations to anything I have said.  It -- it

15   goes against my very core.  I guess that's why I was shocked.

16   I was shocked and then I was mad and then I was hurt.  Because

17   it's -- it's my being, and I am not a racist being.  I'm far

18   from it.

19             That's it.  Thank you.  Y'all have a good day.

20             MS. EVANS:  Thank you, Judge.

21             (Judge Clayton leaves the bench and courtroom.)

22             (Brief pause and Judge Holmes takes the bench.)

23             THE COURT:  All right.  We're on the record.

24             MS. MOSELEY:  Judge, I just want to state for

25   the record that some of the things that were discussed in

chambers last week -- on Friday, I think the last time that the

State and the Defense were on the record, we had indicated that

we were agreeing to quash the panel of jurors -- the pool of

jurors that had been qualified thus far.  And we, after a

conversation in chambers, have all agreed to go forward with

the jurors that have been qualified thus far and basically pick

up where we left off with the jurors from Panel A, starting

with voir dire this morning in front of Judge Holmes.  And that

we -- the State certainly believes that Judge Clayton has been

fair -- more than fair to the Defense thus far and therefore

those jurors that have been qualified are qualified.  And

neither the State, nor the Defense had any reason to believe

that Judge Clayton's rulings had been affected in any way by

any bias or prejudice that he may or may not have.

          Based on the comment, however, we felt that it

was the safer course of action to go ahead and have Judge

Holmes hear the remainder of the voir dire, and I believe we

agreed that Judge Webb Biard would hear the challenges and the

peremptory strikes that were going to be made and any Batson

challenges that might come thereafter.

          MS. BERNHARD:  And that is correct.

          THE COURT:  And the Defense concurs with that?

          MS. BERNHARD:  We do.

          THE COURT:  Thank you.

          (Agreement panel is qualified and continue.)

```
 1                     MS. MOSELEY:  Thank you.  And that's all I
 2    wanted to put on, Judge.
 3                     All right.  Can we have our first juror?
 4                     COURT REPORTER:  Did you want to put on your
 5    agreements?
 6                     MS. MOSELEY:  Oh, yeah.  I can put on the jurors
 7    that we agreed.
 8                     We had jurors scheduled last Thursday, Judge,
 9    that we did not reach, and they were told to be back here this
10    morning.  We -- they totaled five in number.  And we also have
11    five jurors that were scheduled to be here this morning, as
12    well.  The State and the Defense have agreed to excuse four of
13    those jurors.  The first is Brandon Runkel, Juror Number 1217A.
14    The second is Cody Flores, Juror Number 1268A.  The third is
15    Deborah, D-e-b-o-r-a-h, Sterling, Juror Number 1270A.  And the
16    fourth is juror Marlin Thompson, Juror Number 1293A.
17                     MS. BERNHARD:  And we are in agreement with
18    excusing those people.
19                     (Venireperson 1217A, Brandon Runkel, excused.)
20                     (Venireperson 1268A, Cody Flores, excused.)
21                     (Venireperson 1270A, Deborah Sterling, excused.)
22                     (Venireperson 1293A, Marlin Thompson, excused.)
23                     THE COURT:  Thank you.
24                     Who is the juror who is coming in now?
25                     MS. MOSELEY:  Chris Castillo is here and was
```

```
 1   first on our list anyway.

 2                  THE COURT:  Dio?

 3                  MS. MOSELEY:  Castillo.

 4                  THE COURT:  Oh, Castillo.

 5                  THE BAILIFF:  All rise.

 6                  (Venireperson brought into courtroom.)

 7                  THE COURT:  Please be seated.

 8                  Good morning, Mr. Castillo.  How are you?

 9                  VENIREPERSON:  Good morning.  I'm fine.  Thank

10   you.

11                  THE COURT:  Do you, sir, remember being

12   downstairs in the Central Jury Room of this building earlier

13   this summer and being sworn in with the large panel?

14                  VENIREPERSON:  Yes.

15                  THE COURT:  All right.  Well, you're still going

16   to be operating under that oath.  And if you're chosen as a

17   juror in this case, you will continue to operate under that

18   oath --

19                  VENIREPERSON:  Okay.

20                  THE COURT:  -- until you are discharged from

21   jury service.

22                  VENIREPERSON:  Okay.

23                  THE COURT:  This case is going to be tried the

24   weeks of October the 28th and November the 4th.

25                  VENIREPERSON:  Okay.
```

```
 1                    THE COURT:  Has anything happened in the interim

 2  that would prevent you from being free to sit as a juror those

 3  two weeks this fall?

 4                    VENIREPERSON:  No.  That's just the busiest

 5  season of our time at work.  That's about all.  But I could

 6  still --

 7                    THE COURT:  But you could be available?

 8                    VENIREPERSON:  Yes.

 9                    THE COURT:  Have you been exposed to any -- any

10  information about this case in any way?

11                    VENIREPERSON:  No.

12                    THE COURT:  All right.  I'd like to introduce

13  all of the parties to you.

14                    My name is Tracy Holmes, and I'm the judge who

15  will be presiding over the trial.

16                    Sitting to my right and your left is Ms. Darline

17  LaBar.  Ms. LaBar is the official court reporter for this

18  court, and it is her important job to take down everything that

19  is being said.  So if you will do her a favor and please answer

20  audibly.  She can't take down a nod or a shake of the head, and

21  also, if you'll please try to remember to say yes or no,

22  instead of uh-huh or huh-uh.

23                    VENIREPERSON:  Yes.

24                    THE COURT:  I know that we all tend to do that,

25  but it will make for a clear record if you say yes and no.
```

```
1                    VENIREPERSON:  Okay.

2                    THE COURT:  Beginning with the State, the chief

3    lawyer for the State is Ms. Andrea Moseley.

4                    MS. MOSELEY:  Good morning.

5                    VENIREPERSON:  Good morning.

6                    THE COURT:  And sitting next to her is Ms.

7    Elaine Evans.

8                    MS. EVANS:  Good morning.

9                    VENIREPERSON:  Good morning.

10                   THE COURT:  Behind Ms. Evans is Ms. Rocky Jones.

11                   MS. JONES:  Good morning.

12                   VENIREPERSON:  Good morning.

13                   THE COURT:  And Ms. Christine Womble.

14                   VENIREPERSON:  Good morning.

15                   THE COURT:  The Defense is represented by Ms.

16   Catherine Bernhard.

17                   MS. BERNHARD:  Good morning.

18                   VENIREPERSON:  Good morning.

19                   THE COURT:  And Mr. Kenneth Weatherspoon.

20                   MR. WEATHERSPOON:  Good morning.

21                   VENIREPERSON:  Good morning.

22                   THE COURT:  And Nancy Mulder.

23                   MS. MULDER:  Good morning.

24                   VENIREPERSON:  Good morning.

25                   THE COURT:  And the gentleman to your far left
```

1  with the glasses is the citizen accused.  That is Mr. Matthew

2  Lee Johnson.

3                    VENIREPERSON:  Good morning.

4                    THE COURT:  Each side has about 45 minutes to

5  talk to you this morning.

6                    VENIREPERSON:  Okay.

7                    THE COURT:  And after that, they will decide

8  whether you will remain as a qualified juror.  And if you do,

9  then we'll be having another process on the 15th of October so

10 you should know no later than the 15th of October whether you

11 will, in fact, be a juror in this case.

12                    VENIREPERSON:  Okay.

13                    THE COURT:  Have you had an opportunity to

14 review your questionnaire and the pamphlet that was given you?

15                    VENIREPERSON:  Yes, ma'am.

16                    THE COURT:  All right.  And do you have --

17 before we begin, do you have any questions of me?

18                    VENIREPERSON:  No, ma'am.

19                    THE COURT:  Thank you very much.

20                    Ms. Moseley.

21                    MS. MOSELEY:  Yes, ma'am.  Thank you.

22                         CHRIS CASTILLO,

23 was called as a venireperson by the parties, and after having

24 been first duly sworn, testified as follows:

25                    STATE VOIR DIRE EXAMINATION

1  BY MS. MOSELEY:

2      Q.   Mr. Castillo, let me start by thanking you.  I know

3  we called you down here last week.  Were you here last

4  Thursday, as well?

5      A.   Yes, I was.

6      Q.   And then we told you to come back today.

7      A.   To come back Monday.

8      Q.   And I apologize for having done that.  Sometimes

9  things come up in courtrooms that can't be avoided, so I do

10 appreciate that.  I know we're kind of off to a bad start.

11 Jurors tend to think that -- that we waste a lot of time down

12 here.  I can assure you that that was not time wasted, but I

13 apologize for taking that time out of your schedule.

14     A.   Okay.

15     Q.   And I do appreciate you being back here this

16 morning.

17          The first thing I want to do is tell you that

18 there are no right or wrong answers to any of the questions

19 today.  This isn't a quiz about your knowledge of the law or

20 anything of that nature.  We gave you those instructions that

21 the -- the Judge wanted to kind of lay out some basic

22 principles of law for you, but nobody is going to question you.

23 There is no right or wrong answers.  You're not a good or a bad

24 citizen based on what happens today.  It's really just an

25 opportunity for you to tell us how you feel about the law and

1   for us to explain the law to you and make sure at the end of

2   the day whether or not your feelings are such that you could

3   follow the law.  Does that make sense?

4          A.   Yes, it does.

5          Q.   And because obviously, we're talking about the death

6   penalty, people's feelings about the death penalty can -- can

7   range widely from, I'll never be able to assess the death

8   penalty, all the way up to people who tell us, I would always

9   assess the death penalty in a murder case.

10         A.   Right.

11         Q.   So what we're really looking for is people who can

12   sit and listen to the evidence, hear the law that the Judge

13   would give them, and follow the law and base their verdict on

14   the evidence and the law and not their personal feelings.  Does

15   that make sense?

16         A.   Yes, it does.

17         Q.   And so we do know that some people's feelings are so

18   strong, that they can't follow the law for whatever reason, and

19   there's nothing wrong with that.  Nobody -- the -- the State of

20   Texas is not ever going to force a citizen to sit on a case

21   where the death penalty is an issue if it's something that

22   would violate their conscience or for whatever reason they

23   didn't feel like they could be fair to both the State and the

24   Defense.

25         A.   Okay.

1       Q.    So now is the opportunity for you to tell us, as

2   we're going through this and explaining the law, whether

3   there's anything that you hear that you feel like is going to

4   cause you not to be able to follow the law.  Does that make

5   sense?

6       A.    Yes, it does.

7       Q.    Okay.  So you recognize, obviously, how important

8   this process is.  There is no trial more important in the state

9   of Texas than a case of capital murder where the State is

10  seeking the death penalty.  So we want to ensure that we've got

11  12 people that can be fair to both the State and the Defense.

12      A.    Okay.

13      Q.    First, I want to talk to you about a couple of

14  things I saw in your questionnaire about your background and

15  some of your life experiences.  You told us that your niece was

16  raped; is that right?

17      A.    That was -- it was when she was young.  She was

18  going to visit a friend and a car stopped, picked her up,

19  and -- and they raped her.

20      Q.    Do you know if there was anyone ever prosecuted for

21  that?

22      A.    As far as I know there was never any prosecution.

23      Q.    Nobody ever caught?

24      A.    No one ever caught, no.

25      Q.    Okay.  Is there anything about that experience that

```
 1   you think would affect you being a juror in a capital murder
 2   trial?
 3        A.    No -- I mean, I would just -- you know, my niece
 4   being as strong as she was and able to get beyond that, which I
 5   hear it's a bad deal and she got beyond it and continued with
 6   her life and stuff like that.
 7        Q.    Okay.  So nothing about that is going to cause you
 8   any concerns being a juror?
 9        A.    No.
10        Q.    You also have an uncle who went to prison for
11   murder.
12        A.    Yes, it was more -- you know, I'm trying to think.
13   Where it was jealousy, and he just went out of control and
14   winded up shooting his wife -- my aunt.
15        Q.    Oh, he shot your aunt?
16        A.    Yeah.
17        Q.    Okay.  And he went to prison for that.  Do you feel
18   like he was treated fairly by the system?
19        A.    Yes, it -- I mean, he wasn't given the death.  He
20   was given life, and he just died in prison.
21        Q.    Okay.  Did you ever visit him there?
22        A.    No, I never did.
23        Q.    Okay.  So you feel like he was treated fairly then?
24        A.    Yes, because -- I didn't see this.  Like it was
25   something he was planning to do.  It's just -- the
```

1    circumstances being that he got mad and went beyond what he

2    should have done.

3        Q.    Okay.

4        A.    And that was the result of it.

5        Q.    And you feel like the life sentence was the proper

6    sentence in that case?

7        A.    Yes.

8        Q.    Did you ever visit him in prison?  You said --

9        A.    No, I never did.

10       Q.    Did you go to the trial?

11       A.    No.  Basically he was a -- a relative, but not a

12   real close relative.

13       Q.    Okay.  Is there anything about that experience --

14   and you know we're going to be talking about capital murder,

15   which is a kind of murder --

16       A.    Right.

17       Q.    -- anything about that that causes you any concern

18   being fair to the State and the Defense in this case?  Give

19   you --

20       A.    No, not really.

21       Q.    You don't come in with any preconceived notions?

22       A.    No, I don't.

23       Q.    Thank you.  Then let me explain to you what capital

24   murder is and how it's different from your uncle's case.

25       A.    Okay.

1      Q.   Capital murder is going to be an intentional murder,

2   which means that it's not an accident.  It's not self-defense.

3   It's not defending someone else.  It's never going to be a case

4   where it was a mistake.  You didn't mean to kill the person.

5             So when we talk about capital murder, always

6   remember that we're talking about an intentional murder where

7   the person meant to kill the person they killed, okay?

8      A.   Yes.

9      Q.   It's not like, you know, you shoot somebody in the

10  leg to keep them from chasing you, but then they die anyway,

11  because your intent wasn't to kill them.

12     A.   Right.

13     Q.   It's always going to be an intentional killing.

14     A.   Okay.

15     Q.   And that intentional killing even isn't enough to be

16  capital murder.  It's an intentional killing, plus some

17  aggravating circumstance.  And in this case, we're going to

18  keep it to what -- what's alleged here, and that is an

19  intentional killing in the course of committing or attempting

20  to commit another felony, namely a robbery.

21     A.   Okay.

22     Q.   Okay?  So it's an intentional killing, plus a

23  robbery, that makes it capital murder.

24     A.   Okay.

25     Q.   And it's only in capital murder cases that the death

1  penalty is ever an option.  So if it was a mistake or an

2  accident or even just a really bad murder without that robbery

3  aspect, it's never going to be a capital murder where the death

4  penalty is an issue.

5      A.    Okay.  I understand.

6      Q.    Okay?  So you have to have both of those things.

7  And if a jury convicts someone of capital murder, the death

8  penalty is not automatic.

9      A.    Right.

10     Q.    The law says that the automatic sentence is life

11 without parole -- life without the possibility of parole.

12     A.    Okay.

13     Q.    So there's only two options, life without the

14 possibility of parole, or the death sentence if you're

15 convicted of capital murder.

16     A.    Okay.

17     Q.    And it would be a jury of 12 people who will decide

18 whether the life sentence is the proper sentence or a death

19 sentence is the proper sentence, okay?

20     A.    Okay.

21     Q.    And those jurors are never going to be asked to vote

22 do you think he deserves life or do you think he deserves the

23 death penalty.  We're going to get there by those special

24 issues.  The answers to those by the jury determines whether

25 the Judge would assess a life without parole sentence or the

1    death sentence.

2        A.    Okay.

3        Q.    And we'll talk more specifically about that as we --

4    as we go along -- as we get to the phase.  But there were a few

5    things I want to address in your questionnaire before we start.

6    If you'll look to page 4 on your questionnaire.  We asked you

7    about watching TV shows or murders -- TV shows or movies or

8    reading books dealing with the death penalty or life on death

9    row.  And you said you had watched some of those, but you don't

10    recall specifically which ones.  It's that answer to Question

11    Number 26, the next one, that I want to talk about.  You said

12    that it didn't really influence you.  You will research on your

13    own to give an opinion.

14            And when I see that, I think what I understand

15    from you is you recognize that TV shows and movies are fiction?

16        A.    Are fiction, yes.  I look at them a lot, and I know

17    they're not real.

18        Q.    Okay.

19        A.    What they say, what they do, and how they handle

20    things.

21        Q.    One of the things as a juror, when -- I think as

22    lawyers when we see you'll research on your own, we want to

23    make sure that you understand that as a juror, in any case,

24    even a capital murder case, jurors are not allowed to do any

25    independent research.

1        A.    Okay.

2        Q.    So it would be improper for a juror, for instance,

3   to go home at night and go on Google and see what they can find

4   out about either the crime or the law that's going to apply.

5   All of the information that a juror will use to come to their

6   ultimate decisions will come to them in the courtroom.

7        A.    Right.

8        Q.    Okay.  So if you're on the jury, you may be one of

9   those people who wants to kind of find out on your own what

10  happened or find out on your own what the law should be, but as

11  a juror, you'll have to get the law from the Judge and all the

12  evidence from the courtroom.

13       A.    Right.

14       Q.    Okay.  Any concern about being able to do that?

15       A.    No, I mean, I understand the difference.

16       Q.    Okay.  Good.  I just wanted to make sure.

17       A.    Yes.

18       Q.    Like I said, there's no right or wrong answers.  And

19  when we had you fill this out, we didn't tell you anything

20  about the law before you filled it out.  We just wanted to know

21  what your feelings were.

22       A.    Right.

23       Q.    So let's talk about some principles of law that

24  apply in every criminal case.  You've heard of these before,

25  especially if you watch these shows.

1        A.    Right.

2        Q.    That a person charged with a crime has a presumption

3   of innocence.

4        A.    Right.

5        Q.    So as Matthew Lee Johnson sits in the courtroom

6   today, he's presumed innocent of this crime.

7        A.    Right.

8        Q.    The fact that he's been arrested, indicted, charged

9   with capital murder, and the fact that you've heard that the

10  State is seeking the death penalty, isn't any evidence of

11  guilt.

12       A.    Right.

13       Q.    Can you give him the presumption of innocence and

14  presume that he is innocent since you've heard no evidence?

15       A.    Right.  Yes, I can.

16       Q.    Okay.  The burden to prove that someone is guilty of

17  a crime is always on the State of Texas.  If we charged someone

18  with the crime, we have to prove that they're guilty beyond a

19  reasonable doubt.  If we don't prove that to a juror, then the

20  verdict has to be not guilty, because that presumption of

21  innocence is enough for the jury to say, the State didn't prove

22  it, then I have to find them not guilty.

23       A.    Right.

24       Q.    I tell you that because a lot of people think that

25  they want to -- and -- and in real life out there, outside of

```
 1  the courtroom, we always want to hear both sides to the story.
 2  If you have children, you know if something got broken in the
 3  house, you'd call everybody in, tell them, everybody speak up,
 4  tell me how it got broken.  And then you decide which one of
 5  the kids really broke it.
 6          A.   Right.  That, I do know.
 7          Q.   And one of them would say, it wasn't -- maybe both
 8  of them said, it wasn't me.
 9          A.   Right.
10          Q.   But you would use your judgement, listen to
11  everything, and make a decision?
12          A.   Right, I'd do that.
13          Q.   And in the courtroom, it doesn't work like that.  In
14  the courtroom, you may only hear from one side.  You may only
15  hear from the prosecution and the prosecution's witnesses.  Let
16  me kind of flesh that out for you.
17          A.   Okay.
18          Q.   I told you that we have the burden of proof.
19          A.   Right.
20          Q.   And the Defense, frankly, all of -- all three of
21  those lawyers could sit over there and do crossword puzzles all
22  day every day during the trial and never open their mouths and
23  say a word.  They're not going to.  They're good lawyers.
24  They're going to do their job, but I -- but I tell you that
25  because the law only requires that they're here and present.
```

1    They don't have to do anything at all.

2         A.    Okay.

3         Q.    The jury's job is to look to the State of Texas --

4    always the State's table to decide whether the case has been

5    proven or not.  They don't have to prove anything.  They don't

6    have to prove he didn't do it.  They don't have to prove -- if

7    he's convicted, they don't have to prove that he should get a

8    life sentence instead of the death sentence.  It's always my

9    job.

10        A.    Okay.

11        Q.    Have you ever heard that somebody has the right to

12   remain silent?

13        A.    Yes, I've heard that.

14        Q.    Right.  And that follows into the courtroom, right,

15   not just out there --

16        A.    Right.

17        Q.    -- with the police, but into the courtroom.  So a

18   defendant never has to testify and tell their side of the

19   story.

20        A.    Okay.

21        Q.    Okay?

22        A.    Yeah.

23        Q.    So it takes some getting used to, because the

24   courtroom works differently than we run our households because

25   I bet your kids didn't have a right to remain silent, did they?

1      A.    No, I had them both -- I mean, you have to find out

2  everything you can find out to find out who did it.

3      Q.    Exactly.  You know, at the house there is no Fifth

4  Amendment privilege not to testify.

5      A.    No.  Yeah, that's true.

6      Q.    But in the courtroom they have that, so the main

7  thing for jurors to remember is that they have to look to the

8  State to prove the case.  And if I bring all of my evidence,

9  all of my witnesses testify, the Defense never does anything,

10 but you have a reasonable doubt at the end of it, you're like,

11 I'm not so sure that those witnesses are correct or, I think

12 they might have lied, I'm not sure that the Defendant is guilty

13 beyond a reasonable doubt, your verdict would have to be not

14 guilty, right?

15     A.    Right.

16     Q.    Even if they didn't test --

17     A.    Right.

18     Q.    -- even if he didn't testify?

19     A.    Yeah, because you got to go by what you're being

20 told, you know.  You can't guess or assume anything.  You got

21 to go by what you're being shown and told.

22     Q.    Exactly.  And even if the Defense attorneys don't

23 say anything at all, if my witnesses don't convince the jury

24 beyond a reasonable doubt, it doesn't matter if they did or

25 didn't do anything.  The verdict is not guilty.

1          A.    Okay.

2          Q.    If, however, the witnesses come in and testify and

3     you believe that they're telling the truth and that they are

4     correct and you believe that the State of Texas did prove its

5     case beyond a reasonable doubt, the verdict is guilty, right?

6          A.    Right.

7          Q.    If you believe beyond a reasonable doubt we did our

8     job and proved it, the verdict is guilty.  And it doesn't

9     matter whether they did anything.  It doesn't matter whether he

10    testified.

11         A.    Okay.  I understand.

12         Q.    Right?

13         A.    Yes.

14         Q.    So just remember that it's always the State's job to

15    prove the case.

16         A.    Okay.

17         Q.    And that whatever evidence is in front of you is

18    what you look at.

19         A.    Okay.  I understand.

20         Q.    And make your decision.  So if they do bring

21    evidence, you look at their evidence, too.  And then you make a

22    decision based on all the evidence.  But you said it best when

23    you said you can't assume anything.

24         A.    Okay.

25         Q.    You have to wait until you hear the evidence.  Can

1  you do that?

2        A.    Yes, I can.

3        Q.    And as it -- as it relates to the Defense, you

4  understand that they don't have to do anything at all?

5        A.    Yes, I understand that.

6        Q.    And are you okay with that?

7        A.    Yes.  I mean, I know what it takes to -- you can't

8  just say you did it and that's it.  You have to be shown that.

9        Q.    Okay.  And so you're going to wait until you hear

10  all of the evidence and then you'll base your decision on the

11  evidence?

12       A.    Yes, I would.

13       Q.    Our burden of proof, I told you, is beyond a

14  reasonable doubt.  Our evidence has to prove it beyond a

15  reasonable doubt.

16       A.    Right.

17       Q.    We don't have a definition for what that means in

18  the law.

19       A.    Right.

20       Q.    But we do know it's the highest burden of proof in

21  law.  It -- you know, we have -- we have burden of proof.  If

22  you're suing somebody over money, all you have to do is tip the

23  scales a little bit, 51 percent of the evidence and you win.

24       A.    Okay.

25       Q.    We know it's much higher than that, but it's not a

1  hundred percent proof.  It's not beyond all possible doubt.

2       A.    Right.

3       Q.    And it's not beyond a shadow of a doubt as we might

4  hear on Perry Mason and some of those shows.

5       A.    Right.

6       Q.    Because I would submit to you, Mr. Castillo, I

7  probably couldn't prove anything to you beyond all doubt -- all

8  possible doubt unless you saw it for yourself with your own

9  eyes.

10       A.    Right, unless I was there, then I would know for

11  sure.

12       Q.    Right.  So we do have to exclude, though, all

13  reasonable doubt about the guilt.

14       A.    Okay.

15       Q.    If -- can you hold us to that burden and make us do

16  our job and prove everything to you beyond a reasonable doubt?

17       A.    Yes, I'm sure I could.

18       Q.    Okay.  We do that through witnesses, through

19  testimony, through evidence.  All witnesses have to be judged

20  on their testimony.  And you've said you could do that.  Let

21  me -- let me just point out to you what that means.

22             Let's say a police officer comes in and they're

23  wearing their uniform and they have all of their, you know,

24  regalia on and they've got all kind of badges and ribbons and

25  all kinds of decorations on their uniform.

```
 1       A.    Right.

 2       Q.    When they take the uniform off, they're just a human

 3   being just like you and me, right?

 4       A.    Right.

 5       Q.    Some police officers tell the truth, some won't.

 6   Would you agree with that?

 7       A.    Yes.

 8       Q.    Some will be correct and some may be mistaken.  They

 9   may think they're telling the truth and not be telling the

10   truth because they're mistaken.

11       A.    Right.

12       Q.    The law would say that all witnesses have to be

13   judged on their testimony, not on what they do for a living.

14   You can't say, if it's a police officer, I'm automatically

15   going to believe what they say.

16       A.    Right.  That, I understand, yes.

17       Q.    And that makes sense?

18       A.    Yes, it does.

19       Q.    You told us on page 5, Question Number 32, that you

20   do believe that police officers are more likely to tell the

21   truth than the average person.  And I'll tell you there's

22   nothing at all wrong with feeling that way.

23       A.    Right.

24       Q.    We -- we should respect police officers.

25       A.    Right.  They're given the authority and stuff like
```

1   that.

2       Q.   Right.  And -- and they've been sworn to follow the

3   law.

4       A.   Right.

5       Q.   But you do recognize that they're humans --

6       A.   That they are human, right.

7       Q.   Right.  And you won't automatically believe what

8   they say just because they're a police officer?

9       A.   Right.

10      Q.   Okay.  What I have to prove to the jury beyond a

11  reasonable doubt is what's in the indictment, that capital

12  murder charge.  So I have to prove an intentional murder

13  happened during the course of committing or attempting to

14  commit a robbery.

15      A.   Okay.

16      Q.   I don't have to prove what time of day it was or

17  what somebody was wearing when they did it or any of that, but

18  I do have to prove those, what we call elements.  And sometimes

19  the indictment we look at like a checklist.

20      A.   Okay.

21      Q.   So what's in the indictment tells the jury what we

22  have to prove, and they look at it like that checklist.  If I

23  failed to prove that that intentional murder happened during

24  the course of a robbery, the jury's verdict has to be not

25  guilty of capital murder, right?

1      A.    Right.

2      Q.    Let's say -- I'm going to put you on a hypothetical

3 jury, not this case.

4      A.    Okay.

5      Q.    Some other capital murder.  And during the course of

6 the trial, all of the witnesses testify and you're convinced

7 beyond a reasonable doubt that the defendant on trial committed

8 a murder, an intentional murder.  No -- no reasonable doubt

9 about that.  But you never heard anything about the robbery.

10 Nobody ever testified that anything was taken or that even any

11 property was demanded, so I didn't do my job, right?

12      A.    Right, because that's what -- when you're in a

13 capital murder case, that's what you're supposed -- supposed to

14 go by.

15      Q.    Exactly.  I didn't do my job because I didn't prove

16 a robbery happened.

17      A.    Right.

18      Q.    So your verdict would have to be what?

19      A.    It would have to be not guilty because you have to

20 prove everything that you're told to do.

21      Q.    Exactly.  Now, you might be given the option to

22 convict the person of murder, instead of a capital murder,

23 right, because you believed that he was intentional -- that he

24 was guilty of intentionally causing the person's death.

25      A.    Right.

1  Q. So the -- so the law and the Judge might give you an

2 option to convict somebody of murder, instead of capital

3 murder.

4  A. Okay.

5  Q. In that case, if you convict somebody of murder,

6 we're not talking about the death penalty, right?

7  A. Right.

8  Q. Now we're talking about a punishment range of

9 minimum of five years in prison, up to, like your uncle, a life

10 sentence.

11  A. Right.

12  Q. And the jury would get all the information about the

13 person, about their prior criminal history, if there was any,

14 their character, maybe, information more about the victim you

15 might hear, and then the jury would be asked to assess the

16 punishment somewhere in that range from five to life.

17  A. Okay.

18  Q. If the jury thought that five years was the right

19 sentence for the crime and for the Defendant on trial, then

20 five years would be the sentence.

21  A. Right.

22  Q. Could you give a five-year sentence if you thought

23 that was proper?

24  A. Right, because I'm -- I'm given the parameters what

25 I need to go by and listen to.

1    Q.    Right.

2    A.    And then I just base it off of what I'm told.

3    Q.    Okay.  If you thought 30 years or 40 years or even a

4  life sentence was proper, could you assess a life sentence for

5  murder?

6    A.    Yes.

7    Q.    And anywhere in between?

8    A.    Right, anything.

9    Q.    So let's say, though, now I'm going to go ahead and

10  move -- take that step.  You're on the jury and you've

11  convicted of capital murder because I've proved everything.

12  I've proved the intentional murder and the robbery.

13    A.    Okay.

14    Q.    Now you've convicted the person of capital murder,

15  and we're talking about life without parole or death.  Those

16  are the only two options, okay?

17              So let's talk about how we get there now.  As we

18  go to the punishment phase, once you've found the person guilty

19  of capital murder, you would come back into the courtroom and

20  more evidence could be presented to the jury to help them

21  decide which is the proper sentence, okay?

22    A.    Okay.

23    Q.    You might hear about the person's background, how

24  they were raised, their educational background.  You might hear

25  about their mental capacity, more about the victim.  Is there a

1   relationship between the victim and the Defendant?  Criminal

2   history, or lack of.  Anything at all at that point that will

3   help the jury answer those two special issues will be presented

4   to them.

5       A.   Okay.

6       Q.   Okay.  Again, you're going to look to the State of

7   Texas to bring you the evidence because remember, the

8   Defense --

9       A.   You're right.

10      Q.   -- even in the punishment phase don't have to do

11  anything.

12      A.   Okay.

13      Q.   The first question you'll ask after hearing all of

14  the evidence is whether there's a probability that the

15  Defendant would commit criminal acts of violence that would

16  constitute a continuing threat to society.  And the State of

17  Texas, again, has the burden of proof.

18      A.   Right.

19      Q.   We have to prove to the jury beyond a reasonable

20  doubt that it's more likely than not -- that's what probability

21  means -- more likely than not that the Defendant you've just

22  convicted of capital murder would commit criminal acts of

23  violence that would constitute a continuing threat to society.

24            Now, I've already told you that once you've

25  convicted somebody of capital murder, the best they can do is

```
 1  life without parole, right?

 2       A.    Right.

 3       Q.    So where are they going to serve that sentence?

 4       A.    In prison.

 5       Q.    In prison?

 6       A.    Right.

 7       Q.    So when we talk about society in Special Issue

 8  Number 1, we're not just talking about our society where we

 9  come and go to work and the grocery store and our

10  neighborhoods, but also in prison society.

11       A.    Okay.

12       Q.    Okay.  Wherever the person finds them self is the

13  society we're talking about.

14       A.    All right.  Yeah, I understand that.

15       Q.    Do you believe that it's possible for there to be

16  violence in prison?

17       A.    Violence in prison, yes.

18       Q.    The prison officials do the best they can, but

19  there's still violence there, right?

20       A.    Right.

21       Q.    Do you believe that the people in the penitentiary

22  should be given protection from those who would be violent?

23       A.    Yes.

24       Q.    They deserve protection like you and I?

25       A.    Well, they don't -- I mean, they're there to serve a
```

1  sentence and pay their dues.  They're not there to get killed,

2  murdered, or anything like that.

3      Q.    Exactly.  And the prison guards, they're there just

4  to work, right?

5      A.    Right.

6      Q.    Have you ever known anybody that worked at a prison?

7      A.    Just -- my daughter just started about a month ago

8  working in the medical part of a prison.

9      Q.    Okay.  So you think -- you recognize that she --

10     A.    Her safety, yes.

11     Q.    -- she needs to be protected?

12     A.    Right.

13     Q.    So the people that work there, the people that come

14 in and out to visit loved ones there and also obviously other

15 prisoners, deserve protection.

16     A.    Right.

17     Q.    When we talk about criminal acts of violence, the

18 law is not going to tell us exactly what that means.  It's

19 going to mean whatever it is to you.  In other words, the

20 legislature could have said that the Defendant -- we'd have to

21 prove that the Defendant would commit another murder or a

22 sexual assault or a robbery, but they didn't.  They just said

23 criminal acts of violence that would constitute a continuing

24 threat.

25     A.    Okay.

1    Q.    So it means whatever it means to you.  If I haul off

2  and hit Elaine in the face --

3    A.    That's a criminal act of violence.

4    Q.    Maybe spitting on a prison guard, some jurors tell

5  us, could be a criminal act of violence.

6    A.    Right.

7    Q.    Depending on where you are and the circumstances

8  surrounding it.  So it's whatever it means to you.

9    A.    Okay.

10    Q.    But we know it's criminal acts, plural, of violence

11  that would constitute a continuing threat to society.

12    A.    Okay.  I understand.

13    Q.    And I told you when we very first started this, that

14  it's not about what somebody deserves.

15    A.    Right.

16    Q.    What we're going to do and what the legislature has

17  decided is that if the State can't prove beyond a reasonable

18  doubt that the person is going to be a future threat, a future

19  danger, even in prison --

20    A.    Right.

21    Q.    -- then the life sentence is the proper sentence.

22    A.    Right.

23    Q.    If I can't prove that to you beyond a reasonable

24  doubt, then your answer is no.

25    A.    Right, I understand.

1      Q.    And the life sentence is proper then.

2      A.    Right.

3      Q.    That's really the -- the distinguishing factor

4 between those who receive life and those who will receive

5 death.

6      A.    Okay.  I understand that part.

7      Q.    Okay?

8      A.    Yes.

9      Q.    Do you think that's capable of proof?  Do you think

10 I can prove what somebody more likely than not will do in the

11 future?

12      A.    That, I don't know -- I don't know.  I guess my way

13 of thinking is that history has got to do -- a lot to do with

14 that, a person's history.

15      Q.    Right.  And maybe character or --

16      A.    Right.

17      Q.    -- you know, their background might --

18      A.    Who they are.

19      Q.    The law says that you can look solely to the facts

20 of the crime you've convicted them of -- that capital murder

21 you just convicted them of.

22      A.    Right.

23      Q.    It's possible that some capital murders could be --

24 that you could look at that and say that in and of itself tells

25 me this person is going to be more likely than not a danger in

```
 1   the future.  Let me give you a real quick example.  Let's say
 2   the Fort Hood shooting.
 3        A.    Right.
 4        Q.    Let's say that the guy who did that -- that soldier
 5   who killed all those people on the -- on the military base had
 6   never done anything before in his life violent, been a good guy
 7   his whole life.  It's possible that a juror could say, you know
 8   what, his history doesn't answer this for me, but the facts of
 9   that case alone.  Anybody who's capable of doing that crime
10   will more likely than not constitute a continuing threat to
11   society.
12              Now, it's not always going to be that way,
13   right?
14        A.    Right.
15        Q.    Just because you're convicted of capital murder,
16   doesn't automatically mean you're going to be a continuing
17   threat.
18        A.    Right.
19        Q.    We asked you on page 3 -- if you'll look at that
20   first question, Question Number 11, we told you some crimes
21   called for the death penalty solely because of their severe
22   facts and circumstances.  We asked you if you agreed with that,
23   and you said yes, because of the level that was taken now, not
24   in the past.
25        A.    Right.  I mean, because I look at what they did and
```

1  to what extent they took -- I mean, there's killing people and

2  then there's doing more than just killing a person, taking

3  their life.

4       Q.   Right.  So it's going to depend on the facts of the

5  case, and maybe that won't be enough to answer it.  Maybe you

6  do need to look at that prior history or character or

7  background of the person.

8       A.   Right.

9       Q.   But whatever it is that you look at, you know you

10 can look to the facts of the case, if they help you answer

11 that.

12      A.   Right.

13      Q.   But I have to prove that beyond a reasonable doubt.

14 The Defense never has to prove that he won't be a continuing

15 threat to society, right?

16      A.   Right, I understand that.

17      Q.   Okay.  On Question Number 12, we told you the death

18 penalty is reserved for those defendants that are such a threat

19 to society that even incarceration does not remove the

20 probability of future violent acts.  You told us you disagreed,

21 incarceration can sometimes be enough.

22      A.   Right, because sometimes we just take them away from

23 what society is, it's enough to keep it from ever happening

24 again because they're not there to do it again.

25      Q.   Okay.  And -- and that goes right to the core of

```
 1   that Special Issue Number 1.
 2        A.    Right.  And what you're having to prove.
 3        Q.    Exactly.  You said sometimes it can be enough, but
 4   you recognize sometimes incarceration isn't enough?
 5        A.    Right.
 6        Q.    If they're going to be violent even incarcerated
 7   that's when that Special Issue Number 1 is answered yes.
 8        A.    Right.
 9        Q.    If you answer Special Issue Number 1 no, if I don't
10   prove that to you, the life sentence is what the person will
11   get.
12        A.    Right.  That's what I'm saying --
13        Q.    And the trial is over.
14        A.    Right.  That's what you'll have to show me, who he
15   is.
16        Q.    Exactly.  So if you say no, the State didn't prove
17   it, you never even get to Special Issue Number 2.
18        A.    Okay.
19        Q.    Okay.  If you answer that Special Issue Number 1
20   yes, that I did do my job and I did prove it to you beyond a
21   reasonable doubt, then you would go to Special Issue 2.
22        A.    Okay.
23        Q.    And my job now is over, okay?  Your job as a juror
24   is not over, but I don't have a burden of proof anymore.  I've
25   done everything that I'm required to do.
```

1      A.    Right.

2      Q.    Special Issue Number 2 -- and I'm going to sum that

3  up because it's a lot of words.  Basically the law is going to

4  require the jurors to look at everything they heard one more

5  time, all of the evidence, the crime itself, the circumstances

6  of the offense, the Defendant's character and background,

7  personal moral culpability.  You're going to look at everything

8  one last time.

9      A.    Right.

10     Q.    And you're going to make the decision in your mind

11 whether you heard something in the evidence that convinces you

12 that the life sentence is really the more proper sentence.

13     A.    Right.

14     Q.    Okay.  This is -- this is what we sometimes refer to

15 as the safety net question because you know by the time we get

16 to Special Issue 2, we're talking about a pretty bad guy,

17 right?

18     A.    Right.  That's -- y'all have done your job.  Y'all

19 proved it to me.

20     Q.    That he's guilty of capital murder?

21     A.    Right.

22     Q.    And not only that, but he's going to be a continuing

23 threat even in prison.

24     A.    Right.  That's where I go back to see if I

25 overlooked anything or missed anything, to see what I'm --

1  decided on is the right decision I made.

2      Q.    Exactly.  The law is going to say that if there is

3  something in the evidence that is sufficiently mitigating --

4  mitigating means anything that would make the life sentence

5  more proper.

6      A.    Right.

7      Q.    Anything that would lessen the Defendant's moral

8  blameworthiness.

9      A.    Right.

10      Q.    Okay.  So you're going to go back and say even

11  though he's guilty and even though I believe he's going to be a

12  continuing threat to society --

13      A.    Right.

14      Q.    -- if there is something in the evidence that tells

15  me that the death penalty really isn't proper, then I'll answer

16  that yes.

17      A.    Right.

18      Q.    And send him to prison instead of the death

19  sentence.

20      A.    Right, I understand that part.

21      Q.    Okay.  I would -- I would assume, and I think you

22  would agree that it's going to have to be something pretty

23  darned mitigating.

24      A.    Right.  If it took me to where I have -- I'm at the

25  second option, it has to be something that I just totally

1  missed.  I mean, they'd have to show -- I'd have to see

2  something that would make me change my mind from --

3       Q.   Right.  And nobody is going to tell you what is or

4  isn't mitigating.

5       A.   Right.

6       Q.   Okay.  There's not going to be a list.  If any of

7  this was --

8       A.   That we're checking off.

9       Q.   Right.  It's not a checklist.  Now this is just you

10 looking at everything again.  Now, some jurors tell us that a

11 person -- maybe they were, you know, locked in a closet for the

12 first 20 years of their lives.

13      A.   Right.

14      Q.   Never got any love or kindness, nobody ever taught

15 them right from wrong, and then suddenly they escape and now

16 they're a maniac.

17      A.   Right.

18      Q.   And that could be something that you would look at

19 and say, that person -- that would lessen his moral

20 blameworthiness.  It wasn't really his fault.

21      A.   Right, I understand that part.

22      Q.   Severe childhood abuse, sexual abuse, or physical

23 abuse, sometimes jurors tell us is mitigating to them.  Some

24 people say intoxication can be mitigating to them, or drug

25 addiction or alcohol addiction could be mitigating to them.

```
 1   Others say it's not mitigating to me, that doesn't matter.

 2        A.    Right, I understand.

 3        Q.    Or your background doesn't really matter to me

 4   because people grow up in bad homes all the time and they

 5   overcome it and they do fine.  Everybody has choices.  Nobody

 6   is going to tell you what's mitigating.  You have to decide for

 7   yourself if there's anything there.  Does that make sense?

 8        A.    Yes, it does.

 9        Q.    And what you find mitigating, some other juror may

10   say, that's not mitigating to me.  You may not even agree on

11   what is mitigating, but if you heard something, Mr. Castillo,

12   that you thought was sufficiently mitigating -- in your mind

13   and your heart you believed that there was something that

14   warranted a life sentence, could you do that?

15        A.    Yes, I could.

16        Q.    Even though you know they're going to be a threat to

17   the people in the penitentiary --

18        A.    Even -- I mean -- I mean, to me, the way I

19   understand prison, you're put on what level you are -- what

20   level threat you are.  To take a life is bad -- I mean -- on

21   anybody.  So, yeah, I see that it -- depending on the

22   circumstances, you know.

23        Q.    Right.

24        A.    They can serve a life sentence.

25        Q.    Okay.
```

1      A.    But they can also be kept away from being a danger

2  to other people.

3      Q.    Do you believe --

4      A.    I believe that.

5      Q.    -- do you believe that there are people that the

6  prison can't control, and that therefore they might be

7  deserving -- not deserving, but the death penalty might be

8  necessary for some?

9      A.    Well, I'm thinking that the prison system is a

10  little bit more -- what, better than just throwing a bad person

11  in a place that's going to cause more problems.  I think they

12  can be controlled.

13      Q.    Let me ask you this.  As it relates then to Special

14  Issue Number 1, do you believe that I could ever prove to you

15  beyond a reasonable doubt that a person in prison more likely

16  than not would commit criminal acts of violence that would

17  constitute a continuing threat to that society?

18      A.    I mean, you could prove it that he can.  I'm just

19  under the deal that he can be kept away from causing more.

20      Q.    Tell me what you know about how the prison works.

21      A.    Well, as far as I know, and it's not just by TV, is

22  that -- because I had my uncle and all that stuff like that, he

23  was given a life sentence.  And they thought -- to me, they

24  thought he was going to become, you know, a problem and stuff

25  like that, but I never saw it as that.  I saw that he knew what

1    he did after -- after the fact.  Of course, he had to still pay

2    for his crime, but I didn't think he would have to deserve

3    death.

4        Q.    He didn't -- he didn't cause any problems in the

5    penitentiary?

6        A.    Right.

7        Q.    Was he in the general population?

8        A.    I don't think he was in the beginning.  I know that

9    he winded up in the medical part because he winded up getting

10   diabetes or something like that --

11       Q.    Uh-huh.

12       A.    -- that required medical.

13       Q.    Do you know if he was housed in a cell by himself or

14   was he around other prisoners?

15       A.    That, I don't know.

16       Q.    Are you open to hearing testimony, if there is any,

17   about how the prison works and where somebody might be housed

18   if they're convicted and given a life sentence?

19       A.    Yes -- yes.  I mean, that would give me a better

20   understanding of what --

21       Q.    Would it surprise you to know that somebody who was

22   given a life without parole sentence might be in the general

23   population and housed around others and work and all of that,

24   or do you think they would be in a single cell?

25       A.    Well, I would think they would be in a single cell.

1    I mean, they're having to pay for their -- their crime.

2        Q.    Right.  Okay.

3        A.    But like you were saying that -- if he was put in a

4    general population, I do know -- I do feel that he would

5    continue to be a problem, but I don't know, I -- I do place a

6    high value on life, but I also place it that when you do things

7    that you shouldn't be doing, you do have to pay for what you

8    do.  It is conflicting.  That's where the -- like you say, I

9    have to look at the burden of proof to see where my decision

10   would go.

11       Q.    Let me -- let me put this -- I want to make sure

12   that -- that it's real clear where we're going, okay?  And I'm

13   not going to tell you any of this to scare you or being morbid

14   or anything, but you understand that the State of Texas and

15   Craig Watkins, the elected District Attorney that I work for,

16   my boss, has decided that we are seeking the death penalty

17   against Matthew Lee Johnson.

18       A.    Right, I understand that.

19       Q.    Not a fictional person, not somebody you saw on TV,

20   but a real human being.

21       A.    Right.

22       Q.    Who has family that cares about him like you and I

23   do.

24       A.    Right.

25       Q.    That we believe that we have the evidence that will

 1  convince the jury to convict him of capital murder.

 2      A.    Right.

 3      Q.    And we also believe that we have the kind of

 4  evidence that will cause a juror, following their oath, to

 5  answer Special Issue Number 1 yes.

 6      A.    Okay.

 7      Q.    We believe we can carry our burden of proof on that.

 8      A.    Right.

 9      Q.    We also believe that the evidence, after considering

10  all of the evidence, the jury will answer Special Issue Number

11  2 no, that there isn't anything sufficiently mitigating to

12  warrant a life sentence.

13      A.    Right.

14      Q.    The answer yes to 1 and no to 2 will require the

15  Judge to assess the death penalty.

16      A.    Right.

17      Q.    And some day in the future, you're likely to be

18  sitting at home, if you serve on this jury, and see it come

19  across the news that today is the day Matthew Lee Johnson is

20  going to be executed.

21      A.    Right.

22      Q.    That he's going to be taken to the death chamber,

23  laid out on a gurney, and he'll receive lethal injection.

24      A.    Right.

25      Q.    Is that a process that you feel like you can

```
 1  participate in, because you'll know that you played a part in

 2  his ultimate execution?

 3      A.   I mean, I tend to say yes because, like you said,

 4  the burden of proof, if you believe that you have everything

 5  that you can on there, my decision is going to be based on

 6  that.  Yeah, I say I would be able to --

 7      Q.   Okay.

 8      A.   -- shown that.

 9      Q.   Nothing that's going to cause any harm to your

10  conscience?

11      A.   No, not if -- what I'm told is the truth and it was

12  proven to me.

13      Q.   And in Special Issue Number 2, are -- you know,

14  obviously, you have to consider all of the evidence, but it has

15  to -- your answer to that has to be based on the evidence.

16  Some people tell us that there will always be something that's

17  sufficiently mitigating to them because life is so important.

18      A.   Right.

19      Q.   That they will always answer that yes, so that a

20  life sentence would result because they don't like the death

21  penalty, or they don't like the idea of the death penalty.

22      A.   Right.

23      Q.   How do you feel about that?

24      A.   Well, I don't like -- you mentioned alcoholism.  I

25  never used -- or believed alcoholism was an excuse because
```

1    people have choices.  You can be raised badly, but it's when

2    you grow up and you start developing who you are, you have

3    choices in life.  And I've like -- I've taught and talked to

4    other people -- is that you have to realize when you make the

5    choice and if it's wrong, you got to pay for what you did.  I

6    mean, there was -- there were other options that could have

7    been done, but you chose to do the one that wasn't the right

8    one.

9        Q.    Okay.  So if you're on the jury and you get to that

10   Special Issue Number 2, if you don't see anything in the

11   evidence --

12       A.    Right.

13       Q.    -- that's sufficiently mitigating, whatever it is --

14       A.    Right.

15       Q.    -- could you answer Special Issue Number 2, no,

16   knowing that a death sentence will result?

17       A.    I think I could.  Yes, I can.

18       Q.    Do you have any questions for me about the process

19   or about whether you can -- do you think you can follow the

20   laws that we've set out today?

21       A.    Yes, I think I can.

22       Q.    Any -- any concern about being fair to both sides

23   and listening to the evidence and making your decisions based

24   on the evidence?

25       A.    Yeah, I think -- I mean, I know I can be fair,

```
 1  because that's just the way I was raised.  You don't assume or

 2  take -- well, really can't take anybody on their word

 3  without -- like I said, that's where I call it research, but

 4  it's -- you've got to know who the person is, and not just --

 5       Q.   And you understand if the Defendant doesn't testify,

 6  which you know he never has to testify --

 7       A.   Right.

 8       Q.   -- that you may not hear anything about remorse, or

 9  whether the person feels bad about what they did.  I think you

10  told us on page 2, the best argument for the death penalty is

11  showing that a person did it just for doing bad with no

12  regrets.

13       A.   Right.  I mean, they went in -- that's what I'm

14  saying, about choice.  He chose to go into that place or that

15  person and do what he did.

16       Q.   And you -- and you may never know if they have

17  regrets or not.

18       A.   Right.  I may never know that, but I know what he

19  did -- what was shown to me that he did at that moment.

20       Q.   Any other questions for me?  I think I'm out of

21  time.

22       A.   No, no.  I understand everything you were saying to

23  me.

24            MS. MOSELEY:  Okay.  Thank you, Mr. Castillo.

25            That's all I have, Judge.
```

1            THE COURT:  Thank you.

2            DEFENSE VOIR DIRE EXAMINATION

3  BY MS. BERNHARD:

4       Q.    Mr. Castillo, again, my name is Catherine Bernhard,

5  and I'm going to have some questions about some of these same

6  topics.

7       A.    Yes, ma'am.

8       Q.    Obviously, because at this table we have a slightly

9  different take on some of the issues than the State does.

10      A.    Right.

11      Q.    And I want to start out by reminding you that there

12  aren't any right or wrong answers here.  You have fulfilled

13  your civic duty simply by showing up on June 21st and filling

14  out this lengthy questionnaire.

15      A.    Okay.

16      Q.    And then coming down here today and subjecting

17  yourself to our questions.

18      A.    Right.

19      Q.    So I don't want you to think that if you answer

20  questions a certain way and you end up on this jury, you're a

21  good citizen and if you don't, you're not.

22      A.    Right, I understand that.

23      Q.    You've fulfilled your civic duty by just

24  participating in the process and we do appreciate that.

25      A.    Right, I understand.

1      Q.    I also want to point out that even though we spend a

2  lot of time talking about the death penalty, I don't want you

3  to think that -- that here at the Defense table we think that's

4  somehow a foregone conclusion.  It's just because of the way

5  the process is set up, we have to address that now before the

6  trial even starts, but it's certainly the position at this

7  table that if you are selected as one of the 12 jurors, that

8  that jury is never going to find Matthew Johnson guilty of

9  capital murder, and you're never going to be called on to

10  address any of those special issues.

11     A.    Right.

12     Q.    But we have to deal with it now because the death

13  penalty is something that makes this case different from most

14  of the other cases that are tried in this building.

15     A.    Right, I understand.

16     Q.    So I just don't want you to think that, oh, we're

17  conceding that the jury is going to get there and find Mr.

18  Johnson guilty and -- and reach the issues --

19     A.    Right, I understand.

20     Q.    -- in the punishment phase.

21          It seems from reading your questionnaire that

22  you are, in fact, in favor of the death penalty; is that fair

23  to say?

24     A.    Yes, to some -- for some cases, yes.

25     Q.    You -- when we asked you, you know, on page 3 if you

1  believe in using the death penalty, how strongly on a scale of

2  1 to 10, and you said you were a 9.

3       A.    Right.

4       Q.    When we asked if you were in favor of the death

5  penalty on the very first page, you think that -- you said, I

6  think if it is proven that a person has knowingly taken a life

7  without feeling guilty, that it should be considered as a

8  punishment.

9       A.    Right.

10      Q.    So you believe in the death penalty.

11      A.    Yes, I do.  I do.  If it's proven to me that a

12  person did what they say they did or what they've been accused

13  of, yes, I do believe --

14      Q.    Okay.  What purpose do you think the death penalty

15  serves?  Why should we have it?

16      A.    Well, it's not like an eye for an eye to me.

17  It's -- because like I said to them, I do place value on life.

18  I think to where if it gets to the point where I do choose that

19  they are -- that they do deserve death penalty, to me, they are

20  going to do it again if you don't stop them.

21      Q.    Okay.  I want to kind of back up a little and talk

22  about -- because you've never served on a jury before at all?

23      A.    Right.  No, I never have.

24      Q.    And I know we kind of told you that there is no

25  definition for what proof beyond a reasonable doubt means.

1         A.    Right.

2         Q.    It's up to each individual juror to determine that

3    for -- for themselves.

4         A.    Right.

5         Q.    We know it's not a hundred percent proof, but we

6    don't really have a definition for what it is.

7         A.    Right.

8         Q.    And I think sometimes it can help by comparing it to

9    other burdens of proof where we do have definitions, and I know

10   Ms. Moseley talked about preponderance of the evidence as being

11   a burden of proof that might apply in civil cases when people

12   are suing over -- could be millions upon millions of dollars.

13        A.    Right.

14        Q.    But the burden of proof that applies in that case is

15   by a preponderance of the evidence, and that just means you tip

16   the scales, 51 percent to 49 percent.

17        A.    Right.

18        Q.    We have a definition for that.

19        A.    Right.

20        Q.    We know that proof beyond a reasonable doubt is much

21   higher than that.

22        A.    Right.

23        Q.    And we have another burden of proof that we call

24   clear and convincing evidence.  Now, that's the kind of burden

25   of proof that might apply if the State was trying to terminate

1    someone's parental rights, take their children away from them.

2        A.    Right.

3        Q.    You would expect the government would have to have a

4    lot of pretty good evidence in order to do that, wouldn't you?

5        A.    Right.

6        Q.    Because we're talking about, you know, someone's

7    children?

8        A.    Right.

9        Q.    Well, the burden of proof that applies in that

10    situation is what we call by clear and convincing evidence.

11    That's how much evidence the State has to have or the

12    government has to have before they can terminate someone's

13    parental rights and take their children.

14        A.    Right.

15        Q.    We know that proof beyond a reasonable doubt,

16    though, is higher even than that.  In fact, it is the highest

17    burden that we have anywhere in any legal proceeding.  It's the

18    highest burden we have in our system.

19        A.    Okay.

20        Q.    You understand?

21        A.    Yes.

22        Q.    And that's because I think our system is set up to

23    regard life and a person's liberty as really the most important

24    things that we can making decisions about.  Would you agree?

25        A.    Yes.

1    Q.    And that's the kind of evidence that the State has

2  to bring you to convince you and 11 other jurors that someone

3  is guilty of a criminal crime or criminal offense.

4    A.    Okay.

5    Q.    And that burden applies whether we're talking about

6  a traffic ticket or whether we're talking about a capital

7  murder where the death penalty applies.

8    A.    Right.

9    Q.    Do you agree that that's how it should be?

10    A.    Yes.

11    Q.    And I want to kind of go back and make sure we're on

12  the same page when we talk about capital murder.

13    A.    Okay.

14    Q.    You know that capital murder is an intentional

15  murder, plus something else.

16    A.    Right.

17    Q.    Like in your uncle's case, it was probably just the

18  murder.

19    A.    Right.

20    Q.    There wasn't another crime or there wasn't some

21  aggravating factor that -- that made it into a capital murder.

22    A.    Right.

23    Q.    Now, there are a number of ways that one can commit

24  capital murder, such as killing a police officer or a child

25  under the age of 10, but what we're dealing with in this case

1    is an intentional murder committed in the course of a robbery.

2        A.    Right.

3        Q.    Okay.  So I'm going to kind of limit our

4    conversation to that since that's what we're talking about in

5    this case.

6        A.    Okay.

7        Q.    Now, when we say an intentional murder, we mean that

8    it is somebody's conscious objective or desire to cause the

9    result.  They wanted somebody dead, and they did whatever they

10   had to do to make that happen.

11       A.    Okay.

12       Q.    So that's what -- what we mean when we're talking

13   about an intentional murder.

14       A.    Okay.

15       Q.    And for capital murder, it's an intentional murder

16   in the course of committing the offense of robbery.  So we're

17   not talking about a situation of self-defense.  We're not

18   talking about defense of someone else or defense of property.

19   We're not talking about something that's an accident.  We're

20   not talking about somebody who was legally insane so that they

21   didn't know right from wrong.  We're not talking about somebody

22   who may have been mentally retarded.

23       A.    Right.

24       Q.    We're not talking about a mistake.  We're talking

25   about somebody who wanted somebody dead and did what they had

 1  to do to make that happen.

 2       A.    Right.

 3       Q.    And they did that in the course of committing the

 4  offense of robbery.

 5       A.    Right.

 6       Q.    Now, I want to kind of put you on a hypothetical

 7  capital murder jury, okay?

 8       A.    Okay.

 9       Q.    You and 11 other jurors have listened to the State's

10  case, and you understand the Defense doesn't have to prove

11  anything to you?

12       A.    Right.

13       Q.    We don't have to prove that Matthew Johnson is

14  innocent.  We don't have to prove that Matthew Johnson is not

15  going to be a continuing threat to society.  We have absolutely

16  no burden of proof over here at this table, okay?

17       A.    Right.

18       Q.    So you're on a hypothetical capital murder jury, and

19  you and the 11 other jurors have all decided beyond a

20  reasonable doubt that the person is guilty of a capital murder.

21  They're --

22       A.    Okay.

23       Q.    -- guilty of an intentional murder in the course of

24  the offense of robbery.

25       A.    Okay.

1      Q.    Now, at that point you would move over to the

2  special issues, and you would have to first address Special

3  Issue Number 1.  And let me just tell you that much like we

4  talked about the presumption of innocence, how if -- before the

5  State proves to you beyond a reasonable doubt that the person

6  is guilty, you have to presume him innocent.

7      A.    Right.

8      Q.    You understand that?

9      A.    Yes.

10      Q.    There's also a presumption that applies after

11  somebody is found guilty of capital murder, and -- and you move

12  into the punishment phase.  And under the law, the presumption

13  is that life without parole is the appropriate sentence.

14  You --

15      A.    Okay.

16      Q.    -- understand?

17      A.    Yes.

18      Q.    Do you agree with that?

19      A.    That that's -- the main -- I mean, that's the only

20  choice.

21      Q.    For somebody convicted of capital murder, the

22  appropriate sentence -- the law presumes that life without

23  parole is the appropriate sentence.

24      A.    Okay.  Yes, I understand.

25      Q.    Okay.  And it never -- it doesn't change to the

1  death penalty unless the State can prove Special Issue Number 1

2  to you beyond a reasonable doubt, and then the jury goes on

3  to -- to answer Special Issue Number 2?

4       A.    Right.

5       Q.    And find that there is not sufficient mitigating

6  circumstances.

7       A.    Right.

8       Q.    If the State doesn't prove Issue Number 1 to you,

9  then it's life without parole.

10      A.    Okay.

11      Q.    It just defaults to the --

12      A.    To that right there.

13      Q.    -- I guess it would be the default sentence.

14      A.    Right.

15      Q.    Some people come down here, though, and they say,

16 you know, if I found somebody guilty of capital murder, an

17 intentional killing where they wanted somebody dead and they

18 did what they had to do to make that happen and they did that

19 in the course of committing the offense of robbery --

20      A.    Right.

21      Q.    -- if I find somebody guilty beyond a reasonable

22 doubt of that, then in my mind that person is going to be a

23 continuing threat.

24      A.    Right.

25      Q.    How do you feel about that?

```
 1        A.    Well, it's like I was saying earlier -- I mean,

 2  especially with y'all saying Number 2 there's going to be other

 3  parts of -- of the character that y'all are going to be showing

 4  me at that time, how do you say -- I mean, once they've proven

 5  to me that that was -- that that was it, then that would be my

 6  choice that capital murder, and then like for the second phase

 7  is that -- I'm sorry --

 8        Q.    You want me to ask it again?

 9        A.    Yeah, because it's throwing me.

10        Q.    You found -- you and the 11 other jurors have found

11  somebody --

12        A.    Right.

13        Q.    -- guilty of capital murder.

14        A.    Right.

15        Q.    An intentional killing in the course of committing

16  the offense of robbery.

17        A.    Right.

18        Q.    Some people come down and tell us, you know, if I

19  find somebody guilty of capital murder, an intentional killing

20  in the course of a robbery, then in my mind that person is

21  always going to be a continuing threat because if they did that

22  once, they're more likely than not going to do it again.

23        A.    Right.  I do believe that, especially if they're not

24  caught at it.

25        Q.    Okay.  Well, on our capital murder jury they've been
```

```
 1  caught because you've found --

 2       A.    Right.

 3       Q.    -- on our hypothetical jury, you've found them

 4  guilty.

 5       A.    Okay.

 6       Q.    Okay.  So somebody who has been convicted of capital

 7  murder.

 8       A.    Right.

 9       Q.    Can you presume that that person is not going to be

10  a continuing threat, or do you think that, well, if they did an

11  intentional killing in the course of a robbery, that person is

12  more likely than not going to be a continuing threat to

13  society?

14       A.    Yeah, I think he would be, which is where I bring in

15  that the prison system would be the one to control that.  I

16  mean, if I'm given doubt, I'm not going to prove -- I mean, I'm

17  not going to okay a death charge.

18       Q.    Sure.

19       A.    But I do think that they would be a continuing

20  threat, and that's where my belief in the prison system is --

21  where he carries out his life sentence if it's by himself.

22       Q.    Okay.  But you understand that what our -- what the

23  law says is that once somebody is convicted of capital murder,

24  intentional killing in the course of a robbery, the presumption

25  is that they're not going to be a continuing threat to society?
```

```
 1        A.    That's the presumption of it.

 2        Q.    The State has to prove beyond a reasonable doubt.

 3   It's just like the presumption of innocence.  You have to

 4   presume that the person is innocent unless the State convinces

 5   you otherwise beyond a reasonable doubt.  Once you've found

 6   somebody guilty of capital murder, you have to presume that the

 7   person is not going to be a continuing threat to society,

 8   unless or until the State convinces you that they are beyond a

 9   reasonable doubt.

10        A.    Okay.  I understand.

11        Q.    But what I hear you saying is that if you find

12   somebody guilty, in your mind that person is going to be a

13   continuing threat to society, that that's where you start out.

14        A.    Right, I mean --

15             MS. MOSELEY:  Your Honor, I -- I apologize, but

16   it might be helpful to explain society includes prison society,

17   and I think that's where he's getting confused.

18        A.    Right, because that's where --

19        Q.    (BY MS. BERNHARD)  Well, there is no definition to

20   society in that term, but what we understand it is, is that's

21   just wherever the person is going to be.  That may be prison.

22   That may be -- I mean, wherever the person finds them self.

23        A.    Right.

24        Q.    Because once you're -- once you're found guilty of

25   capital murder, the presumption is it's life without parole.
```

1    You can't do any better than that.

2        A.    Right.

3        Q.    It's either going to be life without parole or the

4    death penalty for --

5        A.    Right.

6        Q.    -- somebody convicted of capital murder.

7        A.    That's correct.

8        Q.    Okay.

9        A.    Which is where the society -- the prison system.

10   And if that's where he's at, I do believe that person will

11   continue to be a threat, if he's not taken away from the

12   general population or in controlled.

13       Q.    Okay.  Well, we -- we may not know what the prison

14   is going to do to him, because that's, to some extent,

15   speculative, but as a juror, the question that you have to

16   answer is, if you find somebody guilty of capital murder --

17       A.    Uh-huh.

18       Q.    -- an intentional killing in the course of a

19   robbery --

20       A.    Right.

21       Q.    -- can you presume that life without parole is the

22   appropriate sentence and that the person is not going to be a

23   continuing threat?

24       A.    Well, I won't presume.  I mean, I have to be shown.

25   I mean --

1       Q.   Okay.  Maybe we're getting twisted in -- in

2  definitions of things.  You understand that when somebody is

3  found guilty of capital murder --

4       A.   Right.

5       Q.   -- the State still has the burden of proof?

6       A.   Right.

7       Q.   They've got to convince you beyond a reasonable

8  doubt that there's a probability that the Defendant will commit

9  criminal acts of violence that will constitute -- or that would

10  constitute a continuing threat to society?

11       A.   Right.

12       Q.   When you start the punishment phase, after having

13  found somebody guilty of capital murder --

14       A.   Right.

15       Q.   -- the presumption is that they're not going to be a

16  continuing threat.

17       A.   That's the presumption.

18       Q.   That's the presumption.  That's where the law starts

19  out.

20       A.   Okay.

21       Q.   And the State has to convince the jurors beyond a

22  reasonable doubt that that person is going to be a continuing

23  threat.

24       A.   Right.  Which they proved to me in order to get the

25  guilty verdict from the first -- for the --

1      Q.    Okay.

2      A.    -- first special issue.

3      Q.    That's -- that's kind of what I'm trying to get at,

4 because it seems to me that what you're saying is that if you

5 find somebody guilty of capital murder, to your mind, that

6 person is always going to be a continuing threat to society.

7      A.    Right.

8      Q.    That's where you start.

9      A.    Right, that's where I start and like, you got to

10 define what the society is.  To me, prison system is a society.

11      Q.    Sure.

12      A.    Right?

13      Q.    Right.

14      A.    And then if he's a continuing threat, to that

15 extent, that -- that's where he's separated from that, but to

16 where they proved to me that he's not guilty of it and I've

17 already --

18      Q.    Okay.  We're past the guilt.

19      A.    Right.

20      Q.    There are two parts to the trial.  The first part

21 you decide whether or not they're guilty of the offense of

22 capital murder.  And then the second part, you move into to --

23 to determine the appropriate sentence.

24      A.    Right.

25      Q.    And you don't ever get to the second part of the

1   trial unless you have found and all 11 other jurors agree with

2   you that the person is guilty beyond a reasonable doubt.

3        A.   Right.

4        Q.   So the punishment phase begins.  You've got somebody

5   who is guilty of an intentional killing in the course of a

6   robbery.

7        A.   Right.

8        Q.   Is that person always in your mind going to be a

9   future danger?

10       A.   Yes.

11       Q.   Just because they -- they've been convicted of an

12  intentional killing?

13       A.   Because it's been proven to me that it -- that it

14  is.

15            THE COURT:  Because it's been proven to you that

16  they've committed a capital murder?

17            VENIREPERSON:  Right, that they committed a --

18            THE COURT:  Or because it's been proven to you

19  that -- because it's been proven to you that they will continue

20  to be a threat to society?

21            VENIREPERSON:  Right.  Because they --

22            THE COURT:  It's one or the other.

23            VENIREPERSON:  One or the other?

24            THE COURT:  Well, in order to answer Special

25  Issue Number 1, the State has to prove to you not that he

1    committed a capital murder, but that he will be a continuing

2    threat to society.

3                    VENIREPERSON:  Continuing threat, right.

4                    THE COURT:  And Ms. Bernhard, if you would ask

5    him the way I've heard you ask it before, if he would

6    automatically answer yes, maybe that will help us get over the

7    burden.

8                    MS. BERNHARD:  I think we have an agreement,

9    Judge.

10                    THE COURT:  Okay.

11                    MS. BERNHARD:  Could we have a moment?  I think

12    we have an agreement.

13                    THE COURT:  Okay.  All right.  If you'll step

14    out just a minute.

15                    VENIREPERSON:  Okay.

16                    (Venireperson excused from courtroom.)

17                    THE BAILIFF:  Just leave that here.

18                    VENIREPERSON:  Okay.

19                    MS. BERNHARD:  Judge, I think the State is in

20    agreement that this juror is not qualified.

21                    THE COURT:  Okay.

22                    MS. MOSELEY:  He certainly can't articulate it

23    if he is.

24                    THE COURT:  Yeah.

25                    (Venireperson returned to courtroom.)

```
 1                    THE COURT:  Thank you, Mr. Castillo.  You're

 2   excused.

 3                    VENIREPERSON:  Okay.

 4                    (Venireperson 1234A, Chris Castillo, excused.)

 5                    MS. MOSELEY:  Thank you, sir.

 6                    (Recess.)

 7                    THE BAILIFF:  All rise.

 8                    (Venireperson brought into courtroom.)

 9                    THE COURT:  Good morning, Ms. Williams.

10                    VENIREPERSON:  Hi.

11                    THE COURT:  Please be seated.

12                    Everyone may be seated.

13                    Is this the first time you've ever been on a

14   witness stand?

15                    VENIREPERSON:  Yes.

16                    THE COURT:  Are you nervous?

17                    VENIREPERSON:  Yes, a little awkward.

18                    THE COURT:  Try to be calm.  We're not going to

19   do anything to embarrass you or insult you.

20                    Do you remember being downstairs this June with

21   a large panel and being sworn in?

22                    VENIREPERSON:  Yes.

23                    THE COURT:  All right.  Well, you're still going

24   to be operating under that -- that swearing in that I did in

25   June.
```

 1                    VENIREPERSON:  Okay.

 2                    THE COURT:  And you'll continue to be operating

 3    under that oath if you're chosen as a juror in this case, until

 4    the jury is discharged.  Do you understand that?

 5                    VENIREPERSON:  Yes.

 6                    THE COURT:  All right.  This case is going to be

 7    tried on October the 28th and November the 4th -- through the

 8    week of November the 4th.  Has anything happened to you from

 9    June until now or in your life that would prevent you from

10    sitting in October -- on October the 28th through November the

11    4th?

12                    VENIREPERSON:  Yeah, I'm in school.

13                    THE COURT:  I'm sorry, I can't hear you.

14                    VENIREPERSON:  I'm in school.

15                    THE COURT:  You're in school?

16                    VENIREPERSON:  Yes.

17                    THE COURT:  All right.  And are you in school

18    here in Dallas?

19                    VENIREPERSON:  Yes.

20                    THE COURT:  And a regular school day?

21                    VENIREPERSON:  Yes.

22                    THE COURT:  All right.

23                    MS. MOSELEY:  She can claim an exemption.

24                    MR. WEATHERSPOON:  If she wants to take her

25    exemption, she can claim it.

```
 1                    THE COURT:  Would you like to take an exemption
 2   and not be in this trial or --
 3                    VENIREPERSON:  Yeah, I work two jobs and go to
 4   school.  About to work a third one.  I have no time.
 5                    THE COURT:  Okay.  All right.  Thank you, ma'am.
 6                    VENIREPERSON:  All right.
 7                    THE BAILIFF:  All rise.
 8                    THE COURT:  You're excused.
 9                    (Venireperson 1260A, Taylor Williams, excused.)
10                    (Venireperson excused from courtroom.)
11                    (Off the record.)
12                    THE BAILIFF:  All rise.
13                    (Venireperson brought into courtroom.)
14                    THE COURT:  Please be seated.
15                    Good morning, Ms. Smith.
16                    VENIREPERSON:  Morning.
17                    THE COURT:  How are you?
18                    VENIREPERSON:  Okay.
19                    THE COURT:  Good.  Do you remember, Ms. Smith,
20   being down in the Central Jury Room of this building in June
21   with a large panel when I was down there and I swore you in?
22                    VENIREPERSON:  Yes.
23                    THE COURT:  All right.  Well, you're operating
24   under those -- under that oath at this time, and if you're
25   selected as a juror, you will continue to operate under that
```

1  oath until you are discharged from service.

2                    VENIREPERSON:  Okay.

3                    THE COURT:  This case is going to be tried the

4  weeks of October the 28th and -- through November the 4th.  Has

5  anything occurred in your life from -- since June that would

6  prevent you from being able to sit if you were chosen as a

7  juror from October the 28th through the week of November the

8  4th?

9                    VENIREPERSON:  No.

10                   THE COURT:  All right.  Thank you very much.

11                   I'd like to introduce yourself -- I'd like to

12  introduce myself to you, and I'd like to introduce the parties

13  involved in this case.

14                   I'm Tracy Holmes.

15                   The lady sitting to your left right there is

16  Darline LaBar.  She's the official court reporter for this

17  court, and she's taking down everything that is being said.  As

18  a favor to her, if you would please answer audibly.  She can't

19  take down a nod or a shake of the head, and it's not very clear

20  if you say uh-huh or huh-uh, which we tend to do a lot.  So if

21  you try to answer out yes or no, we'd appreciate that.

22                   VENIREPERSON:  Okay.

23                   THE COURT:  I'll start with the State, Ms.

24  Andrea Moseley.

25                   MS. MOSELEY:  Good morning.

```
 1                    THE COURT:  Ms. Rocky Jones.

 2                    MS. JONES:  Good morning.

 3                    THE COURT:  Ms. Elaine Evans.

 4                    MS. EVANS:  Good morning.

 5                    THE COURT:  And Christine Womble.

 6               Moving over to the Defense table, there's Mr.

 7  Kenneth Weatherspoon.

 8                    MR. WEATHERSPOON:  Good morning.

 9                    THE COURT:  Ms. Catherine Bernhard.

10                    MS. BERNHARD:  Good morning.

11                    THE COURT:  Nancy Mulder is also representing

12  the Defense, but she's not in the court -- courtroom at this

13  time.

14               And on the far left is Mr. Matthew Lee Johnson,

15  who is the citizen accused.

16               Each side is going to get about 45 minutes to

17  talk to you.  And when they've finished talking to you, we'll

18  ask you to step outside in the hall.  If you are chosen today,

19  you will be one of about 49 or 50 jurors who we will then --

20  select down to 12, and that will happen on October the 15th.

21  So by October 15th, you will know for certain whether or not

22  you'll be a juror in this case.  Does that sound fair to you?

23                    VENIREPERSON:  Yes.

24                    THE COURT:  All right.  Thank you very much.

25  Have you been exposed to anything about this case through the
```

1  media or any other means?  Any of the facts or particulars of

2  this particular case, do you know anything about it?

3                    VENIREPERSON:  No.

4                    THE COURT:  All right.  I'm going to let the

5  lawyers speak to you then.  Ms. Jones.

6                    MS. MOSELEY:  It's me, Judge.  Thank you.

7                    THE COURT:  Oh, I'm sorry.

8                    MS. MOSELEY:  Ms. Jones had the last one.

9                          RACHEL SMITH,

10  was called as a venireperson by the parties, and after having

11  been first duly sworn, testified as follows:

12                    STATE VOIR DIRE EXAMINATION

13  BY MS. MOSELEY:

14      Q.   Ms. Smith, thank you for being here this morning.

15  I'm sorry we've kept you waiting a little while.  We try to get

16  through as quick as we can, but as you probably have already

17  figured out, this process is a slow process and it needs to

18  take a long time because there's really not any more important

19  kind of trial in the criminal justice system since this is the

20  case where we're seeking the ultimate punishment.  So I do

21  appreciate your patience this morning.

22                    Let me talk to you, if I can, about a few things

23  in your questionnaire and start by telling you that we know

24  when we had you fill out this questionnaire, that we didn't

25  explain any of the law to you.  We didn't tell you what laws

1    were going to apply.  We really wanted to know your feelings.

2    And today, we still want to just know how you feel and be able

3    to tell us at the end of the day whether your feelings are so

4    strong that they might interfere with your ability to be fair

5    to both the State and the Defense and to follow the laws that

6    apply in this case.

7                We know that people in the community have really

8    strong feelings about the death penalty.  As you know, we

9    brought down a big group of people when you were here in June.

10   That same number of people were brought down that afternoon,

11   and everybody filled out this questionnaire.  And you're Juror

12   Number 1300, so you know that it takes a lot of people -- we've

13   talked to a lot of people.  And I think we're at the beginning

14   of Week 9 in talking to jurors about their feelings, and so as

15   we go through this, know there are no right or wrong answers,

16   just truthful ones.  And that's all we're asking you to do is

17   just be truthful with us.

18                You told us in your questionnaire that you had a

19   dear friend that was murdered here recently --

20        A.    Yes.

21        Q.    -- is that right?

22        A.    Yes.

23        Q.    Somebody that was close to you, then?

24        A.    Yes.

25        Q.    Was someone caught?

```
 1       A.    Well, the person that they caught?

 2       Q.    Yes.

 3       A.    Yes.

 4       Q.    And where is that in the process now, do you know?

 5       A.    All I know, he's still in jail waiting trial, as far

 6  as I know, uh-huh.

 7       Q.    And that happened here in Dallas County?

 8       A.    Yes, it did.

 9       Q.    Okay.  Do you feel like things are working the way

10  you would expect them to work thus far?  In other words, are

11  you happy with the process so far?

12       A.    I really don't know.

13       Q.    Okay.

14       A.    I really don't know what's going on.

15       Q.    Okay.  And obviously, you know, we're talking about

16  a murder case.

17       A.    Yes.

18       Q.    A capital murder case, which may be different.  I

19  don't know if the person who killed your friend is charged with

20  capital murder or not.

21       A.    He is.

22       Q.    Okay.

23       A.    Uh-huh.

24       Q.    This is a capital murder case, and sometimes these

25  feelings -- sometimes this can hit too close to home if
```

1  you're -- if you're part of that experience at this point.

2  Tell me how you feel about that.  Do you feel like you could be

3  fair and impartial in this case of capital murder?

4      A.    Yes.  I know I can be fair because I know each case

5  is different and it always depends on the evidence that you,

6  you know, hear.

7      Q.    Okay.

8      A.    And so, yes.

9      Q.    And you know every case is different, every

10 defendant, every victim is different.

11     A.    Exactly.

12     Q.    In a capital murder trial, obviously, you -- you

13 understand the impact that these crimes can have on the victim

14 and loved ones of the victim.  Are you going to relate more to

15 the victim or victim's family members if you're a juror because

16 of your experience with your friend, or do you think you really

17 can stay impartial?

18     A.    I believe I could be impartial.  Like I said, it

19 all -- all depends -- you know, the other evidence or what I

20 hear, that's the only thing I could go by.

21     Q.    Okay.  Okay.  Then let's go through the process and

22 if anything -- as we get to it, if you think, well, that's

23 something there that might -- I might be thinking about my

24 friend, because obviously what we need are 12 jurors who are

25 going to come in and like you've said, look at the evidence,

1 make the State do its job proving the case, and base their

2 verdict, whether guilty or not guilty, based on the evidence

3 and based on whether I did my job or not.

4      A.    Yes.

5      Q.    And then in the punishment phase, again, look to the

6 evidence in this case and not be worried about something that's

7 happened to them in their history or -- or their -- been able

8 to relate to some other incident.  Does that make sense?

9      A.    Yes.

10     Q.    Okay.  You have been on a jury before?

11     A.    Yes.

12     Q.    And you told us that it wasn't an easy thing to do

13 on deciding someone's future.

14     A.    No.  That was pretty hard, you know, because you

15 don't -- you want to make sure you make the right decision,

16 and -- it was a little bit tough.

17     Q.    And that wasn't a case where the death penalty was

18 an issue at all?

19     A.    No.  No.

20     Q.    It was a drug case, I think?

21     A.    It was a drug case, but the only thing I had to do

22 was, we had to do the sentencing part, yes.

23     Q.    The person pled guilty to the crime?

24     A.    Yes, uh-huh.

25     Q.    And then the jury was asked to assess the sentence?

1      A.    Yes.

2      Q.    Do you remember what sentence was imposed?

3      A.    Oh, gosh, I know they got some time, look like

4  maybe -- I think it was 15 years, and then so many years

5  probation, something like that.  It was awhile back.

6      Q.    Okay.  Okay.  Well, obviously, you know from the

7  prosecutor's perspective when I read that you didn't find that

8  an easy thing to do because you're deciding someone's future --

9      A.    Right.

10      Q.    -- my thought is on a capital murder trial, you know

11  we're seeking the death penalty.

12      A.    Exactly.

13      Q.    How do you feel about that?  If it was difficult to

14  send someone to prison, how do you feel about this prospect of

15  the death penalty?

16      A.    I know it wouldn't be easy.  I mean, it would be a

17  hard decision, but the only thing I could do -- like I say, if

18  y'all proved, you know, beyond a reasonable doubt that that

19  person is guilty or innocent, and the only thing I could go by

20  will be, you know, the evidence that I hear.  And either way,

21  it's still going to be hard.

22      Q.    Sure.

23      A.    It's never easy.

24      Q.    No, and that -- and we wouldn't expect anyone to

25  find it easy.  If somebody came in here and told us, oh, yeah,

1  that's an easy thing, give it to me, let me do it, we would be

2  very concerned about their motives.

3       A.    Right.

4       Q.    There's a real process that goes into reaching that

5  ultimate conclusion, and we'll talk about that process in a

6  moment.

7              One more thing from your questionnaire, you take

8  some medication that you said indicate -- maybe requires some

9  more frequent restroom breaks.

10      A.    Yes.

11      Q.    Do you feel like that would cause you any concerns

12 being on a jury?  The Judge usually takes a morning break, a

13 lunch break, and an after afternoon break.  We usually work,

14 8:30 or 9:00 until 4:30 or 5:00.

15      A.    That would be fine, as long I don't drink a lot of

16 water.

17      Q.    Okay.  And I don't -- obviously, I don't mean to

18 embarrass you.

19      A.    No, that's fine, that's fine.

20      Q.    I just want to make sure.  You don't think it would

21 cause you any problems being a juror?

22      A.    No.

23      Q.    Okay.  Then let me -- let me tell you that we

24 believe we do have the kind of evidence that's going to cause a

25 jury, following their oaths, to find the Defendant guilty of

```
 1   capital murder.  And when I talk about the Defendant, you know,
 2   we watch TV and sometimes it's easy to sit on the couch and
 3   maybe it's easy for you to think about the man who murdered
 4   your friend and say, well, that guy ought to get the death
 5   penalty, or, you know, boy, he sure deserves it, can't believe
 6   that happened, that guy -- I hope they catch that guy and
 7   string him up, whatever the case may be when we're sitting at
 8   home.  But you know we're talking about a real human being,
 9   this man sitting down here, Matthew Lee Johnson.
10        A.   Uh-huh.
11        Q.   He's got a family that cares about him just like you
12   and I have family that cares about us.  And we believe that we
13   have the evidence that will convince a jury to find him guilty
14   of capital murder.  We also believe in the punishment phase
15   that we have the kind and quality and type of evidence that's
16   going to cause the jury following their oaths to answer Special
17   Issue Number 1 yes and Special Issue Number 2 no.  And that --
18   those decisions -- those answers will leave the Judge with no
19   option but to sentence him to the death penalty.  And that some
20   day certain in the future, maybe two, three, four, ten years
21   down the road, he'll be taken to Huntsville and his -- his day
22   of execution will come.  You may be sitting at home with your
23   family watching the news and hear that today's the day Matthew
24   Lee Johnson is to be executed.
25             You'll know, if you're on this jury, that you
```

1  played a part in that, that you participated in that process

2  that will result in his execution.  I don't tell you that to be

3  morbid or gruesome, but just so you are understanding how real

4  --

5      A.  Yes.

6      Q.  -- this process is.  Do you feel like that's a

7  process you can take part in without doing any harm to your

8  conscience or your -- your heart?

9      A.  To be honest, I don't know.  I don't know, because I

10 never had to deal with anything like this.  So, I don't know.

11 That's about the honest I can give you -- answer I can give you

12 on that.

13     Q.  Okay.  I want -- I want to make it clear right from

14 the start that the State of Texas, our laws, our government is

15 never going to force a juror to sit in a capital murder trial

16 if the death penalty is something that's going to cause them

17 regret, harm -- that's going to leave them thinking that

18 they've done something that they regret.  You know what I mean?

19     A.  Yes.

20     Q.  We want to make sure everybody understands the

21 process, so let's talk about the process.

22     A.  Okay.

23     Q.  We have the burden of proof, as you know, to prove

24 that somebody is guilty beyond a reasonable doubt in any case,

25 whether it's a capital murder case or whether it's theft of a

1  pack of chewing gum from 7-11.  The burden of proof is always

2  on the State.  The Defendant has a presumption of innocence,

3  never has to prove his innocence at all, right?

4       A.    Uh-huh.

5       Q.    You're familiar with those -- those principles?

6       A.    Yes.  Yes.

7       Q.    You know that anybody charged with a crime has an

8  absolute right to remain silent.  You may only as a juror hear

9  one side of the story.  You may -- you may never hear from the

10  Defendant in the case.  How do you feel about that?

11       A.    I feel okay about that, yes, uh-huh.

12       Q.    So you understand that you have to look to the

13  evidence that you do hear and not speculate about or wonder why

14  the Defendant didn't testify, you just look to the evidence you

15  did hear in the courtroom.

16       A.    Right, yes.

17       Q.    And you know, his lawyers, they're good lawyers.

18       A.    Uh-huh.

19       Q.    The law would allow them to sit and do crossword

20  puzzles all day today, all through the two weeks of trial,

21  never ask a question, never open their mouths, because, again,

22  the jury is always going to look to this table to bring the

23  evidence.

24       A.    Right.

25       Q.    So you never look to the Defense to prove anything

1   or disprove anything.  Does that make sense?

2        A.   Yes, I think.

3        Q.   They're good lawyers, and I promise you, they're not

4   doing crossword puzzles.

5        A.   Okay.

6        Q.   They're doing their job.  But -- but I tell you that

7   to illustrate how important it is for the jurors to put the

8   burden on me, make me do my job.  And for capital murder, that

9   means it is an intentional murder.  Not an accident.  Not a

10  mistake.  You know, if I -- if I came up to Rocky and grabbed

11  her purse and started running off and she shot me in the leg to

12  drop me down, she didn't intend to kill me.  She stopped -- she

13  was trying to stop me.  That wouldn't be an intentional murder,

14  even if I died of blood loss.  She wouldn't be guilty of an

15  intentional murder.  Can you see why?

16       A.   (Shakes head up and down.)

17       Q.   You have to say yes or no.

18       A.   Oh, I'm sorry, yes.

19       Q.   I know.  We do a lot of nodding.  Because for an

20  intentional murder, it has to be the person's goal to cause the

21  death of the person, not just hurt them, not just slow them

22  down.  It's not going to be self-defense or defense of a third

23  person, accident, mistake.  It's not going to be ever -- we're

24  never going to be talking about somebody who was mentally ill

25  to the point that they were insane at the time of the crime.

1  We're not talking about someone who is mentally retarded.

2  We're talking about somebody who is sane and caused the death

3  intentionally.  Does that make sense?

4      A.   Yes.

5      Q.   And for capital murder -- for the death penalty

6  to -- to be an option, it's just not going to be even that

7  intentional murder.  It's going to be an intentional murder,

8  plus some other aggravating circumstance.  So like an

9  intentional murder committed during the course of a burglary,

10 or an intentional murder committed during the course of a

11 sexual assault or a robbery.  And in this case, we've alleged

12 that it is an intentional murder committed during the course of

13 committing or attempting to commit another robbery, okay?

14     A.   Okay.

15     Q.   So it's not just an intentional murder.  It's also

16 plus some other aggravating circumstance -- a robbery, okay?

17     A.   Okay.

18     Q.   And only if the State proves beyond a reasonable

19 doubt an intentional murder committed during the course of a

20 robbery is the death penalty ever an option.

21     A.   Okay.

22     Q.   Okay.  And while we're sitting at home watching the

23 news and doing the -- that guy deserves it, that guy maybe not

24 stuff, that's not the way it works in a courtroom.  You've

25 probably already figured that out by reading the instructions.

1          A.    Yes.

2          Q.    A jury is never going to be asked to vote life or

3     vote death.  They're never going to be asked, does the person

4     deserve life or does the person deserve death.  Does that make

5     sense?

6          A.    Yes.

7          Q.    It's going to be the answer to these questions

8     that -- that -- that makes that decision, whether it's life or

9     death.

10               So let's -- let's first talk about getting

11     through that guilt/innocence phase, right?  Whose job is it to

12     prove somebody guilty?

13          A.    Theirs -- I mean, yours, I'm sorry.

14          Q.    Right.

15          A.    Yours.

16          Q.    They don't have to prove anything.  It's my job to

17     prove the person guilty.  I have to prove an intentional murder

18     committed during the course of a robbery.  If I failed to prove

19     the robbery, the verdict is not guilty of capital murder,

20     right?

21          A.    Right.

22          Q.    If, however, I do prove an intentional murder during

23     the course of a robbery, beyond a reasonable doubt -- and we

24     don't have a definition of beyond a reasonable doubt.  It is

25     whatever it means to you.  We know it's the highest burden of

1  proof that we have in the law and it should be, right?

2       A.   Right.

3       Q.   We're talking about somebody's life or liberty.

4       A.   Yes.

5       Q.   But it's not a hundred percent.  Even in a capital

6  murder case where the State is seeking the death penalty, we

7  don't have to prove it beyond all possible doubt.  We have to

8  prove it beyond a reasonable doubt.  Does that make sense to

9  you?

10      A.   Yes, uh-huh.

11      Q.   Do you think that's fair?

12      A.   Yes.

13      Q.   Okay.  Because I probably wouldn't be able to

14  convince you of anything beyond all doubt unless you saw it

15  yourself, right?

16      A.   Right.

17      Q.   It's beyond a reasonable doubt.  And this trial

18  works a little bit different from the one you were on before,

19  because we expect a defendant is going to plead not guilty.  So

20  we have to prove it to you.  If we prove to you beyond a

21  reasonable doubt the person is guilty of capital murder, then

22  there are only two possible punishments.  Do you know what they

23  are, for capital murder?

24      A.   Death penalty and life.

25      Q.   Life without the possibility of parole.

 1          A.    Of being on parole.   Okay.

 2          Q.    That means the person is never going to get paroled,

 3    never going to be considered for parole, okay?

 4          A.    Okay.

 5          Q.    So it's life without the possibility of parole or

 6    the death sentence.  And the law would say, you know, like we

 7    had that presumption of innocence in the first part of the

 8    trial --

 9          A.    Yes.

10          Q.    -- the second part of the trial, the jurors are to

11    go into that assuming and presuming that the life without

12    parole sentence is the proper punishment, okay?

13          A.    Okay.

14          Q.    So we don't go in thinking death penalty.  We go in

15    thinking life without parole.  And I have a burden of proof

16    even in the punishment phase.  So let's talk about Special

17    Issue Number 1, whether there's a probability that the

18    Defendant would commit criminal acts of violence that would

19    constitute a continuing threat to society.  I have to prove to

20    the jury, again beyond a reasonable doubt, that it is more

21    likely than not -- that's what probability means in the law --

22    more likely than not, okay?  Not maybe, not it's possible, and

23    not a hundred percent or absolutely, but more likely than not.

24    I have to prove it's more likely than not that the Defendant

25    that you've convicted of capital murder will commit criminal

1  acts of violence that would constitute a continuing threat to

2  society.

3          Now, where -- what's the best thing that can

4  happen to somebody that gets convicted of capital murder?

5      A.    Get life.

6      Q.    Where are they going to serve that life sentence?

7      A.    In prison.

8      Q.    In prison?

9      A.    Yes.

10     Q.    When we talk about society here, we're talking about

11 whatever society he finds himself in.  Have you ever visited a

12 penitentiary -- prison?

13     A.    Yes.

14     Q.    Were you visiting someone -- family member or loved

15 one?

16     A.    Family member, yes.

17     Q.    And when you went to visit, you saw -- obviously,

18 there are other inmates, right?

19     A.    Yes.

20     Q.    When you went to visit, where did you have that

21 visit?

22     A.    Like they was on the other side of the glass, and I

23 was on one side.

24     Q.    Okay.  Were there other people there visiting, as

25 well?

1    A.    Yes.

2    Q.    And other inmates there?

3    A.    Yes.

4    Q.    Did you see other inmates walking around the

5  penitentiary when you were there?

6    A.    Yes, what they call -- oh, gosh, I'm brain dead.

7    Q.    Trusties?

8    A.    Yes.  Thank you.  Yes.

9    Q.    Okay.  So you -- you realize that we've got people,

10  not only other inmates there that kind of socialize among one

11  another, they work, they go to school, they go to chapel --

12    A.    Yes.

13    Q.    -- and have Sunday school services.  They -- they

14  have their own little society in there, don't they?

15    A.    Yes.

16    Q.    And then obviously, we've got prison guards and

17  nurses and teachers and doctors and all kinds of people working

18  inside the penitentiary and visitors coming to visit loved

19  ones.

20    A.    Yes.

21    Q.    Do you believe that that society -- that prison

22  society, also the people in there deserve protection?

23    A.    Yes.

24    Q.    Do you believe that it's possible that people inside

25  the penitentiary can commit violent acts?

1      A.    Yes.

2      Q.    And that they could pose a threat to other people

3  inside the prison, whether it's guards or inmates?

4      A.    Yes, I believe that.

5      Q.    So when we talk about Special Issue Number 1, we're

6  talking about society as a whole, even that prison society.

7  Wherever the person finds them self, okay?

8      A.    Okay.

9      Q.    And I have to prove, again, beyond a reasonable

10  doubt it's more likely than not the person convicted of capital

11  murder will commit criminal acts of violence that constitute a

12  continuing threat.

13      A.    Okay.

14      Q.    Okay.  The law doesn't say what criminal acts of

15  violence means.  It means whatever it is to you.  In other

16  words, the legislature could have said, State of Texas, you're

17  going to have to prove that the person will commit another

18  murder or a sexual assault or a robbery or -- or even just an

19  assault.  But it didn't tell us specifically what kinds of

20  criminal acts of violence we're talking about.

21      A.    Okay.

22      Q.    If I haul off and hit Rocky in the face, some jurors

23  tell us that's a criminal act of violence, and I would tend to

24  agree with them.  I think she would, for sure.  But we know

25  it's whatever criminal acts of violence would constitute a

1 continuing threat to society.

2            Now, you can tell that's where the legislature

3 just kind of says people who are not going to be a future

4 threat, the life sentence is okay for them.  The life sentence

5 is the proper sentence unless they're going to be a continuing

6 threat to society, right?

7      A.   Right.

8      Q.   If they're going to commit criminal acts of violence

9 that would constitute a continuing threat to society, the

10 legislature moves them into that category of people that should

11 be considered for the death penalty.  Does that make sense?

12     A.   Yes.

13     Q.   Do you think that's the right way to make that

14 decision?

15     A.   It depends.

16     Q.   Tell me what you mean.

17     A.   The only thing I can say is, it depends still on the

18 evidence and that person -- cause I know each case is different

19 and that person is different because there is some people that

20 can change and some people don't, so it still all depends on,

21 you know.

22     Q.   How would you decide, Ms. Smith, whether a person is

23 the kind of person that's going to change or not?

24     A.   I don't know.  I really don't know.  Some -- you

25 know, some that I have known, you know, they turn their life

 1  over to God and they do change.  It may not be a murder case or

 2  nothing, but just, you know, being in trouble itself.  And

 3  sometimes it's just jail talk.  They get out, they go right

 4  back to the same thing they was doing, so --

 5       Q.    Right.  So it's hard to know.

 6       A.    It's hard -- right, it's hard to know really.

 7       Q.    If someone is sincere or not.

 8       A.    Exactly.

 9       Q.    It's easy to talk the talk.

10       A.    Exactly.

11       Q.    All right.  Do you believe -- I mean, I can tell you

12  that some jurors have told me that -- that that Special Issue

13  Number 1 is basically asking them to look to what somebody is

14  going to do in the future.  And we don't have a crystal ball,

15  right?

16       A.    No.

17       Q.    We don't have somebody --

18       A.    Right.

19       Q.    -- that can tell us that.  But -- so some people

20  tell us that there's no way I would ever be able to prove what

21  someone more likely than not will do in the future.

22       A.    Exactly.

23       Q.    Do you think that that's capable of proof?  Do you

24  think there's evidence that would -- that would answer that

25  question?

```
 1        A.    No, not during the trial.  I don't think so.
 2        Q.    So you don't believe that I could ever prove that
 3   beyond a reasonable doubt?
 4        A.    That a person is going to be violent in the future?
 5        Q.    More likely than not.
 6        A.    I don't think so.  I don't know.
 7        Q.    You don't --
 8        A.    I can't see that right now.  I don't know.  I don't
 9   know.
10        Q.    All right.  Okay.  Thank you, ma'am, I really
11   appreciate it.
12              THE COURT:  Ms. Smith, we're going to ask you to
13   step outside, please.
14              (Venireperson excused from courtroom.)
15              THE COURT:  Is there an agreement?
16              MS. MOSELEY:  Yes, Your Honor.  The Defense has
17   indicated they would agree to excuse Ms. Smith.
18              THE COURT:  Thank you.  I just want to make sure
19   we get it on the record.
20              (Venireperson returned to courtroom.)
21              THE COURT:  Ms. Smith, thank you very much for
22   your time, ma'am.  You are excused.
23              (Venireperson 1300A, Rachel Smith, excused.)
24              VENIREPERSON:  Okay.  Thank you.
25              MS. MOSELEY:  Thank you, ma'am.  I appreciate
```

```
 1  it.
 2                      (Recess.)
 3                      (Venireperson brought into courtroom.)
 4                      THE COURT:  Please be seated.  Good afternoon,
 5  Mr. Davis.
 6                      VENIREPERSON:  Afternoon.
 7                      THE COURT:  How are you today?
 8                      VENIREPERSON:  I feel pretty good.
 9                      THE COURT:  Good.  Mr. Davis, do you remember
10  back in June when you were down here in the Central Jury Room
11  with the large panel and I swore you in?
12                      VENIREPERSON:  Yes.
13                      THE COURT:  All right.  Well, you're still
14  operating under that oath, and you'll be operating under that
15  oath for the entire time that you're with this court until
16  you're discharged.
17                      VENIREPERSON:  Okay.
18                      THE COURT:  All right?
19                      VENIREPERSON:  Okay.
20                      THE COURT:  We expect that this case will be
21  tried -- or rather we know that this case will be tried Monday,
22  October the 28th, and it will probably go into the following
23  week, which is the week of November the 4th.  Has anything
24  happened to you between June and now that would prevent you
25  from sitting as a juror for two weeks beginning in October --
```

1   October the 28th?

2                   VENIREPERSON:  Let me see -- no.

3                   THE COURT:  Okay.  So you will be available on

4   those two weeks?

5                   VENIREPERSON:  For the first week.

6                   THE COURT:  10-28 and 11-4.

7                   VENIREPERSON:  Oh, yeah, that's -- that's good

8   right there, because after the 15th, I've got a doctor's

9   appointment, but that's November.

10                  THE COURT:  Okay.  All right.  And have you been

11  exposed to any facts or any information about this case that

12  you know of, since June?

13                  VENIREPERSON:  No.

14                  THE COURT:  You know nothing about it?

15                  VENIREPERSON:  Know nothing about it.

16                  THE COURT:  All right.  I'd like to introduce

17  everyone to you.  My name is Tracy Holmes, and I will be the

18  judge who presides over the trial.

19                  Sitting to your left is Ms. LaBar -- Ms. Darline

20  LaBar.  She's the official court reporter for this court, and

21  it's her very important job to take down everything that's

22  being said.  So it's important for you to please speak audibly.

23  Try not to nod and shake your head because we can't take that

24  down, and also try to avoid uh-huh and huh-uh if you can.

25                  VENIREPERSON:  Okay.

```
 1                      THE COURT:  We say all those things in normal

 2   everyday speech, but we need the record to be clear, so if

 3   you'll do those things, I'd appreciate it.

 4                      VENIREPERSON:  Okay.

 5                      THE COURT:  I'll start introducing the State,

 6   Ms. Andrea Moseley.

 7                      MS. MOSELEY:  Good afternoon.

 8                      VENIREPERSON:  Hello.

 9                      THE COURT:  Ms. Elaine Evans.

10                      MS. EVANS:  Good afternoon.

11                      THE COURT:  Rocky Jones.

12                      MS. JONES:  Good afternoon.

13                      THE COURT:  Christine Womble.

14                      VENIREPERSON:  Hello.

15                      THE COURT:  And representing the Defense is

16   Catherine Bernhard.

17                      MS. BERNHARD:  Good afternoon.

18                      VENIREPERSON:  Hello.

19                      THE COURT:  Nancy Mulder.

20                      MS. MULDER:  Good afternoon.

21                      VENIREPERSON:  Hello.

22                      THE COURT:  Kenneth Weatherspoon.

23                      MR. WEATHERSPOON:  Good afternoon.

24                      THE COURT:  And the citizen accused, Mr. Matthew

25   Lee Johnson, is the gentleman sitting to your far left.
```

```
 1                    VENIREPERSON:  Okay.  Hello.

 2                    THE COURT:  Each side gets about 45 minutes to

 3    talk to you, and then we'll excuse you.  If you will -- if you

 4    remain as part of this trial, there will be about 50 qualified

 5    jurors.  On October 15th we'll get down to the -- to the

 6    remaining -- to the 12 who will comprise the jury with two

 7    alternates.  So you will know no later than October the 15th

 8    whether or not you will be serving on this jury.  Is that -- is

 9    that all right with you?

10                    VENIREPERSON:  Yes.

11                    THE COURT:  All right.  I'm going to let the

12    State speak to you now.

13                    MS. EVANS:  Thank you, Your Honor.

14                    THE COURT:  Oh, did you have -- I'm sorry.  Did

15    you have an opportunity to review the pamphlet and the

16    questionnaire?

17                    VENIREPERSON:  Yes, I did.

18                    THE COURT:  And do you have any questions of me?

19                    VENIREPERSON:  No.

20                    THE COURT:  Thank you.

21                    MS. EVANS:  Thank you.

22                         GERALD DAVIS,

23    was called as a venireperson by the parties, and after having

24    been first duly sworn, testified as follows:

25                    STATE VOIR DIRE EXAMINATION
```

```
 1   BY MS. EVANS:

 2        Q.    Good afternoon, Mr. Davis.

 3        A.    Hello.

 4        Q.    Just so that you kind of understand where we're

 5   going this afternoon in talking to you, there are clearly no

 6   right or wrong answers to anything that we're going to be

 7   talking about.  We're not going to ask you a pop quiz at the

 8   end.  It's really just how you feel about things, and really

 9   the main question is to ask if you're going to be able to

10   follow the law as it might be given to you by the Judge in this

11   case.  And I know when you filled this questionnaire out, you

12   didn't know what the law was and we didn't expect you to know

13   it and we didn't expect you to know it as you sit here today.

14   That's why we do this process is to make sure that you

15   understand the types of things that may come up and that you

16   would be able to sit and serve and be qualified to serve as a

17   juror in this type of case if you were called upon to do so.

18              As you might imagine, the end of October, first

19   of November, it's going to be a little bit too late to tell us

20   that you have an issue with something, and so that's why we do

21   this process here today.  Does that make sense?

22        A.    Yes, it does.

23        Q.    Okay.  And so the lawyers from both sides are just

24   going to be talking to you about your feelings regarding the

25   death penalty, and then also making sure you understand certain
```

1  principles of law and then would be able to agree to follow

2  those principles of law if you were to sit and serve as a

3  juror.  So that's all we're doing here today.

4        A.    Okay.

5        Q.    Okay.  In looking at your questionnaire, I see that

6  you, like many jurors, are not eager to get down here and serve

7  on this type of case.

8        A.    Right.

9        Q.    That doesn't come as any sort of surprise.  In fact,

10  there's been a handful of jurors that say, sign me up, that

11  they want to come, and that makes us -- both sides a little bit

12  skeptical about, oh, really, why would you want to give two

13  weeks of your life to sit on something so important.  And so

14  you're right in line with everybody else.

15              But I will tell you, Mr. Davis, that you

16  remember that roomful of people we had down there back in June,

17  every seat filled?

18        A.    Yes, I do.

19        Q.    Well, we had the same number of people come that

20  afternoon.  And the reason for that is we've got some jurors

21  that come in here and tell us that, you show me a murder

22  occurred and that it was this Defendant that did it and they're

23  getting the death penalty.  That's their automatic response.

24  We've got other jurors that come in here and tell us, oh,

25  you're talking about the death penalty, I'm not ever going to

1   do that.  And so their feelings are so strong the opposite

2   direction.  And so that's what we're looking for or trying to

3   figure out is those jurors that their feelings are so strong

4   that they can't give a fair trial to the State or the Defense,

5   whichever one it may be, because their feelings are so strong

6   that it will affect the way they're answering these special

7   issues.  Does that make sense?

8          A.   Yes.

9          Q.   Now, it looks like in looking at your questionnaire

10  that while you are in favor of the death penalty, you also

11  agree on page 2, Question Number 3, that a life sentence,

12  rather than a death sentence, is appropriate under the proper

13  set of circumstances.  Would you agree with that?

14         A.   Yes.

15         Q.   And so that's exactly what we're looking for is just

16  jurors that can keep an open mind, listen to the evidence, and

17  evaluate it just based on that because your verdict in the

18  guilt/innocence phase of the trial, as well as in that

19  punishment phase, can only be based on two things and two

20  things only.  And that is the law as it's given to you by the

21  Court and the evidence that comes from this courtroom, not

22  based on anything else.

23              And so it looks like you would be able to do

24  that.  Let me ask you, though, whenever you say that you

25  wouldn't like to serve, where does your reservation come from

1  in serving on this type of case?

2      A.    Most of this -- I couldn't sit, you know, because --

3  sit around that jury box too long because I've got to go

4  back -- I take a -- a pill -- water pill, and I got to go with

5  certain times.  Sometimes when it starts, it's every 20

6  minutes, sometimes it's every 30, and it might be an hour, but

7  then sometimes it's every ten minutes.

8      Q.    I understand.  Do you think if you were to sit and

9  serve as a juror in this type of case that you're going to have

10  to give your full attention to the evidence happening in this

11  courtroom if you were worried about when you might have to go

12  to the restroom next?

13      A.    I probably couldn't.

14      Q.    It is going to distract you?

15      A.    Yes.

16      Q.    And it will distract you to such a degree that you

17  wouldn't be able to sit and serve in this lengthy of a case?

18      A.    Right, because I'll have to get up, leave.

19      Q.    I completely understand.  Thank you, Mr. Davis.

20              MS. EVANS:  May we have a break, Your Honor?

21              THE COURT:  Sure.

22              (Venireperson excused from courtroom.)

23              THE COURT:  All right.  Venireperson Gerald

24  Davis, Number 1267A.

25              MS. EVANS:  Your Honor, I think both the State

```
 1   and Defense have an agreement with him due to his medical

 2   condition.

 3                  MS. MULDER:  We agree.

 4                  MS. BERNHARD:  We agree.

 5                  THE COURT:  Thank you.

 6                  (Venireperson returned to courtroom.)

 7                  THE COURT:  Thank you for coming down, Mr.

 8   Davis.  You're excused.

 9                  (Venireperson 1267A, Gerald Davis, excused.)

10                  VENIREPERSON:  Oh, thank you.

11                  THE COURT:  Well, I thought I was going to have

12   beginner's luck, but it's not looking like that, is it?

13                  MS. MULDER:  Welcome to our world, Judge.

14                  (Discussion off the record.)

15                  MS. EVANS:  I have this juror, as well.

16                  MS. BERNHARD:  I'm going to take this one, too,

17   Judge.

18                  THE COURT:  Okay.

19                  MS. BERNHARD:  Is Lopez next?

20                  MS. MOSELEY:  Lopez is next.  Judge, do you want

21   to bring in Lopez?

22                  THE COURT:  Sure.

23                  THE BAILIFF:  All rise.

24                  (Venireperson brought into courtroom.)

25                  THE COURT:  You can be seated.
```

```
1                    VENIREPERSON:  Okay.  Perfect.

2                    THE COURT:  Thank you.

3                    Please be seated.

4                    Good afternoon, Mr. Lopez.  How are you?

5                    VENIREPERSON:  Good.  Thank you.

6                    THE COURT:  Good.  I need to ask you a few

7     questions.  Do you remember being down in this courthouse in

8     June with a large panel down in our Central Jury Room and being

9     sworn in by me?

10                   VENIREPERSON:  Yes, ma'am.

11                   THE COURT:  All right.  Well, you're still

12    operating under that oath, and you'll be operating under that

13    oath until you're discharged from service.

14                   VENIREPERSON:  Okay.

15                   THE COURT:  We will be trying this case the week

16    of October the 28th through the week of November the 4th.  Has

17    anything happened to you from June until now that would prevent

18    you from sitting during those two weeks this fall?

19                   VENIREPERSON:  No.

20                   THE COURT:  All right.  And have you been

21    exposed to any kind of information about this case?  Do you

22    know anything about this case that you didn't know in June or

23    even before that?

24                   VENIREPERSON:  No, ma'am.

25                   THE COURT:  All right.  I'd like to introduce
```

1    everybody to you.  My name is Tracy Holmes, and I will be the

2    Judge who's presiding over this case in October.

3              Sitting between you and I is Ms. Darline LaBar.

4    She's the court reporter, and it's her job to take down

5    everything that's being said, so if you would, please, as a

6    favor to her and all of us, answer out audibly -- say yes or no

7    and try to avoid shaking or nodding your head or saying huh-uh

8    or uh-huh and the lawyers -- the lawyers will help you with

9    that if you forget.

10              Sitting at the State's counsel table is Ms.

11   Andrea Moseley.

12              MS. MOSELEY:  Good afternoon.

13              THE COURT:  Elaine Evans.

14              MS. EVANS:  Good afternoon.

15              THE COURT:  Rocky Jones.

16              MS. JONES:  Good afternoon.

17              THE COURT:  And Christine Womble.

18              MS. WOMBLE:  Hello.

19              THE COURT:  And the State (sic) is represented

20   by Ms. Nancy Mulder.

21              MS. MULDER:  Good afternoon.

22              THE COURT:  Catherine Bernhard.

23              MS. BERNHARD:  Good afternoon.

24              THE COURT:  Kenneth Weatherspoon.

25              MR. WEATHERSPOON:  Good afternoon.

```
 1                    THE COURT:  And the gentleman to your far right
 2   is the citizen accused, and that's Mr. Matthew Lee Johnson.
 3                    VENIREPERSON:  Good afternoon.
 4                    THE COURT:  All right.  The lawyers get about 45
 5   minutes a side to talk to you, and at the end of that hour and
 6   a half we'll excuse you and then you bring you back in.  And if
 7   you are one of the qualified jurors -- there will be 50 of you
 8   -- and on October the 15th, the State and the Defense will
 9   agree to the final 12 jurors and the two alternates.  So you
10   will know no later than October the 15th whether or not you
11   will, in fact, be sitting as a juror in this case.  Is that all
12   right with you?
13                    VENIREPERSON:  Yes.
14                    THE COURT:  Is that enough time?
15                    VENIREPERSON:  Yes, ma'am.
16                    THE COURT:  Okay.  And did you have an
17   opportunity to review the pamphlet and your questionnaire
18   before coming in?
19                    VENIREPERSON:  Correct.
20                    THE COURT:  Do you have any questions of me?
21                    VENIREPERSON:  I do not.
22                    THE COURT:  All right.  Then I'm going to let
23   the State talk to you.
24                    MS. EVANS:  Thank you, Judge.
25                         JUSTIN LOPEZ,
```

```
 1  was called as a venireperson by the parties, and after having

 2  been first duly sworn, testified as follows:

 3                  STATE VOIR DIRE EXAMINATION

 4  BY MS. EVANS:

 5       Q.   Good afternoon, Mr. Lopez.

 6       A.   Thank you.

 7       Q.   I see that you are saving up money for grad school.

 8       A.   Yes, ma'am.

 9       Q.   What are you looking to go to grad school for?

10       A.   Still up in the air.  I have to take my GRE and then

11  decide what direction I'd like to go.

12       Q.   Wonderful.  That's great.  And is there anything

13  about -- I see on that last page of your questionnaire that

14  obviously sitting and serving as a juror in this case is going

15  to take up two weeks of your time, as it does many of our

16  jurors that come in.  They've got jobs.  They don't make money

17  unless they're there.  Given your special set of circumstances

18  and you are trying to save up for that, would you still be able

19  to give your full attention to this trial if you were selected

20  to serve as a juror, or would you be concentrating or worried

21  about the monetary loss?

22       A.   I would be able to give my full attention.

23       Q.   Thank you.  We appreciate that very much, Mr. Lopez.

24            I want to talk to you a little bit more about

25  stuff in your questionnaire, but first let me just give you
```

 1  kind of an idea of why we're doing what we're doing today.  You

 2  know, whenever you came down back in June, there was an entire

 3  room of people.  Every seat filled in it, right?  We had the

 4  same number of people come that afternoon.  And that's because,

 5  as you might imagine, when you're talking about things like the

 6  death penalty, that goes to the very heart of people's feelings

 7  and beliefs because you've got religious beliefs, you've got

 8  personal beliefs, moral beliefs, the way people are raised, all

 9  sorts of beliefs that come into play when you're talking about

10  having to agree and follow a law like the death penalty.  You

11  know, we can all stop at stop signs, not run red lights, we can

12  wait until they turn green, and we can all try to obey the

13  speed limit, but not everybody can follow the law as it relates

14  to the death penalty because some jurors come in here and tell

15  us, you know what, you show me that this Defendant killed

16  somebody and I am automatically always going to answer these

17  questions in such a way that the death penalty results.  Well,

18  as you might imagine, their feelings and beliefs are too

19  strongly in favor of the death penalty.  They can't give the

20  Defense a fair trial, right?

21       A.    Correct.

22       Q.    So they're not qualified.  Then you've got other

23  jurors that come in here and tell us, I completely disagree

24  with the death penalty, I think it's State-sanctioned murder

25  basically, and I will always answer these questions in such a

115

1  way that will result in a life sentence because I don't believe

2  in the death penalty and I'll never do it.  Well, they can't

3  give the State a fair trial, right?  And so they're not

4  qualified to sit and serve because both sides are entitled to

5  that fair trial and fair and impartial jurors that will render

6  a true verdict according to two things and two things only and

7  that's based on the law as it's given to you by the Court and

8  the evidence that comes from this courtroom only.  Not bringing

9  your personal feelings and beliefs into it.  Does that make

10  sense?

11        A.    Yes, ma'am.

12        Q.    Now, with that said, nobody -- neither the State,

13  nor the Defense are going to question you regarding your

14  beliefs or try to change your feelings and beliefs regarding

15  the death penalty because that's not the goal here.  You don't

16  have to check your beliefs at the door regarding the death

17  penalty.  You just have to understand the law as it might

18  relate in a case like this and then agree to follow the law as

19  it's given to you.  So that's why we do this.  Not only are we

20  going to talk about the death penalty, but we're going to talk

21  about certain principles of law that come up in every type of

22  criminal case, whether it's a misdemeanor case where somebody

23  has been charged with a DWI or shoplifting case, all the way up

24  here to capital murder where the State is seeking the death

25  penalty.  Defendants have certain rights, and you would have to

1    be able to understand those rights, and, again, agree to follow

2    those principles of law in order to be qualified to sit and

3    serve.  And so that's all we're doing.  There will be no pop

4    quiz at the end.  It's just how you feel and if you're able to

5    follow the law that will be set out, okay?

6              Let me ask you just a few things from your

7    questionnaire, and that is regarding handling the grad school

8    thing.  I'll tell you that one of the primary roles of a juror,

9    if you were to sit and serve, it's going to be your job to

10   evaluate the credibility of witnesses.  All witnesses under the

11   law have to start out on equal footing.  It doesn't matter if

12   you're a police -- police officer, prostitute, somebody with a

13   criminal record a mile long, or some other profession that

14   maybe you think is highly esteemed or maybe you think is a bit

15   questionable.  The fact of the matter is the law says that all

16   witnesses start out the same and it's not until you start

17   hearing what those witnesses have to tell you that you then

18   judge their credibility and decide whether you believe all,

19   part, or none of what that witness is telling you.  Does that

20   sound fair?

21        A.    Yes, ma'am.

22        Q.    And the reason I say that is there are two questions

23   that kind of relate to that on your questionnaire, and we don't

24   tell you what the law is before we ask you to just fill this

25   out.  So in looking at page 5 of your questionnaire, of course,

1    you answer like many other jurors do.  On Question Number 32:

2    Do you believe police officers are more likely to tell the

3    truth than the average person?  And you say:  Yes, it is their

4    duty to society.  Well, one would hope, since they're in that

5    role, but there's good officers and there's bad officers.

6    Would you agree with that?

7         A.    I would agree.

8         Q.    Okay.  And so even though that we're all taught to,

9    you know, obey police officers and that we should be able to

10   trust them, that doesn't mean just simply by the fact that they

11   put on a uniform and they're wearing a badge and a gun and

12   swear to tell the truth means that they're always going to be

13   telling the truth.  And it could be that they have the best of

14   intentions, but they just could be mistaken about what they saw

15   or what they experienced.  And so that's why the law is as it

16   is, that you've got to judge -- start them out on an equal

17   playing field.  They don't get a leg up simply because they're

18   in a uniform.  Would you be able to start a police officer out

19   on an equal playing field with all other witnesses and wait

20   until you hear what they have to tell you?

21        A.    Yes.

22        Q.    Okay.  Now, same holds true for Question Number 71,

23   page 11.  We talked to you a little bit about how would you

24   feel about a psychiatrist, psychologist, or other mental health

25   professional testifying in a capital murder case as an expert

118

```
 1  witness.  Now, we can't get into the facts of this case.  And

 2  so you may hear from one, you may not hear from one.  The real

 3  question is just to ask -- you say you're uncertain about how

 4  you feel, and that's perfectly fine to feel that way.  It's

 5  just, if you were to hear from some sort of mental health

 6  professional where it's a psychiatrist or a psychologist, would

 7  you not automatically say that they're going to be some kook or

 8  some quack doctor, you -- you have to wait.  The law would say

 9  you have to wait until you hear what they have to tell you mand

10  then based on what it is they're telling you, you believe all,

11  part, or none of it.  Would you wait with regards to their

12  testimony, as well, and not automatically prejudge them?

13       A.    Yes.

14       Q.    Okay.  And that's all that's relating to there in

15  the questionnaire.  Also, I know that when we asked you the

16  question about what would be important to you in deciding

17  whether or not someone receives the death sentence versus a

18  life sentence, you say, legitimate remorse for their actions.

19  How do you think you go about knowing whether or not someone is

20  being genuinely remorseful?

21       A.    I think it would depend on how they testify and what

22  they have to say.

23       Q.    Okay.

24       A.    Maybe apologetic.

25       Q.    Okay.  Now, there are -- this brings up another
```

1  important principle of law that in order to sit and be

2  qualified to serve as a juror -- and you've never testified

3  before, right?

4      A.   No, ma'am.

5      Q.   Just seen the stuff on TV.  I'll tell you that you

6  may very well in any given case hear from a criminal defendant

7  and get to judge their credibility just like you would any

8  other witnesses.  However, we have an important Fifth Amendment

9  right here in our country that I'm sure you've heard of it.  It

10  holds true out on the streets where a police officer approaches

11  you, you don't have to talk to him.  You could say, you know

12  what, I plead the Fifth and I want my lawyer present or, I'm

13  not going to talk.  That same Fifth Amendment right holds true

14  in this courtroom.  A criminal defendant has an absolute right

15  to testify if they choose to, but they have an absolute right

16  not to testify.  And it's his decision and his decision alone.

17  If -- the law would tell you that if a defendant chooses not to

18  testify in either the guilt/innocence phase or the punishment

19  phase, because that right prevails in both phases of the trial,

20  you cannot take that fact and use it as evidence of anything.

21  It's not evidence of guilt.  It means nothing.

22          We don't know why they may not be testifying

23  because the law recognizes there can be a whole host of reasons

24  why somebody chooses not to testify.  We're going to talk about

25  another important right, and that is that the burden is always

1    on the State of Texas, and if we fail in our proof, then his

2    counsel may say, hey, why in the world would you get up there

3    to testify because the State of Texas, they failed in their

4    proof, they didn't do their job, so the jurors are going to

5    have to return that verdict of not guilty.  So they don't take

6    the chance, you know, to testify, because why do it if we fail.

7    Or it could be somebody is not well spoken or they're fearful

8    that they'll incriminate themselves about the case they're on

9    trial for, about some other matter.  There could be a whole

10   host of reasons, and so that's why the law is as it is?

11                  If the Defendant chooses not to testify, could

12   you give him his Fifth Amendment right and not hold it against

13   him or use it as evidence of anything?

14        A.    Yes.

15        Q.    And that same would hold true in the punishment

16   phase.  You could do that then, as well?

17        A.    Yes.

18        Q.    And so that's why, you know, I brought up how would

19   you legitimately know whether or not somebody is remorseful?

20   You may have that opportunity, but you may not hear the

21   opportunity to hear from them; does that make sense?

22        A.    Yes, ma'am.

23        Q.    And that would be perfectly all right with you and

24   you would judge the evidence based on what you do hear and not

25   hold it against the Defendant?

121

```
 1        A.    Yes.
 2        Q.    Okay.  Whenever I was talking about that other
 3   important principle of law, the burden of proof always rests
 4   over here on the State of Texas.  The Defense -- they've done
 5   their job by simply showing up.  That's all that's required of
 6   them.  They could work crossword puzzles or Sudoku throughout
 7   the rest of this trial and, in fact, the end of October and
 8   November if they choose because the burden is on the State, and
 9   that's the way it should be, right?  I mean, we're the ones
10   doing the accusing.  We better be the ones doing the proving
11   with what we say he did, right?
12        A.    Yes, ma'am.
13        Q.    And so simply because the fact this Defendant has
14   been indicted for the offense of capital murder, doesn't mean
15   he's guilty of anything.  An indictment is nothing more than a
16   sheet of paper.  It lets the State know what we've got to prove
17   and it puts the Defense on notice with what he's been charged
18   with.  And it serves as a road map for the jurors because they
19   can use it like a checklist in determining if we dotted all our
20   I's and crossed all our T's just like we've got to do in the
21   guilt/innocence phase of this trial.  And so could you always
22   hold the State to our burden in proving the Defendant guilty
23   beyond a reasonable doubt and never shift it over here?
24        A.    Yes.
25        Q.    Okay.  In other words, the Defendant is not required
```

```
 1  to prove he's innocent; fair to say?
 2       A.   Yes, ma'am.
 3       Q.   And then when we get into the punishment phase that
 4  we'll talk about a bit more in a bit, if the Defendant is found
 5  guilty of the offense, then you answer these special issues
 6  over here.  And, again, the State has the burden of Special
 7  Issue Number 1, and we would be required to prove to you beyond
 8  a reasonable doubt -- and I'll just shorten it for now -- that
 9  the Defendant more likely than not is going to be a future
10  danger.  If we fail in our proof, then the answer to that would
11  be no, but you never look to this table to prove -- you never
12  look to them to show or prove that he's not going to be a
13  future danger.  Does that make sense?
14       A.   Yes, ma'am.
15       Q.   It's all on us.  And if we fail, we fail and we
16  don't get a leg up.  And you could do that, hold us to our
17  burden?
18       A.   Yes, ma'am.
19       Q.   Okay.  And it's beyond a reasonable doubt.  Beyond a
20  reasonable doubt does not have a definition under the law.
21  It's whatever it is to you as a juror.  I can tell you what
22  it's not.  It's not 100 percent certainty.  It's not beyond all
23  possible doubt, because probably if you were to know something
24  beyond all possible doubt, then you'd probably have to see that
25  with your own eyes, would you not?
```

```
 1        A.    Yes, ma'am.

 2        Q.    And then you wouldn't be asked to serve as a juror,

 3   we would be calling you up here to testify to the other jurors

 4   about what you experienced or witnessed.  And so could you hold

 5   the State -- even though we're talking about a capital murder

 6   case where the State is seeking the death penalty, could you

 7   still hold the State to the burden of beyond a reasonable

 8   doubt?

 9        A.    Yes.

10        Q.    Okay.  Another important principle of law, first and

11   foremost probably principle of law is the presumption of

12   innocence.  As the Defendant sits here today and whenever we

13   come down to his trial in October -- the end of October, he is

14   presumed to be innocent, not guilty of anything.  And we've

15   talked about that, that that indictment doesn't mean anything.

16   Some jurors tell us, well, you know, the fact that you're

17   selecting jurors for a death penalty case, I mean, he's got to

18   be guilty of something.  Where there's smoke, there's got to be

19   some fire.  Do you understand how that's an improper, incorrect

20   way of thinking under the law?

21        A.    Yes.

22        Q.    It's not -- it's unless and until the State goes

23   about proving the things in the indictment that you would then

24   be entitled to find the Defendant guilty of the offense, but if

25   we fail in our proof, then you'd have to find him not guilty,
```

```
 1  right?  Because the presumption of innocence would remain --
 2      A.    Yes, ma'am.
 3      Q.    -- unless and until we do our job.  Could you give
 4  this Defendant his presumption of innocence?
 5      A.    Yes.
 6      Q.    Now, let me give you an example, just -- not talking
 7  about the facts of this case, because I told you neither side
 8  is going to talk about the facts of this case.  But if you were
 9  on a hypothetical jury and let's say the State alleged in our
10  indictment -- and remember, our indictment is really just like
11  a checklist.  For the offense of capital murder, it's always
12  going to be an intentional killing, plus some sort of
13  aggravating factor.  Capital murder can be an intentional
14  killing of two or more people in the same criminal transaction.
15  It can be killing of a police officer in the line of duty.  It
16  can be a killing of a child under the age of 10.  Or for the
17  purposes like we're talking about, it can be an intentional
18  killing in the course of a robbery.  Intentional killing in the
19  course of another felony.  That's always going to be capital
20  murder, but capital murder is always going to be an intentional
21  killing.  And what I mean by that is, it was the Defendant's
22  conscious objective or desire to do exactly what he set out to
23  do, to cause that result.  Not a mistake.  Not an accident.
24  Not due to mental disease or defect that the Defendant didn't
25  know the difference between right and wrong.  And not something
```

125

1  where self-defense or some defense like that would apply.  No

2  legal justification.  We're talking about an intentional

3  killing, okay?

4            And so let's say our indictment was a capital

5  murder, and in our indictment we said that we were going to

6  prove an intentional killing in the course of a robbery.

7  That's what we've got to prove to the jurors.  You're sitting

8  on that jury and at trial you believe beyond a reasonable

9  doubt, as do the other 11 jurors, that the State proved to you

10 that intentional killing.  You believe that beyond a reasonable

11 doubt that it was this Defendant that did it and that it was an

12 intentional murder.  However, you don't hear any evidence of a

13 robbery taking place at the time of the intentional killing.

14 In fact, you hear it was an intentional killing in the course

15 of a sexual assault.  Do you see how the proof at trial is not

16 the same as what we put in our indictment?

17      A.    Yes.

18      Q.    Two different things.  And so since they don't

19 match, the jury would be required, following their oath to

20 render a true verdict according to the law and the evidence, to

21 render a verdict of not guilty as to capital murder.  Do you

22 understand that?

23      A.    Yes, ma'am.

24      Q.    And if we fail in our proof, and we -- there are no

25 technicalities in this.  It literally has to match exactly.

1    And if it does not, would you be able to, no matter how

2    distasteful it may seem to you, since you've got somebody

3    that's done an intentional killing, would you still be able to

4    return that verdict of not guilty as to capital murder if we

5    failed?

6         A.    Yes.

7         Q.    All right.  And, you know, if you and the other 11

8    jurors believe that this Defendant is the one that did an

9    intentional killing, you may be able to consider that lesser

10   offense of murder.  He's certainly not guilty of capital

11   murder, but maybe guilty of the lesser offense of murder.  And

12   by murder, I just mean a regular murder.  There was no

13   aggravating factor, no murder plus something else to make it

14   capital, because we didn't prove that something else, right?

15             And so if you were to be looking at a situation

16   where you got to consider the lesser offense, life without

17   parole would then be off the table and the death penalty would

18   be off the table -- because those are the two options that are

19   the punishments only available for the offense of capital

20   murder if you find the Defendant guilty.

21             Now, if guilty of murder, the legislature has

22   given us a range of possible punishment.  That range is

23   anywhere from five years in prison, all the way up to 99 years

24   or life, or anywhere in between.  And so to be qualified to sit

25   and serve as a juror in this case, if you were looking at the

127

```
 1   offense of murder, you would have to be able to consider
 2   punishment somewhere in that range, the five, all the way up to
 3   life and anywhere in between, and then be able to assess that
 4   if you thought it was the right thing to do after hearing all
 5   the evidence in the case.  And so if you thought it was the
 6   right thing to do, would you be able to give a sentence of five
 7   years for the offense of murder after you heard all the
 8   evidence?
 9        A.    Yes.
10        Q.    Could you give a life sentence if you thought it was
11   the right thing to do after hearing all the evidence?
12        A.    Yes.
13        Q.    And that's all that would be required of you is
14   just -- the evidence is always going to guide you.  It's very
15   much of a process.  There are no automatics.  And it sounds
16   like you could do that.
17             Now, let's talk about the scenario where we're
18   talking about a capital murder and jury finds the Defendant
19   guilty of something lesser.  We've already talked about it.
20   The jury finds that we've failed in our proof altogether, then
21   it's not guilty and everybody goes home, including the
22   Defendant.  If the Defendant is found guilty of capital murder,
23   remember, there are those two possible punishments.  There are
24   no automatics.  It's the way the jury answers these special
25   issues that will determine what sentence the Defendant will
```

128

1  get, whether it's life without parole or a death sentence.

2  Because the jurors are never going to be asked to go back there

3  in the jury room and say, you know what, based on what I heard,

4  this Defendant deserves a life sentence or based on what I

5  heard, he deserves a death sentence.  That's not the way it

6  works.  And I think you get that from looking at the pamphlet,

7  right?

8          A.    Yes, ma'am.

9          Q.    It's the way you answer the special issues.  And so

10  actually under the law -- you know, just like we have the

11  presumption of innocence where unless and until the State of

12  Texas proves this Defendant guilty, then the proper verdict is

13  not guilty.  We also have a presumption that the life

14  sentence -- so if we're now in that second phase of the

15  trial -- the guilt/innocence phase, all you get to hear about

16  is the stuff in the indictment.  The day in question.  Was it

17  this Defendant that did it, and did it happen the way the State

18  said -- set it out?

19              The punishment phase, you get to hear additional

20  information.  You get to hear about a defendant's criminal

21  history or lack thereof, character, a whole host of other

22  things it just is not proper or permissible in that

23  guilt/innocence phase that may help you in assessing how to

24  answer these special issues.  And in that phase of the trial,

25  the Defendant starts out -- the best he could possibly do after

```
 1   being found guilty of capital murder is life without parole,

 2   right?

 3          A.    Yes, ma'am.

 4          Q.    And, in fact, the law presumes that for the vast

 5   majority of capital murder defendants, that life without parole

 6   is, in fact, the proper punishment.  That's the presumption

 7   under the law.  Could you give this Defendant the presumption

 8   that life without parole is proper unless and until you answer

 9   these special issues?

10          A.    Yes.

11          Q.    Okay.  And in looking at that, the way the State of

12   Texas ferrets out or the way we separate those that are going

13   to receive a life sentence without parole versus those capital

14   murder defendants that get death is not based on the offense

15   for which you've been found guilty or the offense which you've

16   done, but it's based on what you're more than likely going to

17   do in the future.  So Special Issue Number 1 is very forward

18   looking.  In fact, it's almost requiring us to get out our

19   crystal ball and look in the future and say based on the

20   evidence in the case, more likely than not, yes, I believe the

21   Defendant is going to commit criminal acts of violence that

22   would constitute him being a continuing threat, or, no, I don't

23   believe based on the evidence that the State has proven that to

24   me, and then the trial would stop and it would be life without

25   parole, okay?
```

 1              And so let's talk about what Special Issue

 2    Number 1 says.  Whether there is a probability -- and under the

 3    law that means more likely than not.  You know, we can't

 4    obviously predict with certainty what's going to happen, but

 5    it's just more likely than not what's going to happen.  And

 6    it's not a possibility, because anything is possible.  So it's

 7    more likely than not the Defendant would commit criminal acts

 8    of violence.

 9              Now, criminal acts of violence is another thing

10    kind of like beyond a reasonable doubt.  It's not defined.

11    It's whatever it is to you.  I will tell you that it's not --

12    the legislature is not telling us, State, you better prove that

13    the Defendant is going to commit another murder or that he's

14    going to do another robbery or he's going to do a rape.

15    They're not pigeonholing us into what we've got to prove.  It's

16    whatever criminal acts of violence to you are going to

17    constitute the Defendant being a continuing threat, if you hear

18    it in the evidence.

19              Some jurors tell us if I were to haul off and

20    hit Andrea right now in the face, that they would say, yeah,

21    that's an assault.  That would be a criminal act of violence to

22    me.  Other jurors tell us that spitting on a prison guard might

23    be a criminal act of violence to them, given the situation they

24    hear.  We're not going to ask you what you would consider to be

25    or not be a criminal act of violence.  It's just knowing that

1  it doesn't have a definition, that it's whatever it is to you,

2  but it does say acts, plural.  So you would have to find more

3  likely than not, based on the evidence, the Defendant is going

4  to commit criminal acts of violence that would constitute him

5  being a continuing threat to society.

6              Now, when we talk about society, remember, the

7  point where you're looking at these special issues, you've

8  already found the Defendant guilty of an intentional killing in

9  the course of a robbery.  He's guilty of capital murder or you

10 wouldn't even be answering these, right?

11     A.    Yes, ma'am.

12     Q.    So at that point in time remember the best possible

13 punishment he can hope for is life without parole, so where

14 would his society then be?

15     A.    Capital murder.  Excuse me, where was --

16     Q.    Where would his society be if the best possible

17 punishment he could hope for is life without parole?  Where is

18 he going to be serving that sentence?

19     A.    In prison.

20     Q.    Exactly.

21     A.    Okay.

22     Q.    So really it's wherever the Defendant finds himself,

23 but, you know, we're talking about the scenario where you have

24 found him guilty, remember, because that's why you're answering

25 these?

1      A.    Correct.

2      Q.    And so the best he can hope for is life without

3  parole because that's the presumption, remember, is that that's

4  the proper sentence.  In looking at Special Issue Number 1,

5  we're talking about those people who are guilty of capital

6  murder who even in prison are going to pose a future danger.

7      A.    Okay.

8      Q.    Do you get -- that kind of sums it up --

9      A.    Yes, ma'am.

10     Q.    -- what we're talking about.  What types of evidence

11 would be important to you or helpful to you in trying to answer

12 Special Issue Number 1?

13     A.    Probably track record and previous criminal acts.

14     Q.    Okay.

15     A.    I think they speak for themselves, and any

16 information brought to the jury during court.

17     Q.    Okay.

18     A.    Any evidence provided then because we wouldn't have

19 any evidence previously.

20     Q.    Absolutely.  And as you sit here right now, I know

21 you can't tell us how you would or would not answer because you

22 haven't heard any evidence and you won't.  And so remember, the

23 evidence will be the one to guide you.  And I will tell you

24 what the law says regarding Special Issue Number 1, that you

25 can consider the facts of the offense for which you just found

1  the Defendant guilty of, in answering Special Issue Number 1

2  yes, if it answers that for you, based solely on the offense

3  for which you found him guilty of.

4                What the law does not permit you to do is to say

5  just because somebody has done an intentional killing in the

6  course of robbery, I'm always going to find them to be a future

7  danger or I'm automatically going to answer this yes.  Do you

8  understand that?

9        A.    Yes, ma'am.

10        Q.    You've got to couch the evidence that you've heard

11  in terms of Special Issue Number 1 because remember, there are

12  no automatics and there are no always, because you don't know

13  what you're going to hear until you hear it because you get to

14  hear additional stuff in the punishment phase, right?

15        A.    Yes, ma'am.

16        Q.    And so will you wait until you hear the evidence in

17  the punishment phase in deciding whether or not the State --

18  because remember, you never look to this table to prove that

19  he's not going to be a future danger.  It's our job to prove,

20  based on the evidence, that more likely than not that he's

21  going to be, even in prison.  And so would you hold the State

22  to our burden and wait and not automatically judge just because

23  somebody has done an intentional killing in the course of a

24  robbery, would you wait and then couch the evidence in terms of

25  Special Issue Number 1?

1          A.    Absolutely.

2          Q.    Okay.  And so in looking at Special Issue Number 1,

3     do you think that that's something possible that we would --

4     that based on evidence, we would be able to prove or could be

5     able to prove, depending on the case?

6          A.    Sure.

7          Q.    Okay.  And the reason we ask that is some jurors

8     tell us, no, I don't know how in the world.  I don't have a

9     crystal ball, and I can't do that.  But it sounds like you

10    could and what you would base it on or important to you would

11    be a track record or a history?

12         A.    Yes, ma'am.

13         Q.    All right.  In -- in looking at Special Issue Number

14    1, remember if we fail in our proof and you don't find based on

15    the evidence that this Defendant would be a continuing threat

16    to society, even in prison then your answer to that is no.  And

17    then the proper punishment is life without parole because that

18    is the presumption.  However, if you find that, yes, the answer

19    to Special Issue Number 1 should be yes, they're going to be a

20    future danger, your job is still not done.  You've got Special

21    Issue Number 2.

22               And what that is asking you to do is to look at

23    everything you've heard again, everything in the

24    guilt/innocence phase, everything you heard in the punishment

25    phase.  You've got to consider all of the evidence, including

 1    the circumstances of the offense, the Defendant's character and

 2    background and his personal moral culpability and determine

 3    whether there is sufficient mitigating circumstances or a

 4    sufficient mitigating circumstance that would now warrant this

 5    person receiving a life sentence rather than a death sentence.

 6    And I know that that's very, very wordy.  But here's what the

 7    deal is.  We basically call that the safety net?

 8         A.    Okay.

 9         Q.    Because the jurors in abiding by their oath may feel

10    strapped that -- you know, there's no burden as it relates to

11    Special Issue Number 2.  You're just given a look at everything

12    again.  Remember, they never have a burden, but we don't even

13    have a burden with regard to Special Issue Number 2.  But

14    before we had Special Issue Number 2, there was a point in time

15    where jurors may leave here saying, hey, you know, I was

16    abiding by my oath, and the State of Texas did prove each and

17    every one of the elements beyond a reasonable doubt for the

18    offense of capital murder, so I was required to find the

19    Defendant guilty of the offense.

20              And then in looking at Special Issue Number 1,

21    according to the evidence, again, the State proved that to me

22    beyond a reasonable doubt so I was required, according to my

23    oath, to say, yes, he's going to be a future danger, but there

24    was still something about the evidence, something about the

25    case, something about this Defendant that gave me pause and

1  made me feel like a life sentence was proper rather than a

2  death sentence.  And so that's why we have Special Issue Number

3  2 is so that no juror walks out of here saying, you know, my

4  oath caused me to be strapped and there was -- I felt a life

5  sentence was more appropriate because there could be something

6  about the case, something about the evidence, and you don't

7  have to be able to think about it now in your mind what would

8  be sufficiently mitigating.  And by mitigating, we mean

9  something that lessens the moral culpability of this Defendant,

10 lessens his responsibility in some way.  You don't have to be

11 able to think of it right now as you sit here.  It's just what

12 the law would say is if you heard that case -- you may hear a

13 thousand cases having to do with capital murder, and in 999 of

14 them you don't even hear anything to you that would rise to the

15 level of lessening this Defendant's responsibility, much less

16 of raising to that level of being sufficiently mitigating.  But

17 what the law would say is if you heard that one case, that

18 something based on the evidence was sufficiently mitigating to

19 you, such that life was more appropriate than death, would you

20 answer that Special Issue Number 2 yes that would result in the

21 life sentence?

22      A.   Yes.

23      Q.   Okay.  And I know it's a tough question to ask

24 because you haven't heard any evidence, but we've got to ask

25 you before you get there.  It's just you're going to be

1  required to consider everything, and I know that on page 10,

2  we're talking to you specifically about intoxication at the

3  time of the offense and how you feel about drugs and alcohol.

4  And you said:  People should suffer the consequences of their

5  own decisions.  And that's perfectly fine to feel that way.

6           And in Question Number 39, we're asking you:

7  Some people feel genetics -- that's on page 6 -- circumstances

8  of birth, upbringing, and environment should be considered when

9  determining the proper punishment of someone convicted of a

10 crime.  What do you think?  And you say:  I believe that each

11 individual makes their own decisions and that if they take part

12 in a crime, they should be punished.  And that's perfectly fine

13 to feel that way.  And, you know, people can make their own

14 decisions and own choices.  And I get what you're saying there,

15 but the real question to ask, do you see how those questions

16 now kind of go to the types of things you might hear as it

17 relates to Special Issue Number 2?

18      A.   Yes.

19      Q.   And what Special Issue Number 2 is just telling you,

20 if you were to sit and serve as a juror, you can't say, even

21 though that was part of the evidence, I'm not going to choose

22 to hear it, I'm not going to choose to consider it.  You would

23 be required to consider everything.

24           Now just because you're required to consider it,

25 doesn't mean you have to consider it to be mitigating.  It may

```
 1  not be something in your mind that lessens this Defendant's
 2  responsibility because what may be mitigating to some may be
 3  aggravating to others.  And a lot of times drug and alcohol use
 4  at the time of the offense, some jurors say, well, no, if he
 5  made the choice to go get out and be high or to consume alcohol
 6  to the point of intoxication and then go commit that crime,
 7  then I think that makes him worse.  And that's perfectly fine.
 8  You're just, under Special Issue Number 2, required to consider
 9  everything, and it's not until after you've considered
10  everything that you then start categorizing it and then say,
11  well, was there anything mitigating.  And even if there is
12  something mitigating, you may say, well, but there was nothing
13  sufficiently because it's got to be sufficiently mitigating to
14  make this then be a life sentence rather than death.  And you
15  would be able to do that?
16       A.   Yes, ma'am.
17       Q.   Consider everything.  You wouldn't turn a blind eye
18  to any piece of evidence?
19       A.   No.
20       Q.   Now, let me tell you where you are when you're
21  answering Special Issue Number 2, because some jurors sometimes
22  say, whoa, I wasn't thinking about it in terms of this.  Where
23  you are is you have found the Defendant guilty of an
24  intentional killing in the course of a robbery.  You have also
25  found in Special Issue Number 1 that this person is going to
```

1  continue being a future danger even in prison.  And so they may

2  not be the type of person that you want to go have dinner with,

3  right?

4      A.    Correct.

5      Q.    They're probably a pretty bad individual if they're

6  guilty of an intentional killing in the course of a robbery and

7  going to be a future danger, even in prison.  A pretty

8  dangerous guy.  But your job would still not be done because

9  the law will tell you, you still got to look at everything in

10  Special Issue Number 2 because it's very much a process.  There

11  are no automatic answers or responses.  You've got to work it

12  all the way through, unless, obviously, your answer to Special

13  Issue Number 1 is no, and then the trial stops and it's life

14  without parole, okay?  But you would be able to do that?

15      A.    Yes, ma'am.

16      Q.    Now, in looking, again, on -- I think you get

17  exactly what we're talking about because on page -- Question

18  Number 11, you're telling us whenever we're asking the question

19  about the law allows you to base your answer to Special Issue

20  Number 1 -- you didn't know that's what we were talking

21  about -- but solely on the facts of the offense.  You're saying

22  it depends on the specific case.  And that's exactly what we're

23  talking about.  It's just letting the evidence guide you and

24  steer you, and that's why you can't possibly know right now

25  what your answers would be.  And we're not allowed to pin you

```
 1   down on that.  Does that make sense?

 2        A.    Yes, ma'am.

 3        Q.    Now, on Question Number 36, when we're asking you to

 4   kind of rate -- we're putting you in an awkward situation of

 5   ranking objectives of punishment.  And you say, these rankings

 6   are subject to change according to different offenses.  On page

 7   6 you rank deter first, rehabilitate two, and punish as third.

 8   Were you ranking those thinking about a capital murder where

 9   the death penalty would apply, or -- were you thinking of that

10   scenario or were you thinking --

11        A.    General -- more general and any crime.

12        Q.    General, any crime.  And so I get what you're

13   saying.  It could vary, depending on what you're talking about.

14   And I do appreciate Question Number 37 where you're saying each

15   case is unique according to that individual.  And that's all

16   either side is asking you to do, judge it based on the case

17   you've got in front of you.

18              Now, I also see where you have been -- you or

19   your family member -- is it you or your family members that

20   have been victims of robberies and thefts?

21        A.    My parents before I was born, so I'm not emotionally

22   involved.  It was just a subject that had been brought up at

23   the dinner table and nothing came of it.

24        Q.    Okay.  And so nothing about that would influence you

25   or affect you if you were to sit and serve as a juror in this
```

1  case?

2       A.   No, I wasn't even born.

3       Q.   Okay.  I can appreciate that.  Let me tell you, kind

4  of the situation as we sit here right now.  We've already

5  talked about this is very much a process and there are no

6  automatics.  I can tell you though as we sit here right now

7  that my boss, Craig Watkins, the District Attorney here in

8  Dallas County, has decided that the State of Texas is seeking

9  the death penalty against Matthew Lee Johnson.

10      A.   Okay.

11      Q.   This man seated down here at the end of the table.

12  And, you know, we can all armchair quarterback pretty good when

13  we're at home watching the news about who deserves the death

14  penalty or doesn't deserve the death penalty or that person

15  should be shot in the middle of the town square.  You know,

16  we're -- we're good about talking about those things from at

17  home.  But we're talking about a very real process, and we're

18  talking about a human being here at the end of the table who

19  has family that loves him just like you and I do.  He puts on

20  his pants on one leg at a time just like you and I do.  And so

21  what we're talking about is if the jurors answer these

22  questions in such a way, yes and then no, we're talking about a

23  death sentence resulting.  And I'll tell you right now that we

24  believe that we have the quality and the quantity and the type

25  of evidence that will cause the jurors, abiding by their oaths,

1  to find this Defendant guilty of capital murder.  And, again,

2  we believe we have the type, the quality, and the quantity of

3  evidence that will cause the jurors to answer these questions

4  yes and no, to which the Judge would then have no choice but to

5  sign a death warrant for Matthew Lee Johnson.  At that point he

6  would be taken to Huntsville and at some point down the road

7  he'd be taken to the death chamber, laid on a gurney, his arm

8  extended, needle inserted into his arm, and lethal injection

9  pumped into his body until he's pronounced dead.  Very real

10  process.  I don't tell you that to be morbid or gruesome, but

11  just the reality of the situation for some jurors is a little,

12  wow, I've never considered it like that type moment.  How do

13  you feel about participating in a process like this?

14       A.   That would decide the outcome?

15       Q.   Right, that could -- at the end of the day, and if

16  it goes based on the evidence we believe we have that would

17  result in the death of this man.  How do you feel?

18       A.   I feel like everyone is entitled to a fair trial,

19  and I would just serve accordingly.  And I just think it's

20  depending upon the case and everything, but I'm not against the

21  death penalty, if that's what you're asking.

22       Q.   Okay.

23       A.   I think it just is the circumstances.

24       Q.   Certainly.  And I can tell from your answers in your

25  questionnaire that you're not against the death penalty, but

```
 1   you also find where a life sentence is appropriate in some
 2   circumstances --
 3        A.    Absolutely.
 4        Q.    -- depending on the case.  The position we don't
 5   want to put anybody in is where that they would be violating
 6   their conscience down the road because there are -- there is no
 7   turning back.  The Judge can't say, you know what, based on the
 8   evidence I heard, I think this really shouldn't have been the
 9   death sentence, therefore I'm going to overturn the jury's
10   verdict.  She cannot do that.  It doesn't matter if this
11   Defendant down the road were to change and bring peace to the
12   Middle East and find a cure for cancer, after that death
13   warrant is signed, based on these answers of yes and no, it's
14   final.  Everything is done.  And so we just don't want you to
15   be in a situation down the road where you're sitting around the
16   dinner table and you find that it's Matthew Lee Johnson's day
17   to go to that death chamber and his execution has rolled
18   around, and you would know but for your decision, because the
19   verdict has to be unanimous for him to receive a death
20   sentence, but for your decision this man wouldn't be dying.  We
21   just don't want anybody to be in that situation, and it's too
22   late to talk about this in October, first of November.  So I
23   just want to make sure you're perfectly fine participating.
24        A.    I feel it doesn't rest on me as an individual, but
25   the jury as a whole, so I wouldn't -- I would consider.
```

```
 1      Q.    And it would be very much based on the evidence,
 2  right?
 3      A.    Yes, ma'am.
 4      Q.    Because the evidence is going to guide you and steer
 5  you.
 6      A.    Yes, ma'am.
 7      Q.    Okay.  Any questions for me about the process?
 8      A.    Y'all had written in one of the pamphlets that I
 9  read that y'all were expecting it to be about two weeks, the
10  trial time.  I didn't know how you came to that conclusion or
11  that was a hundred percent accurate, just considering my job
12  and income.
13      Q.    We can never know how long a jury will deliberate.
14      A.    Right.
15      Q.    But just on past trials of this nature, because
16  you've got the two phases, you've got the guilt/innocence
17  phase, the punishment phase, we know that's generally how long
18  trials like this last, but, again, there's no way to
19  predict how long --
20      A.    Right.
21      Q.    -- you -- you may deliberate a short time.  You may
22  deliberate a long time.  Does that give you any pause or -- we
23  don't think it will go past two weeks.
24      A.    It doesn't affect how invested I would be if I was
25  chosen.  I was just curious.
```

1      Q.   Okay.  No, we appreciate you asking that.  I have

2  just one other important thing that I want to bring up with

3  regards to Special Issue Number 2.

4      A.   Okay.

5      Q.   Remember that principle of law, the Fifth Amendment

6  right, a lot of jurors tell us, well -- kind of like you were

7  talking about remorse in your questionnaire.  You know, well,

8  how am I to know the personal moral culpability of the

9  Defendant if he doesn't testify?  Remember the law, though,

10  doesn't allow you to require the Defendant to testify.  It's

11  just based on the evidence you do hear.  And so if you don't

12  hear any evidence that causes you to answer Special Issue

13  Number 2 yes, that it's sufficiently mitigating, then clearly

14  your answer to that would then be no, right?

15      A.   Yes, ma'am.

16      Q.   If there is no evidence.  You would still not

17  require the Defendant to testify in order to answer this

18  Special Issue Number 2 yes, if there was something about the

19  evidence that was sufficiently mitigating to you, correct?

20      A.   Yes, ma'am.

21      Q.   It's just if you hear it?

22      A.   Yes, ma'am.

23      Q.   All right.

24           MS. EVANS:  Pass the juror.

25           THE COURT:  Ms. Mulder.

```
 1              MS. MULDER:  Thank you, Your Honor.
 2                  DEFENSE VOIR DIRE EXAMINATION
 3   BY MS. MULDER:
 4        Q.    Good afternoon, Mr. Lopez.
 5        A.    Good afternoon.
 6        Q.    Once again, my name is Nancy Mulder, and along with
 7   Catherine and Kenneth Weatherspoon, we represent Matthew
 8   Johnson, our client.
 9              I'm going to talk to you about some of the same
10   issues that Ms. Evans spoke about.  But first, I want to make
11   sure you understand that you have fulfilled your civic duty by
12   coming down here on June 21st and filling out this lengthy
13   questionnaire and also being here today.  What I'm basically
14   saying is that there are no right or wrong answers.  The reason
15   we have you fill out these questionnaires prior to explaining
16   what the law is is so that we can get an idea of how you truly
17   feel about these very important issues and if those feelings
18   will -- and how those feelings will affect you and your
19   interpretation and application of the law.
20        A.    Yes, ma'am.
21        Q.    Do you understand?
22        A.    Yes.
23        Q.    Okay.  Great.  Basically I wanted to talk to you --
24   well, oh, first you work at Gleneagles?
25        A.    Yes, ma'am.
```

```
 1        Q.    How long have you been there?

 2        A.    I've been there since May, after I graduated, and I

 3   did my internship there last summer.

 4        Q.    Do you -- do you work inside with the food and

 5   beverages?

 6        A.    I manage a staff of 43 employees, all food and

 7   beverage, golf tournaments, private events, et cetera.  I'm

 8   slowly weaving my way in to become a private event director, so

 9   I'm trying to get a good handle on food and beverage.

10        Q.    Okay.  Great.  Have you ever met a member out there

11   named Doug Mulder?

12        A.    I've heard that name, I believe.

13        Q.    Okay.  That's my father-in-law.

14        A.    Okay.

15        Q.    He plays golf out there often.

16        A.    Okay.

17        Q.    He's been a member for a long time.  Since you've

18   never met him, obviously nothing about his being a member at

19   Gleneagles would affect you in deciding this case?

20        A.    No.

21        Q.    Do you like working out there?

22        A.    I do, I enjoy it.

23        Q.    Now, where was I?  Oh, yes.  Okay.  Now back to

24   these issues at hand.

25                    I see on your questionnaire your answer to
```

1    Number 1, you know, are you in favor of the death penalty?

2    Yes.  If an individual has the capacity to take another

3    individual's life, they should receive the same punishment.

4    That's what you wrote.  You remember?

5        A.    That sounds like -- yes.

6        Q.    Okay.  And that's truly how you feel inside, would

7    you agree?

8        A.    I should have wrote in certain circumstances, I feel

9    like a fair trial would be necessary for me to really validate

10   that statement.

11       Q.    Okay.  Well -- okay.  Well, let me kind of go back

12   and explain a little bit more about what capital murder is.  As

13   Ms. Evans explained, it is murder plus, meaning committing a

14   murder during the course of another felony.  Do you understand

15   that?

16       A.    Yes.

17       Q.    Okay.  But in order to be guilty of capital murder,

18   the State has to prove beyond a reasonable doubt that it was

19   the Defendant's specific intent to kill the victim.

20       A.    Yes, ma'am.

21       Q.    Okay.  You understand that?

22       A.    Yes, ma'am.

23       Q.    So it's not a case of, you know, it was an accident

24   or self-defense or there was some kind of struggle with the

25   victim.  It wasn't a mistake.  It wasn't defense of a third

```
 1  person.  It wasn't defense of property.  Do you understand what
 2  I'm saying?
 3       A.   Yes, ma'am.
 4       Q.   Okay.  If you find somebody guilty of capital
 5  murder, then it is -- that the Defendant had the intent for a
 6  specific outcome, meaning the person's death, and took the
 7  steps necessary to cause that death.  Do you understand what I
 8  mean?
 9       A.   Yes, ma'am.
10       Q.   So when you say in your answer to Number 1 you
11  should have said in certain circumstances, you think the death
12  penalty is appropriate, what are those circumstances that come
13  into your mind?
14       A.   Well, I guess it's how you just -- what you just
15  reiterated, whether it was intentional or accidental.  I think
16  that that would have a huge factor in deciding the punishment.
17       Q.   Okay.  Well, if it's -- if you kill somebody and
18  it's an accident, then you are not guilty.  You walk out of the
19  courtroom.
20       A.   Correct.
21       Q.   Do you understand?
22       A.   Yes, ma'am.
23       Q.   So if it's an accident, there is no punishment.  Do
24  you see what I mean?  So their death penalty wouldn't come in
25  at all.
```

1      A.    Correct.

2      Q.    Not even -- okay.  So for you, if -- and I'm -- so

3  for you, if an individual has the capacity to take another

4  individual's life, they should receive the same punishment --

5      A.    If it was intentional.

6      Q.    -- if it was intentional, okay.  And you understand

7  that capital murder is the intentional killing of someone.

8      A.    Yes.

9      Q.    Specific -- specific intent to kill.

10      A.    Yes, ma'am.

11      Q.    Okay.  So you feel if somebody has committed a

12  capital murder, the appropriate punishment in your heart of

13  hearts is the death penalty; is that right?

14      A.    Yes.

15      Q.    Okay.  All right.  Thank you.  In that regard -- and

16  let me tell you, we've been doing this -- this is our ninth

17  week, and a lot of people feel exactly the same way that you

18  do.  I'm going to skip around a little bit, so just bear with

19  me.

20      A.    Okay.

21      Q.    Okay.  In -- in light of that, that you feel the

22  death penalty is appropriate if somebody is guilty of capital

23  murder, you know, some of the other people that have come in

24  here and feel the same way tell us that, you know, with regard

25  to answering Special Issue Number 1, if I have found somebody

1  guilty of the intentional murder of a person during the course

2  of a robbery, then in answering Special Issue Number 1, I'm

3  always going to find that person is a future danger.  Do you

4  feel that way?

5       A.   I would -- yes, I agree I would feel that way.

6       Q.   Okay.  And understanding though that the State does

7  have the burden of proof in Special Issue Number 1, that there

8  is a presumption that life without parole is the appropriate

9  punishment, for you, if you found somebody guilty of an

10 intentional murder during the course of a robbery, no matter if

11 the State proves it to you or not, if he's guilty of capital

12 murder, and if you and the other jurors have found him guilty

13 of capital murder, he is automatically in your mind going to be

14 a future danger; is that right?

15      A.   Depending upon the trial.  It's a difficult question

16 to answer.  I'm making sure I don't say anything that I don't

17 feel.  I would agree probably, yes.

18      Q.   So what I hear you say, I would agree probably yes,

19 that kind of qualifies your answer.  And unfortunately, because

20 we're lawyers, we have to --

21      A.   Right.

22      Q.   -- kind of pin you down.  And it's okay if you feel

23 this way.  We just need to know.  If it's something that --

24 despite what the law says about the State proving Special Issue

25 Number 1 beyond a reasonable doubt, what I hear you saying is

```
 1  that if you and the other jurors have found somebody guilty of

 2  capital murder, an intentional killing during the course of a

 3  robbery, for you, you will automatically answer Special Issue

 4  Number 1 yes, because it was an intentional murder during the

 5  course of a robbery?

 6        A.    Yes.

 7              MS. MULDER:  May we take a break, Your Honor?

 8              THE COURT:  Sure.

 9              MS. MULDER:  Mr. Lopez, we're just going to take

10  a break.

11              VENIREPERSON:  Okay.

12              (Venireperson excused from courtroom.)

13              THE COURT:  All right.  Justin Lopez is

14  Venireperson 1326A.  Does the State and the Defense have an

15  agreement?

16              MS. EVANS:  Your Honor, I believe the State will

17  concede that this juror is challengeable for cause at this

18  point.

19              MS. MULDER:  And we do challenge him.

20              (Venireperson challenged by the Defense.)

21              THE COURT:  All right.  Challenge for cause is

22  granted.

23              (Challenge granted.)

24              (Venireperson returned to courtroom.)

25              THE COURT:  Thank you for your service, Mr.
```

```
 1   Lopez.  You're free to go.

 2              VENIREPERSON:  Thank you.

 3              (Venireperson excused from courtroom.)

 4              THE COURT:  We're trying to get five more, just

 5   want to remind y'all you of that.

 6              MS. BERNHARD:  This week, too.

 7              THE COURT:  Yeah, before -- before -- the end of

 8   this is Wednesday.

 9              THE BAILIFF:  Ready?

10              All rise.

11              (Venireperson brought into courtroom.)

12              THE COURT:  Please be seated.

13              Good afternoon, Mr. McComas.

14              VENIREPERSON:  Good afternoon.

15              THE COURT:  Mr. McComas, sir, do you remember

16   back in June when you were down in the Central Jury Room with

17   the large panel and I swore you in?

18              VENIREPERSON:  Yes, ma'am.

19              THE COURT:  All right.  And you're still

20   operating under that oath, and you will be operating under that

21   oath until you're discharged.

22              VENIREPERSON:  Okay.  Thank you.

23              THE COURT:  Also, we're going to be trying this

24   case beginning October the 28th -- Monday, October the 28th,

25   through the week of November the 4th.  Has anything happened in
```

1  your life from June until now that would prevent you from being

2  able to sit as a juror during those two weeks this fall?

3              VENIREPERSON:  No, ma'am.

4              THE COURT:  Okay.  Have you been exposed to any

5  facts about this case, or have you learned anything about this

6  case that you didn't know before?

7              VENIREPERSON:  No.

8              THE COURT:  Thank you.  I'd like to introduce

9  you to the parties.  My name is Tracy Holmes, and I will be the

10 presiding judge in this trial.

11             Sitting between us is Ms. Darline LaBar.  She's

12 the court reporter, and it's her job to take down everything

13 that's being said from now until the trial ends.  And so I'm

14 going to ask as a courtesy to her, if you would try to remember

15 to answer audibly yes or no, instead of nodding or shaking your

16 head or saying uh-huh or huh-uh.  We all do that very often in

17 just normal speech, but if you can try to remember and the

18 lawyers will remind you.

19             Sitting at the counsel tables is Ms. -- I'm

20 sorry, I'm going to have to -- Ms. Andrea Moseley.

21             MS. MOSELEY:  Good afternoon.

22             THE COURT:  Ms. Elaine Evans.

23             MS. EVANS:  Good afternoon.

24             THE COURT:  Ms. Rocky Jones.

25             MS. JONES:  Good afternoon.

155

```
 1                    THE COURT:  And Christine -- I think I must be
 2   pronouncing your last name wrong.
 3                    MS. WOMBLE:  Christine Womble.
 4                    THE COURT:  Christine Womble.
 5                    Sitting at the table for the Defense is Mr.
 6   Kenneth Weatherspoon.
 7                    MR. WEATHERSPOON:  Good afternoon.
 8                    VENIREPERSON:  Hi.
 9                    THE COURT:  Mr. Catherine Bernhard.
10                    MS. BERNHARD:  Good afternoon.
11                    THE COURT:  Ms. Nancy Mulder.
12                    MS. MULDER:  Hello.
13                    THE COURT:  And the gentleman to your far left
14   is the citizen accused.  That's Matthew Lee Johnson.
15                    VENIREPERSON:  Hi.
16                    THE COURT:  The State and the Defense will each
17   have 45 minutes to talk to you, and we'll take a short break.
18   And if you are qualified to be one of the 50 jurors who we have
19   -- who we will have by the time we finish this process, then on
20   October the 15th the lawyers are going to decide which 12 of
21   those jurors -- those qualified jurors will indeed be the
22   jurors for this jury and two alternates.  So we will be able to
23   tell you specifically you will or will not be a juror in this
24   case by October the 15th.  Is that enough time for you to take
25   care of your business?
```

```
 1                    VENIREPERSON:  Yes, ma'am.

 2                    THE COURT:  All right.  Have you had an

 3     opportunity to review the pamphlet and the question -- and your

 4     questionnaire?

 5                    VENIREPERSON:  Yes.

 6                    THE COURT:  Do you have any questions of me?

 7                    VENIREPERSON:  No.

 8                    THE COURT:  All right.  Thank you very much.

 9                         SCOT McCOMAS,

10     was called as a venireperson by the parties, and after having

11     been first duly sworn, testified as follows:

12                    STATE VOIR DIRE EXAMINATION

13     BY MS. MOSELEY:

14         Q.    Good afternoon.

15         A.    Hi.

16         Q.    Thank you for coming down this afternoon, finding

17     your way to the right place.  Not everybody is able to do that

18     for some reason, so I do appreciate it.  Obviously, I can tell

19     from reading your questionnaire that you take your

20     responsibility as a citizen very seriously, and I appreciate

21     it.  Not everyone does.  We called lots and lots of people, as

22     you well know, back in June to come down to the courthouse in

23     the big panel that morning.  We called that same number of

24     people in the afternoon.  And really, only about a third of the

25     people we sent summons to even showed up that day.  It's kind
```

1  of a sad statement on our -- on our society, unfortunately.  So

2  I do really appreciate you being here.

3              As I went through your questionnaire, there were

4  several things that I want to talk to you about today.  Today

5  is the only opportunity really that -- that the parties have to

6  talk to you.  But more importantly, that you have the

7  opportunity to talk to us and tell us how you feel.  Obviously,

8  there are no more serious cases than capital murder cases where

9  the State is seeking the death penalty.  The stakes are as high

10 as they will ever be in these cases, and so it's critical

11 really that you're given the opportunity to tell us how you

12 would feel about serving as a juror in a case like this,

13 whether or not your personal feelings or beliefs are strong --

14 so strong one way or the other that they might impact your

15 ability to give both the State and the Defense a fair trial in

16 this case because obviously, today is the only opportunity

17 we're going to get to explore that.

18             In the event you find yourself a juror in this

19 case at the end of October -- October 28th, it will be far too

20 late to speak up then, so we give every juror called the

21 opportunity to talk to us individually so that you do feel

22 comfortable in sharing your feelings and probably thinking

23 about these types of issues sometimes for the first time ever

24 for a juror.

25             So the only responsibility you have today is to

1    tell us the truth.  You have already fulfilled your civic duty

2    by showing up here back in June and now once again today.  So

3    there are no right or wrong answers to any of this.  It's just

4    a matter of us having the opportunity to have a conversation

5    about it.

6                I had some curiosities.  I know, obviously, from

7    your questionnaire, that you're opposed to the death penalty.

8         A.    Yes, in most cases.

9         Q.    If you were somehow crowned the King of Texas today,

10   would you abolish the death penalty?  Would you take it out of

11   the books as even a possibility for capital murder convictions?

12        A.    I think I would want to make sure that there is not

13   any kind of reasonable doubt, so the idea that DNA evidence

14   seems to be almost a sure thing 99 point -- I'm not a

15   scientist, but 99 point whatever percent, I think would be

16   important to have real concrete proof, if you will, before

17   someone is sentenced to death.

18        Q.    Okay.  So if I -- if I understand what -- I want to

19   make sure I understand.

20        A.    If I was to abolish the death penalty, like you said

21   in that hypothetical --

22        Q.    Right.  And -- and would you abolish it or would you

23   leave it as a possibility and -- and change the way it's

24   imposed or --

25        A.    I don't know enough about -- I haven't studied the

1 death penalty enough to know whether it's a deterrent for crime
2 for all criminals or certain criminals.  So I don't think I
3 could make that decision at this point right now without enough
4 information.

5     Q.    And your concerns as they relate to the death
6 penalty are rooted in the potential for convicting someone --
7 sentencing someone to death who's actually innocent of the
8 offense?

9     A.    That's one of them, yes.

10    Q.    Tell me -- tell me what your other concerns are.

11    A.    I wonder if sentencing -- the death penalty
12 sometimes can be so politicalized in people's campaigns, as
13 they say, I'm for the death penalty, I'm running for such and
14 such position, I wonder why it is that our United States has
15 certain states that have abolished the death penalty, certain
16 states that still have the death penalty, certain states that
17 seem to use it quite a bit, such as Texas.  So it's perplexing
18 to me to see that inconsistency across our nation when the
19 Constitution has -- has set forth it was for the United States,
20 and we have such a disproportionate application of the death
21 penalty.

22            And not only that, I think that the studies show
23 that African-Americans are 12 percent of the population, yet
24 many more are on death row and have been put to death.  I think
25 that that's something that should be looked at.  And also as a

160

 1   theologian and clergyman, I find it somewhat difficult to take

 2   the role of God.  However, I do think there are certain

 3   circumstances where the death penalty could be applied, so I'm

 4   not a hundred percent against it.

 5        Q.   Okay.  Is -- as we went -- as we go through some of

 6   this, I can tell you -- you told us that prior to going into

 7   the clergy, you were in support of the death penalty.

 8        A.   Correct.

 9        Q.   And what about your role now -- what about that

10   changed your feelings or thoughts about the death penalty?

11        A.   I think I learned more about it, and I think I

12   discovered more that people can change, and that -- if given a

13   chance, rehabilitated.  And so when someone is put to death,

14   there's not a lot of chance for them to change because that's a

15   finite thing.  So I think in a kind of theological context, I

16   was able to have a new understanding of -- of that.

17        Q.   And you're Episcopalian; is that correct?

18        A.   Yes, ma'am.

19        Q.   And can you -- can you tell me whether your church

20   has a position on capital punishment?

21        A.   We're generally against it.  There's really not any

22   official position, but that's kind of the leaning of the

23   church.  Of course, regardless of what the official church

24   stance is, I am my own free thinker and I can decide, you know.

25   Our church is not like the Roman Catholic church where whatever

 1   is decided kind of in a more dogmatic -- that everyone has to

 2   implement, we're able to have the freedom to believe certain

 3   things.  So some clergy are pro life, some are -- are not.

 4   Some are pro choice, some are not.

 5        Q.   Okay.  So as -- as it relates to you potentially

 6   serving on a jury where the death penalty may, in fact,

 7   result as a result of the jurors' decisions, that would not be

 8   something that would cause you any kind of religious concerns?

 9   Nothing that you wouldn't be able to go back to the church and

10   talk about?

11        A.   No, no, not at all.

12        Q.   Okay.

13        A.   I can make my own decision.

14        Q.   Okay.  You -- you mentioned on page 3, Question

15   Number 12, if I can draw your attention there.  We told you in

16   that question that the death penalty is reserved for those

17   defendants that are such a threat to society that even

18   incarceration does not remove the probability of future violent

19   acts.  And we asked you if you agreed or disagreed.  And I want

20   to tell you, like we said before, that the law wasn't really

21   explained to you guys.  The procedure whereby a death sentence

22   is the result wasn't explained to you guys when you filled this

23   out.

24             But that Question Number 12 is actually the

25   statement of the law in Texas.  A person will not be subject to

1  the death penalty unless the State of Texas can prove beyond a

2  reasonable doubt that they're guilty of capital murder, and

3  further prove beyond a reasonable doubt that it's more likely

4  than not that they will be a continuing threat to society even

5  in prison.  Even someone who is incarcerated, we have to prove

6  would more likely than not still be a threat.  And those are

7  the only people that the State of Texas is going to subject to

8  the death penalty.

9              So we told you that and you didn't say whether

10 you agreed or disagreed, but you -- you said:  Not sure.  I

11 think there are other ways to prevent future violent acts, such

12 as castration for rapists and lobotomy for killers.

13     A.   Right.  I didn't understand the -- what you had just

14 explained a few minutes ago on the day in June.

15     Q.   Sure.

16     A.   So that -- I was not clear of that law.

17     Q.   Okay.  Tell me where you were coming from when you

18 answered that question.

19     A.   Well, I guess my question would be how does the

20 State ascertain the probability and the future violent acts?

21 Is that through calling a psychiatrist, or is that through

22 statistical analysis?  I don't know because I'm not in your

23 field.  So that would be why I wrote I'm not sure because I

24 would want the know -- well, how do you determine the

25 probability of someone creating a future act -- future violent

1  act.

2      Q.    Okay.  As it relates -- I wanted to make sure that

3  -- that we're -- that I understand you.  Castration and

4  lobotomy, you recognize, are not permissible under the law?

5      A.    Correct.

6      Q.    And you wrote that there --

7      A.    But I don't know enough about the law.  So if

8  someone who is a rapist, for example, says, I can't stop raping

9  children, please castrate me or through the chemical castration

10  procedure, I don't know enough about the law to know whether

11  that person is allowed to receive that or not.

12      Q.    And lobotomy for killers?

13      A.    I don't know enough either about that.  I know that

14  that used to be something that was used back in the 50's.

15      Q.    Okay.

16      A.    To me, it seems if the -- if the option is either

17  putting someone to death or perhaps giving them the choice to

18  have a lobotomy or some kind of procedure on the brain that

19  will diminish the violent part of the brain or whatever -- I'm

20  not a doctor, I don't know -- then I would think that that

21  might be an option that the State or the Defendant could say,

22  you know, I would rather live but have a part of my hippocampus

23  taken off or whatever.

24      Q.    Okay.  Let's talk then a little bit about the -- the

25  question you had a minute ago about how do we predict what

1   someone is more likely than not to do in the future.  And I'll

2   tell you that probability -- that word "probability" in the law

3   means more likely than not.  It's not absolute certainty.  But

4   it's not a mere possibility because I think we would all agree

5   that anything is possible to happen in the future.

6              What we're talking about is that the State has

7   the burden -- and if you'll look at this board here, we've got

8   Special Issue Number 1.  That would be the first question the

9   jurors would come across in the punishment phase, having

10  convicted somebody of capital murder.  The first question they

11  would be asked is whether the State proved beyond a reasonable

12  doubt that it's more likely than not that the Defendant they

13  just convicted would commit criminal acts of violence that

14  would constitute a continuing threat to society.  And someone

15  convicted of capital murder either gets life without the

16  possibility of parole or the death sentence.  Those are the

17  only two options.

18             So you've mentioned the potential for

19  rehabilitation and things of that nature.  There's never going

20  to be a time where somebody convicted of capital murder today,

21  and -- at least as the law stands today, is ever going to be

22  eligible for parole.  They will spend the rest of their life in

23  prison or they'll receive the death sentence.

24        A.   Is that -- you said it's the way the law stands now.

25        Q.   Right.

1    A.    What if in the future the law is changed?  Will

2  those people who then was convicted under this current law,

3  would they then not be eligible to possibly be released later

4  if they were rehabilitated?

5    Q.    I can't speak to what may or may not happen in the

6  future.  What I can tell you is that the law would instruct the

7  jurors -- and -- and it would be based on what the law is today

8  and that is life without the possibility of parole or the death

9  sentence.  And it would not -- life without the possibility of

10  parole is the presumed sentence unless the State can prove

11  beyond a reasonable doubt that Special Issue Number 1 answer is

12  yes.

13         Now, you can tell, obviously, that the burden is

14  on me, and I have to prove that beyond a reasonable doubt.  We

15  don't have a crystal ball.  Nobody can predict the future

16  absolutely, certainly.  But I do have to prove it's more likely

17  than not.  Whether that's through psychiatric evidence, as you

18  mentioned before, it's highly unlikely that that kind of --

19  that any psychiatrist or psychologist would be permitted to

20  come in and say, in my opinion this person will be a future

21  threat.  It will be up to the jurors to look at the totality of

22  the evidence and answer that.  Although I will tell you we have

23  people all the time come in and tell us that that's not

24  something that they believe is capable of proof, because

25  everybody can change and because I don't know what's going to

1    happen tomorrow much less five years or 10 years down the road.

2    That no matter the evidence, that's not capable of proof.  What

3    do you think?

4         A.    Well, let me ask a question, if I could.  In

5    providing that proof, as you said, which falls on you, the

6    State to prove, is -- in a hypothetical case or this case, is

7    the juror asked to determine that based upon the only evidence

8    pertaining to this case, or is the juror given a previous

9    history of the Defendant as to their current -- their previous

10   temperament or acts or history or violence or whatever?

11        Q.    Okay.  That's a -- that's a great question.  Because

12   I kind of skipped around a little bit this afternoon.  The

13   first part of the trial is the guilt/innocence phase.  And we

14   basically try our cases in the state of Texas in two parts.

15   First is the guilt/innocence phase, the State has the burden to

16   prove somebody guilty beyond a reasonable doubt.  If the jury

17   finds somebody guilty of capital murder, then we would come

18   back in -- the jury would come back in having returned that

19   verdict, and more evidence could be presented at that time.

20              Now, the law does say that a jury can look

21   solely to the facts of the capital murder that they've

22   convicted the Defendant and decide, if they can, whether that

23   person will more likely than not continue to be a threat to

24   society.  And I -- we asked you that kind of in Question Number

25   11, whether you think there are some crimes which call for the

1  death penalty solely because of their facts and circumstances.

2  And you said:  Yes.  Serial killer or rape and murder of a

3  child.  I guess those are the two that came to your mind

4  initially?

5      A.    Yes.  So what you're saying is, is that the -- once

6  the guilt or innocence is determined by the facts of the case,

7  or the alleged crime and all that, then that's -- say,

8  hypothetically, it's guilty.  Then the second part of the

9  sentencing phase and those previous histories can be introduced

10  to allow the jury to determine whether or not in their

11  estimation the person has a prior criminal history of violence,

12  whatever; is that right?

13      Q.    Yes.  And the second phase -- in the punishment

14  phase of the trial, prior criminal history or lack thereof,

15  Defendant's character, members of the Defendant's family

16  perhaps might testify as to upbringing, childhood.  There's all

17  kind -- really, any type of evidence that would assist the

18  jurors in answering these two special issues can be presented

19  in the second phase.

20          In the first phase of the trial where you're

21  deciding guilt or innocence, none of that is admissible.

22      A.    Right.  I didn't think so.  Okay.

23      Q.    But in the punishment phase, more can be provided to

24  the jurors to help them answer that, if it would.

25      A.    Sure.  Then I guess to answer to your question on

168

1  Question 12, since I now understand a little more how it works

2  in terms of, you know, keeping certain parts in one phase of

3  the trial and other parts in the second phase of the punishment

4  phase, then I guess I would agree with Question 12.

5      Q.   And do you believe that that is something that the

6  State of Texas could potentially prove in a given case with

7  evidence, whether someone would more likely than not be a

8  threat in the future?

9      A.   In the second phase of the trial?

10     Q.   Yes.

11     A.   Punishment phase?

12     Q.   Yes.  Because we don't deal with that until --

13     A.   Right.

14     Q.   -- we get to the punishment phase.

15     A.   I -- I believe you could, if you have that

16 information.  I'm sure you could -- you would tell the jury,

17 right?

18     Q.   We would -- we believe that we have the type and

19 quality of evidence that would convince a jury to answer that

20 yes, but as I said before, I want to make sure that you're not

21 one of the jurors who believes -- potential jurors who believes

22 that there's no way under any circumstances that could be

23 proven.

24     A.   Oh, no, I think if you were to bring up a certain --

25 it would depend on all that, I think you would be able to make

 1    the case and -- and try to persuade the jury.  And then I would

 2    take that into consideration if I was a potential juror.

 3        Q.    And you recognize then that when we're talking about

 4    a continuing threat to society, we're talking about even in the

 5    penitentiary, other inmates, prison guards, priests who come in

 6    to -- to minister to the inmates, people come in to visit loved

 7    ones, you believe that those people deserve protection from

 8    someone who would be violent?

 9        A.    Yes.

10        Q.    Do you believe it's possible to have violence in the

11    penitentiary?

12        A.    Do I believe there's potential?  I believe it is.

13    There's evidence, yes.

14        Q.    And that we should do all we can to prevent that?

15        A.    Yes.  Prison guards and clergy have a right to do

16    their job and not be stabbed or whatever.

17        Q.    And other inmates, as well?

18        A.    Correct.

19        Q.    Now, let's talk about Question Number 13.  And the

20    first thing I want to tell you is that the -- that the law is

21    never going to tell the State of Texas what type of evidence we

22    have to have to convince a jury of someone's guilt.

23        A.    Okay.

24        Q.    The law says whether it's one single eyewitness or

25    whether it's two eyewitnesses, or two eyewitnesses and DNA, or

1  two eyewitnesses and fingerprints, whatever the evidence is, if

2  that evidence convinces a jury of the Defendant's guilt beyond

3  a reasonable doubt, they're required under their oath to return

4  a verdict of guilty.  Even if it's one eyewitness.  I,

5  obviously, recognize the issues that we've had in this county.

6  And frankly, I work for Craig Watkins who's been devoted to

7  clearing up some of the -- the prior problems with DNA now.

8  However, there are -- there are no rules laid upon the State of

9  Texas that tell us what type of evidence we're required to

10  bring.

11          That being said, I do know that people like --

12  many people like I think you feel, DNA is what we really need

13  to prove somebody's guilt these days.

14      A.  I'm not saying that's the only thing you need.  I'm

15  saying that I could perhaps return a verdict if there was not

16  DNA, but if there were other cases like you said.

17      Q.  You answered Question Number 13, and you said:  But

18  only DNA, not fingerprints.  What do you mean by that?

19      A.  Well, when you're sitting there in that room of 500

20  people and you have -- you don't know what you're doing and

21  you're called down and you filled out a 19-page document, you

22  know, and you feel that you're under time pressure to do this,

23  it's -- and you're not in this field, sometimes you're not sure

24  what you're writing down.  So in reflection now, based upon

25  having reviewed this 30 minutes ago and knowing I was coming

```
 1   down here and so forth, I think that -- that one doesn't have

 2   to have DNA necessarily.  You can have eye an eyewitness,

 3   fingerprints, whatever.

 4        Q.   And regardless of what the evidence was, if you

 5   believed the evidence, you could convict.  If you believed it

 6   proved the Defendant's guilty beyond a reasonable doubt?

 7        A.   Yes, if you proved the case beyond a reasonable

 8   doubt and you have the evidence that indicates the Defendant is

 9   the one who committed the alleged crime, then, yes.

10        Q.   Even without DNA?

11        A.   Yes.

12        Q.   Okay.  Perfect.

13        A.   You don't have any water here, by chance, do you?

14             THE COURT:  Can somebody get Mr. McComas some

15   water, please?  Bill, can you do that?

16             THE BAILIFF:  Yes.

17             THE COURT:  Thank you.

18             VENIREPERSON:  Thank you very much.

19        Q.   (BY MS. MOSELEY)  Let's -- let's talk about -- I

20   know, my throat is dry, too, but I'm -- I came better prepared.

21        A.   You did.  You've got your --

22        Q.   I apologize.

23             Let's talk about one of the other things that

24   you mentioned.  On page 4, we asked you what you believed the

25   biggest problem in our criminal justice is, and I want to make
```

1  sure you understand that nobody is here to quibble with your

2  feelings.  I'm not here to change your mind or argue with your

3  position at all.  I'm just trying to figure out where you stand

4  on all of this.  You said you believe that racism in the system

5  is -- is the biggest problem.  You said, many more blacks on

6  death row, but only 12 percent of the population, why?  And you

7  mentioned that a moment ago.  Obviously, it's no secret that

8  the Defendant in this case is African-American.  Is that

9  going --

10        A.   Can I stop you one second?  I don't know if that's

11  the biggest problem.  I think it's one of the -- one large

12  problem.  I don't know if it's the top problem.

13        Q.   Okay.  And we were certainly just asking your

14  opinion about it anyway.  Obviously, we recognize nobody did a

15  lot of research before they came down here to figure it out.

16  And if you can figure it out, be sure and, you know, fill

17  everybody else in.

18        A.   Right.

19        Q.   But I guess my concern and my question for you is

20  knowing that the Defendant on trial in this case where -- we're

21  talking about a capital murder charge and seeking the death

22  penalty, he's African-American, how, if at all, does that

23  affect you as a juror?

24        A.   The person's race doesn't affect at all if you're

25  able to prove -- whether he's purple or orange or white or

1  black, whatever, that he committed a crime, the crime he's

2  alleged to have committed, and you prove it beyond a reasonable

3  doubt, his color would not make a difference to me whether or

4  not I was able to convict him.  I was indicating here kind of a

5  philosophical comment.  I'm a teacher.  Maybe I was getting on

6  my little soapbox or whatever.  But that would not indicate --

7  that would not change my opinion.  I'm very methodical and I'm

8  a thinking person.  I would look at the facts.  And as I -- as

9  I indicated on another question, I think it's better for ten --

10  what did you say, what was that question, ten guilty people go

11  free than one innocent person to go to jail.  But his race

12  would have no bearing on my verdict.

13      Q.    Does it have any bearing on your assessing the

14  evidence in the case?  In other words, do you -- do you

15  question -- because you've said that the death penalty in your

16  view is politicized, that it can have political motives and

17  that African-Americans tend to be given the death penalty at a

18  higher rate in your opinion; are those --

19      A.    Well, I said it can be politicized.

20      Q.    Sure.

21      A.    I didn't say that it was politicized.

22      Q.    Does that -- do those feelings impact the way that

23  you would view the evidence?  In other words --

24      A.    No, not at all.  If there was evidence, it's

25  factual.  I would look at the evidence, based upon the

1   evidence.  I would not allow that to -- to influence my

2   examination.

3       Q.    Okay.  Okay.  We've talked about Special Issue

4   Number 1, and you've told me that you believe that that is

5   capable of proof.  So I'll tell you that if the jury answers

6   Special Issue Number 1 yes, that the State of Texas proved that

7   beyond a reasonable doubt more likely than not the Defendant

8   would commit criminal acts of violence that constituted a

9   continuing threat, then they would move on to Special Issue

10  Number 2.

11          And in Special Issue Number 2, there's no burden

12  of proof anymore.  Once the jury has convicted the Defendant of

13  capital murder and answered Special Issue Number 1 yes, my job

14  is over.  I've done all I have to do, but the jury still has to

15  address Special Issue Number 2.

16          And Special Issue Number 2, I'll kind of

17  summarize it for you.  We sometimes call that the mitigation

18  question.  It requires the jury -- each individual juror to

19  look at all of the evidence again.  Look at the circumstances

20  of the offense, the Defendant's character and background,

21  personal moral culpability of the Defendant.  If any of that

22  has been provided in the evidence during the -- during the

23  trial, first part of the trial or second part of the trial, the

24  jury would be instructed to consider all of that again and

25  decide whether there is a sufficiently mitigating circumstance

1  or circumstances to warrant life instead of death.

2                 It's kind of a mouthful, but the real

3  responsibility for the juror is to consider all of the evidence

4  again and decide whether the death sentence is really the

5  proper sentence.  You -- I think you would agree that by the

6  time we get to Special Issue Number 2, we're talking about a

7  pretty dangerous person, somebody that's been convicted of

8  capital murder, the intentional taking of someone's life during

9  the course of a robbery, which means it wasn't a mistake.  It

10  wasn't an accident.  It wasn't self-defense.  It wasn't defense

11  of a third person.  Intentional in the law means that the

12  person formed in their mind the intent to cause the other

13  person's death and did so, and that they did so in the course

14  of a robbery.

15                 And then in the Special Issue Number 1 you will

16  have already found that the Defendant more likely than not will

17  commit criminal acts of violence in the future that would

18  constitute a continuing threat to society.  As -- so you've

19  already decided all of that before you get to Special Issue 2.

20  So it's -- would you agree if I said that we all have something

21  in our background that could be perceived as mitigating?

22       A.    Perhaps.  I don't know a hundred percent.  I mean,

23  there probably is a high probability that we would all have

24  something in our past.

25       Q.    Like nobody had the perfect -- had the perfect

1    upbringing or the perfect childhood, the perfect education, the

2    perfect opportunities; fair to say?

3        A.    Perhaps.

4        Q.    I certainly didn't.  Did you?

5        A.    No.

6        Q.    So when we're talking about something that is

7    mitigating, nobody is going to tell any individual juror what

8    is or isn't mitigating to them.  Some jurors would tell us that

9    childhood abuse, sexual abuse, physical abuse could be

10   mitigating to them.  Others would say drug use, intoxication,

11   or addiction could be mitigating to them.  Others would say

12   that's not mitigating to me, that's aggravating.  That's

13   personal decision, personal choice stuff.  But it is up to each

14   individual juror to decide what is mitigating or not.

15              The law is not going to give you a list that

16   says, these seven things are mitigating and if these are here,

17   check yes.  It's going to be up to the juror to decide.  But we

18   know that whatever the jury or juror finds mitigating has to be

19   something in the evidence, not their personal feelings or

20   something that they come into the courtroom with themselves.

21   It has to be present in the evidence, and it's not only

22   mitigating, but it has to be sufficiently mitigating because

23   we're talking about sending a person you believe will

24   constitute a threat to the people inside the penitentiary and

25   sending them in there anyway, right?

177

```
 1       A.   Right.  I just am a little bit confused.  Maybe you
 2  can clarify it.  So if there's drug use or emotional abuse,
 3  sexual abuse from a childhood, is all that presented in the
 4  first phase of the trial, or is that in the second?
 5       Q.   It would --
 6       A.   Only if it's related to the evidence in the case?
 7       Q.   It would not be presented in the first part of the
 8  trial.
 9       A.   Right.
10       Q.   Because it's not relevant about how bad someone's
11  childhood was.
12       A.   Right.  But what if the -- what if the alleged -- or
13  the Defendant in the alleged crime was on drugs at the time of
14  the offense, is that brought into the trial?
15       Q.   Let's talk about that because that was -- you're
16  actually reading my mind.  We're going forward, but let's go
17  ahead and jump to that now.  On page 10 of the questionnaire we
18  talked about issues related to drug and alcohol use or
19  addiction.  And Question Number 64 states what the law is in
20  Texas.  Voluntary intoxication does not constitute a defense to
21  the commission of a crime, which means if the person was high
22  or on drugs or intoxicated with alcohol or any other substance
23  at the time of the crime, that is no defense to -- you can't --
24  you can't find somebody not guilty because they were high at
25  the time.
```

1    A.    Right.

2    Q.    And you -- you seemed to agree with that.

3    A.    Right, right, being drunk is no excuse for crime

4    committed.

5    Q.    Exactly.  And that is the law in the state of Texas.

6         The second -- this next question, Question

7    Number 65 provides that evidence of intoxication may be

8    considered in mitigation of punishment.  So that's evidence

9    that the jury would be presented with in the punishment phase

10   of the trial, if it applied in a given case.  And then it would

11   be evidence that if it's in the trial, if it's heard by the

12   jury during the trial, then it would have to be considered by

13   them.  And then as I stated, every individual juror would

14   decide whether -- A, whether it's truthful or reliable

15   evidence, whether they believe it is true, and, B, if it is

16   truth, is it mitigating, aggravating, really neither here nor

17   there.  And then if it's mitigating, the jury needs to go on

18   further to decide is it sufficiently mitigating.  Does that

19   make sense?

20   A.    Yes.  Yes.

21   Q.    And -- and nobody is going to ask you whether it's

22   mitigating to you or not.  I would submit that you'd have to

23   hear all of the evidence to know whether it's mitigating to

24   you.

25         We asked you in Question Number 66 whether a

179

1   person's use of drugs or alcohol at the time of the offense

2   would automatically prevent from you assessing the death

3   penalty if you found him guilty of capital murder, and you said

4   no.  Do you still feel that way?

5       A.   Let me read this to make sure I understand.

6            If they used -- if they were on alcohol or drugs

7   at the time of the offense, that would not, again, be an excuse

8   or cause me to say, no, they should not receive the death

9   penalty.

10      Q.   And really in the law there's nothing that can be

11  automatic about any of this.  It has to be based on the

12  totality of the evidence.

13           I -- I see here that you said your father was an

14  alcoholic.

15      A.   Correct.

16      Q.   And then you also tell us that when we asked you who

17  most influenced you in your life, you -- you said your father

18  did.

19      A.   Yes.  He was one of them, yes.  What page is that

20  on?  Is that page 16?  Yeah.

21      Q.   Page 16, Question 123.  You said, your father taught

22  you ethics, to do the right thing always, stand up to help

23  others, love God, love family, and was kind to all.  Was your

24  -- was your father ever violent as it related to alcohol?

25      A.   Sometimes.

```
 1        Q.    Do you believe that that -- I mean, obviously, that

 2   has an effect on you.  I say, obviously.  I would assume so.

 3   Anything about that cause you any concerns being fair both to

 4   the State and the Defense based on your experience with someone

 5   who was an alcoholic?

 6        A.    No.

 7        Q.    In the end, the question is going to be whether you

 8   as a juror, if you're asked to serve, could base your verdict

 9   on only the evidence and nothing else, other than the evidence

10   and the law.

11        A.    Yes.  That's my view of what a juror should do is

12   not bring in their own personal history or baggage.  You're

13   here to consider the evidence and a man's life is in question,

14   and you have to do your due diligence and not be bringing your

15   own stuff, if you will.

16        Q.    Do you think that the State has the right to a fair

17   trial, as well?

18        A.    Of course.

19        Q.    And the -- obviously, the victims' families have

20   a --

21        A.    I do.

22        Q.    -- right.  Okay.

23        A.    I do.  But also, in our country a person is innocent

24   until proven guilty.

25        Q.    Absolutely.
```

1      A.    So that's absolutely something I think, which I'm

2  glad I live in a country that's like that, as opposed to

3  another place.

4      Q.    Absolutely.  That's one of the things that makes

5  this country great.

6      A.    Yeah.

7      Q.    Special Issue Number 2, we've had jurors tell us --

8  and I don't know if you feel this way.  That's why I'm going to

9  ask you.  That there will always be something in their mind

10  that is sufficiently mitigating to warrant a life sentence.  I

11  mean, frankly just the fact that someone is a living, breathing

12  human being who has potential to someday rehabilitate will be

13  enough for me to answer Special Issue Number 2 yes always.  How

14  do you feel about that?

15      A.    I think that when people have preconceived notions

16  of kind of the phraseology always or never, if they come into a

17  jury or into a proceeding like this, I think that that is not

18  an item to be open enough to the proceedings of the court.  And

19  so I find that would be a hindrance to doing a real due

20  diligence and giving a more fair verdict or decision.

21      Q.    And you're exactly right.  And that's what we're

22  looking for is people who are open-minded, but as I told you

23  during the very beginning of this process, we're not going to

24  make -- the State of Texas is not going to force any of its

25  citizens to serve on a death penalty case, a case where the

1  death penalty may be the result if it's going to cause them

2  emotional distress or, you know, bother their conscience down

3  the road.  And we know not everybody can do it.  You're Juror

4  Number 1331, that -- we're nine weeks into this process.  So

5  clearly, if everybody could do it, we wouldn't be nine weeks

6  into the process.  So that's why I asked.  Because a lot of

7  people just can't.

8      A.    Sure.  May I ask you a question?

9      Q.    Absolutely.

10     A.    In terms of like the punishment phase of the trial,

11  is it similar in that with the first phase that it's 12 to 0 in

12  the second phase?

13     Q.    In order to find somebody guilty, it has to be

14  unanimous.

15     A.    Right.

16     Q.    And for Special Issue Number 1 to be answered yes,

17  it has to be unanimous.  All 12 have to agree I proved it.  And

18  for Special Issue Number 2, the answer must be unanimously no

19  for the death sentence to result.  All 12 jurors have to agree

20  that the person is a future danger in Special Issue 1, and in

21  Special Issue Number 2, all 12 have to agree unanimously that

22  there isn't anything sufficiently mitigating to warrant a life

23  sentence.  The answer yes to 1 and no to 2 would leave the

24  Judge with no option but to basically sign a death warrant for

25  the Defendant.  The Judge doesn't get to second-guess the jury

```
 1  or say, well, I heard it differently, so I'm changing that.
 2  They said life, but I think death, or they said death, and I
 3  think life.  And a jury is never going to be asked to check a
 4  life box or a death box.  It's their answers to these that
 5  leave -- that lead the Judge to the sentence.
 6                One last thing I want to talk to you about is
 7  Question Number 10 on page 2, and we've talked about the fact
 8  that the allegation in this case is an intentional murder
 9  committed during the course of committing or attempting to
10  commit the offense of robbery.  You told us in Question Number
11  10 that you weren't sure if that was the -- if that should be a
12  capital offense for which the death penalty may be imposed.
13  You didn't know if you agreed.
14       A.   I was a little confused as to whether in the
15  committal of the alleged crime, the person who was killed,
16  whether it was intentional or whether it was an accident.  I
17  didn't -- as I said, coming into a room of 500 people and
18  filling this out and not being a lawyer and all that kind of
19  stuff, didn't quite understand a lot of these questions.  But
20  so what you're saying is that the Defendant here intentionally,
21  you're alleging, killed someone in the committing of the
22  robbery?
23       Q.   That is the allegation.  An intentional murder
24  during the course of a robbery.
25       A.   Okay.  Then I -- if that's the law, and I could sit
```

1   on a jury to, you know, determine -- I thought -- I think I

2   thought earlier that maybe whether or not the person had been

3   killed was an accident or not, but if it is intentional, as it

4   says here, which I understand now a little more clearly,

5   then -- then, yes, I could agree with the law and sit on the

6   trial to determine guilt or innocence and then the punishment

7   phase.

8        Q.    And so I guess now if we asked, do you agree with

9   the law, you would say yes?  Or are you saying I -- or are you

10  saying don't agree with it, but I could do it anyway?

11       A.    If that is the law as it states, the intentional

12  causing of death of an individual, murder, in the course of

13  committing or attempting to commit the offense of robbery, I'm

14  not sure I understand.  Do I agree that that's the law, or do I

15  agree with the law?

16       Q.    Do you agree with the law is the question that we

17  proposed to you on 10?

18       A.    Yes.

19       Q.    Okay.  I'm going to -- I'm going to put you on this

20  hypothetical jury.  And obviously, you know we're seeking the

21  death penalty in this case, and we believe we have the evidence

22  that will cause the jury, following their oath, to find the

23  Defendant, Matthew Lee Johnson, guilty of capital murder.  He

24  puts on his pants the same way you and I do every day, one leg

25  at a time.  He's got family that cares about him just like

```
 1   everybody else in this room.  So we're not talking about a

 2   fictional person.  We believe that we have the evidence that

 3   will convince a jury, again, following their oaths, to answer

 4   Special Issue Number 1 yes and to answer Special Issue Number 2

 5   no, that there isn't anything in the evidence sufficiently

 6   mitigating to warrant a life sentence.  You now know that those

 7   answers result in a death sentence, and that some day Matthew

 8   Johnson will be taken to Huntsville and will receive lethal

 9   injection as a result of the jury's answers to those.

10            You'll be sitting at home one day in all

11   likelihood and watching the news and see that today's the day

12   that Matthew Lee Johnson is to be executed and you'll know, if

13   you serve on this jury, that you played a part in that because

14   you know the verdict has to be unanimous for that result to

15   occur.  I don't tell you any of that to be morbid or gruesome

16   or to jump the gun.  Obviously, we haven't started the trial.

17   But I tell you that to put you in that spot and ask you whether

18   you can participate in that process and not do any harm to your

19   personal, religious, moral beliefs or your conscience?

20        A.   I'm not sure if I understand the question.  Could I

21   do that?

22        Q.   Yes, without -- without doing harm to your

23   conscience?

24        A.   Yes.

25            MS. MOSELEY:  I think that's all I have.  Thank
```

```
  1   you.

  2                   THE COURT:  Thank you.

  3                   THE WITNESS:  Thank you.

  4                   COURT REPORTER:  Just one second.  I'm so sorry.

  5                   VENIREPERSON:  Can I ask a question?

  6                   THE COURT:  Yes, sir.

  7                   VENIREPERSON:  When this is over, do I keep this

  8   or turn it back in?

  9                   THE COURT:  The questionnaire remains with us?

 10                   MS. BERNHARD:  It does.

 11                   VENIREPERSON:  Okay.

 12                   DEFENSE VOIR DIRE EXAMINATION

 13   BY MS. BERNHARD:

 14        Q.   Is it Mr. --

 15                   MS. BERNHARD:  Are you ready?

 16                   COURT REPORTER:  Uh-huh.

 17        Q.   (BY MS. BERNHARD)  Is it Mr. McComas or Father

 18   McComas, or how do you like to be addressed?

 19        A.   Either way, it doesn't matter.

 20        Q.   Okay.  As the Judge told you, my name is Catherine

 21   Bernhard.  I know we've already spent a significant amount of

 22   time going over the law, and I think you've demonstrated a

 23   better understanding of -- of the process and -- and how it

 24   applies in a capital murder situation.  Would you agree?

 25        A.   Yes.
```

```
 1        Q.    So I'm not going to spend a lot of time going over

 2   all of that.  I would like to ask you if you know anyone in

 3   either the Dallas Police Department or the Garland Police

 4   Department?

 5        A.    No.

 6        Q.    How about in the Dallas Fire Department or the

 7   Garland Fire Department?

 8        A.    No.

 9        Q.    How about someone who works in the Dallas Sheriff's

10   Office?

11        A.    No.

12        Q.    The Texas prison system?

13        A.    No.  No, ma'am.

14        Q.    I'm going to read a list of names to you, and if any

15   of these happen to sound familiar, just stop me, and we'll

16   figure out if it's the same.  Scott Harris, Elizabeth Harris,

17   Chris Harris, Kenneth Marecle, Amy Marecle, Michael Frank, Anna

18   Lunceford, Jim Medley, Lawrence Denson, Jonas Lucht, Greg

19   Mansell, Carina Pinzon, Digna Salmeron, Kelly Keeton, Daphne

20   Johnson, Sherry Ann Clark, Amy Armstrong, Anthony Johnson, Alma

21   Johnson, Courtney Johnson, David Williams, Danny Mullins, David

22   Contente, Gioconda Verdaguer, Donald Dunlap, Johnny Wright,

23   Monica Cajas, Michael Crosby, Roxanne Luttrell, Robbie Denmark,

24   Quinlen Minor, Margaret Tatum, Jim Bertucci, John Harris,

25   Timothy Proctor, Carlton Jenkins, Durian Allen, Gene Gathright,
```

```
 1   Manuel Turner, Andre Howard, Kenneth Lewis, or Sheldon Henry.

 2        A.    None of those sound familiar.

 3        Q.    None of them do?

 4        A.    No.   There's a Ken Lewis that used to be the CEO of

 5   the Bank of America, but I don't know if that's the same person

 6   or not.

 7        Q.    I don't think so.  Do you have any questions of us

 8   about the process?

 9        A.    Not at this moment.

10        Q.    Okay.   Then I think that's all I have for now.

11             THE COURT:  Can we take a brief recess, please.

12             (Venireperson excused from courtroom.)

13             THE COURT:  All right.  Venireperson 1331A, Scot

14   McComas.  What says the State?

15             MS. MOSELEY:  We have no legal challenge.

16             THE COURT:  Defense?

17             MS. BERNHARD:  No challenge.

18             THE COURT:  All right.  When we bring the juror

19   in, do I instruct him that he will be -- a photograph will be

20   taken and that we'll notify him on the 15th?

21             MS. BERNHARD:  And to still maintain the

22   instructions, don't Google, don't --

23             THE BAILIFF:  Would you step back in.

24             (Venireperson returned to courtroom.)

25             THE COURT:  Mr. McComas, you have been qualified
```

```
 1   as a potential juror in this case.

 2                    (Venireperson 1331A, Scot McComas, qualified.)

 3                    THE COURT:  And so I'm going to ask you to step

 4   back out into the hall.  The bailiff will take your photograph,

 5   just so the lawyers can keep track of your questionnaire with

 6   who you are.  And then if you will remember the admonishments

 7   that you have been given and operate under those from now until

 8   October 15th when we will be notifying you if you are, in fact,

 9   a member of the jury.

10                    VENIREPERSON:  Okay.

11                    THE COURT:  Do you have any questions of us?

12                    VENIREPERSON:  I do have a question.  May I sit

13   down?

14                    THE COURT:  Certainly.

15                    VENIREPERSON:  If the -- if I am called for the

16   trial, is this a case where the jury would normally be

17   sequestered?

18                    THE COURT:  I don't anticipate that.

19                    MS. MOSELEY:  Your Honor, it's -- it's a

20   possibility.  We've been warning the jurors it's a possibility

21   during their deliberations that they could be sequestered.

22   It's not like California where it will be two months of staying

23   in a hotel --

24                    VENIREPERSON:  Okay.

25                    MS. MOSELEY:  But it is possible during the
```

```
 1  deliberations that the jurors could be sequestered.

 2              VENIREPERSON:  Okay.  That's fine either way.

 3              THE COURT:  All right.

 4              VENIREPERSON:  Thank you.

 5              THE COURT:  Thank you very much.

 6              (Venireperson excused from courtroom.)

 7              THE COURT:  Scot McComas, 1331A, is now Juror

 8  Number 46.

 9              COURT REPORTER:  Are we off the record now,

10  Judge?

11              THE COURT:  Yes.

12              (Recess of proceedings.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    Reporter's Certificate

 2  THE STATE OF TEXAS:

 3  COUNTY OF DALLAS:

 4       I, Darline King LaBar, Official Court Reporter in and for

 5  the 363rd District Court of Dallas County, State of Texas, do

 6  hereby certify that the above and foregoing volume constitutes

 7  a true, complete and correct transcription of all portions of

 8  evidence and other proceedings requested in writing by counsel

 9  for the parties to be included in the Reporter's Record, in the

10  above-styled and numbered cause, all of which occurred in open

11  court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if any,

14  admitted by the respective parties.

15       WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16  on the 23rd day of February, A.D., 2014.

17

18

19
                         \s\Darline LaBar
20                       DARLINE KING LABAR
                         Official Court Reporter
21                       363rd Judicial District Court
                         Dallas County, Texas
22                       hpdkfaith@msn.com
                         (214) 653-5893
23

24
    Certificate No:  1064
25  Expiration Date:  12/31/2014
```

Darline King LaBar, Official Reporter