```
 1                    REPORTER'S RECORD

 2                 VOLUME 38 OF 57 VOLUMES

 3            TRIAL COURT CAUSE NO. F12-23749-W

 4         COURT OF CRIMINAL APPEALS NUMBER:  AP-77,030

 5   THE STATE OF TEXAS          :           IN THE 363RD JUDICIAL

 6   VS.                         :           DISTRICT COURT OF

 7   MATTHEW LEE JOHNSON         :           DALLAS COUNTY, TEXAS

 8

 9

10                    INDIVIDUAL VOIR DIRE

11

12

13

14

15                    ***********

16

17

18

19

20        On the 18th day of September, 2013, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable Tracy Holmes, Judge

23   Presiding, held in Dallas, Dallas County, Texas:

24        Proceedings reported by machine shorthand computer

25   assisted transcription.
```

```
 1  A P P E A R A N C E S:

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
            Crowley Criminal Courts Building
 3          133 North Riverfront Boulevard
            Dallas, Dallas County, Texas 75207
 4          Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
          MS. ELAINE EVANS, A.D.A., SBOT # 24032880
 6        MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724

 7              FOR THE STATE OF TEXAS;

 8

 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
            P.O. Box 2817
11          Red Oak, Texas 75154
            Phone:  972-617-5548

12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13          325 North St. Paul Street, Suite 2475
            Dallas, Texas 75201
14          Phone:  214-922-0212

15  MS. NANCY MULDER, Attorney at Law, SBOT # 00792971
            2214 Main Street
16          Dallas, Texas 75201
            Phone:  214-764-7246

17
                FOR THE DEFENDANT.
18

19

20

21

22

23

24

25
```

1                     **INDEX VOLUME 38**

2 September 18th, 2013                             PAGE  VOL.

3 INDIVIDUAL VOIR DIRE:

4 Proceedings.........................................  4    38

5 Venireperson challenged by the State............... 184    38

| 6 PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| 7 CHRISTINA SALAZAR | 6 | 36 | 38 |

8 Venireperson 1365A, Christina Salazar, qualified..... 63    38

| 9 PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| 10 SHONQUIDRIA JENKINS | 66 | 105 | 38 |

11 Venireperson 1368A, Shonquidria Jenkins, qualified.. 124    38

12 Venireperson 1372A, Jimmy Roberts, excused.......... 124    38

| 13 PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| 14 WANDA BENJAMIN | 128 | 166 | 38 |

15 Challenge denied.................................... 184    38

16 Venireperson 1369A, Wanda Benjamin, qualified....... 184    38

17 Reporter's Certificate.............................. 186    38

18

19                     **ALPHABETICAL INDEX**

| 20 PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| 21 WANDA BENJAMIN | 128 | 166 | 38 |
| 22 SHONQUIDRIA JENKINS | 66 | 105 | 38 |
| 23 CHRISTINA SALAZAR | 6 | 36 | 38 |

24

25

```
 1                        P R O C E E D I N G S

 2                 THE BAILIFF:  All rise.

 3                 (Venireperson brought into courtroom.)

 4                 THE COURT:  Good morning, Ms. Salazar.

 5                 VENIREPERSON:  Good morning.

 6                 THE COURT:  How are you?

 7                 VENIREPERSON:  Good.  How are you?

 8                 THE COURT:  Ms. Salazar -- oh, please be seated,

 9     everyone.

10                 Do you remember being downstairs in the Central

11     Jury Room of this building in June and me swearing you in?

12                 VENIREPERSON:  Yes.

13                 THE COURT:  All right.  Well, you're still

14     operating under that oath, and you will be until you're

15     discharged from service.

16                 VENIREPERSON:  Okay.

17                 THE COURT:  We're going to try this case in

18     October -- October the 28th -- the week of October the 28th

19     through November the 8th.  That's two weeks.  Has anything

20     happened between June and now that would prevent you from

21     sitting during those two weeks this fall?

22                 VENIREPERSON:  No.

23                 THE COURT:  All right.  Have you had any

24     exposure to any of the facts of this case, or do you know

25     anything about it?
```

```
 1                    VENIREPERSON:  No.

 2                    THE COURT:  Thank you very much.  I'm going to

 3   introduce everyone to you.  I'm Tracy Holmes.  I'm the

 4   presiding Judge, and I'll sitting for the trial.

 5                    Sitting between us is Darline LaBar.  She's the

 6   official court reporter, and she's taking down everything

 7   that's being said.  As a courtesy to her, I'd appreciate it if

 8   you answer out audibly yes or no.  She can't really take down

 9   nods and shakes of the head or uh-huh or huh-uh.  So if you'll

10   remember to do that, and the lawyers will help you with that.

11                    Sitting at the State's table is Andrea Moseley.

12                    MS. MOSELEY:  Good morning.

13                    THE COURT:  And Elaine Evans.

14                    MS. EVANS:  Good morning.

15                    VENIREPERSON:  Good morning.

16                    THE COURT:  And at the Defense table is Kenneth

17   Weatherspoon.

18                    MR. WEATHERSPOON:  Good morning.

19                    VENIREPERSON:  Good morning.

20                    THE COURT:  Catherine Bernhard.

21                    MS. BERNHARD:  Good morning.

22                    VENIREPERSON:  Good morning.

23                    THE COURT:  And Nancy Mulder.

24                    MS. MULDER:  Good morning.

25                    VENIREPERSON:  Good morning.
```

```
 1                    THE COURT:  And the gentleman to the far left is
 2   the citizen accused, that's Mr. Matthew Lee Johnson.
 3                    THE DEFENDANT:  Good morning.
 4                    VENIREPERSON:  Good morning.
 5                    THE COURT:  The lawyers are going to get 45
 6   minutes to talk to you -- each side has 45 minutes, and at that
 7   point we will determine whether you've been qualified as a
 8   potential juror.  And if that's the case, then we'll be calling
 9   you on October the 15th to tell you whether you are, in fact, a
10   juror in this case or not.  Is that enough time for you to get
11   your affairs in order?
12                    VENIREPERSON:  Yes.
13                    THE COURT:  All right.  You've had a chance to
14   review the pamphlet and the questionnaire.
15                    VENIREPERSON:  Yes, ma'am.
16                    THE COURT:  Thank you very much.
17                    Please proceed.
18                    MS. MOSELEY:  Thank you, Judge.
19                        CHRISTINA SALAZAR,
20   was called as a venireperson by the parties, and after having
21   been first duly sworn, testified as follows:
22                    STATE VOIR DIRE EXAMINATION
23   BY MS. MOSELEY:
24       Q.   First, let me start by telling you -- I -- I see
25   you're nervous this morning.  And I -- I -- and everybody is.
```

1   Understand there's not going to be any right or wrong answers

2   today.  I know it's easy for me to say, don't be nervous, but

3   really today is just about exploring some of the things you put

4   in your questionnaire.  It gives us an opportunity to explain

5   the law to you, but most importantly, this is your opportunity

6   to tell us if there's any reason that you feel you cannot sit

7   as a juror in a case where the death penalty is a potential

8   outcome, or any other reason you feel like you couldn't be fair

9   and impartial and give both sides, the State and the Defense, a

10  fair trial in this case.

11          The law recognizes that death penalty cases

12  aren't really the types of cases that all citizens could sit on

13  and be a fair juror.  We know we've got people that come down

14  here who say, you know what, if you show me that someone

15  intentionally killed another person, not in self-defense, not a

16  mistake, not an accident, then I'm always going to always say

17  that the death penalty is the outcome.  I'm going to do

18  whatever it takes to get to the death penalty.  Those people

19  obviously are not going to be able to be fair to the Defendant

20  because they have such strong feelings about the death penalty

21  in favor of it.

22          We also have jurors that come down and tell us

23  that because of personal issues in their background or their

24  religious beliefs or their moral beliefs, they could never

25  return a verdict that resulted in someone's execution because

1  they just flat don't believe in the death penalty, don't think

2  we should have it, and could never do that.  Obviously, those

3  jurors aren't qualified because they wouldn't be able to give

4  the State a fair trial.  Does that make sense?

5        A.    Yes.

6        Q.    So what we're really looking for is jurors to come

7  in like yourself and just be honest with us about how you feel.

8  You're the only one who knows whether you can participate in

9  this process without doing harm to your conscience.  And the

10 State's never going to put anybody or force anybody to serve on

11 a jury if the result of their service would hurt their

12 conscience going forward.  So -- so we recognize that, and

13 that's -- this is the only kind of case that jurors get an

14 opportunity or prospective jurors get an opportunity to come

15 down and spend an hour and a half of good quality time with us.

16 So that's kind of the process.  I know it's nerve racking

17 sitting in that chair and everybody looking at you, but it's

18 not a pop quiz.  It's not a test.  And nobody is going to say

19 she's a good citizen or she's not a good citizen based on this

20 process.  So the only obligation you have today is to tell us

21 the truth about how you feel.

22              And just so you understand where we're at in the

23 process, the Judge told you we're trying to qualify jurors to

24 sit on the case.  And the decision has been made by my boss,

25 Craig Watkins, to seek the death penalty in this case.  So

```
 1  we're not still talking about it or thinking or contemplating.
 2  That decision has been made, and I tell you that because
 3  sometimes it's easy to sit at home and you've told us, you
 4  know, if it's found the Defendant's guilty and a crime against
 5  a child or an elderly person, especially the punishment should
 6  fit the crime.  And it's easy for us to feel that way when
 7  we're talking in the abstract and sitting at home.  We see news
 8  stories, and we go, that guy deserves it or, that guy doesn't.
 9  But I want to make sure you understand that what we're talking
10  about is not that guy you see on TV.  It's the man sitting down
11  at the end of this table, Matthew Johnson.  And he has a family
12  that cares about him like you and I do.  He puts his pants on
13  one leg at a time every day just like you and I do.  And we
14  believe -- the State of Texas believes that we have the
15  evidence that will convince a jury, following their oaths, to
16  find him guilty of capital murder.
17              We also believe that we have the kind of
18  evidence, the quality and quantity of evidence, that will
19  convince a jury that he is more likely than not going to be a
20  continuing threat to society.  We also believe that after
21  hearing all of the evidence, the jury will answer Special Issue
22  Number 2 no, that there isn't anything in the evidence that
23  would support a life sentence over a death sentence.  And that
24  the result of that evidence and the result of the jurors'
25  answers in that would be that Matthew Lee Johnson one day would
```

     1  receive lethal injection.

     2                 The Judge is bound by the jury's answers, and

     3  that some day you may be sitting at home with your family

     4  watching the news and see -- come across the 6 o'clock news

     5  that today is the day Matthew Lee Johnson is going to be

     6  executed.  And if you're on this jury, you will know that you

     7  played a part in that result, that but for your answers, that

     8  wouldn't be happening.  And I don't tell you that to be morbid

     9  or gruesome or to make you nervous, but I want you to recognize

    10  that what we're talking about is a very real process.  And I

    11  tell you that to ask you whether feel like you could

    12  participate in that process, knowing that his execution may be

    13  the result.  Do you believe you could participate in that

    14  process without harming your conscience?

    15        A.    I believe so.

    16        Q.    And base your verdict on the evidence that you hear

    17  in the case?

    18        A.    Yes.

    19        Q.    One of the things that I noticed in your

    20  questionnaire is that you told us that you -- you are Catholic.

    21        A.    Yes.

    22        Q.    And I know from talking to prospective jurors, that

    23  the Catholic church may have a position.  Do you know if they

    24  have a position on the death penalty, one way or the other?

    25        A.    I do not.

1          Q.    Okay.  Some people who are Catholic tell us they

2    can't participate, and others say they can.  You're telling me

3    that if the evidence leads you down that path, you could -- you

4    could assess a death sentence?

5          A.    Yes.

6          Q.    Okay.  And you'll have to keep your voice up.

7          A.    I'm sorry.

8          Q.    I can already see Darline leaning in.

9               Then I want to talk to you about a couple of

10   things in your questionnaire before we start explaining the

11   process to you.  On page 2, Question Number 4, we asked you if

12   you had any moral, religious, or personal beliefs that prevent

13   you from sitting in judgement of another human being.  And

14   really, what we're getting at there is some jurors tell us they

15   can't sit on a criminal jury because they would feel like they

16   were judging someone and that that's not in their nature to do.

17   You said:  Every human being should have some beliefs which

18   would prevent them from judging another, but you feel it's your

19   duty as a citizens to serve on a jury.  Tell me -- tell me

20   where you're coming from there.

21         A.    Well, I just think as a U.S. citizen, that's our

22   duty.  If not, then everybody would just go crazy on judgement

23   and just start hanging everyone.  It's our duty to make sure

24   it's -- I mean, we have court systems and the -- and rules for

25   a reason, and it's -- in order -- and to be part of -- be a

 1  U.S. citizen, that's part of our duty.  I just -- I just have a
 2  lot of family who's not -- who aren't U.S. citizens.  And when
 3  they become one, it's such a pride to them, so we don't take
 4  that lightly in my family.
 5      Q.    Okay.  So despite your reservations about sitting in
 6  judgement, you would be able to listen to the evidence in a
 7  case and if the evidence led you to a guilty verdict, you
 8  could -- you could -- you hate to sit in judgement.  You're
 9  basically just following the evidence and the law where it
10  leads you.
11      A.    Right.  I mean, if I was in that situation, I would
12  want to be -- not that I'm in any means perfect, but I would
13  want somebody like me to -- to -- if I was in that situation,
14  to -- to have an open mind and to listen to everything.
15      Q.    If you're a victim or the Defendant?
16      A.    Right.  Correct.
17      Q.    Because you recognize that the State also is
18  entitled to a fair trial --
19      A.    Correct.
20      Q.    -- and 12 jurors.
21            On page 3, Question Number 13, we kind of talk
22  to you about circumstantial evidence, and I want to make sure
23  that you understand where we're going there.  The law doesn't
24  tell the State what kind of evidence we have to have to get a
25  jury to convict someone.  It doesn't say you have to have at

 1  least two eyewitnesses.  It doesn't say you have to have two

 2  eyewitnesses and DNA.  It really is left up to the jury to

 3  decide what evidence convinces them beyond a reasonable doubt.

 4  And the law is -- even in a capital murder case, if one single

 5  witness took the witness stand and the jury believed that

 6  witness was telling the truth and believed they were correct

 7  and believed that that one witness convinced them beyond a

 8  reasonable doubt of the Defendant's guilt, they would have to

 9  return a verdict of guilty.

10            The same is true if there is no eyewitness.  If

11  all we have is -- and we call it circumstantial evidence.  That

12  kind of has a bad connotation.  People think, oh, that's a weak

13  case, it's just circumstantial.  And I'll tell you whether it's

14  DNA -- DNA is circumstantial evidence, fingerprints, you know,

15  anything other than eyewitness testimony is circumstantial.  So

16  if all we had was circumstantial evidence and no eyewitnesses,

17  the jury's responsibility would be the same, to look at the

18  evidence and decide if it convinced them of the Defendant's

19  guilt beyond a reasonable doubt.

20       A.   Okay.

21       Q.   So whatever evidence is brought to the jury, if

22  they're convinced beyond a reasonable doubt, the verdict is

23  guilty.  And if they're not -- even if there's 42 eyewitnesses,

24  and DNA and fingerprints, if that doesn't convince them beyond

25  a reasonable doubt, the verdict would be not guilty.

```
 1        A.    (Nods head up and down.)

 2        Q.    Could -- could you follow that law and not require

 3   any specific type of evidence before you could convict?

 4        A.    Yes, ma'am.

 5        Q.    Okay.  Okay.  You said no here, and I -- the -- I

 6   think the question --

 7        A.    Yeah, I didn't understand that question.  I was

 8   rereading it, I'm like, yeah, that didn't make sense.

 9        Q.    I think it's just worded poorly.  So that doesn't

10   cause you any concern now, having had it explained?

11        A.    No.

12        Q.    You said that -- on Question 7 that you believe

13   serving a lifetime in prison is more severe than a death

14   penalty.  Tell me why.  Where are you coming from?

15        A.    That's my opinion.  I wouldn't want to be somewhere

16   for a long period of time and I can't go anywhere else.  I

17   can't even do a Carnival cruise ship, so, no, I can't do that.

18        Q.    That's just for you personally?

19        A.    That's just my opinion, my -- yes.

20        Q.    Okay.  For you personally a life sentence --

21        A.    Correct.

22        Q.    On page 5, Question Number 30, we asked you about

23   the first thing that comes to your mind when you think about

24   police officers.  You said tickets.  Very common.  For

25   prosecutors, you said, I should have gone to law school.
```

1  What --

2      A.   I -- I was -- when I would -- you know, when I was

3  growing up and even into college, I was indecisive, so I went

4  to accounting.  It's thrilling.

5      Q.   You feel like that was something, like a

6  prosecutor -- you thought you might be interested in doing?

7      A.   Yeah, when I -- yeah, when I was -- so that's just

8  always what I think of.

9      Q.   Okay.  And billboards, I guess, because they're --

10  they have the signs that say tickets, call me or --

11      A.   Yeah.

12      Q.   I want to talk a little bit about your sister's drug

13  addiction -- your younger sister, right?

14      A.   Yes.

15      Q.   Is she still addicted to drugs now, or is she

16  struggling with it?  Where is she?

17      A.   I believe she's off drugs.  I haven't talked to her

18  in -- I mean, we'll go six months without talking to each other

19  and then whenever she needs anything, she'll call me.  But from

20  what I hear, she's off drugs and just drinking, so --

21      Q.   Okay.  So obviously, it has caused a -- I don't want

22  to say a rift, but some difficulties in your relationship with

23  your sister?

24      A.   Not -- not -- I wouldn't say difficulties.  I mean,

25  with my -- seeing what my mother goes through, yes, but --

1  because that -- you know, that's her daughter.  With me, it's

2  easier for me to separate because I just don't have tolerance

3  for -- you know, after so many times of helping someone, you

4  just have to step back and just separate yourself from the

5  situation.  And that's what I've done.  And she knows that.

6  And the only time she does call me is -- she knows -- she's --

7  even if she were to ask, I -- she knows I will not give her

8  anything, because I don't know where that money is going or

9  I -- you know, if she's hungry, I'll buy her food, but I won't

10 give her money.  And so she knows that and so -- which is why

11 we -- she -- we rarely talk.

12      Q.    Okay.  On page 10, we asked some questions related

13 to drug and alcohol abuse and addiction and intoxication.  And

14 I want to explain kind of where the law is coming from on this

15 issue.  We know that drugs and alcohol are a big problem in our

16 community, and frankly, across the country.  And we know that

17 people's lives are affected by it, whether personally or like

18 you through a family member.  So we take the time to delve into

19 that.

20            On Question Number 64, that's the first thing I

21 want to explain.  I under -- I guess you didn't understand what

22 we were saying.  The law says that if you go out and get

23 yourself high on drugs or intoxicated with alcohol voluntarily,

24 meaning you made the choice to drink or made the choice to use

25 the drugs, that that is not going to be a defense to the

1  commission of a crime.  So if you get high or drunk and you go

2  commit a crime, you can't come into court and say, well, I was

3  high, I was drunk, I didn't know what I was doing, therefore,

4  I'm not guilty.  Does that make sense?

5       A.    Yes.

6       Q.    Do you agree that that should be the law?

7       A.    Yes.

8       Q.    And Question 65, we told you that -- that evidence

9  of intoxication, I was drunk or I was high during the crime,

10  may be considered in the punishment phase of the trial.  So

11  while it's not a defense to the crime, you're still guilty, you

12  would be found guilty.  In the punishment phase, the jury may

13  be able to consider that evidence and decide are we looking at

14  a minimum kind of punishment or a maximum kind of punishment.

15  And in a case where it's a capital murder, where the State is

16  seeking the death penalty, they may be able to consider that as

17  it relates to Special Issue Number 1 or Special Issue Number 2.

18            Nobody is going to tell a juror or a jury that

19  evidence of intoxication is something that should lessen

20  responsibility.  Some jurors tell us that, if I hear that a

21  person was intoxicated at the time they committed a crime, I

22  will think they're less responsible for the crime.  Others will

23  tell us, I think they're more responsible because now they've

24  made two bad decisions.  They made the decision to get high,

25  and they made the decision to commit the crime.  So every juror

 1  would maybe look at it differently, but the law says that if

 2  it's in the evidence, the jury would have to consider the --

 3  the evidence and then decide what, if anything, it means to

 4  them in terms of the proper punishment.  Does that make sense?

 5       A.   Yes, ma'am.

 6       Q.   So that's what we're talking about in Question 65,

 7  and the question I have for you now that we've explained it is

 8  would you consider the evidence, if it was in evidence, and

 9  then decide how it -- how it weighed in your judgement?

10       A.   Yes, ma'am.

11       Q.   Okay.  In other words, your mind isn't closed off to

12  the -- to the evidence?

13       A.   No, ma'am.

14       Q.   Okay.  And in Question Number 66, following up on

15  that, we -- we asked:  Would a person's use of drugs or alcohol

16  at the time of the offense automatically prevent from you

17  assessing the death penalty if you found him guilty of capital

18  murder?  You said:  Yes, drugs and alcohol affect the mind and

19  decisions.

20            Let me first explain to you what the law is

21  about that.  As -- and we'll get more into the details of the

22  process.  But anytime you hear the word "automatically," it

23  should raise a red flag in your mind because this is very much

24  a process.  And what the law is going to set out in a capital

25  murder case is that everything has to be weighed.  Everything

1  has to be considered and then weighed.  But we do have jurors

2  that tell us because of their background, that if I hear

3  somebody was intoxicated at the time they committed a capital

4  murder, I'm never going to assess the death penalty, in any

5  case.  It doesn't matter what other evidence there is, that's

6  something that is automatically going to cause me to assess a

7  life sentence.

8             That -- and that would not be the proper answer

9  under the law, but it would be the proper answer if it was the

10  truth about how you felt.  Does that make sense?

11        A.    Yes, ma'am.

12        Q.    So I've explained to you that under the law, you

13  can't automatically go one way or the other if you're a juror.

14  How do you feel about that?

15        A.    Well, I think that with having my sister involved --

16  or in my -- you know, with her experiences and her past,

17  everything has a consequence, so -- and I guess I have the same

18  as I do with her.  If you -- whether or not you're on drugs or

19  alcohol or whatever you're doing out there and you do

20  something, there's a consequence.

21        Q.    Uh-huh.

22        A.    And every -- you have to answer to those

23  consequences.

24        Q.    Okay.

25        A.    So --

```
 1          Q.    So I guess what I'm hearing -- and correct me if I'm
 2   wrong -- that's not -- evidence of intoxication at the time of
 3   the crime isn't something that would cause you automatically --
 4          A.    No.
 5          Q.    -- to answer life or answer death?
 6          A.    No, ma'am.  No.
 7          Q.    Okay.  You'd just consider everything and weigh it?
 8          A.    Most definitely.
 9          Q.    Okay.  Because you told us in the questionnaire you
10   would automatically go for life, not death?
11          A.    Right.  And I don't know if I understood that
12   question, along with the other two up top.  I apologize.
13          Q.    Okay.  And that's why -- that's why we talk to you.
14   That's why we don't just put people on the jury on the
15   questionnaire because we know it's confusing.
16               Then let's talk some about the process.  In any
17   criminal case -- you talked about, you know, your duty as a
18   U.S. citizen, and there are principles of law that you're
19   familiar with, I'm sure, that apply in any criminal case.  A
20   person is presumed innocent of the crime until the State and
21   unless the State can prove their guilt beyond a reasonable
22   doubt.  That means as the Defendant sits in the courtroom
23   today, even accused of capital murder, and even though you know
24   the State has said they're seeking the death penalty, he is
25   presumed to be innocent, because I haven't provided any
```

1    evidence.  Do you agree with that?

2          A.    I do.

3          Q.    The burden of proof is on the State of Texas.  That

4    table over there, the Defense table, his lawyers, never have to

5    do anything at all.  My job is to prove somebody guilty.  They

6    don't have to prove he's innocent.  And in the punishment phase

7    after the jury has decided he's guilty, they don't have to

8    prove that the life sentence is the proper sentence.  I have to

9    prove that the death sentence is the proper sentence.  So you

10   always look to the prosecution -- to the State of Texas to

11   bring the evidence.  They don't have to ask any questions.

12   They don't have to put on any witnesses.  They don't have to

13   make a closing argument.  They don't have to make an opening

14   statement.  They don't even have to talk to you today if they

15   don't want to.  It's always my job because I've brought the

16   charges, I have to prove it.  Does that make sense?

17         A.    Yes, ma'am.

18         Q.    Do you think that's the way it should be?

19         A.    If that's part of the law, yes.  Yes, ma'am.

20         Q.    Along with that is the Defendant's Fifth Amendment

21   privilege which is that he doesn't ever have to testify.  I

22   can't call him to the stand.  His own mamma can't say, you know

23   what, you need to get up there and tell your story.  It is

24   always going to be the Defendant's decision and his decision

25   alone.  He may get help from his attorneys to make the

```
 1  decision, but even if his lawyers say, you need to testify, it
 2  is his decision whether he does or doesn't.
 3                And the jury would be instructed in any case
 4  where the Defendant chose not to testify, that they can't
 5  consider it for any reason at all.  The jury would be
 6  instructed to look to the evidence they did hear and not
 7  consider whether the Defendant did or didn't testify.  You
 8  can't say, well, you know, if I was accused of capital murder,
 9  I'd get up there and tell my story.  So I think he must be
10  guilty.  And I see you shaking your head no.  You understand
11  that that is an absolute privilege accorded him?
12       A.    Most definitely.
13       Q.    And he -- if he chooses not to testify, you wouldn't
14  hold it against him?
15       A.    No, ma'am.
16       Q.    Always just look to the evidence you did hear and
17  don't speculate about things you didn't or why you didn't.
18       A.    Correct.
19       Q.    That applies in the guilt/innocence phase, as well
20  as in the punishment phase.  A defendant is never going to have
21  to take the witness stand and say, I won't be a continuing
22  threat to society, I'm never going to commit another crime, I'm
23  real sorry, I feel bad about what I did, please give me a life
24  sentence.  That's never going to be required of anybody.  So
25  you always just look to the evidence you did hear, and if he
```

1  doesn't testify, could you afford him that Fifth Amendment

2  privilege and not consider it for any reason?

3        A.    Of course.  Yes, ma'am.

4        Q.    I've told you that I have the burden of proof, and

5  that burden is beyond a reasonable doubt.  It is not beyond all

6  possible doubt.  It's not beyond a shadow of a doubt.  It's the

7  highest burden that we have in the law, and it should be

8  because we're talking about taking someone's liberty and

9  potentially their life.  But it's never going to be a hundred

10  percent proof because I would tell you, Ms. Salazar, that if I

11  convinced you of something beyond all possible doubt, you're

12  probably a witness to the crime.  That's probably because you

13  saw it yourself.  There's always going to be some doubt, but we

14  have to exclude all reasonable doubt.

15              If our burden is beyond a reasonable doubt,

16  which I've told you it is, could you hold us to that burden?

17        A.    Of course.

18        Q.    And not require us to prove it beyond all possible

19  doubt, but beyond a reasonable doubt?

20        A.    Yes, ma'am.

21        Q.    What we have to prove is everything we put in our

22  indictment.  I have to prove for capital murder -- and capital

23  murder is the only crime for which the death penalty is

24  available as a punishment.  Capital murder is an intentional

25  murder, intentionally causing another person's death.  That

1  means that the goal of the person is to cause the death.  Not

2  to hurt them real bad, not to wing them.  It's not self-defense

3  because self-defense, you're not ever going to be guilty of a

4  crime if it was self-defense or defense of a third person.

5  It's not going to be a mistake or an accident like I was

6  cleaning my gun and the gun went off.  It's not going to be

7  whether somebody was insane at the time of the offense or

8  mentally retarded.  It means that the person formed the goal to

9  cause the other person's death and did what it took to get

10 there.

11                 That intent, though, is not premeditation.  I

12 don't ever have to prove premeditation.  Let me give you an

13 example.  Let's say that I come up to Elaine with a gun and I

14 say, give me your shoes, and she says, I'm not giving you my

15 shoes.  And I point the gun at her head and I say, give me your

16 shoes.  She decides she's going to take a swing at me to defend

17 herself against me, and I shoot her in the head and take her

18 shoes.  I may not have thought about killing her.  I may not

19 have planned on killing her yesterday, or even five minutes or

20 even 30 seconds before I pulled the trigger.  But when I pulled

21 the trigger and shot her in the head, did I intend to cause her

22 death?

23      A.   Yes, ma'am.

24      Q.   Right.  So we say intent can be formed in an

25 instant, and -- but it is intent, and I have to prove that the

```
 1    goal of the person was to cause the death at the time of the

 2    offense.  That in and of itself even isn't capital murder.

 3    What made the crime I just committed against Elaine capital

 4    murder is the robbery, me demanding her shoes, me taking her

 5    shoes.  Capital murder is always going to be an intentional

 6    murder, plus that extra robbery or sexual assault or killing a

 7    police officer or a child younger than 10.  It's going to be an

 8    intentional murder, plus something else.

 9                   In this case, we've alleged an intentional

10    murder committed during the course of a robbery.  That is what

11    I have to prove to the jury beyond a reasonable doubt in order

12    for the jury to return a verdict of guilty.  Sometimes we say

13    the indictment works like a checklist for the jury.  You go

14    through and you say did the State prove this crime was

15    intentional and did they prove it was a robbery and did they

16    prove it was this Defendant that committed the crime?  If I've

17    failed to prove any one of those things, the jury's verdict has

18    to be not guilty, okay?

19                   So put you on a hypothetical capital murder --

20    not this case because we can't talk about this case.  If I

21    prove that it was an intentional murder, that this Defendant on

22    trial did, in fact, kill the victim intentionally, but there is

23    no evidence that there was a robbery, the verdict would be not

24    guilty.  Can you see why?

25         A.    Yes.
```

```
 1        Q.    Because --

 2        A.    Because you didn't prove both actions happened.

 3        Q.    Exactly.  Now, the jury may be allowed to consider a

 4   lesser offense of murder, if they believe that the person

 5   intentionally caused the death of the victim.  They may be able

 6   to convict him of murder, but not capital murder.  You can see

 7   why?

 8        A.    I understand, yes, ma'am.

 9        Q.    And if they convict of murder, there's a punishment

10   range because I told you capital murder, we have life without

11   parole or the death sentence.  But for murder, neither one of

12   those things would be in front of the jury.

13              Now they would be having to decide is five years

14   the proper sentence or 10 or 20 or 30, all the way up to even

15   life in prison.  And they would get more evidence in the

16   punishment phase of the trial to help them decide is this a

17   five-year kind of case, or is this a life kind of case.  Does

18   that make sense?

19        A.    Yes, ma'am.

20        Q.    And if you're on a jury where the verdict -- where

21   the -- the conviction is for murder, could you consider and

22   keep an open mind to the full range of punishment?

23        A.    Yes, ma'am.

24        Q.    And if you thought five years was the proper

25   sentence for the person convicted of murder, could you assess a
```

1    five-year sentence?

2         A.    Yes, ma'am.

3         Q.    If you thought a life sentence was proper, could you

4    assess a life sentence?

5         A.    Yes, ma'am.

6         Q.    That's -- when I talk about my burden of proof,

7    there's never going to be any shortcuts.  There's never a

8    technicality.  I have to do everything that I've alleged, and I

9    have to prove it beyond a reasonable doubt or the jury, by

10   their oath, cannot find the person guilty.  But if I prove all

11   of the elements, if I check that list off beyond a reasonable

12   doubt, the jury has to, following their oath, return a verdict

13   of guilty.  And for capital murder, if you return a verdict of

14   guilty of capital murder, now we're talking about life without

15   parole or the death sentence.

16              And it's not ever going to be asked of the jury

17   to vote do you -- you know, how many think he deserves death,

18   how many think he deserves life.  We get there through that

19   process, the Special Issue 1 and Special Issue 2 that you read

20   about in the pamphlet.

21        A.    Okay.

22        Q.    So I want to talk to you -- I'm going to put you

23   again -- once you've convicted the person of capital murder,

24   now we go into the punishment phase.  The jury would come back

25   in the courtroom and more evidence is presented to the jury to

1  help them decide whether the life without parole sentence is

2  proper or whether that should be a death sentence.

3              Special Issue Number 1 is the first thing that

4  the jury goes to consider.  And, again, you know, we had that

5  presumption of innocence in the first part of the trial?

6       A.    Yes, ma'am.

7       Q.    That's gone now, right, because you've convicted?

8       A.    Correct.

9       Q.    But now we have a presumption that the life sentence

10  is proper.  And in the vast majority of cases of capital

11  murder, the life sentence is proper under our law.  The law is

12  going to presume that the answer to Special Issue 1 is no

13  unless and until I prove beyond a reasonable doubt that the

14  answer is yes.

15             So you always look to the State to prove whether

16  there's a probability that the Defendant would commit criminal

17  acts of violence that would constitute a continuing threat to

18  society.  And we know by now, the best the person can do is

19  life without parole, right?

20       A.    Correct.

21       Q.    And they're going to serve that where?  Where is

22  that sentence going to be served?

23       A.    In prison.

24       Q.    In prison.  So when we talk about society, we're

25  talking about even prison society.

1      A.    Okay.

2      Q.    Okay.  And I have to prove beyond a reasonable doubt

3  that it's more likely than not -- that's what probability

4  means, more likely than not -- more likely than not that the

5  Defendant you've convicted of capital murder will commit

6  criminal acts, plural, of violence in the future that are going

7  to constitute an ongoing threat -- a continuing threat to

8  society, even in prison.  Do you think there's violence in

9  prison?

10      A.    Most definitely.

11      Q.    Do you think that the people inside the prison,

12  whether they're inmates or guards or teachers or visitors

13  deserve the same protection you and I deserve?

14      A.    Yes.

15      Q.    And that we ought to protect them from people who

16  would commit criminal acts of violence?

17      A.    Yes, ma'am.

18      Q.    Do you believe that that's capable of proof?  In

19  other words, do you think it's possible that I could prove what

20  someone would be more likely to do in the future?

21      A.    Yes, I think it's possible.

22      Q.    And what do you think is important in helping you

23  answer that question?

24      A.    (No response.)

25      Q.    I mean, how do you go about predicting what somebody

1  is more likely than not to do in the future?

2       A.   I guess you can't, but if you can, you know, show a

3  history or I mean, if it's just a continuation, then you just

4  have to assume that it's going to continue.

5       Q.   You look at all of the evidence, whether -- and at

6  this time you will know from the evidence that there's a

7  criminal history in the past or not, a history of violence or a

8  history of peacefulness.  You'll know more about the character

9  of the person you've convicted, his background, upbringing,

10  educational background.  You know, all of the evidence will be

11  there for the jury to consider, all the way back to birth to

12  the day of trial.  And you believe you could look at all of

13  that and decide whether I've proved beyond a reasonable doubt

14  that this Defendant will more likely than not be a continuing

15  threat?

16       A.   Yes, ma'am.

17       Q.   And if I fail to prove that, if the jury is not

18  convinced that this person will more likely than not -- not

19  absolutely, right?

20       A.   Right.

21       Q.   Because I'll never be able to predict --

22       A.   Correct.

23       Q.   -- with 100 certainty what somebody will do.

24       A.   Correct.

25       Q.   But I have to prove it's more likely than not.  And

1    if I do that, you'd answer that yes?

2        A.    Correct.

3        Q.    And if I failed to do that, then the presumption is

4    the answer is no and that's what stands?

5        A.    Correct.

6        Q.    If you answer that no, then the life sentence is the

7    proper sentence.  If the person can be safely incarcerated,

8    then that's all that the law is going to ask.

9        A.    Yes.

10        Q.    If the jury answers that no, the Judge sentences the

11   person to life without the possibility of parole and the trial

12   is over.  The jury never considers Special Issue 2.  You don't

13   get there.  If, however, the jury unanimously agrees that I've

14   done my job, I've proved that, the answer is yes, you move on

15   to Special Issue 2.  And now my job is done.  I don't have any

16   other responsibilities in terms of burdens of proof.  I've done

17   all that the law is going to require me to do in order for the

18   jury to return a death sentence.

19                 But the jury's job is not done.  The jury still

20   has to look at Special Issue 2.  And that's a lot of words, I'm

21   going to try to sum up for you.  Basically it's going to

22   require the jury to go back one more time and look at all the

23   evidence again, everything from the first part of the trial and

24   the second part of the trial, circumstances of the offense,

25   Defendant's character and background, personal moral

1    culpability of the Defendant, look at everything you heard, and

2    ask yourself whether there was something in the evidence that

3    tells me that the Defendant really should get a life sentence

4    instead of a death sentence.  And nobody is going to tell you

5    what that is.  We don't have a checklist for what is mitigating

6    or isn't mitigating, like we talked about with intoxication or

7    addiction.

8         A.    Right.

9         Q.    Every juror will decide for themselves.  After they

10    consider all the evidence, you kind of categorize it.  I think

11    some jurors tell us that severe childhood sexual abuse or

12    physical abuse could be mitigating to them.  That might be

13    something that would lessen the Defendant's moral

14    blameworthiness.  Other jurors might say, you know, maybe we're

15    not talking about mental retardation, but maybe we're talking

16    about a low I.Q., or not the best educational background.  That

17    might be mitigating.  Maybe intoxication or addiction might be

18    mitigating.  But every juror looks at everything in the

19    evidence and decides for themselves is this mitigating, maybe

20    it's aggravating, maybe it's neither.  Maybe it doesn't sway

21    you at all.  We all have something in our background that

22    wasn't the best.  Grew up in a single parent household,

23    poverty, whatever the case may be, that doesn't move me, but it

24    might move somebody else.  Does that make sense?

25         A.    Yes.

1        Q.    So you decide if there is something that you heard

2    in the evidence that to you was mitigating, if it's mitigating,

3    is it sufficiently mitigating?  Is it enough for you to say

4    despite the fact that the person is guilty of an intentional

5    killing in the course of a robbery, despite the fact that I

6    believe the person is going to be a threat in the penitentiary,

7    I believe if we send him to prison, more likely than not he's

8    going to be a continuing threat.  Despite all of that, there

9    was something that tells me the death sentence is not proper.

10   Does that make sense?

11       A.    Yes, ma'am.

12       Q.    And it will be up to the jury to decide whether

13   there was something sufficiently mitigating to warrant a life

14   sentence instead of a death sentence.  That is -- that

15   basically -- we sometimes call that the safety net.  That's the

16   jury's opportunity to exercise their discretion over the

17   evidence.

18             Now, what is not proper in Special Issue Number

19   2 is to say, I'm automatically going to answer that yes because

20   I don't like the death sentence.  That scares me.  It's too

21   final, I don't like it, because that wouldn't be based on the

22   evidence.

23       A.    Correct.

24       Q.    It's also not proper for the jury to say, I don't

25   care what I hear, I'm always going to answer that no because

1   I'm not sending a dangerous person to the penitentiary.  You

2   just have to consider everything and then decide in your

3   heart -- obviously, if there's deliberation among the jurors

4   and they can talk to each other about it, but in your mind and

5   in your heart, if you hear something that you believe is

6   sufficiently mitigating to warrant a life sentence, would you

7   answer that yes?

8       A.    Yes.

9       Q.    And if you didn't hear anything that told you that

10  the life sentence was more proper, you could answer it no, even

11  though you know that the Judge would be left with no option but

12  to sentence him to death?

13      A.    Yes, ma'am.

14      Q.    And you could live with your decision either way?

15      A.    I'd have to, yes, ma'am.

16      Q.    One thing that I want to point out is some jurors

17  tell us that what might be important to them in Special Issue 2

18  is remorse.  If somebody felt bad about what they did, that

19  that might be something they would consider mitigating.  And I

20  tell every juror that comes in, you may never know whether the

21  person feels bad about what they did because of the Fifth

22  Amendment, right?

23      A.    Correct.

24      Q.    If they choose not to testify, that personal moral

25  culpability may not be in the evidence.  And if it's not in the

1  evidence, you just don't consider it.  But you can never

2  require the Defendant to testify in order to answer one of

3  these questions, right?

4       A.    Correct.

5       Q.    Do you have any questions for me about any of

6  this -- about the process?  Have I explained the law to you

7  clear enough?

8       A.    Yes, ma'am, you've explained it.

9       Q.    Is there anything that I've explained to you that

10 you feel like that's just a job I can't take on, I can't do

11 this and be fair to both sides, for whatever reason?

12      A.    No, ma'am.

13      Q.    The last thing that I want to talk to you about, it

14 relates to this Special Issue Number 2, page 30 -- I'm sorry,

15 page 6, Question 39.  We talked to you about genetics and

16 circumstances of birth and upbringing and environment and

17 whether that should be considered in punishment.  You probably

18 now know, although you didn't when you answered this, that what

19 we're talking about is stuff that might be in the evidence for

20 Special Issue Number 2.  You have to consider everything.  You

21 said you disagree.  There's lots of people who grew up in an

22 environment, wasn't great, and we turn out okay.  We make

23 choices.  This question isn't saying that you have to consider

24 these things mitigating.  This question tells you -- is asking

25 could you consider it all and then decide whether it's

1  mitigating or not.

2       A.   I could consider it, but it's not -- as -- you know,

3  that doesn't -- like, as you said, move me.  You know, I grew

4  up with -- wasn't the best, but --

5       Q.   Right.

6       A.   But I didn't --

7       Q.   You turned out one way, your sister turned out

8  another?

9       A.   Correct.

10      Q.   All it's asking is would you consider it.

11      A.   Most definitely.

12      Q.   Consider everything, and then make up your mind.

13  And -- and obviously, by the time we get to Special Issue 2,

14  we're talking about a pretty bad guy, right?  We're talking

15  about somebody that's guilty of capital murder and is going to

16  be a continuing threat more likely than not.

17      A.   Correct.

18      Q.   But you could still assess a life sentence if there

19  was something that told you that was the right thing?

20      A.   Most definitely.

21      Q.   That's all I have then for you.  Thank you.

22      A.   Thank you.

23                    DEFENSE VOIR DIRE EXAMINATION

24  BY MS. BERNHARD:

25      Q.   Ms. Salazar, again, my name is Catherine Bernhard,

and I'm going to have some questions for you -- over some of

the same questions that Ms. Moseley just talked to you about.

Because obviously over here at this table we have a slightly

different take on some of these issues.

I want to start out by saying and reiterating

really, there are no right or wrong answers to what we're

asking you here today.  We just kind of want to know how you

feel about some of the issues that may apply in a case like

this.  Nobody is going to argue with your feelings or tell you

you can't feel that way or shouldn't feel that way.  We just

kind of need to know how you feel about some of these issues,

and that's really why we give you the questionnaire before we

tell you what the law is because we want to know how you feel.

We're not after just can you follow the law, but we want to

know how your feelings might interact with your ability to

follow the law.  Does that make sense?

A.    Yes, ma'am.

Q.    And I also want to tell you -- I know you think

you're -- you're very concerned about doing your civic duty and

-- and fulfilling your role as a citizen.  You have fulfilled

your civic duty simply by showing up on June 21st and filling

out this very lengthy questionnaire and then showing up today

and submitting yourself to a bunch of questioning by lawyers.

So I don't want you to think that if you answer the questions a

certain way or don't answer them a certain way, that somehow

1  you're not as good of a citizen if you don't end up on the

2  jury.  It's all part of the process, as we've explained, and,

3  you know, you've fulfilled your civic duty and -- and your

4  citizenship responsibility simply by participating in the

5  process thus far, okay?

6      A.  Yes, ma'am.

7      Q.  And one other thing that I want to just kind of

8  point out before we get into some of this other stuff is even

9  though we're spending a lot of time talking about the death

10 penalty and this little procedure that we're doing here today,

11 I don't want you to think that for some reason we at the

12 Defense table think it's a foregone conclusion that the jury is

13 ever going to be called upon to answer those special issues or

14 that we're going to reach the death penalty, because it's our

15 position at this table that the jury that's selected is going

16 to find Matthew Johnson not guilty of capital murder and you're

17 never going to be addressing those special issues.  But because

18 of the way the process is set up, we have to talk about that

19 now because it's one of the things that makes this case

20 different from most other criminal cases that are tried in this

21 building.  Do you understand?

22     A.  Yes, ma'am.

23     Q.  Okay.  I did want to address some things in your

24 questionnaire.  What purpose do you think the death penalty

25 serves?

1          A.    To keep someone from committing crimes more and

2    more, over and over.  You've done a horrific crime, even if

3    it's one time.  If it's against a child, if it's against the

4    elderly, I think the punishment should fit the crime.

5          Q.    Okay.  So for you -- so in your mind, the death

6    penalty should be based on the crime that was actually

7    committed rather than what somebody is going to do in the

8    future?

9          A.    I agree.  And -- in a sense, and if it's -- if

10    it's -- I mean, it's hard to tell what they're going to do in

11    the future, but if there's a history and it's been ongoing, I

12    find it hard for it to stop, or, you know, where they

13    couldn't -- where they wouldn't commit another crime.

14          Q.    Okay.  Do you think a life without parole sentence

15    fulfills that role at all, or do you think it has to be the

16    death penalty?

17          A.    I don't think it has to be the death penalty, no.

18          Q.    Okay.  What I'm getting at is what in your mind --

19    why should we have the death penalty?  Why can't we just be

20    satisfied with locking everybody up forever?

21          A.    Well, I mean, as I said, I mean, if it's -- if

22    it's -- so many crimes against children, and I just don't --

23    and because I have them, I just -- I just wouldn't consider

24    that being a life just because it's so dear to my heart.

25          Q.    Okay.

1      A.    So I would consider the death penalty at all times

2  when it comes to a child.

3      Q.    So in your mind the death penalty should be

4  primarily -- and I'm not talking about the law here.  I'm just

5  talking about how you feel or what you think.  But in your

6  mind, the death penalty should be based on the act that was

7  actually committed?

8      A.    I agree, yes.

9      Q.    Rather than what somebody is going to do in the

10 future or -- or something like that?

11     A.    Yes.  I mean it -- yeah.

12     Q.    Okay.  You've -- you said you did have some prior

13 jury service but the case settled?

14     A.    Yeah, it was a -- it was a civil.

15     Q.    A civil case?

16     A.    Yes.

17     Q.    Okay.  Just to kind of give you the -- a little

18 primer on some of the issues.  I know we talked about the State

19 has the burden of proving things beyond a reasonable doubt, and

20 we don't have a definition for what that means.  It's up to

21 each individual juror to determine what proof beyond a

22 reasonable doubt is to them.  But I think sometimes it helps if

23 we can put it into context of other burdens of proof that we

24 have in the legal system that we do have definitions for.  So

25 in a civil case -- I don't know how long -- how far along in

1  the process you got with your jury service, but you might

2  recall that there was some talk about a burden of proof of

3  preponderance of the evidence?

4      A.    Uh-huh.

5      Q.    Does that ring a bell?

6      A.    Yes.

7      Q.    And preponderance of the evidence just means that

8  the scales are tilted slightly one way, 51 percent to

9  49 percent.  That's what you have to prove to prevail in a

10  civil case, even if you're talking about millions upon millions

11  of dollars.  You just prove your case by 51 percent, and you

12  win.  That's a preponderance of the evidence.

13          We know that proof beyond a reasonable doubt is

14  much higher than that.

15          Now, there's another burden of proof that we

16  have in the legal system called clear and convincing evidence,

17  and that's a burden of proof that might apply in a situation

18  where let's say the State was trying to terminate someone's

19  parental rights, you know, take their children away from them

20  forever because they weren't a good parent.  You would expect

21  the government would have to have pretty good evidence in order

22  to do that, wouldn't you?

23      A.    Yes, ma'am.

24      Q.    And what we have is -- in the system is the

25  government is required to prove that by clear and convincing

1  evidence.  And it's not quantified like the preponderance

2  standard is, but we do know that it's higher than the

3  preponderance standard because it should take more evidence to

4  terminate away (sic) parental rights than it does to, you know,

5  win a bunch of money.

6          A.    Yes, ma'am.

7          Q.    But beyond a reasonable doubt is higher even than

8  that.  It is the highest burden that we have anywhere in the

9  legal system, and that's because the way our system is set up,

10  we regard a person's life and a person's liberty as pretty much

11  the most important things that you can be making a decision

12  about.  Would you agree?

13          A.    Yes, ma'am.

14          Q.    And so proof beyond a reasonable doubt, although

15  it's not defined, we do know that it's the highest burden that

16  we have anywhere.  And that's the kind of burden that you would

17  be asked to hold the State to in any criminal case, whether

18  it's a traffic ticket or a capital murder death penalty case.

19  The burden of proof is always going to be the same, and it's

20  always going to be on the State of Texas.  We don't have to

21  prove anything.  We don't have to prove that Matthew Johnson is

22  not guilty.  We don't have to prove that Matthew Johnson is not

23  going to be a continuing threat to society.  We have no burden

24  to prove anything to you.  Do you think that's how the system

25  ought to work?

1      A.    Yes.  I mean, it's --

2      Q.    It would be kind of hard to prove that you didn't do

3  something.  Would you agree with that?

4      A.    Yes.

5      Q.    If the government made an accusation, and you could

6  say, well, but I can prove I was home alone with my family.

7  That can be a hard thing to prove.  Would you agree?

8      A.    Yes.

9      Q.    I think that's part of the reason why we've designed

10  a system where the State has the burden of proving it.  The

11  Defense doesn't have to prove that somebody is not guilty or

12  somebody's innocent.  It's all on the State.  And you think

13  that's how it should be?

14      A.    Yes.

15      Q.    Okay.  I want to kind of put you on a hypothetical

16  capital murder jury and make sure we're talking about the same

17  things.  Ms. Moseley explained to you that when we talk about

18  capital murder, we're talking about an intentional killing in

19  the course of another felony -- for our purposes, in the course

20  of committing a robbery.  There are other ways of committing

21  capital murder.  If somebody murders a child under the age of

22  10, that's a capital murder.  And I think that's part of what

23  you were talking about is one of the reasons for the death

24  penalty.  But there are a lot of different ways of committing a

25  death eligible for capital murder, but I'm going to limit it to

1   kind of what we're dealing with in this case just for

2   simplicity's sake.  So when we talk about capital murder, we're

3   talking about an intentional killing in the course of a

4   robbery.  And when we say intentional, we mean that it's the

5   person's conscious objective or desire to cause the result.

6   They wanted somebody dead, and they did what they had to do to

7   make that happen, okay?  It's not an accident.  It's not

8   self-defense.  It's not a mistake, or any of those other things

9   that might be a legal justification or defense.  If it was an

10  accident, the person would be not guilty.  If it was

11  self-defense, the person would be not guilty.  You understand?

12       A.    Yes, ma'am.

13       Q.    So we're talking about an intentional killing in the

14  course of a robbery because that's what makes it a capital

15  murder is that extra thing, that in the course of a robbery.

16  Because just a plain old intentional murder would not be a

17  capital murder, even if it's a heinous, horrible murder.  If

18  that's all it is, it's not capital and it's not subject to the

19  death penalty.

20            So I want you to assume that you and 11 other

21  jurors on your hypothetical capital murder jury have been

22  convinced beyond a reasonable doubt that the person is guilty

23  of an intentional killing in the course of committing the

24  offense of robbery.  What are your feelings on the death

25  penalty at that point for that person?

1        A.    If the law says they're going for -- I mean, then,

2  yeah, capital murder is -- I mean, why can't you just rob them,

3  just rob them, you don't have to kill them.

4        Q.    Okay.  You know, for somebody who is guilty of

5  capital murder, we've explained that there are only two

6  possible punishments.  That's going to be life without parole

7  or the death penalty.  Now, when you find -- when you and the

8  11 other jurors find someone guilty of capital murder, an

9  intentional killing in the course of a robbery, is that a death

10 penalty case to you at that point?

11       A.    No, because they can have -- you can decide whether

12 or not life without parole -- wouldn't that go into Special

13 Issue Number 2?

14       Q.    Well, you first address Special Issue Number 1, and

15 that's really how the State of Texas has decided to sort out

16 who gets the death penalty and who gets life without parole.

17 The law presumes that life without parole is the appropriate

18 punishment for somebody who's convicted of capital murder.

19 It's much like the presumption of innocence, like in the

20 beginning of the trial where you presume that a defendant is

21 not guilty.  Once you've found somebody guilty of capital

22 murder, you presume that the appropriate sentence is going to

23 be life without parole.  Do you understand?

24       A.    Yes, ma'am.

25       Q.    So that's where you start out for the person who's

1  guilty of that intentional killing in the course of committing

2  a robbery.  Can you do that?

3       A.    Yes, ma'am.

4       Q.    And it only becomes the death penalty once you get

5  over here to Special Issue Number 1 and the State has the

6  burden of proving that to you beyond a reasonable doubt, once

7  again.  Much like the indictment, they've got to prove

8  everything in that special issue question to all 12 jurors

9  beyond a reasonable doubt.

10            And just to kind of talk a little bit about what

11  that issue is getting at, I know we've told you that

12  probability in that context means more likely than not because

13  anything is possible.  So we're talking about more likely than

14  not, a probability -- that they have to convince you that the

15  Defendant would commit criminal acts of violence.  And, again,

16  none of these terms are going to be defined for you, so it's

17  just up to each individual juror to decide what they mean to

18  them.

19            Some person could say a criminal act of violence

20  would be somebody beating somebody to a pulp.  Somebody might

21  say, well, if it was just a fist fight, yeah, maybe I don't

22  think that's -- that's as severe.  It's up to the individual

23  juror to determine what is sufficient to be a criminal act of

24  violence to them.  There's not going to be a definition that

25  has to rise to this level.  But I would like to point out that

1  it does say acts, plural, so it would seem to contemplate more

2  than one criminal act.  Would you agree?

3       A.   Yes.

4       Q.   And it also -- the question doesn't just stop there.

5  It doesn't just ask you if you think the person is going to

6  commit criminal acts of violence.  It wants you to go on to

7  then decide that those criminal acts of violence are such that

8  they would constitute a continuing threat to society.  So it

9  would seem to be asking for something more than just a criminal

10 act of violence.  Would you agree?

11      A.   Yes.

12      Q.   It would have to rise to the level that this is --

13 this is serious enough that we think it's -- it's a continuing

14 threat to society.

15      A.   Yes.

16      Q.   Does that make sense?

17      A.   Yes, ma'am.

18      Q.   So that has to be -- all 12 people have to be

19 convinced of that beyond a reasonable doubt, okay?  If the

20 answer to that question is no, then the trial is going to be

21 over, and the person gets life without parole because the jury

22 has decided that this person is not going to be a continuing

23 threat to society and that's how we, you know, make that

24 determination under the law in Texas.

25           But if the answer is yes, so let's -- back on

1    your hypothetical capital murder jury.  The answer is yes.

2    You've decided that, yes, this person is guilty of an

3    intentional killing in the course of a robbery, you and all 11

4    other jurors, and that furthermore, after you've gotten into

5    the punishment phase -- because there are kind of two phases to

6    the trial, one where the jury decides is the person guilty or

7    not guilty of capital murder, and then a second phase we may

8    hear additional evidence and then you answer those special

9    issues.

10            So on your hypothetical capital murder jury,

11   let's say that you and the 11 other jurors have found this

12   person is guilty beyond a reasonable doubt of an intentional

13   killing in the course of a robbery.  And you also -- you and

14   the 11 other jurors have now been convinced beyond a reasonable

15   doubt that this person is going to be -- there's a probability

16   that this person is going to commit criminal acts of violence

17   that constitute a continuing threat to society.  This person is

18   going to be a future danger, is kind of how we sometimes

19   shorten it.  Can you consider a life sentence for that person

20   at that point?

21        A.   Could I consider a life sentence?

22        Q.   Yes.

23        A.   Yeah, I can consider it.

24        Q.   Okay.  Because some people say, you know, if

25   somebody is guilty of capital murder and I know they're going

1  to be a threat in prison, I'm -- you know, mitigation doesn't

2  matter.  I'm not going to send a dangerous person to prison

3  where they're a potential threat to others.

4       A.   I mean, I can -- like I said, I mean, I can consider

5  it.  I mean, if you see all the evidence and see -- I mean, you

6  can consider it.  I mean, you'd have to look at everything

7  before you can say that.

8       Q.   But do you think in the proper circumstances if you

9  found sufficient mitigating evidence, that you could send a

10 dangerous capital murderer to prison, even knowing that they're

11 going to be a threat there?

12      A.   If -- knowing they're going to be a threat there?

13      Q.   Because you've decided they're going to be a

14 continuing threat to society.

15      A.   Then if I'm knowing that they're going to be a

16 threat there, then, no -- I mean, I would have to go with the

17 death penalty.

18      Q.   Okay.

19      A.   If they're going to continue being a threat.

20      Q.   Okay.  Because that -- you have to answer Question

21 Number 1 yes before you ever get to that second special issue.

22      A.   Right.

23      Q.   So by the time you get to that second special issue,

24 you know they are going to be a threat -- a continuing threat

25 to society, prison or wherever.  So what I'm hearing you saying

1  is that if you think they're going to be a continuing threat to

2  society, then they get the death penalty and mitigation doesn't

3  really matter?

4      A.    No, mitigation -- I mean, I would like to go to

5  Special Number 2.  When do I get to go there?

6      Q.    You only go there if you and the 11 other jurors

7  have all decided that this person is going to be a threat

8  wherever they end up.

9      A.    Then, yes -- I mean, they would have to have the

10 death penalty.  If they're going to continue being a threat,

11 yes.  And that's been proven, yes.

12     Q.    Okay.  You understand that the law would then

13 require to you go on to Special Issue Number 2 and consider

14 mitigation.  But what I hear you saying is that you think that

15 if you and the 11 other jurors have found somebody is going to

16 be a continuing threat to society --

17           MS. MOSELEY:  Judge, I'm sorry, but it's not

18 going to be.  It's more likely than not.

19           THE COURT:  Sustained.

20     Q.    (BY MS. BERNHARD)  That is more likely than not

21 going to commit criminal acts of violence that would constitute

22 a continuing threat to society, that that's been proven to you

23 beyond a reasonable doubt, what I hear you saying is that -- at

24 that point mitigation doesn't matter to you?

25     A.    No.  I mean --

1          Q.    You believe beyond a reasonable doubt that the

2     person -- there's a probability that the person is going to be

3     a threat in the future.

4          A.    Well, you're saying mitigation doesn't matter to me.

5     It does, because I mean, you -- yes, if you're going to be a

6     continuation to threat -- the death penalty would be there, but

7     then you have to look at all -- at everything.

8          Q.    Okay.

9          A.    And consider all -- consider all evidence before

10    coming to that -- I mean --

11         Q.    But my point is you don't ever get to that

12    mitigation question, that second special issue, unless you and

13    the 11 other jurors have already decided that there's a

14    probability that this person is going to be a threat in prison.

15         A.    If -- if likely they're going to be a threat, you

16    would have the death penalty.  And then you would, again, sit

17    down and look at everything and see if there's anything else

18    that -- that you're missing or that you're not considering to

19    have a life sentence.

20         Q.    Okay.  That's kind of where I'm getting at.  So

21    that's -- and it's a little different from what I thought you

22    said previously, but we may not be on the same page here.

23    Because what I'm getting at is you never address that

24    mitigation special issue unless you and the 11 other jurors

25    have all unanimously found that there's a probability that this

1  person is going to be a threat in the future.

2      A.    Right.  I mean, you -- if they're going to be a

3  threat, then, yes, the death penalty.  But then you again

4  see -- look at all evidence and make sure you're not missing

5  anything to see if they may -- if maybe a life sentence would

6  be more --

7      Q.    Okay.  So you could consider a life sentence for a

8  person even though you had already previously found there's a

9  probability that they're going to be a danger in prison?

10     A.    Yes.  I mean, by looking at all evidence and -- and

11 making sure nothing was missed.

12     Q.    If you found --

13     A.    Yeah, or -- I'm sorry.

14     Q.    Go ahead.

15     A.    No, I'm just -- you know, if you're looking at all

16 evidence and considering everything.

17     Q.    So if you found sufficient mitigating evidence,

18 whatever that is to you, you could be okay with a life sentence

19 for somebody that you have also found there's a probability

20 that they're going to be a threat in prison?

21     A.    Yes.

22     Q.    Okay.  You see how that's a little different from

23 what I thought you were saying before, but I -- were we just

24 not clear?

25     A.    I mean, it was either all or nothing.  I mean, I

1   guess that's what -- I mean, it's definite that they're going

2   to be a society -- I mean, a threat to society.  I mean, I

3   guess that's what I understood.  And it's not.  It's -- it's

4   more than -- I guess, what -- because --

5        Q.    Well --

6        A.    -- it's not a --

7        Q.    -- you found -- you and the 11 other jurors have

8   found beyond a reasonable doubt, that highest burden that we

9   have, that it's more likely than not that this person is going

10  to be a threat in prison.

11       A.    There you go, yes.

12       Q.    So you can find that and -- and, you know, be

13  convinced of that beyond a reasonable doubt and still, in the

14  right set of circumstances, be okay with a life sentence?

15       A.    Yes, ma'am.

16       Q.    Knowing -- even knowing that the person is going --

17  or there's a probability that the person would be a threat?

18       A.    Yes, ma'am, because I'd have to consider everything.

19       Q.    Okay.  Let me talk a little bit about the second

20  special issue.  Again, we've told you that nobody really has

21  the burden of proof on that issue.

22       A.    Correct.

23       Q.    The Defense doesn't have a burden of proof on the --

24  on the first special issue, so would you be able to answer that

25  even if you didn't hear anything from the Defense?

1     A.    Yes.

2     Q.    And just look to the State?

3     A.    Yes, it's their -- it's their job to prove it.

4     Q.    And if they don't prove that to you, the answer to

5  that first special issue would be no?

6     A.    Correct.

7     Q.    Whether you heard from the Defense or not?

8     A.    Correct.

9     Q.    Okay.  So you move to the second special issue where

10 nobody really has a burden of proof.  And in some respects I

11 think the second special issue is much more subjective than the

12 questions that the jury has had to address previously.  Would

13 you agree with that?

14    A.    Yes.

15    Q.    Because mitigation is -- is really pretty broad, and

16 it's really kind of a personal moral judgement kind of thing

17 that's going to be different for each juror.  Would you agree?

18    A.    Yes.

19    Q.    Because nobody is going to tell you what's

20 mitigating or what's not mitigating or what's sufficiently

21 mitigating or what's not sufficiently mitigating.  And those

22 are kind of personal moral judgements.  Would you agree?

23    A.    Yes, ma'am.

24    Q.    And those are going to be influenced by each

25 individual juror's personal moral compass and their, you know,

1  life experiences, the things that make them think the way they

2  think.  Would you agree?

3       A.   Yes, ma'am.

4       Q.   And mitigation itself can be really very broad.  It

5  can be anything that calls for a sentence less than death.  And

6  it's up to each individual juror.  And in this instance, the

7  jurors do not have to be unanimous in what they think miti --

8  is mitigating in a particular case.  And what I mean by that is

9  that one juror might go back there and say, you know, well, I

10 think the fact that this person had a horrible addiction and

11 they tried to kick it and they just couldn't and they really

12 struggled, I think that's mitigation.  And I think it's

13 sufficiently mitigating.

14          And another juror could say, well, I don't think

15 that's mitigation because they made the choice in the first

16 place to use drugs so I don't find that mitigating at all, but

17 I find the fact that that they were sexually abused as a young

18 child, I feel -- I find that to be mitigating and I find it to

19 be sufficiently mitigating.  And a third juror could say, well,

20 I don't think either of those, to me, are sufficiently

21 mitigating, but I think there's something sufficiently

22 mitigating here.  I just can't quite articulate it.  Would that

23 -- do you think -- do you think sometimes it's possible that a

24 person could just say, I feel it in my gut that there's some

25 sufficient mitigation here, but I can't put into words why I

```
 1  feel that?

 2       A.    Yeah, I guess so.  I mean, everybody has a feeling.

 3  I mean, everyone has a gut feeling.

 4       Q.    And particularly when you're talking about something

 5  that could be a personal moral judgement?

 6       A.    Yes.

 7       Q.    It may be something that a juror can't really

 8  articulate.  They just could say I think based on the evidence

 9  that life sentence is the appropriate sentence in this case.

10       A.    True, yes.

11       Q.    And would that person's opinion still be entitled to

12  respect?

13       A.    Of course.

14       Q.    As much as the others who can articulate and explain

15  why they think they -- the way they do?

16       A.    Of course.

17       Q.    And you see how all of those jurors may not agree on

18  what's mitigating, but they can all answer that question in the

19  same way.  Do you understand that?

20       A.    Yes.

21       Q.    So you don't have -- in other words, the jurors do

22  not have to be unanimous or agree on what they think mitigation

23  is in a particular case.

24       A.    Correct.

25            MS. BERNHARD:  If I can just have one moment.
```

```
 1                    VENIREPERSON:  That's okay.
 2          Q.   (BY MS. BERNHARD)  There was one thing I wanted to
 3   ask in your questionnaire.  At the time we asked if you thought
 4   that there might be any kind of job projects that would
 5   interfere with your ability, and you said:  Yes, currently
 6   working on my financial HR system's conversion for the past
 7   year of which go live in the next two weeks.  Is that something
 8   that was happening back in June?
 9          A.   Correct.
10          Q.   Okay.  So that no longer is applicable to --
11          A.   No, we went live June 8th, so it's done.
12          Q.   So the trial date in October 28th --
13          A.   Right, has nothing --
14          Q.   -- doesn't cause any issues?
15          A.   No.
16          Q.   Do you have any questions of me about any of the
17   process?
18          A.   No, ma'am.
19          Q.   Because this may be your last chance to ask us.
20          A.   No, ma'am.
21          Q.   Do you know any people that work in either the
22   Dallas Police Department or the Garland Police Department?
23          A.   Yes.
24          Q.   Who do you know?
25          A.   My husband's uncle just retired with the Dallas
```

1    Police Department.

2         Q.    Okay.

3         A.    But he worked in the courthouse, the main

4    courthouse.  That's --

5         Q.    This courthouse?

6         A.    No, the one off of --

7         Q.    The city courthouse?

8         A.    Yes.  Right off of -- across from that dog park.

9         Q.    Okay.  What was his name?  What is his name?

10        A.    Oh, my goodness, his last name is Rodgers.  He's

11   obviously an uncle we never see.

12        Q.    Okay.  Did he do any patrol or he was --

13        A.    No, he was always in the courthouse.

14        Q.    He was always in the courthouse?

15        A.    Uh-huh.

16        Q.    Okay.  Anything about that that you think would

17   affect your ability to be a fair and impartial juror?

18        A.    No.

19        Q.    And is that the only person you know in either the

20   Dallas or Garland Police Department?

21        A.    My husband has a cousin who works at the jail.  He's

22   a guard.  He works for the Dallas Sheriff.

23        Q.    Dallas Sheriff's Department?

24        A.    Yes, ma'am.

25        Q.    Anything about that that you think would influence

1    your ability?

2          A.    No.

3          Q.    How often do you see that cousin?

4          A.    Not very often.

5          Q.    So you don't sit down around the dinner table and

6    talk about what he did over at the jail?

7          A.    No.

8          Q.    Okay.  What's his name?

9          A.    Carlos Porfolio -- Carlos -- yeah, Carlos Porfolio,

10   I think -- I believe is his last name.

11                COURT REPORTER:  Can you spell it for me?

12                VENIREPERSON:  Porfolio?  P-o-r-f-o-l-i-o.

13         Q.    (BY MS. BERNHARD)  But like you said, you don't

14   really talk to him about anything at work?

15         A.    No.  He's on my husband's father's side, so --

16         Q.    Do you know anyone who works -- did I ask you about

17   fire departments?

18         A.    No.  But, no, I don't know anyone.

19         Q.    Nobody who works at any of the Dallas or Garland

20   Fire Departments?

21         A.    No.

22         Q.    What about the Texas Department of Criminal Justice,

23   the prison system?

24         A.    No.

25         Q.    There was one other thing.  Your husband has an

```
 1  uncle or something that's in prison?

 2      A.   He has a cousin.

 3      Q.   Cousin.  Is this somebody that is a close cousin

 4  or --

 5      A.   He used to be.  Haven't seen him in 20 years.

 6      Q.   Okay.  So y'all don't go visit him in prison --

 7      A.   No.

 8      Q.   -- or anything like that?

 9      A.   No.

10      Q.   Is he in prison here in Texas?

11      A.   He is.

12      Q.   Where was his -- did you follow the murder case or

13  anything, or did you even know your husband then?

14      A.   Oh, yeah.  Yes, we were married.

15      Q.   How long ago was this?

16      A.   It was -- how old am I -- almost 15 -- 20 years ago.

17  He was 21 when he was convicted.

18      Q.   Okay.  Was he -- did he go to trial, or did you

19  follow that enough to know what happened?

20      A.   He did go to trial.

21      Q.   Okay.

22      A.   I believe he settled -- he took -- he took a --

23      Q.   A plea bargain?

24      A.   A plea bargain.

25      Q.   Okay.  Was that here in Dallas County?
```

```
 1        A.    Yes.

 2        Q.    Did you attend any of the proceedings?

 3        A.    No, ma'am.

 4        Q.    Or did your husband?

 5        A.    No, ma'am.

 6        Q.    Okay.  So you really haven't seen this husband's

 7   cousin since he got sentenced to prison?

 8        A.    Correct, haven't seen him.

 9        Q.    Nothing about that that you think would affect your

10   ability --

11        A.    No.

12        Q.    Does he correspond with your husband, or do y'all

13   have any communication at all?

14        A.    No.

15        Q.    Okay.  I'm going to read a list of names and ask if

16   you -- or if any of these sound familiar, just let me know.

17   Scott Harris, Elizabeth Harris, Chris Harris, Kenneth Marecle,

18   Amy Marecle, Michael Frank, Anna Lunceford, Jim Medley,

19   Lawrence Denson, Jonas Lucht, Greg Mansell, Carina Pinzon,

20   Digna Salmeron, Kelly Keeton, Daphne Johnson, Sherry Ann Clark,

21   Amy Armstrong, Anthony Johnson, Alma Johnson, Courtney Johnson,

22   David Williams, Danny Mullins, David Contente, Gioconda

23   Verdaguer, Donald Dunlap, Johnny Wright, Monica Cajas, Michael

24   Crosby, Roxanne Luttrell, Robbie Denmark, Quinlen Minor,

25   Margaret Tatum, Jim Bertucci, John Harris, Timothy Proctor,
```

```
 1  Carlton Jenkins, Durian Allen, Gene Gathright, Manuel Turner,

 2  Andre Howard, Kenneth Lewis, or Sheldon Henry.

 3       A.   No, ma'am.

 4       Q.   None of those?

 5       A.   No.

 6       Q.   If you don't have any questions, that's all I have

 7  at this point.

 8       A.   No questions.

 9            THE COURT:  Thank you, Ms. Salazar.  We're going

10  to take a very short break.

11            VENIREPERSON:  Okay.

12            THE COURT:  Ask you to step out in the hall for

13  a minute.

14            (Venireperson excused from courtroom.)

15            THE COURT:  All right.  Juror Number 1365A,

16  Christina Salazar, does the State --

17            MS. MOSELEY:  No challenge, Your Honor.

18            THE COURT:  -- have a challenge?  No challenge

19  from the State.

20            From the Defense?

21            MS. BERNHARD:  No challenge.

22            THE COURT:  All right.  Thank you very much.

23            (Venireperson returned to courtroom.)

24            THE COURT:  Ms. Salazar, you have been qualified

25  as a juror, so we're going to ask you to step out in the hall.
```

```
 1  The bailiff is going to take a photograph of you so that the
 2  lawyers can be able to place your face with your name when
 3  they're reviewing notes.  Then we'll be contacting you on
 4  October 15th to let you know whether you will, in fact, be a
 5  part of this jury.
 6                    (Venireperson 1365A, Christina Salazar,
                       qualified.)
 7
 8                    VENIREPERSON:  Okay.
 9                    THE COURT:  Thank you very much, ma'am.
10                    VENIREPERSON:  Thank you.
11                    (Recess.)
12                    THE COURT:  All right.  We're ready for Ms.
13  Jenkins.
14                    THE BAILIFF:  All rise.
15                    (Venireperson brought into courtroom.)
16                    THE COURT:  Please be seated.
17                    Good morning, Ms. Jenkins.
18                    VENIREPERSON:  Good morning.
19                    THE COURT:  You seem to have a leery expression
20  on your face when you walked in.  Are you nervous?  All right.
21  Well, you don't need to be nervous.  The lawyers aren't going
22  to say anything to you that's going to embarrass you or brow
23  beat you or intimidate you or anything, and there aren't any
24  right or wrong answers, so if you can, relax, try to do that.
25                    VENIREPERSON:  Okay.
```

```
 1                    THE COURT:  Do you remember being sworn in back
 2  in June by me down in the Central Jury Room?
 3                    VENIREPERSON:  Yes.
 4                    THE COURT:  All right.  Well, you're going to be
 5  operating under that oath continuously until you are discharged
 6  from service.
 7                    VENIREPERSON:  Okay.
 8                    THE COURT:  And we're going to be trying this
 9  case the week of October the 28th and the week of November the
10  4th.  Has anything happened since June in your life that would
11  prevent you from being able to sit during those two weeks this
12  fall?
13                    VENIREPERSON:  No.
14                    THE COURT:  All right.  Have you been exposed to
15  anything about this case?  Do you know anything about the facts
16  of this particular case?
17                    VENIREPERSON:  No.
18                    THE COURT:  I'd like to introduce everyone to
19  you.  My name is Tracy Holmes, and I will be the presiding
20  juror (sic) for the trial.
21                    Sitting between us is Darline LaBar.  She's the
22  official court reporter, and it's her important job to take
23  down everything that's said.  So as a courtesy to her, I'm
24  going to ask you to try to remember to say yes or no instead of
25  nodding or shaking your head or saying uh-huh or huh-uh, and
```

```
 1  the lawyers will remind you if you -- if that happens.
 2                  The State's lawyers are Andrea Moseley.
 3                  MS. MOSELEY:  Good morning.
 4                  VENIREPERSON:  Good morning.
 5                  THE COURT:  And Elaine Evans.
 6                  MS. EVANS:  Good morning.
 7                  THE COURT:  And sitting at the Defense table is
 8  Mr. Kenneth Weatherspoon.
 9                  MR. WEATHERSPOON:  Good morning.
10                  VENIREPERSON:  Good morning.
11                  THE COURT:  Ms. Catherine Bernhard.
12                  MS. BERNHARD:  Good morning.
13                  THE COURT:  Nancy Mulder.
14                  MS. MULDER:  Good morning.
15                  THE COURT:  And the citizen accused is at your
16  far left, Mr. Matthew Lee Johnson.
17                  Each side has 45 minutes to speak with you, and
18  at the end of that time, we'll take a brief recess.  And then
19  if you are qualified as a juror, we'll take your photograph and
20  you will be notified on October the 15th whether you are, in
21  fact, a juror in this case.  Will that give you sufficient time
22  to prepare to be away from home for two weeks?
23                  VENIREPERSON:  Yes.
24                  THE COURT:  All right.  Thank you very much.
25                  Please proceed.
```

```
 1                  MS. EVANS:  Thank you, Your Honor.

 2                     SHONQUIDRIA JENKINS,

 3  was called as a venireperson by the parties, and after having

 4  been first duly sworn, testified as follows:

 5                  STATE VOIR DIRE EXAMINATION

 6  BY MS. EVANS:

 7       Q.    Good morning, Ms. Jenkins.

 8       A.    Good morning.

 9       Q.    I see from your questionnaire that you've served on

10  a civil jury before.

11       A.    Yes.

12       Q.    And so now you get to see the other side of it over

13  here at the criminal courthouse, right?

14       A.    Yes.

15       Q.    How long -- I know you said ultimately that reached

16  in a settlement, but how long did that civil jury trial last

17  that you were there for?

18       A.    I would say maybe a week or so.

19       Q.    Okay.  So it was a little bit lengthy.

20       A.    Yes.

21       Q.    Sometimes our trials down here, depending on what

22  type of case it is, just last a day, if it's a misdemeanor

23  case.  Sometimes they last, like the Judge said, for -- we

24  expect maybe a period of two weeks.  I'll tell you I have an

25  8-year-old daughter, just one child, and I have a difficult
```

1  time sometimes maneuvering her and getting her to school.  And

2  I do notice you have an awful lot of young children.

3       A.   Yes.

4       Q.   And I just want to make sure -- because obviously,

5  given the type of case we're talking about, a capital murder,

6  and with the State seeking the death penalty where somebody's

7  life is literally on the line is what we're talking about, it's

8  important that the jurors be able to give their full devoted

9  attention to what's going on in this courtroom.  And I know you

10  appreciate that and understand that because I can tell by your

11  questionnaire that you do.  And I just want to make sure that

12  you've got somebody else that can help you out with your kiddos

13  if need be.

14       A.   Yes, ma'am, I do.

15       Q.   Okay.  And then the process generally, the Judge

16  starts it straight up 9:00 a.m. and so we'd have to be here

17  about 8:30 in the morning and go until 4:30, 5 o'clock in the

18  afternoon.  Is there anything with that time period that would

19  cause you some pause or difficulty?

20       A.   No.

21       Q.   Okay.  I know that -- had you ever been to this

22  courthouse before?

23       A.   Yes.

24       Q.   You have?  Okay.  I know this morning we had asked

25  y'all to arrive at 8:30, and maybe it was 9:30 when you

1   arrived.  Was there any problem getting here this morning, or

2   what was --

3         A.    A little traffic.

4         Q.    Okay.  I completely understand.  We just want to

5   make sure that we're able to start on time, you know, once the

6   process gets started because that will be very important and

7   keeping to a strict schedule, but you won't have a problem with

8   that going forward; is that correct?

9         A.    No.

10        Q.    Just wanted to clear up some little housekeeping.

11  Let's talk about the type of case that we're called upon or

12  asking you to serve as a juror on today if you're qualified,

13  and that is a capital murder.  We have regular murders down

14  here where if I were to turn and shoot Andrea in the head right

15  now 16 times, I'm clearly intending to kill her if I'm shooting

16  her in the head 16 times, and especially if I were to dance

17  around on her body and run out of here and tell everybody what

18  I did and that I was proud of it.  That would just be a regular

19  murder because I don't have any sort of aggravating factor to

20  go with it.  And so that regular murder, as cold and callous

21  and heinous as that may be, I wouldn't be eligible for the

22  death penalty and I wouldn't be eligible for life without

23  parole because there's not that intentional killing plus

24  something else.  Do you see that?

25        A.    Yes.

1     Q.    So a capital murder is always going to be an

2  intentional killing, but it's going to have some sort of other

3  factor to go with it.  So capital murder here in Texas can be

4  killing of a police officer in the line of duty, a killing of a

5  child under the age of 10.  It can be the intentional killing

6  of two or more individuals in one transaction.  Or we can have

7  what we're talking about here, the intentional killing of a

8  person in the course of another felony offense, here being a

9  robbery.  Do you see that?

10     A.    Yes.

11     Q.    And so for the offense of capital murder, there are

12  only two possible punishments if the jury were to find the

13  Defendant guilty and the jury was unanimous in guilt of capital

14  murder.  Those two possible punishments are life without parole

15  or the death sentence.

16          Now, I know in your questionnaire you talk a lot

17  about -- kind of in terms of what somebody would deserve or

18  like Question Number 10 on page 2:  If you know you are doing

19  something wrong and cause a person to die when you deserve --

20  then you deserve the death penalty unless it was an accident.

21  I'll tell you what we're talking about when we say an

22  intentional killing, it's going to be that person's conscious

23  objective or desire is what the law says.  And so in other

24  words, you do what you meant to do.  That's what intent is.

25  And intent can be formed just like that, in an instant.  Do you

1  agree with that?

2       A.    Yes, ma'am.

3       Q.    You know, I may go and want to steal Andrea's shoes

4  she has on today and that -- that's my goal is to take her

5  shoes.  But I take my gun with me in case she gets feisty and

6  sure enough, lo and behold, she does.  She tells me, no, you're

7  not taking my shoes and, you know, tries to push me off of her

8  and so I end up shooting her because I really want the shoes.

9  Now, that wasn't what I intended when I went into it, but

10 obviously at the time I pulled that trigger and shot her to

11 take those shoes, that was my intent.  Do you get how that

12 intent can change?

13      A.    Yes, ma'am.

14      Q.    So it's your intent at the time that you're

15 committing that offense, whatever that may be.  And it can be

16 formed like that.  But what we're not talking about is

17 anything -- a death that is caused by an accident or a mistake

18 or because of mental disease or defect the person doesn't know

19 the difference between right or wrong, or because some sort of

20 self-defense or defense of another person would apply.  We're

21 talking about that person did what they meant to do, an

22 intentional killing, plus that something else to make it

23 capital murder.

24            And so I get completely what you're talking

25 about in your questionnaire whenever you're talking about then

 1   you deserve the death penalty.  And a lot of jurors talk in

 2   terms of, you know, what somebody may or may not deserve.  And

 3   we do that a lot at home, do we not, when we're watching TV

 4   and, you know, you'll see something on TV and say, wow, that

 5   person deserves the death penalty.  Or, you know, you may see

 6   something else that you say, well, that deserves this penalty

 7   or that penalty.  And we can arm chair quarterback at home

 8   pretty well, but I'll tell you that the jurors are never going

 9   to be called upon in this process, because it's very much of a

10   legal process and I know you saw that before in your civil

11   service as a juror -- is that the jurors are never going to be

12   called upon to say who deserves the death penalty or who

13   deserve a life sentence because while we're real good at that,

14   that's not what the law is.

15            The way we arrive at the verdict in the

16   sentencing phase, whether it's going to be life without parole

17   or a death sentence after somebody's found guilty of capital

18   murder, is your way you answer these special issues.  Does that

19   make sense?

20        A.   Yes, ma'am.

21        Q.   Because we separate them out not based on who

22   deserves it, but the State of Texas says it's going to be based

23   on what you're more than likely going to do in the future down

24   the road because we don't execute people for what they've done.

25   We execute them for what they're more likely going to do in the

1  future.  That they're going to continue to be a constant threat

2  in society.  Did you get that distinction when you were kind of

3  looking at the pamphlet?

4       A.   Yes.

5       Q.   And we'll go into that more in depth.  We, of

6  course, ask you to fill out this questionnaire before you knew

7  the law about anything, so I know you're just talking about

8  your thoughts and feelings surrounding the death penalty and

9  there is nothing wrong with that.  I see that you do have

10  strong feelings in favor of the death penalty; is that right?

11       A.   Yes.

12       Q.   And nobody is going to try to change your feelings

13  or beliefs.  We dont ask you to -- when we're sending you

14  through the metal detector, we don't say to check all your

15  common sense and beliefs down at the courthouse door.  You get

16  to bring all that with you.

17            The thing about it is, the process we're doing

18  right now is to make sure that if the Judge were to give you

19  the law as it relates to a case like capital murder, that even

20  though you have these strong feelings and beliefs regarding the

21  death penalty, that you would still be able to follow the law

22  and follow the process and not automatically arrive at any

23  sentence that would be a death sentence, just because of your

24  strong feelings and beliefs.  Does that make sense?

25       A.   Yes.

1      Q.    Because we do have some jurors that come in here and

2  say that they will always answer these questions in such a way

3  that a death penalty will result because that's how strongly

4  they feel about the death penalty.  Can you see how that

5  wouldn't be fair to the Defendant?

6      A.    Yes.

7      Q.    And then we've got other jurors that come in here

8  and they're on the opposite end.  They -- for whatever reason,

9  because the death penalty does bring with it strong personal,

10  moral, religious beliefs.  Sometimes how we're raised, some

11  jurors come in here and tell us that they're so opposed to the

12  death penalty and think that it's absolutely wrong, that

13  they're always going to answer these questions in such a way

14  that a life sentence is going to result.  Well, the State of

15  Texas is entitled to a fair trial, too, so can you see how that

16  wouldn't be proper either?

17      A.    Right.

18      Q.    And so we're just looking for jurors that can follow

19  the law after it's been given to them and clearly -- like I

20  said, we know you didn't know the law whenever you came in and

21  just filled this out blankly.  So let's talk a little bit about

22  the law that would apply if you were to sit and serve as a

23  juror, and then I'm going back to your questionnaire with a few

24  questions I have.

25      A.    Okay.

1        Q.    There are certain principles of law that come up in

2   every type of criminal case.  It doesn't matter -- you probably

3   didn't deal with these too much over in the civil courthouse,

4   but I'm sure you've seen a lot of this on TV.  It doesn't

5   matter if we're talking about a shoplifting case in misdemeanor

6   court or if we're talking about the capital murder where the

7   State is seeking the death penalty, the Defendant on trial

8   always has the presumption of innocence.  Just because he's

9   been indicted for the offense of capital murder doesn't mean

10  he's guilty of anything because an indictment is nothing more

11  than a sheet of paper, and it lets the State know what we've

12  got to prove to the jurors and it puts the Defense on notice

13  with what he's been charged with, and it really serves as a

14  road map or checklist for the jurors so they can go through and

15  make sure that the State of Texas dotted all their I's and

16  crossed all their T's in the courtroom with what we've got to

17  prove.  Does that make sense?

18        A.    Yes, ma'am.

19        Q.    And so some jurors will tell us, well, you know

20  what, if you've gotten to this process and you're in here

21  selecting jurors on a death penalty, then I believe that where

22  there's smoke, there's got to be some fire and he must be

23  guilty of something or he wouldn't be sitting here.  Can you

24  see where that flies in the face of the law and the presumption

25  of innocence?

1      A.    Yes.

2      Q.    And so if you were to sit and serve as a juror in

3 this case, would you be able to give this presumption of

4 innocence -- give this Defendant his presumption of innocence

5 and wait until the State of Texas does our job in proving the

6 elements in that indictment beyond a reasonable doubt?

7      A.    Yes, ma'am.

8      Q.    And as he sits here right now, you get it, he isn't

9 guilty of anything?

10     A.    Yes, ma'am, I do.

11     Q.    Okay.  Another important right is that the burden

12 always rests solely over here at this table.  You always look

13 to the State to prove that stuff in the indictment.  We're the

14 ones that did the accusing, we better be the ones to do the

15 proving.  In the punishment phase, we're the ones saying that

16 he is going to more than likely continue to commit criminal

17 acts of violence that constitute him being a continuing threat,

18 which is why we're seeking the death penalty.  And so it's

19 going to be our job, again, in Special Issue Number 1 to prove

20 that stuff to you beyond a reasonable doubt.  You never look to

21 this table to prove that he's innocent, you know, because that

22 would be backwards and wrong, right?  You got to look to the

23 ones doing the accusing.  And you never look to this table to

24 show that he's not going to be a danger in the future.  You got

25 to hold State to the burden and require us to prove it.  And if

1  we fail, then it's a not guilty.  If we fail in Special Issue

2  Number 1, then the answer to that is no and a life sentence is

3  proper.  Could you only look to the State in proving what we

4  have to prove and never shift it over here?

5       A.    Yes.

6       Q.    You could just require the State to do our job?

7       A.    Yes, ma'am.

8       Q.    And I say that because really under the law, the

9  Defendant, he's done his job.  And in trial, come the end of

10 October, first of November, simply by showing up and being here

11 in this courtroom, he will have done his job.  They can work

12 crossword puzzles or do whatever they want over there at that

13 table.  They're good lawyers.  They're not going to, but the

14 law doesn't require them to call witnesses.  The law doesn't

15 require them to cross-examine the witnesses we bring.  And it

16 certainly doesn't require them to bring any sort of evidence

17 because you look to the State.  And you would do that, right?

18      A.    Yes, ma'am.

19      Q.    Now, when I say it's our burden -- when you served

20 on that civil trial, do you remember how -- what their level of

21 proof was or their burden of proof was over there?

22      A.    Yes.

23      Q.    And was it something like slightly tipping the

24 scales?  Preponderance?  Does that ring a bell?

25      A.    Yeah, because they had to also prove their point

1  versus the other side.  Pretty much how it's kind of going

2  here.

3      Q.    Okay.  You're absolutely right.  But with a civil

4  trial, it's a lower burden of proof.  You just have to be --

5  slightly tip the scale --

6      A.    Uh-huh.

7      Q.    -- for one side or the other.  Here, remember, you

8  only look to the State to be bringing you that proof.  And our

9  burden is beyond a reasonable doubt.  And it's the highest

10 burden in our legal system, and we would want it to be, right?

11     A.    Yes.

12     Q.    If we're talking about a person's liberty and

13 perhaps their life, then we want to be convinced beyond all

14 reasonable doubt.  Now, I can tell you under the law what it's

15 not.  It doesn't have a legal definition, but it's not

16 100 percent certainty and it's not beyond all possible doubt

17 because obviously, to know something like that, you would have

18 to see it with your own eyes, would you not?

19     A.    Yes, ma'am.

20     Q.    Could you just hold the State to beyond a reasonable

21 doubt in this case?

22     A.    Yes, ma'am.

23     Q.    But understanding it is a high burden?

24     A.    Yes.

25     Q.    And we've got to do our job.

1            Another important right is that the Defendant

2   has a Fifth Amendment right, and I know you've probably heard

3   of this one.  Out there on the streets, they can say, hey, I

4   plead the Fifth, you know, I don't want to talk to you, police

5   officer, who's trying to stop me about this speeding ticket.

6   You could say, I want my lawyer.  Same holds true in this

7   courtroom.  A criminal defendant never has to testify.  It

8   doesn't matter if it's the guilt/innocence phase or the

9   punishment phase, I can't call him to the stand to testify.

10  His own lawyers can't say, you better get up there and tell

11  that jury what you have to say.  It's his decision and his

12  decision alone.

13            Now, he has an absolute right to testify, if he

14  chooses to, but he has that absolute right not to testify.  And

15  here's what the law would tell you, that if a defendant chooses

16  not to testify, regardless of what phase, the guilt/innocence

17  or the punishment phase, you can't take that fact and use it as

18  evidence of anything because we don't know why.  There's a

19  whole host of reasons, as you might imagine, why somebody

20  chooses not to testify.

21            First and foremost, his lawyers may tell him,

22  well, the State didn't do their job, so the jury is going to

23  have to return a verdict of not guilty and so why in the world

24  would you get up there and subject yourself to that when the

25  jury's going to have to return a verdict of not guilty?  Or it

1   could be they're not well spoken.  They might be fearful that

2   they're going to incriminate themselves, if not of the case

3   they're on trial for, but of maybe something else.  There can

4   be a whole lot of reasons and the law recognizes that and

5   that's why it says that you can't use it as evidence of

6   anything if they choose not to.  If the Defendant chose not to

7   testify, can you guarantee us that you wouldn't hold it against

8   him?

9        A.    Yes.

10       Q.    You wouldn't use it as evidence of anything?

11       A.    No.

12       Q.    Okay.  Now, another important principle or thing

13  that you would have to do if you were to sit and serve as a

14  juror, and I think you get this, is that it would be your job

15  to listen to and evaluate all the evidence and listen to the

16  witnesses and determine whether you believe all, part, or none

17  of what somebody is telling you.

18            Now, just because a police officer walks in

19  here, it doesn't matter how decorated his uniform is and that

20  he carries a badge and a gun, we know there are some good

21  officers and some bad officers, right?

22       A.    Right.

23       Q.    And so simply by virtue of the fact somebody's a

24  police officer, the law says that you've got to start out all

25  witnesses, doesn't matter what profession they're in -- a

1  priest, a prostitute, a police officer -- you've got to start

2  them out all the same and wait until you hear what they have to

3  tell you before you start giving them a leg up or giving them a

4  leg down judging their credibility.  Would you be able to wait

5  until you hear what a police officer has to tell you before you

6  automatically say they're going to be more truthful?

7        A.    Yes.

8        Q.    Okay.  And you recognize that in your questionnaire.

9  And so those are all of the important rights that the jurors

10  would have to understand and agree to follow if you were to sit

11  and serve as a juror.  And I think you get all those.

12              Let's talk a little bit more about that

13  indictment.  We are required to prove to you every single thing

14  in there.  There are no technicalities.  So if we fail to prove

15  even one of them, no matter how insignificant it may seem or be

16  in light of everything else you heard, the proper verdict would

17  have to be not guilty as to the charged offense if we fail in

18  our proof.

19              Now, let me give you an example of what I'm

20  talking about, and we're not going to be talking about the

21  facts of this case because the law doesn't allow either side to

22  talk about this case.  But let's say our indictment said that

23  we were going to prove capital murder against the Defendant,

24  and it was an intentional killing in the course of a robbery,

25  in our indictment, but let's say you're sitting on that jury,

```
 1  and you believe, as do the other 11 jurors, that we did get it
 2  right in terms of it is this Defendant, he did do this
 3  intentional killing, and it happened against the victim on the
 4  day we said it happened and it happened in Dallas County, but
 5  you never heard any evidence about a robbery taking place.  You
 6  just believed beyond a reasonable doubt that this Defendant did
 7  an intentional killing.  In fact, you don't hear about a
 8  robbery.  You hear about that it was a killing in the course of
 9  a sexual assault, a different felony than what we've put in our
10  indictment.  Do you get how those two don't jive?
11        A.    Right.
12        Q.    They're not the same.
13        A.    No.
14        Q.    And so as a result of that, your verdict as to
15  capital murder would have to be, if you're following your oath,
16  not guilty, right?
17        A.    Right.
18        Q.    And would you be able to hold us to that, and if we
19  fail in our proof, could you return a verdict of not guilty?
20        A.    Yes, ma'am.
21        Q.    No matter how distasteful it may be?  If I don't do
22  my job, I may be looking for a new one, but it's not the
23  jurors' job to give me a leg up or help me out, right?
24        A.    Right.
25        Q.    And you wouldn't do that, help us out?  No?
```

1          A.    No.

2          Q.    Okay.  Because it's just your job to render a true

3     verdict according to the law and the evidence, those two things

4     only.

5                     Now, in that situation I'm telling you about,

6     the Defendant still may be guilty of something because

7     remember, you believe beyond a reasonable doubt he did an

8     intentional killing.  You just didn't believe that extra part

9     to make it capital murder.  And so in that situation you may be

10    given the option to convict the Defendant of that lesser

11    offense of murder, just a plain murder.  In that situation life

12    without parole would be off the table.  The death penalty would

13    then be off the table, obviously, because we're talking about a

14    regular murder.  And you would be looking at a range of

15    punishment.  Anywhere from five to 99 years or life is what our

16    legislature has said is the proper punishment range for the

17    offense of murder.

18                    Now, after you've heard all the evidence in the

19    case -- the situation I'm telling you about, if you thought

20    that the proper thing to do after you heard everything was to

21    then give a sentence of five years in prison, could you give a

22    sentence of five years in prison for murder if you thought that

23    was the right punishment?

24         A.    Yes, if that was the right punishment.

25         Q.    After you've heard everything?

1      A.    Yes, ma'am.

2      Q.    And if you thought a life sentence was the

appropriate punishment after you heard all of the evidence,

could you then give a life sentence?

5      A.    Yes, ma'am.

6      Q.    And anywhere in between?

7      A.    Yes.

8      Q.    Because in order to be qualified to sit and serve as

a juror, you just have to be able to keep an open mind, and

your mind can't be foreclosed to either end of that range.  And

you would be able to do that, right?

12      A.    Yes, ma'am.

13      Q.    Okay.  And so now we've talked about the scenario.

Obviously, if somebody is found not guilty altogether, then we

all go home, including the Defendant.  If you got the lesser of

murder, that's what we just talked about.

17      Now, if somebody is found guilty of the offense

of capital murder, there's two phases to a criminal trial.

That first phase, you just get to see a snapshot, just the day

in question, just the stuff in our indictments and go through

and say did we prove those things in the indictment.  It's not

proper and the law doesn't permit us to talk about a

Defendant's criminal history or lack thereof or their character

or background or anything like that in that first phase of the

trial because it's just did the State prove what they alleged

1  happened.  Does that make sense?

2      A.  Yes, ma'am.

3      Q.  Now, in the second phase of the trial, if you find

4  the Defendant guilty of capital murder, you get to hear

5  additional evidence.  You get to consider what you heard and

6  what you found the Defendant guilty of in that first phase of

7  the trial, but you also might hear a criminal history, or a

8  lack thereof.  You may hear a person's character, background,

9  all sorts of things that you get to hear additional in that

10 punishment phase that you didn't get to hear in the

11 guilt/innocence phase.  And whenever we're going to the

12 punishment phase, just like the Defendant as he sits here now

13 and as he'll sit there at his trial, unless and until we do our

14 job and prove it beyond a reasonable doubt, he has that

15 presumption of innocence, remember?

16     A.  Yes.

17     Q.  The law says that the presumed punishment for

18 capital murder defendants is going to be life without parole.

19 The vast majority of defendants convicted of capital murder are

20 going to receive that sentence, life without parole, because

21 remember, we reserve that death penalty for those few that are

22 going to continue to be a danger in our society, right?

23     A.  Yes, ma'am.

24     Q.  And so could you give the Defendant the presumption

25 that a life without parole is proper, unless and until we

1  answer these special issues in a certain way?

2       A.   Yes, ma'am.

3       Q.   Okay.  Looking at Special Issue Number 1 we're going

4  into this knowing that the best possible punishment -- because

5  where we are when you're answering these is, is you've found

6  the Defendant guilty of an intentional killing in the course of

7  a robbery.  That -- that's what you would have done when you're

8  looking at these.

9            So Special Issue Number 1 says whether there is

10 a probability, and under the law that just means more likely

11 than not.  It's not a possibility because anything would be

12 possible.  And it's not something that we're saying will happen

13 because obviously, we can't know with all certainty.  Again,

14 it's kind of like that 100 percent.  We can't know with

15 100 percent certainty.  So what the law would say is more

16 likely than not that the Defendant would commit criminal acts

17 of violence.

18           Now, criminal acts of violence is something like

19 that beyond a reasonable doubt.  It doesn't have a definition.

20 It's whatever criminal acts of violence to you would constitute

21 that person being a continuing threat.  Some jurors tell us if

22 I were to haul off and hit Andrea right now, that, yeah, that

23 would be an assault, so that would be a criminal act of

24 violence to them.  Other jurors tell us that spitting on a

25 guard in a given situation might be a criminal act of violence

```
 1  to them.  I'm not going to pin you down and ask you what it is
 2  to you today.  You'll just know it if you see it, but I -- I
 3  can tell you what it's not.  The law doesn't tell us, State,
 4  you better prove more likely than not this Defendant is going
 5  to kill again.  You better prove more likely than not that he's
 6  going to do another robbery or rape.  It doesn't pigeonhole us
 7  into the type of criminal act of violence that we've got to go
 8  about proving.  Does that make sense?
 9       A.    Yes, ma'am.
10       Q.    But it does say criminal acts, more than one,
11  violence that would constitute him being a continuing threat to
12  society.  Now, remember, at this point in time you have found
13  the Defendant guilty of an intentional killing in the course of
14  a robbery -- if we're looking at these --
15       A.    Uh-huh.
16       Q.    And the best possible punishment he can get is life
17  without parole, and that's the presumed punishment.  So where
18  is he going to be when we're talking about society, when you're
19  looking at answering that?
20       A.    Number 1 or Number 2?
21       Q.    Number 1.
22       A.    Number 1.  Just in general?
23       Q.    What do you think we're talking about when we say
24  society?
25       A.    The outside world.
```

1          Q.    That's what most people think of, I'll tell you

2    that.  But if you found the Defendant guilty of capital murder,

3    the best punishment he can hope for is to be in prison for the

4    rest of his life.  And life without parole means exactly that.

5    He ain't getting out.  He's going to die there.

6                    And so when we're talking about society, it's

7    wherever the Defendant finds himself, but, you know, honestly,

8    if you've found him guilty, then the best he can do is going to

9    be prison society, right?

10         A.    Right.

11         Q.    And so really what Special Issue Number 1 is talking

12   about, that more likely than not this person is going to

13   continue to be a danger even in prison.  Do you get that?

14         A.    Yes, ma'am.

15         Q.    Do you think there are people in prison that deserve

16   the same level of protection as you and I do?

17         A.    Yes.

18         Q.    And I mean, you've got other inmates, some of which

19   are trying to do their time peacefully.  You've got guards just

20   trying to earn a living.  You've got ministers that go in there

21   and try to talk to some of them.  You've got nurses, doctors.

22   You've got other family members that are going to visit their

23   loved ones there.  And so can you see how that is in and of

24   itself its own society?

25         A.    Yes.

1      Q.    Do you think that prison is a dangerous place, or

2  could be?

3      A.    It could be.

4      Q.    Have you ever visited a prison?

5      A.    Yes.

6      Q.    You have?  Were you visiting someone that you know

7  or were you just on a tour?

8      A.    Visiting someone.

9      Q.    Okay.  And so you in and of -- whenever you were

10  there visiting, you would be part of that society, right?

11      A.    Yeah.

12      Q.    And certainly you would want to be protected while

13  you were there?

14      A.    Yes.

15      Q.    And so that's why we have Special Issue Number 1

16  because do you think there are those individuals that still

17  more likely than not are going to be a danger even in prison?

18      A.    Yes.

19      Q.    There are those people.  How do you think that we

20  could -- or what would be important to you in answering Special

21  Issue Number 1?

22      A.    As far as like --

23      Q.    Based on evidence that could be presented to you,

24  what's important, in your mind?

25      A.    In my mind, basically if the person was found, you

1    know, guilty, and they got the lesser charge and they did go

2    into the society of prison, that they had like remorse and they

3    wanted to do better or not harm anybody else, basically.

4         Q.    Okay.

5         A.    But if they did -- were guilty, and they didn't have

6    any remorse, no feelings for humanity, then the death penalty

7    would be the more reasonable decision.

8         Q.    Okay.  And remember, when we talk about that this is

9    a process, that there are no automatics.  Just because somebody

10   is guilty of capital murder, just because they've done an

11   intentional killing in the course of a robbery --

12        A.    Uh-huh.

13        Q.    -- no matter how bad that offense may or may not be,

14   you know, to the jurors that you found them guilty of, you

15   don't automatically assess the death sentence or we would have

16   no reason to have a punishment phase and no reason --

17        A.    Right.

18        Q.    -- to answer these, right?

19        A.    Right.

20        Q.    Because there's two possible punishments, with life

21   without parole being the presumed punishment -- it should be,

22   unless and until we do our job --

23        A.    Uh-huh.

24        Q.    -- and prove Special Issue Number 1 to you.  I'll

25   tell you, some jurors tell us exactly what you're talking

1   about, which is if I don't see any remorse, then I just -- I

2   don't know.  Now, you can look to the circumstances of the

3   offense that you found him guilty of.  The law permits you to

4   do that.  You can look to what was going on before that

5   offense, during that offense, and how the Defendant acted after

6   that offense, but remember, the Defendant has that important

7   Fifth Amendment right where he doesn't have to testify and you

8   can't require him to testify.  Now, if you hear from him,

9   obviously you may know whether or not they're remorseful.  But

10  the law also isn't going to permit some of his family members

11  to get on the stand and say, oh, he feels really bad about what

12  he did because that would be hearsay.

13       A.   Yes.

14       Q.   And so even if you don't hear from -- or how do you

15  think you would be able to determine whether or not somebody

16  was genuinely remorseful or they were just kind of giving lip

17  service to it, or do you think that happens sometimes?

18       A.   It happens sometimes, but some -- you can also tell

19  in body language, the way a person acts.

20       Q.   Okay.  And do you think some people could be on

21  their very best behavior when they're in here for their

22  judgement day?

23       A.   Yes.

24       Q.   Okay.  So there's a whole host of things you may

25  have to be looking to in the evidence, right?

1          A.    Yes.

2          Q.    But it's got to be based on the evidence because

3    remember, it's a process.  There are no automatics, and so

4    you've got to look at what you do have.  You can't require him

5    to prove that he's not going to be or that he is remorseful

6    because that might be requiring him to testify, right?

7          A.    Right.

8          Q.    And we can't do that.

9          A.    Huh-uh.

10          Q.    Do you think that it's possible -- because, you

11    know, really when we're looking at -- down the road into the

12    future, we're really asking you to get out your crystal ball

13    and look at it and say more likely than not, based on the

14    evidence you're seeing in that case, whether or not somebody is

15    going to commit criminal acts of violence that are going to

16    constitute them being a continuing threat even in prison.  Do

17    you think that's something that it's possible for the State to

18    prove to you beyond a reasonable doubt?

19          A.    Yes.

20          Q.    Okay.  Just based on what you hear or see in the

21    evidence?

22          A.    Right.

23          Q.    And remember, the law does say you can look solely

24    to the offense for which you've found them guilty of.  You just

25    can't automatically say that, oops, just because they did an

1  intentional killing in the course of a robbery, I'm always

2  going to answer that yes.

3      A.    Right.

4      Q.    Does that make sense?

5      A.    Yes, ma'am.

6      Q.    You've got to look at it in terms of the evidence

7  and say, well, based on that, are they going to commit criminal

8  acts of violence that are going to constitute them being a

9  continuing threat.

10          Now, if looking at Special Issue Number 1, the

11  answer to that is no, we fail in our proof and we don't prove

12  that to you, then the trial stops and the proper punishment is

13  life without parole.  If, however, we prove that to you, that

14  the answer is yes, then your job as a juror is not done.  The

15  State of Texas's job is done because we don't have a burden of

16  proof as it relates to Special Issue Number 2.  And remember,

17  the Defense, you never look to them to prove anything to you.

18  And so they don't have a burden of proof as it relates to

19  Special Issue Number 2 either.  It's just you look at

20  everything that you do have in the evidence, everything in the

21  guilt/innocence phase, everything in that punishment phase, you

22  take another look at it again in relation to Special Issue

23  Number 2, and decide whether taking into consideration all of

24  the evidence, including the circumstances of the offense, the

25  Defendant's character and background, and the personal moral

1   culpability of the Defendant, whether or not there is a

2   sufficient mitigating circumstance or circumstances to warrant

3   that a sentence of life imprisonment without parole rather than

4   a death sentence be imposed.  Now, that's a lot of words.  But

5   basically it's just asking you not to disregard or turn a blind

6   eye to any piece of evidence that you heard in the trial.

7               Well, some jurors tell us that what may be -- by

8   mitigating, what we're talking about is something that would

9   lessen the Defendant's responsibility, lessen his potential

10  exposure for punishment.  Does that make sense?

11      A.    Yes.

12      Q.    Some jurors tell us that what may be lessening the

13  Defendant's responsibility to them, another juror may say, no,

14  I think that makes them worse.  And what I mean by that is,

15  some jurors tell us that being intoxicated on drugs or alcohol

16  at the time of the offense -- you know, high or intoxicated may

17  be lessening their responsibility to them.  And other jurors

18  say, no, no, no, if you do two things, you voluntarily ingest

19  that substance that's making you high or intoxicated, then you

20  go out and commit a crime, not only are you guilty, but I think

21  that makes you worse.  And that's perfectly fine.

22              What the law would say is if you hear evidence,

23  such as a person's upbringing, circumstances of their birth,

24  their educational background or lack of a good educational

25  background, or a bad home life or being abused physically or

1   sexually as a child -- and, again, we -- we're not talking

2   about facts of this case.  We're just saying things that

3   sometimes come up in the punishment phase -- that those would

4   just be things that you would consider because the law would

5   require you to do that in Special Issue Number 2 -- is just

6   listen to it all.  And after you listen to it all, then you

7   determine if there's something in your mind that lessens the

8   Defendant's responsibility.  And then if there was something

9   that lessened his responsibility or role based on the evidence,

10  then you would have to look at it and say, but, after I found

11  this person guilty of an intentional killing in the course of a

12  robbery and after I've found that they're going to be a danger,

13  even in prison, is this something so sufficiently mitigating to

14  me, something, you know, that really lessens his

15  blameworthiness to the degree that this should be a life

16  sentence now, rather than a death sentence.  Does that make

17  sense?

18        A.    Yes, ma'am.

19        Q.    And you don't have to think of something right now

20  in your mind that -- because obviously, you're talking about a

21  pretty bad person.  If you found him guilty of capital murder,

22  and if you found they're going to still be a danger even in

23  prison, it's going to have to rise to the level of being pretty

24  darned mitigating -- sufficiently mitigating to you, such that

25  you're going to make this a life sentence.  But what the law

1    would just say is, if you hear something in the evidence, even

2    though you've found them guilty of capital murder, even though

3    you found they're a future danger, would you answer Special

4    Issue Number 2 yes, if based on the evidence something said to

5    you that he was deserving of a life sentence?

6         A.   Yes.

7         Q.   Now, if you don't hear anything, then the answer to

8    that is no.  And, now, again, with Special Issue Number 2, you

9    know, people will tell us, well, the moral culpability of the

10   Defendant, how am I going to know that if he doesn't take the

11   stand and testify.  Well, what Special Issue Number 2 would say

12   is, again, you can't require him to do that.  But if you hear

13   it in the evidence, would you answer that yes.  Again, if you

14   don't hear it, then the answer is no, if you don't hear

15   anything.

16        A.   If I don't hear like about any moral -- if I don't

17   hear it, I wouldn't consider.

18        Q.   You just don't hold it against him --

19        A.   No.

20        Q.   -- that he doesn't testify, right?

21             But if you heard something in the evidence, even

22   if he doesn't testify, but there was something about the

23   evidence to you that says he's deserving of a life sentence,

24   would you answer that yes?

25        A.   Yes.

1      Q.    Okay.  Do you have any questions about Special Issue

2  Number 2, because we didn't always have Special Issue Number 2.

3  The reason we have it is because if you're abiding by your oath

4  and rendering a true verdict according to the law and the

5  evidence, jurors may find that they have to, because following

6  that checklist, the State of Texas proves beyond a reasonable

7  doubt that the Defendant is guilty of capital murder, then

8  we're entitled to verdict of guilty on that.  And then jurors

9  in looking at the evidence and in following their oath, they

10 may have felt required to, based on the law and the evidence,

11 to find that, yeah, everything that I saw and heard, he's more

12 likely than not going to be committing criminal acts of

13 violence that constitute him being a continuing threat.  And

14 before we had Special Issue Number 2, jurors had no way.  They

15 had no vehicle of saying, but, wait, there was still something

16 about the Defendant or there was still something about that

17 offense that says to me that that should be a life sentence.

18 Do you see that Special Issue Number 2 is pretty important?

19     A.    Yes, ma'am.

20     Q.    And so it gives the jurors a way, but it's got to be

21 based on the evidence.  And I see on Question Number 39, page

22 6, where you recognize the types of things that we're talking

23 about that can play a factor in some circumstances.  You see on

24 page -- Question Number 39 --

25     A.    Yes.

1       Q.    -- where you're talking about those exact things

2   that we're talking about you may hear in Special Issue Number

3   2?

4       A.    Yes.

5       Q.    And just because they may be a factor in one case,

6   doesn't mean they're going to be a factor in another.  And just

7   because you hear evidence of it, doesn't mean that it's going

8   to be sufficiently mitigating to you to make it a life

9   sentence.  It's just if you hear it, would you do it?  Because,

10  remember, it's -- there's no automatic answers.

11      A.    Yes.

12      Q.    Okay.  In looking, again, at your questionnaire, I

13  just want to ask you a couple of things.  Let me first tell you

14  where we are today.  Obviously, the jurors have to listen to

15  and evaluate the evidence at the time of the trial because

16  you're not going to hear anything today and we're not going to

17  ask you how you would vote regarding anything.  But I will tell

18  you where we are is that my boss, Craig Watkins, has decided

19  that we are seeking the death penalty against that man down

20  there at the end of the table, Matthew Lee Johnson.  It's not

21  something he's still thinking about or that he may change his

22  mind about.  It's our goal at the end of the day, and we

23  believe we have the quality and the quantity and the type of

24  evidence that will cause the jurors to convict Matthew Lee

25  Johnson of capital murder.

1              And then going on into that punishment phase,

2  again, we believe we have the quality and the quantity and the

3  type of evidence that are going to cause the jurors to answer

4  these special issues yes and then no, that will cause the Judge

5  to sign essentially a death warrant -- a warrant for his death.

6  And at that point in time he will be taken to Huntsville and at

7  some point -- date in the future, taken to the death chamber,

8  laid on a gurney, his arm extended, needle inserted into his

9  arm whereby lethal injection will be pumped into his body until

10 the point in time where he's pronounced dead.  And I don't tell

11 you that to be morbid or gruesome.  It's just how we kind of

12 started out talking about the process.  And we can armchair

13 quarterback at home all day long.  Sometimes jurors, when they

14 get in there and they recognize and realize that we're talking

15 about this human being here at the end of the table who has a

16 family who loves him just like you and I do and he puts on his

17 pants every day just like you and I do, they say, wait, I might

18 better take a step back.  I don't know how I feel.  How do you

19 feel about participating in this very real process?

20      A.    I feel okay.

21      Q.    You do?

22      A.    (Nods head up and down.)

23      Q.    Okay.  And if the State proves to you what we're

24 setting out to prove beyond a reasonable doubt, and if we

25 proved to you these things in Special Issue Number 1 and your

1  answer to that is yes and you go on to consider everything in

2  Special Issue Number 2 and your answer is no and that results

3  in an execution date being set for this Defendant, down the

4  road you may be with family and friends -- and I know I saw

5  that you've got some family members that believe only God can

6  judge, that it's not our job to be participating in this sort

7  of process and making these calls and doing this sort of thing.

8  If you were to be sitting around your family and that date

9  arrived and you know that but for your decision -- because it

10  has to be unanimous before he receives the death penalty -- but

11  for your decision and but for your hand in that, this man

12  wouldn't be executed, are you going to have any problem with

13  that, living with that, and being with these family members

14  that maybe don't believe --

15       A.    No.

16       Q.    -- like you do?

17       A.    No.

18       Q.    You'd still be all right with that?

19       A.    Yes, ma'am.

20       Q.    Okay.  And I also see in your questionnaire that

21  you, yourself have been a victim of family violence type stuff;

22  is that right?

23       A.    Yes.

24       Q.    Is that on one situation or more than one?

25       A.    One situation.

1        Q.    Okay.  And as a result of that, did you have to use

2   the services here of the D.A.'s office or did you have to meet

3   a prosecutor?

4        A.    I used the services here at the court.

5        Q.    Okay.  And was that in response to the criminal

6   proceeding, as well as a protective order?

7        A.    It was just a protective order.

8        Q.    Just a protective order?

9        A.    Yes.

10        Q.    Okay.  Was there anything about that experience that

11   left a bad taste in your mouth or that you think you would

12   bring it into your listening to and evaluating the evidence in

13   this trial and hold it against either the State or the Defense?

14        A.    No.

15        Q.    You can separate those two out?

16        A.    Yes.

17        Q.    Okay.  Now, I do see on Question Number 52 where we

18   asked you if you or your spouse or any family members, close

19   personal friend, have ever been accused or arrested or

20   convicted of an offense.  And you checked no at first, and then

21   scribbled it out and put yes, but you didn't list for us who

22   the individuals were you were thinking of.

23        A.    Forgot to go back and write that in.

24        Q.    That's all right.  Do you mind telling us about that

25   now?

```
 1        A.    I have an uncle that was in prison.

 2        Q.    For what offense, if you know?

 3        A.    I was a young child.  I was 11 at the time when he

 4   went, but he got out in '04, I believe.

 5        Q.    Okay.

 6        A.    I can't remember --

 7        Q.    You don't know what the crime was he was accused of?

 8        A.    I can't remember what he was accused of.

 9        Q.    Do you think it was for something like we're sitting

10   here on today or definitely not?

11        A.    No.

12        Q.    Okay.  Anything about that experience with your

13   uncle having been incarcerated that's going to affect you here

14   today?

15        A.    No.

16        Q.    Okay.  Is that who you went and visited or was it

17   someone else?

18        A.    Yes.

19        Q.    Okay.  And do you still keep in touch with him now

20   that he's out?

21        A.    Yes.

22        Q.    All right.  Now, what about any other person that

23   you were thinking of with relation to 52?

24        A.    I have two brothers that's -- I have a brother

25   that's in here now, and his charge, I think, is assault, maybe.
```

```
 1        Q.    Okay.  He's currently in Lew Sterrett?

 2        A.    Yeah.

 3        Q.    All right.  And is he waiting on trial, or has he

 4   been punished, do you know?

 5        A.    I have no idea.  I think they kind of just picked

 6   him up like last Thursday or something like that, so --

 7        Q.    Okay.  And is he a brother that you keep close

 8   contact with or not so much?

 9        A.    Yeah.  My mom has five kids.  I have four brothers,

10   so we're kind of a close-knit --

11        Q.    Tight family?

12        A.    -- family, yeah.

13        Q.    Okay.  Anything about the fact that your brother has

14   pending charges right now that you would hold against the State

15   or the Defense or do you think -- I know it's kind of fresh and

16   new, but has he been treated fairly thus far?

17        A.    Yeah, he's -- I mean --

18        Q.    To your knowledge?

19        A.    Like I feel if you do something to someone -- I

20   mean, if it's proven against you, then you have to, you know,

21   deal with the consequences that you did.  Can't do anything but

22   pray for him and, you know, keep going.

23        Q.    Certainly.  But it's certainly important that

24   everybody is entitled to that fair process.

25        A.    Yeah.
```

```
 1        Q.    And that's what both sides, as well as the Judge,

 2   try to make certain happens and so I just want to make sure

 3   there's nothing --

 4        A.    No.

 5        Q.    -- in that background that has affected you.

 6   Anybody else, family members, friends?

 7        A.    I have another brother, but he's not in jail or

 8   anything.  He just has a charge.  I think he's like on

 9   probation or something like that, for -- I think it's burglary

10   of a habitat or something like that.

11        Q.    Okay.  And his probation is going okay?

12        A.    Yes.

13        Q.    And he's been treated fairly thus far?

14        A.    Yes.

15        Q.    That's good.  What about the situation where you

16   were a victim of family violence.  Was anybody convicted of

17   that offense?

18        A.    No, I just got a --

19        Q.    A protective order?

20        A.    -- protective order.  That was it.

21        Q.    Okay.  Are you still in contact with that individual

22   that you had the protective order against?

23        A.    We have children together, but we go through the

24   child support court, so --

25        Q.    Okay.  To --
```

1      A.    To kind of -- yeah, for the children.

2      Q.    Move the children back and forth and for child

3  support?

4      A.    Yes.

5      Q.    Okay.  There was one other distinction that I wanted

6  to make sure that you understood, and I kind of talked about

7  this when we first started.  Question Number 9 on page 2, when

8  we asked you for what crimes do you think the death penalty

9  should be available in Texas.  You say people who plan to kill

10 anyone.  You remember I talked about how somebody's intent can

11 be formed like that?

12     A.    Yes.

13     Q.    I may have one intent to take Andrea's shoes and

14 then I change my mind whenever she's not giving them to me and

15 I just have to kill her, or maybe I don't want her to run tell

16 that I've stolen her shoes later.  So my intent can change or

17 my plan can change.  In the state of Texas, we don't make a

18 distinction between premeditated murder, like something that

19 you're planning out, versus something that you just have the

20 intent to do.  It always got to be that intentional killing,

21 but we don't have to plan about it beforehand.  Does that make

22 sense?

23     A.    Yes.

24     Q.    And then also, I think you mentioned here, again,

25 best argument for the death penalty, proving the person meant

```
 1  to do it and has no feeling about what he or she has done.  And
 2  I certainly respect what you're talking about here today and
 3  what you were filling out here, that that's important to you.
 4  Again, it kind of goes back to that remorse.  But understanding
 5  you feel that way, at no point in time are you going to require
 6  this Defendant to testify, right?
 7       A.   No.
 8       Q.   Okay.
 9            MS. EVANS:  Pass the juror.
10            THE COURT:  Mr. Weatherspoon.
11                 DEFENSE VOIR DIRE EXAMINATION
12  BY MR. WEATHERSPOON:
13       Q.   Good morning, Ms. Jenkins.  How are you today?
14       A.   Good morning.  I'm fine.
15       Q.   As the Judge previously introduced me, my name is
16  Kenneth Weatherspoon.  I have a couple of questions to ask you,
17  and I want to reiterate what Ms. Evans told you, that there's
18  no such thing as a right answer or wrong answer.  We just want
19  to know how you feel.  And one of the reasons why we had you
20  fill out the questionnaire before we told you what the law was,
21  was because we wanted your true feelings.  Whatever they may
22  be, we just want to know your true feelings.  And I don't know
23  if this helps you or not, but I've noticed you've been kind of
24  leaning when you talk.  That microphone -- you can pull it
25  down.
```

106

1      A.    Okay.

2      Q.    That make you -- if that makes it easier for you.

3            I want to start out by telling you that by

4    coming down on June 21st and filling out this questionnaire and

5    coming back today and answering these questions, you have

6    fulfilled your civic duty, so I don't want you to think that

7    whether you are on the jury or whether you're not on the jury,

8    that you haven't performed your civic duty because everybody in

9    this courtroom is grateful that you're here today, grateful

10   that you showed up, grateful that you filled out the

11   questionnaire, so you have done your civic duty already.

12           Another thing I wanted to tell you is that even

13   though we've spent a lot of time talking about punishment and

14   the death penalty, by no means do I want you to take that as we

15   over here at the Defense table think that Matthew Johnson will

16   be found guilty.  That's just the nature of the process.  In

17   fact, we believe Matthew Johnson will be found not guilty of

18   capital murder, so I don't want you leaving here thinking just

19   because the Defense spent a lot of time talking about the

20   punishment phase, that we believe he'll get there.  We don't

21   believe you'll ever be called upon to answer those special

22   issues because we don't think he'll be found guilty of capital

23   murder, okay?

24     A.    Okay.

25     Q.    Now, I'm going to go over some of the things that

107

```
 1   Ms. Evans went over, but you can understand me being a Defense

 2   attorney, we have a different take on what you've talked about

 3   with Ms. Evans.  So I just want to go over it and make sure

 4   that we're all on the same page, okay?

 5        A.   Okay.

 6        Q.   Now, because of the nature of these proceedings,

 7   because we are where we are right now, do you have an opinion

 8   on Matthew Johnson's guilt or innocence?  Some people tell us

 9   if we've gotten this far, he must have done something.  Do you

10   feel that way?

11        A.   No.

12        Q.   Okay.  So you can give him the presumption of

13   innocence?

14        A.   Yes.

15        Q.   And in your mind, as he sits here right now, he's an

16   innocent man?

17        A.   Yes.

18        Q.   Now, I notice in going through your questionnaire,

19   you have pretty strong feelings about the death penalty.  Would

20   that be fair?

21        A.   Yes.

22        Q.   And I believe in a couple of places you said you

23   believe in an eye for an eye; is that correct?

24        A.   Yes.

25        Q.   Okay.  Tell me what you mean by that.
```

```
 1        A.    Like -- if say like somebody came and took something

 2   from me, and I'm -- like she said, she was going to fight back

 3   if she took her shoes.  I don't know that that person is going

 4   to do something to me, but if they do harm me or, you know,

 5   make me, you know, immobile or disabled or whatnot, I would

 6   want justice for -- for my health.  Or if it was another

 7   person, vice versa, I did it to them, they would want justice

 8   because if they had a job or if they had kids that they had to

 9   take care of, it would leave them in a bad spot.

10        Q.    Okay.

11        A.    So that's what I mean by eye for an eye -- you know,

12   justice basically for that person.

13        Q.    So in -- in keeping with that train of thought, do

14   you believe that in a situation of a death then, if you cause

15   someone's death, that you should be put to death?

16        A.    I can keep an open mind because I have -- you have

17   to know the facts first to get to that point.

18        Q.    So you're saying in that aspect, you may not

19   consider an eye for an eye?

20        A.    Yeah.

21        Q.    Now, if you look -- I think it's Question 15, you

22   told us, on page 3, you told us you believe in an eye for an

23   eye, and then if you look at Question 23 on page 4, once again,

24   you told us you believe in an eye for an eye and you said that

25   in Question 23, specifically in reference to the death penalty,
```

```
 1   that you believe in an eye for an eye; is that correct?

 2        A.   Yes.

 3        Q.   So you -- you wrote you believe in an eye for an

 4   eye, but now you're telling me that's not how you feel?

 5        A.   No.  I -- I feel an eye for an eye, but if it's --

 6   if I can be, you know swayed or if that situation doesn't call

 7   for the same punishment, then -- then it won't be the same.

 8   You get what I'm saying?

 9        Q.   I think so.  I think so.  Well, let me ask you this.

10   You -- you understand that capital murder is the intentional

11   killing -- and for purposes of this trial, in the course of a

12   robbery.  It's not an accident.  It's not a mistake.  That you

13   intended to kill the person, that was your goal to kill the

14   person and you did kill the person.

15        A.   Yes.

16        Q.   So if you find someone guilty of a capital murder,

17   do you think they deserve the death penalty?

18        A.   Yes.

19        Q.   Now, you understand that the law says that the

20   presumed correct punishment in a capital murder case is life

21   imprisonment without the possibility of parole.  That's what

22   the law says.

23        A.   Okay.

24        Q.   You understand?

25        A.   Yes.
```

1        Q.    But the way you feel is that if a person

2    intentionally kills someone during the course of a robbery,

3    that it's their goal to kill someone and they do kill someone

4    during the course of a robbery, that that person deserves the

5    death penalty?

6        A.    I guess in my -- with my question here, answering

7    it, I guess that's what I believe.

8        Q.    Okay.  And as a juror, is that the way you feel?

9        A.    As a juror, no.

10       Q.    Tell me how you distinguish between --

11       A.    Because that's what I was explaining where like if

12   it was -- like you said, it's not an accident, you know, it's

13   intentional process or whatnot, then, you know, it's the death

14   penalty.  But if there are facts in the case, then it will go

15   the other way to where it's life imprisonment, as I was

16   explained to earlier.

17       Q.    Okay.  And when you say facts in the case --

18       A.    Evidence.

19       Q.    Okay.  So if you find someone -- if you believe

20   beyond a reasonable doubt that someone has intentionally killed

21   someone during the course of a robbery, that they set out to

22   kill that person and they did kill that person, you could keep

23   an open mind to a sentence of life imprisonment?

24       A.    Yes.

25       Q.    Now, if you look at Special Issue Number 1, it talks

1  about whether there is a probability that the Defendant would

2  commit criminal acts of violence that would constitute a

3  continuing threat to society.  And you understand that the

4  State has the burden of proof to prove that to you?

5      A.   Yes.

6      Q.   And they have to prove it to you beyond a reasonable

7  doubt?

8      A.   Yes, sir.

9      Q.   And when you were on the civil jury, they talked

10  about preponderance of evidence; is that correct?

11      A.   Yes.

12      Q.   Okay.  Well, in the law there's no definition of

13  beyond a reasonable doubt -- what beyond a reasonable doubt

14  means, but it's the very highest standard we have in law.  I

15  can't tell you what beyond a reasonable doubt is, but let me

16  kind of help you by telling you -- talking about the other

17  standards in law.

18           In a civil case like you were on, the standard

19  is preponderance of the evidence, which means that one side has

20  51 percent, the other side has 49 percent.  The 51 percent

21  wins.

22           In a child custody -- excuse me, in a parental

23  termination case where the State is trying to take someone's

24  kids away from them, the standard of proof is what's called

25  clear and convincing evidence.  And you would agree with me

112

```
1   that before the State should be allowed to take someone's kids
2   away from them, that they should have a lot of evidence?
3       A.   Yes.
4       Q.   Would you agree with that?
5       A.   Yes.
6       Q.   Now, proof beyond a reasonable doubt as -- is a
7   standard even higher than that.  It's the highest standard we
8   have in law.  It doesn't mean 100 percent, and it means
9   whatever that is to each individual juror, but it is the
10  highest standard in law.  And that's the -- what the State has
11  to bring evidence to you to find the person guilty beyond a
12  reasonable doubt, and also to prove Special Issue Number 1 to
13  you.
14           Now, do you believe that the State could prove
15  Special Issue Number 1 to you beyond a reasonable doubt, about
16  the probability of what someone would do in the future?
17      A.   Given the evidence, then most likely they probably
18  could prove that Number 1.
19      Q.   I don't follow you.
20      A.   Well, for me -- like to answer it, I would have to
21  know, you know -- like if I'm sitting on the jury and they say,
22  you know, their evidence and facts on what -- you know, against
23  the other party, if I feel that they proved their point to me,
24  everything was -- they had their ducks in a row basically, then
25  I could, you know, say yes to Number 1.
```

1    Q.    Okay.  So when you say when they prove what they had

2  against the other person, are you talking about the victim of

3  the crime?

4    A.    Who they're representing -- well, they're trying to

5  prove their case against the other party.  That's what I'm

6  talking about.  Not the victim.

7    Q.    The Defendant?

8    A.    Yes.

9    Q.    Okay.  So you would require them -- or you could

10  hold them to the burden of beyond a reasonable doubt in proving

11  Special Issue Number 1 to you?

12    A.    Yes.

13    Q.    And if they didn't prove Special Issue Number 1 -- I

14  know you talked about remorse and things of that nature.  If

15  you did not believe that the Defendant constituted a continuing

16  threat, you could say no to Special Issue Number 1?

17    A.    Yes.

18    Q.    Okay.  Now, you understand that before you even get

19  to Special Issue Number 2, you have to have said yes to Special

20  Issue Number 1?

21    A.    Yes, I understand that.

22    Q.    Okay.  So if you don't find that person a continuing

23  threat, you don't even get -- the probability that the

24  Defendant would be a continuing threat, you don't get to

25  Special Issue Number 2.  You understand?

1          A.    Yes, I understand that.

2          Q.    Okay.  And understanding that to get to Special

3    Issue Number 2, you would have had to have found that the

4    Defendant committed an intentional murder during the course of

5    a robbery and also you believe beyond a reasonable doubt that

6    there's a probability that the Defendant would commit criminal

7    acts of violence that would constitute a continuing threat to

8    society, you believe that there's a probability that the

9    Defendant would commit -- would commit criminal acts

10   constituting a continual threat to people within the prison

11   society, other inmates, guards, workers, could you assess that

12   person a life sentence knowing that he -- that there's a

13   probability that he's a continuing threat?

14         A.    Yes, I could assess that.

15         Q.    So after believing that he is a continuing threat --

16   the probability that he's a continuing threat and that he's

17   committed an intentional murder, you could still give a life

18   sentence?

19         A.    If he's not a threat to the society in a prison,

20   then I can probably do that life imprisonment.

21         Q.    But now you understand that to find Special Issue

22   Number 1 yes, you have to believe that he's a continuing

23   threat.

24         A.    Right.

25         Q.    So you don't -- you don't get to Special --

115

```
 1         A.    Issue Number 2 --

 2         Q.    -- Issue Number 2 unless you believe he's a

 3    continuing threat.

 4         A.    Right.

 5         Q.    So knowing that, that you believe there's a

 6    probability that he's a continuing threat, you could still send

 7    that person back to prison knowing he's a threat?

 8         A.    Yes, if I --

 9              MS. EVANS:  Your Honor, I object.  He's not

10    asking it the proper way.  It's if more likely than not.

11              THE COURT:  I think he said that, but re --

12    rephrase, please, Mr. Weatherspoon.

13              MR. WEATHERSPOON:  Okay.

14         Q.    (BY MR. WEATHERSPOON)  If you think there's a

15    probability that the Defendant would commit criminal acts of

16    violence that would constitute a continuing threat to society,

17    you believed beyond a reasonable doubt that there's a

18    probability that the Defendant would commit criminal acts of

19    violence that would constitute a continuing threat to society,

20    you believe that --

21         A.    Yes.

22         Q.    -- could you send that person back to prison for a

23    life sentence?

24              MS. EVANS:  Your Honor, I would object because

25    he -- he's not following --  he's not asking her if she could
```

1  follow the process and consider something mitigating with

2  respect to Special Issue Number 2.

3              THE COURT:  Sustained.

4              MR. WEATHERSPOON:  Okay.

5      Q.   (BY MR. WEATHERSPOON)  Well, let me ask it this way.

6  Once you find Special Issue Number 1 yes, okay, would you still

7  consider mitigation?

8      A.   Yes.

9      Q.   If you turn to page 3, Question Number 12.

10     A.   Question Number --

11     Q.   Twelve, page 3.  The death penalty is reserved for

12 those defendants that are such a threat to society that even

13 incarceration does not remove the probability of future violent

14 acts.  Do you agree?  And you said you agree.  And you went on

15 to say because if they have not shown any feeling about their

16 crime or plan the crime, then who is to say they won't kill

17 someone while incarcerated.  Tell me what you mean by that.

18     A.   I'm saying -- like I was saying about the remorse --

19 remorsefulness, if they don't have remorse for killing the

20 person that was killed in the --

21     Q.   In the robbery?

22     A.   -- in the robbery, then who is to say when they go

23 in there, someone upsets them or whatnot, they might end up

24 reacting to that person the same way they did in the robbery.

25 Or another situation, you know, if somebody skipping in line or

117

```
 1  taking their food, whatever they got going on in there, you
 2  know, a -- a confrontation arises that leads to them possibly
 3  having to hurt that person, like I said, or kill them, so
 4  that -- that's what I mean by that answer.
 5       Q.   Something about what you just said -- have you ever
 6  discussed with any of the individuals that you spoke about,
 7  what it was like being in prison?
 8       A.   No, I've never asked.
 9       Q.   Okay.
10       A.   When you said that, all I -- you know, TV --
11       Q.   Okay.
12       A.   -- TV is --
13       Q.   That's how --
14       A.   That's -- that's why I just said, you know, food or
15  any -- that's why I said any kind of confrontations because I
16  really don't know what goes on in there.  I don't have an idea
17  besides TV.
18       Q.   Okay.  How -- how many times did you visit your
19  uncle?
20       A.   I was young girl.  When he went in, I was, I
21  believe, 11.
22       Q.   I mean, I know you didn't keep count, but just a --
23       A.   I guess -- I'd say maybe -- I'll give roughly maybe
24  ten because whenever my grandmother went, I would go with her.
25       Q.   Okay.  If you look at page 5, Question 32, what did
```

1    you mean by that?  Because everybody lies about something.

2         A.    Everybody tells white lies, so everybody lies about

3    something.  That's what I mean.  Even if it's just, you know,

4    to get by, or to -- like you might tell your kids, you know,

5    it's Santa Claus, but, you know, there really is no Santa

6    Claus.  You are Santa Claus.  That's a white lie that you tell

7    all kids about Santa Claus, Easter bunny, so that's what I

8    mean, everybody lies.

9         Q.    Okay.  Now, if you turn to page 6, Question 37:  Do

10   you think that a person convicted of capital murder can be

11   rehabilitated?  And you said:  Yes, if the person has shown

12   feeling for committing the crime.  Tell me what you mean.

13        A.    Again, it's where like -- you know, they explained

14   to me now that, you know, they don't have to take the stand or

15   whatnot to show remorse or whatnot, but if -- sometimes if

16   you're a good judge of person -- a person's character or body

17   language, then you can see if somebody really has remorse for

18   what they did.  That's what I mean by showing feeling, because

19   in your body language, some people may not know about body

20   language, but if you hold your fist like this or your arms

21   closed like this (indicating), then you are closed to, you are

22   -- you are closed to anything that's coming to you or being

23   said to you.  If you're kind of, you know, like this or whatnot

24   (indicating), you're open to ideas, opinions, and so forth.

25   That's what I mean by showing the feelings for committing the

119

```
 1   -- the crime basically.

 2        Q.    Is that something that would be important to you in

 3   determining punishment?

 4        A.    You talking about the body language or --

 5        Q.    The remorse?

 6        A.    The remorse?  No, because if -- I mean, like if she

 7   hit her, some people don't cry when they're hit.  So that's not

 8   showing feelings.  So I can't base it off of that.  No, I

 9   can't.  I won't.

10        Q.    Well, let me ask you this.  In looking at Special

11   Issue Number 1, would you require the Defense to prove to you

12   that the Defendant would not be -- that there's not a

13   probability that the Defendant would commit criminal acts of

14   violence that would constitute a continuing threat to so

15   society?

16        A.    No, because the burden of proof lies with the State,

17   correct?

18        Q.    Correct.  So you wouldn't require the Defense --

19        A.    (Shakes head from side to side.)

20        Q.    And in Special Issue Number 2, even though neither

21   side has a burden of proof in Special Issue Number 2, would you

22   require the Defense to bring you evidence?  Would you -- before

23   you would answer Special Issue Number 2 yes, knowing that

24   neither side has the burden of proof and knowing that the

25   Defendant is not required to take the stand, nor is the Defense
```

120

```
 1   required to bring you proof, would you still need to hear

 2   something from the Defense concerning Special Issue Number 2?

 3                    MS. EVANS:  Your Honor, I would object because

 4   it's from wherever the evidence comes from.  And there's case

 5   law that says that they can want to hear from the Defense, just

 6   not the Defendant.

 7                    MR. WEATHERSPOON:  And I'm just asking the

 8   question.

 9                    MS. EVANS:  Okay.  As long as it's not -- it's

10   improper because it's not --

11                    MR. WEATHERSPOON:  I haven't used it to

12   challenge her for cause.  I'm just asking the question.

13                    THE COURT:  Proceed.

14        Q.   (BY MR. WEATHERSPOON)  Did you understand my

15   question, or do I need to repeat it?

16        A.   Can you repeat it?

17        Q.   Okay.  You understand that the law says that neither

18   side has the burden of proof on Special Issue Number 2,

19   correct?

20        A.   (Nods head up and down.)  Correct.

21        Q.   And you understand that the law also says that the

22   Defense is not required to put on any evidence, nor is the

23   Defendant required to testify concerning Special Issue Number

24   2.

25        A.   Correct.
```

```
 1        Q.    My question is, is that something that you would

 2  want to hear, or would you want to hear evidence concerning

 3  Special Issue Number 2 from some source?

 4        A.    No.

 5        Q.    When you said the last trial, you said you all were

 6  in court for a week?

 7        A.    Yeah, about a week.

 8        Q.    Okay.  Pretty much the same schedule from 9:00 to

 9  4:30 or 5:00 every day?

10        A.    Yes.

11              (Discussion between counsel off the record.)

12              VENIREPERSON:  I'm cold.

13        Q.    (BY MR. WEATHERSPOON)  I thought that meant you

14  weren't open to any questions.  Okay.  Just checking.

15        A.    I'm sorry.

16              THE COURT:  I'm glad you recognize that.  I have

17  my arms crossed all the time.

18        Q.    (BY MR. WEATHERSPOON)  Do you know anyone in the

19  Dallas Police Department?

20        A.    No.

21        Q.    Garland Police Department?

22        A.    No.

23        Q.    Mesquite Police Department?

24        A.    No.

25        Q.    Dallas Fire Department?
```

122

```
 1        A.    No.

 2        Q.    Garland Fire Department?

 3        A.    No.

 4        Q.    Dallas Sheriff's Office?

 5        A.    No.

 6        Q.    Southwestern Institute of Forensic Sciences?

 7        A.    No.

 8        Q.    Anyone who works for the Texas Department of

 9   Criminal Justice?

10        A.    No.

11        Q.    I'm going to read you a list of names, and if you

12   recognize any of these names, stop me, okay?

13        A.    Okay.

14        Q.    Scott Harris, Elizabeth Harris, Chris Harris,

15   Kenneth Marecle, Amy Marecle, Michael Frank, Anna Lunceford,

16   Jim Medley, Lawrence Denson, Jonas Lucht, Greg Mansell, Carina

17   Pinzon, Digna Salmeron, Kelly Keeton, Daphne Johnson, Sherry

18   Ann Clark, Amy Armstrong, Anthony Johnson, Alma Johnson,

19   Courtney Johnson, David Williams, Danny Mullins, David

20   Contente, Gioconda Verdaguer, Donald Dunlap, Johnny Wright,

21   Monica Cajas, Michael Crosby, Roxanne Luttrell, Robbie Denmark,

22   Quinlen Minor, Margaret Tatum, Jim Bertucci, John Harris,

23   Timothy Proctor, Carlton Jenkins, Durian Allen, Gene Gathright,

24   Manuel Turner, Andre Howard, Kenneth Lewis, or Sheldon Henry.

25   You have to say yes or no.
```

```
 1          A.    Oh, I'm sorry.  No.

 2          Q.    Okay.  Do you have any questions that you would like

 3   to ask me?

 4          A.    No, sir.

 5          Q.    Do you have any questions about the process?

 6          A.    No, sir.

 7          Q.    Oh, I have one last question.  If you look at page

 8   6, Question 37 -- excuse me, 36.  When it had you to rank the

 9   objectives of punishment in the order of importance, it seems

10   like at first you had one order and then you scratched it out

11   and put a second order, put the rehabilitation first,

12   punishment second, and deterrence third.  Is that what you

13   finally rested on?

14          A.    Yes.

15          Q.    And is that the way you feel?

16          A.    Yes.

17          Q.    Do you have any other questions -- any questions you

18   would like to ask of me?

19          A.    No.

20          Q.    Thank you very much.

21                THE COURT:  All right.  Ma'am, we're going to

22   ask you to just step out in the hall very briefly.

23                (Venireperson excused from courtroom.)

24                THE COURT:  All right.  Shonquidria Jenkins,

25   Juror 1368A, any challenges for cause from the State?
```

```
 1                    MS. EVANS:  No challenge.

 2                    THE COURT:  Any challenge for cause from the

 3  Defense?

 4                    MR. WEATHERSPOON:  None from the Defense.

 5                    THE COURT:  All right.  Thank you very much.

 6                    (Venireperson returned to courtroom.)

 7                    THE COURT:  Ms. Jenkins, you have been qualified

 8  as a juror so the bailiff is going to take your photograph so

 9  that when the lawyers are reviewing their notes, they'll be

10  able to put a face to a name.  And then we'll let you know on

11  October the 15th whether or not you will be a juror in this

12  case.

13                    (Venireperson 1368A, Shonquidria Jenkins,
                        qualified.)
14

15                    VENIREPERSON:  Okay.

16                    THE COURT:  Thank you very much, ma'am.

17                    (Venireperson excused from courtroom.)

18                    THE COURT:  We're on the record.

19                    MS. MOSELEY:  The State and the Defense agreed

20  yesterday to excuse Jimmy Roberts, Juror Number 1372A.  He was

21  scheduled for this afternoon, but we made an agreement

22  yesterday to excuse him so he is not here today.

23                    MS. BERNHARD:  And that is correct.

24                    (Venireperson 1372A, Jimmy Roberts, excused.)

25                    THE COURT:  All right.  If we could get Ms.
```

```
 1   Benjamin, please.

 2                   (Discussion off the record.)

 3                   THE BAILIFF:  All rise.

 4                   (Venireperson brought into courtroom.)

 5                   THE COURT:  Be seated.

 6                   Good morning -- afternoon, Ms. Benjamin.  How

 7   are you?

 8                   VENIREPERSON:  I'm well.  Thank you.

 9                   THE COURT:  Good.  Thank you for being here.

10                   Ms. Benjamin, do you remember being down in the

11   Central Jury Room in June of this year when I swore you in with

12   the large panel?

13                   VENIREPERSON:  I do.

14                   THE COURT:  All right.  Well, you're still

15   operating under that oath, and you'll continue to operate under

16   that oath until you're discharged as a potential juror.

17                   VENIREPERSON:  Okay.

18                   THE COURT:  We're going to be trying this case

19   October the 28th through November the 8th.  Has anything

20   happened between when I swore you in back in June and now that

21   would prevent you from being able to sit during those two

22   weeks?

23                   VENIREPERSON:  No.

24                   THE COURT:  All right.  Have you heard anything

25   or seen anything or do you know anything about this case?
```

```
 1                    VENIREPERSON:  Not at all.

 2                    THE COURT:  All right.  I'd like to introduce

 3   you to everyone.  My name is Tracy Holmes, and I am going to be

 4   the presiding Judge for the trial.

 5                    Sitting between you and I is Darline LaBar.

 6                    VENIREPERSON:  Okay.

 7                    THE COURT:  She's the court reporter, and she's

 8   taking down everything that's being said.  So as a courtesy to

 9   her, I'm going to ask you to try to remember to say yes or no,

10   instead of nodding or shaking your head or saying uh-huh or

11   huh-uh.

12                    VENIREPERSON:  That will work.

13                    THE COURT:  And the lawyers will remind you if

14   that happens.

15                    VENIREPERSON:  Okay.

16                    THE COURT:  The lawyers for the State are Andrea

17   Moseley.

18                    MS. MOSELEY:  Good morning.

19                    THE COURT:  And Elaine Evans.

20                    VENIREPERSON:  Hello.

21                    MS. EVANS:  Good afternoon.

22                    VENIREPERSON:  Hello.

23                    THE COURT:  The lawyers for the Defense are

24   Nancy Mulder.

25                    MS. MULDER:  Good afternoon.
```

```
 1                    VENIREPERSON:  Hi.

 2                    THE COURT:  Catherine Bernhard.

 3                    MS. BERNHARD:  Good afternoon.

 4                    VENIREPERSON:  Hi.

 5                    THE COURT:  And Kenneth Weatherspoon.

 6                    MR. WEATHERSPOON:  Good afternoon.

 7                    VENIREPERSON:  Hello.

 8                    THE COURT:  And the gentleman to your far left

 9   is Mr. Matthew Lee Johnson.  He's the citizen accused.

10                    VENIREPERSON:  Okay.

11                    THE COURT:  I give each side 45 minutes to talk

12   to you.  At the conclusion, we're going to ask you to step

13   outside.  If the lawyers decide you've been qualified as a

14   juror, then we'll get your photograph and let you go.  We will

15   call you on October the 15th and let you know for sure one way

16   or the other whether you will be a juror in this case.

17                    VENIREPERSON:  Thank you.

18                    THE COURT:  Is that enough time for you to get

19   your affairs in order?

20                    VENIREPERSON:  That's enough.  Thank you.

21                    THE COURT:  Okay.  Have you had an opportunity

22   to review the pamphlet and your questionnaire?

23                    VENIREPERSON:  Yes.

24                    THE COURT:  All right.  Thank you very much.

25                    MS. MOSELEY:  Thank you, Judge.
```

1                         WANDA BENJAMIN,

2    was called as a venireperson by the parties, and after having

3    been first duly sworn, testified as follows:

4                    STATE VOIR DIRE EXAMINATION

5    BY MS. MOSELEY:

6         Q.   Ms. Benjamin, first off, let me start off by saying

7    we probably did not get off on the best foot with you since

8    we've had you here since 8:30 this morning.

9         A.     Absolutely.

10        Q.    I apologize for that.  Obviously, none of us knew

11   that that was going to happen, but, you know, we had three

12   jurors here and we have to go in the order by the juror number.

13   And unfortunately for you, yours was third on the list this

14   morning, and we just didn't get to you.  So I appreciate you

15   smiling and not coming into the courtroom throwing things or

16   anything.  I was afraid how I would -- how I would be if I were

17   in your shoes, so I appreciate that.

18        A.     Thank you.

19        Q.    Let me tell you a little bit about why you're here

20   today.  I mean, when you were back here in June, we had you

21   fill out this lengthy questionnaire, nosey questionnaire -- I

22   mean, it was clear in your answers, some -- the time you

23   thought we were just being nosey.  I assure you that we are not

24   being nosey just to be nosey.  We -- we do find sometimes that

25   people's affiliations -- I think one of the questions we asked

1    you was if you had ever worked on a political campaign or -- or

2    anything and you said you had, but it wasn't really our

3    business --

4         A.    Correct.

5         Q.    -- whose it was.  One of -- one of the reasons we

6    ask that is because we want to know, for instance, if you had

7    worked on my boss, Craig Watkins' campaign, the Defense would

8    want to know that because that might affect the way you would

9    view our evidence or whether you would come in kind of with a

10   bias or a leaning one way or the other.  So I just want to

11   clear that up.  We weren't just being nosey.

12             The -- the second thing I want to tell you is

13   that even though we got all of your information and -- and

14   asked a lot of questions in the questionnaire, we still give

15   everybody the opportunity to come in and talk to us

16   individually.  And you just heard the Judge say I get 45

17   minutes, if I need 45, and the Defense gets 45 minutes for each

18   individual juror.  You've been on a jury before, twice; is that

19   right?

20        A.    Correct.

21        Q.    And you know that when you were on those juries,

22   they just brought up a group of citizens and everybody talked

23   to the jurors all at one time.  That same day probably you went

24   in and started to hear evidence of the case.  How long did

25   those trials last?

1          A.    I had one occasion where it lasted a couple of days.

2          Q.    And the other one?

3          A.    One day.

4          Q.    One day.  So really short trials.  And most of the

5     trials that happen down here at this courthouse work that way,

6     but because we're talking about a capital murder case where the

7     State is seeking the death penalty, the process is completely

8     different in terms of how we seat the jurors and then how the

9     case proceeds through the trial, as well.  So this is your only

10    opportunity today to tell us how you feel about the law, what

11    your personal feelings are, and then in the end let us know

12    whether your personal feelings are so strong one way or the

13    other that you're not going to be able to set them aside and

14    follow the law as the Judge will give it to you, because we

15    know when we're talking about the death penalty, we've got

16    jurors that have come in and told us -- I say jurors, potential

17    jurors, citizens that come in and told us that if you show me

18    that somebody intentionally took someone's else's life in the

19    course of a robbery, which is what a capital murder is, I'm

20    going to vote for the death penalty every time.  You just tell

21    me which -- how do I answer this stuff, because I'm always

22    going to say the death penalty.

23                We also have jurors that come in and tell us

24    that because of their feelings about the death penalty, they're

25    never going to be able to assess the death penalty.  That's

 1   just not something they believe in.  It's not a decision that

 2   they could live with.

 3                  Neither one of those groups of people are going

 4   to be qualified.  Can you see why?

 5       A.    Definitely.

 6       Q.    Tell me why.  Why not?

 7       A.    Because they have already have a made-up mind.

 8       Q.    Right.  Because both the State of Texas and the

 9   Defense are entitled to 12 jurors who will come in and listen

10   to the evidence open-minded, and base their verdicts on the

11   evidence.  Kind of let the evidence and the law lead them to

12   the proper verdict, whether that's guilty or not guilty of

13   capital murder and whether that ends up being a life sentence

14   without parole or a death sentence, right?

15       A.    Correct.

16       Q.    So I wanted to talk to you about a few things in

17   your questionnaire, and I know when we asked you to fill this

18   out, we didn't explain how the law would apply or what the law

19   is, frankly, for capital murder.  We were looking for your

20   feelings.

21                  On the very first page we asked you if you were

22   in favor of the death penalty, and you said you were.  An eye

23   for an eye.  And I think you tell us that in a couple of

24   different places.  You believe in an eye for an eye, do you

25   not?

```
 1        A.    I believe in the Bible, so, yes.

 2        Q.    And then you said if you take a life, then you give

 3   a life.

 4        A.    Correct.

 5        Q.    You understand now, I'm sure, by reading the

 6   pamphlet that the -- that the Judge gave you, that that's not

 7   the way the law works in a courtroom.  And I -- and I mean no

 8   disrespect to your personal feelings.  Nobody is going to try

 9   to change your feelings.  Nobody is going to argue with how you

10   feel, but I'm pointing out that the law doesn't say that

11   obviously because we have two possible punishments, life

12   without parole in prison or the death sentence, right?

13        A.    Understood.

14        Q.    And so if -- if every time somebody committed an

15   intentional murder, the death penalty was the result, we

16   wouldn't need all this process, right?

17        A.    Absolutely.

18        Q.    Okay.  So -- and we'll talk more about specifically

19   how the process works in a minute.

20              On the second page we asked you:  What do you --

21   what's your best argument for the death penalty, and what's

22   your best argument against the death penalty?  And you said:  I

23   don't know to both of those.  Had you ever really given a lot

24   of thought about the death penalty before we called you down

25   here back in June?
```

1      A.    Actually I had not been on that type of trial, so I

2  had not thought about one way or the other.  I think it would

3  have to depend on the case.  It's on a case-by-case basis, and

4  I cannot predict how a case will go if I have not sat in on

5  one, so I wouldn't know that answer.

6      Q.    Okay.  Is -- this may sound like a silly question to

7  you.  It probably is because I'm a criminal lawyer.  I practice

8  criminal law.  So it's not unusual in my house for the death

9  penalty to be a topic of conversation.  I recognize that in

10 most citizens' homes you don't talk about the death penalty a

11 lot; is that fair?

12     A.    That's fair.

13     Q.    Have you had any conversations with family members

14 in the past about what their feelings are about the death

15 penalty?

16     A.    No, I have not.  I have not discussed their feelings

17 because once again, I have to say, their feelings are their

18 feelings.  I really don't want to know what they are.

19     Q.    Okay.  Can you -- have you thought more about the

20 death penalty from the time you were here in June until now,

21 kind of with the thought I may be on this jury, how do I really

22 feel?

23     A.    Well, I thought about that it's a possibility that I

24 could be chosen to serve on the jury, but whether I thought

25 about the death penalty, no.  I put it out of my mind thinking

```
 1   whether or not I get called in again, I will cross that bridge
 2   when I get there.
 3        Q.    Okay.  So at this point, do you -- are you able to
 4   tell me -- let me ask you this.  What purpose do you think the
 5   death penalty serves?  You're in favor of it.  Why do you think
 6   we should have it?
 7        A.    Well, honestly -- I mean, I can't say that I'm
 8   necessarily in favor of it to that degree.  I just say that, in
 9   some cases it warrants, depending on the case.  But once again,
10   I can't say, you know.  I really don't.  It always have to be
11   on a case-by-case basis, and I don't try to make pre-decisions
12   about things I have no knowledge of.  I really don't.
13        Q.    Have you ever found yourself watching the news or
14   whatnot and heard about a case that came on the news, a crime
15   happened last night and they're talking about it on Fox 4 or
16   Channel 8, whatever news you watch, and you say, boy, whoever
17   did that really ought to get the death penalty?
18        A.    No.  That's not my choice, nor decision to make.
19        Q.    Okay.  Okay.  When you tell us that you believe in
20   an eye for an eye, how do you think that applies -- I know that
21   comes from your religious beliefs.  How do you think that
22   applies in -- you know, in how you feel about justice and the
23   criminal process?
24        A.    Well, I guess maybe it probably don't have anything
25   to do with it, other than just my opinion.
```

135

1      Q.    No, and that's what I'm asking for.

2      A.    Right.

3      Q.    I'm just asking if you -- how you reconcile those --

4  those feelings with the law.

5      A.    Well, the law is the law, and you have to go

6  according to the law.  And I'm always going to consider the law

7  and be respectful of the law.  I mean, I live in a great

8  country and I'm thankful that we do have -- it protects us, and

9  it's just a right that we're given as citizens.  So that's how

10  I see that.

11     Q.    Okay.  On page 3, if we can kind of go to page 3,

12  the very first question, Question Number 11, we said -- we

13  asked you if you think there are some crimes which call for the

14  death penalty solely because of their severe facts and

15  circumstances, regardless of whether the guilty person has

16  committed prior violent acts.  This is the first violent crime

17  they've ever committed.  They started with the biggest one of

18  capital murder.  And you said:  Yes, murder is final and no

19  coming back from.  Society can't allow anyone to go around

20  taking another person's life.

21            Do you feel like that's kind of where your --

22  what purpose you think the death penalty would serve is to --

23  that that is the just verdict?

24     A.    Well, I'm not judge -- I'm not a judge, and I'm not

25  the jury as of yet.  I don't know.  It will pertain to the case

1  and the facts that are presented within the case, so whether or

2  not that case will be death penalty or whatever, I can't

3  predict that.  I don't know.  I'm just giving you my opinion

4  regardless to how -- and correct it may be.

5        Q.    Right.  And there are no right or wrong opinions.

6  There are no right --

7        A.    Right.

8        Q.    -- or wrong answers.

9        A.    Right.

10       Q.    You know, I'll tell you again that I'm not arguing,

11  and I'm -- believe me, I'm not arguing or quibbling with your

12  feelings.  I'm just trying to kind of figure out where you're

13  coming from in terms of --

14       A.    Right.

15       Q.    -- of what -- you know, what you think is right

16  versus what you think is wrong.  And some of these questions,

17  that's what we're trying to get at in the questionnaire.

18             On Question Number 14 we said:  If you believe

19  in using the death penalty, how strongly do you hold that

20  belief on a scale of 1 to 10, and -- 1 being the least and 10

21  being the most?  You said 10.  You -- you firmly believe that

22  the death penalty is a proper punishment under the right set of

23  circumstances.

24       A.    Correct.

25       Q.    Okay.  You told us in the questionnaire that when

1  you were on the previous trials, we asked you if you

2  participated in the jury's discussion the same, less, or more

3  than other jurors and whether your -- whether you had more

4  influence, less influence, or the same influence on the

5  verdict.  Do you remember that question?

6         A.    I do.

7         Q.    And you told us that you participated more than the

8  other jurors and had more influence than the other jurors.

9  Tell -- tell me about that.  How -- how did that process work?

10        A.    Well, because of my personality, I'm credible, so

11  based on that.

12        Q.    So the other jurors just kind of followed your lead?

13        A.    Not necessarily followed my lead.  I had my opinion,

14  and I gave my opinion.  I voiced my opinion.  So -- and I do

15  believe that a person's opinions sometime warrant others

16  listening, so --

17        Q.    Did the other jurors participate, as well, or did

18  you find some of them just sat and didn't really --

19        A.    Some didn't say very much.

20        Q.    Okay.  Did you enjoy being on the juries?

21        A.    Not particularly.

22        Q.    Tell me why.

23        A.    Well, I mean, I was just doing my duty.  I mean,

24  because we're called to serve on a jury.  And sometimes we get

25  chosen and that's -- I'm just going along with doing my civic

1  duty and not that I'm going to volunteer to do it unless I'm

2  called.

3      Q.   Right.  Right.  No, I understand that, and we do

4  appreciate you coming down because not everybody is as

5  civic-minded as you.  A lot of people ignore the summons.  So

6  we do appreciate you coming.  I just kind of wanted to

7  explore -- it's not very often that we see somebody say that

8  they participated more and had more influence than the other

9  jurors, so I was curious about how that worked.

10         Let's talk about some basic principles of law.

11 You're going to be familiar with them because you've served on

12 two juries before, so I'm going to go through them pretty

13 quickly, but if you have any questions, let me know.

14         The first is you know that anybody charged with

15 a crime has the presumption of innocence?

16     A.   Correct.

17     Q.   And the State has the burden to prove somebody

18 guilty, and if we fail to prove them guilty, then that

19 presumption of innocence alone is enough for them to be found

20 not guilty, right?

21     A.   Understood.

22     Q.   The job is always going to be on the prosecution --

23 on the State of Texas to bring the proof and the evidence in

24 the case, and that never shifts over to the Defense.  The

25 Defense attorneys don't have to prove anything, right?

```
 1        A.    Understood.

 2        Q.    And a defendant never has to testify in their own

 3   trial, right?

 4        A.    Correct.

 5        Q.    If a defendant chooses not to testify, that right is

 6   there -- that choice is theirs and theirs alone, and that Fifth

 7   Amendment right protects them in that choice in the

 8   guilt/innocence phase of the trial, as well as the punishment

 9   phase of the trial, if the jury should get there.  That means

10   that if a defendant chooses not to testify, the jury is

11   instructed by the Judge that they cannot consider that silence.

12   They can't talk about it, refer to it, or use it as any

13   evidence at all.  You've heard that before?

14        A.    Absolutely.

15        Q.    And do you have any concerns about being able to

16   afford the Defendant that Fifth Amendment right if the

17   Defendant chooses not to testify?

18        A.    That's a given right that we all have.

19        Q.    Okay.  And it could be somebody chooses not to

20   testify for any number of reasons, but the jury would be

21   instructed not to even consider it.  You could do that?

22        A.    Correct.

23        Q.    You look to the evidence you did hear in the case

24   and decide, did the State of Texas prove what they were

25   supposed to prove or not.
```

```
 1                  In a capital murder case, and we -- I kind of
 2     brushed over it, but capital murder is the only crime for which
 3     the death penalty is an available punishment.  I want to talk
 4     to you and describe to you what capital murder is.  And capital
 5     murder is always going to be an intentional murder.  And when I
 6     say intentional, that doesn't mean premeditated.  That's two
 7     different things.  We don't have premeditated murder in Texas.
 8     We say that intent can be formed in an instant.
 9                  So let's say that I'm sitting around last night
10     at my house and I start thinking about these cool shoes that
11     Elaine is always wearing and I want them.  And I think Elaine
12     is probably not just going to give them to me because I asked
13     real nice.  So I decide I'm going to have to bring a gun in
14     case she doesn't cooperate and just give them to me, okay?
15          A.    Okay.
16          Q.    My goal is to get the shoes.  I come in today and I
17     point the gun and I say, Elaine, I got this gun and I want you
18     to give me the shoes.  I don't want to have to use this.  Give
19     me the shoes.  And she gets feisty like I thought she might,
20     and she pushes me back to keep me from taking her shoes, to
21     keep me away from her.  And I point the gun at her head and
22     pull the trigger and take the shoes.  That wasn't my plan last
23     night, was it?
24          A.    No.
25          Q.    I prepared that it might have to happen, but that
```

 1   wasn't my plan.  My plan was to take the shoes, but did I

 2   intend to cause her death when I shot her in the head?

 3        A.    Maybe at that moment.

 4        Q.    At that moment I did, right?  And that's what we

 5   say -- that's why we say intent can be formed in an instant.

 6   We're not talking about premeditation or planning.  It may not

 7   be your plan going into the crime, but something happens and

 8   you decide -- and at the moment you decide to take the person's

 9   life, you're guilty of an intentional murder.  And that could

10   be the case even if I instantly regret what I did.  Even if I

11   instantly say, oh, that was a bad idea, I shouldn't have killed

12   her, I'm still guilty of an intentional murder.  And in that

13   case, I'd be guilty of an intentional murder and a capital

14   murder because it was during the course of taking her shoes --

15   in the course of a robbery.  Can you see that?

16        A.    Understood.

17        Q.    What do you think about that?  Do you think that's

18   fair and reasonable, that I should be guilty of capital murder

19   in that situation?

20        A.    I don't want to say.  I'm not there to hear all the

21   facts.  I just heard what you said as a general summary of

22   that, and I would want to hear everything to be able to make a

23   decision, so I'm not going to say.

24        Q.    Well, I can tell you that in the guilt/innocence

25   phase of the trial when you're trying to decide if somebody is

1  guilty or not guilty of capital murder, that's about all you're

2  going to hear is that I came up to her, told her to give me the

3  shoes, she didn't, I shot her in the head, and I took the shoes

4  and it occurred on this date in Dallas County, Texas.  There's

5  not going to be any other facts.

6        A.   Oh, okay.

7        Q.   So I think what I'm asking you is if you think

8  that's fair, because a lot of people tell us, you know, things

9  happen in a snap decision, and I don't think somebody ought to

10 be guilty of capital murder unless it was premeditated.  What

11 do you think about that?

12       A.   Are you asking me if I think the sentencing portion

13 is fair, or what are you asking me?

14       Q.   No, I'm asking whether you think it's fair that

15 someone would be guilty of capital murder if they didn't -- if

16 they didn't premeditate or plan the murder?  If it was one of

17 those intent in an instant situations, whether they should even

18 be guilty of capital murder?

19       A.   Murder is murder.

20       Q.   Okay.  So in that situation, it's a capital murder,

21 and that's what we're talking about.  We're not talking about a

22 case of self-defense, because if you're defending yourself,

23 you're going to be not guilty , right?  You have a right to

24 defend yourself.

25       A.   Right.

1      Q.   If it is -- and, again, we're talking about an

2  intentional murder, not a -- not self-defense, not an accident.

3  You know, not I come up to Elaine to get her shoes, point the

4  gun, I take the shoes, and she starts chasing after me, and I

5  shoot her in the foot to keep her from chasing me -- keep her

6  from catching me, and then she bleeds to death.  The jury might

7  look at those facts and say, I'm not so sure that Andrea meant

8  to kill Elaine.  I think she just tried to stop her from

9  running and she died anyway.  That might not be an intentional

10 murder because for intentional murder, we're talking about the

11 person's goal was to cause the death.  Their intent was to kill

12 the person, not slow them down, not hurt them, but kill them.

13 Does that make sense?

14      A.   It makes sense.

15      Q.   So keep in mind that when we're talking about

16 capital murder, it's an intentional murder, plus that something

17 else -- in this case a robbery.  That's what we've alleged,

18 intentional murder in the course of a robbery.  And it's only

19 in capital murder cases where the death penalty is available as

20 a punishment.  And it's never automatic.  You either get life

21 without the possibility of parole or the death sentence.

22           So the jury is not going to ever be asked who

23 thinks he deserves death, who thinks he deserves life or who

24 votes life, who votes death because the law is going to tell us

25 in the state of Texas that really how we decide who gets life

```
 1  versus who gets death is that first special issue.  The State
 2  of Texas says there is a presumption, like we had the
 3  presumption of innocence, that's gone once somebody is found
 4  guilty of capital murder.  But going into the punishment phase,
 5  there's a presumption that the life sentence is proper.  And in
 6  the vast majority of capital murder cases, the life without
 7  parole sentence is the proper sentence.  It's only in those
 8  cases where the person is convicted of capital murder and the
 9  State can go on in the punishment phase of the trial to prove
10  that the person will more likely than not be a continuing
11  threat to society that the death sentence becomes the more
12  proper punishment.  Does that make sense?
13        A.   It does.
14        Q.   So if the person that you've convicted of capital
15  murder is not going to be a continuing threat to society, the
16  life sentence stands.  And the burden is on the State of Texas,
17  even in the punishment phase of the trial, to bring forth
18  evidence to convince the jury beyond a reasonable doubt the
19  answer to Special Issue 1 is yes.  The presumed answer is no
20  until I prove it's yes.  Does that make sense?
21        A.   It does.
22        Q.   What -- when I'm talking about the punishment
23  phase -- did y'all do punishment in the cases you were juror
24  on --
25        A.   We did.
```

1    Q.    -- or did the Judge?

2    A.    Well, I can't remember really, to tell you the

3 truth, it's been so long ago.

4    Q.    We have two parts to the criminal trial.  I've told

5 you in the first part of the trial all you're going to hear

6 about is kind of that checklist of things that are in the

7 indictment.  In Dallas County on this date the Defendant on

8 trial committed an intentional murder during the course of a

9 robbery.  That's what I have to prove.  And that's the only

10 evidence that will come in in the first part of the trial.

11 Somebody's background, upbringing, you know, any of the other

12 things that might be relevant to whether they receive a life

13 sentence or a death sentence don't come in in the first part of

14 the trial.  So you're not going to hear about criminal history

15 or lack of criminal history in the first part.  But in the

16 second part of the trial, all of that evidence is presented to

17 the jury.  So you'll know before you go back to deliberate

18 whether this should be a life sentence or a death sentence.

19 You will know as much as we can bring you about the person's

20 background, upbringing, education, character.  Any of that

21 information that we can bring to you, the jury will have, okay?

22    A.    Okay.

23    Q.    And it is my job, once again, to prove that he will

24 be more likely than not that he will commit criminal acts of

25 violence that would constitute a continuing threat to society

 1  in the future, okay?

 2      A.    Okay.

 3      Q.    Now, you and I probably both recognize that

 4  predicting the future is not something that can be done with

 5  any absolute certainty, right?

 6      A.    Correct.

 7      Q.    But you can see that in Special Issue Number 1, the

 8  first question the jury gets asked is what is more likely than

 9  not to happen in the future, right?

10      A.    Right.

11      Q.    Do you think it's possible for the State of Texas to

12  prove that beyond a reasonable doubt, what somebody more likely

13  will do in the future?

14      A.    It's possible.

15      Q.    What do you think -- what information do you think

16  is helpful to answer what somebody is more likely than not to

17  do in the future?

18      A.    I'm not going to predict something -- no, I'm sorry.

19      Q.    I'm sorry?

20      A.    You're asking me what do I think could be said or

21  done.  I don't know.

22      Q.    No, I'm asking you how -- I mean, this is something

23  that I have to prove --

24      A.    Okay.

25      Q.    -- beyond a reasonable doubt.  You've told me that

```
 1  you do think it's possible to determine what somebody more

 2  likely than not would do in the future, right?

 3        A.    Yes.

 4        Q.    What -- what kind of information do you think helps

 5  make that decision?

 6        A.    Facts.

 7        Q.    What kind -- what do you mean, facts?

 8        A.    The facts of the case -- I mean, you know, you'd

 9  have to hear that.

10        Q.    Uh-huh.

11        A.    So you could make a decision.  I couldn't make a

12  decision on something I know nothing of.

13        Q.    Well, let me ask you, do you have children?

14        A.    I do.  I have two.

15        Q.    And when your kids were little, obviously the laws

16  of the state of Texas -- I don't know about your house, but I

17  know -- I don't have kids, but I remember growing up, and in my

18  house these laws that we've talked about, that presumption of

19  innocence and the Fifth Amendment and all that did not -- did

20  not apply at my mamma's house, and I bet they didn't at your

21  house either.  You -- something got broken in the house, you

22  bring the kids in and you say, everybody fess up, who did it,

23  right?

24        A.    Well, yeah.

25        Q.    They didn't have the right to tell mamma, I would
```

```
 1  like to plead the Fifth, did they?
 2      A.   Well, if you're speaking in terms of something
 3  broken, the evidence speaks for itself, if something is broken.
 4      Q.   Right.
 5      A.   And if you've got two children, one of the two are
 6  responsible, yes.
 7      Q.   And how did you go about figuring out which one it
 8  was?
 9      A.   Well, you fess up or both of you get a spanking.
10      Q.   That's the way it worked in my house, too.  So that
11  Fifth Amendment didn't apply.  Somebody better start talking,
12  right?
13      A.   Well, I wasn't in a court of law, so it didn't have
14  anything to do with law.
15      Q.   Exactly.
16      A.   It was just Wanda's rules.
17      Q.   Exactly, exactly.  I'm familiar with that.
18           So the -- so I guess -- were you able to look at
19  your children -- you have two daughters?
20      A.   Two, yes.
21      Q.   Look at your two girls and kind of look ahead and
22  see how they were going to turn out based on how they had been
23  in the past?
24      A.   No, I couldn't predict that.  I wish I could.  As a
25  mother, we would like to believe we know how our children will
```

```
 1   turn out, but we don't know that.
 2       Q.   Did you know which kid was more likely to be the one
 3   who had broken the lamp?
 4       A.   No, because both of my girls would hide behind each
 5   other, so, no.
 6       Q.   Well, I'm -- I'm trying to kind of figure out if you
 7   believe it's possible, how do we know what somebody is more
 8   likely than not going to do tomorrow or five years or 10 years
 9   down the road?
10       A.   We don't.  We don't know that, based on just home
11   environment, you don't.  Criminal law is different from my
12   personal life.  It has nothing to do with the other.
13       Q.   Okay.  Well, you've told me that it is possible to
14   prove that, and I'm trying to figure out because now it sounds
15   like you're telling me we can't predict what somebody is going
16   to do.
17       A.   Well, you can predict.  I'm not speaking of a
18   criminal case.  I'm speaking of my personal life which has
19   nothing to do with a criminal case, and I cannot --
20       Q.   Then let's talk about the criminal case.
21       A.   I cannot make that applicable.
22       Q.   Okay.  Then let's talk about the criminal case.  In
23   a criminal case, you know we're talking about this first
24   special issue, and how is it that -- that you believe that's
25   capable of proof.  What -- how do you think somebody goes about
```

1  predicting whether this person you've convicted is more likely

2  than not to do something in the future?

3      A.   I guess it would determine based on the facts and

4  the evidence and what the case is and what they have done,

5  so --

6      Q.   Okay.  Do you think that you could look at evidence

7  of a person's character to try to determine what they would

8  more likely do in the future?

9      A.   Character does not tell you what a person will do or

10  not do.

11      Q.   Okay.

12      A.   It does not.

13      Q.   What about a person's criminal past?  What if

14  they've been --

15      A.   Criminal past has nothing to do with whether or not

16  you make a decision on a given moment.

17      Q.   Okay.

18      A.   I mean, things and circumstances are always

19  different at any given time, so, no, I wouldn't say that you

20  could determine whether or not a person is going to do a

21  heinous act based on prior history.

22      Q.   Okay.  What do you think would speak to what

23  somebody would do in the future?

24      A.   Well, if you break the law and you have done certain

25  cases and you done certain things, crimes -- I mean, if you've

1  killed people not accidentally and it's something that you

2  intentionally do, I would say that that warrants the law to

3  enforce the law.  I mean, what can I say?

4       Q.   By the time you get to Special Issue Number 1, you

5  will have already determined that the person on trial committed

6  an intentional killing in the course of committing or

7  attempting to commit a robbery.  That's -- that's done, right?

8  You've already convicted him.

9       A.   Okay.

10       Q.   Do you believe that anybody who is capable of

11  committing that type of intentional crime, an intentional

12  murder in the course of a robbery, would more likely than not

13  commit criminal acts of violence in the future?

14       A.   I would say it's a good possibility they would.

15       Q.   When we talk about probability -- see the word

16  "probability" there in that question.  I keep saying more

17  likely than not, and I want to make sure you know that's what

18  probability means.

19       A.   Understood.

20       Q.   More likely than not -- I'm sorry?

21       A.   I understand.

22       Q.   So it's not absolute certainty because nobody could

23  ever predict with absolute certainty what will happen in the

24  future, but it's more likely than not which is more than a mere

25  possibility, because anything is possible.  The question is, is

152

1    it probable, more likely than not?

2                    And criminal acts of violence is not defined in

3    that question.  It means what it means to you.  But you'll

4    notice we know what it isn't.  It isn't another murder or a

5    robbery or a sexual assault.  The legislature didn't pin us

6    down to what we -- what kind of criminal acts of violence we're

7    talking about, right?

8         A.   Right.

9         Q.   It means whatever it means to you, and some jurors

10   say if I haul off and hit Elaine in the face, that's a criminal

11   act of violence.  That's an assault.  Others say, you know, in

12   the right circumstances, maybe spitting on a prison guard could

13   be a criminal act of violence.  But we know that what we're

14   talking about in Special Issue Number 1 is criminal acts of

15   violence that would constitute a continuing threat to society.

16   When you hear the word "society," what do you think of?

17        A.   People at home, the general public.

18        Q.   Coming and going, work and school and home and then

19   grocery store, etcetera.  When we're talking about society in

20   Special Issue Number 1, can you see how we're -- we're talking

21   about even prison society, because by the time you get here,

22   the best thing that can happen to the Defendant is life without

23   parole, right?

24        A.   Right.

25        Q.   Where is he going to serve that sentence?

```
 1        A.    In the penitentiary.

 2        Q.    Exactly.  So the question being asked of the jurors

 3   in Special Issue Number 1 is whether it's more likely than not

 4   that that Defendant will commit criminal acts of violence that

 5   would constitute a continuing threat even to prison society,

 6   whether it's prison society or our society.  Do you believe

 7   there's violence in prison?

 8        A.    Absolutely.

 9        Q.    Have you ever visited a penitentiary?

10        A.    No, I cannot say that I have.  Haven't had occasion

11   or a reason to.

12        Q.    But obviously, the news and just being around, we

13   know there's violence in prison, right?

14        A.    Yes.

15        Q.    We know that there's guards that work there and

16   teachers and preachers and nurses and doctors, people who go in

17   to visit loved ones, other inmates, that they kind of socialize

18   among one another, work together, eat together, live together.

19   Do you believe that the people inside those prison walls,

20   whether they're inmates or people who work there or visit

21   there, deserve protection like you and I do?

22        A.    Of course.

23        Q.    Do you think that the prison can control all

24   prisoners?

25        A.    No, I don't believe that.
```

1          Q.    So it is possible for a person who has tendencies to

2    be violent to pose a threat to people in the penitentiary.

3    Would you agree?

4          A.    I'll agree.

5          Q.    So Special Issue Number 1, it's my job, again, to

6    prove that beyond a reasonable doubt, that the Defendant you've

7    convicted of capital murder will more likely than not be a

8    threat even in the penitentiary.  And, again, I have to prove

9    it beyond a reasonable doubt.  The Defense doesn't have to

10   prove that he won't.  If I prove that beyond a reasonable

11   doubt, the answer to that question is yes, and then we would

12   move on to the second special issue.

13              If the answer is no, the State didn't prove

14   that, then you would answer it no, and the trial would be over.

15   The jury would never get to Special Issue 2, okay?

16         A.    Okay.

17         Q.    If the jury says, yes, then we go on to Special

18   Issue Number 2.  And now my job is over.  I've done everything

19   that I have to do to prove to this jury that the death sentence

20   is the proper sentence in this case.  Special Issue 2 tells the

21   jury to go back and look at everything one last time and ask

22   themselves whether they heard anything in the evidence that

23   convinces them that the life sentence is really the more proper

24   sentence.  I don't have any burden of proof.  The Defense

25   doesn't have any burden of proof.  And, again, the Defendant

155

1   doesn't have to testify and convince the jury that the life

2   sentence is really better.  He doesn't have to take the stand

3   and beg for his life, but the jury has to consider whatever

4   evidence they heard.  They consider the circumstances of the

5   offense.  They consider the Defendant's character and

6   background.  That may mean criminal history or lack of criminal

7   history, what kind of person have they been, the personal moral

8   culpability of the Defendant.

9              Now, that, sometimes jurors tell us, means to

10  them they're talking about remorse.  Does the person feel bad

11  about what they did?  Are they sorry?  Are they remorseful?

12  But you may never know that, right?  If a defendant chooses not

13  to testify, how are you going to know whether they're

14  remorseful?

15       A.   You don't.

16       Q.   You wouldn't, right?  And the law would say if you

17  don't hear it, then it's nothing to consider at all.  Once

18  again, if he doesn't testify, you just don't consider it.  You

19  look at the things you did hear.  But you look at all of the

20  evidence from the first part of the trial and all of the

21  evidence from the second part of the trial and ask yourself

22  whether there was something in the evidence, something

23  sufficiently mitigating, to tell you in your heart of hearts

24  that his moral blameworthiness is lessened, that he really

25  does -- that the life sentence really is the more proper

1  sentence for whatever reason.  And there's not going to be a

2  checklist of things to tell you this -- if there's evidence of

3  this, that's mitigating, or if there's evidence of this, that's

4  aggravating.  It's really up to you to decide.

5          We asked you a few questions in the

6  questionnaire that relate to this mitigation issue, so I want

7  to talk on page 6 -- if I could get you to look there at

8  Question Number 39.  And, again, I want you to remember that

9  nobody is going to tell you what is or isn't mitigating to you.

10  It's one of those things that you probably can't even

11  articulate until you see it for yourself.  But we said in

12  Question 39:  Some people feel genetics, circumstances of

13  birth, upbringing, and environment should be considered when

14  determining the proper punishment of someone convicted of a

15  crime.  What do you think?  You said:  It depends on the crime.

16  What do you mean by that?

17      A.    Well, I was actually thinking whether or not --

18  depends, like I said, on what the case is about.  We're talking

19  about capital murder, and I was speaking in general.

20      Q.    Well, tell me what you think about in a capital

21  murder case.  Do you think these things should be considered in

22  a capital murder case in deciding whether a person receives

23  life or death?

24      A.    No.

25      Q.    Let me tell you what the law says, and then you tell

1  me if that's something you think you can follow as a juror,

2  because I'm just asking your personal feelings now.  Now we're

3  going on to that if you're on the jury, can you follow the law,

4  okay?

5         A.    Okay.

6         Q.    The law would tell you that if there is evidence

7  about a person's background, upbringing, genetics.  Maybe you

8  hear evidence about abuse as a child, severe physical or mental

9  abuse or sexual abuse or maybe you hear they grew up in a poor

10 neighborhood or single parent household.  If that is in the

11 evidence, Special Issue Number 2 is going to tell the jury that

12 they have to consider it.  It doesn't say you have to consider

13 it mitigating.  It doesn't say you have to consider it and

14 think it lessens their moral blameworthiness or their

15 responsibility for the crime.  It just says you can't say, oh,

16 well, you know, let me just -- here comes mamma to say he had a

17 bad childhood, I'm not even going to listen.  I'm going to do

18 crossword puzzles or I'm going to play on my phone because I

19 don't care about that, right?  You have to consider it, listen

20 to it, and then decide for yourself is that something that is

21 mitigating to me or is that something that really doesn't move

22 me at all, because a lot of people tell us you make personal

23 choices.  People overcome bad childhoods all the time.  It is

24 an individual choice that's up to the person.

25               The question I have for you is, if it's in the

1  evidence, are you going to consider it, listen to it before you

2  just close your mind to it, even in a capital murder case?

3       A.    I would consider it.

4       Q.    Okay.  And then you decide if it is -- if it has any

5  weight to be given in your mind.  Does that sound fair?

6       A.    Fair.

7       Q.    Okay.  On page 9, going into page 10, we asked you

8  some of your opinions and thoughts on alcohol and drugs,

9  addiction and intoxication.  And I want you to understand and

10  know that we're not ever going to be talking about this case

11  today.  I'm not asking you now what are you going to do or how

12  are you going to feel about this case, because we can't talk

13  about this case.  But in general terms in a capital murder case

14  in the punishment phase, there may be evidence of drug use or

15  alcohol use or addiction.  Would you agree with the statement

16  that drugs and alcohol are a big problem in our community?

17       A.    Yes.

18       Q.    That a lot of crime in general -- and I don't mean

19  necessarily capital murders, but a lot of crime in our

20  community stems from drug use and addiction, whether it's car

21  burglaries to get money for drugs and whatnot.  Would you agree

22  with that statement?

23       A.    Definitely could be a factor.

24       Q.    That drugs play a role in that.  So it does come

25  into evidence in many criminal cases.  When we asked you your

1  thoughts and general feelings about alcohol and drug abuse, you

2  said you don't like it.  And you've never had any family member

3  or close friend involved in drug use or alcohol use at all or

4  addiction?

5      A.    Not to my knowledge.

6      Q.    Question Number 64, on page 10.  We told you that

7  the law in the state of Texas is that voluntary intoxication

8  does not constitute a defense to the commission of a crime.

9  And then we asked you if you agreed with that, and you said no.

10 I want to make sure that we're on the same page about what that

11 statement means.

12     A.    Okay.

13     Q.    That means if I go out tonight and get myself good

14 and drunk, drink a bottle of vodka, and then decide to go, you

15 know, burglarize somebody's house, I can't -- when I get

16 arrested by the police, I can't go, well, you know, I was

17 really drunk, therefore you can't arrest me.  That's not a

18 defense, because it's never going to be the defense available

19 to somebody to the crime.  Does that make sense?

20     A.    Yes.

21     Q.    How do you feel about that?  Do you think that

22 should be the law?

23     A.    No.

24     Q.    Tell me why.

25     A.    I mean, if you're intoxicated and you go out and

```
 1   commit a crime, you're still responsible for that crime.

 2        Q.   So you -- you do agree that the law shouldn't allow

 3   somebody to say, I was drunk so I don't get prosecuted?

 4        A.   I do.

 5        Q.   Okay.  And then on Question Number 65, the next

 6   question, we said that the law further provides that this

 7   evidence of intoxication may be considered in mitigation of

 8   punishment.  I want to make sure it's real clear what we're

 9   asking.  We're not asking you if you would find it mitigating.

10   What I'm -- again, kind of like what we talked about with

11   Question 39 a minute ago, if there is evidence that somebody

12   was intoxicated at the time they committed the crime, Special

13   Issue 2, again, comes back and says you have to consider

14   everything, even evidence of intoxication, if it's before you

15   in the trial, and then you decide is it mitigating, is it

16   aggravating, or is it neither and it just doesn't matter to me

17   at all.  You can't just say, well, here we go with the excuse I

18   was drunk.  I'm not listening to that.  Does that make sense?

19        A.   It does.

20        Q.   Do you believe that you could consider that if it

21   was in the evidence before you decide to disregard it or before

22   you decide how, if at all, it weighs in your verdict?

23        A.   Yes.

24        Q.   And following up on that in Question 66:  Would a

25   person's use of drugs or alcohol at the time of the offense
```

```
 1  automatically prevent you from assessing the death penalty if
 2  you found him guilty of capital murder?  And you said:  No, it
 3  wouldn't.  And I'll tell you that nothing is ever automatic.
 4  You've said it over and over again.  It's going to depend on
 5  the facts and the circumstances.  If there is evidence of
 6  intoxication at the time of the offense, you weigh it, you
 7  consider it, you compare it to the other evidence.  All of it
 8  plays a part in your decision making, but it can't
 9  automatically mean I'm going to vote life every time.  Does
10  that make sense?
11       A.   It does.
12       Q.   And is that how you feel?
13       A.   Yes.
14       Q.   Just because somebody was high or drunk at the time
15  isn't automatically going to make a death sentence or a life
16  sentence; is that right?
17       A.   True.
18       Q.   You know, I think, by the time we've gotten here --
19  this far along, that my boss, Craig Watkins, the elected
20  District Attorney, has decided that we're seeking the death
21  penalty in this case.  We've gone nine weeks now into the
22  process of selecting the jury, and we're not still thinking
23  about it or considering it.  That decision has been made.
24            We believe that we have the type of evidence,
25  the quality and quantity of evidence that will convince 12
```

162

```
 1   jurors, following their oaths, to find Matthew Lee Johnson

 2   guilty of capital murder.  And I tell you this because

 3   sometimes sitting at home and thinking about the death penalty

 4   or thinking about serving on a jury, you've had a couple of

 5   months now to think about potentially serving on a case like

 6   this.  Your answers, based on the evidence, we believe, will be

 7   answers that will lead the Judge to basically sign a warrant

 8   for his execution, that -- an answer yes to Special Issue 1 and

 9   no to Special Issue Number 2, by all of these jurors will

10   result one day in Matthew Lee Johnson being taken to Huntsville

11   and strapped to a gurney and receiving lethal injection.  And

12   I'm not telling you that to be gruesome or morbid, but just to

13   kind of put you in the real situation, that we're talking about

14   a real human being who has family that cares about him like you

15   and I do.  I tell you that to ask you whether you feel like you

16   could participate in a process that might result in his

17   execution, without doing any harm to your conscience, or

18   weighing heavy on your heart years down the road.

19        A.   Honestly, I'm going to say I prefer to be excluded.

20        Q.   And I -- and I respect that position, and I

21   understand.  I'm going to tell you that over the past nine

22   weeks we have not spoken to a single person that didn't prefer

23   to be excluded.  I mean, nobody -- nobody wants to do the job.

24        A.   Right.

25        Q.   It's not an easy job to do, but I will tell you that
```

1  the State of Texas is never going to put one of its citizens in

2  a position where their heart will be heavy, their conscience

3  will be bothered, or they will have difficulty living with

4  their decision.  Not a death penalty case certainly, and that's

5  why I ask you that because sometimes I see you believe in the

6  death penalty and I see you favor the death penalty in the

7  right kind of case, but it's sometimes different when you know

8  but for your decision, a human being might not be getting

9  executed, so I put you in that seat to ask you, if it's

10  something that's going to bother you, now is your only

11  opportunity to tell us that you really can't in clear

12  conscience participate.

13      A.   Let me say it like this.  Once again, I prefer not

14  to, I mean, participate in a decision that's life and death.

15  Could I?  Yes, I probably could make a decision.  Would I want

16  to make a decision?  Not necessarily.

17      Q.   If you're sitting at home two, three, five, 10 years

18  from -- from now, after serving on this jury, and you see

19  across the news today is the day that Matthew Lee Johnson is

20  going to be executed, you'll know that but for your vote that

21  wouldn't be happening.

22      A.   I wouldn't feel comfortable with that.

23      Q.   Is that something that would violate your

24  conscience, something that would make you regret having done

25  your civic duty?

```
 1        A.    Maybe.  I don't know.

 2        Q.    Do you feel like you could live with that decision

 3   and not look back?

 4        A.    I wouldn't want to have to.

 5        Q.    I really am not trying to be tacky or mean, but I

 6   keep telling you the same thing.  Nobody wants to have to do

 7   it.  And I -- I just want to make sure that October 28th, that

 8   last week of October and that first week of November, that

 9   we've got 12 jurors who can without hesitation make the

10   decisions that need to be made based on the law and the

11   evidence without worrying about violating their own conscience

12   or their own principles or worrying how it's going to affect

13   them.  And now is really your only chance to tell us.  You are

14   the only one who knows.  If you can't do it, there's nothing

15   bad about that.  You've done your civic duty by coming down

16   here and talking to us and by serving twice before and I

17   promise, you'll be back again to serve on another case.  But a

18   death penalty case isn't the case for everybody.

19        A.    I don't -- I don't want to participate, really.

20              (Discussion between the counsel off the record.)

21        Q.    (BY MS. MOSELEY)  Do you -- and I'm going to tell

22   you that legally right now, you're qualified to serve on this

23   jury.  And the only question that -- you're the only one that

24   can answer whether you can do it.  You're -- you're almost

25   there, Ms. Benjamin, and I don't know if it would violate your
```

1  conscience to participate or not.  I mean, you're looking at

2  the man right down here at this table, and you're going to have

3  the decision to make whether he lives or dies in all

4  likelihood.  Can you do it?

5       A.    I'm sure I could make that decision.  I'm not sure

6  how it would affect me, depending on the outcome.

7       Q.    Do you believe that it may violate your conscience,

8  that you may worry years down the road that this bothers you,

9  that you'll take it with you?

10       A.    It's possible.  I don't know that.  I've never had a

11  decision of this magnitude.

12       Q.    Can you guarantee me that you would base your

13  answers to these questions -- and you know what the result of

14  your answers would be.  An answer of yes to Special Issue 1 and

15  no to Special Issue 2 leaves the Judge with no option but to

16  enter a death sentence.

17       A.    Understood.

18       Q.    Can you guarantee me that your answers to those

19  questions would be based on the evidence and the law and not

20  your personal feelings or your concern about what might happen

21  down the road?

22       A.    Yes, I -- I feel that.

23       Q.    Okay.  Okay.  You're telling me you don't want to

24  serve, but you understand at this point that that -- that you

25  may be called upon to do it?

166

```
1        A.    Definitely understand.

2        Q.    And you could do it if you were chosen?

3        A.    If I had to.

4        Q.    Okay.

5              MS. MOSELEY:  That's all I have, Judge.  Thank

6    you, ma'am.

7                  DEFENSE VOIR DIRE EXAMINATION

8    BY MS. MULDER:

9        Q.    Good afternoon, Ms. Benjamin.  Once again, my name

10   is Nancy Mulder, and I'm going to ask you some questions along

11   the same lines with regard to the law and your questionnaire

12   answers, but certainly it's -- and not in any attempt to change

13   your mind or to -- to question how you feel.  The reason we

14   have you fill out this questionnaire before we tell you what

15   the law is, is so we can really get a -- a true feeling for

16   what your feelings are about the death penalty and the law that

17   will apply in the case.

18              So what I'm basically saying is that there are

19   no right or wrong answers, we just need to know how you feel.

20       A.    Okay.

21       Q.    Okay.  First of all, I just want to make sure that

22   we're on the same page with regard to -- you know, I know

23   it's -- we're kind of putting the cart before the horse

24   whenever we pick a jury on a death penalty case because -- just

25   because we're here talking about the special issues doesn't
```

1  mean that we are in any way conceding that Matthew Johnson is

2  guilty of capital murder.  You understand that?

3      A.    I do.

4      Q.    Okay.  It's just in order to be qualified to sit and

5  listen to the evidence, you have to be able to answer Special

6  Issues Number 1 and 2.  Do you understand?

7      A.    Yes.

8      Q.    I did want to ask you about your job because it

9  looks like you work as a default processor -- is it CHE

10  litigation?

11              COURT REPORTER:  C-h-e?

12              MS. MULDER:  Yes, ma'am.

13      A.    CHE.  That stands for -- home equity is actually

14  what it stands for.  We're the go-between for the loss

15  prevention department and the attorneys to pursue for default,

16  nonpayment on mortgages, but I'm not in that department any

17  longer.

18      Q.    Oh, you're not?  Okay.  What department are you in

19  now?

20      A.    I'm now in bankruptcy.

21      Q.    Okay.  Are you still working with attorneys?

22      A.    No.

23      Q.    How long did you work in the Litigation Department?

24      A.    Two years.

25      Q.    Did you have to -- I don't know, did you have a lot

1  of exposure to the law or to the attorneys?

2       A.    We had -- yes.  I had like a conference call I did

3  with them monthly to discuss issues to determine whether or not

4  they were servicing the mortgage loans correctly or --

5  basically our department was created to cure the delinquency,

6  to bring the account current, and to work out a plan that will

7  work for the customer to get their account back in order.

8       Q.    So that you wouldn't have to --

9       A.    So we wouldn't have to litigate.  Our bottom line,

10  we didn't want the property.

11      Q.    You want the money --

12      A.    We want the money.

13      Q.    -- which everyone does.  I totally understand that.

14  Okay.  So you didn't have to file papers at the courthouse

15  or --

16      A.    Oh, no, I didn't go in -- the attorneys took care of

17  the legal -- legality of that.

18      Q.    The only reason I asked was to see if you had any

19  exposure to, you know, the courthouse, if you had been in court

20  while your company was litigating something.  I was just trying

21  to find out --

22      A.    There was a possibility we could have been called,

23  but, no, I never had that occasion.

24      Q.    Did you ever have an experience where your company

25  prepared you to be a witness?

1          A.    Oh, no, never.

2          Q.    Is there anything about your exposure to mortgage

3    litigation law that would affect you in -- in fairly sitting

4    and listening to the evidence in this case?

5          A.    No, because everybody want to keep their home, and

6    bottom line, we're all -- all homeowners, or we live somewhere,

7    whether rent or own.

8          Q.    Okay.  Hold on.  Let me see, I had some other things

9    that I just jotted down.  Oh, I'm also curious about the cases

10   that you served on as a juror.  One of -- I'm sorry, were they

11   civil or criminal cases?

12         A.    It was a DWI is one I remember, but I don't remember

13   much about it.

14         Q.    Was it in this courthouse?

15         A.    I don't remember because I've served, and I can't

16   remember which was which.  I don't remember, I'm sorry.

17         Q.    That's okay.  Well, okay, but it was in Dallas

18   County?

19         A.    Yes.

20         Q.    Okay.  Do you remember on the DWI if you -- what the

21   outcome was?

22         A.    I'm not sure.  I think he was found guilty.

23         Q.    And the other case, was that also criminal or

24   something else?

25         A.    No, it wasn't criminal.

```
 1        Q.    It was civil?

 2        A.    Yes, civil.

 3        Q.    What kind of -- just out of curiosity, what kind of

 4   case was it?

 5        A.    I don't remember really, to be honest.  It was

 6   nothing major.

 7        Q.    A fight about money?

 8        A.    I really don't remember.

 9        Q.    Okay.

10        A.    I don't.

11        Q.    Thank you, Ms. Benjamin.

12              Now, just to go over a few of the things that

13   Ms. Moseley also went over, and I'm not trying to belabor the

14   point.  Obviously, we're all dealing with the same law, but

15   certainly at this table we have a different take on it than the

16   prosecutors do, so if you'll bear with me.

17              As Ms. Moseley said, when somebody is guilty of

18   capital murder, they have to prove beyond a reasonable doubt

19   that it was an intentional killing during the course of

20   another.  And in this case, they've alleged a robbery.  And you

21   understand that?

22        A.    Yes.

23        Q.    Okay.  So it's not a situation where it was any kind

24   of self-defense or an accident or a mistake, because if it was

25   any of those three, it would be not guilty.  Do you understand?
```

 1          A.    Yes.

 2          Q.    Okay.  So when we're talking about somebody who is

 3    guilty of capital murder, we're talking about a person who had

 4    the intent to cause someone's death and then took the action to

 5    do so.

 6          A.    Okay.

 7          Q.    Okay.  Thank you.  I know I'm making a lot of

 8    statements.  I just want to make sure we're on the same page if

 9    you don't mind.

10          A.    No problem.

11          Q.    Thank you.  And I know -- like Ms. Moseley said,

12    we've been doing this for about nine weeks.  This is our ninth

13    week, so we've talked to a lot of people, and it runs the gamut

14    of feelings, honestly, with regard to how people feel about the

15    death penalty and the law.  Some people have come in here and

16    said, you know what, based on the fact that the District

17    Attorney's Office has decided to seek the death penalty, based

18    on the fact that we are now in this process, we've had people

19    come in and say, you know what, at this point he's got to be

20    guilty of something.  How do you feel about that?

21          A.    I wouldn't be able to say that.

22          Q.    So you can presume him innocent at this point?

23          A.    Absolutely.

24          Q.    Even though we're in this process?

25          A.    Yes.

1      Q.    When you were working in mortgage litigation, did

2  you ever come across the different burdens of proof that are

3  applied in cases or -- criminal or civil?

4      A.    No.

5      Q.    Okay.  I just wanted to go over them briefly with

6  you.  In a civil case, like a mortgage default, where people

7  are really arguing about money or property or something, the

8  plaintiff in the case has to prove merely by a preponderance of

9  the evidence what their case is in order to win, so that's

10  really just 51 percent, more likely than not.  So that's

11  preponderance of the evidence.

12              The next level is clear and convincing evidence.

13  For example, if the State of Texas was going to commit you to a

14  mental institution without your permission or if the State of

15  Texas was going to take your children away and terminate your

16  parental rights, you would expect them -- I mean, if they're

17  going to take your children away forever, you would expect them

18  to have a significant amount of evidence in that kind of case,

19  wouldn't you?

20      A.    Yes.

21      Q.    Okay.  Well, the State of Texas only has to prove

22  that by clear and convincing evidence.

23              Beyond a reasonable doubt is the highest burden.

24  It's not beyond a shadow of a doubt.  It's not beyond all

25  possible doubt, but it's beyond all reasonable doubt.  And we

1  all think basically the reason it's the highest burden is

2  because we're dealing with people's lives and liberty.  Does

3  that make sense?

4        A.    Yes.

5        Q.    Okay.  So when the State said that they had the

6  burden of proof, they absolutely do and they have that burden

7  beyond all reasonable doubt in each criminal case.  And you

8  could hold that -- hold them to that burden, can't you?

9        A.    Yes.

10       Q.    Okay.  Now, since the last criminal trial, or the

11  only criminal trial that you served on was a DWI, when you're

12  dealing with a murder or capital murder case, we anticipate

13  that some of the evidence may or may not be an autopsy report

14  of the victim and/or photographs of an autopsy, crime scene

15  photographs, other things that, you know, like you see on

16  dramatic television, things that might be gruesome.  Can you --

17  can you base your decision in this case on the facts and the

18  evidence and not any kind of knee jerk emotion you might have

19  to seeing some evidence if it's gruesome or disturbing?

20       A.    Yes.

21       Q.    Now, with regard to Special Issue Number 1, some of

22  the people we've talked to have come in and told us that, you

23  know, if they found somebody guilty of capital murder, meaning

24  the intentional killing of someone during the course of a

25  robbery, that when looking at Special Issue Number 1, they're

```
 1   always going to find that there's a probability that the
 2   Defendant would commit criminal acts of violence that would
 3   constitute a continuing threat to society automatically because
 4   capital murder is such a heinous crime.  Do you feel the same
 5   way?
 6          A.    Repeat that, please.
 7          Q.    Yes, ma'am.  We have had jurors come in and tell us
 8   that, you know, if they were on a jury and they found a
 9   defendant guilty of capital murder, the intentional murder of a
10   victim during the course of a robbery, that when get -- when
11   then moving to Special Issue Number 1, for them, they would
12   automatically find that there is a probability that the
13   Defendant would commit criminal acts of violence that would
14   constitute a continuing threat to society because they found
15   him guilty of capital murder.  Do you feel the same way?
16          A.    I would say yes.
17          Q.    Now, even though in Special Issue Number 1 you
18   understand the burden of proof is on the State to prove that to
19   you beyond a reasonable doubt?
20          A.    I do understand that.
21          Q.    Okay.  I just wanted to make sure.  But for you --
22   and correct me if I'm wrong, I don't want to put words in your
23   mouth -- but what I hear you saying is that if you convicted
24   somebody of capital murder, the intentional murder of somebody
25   during the course of a robbery, you would always automatically
```

1  answer Special Issue Number 1 yes?

2       A.    No.  No.  I'm sorry.

3       Q.    Okay.  Tell me how I'm wrong.

4       A.    I just misunderstood what you were saying.  I won't

5  automatically make a decision on anything until I know the

6  facts.

7       Q.    Okay.  I'm sorry.  My cocounsel just reminded me

8  that I forgot to tell you about the presumption.  Let me go

9  back.  When a jury has found somebody guilty of capital murder,

10  there is a presumption in the law that life without parole is

11  the appropriate punishment.  Can you follow that presumption?

12       A.    Yes.

13       Q.    Do you agree with that presumption?

14       A.    Yes, I guess I could.

15       Q.    Okay.  So after finding somebody guilty of capital

16  murder, there's a presumption of life without parole.  Then

17  when you get to Special Issue Number 1, the State has to prove

18  beyond a reasonable doubt that there is a probability that the

19  Defendant would commit criminal acts of violence that would

20  constitute a continuing threat to society.  And you could hold

21  them to that burden?

22       A.    Yes.

23       Q.    If they didn't prove to you beyond a reasonable

24  doubt that there was a probability that the Defendant would

25  commit criminal acts of violence that would constitute a

 1   continuing threat to society in the future, would you answer

 2   no?

 3        A.   I would answer no if they couldn't prove it.

 4        Q.   Okay.  All right.  So you could hold them to that

 5   burden?

 6        A.   Yes.

 7        Q.   Now -- and just bear with me.  In taking a look at

 8   Special Issue Number 1, I know Ms. Moseley went over, you know,

 9   probability is just more likely than not.  I just kind of want

10   to break down the -- the question -- or statement, rather --

11   that the Defendant would commit criminal acts of violence.  You

12   can see that acts is plural?

13        A.   Yes.

14        Q.   Okay.  Which leads me to believe that they mean more

15   than one.  Would you agree?

16        A.   I would.

17        Q.   Criminal acts of violence that would constitute a

18   continuing threat to society.  So it's kind of like three

19   parts.  There's a probability that the Defendant would commit

20   criminal acts, meaning more than one, of violence that would

21   actually, you know, constitute a continuing threat to society.

22   Does that make sense?

23        A.   Yes.

24        Q.   Okay.  So it would have to reach that level of

25   constituting a continuing threat to society.  Does that sound

177

1   right?

2        A.    I understand what you're saying, yes.

3        Q.    Okay.  And if -- if a jury answers Special Issue

4   Number 1 no, then it's done.  So life without parole.  And when

5   we say life without parole, it truly is life without parole.

6   No chance of parole ever, ever.  I just want to make sure you

7   understand that, too.  It's not --

8        A.    I do.  Thank you.

9        Q.    But if a jury answers Special Issue Number 1 yes,

10  you move on to Special Issue Number 2.  And this is one where I

11  disagree with Ms. Moseley with regard to, you know, about your

12  personal beliefs and feelings because it certainly comes into

13  play with Special Issue Number 2, whether in taking into

14  consideration all of the evidence, including the circumstances

15  of the offense, the Defendant's character and background, and

16  the personal moral culpability of the Defendant, that there is

17  sufficient mitigating circumstance or circumstances to warrant

18  that a sentence of life imprisonment without parole, rather

19  than a death sentence, be imposed.

20              Okay.  So what -- and I think we can only -- ask

21  you to take a look at all the evidence that's been presented.

22  But in Special Issue Number 2, the jury does not have to be

23  unanimous.  And what I mean is this.  For example, if you -- if

24  there was some evidence that a person -- the Defendant had --

25  had a horrible drug problem throughout his life and was under

1  the influence of drugs or alcohol at the time of the offense,

2  some of the jurors may find that mitigating.  Some may find it

3  not mitigating.  Some -- that other set of the jury may find

4  that because he had a rough childhood, to them that's

5  mitigating.  Do you understand what I mean?

6      A.    I do.

7      Q.    Okay.  So the jury doesn't have to be unanimous with

8  regard to what they think is mitigating, just that something

9  is.  And another juror may say, you know what, I can't really

10  articulate or explain what it is I find mitigating.  I just do.

11  Could you see how somebody might feel that way?

12      A.    Yes.

13      Q.    Okay.  And certainly you would agree that different

14  opinions are -- are worthy of respect?

15      A.    Absolutely.

16      Q.    Absolutely.  And now comes the big question.

17  Because at the point you're looking at Special Issue Number

18  2 -- and like I've said, we've talked to a lot of people.

19  There have been people who have come in and said, you know

20  what, if I found somebody guilty of capital murder, the

21  intentional murder of a person during the course of a robbery,

22  and it's been proven to me that there is a probability that the

23  Defendant would commit criminal acts of violence that would

24  constitute a continuing threat to society in the future, some

25  people tell us at that point, when answering Special Issue

179

1  Number 2, they're always going to answer it no, there is

2  nothing sufficiently mitigating because they are dealing with

3  somebody who committed an awful crime who is what they consider

4  a future danger.  How do you feel about that?

5      A.   I can't say that.

6      Q.   Okay.

7      A.   I agree with that.

8           COURT REPORTER:  I'm sorry?

9      A.   I can't say that I agree with that necessarily.

10      Q.   (BY MS. MULDER)  Okay.  Can you explain a little

11  more how you feel?

12      A.   I really can't.  I don't.  I don't know how to

13  explain it to you, but you just can't say that I would agree

14  with that necessarily.

15      Q.   Okay.  Well, let me ask it this way.  If you were on

16  a hypothetical jury, you found somebody guilty of capital

17  murder, the intentional murder of a victim during the course of

18  a robbery and the State proved to you beyond a reasonable doubt

19  that there is a probability that the Defendant would commit

20  criminal acts of violence that would constitute a continuing

21  threat to society, could you seriously consider Special Issue

22  Number 2 and answer it yes if you found something that was

23  sufficiently mitigating?  Despite the fact that you had

24  somebody here who had committed this crime and you -- had been

25  proven to be a future danger?

```
 1        A.    I can't be certain.

 2        Q.    Okay.  And why can't you be certain?

 3        A.    I really -- I really don't know.  I'm going to be

 4   honest with you, I don't.

 5        Q.    Well, do you feel like it's an issue of because if

 6   somebody was guilty of a capital murder and was a future

 7   danger, that you couldn't -- you couldn't imagine any kind of

 8   circumstance that would be sufficiently mitigating?

 9        A.    No, I'm not saying that.

10        Q.    Oh, okay.  I'm sorry.  I'm just trying to -- I'm

11   just trying to figure out a little bit of where your -- of how

12   you feel.

13        A.    I really don't -- I really can't answer that.  I'm

14   sorry.

15        Q.    Uh-huh.

16        A.    I don't know.

17        Q.    Okay.  Well -- and I hear you say, I don't know.  Is

18   there -- well, hmm, I don't know how else to really ask it.

19              Is there -- okay.  Thank you.  Okay.

20              Can you fairly consider a life sentence for

21   somebody who has been found guilty of capital murder and has

22   found to be a future danger?

23        A.    Yes.  I could consider it, yes.

24        Q.    Okay.  Well, could you consider and give it if you

25   thought it was appropriate?
```

1       A.    Yes.

2       Q.    So you can fairly consider all the evidence in

3  Special Issue Number 2?

4       A.    Yes.

5       Q.    Okay.

6             MS. MULDER:    Just give me a minute, ma'am.

7  Thank you.

8       Q.    (BY MS. MULDER)  Ms. Benjamin, do you know anybody

9  who works in the Dallas Police Department?

10      A.    No, I don't.

11      Q.    How about the Garland Police Department?

12      A.    Not to my knowledge, I don't know anybody.

13      Q.    Okay.  How about any of the Garland Fire Department

14  or the Dallas Fire Department?

15      A.    No.

16      Q.    The Dallas District Attorney's Office?

17      A.    No.

18      Q.    Anybody at the Southwestern Institute of Forensic

19  Sciences?

20      A.    Oh, Lord, I don't know.  I'm sorry.  I don't know.

21      Q.    All right.  How about the Dallas Sheriff's Office?

22      A.    No, I don't know anybody.

23      Q.    Okay.  How about anybody that works in the -- I've

24  got a list I've got to go through, so just bear with me.

25      A.    Okay.

```
 1        Q.    Anybody that works in the -- in the Texas

 2   penitentiary system?

 3        A.    Not personally, I don't know anybody.

 4        Q.    Anybody who works at Parkland Hospital?

 5        A.    No.

 6        Q.    Anybody at Presbyterian Hospital?

 7        A.    I -- I don't know anyone, no.

 8        Q.    Okay.  All right.  I'm going to read a list of names

 9   to you.  If at any time any of them sound familiar, just tell

10   me to stop; otherwise, I'll just -- it's a long list, so I'll

11   just read through them.

12        A.    Okay.

13        Q.    Okay.  Here we go.  Scott Harris, Elizabeth Harris,

14   Nancy Harris, Chris Harris, Kenneth Marecle, Amy Marecle,

15   Michael Frank, Anna Lunceford, Jim Medley, Lawrence Denson,

16   Jonas Lucht, Greg Mansell, Carina Pinzon, Digna Salmeron, Kelly

17   Keeton, Daphne Johnson, Sherry Ann Clark, Amy Armstrong,

18   Anthony Johnson, Alma Johnson, Courtney Johnson, David

19   Williams, Danny Mullins, David Contente, Gioconda Verdaguer,

20   Donald Dunlap, Johnny Wright, Monica Cajas, Michael Crosby,

21   Roxanne Luttrell, Robbie Denmark, Quinlen Minor, Margaret

22   Tatum, Jim Bertucci, John Harris, Dr. Timothy Proctor, Carlton

23   Jenkins, Durian Allen, Gene Gathright, Manuel Turner, Andre

24   Howard, Kenneth Lewis, Sheldon Henry.

25        A.    No, no knowledge of those people.
```

```
 1        Q.   Do you have any questions for -- for me or for the

 2   Defense?

 3        A.   No, I don't.

 4        Q.   There is just one other thing I just wanted to make

 5   sure we were on the same page with regard to the Defendant's

 6   right not to testify.  You can follow the Judge's instruction

 7   and not consider or hold it against him in any way if he

 8   chooses not to testify in guilt/innocence or in the punishment

 9   phase?

10        A.   That's a right that we all have.

11        Q.   Okay.  Thank you very much.

12        A.   Thank you.

13             THE COURT:  All right.  Thank you, Ms. Benjamin.

14   We're going to take a short recess.  If you'll just step out in

15   the hall for just a moment.

16             VENIREPERSON:  Okay.

17             (Venireperson excused to hallway.)

18             THE COURT:  Ms. Wanda Benjamin, 1369A, any

19   challenges for cause from the State?

20             MS. MOSELEY:  Your Honor, I'm going to challenge

21   this juror.  I think at a minimum she was vacillating on

22   whether or not this is a process she could participate in.  She

23   wasn't able to assure us that she could participate in a case

24   that resulted in a death case without it doing some harm to her

25   conscience.  And frankly, I'm concerned that she's not going to
```

1  be able to participate.  And based on her answers, I would

2  submit her for cause.

3                (Venireperson challenged by the State.)

4                MS. MULDER:  Your Honor, our response is that

5  according to case law, if it violated her conscience, is not

6  the standard.  The standard is would it prevent or

7  substantially impair her ability to answer the -- either of the

8  two special issue questions.  And -- and she said repeatedly

9  that she could follow the law and that she could do it, and

10  that does make her qualified.

11                THE COURT:  All right.  The request is denied.

12  I think that the witness did say numerous times, with great

13  reluctance, that she could do it.

14                (Challenge denied.)

15                (Venireperson returned to courtroom.)

16                THE COURT:  Ms. Benjamin, you have been

17  qualified as a juror.  So we will be taking your photograph, if

18  you don't mind, so the lawyers, when they're reviewing their

19  notes, can put a face to your name.  And then we will be

20  calling you on October the 15th to let you know if you are, in

21  fact, one of the jurors.

22                Thank you very much.

23                (Venireperson 1369A, Wanda Benjamin, qualified.)

24                (Venireperson excused from courtroom.)

25                THE COURT:  Are we off the record?

1          MS. MOSELEY:  I don't need it on the record.

2          THE COURT:  Anything on the record?

3          MS. BERNHARD:  Nothing.

4          THE COURT:  Close the record.

5          (Recess of proceedings.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Reporter's Certificate

 2  THE STATE OF TEXAS:

 3  COUNTY OF DALLAS:

 4       I, Darline King LaBar, Official Court Reporter in and for

 5  the 363rd District Court of Dallas County, State of Texas, do

 6  hereby certify that the above and foregoing volume constitutes

 7  a true, complete and correct transcription of all portions of

 8  evidence and other proceedings requested in writing by counsel

 9  for the parties to be included in the Reporter's Record, in the

10  above-styled and numbered cause, all of which occurred in open

11  court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if any,

14  admitted by the respective parties.

15       WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16  on the 23rd day of February, A.D., 2014.

17

18

19
                        \s\Darline LaBar
20                      DARLINE KING LABAR
                        Official Court Reporter
21                      363rd Judicial District Court
                        Dallas County, Texas
22                      hpdkfaith@msn.com
                        (214) 653-5893
23

24
    Certificate No:  1064
25  Expiration Date:  12/31/2014
```