1              REPORTER'S RECORD

2           VOLUME 39 OF 57 VOLUMES

3        TRIAL COURT CAUSE NO. F12-23749-W

4      COURT OF CRIMINAL APPEALS NUMBER: AP-77,030

5  THE STATE OF TEXAS           :         IN THE 363RD JUDICIAL

6  VS.                          :         DISTRICT COURT OF

7  MATTHEW LEE JOHNSON          :         DALLAS COUNTY, TEXAS

8

9

10                    **INDIVIDUAL VOIR DIRE**

11

12

13

14

15                      * * * * * * * * * * *

16

17

18

19

20      On the 1st day of October, 2013, the following proceedings

21  came on to be heard in the above-entitled and numbered cause

22  before the Honorable Tracy Holmes, Judge Presiding, held in

23  Dallas, Dallas County, Texas:

24      Proceedings reported by machine shorthand computer

25  assisted transcription.

```
 1  A P P E A R A N C E S:

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
          Crowley Criminal Courts Building
 3        133 North Riverfront Boulevard
          Dallas, Dallas County, Texas 75207
 4        Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
          MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724
 6
                 FOR THE STATE OF TEXAS;
 7

 8

 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
          P.O. Box 2817
11        Red Oak, Texas 75154
          Phone:  972-617-5548
12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13        325 North St. Paul Street, Suite 2475
          Dallas, Texas 75201
14        Phone:  214-922-0212

15  MS. NANCY MULDER, Attorney at Law, SBOT # 00792971
          2214 Main Street
16        Dallas, Texas 75201
          Phone:  214-764-7246
17
                 FOR THE DEFENDANT.
18

19

20

21

22

23

24

25
```

1                    **INDEX VOLUME 39**

2  October 1st, 2013                                    PAGE   VOL.

3  INDIVIDUAL VOIR DIRE:

4  Proceedings......................................... 5    39

5  PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

6  JERRI ADAMS              8                  54          39

7  Venireperson challenged by the Defense............... 99   39

8  Challenge denied.................................... 99   39

9  Venireperson 1393A, Jerri Adams, qualified.......... 100  39

10 PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

11 DEXTER REDIC                         106               39

12 Venireperson challenged by the State................ 107  39

13 PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

14 DEXTER REDIC             108                           39

15 Venireperson 1421A, Dexter Redic, excused........... 121  39

16 PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

17 JOE ZAMORA               125                           39

18 Venireperson challenged by the State................ 150  39

19 Venireperson 1424A, Joe Zamora, excused............. 150  39

20 PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

21 CAROLINA AVILES          154                188        39

22 Venireperson challenged by the Defense.............. 198  39

23 Venireperson 1446A, Carolina Aviles, excused........ 198  39

24 Venireperson 1431A, Marcia Jones, excused........... 199  39

25

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| RUTH WHITE | 203 | | 39 |

Venireperson 1448A, Ruth White, excused............. 234    39

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| CALLIE STANLEY | 238 | 282 | 39 |

Venireperson challenged by the Defense.............. 294    39

Venireperson 1455A, Callie Stanley, excused......... 295    39

Reporter's Certificate............................. 296    39

**ALPHABETICAL INDEX**

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| JERRI ADAMS | 8 | 54 | 39 |
| CAROLINA AVILES | 154 | 188 | 39 |
| DEXTER REDIC | | 106 | 39 |
| DEXTER REDIC | 108 | | 39 |
| CALLIE STANLEY | 238 | 282 | 39 |
| RUTH WHITE | 203 | | 39 |
| JOE ZAMORA | 125 | | 39 |

```
 1                    P R O C E E D I N G S

 2               THE COURT:  Please be seated.

 3               Good morning, Ms. Adams.

 4               VENIREPERSON:  Morning.

 5               THE COURT:  How are you today?

 6               VENIREPERSON:  I'm fine.  Thank you.  How are

 7  you?

 8               THE COURT:  Good.  Ms. Adams, do you remember

 9  the oath that I gave you back in June?

10               VENIREPERSON:  Yes.

11               THE COURT:  Okay.  You're still operating under

12  that oath and all of those instructions, and you'll continue to

13  operate under that oath and the instructions until you're

14  released from service in this case.

15               VENIREPERSON:  Okay.

16               THE COURT:  This case is going to be tried the

17  weeks of October the 28th through November the 4th.  Has

18  anything happened between June and now that would prevent you

19  from sitting during those two weeks?

20               VENIREPERSON:  No.

21               THE COURT:  All righty.  Have you had any

22  exposure to this case during that time?

23               VENIREPERSON:  No.

24               THE COURT:  You know nothing about it?

25               VENIREPERSON:  No, I don't.
```

```
 1                    THE COURT:  All right.  Well, each side has 45
 2   minutes to talk to you, and at the end of that time, we'll ask
 3   you to step out in the hall.  And then if you're qualified as a
 4   juror, we're going to take your photograph, so that the lawyers
 5   can put a face to your name when they're going through their
 6   process later on.  And then on October the 15th or the 16th,
 7   you'll be notified about whether or not you will definitely be
 8   a juror.
 9                    VENIREPERSON:  Okay.
10                    THE COURT:  Does that -- is that convenient for
11   you?  It may not be convenient, but does that fit in your
12   schedule?
13                    VENIREPERSON:  That's fine, yes.
14                    THE COURT:  All right.  Let me introduce the
15   parties to you.
16                    The lady who just walked out of the courtroom is
17   name -- her name is Andrea Moseley.
18                    Rocky Jones is sitting next to her.
19                    MS. JONES:  Good morning.
20                    VENIREPERSON:  Good morning.
21                    THE COURT:  And on down at the Defense table is
22   Nancy Mulder.
23                    MS. MULDER:  Good morning.
24                    VENIREPERSON:  Good morning.
25                    THE COURT:  Catherine Bernhard.
```

```
 1                    MS. BERNHARD:  Good morning.

 2                    VENIREPERSON:  Morning.

 3                    THE COURT:  Kenneth Weatherspoon is sitting in

 4  the back.

 5                    MR. WEATHERSPOON:  Good morning.

 6                    VENIREPERSON:  Morning.

 7                    THE COURT:  The citizen accused is Mr.

 8  Matthew -- sorry, Matthew Johnson --

 9                    THE DEFENDANT:  Morning.

10                    VENIREPERSON:  Morning.

11                    THE COURT:  -- sitting to the left of Ms.

12  Bernhard.

13                    The lady sitting between you and me is Darline

14  LaBar.  She's the court reporter, and as a courtesy to her,

15  it's her responsibility to take down everything that's being

16  said, so please answer audibly and please answer yes or no.

17  She can take down uh-huh and huh-uh, but it doesn't make for a

18  clear record.

19                    VENIREPERSON:  Okay.

20                    THE COURT:  And my name is Tracy Holmes, and I'm

21  the presiding judge and I'll be sitting in the trial.

22                    VENIREPERSON:  Okay.

23                    THE COURT:  Ms. Jones.

24                    MS. JONES:  Thank you, Your Honor.

25                                JERRI ADAMS,
```

 1  was called as a venireperson by the parties, and after having

 2  been first duly sworn, testified as follows:

 3                    STATE VOIR DIRE EXAMINATION

 4  BY MS. JONES:

 5       Q.   Ms. Adams, thank you so much for showing up this

 6  morning.  We know it's a task to come down to the courthouse,

 7  and thank you for doing that for us.

 8       A.   You're welcome.

 9       Q.   Also, I wanted to say looking at your name, I think

10  it's kind of cool that it's Jerri with an I.  And when I first

11  read that, I said, I have to meet this lady, because, of

12  course, my name is Rocky, so I love boy-girl names.

13       A.   Right.

14       Q.   As the Judge told you, this is a -- it's a process.

15  The fact that when you came down back in June that morning, do

16  you remember it was close to maybe 800 people there?  Do you

17  remember that?

18       A.   Yes.

19       Q.   All the seats taken up.  Well, that same afternoon,

20  that same amount of people came back.  And we have to talk to

21  that number of people because, as you understand, we're talking

22  about the death penalty.

23       A.   Right.

24       Q.   People have varying views.

25       A.   Sure.

 1        Q.    And so what we're trying to do with each juror that
 2   we talk to, we want to get your personal feelings and views on
 3   it.  And that's why we don't do it in a big group setting.  And
 4   basically all we're trying to do is find that middle of the
 5   road person because, you know, it's not fair for somebody to be
 6   so pro death penalty that they violate the Defendant's rights.
 7        A.    Right.
 8        Q.    Nor is it fair to the other side to say, you know
 9   what, I can never assess the death penalty.
10        A.    Right.
11        Q.    And from looking at your questionnaire, it looks
12   like you are that middle of the road person.  When I look at
13   your answer in Question Number 1, it says:  I believe it should
14   be applied -- the death penalty should be applied as long as it
15   is in accordance with the law and handled appropriately through
16   the justice system.
17        A.    Yes.
18        Q.    And it sounds like from reading that, that you
19   understand it's a process, that there are no automatics.
20        A.    Right.
21        Q.    That just because -- let's say you look and you see
22   something on TV -- and I'll give you an example.  Just recently
23   we had the Naval base where we had that gentleman that attacked
24   all those people.  There might be a lot of people like my mom
25   who will say, well, Raquel, I don't understand why we even have

```
 1   a trial for that.  It was all on video.  And let's just make it

 2   happen.  Well, you understand it's a process.  We can't just do

 3   that.

 4        A.   Right.

 5        Q.   Okay.  And also, it appears that if we look at your

 6   questionnaire, on page Number 3, Number 14, you stated that you

 7   believe in the death penalty and that if you had to pick

 8   between -- on a scale from 1 to 10, you would go with a 10.

 9   But I just need to understand that even though you've put a 10

10   here, do you understand that in some cases a life sentence

11   would be appropriate?

12        A.   I do.

13        Q.   Okay.

14        A.   Yes.

15        Q.   And so when you put a 10 here, you're not telling us

16   that you will automatically always go with the death penalty

17   and not keep an open mind, are you?

18        A.   No, I -- I believe I was thinking that --

19        Q.   That's okay.

20        A.   -- that I'm not -- I'm not wishy-washy -- I don't

21   know, is that a word?  I'm not wishy-washy in my -- I mean, I

22   understand that in some -- you know, in the --

23        Q.   Okay.

24        A.   Yeah, I'm not -- I understand --

25        Q.   You're not on the fence?
```

```
 1        A.    I'm not on the fence, yeah, that's what I'm trying

 2   to say.

 3        Q.    Okay.

 4        A.    I'm not on the fence -- I mean, right.

 5        Q.    That makes -- that makes sense.  Thank you for

 6   clearing that up.  And also, as we go through this process,

 7   since you've had an opportunity to read your questionnaire,

 8   just let me know if there's anything you would like to change.

 9   You know --

10        A.    Okay.

11        Q.    -- if you've looked at something and go, hey, let me

12   explain that further --

13        A.    Okay.

14        Q.    -- then we'll go ahead and let you do that.

15              Now, also, looking at your answers in 21 and in

16   42 -- if we look at your answer in Question Number 21 on page

17   4, when I say you're that middle of the road person, it's when

18   I look at your answer in this.  You said:  I don't know

19   specifics on any cases as far as if the death penalty is used

20   too often or too seldom in the state, but I believe that the

21   death penalty is appropriate for cases meeting the state laws.

22   You know, that tells us right there that you don't already have

23   any kind of preconceived notions --

24        A.    No.

25        Q.    -- as far as who should get the death penalty and
```

```
 1  who shouldn't --

 2       A.    No.

 3       Q.    -- as long as the laws are followed.

 4       A.    Yes.

 5       Q.    Then if we go further in Question Number 42, on page

 6  7, we asked you:  Do you agree with the following statement

 7  that regardless of what a judge says the law is, jurors should

 8  do what they believe is the right thing?  And you stated:  We

 9  have laws so that we can have order and so that everyone

10  receives the same opportunities.  That right there is probably

11  one of the best answers we could have for that, because as you

12  sit here right now, Ms. Adams, you don't know anything about

13  this case, do you?

14       A.    No.

15       Q.    You don't know any of the facts?

16       A.    No.

17       Q.    And as you sit here right now, the Defendant has to

18  be presumed innocent.

19       A.    Yes.

20       Q.    Because the State hasn't proven him guilty, correct?

21       A.    Correct.  Yes.

22       Q.    All right.  And so if we go a little bit further

23  into your questionnaire, if we look on page Number 2 at your

24  answer in Question 7, 8, and 9, I want to talk to you a little

25  bit about how the death penalty is even -- how a person even
```

1  becomes eligible for the death penalty.

2          In Question Number 7, you said that the best

3  argument for the death penalty is when the crime is such that

4  removal by death is warranted by law, then the law should be

5  imposed.  And that is -- that is absolutely correct.  In the

6  state of Texas, what happens is that a person can be charged

7  with capital murder and eligible for the death penalty in

8  certain ways.  There can be the killing of a police officer

9  during their duty, during the course of their duty.  It can be

10 death to a child under the age of 10 years old.  And it could

11 be an intentional killing plus something else, okay?  So it

12 could be an intentional killing plus a burglary, intentional

13 killing plus a robbery, intentional killing plus sexual

14 assault.  Does that make sense --

15      A.   Yes.

16      Q.   -- what I'm saying?

17      A.   Yes.

18      Q.   And then when we go further, I see that you noted in

19 Number 8 that the best argument against the death penalty is if

20 a person's mental capacity -- you know, if they are -- I'm

21 assuming you meant by that if a person is mentally disabled or

22 if they're impaired or anything like that.

23      A.   Yes.

24      Q.   Well, I'll let you know that if a person was insane

25 or mentally incapacitated at the time of the offense, then they

1  would not be eligible for the death penalty.  Does that make

2  sense?

3          A.    It does.

4          Q.    Because once again, we have to look at the

5  intentional act.  And if a person does not -- let's say they're

6  not in their right mind --

7          A.    Right.

8          Q.    -- then we can't determine if they did it

9  intentionally.

10         A.    Right.

11         Q.    Okay?

12         A.    Yes.

13         Q.    All right.  Also, we're going to -- we're putting a

14 little presentation up for you later on, so give us a moment

15 there.

16               Okay.  If we look at your answer in Question

17 Number 9, you look like -- even though you didn't know what the

18 law was before reading that brochure, looks like you got it

19 right.  You know that when it comes to capital murder, it's

20 like we talked about before.  It's with -- it says:  What crime

21 do you think the death penalty should be available?  You said:

22 Capital murder, rape, torture, child abuse, abusing elderly or

23 handicapped.  You're kind of close on that, you know.  But once

24 again, it has to be an intentional killing plus something else.

25         A.    Okay.

1      Q.    Okay?  So most of those you got.  Now, when it comes

2    to torture, you know, the state of Texas, we don't have a law

3    for that.  But once again, if you can get the intentional

4    killing plus another aggravating offense, that's what gets us

5    to capital murder, and one of the possible punishments can be

6    the death penalty.

7              If a person is accused and later proven guilty

8    and convicted of capital murder, then there is two punishments

9    they could have, either life in prison without the possibility

10   of parole -- and it's just like that, they never ever get

11   out -- or they can receive the death penalty if these two

12   questions over here are answered in such a way as to answer

13   Number 1 as yes and Number 2 as no.  Then that's what will lead

14   a person to the death penalty.

15     A.    Okay.

16     Q.    Okay?

17     A.    Uh-huh.

18     Q.    All right.  Now, if we look at your answers to --

19   also, let me look at one other place.  In number -- if we look

20   at your answers in Question Number 10 and in Number 27, but

21   let's look at Number 10 -- when we ask you about what is

22   capital murder and we talk about intentionally killing another

23   person during the course of a robbery.  And you stated:  Laws

24   of the land should be followed as long as there is no

25   contradiction with scripture.  The Bible gives several reasons,

1  examples in both the Old and New Testament, where death was the

2  punishment.

3              Well, I just wanted to kind of get your views

4  and thoughts when you say that, because you mention it again in

5  Question Number 27 on page 4.  You said -- it says:  What are

6  your thoughts and feelings in general about the criminal

7  justice system?  You said:  My thoughts are based on scripture,

8  giving us examples of how order should be maintained.  And so I

9  just want to make sure that it looks like you've kind of

10  intersected the two.  You know, we're talking about man's law

11  and we're talking about God's law.

12       A.    Uh-huh.

13       Q.    And I just want to make sure that there's no

14  conflict for you in any way when you say that, yes, you are a

15  supporter of the death penalty, but I didn't -- I just want to

16  make sure there's no conflict with your religious beliefs.

17       A.    There's no conflict.  In fact, I believe there are

18  places in scripture where God commanded death for certain

19  crimes or -- and I just -- I base all of my -- my whole life is

20  based on biblical scripture, and I believe that God put

21  government -- I mean he -- he allowed for that --

22       Q.    Yeah.

23       A.    -- as well, so that we can have order, so that we

24  can have fair and -- I believe we have to have order.  I mean,

25  I think -- I mean, I'm not sure what -- how much detail do you

```
 1   want on that?  I mean --
 2        Q.   No, that makes sense what you are saying.
 3        A.   I mean, I can give you an example from what I know
 4   from the Bible.  Is that what you're looking for?
 5        Q.   Oh, no, no.
 6        A.   Oh, okay.
 7        Q.   I was just making sure that, you know, there was
 8   no -- because, of course, we ask that question.  Is there any
 9   moral or religious reasons why you wouldn't be a good juror for
10   this or why you wouldn't sit on this case, and I saw that you
11   marked no, that there was no conflict for you.
12        A.   Right.
13        Q.   But when I saw that you mentioned that, I just
14   wanted to make sure that we talked about it.
15        A.   Okay.
16        Q.   And I notice that you do understand that there's a
17   difference between following man's law and God's law and
18   vengeance because when we look at your answer to Number 15 on
19   page 3, you said you don't necessarily believe in an eye for an
20   eye because that's more vengeance towards -- you know, in your
21   opinion.
22        A.   I think that's what -- I think that's what society
23   sees that as these days.
24        Q.   Okay.
25        A.   Yes, I do.
```

1      Q.    And so I see that you do -- you know, you can make

2  the difference between the two.  And it would not be violating

3  your conscience, nor would it be violating --

4      A.    Right.

5      Q.    -- any beliefs that you have to sit on a case like

6  this.

7      A.    Right.

8      Q.    Okay.  Now, let's talk a little bit about what this

9  case is.  I notice that you put in your questionnaire back

10 on -- I believe it's one of the last things that you said on

11 page 18 in Question 139.  You said that this is a very serious

12 case, and you said that you would be nervous having never

13 served and the nature of the case.

14              Well, let me just kind of tell you a little bit

15 about what that is.  As we talked about before, once a jury of

16 12 sit over here and they convict a defendant of capital

17 murder, then we go on to the punishment phase.  And in the

18 punishment phase, as we talked about before, if the jury

19 answers Issue Number 1 as yes, that the Defendant will be a

20 continued future danger to society and if they answer Issue

21 Number 2 as no, I don't see anything that was sufficiently

22 mitigating to warrant a life sentence, then at that point the

23 Judge would have no recourse but to sign a death warrant,

24 basically.  And that once a person has been sentenced to the

25 death penalty, that some day they will go to Huntsville and

1    they will be administered a lethal injection, okay?

2              Now, knowing all that, is this something you

3    could still participate in?

4         A.    I can, yes.

5         Q.    Okay.  All right.  I just wanted to make sure.

6              Now, we've talked a little bit about the death

7    penalty and how a person becomes, you know, eligible for it.

8    But I want to talk to you more specifically now about the

9    principles of law that will apply to any kind of case, not just

10   a capital murder case, but any case in general because the --

11   the general principles of law will cover all of us, not just

12   the Defendant, but each and every one of us, whether we're

13   inside the courtroom or on the street.  And basically, when we

14   talk about the process of what a trial is, just in general, a

15   trial is a two-part system in the state of Texas.  And I don't

16   remember from looking at your questionnaire.  It doesn't appear

17   that you have served on a jury before.

18        A.    No.

19        Q.    Yeah.  And so in the state of Texas, it's a

20   bifurcated system.  It's a two-part system.  The first part of

21   the trial is the guilt/innocence phase.  That's where you

22   decide who -- did the person do it or did they not do it.  I

23   know that's bad English, but that's what we have to figure out.

24   Did they do it or did they not do it?  If the jury says yes,

25   the State has proven beyond a reasonable doubt that this person

1   is guilty of this crime, then we go on to the second part of

2   the trial, okay?  And that part is called the punishment phase.

3                   And in the punishment phase, that's when you can

4   hear everything about the Defendant's life.  And typically I

5   summarize it as a photo album, okay?  If you can imagine this.

6   If you have a photo album in front of you, the very first part

7   of the trial is when you look at one picture in that photo

8   album.  You look at one period of time, just one photo, okay?

9   And after we get to the punishment phase, that's when you can

10  flip through all the pictures of the photo album.  You can look

11  at the Defendant's life from birth until present.  Does that

12  make sense to you?

13      A.    Uh-huh.

14      Q.    And why do you think we have a system like that?

15      A.    I would assume it's because you have to only take

16  into account -- if you're looking at one -- at one particular

17  crime and trying to decide guilt or innocence, you would only

18  want to look at that snapshot of time --

19      Q.    Yes.

20      A.    -- to determine.

21      Q.    Yeah.  Because it wouldn't be fair to go through the

22  whole photo album and go, well, they did it before, they must

23  have did it this time --

24      A.    Right.

25      Q.    -- right?

 1      A.    Right.  Sure.

 2      Q.    Okay.  And then when we talk about the actual

 3  principles of law that will apply during the guilt/innocence

 4  phase and/or the punishment phase, the first one is the

 5  presumption of innocence.  We've talked about that a little

 6  bit.  As the Defendant sits here right now, he is presumed

 7  innocent because as it stands right now, he's only been charged

 8  by indictment, which is a piece of paper that says we are

 9  charging you with this offense.  That's all it is.  Until and

10  unless the State proves to you beyond a reasonable doubt what

11  certain facts are, the Defendant sits here and he's innocent.

12  A person does not have to prove their innocence.

13      A.    Right.

14      Q.    It's up to the State to prove their guilt.  Does

15  that make sense?

16      A.    It does.

17      Q.    And can you afford the Defendant -- the Defendant

18  that presumption of innocence?

19      A.    Yes.

20      Q.    Okay.  And when we talk about the next principle of

21  law, we talk about the Fifth Amendment.  And if you've ever

22  watched Law & Order or any of those case -- any of those kind

23  of TV shows, you always hear the Fifth Amendment right where

24  you have the right to remain silent, anything you say can and

25  will be used against you.  You've heard that before --

```
 1        A.    Yes.

 2        Q.    -- right?

 3        A.    Yes.

 4        Q.    Well, the Defendant has that right throughout the

 5   process of this trial.  Not only in the courtroom does a person

 6   have that right, but on the street.  If a police officer stops

 7   you --

 8        A.    Uh-huh.

 9        Q.    -- whether it's for speeding or for no seat belt, if

10   they ask you to talk to them, you can say, I don't want to.

11   That's the Fifth Amendment right.

12              Now, I need to ask you.  As you sit here right

13   now, if the Defendant chose not to testify -- because you

14   understand, some people don't want to get on the stand, and not

15   their Defense attorneys, not even their mother can come in here

16   and say, you better get on this stand and tell these people

17   what happened, that no one can make a person get on the stand

18   because, as you understand, some people don't like speaking in

19   public, huh?

20        A.    Right.

21        Q.    Would you agree with that?

22        A.    Yes.

23        Q.    And probably when you came in and realized you had

24   to sit in that box with that microphone right there, that

25   probably made you a little nervous, didn't it?
```

 1        A.    A little bit.

 2        Q.    Okay.  So knowing that there's various reasons why a

 3   person may or may not want to testify, we just have to find out

 4   from you if you will hold that against the Defendant if he

 5   decides not to take the stand.

 6        A.    No.

 7        Q.    Okay.

 8              COURT REPORTER:  I'm sorry?

 9        A.    No.  I said no.

10        Q.    (BY MS. JONES)  And you understand that during the

11   whole course of the trial, if the Defendant does not take the

12   stand, that at no time can you or any of the other jurors go in

13   the back where we have the deliberation room --

14        A.    Uh-huh.

15        Q.    -- and you can go in the back and say, you know

16   what, if he would have testified, maybe I would have found him

17   not guilty.  Nor can you do the opposite and go, well, you know

18   what, since he, you know, didn't testify, I don't really know

19   his side, so I'm going to go ahead and find him not guilty

20   because we don't know all sides of the story.  So you

21   understand that's not fair to either side, right?

22        A.    I do.

23        Q.    Can you promise us that you will only base your

24   deliberations and your verdict on the evidence that you hear

25   from that witness stand?

1      A.    Yes.

2      Q.    Can you promise us that?

3      A.    Yes.

4      Q.    Okay.  And that if the Defendant does not take the

5  stand, that you won't hold it against him.

6      A.    That's correct, I won't.

7      Q.    Okay.  Now, let's talk about the burden that the

8  State has.  As we say, if the State does the accusing, the

9  State has to do the proving.  So we have to prove all the

10  elements of a crime beyond a reasonable doubt, okay?  And so

11  what that means is not a shadow of a doubt.  It's not beyond

12  all doubt.  We actually don't even have a definition for it.

13  It's just based on reason and common sense.

14            When you came in the building today, they

15  probably -- you had to go through the metal detectors.  You had

16  to give them your purse and if you had belt on or some shoes,

17  they may have made you take it off.  You kind of remember that?

18  It's almost like the airport.

19      A.    Yes.

20      Q.    Well, what they didn't ask you to do is leave your

21  common sense, and I try and tell people that because all the

22  State has to do is prove to you -- prove to your satisfaction,

23  whatever that may be, we just have to prove to your

24  satisfaction that an offense happened.  Does that make sense

25  what I'm saying?

 1          A.    Yes.

 2          Q.    That -- of course, you know, there may be some doubt

 3    as far as, you know, some people might say, well, a witness

 4    testified that it was a maroon shirt and another witness

 5    testified it was a red shirt, but that doesn't have anything to

 6    do with whether or not the offense itself happened.  Does that

 7    make sense?

 8          A.    Yes, it does.

 9          Q.    Okay.  So when we talk about beyond a reasonable

10    doubt, we ask you to hold the State to our burden, that if we

11    have to prove five elements -- we call them elements -- if we

12    have to prove five elements of the offense and we only prove

13    four to you, then that's a not guilty.  Does that make sense?

14          A.    Yes.

15          Q.    And that at no time and no way would we ask you to

16    give us a leg up.  You know, it wouldn't be fair for you to go

17    back there and go, you know what, the State got close.

18          A.    Right.

19          Q.    They got really close.  You know, those facts were

20    really bad and I would hate for somebody to get off on a

21    technicality.  Well, it's not a technicality.  It's what the

22    law is, and it's like what you said in your questionnaire.  As

23    long as it's in accordance with the law.

24          A.    Yes.

25          Q.    And if we don't prove all our elements, then we're

1  not in accordance with the law.  Does that make sense what I'm

2  saying?

3       A.    Yes, it does.

4       Q.    All right.  And so let me give you a really quick

5  example.  As I told you before, we have to prove an intentional

6  killing, plus another aggravating offense, okay?  So let's say

7  we have a hypothetical jury here and we allege in our

8  indictment -- we say that a particular defendant, not this one,

9  but a particular defendant has committed an intentional killing

10 during the course of a sexual assault, okay?  We get through

11 the whole trial.  You don't hear anything about a sexual

12 assault.  You hear about the murder, but you don't hear

13 anything about a sexual assault.  However, you hear that during

14 the course of killing this person, they took their shoes or

15 they took their purse, okay?  Let's say they took their purse.

16 Now I have an intentional killing, plus a robbery.  So for all

17 means, that is a capital murder.  But do you see where the

18 problem is?  I alleged that it was an intentional killing, plus

19 sexual assault, not robbery.  So you would have to find him

20 guilty of -- I mean, not guilty of capital murder.  Is that

21 fair?

22      A.    Yes, because -- yeah.

23      Q.    Because I didn't prove it, right?

24      A.    Yeah, right.

25      Q.    And at no time can you say, you know what, the State

1  said sexual assault, but they proved robbery.  Close enough.

2  No, we don't win that.

3          A.    Okay.

4          Q.    But what can happen, however, is that the person

5  would not be guilty of capital murder, but they would probably

6  be guilty of what we call regular murder --

7          A.    Okay.

8          Q.    -- or a lesser-included so it wouldn't be capital,

9  but it would just be murder.  And if a person is guilty of

10 murder in the state of Texas, then the punishment range goes

11 from a minimum of five years in the penitentiary, all the way

12 to 99 or life.  So you have a wide punishment range, okay?

13 And, of course, the legislature does that because you don't

14 know what facts and circumstances are, correct?  So they give

15 you varying degrees of punishment you can give a person.  Does

16 that seem fair?

17         A.    Yes.

18         Q.    Okay.  And I need to ask you this.  You know, so

19 given all the circumstances and evidence, if you were -- you

20 know, let's say, if you were in a situation where a person is

21 convicted of murder, okay?  If you thought it was the

22 appropriate thing to do and the right thing to do, could you

23 consider five years as a punishment for murder?

24         A.    Yes.

25         Q.    If you thought it was the right thing to do?

```
 1        A.    Yes.

 2        Q.    Okay.  And can you consider 99 or life if you

 3   thought it was the right thing to do for a murder?

 4        A.    Yes.

 5        Q.    As well as anything in between, 60, 20 --

 6        A.    Anything in between.

 7        Q.    -- even 10?

 8        A.    Yes.

 9        Q.    You could?

10        A.    Yes.

11        Q.    Okay.  And you understand, as we talked about

12   before, there are no automatics.  We have some people who may

13   come in and say, oh, I could never give five years for a

14   murder.  Well, at this point you don't know any of the facts;

15   is that correct?

16        A.    That's correct.

17        Q.    So you don't know what the circumstances are.

18        A.    That's right.

19        Q.    Okay.  And I'm going to ask you, Ms. Adams, if you

20   can either pull the mic a little closer to you --

21        A.    I'm sorry.

22        Q.    -- and -- and when you do answer, you have to answer

23   audibly.  I notice a lot of times you'll just nod at me.

24        A.    Okay.

25        Q.    And Darline is looking like, I don't know if that's
```

1  a yes or a no.

2       A.    Sorry.

3       Q.    So it has to be out loud, okay?

4       A.    Okay.

5       Q.    All right.  Now -- now that we've talked about a lot

6  of the principles of law, the last thing I want to talk to you

7  about is credibility of the witnesses.

8              Now, I notice in your questionnaire, you said in

9  Question Number 32, officers are -- you say that basically they

10 are -- you know, yes, you would likely believe them to tell the

11 truth more than the average person.  And you said you think

12 that they better understand the repercussions of not telling

13 the truth.  Well, it's one thing to say that they may, you

14 know, understand the repercussions of not telling the truth,

15 but basically what this question is asking is that just by the

16 mere fact that a police officer comes in here with a uniform

17 on, are you automatically going to just say, I believe whatever

18 comes out of their mouth, or are you going to wait to hear what

19 he -- what they have to say, just like you would any other

20 witness?  Could you wait until you hear what they have to say?

21      A.    Oh, yes.

22      Q.    Okay.

23      A.    Yes.

24      Q.    And the reason that we ask that is because it's not

25 fair to let's say give a police officer a leg up because what

 1   do you have when you take a uniform off a police officer?

 2        A.   Right.  They're just like everyone else.

 3        Q.   All right.  Besides a naked person, they're just

 4   like everybody else.  And so therefore, we just want to make

 5   sure that you won't already say that you're going to believe a

 6   police officer just because they have a uniform on.  So you're

 7   not going to do that, right?

 8        A.   No.

 9        Q.   Okay.  All right.  And now that we've talked about,

10   you know, all of the principles -- and also, you kind of said

11   in Question Number 57 that you have a friend that's a retired

12   police officer.  And I wanted to make sure that just because

13   you had a relationship with a police officer, that you're not

14   going to automatically say, well, they all must be telling the

15   truth because I have a friend that's a police officer.

16        A.   Oh, no, no.

17        Q.   Okay.  Okay.  All right.  Now, let's kind of talk

18   about what you've looked at in that brochure while you were

19   sitting outside.

20             Now, the law presumes -- I'll tell you this,

21   that even after a defendant has been found guilty of capital

22   murder, even after 12 people who have sat here and said, you

23   know what, I believe this person is guilty beyond a reasonable

24   doubt of capital murder -- intentionally killing someone during

25   the course of a robbery -- that even then the law presumes that

1    the person gets a life sentence.  You understand that?

2        A.    Yes.

3        Q.    And do you believe that to be fair?

4        A.    Yes.

5        Q.    Okay.  And why do you think that's fair?

6        A.    That they get the life sentence?

7        Q.    Yeah, they get the life sentence.  Not death, but

8    they start off with a life sentence.  Why do you think that's

9    fair?

10        A.    What do you mean they start off with a life

11    sentence?

12            THE COURT:  Ma'am, you're going to need to keep

13    your voice up for me, please.

14            VENIREPERSON:  I'm sorry.

15        Q.    (BY MS. JONES)  Yeah, that once a person has been

16    convicted of capital murder, that the legislature says you

17    don't jump automatically to the death penalty.

18        A.    Okay.

19        Q.    Okay.  You don't automatically say, okay, well,

20    they're going to the death chamber.  You know, that -- first

21    the legislature says, okay, you've convicted them of capital

22    murder, so they're going to start off with a life sentence

23    unless and until the State can prove these next two things.

24    Does that make sense?

25        A.    Oh, okay, yes.

1      Q.    Okay.  And I was just asking you.  Do you believe

2   that that's a fair process?

3      A.    Yes.

4      Q.    Okay.  Why do you think it's a fair process?

5      A.    Because death is final, and we have to make sure --

6   absolutely sure that that's an appropriate --

7      Q.    Exactly.

8      A.    -- penalty for the crime.

9      Q.    Exactly.  Exactly.  And so now let's talk more

10  specifically about that.  Now, you said in your answer to

11  Question Number 37 -- we asked:  Do you think that a person

12  convicted of capital murder can be rehabilitated?  And you said

13  that it's a hard answer.  I don't know what the process would

14  be.  So we're going to talk about the process now.

15              Okay.  So as we talked about in Special Issue

16  Number 1, this is a part where -- as I stated, this answer

17  starts off as no.  It starts off as no unless and until we can

18  prove Number 1 to you.  So in other words, we have to prove

19  whether there's a probability.  And when we say a probability,

20  we mean more likely than not, okay?  We don't mean probability

21  in the percentage realm like 51 percent or 70 percent, but we

22  have to prove that it's more likely than not that the Defendant

23  would commit criminal acts of violence that would constitute a

24  continuing threat to society.

25              Now, that starts off as no, even after you have

1  already said that you believe this person has been proven

2  guilty beyond a reasonable doubt of an intentional killing

3  during the course of a robbery.  You don't automatically come

4  into the punishment phase and go, oh, I'm automatically going

5  to put yes to that, that they're going to be a continuing

6  threat to society because I've already found them guilty of

7  capital murder.  Does that make sense what I'm saying?

8       A.   Yes.

9       Q.   And why should we not, you know, automatically say

10  yes to Number 1?

11      A.   Because we've only looked at a snapshot of what

12  happened that --

13      Q.   Exactly.

14      A.   -- particular time.

15      Q.   You're right.  And so now that we're at this part,

16  we can look through that whole photo album, and that includes

17  Issue Number 1.  And in Issue Number 1, what would be some

18  things that would probably be important to you when deciding

19  Issue Number 1?

20      A.   Something that had happened in their past before

21  that particular event.

22      Q.   Okay.  Because I will tell you, Issue Number 1, the

23  State still has the burden in that.  We have to prove to you

24  beyond a reasonable doubt that a person more likely than not

25  would commit further criminal acts of violence that would

1  constitute a continuing threat to society.  So it's like we're

2  asking you to look in a crystal ball.  We're asking you to

3  predict the future.  However, since we're not all, you know --

4  what do they call those people?  Clairvoyant.  Since we're not

5  clairvoyant, we sometimes have to look to the past in order to

6  predict the future.  Would you agree with me?

7       A.    Yes.

8       Q.    Okay.  And that when we get to Special Issue Number

9  1, that, yes, we start off as no.  We don't put automatic yes,

10  unless and until we can prove to you that the person did commit

11  future acts of violence.  Now, I have to tell you that the law

12  doesn't say that we have to prove that a person is going to

13  commit another rape or another murder or anything like that.

14  You understand that?

15       A.    Yes.

16       Q.    That it can be something as simple as if I haul off

17  and hit, you know, Ms. Moseley right here, some people would

18  consider that a criminal act.  It would be assault.  You have

19  some people that would say, you know what, if a person spits on

20  a prison guard, I think that that's, you know, a violent act.

21  So you see it can be varying.  Do you understand that?

22       A.    Yes.

23       Q.    Okay.  And I will also tell you that when we look at

24  Issue Number 1, when we say society, we've already talked about

25  that the minute a person is found guilty of capital murder in

1   the state of Texas, that they automatically get a life sentence

2   without the possibility of parole.  So if that's the case,

3   where would their society be?

4        A.    Within the prison.

5        Q.    Exactly.  And so when we talk about being a

6   continuing threat to society, we just don't mean out here

7   amongst us.  We mean that also within the penitentiary.  And do

8   you think that's fair that the people in the penitentiary also

9   deserve a level of protection?

10       A.    Yes.

11       Q.    Because we understand it's just other inmates.  You

12   have some inmates who are just peacefully trying to do their

13   time, but there's also doctors and lawyers and dentists and all

14   other people who come to the jail, as well -- or the prison?

15       A.    Yes.

16       Q.    So as it stands right now, can you -- or let me ask

17   you this.  If after hearing all of the evidence and all the

18   testimony, if you truly believe that the right thing to do --

19   or better yet, if you believe that the State did not prove to

20   you that the Defendant would be a continuing threat, could you

21   answer that question no?  If we didn't prove to you that they

22   would be a continuing threat, could you answer that no?

23       A.    Yes.

24       Q.    Okay.  And if the State proved to you beyond a

25   reasonable doubt that they would be a continuing threat, could

1    you answer that yes?

2        A.    Yes.

3        Q.    Okay.  After -- now, even after you've convicted the

4    Defendant of an intentional killing in the course of a robbery,

5    could you still wait until you've heard everything before you

6    answer that question?

7        A.    Yes.

8        Q.    You wouldn't automatically come in and answer yes,

9    would you?

10       A.    No.

11       Q.    Okay.  And in regards to Issue Number 1, is there

12   ever going to be a time that you will require the Defendant to

13   testify -- that you would require him to take the stand and

14   say, I promise I will never commit any other future acts of

15   violence?

16       A.    No.

17       Q.    Because that wouldn't be fair, would it?

18       A.    No.

19       Q.    Okay.  Now, I want to ask you real quick -- when I

20   look at your answers on Question 11 and Question Number 12 --

21   on page 3, in Question 11, we ask you:  Do you think there are

22   some crimes which call for the death penalty solely because of

23   their severe acts?  And you said:  Yes.  Severe acts and

24   circumstances for a current crime should be sufficient to

25   determine penalty.

1            Well, that kind of talks about what we were

2   saying before.  Now, the law does allow for you to look at the

3   offense that you just convicted him of, okay?

4        A.   Yes.

5        Q.   It does allow you to look at that.  But what we're

6   saying here is that until we can prove to you that that person

7   will be a continuing threat -- so, yes, it's okay to consider

8   that.  It's okay to look at that.  I mean, some cases are just

9   that heinous.  You know, if we look at the attacks on United

10  States and 9-11, okay?

11       A.   Yes.

12       Q.   If one of those pilots would of lived, then, yes,

13  maybe you could look right at that case and go, you know what,

14  I believe that this person will be a continuing threat to

15  society, okay?

16       A.   Yes.

17       Q.   But even here it looks like you understood that you

18  need to look at that, but also look at other things; is that

19  fair?

20       A.   Yes, that's fair.

21       Q.   Okay.  So you can -- I just want to be clear.  You

22  can look at everything that happened during the guilt/innocence

23  phase, but even then, it's still no automatics.

24       A.   Yes.

25       Q.   Okay.  And if we look at your answer to Question

```
 1   Number 2, it says:  The death penalty is reserved for those

 2   defendants that are such a threat to society that even

 3   incarceration does not remove the probability of future

 4   violence.  And you said that you agree with that.  An

 5   individual -- individual incarcerated could still be violent

 6   towards others and possibly order violent acts committed.

 7        A.   Yes.

 8        Q.   So you understand the utility of Issue Number 1,

 9   that to protect society -- whatever society that person may end

10   up in --

11        A.   Uh-huh.

12        Q.   -- that if you believe they will continue to be a

13   threat, you can answer yes to that?

14        A.   Yes.

15        Q.   Okay.  Do you have any questions about Issue Number

16   1?

17        A.   No.

18        Q.   Okay.  Now let's talk about Issue Number 2.  That's

19   the tough one.  That's a mouthful.  Now, in Issue Number 2,

20   there is no burden of proof.  The State does not have to prove

21   anything beyond a reasonable doubt, okay?  Because if you look

22   at Issue Number 2, this is where it solely truly depends on

23   what the jurors believe, okay?  It's their own individual

24   beliefs.  Does that make sense to you?

25        A.   Okay.  Yes.
```

1        Q.    Okay.  Because in Issue Number 2 it talks about

2   whether taking into consideration all the evidence, including

3   the circumstances of the offense, meaning the original case in

4   the guilt/innocence, that the Defendant's character and

5   background and the personal moral culpability of the Defendant

6   there is a sufficient mitigating circumstance or circumstances

7   to warrant that a sentence of life imprisonment without parole,

8   rather than a death sentence, be imposed.

9                Now, that is a mouthful.  That's a big

10  paragraph.

11       A.    Yes.

12       Q.    But that part specifically talks about the photo

13  album, okay, when you can look at everything, from birth till

14  present.  And usually how -- I like to break special issue up

15  -- Special Issue Number 2 up in four parts.  You first have to

16  look at all the evidence presented, okay?

17       A.    Yes.

18       Q.    Whether it comes from this table, it comes from that

19  table.  Now, once again -- -

20       A.    Okay.

21       Q.    -- the Defense does not have a burden, okay?

22       A.    Okay.

23       Q.    They don't necessarily have to do anything.  Once

24  the State brings the case, you typically look to this table,

25  okay?  Even when we come to Issue Number 2, it can't be a

1  situation where you sit there and go, you know what, I'm

2  waiting for the Defense to prove something to me.  They need to

3  prove something to me.

4      A.   Okay.

5      Q.   Okay?  It can come from either side.  Even if the

6  Defense during this whole trial, guilt/innocence phase and

7  punishment phase, if they want to sit there and do crossword

8  puzzles, they could.  Now, I'll tell you they're not.

9      A.   Okay.

10      Q.   I'm going to tell you they're not, but there can't

11  be a time that you require them to put on a case as you'll

12  require the State.

13      A.   Okay.

14      Q.   Does that make sense?

15      A.   Yes.

16      Q.   And so with that being said, when we say that you

17  have to look at all the evidence presented, that's whether

18  something comes from our table or if it comes from that table,

19  that you first have to do that, keep an open mind to look at

20  everything.

21      A.   Okay.

22      Q.   The second thing you have to do is after you look at

23  everything, you have to decide within yourself if there was

24  anything that was mitigating.  And when we talk about

25  mitigation, what that means is anything that would lessen the

1  blameworthiness of the Defendant, okay, or anything that would

2  lessen the moral culpability of the Defendant.  Does that make

3  sense what I'm saying, when we say mitigation?

4        A.    No.

5        Q.    Okay.  Well, some people might consider mitigation

6  as, you know, they have a bad background or they didn't have

7  the same educational opportunities as other people or, you

8  know, even some people go so far as to say life itself is

9  mitigating.  You know, we think that, you know, nobody should

10  have their life taken from them.  Do you see what I'm saying?

11        A.    I do.

12        Q.    And now just because the word "mitigation" is there

13  and just because the law says consider it, that does not mean

14  that a person gets an automatic pass.

15        A.    Okay.

16        Q.    That does not mean that you have to say, oh, well,

17  there's something there mitigating, so this means they get an

18  excuse.

19        A.    Okay.  That makes sense.

20        Q.    Does that make sense?

21        A.    Yes.

22        Q.    So after we do -- the first thing is we look at

23  everything that's presented, okay?  The second thing is you

24  have to decide within yourself was there anything that was

25  mitigating, was there anything that made you take pause and go,

1  well, maybe that kind of answers some of the things or some of

2  the issues that went on in this trial.

3      A.   Okay.

4      Q.   And then the third thing you have to do is after

5  you've looked at it and thought about if something was

6  mitigating, you have to determine if it's sufficiently

7  mitigating.  And when I'm putting my hand up, that means it has

8  to rise to a level that it's so mitigating, that it would

9  convince you to vote yes to Issue Number 2, saying, yes, there

10 is something so sufficiently mitigating that this person should

11 have a life sentence instead of death.

12     A.   Okay.

13     Q.   Okay.  Those are the four things you have to do.

14          Now, at this juncture, all the law requires you

15 to do is consider everything.  What you can't do is when you

16 sit there say, you know what, I've already found him guilty of

17 capital murder, you know, there can't be anything mitigating.

18 I'm going to automatically answer Issue Number 2 as no, because

19 I want to get closer to the death penalty.  Now, that wouldn't

20 be fair, would it?

21     A.   No.

22     Q.   Why not?

23     A.   Because it's a process.  And you have to continue

24 the process until the very end.

25     Q.   Yeah.  And you see why Issue Number 2 would kind of

1  be a safety net because what the law does not want is anyone to

2  walk away saying, you know what, I heard all the evidence, I

3  heard all the testimony, but, you know what, maybe if I would

4  have heard more about their background or maybe if I would have

5  heard more about their education, that would have swayed me one

6  way or the other.  So you understand it -- it's a situation

7  where we want to make sure the jury gets everything.

8       A.    Right.

9       Q.    And after you hear everything, if you make that

10 determination that it's sufficiently mitigating, then you would

11 make your decision of whether you would answer that yes or no.

12      A.    Okay.

13      Q.    Can you do that?

14      A.    Yes.

15      Q.    And as you sit here right now, if you hear nothing,

16 if you hear nothing that's mitigating, could you answer that

17 question no, knowing, you know, if you believe that was the

18 right thing to do, to answer it no?  You hear no mitigating

19 evidence.

20      A.    Yes.

21      Q.    Okay.  And if you do hear mitigating evidence,

22 whatever that may be, because I will tell you all 12 jurors do

23 not have to agree on what that mitigation is.

24      A.    Okay.

25      Q.    Let's say all 12 jurors hear the same facts and

1    evidence.  And you have one juror that says, you know, to

2    themselves, huh, I think it was mitigating that he had a bad

3    background.  Another one says, I think it was mitigating that

4    he had a bad education.  You know, they don't have to agree

5    what that mitigation is.

6         A.    Okay.

7         Q.    Okay?  And also, in deciding that, we need to know

8    right now that in your own personal views and opinions, if you

9    believe that something is mitigating -- sufficiently

10   mitigating, okay, that it reaches that level, that if you

11   believe it's sufficiently mitigating, that you would stick to

12   your ground.  If you really believe that that should be yes,

13   that you would answer yes.

14        A.    Yes.

15        Q.    Okay.  And if you truly believe that the answer

16   should be no, that you don't see anything sufficiently

17   mitigating, that you would stick to your guns and say no?

18        A.    Yes, I would.

19        Q.    Okay.  Now, let me ask it this way.  This is

20   probably the easiest way that I can ask this.  Now, keep it in

21   mind that by the time we get to Issue 1 and 2, we've already

22   pretty much determined that the Defendant is a bad guy.  Pretty

23   bad dude.  And we're saying it's a bad guy because at this

24   juncture, we've already found him guilty of capital murder.

25        A.    Okay.

 1      Q.    Intentional killing of a person during the course of

 2 a robbery, okay?

 3      A.    Okay.

 4      Q.    And that you know that going in.  And can you see a

 5 situation that even though you've already found a person guilty

 6 beyond a reasonable doubt of capital murder, can you see a

 7 situation that in Issue Number 1 that you could answer that as

 8 no, I don't see them being a continuing threat to society?  Can

 9 you see a situation where you would answer that no?

10      A.    I can.

11      Q.    Okay.  Because for all we know, that could be just a

12 one-time event.

13      A.    Yes.

14      Q.    Okay.  But can you also see a situation that, yeah,

15 you answer Issue Number 1 as yes, I believe they will be a

16 continuing threat?

17      A.    Yes.

18      Q.    Based on all the facts and evidence?

19      A.    Based on everything, yes.

20            COURT REPORTER:  I'm sorry?  I didn't hear you.

21            VENIREPERSON:  I said, based on everything.

22      Q.    (BY MS. JONES)  So you just don't go into Issue

23 Number 1 going automatically yes, that you wait until you hear

24 everything, right?

25      A.    Right.

```
 1        Q.    Okay.  So now let me ask you another way.  Can you
 2   see a situation that you've already answered Special Issue
 3   Number 1 as yes, I believe they're a continuing threat to
 4   society, but then you come down to Issue Number 2 and you go,
 5   you know what, after hearing everything, I believe there was
 6   something sufficiently mitigating so I'm going to answer
 7   Special Issue Number 1 as yes, I believe there is mitigation.
 8   And if you say yes, you know that that will result in a life
 9   sentence.  Can you see a situation where you would do that?
10        A.    I'm not sure what the mitigation -- mitigating
11   circumstances would be.  I don't know.  I don't know.
12        Q.    Exactly.  Because as you sit here right now, we've
13   given no evidence to you whatsoever.  And so the question
14   becomes can you keep an open mind, meaning that --
15        A.    Yes.
16        Q.    -- if you do hear something that's sufficiently
17   mitigating and that even though you've already said, I think
18   they're a continuing threat, I think that, yes, this is a
19   pretty bad dude and they'll be a bad dude in the future, yes, I
20   think they're a continuing threat, but yet you come down to
21   Issue Number 2 and there's something within your mind and in
22   your heart that you hear, that you go, you know what, that's
23   sufficiently mitigating.  I'll give him a life sentence.  Or
24   I'll answer yes so it results in life.  Can you see a situation
25   where that happens?
```

```
 1        A.    I imagine there could be, yes.

 2        Q.    Because at this point you don't know anything.

 3        A.    Right.

 4        Q.    It's just keep an open mind.  And as you told me in

 5   your questionnaire, it's all a process.  It's all a process.

 6   So as you sit here right now, are you telling us that you don't

 7   go into this automatically saying that you're going to answer

 8   Issue Number 1 as yes, a continuing threat, and answer Special

 9   Issue Number 2 as no automatically knowing that that will

10   result in a death sentence?

11        A.    That's correct, I don't -- yeah, not automatically,

12   no.

13        Q.    Okay.  Because there's a process, right?

14        A.    Yes.

15        Q.    And we need that process to keep it fair for

16   everybody?

17        A.    Yes.

18        Q.    Okay.  And regardless of Special Issue Number 2, I

19   need to ask you specifically, because we're talking about the

20   personal upbringing and the personal moral culpability of the

21   Defendant, is there ever going to be a time that you will

22   require the Defendant to take the stand and sit where you're

23   sitting and basically beg for their life?

24        A.    No.

25        Q.    Okay.  Because you understand that that evidence can
```

1  come from anywhere.  Now, the law doesn't allow for someone to

2  come in and say, hey, the Defendant told me he was very sorry

3  for what he did.  It doesn't work that way.  But you can hear

4  things about a person's education or things about a family

5  upbringing from other witnesses.  It doesn't have to come

6  directly from the Defendant.

7        A.    Okay.

8        Q.    And can you accept that?

9        A.    Yes.

10        Q.    Okay.  So as you sit here now, you're telling us

11  that you can listen to everything before you make a decision on

12  Issue Number 1 or Issue Number 2?

13        A.    Yes.

14        Q.    Okay.  And I want to ask you real quickly, briefly

15  about some of your answers in Questions Number 65 and 66.  Now,

16  on page -- it starts on page 9, but let's go to page 10.  On

17  page number 9 it asks the basic question of, you know, your

18  feelings and thoughts about alcohol and drugs.  And you said

19  you believe it's a person's -- person's choice the first time

20  that they take a drink or drug.  So if they become abusers or

21  addicted, it was originally their control.

22        A.    Yes.

23        Q.    Now, this kind of speaks directly to Issue Number 2,

24  okay?  Question Number 61 and 62 -- and in 62 you said that --

25  do you believe that drug or alcohol addiction is a disease?

1  You first said yes, but then you scratched it out and put no.

2  And you said you believe some people have a propensity to

3  addictive behavior.  So why did you scratch out yes and then

4  mark no?

5      A.    Well, I guess when I first read it, I was thinking

6  addiction or already addicted.  I'm guessing the -- the

7  alcoholism -- there are diseases associated with alcoholism.  I

8  was thinking that, and then I realized maybe that the alcohol

9  addiction wasn't the disease.

10      Q.    I see what you're saying.  I see what you're saying.

11  You're one of those -- as I say, one of those smart people who

12  really thinks it through and is like, you know, almost kind of

13  outsmarted yourself, you know, when you scratched out no and

14  then put yes.

15      A.    And changed it, yes.

16      Q.    Okay.

17      A.    Yeah, I changed it.

18      Q.    And so when you say propensity to addictive

19  behavior, I kind of took it to mean like you're saying right

20  now that maybe the person may have drank alcohol, but then when

21  they started drugs with it, it exacerbated or something of that

22  nature.

23      A.    Right.  I think you can have an addictive behavior

24  towards anything.

25      Q.    Okay.  Okay.  And that's fair.  That's fair.

```
 1              And so when we look at Question Number 64, we
 2   talk about the law in the state of Texas is voluntary
 3   intoxication does not constitute a defense to the commission of
 4   a crime.  And you said, yes, you agree with that.  Alcohol is
 5   known to cause impairment and reduce inhibition.  Voluntarily
 6   being intoxicated is a choice.
 7              Now, even though you believe that, you
 8   understand that in Special Issue Number 2, if there is evidence
 9   or testimony that drugs and alcohol may have been a part of
10   this person's life or part of the offense or anything of that
11   nature, that you can't automatically give them extra
12   punishment.  Does that make sense?  That you will automatically
13   hold it against them.
14       A.   No, I wouldn't hold it against them, no.
15       Q.   But on the flip side, you're not going to
16   automatically give them a pass, are you?
17       A.   No.
18       Q.   Okay.  Okay.  And -- and with all things, we just
19   need to make sure that you would keep an open mind and listen
20   to everything.  And after you hear everything, then make your
21   decision and determination.
22       A.   Yes.
23       Q.   That you don't already have a preconceived notion or
24   already have your mind made up, if you hear anything about
25   drugs and alcohol, that you know you will automatically vote a
```

 1  certain way because that wouldn't be fair, right?

 2      A.   That's right.

 3      Q.   And I saw here in this same questionnaire that said

 4  your husband's grandfather was an alcoholic.

 5      A.   He was.

 6      Q.   Well, now, knowing that, would that affect you in

 7  your deliberations or -- whether or not this Defendant would

 8  receive any kind of special treatment or ill treatment --

 9      A.   No.

10      Q.   -- because of that fact?

11      A.   No, no.  I wasn't close to him.

12      Q.   Okay.  Okay.  And then I see that you said in

13  Question Number 65, if someone chooses to do something knowing

14  -- known to cause them to be impaired and they commit a crime,

15  it should be considered.  It sounds like you already know what

16  to do on Issue Number 2, that even though you know that they've

17  voluntarily ingested alcohol or drugs or something of that

18  nature, that you still need to take it into consideration.

19      A.   Sorry, let me read that one.

20      Q.   And while you're reading that.  You know with this,

21  it's still up to you to consider it.  It's up to you to decide

22  if that's something mitigating or if it's something

23  aggravating.

24      A.   Right.

25      Q.   You know, you have some jurors that say, you know

```
 1  what, if I hear anything about, you know, drugs and alcohol,

 2  this is the way I'll decide on that, you know.  And then,

 3  there's what your own personal beliefs are.  We just need to

 4  make sure that you don't automatically go in with any kind of

 5  bias towards the Defendant, that what you can do and will do is

 6  keep an open mind until you've heard everything.

 7       A.    Right, I will.  I will keep an open mind, yes.

 8       Q.    Okay.  And that even in Number 66, you said that

 9  even though that person made the choice the first time that

10  they took a drink or a drug, you understand that, once again,

11  the law says that you still have to consider everything.  You

12  don't have to give them automatic passes.  You know, it's not

13  an automatic excuse, but it also isn't an automatic punishment,

14  that you have to wait and consider everything before you

15  decide.

16       A.    Okay.  Yes.

17       Q.    Okay.  And can you do that?

18       A.    Yes.

19       Q.    Okay.  And -- and let me just ask you this.  Do you

20  think that's fair?

21       A.    Do I think that it's fair?

22       Q.    That the jury has to consider everything --

23       A.    Absolutely --

24       Q.    -- before they make a decision?

25       A.    -- yes.
```

1     Q.    And why do you think that's fair?

2     A.    I think about it in terms of if it were me and what

3 I would want.  I would want all the evidence presented.  I

4 would want everyone to take consideration of everything

5 presented before they determined, because they don't know me.

6     Q.    Exactly.  And can you apply that same principle --

7 when we talk about Issue Number 1, in Issue Number 1, that,

8 yes, you will go into that knowing that that answer is no,

9 unless and until the State proves to you that they will be a

10 continuing threat?

11     A.    Yes.

12     Q.    Okay.  And can you still keep that same opinion --

13 open mind when we talk about Special Issue Number 2?  And in

14 Issue Number 2, that, you know, you'll keep an open mind and

15 say, you know what, this person -- the law says this person

16 gets a life sentence until and unless I hear something

17 personally within Ms. Adams that rises to the level of

18 sufficient mitigation, that you say, you know what, you are

19 going to get a death sentence.  Does that make sense?

20     A.    Yes.

21     Q.    Okay.  Well, I believe that's all the questions that

22 I have.  Do you have any questions for me?

23     A.    (Shakes head from side to side.)  No.

24          MS. JONES:  Thank you.

25          THE COURT:  Ms. Mulder.

<u>DEFENSE VOIR DIRE EXAMINATION</u>

BY MS. MULDER:

Q.    Good morning, Ms. Adams.

A.    Good morning.

Q.    Once again, my name is Nancy Mulder.

(Discussion between counsel off the record.)

Q.    (BY MS. MULDER)  Pardon us while we get a little organized.

First of all, I wanted to let you know that, you know, we have a lot of people come in and tell us, you know, it's very important they feel like they have to do their civic duty.  And what I want you to understand is that by showing up on June 21st and by coming back and being rescheduled and making yourself available and filling out this very lengthy questionnaire, you have done your civic duty.

A.    Okay.

Q.    There are no right or wrong answers is what I'm basically trying to tell you.  We -- we need to know -- well, let me back up a little bit.  The reason we have you fill out this questionnaire before you know what the law is is so we can find out how you truly feel about the death penalty and things like that.

A.    Right.

Q.    And that's important to us so that we can find out if those beliefs and how those beliefs will affect your

1    interpretation of the law and the evidence in this case.

2         A.    Okay.

3         Q.    So really, how you feel is the most important answer

4    you can give us today.

5         A.    Okay.

6         Q.    Okay.  Excuse me.  If at any time you don't

7    understand, just let me know and I can rephrase the question.

8         A.    Okay.

9         Q.    Obviously, I represent Matthew Johnson, along with

10   Catherine Bernhard and Kenneth Weatherspoon.  We are not here

11   to change your mind about the death penalty.  We just want to

12   know how you feel.

13        A.    Okay.

14        Q.    Okay?  Certainly -- you know, this process kind of

15   puts the cart before the horse, so to speak, because we're

16   talking about a punishment phase when Matthew Johnson hasn't

17   even been found guilty yet.

18        A.    Okay.

19        Q.    And it's our assertion that we won't even get to

20   these special issues at trial because we believe he will be

21   found not guilty of capital murder.

22        A.    Okay.

23        Q.    Okay.  And you understand that?

24        A.    Yes.

25        Q.    Now, certainly -- oh, there is one thing.  I know

 1  Ms. Jones mentioned your name Jerri.  When I got to the page

 2  and saw that you had a sister named Jenni with an I, I -- I

 3  looked back to see if you guys were twins.

 4        A.    Oh, no.

 5        Q.    You're two years apart.

 6        A.    Yes.

 7        Q.    Okay.  Jerri and Jenni.

 8        A.    Yes.

 9        Q.    Those would be cute names for twins.

10              Basically I just wanted to go over some of the

11  things that we think are important, obviously --

12        A.    Okay.

13        Q.    -- when talking about the death penalty.  As Ms.

14  Jones explained to you in detail, capital murder is the

15  intentional killing of someone during the course of another

16  felony.  And in this case it's been alleged as a robbery.

17        A.    Okay.

18        Q.    So what that means is that it wasn't a mistake, it

19  wasn't self-defense, or defense of a third person, like a child

20  or a spouse.

21        A.    Okay.

22        Q.    It wasn't an accident.  It wasn't something the

23  victim did to -- to -- you know, a tussle over a gun or

24  something, meaning that kind of accident or the victim did

25  anything to provoke something.  You know what I mean?

1        A.    Yes.

2        Q.    Okay.  Because to be guilty of capital murder, the

3   State has to prove beyond a reasonable doubt that the Defendant

4   had the specific intent to kill.  Do you understand that?

5        A.    Yes.

6        Q.    Okay.  That the Defendant had a conscious objective

7   to cause the person's death and then took action to see that

8   that person died.

9        A.    Okay.

10       Q.    Do you understand?

11       A.    Yes.

12       Q.    Okay.  So if a person is guilty of capital murder,

13   that's because the State has proven beyond a reasonable doubt

14   that he had the specific intent to kill the victim.

15       A.    Okay.

16       Q.    Okay.  You're with me?

17       A.    Yes.

18       Q.    All right.  Let me get back to some notes.  I have a

19   tendency to scribble a lot.  You have to forgive me.  And I

20   just wanted to point out a few things in your questionnaire

21   with regard to -- one of the first things -- and I wrote down

22   what you said.  You said with regard to the death penalty,

23   you're not on the fence about it.  With what you stated in your

24   answer on Number 1, you're in favor of the death penalty.  Your

25   other answers, you rated yourself on a scale of 1 to 10 how

1  strongly do you believe in it, you rated yourself a 10, which

2  is fine.  But would you agree it's fair to say that -- that you

3  lean toward the death penalty?

4         A.    That I lean toward it?

5         Q.    Uh-huh.  Because you strongly believe in it?

6         A.    I strongly believe in it if that's the penalty for

7  the crime.  I mean, I don't say that I believe that -- strongly

8  for it?  No.

9         Q.    I'm just asking how you feel --

10         A.    Right.

11         Q.    -- because you rated yourself a 10.  Then based on

12  some of your other answers that you believe it should be

13  applied --

14         A.    Well, I meant -- I just meant that I wasn't on the

15  fence, because this -- this particular case, when it was

16  presented to us and the indictment was read to us, you were

17  seeking the death penalty.  So, yes, in that particular -- in a

18  case where that is the penalty, if that's proven.  Now that

19  I've learned more --

20         Q.    Exactly.  I want you to not --

21         A.    Okay.  Don't think about that.  Okay.  How I feel?

22         Q.    Yes.  And you -- you mentioned the indictment.  And

23  so what -- where were your thoughts when the Judge read the

24  indictment to you, if any?

25         A.    I thought it was terrible.  But I don't -- I didn't

 1  decide, yes, that deserves the death penalty.  I only knew that

 2  it was a capital murder seeking the death penalty because

 3  that's what we were told.  I mean, I didn't come in thinking --

 4  I mean, I didn't know what it was when we came that first time.

 5      Q.   Sure.  Nobody did.

 6      A.   Right.  So I didn't know, but I guess I put a 10

 7  thinking, I could make up my mind on it.  Not a 5, and I'm

 8  going to be on the fence and not be able to make a decision

 9  based on what we hear.

10      Q.   Sure.

11      A.   What we learn.

12      Q.   Okay.

13      A.   Does that make sense?  I don't know if that --

14      Q.   It totally does.

15      A.   Okay.

16      Q.   It totally does.  To use your words, you -- and what

17  I hear you saying is that you are definitely not on the fence

18  about the death penalty.  You do believe strongly in it?

19      A.   I believe in it.  I don't -- yeah.

20      Q.   Yeah.  You believe in it, okay.

21           Now, as Ms. Jones told you, you know, the D.A.'s

22  office has decided to seek death in this case.  And you know we

23  had the 800 people there in the morning to fill out

24  questionnaires --

25      A.   Yes.

1      Q.    -- and another 800 people in the afternoon and we're

2  going through this process.  Some people do come in and tell

3  us, you know what, the fact that we are here and he's being

4  prosecuted and we're going through this process, he's got to be

5  guilty of something.  How do you feel about that?

6      A.    No, I don't know anything about it yet, so I don't

7  -- I can't make a decision on that, or a thought -- I mean, I

8  don't know.

9      Q.    Okay.  All right.

10              And I want to draw your attention to page 2,

11  your answer to Number 8, with regard to your best argument

12  against the death penalty, it says:  When someone is of a

13  mental capacity that they don't understand, meaning they're

14  mentally handicapped and not from an outside source.  What did

15  you mean, not from an outside source?

16      A.    When I read that, I meant that something that they

17  took, maybe like alcohol or something --

18      Q.    Or drugs?

19      A.    -- or drugs or something, yeah.

20      Q.    Okay.  That's what I thought.  I just didn't want to

21  put words in your mouth or anything.

22      A.    Right, right.

23      Q.    Okay.  But you understand now after going over the

24  law, if somebody was mentally handicapped or mentally ill to

25  the point they didn't know the difference between right and

```
 1  wrong, they would actually be not guilty?

 2       A.    Right.

 3       Q.    You understand --

 4       A.    I don't think -- yeah, I don't think they could --

 5  yeah.

 6       Q.    Yeah, they're not eligible for the death penalty or

 7  even a conviction --

 8       A.    Okay.

 9       Q.    -- in many cases.

10             Okay.  Now, I want to draw your attention to

11  your answer in Number 10 on the same page.

12       A.    Okay.

13       Q.    With regard -- yes, you believe that murder during

14  the course of a robbery is -- should be prosecuted -- should be

15  eligible for the death penalty, as most people do.  And it says

16  the laws of the land should be followed as long as there's no

17  contradiction with scripture.  The Bible gives several reasons

18  and examples in both the Old and New Testaments where death was

19  the punishment.  And then on page 4, Number 26, with regard to

20  how do shows, movies, articles affect your influence about the

21  death penalty, and you said those did not influence you at all,

22  that your views are based on biblical -- or Bible scripture.

23       A.    Yes.

24       Q.    And I forget -- you attend church regularly?

25       A.    I do.
```

```
 1        Q.    And your religion is very important to you?

 2        A.    Yes.

 3        Q.    My question is this.  If during the course of a

 4   trial, the Judge gave you instructions regarding the law that

 5   you believed contradicted with the scripture --

 6        A.    Uh-huh.

 7        Q.    -- what I hear you saying in your questionnaire is

 8   that you would follow biblical scripture, as opposed to any law

 9   that the Judge gave you if it contradicted.

10        A.    When I wrote this, I meant in the bigger picture,

11   that the laws of the land have to be followed or should be

12   followed --

13        Q.    Yes.

14        A.    -- without contradiction to scripture.  Not

15   specifically to this case, not specifically to anything in

16   particular.  I think what I think of in that type of thing is,

17   you know -- well, this will get into my views on abortion and

18   those kinds of things.

19        Q.    That's fine.

20        A.    If the law says you can do it, I still don't think

21   you can do it, because I believe it's against scripture.  That

22   type of a thing.

23        Q.    Okay.

24        A.    I didn't mean that I'm not going to obey whatever

25   the law is in the court for determining something or that type
```

1    of thing.

2         Q.    And I understand that.  And that's why we need to

3    kind of know how your feelings are about things.

4         A.    Sure.

5         Q.    Because obviously, if there was some kind of legal

6    contradiction to your interpretation of biblical scripture --

7         A.    Right.

8         Q.    -- what I hear from your questionnaire is that you

9    would go with -- you would follow the biblical scripture if it

10   contradicted with any law that the Judge gave you and

11   instructed you to use.

12        A.    I guess I would, but I -- I don't know of -- I mean,

13   I -- yes, I do have that -- that is my mind-set, but I don't

14   know that there's something like that in -- I mean, I don't

15   know, but, yeah.

16        Q.    I understand that, but --

17        A.    That's just my mind-set, yes.

18        Q.    And I -- and -- okay, so if there was a circumstance

19   -- and that's a big if -- if there was a circumstance where the

20   law that the Judge gave you contradicted with your personal

21   interpretation of biblical scripture --

22        A.    Uh-huh.

23        Q.    -- you would disregard that law and follow what you

24   believed the biblical scripture instructed you to do?

25        A.    No.  Because I don't think it -- I'm thinking of it

1  the opposite way.

2      Q.    Okay.

3      A.    That law may allow you to do things.  Like I'll go

4  back to the abortion example.  May allow you to do that, but I

5  don't believe it's right.  So I don't think that it's right for

6  people to do that kind of thing.  I wasn't saying that I was

7  going to ignore the law in --

8      Q.    No, no, I'm not talking about ignoring the law.  I'm

9  just -- I'm trying to get down to the bare bolts of it --

10     A.    Okay.

11     Q.    -- that if for some reason the Judge gave you a

12 legal instruction that you believed contradicted biblical

13 scripture -- follow me with that example?

14     A.    Right.

15     Q.    A specific area of law that might be out there that

16 we can't imagine right now.

17     A.    Okay.

18     Q.    But if there was a specific area of law the Judge

19 gave you instructions to apply this law in the case and it

20 contradicted with your interpretation of biblical scripture --

21     A.    Uh-huh.

22     Q.    -- what I'm --

23     A.    Yes.

24     Q.    -- saying is that -- from what I hear from your

25 questionnaire, you would follow biblical scripture if it

 1  contradicted with the law the Judge gave you; is that right?

 2      A.   I guess it could be, yes -- I've -- I've not ever

 3  run into something like that, so I don't know.  I mean, yeah --

 4      Q.   And I understand that.  And when --

 5      A.   And I can't imagine that, yeah.

 6      Q.   And when we qualify answers like -- when I hear you

 7  say -- and it's very normal.  We all do it in everyday life, I

 8  guess it could, it might, unfortunately, we need to know --

 9      A.   Okay.

10      Q.   -- whether or not -- you did say yes, so it would --

11           MS. JONES:  Your Honor, that's asked and

12  answered.  She has said no numerous times, and now it's just

13  being rephrased and redone.  We believe it's asked and

14  answered.

15           THE COURT:  All right.  Well, I've heard her say

16  no twice to that question.

17           MS. MULDER:  Well, Judge, she did just answer

18  yes, so I request leave to ask her to explore that.

19           THE COURT:  Well, you can ask her one more time

20  and then we're going to move on.

21           MS. MULDER:  Yes, ma'am.  Okay.

22      Q.   (BY MS. MULDER)  Because I think we were having a

23  misunderstanding, and we take it down to the bare bolts.

24      A.   Okay.

25      Q.   You've just answered, yes, that you would go with

```
 1   biblical scripture if the Judge gave you a law that
 2   contradicted.
 3        A.   If there was something.  That's not what in my --
 4   when I wrote it, that wasn't what I was thinking.  I wasn't
 5   thinking that direction.
 6        Q.   I understand.
 7        A.   I was thinking --
 8        Q.   But that's what prompted my question.
 9        A.   Okay.
10        Q.   So you're saying it would?  That you would go with
11   biblical scripture if there was law that contradicted --
12        A.   If there was something, probably -- yes, I would,
13   but that's my belief.
14        Q.   Absolutely.
15        A.   But there's not anything that's -- am I --
16             THE COURT:  What do you mean there's not
17   anything?
18             VENIREPERSON:  There's not any -- there's not a
19   law that I -- that I know of that's going to not allow me to
20   follow.
21        Q.   (BY MS. MULDER)  I understand.
22        A.   In this type of -- I mean, yeah.
23        Q.   That you can think of?
24        A.   I was thinking of it the other way.
25        Q.   And before you came here today, you didn't know
```

1    about the process of how the death penalty works.

2        A.    Right.

3        Q.    And I understand you can't imagine anything at this

4    point.

5        A.    Right.

6        Q.    But if there was something, you would go with the

7    biblical scripture and --

8        A.    I'm not going to break the law of the land unless it

9    goes against something that's -- that I think God would send me

10   to hell for, yeah.

11       Q.    No.  And I'm not talking about breaking the law.

12       A.    That's what I'm thinking.  I guess that's what I'm

13   thinking when I --

14       Q.    Well, you're thinking about laws of the land where

15   people break a law and get in trouble.  You understand?

16       A.    Right.

17       Q.    That's what you're thinking of?

18       A.    Yes.

19       Q.    I'm talking about the law in court that the Judge

20   will instruct the jury about when deciding the case.

21              MS. JONES:  And, Your Honor, once again, asked

22   and answered.

23       A.    Okay.  I'll foll -- I'll follow the --

24              MS. MULDER:  I'm moving on, Judge.  I just

25   wanted to make that clarification right there.

 1          Q.    (BY MS. MULDER)  Do you understand what I mean, that

 2    there's -- I'm not talking about the laws that are written --

 3          A.    Right.  Okay.  That's what I'm thinking.  Okay.

 4    Okay.

 5          Q.    No, no, no, I'm talking about the law that will be

 6    applied in the death penalty case, that the jury will use to

 7    decide.

 8          A.    I'll follow those laws.

 9          Q.    And I understand that, but we need to know how you

10    feel about those laws.

11          A.    I don't --

12                THE COURT:  Let's move on, Ms. Mulder.

13          A.    I don't know.

14          Q.    (BY MS. MULDER)  All right.  With regard to beyond a

15    reasonable doubt -- and that is the State's burden of proof.

16    You've never served on a jury before?

17          A.    No.

18          Q.    And I just wanted to explain what that means.  In a

19    civil case where people are arguing over, you know, millions of

20    dollars at times --

21          A.    Uh-huh.

22          Q.    -- if a Plaintiff or person is suing a company for

23    money, they have to prove their case simply by a preponderance

24    of the evidence, meaning it's more likely than not.

25          A.    Okay.

1    Q.    Okay.  That's 51 percent.

2    A.    Okay.

3    Q.    That is the lowest burden of proof in the law.

4    A.    Okay.

5    Q.    The second highest burden of proof is called clear

6    and convincing evidence.  For example, if the State is going to

7    commit you to a mental institution without your permission,

8    they have to prove it's needed, that you need to go there by

9    clear and convincing evidence.

10    A.    Okay.

11    Q.    And -- and the same regard -- for example, if the

12    State is going to terminate a mother's rights to her

13    children --

14    A.    Yes.

15    Q.    -- you would expect there would have to be a lot of

16    evidence for that to happen?

17    A.    Yes.

18    Q.    That only has to be proven by clear and convincing

19    evidence.

20    A.    Okay.

21    Q.    Okay.  You with me?

22    A.    Yes.

23    Q.    All right.  And I'm not trying to confuse you or

24    trick you.  I'm just trying to explain what the law is and see

25    how you feel about it.

1          A.    Okay.

2          Q.    The highest burden of proof is called beyond all

3    reasonable doubt.  It's the highest burden because it applies

4    in criminal cases where a person's liberty and/or life are

5    potentially being taken away.

6          A.    Okay.

7          Q.    So that is the absolute highest burden there is

8    under the law.

9          A.    Okay.

10         Q.    And that's the burden the State has in the case, and

11   you understand that?

12         A.    Yes.

13         Q.    Okay.  Now, I know Ms. Jones talked about the

14   elements of an offense.  For example, when I spoke earlier

15   about they have to prove a specific intent to kill, meaning

16   they have to prove that the Defendant intentionally and

17   knowingly killed somebody during the course of a robbery, okay?

18         A.    Yes.

19         Q.    And she had mentioned, you know, whether a person is

20   wearing a red shirt or a blue shirt may or may not be

21   important.

22         A.    Yes.  May I get a tissue?

23         Q.    But certainly you would agree it certainly would be

24   important if a witness said the guy who committed the shooting

25   was wearing a red shirt and the evidence showed that the

 1  Defendant had a blue shirt on that day?  I mean, that would be

 2  important, you'd agree?

 3      A.    Yes.

 4      Q.    Okay.  Now, with regard to -- if a jury has found a

 5  defendant guilty of capital murder, the intentional killing of

 6  a person during the course of a robbery, there have been people

 7  who have come in and told us, you know what, at that point, if

 8  a person had a specific intent to kill a person and did so

 9  during a robbery, and the jury -- we, the jury, have convicted

10  him of that, then I'm always going to answer Special Issue

11  Number 1 yes, because for me, I personally feel that there will

12  always be a probability that the Defendant would commit

13  criminal acts of violence that constitute a continuing threat

14  to society in the future.  How do you feel?

15      A.    I feel it's going to depend on the circumstances

16  around it.

17      Q.    Okay.

18      A.    If they intentionally killed somebody.

19      Q.    Uh-huh.  And it wasn't an accident.  It wasn't a

20  mistake.  Had specific intent to kill somebody --

21      A.    Right.

22      Q.    -- during the course of a robbery.  And it's okay.

23  A lot of people come in and tell us that person is always going

24  to be a future danger to me.

25      A.    I don't know that they would be a future danger to

```
 1   everybody -- or, I mean, I don't know until I hear --

 2        Q.    Okay.

 3        A.    -- the rest of it.

 4        Q.    Okay.  I just --

 5        A.    No.

 6        Q.    -- wanted to know how you felt about that.  And it's

 7   kind of, you know, like the photo album, some jurors say, I

 8   don't need to see any more pictures, that one picture --

 9        A.    Yeah.

10        Q.    -- of a victim murdered during the course of a

11   robbery is enough for me, you know.

12             Now, in taking a look at Special Issue Number 1,

13   we kind of view it in three parts, whether there is a

14   probability -- meaning more likely than not that the Defendant

15   would commit criminal acts of violence.  And you can see that

16   there's an S on acts, meaning it's plural.

17        A.    Okay.

18        Q.    Would you agree?

19        A.    Would I agree to what?

20        Q.    That -- because there's an S on acts, that it's

21   plural meaning more than one.  Meaning more than one criminal

22   act of violence.

23        A.    I don't know if it's just the wording or they could

24   have said would commit a criminal act of violence.  I'm not

25   sure what you're asking.  Are you just asking me if that
```

1    implies plurality?

2        Q.    To me, that implies more than one.

3        A.    Would commit -- I just took it as a general

4    statement.  I'm not sure.  I mean, the word --

5        Q.    Okay.  There's no right or wrong answer.

6        A.    -- is plural.  Yeah, I mean, whether there's a

7    probability the Defendant would commit criminal acts of

8    violence.  Well, you can't just say a criminal act because you

9    don't know, right?

10        Q.    Right.

11            THE COURT:  I'm sorry, I didn't hear you.

12        A.    I just said it couldn't say would commit a criminal

13    act.  That would limit it to just one.  You wouldn't know,

14    right, if it was -- is that what you're asking me?

15        Q.    (BY MS. MULDER)  Yes.  Because the State has the

16    burden of proof, beyond a reasonable doubt, to prove that it is

17    more likely than not that the Defendant would commit criminal

18    acts of violence, meaning more than one, that would constitute

19    a continuing threat to society, so it's not --

20        A.    So you're saying that it's okay if they just do one?

21    I'm not --

22        Q.    I'm saying they have the burden to prove that --

23        A.    It would have to be more than one?

24        Q.    -- that the Defendant would commit criminal acts of

25    violence.  Yes.

1        A.    Because of the way that's written?

2        Q.    Yes.

3        A.    I'm not sure, because they would have to prove that

4    he's going to -- that the person would commit more than one

5    more.  You're saying multiples.  You're saying two or more.

6        Q.    Because it has an S on the end of acts --

7        A.    Because there's an act -- acts --

8        Q.    -- that he would commit criminal acts of violence.

9        A.    I don't know.  I -- because if it was -- I mean, one

10   more would be bad, so --

11       Q.    That would be enough -- that would be enough for you

12   to --

13       A.    Well, I mean, I don't know if you can -- you can

14   quantify it.  I don't know -- a probability that they would

15   commit criminal acts of violence that would constitute a

16   continuing threat to society.

17              So you're saying you can only say yes to it if

18   you think they're going to commit more than one more?  Is that

19   what you're asking?

20       Q.    (BY MS. MULDER)  Yes.  I'm asking if you can see it

21   that way?

22       A.    When I read it the first time, I didn't -- I didn't

23   even pay attention to it that it said acts, that it was more

24   than one.

25       Q.    There are no right or wrong answers.

```
 1        A.    Right.
 2        Q.    I just need to know what your view of it is.  And if
 3   it's --
 4        A.    My view is that when I read it, I thought a
 5   continuing -- they would continue to commit -- or could
 6   continue to commit criminal acts of violence.
 7        Q.    So if the State proved -- not that there was a
 8   probability, but just a possibility that a defendant could
 9   commit --
10        A.    It says probability, so I would think it would have
11   to be --
12               THE COURT:  I'm sorry.  When you turn your face
13   away from me --
14               VENIREPERSON:  I'm sorry.
15               THE COURT:  -- I can't hear what you're saying.
16        Q.    (BY MS. MULDER)  You have to speak up.  Sorry.
17        A.    It would have to be probable, not just possible.
18        Q.    Okay.  All right.
19        A.    It says probable, yeah.
20        Q.    Because you said, if he could.  If they proved that
21   he could commit criminal acts.
22        A.    Oh, okay, I'm sorry.  Then, yes, probable.  Yes,
23   that he would.  Likely or probably.
24        Q.    Uh-huh.
25        A.    I don't know the right words to use.
```

1    Q.    Commit criminal acts of violence that reached the

2  level of constituting a continuing threat to society, and

3  that's the third part of how I break down that question -- that

4  special issue -- that criminal acts of violence that actually

5  constitute a continuing threat to society.  And they have that

6  burden beyond a reasonable doubt.

7    A.    So -- right.  So what are you asking me about it?

8    Q.    Well, do you see how that they would actually have

9  to prove beyond a reasonable doubt that those continuing --

10  those criminal acts of violence would constitute a continuing

11  threat to society?

12    A.    Probability the Defendant would commit --

13  constitute -- I guess I'm not understanding what you're asking

14  me.

15    Q.    That's all right.  That's all right.  I'll move on.

16          But you understand they have the burden of proof

17  in Special Issue Number 1?

18    A.    Yes.

19    Q.    And they have to prove it to you beyond all

20  reasonable doubt?

21    A.    Yes.

22    Q.    That there is a probability the Defendant would

23  commit criminal acts of violence that would constitute a

24  continuing threat to society?

25    A.    Right.  And this is where you can take into

```
 1  consideration previous --

 2       Q.   If there is anything.

 3       A.   Right.  Right.

 4       Q.   If there is absolutely any kind of previous criminal

 5  history --

 6       A.   Right.

 7       Q.   -- or anything else.

 8       A.   Okay.

 9       Q.   Or --

10       A.   Right.  So if there isn't any --

11       Q.   Uh-huh.  Okay.  Now, moving on to Special Issue

12  Number 2, with regard to mitigation -- and that's a long

13  paragraph.  I'm not going to beat us all over the head with it.

14       A.   Okay.

15       Q.   With regard to circumstances of the offense, the

16  Defendant's character and/or background, the personal moral

17  culpability of the Defendant, there is a sufficient mitigating

18  circumstance or circumstances to warrant that a sentence of

19  life imprisonment without parole, rather than a death sentence,

20  be imposed, okay?  Now, at no time does a defendant have to

21  testify, however --

22       A.   Right.

23       Q.   -- there are people who come and tell us, look --

24  and I think you had mentioned before that you thought about

25  yourself if it was you, you would want all the evidence to be
```

1  shown.

2      A.    Yes.

3      Q.    And probably tell your side of the story, I would

4  assume.  It would depend?

5      A.    It would depend, I guess.

6      Q.    But some people come in here and tell us, you know

7  what, unless I hear that a person is remorseful for taking a

8  life, I will never answer Special Issue Number 2 yes unless I

9  hear that that person has remorse.

10      A.    To me personally, they don't have to be remorseful.

11  I mean -- I mean, I don't have to know their remorse or not.

12      Q.    Uh-huh.

13      A.    If I can go back to what I believe in scripture and

14  things, that that's going to be between them and God, right?

15  So are you asking if they show remorse to someone else, like to

16  the family members or something or --

17      Q.    No --

18      A.    -- just in general apologizing or something like

19  that?

20      Q.    The only way a jury would ever hear about any

21  remorse is if the Defendant testified.

22      A.    Okay.

23      Q.    You know, a family member can't come in and say, oh,

24  he told me this and that because that's called hearsay.

25      A.    Right.

```
 1        Q.    So the only way a jury would hear anything about

 2   remorse if --

 3        A.    Is if they did.  Okay.

 4        Q.    A lot of people come in here and say --

 5        A.    They have to hear that.  I don't.

 6        Q.    -- I would have to hear that.

 7        A.    Yeah, I --

 8        Q.    Do you feel the same way?

 9        A.    No.  No.

10        Q.    So you could vote yes to Special Issue Number 2,

11   even if you didn't hear remorse but you -- there was something

12   else sufficiently mitigating to you?

13        A.    That I would say that it warrants life rather than

14   death?

15        Q.    If you found something sufficiently mitigating.

16        A.    If I -- yes, if I found something sufficiently

17   mitigating, yes.

18        Q.    Okay.  And that brings me to page 10, if you would,

19   on your questionnaire, the answer to Number 65, with regard to

20   evidence of intoxication may be considered as mitigation.  And

21   I didn't understand the last part of your answer.  It says if

22   someone chooses to do something known to cause them to be

23   impaired and they commit a crime, it should be considered --

24        A.    That they chose to drink or take the drug.

25        Q.    Okay.  And based on your answer in 64, because
```

1  alcohol -- and I would assume drugs -- are known to cause

2  impairment, reduce inhibition, voluntarily being intoxicated is

3  a choice.

4       A.   Yes.

5       Q.   Okay.  And on up to Number 62, why did you change

6  your answer from your belief with regard to alcoholism being a

7  disease from yes to no?  I'm sorry?

8       A.   When I first saw the word "disease" and alcohol

9  addiction I was just thinking the diseases that are associated

10 or that come from maybe like alcohol addiction, like liver

11 disease and that type of thing.  I wasn't thinking of the

12 actual addiction being the disease, but I'm not a doctor.  But

13 I mean, that's just my thought on it.

14      Q.   Okay.  That's just your thought that the actual

15 addiction is not -- that's your personal belief?

16      A.   That's just my personal -- it's just all I know.  I

17 don't know.

18      Q.   Okay.  Okay.  Now, with regard to your personal

19 beliefs, because I know Ms. Jones went through, you know, the

20 situation where, you know, the answers to special issues could

21 result in the death penalty for the Defendant?

22      A.   Uh-huh, yes.

23      Q.   I need to know if you could vote and find and hold

24 the State to their burden in Special Issue Number 1 and vote

25 yes in Special Issue Number 2 if you found something

```
 1   sufficiently mitigating, despite what you think the prosecutors
 2   may or may not want the result to be and despite what you may
 3   interpret the victim's family to want in the case?  Do you
 4   understand --
 5        A.   I do.
 6        Q.   Because that can be a hard thing.
 7        A.   I -- yeah, I can imagine that would be difficult.
 8        Q.   Uh-huh.
 9        A.   The victim's family being there, it would be
10   difficult.
11        Q.   Because they'll all be here.
12        A.   Yes.  And I'm sure each side wants their outcome --
13        Q.   Obviously.
14        A.   -- to be the outcome.
15        Q.   It's an adversarial process.
16        A.   Right.
17        Q.   They're on that side --
18        A.   Right.
19        Q.   -- we're on this side.
20        A.   Right.  So I guess that's why it's up to the jury to
21   take it all into consideration and come up with the answer
22   regardless of -- yeah, the victim's family sitting there or
23   whatever.
24        Q.   So --
25        A.   So what you're asking -- so --
```

1      Q.    So is that something that you can do, or would you

2  feel like you --

3      A.    No.

4      Q.    -- you needed to have a certain result for the

5  victim's family?

6      A.    No, no.

7      Q.    Or because the prosecutors wanted a specific result?

8      A.    No.

9      Q.    Whatever that may be.

10     A.    No.

11     Q.    Okay.

12     A.    No, it would be based on what's presented.

13     Q.    Okay.  The facts and the evidence?

14     A.    Yes.

15     Q.    And during a trial like this, there might be -- and

16 I anticipate there will be -- I was a prosecutor for 12 years

17 myself.  I've been practicing criminal defense for seven years.

18 Usually in these kinds of cases there's crime scene photos,

19 autopsy photos, and things that are very disturbing to people

20 who haven't had exposure to them.

21     A.    Right, uh-huh.

22     Q.    Can you handle that, basically is my question.  Can

23 you put your emotion aside and base your decision on the law

24 and the evidence that is given to you?

25     A.    I think I can.  I mean, I will, if -- if I'm chosen

1    to do so, I will.  I think it will be hard.  I don't think

2    anybody could go through this process without being changed

3    or --

4        Q.    I agree completely.  I agree completely.  That's why

5    we need to know.

6        A.    Yeah.  Sorry.

7        Q.    That's all right.  It's upsetting to you?  It's okay

8    if it is.  We have people who -- who do tear up and cry, and

9    I'm so sorry if I -- I wasn't trying to upset you in any way.

10   But these are important issues for our client, so if it is

11   something that -- sometimes a juror may be -- sometimes a

12   potential juror says, you know what, if it was a burglary of a

13   habitation or a car theft or a DWI, I can sit on that kind of

14   case.  But because we're dealing with a case where they've

15   alleged an intentional killing during the course of a robbery,

16   there have been people who have come in and told us -- men and

17   women who say, I cannot sit on this kind of case.  And I know

18   that you want to be able to say you can, but because you're --

19   you're tearing up and blowing your nose, it makes me --

20       A.    My nose runs anyway just because of allergies.

21       Q.    Well, I know, mine does, too.

22       A.    Yeah, the tearing -- I think it's just -- I've tried

23   not to think about it since June because we were told, don't

24   think about it, don't research anything, So I just didn't, but

25   in the back of your mind, you're always thinking, wow, that's

```
 1   hard.

 2       Q.   Yeah.  It is hard.  And we wouldn't --

 3       A.   And I don't know that anybody can go through it

 4   without being changed or, you know, just by, you know -- the

 5   nature of what it is.  Can I do it?  Sure.  I can do -- I'm

 6   strong, I can do anything, but --

 7       Q.   Well, and I understand that.

 8       A.   -- is it going to be affecting me?  Yeah, it will

 9   affect me.

10       Q.   It's okay if it would be too emotionally taxing for

11   you.

12       A.   I don't know.  I've never --

13       Q.   Let me just finish my question.

14       A.   Okay.  I'm sorry.

15       Q.   We do have people who come in and say, you know

16   what, it would be so emotional for me, that there's -- it would

17   affect my ability to -- to render a verdict in the case, to

18   listen to the evidence.

19       A.   Oh, no, no, I don't think it would do that, no.

20       Q.   And I understand you don't think it would, but --

21       A.   But I've never been in this situation to even --

22       Q.   I know.

23       A.   -- to consider all this.

24       Q.   And just even the mention of crime scene photos and

25   autopsy photos made you cry.
```

```
 1        A.    Oh, I think that was just building up to the --

 2   yeah, the whole day.

 3        Q.    I understand.

 4        A.    Just got to that point, yeah.

 5        Q.    But let me -- let me just finish.

 6        A.    Okay.

 7        Q.    Because even just the mention of crime scene photos

 8   and autopsy photos made you tear up and cry.  You seem highly

 9   emotional.  That leads me to believe that -- I know you

10   would -- you think it wouldn't affect you -- because of the --

11   just even the mention of the autopsy photos and crime scene

12   pictures and it made you tear up, just based on my 18 years of

13   experience, it seems like this kind of case would be very

14   difficult for you to sit and listen to and would affect your

15   ability to base your decision -- your verdict on the law and

16   the evidence.  Would you agree?

17        A.    No.  I mean, you have the experience, I don't.  But

18   it's going to affect me, yes.

19        Q.    And you can understand my --

20        A.    I can.

21        Q.    You can totally understand my concern.

22        A.    I sure can because you -- yeah, cause you -- I can

23   understand.  But the emotion is just that moment and then --

24   this is what I'm thinking for me.  The emotion was just that

25   moment when it all came to a head and you talked about it.
```

1        Q.    Absolutely.  Well, and that's --

2        A.    And then, you move on and you look at the evidence

3    and I'm sure after -- I mean, the first time anybody hears this

4    type of thing, I'm sure they're emotional.  I can't imagine not

5    being moved by it or just affected by it.

6        Q.    Well, a lot of people --

7        A.    But if I had to make a decision on something, you

8    know, you would have to just consider the facts.  I mean,

9    that's part of the facts, and if that type of stuff doesn't

10   move you, I don't know.

11       Q.    It is, but the Judge will give you the instruction

12   that you base your decision on the law and the evidence.

13       A.    Oh, yeah.

14       Q.    And lot of people aren't -- don't come in and tear

15   up.

16       A.    Okay.

17       Q.    A lot of people don't.

18       A.    Okay.

19       Q.    And that -- hence my --

20       A.    That's fine.  Okay.  Fair enough.

21       Q.    -- concern.

22       A.    Okay.

23       Q.    I'm going to draw your attention back to the

24   guilt/innocence phase where the jury decides if the State has

25   proven their case beyond a reasonable doubt with regard to

1    capital murder.  And I think Ms. Jones gave you the --

2    explained to you how the State has to prove each and every

3    element in the case beyond a reasonable doubt.

4        A.    Uh-huh.

5        Q.    And I just want to give you a hypothetical.  It has

6    nothing to do with this case.  It's simply a hypothetical.

7        A.    Okay.

8        Q.    For example, in this case -- and I'm not talking

9    about this case, other than the indictment is murder during the

10   course of a robbery.

11       A.    Okay.

12       Q.    Okay.  Let's hypothetically say you're sitting on a

13   jury with 11 other people, and you're chosen to sit on a death

14   penalty case -- a capital murder case.  During the evidence

15   that's presented, the State proves that they've proven their

16   case that it was a murder during the course of -- that it

17   wasn't a robbery.  It was a sex assault.

18       A.    Right.

19       Q.    Okay.  And you believed beyond a reasonable doubt

20   they've proven that it was a murder during the course of a

21   sexual assault, but in their indictment, it states it was a

22   murder during the course of a robbery.

23       A.    Right.

24       Q.    There are people who have come in here and said, you

25   know what, despite that, I would find the Defendant guilty,

1  despite the error in the indictment.

2       A.    That's not what they were charged with, right?

3       Q.    That's right.  He was charged with murder during the

4  course of a robbery.

5       A.    Right.  So that's not what would make your decision.

6       Q.    Even though -- even though a technicality is not a

7  legal term, a lot of people call it that because you -- you as

8  a juror, if you believe beyond a reasonable doubt that he

9  intentionally killed a person during the course of a sexual

10 assault --

11      A.    Uh-huh.

12      Q.    -- that even if, you know, if they had pled it wrong

13 in the indictment, you would vote how?

14      A.    Not guilty.

15      Q.    That's right.

16      A.    Right.

17      Q.    And you could -- and you would do that despite

18 whatever you think the prosecutors may want and the family

19 might want?

20      A.    Right.

21      Q.    The victim's family?

22      A.    Yeah.

23      Q.    And you could do that with a clear conscience?

24      A.    Yes.

25      Q.    Okay.  Okay.  I just have one other quick question

```
 1   about your -- actually no, I do have a couple of questions.

 2   What is -- your brother -- I think it's your brother-in-law

 3   works at -- what is QMRP?  None of us know what that is.

 4        A.   Oh, it -- he worked also for the state school.  He

 5   works with the mentally handicapped.  It's a qualified

 6   something.

 7        Q.   That's all right.

 8        A.   He actually -- yeah.

 9        Q.   Are they children or adults?

10        A.   Every age.

11        Q.   Okay.

12        A.   He's retired now, so he's not --

13        Q.   I'm sorry?

14        A.   He's retired now.  He's not --

15        Q.   And then one other issue on your questionnaire with

16   regard to -- page 3, your answer to Question 12.  With regard

17   to the death penalty is reserved for those that are such a

18   threat to society that even incarceration does not remove the

19   probability of future violent acts.  And you agreed with that

20   and you said an individual incarcerated could still be violent

21   towards other and possibly order violent actions committed.

22        A.   Sure.

23        Q.   And I was wondering where you got the ordered

24   violent actions committed because I wrote TV, question mark.

25        A.   No, I mean, sure, it could be done.  I mean --
```

1        Q.    What did you watch or see or hear that made you

2   think that?  A specific case in the news or --

3        A.    No, some show we used to watch on HBO probably.

4        Q.    Sopranos?

5        A.    Yes.  It's exactly what I thought of when you said

6   that.  I was like, oh, yeah.  Probably, yeah.

7        Q.    Uh-huh.  But you --

8        A.    I guess ordered is not a --

9        Q.    Well, and a lot of people --

10       A.    Just ask somebody to do them or pay somebody.  I

11  don't know.

12       Q.    Okay.  And I understand that.  Which brings me back

13  to, you know, how some people come in and say, you know what,

14  if we're here, he's got to be guilty of something.  And that's

15  kind of a -- and I thought that -- that it's possible the

16  Defendant or somebody charged with this kind of crime is

17  somehow -- you understand where I'm going with this?

18       A.    I think so.  But -- such a threat to society that

19  incarceration does not remove the probability -- I had to

20  explain why I agreed with that.

21       Q.    Uh-huh, yes.

22       A.    I mean, I was just giving ways that I thought that

23  it could possibly happen.

24       Q.    Oh, okay.  I understand now.

25                  What purpose do you think the death penalty

1  serves?

2      A.    Well, I think it's a punishment for a crime that

3  allows for that punishment.  Does that make sense?  I think

4  that it probably hopefully deters others from making the same

5  mistakes or committing the same crimes.  I just think that the

6  law has that as the penalty in some instances and that's what

7  it is.  That's your penalty.

8      Q.    And if you found somebody guilty of an intentional

9  murder during the course of a robbery, you could still presume

10  that life is the appropriate sentence?

11      A.    I could now that I know what mitigating

12  circumstances -- I mean, yes.

13      Q.    You could?

14      A.    And I understand the terms -- the --

15      Q.    I know you could, but I want to know if you

16  personally agree with that.

17      A.    Well, yeah, sure.

18      Q.    Okay.  Well, I mean, some people disagree with the

19  law, and that's okay.

20      A.    Okay.

21      Q.    A lot of people -- we mentioned abortion.  Some

22  people disagree with --

23      A.    Right.

24      Q.    -- the abortion law.

25      A.    Right.

```
 1        Q.    And that's fine.  They're entitled to their personal
 2   feelings.  And I just wanted to know how you feel about that --
 3        A.    Yes.
 4        Q.    -- based on your belief.
 5        A.    It doesn't say that you must give them the death
 6   penalty.
 7        Q.    No, it does not.
 8        A.    This is -- she said today that it starts with life,
 9   and then you have the special issues --
10        Q.    That's right.
11        A.    -- to consider.
12        Q.    They have to prove that there's a probability that
13   the Defendant would commit criminal acts of violence in the
14   future that would constitute a continuing threat to society.
15        A.    Uh-huh.
16        Q.    If the jury --
17        A.    Yes.
18        Q.    -- if they do not prove that, can you answer no?
19        A.    If they do not prove it, yes.  If they do not prove
20   that he -- yes, that it would -- yes.  Sure.
21        Q.    And it's not that you're afraid he might or that he
22   possibly could.
23        A.    Right.  It's probably.  Right.
24        Q.    They have to prove it?
25        A.    Yes.
```

```
 1        Q.    Exactly.

 2        A.    Right.

 3        Q.    And then with regard to Special Issue Number 2, just

 4   quickly with regard to mitigating circumstance or

 5   circumstances.  Because they have actually listed that in the

 6   singular and plural, it could be one or more mitigating.  Could

 7   be just one mitigating circumstance --

 8        A.    Okay.

 9        Q.    -- that you find.  And the 12 jurors could -- you

10   know, two of you could think, oh, well, he had a rotten

11   childhood.  That's mitigating to me and sufficiently mitigating

12   to me.

13        A.    Uh-huh.

14        Q.    Or he had a bad drug problem, that's sufficiently

15   mitigating to me.  Two others could think that.  And the jury

16   does not have to be unanimous in what they think is mitigating,

17   just that they do find something mitigating.

18        A.    Okay.

19        Q.    Okay.  Now, you could have a juror that says, you

20   know, I -- I -- to me, there was something mitigating in the

21   case, but I can't really articulate what that was.  They just

22   feel that there's something sufficiently mitigating.  Does that

23   person's opinion -- even though that person cannot articulate

24   it, do you think that person deserves that respect for that

25   opinion?
```

1      A.   I would think it is sufficient, they would be able

2  to tell us or to tell the group of jurors what it is.  I mean,

3  I -- you said articulate it.  I would think they would be able

4  to --

5      Q.   What if it's just a feeling -- what if it's just a

6  feeling they have that they got from the testimony and the

7  evidence that they found to be sufficiently mitigating?  You

8  would respect that juror's opinion, obviously?

9      A.   Well, yeah, I would respect all the jurors, yes.

10 But -- yeah.

11     Q.   Okay.  I want to -- do you know anybody who works in

12 the Garland Police Department?

13     A.   Garland Police?  I don't think so.  No.

14     Q.   Oh, that brings me back to -- I know you had a --

15 was it a good friend who worked as a police officer?

16     A.   It was a friend from church.  He's retired.  I think

17 he's Dallas.

18     Q.   Okay.  And I know that Ms. Jones instructed you --

19 you know, told you that the law says everybody starts off on a

20 level playing field.

21     A.   Uh-huh.

22     Q.   But there are people who have such a great deal of

23 respect for police and police officers, and I can tell by your

24 answer when you say, you know, they're -- police officers are

25 culled from all the applicants and chosen to be police

1  officers, that you have a great deal of respect for them.

2       A.    I do.

3       Q.    And I think most people do.  So it sounds to me that

4  if you -- if a police officer, you know, swears to tell the

5  truth and sits down to testify, he's already going to have a

6  leg up with credibility with you.  Would you agree?

7       A.    A leg up with credibility, as opposed to anybody

8  else who gets sworn in?  I mean, anybody that's sworn in, I

9  think they're --

10      Q.    No, no, I'm talking -- if a police officer walks in

11 and he's in his uniform, or you -- you know, I mean --

12      A.    Yeah.

13      Q.    -- he's automatically going to have more credibility

14 with you because of your experience with police and your great

15 deal of respect with them.

16      A.    I would -- I would say yes, he would.

17      Q.    So even if -- so when a police officer comes in and

18 sits -- sits down to testify, he's -- he automatically gets

19 more credibility with you?

20      A.    Not more credibility.  What do you mean more

21 credibility than just anybody?

22      Q.    Yes.  Simply because he's a police officer.

23      A.    I don't know that I look at anybody else less

24 credible.  I do think that police officers are -- I mean, they

25 obviously have to go through a bunch of processes -- a process

1  to get to be a police officer, so just knowing that, I would

2  think that, you know, in my mind I would expect them to be

3  telling the truth on things, but I don't know that they're -- I

4  don't think it makes any -- I don't think the -- I don't think

5  anybody else stepping up here would be any less credible than

6  the officer just because he had a uniform.

7      Q.    I'm not saying that.  But you did hit on what I was

8  asking you is that for you, simply because a person is --

9      A.    Well, sure, but that's just because I can recognize

10  a uniform.  I mean, yeah -- I mean, yeah, you can see a uniform

11  and you would --

12              THE COURT:  Okay.  Let's move on, Ms. Mulder.

13  We're at 50 minutes already.

14      Q.    (BY MS. MULDER)  Do you know anybody in the Dallas

15  Police Department?

16      A.    I think -- I think my friend from church.  I think

17  that's where he's retired from, Dallas.

18      Q.    Do you know anybody in the Dallas or Garland Fire

19  Departments?

20      A.    No.

21      Q.    Okay.

22      A.    I don't think so.  I just -- I've only lived here a

23  year, so I don't --

24      Q.    All right.  I'm going to read you a list of names.

25      A.    Okay.

1      Q.    If you recognize any of them, stop me.

2      A.    Okay.

3      Q.    Okay.  Otherwise I'm just going to go through them

4  because there's a lot of them.

5      A.    Okay.

6      Q.    And my time is up.

7      A.    Oh, okay.  Sure.

8      Q.    Scott Harris, Elizabeth Harris, Nancy Harris, Chris

9  Harris, Kenneth Marecle, Amy Marecle, Michael Frank, Anna

10  Lunceford, Jim Medley, Lawrence Denson, Jonas Lucht, Greg

11  Mansell, Carina Pinzon, Digna Salmeron, Kelly Keeton, Daphne

12  Johnson, Sherry Ann Clark, Amy Armstrong, Anthony Johnson, Alma

13  Johnson, Courtney Johnson, David Williams, Danny Mullins, David

14  Contente, Gioconda Verdaguer, Donald Dunlap, Johnny Wright,

15  Monica Cajas, Michael Crosby, Roxanne Luttrell, Robbie Denmark,

16  Quinlen Minor, Margaret Tatum, Jim Bertucci, John Harris,

17  Timothy Proctor -- Dr. Timothy Proctor -- excuse me, Carlton

18  Jenkins, Durian Allen, Gene Gathright, Manuel Turner, Andre

19  Howard, Kenneth Lewis, Sheldon Henry.

20      A.    No.

21      Q.    Do you know anybody that works at the Southwestern

22  Institute of Forensic Sciences or Parkland Hospital?

23      A.    Parkland Hospital, maybe.  Somebody from church is a

24  nurse.

25      Q.    Do you know her name?

```
 1        A.   First name is Charlotte.  Oh, shoot.  I go to church
 2   with her.  I'm sorry, I don't --
 3        Q.   I'm trying to get to the Parkland.  If Charlotte
 4   were to testify in the case, would -- because you know her,
 5   would that affect you?
 6        A.   No.
 7        Q.   So despite the fact that you know her and she goes
 8   to your church, you could judge her credibility just like you
 9   would anybody else's who you didn't know?
10        A.   Uh-huh.
11             THE COURT:  You have to answer the question --
12             VENIREPERSON:  Yes.
13             THE COURT:  Thank you.
14             VENIREPERSON:  I'm sorry.
15             MS. MULDER:  Thank you very much.
16             THE COURT:  Thank you, ma'am.  We're going to
17   ask you to step outside for just a minute.
18             VENIREPERSON:  Okay.  Do I take these with me?
19             THE BAILIFF:  All rise.
20             (Venireperson excused from courtroom.)
21             THE COURT:  State?
22             MS. JONES:  No objection from the State, Your
23   Honor.
24             THE COURT:  Defense?
25             MS. MULDER:  Your Honor, we do have multiple
```

1  objections to this juror.  She stated that if the law

2  conflicted with biblical scripture -- what she understood what

3  I was talking about with regard to a jury instruction from the

4  Court, that she would not -- that she would disregard the

5  Court's instruction and go with what she believed biblical

6  scripture told her to do.

7                    In addition, she also testified just now that

8  she would find police officers more credible simply because

9  they are police officers automatically.

10                   In addition, she is mitigation challenged based

11 on her answers in her questionnaire and her answers to the

12 Court under the Sixth, Eighth, and Fourteenth Amendments.  We

13 request she be excused.

14                   (Venireperson challenged by the Defense.)

15                   THE COURT:  I -- I clearly heard her say

16 multiple times that she would follow the law in this case.  I

17 also heard her say numerous times that she felt like everyone

18 was as credible as a police officer, so your challenge is

19 denied.

20                   (Challenge denied.)

21                   (Venireperson returned to courtroom.)

22                   THE COURT:  Ms. Adams, you have been qualified

23 as a juror, so we're going to take your photograph and then

24 we'll be calling you on the 15th or the 16th to let you know if

25 you will, in fact, be a juror.  Thank you for your service and

 1    your time.

 2                        (Venireperson 1393A, Jerri Adams, qualified.)

 3                        (Venireperson excused from courtroom.)

 4                        THE COURT:  All right.  We're on the record.

 5    Did we -- what -- are we putting something on the record before

 6    we bring the juror in?

 7                        MS. MOSELEY:  I was just going to bring to the

 8    Court's attention the -- the criminal history and the conflict

 9    between our record check and Mr. Redic, Juror 1421A.  His

10    questionnaire -- in the questionnaire he said that he had no

11    one, either himself nor close family member or a friend who had

12    ever been arrested, accused, or convicted, including probation,

13    deferred adjudication, conditional discharge --

14                        COURT REPORTER:  I'm sorry.

15                        MS. MOSELEY:  Including probation, deferred

16    adjudication, conditional discharge, fine, etcetera, of a crime

17    above the level of a traffic ticket, and he checked no.  Also,

18    checked no as to knowing anyone who has now or ever been in

19    jail or prison.  And our records indicate that he was arrested

20    twice and convicted twice of DWI.

21                        THE COURT:  Okay.  Can I see the questionnaire

22    so that I can read that to him when I have him in here?

23                        MS. BERNHARD:  And, Judge, just to state our

24    position for purposes of the record, it's our position that

25    that does not necessarily make him subject to a challenge for

1  cause, but the question is whether or not he's really -- you

2  know, whether it's a true lack of candor or whether he just

3  forgot or didn't read the question closely enough because it's

4  our position they're not subject to a challenge for cause

5  unless lack -- not only is there a lack of candor, but that

6  that lack of candor rises to the level of a bias which would

7  make them challengeable.

8             THE COURT:  All right.  Well, then do you want

9  to do it this way?  Do you want me to tell -- give him the

10  opening remarks that I've been using and then ask him the

11  question about the convictions and then excuse him?

12             MS. MOSELEY:  It would be up to the Court, I

13  think, to make that determination.

14             THE COURT:  I mean, I don't mean excuse him from

15  service.  I mean, have him step outside so we can talk about

16  it.

17             MS. BERNHARD:  So we can argue it.

18             MS. MOSELEY:  I think that's --

19             THE COURT:  Okay.  All right.  We'll do that.

20             And this is -- who is this coming?

21             MS. MOSELEY:  Mr. Redic.

22             THE COURT:  Okay.  Okay.  We're ready for the

23  juror.

24             For the record, Venireperson Jerri Adams, Number

25  1393A, has been qualified.

```
 1                    (Venireperson brought to courtroom.)

 2                    THE COURT:  Good afternoon, Mr. Redic.

 3                    VENIREPERSON:  How you doing, Your Honor?

 4                    THE COURT:  Please be seated, everyone.

 5                    First, I'd like to apologize to you for all the

 6      inconvenience that we've caused you.  I -- I feel terrible

 7      about it.  It certainly was not on purpose, and we'll do

 8      everything we can to expedite you and get you out of here as

 9      quickly as possible.

10                    VENIREPERSON:  Thank you.

11                    THE COURT:  So I'm very, very sorry about that,

12      and thank you very much for coming in spite of all of it.  We

13      appreciate it.

14                    Do you remember the oath that you took in June

15      when you were down in the Central Jury Room?

16                    VENIREPERSON:  Yes, Your Honor.

17                    THE COURT:  All right.  Well, you are still

18      operating under that oath, and you will continue to operate

19      under that oath and the instructions that you were given then

20      until you've been discharged from this jury service.  We're

21      going to try the case October the 28th and November the 4th.

22      Has anything happened to you since June that would preclude you

23      from being able to sit during those two weeks?

24                    VENIREPERSON:  No, Your Honor.

25                    THE COURT:  Okay.  Have you heard anything about
```

1  the case during those two -- during that period, from June

2  until now, that would prevent you from sitting as a fair and

3  impartial juror?

4            VENIREPERSON:  No, Your Honor.

5            THE COURT:  Okay.  I'm going to introduce you to

6  the parties.

7            At the State's table is Ms. Andrea Moseley.

8            MS. MOSELEY:  Good afternoon.

9            THE COURT:  And Ms. Rocky Jones.

10           MS. JONES:  Good afternoon.

11           THE COURT:  And at the Defense table is Mr.

12  Kenneth Weatherspoon.

13           MR. WEATHERSPOON:  Good afternoon.

14           THE COURT:  And Catherine Bernhard.

15           MS. BERNHARD:  Good afternoon.

16           THE COURT:  And the citizen accused, Mr. Matthew

17  Lee Johnson, is sitting to her left.

18           The lady sitting between you and I is the court

19  reporter, and she's taking everything down that's being said.

20  And as a courtesy to her, I'm going to ask you to please answer

21  audibly yes or no.  She can take down uh-huh and huh-uh, but it

22  doesn't make for a very clear record, so if you'll answer

23  audibly, I would appreciate that.

24           Have you had an -- my name is Tracy Holmes.  I'm

25  the presiding juror (sic), and I'll be sitting as the presiding

1  juror (sic) when this case is called to trial.

2              Have you had an opportunity to read the pamphlet

3  and review your questionnaire?

4              VENIREPERSON:  Yes.

5              THE COURT:  Do you have any questions about any

6  of that?

7              VENIREPERSON:  No.

8              THE COURT:  All right.  Each side gets 45

9  minutes to talk to you.  And at the end of that time, we'll ask

10  you to step out and the lawyers will determine whether you've

11  been qualified as a juror.  And if they determine that you have

12  been, then we'll call you back -- we'll call you on October the

13  15th or 16th and let you know if you have been chosen as a

14  juror in this case.  Will that work for you?

15             VENIREPERSON:  Yes, Your Honor.

16             THE COURT:  All right.  Question -- I just need

17  to ask you one thing.  Question 52 of your questionnaire, if

18  you could turn to that.  That question is asking you about any

19  kind of convictions that you've had or any family member you've

20  had.  And you answered that no.  The District Attorney's

21  Office, as they do, have done a criminal record check and it

22  shows that someone by your name was convicted of DWI in 1994

23  and 2007.  Is that you or would that have been someone else?

24             VENIREPERSON:  Yes.

25             THE COURT:  That's you?

```
 1                    VENIREPERSON:  Yes.

 2                    THE COURT:  Did you understand that was a

 3   conviction greater an a traffic ticket?

 4                    VENIREPERSON:  Yes.

 5                    THE COURT:  Okay.  Is there a reason that you

 6   didn't disclose that?

 7                    VENIREPERSON:  I'm not sure.

 8                    THE COURT:  Okay.  You're not sure why you

 9   didn't disclose it, or did you not understand the question?

10                    VENIREPERSON:  Yes.  It said me or a family

11   member?

12                    THE COURT:  Yes, sir.

13                    VENIREPERSON:  Maybe I didn't have all the

14   information.

15                    THE COURT:  Okay.

16                    VENIREPERSON:  That I didn't completely fill it

17   out.

18                    THE COURT:  Okay.  Does the State have any

19   questions with regard to this particular issue?

20                    MS. MOSELEY:  No, Your Honor.

21                    THE COURT:  Okay.  Does the Defense have any

22   question with regard to this particular issue?

23                    MS. BERNHARD:  Just briefly.

24                         DEXTER REDIC,

25   was called as a venireperson by the parties, and after having
```

```
 1  been first duly sworn, testified as follows:
 2                  DEFENSE VOIR DIRE EXAMINATION
 3  BY MS. BERNHARD:
 4       Q.   Mr. Redic, again, my name is Catherine Bernhard.
 5  When you say you didn't have all the information, I'm not quite
 6  clear on what you're saying.
 7       A.   You want to know why I didn't fill this out?
 8       Q.   Why you didn't mention -- if those are your DWIs,
 9  why you didn't mention them when you answered Question 52.
10       A.   I'm not really sure, just --
11       Q.   Did you understand what the question was asking you
12  or --
13       A.   Yes.
14       Q.   Okay.  So you just -- you don't know why you didn't
15  say anything?
16       A.   I'm not really sure.
17                  MS. BERNHARD:  That's all.
18                  THE COURT:  All right.
19                  MS. MOSELEY:  Can we have just a real quick
20  recess, Judge?
21                  THE COURT:  Sure.
22                  We're going to ask you to just to step outside
23  that door right by -- by your right, Mr. Redic, for just a
24  minute.
25                  (Venireperson excused from courtroom.)
```

1              MS. MOSELEY:  Judge, based on Mr. Redic's

2  answers to the Court's inquiry and to Ms. Bernhard, I would

3  submit this juror.  It's clear that he did understand what the

4  question was asking, and he has no reasonable explanation for

5  why he didn't fill it out.  He answered the other questions on

6  the questionnaire.  I believe that his failure to answer that

7  does indicate a lack of candor with the tribunal and would

8  challenge the juror on that basis.

9             (Venireperson challenged by the State.)

10            MS. BERNHARD:  And it would be our position that

11  his answers are not indicative of a bias that would make him

12  challengeable for cause.

13            THE COURT:  All right.  Well, let's see if we

14  can qualify him then.

15            MS. MOSELEY:  Judge, may I approach and get that

16  questionnaire?

17            THE COURT:  Yes, I'm sorry.

18            Ms. Moseley, are you going to be doing the

19  questioning?

20            MS. JONES:  It will be Ms. Moseley, Your Honor.

21            (Venireperson returned to courtroom.)

22            THE COURT:  Thank you, Mr. Redic.  I'm going to

23  turn you over to Ms. Moseley.

24                  DEXTER REDIC,

25  was called as a venireperson by the parties, and after having

1  been first duly sworn, testified as follows:

2                    STATE VOIR DIRE EXAMINATION

3  BY MS. MOSELEY:

4       Q.   Good afternoon, Mr. Redic.  How are you?

5       A.   I'm fine.  How are you?

6       Q.   Good.  I'm glad you made it.  I know we called you

7  down here once before and then called you off, told you not to

8  come and then we call and tell you to come back and then we

9  tell you to come back after lunch.  We haven't treated you the

10  best, and I apologize for that.  We'll hopefully get through

11  this pretty quick this afternoon.

12                    I want to talk to you a little bit about some

13  things in your questionnaire.  And first, before we get

14  started, let you know really why we're doing this process.  In

15  most -- have you ever been a juror before?

16       A.   No.

17       Q.   Most cases we talk to all of the jurors at one

18  time -- all the potential jurors at one time.  Because this is

19  a capital murder case where the State is seeking the death

20  penalty, we bring jurors in individually, as we have yourself

21  this afternoon, and -- and each side gets 45 minutes to talk to

22  you.  Really, it's 45 minutes for you to talk to us, because in

23  the end, the goal is to get 12 jurors who are going to sit and

24  hear the evidence, hear the testimony in this case, and make a

25  decision that may result in someone's execution.  And we know

1  that because we're talking about the death penalty, people have

2  really strong feelings about the death penalty.  You can see

3  that, I'm sure.

4        A.    Yes.

5        Q.    Some people feel so strongly in favor of the death

6  penalty, that their position is, look, if you tell me somebody

7  is guilty of capital murder, I'm always going to find for the

8  death penalty.  And obviously, that wouldn't be giving the

9  Defendant a fair trial because that's not the way the law

10  works.

11              We have people on the other end of that spectrum

12  who say, because of my feelings about the death penalty, either

13  based on my religious beliefs or my personal beliefs, there is

14  no way I could ever assess a verdict that would result in

15  someone's execution.  I just couldn't do that.  And so we know

16  because we have people on both ends of that spectrum, that we

17  need to bring people in individually and give them kind of an

18  opportunity to really tell us how they feel.  In the end, it's

19  going to be you, the juror, if you're qualified in this, that

20  will end up making those decisions and you're the one that

21  would have to live with those decisions.  So today is really

22  your opportunity to tell us whether you could do that and live

23  with -- with the decision, no matter whether it meant someone

24  received a life sentence or whether someone received the death

25  sentence.  Does that make sense?

```
 1        A.    Yes.

 2        Q.    So your only obligation to us today is to tell us

 3   the truth about how you feel and let us know whether you could

 4   follow the laws that are going to be given to you or whether

 5   you can't.  And there's nothing wrong either way.  There's no

 6   right or wrong answer to that.  We've talked to a whole bunch

 7   of people.  I don't know if you realize it, but you were Juror

 8   Number 1421 called up for this case.  So obviously, we've gone

 9   through a whole lot of people trying to get to this -- this 12

10   which is our ultimate goal.

11              Are you comfortable today telling us about how

12   you feel and answering the questions honestly?

13        A.    Yes.

14        Q.    Okay.  I -- the first thing I noticed in your

15   questionnaire, you told us you went to high school with Craig

16   Watkins.

17        A.    Yes.

18        Q.    Were you all friends in school?

19        A.    No, he was -- he's three years older than me.

20        Q.    Okay.  So you just knew of him?

21        A.    Yes.  Well, when I was a freshman, he was senior

22   class president.

23        Q.    Okay.  Did you have any direct contact with him at

24   all back then?

25        A.    No.
```

111

```
 1        Q.    Have you had any contact with him since high school?

 2        A.    No.

 3        Q.    Obviously, you're aware that he ran for District

 4   Attorney and -- and won, and has been elected District

 5   Attorney.  And you realize that he's my boss?

 6        A.    Yes.

 7        Q.    Is there anything about your knowledge of Mr.

 8   Watkins or your familiarity with him that would cause you to

 9   kind of come into the process thinking the State must be right

10   if we're seeking the death penalty because Mr. Watkins said so?

11        A.    Can you repeat that again?

12        Q.    Do you think your feelings about Mr. Watkins or your

13   knowledge of him would influence you in some way as a juror?

14   Would you think that he was -- because he's made the decision

15   to seek the death penalty, that he might be right about that?

16        A.    No.

17        Q.    Because of your relationship?

18        A.    No.

19        Q.    Okay.  I want to talk to you first about the kinds

20   of cases where the death penalty is ever even an option.  Only

21   in capital murder cases is the death penalty a possible

22   punishment, so not in what we call regular murder cases.  And I

23   think on your questionnaire, if you'll look on page 2, we asked

24   you in Question Number 9:  What crimes do you think the death

25   penalty should be available in Texas?  And you said:  For some.
```

1    Tell me -- tell me what you have in mind there when you say for

2    some crimes.

3           A.    What question is that?

4           Q.    Question Number 9.

5           A.    Okay.  Like -- you said what do I think would the

6    death penalty be -- what again?

7           Q.    What kind of crimes do you think the death penalty

8    should be available for?

9           A.    Oh, I mean crimes of extreme -- extreme in nature.

10          Q.    Okay.

11          A.    Horrific.

12          Q.    Okay.  Would you consider -- Question Number 10, we

13   told you that intending to cause the death of an individual in

14   the course of committing or attempting to commit the offense of

15   robbery is a capital offense for which the death penalty should

16   be available.  Do you think that that's the kind of crime that

17   you would agree should be -- the death penalty should be

18   available for?

19          A.    Yes.

20          Q.    Okay.  What purpose do you think the death penalty

21   serves?  Why should we have the death penalty?

22          A.    Just -- I mean, somebody that's not, you know,

23   just -- the crime that was so horrific that it just doesn't

24   warrant them being housed anymore, just paying -- you know,

25   paying to keep them housed.

```
 1        Q.    Okay.

 2        A.    Because even they may be a bad influence on other

 3  inmates.

 4        Q.    Okay.

 5        A.    Even though they have life sentences.

 6        Q.    So for you, part of it -- if I understand right, and

 7  please correct me if I'm wrong, I want to make sure I'm

 8  understanding you.  Part of you says that there are just some

 9  crimes that are bad enough that the person really just deserves

10  the death penalty?

11        A.    Yes.

12        Q.    And then another reason or justification you would

13  have is because they may be a bad influence on other people or

14  may continue to be a threat?

15        A.    Yes.

16        Q.    Okay.  You also recognize that there are some cases

17  of capital murder where a life sentence could be appropriate?

18        A.    Yes.

19        Q.    One of the things that I noticed in your

20  questionnaire is that you said that a person can be changed.

21  So we asked you what would be important to you in deciding

22  whether a person received the death sentence versus a life

23  sentence, and you said, if a person can be changed.  Tell me

24  what you mean by that, if a person can be changed.

25        A.    What question is that?
```

1        Q.    That's on page 3, Question 18.

2        A.    I mean, if the person was really remorseful -- you

3    said -- what -- what -- what was the question again?

4        Q.    What -- what do you mean if a person can be changed?

5    What do you mean by that?

6        A.    Well, I mean, a lot of times people say that

7    they've -- that they're a Christian now or they've -- you know,

8    they've got God in their life.

9        Q.    Uh-huh.

10       A.    I mean, that's the only way you can be changed, I

11   mean.

12       Q.    How do you know if somebody is just saying that or

13   if they really have changed?

14       A.    Most of the time after they done sat in there 20

15   years -- I mean, they normally come -- they probably mean it by

16   then.

17       Q.    And where do you -- where do you come to that -- do

18   you have some experience?  Do you know somebody who's made a

19   change, or where do you get that feeling?  How do you know

20   that?

21       A.    I don't know anybody, but I imagine, you know,

22   after, you know, so long that you just -- once a person starts

23   educating their selves and just looking for another -- for

24   peace and redemption, I imagine that -- that they could have

25   done -- you know, seeked a higher power by then.

1       Q.    Do you think there are people who don't change?

2       A.    Yes.

3       Q.    Or do you think everyone does?

4       A.    No, not everybody.

5       Q.    And how do you know whether the person -- because,

6    you know, we can't -- we can't go 20 years in the future and

7    look at what somebody's like that far in advance and make a

8    decision today.  We have to make a decision today based on the

9    past, based on what we know up to that point.  Would you agree?

10      A.    Yes.

11      Q.    How would you know whether the person is -- is

12   really truly going to change or whether they're just saying it?

13   What would you look at to make that decision, or do you think

14   you can make that decision?

15      A.    If somebody can be changed?

16      Q.    Uh-huh.

17      A.    I mean, they probably would have to know -- I mean,

18   they would probably have to know themselves, that they really

19   mean it.

20      Q.    Okay.  Okay.  We'll probably come back to that idea

21   in a little while when we -- when we talk some more about how

22   we get to the issue -- how we get to whether somebody receives

23   a life sentence or a death sentence.

24            I want to ask you a few more questions about

25   some things in your questionnaire.  On page 4, we asked you --

Question 27:  What are your thoughts and feelings in general

about our criminal justice system?  You said:  It needs to be

fixed.  What do you mean by it needs to be fixed?

    A.    I probably was just filling in answers.

    Q.    Well, tell me -- tell me today how you feel about

the criminal justice system, specifically in Dallas County.

How do you think we're doing in Dallas County?

    A.    I think that -- there shouldn't be any more wrongful

convictions with this -- this DNA that we have going now.

    Q.    Uh-huh.  Is that something that you continue to be

concerned about, people being wrongfully convicted?

    A.    Yes.

    Q.    And I would imagine that that's certainly about --

would certainly concern you when we're talking about the death

penalty for sure?

    A.    Yes.

    Q.    You probably know that in the criminal justice

system, when -- when the State of Texas is bringing charges

against someone, we have to prove our case beyond a reasonable

doubt before a guilty verdict could be had from a jury.

    A.    Yes.

    Q.    Beyond a reasonable doubt, we don't have a

definition for what that is.  But if you're a juror on a case,

you have to be convinced beyond a reasonable doubt before you

can find somebody guilty.  We do know that beyond a reasonable

117

```
 1  doubt isn't beyond all possible doubt.  It doesn't mean that

 2  the State has to prove the case, prove the person guilty with

 3  100 percent certainty.  Do you understand that?

 4       A.   Yes.

 5       Q.   Do you think that that sounds reasonable, or do you

 6  think that we should have to prove somebody's guilty beyond all

 7  doubt?

 8       A.   Most of the time isn't that what you strive for?

 9       Q.   Well, we certainly strive to prove the case to a

10  jury beyond a reasonable doubt, because that's our burden under

11  the law.  We will sometimes say that I -- we couldn't prove it

12  beyond all possible doubt to a jury unless they were 12

13  witnesses who saw it themselves.  Do you think it's possible

14  for something to be proven to you to 100 percent certainty?

15       A.   Yes.

16       Q.   And in a case where the State is seeking the death

17  penalty -- in a capital murder case where we're seeking the

18  death penalty, that burden of proof is still just beyond a

19  reasonable doubt.  It's not beyond all possible doubt.  Do you

20  understand that?

21       A.   Yes, ma'am.

22       Q.   Do you think that you would hold us to that higher

23  standard of beyond all possible doubt before you could convict

24  somebody of capital murder?

25       A.   Yes.
```

```
 1       Q.    Would you -- as a juror, would you require us to

 2  prove it to you beyond all possible doubt?

 3       A.    Yes.  I mean, if you have the evidence, it's going

 4  to show that.

 5       Q.    Tell me just a little bit about the -- the two times

 6  that you were convicted of DWI, did you plead guilty in those

 7  cases or did you have a trial?

 8       A.    No contest.

 9       Q.    Do you believe that you were treated fairly?

10       A.    I imagine.

11       Q.    We asked you -- if you'll turn to page 5 on your

12  questionnaire.  We asked you on Question Number 32 if you

13  believe police officers are more likely to tell the truth than

14  the average person, and you said no.  It depends on how they

15  see things.  Tell me -- tell me what you meant there.

16       A.    I imagine in the -- what they think is -- well, I

17  imagine they maybe would tell the truth, but then sometimes

18  they -- you know, they can tell another story to it, too.

19       Q.    Okay.  Would you agree that police officers are just

20  like other human beings, there are some that are going to be

21  truthful and some that might not be.  They could be mistaken?

22       A.    Yes.

23       Q.    Just like any other witness, for instance?

24       A.    Yes.

25       Q.    Okay.  There are some basic principles that apply in
```

```
 1  any criminal case, including a capital murder case, where the
 2  State is seeking the death penalty.  And we talked about one
 3  already, and that is that the State has to prove the case
 4  beyond a reasonable doubt.  You've told us that you would
 5  require -- I think that you would require us to prove it to you
 6  beyond all possible doubt before you could convict somebody.
 7  Because you know that their life is on the line; is that a fair
 8  statement?
 9       A.    Yes.
10       Q.    And if we didn't prove to you beyond all possible
11  doubt, you wouldn't find somebody guilty; is that -- is that
12  what you're saying?
13       A.    No.
14       Q.    Tell me what you're saying.
15       A.    I mean, if there's a -- if you have the evidence,
16  most of the time you'd have the evidence that would support
17  that above -- I mean, a reasonable doubt, you know -- you know
18  what I'm saying?  Like if you have the -- if there's not
19  another person that -- I mean, you have the evidence that
20  supports this person here.
21       Q.    You know the -- that the State has the burden to
22  prove somebody guilty, right?  The Defendant doesn't have to
23  prove he's not guilty.
24       A.    Yes.
25       Q.    And -- and when somebody is charged with a crime,
```

120

1   even capital murder and even in a case where the State is

2   seeking the death penalty, the person is presumed innocent

3   until the evidence is presented.

4        A.   Yes.

5        Q.   Do you believe that there are some cases where the

6   State doesn't have enough evidence to prove somebody guilty, or

7   do you think we always have the evidence?

8        A.   I would hope or imagine that you would have the

9   evidence.

10       Q.   Some people tell us that if a person has gotten this

11  far into the process where that they're charged and indicted

12  for capital murder and where the State is seeking the death

13  penalty, that, you know, that where there's smoke, there's

14  fire, they must be guilty of something.  What do you think

15  about that?

16       A.   Could you repeat that again?

17       Q.   Some people think if a person is sitting in the

18  courtroom now, charged with capital murder, and the State is

19  seeking the death penalty, that they must be guilty of

20  something or they wouldn't have gotten this far.

21       A.   Yes.

22       Q.   Do you -- do you think that?

23       A.   Yes.

24       Q.   And you understand that a person is presumed

25  innocent?

1      A.    Yes.

2      Q.    Okay.

3             MS. MOSELEY:  Judge, can we have just a real

4    quick recess?

5             THE COURT:  Sure.

6             We're going to ask you to step right out that

7    door again, Mr. Redic.

8             (Venireperson excused from courtroom.)

9             MS. MOSELEY:  Judge, I believe that the State

10   and the Defense have reached an agreement to excuse this juror.

11   I don't think he's really fully capable of understanding the

12   law.

13            MS. BERNHARD:  And we think that he's given

14   answers that would indicate he's not qualified.

15            THE COURT:  All right.  Juror 1421A is excused.

16            (Venireperson 1421A, Dexter Redic, excused.)

17            (Venireperson returned to courtroom.)

18            THE COURT:  Mr. Redic, thank you very much for

19   your time.  You are excused.

20            VENIREPERSON:  Okay.  Thank you.

21            THE COURT:  Thank you.

22            MS. MOSELEY:  And you won't get called again.

23            THE COURT:  No, that's the end.

24            MS. JONES:  Thank you.

25            MS. MOSELEY:  We really mean it this time.

```
 1                    (Venireperson excused from courtroom.)

 2                    (Venireperson brought into courtroom.)

 3                    THE COURT:  Mr. Zamora.

 4                    VENIREPERSON:  Yes, ma'am.

 5                    THE COURT:  How are you?

 6                    Please be seated.

 7                    Mr. Zamora, I'm sorry for the inconvenience

 8   we've caused you by having you wait around all day.  There are

 9   some things that we just couldn't help, but I apologize and I

10   appreciate you waiting, and I appreciate your presence here

11   today.  Thank you very much.

12                    VENIREPERSON:  No problem.

13                    THE COURT:  Do you remember the oath that you

14   were given --

15                    VENIREPERSON:  Uh-huh.

16                    THE COURT:  -- back in June?  You are still

17   operating under that oath and those instructions, and you will

18   continue to do that until you're discharged from service in

19   this case.

20                    We're going to try this case October the 28th

21   and November the 4th.  Those are two consecutive weeks.  And we

22   think it will probably take most of those two weeks to try this

23   case.  Has anything happened since June that would prevent you

24   from sitting as a juror during those two weeks this fall?

25                    VENIREPERSON:  No, not that I can think of right
```

```
 1   now.
 2              THE COURT:  Okay.  Have you learned anything
 3   about the specific facts of this case that you hadn't known
 4   before?
 5              VENIREPERSON:  Huh-uh.
 6              THE COURT:  I'm going to give each side 45
 7   minutes to talk to you.  And when they're finished, then we're
 8   going to ask you to step out in the hall and they'll make --
 9   they'll talk to me about whether you've been qualified as a
10   juror.  And if you have, then we'll get a photograph of you so
11   that the lawyers can put a name to a face when they're going
12   over their lists later on, and we will be contacting you on
13   October 15th or the 16th to let you know one way or the other
14   whether you will or will not be a juror in this case.  Is that
15   acceptable to you?
16              VENIREPERSON:  Uh-huh.
17              THE COURT:  Have you had an opportunity to
18   review the pamphlet and the questionnaire?
19              VENIREPERSON:  Yes.
20              THE COURT:  All right.  Let me introduce you to
21   the parties.
22              The State's table is Andrea Moseley.
23              MS. MOSELEY:  Good afternoon.
24              THE COURT:  Rocky Jones.
25              MS. JONES:  Good afternoon.
```

124

```
 1                    THE COURT:  And at the Defense table is Kenneth
 2  Weatherspoon.
 3                    MR. WEATHERSPOON:  Good afternoon.
 4                    THE COURT:  Catherine Bernhard.
 5                    MS. BERNHARD:  Good afternoon.
 6                    THE COURT:  Nancy Mulder.
 7                    MS. MULDER:  Good afternoon.
 8                    VENIREPERSON:  Good afternoon.
 9                    THE COURT:  And the citizen accused, Mr. Matthew
10  Johnson.
11                    Between you and I is Ms. Darline LaBar.  She's
12  the official court reporter, and she's taking down everything
13  that's being said, so as a courtesy to her, if you will answer
14  audibly yes or no, instead of nodding or shaking your head or
15  saying uh-huh or huh-uh.
16                    VENIREPERSON:  Okay.
17                    THE COURT:  We all forget to do that, and the
18  lawyers will remind you.
19                    VENIREPERSON:  All right.
20                    THE COURT:  My name is Tracy Holmes.  I'm the
21  presiding judge in this court, and I will be the presiding
22  judge for the trial.
23                    VENIREPERSON:  Okay.
24                    THE COURT:  Do you have any questions of me?
25                    VENIREPERSON:  No, ma'am.
```

```
 1                    THE COURT:  All right.  Thank you.

 2              Ms. Moseley.

 3              MS. MOSELEY:  Thank you, Judge.

 4                    JOE ZAMORA,

 5  was called as a venireperson by the parties, and after having

 6  been first duly sworn, testified as follows:

 7              STATE VOIR DIRE EXAMINATION

 8  BY MS. MOSELEY:

 9      Q.   Good afternoon.  And I want to repeat the Judge's

10  appreciation for you coming back.  I know we told you to be

11  here this morning and then we told you to come back, so I

12  apologize for that and I appreciate your patience.  Hopefully

13  we'll get through this pretty quick this afternoon, so you can

14  get out of here and get back to your day.

15              Have you ever been on a jury before?

16      A.   I have not.

17      Q.   Okay.

18      A.   This is my first time.

19      Q.   So you've -- you've been called, as we would say, to

20  the big leagues now, right?

21      A.   Yes.

22      Q.   Your first time, and I can tell from reading your

23  questionnaire that you're little nervous maybe about some of

24  the issues that are involved.

25      A.   Yeah.
```

126

1      Q.    Let me tell you right up front why you're here today

2  for an individual interview, basically.  Unfortunately, there's

3  no job or big paycheck at the end of the interview.

4      A.    Uh-huh.

5      Q.    But it is really your opportunity as a citizen to

6  come in and tell us how you feel about the laws that may apply

7  in a case like this, how you feel about the possibility of

8  serving on a jury where the end result may be someone's

9  execution.  We know that jurors and that citizens in general

10  have varying views about the death penalty.  You've probably --

11  I know you studied criminal justice, so you've probably seen

12  widely varying points of view as it relates to the death

13  penalty in that background; is that fair?

14      A.    Uh-huh, yes, ma'am.

15      Q.    So we have some jurors who feel so strongly in favor

16  of the death penalty, that they basically say, you know, you

17  show me somebody intentionally killed someone and I'm always

18  going to vote for the death penalty.  Those people wouldn't

19  really be able to follow the law and be fair to both sides so

20  they would be excused from service.

21          We also have people on the other end of the

22  spectrum that say because of their personal experiences or

23  their moral beliefs or their religious beliefs, the death

24  penalty just isn't something -- isn't a process that they could

25  participate in, in good conscience, without violating their

1    principles.  And they're also going to be excused from service.

2                    The State of Texas -- you know, we often have a

3    feeling that we need to be able to follow the laws.  I've got

4    to stop at red lights even when I'm in a hurry.  I'm supposed

5    to drive 60 when I'm going someplace because that's the law.

6    There's an implication that we should be able to follow the

7    laws, but we recognize that this may be one of those laws that

8    not everybody can follow.  And there's nothing wrong with that.

9    That's why we take the time to bring each individual juror in

10   and talk to you individually because in the end, it's going to

11   be your answers and your decision that could cause you to be

12   over here sitting and hearing the case.  And in the end five,

13   six, 10, 20 years down the road, having to live with the

14   decision that you made.

15          A.    Uh-huh.

16          Q.    And -- and so now is really your opportunity to tell

17   us if you feel like your feelings are so strong one way or the

18   other that you're not going to be able to participate in the

19   process.  Does that make sense?

20          A.    Yes, it does.

21          Q.    So we'll talk first about what this means.  And the

22   death penalty is only a possible punishment -- it's never

23   automatic -- it's only a possible punishment for capital murder

24   cases.  And capital murder, there's lots of ways to commit

25   capital murder.  Killing a police officer in the line of duty

1    is one way.  Killing a child younger than 10.  Killing two or

2    more people in the same criminal transaction, serial killer, or

3    mass murderer.

4              The way that we're going to focus on is the

5    intentional killing of a person in the course of committing or

6    attempting to commit a robbery.  That's the allegation of this

7    case.  So that's what we're going to limit it to, but it's only

8    in capital murder cases is the death penalty even an option.

9    So if it's not capital murder, that's not an issue you'll ever

10   have to deal with.

11             But I will tell you that in this case, Craig

12   Watkins, the elected District Attorney in Dallas County, my

13   boss, has made the decision that we are seeking the death

14   penalty against Matthew Lee Johnson, that man that was just

15   introduced to you a few minutes ago.

16        A.    Uh-huh.

17        Q.    I tell you that because, you know, sometimes when

18   we're sitting at home or when we're studying criminal justice

19   or, you know, thinking about law enforcement as a career

20   choice, it's maybe easier to say, you know, I saw this story

21   about some crime on TV and it was so horrific and that guy

22   deserves the death penalty, I could do that.  But then you're

23   sitting in your living room, you know, in your comfortable

24   chair making that decision.  It's sometimes a lot different

25   when we bring you into the courtroom and you realize that it's

1   a real human being who has family that care about him just like

2   you do.  And we're talking about a real human being in this

3   case.

4          And if you're on this jury, the State of Texas

5   believes that we have the kind of evidence that's going to

6   convince the jury to convict Matthew Johnson of capital murder,

7   and we also believe going into the punishment phase that we

8   have the quality and quantity and type of evidence that's going

9   to lead those 12 jurors to unanimously agree that he will more

10  likely than not commit criminal acts of violence in the future

11  that will constitute a continuing threat to society and answer

12  that Special Issue Number 1 yes.

13         We also believe that the jury, considering all

14  of the evidence, will answer Special Issue Number 2 no.  And

15  when they do that, the judge is left with no option but to

16  basically sign a warrant for his execution.  And that some day,

17  if you're on this jury, you may be sitting at home in your

18  living room and not see some hypothetical case or some news

19  story come across about something, you're going to see the news

20  story come across that Matthew Lee Johnson's execution date has

21  arrived.  And you'll know that he's being taken to Huntsville,

22  he'll be strapped to a gurney and he'll receive lethal

23  injection until he's pronounced dead.  And you'll know that you

24  played a part in that process because you were one of the 12

25  jurors who made that decision and but for your answers to those

```
 1   special issues, that wouldn't be happening.  And I'm not

 2   telling you all of that to scare you or be morbid or gruesome,

 3   but really just to tell you how -- how serious and how real the

 4   process is.

 5               Do you feel like you could participate in that

 6   process without doing violence to your conscience?

 7        A.    Yes, I can.

 8        Q.    When you told us on page 18 of your questionnaire

 9   that you weren't sure if you could condemn a man to death, you

10   told us that on Question Number 137 and Question Number 138,

11   have you had some time to think about that and now you feel

12   like you could?  Or tell me where you're coming from there.

13        A.    Well, I mean, I would say it's something very

14   serious, taking about a man's life here.  To this day, I'm not

15   really sure if I could condemn a man to death or not.  I don't

16   know if I'll ever be able to say yes or no to that question.

17        Q.    Well, you recognize how this question and your

18   answer to it plays directly into the scenario I just laid out

19   for you.

20        A.    Uh-huh.

21        Q.    Because if you're a juror on this case, we're going

22   to need -- and you're going to take an oath --

23        A.    Right.

24        Q.    -- to follow the law and to answer the questions to

25   these special issues based on the evidence and based on the
```

```
 1    law.  And -- and I -- I -- you've told me you have some
 2    hesitation in whether you'd be able to do that --
 3         A.   Uh-huh.
 4         Q.   -- if the end result would be his execution.  And I
 5    hate to put you on the spot, but I -- I do it not for my sake
 6    so much as for yours.
 7         A.   Uh-huh.
 8         Q.   Because once you take that oath, it will be too late
 9    to have any hesitation about whether you could do the job.
10         A.   Exactly.
11         Q.   Do you -- do you -- can you promise us today that
12    you would answer these questions based on the evidence and
13    based on the law and not because you're concerned about living
14    with the decision if it results in an execution or a death
15    sentence?
16         A.   I would say after having all the facts and all the
17    evidence applied and knowing pretty much every detail that
18    happened, maybe after that I probably would be able to say yes
19    or no, depending on the facts, my opinion, and everything would
20    come into consideration.
21         Q.   Okay.  Okay.  Well, I tell you what, we're going to
22    spend some time talking about the process and how we get to
23    these answers and some of the evidence that may be presented,
24    and then we may address it at the end.  Because, again, I want
25    you to realize that today's your only opportunity really --
```

1          A.    Uh-huh.

2          Q.    -- and I hate to say to get out of this, but for

3    somebody who is concerned about whether they could make this

4    decision, today is your last opportunity to get out of this and

5    not be put in that position because nobody in this courtroom is

6    going to force you to take a seat in a jury where the death

7    penalty may be the result, if it's going to offend your

8    conscience, if you're going to have problems living with it.

9    Does that make sense?

10         A.    Yes, it does.

11         Q.    Okay.  We'll go back then.  We -- we started with

12   the end of your questionnaire.  Let's go to the very first

13   page.

14         A.    Okay.

15         Q.    We asked you if you're in favor of the death

16   penalty.  And you said, yes, I'm in favor when the Defendant

17   shows no remorse for the crime committed.  Then on the second

18   question, you said -- you circled Number 3, which is, although

19   I do not believe the death penalty should ever be imposed.  And

20   I'm a little confused --

21         A.    Uh-huh.

22         Q.    -- because on Question 1 you said you are in favor

23   and in Question 2, you basically said, you don't think we

24   should ever impose it.  Can you reconcile those two for me?

25         A.    Okay.  I see what you're talking about.  On that

133

 1  second question, I was going to answer Number 2.  I don't know

 2  why I circled 3.

 3       Q.    Okay.

 4       A.    Yeah.

 5       Q.    So you -- you do believe it's appropriate in some

 6  murder cases and you could assess the death penalty if you --

 7  if you -- if the evidence led you there?

 8       A.    Right.

 9       Q.    Okay.  Let's talk about some basic principles, and

10  if you've studied criminal justice, this isn't going to be new

11  to you so I'll go through it pretty quick.  A person who is

12  accused of a crime has a presumption of innocence.  That means

13  as Matthew Johnson sits in the courtroom today, he's presumed

14  to be innocent of these charges.  All we have is an indictment

15  which is just an allegation by the State of some offense.  But

16  before we bring the proof and prove the case, he's presumed

17  innocent.  Do you agree with the law?

18       A.    Yes.

19       Q.    And can you give him that presumption of innocence

20  as he sits here today?

21       A.    Yes, I can.

22       Q.    You know that the State brings the charges, the

23  State has to prove the case.  The burden of proof is always on

24  the State of Texas.  What that means is that the Defense

25  attorneys and the Defendant never have any responsibility in

1    the evidence at all.  They don't have to contest the evidence.

2    They don't have to bring any evidence.  They certainly never

3    have to prove he's innocent of the crime.  Do you understand

4    that?

5        A.    Yes, ma'am.

6        Q.    And our burden of proof in a criminal case and any

7    criminal case, whether it's theft of a bicycle down in the

8    misdemeanor courts, all the way up to capital murder where the

9    death penalty is on the line, is always beyond a reasonable

10   doubt.  We don't have a definition of what beyond a reasonable

11   doubt is, but we do know that it's not beyond all possible

12   doubt.  So I never have to prove beyond all possible doubt or

13   to 100 percent certainty that someone is guilty, but my job is

14   to exclude all reasonable doubt about the person's guilt.  How

15   do you feel about that?  Do you think that's right, that's

16   appropriate?

17       A.    Yes, I think it is.

18       Q.    When we're talking about the death penalty, do you

19   think that that burden should be higher?  Do you think that I

20   should have to prove somebody guilty beyond all possible doubt?

21       A.    Well, I do think there should be no doubt left when

22   talking about the death penalty, a hundred percent sure.

23       Q.    Okay.  And I want to make sure that we're real clear

24   about it because I've told you that our burden is beyond a

25   reasonable doubt.

 1        A.    Uh-huh.

 2        Q.    And I've asked you if you think it should be higher,

 3   and there's nothing wrong with your answer that you feel it

 4   should be higher.  But we often say that I couldn't prove

 5   anything to you, Mr. Zamora, to 100 percent certainty unless

 6   you saw it happen with your own eyes, unless you were a

 7   witness.

 8        A.    Right.

 9        Q.    Which is why the burden of proof is beyond a

10   reasonable doubt.

11        A.    Okay.

12        Q.    An easy example would be, you know, if a juror heard

13   all of the evidence, the jury was back in the jury room.  There

14   was 12 jurors there, and one of them said, you know, I think --

15   I think maybe he has an identical twin who did it, and there

16   was no evidence of any identical twin even existing.  That

17   would be an unreasonable doubt.  Can you see that?

18        A.    Uh-huh.

19              THE COURT:  You have to say yes or no.

20        A.    I'm sorry.  Yes, I understand.

21        Q.    (BY MS. MOSELEY)  So we're not talking about the

22   State's burden being beyond all possible doubt because frankly,

23   that's a burden we don't think we could ever meet in any case.

24   But some jurors do tell us that when we're talking about a

25   human life, we're talking about an execution potentially, I'm

```
 1   going to require the State to prove it to me beyond all doubt.

 2   Do you feel that way?

 3          A.    Yes, ma'am.

 4          Q.    Okay.  Even though you understand our burden -- that

 5   would be raising our burden?

 6          A.    Yes.

 7          Q.    Okay.  As it relates to the presumption of innocence

 8   and the burden of proof being on the State of Texas, a

 9   defendant has a Fifth Amendment right not to testify.  You've

10   heard that?

11          A.    Uh-huh.

12          Q.    Either on TV or in your studies?

13          A.    Yes.

14          Q.    That right follows through the entire trial process.

15   In other words, a defendant can never be called to the stand by

16   the State of Texas.  I can't say, the State now calls the

17   Defendant to testify.  His own lawyers or mother can't make him

18   testify.  It's always the person's choice and their own

19   decision to make.  If a Defendant chooses not to testify, the

20   jury would be instructed by the judge that they can't consider

21   his silence for any reason at all, can't even talk about the

22   fact that he didn't testify.  The jury would be instructed to

23   just look at the evidence they did hear and base their verdict

24   on that.  Does that sound fair to you?

25          A.    It does.
```

```
 1        Q.   That right to remain silent is present in the

 2   guilt/innocence phase of the trial where we're deciding --

 3   where the jury would be looking at whether the person is guilty

 4   or not guilty of the crime.  It also applies in the punishment

 5   phase of the trial.  So a defendant is never going to be forced

 6   to get on the stand and -- and beg for mercy or say they're

 7   sorry or convince the jury that they should -- that they should

 8   give them a life sentence, spare their life.  They're never

 9   going to be required to get on the stand.  You understand that?

10        A.   Yes, ma'am.

11        Q.   Some -- and, in fact, in a number of places in your

12   questionnaire, I see things like on the very first page, if the

13   Defendant shows no remorse for the crime, that would be

14   important to you.  On page 2, Question Number 7, we ask you the

15   best argument for the death penalty -- is if the criminal shows

16   no remorse or regret.  On page 3, you said in Question Number

17   18, if the person is truly not regretful of the crime

18   committed.  It seems to me that kind of an going theme here is

19   that you're concerned about whether the person is regretful,

20   remorseful, sorry about what they did; is that fair?

21        A.   Uh-huh, yes.

22        Q.   And you understand that that may never be

23   information that you have as a juror?

24        A.   Yes, I do.

25        Q.   Because if a person exercises their Fifth Amendment
```

1  privilege not to testify, nobody else could bring that forward,

2  right?

3       A.   Right.

4       Q.   If I'm on trial and I choose not to testify, my

5  lawyers can't call my mom to get on the stand and say, she's

6  really sorry and she'll never do it again because that would be

7  hearsay.  Only -- it can only come from the person.  How do you

8  feel about that, in making these decisions when it's obvious to

9  me that that issue of remorse and regret is so important to

10  you?

11       A.   Well, you -- you make -- you make a lot of sense

12  there.  I mean, there's no way I would really know if he's

13  regretful or not in court.  I didn't really think about that.

14  I mean, it's pretty tough.

15       Q.   Do you feel like in order to make a decision about

16  whether somebody is going to be a continuing threat to society,

17  you would need to hear that kind of information?

18       A.   Right.  Correct.

19       Q.   You feel like you would need to hear that?

20       A.   Yes.

21       Q.   And in Special Issue Number 2 when we're talking

22  about the personal moral culpability of the Defendant, or --

23  and whether there is any sufficient mitigating circumstance, do

24  you feel like you would need to hear from the Defendant himself

25  to answer those questions?

1      A.    I think I would.

2      Q.    And, again, you know, there's no right or wrong

3  answer to any of this.  Obviously, we ask you these questions

4  on the questionnaire and it's kind of in a vacuum.  You're not

5  really given a lot of time to think about it, and you're not

6  really realizing the practical impact of how the trial works.

7  And a lot of people tell us, you know, listen, I'm going to

8  have to hear from the Defendant to know whether the life

9  sentence is a proper sentence or the death sentence is a proper

10 sentence.  I understand he doesn't have to testify, but in

11 order for me to answer these questions, I'm going to have to

12 hear from him.  Is that what you're saying?

13     A.    Yeah, it's pretty much how I feel.

14     Q.    Okay.  Along those lines, let me just ask you this

15 question.  Let's say that a defendant chooses to testify.  They

16 do decide to take the stand.  If somebody were to take the

17 stand and say they were really sorry, how do you know if that's

18 sincere or not or if they're just saying it because they think

19 that's what the jury wants to hear?  How do you know if

20 somebody is just talking the talk?

21     A.    I would estimate from body language or like the look

22 in their eyes or the tone in their voice, you might be able to

23 tell if they're being sincere or not.

24     Q.    Do you think some people can be pretty convincing,

25 manipulative?

140

```
 1        A.    Like a good actor, yeah, I think so.

 2        Q.    So even if somebody says they're really sorry, it

 3  may be difficult to know; is that a fair statement?

 4        A.    It's fair, yes.

 5        Q.    But in the end, as we're talking about the

 6  punishment issues -- and I know we've jumped ahead a little

 7  bit, but we're talking about proving whether somebody is going

 8  to commit criminal acts of violence in the future, to you, the

 9  answer to that question lies in whether they're sorry for what

10  they've done in the past.

11        A.    I would say it depends on what they did in the past.

12  It depends on the crimes they committed.

13        Q.    Okay.  If a defendant chooses not to testify and you

14  are on the jury -- let's -- hypothetical case.  You're on the

15  jury.  Defendant chooses not to testify.  You never hear from

16  them in the first part of the trial or in the second -- the

17  punishment phase of the trial --

18        A.    Uh-huh.

19        Q.    -- so you don't have any information about remorse

20  or regret.  Can you answer those questions without that

21  information?

22        A.    I think I would be able to.

23        Q.    A minute ago you told me that you felt like you

24  would -- you would require the Defendant to take the stand,

25  that you were going to -- you understood that he didn't have
```

```
 1   to, but that for you, you'd have to hear from him.  Do you

 2   still feel that way?

 3        A.    Well, I feel more like 50 and 50.  I would say it

 4   just depends on the background of the Defendant, past history,

 5   past crimes committed.  Seems like if there's a pattern, like

 6   if he'll keep doing -- breaking the law or doing those types of

 7   crimes.

 8        Q.    Okay.  Well, then let's -- we'll get even more

 9   specific about how the punishment phase works.  The first part

10   of the trial, I have to prove that the person is guilty of

11   intentionally causing somebody's death.  That means that it was

12   their conscious objective or desire to cause the result.  Not

13   an accident.  Not a mistake.  You know, let's say I'm -- I

14   break into somebody's house and the homeowner comes home and is

15   trying to chase me down and I shoot him in the foot to keep him

16   from chasing me -- just to stop him from chasing me and then

17   they die.  I may be guilty of murder because I caused the

18   person's death, if they bled to death from the gunshot wound,

19   but it probably isn't an intentional murder.  Can you see why?

20        A.    Uh-huh.  Yes.

21        Q.    Tell me why.

22        A.    Because you just intended to slow the person down

23   and not to kill them.

24        Q.    Right.  So I have to prove for capital murder that

25   it was the person's intent to cause the death.  Now, for
```

1    intent, you would agree that that's kind of looking inside

2    what's going on in somebody's mind which may not be directly

3    possible.  Would you agree?

4         A.    Yes.

5         Q.    How do you decide what somebody's intent is, if you

6    don't hear from the person and we don't have a mind reader?

7         A.    Based on the evidence.

8         Q.    Just the circumstances of the crime, maybe what

9    happened before, during, and even after the crime -- how

10   somebody reacts afterward --

11        A.    Exactly.

12        Q.    -- might help you figure out what they meant to do?

13        A.    Yes.

14        Q.    But I have to prove that it was an intentional

15   crime, so we're not going to be talking about mental

16   retardation.  A person who's mentally retarded may be guilty of

17   capital murder, but they're never going to be subject to the

18   death penalty.  A person who is insane because of a severe

19   mental disease or defect, didn't know what they were doing was

20   right or wrong, they would not be guilty of capital murder at

21   all.  So we're talking about somebody who intended to cause the

22   person's death and did so during the course of committing or

23   attempting to commit robbery, okay?

24        A.    Okay.

25        Q.    If the jury finds beyond a reasonable doubt -- not

```
 1  beyond all doubt, but beyond a reasonable doubt, the person is
 2  guilty of the crime, then we would move into the punishment
 3  phase.  And in the punishment phase you get to hear all sorts
 4  of other evidence that you didn't hear in the first part of the
 5  trial, like the person's background, the things you're talking
 6  about, a history or a pattern of behavior, if they have a
 7  criminal record or not, how they were raised, maybe their
 8  educational background, maybe mental health issues, if any.
 9  Maybe you hear about drug or alcohol use or addiction or not.
10  All of those things are things that come into evidence in the
11  punishment phase of the trial.  But you wouldn't hear about any
12  of that in the first part of the trial.
13            You see the separation of the two parts?
14       A.   Yes.
15       Q.   The first question that the jury is going to be
16  asked after hearing all of the evidence in the punishment phase
17  is that Special Issue Number 1.  So you listen to everything
18  that's presented, and then the jury will go back and start with
19  Special Issue 1.  I have the burden to prove, again beyond a
20  reasonable doubt, that it is more likely than not -- that's
21  what probability means here -- that it's more likely than not
22  that the Defendant would commit criminal acts of violence that
23  would constitute a continuing threat to society.  There's only
24  two punishments for capital murder, life without parole or the
25  death sentence.  What society do you think the Defendant is
```

1   going to find himself in once convicted of capital murder?

2         A.    Society?  I would say inmates.

3         Q.    Prison, right?

4         A.    Prison, uh-huh.

5         Q.    Have you ever been to a prison?

6         A.    No, I haven't.

7         Q.    But you know we have other inmates, obviously, and

8   they all live amongst each other and work sometimes and go to

9   lunch and eat together and go to school and church and all of

10  the other things.  It's kind of a society of its own.  But we

11  also have guards and preachers and teachers, visitors coming in

12  to visit loved ones and all of those people while they're there

13  are part of that society.  Do you think those people, inmates

14  and other people in the prison, deserve protection from someone

15  who would commit criminal acts of violence?

16        A.    Yes.

17        Q.    Do you think it's possible for somebody in prison to

18  commit criminal acts of violence that would constitute a

19  threat?

20        A.    Yes.

21        Q.    You can see then that Special Issue Number 1 is

22  asking you to kind of look forward into the future about what

23  someone is more likely than not going to do in the future.  And

24  again, we don't have a crystal ball or a clairvoyant to come in

25  and tell us, I can see 20 years down the road, and here's

1  what's going to happen.  How do you answer that question?  Do

2  you think it's possible to answer that?

3       A.    After knowing his background and patterns, I would

4  say yes.

5       Q.    Do you believe that that's something that the State

6  can prove beyond a reasonable doubt?

7       A.    Yes, I believe so.

8       Q.    If the State proves that beyond a reasonable doubt,

9  the jury has to answer it yes.  And you realize that once the

10 jury answers that question yes, we're that one step closer to

11 the death sentence, right?

12      A.    Yes.

13      Q.    And Special Issue Number 2 then would be the jurors'

14 next question.  They -- basically the law is going to require

15 them in Special Issue Number 2 to go back and look at all the

16 evidence again, look at the Defendant's character and

17 background, the circumstances of the offense, how heinous is

18 the crime, was there a relationship between the victim and the

19 Defendant, all the circumstances of the offense, and the

20 personal moral culpability of the Defendant, again, if that's

21 in evidence.  If it isn't because he chose not to testify, then

22 you just don't have that in front of you.  But you look at all

23 of that and ask yourself was there something in the evidence

24 that was sufficiently mitigating, that I believe a life

25 sentence is really the more proper sentence.  That's what that

1    Special Issue 2 asks you to do.

2              And nobody is going to tell you what is or isn't

3    mitigating, but mitigating means anything that would lessen the

4    person's moral blameworthiness for the crime.  And, again, you

5    know, we've talked about remorse and regret.  You may or may

6    not have that evidence.  You understand that?

7         A.   Yes.

8         Q.   And if you do have it, it may not be sincere.  Would

9    you agree?

10        A.   Yes.

11        Q.   Just because somebody takes the stand doesn't mean

12   they're always going to be believable, right?

13        A.   Right.

14        Q.   A person -- because they choose to give up their

15   Fifth Amendment privilege and testify, doesn't mean they get a

16   leg up or they get more credibility because of that, right?

17        A.   Right.

18        Q.   You still have to judge their credibility and decide

19   whether you can trust what they're telling you.  But Special

20   Issue 2 requires a jury to look at everything one last time.

21   And if there's something in the evidence that tells you the

22   life sentence is more proper, this is the way that you would

23   assess the life sentence by answering that yes.  However, just

24   because something may be mitigating -- for example, some jurors

25   tell us that childhood abuse or neglect could be mitigating.

147

```
 1   That may be something that would lessen the moral
 2   blameworthiness of the person.  Some people say maybe drug or
 3   alcohol use or addiction might lessen the moral
 4   blameworthiness.  Others may say, I don't find that mitigating,
 5   I don't find that to lessen it, I think it makes it worse,
 6   because they made that choice to get themselves in that
 7   situation.  So each person can disagree about what is
 8   mitigating or not.  But you look inside yourself and if there's
 9   something that's mitigating, you then have to ask yourself is
10   it sufficiently mitigating.  Because would you agree that by
11   the time we get to Special Issue Number 2, we're talking about
12   a pretty bad guy?
13        A.    Yes.
14        Q.    We're talking about somebody that's guilty of an
15   intentional murder in the course of a robbery and somebody that
16   you believe more likely than not will be a danger in the
17   future, will constitute a continuing threat.  So when you get
18   to Special Issue Number 2, it's going to have to be something
19   pretty mitigating to warrant sending him to prison where you
20   believe he's going to pose those people a threat.  Can you see
21   that?
22        A.    Yes.
23        Q.    And how do you feel about that?  Do you think
24   Special Issue Number 2 is important?
25        A.    I do.
```

1    Q.    Tell me why.

2    A.    Because maybe after having all the evidence and all

3    the facts and all the background, the patterns, maybe it will

4    prove that he won't be a danger to society and he would be able

5    to have life without parole.

6    Q.    Well, I want to make sure that -- that you're clear

7    on exactly how the process works because you hear all the

8    evidence at one time.  All the evidence gets presented to the

9    jury, both sides get an opportunity to argue, make closing

10    arguments to the jury about their beliefs what the evidence

11    showed, then the jury goes back and the first question they

12    answer is Special Issue 1.  They've heard everything.

13    A.    Uh-huh.

14    Q.    And if you answer that yes, we -- then you're

15    convinced beyond a reasonable doubt that he is going to be a

16    threat in the future.  And you don't even talk about Special

17    Issue Number 2 until you've decided he is going to be a threat

18    in the future.

19    A.    Okay.

20    Q.    So when we get to Special Issue Number 2, we're

21    talking about somebody you've already decided will be more

22    likely than not a continuing threat to society.  And now the

23    question is different.  And, again, I don't have a burden or

24    proof anymore.  I don't have to prove that there's something

25    mitigating or that there's not anything mitigating.  That's up

1  to the jury to decide.  But you've already decided he is going

2  to be a threat in the future.  Can you see that Special Issue

3  Number 2 is saying despite that, despite the fact that you

4  believe he's going to be a threat --

5      A.    Oh, okay.

6      Q.    -- is there something in the evidence that is

7  sufficiently mitigating to warrant sending him to prison anyway

8  instead of the death sentence?  Does that make sense?

9      A.    It makes sense.

10     Q.    Do you believe that there's ever going to be

11 anything sufficiently mitigating to send somebody to prison

12 when more likely than not they're going to be a threat there?

13     A.    No.

14     Q.    If you believed that the person is going to be more

15 likely than not a continuing threat, then your answer to

16 Special Issue Number 2 is no, there's never anything

17 sufficiently mitigating, the death sentence is appropriate

18 then?

19     A.    Yes.

20     Q.    Strictly because you answered Special Issue Number 1

21 yes?

22     A.    Exactly.

23             MS. MOSELEY:  Thank you.

24             THE COURT:  All right.  We're going to take a

25 short recess, Mr. Zamora.  If you wouldn't mind stepping out

1    that door right there.

2                    (Venireperson excused from courtroom.)

3                    MS. MOSELEY:  Judge, based on Mr. -- Joe Zamora,

4    Juror 1425A's answers as it relates to the burden of proof, as

5    well as the Fifth Amendment, and now the mitigation issue, I

6    would challenge this juror.

7                    (Venireperson challenged by the State.)

8                    MS. BERNHARD:  And we would agree that he has

9    answered the questions in a way that would make him not

10   qualified.

11                   THE COURT:  All right.  Mr. Zamora is excused by

12   agreement.

13                   (Venireperson returned to courtroom.)

14                   THE COURT:  Mr. Zamora, thank you very much,

15   sir.  You're excused.

16                   (Venireperson 1424A, Joe Zamora, excused.)

17                   THE BAILIFF:  All rise.

18                   (Venireperson brought into courtroom.)

19                   THE COURT:  Please be seated.

20                   Good afternoon, ma'am.

21                   VENIREPERSON:  Hello.

22                   THE COURT:  I'm not calling you by name, because

23   there's some confusion what your last name is.  If you would

24   clarify what your legal name is for the record and what name

25   you prefer to go by for this portion of our -- of our trial.

```
 1                    VENIREPERSON:  Carolina Aviles.

 2                    THE COURT:  Okay.  That's your legal name?

 3                    VENIREPERSON:  Yes, ma'am.

 4                    THE COURT:  And that's the name that you prefer

 5   to be called during this section of our trial?

 6                    VENIREPERSON:  Yes, ma'am.

 7                    THE COURT:  All right, Ms. Aviles.

 8                    Do you remember the oath that you were given

 9   when you came down in June?

10                    VENIREPERSON:  I do.

11                    THE COURT:  All right.  Well, you're still

12   operating under that oath and all of the instructions that you

13   were also given then, and you'll be continuing to operate under

14   that oath until you are discharged from jury service in this

15   case.

16                    We're going to try the case the week of October

17   the 28th and the following week, November the 4th.  Has

18   anything happened from June until now that would prevent you

19   from sitting as a juror during those two weeks?

20                    VENIREPERSON:  No.

21                    THE COURT:  Have you heard anything about the

22   specific facts of this case that you didn't know before now?

23                    VENIREPERSON:  No.

24                    THE COURT:  I'm going to introduce the parties

25   to you.  The State is represented by Ms. Andrea Moseley.
```

```
 1              MS. MOSELEY:  Good afternoon.

 2              THE COURT:  And also Rocky Jones.

 3              MS. JONES:  Good afternoon.

 4              THE COURT:  The Defense is represented by

 5   Kenneth Weatherspoon.

 6              MR. WEATHERSPOON:  Good afternoon.

 7              THE COURT:  Nancy Mulder and Catherine Bernhard

 8   are also lawyers on the case, but they're not here for this

 9   portion of your questioning.

10              The citizen accused is Mr. Matthew Johnson.

11   He's sitting to the left of Mr. Weatherspoon.

12              The lady between you and I is Ms. Darline LaBar.

13   She's the official court reporter, and it's her important

14   responsibility to take down everything that's said.  So as a

15   courtesy to her, would you please answer audibly or say yes or

16   no.  We all, just as a pattern of speech, tend to shake or nod

17   our heads or also say uh-huh and huh-uh, but we're going to try

18   to remind you not to say that because it doesn't make for a

19   clear record.

20              VENIREPERSON:  Okay.

21              THE COURT:  My name is Tracy Holmes.  I'm the

22   presiding judge of the 363rd, and I will be presiding over the

23   trial.

24              VENIREPERSON:  Okay.

25              THE COURT:  And I'm the one who administered the
```

```
 1  oath to you, if you remember that.

 2                  VENIREPERSON:  Yes, ma'am.

 3                  THE COURT:  The parties -- each side has 45

 4  minutes to ask you questions about how you feel about the death

 5  penalty, among other things.

 6                  VENIREPERSON:  Okay.

 7                  THE COURT:  And at the end of that hour and a

 8  half, we're going to ask you to step out into the hall and

 9  we'll determine whether or not you've been qualified as a

10  juror.  If so, we're going to bring you back in and take a

11  photograph of you so that when the lawyers are checking their

12  lists later on, they'll be able to put a name to a face.

13                  VENIREPERSON:  Okay.

14                  THE COURT:  And then we're going to call you

15  either on October the 15th or the 16th and let you know

16  definitely whether or not you will or will not be a juror.

17  Does that sound fair to you?

18                  VENIREPERSON:  Yes.

19                  THE COURT:  All right.  Thank you very much.

20  Have you had an opportunity to review the pamphlet and the

21  questionnaire?

22                  VENIREPERSON:  Yes.

23                  THE COURT:  Do you have any questions for me?

24                  VENIREPERSON:  No.

25                  THE COURT:  All right.  Thank you.
```

```
 1              Ms. Moseley.
 2                   CAROLINA AVILES,
 3  was called as a venireperson by the parties, and after having
 4  been first duly sworn, testified as follows:
 5                   STATE VOIR DIRE EXAMINATION
 6  BY MS. MOSELEY:
 7       Q.    Good afternoon.  Thank you for being here, and I'm
 8  sorry that you were here this morning and waiting on us and
 9  then you had to come back this afternoon.  It was really
10  unavoidable, but I appreciate your patience and you still have
11  a smile somehow about it, so I do appreciate that.
12              I want to just kind of give you a brief overview
13  about what we're doing and why we're doing this 45-minute
14  process.
15       A.    Okay.
16       Q.    I get 45 minutes and the Defense gets 45 minutes.
17  And normally we don't do it that way.  Frankly, in a normal --
18  and I say normal -- in a case -- a criminal case down here
19  where we're not talking about the death penalty, we bring 60 or
20  65 jurors in.  They fill up all these seats.  We question
21  everybody at one time.  Then that same day we pick the 12
22  jurors who are going to sit on the jury, and they may even
23  start hearing testimony that day.  Any questions that we ask
24  are asked in front of all the other jurors.
25       A.    Right.
```

1     Q.    You've been on a jury before?

2     A.    Six or seven times.

3     Q.    Oh, boy, so you know.  This is old hat.  Have you

4  ever gone through this process?

5     A.    No.

6     Q.    Okay.  So you already know that -- how vastly

7  different this is?

8     A.    Yes.

9     Q.    And I'm sure you recognize that the reason it's so

10  different is because we're talking about the death penalty.

11    A.    Yes.

12    Q.    And that there are people in the community who have

13  varying notions and ideas and -- and feelings about the death

14  penalty.

15    A.    Right.

16    Q.    We've got people in the community who believe that

17  if you commit murder, nothing else matters.  If you convince me

18  that the person is guilty of murder, then I'm always going to

19  vote for the death penalty no matter what.  And they're not

20  going to be jurors in this case because they can't really

21  follow the law and follow the process and recognize that --

22  that that wouldn't really be fair to the Defense to feel that

23  way.

24              On the other end of the spectrum we have jurors

25  who say, because of my religious beliefs or my personal beliefs

156

```
 1   or some experience in my life, I could never assess the death
 2   penalty, no matter what the facts were.  And they're not going
 3   to be on the jury either.  What we're looking for, and the
 4   reason it takes so long to get this done, is because we're
 5   looking for those jurors down the middle who will say, if you
 6   bring me evidence and facts and testimony that convince me
 7   somebody is guilty of capital murder, I can find them guilty.
 8   And then I can wait until I hear all the other evidence and --
 9   and answer the special issues yes or no, depending on the
10   evidence.  And if those answers lead to a life sentence, I'm
11   okay with that.  If those answers lead to a death sentence, I'm
12   okay with that.  So we're really looking for those jurors right
13   down the middle who will wait, listen to the evidence, and
14   follow the law as the judge gives them and not let their
15   personal feelings interfere in that.  Does that make sense?
16        A.   Yes.
17        Q.   And I can tell by reading your questionnaire that
18   you feel strongly about the death penalty; is that fair?
19        A.   Yes.
20        Q.   I also saw -- and I have a note here that you
21   indicated that you are of the Catholic faith?
22        A.   Yes.
23        Q.   Do you know what your church's position is on the
24   death penalty?
25        A.   Yes.
```

1    Q.    And what is that?

2    A.    They do not believe in the death penalty.

3    Q.    Okay.  And -- and despite that, you as a -- as a

4    person, feel differently from that?

5    A.    Correct.

6    Q.    And you can reconcile those two.  I know lots of

7    people who are Catholic who do believe in the death penalty.  I

8    just want to make sure that -- that you're not going to have a

9    religious concern about serving as a juror in a capital murder

10   case.

11   A.    No.

12   Q.    Okay.  Then -- because some people do.  That's the

13   only reason.  And obviously, today is your opportunity to tell

14   us whether or not this is the kind of case where you're going

15   to be able to set aside any personal feelings and base your

16   answers, your decisions, on the law and the evidence and

17   nothing else.  At the end of the day, we'll make that decision,

18   as the Judge said, about whether you're qualified as a juror in

19   the case or not.  So you'll at least know if you're qualified

20   under the law.  Does that make sense?

21   A.    Yes.

22   Q.    While you apparently have strong feelings in favor

23   of the death penalty, on page 2, Question Number 3, we asked if

24   you're in favor of the death penalty in some cases, do you

25   agree that a life sentence, rather than a death sentence, could

1    be appropriate under the proper set of circumstances.  And you

2    said, yes.  So you recognize that just because somebody is

3    guilty of capital murder, doesn't mean they're always going to

4    receive the death sentence.

5        A.    Right.

6        Q.    And I'll tell you as I was reading through this, it

7    was as though, frankly, my mom had filled this questionnaire

8    out.  So I'm going to find it pretty easy to talk to you today

9    because I think you're going to express a lot of the same

10    opinions that my mom would.  And I always have to remind my mom

11    that it's okay to think that somebody deserves the death

12    penalty.  If you're sitting at home and you're watching the

13    news and there's some news report about a horrific crime, you

14    don't have to worry about the presumption of innocence, you

15    don't have to worry about the Fifth Amendment, you don't have

16    to worry about the process and the procedure, you can right

17    then and there in your recliner find somebody guilty and say,

18    they deserve the death penalty.  And that's fine as a citizen.

19    But once you walk into the courtroom, once you take the oath as

20    a juror, all that has to be left at the house in the living

21    room.

22        A.    Right.

23        Q.    You have to look to the law and the evidence.  You

24    have to give somebody the presumption of innocence.  You have

25    to allow them their Fifth Amendment privilege if you're a

1  juror.  And, you know, there are some things my mom says, I

2  can't do that, I guess I'll never be a juror.  And that's okay,

3  as long as we get it all out on the table today.

4           So if you sit at home and you say that person

5  deserves the death penalty, there's nothing wrong with that,

6  but you recognize that in the law as you've read through the --

7  the pamphlet that the Judge gave you, that our law really has

8  very little to do with what somebody deserves.

9       A.    Correct.

10      Q.    Our law -- and the state of Texas and the

11  legislature has decided that we are going to separate those

12  capital murderers, those people convicted of capital murder,

13  who get life from those who get death based mainly on one

14  question and that is are they going to be a future threat.  Are

15  they going to be the kind of capital murderer who will pose a

16  threat to society in the future.  And that's where we're going

17  to draw the line.  And the State of Texas has the burden of

18  proof, even in the punishment phase, to prove that the person

19  you've convicted will more likely than not be a threat in the

20  future.  If we can't prove that, then the life sentence is the

21  proper sentence under the law.  Does that make sense?

22      A.    Yes.

23      Q.    I was kind of talking pretty fast.  I want to make

24  sure you're following me there.  So it's not going to be, jury,

25  go back and vote does he deserve a life sentence, does he

160

```
 1  deserve a death sentence.  And it's not going to be, who wants
 2  to give him life and who wants to give him death, because
 3  that's the way it works at home in the living room, but it's
 4  not the way it works here in the court.
 5       A.   Right.
 6       Q.   The question for the jury is, did the State of Texas
 7  prove to us beyond a reasonable doubt that it's more likely
 8  than not that he is going to commit criminal acts of violence
 9  that would constitute a continuing threat to society.  That's
10  the question.  Not does he deserve it.  And you recognize that?
11       A.   Yes.
12       Q.   Do you think that that's as good a way as any for
13  the law to separate those two categories, who gets life and who
14  gets death?
15       A.   Yes.
16       Q.   Because frankly, if somebody is not going to be a
17  continuing threat in prison, then the life sentence is the
18  proper sentence.  Would you agree?
19       A.   Yes.
20       Q.   Okay.  Let's talk about -- and I'm going to go
21  pretty quick through this because you've served on a lot of
22  juries and you've probably heard these things before.
23       A.   Yes.
24       Q.   I just want to make sure that these are laws you can
25  follow.  A person is presumed innocent until the State proves
```

```
 1   them guilty beyond a reasonable doubt.  What that means is even
 2   if somebody has been indicted for a crime and even if the State
 3   has said that they're seeking the death penalty, they still get
 4   that presumption of innocence.  And as the Defendant sits in
 5   the courtroom today, he's innocent of these charges because I
 6   haven't brought any evidence.
 7        A.   Right.
 8        Q.   Do you -- can you afford him that?  Can you presume
 9   him to be innocent?
10        A.   Yes.
11        Q.   And not say, well, you know, if he got this far into
12   the process, he must have done something, he must be guilty of
13   something, because you can see that would violate his
14   presumption of innocence?
15        A.   Right.
16        Q.   I have to prove the person is guilty beyond a
17   reasonable doubt.  I bring the charges.  I have to prove them
18   beyond a reasonable doubt.  Now, beyond a reasonable doubt
19   doesn't have a definition.  We did -- we used to, and maybe in
20   the past when you've served on a jury there was a definition,
21   but now there isn't.  And the law is going to leave it up to
22   you as an individual juror to decide when you've been convinced
23   to your satisfaction that the person is guilty.  I don't have
24   to prove it beyond all possible doubt because, Ms. Aviles, I
25   bet I couldn't convince you of anything beyond all possible
```

1    doubt unless you saw it for yourself with your own eyes.

2         A.    Right.

3         Q.    But I am required under the law to exclude all

4    reasonable doubt before you could return a verdict of guilty.

5         A.    Right.

6         Q.    And it's always my job to do that.  The Defense

7    attorneys could sit over there, starting today, all the way

8    through the end of the trial, and do crossword puzzles, never

9    talk to you, never ask any questions of the witnesses, never

10   make any closing arguments.  They don't have to do anything.

11   They've done all they're required to do.  Always look to me to

12   bring the evidence.

13              Now, they're not going to do crossword puzzles

14   and they're not doing them now.  They're good lawyers, and

15   they'll do their job.  But I tell you that to illustrate how

16   important it is to always look to the State for the evidence.

17   Never require them to prove somebody is not guilty.  Never

18   require them to prove that somebody is not going to be a future

19   threat.  Never require them to prove that the life sentence is

20   the proper sentence.  It's always my job to bring the evidence.

21   Do you think that's the way it should be?

22        A.    Yes.

23        Q.    It would be pretty hard to prove yourself -- to

24   prove a negative, to prove you didn't do something.  Would you

25   agree?

1          A.    Yes.

2          Q.    And that's why in -- in the United States, unlike in

3    many other countries, it's always the government's job to bring

4    the proof.  Part of that is a defendant's Fifth Amendment right

5    not to testify.  You know you have it in the hallway and out on

6    the street.  If you got pulled over for speeding and a police

7    officer came up and said, ma'am, how fast were you going, why

8    are you going so fast, where are you going, you could tell him

9    you choose not to talk to him.  I'm not telling you anything,

10   just give me my ticket.

11         A.    Right.

12         Q.    That's your right.  That right would follow you into

13   the courtroom if you had to go to court for the speeding

14   ticket.  You don't have to testify in your own behalf.  The

15   jury would be instructed if a defendant chooses not to testify,

16   that they look to the evidence that was presented.  You just

17   look to what you did hear and decide did I do my job.

18         A.    Right.

19         Q.    If my evidence convinces you of the person's guilt

20   beyond a reasonable doubt, then it doesn't matter whether the

21   person testified or not, right?

22         A.    Right.

23         Q.    The verdict would be guilty.  And if I don't prove

24   it to you beyond a reasonable doubt, the verdict is not guilty,

25   and it doesn't matter whether he did or didn't testify because

1    I didn't do my job.

2         A.    Correct.

3         Q.    Can you afford the Defendant that Fifth Amendment

4    right and if he chooses not to testify, could you follow the

5    Judge's instructions and not talk about it, not consider it for

6    any reason?

7         A.    Yes.

8         Q.    And not hold it against him?

9         A.    Right.

10        Q.    Okay.  That Fifth Amendment right applies in the

11   punishment phase of a trial, as well.  So a defendant is never

12   going to be required -- I can't call him to the stand.  His mom

13   can't make him testify.  His lawyers can't make him testify,

14   even in punishment.  So he doesn't have to get up and say, I

15   promise I've changed, I'm never going to do anything wrong

16   again.  Or beg for mercy or beg for his life.  He's never going

17   to be required to do that.  Again, the jury would be instructed

18   to just look to the evidence that they heard and disregard that

19   silence.  Could you do that?

20        A.    Yes.

21        Q.    And not require anything of the Defendant, either in

22   the guilt/innocence phase or the punishment phase?

23        A.    Right.

24        Q.    Okay.  Any questions or concerns about any of that?

25        A.    No.

```
 1        Q.    Or your ability to follow those laws?

 2        A.    No, because I've done it before.

 3        Q.    Exactly.  And then the laws and the rules are

 4   exactly same in this trial as they are in the others.

 5        A.    Right.

 6        Q.    Now, the punishment phase is vastly different.

 7   We'll get to that.

 8              One last thing I wanted to bring up is with

 9   regard to witness testimony.  And you know as a juror it's your

10   job to decide whether or not the witness is somebody that

11   you're going to believe all, some, or none of what they say.

12   You judge the witness's credibility.  You judge -- if a

13   defendant chooses to testify, you judge their credibility the

14   same as you would all the other witnesses.  And the same with

15   police officers.  We asked you -- do you have your

16   questionnaire in front --

17        A.    Yes.

18        Q.    On page Number 5, we asked if you believe police

19   officers are more likely to tell the truth than the average

20   person.  You said, yes.  Although they're humans, I'd like to

21   believe when they took their job, they see it as a

22   responsibility to tell the truth.  And -- and there's

23   absolutely nothing wrong with that.  It sounds like you have

24   respect for law enforcement --

25        A.    I do.
```

```
 1        Q.    -- and the job they do.  But you recognize that they

 2   are human.

 3        A.    They are human.

 4        Q.    Good police officers and bad police officers.

 5        A.    Right.

 6        Q.    Can you tell the difference between them based on

 7   the uniform?

 8        A.    No.

 9        Q.    So you have to wait until you hear what they say --

10        A.    Correct.

11        Q.    -- before you decide whether they're being truthful

12   or not.

13        A.    Right.

14        Q.    And not automatically because they're wearing a

15   uniform say, well, they're going to tell the truth, I can quit

16   listening?

17        A.    No.

18        Q.    And -- and so the police officer testimony thing is

19   just -- just a reminder to make sure that you're listening to

20   everything all of the witnesses say.

21        A.    Right.

22        Q.    And then decide whether they can be believed or not.

23        A.    Right.

24        Q.    I told you I have to prove -- that I have the burden

25   of proof beyond a reasonable doubt.  I have to prove everything
```

1  that I allege in the indictment beyond a reasonable doubt.  I

2  don't have to prove, for instance, things that aren't in the

3  indictment, like what time of day it was or what somebody was

4  wearing or, you know, whether the crime was premeditated.  A

5  lot of people think that capital murder needs to be

6  premeditated, and in the state of Texas, we don't have

7  premeditated.

8            What kind of juries did you serve on before?

9  What were the charges?

10       A.   Negligence, malpractice --

11       Q.   Were they just civil juries, or did you serve on a

12  criminal jury?

13       A.   They were all civil.

14       Q.   All civil.  Okay.

15       A.   I think I only served criminal once before, and it

16  was only a few hours and they let us go because they settled

17  out of court.

18       Q.   Okay.  So you never actually got to hear the

19  evidence?

20       A.   No.

21       Q.   The job of the prosecutor in a criminal case is

22  different from what happens in civil cases.  In civil cases,

23  both sides present evidence and whoever tips the scales wins,

24  basically.  Fifty-one percent of the evidence for the

25  plaintiff, plaintiff gets an award of damages.

```
 1              In the criminal case, you always look just to
 2   the one side.  And the burden of proof is much higher in a
 3   criminal case than it is in a civil case, beyond a reasonable
 4   doubt.  But I have to prove the things that I allege in the
 5   indictment.  And sometimes jurors say, well, you know, I'm not
 6   going to let somebody go on a technicality.  And I say jurors,
 7   really what I mean is my mom.  I'm not going to let somebody go
 8   because of a technicality, and I always tell her and I'm going
 9   to tell you that there's nothing in the indictment that is a
10   technicality.  Every single thing in the indictment is just as
11   important as the rest.
12              And for capital murder, I have to prove that a
13   percent intentionally caused the death of another individual.
14   No legal excuse, meaning it wasn't an accident.  It wasn't
15   self-defense.  It wasn't a mistake.  It -- not because the
16   person was insane at the time, meaning that they had -- because
17   of a mental disease or defect they didn't know what they were
18   doing was wrong.  And -- and no one who is mentally retarded
19   will ever be subjected to the death penalty, so we're not
20   talking about insanity or mental retardation or self-defense or
21   defense of a third person or accident or mistake.  What I have
22   to prove is that it was somebody's intent.  They meant to cause
23   the person's death, and they did what it took to get it done,
24   okay?
25         A.    Okay.
```

1      Q.    Intending to cause the death, and I have to prove

2  that it occurred in Dallas County.  And I have to prove that it

3  was during the course of committing or attempting to commit a

4  robbery.  There's nothing about any of that that is a

5  technicality.

6            Let me give you an example.  Let's say -- not on

7  this case, because we can't talk about the facts of this case.

8      A.    Right.

9      Q.    But on another hypothetical capital murder case,

10  let's say that the State has alleged that there was a capital

11  murder and it was an intentional murder committed during the

12  course of a robbery.  You get in, you're a juror, you hear all

13  of the witnesses testify.  All of the witnesses convince you

14  beyond a reasonable doubt that the person on trial is the right

15  person, that they did, in fact, intentionally cause the death

16  of the victim, but you never hear anything about the robbery.

17  Nobody ever says anything about any property being demanded or

18  any property being taken.  There's no property missing.  In

19  fact, the witnesses come in and say that the person on trial

20  committed a sexual assault against the victim.  They raped the

21  victim before they killed her.  Now, that's not what I alleged,

22  right?  My indictment says robbery.

23      A.    Right.

24            Can you see how the proof at trial is different

25  from what I said in the indictment?

```
 1        A.    Yes.

 2        Q.    So I didn't do my job.  I failed in my proof.

 3        A.    Right.

 4        Q.    So the jury would have to, following their oaths,

 5   find the Defendant not guilty of capital murder.

 6        A.    Right.

 7        Q.    Even though they believe he intended to cause the

 8   death.  I didn't do my job and the jury can't give me a leg up

 9   or give me a helping hand because I got close.  Everything is

10   as important as the rest.

11        A.    Right.

12        Q.    So it's kind of like a checklist for the jury.  He

13   intended to cause the death of the victim.  It was the person

14   on trial, and it was in the course of committing the robbery.

15   If any one of those things doesn't get checked off, then the

16   verdict is not guilty.

17        A.    Right.

18        Q.    Could you do that?  Could you find somebody not

19   guilty of capital murder if I didn't follow and do -- and do my

20   job and prove everything I alleged?

21        A.    Yes.

22        Q.    In that case, the jury might be given the option of

23   a lesser charge of finding him guilty of murder, not capital

24   murder, but murder.  And for murder there is no death penalty,

25   right, because the death penalty is only for capital murder.
```

1     A.   Right.

2     Q.   For murder, the punishment range is five years in

3 prison up to life in prison, so anything in between.  It could

4 be five, 10, 20, 30, all the way up to 99 years or life.  And

5 it would be up to the jury, after they heard all the evidence

6 about the person's background, about the crime, is there any

7 criminal history or not, their character, all of those things

8 would be presented.  And then the jury would decide, is five

9 years the right sentence, do I think that's proper or do I

10 think life is proper.  And whatever they believe the proper

11 sentence is, is what they would give.  Does that make sense?

12     A.   Yes.

13     Q.   And in a proper -- in a case where you thought five

14 years was the right thing to do for murder, could you do it?

15     A.   Yes.

16     Q.   If you thought life was the proper sentence, could

17 you assess a life sentence for murder?

18     A.   Yes.

19     Q.   Or anywhere in between?

20     A.   Right.

21     Q.   Now, if I do everything I'm supposed to do and the

22 jury checks off all those boxes and says State proved guilt of

23 capital murder beyond a reasonable doubt, then we would come

24 back into the courtroom.  The jury would return a verdict of

25 guilty, come back in the courtroom, and more evidence is

1  presented to help them decide whether this is a case where the

2  person is going to receive a life sentence without parole or a

3  death sentence.  And they do that by getting to these two

4  special issues.

5          So first, I want to make sure that you

6  understand the full process because it is a process.

7      A.    Right.

8      Q.    It's not like you find somebody guilty of capital

9  murder and, wham, the death penalty.  It's not that at all,

10 right?

11     A.    I understand that.

12     Q.    You're going to come back into the courtroom.  The

13 State's still -- like I told you before, has the burden of

14 proof on the first special issue.

15     A.    Right.

16     Q.    So we have the responsibility of bringing forth that

17 evidence.  The best that a person convicted of capital murder

18 can do is life without parole.  And I know we used to have

19 parole.  It used -- it used to be life in prison with the

20 possibility of parole.  It's not anymore.  When we say life in

21 prison, we mean life in prison.  The person will die in the

22 penitentiary, just so we're clear on that, because I think you

23 did on page 3, Question Number 12, you mentioned that an

24 individual might get back into society.

25     A.    Right.

1      Q.    Once convicted of capital murder, they're -- they're

2  going to be behind prison walls until they're dead --

3      A.    Okay.

4      Q.    -- okay?  So I have the burden of proof, and I'm

5  going to bring more evidence to the jury to help them answer

6  these questions.  The jury's job is going to be to wait until

7  they've heard all of the evidence.

8      A.    Yes.

9      Q.    Everything that the State presents and if the

10  Defense chooses to present any evidence, they go after me.  So

11  I put on all my evidence and then I would rest my case, and

12  then the Defense has the opportunity, if they want to, to

13  present evidence.  And the jury has to wait until they've heard

14  everything.

15      A.    Right.

16      Q.    After they've heard all of that evidence, maybe

17  dating back to birth about the person, their background, how

18  they were raised, abuse or not abuse, education or lack

19  thereof, criminal history, if any, everything comes out.  The

20  first question the jury asks when they get back there is,

21  whether there's a probability that the Defendant will commit

22  criminal acts of violence that would constitute a continuing

23  threat to society.  I have to prove beyond a reasonable doubt

24  that it's more likely than not.  That's what probability means.

25  We do have a definition for that.  It means more likely than

```
 1  not -- not maybe, not it's possible, and not absolutely, but

 2  more likely than not, the person you've convicted of

 3  intentionally killing someone in the course of a robbery, would

 4  in the future commit criminal acts of violence.

 5       A.   I understand.

 6       Q.   And you see it says criminal acts, plural.

 7       A.   Yes.  Right.

 8       Q.   I have to prove that this person more likely than

 9  not will commit criminal acts of violence.  Notice it doesn't

10  say another murder.  It doesn't say a sexual assault or a

11  robbery or a kidnapping.

12       A.   Right.

13       Q.   It just says criminal acts of violence, leaving that

14  up to you to decide what that is.  But they're criminal acts of

15  violence that would constitute a continuing threat to society.

16       A.   Right.

17       Q.   Now, we said he's going to be in prison.  What's his

18  society going to be?  When we talk about continuing threat to

19  society, can you see that that encompasses prison society?

20       A.   Yes.

21       Q.   It also means us, right?

22       A.   Right.

23       Q.   It's everybody.

24       A.   I say more for us, than in prison.

25       Q.   Do you believe that they're -- have you ever been to
```

```
 1   a prison?

 2        A.    No.

 3        Q.    You know obviously that there are other inmates

 4   there?

 5        A.    Yes.

 6        Q.    And that they live and work --

 7        A.    Yes.

 8        Q.    -- and eat and socialize amongst one another?

 9        A.    Yes.

10        Q.    There are guards there --

11        A.    Yes, ma'am.

12        Q.    -- that work.  Doctors and teachers and nurses?

13        A.    I understand now.

14        Q.    And even people who are coming in to visit loved

15   ones.

16        A.    Right.

17        Q.    Do you believe that the people inside prison deserve

18   protection from someone who --

19        A.    Yes.

20        Q.    -- who would commit criminal acts of violence?

21        A.    Yes.

22        Q.    So when we're talking about Special Issue Number 1,

23   we're talking about all of society, even prison.

24        A.    Okay.  I understand now.

25        Q.    And we don't have a crystal ball.
```

```
 1        A.    Right.

 2        Q.    So it's not possible for us to prove absolutely what

 3   someone is going to do in the future.

 4        A.    I understand.

 5        Q.    Do you believe though that you could look to the

 6   evidence presented to -- to answer that question about whether

 7   the State proved that the person would commit criminal acts of

 8   violence in the future?

 9        A.    Yes.

10        Q.    What would be important to you?

11        A.    That it's proven beyond a reasonable doubt.

12        Q.    And -- and based on that, obviously this question

13   assumes that there are some people guilty of capital murder who

14   won't more likely than not be a threat in the future.  Can you

15   see that?

16        A.    Yes.

17        Q.    And just because somebody is guilty of capital

18   murder, doesn't mean that they're always going to be a future

19   threat.

20        A.    Right.

21        Q.    If I don't prove that beyond a reasonable doubt, the

22   answer is no.  If the answer is no --

23        A.    I understand.

24        Q.    -- the life sentence is the proper sentence.  And

25   the law assumes that the life sentence is the proper sentence,
```

1  unless and until I prove otherwise.

2        A.    Right.

3        Q.    Can you see that?

4        A.    Yes.

5        Q.    So the presumption -- kind of like we had the

6  presumption of innocence in the first part of the trial, the

7  presumption is the answer to Special Issue Number 1 is no until

8  I prove otherwise.

9        A.    Right.

10       Q.    Can you hold me to that burden and make me bring

11 the --

12       A.    Yes.

13       Q.    --  proof?

14       A.    Yes.

15       Q.    You believe it is capable of proof?

16       A.    Yes.

17       Q.    If I prove that beyond a reasonable doubt, then and

18 only then would you go to Special Issue 2, because like I said,

19 if the answer to 1 is no, trial is over.

20       A.    Right.

21       Q.    The life sentence is the sentence and we're done.

22 Everybody goes home, and the Defendant starts serving that life

23 sentence.

24       A.    Right.

25       Q.    If it's yes, you move to Special Issue 2.  Now, I'll

1    tell you at this point in the trial, my job is over.  I'm done.

2    I've done all I have to do for the jury to answer the questions

3    in a way that result in the death sentence.  But the jury's job

4    isn't over.  The jury still has that Special Issue 2, and it's

5    different from everything we've done because there's no more

6    burden of proof.  This we sometimes call the safety net

7    question.  It gives the 12 jurors the opportunity and the

8    responsibility to go back and look at all the evidence again.

9    You look at the circumstances of the offense, the capital

10   murder you convicted him of.  Look at that.  You look at the

11   Defendant's character and background.  You look at the personal

12   moral culpability of the Defendant, if there's any evidence of

13   that and there may not be.

14            If the Defendant chooses not to testify, you may

15   not have any evidence about the personal moral culpability of

16   the Defendant.  But you look at all the evidence from the first

17   part of the trial and the second part of the trial, look at

18   everything again, and ask yourself if there was something in

19   the evidence that tells you in your heart that the life

20   sentence is really the more proper sentence here.  Even though

21   the person is guilty of capital murder and even though you

22   believe more likely than not they're going to be a threat to

23   society in the future -- even in prison, they're going to be a

24   threat, is there something in the evidence that tells me in my

25   heart that the life sentence is really the more proper

1    sentence.

2              And nobody is going to tell you what is or isn't

3    mitigating.  What mitigating means is -- mitigating evidence is

4    some evidence that would in your mind lessen the Defendant's

5    moral blameworthiness, maybe make them less responsible morally

6    for the crime.  And I'll give you some examples, because what's

7    mitigating to you, may not be mitigating to somebody else, and

8    vice versa.  But we've had jurors tell us that something like

9    maybe severe childhood abuse or neglect could be.  Maybe sexual

10   abuse as a child could be sufficiently mitigating to some

11   jurors.

12             For example, if somebody is locked in a closet

13   for the first 20 years of their life, nobody has ever taught

14   them right from wrong, nobody has ever loved them, they've

15   never had any human interaction, somehow they manage to find

16   their way out of the closet at age 20 and they go on a killing

17   spree and they kill the first 10 people they see in the

18   neighborhood.  They're going to be guilty of capital murder,

19   but that might be evidence in the punishment phase that the

20   jury could consider to decide is that sufficiently mitigating.

21   Maybe this person is not -- maybe it's not their fault they are

22   what they are.  They were created that way.  Does that make

23   sense?

24        A.    Yes.

25        Q.    So that might be sufficiently mitigating to some

```
 1  jurors, that type of abuse or neglect as a child.  Some people
 2  tell us that alcohol or drug abuse or intoxication at the time
 3  of the crime might be mitigating to them.  You can see that
 4  some other jurors say, that's not mitigating to me, you made a
 5  choice, that's aggravating to me.
 6       A.    Right.
 7       Q.    So the jurors don't even have to agree.
 8       A.    Right.
 9       Q.    But what the law is going to tell you is not you
10  have to see this as mitigating or you have to see this as
11  aggravating, but it's going to tell you that you have to wait
12  and listen to everything.
13       A.    Right.
14       Q.    You consider all the evidence you hear, whether it's
15  childhood upbringing or education or drugs or alcohol, whatever
16  it is, you hear it, you listen to it, you consider it, and then
17  you decide is it mitigating or not.
18       A.    Right.
19       Q.    And if it is mitigating, is it sufficiently
20  mitigating, because it's going to have to be something, I would
21  submit, pretty darn mitigating for you to answer this yes,
22  knowing you're sending a dangerous person to prison.  You're
23  sending somebody you believe will be a threat in the future
24  more likely than not, right?
25       A.    Correct.
```

1      Q.   So it's going to have to be something pretty darn

2  mitigating?

3      A.   Right.

4      Q.   But are you open to the possibility that there may

5  be some evidence in a case -- it may be one in a million cases,

6  but are you open to listening to everything?

7      A.   Yes.

8      Q.   And waiting until you hear it?

9      A.   Yes.

10      Q.   If you heard something that in your mind told you

11  the life sentence was really the more proper sentence, could

12  you answer that yes?

13      A.   Yes.

14      Q.   Knowing you'd be sending him to prison, that it

15  would result in a life sentence, not a death sentence?

16      A.   Yes.

17      Q.   And if there was nothing in the evidence that told

18  you -- if there was nothing sufficiently mitigating in the

19  evidence that told you that a life sentence was proper, could

20  you answer that no, understanding that that would -- that would

21  basically require the judge then to sign a death warrant for

22  the death sentence?

23      A.   Yes.

24      Q.   An answer yes unanimously among the 12 jurors, yes

25  to Special Issue 1 and no to Special Issue 2, results in a

```
 1  death sentence.  And the judge doesn't get to second guess or

 2  say, well, I think they're wrong, I'm changing that answer.

 3       A.    I understand.

 4       Q.    The jurors' decision is final, and you think that's

 5  a process you can participate in?

 6       A.    Yes.

 7       Q.    And can you base your answers to those questions --

 8  if we get to the punishment phase, can you base your answers on

 9  the evidence and the law and not any personal feelings you have

10  one way or the other?

11       A.    Right.

12       Q.    Now, I want -- real quick, and I'm almost done, but

13  I want to make sure that we go through a couple of things in

14  your questionnaire real quick.

15            As I told -- we asked you a bunch of questions

16  on page 10 about drug and alcohol abuse or addiction and

17  intoxication.  And I just want to make sure that you understand

18  what we're asking in Question Number 65, I've told you that --

19  that evidence of intoxication, if it's presented in a trial,

20  may be considered in mitigation, but it doesn't mean that it

21  has to be mitigating to you.

22       A.    Right.

23       Q.    You decide whether it's mitigating or not, but you

24  have to consider it if it's in the evidence.

25       A.    Right.
```

```
 1         Q.    Your granddaughter was recently or fairly

 2   recently --

 3         A.    Granddaughters.

 4         Q.    I'm sorry?

 5         A.    Granddaughters.

 6         Q.    Granddaughters were victims.

 7         A.    Correct.

 8         Q.    Is there anything about that that causes you any

 9   concern about being a fair juror in this case?

10         A.    No.

11         Q.    You can set that aside and not --

12         A.    Yes.

13         Q.    -- let that affect you?

14               You testified at the trial?

15         A.    Yes.

16         Q.    So you have a closer understanding then of exactly

17   how this process works.

18         A.    Yes.

19         Q.    When we asked you on page 2, the best argument

20   against the death penalty is being proven not guilty.  You

21   recognize that if somebody is found not guilty, the death

22   penalty is never going to be even a consideration, right?

23         A.    Right.

24         Q.    If someone is found not guilty?

25         A.    Right.
```

```
 1        Q.    And that if somebody is found guilty of capital
 2   murder, that doesn't automatically equal a death sentence.
 3        A.    Yes.
 4        Q.    Now you understand that there's always that process?
 5        A.    Yes.  Right.
 6        Q.    And page 7, Question Number 41, I just want to point
 7   out -- you answered Question Number 41 -- we had a lot of
 8   people do that -- it's not better that 10 guilty people go
 9   free, but I want to make sure that you understand as a juror
10   how important it is to recognize that your decision is final.
11   There are appeals and everybody is aware of appeals processes
12   and retrials.
13        A.    Right.
14        Q.    And we've -- you know, there's been cases reversed.
15        A.    Yes.
16        Q.    And it's actual innocence -- that we've gotten it
17   wrong in the past?
18        A.    Right.
19        Q.    But a juror always needs to recognize that their
20   decision is final.  Nobody is going to second-guess your
21   decision.  The questions are going to arise on appeal as to the
22   procedure, as to the law, and the evidence that was presented.
23        A.    Presented, correct.
24        Q.    Not the jurors' judgement.
25        A.    Correct.
```

185

```
 1        Q.    Your decision -- if you answer yes and no, you need

 2   to answer that with the full understanding that that is one day

 3   going to result in Matthew Johnson's execution, but it's not

 4   going to be undone.

 5        A.    Right.

 6        Q.    And you understand that?

 7        A.    Yes.

 8        Q.    And you still can participate in the process?

 9        A.    Yes.

10        Q.    And Question Number 42, I think it's a bad -- I

11   think it's a bad question, frankly, but I want to make sure you

12   understand that a juror is not allowed to disregard the law

13   ever under any circumstances.  You decide what the evidence is

14   and how the evidence applies to the law, but the judge gives

15   you the law and you can't go, well, I know the judge says that

16   the State's burden of proof is beyond a reasonable doubt, but

17   I'm not going to follow that.  Right?  Even if you disagree

18   with the law, you still have to follow the law.

19        A.    I still have to follow, correct.

20        Q.    Not today, but if you're a juror.

21        A.    If I'm a juror, correct.

22        Q.    And so far we haven't talked about any laws you

23   can't follow?

24        A.    Right.

25        Q.    Okay.  Do you have any questions for me?  I think
```

1    I'm about done with my questions for you.  Do you have any

2    questions or concerns or anything you think we need to know

3    about you or how you would be as a juror in this case?

4         A.   My only personal issue is financially, is that I

5    can't afford to take two weeks off and not get paid because I'm

6    putting my daughter through college and I'm a single parent.

7    So that's my only issue, financially.

8         Q.   Well, I'm really glad you brought that up, and I

9    want to tell you, unfortunately, this job here as a juror

10   doesn't pay much.

11        A.   Right.

12        Q.   You probably figured that out.  But the law also

13   doesn't allow us to excuse jurors because of the financial

14   burden.  I mean, the vast majority of our jurors are going to

15   be in a financial bind being out of work two weeks.

16        A.   Right.

17        Q.   And I -- and I tell you that with all due respect, I

18   understand your position.  The question is whether you could --

19   if you're asked and sworn in as a juror, could you devote your

20   full attention to the trial, or are you --

21        A.   Yes.

22        Q.   -- going to be distracted by the electric bill

23   that's coming and how you're missing work?

24        A.   No.  I would -- if I'm a juror, I would put -- I

25   would put forth 100 percent of myself.

```
 1        Q.    Okay.  Obviously, you understand how important it
 2   is.
 3        A.    Oh, yes.
 4        Q.    To both sides.
 5        A.    Right.  Right.
 6        Q.    So while it would be a financial burden, it's not
 7   something so extreme that it would distract you from focusing
 8   on the evidence?
 9        A.    No.
10        Q.    I appreciate you telling us that.
11              Is there anything else?
12        A.    No.
13        Q.    You think you can give both sides a fair trial?
14        A.    Yes.
15        Q.    And wait until you've heard all the evidence?
16        A.    Yes.
17        Q.    Follow this process?
18        A.    Yes.
19        Q.    And let the evidence lead you to the answers to
20   these questions?
21        A.    Right.
22              MS. MOSELEY:  Thank you.
23              Judge, that's all I have.
24              THE COURT:  Thank you.
25              Mr. Weatherspoon.
```

```
 1              MR. WEATHERSPOON:  Thank you, Your Honor.
 2                  DEFENSE VOIR DIRE EXAMINATION
 3   BY MR. WEATHERSPOON:
 4       Q.    Good afternoon, Ms. Aviles.
 5       A.    Good afternoon.
 6       Q.    As the Judge told you, my name is Kenneth
 7   Weatherspoon, and along with Catherine Bernhard and Nancy
 8   Mulder, we represent Matthew Johnson.  And as the Judge told
 9   you, there's no such thing as a right answer or a wrong answer.
10   We just want to know how you feel so we can have a jury that's
11   fair both to the State and to the Defense.  And one of the
12   reasons why we gave you the questionnaire and asked you to fill
13   out the questionnaire before we told you what the law is,
14   because we wanted to get your true feelings.  We don't want
15   anyone to answer the questionnaire in a way that will make sure
16   they're on the jury or anyone to answer the questionnaire to
17   make sure they're not on the jury.
18       A.    Right.
19       Q.    We wanted you to just tell us exactly how you felt.
20   Now, I want to start off by telling you that by coming down
21   here on July 21st -- excuse me, June the 21st and spending all
22   your day down here today, you've fulfilled your civic duty.  So
23   I don't want you to think that if you don't end up on the jury,
24   that you're not a good citizen, that you haven't done your
25   civic duty, because we do appreciate you being down here.  We
```

189

1  do appreciate you putting up with us, keeping you down here all

2  day.  So you have more than fulfilled your civic duty, so

3  that's the first thing I wanted to let you know.

4                    Additionally, the process kind of puts the cart

5  before the horse.  Even though we've spent a lot of time

6  talking about punishment, I don't want you to think that we at

7  this table think you'll ever reach punishment if you are a

8  jury.  We believe that Matthew Johnson will be found not

9  guilty, and we don't believe you'll ever have to consider those

10  special issues.  So I don't want you to think just because

11  we're talking about it now means that we on the Defense side

12  think as a foregone conclusion that Matthew Lee Johnson will be

13  found guilty, okay?

14      A.    Okay.

15      Q.    Now, there was some things in your questionnaire

16  that I wanted to talk to you about.  And let me just start off

17  by asking you this.  Why do you think the death penalty is

18  necessary?

19      A.    Majority to -- majority of my feeling is to free up

20  the prison, to be able to incarcerate more criminals.  And also

21  to the person who is on the death penalty, to pay for a crime

22  that they commit.

23      Q.    So to free up the prisons to incarcerate more

24  people; is that correct?

25      A.    Uh-huh.

```
 1        Q.   I need you --

 2        A.   Yes, sir.

 3        Q.   And the second thing you said is so the individual

 4   can pay for the offense --

 5        A.   Offense they are committing -- they have committed.

 6        Q.   Okay.  Now, let me turn your attention to page 2 of

 7   your questionnaire, Question 8, where it says, the best

 8   argument against the death penalty is being proven not guilty.

 9   So explain to me what you -- what you meant when you answered

10   the question in that way.

11        A.   Well, that is the best argument.  It has to be

12   proven beyond a reasonable doubt that the person didn't commit

13   the crime in order --

14        Q.   Now -- and -- and this question is probably poorly

15   written, so let me kind of tell you what I think the question

16   really wanted to ask.  If someone was guilty of capital murder,

17   what would be the best argument against the death penalty?

18        A.   I don't understand.

19        Q.   Okay.  I think the question presumes that the person

20   is being found guilty of capital murder, and you understand --

21        A.   Yes.

22        Q.   -- that when someone is charged with capital murder,

23   there are only two possible punishments if they're found

24   guilty, life imprisonment without the possibility of parole and

25   the death sentence.  So Question 7 and 8 already assumes that
```

```
 1   the person is going to be found --

 2        A.    He's guilty.

 3        Q.    -- is guilty, so it says if a person were guilty of

 4   capital murder, what would be the best argument for the death

 5   penalty.  And then 8 would be what would be the best argument

 6   against the death penalty.  So for the sake of this question,

 7   let's assume that the person has been found guilty of capital

 8   murder -- or in Question 8, are you saying that if the person

 9   is found --

10        A.    It would be the severity of the crime.

11        Q.    Severity of the crime.  Okay.  And for you, that

12   would be an important factor --

13        A.    Yes --

14        Q.    -- in whether --

15        A.    -- it would.

16        Q.    And -- and let me just tell you this.  The court

17   reporter is going to get angry with me and is going to get

18   angry with you.  You have to let me finish asking my question

19   before you answer because if we're talking at the same time,

20   she can't take down both of us.

21        A.    I understand.

22        Q.    Okay.  Now, Ms. Moseley asked you about certain

23   principles of law, and one of the principles she asked you

24   about is the presumption of innocence.  I want you to turn to

25   your questionnaire, page 5, and if you look at Question Number
```

1   30, when the question asks you what is the first thing that

2   comes to mind when you think of the following.  And for Defense

3   lawyers you put, to protect criminals.  And I guess my question

4   is, you didn't say to protect people accused of crimes or you

5   didn't say people to protect people charged with crimes.  You

6   said, to protect criminals, meaning you already thought they

7   were guilty; is that correct?

8        A.   I didn't know how to explain myself.  Now reading

9   back on it, that's not what I meant.  What I meant is to

10  protect a person who is charged of committing a crime, but

11  is -- hasn't been proven -- to protect the -- the guilty.  The

12  person that people see as a person of guilt who have committed

13  a crime.  It could be an innocent person, or I wouldn't -- I

14  don't know how to explain it.  A defendant lawyer (sic) is to

15  defend the person who is guilty of a crime.  Yeah.  I think

16  it's --

17       Q.   Okay.

18       A.   I don't know how to explain.

19       Q.   Okay.  Well, and I'm not trying to confuse you.  Let

20  me just make sure we're on the same page.  Do you believe that

21  a defense attorney can be defending someone who's actually not

22  guilty?

23       A.   Yes.

24       Q.   So do you believe that when individuals come into

25  court that you -- I know what the law tells you to believe, but

193

1   do you really give the Defendant the presumption of innocence?

2       A.   Yes, because I have no history of them.  I don't

3   know them.  I do not look up any information on that person.

4   So when I come into court, I come in blinded.  I do not know

5   anything about either side.  So I'm working on a clean slate.

6   I do not assume anything on either the Defendant or the

7   prosecutor's side, I do not.  I -- I come in with a clean

8   slate.  I -- I don't know anything about either party.

9       Q.   Now -- thank you.  When you look at Question Number

10   32, do you believe police officers are more likely to tell the

11   truth than the average person, and you said, yes.  Is that how

12   you truly feel?

13       A.   Yes.  Because they take an oath and that is -- they

14   are to serve and protect.  And if we cannot look up to a police

15   officer to -- for protection, then who do we have.

16       Q.   So in your mind do police officers start off with

17   more credibility than the average citizen?

18       A.   Yes, because they take an oath.  And I would like to

19   believe that they take the oath seriously and they're going to

20   provide the information to the best of their ability.

21       Q.   Now, you understand that the law says that when they

22   first take the witness stand, you must start all citizens off

23   at the same level?

24           MS. MOSELEY:  Your Honor, I'm going to object.

25   That's not what the law says.  The law says you can't

```
 1  automatically believe a police officer because he's a police

 2  officer.  There's absolutely nothing wrong with a juror giving

 3  more credibility to a police officer as long as she'll listen

 4  to the testimony before she decides.

 5              THE COURT:  Rephrase your question, Mr.

 6  Weatherspoon.

 7              MR. WEATHERSPOON:  Just for the record, I think

 8  Ms. Moseley's statement was an incorrect statement of the law,

 9  but I will rephrase.

10      Q.   (BY MR. WEATHERSPOON)  In terms of determining the

11  credibility of a witness, would you believe the testimony of a

12  police officer over that of another witness simply because that

13  person is a police officer?

14      A.   I would have to go on my feelings and who I feel is

15  the person telling the truth.

16      Q.   Okay.  So you could believe the testimony of a

17  layperson over that of a police officer?

18      A.   Yes.

19      Q.   Let me have you turn to page 6, Question 37.  It

20  says:  Do you think a person convicted of capital murder can be

21  rehabilitated?  And you said, no.  Is that correct?

22      A.   Yes.

23      Q.   And you said:  I feel that -- and I'm having a

24  little bit of problem reading your writing, so could you read

25  that for me?
```

1          A.    On which one, Number --

2          Q.    Question 37, your answer.

3          A.    I feel that -- I can't even read it.  Oh, I feel

4    that in prison they would have to be more aggressive to

5    survive, which --

6                THE COURT:  I'm sorry, would you repeat that?

7          A.    I feel that -- I lost it again.  I feel that in

8    prison they would have to be more aggressive to survive, which

9    means the prisoner would have to be more aggressive in prison

10   in order to -- to survive on a daily basis in prison, from what

11   I understand.  So I don't -- I mean, I know that there is Bible

12   studies and all kinds of rehabilitation in prison, but I feel

13   that if the person is willing to commit such a severe crime,

14   that it's not easily taken away from their brain, from their

15   mentality, from them -- from themselves.

16         Q.    (BY MR. WEATHERSPOON)  Now, you understand that -- I

17   think Ms. Moseley explained to you that capital murder -- and

18   for purposes of this discussion, we'll say in the course of a

19   robbery, is an intentional killing, that you wanted to cause

20   the death of the individual and you did cause the death of the

21   individual.  It wasn't by accident.  It wasn't by mistake.

22   That it was your goal to kill that person and you did kill that

23   person in the course of a robbery.  So you understand you have

24   to believe that beyond a reasonable doubt before you find

25   someone guilty of capital murder?

1      A.    Right.

2      Q.    Okay.  So then you go to Special Issue Number 1, and

3  it says whether there's a probability that the Defendant would

4  commit criminal acts of violence that would constitute a

5  continuing threat to society, meaning prison society.

6      A.    Right.

7      Q.    Okay.  If you look at your answer to Question 37

8  where you said you feel like that a person would have to become

9  more aggressive to --

10      A.    Survive in prison.

11      Q.    -- to survive in prison, would that mean that you

12  would always answer Special Issue Number 1 yes?

13      A.    No.

14      Q.    So -- but you do -- by your answer to Question

15  Number 37, you do feel like that person would become more

16  aggressive; is that correct?

17      A.    My understanding -- like I said, I've never been to

18  a prison.  Just by watching TV and things like that, that --

19  you know, from what I hear, that people have to survive in

20  prison, and they have to be more aggressive than -- or

21  submissive.  I don't know.  I -- I -- it just depends.  Again,

22  I would have to listen to all the evidence.  I would have to

23  listen to both sides before I could decide.  I cannot sit here

24  and say yes, the person can be rehabilitated or, no, they

25  cannot, because I don't know the person.  I don't know their

```
 1  background.  I don't know the evidence -- I don't have

 2  evidence.  I have nothing to go by right now so I don't know

 3  how to answer that question.

 4       Q.   So when we look at your answer to Question Number 37

 5  in your questionnaire, are you saying that you are sticking

 6  with that answer, or are you saying that you would need to hear

 7  all the evidence before --

 8       A.   I would need to hear all the evidence.

 9       Q.   Now, you understand that the law says that a person

10  convicted of capital murder, the -- starts off with the

11  presumption that the appropriate punishment is life in prison

12  without parole.

13       A.   Do I understand that?

14       Q.   Yes.

15       A.   Yes, I understand that.

16       Q.   Would you require the Defense to put forth evidence

17  that he is not a future danger?

18       A.   Yes.

19       Q.   So understanding that the State has the burden of

20  proof to prove he is -- would be a continuing threat and would

21  continue to commit criminal acts of violence, you would require

22  the Defense to prove that he would not be a future danger?

23       A.   I would like to hear both sides, yes.

24       Q.   And I hate to be pesky, but the law requires to me

25  to get a yes or no from you.  When you say you would like, that
```

```
 1  leads a little wiggle room.

 2       A.   I would require.

 3       Q.   Okay.  So you would require the Defense to put forth

 4  evidence that he's not a future danger?

 5       A.   Correct.

 6       Q.   Now --

 7                 MR. WEATHERSPOON:  Your Honor, may we have a

 8  little break?

 9                 THE COURT:  Yes, sir.

10                 THE BAILIFF:  All rise.

11                 (Venireperson excused from courtroom.)

12                 MR. WEATHERSPOON:  Your Honor, the Defense will

13  submit the juror for cause based on her answer to the questions

14  concerning Special Issue Number 1.

15                 (Venireperson challenged by the Defense.)

16                 MS. MOSELEY:  We agree, Your Honor.

17                 THE COURT:  All right.  Thank you very much.

18  Juror 1446A is excused by agreement.

19                 (Venireperson 1446A, Carolina Aviles, excused.)

20                 (Discussion off the record.)

21                 THE COURT:  Okay.  We're on the record.

22                 MS. MOSELEY:  Judge, Juror Number 1446A,

23  Carolina -- I'm sorry, wrong juror.  Juror Number 1431A, Marcia

24  Jones, did not appear today as she was instructed.  Both sides

25  agree to excuse her without an interview.
```

```
 1                    THE COURT:  Thank you.

 2                    (Venireperson 1431A, Marcia Jones, excused.)

 3                    MS. BERNHARD:  And just for the record, we would

 4   state that based on her questionnaire, I do not think that she

 5   would qualify.

 6                    (Venireperson returned to courtroom.)

 7                    THE COURT:  Ms. Aviles, you have been excused,

 8   ma'am.  Thank you very much.

 9                    VENIREPERSON:  Okay.

10                    (Venireperson excused from courtroom.)

11                    (Lunch recess.)

12                    THE BAILIFF:  All rise.

13                    (Venireperson brought into courtroom.)

14                    THE COURT:  Good afternoon.

15                    VENIREPERSON:  Good afternoon.

16                    THE COURT:  Thank you for coming down today, and

17   thank you for waiting for us.  I appreciate it.  It is much

18   appreciated by all concerned.

19                    VENIREPERSON:  Absolutely.

20                    THE COURT:  Please be seated.

21                    VENIREPERSON:  Thank you.

22                    THE COURT:  Ms. White, do you recall the oath

23   that you were given by me in the Central Jury Room in June of

24   this year?

25                    VENIREPERSON:  Yes, I do.
```

```
 1                    THE COURT:  All right.  Well, you're still

 2    operating under that oath, and you will continue to operate

 3    under that oath and the jury instructions that were given until

 4    you're -- until you are excused from this jury.

 5                    VENIREPERSON:  Okay.

 6                    THE COURT:  We're going to try this case the

 7    week of October the 28th and November the 4th.  Has anything

 8    happened in your life from June until now that would prevent

 9    you from being able to sit as a juror during those two weeks?

10                    VENIREPERSON:  No.  I do have a question.

11                    THE COURT:  Okay.

12                    VENIREPERSON:  Would there be any sequestering?

13                    THE COURT:  I don't know.

14                    VENIREPERSON:  Well, the only thing -- and I --

15    and this is important to me, would be a certain family function

16    on November the 2nd.

17                    THE COURT:  Okay.

18                    VENIREPERSON:  Which is on a Saturday.

19                    THE COURT:  I'll let the lawyers get into that

20    with you in depth, but we don't know at this point whether you

21    will be or not.

22                    VENIREPERSON:  Okay.

23                    THE COURT:  Have you been exposed to the facts

24    of this case since --

25                    VENIREPERSON:  No.
```

```
 1                    THE COURT:  All right.  You know nothing about

 2    it?

 3                    VENIREPERSON:  No.

 4                    THE COURT:  Let me introduce the parties to you.

 5    Representing the State is Ms. Andrea Moseley.

 6                    MS. MOSELEY:  Good afternoon.

 7                    VENIREPERSON:  Hello.

 8                    THE COURT:  And Rocky Jones.

 9                    VENIREPERSON:  Hello.

10                    THE COURT:  Elaine Evans is also representing

11    the State.  She's not here today.

12                    Representing the Defense is Nancy Mulder.

13                    MS. MULDER:  Good afternoon.

14                    VENIREPERSON:  How do you do?

15                    THE COURT:  Catherine Bernhard.

16                    MS. BERNHARD:  Good afternoon.

17                    VENIREPERSON:  Hello.

18                    THE COURT:  Kenneth Weatherspoon.

19                    MR. WEATHERSPOON:  Good afternoon.

20                    VENIREPERSON:  Hello.

21                    THE COURT:  And the citizen accused is Mr.

22    Matthew Johnson who is sitting to the left of Ms. Bernhard.

23                    VENIREPERSON:  Okay.

24                    THE COURT:  The lady between you and I is

25    Darline LaBar.  She's the official court reporter, and her job
```

```
 1   is to take down everything that's being said.  So as a courtesy

 2   to her, I'll ask you to try to remember to answer audibly yes

 3   and no and try not to say uh-huh and huh-uh.  We do that so

 4   often in everyday language.  It's hard to remember that, but

 5   we'll try to remind you if you forget.

 6                   VENIREPERSON:  This is true.

 7                   THE COURT:  My name is Tracy Holmes.  I am the

 8   District Judge in this court, I will be hearing the case.  And

 9   I am the one who swore you in in June --

10                   VENIREPERSON:  I understand.

11                   THE COURT:  -- if you don't remember.

12                   VENIREPERSON:  I understand.

13                   THE COURT:  Have you had an opportunity to

14   review the pamphlet and your questionnaire?

15                   VENIREPERSON:  Yes.

16                   THE COURT:  Okay.  Each side has 45 minutes to

17   talk to you, and at the conclusion of that hour and a half,

18   we're going to ask you to step out in the hall and the lawyers

19   will determine whether or not you have been qualified as a

20   juror.  If so, we'll take your photograph so that the lawyers

21   can put a name to a face when they're going over their list

22   later on.  And then on October the 15th or the 16th we will be

23   notifying you definitely whether you will or will not be a

24   juror in this case.

25                   VENIREPERSON:  I understand.
```

```
 1              THE COURT:  Is that acceptable to you?

 2              VENIREPERSON:  I understand, yes.

 3              THE COURT:  Thank you very much.

 4              Ms. Moseley.

 5              MS. MOSELEY:  Thank you, Judge.

 6                        RUTH WHITE,

 7  was called as a venireperson by the parties, and after having

 8  been first duly sworn, testified as follows:

 9              STATE VOIR DIRE EXAMINATION

10  BY MS. MOSELEY:

11      Q.    Good afternoon, and thank you for being so patient.

12  I'm always surprised when people come in and still manage to

13  have a smile on their face.

14      A.    Oh, no problem.

15      Q.    After being left out on those hard benches outside,

16  we don't -- we don't make the best of accommodations, so I

17  appreciate it.

18      A.    Thank you.

19      Q.    The first thing I want to let you know, the purpose

20  for why we're here today and why we're talking to you

21  potentially for an hour and half by the end of this at

22  4 o'clock in the afternoon, is just to let you know -- because

23  we're talking about the death penalty.  And we're talking about

24  a process in criminal law that's very different from most

25  criminal cases and the way criminal cases are tried, but
```

```
 1   because we're dealing with the death penalty, we know that
 2   people's views can be very strong and their feelings can be
 3   very strong, either in favor of the death penalty or opposed to
 4   the death penalty in a way that might affect their ability to
 5   follow the law that would be given to them and base their
 6   verdict on the law and the evidence.  And we understand that,
 7   and we accept it.  And there's nothing wrong with that.
 8               So our purpose and our goal -- we looked at your
 9   questionnaire and thought that you appear to be one of those
10   middle of the road people who wouldn't always give the death
11   penalty in every murder case or who wouldn't never give the
12   death penalty in any case, but you would wait and listen to all
13   the evidence and base your answers and your decisions on the
14   evidence and the law.  But there's always the -- the chance
15   that a juror gave us these answers in June and have had several
16   months to think about more and really consider how they would
17   react and how they would feel about being a juror, and their
18   feelings may be different now than they were then.
19               And one thing that caught my eye about your
20   questionnaire was on page 18, the very last -- well, second to
21   last page, Question Number 139.  We ask:  How would you feel
22   about being chosen as a juror in this case?  You said:  It
23   would certainly be a life changing event.  It's always
24   different when you're faced with reality as opposed to what you
25   would do on TV.
```

1        A.    That's true.

2        Q.    And that's one of the things -- really one of the

3    purposes of our conversation today is to make sure that every

4    juror who comes in to talk to us realizes how real a process

5    this is, because it is easy sometimes to sit at home, watch the

6    news come across at 6 o'clock.  Horrific things are happening

7    in our community and are being reported, and we say, you know,

8    whoever did that ought to get the death penalty.  That guy

9    deserves to die for what he did.  And it's pretty easy sitting

10   in your recliner at home to say that.  Obviously, when you come

11   into the courtroom and you're faced with a real life human

12   being -- and in this case, my boss, Craig Watkins, the elected

13   District Attorney, has decided that we are seeking the death

14   penalty in this case against Matthew Johnson.  And he has a

15   family that cares about him like you and I do.  He's a real

16   person, not some newsreel on the 6 o'clock news.  And we

17   believe that we have the type and quality of evidence that's

18   going to convince the 12 jurors in this case that he is guilty

19   of capital murder.  And we also believe in the punishment phase

20   that we are going to have the type of evidence that will

21   convince the jury and leave them with no option under their

22   oath but to answer Special Issue Number 1 yes, that we did

23   prove that he will more likely than not commit criminal acts of

24   violence in the future that would constitute a threat to

25   society.  And we believe that there won't be anything in the

1  evidence that will convince the 12 jurors that anything other

2  than the death sentence is the proper sentence.

3              And answering Special Issue Number 1 yes and

4  Special Issue 2 no would leave the Judge with no option but to

5  basically sign a warrant for his execution.  And that one day

6  you may be sitting at home in your recliner with your family

7  and watch the news at 6 o'clock and see that today is the day

8  that Matthew Lee Johnson is going to be executed.  And you'll

9  know, if you're on the jury, that you played a part in that,

10  because the answers to these questions for that result have to

11  be unanimous.  So but for your answers, he wouldn't be

12  receiving lethal injection.

13              And I tell you that not to be morbid or gruesome

14  or to scare you, but really to bring home how real the process

15  is and to ask you whether you feel like you could participate

16  in a process that may end in his execution some day without

17  doing harm to your conscience.

18        A.    I understand.

19        Q.    And do you believe you could participate in that

20  process and live with that decision?

21        A.    I believe I could, but there again, I would have to

22  hear the circumstances.

23        Q.    Okay.  Okay.  And I guess my question is, there's

24  nothing in you that says, if the evidence leads me to the

25  answers, I'm going to be -- my conscience is going to be so

207

```
 1   bothered, that I'm not going to answer that based on the
 2   evidence.  I'm going to answer it in a way that would spare his
 3   life because I can't live with being part of an execution?
 4        A.   It's overwhelming.  It is an overwhelming thought.
 5        Q.   Right.
 6        A.   But there again, I believe that the victim's
 7   families don't get choices, and, you know, it needs to be
 8   addressed.
 9        Q.   Sure.  Absolutely.  And I know -- you know, we have
10   a lot of jurors -- and I'm not saying that this is how you feel
11   because I gather that you just recognize how serious the
12   process is.
13        A.   Exactly.
14        Q.   And how -- what a -- what a job it is to undertake
15   for a juror.  And it should be.  Nothing about this should be
16   easy.
17        A.   No.
18        Q.   For anyone.
19        A.   No.
20        Q.   But we do have jurors that say while I recognize
21   the -- that a death sentence is the proper sentence in some
22   cases, I'd rather not be part of it myself and I'd rather let
23   somebody else take it.  And I will tell you that the State of
24   Texas -- nobody in this room is going to force anyone to serve
25   on a jury if it's going to affect them negatively for years to
```

1  come, if their conscience will be bothered by it, because we

2  will find 12 jurors who can do it.  Does this make sense?

3       A.    Absolutely.

4       Q.    Okay.  So we may come back to it.  You mentioned one

5  other thing I wanted to talk to you about right away and that

6  was the victim's families have some expectations in the

7  process.  And obviously, the Defendant has the right to a fair

8  trial.  And he's given a lot of rights under the Constitution

9  in any criminal case, any criminal defendant would be.  If you

10  were charged with a crime, you would have the same rights and

11  privileges.  But what we don't often hear about is that the

12  State of Texas and the victim's family and the citizens have a

13  right to a fair trial, as well.  So both sides are entitled to

14  a fair trial.

15            When we're sitting at home and we're talking

16  about the death penalty, many times people feel the way you do,

17  I think, and support the death penalty, believe that it's about

18  the punishment fitting the crime.  If you commit this crime,

19  you deserve this punishment.  And as you've probably figured

20  out by now, having read the pamphlet that the Judge gave you,

21  our law has very little to do with what somebody deserves in

22  terms of the -- whether the death sentence or the life sentence

23  is the proper sentence.

24            The legislature doesn't have the jury go back

25  and say, who votes for life, who votes for death, or who thinks

1    he deserves life or who thinks he deserves death.  It doesn't

2    work that way at all.  Our legislature has decided that the way

3    the law is going to separate and the way a jury must separate

4    those who receive life from those who will receive the death

5    sentence is based mainly on that Special Issue 1.  Are they a

6    capital murderer who will more likely than not continue to be a

7    threat to society.  Or, are they the capital murderer who

8    committed a horrible, heinous crime but can be safely

9    incarcerated without fear that they'll continue to be a threat?

10   Does that make sense?

11          A.    Yes.

12          Q.    And our law says even if a juror believes that the

13   person deserves the death penalty, even if the victim's family

14   wants the Defendant to get the death penalty and feels like

15   that would be justice for the victim's family, if the State of

16   Texas cannot prove that that person would more likely than not

17   be a continuing threat to society, if I can't prove that, then

18   despite what you may think he deserves, the life sentence is

19   the verdict.  Does that make sense?

20          A.    Yes, it does.  I understand.

21          Q.    And so sometimes jurors have to separate their, what

22   I'm doing at home in my recliner from what I have to do as a

23   juror and following my oath.  Some -- some citizens can do that

24   and others can't.  And there's nothing wrong either way, but I

25   want to follow through with you and -- and find out whether

1  you're one of those jurors who can set aside those personal

2  feelings and look to the evidence and the law.

3            We talked about some -- that the Defendant has

4  certain rights in all criminal cases, whether it's theft of a

5  bicycle or a capital murder.  One of those is the presumption

6  of innocence, and anybody charged with a crime is presumed

7  innocent unless and until the State can prove them guilty.  No

8  matter whether a person has been arrested and indicted, brought

9  into court, and told that the State is seeking the death

10  penalty, none of that is any evidence of guilt.

11            A lot of people say, you know, where there's

12  smoke, there's fire.  If you bring somebody this far into the

13  process, they got to be guilty of something.  That would

14  violate the presumption of innocence, though, wouldn't it?

15       A.   Yes, it would.

16       Q.   I can see you kind of turn your head because you can

17  see that that is not the way you ought to look at this.  And

18  certainly as a juror, you have to be able to presume the

19  Defendant innocent all the way up until there has been

20  sufficient evidence produced to convince you beyond a

21  reasonable doubt of his guilt.  And that burden is always on

22  me -- on the State of Texas.  Can you afford the Defendant that

23  presumption of innocence?

24       A.   Yes.

25       Q.   And believe truly in your heart this he's innocent

1    as he sits here today until I prevail?

2        A.    Until you -- yes.

3        Q.    Right.  That doesn't mean he's actually innocent,

4    but you have to presume that.

5        A.    Right.

6        Q.    And if I cannot prove beyond a reasonable doubt that

7    he's guilty, the verdict has to be not guilty, right?

8        A.    Exactly.

9        Q.    I bring the charges.  I have to prove them.

10   Sometimes we say if we do the accusing, we have to do the

11   proving.  And it's never going to be on that table -- on the

12   Defense table.  It's never going to be the Defense attorney's

13   job or the Defendant's job to convince the jury that he isn't

14   guilty.  It's always going to be my job to prove that he is.

15              So they never have to do anything.  They don't

16   have to call any witnesses.  They don't have to question my

17   witnesses.  They don't have to make closing arguments.  They

18   don't even have to talk to you today.  They will.  They're good

19   lawyers, and they're going to do their job, but they're not

20   required to prove anything.  And the jury's job is always to

21   look to the evidence that they did hear and not worry about

22   what they didn't, not require the Defense to put on any

23   evidence.  Can you do that?

24       A.    Yes.

25       Q.    I told you my burden is beyond a reasonable doubt.

```
 1   Doesn't mean beyond all possible doubt.  And we don't have a
 2   burden of what beyond a reasonable -- we don't have a
 3   definition of what beyond a reasonable doubt means, so it's
 4   left up to you as a -- as a person to decide.  We know it's
 5   based on your reason and common sense.  Nobody told you to
 6   leave that outside when you come in and take the juror's seat.
 7   But we don't have a definition of what it is.  It could be
 8   different from juror to juror, but whenever you're convinced in
 9   your mind that the State has proven it to your satisfaction,
10   then your verdict is guilty.
11              I say it doesn't have to be beyond all possible
12   doubt or with 100 percent certainty, because I would -- I would
13   guess, Ms. White, that you would agree that I couldn't prove
14   anything to you beyond all possible doubt unless you saw it
15   yourself.
16        A.   I see what you're saying.
17        Q.   I mean, anything is possible.  But -- so that would
18   be a burden we couldn't -- we could never attain.  But we do
19   have to exclude all reasonable doubt.  And obviously, that's
20   the highest burden, and it should be because we're talking
21   about somebody's -- potentially somebody's life.
22              What I have to prove beyond a reasonable doubt
23   is everything in that indictment.  The indictment kind of
24   serves as a checklist, so it tells me what I have to prove.  It
25   tells the Defendant what he's been charged with, and it tells
```

1   the jury what it is they need to be looking for.  I have to

2   prove, for capital murder, that the murder was committed

3   intentionally, that the person on trial is the right person,

4   that we got the right guy, and that he intentionally caused the

5   death of the victim.  And you notice I put a focus on that word

6   "intentionally."  What that means in law is that it was the

7   person's conscious objective or desire to cause the result.  It

8   was -- they -- they formed the intent, wanted to kill the

9   person and did what it took to kill them.  That means it wasn't

10  a mistake.  You know, the gun didn't go off while I was

11  cleaning it.  It wasn't an accident.  It wasn't self-defense or

12  defense of a third person.  We're never going to be talking

13  about someone who was insane at the time of the crime or

14  someone who was mentally retarded because someone who is

15  mentally retarded would never be subject to the death penalty.

16  So we're talking about someone who intended to cause the death

17  of the person.  I have to prove that.  And I have to prove that

18  that death was caused during the course of committing or

19  attempting to commit a robbery.

20              No one of those things is more important or less

21  important than the other.  Each box has to be checked.  Let me

22  give you a simple example.  Let's say in that case -- not in

23  this case -- but in a hypothetical, I've alleged an intentional

24  murder in the course of a robbery, capital murder.  All of

25  my -- all of my evidence comes in and my witnesses testify, and

```
 1   all 12 jurors agree beyond a reasonable doubt that the

 2   Defendant is the right person and that, in fact, he did cause

 3   the death intentionally of the victim, but they never hear

 4   anything about a robbery.  Nothing about any property taken.

 5   Nothing about any threats to take property or demands.  Nothing

 6   about a robbery.  You would agree, I haven't proven my case,

 7   right?

 8       A.    Right.

 9       Q.    The jury's verdict would have to be not guilty of

10   capital murder.  Now, that may -- they may have an option of a

11   lesser offense of murder.  Maybe they'd say, you know, they

12   proved that it was an intentional murder.  Didn't prove the

13   robbery, so I can't do capital murder, but I can find them

14   guilty of murder.  And if it's murder, we're not even going to

15   be dealing with these special issues because those special

16   issues only apply in a capital murder conviction, okay?

17              For murder, there's a punishment range.  We're

18   talking about years in prison, anywhere from five years, all

19   the way up to 99 years or life.

20              And the jury would decide, after hearing all of

21   the evidence, everything about the crime, and the Defendant on

22   trial, character, if there's any prior criminal record or not,

23   relationship between the victim and the Defendant, all those

24   things, to help them decide where in that range is the proper

25   punishment.  And if the jury heard everything in a murder case
```

1  and believed five years was the right sentence, they'd give

2  them five years in prison.  If they thought 20 or 30 or 99 or

3  life was proper, that would be their sentence.  But they have

4  to keep an open mind and wait until they've heard everything

5  before they decide.

6                    If you were on a jury and, you know, I didn't

7  prove the robbery, could you find somebody not guilty of

8  capital murder, if I didn't prove all of the things I have to

9  prove?

10      A.    If you did not prove all the things you have to

11  prove, then it would be murder.

12      Q.    It would be not guilty of capital murder.

13      A.    Not guilty of capital murder, according to the

14  special issues.

15      Q.    According to the indictment.

16      A.    Yeah, right.

17      Q.    And the jury's -- the jury's job is always to look

18  to that and make sure they hold me to my job.  There's nothing

19  like a technicality.  There's nothing like a technicality.

20  They're all important.  If you found somebody guilty of murder,

21  not capital murder, could you keep an open mind to that full

22  range of punishment we talked about?

23      A.    Yes.

24      Q.    And if you thought five years was the right thing

25  after hearing everything, you could do that?

1        A.    Yes.

2        Q.    If you thought life was the right thing, you could

3   do that?

4        A.    Yes.

5        Q.    Let's say that the State does prove all of those

6   beyond a reasonable doubt, everything we alleged, then you

7   would find the Defendant guilty of capital murder.  And we'll

8   talk in a second about the -- the punishment phase.

9                A couple more things.  The Fifth Amendment.

10  You've heard that, a person has the right not to testify.

11       A.    Right.

12       Q.    If a defendant chooses not to testify, the Judge

13  would instruct the jury that they can't consider that silence

14  for any reason.  Have you ever served on a jury?

15       A.    A civil.

16       Q.    Civil.  So it's a little different in a criminal

17  case.  Basically it goes step-by-step with the burden of proof.

18  It's my job to prove them guilty, not his job to prove he's

19  innocent.  So he never has to take the stand.  I can't call him

20  to testify.  His own mamma can't convince him to testify.  It's

21  always his choice.  If a defendant chooses not to testify, the

22  jury would just look to the evidence they did hear.

23       A.    Okay.

24       Q.    Could you do that?

25       A.    Yes.

217

```
 1        Q.    And disregard his silence and not use it as any
 2   evidence at all?
 3        A.    Yes.
 4        Q.    Not hold it against him, in other words?
 5        A.    No.
 6        Q.    That Fifth Amendment right applies in the punishment
 7   phase, as well.  Just keep that in mind.  So you may never hear
 8   from a criminal defendant, even in a case where the State is
 9   seeking the death penalty.  You would always just look to the
10   evidence that was presented.
11                With regard to witnesses, the jurors are the
12   sole judges of the credibility of the witnesses.  And all
13   witnesses come in, they take an oath to tell the truth, the
14   whole truth and nothing but, but the jury's got common sense
15   and they know some witnesses might lie, right?  Can you imagine
16   that not everybody would tell the truth just because they've
17   been given an oath?
18        A.    Right.
19        Q.    It's sad, but true.  And some people might be
20   mistaken.  Maybe they're wrong, but they aren't lying.  They're
21   just wrong.  And some people may come in and tell the truth and
22   be exactly right about it.  It's the jurors' job to wait until
23   they've heard all of their testimony and then decide where they
24   fall in that credibility spectrum.  That applies to all
25   witnesses.
```

```
 1                So I saw on page 5 that we asked you about
 2    police officers, and we didn't ask it in terms of them being
 3    witnesses.  But we asked if you believe police officers are
 4    more likely to tell the truth than the average person, and you
 5    said yes.  They are sworn to protect and defend.  I firmly
 6    believe that.  And there's absolutely nothing with respecting
 7    police officers, but I think you'd probably have to have been
 8    living under a rock to not recognize that some police officers
 9    are not so good as others.
10         A.    That's true.  I mean --
11         Q.    And you can't really tell a good police officer, one
12    who's going to uphold these duties and obligations, from a bad
13    police officer, by their uniform, right?
14         A.    Right.
15         Q.    They wear the same uniform.  So the law requires
16    witnesses to wait until they've heard the witness testify
17    before they decide whether they're going to believe their
18    testimony or not.  It wouldn't be proper to say, well, a police
19    officer comes in, they're wearing their uniform, I don't really
20    need to pay much attention to them because I'm automatically
21    going to believe what they say.  You can see that?
22         A.    I can see that.
23         Q.    And you wouldn't do that, I assume?
24         A.    No.
25         Q.    Automatically believe them?
```

1      A.    Well, we're just all brought up to respect the law

2  and the officers, so I think you have a tendency more to think

3  they're going to tell the truth than not.

4      Q.    Right.  Absolutely.  And there's nothing wrong with

5  respecting law enforcement.  Like I said, this may be one of

6  those things that's different from how you would conduct

7  yourself at home if a police officer knocked on the door versus

8  as a juror.  All the law requires you to do is wait until

9  you've heard their testimony.  And -- I mean, if a police

10 officer testified that the sun rose in the west this morning,

11 you probably wouldn't believe that, would you?

12     A.    No, I would not believe that.

13     Q.    Right.  That police officers are human beings and

14 they can be good and bad.  They can be right and wrong.  They

15 can be mistaken.  So as a juror, you kind of have to wait until

16 you hear the testimony, whether it's a police officer or a

17 prostitute or a prisoner, whoever it is, you have to wait until

18 you hear what they say before you decide to believe some, none,

19 or all of what they say.  Can you do that?

20     A.    Yes.

21     Q.    Even for police officers?

22     A.    Yes.

23     Q.    Okay.  Now, those are the basic principles of law

24 that apply in any criminal case in the guilt/innocence phase of

25 the trial, and it works the same whether it's a theft case in

1  misdemeanor court, all the way up to a capital murder.  But in

2  the punishment phase is where a capital murder case becomes

3  vastly different.  We're not talking about that range of years

4  in prison anymore.  If you are convicted of capital murder, one

5  thing automatically happens.  The moment that guilty verdict is

6  accepted by the Judge, life without parole is the best you're

7  ever going to do.  That sentence is an automatic sentence, and

8  under our law, life without the possibility of parole is the

9  presumed proper sentence.  And it will be the proper punishment

10 for the vast majority of capital murder defendants.  The death

11 penalty is reserved, as we talked about before, for those few

12 capital murder defendants who are going to be more likely than

13 not a threat in the future.  They're going to continue to

14 commit criminal acts of violence.  Does that make sense?

15      A.   Yes.

16      Q.   So with Special Issue Number 1, once again, in the

17 punishment phase, you look to the State of Texas to be bringing

18 the evidence.  I have the burden to prove that the answer to

19 Special Issue Number 1 is yes, because like we had that

20 presumption of innocence in the first part of the trial, in the

21 second part of the trial we have a presumption that the answer

22 to that is no until I bring sufficient evidence to the jury to

23 convince them that the answer should be yes.  Does that make

24 sense?

25      A.   Yes.

```
 1        Q.    So you look to me, and you look to this table.  They
 2   never have to prove that he won't commit criminal acts of
 3   violence in the future.  The Defense doesn't have to call any
 4   witnesses to say, I promise he's changed, he will never do it
 5   again.  The Defendant never has to testify, right?
 6        A.    Right.
 7        Q.    So you look to my evidence.  And -- and the
 8   question -- I'm going to break it down for you.  You see the
 9   word "probability" there.  That means more likely than not.
10   It's not a mere possibility, because it's always possible
11   somebody is going to do something in the future.  It's not
12   absolute certainty, because I could never prove with absolute
13   certainty what someone is going to do.  But it is more likely
14   than not.  I have to prove more likely than not the Defendant
15   that you've just convicted of intentionally killing someone in
16   the course of robbery would commit criminal acts of violence.
17   Doesn't tell us what that is.  We can see it's plural.  You see
18   it says acts.
19        A.    Uh-huh.
20        Q.    That he's going to commit criminal acts of violence,
21   whatever that means to you.  It doesn't say another murder.  It
22   doesn't say a sexual assault or a kidnapping or even an
23   assault.  It means whatever criminal acts of violence means to
24   you, but it's criminal acts of violence that would constitute a
25   continuing threat to society.
```

1          Now, the best they can do is life without

2    parole, and that means just that.  We used to have the

3    possibility of parole.  We don't anymore.  So don't ever worry

4    that the person is going to get out of prison on parole or be

5    released back into society.  They're going to spend the rest of

6    their life in prison.

7          So when we talk about society, we're talking

8    about all of society, prison society included.  Have you ever

9    been to a prison?

10   A.    No.

11   Q.    But you obviously know that there are inmates kind

12   of moving about and socializing and living together and eating

13   together.  There are guards there to keep security.  People

14   come in to visit loved ones in prison.  I'm sure you recognize

15   that there are inmates there trying to do their time

16   peacefully, pay their debt to society, and get back out.  Do

17   you believe that all of those people deserve protection from

18   someone who would commit criminal acts of violence?

19   A.    I'm not sure about that.  I'll be honest with you.

20   And I'll be honest with you.  I mean, because I do watch the

21   news and take, for instance, Castro with the girls, okay?  I'm

22   sorry, he got what he deserved.  And I agree -- at first I

23   thought, why are they not going for the capital punishment.

24   Well, then they explained it.  Rather than put the victims and

25   the victim's family through all that horrendous recount of what

1    they went through for those 10 years, I agreed with that.  And

2    he was going to get all -- the continuous life sentences, and

3    he took the ultimate cop-out, which --

4        Q.    Well, I -- I -- I agree with you completely, and I'm

5    not specifically saying that you may not find that there are

6    people who kind of have it coming in prison.  I guess what I'm

7    asking is if you recognize that there may be people in prison

8    for drug crimes or driving while intoxicated -- third time is

9    punishable by prison time, that there are people in prison, who

10   are non-violent offenders who may just really be trying to get

11   their time behind them.  Do you believe that they ought to be

12   subjected to people who would constitute a threat to them?

13       A.    No.

14       Q.    What about the guards who are there trying to work,

15   earn a living, do they deserve protection?

16       A.    Yes.

17       Q.    And the people who come to visit loved ones and the

18   teachers and preachers and other people that find themselves

19   there?

20       A.    Yes.

21       Q.    And so what we're talking about in Special Issue

22   Number 1 is the State having to bring evidence to prove beyond

23   a reasonable doubt that the Defendant convicted of capital

24   murder is the kind of capital murderer who will more likely

25   than not constitute a continuing threat to society, even prison

```
 1   society.

 2         A.    I see what you're saying.

 3         Q.    Does that make sense?

 4         A.    Yes, yes.

 5         Q.    And that's where the state of Texas draws the line.

 6   Those that the State cannot prove that, get life, because

 7   they'll go to prison and do their time.  Those that the State

 8   can prove will be a future threat will be one step closer to

 9   the death sentence.  Does that make sense?

10         A.    Yes.

11         Q.    And you can see, and I -- and I feel from you how

12   important it is to you that the victims kind of have a -- that

13   they have some consideration in this process.  And I represent

14   the State of Texas.  I get that.  But Special Issue Number 1

15   doesn't say anything at all about what the victims want or

16   their wishes at all, does it?

17         A.    No.

18         Q.    So as a juror you recognize that that's the question

19   you have to answer.

20         A.    Yes.

21         Q.    Even if it's not what the victim's family would

22   want.

23         A.    Right.

24         Q.    Could you do that?  Could you answer that based on

25   the evidence brought to you and not your feelings about what
```

225

 1   someone deserves or what you think the victim's family wants?

 2        A.    Right, whether they're just going to continue to be

 3   a threat.

 4        Q.    Right.  And did I prove that beyond a reasonable

 5   doubt.

 6        A.    Yes.

 7        Q.    Okay.  And you could base your answer on the

 8   evidence there?

 9        A.    Yes.

10        Q.    Even if it means that the person will get a life

11   sentence?

12        A.    Yes.

13        Q.    Okay.  If the jury says no to Special Issue 1, I

14   didn't prove it, I don't believe beyond a reasonable doubt he's

15   going to more likely than not be a threat, if the answer is no,

16   the trial is over.  You've done all you've got to do.  You're

17   going to be discharged.  The Defendant will go down to prison

18   on the life sentence.  If you answer it yes, the State proved

19   it to me, then and only then would you go on to consider

20   Special Issue 2.  And I tell you that because it's real

21   important to remember where we are in the process.  At the time

22   that you look at Special Issue Number 2 all 12 jurors have

23   found him guilty of capital murder, which you would agree is a

24   serious crime?

25        A.    Right.

226

1      Q.    Intended to kill somebody in the course of a

2  robbery.

3      A.    Right.

4      Q.    And all 12 jurors agree that more likely than not

5  he's going to be a threat in the future.

6      A.    Okay.

7      Q.    Then you look to Special Issue 2.  And Special Issue

8  Number 2, I sometimes refer to as a safety net question.  We

9  didn't always have this question.  The legislature put it

10  there, and I believe it is as much for the benefit of the

11  jurors as it is for the benefit of the Defendant.  What Special

12  Issue Number 2's job is, is to ensure that the jurors have the

13  opportunity to go back one more time and look at all of the

14  evidence again, and this time you're looking at it a little bit

15  differently because I don't have a burden of proof anymore, and

16  the Defense doesn't have a burden of proof.  The only people

17  with any burden is the jurors, to go back and consider

18  everything one more time and make sure -- make certain that the

19  death sentence is the proper sentence.  Because if there is

20  anything in the evidence that you hear in the trial that

21  convinces you that the life sentence is really the proper

22  sentence here, whatever that evidence is, if you believe that

23  the life sentence is really the proper sentence, this is how

24  you do it.

25      A.    Okay.

1        Q.    You answer that yes.

2        A.    Yes.

3        Q.    And nobody is going to tell you what is or isn't

4   mitigating.  We'll go through it real quick.  It says consider

5   all the evidence, including the circumstances of the offense,

6   the Defendant's character and background.  You may hear things

7   there about the way he was raised, childhood abuse or neglect,

8   educational background, information about the parents, you

9   know, single parent household, both parents, good neighborhood,

10  bad neighborhood, good schools, bad schools, drug and alcohol

11  abuse or addiction may be in evidence there, anything about the

12  Defendant's character and background, personal moral

13  culpability of the Defendant.  You may or may not hear anything

14  about that.  The Defendant is really the only source of that

15  evidence, and remember, he doesn't have to testify.

16       A.    Right.

17       Q.    But you look again at all the evidence you heard,

18  and what we mean by mitigating is some evidence, something that

19  would lessen his moral blameworthiness, something where you

20  might say, you know, for -- I'll take, for example, severe

21  childhood abuse where you may say, that it's not really his

22  fault, that he was created this way, that, you know, the abuse

23  caused him to be that way.  You might find that to be

24  mitigating.  You may not find it to be sufficiently mitigating.

25  Nobody is going to tell you it is.  But you look at all of it

1   and decide for yourself, kind of categorize the evidence.  Is

2   this mitigating?  Maybe it's aggravating.  If it's mitigating,

3   is it sufficiently mitigating?  As you can imagine by this

4   point, we're talking about a really bad guy, right?

5        A.   Uh-huh, yes.

6        Q.   Guilty capital murderer and in all likelihood a

7   future threat.  But if there's something in the evidence that

8   convinces you that the life sentence is really the proper

9   sentence, even though you know how bad he is, your answer to

10  that has to be yes.  And then the life sentence is the proper

11  sentence.  All 12 jurors have to agree that there's nothing in

12  the evidence sufficiently mitigating to warrant a life sentence

13  before the death sentence is imposed.

14            This prevents you from going home and saying,

15  the State had my hands tied.  They proved he was guilty beyond

16  a reasonable doubt.  I had no choice under my oath but to find

17  him guilty.  The State proved more likely than not he's going

18  to be a threat in the future, and under my oath I had to answer

19  that yes.

20            Special Issue Number 2, there is no burden and

21  no -- no restriction on the jury, except that it has to be

22  something in the evidence.  That's the way you ensure the right

23  thing is done.  Does that make sense?

24        A.   It does.

25        Q.   And there may be -- you may be a juror on a hundred

1  thousand cases of capital murder and only find in one case that

2  there was something sufficiently mitigating.  You may find in

3  most of them, 99.9 percent of them the proper sentence is the

4  death sentence.  But if there's something in the evidence

5  that's mitigating to you, that tells you the life sentence is

6  proper, would you answer that yes and send him to prison for

7  life?

8          A.    Yes.

9          Q.    Even though you know they're going to be -- and more

10  likely than not a continuing threat?

11         A.    Based on the evidence, if there was any mitigating

12  evidence, yes.

13         Q.    And you understand that nobody is going to tell you

14  what is or isn't mitigating?

15         A.    Right.

16         Q.    We asked you a couple of questions in the

17  questionnaire that kind of relate to that.  We don't give you a

18  lot of the law in here, but on page 6, Question Number 39, you

19  kind of agreed that things like genetics and circumstances of

20  birth, upbringing and environment, the things that we've talked

21  about may be in evidence, could attribute to a crime, that

22  those are things that you recognize that might be in evidence

23  and that you could consider and decide whether or not they're

24  mitigating to you.  You agree?

25         A.    Yes.

1        Q.    On page 10, Question Number 65, we talk about -- in

2    64 and 65 we talk about some of the laws that apply as it

3    relates to intoxication.  Voluntary intoxication, deciding to

4    get high or drunk voluntarily is never going to be a defense to

5    a crime.  If I go out and get good and drunk and go break into

6    somebody's house tonight and steal all their stuff, I don't get

7    to go, I'm not guilty, you can't find me guilty because I was

8    drunk, right?

9        A.    Right.

10        Q.    That's common sense.  However, evidence of

11    intoxication, if there is anything in the evidence, you notice

12    Special Issue Number 2 says consider all the evidence -- if

13    there's anything in the evidence about intoxication or

14    addiction, for instance, the jury has to consider it because

15    it's in evidence.  Then they decide is it -- is it mitigating,

16    is it aggravating, is it neither, doesn't sway me one way or

17    the other.  You said, should not be mitigating.  It was a

18    choice.

19        A.    That's right.

20        Q.    Right.  And there is --

21        A.    Unless somebody poured the alcohol down them or

22    injected them with the drugs, it was a choice.

23        Q.    And there's absolutely nothing wrong with that.

24    Nobody is going to quibble with that.  I just want to make sure

25    that you recognize if it's in evidence, it has to be

231

```
 1  considered.  You can consider it and decide, nope, not
 2  mitigating.  Another juror might consider it mitigating.  And
 3  everybody may view it differently.  That's what deliberations
 4  are about.  And obviously, all the jurors have a right to their
 5  opinion, and then you just talk it out.  But not everybody is
 6  going to agree on what is or isn't mitigating.
 7       A.    I understand.
 8       Q.    But the law is not going to tell you what it is.
 9  The law is just going to say you have to consider it all.
10              Since we've talked about all of this, do you
11  understand the process that the jury goes through and how we
12  get to whether it's a life sentence or a death sentence?
13       A.    I do.
14       Q.    Do you believe that you could participate in that
15  process and base your answers on the law and the evidence and
16  not any personal feelings?
17       A.    I do.
18       Q.    Whether we're talking guilt/innocence or the
19  punishment, Special Issue 1 or 2, and let that evidence lead
20  you to whether it's a life sentence or a death sentence?
21       A.    It's a scary thought, I'll admit that.  And just
22  like I had put down there, when you're faced with the reality
23  of it, it's -- it's different than just sitting here and
24  saying -- like on TV or hearing someone else say, well, I chose
25  this or I chose that to do.  Because now you're faced with it
```

 1  and it's your decision.  And it is a scary thought, I'll admit

 2  that.

 3       Q.   Sure.  And like I said in the very beginning, it's

 4  not intended to be easy.  It should never be easy.

 5       A.   No, it shouldn't be because you are talking about

 6  another human being.  Right, wrong, or indifferent, you're

 7  talking about another human being.

 8       Q.   And I just want to make sure that I've done all I

 9  can do to make it clear to you that today is your day.  Today

10  is the only opportunity that you're going to get to tell us,

11  yes, I can, or, no, I can't.  And it's not a right or wrong

12  answer.  Nobody is going to think you're a bad citizen or, you

13  know, not doing your duty.  We -- I don't want you over here in

14  October, the first week of November, and say, I thought I could

15  and now I can't and be put in that spot, because it's a bad

16  spot to be in if you're not comfortable.

17       A.   I think right now, the way I'm feeling because this

18  is the first time I've ever experienced anything like this, I

19  would be more inclined -- and I know I would need to hear the

20  evidence of the crime and what happened, but I think I would

21  probably be more likely to want to give a life without parole.

22  I'm being very honest with you.

23       Q.   And that's -- and you would be leaning toward that

24  answer not based on the evidence, but based on your personal

25  feelings?

```
 1      A.    Exactly.

 2      Q.    For fear of having to live with the decision?

 3      A.    Exactly.

 4      Q.    Can you promise me today -- and I know it's hard

 5  because you don't know any of the evidence.  I have a feeling

 6  on Castro's case you'd have no problem at all.

 7      A.    Not at all.

 8      Q.    But I can't give you the facts of this case and ask

 9  you if you'd have any problem in this case.

10      A.    Right.

11      Q.    You understand?

12      A.    I understand.

13      Q.    What I have to ask you though is can you promise me

14  today that regardless of the evidence, which way it goes, can

15  you promise me today that you would base your answers on that

16  evidence and if the evidence led you to a death sentence, if

17  you didn't see anything sufficiently mitigating in the

18  evidence, could you answer the question based on the evidence

19  or are you not able to tell me that today?

20      A.    I'm not able to answer that.

21            MS. MOSELEY:  Judge, can we -- thank you.

22            THE COURT:  Sure.

23            MS. MOSELEY:  Can we have a quick break?

24            THE COURT:  Sure.

25            (Venireperson excused from courtroom.)
```

```
 1                    THE BAILIFF:  All rise.

 2                    MS. MOSELEY:  Judge, I think the State and

 3   Defense have an agreement to excuse Ruth White, 1448A.

 4                    THE COURT:  All right.  Ruth White, 1448A, is

 5   excused by agreement.

 6                    MS. JONES:  They didn't say anything.

 7                    MS. MULDER:  Yes, we agree, Your Honor.

 8                    THE COURT:  Well, I assume when Andrea says

 9   that, that she's looked over and y'all have gone like this

10   (indicating).

11                    MS. BERNHARD:  We would certainly be objecting

12   if that were not right.

13                    THE COURT:  I'm assuming that she's looked over

14   and you've nodded your approval.

15                    MS. MULDER:  They just, I think, want us to make

16   an affirmation for the record that we agree so there's no

17   question later.

18                    (Venireperson 1448A, Ruth White, excused.)

19                    (Venireperson returned to courtroom.)

20                    THE COURT:  Ms. White?

21                    VENIREPERSON:  Yes.

22                    THE COURT:  We are going to excuse you, ma'am,

23   and that means you are relieved of any of the obligations or

24   duties that you've been under.

25                    VENIREPERSON:  Okay.  Thank you.
```

```
1                    THE COURT:  Thank you very much.

2                    MS. MULDER:  Thank you very much.

3                    MS. MOSELEY:  Thank you, ma'am.

4                    (Venireperson excused from courtroom.)

5                    THE BAILIFF:  All rise.

6                    (Venireperson brought into courtroom.)

7                    THE COURT:  Good afternoon, Ms. Stanley.

8                    VENIREPERSON:  Hi.

9                    THE COURT:  The parties may be seated, please.

10                   Thank you so much for your service.  I just want

11   to tell you at the outset how much we appreciate it and how

12   sorry we are about all the inconvenience, but we're very

13   grateful for your service and for your participation.

14                   VENIREPERSON:  You're welcome.

15                   THE COURT:  Thank you very much.

16                   Do you remember the oath that I was -- that you

17   were given by me down in the Central Jury Room in June of this

18   year?

19                   VENIREPERSON:  Yes, ma'am.

20                   THE COURT:  All right.  Well, you'll be

21   operating under that oath and those instructions until you've

22   been relieved from duty.

23                   VENIREPERSON:  Okay.

24                   THE COURT:  We're going to try this case October

25   the 28th and November the 2nd, those are two consecutive weeks,
```

236

```
 1  and we think it will take about 10 business days to try this

 2  case.

 3              Has anything happened since June that would

 4  preclude you from sitting as a juror for those two weeks this

 5  fall?

 6              VENIREPERSON:  No, ma'am.

 7              THE COURT:  Have you heard or seen or read

 8  anything about this case -- about the specific facts of this

 9  case?

10              VENIREPERSON:  I'm not sure if I have or not.

11              THE COURT:  Okay.

12              VENIREPERSON:  I read the news all the time, and

13  I'm always looking at the news, but if I can just tell you

14  about the incident -- I don't know that it -- I do remember

15  reading an incident about a gentleman who robbed a 7-11 and set

16  the clerk on fire.  Is that the same -- I mean, I don't know.

17              THE COURT:  If you knew anything about it, would

18  you be able to set it aside?

19              VENIREPERSON:  Yeah, because, you know, it was

20  just one of those things I had read and then I just went on and

21  read something else.

22              THE COURT:  Okay.  Have you had an opportunity

23  to review the pamphlet and the questionnaire?

24              VENIREPERSON:  Yes, I did.

25              THE COURT:  Okay.  I'm going introduce you to
```

```
 1  the parties.  The State is represented by Ms. Andrea Moseley.

 2                 MS. MOSELEY:  Good afternoon.

 3                 THE COURT:  Ms. Rocky Jones.

 4                 MS. JONES:  Good afternoon.

 5                 THE COURT:  Elaine Evans is a prosecutor for the

 6  State in this case, as well.  She's not here today.

 7                 The Defense is represented by Ms. Nancy Mulder.

 8                 MS. MULDER:  Good afternoon.

 9                 THE COURT:  Ms. Catherine Bernhard.

10                 MS. BERNHARD:  Good afternoon.

11                 THE COURT:  The gentleman who just walked out of

12  the courtroom is Kenneth Weatherspoon.  He's also a lawyer for

13  the Defense.

14                 VENIREPERSON:  Okay.

15                 THE COURT:  And the citizen accused, Mr. Matthew

16  Johnson, is sitting to the left of Ms. Bernhard.

17                 The lady between us is Darline LaBar.  She's

18  right here.

19                 VENIREPERSON:  Uh-huh.  Okay.

20                 THE COURT:  She's the court reporter, and she's

21  taking down everything that's said.  And as a courtesy to her,

22  I'm going to ask you to try to remember, it's difficult, to

23  answer audibly yes or no and try to avoid shaking or nodding

24  your head or saying uh-huh or huh-uh.

25                 VENIREPERSON:  Oh, okay.  All right.
```

```
 1                    THE COURT:  Because we do that so frequently in
 2      everyday speech, generally we need to remind you and we -- I
 3      hope you won't take offense at that.
 4                    VENIREPERSON:  No, no.
 5                    THE COURT:  Okey-doke.  The lawyers have 45
 6      minutes a side to talk to you, so that means you'll be here for
 7      about an hour and a half.  And at the end of that time, we're
 8      going to ask you to step out in the hall and if you're
 9      qualified, we'll take a photograph of you so the lawyers can
10      put your face to your name when they're making notes later on.
11      And then we'll notify you on either October the 15th or the
12      16th whether or not you'll definitely sit as a juror in this
13      case.
14                    VENIREPERSON:  Okay.
15                    THE COURT:  Is that fair to you?
16                    VENIREPERSON:  That works, yeah.
17                    THE COURT:  Okay.  Ms. Moseley.
18                    MS. MOSELEY:  It's actually Ms. Jones finally.
19      I'm done for the day.
20                    THE COURT:  Oh, okay.  Ms. Jones.
21                    MS. JONES:  Thank you, Your Honor.
22                          CALLIE STANLEY,
23      was called as a venireperson by the parties, and after having
24      been first duly sworn, testified as follows:
25                    STATE VOIR DIRE EXAMINATION
```

```
 1   BY MS. JONES:
 2        Q.    Mrs. Stanley, as the Judge said, thank you so much
 3   for waiting for us.  As you can understand, this is a very long
 4   and hard process because we are talking about the death
 5   penalty.  And if you will recall from looking at your juror
 6   number, okay, you recall back in June when you came down,
 7   remember that big room downstairs and almost every seat was
 8   full?
 9        A.    Oh, yes, ma'am.  Yes, ma'am.
10        Q.    Close to about 800 people there.
11        A.    Yeah, lots of people.
12        Q.    Well, if you can imagine that big number -- well,
13   that same number of people came back that afternoon.  So as you
14   can tell from your juror number, you are Juror Number 1,455, so
15   as you can tell, it takes a lot of people for us to talk to in
16   order to get 12 people who can sit over here and be fair and
17   impartial to both sides.
18        A.    Yes, ma'am.
19        Q.    Okay.  Because when we talk about the death penalty,
20   we all understand and appreciate that we have varying opinions.
21   We have those who say, you know what, I will -- no matter what
22   the case is, what the crime is, the minute that I hear it's a
23   murder or the minute that I hear it's a very heinous crime,
24   that I am going to say death all the time.  Then we have
25   another group of people who says, you know what, it doesn't
```

240

```
1   matter, Rocky, I am never ever going to be able to assess the
2   death penalty.  So what we have here today, Ms. Stanley, is
3   what we are charged with doing, not only the State of Texas,
4   but the Defense, we're charged with trying to find pretty much
5   that middle of the road juror, that person who says, you know
6   what, I can come in here, I can listen to all the facts and all
7   the evidence, and base it only on that.  I see you're nodding
8   your head.  You have to answer out loud.
9        A.   Yes, I'm sorry.
10       Q.   Okay.  It's kind of hard, I know.  But I will tell
11  you, Darline doesn't know the difference between a uh-huh and
12  huh-uh.
13       A.   Yeah, yeah, I understand.
14       Q.   All right.  And so when we talk about that -- that
15  middle of the road person, it's been put best -- as a matter of
16  fact, Ms. Moseley says it best when she says sometimes we have
17  to separate what we'll do at home while watching TV --
18       A.   Right.
19       Q.   -- on our couch and what we will actually do when we
20  get in a courtroom and we're faced with that reality.
21       A.   Yes, ma'am.
22       Q.   And so when I look at your questionnaire, like I
23  said, I see that you're that middle of the road person.  If we
24  look at your answers before you -- if you look at how you
25  answered Number 18.  When you answered Question Number 18 on
```

1  page 3, it says:  What would be important to you in deciding

2  whether a person received the death sentence?  You said:  What

3  were all the circumstances in the case?  Is there a reason that

4  the person behaved in the manner they did?  We'll talk about

5  some other parts of that, but more importantly, I saw that you

6  answered that almost perfectly straight down the middle because

7  as you sit here right now, Ms. Stanley, you don't know anything

8  about this case, do you?

9      A.    No, I do not.

10     Q.    We haven't told you any facts.  You don't know any

11 of the circumstances.

12     A.    No, I do not.

13     Q.    So before you can make a decision whether a person

14 was guilty or innocent or before you could make a decision on

15 whether a person receives life or death, you would need to hear

16 some facts and evidence, right?

17     A.    Well, yes, definitely.

18     Q.    Okay.  And then when we look at your answer in

19 Number 66, which is on page 10, we ask you:  Would a person's

20 use of drugs or alcohol at the time of the offense

21 automatically prevent from you assessing the death penalty?

22 You said no.  All circumstances should be considered.  It can

23 change a person's mental state, and you said some other things.

24 But the first part of that sentence, you got it right again.

25 It says you have to wait and consider everything, correct?

1    A.    Yes.

2    Q.    Okay.  And lastly when we look at your answer in

3  139, on page 18, it is next to the last question.  You stated

4  in that -- your answer in that was -- it says:  How do you feel

5  about being chosen as a juror in this case?  You said:  I feel

6  it is very important.  This is a person's life.  I also think

7  that a process is -- that process is interesting.  You use the

8  word "process."  And what I want to talk about with you right

9  now is that there is a process.  As I've stated before, there

10  is -- it is very easy for us to sit at home on our couch.  You

11  know, I will tell you my mom, when the Naval shooting happened

12  just a couple of weeks ago --

13    A.    Uh-huh.

14    Q.    -- she called me and she was like, I don't

15  understand -- if he would have lived, I don't understand why

16  they would need a trial because it was all on video, we know it

17  was him.  She wants to jump straight to the death penalty.  And

18  I have to explain to her, mom, there's a process.  You know, we

19  still have to have a trial.  We still have to have a jury

20  assess whether a person is guilty of a crime or whether they're

21  not guilty.  You understand that?

22    A.    Well, their mental stability at the time, I think,

23  matters a lot.  You know, I mean people do have mental illness.

24    Q.    Yes, they do.

25    A.    And personally, in my life I've had -- my brother

1   was on drugs and he had some problems with that.  And he

2   doesn't remember a lot of the things he did.

3       Q.    Uh-huh.

4       A.    So -- I'm not saying people shouldn't be accountable

5   for their actions, but maybe there's a reason they did what

6   they did.

7       Q.    And you have to take it all into consideration.

8       A.    Yes, uh-huh.

9       Q.    And while we're talking about your brother right

10  now, based on some of the answers that you did give --

11      A.    Uh-huh.

12      Q.    -- when you look back on page 10 in answers to

13  Questions 62 through 66, you kind of mentioned your brother a

14  little bit.

15      A.    Yes.

16      Q.    You not only mentioned the fact that he had a drug

17  problem, but, if I'm not mistaken, he also went to jail,

18  correct?

19      A.    He went to prison.

20      Q.    Yeah, he went to prison.

21      A.    Yes.

22      Q.    And it was based on a robbery, correct?

23      A.    Yes, yes.

24      Q.    And you also indicated that that had to do with his

25  drug use.

```
 1        A.    Yes.

 2        Q.    Correct?

 3        A.    Yes.

 4        Q.    And so knowing all of that, knowing all of that, Ms.

 5  Stanley, you know, the Judge read to you back in June that this

 6  is a case that is involving intentional killing during the

 7  course of a robbery, okay?  Now, we understand that when you

 8  come in this courtroom -- when you came in this building, you

 9  had to go through those metal detectors, remember?

10        A.    Yes, uh-huh.

11        Q.    They may have asked you to take off your belt and

12  even take off your shoes.

13        A.    Right.

14        Q.    But what they didn't ask you to do was leave your

15  common sense, nor do they ask you to set, you know, all of your

16  personal experiences and your feelings aside, okay?  You

17  understand that?

18        A.    Right.  Right.

19        Q.    Now, what we need to find out from you today as you

20  sit here, knowing and understanding that this case is very

21  similar to your brother's --

22        A.    Yes.

23        Q.    -- you know, sitting on a case like this, would

24  that -- how would that affect your deliberations or affect any

25  verdict that you may give in a case like this?
```

 1        A.    I don't really know.  I don't know how I will feel

 2   until I get to that point.  I don't know how personal that will

 3   be to me.  My brother was very young at the time.

 4        Q.    Okay.

 5        A.    You know, he -- I don't know how that will make me

 6   feel.

 7        Q.    And how is your brother doing now?

 8        A.    He's great.

 9        Q.    Okay.

10        A.    He served five years.  He's doing really well.

11        Q.    And you understand that, you know, this particular

12   Defendant is not your brother, of course?

13        A.    Correct.  Correct.  Correct.

14        Q.    Okay.  And you also understand that your brother's

15   circumstances and things that happened in your brother's life

16   may not necessarily be the same circumstances and things that

17   happened in this Defendant's life?

18        A.    And that's correct.  That's correct.

19        Q.    And the reason we're asking you now -- and I will

20   tell you, no one will ever ask you or pin you down and say, if

21   drugs or alcohol are brought up in this case, are you

22   automatically going to give a person a pass, or are you

23   automatically going to punish a person more.  What we need to

24   know from you is as you sit here right now, can you keep an

25   open mind?

```
 1        A.    Absolutely.  I mean, I can be fair, absolutely.
 2        Q.    Okay.  And that you wouldn't necessarily take all of
 3   your brother's issues into account and answer any punishment
 4   questions, Issue Number 1 and Issue Number 2 in such a way that
 5   a life sentence will result because you're thinking about what
 6   happened with your brother?
 7        A.    No, I would not.
 8        Q.    All right.
 9        A.    I just think about that because I've never been in
10   trouble with the law.
11        Q.    Okay.
12        A.    I've never done this before.  This is all new to me,
13   and that's all I can relate to.
14        Q.    Okay.  Is your brother's circumstance?
15        A.    Yes, that's correct.
16        Q.    And do you believe your brother was treated fairly
17   during the process?
18        A.    Yes, I do.  Yes, I do.
19        Q.    And how long ago was that?
20        A.    Probably 25 years ago, 30 years ago.
21        Q.    Okay.  Okay.  And as you understand, the laws
22   regarding whatever issues was going on with your brother may
23   have changed since then.
24        A.    Oh, yes, yes.
25        Q.    And once again, that -- you know, just because you
```

1    have those feelings and opinions, can you tell us right now

2    that you could set those aside and be a fair and impartial

3    juror in this case and base all of your deliberations and your

4    verdict on the evidence and testimony you hear from that

5    witness stand?

6          A.    Yes, I can.  Yes, I can.

7          Q.    Okay.  Now, in your questionnaire you said some

8    things like it depends on -- you talk about "deserve" a lot,

9    saying that, you know, for instance, in Question Number 6 and

10   7 -- and actually on page number -- the first page, it says in

11   Question Number 1:  If you're in favor of the death penalty.

12   You said, yes.  You said:  You believe that no one has the

13   right to take someone else's life -- sorry, Darline, I'll slow

14   down.

15                It says no one has the right to take someone's

16   else's life.  Only God should be the person's life -- take the

17   person's life.  Not a murderer.  They do not have that right.

18   You said:  If someone choose to take someone's life, they

19   should be willing to give their own.  If we look further at

20   page 2, your answers in page -- on Number 6 and 7 -- in Answer

21   Number 6 you said that:  Is there -- we ask:  Is there any

22   particular event, criminal case, or person in your life that

23   has influenced your beliefs about the death penalty?  And you

24   said, yes, and you told us about the Susan Smith case.  And you

25   said in that case you believe she deserved the death penalty.

1  You go down to answer Question Number 7, and it says:  The best

2  argument for the death penalty is if a person is guilty of

3  taking someone's life, then they should give their own, once

4  again, implying that a person deserves a life sentence -- I

5  mean, a death sentence.  Do you see where I'm going with this?

6        A.    Uh-huh.

7        Q.    That you've used the word "deserve" quite often.

8  Well, I want to talk to you and let you know that it's not

9  about what a person deserves.  It's about what we can prove --

10  what the State of Texas can prove and what the law allows.

11  Does that make sense?

12        A.    Okay.  Okay.  Yes.

13        Q.    That -- as we talked about before, when you're

14  sitting at home on the couch and you go, I think that person

15  deserves the death penalty, that person deserves to die because

16  of -- let's say we're talking about the events that took place

17  on 9-11.

18        A.    Yes.

19        Q.    You know, most people looked at that and said, if

20  those pilots would have lived, we believe they deserved the

21  death penalty.  Well, even with that, you understand there is a

22  process?

23        A.    Yes, ma'am, I do.

24        Q.    And that even though, you know, we may sit here and

25  say in my heart of hearts and my mind of minds I believe that a

```
 1  person deserves the death penalty, that it still has to be a

 2  process.  We still have to have 12 people sit over there and

 3  find the person guilty beyond a reasonable doubt of an offense.

 4       A.    Correct.

 5       Q.    Correct?

 6       A.    Uh-huh.

 7       Q.    And then we have to then go to -- the next process

 8  would be the punishment phase.  And at that time, we decide

 9  whether a person has life or a person has death.  You

10  understand that?

11       A.    Yes, I do.

12       Q.    Okay.

13       A.    Yes, I do.

14       Q.    Now, let me ask you this.  Since you are in favor or

15  should I say you support the death penalty, I won't say that

16  you're in favor of it, but I'll say that you support it, if

17  necessary.

18       A.    I'm okay with it, if necessary.

19       Q.    You're okay with it, if necessary.  So let me ask

20  you this.  What is the purpose of the death penalty?  Why do

21  you think the death penalty is necessary?

22       A.    I think maybe it's a society thing.  Maybe it's

23  detrimental to some criminals.

24       Q.    Okay.  When you say detrimental to some criminals,

25  what do you mean by that?
```

```
 1        A.    Maybe they would stop and think about what they're

 2   doing before they -- before they commit that crime.

 3        Q.    So it would be a deterrent, maybe?

 4        A.    Yes.  Yeah.

 5        Q.    If other people see you can get the death penalty

 6   for this crime --

 7        A.    Yes.

 8        Q.    -- then maybe they won't do that?

 9        A.    Maybe they won't.

10        Q.    Okay.  Now, let me ask you the flip side of that.

11   Do you see that there could also be situations where a life

12   sentence is the appropriate thing to do?

13        A.    Yes.

14        Q.    Even on a capital murder case?

15        A.    Yes, I do.  If that person can be any help to

16   society, maybe they can tell their story.  Maybe they have a

17   story.  Maybe they can help someone else.  So it depends on the

18   person and the situation.

19        Q.    Okay.  Perfect -- perfect answer.  Now, there's two

20   things that you said in there that we're going to address.  The

21   first thing you said is, you know what, maybe if a person can

22   be rehabilitated or maybe if a person can turn their life

23   around and be productive in society, that maybe they should get

24   a life sentence.  Well, let me explain to you, in the state of

25   Texas once a jury convicts a defendant of capital murder, once
```

```
 1  they say that this person is guilty beyond a reasonable doubt
 2  of capital murder, the law presumes that they will have a
 3  sentence of life, that they will automatically go to the
 4  penitentiary for life without parole, that they will never get
 5  out.  It's what it says.  So when you talk about
 6  rehabilitation, if they're convicted of capital murder, they
 7  will not come back into our society.  They will be in prison
 8  society, but they won't come back to our society.
 9        A.    Okay.
10        Q.    Do you understand?
11        A.    Okay.
12              MS. JONES:  Bless you, Your Honor.
13        Q.    (BY MS. JONES)  And then you also said another
14  comment about, hey, it depends on the circumstances.  If they
15  can get up and explain why they did something, then maybe, you
16  know, they should get a life sentence for that.  Well, that's
17  going to jump us right into some different principles of law
18  that we need to talk about, whether we're in this courtroom or
19  outside on the street, okay?  And from looking at your
20  questionnaire, it appears you've watched some law shows and
21  you've watched some trials on TV, correct?
22        A.    Yeah, a few.  A few.
23        Q.    Okay.  And you're aware that everyone has a Fifth
24  Amendment right?  Everyone has a right to not testify.  You
25  understand that?
```

```
 1        A.    Yes.   Yes, I do.

 2        Q.    Everybody has the right, whether you're getting a

 3  speeding ticket or you're being arrested for a murder case, if

 4  a police officer comes up to you and says, you know, I want to

 5  talk to you, you have the right to say no, I don't want to talk

 6  to you, okay?  Well, that also applies in the courtroom, that

 7  as a defendant comes into a court, no one can ever make them

 8  testify, not even their parents, not even their mother coming

 9  in and going, you know what, you need to get on that stand and

10  tell those people what happened on that day.  Not even their

11  lawyer --

12        A.    Right.   Right.   Uh-huh.

13        Q.    -- can make them testify.  And you understand that

14  there's a lot of reasons why a person might not want to

15  testify.  Would you admit that when you came in and realized

16  you had to sit in that seat right there, you got a little

17  nervous, right?

18        A.    Oh, yeah.

19        Q.    Oh, yeah.  And that some people just don't like

20  public speaking.  You understand that, huh?

21        A.    Yes.

22        Q.    Nor do people want to be grilled or cross-examined.

23  Would you agree with me?

24        A.    Yes.

25        Q.    Okay.  So you understand that a defendant, just
```

1  because they can't get up there and tell you this is why I did

2  this or this is what happened, that they still have that Fifth

3  Amendment right and that you cannot hold that against them in

4  any way?

5       A.    I understand that.

6       Q.    And when I say you can't hold it against them in any

7  way, if a defendant chooses not to take the stand, you or no

8  other juror can go in the back and discuss it.  You can't even

9  talk about, man, if he would have took the stand, I would have

10  done such and such and such.  But since he didn't take the

11  stand, then I'm going to find him, you know, guilty.  And you

12  can't do the converse of that.  You can't say, well, since he

13  did take the stand, I didn't hear his side, then I'm going to

14  say not guilty.  Does that make sense?

15       A.    Yes.

16       Q.    Okay.  And why do you think it's important for us to

17  have the Fifth Amendment?

18       A.    Well, a person just -- like you say, may not feel

19  comfortable with it.

20       Q.    Okay.

21       A.    I don't really know.

22       Q.    Well, I ask that because you also say in a lot of

23  your answers -- when we look at your answer on Question 18, as

24  well as your answer on Question Number 9 -- Question Number 9,

25  you say what is important to you in deciding if the death

```
 1  penalty be available in Texas, you said murder that is
 2  premeditated, no matter the age of the victim.  Well, when you
 3  say things like premeditated in your answer to Number 9 and
 4  Number 18, the only way we would know if something is
 5  premeditated is if we get inside that person's head, right?
 6        A.    Correct.
 7        Q.    Or if that person gets up there and tells us why
 8  they did it.
 9        A.    Or if you could find proof that this person had been
10  planning to do this for a long time.
11        Q.    Exactly.
12        A.    Physical proof that -- you know, that this person
13  had been planning to murder this individual.
14        Q.    But you understand that -- and we'll talk about this
15  with the next thing, the burden of proof -- that the State does
16  not have to prove premeditation and that the State does not
17  have to prove that it was well planned.  Do you understand that
18  crime can happen in an instant?
19        A.    Yes, ma'am, I do.
20        Q.    Does that make sense?
21        A.    Yes, ma'am, I do.
22        Q.    And that even though as we sit here right now, I
23  look down at Ms. Moseley's shoes and say, you know what, I want
24  those shoes, you know, and I try to fight her and take them
25  from her.  And she gives me a fight and doesn't want to give
```

1  them to me.  If I have a gun and I shoot her right there in the

2  head and take those shoes, it wasn't that I planned to do that,

3  I wanted those shoes.  If she would have gave me the shoes,

4  maybe I wouldn't have pulled the trigger.  But you see what I'm

5  saying?  It does not have to be that I planned to do that a

6  long time ago.

7            Now, some will say, Rocky, you brought a gun, so

8  if you brought a gun, that meant you intended to use it.  But

9  you understand that there are some instances where, you know,

10  maybe a person uses a gun to intimidate or uses a gun just to

11  display it.  Or in this situation, if she's trying to chase me,

12  maybe I shoot her in the knee.  If I shoot her in the knee, I'm

13  just trying to stop her, right?

14       A.    Right.

15       Q.    If I shoot her dead in the temple, this means, oh, I

16  was trying to do a kill shot.  Do you see the difference?

17       A.    Uh-huh.

18       Q.    Okay.

19       A.    I do.  I do.

20       Q.    So when I say premeditation, you know, in that

21  instance we can't prove that that was planned out, correct?

22       A.    Correct.

23       Q.    Okay.  And so when we go further and talk about

24  beyond a reasonable doubt, the State only has to prove evidence

25  to you beyond a reasonable doubt.  We don't have a definition

```
 1   for that.  What that typically means is any kind of doubt based
 2   on reason and common sense.  It has to be reasonable, okay?
 3   If -- let's say you hear all the evidence and testimony and you
 4   hear jurors go in the back and they start talking about, well,
 5   I think the twin brother did it, you know, but you heard no
 6   evidence, you heard no testimony about a twin brother.
 7   Somebody that's in the back just out of the blue says, you
 8   know, I think there's a twin brother.  Well, that may not be
 9   necessarily be a reasonable doubt because there's been no
10   evidence or testimony of that.  Does that make sense?
11        A.    Correct.  Correct.
12        Q.    Okay.  And that also when we're talking about beyond
13   a reasonable doubt, what is the only way that I can remove all
14   doubt from you?
15        A.    With proof.
16        Q.    Or you would have to be a witness, right?
17        A.    Yes.
18        Q.    You would have to see it for yourself?
19        A.    I would have to have seen it, yes.
20        Q.    And I will tell you, Ms. Stanley, if you have seen a
21   crime for yourself that we're putting on trial, you won't be
22   sitting over there, you'll be sitting right there.  Does that
23   make sense?  You'll be a witness.  You can't be a juror in that
24   case.
25        A.    Correct.  Correct.
```

257

1    Q.   So what I'm saying to you is that there is no way to

2    remove all doubt, that the State's burden is not a hundred

3    percent.  It's just beyond all reasonable doubt, that once

4    you --

5    A.   I understand that.

6    Q.   Okay.  That once you've heard all the evidence and

7    all the testimony and once we've proven it to you -- to your

8    satisfaction, that that's all the State has to do.  Does that

9    make sense?

10   A.   Yes, ma'am.

11   Q.   Okay.  And lastly, when talking about beyond a

12   reasonable doubt, we've -- there's a thing called the

13   indictment, okay?  And what the indictment is, is it's a --

14   pretty much a piece of paper that tells the Defendant what

15   they're being charged with, okay?  It tells them this is the

16   crime that the State of Texas is charging you with.  And in

17   this particular case, the Defendant has been charged with an

18   intentional killing, meaning they did it on purpose, not by

19   accident, not self-defense, but it was an intentional killing

20   during the course of a robbery, okay?  That's all that piece of

21   paper says.  But that as the Defendant sits here right now, he

22   is presumed innocent.  And why is he presumed innocent right

23   now, as we sit here, Ms. Stanley?

24   A.   Because he is -- until you prove that he's guilty.

25   Q.   Exactly.  And you always will look to this table.

```
 1   You will always look to the State.  And we have a saying that
 2   says if the State does the accusing, then we have to do the
 3   proving.  So if we accuse the Defendant of any kind of crime,
 4   that we have to prove it here at the state -- at the table.  At
 5   our table we have to prove to you beyond a reasonable doubt
 6   that that person committed that offense, okay?  So can you
 7   afford the Defendant that presumption of innocence?
 8        A.    Yes, uh-huh.
 9        Q.    As he sits here right now, he's not guilty of
10   anything, right?
11        A.    No, he's not.
12        Q.    I know.  And that seems like a silly question, but
13   there are some people who come in and say, well, Rocky, you
14   know what, the mere fact that he's even in this courtroom, he
15   must have done something to get here.  Now, it's one thing to
16   say that, Ms. Stanley, you know, because, of course, that's
17   human nature, but when it goes from someone saying, I wonder
18   what they did or, I wonder what happened to -- well, they must
19   already be guilty of it because they've gotten this far, you
20   understand that's the difference?
21        A.    Yes.  Yes, I do.
22        Q.    It's one thing to be curious, but when you go that
23   step further and go, they must have already done it, without
24   hearing any facts or any evidence, the law doesn't allow that.
25        A.    I understand that.
```

```
 1        Q.    Okay.  And can you follow that law?

 2        A.    I can.  I can.

 3        Q.    All right.  And in regards to proof beyond a

 4   reasonable doubt, as I told you before, the State has an

 5   indictment, and in the indictment -- let's say it's five things

 6   that I have to prove to you, okay?  Let's just say it's five

 7   things.  It's this Defendant, this place, this time, things of

 8   that nature, okay?  It's five things I have to prove.

 9        A.    Okay.

10        Q.    Well, if I only prove four to you, then in that

11   case, it would be a what, a guilty or not guilty?

12        A.    I would say a not guilty.

13        Q.    Exactly.  And I saw you hesitated.

14        A.    Yeah, because --

15        Q.    I saw you hesitating.  Why?

16        A.    Because you haven't proven -- proven it all.  I

17   mean, you're saying that, but you have to prove it.

18        Q.    Exactly.  And when you hesitated, I wanted to make

19   sure that you weren't like I say my mom is.  She's one of those

20   people that, you know what, if you prove a bad enough crime to

21   me and if you only prove four out of five, close enough.  I'm

22   going to go ahead and give you that guilty because I think it's

23   a bad enough crime or bad enough case.  You understand you

24   can't do that, correct?

25        A.    Correct, uh-huh.
```

1      Q.    And that can you hold the State to its burden?

2      A.    Yes.

3      Q.    Can you hold me to that burden?

4      A.    Yes.

5      Q.    And even though it might be hard for you to do, can

6   you sit over there in those chairs and say, you know what,

7   Rocky, you didn't prove it, it's not guilty?

8      A.    Yes, I can.

9      Q.    Okay.  And I'll give you another example really

10  quick.  Let's say that we have to prove to you that a person

11  did a killing during the course of a robbery, okay?  Well, we

12  don't ever prove to you that a robbery occurred.  We prove to

13  you that there was a murder, but we never prove it's a robbery,

14  okay?  In that instance, the person would not be guilty of

15  capital murder, okay?

16     A.    Okay.

17     Q.    And actually let me go back a little further, Ms.

18  Stanley.  I forgot to tell you something.  I was looking at

19  your questionnaire, and they asked questions like what do you

20  think would be -- when do you think that the death penalty

21  would be appropriate in the state of Texas, and you said

22  murder.

23              COURT REPORTER:  I'm sorry, you said what?

24              MS. JONES:  Murder.

25     Q.    (BY MS. JONES)  And we're talking about your answer

1  on Question Number 9.  Well, let me explain to you, for a

2  person to be eligible for the death penalty in the State of

3  Texas, it has to be an intentional killing, plus another

4  felony, plus another aggravated -- aggravated offense.  So it

5  would have to be -- have to be murder plus burglary, murder

6  plus robbery.

7         A.   I was not aware of that.  I did not know that.

8         Q.   I understand.  Or it has to be murder plus sexual

9  assault.  There's other instances that it can be a capital

10 murder.  If a police officer is killed in the line of duty or

11 if a child under the age of 10 is murdered.  So these are ways

12 that a person could be guilty of capital murder.  Does that

13 make sense to you?

14        A.   Yes, uh-huh.

15        Q.   Okay.  But now going back to our indictment, if we

16 allege -- if we say that the Defendant has committed capital

17 murder by robbery, okay --

18        A.   Okay.

19        Q.   -- but during the course of the trial you never hear

20 anything about a robbery, what you hear about is a sexual

21 assault.

22        A.   Okay.

23        Q.   You hear robbery during a sexual assault.  In this

24 instance, if I didn't prove robbery to you, that would be a not

25 guilty, right?  Not guilty to capital murder.

1       A.    Correct.

2       Q.    Now, it might be that I prove the sexual assault,

3  and you say, hey, Rocky told me that that's capital murder,

4  also, but you understand that's not what I put in the piece of

5  paper.

6       A.    Yes.

7       Q.    That I did not prove my offense.

8       A.    Yes.

9       Q.    Okay.

10      A.    So in other words, you're saying that this is --

11  this is an offense of capital murder, so you have to prove

12  that.

13      Q.    I have to prove that, yes.

14      A.    All of it?

15      Q.    Yes, I have to prove all of it.  You can't give me a

16  pass and say close enough.  You can't say, well, she didn't

17  prove robbery, but she proved sexual assault.

18      A.    I understand.

19      Q.    In other words, we can't get off on a technicality.

20      A.    I understand.

21      Q.    Okay.  That it's not guilty -- because we didn't

22  prove all of it, it's not guilty on capital murder.

23      A.    Okay.

24      Q.    Now, during the course of this, we proved to you

25  that it's a murder.  We have proved that this person killed

1    someone.  In that instance, it's not a capital murder.  It

2    doesn't go to a life sentence or a death sentence.  Then the

3    jury has a full range of punishment.  The jury can sentence a

4    person anywhere from a minimum of five years in the

5    penitentiary, all the way to 99 or life, if we're talking about

6    regular murder, okay?

7         A.   Okay.

8         Q.   Not capital.  Now, as you talked about before in

9    your questionnaire, you're one of those people that you want to

10   wait and hear everything, that you will keep an open mind to

11   all evidence, all facts, all circumstances, correct?

12        A.   Yes, ma'am.

13        Q.   So let's say on a hypothetical jury -- not this case

14   right here -- but just on a hypothetical jury, if you're

15   sitting on a jury and you find out that a person committed

16   murder, if you thought five years was the right thing to do,

17   could you and would you assess a punishment of five years in

18   the penitentiary if you thought it was the right thing to do?

19        A.   Yes, I would.

20        Q.   Okay.

21        A.   I could do that.

22        Q.   Now, I know some people -- and you kind of

23   hesitated -- some people say, Rocky, I could never give five

24   years for murder.  But as you sit here right now, Ms. Stanley,

25   you wouldn't know any evidence, right?

```
 1        A.    Well, it depends on the circumstance.

 2        Q.    Exactly.  Exactly.  And if you hear a circumstance

 3   or you hear a situation where you thought five years was

 4   appropriate, would you do that?

 5        A.    Yes.

 6        Q.    And conversely, if you heard a situation or

 7   circumstance where you thought 99 years or life was

 8   appropriate, could you do that?

 9        A.    Yes.

10        Q.    Okay.  And anywhere in between.  If you thought 20

11   was appropriate or you thought 10 was appropriate --

12        A.    Yes.

13        Q.    -- could you assess those ranges of punishment?

14        A.    Yes, I could.

15        Q.    Okay.  Now, the last principle I want to talk to you

16   about is credibility of the witnesses.  I saw that you stated

17   in answer to Question Number 32, that if you saw that a police

18   officer testified, that you would tend to believe what says --

19   would you believe a police officer s more likely to tell the

20   truth than the average person.  And you said, they're

21   dedicated.  They have dedicated their life with a cause to

22   protect others.  Well, I want to tell you a little bit about

23   what a law says.  Whether it's a police officer, a priest, or a

24   prostitute, everybody comes in at the same level, okay?

25        A.    Okay.
```

```
 1          Q.    Just because a police officer comes in a courtroom

 2   doesn't mean that we automatically will believe what they say

 3   because of the uniform.  Does that make sense?

 4          A.    Yes, ma'am.

 5          Q.    Because if we take a uniform off a police officer,

 6   what do we have?

 7          A.    Just a guy.

 8          Q.    Just a guy.  Might be a naked guy, but just a guy.

 9          A.    Just a guy.  Just a woman.

10          Q.    Just a guy.  And that what the law says is that you

11   have to wait till that person gets on the stand and judge their

12   credibility like everybody else.  You can believe part of what

13   a police officer says, some of what a police officer says, or

14   none of what they say.

15          A.    Okay.

16          Q.    Does that make sense?

17          A.    Okay.

18          Q.    And that it's okay to say, you know what, I was

19   brought up to believe that police officers protect and serve,

20   and there's no way they would come in here under oath and tell

21   a lie, but we all know that people are normal.  People can be

22   mistaken.

23          A.    Yes, I understand that.

24          Q.    Okay.  And so as you sit here now, are you

25   automatically going to give a police officer more credibility
```

1  than you would any other witness, or would you wait until you

2  hear everything?

3       A.    No, I think I would need to wait.

4       Q.    You kind of paused on me a little bit.

5       A.    Yeah.  I mean, my neighbor across the street from me

6  is a police officer, but he's not always a great guy.  But --

7  we're taught our whole life to be -- to trust them.

8       Q.    Yes, we have.  And I will tell you, my ex-husband is

9  a police officer.

10      A.    Uh-oh, your ex-husband.

11      Q.    Exactly.  We'll say ex.  We'll just move on from

12  there, Ms. Stanley.

13            Now that we've talked about all the principles

14  of law, let me tell you a little bit about how our system is

15  going to work, that it is a two-part system in the state of

16  Texas.  We have the first part of the case where as we have to

17  decide if the person committed the crime or not, okay?

18      A.    Okay.

19      Q.    That's called the guilt/innocence phase.  It's did

20  they do it or not.  It's bad English, but that's what it is.

21  Did they do this crime or did they not do the crime?

22            Then we have the second part of the trial, and

23  the second part of the trial is the punishment phase.  That's

24  when you can decide, you know, after looking at this person's

25  life, do they deserve to have a life sentence or the death

```
 1  sentence.  Does that make sense?

 2       A.   Yes, uh-huh.

 3       Q.   And that I often say it's very similar to a photo

 4  album.  The very first part of the trial is if you open that

 5  photo album and you're looking at one picture -- just one

 6  picture in time.

 7       A.   Okay.

 8       Q.   You can only look at that picture.  And then when we

 9  get to the second phase, you can open that photo book and

10  you -- that photo album and you can look from the beginning of

11  the album, all the way to the back, from birth until present.

12  Does that make sense?

13       A.   Yes.

14       Q.   Why do you think we have the system set up like

15  that?

16       A.   Because you can't take into account maybe just that

17  moment.  You have to take into account a person's entire life.

18       Q.   Okay.

19       A.   What influences them in their life.

20       Q.   Exactly.  It wouldn't be fair if during the

21  guilt/innocence phase, if all we're trying to do is determine

22  if they committed this crime, it wouldn't be fair to look at

23  the photo album at that stage and go, you know what, since they

24  did it before, they must have did it this time.  That wouldn't

25  be fair, right?
```

```
 1       A.    No, it would not be.

 2       Q.    Okay.  So we just have to look and see if they

 3  committed that offense, right?

 4       A.    Uh-huh, yes.

 5       Q.    Now, once we get to the second part of the trial,

 6  that's when Issue Number 1 and Issue Number 2 come into play.

 7  You may have read that in your brochure that the Judge gave

 8  you.  And I will tell you that the state of Texas says even

 9  if -- even after a defendant has been convicted of capital

10  murder in the state of Texas, even after they've been convicted

11  of capital murder, that they are presumed to have a life

12  sentence, okay?

13       A.    Okay.

14       Q.    It doesn't automatically go to the death penalty.

15       A.    Okay.

16       Q.    I don't know if you were aware of that.

17       A.    No, I was not.  I was not.

18       Q.    And do you understand why we still have to have that

19  process, that even though we've convicted a person of capital

20  murder, that we don't automatically jump to the death penalty?

21       A.    Yes, I do.

22       Q.    And why do you think we have that process?

23       A.    To make that portion fair, as well.  I mean, you

24  don't know -- you have to take into account that person's life.

25       Q.    Exactly.  Exactly.  And so just knowing that after a
```

```
 1  person has already been convicted of the capital murder of
 2  let's say intentionally killing someone during the course of a
 3  robbery, that they're going to get a life sentence and that
 4  they don't get a death sentence unless and until the State can
 5  prove to you in Issue Number 1 that this person will continue
 6  to be a continuing threat to society.  In other words, if you
 7  look at Issue Number 1 with me, the State of Texas has the
 8  burden of proof, okay, just like in the guilt/innocence phase.
 9          A.   Okay.
10          Q.   You have to look to this table and see if we proved
11  to you that the Defendant is more likely --
12          A.   Yes.
13          Q.   -- because you see the word "probability."
14          A.   Yes.
15          Q.   We're not talking about percentages, not 61 percent
16  or 67 percent.  We have to prove that the Defendant is more
17  likely than not going to commit further criminal acts of
18  violence that would constitute a continuing threat to society,
19  okay?
20          A.   Okay.
21          Q.   We have to prove that to you.  And in Issue Number
22  1, that answer, Ms. Stanley, is going to be no.  When you first
23  sit down, that answer has to be no, because we have to prove it
24  to you, right?
25          A.   I've heard nothing.  I don't know.
```

270

```
 1       Q.    Exactly.  Exactly.  And if we don't bring you any
 2  evidence about any further criminal acts that the Defendant
 3  will commit, then your answer would have to be no, correct?
 4       A.    Correct.
 5       Q.    And if that answer is no, Ms. Stanley, you don't
 6  even get to Issue Number 2.
 7       A.    Exactly.
 8       Q.    The trial is over.  We're done.  The Defendant gets
 9  a life sentence.  Everybody goes home.
10       A.    Okay.
11       Q.    Does that make sense?
12       A.    Yes, it does.
13       Q.    And this is even after you and the 11 other jurors
14  have decided that this person is a capital murderer.  You know
15  that they will get a life sentence.  They will not have the
16  possibility of death.  And is that okay with you?
17       A.    Yes.
18       Q.    Because that's the law, right?
19       A.    Yes, it is.
20       Q.    And do you think that's fair?
21       A.    In some instances, yes.
22       Q.    Okay.  You say --
23       A.    Yes, I do.
24       Q.    You say in some instances.  What we're trying to
25  find out is, as you sit here right now, not knowing anything
```

271

```
 1  about the case, not knowing any facts or circumstances --
 2       A.    Okay.
 3       Q.    -- are you automatically going to answer Issue
 4  Number 1 as yes, without even hearing any facts or any
 5  evidence?
 6       A.    No.
 7       Q.    And you can't do that because you haven't heard
 8  anything, right?
 9       A.    Right.
10       Q.    Okay.  And that it's only fair to both sides that
11  you wait and hear everything, right?
12       A.    That's correct.
13       Q.    Okay.  And you understand with Issue Number 1 that
14  it is the State's burden of proof so I have to ask you, do you
15  believe that that can even be proved to you?  Because if you
16  look at the question really closely, we're asking you to prove
17  a future event, like we're asking you to look into a crystal
18  ball.
19       A.    Right.
20       Q.    So what are some things that would be important to
21  you when trying to decide Issue Number 1?
22       A.    The person's life, all the issues in the person's
23  life.
24       Q.    Okay.  And would you agree with me that sometimes in
25  order to predict the future, we have to look at the past?
```

```
 1        A.    Exactly.  Exactly.

 2        Q.    So you do believe it is possible to prove Issue

 3   Number 1 to you?

 4        A.    Yes.

 5        Q.    Okay.  And that when we look at this, it says,

 6   criminal acts of violence, meaning that acts is plural.  It can

 7   be something as simple as me punching Ms. Moseley.  Some people

 8   say that's an assault.  That's a criminal act.  Or if we talk

 9   about a penitentiary situation, there's guards.  Some might say

10   a criminal act is spitting on a guard.  So you understand it

11   doesn't have to be a specific act.  It doesn't have to be

12   another murder, doesn't have to be a rape, doesn't have to be

13   anything like that.

14        A.    Okay.

15        Q.    You understand that?

16        A.    Okay.

17        Q.    Okay.  And can you follow that?

18        A.    Yes, I can.

19        Q.    And you understand when we get to Issue Number 1,

20   when we say society, the State of Texas has already said that

21   that person has a life sentence.  So you know their society is

22   going to be in the penitentiary.

23        A.    Correct.

24        Q.    And do you agree with me that people in the

25   penitentiary deserve a level of protection, as well?
```

```
 1        A.    Oh, yes, uh-huh.

 2        Q.    Because there's not just inmates.  There are some

 3   inmates there that just want to do their time, but there's

 4   going to be visitors that come to visit --

 5        A.    Yes.

 6        Q.    -- people in the penitentiary.  There's going to be

 7   police officers, guards, doctors, lawyers.  So do you believe

 8   they deserve protection?

 9        A.    Well, yes, uh-huh.

10        Q.    Uh-huh.  Did you visit your brother when he was in

11   the penitentiary?

12        A.    No, I did not.

13        Q.    Okay.  Okay.  And so everything that you may know

14   about is probably what you've seen on TV, right?

15        A.    That's it, yeah.  Yeah.

16        Q.    And so when we talk about Issue Number 1, I need to

17   ask you, is there ever going to be a time that you would

18   require -- that you would require that the Defendant take the

19   stand and tell you that he promises that he will not continue

20   to be a threat to society and he's never going to break the law

21   again?  Are you going to require that?

22        A.    No, no.

23        Q.    Because you understand he has a Fifth Amendment

24   right during the punishment phase, as well?

25        A.    He does, okay.  Okay.
```

1        Q.    I don't know if you knew that.

2        A.    I didn't know that.

3        Q.    All right.  Well, all of the principles of law that

4    we discussed, it carries all the way through the trial.

5        A.    Okay.

6        Q.    The first part of the trial and the second part.

7        A.    Okay.

8        Q.    Does that make sense?

9        A.    Yes, it does.

10       Q.    Okay.  And so now that we've talked about Issue

11   Number 1, let's say that the jury has said, you know what, the

12   State has proved beyond a reasonable doubt that he will

13   continue to be a continuing threat to society.  You've answered

14   that question yes.  It now takes you to Special Issue Number 2.

15             And Special Issue Number 2, it is a bit of a

16   mouthful, okay?  And I will tell you kind of the easier way to

17   look at Special Issue Number 2 is kind of what you've already

18   said in your questionnaire, that you have to look at

19   everything.  You have to look at all the evidence and consider

20   everything.

21             You answered in Questions Number 37 and in 39 on

22   page Number 6 that, some people may have issues in their life

23   that affect their behavior at that time that they commit the

24   offense.  And in Number 39 we ask you if genetics and

25   circumstances of birth and upbringing, should that be

 1  considered when determining punishment?  And you said:  I feel
 2  that this may affect the person.  That -- but people still
 3  choose their own paths for their life.  In right and wrong
 4  situations, this is not an excuse for violent behavior.
 5              Well, you said it appropriately when you
 6  answered that, that you have to look at and consider
 7  everything, okay, that there are no automatic passes, but that
 8  you can't automatically punish someone further either, meaning
 9  that just because you have certain beliefs on things, you can
10  never, never answer Special Issue Number 1 and Special Issue
11  Number 2 in such a way that you know it will result in a death
12  sentence.  Does that make sense?
13      A.   Yes.  Yes, it does.
14      Q.   That you have to wait and hear everything, right?
15      A.   That's correct.
16      Q.   And that's only fair, right?
17      A.   It is fair.
18      Q.   And when we look at Issue Number 2, when it says we
19  have to look at all the evidence, including the circumstances
20  of the offense, the Defendant's character, the background --
21              THE COURT:  Ms. Jones, I'm going to ask you to
22  slow down just a little bit.
23              MS. JONES:  Sorry.  Sorry, Your Honor.
24      Q.   (BY MS. JONES)  That when we have to look at all the
25  person's personal moral culpability, when we got to look at all

```
 1   of that, whether it's their education, their criminal

 2   background or lack thereof a criminal background, that we need

 3   to look at all that in Issue Number 2.  Do you think that's

 4   important that we look at all that stuff?

 5        A.   Well, yes.

 6        Q.   And why do you think it's important?

 7        A.   Because I think that that person's upbringing and

 8   their life is who they are.  That's who we are mentally and --

 9   and maybe the way we behave --

10        Q.   Okay.

11        A.   -- is determined by that.

12        Q.   And from reading Issue Number 2, do you understand

13   that that's kind of like the fail-safe.  That's kind of like

14   the safety net.  This allows jurors to say, you know what, even

15   though I've already convicted this person of capital murder,

16   I've already said that they have intentionally killed someone

17   during the course of a robbery, okay, and even though I've

18   already said that in Special Issue Number 1 that they are going

19   to be a continuing threat to society, Special Issue Number 2

20   allows you then to look in that photo album and say, you know

21   what, even knowing all of that, I still feel like there was

22   something sufficiently mitigating that was there that would

23   tell me, you know what, this person deserves a life sentence,

24   instead of a death sentence.  Does that make sense?

25        A.   Yes, it does.
```

```
 1        Q.    Because the State of Texas does not or, you know, no

 2   one from this table wants you to walk away going, you know

 3   what, I've answered all these questions and it led me to a

 4   death sentence, but if they just would have let me look at

 5   everything in life, I would have had a different situation.

 6   Does that make sense?

 7        A.    Correct, uh-huh.

 8        Q.    So in Special Issue Number 2, when we say

 9   mitigation, do you understand what that means when we say the

10   word "mitigation"?

11        A.    I would assume that it's just through everything

12   you're telling me, through your proof and --

13        Q.    Uh-huh.  And mitigation means anything that will

14   lessen the blameworthiness of the Defendant or anything that

15   would lead you to believe that -- it would explain things that

16   happened in the case, anything that would lessen the

17   Defendant's moral culpability.  Does that make sense?

18        A.    Okay.  Okay.  Uh-huh.

19        Q.    It doesn't mean it's an automatic pass.  I don't

20   want you to think that jurors have to sit there and say because

21   there's mitigation, that they automatically get King's X and

22   everybody goes home, that it just means that you have to look

23   at and consider everything.  Do you understand that?

24        A.    Correct.  Correct.

25        Q.    And if we look at Issue Number 2, there's -- there's
```

```
 1   four things you have to do.  You have to first look at all the
 2   evidence and consider it, okay?  The second thing you have to
 3   do is after looking at everything, you have to decide within
 4   yourself was it anything mitigating.  Okay.  Was it anything
 5   that made you have pause, to say, you know what, you know, some
 6   people might say his background and upbringing is enough for
 7   that to be mitigating for them.
 8        A.   Okay.
 9        Q.   Other jurors might say, no, that's aggravating to
10   me.  You know, I think that they have choices and they made
11   poor choices, okay?
12        A.   Right.
13        Q.   So you have to first, you know, look at everything
14   and then decide if there's mitigation.  Well, after you've
15   decided that there's mitigation, you then have to say does that
16   mitigation rise to such a level that this person should have a
17   life sentence.
18        A.   Correct.
19        Q.   Do you see what I'm saying?
20        A.   Correct.
21        Q.   It can't just be that you see it, but it has to rise
22   to such a level that you believe that person gets a life
23   sentence versus a death sentence.
24        A.   I understand.
25        Q.   So the question to you is, as you sit here, Ms.
```

1   Stanley, if there is something, after looking at all the

2   evidence -- after looking at all the evidence, if there's

3   something that you saw that was sufficiently mitigating to you,

4   even though you've decided that they're a capital murderer,

5   even though you've decided they'll be a future danger, if

6   there's something that you see that's sufficiently mitigating,

7   can you answer that question yes, I believe they should have a

8   life sentence?

9        A.   Yes, I can.

10       Q.   And if after you've heard everything and you decide

11  that there was nothing that was mitigating there, that you've

12  heard no evidence that there was anything mitigating, could you

13  answer that question no and say that, you know what, they are

14  going to get a death sentence?  Can you do that?

15       A.   Yes, I can.

16       Q.   Okay.  Now, you kind of paused a little bit when I

17  asked you, can you answer that question yes, even after knowing

18  that this person is a capital murderer and knowing that this

19  person is a future danger.  You kind of paused like, yeah, I

20  guess I could find somebody --

21       A.   Well, I thought that the sentence would be life at

22  that point.

23       Q.   Let me back up a little bit.  The sentence -- it

24  starts off as life.  The minute that a person gets convicted of

25  capital murder, you're right, the law presumes life.

1      A.    Okay.  I'm getting confused.  I'm sorry.

2      Q.    That's okay.  That's okay.  In the punishment phase,

3  however, once the State proves that Special Issue Number 1 is

4  yes, once we've proved that they are a continuing threat to

5  society, once --

6      A.    Yes.

7      Q.    -- the jury answers that as yes, then it allows you

8  to go to Issue Number 2.

9      A.    Okay.

10     Q.    Does that make sense?

11     A.    Okay.  Yes, ma'am.

12     Q.    So if you answer no, they're not a continuing

13  threat, then we don't even get to the possibility of death.

14     A.    Okay.  I understand.  I understand.

15     Q.    It's automatically life, okay?  And so when I ask

16  you about Issue Number 2, I was asking that -- when we get to

17  Special Issue Number 2, nobody has a burden of proof.  The

18  State does not have a burden of proof.  The State does not have

19  to bring any evidence on mitigation.  And I will tell you that

20  the Defense doesn't have to bring any evidence of mitigation

21  either.

22          Now, the Defense can sit here and they can do

23  crossword puzzles.  They don't even have to mount a defense.

24  Now, I'm telling you that 9 times out of 10, they're going to

25  ask questions and -- and stuff is going to happen.

1          A.    Okay.

2          Q.    But you have to understand that at no time are they

3    required during the course of this trial to bring any evidence

4    or testimony.  You understand that?

5          A.    Okay.  Yes.

6          Q.    And can you afford them that right because that is

7    their right?

8          A.    Yeah, I mean -- yeah.

9          Q.    And, of course, like we talked about before, it's

10   okay to be curious and would want to hear something, but the

11   question is, is will you require something to come from this

12   table?

13         A.    No, I won't.

14         Q.    And will you require the Defendant to take the stand

15   and say, you know what, this is my background, this is what I

16   had to suffer through in life?

17         A.    No.

18         Q.    Would you require the Defendant to take the stand?

19         A.    No.

20         Q.    No?

21         A.    No.

22         Q.    Okay.  And so the magic question becomes, Ms.

23   Stanley, that after you've looked at everything and after you

24   have considered all evidence and testimony, can you see a

25   situation where after you've answered Special Issue Number 1 as

```
 1  yes, that they are a continuing threat to society, can you see
 2  a situation where you can then come down to Special Issue
 3  Number 2 and say, yeah, even though I believe they're a threat
 4  to society, I'm going to say, yes, I believe there was
 5  something that was sufficiently mitigating there that would
 6  warrant a life sentence?  Can you see yourself doing that?
 7       A.   Yes, uh-huh.
 8       Q.   Okay.  And --
 9            THE COURT:  Your time has expired, Ms. Jones.
10            MS. JONES:  Thank you, Your Honor.
11       Q.   (BY MS. JONES)  And I will tell you, Ms. Stanley --
12  do you have any questions for me?  Do you have any questions
13  for me?
14       A.   Not that I can think of, no.
15            MS. JONES:  Okay.  All right.  Thank you, Ms.
16  Stanley.
17            VENIREPERSON:  Thank you.
18            THE COURT:  Ms. Bernhard.
19                 DEFENSE VOIR DIRE EXAMINATION
20  BY MS. BERNHARD:
21       Q.   Ms. Stanley, again, my name is Catherine Bernhard,
22  and I'm going to have a few questions for you, because
23  obviously over here at this table we have a slightly different
24  take on some of these issues.  And I want to start out by -- by
25  saying I don't want you to think that just because we're
```

```
 1  spending all this time talking about the death penalty, that we
 2  at this table think that that's a question that jurors in this
 3  case will ever be called upon to answer.  Because it's our
 4  position that if you are selected on the jury in this case,
 5  that this jury is going to find Matthew Johnson not guilty of
 6  capital murder and so you're never going to be called on to
 7  address those special issues.  But just because of the way the
 8  system is set up, the death penalty is something that makes
 9  this case different from most other criminal cases that are
10  tried in this building, so we have to talk about it now.  Do
11  you understand that?
12        A.   Yes, ma'am, I do.
13        Q.   I wanted to ask you -- you mentioned in your
14  questionnaire something about a coworker who was killed by her
15  husband?
16        A.   Yes.
17        Q.   Can you tell me more about that?
18        A.   She was a victim of domestic violence, and she left
19  him because she got tired of being beat every day.  And he had
20  threatened that he would kill her and she got a restraining
21  order, but he did kill her.
22        Q.   Do you know --
23        A.   He shot her one morning when she was coming to work.
24  She had gotten into the car with her two kids and he walked up
25  point blank and shot her.
```

```
1        Q.    Do you know whatever happened to him?  Was he

2   prosecuted?

3        A.    I do not know.  I do not know.

4        Q.    About how long ago was that?

5        A.    I was -- let's see, I'm almost 50.  I would say I

6   was probably about 22.

7        Q.    So awhile ago?

8        A.    Yeah.  Yeah.

9        Q.    Is there anything about your closeness to that case

10  and -- and knowing a coworker who was murdered and kind of

11  seeing some of the aftereffects of that, that you think might

12  influence you as a juror in another murder case?

13       A.    No, no.  It's been a long time ago.  And it's the

14  only person that I ever knew that was murdered.

15       Q.    Was that here in Dallas?

16       A.    It was.

17       Q.    Okay.

18       A.    It was.

19       Q.    I want to kind of make sure that we're on the same

20  page when we talk about some of these issues.  As Ms. Jones has

21  explained to you, capital murder is the intentional killing --

22  and for our purposes, we're just going to say in the course of

23  a robbery.  There are other ways of committing capital murder,

24  but since that's the allegation in this case, we can kind of

25  limit it to that.
```

285

```
 1        A.    Okay.
 2        Q.    And when we say the intentional killing, we mean
 3   that it's someone's -- it is someone's conscious objective or
 4   desire to cause the result.  They wanted somebody dead, and
 5   they did whatever they had to do to make that happen.
 6        A.    Okay.
 7        Q.    So that's what we're talking about when we talk
 8   about capital murder, an intentional killing in the course of
 9   committing the offense of robbery.  We're not talking about a
10   situation of self-defense.  We're not talking about a situation
11   where somebody may be legally insane and they don't know right
12   from wrong.  We're not talking about an accident.  We're not
13   talking about defense of others.  We're talking about somebody
14   who wanted somebody dead and did what they had to do to make
15   that happen and they did that in the course of committing the
16   offense of robbery.
17        A.    Okay.
18        Q.    Do you follow me?
19        A.    Yes.
20        Q.    And you said you've never been on a jury before; is
21   that right?
22        A.    I have not, huh-uh.
23        Q.    Okay.  We kind of talk about the burden of proof in
24   a criminal case being beyond a reasonable doubt.  There is no
25   definition for what that means.  It's up to each individual
```

1   juror to kind of figure it out for themselves what convinces

2   them beyond all reasonable doubt.  But I think sometimes it

3   does help if we can kind of compare it to other burdens of

4   proof that we do have in the legal system because we know that

5   it's even higher than them.

6       A.   Okay.

7       Q.   For instance, in a civil suit, even if somebody is

8   suing over millions upon millions of dollars, the burden of

9   proof in that type of case is what we call the preponderance of

10  the evidence.  And that just means that one side tilts the

11  scale a little more than the other, 51 percent to 49 percent.

12      A.   Okay.

13      Q.   That's the burden of proof that applies in that type

14  of case.

15           There is a higher burden of proof that might

16  apply in a situation if the State was trying to terminate

17  someone's parental rights, in other words, take their children

18  away from them for good.

19      A.   Okay.

20      Q.   You would expect the government would need a pretty

21  good amount of proof in order to do that, wouldn't you?

22      A.   Yes, uh-huh.

23      Q.   And what the system requires in that type of case is

24  what we call clear and convincing evidence.  It's higher than a

25  preponderance.  We don't really have it quantified like we do

1    preponderance, but we know that clear and convincing evidence

2    is higher than a preponderance.  And that's the burden of proof

3    that would apply if the State was trying to terminate someone's

4    parental rights or commit someone to a mental institution

5    against their will.  That's the kind of -- the level of

6    evidence that the government would need in those situations.

7              But we know that proof beyond a reasonable doubt

8    is higher even than that, because it's the highest burden that

9    we have anywhere in the legal system.  And I think that's

10   because our system is set up where we regard a person's life

11   and liberty as pretty much the most important things that a --

12        A.   Correct.

13        Q.   -- jury can make decisions about.

14        A.   Correct.

15        Q.   So we require that very high standard of proof,

16   proof beyond a reasonable doubt in order to convict someone.

17   So I want to kind of put you on a hypothetical capital murder

18   jury, and let's assume that you and the 11 other jurors have

19   all been convinced beyond a reasonable doubt, whatever that

20   means to you, that the person on trial is guilty of an

21   intentional killing in the course of committing a robbery,

22   okay?

23        A.   Okay.

24        Q.   That's been proven to all 12 of you unanimously

25   beyond a reasonable doubt.  Now, at that point you would move

```
 1   into the punishment hearing or the punishment phase of the
 2   trial.  So what I first want to ask you is if you find somebody
 3   guilty of that intentional killing in the course of a robbery,
 4   what are your thoughts on the death penalty for that person at
 5   that point?
 6        A.   I don't know.  I think you would have to still look
 7   at the circumstances.
 8        Q.   Okay.
 9        A.   That -- surrounding why it happened, what happened.
10        Q.   And you understand, though, you found them guilty
11   beyond a reasonable doubt --
12        A.   Yes.
13        Q.   -- so you know that much?
14        A.   Yes.
15        Q.   And you understand that then there is a presumption
16   that life without parole is the appropriate sentence for that
17   person?  Do you understand that?
18        A.   I do understand that.
19        Q.   Okay.  Much like the presumption of innocence.
20        A.   Correct.
21        Q.   When you start the trial, you presume that the
22   person is innocent.
23        A.   Correct.
24        Q.   And that doesn't change unless the State can prove
25   it to you beyond a reasonable doubt.
```

```
 1         A.    Correct.
 2         Q.    And it's the same kind of thing then after you find
 3   somebody guilty of capital murder.  The presumption is that the
 4   person is not going to be a future danger.  The presumption is
 5   that life is the appropriate punishment.  Do you understand
 6   that?
 7         A.    Yes, uh-huh.
 8         Q.    Okay.  And once again, the State has the burden of
 9   proof on the first special issue.  And once again, it's beyond
10   a reasonable doubt.  But some people come down here and they
11   say, well, if I've been convinced beyond a reasonable doubt
12   that a person is guilty of capital murder, that they have
13   committed an intentional killing in the course of committing
14   the offense of robbery, to my mind that person is always going
15   to be a continuing threat because if you've done it once,
16   you're going to do it again.  How do you feel about that?
17         A.    Not necessarily.
18         Q.    Okay.
19         A.    You have to take into account the person at that
20   time.
21         Q.    Okay.  So you could presume that the answer to
22   Special Issue Number 1 is no?
23         A.    Yeah, I guess I could.
24         Q.    Okay.  Would the Defense have to show you that the
25   Defendant would not be a continuing threat in order for you to
```

1    answer that no?

2        A.    Yes.

3        Q.    Okay.  You understand under the law that the State

4    has the burden of proof and they've got to convince you beyond

5    a reasonable doubt that the answer to that question is yes?

6        A.    Yes.  Yes, I understand.

7        Q.    But what I -- what I'm hearing you say is that even

8    understanding that, that you would still require the Defendant

9    to prove to you that he would not be a continuing threat; is

10   that right?

11       A.    I think that you would have to look at that

12   gentleman's situation at that time -- or that woman's

13   situation, whatever their situation was at that time.

14       Q.    Okay.  Well, what the law says is that you have to

15   look at what the State proves to you, the evidence that they

16   bring you.

17       A.    Okay.

18       Q.    And what I'm asking you -- because I know in a

19   perfect world we'd all like to hear all sides of everything.

20       A.    Correct.

21       Q.    But in a criminal process, the Defense doesn't have

22   to prove anything to you.  You understand that's what the law

23   says?

24       A.    Okay.

25       Q.    But some people come down here and they say, look,

```
 1  we're talking about the death penalty.  And if I'm going to

 2  find that somebody is not going to be a continuing threat to

 3  society, then I'm going to need the Defense to bring me some

 4  evidence of that.

 5       A.   Oh, I understand.  I understand what you're saying.

 6       Q.   So how do you feel about that?

 7       A.   I really don't know how I feel about that.

 8       Q.   And I know --

 9       A.   That's really -- that's really -- it's really bad

10  for me to say that, but I really don't.

11       Q.   No, it's not, and it's perfectly understandable

12  because you're not in that situation.  And it's hard for us to

13  say what you'd do because you don't know.

14       A.   I don't know how I feel about it at the time,

15  honestly.

16       Q.   And unfortunately, the way our system is designed is

17  we have to kind of put you in some hypothetical situation and

18  ask you what's your best guess of what you would do because we

19  can't sit here and say, well, okay, this is what we have in

20  this case and if I show you X, Y, and Z, what's your verdict

21  going to be?  The law won't --

22       A.   Exactly.

23       Q.   -- let us do that.  That would be a lot easier, I

24  agree.

25       A.   Yeah.
```

```
 1        Q.   So we just have to kind of ask you what your best
 2   guess is in that hypothetical situation.
 3        A.   Oh, I don't know.
 4        Q.   (BY MS. BERNHARD)  Okay.  Let me --
 5             THE COURT:  I'm sorry, I didn't hear what you
 6   said.
 7        A.   I just don't know --
 8             THE COURT:  Okay.
 9        A.   -- how I'd -- how I'd feel in that situation.
10        Q.   (BY MS. BERNHARD)  Okay.  Let me ask it this way.
11   Can you promise us that if you find somebody guilty of capital
12   murder, an intentional killing in the course of a robbery, or
13   can you guarantee us that you would not require the Defense to
14   bring you any evidence in order to answer that question no --
15   that first special issue?  And there are no right or wrong
16   answers.  I mean, you've fulfilled your civic duty --
17        A.   I just have to -- have to think about it.
18        Q.   Okay.
19        A.   I think that I could.
20        Q.   Okay.  You could what?
21        A.   Could just put that aside, and I guess -- I think
22   I'm confused.
23        Q.   Okay.  We'll go back.
24        A.   I'm sorry.  I'm embarrassed.
25        Q.   We're tired, and we're all confused.  You and 11
```

1 other jurors have found somebody guilty beyond a reasonable

2 doubt of an intentional killing in the course of a robbery.

3      A.    Correct.

4      Q.    Which brings you into the special issues in a

5 capital murder case.

6      A.    Right.

7      Q.    The presumption is life without parole is the

8 appropriate sentence, and the law says the State has the burden

9 of proving to you beyond a reasonable doubt that there's a

10 probability that the Defendant would commit criminal acts of

11 violence that would constitute a continuing threat to society.

12 That's the question the jury has to answer.

13      A.    Okay.

14      Q.    And some people say, well, in order to answer that

15 question no, that a person would not be a continuing threat, I

16 would have to hear something from the Defense.  I would require

17 the Defense to present something in order to answer that no.

18 Do you feel that way?

19      A.    I guess I honestly do.

20      Q.    Okay.  Even understanding that the law says it's --

21 that the State has the burden?

22      A.    Uh-huh, uh-huh.

23      Q.    But some people come down here -- and there are no

24 right or wrong answers.  Nobody is going to quibble with you or

25 say, oh, my goodness, you're wrong -- I mean, you're a bad

```
 1  citizen.
 2       A.   I understand that, because -- I mean, but if I -- if
 3  I'm completely honest, I -- I honestly can say that, yes, I
 4  think I would.
 5       Q.   Before you could answer that question --
 6       A.   Yeah --
 7       Q.   -- no --
 8       A.   -- that's right.
 9       Q.   -- you would require something from the Defense?
10       A.   Yeah.
11       Q.   Okay.
12                MS. BERNHARD:  I think --
13                THE COURT:  Sorry?
14                MS. BERNHARD:  Take a break.
15                THE COURT:  Take a break.  All right.
16                Ma'am, if you don't mind, if you'll just stand
17  out in the hall for just a second.
18                THE BAILIFF:  All rise.
19                (Venireperson excused from courtroom.)
20                MS. BERNHARD:  The Defense would certainly have
21  a challenge for cause in that she would require the Defense to
22  present evidence on the first special issue.
23                (Venireperson challenged by the Defense.)
24                MS. JONES:  And we would agree, Your Honor, that
25  the juror, based on some of her answers, does not appear to be
```

```
 1   qualified.

 2                   THE COURT:  Thank you.  Juror --

 3                   MS. MULDER:  1455.

 4                   THE COURT:  -- 1455?  Juror 1455 is excused by

 5   agreement.

 6                   If we can get her back in, please.

 7                   (Venireperson 1455A, Callie Stanley, excused.)

 8                   (Venireperson returned to courtroom.)

 9                   THE COURT:  Ms. Stanley, we're going to excuse

10   you.

11                   I've heard you say that you're embarrassed and

12   that you don't understand and that you feel bad.  Please,

13   please try not to have any of those emotions, because --

14                   VENIREPERSON:  I just -- I just -- I want to

15   truly be fair.

16                   THE COURT:  I understand, and we're very

17   grateful for your service.  And please don't walk away from

18   here feeling bad.

19                   VENIREPERSON:  Okay.  Thank you.

20                   THE COURT:  Thank you.

21                   (Recess proceedings.)

22

23

24

25
```

```
 1                    Reporter's Certificate

 2   THE STATE OF TEXAS:

 3   COUNTY OF DALLAS:

 4        I, Darline King LaBar, Official Court Reporter in and for

 5   the 363rd District Court of Dallas County, State of Texas, do

 6   hereby certify that the above and foregoing volume constitutes

 7   a true, complete and correct transcription of all portions of

 8   evidence and other proceedings requested in writing by counsel

 9   for the parties to be included in the Reporter's Record, in the

10   above-styled and numbered cause, all of which occurred in open

11   court or in chambers and were reported by me.

12        I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if any,

14   admitted by the respective parties.

15        WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16   on the 23rd day of February, A.D., 2013.

17

18

19
                         \s\Darline LaBar
20                       DARLINE KING LABAR
                         Official Court Reporter
21                       363rd Judicial District Court
                         Dallas County, Texas
22                       hpdkfaith@msn.com
                         (214) 653-5893
23

24
     Certificate No:  1064
25   Expiration Date:  12/31/2014
```