1                        REPORTER'S RECORD

2                    VOLUME 42 OF 57 VOLUMES

3                TRIAL COURT CAUSE NO. F12-23749-W

4          COURT OF CRIMINAL APPEALS NUMBER:  AP-77,030

5   THE STATE OF TEXAS          :          IN THE 363RD JUDICIAL

6   VS.                         :          DISTRICT COURT OF

7   MATTHEW LEE JOHNSON         :          DALLAS COUNTY, TEXAS

8

9

10                     **INDIVIDUAL VOIR DIRE**

11

12

13

14

15                          * * * * * * * * * * *

16

17

18

19

20       On the 14th day of October, 2013, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable Tracy Holmes, Judge

23   Presiding, held in Dallas, Dallas County, Texas:

24       Proceedings reported by machine shorthand computer

25   assisted transcription.

                    Darline King LaBar, Official Reporter

```
 1  A P P E A R A N C E S:

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
            Crowley Criminal Courts Building
 3          133 North Riverfront Boulevard
            Dallas, Dallas County, Texas 75207
 4          Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
         MS. ELAINE EVANS, A.D.A., SBOT # 24032880
 6       MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724

 7              FOR THE STATE OF TEXAS;

 8

 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
            P.O. Box 2817
11          Red Oak, Texas 75154
            Phone:  972-617-5548
12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13          325 North St. Paul Street, Suite 2475
            Dallas, Texas 75201
14          Phone:  214-922-0212

15              FOR THE DEFENDANT.

16

17

18

19

20

21

22

23

24

25
```

1                       **INDEX VOLUME 42**

2  October 14th, 2013                              PAGE   VOL.

3  INDIVIDUAL VOIR DIRE:

4  Proceedings......................................... 4   42

5  PROSPECTIVE JUROR   STATE VOIR DIRE   DEFENSE VOIR DIRE     VOL.

6  BOBBY COLEY                40                  92         42

7  Venireperson 1497A, Bobby Coley, qualified........... 59   42

8  Venireperson 0797A, Brian MacDonough, excused........ 60   42

9  Venireperson 0960A, Becky Arguijo, excused........... 60   42

10 PROSPECTIVE JUROR   STATE VOIR DIRE   DEFENSE VOIR DIRE     VOL.

11 JERRY MATLOCK               63                  92         42

12 Venireperson 1500A, Jerry Matlock, qualified........ 104   42

13 Reporter's Certificate............................. 106   42

14

15                     **ALPHABETICAL INDEX**

16 PROSPECTIVE JUROR   STATE VOIR DIRE   DEFENSE VOIR DIRE     VOL.

17 BOBBY COLEY                40                  92         42

18 JERRY MATLOCK               63                  92         42

19

20                       **EXHIBIT INDEX**

21 STATE'S                    OFFERED      ADMITTED      VOL.

22  *3   Brian MacDonough letter 60           60         42

23  *4   Becky Arguijo letter    60           60         42

24 *Voir Dire Exhibit

25

```
 1                     P R O C E E D I N G S
 2              (Venireperson brought into courtroom.)
 3              THE COURT:  Good morning, sir.
 4              VENIREPERSON:  Good morning, everyone.
 5              THE COURT:  How are you?  Thank you for coming
 6   down on such short notice.  We appreciate it.
 7              Please be seated.
 8              Is it Coley or Coley (different pronunciation)?
 9              VENIREPERSON:  Coley.
10              THE COURT:  Mr. Coley, I want to thank you very
11   much for coming down this morning.  We really appreciate it.
12   We needed you, and we're grateful.
13              Do you remember the oath that was administered
14   to you in June of this year down in the Central Jury Room?
15              VENIREPERSON:  Yes, ma'am.
16              THE COURT:  All right.  Well, you'll still be
17   operating under that oath, and you'll continue to operate under
18   it until you're discharged, as well as the instructions that
19   you were given.
20              VENIREPERSON:  All right.
21              THE COURT:  We're going to try this case October
22   the 28th and November the 2nd.  Has anything happened in your
23   life between June and now that would prevent you from sitting
24   as a juror in the event that you were qualified and selected?
25              VENIREPERSON:  No.
```

```
 1                    THE COURT:  Have you --
 2                    VENIREPERSON:  I'm available.
 3                    THE COURT:  -- have you been exposed to anything
 4   since that time that would in any way bias you or influence you
 5   in any way?
 6                    VENIREPERSON:  No, Your Honor.
 7                    THE COURT:  All right.  I'd like to introduce
 8   the parties to you.
 9                    Representing the State is Andrea Moseley.
10                    MS. MOSELEY:  Good morning.
11                    THE COURT:  Sitting next to her is Rocky Jones.
12                    MS. JONES:  Good morning.
13                    THE COURT:  And behind them is Elaine Evans.
14                    MS. EVANS:  Good morning.
15                    VENIREPERSON:  Morning.
16                    THE COURT:  These are the lawyers who represent
17   the State.
18                    Representing the Defense is Kenneth
19   Weatherspoon.
20                    MR. WEATHERSPOON:  Good morning.
21                    THE COURT:  Ms. Catherine Bernhard.
22                    MS. BERNHARD:  Good morning.
23                    THE COURT:  And the citizen accused, Mr. Matthew
24   Lee Johnson, is sitting to her right.
25                    The lady sitting between us is Darline LaBar.
```

1   She's the official court reporter, and it's her responsibility

2   to take every single word down that's said accurately.  And so

3   as a courtesy to her, if you could try to remember to answer

4   audibly yes or no and also try to avoid shaking or nodding your

5   head and saying uh-huh or huh-uh.

6                   VENIREPERSON:  All right.

7                   THE COURT:  My name is Tracy Holmes.  I'm the

8   presiding judge, and I will be presiding over the trial.  And

9   I'm the one who swore you in this summer.

10                   Have you had an opportunity to review your

11  questionnaire and that pamphlet?

12                   VENIREPERSON:  Yes, ma'am.

13                   THE COURT:  All right.  Do you have any

14  questions for me?

15                   VENIREPERSON:  Not at this time.

16                   THE COURT:  Okay.  The State has 45 minutes to

17  talk to you, and the Defense has 45 minutes to talk to you.

18  And at the end of that time, if they determine that you've been

19  qualified as a juror, we'll get your photograph and send you on

20  your way and notify you on the 15th or 16th of October if, in

21  fact, you will be a juror.  Is that sufficient timing for you?

22                   VENIREPERSON:  Oh, yes.  I'm looking forward to

23  it.

24                   THE COURT:  All right.  Well, we'll let Ms.

25  Moseley talk to you.

1          MS. MOSELEY:  Thank you, Judge.

2                    BOBBY COLEY,

3  was called as a venireperson by the parties, and after having

4  been first duly sworn, testified as follows:

5                STATE VOIR DIRE EXAMINATION

6  BY MS. MOSELEY:

7     Q.   I don't know if that was a little bit of sarcasm or

8  if you really meant it, but I appreciate the sentiment either

9  way.  Certainly recognize that asking a citizen to serve for

10 two weeks down here is an inconvenience for many, but it is a

11 civic duty.  As I can tell from your questionnaire, you

12 recognize --

13    A.   Oh, it's my duty.

14    Q.   And I -- I do appreciate it, and -- and I know we

15 didn't give you a lot of notice for be -- to be down here this

16 morning, so I'm going to second the Judge's appreciation for

17 you there, as well.  Nice to see you here this morning and

18 smiling about it, even in the rain.

19              My responsibility today is to do my very best to

20 explain to you how this process works.  I will tell you that

21 the vast majority of even the lawyers that work in this

22 building every day don't understand and know as much as you

23 will understand by the time you leave here if I've done my job,

24 about death penalty cases, cases in which the State is seeking

25 the death penalty.  Many times we at home see a news story on

1  the 6 o'clock news and say, you know, whoever did that sure

2  deserves the death penalty, or I think that guy should get it

3  or I think this guy shouldn't.  And in reality, it doesn't

4  really have much at all to do with what someone deserves as far

5  as the law is concerned.

6            Capital murder is the only kind of crime for

7  which the death penalty is an available option.  If you are

8  convicted of capital murder, there are only two possible

9  punishments, one is life without the possibility of parole --

10 which means exactly that, you'll never even be considered for

11 parole -- or the death sentence.  And the way we get to that

12 conclusion is through a very serious process that we're going

13 to talk about today.  And it really will, as you'll see at the

14 end, have very little to do with what somebody deserves.  In

15 fact, it may have very little to do with the actual case itself

16 or the crime itself.

17            In the state of Texas, the legislature has

18 decided that the way we will distinguish those who receive the

19 life without parole sentence from those who receive the death

20 sentence is about what they are more likely to do in the

21 future.  Are they going to be a continuing threat if we don't

22 give them the death sentence?  Does that make sense?

23       A.   Yes, ma'am.

24       Q.   And I want you to understand that your only

25 responsibility today is to tell us the truth about how you

```
 1  feel.  There are no right or wrong answers.  There's not going
 2  to be a quiz at the end of it to see how much you learned and
 3  those who get an A get on the jury or those who don't, get
 4  excused.  We're really trying to figure out what your feelings
 5  are about the law and whether or not your feelings are so
 6  strong that they would prevent you from following the law and
 7  basing your verdict and your answers in the punishment phase on
 8  the law and the evidence and not your personal feelings.
 9            I recognize from your questionnaire that you
10  realize how serious a process this is; is that right?
11       A.   Yes, ma'am.
12       Q.   And certainly we all want to make sure that the 12
13  jurors who are seated and hear the evidence are able to base
14  their decisions only on the law and the evidence and not their
15  personal feelings one way or the other.  So -- so that's really
16  why we're here today.
17            And I want to start by telling you what a
18  capital murder is.  Capital murder is always going to be an
19  intentional murder.  That means that somebody formed the goal
20  to cause the other person's death.  It was their intent to
21  cause their death.  Not an accident.  Not a mistake.  We're
22  never going to be talking about self-defense or defense of a
23  third person because if you're defending yourself, you're not
24  going to be guilty of any crime.  And we're not going to be
25  talking about insanity or mental retardation because if someone
```

1  is mentally retarded, the law will not ever subject them to the

2  death penalty.  So we're going to be talking about somebody who

3  knew what they were doing and committed the intentional murder

4  of another person.  And even that's not enough in and of itself

5  to be capital murder.  Capital murder is that intentional

6  murder, plus some aggravating circumstance.  So like the

7  intentional murder of a police officer in the line of duty.

8  That would be the additional something.  The intentional murder

9  of a child younger than 10 is a capital murder.  Intending to

10 kill someone during the course of committing or attempting to

11 commit another felony, like robbery or burglary or sexual

12 assault is capital murder.

13        So keep in mind as we go through this process

14 that anytime we're talking about capital murder, it's an

15 intentional murder, plus that extra something else.  And in

16 this case, we will limit our conversation to an intentional

17 murder committed during the course of a robbery.  As you are

18 aware, that's the allegation in this case.  So there are other

19 ways, but that's what we'll focus on today.

20        In any criminal case there are certain basic

21 principles of law that will apply.  You've probably heard of

22 these things before, and you're going to recognize the -- the

23 principles.  The first is that anybody charged with a crime has

24 a presumption of innocence.  That means as the Defendant sits

25 here in this courtroom today, he's not guilty of any crime,

1  because the State of Texas hasn't brought any proof of guilt.

2  And until we can bring sufficient evidence to convince a jury

3  beyond a reasonable doubt that he is guilty, that presumption

4  of innocence is enough for the jury to vote not guilty.  You're

5  nodding your head.  You -- you certainly understand that

6  principle?

7        A.    Yes, ma'am.

8        Q.    And sometimes people think where there's smoke,

9  there's fire.  If a person has gotten all this way in the

10  process, they must be guilty of something.  You could certainly

11  see how that thought would violate a presumption of innocence;

12  is that right?

13        A.    Yes.

14        Q.    As you sit there today, can you presume the

15  Defendant innocent of this crime until we bring evidence to

16  prove otherwise?

17        A.    As far -- at this moment, he's innocent.  And until

18  you -- it's your job to convince me of the other way.  So --

19        Q.    Exactly.  And it's always my job.  It's going to be

20  my job throughout the trial to bring the evidence in the case.

21  Along with that presumption of innocence is that burden of

22  proof and that being on the State of Texas to bring the

23  evidence.  A defendant never has to prove they're innocent.

24  Their lawyers don't, frankly, have to do anything at all during

25  this trial, because the jurors' responsibility, following their

1  oaths, would be to look to me to bring the evidence.  And if I

2  fail in my proof, the verdict has to be not guilty, even if

3  they don't ask a single question or speak a single word during

4  the trial, because it is my job, as you pointed out very

5  eloquently, frankly, to prove the guilt.  And the Defense never

6  has to bring any evidence or prove anything at all.  They don't

7  have to disprove my evidence.  If they sat there and did

8  crossword puzzles, that would be under the law okay, because

9  it's my job to bring the evidence.

10            Now, I'm going to tell you, they're fine

11  lawyers, and they're going to make me do my job.  They're not

12  going to do crossword puzzles, but that's -- that's how serious

13  we are about the burden of proof.

14            My burden of proof is to prove beyond a

15  reasonable doubt.  That's not beyond all possible doubt because

16  I think unless I had a jury of 12 witnesses who saw the crime

17  happen, I'd never be able to prove it beyond all possible.  But

18  I do have to remove all reasonable doubt about the person's

19  guilt before a jury could convict.  Can you hold me to that

20  burden?

21       A.   Yes.

22       Q.   Make me do that work?

23       A.   Yes.

24       Q.   If a defendant chooses not to testify, that is their

25  right.  And you've probably heard that before, as well.  A

1  defendant has the right to remain silent, not make any

2  statement at all.  That right applies for all of us out in the

3  streets.  The police officer wants to question you about

4  something, you don't have to talk to them about it.  That right

5  follows a person into the courtroom if they're charged with a

6  crime.  So along with that presumption of innocence and the

7  burden of proof, a defendant never has to testify in their own

8  defense.  I can't call the Defendant and say, now we want to

9  hear your side of the story, because the law won't allow that.

10  If a defendant chooses not to testify, the -- the jury would be

11  given an instruction by Judge Holmes that says, you cannot

12  consider that silence for any reason.  You can't talk about it,

13  refer to it, or consider it for any purpose.

14          There are lots of reasons why a person would

15  choose not to testify, and that's kind of the basis for it.  A

16  jury can't speculate about that.  If the Defendant in this case

17  chose not to testify and you were on the jury, would you be

18  able to follow that instruction and not consider it for any

19  reason?

20      A.   Yes, ma'am.

21      Q.   And if the Defense doesn't testify -- the Defendant

22  doesn't testify, you just, once again, look to the evidence you

23  did hear, and your question as a juror is did the State prove

24  it or not.  And if we did, the verdict is guilty whether or not

25  the Defendant testifies.  And if we didn't, the verdict is not

1  guilty, even if he doesn't testify.  You understand that

2  principle and can follow that?

3       A.   Yes, ma'am.

4       Q.   A juror's job in any case, including a capital

5  murder case, is to wait until they hear the testimony from the

6  witnesses and then decide how much, none, some, or all of that

7  witness's testimony they choose to believe and how much weight

8  they choose to give that testimony.  I'm sure you recognize

9  that all witnesses are going to be sworn to tell the truth, the

10  whole truth, and nothing but the truth, right?

11       A.   Yes, ma'am.

12       Q.   Do you believe that that means that every single

13  witness 100 percent of the time tells the truth?

14       A.   Probably not, not 100 percent.

15       Q.   Unfortunately not, right?  Not everybody comes in

16  and tells the truth.  And because of that, it's the jurors'

17  job -- their responsibility to decide the credibility of the

18  witnesses.  That oath in and of itself is not enough.  And that

19  applies whether we're talking about a police officer, a priest,

20  a prostitute, an expert witnesses.  The jury's job is to say,

21  you know what, it kind of doesn't matter what they do for a

22  living or what clothes they're wearing.  I'm going to have to

23  wait until I hear what they say before I decide whether I

24  believe them.

25           Again, you can look to their qualifications,

1   what is their background, their education, their experience,

2   and decide, weigh all of that, but you won't know any of that

3   until you hear them testify.

4              I know in the questionnaire on page 5, we asked

5   you if you believed police officers are more likely to tell the

6   truth than the average person.  And you said, yes, that they're

7   supposed to set an example.  And -- and I agree with you, and

8   there's nothing wrong with feeling that way, but you certainly

9   recognize there's good police officers and there's some bad

10  ones?

11      A.    Yes.

12      Q.    And they wear the same uniform, right?

13      A.    Yes, ma'am.

14      Q.    Unfortunately, we can't see them coming and know,

15  well, I can tell by looking at that police officer that he's

16  not going to be truthful.  So can you wait until you hear their

17  testimony before you decide whether to believe them or not

18  believe them?

19      A.    I have to wait until I hear their testimony.

20      Q.    And -- and you don't have any problem following that

21  law?

22      A.    No.

23      Q.    My job, as I told you, is to bring the proof beyond

24  a reasonable doubt to convince the jury.  And what I have to

25  prove is everything that we allege in our indictment.  If I

1  bring the charges, I have to prove them exactly like I alleged

2  it or the jury has to find the person not guilty.  I'm going to

3  give you kind of a silly example, but one to illustrate how

4  important that responsibility is.  I know when -- when I talk

5  to my mom about, you know, some things that -- some legal

6  principles and things that may happen down here at the

7  courthouse, she sometimes says things like, well, that's a

8  technicality.  I don't think somebody should get off because of

9  a technicality.  And I try to explain to her, and I'm going to

10 try to explain to you today, that there really is no such thing

11 as a technicality.  Every single allegation in my indictment is

12 just as important as the next.

13              So in a capital murder case -- not this case.

14 Let's talk about a hypothetical case.  I allege in my

15 indictment that there was an intentional murder committed

16 during the course of committing or attempting to commit a

17 robbery.  That's what's in the indictment.  That's what I have

18 to prove.  Let's say it comes to trial and you're on that

19 hypothetical jury and you hear all the witnesses come in and

20 testify, and there's no doubt in your mind that the Defendant

21 on trial is the one that killed the victim and he did so

22 intentionally.  That's a check.  We're going to go down that

23 indictment like a checklist.  Check the Defendant, check

24 intentional murder, but let's say you never hear anything about

25 a robbery.  There's never any evidence from anybody about any

1  property being demanded or any property being taken.  And

2  you're kind of waiting for that, because that's what I alleged,

3  but you don't hear it.

4              Do you think I've done my job?

5      A.    Not fully.

6      Q.    No.  And the jury's responsibility, following their

7  oath in that case, would be to find the Defendant not guilty of

8  capital murder.  Even though they believe he committed an

9  intentional murder, I didn't get all those boxes checked off.

10             Now, the jury might be able to consider murder,

11  a lesser charge of murder, because you did believe beyond a

12  reasonable doubt that there was a murder committed, just not a

13  capital murder.  If you're talking about a murder, now going

14  into the punishment phase, we're not going to be talking about

15  life or death, right?  There's a punishment range for murder.

16  Anywhere from five years in prison, all the way up to and

17  including a life sentence, if the jury thought, with parole --

18  with the possibility of parole.  So the jury's job would be, in

19  that punishment phase, to hear all the evidence, listen to

20  everything.  You'll get to hear in the punishment phase all

21  about the Defendant's background, childhood, education, any

22  prior criminal record or no criminal record, all the good and

23  the bad, so that you as the jury can decide where in that

24  punishment range does the proper punishment lie.

25             If the jury believes that they've heard all of

 1    the testimony and five years sounds like the right sentence for

 2    that, then five years it is.  If the jury hears all the

 3    evidence on the other hand and says, you know what, I've heard

 4    everything and I think a life sentence is the proper sentence,

 5    then that would be the verdict.  Does that make sense?

 6         A.    Yes, ma'am.

 7         Q.    And we have a really large range of punishment, five

 8    years all the way to life, because every murder is different

 9    and every criminal defendant is different.  All the background

10    information is different.  Can you as a juror, if you're on

11    that hypothetical jury, consider that full range of punishment

12    and in a case where you thought five years was proper for the

13    conviction of murder, could you do that?

14         A.    Yes, ma'am.

15         Q.    And if you thought a life sentence was the proper

16    sentence for murder, could you do that?

17         A.    Yes, ma'am.

18         Q.    The -- the responsibility of the juror in the

19    punishment phase is just to -- again, to wait and keep an open

20    mind and wait until you hear everything before you make a

21    decision about what the proper punishment is because as you're

22    well aware, I'm sure, every circumstance is different and

23    you're not going to know what you're going to hear until you

24    hear it.  So as long as you can keep an open mind, then you're

25    going to be a qualified juror, if you can give and assess the

1    proper punishment, whatever that is.

2                    Let's talk about what happens if the jury

3    convicts a defendant of capital murder.  Again, we're talking

4    about an intentional murder committed during the course of a

5    robbery.  Let's say I do my job and that checklist is checked

6    off and the jury returns a verdict of guilty of capital murder.

7    At that point, you know, many people figure that the jury is

8    going to go back and decide, okay, we've convicted him of

9    capital murder, who thinks he should get life and who thinks he

10   should get death.  And now you probably realize just from

11   reading those instructions that the Judge gave you -- kind of

12   that pamphlet on the law, that that's not at all what happens.

13   A jury is never going to be asked to check a box life or check

14   a box death.  They're never going to be asked to vote who

15   thinks he deserves life or who thinks he deserves death

16   sentence.  We're going to get to that answer through a specific

17   process, starting with this Special Issue Number 1.  And we put

18   it up here for everybody's benefit so it's big and bold and you

19   will remember it.

20                    The first question, and -- well, let me explain

21   a little bit better about the process, I guess, because in the

22   punishment phase, the jury comes back and returns a verdict of

23   guilty of capital murder.  Then both sides get an opportunity

24   to present more evidence to the jury.  Again, the jury is going

25   to look to who for the proof?

1          A.    You.

2          Q.    Me, right.  Never going to look to that table for

3    any proof at all.  It's always my job -- even in the punishment

4    phase, it's my job.  So I'm going to go first.  I will present

5    evidence to the jury to help them answer the special issues in

6    the punishment phase, so I put on all of the evidence that I

7    want to put on and then the Defense gets an opportunity, if

8    they wish -- they have the choice to put on evidence to help

9    the jury -- and then I can go again and they can go again and

10   we go back and forth.  But it always starts with me because

11   it's my job to bring the proof.

12          So the -- the jury hears everything, and it --

13   really at this point you get to hear everything.  In the first

14   part of the trial, you're not going to hear anything about the

15   Defendant's background, criminal history, or lack thereof.  Has

16   he been a great guy or a terrible guy.  You're probably not

17   going to hear a whole lot about the victim or, you know, impact

18   on the victim or any of that because in the first part of the

19   trial, the only question is that checklist, right?  Did the

20   offense happen like we said it did, when we said it did.

21          But in the punishment phase all that other stuff

22   comes to the jury, and we recognize that we're asking the jury

23   to -- to do a -- frankly, a really tough job.  Would you agree?

24          A.    Yes, ma'am.

25          Q.    To decide whether somebody's life should be ended,

1   basically.  So we recognize the seriousness of that.  And --

2   and both sides are going to want the jury to have every piece

3   of information available to help them answer the questions.

4              Once all of that evidence is presented, both

5   sides get an opportunity to make a closing argument, sum up the

6   evidence for the jury from their perspective, and then the jury

7   goes back to the deliberation room where you were the first

8   time.  And you're going to discuss all of that evidence.  And

9   the first question that the jury is asked to answer is Special

10  Issue Number 1, whether there's a probability that the

11  Defendant would commit criminal acts of violence that would

12  constitute a continuing threat to society.  It's my job to

13  prove that beyond a reasonable doubt.

14             Now, again, the burden of proof is the same as

15  it was in the first phase.  Not beyond all possible doubt, but

16  beyond a reasonable doubt.  And I have to prove whether there's

17  a probability.

18             Now, probability doesn't mean exactly

19  100 percent certain what's going to happen, because that would

20  be impossible.  It would be impossible, would you agree, Mr.

21  Coley, for me to prove absolutely what somebody is going to do

22  in the future?

23      A.   Correct.

24      Q.   But I do have to prove it's a probability, and

25  probability under the law means more likely than not.  So it's

1    not a mere possibility because anything is possible.  My job is

2    harder than that.  I have to prove what is more likely than not

3    the Defendant going to do in the future.  So you can see that

4    what we're asking the jury to do is look at all of the evidence

5    from the past and make a decision about what will more likely

6    happen in the future.  Do you believe that that is something

7    that's capable of proof, what someone more likely will do in

8    the future?

9          A.    It's very possible.

10         Q.    It's my job to prove it's more likely than not that

11   the Defendant would commit criminal acts of violence.  Now, we

12   don't have a definition of that.  It's going to be left up to

13   the jury and each individual juror to decide for themselves to

14   decide what is a criminal act of violence.  You'll notice it's

15   plural.  I have to prove that it's criminal acts, plural, of

16   violence.  I would suggest to you that that may be mincing

17   words because I think if you believe that the Defendant is

18   going to commit one criminal act of violence in the future,

19   you'd probably believe he's going to commit more than one, not

20   just stop with one.  But I do have to prove that he would

21   commit criminal acts of violence that would constitute a

22   continuing threat to society.

23                Now, when we talk about society, we usually

24   think about where we live, right?  Going to work, going to

25   church, going to school, whatever the case may be.  Can you see

1    how a prison society is also a society?  You have to say yes or

2    no.  I see you nodding.

3        A.    Yes.

4        Q.    Okay.  Darline -- Darline can't write down a nod.

5        A.    Oh, I'm sorry.

6        Q.    When we get to Special Issue Number 1, remember that

7    the best thing the Defendant can hope for is life without

8    parole because life without the possibility of parole is the

9    automatic sentence when you're convicted of capital murder.

10   That -- that's going to happen no matter what, unless the State

11   does its job in the punishment phase.  And there's a

12   presumption going into the punishment phase that the life

13   sentence is the proper sentence.  And I'm going to tell you

14   that for the vast majority of people convicted of capital

15   murder, the life sentence is sufficient.  It's only those few

16   capital murderers who the State can prove will more likely than

17   not be a threat in the future that will be subject to the death

18   penalty, right?  So your job is to decide is this one of those

19   defendants or not who will be a continuing threat.

20                The law does say that you can look back to the

21   facts of the crime itself and help you answer that, if it does.

22   I'll give you a quick example of that.  Let's say that in the

23   9-11 attacks on the Twin Towers, one of the pilots lived.  That

24   person would be charged with capital murder because he -- it

25   was a mass murder.  That would be a capital murder charge.  And

1   I believe that most jurors would say that crime in and of

2   itself, even with no prior violent acts and no history, would

3   be enough for them to say, you know what, I believe it's more

4   likely than not that guy is going to be a continuing threat to

5   society.  So that kind of crime itself is enough to answer

6   Special Issue Number 1 in and of itself.  Somebody capable of

7   that type of crime would more likely than not be a continuing

8   threat.

9                   But not all capital murderers are going to be a

10  continuing threat.  Can you see that as a possibility?

11       A.   Yes, ma'am.

12       Q.   That just because somebody is convicted of a capital

13  murder doesn't necessarily mean they're going to continue to be

14  a threat.

15       A.   Correct.

16       Q.   When we talk about prisons, let's -- let me ask you

17  this.  Have you ever visited a prison?

18       A.   No, ma'am.

19       Q.   But certainly you recognize that there are prisoners

20  even just from watching TV that they mingle amongst one

21  another, they live together, work together, eat together, and

22  have access to one another, the prisoners.  There are also

23  people who work inside the prison, prison guards, teachers,

24  ministers, people who come in and out to visit loved ones in

25  the penitentiary.  Would you agree that all of those people

1  deserve protection from someone who would pose a threat to

2  them?

3      A.   Yes.

4      Q.   And -- and do you believe that the prison is capable

5  of preventing all acts of violence?

6      A.   No.

7      Q.   That most people would say that prison is a pretty

8  dangerous place to be.  And do you think that it's important

9  that we ask this Special Issue Number 1 -- ask that question,

10  so that we don't send someone who is more likely than not to be

11  a threat into that society?

12      A.   Yes.

13      Q.   So Special Issue Number 1, when we say continuing

14  threat to society, we're talking about all of society.  Our

15  society, as well as prison society.  And you look to the State

16  to bring the proof that more likely than not the Defendant

17  would continue to be a threat to society -- whatever society he

18  finds himself in.  If the jury answers that no, I didn't do my

19  job, then the trial is over.  The jury has done their job.  The

20  Judge would sentence the Defendant to life without the

21  possibility of parole for the capital murder conviction and

22  everybody would go home, except the Defendant would go serve

23  that sentence because the jury doesn't believe he's going to be

24  a continuing threat to society.  If, however, the jury says,

25  yes, State, you proved it to me and I believe more likely than

1  not he will be a continuing threat, then you would move on to

2  Special Issue 2.  And it's very important that this process is

3  followed exactly the way it's set out, so you take those

4  questions in order.

5              If you answer no to Special Issue 1, you never

6  get to Special Issue 2.  And Special Issue Number 2 didn't

7  always exist in the law.  It's -- it's fairly new really in

8  terms of capital jurisprudence.  So Special Issue Number 2 is

9  there to benefit both the Defendant and the jury, frankly.

10 Prior to the time where we had Special Issue Number 2, it was

11 possible that the juror could feel that their hands were tied.

12 In other words, they had to follow their oath, find the

13 Defendant guilty because the State proved it beyond a

14 reasonable doubt, and they had to answer Special Issue Number 1

15 yes, because the State proved that beyond a reasonable doubt.

16 And back before we had Special Issue Number 2, that was the end

17 of the trial, and the Judge would sentence the person to the

18 death sentence.  It was possible that a juror could go home and

19 say, you know what, I believe he's guilty of capital murder,

20 and I believe he's going to be a continuing threat to society,

21 but there was something about the Defendant or his background

22 or the facts of the case -- there was something I heard in the

23 evidence that tells me that the death sentence really wasn't

24 the right sentence.  The life sentence was really the proper

25 sentence.  And they wouldn't feel okay about what they did.

1           So the law put Special Issue Number 2 in there

2  to prevent that from happening.  In order for the death

3  sentence to be imposed, the jury has to unanimously agree that

4  he's guilty of capital murder.  They have to unanimously agree

5  that he's going to be more likely than not a threat in the

6  future.  And they have to unanimously agree that there's

7  nothing in the evidence that is sufficiently mitigating to

8  warrant a life sentence.

9           So before we get to the death sentence, it's

10  unanimous guilty, unanimous yes to Special Issue 1, and

11  unanimous no to Special Issue 2.  Those answers are what would

12  force the Judge to basically sign a death warrant, but only in

13  those circumstances.  If any one juror says the State didn't

14  prove guilt beyond a reasonable doubt or the State didn't prove

15  that he's going to be a threat in the future or if one juror

16  says, you know what, I've listened to all of the evidence and I

17  believe that there's something there that warrants a life

18  sentence, then -- then it's a life sentence.  Does that make

19  sense?

20       A.   Yes, ma'am.

21       Q.   Now, by the time we get to Special Issue Number 2, I

22  think you would agree, Mr. Coley, that we're talking about a

23  pretty bad guy, right?

24       A.   Yes, ma'am.

25       Q.   Somebody who is guilty of capital murder.  Most

1  capital murders are heinous crimes.  Guilty of that.  And you

2  believe more likely than not they're going to be a continuing

3  threat to society.  But your job isn't done at that point.  My

4  job is done.  I've done all the proving I have to do.  But the

5  jury still has to go back again and take all of the evidence

6  into consideration, look at everything they heard kind of

7  through a different lens because now nobody has got any burden

8  of proof.  It's up to you to look inside yourself, consider all

9  the evidence, including the circumstances of the offense, the

10  Defendant's character and background, the personal moral

11  culpability of the Defendant.  Sometimes we refer to that as

12  moral blameworthiness.  Look at everything you heard and ask

13  yourself was there something there, a sufficient mitigating

14  circumstance or circumstances, that tells you the life sentence

15  is really the more proper sentence even though he's guilty and

16  even though I believe he's going to be a threat.

17          And nobody is going to tell you what is or isn't

18  mitigating.  This -- this may be, you know, the harder part of

19  the trial for the jury.  There's not a list of things that

20  we're going to give you that says, if you hear this, that's

21  mitigating.  There's no checklist.  But I will tell you there's

22  only two things under the law that are by law sufficiently

23  mitigating, and that is mental retardation, like we talked

24  about before.  If the person is mentally retarded, they'll

25  never be subject to the death sentence.  And if someone is

 1  under the age of 18 when they commit the capital murder.  So a

 2  17-year-old is guilty of capital murder, as an adult, but would

 3  never be subject to the death sentence because that youth in

 4  and of itself would be sufficiently mitigating.  Other than

 5  that, it can be whatever it is for each individual juror.

 6            I can give you some examples of things that some

 7  jurors might find mitigating.  Maybe you hear evidence that the

 8  person was horribly physically or sexually abused as a child.

 9  Some jurors would say that kind of childhood abuse may be

10  sufficiently mitigating.  That may be something that would make

11  the person less blameworthy for the crime.  Maybe they were

12  created to be the monster that they are.  And that might be

13  enough to answer that yes.  Some people may say that drug or

14  alcohol addiction or intoxication at the time of the crime

15  might be something that they would consider mitigating.  Other

16  jurors would say, you know, I don't think that's mitigating, I

17  think that's aggravating, I think now you've done two things

18  you shouldn't have done.

19            And so the jurors don't even have to agree on

20  what is mitigating.  But the law requires you to consider every

21  piece of evidence that comes in, and then decide whether it's

22  mitigating, not mitigating, aggravating, and then if it's

23  mitigating, is it sufficiently mitigating, because I think you

24  would agree that whatever evidence is there, if it's

25  mitigating, it would have to be pretty darned mitigating to

1  answer that yes, knowing you're sending that dangerous person

2  into the society where you think they're going to be a

3  continuing threat.

4           But the question is, not what do you think is

5  mitigating, because we're not going to ask you that.  Most

6  people don't know what they're going to find mitigating until

7  they hear it, so it's not what do you think is mitigating, but

8  the question is, if you heard something that in your heart told

9  you the life sentence was more proper, would you answer that

10  yes and ensure that a life sentence was the proper sentence?

11      A.   Yes.

12      Q.   And if you don't hear anything that is sufficiently

13  mitigating in your mind, could you answer that no, knowing that

14  that would leave the Judge with no option but to sign his death

15  warrant?

16      A.   Yes, I can answer no.

17      Q.   And you don't come into this with any automatic

18  answers.  There's no automatic answer to any of it.  Can you

19  wait until you hear all of the evidence before you answer that

20  question?

21      A.   Yes.

22      Q.   We asked you a couple of questions in the

23  questionnaire that I want to talk about that -- that relate to

24  this special issue, and I know when we had y'all fill this out,

25  we didn't give you the benefit of those instructions, right?

1        A.    Yes.

2        Q.    And so we don't explain the law to you because we

3   really are just looking for how you feel and what your gut

4   tells you.  When we asked you on page 6, Question Number 39, we

5   said:  Some people feel that genetics, circumstances of birth,

6   upbringing, and environment should be considered when

7   determining the proper punishment of someone convicted of a

8   crime.  What do you think?  Now you probably realize that those

9   may be the kinds of pieces of evidence that might come in in

10  the punishment phase of a capital case.

11       A.    Yes, ma'am.

12       Q.    And they might be things that the jury would be

13  required to consider in Special Issue Number 2.  And I'm not

14  quibbling with your answer.  You said, people should know right

15  from wrong.  And there is nothing wrong with that answer.  The

16  question is, if you hear those types of evidence, will you

17  consider it before you decide whether it's mitigating or not to

18  you?

19       A.    Yes.

20       Q.    Again, nobody is going to tell you that somebody's

21  upbringing or circumstances of birth have to be mitigating.

22  You decide that for yourself, as long as you can consider them.

23             On page 10, Question Number 60 -- we'll talk

24  about 64, 65, and 66 kind of together.  We told you in 64 that

25  voluntary intoxication does not constitute a defense to the

1  commission of a crime.  And you said you agree.  You can't go

2  out and get yourself really good and drunk and then commit a

3  crime and go, well, you can't convict me because I was drunk.

4  The law, you recognize, doesn't follow that.

5           However, Question Number 65, we told you that --

6  that the law does provide that if there is evidence of

7  intoxication in -- in the trial, that, again, a jury has to

8  consider that before they decide whether it's mitigating or not

9  mitigating.  And we're not going to ask you whether you would

10 find it mitigating because you haven't even heard it yet.  But

11 the question is, again, can you consider that evidence before

12 you decide how you're going to weigh it?

13     A.   Yes.

14     Q.   And the last -- the last one that I want to talk

15 about there is 66, and that is would a person's use of drugs or

16 alcohol at the time of the offense automatically prevent you

17 from assessing the death penalty?  There's -- there's a key

18 word in there, and it's kind of a trick question because

19 anytime you're asked will this automatically do something, your

20 answer should be no, because nothing can be automatic.  As

21 you've seen -- we've gone through this process, it is exactly

22 that, a process and there's never going to be an automatic

23 answer.

24           MS. MOSELEY:  I can go on.  It's a little

25 distracting.  I guess we're painting.  Am I the only one that

1    hears that?

2                    THE COURT:  They're sanding the door jambs.

3                    MS. MOSELEY:  Oh, they're sanding.  That's good.

4        Q.    (BY MS. MOSELEY)  It's just like road work.  You

5    know, they do it during rush hour.  They don't do this on a

6    weekend.

7                    Anyway, so -- so there's never going to be an

8    automatic answer.  Obviously, it would be improper for a person

9    to say, well, if someone was on drugs, then I'm automatically

10   going to say no death penalty because that -- that wouldn't be

11   doing that balancing, that weighing that Special Issue Number 2

12   is going to ask you to do.  Special Issue Number 2 is going to

13   ask you basically to listen to everything, look at everything

14   again, and then weigh it all and decide is there anything there

15   that is sufficiently mitigating to overcome all of that other

16   evidence that you've heard and overcome that -- that knowledge

17   you have that he's going to be a continuing threat to society.

18   And I think you've told us you could do that; is that right?

19       A.    Yes, ma'am.

20       Q.    Wait until you've heard everything.

21                   I want to go back just a little bit to page 3

22   and make sure that now that we've explained the law, you

23   understand.  On that Number 11, that Question Number 11, we

24   asked you if there's some crimes which call for the death

25   penalty solely because of their severe facts and circumstances,

1  regardless of whether or not the guilty person has committed

2  prior violent acts.  And I kind of talked a little bit about

3  that when I gave the example of the Twin Towers, that you could

4  look at the facts of the case and decide that.  You said,

5  aggravated assault on women, and I want to make sure -- now you

6  know obviously that that's not a case that's ever going to be a

7  death penalty case.

8       A.    Right.

9       Q.    But that's something that you would take very

10  seriously, I understand.

11      A.    Yes.

12      Q.    And -- and as long as whatever the facts are, you

13  can look to those facts and ask yourself that question in

14  Special Issue Number 1, then you're going to be qualified, but

15  you recognize aggravated assault on a woman isn't a capital

16  crime?

17      A.    Correct.

18      Q.    I think it should be.  But it's not under the law,

19  and you understand that?

20      A.    Yes, ma'am.

21      Q.    And you're not going to subject someone to the death

22  penalty just because you heard there was some assault on a

23  woman, I assume?

24      A.    No.

25      Q.    You told us in your questionnaire that you know

```
 1   some -- I guess a lady from church is married to someone who

 2   was getting out of prison and I assume they're out now based on

 3   the --

 4        A.   Yes, they are, and they was at church on Sunday.

 5        Q.   Do you know what he was convicted of?

 6        A.   No, I haven't -- she has not told us all the details

 7   or anything.  I know the length he was in and out on probation.

 8        Q.   Okay.  And how long was he in prison?

 9        A.   Forty-five years.  That was the sentence, 45 years,

10   and he was in for about 24.

11        Q.   Oh, goodness.

12             COURT REPORTER:  About 20, is that what you

13   said?

14        A.   Twenty-four.

15        Q.   (BY MS. MOSELEY)  He was in for 24 years?

16        A.   (Nods head.)

17        Q.   Did she marry him while he was in prison, or do you

18   know?

19        A.   Yes.

20        Q.   Okay.  How well do you know her?  I assume you don't

21   know him?

22        A.   I just met him Sunday.

23        Q.   Okay.  So you didn't -- you didn't go and visit him

24   in prison or anything like that?

25        A.   No, he -- I don't know where he was, but he was down
```

1  South Texas somewhere, I believe.

2     Q.   Okay.  Do you -- do you know if he was treated

3  fairly?

4     A.   I don't know too much about his case.

5     Q.   Okay.

6     A.   I just know what the lady that's in our community

7  group has told us.  Not a lot, but -- about the case, so --

8     Q.   Is there anything about that that causes you any --

9  I don't -- I don't know how to word it exactly, but any ill

10 will toward the prosecution or leaning one way or the other in

11 this case?

12    A.   No, ma'am, because I don't know much about the case.

13    Q.   Okay.  Okay.

14    A.   So --

15    Q.   Do you have any opinion about whether he kind of

16 used that time in the penitentiary to turn his life around and

17 rehabilitate himself?

18    A.   As far as I know, yes, he did.

19    Q.   Okay.

20    A.   He's -- he's turned to the Lord.

21    Q.   Okay.  And we asked you on page 6, Question Number

22 37, whether you thought that a capital murderer could be

23 rehabilitated in prison.  And if I interpreted your answer

24 right, and I'm going to put it in my own words, if I can, your

25 thoughts when you filled out the questionnaire were, you know,

```
 1  really what's the point, because they're never getting out

 2  again, so why would we, because it's life without parole.  And

 3  I -- I just want to point out to you that I assume you

 4  understand now at least that someone can be rehabilitated in

 5  prison?

 6       A.   Yes.

 7       Q.   And that if a person -- in your mind, if you believe

 8  that a person is capable -- a specific person, based on the

 9  evidence, is capable of being rehabilitated, that that might

10  give you some -- something to consider in whether they would be

11  a continuing threat?  Because if you believe they're going to

12  be rehabilitated, maybe they wouldn't be a continuing threat.

13  Does that make sense?

14       A.   Yes, ma'am.

15       Q.   And, again, you know, in filling this questionnaire

16  out, we didn't tell you all that.  But -- but you recognize it.

17  If there is any evidence, it's up to you to decide whether

18  someone can be rehabilitated.

19       A.   Yes, ma'am.

20       Q.   Have you ever heard the phrase that somebody can

21  talk the talk and not walk the walk?

22       A.   Yes, I've heard the phrase.

23       Q.   That somebody may -- may say that they've found the

24  Lord because they think it will benefit them when -- when that

25  may not be the truth?  Can you see that as a possibility when
```

1    we're talking about the criminal justice system?

2        A.    Yes.

3        Q.    If a defendant chooses to testify -- I told you they

4    don't have to.  Even in the punishment phase, a defendant never

5    has to testify.  And the juror can't -- can't require the

6    Defense to prove anything to them, even in the punishment

7    phase, and you understand that.  If a defendant chooses to

8    testify, the jury's responsibility is to judge their

9    credibility just like they would all the other witnesses.  They

10    don't get a head start because they -- they decided to testify,

11    in other words.  They gave up their Fifth Amendment privilege

12    and testified, the jury still has to look and decide whether

13    that -- whether what they're being told is trustworthy

14    information.  And you believe that it's -- that that's a

15    possibility that someone could try to talk the talk and not

16    really walk the walk?

17        A.    Yes.

18        Q.    If -- we've talked to a lot of jurors, in fact, that

19    attend Watermark Church, believe it or not.  Have you spoken to

20    anybody at church about this or know anybody else that's been

21    called down here?

22        A.    No, ma'am.

23        Q.    If there is another juror -- if you're on the jury

24    and there's another juror that you recognize from church, would

25    that cause you any concerns in -- in basing your verdict on the

1  evidence and kind of standing your own -- having your own

2  opinion?

3         A.    No, ma'am, it wouldn't bother me at all.

4         Q.    Even if --

5               COURT REPORTER:  I'm sorry, sir?

6         A.    It wouldn't bother me at all.

7         Q.    (BY MS. MOSELEY)  Even if it's different from

8  somebody else that's on the jury?

9         A.    Right.  Yes.

10        Q.    You understand then how important each juror -- how

11 important it is that each juror have their own verdict?

12        A.    Yes.

13        Q.    The verdict does have to be unanimous, but it's

14 important that each juror look inside themselves for their own

15 answers.

16        A.    Correct.

17        Q.    Do you have any questions of me?  I think I'm out of

18 time.  Is there anything you haven't understood or any concerns

19 you might have about being a juror in this case?

20        A.    No, no.  I have no questions, but I'm just looking

21 forward to being one.

22        Q.    You are?  Okay.

23        A.    Yes.

24        Q.    Is there a particular -- I'm always a little

25 concerned when somebody says they want to do this.

```
 1        A.    No, I'm just -- it's just my -- I just feel like

 2   it's my obligation as a United States citizen and the state of

 3   Texas and the County of Dallas.  It's my obligation.

 4        Q.    Okay.  Well, I -- I appreciate that.  On behalf of

 5   the D.A.'s office and the community, I appreciate that.  Thank

 6   you, sir.

 7                   MS. MOSELEY:  That's all I have.

 8                   THE COURT:  Thank you very much.  Mr.

 9   Weatherspoon -- I'm sorry, Ms. Bernhard.

10                   DEFENSE VOIR DIRE EXAMINATION

11   BY MS. BERNHARD:

12        Q.    Is it Mr. Coley?

13        A.    Coley.

14        Q.    Coley.  Again, my name is Catherine Bernhard, and

15   I'm going to spend some time talking to you about these same

16   issues because obviously over here at this table we have a

17   slightly different take on some of these topics.  And I want to

18   start out by telling you that there aren't any right or wrong

19   answers.  We just need to know what your feelings are about

20   some of the issues that may become relevant in a case like

21   this.  And I also want you to know that you have performed your

22   civic duty simply by showing up on June 21st and filling out

23   this very lengthy questionnaire and then coming down here,

24   particularly on such a short notice, and subjecting yourself to

25   our questioning.  Simply participating in the process fulfills
```

1   your civic duty, so I don't want you to feel like you have to

2   answer questions a certain way in order to end up on the jury

3   and if you don't, you're not a bad -- you're not a good

4   citizen.

5          A.   I understand that.

6          Q.   Because part of it is just the process.  And you

7   have certainly fulfilled that process just by showing up and --

8   and sitting there and subjecting yourself to our questioning.

9          A.   Well, I feel sorry for y'all having to face all the

10  jurors that were in that room that day, over the course of all

11  this time.

12         Q.   Well, and I appreciate that.  I think your number is

13  Number 1497, so if that gives you any idea of how many people

14  we've dealt with.  It hasn't been quite that many because some

15  of them got eliminated right off the bat for other reasons, but

16  we've talked to a fair number of people.  And we do appreciate

17  you participating in the process.

18              And I also want you to understand that even

19  though we're spending a lot of time talking about the death

20  penalty, it kind of puts the cart before the horse, so to

21  speak, because it's our position at this table that if you are

22  selected as one of the jurors for this case, this jury is never

23  going to be called on to answer those special issues or address

24  them because the jury is going to find Matthew Johnson not

25  guilty of capital murder.  But because of the way the process

1    is set up and because the death penalty is something that makes

2    this case different from most other criminal cases, we have to

3    spend a lot of time talking about it, even though it's our

4    position that this jury is never going to be called upon to

5    answer those issues.  So I don't want you to think that just

6    because we're spending all this time talking about the death

7    penalty, that somehow we at this table are assuming the jury is

8    going to get there, because that couldn't be further from the

9    truth.  Do you understand that?

10        A.    Yes, ma'am.

11        Q.    Okay.  I want to kind of make sure -- well, let me

12   -- let me start out by asking you this.  What purpose do you

13   think the death penalty serves?  Why should we have it?

14        A.    The death penalty is -- in my opinion, is that it

15   eliminates someone that has done something wrong, has either

16   murdered somebody -- or in this case, does a double crime.

17        Q.    Okay.  Why can't we just lock these people up

18   without parole?  Why do we need the death penalty?

19        A.    We can't lock them up.  There's too many in there

20   now.

21        Q.    Okay.

22        A.    I mean, they won't let them go after a short time,

23   open door.

24        Q.    Okay.  You understand that the law in Texas has now

25   changed and when we talk about life without parole, which

1    applies in a capital murder, that is exactly what that means.

2    There is no walking out of prison for somebody convicted of

3    capital murder.  Do you understand that?

4          A.    Yes, ma'am.

5          Q.    That didn't used to be the case, but it certainly is

6    now.  Let me kind of put you on a hypothetical capital murder

7    jury.  Now, there are a number of ways of committing capital

8    murder, but for our purposes we're going to kind of limit it to

9    what's alleged in this case, which is an intentional murder in

10   the course of committing the offense of robbery.  And when we

11   say an intentional murder, we mean that it is somebody's

12   conscious desire or objective to cause the result.  It's not an

13   accident.  It's not, didn't really mean to kill him, I just

14   meant to hurt the person.  It is an intentional murder.

15   Somebody wanted somebody dead and took whatever action they

16   needed to take to make that happen.  So that's what we're

17   talking about when we talk about capital murder in this

18   context, an intentional murder in the course of committing the

19   offense of robbery.

20               We're not talking about a situation that was

21   self-defense.  We're not talking about defense of another

22   person or defense of property.  We're not talking about an

23   accident.  We're not talking about somebody who might be

24   legally insane so they didn't know the difference between right

25   and wrong.  We're talking about somebody who wanted to kill

1    somebody and made that happen.  And they did so in the course

2    of committing the offense of robbery.

3                    Now, it's also been explained to you that the

4    State has the burden of proof in any criminal case, and it's

5    proof beyond a reasonable doubt.  We don't have a definition

6    for what that means, but I think sometimes it helps to at least

7    put it in the context of other burdens of proof that we do have

8    definitions for, because we know that proof beyond a reasonable

9    doubt is the highest burden of proof that we have anywhere in

10   the legal system.  For instance, if you were to -- if it was a

11   suit for millions upon millions of dollars, somebody was suing

12   somebody in -- in a civil case, somebody got injured or

13   somebody thinks somebody's liable for something, the burden of

14   proof that would apply in a civil case where they're arguing

15   about -- could be millions upon millions of dollars, that

16   burden of proof is by a preponderance of the evidence.  And we

17   know that the definition for that is just tipping the scale,

18   51 percent to 49 percent.  All you have to do is tilt the scale

19   a little more than the other guy and you win.  That's the

20   burden of proof that applies in those types of cases.

21                   We know that proof beyond a reasonable doubt is

22   higher than that.

23                   There is another kind of burden of proof that

24   would apply in a -- let's say a lawsuit to terminate someone's

25   parental rights, to take their children away from them for

1    good.  You would expect the government would need a good amount

2    of evidence in order to do that, wouldn't you?

3         A.    Yes, ma'am.

4         Q.    Certainly more than just a preponderance of the

5    evidence; would that be fair?

6         A.    Yes.

7         Q.    And the burden of proof that applies in that type of

8    situation is what we call clear and convincing evidence, which

9    we know is higher than a preponderance of the evidence.  That's

10   also the burden of proof that would apply if the government

11   were trying to commit someone to a mental institution against

12   their will.  They need to come forward with clear and

13   convincing evidence.

14              But proof beyond a reasonable doubt is higher

15   even than that.  It is the highest burden that we have anywhere

16   in the legal system, and that's because I think our system is

17   set up -- that when we're dealing with somebody's life and

18   their liberty, that those are really kind of the most important

19   things that we can be talking about.  And so the burden of

20   proof in a criminal case is the highest burden that we have

21   anywhere in -- in our legal system.  Do you agree with that?

22        A.    Yes, ma'am.

23        Q.    Do you agree that's how it should be?

24        A.    Yes.

25        Q.    And so putting you back on this hypothetical capital

1  murder jury, we're not talking about this case, because neither

2  side can really get into this case and say, okay, here's the

3  evidence, what would your verdict be.  But let's say you're on

4  a hypothetical capital murder jury and you and the 11 other

5  jurors have all been convinced beyond a reasonable doubt that

6  the person on trial is guilty of an intentional murder in the

7  course of committing the offense of robbery.  All 12 of you

8  were in agreement.  What are your feelings at that point on the

9  death penalty for that person?

10       A.    Then he must be guilty.

11       Q.    Okay.  But what about the death penalty?  You found

12  him guilty.  All 12 of you agree.

13       A.    Okay.  Yes, I -- I could do the -- vote for the

14  death penalty.

15       Q.    Okay.  Would you say you would be leaning that way

16  for somebody who is guilty of an intentional killing?

17       A.    If the State has proved beyond a shadow of a doubt,

18  all the evidence points in that direction, yes.

19       Q.    Okay.  When you say beyond a shadow of a doubt --

20       A.    Well --

21       Q.    -- you understand that's more a Perry Mason

22  standard, not what we really deal with here?

23       A.    The reasonable -- reasonable doubt.

24       Q.    Beyond a reasonable -- beyond all reasonable doubt?

25       A.    Yes, ma'am.

1      Q.    So you think you would be leaning toward the death

2    penalty at that point?

3      A.    Yes.

4      Q.    Okay.  Let me back just up a little bit.  And just

5    like we talked about the presumption of innocence, before

6    somebody is found guilty, a person is presumed innocent unless

7    and until the State can prove it beyond a reasonable doubt,

8    everything they allege in their indictment.  We also have a

9    presumption that applies in the punishment phase of a capital

10    murder trial.  The presumption is for somebody who's convicted

11    of capital murder -- an intentional murder in the course of a

12    robbery -- the presumption is that life without parole is the

13    appropriate sentence.  Did you -- did you realize that?

14      A.    No.

15      Q.    Okay.  And the death penalty never becomes

16    appropriate unless the State proves, again, beyond a reasonable

17    doubt that first special issue.  And then it's still not the

18    verdict until the jury answers Special Issue Number 2, that,

19    no, they don't think there's sufficient mitigating evidence.

20    So until both of those questions are answered in that way, the

21    presumption is life without parole is the appropriate sentence.

22      A.    Okay.

23      Q.    Okay.  We don't -- the way the law in Texas is set

24    up, it's not about who you think deserves the death penalty

25    based on their offense.  As it's kind of been explained to you

1  in that pamphlet, the way the state of Texas decides which

2  capital murderers get to live and which get to die is based on

3  the answers to those special issues.  That first of all, the

4  State has to prove beyond a reasonable doubt that there is a

5  probability that that person is going to commit criminal acts

6  of violence that would constitute a continuing threat to

7  society, okay?

8     A.    Okay.

9     Q.    And they've got the burden of proving that.  And if

10  the jury does not unanimously think this person is -- is going

11  to be a continuing threat, then the answer to that question is

12  no, and that's the end of the trial.  The person gets life

13  without parole.  That's how the state of Texas has decided to

14  basically decide who -- who lives and who dies.  Do you agree

15  that that's the way that it should be?

16     A.    Yes.

17     Q.    Okay.  Some people come down here and they tell us

18  that once they get to Special Issue Number 1, that if I have

19  found somebody guilty of an intentional murder in the course of

20  the offense of committing the offense of robbery, that just by

21  that factor alone, that person is always going to be a

22  continuing threat to society.  How do you feel about that?

23     A.    No, I think -- no.

24     Q.    Okay.  So you could conceivably have somebody guilty

25  of in intentional murder in the course of a robbery and find

1  that that person is not going to be a continuing threat to

2  society?

3      A.    Yes.

4      Q.    Okay.  And just to point out a few things because,

5  again, you're not going to be given any definitions for what

6  any of the words in Special Issue Number 1 mean, so it's up to

7  jurors to just use their common sense in the common everyday

8  meaning of these words.  But I think -- and as the prosecutor

9  also pointed out to you, it does refer to criminal acts of

10 violence, being plural, but it doesn't stop there.  It doesn't

11 just ask if the person is going to commit criminal acts of

12 violence.  It asks if there's a probability that they're going

13 to commit criminal acts of violence that would then constitute

14 a continuing threat to society.  Do you see how that is

15 phrased?  And so what I would take -- and I think what some

16 people take that to mean is that it's not enough just that it's

17 a criminal act of violence, that maybe every criminal act of

18 violence does not rise to the level of being a continuing

19 threat to society because otherwise they wouldn't have needed

20 to put those words in there.  Do you agree?

21     A.    Yes.

22     Q.    So the fact that they went on to say, you also have

23 to find that it would constitute a continuing threat to

24 society, seems to require a little bit more than just finding

25 that they -- there's a probability that they would commit

1  criminal acts of violence.  Do you agree with that?

2      A.    Yes.

3      Q.    Okay.  Now, back on your little hypothetical capital

4  murder jury, you and the 11 other jurors have found somebody

5  guilty of an intentional killing in the course of committing

6  the offense of robbery.  And then you have gone on to find,

7  again, beyond a reasonable doubt, all 12 of you agree, that

8  this person is -- that the answer to Special Issue Number 1 is

9  yes, that this person is going to constitute a continuing

10  threat to society.  Does mitigation matter at that point?  If

11  somebody is going to be dangerous if you send them to prison

12  for the rest of their life, does mitigation matter?

13      A.    Yes.

14      Q.    Why?

15      A.    Or else it wouldn't be in there.

16      Q.    Okay.  So you could conceive of a situation where

17  you found somebody guilty of capital murder and you and the 11

18  other jurors also found that they are going to be a future

19  danger, which is kind of the shorthand terminology that we use

20  to refer to Special Issue Number 1.  So they're going to be a

21  problem in prison society, but you still think there are

22  circumstances that -- where you could consider a life sentence

23  for that person?

24      A.    Yes.

25      Q.    I want to go back and kind of talk about some of

```
 1  your questionnaire answers in relation to this where you talk
 2  about you don't think that a person convicted of capital murder
 3  can be rehabilitated in prison and that also in response to
 4  Question Number 39, where we talk about genetics, circumstances
 5  of birth, upbringing, and environment, and you said that those
 6  really weren't important and that people should know right from
 7  wrong.  You see how those are kind of different from what
 8  you're saying now?
 9       A.    Yes, ma'am.
10       Q.    Can you explain what your thinking is or --
11       A.    No.  I just -- at the time filling this out, I was
12  struggling to answer those questions.  And I just basically
13  answered just what came to mind at that time.
14       Q.    Okay.  Would your answers be different if you were
15  filling out the questionnaire today?
16       A.    Probably so.
17       Q.    Okay.  Do you think a capital murderer can be
18  rehabilitated in prison?
19       A.    Yes.
20       Q.    Why do you think that?
21       A.    Because I guess they all -- they all have a chance
22  to be rehabilitated, I guess, and I'm also -- and some probably
23  do.
24       Q.    How do you think you would be able to know whether
25  or not a person can be rehabilitated?  What sort of things
```

 1   would you look for?

 2        A.   Maybe moral character.

 3        Q.   So you think that if you're on a hypothetical

 4   capital murder jury and you found somebody guilty of an

 5   intentional killing in the course of a robbery and you've

 6   further gone on to find that you think that that person could

 7   be -- or there's a probability that that person is going to be

 8   a continuing threat to society, that there could be some

 9   circumstance or some factor or something in the evidence that

10   might still tell you that a life sentence would be more

11   appropriate even though you know that person is going to be a

12   danger in prison?

13        A.   Yes.

14        Q.   Okay.  I want to talk a little bit more about

15   Special Issue Number 2.  And as, I think Ms. Moseley explained

16   to you, there is no burden of proof on that issue.  And I think

17   it makes it kind of different from the other questions that a

18   juror is asked to answer because you're not really given any

19   guidance.  You're not told what's mitigating.  You're not told

20   what would be sufficient.  You're not told that one side or the

21   other has to prove it to you by some particular level of proof.

22   And I think in many ways it tends to be a much more subjective

23   question.  Would you agree?

24        A.   Yes, ma'am.

25        Q.   That it's really just asking each individual juror

1  to look inside their heart and make a determination as to

2  whether or not they think that based on the evidence life or

3  the death sentence is more appropriate.  Would you agree?

4      A.    Yes.

5      Q.    And it's really kind of each individual juror's, I

6  guess, personal moral judgement is how they answer that

7  question.  Would you agree?

8      A.    Yes.

9      Q.    And I think when we talk about personal judgements,

10 we can sometimes liken that to something like a person's choice

11 of religion or how they were -- choose to raise their kids.

12 It's just a very personal decision.  It's based on a person's

13 life experiences and -- and their view of the world.  Would you

14 agree?

15     A.    Yes, ma'am.

16     Q.    And so each individual juror's answer to that

17 Special Issue Number 2, would you -- would you say that each

18 individual juror's answer should be entitled to respect?

19     A.    Yes.

20     Q.    Whether you agree with them or not?

21     A.    Yes.

22     Q.    And another thing that I wanted to kind of point out

23 is that jurors, although -- if the question is answered no,

24 that does have to be unanimous.  But jurors do not have to be

25 unanimous as far as what they might think is mitigating or

 1  sufficiently mitigating in a particular case.  And what I mean

 2  by that is you could have a situation where one juror said,

 3  well, you know, I think this person had a horrible upbringing

 4  and I think that's sufficiently mitigating.  And you could have

 5  another juror who said, you know, I don't really think that's

 6  sufficiently mitigating.  Lots of people have bad upbringings,

 7  but I think the fact that this person has -- you know, I

 8  believe this person has rehabilitated themselves.  I believe

 9  that they are, you know, have -- whatever the case may be.  And

10  they don't necessarily have to agree among themselves on what

11  they think is sufficiently mitigating or what they think the

12  reason why a life sentence is more appropriate.  Do you

13  understand?

14       A.    Yes, ma'am.

15       Q.    And I noticed in your questionnaire you talk a lot

16  about the burden of proof and the evidence, that that's

17  important to you, that the State prove it beyond a reasonable

18  doubt.  But you understand on Special Issue Number 2, that

19  that's a little different.  It doesn't require any kind of --

20  either side to prove anything by any particular burden of proof

21  or to any degree.  Is that still something that you would be

22  comfortable answering?

23       A.    Yes.

24       Q.    Let me ask you, back on your questionnaire, Question

25  Number 41 on page 7, we asked:  Do you agree with the following

1    statement?  Is it better that 10 guilty people go free than one

2    innocent man be convicted?  And you said:  No.  Guilty people

3    should not go free.  Well, what about the guy who's innocent?

4        A.    They should go free, if they're innocent.

5        Q.    Okay.  Well, I mean, the question is kind of set up

6    that -- that it's better that 10 guilty people go free than one

7    innocent man be convicted.

8        A.    It's a shame that innocent people do get convicted,

9    but it does happen.

10        Q.    So your answer would still be the same, that it's

11    better that 10 guilty people get convicted and the innocent may

12    get convicted but, you know, we're -- not much we can do about

13    that?

14        A.    Yes.

15        Q.    That's kind of how you feel.  The guy who is married

16    to the church member who did -- I think you said 45 years in

17    prison?

18        A.    That was his sentence.

19        Q.    Do you know anything about the offense or how long

20    she's been married to him or any of that?

21        A.    She hasn't been married -- she's been married, I

22    think, 10 or 11 years to him.

23        Q.    Okay.  Do you know how they met?

24        A.    Through prison ministry.

25        Q.    Okay.  So she was involved in prison ministry?

```
 1        A.    Yes.

 2        Q.    Does your church do a lot of that?

 3        A.    Yes.

 4        Q.    Have you ever participated in any of that?

 5        A.    No, ma'am.

 6        Q.    Why not?

 7        A.    It's just not my thing.

 8        Q.    Okay.  And you don't know -- do you know if he was

 9  convicted in Dallas?

10        A.    I have no idea where it took place at.

11        Q.    Okay.  Do you know if he lived in Dallas before

12  or --

13        A.    No.

14        Q.    You don't know?

15        A.    I know she's from Florida.

16        Q.    Okay.  Do you have any questions about anything that

17  we've talked about?

18        A.    No, ma'am.

19        Q.    And you still think this is something you want to

20  sign up for?

21        A.    Definitely.

22        Q.    I'm going to read -- let me ask you this.  Do you

23  know anybody that works in the Garland Police Department or the

24  Dallas Police Department or really any police department in the

25  Metroplex?
```

```
 1        A.    In Garland.

 2        Q.    Who --

 3        A.    Officer Keith Terry, but he's retired now.

 4        Q.    Okay.  How long has he been retired, do you know?

 5        A.    Six months.

 6        Q.    How do you know him?

 7        A.    He lives behind -- behind me.

 8        Q.    Okay.  Did he ever talk about his work or is there

 9  anything about your knowledge of him that you think would

10  affect you as a juror in a case like this, if you heard from

11  Garland police officers?

12        A.    No, ma'am, he -- he -- well, he lives in Garland.

13  He's not a Garland police officer.  He -- Dallas Police

14  officer.  He lives in Garland.  He flies the helicopters.

15        Q.    Okay.  So he was a Dallas Police officer?

16        A.    Yes, he was a Dallas police -- that was my error.

17        Q.    Okay.  No -- no problem.  But, again, the question

18  is, is there anything about your knowledge of him or your

19  association with him that you think would --

20        A.    No, ma'am.

21        Q.    -- color how you view a police officer's testimony?

22        A.    No, ma'am.

23        Q.    Do you know anybody who works for either the Garland

24  or the Dallas Fire Department?

25        A.    No, ma'am.
```

1          Q.    How about the Dallas Sheriff's Department?

2          A.    No, ma'am.

3          Q.    Anybody who works in the Texas prison system?

4          A.    No, ma'am.

5          Q.    I'm going to read a list of mostly civilian names

6     and just see if you know any of them.  And if you do, just stop

7     me because it's kind of a lengthy list.  Scott Harris,

8     Elizabeth Harris, Chris Harris, Kenneth Marecle, Amy Marecle,

9     Michael Frank, Anna Lunceford, Jim Medley, Lawrence Denson,

10    Jonas Lucht, Greg Mansell, Carina Pinzon, Digna Salmeron, Kelly

11    Keeton, Daphne Johnson, Sherry Ann Clark, Amy Armstrong,

12    Anthony Johnson, Alma Johnson, Courtney Johnson, David

13    Williams, Danny Mullins, David Contente, Gioconda Verdaguer,

14    Donald Dunlap, Johnny Wright, Monica Cajas, Michael Crosby,

15    Roxanne Luttrell, Robbie Denmark, Quinlen Minor, Margaret

16    Tatum, Jim Bertucci, John Harris, Timothy Proctor, Carlton

17    Jenkins, Durian Allen, Gene Gathright, Manuel Turner, Andre

18    Howard, Kenneth Lewis, or Sheldon Henry any of those ring any

19    bells?

20         A.    Okay.  I have a -- you said David Williams, I

21    believe.

22         Q.    Pretty common name.

23         A.    I know.  That's my son-in-law.  That's his name,

24    so --

25         Q.    What does he do, your son-in-law?

1      A.    He invests Wells Fargo's money.

2      Q.    Okay.  Does he live in Garland or in the area?

3      A.    He lives in University Park.

4      Q.    Okay.

5      A.    And I don't think it's the same one, apparently.

6      Q.    And you don't have any questions of me?

7      A.    No, ma'am.

8      Q.    Or anything we've discussed?

9      A.    No, ma'am.

10     Q.    Then I believe that's all I have.

11            THE COURT:  Thank you, Mr. Coley.  We're going

12 to ask you to step outside for just a second.

13            (Venireperson excused from courtroom.)

14            THE COURT:  Does the State have a challenge?

15            MS. MOSELEY:  No, Your Honor.

16            THE COURT:  Does the Defense have a challenge?

17            MS. BERNHARD:  No, Your Honor.

18            THE COURT:  All right.  Juror 1497, Mr. Bob

19 Coley, is qualified.  Would you bring him back in?

20            THE BAILIFF:  Yes, ma'am.

21            (Venireperson returned to courtroom.)

22            THE COURT:  Mr. Coley, you have been qualified

23 as a juror, sir, and we'll be letting you know either tomorrow

24 or Wednesday whether or not you will, in fact, be a juror.

25            (Venireperson 1497A, Bobby Coley, qualified.)

```
 1                    VENIREPERSON:  All right.

 2                    THE COURT:  Thank you for your service.

 3                    VENIREPERSON:  All right.  Thank you very much.

 4                    MS. MOSELEY:  Judge, we have a couple of things

 5    to get on the record before --

 6                    THE COURT:  Okay.  Hold on then.  Just a second.

 7    We're on the record.

 8                    MS. MOSELEY:  Your Honor, we have received

 9    notification from two different jurors that have been qualified

10    in the pool that they have health issues that are going to

11    prevent them from serving.  The State and the Defense have

12    agreed to excuse them based on the letters that we received

13    from their doctors.  Juror Number 797A, Brian MacDonough -- I'm

14    going to offer the letter as Voir Dire Exhibit Number 3.

15                    (Voir Dire Exhibit 3 offered.)

16                    MS. MOSELEY:  And the second juror is Becky

17    Arguijo, Juror Number 960A, and I'll offer that letter as Voir

18    Dire Exhibit Number 4.

19                    (Voir Dire Exhibit 4 offered.)

20                    MS. MOSELEY:  And the State and the Defense have

21    agreed to excuse both of those jurors.

22                    MS. BERNHARD:  That is correct.

23                    (Venireperson 0797A, Brian MacDonough, excused.)

24                    (Venireperson 0960A, Becky Arguijo, excused.)

25                    THE COURT:  All right.  Thank you.  Is that who
```

```
 1  these two are meant to replace?
 2              MS. MOSELEY:  Yes, Your Honor.
 3              THE COURT:  Okay.  Are we ready to bring him in,
 4  if he's finished reviewing?
 5              MR. WEATHERSPOON:  Yes.
 6              THE BAILIFF:  All rise.
 7              (Venireperson brought into courtroom.)
 8              THE COURT:  Mr. Matlock, good afternoon, sir.
 9              VENIREPERSON:  Hi.
10              THE COURT:  I want to start by apologizing to
11  you for all of the considerable inconvenience we've put you to.
12              VENIREPERSON:  Thank you.
13              THE COURT:  And I want to thank you very much
14  for your willingness to come down.  We're very -- we really
15  needed you, and we're very grateful to you.
16              VENIREPERSON:  All right.
17              THE COURT:  Thank you very much.  Do you
18  remember the oath that you were administered in June of this
19  year down in the Central Jury Room?
20              VENIREPERSON:  I just reread it.
21              THE COURT:  All right.  Well, you'll be
22  operating under that now and until you're discharged from
23  service in this case and also the instructions.
24              We're going to be trying this case the last week
25  of October, October 28th, and the first week of November,
```

1   November 2nd.  And we'll be letting you know if you're

2   qualified today -- either tomorrow or Wednesday whether or not

3   you can sit.  Is -- is that possible for you to do under those

4   circumstances?

5              VENIREPERSON:  It's not convenient at all, but

6   it's possible.  I mean, I won't put myself above anybody else

7   in inconvenience.

8              THE COURT:  Thank you.  I'd to introduce you to

9   the parties.  The State is represented by Ms. Andrea Moseley.

10             MS. MOSELEY:  Good afternoon.

11             THE COURT:  And Elaine Evans.

12             MS. EVANS:  Good afternoon.

13             THE COURT:  The Defense is represented by

14  Kenneth Weatherspoon.

15             MR. WEATHERSPOON:  Good afternoon.

16             THE COURT:  Catherine Bernhard.

17             MS. BERNHARD:  Good afternoon.

18             THE COURT:  And the citizen sitting next to Ms.

19  Bernhard is the citizen accused, Mr. Matthew Lee Johnson.

20             THE DEFENDANT:  Good afternoon.

21             THE COURT:  My name is Tracy Holmes.  I'm the

22  presiding judge, and I will be presiding at the trial.

23             And the lady sitting between you and me is

24  Darline LaBar.  She's the official court reporter, and it's

25  important that she take down everything clearly, so if you can

 1  try to remember to answer audibly yes or no and try to avoid

 2  shaking or nodding your head or saying uh-huh or huh-uh.

 3                    VENIREPERSON:  Okay.

 4                    THE COURT:  And you have had an opportunity to

 5  review everything?

 6                    VENIREPERSON:  Yes.

 7                    THE COURT:  Each side has 45 minutes to speak to

 8  you, and at the end of that time, we'll determine whether or

 9  not you've been qualified.  And if you are, we'll take your

10  photograph and send you on your way and then be notifying you

11  either tomorrow or Wednesday.  Thank you, sir.

12                    MS. MOSELEY:  Thank you, Judge.

13                         JERRY MATLOCK,

14  was called as a venireperson by the parties, and after having

15  been first duly sworn, testified as follows:

16                  STATE VOIR DIRE EXAMINATION

17  BY MS. MOSELEY:

18      Q.   Mr. Matlock, I want to second the Judge's

19  appreciation.  We do know that calling someone on Friday

20  afternoon and telling them to be here Monday is -- is a lot to

21  ask, and we wouldn't have done it if it hadn't been absolutely

22  necessary, so we do appreciate you being here.

23      A.   Thank you.

24      Q.   I want to just first tell you what the purpose is,

25  and you heard the Judge say we have 45 minutes to talk and then

1    the Defense will have 45 minutes to talk and really my

2    responsibility is to explain the law to you, make sure you

3    understand all of the laws that -- that may apply in a case

4    like this.  And also to just kind of feel you out about your

5    personal feelings and how you feel about it and whether any of

6    your feelings -- because we know everybody has got strong

7    feelings based on their experiences in life and whatnot, and

8    find out whether those experiences are something that you're

9    not going to be able to set aside or -- or be able to follow

10   the law in this case and base your verdict on the law and the

11   evidence.

12           As you can imagine, you're Juror Number 1500.

13   You know we've been doing this a long time now, so there are no

14   right or wrong answers to any of these questions.  We really

15   just need to know how you feel.  And at the end of the day the

16   question is going to be can you follow the law, and if you're

17   on this jury, will you be able to base your verdict in the

18   guilt/innocence phase, your answers to the special issues in

19   the punishment phase, only on the evidence and the law and not

20   your personal feelings because that's what would be required of

21   the jurors who serve.  Does that make sense?

22        A.   Sure.

23        Q.   And I'm going to go through some things with you

24   pretty quickly because I obviously recognize that you're an

25   educated person and you're going to know that -- a lot of the

1   principles we're going to talk about, you're going to be

2   familiar with already so we'll just kind of breeze by those.

3   And if there's anything that causes you any concern, you'll

4   just let me know.

5          A.    Okay.

6          Q.    When I was going through your questionnaire, the

7   first thing that caught my eye is the very first question.  We

8   asked if you're in favor of the death penalty, and you said no.

9   You went on to explain that it's too expensive, too time

10  consuming, and rarely carried out, but you don't have a moral

11  reason to oppose it.

12               Let me ask you this.  If -- if there was some

13  way, and there isn't, but if there was some way to make it less

14  expensive, a faster more streamlined process, and it was

15  carried -- everybody on death row were executed tomorrow, would

16  that make you feel better about the death penalty?

17         A.    Well, I don't know about tomorrow.  Again, I know

18  that, for example, in Dallas County there have been some people

19  who have been convicted of crimes who have been later

20  exonerated, so I know it's not always a fail-safe system.  So I

21  don't know where the compromise is in that system that you give

22  people a chance to appeal and go through that process to see if

23  they can prove they're innocent, but, you know, once there's a

24  fair -- fair amount of certainty that a person is guilty, I

25  have no reservations about the death penalty.  I have no moral

 1  reservations.  I have no other reservations about it.

 2       Q.   Okay.  That -- that clarifies things for me a little

 3  bit.  I appreciate it.  I guess the question that I have for

 4  you is if you're on a jury where you now have had an

 5  opportunity to review some of the laws and principles that

 6  apply in these cases and you've read the special issues --

 7       A.   Uh-huh.

 8       Q.   -- that would apply in the punishment phase, if

 9  you're on a jury where the State is seeking the death penalty,

10  would you vote in favor of a life sentence every time because

11  of your concerns about the time and money being spent?

12       A.   No, I -- I -- I would not.  Not necessarily, no.

13       Q.   Okay.

14       A.   I think it's not particularly a strong deterrent to

15  crime having the death penalty.

16       Q.   Okay.  I -- I think I understand where you're coming

17  from.  But your feelings aren't so strong that you would oppose

18  the death penalty in every single case?

19       A.   No.

20       Q.   Okay.  Is it fair to say then that you do recognize

21  that there are some cases -- let's say that the State proves

22  that somebody is more likely than not to be a danger in the

23  future -- to be a continuing threat to society and they're

24  obviously guilty of capital murder before we ever get there, do

25  you feel like there are cases where the death penalty would be

1    appropriate under those circumstances?

2         A.    Yes.

3         Q.    And obviously, you have concerns about whether

4    someone who is innocent might be subjected to the death

5    penalty.  If you're on the jury, you'll never have to worry

6    about that, because you're going to be one of the 12 who decide

7    whether the State did its job or not.

8         A.    Right.  I don't -- I mean, I don't know that -- that

9    would still worry me.  I mean, I -- you taking somebody's life

10   in your hand, you worry about whether you're doing the right

11   thing or not, so --

12        Q.    Absolutely.  Absolutely.  And we do know that we're

13   asking a lot of citizens, that this is -- this is a heavy

14   burden and this is not an easy job and it shouldn't be an easy

15   job for anyone.  Again, we have had jurors come in and tell us

16   that the risk of executing someone who is innocent is enough,

17   that they would never vote in a way where the death penalty

18   would result.  Do you feel that strongly about it?

19        A.    No.  But if I voted for the death penalty, I would

20   have to be pretty certain in my own mind that the person were

21   guilty.

22        Q.    Absolutely.  Absolutely.  Our burden of proof, as

23   you are well aware, is beyond a reasonable doubt.

24        A.    Right.

25        Q.    We don't have a definition for what that means in

1  the law, but what we do know is what it isn't.  Beyond a

2  reasonable doubt does not mean absolute certainty.  It doesn't

3  mean 100 percent proof.  I submit to you, Mr. Matlock, that if

4  I were able to prove something to you 100 percent without any

5  doubt in your mind, you would probably have to have seen it

6  yourself.  I'd have to have a jury of 12 witnesses in order to

7  meet that burden.  So obviously, the law doesn't require that,

8  but it is the highest burden that we have in law and it should

9  be.  We have to exclude all reasonable doubt about someone's

10  guilt.  Does that sound like a -- a fair burden to you?

11        A.    I think so.

12        Q.    And would you require the State prove someone's

13  guilt to you with absolute certainty to 100 percent before you

14  could convict of capital murder?

15        A.    No, I don't believe so.

16        Q.    Okay.  You also put on page 2 of your

17  questionnaire -- we asked:  For what crimes do you think the

18  death penalty should be available?  And you said:  Murder of a

19  child, police officer, or firefighter.  And those certainly are

20  capital murder cases in the state of Texas.  If you

21  intentionally kill a police officer or a firefighter or a child

22  younger than 10, that is a capital crime for which the death

23  penalty is an option.

24              But we also have other categories, and that --

25  that next question, says that an intentional murder committed

1  during the course of a robbery is another way a capital murder
2  can occur.  And you would be subject to the death penalty
3  potentially if you were convicted of that.  You said you do
4  agree that that should be the kind of offense for which the
5  death penalty may be imposed; is that right?
6      A.    If it's the law, that's fine.
7      Q.    Okay.  Do you think that that's reasonable?  Or
8  would you limit it only to child, firefighter, and police?
9      A.    No, I -- I -- again, I -- I would follow whatever
10 the law says.
11     Q.    Okay.  Okay.  You told us you have a coworker named
12 Judy, and I gathered you didn't know her last name when you
13 filled out the questionnaire, who is also on the jury panel --
14 had been called for duty.
15     A.    Yes -- okay, she's not -- I had forgotten that,
16 right.
17     Q.    Do you -- have you spoken to her since then?
18     A.    No.
19     Q.    I assume --
20     A.    She's an adjunct faculty member, and I rarely see
21 her.  She only teaches part of the year, and I haven't seen her
22 since that date she came in.
23     Q.    Okay.  You just saw her in the -- in the big room?
24     A.    Yes.
25     Q.    If she were on the jury -- if you're on the jury and

1   Judy's on the jury, would that at all impact your deliberations

2   or your ability to kind of leave with your own verdict?

3        A.    I don't think so.

4        Q.    Not let her influence you anymore than any other

5   juror during deliberations?

6        A.    No.

7        Q.    You also told us that you had not really

8   discussed -- I think, let me make sure.  You hadn't really

9   discussed how your family members feel about the death penalty.

10  I assume -- you know, at my house we talk about the death

11  penalty a lot, as you can imagine, but I know that in most

12  homes in our county that's not a subject that comes up very

13  often.  Since you were called here in June, have y'all

14  discussed the death penalty?  Do you know any more now about

15  how they feel?

16       A.    No.

17       Q.    Okay.  Anything about that cause you a concern being

18  a juror?  If you were to sit on a jury where the result was the

19  death penalty, would you have any concerns about discussing

20  that with your family?

21       A.    No.

22       Q.    One last thing that I want to talk about

23  specifically on your questionnaire.  You mentioned a concern

24  you have about more minorities being subject to the death

25  penalty than whites.  Why do you -- why do you think that

1  happens?  Why do you think that's the case?

2       A.    I don't know.  I don't know.  I haven't even thought

3  about it at all, but I know that's the case or I think I know

4  that that's the case.

5       Q.    You've heard that?

6       A.    Yes.

7       Q.    Do you think -- I mean, obviously you can see in

8  this case the Defendant is African-American.  Would that affect

9  your deliberations in the case or your decision in the case one

10 way or the other?

11      A.    I don't think it would.

12      Q.    You know, trying to right a wrong that you perceive

13 or anything like that?

14      A.    No, I don't believe --

15      Q.    You certainly wouldn't treat him any differently

16 whether he was white, Hispanic, or African-American?

17      A.    Correct.

18      Q.    Obviously, that's not allowed -- it's not an

19 allowable consideration in any case, and you recognize that,

20 I'm sure?

21      A.    Yes.

22      Q.    Let -- you told us you had some concerns about

23 missing work, and I can -- I can remember vaguely being in

24 college and thinking it was great when the professor wasn't

25 there.  I mean no offense.  I'm sure you're a fantastic

1  professor, but it was -- it was really fun to show up to class

2  and the professor would give us 10, 15 minutes, and we're out.

3  In all seriousness, though, this is two weeks of service.  We

4  expect -- I mean, it could go longer, but we don't anticipate

5  that.  We expect it to be the last week of October and first

6  week of November and be done by that Friday.  Can you devote

7  your attention to the evidence for that two weeks without --

8      A.    I think I can.  Again, it's -- I -- I take my job

9  just as serious as you take yours, and I -- I have not -- I can

10 count on my two hands the 39 years I've been teaching that I've

11 missed a class, literally, less than ten times.

12     Q.    Right.

13     A.    Because I take my job very seriously, and I think my

14 students are better off if I'm there rather than a substitute.

15 So it doesn't sit well to miss class, but I -- I can certainly

16 devote myself to doing whatever the task is at hand.

17     Q.    Okay.  And that's really the question.  I do

18 recognize -- and I wasn't trying to make light of it, but I do

19 recognize that you take it seriously, and that's why I was

20 asking.  The jurors obviously need to be able to devote

21 100 percent of their attention for the two-week period that we

22 expect them to be here to the trial.  Some people tell us

23 because of what's going on at work, they're not able to do

24 that.  They're going to be thinking about things going on at

25 work and not focus.  And I think what you're telling me is

1    that's not the case for you?

2         A.    I think I can do that.

3         Q.    If you're sworn in as a juror, you would devote your

4    -- your two weeks attention to the case?

5         A.    Yes.

6         Q.    Then let me start by talking about some basic

7    principles of law that apply in any case, including a capital

8    murder case.  That is -- the first one is that the burden of

9    proof is on the State of Texas.  A Defendant is presumed

10   innocent of a crime until the State can prove him guilty beyond

11   a reasonable doubt.  They never have any job to do in terms of

12   bringing any proof or any evidence to the jury.  If I accuse

13   somebody of a crime, I have to prove that they're guilty before

14   a juror could return a guilty verdict.

15            Some people think where there's smoke, there's

16   fire.  If you've gotten this far into the process where you've

17   been arrested, charged, indicted by a Grand Jury, and now I

18   hear that the state of Texas is seeking the death penalty, you

19   must have done something.  You must be guilty of something.

20   It's okay if that's the way you think at home, but it's not

21   okay if that's the way you're thinking in the jury box.  Can

22   you see why that would violate someone's presumption of

23   innocence?

24        A.    Sure.

25        Q.    Could you afford the Defendant that presumption of

1    innocence and require the State of Texas to bring the proof?

2        A.    I believe I can.

3        Q.    In line with that, the Defendant has an absolute

4    right not to testify.  I can't call him to the witness stand

5    and say, you know, these fine jurors want to hear both sides of

6    the story, so you tell us yours.  His own mamma can't make him

7    take the stand.  His lawyers can't make him take the stand.  It

8    is always a defendant's choice and theirs alone whether they

9    decide to testify in their own case.  If a defendant testifies,

10   the jury's responsibility is to judge their testimony and their

11   credibility like they would any other witness.  Listen to what

12   they have to say, use their common sense and their good

13   judgement, and decide how much, if any, to believe of what

14   they're told.

15            On the other hand, if a defendant chooses to --

16   to exercise that Fifth Amendment privilege and not testify,

17   Judge Holmes would instruct the jury that they cannot consider

18   that silence for any reason at all.  They can't hold it against

19   him.  They can't say, well, you know, if I was -- if I was

20   innocent, I sure would have testified, so he must be guilty.

21   You really just have to disregard that silence and look to the

22   evidence you did hear in the case to make your decision.  Can

23   you afford the Defendant that Fifth Amendment privilege?

24       A.    I believe I can.  I mean, it certainly would make me

25   wonder, but I think I can put that aside.

1    Q.    And I think our human nature is always to want to

2  hear both sides of the story, but you recognize in a criminal

3  arena, in this courtroom, that's not always possible.  And,

4  again, the jury's job would be to look to the State of Texas

5  and say, did they prove it beyond a reasonable doubt.  If they

6  did, guilty.  Doesn't matter if the Defendant did or didn't

7  testify.  And if the State didn't prove the Defendant guilty,

8  it doesn't matter whether he did or didn't testify, the verdict

9  is not guilty.  And you think you can do that?

10    A.    I think I could.

11    Q.    In any case, the State has to prove what we allege

12  in the indictment beyond a reasonable doubt.  We don't have to

13  prove anything that's not in the indictment.  I'll give you an

14  example, like maybe there's a conflict in the testimony about

15  what color car somebody was driving when they committed the

16  crime.  You don't have any question about whether the crime was

17  committed by the person charged, but now you got this, well,

18  one witness says the car was blue and one says the car was

19  green.  Nowhere in the indictment does it say I have to prove

20  what color the car was, so we do have to prove what is in the

21  indictment.  And it works kind of like a checklist.  I have to

22  prove that the Defendant on trial is the one who committed the

23  crime, and I have to prove that the crime was committed exactly

24  like we allege.

25            I'll give you a quick example.  For capital

1  murder -- and capital murder is the only kind of case that a --

2  that a death penalty is ever going to be an option -- a capital

3  murder is an intentional murder committed during the course of

4  committing or attempting to commit a robbery.  We're going to

5  devote our time to that kind of capital murder.  That means

6  that I have to prove every single one of those things, that the

7  Defendant intentionally caused the victim's death, which means

8  it wasn't an accident, it wasn't a mistake.  We're never going

9  to be talking about self-defense or defense of property or

10  defense of a third person because those would be absolute

11  defenses.  You would not be convicted if you were defending

12  your family, for instance.  We're not going to be talking about

13  insanity where someone because of mental disease or defect

14  didn't understand what they were doing was wrong because,

15  again, that's an absolute defense to a conviction.  So we're

16  talking about someone who formed the intent to cause the

17  person's death and did what it took to get it done.  I have to

18  prove that, and I have to prove that that intentional killing

19  was done during the course of committing a robbery, okay?  If I

20  fail to prove any one of those things, the jury's verdict on

21  capital murder has to be not guilty.  Does that make sense?

22      A.   Yes.

23      Q.   I don't get help because I got most of the way

24  there.  If I prove somebody intentionally caused the death of

25  the victim, the jury has no reasonable doubt about that, but

1   there's no evidence about a robbery, the jury's verdict has to

2   be not guilty as to capital murder, because I have to get all

3   the way there, not just close.

4           Now, if a jury convicts somebody of murder

5   instead of capital murder -- in the event that I don't prove

6   the robbery, you may get that option -- then the punishment

7   range is five to 99 or life in prison -- five years, up to 99

8   years or life.  There's no longer a death penalty, no longer

9   life without parole, and the jury would decide where in that

10  punishment range the proper punishment lie.

11          And in a criminal case, we try our cases in two

12  parts.  The first part of the trial is devoted strictly to that

13  indictment checklist.  I have to prove on a certain date in

14  Dallas County this offense occurred just like I alleged.

15  You're not going to hear, for instance, things about a person's

16  criminal history or lack thereof.  You're not going to hear a

17  lot about the character of the victim or much about the --

18  really the circumstances, the why of the crime.  You're

19  probably not going to hear anything about whether somebody

20  feels bad or doesn't feel bad about committing the crime,

21  because those things would not be relevant as to whether the

22  person is guilty.  Those are things that the jury would hear in

23  the event of a guilty verdict in the punishment phase.  Does

24  that make sense?

25          A.   Yes.

1      Q.   And -- and I think if you consider it, you would see

2  why.   I mean, we can't bring in evidence that somebody has been

3  convicted of murder three times before, so that the jury is

4  thinking, oh, well, if he did it three times, he probably did

5  this one.   That's not allowable.   So it would be in the

6  punishment phase of the trial where all that additional

7  evidence would come in.

8           In the event of a capital murder conviction,

9  there's only two possible punishments, life without parole

10  which means just that, they never get considered for parole.

11  We used to have parole for capital murder, and that's -- that's

12  no longer the situation.   Now you got life without parole or

13  you have the possibility of a death sentence.   And there's --

14  there's one way that we figure out which that is, and it has

15  nothing to do with what somebody deserves.   It has to do with

16  whether or not the State can prove in the punishment phase,

17  that the Defendant you've convicted of capital murder will more

18  likely than not be a continuing threat to society.   Those

19  defendants who are convicted of capital murder who will not

20  more likely than not be a threat can safely be incarcerated in

21  the penitentiary for the rest of their lives and no need for

22  the death penalty.   That's how the state of Texas decides who

23  gets death and who gets life.   Does that make sense?

24      A.   I'm not sure.   Can you kind of go back through that

25  again?   The death penalty would be imposed if they were more

1  likely than not to be a threat or commit a crime again.  If

2  they're -- if they're in prison for life without parole, how is

3  that going to happen?

4      Q.   Okay.  Let's talk about it a little bit because

5  let's -- let's first go through this Special Issue 1 because

6  that's really the first question that the jury is asked.

7      A.   Yeah, I had -- I had -- had a problem with that.

8      Q.   I bet you did because you have a math background.

9      A.   Yes.

10     Q.   I knew it.  See, I was already prepared for that.

11     A.   Yes.

12     Q.   Because "probability" is a word that gives math

13  people -- who I am not by the way, so I see it differently --

14  but -- but probability gives math people a difficult time

15  because there's such a thing as a one percent probability.

16     A.   It brings it from 0 to one.

17     Q.   Exactly.  And then what we're talking about, and

18  under the law -- the legislators apparently were not math

19  people either when they picked this word.  It is defined in the

20  law as more likely than not.

21     A.   Okay.

22     Q.   So we look at it -- I look at it more like

23  probably --

24     A.   Okay.

25     Q.   -- instead of probability.  Maybe that's wrong, I

1  don't know.

2        A.    Okay.

3        Q.    But they do tell us that it means more likely than

4  not.  Not a mere possibility, and not an absolute certainty,

5  but something that is more likely than not.

6        A.    Okay.

7        Q.    And it is the State's job to prove in the second

8  phase of the trial -- in the punishment phase more likely than

9  not this Defendant would commit criminal acts of violence.

10  That's not defined for you either.  So it's not like we're

11  going to have this list of things that you have to believe he's

12  going to commit.  It doesn't say another murder or a robbery.

13  It's whatever criminal acts of violence means to you.  But we

14  do know that it's criminal acts of violence that would

15  constitute a continuing threat to society.  And I think you're

16  hung up on the word "society," like most of the jurors we talk

17  to.  We think about society as you and I going to the grocery

18  store and back and forth to our neighbors' houses and to work,

19  but in Special Issue Number 1, you're right, we're talking

20  about somebody who is serving life without parole.  Can you see

21  how prison is a society within our society?

22        A.    Yes.

23        Q.    There are prisoners there, some of whom are there

24  trying to do their time peacefully, pay their debt to society,

25  and get back out.  So they're there kind of wandering amongst

```
 1   one another and eating together and working together and living
 2   together in cells.  We have guards who are paid to be there and
 3   -- and safeguard the prisoners, trying to do their 8:00 to 5:00
 4   and get home to their families.  We've got nurses and doctors
 5   and teachers and other people who come into the prison, as well
 6   as visitors.  You know, if you've got a loved one in the
 7   penitentiary, you'd like to go into the penitentiary and be
 8   able to visit your loved one safely.  So when we talk about
 9   society in Special Issue Number 1, we're talking all of
10   society, including prison society.
11        A.    Okay.
12        Q.    Does that make sense?
13        A.    I can --
14        Q.    A little more?
15        A.    I can understand that.
16        Q.    I think most of us don't recognize that.  So it's --
17   it's whatever society the person finds them self in.  Do you
18   believe that the people inside the prison walls deserve
19   protection?
20        A.    Sure.
21        Q.    And do you think it's possible for someone in prison
22   to commit criminal acts of violence?
23        A.    I've heard that it is.
24        Q.    Right.  Have you ever been to a prison, visited a
25   prison?
```

1          A.    No, I haven't.

2          Q.    But you, like most people, recognize that it could

3    be a dangerous place to be?

4          A.    Yes.

5          Q.    That the prisons do a pretty good job of controlling

6    violence, but they can't control all of it.  And if somebody

7    has a mind to -- to be the kind of person who would commit

8    criminal acts of violence, they could constitute a continuing

9    threat to prison society?

10          A.    Okay.

11          Q.    And so that's really the nuts and bolts of where the

12    legislature has decided those who would more likely than not be

13    a threat in prison -- even in prison, are going to be those who

14    would make -- be subject to the death penalty.

15          A.    Okay.

16          Q.    If they're going to go and do their time peacefully

17    and not cause any problems and -- and just -- you know,

18    wouldn't constitute a continuing threat, then that life without

19    parole sentence is sufficient to protect society.  Does that

20    make sense?

21          A.    Yes, it does.

22          Q.    So it's not about what the person deserves.  It's

23    about what they more likely than not will do in the future.

24                Some jurors tell us that if you're the kind of

25    person who's going to commit a capital murder, an intentional

1    murder during the course of committing or attempting to commit

2    a robbery, then you're the kind of person I think is more

3    likely to be a threat in the future than not.  And that -- and

4    that would be lessening my burden because I have to prove it.

5    And obviously, if all capital murderers were going to be a

6    threat in the future, we wouldn't need Special Issue Number 1,

7    right?

8         A.    Right.

9         Q.    Do you think that it's possible for me to prove

10    beyond a reasonable doubt what someone more likely than not

11    will do in the future?

12         A.    I would say you have a good chance at it.

13         Q.    I mean, we don't have a crystal ball, right?

14         A.    Right.

15         Q.    So we're not required to prove with absolute

16    certainty because that would be an impossibility.  But in

17    looking at -- excuse me, the evidence that's potentially

18    available in terms of a person's character, background,

19    criminal history, upbringing, you know, those types of evidence

20    would be in front of you when you're asking this question -- or

21    trying to answer this question.  Do you think that those types

22    of evidence are capable of proving that, under the right

23    circumstances?

24         A.    I -- I believe I could.

25         Q.    Okay.  Some jurors tell us, you know, you can't

1  predict the future.  I can't do that.  There's no way anybody

2  can tell me what somebody is more likely than not to do.

3  That's why I was asking.

4           If I prove Special Issue Number 1 to the jury

5  beyond a reasonable doubt, the answer is yes to that question,

6  then and only then would the jury go on to consider Special

7  Issue Number 2.  If you answer it no, then the trial is over.

8  You never even think about Special Issue 2.  You never get

9  there.  So we go in that order.

10          But if I prove it beyond a reasonable doubt, you

11 get to Special Issue Number 2 -- and I'll tell you at this

12 point my job is over.  I don't have to prove anything to the

13 jury anymore.  The Defense never has a burden to prove anything

14 to anybody.  They don't have to prove he's innocent of the

15 crime, and they don't have to prove he won't commit criminal

16 acts of violence, because that burden lies with the State.

17          But in Special Issue Number 2, the jury is

18 responsible to go back and take into consideration all of the

19 evidence they heard, everything in the first part of the trial,

20 and everything in the second part of the trial.  And you're

21 really looking at it through different eyes now because there's

22 no checklist and there's no burden of proof.  You're going back

23 and looking at things like the circumstances of the offense.

24 Maybe there was a relationship or not between the victim and

25 the Defendant, an excuse or an explanation for the crime, why

1    it happened the way it did.  Those kinds of things.  You look

2    at the Defendant's character and background.  Look at the

3    personal moral culpability of the Defendant, if it's in

4    evidence.  And it may or may not be in evidence.  But if there

5    is evidence of that, you consider that along with everything

6    else you heard.  And then you ask yourself whether there was

7    something in the evidence that you heard that tells you

8    personally that the life sentence is really the more proper

9    sentence.

10                We sometimes call that the safety net question.

11   It is for the jurors, as well as the Defendant, the opportunity

12   to make sure -- to make certain in your mind that the death

13   sentence is the proper sentence because you can see by the time

14   you get to Special Issue Number 2, that you're talking about

15   somebody that's probably pretty bad, pretty dangerous.  Guilty

16   of capital murder and more likely than not going to constitute

17   a continuing threat to society, even in prison.

18                But the law says that in and of itself is not

19   enough for the Judge to sign the death warrant.  The jury has

20   to go back again, look at everything again, and make sure

21   there's not a sufficiently mitigating circumstance or

22   circumstance -- circumstances that warrant a life sentence

23   instead of a death sentence.  Does that make sense?

24        A.    Yes, it does.

25        Q.    And nobody is going to tell you, Mr. Matlock, what

1    is or isn't mitigating.  There's not a checklist of things.  If

2    you hear this, that's mitigating.  If you hear this, that's

3    aggravating.  That's up to each individual juror to decide for

4    themselves.

5            What I can -- what I can tell you is some things

6    that we've had jurors tell us are mitigating to them, things

7    like, you know, severe childhood abuse or neglect.  Sexual

8    abuse as a child, some jurors say, might lessen a defendant's

9    moral blameworthiness, might warrant a life sentence.  We've

10   had some jurors tell us that drug or alcohol addiction or

11   intoxication at the time of the offense might be mitigating to

12   them.

13           On the other hand, we've had jurors tell us that

14   that's aggravating to them.  So you don't even have to agree as

15   jurors what is or isn't mitigating, but the law is going to

16   require you and all the law requires you to do is look at

17   everything again, consider everything.  And once you've heard

18   all of the evidence and considered it, then you categorize it.

19   Is this mitigating?  Is this aggravating?  Is it neither?  Does

20   it weigh at all?  And if it's mitigating, is it sufficiently

21   mitigating?  And when I say sufficiently mitigating, I'm

22   talking about sufficiently mitigating, something that is

23   sufficient enough in your mind that you would say yes to that

24   knowing that you're sending a person who will more likely than

25   not be a threat right into that society you think they're going

1  to threaten.  Does that make sense?

2       A.    Sure.

3       Q.    Because that's where we are in the process.  And

4  there are only two things under the law that are by law

5  sufficiently mitigating.  And I'll tell you they're not going

6  to be in issue at this case, but I tell you as an example of

7  sufficient mitigation.  One is under the age of 18 at the time

8  of the crime.  If you're 17 years old in Texas, you are an

9  adult under the criminal law, but you would never be subject to

10  the death penalty.  That -- that youthfulness is sufficiently

11  mitigating by law.

12             The other is mental retardation.  If you are

13  mentally retarded, you may be guilty of capital murder, and you

14  may be a continuing threat to society.  But mental retardation

15  in and of itself is sufficiently mitigating to warrant a life

16  sentence.  Anything else in your judgement can or cannot be,

17  depending on your view.  Does that make sense?

18       A.    Yes, it does.

19       Q.    Do you think that we need Special Issue Number 2 or

20  do you think it ought to be enough to prove the person is

21  guilty and that they're a continuing threat?  Do you think

22  there's any need at all for this mitigation business?

23       A.    Well, I'm sort of glad that it's there.  I mean, I

24  guess -- I guess there are circumstances where somebody could

25  commit capital murder, and I would want to take into

1  consideration what the circumstance were.

2      Q.   And this is the -- this is the vehicle.  Basically

3  this -- this ensures that no juror goes home and says, I don't

4  think the right thing happened.  I don't feel good about what

5  happened.  Not that you would ever feel good about it either

6  way, but that you don't feel like the right outcome, that

7  justice was served because all 12 jurors have to agree

8  unanimously that the Defendant is guilty of capital murder.

9  All 12 jurors have to agree unanimously that the person will

10  more likely than not commit criminal acts of violence that

11  would constitute a continuing threat to society.  And all 12

12  jurors have to say that there's nothing sufficiently mitigating

13  in the evidence to warrant a life sentence before the death

14  sentence is ever a possibility.  That's how we get to the death

15  sentence.

16      A.   Okay.

17      Q.   Guilty, yes to 1, and no to 2, leaves the Judge with

18  no option but to sign the death warrant, basically.  And I tell

19  you it leaves the Judge with no option because some jurors

20  think that the Judge might could go back and say, well, I saw

21  something that I thought was mitigating so I'm changing it or

22  vice versa.  Your decision -- the 12 jurors' decision is final

23  and binding on the Court.  But all 12 jurors have to agree

24  before we get to that death verdict.  Does that seem like the

25  way it ought to be to you?

1    A.    Yes.  But what happens if everybody agrees to

2  Special Issue Number 1, but not everybody agrees to Special

3  Issue Number 2?

4    Q.    The only way we get to a death sentence is if all 12

5  agree.

6    A.    All right.

7    Q.    And now -- and it would revert to a life without

8  parole.

9    A.    Okay.

10    Q.    So all 12 jurors have to agree that the death

11  sentence is the proper sentence basically in Special Issue 2.

12  It does, however, have to be based on the evidence.  Earlier on

13  I asked you if you thought you might vote for a life sentence

14  just because you didn't like that it cost so much or that it

15  took too much time, that it was inefficient.  And I asked you

16  that because we do have some jurors who feel like Special Issue

17  Number 2 is their way out of this.  They either have moral

18  reasons against the death penalty.  They're not comfortable

19  with the death penalty because of religious or moral reasons,

20  or maybe like you, they just don't like the death penalty.

21  They think it's a waste of money and time.  That's not the

22  vehicle for those feelings.  This is a vehicle for something in

23  the evidence that you feel lessens, reduces the Defendant's

24  moral blameworthiness.  And if there is that evidence, this is

25  what -- this how you would exercise that.

1       A.    Okay.

2       Q.    Does that make sense?

3       A.    Yes, it does.

4       Q.    Do you have any questions about the process as I've

5   explained it to you?

6       A.    No.

7       Q.    Does any of this make you feel better or worse about

8   the death penalty, about the way it's -- the way we get there?

9       A.    No.  I was pretty familiar with it.  I've -- I've

10  been called to a capital murder situation before.

11      Q.    Oh, you have?

12      A.    I've been through this procedure before.

13      Q.    Do you remember which case?

14      A.    No, I didn't know then.  I don't know now.

15      Q.    How long ago was it?

16      A.    Oh, I don't even know.  It was probably 10 years

17  ago, maybe.  I don't know, but we got hung up on the

18  probability issue.

19      Q.    You may be the one juror who taught the rest of us

20  how to do it right from then on.

21      A.    They never would explain to me what that meant.

22      Q.    Well, and I'll tell you there's probably not going

23  to be a definition for it in your charge, either, but that's

24  what it means, more likely than not.  Do -- do you understand

25  that --

1      A.    Yes, I understand.

2      Q.    -- concept now?

3      A.    Yes.

4      Q.    So I guess maybe I did a better job than the people

5 before?

6      A.    They -- they just said they couldn't do that.  They

7 could not say what that meant.  It was up to me to decide what

8 that meant.

9      Q.    Okay.

10      A.    I was going by the mathematical definitions.

11      Q.    Right.  And that would be pretty difficult for --

12 for a mathematical definition.

13            Well, the law does evolve.  Did y'all have that

14 Special Issue Number 2 when you came the last time?  Do you

15 remember that?

16      A.    There were more special issues, more than this first

17 one, but I don't remember what the second one was.

18      Q.    Okay.

19      A.    I don't remember if we got past the first one.

20      Q.    Is there anything about the process, as I've

21 explained it to you, that you don't understand or don't feel

22 like you could take an oath to follow?

23      A.    Not that I'm aware of.

24      Q.    And you believe that you could base your decision,

25 your answers to these questions on the evidence that's provided

```
 1   to you in the courtroom and not on any personal feelings?

 2        A.    Yes.

 3        Q.    In -- in the end, if the result is the death

 4   sentence, I -- I tell you this not to be morbid or gruesome,

 5   but, you know, we're talking about a real human being who has

 6   family that cares about him like you and I do.  And at some day

 7   you may hear that it's his day to be executed and you'll know

 8   that you participated in that because all 12 had to agree.  Can

 9   you live with that decision?  Is that something that you feel

10   like you could do?

11        A.    I think so.

12        Q.    And if the result is a life sentence, could you live

13   with that decision?

14        A.    Yes.

15        Q.    Do you have any questions for me?

16        A.    No.

17        Q.    Thank you, Mr. Matlock.

18              MS. MOSELEY:  That's all I have, Judge.

19              THE COURT:  Thank you.

20                  DEFENSE VOIR DIRE EXAMINATION

21   BY MR. WEATHERSPOON:

22        Q.    Good afternoon, Mr. Matlock.

23        A.    Good afternoon.

24        Q.    As the Judge told you, my name is Kenneth

25   Weatherspoon, and along with Catherine Bernhard, we represent
```

1   Mr. Matthew Lee Johnson.  And I want to reiterate what the

2   Judge said and what Ms. Moseley told you, that we are extremely

3   appreciative of you coming down here, especially at the last

4   minute.  We know that you as a citizen, you all have lives and

5   you all have things going on in your life.  So for you to take

6   the time out to come down here, we really do appreciate it.

7                And I want to take it one step further and let

8   you know that you have done your civic duty by showing up on

9   June 21st and answering this long questionnaire and then coming

10  back down here today on such short notice, you have done your

11  civic duty.  So whether you do end up on this jury or you don't

12  end up on this jury, we want you to know that you have done

13  your civic duty and we really do appreciate it.

14               Now, I want to start off by telling you that

15  this process kind of puts the cart before the horse, in that

16  since we've spent a lot of time talking about the punishment

17  and the death penalty, I don't want you to think that we at

18  this table ever think you will reach that point.  We at this

19  table think that Matthew Lee Johnson will be found not guilty

20  of capital murder, so I don't want you to think just because

21  we've spent a lot of time talking about it, that the Defense is

22  saying, oh, he's going to be found guilty because that's not

23  the case.  It's just that this is the way the process works,

24  and we have to ask these questions at this time.  So please

25  don't think that we think he'll be found guilty because we

 1  don't, okay?

 2      A.    Okay.

 3      Q.    Now, going through your questionnaire, you said some

 4  things that I found kind of interesting.  And I'm just -- well,

 5  let me start off by saying, in your questionnaire, you consider

 6  yourself a Democrat, but then when you said -- when you listed

 7  the people you least respect, Nancy Pelosi was one of them.

 8      A.    I can't help it.

 9      Q.    I was just curious about that.

10      A.    Her name just came to mind when I was answering

11  that.

12      Q.    Okay.  Okay.

13      A.    I'm not fond of Nancy.

14      Q.    Well, you know, most -- in the questionnaires, most

15  people who are Democrats say favorable things about Democrats

16  and negative things about Republicans and Republicans say

17  negative things about Democrats, and you just -- that kind of

18  caught my attention there.

19      A.    It's hard to find anybody up there right now that

20  I'm fond of.

21      Q.    I completely understand that.

22            Now, when you -- on -- on page 3 of your

23  questionnaire, if you look at Questions 14 and 15 -- let me

24  start off by saying in Question 15, you said you do believe in

25  an eye for an eye, but then in Question 14, if you believe in

1  using the death penalty, how strongly and you listed yourself

2  as a 5.  When you say you do believe in an eye for an eye, tell

3  me what you mean.  Tell me what was going through your mind

4  when you wrote that.

5      A.    Well, I guess I believe in -- in justice being

6  served, one way or the other, whether -- I mean, an eye for an

7  eye, I don't necessarily think just because somebody kills

8  somebody, that the other side of that has to be that they get

9  killed.

10      Q.    Okay.

11      A.    It's just that justice gets served.

12      Q.    Okay.  That -- that -- that's -- so you're not

13  saying a death for a death?

14      A.    Right.

15      Q.    Okay.  And in terms of how strongly you believe in

16  using the death penalty, you say right down the middle, you'd

17  be a 5?

18      A.    Again, I think there are pluses and minuses.  I'm

19  not particularly fond of the death penalty because of the

20  things that I said, but I can certainly abide by the law.

21      Q.    Okay.  Now, if you look at Question 12 on that same

22  page, the death penalty is reserved for those defendants that

23  are such a threat to society that even incarceration does not

24  remove the probability of future violent acts.  Do you agree or

25  disagree?  And we understand that you answered this

1  questionnaire without the full background of the law.  Knowing

2  what you know now, would your answer be the same or --

3      A.    No, it wouldn't.

4      Q.    Okay.  And tell me why.

5      A.    Well, the prosecuting attorney has said that, you

6  know, society can be considered the prison population, as well

7  the people outside.  So I was going on the basis of this

8  society being the people outside prison when I answered that.

9      Q.    Okay.  Now, if you look at page 4, Question 22:  Do

10 you think the death penalty is ever misused?  And you said yes.

11 Do you think that would cause you any concern personally on

12 being on a capital murder jury?

13     A.    Well, it's always of concern when you're sentencing

14 somebody to death, but I -- again, I think I could follow the

15 law and do the best I could with that.  But, you know, I'm sure

16 that even if I convicted somebody of -- or helped convict

17 somebody of a capital murder and they got the death penalty,

18 I'm sure that I would years -- even years later probably wonder

19 did I do the right thing.  It would not be something I would

20 take lightly, and I would worry about it.  It would be of

21 concern to me.  But, again, I think I can follow the law on

22 that.

23     Q.    Now, if you'll turn to page 6, Question 37:  Do you

24 think a person convicted of capital murder can be rehabilitated

25 in prison?  And you said no.  Tell me -- tell me what you were

1  thinking when you answered that question that way.

2        A.    I don't think our prisons do a very good job of

3  rehabilitating, regardless of whether they've been convicted of

4  capital murder or not.  It's -- our society does a very poor

5  job of rehabilitating anybody while in prison.  But capital

6  murder, again, I -- I didn't know that much about capital

7  murder when I answered this question.  A person is in there for

8  either life or death penalty, I don't see the point of

9  rehabilitation.

10        Q.    Okay.  Well, do you think that maybe that person

11  could be an -- talk to other inmates who aren't in there for

12  life and maybe help them change their ways?

13        A.    Well, they probably could.

14        Q.    Well, and -- and -- and looking at Question 37, let

15  me just land right here for a second.  You understand -- I

16  think Ms. Moseley explained to you that capital murder is

17  the -- an intentional killing in the course of a robbery,

18  meaning that it was your desire to cause the death and you took

19  those steps to cause a death.  It wasn't an accidental killing.

20  It wasn't by mistake.  It was that which -- your specific

21  intent to kill the person during the course of a robbery, so

22  when you're talking about capital murder, you're talking about

23  someone who intended to kill the person that they killed.

24              So knowing that, do you think that someone who

25  intentionally killed someone during the course of a robbery

```
 1  will always be a continuing threat in the future?

 2      A.   I -- I don't know that I would say that I would

 3  always think that.  Again, there may be mitigating

 4  circumstances as to why they did capital murder, so, again --

 5      Q.   So knowing that someone committed an intentional

 6  murder during the course of a robbery, you could keep an open

 7  mind to a life sentence?

 8      A.   Sure.

 9      Q.   Now, you understand that the presumption -- once you

10  find someone guilty of capital murder, the law presumes that

11  the correct sentence is life in prison without the possibility

12  of parole.  Were you aware of that?

13      A.   I wasn't aware of that, no.

14      Q.   Okay.  Knowing that is the law, could you give that

15  individual that presumption?

16      A.   I think so.

17      Q.   Okay.  And could you require the State to rebut that

18  presumption beyond a reasonable doubt?

19      A.   It's my understanding that they have to.

20      Q.   Okay.  And when we talk about beyond a reasonable

21  doubt, I see you've -- you sat on a civil jury, but then it was

22  settled out of court; is that correct?

23      A.   You know, I've been down to a lot of different cases

24  and I don't even remember all the different cases -- I don't

25  remember what they were about or at least not -- once it's over
```

1  with, it's not that important that I remember those things.  I

2  don't remember what those things were about.

3       Q.   Okay.

4       A.   I know at least one of the cases I sat on, it was

5  settled before it went to the jury.

6       Q.   Okay.  Well, you understand in civil law, the burden

7  of proof is preponderance of the evidence, which means one side

8  has 51 percent, the other side has 49 percent.  The 51 percent

9  wins.

10           We have another standard of law called clear and

11  convincing evidence, and what that is used in is child-parental

12  termination cases.  If the State wants to take someone's

13  children away from them, terminate their parental rights, the

14  standard they use is clear and convincing evidence.  And you

15  would agree with me that the government should have to have

16  quite a bit of evidence before they take someone's children

17  away from them?

18       A.   Sure.

19       Q.   Okay.  Well, in criminal cases, the standard is

20  higher than that.  And as Ms. Moseley told you, there's no

21  definition -- there is no definition in law as to what beyond a

22  reasonable doubt is, but it is the highest standard in law.

23  It's more than clear and convincing, and it's more than

24  preponderance of the evidence.

25           So in Special Issue Number 1, you understand

```
 1  that the State has the burden of proof to prove that to you

 2  beyond a reasonable doubt?

 3       A.   Yes.

 4       Q.   Okay.  And if they fail to prove it to you beyond a

 5  reasonable doubt, you can return a verdict accordingly; is that

 6  correct?

 7       A.   Correct.

 8       Q.   Now, moving on to Special Issue Number 2 -- and you

 9  understand you don't get to Special Issue Number 2 until you

10  have answered Special Issue Number 1 yes?

11       A.   I understand that.

12       Q.   And you would agree with me that someone who has

13  committed an intentional killing in the course of a robbery,

14  and someone who you and 12 other jurors have already determined

15  is going to constitute a continuing threat, that that's a

16  pretty bad individual.  Would you agree with me?

17       A.   Yes.

18       Q.   And when you look at Special Issue Number 2 -- well,

19  let me back up a second.  If you look on page 6, Question 39,

20  and you see how Question 39 talks about a lot of the things

21  that you would consider in Special Issue Number 2.  Would you

22  agree with me?

23       A.   Probably, yes.

24       Q.   The law says that you must be able to consider -- it

25  doesn't say that you have to agree or disagree, but you must
```

 1  consider mitigation in Special Issue Number 2 --

 2          MS. MOSELEY:  Your Honor, I'm going to object to

 3  the wording of that.  He just has to consider the evidence and

 4  then decide if it's mitigating.  There is no mitigating

 5  evidence.

 6          THE COURT:  Please rephrase.

 7          MR. WEATHERSPOON:  Okay.

 8      Q.   (BY MR. WEATHERSPOON)  You have to keep an open mind

 9  to all the evidence you hear, okay?  You understand that?

10      A.   Yes.

11      Q.   If you've decided that a person is guilty beyond a

12  reasonable doubt of capital murder and you have decided that

13  that person is going to constitute a continuing threat, is that

14  enough for you, or would you still consider all the evidence

15  again in deciding Special Issue Number 2?

16      A.   I think I would consider all the evidence again.

17  Let me reread Number 39 here a second.

18          Well, I don't know.  I think I could consider

19  the evidence that was presented in making a determination about

20  whether the person would be a -- well, my general feeling, I

21  guess, is that -- is that there are a lot of people that whine

22  about their upbringing and so forth, that -- that I don't

23  particularly like.  But I think -- again, I think I could -- I

24  think I could follow whatever the law says.  I think I could

25  make that determination, but special circumstances, I don't

1  know what I would consider special circumstances.

2      Q.    Okay.  Can you give me just a second, Mr. Matlock?

3      A.    Sure.

4      Q.    If you turn to page 11, to Questions 70 and 71,

5  especially 71.  When you said, I think opinions from these

6  professionals often conflict, tell me what you're thinking.

7      A.    Well, I -- I don't consider psychiatry or

8  psychologists as -- as hard-core scientists.  I don't think

9  there's a hard-core science to the field.  I think that you

10 can -- you can get a psychologist -- two psychologists just

11 about to disagree on any subject, so I don't know that I have a

12 real strong feeling about the science that's involved in that.

13     Q.    I -- I'm kind of chuckling because I remember a

14 teacher of mine -- a math teacher of mine who said two plus two

15 is always going to be four.  And in certain sciences you can

16 have different opinions about -- two scientists can come to

17 different conclusions about the same thing.  Is that kind of

18 the way you feel?

19     A.    Well, I don't know that I would put it quite that

20 way, but, again, I -- as far as psychology and -- and

21 psychiatry go, I think that there's a lot of room for opinion

22 on that -- on what they make their conclusions on, how they

23 come to their conclusions.

24     Q.    Okay.  Do you know anyone in the Garland Police

25 Department?

```
 1        A.    In what?

 2        Q.    Garland Police Department?

 3        A.    Not that I know of.

 4        Q.    Okay.  Do you know anyone in the Dallas Police

 5   Department?

 6        A.    Not that I know of.

 7        Q.    Garland Fire Department?

 8        A.    No.

 9        Q.    Dallas Fire Department?

10        A.    No.

11        Q.    Southwestern Institute of Forensic Sciences?

12        A.    No.

13        Q.    Texas Department of Criminal Justice?

14        A.    No.

15        Q.    I'm going to read you a list of names, and if I

16   ask -- if one of the names rings a bell, just stop me, okay?

17        A.    Okay.

18        Q.    Scott Harris, Elizabeth Harris, Chris Harris,

19   Kenneth Marecle, Amy Marecle, Michael Frank, Anna Lunceford,

20   Jim Medley, Lawrence Denson, Jonas Lucht, Greg Mansell, Carina

21   Pinzon, Digna Salmeron, Kelly Keeton, Daphne Johnson, Sherry

22   Ann Clark, Amy Armstrong, Anthony Johnson, Alma Johnson,

23   Courtney Johnson, David Williams, Danny Mullins, David

24   Contente, Gioconda Verdaguer, Donald Dunlap, Johnny Wright,

25   Monica Cajas, Michael Crosby, Roxanne Luttrell, Robbie Denmark,
```

1   Quinlen Minor, Margaret Tatum, Jim Bertucci, John Harris,

2   Timothy Proctor, Carlton Jenkins, Durian Allen, Gene Gathright,

3   Manuel Turner, Andre Howard, Kenneth Lewis, or Sheldon Henry.

4        A.    None of those names ring a bell.

5        Q.    Do you have any questions you'd like to ask of me?

6        A.    No, sir.

7        Q.    Is there anything you think we need to know that we

8   haven't been smart enough to ask you?

9        A.    I can't think of it.

10       Q.    Okay.  Thank you very much, sir.

11             THE COURT:  Mr. Matlock, we're going to ask you

12  to step right outside that door there where all the painting is

13  going on for just a moment.

14             (Venireperson excused from courtroom.)

15             THE COURT:  Any challenge from the State?

16             MS. MOSELEY:  No, Your Honor.

17             THE COURT:  From the Defense?

18             MR. WEATHERSPOON:  No, Your Honor.

19             THE COURT:  All right.  Juror Number 1500, Jerry

20  Matlock, has been qualified by the State and the Defense.

21             (Venireperson returned to courtroom.)

22             THE COURT:  Mr. Matlock, again, thank you so

23  much for coming down.  You have been qualified by the State and

24  the Defense.

25             (Venireperson 1500A, Jerry Matlock, qualified.)

```
 1                    VENIREPERSON:  Okay.  Sorry about that.

 2                    THE COURT:  And we will let you know either

 3  tomorrow or Wednesday whether or not you'll be coming down two

 4  weeks from today.

 5                    VENIREPERSON:  Okay.

 6                    THE COURT:  Thank you very much, sir.

 7                    (Venireperson excused from courtroom.)

 8                    THE COURT:  All right.  Is that all we need to

 9  do today?

10                    MR. WEATHERSPOON:  That's it, I think.

11                    MS. MOSELEY:  I think so.  We got the other two

12  on there.

13                    (Recess of proceedings.)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     Reporter's Certificate

 2   THE STATE OF TEXAS:

 3   COUNTY OF DALLAS:

 4       I, Darline King LaBar, Official Court Reporter in and for

 5   the 363rd District Court of Dallas County, State of Texas, do

 6   hereby certify that the above and foregoing volume constitutes

 7   a true, complete and correct transcription of all portions of

 8   evidence and other proceedings requested in writing by counsel

 9   for the parties to be included in the Reporter's Record, in the

10   above-styled and numbered cause, all of which occurred in open

11   court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if any,

14   admitted by the respective parties.

15       WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16   on the 24th day of February, A.D., 2014.

17

18

19
                     \s\Darline LaBar
20                   DARLINE KING LABAR
                     Official Court Reporter
21                   363rd Judicial District Court
                     Dallas County, Texas
22                   hpdkfaith@msn.com
                     (214) 653-5893
23

24
     Certificate No:  1064
25   Expiration Date:  12/31/2014
```