1                    REPORTER'S RECORD

2                  VOLUME 44 OF 57 VOLUMES

3            TRIAL COURT CAUSE NO. F12-23749-W

4        COURT OF CRIMINAL APPEALS NUMBER:  AP-77,030

5   THE STATE OF TEXAS            :           IN THE 363RD JUDICIAL

6   VS.                          :           DISTRICT COURT OF

7   MATTHEW LEE JOHNSON           :            DALLAS COUNTY, TEXAS

8

9

10                  **TRIAL ON THE MERITS BY JURY**

11

12

13

14

15                      * * * * * * * * * * *

16

17

18

19

20        On the 28th day of October, 2013, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable Tracy Holmes, Judge

23   Presiding, held in Dallas, Dallas County, Texas:

24        Proceedings reported by machine shorthand computer

25   assisted transcription.

```
 1  A P P E A R A N C E S:

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
            Crowley Criminal Courts Building
 3          133 North Riverfront Boulevard
            Dallas, Dallas County, Texas 75207
 4          Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
         MS. ELAINE EVANS, A.D.A., SBOT # 24032880
 6       MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724
         MS. CHRISTINE WOMBLE, A.D.A., SBOT # 24035991

 7
                FOR THE STATE OF TEXAS;
 8

 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
            P.O. Box 2817
11          Red Oak, Texas 75154
            Phone:  972-617-5548

12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13          325 North St. Paul Street, Suite 2475
            Dallas, Texas 75201
14          Phone:  214-922-0212

15  MS. NANCY MULDER, Attorney at Law, SBOT # 00792971
            2214 Main Street
16          Dallas, Texas 75201
            Phone:  214-764-7246

17
                FOR THE DEFENDANT.
18

19

20

21

22

23

24

25
```

**INDEX VOLUME 44**

October 28th, 2013                                              PAGE  VOL.

TRIAL ON THE MERITS BY JURY:

Proceedings.......................................... 9    44

Waive arraignment/plea of not guilty entered......... 9    44

Jury finally sworn................................... 12   44

Jury instructions................................... 12   44

Indictment read by Ms. Moseley...................... 16   44

Plea of not guilty entered.......................... 16   44

Opening statement by Ms. Moseley.................... 16   44

| STATE WITNESSES | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| SCOT HARRIS | 22 | | | 44 |
| ANNA LUNCEFORD | 35 | 57 | | 44 |
| BILLY COFFEY | 60 | 82 | | 44 |
| WILLIAMS CREWS | 89 | 101 | | 44 |
| GARY CHURCH | 105 | | | 44 |
| CARL KING | 115, 137 | 133, 138 | | 44 |
| JIM MEDLEY | 142 | 153 | | 44 |
| KEN MARECLE | 155 | 168 | | 44 |
| RAFAEL PEREZ | 172 | 247 | | 44 |
| DAVID LANDIS | 191 | 211 | | 44 |
| STACY TOOKE | 214 | 236 | | 44 |

Reporter's Certificate............................. 241   44

1                          **ALPHABETICAL WITNESS INDEX**

| 2 | | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|---|
| 3 | GARY CHURCH | 105 | | | 44 |
| 4 | BILLY COFFEY | 60 | 82 | | 44 |
| 5 | WILLIAMS CREWS | 89 | 101 | | 44 |
| 6 | SCOT HARRIS | 22 | | | 44 |
| 7 | CARL KING | 115, 137 | 133, 138 | | 44 |
| 8 | DAVID LANDIS | 191 | 211 | | 44 |
| 9 | ANNA LUNCEFORD | 35 | 57 | | 44 |
| 10 | KEN MARECLE | 155 | 168 | | 44 |
| 11 | JIM MEDLEY | 142 | 153 | | 44 |
| 12 | RAFAEL PEREZ | 172 | 247 | | 44 |
| 13 | STACY TOOKE | 214 | 236 | | 44 |

14

15                              **EXHIBIT INDEX**

| 16 | STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 17 | 1 | Photo of Victim | 25 | 25 | 44 |
| 18 | 2 | Photograph | 28 | 29 | 44 |
| 19 | 3 | Photograph | 28 | 29 | 44 |
| 20 | 4 | Photograph | 28 | 29 | 44 |
| 21 | 5 | Photograph | 28 | 29 | 44 |
| 22 | **6 | Assorted Discovery | 11 | 11 | 44 |
| 23 | 6 | Victim's Gold Ring | 76 | 76 | 44 |
| 24 | **7 | 6th Supp. Discovery | 11 | 11 | 44 |
| 25 | 7 | Victim's Eyeglasses | 30 | 30 | 44 |

| | STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 1 | STATE'S | | OFFERED | ADMITTED | VOL. |
| 2 | **8 | 7th Supp. Discovery | 11 | 11 | 44 |
| 3 | 8 | Victim's DNR Document | 32 | 32 | 44 |
| 4 | 9 | Autopsy ID Photo | 32 | 32 | 44 |
| 5 | 10 | Photograph | 40 | 40 | 44 |
| 6 | 11 | Photograph | 40 | 40 | 44 |
| 7 | 12 | Photograph | 40 | 40 | 44 |
| 8 | 13 | Photograph | 41 | 42 | 44 |
| 9 | 14 | Protection 1 Document | 41 | 42 | 44 |
| 10 | 15 | DVR Box | 47 | 47 | 44 |
| 11 | 16 | Surveillance CD | 49 | 49 | 44 |
| 12 | 17 | Surveillance CD | 49 | 49 | 44 |
| 13 | 18 | Photograph | 52 | 52 | 44 |
| 14 | 19 | Photograph | 54 | 54 | 44 |
| 15 | 20 | Register Receipt | 129 | 129 | 44 |
| 16 | 21 | Photograph | 55 | 55 | 44 |
| 17 | 22 | Photograph | 55 | 55 | 44 |
| 18 | 23 | Photograph | 55 | 55 | 44 |
| 19 | 24 | Photograph | 63 | 63 | 44 |
| 20 | 24 | Photograph | 202 | 202 | 44 |
| 21 | 25 | Arrest Location Map | 36 | 36 | 44 |
| 22 | 26 | Photograph | 76 | 76 | 44 |
| 23 | 27 | Photograph | 76 | 76 | 44 |
| 24 | 28 | Photograph | 76 | 76 | 44 |
| 25 | 29 | Photograph | 76 | 76 | 44 |

| | STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | 30 | Photograph | 76 | 76 | 44 |
| 3 | 31 | In-Car Police CD | 81 | 81 | 44 |
| 4 | 33 | Ambulance Run Sheet | 100 | 101 | 44 |
| 5 | 34 | Photograph | 113 | 113 | 44 |
| 6 | 35 | Photograph | 113 | 113 | 44 |
| 7 | 36 | Photograph | 113 | 113 | 44 |
| 8 | 37 | Photograph | 125 | 125 | 44 |
| 9 | 38 | Mat front of store | 131 | 131 | 44 |
| 10 | 39 | Burned cloth | 130 | 130 | 44 |
| 11 | 40 | Photograph | 125 | 125 | 44 |
| 12 | 41 | Photograph | 125 | 125 | 44 |
| 13 | 42 | Photograph | 125 | 125 | 44 |
| 14 | 43 | Photograph | 125 | 125 | 44 |
| 15 | 44 | Piece of candy | 130 | 130 | 44 |
| 16 | 45 | Piece of candy | 130 | 130 | 44 |
| 17 | 46 | Piece of candy | 130 | 130 | 44 |
| 18 | 47 | Photograph | 125 | 125 | 44 |
| 19 | 48 | Photograph | 152 | 152 | 44 |
| 20 | 49 | Photograph | 152 | 152 | 44 |
| 21 | 50 | Photograph | 152 | 152 | 44 |
| 22 | 54 | Photograph | 158 | 159 | 44 |
| 23 | 55 | Photograph | 158 | 159 | 44 |
| 24 | 56 | Photograph | 165 | 165 | 44 |
| 25 | 57 | Google Earth Photo | 189 | 189 | 44 |

| | STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | 58 | Photograph | 189 | 189 | 44 |
| 3 | 59 | Purple Lighter | 76 | 76 | 44 |
| 4 | 60 | Red Lighter | 76 | 76 | 44 |
| 5 | 61 | Photograph | 76 | 76 | 44 |
| 6 | 64 | Google Earth Photo | 202 | 202 | 44 |
| 7 | 65 | Google Earth Photo | 202 | 202 | 44 |
| 8 | 66 | Google Earth Photo | 202 | 202 | 44 |
| 9 | 67 | Google Earth Photo | 202 | 202 | 44 |
| 10 | 68 | Photograph | 202 | 202 | 44 |
| 11 | 69 | Photograph | 202 | 202 | 44 |
| 12 | 70 | Photograph | 202 | 202 | 44 |
| 13 | 71 | Photograph | 202 | 202 | 44 |
| 14 | 72 | Photograph | 202 | 202 | 44 |
| 15 | 73 | Photograph | 202 | 202 | 44 |
| 16 | 74 | Envelope w/ Cigarette | 202 | 202 | 44 |
| 17 | 75 | Envelope w/ Cigarette | 202 | 202 | 44 |
| 18 | 76 | Envelope w/ Cigarette | 202 | 202 | 44 |
| 19 | 77 | Bag | 207 | 207 | 44 |
| 20 | 78 | Cigarette Package | 207 | 207 | 44 |
| 21 | 79 | Surveillance photo | 229 | 230 | 44 |
| 22 | 80 | Surveillance photo | 229 | 230 | 44 |
| 23 | 81 | Surveillance photo | 229 | 230 | 44 |
| 24 | 82 | Surveillance photo | 229 | 230 | 44 |
| 25 | 83 | Surveillance photo | 229 | 230 | 44 |

| | STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | 84 | Surveillance photo | 229 | 230 | 44 |
| 3 | 85 | Surveillance photo | 229 | 230 | 44 |
| 4 | 86 | Surveillance photo | 229 | 230 | 44 |
| 5 | 87 | Surveillance photo | 229 | 230 | 44 |
| 6 | 88 | Surveillance photo | 229 | 230 | 44 |
| 7 | 89 | Surveillance photo | 229 | 230 | 44 |
| 8 | 90 | Surveillance photo | 229 | 230 | 44 |
| 9 | 91 | Surveillance photo | 229 | 230 | 44 |
| 10 | 92 | Surveillance photo | 229 | 230 | 44 |
| 11 | 93 | Surveillance photo | 229 | 230 | 44 |
| 12 | 94 | Surveillance photo | 229 | 230 | 44 |
| 13 | 95 | Surveillance photo | 229 | 230 | 44 |
| 14 | 96 | Surveillance photo | 229 | 230 | 44 |
| 15 | 97 | Surveillance photo | 229 | 230 | 44 |
| 16 | 98 | Surveillance photo | 229 | 230 | 44 |
| 17 | 99 | Surveillance photo | 229 | 230 | 44 |
| 18 | 100 | Surveillance photo | 229 | 230 | 44 |
| 19 | 101 | Surveillance photo | 229 | 230 | 44 |
| 20 | 102 | Surveillance photo | 229 | 230 | 44 |
| 21 | 103 | Consent to Search | 221 | 221 | 44 |
| 22 | 104 | Photograph | 223 | 223 | 44 |
| 23 | 105 | Photograph | 223 | 223 | 44 |
| 24 | 106 | Photograph | 223 | 223 | 44 |
| 25 | | | | | |

```
 1                    P R O C E E D I N G S
 2              THE COURT:  We're on the record in Cause Number
 3   F12-23749, styled the State of Texas versus Matthew Lee
 4   Johnson.
 5              Let the record reflect Mr. Johnson is present in
 6   the courtroom with his attorneys of record, Catherine Bernhard,
 7   Kenneth Weatherspoon, and Nancy Mulder.
 8              The State is represented by Ms. Andrea Moseley,
 9   Rocky Jones, and Elaine Evans.
10              The parties are before the Court for a jury
11   trial.
12              What says the State?
13              MS. MOSELEY:  The State's ready.
14              THE COURT:  What says the Defense?
15              MS. BERNHARD:  Ready.
16              THE COURT:  Please arraign the Defendant.
17              MS. BERNHARD:  We would waive arraignment and
18   enter a plea of guilty -- I mean, not guilty.
19              (Waive arraignment/plea of not guilty entered.)
20              THE COURT:  All right.  The State -- the Defense
21   has waived arraignment and entered a plea of not guilty.
22              Is that your plea, in fact, Mr. Johnson?
23              THE DEFENDANT:  Yes.
24              THE COURT:  Thank you.
25              I guess we need to bring the jury in.
```

```
 1                    MS. MOSELEY:  We have some pretrial --

 2                    THE COURT:  Oh, I'm sorry, motions in limine.  I

 3     assume that both of you have seen one another's motions in

 4     limine?

 5                    MS. BERNHARD:  Yes.

 6                    MS. MOSELEY:  Yes, Your Honor.

 7                    THE COURT:  All right.  And they're both

 8     granted.

 9                    MS. MOSELEY:  Judge, I -- if I may also, at this

10     time, I'd like to offer into the record for record purposes

11     only State's Exhibit -- Pretrial Exhibit 6.  Contained in

12     this --

13                    COURT REPORTER:  I'm ready.

14                    MS. MOSELEY:  Contained in this envelope is a

15     thumb drive that has data that was downloaded from the

16     Defendant's phone in November of 2011.

17                    Also contains a disk numbered 46 which is some

18     additional still photos that were taken from the surveillance

19     video of this offense.

20                    Disk 47 which is -- contains photographs of the

21     Defendant's tattoos.  The photographs were taken October 15th

22     of this year.

23                    Disk 48 which contains calls made from the jail

24     by the Defendant between the dates of September 12th of this

25     year and October 15th of this year.
```

```
 1                    Disk 49 which has Garland Police Department
 2   reports relating to Timothy Johnson, the Defendant's brother.
 3                    And Disk 50, which contains a copy of the
 4   State's guilt/innocence PowerPoint presentation that we intend
 5   to use at trial.
 6                    The Defense has been provided with copies of all
 7   of these items.
 8                    And State's Exhibits 7 and 8 which are signed
 9   inventory of discovery that was provided to the Defense, the
10   6th supplemental and 7th supplemental discovery.
11                    (State's Pretrial Exhibits 6 thru 8 offered.)
12                    THE COURT:  Does the Defense have any -- an
13   objection to any of those exhibits?
14                    MS. BERNHARD:  Not for record purposes.
15                    THE COURT:  All right.  They're admitted for
16   record purposes.
17                    (State's Pretrial Exhibits 6 thru 8 admitted.)
18                    THE COURT:  Are we ready now?
19                    MS. MOSELEY:  And, Judge, for the record,
20   pursuant to a motion made by the Defense pretrial, the State
21   has run criminal histories, NCIC, TCIC inquiries on all of the
22   civilian witnesses in this case, and those show no criminal
23   histories of any of the witnesses, at least during the
24   guilt/innocence phase of the trial.
25                    In the punishment phase, there may be a couple
```

```
 1  of witnesses testify, but I will provide those criminal

 2  histories or the contents thereof at least to the Defense prior

 3  to their testimony.

 4                  THE COURT:  Thank you.

 5                  Are we ready?

 6                  MS. MOSELEY:  Yes, Your Honor.  The State's

 7  ready.

 8                  THE COURT:  Defense ready?

 9                  MR. WEATHERSPOON:  Defense is ready.

10                  THE COURT:  All right.  Let's bring the jury in.

11                  All right.  Ladies and gentlemen of the gallery,

12  we're not going to have any food, any beverages, or any gum in

13  the courtroom, please.

14                  THE BAILIFF:  All rise.

15                  (Jury brought into courtroom.)

16                  THE COURT:  Members of the jury, would you

17  please stand, rising, so I can swear you in.  Please raise your

18  right hands.

19                  (Jury finally sworn.)

20                  (Jury instructions.)

21                  THE COURT:  Please be seated.

22                  The gallery may also be seated.

23                  Members of the jury, I'd like to thank you again

24  for sustaining yourselves through this arduous process.  We're

25  very grateful for your service, and we're going to get ready to
```

1  go right now.

2  I'd like to tell you sort of how the Court will

3  operate during your service as jurors.  Hopefully, we'll start

4  at 9 o'clock every morning.  We'll have a mid-morning break

5  around 10:30, a lunch break.  We'll have a lunch break for an

6  hour around noon.  We'll have a mid-afternoon break about 2:30,

7  and then we will recess between 4:30 and 5:30 in the

8  afternoons.

9  I'd like to read you some admonishments that

10  you'll be operating under during your service as jurors.

11  Members of the jury:  By the oath that you take

12  as jurors, you become officials of this court and active

13  participants in the public administration of justice.

14  If at any time you cannot hear the proceedings

15  or see a piece of evidence, please let that fact be known to

16  the bailiff at once.

17  No one may discuss this case with you during

18  your service as jurors.

19  Likewise do not be offended if the lawyers do

20  not speak to you.  To maintain the integrity of the judicial

21  system, the law prohibits them from speaking with you until you

22  are discharged from jury service.

23  If someone does contact you or attempts to

24  contact you, please let that fact be known to a bailiff or a

25  court member at once.

1            Do not discuss this case with your fellow jurors

2   until you are instructed to deliberate, or with your spouse,

3   significant other, or your friends until you have been

4   discharged from jury service.

5            You are not permitted to read newspaper articles

6   about this trial, watch television, or listen to radio reports

7   that discuss this trial.

8            Do not go to any of the locations referred to by

9   the witnesses in this case or perform any type of individual

10  investigation.  You will receive all of the evidence here in

11  the courtroom.

12           Do not look in books, encyclopedias, or

13  dictionaries or go to the library or review courthouse records

14  in order to obtain information over and above what is presented

15  to you during this trial.  Do not conduct any type of Internet

16  research.

17           Please listen carefully to the testimony.  No

18  testimony will be read back to you, unless you disagree about a

19  specific statement made by a witness during the trial.  And I

20  need to elaborate on that, because often we get notes from

21  juries that say, we'd like a rereading of Witness A's

22  testimony, something to that effect.  The law does not allow us

23  to give you a general rereading of anyone's testimony.  If you

24  have a specific disagreement about a specific statement, you

25  can send a note out that says, we disagree about this specific

1  statement and would you please look it up, and we can and will

2  do that for you.

3              Once you have retired to deliberate, you shall

4  remain together and are not permitted to separate until a

5  verdict has been rendered or you have activated the jury call

6  button.  That's during the day.  You will allowed to go home

7  tonight.

8              Please validate your parking tickets in the

9  Central Jury Room when you arrive in the morning in the event

10  that the Central Jury Room is closed when we recess in the

11  afternoon.

12              Thank you very much.

13              All right.  The Court is calling to trial Cause

14  Number F12-23749, styled the State of Texas versus Matthew Lee

15  Johnson.

16              What says the State?

17              MS. MOSELEY:  The State's ready.

18              THE COURT:  What says the Defense?

19              MR. WEATHERSPOON:  Defense is ready.

20              THE COURT:  Thank you.  I'll just briefly

21  introduce everyone again, even though I'm sure you already know

22  them.

23              This is my court reporter, Ms. Darline LaBar.

24              Andrea Moseley for the State.  Rocky Jones for

25  the State.  Elaine Evans for the State.

```
 1                   Catherine Bernhard for the Defense.  Kenneth

 2  Weatherspoon for the Defense.  Nancy Mulder for the Defense.

 3                   And the Defendant or the citizen accused, Mr.

 4  Matthew Lee Johnson.

 5                   Please present the indictment.

 6                   MS. MOSELEY:  Good morning.

 7                   "True Bill of Indictment.  In the name and by

 8  the authority of the State of Texas, the Grand Jury of Dallas

 9  County, State of Texas, duly organized at the January Term,

10  A.D., 2012, of the 265th Judicial District Court..."

11                   (Indictment read by Ms. Moseley.)

12                   MS. MOSELEY:  "...Against the peace and dignity

13  of the State.  It's signed by Craig Watkins, Criminal District

14  Attorney of Dallas County, Texas, and also signed by the

15  Foreman of the Grand Jury."

16                   THE COURT:  And to the indictment, sir, how do

17  you plead, guilty or not guilty?

18                   MS. BERNHARD:  Ladies and gentlemen, Matthew Lee

19  Johnson enters a plea of not guilty.

20                   (Plea of not guilty entered.)

21                   THE COURT:  Thank you.

22                   Does the State wish to make an opening statement

23  at this time?

24                   (Opening statement by Ms. Moseley.)

25                   MS. MOSELEY:  Yes, Your Honor, briefly.
```

1          Ladies and gentlemen of the jury, the evidence

2     that you're going to hear in this case is going to relate back

3     to the offense date of May 20th, 2012.  On that early Sunday

4     morning, Nancy Harris, a 76-year-old grandmother, was getting

5     up and getting ready to go to work at the Whip-in Fina store

6     gas station located in Garland, Texas, across the street from

7     South Garland High School.  She worked as a clerk at that

8     store, and you will hear that she got up that Sunday morning,

9     as she did many Sunday mornings, to open the store, that she

10    did so.  And while she was getting ready to go to work and

11    preparing to open the store for business that day, the

12    Defendant, Matthew Lee Johnson, was filling a plastic bottle,

13    much like this plastic bottle, with lighter fluid -- charcoal

14    lighter fluid.  And he was preparing to rob Ms. Harris and that

15    Fina gas station convenience store that morning.

16         And you will hear that the Defendant came into

17    the store while Ms. Harris was behind the counter preparing for

18    the day, that he entered the store carrying that water bottle,

19    only it didn't have water in it.  When he came behind the

20    counter, he poured the contents of that bottle over Ms.

21    Harris's head and body.  He then stood behind her while she

22    attempted to open the computerized cash register.  He carefully

23    selected two different packages of cigarettes.  He took two

24    lighters, although he already had a lighter in his hand.

25         He saw that Ms. Harris was wearing a ring on her

1  right hand, and he tried to remove that ring from her hand.  It

2  didn't work, so he licked his fingers and he tried again.  It

3  still didn't work.  He licked his fingers a second time and

4  finally was able to remove the ring that Ms. Harris was wearing

5  on her right hand.

6              She opens the register, and the Defendant takes

7  all of the bills, the ones, the fives, the tens.  He also takes

8  out the dollar coins and the quarters.  He removes the tray

9  from the drawer, sets it on the counter to see if there's

10  anything of value underneath it.  And once he has everything

11  that he wants, once he robs the store and Ms. Harris

12  personally, he sets her on fire.  And he sets her head and her

13  upper body on fire.

14              As she is on fire behind the counter, he's

15  behind her.  And as they come around the counter, he pushes her

16  out of the way while she's on fire, strolls around the front of

17  the counter, grabs some candy off of a display on the counter

18  and casually walks out the door.  And while Ms. Harris is

19  struggling at the sink in this store to attempt to put out the

20  fire, the Defendant has left and is in the neighborhood

21  directly behind the store, attempting to hide.  He hides his

22  shirt that he was wearing.  He gets rid of the glasses that he

23  had on his face at the time.  All the while Ms. Harris is

24  struggling to save her life, to put out this fire.

25              She's unable to put out the fire.  She removes

1  her shirt and drops it down at the sink.  It catches her pants

2  on fire.  At some point she realizes that she's not going to be

3  able to put the fire out at the sink, and she walks outside and

4  stands on the front porch of the store waiting for help.  There

5  were two police officers -- two Garland police officers sitting

6  across the street at a business and they saw the flames and

7  they come over.  Officer Coffey and Officer Simon exit their

8  cars.  They see her standing on the porch, on fire, and Officer

9  Coffey uses the fire extinguisher in his patrol car to put out

10  the fire.  He then goes in the store and puts out the fire

11  that's still burning from her shirt near the sink.

12            Ms. Harris was on fire for more than two

13  minutes.  She is, however, miraculously able to describe the

14  person who did this to her, tell the officers what happened,

15  and what the person looks like.  And as the officers are

16  looking in the neighborhood trying to find and arrest this

17  person, they're receiving 911 calls from neighbors in that

18  residential area behind the store.  People are calling in

19  saying that someone is trying to get in their house, someone is

20  trying to get in their backyards.  The person that those

21  neighbors describe is the same person that Nancy Harris had

22  described to Officer Simon and Officer Coffey.

23            The officers surround the neighborhood blocking

24  off all of the exits and all of the ways in and out of the

25  neighborhood.  And eventually you'll hear that the Defendant is

1  arrested.  He runs from Officer Perez and is hiding in some

2  bushes in the neighborhood directly behind the store and he is

3  apprehended.  When he's apprehended, of course, he's not

4  wearing the glasses and he's not wearing the shirt that he had

5  been wearing at the time of the crime.  Those were found later.

6  The shirt was located in a trash dumpster that belonged in --

7  in the driveway behind one of the homes in the neighborhood.  A

8  man by the name of Jim Medley found that shirt in his dumpster

9  and alerted the police that it didn't belong to him.

10         During the course of this trial, you will hear

11  that Nancy Harris was transported to Parkland Hospital, that

12  she had severe burns covering 40 percent of her body.  Her face

13  and upper body were burned, third-degree burns.  You will hear

14  that she had told her family previously that she didn't want to

15  live in a case where she had a serious injury or illness that

16  would prevent her from living independently, as she had for her

17  76 years.  She had signed a do not resuscitate affidavit and

18  form, saying that she didn't want to be kept alive by machines,

19  that the family had to make that difficult decision.  Ms.

20  Harris was kept alive until all of her family could be there by

21  her side, and then life support was removed.  And she finally

22  succumbed to her injuries five days later.

23         You're going to see some images during this

24  trial -- video and photographic images -- that will be

25  disturbing to anyone.  There was a surveillance video --

1  surveillance system in the store working, functioning that

2  morning, and this crime was caught on video.  You're also going

3  to see photographs of what happens to a human body when it's

4  set on fire.  You're going to see photographs of Ms. Harris

5  that were taken at the hospital, and you're going to see

6  photographs of Ms. Harris that were taken at the autopsy.

7              While these images will be disturbing and

8  graphic, they will very clearly show the Defendant's face as he

9  comes into that store.  They will very clearly show him

10  carefully selecting the two packages of cigarettes and stealing

11  the two lighters.  They will very clearly show Ms. Harris on

12  fire, while he strolls casually out the front door.

13              At the end of all of this, you will very clearly

14  know that the Defendant, Matthew Lee Johnson, is guilty of

15  capital murder.

16              THE COURT:  Mr. Weatherspoon.

17              MR. WEATHERSPOON:  Your Honor, at this time

18  we'll waive opening and reserve the right --

19              THE COURT:  Thank you.

20              MR. WEATHERSPOON:  -- at a later time.

21              THE COURT:  Will the State call its first

22  witness?

23              MS. MOSELEY:  The State calls Scot Harris.

24              THE COURT:  Good morning.

25              THE WITNESS:  Good morning.

```
 1                    THE COURT:  Please raise your right hand.
 2                    (Witness sworn.)
 3                    THE WITNESS:  I do.
 4                    THE COURT:  Thank you.
 5                         SCOT HARRIS,
 6   was called as a witness by the State, and after having been
 7   first duly sworn, testified as follows:
 8                    DIRECT EXAMINATION
 9   BY MS. MOSELEY:
10        Q.   Sir, would you please introduce yourself to the
11   members of the jury?
12        A.   My name is Scot Harris.
13        Q.   And, Mr. Harris, how do you know Nancy Harris?
14        A.   She's my mother.
15        Q.   How old are you?
16        A.   I'm 51.
17        Q.   And how many children did your mother have?
18        A.   Four -- four boys.
19        Q.   Do they all live here in the Dallas area?
20        A.   Two of us live in the Dallas area, two live out of
21   state.
22        Q.   And one lives in New Jersey; is that right?
23        A.   Yes, the other in Florida.
24        Q.   The other in Florida?
25        A.   Yes, ma'am.
```

1    Q.   Were your parents still married at the time of your

2 mother's death?

3    A.   My father -- they were married.  My father was

4 deceased though.

5    Q.   When did your father pass away?

6    A.   1987.

7    Q.   How many grandchildren did your mother have?

8    A.   She had 11 grandchildren and seven great

9 grandchildren.

10    Q.   And do they all live in the Dallas area?

11    A.   No, they don't.

12    Q.   After your father passed away, did your mom continue

13 to live in Garland?

14    A.   Yes, she lived in the same house.

15    Q.   And where was her house?

16    A.   It was in Garland off of Colonel Drive near South

17 Garland High School.

18         THE COURT:  Sir, I'm going to ask you to lean

19 into that microphone --

20         THE WITNESS:  I'm sorry.

21         THE COURT:  -- if you would, please.  Thank you

22 very much.

23    Q.   (BY MS. MOSELEY)  She lived very close to the store

24 where she worked?

25    A.   Yes, about a block and a half.

```
  1        Q.    And do you know approximately how long she had

  2   worked there at that store?

  3        A.    I want to say 10 to 12 years.

  4        Q.    A long time?

  5        A.    A long time, yes, ma'am.

  6        Q.    How did she get to work generally?

  7        A.    She drove.

  8        Q.    She drove?

  9        A.    Yes.

 10              MS. MOSELEY:  May I approach the witness, Your

 11   Honor?

 12              THE COURT:  You may.

 13        Q.    (BY MS. MOSELEY)  I'm going to show you what I've

 14   marked for identification as State's Exhibit Number 1.  Is that

 15   a photo of your mom?

 16        A.    Yes, it is.

 17        Q.    And Where was that photo taken?

 18        A.    At Texas Stadium.

 19        Q.    She was a big Cowboys fan?

 20        A.    She was, very big.

 21              MS. MOSELEY:  I'd offer State's Exhibit 1.

 22              (State's Exhibit 1 offered.)

 23              MR. WEATHERSPOON:  No objection.

 24              THE COURT:  Admitted.

 25              (State's Exhibit 1 admitted.)
```

```
 1                    MS. MOSELEY:  Permission to publish, Your Honor?

 2                    THE COURT:  You may.

 3         Q.   (BY MS. MOSELEY)  That's your mom -- there's a

 4    screen right next to you, if that helps, I don't know.

 5         A.   Yes, that is my mother.

 6         Q.   And how long before her death was that photograph

 7    taken?

 8         A.   I want to say one to two years.

 9         Q.   On the morning of May 20th, 2012, did you -- were

10    you alerted that something had happened to your mom?

11         A.   Yes.  I received a phone call from my sister-in-law,

12    that --

13         Q.   What's your sister-in-law's name?

14         A.   Libby Harris.

15         Q.   Elizabeth --

16         A.   Yes.

17         Q.   -- she goes --

18         A.   Elizabeth.

19         Q.   She goes by Libby?

20         A.   She goes by Libby, yes, ma'am.

21         Q.   She called you on the telephone?

22         A.   Yes.

23         Q.   Do you remember about what time it was that morning?

24         A.   I want to say -- I was getting ready for church.  It

25    was around probably about 10:00, 10:30, something like that.
```

```
 1        Q.   And without telling us what she told you, because
 2   you know that's hearsay, what did you do in response to her
 3   phone call?
 4        A.   I got my daughter, got her, told her to get ready,
 5   and we went to the church to pick my wife up who was teaching
 6   Sunday school and had my daughter calling the other family
 7   members to go to the hospital.
 8        Q.   And you went Parkland Hospital that morning?
 9        A.   Yes, ma'am.
10        Q.   When you got to the hospital, who came with you?
11        A.   My -- my daughter and my wife were with me, and
12   other daughter and her fiance showed up later.
13        Q.   Were there already other family members there?
14        A.   Yes, Elizabeth was there.
15        Q.   And was your mom already there?
16        A.   Yes.
17        Q.   Were you able to see your mom when you got there?
18        A.   Yes, ma'am.
19        Q.   And can you describe -- were you able to talk to
20   her?
21        A.   She could not communicate.  She was, I guess, under
22   sedation, but I got to see her.
23        Q.   Was she already bandaged?
24        A.   Yes, ma'am.
25        Q.   Did she already have the ventilator?
```

```
 1        A.    Yes.

 2        Q.    The breathing tube?

 3        A.    Right.

 4        Q.    So you weren't able to talk to her.  She wasn't able

 5   to communicate with you, but were you able to see her and spend

 6   some time with her that morning?

 7        A.    Yes, ma'am.

 8        Q.    At some point other family members began arriving,

 9   I'm sure.

10        A.    Yes, yes, family and friends.

11        Q.    Did the nurses and doctors who were treating your

12   mother talk to you about her medical condition, her physical

13   condition?

14        A.    Yes, ma'am, they did.

15        Q.    Did they describe for you what -- what the course of

16   treatment was going to be?

17        A.    Yes, they did.

18        Q.    At some point did you have an opportunity to talk to

19   the police officers or detectives who were working on this

20   case?

21        A.    Yes, I did.

22        Q.    Did they show you some of your mother's property --

23        A.    Yes.

24        Q.    -- that morning?

25        A.    Yes, ma'am.
```

```
 1        Q.   And were you able to identify the items that they

 2   showed you as belonging to your mother?

 3        A.   Yes, ma'am.

 4             MS. MOSELEY:  May I approach the witness, Your

 5   Honor?

 6             THE COURT:  You may.

 7        Q.   (BY MS. MOSELEY)  I'm going to show you some

 8   photographs that are for identification marked as State's

 9   Exhibits 2, 3, 4, and 5, and ask you to take a look at those

10   and see if you recognize the things pictured there.

11        A.   Yeah, this is her place of employment, the Whip-in

12   Fina.  And this is her ring.  Yeah, this is her -- her key

13   chain right there.  It has pictures on it.  And, yeah, her

14   glasses are on the floor.

15             MS. MOSELEY:  I'd offer into evidence State's

16   Exhibits 2 through 5.

17             (State's Exhibits 2 through 5 offered.)

18             MR. WEATHERSPOON:  No objection.

19             THE COURT:  Admitted.

20             (State's Exhibits 2 through 5 admitted.)

21             MS. MOSELEY:  Permission to publish?

22             THE COURT:  You may.

23        Q.   (BY MS. MOSELEY)  If you can see on the screen

24   State's Exhibit Number 2, you said was a photo of the store --

25   the front of the store that your mom worked at?
```

```
 1        A.    Yes.

 2        Q.    And what are we looking at there in State's

 3   Exhibit 3?

 4        A.    Picture of her ring.

 5        Q.    And you don't know where the lighter came from?

 6        A.    No.  My mother didn't smoke.

 7        Q.    What's -- what are we looking at in State's

 8   Exhibit 4?

 9        A.    A set of her keys laying on the counter.  It has

10   pictures of her grand kids on it.

11        Q.    Pictures of her grandchildren?

12        A.    Yes.

13        Q.    And then State's Exhibit Number 5, is that your

14   mom's glasses lying there on the floor next to that stuff?

15        A.    Yes, it is.

16        Q.    And did the police actually bring you some of these

17   items when they talked to you at the hospital so you could look

18   at them?

19        A.    Yes, they did.

20              MS. MOSELEY:  May I approach, Your Honor?

21        Q.    (BY MS. MOSELEY)  And I'm showing you an envelope

22   that's marked State's Exhibit Number 7.  Can you just take a

23   look inside here at what's contained in the envelope and see if

24   you recognize that?

25        A.    Yes.  It's my mother's glasses.
```

```
 1                    MS. MOSELEY:  I'd offer State's Exhibit Number 7

 2  into evidence.

 3                    (State's Exhibit 7 offered.)

 4                    MR. WEATHERSPOON:  No objection.

 5                    THE COURT:  Admitted.

 6                    (State's Exhibit 7 admitted.)

 7       Q.   (BY MS. MOSELEY)  And do you -- do you know whether

 8  the police officers actually gave your family back the ring or

 9  the keys that belonged --

10       A.   We did get those items back, yes.  Now, the ring we

11  did not get back.

12       Q.   Okay.  But the keys --

13       A.   The keys, yes.

14       Q.   Had your mom had some health problems of late, as

15  she aged?

16       A.   Yes, she had had a pacemaker installed probably, I

17  guess, two years before, and she had diabetes.

18       Q.   So she had had some heart problems?

19       A.   Yes.

20       Q.   And she had Type 2 diabetes?

21       A.   Correct.

22       Q.   Were -- were all of those conditions being managed?

23       A.   Yes, they were.

24       Q.   Prior to your mother's death, had she made her

25  wishes known as to what -- what she would want to happen if --
```

```
 1   in the event of a catastrophic accident or illness?

 2       A.    Yes, did.  She had she signed a DNR.

 3       Q.    And you understood what that meant?

 4       A.    Yes, ma'am.

 5       Q.    Did you, based on your conversation with the doctors

 6   at the hospital, make a determination that this was an injury

 7   that -- that your mother wasn't going to survive?

 8       A.    Yes, we did.

 9       Q.    And did you all make efforts to get your family from

10   out of state here before your mother passed?

11       A.    Yes, all my brothers were -- were present.

12       Q.    And on May 25th, did you and your family abide by

13   your mother's wishes and ask the doctors to discontinue the

14   life support?

15       A.    Yes, ma'am, we did.

16       Q.    Were you with her when she passed away?

17       A.    Yes, ma'am.

18             MS. MOSELEY:  May I approach, Your Honor?

19             THE COURT:  You may.

20       Q.    (BY MS. MOSELEY)  I'm showing you State's Exhibit

21   Number 8, and I showed you this earlier.  Is this the DNR that

22   your mother signed and -- and initialed indicating what her

23   wishes were?

24       A.    Yes, it is.

25       Q.    And I'm also at this time showing you State's
```

1   Exhibit Number 9.  Do you recognize that as your mother?

2        A.    Yes, I do.

3              MS. MOSELEY:  At this time, I would offer

4   State's Exhibit Number 8 for all purposes and State's Exhibit

5   Number 9 for the record.

6              (State's Exhibits 8 and 9 offered.)

7              MR. WEATHERSPOON:  No objection for 8, all

8   purposes; 9, record purposes only.

9              THE COURT:  Eight is admitted for all purposes;

10  9 is admitted for record purposes.

11             (State's Exhibits 8 and 9 admitted.)

12             MS. MOSELEY:  I'll pass the witness, Judge.

13             MR. WEATHERSPOON:  No questions, sir.

14             THE COURT:  Thank you, Mr. Harris.  You may

15  stand down.

16             THE WITNESS:  Thank you.

17             MS. MOSELEY:  May we have a brief recess, Your

18  Honor?

19             THE COURT:  May I see the lawyers up here?

20             (Sidebar conference off the record.)

21             THE COURT:  Ladies and gentlemen, we're going to

22  take a 10-minute recess.  My clock says 10 -- I'm sorry, 9:30,

23  if you'll be in the jury room at 9:40, please.

24             THE BAILIFF:  All rise.

25             (Jury excused from courtroom.)

 1                    THE COURT:  Gallery may be seated.

 2                    (Recess.)

 3                    THE COURT:  We're on the record outside the

 4    presence of the jury.  Let the record reflect that the family

 5    of the deceased has removed themselves for the -- from the

 6    courtroom.

 7                    MS. BERNHARD:  Judge, we would urge the

 8    constitutional and statutory provisions for Motion Number 57

 9    which was previously filed with the Court, objecting to the

10    unfairly prejudicial nature of -- of the evidence that's to

11    come, and ask that the Court make a 403 balancing test.

12                    THE COURT:  All right -- I'm sorry, go ahead.

13                    MS. MOSELEY:  I would just like the record to

14    show that the Court has previously had the opportunity to view

15    the video we're -- we're discussing at this time.  It hasn't

16    been said, but we're discussing the surveillance video that

17    captured this offense.  And the State's position certainly is

18    that there's nothing more probative than a video of the offense

19    taking place and -- and would urge the Court to deny -- after

20    having done the balancing test, to find that it is more

21    probative than prejudicial and admit it.

22                    THE COURT:  The Defense's objection is

23    overruled.  The Court's finding is that the evidence about to

24    be presented by the State is more probative than prejudicial.

25                    (Recess.)

```
 1                MS. MOSELEY:  Is the Defense going to have any
 2  objection to Mr. Harris coming back into the courtroom?  I
 3  think under the Victims' Rights Provisions, he's entitled to
 4  come back in and be excluded from the Rule.  I don't think we
 5  invoked the Rule anyway.
 6                MS. BERNHARD:  We ask that the Rule be invoked.
 7  We don't have any objections to him being back in the courtroom
 8  as long as he's admonished.
 9                THE COURT:  All right.  Would you -- everyone
10  let their witnesses know that the Rule has been invoked.
11                MS. MOSELEY:  I will.  And also, Your Honor, we
12  do anticipate at least one family member testifying in the
13  punishment phase of the trial.  And I would ask that they also
14  be excused from the Rule.  They're not a fact witness.
15                MS. BERNHARD:  No objection.
16                THE COURT:  Okay.
17                (Witness brought forward.)
18                THE COURT:  Please raise your right hand.
19                (Witness sworn.)
20                THE WITNESS:  Yes, ma'am.
21                THE COURT:  Thank you.
22                MS. MOSELEY:  Judge, are we ready to get the
23  jury?
24                THE COURT:  We are.
25                THE BAILIFF:  All rise.
```

```
 1                    (Jury returned to courtroom.)

 2                    THE COURT:  Please be seated.

 3                    Let the record reflect this witness has been

 4  sworn.

 5                         ANNA LUNCEFORD,

 6  was called as a witness by the State, and after having been

 7  first duly sworn, testified as follows:

 8                    DIRECT EXAMINATION

 9  BY MS. MOSELEY:

10       Q.   Ma'am, you may have to move your body forward.  That

11  microphone doesn't really move toward you much.

12       A.   Okay.  Can you hear me okay?

13       Q.   That's -- I think that's loud enough.

14       A.   Okay.

15       Q.   Would you introduce yourself to the members of the

16  jury?

17       A.   My name is Anna Lunceford.  L-u-n-c-e-f-o-r-d is my

18  last name.

19       Q.   And, Ms. Lunceford, where do you work?

20       A.   At Whip-in -- Fina Whip-in.

21       Q.   What's your job there?

22       A.   I am the manager.

23       Q.   And where's the store located that you manage?

24       A.   3405 Broadway, Garland.

25       Q.   Is that the Whip-in Fina that's at basically
```

 1  Broadway and Colonel, near South Garland High School?

 2       A.   Yes.

 3            MS. MOSELEY:  May I approach the witness, Judge?

 4            THE COURT:  You may.

 5       Q.   (BY MS. MOSELEY)  I'm going to show you what I've

 6  marked as State's Exhibit Number 25.  Does that appear to be

 7  kind of an overview map -- an aerial map of the area where the

 8  Whip-in Fina is?

 9       A.   Yes.

10       Q.   Showing Broadway and Colonel and the neighborhood

11  directly behind it?

12       A.   Yeah, there's the store.  Yes.

13       Q.   Okay.

14            MS. MOSELEY:  I'd offer State's Exhibit 25.

15            (State's Exhibit 25 offered.)

16            MR. WEATHERSPOON:  No objection, Your Honor.

17            THE COURT:  Admitted.

18            (State's Exhibit 25 admitted.)

19            MS. MOSELEY:  Permission to publish?

20            THE COURT:  You may.

21       Q.   (BY MS. MOSELEY)  And I don't know if this screen --

22  is that screen on?

23       A.   Uh-huh.

24       Q.   Is it working?

25       A.   Yes.

```
 1        Q.   Okay.  And that's the general area where the store

 2   is.  On that screen, if you'll touch it with -- let me get -- I

 3   don't know what we call this thing, but if you'll use this to

 4   circle on that map where the store is.

 5        A.   It's on the corner.  Right there.  I don't know --

 6        Q.   And actually -- if I can reach over you here.

 7        A.   Sure.

 8        Q.   If -- if I can get your bearings a little bit

 9   clearer, this is the South Garland High School, here, just west

10   of Colonel?

11        A.   Uh-huh.  Yes.

12        Q.   And this is Broadway?

13        A.   Right.

14        Q.   Is this here the Fina -- Whip-in Fina?  It's kind

15   of --

16        A.   Yeah, it's kind of --

17        Q.   -- if you're going north?

18        A.   Yes, it's on the corner.  Let's see, south is here.

19   Yes.

20        Q.   Okay.

21        A.   Yes.

22        Q.   And then there's a field behind the store with some

23   homes and a neighborhood behind the store; is that right?

24        A.   Yes.

25        Q.   How long have you worked for the Whip-in Fina?
```

```
 1        A.    It will be 19 years next month.

 2        Q.    And did you know Nancy Harris?

 3        A.    Yes.

 4        Q.    Was she one of your employees?

 5        A.    Yes.

 6        Q.    How long did she work for you?

 7        A.    She had worked there 14 years.

 8        Q.    Would you consider her not just a -- an employee but

 9   also a friend?

10        A.    Yes.

11        Q.    And she worked as a clerk?

12        A.    Yes.

13        Q.    Was she a good and reliable employee?

14        A.    Yes.

15        Q.    Does she often work on Sunday mornings?

16        A.    Yes.

17        Q.    What time does the store open on Sunday?

18        A.    Seven o'clock.

19        Q.    Is there an alarm that has to be turned off or set

20   when someone is coming in or leaving for the opening or closing

21   the store?

22        A.    Yes.

23        Q.    And did she have a code that allowed her to turn the

24   alarm off when she came in to open the store?

25        A.    Yes.
```

1    Q.   And keys for the door?

2    A.   Yes.

3    Q.   How much money is supposed to be in the cash

4  register in the mornings when the store is opened?

5    A.   There should be $80 in bills and change -- quarters,

6  dimes, nickels, pennies -- so no more typically than $100,

7  maybe a little bit more than that.

8              MS. MOSELEY:  May I approach the witness?

9              THE COURT:  You may.

10    Q.   (BY MS. MOSELEY)  I'm going to show you what's been

11  marked for identification as State's Exhibits 10, 11, and 12,

12  and ask you to -- to see if these photographs show where the

13  surveillance cameras are at the store.

14    A.   Okay.  Do you want me to say --

15    Q.   If you see the cameras.

16    A.   Yes, that's correct.  That's our -- the video --

17  and, yes, that's another one, and the one at the back of the

18  store.  Yes.

19    Q.   There are three cameras in the store?

20    A.   Three -- three cameras.

21    Q.   And the -- what's shown in these three exhibits, is

22  that where the cameras were on May the 20th of 2012?

23    A.   Yes.

24              MS. MOSELEY:  I'd offer State's Exhibits 10, 11,

25  and 12.

```
 1                    (State's Exhibits 10 through 12 offered.)

 2                    MR. WEATHERSPOON:  No objection.

 3                    THE COURT:  Admitted.

 4                    (State's Exhibits 10 through 12 admitted.)

 5          Q.   (BY MS. MOSELEY)  And these cameras, were they

 6   capable of recording?  Did -- was there a recording system in

 7   the store?

 8          A.   Yes.

 9          Q.   They recorded whatever the cameras saw?

10          A.   Yes.

11          Q.   And as it relates to the alarm in the store, was

12   that monitored by Protection 1?

13          A.   Yes.

14          Q.   Can you tell the members of the jury whether there

15   was any panic button or some way for a clerk to alert the

16   authorities immediately in the event of an emergency or

17   robbery?

18          A.   There is.  There's a panic button directly below the

19   cash register.

20          Q.   And do you know what happens if that panic button is

21   pushed?

22          A.   The -- the alarm company dispatches the police

23   department out immediately.

24          Q.   And do they notify you or the store owner or both?

25          A.   Yes, both.
```

```
 1                    MS. MOSELEY:  May I approach?

 2                    THE COURT:  You may.

 3        Q.    (BY MS. MOSELEY)  I'm going to show you State's

 4   Exhibit Number 13, and ask you if this photograph taken behind

 5   the counter, if you can see that panic button?

 6        A.    Yes.

 7        Q.    And that's where it was on May 20th?

 8        A.    Yes.

 9        Q.    And State's Exhibit Number 14, these are records

10   from Protection 1, the company that monitored your alarm and

11   the panic button, with an affidavit from the custodian of

12   records.

13                    MS. MOSELEY:  And these records, Judge, have

14   been on file within the requisite amount of time.

15                    And I would offer State's Exhibit 13 and 14 into

16   evidence at this time.

17                    (State's Exhibits 13 and 14 offered.)

18                    MS. BERNHARD:  May we approach?

19                    THE COURT:  You may.

20                    (Sidebar conference, off the record.)

21                    MS. MOSELEY:  I've offered State's Exhibits 13

22   and 14.

23                    MS. BERNHARD:  No objections.

24                    THE COURT:  Admitted.

25                    (State's Exhibits 13 and 14 admitted.)
```

```
 1              MS. MOSELEY:  Permission to publish the

 2   photographs, Your Honor?

 3              THE COURT:  You may.

 4       Q.   (BY MS. MOSELEY)  So on the screen is State's

 5   Exhibit Number 10, and I know it's pretty hard to see, but,

 6   again, is that a photograph of one of the cameras in the store?

 7       A.   Yes.

 8       Q.   And if you look on this screen right here next to

 9   you, again, if you can see the camera and circle it for the

10   jury so they know where we're --

11       A.   It's right there.

12       Q.   So there's a camera that is directed at basically

13   the -- the cashier and the customer at the counter where the

14   transaction would take place?

15       A.   Yes.

16       Q.   And State's Exhibit Number 11, if you can -- you

17   said there's a monitor -- a monitor that the employees and

18   customers can all see when they're in the store?

19       A.   Yes.

20       Q.   And if you would on this one, show us where the

21   camera itself is.

22       A.   Oh, goodness.  It's kind of blurry.

23       Q.   Yeah, that's the monitor.

24       A.   Okay.  There it is.

25       Q.   By the sandwich, I guess?
```

```
1        A.    Yeah.

2        Q.    And I think we got pretty close with the circle --

3        A.    Yes.

4        Q.    -- on this one, but that one also has a camera?

5        A.    Yes.

6        Q.    Can you circle it?

7        A.    (Witness so indicates.)

8        Q.    Now, what would that camera -- what is that camera

9  aimed at?  Where is it in the store?

10        A.    It's aimed at the cash register area.  When the

11  employee enters the counter at the cash register area and

12  leaves.  It's where we work.  It's our entrance.  There's a

13  gate there that goes into where we work, just a little door.

14        Q.    And is it the kind of door that swings like this

15  door swings, or is it one that raises up and lowers?

16        A.    It swings like that one.

17        Q.    And that door is to be kept closed while the store

18  is open for business?

19        A.    Yes.

20        Q.    Are -- are customers allowed to come behind the

21  counter?

22        A.    No.

23        Q.    And in this photograph, State's Exhibit Number 13,

24  can you circle where the panic button is?

25        A.    (Witness so indicates.)
```

1     Q.    On the morning of May the 20th of 2012, were you

2  called and notified that there had been a panic alarm at the

3  store?

4     A.    Yes.

5     Q.    And did you know that Ms. Harris was working that

6  morning?

7     A.    Yes.

8     Q.    Did you go to the store?

9     A.    Yes.

10     Q.    When you got to the store that morning, was the --

11  was Ms. Harris still there?

12     A.    No.

13     Q.    Does the store train its employees or do you as the

14  manager train the employees what to do in the event of a

15  robbery?

16     A.    Yes.

17     Q.    And what are -- what is y'all's training?

18     A.    We take classes with the -- the Dallas Police

19  Department gives convenience store training classes.  We take

20  those.  And then at store level, we go over procedures and how

21  to handle situations that may occur.

22     Q.    And specifically in the event of a robbery, what is

23  the employee trained to do?

24     A.    To just cooperate, don't resist, just do what they

25  ask you to do.

1          Q.    Back on May 20th of 2012, you told us that these

2    cameras were all in place, and were they functioning properly

3    that day?

4          A.    Yes.

5          Q.    There is a recording system -- device in the store;

6    is that right?

7          A.    Yes.

8          Q.    Basically like a digital video recorder?

9          A.    A -- yes, DVR, yes.

10         Q.    And do you know if it was working properly that day?

11         A.    Yes.

12         Q.    How do you know it was working?

13         A.    When I got to the store, I was the only one that

14   knew how to operate it, so I had to operate it and then show

15   the detective -- go back to where the incident had occurred.

16         Q.    And were you able to -- I don't -- I'm not much on

17   technology, so I'm going to use my terms.  Were you able to

18   rewind that video -- the -- the recording back to when the

19   person who committed this crime came in the store?

20         A.    Yes.

21         Q.    And did you watch it there in the store along with

22   the detectives?

23         A.    Yes.

24         Q.    Was there anything unusual about the way it played

25   back, or did it play back like it always did for you?

```
 1        A.    It played back like it should have, like it always

 2   does.

 3              MS. MOSELEY:  May I approach the witness?

 4              THE COURT:  You may.

 5        Q.    (BY MS. MOSELEY)  Now, when the police came -- or I

 6   guess when you got to the store, you said that they asked you

 7   to rewind it so that they could view the offense?

 8        A.    Yes.

 9        Q.    And you all did watch it there at the store?

10        A.    Yes.

11        Q.    When you were finished watching the video, the

12   recording, did the detectives take the actual DVR box?

13        A.    Yes, they took the whole DVR.

14        Q.    And I'm showing you what's marked as State's Exhibit

15   Number 15.  Is that the actual box that they took from your

16   store?

17        A.    Yes.

18              MS. MOSELEY:  I would offer State's Exhibit 15

19   into evidence.

20              (State's Exhibit 15 offered.)

21              MR. WEATHERSPOON:  No objection.

22              THE COURT:  Admitted.

23              (State's Exhibit 15 admitted.)

24        Q.    (BY MS. MOSELEY)  Have you had an opportunity before

25   today --
```

```
 1                    MS. MOSELEY:  May I approach, Judge?

 2                    THE COURT:  You may.

 3          Q.   (BY MS. MOSELEY)  -- to look at the recording

 4  contained on State's Exhibit Number 16, a DVD that contains

 5  footage from the -- all three cameras?

 6          A.   Yes.

 7          Q.   And just so the jury knows, when you rewound the

 8  recording, do each of these cameras record independently?

 9          A.   Yes.

10          Q.   So you can watch, you know, on Camera 1 for -- for

11  an hour, you could watch Camera 1, but it would only show what

12  is in the view of Camera 1; is that fair?

13          A.   I'm not sure what you're asking.

14          Q.   Are there three different videos, basically?

15          A.   Yes, yes.

16          Q.   And you -- the first video would be from Camera 1.

17  You could watch it, but you can only see whatever Camera 1

18  caught?

19          A.   Right, right.

20          Q.   And the same thing for Camera 2 and Camera 3?

21          A.   Two and 3, yes.

22          Q.   But you watched all of that video when you were

23  there at the store with the detectives?

24          A.   Yes.

25          Q.   And is that what's on State's Exhibit 16?
```

```
 1        A.    Yes.

 2        Q.    When you watched the video contained on State's

 3   Exhibit Number 16, was it the same video that you saw in the

 4   store?

 5        A.    Yes.

 6        Q.    And it hasn't been changed?  Nothing has been added

 7   or taken away from that video?

 8        A.    No.

 9        Q.    And on State's Exhibit Number 17, you're aware that

10   the footage from those three cameras was merged or compiled

11   into one video so that it shows a continuous event?

12        A.    Yes.

13        Q.    And did you have an opportunity to watch that

14   recording that's contained on State's Exhibit 17?

15        A.    Yes.

16        Q.    And aside from the fact that those three cameras

17   were merged -- those three videos were merged into one video,

18   has anything been materially changed or altered?

19        A.    No.

20        Q.    Nothing added or taken away from the footage?

21        A.    No.

22             MS. MOSELEY:  I would offer into evidence

23   State's Exhibits 16 and 17 at this time.

24             (State's Exhibits 16 and 17 offered.)

25             (Discussion between counsel off the record.)
```

```
 1                MR. WEATHERSPOON:  Your Honor, we'd object to

 2   17.  She doesn't have any personal knowledge of what's on that

 3   video.  She hasn't seen the compilation video.

 4                THE COURT:  I think she just testified that she

 5   had seen it.

 6                MR. WEATHERSPOON:  Your Honor, she wasn't

 7   present when the offense happened, so she can't say that was an

 8   accurate representation.

 9                THE COURT:  Overruled.

10                MS. MOSELEY:  They're admitted, Your Honor?

11                THE COURT:  Admitted, yes.

12                (State's Exhibits 16 and 17 admitted.)

13                MS. MOSELEY:  Permission to publish, Your Honor?

14                THE COURT:  You may.

15                (Exhibit published.)

16        Q.   (BY MS. MOSELEY)  Ms. Lunceford, we can see on this

17   video the time stamp says 6:07 a.m.  Do you see that?

18        A.   I do.

19        Q.   Was the time off on the video that morning?

20        A.   It was off by one hour.

21        Q.   And -- and I guess this is shortly after we would

22   have advanced the clocks an hour according to the --

23        A.   Yes.

24        Q.   -- time change?

25        A.   Yes.
```

```
 1        Q.    And did you not realize that that needed to be done

 2   manually?

 3        A.    I didn't.

 4        Q.    So that's the reason for the time.  It was actually

 5   a little after 7:00?

 6        A.    After 7:00, yes.

 7        Q.    Have you ever seen the man that's on the video

 8   before?

 9        A.    No.

10        Q.    Had you ever seen him in the store?

11        A.    No.

12        Q.    Do you see him in the courtroom?

13        A.    I do.

14        Q.    Can you identify him by what he's wearing today?

15        A.    He's wearing a dark-colored suit and glasses.

16              MS. MOSELEY:  May the record reflect the witness

17   identified the Defendant in open court?

18              THE COURT:  The record will reflect.

19        Q.    (BY MS. MOSELEY)  And seems like a silly question,

20   but the lady that we saw in the video was Ms. Harris?

21        A.    Yes.

22        Q.    Nancy Harris?

23        A.    Yes.

24        Q.    Did you notice anything about her when you watched

25   that video the -- the first -- anything about her or how she
```

1    appeared to you that day?

2        A.    You mean -- I'm not sure what you're asking.

3        Q.    When -- when you watched the video, you know Ms.

4    Harris well?

5        A.    Right.

6        Q.    Did you notice anything that stood out about her,

7    her appearance, or the way she carried herself that morning?

8        A.    I'm not sure.  You mean if she was happy, or --

9        Q.    Had she had some health issues of late?

10       A.    Yes, she had.  And that morning, in particular, when

11   I did watch the video, she seemed like she was feeling better.

12   She was feeling peppy.  She had fixed her hair for the day.

13   She just seemed like she was just feeling good that day.

14       Q.    And when you received word that the alarm had been

15   triggered at the store -- the panic alarm had been triggered at

16   the store, did you think perhaps she'd had a health issue or

17   something, at first?

18       A.    Yes.

19       Q.    There had been occasions when she was at work and

20   had had some health --

21       A.    Yes.

22       Q.    -- issues and -- and paramedics had come to the

23   store?

24       A.    Yes.

25       Q.    And we can see in the video that she appears to be

```
 1   standing by a sink.  Is there a sink in the store?

 2        A.    There is.

 3              MS. MOSELEY:  May I approach the witness?

 4              THE COURT:  You may.

 5        Q.    (BY MS. MOSELEY)  Show you State's Exhibit Number

 6   18 -- what's marked for identification, is that a photograph of

 7   the sink?

 8        A.    Yes, it is.

 9        Q.    And physically in the store, if you're standing

10   behind the counter to help -- and the customers come here,

11   where is the sink?

12        A.    It's to our left.

13              MS. MOSELEY:  I'd offer State's Exhibit 18 into

14   evidence.

15              (State's Exhibit 18 offered.)

16              MR. WEATHERSPOON:  No objection.

17              THE COURT:  Admitted.

18              (State's Exhibit 18 admitted.)

19              MS. MOSELEY:  Permission to publish?

20              THE COURT:  You may.

21        Q.    (BY MS. MOSELEY)  And that's a photograph of the

22   sink next to the microwave.  You all have a soda fountain?

23        A.    Yes.

24        Q.    And it's nearby, as well?

25        A.    It's to the right of that sink.
```

1      Q.    Because we can see cups there under the microwave.

2      A.    (Nods head up and down.)

3      Q.    In order to open the cash register to get money out

4  or to put money in, does someone -- one of the clerks have to

5  enter their personal code or some --

6      A.    When you first get to the store in the morning to

7  open the store, you have to sign on.  We're each assigned an

8  employee number.  Once you've signed on, if you have

9  transactions, then the register stays on an unlock mode, an on

10 mode.  After about seven minutes or so if you haven't had any

11 transactions, it goes into a lock mode.  So at that point you

12 have to unlock it by pressing the unlock button, and then you

13 enter your code -- your employee code.  And then you can

14 open -- it goes back to a screen where you can run

15 transactions.  You can also open it by hitting a no sale button

16 which you don't have to have a transaction in effect.

17     Q.    To open the drawer without a code?

18     A.    The drawer, yes.

19     Q.    And when that happens, when the employee enters

20 their personal code -- and let's say no sale, does the register

21 print a receipt showing that?

22     A.    Yes, it does.

23           MS. MOSELEY:  May I approach?

24           THE COURT:  You may.

25     Q.    (BY MS. MOSELEY)  I'm showing you what's marked for

1    identification as State's Exhibit 19.  Is that a photograph of

2    a register receipt showing that Ms. Harris -- Nancy opened the

3    register that morning?

4         A.    Yes.

5         Q.    And it has the time upon which that transaction

6    would have happened?

7         A.    Yes.

8              MS. MOSELEY:  I'd offer State's Exhibit 19.

9              (State's Exhibit 19 offered.)

10             MR. WEATHERSPOON:  No objection.

11             THE COURT:  Admitted.

12             (State's Exhibit 19 admitted.)

13             MS. MOSELEY:  Permission to publish?

14             THE COURT:  You may.

15        Q.    (BY MS. MOSELEY)  And State's Exhibit 19 indicates

16   that it's 7:10:54, so 7:10 and 54 seconds a.m., Ms. Harris did

17   a no sale transaction?

18        A.    Yes.

19        Q.    Which would cause the register drawer to open?

20        A.    To open, yes.

21             MS. MOSELEY:  May I approach?

22             THE COURT:  You may.

23        Q.    (BY MS. MOSELEY)  And now I'm showing you State's

24   Exhibits 21, 22, and 23, and I'll ask if you recognize the

25   things in this phot -- in these photographs and if they were

1  taken at your store?

2       A.   Yes, yes, and yes.

3       Q.   Okay.  And with regard to State's Exhibits 21, 22,

4  and 23, these things are -- in the photographs are where they

5  were on May the 20th of 2012?

6       A.   Yes.

7            MS. MOSELEY:  And I'd offer State's 21, 22, and

8  23 into evidence.

9            (State's Exhibits 21 through 23 offered.)

10           MR. WEATHERSPOON:  No objection.

11           THE COURT:  Admitted.

12           (State's Exhibits 21 through 23 admitted.)

13           MS. MOSELEY:  Permission to publish, Your Honor?

14           THE COURT:  You may.

15           (Exhibits published.)

16      Q.   (BY MS. MOSELEY)  State's Exhibit 21, there are

17 several things in the photograph.  One you can see kind of in

18 the back, the lighter -- the display where you all keep the BIC

19 lighters or the cigarette lighters?

20      A.   Yes.

21      Q.   The candy display there, Chick-o-Stick candies?

22      A.   Yes.

23      Q.   Is that where that was on May 20th, 2012?

24      A.   Yes.

25      Q.   And there's -- a cash drawer is out on the counter.

1  I assume that's not where you normally keep it.

2      A.    No.

3      Q.    But that's where it was when this photograph was

4  taken May 20th; is that right?

5      A.    Yes.

6      Q.    And State's Exhibit 22 is kind of focused in on the

7  lighter display.  Each -- do those lighters have a specific

8  slot to fit into?

9      A.    Yes.

10     Q.    And on this particular display where the purple

11 lighters are, does it appear that there are two missing --

12     A.    Yes.

13     Q.    -- from the display?

14     A.    Yes.

15     Q.    So there were two taken out of that display?

16     A.    Yes.

17     Q.    Okay.  And State's Exhibit 23, that's the cigarettes

18 that are kept kind of above the cashier's head?

19     A.    Yes.

20     Q.    But behind the counter?

21     A.    Right.

22     Q.    In other words, the customers can't reach up?

23     A.    They're -- it's above -- it's overhead.  No, the

24 customers cannot reach up and grab a pack.

25     Q.    Since this offense occurred, have you all made some

1  adjustments to the -- not physically moving the cameras, but

2  changing the angle of the cameras?

3        A.    Yes.

4        Q.    After you were at the store and assisted the

5  officers in viewing the video, did you go to the hospital?

6        A.    Yes.

7        Q.    And were you able to see Ms. Harris?

8        A.    I was.

9        Q.    And did you also get an opportunity to speak with

10 her family?

11       A.    Yes.

12       Q.    After watching the surveillance video, does it

13 appear to you that Ms. Harris did exactly as she had been

14 trained to do and cooperate?

15       A.    Yes.

16             MS. MOSELEY:  I'll pass the witness.

17                      CROSS-EXAMINATION

18 BY MR. WEATHERSPOON:

19       Q.    Ms. Lunceford, my name is Kenneth Weatherspoon.  I

20 have just a couple of questions to ask you.

21       A.    Okay.

22       Q.    If I ask you anything you don't understand or can't

23 hear me, ask me to repeat myself.

24       A.    Okay.

25       Q.    In watching the video, you saw police officers

1  approach with the fire extinguisher?

2      A.    Yes.

3      Q.    Did that fire extinguisher come from within your

4  store or somewhere else?

5      A.    It did not come from within our store, no.

6      Q.    Okay.  You all did not have a fire extinguisher?

7      A.    We have two fire extinguishers in our store, one by

8  the front door and one in -- I believe, it's our back room.

9      Q.    And did you have those extinguishers on the day in

10 question?

11     A.    Yes.

12     Q.    Now, you don't -- other than what you saw on the

13 video, you don't have any personal knowledge of anything that

14 took place at the store that day; is that correct?

15     A.    No.

16     Q.    No, that's not correct, or, no, you don't?

17     A.    No, that is correct.  Yes, that's correct.  I'm

18 sorry.

19              MR. WEATHERSPOON:  Nothing further.

20              MS. MOSELEY:  May she be excused?

21              THE COURT:  Yes.  Thank you, ma'am.  You may

22 stand down, and you're excused.

23              Ladies and gentlemen, let's go ahead and take

24 our mid-morning break.  It's 10:20.  We'll reconvene at 10:35.

25              THE BAILIFF:  All rise.

```
 1                    (Jury excused from courtroom.)

 2                    THE COURT:  Please be seated.

 3                    MS. MOSELEY:  Judge, may Ms. Lunceford be

 4  excused -- permanently excused?  She'd like to sit in on the

 5  trial.

 6                    MS. BERNHARD:  I think we want to leave her

 7  subject to recall.

 8                    (Recess.)

 9                    THE COURT:  Everybody ready?  The State ready

10  for the jury?

11                    MS. MOSELEY:  Yes, sir -- yes, Judge, I'm sorry.

12                    THE COURT:  Defense ready for the jury?

13                    MR. WEATHERSPOON:  Yes, ma'am.

14                    THE COURT:  All right.  Bring them in, please.

15                    THE BAILIFF:  All rise.

16                    (Jury returned to courtroom.)

17                    THE COURT:  Please be seated.

18                    Please call your next witness.

19                    MS. MOSELEY:  The State calls Officer Coffey.

20                    (Witness brought forward.)

21                    THE COURT:  Sir, please raise your right hand.

22                    (Witness sworn.)

23                    THE WITNESS:  Yes, ma'am.

24                    THE COURT:  Thank you.

25                          BILLY COFFEY,
```

```
 1  was called as a witness by the State, and after having been

 2  first duly sworn, testified as follows:

 3                      DIRECT EXAMINATION

 4  BY MS. MOSELEY:

 5      Q.   Will you state your name and spell your last name

 6  for the court reporter, please?

 7      A.   Billy Coffey, C-o-f-f-e-y.

 8      Q.   And you work for the Garland Police Department?

 9              THE COURT:  I'm sorry.  I didn't hear you, sir.

10  If you can keep your voice up a little bit.

11              THE WITNESS:  Yes, ma'am.

12      A.   My last name is Coffey, C-o-f-f-e-y.

13      Q.   (BY MS. MOSELEY)  You work for the Garland Police

14  Department?

15      A.   Yes.

16      Q.   How long have you worked for them?

17      A.   Fourteen years.

18      Q.   And are you a licensed peace officer?

19      A.   Yes.

20      Q.   Did you work anywhere before you worked at the

21  Garland Police Department?

22      A.   Not in law enforcement, no.

23      Q.   Did you work for the prison?

24      A.   Yes.

25      Q.   You were a prison guard?
```

```
 1        A.    Yes, I was, for four years.

 2        Q.    What's your current assignment with the Police

 3   Department?

 4        A.    I'm a patrol officer.

 5        Q.    And I see today you're wearing what we call civilian

 6   clothes and not --

 7        A.    Yes.

 8        Q.    -- not a patrol uniform.  Do you normally work in a

 9   uniform?

10        A.    Yes, I do.  I'm on injury leave right now.

11        Q.    And when you're on injury leave, the department

12   won't allow you to wear your full uniform?

13        A.    Correct.

14        Q.    What do you do as a patrol officer?

15        A.    We respond to 911 calls, audible alarms, and work

16   traffic accidents.

17        Q.    Do you normally work the same shift?

18        A.    Yes, I do.

19        Q.    What shift do you work?

20        A.    Typically it's day shift.  That's what it's been the

21   last few years.

22        Q.    What time do you come on?

23        A.    Six o'clock in the morning.

24        Q.    And then you get off at what time?

25        A.    Two or 3:00 in the afternoon.
```

1      Q.    Are you assigned to work a specific part of the city

2  of Garland, or do you work all over?

3      A.    I'm what's considered a floater, so I'm -- I fill in

4  when other officers are off on their days off.

5      Q.    So you could be in any part of town, given the

6  particular day?

7      A.    Depending on the day and our staffing, yes.

8      Q.    Were you working on the morning of May 20th, 2012?

9      A.    Yes, I was.

10     Q.    Can you tell the members of the jury what was going

11 on that morning, around -- around 7:00.

12     A.    We had started receiving audible alarms in the area

13 of the 3300 block of Broadway at the Soulman's Bar-B-Que and

14 also at the plasma center.

15     Q.    Around when you say you had been receiving -- I

16 guess your dispatcher notifies you when an alarm comes in?

17     A.    Yes, I was dispatched over the radio.

18              MS. MOSELEY:  May I approach the witness?

19              THE COURT:  You may.

20     Q.    (BY MS. MOSELEY)  I'm showing you State's Exhibit

21 Number 24.  It's kind of a photograph -- an aerial photograph

22 of this area.  You mentioned a couple of businesses, the plasma

23 center --

24     A.    Yes, ma'am.

25     Q.    -- and Soulman's Bar-B-Que; are those businesses

1  pictured here?

2      A.    Yes, they are.  The plasma center is right here, and

3  Soulman's is right there on that corner.

4      Q.    And that's where they were located back on May 20th?

5      A.    Yes.

6          MS. MOSELEY:  I'd offer State's Exhibit 24.

7          (State's Exhibit 24 offered.)

8          MS. BERNHARD:  No objection.

9          THE COURT:  Admitted.

10          (State's Exhibit 24 admitted.)

11      Q.    (BY MS. MOSELEY)  And if you could, there's a screen

12  right here next to you.  If you could use that pen and circle

13  the Soulman's Bar-B-Que.

14      A.    Okay.

15      Q.    And then the plasma center.

16      A.    (Witness so indicates.)

17      Q.    And on this photograph is the Whip-in Fina on there,

18  as well?

19      A.    Yes, it's directly right there.

20      Q.    So the Soulman's would be basically directly across

21  the street then from the Fina?

22      A.    Yes, it is.

23      Q.    Okay.  And the plasma center is also across the

24  street, but kind of just set a little further back from the

25  road?

 1      A.    Yes.

 2      Q.    When you receive -- as a patrol officer when you

 3  receive notification that there's an audible alarm, what do you

 4  do?

 5      A.    We then respond to the area.  We check the building,

 6  make sure the doors are all secure, no windows are broken.

 7      Q.    You physically get out and walk around?

 8      A.    Yes, we do.

 9      Q.    Do you go alone or with someone -- with another

10  officer?

11      A.    With another officer.

12      Q.    And do you remember who it was with you that day?

13      A.    Officer Simon.

14      Q.    And he's been with the Garland Police Department a

15  long time, as well?

16      A.    I believe 20 years, maybe.

17      Q.    When you all went, did you go to the Soulman's

18  first?

19      A.    No, we went to the plasma center.

20      Q.    And when you got to the plasma center, did you have

21  an opportunity to walk around it and check all the doors?

22      A.    Yes, we did.

23      Q.    Was it secure?

24      A.    Yes.

25      Q.    Any sign that there had been a problem at the store?

1        A.    No, ma'am.

2        Q.    When we say a plasma center, is this a TV store or

3   what?

4        A.    It's a blood donation center.

5        Q.    Is it a big building?

6        A.    Yes, it is.

7        Q.    After you walked around the plasma center and

8   discovered that there was no break-in, what did you do?

9        A.    We then got back into our squad cars, and we were

10  positioned in the parking lot of the plasma center.  We pulled

11  up car-to-car, was talking briefly.  And that's when we noticed

12  some flames inside the Whip-in gas station.

13       Q.    Had you already -- were you still planning on going

14  to the Soulman's, or what happened with the Soulman's?

15       A.    We never made it there.  We were going to head to

16  that one after we finished clearing the --

17       Q.    Okay.

18       A.    -- plasma center out.

19       Q.    Can you show on the screen there next to you where

20  you and Officer Simon had your cars positioned?

21       A.    Yes.  We were probably sitting right about -- right

22  in there -- right in that area off to the corner of the plasma

23  center.

24       Q.    Still in the parking lot?

25       A.    Still in the parking lot.

1      Q.    And you said you saw flames inside the store.  Did

2  that seem unusual?

3      A.    Yes, it did.

4      Q.    What -- did y'all have a conversation about it?

5      A.    Well, Officer Simon observed it first, and he

6  pointed it out to me.  And then I looked, and I saw it, as

7  well.  And then we proceeded towards the gas station.  We -- we

8  drove up Colonel -- from our location, we drove up Colonel that

9  way to the intersection.

10      Q.    And there -- is there a traffic light there?

11      A.    There was.  And we had a red light at the time.

12      Q.    Okay.  At the time that you pull out of that plasma

13  center parking lot, do you stop there at the red light?  Are

14  you still able to see the flames?

15      A.    I could still see the flames.  I pulled up to the

16  red light, and I observed the flames move across the inside of

17  the building, at which time I turned my lights and sirens on so

18  I could go clear the intersection and then pull into the

19  parking lot of the convenience store.

20      Q.    When you saw the flame moving, did it indicate to

21  you then that it was a person on fire or something?

22      A.    Something, yes -- something in the store moving.

23      Q.    When you -- did you have a video -- a camera in your

24  car that day?

25      A.    Yes, ma'am.

1      Q.    When does that camera come on?  When does it start

2  reporting?

3      A.    When the lights are turned on or when I manually

4  turn it on.

5                MS. MOSELEY:  I'm not doing it.  Judge --

6                THE COURT:  The noise?

7                MS. MULDER:  Judge, I believe the volume is

8  turned up high.

9      Q.    (BY MS. MOSELEY)  I don't think it's that

10  microphone, but maybe.  That's the first time we've heard it.

11  Sorry.

12      A.    Okay.  Sorry.

13      Q.    So it comes on either automatically when you turn on

14  your overhead lights?

15      A.    Yes.

16      Q.    The emergency lights?

17      A.    Correct.

18      Q.    Or you can manually turn it on?

19      A.    Yes, I can.

20      Q.    As you're sitting there at the red light and you see

21  the fire moving in the store, is that when you activated your

22  lights and the camera began recording?

23      A.    Yes, ma'am.

24      Q.    Once you get into the parking lot at the gas

25  station, what did you see?

 1      A.    At that time I then saw our victim step out of the

 2  front door, still on fire.

 3      Q.    What did you do in response -- are you in front of

 4  Officer Simon, or is Officer Simon in front of you?

 5      A.    I'm in front of him.

 6      Q.    What did you do then when you pulled into the lot?

 7      A.    I then exited my vehicle, popped the trunk of my

 8  squad car, and grabbed the fire extinguisher and ran up and put

 9  the flames out on the individual.

10      Q.    Okay.  At that time, could you tell who it was or

11  what the situation was at all?

12      A.    I did not.  No, not at the time.

13      Q.    Because -- had y'all received any notification at

14  that point that there had been a panic alarm at the Fina?

15      A.    No, not at that time.

16      Q.    After you put the fire out on Ms. Harris, we --

17  we've seen the surveillance video from the store and we know

18  you went inside the store; is that right?

19      A.    Yes, I did.

20      Q.    And what did you see inside the store?

21      A.    I saw clothing that was on the floor, appeared to be

22  burning.

23      Q.    And did you use the fire extinguisher on that?

24      A.    Yes, I did.

25      Q.    What was Ms. Harris's --  I mean, we could see the

1    physical condition, I guess to some degree on the video.  What

2    was her emotional state when you pulled up?

3         A.    She was screaming for help.

4         Q.    And was she still screaming when you came out of the

5    store?

6         A.    Yes, she was.

7         Q.    Was she able to give Officer Simon a description of

8    the person that had done this to her?

9         A.    Yes.  She said a black male came into the store --

10                   MS. BERNHARD:  Your Honor, I'm going to object

11   to hearsay and confrontation.

12                   MS. MOSELEY:  I believe it's an excited

13   utterance, Your Honor.

14                   THE COURT:  Overruled.

15                   MS. MOSELEY:  And it's not testimonial.

16                   THE COURT:  Overruled.

17        Q.    (BY MS. MOSELEY)   What did she tell y'all?

18        A.    She told Officer Simon and then he repeated it to

19   me, that -- she said there was a black male that came into the

20   store and he robbed her and poured something on her.

21        Q.    Did -- was she able to give a description of the

22   black male?

23        A.    Not to me, no, ma'am.

24        Q.    Did you officers in general receive information

25   related to the description of the suspect so you could try to

1  find him?

2      A.    Yes.  Yes, we did.

3      Q.    And do you recall what the description was of the

4  person you were looking for?

5      A.    Basically heavy-set black male with blue jeans, I

6  believe, and a T-shirt.

7      Q.    Do you remember there being glasses, that he was

8  wearing glasses?

9      A.    I don't recall that, no, ma'am.

10      Q.    Have you watched the video?

11      A.    The in-store video?

12      Q.    Yes.

13      A.    No, ma'am.

14      Q.    Not something you want to see?

15      A.    No, ma'am.

16      Q.    After getting this description of the person that

17  you would be looking for -- your suspect description, did you

18  begin -- you and other officers begin searching the area?

19      A.    Yes, we did.  A short time later we started

20  receiving calls from the neighborhood directly behind the store

21  that there was a subject matching that description in the

22  alleyways and hiding between homes.

23      Q.    Okay.  And did that -- that -- the description that

24  was being given by these residents in the neighborhood, was

25  that a description consistent with the one that Ms. Harris had

1  given?

2       A.    Yes.

3       Q.    What did the police department do at that point?

4       A.    We then set up a perimeter around the neighborhood.

5       Q.    Describe for the jury what it means to set up a

6  perimeter.

7       A.    We basically just put units in key locations to

8  deter anyone from trying to escape from the location.

9       Q.    So you basically just figure out the neighborhood in

10  this -- where you're receiving these --

11       A.    Yes.

12       Q.    -- 911 calls?

13       A.    Yes.

14       Q.    And were cars -- squad cars pulled in to block the

15  streets and alleyways so that no one could get in or out of the

16  neighborhood at that point?

17       A.    Yes.  We -- we try to position ourselves where we

18  are in eyesight of one another, and we can see both directions

19  down the street.

20       Q.    Can you estimate for the jury how many officers were

21  involved in this perimeter and searching for the -- for the

22  suspect?

23       A.    I would probably -- maybe seven or eight.

24       Q.    Was Officer Perez one of those officers?

25       A.    Yes, he was.

1      Q.    And obviously you were out there, as well?

2      A.    Yes.

3      Q.    Did Officer Simon assist?

4      A.    I -- I believe he may have stayed at the -- at the

5 store.

6      Q.    Were you able to communicate with the other officers

7 who were assisting in this search?

8      A.    Yes, by radio.

9      Q.    And y'all have a particular radio channel that y'all

10 tune into so that it's only your traffic?

11      A.    Yes.

12      Q.    At some point, an hour, hour and a half after

13 this -- after you put out the fire, were you notified by

14 Officer Perez that he had found the suspect?

15      A.    Yes, he got on the radio and said he was in foot

16 pursuit -- foot pursuit of the subject running in the alley.

17      Q.    Okay.  Did you go to that -- to help him?

18      A.    Yes, I did.

19      Q.    Do you recall where in the neighborhood that -- that

20 was that he was finally caught?

21      A.    I believe it was around the 600 block of Mt. Vernon

22 Place.

23      Q.    And --

24      A.    Would you like me to point it on --

25      Q.    Is it -- can you see it on there?

 1          A.    Not that particular street.  No, not on that view.

 2          Q.    Can you see -- on this --

 3          A.    Yes, I can see it here.

 4          Q.    Approximately where was it on that -- State's

 5     Exhibit Number 25 that you -- that you saw, or that the

 6     Defendant was apprehended?

 7          A.    Well, the alley is kind of difficult to see.  I

 8     think it was -- the alley runs this way, and I believe that's

 9     where Officer Perez saw him and he pursued him, I guess

10     southeast direction, and he was apprehended somewhere right

11     over there.  I believe that's Colonial there.

12          Q.    Okay.  And Colonial -- we can see Colonial here on

13     the -- on the map that's on the screen.  It runs kind of an L

14     shape?

15          A.    Yes, it does.

16          Q.    And continues around the curve there, and then Mt.

17     Vernon is kind of a horseshoe in the middle of that?

18          A.    Right.

19          Q.    Is that right?

20          A.    I believe so, yes, ma'am.

21          Q.    And then there's an alley between the houses?

22          A.    Between -- yes, between the streets there.

23          Q.    When you arrived at Officer Perez's location, was --

24     well, do you see the person in the courtroom that he had in

25     custody?

1    A.    Yes, ma'am.

2    Q.    Would you identify him by what he's wearing today?

3    A.    He's wearing a dark black/blue suit.

4    Q.    With glasses?

5    A.    Yes.

6         MS. MOSELEY:  May the record reflect this

7    witness has identified the Defendant?

8         THE COURT:  The record will reflect.

9    Q.    (BY MS. MOSELEY)  And once you got there, were you

10   and Officer Perez able to take him into custody?

11   A.    Yes, we were.

12   Q.    And was he searched before he was placed in the

13   squad car?

14   A.    Yes, ma'am.

15   Q.    Did you transport him?

16   A.    I did transport.

17   Q.    And did you take possession then of the items that

18   were on the Defendant, in his pockets?

19   A.    Yes, we bagged up his property, with Ziploc bags.

20        MS. MOSELEY:  May I approach the witness?

21        THE COURT:  You may.

22   Q.    (BY MS. MOSELEY)  I'm showing you State's Exhibits

23   26 through 30.  They're marked for identification.  Can you

24   tell me if these are photographs of the property that you

25   removed from the Defendant's pockets that day?

1      A.    Yes, ma'am, they are.

2      Q.    And those are the photographs of the property -- if

3 I'm -- State's Exhibit Number 6, it's a sealed envelope I'm

4 going to open.  Can you tell us if you found that in the

5 Defendant's pocket?

6      A.    Yes, we did.

7      Q.    State's Exhibit Number 61 is also a sealed envelope.

8 Are those the keys that you took out of his pockets?

9      A.    Yes, ma'am.

10      Q.    State's Exhibit 60 is another sealed envelope.  Did

11 you take that out of his pocket?

12      A.    Yes.

13      Q.    State's Exhibit 59 is another sealed envelope.  Did

14 you take that out?

15      A.    Yes.

16           MS. MOSELEY:  At this time, I'd offer into

17 evidence State's Exhibits 6, 59, 60, and 61, as well as State's

18 Exhibits 26, 27, 28, 29, and 30.

19           (State's Exhibits 6, 59-61, 26-30 offered.)

20           MR. WEATHERSPOON:  Your Honor, no objection to

21 State's 26, 27, and 28, 29, and 30.

22           THE COURT:  Admitted.

23           (State's Exhibits 26 through 30 admitted.)

24           MR. WEATHERSPOON:  And no objection to State's

25 Number 6, 59, 60 and 61.

1                      THE COURT:  Admitted.

2                      (State's Exhibits 6, 59 through 61 admitted.)

3                      MS. MOSELEY:  Permission to publish the

4    photographs, Your Honor?

5                      THE COURT:  You may.

6         Q.   (BY MS. MOSELEY)  State's Exhibit Number 26, you see

7    that photograph there.  Is that a photograph of the red lighter

8    that you removed -- I say red, maybe orange lighter, you

9    removed from the Defendant's pocket when he was arrested?

10        A.   Yes.

11        Q.   And State's Exhibit Number 27, are those keys that

12   were found in his pocket?

13        A.   Yes.

14        Q.   One of those appear to be a car key?

15        A.   Yes, it does.

16        Q.   State's Exhibit 28 is the change -- coins that were

17   found in his pocket?

18        A.   Yes, they are.

19        Q.   And those are still here in evidence, as well, but

20   those were the coins; is that right?

21        A.   Yes, ma'am.

22        Q.   State's Exhibit 29, the five-dollar bills and

23   ten-dollar bills, did you find those in his pocket?

24        A.   Yes, we did.

25        Q.   And State's Exhibit Number 30 is one-dollar bills.

1    Those were found in his pocket, as well?

2         A.    Yes.

3         Q.    And I say in evidence, you guys at the Garland

4    Police Department, when you retrieve property off of someone or

5    evidence of a crime, it's stored at the property room; is that

6    right?

7         A.    Yes, it is.

8         Q.    And those envelopes that I just opened in front of

9    the jury are the types of envelopes where this evidence is

10   stored?

11        A.    Yes, ma'am.

12        Q.    Until it's either released or destroyed or placed

13   into evidence?

14        A.    Correct.

15        Q.    State's Exhibit Number 6 is a gold-colored ring that

16   you found in the Defendant's pocket?

17        A.    Yes.

18              (Exhibit published.)

19        Q.    (BY MS. MOSELEY)  State's Exhibit 59 is the purple

20   lighter that you found?

21        A.    Yes.

22        Q.    Does it appear to be a new lighter?

23        A.    Yes, it does.

24              (Exhibit published.)

25        Q.    (BY MS. MOSELEY)  State's Exhibit Number 60, does

 1    this appear to be a lighter with a little more wear and tear on

 2    it?

 3         A.    Yes.

 4         Q.    A little more age?

 5         A.    Uh-huh.

 6         Q.    State's Exhibit Number 61, does that appear to be a

 7    Nissan key?

 8         A.    Yes, ma'am.

 9              (Exhibit published.)

10         Q.    (BY MS. MOSELEY)  And these are the keys that were

11    in the Defendant's pocket when he was arrested?  Yes?

12         A.    Yes.

13         Q.    After you searched the Defendant and took all of the

14    property from him and put it in bags, what did you do?

15         A.    I then transported him to the jail.

16         Q.    And do you have a video camera in your car that's

17    capable of recording a suspect in the back of the car on the

18    way to jail?

19         A.    Yes, ma'am.

20         Q.    And was your camera working that day?

21         A.    Yes, it was.

22         Q.    How many people have you transported and arrested in

23    your career?

24         A.    Approximately 1400.

25         Q.    You ever dealt with intoxicated people?

```
 1        A.    On a daily basis, yes, ma'am.

 2        Q.    When you arrested and transported the Defendant, do

 3  you have an opinion about whether he intoxicated?

 4        A.    I don't believe he was, no, ma'am.

 5        Q.    Tell the jury why you don't think he was

 6  intoxicated.

 7        A.    I didn't smell any type of alcohol on him at the

 8  time.  He didn't have slurred speech or anything, which is a

 9  key sign.

10        Q.    The things that you normally look for to make that

11  determination, you didn't see in this Defendant?

12        A.    No.

13        Q.    How was he behaving in your -- based on your

14  observations?

15        A.    I guess that he was coming down from adrenaline

16  rush, maybe fatigued.

17        Q.    Is it your understanding he had been chased by

18  Officer Perez?

19        A.    Yes.

20        Q.    On foot?

21        A.    Yes.

22        Q.    The things that you observed in the Defendant,

23  you've had an opportunity, I'm sure, to watch the video of the

24  transportation to the jail?

25        A.    Yes, I have.
```

1      Q.   The things that -- that you observe and that we are

2  about to observe, you describe as fatigue or coming down from

3  an adrenaline rush?

4      A.   Yes, ma'am.

5      Q.   That recording that your -- that the camera in your

6  car made was obviously downloaded to a disk; is that right?

7      A.   Yes.

8      Q.   And while I know you're driving, you can't really be

9  watching behind you, do you recall the conversation that was

10  going on in the car that -- that morning?

11      A.   He said he was hot, said he had high blood pressure,

12  asked me to roll the window down.  He tried to engage me in

13  conversation, asked if I was a family man.  I just -- I didn't

14  respond to any of his questions.

15      Q.   This recording --

16           MS. MOSELEY:  Judge, may I approach?

17           THE COURT:  You may.

18      Q.   (BY MS. MOSELEY)  State's Exhibit Number 31, you

19  watched that video?

20      A.   Yes, ma'am.

21      Q.   And is it an accurate recording of the transport to

22  the jail and the Defendant's actions and words in the back of

23  your squad car?

24      A.   Yes, they were.

25           MS. MOSELEY:  I'd offer State's Exhibit 31.

```
1                    (State's Exhibit 31 offered.)

2                    MR. WEATHERSPOON:  No objection.

3                    THE COURT:  Admitted.

4                    (State's Exhibit 31 admitted.)

5                    MS. MOSELEY:  We may need the volume back up,

6   Judge.  I hope we don't get that humming again.

7                    (Exhibit published.)

8        Q.   (BY MS. MOSELEY)  Officer Coffey --

9        A.   Yes.

10       Q.   -- did he -- what did he just say?

11       A.   I believe he said he -- he had been waiting on us,

12   and we caught him because he wanted us to.

13                   (Exhibit continued playing.)

14                   MS. MOSELEY:  Thank you, Judge.

15       Q.   (BY MS. MOSELEY)  Officer Coffey, why didn't you

16   talk to him?

17       A.   I was informed that the detectives would be en route

18   to the jail, and they were going to conduct an interview down

19   there.

20       Q.   And as a patrol officer, you're concerned about just

21   getting him to the jail; is that right?

22       A.   Yes.

23       Q.   Once you turned the Defendant over to the jail

24   personnel, did you have any further involvement in this case?

25       A.   No, ma'am.
```

1      Q.    Or in the investigation of the case or interviewing

2  witnesses or anything of that nature?

3      A.    No, I didn't.

4            MS. MOSELEY:  I'll pass the witness.

5                    CROSS-EXAMINATION

6  BY MR. WEATHERSPOON:

7      Q.    Detective Coffey -- or, Officer Coffey, my name is

8  Kenneth Weatherspoon.  I have just a couple of questions to ask

9  you.

10     A.    Yes, sir.

11     Q.    If I ask you anything you don't understand or you

12  can't hear me, just ask me to repeat myself.

13            From the time you got the call until you all

14  arrived at the plasma center, about how much time transpired?

15     A.    From the time we got the alarm call?

16     Q.    The alarm call?

17     A.    From our location, it was probably two or three

18  minutes, I believe.

19     Q.    And approximately how much time do you think you all

20  spent outside the plasma -- the plasma center determining

21  whether or not there was a break-in?

22     A.    We were probably there approximately five or six

23  minutes.  It's a fairly large building.  We had to go around to

24  the back, as well, so --

25     Q.    Now, who arrived there first?

1          A.     I believe -- we arrived about the same time, myself

2     and Officer Simon.

3          Q.     Now, you said you all were in the parking lot in

4     your cars when you first noticed the fire from inside the

5     store; is that correct?

6          A.     Yes, sir.

7          Q.     And at the time you noticed the fire, did you see

8     anyone exiting or entering the store at that time?

9          A.     No, we did not.

10         Q.     Okay.  What were you all's immediate impression or

11    what was your immediate impression once you saw the fire?

12    What -- what immediately went through your mind?

13         A.     Well, there was a lot of displays inside the store,

14    and the windows were fairly tinted, so it was hard to tell what

15    exactly it could have been that was burning, so we really had

16    no idea what it was at the time.

17         Q.     And so you all made the decision just to go over

18    there and check it out?

19         A.     Yes, sir.

20         Q.     Would that be the reason why you stopped at the red

21    light?

22         A.     Yes, sir.  Yes, sir.

23         Q.     So at that time, you didn't perceive it as an

24    emergency situation?

25         A.     Well, at the time we didn't know what was -- what

1  could be burning.  We didn't know if it was a display inside

2  the store or just from the -- the tint on the windows, it was

3  hard to tell what exactly it could have been.

4      Q.    So in answer to my question, no, you didn't see it

5  to be an emergency situation; is that correct?

6      A.    Not at that time.  Not until we saw a movement, then

7  we realized it -- it was an emergency situation then, yes.

8      Q.    And when did you first see the movement?

9      A.    As soon as I pulled up to the intersection.

10  Before -- when the light was red, when I pulled up, and I

11  continued looking through the windows at the store.

12     Q.    So at the time that you pulled up to the red light,

13  that's when you perceived it to be an emergency situation?

14     A.    Yes, sir.

15     Q.    Okay.  Did you stop at the red light?

16     A.    I originally did, yes, and we saw the flames move.

17  That's when I proceeded through the intersection.

18     Q.    And did you activate your lights then?

19     A.    Yes.

20     Q.    Now, when you first got to the store, Ms. Harris was

21  already outside; is that correct?

22     A.    She had stepped out as I pulled into the parking

23  lot.

24     Q.    And you immediately went to your trunk and got your

25  fire extinguisher?

1      A.   Yes.

2      Q.   Once you sprayed the fire extinguisher on her -- the

3 fire extinguisher on her, how long did it take to put out the

4 flames?

5      A.   A few seconds.  I don't recall.

6      Q.   Almost instantaneously?

7      A.   Yes, sir.

8      Q.   Now, at that point you went inside the store; is

9 that correct?

10     A.   Yes, I did.

11     Q.   And Officer Simon stayed with Ms. Harris; is that

12 correct?

13     A.   Yes.

14     Q.   Okay.  What was your purpose in going inside the

15 store?

16     A.   To see if there was anyone else inside the store

17 that was possibly hurt, as well.

18     Q.   Did you look through the entire store?

19     A.   I did not.  I just looked in the immediate area

20 through the door and then where the flames were on the floor.

21 I didn't look behind the counter or in the freezer.

22     Q.   And the flame that was inside the store, you saw it

23 and put it out, too; is that correct?

24     A.   Yes.

25     Q.   Now, at what point did you all receive reports of

1  suspicious activity in another area?

2       A.   It's hard to say.  There was so much going on,

3  probably maybe 20 -- 20 to 30 minutes, I believe.

4       Q.   So you were at the store for 20 to 30 minutes before

5  you left in pursuit of the suspect?

6       A.   Yes.

7       Q.   And were you at the store when the paramedics

8  arrived?

9       A.   Yes, I was.

10      Q.   Now, what was the first place you went when you left

11  the store?

12      A.   It was probably near South Garland High School which

13  is the 600 block of Colonel.  It's just a few blocks to the

14  west of the store.

15      Q.   And from the time you left the store until you came

16  into contact with Officer Perez, who had the suspect in

17  custody, how much time would you estimate elapsed?

18      A.   Twenty minutes -- 15, 20 minutes.

19      Q.   Now, when you came upon Officer -- Officer Perez and

20  Mr. Johnson, was he already in handcuffs?

21      A.   No, I put the handcuffs on him.

22      Q.   Okay.  What -- what was the relative positions of

23  Officer Perez and Mr. Johnson?

24      A.   Mr. Johnson was on a -- laid out on a front porch on

25  his stomach with his hands out to his side, and Officer Perez

1    was directly behind him holding him down at gunpoint.  He was

2    like 10 or 15 feet from him.

3        Q.   And you came and put the handcuffs on him; is that

4    correct?

5        A.   Yes.

6        Q.   Did any other officers arrive while you were there?

7        A.   Officer Fusco and Jakeway.

8        Q.   Now, when you transported Mr. Johnson to the Garland

9    Police Department, were you in the vehicle by yourself, you and

10   Mr. Johnson?

11       A.   Yes, sir.

12       Q.   Now, you indicated that you did not believe him to

13   be intoxicated; is that correct?

14       A.   Yes, sir.  I didn't smell anything on him, no, sir.

15       Q.   Okay.  Now, aren't there forms of intoxication that

16   don't have any smell?

17       A.   Yes, sir.

18       Q.   Okay.  So he could have been intoxicated from a

19   substance that didn't have a smell; is that correct?

20       A.   It's a possibility, yes, sir.

21       Q.   And you would agree with me that looking at that

22   video, his behavior is somewhat erratic?

23       A.   It's erratic, yes, sir.

24       Q.   And you attribute that to an adrenaline rush, but it

25   could have been from some other substance; is that correct?

1      A.    Yes, sir, it's a possibility.

2      Q.    Now, from the time -- well -- and you said you

3  didn't talk to Mr. Johnson because you knew there were

4  detectives waiting to talk to him; is that correct?

5      A.    Yes, sir.  I knew they were coming down.  They were

6  going to conduct an interview there in one of the interview

7  rooms.

8      Q.    And when you got him to the police station, did you

9  take him to an interview room?

10      A.    Officer Jakeway and Fusco escorted him from my car

11  into the jail.

12      Q.    And do you know where he went after that?

13      A.    They placed him in a witness or an interview room

14  until the detectives arrived.

15          MR. WEATHERSPOON:  Thank you, Officer.  I have

16  no further questions.

17          THE WITNESS:  Thank you, sir.

18          MS. MOSELEY:  I have nothing further.  Your

19  Honor, may he be excused?

20          THE COURT:  Any objection?

21          MS. BERNHARD:  Subject to recall.

22          THE COURT:  Thank you, sir.  You may stand down.

23          THE WITNESS:  Thanks, ma'am.

24          MS. MS. MOSELEY:  The State calls Bill Crews.

25          (Witness brought forward and sworn.)

```
 1                    THE WITNESS:  I so swear.

 2                    THE COURT:  Thank you.

 3                         WILLIAM CREWS,

 4   was called as a witness by the State, and after having been

 5   first duly sworn, testified as follows:

 6                      DIRECT EXAMINATION

 7   BY MS. MOSELEY:

 8        Q.    Would you please introduce yourself to the members

 9   of the jury and spell your last name for the court reporter?

10        A.    My name is William Crews.  Spelling of last name is

11   C-r-e-w-s.

12        Q.    And I can tell you're wearing a uniform.  Is that

13   Garland Fire Department?

14        A.    Yes, ma'am, Garland Fire Department.

15        Q.    What do you do for the Garland Fire Department?

16        A.    I'm a driver engineer, and also a paramedic.

17        Q.    And how long have you worked for Garland Fire

18   Department?

19        A.    Next month will be 17 years.

20        Q.    Tell the jury what it is to be a driver engineer/

21   paramedic.  What do you do on a daily basis?

22        A.    Responsibility is to, you know, be ready for

23   response for fire calls, EMS calls.  I mean, it's a wide range

24   of what we do at the Fire Department.  As a driver engineer, my

25   normal assignment is to the engine, but I'm also assigned to
```

1    the ambulance at times.  And as the driver, we're the -- in

2    charge of the ambulance.  We're the -- the lead paramedic.

3        Q.    And as a -- as a fire -- are you a fire fighter or a

4    paramedic or both?

5        A.    We're both.

6        Q.    You're both.  So you're trained to put out fires, as

7    well as medically treat the patients in an emergency sort of

8    situation?

9        A.    Yes, ma'am.

10        Q.    Okay.  On the morning of May 20th of 2012, were you

11    working?

12        A.    Yes, ma'am.  We had just come on duty at 7 o'clock

13    that morning.

14        Q.    And which station do you work at?

15        A.    I'm assigned to Station 8.

16        Q.    Where is that located in the city?

17        A.    We are located on Miller Road, just east of Country

18    Club.

19        Q.    And approximately how far is that from Broadway and

20    Colonel where the fire was that morning?

21        A.    It's between one and two miles.

22        Q.    How long does it take you to get there?

23        A.    Takes us about a minute.

24        Q.    Not very long?

25        A.    No, ma'am.

```
 1        Q.    When you were on duty that morning, did you receive
 2  a call that indicated you needed to respond to a fire?
 3        A.    We received an all-call, which it's several
 4  stations.  It was a fire alarm call that we received.  It was a
 5  -- an alarm in a building that was actually located
 6  catty-corner to where we ended up being that morning.
 7        Q.    Okay.  So you actually received a call to go to what
 8  we've been calling the plasma center?
 9        A.    Yes, ma'am.  Octapharma.
10        Q.    And --
11              COURT REPORTER:  I'm sorry?
12        A.    It's called Octapharma.
13        Q.    (BY MS. MOSELEY)  Octapharma.  You said there was an
14  all-call.  Several stations were notified to come and respond?
15        A.    Yes, ma'am.  They put out a tone that opens the
16  speakers in all the stations, and then they notify which units
17  they want to respond.  And we had units responding from Station
18  8, Station 4, Station 9, and Central.
19        Q.    And why is that?
20        A.    When it's a fire alarm, we need all of those units.
21  Most of those are engines and trucks which are, of course, used
22  in the fire fighting.  Our ambulance is the only ambulance that
23  responds.  There's only one ambulance assigned to a call like
24  that.  We're there for personnel support, but also just in case
25  medical support is needed.
```

1    Q.    Okay.  So lots of fire trucks, but one ambulance?

2    A.    Yes, ma'am.

3    Q.    And you were driving the ambulance that day?

4    A.    Yes, ma'am.

5    Q.    When you all started -- began arriving in the

6  truck -- the fire truck, as well as the ambulance, started

7  arriving at the plasma center or the area of Broadway and

8  Colonel, what was going on there?

9    A.    As we were coming down Broadway, Engine 9 was just

10  in front of us.  We began to be notified that the fire was

11  actually located at the Fina that is located southwest of the

12  Octapharma Plasma Center, which we were notified both by NBC,

13  our computers in the apparatus, but also the dispatcher was

14  notifying us over the radio that the Police Department had --

15  had found the fire, and it was actually located in the gas

16  station catty-corner.

17    Q.    Okay.  Initially as you all were approaching the

18  area, were you flagged down by one of the police officers?

19    A.    Yes, ma'am, we were flagged down by one of the

20  police officers who came to my window to let us know that we

21  had a burned patient.

22    Q.    Okay.  Was it apparent to you through what the

23  officer said and how he appeared, that this was an emergency

24  sort of situation?

25    A.    Yeah.  We can -- we can usually tell by the looks on

1  their face, and he was pretty pale and -- and pretty panicked.

2       Q.    Did you go then into the parking lot there at the

3  Fina?

4       A.    That's where he met us, was in the parking lot of

5  the Fina.

6       Q.    Could you see a burn victim?

7       A.    Yes, ma'am.  She was standing by the front door of

8  the gas station.

9       Q.    Was the fire still burning?

10      A.    No, ma'am.

11      Q.    What did you do when you saw her standing at the

12  front porch?

13      A.    I told my partner John Perez, get the bag, I'm going

14  to go up and get a quick assessment.  And I walked up to her,

15  and the police officer was standing at the front door.

16      Q.    What was her emotional condition at that time when

17  you approached?

18      A.    She was in a lot of pain.  She was very worried.

19  The only thing she said at that time was help me, help me, help

20  me, and -- and said she was in a lot of pain.

21      Q.    What injuries did you observe on her?

22      A.    She had first, second, and third degree burns to her

23  face, her shoulders, her abdomen, both of her upper arms, and

24  to her -- her legs.

25      Q.    Had you ever -- did you know who it was that you

1  were talking to?

2      A.    Yes, ma'am.

3      Q.    How did you know?

4      A.    We had made runs on her before.  She worked at the

5  gas station for quite a while and she had a prior medical

6  history, and we had been there before because of her diabetes

7  and also because of her high blood pressure.

8      Q.    So you had actually been on the ambulance and been

9  out to treat her in the past?

10     A.    Yes, ma'am.  And I also knew her because several of

11 us went there for gas from time to time.

12     Q.    Were you concerned -- having that history and

13 knowing her medical history, did that complicate the treatment

14 of her injuries?

15     A.    Very much so.  It made it that much more necessary

16 that we move quickly.  We knew we needed to get her loaded up

17 and get on our way.  We didn't have any time to -- to waste on

18 scene.

19     Q.    How quickly would you say -- what was the time lapse

20 between the time you approached her --

21     A.    We --

22     Q.    -- and the time you had her --

23     A.    -- we had less than a two-minutes on scene time.  By

24 the time we got on scene and had her loaded and left the scene

25 was less than two minutes.

1      Q.    Who rode in the back of the ambulance with Ms.

2  Harris?

3      A.    John Perez and myself.

4      Q.    And you were normally the driver --

5      A.    Yes, ma'am.

6      Q.    -- of the truck -- of the ambulance.  Who drove the

7  ambulance?

8      A.    Another fire fighter named Harry Morgan.

9      Q.    You just pulled a fire fighter off a fire truck?

10     A.    Yes, ma'am.  We pulled him from Engine 9.

11     Q.    Why did you need two paramedics in the back?

12     A.    Due to the acuity of her case, we needed to have the

13  two paramedics.  Certainly it was a worry of her slipping into

14  cardiac arrest before we could get her to the hospital which we

15  need at least two paramedics to take care of.

16     Q.    Normally speaking, you would have one paramedic in

17  the back, the other would drive --

18     A.    Yes, ma'am.

19     Q.    -- to the hospital?

20     A.    Yes.

21     Q.    As a paramedic, are you -- do you receive

22  specialized training for specifically the treatment of burn

23  injuries?

24     A.    Yes, ma'am, we do.

25     Q.    And what do you do when you -- when you had a

1  patient, and we'll talk about this patient in particular, when

2  you got her in the ambulance and you're headed to the hospital,

3  why did you go to Parkland?

4       A.    Because Parkland has a burn unit that is specialized

5  in the treatment of serious burns.

6       Q.    And Parkland is not the closest hospital to this --

7       A.    No, ma'am.

8       Q.    -- location, but it is the best in terms of treating

9  burn injuries?

10       A.    Yes, ma'am.

11       Q.    Do you notify the hospital on the way there with

12  her?

13       A.    Yes, ma'am, made a phone call to the BioTel which is

14  our medical control, which is actually located in the Parkland

15  facility, to notify them of what we had and what we had coming

16  to get the trauma unit notified and activated.  But also to get

17  further orders in -- in Ms. Harris's treatment.

18       Q.    What kind of treatment were you able to provide her

19  there in the back of the ambulance?

20       A.    Primarily was oxygen.  We started an IV and began

21  the burn treatment protocol and fluid resuscitation, giving her

22  a 600 -- 680 milliliter bolus, but we were also able to give

23  her a hundred micrograms of Fentanyl for pain management.

24       Q.    When a person has a history of high blood pressure,

25  heart issues, and diabetes, is that -- does that play into how

 1  much pain medication you can give them?

 2      A.   Yes, ma'am, it does.  It also plays into what kind

 3  we can give them.  And primarily those things come into play

 4  when it comes to their fluid levels and their -- their body.

 5  They become hemodynamically unstable very quickly, especially

 6  when they have cardiac issues.  And Ms. Harris not only was --

 7  had a history of high blood pressure, but she also had a

 8  pacemaker, so her heart was already weak.  And in burn cases,

 9  the fluid begins to move out of the bloodstream into the body,

10  causing swelling.  But also it causes a reduction in the amount

11  of oxygen that they can move through their body.  And we have

12  to quickly move to -- to make them hemodynamically stable to

13  help battle that.

14      Q.   So you give her lots of fluids?

15      A.   Yes, ma'am.  There's a formula called the Parkland

16  Formula that's four times their body weight times the

17  percentage of the burn of their body and we have to give the

18  first half of that fluid within the first eight hours of their

19  treatment.

20      Q.   So you began that in the back of the ambulance?

21      A.   Yes, ma'am.  We -- we coordinate that with BioTel so

22  that that can start there and continue on as they move to the

23  Burn Unit.

24      Q.   And was Ms. Harris still communicating with you at

25  that point?  Was she conscious?

1      A.    Yes, she was conscious.  She was able to give us her

2 name and her history, and we were able to communicate with her.

3 She was still able to -- to talk pretty well at that point, but

4 it was changing quickly.

5      Q.    What do you mean it was changing quickly?

6      A.    As the fluid began to move around and began to fill

7 her lungs and also her -- her trachea began to swell, along

8 with her mouth, she became stridulous which is an indicator of

9 upper airway obstruction or restriction.  And the longer we

10 went, the harder time she was having talking and being able to

11 communicate.

12      Q.    When you say stridulous, what do you mean, to those

13 of us who don't have medical training?

14      A.    It's -- it's almost a crowing sound.  It's -- it's

15 kind of like if you take a balloon and -- and stretch the neck

16 of it, let the air out, it squeals.  It's the same principle

17 with the airway.  As it begins to restrict and swell, the air

18 movement begins -- it becomes very restrictive and starts to

19 make that -- a crowing noise is what we call it.

20      Q.    And as you were getting closer to the hospital, time

21 was passing, obviously.  How long did it take y'all to get to

22 Parkland?

23      A.    It took us 20 minutes.

24      Q.    Then her airway was starting to close?

25      A.    Yes, ma'am.

1     Q.   As part of the regular course of your duties, do you

2 make a report anytime you transport someone or respond to a

3 call?

4     A.   Yes, ma'am, we make a report every time.

5     Q.   And did you, in fact, make a report related to the

6 treatment and transportation of Ms. Harris and her injuries?

7     A.   Yes, ma'am.

8     MS. MOSELEY:  May I approach this witness?

9     THE COURT:  You may.

10    Q.   (BY MS. MOSELEY)  Showing you what's marked for

11 identification as State's Exhibit 33.  If you could just take a

12 look at those records and see if they are the records kept by

13 the Garland Fire Department and specifically contain your run

14 sheet, as we call it?

15    A.   Yes, ma'am, this is the patient care report from

16 that day.

17    Q.   And you completed that patient care report?

18    A.   Yes, ma'am, I did.

19    MS. MOSELEY:  Your Honor, I'd offer State's

20 Exhibit 33.  And, again, it has a certificate of record and

21 affidavit from the custodian of records.

22    (State's Exhibit 33 offered.)

23    MS. BERNHARD:  May we approach?

24    THE COURT:  Yes, ma'am.

25    (Sidebar conference, off the record.)

```
 1                    THE COURT:  Ladies and gentlemen, let's just --
 2  if you don't mind just stepping out in the hall for a brief
 3  moment.
 4                    THE BAILIFF:  All rise.
 5                    (Jury excused from courtroom.)
 6                    THE COURT:  We're on the record outside the
 7  presence of the jury.
 8                    Please be seated.
 9                    The State has tendered -- I'm sorry, what number
10  is it?  Do you remember?
11                    MS. BERNHARD:  Thirty-three.
12                    THE COURT:  State's 33 to the Defense for any
13  objections.
14                    MS. BERNHARD:  Your Honor, we would object to
15  State's Exhibit 33 because although it has been filed as a
16  business record, it's our position that this is more akin to a
17  police report, particularly when you get to the narrative part
18  which is on page 5 of 6, which is more akin to an offense
19  report than it is a medical record.
20                    MS. MOSELEY:  May I respond?
21                    THE COURT:  You may.
22                    MS. MOSELEY:  Your Honor, these records are not
23  police records.  They're not meant for testimonial reasons or
24  for trial purposes.  They are meant -- they are medical
25  records.  Just as though the medical records are kept by the
```

```
 1   doctors at Parkland, these -- the paramedics make reports

 2   regarding the medical treatment and the things that are

 3   relevant to the patient's medical condition and they are

 4   admissible.

 5              THE COURT:  All right.  Defense's objections is

 6   overruled.

 7              MS. MOSELEY:  And they are admitted?

 8              THE COURT:  And they are admitted.  Thank you.

 9              MS. MOSELEY:  So we need to admit them in front

10   of the jury.

11              THE BAILIFF:  All rise.

12              (Jury returned to courtroom.)

13              THE COURT:  Please be seated.

14              State's 33 is admitted.

15              (State's Exhibit 33 admitted.)

16              MS. MOSELEY:  I'll pass the witness.

17                     CROSS-EXAMINATION

18   BY MR. WEATHERSPOON:

19        Q.   Mr. Crews, I have just a couple of questions to ask

20   you.  If I ask you anything you don't understand or you can't

21   hear me, just ask me to repeat myself.

22              Now, you testified that you all had been to the

23   Fina store before in relation to Ms. Harris; is that correct?

24        A.   Yes.

25        Q.   On more than one occasion?
```

102

```
 1        A.    Myself, twice.

 2        Q.    And what did you determine once you arrived there as

 3   her needs -- her medical needs?

 4        A.    On which day, sir?

 5        Q.    On the two prior occasions.

 6        A.    The -- one of the occasions, her blood sugar was

 7   low.  On the second occasion, she was having chest pain.

 8        Q.    Now, from the time you got the call, how much time

 9   elapsed until you got to the Fina station?

10        A.    I would have to refer to my report as to the exact

11   amount of time.

12              MR. WEATHERSPOON:  May I approach, Your Honor?

13              THE COURT:  Yes, sir.

14        Q.    (BY MR. WEATHERSPOON)  See if this helps refresh

15   your memory.

16        A.    Thank you.  We received the alarm at 7:14.  We

17   arrived on scene at 7:19.

18        Q.    And your testimony was that you were only on the

19   scene for two minutes; is that correct?

20        A.    That is correct.

21        Q.    Now, you said when you arrived on the scene, Ms.

22   Harris was standing; is that correct?

23        A.    That is correct.

24        Q.    She was in conversation with the police officers?

25        A.    I can't say whether she was in conversation with
```

```
 1  police officers.  The only thing I heard her say was, help me,

 2  help me, please.

 3       Q.   Were the police officers standing --

 4       A.   The police officer was standing there, yes.

 5       Q.   Okay.  Was it one officer or both officers?

 6       A.   It was one officer standing next to her.

 7       Q.   And at this point you felt because of her prior

 8  conditions and the injuries that you observed, that it was a

 9  need to immediately transport her to the hospital?

10       A.   Due to the severity of her injuries, coupled with

11  the -- her prior medical condition that I had knowledge of,

12  yes.

13       Q.   Was that the reason you asked Henry Morgan (sic) to

14  drive the ambulance, as opposed to you driving the ambulance?

15       A.   Yes, sir.

16            MR. WEATHERSPOON:  Thank you.  Nothing further.

17            MS. MOSELEY:  I have nothing further, Judge.

18            THE COURT:  Thank you, sir.  You may stand down.

19  You're excused, unless recalled.

20            May I see the lawyers, please?

21            (Sidebar conference, off the record.)

22            THE COURT:  Members of the jury, we're going to

23  go ahead and break for lunch.  It's about eight till.  If

24  you'll be back in the jury room at 1 o'clock, please.

25            THE BAILIFF:  All rise.
```

```
 1                     THE COURT:  By the way, you don't have to

 2  maintain the same seating.  If those of you in the non-jury

 3  chairs would like to switch out, you may.  Non-jury box,

 4  chairs.

 5                     (Jury excused from the courtroom.)

 6                     THE COURT:  All right.  We're recessed until

 7  1 o'clock.

 8                     (Recess.)

 9                     THE COURT:  Ma'am, I need you to take that cup

10  out of the courtroom.

11                     MS. MOSELEY:  Judge, may we approach briefly?

12                     (Sidebar conference, off the record.)

13                     THE BAILIFF:  All rise, please.

14                     (Jury returned to courtroom.)

15                     THE COURT:  Please be seated.

16                     Please call your next witness.

17                     MS. MOSELEY:  The State calls Gary Church.

18                     (Witness brought forward and sworn.)

19                     THE WITNESS:  Yes.

20                     THE COURT:  Thank you very much.

21                            GARY CHURCH,

22  was called as a witness by the State, and after having been

23  first duly sworn, testified as follows:

24                      DIRECT EXAMINATION

25  BY MS. MOSELEY:
```

1      Q.    Would you please introduce yourself to the jury?

2      A.    My name is Gary Church.  I'm a fire fighter, City of

3  Garland.

4      Q.    How long have you been a fire fighter for the City

5  of Garland?

6      A.    It will be three years in January.

7      Q.    And can you tell the members of the jury a little

8  bit about the training you go through to be a fire fighter?

9      A.    What I did, I went to a little bit of schooling,

10  Collin County, the EMT course, and took a national registry

11  test to become a registered EMT.  Once I was hired with the

12  City of Garland, they put me through a training to be -- be a

13  fire fighter.

14      Q.    There's an academy, kind of like the police

15  officers --

16      A.    Right.

17      Q.    -- go through an academy?

18      A.    Yes, fire academy, that's right.

19      Q.    And as a fire fighter for the City of Garland, what

20  are your responsibilities on a daily basis?  When you're on

21  duty, what are your responsibilities?

22      A.    Main thing -- I'm -- I'm assigned as a tailboard on

23  the engine, so my main duty is, when we get fire calls, to find

24  the fire and put it out.  On medical calls, I assist with

25  paramedics, just the basic medical needs that they have.

```
 1        Q.    And you said you're a tailboard?

 2        A.    Right.

 3        Q.    What is that -- what does that -- I know y'all have

 4   names for each of the positions, but what does that mean?

 5        A.    Well, there -- on the engine there's driver and an

 6   officer that ride up front.  And then in Garland, we have two

 7   tailboard positions in the back of the engine.  We ride --

 8   usually ride in the back of the engine.  And our assignments

 9   are to -- when we arrive on scene, to pull off the -- the lines

10   and -- and get ready to fight the fire.

11        Q.    Okay.  In your career as a fire fighter, I know you

12   said it's been three and a half years?

13        A.    Be three years in January.

14        Q.    Three years.  How many fires have you responded to?

15        A.    Probably been a couple of dozen, some larger than

16   others.

17        Q.    Were you working on the morning of May 20th, 2012?

18        A.    Yes.

19        Q.    And did you respond to the fire that you came to

20   know related to Nancy Harris?

21        A.    Right.

22        Q.    Were you one of the first firefighters to arrive

23   there?

24        A.    Yeah.  Our engine actually arrived right before the

25   ambulance.  We were there -- we arrived at the same time.  We
```

```
 1  pulled in and parked parallel to Broadway, and the ambulance

 2  pulled in and parked kind of facing the -- facing the gas

 3  station building.  And we all kind of hopped off the apparatus

 4  at the same time, were on the scene at the same time.

 5       Q.   So you saw that the officers were there?

 6       A.   Right.

 7       Q.   Was the victim still there, as well?

 8       A.   She was -- I saw her standing in front of the door

 9  of the store.  I didn't realize she was a patient at the time,

10  until it, you know, was pointed out that, hey, she -- she needs

11  some help.

12       Q.   Were you able to see the injuries on her?

13       A.   I did.

14       Q.   Were you directly responsible that day for her care

15  and treatment, or was that left to the paramedics?

16       A.   It was mainly the paramedics.  I assisted them in

17  placing her on the cot and wheeling her into the back of the

18  ambulance, and that was the extent of my -- my assisting with

19  her.

20       Q.   As it relates to the store itself, was the fire out

21  at that point?

22       A.   Yes.

23       Q.   So there was no fire for you to put out?

24       A.   No.

25       Q.   Did you all -- you and other fire personnel remain
```

1  behind at the store after Ms. Harris was transported in the

2  ambulance?

3      A.    Yes, we did.  We were waiting for the arson

4  investigator to arrive.

5      Q.    And because this was a crime involving a fire, as

6  well as a robbery, it was kind of a coordinated effort between

7  the police and the Fire Department?

8      A.    Yes.

9      Q.    And the arson investigator -- you were waiting there

10 for the arson investigator; what did you do while you were

11 waiting for her?

12     A.    We set up a fan at the front door because there was

13 a haze in the -- in the building, a little bit of smoke, and I

14 don't know if it was the fire extinguisher dust in the

15 building, so we kind of set up a fan to air it out and clear

16 the air.  And then we just waited -- waited for them to arrive.

17     Q.    And when the arson investigator got there, was that

18 Nancy Carpenter?

19     A.    Yes.

20     Q.    When Ms. Carpenter got there, what did -- what was

21 your job then?

22     A.    We didn't really have an assignment.  I was with my

23 captain and another tailboard.  And when Nancy went in the

24 building with the -- with the business owners, we're outside

25 for a few minutes, and then we decided to go inside and take a

```
 1   look at the scene where the -- where the -- where it happened
 2   inside the store.  And when we went in there, I was in there
 3   for a few minutes with the tailboard, and I smelled the --
 4   smelled a little bit of an odor, like the charcoal lighter
 5   fluid, so I went over to the -- the shelf where the charcoal
 6   lighter fluid is being sold to see if there were any containers
 7   that were missing some charcoal lighter.  I was kind of
 8   suspicious at -- at that time thinking that maybe something was
 9   -- maybe something in the store itself was -- was where it came
10   from, the source of it, and we went back --
11        Q.   Let me stop you real quick.  Did you -- when you
12   checked the charcoal lighter fluid in the store, you're talking
13   about what they would have for sale?
14        A.   Right, the bottles of charcoal lighter fluid they
15   sell.
16        Q.   Were any of them -- did any of them appear to have
17   been lighter than they should have been --
18        A.   No.
19        Q.   -- or missing any?  But that was something that you
20   thought maybe --
21        A.   Right.
22        Q.   -- had happened?
23        A.   Yeah, I was -- you know, I was just thinking --
24   thinking, well, maybe that's the source of where the -- where
25   the lighter fluid came from because you could definitely smell
```

 1  it.

 2      Q.   Did you watch the surveillance video there at the

 3  store?

 4      A.   I -- I went in the back room when they were -- they

 5  were watching it and I saw part of it.  I didn't see the whole

 6  thing, but I did see part of it.  And it's at that time when

 7  Nancy said, hey, look for a drinking bottle, look for a

 8  Gator -- she said Gatorade bottle or drinking bottle and so

 9  that's when we -- we left the store to look for it.

10            THE COURT:  Sir, I'm going to need you to keep

11  your voice up.  It sort of --

12            THE WITNESS:  Okay.

13            THE COURT:  -- you sort of fade away at certain

14  points, so if you'll keep your voice up for me, please.  Tap on

15  that microphone and see if it's even working.

16            THE WITNESS:  It works.

17            THE COURT:  Just barely.

18            THE WITNESS:  I'll lean a little closer.

19            THE COURT:  Thank you.

20      Q.   (BY MS. MOSELEY)  Are you accustomed to testifying?

21  Is that part of your job as a fire fighter on a regular basis?

22      A.   It's not very regular.  This is the first time for

23  me as a fire fighter.

24      Q.   Okay.  So you were asked to go and look for some

25  sort of bottle, a plastic bottle, a drinking --

1    A.    Right.

2    Q.    -- bottle, or Gatorade bottle?

3    A.    Right.

4    Q.    And it was the arson investigator that indicated you

5  should do that?

6    A.    Yes.

7    Q.    Were you alone in looking for the bottle, or did

8  some other firefighters go with you?

9    A.    It was my captain and the other tailboard.  When we

10  exited the building, both of them went to the right and I

11  turned to the left, so I was by myself when I -- when I found

12  the bottle.

13    Q.    And when you say you turned to the left, you were

14  outside the store at that point?

15    A.    Right.

16    Q.    And where did you go when you turned to the left?

17    A.    I walked to the left and walked around the corner of

18  the building and kind of towards the back -- back of the

19  building.  Next to the back corner in the grassy area, there

20  was a -- I saw a drinking bottle on the ground.

21    Q.    What did you do when you saw the bottle on the

22  ground?

23    A.    Well, I -- I stooped down, didn't touch it, and --

24  and smelled it, to see if I could smell anything in the bottle.

25  And I could smell charcoal lighter fluid in -- in the bottle.

```
 1        Q.    You say you didn't touch it.  I assume you were
 2   aware then what you were looking for was potential evidence in
 3   this crime?
 4        A.    Right.
 5        Q.    So you just bent down and smelled it.  Did you
 6   notice anything else about the bottle?
 7        A.    It had -- it had a paper towel, looked like it was
 8   saturated with something inside of the bottle.
 9              MS. MOSELEY:  May I approach the witness?
10              THE COURT:  You may.
11        Q.    (BY MS. MOSELEY)  I'm going to show you some
12   photographs marked for identification as State's Exhibits 34,
13   35, and 36, and ask if you recognize those?
14        A.    Yes.
15        Q.    And are these photographs that were taken of the
16   store and behind the store where the bottle was found, as well
17   as the bottle itself?
18        A.    Yes.
19              MS. MOSELEY:  I'd offer into evidence State's
20   Exhibits 34, 35, and 36.
21              (State's Exhibits 34 through 36 offered.)
22              MR. WEATHERSPOON:  No objection.
23              THE COURT:  Admitted.
24              (State's Exhibits 34 through 36 admitted.)
25              MS. MOSELEY:  Permission to publish, Your Honor?
```

```
 1                    THE COURT:  You may.
 2         Q.    (BY MS. MOSELEY)  State's Exhibit Number 34 --
 3  there's also a screen right next to you if that's easier to
 4  see.  I don't know which is easier.
 5         A.    I can see it just fine.
 6         Q.    That's a photograph of the front of the store.  That
 7  red thing there, what is that?
 8         A.    That's the fan that we set in the front of the store
 9  to air it out.
10         Q.    And was that fan off of your truck?
11         A.    Yes.
12         Q.    So it was placed there after the crime by the fire
13  personnel?
14         A.    Right.
15         Q.    In State's Exhibit Number 35, what are we looking at
16  there?
17         A.    It's the back of the building -- the business -- -
18  that you can see South Garland High School in the distance, and
19  then that little white dot in the grass is the bottle, where I
20  found the bottle.
21         Q.    And we can see it magnified a little bit to -- to
22  aid the jury in seeing it, that yellow -- I guess it looks like
23  a yellow placard or something, that's where the bottle was when
24  you found it?
25         A.    Right.
```

1      Q.    So just as you come around the store, back behind it

2  and toward the side?

3      A.    Right.  It's back -- back corner of the building,

4  just kind of a short -- like 10 feet from the corner there.

5      Q.    And State's Exhibit Number 36, is that the bottle

6  itself?

7      A.    Yes.

8      Q.    And is that how it appeared when you found it with

9  the napkin or paper towel in it?

10     A.    Yes, it is.

11     Q.    Could you tell if there was any liquid still in the

12 bottle?

13     A.    I didn't see any liquid other than the paper towel

14 looked like it was a little bit moist -- saturated with

15 something.

16     Q.    Did you -- what did you do after you found the

17 bottle?

18     A.    I notified the arson investigator.

19     Q.    And do you know if -- were you there when she came

20 around the store to inspect it and collect it?

21     A.    Yes.

22     Q.    Did you have any other involvement in the

23 investigation of this case or recover any other evidence in

24 this case?

25     A.    No.

```
 1        Q.    And you were not involved in the treatment of Ms.

 2   Harris's injuries?

 3        A.    No.

 4              MS. MOSELEY:  Thank you.  That's all I have.

 5   I'll pass the witness.

 6              THE COURT:  Mr. Weatherspoon.

 7              MR. WEATHERSPOON:  No questions.

 8              THE COURT:  Thank you, sir.  You may stand down,

 9   and you're excused subject to recall.

10              MS. MOSELEY:  The State calls Detective King.

11              (Witness brought forward and sworn.)

12              THE WITNESS:  Yes, Your Honor, I do.

13              THE COURT:  Thank you.

14                       CARL KING,

15   was called as a witness by the State, and after having been

16   first duly sworn, testified as follows:

17                    DIRECT EXAMINATION

18   BY MS. MOSELEY:

19        Q.    Good afternoon.

20        A.    Hello.

21        Q.    Would you introduce yourself to the members of the

22   jury, please?

23        A.    Yes, I'm Carl King.

24        Q.    And who do you work for?

25        A.    I'm a detective with the Garland Police Department.
```

1    Q.    How long have you been a detective for the Garland

2  Police Department?

3    A.    About 10 years now.

4    Q.    And prior to being a detective, what did you do?

5    A.    Worked in patrol.

6    Q.    And how long were you a patrol officer?

7    A.    About 10 years.

8    Q.    So all in total, how long have you been with Garland

9  PD?

10    A.    Just a -- just a couple weeks short of 20 years now.

11    Q.    So that means you're a certified peace officer?

12    A.    Yes, ma'am.

13    Q.    And currently -- I called you, Detective, where --

14  where are you assigned?

15    A.    I currently work in the Crimes Against Persons Unit.

16  We work crimes like shootings -- adult side shootings, officer

17  involved shootings, robberies, sexual assaults.

18    Q.    Murders?

19    A.    Murders, correct.

20    Q.    Capital murders?

21    A.    Capital murders, correct.

22    Q.    There are other detectives that handle juvenile

23  crimes?

24    A.    Correct.  A whole different unit in our department

25  works juvenile crimes.

```
 1       Q.    And what about sexual assaults and crimes of that

 2  nature?

 3       A.    Correct.  On the adult side, we handle sexual

 4  assaults, also.

 5       Q.    You do?

 6       A.    Yes, uh-huh.

 7       Q.    So kind of a wide range of --

 8       A.    Our unit does all those, yes.

 9       Q.    And how many detectives are assigned to that Crimes

10  Against Persons Unit in Garland?

11       A.    Our unit currently has nine people in it, nine

12  detectives.

13       Q.    It's probably a difficult question to answer, but

14  how many investigations have you been involved in in your 10

15  years with the police department?

16       A.    Over a thousand.

17       Q.    How do you get assigned to work on a particular

18  case?

19       A.    The normal standard procedure is patrol writes a

20  report, it goes into the computer system.  When our lieutenant

21  comes in on Monday or the next day, he goes through the

22  reports, and he assigns that report to a particular detective.

23       Q.    And are y'all -- do y'all take cases on kind of a

24  rotating basis or how does that --

25       A.    Correct.  Correct, it's rotating.
```

```
 1        Q.    So one comes to you and then one will go --

 2        A.    The next one will go to the next guy and so forth,

 3   right.

 4        Q.    The court reporter is going to get mad if we talk

 5   over each other.

 6        A.    Sorry.

 7        Q.    She's already giving me the eye.

 8        A.    Okay.

 9        Q.    So if you'll let me finish my question, and then

10   I'll try to let you finish your answer.

11        A.    Yes, ma'am.

12        Q.    It's a bad habit on my part, too.

13              May 20th of 2012 was a Sunday.

14        A.    Yes, ma'am.

15        Q.    How -- how does it work when a crime happens on a

16   Sunday?

17        A.    On a Sunday, our lieutenant is notified, and he

18   determines, based on that crime and what he has at the crime

19   scene, how many guys he needs to work that particular case.

20        Q.    So a detective would be called in, or are there

21   detectives that work on Saturday and Sunday?

22        A.    In our department, nobody works on Sundays.  In the

23   investigations, the detective will have to call somebody in

24   from home.

25        Q.    So the lieutenant would pick up the phone and call
```

1    whoever was up to pick up the next case?

2         A.    Correct.

3         Q.    For this particular crime, and you know which one

4    we're here talking about today, is that the kind of case where

5    the lieutenant would assign one detective, or would multiple

6    detectives be assigned to work that?

7         A.    No, on murders in our city, multiple detectives are

8    assigned.  And, again, he'll make a decision at the scene

9    whether he needs two detectives, four detectives.  However many

10   he needs, that's what he'll call in.

11        Q.    And do you recall how many detectives were assigned

12   to work on this case?

13        A.    I don't remember exactly.  There were several.

14   There was five or six, maybe, I can't say.  I don't know for

15   sure.

16        Q.    Were you the lead detective?

17        A.    No, I was not.

18        Q.    What was your responsibility?  What -- what was your

19   assignment as it related to this investigation?

20        A.    My assignment was simply to assist with the -- or

21   collaborate with the Forensics Unit to process the inside of

22   the store for -- forensically.

23        Q.    For evidence?

24        A.    For evidence, correct.

25        Q.    To -- and -- and how does it work in terms of the

1  detectives, the Crimes Against Persons detective working with

2  the forensics investigator or crime scene investigator?

3       A.    When we get there, we talk to them and let them

4  know, hey, can I do this, can I do that.  Our Forensics Unit

5  works directly with the lab, so if I want a piece of evidence

6  collected and tested, they'll tell me, well, the lab will test

7  that, they won't test that, and we will determine then whether

8  or not we need to collect that evidence.  So it's a

9  collaborative effort to determine whether or not we need to

10  collect something.  If we collect it, what can we do with it?

11      Q.    And at the Garland Police Department, the forensic

12  investigators, are they civilians or are they sworn officers?

13      A.    They're all civilian.

14      Q.    They're civilian?

15      A.    Yes.

16      Q.    So as it relates to the investigation of a criminal

17  offense, your detectives -- and you and the others in your --

18  in your division would have the most experience in knowing

19  what's going to be needed for that investigation?

20      A.    Sure.

21      Q.    But the forensics investigators are the ones who are

22  trained in how to properly collect the evidence?

23      A.    They're trained on how to collect it, and they work

24  directly with the labs, so they'll tell me, yes, I can do it

25  or, no, I can't.  So, yes, they do -- they collect and send it

1    to the lab and so forth.

2        Q.    Okay.  Generally speaking, the Garland Police

3    Department works most often with the Department of Public

4    Safety lab?

5        A.    Most often that's who we use, yes.

6        Q.    And that's because they do it for free?

7        A.    That's a primary reason, yes, ma'am.

8        Q.    All right.  Not that they're not a qualified lab?

9        A.    Correct.

10       Q.    But they are -- they are less expensive on the

11    agency?

12       A.    Exactly.

13       Q.    And so because of that, are you aware that they're

14    particular about what types of evidence and how many items of

15    evidence they'll process?

16       A.    They're very particular, yes, ma'am.

17       Q.    I'm sorry?

18       A.    They're very particular, yes.

19       Q.    And that's what you're talking about when you say

20    the forensics people really know more about that?

21       A.    Correct.

22       Q.    When you were called that Sunday morning, did you go

23    to the store?

24       A.    I did.

25       Q.    When you got there, were other detectives and

122

```
 1  forensics investigators present?

 2       A.    Yes, yes.

 3       Q.    Was the victim still there?

 4       A.    The victim was not there, no.

 5       Q.    Who was the lead detective on the case?

 6       A.    The lead detective was Detective Tooke.

 7       Q.    Tooke?

 8       A.    Yes.

 9       Q.    And that's T-o-o-k-e?

10       A.    Correct.

11       Q.    What was -- what was the first thing you did when

12  you got to the store that morning?

13       A.    First thing I did was talk to the lieutenant on

14  scene to determine what exactly had occurred as they knew it,

15  and then we went and viewed the video of the actual offense.

16       Q.    And what was the purpose of watching the video?

17       A.    We watched the video to determine what we need to

18  process.  In this particular case, if somebody goes in the

19  store and does not touch a cooler to get a Coke, then we don't

20  need to process that.  We need to concentrate on what we need

21  to process and what we don't.

22       Q.    And you watched that so that you could assist in

23  directing the forensics investigation?

24       A.    Correct.

25       Q.    When you got there, did you observe items of
```

123

```
1   evidence still in -- in place where they had been left?

2       A.   Yes.

3       Q.   We've seen some photographs -- for instance, State's

4   Exhibit Number 18, we can see the -- the sink area.  Was it

5   that way when you observed it?

6       A.   Yes.

7       Q.   And State's Exhibit 19, that receipt -- it's a photo

8   of the receipt.  Was that still present there in the -- in the

9   register?

10      A.   That's where we found it right there, yes.

11      Q.   So when you got there, none of the evidence had been

12  collected yet?

13      A.   No, ma'am.

14      Q.   Do you recall who the forensics investigator was?

15      A.   Yes.  It was Investigator Stanley.

16      Q.   And where is Stanley now?

17      A.   She retired from our department.

18      Q.   She had been there a long time?

19      A.   Several years, yes.

20      Q.   When you say several, what do you mean?

21      A.   Ten that I know of.  I've been working with her

22  since I've been inside, so she had been there a number of

23  years.

24      Q.   If I told you it was more than 20, would that

25  surprise you?
```

```
 1      A.    No, it would not.  No.

 2      Q.    It was time to retire?

 3      A.    She had been there awhile, yes.

 4      Q.    What was Investigator Stanley doing when you got

 5   there?

 6      A.    When I finished, she still had her camera, and she

 7   was finishing up taking photographs of the outside.

 8      Q.    The first thing they do is take photographs?

 9      A.    As is, correct.

10      Q.    I'm sorry?

11      A.    They take photographs as the scene where they --

12   where they found it, yes.

13      Q.    Okay.  Before anything is touched, moved, or

14   handled?

15      A.    Correct.  Yes.

16      Q.    And so she was just finishing that when you got

17   there.  Were -- did you assist in telling Detective Stanley --

18   Investigator Stanley what items you wanted collected and what

19   items you wanted processed?

20      A.    I did.

21      Q.    And did she follow your instructions?

22      A.    Yes.

23      Q.    I'm going to show you some photographs.

24            MS. MOSELEY:  May I approach, Judge?

25            THE COURT:  You may.
```

125

```
 1        Q.    (BY MS. MOSELEY)  What's marked for identification
 2   as State's 37, 40, 41, 42, 43, and 47, and ask you to just take
 3   a look at those and see if they are photographs that were taken
 4   that day at the store.
 5        A.    Yes, they are.
 6        Q.    And the -- and the items of evidence and the things
 7   depicted in this -- in these photographs, they were there and
 8   you observed them there before the photos were taken or shortly
 9   thereafter?
10        A.    Correct.
11        Q.    Certainly before it was collected?
12        A.    Yes.
13              MS. MOSELEY:  I'd offer State's Exhibits 37, 40,
14   41, 42, 43, and 47.
15              (State's Exhibits 37, 40-43, 47 offered.)
16              MR. WEATHERSPOON:  No objection.
17              THE COURT:  Admitted.
18              (State's Exhibits 37, 40-43, 47 admitted.)
19              MS. MOSELEY:  Permission to publish, Your Honor?
20              THE COURT:  You may.
21        Q.    (BY MS. MOSELEY)  State's Exhibit Number 37, in this
22   photograph there are some yellow numbered placards.  What are
23   those, and how did they get there?
24        A.    Our -- Investigator Stanley put them down, and they
25   mark each piece of evidence by number and they log them.  So
```

```
 1   this Log Number 7 will be the mat or so forth.  This is a way
 2   of logging evidence.
 3        Q.    And typically there would be a photograph taken of
 4   the evidence without the placards, and then the placards are
 5   put out and then photographs are taken of the --
 6        A.    Correct.
 7        Q.    -- of the evidence with the placard next to it?
 8        A.    Correct, yes.
 9        Q.    And State's Exhibit -- State's Exhibit Number 40,
10   what are we looking at in that photograph?
11        A.    That's a piece -- a couple of pieces of candy inside
12   the store that had been dropped on the floor.  And then there's
13   a mat there just inside the door.
14        Q.    And State's Exhibit 41 is just a close-up photograph
15   of one of those pieces of candy?
16        A.    Correct.
17        Q.    And State's Exhibit 42 is another photo?
18        A.    Of the candy, correct.
19        Q.    Different -- different piece of candy?
20        A.    Right.
21        Q.    And State's Exhibit 43 is a third piece of candy?
22        A.    Correct.
23        Q.    And those were all there on the floor kind of
24   leading from the counter out the door?
25        A.    Correct, correct.
```

```
 1        Q.    State's Exhibit Number 47, where is that in terms of
 2   the store?  Where is that located, the register?
 3        A.    That's on the checkout counter right next to the
 4   register.
 5        Q.    And is that how it was found?
 6        A.    When I got there, that's how it was, yes.
 7        Q.    Okay.  And we can see the -- where the bills are
 8   kept, those -- I don't know what you call them, the arms that
 9   hold the bills down, those are pulled up?
10        A.    Correct.
11        Q.    And that -- you didn't do that?
12        A.    No, I did not.
13        Q.    And we can see in the coin trays the dimes, nickels,
14   and pennies are still there?
15        A.    Correct.
16        Q.    But no quarters and no dollar coins?
17        A.    Correct.
18        Q.    And you said that you did kind of direct
19   Investigator Stanley what items of evidence needed to be
20   collected?
21        A.    Correct.
22        Q.    And did you observe or collect the candy?
23        A.    Yes.
24        Q.    As well as the burned cloth -- that number -- the
25   placard on State's Exhibit Number 37, marked 7 and 8 are burned
```

128

```
1   pieces of material?

2        A.    Correct.

3        Q.    Those were collected?

4        A.    Yes.

5        Q.    And the register receipt that we saw in the

6   photograph was also collected?

7        A.    Correct.

8                  MS. MOSELEY:  May I approach the witness?

9                  THE COURT:  You may.

10       Q.    (BY MS. MOSELEY)  I'm going to show you what's

11  marked for identification as State's Exhibit 20 and the item

12  inside that envelope.  Is that the register receipt?

13       A.    That's the receipt.

14       Q.    Do you recognize this black powder stuff that's on

15  this envelope?

16       A.    It's from the fingerprint -- our forensics attempted

17  to fingerprint the counter, and that dust gets everywhere.

18       Q.    That's the black powder that's used for

19  fingerprinting?

20       A.    For fingerprinting, correct.

21                 MS. MOSELEY:  I'd offer State's Exhibit 20 and

22  its content.

23                 (State's Exhibit 20 offered.)

24                 MS. BERNHARD:  No objections.

25                 THE COURT:  No objection?
```

```
 1                    MS. BERNHARD:  No objections.

 2                    THE COURT:  Admitted.

 3                    (State's Exhibit 20 offered.)

 4         Q.   (BY MS. MOSELEY)  And I'm showing you what's marked

 5   as State's Exhibit 39, and I know this writing on the bag is

 6   not yours --

 7         A.   Correct.

 8         Q.   -- but does this contain some of that burned

 9   material that was collected there?

10         A.   Yes.

11         Q.   And without opening it, I'm not sure that's

12   necessary, you can testify to that based on the markings here?

13         A.   That's been recorded, yes.

14                    COURT REPORTER:  I'm sorry, sir, I can't hear

15   you.

16         A.   That's been recorded on the -- on the front, yes.

17         Q.   (BY MS. MOSELEY)  And I stand on your side so she

18   can't hear you, sorry.

19         A.   Okay.

20         Q.   And this was collected from the front of the store?

21         A.   Correct.

22                    MS. MOSELEY:  I'd offer State's Exhibit 39.

23                    (State's Exhibit 39 offered.)

24                    MR. WEATHERSPOON:  No objection, Your Honor.

25                    THE COURT:  Admitted.
```

```
 1                    (State's Exhibit 39 admitted.)

 2        Q.   (BY MS. MOSELEY)  Now, State's Exhibits 44, 45, and

 3   46 are envelopes.  Do you recognize what's inside these?

 4        A.   Yes.  Yes, I do.  Uh-huh, yes.

 5        Q.   And do these envelopes, 44, 45, and 46, contain the

 6   candy that we saw in the photographs?

 7        A.   Yes.

 8             MS. MOSELEY:  I'd offer State's Exhibits 44, 45,

 9   and 46.

10                    (State's Exhibits 44 through 46 offered.)

11             MR. WEATHERSPOON:  No objection, Your Honor.

12             THE COURT:  Admitted.

13                    (State's Exhibits 44 through 46 admitted.)

14        Q.   (BY MS. MOSELEY)  Do you know if Detective Stan --

15   or Investigator Stanley collected that mat that we see here in

16   State's Exhibit Number 37?

17        A.   Yes, she collected it.

18        Q.   What was significant about that mat?

19        A.   The -- I noticed there was residue from what I

20   thought was the fire extinguisher, pieces of the burn material

21   -- what looked like burned material and then her footprints

22   where she was standing when they tried to put the flames out.

23        Q.   And did it appear that there was any damage done to

24   the mat where her feet had been?

25        A.   No.  There was an imprint of where her feet was that
```

```
 1   was untouched, basically.

 2         Q.   Detective, is this the mat that was collected?

 3         A.   Yes.

 4         Q.   And can you just kind of stand up and look and make

 5   sure that that's the same mat we're talking about?

 6         A.   Yes.

 7              MS. MOSELEY:  I'd offer State's Exhibit 38 at

 8   this time, Judge.

 9              (State's Exhibit 38 offered.)

10              MR. WEATHERSPOON:  Let me take a look at it.

11              MS. MOSELEY:  Do you want some gloves?

12              MR. WEATHERSPOON:  I'm not going to pull it out.

13              No objection.

14              THE COURT:  Admitted.

15              (State's Exhibit 38 admitted.)

16              MS. MOSELEY:  Permission to publish?

17              THE COURT:  You may.

18         Q.   (BY MS. MOSELEY)  And this mat has been rolled up

19   since the crime?

20         A.   Yes.

21         Q.   And some of this -- there appears to be some of the

22   burned material still burned to the mat?

23         A.   Correct.

24         Q.   Basically, Detective, is it fair to say that the

25   forensics investigator, along with the investigator from
```

132

```
 1   CAPERS, try to take anything that may be of value in the case

 2   later?

 3        A.   Sure.

 4        Q.   And sometimes it's hard to know at the time of the

 5   investigation what will be important and what won't?

 6        A.   Sure.

 7             MS. MOSELEY:  You know I'm stubborn.  Eventually

 8   I'll get it.

 9        Q.   (BY MS. MOSELEY)  While you were at the store

10   helping Investigator Stanley, were other investigators doing

11   other things outside of the store?

12        A.   Yes.

13        Q.   Once all of the evidence was documented and

14   collected there at the store, what did you do?

15        A.   I went back to the neighborhood where they made an

16   arrest, and they were contacting citizens back there, so I went

17   back there to assist them.

18        Q.   And do you remember which detectives that was?

19        A.   Detctive Landis was back there, some patrol officers

20   were back there.

21        Q.   And did you and Detective Landis -- or did you

22   assist Detective Landis in talking to some of those witnesses

23   from the neighborhood?

24        A.   Correct.

25        Q.   Did you ever have any direct contact with the
```

133

1  Defendant, Matthew Johnson?

2      A.    No, I did not.

3      Q.    Never even saw him?

4      A.    No, ma'am.

5              MS. MOSELEY:  Thank you, Detective King.  I pass

6  the witness.

7                      CROSS-EXAMINATION

8  BY MR. WEATHERSPOON:

9      Q.    Detective King, my name is Kenneth Weatherspoon.  I

10 have some questions to ask you.

11     A.    Yes, sir.

12     Q.    If I ask you anything you don't understand, just ask

13 me to repeat myself.

14     A.    Okay.

15     Q.    Now, you said you assisted Detective Stanley; is

16 that correct?

17     A.    Investigator Stanley, yes.

18     Q.    Investigator Stanley.  And you all or she collected

19 the forensic evidence in the case?

20     A.    Correct.  Yes, sir.

21     Q.    Okay.  Could you tell me everything you witnessed

22 her collect?

23     A.    The --the mat, the candy, and I saw her -- the mat,

24 the candy, and then swabs of the -- of the -- of the cash --

25 cash register.

1          Q.    Okay.  When you say swabs, explain for the members

2    of the jury what you're referring to.

3          A.    It's little Q-tip swabs that they swab DNA.

4          Q.    And she was attempting to collect DNA?

5          A.    Correct.

6          Q.    Do you know whether or not she was successful?

7          A.    No.  I just know she was back there collecting

8    evidence, but I don't know any lab results.  If you're asking

9    lab results, no, I don't.

10         Q.    How many swabs did she collect?

11         A.    I don't recall.

12         Q.    Do you know what happened to the swabs she

13   collected?

14         A.    No.

15         Q.    Now, you all -- you also testified that you watched

16   her take photographs; is that correct?

17         A.    Some of the photographs.  She was finishing up when

18   I got there, so I didn't watch her do all the photographs, no.

19         Q.    So do you know how far along she was in her

20   investigation when you arrived?

21         A.    Finishing up photographs, so she was finishing up

22   photographing.

23         Q.    Okay.  So you saw her take photographs and do swabs.

24   Did you see her do anything else?

25         A.    I was there when she collected the mat and the

1  candy.

2       Q.   Were you there when she was dusting for

3  fingerprints?

4       A.   No, I did not see her do that.

5       Q.   So you don't know what her procedure or protocol was

6  in collecting the fingerprint evidence?

7       A.   In that particular scene, no.

8       Q.   How do they usually do it, or how does she usually

9  do it?

10      A.   Normally they have a black powder in a container and

11  a -- a duster -- feather duster and they dip in the black

12  powder, and they dust it on the surface that they're trying to

13  obtain the prints from.

14      Q.   Do you know if she was successful in collecting any

15  fingerprints at this scene?

16      A.   I don't know -- I don't believe she was, but I don't

17  know for sure.

18      Q.   Does she typically use the same brush, or for each

19  item does she use a new brush?

20      A.   I don't know.

21      Q.   Okay.  So you don't know.  And the same with the

22  DNA, you don't know the protocol she uses for taking the swabs?

23      A.   The DNA, they come in individual bottles or

24  individual -- the Q-tips are individually packed, so those -- I

25  guess they have to do every time.

136

```
 1        Q.    And how long were you out at the scene?

 2        A.    Probably -- maybe a couple of hours, maybe a little

 3   more.

 4        Q.    When you say a couple of hours, two hours?

 5        A.    Two hours, give or take.

 6        Q.    Now, did you collect any of the evidence?

 7        A.    No, sir, I did not.

 8        Q.    After you went and assisted Detective Landis and the

 9   pa -- patrol officers, what further part did you play in this

10   case?

11        A.    None.

12              MR. WEATHERSPOON:  May I approach the witness?

13              THE COURT:  Yes, sir.

14        Q.  (BY MR. WEATHERSPOON)  Officer, let me let you

15   review this report and see if it refreshes --

16        A.    Okay.

17        Q.    -- your memory on where the DNA swabs were taken.

18        A.    Okay.  Yes, uh-huh.

19        Q.    Does that help refresh your memory?

20        A.    Yes.

21        Q.    Okay.  Could you tell us where the DNA swabs were

22   taken?

23        A.    The -- the front door, the cash register, and the

24   counter.

25        Q.    The interior and exterior of the door?
```

137

```
 1        A.    Correct.

 2        Q.    And -- now, did you personally observe Investigator

 3   Stanley taking these swabs?

 4        A.    Actually doing the swabs themselves, no, I did not.

 5        Q.    So you just know that's what she normally does?

 6        A.    And I told her to, yes.

 7        Q.    That's what you told her?

 8        A.    Yes.

 9        Q.    And did anything come of the swabs she took?

10        A.    Not that I know of, no.

11              MR. WEATHERSPOON:  Thank you, Officer --

12   Detective.

13              We have nothing further.

14              THE WITNESS:  Yes, sir.

15              MS. MOSELEY:  Just a couple of questions.

16                    REDIRECT EXAMINATION

17   BY MS. MOSELEY:

18        Q.    How important -- you -- you watched the video, did

19   you not?

20        A.    Correct, yes.

21        Q.    Were you concerned about needing DNA to show who

22   committed this crime?

23        A.    No.  The video was very clear.

24        Q.    And fingerprints, would that add much to it, since

25   it's a public store and --
```

```
 1          A.    No.   We don't have much luck with fingerprints in

 2   public places.

 3          Q.    And as far as the front door handle, interior and

 4   exterior, and the counter, no telling how many people may have

 5   potentially left DNA there?

 6          A.    Correct.

 7          Q.    As you were proceeding through this investigation,

 8   Detective, did it appear to you that the identity was going to

 9   be an issue?

10          A.    No, it did not.

11          Q.    And that's typically what we need fingerprints and

12   DNA for?

13          A.    Correct.

14               MS. MOSELEY:  That's all I have, Judge.

15                    RECROSS-EXAMINATION

16   BY MR. WEATHERSPOON:

17          Q.    If you didn't think it was important, why did you

18   collect it?

19          A.    We do -- on every case, we want to do as much as we

20   can forensically and collect as much evidence as possible,

21   because that's just how we're trained and how we do it.  We

22   want as much as possible, if we can get it.  We only get one

23   chance at it.  So this is our one chance to get it.  So if we

24   can get it, we will collect it, and that's what we were doing.

25   We were attempting to get everything that we possibly could.
```

1      Q.    And you think that's important to get all the

2  evidence you possibly can in a case?

3      A.    That we can, that we can pick up at the time, yes,

4  sir.

5                MR. WEATHERSPOON:  I'll pass the witness.

6                MS. MOSELEY:  Nothing further.

7                THE COURT:  Thank you, sir.  You may stand down.

8  You are excused and subject to recall.

9                THE WITNESS:  Thank you.

10                MS. MOSELEY:  Judge, we may need a brief recess

11  before my next witness.

12                THE COURT:  All right.  Ladies and gentlemen,

13  let's take a five-minute recess, please.

14                THE BAILIFF:  All rise.

15                (Jury excused from courtroom.)

16                MS. MOSELEY:  Judge, the next couple of

17  witnesses are from the neighborhood behind the store.  They --

18  I believe that the Defense wanted to address the Court on it

19  before they testified.

20                Jim Medley is the next witness, and he's one of

21  the neighbors who found some items --

22                THE COURT:  Jim Medley is -- is next?

23                MS. MOSELEY:  He is next, yes, ma'am.

24                THE COURT:  And then --

25                MS. MOSELEY:  And then Ken Marecle.  And he --

1  Mr. Marecle is the man that the Defendant pushed down and

2  injured, attempting to get into his home in his flight from

3  this offense -- in his attempt to hide from this offense.

4           The State's argument is that these things are

5  admissible now because they're not extraneous, but they are

6  contemporaneous and go to show his state of mind at the time of

7  the offense and shortly thereafter and his flight from the

8  crime.

9           MS. BERNHARD:  And, Judge, it's our position

10 that -- that the test for whether or not something is

11 extraneous or same transaction is whether it's necessary to the

12 jury's understanding of the charged offense.  I think in this

13 case, those are not necessary to the jury's understanding, and

14 we would object under the constitutional and statutory

15 provisions set out in the pretrial motion regarding extraneous

16 offenses that was previously filed with the Court.

17           MS. MOSELEY:  Judge, my response to that is that

18 we're within an hour and a half, maybe, no more than two hours

19 after this crime, and the defendant's intent is something that

20 I do have to prove in this case.  And I believe it's very well

21 established that a defendant's actions after the crime and

22 their attempt to cover and hide and flee and avoid apprehension

23 go directly to his state of mind and his intent at the time of

24 the crime.  And these witnesses are necessary to establish

25 that.

```
 1                    THE COURT:  The Defense's objections are

 2   overruled.

 3                    Are these the two witnesses who do not want to

 4   be photographed?

 5                    MS. MOSELEY:  Yes, Your Honor.

 6                    THE COURT:  All right.  Could someone let the

 7   cameraman out there know that the next two witnesses do not

 8   want to be photographed?

 9                    MS. BERNHARD:  And just for the record, the

10   pretrial motion I referenced was Number 47.

11                    THE COURT:  Thank you.

12                    Ms. Moseley, do you want to go ahead and get

13   your witness in and I'll swear him?

14                    MS. MOSELEY:  Yes, Your Honor.

15                    (Witness brought forward.)

16                    MS. MOSELEY:  Do you want to go ahead and have

17   him in the seat, Judge?

18                    THE COURT:  Please.

19                    Good afternoon, sir.

20                    (Witness sworn.)

21                    THE WITNESS:  I do.

22                    THE COURT:  Thank you.

23                    THE BAILIFF:  All rise.

24                    THE COURT:  Mr. Medley, I need you to stand up,

25   too, please.
```

```
 1                    THE WITNESS:  Me?

 2                    (Jury returned to courtroom.)

 3                    THE COURT:  Please be seated.

 4                    Please call your next witness.

 5                    MS. MOSELEY:  The State calls Jim Medley.

 6                    THE COURT:  Let the record reflect this witness

 7   has been sworn.

 8                         JIM MEDLEY,

 9   was called as a witness by the State, and after having been

10   first duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12   BY MS. MOSELEY:

13        Q.   Good afternoon, sir.

14        A.   Thank you.

15        Q.   Keep your -- if you'll bring that microphone around

16   to your face.  I know you're a little hard of hearing and --

17        A.   Correct.

18        Q.   -- this courtroom is terrible with sound.

19        A.   Correct.

20        Q.   So we might need you to kind of lean toward that

21   microphone, make sure everybody can hear you.

22                    Where do you live, sir?

23        A.   In Garland, Texas, 718 Colonial Drive.

24        Q.   78 --

25        A.   718 --
```

143

```
 1                  THE COURT:  I'm sorry?  Did the witness
 2   identify himself?  I'm sorry?
 3        Q.    (BY MS. MOSELEY)  State your name for the record.
 4        A.    Jim L. Medley, M-e-d-l-e-y.
 5        Q.    Okay.  And, Mr. Medley, you said you live at 718
 6   Colonial?
 7        A.    Right.
 8        Q.    That's real close to South Garland High School?
 9        A.    Yes, ma'am, in front of it.
10        Q.    And you know where that convenience store gas
11   station -- the Fina is?
12        A.    My property backs up to the alley.  It's just the
13   other side of the alley, half a block away.
14        Q.    How long have you lived there in that neighborhood?
15        A.    Since 1970.
16        Q.    And do you live there alone, or does somebody else
17   live with you?
18        A.    At the moment my granddaughter is living with me.
19   Normally alone.
20        Q.    How old is your granddaughter?
21        A.    She's 29.
22        Q.    On May 20th, 2012, the day where all this stuff
23   happened that brings us here, were you there alone or was your
24   granddaughter there with you?
25        A.    I was there alone at that time.
```

```
 1        Q.    And early that morning, maybe around 7:30 or so, did

 2   something out of the ordinary happen?

 3        A.    Dogs started barking, and I went out to see what was

 4   wrong or what they were barking at.

 5        Q.    And you have a dog there at the house?

 6        A.    Yes.

 7        Q.    And your dog was barking.  Was he or she outside or

 8   inside?

 9        A.    Normally it stays on the patio, if I'm inside the

10   house, otherwise in the backyard.

11        Q.    And was -- was the dog in the backyard that morning?

12        A.    He was on the patio, but he heard something and --

13   and barked.

14        Q.    Okay.  And you said you went outside to investigate.

15   Where did you go?

16        A.    I went out to the backyard and then into the

17   driveway -- my drive -- rear entry driveway.

18        Q.    Did you see anything out of the ordinary back there?

19        A.    At that time, no, except that my gate was open.  And

20   I looked around and couldn't see anything at that time out of

21   place.

22        Q.    So your gate was open.  You're talking about into

23   the backyard?

24        A.    Yes, from the driveway to the backyard.

25        Q.    Is it normally closed?
```

```
  1        A.    Yes.

  2        Q.    Did you see anything in the backyard?

  3        A.    Nothing.  I did not see anything at that time.

  4        Q.    What did you do after you noticed your gate was

  5   open?

  6        A.    I'm sorry?

  7        Q.    What did you do after you noticed your gate was

  8   open?

  9        A.    I -- a neighbor of mine, two houses down, was out of

 10   town.  I walked down to see if his gate had been opened.  There

 11   was -- seemed like a lot of commotion in the neighborhood.  His

 12   gate was open.

 13        Q.    It was?

 14        A.    And then I went back to my house.

 15        Q.    When you say there seemed like there was a lot of

 16   commotion in the neighborhood, what do you mean?

 17        A.    Sirens going, and you could see police cars.  They

 18   were moving around.

 19        Q.    Okay.  Could you tell that that was related to

 20   something that had happened at the store, or did you know then?

 21        A.    I had no idea what had happened.

 22        Q.    After you checked on your neighbor's gate, you came

 23   back to your house?

 24        A.    Right.

 25        Q.    Did you notice anything different about your house?
```

```
 1         A.    My garbage -- the city garbage container had been
 2  moved, and there was a pack of cigarettes in the driveway.  I
 3  noticed those.
 4         Q.    And do you smoke?
 5         A.    I do not anymore, not since '96.
 6         Q.    And you -- you actually told me the exact date and
 7  time you quit smoking.
 8         A.    I'm sorry?
 9         Q.    You told me the exact date and even the time --
10         A.    March 6th of '06.
11         Q.    You remember what time?
12         A.    6:45 in the morning.
13         Q.    That's right.  So when you saw those cigarettes on
14  your driveway, you knew they didn't belong to you?
15         A.    I knew they did not belong to me.
16         Q.    What did you do with them?
17         A.    I picked them up and -- and carried them in the
18  house, and eventually I put them in the garbage.
19         Q.    You said eventually put them in the garbage?
20         A.    Well, I carried them in the house, and I -- I don't
21  remember if I laid them down, but anyway they ended up in -- in
22  my garbage.  I had put them in.
23         Q.    Do you remember if they were opened or close -- or
24  brand new?
25         A.    They had been opened.  It looked like one, maybe two
```

147

1 cigarettes taken out of it.  And there was one cigarette in the

2 driveway that been broken.  It had never been lit.

3     Q.    Okay.  And did -- what did you do with that broken

4 cigarette?

5     A.    I picked it up and threw it in the garbage.

6     Q.    When you picked it up and threw it in the garbage,

7 you're talking about that big green garbage can --

8     A.    Yes.

9     Q.    -- that the city gives you?

10     A.    Yes.

11     Q.    Did you notice anything when you went to put the

12 cigarette in?

13     A.    Yes, I noticed something looked like cloth down in

14 the bottom in one corner.  And I knew -- the garbage pickup was

15 on Friday.  I knew it was supposed to be pretty well empty.  I

16 had cleaned some bricks, and there was a little bit of the

17 chalky residue in there.  I could not see for sure what it was,

18 so I picked it up and it was a T-shirt.

19     Q.    And had you put that T-shirt in the garbage bin?

20     A.    No.

21     Q.    And it didn't belong in your trash?

22     A.    No.

23     Q.    What did you do with the T-shirt when you pulled it

24 out saw it was a T-shirt?

25     A.    I laid it on a little work bench inside my backyard

```
 1  through the gate.  I laid it down there.

 2       Q.   And at the time that all of this was going on, did

 3  you know that something had happened at the store?

 4       A.   I did not know it at the time, no.

 5       Q.   Did you know what all the police activity was about?

 6       A.   No, I did not.

 7       Q.   Did it -- did it seem unusual to you that you would

 8  find some things in your trash while police are in the

 9  neighborhood?

10       A.   Yes, because I did not see it when I went down to my

11  neighbor's house to check his gate.  On the way back, I --

12  that's -- I had noticed a black man without a shirt, pushing a

13  bicycle.  That was about, oh, two houses away.  He had just

14  went around the corner.  I did not see him very well, just --

15  just -- he was right at the corner as he was turning the corner

16  push -- pushing a bicycle.

17       Q.   The corner at Colonial?

18       A.   Colonial and the alley.

19       Q.   And the alley?

20       A.   Yes.

21       Q.   Near your house then?

22       A.   My house is the second house from the street.

23       Q.   Did you ever see him from the front or only from

24  behind?

25       A.   Just from behind.
```

```
 1          Q.    What did you do after you saw the man pushing the
 2   bicycle and you found the stuff that didn't belong?
 3          A.    What did I do?
 4          Q.    Uh-huh.
 5          A.    I went out front to see if I could see the person
 6   again.  I did not see him, but I saw the bicycle laying on the
 7   corner of the street -- of Colonel and Colonial Drive.  And
 8   then I saw some neighbors down the street, and they were
 9   gathered talking.  I walked down toward them and found out that
10   they had seen a man, a black man without a shirt --
11                MS. BERNHARD:  Your Honor, I'm going to object
12   to hearsay.
13                THE COURT:  Sustained.
14          A.    -- trying to --
15          Q.    (BY MS. MOSELEY)  Okay.  Hang on one second.  You
16   can't tell us what other people told you.
17          A.    Okay.
18          Q.    But you did go down and talk to the neighbors, and
19   everybody was aware something was going on?
20          A.    Yes.
21          Q.    Did you at some point see a police officer and tell
22   the officer what you -- what you knew or what you had seen?
23          A.    At some point, yes.  I had seen one of the police
24   officers and told them about the bicycle that I had seen -- a
25   black man pushing it, and then it had been left there on the
```

```
 1   corner.  At that time -- this was -- well, before that, I

 2   had -- rode around in the pickup and saw several police cars.

 3        Q.    You had -- you had gotten in your pickup truck to

 4   see if you could see anything?

 5        A.    Right.

 6        Q.    After you found these things and talked to your

 7   neighbors and all that, did you go on about your day and go to

 8   church that morning and all?

 9        A.    I did go to church later, 10 o'clock in the morning.

10        Q.    At some point in the early afternoon or so, did a

11   police detective come and talk to you at your house?

12        A.    Yes, uh-huh.

13        Q.    And did you show the detective the T-shirt that you

14   had found?

15        A.    Yes.

16        Q.    And the cigarettes?

17        A.    And the cigarettes.

18        Q.    And the broken cigarette that was still in your

19   trash bin?

20        A.    It was there, yes.

21        Q.    And did the police take those things from your

22   house?

23        A.    I'm sorry?

24        Q.    Did the police take them from your house?

25        A.    Yes, they did.
```

```
 1       Q.    And were you -- did you write down a statement about
 2  what you had seen and what you had heard that day?
 3       A.    The police came, and I wrote a statement, yes.
 4             MS. MOSELEY:  Can I approach the witness, Judge?
 5             THE COURT:  You may.
 6       Q.    (BY MS. MOSELEY)  I'm going to show you some
 7  pictures marked State's Exhibit 48, 49, and 50, and ask you if
 8  these are pictures that were taken at your house that day?
 9       A.    That's the back of my garage door, the back of my
10  house, in the driveway.
11       Q.    And in this State's Exhibit Number 48 we can see
12  that trash bin you're talking about?
13       A.    That's the trash can, yes.
14       Q.    And then the T-shirt that we've been talking about?
15       A.    Yes.
16       Q.    And then in State's Exhibit Number 49, we can see
17  that broken cigarette that you put in there?
18       A.    Right.
19       Q.    And these bricks and things that you had been
20  working on?
21       A.    That's right.
22       Q.    And then State's Exhibit Number 50, now, this is a
23  trash can inside your house?
24       A.    Inside my house, yes.
25       Q.    And there's a package -- a green package of
```

```
 1  cigarettes?

 2       A.    Right.

 3       Q.    That's the package you found outside?

 4       A.    Yes, ma'am.

 5             MS. MOSELEY:  I'd offer State's Exhibit 48, 49

 6  and 50.

 7             (State's Exhibits 48 through 50 offered.)

 8             MR. WEATHERSPOON:  No objection.

 9             THE COURT:  Admitted.

10             (State's Exhibits 48 through 50 admitted.)

11             MS. MOSELEY:  Permission to publish?

12             THE COURT:  You may.

13       Q.    (BY MS. MOSELEY)  Mr. Medley, if you can look on

14  that screen there to your left, that's that picture we were

15  just talking about.  That's 718 Colonial?

16       A.    That's right.

17       Q.    And that's your house and that trash can?

18       A.    Yes.

19       Q.    That's the T-shirt you've been telling us about?

20       A.    That's the T-shirt, yes.

21       Q.    And State's Exhibit Number 49, that's the inside of

22  that same trash can?

23       A.    Yes, ma'am.

24       Q.    And I kind of got it magnified.  It makes it easier

25  for everybody to see.  That broken cigarette -- we can see at
```

```
 1   the top is that orange-colored filter?
 2        A.   I cannot see it myself in here.  I did see it in
 3   the -- in the picture.
 4        Q.   Okay.
 5        A.   It was up to the right in this area.  Oh, here it
 6   is, yes.  There it is.
 7        Q.   It helps to make the circles?
 8        A.   Right.  There -- there it is.
 9        Q.   And then State's Exhibit Number 50 is that green
10   pack of cigarettes in your inside trash can?
11        A.   That's right.
12        Q.   And you said the police did come and talk to you and
13   they took that -- they took those things from your house?
14        A.   That's right.
15             MS. MOSELEY:  Thank you, Mr. Medley.
16             I'll pass the witness, Judge.
17             THE COURT:  Mr. Weatherspoon.
18                      CROSS-EXAMINATION
19   BY MR. WEATHERSPOON:
20        Q.   Mr. Medley, I have just a few questions for you.  If
21   I ask you anything you don't understand or you can't hear me,
22   just ask me to repeat myself.
23        A.   I'm sorry?
24        Q.   Can you hear me?
25        A.   I can hear you.  Understanding is a little bit
```

 1  difficult.

 2       Q.    Okay.  I'll try to be more clear.

 3             Do you have any idea -- let me rephrase that

 4  question.  Do you know who left those items in your trash can

 5  or in your driveway?

 6       A.    Do I know who put them there?

 7       Q.    Yes.

 8       A.    No, I do not.

 9       Q.    And you never got a good look at the person on the

10  bicycle --

11       A.    Just from the back and not a very good look, a

12  couple of houses away.

13       Q.    Could you tell what type of bicycle it was?

14       A.    I have no idea.  It was not a full big bicycle.  It

15  was a smaller bicycle.

16             MR. WEATHERSPOON:  Thank you very much, sir.  I

17  have no further questions.

18             MS. MOSELEY:  May he be excused?

19             THE COURT:  Yes, ma'am.

20             Thank you, sir.  You may stand down, and you are

21  excused, subject to recall.

22             MS. MOSELEY:  You do better than most on those

23  steps.

24             (Witness brought forward.)

25             MS. MOSELEY:  Stand right up there.  The Judge

```
 1   will give you the oath.

 2                    The State calls Ken Marecle.

 3                    (Witness sworn.)

 4                    THE WITNESS:  I do.

 5                    THE COURT:  Thank you.

 6                         KEN MARECLE,

 7   was called as a witness by the State, and after having been

 8   first duly sworn, testified as follows:

 9                      DIRECT EXAMINATION

10   BY MS. MOSELEY:

11       Q.    Good afternoon.  Would you please introduce yourself

12   to the members of the jury?

13       A.    My name is Ken Marecle.  I live in Garland, Texas.

14       Q.    How do you spell your last name?

15       A.    M-a-r-e-c-l-e.

16       Q.    And, Mr. Marecle, you live in the area around South

17   Garland High School?

18       A.    I do.

19       Q.    And what do you do for a living?

20       A.    I'm counter sales for Goodman Amana Heating And Air

21   Conditioning.

22       Q.    And how old a man are you?

23       A.    I was 66, September.

24       Q.    Who lives at your house with you?

25       A.    My wife and my daughter.
```

1      Q.    How old is your daughter?

2      A.    She's 43.

3      Q.    And were y'all all there living in the house

4  together back on May 20th of 2012?

5      A.    No.  My wife was away at a retreat for Stampin' Up

6  stuff, and my daughter was -- was there and I was there.

7      Q.    So she lived at the house, she was just off on a

8  stamp --

9      A.    Stampin' Up.  It's a craft -- crafty thing.

10     Q.    Okay.  But she -- so she wasn't home that Sunday

11 morning?

12     A.    No, she wasn't.

13     Q.    Around 7:00 or 7:30 or so that morning, were you --

14 did you notice that something was going on in the neighborhood?

15     A.    No, I didn't notice it right then.  The only time I

16 noticed anything was going on was when my daughter said there

17 was -- there was a man on the back porch.

18     Q.    Of your house?

19     A.    Of my house.

20     Q.    Now, you wouldn't expect a man to be on your back

21 porch, I assume?

22     A.    No.

23     Q.    Do you have a fence around your backyard?

24     A.    No.

25     Q.    When your daughter told you that there was someone

157

```
 1  on the back porch, what did you do?

 2       A.    She said that he was coming around the house on the

 3  bedroom side, and so I figured he was coming to the front door

 4  so I headed for the front door.

 5       Q.    Did you ever see him before you got to the front

 6  door?

 7       A.    No.

 8       Q.    When you got to the front door, what did you do?

 9       A.    I cracked the door open, and I asked the man if I

10  could help him in some way.  And he said, I need somebody to

11  help me.  I need somebody to help me.  He said it about two or

12  three times real quick.

13       Q.    How close to the door was he?

14       A.    Oh, he was about five feet.

15       Q.    Then -- back on this date, Mr. Marecle, how was your

16  health?

17       A.    I was suffering from what they thought was lymphoma.

18  It turned out to be a disease called Sarcosis which is an

19  immune system disease.  I had lost from 190 down to about

20  165 pounds.  I wasn't particularly strength -- I didn't have

21  good -- real good strength at the time.

22               MS. MOSELEY:  May I approach this witness,

23  Judge?

24               THE COURT:  Yes, ma'am.

25       Q.    (BY MS. MOSELEY)  I'm going to show you some
```

```
 1   pictures, State's Exhibits Number 54 and then State's

 2   Exhibit 55.  Is 54 a picture of you -- how you looked on

 3   May 20th?

 4        A.   Uh-huh.

 5        Q.   You have to say yes or no for the court reporter.

 6        A.   Yes.

 7        Q.   Okay.  And State's Exhibit Number 55, is that a

 8   picture of your front yard or leading up to your front gate on

 9   the sidewalk?

10        A.   That it is.

11        Q.   And then the -- you have two front doors?

12        A.   Correct.  It's a double door.

13        Q.   Okay.

14             MS. MOSELEY:  I'd offer State's Exhibits 54 and

15   55 at this time.

16             (State's Exhibits 54 and 55 offered.)

17             MR. WEATHERSPOON:  No objection.

18             THE COURT:  Admitted.

19             (State's Exhibits 54 and 55 admitted.)

20             MS. MOSELEY:  Permission to publish?

21             THE COURT:  You may.

22        Q.   (BY MS. MOSELEY)  State's Exhibit Number 54, there

23   on the screen, is that the photograph we were just talking

24   about of you -- how you appeared?

25        A.   Yes.
```

```
 1        Q.    And you seem a little thinner than you do today?

 2        A.    Yes, I was.

 3        Q.    Have you gained some of that weight back and your

 4   health has improved?

 5        A.    Yes, it has.

 6        Q.    State's Exhibit Number 55, when you said that the

 7   man came to your front door, had he already come through that

 8   gate there?

 9        A.    Yes, he had.

10        Q.    Was he actually on your front porch that we can see

11   in this photograph?

12        A.    Yes, he was.

13        Q.    But not quite to the front door?

14        A.    No, he wasn't to the front door.  He was just to the

15   little step up, right there that you see.

16        Q.    And when you opened the door, you said he said, I

17   need help or --

18        A.    I need somebody to help me, I need somebody to help

19   me.  He repeated it like three times.

20        Q.    Was he walking toward the door?

21        A.    Yes, he was.

22        Q.    What did you say back to him?

23        A.    I didn't say anything.  When he hit the door, I

24   pushed him through -- I caught him between the two doors, his

25   arm was in, his leg was in, and part of his torso was in --
```

```
 1  caught between the two doors.  And I stopped him right there
 2  with that.  He was pressing the door, pushing the door in, and
 3  so when he let up, I let up and opened the door and used my
 4  shoulder to take him out into the courtyard.
 5       Q.   You said he hit the door.  What do you mean when --
 6  when you said he hit the door?
 7       A.   When he got to the door, he came through the crack
 8  in the door that was there.
 9       Q.   He was pushing his way into your house?
10       A.   Pushing his way into my house.
11       Q.   Had you indicated at all to him that you were going
12  to help him or that it was okay for him to come in the house?
13       A.   Didn't have a chance to answer any of that --
14       Q.   And you said the door was just cracked, or did you
15  have it all the way open?
16       A.   No, it was just cracked.  He opened it up when he
17  came -- came on to the door, started pushing on it.
18       Q.   And you were pushing from the inside to try to keep
19  him out?
20       A.   Correct.
21       Q.   How -- how was it that you got him -- did he ever
22  get in your house?
23       A.   Not totally, just an arm and a leg and part of his
24  body.
25       Q.   And how is it that you were able to keep him from
```

1  getting all the way in the house?

2      A.    Well, he let back off of pushing on the door.  And

3  when he did, I opened the door and I used my shoulder to take

4  him out into that courtyard.

5      Q.    And so now both of you are outside --

6      A.    In the court --

7      Q.    -- on the porch or further beyond the porch?

8      A.    No, just on the -- just right there in that porch

9  area behind the gate but in front of the door.

10     Q.    Okay.  And are you still struggling?  Is he holding

11 you?  Are you holding him?  What's going on?

12     A.    He's -- he's using his arms and flailing his arms,

13 and I'm keeping his hands and arms away from me at that point

14 in time.

15     Q.    And he's still -- is he still trying to come to the

16 door, or now is he just swinging at you or what?

17     A.    No, I'm forcing him back the other way.  I'm forcing

18 him back the other way.  He did at one point -- after I got him

19 back a ways, he did start coming back again towards the door.

20     Q.    Where's your daughter while all this is going on?

21     A.    She's in her bedroom.

22     Q.    Could you hear her?

23     A.    No.  I knew that's where she had gone.

24     Q.    And were you concerned about him getting in your

25 house because your daughter was in there or what --

162

```
 1        A.    Yes, that's the main concern I had.

 2        Q.    You may have told me this, but I don't remember,

 3   what -- what was this man wearing?

 4        A.    He was -- did not have a shirt on.  He had pants,

 5   but I don't remember the color of them.  He had pants on.

 6        Q.    Do you remember if he had any glasses?

 7        A.    Yes, he had a pair of military style black rim

 8   glasses --

 9        Q.    Okay.

10        A.    -- that he was wearing.

11        Q.    How close would you say you got to him while all

12   this struggle was going on?

13        A.    We were chest-to-chest nearly.

14        Q.    Did you smell anything on him?

15        A.    No.  I was too busy concentrating on his arms.

16        Q.    Where -- during this struggle, where did y'all end

17   up?

18        A.    He -- he pushed me backwards and I lost my balance,

19   and I fell and skinned my arms and my knee.  I think my knee --

20   no, I'm not for sure about my knee.  But my arms, for sure.

21   And then when I got back up, he grabbed my glasses and took

22   off.

23        Q.    Took your glasses off your face?

24        A.    Uh-huh.

25        Q.    Yes?
```

1    A.    Yep, took -- took the glasses off my face.

2    Q.    And then turned around and ran?

3    A.    And ran off.

4    Q.    Did you see which direction he ran to?

5    A.    He ran towards South Garland High.

6    Q.    Okay.

7    A.    Which would in that picture be to the -- to the

8    right.

9    Q.    And you live kind of in a cul-de-sac?

10   A.    I live in the bend of the cul-de-sac.

11   Q.    Okay.  And he ran off on the street, or did he go

12   into an alley or --

13   A.    No, he ran across my grass.

14   Q.    Okay.

15   A.    The last I saw him was at the -- at the corner of

16   the house, my house.

17   Q.    And you -- and then you did what?

18   A.    I was going back into the house to go where I had

19   started to go in the first place, to retrieve my weapon.

20   Q.    And did you go in the house and get your gun?

21   A.    Yes, I did.

22   Q.    What did you do then?

23   A.    I put it in my pocket.  And I went out the front

24   door and I started looking for him.  My daughter called Garland

25   police while all this was going on.

```
 1        Q.    So she's talking to the police dispatcher while
 2    you're fighting him off and trying to --
 3        A.    Uh-huh.
 4        Q.    -- go find him?
 5        A.    Right.
 6        Q.    Did you ever find him?
 7        A.    No, I never found him.
 8        Q.    Now, later that day, shortly after that, I guess,
 9    the police come to your house?
10        A.    They did about five or 10 minutes after that.  I
11    guess the dispatcher got ahold of the people that were on the
12    scene there that I didn't know were there.
13        Q.    Okay.  You didn't see any police while all this was
14    going on?
15        A.    No, ma'am.
16        Q.    When the police came to your house, did you tell
17    them what had happened?
18        A.    I did.
19        Q.    And they obviously hadn't caught the man yet?
20        A.    No, they hadn't.
21        Q.    Did they take -- did they come back and take
22    pictures of your -- obviously your house and of you and then of
23    the skinned-up elbow?
24        A.    Yes, they did.
25             MS. MOSELEY:  May I approach the witness?
```

```
 1                        THE COURT:  You may.

 2        Q.    (BY MS. MOSELEY)  I'm showing you what's marked as

 3   State's Exhibit 56.  Is that a picture of the injury you had to

 4   your elbow after being pushed down?

 5        A.    Yes.

 6              MS. MOSELEY:  I'd offer State's Exhibit 56 into

 7   evidence.

 8              (State's Exhibit 56 offered.)

 9              MR. WEATHERSPOON:  No objection.

10              THE COURT:  Admitted.

11              (State's Exhibit 56 admitted.)

12              MS. MOSELEY:  Permission to publish?

13              THE COURT:  You may.

14        Q.    (BY MS. MOSELEY)  And, obviously, by the time the

15   police came to take the photographs, you had already cleaned it

16   up and bandaged it?

17        A.    Correct.

18        Q.    Did the police ask you to write a statement for

19   them?

20        A.    They did.

21        Q.    And did you write the statement?

22        A.    I did.

23        Q.    Let me ask you this.  Did you find your glasses?

24        A.    No.  My neighbor found them like three weeks

25   later --
```

1      Q.    Okay.

2      A.    -- when he was trimming some hedges.

3      Q.    They were -- they were there in the neighborhood?

4      A.    Yes, they were.

5      Q.    Did the police ask you to come down and look at some

6  photographs to see if you could identify the person that you

7  had struggled with there?

8      A.    They did.

9      Q.    Did you look at the pictures?

10     A.    I did.

11     Q.    Did you recognize the person in the photographs?

12     A.    I couldn't positively identify him with the -- with

13  the photographs that I saw.

14     Q.    Did you feel like you could have identified him if

15  you saw him in person?

16     A.    Yes.

17     Q.    The photographs that they showed you -- you've --

18  you've expressed some complaints to me about that.  What was --

19  why do you think you didn't recognize him in the pictures?

20     A.    I couldn't recognize him because the picture I saw

21  his head was thrown way back and you were looking up his

22  nostrils, basically.

23     Q.    Do you see the person in the courtroom today?

24     A.    I believe it's the gentleman in the brown suit right

25  over here.

1    Q.    Which one?  Is he -- is he wearing glasses?

2    A.    Yes, he is.  There's the lady, the gentleman there,

3    and he's on the end.

4    Q.    So if I'm sitting in Chair Number 1 -- let's count

5    these chairs going that way.  I'm in Chair 1, Ms. Jones is in

6    2, Ms. Bernhard is in 3, Mr. Weatherspoon is in 4 -- is it the

7    man in the fifth chair?

8    A.    Yes, it is.

9         MS. MOSELEY:  May the record reflect the witness

10    identified the Defendant?

11         THE COURT:  The record will reflect.

12    Q.    (BY MS. MOSELEY)  And you're sure about that today

13    having seen him in person?

14    A.    Yes, I would have been sure that same day.

15    Q.    What condition were your glasses in when you found

16    them, or when you got them back?

17    A.    When I got them back, they were bent a little, but

18    my neighbor had cleaned them up.

19    Q.    When you were struggling with the Defendant there at

20    your house that morning, how was he acting?

21    A.    Well, he was acting irrational, and his eyes were

22    real wide and he -- you know, he was just fighting.

23    Q.    Did you -- you had no idea that he had just

24    committed a robbery?

25    A.    I had no idea of -- of anything.  No.

1      Q.   You didn't know that there had been a robbery at the

2  store?

3      A.   No.

4      Q.   You weren't aware of all the police activity in the

5  neighborhood?

6      A.   No, I hadn't seen any of them.

7      Q.   Could you hear the dogs barking in the neighborhood?

8      A.   No.  I've got storm windows and doors on my house,

9  and you can't hear the kids racing up and down Colonel Drive.

10     Q.   Because you live right by the high school?

11     A.   I live right by the high school.

12     Q.   Okay.  Good insulation, huh?  Thank you.

13          MS. MOSELEY:  That's all I have, Judge.

14          THE COURT:  Mr. Weatherspoon.

15               CROSS-EXAMINATION

16  BY MR. WEATHERSPOON:

17     Q.   Mr. Marecle, I have just a couple of questions to

18  ask you.  If I ask you anything you don't understand, or if you

19  can't hear me, just ask me to repeat myself.

20     A.   All right.

21     Q.   You said he was acting irrational; is that correct?

22     A.   Correct.

23     Q.   Appear to be intoxicated?

24     A.   Didn't smell any liquor on him.

25     Q.   But could --

```
 1        A.    And I would -- I would know liquor smell.

 2        Q.    But could it have been some other substance?

 3        A.    It had to be something because he didn't look -- his

 4   eyes were really wide and big.  And, you know, he was fighting

 5   for no apparent reason, other than he wanted to get into my

 6   house.

 7        Q.    When he said, I need help, I need help, what did you

 8   take that to mean?

 9        A.    I wasn't really for sure, because, you know, he was

10   still coming at the door.  And when he hit the door, you know,

11   and tried to come on in, I didn't answer him anything.

12        Q.    Now, you said at some point he took a step back, is

13   that correct, from the door, and then you hit him --

14        A.    No, he -- he didn't take a step back.  He just let

15   up his pressure from pushing in on the door, and that's when I

16   opened the door and used my shoulder to take him out into the

17   courtyard.

18        Q.    Okay.  So when you say you used your shoulder, do

19   you mean like you put a shoulder block into him to knock him

20   backwards?

21        A.    Correct.

22        Q.    And you all went out into the front part of the

23   house, and you said at that point a struggle began?

24        A.    Yes, he was fighting, flailing his arms, and I was

25   fighting him off and pushing him back -- pushing him back in
```

1  the courtyard.  We did all of our altercation in the courtyard.
2  We didn't -- we weren't out in the yard.
3      Q.   Was there any conversation when the arms were
4  being -- were flailing?
5      A.   No, I was just concentrating on keeping me off of --
6  him off of me.
7      Q.   Now, at any point while the arms were flailing, did
8  you see your daughter, or you said you felt like your daughter
9  was in her bedroom?
10     A.   Yes.  She went into the bedroom, and that's where
11  she was calling the police from.
12     Q.   Okay.  Now, at what point was it during the
13  altercation when your glasses -- when your glasses were
14  removed?
15     A.   Right before he ran from the courtyard.
16     Q.   So once you all had the altercation, he never made
17  another attempt to enter your house?
18     A.   No.
19     Q.   And the bruise to your elbow, was that the extent of
20  your injuries with the -- maybe the possibility of your knees
21  being scraped?
22     A.   Yeah -- yes, that was it.  That was it.
23     Q.   And did you require any medical attention?
24     A.   No, we just doctored it at the house.
25     Q.   Now, you testified that you retrieved your weapon

```
 1    and went looking for him; is that correct?

 2          A.    Correct.

 3          Q.    And what type of weapon do you have?

 4          A.    That day I had a .25 automatic with hollow points.

 5          Q.    And did you -- while you were looking for him, at

 6    that point did you hear the police sirens and see any police

 7    activity?

 8          A.    Two police came up to the house, and they were --

 9    they were looking the -- they were looking in the area.

10          Q.    Okay.  And at that point did you flag them down and

11    tell them what had happened?

12          A.    Yes, I told them, because they had come in response

13    to my daughter's call.

14          Q.    Okay.

15                MR. WEATHERSPOON:  Thank you very much, sir.  I

16    have no further questions.

17                THE COURT:  Ms. Moseley, anything further?

18                MS. MOSELEY:  That's all I have, Judge.

19                Thank you.

20                THE COURT:  Thank you, sir.  You may stand down,

21    and you're excused, subject to recall.

22                THE WITNESS:  Government economy, right?

23                MS. MOSELEY:  That's it.  Lowest bid.

24                THE COURT:  Criminal courthouse economy.

25                MS. MOSELEY:  The State calls Officer Perez.
```

```
 1                    THE COURT:  Good afternoon.

 2                    THE WITNESS:  Good afternoon.

 3                    (Witness brought forward and sworn.)

 4                    THE WITNESS:  Yes, ma'am.

 5                    THE COURT:  Thank you.

 6                         RAFAEL PEREZ,

 7    was called as a witness by the State, and after having been

 8    first duly sworn, testified as follows:

 9                    DIRECT EXAMINATION

10    BY MS. MOSELEY:

11         Q.   Good afternoon.

12         A.   Afternoon.

13         Q.   Will you please introduce yourself to the members of

14    the jury?

15         A.   Investigator Rafael Perez with the Garland Police

16    Department.

17         Q.   And you introduced yourself as an investigator.

18    There's been a change in your career recently; is that right?

19         A.   Yes, ma'am.

20         Q.   Where are you working now?

21         A.   Narcotics.

22         Q.   You were just assigned as a detective in the

23    Narcotics Division?

24         A.   Yes, ma'am.

25         Q.   Prior to that, what was your assignment with the
```

1 police department?

2      A.    Patrol Division -- Patrol Division.

3      Q.    How long had you been a patrol officer?

4      A.    At the time, it was 10 years.

5      Q.    When did you start working for the Garland Police

6 Department?

7      A.    Like in '01.

8      Q.    And can you tell the jury a little bit about your

9 educational and professional background that lets you hold that

10 position?

11      A.    I have 62 hours of college, all in law enforcement.

12 I attended the Garland Police Academy of which I passed, took

13 my TCLEOSE license of which I now carry as a Texas peace

14 officer with the City of Garland.

15      Q.    And you've been a Certified Police Officer, you

16 said, for a little over 11 years, I guess?

17      A.    Yes, ma'am.

18      Q.    When you were working as a patrol officer -- we've

19 talked to Officer Coffey already, so we know generally what a

20 patrol officer does.  He was a -- he was a floater, I think he

21 said -- or do you remember?  Was that --

22      A.    I think he was.

23      Q.    Okay.  As a regular patrol officer, were you

24 assigned to work a particular part of town, or did you work in

25 any part of the town that they needed you on that day?

1      A.    I was also a floater --

2      Q.    Meaning what?

3      A.    -- meaning we work wherever we're needed as a

4  patrolman.

5      Q.    Okay.  That particular day, and I'm talking about

6  May the 20th of 2012, were you working that day?

7      A.    Yes, ma'am.

8      Q.    What shift were you working?

9      A.    Day shift.

10     Q.    You came in at 6:00?

11     A.    Yes, ma'am.

12     Q.    Did you work alone, or did you have a partner in the

13 car with you?

14     A.    I work alone.

15     Q.    Is that the case for all of the Garland Officers?

16     A.    Yes, ma'am.

17     Q.    No two-man patrol units in Garland?

18     A.    We do have them, if we're overly staffed and not

19 have enough cars, but usually we're one-man units.

20     Q.    That morning shortly after 7:00 a.m., did you

21 respond to a call at the Fina -- Whip-in Fina there by South

22 Garland High School?

23     A.    Yes, I did.

24     Q.    Do you remember what -- what was the nature of the

25 call, what brought you there?

175

```
 1        A.   I was dispatched as an audible alarm.  Basically,
 2   alarm system went off and just go check the Fina.
 3              THE COURT:  I'm sorry, I didn't hear what you
 4   said.
 5              THE WITNESS:  Audible alarm.
 6              THE COURT:  Thank you.
 7        Q.   (BY MS. MOSELEY)  And was the audible alarm to the
 8   actual gas station, or were you part of the audible alarm that
 9   was sent to the plasma center across the street?
10        A.   The actual gas station.
11        Q.   Okay.  When you arrive, were other officers already
12   on scene?
13        A.   Yes, ma'am.
14        Q.   Do you remember which officers were already there?
15        A.   It was Officer Coffey and Officer Simon.
16        Q.   Was the victim, Nancy Harris, still there on the --
17   on the front porch when you got there?
18        A.   Front of the station, yes, ma'am.
19        Q.   Did you arrive before or after the paramedics and
20   fire fighters?
21        A.   Before.
22        Q.   Do you remember if you were there -- there was some
23   confusion about where the ambulance and fire truck was going to
24   go.  Were you the officer that was kind of --
25        A.   Yes, ma'am.
```

1      Q.    -- guiding them in?

2      A.    Yes, ma'am.  The confusion was Officer Coffey and

3   Simon were still on their prior call until they noticed the

4   fire at the Fina, which was my audible.  And fire were going to

5   their original call, so I ran out to the middle of the street

6   to actually guide them where we were at, at the Fina.

7      Q.    So the procedure normally would be when Officer

8   Coffey and Simon finished their checking at the plasma center,

9   they would have called the dispatcher and said, we're done

10  here, where do we go next, or we're clear?

11     A.    Correct.

12     Q.    But because of the fact they saw the flame before

13  that, they never did clear from the plasma center?

14     A.    No, ma'am.  They went just straight to the problem

15  or the issue which was the fire at the station.

16     Q.    So when they called in a fire, the dispatcher

17  assumed they were still at the plasma center?

18     A.    Correct.

19     Q.    So you stood there in the street to direct the --

20     A.    The fire -- the ambulance and the fire -- fire

21  station, the engines.

22     Q.    And were you the officer that talked to the

23  paramedics there in the ambulance and told them we had a victim

24  over here that needed treatment?

25     A.    I don't recall.  I don't remember.

1      Q.    What did -- what was your responsibility there once

2  the paramedics and everybody found the right location, what did

3  you do?

4      A.    I became -- started securing the area, meaning I

5  located my yellow tape, caution tape, and began taping the

6  whole scene.  That way we keep people that don't need to be in

7  our secure scene out, depending on what the crime was.  For me,

8  seeing what I saw, it was my call to say, yeah, we're going to

9  have to secure this whole location so I went ahead and secured

10  the whole scene.

11      Q.    Okay.  So that other vehicles and customers couldn't

12  come in, you were going to keep the public out?

13      A.    Correct.

14      Q.    And that's protocol anytime there's a major crime,

15  to make sure that nobody is going in and out of the crime

16  scene?

17      A.    That's correct.

18      Q.    At some point in all of this, did you receive a

19  description of the suspect who had committed this crime?

20      A.    Yes.  Officer Simon -- I believe it was Officer

21  Simon or Coffey relayed to dispatch the description of the

22  suspect that was -- that caused the incident at the Fina

23  station.

24      Q.    And so it's -- I guess the practice is if the -- if

25  there is a description of the person, that's put out over the

1  radio so that all the officers in the area can be looking for

2  the person?

3      A.    That's correct.

4      Q.    Or looking for somebody who matches that

5  description?

6      A.    That is correct.

7      Q.    Did you watch the surveillance video?

8      A.    No, ma'am.

9      Q.    At what point did you begin searching -- actively

10  searching for the suspect?

11      A.    Once I released the scene to CID, which is our

12  Criminal Investigation Division, once they arrived and they

13  took over the scene, then I released because they needed more

14  officers out in the field to look for the subject.

15      Q.    And did you look -- where were you looking?

16      A.    Via -- there was a neighborhood behind the Fina.

17      Q.    Why were you looking there?

18      A.    We were receiving a bunch of 911 calls from

19  civilians, residents, of a black male matching our description

20  from the incident at the Fina, that was trying to go into their

21  homes forcefully.

22      Q.    And because of that, you felt like the person --

23  similarly described person, you assumed was still back there in

24  the neighborhood somewhere?

25      A.    Yes, ma'am.

1    Q.    Were you in your car or were you on foot?

2    A.    At first I was in my car.

3    Q.    And what did you do?

4    A.    I began roving, just driving through the

5  neighborhood, with our lights on, sirens.  Usually that allows

6  or keeps the subject bedded down, because we still had a

7  helicopter being called.  We had our canines, I believe, being

8  called.  We were trying to get everybody we needed to the

9  scene.  So when we drive around with our sirens and lights on,

10  usually it beds down -- beds down the person down to where he

11  doesn't want to come out and he just stays put.

12    Q.    Okay.  And then once you do that, to try to get them

13  to stop and stay put, were other officers kind of blocking off

14  the streets and the exits, the ways in and out of that

15  neighborhood?

16    A.    Yes, ma'am.

17    Q.    At some point did you get out on foot?

18    A.    Yes, ma'am.

19    Q.    What caused you to get out on foot?

20    A.    Well, Officer Coffey first advised that he had

21  located a bike.  I believe it was at Colonial and Colonel.  And

22  since he was one of the main rovers, then I was dispatched to

23  the area to secure the bike.  Once I located the bike, then I

24  notified forensics.  While I was there, another female resident

25  from the area walked up to me and advised me that --

```
 1                    MR. WEATHERSPOON:  Your Honor, we object to

 2  hearsay.

 3                    THE COURT:  Sustained.

 4       Q.   (BY MS. MOSELEY)  You can't tell us what anybody

 5  told you.

 6       A.   Okay.

 7       Q.   But obviously, you're -- are you wearing a full

 8  uniform that day, the Garland Police Officer uniform?

 9       A.   Yes, ma'am.

10       Q.   And you're standing there waiting with a bicycle, I

11  guess, for -- what were you waiting for?

12       A.   Forensics to arrive.

13       Q.   Okay.  So forensics was going to come and collect

14  the bicycle or process the bicycle?

15       A.   Yes, ma'am.

16       Q.   But somebody saw you standing there and approached

17  you to give you some information?

18       A.   Yes, they did.

19       Q.   Was it your understanding that this bicycle may have

20  been either pushed or ridden by the suspect?

21       A.   Yes.

22       Q.   Which is why you wanted forensics?

23       A.   Correct.

24       Q.   Did you wait there with the bicycle, or did you

25  leave the bicycle?
```

1      A.    I waited for the -- I waited with the bicycle until

2 forensics arrived and take -- took custody of it.

3      Q.    And then where did you go?

4      A.    I proceeded to the alley behind Mt. Vernon Place.

5      Q.    What caused you to go behind Mt. Vernon Place?

6      A.    Information that was given to me of the last known

7 location of where the suspect we were looking for was seen.

8      Q.    So you were directed back there?

9      A.    Yes, ma'am.

10     Q.    Were you directed back there by some of the

11 residents or another police officer, or who told you to go back

12 that way?

13     A.    Some of the residents from the area.

14     Q.    And so you went on foot, or you went in your car?

15     A.    I drove my car up to the alley at which time I

16 parked it to block the alley.  And then I notified dispatch

17 that I was going to be on foot out of my car.

18     Q.    And you said you were in the alley behind Mt.

19 Vernon?

20     A.    Yes, ma'am, the west -- I believe it's the west

21 alley.

22     Q.    I'm showing you here on the screens, and there's one

23 next to you -- just to your left, if that helps, State's

24 Exhibit 25.  This is kind of a broad overview of the area that

25 we've been talking about.  Do you see that?

1          A.    Yes, ma'am.

2          Q.    And we can see -- if you can make a circle on that

3     screen.  Did I leave the pen up there?

4          A.    Oh, here.

5          Q.    Around Mt. Vernon so we know where Mt. Vernon is

6     there on the map.

7          A.    (Witness so indicates.)

8          Q.    And it's kind of a horseshoe or cul-de-sac?

9          A.    Yes, ma'am.

10         Q.    Where is the alley -- let me raise that one.

11     Where's the alley that you were talking about?

12         A.    (Witness so indicates.)  Right here.

13         Q.    And it curves around.  Did you come in that way off

14     of Colonel?

15         A.    Yes, ma'am.  I parked at the entrance of the -- of

16     the alley, which is right about here.  Right there.  Then I

17     walked it.

18         Q.    And as you came around that -- that curve there that

19     you've indicated, is -- what happened then?

20         A.    That's when I observed the heavy-set black male, no

21     shirt, with dark pants matching the description that has been

22     broadcast over and over, over the radio.  Basically he looked

23     at me and I looked at him, and he took off running, and I began

24     yelling at him to stop.

25         Q.    And you kind of motioned that way.  Do you see him

183

```
 1  in the courtroom?
 2       A.   Yes, ma'am.
 3       Q.   Would you identify him by what he's wearing today?
 4       A.   Glasses and a suit.
 5            MS. MOSELEY:  May the record reflect the witness
 6  identified the Defendant in open court?
 7            THE COURT:  The record will reflect.
 8       Q.   (BY MS. MOSELEY)  So you said he made eye contact
 9  with you?
10       A.   Uh-huh.
11       Q.   You're in the alley?
12       A.   Yes, ma'am.
13       Q.   And then he turned around and ran the other
14  direction?
15       A.   He ran -- I believe it was south between the houses.
16       Q.   Do you recall which houses that that is from this
17  map?
18       A.   Yes, ma'am.
19       Q.   If you can use your pen and show us the path he
20  took.
21       A.   Right there.
22       Q.   And he came around the front, and now that would be
23  then on Colonial?
24       A.   Yes, ma'am.
25       Q.   And he comes across from the alley, passes through
```

1  that yard, now he's on Colonial?

2      A.    Correct.

3      Q.    And where did he go when he rounded that corner?

4      A.    To the front of the house where I stopped, which is

5  601 Colonial.

6      Q.    And what did he do at 601 Colonial?

7      A.    When I ran after him, I lost sight of him when he

8  turned the corner.  So the way we're trained is, we don't -- we

9  don't run the same way that a suspect does.  So I drew my

10  weapon and I pied off the corner because there's a bunch of

11  bushes and I didn't want to get surprised, you know, for my

12  safety.  So as I pied the corner off, I observed the

13  Defendant's leg sticking out from the bush near the front of

14  the porch.

15      Q.    And you'll have to forgive me, but I don't know what

16  pied the corner off means.  Can you give us -- can you describe

17  that maybe?

18      A.    Yes, ma'am.  Pieing a corner is basically -- if you

19  have your house, corner house, you don't want to attack the

20  area directly because you -- you have nothing visual to see and

21  you don't want to get surprised.  So what it means -- pieing

22  the corner is you take that corner in a pie formation where as

23  you're moving around that corner, you get to see visually

24  what's around the corner from a -- a distance way.  So you have

25  the reaction time in case they engage you.

185

1       Q.    So you kind of backed up and did a big half circle
2  around so you didn't just chase him right around that corner?
3       A.    Correct.
4       Q.    Okay.  And then once you saw his legs sticking out
5  of the bushes, is this the bushes up by the house?
6       A.    Yes, ma'am.
7       Q.    At the front of the house?
8       A.    Correct.
9       Q.    What did you do?
10      A.    I advised dispatch of my location.  And because I
11  already called dispatch which I was in foot chase with him.
12  And then once I advised them where I was, I engaged the
13  Defendant.
14      Q.    What do you mean you engaged him?
15      A.    I showed him my presence.  I had my duty weapon
16  drawn on him, and then began giving him orders to get on the
17  ground.
18      Q.    And was he standing or was he on the ground hiding
19  in the bushes already?
20      A.    He was laid back, kind of leaning against the wall
21  with one leg out.
22      Q.    Okay.  And --
23      A.    He was sitting, but leaning.
24      Q.    Did he come out of the bushes then?
25      A.    When I instructed him to, yes.

186

```
 1        Q.    And where did he go?

 2        A.    He just crawled forward to his belly, and then

 3   waited until my backup arrived.

 4        Q.    And was Officer Coffey your backup?

 5        A.    Yes, ma'am.

 6        Q.    When you got the Defendant down on his belly,

 7   waiting on your backup, did he say anything to you?

 8        A.    Not at that time.

 9        Q.    After Officer Coffey arrived and you all were able

10   to get him handcuffed and searched, whatnot, at some point did

11   he make any statements to you?

12        A.    Yes, he did.

13        Q.    Was it in response to you saying something to him,

14   or did he just start talking?

15        A.    He just started talking.

16        Q.    And what did he say?

17        A.    What took you so long.  Y'all are getting slow.

18        Q.    Y'all are getting slow?

19        A.    (Nods head.)

20        Q.    How long had you been looking for him?  Do you know

21   how long it was after the -- you direct the paramedics in and

22   all that, and then you finally catch him?

23        A.    I have no exact time, but it felt like hours.

24        Q.    More than an hour, maybe less than two?

25        A.    Give or take.
```

187

1     Q.    Did you smell anything on him?

2     A.    No, ma'am.

3     Q.    Alcohol or any kind of flammable liquids or

4  anything?  Did you smell anything at all on him?

5     A.    No, just the normal body odor.

6     Q.    How was he acting to you?  What was his demeanor

7  like?

8     A.    It was real passive, just like wanted to start a

9  conversation like nothing happened or what's going on, kind of

10  like, really nothing.  Like -- to him, it was nothing was going

11  on.  He didn't even know why.

12     Q.    Obviously, he knew you were chasing him?

13     A.    Correct.

14     Q.    Did he appear to be intoxicated?

15     A.    No, ma'am.

16     Q.    What kinds of things -- I mean, obviously -- now

17  you're a narcotics detective, you've certainly seen intoxicated

18  people in your career, I imagine?

19     A.    Correct.

20     Q.    On a daily basis probably?

21     A.    Probably.

22     Q.    What kinds of things are you looking for in

23  determining whether somebody is or isn't intoxicated?  What are

24  the signs?

25     A.    Basic slurred speech, their demeanor, body odor,

```
  1  breath odor, if they can walk or -- their basic common sense is
  2  not there, is basically what it is.  I mean, a normal person
  3  has their commonsense of what they're doing and what -- what's
  4  going on.  He had it -- he didn't have the other intoxicated --
  5  slurred speech, the breath, the -- he didn't have any of that.
  6       Q.    Balance was okay?
  7       A.    Yes, ma'am.
  8       Q.    Did he have any trouble running away from you?
  9       A.    No, ma'am.
 10       Q.    Did he have any trouble walking to the squad car?
 11       A.    No, ma'am.
 12       Q.    Did you introduce yourself to him and -- and tell
 13  him you were Officer Perez?
 14       A.    No, ma'am.
 15       Q.    I know you're looking at me crazy, because we don't
 16  do that.
 17       A.    No.
 18       Q.    Did Officer Coffey introduce himself to the
 19  Defendant?
 20       A.    No, ma'am.
 21       Q.    How would he have known your names?
 22       A.    Unless he read them our -- our nameplates off our
 23  chest.
 24       Q.    After you found and arrested the Defendant and he
 25  was transported in Officer Coffey's car to jail, did you have
```

```
 1  any other involvement in the investigation?

 2       A.   No, ma'am.

 3            MS. MOSELEY:  May I approach the witness, Judge?

 4            THE COURT:  You may.

 5       Q.   (BY MS. MOSELEY)  I want to show you State's

 6  Exhibit 57 and State's Exhibit 58.  57, do you recognize that

 7  to be a map?  I'm basically pointing out the area where that

 8  bicycle was found.

 9       A.   Correct.

10       Q.   And State's Exhibit 58, is that a photograph of the

11  bicycle?

12       A.   Yes, ma'am.

13            MS. MOSELEY:  I'd offer State's Exhibits 57 and

14  58.

15            (State's Exhibits 57 and 58 offered.)

16            MR. WEATHERSPOON:  No objection.

17            THE COURT:  Admitted.

18            (State's Exhibits 57 and 58 admitted.)

19            MS. MOSELEY:  Permission to publish?

20            THE COURT:  You may.

21       Q.   (BY MS. MOSELEY)  State's Exhibit Number 57, there's

22  a star there on the screen.  Can you see that?  Did it show up

23  on yours?

24       A.   Yes, ma'am.

25       Q.   That's the corner of Colonial and Colonel.  Is that
```

```
 1   where the bicycle was found, kind of just leaning against the

 2   curb?

 3        A.   Yes, ma'am.

 4        Q.   And State's Exhibit Number 58, that's where the

 5   bicycle was when you were asked to sit and watch it?

 6        A.   Correct.

 7        Q.   Did you ever see anybody on it?

 8        A.   No, ma'am.

 9        Q.   And you don't really know if it has anything to do

10   with this case or not at this point?

11        A.   Correct.

12        Q.   When you were sitting on it?

13        A.   Correct.

14             MS. MOSELEY:  That's all I have.  Thank you.

15             THE COURT:  Mr. Weatherspoon.

16             MR. WEATHERSPOON:  I don't have any questions.

17             THE COURT:  Thank you.

18             Thank you, Detective Perez.

19             THE WITNESS:  Yes, ma'am.

20             THE COURT:  You're excused, subject to recall.

21             THE WITNESS:  Yes, ma'am.

22             THE COURT:  Ladies and gentlemen, let's take our

23   afternoon break.  It's a little bit after 3:00.  If you'll be

24   back in the jury room at 3:15, please.

25             THE BAILIFF:  All rise.
```

```
 1                         (Jury excused from courtroom.)

 2                         THE COURT:  Please be seated.

 3                         (Recess.)

 4                         THE BAILIFF:  All rise.

 5                         (Jury returned to courtroom.)

 6                         THE COURT:  Please be seated.

 7                         The State call its next witness, please.

 8                         MS. MOSELEY:  The State calls Detective Landis.

 9                         (Witness brought forward and sworn.)

10                         THE WITNESS:  I do.

11                         THE COURT:  Thank you.

12                                 DAVID LANDIS,

13   was called as a witness by the State, and after having been

14   first duly sworn, testified as follows:

15                         DIRECT EXAMINATION

16   BY MS. MOSELEY:

17        Q.   Good afternoon.  Would you please introduce yourself

18   to the members of the jury?

19        A.   Good afternoon.  My name is David Landis.  I'm a

20   Detective with the Garland Police Department.

21        Q.   How long have you worked for the Garland Police

22   Department?

23        A.   Twenty-one years this month.

24        Q.   And how long have you been a detective?

25        A.   Six years, going on seven.
```

```
 1        Q.    What did you do before that?

 2        A.    Before that, I was a school resource officer at a

 3   high school for five years.

 4        Q.    Which one?

 5        A.    Lakeview Centennial.

 6        Q.    And I'm sure that was a blast.

 7        A.    Oh, yeah, never a dull moment.

 8        Q.    Prior to being a school resource officer, what did

 9   you do?

10        A.    I was in patrol for three years, and then I spent

11   three years in a specialized unit called the Neighborhood

12   Service Team, which is a community-oriented policing group with

13   Garland.

14        Q.    Well, that -- we know what a patrol officer does,

15   and I think we know what a Crimes Against Persons detective

16   does now.  What did you do when you were in the neighborhood --

17   what did you call it?

18        A.    Well, now it's called NPO, but back then it was

19   Neighborhood Service Team.  And we identified ongoing problems

20   in the community, and we used non-traditional methods to try to

21   eliminate the source of the problem to keep from having to

22   answer the same calls over and over again.

23        Q.    Kind of try to get ahead of it instead of just

24   responding to 911 calls, you would go out and try to be

25   proactive in the community?
```

1        A.    Yes, ma'am.

2        Q.    What part of town did ou work when you were doing

3   that?

4        A.    I worked in the -- the West Walnut area which is the

5   central part of Garland from Garland Road to the west by Plano

6   and Dallas.

7        Q.    And once you became a detective, did you get

8   assigned right away to the Crimes Against Persons, or did you

9   investigate other types of crimes first?

10       A.    Yes, ma'am.  I first came inside for a year and a

11  half as a burglary of a habitation detective and property

12  crimes.

13       Q.    Okay.  And you did that for, you said a year and a

14  half?

15       A.    Yes, ma'am.

16       Q.    After that then, did you then move into CAPERS?

17       A.    Yes, ma'am.

18       Q.    And that's what we -- CAPERS is Crimes Against

19  Persons?

20       A.    Yes, exactly.

21       Q.    It's shortened?

22       A.    Yes, an acronym.

23       Q.    You work with Detective King that we've already

24  heard from?

25       A.    Yes.

1      Q.    And Detective Tooke --

2      A.    Yes.

3      Q.    -- and Detective Sweet?

4      A.    Yes.

5      Q.    You're aware that all of those detectives were also

6  involved in this case, along with you?

7      A.    Yes, ma'am.

8      Q.    On the -- Sunday morning, May the 20th of 2012, I

9  assume you were going about your daily business, not working

10  that day; is that right?

11      A.    That is correct.  I was off on -- on the weekends.

12      Q.    And how did you get notified that you needed to

13  report in to assist in the investigation?

14      A.    My boss, Lieutenant Bill Brown, called me and told

15  me that we had the case working and I needed to respond.

16      Q.    Where did you go when you got the word you needed to

17  assist?

18      A.    I -- I first went to the Fina -- to the -- the crime

19  scene there and contacted Lieutenant Brown and some patrolmen.

20  And I signed into the log, but he told me there were other

21  people in the neighborhood that might have some information on

22  the suspect, and he directed me then to go contact those

23  people.

24      Q.    When you say you signed into the log, the crime

25  scene log, an officer's responsible for writing down everybody

1    that comes in and out of the crime scene?

2        A.    Yes.

3        Q.    And at this point, the crime scene you were talking

4    about was the Fina?

5        A.    Yes.

6        Q.    The victim was already transported to the hospital

7    by the time you got there?

8        A.    She was.

9        Q.    Was Detective Tooke there at the time, do you

10    remember?

11        A.    Yes, ma'am, he was there.

12        Q.    And what -- they assigned you then to go into the

13    neighborhood and speak to some of the witnesses in the

14    neighborhood who may have seen the person?

15        A.    Yes.

16        Q.    Which -- if you remember, which house you went to

17    first?

18        A.    I went to Mr. Medley's house -- I don't remember the

19    exact address -- because it was the closest one to the station.

20        Q.    To the gas station?

21        A.    Yes.  And we went to his house and knocked on his

22    door, didn't get an answer.  We called a cell phone number that

23    we had for him.  I left a message on his voicemail to call me

24    back, stuck a card in the door.  And then we moved on to -- a

25    couple of houses down to Mr. Benson, I believe.

```
 1        Q.    Mr. Denson?

 2        A.    Denson -- Denson.

 3        Q.    Lawrence Denson?

 4        A.    Yes.

 5              MS. MOSELEY:  May I approach the witness, Judge?

 6              THE COURT:  You may.

 7        Q.   (BY MS. MOSELEY)  I want to show you State's

 8   Exhibits 64, 65, 66, and 67, and -- and you'll notice that

 9   there's some stars on these maps -- maps or aerials.  If you'll

10   just take a look and see if you went to those houses where the

11   stars are.

12        A.    Yes, I went to all these houses.

13        Q.    Okay.  And you said you first started with Mr.

14   Medley, but Mr. Medley didn't answer the door?

15        A.    That's correct.

16        Q.    And then you went a couple of houses down to

17   Lawrence Denson's house?

18        A.    Yes, ma'am.

19        Q.    Were you able to speak with him?

20        A.    Yes.  He was home and we were able to talk to him,

21   and he told me --

22        Q.    Without -- without telling us what he told you --

23        A.    Okay.

24        Q.    -- because you know you can't say what somebody told

25   you.  Was he able to indicate to you that he had, in fact, had
```

1  contact with somebody matching the description of the suspect?

2       A.    Yes, ma'am.

3       Q.    And did you ask him to write a statement -- a

4  written statement about what it was -- his encounter entailed?

5       A.    I did.

6       Q.    Later that afternoon, did you call him and ask him

7  if he would come down and look at a photographic lineup?

8       A.    Yes, ma'am.

9       Q.    Did you show him a photo lineup?

10      A.    I did.

11      Q.    After you got finished that morning -- do you know

12 about what time it was you started talking to these people,

13 started knocking on doors and -- and interviewing the

14 witnesses?

15      A.    It was pretty much right away.  I got -- I think I

16 got there a little after 10:00, so it was between 10:30 and

17 11:00 when I first started contacting the folks there in the

18 neighborhood.

19      Q.    And after you spoke with Mr. Denson that morning,

20 where did you go?

21      A.    Then we went over to Mr. Mercle -- Mr. Marecle.

22      Q.    Mr. Marecle's house?

23      A.    Mr. Marecle's house, yes.

24      Q.    And did you -- were you able to make contact with

25 Mr. Marecle?

```
 1        A.    Yes, ma'am.

 2        Q.    And did you speak with him there?

 3        A.    I did.

 4        Q.    Was he able to describe for you -- again, without

 5   saying what he told you -- was he able to describe for you his

 6   encounter with the person?

 7        A.    He was.

 8        Q.    And a person matching the description of the suspect

 9   you were looking for?

10        A.    Yes, ma'am.

11        Q.    At the time that you're doing all this, do you know

12   whether the suspect in the capital murder has already been

13   arrested by Officer Perez?

14        A.    At the time, I did not know.

15        Q.    You didn't know if he had or had not been arrested?

16        A.    No.

17        Q.    Did you -- were you aware while you were there in

18   the neighborhood that there were lots of patrol cars still in

19   the neighborhood?

20        A.    Yes.

21        Q.    When you contacted Mr. Marecle and had him kind of

22   explain to you what had happened, did you have him write a

23   written statement?

24        A.    I did.

25        Q.    Did you notice that there was an injury on him?
```

99

1      A.    Yes.

2      Q.    And he showed it to you, I imagine?

3      A.    Yes, he did.

4      Q.    Did you have a forensics investigator with you?

5      A.    We did.  I had one with me.

6      Q.    Who was that?

7      A.    Vicki Stanley.

8      Q.    Investigator Stanley?

9      A.    Yes.

10     Q.    Who has since retired?

11     A.    She has retired, yes.

12     Q.    Did you ask her to photograph Mr. Marecle, kind of

13  the area where he described the incident occurring, as well as

14  his injury?

15     A.    Yes, ma'am.

16     Q.    And she did that?

17     A.    She did.

18     Q.    In your presence?

19     A.    Yes.

20     Q.    As you were there with Mr. Marecle, did anything

21  happen as you were preparing to leave?

22     A.    Yes.  A neighbor came over from the next house and

23  asked what we were doing.  We told them, and he said, well,

24  this might be important.

25              MR. WEATHERSPOON:  Your Honor, I'm going to

```
 1  object to the hearsay.

 2                  THE COURT:  Sustained.

 3                  MS. MOSELEY:  Judge, I'm not offering that for

 4  what -- for the truth of the matter asserted, just to explain

 5  why the officer did what he did next.

 6                  I'll rephrase the question.

 7                  THE COURT:  Thank you.

 8      Q.   (BY MS. MOSELEY)  Did the neighbor indicate that you

 9  should come and look at something he found in his backyard?

10      A.   He did.

11      Q.   And did you --

12      A.   In his driveway.

13      Q.   In the driveway?

14      A.   Yes.

15      Q.   And it's a rear drive?

16      A.   Yes, it's a rear drive.

17      Q.   And that was the neighbor immediately next door to

18  Mr. Marecle's house?

19      A.   Yes.

20      Q.   Did you go where he had directed you to go and look?

21      A.   Yes.

22      Q.   And what did you see?

23      A.   A pack of cigarettes opened and some were missing.

24  They were in the grass next to the driveway, and some of the

25  cigarettes were actually on the concrete driveway.
```

 1      Q.    And that seemed significant to you at that point?

 2      A.    Yes.

 3      Q.    Did you also -- at that time was -- was Investigator

 4   Stanley still with you?

 5      A.    She was.

 6      Q.    Did you ask her to photograph these items?

 7      A.    Yes, ma'am.

 8      Q.    And were you present when she, in fact, did

 9   photograph them?

10      A.    Yes.

11      Q.    And when she collected the items and took them for

12   -- for safekeeping?

13      A.    Yes.

14              MS. MOSELEY:  May I approach the witness?

15              THE COURT:  You may.

16      Q.    (BY MS. MOSELEY)  I'm showing you what's marked for

17   identification as State's Exhibits 68, 69, 70, 71, 72, and 73.

18   Are those the photographs that were taken at the home next door

19   to Ken Marecle?

20      A.    Yes.

21      Q.    And those items were collected there by -- by

22   Investigator Stanley?

23      A.    Yes, ma'am.

24              MS. MOSELEY:  I'd offer State's Exhibits 68

25   through 73, inclusive.

```
 1                    (State's Exhibits 68 through 73 offered.)

 2                    MR. WEATHERSPOON:  No objection.

 3                    THE COURT:  Admitted.

 4                    (State's Exhibits 68 through 73 admitted.)

 5                    MS. MOSELEY:  And I would offer State's

 6   Exhibits 64 through 67, if I didn't already.  Did I?

 7                    (State's Exhibits 64 through 67 offered.)

 8                    MR. WEATHERSPOON:  No.  No objection.

 9                    THE COURT:  Admitted.

10                    (State's Exhibits 64 through 67 admitted.)

11                    MS. MOSELEY:  Permission to publish, Judge?

12                    THE COURT:  You may.

13        Q.   (BY MS. MOSELEY)  State's Exhibit Number 64 is there

14   on that screen next to you.  That may be the easiest for you to

15   see -- or that one.

16        A.   Can this adjust?  There's a glare on it.

17        Q.   Well, maybe not.  You may find it better to either

18   look at that one or this one.

19        A.   Okay.

20        Q.   I don't know which one is easier for you.

21                    State's Exhibit 64 shows 718 Colonial Drive.  Is

22   that Mr. Medley's house that you first went to?

23        A.   Yes.

24        Q.   And State's Exhibit 65 shows 706 Colonial.  Is that

25   Mr. Denson's house that you went to?
```

203

```
 1        A.    Yes, it is.

 2        Q.    State's Exhibit 66 is 608 Mt. Vernon Place.  Is that

 3   Mr. Marecle's house?

 4        A.    Yes, ma'am.

 5        Q.    And then after Mr. Marecle's house, you went next

 6   door to 610 Mt. Vernon Place; is that right?

 7        A.    Yes.

 8        Q.    And that was Greg Mansell's house?

 9        A.    Yes, I believe so.

10        Q.    State's Exhibit 68, is that a photograph of 610 Mt.

11   Vernon Place, Mr. Mansell's house?

12        A.    Yes, ma'am.

13        Q.    And the side of his house --

14        A.    Yes.

15        Q.    -- is State's Exhibit 69.  And we can see kind of

16   magnified in that is a -- some item.  What is that?

17        A.    It's Marlboro Reds cigarettes in a box.

18        Q.    Opened or unopened?

19        A.    Opened.

20        Q.    And that's a closer up photograph of it there in

21   State's Exhibit 70?

22        A.    Yes, ma'am.

23        Q.    And State's Exhibit 71, we can kind of see --

24   there's some other items back there on the driveway and see how

25   close this cigarette pack is to the driveway; is that right?
```

1     A.    Yes.

2     Q.    State's Exhibit 72, what are we looking at there?

3     A.    A -- a single cigarette or maybe a couple of

4   cigarettes.  Looks like one Marlboro cigarette.

5     Q.    Okay.  Has not been lit?

6     A.    Correct.

7     Q.    And then State's Exhibit 73, there's a cigarette

8   underneath that pickup truck in Mr. Mansell's driveway?

9     A.    Yes, ma'am.

10            (Brief pause.)

11    Q.    (BY MS. MOSELEY)  I'm showing you what's marked as

12  State's Exhibits 74, 75, and 76.  There's some paper bags with

13  evidence tape on them.  If you don't mind looking inside there

14  and see if you recognize what are -- what are contained inside?

15    A.    That's the Marlboro cigarettes, the box, looks like

16  some fingerprint dust on them.  Marlboro cigarette.  And a

17  slightly flattened Marlboro cigarette.

18    Q.    I might have just done that.  And these are the

19  items of evidence that were collected by Investigator Stanley

20  while you were there at 610 Mt. Vernon?

21    A.    Yes, ma'am.

22            MS. MOSELEY:  I'd offer State's Exhibits 74, 75,

23  and 76.

24            (State's Exhibits 74 through 76 offered.)

25            MR. WEATHERSPOON:  No objection.

205

```
 1                    THE COURT:  Admitted.

 2                    (State's Exhibits 74 through 76 admitted.)

 3                    MS. MOSELEY:  Permission to publish?

 4                    THE COURT:  You may.

 5         Q.   (BY MS. MOSELEY)  Now, you said, Detective, that

 6  State's Exhibit 76 is some black powder -- fingerprint powder?

 7         A.   Yes.  That's what it looks like, yes.

 8                    (Exhibit published.)

 9         Q.   (BY MS. MOSELEY)  And State's Exhibits 74 and 75 are

10  those loose cigarettes that we can see in the photographs?

11         A.   Yes, ma'am.

12         Q.   After you got finished talking to Mr. Mansell at 610

13  Mt. Vernon, did you -- did you hear back from Mr. Medley?

14         A.   Yes, I did.  After that, we heard back from him.

15         Q.   And were you still there in the neighborhood when he

16  called you?

17         A.   I was.

18         Q.   What did you do then?

19         A.   We drove over to his house, we being myself and

20  Investigator Stanley.

21         Q.   And was it your understanding, as you were going

22  over to speak with Mr. Medley, that there had been some items

23  of evidence that needed to be collected there at his house?

24         A.   Yes.

25                    MS. MOSELEY:  May I approach?
```

```
 1                    THE COURT:  You may.
 2         Q.    (BY MS. MOSELEY)  I'm going to show you what's
 3  marked as State's Exhibits 77 and 78, and ask if you can just
 4  take a look at 78 first -- inside 78 --
 5         A.    Okay.
 6         Q.    -- and see if you recognize that?
 7         A.    Yes.
 8         Q.    And is that the package of cigarettes that was
 9  taken -- that was collected in your presence by Investigator
10  Stanley at Jim Medley's house?
11         A.    Yes, it was.
12         Q.    Now, State's Exhibit 77 is an empty bag, but can you
13  tell what was in this bag?
14         A.    White T-shirt.
15         Q.    Is this the white T-shirt that came from Mr.
16  Medley's trash?
17         A.    Yes.
18         Q.    And it's not in here anymore?
19         A.    No.
20         Q.    And you wouldn't know why.  But that's the bag that
21  it was collected in there at the house?
22         A.    Yes, ma'am.
23                    MS. MOSELEY:  I'd offer State's Exhibits 77 and
24  78.
25                    (State's Exhibits 77 and 78 offered.)
```

```
 1                    (Discussion between counsel off the record.)

 2                    MR. WEATHERSPOON:  No objection.

 3                    THE COURT:  Admitted.

 4                    (State's Exhibits 77 and 78 admitted.)

 5                    MS. MOSELEY:  Permission to publish?

 6                    THE COURT:  You may.

 7          Q.   (BY MS. MOSELEY)  State's Exhibit 78 appears to be

 8   an opened pack of -- a green pack Marlboro Blend Number 54

 9   100s; is that right?

10          A.    Menthol, yes.

11          Q.    Menthol.  And we saw a photograph of this when Mr.

12   Medley was testifying.

13          A.    Okay.

14                    THE COURT:  Just so the record is clear, what --

15   what is being admitted in 79?

16                    MS. MOSELEY:  It is just the bag that formerly

17   contained the white T-shirt from Mr. Medley's house.

18                    THE COURT:  Thank you.

19                    MS. MOSELEY:  Oh, you said 79, Your Honor, and I

20   think you met 77.  I hope I didn't -- 77 is the bag --

21                    THE COURT:  The empty bag -- I thought -- the

22   empty bag is what I'm referring to.

23                    MS. MOSELEY:  Yes, ma'am.  That's 77.  And then

24   78 was the cigarette package.

25          Q.   (BY MS. MOSELEY)  Now, you said that you actually
```

1    asked Mr. Marecle, as well as Mr. Denson, to come down and look

2    at photographic lineups; is that right?

3         A.    Yes.

4         Q.    Did they come to the police station to do that?

5         A.    They did.

6         Q.    Can you give the members of the jury a little bit of

7    an idea of how that process works?

8         A.    At that time, we had an array of six photographs in

9    the lineup, and they were all on the same piece of paper, but

10    they just had a number 1 through 6 for the -- the photographs

11    that we put in the lineup.  We also had a -- a set of

12    instructions and -- and since then, our procedure has changed.

13    But at this time we read the instructions to view the photo

14    lineups and told the people to keep in mind that facial

15    features, hairstyles, people can shave or grow moustaches and

16    that they don't have to pick anybody out of a lineup.  Once we

17    read the instructions to them and they understand them --

18         Q.    You also tell them if there's -- the person that

19    they encountered may or may not be in the photographs?

20         A.    Yes.

21         Q.    Okay.

22         A.    And we -- we generally like to call people to the

23    station because we have a room where we can audio and videotape

24    the procedure so that it's all captured and recorded.

25         Q.    And -- and did you do that with both Mr. Marecle, as

1   well as Mr. Denson?

2         A.   Yes, ma'am.

3               MS. MOSELEY:  May I approach the witness, Judge?

4               THE COURT:  You may.

5         Q.   (BY MS. MOSELEY)  I'm showing you what I've marked

6   as State's Exhibit 62 and 63.  Can you tell if that is the

7   actual -- it's actually a photocopy of the sheet that you

8   showed to Mr. Denson, and the instructions, as well as the

9   photographs that were shown?

10        A.   Yes, this is a copy of them.

11        Q.   And at the time that you showed these photographs to

12  the witnesses, did you know who the suspect was?

13        A.   No.

14        Q.   Did you know which photograph, so that you would

15  know did he pick the right person or the wrong person?

16        A.   I had no idea.

17        Q.   Who put these photographs together?

18        A.   I believe it was Detective Sweet.

19        Q.   But another --

20        A.   Yes.

21        Q.   Somebody else?

22        A.   Uh-huh.

23        Q.   And at that time you didn't know which of the

24  suspects -- or which of the photographs was actually the

25  suspect?

```
 1      A.   No, ma'am.

 2      Q.   And you read the instructions to Mr. Denson?

 3      A.   Yes.

 4      Q.   And was he able to indicate that he did believe he

 5 saw the person he had encountered at his home?

 6      A.   Yes, he did.

 7      Q.   And he circled and put his initials there?

 8      A.   He did.

 9      Q.   And that was recorded -- video and audio recorded --

10      A.   Yes, ma'am.

11      Q.   -- is that right?

12           Did you in any way indicate to him who he should

13 select?

14      A.   No.

15      Q.   Seems kind of silly because you don't know who it is

16 he should select, right?

17      A.   That's true.

18      Q.   After you got finished with the process of showing

19 the lineups and taking the statements from those witnesses, did

20 you have any further involvement in the investigation?

21      A.   I had one other -- the daughter Amy, I had to go

22 talk to her.

23      Q.   That was Mr. Marecle's daughter Amy?

24      A.   Yes.

25      Q.   Because she wasn't at the house when you got there?
```

```
 1        A.    When I got there, no, she wasn't.

 2        Q.    You had to go to her place of business?

 3        A.    Yes.

 4        Q.    And were you able to interview her about what she

 5   had seen and observed?

 6        A.    I was.

 7        Q.    Did you show her a lineup, as well?

 8        A.    I did.

 9        Q.    And was she able to identify anyone?

10        A.    She was not able to pick anybody out of the lineup.

11        Q.    And neither was Mr. Marecle?

12        A.    No, ma'am.

13              MS. MOSELEY:  That's all I have.  Thank you.

14              THE COURT:  Mr. Weatherspoon.

15                     CROSS-EXAMINATION

16   BY MR. WEATHERSPOON:

17        Q.    Detective Landis, I have just a couple of questions

18   for you.  If I ask you anything, just ask me -- if you don't

19   understand, just ask me to repeat myself.

20        A.    Yes, sir.

21        Q.    Now, you said Investigator Stanley was with you

22   during certain parts of the investigation; is that correct?

23        A.    Yes, sir.

24        Q.    And what occasions were those?

25        A.    When we were talking to Mr. Marecle and at the same
```

212

```
1   time before she left when the -- the neighbor came out, she was
2   there then, and then when I got the phone call from Mr. Medley,
3   she accompanied me back over to his house and took her
4   photographs and collected the items from that location.
5        Q.   Were you -- was she with you at the Fina -- at the
6   Whip-in station?
7        A.   She was there, but I -- I didn't even go inside.  As
8   soon as I got there, my lieutenant sent me to this other place.
9        Q.   Did you observe her swabbing for any DNA?
10       A.   No.
11       Q.   Now, from the -- from the time you first got to the
12  Whip-in station until you made your first contact with the
13  witnesses, how much time passed?
14       A.   Probably 20, 25 minutes.
15       Q.   And when you spoke with the witnesses, were they
16  still in somewhat of an excited state?
17       A.   I'd say a little bit, not just overly excited, but
18  they were still excited, somewhat.
19       Q.   Did anyone tell you of any injuries, other than Mr.
20  Marecle?
21       A.   Besides him, no, sir.
22       Q.   At what point did you talk to Amy Marecle?
23       A.   It was later in the afternoon.  It was hours later
24  when -- after I went back to the station, showed the lineups,
25  and found out where she worked and made arrange -- it was -- I
```

```
 1  don't remember the exact time, but it was several hours later.

 2                   MR. WEATHERSPOON:  Can I have just one minute,

 3  Your Honor?

 4                   THE COURT:  Sure.

 5                   (Brief pause.)

 6                   MR. WEATHERSPOON:  Nothing further from this

 7  witness.

 8                   MS. MOSELEY:  I have no further questions.

 9                   THE COURT:  Thank you, sir.  You may stand down,

10  and you are excused, subject to recall.

11                   THE WITNESS:  Thank you.

12                   MS. MOSELEY:  The State calls Detective Tooke.

13                   THE COURT:  Afternoon.

14                   (Witness brought forward and sworn.)

15                   THE WITNESS:  Yes, I do.

16                   THE COURT:  Thank you.

17                        STACY TOOKE,

18  was called as a witness by the State, and after having been

19  first duly sworn, testified as follows:

20                   DIRECT EXAMINATION

21  BY MS. MOSELEY:

22      Q.   Good afternoon, Detective.

23      A.   Good afternoon.

24      Q.   Would you please introduce yourself to the members

25  of the jury?
```

214

```
 1        A.    Detective Stacy Tooke.  It's T, as in Tom, o-o-k-e.

 2        Q.    And, Detective Tooke, you'll have to keep your voice

 3   up so everybody can hear you.  I think we've been having some

 4   trouble with the sound system --

 5        A.    Okay.

 6        Q.    -- of one sort or another today.  You obviously work

 7   for the Garland Police Department; is that right?

 8        A.    Yes, ma'am, I do.

 9        Q.    How long have you worked for them?

10        A.    For 22 years.

11        Q.    Can you tell us how long you've been a detective?

12        A.    For about 16 years.

13        Q.    Did you start off working homicides, or did you

14   start off somewhere else in your investigations?

15        A.    Once I was in investigations, I worked thefts for

16   about three years.  I've been assigned to the CAPERS Unit, the

17   Crimes Against Persons Unit since 2000.

18        Q.    Since 2000?

19        A.    Yes, ma'am.

20        Q.    So 13 years?

21        A.    Yes, ma'am.

22        Q.    Prior to that, were you a patrol officer?

23        A.    Yes, ma'am.  I worked patrol for about six years.

24        Q.    And as a Crime Against Persons detective, you

25   investigate homicide cases, as -- as well as other Crimes
```

215

```
 1   Against Persons, right?

 2        A.   Yes, we do.

 3        Q.   How many murder cases have you investigated in your

 4   career?

 5        A.   Probably anywhere between 25 to 30 as a lead

 6   investigator, and as many as a hundred as a backup or other --

 7   on the -- on the case.

 8        Q.   And you guys work -- when you get a homicide, a

 9   murder or capital murder case, you work as a team if there's a

10   lot to do; is that right?

11        A.   Yes, ma'am.

12        Q.   You, as well as some other detectives, and we've

13   heard from Detective Landis and Detective King today.  They

14   were assisting you on this case?

15        A.   Yes, they were.

16        Q.   But you were -- you were responsible for the case as

17   the lead detective?

18        A.   Yes, that's right.

19        Q.   As the lead detective, what are your

20   responsibilities initially on the investigation?

21        A.   Well, upon responding to the scene and assessing

22   what needs to be done by everybody else, by patrol and

23   forensics and what everybody needs to concentrate on, it didn't

24   take too much longer to decide I should notify my supervisor

25   and get a backup.  And I told him I would need another
```

216

```
1   detective because there were other crimes being reported at the
2   same time and that I believed we were getting close to
3   apprehending the offender.  So while having that
4   conversation -- in the course of that one conversation, my --
5   my lieutenant and other detectives responded out.
6        Q.   And then are -- are you responsible for kind of
7   splitting up the duties so Detective King was asked to stay at
8   the crime scene and -- and kind of direct forensics while
9   Detective Landis was out in the neighborhood talking to
10  witnesses there?  Was that kind of your responsibility to split
11  up the duties?
12       A.   Well, I asked for Detective Sweet to be my liaison
13  or my backup officer, and then Lieutenant Brown assigned the
14  other detectives to the tasks.
15       Q.   Okay.  So Detective Sweet was also helping you?
16       A.   Yeah, he was my primary backup.
17       Q.   I assume, like the other detectives, you were at
18  home that morning and got a call that you needed to get up and
19  come to work?
20       A.   Yeah.  I was on call back that weekend, so I had
21  been working all weekend.  I had gone to my friend's store to
22  have coffee like I do on Sunday mornings and got the call while
23  I was -- while I was there that Sunday morning.  It was a
24  little after 7 o'clock, maybe 7:30.
25       Q.   And you went on in then to the store, or did you go
```

1    to the police department first?

2         A.    I went to my house to get my gear and my car and

3    then headed out and responded straight to the store -- straight

4    to the Whip-in.

5         Q.    And by the time you got there, I assume that Nancy

6    Harris had already been taken to the hospital?

7         A.    Yes.

8         Q.    Were the fire personnel still on the scene?

9         A.    Yes, they were.

10        Q.    And I assume that forensics was beginning to arrive

11   and start taking photographs and whatnot?

12        A.    Yeah, forensics was there and taking photographs.

13   And once I was en route, I talked to the lieutenant that was on

14   scene, told him to start a major -- major incident log and to

15   shut everything down.  I wanted to work it as if it -- as if it

16   had the potential to be a murder.

17        Q.    At that time you were aware that Ms. Harris was

18   still alive?

19        A.    I was aware that she was alive, but they advised me

20   of how severe the burns was and -- and how bad things were at

21   the time.  And I had concerns from working cases in the past of

22   how quickly things can change in -- in one or more days.

23        Q.    So right from the beginning, you were treating it as

24   a - as a homicide?

25        A.    Yes, I was.

218

1      Q.    At some point in this -- in the course of you being

2  at the store, did you watch the surveillance video?

3      A.    Yes, I did.

4      Q.    And as the lead detective on the case, what's your

5  reason behind watching that surveillance video there at the --

6  still at the crime scene?

7      A.    Well, we were trying to find and arrest Mr. Johnson,

8  unknown at that time -- unidentified at the time, but the tape

9  would be what we would need to identify him.  We knew that they

10  were looking for him in the area.  I wanted to -- I knew that I

11  would be one of the first people to talk to him after the

12  arrest.  I wanted to know what he looked like.  I also needed

13  to know what -- what to do at the scene.  We've got a -- a

14  complete preservation of everything that happened.  It's all

15  right there on camera so we can watch what happened and then

16  know why things are the way that we see them in the store.

17      Q.    Did it assist not only in identifying the

18  perpetrator, the person who committed the crime, but also in

19  knowing what evidence would be significant in the store?

20      A.    Correct.

21      Q.    And what kinds of evidence perhaps you needed to be

22  looking for --

23      A.    Correct.

24      Q.    -- that you didn't see in the store.

25            At some point were you aware that the -- that

```
 1  the suspect had been arrested?

 2       A.    Yes, I was.

 3       Q.    And did you have contact with him at the jail?

 4       A.    Yes, I did.

 5       Q.    Do you see him in the courtroom?

 6       A.    Yes, I do.

 7       Q.    Can you identify him by what he's wearing today?

 8       A.    He's sitting to my left wearing glasses, a white

 9  shirt, and a black coat.

10            MS. MOSELEY:  May the record reflect this

11  witness has identified the Defendant.

12            THE COURT:  The record will reflect.

13       Q.    (BY MS. MOSELEY)  When you contacted him he was

14  already arrested and at the jail; is that right?

15       A.    Yes, he was.

16       Q.    During the course of your contact with him, did you

17  ask him for a consent to take a DNA sample from him?

18       A.    Yes, I did.

19       Q.    And was it your understanding at that point that

20  there may, in fact, be items of evidence that could contain

21  DNA?

22       A.    Yes.

23       Q.    And despite the fact that you had a pretty clear

24  video that you had already seen of the suspect's face, why

25  would DNA be -- why would you even think -- be thinking about
```

```
 1   DNA?

 2        A.    For a thorough investigation, there's any number of

 3   things that can -- that can be seen or questioned later.  This

 4   would pretty -- would firm up any doubt in anybody's mind that

 5   there would be no doubt that that was what happened and that

 6   that is who is responsible for it.

 7        Q.    And in asking the Defendant to consent for a buccal

 8   swab, what we call the DNA swab out of the mouth, that's how we

 9   collect DNA?

10        A.    Yes, ma'am.

11        Q.    Did he sign and date a consent for you to send

12   somebody in to take a sample of his DNA?

13        A.    Yes, he did.

14             MS. MOSELEY:  May I approach the witness?

15             THE COURT:  You may.

16        Q.    (BY MS. MOSELEY)  I'm showing you State's Exhibit

17   Number 103.  Do you recognize that?

18        A.    Yes.  This is our standard consent to search form

19   for bodily fluids -- in essence, DNA.

20        Q.    And while this is a photocopy, is it a photocopy of

21   the original that the Defendant signed, as well as yourself and

22   Detective Sweet?

23        A.    Yes, it is.

24             MS. MOSELEY:  I'd offer State's Exhibit 103.

25             (State's Exhibit 103 offered.)
```

```
 1              MR. WEATHERSPOON:  No objection.

 2              THE COURT:  Admitted.

 3              (State's Exhibit 103 admitted.)

 4         Q.   (BY MS. MOSELEY)  And you're not the detective who

 5    collects the buccal swab -- physically takes the DNA sample; is

 6    that right?

 7         A.   No, we had a forensics investigator on scene, so I

 8    requested him to do it.

 9         Q.   And did he also take photographs of the Defendant as

10    he appeared there just after his arrest?

11         A.   Yes, he did.

12         Q.   Now, during the course of the investigation at the

13    Fina station, were you made aware that an item of evidence was

14    located kind of behind the -- the bank?  There's a bank next

15    door.

16         A.   Yes.

17         Q.   Were you made aware that there was some evidence

18    located behind that bank?

19         A.   Yes, I was.

20         Q.   And it was a T-shirt?

21         A.   That's correct.

22         Q.   At that time, did you know whether or not that

23    T-shirt was going to be significant in the investigation?

24         A.   No, but at the time we collected it, in the event

25    that it did become important.
```

1        Q.    So in any investigation, early on it's difficult to

2    tell what will or won't become a piece of evidence until later?

3        A.    Absolutely.  And you don't get to redo things.

4        Q.    So you do -- just go ahead and collect it in the

5    event that it might end up being relevant?

6        A.    That's correct.

7              MS. MOSELEY:  May I approach, Your Honor?

8              THE COURT:  Yes, ma'am.

9        Q.    (BY MS. MOSELEY)  I'm showing you what's marked as

10   State's Exhibits 104, 105, and 106.  Are those -- State's 104,

11   is that a photograph of the bank next door to the store?

12       A.    Yes, it is.

13       Q.    And in that photograph, is there a squad car in

14   that -- behind the bank?

15       A.    There's a squad car.  It looks like it's positioned

16   in the alleyway behind the bank.

17       Q.    Okay.  And then State's Exhibits 105 and 106, that

18   the T-shirt that was found there behind the bank?

19       A.    Yes, it is.

20       Q.    Does it appear to be a long sleeve T-shirt?

21       A.    Right, it does.

22       Q.    And when you watched the surveillance video of this

23   crime, did it appear that the suspect -- the unknown suspect at

24   that time, did it appear he was wearing a long sleeve or short

25   sleeve T-shirt?

1      A.    A short sleeve T-shirt.

2      Q.    But, again, you never know, so you collect it?

3      A.    Well, yeah, it was described to me that they had

4  located a T-shirt.  I told them to collect it.

5            MS. MOSELEY:  I'd offer State's Exhibits 104,

6  105, and 106.

7            (State's Exhibits 104 through 106 offered.)

8            MR. WEATHERSPOON:  No objection.

9            THE COURT:  Admitted.

10           (State's Exhibits 104 through 106 admitted.)

11           MS. MOSELEY:  Permission to publish?

12           THE COURT:  You may.

13     Q.    (BY MS. MOSELEY)  If you'll look there to your left,

14  Detective, State's Exhibit 104 -- or up here, is the -- the

15  picture of the bank next door?

16     A.    Yes, it is.

17     Q.    And then the -- if we can see, there's an alley and

18  some driveways there on State's Exhibit 105 in the -- in the

19  back part of that photograph.  Is that actually Colonial, the

20  street Colonial?

21     A.    I believe that's Colonial, yes, ma'am.

22     Q.    And it backs up to that store then?

23     A.    The alleyway -- just a field area between the -- the

24  alley and the store.

25     Q.    And then that's a close-up photograph of that shirt

1    that was found there behind the -- in the field?

2         A.    Yes, it is.

3         Q.    At some point in the investigation were you aware

4    that another short-sleeved T-shirt had been collected in the

5    case?

6         A.    Yes, I was.

7         Q.    And taken in by the -- by the forensics investigator

8    and collected?

9         A.    Yes.

10        Q.    Did that T-shirt -- is it -- is it your

11   understanding at that point that that T-shirt more closely

12   resembled the T-shirt worn by the Defendant at the time of the

13   crime?

14        A.    Yes, it did.

15        Q.    And as part of the investigation, do you request

16   that certain items of evidence be sent to the lab and be tested

17   either for DNA or some other purposes, blood or depending on

18   the crime?

19        A.    Yes, we do.

20        Q.    And did you do that in this case?

21        A.    I did.

22        Q.    You submitted some swabs, as well as the T-shirts?

23        A.    There's swabs and articles submitted for DNA

24   processing.

25        Q.    The T-shirt that was found at Jim Medley's house in

225

 1   the trash can, was that submitted?

 2        A.   Yes, it was.

 3        Q.   Was this T-shirt that we see in State's Exhibit 106

 4   submitted to SWIFS?

 5        A.   No, not -- I eliminated it in the process of

 6   identifying what to test and what not needed -- the things that

 7   didn't need to be tested.

 8        Q.   So you -- you didn't request any -- any testing be

 9   done on the item that we see in State's Exhibit 106?

10        A.   No, I didn't.

11        Q.   Did you ask for DNA testing on every single piece of

12   evidence in the case?

13        A.   No.

14        Q.   Why not?

15        A.   It's -- part of the job as the lead detective is to

16   determine what the best evidence is going to be and what

17   evidence needs to be processed in order to prove up your

18   offense.  Everything that -- that we sent -- everything that

19   was submitted for testing were articles that were directly

20   related to the offense -- believed to be directly related to

21   Matthew Johnson, and also to any other trace evidence at the

22   scene that needed to be processed, things that would prove up

23   the offense.

24        Q.   We see -- we see a lot on CSI that DNA testing, A,

25   gets done in about -- well, within a 30-minute program and

226

```
 1  nobody ever talks about the bill that gets attached to it or

 2  the time that it really takes.  Is it important that you narrow

 3  down the items of evidence both for financial reasons, as well

 4  as for time reasons?

 5       A.   That and some of the labs even tell us exactly how

 6  many items we can submit and what time frame we can submit more

 7  later.  There has to be some kind of a judicious -- you have to

 8  decide how much -- how important an article is and then this --

 9  this article was easily excluded as -- as being a part of our

10  offense or important to the crime.

11       Q.   Do you normally submit your items of evidence to the

12  Department of Public Safety?

13       A.   Usually we do.  We submit them to DPS.

14       Q.   And that's because they will test items for free?

15       A.   Correct.

16       Q.   At no charge to the police agency?

17       A.   Correct.

18       Q.   Is there a really long wait to get results from the

19  Department of Public Safety?

20       A.   Yes, there is.

21       Q.   There's a backlog, in other words?

22       A.   There's a backlog of sometimes a year or longer.

23       Q.   And the City of Garland is not the only police

24  agency that uses the Department of Public Safety because of the

25  same reasons?
```

```
 1        A.    Right.

 2        Q.    And they will limit what they will and won't test

 3   for you?

 4        A.    Right.

 5        Q.    In an effort to get all of the work done eventually?

 6        A.    That's correct.

 7        Q.    In this case, did you decide to send the items that

 8   you wanted tested for DNA, did you send it to the Southwestern

 9   Institute of Forensic Sciences?

10        A.    Yes, I did.

11        Q.    What we call SWIFS?

12        A.    Yes, ma'am.

13        Q.    And why did you decide to send those items to SWIFS?

14        A.    I've gone to SWIFS with major cases over the years,

15   and they're accredited, very proficient, very timely lab, very

16   easy to communicate with and -- and have good feedback from

17   them and -- and did everything that we needed to do in this

18   case in a -- in a pretty expedient manner.

19        Q.    You were able to get your results quicker, because

20   it does cost money?

21        A.    Yes.

22        Q.    And they actually send a bill to the Garland Police

23   Department for the processing of this evidence?

24        A.    That's right.

25        Q.    I know you've watched the surveillance video of the
```

1  offense.  Would you agree with me that the more you watch it,

2  the more you see?

3      A.    Yes.

4      Q.    That it happens pretty quick the first -- the first

5  time you watch it; would you agree?

6      A.    Yes, it does.

7      Q.    And that the details sometimes can be missed in --

8  in the watching of the video?

9      A.    Yes.

10          MS. MOSELEY:  May I approach?

11          THE COURT:  You may.

12      Q.    (BY MS. MOSELEY)  I'm going to show you State's

13  Exhibits 79 through 102, and ask you if those are screen shots

14  or still shots from this surveillance video that showed some of

15  the significant things that occurred in the video?

16      A.    Yes, they are.

17      Q.    Do you believe that these photographs make it easier

18  to -- to see the things that are important in the video?

19      A.    Yes, it does.

20      Q.    Have there been any changes -- material changes to

21  the content of these photographs that isn't contained in the

22  video itself?

23      A.    No.  These are shots from the video -- taken from

24  the video as we do routinely.

25      Q.    And do you think that they will assist the members

```
 1   of the jury in seeing the significant aspects of that video?

 2        A.   Yes, I do.

 3              MS. MOSELEY:  I would offer State's Exhibit 79

 4   through 102.

 5              (State's Exhibits 79 through 102 offered.)

 6              MS. BERNHARD:  Your Honor, we're going to object

 7   to 79 through 102 due to their cumulative nature and also the

 8   previous objections that were set out in Pretrial Motion Number

 9   57.

10              THE COURT:  Any response?

11              MS. MOSELEY:  Judge, I can show the video

12   multiple times and stop and freeze this, but I believe that

13   this is more expedient.  The fact is that the content contained

14   in these photographs is already in evidence through the video,

15   and this just allows the State to show this and point out

16   the -- the specific -- the specific aspects of the video

17   without playing it again.

18              THE COURT:  All right.  Defense's objection is

19   overruled.

20              (State's Exhibits 79 through 102 admitted.)

21              MS. MOSELEY:  Permission to publish to the jury?

22              THE COURT:  You may.

23              MS. MOSELEY:  Judge, could we have the -- maybe

24   lights turned down just a little bit, please?

25        Q.   (BY MS. MOSELEY)  State's Exhibit Number 79, what is
```

1  in the Defendant's hand in that photograph, Detective?

2       A.    It's a bottle.

3       Q.    Some sort of drinking bottle, plastic bottle?

4       A.    Appears to be like a -- yeah, like a plastic -- like

5  a water bottle or -- or that type of bottle.

6       Q.    And State's Exhibit Number 81 gives you a pretty

7  good shot of what he looks like and what he's wearing?

8       A.    Yes, it does.

9       Q.    And, again, State's Exhibit Number 82 shows the

10  glasses, as well as the facial features of the person in the

11  video?

12       A.    Yes, it does.

13       Q.    State's Exhibit 83, you can see the Defendant from

14  behind.  And, again, in his right hand is the bottle, as well

15  as something else.  Can you tell what that is?

16       A.    From this photo, you probably couldn't tell what it

17  is.

18       Q.    And then coming around the corner there where -- on

19  the time stamp it says 6:07:59, and we know really it's

20  7:07:59, just before 7:08 a.m.

21            Now, State's Exhibit Number 85 -- now, in the

22  Defendant's right hand, what do you see?

23       A.    Appears to be a lighter.

24       Q.    The silver shiny part, the top of the --

25       A.    Top part of the lighter.

```
 1        Q.    And now we can see that the Defendant is grabbing a

 2   lighter off of the -- and he actually takes two.  Do you recall

 3   that?

 4        A.    That's correct.

 5        Q.    And State's Exhibit 87, he's selecting a package of

 6   cigarettes?

 7        A.    That's correct.

 8        Q.    And then a different package of cigarettes in

 9   State's Exhibit 88?

10        A.    That's correct.

11        Q.    And the -- it appears as though Ms. Harris is trying

12   to open the register?

13        A.    She is.

14        Q.    State's Exhibit 89, the Defendant has his hand on

15   Ms. Harris's hand?

16        A.    He does.

17        Q.    Is that when the ring is --

18              MS. BERNHARD:  Judge, I'm going to object to the

19   leading questions at this point.

20              THE COURT:  Sustained.

21        Q.    (BY MS. MOSELEY)  What do we see in State's

22   Exhibit 89?

23        A.    You see the Defendant's hand on top of Ms. Harris's

24   hand, and there's a series of photographs that follow this one

25   that show what happens after that.
```

```
 1        Q.    And State's Exhibit 90, what do we see?

 2        A.    You see the Defendant licking -- licking his

 3   fingers.

 4        Q.    And, again, in State's Exhibit 91?

 5        A.    He's licking his fingers.

 6        Q.    State's Exhibit 92, what is that showing?

 7        A.    He's got his hand back on her hand.

 8        Q.    State's Exhibit 93?

 9        A.    His hand has gone to the counter, and her hand is

10   still on the screen.

11        Q.    How much room, Detective -- you were there in that

12   store.  How much room is there back behind that counter for two

13   adults to be standing?

14        A.    Not much at all.  It would be considered a very

15   uncomfortable space for someone to be standing directly behind

16   someone else, unless you knew them extremely well.

17        Q.    And in State's Exhibit 94, what do we see?

18        A.    Ninety-four looks as if the till is open on the

19   drawer.

20        Q.    And 95?  I don't know if this one is on your --

21        A.    You see another shot of the -- another shot of the

22   store and the --

23        Q.    The register open?

24        A.    The register is still open, yeah.

25        Q.    And State's Exhibit 96?
```

```
 1        A.   You can see the Defendant's hand coming and going

 2   from the register drawer.

 3        Q.   What do we see in 97?

 4        A.   The register drawer sitting empty on the countertop,

 5   next to the register.

 6        Q.   And what do we see in the register screen?

 7        A.   You can see a blaze on the screen -- a fire blaze on

 8   the screen.

 9        Q.   State's Exhibit 98, what are we seeing there?

10        A.   It's Nancy Harris and she comes around the counter

11   and she's on fire.

12        Q.   And the Defendant is where?

13        A.   The Defendant is directly behind her.

14        Q.   And State's Exhibit 99?

15        A.   She's moved forward, and the Defendant has moved

16   forward and is moving out past her to the side.

17        Q.   State's Exhibit 100?

18        A.   Nancy Harris is still on fire.  She's changed her

19   position.  She's standing over on a mat now, and the Defendant

20   is over by the candy rack.

21        Q.   What's in his hand?

22        A.   Looks like the -- the bottle is in his -- looks like

23   the bottle is in his hand.

24        Q.   And State's Exhibit 101?

25        A.   It's him walking out the door -- the Defendant
```

1  walking out the door.

2       Q.    At 6:09:57, which is really 7:09:57?

3       A.    That's correct.

4       Q.    Does it appear -- look in State's Exhibit Number

5  102.  What direction does it look to you like the Defendant is

6  looking?

7       A.    He appears to be looking to his right.  That would

8  be back to the east.

9       Q.    Which would -- across the street in that direction,

10 what's over there?

11      A.    On the other side of the street are businesses.

12 There's a couple of different strip centers on either side of

13 the intersection.

14      Q.    Is that where that plasma center is?

15      A.    That -- that's one of the businesses, yes, ma'am.

16            MS. MOSELEY:  Thank you, Judge.

17            (Lights turned back on.)

18      Q.    (BY MS. MOSELEY)  And we've already talked about you

19 sending or requesting certain items be submitted to SWIFS for

20 DNA testing.  Were you aware that an arson investigator, Nancy

21 Carpenter, was also involved in this investigation?

22      A.    I met Nancy Carpenter at the scene.

23      Q.    Okay.  And were you two kind of working together,

24 you handling the criminal investigation and her more handling

25 the fire evidence and the testing that needed to be done on

1    those items?

2         A.   Yes, we were.

3         Q.   Did she -- did she collect those fire -- the pieces

4    of fire evidence there at the store?

5         A.   Yes, ma'am, articles that had fire evidence, she

6    collected all of those.

7         Q.   And did she kind of keep you updated when the

8    results of those tests came in?

9         A.   I spoke with her frequently.

10        Q.   You relied on her expertise there to request the

11   testing that needed to be done?

12        A.   That's correct.

13        Q.   Did you go to the hospital and talk to the victim's

14   family?

15        A.   Yes, I did.

16        Q.   That same day?

17        A.   Not that same day.

18        Q.   Were you able to update the victim's family members

19   on the -- the progress of the investigation and the arrest of

20   the suspect?

21        A.   Yes, I did.

22        Q.   And, in turn, were they able to keep you informed as

23   to the condition -- the medical condition of Ms. Harris?

24        A.   Yes, they did.

25        Q.   Initially when the Defendant was arrested and put in

```
 1  jail, what did you charge him with?

 2       A.    Attempted murder.

 3       Q.    Attempted capital murder?

 4       A.    Attempted capital murder, that's correct.

 5       Q.    And then on Friday, May 25th of 2012, were you

 6  notified that Ms. Harris had succumbed to her injuries and

 7  passed away?

 8       A.    Yes, I was.

 9       Q.    And at that point did you change the charge?

10       A.    Yes, I did.

11       Q.    And what did you change it to?

12       A.    Capital murder.

13             MS. MOSELEY:  Thank you, Detective.

14             I'll pass the witness.

15             MR. WEATHERSPOON:  Your Honor, may we approach?

16             THE COURT:  Yes, sir.

17             (Sidebar conference, off the record.)

18                    CROSS-EXAMINATION

19  BY MR. WEATHERSPOON:

20       Q.    Detective Tooke, my name is Kenneth Weatherspoon.  I

21  have just a couple of questions to ask you.  If I ask you

22  anything you don't understand, just ask me to repeat myself.

23       A.    Okay.

24       Q.    Now, you are the lead detective on this case; is

25  that correct?
```

```
 1        A.    Correct.

 2        Q.    So you are responsible for basically making sure

 3   everything is done and done correctly in this case; is that

 4   correct?

 5        A.    Correct.

 6        Q.    Now, at any point did you talk to Mr. Johnson?

 7        A.    Yes, I did.

 8        Q.    And where did you talk to Mr. Johnson?

 9        A.    In our jail.

10        Q.    In your interrogation room?

11        A.    Yes, sir, in an interview room in our jail.

12        Q.    And that interview was recorded; is that correct?

13        A.    Yes, it was.

14        Q.    And prior to you interviewing him, you explained his

15   rights to him and got a consent signed by him; is that correct?

16        A.    That's correct.

17        Q.    Now, what specifically did you do in connection with

18   this investigation, other than interview Mr. Johnson?

19        A.    Everything from running the criminal history check,

20   putting the information together from the -- the scene,

21   coordinating with everybody that was working and what needed to

22   be done next as far as reaching out to and -- and contacting

23   other witnesses, the -- all the follow-up work that goes with

24   family members, getting their information, and -- and talking

25   to the District Attorney's Office about the offense prior to
```

1   and -- and during.  And then coordinating with our forensics of

2   what to do next.  Everything from the trip to the hospital when

3   we met with Nancy Harris and took photographs, to the going up

4   with the -- and taking the aerial photographs that were done

5   later, going back out to the scene, driving through all of the

6   different areas, retracing the steps that were taken that day

7   by the Defendant, and putting everything back together -- more

8   or less putting the crime back together in the order that

9   things happened.  Getting the -- all the different statements,

10  just determining that we had done everything that needed to be

11  done.

12       Q.   Now, did you have sole discretion on what was

13  submitted to SWIFS for testing?

14       A.   I don't have sole discretion.  Everything that I

15  submit goes through a supervisor.  He reviews what I'm

16  submitting, and then our forensics is actually the ones that --

17  that take it and submit it.

18       Q.   Would it be fair to say that you wouldn't recommend

19  something be submitted to the Southwestern Institute of

20  Forensic Science if you didn't think it was important in the

21  investigation?

22       A.   The articles that are important to the investigation

23  I submitted.

24       Q.   Now, when you first arrived on the scene -- on the

25  crime scene, who was there?

```
 1        A.    Lieutenant Holmes was the supervisor that was on
 2   scene.  There were several officers that were on scene.
 3   Forensics was on scene.  And I believe the store manager had
 4   arrived, either shortly after I did or just before.
 5        Q.    Did you interview the store manager?
 6        A.    I spoke with her there at the store.
 7        Q.    Was that the only time you spoke with her?
 8        A.    I spoke with her in the days to follow.  I did a
 9   follow-up on the articles that were in the cash drawer,
10   different denominations, and then a follow-up later to go back
11   over that with an employee that had worked the shift prior to
12   Nancy Harris's shift.
13        Q.    And who was that employee?
14        A.    I don't recall his name.  I took a -- I took a
15   statement from him and interviewed him at the time.
16                    MR. WEATHERSPOON:  Thank you, Officer.
17                    I have no further questions.
18                    MS. MOSELEY:  Nothing further.
19                    THE COURT:  Thank you, sir.  You may stand down.
20   You are excused, subject to recall.
21                    Members of the jury, we'll be in recess for the
22   afternoon.  Please remember all the admonishments and
23   instructions that you're working under, and we'll see you in my
24   jury room tomorrow morning at 8:45.
25                    THE BAILIFF:  All rise.
```

```
 1                MR. WEATHERSPOON:  Your Honor, the badge.

 2                THE COURT:  Oh, and please, if there aren't

 3   juror badges back there -- are there?  Do you know if there are

 4   juror badges -- you need to have your juror badges on at all

 5   times when you're in the courthouse because the chances of

 6   someone saying in front of you -- saying something

 7   inappropriate are just too great.  So please put your badges on

 8   and keep them on the entire time you're in the courthouse.

 9                (Jury excused from courtroom.)

10                (Recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      Reporter's Certificate

 2  THE STATE OF TEXAS:

 3  COUNTY OF DALLAS:

 4       I, Darline King LaBar, Official Court Reporter in and for

 5  the 363rd District Court of Dallas County, State of Texas, do

 6  hereby certify that the above and foregoing volume constitutes

 7  a true, complete and correct transcription of all portions of

 8  evidence and other proceedings requested in writing by counsel

 9  for the parties to be included in the Reporter's Record, in the

10  above-styled and numbered cause, all of which occurred in open

11  court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if any,

14  admitted by the respective parties.

15       WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16  on the 24th day of February, A.D., 2014.

17

18

19
                       \s\Darline LaBar
20                     DARLINE KING LABAR
                       Official Court Reporter
21                     363rd Judicial District Court
                       Dallas County, Texas
22                     hpdkfaith@msn.com
                       (214) 653-5893
23

24
    Certificate No:  1064
25  Expiration Date:  12/31/2014
```