```
 1                    REPORTER'S RECORD

 2                  VOLUME 47 OF 57 VOLUMES

 3             TRIAL COURT CAUSE NO. F12-23749-W

 4         COURT OF CRIMINAL APPEALS NUMBER: AP-77,030

 5   THE STATE OF TEXAS          :          IN THE 363RD JUDICIAL

 6   VS.                         :          DISTRICT COURT OF

 7   MATTHEW LEE JOHNSON         :          DALLAS COUNTY, TEXAS

 8

 9

10                  PUNISHMENT PHASE BY JURY

11

12

13

14

15                     * * * * * * * * * *

16

17

18

19

20       On the 31st day of October, 2013, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable Tracy Holmes, held in

23   Dallas, Dallas County, Texas:

24       Proceedings reported by machine shorthand computer

25   assisted transcription.
```

```
 1  A P P E A R A N C E S :

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
          Crowley Criminal Courts Building
 3        133 North Riverfront Boulevard
          Dallas, Dallas County, Texas 75207
 4        Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
          MS. ELAINE EVANS, A.D.A., SBOT # 24032880
 6        MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724
          MS. CHRISTINE WOMBLE, A.D.A., SBOT # 24035991

 7
              FOR THE STATE OF TEXAS;
 8

 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
          P.O. Box 2817
11        Red Oak, Texas 75154
          Phone:  972-617-5548
12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13        325 North St. Paul Street, Suite 2475
          Dallas, Texas 75201
14        Phone:  214-922-0212

15  MS. NANCY MULDER, Attorney at Law, SBOT # 00792971
          2214 Main Street
16        Dallas, Texas 75201
          Phone:  214-764-7246
17
              FOR THE DEFENDANT.
18

19

20

21

22

23

24

25
```

INDEX VOLUME 47

October 31st, 2013                                            PAGE  VOL.

PUNISHMENT PHASE BY JURY:

Proceedings......................................... 5    47

Opening statement by Ms. Moseley..................... 13   47

Opening statement by Ms. Bernhard.................... 16   47

| STATE WITNESSES | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| ERIC HAGAN | 17 | 26 | | 47 |
| AMY FRANKS | 29, 73 | 63 | | 47 |
| JOHN SPERA | 76,99 | 97, 100 | | 47 |
| BERRY OLIVER | 101, 112 | 110 | | 47 |
| BLAINE RALSTON | 114 | 128 | | 47 |
| M.G. CLARK | 131, 144 | 143 | | 47 |
| CLAY LACEY | 145, 152 | 151 | | 47 |
| GARY STEADMAN | 153 | 162 | | 47 |
| MATTHEW ST. CLAIR | 164 | 176 | | 47 |
| DIGNA SALMERON | 179 | 190 | | 47 |
| PEDRO BARINEAU | 194 | | | 47 |
| CARLTON JENKINS | 198, 250, 253 | 236, 252 | | 47 |
| ASHLEY VILLEGAS | 255, 275 | 273 | | 47 |

Reporter's Certificate............................. 277   47

```
 1                    ALPHABETICAL WITNESS INDEX

 2                      DIRECT        CROSS        VD        VOL.

 3   PEDRO BARINEAU      194                                 47

 4   M.G. CLARK          131, 144      143                   47

 5   ERIC HAGAN          17            26                    47

 6   AMY FRANKS          29, 73        63                    47

 7   CARLTON JENKINS     198, 250, 253 236, 252             47

 8   CLAY LACEY          145, 152      151                   47

 9   BERRY OLIVER        101, 112      110                   47

10   BLAINE RALSTON      114           128                   47

11   DIGNA SALMERON      179           190                   47

12   JOHN SPERA          76,99         97, 100               47

13   MATTHEW ST. CLAIR   164           176                   47

14   GARY STEADMAN       153           162                   47

15   ASHLEY VILLEGAS     255, 275      273                   47

16

17                        EXHIBIT INDEX

18   STATE'S                  OFFERED       ADMITTED      VOL.

19   166    Prior Conviction    92, 97        97           47

20   167    Prior Conviction    109           109          47

21   168    Prior Conviction    127           127          47

22   169    Prior Conviction    141,143       143          47

23   170    Prior Conviction    160           161          47

24   171    Prior Conviction    175           175          47

25   172    Photograph          232           232          47
```

```
 1                    P R O C E E D I N G S
 2              THE COURT:  All right.  We're on the record
 3    outside the presence of the jury.
 4              The State is making a proffer of unadjud --
 5    unadjudicated offenses allegedly committed by the Defendant.
 6              MS. WOMBLE:  That's correct.
 7              THE COURT:  And the State has just cited the
 8    standard being --
 9              MS. WOMBLE:  It's from Hughes v. State, 24
10    S.W.3d 833, Texas Crim. App. 2000, and the quote is, "before
11    the evidence can be declared admissible."  And it says,
12    "however:  The State is burdened with the obligation of clearly
13    proving to the trial court that the extraneous offense was
14    committed and that the appellate was the perpetrator --
15    Defendant in this case."  That's the standard for the Court --
16              THE COURT:  So clearly proving is the burden of
17    proof, as opposed to --
18              MS. WOMBLE:  Beyond --
19              THE COURT:  -- beyond a reasonable doubt.  Okay.
20              MS. BERNHARD:  And we would dispute that though
21    citing the Court to Rachel versus State at 917 S.W.2d 799 --
22              COURT REPORTER:  One more time, I'm sorry.
23              MS. BERNHARD:  917 S.W.2d 799, Footnote 4, it
24    says -- it does -- we do agree that the case law says the State
25    must clearly prove that an offense was committed and the
```

1    accused was the perpetrator, but then in Harrell versus State

2    at 884 S.W.2d 154, 158 to 159, clearly means beyond a

3    reasonable doubt.  So we would submit that -- that it still

4    must be proven beyond a reasonable doubt.

5                    Furthermore, it also has to be relevant to a

6    Defendant's death worthiness, and its probative value must

7    still substantially -- be substantially outweighed by its

8    inflammatory and prejudicial potential.

9                    MS. WOMBLE:  If I may respond to that, I -- I

10   have to go back and look at that particular case and read it

11   myself, but if I'm not mistaken, I believe that standard that

12   clear proof is beyond a reasonable doubt, I believe that

13   applies to offenses during guilt/innocence, not during

14   punishment.

15                   MS. BERNHARD:  I believe it specifically states

16   the admissibility of extraneous offense evidence offered in

17   punishment in capital murder cases.

18                   THE COURT:  Okay.  So the Defense is --

19                   MS. BERNHARD:  It's our position that they have

20   to prove it beyond a reasonable doubt.

21                   THE COURT:  Beyond a reasonable doubt.

22                   MS. BERNHARD:  It has to be relevant to death

23   worthiness and has --

24                   THE COURT:  And it has to be more probative than

25   prejudicial.  Okay.

```
 1              MS. WOMBLE:  But in the proffer, we would think
 2   it's just clearly proof.
 3              THE COURT:  I'm not understanding that.
 4              MS. WOMBLE:  Beyond a reasonable doubt is before
 5   the jury, and then clearly prove to you in our proffer meaning
 6   that we don't have to put on --
 7              THE COURT:  Okay.  All right.
 8              MS. WOMBLE:  -- a witness and testify to
 9   absolutely everything.
10              THE COURT:  All right.
11              MS. JONES:  Your Honor, excuse me -- and the
12   State would proffer that we intend to call a witness by the
13   name of Amy Armstrong who will testify to dates certain and
14   dates that are uncertain that during the course of her
15   relationship with the Defendant, Matthew Lee Johnson, that
16   several assaults did occur.  We will specifically -- several
17   assaults, as well as threatening statements were made to her.
18   The State will specifically --
19              THE COURT:  Who is Amy Armstrong?
20              MS. JONES:  Excuse me, Amy Armstrong is the
21   complaining witness on at least three of the unadjudicated
22   offenses that we anticipate that the State will be calling as a
23   witness in this case, Your Honor.
24              THE COURT:  What is her relationship?
25              MS. JONES:  She's the former boy -- she's the
```

1  former boy -- girlfriend of the Defendant.

2              THE COURT:  All right.

3              MS. JONES:  And we anticipate that on dates that

4  are certain, dates in the summer of 1993, as well as the fall

5  of 1993, so we're talking about August of '93, as well as

6  September of 1993, that the witness Amy Armstrong will testify

7  to such things as the assaults that occurred in her home while

8  they were living together.  She will also discuss several

9  threats that were made to her.  And we anticipate that the

10  State will be bringing Mrs. Armstrong to testify to these

11  things personally, so therefore, there is not an issue with the

12  Sixth Amendment, nor the Crawford issue.

13              Also, Your Honor, appropriate notice was given

14  to the Defense counsel and was filed with the court on or about

15  September -- September 27th of 2013, and that they do have

16  notice of our extraneous offenses per Article 38.37 of the

17  Texas Rules of Criminal Evidence, as well as 404(b), and of

18  37.07.

19              MS. BERNHARD:  Your Honor, we would argue that's

20  not a sufficient proffer simply saying that there was an

21  assault.  We don't know the details of what she's going to

22  testify to.  We don't know the details of the threat.  And

23  furthermore, Ms. Mulder has an additional objection.

24              MS. MULDER:  Your Honor, based on the notice of

25  extraneous that was filed in this case, there are four

1  allegations listed therein that -- an assault occurred on
2  August 13th of 1993, when the Defendant was 17 years of age;
3  September 7th of '93; September 8th of '93; and September 9th
4  of 1993.  What I -- and that one is simply a Class C citation.
5           THE COURT:  The last -- the last one that you
6  cited?
7           MS. MULDER:  Yes, ma'am.  And what I got from
8  Ms. Jones's statement just now is that it sounds like they are
9  going to have a witness testify to an ongoing abuse.  And we
10  would certainly object that there isn't any kind of notice --
11           THE COURT:  They're going to testify to what?
12           MS. MULDER:  That there was a continual course
13  of criminal conduct based on -- on the duration of their
14  relationship, that he engaged in an ongoing continual course of
15  conduct of abuse.  And I -- I cannot find that -- okay.
16           It does say on the second to last page of the
17  notice that there is -- the Defendant's relationship with Amy
18  Armstrong in or about the year 1993, the Defendant was
19  physically abusive, the Defendant was jealous and would get
20  violent if he thought she was with someone else.  She said he
21  punched her, pushed her, choked her.  He drank alcohol a lot
22  and smoked marijuana.  He threatened Ms. Armstrong saying,
23  nobody's going to have you if I can't have you.  And these
24  incidents all occurred in Dallas County, Texas.  Certainly that
25  notice is insufficient with regard to specific instances,

1    and --

2                THE COURT:  Did you say that the -- these all --

3    allegations occurred in August, September 7th, 8th, and 9th of

4    1993?

5                MS. MULDER:  That is -- okay.  There's four --

6    in the notice of extraneous, there are four listed allegations

7    of unadjudicated offenses where the alleged victim is Amy

8    Armstrong:  August 13th, September 7th, September 8th, and

9    September 9th.

10               THE COURT:  How can you get more specific about

11   when they occurred?

12               MS. MULDER:  Those four, yes, but what I'm

13   talking about is -- is that the then -- they're -- they're

14   making a general allegation that on or about during the year

15   1993 that the Defendant was physically abusive to her, adding

16   in -- they're -- this notice is insufficient.  It lacks detail

17   with regard to specific dates.  It does not give the Defendant

18   notice of any specific allegations other than the four that are

19   listed that occurred in the year 1993.

20               As far as, you know, he punched her, pushed her,

21   choked her, there's no dates, other than the four dates listed

22   that we have for that.  That he drank alcohol and -- and smoked

23   a lot of marijuana -- excuse me, drank alcohol a lot and smoked

24   marijuana, that's certainly very general and vague.

25               And with regard to he threatened Ms. Armstrong,

1  saying, nobody is going to have you if I can't have you, there

2  -- there's no date or time associated with that.  Certainly

3  anything additional than the four allegations, we have not had

4  proper notice.  And certainly they cannot be proven beyond a

5  reasonable doubt.

6          MS. WOMBLE:  Judge, the drinking alcohol and

7  things of that nature, those -- those aren't criminal offenses.

8  It's our position that this notice that we filed is sufficient,

9  and the Defense is not entitled to a preview of all evidence.

10         MS. JONES:  And more specifically, Your Honor,

11  we would also add that Defense counsel has had copies of

12  offense reports that detail all of the offenses that we are

13  discussing.  They've also had access to their client to ask and

14  discuss with him these offenses that are alleged.

15         Lastly, we would state to the Court that Amy

16  Armstrong has been listed as a witness on our State's notice of

17  witnesses.  She has been available.  Any conversation they

18  wanted to have, they could have with her.  Also, Your Honor, we

19  would also state that in regards to all of the ongoing and

20  continuing information that we put in there about the assault

21  and the abuse and other -- and other statements, it's because

22  it was an ongoing continuous relationship, Your Honor.  And

23  more importantly, the standard for the Court is that there is

24  clear proof that these offenses occurred.  And that when we

25  talk about the beyond a reasonable doubt standard, that is for

```
 1   the jury at that point, Your Honor, so we would state that we

 2   have met this burden and we believe that these statements and

 3   any testimony that Amy Armstrong would provide should be

 4   allowed.  At this juncture it is not the appropriate stage for

 5   them to get a preview of what this witness will say.

 6                   THE COURT:  Anything further from the Defense?

 7                   MS. BERNHARD:  We would also just add that I

 8   don't think these offenses or transactions or whatever we're

 9   calling them, are relevant to the Defendant's death worthiness,

10   particularly in light of the fact that we're talking about

11   things that happened 20 years ago.

12                   MS. MULDER:  In addition, Your Honor, as part of

13   the Brady material we were given by the State, Amy Armstrong

14   has a history of mental illness, including a diagnosis for

15   bipolar, has extensive --

16                   (Discussion off the record.)

17                   MS. MULDER:  -- Green Oaks records and certainly

18   an offense that -- that occurred 20 years ago or alleged

19   offenses that occurred when the Defendant was 17, 20 years ago,

20   are not relevant.  They're highly prejudicial at this stage.

21                   THE COURT:  All right.

22                   MS. WOMBLE:  Judge -- I'm sorry.

23                   THE COURT:  Defense's objection is overruled.

24                   Are both sides ready?

25                   MS. MOSELEY:  We're ready, Judge.
```

```
 1                      THE COURT:  All right.  Let's bring in the jury,
 2    please.
 3                      MS. BERNHARD:  Judge, briefly, just for the
 4    record, the constitutional and statutory objections that we
 5    were making to the unadjudicated offenses are referenced in
 6    Pretrial Motion Number 43.
 7                      THE COURT:  Thank you.
 8                      THE BAILIFF:  All rise.
 9                      (Jury returned to courtroom.)
10                      THE COURT:  Please be seated.
11                      Will the State call its first witness, please.
12                      MS. MOSELEY:  Your Honor, may I make a brief
13    opening?
14                      THE COURT:  You may.
15                      (Opening statement by Ms. Moseley.)
16                      MS. MOSELEY:  Ladies and gentlemen, now we're
17    entering into the punishment phase of the trial, and you will
18    all remember, I think, from back when we talked to you
19    individually on voir dire that there are going to be two
20    questions that you're going to be asked to answer at the end of
21    this trial when you go back to deliberate the appropriate
22    punishment in this case.
23                      The first question is whether or not the State
24    has proved beyond a reasonable doubt that the Defendant will
25    more likely than not continue to be a threat to society.  As we
```

1  talked about in voir dire, many of you agreed that the best way

2  to prove what someone is more likely to do in the future is by

3  showing you what he's done in the past.  Much of the testimony

4  that you're going to hear over the next couple of days is going

5  to relate to just that, his criminal activity, assaults on

6  other women, crimes that he has committed dating back to

7  1993 -- 1992 and 1993 and a progression of that violence

8  leading up to May 20th of 2012, the capital murder you've

9  convicted him of.  So you're going to hear all about the

10  Defendant's prior criminal history.  You're going to hear all

11  about what kinds of crimes and what kinds of violence he has

12  perpetrated on society up to that date.  You will also hear

13  about how he behaved when he went to the penitentiary in the

14  mid-2000s.

15          You're also going to have to answer at the end

16  of this trial whether or not you've heard anything about the

17  Defendant or about the circumstances of the offense, anything

18  about him or this crime that you would find to be sufficiently

19  mitigating to warrant a life sentence instead of the death

20  sentence.  You're going to get to hear about his educational

21  background and that he went to school in Garland and that he

22  dropped out of high school, but he wasn't in any special

23  education classes.  He was a normal, average student up to the

24  point that he decided he didn't want to go anymore.

25          You're going to hear that he also attended some

1  college courses and has some college credit.  You will hear

2  that he has been employed, that he has been fired from jobs

3  because he chose to use drugs, instead of going to work.

4  You're going to hear that he has no mental illness.  He has not

5  been diagnosed with anything other than being a drug abuser and

6  what they call drug-induced or substance-induced mood disorder.

7           At the end, I expect you will hear from some of

8  the Defendant's family members and that they're going to come

9  up here, and they're going to try to convince you that you

10  should spare his life.  You will hear from -- I anticipate

11  you'll hear from his wife.  He's been married to the same woman

12  for 20 years.  You'll know by the end of this trial that he has

13  abused her over the course of their relationship.  And you will

14  know at the end of all of this that there's not going to be

15  anything sufficiently mitigating about the Defendant's

16  background or his character that should spare his life, knowing

17  what he did to Ms. Harris and knowing that really the only

18  problem he's ever had is that he chooses to use drugs and that

19  his drug problem has become society's problem.

20           At the end of the trial we're going to send you

21  back with those two special issues, and we're going to ask you

22  to answer them based on the evidence that you're going to hear

23  over the next few days and based only on the evidence that

24  you've heard in this trial.  Not based on any kind of sympathy.

25  Not based on any kind of reservations that you may have.  Every

1  one of you told us you support the death penalty in the

2  appropriate case, and we anticipate at the end of this trial

3  you will see that this is, in fact, going to be very clearly an

4  appropriate case for the death sentence.

5              THE COURT:  Ms. Bernhard.

6              MS. BERNHARD:  Just briefly, Your Honor.

7              May it please the Court.

8              THE COURT:  Thank you.

9              (Opening statement by Ms. Bernhard.)

10             MS. BERNHARD:  Ladies and gentlemen, what we're

11  going to present to you in this phase of the trial is the story

12  of Matthew Lee Johnson.  He's 38 years old, if my math is

13  right.  He's been married for 20 years to the same woman.

14  You're going to hear it's been a rocky relationship, but she is

15  absolutely committed to him and he is absolutely committed to

16  her.  They have three beautiful daughters who love their father

17  very much.

18             You will also hear that Matthew Lee Johnson was

19  diagnosed with severe depression at least 10 years ago.  It is

20  something he has struggled with throughout his life.  You will

21  hear friends and family members tell you that they saw signs of

22  that.  They have watched his struggles with drugs.  It's not a

23  choice for him to use drugs.  You're going to hear about that,

24  and you're going to learn about what addiction means.  It has

25  nothing to do with willpower.  You're going to hear about

1  Matthew Johnson's struggle with that, and you're going to hear

2  about his attempts to overcome that.

3              And at the end of the day, you're going to find

4  that Matthew Lee Johnson does not have any of the

5  characteristics that are going to make him a threat to society

6  in the future and a life sentence will be more than appropriate

7  in this case.

8              THE COURT:  Thank you, Ms. Bernhard.

9              The State call its first witness, please.

10             MS. JONES:  We will call Officer Hagan.

11             (Witness brought forward and sworn.)

12             THE WITNESS:  I do.

13             THE COURT:  Thank you.

14             MS. JONES:  May I proceed, Your Honor?

15             THE COURT:  You may.

16                  ERIC HAGAN,

17  was called as a witness by the State, and after having been

18  first duly sworn, testified as follows:

19                  DIRECT EXAMINATION

20  BY MS. JONES:

21     Q.   Good morning, Officer Hagan -- or should I say

22  goodnight?

23     A.   Either one of them will work.

24     Q.   Could you please state your full name and spell your

25  last name for the record?

1        A.    My name is Eric Hagan.  It's H-a-g-a-n.

2        Q.    And I asked you was it good morning or goodnight,

3   because this is the middle of the night for you, correct?

4        A.    Correct.

5        Q.    What are the hours that you work?

6        A.    I work 3:00 p.m. to 11:00 p.m., but usually I'm up

7   late because I go home and I can't just go to sleep, so that's

8   what makes it the middle of the night.

9        Q.    All righty.  And can you please describe for the

10   jury where you work at and how long you've worked there?

11        A.    I'm a police officer with the City of Dallas.  I've

12   been there for just a little over 24 years now.

13        Q.    And you said you've been there how long?

14        A.    Just a little over 24 years.

15        Q.    Okay.  Just a little over 24 years.  And what is

16   your training and experience that qualifies you to be a Dallas

17   police officer?

18        A.    I went through the basic academy, had the continuing

19   education.  Currently have almost -- I believe almost 4,000

20   hours of TCLEOSE credit, TCLEOSE being the agency that licenses

21   us to be a peace officer.

22        Q.    Prior to coming to the Dallas Police Department, did

23   you have any other law enforcement experience?

24        A.    No.

25        Q.    What are your duties -- are you -- I see you have

```
 1  the green patches on your shoulder.  Is that patrol?
 2        A.    Currently, yes, I'm assigned to the Southeast Patrol
 3  Division.
 4        Q.    Okay.  And what are your duties?
 5        A.    Answer calls for police service, traffic
 6  enforcement, primarily right now to investigate crashes.
 7        Q.    Okay.  Now, what I want to do is turn your attention
 8  back to the summer of 1993.  Were you working at the Dallas
 9  Police Department?
10        A.    Yes, I was.
11        Q.    And what were your duties back then?
12        A.    At that time I was assigned to the Northeast Patrol
13  Division as a patrol officer, same -- pretty much the same
14  duties that I have now.
15        Q.    And what encompasses the Northwest Patrol Division?
16        A.    Northeast patrol --
17        Q.    I'm sorry.
18        A.    It's basically if you take the Central Expressway up
19  to Richardson city limit, I-30 out towards Garland, and then
20  White -- White Rock Creek up to the East Grand.  Everything
21  northeast, that direction would be the Northeast Patrol
22  Division.
23        Q.    And so back then were you responding to disturbance
24  calls or things of that nature that you might be dispatched to?
25        A.    Yes, I was.
```

1     Q.   And what did you routinely do?  What was the first

2 thing you typically did when you had to respond to a

3 disturbance call?

4     A.   I acknowledged that I was on my way.

5     Q.   Okay.  And once you got there, was there anything

6 specific that you had to do differently on disturbance calls

7 versus, you know, going to any other kind of call?

8     A.   Wait for cover or backup, wait for another officer

9 before you approach the call.

10     Q.   Okay.  Now, I want to turn your attention

11 specifically to the dates of September 7th and 8th --

12     A.   Okay.

13     Q.   -- of 1993, and specifically to the location of 7604

14 Fair Oaks.  Are you familiar with that?

15     A.   Yes, I am.

16     Q.   And did you have an offense report to help refresh

17 your recollection?

18     A.   Yes, I did.

19     Q.   Because we're talking what, almost --

20     A.   It's over --

21     Q.   -- how many years?

22     A.   -- over 20 years ago.

23     Q.   Over 20 years ago, and I know that you don't have

24 this committed to memory, do you?

25     A.   No, I do not.

1          Q.    So on those dates that we've been discussing, did

2     you have an occasion to receive a disturbance call from a

3     complaining witness by the name of Amy Armstrong?

4          A.    Yes, I did.

5          Q.    And during those dates, did you go to that location

6     at Sundance Apartments on more than one occasion?

7          A.    I only went one time.

8          Q.    Okay.

9          A.    I actually didn't come on duty until midnight that

10    night.

11         Q.    All right.

12         A.    So technically, we were there for -- for the date of

13    September 8th.

14         Q.    All right.  And can you please tell the jury what,

15    if anything, happened when you got to the call?

16         A.    I was dispatched -- originally it was -- it was as a

17    burglary in progress.  And when I arrived, didn't see a

18    suspect.  And when I knocked on the door, I couldn't get

19    anybody to answer at first, wouldn't come to the door.

20         Q.    When you arrived at the door or to the complex, were

21    you in a marked patrol car?

22         A.    Yes, I was.

23         Q.    You had your uniform on such as you do today?

24         A.    Yes, I did.

25         Q.    And so when you go to the door and no one answers,

1  what's the next thing you do?

2      A.    Specifically, I don't remember, but procedure would

3  have been to have the dispatcher call the person back, let them

4  know it was us at the door.

5      Q.    And did you ever have the opportunity to talk to the

6  person who made the call?

7      A.    Yes, she finally did open the door.

8      Q.    Okay.  And who was that?

9      A.    It was the -- Amy Robinson.

10      Q.    And at the time was her name Amy Armstrong?

11      A.    I'm sorry, yes, Amy Armstrong.  I got my names mixed

12  up.

13      Q.    That's okay.  And so when you spoke with Amy

14  Armstrong, without telling us exactly what she said, could you

15  tell anything by her demeanor or better yet did she even open

16  the door and let you come in?

17      A.    She never did let me come in.  She did open the

18  door.  She was extremely agitated and upset.  I do remember

19  that.  Not only the situation, but I believe also other

20  officers that responded earlier.

21           THE COURT:  Sir, would you bring that microphone

22  around to your mouth and try to speak into it?

23           THE WITNESS:  Yes, ma'am, sorry.

24      Q.    (BY MS. JONES)   And so you said there were other

25  officers that responded with you?

1        A.    That responded earlier in the evening, yes.

2        Q.    And when you said she was very upset and agitated,

3   without any words being said, could you just look and tell that

4   something bad must have really happened there?

5        A.    I could tell she was very upset, yes.

6        Q.    Okay.  And after speaking with her at the door, what

7   did you do next?

8        A.    She had indicated that --

9              MS. MULDER:  Objection to hearsay, Your Honor.

10             THE COURT:  Sustained.

11       Q.    (BY MS. JONES)  Now, in talking with Mrs. Armstrong,

12   were you directed to do something next?

13             MS. MULDER:  Objection, calls for a hearsay

14   answer.

15             THE COURT:  Sustained.

16             MS. JONES:  Your Honor, it's not for the truth

17   of the matter asserted.  It's through the course of this

18   investigation, which would lead the officer to go to the next

19   stage of the offense -- the next stage of what he's going to do

20   in his investigation.

21             THE COURT:  All right.  I'll let him answer.

22       Q.    (BY MS. JONES)  Continue, Officer.

23       A.    After speaking to her at the front door, I went

24   around back -- to the back porch of the apartment complex.

25       Q.    And what, if anything, did you see when you got to

<sup>24</sup>

```
 1   the back of the apartment complex?

 2        A.   I had seen a burned piece of wood and burned patio

 3   carpet by looking over the fence to the patio.

 4        Q.   And by looking over the fence of the patio, once you

 5   saw that it was burned items, what was the next thing that you

 6   had to do?

 7        A.   Well, first thing I did is make sure it definitely

 8   wasn't burning anymore.  And then after that, I attempted to

 9   contact an arson investigator.

10        Q.   And during your conversation -- actually during the

11   investigation, did you ever learn who actually started the fire

12   or set the fire?

13             MS. MULDER:  Objection, calls for a hearsay

14   answer.

15             THE COURT:  Sustained.

16        Q.   (BY MS. JONES)  Well, let me ask you this -- let me

17   ask you this.  When you first received the call, it came in as

18   a disturbance call, correct?

19        A.   Originally came as a burglary in progress.

20        Q.   As a burglary in progress.  And during your

21   conversation with the complaining witness, that's what led you

22   back to the back patio, correct?

23        A.   Correct.

24        Q.   Okay.  And when you came to the back patio, did she

25   come outside?
```

```
 1        A.    Yes, she did.

 2        Q.    Okay.  And did you have any indication of whether or

 3   not the possible suspect was still in the complex, or did

 4   you -- what was your understanding?

 5                  MS. MULDER:  Objection, calls for hearsay.

 6                  THE COURT:  Overruled.

 7        A.    As far as I determined, the suspect was no longer at

 8   the scene, and I did not see the suspect.

 9        Q.    (BY MS. JONES)   And so you didn't make any arrests,

10   did you?

11        A.    No, I did not.

12        Q.    And other than file your report, what other activity

13   did you have with this particular offense?

14        A.    Other than doing the report, that was it.  After I

15   did it, it was assigned to an investigator.

16        Q.    Now, what made you call an arson investigator, or

17   why did you want it reassigned it to the Arson Unit?

18        A.    Because they're the ones that specialize in

19   investigating any offenses involving fire.

20        Q.    And what time of night are we talking about?

21        A.    About 1:45 is when the call came in, so sometime

22   after 2 o'clock was when I was trying to get the arson

23   investigator.

24        Q.    And so just based on the surroundings and everything

25   you saw that day, you stated it was the back patio, correct?
```

1    A.    Correct.

2    Q.    Did it appear that someone was trying to have a

3    barbecue at 1:45 in the morning?

4    A.    No, it did not.

5    Q.    And based on the burns that you saw, it was

6    specifically to what area of the patio?

7    A.    There was a -- like patio carpet out there, and it

8    appeared as if somebody was intentionally trying to set that on

9    fire.

10            MS. JONES:  Your Honor, we pass the witness.

11                    CROSS-EXAMINATION

12    BY MS, MULDER:

13    Q.    Good morning, Officer.  My name is Nancy Mulder.  I

14    just have some questions for you.  If at any time you don't

15    understand, just let me know and I can rephrase it.

16    A.    All right.

17    Q.    About how big was the patio?

18    A.    I couldn't give you a specific size.  It was a --

19    you know, your standard apartment patio, not large.

20    Q.    Ground floor apartment or second floor, third floor?

21    A.    Ground floor.

22    Q.    Do you have an independent recollection of this, or

23    is it just something that you have read your report and --

24    A.    Believe it or not, I actually do remember it, just

25    not all the details.

```
 1        Q.    What kind of carpet was on the patio?

 2        A.    I want to say it was oval-shaped and almost like

 3   a -- a knit style, something that would survive being outdoors,

 4   but could also be used indoors.

 5        Q.    How big was it?

 6        A.    Again, giving a specific size, I couldn't, but

 7   probably about the size of something you would -- you have in

 8   front of like your kitchen sink.

 9        Q.    So fairly small?

10        A.    Medium size carpet for that type.

11        Q.    Two feet wide?

12        A.    Two to three feet, yes.

13        Q.    We're not talking a six-foot or eight-foot rug?

14        A.    No, nothing like that.

15        Q.    Two to three feet; fair enough?

16        A.    Fair enough, yes.

17        Q.    Did anybody come out to process the scene?

18        A.    No.

19        Q.    You couldn't get in touch with anybody?

20        A.    No, not from -- not from the Fire Department, no, I

21   could not.

22        Q.    And there was no danger.  The wood was not on fire

23   anymore?

24        A.    When I arrived, no, it was not.

25        Q.    How large was the piece of wood?
```

```
 1        A.    Smaller than the rug, so, again, I would put it at
 2   that two-feet size.
 3        Q.    That large?  Or was it more like a -- more like a
 4   foot, about this big?
 5        A.    Again, I can't remember the exact size.
 6        Q.    And ultimately, you all cleared out and left the
 7   scene?
 8        A.    Correct.
 9        Q.    Certainly if you thought there was any remaining
10   danger, y'all wouldn't have left?
11        A.    Correct.
12                   MS. MULDER:  I'll pass the witness.
13                   THE COURT:  Anything further?
14                   MS. JONES:  Nothing further, Your Honor.
15                   THE COURT:  Thank you, sir.  You may stand down.
16   You're excused.
17                   MS. JONES:  Is he finally excused, Your Honor?
18                   MS. MULDER:  No objection.
19                   MS. JONES:  We will call Amy Armstrong, Your
20   Honor.
21                   (Witness brought forward.)
22                   MS. JONES:  May I proceed, Your Honor?
23                   THE COURT:  You may.
24                        AMY FRANKS,
25   was called as a witness by the State, testified as follows:
```

```
 1                    DIRECT EXAMINATION
 2   BY MS. JONES:
 3       Q.   And if you could move the microphone toward your
 4   mouth.  There you go.  Ms. Armstrong, could you please state
 5   your full name and spell your last name --
 6                COURT REPORTER:  Judge, has the witness been
 7   sworn?
 8                THE COURT:  I'm sorry.
 9                MS. JONES:  Oh, I'm sorry.
10                THE COURT:  Please raise your right hand.
11                (Witness sworn.)
12                THE WITNESS:  Yes, ma'am.
13                THE COURT:  Thank you.  Please keep your voice
14   up for me.
15                MS. JONES:  And if you could move the microphone
16   to your mouth.  Yeah.  There you go.
17                        AMY FRANKS,
18   was called as a witness by the State, and after having been
19   first duly sworn, testified as follows:
20                CONTINUED DIRECT EXAMINATION
21   BY MS. JONES:
22       Q.   Could you please state your full name and spell your
23   last name for the record?
24       A.   It's Amy Heather Franks.
25       Q.   Okay.  And were you previously Amy Armstrong?
```

 1        A.    Yes, ma'am.

 2        Q.    And are you currently married to Michael Franks?

 3        A.    Yes, ma'am.

 4        Q.    Okay.  And so during the course of our direct

 5   examination and cross-examination, would you be prefer -- do

 6   you prefer Armstrong, Franks, or if we interchange this, is

 7   that --

 8        A.    Franks.  But if you interchange, that's fine.  It

 9   doesn't matter really.

10        Q.    Because I will tell you that sometimes I'll say

11   Armstrong and sometimes I'll say Franks.

12        A.    Okay.  That's fine.

13        Q.    I just wanted to make sure it wasn't offensive to

14   you.

15              Now, first of all, we see that you came in in a

16   wheelchair.  You just had major surgery, correct?

17        A.    Yes, ma'am.

18        Q.    When I say you just had it, we're talking Monday or

19   Tuesday of this week?

20        A.    Yes, ma'am.

21        Q.    And there were complications with your surgery?

22        A.    Yes, ma'am.

23        Q.    And so just getting here today was a task?

24        A.    Yes, ma'am.

25        Q.    All right.  And you're going to have to make sure

1  and keep your voice up.

2      A.   Okay.

3      Q.   All right.  And you'll have to excuse my voice.

4           Now, also, let's talk about the fact that you

5  really didn't even want to be involved in this trial or even be

6  here today, did you?

7      A.   No, ma'am.

8      Q.   And as a matter of fact, we had to find you and

9  bring you down here and get you sworn in before the Judge, just

10  to make sure that you would appear for trial, right?

11      A.   Yes, ma'am.

12      Q.   Okay.  And so with that being said, now that you're

13  here and you're sworn in, you are going to tell us the truth

14  about what happened during a relationship of you and Matthew

15  Johnson, correct?

16      A.   Yes, ma'am.

17      Q.   All right.  So now let's talk about the fact that

18  you just had this major surgery.  Are you taking any

19  medications for pain?

20      A.   Yes, ma'am.

21      Q.   Okay.  And of those medications for pain, are they

22  going to affect your memory or affect anything that --

23      A.   No, ma'am.

24      Q.   Okay.  All right.  And they're specifically for

25  pain?

```
 1        A.    Yes, ma'am.

 2        Q.    So it has nothing -- it will have no effect on you

 3   telling us of the abuse that took place in your life, and

 4   specifically we'll talk about, you know, 1993 to the present.

 5        A.    Yes, ma'am.

 6        Q.    Okay.  All right.  Now, let's talk about -- where

 7   are you from?

 8        A.    Garland -- not Garland, Royce City, Quinlan area.

 9        Q.    Okay.  And where is that at?

10        A.    Out towards Greenville -- towards going east out

11   that way.

12        Q.    Okay.  And how long did you live there before you

13   moved up to this area?

14        A.    I was probably about 12 when I moved up this way.

15        Q.    Okay.  And when you moved up this way, did you move

16   with your mom, your dad?  How did you get to the Dallas area?

17        A.    With my mom.

18        Q.    Okay.  And once you got to the Dallas area, is that

19   where you went to school?  Is that where you --

20        A.    Yes, ma'am.

21        Q.    -- pretty much made your home?

22        A.    Yes, ma'am.

23        Q.    Okay.  And after you finished school, what did you

24   do?

25        A.    Nothing.  With my children, that's about it.  Raised
```

```
 1   my children, that's it.

 2        Q.   How many kids do you have?

 3        A.   I have four.

 4        Q.   Okay.  And what are their names and ages?

 5        A.   I have Brandon -- Brandon is 28, Curtis is 26,

 6   Matthew is 24, and Karen is 23.

 7        Q.   Okay.  And Karen came with you today, right?

 8        A.   Yes, ma'am.

 9        Q.   Okay.  Because you needed some assistance?

10        A.   Yes, ma'am.

11        Q.   Okay.  All right.  And so during this time -- well,

12   let's say prior to 1993, were you married?

13        A.   Yes, ma'am.

14        Q.   Okay.  And who were you married to?

15        A.   Christopher Armstrong.

16        Q.   Okay.  So that's where the Armstrong came from?

17        A.   Yes, ma'am.

18        Q.   And what was your maiden?

19        A.   Pelfrey.

20        Q.   Okay.  And so --

21             COURT REPORTER:  I'm sorry.  Can you spell it?

22             THE WITNESS:  P-e-l-f-r-e-y.

23        Q.   (BY MR. JONES)  And so how long were you married to

24   Mr. Armstrong?

25        A.   Almost 20 years.
```

1      Q.   Okay.  So was it one of those marriages where you

2  were married in paper, but separated?

3      A.   Yes, ma'am, we were only together a year.

4      Q.   Okay.  And so after you got married and y'all

5  separated, I guess shortly after a year, what did do you next

6  in your life?

7      A.   I pretty much -- I tried to work.  I would try to

8  work at different day cares and things like that, take care of

9  people like home health care, whatever.  But then I got hurt,

10  and I haven't been able to do anything but just be with my

11  kids.

12      Q.   Okay.  And when you say you got hurt, how did you

13  get hurt?

14      A.   I actually got hurt doing home health care.  I had a

15  male patient that was quite a bit bigger than me --

16      Q.   Okay.

17      A.   -- and I have a herniated disk now.

18      Q.   Okay.  And you've had several surgeries for that,

19  correct?

20      A.   Uh-huh.

21           THE COURT:  You have to say yes or no.

22      A.   Yes, ma'am.

23      Q.   (BY MS. JONES)  Yeah, you can't say uh-huh or

24  huh-uh.

25      A.   Okay.  I'm sorry.  I apologize.

```
 1        Q.   Because Darline can't take that down -- don't know

 2   what that is.

 3        A.   Yes, ma'am.

 4        Q.   Okay.  So let's talk specifically about the summer

 5   and the spring of 1993.

 6        A.   Yes, ma'am.

 7        Q.   Where were you living at?

 8        A.   In Sundance.

 9        Q.   Okay.  Do you remember what that physical address

10   was?

11        A.   No, ma'am.

12        Q.   Does 7604 Fair Oaks --

13        A.   Yeah.

14        Q.   -- sound familiar?

15        A.   Yeah, that sounds familiar.

16        Q.   Was that in Dallas County?

17        A.   Yes, ma'am.

18        Q.   State of Texas?

19        A.   Yes, ma'am.

20        Q.   Okay.  And you said you were living in Sundance.

21   Who was living with you?

22        A.   My three kids.  And then at one point in time

23   Matthew.

24        Q.   Now, I saw you look over to this table, and you said

25   at one point in time --
```

```
 1        A.    It was Matthew.

 2        Q.    -- Matthew.  Who are you talking about?  Who is

 3   Matthew, or who was he to you?

 4        A.    He was, to me -- we were boyfriend-girlfriend.

 5        Q.    Okay.  And so you see him in the courtroom today?

 6        A.    Yes, ma'am.

 7        Q.    And can you please tell me an article of clothing

 8   that he has on?  And if we're looking at this table, and if

 9   this is Seat Number 1, what seat would he be in?

10        A.    Seat Number 3.  He has on his tie and his glasses.

11        Q.    Okay.

12              MS. JONES:  Your Honor, let the record reflect

13   the witness has identified the Defendant in open court.

14              THE COURT:  The record will reflect.

15              MS. JONES:  Thank you.

16        Q.    (BY MS. JONES)  So let's kind of go back to 1993.

17   How did you first meet Matthew Lee Johnson?

18        A.    Kind of like through -- I met him actually through

19   his family, because Cheryl and Stetron, his family, and I met

20   him and he was nice.

21        Q.    Okay.  And when -- you said through his family.  So

22   did he have several family that lived in Sundance Apartments?

23        A.    Yes, ma'am.

24        Q.    And about how long had you been living there by the

25   time you befriended Cheryl and Stetron and Matthew?
```

1      A.    Not quite a year.

2      Q.    Okay.  Okay.  So at that point it was just you and

3 your three kids or four kids at that time?

4      A.    Just my three.

5      Q.    Okay.  And so shortly after you meeting him, about

6 how long did it take for y'all to date?

7      A.    Well, we were friends first.  Again, just -- I mean,

8 we -- we enjoyed each other.  We enjoyed each other's company,

9 and we just started being boyfriend and girlfriend.

10      Q.    Okay.

11      A.    He was sweet.

12      Q.    Okay.  All right.  And now, at what point would you

13 say that y'all became official -- where you were an official

14 couple and started living together?

15      A.    Probably about two -- two -- maybe a month or two

16 after we started talking.

17      Q.    Okay.  So are we talking early spring, like April,

18 or --

19      A.    I'm not sure.

20      Q.    Okay.  All right.  Now, how long did you actually

21 date Matthew Lee Johnson, do you remember?

22      A.    Probably four or five months, wasn't long.

23      Q.    Okay.  Wasn't a long relationship.  Now, you said

24 that he was sweet.  What were some things that he did that made

25 you want to date him?

```
 1        A.    He loved my kids.  He was good to my kids, and that
 2   was, to me as a single mother, was all thumbs up, you know.
 3        Q.    And how old were your kids at that time?
 4        A.    My daughter was two, my son was four, and my other
 5   son was seven.
 6        Q.    Okay.  And so when you say that he was sweet to the
 7   kids -- I mean, was he also nice to you?
 8        A.    Oh, yeah, he was nice to me at first.
 9        Q.    Okay.  And when you said y'all started living
10   together, was he working?  Was he going to school?  Matter of
11   fact --
12        A.    No, ma'am.
13        Q.    Okay.  Let me back up a little bit.  How old was he
14   when y'all started dating?
15        A.    Well, that was what was a little -- I wasn't quite
16   sure of.
17        Q.    Okay.
18        A.    So --
19        Q.    How old did you think he was?
20        A.    Eighteen.
21        Q.    Okay.  And you later came to find out he was
22   actually 17?
23        A.    Yes, ma'am.
24        Q.    And how old were you?
25        A.    I think I was like 23.
```

```
 1        Q.    Okay.  So it was an age difference there?
 2        A.    Yes, ma'am.
 3        Q.    Okay.  And so when y'all lived together, was he
 4   enrolled in school at that time?
 5        A.    No, ma'am.
 6        Q.    Okay.  Did he work?  Was he providing for you and
 7   your family?
 8        A.    No, ma'am, not really.
 9        Q.    Okay.  So you were the only one that was working?
10        A.    Yes, ma'am.
11        Q.    Okay.  And so about how long did he live with you?
12        A.    I guess about four or five months.
13        Q.    Okay.  During the course of your relationship?
14        A.    Yes, ma'am.
15        Q.    Okay.  And so when did it start going a little south
16   for you?  When did it start going bad?
17        A.    I think when it really started to go bad was my
18   little girl -- my little girl -- my daughter, her father got
19   killed.  And he just kind of flipped from there.  I never
20   understood.  He woke me up and said I was dreaming, I was
21   making love to her father.  And we just started fight -- just
22   fighting all the time from there.
23        Q.    Was that odd to you?
24        A.    Yeah -- yes, ma'am.
25        Q.    And do you remember about when that was?
```

```
 1        A.    I want to say maybe June.

 2        Q.    Okay.

 3        A.    I'm not -- I don't remember when her father got

 4   killed.  It's been so long.

 5        Q.    Yeah.  But that's the first time you remember it

 6   getting physical or the first time --

 7        A.    Yeah.

 8        Q.    -- that you remember having a problem?

 9        A.    The first time it was getting physical.

10        Q.    Okay.  And prior to it getting physical, were there

11   other -- any other events or any other things that took place

12   that led up to it getting physical?

13        A.    Not to my knowledge.  We were arguing, and then --

14   you know, he would put his hands on me.

15        Q.    Okay.  When you say put his hands on you, he would

16   like shake you or pinch you or --

17        A.    Grab -- grab me or, you know, he grabbed me, hit me.

18   You know, I mean, I fought back, you know, so --

19        Q.    Yeah.  That's what I was going to ask you, during --

20        A.    Yes, ma'am.

21        Q.    -- some of the occasions that y'all had arguments

22   and altercations and it got physical, did you fight back?

23        A.    Yes, ma'am.

24        Q.    Okay.  So lot of times you didn't just stand there

25   and take it, right?
```

```
 1          A.    No, ma'am.

 2          Q.    Okay.  So let's talk specifically about some of the

 3   instances where the police actually had to come out to your

 4   home.

 5          A.    Yes, ma'am.

 6          Q.    So in August of 1993, do you recall the police

 7   coming out to your home for an assault involving Matthew Lee

 8   Johnson and involving your two-year-old daughter?

 9          A.    Yes.  Yes, ma'am.

10          Q.    What happened?

11          A.    We had got into a fight, and my best friend lived

12   upstairs.  And my boys were already upstairs, and I had just

13   ran and I left my daughter in the house.  And he took her and

14   he left.  You know, so I guess the police wouldn't come, and

15   then they asked me, did he kidnap her and I told them, no.  And

16   I knew that he wouldn't do anything to her, so that wasn't an

17   issue.  It was just the issue between me and him.

18          Q.    So on that date did you call the police?

19          A.    No, somebody else did.

20          Q.    Okay.  So y'all were arguing and fighting pretty

21   loud -- loud enough for you to run out of the apartment?

22          A.    Yes, ma'am.

23          Q.    Okay.  And when you ran out of the apartment, you

24   left your two-year-old daughter in the apartment?

25          A.    Yes, ma'am.
```

```
 1        Q.   And when you came back, he was gone and she was
 2   gone?
 3        A.   Yes, ma'am.
 4        Q.   And, of course, he eventually brought her back,
 5   correct?
 6        A.   Yes, ma'am.
 7        Q.   And after that incident, did y'all get back
 8   together?
 9        A.   Yes, ma'am.
10        Q.   Okay.  And as a matter of fact, during several of
11   your arguments, fights, altercations, y'all would break up and
12   then make up, right?
13        A.   Yes, ma'am.
14        Q.   Okay.  So it was kind of a back and forth?
15        A.   Yes, ma'am.
16        Q.   All right.  So after the August incident, I guess
17   things were fine for a while, all was going good.  And then by
18   the time September came along, do you remember calling the
19   police on several occasions in September of 1993?
20        A.   I don't -- I honestly don't remember if I called
21   them or if somebody else called them, but I had just got really
22   upset because he had hit me, and I was holding my two-year-old
23   daughter.  And it's like she caught the back part of his hand.
24   And then that's when he left and I locked him out, and I
25   wouldn't let him back in.
```

```
 1        Q.    And this is the early part of September of 1993?

 2        A.    Yes, ma'am, I believe so.

 3        Q.    Okay.  And so what happened after that -- after you

 4   locked him out and wouldn't let him back in?

 5        A.    He wanted in.

 6        Q.    Okay.

 7        A.    He kept trying to come in.  And then he kept

 8   threatening to kick in the door, and I told him to go ahead.

 9        Q.    And so let me ask you this, on that occasion when

10   you said that he was trying to hit you and your daughter caught

11   it, where exactly were you hit at on your body?

12        A.    In my face.

13        Q.    Okay.  Was it with a closed hand or an open hand

14   or --

15        A.    To be honest, I can't remember.

16        Q.    Okay.  But it caused you pain, right?

17        A.    Oh, yeah.  Oh, yeah.  And -- and she caught the back

18   part, so I don't know if it was -- I really don't honestly

19   remember if it was closed or open, but she caught the back part

20   of his hand.

21        Q.    Did she cry?

22        A.    Oh, yes, ma'am.  Yes, ma'am.  That's what really

23   just set me over.

24        Q.    Okay.  So that was kind of the final straw for you?

25        A.    Oh, yes, ma'am.
```

1      Q.    Okay.  And so how did -- how did -- how did he get

2  out of the apartment?  How did you put him out?  I mean, did he

3  just leave out on his own or --

4      A.    I honestly think that he had realized he hit her,

5  and it bothered him, too.  So he left.  But he thought he was

6  going to get back in and -- (shakes head from side to side).

7      Q.    And you're shaking your head.  Is that a no?

8      A.    Oh, no, and he -- but he wasn't getting back in.  I

9  mean, he apologized and everything, but that just -- it wasn't

10  good enough.  My kids are all I have in my life.

11      Q.    Okay.  And so after -- and at this -- on this day,

12  did the police come out and talk to you?

13      A.    Yes.

14      Q.    Okay.  And did you describe for them who it was that

15  assaulted you --

16      A.    Yes.

17      Q.    -- and who you got in a fight with?

18      A.    Yes.

19      Q.    What did you tell them?

20      A.    I told them his name, you know, kind of how he

21  looked, and, you know, told them what happened.

22      Q.    Okay.  And do you know if he got a ticket or if he

23  got arrested?  Do you know what happened with that offense?

24      A.    I have no idea, because he had disappeared.

25      Q.    Okay.  So about what time of day was that?

```
 1        A.    That was -- I think like in the evening -- evening,
 2   but not like -- maybe 4:00 or 5:00.
 3        Q.    Okay.  So around dusk.  It wasn't really dark out
 4   yet?
 5        A.    Yeah, it wasn't dark yet, yeah, but it was -- yeah.
 6        Q.    And so after the police left, did he come back?
 7        A.    Yes, ma'am.
 8        Q.    Okay.  And is that when he came back in, trying to
 9   open the door and wanting you to let him in?
10        A.    Yes, ma'am.  Yes, ma'am.
11        Q.    Now, if y'all lived together, didn't he have a key?
12        A.    No, ma'am.
13        Q.    Okay.  Okay.  You kind of said that with
14   indignation.
15        A.    Yes, because I -- I'm paying all the bills.  I'm
16   doing everything.  I had the key to my house.
17        Q.    Okay.  All right.  So when he came back and tried to
18   get in, you told him no?
19        A.    Yes, ma'am.
20        Q.    You wouldn't let him in?
21        A.    I told him I was done, nope, he couldn't come in,
22   and I told him I would get his stuff or whatever and give it to
23   his brother, his sister, whatever.  That was fine.  I told him
24   I just didn't want any more dealings.  I couldn't do it
25   anymore.
```

1          Q.    So you officially broke up with him?

2          A.    Yes, ma'am.

3          Q.    So this wasn't one of those breakup and makeups?

4          A.    No, ma'am.

5          Q.    So did he go away quietly?  Did he go away

6    peacefully that time?

7          A.    No, ma'am.

8          Q.    What happened?

9          A.    He banged on the doors for a while.  I had

10   actually -- I was afraid because he -- you know, he has a

11   temper.  He can be sweet, but it's like he can have a temper,

12   and I have put mattresses up on my kids' windows and stuff

13   because he had hit the windows, too.  And he was banging on the

14   door and he was talking about he was going to kick it in.  And

15   I told him, go ahead, kick it in, kick it in.  And then he went

16   around and set my patio on fire.

17         Q.    And let me back up a little bit.  When y'all were

18   living together, I believe that -- or let me ask you this.  So

19   you told him, go ahead, kick it in, kick it in?

20         A.    Uh-huh.

21         Q.    And you took precautions to barricade your doors?

22         A.    Yes, ma'am.

23         Q.    And how did you do that?

24         A.    Well, I had chairs.  I had -- like I said,

25   mattresses, and I turned off all the lights and just was

1  laying, waiting for him to come on in.

2      Q.   When you say laying and waiting for him, I mean,

3  what were you going to do?  I mean, you couldn't beat him

4  physically because y'all had fought before --

5      A.   I had a gun.

6      Q.   Okay.  And where did you get the gun from?

7      A.   It was his.

8      Q.   Okay.  And so when you were laying in the middle of

9  the floor, what happened?

10     A.   He never did -- he said -- I said, he went around to

11 the patio.  The patio was around the side of the house.  And he

12 set the patio on fire, so I would come out.

13     Q.   About what time of day are we talking about?

14     A.   It was dark, so I -- it had been about maybe 8:00 or

15 9:00.  I'm not absolutely sure.  It might have been later.  I

16 just know it was dark.

17     Q.   Did you sleep that night at all?

18     A.   Oh, no.

19     Q.   Okay.  So you don't know if it was 8 o'clock in the

20 evening, 1 o'clock in the morning?

21     A.   I really don't, no.

22     Q.   Okay.

23     A.   Because I was laying waiting.

24     Q.   Okay.  And where were the kids at?

25     A.   The kids was in the closet.

```
 1        Q.    Now, during this -- I guess this altercation with
 2   him telling you that he's going to kick the door in if you
 3   don't open it, was there anything else that he said to you?
 4        A.    Oh, he was telling me about how he was going to --
 5   you know, if I didn't open the door, he was going to beat me up
 6   or whatever, and -- I mean, because at first, he tried to talk
 7   nice, I'm sorry, just let me in, just let me in.  And then when
 8   he realized I wasn't going to let him in, he started talking
 9   negative.
10        Q.    And when you say talking negative, did he ever tell
11   you that --
12        A.    He was going to beat my behind?
13        Q.    Yes.
14        A.    Uh-huh.
15        Q.    Did he ever tell you that if you didn't come out,
16   that he was going to do something?
17        A.    Uh-huh.
18        Q.    What did he tell you?
19              THE COURT:  You need to say yes or no, ma'am.
20              THE WITNESS:  I'm sorry, I apologize.
21        A.    Yes, he did.  He told me -- well, his words was, I
22   can make you come out of this house.
23        Q.    (BY MS. JONES)  Okay.  And what did you take that to
24   mean?
25        A.    Right then, I was just -- I was just -- just laying
```

1    there waiting.  I didn't know what to think, what to -- you

2    know, I just laid there and waited.

3         Q.    So how did you know that something was going on at

4    the back patio?

5         A.    Because he start screaming at my back patio.  You

6    know, because I lived downstairs, he start screaming, you're

7    going to come outside, you're going to come outside.  No, I'm

8    not.  And I said, no, I am not coming outside.  He said, well,

9    I'm going to make you come outside.  Then I had -- on my patio,

10   because the kids was still kind of little, so I had a rug, like

11   an -- you know, like a rug.  So when the kids went out there,

12   it wasn't, you know, on the concrete.

13        Q.    Okay.

14        A.    I don't know exactly what he threw over there or set

15   on fire, but he set something -- a little something on fire.

16        Q.    Did he tell you to come outside and look at it, or

17   how did you know it happened?

18        A.    Oh, I seen it when he did it, I seen the flames.

19        Q.    Okay.

20        A.    When I seen the flames, I went outside.

21        Q.    Okay.

22        A.    I put it out.

23        Q.    All right.  How did you put it out?

24        A.    Well, first I shot at him.  He was running.

25        Q.    Okay.  Did you shoot in the air?

1    A.    Huh-uh.

2    Q.    Okay.  So apparently it didn't hit him?

3    A.    No, ma'am.  No, ma'am.

4    Q.    Okay.  And so you shot at him to get him away from

5    your apartment, to get him away from the kids, what?

6    A.    I felt like -- you know, I felt like I was like a

7    lion with her -- with her cubs, you know.  I just felt like I

8    had to protect my kids at any means necessary.

9    Q.    Were you scared?

10    A.    To death.

11    Q.    Okay.  Were you also upset?

12    A.    Yes, hurt.

13    Q.    Okay.  Why were you hurt?

14    A.    Because I actually did love Matthew.

15    Q.    Okay.  And did it -- I guess other than it

16    escalating to the point that he's, you know, throwing fire on

17    your patio, what made this different than the other situations?

18    A.    Like I said, it did it for me when he hit me and I

19    know -- and I know that he didn't do it on purpose, but it's

20    the effect, you hit me when I'm holding my baby, and then it

21    hit her, I would not allow that.  My kids are 23, 24, like that

22    now, and I still will not allow anybody to put their hands on

23    my children.

24    Q.    And on that evening, did it cause you greater

25    concern -- or greater hurt that he's throwing this fire on the

1  patio knowing that the kids were inside?

2      A.    Yes, they -- yes, ma'am, that's what I said.  That's

3  what finished it all the way, because if you can throw

4  something over my patio, knowing that -- how my patio was, my

5  kids' room was right here, and like the patio and their window

6  was right here, so they would have gone first.  My room was way

7  on the other side.

8      Q.    And did you -- you said you barricaded their window?

9      A.    Yes, ma'am.

10     Q.    With what?

11     A.    Mattresses.  And then I pushed the bunk bed up

12  against the mattresses.

13     Q.    Okay.  Had he tried to come in through the windows

14  before?

15     A.    No, ma'am.

16     Q.    But on that day you weren't taking no chances?

17     A.    No, ma'am.  I was in survival mode.

18           COURT REPORTER:  I'm sorry?  I didn't understand

19  what you said.

20     A.    I said, no, ma'am.

21     Q.    (BY MS. JONES)  You were in survival mode?

22     A.    I was in survival mode, yeah.

23     Q.    Okay.  So after you, you know, go out to the patio,

24  you said you fired a shot to make him run or whatever?

25     A.    Uh-huh.

```
 1        Q.   How did you put the fire out?

 2        A.   I honestly don't remember.  I don't know if I hit it

 3   or if I had like a blanket.  I really don't honestly remember

 4   because it just all happened so fast.

 5        Q.   And so did you call the police?

 6        A.   Huh-uh.

 7             THE COURT:  Yes or no, ma'am.

 8             THE WITNESS:  No, ma'am.  I'm sorry.

 9        A.   No, ma'am.

10        Q.   (BY MS. JONES)  So maybe a neighbor or someone else

11   called?

12        A.   Yes, ma'am.

13        Q.   And do you remember a police officer coming to your

14   house?

15        A.   Yes, ma'am.

16        Q.   Okay.  Did you open the door?

17        A.   No, ma'am.

18        Q.   Okay.  What finally made you open the door to talk

19   to the officer?

20        A.   Well, because the officers that came, the second set

21   of officers that came, the man, he was -- he was nicer.

22        Q.   Okay.

23        A.   He talked to me and helped me calm down because the

24   first set of officers that came were very rude and mean to me,

25   and I told them to get out of my house.
```

```
 1        Q.    So by the time the next officers came, were you just
 2   really not wanting to deal with the Dallas Police Department?
 3        A.    Exactly.  No, ma'am.
 4        Q.    All right.  And so after you finally talked to him,
 5   were you able to describe to him --
 6        A.    Yes.
 7        Q.    -- you know, the one person --
 8        A.    I said, the one officer that I talked to, he talked
 9   to me, he calmed me down.  I was real aggressive with him at
10   first.  I wouldn't open the door, and I was mean, but then he
11   talked to me and, you know, helped me just kind of get -- get a
12   grip, I guess.
13        Q.    And was that Officer Hagan that we saw --
14        A.    Yes, ma'am.
15        Q.    -- walking out?  And so after you spoke with Officer
16   Hagan, did anything else happen with this?  Did Matthew come
17   back?
18        A.    No, ma'am.
19        Q.    He never came back again after this?
20        A.    No, ma'am.
21        Q.    Did you have any other contact with him as far as a
22   relationship or even trying to be friends again after this
23   incident?
24        A.    He had talked -- I had talked to him on the phone a
25   couple of times, but that was about it.
```

54

```
 1       Q.   Now, during all these assaults and these different

 2  threats that you told us about with Matthew, at any time did

 3  you think about maybe trying to get a protective order or

 4  trying to get make sure that he stayed away from you?

 5       A.   I didn't know anything about that, and every time

 6  I've came across an officer to try to help me, because I do

 7  date black men, they've gave me a hard time and treated me

 8  ugly, so I -- I don't want to be bothered with the officers,

 9  period.

10       Q.   And so did you just kind of at that point knew that

11  you had to protect yourself?

12       A.   Yes, ma'am.

13       Q.   Okay.

14       A.   I don't have anybody else.

15       Q.   And so after y'all broke up in September of 1993,

16  did you know or have any information about the fact that he had

17  a girlfriend named Daphne or later --

18       A.   Yes -- yes, ma'am.

19       Q.   -- his wife?

20       A.   Yes, ma'am.  I had heard of it, yes, ma'am.

21       Q.   Had you ever met her?

22       A.   No, ma'am.

23       Q.   Okay.  And he still had family that lived in

24  Sundance Apartments, right?

25       A.   Uh-huh, yes, ma'am.
```

1    Q.    Okay.  And even though he still lived there, you

2  didn't have any more contact with him?

3    A.    No, ma'am, he didn't bother me anymore.

4    Q.    Now, after 1993, you kind of moved on with your

5  life, right?

6    A.    Yes, ma'am.

7    Q.    And you didn't have any more contact with him or

8  anything like that, but during the time that y'all had broken

9  up, you started experiencing a lot of different stuff in your

10  life, didn't you?

11    A.    Yes, ma'am.

12    Q.    As a matter of fact, you are aware and you know that

13  as a part of you testifying, that we talked to you and you gave

14  us permission to get all of your medical records?

15    A.    Yes, ma'am.

16    Q.    And that you've had medical records going from

17  Parkland to Green Oaks, as well as to Metrocare?

18    A.    Yes, ma'am.

19    Q.    And that during a lot of your visits to these

20  different facilities, you were diagnosed with mental illness --

21    A.    Yes, ma'am.

22    Q.    -- correct?

23    A.    Yes, ma'am.

24    Q.    And that mental illness you're diagnosed with is

25  what?

1      A.    Bipolar.

2      Q.    Okay.  And as a matter of fact, it's bipolar, but is

3  it also a depressive disorder that you have, as well?

4      A.    Yeah, that's what -- bipolar, that's what that is.

5  I have ADHD and bipolar.

6      Q.    And that it causes you to have like mood swings, you

7  know, some memory loss?

8      A.    Yes, ma'am.

9      Q.    Hallucinations?  As a matter of fact, you even had

10  some suicide attempts, didn't you?

11      A.    Yes, ma'am.

12      Q.    Now, did all of this occur after dating Matthew?

13      A.    Yes, ma'am.

14      Q.    And -- now, even though you experienced all of that,

15  that doesn't mean it's okay for you to have ever been

16  assaulted, right?

17      A.    Yes, ma'am.  That's what I -- that's what I --

18  that's what I had to learn.

19      Q.    Okay.

20      A.    That's what I had to learn.

21      Q.    That it wasn't your fault?

22      A.    Yes, ma'am.

23      Q.    And that even though you have this disorder, does

24  that affect your memory of what happened in 1993?

25      A.    No, ma'am.

1    Q.   Does it affect your memory of what happened in 1995?

2    A.   No, ma'am.

3    Q.   Okay.  Because on a lot of those occasions, you

4 called to the hospital and turned yourself in, right?

5    A.   On every one of those cases, I did.

6    Q.   Okay.  Why did you do that?

7    A.   Because I -- like I said, my children are my world

8 and if I -- I feel myself and I know that I'm getting too much,

9 or I want to do something to myself or I feel like I could, you

10 know, hurt myself, I wouldn't want my kids to see that.  I

11 asked -- I reached out and asked for help.  And then, you know,

12 I have somebody that watch my kids.  My best friend usually

13 does it.

14    Q.   So you were first officially diagnosed with bipolar

15 back in 1995?  Do you remember?

16    A.   No, ma'am, it was like -- I think it was -- well,

17 may have been '95, '96, something like that.

18    Q.   Okay.  And how did -- how has it been managed?  I

19 mean, how do they --

20    A.   I take medication.  I take medication.

21    Q.   And with that medication, does it cause you to have

22 any kind of memory loss --

23    A.   Oh, no, ma'am.  It keeps me sharp as a tack.

24    Q.   Okay.  And so would you say that it's under control?

25    A.   Yes, ma'am.

1      Q.    Now, you're not saying you don't have episodes,

2  right?

3      A.    I don't have very many.

4      Q.    Okay.

5      A.    Yeah, because I have it under control.  I've been on

6  the same medicine now for almost 15 years, so I pretty much got

7  a handle on it.  At first, it was hard, because they couldn't

8  find the right medicines, but now I'm on the right medicines

9  and I -- I'm good.

10     Q.    And you keep that regulated because if I'm not

11 mistaken, looking at your medical records, if you feel like

12 something is about -- about to happen --

13     A.    I will call, yes, ma'am.

14     Q.    Because I see on several occasions, you were calling

15 a couple of times a day to talk to nurses?

16     A.    Yes, ma'am.

17     Q.    And they kept your medications regulated.  And when

18 they saw it was an issue, they addressed it, correct?

19     A.    Yes, ma'am.

20     Q.    And along with that, did you get some counseling and

21 things of that nature?

22     A.    Yes, ma'am.

23     Q.    Because if I'm not mistaken, Green Oaks and

24 Metrocare, they're specifically dealing with mental illness,

25 right?

```
 1        A.    Yes, ma'am.

 2        Q.    And did you ever have any overnight stays?

 3        A.    Yes, ma'am.

 4        Q.    Okay.  And where was that at?

 5        A.    Green Oaks and then at Parkland.

 6        Q.    And with the Parkland situation, let's talk about

 7   that.  At some point were you contemplating suicide, and you

 8   called the officers?

 9        A.    Yes, ma'am.  When I called the officers, yes, ma'am.

10        Q.    And you asked them to take you to Parkland or how

11   does that happen?

12        A.    Yes, ma'am, I asked them to take me.  I told them I

13   needed help.  I felt like I was off my edge.  And at that time

14   my husband was at the house, and he said he didn't think I

15   needed to go, but I told him I know what I need to do with my

16   body, so --

17        Q.    And when you stayed at Green Oaks, about how long a

18   stay was that?

19        A.    I only stayed 24 hours.

20        Q.    And on that occasion did you drive there, or did you

21   get the police to take you?

22        A.    No, ma'am, the officers took me.

23        Q.    And when they came and got you, did you tell them

24   specifically, this is where I want to go, or did you just tell

25   them --
```

```
 1        A.    No, that's where they take you automatically.
 2        Q.    Okay.  Okay.  And so now, other than the mental
 3   illness that you said you've been dealing with, it's also true
 4   that in your life you've also had some issues with drugs,
 5   right?
 6        A.    Yes, ma'am.
 7        Q.    Okay.  And about how long ago was that?
 8        A.    I can tell you exactly how long ago that was.  My
 9   son is 26 years old.  My son turned one, I was clean.  Been
10   clean off crack ever since my son turn turned one.  He's going
11   to be 27 in December.
12        Q.    And why did you do that?
13        A.    Like I said, my kids are my world.  My kids are my
14   everything.  They're the reason I'm alive, the reason I exist,
15   everything.  My kids are everything to me.
16        Q.    And about how old were you when you were
17   experimenting with, you know, cocaine and --
18        A.    Oh, my son was barely -- I was about 17, 18.
19        Q.    Okay.  And so to kick the habit of cocaine, did you
20   go to rehab?  What did you do?
21        A.    No, ma'am.  I prayed to God and has kept -- kept
22   praying and just doing -- keeping -- I -- I cut loose a lot of
23   friends that I had, stayed to myself.  I moved out of the area
24   and just kept my -- focused on my kids.  Whenever I felt weak,
25   I focused on my kids.
```

61

```
 1        Q.    So by the time you met Matthew, you were 23.  You
 2   had been clean and sober for, what, about four years, five
 3   years by that time?
 4        A.    Yes, ma'am.
 5        Q.    And you did that all by yourself, right?
 6        A.    Yes, ma'am.
 7        Q.    Would you say that's one of your proudest moments?
 8        A.    Yes, ma'am.  But I wouldn't say all by myself.  I
 9   would say with the help of God.
10        Q.    Okay.  Now, when you were with Matthew, I understand
11   that you said you changed, you know, the people you hung out
12   with and your lifestyle and everything?
13        A.    Uh-huh.  I was -- I was an alcoholic at the time.
14        Q.    Okay.
15        A.    I turned to -- I went from that to alcohol.  I was
16   an alcoholic at the time.
17        Q.    And with Matthew, did y'all do anything other than
18   alcohol together?
19        A.    We smoked weed.  That was it.
20        Q.    And the truth is, had you ever seen Matthew do any
21   other substance besides marijuana or alcohol in your presence?
22        A.    No, ma'am.
23        Q.    All right.  And let me ask you this.  Do any of the
24   drugs or any of the mental illness or any of the stuff that
25   you've suffered, do you believe that's okay or that it's okay
```

1   for a person to assault you?

2       A.   Oh, no, ma'am, it's no reason, and -- it's no reason

3   for a man to hit a woman, a woman to hit a man.  That's no

4   reason for that at all.  That's -- that's against nature of

5   God.

6       Q.   Do you think that that -- because of all you had

7   going on in your life and the experiences you had, do you think

8   that made it okay for somebody to throw a burning piece of wood

9   on your patio?

10      A.   Oh, no, ma'am.

11      Q.   Now, you said you haven't had any significant

12  contact with Matthew since the early 90's, right?

13      A.   Yes, ma'am.

14      Q.   And you're testifying today only because we asked

15  you, correct?

16      A.   Yes, ma'am.

17      Q.   Are you -- do you have a grudge against Matthew?

18      A.   No, ma'am.

19      Q.   Are you trying to get back at him?

20      A.   No, ma'am.  I didn't actually want to do this at

21  all.

22      Q.   Okay.  And as a matter of fact, if we wouldn't have

23  called you, you wouldn't have came looking for us, would you?

24      A.   No, ma'am.

25              MS. JONES:  Your Honor, I pass the witness.

```
 1                      CROSS-EXAMINATION
 2  BY MS. MULDER:
 3       Q.    Good morning.  Is it Ms. Franks?
 4       A.    Yes, ma'am.
 5       Q.    My name is Nancy Mulder.  I'm going to be asking you
 6  some questions.  If at any time you don't understand me or need
 7  me to rephrase a question, just let me know and I will.
 8       A.    Okay.
 9       Q.    How old a woman are you?
10       A.    I'm 43 -- be 44 this month in November.
11       Q.    Okay.  You and I are about the same age.  I'll be 44
12  in January.
13       A.    Yes, ma'am.
14       Q.    When you met Matthew, you -- he was 17?
15       A.    Yes, ma'am.  I was 18, but he was 17.  I mean, I had
16  found out later on in the relationship that he was 17, but --
17       Q.    At what point did you find out he was 17?
18       A.    I don't exactly remember the day or the month, but I
19  mean, once we got involved, I think I found out through one of
20  his sisters or something.  And I mean -- or a cousin, I don't
21  know, but at that time it didn't matter to me.
22       Q.    So you knew he was 17 when -- when he moved in with
23  you?
24       A.    No, he was already in the house.
25       Q.    All right.  He was young.  Do you agree?
```

```
 1        A.    Yes, ma'am.

 2        Q.    Should have been in high school?

 3        A.    Yes, ma'am.

 4        Q.    Immature?

 5        A.    Oh, I'm sure.

 6        Q.    And he moves in with you and has instant

 7  responsibilities.  Would you agree?

 8        A.    I didn't put any responsibilities on him.  I paid

 9  all the bills, and I took care of everything.

10        Q.    Isn't it -- isn't it true that Matthew got a job

11  with your brother Eric -- moving company?

12        A.    Yes, he did.  Yeah, he did.

13        Q.    So he did work?

14        A.    Yeah, he did.  I had forgot about that, but, yeah,

15  he did.

16        Q.    That's all right.  So he did contribute to the

17  family?

18        A.    Oh, yeah.  I mean, he did little things or whatever,

19  but I said he contributed just by the fact of how good he was

20  to my kids.

21        Q.    Well, tell us about that.  What kind -- how --

22  how -- how was he good to your kids?  What would he do with

23  your kids?

24        A.    Oh, he would spend time with my kids, you know, love

25  my kids and, you know, he just -- he was good to them, I mean.
```

```
 1        Q.    Good father figure?

 2        A.    Yeah.

 3        Q.    Even at the age of 18?

 4        A.    Yes, ma'am.

 5        Q.    Played with them?

 6        A.    Yeah.

 7        Q.    Was patient with them?

 8        A.    Yes, ma'am.

 9        Q.    And your children were, I believe, four, six, and

10   eight at the time?

11        A.    No, ma'am.

12        Q.    I'm sorry, how old were they?

13        A.    Two, four -- no, two, three, and six or seven, I

14   think he was.

15        Q.    So you had -- I mean, three kids under the age of

16   seven.  That's a lot of work.  Would you agree?

17        A.    Yes, ma'am.

18        Q.    I have a seven-year-old, and one is tough enough.

19        A.    Yes, ma'am.

20        Q.    And he helped you with that?

21        A.    Yes, ma'am.

22        Q.    Just -- you had been dating about a month when he

23   moved in?

24        A.    Yeah, I guess.

25        Q.    Okay.  Instant fatherhood.  Would you agree?
```

```
 1        A.    Yes, ma'am.

 2        Q.    How -- would you agree that he handled it well for

 3   an 18-year-old?

 4        A.    Yes, ma'am.

 5        Q.    So he -- you never had an issue with his -- with his

 6   behavior with --

 7        A.    With my children.

 8        Q.    -- with your children?

 9        A.    No, ma'am.

10        Q.    He was --

11        A.    Just -- just like when he left with them, I didn't

12   have a problem with it.  I know he wouldn't hurt her.

13        Q.    Oh, with your baby girl?

14        A.    Uh-huh.

15        Q.    You have to answer yes or no.

16        A.    Yes, ma'am.

17        Q.    All right.  And you loved him?

18        A.    Yes, ma'am.

19        Q.    But you would agree, based on the fact that -- since

20   you have gotten so much help in the last several years for your

21   bipolar disorder, the fact that you were diagnosed in 1995 or

22   1996, would you agree that when you were with Matthew in 1993,

23   you were most likely suffering from that mental illness, but it

24   was undiagnosed at the time?

25        A.    I've been suffering with the illness from the time I
```

```
 1  was born.
 2       Q.   Okay.
 3       A.   It just didn't get discovered until then.
 4       Q.   Okay.  So you agree that you were suffering from
 5  bipolar disorder when you were with Matthew during this time?
 6       A.   Yes, ma'am, I was born like that.
 7       Q.   Okay.  And I'm not trying to say that there's
 8  anything wrong with that.
 9       A.   Okay.
10       Q.   It's a chemical imbalance in the brain.  I totally
11  agree with you completely.
12       A.   Okay.
13       Q.   Okay.  But based on the fact that you were suffering
14  from that mental illness at the time, you agree that it made
15  your behavior much more erratic than it is now?
16       A.   No, ma'am.
17       Q.   No?  You didn't -- you weren't -- you're telling us
18  you weren't suffering any symptoms of your bipolar disorder?
19       A.   Oh, yes, ma'am, I would -- I would have -- but, yes,
20  but I never got physical.
21       Q.   Okay.  But like you say, you're a fighter?
22       A.   Yes, ma'am.
23       Q.   Okay.  And you and Matthew had a volatile
24  relationship.  Would you agree?
25       A.   Yeah.  It didn't start out like that, but, yeah,
```

1  that's how it ended.  Yes, ma'am.

2      Q.    Okay.  And you would fight back with him.  Would you

3  agree?

4      A.    Of course.  I'm not going to let anybody hit me.

5      Q.    That's right.  When -- but it wouldn't always start

6  that way.  It would always start with a verbal disagreement.

7  Would you agree?

8      A.    Yes, all fights do.

9      Q.    Okay.  And you would verbally fight back with him.

10 Would you agree?

11     A.    Yes.

12     Q.    And he was 18 at the time?

13     A.    Yes.

14     Q.    You never sought any kind of medical attention for

15 any assaults --

16     A.    No, ma'am.

17     Q.    -- or pushing?  And you never pressed charges

18 against him for anything?

19     A.    No, ma'am, I did not.

20     Q.    Now -- and during this incident with the -- with the

21 wood on your patio, the incident that ended everything.

22     A.    Yes, ma'am.

23     Q.    I want to go back to that, because you said he came

24 back and he was apologetic and he was telling you he wanted to

25 come back in and was telling you were -- that he was sorry,

```
 1   right?

 2        A.   Yes.  Standing outside the locked door, yes, ma'am.

 3        Q.   Okay.  And that was pretty typical of how things

 4   went with y'all.  Would you agree?

 5        A.   Yeah.

 6        Q.   Okay.  You guys would -- as Ms. Jones said, you

 7   would break up and make up?

 8        A.   Uh-huh, yes, ma'am.

 9        Q.   But for you that had been the end of it?

10        A.   That's right, my child had been hurt.  It's no

11   longer -- it was no longer a question anymore in my mind.

12        Q.   And I -- I totally understand.  But you guys

13   continued going back and forth --

14        A.   No, ma'am.

15        Q.   -- as far as when he was -- he wanted you to come

16   out or he said he was going to kick the door in and you were

17   telling him --

18        A.   Oh, yeah --

19        Q.   -- go ahead?

20        A.   -- as far as that, I told him to go ahead and kick

21   it in.

22        Q.   That's right.

23        A.   I was laying in the hallway in the dark with his

24   gun.

25        Q.   Because you were going to shoot him?
```

 1      A.    Yes, ma'am.

 2      Q.    And you actually did take a shot at him?

 3      A.    Yes, ma'am.

 4      Q.    But you knew his goal that night was to -- he said

 5  he was going to -- make you come out of the house?

 6      A.    No, he told -- he told me I was going to come out of

 7  the house, and he was going to beat -- beat my behind.

 8      Q.    Okay.

 9      A.    And I wasn't doing it anymore.  I was done.

10      Q.    All right.  But you'll agree that he threw that log

11  on your patio to get you to come out?

12      A.    Oh, yeah, I'm sure.

13      Q.    Okay.

14      A.    Yes, ma'am, so I would come outside, because he knew

15  if I seen the fire, I would come outside.

16      Q.    And you've testified before this jury, you know it

17  was not his intention to hurt your daughter in any way.  You

18  said that it was --

19      A.    Yes, ma'am.  Yes, ma'am.  When he took her, no, I

20  didn't think he would hurt her in any way.  I told the officers

21  that because they wanted to say, well, maybe he kidnapped her

22  because he wasn't her father.  And I said, no, I believed in

23  all my heart he wouldn't hurt her.

24      Q.    Well, I'm talking about the incident that --

25      A.    When he took her?

1    Q.   No, I'm not.  I'm talking about the incident

2 where -- when you said he hit you and the back of his hand

3 caught the baby that you were holding.

4    A.   Oh, Lord, that was not forgiven because any man that

5 would hit a woman while she's holding a child is nothing.

6    Q.   I understand.  But what you testified to the jury,

7 and I want to make sure that we all understand, it was not his

8 intent to hurt that baby?

9    A.   Oh, I know he didn't intentionally hit her.

10    Q.   Okay.

11    A.   Yes, he didn't intentionally hit her.  I didn't say

12 that, but I mean, it caught -- she caught the back of the

13 hand --

14    Q.   Uh-huh.

15    A.   -- because I was holding her.

16    Q.   Okay.  Now, you said you were drinking alcohol

17 during this time period?

18    A.   Yes, ma'am.

19    Q.   You drank every day?

20    A.   No, not every day.

21    Q.   You -- you were -- you were off the crack, but you

22 had turned to alcohol during that time period?

23    A.   I drank alcohol.  I was an adult.  I drunk alcohol.

24    Q.   Okay.  And you said you drank alcohol and smoked

25 marijuana with Matthew?

1      A.    Yes, ma'am.

2      Q.    Okay.  So you were aware that he had a drug problem?

3      A.    I honestly didn't see it as a drug problem.  We

4  was -- I mean, it was just weed and drinking and he wasn't --

5  from my knowledge, he wasn't doing anything else, and he didn't

6  fall out high and stuff like that, so --

7      Q.    Where would y'all drink and smoke marijuana?

8      A.    In our room.  It just depends where the kids was.  I

9  would put the kids in another room.

10     Q.    How often would y'all smoke marijuana?

11     A.    I couldn't honestly tell you.  I mean, it was in

12  '93.

13     Q.    Uh-huh.

14     A.    I don't know, maybe -- I don't know if it was on the

15  weekends or whatever.  If I would sit here and tell you a

16  certain -- a certain amount of time, I would be lying and I'm

17  not going to do that.

18     Q.    And I don't want you to.

19     A.    Okay.

20     Q.    If you can't recall, that's all right.  I

21  understand.  It was a long time ago?

22     A.    Yes, ma'am.

23     Q.    Over 20 years ago?

24     A.    Yes, ma'am.

25     Q.    And when you fired that shot at him, you were trying

1  to hit him.  Would you agree?

2      A.    Yes and no.  You know, I mean, a woman scorned, you

3  do, but -- yeah -- no, I was trying to hit him.

4      Q.    Okay.  That's fair enough.  Fair enough.

5      A.    Yeah.

6      Q.    He never -- he never pressed charges on you?

7      A.    I didn't want to kill him, but I wanted to shoot

8  him.  Yeah --

9      Q.    You wanted to hurt --

10     A.    -- I just wanted to -- I wanted to really just -- I

11 wanted him to hurt like I hurt.

12     Q.    Okay.  All right.  Fair enough.  I mean, if it had

13 accidentally hit him in the head, you would have been in big

14 trouble because he would have died.

15     A.    Yep, but I -- I do whatever I need to do for my

16 kids.  I'll die for my kids and go to jail for my kids.  It

17 don't matter.

18     Q.    Fair enough.

19         MS. MULDER:  I'll pass the witness, Your Honor.

20         THE COURT:  Thank you.

21             REDIRECT EXAMINATION

22 BY MS. JONES:

23     Q.    I've just got a few follow-up questions real quick.

24 Defense counsel asked you, you really didn't know or did you

25 know his intent with the fire.  You didn't know his intent with

```
 1  that fire, did you?
 2       A.   How would I know that?  I mean, I -- I know he was
 3  trying to get my attention, but I didn't --
 4       Q.   Of all the fights and arguments y'all had --
 5       A.   He had never done that.
 6       Q.   So that was very scary to you, right?
 7       A.   Yes, ma'am.
 8       Q.   And it did get you outside?
 9       A.   Yes, ma'am.
10       Q.   And she --
11       A.   I felt my -- I felt me and my children's life was in
12  danger, and that's why I shot.
13       Q.   And then she also asked you a question about the
14  fact that, you know, based on your relationship, as you told
15  me, give and take, you know, you break up to make up and that
16  he was very apologetic to you?
17       A.   Yes, ma'am.
18       Q.   Even somewhat remorseful while he was standing
19  outside a locked door, right?
20       A.   Yes, ma'am.
21       Q.   Because what would have happened -- based on your
22  relationship, what would have happened if you opened that door
23  and let him in?
24       A.   If I had opened that door, the way I was feeling --
25       Q.   Uh-huh.
```

```
 1        A.    -- I'm not sure -- you know, he said he was sorry,
 2   but I didn't believe him because when I thought about -- to
 3   open the door, he started, if you don't bring your a-s-s
 4   outside, you know, I'm going to -- I'm going to kick the door
 5   in, and I'm going to beat -- you know, beat you up, and all
 6   this start saying a lot of stuff so I'm like, oh, okay, because
 7   I waited a minute.  He was apologetic, and then he started with
 8   the threats to do something to me, so, no, ma'am, it wasn't
 9   happening.
10        Q.    Because he told you exactly what he was going to do?
11        A.    Uh-huh.  And I've been beat before, and I won't -- I
12   won't go through it again.
13               MS. JONES:  No further questions, Your Honor.
14               MS. MULDER:  Nothing further, Your Honor.
15               THE COURT:  Thank you, ma'am.  You may stand
16   down.
17               Ladies and gentlemen, let's take a break.  It's
18   five after 10:00.  If you'll be back in the jury room at 10:20,
19   please.
20               MS. JONES:  Is it okay if she stays seated, Your
21   Honor?
22               THE COURT:  Yeah.
23               THE WITNESS:  Thank you.
24               (Recess.)
25               THE COURT:  Please be seated.
```

```
 1                    MS. JONES:  Your Honor, may this witness be

 2  finally released, Your Honor?

 3                    MS. MULDER:  No objection.

 4                    THE COURT:  Off the record.

 5                    (Witness brought forward and sworn.)

 6                    THE BAILIFF:  All rise.

 7                    (Jury returned to courtroom.)

 8                    THE COURT:  Please be seated.

 9                    Please call your next witness.

10                    MS. JONES:  Thank you, Your Honor.

11                         JOHN SPERA,

12  was called as a witness by the State, and after having been

13  first duly sworn, testified as follows:

14                    DIRECT EXAMINATION

15  BY MS. JONES:

16       Q.   Officer, could you please state your full name and

17  spell your last name for the record?

18       A.   John Spera, S-p-e-r-a.

19       Q.   And how are you employed?

20       A.   I'm a lieutenant with the Garland Police Department.

21       Q.   And how long have you been doing that?

22       A.   Right at about 23 years now.

23       Q.   And prior to coming to the Garland Police

24  Department, did you have any other prior law enforcement

25  experience?
```

1       A.    No, ma'am.

2       Q.    And what training and experience do you have that

3  qualifies you to be a Garland Police officer?

4       A.    I had basic police academy and ongoing training that

5  takes place every year -- certain amounts of hours every two

6  years.

7       Q.    Now, you said you're a lieutenant.  What -- are your

8  duties a little different than let's say a regular patrol

9  officer because I see you have the green patches?

10      A.    I'm assigned to the Patrol Division, and I'm over

11  the Canine Unit, as well.  But, yes, ma'am, I'm a supervisor on

12  the streets.

13      Q.    Okay.  Okay.  Supervisor on the streets.  All right.

14  And how long have you been with the Canine Unit?

15      A.    I've had canine for about -- almost three years now.

16      Q.    Oh, wow, what kind of dog do you have?

17      A.    I don't have a dog.  I just keep an eye on guys that

18  do.

19      Q.    Okay.  All right.  That's what I thought, because

20  I'm like, you don't have any dog hair on.

21      A.    No.

22      Q.    So let's talk about what your typical duties are as

23  a lieutenant on patrol, because you're not only answering

24  calls, but you have to supervise those people who get calls?

25      A.    Correct, yes, ma'am.

```
 1        Q.    Okay.  How does that work?

 2        A.    If I'm needed by a patrol officer, I obviously

 3   respond to those.  I go to the Priority 1 type calls, do my

 4   report checks, and handle a lot of telephone business and

 5   scheduling and things along that line.

 6        Q.    What's a Priority 1 type call?

 7        A.    Disturbances in progress, robberies, burglaries,

 8   things of that nature.

 9        Q.    And do you encompass any particular sector or

10   division of Garland or just the whole city?

11        A.    I generally work the south sector, south of Miller

12   Road, but a lot of times I'm kind of all over the place.

13        Q.    Okay.  When you say south of Miller Road, is that to

14   what -- what are the boundaries?

15        A.    Miller to our city limits which goes down to -- past

16   I-30 and then out I-30 to the lake -- to Lake Ray Hubbard.

17        Q.    All right.  And specifically, I want to turn your

18   attention to September 13th of 2004.

19        A.    Yes, ma'am.

20        Q.    Were you working on that day?

21        A.    Yes, ma'am.

22        Q.    And were you called out to a specific location or

23   disturbance back in September of '04, specifically a location

24   at 4263 Rose Hill Road?

25        A.    Yes, ma'am.
```

```
 1        Q.    Okay.  And do you know if that's a residence, or --
 2   I mean, when I say a residence, do you know if that's an
 3   apartment or a home?
 4        A.    It's an apartment complex.
 5        Q.    Okay.  And that's in Garland, right?
 6        A.    Yes, ma'am.
 7        Q.    Texas?
 8        A.    Yes, ma'am.
 9        Q.    All right.  And what specifically were you called
10   out for on that day?
11        A.    A family disturbance, domestic.
12        Q.    Okay.  And were you -- were you sent or dispatched
13   by 911?  Was it that you were just going to add security or
14   just have a patrol presence?  What was the initial reason?
15        A.    It came in through our 911 call, and it then gets
16   sent to a patrol officer and we respond to the call, and so I
17   was going out on a family disturbance call.
18        Q.    Okay.  And on your way there, did it escalate or did
19   something happen that would change it from a disturbance call
20   to something else?
21        A.    We were advised on the way there that there was a
22   suspect there attempting to kick the door in and that there was
23   also a protective order on him.
24        Q.    Okay.  And so how does that work?  What's the first
25   thing you routinely do when going to a disturbance call?
```

1        A.    Immediately check on the people involved in the

2   disturbance and verify everybody's safety.  That's the first

3   priority.

4        Q.    Do you go by yourself?  Do you have a cover unit?

5        A.    There is a backup unit dispatched to those, yes,

6   ma'am.

7        Q.    Because in Garland you ride one man, correct?

8        A.    That is correct.

9        Q.    And so you're on your way there.  You realize that

10  it gets escalated.  Does the caller call back to 911 again, or

11  what happens?

12       A.    No, they -- I'm sure they kept her on the phone.

13       Q.    Okay.

14       A.    They give the information to the call taker, which,

15  in turn, is transferred over to the actual dispatcher.

16       Q.    And so it went from a disturbance call to, okay,

17  somebody is trying to kick in the door and there's a protective

18  order in place?

19       A.    Correct, yes, ma'am.

20       Q.    And so on September 13th of 2004, did you come into

21  contact with a person later known to you as Daphne Johnson who

22  was the complaining witness on this call?

23       A.    Yes, ma'am, I did.

24       Q.    How did you come into contact with her?

25       A.    She was the caller that called us, and I did contact

 1  her at her apartment.

 2      Q.    Okay.  So take us back.  When you first arrived at

 3  the apartment complex, were you in your car -- marked car?

 4      A.    Yes, ma'am.

 5      Q.    Had the uniform on similar to what you have today?

 6      A.    Yes, ma'am.

 7      Q.    And what is the first things that you do when you

 8  arrive at a call like that?

 9      A.    It -- this particular call, I was actually looking

10  for the suspect that was trying to kick in the door.  And at

11  that point we didn't think he'd actually made entry, so I

12  looked around for him briefly and then walked up to the

13  apartment.

14      Q.    Okay.  And while you're walking up to the apartment,

15  where was Ms. Johnson at?

16      A.    She was inside the apartment, but hollered out the

17  window, giving us directions on where he had gone.

18      Q.    Okay.  All right.  So was he -- from your

19  understanding, during your investigation, before you even got

20  upstairs, you were given information that he was still in the

21  complex?

22      A.    Correct.  Yes, ma'am, she had told us that --

23              MS. MULDER:  Objection to hearsay, Your Honor.

24              THE COURT:  Sustained.

25      Q.    (BY MS. JONES)   Without telling us what she said at

1    this point, you just knew to start looking around the complex?

2         A.    Absolutely.

3         Q.    Okay.  And when you looked around, did you find him?

4         A.    Yes, ma'am.

5         Q.    Okay.  Immediately or after talking to the -- the

6    witness?

7         A.    After talking to the caller.

8         Q.    Okay.  So you -- you finally get upstairs, you

9    looked around, you didn't see who the suspect was, so that's

10   when you went into the apartment?

11        A.    We had him in custody before we actually went into

12   the apartment.

13        Q.    Okay.  All right.  So take me back.  Let's talk

14   about what happened when you actually went upstairs and talked

15   to Daphne -- or excuse me, Ms. Johnson.  So you get to the call

16   and you go upstairs and what happens?

17        A.    I contacted her, saw that she was very upset,

18   crying, and shaking, very, very upset about what was going on

19   and she explained that --

20                    MS. MULDER:  Objection to hearsay.

21                    THE COURT:  Sustained.

22                    MS. JONES:  Your Honor, it's actually an excited

23   utterance, but if the Court would indulge me, I will lay the

24   proper predicate --

25                    THE COURT:  Please do.

```
 1              MS. JONES:  -- so these statements can come in.
 2   Thank you, Your Honor.
 3        Q.   (BY MS. JONES)  So, Spera, when you first come
 4   upstairs to this apartment, without any words being said, did
 5   you take a cursory glance around?
 6        A.   Yes, true.
 7        Q.   And from everything you saw and witnessed, did it
 8   appear that something bad must have really just happened?
 9        A.   Oh, yeah.
10        Q.   Okay.  And after you finally make entry into the
11   apartment, what was Ms. Johnson's demeanor?
12        A.   She was very upset, she was crying and shaking.
13        Q.   Okay.  And when you say she was crying and shaking,
14   did she appear to still be under the excitement of what just
15   happened?
16        A.   Oh, very much so.
17        Q.   And where was she standing at in the apartment?
18        A.   In the living room.
19        Q.   Okay.  And where was the kicks on the door coming
20   from?
21        A.   It was in the front door.
22        Q.   Okay.  And would she have been in proximity to that?
23        A.   It's right there, yes, ma'am.
24        Q.   And as you're talking to her, is she still in this
25   excited state?  Is she still crying and shaking?
```

```
 1        A.    Yes, ma'am.

 2        Q.    Okay.  And while you were talking to her, what did

 3   she say?

 4        A.    She told me that Matthew Johnson had told her he was

 5   coming over to get some money and that he would kick in the

 6   door if he had to.  She told us that she was going to call and

 7   ask for an extra patrol, meaning we would go by and keep an eye

 8   on the place, but then she heard the door being kicked and

 9   immediately called 911 which is when we actually got the call.

10        Q.    So when they say ask for extra patrol, how does that

11   work?

12        A.    You can call the police department and ask that your

13   residence get an extra patrol, means we'll come by there and

14   try to keep an eye on it in between calls for service and other

15   things like that.  We'll just try to keep a good eye on it for

16   you.

17        Q.    So before you could even come to try to keep a good

18   eye, it escalated?

19        A.    Correct, yes, ma'am.

20        Q.    And so as she's telling you that he told her that

21   he's coming over, he's going to get money and he's going to

22   kick the door in if she doesn't answer it, did you look around

23   and see evidence of that?

24        A.    I did, yes.

25        Q.    Okay.  What did you see?
```

1     A.   I saw some footprints on the door where it had been

2 kicked on.

3     Q.   Okay.  And -- but you're not saying that it actually

4 got kicked in?

5     A.   No, it wasn't kicked in.  You could just see

6 footprints on the door.

7     Q.   Okay.  All right.  And so after you see the

8 footprints on the door, where -- where is the suspect at this

9 time?

10     A.   At that time he's actually in custody.  He's in the

11 backseat of a squad car.

12     Q.   So he was downstairs.  He was no longer by her?

13     A.   Correct.

14     Q.   Okay.  So the statements that she's making to you

15 and that she's talking to you about, he's not in her presence

16 anymore?

17     A.   No.

18     Q.   And so did she have any visible injuries to her?

19     A.   I don't remember seeing any, no, ma'am.

20     Q.   Because he didn't actually make it in, did he?

21     A.   No.

22     Q.   Okay.  So when she's standing in the apartment and

23 she's yelling to you, he's -- you know, he's right there, or

24 he's over there, was she still in that excited state?

25     A.   Oh, very much, yes, ma'am.

```
 1        Q.   And based on her direction, did you know which way
 2   to go in the complex or how did y'all --
 3        A.   Yes, ma'am.  She directed us where he was.  She told
 4   us that he ran around the back toward the -- her sister's
 5   apartment.  We went in that direction, and I found him behind
 6   -- behind her building.
 7        Q.   Okay.  Was he hiding?  What was he doing?
 8        A.   He was just standing there.
 9        Q.   Okay.  And as a matter of fact, when you encountered
10   him, I mean, he was very cooperative, wasn't he?
11        A.   Not a problem, no.
12        Q.   Didn't resist you in any way, did he?
13        A.   No, ma'am.
14        Q.   Okay.  Did he appear to be intoxicated or anything
15   like that?
16        A.   No, ma'am.
17        Q.   And about what time of day are we talking about?
18        A.   I've worked nights a long time.  I really don't
19   remember.  I know it was --
20             MS. JONES:  May I approach, Your Honor?
21             THE COURT:  You may.
22        Q.   (BY MS. JONES)   Now, you created an offense report
23   in relation to this incident, correct?
24        A.   Yes, ma'am.
25        Q.   And if you had the opportunity to review your
```

```
 1  offense report, would it help you in your testimony?

 2       A.    True.  Yes, ma'am.

 3             MS. JONES:  May I approach, Your Honor?

 4             THE COURT:  You may.

 5       Q.    (BY MS. JONES)  Did that help review your -- refresh

 6  your recollection?

 7       A.    Yes, ma'am.

 8       Q.    So about what time of day was it?

 9       A.    10:55 p.m.

10       Q.    Okay.  And when you initially went to the

11  disturbance call and -- and went inside the apartment, do you

12  remember if the kids were there or anything like that?

13       A.    There were two children there, yes, ma'am.

14       Q.    Okay.

15       A.    I didn't actually see them, but she had told me

16  that.

17       Q.    And did she say what ages they were or --

18       A.    I knew they were young children, but I don't know

19  their ages.

20       Q.    Okay.  All right.  And so about 10:55 at night, you

21  stated that you found him around the corner at his sister's

22  house?

23       A.    Yes, ma'am, behind the -- behind the building --

24  behind the building, the apartment.

25       Q.    And you said he did not appear to be intoxicated?
```

```
 1        A.    No, ma'am.
 2        Q.    Okay.  And so after y'all tell him, hey, you need to
 3   come with us, at this time do you tell him why you are
 4   detaining him?
 5        A.    I'm sure that I did, yes, ma'am.
 6        Q.    Okay.
 7        A.    I don't recall per se what our conversation was,
 8   but, yes.
 9        Q.    You don't remember your exact words, in other words?
10        A.    No.
11        Q.    I know you refreshed your recollection, but did you
12   have some independent recollection of this offense?
13        A.    Yes, ma'am, I remembered it.
14        Q.    And why is that?
15        A.    Honestly, we don't really arrest a whole lot of
16   protective order violations.  A lot of times by the time we get
17   there, unfortunately, they're already gone.
18        Q.    Okay.
19        A.    So --
20        Q.    So let's talk about that, specifically protective
21   order violations.  What is the process that your department
22   uses when going out to a protective order violation call?
23        A.    Is -- as far as verifying there's a protective
24   order, it's very similar to the way we verify a warrant.  An
25   actual copy of the protective order is kept at our dispatch,
```

```
 1   and once we contact somebody and we check them and find there

 2   is a protective order, we contact our NCIC operator.  And as

 3   long as they can lay hands on a hard copy, it's on file with

 4   our department, then it's a valid protective order, if the

 5   dates are good.

 6        Q.   When you say, lay hands on a hard copy, you mean

 7   that it's not just going by what's in the computer?

 8        A.   Right.  It's a physical copy that they pick up and

 9   look at.

10        Q.   Okay.  And that would be a physical copy that comes

11   from, I'm assuming, the courthouse or --

12        A.   Correct.

13        Q.   -- a certified document?

14        A.   Yes, ma'am.

15        Q.   And so after you make that call, what is your next

16   step?

17        A.   As soon as it's verified, they're placed under

18   arrest --

19        Q.   Okay.

20        A.   -- for the violation.

21        Q.   So at that time you know you must have or would have

22   told Matthew Lee Johnson that he was under arrest for violation

23   of protective order?

24        A.   Yes, ma'am.

25        Q.   Okay.  Now, that person that you encountered on
```

 1  September 13th of 2004, do you see him in the courtroom today?

 2      A.    Yes, ma'am.

 3      Q.    Okay.  And at this table, there's Chair 1 through 3.

 4  What chair would the Defendant be sitting in, and also identify

 5  an article of clothing he has on?

 6      A.    Chair 3 in a blue blazer.

 7            MS. JONES:  Your Honor, let the record reflect

 8  the witness has identified the Defendant in open court.

 9            THE COURT:  The record will reflect.

10            MS. JONES:  Thank you.

11      Q.    (BY MS. JONES)  So once you actually, you know,

12  arrested him for the offense of violation of protective order,

13  once you get down to the station, is pretty much your part of

14  it done?

15      A.    Yes, ma'am.  It's generate the report and then

16  that -- that's it.

17      Q.    And there were several officers that respond to

18  these type of calls, right?

19      A.    Yes, ma'am, generally.

20      Q.    And specifically on this case, you know, I see that

21  there was Officer Hall, as well as, you know, other officers.

22  Were you the lead officer on this?

23      A.    I was, yes, ma'am.

24      Q.    And were you the officer that had all the contact

25  with the complaining witness, Daphne Johnson, as well as the

```
 1  Defendant, Matthew Lee Johnson?

 2       A.   Yes, ma'am.

 3                 MS. JONES:  May I approach, Your Honor?

 4                 THE COURT:  You may.

 5       Q.   (BY MS. JONES)  I want to show you what's been

 6  previously marked as State's Exhibit Number 166 and ask you if

 7  you recognize this?

 8       A.   Yes, ma'am.

 9       Q.   Okay.  And do you recognize that to be a judgement

10  and sentence?

11       A.   Yes, ma'am.

12       Q.   And do you recognize the names and dates that appear

13  within that document in 166?

14       A.   Yes, ma'am.

15       Q.   And are you familiar with the name of the Defendant

16  that's listed in Document 166?

17       A.   Yes, ma'am.

18       Q.   And in your offense report that you filed -- well,

19  actually, are you familiar with the name of the complaining

20  witness that appears in that document?

21       A.   Yes, ma'am.

22       Q.   And the date that appears on that document, is it

23  September 13th of 2004?

24       A.   It is, yes, ma'am.

25       Q.   And in your offense report that you filed for the
```

1  offense of violation of protective order, do the dates, names,

2  and addresses listed in your report relate to the dates, names,

3  and addresses that are listed in State's Exhibit Number 166?

4       A.   Yes, ma'am, they do.

5       Q.   And did you personally make the arrest of the

6  Defendant, Matthew Lee Johnson, for the offense of violation of

7  protective order on September 13th of 2004?

8       A.   Yes, ma'am, I did.

9       Q.   And is the person listed in your report one and the

10 same person that is listed as the Defendant in State's Exhibit

11 Number 166?

12      A.   Yes, ma'am, it is.

13      Q.   And does this record that you have before you relate

14 to the Defendant, Matthew Lee Johnson?

15      A.   Yes, ma'am.

16           MS. JONES:  May I approach, Your Honor?

17           THE COURT:  You may.

18           MS. JONES:  At this time, Your Honor, we would

19 like to offer into evidence State's Exhibit Number 166 --

20 excuse me, 166 to Defense counsel for review, and we would

21 state that State's Exhibit Number 166 is a certified copy that

22 has been on file with the Court for the requisite amount of

23 time, Your Honor.

24           (State's Exhibit 166 offered.)

25           MS. MULDER:  Your Honor, may we approach?

```
 1                    THE COURT:  Yes.

 2                    (Sidebar conference, discussion off the record.)

 3                    THE COURT:  All right.  Members of the jury,

 4   we're going to take a very short recess, about five minutes.

 5   If you'll be back in the jury room at 10 to 10:00, please.

 6                    THE BAILIFF:  All rise.

 7                    (Jury excused from courtroom.)

 8                    THE COURT:  All right.  We're on the record

 9   outside the presence of the jury.

10                    The State has tendered to the Defense for

11   objection documents representing an arrest of the Defendant,

12   Matthew Lee Johnson, for violation of a protective order, and

13   the Defense's objections are?

14                    MS. BERNHARD:  Your Honor, we would object to

15   State's 166 in that it has not been sufficiently tied to this

16   Defendant.  While the officer has identified Matthew Johnson

17   here in the courtroom as the person he arrested, the officer

18   wasn't present in court when this judgement and sentence were

19   entered.  So our objection would be that that's not

20   sufficiently linked to this Defendant to be able to say that

21   that's his judgement and sentence.

22                    We would further object to any extraneous

23   information contained in State's 166, other than the judgement

24   and sentence, that it's my understanding that the State is

25   agreeing to remove the warrant and the plea bargain agreement.
```

```
 1                    THE COURT:  And that's the State's position that
 2   you'll remove those things?
 3                    MS. MOSELEY:  Yes, Your Honor.  We're -- we're
 4   willing remove those two documents.  However, we do believe, A,
 5   the document itself is a public record so it's self
 6   authenticating, and the law doesn't require us to prove it up
 7   specifically through a fingerprint.  We can prove it through
 8   extraneous information, as well.  The fact that the same
 9   offense date, the Defendant's name, the complainant's name, and
10   the offense are all the same as this offense that the officer
11   has described is enough to sufficiently make it relevant in
12   this case and connect the Defendant.  Any argument that it's
13   not really him or that he didn't really enter into that, wasn't
14   really sentenced, it goes to the weight that the jury can give
15   it.
16                    THE COURT:  All right.  The Defense's objection
17   is overruled with the documents removed.
18                    MS. JONES:  May I approach, Your Honor?
19                    THE COURT:  Yes, ma'am.  I took it out.
20                    MS. JONES:  Okay.
21                    MS. BERNHARD:  Can we just take a look at it?
22                    MS. MOSELEY:  And, Judge, we're going to have --
23   not -- not the very next witness, but pretty quickly another
24   extraneous that Elaine is going to be handling if you want to
25   take up the Defense's request for a hearing outside while we
```

```
 1   have the jury out.

 2                   THE COURT:  Okay.

 3                   MS. EVANS:  Your Honor, Officer Clark with the

 4   Garland Police Department is going to be detailing an arrest

 5   for a retaliation case.

 6                   COURT REPORTER:  I'm sorry, Judge, I'm still on

 7   the record and I can't hear.

 8                   THE COURT:  Why can't you hear?  Oh, because of

 9   all these people?  I'm sorry.  All right.  Go ahead.

10                   MS. EVANS:  Officer Clark is going to be

11   detailing an arrest of this Defendant back on August 7th, 1995.

12   He arrested -- put this Defendant in jail for multiple

13   probation violation warrants, as well as for an aggravated

14   assault with a deadly weapon that had happened earlier in the

15   evening to which this Defendant has pled guilty to and was on

16   probation for.

17                   The extraneous offense that comes in is the

18   retaliation in that whenever he's booked into the jail, this

19   Defendant threatens -- makes a threat to the officer about

20   whenever he gets out of jail what's going to happen.

21   Specifically:  Officer, you will get yours when you get back

22   out on the street.  And so the retaliation case was ultimately

23   no billed, this defendant was never convicted of it, but we do

24   believe it's admissible as an extraneous offense in the

25   punishment phase, as a bad act.
```

```
 1              MS. BERNHARD:  And, Your Honor, we would urge
 2   the previous objections that were made to an unadjudicated
 3   offense, particularly the fact that this offense was no billed,
 4   meaning the Grand Jury didn't even find probable cause, we
 5   would submit that that's not sufficiently -- that's not --
 6   that's either clear proof or proof beyond a reasonable doubt.
 7   It's our position it should be proof beyond a reasonable doubt.
 8   And for that reason, we would object to the admission of a no
 9   billed offense.
10              MS. EVANS:  Your Honor, if I may respond.  The
11   fact that an offense is no billed doesn't preclude it from
12   being admissible in the punishment phase, because, quite
13   frankly, we can prove the case beyond a reasonable doubt, that
14   the officer was, in fact, threatened.  He's going to testify to
15   that, and so that doesn't preclude us from putting it on as a
16   bad act committed by this Defendant.
17              THE COURT:  Objection overruled.  All right.  Is
18   that all?
19              MS. BERNHARD:  And, again, just for the record,
20   we're referencing Pretrial Motion Number 43.
21              THE COURT:  Thank you.
22              All right.  If we can get the jury, please, sir.
23              THE BAILIFF:  All rise.
24              (Jury returned to courtroom.)
25              THE COURT:  Please be seated.
```

```
  1                    Please proceed.

  2                    MS. JONES:  Your Honor, at this time we would

  3    re-offer State's Exhibit Number 166.

  4                    (State's Exhibit 166 offered.)

  5                    THE COURT:  Admitted.

  6                    (State's Exhibit 166 admitted.)

  7                    MS. JONES:  May I publish, Your Honor?

  8                    THE COURT:  You may.

  9                    MS. JONES:  State's Exhibit Number 166 is a

 10    judgement and sentence of Matthew Lee Johnson.  Date of

 11    judgement, 9-22-04.  The Defendant in this case received a

 12    sentence of 330 days, and it appears that the Defendant in this

 13    judgement and sentence did plead guilty to the offense of

 14    violating protective order -- a valid protective order that his

 15    wife Daphne Johnson had against him at that time.

 16                    Pass the witness, Your Honor.

 17                    THE COURT:  Ms. Mulder.

 18                    CROSS-EXAMINATION

 19    BY MS. MULDER:

 20        Q.    Good morning, Officer Spera.

 21        A.    Yes, ma'am.

 22        Q.    My name is Nancy Mulder.  I just have a few

 23    questions for me (sic).  If at any time you don't understand

 24    me, just let me know and I can rephrase them.

 25        A.    Certainly.
```

```
 1        Q.    What violation of offense is a violation of

 2   protective order?

 3        A.    I believe that's a Class A misdemeanor, I believe.

 4              MS. MULDER:  May I approach the witness, Your

 5   Honor?

 6              THE COURT:  You may.

 7        Q.    (BY MS. MULDER)  If you would, take a look at

 8   State's Exhibit Number 60 -- 166, excuse me -- and see if that

 9   refreshes your recollection as to the level of offense.  If

10   you'll allow me, I can show you.

11        A.    Sure, go ahead.  It's a Class A misdemeanor.

12        Q.    Class A misdemeanor is punishable by -- from zero up

13   to a year in the county jail and a fine not to exceed $4,000;

14   is that right?

15        A.    Sounds good to me.

16        Q.    If I -- if I told you that's what the law said,

17   would you have any reason --

18        A.    I'll take your word for it, yes, ma'am.

19        Q.    All right.  And his sentence in this case was 330

20   days in the county jail?  You have to answer out loud.

21        A.    Yes, ma'am, sure.

22        Q.    And you said Mr. Johnson cooperated with you?

23        A.    Yes, ma'am.

24        Q.    And there was no injury to the door, it just had a

25   couple of footprints on it?
```

```
 1        A.    Correct.

 2                  MS. MULDER:  I'll pass the witness.  Thank you.

 3                  MS. JONES:  May I approach, Your Honor?

 4                  THE COURT:  Yes, ma'am.

 5                       REDIRECT EXAMINATION

 6   BY MS. JONES:

 7        Q.    Officer Spera, in State's Exhibit Number 166, what

 8   was -- first of all, what is a protective order?

 9        A.    It is an order from the Court designed to protect a

10   family member from another, basically.  Protects the family

11   member, the children, the location, whether it be at home or at

12   work.  There's many things that go into it, but it's an order

13   of protection.

14        Q.    And what exactly was the Defendant ordered to not

15   do?

16        A.    Be there.

17        Q.    Okay.  And if you could look at State's

18   Exhibit Number 166, and if you look at the back page, where was

19   he directed to not be?  Does it have a specific location?

20        A.    The -- yeah, the location of the -- let me find it.

21        Q.    Was that the 42 --

22        A.    4263 Rose Hill Road, Garland, Dallas County, Texas.

23        Q.    And oftentimes once that directive is made, it does

24   not matter what happens, if that person comes to that location

25   one or many times, as long as your department has a valid
```

```
 1   protective order on file and it's still good at the time that

 2   you go out --

 3        A.   Correct.

 4        Q.   -- to that make arrest, at the end of the day,

 5   someone is going to get arrested for that offense?

 6        A.   Correct, yes, ma'am, we have to.

 7        Q.   Okay.

 8             MS. JONES:  Thank you, Your Honor.  No further

 9   questions, Your Honor.

10                        RECROSS-EXAMINATION

11   BY MS. MULDER:

12        Q.   Just one more question, Officer.  It's still -- even

13   if the person is invited over?

14        A.   I've made that arrest before, yes, ma'am.

15        Q.   You know, she called me, she asked me to come over,

16   I've been -- you know, we made up, I've been staying there, you

17   still have to arrest them?

18        A.   Yes, ma'am.

19             MS. MULDER:  Nothing further, Your Honor.

20             THE COURT:  Thank you, sir.  You may stand down.

21             MS. JONES:  And, Your Honor, may this witness be

22   finally released?

23             MS. MULDER:  No objection.

24             THE COURT:  Yes, ma'am.

25             The State will call their next witness, please.
```

```
 1              MS. EVANS:  The State will call Officer Oliver.

 2              (Witness brought forward and sworn.)

 3              THE WITNESS:  Yes.

 4              THE COURT:  Thank you.

 5              Please proceed.

 6                      BERRY OLIVER,

 7  was called as a witness by the State, and after having been

 8  first duly sworn, testified as follows:

 9                    DIRECT EXAMINATION

10  BY MS. EVANS:

11        Q.    If you would state your name for the record, please?

12        A.    Berry Oliver.

13        Q.    And, Officer Oliver -- or Investigator Oliver, I

14  should say, where are you employed?

15        A.    With the Garland Police Department.

16        Q.    How long have you worked for them?

17        A.    Twenty-seven years.

18        Q.    Where are you currently assigned?

19        A.    I'm a property crimes detective.

20        Q.    And how long have you been dealing in property

21  crimes as a detective?

22        A.    Seventeen years.

23        Q.    And prior to that, what was your assignment with the

24  Garland Police Department?

25        A.    I was a patrolman basically in the Neighborhood
```

1    Service Team over on the east side of Garland.

2        Q.    Now, the jury has heard a lot about what patrol

3    officers do in answering calls, but when you say the

4    neighborhood -- what is the name of it, again, the department

5    or the --

6        A.    Neighborhood Service Team.

7        Q.    Neighborhood Service Team.  I believe they heard a

8    little bit about that in the guilt/innocence phase, but remind

9    us what the Neighborhood Service Team does and approximately

10   when it was put into place.

11       A.    Well, actually Garland had just implemented it in

12   '93.  I was on the first, I guess, Neighborhood Service Team,

13   if you want to call it that.  We were assigned to a specific

14   area of Garland.  And at that time they had just started doing

15   it in the east -- east area of Garland.  There was a lot of --

16   we had a lot of drug problems over there, assaults, domestic

17   problems, gambling houses, dope houses, and so that's where

18   they basically put us.  We basically were assigned to one area,

19   and we answered those calls, got to know who our, you know,

20   residents were, our bad guys were, and that -- that basically

21   was our area, and we stayed there.

22       Q.    Okay.  And so basically you were assigned to problem

23   areas, and at this time in 1993 when it was created, that was

24   the problem area --

25       A.    That was -- that was probably Garland's biggest

1  problem area at that -- at that time.

2      Q.    Okay.  And what is the purpose -- you know, rather

3  than just continuing to police it like you were normally doing

4  it, what is different about this group or team?

5      A.    You get to know -- you get to know your citizens,

6  they get to know you on a personal basis.  If they have a

7  problem, they feel like they can call you and it's a one-on-one

8  instead of never knowing who's going to show up, if it's an

9  officer from three beats over.  You get to know who your

10  citizens are, your bad guys are, what your problem areas are,

11  and you get to basically come up with creative problem solving.

12      Q.    Okay.  And so to better familiarize yourself with

13  the neighborhood, as well as get the citizens comfortable with

14  you in making reports; is that fair to say?

15      A.    Yes.

16      Q.    Now, directing your attention back to November 9th

17  of 1993.  You said you were working in this capacity with the

18  Garland Police Department, right?

19      A.    Yes.

20      Q.    Around 5 o'clock in the afternoon -- and this was a

21  long time ago and you create reports, right, whenever you go

22  out on an offense or a call; is that fair to say?

23      A.    Yes.

24      Q.    And you've reviewed your report as it relates to

25  this incident on November 9th, 1993; is that correct?

1        A.    Yes.

2        Q.    And did it refresh your memory as to what we would

3   be talking about?

4        A.    Yes.

5        Q.    Now, in looking at that, describe for the jury, did

6   you have an occasion to come into contact with an individual by

7   the name of Matthew Lee Johnson?

8        A.    Yes.

9        Q.    Do you see that individual here in the courtroom

10  today?

11       A.    I do.

12       Q.    Could you identify an article of clothing he's

13  wearing?

14       A.    It's either a black or blue suit top with a tie.

15       Q.    Okay.  Down at the end of the other counsel table?

16       A.    Yeah, wearing glasses.

17            MS. EVANS:  Let the record reflect this witness

18  has identified the Defendant in open court.

19            THE COURT:  The record will reflect.

20       Q.    (BY MS. EVANS)  Back on November 9th, 1993, describe

21  for the jury how it is that you initially came into contact

22  with this individual or what drew your attention to him?

23       A.    I was just on normal patrol, driving down the 600

24  block of a street named Alto.  The Defendant was actually

25  walking away from a house towards his vehicle and was smoking a

```
 1   joint.  He sees me.  He's got, you know, the two fingers on the
 2   joint, sees me, becomes extremely nervous, sticks it down the
 3   back of his neck and then immediately starts trying to get into
 4   the trunk of the car which makes me nervous.  I don't know if
 5   he's going for a weapon or what the deal is.  I stop him, pat
 6   him down.  I've got a backup on the way.  He was carrying a
 7   rolled up towel and I think a pair of jeans at the time, and he
 8   had thrown those down on the ground.  When I went to pat him
 9   down, I noticed that the marijuana joint he was smoking, he'd
10   actually put out on the back of his neck.  I think that's why I
11   remember this, because it just stuck out as kind of odd.  My
12   backup gets there.  We look at -- he looks at the rolled up
13   towel, and he had a bag of marijuana in there.  Put him in
14   custody, and then I find the marijuana joint that he put
15   between his coat and his shirt.  He went to jail for that.  He
16   also had a warrant out of I believe Dallas PD.
17        Q.    Okay.  So, Officer, just to back it up a bit.  This
18   600 block of Alto, there in Garland, is that in that
19   neighborhood that you were talking about you were patrolling?
20        A.    Yes.
21        Q.    And aside from the Defendant walking around smoking
22   a marijuana joint, which is clearly against the crimes of the
23   State of Texas; fair to say?
24        A.    Yes.
25        Q.    Was there anything about the situation that caused
```

1  you concern or that drew your attention to another thing or

2  violation that was happening?

3      A.   Well, we did impound the vehicle.  I don't know if

4  that's what you're referring to.  It was -- the vehicle he was

5  going to was parked facing the wrong way.  I believe it was

6  kind of pulled in with the back wheels more than 18 inches away

7  from the curb, and I don't think it was registered to him

8  either, didn't belong at that location, so we -- it was

9  impounded.

10     Q.   Okay.  So he's walking away from the house smoking a

11 joint and going to this car that's parked incorrectly?

12     A.   Yes.

13     Q.   And so you end up towing that vehicle?

14     A.   Yes.

15     Q.   Now, you said that he started acting nervous as soon

16 as he saw you; is that right?

17     A.   Yes.

18     Q.   Were you in your marked patrol car at the time or on

19 foot?

20     A.   I was in the squad car.

21     Q.   And you said that this stands out because he put it

22 out right there on the back of his own neck?

23     A.   Yes.

24     Q.   Now, did you see any evidence of that when you went

25 to pat him down for weapons?

107

1    A.    Yes, I could see the ashes on the back of his neck.

2    Q.    And then you said at the time -- did he have the

3  towel and the jeans in his hand when he came from that house?

4    A.    Yeah, he was -- he was walking from the house to the

5  vehicle carrying the towel and the -- and the jeans and smoking

6  the joint with the other hand.

7    Q.    And based on your training and experience, Officer,

8  in the area that you're there working that day, what about him

9  going to the trunk of his car caused you to be alarmed?

10    A.    Well, my -- as nervous as he got seeing me, I became

11  nervous because I didn't know if he was going for a weapon

12  or -- you know, hindsight, I realize he was trying to probably

13  hide the marijuana that we found in the towel, but I didn't

14  know that at the time.

15    Q.    And did you give him any commands or anything once

16  he got to the back of the car?

17    A.    Yes.

18    Q.    What was that?

19    A.    To place his hands on the back of the car.

20    Q.    And did he comply?

21    A.    He did.

22    Q.    And what happened with the jeans and the towel at

23  that point?

24    A.    He had -- he had dropped them on the ground.

25    Q.    And that's when later after the pat down, your

1   partner comes over and finds the additional marijuana?

2       A.   Yes.

3       Q.   What happened to the marijuana joint that you find

4   in between his coat and his shirt and then that baggie of

5   marijuana that was in the towel?

6       A.   They were logged in as evidence.

7       Q.   And what about the Defendant, was he arrested that

8   day?

9       A.   He was.

10      Q.   For what offense?

11      A.   Possession of marijuana, and he had a Dallas PD

12  warrant.

13      Q.   Did you have any problems -- once he complied with

14  that and put his hands on the back of this car, did you have

15  any problems making that arrest?

16      A.   Not that I recall.

17           MS. EVANS:  May I approach the witness?

18           THE COURT:  You may.

19      Q.   (BY MS. EVANS)  Officer Oliver, I'm showing you

20  what's been marked State's Exhibit Number 167.  Do you

21  recognize this document as a certified copy of our FORVIS

22  computer-generated criminal database?

23      A.   Yes.

24      Q.   And does it contain the name of Matthew Lee Johnson

25  and his other identifying information, such as his date of

1  birth and his address, as well as the date of this offense,

2  November 9th, 1993, for which you arrested this Defendant?

3      A.    Yes.

4      Q.    Does it also contain the Garland service number that

5  would be found and detailed in the report that you created

6  immediately after the arrest of this Defendant on that day?

7      A.    Yes.

8      Q.    In addition to that information, do we see

9  information regarding him pleading guilty to this offense in

10  the certified document?

11     A.    Yes.

12              MS. EVANS:  The State would offer State's

13  Exhibit Number 167, tendering to Defense for any objection.

14              (State's Exhibit 167 offered.)

15              MS. BERNHARD:  Your Honor, we would urge our

16  previous objections to State's 166 and to State's 167, as well,

17  particularly that there's not sufficient identifying

18  information.

19              THE COURT:  Thank you.  Defendant's objection is

20  overruled.

21              (State's Exhibit 167 admitted.)

22              MS. EVANS:  Permission to publish, Your Honor?

23              THE COURT:  You may.

24     Q.    (BY MS. EVANS)  State's Exhibit 167, in Cause Number

25  MB93-28575, the Defendant, Matthew Lee Johnson, pled guilty to

```
 1   the offense of possession of marijuana on January 10th, 1994,
 2   initially received six months probation.  That probation was
 3   later revoked on August 5th, 1994, and he received 30 days in
 4   the Dallas County Jail.
 5                   Pass the witness.
 6                   CROSS-EXAMINATION
 7   BY MS. BERNHARD:
 8        Q.   Officer, how much marijuana did you find on Matthew
 9   Johnson that day?
10        A.   I believe it was around 26 grams.
11        Q.   And that's a misdemeanor?
12        A.   It is.
13        Q.   And you said you also were arresting him for a
14   warrant that was outstanding?
15        A.   Yes.
16        Q.   Do you know what that was for?
17        A.   It was a Dallas warrant.  It would have been some
18   type of traffic violation, but I'm not sure what the actual
19   charge was.
20        Q.   Like a speeding ticket or something like that?
21        A.   Something of that nature.
22        Q.   That he just didn't take care of?
23        A.   Correct.
24        Q.   And you said that one of the things that initially
25   drew your attention to Mr. Johnson was the fact that the
```

```
 1  vehicle was parked illegally; is that correct?

 2       A.   No, that's not what initially drew my attention to

 3  him.

 4       Q.   Well, that was the first thing you mentioned in your

 5  report, isn't it?

 6       A.   I don't -- I don't recall that.

 7                 MS. BERNHARD:  May I approach?

 8                 THE COURT:  Yes, ma'am.

 9                 MS. BERNHARD:  May I approach?

10                 THE COURT:  You may.

11       Q.   (BY MS. BERNHARD)  Do you recognize this as a copy

12  of the report that you made back in 2000 -- or 19 --

13       A.   Yes, I do.

14       Q.   --'93 -- yeah, '93.

15       A.   '93.

16       Q.   Does that refresh your recollection as to what you

17  put in the narrative?

18       A.   This is my narrative, but what drew my attention to

19  him is he was walking towards the car smoking a joint, so

20  that's what drew my attention.

21       Q.   But the first thing you mention is that the car was

22  illegally parked.

23       A.   Okay.

24       Q.   Correct?

25       A.   I guess that would be correct.
```

1        Q.    How is it illegally parked?

2        A.    It was parked facing the wrong way on the road, and

3  it was kind of angled in.  The back wheels were more than

4  18 inches from the curb.

5        Q.    This is a residential area?

6        A.    It is.

7        Q.    And do you recall -- do you recall how old Mr.

8  Johnson was at the time?

9        A.    Eighteen or 19.

10        Q.    Would it help to refresh your recollection to look

11  at your report again?  Would it help?

12        A.    Yes, yes.  Eighteen.

13        Q.    So he was 18 years old in 1993?

14        A.    Yes.

15        Q.    And you mentioned that you patted him down or your

16  partner did or whoever else was there; is that correct?

17        A.    Correct.

18        Q.    And you didn't find any weapons?

19        A.    No.

20        Q.    And he cooperated?

21        A.    Yes.

22              MS. BERNHARD:  I pass the witness.

23                    REDIRECT-EXAMINATION

24  BY MS. EVANS:

25        Q.    Officer Oliver, did it matter how old or young an

1  individual was if they're committing a crime, specifically

2  you're trying to clean up this neighborhood, were you not, you

3  and the other officers?

4      A.   Correct.

5      Q.   So there was pretty much a zero tolerance policy,

6  was there not, for anybody committing any offense, no matter

7  how old or young they are?

8      A.   Yes, exactly.

9      Q.   And that was the purpose of the program, right?

10     A.   Yes.

11     Q.   Okay.  And was this Defendant committing an offense

12  that day?

13     A.   Yes.

14          MS. EVANS:  Okay.  Pass the witness.

15          MS. BERNHARD:  Nothing further.

16          THE COURT:  Thank you, sir.  You may stand down.

17          MS. EVANS:  The State calls Officer Ralston.

18          May this witness be excused, Your Honor, Officer

19  Oliver?

20          THE COURT:  He may.

21          MS. BERNHARD:  No objection.

22          (Witness brought forward and sworn.)

23          THE WITNESS:  Yes, ma'am, I do.

24          THE COURT:  Thank you.

25                BLAINE RALSTON,

```
 1   was called as a witness by the State, and after having been

 2   first duly sworn, testified as follows:

 3                         DIRECT EXAMINATION

 4   BY MS. EVANS:

 5        Q.    If you would state your name for the record.

 6        A.    I'm Officer Blaine Ralston.

 7        Q.    And, Officer Ralston, we can see by your uniform

 8   that you are a Garland police officer; is that right?

 9        A.    Yes, ma'am.

10        Q.    How long have you been working there?

11        A.    About 22 years.

12        Q.    Okay.  And where are you presently assigned?

13        A.    I'm assigned to the Neighborhood Police Officer

14   Unit.

15        Q.    Okay.  And so the jury just heard a little bit about

16   the Neighborhood Police Officer Unit and that it was created

17   all the way back in 1993.  Does that sound about right?

18        A.    About.

19        Q.    Now, were you serving in that capacity at its

20   inception, or is this recently that you joined?

21        A.    It was just recently.  I spent my first four-years

22   in Garland as a -- as a patrolman.  Then I went to the Gang

23   Unit for about 16 years, and now I'm in the NPO Unit.

24        Q.    And so back July 23rd, 1994, where would you have

25   been assigned with the Garland Police Department?
```

1      A.    At that time, I was still assigned to patrol.

2      Q.    So it's prior to you going to the Gang Unit?

3      A.    Yes, ma'am.

4      Q.    And so let me direct your attention to that day back

5   July 23rd of 1994, around 3:52 in the afternoon.  Did you have

6   an occasion to come into contact with somebody that you later

7   came to know as Matthew Lee Johnson?

8      A.    Yes, I did.

9      Q.    And do you see that individual here in the courtroom

10  today?

11     A.    Yes, I do.

12     Q.    Could you describe an article of clothing he's

13  wearing today?

14     A.    He's wearing a black suit with a -- a tie with red

15  dots in it, I guess.

16     Q.    Okay.  And glasses, seated at the end of the counsel

17  table?

18     A.    Yes.

19           MS. EVANS:  Let the record reflect this

20  Defendant (sic) has identified the Defendant in open court?

21           THE COURT:  The record will reflect.

22     Q.    (BY MS. EVANS)  And so, Officer, back July 23rd,

23  1994, that was awhile back, so you've refreshed your memory

24  with your report; is that correct?

25     A.    Yes, ma'am.

1      Q.    And you made that report at or near the time of the

2  arrest of this Defendant on that day?

3      A.    Yes, ma'am.

4      Q.    Now, can you describe for the jurors what area of

5  town you were patrolling when you first came into contact with

6  this individual?

7      A.    It was what we call the east end of -- of Garland.

8  It was an area of Dairy and -- and Miller Road at the time.  It

9  was kind of central -- central Garland.  It's a residential and

10  small convenience stores and such.

11      Q.    Now, this area of town, you said it's residential.

12  This is July, so school is not in session, right?

13      A.    I wouldn't think it would be at that time.

14      Q.    But there could be kids out in this residential area

15  or based on your knowledge of the area, was that quite often

16  the case around 3 or 4 o'clock in the afternoon?

17      A.    Yeah, this -- in this particular neighborhood, there

18  was -- there's always kids out.  Like I say, it's a very small

19  lot -- lot-to-lot type housing, small houses and such, and

20  pretty populated area.

21      Q.    And so describe while you're on patrol in this area

22  what you observe or your reason for attempting to contact this

23  defendant.

24      A.    We have -- we have mobile computers in our car, and

25  officers routinely run tags to see if vehicles are stolen or

```
 1   see if anybody that's in the car possibly have warrants.  And

 2   on that particular day, we ran a tag on the car and it come

 3   back with a -- with a hit on a subject, which means that

 4   somebody who has driven that car in the past has not paid a

 5   traffic ticket, or - or some other crime and he's wanted, and

 6   they attach it to that vehicle's tag.  We come back with a hit

 7   that day for a -- a subject, and what's -- the basis of our

 8   probable cause to make a stop on the car.

 9        Q.    Okay.  And, Officer Ralston, you're not -- this car

10   wasn't doing anything wrong at the time that you ran the tag,

11   just traveling down the road; is that right?

12        A.    As I recall.

13        Q.    Or the license plate, and you weren't specifically

14   targeting this one individual.  You're just randomly checking

15   license plates that day?

16        A.    Yes, ma'am.

17        Q.    Is that what you're talking about?

18        A.    Right.

19        Q.    This particular vehicle, do you recall it being a

20   black four-door Cadillac?

21        A.    Yes.

22        Q.    And you said when you ran this tag, you don't know

23   who is in the vehicle at that time, the actual names of the

24   individuals?

25        A.    No, I do not.
```

Darline King LaBar, Official Reporter

1      Q.    But when you ran this tag, it came back to hit -- to

2  somebody that had a ticket out?

3      A.    Yes.

4      Q.    And so what did you attempt to do whenever you

5  realized that this has come back with a hit for somebody with a

6  warrant out?

7      A.    At that point in time, we -- we attempted to

8  initiate a traffic stop on the vehicle by turning our red and

9  blue lights on the car.

10     Q.    Now, when you turn the red and blue lights on the

11  car, does that automatically activate the siren, or do you just

12  have your lights on at this time?

13     A.    Just have the lights on at that time.

14     Q.    And still driving through this residential area?

15     A.    Yes, ma'am.

16     Q.    What, if anything, does the vehicle do once you turn

17  the red and blue lights on, try and make a traffic stop?

18     A.    The vehicle just continues to roll.  They're not

19  rolling at a fast speed, but they -- they don't stop or

20  anything, just continue to roll down the road.

21     Q.    And could you tell anything about the number of

22  occupants or the sex of occupants in the car?

23     A.    They were two occupants in the car, the driver and a

24  front passenger.

25     Q.    And could you tell anything about if they were male,

```
  1  female?
  2       A.   The driver was female, and the passenger was a male.
  3       Q.   And so once -- about how far do they proceed down
  4  while you've got your red and blue lights on and not stopping?
  5       A.   Just a couple of blocks from where Miller is and --
  6  and actually made a right turn onto Alto Drive, which would be
  7  east on Alto from Dairy, so it's not -- it's not -- it's not
  8  real far, just a block or two from where we initiated the
  9  traffic stop.
 10       Q.   And do you do anything additional to try to further
 11  get their attention since the vehicle is not pulling over?
 12       A.   Once the vehicle got on Alto, we -- we hit our
 13  siren, and the vehicle continued to go down Alto and continued
 14  all the way to Curtis where the vehicle run a stop sign at
 15  Curtis and then made a right and went back south on -- onto
 16  Curtis.
 17       Q.   Now, again, that stop sign that you're describing
 18  that the vehicle ran, this same residential neighborhood that
 19  kids are prevalent at this time of day?
 20       A.   Yes, ma'am.  Yes, it is.
 21       Q.   Just flew right through the stop sign with -- you
 22  have your lights and sirens on, all of that going on now?
 23       A.   Yes.
 24       Q.   So approximately how far is this vehicle traveling
 25  now from the time you first tried to initiate this traffic stop
```

1  to the point that they run this stop sign?

2      A.    It's not a -- it's not a -- not huge distance.

3  Basically block or two down Dairy and then a block or so down

4  Alto, and Alto actually dead ends into Curtis; and then the

5  vehicle made a right and it started slow rolling -- as it's

6  pulling over to the curb and started slow rolling down -- down

7  Curtis, at that point in time.

8      Q.    Now, were you able to still keep an eye on the

9  occupants of the vehicle and what, if anything, they were doing

10  inside as you're trying to attempt a traffic stop?

11      A.    Prior to -- prior to us -- to the vehicle running a

12  stop sign, you know, we could see -- I could see the driver

13  making eye contact with us in the rearview mirror, and you

14  could see that they knew that we were there.  And also could

15  see the front passenger with his hand, talking to the driver,

16  and he's motioning with his hand as if telling her to continue

17  to go.

18      Q.    So you could tell the driver, the female, was aware

19  that you're right there behind her and you're making eye

20  contact, and then you see motioning by the male passenger in

21  the car, as well?

22      A.    Yes.

23      Q.    And it's the type of motioning that you say is

24  indicating to go, keep going?

25      A.    It appeared to us that he was telling her to keep

1  going, just based on his -- on his hand movements.

2      Q.   And, in fact -- in fact, that's what continued to

3  happen, right?

4      A.   Yes, it was.

5      Q.   The driver kept going?

6      A.   Yes.

7      Q.   Did -- you said we.  Did you have a partner that

8  day?

9      A.   Yes, I did, Officer Hunter Poteet was riding with me

10  that day, I believe.

11          COURT REPORTER:  Officer who?

12      A.   Hunter Poteet.

13      Q.   (BY MS. EVANS)  And that's P-o-t-e-e-t?

14      A.   P-o-t-e-e-t, I believe.

15      Q.   And he's the passenger, and you're the driver in the

16  squad car that day?

17      A.   Yes.

18      Q.   Y'all are in a marked Garland squad car?

19      A.   Yes.

20      Q.   With at this point lights and sirens going?

21      A.   Yes.

22      Q.   Now, once they get to Curtis, after they've ran that

23  stop sign, did you have some concerns when they'd run the stop

24  sign at this point?

25      A.   You never know -- when somebody is not stopping for

1  you, you never know why they're not -- there's always a reason,

2  you know, that they're not stopping.  And at that point in time

3  it heightens your awareness, as far as your officer safety

4  goes, as to why this person is not wanting to pull over on

5  basically what is a routine stop for us.

6      Q.    And then what happens after running of the stop

7  sign?

8      A.    As the vehicle started to slow roll, hadn't come to

9  a stop yet, the door of the passenger door of the vehicle opens

10  up.  And, of course, we start opening our doors and the car is

11  still rolling a little bit.  And the Defendant starts getting

12  out of the car.  And we yell commands at him to get back in the

13  car.  At that time he -- as the car is still rolling, he jumps

14  out of the car and flees on foot up towards a house.

15      Q.    Okay.  And so you've already identified this

16  Defendant in open court as the one that you came into contact

17  with this day.  So the male that was in the passenger seat of

18  that car was, in fact, this Defendant?

19      A.    Yes.

20      Q.    And you said it's slow rolling and he's getting out.

21  Is the car still moving?

22      A.    The car is still moving as the -- as his door opens

23  and he starts to -- to -- to exit the vehicle.  His car hadn't

24  come to a complete stop yet.

25      Q.    As he's exiting the vehicle and taking off running,

1   do you give him any commands?

2       A.    Yes.  We -- we yell at him to stop and get on the

3   ground, stop running, police.  And we bail out of our car and

4   we start pursuing him, and he's running up to a house in an

5   attempt to get in the front door of a house.

6       Q.    And so clearly he didn't obey your commands to stop

7   running and get on the ground; is that fair to say?

8       A.    No, did he not.

9       Q.    Did you know whose house this was he was running to

10  at this time?

11      A.    No, I did not.

12      Q.    Did you have any concerns about that?

13      A.    Well, you always are concerned about -- you know, if

14  they're running into somebody's house that -- that they don't

15  know or just trying to get into a house or is it a relative of

16  theirs, you know, where they can get in to get weapons or --

17  there's all kinds of things and situations that go through your

18  mind when something like that is happening.

19      Q.    And once the Defendant made it to that front door of

20  that residence over on Curtis you said?

21      A.    Yes, it was.

22      Q.    What happened at that time?

23      A.    At that point in time, he -- he attempted to open up

24  the door and was unable to get inside the door.  And we were

25  right on top of him pretty much then.  We -- we were relatively

124

1  close to him.  And we were still ordering him to get on the

2  ground.  At that point in time myself and Officer Poteet took

3  hands on and he -- he struggled with us, you know, momentarily.

4  We were able to use muscling techniques and were able to take

5  him to the ground and get him handcuffed without further

6  incident.

7      Q.   Okay.  So, again, in response to your commands, he's

8  not getting on the ground and complying?

9      A.   No.

10     Q.   Fair to say?  And so you said you had to end up

11  using muscling techniques on him to get him to comply?

12     A.   Yes.

13     Q.   So even though you're right there up on him, he's

14  not giving up and letting you take him into custody at that

15  time?

16     A.   No.

17     Q.   And describe to the jury, what you mean by muscling

18  techniques.

19     A.   Basically instead of using any of our intermediate

20  weapons or pepper spray, anything like that, we just used just

21  our hands basically to take ahold -- take ahold of both of his

22  arms to keep him from possibly reaching for a weapon.  At that

23  point in time, we take him down to the ground and just using

24  our muscling technique -- using our hands and arms were able to

25  muscle his hands behind him -- behind his back and get him

1  handcuffed.

2      Q.    Because he wasn't freely giving you his hands to do

3  so?

4      A.    No, he wasn't.  He was not.

5      Q.    Now, did the Defendant make a statement to you about

6  why it was they didn't just stop the car?

7      A.    Yes, he did.  He had -- he had -- when we were

8  actually going to take the driver into custody for evading, for

9  not stopping for us, he had made a statement that he had told

10 her to continue to go and not stop because he had warrants for

11 his arrest.

12     Q.    Okay.  And did he, in fact, have warrants for his

13 arrest that day?

14     A.    Yes, he did.

15     Q.    Now, based on what you saw, the gesturing that he

16 was making inside the car to the female driver, was his

17 statement that he told her to keep driving consistent with what

18 you observed?

19     A.    Yes, it was.

20     Q.    Did you come to find out who the driver of that

21 vehicle was?

22     A.    Yes, we did.

23     Q.    And who was that?

24     A.    I believe it was his wife, Daphne -- Daphne Johnson,

25 I believe, was her name.

```
 1        Q.    And while he's bailing out on foot with the car

 2   still rolling and not complying with your commands, where was

 3   she at that time?

 4        A.    In the vehicle.

 5        Q.    So she never left the vehicle?

 6        A.    No, ma'am.

 7        Q.    Did she, in fact, go to jail that day?

 8        A.    Yes, she did.

 9        Q.    What for?

10        A.    For evading.

11        Q.    And that appeared, I guess, to be at the direction

12   of this Defendant, based on his statement and what you saw?

13        A.    Yes.

14        Q.    That she kept driving?

15        A.    That she continued and -- and didn't stop.

16        Q.    So what offense did you file on the Defendant this

17   day for his actions?

18        A.    We filed an evading arrest and detention.

19        Q.    And that was for his actions on foot, when he fled?

20        A.    Yes, that's for him not stopping and us ordering him

21   to the ground and then him continue to flee from us.

22                  MS. EVANS:  May I approach the witness?

23                  THE COURT:  You may.

24        Q.    (BY MS. EVANS)  Officer Ralston, I'm showing you

25   State's Exhibit Number 168.  Do you recognize this as a
```

1  computer-generated printout screen of our FORVIS computer

2  database system for this evading arrest that contains the

3  Defendant's name, date of birth, your service number for the

4  offense you just described and arrested him for, with the date

5  of the offense being July 23rd, 1994?

6          A.    Yes, ma'am, I do.

7          Q.    And does it show a certified conviction for this

8  offense?

9          A.    Yes, it does.

10              MS. EVANS:  The State would offer State's

11  Exhibit Number 168, tendering to the Defense for any objection.

12              (State's Exhibit 168 offered.)

13              MS. BERNHARD:  Your Honor, at this we object.

14  There is insufficient identifying -- sufficient identifying

15  information.  This is not a judgement and sentence.  And we

16  re-urge all of our objections we made to State's Exhibits 166

17  and 167.

18              THE COURT:  May I see the document?

19              MS. EVANS:  Yes, Your Honor.

20              THE COURT:  Objection overruled.  The document

21  is admitted.

22              (State's Exhibit 168 admitted.)

23              MS. EVANS:  Permission to publish?

24              THE COURT:  You may.

25              MS. EVANS:  In Cause Number MB94-27297, the

128

1    Defendant, Matthew Lee Johnson, was convicted of the offense

2    of -- or pled guilty to the offense of evading arrest on

3    September 19th, 1994, and received a year probation for that

4    offense.  That probation was later revoked on October 4th,

5    1995, and he was sentenced to 180 days in the Dallas County

6    Jail.

7                    Pass the witness.

8                    <u>CROSS-EXAMINATION</u>

9    BY MS. MULDER:

10        Q.    Good morning, Officer -- is it Ralston?

11        A.    Yes, ma'am, Ralston.

12        Q.    My name is Nancy Mulder.  I just have some questions

13   for you.  If at any time you don't understand me, just let me

14   know and I'll rephrase them.

15        A.    Okay.

16        Q.    The home that the Defendant was trying to get into,

17   that was his house, wasn't it?

18        A.    I later learned, yes, ma'am.

19        Q.    Correct, but it was his house?

20        A.    Yes, ma'am.

21        Q.    Okay.  And evading arrest is a misdemeanor, correct?

22        A.    Yes, ma'am, it is.

23        Q.    Now, the way that Daphne Johnson was driving the car

24   after you saw that she knew that you were behind her, there

25   wasn't anything dangerous about the way she was driving, other

1  than she just wouldn't pull her over?

2      A.   Other than running the stop sign.

3      Q.   Okay.  Running a stop sign, but she wasn't going

4  fast or anything?

5      A.   No, it was not fast at all.

6      Q.   Okay.  How -- do you -- I mean, this was 20 years --

7  well, was it 20 years ago?  Yeah, almost.  Do you remember?

8      A.   A long time ago.  She was not going too fast, I

9  don't remember -- I couldn't tell you what speed she was going,

10  but it was not totally unsafe speed.

11      Q.   Okay.  And he never had his hands on her or

12  anything, the passenger?

13      A.   Not that I could see.

14      Q.   He was just -- the one thing, you saw him motioning

15  go forward?

16      A.   Right.

17      Q.   And, Officer, 180 days -- that's the same as six

18  months?

19      A.   Yes, ma'am.

20      Q.   And since you found out that they actually went to

21  their house, you didn't tow the car?

22      A.   I do not honestly recall.  I would have to look at

23  the report and see if the vehicle was impounded -- if the

24  vehicle was impounded or not.

25      Q.   If I explained to you that it was not, based on your

1    report, would you have any reason to think -- it says vehicle

2    was released at the scene.  Would you have any reason to doubt

3    me?

4         A.   No, ma'am.

5         Q.   I mean, obviously, if it wasn't in front of their

6    house and had been somewhere else, you would have had to

7    impound the car?

8         A.   Depending on the circumstance and the situation at

9    the time, yes, ma'am.

10         Q.   Officer, since this did happen 19 years ago, do you

11    actually have an independent recollection of this event or just

12    what -- you're just testifying to what's on the report?

13         A.   I can actually remember parts of it.  I don't -- of

14    course, don't remember everything, and I have read the report.

15         Q.   Uh-huh.

16         A.   But I do have a -- a recollection of it.

17         Q.   And the extent of the evading in the car was two

18    blocks?

19         A.   It was several blocks.  It was -- it was several

20    blocks.  She had plenty of time to pull over.

21         Q.   Okay.

22         A.   And she knew we were there, and she knew what we

23    were.  And she chose not to do so, driving all the way to the

24    house, you know, at the request of -- of, I guess, her husband

25    who supposedly knew he had warrants for his arrest.  And that's

```
 1   what she went to jail for is evading.
 2                   MS. MULDER:  Nothing further, Your Honor.
 3                   Thank you, Officer.
 4                   THE COURT:  Thank you.
 5                   MS. EVANS:  May he be excused, Your Honor?
 6                   THE COURT:  Yes.  Sir, you may stand down and
 7   you're excused.
 8                   MS. MULDER:  No objection.
 9                   MS. EVANS:  The State calls Officer Clark.
10                   (Witness brought forward and sworn.)
11                   THE COURT:  Sir, would you please raise your
12   right hand.
13                   (Witness sworn.)
14                   THE WITNESS:  Yes, ma'am.
15                   THE COURT:  Thank you.
16                         M.G. CLARK,
17   was called as a witness by the State, and after having been
18   first duly sworn, testified as follows:
19                   DIRECT EXAMINATION
20   BY MS. EVANS:
21       Q.   If you would state your name for the record.
22       A.   Officer M.G. Clark.
23       Q.   And, Officer Clark, how are you employed?
24       A.   I'm with the City of Garland Police Department.
25       Q.   How long have you worked with them?
```

1        A.    Twenty-one years.

2        Q.    Where are you presently assigned?

3        A.    I'm in the NPO Unit, Neighborhood Police Officers

4    Unit.

5        Q.    And this jury has heard a lot about the Neighborhood

6    Police Officers Unit, so we won't detail that again, but how

7    long have you been serving with them?

8        A.    I've been there for two and a half years.

9        Q.    Two and a half years?

10       A.    Uh-huh.

11       Q.    Prior to that -- I'm sorry, you'll have to say yes

12   or no.

13       A.    Oh, yes.

14       Q.    Okay.  Prior to the two and a half years that you're

15   doing with the neighborhood police -- is it -- yeah -- unit,

16   where -- what were you doing with Garland?

17       A.    I was in the Canine Unit for about 10 years, and

18   then five years prior to that I was patrol.

19       Q.    Okay.  And I'm going to direct your attention back

20   when you were on patrol.  About how many years did you serve as

21   a patrol officer?

22       A.    Including canine, because I was actually patrol

23   also, probably 11 years, 12 years.

24       Q.    Now, the jury has heard about what patrol officers

25   do.  Let me direct your attention to August 7th, 1995, around

1  5:45 in the morning.

2       A.    Uh-huh.

3       Q.    Do you recall back then approximately when your

4  shift began?

5       A.    Yes.

6       Q.    When would that have been?

7       A.    It would have been 11:00 to 7:00 in the morning.

8       Q.    Okay.  So 11:00 p.m. --

9       A.    To 7:00 a.m.

10      Q.    -- to 7:00 a.m.?

11      A.    Yes.

12      Q.    Prior to you coming on duty that evening, had there

13 been an incident that you were then kind of -- that was

14 bleeding over into your shift that you were having to deal with

15 the ongoing situation?

16      A.    Yes, ma'am.

17      Q.    Can you describe for the jury what the initial call

18 that Garland police officers had responded to earlier in the

19 evening was?

20      A.    It was agg assault, deadly weapon, with a family --

21 with a girlfriend/wife -- live-in wife.  Basically when I got

22 on duty, I was informed of the -- of the assault going on.

23 Through the night the calls kept coming from this suspect,

24 threatening the wife.  5 o'clock in the morning I get a call

25 saying that he was at a certain location which is on Curtis.  I

134

```
 1  go over there and find the suspect.
 2       Q.   Okay.  And so just to back it up, the individual
 3  that you end up finding over on Curtis that you're referring
 4  to, was that a Matthew Lee Johnson?
 5       A.   Yes, ma'am.
 6       Q.   And do you recognize Matthew Lee Johnson here in the
 7  courtroom today?
 8       A.   Yes, ma'am.
 9       Q.   Could you identify an article of clothing he's
10  wearing?
11       A.   He's wearing a black jacket.
12       Q.   Okay.  And is there anything else about his
13  appearance that sets him apart from the others?
14       A.   Glasses with, I guess, dreads.
15       Q.   Okay.
16            MS. EVANS:  Let the -- let the record reflect
17  that this witness has identified the Defendant in open court.
18            THE COURT:  The record will reflect.
19       Q.   (BY MS. EVANS)  So, Officer Clark, you were not on
20  the previous aggravated assault, deadly weapon call?
21       A.   No, ma'am.
22       Q.   And you had no contact with the actual victim or
23  complainant in that case?
24       A.   No, ma'am.  That happened on the south side of town,
25  and I worked on the north side of town.
```

1      Q.    And so whether the actual victim for that offense

2   was, in fact, a live-in wife or it was a combination of

3   individuals that there was an ongoing thing going on, but the

4   actual victim in the case, you never made contact with?

5      A.    No, ma'am.

6      Q.    And so you don't know for certain the actual victim

7   in that aggravated assault, deadly weapon, if that was, in

8   fact, a wife or another family member?

9      A.    Yeah, I don't recall.

10      Q.    Okay.  Well, you were never present at that?

11      A.    No, never present -- right.

12      Q.    Okay.  And so explain how it is that you get called

13   out hours later after the initial aggravated assault, deadly

14   weapon, has taken place and that call received by Garland

15   officers.

16      A.    It was basically where it was ongoing threats by

17   phone telling them that the -- I guess he was going to, you

18   know, commit more assaults.

19            MS. BERNHARD:  Object to hearsay.

20            THE COURT:  Sustained.

21      A.    So I get called stating that the guy was at this

22   location on Curtis, so that's when I get there --

23      Q.    (BY MS. EVANS)  Okay.

24      A.    -- and find him at the location.

25      Q.    So basically you -- the call comes in that threats

```
 1   are still going on and this is where you can find him?

 2        A.    Uh-huh.

 3        Q.    That's how the call came in?

 4        A.    Yes, ma'am.

 5        Q.    And so did you basically go to put an end to this

 6   situation and try to locate the individual --

 7        A.    Yes.

 8        Q.    -- Matthew Lee Johnson?

 9        A.    Yeah, I just -- to end it.  It was going on all

10   night, couldn't find him.  Finally we found him at that

11   location and basically he had warrants, so I put him in jail

12   for the probation violation.  I guess it was a resisting arrest

13   and a probation violation for evading, and he had a warrant for

14   some thefts, and I went ahead and booked him in under the agg

15   assault, deadly weapon, just because the threats were

16   continuous, all night long, so --

17        Q.    And you said you found this Defendant at that

18   address over on Curtis?

19        A.    Yes, ma'am.

20        Q.    Were you familiar with whose address that was?

21        A.    I believe it was his mom -- mother's, yes.

22        Q.    And when you got there, did this Defendant give you

23   any problems when you put him under arrest?

24        A.    Not at the time, we -- he wasn't too happy.  He was

25   pretty upset.
```

1    Q.    And it had taken you all night to locate the

2    individual?

3    A.    Yes, ma'am.

4    Q.    Now, you said that he's placed in jail for numerous

5    probation violations, a theft warrant, as well as this

6    aggravated assault, deadly weapon, that had happened earlier in

7    the evening?

8    A.    Yes, ma'am.

9    Q.    So is it fair to say if he's just now being arrested

10   for that aggravated assault, deadly weapon, that happened the

11   same day, earlier in the evening that he wasn't at that

12   location to be arrested before?

13   A.    I believe so, yes.

14   Q.    Because that's the type of offense that you, based

15   on your training and experience, would make an arrest for --

16   A.    Sure.

17   Q.    -- if the suspect was on scene?

18   A.    Yeah, immediately.  Yes.

19   Q.    And you say you're doing so for the safety of the

20   victim?

21   A.    Yes.

22   Q.    And those involved?

23   A.    Yes, because it was an ongoing, all night

24   occurrence, so --

25   Q.    Now, you say initially other than him not being too

1    happy, you were able to make that arrest?

2         A.    Yes.

3         Q.    Once you got to the Garland jail, transporting this

4    Defendant, did there become an issue?

5         A.    Yes, ma'am.  When we booked him in, he basically

6    looked at me and told me that I would get mine when I was back

7    out on the street.

8         Q.    And, Officer, what did you take that to mean?

9         A.    He was threatening bodily harm to me, and I filed a

10   retaliation, threat bodily -- bodily injury on him which is

11   another charge.

12        Q.    And when you said this Defendant looked at -- right

13   at you and said that, once you got him to the jail --

14        A.    Uh-huh.

15        Q.    -- what was his demeanor like in saying that to you?

16        A.    He had -- I don't really recall because of how long

17   it was.  But I will tell you that I get threatened often.  I

18   mean, I've been doing it for 21 years and, you know, people

19   always tell you, you know, if you ain't wearing that badge or

20   if you ain't wearing the uniform or if you don't have that gun,

21   and so sometimes you just let that go because you know

22   sometimes -- but I will tell you that there are some people

23   that will tell you certain things that give you that gut

24   feeling that maybe you need to take this a little serious.  And

25   I will tell you that if I file a retaliation report, it's

1  basically for my protection to have that name on record.  So

2  I've only got thousands of faces to remember.  He's got one.

3  So I like to try to make record of it so I'll have it for my

4  use.

5      Q.   And, Officer Clark, you said in your many years of

6  service with the Garland Police Department, that people are

7  running off at the mouth all the time?

8      A.   Uh-huh.

9      Q.   Is that fair to say?

10      A.   Yeah.

11      Q.   And you don't file retaliation based on every threat

12  or everything that comes out of a person's mouth?

13      A.   No.  I mean, you -- you learn to know when people

14  are just -- you know, just running their mouth, because they're

15  upset because they got caught or whatever.  And there are some

16  people that when they look at you just the history that you

17  have with them or just the agitation that they show --

18             MS. BERNHARD:  Your Honor, I'm going to object

19  to the relevance of some people.

20             THE COURT:  Sustained.

21             MS. BERNHARD:  And ask that the jury be

22  instructed to disregard.

23             THE COURT:  The jury will disregard.

24             MS. BERNHARD:  Move for a mistrial.

25             THE COURT:  Denied.

1    Q.    (BY MS. EVANS)  Officer Clark, based on that

2  statement that this Defendant made to you there at the Garland

3  jail, you did, in fact, file a retaliation?

4    A.    Yes, I took it very serious.  Just because of the

5  way I felt at the time, I -- I will tell you that I won't file

6  a retaliation because I know pretty much of the time unless

7  they do bodily harm to you, that it probably doesn't get

8  conviction on it.  But it's basically for my record so I'll

9  know whenever I come across that person again, if I pull him

10  up, there it is.  So now I get familiarized with maybe

11  something happen like this here 10, 20 years ago.  I might

12  forget about it, but when I pull it up, there it is.  So it

13  kind of reminds me, you know, just for history, just for my

14  safety.

15    Q.    And so this Defendant and his statements to you that

16  night, something in your gut led you to believe that he might

17  make good on it?

18    A.    Yeah, I wouldn't have -- I would -- I wouldn't have

19  made that report if it didn't.

20          MS. EVANS:  May I approach?  May I approach the

21  witness?

22          THE COURT:  You may.

23    Q.    (BY MS. EVANS)  Now, Officer Clark, I'm showing you

24  what's been marked as State's Exhibit Number 169.  Do you

25  recognize this as a certified prior conviction belonging to

1    this Defendant, Matthew Lee Johnson, occurring with the date of

2    the offense August 7th, 1995, for the offense of aggravated

3    assault, deadly weapon?

4          A.    Uh-huh.  Yes, ma'am.

5          Q.    You recognize this document as that?

6          A.    Uh-huh.

7                THE COURT:  You have to say yes or no.

8          Q.    (BY MS. EVANS)  You have to say yes or no.

9          A.    Yes.

10               MS. EVANS:  The State would offer State's

11   Exhibit Number 169, tendering to Defense for any objection.

12               (State's Exhibit 169 offered.)

13               MS. BERNHARD:  May we approach?

14               THE COURT:  You may.

15               (Sidebar conference, discussion off the record.)

16               THE COURT:  All right.  Members of the jury,

17   let's just go ahead and take our lunch break.  It's almost a

18   quarter to 11:00.  If you'll be back -- I mean, quarter to

19   12:00.  If you'll be back in the jury room at 1 o'clock,

20   please.

21               THE BAILIFF:  All rise.

22               (Jury excused from courtroom.)

23               THE COURT:  All right.  On the record outside

24   the presence of the jury.

25               The State has tendered documents -- evidence of

```
 1   a conviction of Matthew Lee Johnson of aggravated assault with

 2   a deadly weapon, and the Defense's objections are?

 3                    MS. BERNHARD:  Your Honor, we would object

 4   because I don't think that that judgement and sentence or -- or

 5   documents have been sufficiently tied to Matthew Johnson.  This

 6   witness has testified he didn't know any of the details of the

 7   aggravated assault, so I don't see how he can possibly testify

 8   that this is one and the same person that got the conviction.

 9                    We would further object to the inclusion of

10   unsigned pages in the conditions of probation.  We would object

11   to the inclusion of the Motion to Revoke the probation which

12   sets out other extraneous offenses, which have not been proven

13   beyond a reasonable doubt.  And I think -- and I think

14   that's --

15                    THE COURT:  Okay.  Your objection with regard to

16   the judgement is overruled.

17                    With regard to unsigned probation papers and

18   violations, your motion -- your objection is sustained.

19                    MS. EVANS:  And the State can remove those

20   items, Your Honor.

21                    THE COURT:  Fine.  All right.  We're in recess

22   until 1 o'clock.

23                    (Recess.)

24                    THE COURT:  All right.  If we can get the jury

25   lined up, please.
```

```
 1                      THE BAILIFF:  All rise.

 2                      (Jury returned to courtroom.)

 3                      THE COURT:  Please be seated.  When we left at

 4  lunchtime, the State was introducing -- was it Exhibit 169?

 5                      MS. EVANS:  Yes, Your Honor.

 6                      THE COURT:  All right.  And my ruling is that

 7  portions of that are admitted and the rest has been redacted.

 8                      MS. EVANS:  Yes, Your Honor, the State would

 9  re-offer State's Exhibit Number 169 with the redacted portions

10  already removed.

11                      (State's Exhibit 169 offered.)

12                      THE COURT:  And it's admitted in its current

13  form.

14                      (State's Exhibit 169 admitted.)

15                      MS. EVANS:  Permission to publish?

16                      THE COURT:  You may.

17                      MS. EVANS:  In Cause Number F95-25906-K, this

18  Defendant, Matthew L. Johnson, was convicted of the offense of

19  aggravated assault.  Date of judgement was September 27th,

20  1995.  He received a sentence of 10 years in the penitentiary,

21  and that sentence was probated for a period of five years.  The

22  complaining witness on this conviction was Courtney Johnson.

23                      Pass the witness.

24                           CROSS-EXAMINATION

25  BY MS. BERNHARD:
```

1    Q.   Officer Clark, you don't know anything about the

2  facts of the aggravated assault, do you?

3    A.   No.

4    Q.   You don't know if anybody was actually injured or if

5  it was just a threat?

6    A.   No.

7    Q.   And the retaliation case that you filed on Mr.

8  Johnson, did you subsequently learn that the Grand Jury no

9  billed that case?

10   A.   Yes.

11   Q.   And what does that mean, a no bill?  Can you explain

12  that?

13   A.   He was found not guilty or just --

14   Q.   Or the Grand Jury declined to indict it?

15   A.   Right, right.

16   Q.   And you had no further contact with Mr. Johnson

17  after that day?

18   A.   No, ma'am.

19        MS. BERNHARD:  I'll pass the witness.

20              REDIRECT EXAMINATION

21  BY MS. EVANS:

22   Q.   Officer Clark, based on your 20 plus years of

23  experience, you've already described in the instances that you

24  file a retaliation.  In what instances did you say that you

25  typically see the Grand Jury true billing or accepting a

```
 1   retaliation case on an officer?

 2        A.    Unless you get bodily injury on an officer, then

 3   they will probably go forward with it, but if you just get

 4   threatened by it, they probably won't go forward with it.  But

 5   I will tell you that just because they won't go forward with

 6   it, doesn't mean that I won't file that charge, just so I will

 7   have it on record, so --

 8        Q.    And here you did because the threat stood out?

 9        A.    Yes.  If -- if I filed a retaliation, it's because I

10   found it serious enough for me to document the case.

11                  MS. EVANS:  Pass the witness.

12                  MS. BERNHARD:  Nothing further.

13                  THE COURT:  Thank you, sir.  You may stand down.

14   You're excused.

15                  MS. EVANS:  The State calls Officer Lacey.

16                  THE COURT:  Come on up.

17                  (Witness brought forward and sworn.)

18                  THE WITNESS:  Yes, ma'am.

19                  THE COURT:  Thank you.

20                       CLAY LACEY,

21   was called as a witness by the State, and after having been

22   first duly sworn, testified as follows:

23                  DIRECT EXAMINATION

24   BY MS. EVANS:

25        Q.    If you would state your name for the record.
```

1        A.    Clay Lacey.

2        Q.    And, Officer Lacey, how are you employed?

3        A.    I'm employed with the City of Garland Police

4   Department as a police officer.

5        Q.    How long have you been with Garland Police

6   Department?

7        A.    I worked for Garland since August of 1996 --

8        Q.    Okay.  And so --

9        A.    About 17 years, I believe.

10        Q.    Okay.  And we see you're dressed in a different

11   uniform than the other officers that have come in here.  What

12   do you do now?

13        A.    I'm assigned as a tactical flight officer with the

14   Texas Department of Public Safety Aviation Division.

15        Q.    So you are still with Garland Police Department, but

16   you're assigned with Texas DPS?

17        A.    Correct.

18        Q.    And you fly --

19        A.    We have a fixed wing airplane and helicopter out of

20   Mesquite Airport.

21        Q.    Why would Garland Police Department be working in

22   conjunction with DPS and having a helicopter?

23        A.    It began years ago when it was tough to recruit

24   people for specialized positions.  Some of the agencies pooled

25   resources together, so Garland lends some staffing to the

1  State, and in return gets some preferential helicopter coverage

2  for the city.

3       Q.    And based on your current duties in that capacity,

4  what is the utility, I guess, of a police department being able

5  to be up in the air in a helicopter?

6       A.    The -- the force multiplication and the unique tools

7  that the helicopter brings to the table in certain

8  circumstances is advantageous to the city.

9       Q.    Okay.  And one of those such circumstances, I guess,

10  would be to locate a suspect?

11       A.    We locate missing things, missing people, both

12  suspects or children, the elderly.  We have some technology on

13  the machine that allows us to cover a search in a large area

14  that would take ground units and a lot of folks to do.

15       Q.    Got you.  Now, back in 2002, you weren't working

16  with that unit, right?

17       A.    No, ma'am.

18       Q.    Where were you assigned at that time?

19       A.    The Garland Police Department Patrol Division

20  working late nights.

21       Q.    Okay.  Now, the jury has heard a lot about the

22  Patrol Division and what sort of calls that you answer.

23  Approximately 1:50 in the morning on October 9th of 2002, what

24  type of call were you responding to?

25       A.    A reported hit and run accident.

```
 1        Q.    Now, you've -- 2002 was awhile ago, so you've

 2   reviewed the incident report you're going to be here to talk

 3   about today, right?

 4        A.    Yes, ma'am.

 5        Q.    And you said it came out as a hit-and-run?

 6        A.    Yes, ma'am.

 7        Q.    Now, just because a call comes out a certain way or

 8   it's being a certain type of offense, does that mean when you

 9   arrive -- arrive on scene and investigate it, that that's

10   what's actually going to pan out?

11        A.    No, ma'am.

12        Q.    Did you -- were you driving alone or with a partner

13   on that day?

14        A.    I was alone that night.

15        Q.    Now, once you receive that call from service, you

16   said you work late nights and this is 1:50 in the morning, what

17   area of Garland did you go to?

18        A.    Kind of east of town, southeast Garland, area of

19   First Street and Avenue D.

20        Q.    And when you responded to that location, what was

21   your understanding or what was your purpose in going there?

22        A.    The caller reported that they were following a

23   vehicle involved in this hit-and-run accident and -- and

24   requested us to respond.  By the time we got in the area, the

25   person that was driving the vehicle had stopped and got out of
```

1  the vehicle.  And the person on the phone with 911 had told us

2  that.  So we were -- we were arriving as the person in the car

3  was getting out.

4       Q.    Okay.  So initially the call comes in, the suspect

5  you're looking for is going to be in a vehicle?

6       A.    Correct.

7       Q.    And I assume you were given a description of that

8  vehicle to be looking for --

9       A.    Correct.

10      Q.    -- right?  But once you arrive to that location,

11  you're now looking for a suspect on foot?

12      A.    Correct.  And -- and that suspect's description was

13  given to us by the caller that was still on the phone.

14      Q.    Now, was the caller on the phone the person who had

15  been hit and run or somebody else, or do you know?

16      A.    I don't recall that.  I don't believe at the end of

17  it there was even an actual hit and run that happened.  This

18  was just the caller that was reporting these events.

19      Q.    Okay.  And that person was following the person and

20  letting you know where to find them?

21      A.    Correct.

22      Q.    Now, what area -- you said it was like South First

23  Street, Miller Road?

24      A.    Yes, ma'am.

25      Q.    What type of area is that there in Garland?

1          A.    Mostly residential.  There's some retail along the

2     main First Street, but mostly a neighborhood, single family.

3          Q.    So while you're actively looking for the suspect who

4     is now on foot, what do you first observe and do you direct

5     another officer to help in the search?

6          A.    As I'm getting there, I'm coming down First Street,

7     and I'm trying to glance down each alley and each street as I'm

8     getting in the area to maybe pick up the person on foot.  And

9     -- and unfortunately, I see a subject matching the description,

10    but I've already passed the turn because I was going a little

11    quick.  So I saw him.  I got on the brakes, and I had to ask

12    another officer, Steadman, turn down that street I just passed

13    and I'll go a little further north because I saw an individual

14    matching the description given by the caller.

15         Q.    Okay.  And so did Officer Steadman then take over

16    where you left off on that street to locate him?

17         A.    He turned down a street, and I went another block or

18    two up, trying to kind of set of a little bit of containment

19    to -- to contain the subject.

20         Q.    And kind of block him in, in other words; is that

21    fair to say?

22         A.    Correct.

23         Q.    Now, did you ever see Officer Steadman actually make

24    contact with the individual who is now on foot?

25         A.    No, ma'am.

                                                                    151

1        Q.    So anything that went on with that, Officer Steadman

2   would be the better one to talk about it?

3        A.    Correct.

4        Q.    But that's how it got initiated?

5        A.    Yes, ma'am.

6              MS. EVANS:  Pass the witness.

7                        CROSS-EXAMINATION

8   BY MS. BERNHARD:

9        Q.    Officer Lacey, do you recall what the sus -- suspect

10  description was?

11       A.    No, ma'am, I don't recall.

12       Q.    And it's 2 o'clock in the morning?

13       A.    Correct.

14       Q.    It's dark?

15       A.    Correct.

16       Q.    And when you first saw this person down an alley --

17  was it an alley?

18       A.    When I -- when I first saw him, it was about -- what

19  I put in my report and the way I recall it is about the 300

20  Block of Avenue E, near Third.

21       Q.    So on a street?

22       A.    Correct.

23       Q.    Do you remember if the suspect was on the sidewalk,

24  in the street, or where?

25       A.    When I first saw them, they were on the street and

1  turned to my right, which would be northerly.  I didn't know if

2  they turned between the houses or up another street.  It was

3  too far down to tell.

4      Q.   About how far down was it?

5      A.   I couldn't guess.  A guess would be maybe six to

6  seven houses in a -- in a single family neighborhood.

7      Q.   And I -- you don't recall what the suspect

8  description was?

9      A.   I don't recall now, I don't.  She gave one, but I

10 don't remember what it was.

11     Q.   Do you remember how detailed it was?

12     A.   No, I don't.

13     Q.   Do you remember if it had any kind of clothing

14 identification, or was it just a black male?

15     A.   I don't recall.

16     Q.   And you -- subsequently in your investigation or the

17 course of the other officers who are involved in this

18 determined that there was no hit-and-run offense?

19     A.   I believe that's correct, there was no hit-and-run.

20          MS. BERNHARD:  I'll pass the witness.

21                    REDIRECT EXAMINATION

22 BY MS. EVANS:

23     Q.   Officer, this is 1:59 or so in the morning that

24 we're talking about.  Was there a lot of people outside and a

25 lot of foot traffic and other --

```
 1       A.    No, ma'am.

 2       Q.    -- in that area?

 3       A.    No, ma'am.

 4       Q.    No.  And so Officer Steadman just picked up where

 5  you left off because you missed that turn --

 6       A.    Correct.

 7       Q.    -- where you last saw the suspect?

 8       A.    Correct.

 9       Q.    Okay.

10              MS. EVANS:  Pass the witness.

11              MS. BERNHARD:  Nothing further.

12              THE COURT:  Thank you, sir.  You may stand down.

13  You're excused.

14              THE WITNESS:  Yes, ma'am.  Thank you.

15              MS. EVANS:  The State calls Officer Steadman.

16              (Witness brought forward and sworn.)

17              THE WITNESS:  Yes.

18              THE COURT:  Thank you.

19              Please proceed.

20                  GARY STEADMAN,

21  was called as a witness by the State, and after having been

22  first duly sworn, testified as follows:

23                  DIRECT EXAMINATION

24  BY MS. EVANS:

25       Q.    If you would state your name and spell your last
```

```
 1   name for the record.

 2        A.    Gary Steadman, S-t-e-a-d-m-a-n.

 3        Q.    And, Officer Steadman, how are you currently

 4   employed?

 5        A.    I'm a police officer with the City of Garland.

 6        Q.    How long have you been a police officer for Garland?

 7        A.    It will be 19 years this December 5th.

 8        Q.    And where are you currently assigned?

 9        A.    I'm the school resource officer at Naaman Forest

10   High School.

11        Q.    How long have you been at Naaman Forest?

12        A.    This will is my first year.

13        Q.    Okay.  So you're taking a break from the patrol

14   world and moved on to the school --

15        A.    Yes, ma'am.

16        Q.    -- as a resource officer?  Prior to you becoming a

17   school resource officer, in what capacity did you serve with

18   Garland?

19        A.    I was a SWAT officer for the last 15 years.

20        Q.    A what?

21        A.    SWAT officer.

22        Q.    SWAT officer for the last 15 years?

23        A.    Yes, ma'am.

24        Q.    Let me direct your attention to October of 2002, and

25   what capacity were you serving at that time?
```

1      A.    I was a SWAT officer currently, but I was also

2  assigned to patrol.

3      Q.    And when you were assigned to patrol on the night of

4  October 9th, 2002, around 1:50 in the morning, did a call come

5  out from fellow Officer Lacey that you just -- that the jury

6  just heard from and saw, regarding something he was

7  investigating?

8      A.    Yes, ma'am, I was his backup.

9      Q.    And what were you directed to do as his backup?

10      A.    I believe we were going to a hit-and-run accident

11  where a lady was following the car they believed that had the

12  accident.  And another officer checked out there and the

13  individual ran from that officer.  And as myself and Officer

14  Lacey were pulling up, he actually passed the street and saw

15  the subject running down the street and yelled for me to take a

16  left turn and I turned down that street.

17      Q.    Okay.  So Officer Lacey passed the street up, he

18  said, hey, the dude is down there, so go that way?

19      A.    Yes, ma'am.

20      Q.    Was that basically -- and so what did you do in

21  response to that direction?

22      A.    I did what he said and turned down the street.

23      Q.    Did you immediately act on his request?

24      A.    Yes, ma'am.

25      Q.    And were you able to locate the suspect that Officer

```
 1  Lacey had been looking for, as well?

 2       A.   Yes, ma'am.

 3       Q.   When you came into contact with him, did you

 4  ultimately come to know him as Matthew Lee Johnson?

 5       A.   Yes, ma'am.

 6       Q.   Do you see that individual here in the courtroom

 7  today?

 8       A.   Yes, ma'am.

 9       Q.   Could you identify an article of clothing he's

10  wearing today?

11       A.   Yes, ma'am, he's wearing a suit and tie in the far

12  left-hand chair.

13            MS. EVANS:  Let the record reflect this witness

14  has identified the Defendant in open court.

15            THE COURT:  The record will reflect.

16       Q.   (BY MS. EVANS)  Now, when you immediately turned

17  down the street, can you describe for the jury what this

18  Defendant did?

19       A.   Yeah.  When I turned out the street, he stopped and

20  ducked down between some houses.  And it looked like he was

21  actually watching the other squad car turn.  And I parked and

22  jumped out of the car and yelled at him.  When I yelled at him,

23  he took off running from me.

24       Q.   Okay.  So the Defendant's initially running, and

25  then he sees you turn on the street, and that's when he stops
```

1  and ducks down?

2      A.    Yes, ma'am.

3      Q.    And then you're in your squad car at that time.

4  When you go to exit your squad car, that's when he does what?

5      A.    I actually yelled at him, and he looked up and saw

6  me and took off running.

7      Q.    Okay.  And so now, did you engage him -- in a foot

8  chase with him?

9      A.    Yes, ma'am.

10      Q.    At some point in time were you able to catch up with

11  him?

12      A.    Yes, ma'am.  We ran probably two or three houses

13  down -- I can't remember the name of the -- I think it was

14  Avenue E, I'm not positive.  And he slipped and fell at one

15  house.  It was wet that night.  He slipped and started

16  stumbling and fell in the yard which gave me a chance to catch

17  up on him.  And then he jumped back to his feet, and we made it

18  to the next yard, and I tackled him in the next yard.

19      Q.    Okay.  So basically he waits for you to get out of

20  your car before he takes off running again.  Are you yelling

21  commands at him this entire time that he's taking off running

22  on foot?

23      A.    Yes, ma'am, I yelled at him several times and got on

24  the radio, telling everybody else that I was in a foot chase to

25  get them to come over there.

1       Q.    And what was your command to him?

2       A.    I told him to stop and get on the ground.  I

3  identified myself as the police when I first got out of the

4  car.  And then when he ran, I yelled several times for him to

5  stop, and I yelled for him to get on the ground.  When he

6  actually fell on the ground, I yelled for him to stay on the

7  ground.  He got up and continued to run.

8       Q.    Okay.  So he never complied with your initial

9  commands to stop and get on the ground?

10      A.    No, ma'am.

11      Q.    It was only when he fell that he went to the ground?

12      A.    Yes.

13      Q.    But even then he got back up and started running?

14      A.    Yes.

15      Q.    Now, were you able to ultimately gain control of him

16  or catch up to him again?

17      A.    Yes, ma'am.  I tackled him.  When he got up, he made

18  it to the next yard and I tackled him in the next yard.

19      Q.    But I guess the fall helped slow him down so that

20  you could get --

21      A.    Yes, it allowed me to gain.

22      Q.    Now, was this Defendant placed under arrest at that

23  time?

24      A.    Yes, ma'am.

25      Q.    What for?

1    A.    Evading arrest at that time.

2    Q.    Now, did you see any -- or did he -- once you got

3  control of him or tackled him, had to do that, did he just

4  willingly let you cuff him or did you have a problem there?

5    A.    He didn't fight like swinging or kicking.  He just

6  tried to tuck his arms underneath him and wasn't going to let

7  me have his arms.  And I started trying to use physical force

8  to pull his arms out.  I believe Officer Lacey cut through the

9  houses and helped me, and we put his hands behind his back and

10 handcuffed him.

11   Q.    Okay.  And then once you had him under arrest, did

12 you observe any injuries on him from his fall?

13   A.    I believe he had like road rash -- what we call road

14 rash on his hands from where he caught himself when he was

15 falling.  And I believe we called an ambulance for him because

16 he was complaining of having trouble breathing.  And so we had

17 an ambulance come out there.  They cleared him to go the jail,

18 and I transported him to jail.

19   Q.    And you said he had been running quite a ways from

20 you?

21   A.    Yes, ma'am.

22   Q.    So trouble breathing, you had the ambulance check

23 him out, he ultimately goes to jail?

24   A.    Yes, ma'am.

25         MS. EVANS:  May I approach the witness?

```
 1                    THE COURT:  You may.

 2      Q.   (BY MS. EVANS)  Officer Steadman, I'm showing you

 3  what's been marked State's Exhibit Number 170.  Does this

 4  appear to be a certified copy of a judgement and sentence for

 5  Matthew Johnson for the offense of evading that you have been

 6  describing that happened on October 9th, 2002?

 7      A.   Yes, ma'am.

 8                    MS. EVANS:  The State would offer State's

 9  Exhibit Number 170, tendering to Defense for any objection.

10                    (State's Exhibit 170 offered.)

11                    MS. BERNHARD:  May we approach?

12                    THE COURT:  Yes.

13                    (Sidebar conference, off the record.)

14                    THE COURT:  All right.  We're going to excuse

15  the jury for about five minutes.  If you'll be back in the jury

16  room in five minutes.

17                    THE BAILIFF:  All rise.

18                    (Jury excused from courtroom.)

19                    THE COURT:  All right.  We're on the record

20  outside the presence of the jury.

21                    Ms. Bernhard.

22                    MS. BERNHARD:  Judge, we would object to State's

23  Exhibit 170 because, again, I do not believe there's sufficient

24  identifying information to tie that judgement and sentence to

25  this Defendant.  Just identification of names and the dates is
```

```
 1   not sufficient.
 2                 THE COURT:  Anything further from the State?
 3                 MS. EVANS:  Your Honor, the State does believe
 4   there's sufficient identifying information.  Officer Steadman
 5   just testified he is the listed complainant in that, and it's
 6   the same date he just described.  It would go to the weight,
 7   not the admissibility.
 8                 THE COURT:  All right.  Overruled, except that
 9   the plea bargain agreement will be removed --
10                 MS. EVANS:  Yes, Your Honor.
11                 THE COURT:  -- at the request of the Defense.
12                 We're ready.
13                 THE BAILIFF:  All rise.
14                 (Jury returned to courtroom.)
15                 THE COURT:  Please be seated.  Is it 170?
16                 MS. EVANS:  Yes, Your Honor.
17                 THE COURT:  State's Exhibit 170 is admitted.
18                 (State's Exhibit 170 admitted.)
19                 MS. EVANS:  Permission to publish?
20                 THE COURT:  You may.
21                 MS. EVANS:  In Cause Number M02-27021, the
22   Defendant, Matthew Lee Johnson, was convicted of the offense of
23   evading arrest or detention on December 2nd, 2002, and
24   sentenced to 75 days in the Dallas County Jail.
25                 Pass the witness.
```

CROSS-EXAMINATION

BY MS. BERNHARD:

    Q.    Officer Steadman, I mean, did you actually have a reason to arrest Matthew Johnson at the time or were you just detaining him for investigation?

    A.    No, he was under arrest for evading arrest from me when I yelled for him to stop and he fled the scene.

    Q.    Okay.  But why would you have a reason to arrest him?

    A.    Well, originally he was a suspect in a hit and run accident.

    Q.    Okay.  But wouldn't that be --

    A.    Once I tried to contact him and he took off running, that is evading arrest or detention, so he was under arrest for evading arrest and/or detention.

    Q.    But you wanted to talk to him to investigate the potential hit and run?

    A.    Yes, ma'am.

    Q.    And you subsequently learned there was no offense?

    A.    I did not investigate that, so I have zero knowledge about that.

    Q.    Did you prepare or review the report in this case?

    A.    Yes, ma'am.

    Q.    And it says there was no offense, correct?

    A.    I just read the portion of it that has to do with

```
 1   me.  I have no idea.

 2        Q.   Do you recall anything about Matthew Johnson's

 3   appearance or demeanor when you arrested him?

 4        A.   Such as?

 5        Q.   Did he appear to be intoxicated?

 6        A.   I don't believe he was intoxicated at the time.

 7        Q.   Do you have any specific recollection?

 8        A.   Not really.

 9        Q.   So you can't say that he wasn't?

10        A.   I don't know if he was intoxicated or not.

11             MS. BERNHARD:  That's all I have.

12             MS. EVANS:  The State has nothing further of

13   this witness.

14             THE COURT:  Thank you, sir.  You may stand down.

15   You're excused.

16             MS. MOSELEY:  The State calls Officer St. Clair.

17             Is he finally excused?

18             THE COURT:  Any objection to the Officer being

19   finally excused?

20             MS. BERNHARD:  No objection.

21             (Witness brought forward and sworn.)

22             THE WITNESS:  Yes, ma'am.

23             THE COURT:  Please take the witness stand.

24                  MATTHEW ST. CLAIR,

25   was called as a witness by the State, and after having been
```

1   first duly sworn, testified as follows:

2                   DIRECT EXAMINATION

3   BY MS. MOSELEY:

4        Q.   Good afternoon.

5        A.   Good afternoon.

6        Q.   How are you?

7        A.   Good.

8        Q.   I see you -- from your uniform, you work for the

9   Garland Police Department.  Can you state your name and spell

10  your last name for the court reporter?

11       A.   Yes, ma'am.  Matthew L. St. Clair.  Last name is

12  spelled S-t, period, C-l-a-i-r.

13       Q.   How long have you worked for the Garland Police

14  Department?

15       A.   A little over 11 years.

16       Q.   And you have a different color -- I think we call

17  these epaulets; am I right?

18       A.   Yes, ma'am.

19       Q.   Yours is gray.  What does that mean?

20       A.   I'm a neighborhood patrol officer.

21       Q.   Okay.  How long have you been assigned to that

22  division?

23       A.   A little over a year.

24       Q.   And what part of town do you work?

25       A.   The south part of Garland, near LBJ.

```
 1        Q.    Prior to that, were you a patrol officer?

 2        A.    Yes, ma'am.

 3        Q.    And as a -- we already know generally what a patrol

 4   officer does.  When you're working -- back when you were in

 5   patrol, did you work alone or did you have a partner in the car

 6   with you?

 7        A.    I was a one-man unit, alone.

 8        Q.    Were you working on the morning of June 19th, 2004?

 9        A.    Yes, ma'am, I was.

10        Q.    And somewhere around 6:15 that morning, did the

11   Garland Police Department receive a call regarding a car

12   jacking?

13        A.    Yes, ma'am, we did.

14        Q.    And was that at 127 Lake Drive?

15        A.    Yes, ma'am.

16        Q.    What part of town is that in?

17        A.    It's kind of the eastern side of Garland, northeast

18   of Miller -- kind of around Miller and Dairy area.

19        Q.    Miller and Dairy?

20        A.    Yes, ma'am.

21        Q.    Not too far from First Street?

22        A.    No, ma'am.

23        Q.    What was your responsibility as it related to that

24   call?  What did you do?

25        A.    I was dispatched as a backup officer to another
```

1  officer at the time, Officer McClendon.  We were responding to

2  that -- that call.  And then while en route to that, Officer

3  McClendon located the suspect vehicle.

4      Q.   And at this point when you talk about a suspect

5  vehicle, you're talking about the vehicle that was taken from

6  someone?

7      A.   Yes, ma'am.  It was -- yes, ma'am.

8      Q.   The stolen vehicle?

9      A.   Correct.

10     Q.   And you guys had already received a call -- or a

11 description of the vehicle you were looking for, license plate

12 or partial?

13     A.   Yes, ma'am, we were -- we did.

14     Q.   Okay.  Who was the officer you were backing up?

15     A.   Officer McClendon.

16     Q.   And where is Officer McClendon now?

17     A.   I'm not sure.  He's no longer an officer with the

18 police department.  I'm not sure where he's working.

19     Q.   He left the Garland Police Department quite awhile

20 ago?

21     A.   Yes, ma'am, several years.  Yeah, I can't remember

22 how many years.

23     Q.   So you were supposed to be backing him up.  Did you

24 actually see this -- this vehicle that had been taken?

25     A.   Yes, ma'am.  When I got to the area, Officer

1    McClendon at that point had engaged in a vehicle pursuit.  He

2    located the vehicle and tried to attempt a traffic stop, and

3    the vehicle began fleeing from him.  So he was in the midst of

4    a vehicle -- high speed vehicle pursuit through some

5    neighborhoods.

6         Q.    And when there is a high speed vehicle pursuit,

7    what -- what's the responsibility of the officer who is chasing

8    that car?  Are they supposed to be notifying dispatch or how

9    does that work?

10        A.    Yes, ma'am.  They notified dispatch of the

11   direction, suspect description, vehicle description, speeds,

12   reason for stop, that kind of pertinent information.

13        Q.    And how -- what -- what kind of neighborhood was

14   this in?  Was it in a residential neighborhood, commercial?

15        A.    Yes, ma'am, it was a residential area in our city,

16   just -- that entire area over there is just nothing but just

17   regular homes.  Unless you're around Miller, that's where a few

18   businesses are, but there's mainly even homes up and down

19   Miller Road.

20        Q.    So in a high speed pursuit, it's your understanding

21   that Officer McClendon was the first one to spot this vehicle?

22        A.    Yes, ma'am.

23        Q.    Do you remember what kind of vehicle it was that had

24   been taken?

25        A.    It was a pickup truck, a Chevy pickup truck.

```
 1        Q.    At some point did you ever catch up to this chase --
 2   the high speed pursuit?
 3        A.    Yes, ma'am.  As a -- as Officer -- as the pursuit
 4   came onto Dairy Road northbound, I got in behind Officer
 5   McClendon.  They went through an intersection called High
 6   Meadow, and then they -- right after High Meadow, they made an
 7   abrupt right on a street called Glynn.  And I was still
 8   catching up to him.  As a -- as the pursuit went to Glynn --
 9   and then Glynn T's into a street called Curtis, and that's
10   where the vehicle lost control and wrecked out and struck a
11   wall, some parked cars in a driveway, and the corner of a
12   house.
13        Q.    Now, back up just a little bit.  There at High
14   Meadow, is that Dairy and High Meadow?
15        A.    Yes, ma'am.
16        Q.    Is that a traffic controlled intersection?
17        A.    Yes, ma'am, it is.
18        Q.    Is there a red light, a stop sign?
19        A.    There's a stop sign, and there's a red light there.
20        Q.    A flashing red?
21        A.    Yes, ma'am.
22        Q.    And it's a four-way stop?
23        A.    Yes, ma'am.
24        Q.    Do you know -- were you able to tell whether this
25   vehicle stopped at the stop sign?
```

1        A.    No, ma'am, they -- that vehicle -- the suspect in

2   the vehicle did not stop and blew the -- the intersection.

3        Q.    And this is about 6:15 in the morning.  Was there a

4   lot of traffic out yet?

5        A.    It was still light traffic, starting to increase.

6   You know, people starting to get up and go to work early in the

7   morning.

8        Q.    After -- you said -- did you see the truck crash

9   into the wall, and what else did you say?

10       A.    It hit some parked cars in a driveway and also

11  struck the corner of a house -- a home right near there.  It

12  was -- the home was actually on Curtis, but Glynn T's into

13  Curtis so as the vehicle came -- tried to making a turn and

14  struck -- actually went through the driveway, struck cars, and

15  struck the side of the house.

16       Q.    Somebody's house?

17       A.    Yes, ma'am.

18       Q.    Could you tell why that crash happened?

19       A.    Excessive speed and the -- the suspect was unable to

20  negotiate the turn -- was trying to turn -- was unable to

21  negotiate the turn.

22       Q.    And trying to turn onto Curtis?

23       A.    Yes, ma'am.

24       Q.    Once you saw the -- the truck crash, did you see

25  anybody in the truck come out or what happened after that?

```
 1          A.    Yes, ma'am.  The individual sitting to my left

 2   exited the vehicle and began fleeing on foot in between the

 3   houses toward what I would call the east alleyway of Curtis.

 4          Q.    And you said the individual to your left.  You're

 5   talking about the Defendant in the courtroom today?

 6          A.    Yes, ma'am.

 7          Q.    You recognize him from this offense back in 2004?

 8          A.    Yes, ma'am.

 9          Q.    Would you identify him by something he's wearing

10   today?

11          A.    Yes, ma'am.  He's wearing a black suit, black tie,

12   and like a light gray or white shirt with eyeglasses.

13                MS. MOSELEY:  May the record reflect that the

14   witness has identified the Defendant?

15                THE COURT:  The record will reflect.

16          Q.    (BY MS. MOSELEY)  So he actually jumped out and you

17   said ran through between houses back in -- toward the alley of

18   Curtis?

19          A.    Yes, ma'am.

20          Q.    What did you do?

21          A.    Officer McClendon, he was the first officer.  He

22   bailed out and began chasing him on foot.  I could see -- by

23   the time I got my vehicle to a stop, I could see that the

24   Defendant had then began fleeing back northbound in the

25   alleyway, so I paralleled along the front of the houses trying
```

1  to get ahead of the individual and -- try to get ahead and cut

2  between the houses.  I got -- I sort of got ahead of him, and I

3  started to cut between houses to cut him off.  I was running

4  through the backyard of a house and ended up stepping in a hole

5  and breaking my ankle.

6      Q.    Could you -- I guess there are homes between you and

7  the Defendant as he's running, but you're running in the same

8  direction?

9      A.    Yes, ma'am.

10      Q.    So you're occasionally able to glimpse where he's

11  at, and you're trying to get ahead of him so you can cut him

12  off?

13      A.    Yes, ma'am.

14      Q.    Could you hear Officer McClendon or were you --

15  either one of you or both of you giving him any commands?

16      A.    I could just hear -- from where I was at, I could

17  just hear him yelling in the alleyway and the -- I remember

18  hearing a no, no, no, or something as I was cutting through the

19  backyard, but I can't -- I couldn't distinguish what it was,

20  because I was just trying to get ahead and cut through.

21  Eventually after I got up out of the back -- after I broke my

22  ankle and tried -- I was still up ahead of -- of the Defendant,

23  and as I tried to get to the alleyway to cut him off, so

24  Officer McClendon was trying to take him into custody.  I

25  jumped over the fence and helped Officer McClendon take him

```
 1   into custody.  And at that point was when I heard the Defendant
 2   starting to say comments to the effect of, you know, just shoot
 3   me, just shoot me, just put a bullet in my head, that effect.
 4        Q.   And was that the exact words he used?
 5        A.   Yes, ma'am, I remember those words.
 6        Q.   Without any profanity?
 7        A.   I don't -- I -- I don't remember the exact -- the
 8   one thing that sticks out in my mind, it's been several years,
 9   I do remember him saying to, put a bullet in my head.  I
10   remember him yelling as I was running down the street, but I
11   couldn't distinguish what all that was.
12        Q.   Did it appear to you from where you were, that he
13   was -- that he and Officer McClendon may have been yelling back
14   and forth at one another?
15        A.   Yes, ma'am.
16        Q.   One -- were -- you said Officer McClendon already
17   had him kind of down on the ground by the time you got there?
18        A.   Yes, ma'am.
19        Q.   Because of the injury you sustained?
20        A.   Yes, ma'am.
21        Q.   Once you got there, were you able to assist Officer
22   McClendon in getting the Defendant in custody?
23        A.   Yes, ma'am.  I helped place him in handcuffs, and
24   then at that point I realized that I couldn't get back up off
25   the ground because my foot was injured.
```

```
 1        Q.    Was the Defendant cooperative in just putting his
 2   hands behind his back and going into custody?
 3        A.    No, ma'am.  We had to use -- it took muscling
 4   techniques from both of us to force his hands behind his back
 5   and get him in cuffs.  I remember that.  And then other
 6   officers began arriving and had to help Officer McClendon
 7   escort him back, and then another officer had to help me get
 8   out to the street for the ambulance.
 9        Q.    And an ambulance actually came for you?
10        A.    Yes, ma'am.
11        Q.    Did you go to the hospital?
12        A.    Yes, ma'am, I went to Baylor Garland Hospital.
13        Q.    And that's where you learned that your ankle was
14   broken?
15        A.    Yes, ma'am.
16        Q.    How long were you off work?
17        A.    I want to say until the end of July, mid-August.  I
18   can't remember exact date, but I remember it was through July.
19        Q.    So, six weeks?
20        A.    Yes, ma'am.
21        Q.    And then -- and then I assume you had to have light
22   duty or something while you were recovering, or did you go --
23        A.    Yes, ma'am.
24        Q.    -- right back?
25        A.    I remember I had some physical therapy kind of
```

174

```
 1  stuff, but I was able to go back, I want to say around August,
 2  sometime in August.  I can't remember exactly.
 3      Q.   I know it's been a long time.  Do you remember what
 4  condition the truck was in?
 5      A.   When I got back out to the street and was waiting
 6  for the ambulance, I remember the truck was pretty badly
 7  damaged from the accident, striking the house and multiple
 8  vehicles in the driveway.
 9      Q.   And obviously, other damage done to those vehicles
10  and the home even?
11      A.   Yes, ma'am.
12      Q.   Did -- and you were taken to the hospital, so you
13  didn't transport the Defendant to jail?
14      A.   No, ma'am.
15      Q.   Were you aware that he was, in fact, charged with
16  robbery and evading arrest for his actions that day?
17      A.   Yes, ma'am, that was my understanding.
18           MS. MOSELEY:  May I approach the witness?
19           THE COURT:  You may.
20      Q.   (BY MS. MOSELEY)  I'm showing you what I've marked
21  as State's Exhibit Number 171.  It's what we call a
22  penitentiary packet or a pen packet for short.  Does this
23  contain a photograph of the Defendant?
24      A.   Yes, ma'am, it does.
25      Q.   And it was taken back on October 29th, 2004?
```

```
 1          A.    Yes, ma'am.

 2          Q.    And inside this penitentiary packet, do you see a

 3   judgement and sentence regarding a robbery offense?

 4          A.    Yes, ma'am.

 5          Q.    Okay.  And it shows he received five years in the

 6   penitentiary and a $1500 fine?

 7          A.    Yes, ma'am, right there it states that.

 8          Q.    And, again, in this same document or packet is a

 9   judgement and conviction for the offense -- a state jail felony

10   offense of evading arrest or detention using a vehicle?

11          A.    Yes, ma'am.  It states one year state jail and a

12   fine of $1500.

13          Q.    And attached also in this document or packet is a

14   true bill of indictment for robbery?

15          A.    Yes, ma'am.

16          Q.    The offense date of June 19th, 2004?

17          A.    Yes, ma'am.

18          Q.    And an indictment for evading arrest or detention,

19   offense, again, occurring on June 19th, 2004?

20          A.    Yes, ma'am, as well.

21                MS. MOSELEY:  I'd offer State's Exhibit 171.

22                (State's Exhibit 171 offered.)

23                MS. BERNHARD:  Judge, we would object to State's

24   Exhibit 171, because of insufficient identifying information.

25                THE COURT:  Overruled.
```

```
 1                    MS. MOSELEY:  Permission to publish the second

 2   page of this document?

 3                    THE COURT:  You may.

 4                    It's admitted.

 5                    (State's Exhibit 171 admitted.)

 6                    MS. MOSELEY:  Thank you.

 7        Q.   (BY MS. MOSELEY)  Is that a picture of the man

 8   sitting right down here?

 9        A.   Yes, ma'am, it is.

10                    MS. MOSELEY:  I'll pass the witness.

11                         CROSS-EXAMINATION

12   BY MS. BERNHARD:

13        Q.   Officer, do you recall when you first encountered

14   Matthew Johnson that night, that he also made statements to the

15   effect of, the crack made me do it?

16        A.   I don't -- I don't remember the -- I don't remember

17   exactly hearing those words.  I believe he might have said that

18   to the other officer, Officer McClendon.

19        Q.   Did you review the report --

20        A.   Yes, I did.

21        Q.   -- prior to your testimony?

22        A.   Yes, ma'am.

23        Q.   And did you notice that in the report?

24        A.   Yes, ma'am, I did.

25        Q.   So you're saying you just don't specifically
```

1  remember hearing him say that?

2      A.   Yes, ma'am, I -- I don't.  To me specifically, I

3  don't.  But like I said, there were several things being said

4  back and forth in the alleyway when I was on the opposite side

5  of the houses.

6      Q.   And when you finally encountered Mr. Johnson, did he

7  appear to be under the influence of something?

8      A.   I -- I know that he was not cooperative.  I don't

9  know -- I wouldn't say that I was with him long enough to make

10 a fair evaluation whether he under the influence or not.

11     Q.   If the offense report said he had a crazed look

12 about him, would you disagree with that?

13     A.   No, ma'am, I would not.

14     Q.   And when you ultimately arrested Mr. Johnson, he

15 didn't have any weapons on him, did he?

16     A.   I don't believe so.  I didn't -- I don't -- I never

17 located any.

18     Q.   He wasn't charged with robbery with a weapon, was

19 he?

20     A.   No, ma'am, I don't believe so.  He was just charged

21 with robbery.

22     Q.   And there's a difference between robbery and

23 aggravated robbery --

24     A.   Correct.

25     Q.   -- is that fair to say?

1        A.    Yes, ma'am.

2        Q.    And aggravated robbery generally involves a deadly

3  weapon?

4        A.    Deadly weapon or serious bodily injury.

5        Q.    But that wasn't what he was charged with in this

6  instance?

7        A.    No, ma'am, robbery.

8              MS. BERNHARD:  I'll pass the witness.

9              MS. MOSELEY:  I have nothing further.

10             THE COURT:  Thank you, sir.  You may stand down,

11  and you are excused.

12             THE WITNESS:  Thank you, Your Honor.

13             MS. MOSELEY:  Is he finally excused?

14             MS. BERNHARD:  No objections.

15             THE COURT:  Yes.

16             THE WITNESS:  Okay.  Thank you.

17             MS. MOSELEY:  Judge, I hate to ask, but I've

18  got -- my next witness is a Spanish speaker, and if I can have

19  just a couple of minutes with the translator and the witness

20  before we bring her in.

21             THE COURT:  All right.  We'll have a 10-minute

22  recess.  It's 1:45.  If you'll be back in the jury room at five

23  till 2:00.

24             (Recess.)

25             THE COURT:  Will the witness raise their right

```
 1  hand, please.
 2                  (Witness sworn.)
 3                  THE WITNESS:  Yes.
 4                  THE COURT:  Please raise your right hand.
 5                  (Translator sworn.)
 6                  TRANSLATOR:  I do.
 7                  THE COURT:  Thank you.  Please state your name
 8  your and license.
 9                  INTERPRETER:  Margarita Birnbaum,
10  B-i-r-n-b-a-u-m, License Number 1581.
11                  THE COURT:  Thank you.
12                  THE BAILIFF:  All rise.
13                  (Jury returned to courtroom.)
14                  THE COURT:  Please be seated.
15                  Please call your next witness.
16                  MS. MOSELEY:  The State calls Digna Salmeron.
17                  THE COURT:  Let the record reflect this witness
18  and the interpreter have been sworn.
19                  THE WITNESS:  Salmeron.
20                  MS. MOSELEY:  Salmeron.
21                      DIGNA SALMERON,
22  was called as a witness by the State, and after having been
23  first duly sworn, testified as follows:
24                  DIRECT EXAMINATION
25  BY MS. MOSELEY:
```

```
 1         Q.    Would You please spell your last name for the

 2    court -- state your full name and spell your last name?

 3                    THE WITNESS:  Oh, I don't know how to write.

 4                    THE COURT:  Ms. Birnbaum, would you mind

 5    standing back a little bit because the jurors can't see the

 6    witness.

 7                    And would you bring that microphone around to

 8    her mouth?  Thank you.

 9         Q.    (BY MS. MOSELEY)  Tell -- tell the jury what your

10    name is.

11         A.    My name is Digna Salmeron.

12         Q.    And is your last name S-a-l-m-e-r-o-n?

13         A.    Yes.

14         Q.    Are you nervous today?

15         A.    Yes.

16         Q.    I want to make sure that you know you have to wait

17    for the Spanish to English or English to Spanish translation

18    before you answer.

19         A.    Okay.

20         Q.    You understand some of what I say?

21         A.    A little.

22         Q.    And I understand a little of what you say, so it's

23    best we let the translator make sure we understand each other

24    completely, okay?

25         A.    Okay.
```

```
1        Q.    How old are you?

2        A.    Fifty-three years.

3        Q.    When did -- when did you come to the United States?

4        A.    The year '86, I think -- '82, I don't remember

5   anymore.

6        Q.    Do you have children?

7        A.    Yes.

8        Q.    How many kids?

9        A.    Four.

10       Q.    Are they boys or girls?

11       A.    Girls.

12       Q.    All four?

13       A.    Yes.

14       Q.    How old are they?

15       A.    I don't remember.

16       Q.    Okay.

17       A.    The youngest is 23 years old.

18       Q.    So they're all grown?

19       A.    Yes.

20       Q.    Do you work?

21       A.    Yes.

22       Q.    How long have you worked at the same job?

23       A.    For 28 years.

24       Q.    At the same place?

25       A.    Yes.
```

         1          Q.    And I'm going to ask you to think back to June the

         2    14th of 2004.  Around 6 o'clock that morning were you at home?

         3          A.    Yes.

         4          Q.    What were you doing?

         5          A.    I was going to work.

         6          Q.    Is that what time you leave to go to work?

         7          A.    Yes.

         8          Q.    And what -- when you were going to leave for work,

         9    were you at your truck?

        10          A.    I was inside of my truck.

        11          Q.    Did you have the door open or closed?

        12          A.    It was partially closed.

        13          Q.    And what were you doing?

        14          A.    I was putting down my purse and my lunch.

        15          Q.    What happened while you were putting your purse and

        16    your lunch in the truck?

        17          A.    I felt that somebody approached me and knocked on

        18    the window of the truck.

        19          Q.    Did you see the person coming?

        20          A.    Yes.

        21          Q.    And what -- was it someone that you knew?

        22          A.    No.

        23          Q.    When the person -- when you saw the person coming,

        24    were they walking near your home?

        25          A.    Since I live at the edge of the street, he was

```
 1   coming like this from here to the wall.

 2        Q.   So you saw him from a distance?

 3        A.   Yes.

 4        Q.   Did he say anything to you when you saw him from

 5   that distance?

 6        A.   No.

 7        Q.   What -- did you pay any attention to him?

 8        A.   No, because it's a street.  No.

 9        Q.   And you said that the next thing you knew, that

10   someone had approached you and had touched you -- tapped you?

11        A.   Yes.

12        Q.   Did -- did the person say something?

13        A.   He said that he needed a phone to call the ambulance

14   because he was sick.

15        Q.   Did you have a telephone?

16        A.   Yes, but at the moment I didn't even remember I had

17   the phone, because I did get scared.

18        Q.   You were -- and what made you afraid?

19        A.   Well, I didn't expect to suddenly see someone, and

20   it was then that he opened the door to the truck.

21        Q.   Were you on the driver's side of the truck?

22        A.   Yes.

23        Q.   And was he on the same side, or did he go to the

24   other side?

25        A.   No, same side.
```

1    Q.   When he asked to use your telephone, did you say

2 anything to him?

3    A.   Yes.  I told him I didn't have a phone, and that I

4 was going to work.

5    Q.   Were your children inside the home?

6    A.   Yes.

7    Q.   And obviously, they were much younger then.  It was

8 10 years ago, almost.

9    A.   Yes.

10    Q.   What were they doing in the house?

11    A.   They were sleeping.

12    Q.   After you told him that you didn't have a phone, you

13 said he opened the door.

14    A.   Yes.

15    Q.   And what did he do then?

16    A.   He didn't tell me anything.  He just went at me.

17    Q.   What do you mean he went at you?

18    A.   Well, I was sitting like that, to the side, and he

19 came over like this, on top of me.

20    Q.   So he was coming into the truck on top of you?

21    A.   Yes.

22    Q.   And what did you do?

23    A.   Well, I was pushing him with my hands.

24    Q.   Were you able to push him off of you?

25    A.   I was pushing him with my hands, and then I was

```
 1  holding him at bay with my knee so he wouldn't come over me.

 2       Q.   Did you feel like he was trying to hurt you?

 3       A.   Not precisely, but -- but I don't know what he

 4  wanted really because he wouldn't tell me what he wanted.

 5       Q.   Was he -- was he pushing or pulling on you or

 6  hitting you or what was --

 7       A.   No, he was only grabbing my hands.

 8       Q.   And what was he doing with your hands?

 9       A.   Well, I just remember that -- well, I don't remember

10  much of that -- I just remember that I was pushing him.

11       Q.   And how long was that -- were you saying anything to

12  him?

13       A.   No, I don't remember.  I was very frightened.

14       Q.   How long was he holding your wrists and you're

15  trying to keep him off?

16       A.   More or less 15 minutes.

17       Q.   You think it was 15 minutes?

18       A.   I think so.

19       Q.   It seemed like a really long time?

20       A.   Yes.

21       Q.   Did you scream?

22       A.   Yes.

23       Q.   Were you screaming a lot?

24       A.   Yes, but nobody could hear me because the windows of

25  the truck were up.
```

```
 1        Q.    How did -- how did this struggle end?

 2        A.    I think that he realized that I had the keys

 3   fastened here on my finger --

 4        Q.    And what did he do?

 5        A.    He took the keys away from me.

 6        Q.    Okay.  And then what?

 7        A.    He grabbed me from here, and he threw me onto the

 8   yard.

 9        Q.    And you mean he pushed you, or you mean he threw

10   you?

11        A.    He got me out.  He threw me.

12        Q.    And where did you land?

13        A.    Off the sidewalk of the parking lot on the yard of

14   my house.

15        Q.    So you landed in the grass?

16        A.    Yes.

17        Q.    And what did he do?

18        A.    He cranked up the car and left.

19        Q.    Did he take your purse with him?

20        A.    Yes, everything that was there.

21        Q.    Did you have any other cars at the house that you

22   could drive?

23        A.    Yes, I think so, my daughter's.

24        Q.    Your daughter had a car?

25        A.    Yes.
```

```
 1        Q.    After he left in your car, he had your keys, yes?

 2        A.    Yes.

 3        Q.    Did he have your house keys?

 4        A.    Everything.

 5        Q.    What did you do?

 6        A.    Well, since my daughters were inside, they could

 7   open the door for me.

 8        Q.    Did you -- were you screaming for them?  Did you

 9   knock on the door?  Did they hear you?

10        A.    No, they woke up because of the tires screeching

11   sound that came from the truck.

12        Q.    And how were you emotionally when your daughters

13   came out?

14        A.    I was crying and crying and really frightened.

15        Q.    Did they call the police for you?

16        A.    Yes.

17        Q.    And did a police officer come?

18        A.    Yes.

19        Q.    Was it an officer who spoke Spanish?

20        A.    No.

21        Q.    Did you -- do you remember speaking to an officer

22   later that morning that did speak Spanish?

23        A.    Yes.

24        Q.    Were you able to give the police a description of

25   your truck?
```

```
 1        A.    Yes, my daughters told him.

 2        Q.    And while the officer was there with you, did you

 3   know that they had found your truck?

 4        A.    He told me they had already found it.

 5        Q.    At some point in that, did you -- did you learn that

 6   your truck had been wrecked?

 7        A.    Yes, when the police officer told me where my truck

 8   was.

 9        Q.    Did you go look at your truck?

10        A.    Yes.

11        Q.    Did you get your purse back?

12        A.    Yes.

13        Q.    What condition was your truck in?

14        A.    Inoperable.

15        Q.    Did you ever get to drive it again?

16        A.    No.

17        Q.    Had you already paid for the truck?

18        A.    Yes.

19        Q.    Did you have to buy a new truck?

20        A.    Yes.

21        Q.    And this afternoon you told me about problems with

22   your insurance after that.  What -- tell -- tell the jury about

23   that.

24        A.    For a long time, every time I had to renew the

25   insurance, that problem would come up.
```

```
 1        Q.   And did you have to pay more for your insurance

 2   after that?

 3        A.   Yes.

 4        Q.   Do you have a lot of money?

 5        A.   No.

 6        Q.   Do you remember the police coming to you that

 7   afternoon and taking pictures of your injuries?

 8        A.   Yes.

 9        Q.   And the red marks on your neck?

10        A.   Yes.

11        Q.   And your arms?

12        A.   Yes.

13        Q.   Did -- back in 2004 when this happened, did you live

14   on the east side of Garland?

15        A.   Yes.

16        Q.   Near Dairy Road and Miller Road?

17        A.   Yes.

18        Q.   Do you -- do you remember what the man looked like

19   who did this?

20        A.   No.

21        Q.   You don't remember -- what -- what do you remember

22   about him?

23        A.   I just remember he was a big and strong man.

24        Q.   Was he white, black, Hispanic?

25        A.   He was a black man.
```

```
 1       Q.    Had you ever seen him before?

 2       A.    No.

 3       Q.    Do you remember what he smelled like?

 4       A.    Well, he looked like -- I felt that he was drunk.

 5       Q.    Before this happened, were you afraid of strangers?

 6       A.    No.

 7       Q.    What about after?  How did this affect you?

 8             MS. MULDER:  Objection, Your Honor, extraneous.

 9  Impact evidence.

10             COURT REPORTER:  I'm sorry, Judge, I didn't

11  hear.

12             THE COURT:  Overruled.

13       A.    Yes.

14       Q.    (BY MS. MOSELEY)  It affected you?

15       A.    Yes.

16       Q.    Do you remember what day of the week this was?

17       A.    On a Saturday.

18       Q.    You were going to work at 6 o'clock on Saturday

19  morning?

20       A.    Yes.

21       Q.    Do you always work Saturdays?

22       A.    No, it was a coincidence.

23             MS. MOSELEY:  I'll pass the witness.

24                    CROSS-EXAMINATION

25  BY MS. MULDER:
```

1       Q.    Good afternoon, Ms. Salmeron.

2       A.    Good afternoon.

3       Q.    My name is Nancy Mulder, and I just have some

4  questions for you.  If at any time you don't understand me,

5  just let me know and I can rephrase them.

6       A.    Okay.

7       Q.    Ma'am, you do speak some English?

8       A.    No.

9       Q.    You said before in your testimony that the man had

10  told you he needed to call an ambulance because he was sick?

11       A.    Yes.

12       Q.    Did the man say that in English or Spanish?

13       A.    I do understand that word "sick" and "ambulance."

14       Q.    So you do understand some English?

15       A.    Well, that's what I understood.

16       Q.    So the man at first knocked on your car window?

17       A.    Yes.

18       Q.    And then after that is when he opened the door and

19  came at you?

20       A.    He opened the door and threw himself on me.

21       Q.    What kind of truck was it?

22       A.    A Chevrolet.

23       Q.    Do you recall what year it was?

24       A.    It was an '80 model -- '86, it seems like.

25       Q.    When the police got to your house, did your

192

```
 1  daughters translate for you?

 2       A.    Yes.

 3       Q.    Why did you think the man was drunk?

 4       A.    Because he smelled of alcohol.

 5       Q.    It was a strong odor?

 6       A.    Yes.

 7       Q.    Did he have a body odor?

 8       A.    His bad breath.

 9       Q.    Did you see his face?

10       A.    No, because it was still dark.

11       Q.    Was the light on when he opened the door of the

12  truck?

13       A.    No.

14       Q.    The truck didn't have a light that comes on when you

15  open the door?

16       A.    I had it turned off, and the thing was is that the

17  windows were very dark.

18       Q.    And, ma'am, at that time you said you don't read or

19  write?

20       A.    Yes, I don't know how to write or read.

21       Q.    You did not have a driver's license at that time?

22       A.    Yes.

23       Q.    How were you able to get a driver's license?

24            MS. MOSELEY:  Judge, I'm sorry, I'm going to

25  have to object to the relevance of that.
```

```
 1                    THE COURT:  Sustained.

 2        Q.   (BY MS. MULDER)  I know you stated he was big and

 3   strong, but he didn't have a weapon?

 4        A.   No, I didn't see a weapon on him.

 5        Q.   He didn't threaten you with a weapon?

 6        A.   No.

 7        Q.   You did not have to go to the doctor for your

 8   injuries?

 9        A.   No, but then I had to go because of the nervousness

10   that I had.

11                    MS. MULDER:  Nothing further, Your Honor.

12                    Thank you.

13                    MS. MOSELEY:  I have nothing further.

14                    THE COURT:  Thank you, ma'am.  You are excused.

15                    MS. MOSELEY:  May she be finally excused?

16                    THE COURT:  Yes.

17                    MS. MULDER:  No objection.

18                    THE COURT:  Thank you, Ms. Birnbaum.

19                    THE TRANSLATOR:  You're welcome, Judge.

20                    MS. MOSELEY:  The State calls Officer Barineau.

21                    (Witness brought forward and sworn.)

22                    THE COURT:  Thank you.  Please take the stand.

23                         PEDRO BARINEAU,

24   was called as a witness by the State, and after having been

25   first duly sworn, testified as follows:
```

194

DIRECT EXAMINATION

1

2  BY MS. MOSELEY:

3       Q.    Good afternoon.

4       A.    Good afternoon.

5       Q.    How are you?

6       A.    Doing well.  Thank you.

7       Q.    Would you please introduce yourself to the members

8  of the jury?

9       A.    Yes.  My name is Officer Barineau.  I'm with the

10  Garland Police Department.

11       Q.    And spell your last name for the court reporter.

12       A.    B, as in boy, a-r-i-n-e-a-u.

13       Q.    I can already tell you talk really fast.  Maybe it's

14  because I talk slow.  But make sure that you wait for me to

15  finish my question before you answer it, and I'll try to do the

16  same.

17       A.    Yes, ma'am.

18       Q.    Are you -- I'm guessing --

19            THE COURT:  Excuse me, just a second.  Would you

20  state your first name, please?

21            THE WITNESS:  It's Pedro, P-e-d-r-o.

22       Q.    (BY MS. MOSELEY)  And I'm guessing from the color of

23  your epaulets, that you're also a neighborhood patrol officer?

24       A.    Yes, ma'am, that's correct.

25       Q.    What part of town do you work?

195

```
 1        A.    I work District 35, which is east of First Street,

 2   north of Miller, south of Highway 66 to the Rowlett city

 3   borderline.

 4        Q.    Kind of the east part of Garland?

 5        A.    Yes, ma'am.

 6        Q.    And how long have you worked for the Garland Police

 7   Department?

 8        A.    Just over 10 years now.

 9        Q.    How long have you been in the neighborhood -- is it

10   neighborhood patrol?

11        A.    Neighborhood Police Officer Unit.

12        Q.    Neighborhood Police Officer Unit?

13        A.    Yes, ma'am.  I've been in the unit approximately

14   five years now -- just under five years.

15        Q.    In the same part of town?

16        A.    No, I've just been recently reassigned to this area.

17   For four-years, I worked down south, Centerville and LBJ area.

18        Q.    Were you working as a patrol officer back on June

19   19th of 2004?

20        A.    I was.

21        Q.    And I assume you were pretty new on the force back

22   then?

23        A.    Yes, ma'am.  I was just -- just about a one-year

24   officer at that point in time.

25        Q.    Did you respond to a call for assistance regarding a
```

1    car jacking that had occurred over in the area -- the east part

2    of town near Miller and Dairy?

3        A.    Yes, I did respond to that call.

4        Q.    What was your role or your responsibility on that

5    call?

6        A.    My responsibility on that call, I was dispatched to

7    the call, but everything had already occurred.  And I showed up

8    at the latter end.  My responsibility was to contact the victim

9    and to find out what actually happened since I spoke Spanish.

10        Q.    So by the time you got to that -- I guess you had to

11    come from a different part of town, you were headed that way,

12    and by then the suspect had already been arrested?

13        A.    Yes, ma'am, the suspect had already been arrested.

14        Q.    Did you ever see the suspect?

15        A.    No, I did not.  Never saw the suspect.

16        Q.    So your responsibility then was to talk with Ms.

17    Salmeron because you speak Spanish?

18        A.    Yes, ma'am, this is correct.

19        Q.    And did you go to her home?

20        A.    Yes, I went to her home.

21        Q.    Can you describe for the members of the jury how

22    she -- what was her emotional condition at the time you talked

23    to her?

24        A.    When I responded there, she had just been robbed of

25    her vehicle, so she was very shaken up.  She had red markings

1  on her face and red markings on her neck.

2      Q.    And did you notify forensics that they needed to

3  come and take some photographs of her injuries at some point in

4  this investigation?

5      A.    I believe so, yes, ma'am.

6      Q.    Did you -- I guess first thing is was she able to

7  tell you what had happened to her?

8      A.    Yes.  Yeah, I was able to communicate with her, and

9  she was able to explain to me the circumstances that arose.

10      Q.    And when you saw the injuries on her, were those

11  injuries consistent with what she told you that this suspect

12  had done to her?

13      A.    Yes, ma'am.

14      Q.    Did you take her to where her truck had been wrecked

15  out?

16      A.    Yes, I transported her to her vehicle where the

17  accident scene of her vehicle ended up -- I believe it was a

18  house -- was located at.

19      Q.    And do you remember that truck having to be removed

20  from that wreck scene by a tow truck?

21      A.    Yes, it was not drivable, so a tow truck had to

22  remove the vehicle.

23      Q.    And you said you never saw the suspect at all?

24      A.    No, ma'am, I never saw the suspect.

25              MS. MOSELEY:  I'll pass the witness.

```
 1                    MS. BERNHARD:  No questions.

 2                    THE COURT:  Thank you, sir.  You may stand down,

 3   and you are excused.

 4                    MS. MOSELEY:  And is he finally excused, Your

 5   Honor?

 6                    THE COURT:  Yes, ma'am.

 7                    MS. EVANS:  The State calls Carlton Jenkins.

 8                    (Witness brought forward.)

 9                    THE COURT:  Please raise your right hand, sir.

10                    (Witness sworn.)

11                    THE WITNESS:  Yes, ma'am.

12                    THE COURT:  Thank you.

13                         CARLTON JENKINS,

14   was called as a witness by the State, and after having been

15   first duly sworn, testified as follows:

16                       DIRECT EXAMINATION

17   BY MS. EVANS:

18        Q.    If you would state your name, please.

19        A.    Carlton Richard Jenkins.

20        Q.    And, Mr. Jenkins, I told you we were going to get

21   some housekeeping matters out of the way first off, right?

22        A.    Yes, ma'am.

23        Q.    You are one and the same Carlton Jenkins that was

24   convicted of burglary of a habitation back January 3rd, 1989,

25   first given probation -- well, May 25th, 1982, you were
```

1  convicted and sentenced to probation, and then that probation

2  was later revoked on January 3rd, 1989, and you got five years

3  in prison for that burglary of a habitation?

4      A.    Yes, ma'am.

5      Q.    Is that correct?

6      A.    Yes, ma'am.

7      Q.    And you are also one and the same Carlton Jenkins

8  who was convicted of the offense of indecency with a child by

9  contact, and you were originally placed on probation for that

10  offense November 3rd of 2000, and then that probation was later

11  revoked February 22nd of 2005 and you were sentenced to 10

12  years in prison; is that correct?

13      A.    Yes, ma'am.

14      Q.    Okay.  And so obviously, you've spent some time in

15  prison?

16      A.    Yes, ma'am.

17      Q.    Is that right?  You are -- by my calculations, if

18  you got a sentence of 10 years in 2005, was it?

19      A.    Yes, ma'am.

20      Q.    You are still on parole; is that right?

21      A.    That's correct.

22      Q.    How much time do you have left on your parole?

23      A.    One year.

24      Q.    Okay.  And of that 10-year sentence, how much time

25  did you do in prison?

```
 1        A.    Seven and a half years.

 2        Q.    Now, do you recall the approximate dates of your

 3   incarceration and when you were released?

 4        A.    I was -- well, I went to TDC in 2005, and I was

 5   released in 2000 -- March of 2012.

 6        Q.    And I would imagine or guess that during your time

 7   in prison you spent time at a number of facilities; is that

 8   right?

 9        A.    That's correct.

10        Q.    I'm going to direct your attention to an inmate by

11   the name of Matthew Lee Johnson.  Is that a familiar person to

12   you?

13        A.    Yes, ma'am.

14        Q.    And why is that?

15        A.    I was incarcerated with him on the Rudd Unit.

16        Q.    Okay.  Do you see Matthew Lee Johnson here in the

17   courtroom today?

18        A.    Yes, ma'am, I do.

19        Q.    Could you identify an article of clothing he's

20   wearing in here today?

21        A.    He's wearing a black suit.

22        Q.    And could you be more specific?  I see you nodding

23   or looking over in that direction at counsel table, but is

24   there anything else about him that stands out today in terms of

25   his clothing?
```

1      A.   White shirt.  I think he has a bow tie or a tie.

2      Q.   Okay.  And is he wearing glasses?

3      A.   Yes, ma'am.

4           MS. EVANS:  All right.  Let the record reflect

5  this witness has identified the Defendant in open court.

6           THE COURT:  The record will reflect.

7      Q.   (BY MS. EVANS)  Now, you said that you were

8  incarcerated with him on the Rudd Unit; is that right?

9      A.   That's correct.

10     Q.   Where is the Rudd Unit located?

11     A.   Just a little south of Lubbock, Texas.

12     Q.   What period of time would it have been that you were

13  at the Rudd Unit with him?

14     A.   That would have been like 2005, to the first of

15  2007, roughly.

16     Q.   So during the first period of your incarceration for

17  that offense, that's whenever you were spending time in the

18  Rudd Unit?

19     A.   Yes, ma'am.

20     Q.   When -- do you remember who got to that unit first?

21  Was he already there or you there?

22     A.   Yes, ma'am, he was already present.

23     Q.   Can you describe to us the Rudd Unit and how it's

24  set out, like your living situation?

25     A.   Well, it's a -- it's mainly -- there's three housing

202

1    unit buildings, Building 1, 2, and 3.  When you first get on

2    the unit, usually everybody goes to Building 3, and then you're

3    assigned your jobs and your tasks and all that other stuff.

4         Q.    Okay.  And when you say that there's three different

5    buildings, is this prison facility -- is it like you're housed

6    in dorms or you're housed in cells?  How -- how are the

7    people -- inmates in there?

8         A.    We're housed in dorms.

9         Q.    And by dorms, specifically are you able to wander

10   about the entire dorm facility?

11        A.    Yes, ma'am.

12        Q.    In relation to you, where was this Defendant's

13   sleeping quarters?

14        A.    Right above me.

15        Q.    And so bunk beds?

16        A.    Yes, ma'am.

17        Q.    So this Defendant was in the top bunk there at the

18   Rudd Unit in 2005, and you're there in that bottom bunk?

19        A.    That's correct.

20        Q.    So essentially bunkmates; is that what you would

21   call them?

22        A.    That's correct.

23        Q.    Approximately how many inmates are in that one

24   building in that dorm?

25        A.    I believe there was roughly 60 or 70 of us.

1    Q.    Sixty to 70 inmates all in that one quarters moving

2  about?

3    A.    That's correct.

4    Q.    How long in total were you incarcerated or housed

5  with this Defendant?

6    A.    I would say maybe two months, roughly.

7    Q.    And is the last time you saw this Defendant, would

8  it have been back July 25th, 2005, the incident you're here to

9  tell this jury about today?

10    A.    That's correct.

11    Q.    Last time you saw him or communicated with him?

12    A.    That's correct.

13    Q.    Now, you said there were 60 to 70 inmates in your

14  dorm that you're assigned to, and I guess the same for the

15  other two buildings, each have 60 to 70?

16    A.    Yes, ma'am.

17    Q.    How many guards or correctional officers were in

18  charge of you inmates in the one dorm?

19    A.    Well, I mean, there's usually one in the picket and

20  two roaming for three dorms.

21    Q.    So those three guards are in charge of one dorm or

22  all three at the same time?

23    A.    Well, the one -- the one guard stays in the picket.

24  It's a glass picket.  He stays in.  He works the doors.  And

25  the other two guards, they roam in and out of the three other

```
 1   dorms --

 2        Q.    Okay.

 3        A.    -- in that building.

 4        Q.    So essentially the three guards for approximately

 5   210 inmates total?

 6        A.    Yes, ma'am, roughly.

 7        Q.    Is that right?

 8        A.    Yes, ma'am.

 9        Q.    So I guess it's fair to say that those guards aren't

10   able to control and see everything that's going on in any

11   particular dorm at a given time?

12        A.    That's correct.

13        Q.    What types of offenders were housed there on the

14   Rudd Unit with you guys?

15        A.    All types, burglars, thefts, murderers, rapists,

16   child offenders.

17        Q.    So you got anywhere -- somebody that's a habitual

18   shoplifter that's stealing that's incarcerated in prison, all

19   the way up to murderers?

20        A.    That's correct.

21        Q.    And everywhere in between?

22        A.    Yes, ma'am.

23        Q.    So I guess then you would say that the prison system

24   doesn't classify based on the type of offense, whether it's a

25   non-violent versus a violent offense, you're all in there
```

```
 1   together.  It's based on your behavior inside; is that right?

 2        A.    Yes, ma'am, that's correct.

 3        Q.    What was your relationship like with this Defendant

 4   whenever you first came to the Rudd Unit?

 5        A.    When I first got into the housing unit, we had a

 6   decent relationship.  We communicated, talked.  We were both

 7   from Dallas, so we had some -- we related a little.

 8        Q.    So there were things you could talk about and -- I

 9   mean, fair to say it was pleasant?

10        A.    Yes, ma'am, at first.

11        Q.    Initially.  When you're in prison there in the Rudd

12   Unit, tell the jury about what day-to-day activities you're

13   required to do when you're there in prison.

14        A.    Well, you're supposed to work.  You're assigned a

15   job.  And if you don't have a high school diploma or college

16   education, you're -- you're supposed to go to school to get

17   your education.  And then you go to -- you go to chow, and

18   basically that's it.

19        Q.    And chow would be what?

20        A.    Where you eat food.

21        Q.    And all of you inmates go in there together?

22        A.    Yes, ma'am.  That --

23        Q.    Go ahead.

24        A.    That particular dorm.

25        Q.    Okay.  So not all 210 at the same time, but each
```

```
 1  dorm goes --

 2       A.   Yes, ma'am.

 3       Q.   -- at a given time?  So you said if you do not have

 4  a diploma, you're required to go to school?

 5       A.   That is correct.

 6       Q.   Were you attending school when you were there?

 7       A.   Yes, ma'am.

 8       Q.   Was this Defendant initially attending school while

 9  he was there?

10       A.   Yes, ma'am.

11       Q.   And what happens if you don't choose to do that

12  since it's a requirement?

13       A.   You get a case.

14       Q.   What does it mean to catch a case?

15       A.   You're wrote up for not complying with the rules.

16       Q.   And what about work?  Were you assigned a work?

17       A.   Yes, ma'am.  I was on a field squad or cleanup crew

18  at first.

19       Q.   And so everybody starts out kind of on a lower level

20  job; is that fair to say?

21       A.   That's correct.

22       Q.   And then were you able to then work your way up to a

23  different job by the time you were being released?

24       A.   Yes, ma'am.

25       Q.   What was that?
```

```
 1        A.    I was actually sewing for the Captain in the laundry
 2   and I was -- I was actually doing alterations for all the
 3   guards on the unit, on their uniforms.
 4        Q.    Okay.  So you're sewing their uniforms for them,
 5   some of the top rank?
 6        A.    That's correct.
 7        Q.    All right.  What about this Defendant, where was he
 8   assigned to work?
 9        A.    If I remember correctly, he was on a field squad,
10   and then he stopped going to work.  And then I don't know -- he
11   was confined to the housing unit then.
12        Q.    Okay.  For not going to work?
13        A.    That's correct.
14        Q.    And so I mean, if you're able-bodied, you're
15   required to be working while you're incarcerated?
16        A.    That is correct.
17        Q.    And was there anything physically wrong with him why
18   he couldn't go to work?
19        A.    No, ma'am.
20        Q.    What happens if you don't go to work like you're
21   supposed to?
22        A.    You catch a case.  You get wrote up.
23        Q.    And what happens whenever you're getting wrote up or
24   you're catching a case?
25        A.    Well, you're denied -- you're denied rec, which is
```

1  outside recreation.  You're denied commissary, which is going

2  to the store.  And denied certain activities -- other certain

3  activities.

4      Q.   And I guess, you know, it's probably -- I'm

5  guessing, you tell us.  Is it a progressive thing where the

6  more times you keep not doing what you're supposed to be doing,

7  the more privileges you lose?

8      A.   That's correct.

9      Q.   Okay.  This may be a silly question, but you don't

10 get to keep or you don't get paid for the jobs that you're

11 doing there in prison, right?

12     A.   That is correct.

13     Q.   So how is it that you can go to commissary or the

14 store?  How -- how do you get money for that?

15     A.   Well, actually your family puts money on your -- on

16 your books, which is your inmate account.

17     Q.   And you said that was one of the day-to-day things

18 besides going to work, school, chow, do you sometimes get to go

19 to commissary?

20     A.   That's correct, about once a week.

21     Q.   Once a week, so that's not a daily thing?

22     A.   No, ma'am.

23     Q.   But, again, that's a privilege and you might lose it

24 if you're doing things you're not supposed to be doing --

25     A.   That is correct.

1    Q.    -- fair to say?  You said that initially this

2  Defendant, he was pleasant, y'all were able to talk, you're

3  both from Dallas.  Did this Defendant's attitude change at some

4  point in time?

5    A.    Yes, ma'am, it did.

6    Q.    And tell us about that.  How did it change and what

7  did you notice that caused that change?

8    A.    Well, roughly, couple of weeks after I was in the

9  housing unit, one night late at night one of his friends from

10  Dallas, I guess, came over to him and started talking to him.

11  This is after lights out, after 10 o'clock, and he informed --

12    Q.    Let me stop you just for a second.  Remember, Mr.

13  Jenkins, we talked about you're not going to be able to say

14  what the inmate that came in from Dallas said?

15    A.    Yes, ma'am.

16    Q.    Because that would be hearsay, but this is another

17  inmate from Dallas, came over, and started talking --

18    A.    Yes, ma'am.

19    Q.    -- to this Defendant?

20    A.    Yes, ma'am, that is correct.

21    Q.    After that conversation, what was the Defendant's

22  demeanor like?

23    A.    He was unhappy.  He was visibly mad.

24    Q.    And prior to that conversation taking place, had

25  there been some issues going on whenever he would try to go to

1  commissary?

2      A.   No, ma'am.

3      Q.   Was he able to get things out of commissary?

4      A.   Well, I mean, I never -- I just started noticing

5  after that conversation with that other man, that he -- he

6  would -- he would go to store and then he would make what we

7  call is a dry run.

8      Q.   And so this was after the conversation, I'm sorry.

9  So after the conversation with the guy from Dallas -- was this

10  a new inmate that had just checked into the Rudd Unit?

11      A.   That's correct.

12      Q.   And so after that conversation, that's whenever you

13  noticed the Defendant would go to store and make dry runs?

14      A.   That is correct.

15      Q.   Tell the jury what a dry run is.

16      A.   Dry run is where you go to the commissary and you

17  don't have money -- sufficient money or funds, and then they

18  give you a receipt and they send you back to your housing unit

19  without groceries.

20      Q.   And approximately how many times did you witness

21  this Defendant's attempts to go to store and it not pan out?

22      A.   Several -- four or five.  I mean --

23      Q.   Go ahead.

24      A.   I just -- that I visibly saw.  The rest of the time

25  I was at work or school.

1       Q.    And during the initial time -- or the first time you

2   noticed that your bunkmate or this Defendant made a dry run and

3   wasn't able to buy anything there at the store, what, if

4   anything, did you do?

5       A.    I -- well, he -- he came back and he's actually

6   visibly unhappy.  And I had made store, so I -- I think I gave

7   him four to eight soups, maybe a bag of beans, and then later

8   on that evening we made a spread, and then I shared some food

9   with him.

10      Q.    Okay.  What's a spread?

11      A.    A spread is where one or two other inmates, they

12  combine their food, and you make it in a big bowl and you all

13  eat out of it with like dried flour tortillas or something like

14  that.

15      Q.    And so you see your cellmate, your bunkmate hadn't

16  been able to get things from the store like you had.  You had a

17  wife at the time, right?

18      A.    That is correct.

19      Q.    And she was putting money on your books regularly?

20      A.    That is correct.

21      Q.    So why would you share these items with him?

22      A.    Well, I actually felt a little sorry for him

23  because -- and also he was my bunkmate, so I was trying to be

24  nice.

25      Q.    Did you expect anything in return?

```
 1        A.    No, ma'am.

 2        Q.    Did you ever expect him to pay you back for the

 3  items that you had shared with him?

 4        A.    Absolutely not.

 5        Q.    And so is it kind of a culture or a way you, I

 6  guess, attempt to get along or show respect for each other in

 7  prison, as well?

 8        A.    That is correct.

 9        Q.    Now, you said that there were probably four or five

10  total times that he was making these dry runs.  When you

11  noticed that happening the other times, did you give him some

12  of your items or let him partake in the spreads those times?

13        A.    No, ma'am.

14        Q.    Why not?

15        A.    Because I didn't want it to become a habit.

16        Q.    And is that something that happens in prison where

17  sometimes people go to -- start expecting things from you?

18        A.    Yes, ma'am.

19        Q.    Is that any position that you want to be in as

20  another inmate there trying to do your time?

21        A.    No, ma'am.

22        Q.    Why not?

23        A.    Because it just -- it drives on you.  You have

24  enough on your plate doing time and trying to get along with 60

25  to 80 other people, so you have enough on your plate.
```

1    Q.    And what -- each time or the times that you

2  witnessed this Defendant going to the store -- because y'all go

3  at the same time?  Kind of it's time to go to store, and then

4  you're going about the same time?

5    A.    Yes, ma'am, our dorm.

6    Q.    Okay.  And the other times that you witnessed this

7  Defendant go, you said the first time you felt sorry for him.

8  What was his attitude and demeanor like as each of the times

9  progressed that he was making these dry runs?

10    A.    It got progressively worse.  He was more and more

11  mad, upset.

12    Q.    So much so did you start altering your behavior with

13  regards to going to the store?

14    A.    Yes, ma'am.

15    Q.    What did you do?

16    A.    Well, I would actually -- when I'd go to store, I'd

17  come back and I'd put it in my locker, and then I wouldn't try

18  to have all my groceries out on my bed and stuff.

19    Q.    And is that because of this Defendant's anger that

20  you were discussing?

21    A.    Well, that and also it's -- I didn't want to show

22  off.  It's a show-off thing.  I didn't want to let him know

23  that I had a lot of groceries and that he didn't.

24    Q.    Gotcha.  Nothing to instigate more of a problem or

25  to show off?

1        A.    That's correct.

2        Q.    Was there a time -- you've already talked about his

3   attitude is starting to progressively change.  Did it get worse

4   after another incident or occasion took place one night?

5        A.    Yes, ma'am.

6        Q.    What happened to cause things to even escalate

7   further?

8        A.    Well -- oh, he -- he actually started sitting on the

9   head of my bunk.  We -- when we lay in a bunk, our feet goes on

10  one end and our head goes on the other.  And at the head of the

11  bunk is where we lay our head.  I noticed a lot of times when

12  I'd come back from school or work, that he'd be sitting on the

13  head of my bed and that was a disrespectful to me.

14       Q.    Okay.  Because, obviously, that's where you plan to

15  lay your head at night?

16       A.    That's correct.

17       Q.    And not only did you notice that, but you had other

18  cellmates letting you know that was going on; is that right?

19       A.    That is correct.

20       Q.    Do you -- was there any other occasion where another

21  individual came from the Dallas area besides the one you've

22  talked about and had a conversation with this Defendant?

23       A.    Yes, ma'am.

24       Q.    And, again, without saying what was said by the

25  other guy, the other inmate that came in, what was this

1    Defendant like after the second conversation?

2         A.    Real mad then.

3         Q.    Okay.  This is another dude from back home here in

4    Dallas?

5         A.    Yeah.  Yes, ma'am.  He had backed up the first guy's

6    story.

7         Q.    Can you describe for us how his attitude changed or

8    how his day-to-day routine changed after the dry runs and after

9    the two conversations with guys from back here in Dallas?

10        A.    Well, he'd -- he was short with the guards.  He was

11   short with other inmates.  He'd sleep most of the day.  And

12   then -- he just had a real bad attitude all day.  I mean, from

13   when I got home from work and school.  It was just -- his

14   demeanor went south.

15        Q.    And if he's sleeping most of the day, isn't that

16   during the hours he's supposed to be going to school and work?

17        A.    Yes, ma'am.

18        Q.    You said before that at some point in time he quit

19   work; is that right?

20        A.    Yes, ma'am.

21        Q.    Was this the period of time you're referring to that

22   he quit going to work?

23        A.    Yes, ma'am.

24        Q.    And what about school?  Was he still attending

25   school?

1      A.    No, he quit school, too.

2      Q.    And so since he wasn't going to school or work, was

3 he written up or did he catch a case?

4      A.    Yes, ma'am.  Well, then he was on confined housing.

5      Q.    What does that mean?

6      A.    Well, he's -- he was denied to go to rec and stuff

7 like that.  All he could do was either go to the chow hall or

8 to the infirmary.

9      Q.    And when you say he's on confined housing and he

10 can't go to rec, he can't even go out in the day room; is that

11 right?

12      A.    That is correct.

13      Q.    And day room, is that the area where people

14 sometimes play games and watch TVs?

15      A.    Yes, ma'am.

16      Q.    What is rec?

17      A.    Well, rec is outside, outdoor activities where you

18 can work a weight set.  You can do basketball, handball, you

19 can walk or run, play horseshoes, stuff like that.

20      Q.    Okay.  So I guess the official language or whatever

21 that he's in trouble for is refusing to obey an order?

22      A.    That is correct.

23      Q.    Is that right?

24      A.    Yes, ma'am.

25      Q.    And inmates are given a handbook as soon as you get

1  to prison from TDCJ, are you not?

2      A.    That's correct.

3      Q.    And it states all the rules and regulations and

4  what's required of you and what's going to happen if you don't

5  comply?

6      A.    That is correct.

7      Q.    And so as a former inmate, you know full well what

8  you've got to do in order to keep your privileges, do you not?

9      A.    Yes -- yes, ma'am.

10     Q.    But he just continued sleeping, not going to work,

11 not going to school.  Was there anything that -- even though he

12 was on restriction in that confinement, would he sometimes

13 break that or bend those rules?

14     A.    Yes, ma'am.

15     Q.    How so?

16     A.    Well, some of the guards in TDC are sort of lax.

17 They'll -- they're just there for their eight hours.  They

18 don't enforce the rules.  And that's when -- some of the guards

19 would work our housing unit, and Mr. Johnson would go out in

20 the day room and watch TV and play dominoes, stuff like that.

21     Q.    So while the rest of the people are at school and

22 work, as required, even though he wasn't doing those things, he

23 would still get to go out, I guess, into the -- that area of

24 the day room and do those things?

25     A.    That's correct.

1       Q.   If it was one of those guards that allow it?

2       A.   Yes, ma'am.

3       Q.   Did his behavior start affecting you and how you

4   were there doing your day-to-day time?

5       A.   Yes, ma'am.

6       Q.   How so?

7       A.   Well, he just -- he was really mad all the time.

8   And I just actually stopped communicating with him.  I --

9   because I didn't want any trouble.  I was there to do my time,

10  with the least grief, and -- and go home and go back to my

11  family.

12      Q.   And what about -- did the Defendant get going on

13  some exercise kick during this time he wasn't going to school

14  or work?

15      A.   Yes, ma'am.

16      Q.   What periods of time of day would he do that?

17      A.   Well, usually he'd sleep until 1:00 or 2:00 in the

18  afternoon.  He'd wake up and he'd start exercising at the end

19  of the bunk.

20      Q.   Okay.

21      A.   And I heard on a couple of occasions he had actually

22  exercised on my bunk.

23      Q.   And so what time of day is this that he's trying to

24  exercise at the end of your bunk?

25      A.   Probably between 3:00 p.m. and -- until the end of

1    the evening, 6:00 or so.  He would work out a couple of hours a

2    day.

3        Q.    And when you say he's exercising, what specifically

4    is he doing on the end of your bunk?

5        A.    Sit-ups.

6        Q.    We talking 20 to 30, or what are we talking about?

7        A.    No, he'd do hundreds.  He would do it for 30

8    minutes, 20 minutes, real hard-core workout.

9        Q.    And why was this disturbing you or your pattern?

10       A.    Because I was dead tired after work and school.  I'd

11   come home and lay down, and all I'd want to do was just fall

12   out and go to sleep and then it -- he'd start working out, and

13   then you'd feel this -- (indicating) -- on the end of my bunk.

14       Q.    For the record, you're tapping on the witness stand?

15       A.    Yes, ma'am.

16       Q.    And so there's thumping going on as you're trying to

17   rest?

18       A.    Yes, ma'am.

19       Q.    Did you ever try to have a talk with the Defendant

20   about this workout schedule?

21       A.    Yes, ma'am.

22       Q.    How did that go?

23       A.    It went bad.

24       Q.    Why do you say that?

25       A.    Well, he just -- he -- he said, look, I'm doing my

```
 1  thing, that's not -- it shouldn't be bothering you, and you
 2  need to move on.
 3       Q.    And did he stop doing that?
 4       A.    Oh, no, no.
 5       Q.    Let's talk about the incident on July 25th, 2005.
 6  What was special or unique about that day other than the
 7  incident that took place?
 8       A.    It was GI day.
 9       Q.    What's that?
10       A.    It's where you -- everybody cleans the dorm.
11  Everybody would do -- it's like a -- you know, where you mop
12  and sweep, wipe down the walls.  They give you some -- little
13  bit of watered-down disinfectant and water and you clean your
14  bunks and the lavatories, showers, day room, wipe everything
15  down.
16       Q.    So when you're saying everybody is cleaning, all the
17  inmates are responsible for cleaning their own living quarters?
18       A.    That's correct.
19       Q.    Are you given a specific job that you're required to
20  do, or do you pick and choose what it is you want to do?
21       A.    You sort of pick and choose.
22       Q.    But everybody better be participating; is that
23  right?
24       A.    Pretty much, yes, ma'am.
25       Q.    Who holds you accountable?
```

```
 1        A.    Well --

 2        Q.    I mean, each other or the guards?

 3        A.    It's the guards.

 4        Q.    What's the purpose of this GI day or cleaning day?

 5        A.    Well, it's to keep the housing unit clean so if we

 6   have a surprise inspection from the ACC, then -- then basically

 7   everything is covered for cleanliness and safety and stuff like

 8   that.

 9        Q.    Okay.  And the ACC is who regulates the prisons'

10   cleaning?

11        A.    That is correct.

12        Q.    What area did you clean on that day?

13        A.    I cleaned the lavatory-toilet area and shower area.

14        Q.    And was there any specific reason why you chose that

15   rather than the area around your bunk?

16        A.    Well, because -- it was just a tougher job, and I

17   thought, you know, I wouldn't -- I wouldn't be given any

18   problem for not holding my own, and that's why I picked that

19   area.

20        Q.    So you're cleaning the lavatory and the toilets and

21   so you said that you figured you wouldn't be given any grief

22   for holding your own.  You basically want to show the other

23   inmates that you're pulling your weight?

24        A.    That's correct.

25        Q.    Is that what you were doing?
```

222

```
 1        A.    Yes, ma'am.

 2        Q.    Is that a job that a lot of people -- or a lot of

 3   the inmates are jumping up wanting to do?

 4        A.    That's correct.

 5        Q.    They're not, right?

 6        A.    No.

 7        Q.    Did you see what area this Defendant was cleaning

 8   that day?

 9        A.    Well, he cleaned around our bunk area a little bit,

10   and then I saw him cleaning a couple of other areas, but I

11   didn't really pay too much attention to him.

12        Q.    Now, after the cleaning was over, did you notice

13   this Defendant that was doing something that you had already

14   said was disrespectful to you?

15        A.    He was sitting on my bunk.

16        Q.    At the head?

17        A.    Yes, ma'am.

18        Q.    Of your bunk?

19        A.    Yes, ma'am.

20        Q.    That's where you lay your head at night?

21        A.    That's correct.

22        Q.    Where were you whenever you saw that?

23        A.    I was in the day room.

24        Q.    And once you saw this, did you go to have another

25   discussion with this Defendant?
```

```
 1        A.    Yes.  I walked up to him and I said, look, we need

 2   to talk because you're disrespecting me and I want it to stop.

 3        Q.    And at this period of time, you had started ignoring

 4   him; is that right?  You told the jury before that his attitude

 5   was just so bad that you didn't want to have anything to do

 6   with him?

 7        A.    Yes, ma'am.

 8        Q.    But at this point you feel like you have to talk to

 9   him?

10        A.    Yes, ma'am.

11        Q.    Why -- did you say where you were going to have this

12   conversation?

13        A.    In the back of the dorm.

14        Q.    Why would you go to the back of the dorm?

15        A.    Well, we didn't want to raise a ruckus in case the

16   guards looked in, and also we were waiting for inspection so we

17   could come off of GI.

18        Q.    So do both of the two of you go to the back of the

19   dorm?

20        A.    That is correct.

21        Q.    And once you get to the back of the dorm, tell the

22   jury how that goes.

23        A.    He assaulted me.  He swung on me.

24        Q.    Okay.  When you say he swung on you, with his fists,

25   I assume?
```

```
 1        A.    That's correct.

 2        Q.    And he didn't have any sort of object or anything

 3  like that --

 4        A.    No, ma'am.

 5        Q.    -- that sometimes we hear about in prison?

 6        A.    No, ma'am.

 7        Q.    Where on your body did he swing at you?

 8        A.    He hit me in the head.

 9        Q.    Once he hit you in the head, did you respond back in

10  any way?

11        A.    Yes, ma'am.

12        Q.    Or what did you do?

13        A.    Yes, ma'am.  I -- well, we sort of grabbed each

14  other, and I was standing close to him so he couldn't hit me

15  very hard or get a good swing on me and knock me out.

16        Q.    Because he's quite a bit bigger than you; is that

17  correct?

18        A.    That is correct, yes, ma'am.

19        Q.    And a lot younger?

20        A.    Yes, ma'am.

21        Q.    But -- so once he swings on you the first time, and

22  you said you were trying to stay close to him, I mean, did

23  y'all have kind of a mutual fight at that point back there or

24  how does it proceed?

25        A.    Well, he was -- he's a lot bigger and stronger than
```

```
 1  me, so he -- I knew he was going to get the best of me, so I
 2  was trying to tire him out.  I tried to run him into the bunk,
 3  but it was hard to manipulate him because he's a good sized
 4  guy.  And that's when the guards came in.  I mean, somebody
 5  said the guard is going to come in.  And so we stopped for a
 6  second.  We separated for a minute.  He went to the one side of
 7  the back of the dorm, and I went toward the shower, lavatory
 8  area.  The guard didn't come in, and then that's when he said,
 9  come on, let's -- let's do this again.  It ain't over.  So I
10  went back and then we fought some more.
11       Q.   So he called you back over to finish this?
12       A.   That is correct.
13       Q.   Now, whenever you felt the guard was coming in, I
14  mean, is it against the rules and regulations to be fighting in
15  prison?
16       A.   Yes, ma'am.
17       Q.   And so no matter who starts it, the fact that this
18  Defendant swung on you first, will you also get disciplined if
19  you're engaged in this behavior?
20       A.   Yes, ma'am.
21       Q.   And so as soon as you're notified the guards may be
22  coming in, y'all peel off, but then this Defendant reconvenes
23  and says, let's do this again?
24       A.   That's correct.
25       Q.   Whenever you go back there the second time, what
```

1  happens?

2      A.   Well, we wrestle around.  He swung on me a couple of

3  times, and then that's when he grabbed right below my knees and

4  he flipped me.  And that's when my head went back and hit the

5  wall and then it hit the bottom of the concrete floor.

6      Q.   Is it fair to say you were pretty injured at that

7  time?

8      A.   Yes, ma'am.

9      Q.   So he flipped you right blow the knees, your head

10  hit not only the wall, but then the concrete floor?

11      A.   That's correct.

12      Q.   If you knew that, I guess, engaging in fighting,

13  that you could get disciplined just as well as he would, why --

14  why did you continue to fight him or go back that second time?

15      A.   Well, it's sort of a -- if you don't fight -- if you

16  don't -- if you don't stand up in prison, you're considered

17  weak, so that's why I tried to stand my ground.

18      Q.   So did you feel like you had to defend yourself?

19      A.   Yes, ma'am, I did.

20      Q.   Where are the other inmates while this is going on?

21      A.   They're all watching.

22      Q.   Is it sort of a, I guess, spectator thing,

23  everybody's into it?

24      A.   It's a show.

25      Q.   After you're on the ground from this Defendant

```
 1   picking you up and, I guess, throwing you down --

 2        A.   Yes, ma'am.

 3        Q.   -- essentially, what were your injuries?

 4        A.   Well, I split my head open.

 5        Q.   What did you do right afterwards?  When you say you

 6   split your head open, are we talking about a lot of blood?

 7        A.   Yes, ma'am.

 8        Q.   What do you do?

 9        A.   Well, I got -- I got up.  Someone helped me.  I had

10   had a Mexican friend in there.  He helped me up.  He said, man,

11   you're -- you're in bad shape, and he got me right over to the

12   shower area.

13        Q.   And once you're in the shower area, do you turn the

14   shower on?

15        A.   Yes, ma'am.

16        Q.   Are you dressed like you're supposed to be in the

17   shower?

18        A.   No, ma'am.  I had -- I had -- I had my prison

19   uniform on, pants and shirt.

20        Q.   And what was the purpose of going over to the

21   shower?

22        A.   Well, I was going to try to rinse the blood off

23   because he said I was bleeding pretty bad.  And that's when I

24   reached back and I felt my head and I was -- I was pretty split

25   open.
```

1      Q.    Okay.  Once you felt your head and, I guess,

2  realized the situation, how were you feeling at that time?

3      A.    I was a little mad at myself for having to go

4  through this, because actually at first I thought I could talk

5  with Mr. Johnson about and get this all cleared out.  With

6  communication, I believe we could have worked it out.  It

7  didn't have to come to that, and now I'm hurt.  And now I'm

8  real mad.

9      Q.    Okay.  And physically, not only are you bleeding,

10  but I mean, how were you feeling physically there in the

11  shower?

12      A.    Dizzy.

13      Q.    Losing a lot of blood?

14      A.    Yes, ma'am.  There was blood everywhere.

15      Q.    While you're there in the shower, does it come to

16  somebody's attention that you're injured?

17      A.    Yes, ma'am, a guard.

18      Q.    Go ahead.

19      A.    Well, a guard sees everybody at the back of the

20  dorm.  And when there's a show like that, the day room empties,

21  so when the day room empties, they're -- they're pretty smart.

22  They know something is going down in the back of the dorm.  So

23  a guard came in and he walked up onto me in the shower, and I'm

24  in the shower and I grabbed some soap acting like I'm trying to

25  bathe a little bit.  And he walked up and he said, hey, what

229

```
 1  are you doing in the shower and I -- I didn't really say
 2  anything, because I didn't want him to get closer to me.  But
 3  anyway, that's when he walked up and he looked on the ground
 4  and he saw the blood running into the drain.  Then that's when
 5  he walked up and turned me to the side and he, said you're
 6  coming with me now.
 7       Q.    So he noticed how injured you were once he got
 8  close?
 9       A.    That's correct.
10       Q.    Now, why is it that immediately when something
11  happens like that, do you not go to the guards and say, hey,
12  this is what happened and he did it, or why do the other
13  inmates not go call the guards and say, hey, this guy did this
14  to this guy?
15       A.    It's called snitching.
16       Q.    It's not tolerated either by the inmates, right?
17       A.    That -- that's correct.
18       Q.    Is that why you're pretending to wash off?
19       A.    That's correct.
20       Q.    You were planning to keep quiet --
21       A.    Yes, ma'am.
22       Q.    -- or try to?
23       A.    Yes, ma'am.
24       Q.    When the guard noticed the blood on you, did you
25  have to talk about what had happened?
```

```
 1        A.    Yes, ma'am.

 2        Q.    Where did he take you?

 3        A.    He tack -- he took me to the infirmary on the other

 4   side of the unit.

 5        Q.    Now, were they able to treat you there in the

 6   infirmary?

 7        A.    No, ma'am.

 8        Q.    Why?

 9        A.    It was too bad.

10        Q.    When you say too bad, did they have to transfer you

11   to an entirely different facility to get the treatment you

12   needed?

13        A.    Yes, ma'am.  They had to transfer me about 15 miles

14   north to the Montford Unit.

15        Q.    And so while you're there in the infirmary, did you

16   see where they took the Defendant to?

17        A.    They took him to seg.

18        Q.    What is that?

19        A.    Solitary.

20        Q.    Solitary confinement?

21        A.    Yes, ma'am.

22        Q.    So he just went somewhere by -- in a cell by

23   himself?

24        A.    That's correct.

25        Q.    How did you see that?
```

```
 1       A.   Well, I saw -- I was -- there's windows in the -- in

 2  the infirmary that look out toward the inside toward Building

 3  3, and I saw them escort him right over to the seg department.

 4       Q.   Is that the last time you saw him?

 5       A.   That's correct.

 6       Q.   Now, when you got transferred over to that other

 7  facility, what treatment did they give you or what did they

 8  have to do to -- you said your head was split open?

 9       A.   Yes, they had to give me nine staples.

10            MS. EVANS:  May I approach the witness?

11            THE COURT:  You may.

12       Q.   (BY MS. EVANS)  Mr. Jenkins, I'm showing you what's

13  been marked State's Exhibit 172.  Do you recognize that?

14       A.   Yes, ma'am.

15       Q.   Are those photographs of your injuries that were

16  taken there in the infirmary before you headed out to the other

17  place?

18       A.   That's correct.

19       Q.   Do they fairly and accurately represent your

20  injuries other than they're in black and white, so we can't see

21  them that great?

22       A.   Yes, ma'am.

23            MS. EVANS:  The State would offer State's

24  Exhibit Number 172, tendering to the Defense for any

25  objections.
```

```
 1                    (State's Exhibit 172 offered.)

 2                    MS. BERNHARD:  No objections.

 3                    THE COURT:  Admitted.

 4                    (State's Exhibit 172 admitted.)

 5                    MS. EVANS:  Permission to publish?

 6                    THE COURT:  You may.

 7          Q.   (BY MS. EVANS)  So this is -- they're from the Texas

 8   Department of Criminal Justice, right?  And is that you?

 9          A.   Yes, ma'am, that is.

10          Q.   And aside from the injuries to the back of your head

11   that you've described, what's going on there with your face?

12          A.   I'm bruised and -- and I guess I have contusions and

13   stuff in the front because he had hit me multiple times in the

14   face and in the forehead.

15          Q.   We can clearly see on State's Exhibit Number 172

16   that your face is beaten up pretty bad, and this is immediately

17   after the fight, right?

18          A.   Yes, ma'am.

19          Q.   Did you get very many blows in on him?

20          A.   Not really.

21          Q.   Did you ever see him have to come to the infirmary

22   that day?

23          A.   No, ma'am.

24          Q.   For any injuries on him?

25          A.   No, ma'am.
```

1    Q.   And this is of the back of your head, right?

2    A.   Yes, ma'am.

3    Q.   And so once you went over to the other unit that

4  they transferred you to to give you treatment, how did the back

5  of your head look once you got the staples?

6    A.   It looked pretty bad.  They had to shave me all the

7  way around here.  And it was actually a pretty bad split.  It

8  was like an X, so it was hard to repair.

9    Q.   If you take that pen thing, the black stylus that's

10 there.

11   A.   Yes, ma'am.

12   Q.   If you'll draw a circle around the area that you're

13 referring to.

14   A.   (Witness so indicates.)

15   Q.   So that entire area was basically split open?

16   A.   Yes, ma'am.

17   Q.   And you had nine staples?

18   A.   Yes, ma'am.  Actually, I had a -- it was -- I had a

19 cut like that, so they had to put like two staples, two

20 staples, two staples, two staples.  It was a weird cut.  The

21 guy -- the doctor at the Montford Unit, he said he'd never seen

22 anything like that on a head.

23   Q.   That's from hitting the wall and the concrete after

24 this Defendant grabbed you by the knees and slung you down?

25   A.   That's correct.

```
 1        Q.    After you got back from receiving the staples, did
 2   you go back to the Rudd Unit?
 3        A.    Yes, ma'am.
 4        Q.    Did you receive the discipline that we talked about
 5   that happens regardless of who starts the fight and who's
 6   injured worse, that you have to receive when you're engaged in
 7   fighting?
 8        A.    Yes, ma'am.
 9        Q.    What was your punishment?
10        A.    I was put on seven days rec restriction.
11        Q.    Okay.  And were you probably supposed to be recking
12   anyway due that head injury?
13        A.    I'm sorry, what?
14        Q.    Were you supposed to be going outside and lifting
15   weights and doing all that anyway with that head injury?
16        A.    No, ma'am.
17        Q.    Okay.  And so that's the only thing that happened
18   with you is you got seven days rec restriction?
19        A.    Only.  Yes, ma'am.
20        Q.    You said you didn't see the Defendant anymore after
21   this day.  Who moved, you or the Defendant?
22        A.    The Defendant.
23        Q.    So from the time that he went into that solitary
24   confinement or the segregation that you talked about, you
25   didn't see him anymore?
```

1    A.    No, ma'am.

2    Q.    He was moved from -- to a totally different facility

3    within TDCJ?

4    A.    That's correct.

5    Q.    Did you ever have any other fights -- physical

6    fights with other inmates during your entire seven and a half

7    years that you served of your sentence?

8              MS. BERNHARD:  Your Honor, I'm going to object

9    to relevance.

10    A.    No, ma'am.

11              THE COURT:  Sustained.

12              MS. BERNHARD:  Ask that the jury be instructed

13    to disregard that answer.

14              THE COURT:  The jury will disregard.

15              MS. BERNHARD:  Move for a mistrial.

16              THE COURT:  Denied.

17    Q.    (BY MS. EVANS)  Now, you've already talked a little

18    bit about this Defendant's attitude.  When it started changing,

19    you said that he was short with the guards?

20    A.    Yes, ma'am.

21    Q.    Is that right?

22    A.    Yes, ma'am.

23    Q.    What about his relationship with the other inmates?

24    What was his attitude towards the other people in there besides

25    yourself?

```
 1        A.    Short, rough.  Like, well, he -- he became sort of
 2   solitary.  He wasn't -- he didn't talk to too many people
 3   after.  He started having a lot of cases and stuff.
 4        Q.    And was there a specific race of inmates and/or
 5   guards that he really had a particular problem with?
 6        A.    Well, Mexicans and whites.
 7        Q.    And did you see that exhibited in his behavior and
 8   his attitude towards those individuals?
 9        A.    Yes, ma'am.  A little bit, yes.
10              MS. EVANS:  Pass the witness.
11                        CROSS-EXAMINATION
12   BY MS. BERNHARD:
13        Q.    Mr. Jenkins, let's talk a little bit about your life
14   in TDCJ.  You testified that you had been in a dorm there at
15   the Rudd Unit with Mr. Johnson for about two months; is that
16   right?
17        A.    Yes, ma'am.
18        Q.    What's the typical day like for you there?
19        A.    Well, for me?
20        Q.    For you.
21        A.    You wake up at 4:00, you go to eat.
22        Q.    You go to eat with the other people from your dorm?
23        A.    That is correct.
24        Q.    Now, when you go to eat, do you just get to wander
25   on your own to the cafeteria or the chow hall?
```

1       A.    No, ma'am.

2       Q.    Or are you supposed to go in a particular way?

3       A.    Yeah, you go in waves, and you walk in a straight

4  line.

5       Q.    And are the guards watching you as you walk?

6       A.    All the time.

7       Q.    And you have to walk in a single file?

8       A.    Yes.

9       Q.    And, in fact, there are little lines that are drawn

10  through the hallways; is that correct?

11       A.    That is correct.

12       Q.    Yellow lines?

13       A.    Yes, ma'am.

14       Q.    And you have to stay on one side of that little

15  yellow line?

16       A.    Yes, ma'am.

17       Q.    So you get up at 4:00, and you go eat?

18       A.    Yes, ma'am.

19       Q.    With everybody else in the dorm?

20       A.    Yes, ma'am.

21       Q.    And then what?

22       A.    Well, then you come back and you usually get ready

23  to go to work.

24       Q.    And you have told us that you worked.

25       A.    In the -- I was alteration tailor in the laundry.

```
 1         Q.    Okay.  I'm talking about the time when you were in

 2    the unit with Mr. Johnson.  What -- what was your job

 3    assignment then?

 4         A.    Oh, I was in cleanup squad.

 5         Q.    Okay.  Because you had just gotten to TDC at that

 6    time; is that correct?

 7         A.    That is correct.

 8         Q.    Because you were sentenced in February of 2005, and

 9    when did you arrive in TDC?

10         A.    Well, I -- we went to -- I was out of the Middleton

11    Unit for a couple of months or something like that.  That's

12    where they do all your health stuff.  Then I was transferred to

13    the Rudd Unit.

14         Q.    Do you recall approximately when you got to the Rudd

15    Unit?

16         A.    I can't actually physically remember.

17         Q.    But you think you were -- you were there with Mr.

18    Johnson for two months?

19         A.    Roughly, yes, ma'am.

20         Q.    And if this happened in July, so that would have

21    been maybe May when you arrived at the Rudd Unit?

22         A.    Yes, ma'am.

23         Q.    So you get up and you -- at 4 o'clock, you eat in

24    the chow hall, and then you go to work?

25         A.    That's correct.
```

```
 1        Q.    What time do you -- do you have to be at work?

 2        A.    Well, I mean, it's different times.  You have

 3   different shifts.  Sometimes your bosses come pick you up at

 4   different times.

 5        Q.    Do you recall what your shift was during this period

 6   of May to July?

 7        A.    I was on the field squad, but I was never called

 8   out.

 9        Q.    I'm sorry, you were what?

10        A.    I was on the cleanup squad, but I was never

11   actually -- they never took us out.

12        Q.    So you never actually worked?

13        A.    Not on the cleanup squad.

14        Q.    What did you do?

15        A.    Well, I stayed in the unit.  I stayed in the housing

16   unit.  Then I got a job in the laundry.

17        Q.    Okay.  So when you say you stay in the housing unit,

18   you're just there doing your own thing all day?

19        A.    Yes, ma'am.  I would usually go to rec.  Read.

20        Q.    So you weren't working during this two-month period

21   that you knew Mr. Johnson; is that correct?

22        A.    No, ma'am, I didn't work for about a month.

23        Q.    Okay.  Was that in the first part of that two-month

24   period?

25        A.    Yes, ma'am.
```

```
 1        Q.    Okay.  So you didn't work during the first month

 2   that you were in a -- in a dorm with Mr. Johnson; is that

 3   right?

 4        A.    That's correct, but I did go to rec, and I did go to

 5   school.

 6        Q.    What hours would you go to school?

 7        A.    We'd go from -- I believe it was 2:00 to 4:00.

 8        Q.    So you went to school from 2:00 to 4:00 in the

 9   afternoon, and the rest of the time you were just on your own

10   in the rec room?

11        A.    Yes, ma'am.

12        Q.    So after a month of doing nothing, you then start

13   working; is that right?

14        A.    That is correct.

15        Q.    And what were you doing then?

16        A.    Alteration tailor in the laundry.

17        Q.    So you never did actually work on the cleanup squad?

18        A.    No, but I was assigned to it.

19        Q.    When you went to work on the alteration unit,

20   what -- when did you have to be there?  What were your hours?

21        A.    4:00 a.m.

22        Q.    4:00 a.m.  So you don't even get to go to breakfast?

23        A.    No, we went to breakfast from the laundry

24   department.

25        Q.    Okay.  So you wake up at 4:00 a.m. and immediately
```

241

```
 1  go to the laundry department?

 2       A.   That's correct.

 3       Q.   And you have your breakfast from the laundry

 4  department?

 5       A.   Well, we go to the laundry department, then they

 6  called chow, and then all the laundry department walks over to

 7  the chow hall, we eat, we return to work, and we finish out

 8  our -- until we go to lunch.  And then that repeats itself.

 9       Q.   So when would you be done working in the laundry

10  department?

11       A.   Well, when I was going to school, it would -- I'd

12  probably get off about 3:00 -- 2:00, 2:30, 3 o'clock, and then

13  I would go to school because my class went to --

14       Q.   I thought school was 2:00 to 4:00?

15       A.   Well, the earlier classes were, but when I got the

16  job, they shifted me to the later class.

17       Q.   So then you would go to school from 3:00 to 4:00?

18       A.   That's correct.

19       Q.   So during this month, you would be waking up at

20  4:00 a.m. and immediately going to the laundry room?

21       A.   Yes, ma'am.

22       Q.   And not going back to your bunk until -- until after

23  4 o'clock in the afternoon?

24       A.   That's correct.

25       Q.   So you didn't see Mr. Johnson or have any
```

```
 1   interaction with him during that time, did you?

 2        A.   No, ma'am.

 3        Q.   Because you were working?

 4        A.   Yes, ma'am, not --

 5        Q.   And going to school?

 6        A.   Yes, ma'am.

 7        Q.   So you don't know what he was doing, do you?

 8        A.   During that period of time, no.

 9        Q.   So the only time that -- that you were around to see

10   what he was doing is that first month that y'all were bunking

11   together; is that right?

12        A.   Yes, ma'am.

13        Q.   Now, you testified that you thought there were about

14   three guards in charge of all the inmates there at the Rudd

15   Unit?

16        A.   Yes, ma'am.

17        Q.   That's it?

18        A.   Roughly, yes, ma'am.

19        Q.   Describe -- you mentioned a picket.  Can you

20   describe that for the jury?

21        A.   It's like an octagon picket.  It's encircled, and

22   the dorms are off from there.  And the guard stays in that

23   unit -- I mean, in that picket, and it's glass and you can see

24   all individual dorms.

25        Q.   Okay.  So the picket is kind of a central area, and
```

```
 1   the dorms are kind of in a circularish octagon shape around the

 2   picket?

 3        A.    That's correct.

 4        Q.    Now, during the day, in that first month that you

 5   were there with Mr. Johnson on the Rudd Unit --

 6        A.    Yes, ma'am.

 7        Q.    -- what did you do with yourself during the day when

 8   you weren't working?

 9        A.    I went to rec.  I was involved in church activities,

10   and I --

11        Q.    So what were you doing with church activities?

12        A.    Well, I would go to these -- they offered classes

13   where you could go to church and read Bibles and other little

14   type of like AA and NA type classes.

15        Q.    So when did you do that?

16        A.    Well, I did that -- whenever they offered it during

17   the day.  They -- they would -- you know, they would be

18   different parts of the day.  Sometimes during the day -- you

19   could either go during the day or during the evening, depending

20   on your schedule or when they offered the classes.

21        Q.    So you pretty much kept yourself busy during the

22   day; is that correct?

23        A.    That's correct.  Yes, ma'am.

24        Q.    So you wouldn't know what Mr. Johnson was doing

25   during the day while you were busy, would you?
```

244

```
 1        A.    Well, not after the first month.

 2        Q.    Well -- and even during the first month, you said

 3   you were busy going to classes and Bible study and AA and that

 4   kind of thing?

 5        A.    Well, no, I didn't see him all the time, no, ma'am.

 6        Q.    Okay.  So when you were busy, you had no idea what

 7   he was doing?

 8        A.    That's correct.

 9        Q.    And you said that initially the two of y'all got

10   along okay?

11        A.    That's correct.

12        Q.    And that the dispute or the problems began when you

13   shared a spread with Mr. Johnson?

14        A.    No.  When he started sitting on the head of my bed.

15        Q.    There are not any chairs in there for him to sit on,

16   are there?

17        A.    No, ma'am.

18        Q.    Now, you said at some point that Mr. Johnson quit

19   working and quit going to school and would sleep most of the

20   day?

21        A.    That's correct.

22        Q.    What part of the two months was that -- did that

23   happen?

24        A.    The last month I was in that dorm.

25        Q.    The last month you were in the dorm when you were in
```

 1  the laundry at 4:00 a.m. and didn't come back to the cell until

 2  after 4:00 p.m.?

 3       A.   That's correct.

 4       Q.   So how would you possibly know what Mr. Johnson was

 5  doing during the day?

 6       A.   Well, I heard from other inmates.

 7       Q.   So you have no personal knowledge of that at all, do

 8  you?

 9       A.   Well, sometimes I'd be -- I'd go to the dorm and get

10  my bags for commissary.  Sometimes I would have to go back to

11  the dorms, get my lay-ins for the infirmary --

12            COURT REPORTER:  Get me what?

13       A.   Get my lay-ins.  They're little passes that you can

14  go from one side of the unit to the other.

15       Q.   (BY MS. BERNHARD)  So you're saying that for a month

16  that Mr. Johnson didn't work and didn't go to school?

17       A.   Yes, ma'am.  The -- the last month that I was in the

18  housing unit with him.

19       Q.   Now, if you -- if an inmate refuses to go to work or

20  refuses to go to school, they get a disciplinary infraction?

21       A.   That's correct.

22       Q.   Every time that happens?

23       A.   That's correct.

24       Q.   So for every single day that somebody doesn't work,

25  they get a disciplinary infraction?

```
 1        A.    That's correct.

 2        Q.    Would it surprise you to know that Mr. Johnson

 3   didn't have any disciplinary infractions during that time

 4   period for not working or not going to school?

 5        A.    I don't know.

 6        Q.    You testified previously that he caught a case,

 7   didn't you --

 8        A.    Yes.

 9        Q.    -- for not working and not going to school?

10        A.    Yes, ma'am.

11        Q.    But you don't have any personal knowledge of that,

12   do you?

13        A.    No.  He informed me of that.

14        Q.    Just one?

15        A.    I don't know.  I -- I stopped communicating with

16   him.  I would just visibly see him.

17        Q.    Now, this fight that happened in July of 2005, you

18   started that argument, didn't you?

19        A.    No, ma'am.

20        Q.    In fact, you're the one that called him to the back

21   to fight, weren't you?

22        A.    No, ma'am.

23        Q.    Would it surprise you to know that the official

24   reports say that you began the argument?

25        A.    Well, I don't know where the information -- that
```

247

```
 1  came from.  I wanted to communicate with him about the problem
 2  that we had.
 3       Q.   So you -- you wanted to talk to Mr. Johnson at that
 4  point?
 5       A.   Yes, ma'am.  Oh, I wanted to talk to him before
 6  that.
 7       Q.   Okay.  Did you call him to the back to talk?
 8       A.   Several times.
 9       Q.   And you testified that when an inmate calls another
10  inmate to the back, isn't that an invitation to fight?
11       A.   Well, it's either/or.
12       Q.   How is an inmate supposed to know whether you want
13  to talk or you want to fight?
14       A.   Well, I was hoping he would choose to communicate
15  with me.
16       Q.   But you did this in front of other inmates, correct?
17       A.   That's correct.
18       Q.   So everybody hears you call somebody to the back?
19       A.   Well, no, not necessarily.  I was just talking to
20  him.  There was a few around us in the immediate area.
21       Q.   That certainly could have heard?
22       A.   That's correct.
23       Q.   And if you call somebody to the back and somebody
24  doesn't go, you testified that that basically puts you in a bad
25  way with the other inmates in TDC?
```

```
 1        A.    Yes, ma'am.

 2        Q.    That you are then labeled as weak?

 3        A.    That's correct.

 4        Q.    So you asked for Mr. Johnson to come talk to you in

 5   the back; is that right?

 6        A.    No, ma'am.  We both agreed to go into the back.

 7        Q.    Well, who brought it up first?

 8        A.    I wanted to talk to him.

 9        Q.    You wanted to talk to him so you asked him to come

10   to the back where other inmates could hear that, correct?

11        A.    No, actually I wanted for us to communicate

12   privately.

13        Q.    Okay.  But you asked him to come to the back, right?

14        A.    Yes, ma'am.  It was a --

15        Q.    You didn't say, Mr. Johnson, I just want to talk to

16   you.  I don't want to have any kind of physical confrontation,

17   could you come with me, please?

18        A.    No, I said --

19        Q.    That's not what you said?

20        A.    I said, we need to talk about this.  We need to

21   clear the air.

22        Q.    And we need to go to the back?

23        A.    Yes, ma'am.

24        Q.    Now, when you're in TDC, if you talk back to a guard

25   or are flippant with a guard or mouth off to a guard, you get a
```

```
 1   case for that, don't you?
 2        A.   Yes, ma'am, it's called verbally abusing the staff.
 3        Q.   Would it surprise you to know that Mr. Johnson
 4   didn't have any offenses for that?
 5        A.   I don't know.
 6        Q.   Well, you testified that he was short with the
 7   guards, didn't you?
 8        A.   Yes, ma'am.  I don't know if he got wrote up or not.
 9        Q.   So when you say short, what do you mean?
10        A.   Smart-ass.
11        Q.   Isn't that the kind of thing you get wrote --
12   written up for?
13        A.   Yes, ma'am.  But, again, a lot of TDC guards are
14   pretty --
15             MS. BERNHARD:  Your Honor, I'm going to ask that
16   the witness just answer questions.
17             THE WITNESS:  Yes, ma'am.
18             MS. BERNHARD:  Object as nonresponsive.
19        Q.   (BY MS. BERNHARD)  Now, you initially went to TDC, I
20   guess, in May of 2005; is that right?
21        A.   Yes, ma'am.
22        Q.   On a 10-year sentence?
23        A.   Yes, ma'am.
24        Q.   And was that what they call aggravated or 3(g) time?
25        A.   That's correct.  I believe so, yes, ma'am.
```

```
 1        Q.   So you became eligible for parole then after five

 2   years?

 3        A.   That's correct.

 4        Q.   But you didn't make parole for seven and a half

 5   years; is that right?

 6        A.   That's correct.

 7        Q.   And you're still on parole?

 8        A.   That is correct.

 9        Q.   And if you do something or upset the State of Texas,

10   then they could send you back to TDC; is that right?

11        A.   You bet.

12             MS. BERNHARD:  I'll pass the witness.

13             THE COURT:  Anything further?

14             MS. EVANS:  Briefly, Your Honor.

15                      REDIRECT EXAMINATION

16   BY MS. EVANS:

17        Q.   So, Mr. Jenkins, you said that if you do something

18   to upset the State of Texas, you can go back to TDC, in terms

19   of violating your parole, right?

20        A.   That is correct, or, you know, breaking the law.

21        Q.   Gotcha.  Catching a new case?

22        A.   That's correct.

23        Q.   When you are -- you said that you -- when you go to

24   chow and places, that you all have to go in waves and you walk

25   in a straight line.  Y'all aren't handcuffed to go to chow,
```

251

1    right?

2        A.    No, ma'am.

3        Q.    And so your hands, arms, all that's free and you're

4    just walking, and if another inmate decides to haul off and hit

5    another, that can happen because you're not cuffed, right?

6        A.    That's correct.

7        Q.    You're not walking in some kind of chain gang.

8    You're free.  You're just walking in a straight line?

9        A.    Yes, ma'am.

10       Q.    Same goes for when you're going to work, when you're

11   going to rec, when you're going to commissary, you're not

12   handcuffed --

13       A.    No, ma'am.

14       Q.    -- at any point in time that you're walking there

15   around TDC --

16       A.    That's correct.

17       Q.    -- in prison?

18       A.    Yes, ma'am.

19       Q.    And same goes true for the murderers that are in

20   there, the same as the simple drug possessions, felony DWI's,

21   and theft cases, right?

22       A.    Yes, ma'am.

23       Q.    All of those people and everywhere in between are

24   not handcuffed on a daily basis?

25       A.    That's correct.

```
 1        Q.    You -- you were saying that if you're smart, that
 2   you could get a case, right?
 3        A.    Yes, ma'am.
 4        Q.    Are all guards writing people up in prison?
 5        A.    Oh, good Lord, no.
 6        Q.    In fact, they probably would be spending all day
 7   writing if that were the case?
 8        A.    Yes, ma'am.
 9        Q.    And are some guards just there to collect a paycheck
10   really; is that what you mean?
11        A.    Yes.  Yes, ma'am.
12              MS. EVANS:  Pass the witness.
13                       RECROSS-EXAMINATION
14   BY MS. BERNHARD:
15        Q.    Mr. Jenkins, TDC.  When somebody is in TDCJ,
16   you're -- pretty much your every waking moment is controlled by
17   the guards; is that correct?
18        A.    That is correct.
19        Q.    And even though you may not be handcuffed, certainly
20   if an inmate did something like stepped out of line or stepped
21   over that little yellow line, they're going to get a case?
22        A.    Yes, ma'am.
23        Q.    They're going to lose some privilege?
24        A.    Yes, ma'am.
25        Q.    They're going to get some kind of punishment?
```

```
 1        A.    Yes, ma'am.

 2        Q.    And they do a pretty good job of keeping everybody

 3   in line, don't they?

 4        A.    Roughly.

 5        Q.    I mean, considering the population, TDCJ does a

 6   pretty good job of controlling everybody?

 7        A.    Roughly.

 8        Q.    Because certainly if they don't control people, they

 9   have ways of -- of controlling them?

10        A.    Well, yes, ma'am, but there's a lot that goes down.

11              MS. BERNHARD:  I'll pass the witness.

12              THE COURT:  Thank you, sir.  You may stand down.

13              MS. EVANS:  Judge, I have one final question if

14   I may.

15              THE COURT:  One more.

16              MS. EVANS:  Thank you, Your Honor.

17                   FURTHER DIRECT EXAMINATION

18   BY MS. EVANS:

19        Q.    You said there's a lot that goes down.  Are there

20   drugs in prison?

21        A.    Oh, good Lord, yes, ma'am.

22        Q.    So whereas we might think that those are out here on

23   the outside, you've got them right there inside prison walls?

24        A.    You've got everything you want.

25        Q.    As well as weapons that are homemade and brought in?
```

```
 1                    MS. BERNHARD:  Your Honor, I'm going to object
 2    to anything that involves other inmates.
 3                    THE COURT:  Sustained.
 4                    MS. BERNHARD:  Have a specific Motion in Limine
 5    regarding that.
 6                    THE COURT:  Sustained.
 7                    MS. BERNHARD:  Ask the jury be instructed to
 8    disregard.
 9                    THE COURT:  Well, he hasn't said anything.
10                    MS. EVANS:  Your Honor, Defense counsel opened
11    the door to that line of questioning.
12                    THE COURT:  Sustained.  Let's move along.
13                    MS. EVANS:  The State has nothing further of
14    this witness.
15                    THE COURT:  Anything further, Ms. Bernhard?
16                    MS. BERNHARD:  Nothing further.
17                    THE COURT:  Thank you, sir.  You may stand down.
18                    THE WITNESS:  Yes, ma'am.
19                    THE COURT:  Okay.  We're going to take a break.
20    Ladies and gentlemen, it's 3:40.  If you'll be back in the jury
21    room at 3:55, please.
22                    THE BAILIFF:  All rise.
23                    (Jury excused from courtroom.)
24                    THE COURT:  Are you ready?
25                    MS. MULDER:  Yes, ma'am.  Thank you, Judge.
```

```
 1                    THE BAILIFF:  All rise.

 2                    (Jury returned to courtroom.)

 3                    THE COURT:  Please be seated.

 4                    Will the State call its next witness?

 5                    MS. EVANS:  The State calls Ashley Villegas.

 6                    (Witness brought forward.)

 7                    THE COURT:  Ma'am, would you raise your right

 8  hand.

 9                    (Witness sworn.)

10                    THE WITNESS:  Yes.

11                    THE COURT:  Thank you.

12                         ASHLEY VILLEGAS,

13  was called as a witness by the State, and after having been

14  first duly sworn, testified as follows:

15                     DIRECT EXAMINATION

16  BY MS. EVANS:

17       Q.   Would you state your name and spell your last name

18  for the court reporter?

19       A.   It's Ashley Villegas.  Last name is V as in Victor,

20  i-l-l-e-g-a-s.

21       Q.   And, Ms. Villegas, how are you currently employed?

22       A.   I'm a medical assistant and an x-ray tech at a

23  doctor's office.

24       Q.   And how long have you worked there?

25       A.   Almost seven years.
```

```
 1          Q.    Prior to that, were you employed with TDCJ?

 2          A.    Yes.

 3          Q.    What did you do with -- and TDCJ, that's short for

 4    what?

 5          A.    I was a correctional officer.

 6          Q.    Okay.  But TDCJ --

 7          A.    Texas Department of Criminal Justice.

 8          Q.    Okay.  And you were a correctional officer for them?

 9          A.    Yes.

10          Q.    How long did you do that?

11          A.    I was there one year.

12          Q.    And how old were you when you started out as a

13    correctional officer?

14          A.    I was 18.

15          Q.    Why did you decide to go to work as a correctional

16    officer?

17          A.    I had graduated high school.  I wanted to save up

18    money to move to Dallas to go to college, so I worked there to

19    save money.

20          Q.    And you worked there for a year?

21          A.    Yes, ma'am.

22          Q.    Did you have other family members that worked as

23    correctional officers at TDCJ?

24          A.    Yes.

25          Q.    So that's kind of how you knew about it, and you
```

```
 1   could make some extra money and save it up?

 2        A.    Yes.

 3        Q.    Now, during your time working for them, what unit

 4   were you assigned to?

 5        A.    The Price Daniel Unit.

 6        Q.    The Price Daniel Unit?

 7        A.    Yes.

 8        Q.    Where was that located?

 9        A.    In Snyder, Texas.

10        Q.    Where is Snyder, Texas, for those of us that don't

11   know?

12        A.    It's in West Texas between Lubbock and Abilene, if

13   you've heard of those before.

14        Q.    Okay.  And describe what types of offenders were

15   housed there on the unit where you worked.

16        A.    Medium custody offenders and male offenders.

17        Q.    Okay.  And so these are medium custody male only --

18        A.    Yes.

19        Q.    -- facility?

20        A.    Yes.

21        Q.    So you didn't have any female inmates housed there?

22        A.    No, just male.

23        Q.    When you say medium custody, do you classify the

24   inmates like according to what offense they've committed or how

25   is that decided?
```

258

```
 1        A.    Yes, they are.

 2        Q.    By the offense they've committed or the -- or -- I

 3   guess, what types of offenders are there in terms of --

 4        A.    All different kinds.  There's all different kinds of

 5   offenses -- inmates that are in there for different things.

 6        Q.    Okay.  And do you as a correctional officer concern

 7   yourself with what that individual is in for?

 8        A.    No.

 9        Q.    Why not?

10        A.    It's just not something that they tell us what

11   they're in there for, so you treat everyone the same.

12        Q.    Whether they're in there for murder versus whether

13   they're in there for simple drug possession --

14        A.    Yes, ma'am.

15        Q.    -- or petty theft?

16        A.    Yes.

17        Q.    Well, not petty theft, but multiple petty thefts --

18        A.    Yes.

19        Q.    -- right?  So -- and don't -- you as a correctional

20   officer don't decide who's going to be in your unit.  You get

21   who you've got there, right?

22        A.    Yes, ma'am.

23        Q.    That's decided by somebody, what, probably down in

24   Huntsville or Austin?

25        A.    Yes.
```

```
 1        Q.   Is it common or uncommon to have female guards there
 2   in an all male prison?
 3        A.   It's very common.
 4        Q.   So you had other peers there or people you knew,
 5   other females?
 6        A.   Yes.
 7        Q.   What about young females, 18, like yourself?
 8        A.   Yes, there's a lot of them.
 9        Q.   Do you know -- well, how many -- I guess at the time
10   you were working there -- you were there a year -- for that
11   facility that you're talking about, can you describe to us how
12   the housing situation works?  They've heard about dorms.  Were
13   yours dorms or something else?
14        A.   Basically it's a dorm-type setting, and the
15   offenders are in different buildings.  There's three wings in
16   every building, and there's 88 offenders in each wing.
17        Q.   So you've got 88 offenders in each wing?
18        A.   Wing, and there's three wings in a building, so
19   200 -- almost 300.
20        Q.   Total inmates there?
21        A.   Yes.
22        Q.   How many correctional officers were there for all
23   those inmates?
24        A.   Depending on what shift.  The shift that I worked,
25   there was just two.
```

 1      Q.    What shift did you work?

 2      A.    I worked third shift, the night shift.

 3      Q.    So what hours does that mean?

 4      A.    Usually around 9:00 to 5:00 in the morning.

 5      Q.    9:00 p.m.?

 6      A.    9:00 p.m. to 5:00 a.m.

 7      Q.    And there's only two of you?

 8      A.    Yes.

 9      Q.    For the one wing or for the whole thing?

10      A.    For the whole building.

11      Q.    For the whole building.  And so you and one other

12 person are in charge of basically 300 --

13      A.    Or almost 300, yes.

14      Q.    -- inmates?  And so is it fair to say that you're

15 not able to catch and see everything that goes on in there?

16      A.    Yes.

17      Q.    Are the inmates housed in that unit in like bunk bed

18 situation room or are there cells?

19      A.    There are cells, and there's usual usually two

20 inmates to a cell.

21      Q.    So here they're locked in a cell?

22      A.    Yes.

23      Q.    Not like one big room with bunk beds?

24      A.    Well, the shift that I worked on, usually they were

25 already in their cell because they were already asleep --

1       Q.    Okay.

2       A.    -- because it was at night.  During the day, they

3   got to come out and watch TV and do stuff like that.

4       Q.    But this facility, they were closed off in a cell?

5       A.    Yes, they're in a cell.

6       Q.    Not all facilities are like that; is that fair to

7   say?  Some of them are open rooms with bunk beds, or are you

8   aware?

9       A.    I'm not -- I've never been to any other prisons, but

10  I think that is how it is at other places.

11      Q.    Okay.  But you only worked at the one unit?

12      A.    Yes.

13      Q.    So on your shift from 9:00 p.m. to roughly 5:00 a.m.

14  in the morning, can you give us an idea of a typical night at

15  work for you, what you're doing?

16      A.    Basically just making sure that all the inmates are

17  there and accounted for, that no one is doing anything that

18  they're not supposed to, that everyone is breathing and alive

19  and that there's no problems going on.

20      Q.    And how do you go about checking to make sure that

21  all the inmates are accounted for and that everybody is

22  breathing and alive?

23      A.    Every two hours we do what's called count time, and

24  we have to walk around and count all of the inmates.

25      Q.    And so let me direct your attention, Ms. Villegas,

```
 1    to an individual or an inmate by the name of Matthew Lee

 2    Johnson.  Is that name familiar to you?

 3         A.    Yes.

 4         Q.    And do you actually see him here in the courtroom

 5    today?

 6         A.    Yes.

 7         Q.    Could you identify an article of clothing he's

 8    wearing here today?

 9         A.    He has a dark suit on and glasses.

10         Q.    Okay.  When you say a dark suit and glasses, where

11    is he seated in relation to everyone else?

12         A.    To my left.

13         Q.    To your far left --

14         A.    Yes.

15         Q.    -- at the counsel table?

16         A.    Yes.

17              MS. EVANS:  Let the record reflect this witness

18    has identified the Defendant in open court.

19              THE COURT:  The record will reflect.

20         Q.    (BY MS. EVANS)  And so was he an inmate there at the

21    unit where you were working?

22         A.    Yes, ma'am.

23         Q.    And approximately -- or I guess was he there the

24    entire -- housed there the entire time you worked there for the

25    year?
```

1       A.    Yes.  As far as I know, he was.

2       Q.    Now, let me direct your attention to February 14th

3  of 2006.  Were you working as a correctional officer on that

4  day?

5       A.    Yes, ma'am.

6       Q.    And on that day was there an incident involving this

7  Defendant?

8       A.    Yes, ma'am.

9       Q.    Was that -- when did you start working there at that

10  unit?

11       A.    Probably around September or October of the year

12  before, so I had only been there a few months.

13       Q.    Okay.  So at that time you weren't brand new, but --

14       A.    Just a little new, yes.

15       Q.    You hadn't been there that long?

16       A.    No.

17       Q.    And so can you describe what happened on that date

18  with this individual Defendant?

19       A.    Yes.  It was one of my 1 o'clock a.m. count, so I

20  was walking around the cells to count all of the inmates to

21  turn in my count.  The offender lived on 2 Row which was the

22  second level.  So I had finished counting my bottom level and

23  was walking up the stairs to the second row.  As I was walking

24  up the stairs, I noticed the offender standing at his door

25  staring at me.  I kept walking up the stairs and just continued

264

```
 1    my count.  And as I got to his door, that's when I noticed the

 2    offender having one arm up on his door and the other arm on his

 3    penis masturbating and looking at me and smiling like with a

 4    grin, I guess as if he thought it was funny.

 5         Q.    Were you able to see --

 6         A.    Yes, I saw everything.  I saw his hand moving and

 7    everything.

 8         Q.    His pants are down?

 9         A.    Pants are down.

10         Q.    And his penis is visible to you?

11         A.    Yes.

12         Q.    I mean, honestly this is a prison and it's a male

13    prison, stuff like that's going to happen, right?

14         A.    It happens, but it doesn't -- it doesn't happen

15    during count times or they know a time whenever they can do it

16    and when we're not like -- they have their personal time, I

17    guess, you can say.

18         Q.    Time when nobody else would be watching?

19         A.    Yes.  They have plenty of time like that.

20         Q.    What did you feel about or how did it make you feel

21    to see this Defendant standing in that doorway doing that

22    during your count?

23         A.    It made me feel very disrespected.  It made me very

24    upset because I knew he knew that I was coming around to count

25    and he did it to me on purpose.
```

1      Q.    And when you say he did it to you on purpose, you

2  said the inmates know every two hours this is going to happen?

3      A.    And they also have night lights in their cells that

4  we turn on that are on whenever we are walking around to see,

5  to make sure that they're alive and breathing.

6      Q.    Okay.  So the lights come on?

7      A.    Yes.

8      Q.    When you start your count or as you come by?

9      A.    When we start the count.

10      Q.    Okay.  So that's one indication that you're coming

11  around --

12      A.    Yes.

13      Q.    -- lights come on.  You said this is your

14  1 o'clock -- 1:00 a.m. count?

15      A.    Yes, ma'am.

16      Q.    Do you always do it at 1:00 a.m.?

17      A.    Yes, it's always at the same times.

18      Q.    Always at the same time.  Is there another indicator

19  that the Defendant would have known, hey, the correctional

20  officer is coming around now, I better stop what I'm doing?

21      A.    We also have really large doors, so every time when

22  you walk into a wing, you can hear the door open and then you

23  hear it shut and it's very loud.

24      Q.    And here you felt like he was doing it on purpose,

25  and the reason you say that is the expression on his face

```
 1   and --
 2        A.    Yes.
 3        Q.    -- he continued, despite all of those things knowing
 4   you're coming around?
 5        A.    Yes, ma'am.
 6        Q.    Were there other inmates standing at their door
 7   doing the same activity when you came around or --
 8        A.    No, ma'am, just him.
 9        Q.    What did you do in response to seeing the Defendant
10   do this?
11        A.    I wrote a disciplinary report and turned it in to my
12   supervisors.
13        Q.    And what is a disciplinary report?
14        A.    It's just basically a report.  Whenever an inmate
15   does something against the rules, you have to put in detail
16   what happened, and then you turn it in to your supervisor and
17   they review it.  They interview the offender and the officer to
18   see what happened, and then they determine what happens to the
19   offender.
20        Q.    And how do you make sure -- you said there's two
21   people in each cell and you've already identified this
22   Defendant in court today as being the one that was standing
23   right there?
24        A.    Yes.
25        Q.    But are there any other precautions that you do, at
```

1  the time that you're writing up the report, to make sure years

2  later you've gotten the right person?

3      A.    Whenever you write them up, you do ask them for

4  their ID, and we make sure that is the correct inmate and not

5  the other one in the cell.

6      Q.    And when you say their ID, do they have specific --

7      A.    Yes, they have an ID with their picture and their

8  number on it.

9      Q.    Because they're assigned a unique number to them?

10     A.    Yes.

11     Q.    That also has their picture?

12     A.    Yes, it has their picture, too.

13     Q.    And you include that in your report?

14     A.    Yes, ma'am.

15     Q.    Now, after you write him up, you said you give that

16 to rank or higher ups?

17     A.    Yes, ma'am.

18     Q.    Do you decide what discipline he receives or who

19 does?

20     A.    No, the rank does.  The supervisors do.

21     Q.    And so are you aware what, if any, discipline he

22 received --

23     A.    No.

24     Q.    -- for doing this?

25     A.    I'm not aware of any discipline.

1      Q.    Based on your experience there at TDCJ, what sort of

2  thing happens when you're doing this type of activity?

3      A.    They usually just lose privileges, maybe commissary,

4  or visits with family, stuff like that.

5      Q.    Now, if you just happened upon an inmate who was --

6  basically what you've described is he was masturbating, right?

7      A.    Yes, ma'am.

8      Q.    If you walk up on an inmate who is masturbating, do

9  you write everybody who's masturbating?

10     A.    Sometimes if we're just checking the cells and they

11  don't really know that we're walking around, of course, that's

12  their personal time, so, no, we don't write them up because

13  they don't know that we're coming around.  But we do write them

14  up when they do know that we're coming and they do it on

15  purpose.

16     Q.    So what was different about this one, why you wrote

17  him up?

18     A.    Because basically he knew that I was coming around

19  for count time and he still did it regardless, and he smiled at

20  me while he was doing it, I guess -- I guess he thought it was

21  cute.

22     Q.    And I guess he continued doing it as you're making

23  your way up there; fair to say?

24     A.    Yes, exactly.  Yes.

25     Q.    After this happened, did you continue working in the

```
 1   same unit where the Defendant was housed?

 2         A.    Yes, ma'am.

 3         Q.    How did that make you feel?

 4         A.    It made me feel a little uncomfortable, but that's

 5   kind of part of what you have to deal with whenever you work at

 6   a prison.

 7         Q.    And so you still had to maintain contact with him?

 8         A.    I still worked on that building, yes.

 9         Q.    And still go by and do counts --

10         A.    Yes.

11         Q.    -- that would involve this Defendant?

12         A.    Yes.

13         Q.    How much longer did you continue working there then,

14   six, seven months?

15         A.    Yes.

16         Q.    After this incident?

17         A.    After the incident, yes, ma'am.

18         Q.    How did this Defendant react or how did he act

19   towards you once you had written him up?

20         A.    I could tell he was upset.  Whenever I would work on

21   the building, he would kind of look at me with ugly looks on

22   his face.  And he did mouth certain things to me, but I can't

23   remember in detail the little things that he would say.  That

24   would be usually -- mostly the looks.

25         Q.    Okay.  And so you could tell, I guess, his attitude
```

1    towards you changed?

2         A.    Yes, like he had a bad attitude.

3         Q.    And I guess do some inmates that you work with,

4    based on your experience there, after you would write them up,

5    would you gain their respect and they would go about doing

6    their time peacefully?

7                   MS. BERNHARD:  Your Honor, I object to what

8    other inmates do.

9                   THE COURT:  Sustained.

10                  MS. BERNHARD:  Ask for a mistrial.

11                  THE COURT:  Denied.

12        Q.    (BY MS. EVANS)  Well, this Defendant clearly changed

13   his attitude towards you?

14        A.    Usually some do, yes.

15        Q.    Or this time?

16        A.    This one did not.  This one was -- had a bad

17   attitude after I wrote him up, yes.

18        Q.    And not only did he have a bad attitude, but you

19   said that specifically he would mouth things to you?

20        A.    Yes, but I don't remember in detail what he would

21   say.

22        Q.    And you told me before you testified here today that

23   you don't remember the specifics and you wish you would have.

24   Does that mean that you didn't write him up for the smart

25   things that would come out of his mouth?

1      A.    No, I didn't write him up for that.

2      Q.    Is that common or uncommon as a correctional officer

3  not to write up when offenders are mouthing?

4      A.    It's common, because a lot of them do get upset, so

5  I mean, of course, you're not going to write up every single

6  inmate.  So I had already wrote him up, so I knew that's why he

7  was upset with me.

8      Q.    So you just took it?

9      A.    Basically, yes.

10      Q.    Okay.  Aside from his attitude towards you, did this

11  Defendant have a reputation for one that was doing his time

12  peacefully there, or that was more problematic, amongst the

13  other guards?

14      A.    He was kind of known as what's called a high profile

15  inmate so that means that all the officers knew who he was, but

16  not in a good way, because they had also written disciplinary

17  reports on him, too.

18      Q.    Now, if it's -- if people would think -- I guess,

19  just the general public that you're able to control what goes

20  on in prison, you've already said that there's two of you on

21  your night shift, right?

22      A.    Yes, ma'am.

23      Q.    Controlling some 300 inmates.  Is it true that you

24  can control all that's going on?

25      A.    No.

272

```
 1      Q.    In fact, are there drugs in prison?

 2      A.    Yes.

 3      Q.    Are there weapons in prison?

 4      A.    Yes.

 5            MS. BERNHARD:  I'm going to object to behavior

 6  by other inmates.

 7            THE COURT:  Sustained.

 8            MS. BERNHARD:  Ask the jury be instructed to

 9  disregard.

10            THE COURT:  Jury disregard.

11            MS. BERNHARD:  Move for a mistrial.

12            THE COURT:  Denied.

13            MS. EVANS:  Your Honor, again, Defense counsel

14  opened the door by saying what the other witness -- or asking

15  the other witness if they can control everything that goes on

16  in prison.  And she attempted to answer that with somewhat --

17  and so I'm attempting to ask a question of somebody with

18  experience there that knows.

19            THE COURT:  Okay.  You can go into that short

20  line of questioning.

21      Q.    (BY MS. EVANS)  So you said there's drugs there?

22      A.    Yes.

23      Q.    There's weapons there?

24      A.    Yes.

25      Q.    And do you do your best to try to locate those
```

273

 1  items?

 2      A.    Yes.

 3      Q.    And I guess if you're trying to locate those items,

 4  I guess it's fair to say that they exist and you do find them?

 5      A.    Yes.

 6      Q.    So not everything is controlled, in fact?

 7      A.    No.

 8              MS. EVANS:  Pass the witness.

 9                      CROSS-EXAMINATION

10  BY MS. BERNHARD:

11      Q.    Ms. Villegas, what sort of training do you get prior

12  to becoming a guard?

13      A.    You go to school for about six months or so, and

14  they train you.  They teach you physical stuff.  You shoot the

15  guns and do all of that.  And you do book work, too, also.

16      Q.    So they don't just throw you in there?

17      A.    No.

18      Q.    No guidance or no experience or --

19      A.    No, there's a lot of training.

20      Q.    Now, on this occasion on February 14th, at 1:30 in

21  the morning when you say you caught Mr. Johnson masturbating,

22  you told him to stop and he did, didn't he?

23      A.    Yes.

24      Q.    And you say that after that, he had a bad attitude;

25  is that right?

```
 1        A.    Yes, ma'am.

 2        Q.    But you didn't write him up for anything?

 3        A.    No, not for the attitude.  No.

 4        Q.    Did you write him up for anything else?

 5        A.    No.  After that, no.

 6        Q.    Or before that?

 7        A.    No, that was the only time.

 8        Q.    That was the only time you wrote him up?

 9        A.    Yes.

10        Q.    And you testified that other -- that he had a

11 reputation as a high profile inmate among the guards?

12        A.    Yes.

13        Q.    Would it surprise you that he only had four

14 disciplinaries in his entire TDC stay?

15        A.    It is surprising, yes.

16        Q.    You had mentioned previously that -- that inmates

17 weren't classified -- their custody status was not based on

18 their offense.  In fact, you would -- often would not know what

19 kind of offense they had been convicted of?

20        A.    No, we never know what they're in there for.

21        Q.    But their custody status was based on their behavior

22 in TDC; is that correct?

23        A.    I guess so.  I'm not really sure about that.

24        Q.    I mean, they don't just pick it out of thin air, do

25 they?
```

```
 1        A.    I'm not really sure how all that works.

 2              MS. BERNHARD:  I pass the witness.

 3                     REDIRECT EXAMINATION

 4  BY MS. EVANS:

 5        Q.    Ms. Villegas, is it belief -- is it your belief that

 6  you just caught him masturbating on that night, or that it was

 7  purposeful?

 8        A.    He did it on purpose.

 9        Q.    And that was based on what you observed --

10        A.    Yes.

11        Q.    -- the whole thing that night?

12        A.    Yes.

13              MS. EVANS:  Pass the witness.

14              MS. BERNHARD:  Nothing further.

15              THE COURT:  Thank you, ma'am.  You may stand

16  down.

17              Members of the jury, we're going to recess today

18  at 4:13 so you can get home to trick or treat.  We'll see you

19  in the morning at 8:45.

20              THE BAILIFF:  All rise.

21              (Jury excused from courtroom.)

22              THE COURT:  Please be seated.

23              Is there anything for tomorrow that we need to

24  do today?

25              MS. EVANS:  I don't think so.
```

1                    (Recess or proceedings.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      Reporter's Certificate

 2   THE STATE OF TEXAS:

 3   COUNTY OF DALLAS:

 4        I, Darline King LaBar, Official Court Reporter in and for

 5   the 363rd District Court of Dallas County, State of Texas, do

 6   hereby certify that the above and foregoing volume constitutes

 7   a true, complete and correct transcription of all portions of

 8   evidence and other proceedings requested in writing by counsel

 9   for the parties to be included in the Reporter's Record, in the

10   above-styled and numbered cause, all of which occurred in open

11   court or in chambers and were reported by me.

12        I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if any,

14   admitted by the respective parties.

15        WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16   on the 24th day of February, A.D., 2014.

17

18

19
                         \s\Darline LaBar
20                       DARLINE KING LABAR
                         Official Court Reporter
21                       363rd Judicial District Court
                         Dallas County, Texas
22                       hpdkfaith@msn.com
                         (214) 653-5893
23

24
     Certificate No:  1064
25   Expiration Date:  12/31/2014
```