REPORTER'S RECORD

VOLUME 48 OF 57 VOLUMES

TRIAL COURT CAUSE NO. F12-23749-W

COURT OF CRIMINAL APPEALS NUMBER: AP-77,030

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE 363RD JUDICIAL |
| VS. | : | DISTRICT COURT OF |
| MATTHEW LEE JOHNSON | : | DALLAS COUNTY, TEXAS |

**<u>PUNISHMENT PHASE BY JURY</u>**

\* \* \* \* \* \* \* \* \* \*

On the 1st day of November, 2013, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Tracy Holmes, held in Dallas, Dallas County, Texas:

Proceedings reported by machine shorthand computer assisted transcription.

```
 1  A P P E A R A N C E S:

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
          Crowley Criminal Courts Building
 3        133 North Riverfront Boulevard
          Dallas, Dallas County, Texas 75207
 4        Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
          MS. ELAINE EVANS, A.D.A., SBOT # 24032880
 6        MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724
          MS. CHRISTINE WOMBLE, A.D.A., SBOT # 24035991

 7
                  FOR THE STATE OF TEXAS;
 8

 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
          P.O. Box 2817
11        Red Oak, Texas 75154
          Phone:  972-617-5548
12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13        325 North St. Paul Street, Suite 2475
          Dallas, Texas 75201
14        Phone:  214-922-0212

15  MS. NANCY MULDER, Attorney at Law, SBOT # 00792971
          2214 Main Street
16        Dallas, Texas 75201
          Phone:  214-764-7246
17
                  FOR THE DEFENDANT.
18

19

20

21

22

23

24

25
```

```
1              INDEX VOLUME 48

2  November 1st, 2013                        PAGE  VOL.

3  PUNISHMENT PHASE BY JURY:

4  Proceedings......................................... 5   48

5  STATE WITNESSES    DIRECT        CROSS        VD        VOL.

6  MELODYE NELSON     5             13                     48

7  MELODYE NELSON     17, 93        79, 96                 48

8  CARINA PINZON      100           107                    48

9  MARK MENDOZA       109           126                    48

10 JENNIFER PYBURN    133           154                    48

11 DAVID CONTENTE     157, 186      180                    48

12 LISA PARKER        187,208       201, 211               48

13 State rests......................................... 212  48

14 Reporter's Certificate............................. 213  48

15

16          ALPHABETICAL WITNESS INDEX

17                 DIRECT        CROSS        VD        VOL.

18 DAVID CONTENTE     157, 186      180                    48

19 MARK MENDOZA       109           126                    48

20 MELODYE NELSON     5             13                     48

21 MELODYE NELSON     17, 93        79, 96                 48

22 CARINA PINZON      100           107                    48

23 LISA PARKER        187,208       201, 211               48

24 JENNIFER PYBURN    133           154                    48

25
```

## EXHIBIT INDEX

| STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 173 | Kwik Surveillance CD | 176 | 176 | 48 |
| 174 | Kwik Surveillance CD | 176 | 176 | 48 |
| 175 | Photograph | 167 | 167 | 48 |
| 176 | Photograph | 167 | 167 | 48 |
| 177 | Photograph | 167 | 167 | 48 |
| 178 | Photograph | 167 | 167 | 48 |
| 188 | Presby Med Records | 192 | 192 | 48 |
| 189 | Prior Conviction | 116 | 116 | 48 |

```
 1                    P R O C E E D I N G S

 2               THE COURT:  Good morning.

 3               (Witness sworn.)

 4               THE WITNESS:  Yes, ma'am, I do.

 5               THE COURT:  Thank you.

 6               (Outside the presence of the jury, defendant
                  present.)

 7

 8                    MELODYE NELSON,

 9  was called as a witness by the State, and after having been

10  first duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12  BY MS. EVANS:

13       Q.   If you would state your name for the record, please.

14       A.   Melodye Nelson.

15       Q.   Warden Nelson, how are you employed?

16       A.   I'm a warden with the Texas Department of Criminal

17  Justice.

18       Q.   And how long have you worked -- or how long have you

19  been a warden, first?

20       A.   About three years and three months.

21       Q.   And in total, how long have you served in some

22  capacity with the Texas Department of Criminal Justice?

23       A.   I began my career in 1989 as a correctional officer

24  and have just moved forward from there, so about -- almost 25

25  years, 24 years.
```

1  Q. And so in your 24, 25 years working there in the

2 prison system in various capacities and levels, do you have a

3 broad amount of expertise in how inmates are classified and as

4 well as what goes on in the prison system?

5  A. Yes, ma'am.

6  Q. Have you testified before as an expert in cases such

7 as this regarding inmate classification and -- and general

8 prison violence?

9  A. Yes, ma'am, I have.

10  Q. Okay.  Do you have an opinion today or what -- what

11 would be -- be your opinion on how inmates are classified?

12  A. I think our agency has taken a very proactive stance

13 into classifying our offender population that best suits their

14 needs and the needs of our agency based upon safety, security

15 of staff, safety and security of the offender population, as

16 well as safety and security of -- of the general public.

17  Q. And when your -- would your opinion -- or the

18 testimony today discuss levels -- various levels of

19 classification of the offenders?

20  A. Yes, ma'am, I can.

21  Q. And specifically if a defendant is convicted of

22 capital murder, doing life without parole, what level would he

23 be classified as?

24  A. They would be called what is General Population 3 or

25 a G3 -- what's known in our -- our system a G3.

1          Q.    And are you prepared to discuss with the jury where

2     a G3 would be housed, as well as what privileges they have and

3     I guess how they are escorted around campus -- prison campus on

4     a daily basis?

5          A.    Yes, ma'am, I can do that.

6          Q.    And do you also have an opinion or expertise in

7     death row and how housing is done there?

8          A.    Yes, ma'am.  I have three -- a little over three and

9     a half years of experience on the male death row for TDCJ, and

10    I currently serve as the senior warden over the female death

11    row housing right now.

12         Q.    So you would be able to discuss the differences in

13    the general population where a G3 offender would be, contrast

14    that with death row?

15         A.    Oh, yes, I can.

16         Q.    And are you also prepared to discuss the amount of

17    violence that occurs in prison, even though you do your best to

18    try to contain it?

19         A.    Yes, ma'am.

20         Q.    What is your opinion on that?

21         A.    There again, I believe we -- we -- as an agency, as

22    large as we are, violence does occur, unfortunately.  We do

23    have some mechanisms in place to not prevent, but potentially

24    at least preserve some of it, contain some of it, and hopefully

25    prevent as much of it as we potentially can.  That's our goal

 1  every day is -- is to prevent it.  Unfortunately, we're not

 2  always very successful with that sometimes.

 3       Q.    Do you also have an opinion on certain types of

 4  infractions or disciplinary violations that can occur in

 5  prison, whether they be major or minor, and what -- how that

 6  disrupts the prison?

 7       A.    Yes, ma'am, I do.

 8       Q.    Okay.  And do you plan to give that opinion to the

 9  jury?

10       A.    Yes, ma'am.

11       Q.    What is that opinion?

12       A.    Well, we have a -- a very well defined disciplinary

13  process where we can -- all of our disciplinary for the

14  offender population is done on a progressive level.  We try to

15  begin with the least amount of sanctions imposed or -- in

16  disciplinary -- our disciplinary process is set forth to

17  correct offender behavior or to guide offender behavior,

18  hopefully in order to make them understand that this types of

19  behavior have consequences.  Hopefully the consequences will

20  prevent them from repeating this type of behavior, and so we

21  have some minor disciplinary cases which means that that

22  offender may not have had -- I mean, there's variables.  He

23  might have been -- he or she may have only had one or two, and

24  we're going to give him the -- the opportunity to start at that

25  very low level of the sanctions.  There are some disciplinary

1  cases that, regardless of how many they've had, we'll

2  automatically go to a major just to -- just due to their

3  severity or their cost to the agency or whether it be

4  assaultive in nature, things of that nature.

5      Q.    And, Warden Nelson, do you have experience in seeing

6  or knowing that certain records, depending whether it's a major

7  or minor case, may not be kept for years and years on end?

8      A.    That's correct.  Currently we're incarcerating, you

9  know, roughly between 148 to 150,000 offenders.  As they leave,

10  the units send all of our -- all 109 prison units send those

11  records to a centralized clearing warehouse in Huntsville.

12  Those records are maintained for a period of time.

13  Unfortunately, there's just no way to -- to store those

14  forever, so certain portions of their file will be deleted, and

15  certain portions of their file will be put on microfiche to be

16  kept in the event of their return.

17      Q.    And what factors may affect that?

18      A.    Really, I -- I don't do that -- that portion of it,

19  so I -- I really can't tell you.  I know that -- that there are

20  certain things that wouldn't affect their incarceration, should

21  they come back, wouldn't affect their custody, wouldn't affect

22  what has -- what's going to happen in the future for them.  So

23  I would assume that's probably what we try to -- to take care

24  of in that file.

25      Q.    Based on your experience, what about -- do major or

```
 1  minor cases have an impact --

 2       A.    The major cases --

 3       Q.    -- on whether or not we're able to get the records

 4  years later?

 5       A.    Correct, yes.

 6             COURT REPORTER:  One more time.

 7       Q.    (BY MS. EVANS)  On whether or not we're able to get

 8  the records years later.

 9       A.    Major cases would -- should affect an offender's

10  custody or housing or something of that nature, should they

11  come back.  A minor case doesn't.  Minor cases really are not

12  perceived sometimes through our parole process, so we

13  probably -- you know, like I say, we wouldn't keep those minor

14  cases.  Anything that would affect or could adversely affect

15  the agency, whether he had escaped or whether there was

16  assaultive behavior, something of that nature, those

17  disciplinary cases, things of that nature should remain on

18  file.

19       Q.    Are you also prepared to talk about how the

20  correctional officer and inmate relationship or what you

21  instruct your correctional officers on maintaining

22  relationships or not maintaining relationships with inmates

23  could affect the prison security and propensity for violence

24  down the road?

25       A.    Yes, ma'am, I can discuss that.
```

1      Q.    And what is your opinion regarding that?

2      A.    We -- we do five and half weeks of training with our

3  correctional officers when they come on, when they're first

4  hired.  We do another 100 hours of training once they get on to

5  the facility, and we -- the -- the terms that we use are -- are

6  firm, fair, and consistent with the offender population.  They

7  need to maintain a professional relationship, nothing beyond

8  that.  There doesn't need to be a friendship or anything of

9  that nature.  They need to treat all the offenders equally, but

10  be firm and fair in their decisions.  And, you know, anything

11  that becomes beyond that, if there's a friendship or there's

12  some sort of inappropriate relationship, whether it be sexual,

13  whether it be, just, you know, correspondence or having

14  personal conversations, those are violations of agency policy,

15  both for the offender population and the staff.

16      Q.    And why is that a concern?

17      A.    If -- if we allowed them to do that, there could be

18  huge breaches in our security.  The offender population could

19  learn of some of the practices and our policies of how we

20  prevent escapes, how we prevent and what we do in the event of

21  an escape, so there are some things -- some responses that we

22  have.  If that offender and -- if an offender and a staff

23  member become friends, is that staff member going to be able to

24  control that offender or stop that offender from doing an act

25  that is -- that is a risk to someone else's safety and

1    security.

2        Q.    So in other words, some manipulation going on?

3        A.    Manipulation, yes, ma'am.

4        Q.    Do you -- did you also bring with you some -- today

5    some items that you have seized over the years in prison that

6    you think would help illustrate to the jury the types of things

7    that the normal population out here wouldn't think would exist

8    or they wouldn't be able to fashion there in prison?

9        A.    Yes, ma'am.  You know, I think the -- for a general

10   person that has not been in a prison environment, doesn't know

11   anybody in a prison environment, it's hard to fathom that they

12   have weapons.  And, you know, we get a lot of comments and a

13   lot of questions about how do inmates get cell phones, how do

14   inmates get drugs, how do they make weapons.  If they're inside

15   of a prison they shouldn't have those capabilities, but there

16   are those capabilities, unfortunately.  And so I -- I do have

17   some to -- to provide to show you.  They're made out of some

18   common -- common things.

19       Q.    Do you think that would aid and assist the jury in

20   understanding those types of things that really do go on in

21   prison?

22       A.    Oh, absolutely, yes, ma'am.

23       Q.    And, Warden Nelson, you would also be able to

24   describe the breakdown of your correctional officers that you

25   have, like your correctional officer-to-inmate ratio, as well

1  as what types of guards, male versus female, and the ratio of

2  those that you have housed on death -- or working on death row,

3  as well as throughout the prison system?

4       A.    I can give you some generalized -- those -- those

5  numbers, obviously, fluctuate.  They fluctuate not only daily

6  but they fluctuate unit to unit.  They may even fluctuate

7  between the general population housing and death row housing,

8  but I can give you some general ideas of what our population is

9  and how we staff -- or how each unit attempts to staff their

10 facilities.

11                 MS. EVANS:  Pass the witness.

12                 CROSS-EXAMINATION

13 BY MS. BERNHARD:

14      Q.    Warden Nelson, have you reviewed any records

15 particular to Matthew Johnson?

16      A.    No, ma'am, I don't have any.

17      Q.    Okay.  So you don't know anything about him and his

18 time in TDC?

19      A.    No, ma'am, I do not.

20      Q.    Are those the only opinions -- the ones you've gone

21 through with Ms. Evans, are those the only opinions you're here

22 to testify about here today, as far as you know?

23      A.    As far as I know, yes, ma'am.  I mean, unless she

24 asks me something else.

25      Q.    And have you ever worked at either the Rudd Unit or

```
 1   the Price Daniel Unit?

 2        A.    No, ma'am, I have not.

 3        Q.    How about the Middleton Unit?

 4        A.    No, ma'am, I have not.

 5        Q.    Were you prepared to give us any statistics about

 6   violence in prison?

 7        A.    I don't have specific numbers.  I can give you

 8   generalized, based upon my knowledge that I work in every day

 9   that we're provided as senior wardens and as administrators,

10   some of the direct knowledge that I have of some of the

11   incidents that have occurred should I be asked.

12        Q.    What incidents would you be testifying about if

13   asked?

14        A.    Generalized.  I mean, nothing specific.  I don't --

15   I don't know him, so I don't know -- I can't testify to

16   anything he did or didn't do.  But if you asked me, have

17   inmates in general population assaulted staff, I can -- I can

18   attest to that.  If you asked me things of do we have

19   manipulation where staff bring in contraband and drugs and cell

20   phones and provide weapons and weapon-making material to

21   offenders, I can testify to -- to those.  Whether we have staff

22   -- or offenders who manipulate staff into becoming involved in

23   inappropriate sexual relationships, I can testify to those

24   things.  And like I said, very general because I don't know

25   this man, so --
```

```
 1        Q.   And I'm sorry, I think I probably missed it, but
 2   what unit are you the warden of currently?
 3        A.   I'm the -- I'm the senior warden currently of two
 4   facilities, the Hilltop Unit and the Mountain View Unit, which
 5   is in Gatesville, Texas.
 6                  COURT REPORTER:  One more time, the Hill --
 7                  THE WITNESS:  Hilltop --
 8                  COURT REPORTER:  And the other one?
 9                  THE WITNESS:  -- which is one word, and Mountain
10   View, two words.
11        Q.   (BY MS. BERNHARD)  And what sort of inmates are
12   housed at the Hilltop Unit and the Mountain View Unit?
13        A.   Hilltop has General Population 1, 2, and 3, also
14   houses the youthful offender program for females there --
15   excuse me.  I house at -- Mountain View, I house all five
16   general population levels, General Population 1, 2, 3, 4, and
17   5.  I house administrative segregation offenders.  I house the
18   female death row and also house the female protective custody,
19   so there's not a custody level of the female population that I
20   don't house at the Mountain View Unit.  We house them all.
21        Q.   Is the Mountain View Unit all -- all female?
22        A.   Yes, ma'am, they are.  Both of my facilities are --
23   are currently female.
24        Q.   And the Hilltop Unit is also all female?
25        A.   Yes, ma'am, they are.
```

1              MS. BERNHARD:  That's all I have.

2              MS. JONES:  The State has nothing further.

3              THE COURT:  All right.  Thank you.

4              Are we ready?

5              MS. BERNHARD:  Judge, we would have objections

6  to testimony by Warden Nelson, concerning violence and weapons

7  and -- and things done by other inmates.  We would refer the

8  Court to the Pretrial Motion in Limine that we filed with

9  objections to that evidence, which would be Motion Number 52.

10             And we would further argue that -- that such

11 evidence violates the Eighth Amendment requirement for

12 particularized and individualized sentencing in a death penalty

13 case.

14             MS. EVANS:  Your Honor, if I may respond, the

15 State doesn't plan to go into any specific instances of other

16 inmates.  The warden's testimony will go directly to Special

17 Issue Number 1 in that this jury doesn't have a common

18 knowledge of how prison works and the types of things that go

19 on in prison on a day-to-day basis, and that's the purpose of

20 Warden Nelson's testimony, is to aid and assist the jury in

21 understanding that, since we do have to prove beyond a

22 reasonable doubt that this Defendant will more likely than not

23 commit criminal acts of violence in the future.  It goes

24 directly to show that that is quite possible and the things

25 that -- the opportunity exists for that type of thing to

 1  happen, not specific instances of violence.

 2              MS. BERNHARD:  Well, and, Judge, we would say

 3  that -- that the weapons really are specific instances of

 4  violence.  They have nothing to do with Mr. Johnson, and we

 5  would object specifically to any testimony or showing of

 6  weapons that have nothing to do with Mr. Johnson.

 7              THE COURT:  All right.  Overruled.

 8              Go get the jury, please.

 9              THE BAILIFF:  All rise.

10              (Jury returned to courtroom.)

11              THE COURT:  Please be seated.

12              Will the State call its next witness, please?

13              MS. EVANS:  The State calls Warden Nelson.

14              THE COURT:  Let the record reflect this witness

15  has been sworn.

16                    MELODYE NELSON,

17  was called as a witness by the State, and after having been

18  first duly sworn, testified as follows:

19                    DIRECT EXAMINATION

20  BY MS. EVANS:

21      Q.   If you would state your name for the record, please.

22      A.   Yes, Melodye Nelson.

23      Q.   And how are you employed?

24      A.   I'm a warden with the Texas Department of Criminal

25  Justice.

1    Q.    How long have you been employed with the Texas

2   Department of Criminal Justice?

3    A.    Roughly 24 and a half, working on 25 years.

4    Q.    Can you go ahead and describe for the jury how your

5   career with TDCJ began and how you got to where you are now?

6    A.    Yes, ma'am.  I began my career in 1989 as a

7   correctional officer.  I've worked my way up.  Our system is --

8   is set on a paramilitary so I promoted to sergeant, lieutenant,

9   captain, major, assistant warden, and now the senior warden.

10  I've been on -- counting the two facilities that I'm senior

11  warden of now, eight facilities in various parts of the State

12  of Texas.

13    Q.    When you say that you've been at eight facilities,

14  do they house various types of offender levels?

15    A.    Yes, ma'am.  I've been on maximum security

16  facilities, minimum security facilities.  I've been -- when I

17  was the major, which is considered our chief of security, I was

18  the major over the male death row at the Polunsky Unit,

19  Livingston, and I'm the warden of two facilities now.  One of

20  my facilities is considered -- what would be considered a

21  minimum security facility, and then one of my facilities is a

22  maximum security facility.

23    Q.    Okay.  And so taking us back to -- you said you were

24  a major on the male death row?

25    A.    Yes, ma'am, I was.

1      Q.    Where is male death row located?

2      A.    It's located at the Allan Polunsky Unit in

3 Livingston, Texas.

4      Q.    And how long did you serve as the major on male

5 death row?

6      A.    Roughly three and a half years.

7      Q.    What did your duties consist of while you had

8 experience there?

9      A.    I was the chief of security assigned over the

10 maximum security portion of the facility, which was death row

11 and administrative segregation.  Basically my job every day was

12 the safety and security and well-being of the staff and

13 offenders who were assigned to death row and administrative

14 segregation.

15      Q.    And currently -- you've talked a little bit about

16 the unit that you're assigned to now; what -- what units are

17 you the senior warden over?

18      A.    I'm the senior warden of the Hilltop Unit and the

19 Mountain View Unit located in Gatesville, Texas.

20      Q.    Both of those units are in Gatesville?

21      A.    Yes, ma'am, they are.

22      Q.    How long have you held that position?

23      A.    January will be two years.

24      Q.    Can you describe for us the types of offenders that

25 are housed in each of those units?

1      A.    Yes, ma'am.  The Hilltop Unit I have -- like I say,

2  it's basically what we would consider a minimum custody.  I

3  have general population offenders.  I don't have offenders who

4  are considered disciplinary -- disciplinary problems.  I have a

5  youthful offender program there for the 16, 17, and 18-year-old

6  female offenders in the State of Texas.

7            At the Mountain View Unit, I house all custody

8  levels that the State offers, which are general populations,

9  Levels 1 through 5.  I house administrative segregation, death

10  row for females, and the protective custody for females, as

11  well.

12      Q.    Okay.  And so female death row is housed there at

13  your Mountain View Unit?

14      A.    Yes, ma'am, it is.

15      Q.    And you're the senior warden over that?

16      A.    Yes, ma'am.

17      Q.    We're going to get more into the different levels of

18  offenders and administrative segregation as we talk here in a

19  bit, but can you describe to the jury your day-to-day duties

20  now in your current title?

21      A.    Basically as -- as the administrator, in relying

22  with my staff or working with my staff, we -- I oversee the

23  education opportunities, vocational, the feeding, the making

24  sure that they're showered, day-to-day living, quality of life

25  of the offender population, as well as our staff.  Making

```
 1  security decisions, based upon our population, based upon the

 2  activities of the offenders, coordinate and ensure that the

 3  offender activities and daily activities that we have set are

 4  accomplished every day, every 24 hours.  Make sure that we have

 5  served three wholesome nutritious meals.  To make sure that we

 6  have afforded, given them all showers, given them all clothes,

 7  things of that nature.  Responding to emergencies, should we

 8  have them, things of that nature, overseeing those instances.

 9       Q.   And, Warden Nelson, you said you've been serving in

10  some capacity with TDCJ since 1989?

11       A.   1989, yes, ma'am.

12       Q.   So some 24, 25 years with them?

13       A.   Yes, ma'am.

14       Q.   In that total amount of time, would you say that you

15  have a great deal of experience in discussing inmate

16  classification, as well as what goes on inside of the prisons?

17       A.   Yes, ma'am, I do.

18       Q.   Can you describe for the jury how many offenders,

19  approximately -- I understand that that would probably

20  fluctuate on a day-to-day basis, but how many offenders do we

21  have -- currently have approximately in Texas?

22       A.   Texas, we do fluctuate, but we usually fluctuate

23  between 146,000 and 150,000, which are housed in about 109

24  facilities that we oversee, that the agency -- the

25  Institutional Division oversees.
```

1      Q.    And this is 150,000 inmates in our Texas prison

2  system?

3      A.    Yes, ma'am, that are actually incarcerated.  That's

4  not those on active parole or mandatory supervision.  Those are

5  actually the ones inside of our prison facility.

6      Q.    Or those waiting to be transferred to your

7  facilities?

8      A.    We don't actually count those until we get them,

9  but, yeah, we have several in county jails that have just --

10  that have already been convicted, but haven't made it to our

11  prison system yet.

12      Q.    Okay.  And, Warden Nelson, for those approximately

13  150,000 offenders who are incarcerated, how many units do we

14  have throughout Texas?

15      A.    Approximately 109.  We do have some private

16  facilities that house some of our offenders.  We do contract

17  out with private prisons, and they do warehouse or house some

18  of our offenders, based upon their needs and our needs, our

19  custody and our capacity.

20      Q.    And even though that's sent out to, I guess, private

21  facilities or private companies, is it still overseen by TDCJ?

22      A.    Yes, we do monitor those -- those offenders.  We

23  have TDCJ employees who oversee that -- their day-to-day

24  activities, as well, and report back to our centralized

25  location.  But, yes, we do oversee them, and we do count them

1  in our offender population.

2      Q.   And of the approximately 109 units that we have

3  across the State of Texas, do they vary in types of facilities

4  and level of offenders that are there?

5      A.   Yes, ma'am.  We have a multitude of -- of types,

6  whether -- sometimes it's easier to call them maximum security,

7  minimum security.  Some are treatment facilities where it's

8  basically a substance abuse treatment facility.  Some are in a

9  DWI program, so they're on a treatment facility.  Some are what

10  are called intake transfer facilities.  Those are the offenders

11  who are just coming into our system, going through our process

12  and background checks and things of that nature.  And they're

13  housed there.  We have state jails for offenders who can be

14  convicted of a state jail felony which is convicted of a

15  offense that's a felony but only carries a sentence of two

16  years or less.

17      Q.   And in addition to that, do you have some facilities

18  that are kind of psyche facilities, dealing with mental health?

19      A.   Yes.  Yeah, I didn't -- didn't get to those.  Yeah,

20  we do.  We have a couple of facilities that their main

21  objective is psychiatric inpatient treatment.  We also have one

22  that is a medical facility.  We actually have three down there

23  now in the Texas City and the Galveston area.  We have some

24  facilities that are just set up for medical offenders,

25  offenders who cannot -- due to their medical condition, cannot

1  physically live on -- in another environment, so they almost

2  live in a hospital environment.

3       Q.   So I guess these various units would house different

4  numbers of offenders, depending on the type of unit we're

5  talking about?

6       A.   Yes, ma'am.  Everybody's numbers are -- are

7  different, based upon their assigned bed population.

8       Q.   Approximately, I guess, how many offenders are in

9  our largest prison unit?

10      A.   I believe -- if I'm correct, I believe our largest

11 facility is the Beto facility in Palestine, and I think it

12 houses almost 4,000 offenders is the largest.  We do have a

13 cluster of 10 that are called our 2250's which originally were

14 built to house 2,250 offenders.  However, we've gone back and

15 put in some dorm space so they actually house about 3,000

16 offenders in those -- those 2250's.

17      Q.   Okay.  And so all the way up to prisons holding

18 4,000 offenders here in Texas, and then this jury heard about

19 yesterday maybe some units such as the Rudd Unit and the Price

20 Unit that hold maybe 300 offenders?

21      A.   Yeah, we have some that hold between 3 and 500.

22 Those are our smaller facilities.  Most of those -- for

23 instance, mine, the Hilltop Unit, my capacity is 550 inside.

24 So they vary depending on just bed space, and sometimes they'll

25 be close to another unit, a larger unit, that they parent off

1  of, which is what mine do, Hilltop and Mountain View.  That's

2  why I have two.

3      Q.    And so you've already told us approximately how many

4  inmates we have across Texas.  What about correctional

5  officers, do you know an approximate number of those that are

6  employed?

7      A.    I don't really know our exact correctional officer

8  number.  I know yesterday, I was in a region wide warden's

9  meeting, and we were told yesterday the agency is approximately

10  3,700 short of our correctional staff as it is right now.  And

11  I really right off the top of my head don't really know the

12  number that we do have, that are in the field.

13      Q.    That are currently --

14      A.    That are currently in the field, uh-huh.

15      Q.    Can you give us a breakdown though in any given

16  prison what the inmate-to-correctional ratio would be?

17      A.    Specifically, I'll give you Hilltop.  I turn out 19

18  correctional officers for 500 -- approximately 550 offenders.

19  That includes those officers who are out on our perimeter

20  pickets and doing other -- they're not just in housing areas.

21  Some -- some units have one officer that watches as many as

22  150, 200 off -- 200 offenders at one time, depending on where

23  they're at.  One of my facilities -- in a dormitory for a

24  minimum custody, one officer watches 72 offenders at a time.

25  You get into your maximum security facilities, for instance, at

1    the Polunsky Unit, there's roughly 3,000 offenders, and there's

2    524 correctional officers assigned.  And then you have to take

3    into consideration only half of those are there every day or

4    assigned to be there every day, and then about a third of those

5    are not there for either approved time, in training of some

6    sort, sick, things of that nature.  So you can imagine, there's

7    probably 64, 65 officers for almost 3,000 offenders.

8         Q.    And that's there at the maximum security unit,

9    Polunsky Unit --

10        A.    Yes, ma'am.

11        Q.    -- that you're describing?

12        A.    Yes, ma'am.

13        Q.    What about depending on the shift that the

14   correctional officer is working, could there be fewer officers

15   working a certain shift, rather than others?

16        A.    Yes, ma'am.  Every unit is given what is called a

17   staffing plan.  And based upon the needs and -- and the mission

18   of that facility, normally your first shift -- and we have two

19   types of facilities.  We either have a 12-hour shift where the

20   officers work 12 hours four days a week, and then off four days

21   a week.  Or we have facilities that work eight-hour shifts.  We

22   have three shifts coming on.  If you're on the 12-hour shifts,

23   normally your first shift carries the bulk of the correctional

24   staff because that's when the majority of your activities

25   occur.  Your -- the most of your showering, feeding, education,

1  medical, things of that nature, work.  They work during the day

2  for the most part.  So those things you're going to have more

3  correctional officers during those early daylight hours versus

4  the evening hours.  It varies unit to unit.  Sometimes it's as

5  few as 10 officers difference, and sometimes it's -- it's way

6  more than that.  Sometimes it can be up to 15 or 20

7  correctional staff short.

8       Q.    Okay.  And so the time period you just described,

9  the heavy volume time when people -- or the inmates are being

10  moved around or they're moving around, you have more

11  correctional officers than you would, say, at night when

12  they're sleeping?

13      A.    Correct.  Yeah, usually between 5:00 a.m. or

14  4:00 a.m. -- between 4:00 and 5:00 a.m. and 10:00 p.m., there's

15  -- there's more offender activities.

16      Q.    Now, we're going to talk more about the activities

17  that occur.  You said that they work and go to school, and, I

18  guess, shower during the day and they're fed during the day and

19  go to medical and sometimes, I guess, commissary --

20      A.    Yes, ma'am.

21      Q.    -- even during the day, and library -- they even --

22      A.    Library, yes, ma'am, education.

23      Q.    We're going to talk more about that in a bit, but

24  just curious, do they get paid for the work that they're out

25  there doing?

1    A.    No, ma'am.  The State of Texas does not pay our

2  offender population.  If they are -- depending on their

3  custody, and you said we're going to talk about that in a

4  minute, but depending on their custody, they can earn what is

5  called good time, so for every day that they serve, they may

6  get a day added on to their good time to help them leave prison

7  early.  If they got a 20-year sentence, then they could do it

8  in seven years or five years or eight years or whatever, if

9  they've earned any good time, things of that nature.  But we

10  don't pay our offender population.

11    Q.    What if they choose not to work?

12    A.    Then they don't, obviously, earn that good time.  It

13  affects their -- it will adversely affect their parole.  They

14  would technically have to discharge their sentence, meaning do

15  their time for day-for-day.

16    Q.    So going back to where we were talking about, I

17  guess, the correctional officers versus your inmate population,

18  there at some of the facilities -- or let's say -- would it be

19  uncommon, I guess, to have maybe just two -- given the facility

20  we're talking about, two correctional officers for 300 inmates

21  on the evening shift?

22    A.    On the evening shift, probably not.  I mean, I know

23  of one of the facilities that normally turns out nine on a

24  night shift, and there's -- their population is almost 500, so

25  there's nine correctional for the 500.  But like I said, it

 1  would obviously depend on their custody level.  If they were a

 2  higher level of custody, we'd have more -- a few more

 3  correctional staff.

 4       Q.    Okay.  And their staffing plan is given to them

 5  based on the type of facility we're talking about?

 6       A.    Correct.  Yes, ma'am.  Yes, ma'am.

 7       Q.    But there's nothing unusual about that?

 8       A.    No, ma'am.

 9       Q.    What about -- do you know in general the

10  male-to-female correctional officer ratio?

11       A.    It varies on the units.  We do try to -- especially

12  on a female facility, we do currently try to have a larger

13  female population of staff, due to some things that the male

14  stuff just cannot do.  And the same things goes for our female

15  staff.  Now, in our male facilities, there are things that a

16  female cannot do inside of a male correctional facility.  We --

17  the -- when it comes to nudity and strip searches and things of

18  that nature, we utilize same gender searches, so we try to have

19  a higher ratio.  We do try to keep it at about -- on the male

20  facilities, usually at 60 percent male, 50 percent -- I mean,

21  40 percent female, but that's not always the case.  On the

22  female facilities, we do try to keep it a little higher.  We

23  try to keep it about 70 percent female staff and about

24  30 percent male staff, but we don't -- sometimes that doesn't

25  happen.  Correctional staff get assigned, gets transferred, and

1  so numbers kind of get skewed sometimes.

2  　　　Q.　　But on average, you've got approximately 40 percent

3  of those correctional officer being female in the male units?

4  　　　A.　　Correct, on an average.

5  　　　Q.　　What about -- do you ever get young correctional

6  officers -- 18-year-old correctional officers?

7  　　　A.　　Yes, ma'am, we -- our hiring policy is that GED or

8  high school -- or equivalent high school diploma and 18 years

9  of age and no experience is required.

10 　　　Q.　　Now, are these youthful or younger correctional

11 officers and these female correctional officers, are they

12 prohibited, I guess, from working the maximum security, the

13 administrative segregation, or even death row?

14 　　　A.　　No, ma'am.  We don't prohibit them.  We get them on

15 to our facilities -- like I say, we give them some on-the-job

16 training.  We do try to put them with a more seasoned officer

17 or veteran staff member if they're going to work those higher

18 custody levels, but if that's the staff we have, you know, I

19 can't prohibit them from working that area, just -- I mean,

20 because I wouldn't have anybody because I do have a lot of very

21 young correctional officers, very new correctional officers.

22 　　　Q.　　And females, as well?

23 　　　A.　　And females, yes, absolutely.

24 　　　Q.　　So when we're talking about the male death row that

25 you have experience working on, it's actually quite the

1  contrary, that you have quite a bit of female guards working

2  the male death row, do you not?

3      A.    Yes, I do, and I have female ranking supervisors,

4  sergeants, and lieutenants, as well.

5      Q.    And so based on that -- I mean, while we might like

6  to have, you know, a 1-to-1 ratio or something more like a

7  3-to-1 or whatever to make sure that we are catching everything

8  in prison -- and those of us on the outside might think that

9  that ratio might be a bit greater, but like you said, you're

10  down 3700 right now --

11      A.    Correct.

12      Q.    -- as of the meeting you just attended, is it fair

13  to say based on that, that they're unable to catch everything

14  that goes on?

15      A.    Oh, absolutely.  There's -- there's no way for one

16  correctional officer or even two correctional officers assigned

17  to a housing area to catch everything that a hundred people are

18  doing.

19      Q.    Absolutely.  Can you describe for us -- you were

20  mentioning before some Level 1 offenders, up to Level 5, and

21  then administrative segregation, and death row; can you

22  describe when an inmate first gets to TDCJ, how that

23  classification process works?

24      A.    Basically at the intake process, the offenders come

25  in and we look at -- we pull up their prior.  If they've been

```
 1   incarcerated, whether it be in the State of Texas, whether it
 2   be somewhere else, whether it be in county jails, we have to
 3   take into consideration their jail conduct.  If the jail that
 4   they're coming from or the County they're coming from has
 5   brought reports of any activity that they've done, we look at
 6   the crime that they have committed, how much time they are
 7   doing, and an offender is based -- or an offender is assigned
 8   what is called a custody level based upon those factors.
 9        Q.   So all those factors come into play?
10        A.   Yes, ma'am, they do.
11        Q.   I don't believe --- you said that based on the crime
12   you've committed, are murderers put with murderers and DWI
13   people put with DWI people?
14        A.   No, ma'am.  We don't -- we don't segregate those.
15   What I'm saying is if -- if someone is convicted of a crime
16   that they are sentenced to 50 years or more, their custody
17   level would be a General Population 3.  Now, they're going to
18   be housed with other general population offenders, but they are
19   a General Population 3, where if a person is convicted of auto
20   theft or even credit card abuse and they get 10 years or 15
21   years, they would come in as a G2, if their behavior warranted
22   that -- that level, which is -- which is a better custody
23   level.  We start at G1 which is the best.  G2 is at most the
24   largest percentage of our general population.  G3s are serving
25   50 years or more.  G4s are disciplinary problems.  And G5s are
```

```
 1   disciplinary problems who have assaultive behaviors.

 2        Q.    And so who does this classification?

 3        A.    At the initial classification, it is the intake

 4   procedures and -- and they refer to what is called our State

 5   Classification Committee, and they will -- they will subject

 6   them or they will give them the information of what the inmate

 7   is doing time for, how much, if they have any prior TDC, did

 8   they leave TDC, were they an ad seg offender, were they an

 9   outside trusty.  We take into consideration that.  And a

10   committee will decide what level to give them, and then move

11   them on into the Institutional Division into a regular

12   facility.

13        Q.    So committee is deciding that.  And then what about

14   as they are doing their time, can they move between varying

15   levels?

16        A.    You can.  Anybody can move between a G1, all the way

17   to a G5, which is to ad seg and into protective custody, if you

18   -- so need to.  But we have what is called a Unit

19   Classification Committee, and that is chaired by the senior

20   warden, an assistant warden, or the chief of -- I mean, the --

21   the major, which is our chief of security.  One of those three

22   people will chair it, and it's a three-person committee, who

23   will, based on that offender's behavior and that offender's

24   issues that they're having, we will make a decision on what

25   custody level they become.
```

1      Q.    So as a senior warden at your units that you're in

2  charge of, you would serve on such a committee?

3      A.    Yes, ma'am, I do.

4      Q.    Okay.  And you discussed a little bit that a G1 is

5  the best, I guess, type of classification you can get.  That's

6  what they would want --

7      A.    That's our least at risk.  Those are at least risk

8  offenders.  They are our lowest risk.

9      Q.    And can you describe what sorts of, I guess,

10  privileges that a G1 have, say, over a G3?

11      A.    A G1 offender is usually what we call a trusty -- an

12  outside trusty for the most part.  They can live and work

13  outside of our perimeter fences.  We have free-standing

14  buildings outside of our perimeter fences.  They work outside

15  in our agricultural for the most part.  They do a lot of our

16  agriculture.  They do a lot of our farming where we raise

17  horses, we raise cattle, we raise chickens, we raise hogs, so a

18  lot of our G1 offenders help us.  They are support staff

19  basically to do that as we raise those animals.

20           We do have a lot of farming.  We do a lot of

21  crop operations, and so those -- that outside population -- we

22  also do a lot of public or community work, assignments where we

23  go into the community, we clean parks, we clean state

24  buildings, and state and county buildings, things of that

25  nature.  So those would be the level, because they are our

```
 1  lowest risk offenders.  They don't have disciplinary histories.
 2  They don't -- they're, for the most part, very well behaved,
 3  and they have earned that capability.  Where a G3 offender
 4  cannot go into public, unrestrained and without armed
 5  supervision, a G1 offender will go out and mow and we don't
 6  even have to check on them once every hour.  We have to
 7  physically account for them once every hour, where a G3 has to
 8  be under direct sight, sound, and observation of an armed
 9  correctional officer outside of our perimeters -- outside of
10  our fences.
11       Q.   And that's outside of the perimeter, the G3s --
12       A.   Correct, outside.  If they are to go outside and
13  work in our -- because they do go outside and work in our
14  agricultural, as well.  They help grow some of our crops,
15  things of that nature, but they will always have armed
16  supervision -- a correctional -- a multitude of correctional
17  staff that are armed with weapons to prevent escapes and things
18  of that nature.
19       Q.   But the G3 offender doesn't have that armed
20  supervision inside the prison?
21       A.   No, ma'am, no one inside -- we don't have armed
22  security on the inside of our prisons.  We only have it on the
23  outside.
24       Q.   Okay.  And so the G1 offender, by his or her own
25  behavior, has basically earned a lot more freedom than, say,
```

1   the G3s?

2       A.   Usually, yeah.  They get contact visits with

3   everybody on their visitation list where the other custody

4   levels, it's immediate family only.  So if a G1 offender has a

5   friend on their visitation list, they can have a contact visit,

6   so there's -- there are certain advantages to being a trusty.

7       Q.   Okay.  And does that disciplinary history, I guess,

8   follow you from -- if you go in once and then you come in

9   again?

10      A.   It has the potential to, depending on the amount of

11  time between your incarcerations.  We do keep the -- what we

12  call a classification folder, classification file.  We do keep

13  those for a period of time.  If they've committed some -- some

14  minor infractions, they -- they would not be held.  We'll just

15  shred those.  We don't keep them.  If they committed major

16  infractions that would impact them -- impact their custody

17  level or impact -- or adversely affect our agency, should they

18  come back, were they staff assaultive, inmate assaultive, do

19  they have a history of drug possession, weapon possessions,

20  things of that nature, we would keep those on microfiche in the

21  event of a re-incarceration.

22      Q.   So you said that you shred the minor infractions?

23      A.   That's -- that's my understanding.  We don't keep

24  those folders, and they -- they put everything else on

25  microfilm or microfiche.

1      Q.    What types of things would you consider a minor

2  infraction within -- or what types of things are considered by

3  TDCJ to be minor?

4      A.    Well, everything is done on a progressive level.

5  Every offender is to be in a certain place at a certain time.

6  We have very controlled movements or we try to have very

7  controlled movements.  But let's say, for instance, an inmate

8  goes to eat and on the way back to his living assignment,

9  decides he wants to go by the commissary.  Well, it's not his

10 turn to go to commissary, and the staff finds him there, we can

11 write him what's called an out-of-place case.  That may be a

12 minor infraction.  Depends on how many he's had or they've had.

13 Trafficking and trade.  They're not allowed to give things from

14 one offender to another, so that could be a minor infraction.

15 Not obeying a direct order.  Staff member says, hey, come over

16 here and go do that.  And he says, no, I'm not going to do

17 that.  Not going to school, first few infractions, you know, if

18 they just don't go to school today, it's probably going to be a

19 minor.  If it becomes habitual, it may go to major.  Not going

20 to work could be a minor disciplinary case, if it's -- you

21 know, he says, look, I didn't -- I didn't wake up, or they

22 didn't call me, or I didn't feel good, whatever, we may write

23 it as a -- we may grade it as a minor infraction hoping that

24 that -- that level of sanctions will prevent him from doing it

25 in the future, try to do things a little better, going to the

1  medical department or asking staff, going to work and asking a

2  staff member to send them to medical or send them to wherever

3  they need to be.

4      Q.    And what about shooting their mouth off to a guard?

5  If they get written up for that, I guess -- do they get written

6  up every time they do it?

7      A.    No, no.  No, we wouldn't -- we wouldn't have enough

8  time to write the disciplinary cases.  There's going to be a

9  level of argumentativeness, I guess you would say.  And it's at

10  some point that the staff says, look, this is your last order.

11  I'm not going to -- I'm not going to stand here and continue to

12  argue with you.  You need to do this.  Either at that point

13  they do it or they -- they get the minor infraction or get --

14  get a disciplinary case.

15          A lot of times staff gets busy, they have a --

16  what we call a verbal confrontation between them, and an

17  offender -- and the offender goes their way and the staff goes

18  back to doing what they were doing, so they may not even get an

19  infraction, but if they are, it could be creating a

20  disturbance, for instance.  Maybe that officer felt like this

21  inmate is getting loud.  They may have to call for a

22  supervisor.  We may have to stop the feeding process or stop a

23  turn-out of inmates.  We can give them a creating a disturbance

24  case.  We can give them a disciplinary case for just failing --

25  refusing to obey orders.  The use of vulgar language directed

1    at staff.  You know, they call the staff certain names, if it's

2    vulgar or indecent, then the staff has the opportunity to write

3    them up at that point for that, as well.

4        Q.    Okay.  And you say they have the opportunity.  Like

5    you said, that doesn't mean they do.

6        A.    No.  Right, exactly, and -- and, you know, it really

7    takes a certain level at one point to -- for the staff to have

8    to stop, write that disciplinary case, go through that

9    procedure.  A lot of times it's just easier to have that

10   argument, win the argument in the end.  You know, hopefully the

11   offender does what we've asked them to do in the end and move

12   on about our day.

13       Q.    Okay.  And if they do, in fact, get written up for

14   something like that, that's another one of those minor

15   infractions?

16       A.    Could be, yeah.  Now, if they've got eight or nine

17   or six -- or they can get up to three, if it's the same thing,

18   all of our disciplinary cases are graded by our chief of

19   security, our major.  And if they've done this repeatedly, the

20   major may say, you know, the minor infractions aren't or the

21   minor sanctions aren't helping him, maybe I need to give him a

22   major disciplinary case which has the ability to affect parole

23   and custody and things of that nature that would adversely

24   affect that -- that person.  Maybe it takes that to get their

25   attention.

1      Q.    Okay.  And so those minors that you said, they may

2   not follow you if you come back in, because they may be shred

3   after a number of years?

4      A.    Correct.  And -- and normally when they come in,

5   it's a -- it's a clean slate -- for the most part, it's a clean

6   slate.  Like I said, depending on the timeframe, if they don't

7   come right back.  But if it's a timeframe, you go to their

8   disciplinary history.  It won't show any of those

9   disciplinaries because it's not being counted against them,

10  it's not being held against them at that point.  We have the

11  capability to look them up, but in some instances, depending on

12  the time, like you said.

13     Q.    Now, back to talking about our various levels of

14  offenders.  You discussed the G1.  You said the G2 is the

15  common offender that you would have housed in any given unit.

16  What -- what about a G2?  What separates them between the G1

17  and G3?  How are they --

18     A.    Some G2s earn the same amount of good time that an

19  outside trusty does, but because of their crime, they cannot be

20  outside trusties.  Murderers cannot be outside trusties.

21  Anyone who has any type of sexual offense cannot be an outside

22  trusty, but they can be a G2.  They can earn the same amount of

23  good time.  They just can't live and work outside of our

24  perimeter fences.  If -- if a person has three or more arrests

25  for violent offenses, they might not be able to be an outside

1  trusty.  Maybe they had some assaults in their past, and we

2  take that into consideration before we try to put them into a

3  situation where they're out and -- and in our public and in our

4  general population.

5       Q.    And how is a G2 treated differently than a G3, for

6  example?

7       A.    The only thing is, G2s and G3s both can live in

8  dormitories, or they can live in cell blocks, depending on your

9  current housing availability.  A G2 -- the -- the difference is

10  their work assignments.  A G2 can be assigned to maintenance,

11  food service, laundry, things of that nature.  A G3 cannot be

12  assigned anywhere on a facility that they would have access to

13  multiple areas, such as maintenance crews.  Our maintenance

14  crews, they travel from dormitory to dormitory or housing area

15  to office building to office building working on our

16  maintenance.  We cannot have a G3 in that area.  Some

17  facilities can't -- will not let G3s be -- can't work in the

18  kitchen, for instance, because the kitchen back dock backs up

19  to a perimeter fence, and they may not want them that close to

20  a perimeter fence, but others do have G3s in their kitchen

21  based on their -- their plant design -- general plant design.

22       Q.    Okay.  And can you discuss the G3s for us and where

23  are they housed?

24       A.    We house G3s?  They can be housed with G2s in the

25  same dormitory, if it's in a dormitory setting.  They're -- or

```
 1  they can live in a cell block if -- like I said, depending on
 2  your housing scheme and how many cells you have versus dorms.
 3  Like I said, their only real difference sometimes is -- is
 4  their access to multiple areas, their -- their movements, and
 5  things and their work assignments.
 6       Q.   And then what about your G4s?
 7       A.   G4s are controlled movements.  G4s, you have to be
 8  convicted of at least two minor -- I'm sorry, two major
 9  disciplinaries in the last six months, or just have a multitude
10  of disciplinaries.  We will put them -- most -- most G4s, there
11  again, we try to -- most G4s live in a cell block where they
12  are two-man cells versus 30 to 100 in a dormitory.  They live
13  in two-man cells.  Their movement, again, is very restricted.
14  Their jobs are restricted.  Depending on their behavior, if
15  they can go to school, if they're a G4.  But they are -- it's
16  been awhile since they've had a disciplinary case, some
17  offenders are G4s because they have escaped prior.  They have a
18  habit of prior escape charge from a secure correctional
19  facility, so they will always be a G4.  But if they have good
20  behavior, we still let them go to school.  But our G4s are very
21  limited where they go.  They are limited on their recreation
22  hours.  A G2 can go -- come and go inside the day rooms every
23  day.  G3s can come and go inside the day rooms as long as
24  they're not supposed to be at work or school, where a G4, we
25  have specified blocks during the day for recreation, two hours
```

1  at a time, so most of them -- those -- those offenders are

2  basically your -- your disciplinary problems.

3        Q.    But you don't come in as a G4?

4        A.    No, you don't come in -- unless you have that escape

5  or taking a hostage in a -- in a secure correctional facility,

6  whether it be a jail, maybe you broke out of jail, they

7  could -- we could bring you in as a G4 then.

8        Q.    Okay.  What about a G5?

9        A.    G5s are offenders who have had -- in the prior year

10 have had one or more assault disciplinary infractions filed

11 upon them, was found guilty of that assault.  They are reviewed

12 every year to see.  And if they continue that assaultive

13 behavior, they remain that G5.  Again, very limited movement.

14 Most of your facilities feed G5s in their housing area, whether

15 it be in their day room or recreation room or in their house --

16 in their cells.  They are limited to very few jobs.  They can

17 only go outside of our perimeter fence and work in our fields

18 in our agriculture, but for the most part, they don't work at

19 all unless they have that capability of taking a squad.

20 Sometimes we work them inside of our perimeter fences, inside

21 of gardens and things of that nature.  We'll give them

22 something to do and work them in those capacities.

23        Q.    Okay.  But if you have previously been incarcerated

24 and had an assaultive offense, I think you said before when you

25 go back in, you're starting with a clean slate?

1      A.    Correct.  You -- it would have to be within one year

2  that they had that assault, whether it be a staff assault or

3  assault on another offender with serious injuries or what we

4  call now, injuries requiring treatment beyond first aid.

5      Q.    So, again, you're not going to come into TDCJ as a

6  G5?

7      A.    No, you're not.

8      Q.    What about administrative segregation?

9      A.    Administration segregation, those are offenders who

10 have had multiple incidents and who have posed a threat -- a

11 continuing threat to the safety and security of our

12 institutions.  Some offenders are in administrative segregation

13 based upon their gang affiliation.  They are a known and

14 confirmed gang member.  Currently the agency recognizes nine, I

15 believe, gangs, that -- so if we have confirmed that you are,

16 in fact, a member of those gangs, you will automatically go to

17 administrative segregation.  You can also go to administrative

18 segregation, there again, as I said, if you're a threat, if the

19 agency or the unit classification committee feels that your

20 presence or that offender's presence in population remains a

21 threat to the -- to the safety and security of the staff and

22 offenders.

23     Q.    Okay.  So basically the way to come into prison

24 going automatically to ad seg or administrative segregation is

25 because you're in one of those nine --

```
 1        A.    Gangs or security threat groups, yeah.  But yes --
 2   yes, ma'am.
 3        Q.    Okay.  Otherwise, you're not going to go directly
 4   into administrative segregation just because you're convicted
 5   of a certain offense or how heinous the crime is or anything
 6   like that?
 7        A.    No.  No, ma'am.  No, we don't look at that.
 8        Q.    Okay.  And it's not a permanent assignment, right?
 9        A.    No, every -- every offender in administrative
10   segregation is reviewed every six months, their behavior record
11   is reviewed.  Their -- basically their institutional
12   confinement records, everything that we have, we look at -- a
13   member of the State classification committee comes to the
14   facilities that house administrative segregation.  That
15   offender is interviewed, and, there again, it is a three-person
16   committee.  We look at it, and we make a decision if that
17   inmate's behavior, attitude, if their disciplinary has
18   improved, should we release them into -- back into our
19   population and can they function in population without being a
20   continued threat.
21        Q.    Okay.  And so if it's found they could be, then that
22   offender would move down in classification?
23        A.    That is correct.  That offender would go either G5
24   or G4, depending on that committee's vote.  Most of the time
25   they go up to G5, they stay there for a period of few months,
```

1  they're reviewed by that unit classification to see if they can

2  go to a lesser custody level.  There again, go to that G4.  If

3  they remain, you know, disciplinary free, that committee can

4  take them all the way to a G2.

5          Q.   Okay.  And so how about death row, how are those

6  individuals housed?

7          A.   All of our death row offenders are segregated.

8  Basically they -- one person to a cell, both male and female.

9  We don't -- they don't have any time earning status, so we

10  don't really worry -- they don't -- their custody level is

11  death row.  There are three levels of death row, 1, 2, and 3,

12  Death Row 1 meaning no disciplinaries, not a behavior problem;

13  2 would be the same thing, had a major disciplinary case; and a

14  Death Row 3 would be assaultive death row, or assaultive

15  disciplinary case.  And we keep them as a D3 30 days.  We

16  review them.  If they haven't had another assaultive case, we

17  move them up to a D2.  A Death Row 2, Level 2 stays there 90

18  days.  At the 90-day mark, we review them, and if they haven't

19  had some continued disciplinary problems, we -- we bump them

20  back up to a Death Row Level 1, a D1.

21          Q.   So, Warden Nelson, I mean, death row is your most

22  secure level that you have there or secure unit that you have

23  in prison, right?

24          A.   Yes, ma'am, we hope so.

25          Q.   And you're talking about you have three -- 1, 2, and

1  3 varying levels about whether or not they've been disciplined

2  while on death row?

3      A.   Yes, ma'am, while on death row.

4      Q.   And so even individuals on death row have

5  disciplinary issues in prison?

6      A.   Yes, ma'am, they have assaults, assaults on staff,

7  assaults on other offenders.  They have cases of -- what we

8  call sexual misconduct, basically masturbation cases.  They can

9  get cases for possession of contraband, possession of weapons,

10 possession of drugs, possession of cell phones, things of that

11 nature.

12     Q.   On death row, even though you've got it in the

13 most -- them in the most secure portion you can be in prison?

14     A.   Yes, ma'am.

15     Q.   How many guards, approximately, are on death row --

16 or correctional officers?

17     A.   I would say at the male death row, there were 88

18 inmates in a section.  There are seven -- six sections, 88

19 inmates in a section, and there were two officers assigned to

20 the ground to what they call the floor and one officer in a

21 picket -- in a contained area that controls and operates all

22 the doors into that area so you have two corrections officers

23 per every 88 offenders.

24     Q.   Okay.  And that's on death row?

25     A.   That's on the male death row, yes, ma'am.

```
 1        Q.    And so, Warden Nelson, if somebody is convicted of

 2   capital murder and they're receiving a punishment of life

 3   without the possibility of parole, what are they going to be

 4   classified as when they come to TDCJ?

 5        A.    A G3 unless they are -- like I said, unless they're

 6   a confirmed member of a security threat group, but they would

 7   come in as a General Population 3.

 8        Q.    And can that offender ever move or change its status

 9   from a G3, a life without parole?

10        A.    No, they will always maintain that G3 status.

11        Q.    Unless they do something to violate their --

12        A.    Correct.  They could go to a G4 or G5.  They could

13   go to ad seg.  They just can't go to a lesser custody level of

14   a G2 or a G1.

15        Q.    So they'll always be a G3?

16        A.    Correct, at our current -- yes, ma'am, according to

17   our current policies.

18        Q.    Previous years that wasn't the case, but it is now?

19        A.    We were real unsure, I think when we first took on

20   the life without parole, because policy says G3 only remains a

21   G3 for 10 years -- once they've done 10 years.  So an offender

22   comes in, he's doing a 50-year sentence, once they've done 10

23   flat years, they have the potential to move to a G2.  At -- at

24   some time we were, I guess, under the assumption maybe it

25   wasn't clarified by -- that that would be with our life without
```

1   paroles, but they've now -- since it is now in our policy that

2   G3, life without parole will not have the ability to go to G2

3   or G1.

4        Q.   So they're going to remain a G3?

5        A.   Absolutely.

6        Q.   Now, not everybody that is a G3 is a capital murder

7   life without parole inmate, right?

8        A.   No, ma'am, those are any inmate that's serving a

9   50-year or more sentence and has done less than 10 of that.

10        Q.   Okay.  So you could have an offender that's

11   classified as a G3 in with a capital murder offender, who --

12   that inmate is, say, on his, I don't know, multiple felony

13   DWIs, and he's received a sentence of 50 years?

14        A.   Correct.

15        Q.   And that offender is there with that capital murder

16   life without paroler?

17        A.   Correct.  Yes, ma'am.

18        Q.   And they can be housed in the same cell together?

19        A.   Yes, ma'am.

20        Q.   Now, before you were talking about that certain

21   facilities are done on cell blocks and certain ones are dorms.

22   I believe you said the G4 offenders cannot be housed in dorms;

23   is that right?

24        A.   I won't say they can't because we have had

25   situations where we've had to, because we didn't have any --

1  but we didn't house them with G2s or G3s.  It was just G4s in

2  that dormitory area, just based on population.  Unfortunately,

3  G4s at one point were on the rise, I guess, our population,

4  but -- and I think at one time, before I got there, but before

5  I got to the female correctional facility, I understand they

6  housed females on -- in the dorm -- G4 female offenders in a

7  dormitory, but we don't do that now.  We -- we just basically

8  house them in our G4s, or we house them all in our cell blocks.

9  And we currently have the capability to maintain those numbers,

10  so --

11      Q.    And the cell blocks contain you said two inmates per

12  cell?

13      A.    Two inmates per cell, yes, ma'am.

14      Q.    But then you've got, I guess, neighbors to the side

15  of you in another cell?

16      A.    Correct.  Correct, right beside you.

17      Q.    And then what about the dorm?  I think you said that

18  could house anywhere from 30 to a hundred?

19      A.    Absolutely.  One of the facilities I was housed

20  at -- I was the warden at had 106 in a dorm, so you can have --

21  you know, some dorms are very small, depending on your unit.  I

22  have one dorm at Hilltop that only has 12 inmates, but it's

23  just based upon that unit was built in the 1800s so they

24  didn't -- they didn't consider all this stuff that was going to

25  be in the 1900s, but -- so some of the facilities are just --

1  the way they're built.  But for the most part, your newer

2  facilities that were built in the '40s, '50s, and 60's, if

3  that's newer to us, have 50, 60, 70, 80, 100 in a dormitory.

4       Q.   Okay.  And the jury heard a little bit about that

5  dorm setup yesterday.  Is that where you have like the bunk

6  beds in a big room or --

7       A.   Some have bunk beds.  Some just have single level

8  beds.  They have partitions, small walls in between those

9  bunks.  They have -- just basically a -- we have an iron or

10 metal bunk.  We put mattresses on top of that.  Then we have

11 the wall and then we have the next cubicle.  Each offender has

12 what's called a locker box that they store their personal

13 property in.  And that's in there.  And then every offender has

14 a -- a writing surface, a table, where they can write letters

15 and things that's inside that cubicle.  Most of them are 8-foot

16 by 12-foot, 6 by 10, depending on the size of your facility.

17      Q.   Okay.  And can G3 offenders like, for example, what

18 the capital murder life without parole is going to come in as

19 and remain as, unless they get in trouble, are they -- can they

20 be housed in that dorm setting you're describing?

21      A.   Yes, ma'am, they are.

22      Q.   And when they're housed in that dorm setting, who

23 can they be housed with?

24      A.   Anybody that's either a G2 or G3, our -- every unit,

25 again, has a housing scheme.  Some of our dormitories are

1  specified G1s, outside of trusties, G1s.  Some are specified

2  for G2s.  Some are specified G2s/G3s.  Some are specified just

3  G3s.  So we do that because our population fluctuates.  We have

4  -- sometimes we have a high population of G3s.  I don't have

5  enough designated G3 dormitory and I can't -- if I have five

6  extra inmates, I can't take up a hundred beds for those five,

7  so I -- we fill up those other 95 beds with G2s that have those

8  five being overflow in that G2/G3 dormitory.

9      Q.   Okay.  And then if not housed in a dormitory, the G3

10  can be in a cell block?

11      A.   In a cell block.

12      Q.   And what level of offender can be in the cell with

13  the G3?

14      A.   A G3 or a potential -- we would try to house them

15  with a G3 in a cell -- in a cell situation.  I won't tell you

16  that it's an automatic, but we would try.  Based upon their

17  custody, that's a G3.  We need to try to find another G3.  And

18  a lot goes into their housing in those cells, height, weight,

19  age, things of that nature, so you not only have to worry about

20  their custody level, you have to worry about how tall they are,

21  how heavy they are.  You know, so we have a lot of factors.

22  The age -- you know, we -- we have a certain age limit that we

23  try to keep them in, based upon our housing, for their safety

24  and everybody else's.

25      Q.   Okay.  And I mean, that's the reason why you're --

1  all that's going into that, for their safety, as well as the

2  other inmates?

3      A.    Correct.  I don't want to put a -- you know, a

4  19-year-old offender doing a two-year sentence or a three-year

5  sentence in with a 35-year-old doing 99 years, who is 6 foot

6  tall, and 280 pounds, and the 19-year-old's five three and 112

7  pounds.  It's not a very fair fight, if one breaks out, so we

8  try to -- we have to get them as close as we can to age,

9  weight, height, and custody levels.

10      Q.    And I mean, quite frankly, based on your

11  experience -- I mean, these cells are close living quarters;

12  fair to say?

13      A.    Fair to say.  Very close quarters.

14      Q.    And you might not or based on your experience, have

15  you seen situations where they're not getting along with their

16  cellie?

17      A.    Every day.

18      Q.    Okay.  So that happens.  And that's going into the

19  consideration as to where to put them?

20      A.    Correct.

21      Q.    Now, the -- when we think of prison, you know, you

22  describe this cell block where people are behind -- I guess two

23  of them are in a cell together and then you -- there's more

24  free movement.  I know when I think of prison, I think of being

25  locked down most of the day, every day all day, but you've

1  already described various activities that go on that they're

2  able to do.  Can you describe for us, if there's any period of

3  time that they are going to be locked down behind bars?

4       A.   After what is called rack time, usually 10:00,

5  10:30, we will put all the offenders in their housing areas,

6  and that excludes those who are working.  We have night shift

7  inmates who work as janitors.  We have some that work in our

8  Food Service Department, and our Food Service Department opens

9  around 1:00 a.m. to start feeding that breakfast meal, to start

10  preparing.  For the most part, they're all locked down in the

11  evening hours after 10 o'clock, 12:30 on weekends, and -- and

12  so for the most part, they're all locked down with the -- with

13  the exception of a handful.  During the day, you know, the

14  majority of your population is up, some are at school, some are

15  at work, some are at medical appointments, wandering around at

16  visitation, depending on what day it is.  They're in the

17  commissary line.  They could be a lot of places.

18       Q.   Okay.  And so your G3 offender, they're considered

19  housed in general population?

20       A.   Correct.

21       Q.   What does it mean to be in general population?

22       A.   You have a little more free and frequent access --

23  means, for instance, at -- when they get ready to feed, they

24  tell them everybody wants to go eat, let's go, and all the

25  inmates will -- that want to go eat or the offenders that want

1  to go eat, get up and go eat and nobody escorts them.  They

2  just walk freely from their housing area to the -- to the

3  dining hall.  Same thing when they call out work, they call

4  out -- we need all the kitchen workers, all first shift kitchen

5  workers, those offenders will come up to the door, the officer

6  will unlock the dormitory door, and they go to the kitchen, we

7  hope -- let's hope -- we hope they get there.  Commissary, we

8  send them -- they'll call the dorms and tell them to send 10

9  out for commissary.  We open the door and trust that they're

10 going to get to where they're supposed to go.

11      Q.   So during that time when they're called and can go

12 to those various places, wherever it may be, the G3 offenders

13 would be then intermingling with other G2 offenders, other G1s,

14 as well?

15      A.   As well.

16      Q.   And is there any risk posed during that transfer

17 time or when they get up and go?

18      A.   Well, like I said, there's some level that -- you

19 know, when we call that we're -- we're feeding, for instance,

20 we -- we call them and tell them to go.  We do try to stage

21 officers at different points if we have that staffing that day.

22 The dorm officer on the radio, I have 10 for chow.  It's lunch.

23 I have 10 for chow, and hopefully that person that's staged out

24 here can count to 10 and hopefully there is 10, that the

25 offender didn't go somewhere else.  We find in a lot of

56

1    instances offenders will be going from one point to another and

2    they'll see somebody they want to talk to, so they go over

3    there, and, you know, staff will have to go, well, where are

4    you supposed to be.  Well, I was going to chow, but -- okay,

5    well, go to chow.  Where are you supposed to be?  Well, I was

6    going to school, but I need to go talk to so-and-so, or I need

7    to go to the pill line and talk to the nurse or I need to go to

8    the mailroom or I -- that's where I was going and I was

9    supposed to be over here.

10            So we try to maintain that flow of traffic, but

11   you can imagine with -- you know, especially on some of the

12   larger facilities, 500, a thousand offenders sometimes moving,

13   it's hard to determine that those offenders supposed to be

14   going here and those offenders supposed to be going in a

15   certain direction.

16       Q.   So that day-to-day movement and activity that you're

17   describing, that's going to apply to the G3 person convicted of

18   capital murder life without parole?

19       A.   Correct, G1s, 2 and 3s, yes, ma'am.

20       Q.   So while they're, I guess, directed to go to various

21   places, they're certainly not controlled, being walked and

22   escorted in handcuffs?

23       A.   No.

24       Q.   Okay.  They're moving about freely?

25       A.   Yes, they are.

```
 1        Q.   Now, you've said before, I guess, that the person --
 2   it's based on the sentence they receive to be a G3, so somebody
 3   that's received 50 years plus, regardless of what they're in
 4   for, can be housed right there in the house with G3s together?
 5        A.   Yeah, correct.  G3s can come in for a multitude of
 6   crimes.  We see them for a lot of drug possessions, multiple
 7   drug possessions, or drug trafficking or DWI's, aggravated
 8   assaults, things of that nature.  I mean, you know, our
 9   sentencing -- in Texas, some crimes you can get, you know,
10   anywhere from probation to 99 years.  So I don't think there's
11   a limit on the types of crimes that -- that a G3 can commit,
12   really.
13        Q.   And those other people, if they're not serving life
14   without parole, then they have an incentive for parole?
15        A.   Correct, and they have an incentive to -- to try to
16   get to that G2 custody and things of that nature.
17        Q.   Okay.  What about G3 inmates and visitors?  You
18   talked before about G1s able to have contact visits with
19   whoever they want to on their lists.  What about G3s and their
20   visitors?
21        A.   They are at a certain point.  They have to be a -- I
22   think it's -- Line 1 or above time earning status.  It's pretty
23   complicated in how we integrate our time earning status versus
24   our custody levels.  But G3s can have contact visits with their
25   immediate family.
```

1       Q.    Okay.  So contact visits with their immediate

2  family --

3       A.    Yes.

4       Q.    -- G3s are allowed to have?

5       A.    Correct.

6       Q.    Do contact visits -- you know, try as you might to

7  control everything you can, sometimes pose a risk to the

8  security within the prison?

9       A.    Yes, we do -- currently our agency does do a level

10  of search on our visitors.  We do a pat search on every visitor

11  coming into our facilities.  We do run metal detectors over

12  them and some of the larger, more maximum secure facilities,

13  visitors and staff have to walk through a metal detector to get

14  in.  You know, things -- things can still be hidden.  We do pat

15  searches.  You know, sometimes it's not comfortable for staff

16  to put their hands on somebody, so we have a tendency to kind

17  of sometimes go through those things pretty fast, and we may

18  miss things.  So, yes, they do pose a risk.  We do them because

19  we think they're an incentive, but it's up to us as

20  correctional staff to try to prevent that, either on the side

21  of the family member bringing it in or the offender trying to

22  get it out of that visitation room back to their dorm -- back

23  to their housing area.

24       Q.    So you're checking the visitors as they come in, and

25  you're checking the offender as they leave?

1      A.    Correct.

2      Q.    But fair to say, based on your experience, and all

3  the 24, 25 years you've been there, you can't catch everything?

4      A.    We cannot.

5      Q.    Now, you've talked about the opportunity for

6  violence even there on death row, as well as throughout in the

7  general population.  Have you over a number of years collected

8  certain items that have been either manipulated or shaped or

9  fashioned into some sort of instrument there in prison?

10     A.    Yes, ma'am, I have.

11     Q.    Do you think that it would aid and assist the jury

12 in showing them some of those items that have been created

13 among the inmates there in prison?

14     A.    I do.  I think for someone who hasn't worked inside

15 of one of our prisons, they're very creative in how they can

16 construct a weapon.  I will tell you there's -- we still find

17 weapons and things of that nature that it shocks me.  I'm like,

18 wow, I never thought about doing that to make a weapon.  We've

19 had everything from chicken bones made into a stabbing device,

20 so certain levels don't get chicken bones.  We don't serve the

21 legs to them, just take the meat off.  So I mean, you know,

22 that -- when I came to prison, even as a correctional officer,

23 the first time I ever saw that, I was -- I was pretty shocked,

24 and I was a correctional officer, so --

25     Q.    Things that you wouldn't even imagine?

1          A.    Correct.

2          Q.    Can you go ahead and show us the items you brought

3    with us -- with you today?  And describe for us what we're

4    looking at.

5          A.    Yes, ma'am.

6                And -- and these weapons were all found in

7    common areas, so none of these were ever used in any

8    behavioral -- or no one was convicted or used them against

9    anyone.  So this basically is a screw that they have taken a

10   mop handle or broom handle and have manipulated it in there to

11   make it into a stabbing device.

12               MS. EVANS:  May I approach the witness, Your

13   Honor?

14               THE COURT:  You may.

15         Q.    (BY MS. EVANS)  And these are actual items that you

16   collected from inmates in prison?

17         A.    Yes, ma'am.  In common areas that we have searched

18   and found these weapons, these are just -- and understand,

19   these are just different varieties.  I mean, there's a lot

20   of -- they come out as the same type, but these are just some

21   different ones.

22         Q.    This is the broom handle?

23         A.    It's a broom handle with a screw that they picked up

24   or either manipulated out of their -- their bunk, taking a

25   screw out of the wall of some kind.

```
 1        Q.    What's the next item?

 2        A.    The next one is -- is taking just general pencils,

 3   pencils that we issued them.  They made a weapon to secure it

 4   together.  They've gotten some tape and then they taped these

 5   pencils and sharpened them.  And if hit hard enough, they will

 6   stab you.

 7        Q.    So these have basically been manipulated into a

 8   point?

 9        A.    Uh-huh, correct.  This one is a pretty common one

10   found in our death row and some of our administrative

11   segregation.  This is a typewriter rod -- or half of a

12   typewriter rod that -- we sell them typewriters in the

13   commissary if they -- if they have the money to purchase them.

14   And that rod that keeps the roller going, there is a rod in it

15   and they will manipulate this.  They will take that rod out of

16   that roller using cardboard paper or something else.  They'll

17   make that roller to stay in there and continue to operate their

18   typing so that staff is unaware that they've gotten this out.

19   Then they take just cardboard -- most of this is either backs

20   of magazines or they may have gotten legal mail or they might

21   have gotten an envelope and they can roll it up really tight.

22   The string is fashioned out of their clothes.  They'll --

23   they'll take the sheets, their pants, their shirts, their

24   boxers, whatever, manipulate the strings out of it, make a

25   handle.  The tape normally comes off their mail, where they
```

1    tape some of these things.  This is actually a sphere intended

2    to be used with a sling.  They'll manipulate with -- elastic

3    out of their clothes.  They will manipulate a sling and it will

4    slide back and they can actually -- or they can throw it or

5    they can just use it as a handheld weapon.

6        Q.    And I think when you first started talking about

7    this item, that you said these have been found on death row?

8        A.    Yes, ma'am.  The typewriters are a common item that

9    they possess.  They can actually fashion two weapons out of

10   every typewriter rod.  Now, the agency has sought out and now,

11   because of these weapons that we found, has sought out and

12   found some that no longer have those rods in them, but they can

13   find other parts that will still do the same thing.

14             This is a piece of fencing material, probably --

15   it's what we guess it is.  It -- there again, just has a handle

16   with paper taped so it so they can hold on to it to give them a

17   grip if they were to go and stab somebody.

18       Q.    And so it appears that the inmates can get very

19   creative, depending on what it is they're wanting to do or

20   achieve?

21       A.    Yes, ma'am, they -- they can make spheres out of

22   things.  They -- our male and female population -- our male

23   population is required to shave -- to be clean shaven, and,

24   therefore, we issue razors -- disposable razors.  They can

25   extract those blades from those razors.  They'll try to

1  manipulate them onto a tooth brush or a piece of plastic or

2  more paper to make a cutting device or a stabbing device.  They

3  will take items that they find, paper clips.  They can make

4  handcuff keys out of paper clips.  They'll take handcuffs

5  keys -- I mean, they'll take paper clips and -- and rub them on

6  the concrete, make them very sharp.  They can make a -- a dart

7  out of those -- very small darts that can be shot from their

8  cell front and stab staff or other offenders.

9       Q.    And so not only can, I guess, assaultive behavior

10 happen in close quarters whenever you're moving about with

11 inmates, but the items you're describing can be used and

12 manipulated across cell blocks even?

13      A.    Correct.  The offender population is pretty

14 creative.  They do what we call fishing lines, and they'll

15 take -- get them a long string, a long line, and they'll slide

16 it out, underneath their cell doors.  Another inmate will take

17 his -- throw his fishing line over, pull it in, and then they

18 will continue to slide it, and they can slide it around pretty

19 fast, faster than we can catch them.

20      Q.    And how is it that you're able to find items like

21 that?

22      A.    We do searches.  Every year each facility is

23 required a minimum of two, what is called semiannual searches.

24 We search common areas, day rooms, bathrooms.  We search every

25 bit of the inmate's property they own.  We will search their

cells, underneath.  We -- we actually flip cubicles upside

down, the bunks that are on the ground, we'll slip them to see

if they've taken anything and put it inside the -- the legs of

those bunks.  On top of things, they will manipulate -- they'll

actually drop things inside of the toilet, tie it off with a

small string where it's very difficult to see.  They'll drop it

down into a toilet thinking staff is not going to put their

hand down in that toilet, so we have the capability to -- we

have some mechanism now to -- to send a camera and a light down

our toilets to see if there are items -- behind shower walls.

Like I said, they're very good at hiding things.  They make

false walls in the back of their locker boxes when staff just

opens it up, looks at it, looks like it's closed off.  Looks

like the box is secure.  It is, but it has a false bottom -- a

false back.  You pull that off and there's weapons, cell

phones, contraband, things of that nature, money, whatever.

    Q.   And those searches are only required two times a

year?

    A.   Only twice a year.  Every inmate is searched a

minimum of -- every cell is searched a minimum of every 30 days

in general population.  Ad segs are a little more often.  Death

row, we search them about every other day or every third day.

I think it's every 72 hours, and so they know every 72 hours,

if I've got searched today, probably won't get searched

tomorrow, but by the next day, I'm probably going to get

```
 1  searched so they try to pass their contraband to the next

 2  offender that just got searched today or got searched

 3  yesterday, knowing that they probably won't get searched.

 4              We do random searches.  We do frequent searches.

 5  If staff suspect that an offender has contraband in their cell,

 6  they -- they are allowed to call the supervisor and say, hey,

 7  here's -- here's what I think.  I think this inmate's got some

 8  contraband.  And then every day the staff are given random

 9  cells to search.  And in their eight-hour timeframe, if they're

10  a eight-hour staff or 12-hour, they're given certain cubicles

11  or bunk numbers to search so that those offenders are searched.

12      Q.   Okay.  And so the general population where G3 would

13  be, though, is searched every 30 days?

14      A.   Every 30 days.  That's the -- that's the requirement

15  by policy.

16      Q.   And so is it fair to say, that's a large number that

17  the officers are having to search.  Some items can be missed,

18  or maybe they didn't have it during the time that they're being

19  searched?

20      A.   Correct.  And -- or they pass it off or they had it

21  on them and the officer's searching their property and they may

22  have that contraband concealed on them.  And it really depends

23  on the quality of the search, how -- how serious that staff

24  member was about that search.  Or, you know, are they tired and

25  just kind of give it a look through to see if there's anything
```

1  that just sticks out, or are they really going through, taking

2  their time doing a good concise search.

3      Q.    And unfortunately, sometimes you find those items

4  that have been manipulated or constructed by the inmates after

5  it's already been used?

6      A.    Correct.

7      Q.    How is assaultive conduct a problem there in prison,

8  or how does it disrupt what's going on there?

9      A.    Well, our goal every day is -- is to provide public

10  safety.  And we do that by maintaining custody and control of

11  those offenders inside of our prison walls.  And if you have a

12  fight, you know, you have the potential for the loss of life or

13  serious injury, both to the offender population and to the

14  staff.  So depending on, you know, their disruptive behavior,

15  and it can escalate, unfortunately, inside a prison's -- a

16  small situation can start here and other inmates can become

17  involved.  It may start out with a fight of two offenders and

18  you may have 12 get involved, just simply because they wanted

19  to.  I mean, I've seen instances where we've had that.  Why did

20  you get involved?  I don't know, they were fighting.  I just

21  wanted to fight, so I just did and I got in it.  So those

22  things can cause a true breach to our security.  Are they

23  fighting because they're trying to distract staff so somebody

24  can escape or so that a sexual assault or something of that

25  nature can happen in another area, so -- because they know

 1  we're going to respond to certain -- certain situations.  So

 2  are they trying to distract staff's attention for a much larger

 3  incident going on?

 4      Q.   And that's going on on a day-to-day basis based on

 5  your experience?

 6      A.   We have -- you know, I would say during the day, we

 7  probably have anywhere from three to 12 instances every day --

 8  on -- on my facility with 650 offenders, we probably have three

 9  to 12 at a maximum security facility that require additional

10  staff to respond, that cannot just be resolved between that one

11  offender or those two offenders and that one staff member, so

12  we have a lot.

13      Q.   And that's three to 12 daily on your female unit

14  that you're currently working?

15      A.   Yes.

16      Q.   Okay.  And like you said, you're already short on

17  correctional officers, and they can't be everywhere at once?

18      A.   Correct.  And like I said, some days we're very

19  limited to the staff.  We've had situations where we knew we

20  didn't have enough staff on duty that day to resolve the

21  problem.  We've had to call local facilities, other units to

22  say, hey, can you send us whatever staff you have to help us

23  quell the situation that we have right now.

24      Q.   And that situation can escalate, as you've already

25  mentioned?

1      A.    Absolutely.

2      Q.    Now, is contraband allowed in prison?

3      A.    No, it's not.

4      Q.    What's classified as contraband?

5      A.    Anything that an offender is not issued or that they

6  purchased in a unit commissary or that they received through

7  legal means, by mail or through education -- if the education

8  gives them things, or anything that can be altered or is

9  altered, that has the potential to jeopardize our safety and

10  security, so there are certain things that can be contraband.

11  Offenders can have up to 60 stamps in their possession.  So if

12  they have 75, 15 of those are considered contraband.  So we

13  allow a certain amount of things.  And if they possess more

14  than that -- they may possess an item or radio, for instance,

15  that doesn't belong to them.  It belongs to another inmate.

16  They either stole it, they bought it, you know, the other

17  inmate sold it to them, or that inmate has gone home and they

18  just kept their radio.  They gave it to them, so that can be

19  contraband.

20      Q.    Okay.  And you have a specific reason for why you're

21  limiting the items they can have and the numbers of what they

22  can have, right?

23      A.    Yeah, based upon just the safety and security and --

24  and the ability to control our prison environments, we have to

25  limit what they can possess or we'd never -- we wouldn't be

1   safe for sure.

2        Q.    And I think you mentioned before, but do you find

3   drugs in prison?

4        A.    Absolutely.

5        Q.    Are inmates allowed to have cell phones?

6        A.    No, they're not.

7        Q.    But we've seen in reports that they've had them,

8   right?

9        A.    Yes, ma'am.  We still find cell phones and cell

10  phone accessories almost on a daily basis throughout our

11  agency.

12       Q.    So how do they get items like drugs and other

13  contraband into prison?

14       A.    They've either manipulated staff to bring them or

15  they have manipulated family members or friends.  Sometimes we

16  find they're secreted in -- an offender can get certain items

17  mailed in to them.  Books, for instance, from book stores.  And

18  if you really open up that book binding, there may be a cell

19  phone in there or cell phone battery.  We had an instance

20  where -- we have craft shops on some of our facilities where

21  inmates can go and make certain things and sell them for a

22  profit -- for their profit.  An inmate had ordered an air

23  compressor for this -- for his work assignment and when the

24  staff member received the -- staff member received that air

25  compressor, he thought, well, I'm going to see if it -- I'm

1  going to see if I can get it -- make sure it works.  And so I

2  give it to him.  Couldn't get it to turn on.  Couldn't get it

3  to turn on.

4              When they opened it, it had multiple cell

5  phones, multiple amounts of tobacco and marijuana.  It was

6  never intended to be operational, but that offender had somehow

7  manipulated it through the company that manufacturers those

8  to -- to be able to take the guts out of it and then -- the

9  motor components out of it and be stuffed or have it shipped

10  from one point to another, and then it appeared it came from

11  that manufacturing company and it absolutely didn't, so --

12      Q.    Warden Nelson, you said one of the ways that these

13  items get in is from manipulating staff?

14      A.    Manipulating staff, yes, ma'am.

15      Q.    Who's staff?

16      A.    My staff, unfortunately.  Some of the offender

17  population -- I mean, some of the correctional officer

18  population can be deterred for one way or another, either

19  through a mutual admiration between them -- it starts --

20  sometimes it starts very small, hey, bring me some candy or,

21  have you got some candy?  Can I have a piece of that?  Hey, can

22  I borrow your pen?  Hey, let me keep this pen.  I really like

23  the way this pen writes.  Sometimes it starts small.  Sometimes

24  they knew them.  Sometime that staff member may have grown up

25  in that area where this offender grew up, so they may have

1  common friends or common acquaintances.  A lot of times it's

2  the manipulation and the -- the ability to give them money.

3  Our correctional staff, unfortunately, you know, our pay is --

4  is although not a bad salary, it's not a good one either.  We

5  rank like 47th in the nation in pay for --

6              COURT REPORTER:  What's the number?

7        A.    Forty-seven for the nation, about, on correctional

8  officer pay.  So you give a correctional officer who's bringing

9  home 12 or $1400 for that whole month the ability to make $1200

10  tomorrow, to bring in two cell phones, it's tempting to a lot

11  of our correctional staff.  They -- they want that fast money.

12  Hey, you're not going to get caught, don't worry about it.  I'm

13  going to take the fall.  They're never going to know you

14  brought me in these cell phones, and I'm going to make sure you

15  get $1200 cash.  You know, it's a manipulation.

16        Q.    So it could be something very small, like you said,

17  candy, all the way up to paying them money to bring something

18  in?

19        A.    Correct.  And then some of it is just manipulation

20  of information.  Hey, you know, I like you, you like me, you're

21  cool, I'm cool, tell me about what y'all do during an escape,

22  where would y'all go, or, hey, let me get out and go over to

23  the commissary, because, you know, I'm cool with you and I'm

24  going to buy you a Coke.  I'm going to buy you something.  I'm

25  going to buy you some ice cream.  It's hot out here, I'm going

1    to buy you something, and just let me go to commissary, and

2    they'll manipulate staff even to that point.

3        Q.    And they would at times give out that information?

4        A.    Correct.

5        Q.    How does all this, whether it's something so small

6    or up to something more major, pose a risk to the safety and

7    security of your facility?

8        A.    You know, like I said, our main mission in our

9    agency is to protect the public, is -- and -- and so if our

10   secure facilities are not secure and we have weapons and we

11   have drugs, and, obviously, those under the influence of drugs

12   can have behavior issues, they can become very assaultive, they

13   can do things that they wouldn't have done in a sober -- in a

14   sober state, try to escape, stab people, kill people, fight.

15   They become a threat, and then, there again, like I said, it

16   can boil over into riots and disturbances where they've taken

17   over our entire secure facility so our staff is not safe.  The

18   public becomes at risk because they take over our facilities,

19   or they're able to manipulate our -- our secure perimeters.

20   Can they get in and out of our fences?  Do they cut a fence to

21   get out?

22            Sometimes it's the small things that can

23   escalate.  What are they going to do with that information?

24   They may manipulate staff to get information about public

25   officials or about jurors.  Hey, find out who, you know, was in

1   the room, and, you know, I want to know about them and it's

2   just what they do with that information.  They want to extort

3   people in the world.  They may know a rich man, hey, get me his

4   information, I'll write him.  You know, maybe I can get a

5   little money out of him.  They may just extort them for money,

6   so it just depends.  And there again, we become a risk to the

7   public by allowing that type of behavior to occur.

8       Q.   Okay.  And, Warden Nelson, you and TDCJ have taken

9   measures to identify and classify inmates that are being

10  violent -- I mean, they're labeled G4s and G5s, and they're put

11  in administrative segregation.  You have various levels on

12  death row when they're causing disciplinary problems, and so

13  those that are being violent or readily identifiable, is there

14  another type of inmate that poses a concern to you?

15      A.   To be quite honest with you, every inmate has the

16  potential to pose a threat to me, even our outside trusties.

17  You know, although they've earned that -- that credit, we've

18  had serious staff assaults done by outside trusties.  We've had

19  escapes committed by outside trusties.  So, you know, there's

20  not a level that -- that really to me doesn't pose a threat.

21  It's -- it's how we respond to it and how we as a

22  correctional -- a secure correctional facility ensure that we

23  limit those opportunities as much as we potentially can.

24      Q.   And you've talked a lot about the manipulation that

25  goes on.  Does that concern you when that's going on with an

1    individual inmate?

2        A.    Absolutely.  Sometimes more than some of the other

3    things that go on.  I think the manipulation is -- has the

4    opportunity to break down your basic security, whether it be,

5    like I said, just a friendship, the information that's going in

6    and out, the passing of information from an offender to the

7    outside, gang information, gang hits, you know, letters, some

8    inmates will say -- you know, will manipulate staff, say, look,

9    I don't have time for this, go to the mailroom.  Can you please

10   take it to the Post Office and -- and get it mailed.  It's got

11   to go to my mom, she's dying, and they'll manipulate staff,

12   they'll try to pull on their heartstrings or say, hey, I'll pay

13   you, you know, three sodas if you take this and put this in a

14   mailbox outside of the agency.  We do scan their mail incoming

15   and outgoing, so those things can really pose a huge threat,

16   and they don't seem very big, but it really is dependent upon

17   the information that's being passed can pose a serious threat

18   to anybody, anybody in the public.  And, again, I can't stress

19   enough.  That is -- our main function is to protect the public.

20       Q.    Okay.  When you've got, I guess, an all male

21   facility, would it be fair to say, based on your experience

22   that males masturbating in prison happens?

23       A.    Yes, ma'am.

24       Q.    What do you encourage your guards to do whenever

25   that's occurring?

1       A.    Normally, when we get new staff in and even some of

2  our seasoned staff, we remind them, especially the new staff,

3  because the offender population knows who the new staff are and

4  that they're vulnerable.  They don't know all the rules and

5  regulations.  I've got 18-year-olds coming in as correctional

6  officers.  You've got prisoners or -- or offenders who have

7  done 18 or more years.  So they've been in prison longer than

8  this person has been alive, so, you know, the potential for

9  manipulation is -- is big, but I do encourage our staff, if you

10  see that behavior, address it.  Don't -- you have to have the

11  courage to say no.  You have to have the courage to address

12  that behavior, and say, I need your ID card, I want to know who

13  you are and your TDC number, because you're getting a

14  disciplinary infraction for this.  Because if they don't the

15  inmate population assumes and some of the offenders take that

16  as a silent affirmation it's okay.  She's not going to write us

17  a case.  If we do that, she's not going to give us a

18  disciplinary case and they tell somebody who tells somebody and

19  they tell somebody, and the next thing you know, this poor

20  female 18-year-old comes to work and several of our offenders

21  will be doing, you know, what is called -- what's really

22  considered a lewd act and it's, you know, upon them every day,

23  multiple times a day, and nobody should have to work in that

24  environment.

25            THE COURT:  Can I see the lawyers up here,

1  please?

2              (Sidebar conference.)

3      Q.    (BY MS. EVANS)  And, Warden Nelson, that act in the

4  general public, doing it out amongst other people here in our

5  society, not behind prison walls, would be a crime, right?

6      A.    Correct.

7      Q.    And so basically what you're describing is the

8  inmates do certain things like that even to kind of test the

9  waters and see if that new guard is going to write them up?

10     A.    Correct, if they have the courage to address certain

11 behaviors.

12     Q.    And can that also escalate, as you're describing, if

13 they test the waters and they don't immediately do what you're

14 instructing them to do?

15     A.    Correct.  They can assume that that officer may --

16 may like it, may be a warranted -- you know, hey, and then it

17 may strike up a conversation, look, I know you saw what I was

18 doing, you know, here's -- here's how I feel.  I think you're

19 cool, you're nice, and it starts a manip -- it's a

20 manipulation.  It's a beginning tool of a manipulation for

21 sure.

22     Q.    Something as simple as masturbating in prison?

23     A.    Correct.

24     Q.    And you've described for us the differences in

25 general population in death row, but death row is locked down

77

1    what percentage of the time?

2         A.    For the most part, the Death Row Level 1s are

3    afforded one hour of recreation a day or up to two hours of

4    recreation a day.  They get visits -- two hours of visitation

5    once a week.  They can have a spiritual advisor visit, which

6    takes them out of their cell.  And then they're afforded a

7    shower every day, so they're out of their cell for that period

8    of time, so technically, 23 or 22 to 24 hours a day they would

9    be in some -- unless they were at a visit, spiritual advisor

10   visit of some nature.

11        Q.    In that single cell that you've described for the

12   death row inmate?

13        A.    Yes, ma'am.

14        Q.    Same is completely not true for the general

15   population?

16        A.    Correct, no.

17        Q.    And what factors go into determining -- or have you

18   seen, based on your experience, influence an inmate's

19   propensity for violence while in?

20        A.    Well, a lot of times it's their gang affiliation.  A

21   lot of times it's who they associate with once they get to

22   prison.  Sometimes it's their mental status, their capability,

23   you know, if -- you know, maybe they -- maybe they were on

24   psychotropic medications or maybe they are in need of

25   psychotropic medications, and sometimes it's just -- if they've

1  committed violent offenses, they just kind of continue that

2  pattern.  It's just a pattern that they continue on with.

3       Q.    So their past?

4       A.    Past.

5       Q.    What about their attitude on incarceration, could

6  that also affect it?

7       A.    Absolutely, their attitudes.  You know, that's why

8  they're seen -- before they are sent on to a facility, they are

9  seen by the unit classification committee, and things are

10 discussed about, you know, do you have any questions, here's

11 what's going to happen.  Here's where you're going to live.

12 Here's where you're going to work.  Here's what's going to

13 happen to you on a day-to-day -- day-to-day basis.  And a lot

14 of times they come in with a bad behavior or a bad attitude.

15 You know, we have to try to take that time to discourage it,

16 and encourage them that, you know, a good attitude is only

17 going to be a positive thing for you.  If you're mad, you're

18 the only one that is mad.  Nobody else is mad around you, but

19 you -- but you have -- you know, an attitude is contagious

20 and -- and that's why we try to have positive attitudes when we

21 go to work every day because our attitudes -- we want our

22 attitudes to be contagious.  We want the fact that it's okay,

23 we're living in a different world, we work in a different

24 world, but, if I'm mad and the offender approaches me and I'm

25 already mad, chances are they're going to get mad right along

1  with me because I'm going to say something mean and then

2  they're going to want to say something mean back, so we try --

3  you know, we try to be professional, try to be -- have good

4  attitudes, things of that nature, and we encourage them to do

5  the same.

6            MS. EVANS:  Pass the witness.

7            THE COURT:  Members of the jury, let's take a

8  break.  It's about 40 after.  If you'll be back in the jury

9  room a little bit before 11:00.

10            THE BAILIFF:  All rise.

11            (Jury excused from courtroom.)

12            THE COURT:  Please be seated.

13            (Recess.)

14            THE BAILIFF:  All rise.

15            (Jury returned to courtroom.)

16            THE COURT:  Please be seated.

17            Ms. Bernhard.

18                 CROSS-EXAMINATION

19  BY MS. BERNHARD:

20      Q.   Warden Nelson, you don't know anything about Matthew

21  Johnson, do you?

22      A.   No, ma'am, I do not.

23      Q.   You haven't reviewed any of his records from his

24  past incarceration or anything like that?

25      A.   No, ma'am.

```
 1        Q.   You have no idea what his behavior was in a previous
 2   prison stay at all?
 3        A.   No, ma'am.
 4        Q.   Now, you've testified that it's generally the
 5   objective and -- and your goal to make prison -- TDCJ as safe
 6   as it possibly can be?
 7        A.   Yes, ma'am.
 8        Q.   And y'all put a lot of effort into that?
 9        A.   Yes, ma'am, we do.
10        Q.   You study what works and what doesn't work, you're
11   constantly changing things to improve things?
12        A.   Correct.
13        Q.   Is that fair to say?
14        A.   Yes, ma'am, that's fair to say.
15        Q.   By and large, would you agree that TDCJ is a
16   well-run prison?
17        A.   Yes, ma'am.  I think we're one of the best, but I'm
18   pretty biased because I work there, so --
19        Q.   And y'all do a good job of keeping everybody safe?
20        A.   Yes, ma'am, we do.
21        Q.   And if an inmate presents some sort of difficulty,
22   you have ways to try to prevent any further difficulties?
23        A.   Yes, ma'am, we - we try every day.  I mean, that's
24   -- obviously, as things progress, things are different every
25   day and every -- and people are different every day, so --
```

1      Q.    Sure.

2      A.    But, yes, ma'am, we do.

3      Q.    And in the realm of possibilities, anything is

4 possible?

5      A.    Sure, absolutely.

6      Q.    But y'all do whatever you can and take great lengths

7 and great effort to keep everybody as safe as they possibly can

8 be?

9      A.    Yes, ma'am, we do.

10     Q.    Now, you testified about an inmate's prison records,

11 once they leave TDC, that sometimes the minor infractions may

12 get destroyed?

13     A.    Correct.

14     Q.    But you don't know how many years those records are

15 kept or what the policy is on that?

16     A.    No, ma'am.  I've not been assigned to that area, so

17 I don't want to testify to it.  I do know that we keep the

18 records -- their inmate file -- there's -- there's actually two

19 sets of records that are maintained, those that are on the

20 unit, and then those that are in Huntsville.  And the one in

21 Huntsville, which is our centralized clearing area, has jail

22 reports, things of that nature, that may not be on that unit.

23 The one that's on the unit has different things, correspondence

24 that that offender may have written to one of the

25 administrators that we would make a copy of or bench warrant

information, things of that nature that we would keep on a unit

copy.  Once that offender leaves our custody, whether it be

parole, discharge, whatever, we send our hard copy to

Huntsville.  We don't maintain them on our facilities.

Q.    But certainly if there was some sort of disciplinary

infraction on an inmate's record that was regarded as something

that was important to keep and important for the prison to

know, that record would not be destroyed, would it?

A.    We hope not, but, no, it should not have been, no.

Q.    So anything that -- that y'all need to know,

hopefully gets retained?

A.    Correct, yes, ma'am.

Q.    And generally does?

A.    Yes, ma'am.

Q.    You testified that when an inmate comes into TDC --

or TDCJ, I'm sorry --

A.    That's fine.  Either one.

Q.    Some of us who have been around a little longer

still say TDC, but it's now TDCJ.  When a inmate comes into

TDCJ, there is, I guess, a -- an introductory review or you

review the records of the inmate and -- and there's a

classification committee that meets and determines where that

inmate needs to be housed and what classification level they

need to be at, correct?

A.    Yes, ma'am.  There's -- there's a process and -- and

1  -- at our intake, and our intake/transfer facilities, they try

2  to gather as much medical information as they -- they can,

3  psychological information, background, jail reports, prior

4  incarcerations, history -- job histories, what jobs did they

5  have, and all of those factors are documented in their

6  permanent file.  And -- and we get a portion of that on to the

7  unit.  Some of it goes directly and stays in the Huntsville

8  files, but some of it gets directly put onto the files.  But,

9  yes, ma'am, we try to do a complete -- we do a medical workup

10 on them.  We do a psychological workup, we do an education

11 background, how much education do they have.  What would they

12 need?  Do they have any vocational skills, things of that

13 nature, so that we can best assign them to a facility if they

14 need 24-hour medical care, if they need a place that has a unit

15 psychologist assigned to it.  So, you know, things of that

16 nature.  What type of education would they need?  What unit has

17 that?  Or would they need just strictly substance abuse, things

18 of that nature.

19     Q.    And this intake process and the things that y'all

20 test for and -- and gather information -- the information that

21 you gather, that's based on years of experience and information

22 because you think those things are important in determining how

23 that inmate is housed and how that inmate is classified?

24     A.    I think it gives us, yes -- and you're right, we do

25 it based upon probably best practice.

```
 1         Q.   Okay.  And you had said that -- that you don't
 2    necessarily take into account the offense itself, but rather
 3    the length of the sentence?
 4         A.   Correct.
 5         Q.   And is that --
 6         A.   Other than -- other than some murder, sexual
 7    offenses, some of those are taken into consideration, but, the
 8    difference between someone who possessed drugs or abused their
 9    credit card, probably is not going to be a mitigating factor.
10         Q.   Okay.  So -- but that's based on years of experience
11    and -- and how y'all have done things, that that's what's
12    important to look at?
13         A.   Right.  Trial and error, I guess, yes, ma'am.
14         Q.   And if -- if the offense of conviction was something
15    that your experience and -- and the knowledge of TDCJ, if the
16    offense of conviction was something that had an effect on the
17    inmate's behavior, then that's something you would probably be
18    looking at?
19         A.   Correct.  If I understand you right, you're saying
20    if their offense is going to be something of a violent nature,
21    did they do -- did they have a violent crime versus a
22    victimless crime, shoplifting maybe.  You know, those things I
23    think would obviously have to have some -- some mitigating
24    circumstances into what we're -- what we're looking at, where
25    we're housing them.
```

1      Q.    Okay.  So the offense of conviction is not

2   completely irrelevant when it comes to their classification in

3   housing?

4      A.    Oh, absolutely not.  There are levels of offenses

5   that they have to be taken in consideration.  For instance,

6   some units only have one perimeter fence.  Those are the units

7   -- you don't want to put somebody who's doing a 99-year

8   sentence who can jump one fence and get out, obviously, so

9   that -- those would have some mitigating circumstances.

10      Q.    You may have testified to this, but -- if you did, I

11   may have missed it.  When -- once somebody is given a general

12   custody level, G1 through 5, how often does that get reviewed?

13      A.    They are reviewed at different increments, depending

14   on their custody levels.  G4s, for instance, are -- are

15   reviewed every six months; G5s every -- I believe we see them

16   every year.  Ad seg, every six months.  G2s, really if they are

17   not eligible -- for instance, someone who is a murderer, but is

18   a G2 offender, they may not be reviewed again until a need

19   arises, whether it be a job change, whether it be -- because

20   their custody won't change.  They won't -- they're not eligible

21   to go to that G1 status.  If they get a disciplinary case, a

22   major disciplinary case, every offender who receives that goes

23   back through that classification process to determine whether

24   they're going to maintain that custody that they currently have

25   or we're going to take them back into a custody level, so some,

1  if they come in as a G2 and they're not eligible for a G1

2  status, they may not be reviewed for a very long time.

3      Q.  Let's say, for instance, that somebody was a G2

4  inmate, and they get a major disciplinary infraction, let's say

5  it's a fight without weapons, but it results in injury more

6  than first aid.

7      A.  Okay.

8      Q.  And their custody status -- let me ask you this.  If

9  somebody is in a fight in prison, does everybody get punished

10  who's involved in the fight?

11      A.  Not necessarily.  We -- we do an investigation.

12  First off, we find out if that -- if one or the other was a

13  victim.  Was it an equal confrontation?  We have to take into

14  consideration the -- the amount of the injuries, what did they

15  do when staff arrived, did they stop, or did it -- did it

16  result in staff being forced to physically stop them or -- or

17  the use of chemical agents to stop that fight.  So there's a

18  lot of mitigating factors that would go into whether that

19  person could be considered a victim or -- or basically an

20  aggressor.

21      Q.  Would it be unusual for both -- if there's a fight

22  between two inmates, would it be unusual for both of the

23  participants to be disciplined?

24      A.  No, it's not unusual.

25      Q.  Because does it really matter who starts the fight

```
 1  if it's kind of an equal --
 2       A.    No, it really doesn't.  And -- and like I said, it
 3  -- it goes back to -- you have to look at the entire
 4  circumstances and -- and a lot of that comes out in that
 5  investigation process, you know, what happened.  Well, he came
 6  up and he did this and he did this and so I responded, you
 7  know, this way.  And so we have to look at it.  Was it equal
 8  confrontation?  Was it something either one or both could have
 9  prevented by simply turning around and walking away or -- or
10  notifying staff that they were having an issue?
11       Q.    So back to my hypothetical question where we have
12  a -- somebody whose custody status is G2 that gets into a fight
13  and is disciplined as -- I guess demoted to a G4 --
14       A.    Okay.
15       Q.    -- would that be typical for that type of incident?
16       A.    It -- it could.  Yes, absolutely.
17       Q.    And they would not be reviewed then for six months;
18  is that your testimony?
19       A.    That is correct.  For promotion back to a G2,
20  correct.
21       Q.    And if after a six-month period they got promoted
22  to -- is it possible to get promoted from a G4 to a G1, or do
23  you have to go --
24       A.    No, you'd have to go back to the G2 status, maintain
25  that custody status for some time, whether it be a period of
```

```
 1  months.  It's really up to the warden, you know, who -- who
 2  they want to put outside those perimeter fences because
 3  literally I am responsible -- I am the responsible party for
 4  putting those individuals outside that perimeter fence.  And if
 5  I say that this G2 can go outside, then it's really my
 6  liability for putting them out there, so -- but I -- we -- I
 7  don't know of any that have gone from a G4 to a G1.  I will
 8  tell you that I've never known anybody.
 9        Q.    But it's not theoretically impossible?
10        A.    I think it is theoretically possible -- I mean,
11  impossible.  I think you have to go to G2, because only a G2 is
12  eligible to be a G1.
13        Q.    Okay.  But you could -- it doesn't -- you don't
14  necessarily just move one custody level, like if you're a G4,
15  you wouldn't necessarily only be able to become a G3?
16        A.    If you're not serving over 50 years, you wouldn't do
17  the G3 at all.  That currently is -- is reserved for life
18  without parole, or those serving 50 years or greater, so they
19  would skip the G4 and go to a G2.  A G3 is just basically that
20  custody level that --
21        Q.    Okay.
22        A.    -- that I talked about.
23        Q.    And G4s get reviewed every six months?
24        A.    Correct.
25        Q.    And G5s once a year?
```

1      A.    Correct.

2      Q.    But certainly if something happens that -- I guess

3    they could get demoted within that time frame if something were

4    to happen?

5      A.    Sure.  If a G4 has an assaultive behavior, they

6    could go to G5, absolutely.

7      Q.    But they're not going to get any better -- get a

8    better custody status before that six-month review?

9      A.    Correct.  And when I say six months, five weeks -- I

10   mean, five months, two weeks -- I mean, we don't -- we're not

11   really held to the letter of -- of the days, okay?  I've got

12   some that because of housing, I may need some G4 houses.  I

13   know I have some that I've got, but I've got five inmates that

14   they're due up next week or the week after.  I may bring them

15   up seven to ten days early, but, yes, but they can do -- it is

16   a six-month time frame.

17     Q.    Now, when somebody is in let's say a G1, a G2, or a

18   G3 in general population, they're supposed to be somewhere

19   every minute of every day, correct?

20     A.    Yes, ma'am.

21     Q.    I mean, inmates are not just allowed to be wherever

22   they want to be whenever they want to be, are they?

23     A.    Well, technically, no.  Like I said, everybody -- if

24   -- if they're not at work, they're not at school, and they

25   don't have a medical appointment, technically I should be able

1    to find that individual in that -- in that housing area.  Or

2    they could be at the recreation yard, because we may be running

3    recreation so they may be in the gym or recreation.  They're

4    not assigned to recreation time in G1s, 2s, and 3s, technically

5    I should be able to narrow it down.  We count eight times a

6    day.  In a 24-hour period, we count a minimum of eight times.

7    Eight times a day, all traffic stops.  Everybody stops their

8    movement, and we do count.  So hopefully at some point, if I'm

9    looking for a particular individual, they're not at work, they

10   don't have a medical lay-in, they're not at school, I should be

11   able to find them either on the recreation yard or in the

12   housing area.  I should be able to limit unless they're in a

13   place that they're not supposed to be.

14        Q.    And that would be a disciplinary violation if they

15   were --

16        A.    It could be.  It doesn't have to be, but it can be.

17        Q.    And you mentioned that you conducted periodic

18   searches of inmates in their cells and --

19        A.    Their property.

20        Q.    -- and that happens on a regular basis?

21        A.    Yes, ma'am.  By policy, like I said, all general

22   populations are 1s, 2s, and 3s.  We do once -- we're required

23   to do them at least once every 30 days, document every 30 days.

24        Q.    And then there are random searches?

25        A.    And then there are random -- some random, yes.

1      Q.   And certainly if there's a reason to suspect a

2  problem, a search can happen at any time?

3      A.   Yes, ma'am.

4      Q.   To any inmate?

5      A.   That's correct.

6      Q.   Describe -- do inmates get strip searched on a

7  regular basis?

8      A.   Yes, ma'am, depending on where they're going.  We

9  bring them out of certain areas at work assignments -- for

10  instance, maintenance, food service, laundry, they're strip

11  searched going out.  If an offender in some of the higher level

12  custodies, G4, G5s, they're stripped before they're allowed out

13  of their cells.  Coming in from outside, they are strip

14  searched, as well.

15      Q.   And when an inmate is strip searched, can you

16  generally describe that process?

17      A.   It's basically when they are forced to remove all

18  their clothing or -- they remove all their clothing items.  We

19  check their body for contraband, to make sure that they don't

20  have something taped to them or hidden inside their crotch or

21  their pants or underneath their arms or in their mouths, in

22  their hair, things of that nature.

23      Q.   And that happens on a regular basis?

24      A.   It -- I will tell you, it happens frequently in a

25  day to certain varieties.  And if they're unassigned, they

```
 1   don't go to work, they may not be strip searched for a while.

 2   You know, it may not be something that's necessary.  We do pat

 3   search -- random pat searches, but even -- and even the strip

 4   searches are not a hundred percent.

 5        Q.   But y'all do a pretty good job?

 6        A.   We try, yes, ma'am.

 7        Q.   Now, you mentioned an inmate who ordered an air

 8   compressor from a -- from a manufacturer that somehow he had

 9   managed to get cell phones and stuff in there.  You don't --

10   you restrict what inmates can receive through the mail, don't

11   you?

12        A.   Yes, we do.

13        Q.   A family member can't send books and -- and certain

14   items from the family; is that correct?

15        A.   Not directly from them.  It has to come from an

16   approved vendor, you know, Amazon.com or somebody of that

17   nature.

18        Q.   Directly from the manufacturer or the --

19        A.   Correct.

20        Q.   -- the vendor --

21        A.   Yes, ma'am.

22        Q.   -- I guess is the word.  So family members aren't

23   able just to ship anything in that they want?

24        A.   No.

25        Q.   And mail -- like you said, mail gets searched and
```

1  mail gets scanned and mail gets read?

2      A.    And we still find contraband, and we still -- it

3  comes in.

4      Q.    And when you find it, you confiscate it?

5      A.    Yes, ma'am, we do.

6          MS. BERNHARD:  I'll pass the witness.

7                    REDIRECT EXAMINATION

8  BY MS. EVANS:

9      Q.    Warden Nelson, even though obviously you're

10 operating a very well-run prison unit or two units, and even

11 though the Texas prison system as a whole is doing the best

12 that it can and you describe it as being well-run, as well,

13 does violence still happen there on a daily basis?

14     A.    Oh, yes, ma'am.

15     Q.    And why do you count the inmates?

16     A.    Like I said, our -- our objective is public safety,

17 and one of the things that we have to do is be accountable to

18 make sure that I have every inmate on our facility each day

19 that I'm assigned.  Inmates come and go on a daily basis,

20 whether they're being transferred to another facility or being

21 released, going out on work squads, things of that nature, so,

22 eight times a day we stop all that movement and we perform a

23 physical count of our offenders, just to make sure that we have

24 them all, because we've been known to not have them all a time

25 or two.

1      Q.    Absolutely.  So, also, you know, I'm sure that the

2   correctional officers would like to rely on and you as a warden

3   would like to rely on other inmates to let you know if say, for

4   example, somebody has one of those shanks or items that can be

5   used as a sphere, or report about assaultive behavior that's

6   going on, but the reality of it is, the culture of it, if those

7   inmates are letting the correctional officers know this, what

8   are they labeled?

9      A.    They are labeled what is called a snitch, and

10   therefore, may be putting themselves in -- in harms way for

11   coming and telling staff.

12      Q.    Basically every individual incarcerated in TDCJ has

13   an opportunity to do good or do bad.  It's up to that

14   individual, right?

15      A.    Absolutely.  You know, I -- I truly believe in my

16   heart that rehabilitation is -- is something that you -- you

17   have to want.  You have to be able to do that yourself.  I

18   offer the education programs, the vocational programs, the AA

19   and NA, and things of that nature.  If they choose to accept

20   those -- those opportunities, to use them, then they certainly

21   can.  Not all do.  Some do and are very successful.  Some

22   don't, and -- they're not as successful.

23      Q.    I'm sorry?

24      A.    And they're not successful, I guess.

25      Q.    Once they get on the outside world?

1      A.    Correct.

2      Q.    Now, Warden Nelson, how long have those

3 opportunities and those programs, such as AA and NA, been

4 available in the prison system?

5      A.    For a long time.  I mean, ever since I've been here,

6 we provide religious programming of all sorts in an attempt to

7 assist our offender population.  We've had AA counselors, NA.

8 We have psychiatrists, psychologists, social workers, things of

9 that nature on our facilities.  We have education, vocation.

10 Those have always been -- for a very long time.  I would say

11 probably be, 50 years or more that we have at least offered

12 those as a -- as a means of being very proactive in -- in

13 assisting in rehabilitation, I think.  At one time most

14 prisons, to include Texas, was basically a warehouse.  We -- we

15 brought them in, and we didn't concern ourselves with their

16 education and -- and what they were going to do, their

17 rehabilitation, but we certainly have gone to that now.  And

18 certainly in the last 30 years, at least, that I'm aware of,

19 that we are concentrating on the rehabilitation and that

20 reentry point that an offender comes back into society, should

21 they come back into society.

22      Q.    And so while they are required to go to school and

23 they're required -- if they don't have a GED and required to go

24 to work, it's up to that individual inmate to do those other

25 classes that you've discussed?

```
 1        A.   Right.  And when we say required to go to school,

 2   we -- we will test them, and if they have less than a 6th grade

 3   education average, then we will put them on a list to make sure

 4   that they are the priority to go to school.  And if they choose

 5   to go to school it takes them 10 years to get a GED, I mean,

 6   they don't really try, but they're still going.  You know, and

 7   if they choose not to go to school, then we can drop them out

 8   of school for a while.  The principal can bring that to my

 9   attention, say I've got a student just doesn't want to be

10   there, he doesn't want to go to school, I want to drop him from

11   school, we can make him a full-time worker.  And then at some

12   point before his parole or discharge date, try to provide him

13   with those educational opportunities.

14        Q.   But the opportunity, the tools, the programs, are

15   there to be taken advantage of if that individual chooses to?

16        A.   Absolutely.

17             MS. EVANS:  Pass the witness.

18                      RECROSS-EXAMINATION

19   BY MS. BERNHARD:

20        Q.   Warden, is substance abuse treatment available at

21   every unit?

22        A.   No, ma'am.

23        Q.   So there are some inmates who may need it and want

24   it, but can't get it?

25        A.   Let me -- let me recant.  We do have -- most
```

```
 1  facilities -- most will provide a free world volunteer base for
 2  AA and NA, either Winners Circle, something of that nature.
 3  But we have designated facilities that are assigned AA or that
 4  are assigned for an intensive drug treatment.  When I said, no,
 5  I meant not every unit has an intensive drug treatment program.
 6  Most of us all have an AA and NA volunteers coming in on the
 7  weekends that we do provide to the offender population.
 8       Q.   But some people -- for some addictions, they may
 9  need the intensive treatment; fair to say?
10       A.   Absolutely, and that's done, there again, through a
11  therapeutic evaluation of that offender, what -- what their
12  history is of drug use and things of that nature as to whether
13  they'll be eligible at any point to go to a drug
14  rehabilitation -- intensive drug treatment program that we
15  provide.
16       Q.   Does it happen or have you seen it happen in your
17  experience where somebody is deemed in need of substance abuse
18  treatment, but it's simply not available?
19       A.   Because of their custody level if they were G4, G5,
20  because of their behavior problem, yeah, probably.
21       Q.   And they could even be assigned to a unit that
22  didn't have the intensive treatment?
23       A.   Correct.
24       Q.   So not everybody who needs it or wants it can get
25  it?
```

1      A.    Correct.

2      Q.    And in the past years, is it fair to say that some

3   of the funding for these programs has been cut?

4      A.    I don't -- I don't deal directly with -- with the

5   programming's funding.  I -- we have seen a larger -- or a huge

6   increase in our volunteer base programming.  Those intensive

7   drug treatment programs are -- are certainly available out

8   there.  We have certain units that are specified drug treatment

9   programs, but we do rely a lot on our volunteer base

10  programming for drug -- drug treatment, drug abuse, substance

11  abuse, and the ability to get into those AA and NA, so I'll say

12  we've seen an increase in that, and maybe less of what we did

13  on an every unit -- we don't have an AA counselor, for

14  instance, a paid AA or NA counselor on any correctional

15  facility, except for those who are designated as therapeutic

16  treatment communities.

17     Q.    If somebody is classified as a G3 inmate, can they

18  go to a substance abuse treatment facility?

19     A.    No, ma'am, because they're going to have to be a G2

20  before they're ever considered for parole.  If they're doing a

21  50-year sentence and they haven't done 10 years, they're not

22  even going to be considered for parole anyway.  And if -- if an

23  incarcerated person, an offender is going to go to a drug

24  treatment program, they have to be a G1 or a G2, so they're

25  going to have to have done a portion of that G3 sentence.  If

```
 1  they're serving life without parole, we're not going to send
 2  them anyway.  They're not -- because we're not sending them
 3  back into society, so therefore, they're not in need for the
 4  drug treatment because it is rehabilitation -- is a re-entry
 5  point for our offenders.
 6                  MS. BERNHARD:  I'll pass the witness.
 7                  MS. EVANS:  The State has nothing further.
 8                  THE COURT:  Thank you, ma'am.  You may stand
 9  down, and you are excused.
10                  THE WITNESS:  Thank you.
11                  MS. MOSELEY:  The State calls Carina Pinzon.
12                  (Witness brought forward.)
13                  THE COURT:  Ma'am, would you please raise your
14  right hand?
15                  (Witness sworn.)
16                  THE WITNESS:  Yes.
17                  THE COURT:  All right.  Put your hand down.
18                  (Interpreter sworn.)
19                  INTERPRETER:  I do.
20                  THE COURT:  Thank you.  Please state your name
21  and your license number.
22                  INTERPRETER:  My name is Irene Vera, License
23  Number 1643.
24                  THE COURT:  Thank you.
25                  Please proceed.
```

```
 1              MS. MOSELEY:  Thank you, Judge.
 2                     CARINA PINZON,
 3   was called as a witness by the State, and after having been
 4   first duly sworn, testified as follows:
 5                    DIRECT EXAMINATION
 6   BY MS. MOSELEY:
 7        Q.   Ma'am, would you please state your name?
 8        A.   Carina Pinzon.
 9        Q.   Can you spell it?
10        A.   C-a-r-i-n-a P-i-n-z-o-n.
11              THE COURT:  Ma'am, I'm going to ask you to step
12   back so that juror right behind you can see the witness.
13              INTERPRETER:  Oh, sure.
14              THE COURT:  Thank you.
15        Q.   (BY MS. MOSELEY)  Ms. Pinzon, are you a married
16   lady?
17        A.   Yes.
18        Q.   Do you live in the Dallas area?
19        A.   Dallas, yes.
20        Q.   Do you have children?
21        A.   Yes.
22        Q.   How many children?
23        A.   Three.
24        Q.   You have to wait for the translator to say it in
25   Spanish, and then you answer in Spanish.
```

```
 1                    Okay.  You said you have three children?

 2       A.    Yes.

 3       Q.    Are they girls or boys?

 4       A.    Two boys, one girl.

 5       Q.    Do you work?

 6       A.    Yes.

 7       Q.    What do you do for a living?

 8       A.    Right now, I work in a restaurant.

 9       Q.    Before that, did you work as a housekeeper at a

10  motel?

11       A.    Yes.

12       Q.    How long did you work in that kind of job?

13       A.    Housekeeping?

14       Q.    Yes.

15       A.    The last hotel I worked at I was there for one year.

16       Q.    And -- and what about the one before that?

17       A.    Three years.

18       Q.    I'm going to direct your attention back to April the

19  26th of 2012.

20       A.    Okay.

21       Q.    Which motel were you working at then?

22       A.    It's called Express Inn.

23       Q.    Is it in Garland?

24       A.    Yes.

25       Q.    And you were a housekeeper at the Express Inn?
```

1       A.    Yes.

2       Q.    What -- what hours of the day did you work?

3       A.    Sometimes I would go in at 9:00 or 10 o'clock in the

4    morning.

5       Q.    And was it your responsibility to clean the rooms

6    that the guests would stay in?

7       A.    Yes.

8       Q.    That morning of April 26th of 2012, somewhere around

9    10:00 or 11:00 in the morning, were you cleaning a room?

10      A.    Yes.

11      Q.    And where in the room were you cleaning?

12      A.    I was in the room, but I was cleaning the bathroom.

13      Q.    Do you leave the door to the room open when you're

14   cleaning?

15      A.    Yes.

16      Q.    And do you do anything to kind of block the door?

17      A.    Yes, I always put the material that we use to work,

18   I put that close to the door -- up to the door.

19      Q.    And is it on a cart of -- on wheels?

20      A.    Yes.

21      Q.    And you put that in the doorway so that someone

22   can't walk right in the door, they have to move it?

23      A.    Yes.

24      Q.    While you were cleaning the bathroom that morning,

25   did something happen?

1      A.    That's when the man came in to go in -- that's when

2  the man came in while I was there cleaning the bathroom.

3      Q.    And what happened when he came in?

4      A.    I didn't hear when he moved the cart because the

5  faucet was open.  I noticed him when he touched my shoulder.

6      Q.    He put his hand on your shoulder?

7      A.    Yes.

8      Q.    Did you have your back to him?

9      A.    Yes.

10     Q.    Did he say anything when he touched your shoulder?

11     A.    He said something in English, but I didn't

12 understand him.

13     Q.    What did you do when he touched your shoulder?

14     A.    I asked him what was going on, if he needed

15 something.

16     Q.    Did you ask in English or in Spanish?

17     A.    Yes, I told him, what happened, do you need

18 something.

19     Q.    You speak a little bit of English?

20     A.    Very little, yes.

21     Q.    Do you understand a little bit of English?

22     A.    Yes, but he was speaking -- I didn't understand very

23 well what he was saying.

24     Q.    Did you turn around when he spoke to you?

25     A.    Yes, yes, I wasn't expecting -- I got startled

104

1  because when he touched me, I wasn't expecting anybody there,

2  and I turned around to look at him.

3          Q.    Had you ever seen that man before?

4          A.    No.

5          Q.    Do you know if he was staying in the motel?

6          A.    I hadn't seen him before, but I think he had rented

7  a room there because that's where the police found him.

8          Q.    When you turned around, did you just turn your head,

9  or did you turn all the way around to see all of him?

10         A.    Well, I turned around like this (indicating) to see

11 him, but he was leaned over like this.

12         Q.    He was leaned over you?

13         A.    No.

14         Q.    What was he leaned over?

15         A.    No, I was like this, because the bath -- the

16 bathtubs are a little bit low like this, but he was -- I saw

17 him like this, but he was over like this, you know, like if

18 he's saying, hey, how are you.

19         Q.    So he had leaned over to touch you?

20         A.    A little bit like that, yes, when he touched me.

21         Q.    At some point did you see all of him?

22         A.    Yes, when I turned around and I asked him what did

23 he need, that's when I saw that he had his penis outside and

24 that's when I got scared.

25         Q.    Did he have his pants on or off?

```
 1        A.    No, he had his pants on, but he had lowered the

 2   zipper.

 3        Q.    And you saw his penis?

 4        A.    Yes.  Yes, that's when I got really scared.

 5        Q.    When you saw that, what did you do?

 6        A.    When he stood up like that, that's when I saw that

 7   he had his penis outside and that's when he -- he tried to

 8   touch me.  He grabbed me here by the hand, and in this hand I

 9   had like an ice bucket that I use to clean the bathrooms and

10   that's when I threw water at him and I pushed him.

11        Q.    And did he -- did -- were you able to get away?

12        A.    Yes.

13        Q.    When -- did you have to run past him or did he leave

14   first?

15        A.    Well, I don't know.  I just threw the water at him

16   and I don't know what he did, but I just pushed him and then I

17   just left the bathroom.

18        Q.    Do you think he was still in the bathroom when you

19   left?

20        A.    I don't know.  I just went out running, and I didn't

21   know anything else.

22        Q.    When you went out running, where did you go?

23        A.    I went downstairs in the office because I was in the

24   second floor.

25        Q.    And why did you go to the office?
```

```
 1       A.    To talk to the manager.

 2       Q.    Did the manager call the police for you?

 3       A.    Yes.

 4       Q.    Did the police come and talk to you?

 5       A.    Yes.

 6       Q.    Did you tell them what had happened?

 7       A.    Yes.

 8       Q.    Were you able to tell them what the man looked like

 9  who had done that?

10       A.    Yes, I told him that he was wearing a white shirt,

11  and that he was of dark skin.

12       Q.    But you didn't know if he was staying in the motel

13  or not at that time?

14       A.    No, no, I didn't know.

15       Q.    Did the police ask you -- did the police find the

16  man?

17       A.    Yes.

18       Q.    And did they show him to you?

19       A.    Yes.

20       Q.    And are you sure that the man that they caught was

21  the man who had exposed himself to you?

22       A.    Yes.

23       Q.    Do you see him in the courtroom, the man who did

24  this?

25       A.    I don't see him.
```

1      Q.    And it's been a year and a half?

2      A.    Yes.

3      Q.    After the -- after the police had this man arrested,

4  or -- or found the man, did -- did you leave work that day?

5      A.    Yes.

6      Q.    Did you go back to work the next day?

7      A.    No, I didn't go back to work.

8      Q.    You never went back to that job?

9      A.    No, no, not anymore.

10     Q.    How long did you work there before this happened?

11     A.    Three years.  I had just completed three years in

12  March.

13     Q.    Do you need to work to -- to support your family?

14     A.    Yes.  Yes, I need to help my husband.

15          MS. MOSELEY:  I'll pass the witness.  Thank you,

16  ma'am.

17                      CROSS-EXAMINATION

18  BY MS. MULDER:

19     Q.    Good morning, Mrs. Pinzon.

20     A.    Good morning.

21     Q.    My name is Nancy Mulder, and I'm just going to ask

22  you some questions.  If at any time you don't understand me,

23  just let me know and I can rephrase them.

24     A.    Okay.

25     Q.    I also speak Spanish, but we can't use Spanish in

1  the courtroom because the court reporter doesn't speak Spanish.

2  And she's taking down everything we say.

3              Just so I understand what the man's pants were

4  like, you said his -- his pants were up but they were unzipped.

5      A.   Yes.

6      Q.   Were they buttoned and unzipped or unbuttoned and

7  unzipped?

8      A.   Well, I can't remember very well if he had the

9  button on, but I do know that the zipper was down.

10     Q.   Did the man seem -- seem dishevelled?

11     A.   Yes.

12     Q.   Ms. Pinzon, how -- how old a lady are you?

13     A.   I'm 39 years old.

14     Q.   And you're a married woman and you have children?

15     A.   Yes.

16     Q.   Was the man's member just hanging there?

17     A.   No.

18     Q.   Was it erect?

19     A.   Yes.

20     Q.   Did the man have any body odor?

21     A.   No, no, I don't remember.

22     Q.   Did you -- could you tell if the man seemed drunk or

23  high?

24     A.   Well, his face didn't look normal like a normal

25  person who just wants to talk to you or ask you something.

```
 1        Q.    He looked dishevelled?

 2        A.    Yes.

 3        Q.    After you left that room, you never saw -- the man

 4   didn't chase you or anything?

 5        A.    I don't know if he stayed there or if he went to his

 6   room because I just left there, and I did not go back to the

 7   second floor.

 8        Q.    But the man did not chase after you?

 9        A.    No.

10        Q.    Thank you, Ms. Pinzon.

11              MS. MULDER:  Nothing further, Your Honor.

12              MS. MOSELEY:  I have no further questions.

13              THE COURT:  You both may be excused.  Thank you

14   very much.

15              MS. MOSELEY:  And is she permanently excused?

16              THE COURT:  Yes, ma'am.

17              MS. MOSELEY:  The State calls Officer Mendoza.

18              (Witness brought forward and sworn.)

19              THE WITNESS:  I do.

20              THE COURT:  Thank you.

21              THE WITNESS:  Sorry.

22                    MARK MENDOZA,

23   was called as a witness by the State, and after having been

24   first duly sworn, testified as follows:

25                    DIRECT EXAMINATION
```

1  BY MS. MOSELEY:

2       Q.    They didn't really design those chairs for police

3  officers and their belts.

4       A.    No.

5       Q.    Would you please introduce yourself to the members

6  of the jury?

7       A.    Officer Mark Mendoza.

8       Q.    And you work for the Garland Police Department?

9       A.    Yes, ma'am.

10      Q.    How long have you worked for them?

11      A.    Twenty-one years.

12      Q.    What's your current assignment with the police

13 department?

14      A.    I'm assigned to the Patrol Division, currently.

15      Q.    And is that how you've spent most of your years with

16 the Garland Police Department?

17      A.    No, ma'am.  I've been in criminal investigations,

18 narcotics, and just recently in patrol the last few years.

19      Q.    Just went back to patrol the last few years?

20      A.    Yes, ma'am.  Yes, ma'am.

21      Q.    I can tell you and I are going to talk over each

22 other.  Darline is already looking at me.  So make sure I

23 finish the question before you answer, and I'll try to let you

24 finish your answer.

25      A.    Okay.

```
 1        Q.    As a patrol officer, were you working in that

 2   capacity -- I'm going to take you back a long ways, back to

 3   May 31st of 1994.

 4        A.    Yes.

 5        Q.    And did you work alone or with a partner back then?

 6        A.    With a partner.

 7        Q.    Who were you working with?

 8        A.    Officer Ehrman.

 9        Q.    Can you spell that for the court reporter?

10        A.    I believe it's E-h-r-m-a-n.

11        Q.    And you were you and Officer Ehrman working together

12   then that day?

13        A.    Yes.

14        Q.    Did you come into contact with a person later known

15   to you as Matthew Lee Johnson?

16        A.    Yes, ma'am.

17        Q.    Do you see him in the courtroom?

18        A.    Yes.

19        Q.    Would you identify him by something he's wearing

20   today?

21        A.    He is wearing a dark-colored blazer and looks like a

22   maroon tie, dark-colored tie, sitting on the end.

23        Q.    Wearing glasses?

24        A.    Yes, wearing glasses.

25              MS. MOSELEY:  Your Honor, may the record reflect
```

 1    the witness has identified the Defendant in open court.

 2                  THE COURT:  The record will reflect.

 3         Q.    (BY MS. MOSELEY)  Can you tell the members of the

 4    jury how you came into contact with him?  What were the

 5    circumstances?

 6         A.    We were dispatched to a disturbance call between a

 7    male and female fighting on the side of the road.

 8         Q.    When you got there, did you see the fight?

 9         A.    No.  Just the male and female looked like they had

10    been arguing, a disturbance had occurred.

11         Q.    What did you do to investigate this call, figure out

12    how you were going to split it up?

13         A.    Yeah, we -- basically we separate them.  Officer

14    always speaks to someone, and I speak to someone.  And so we

15    placed the subject to the back of the squad car while we talked

16    to the female, tried to ascertain what happened.  And during

17    that time, which is normal, we just do a routine check for

18    warrants, and we were just waiting on that to come back.

19         Q.    Did you kind of determine that there wasn't any --

20    nobody was going to be arrested for whatever this assault or

21    disturbance had occurred earlier?

22         A.    Right.

23         Q.    Did you have contact with the Defendant during this

24    time where you were waiting for the results of the warrant

25    check to come back?

```
 1        A.    Just had him in the backseat of the car, like I

 2  said, while we were waiting.  And once we determined that we

 3  were going to place him into custody, we opened the back door

 4  to inform him of that, and that's when he came charging out of

 5  the back squad car, like trying to get away, and we began

 6  wrestling with him.

 7        Q.    Was the female still there on the scene or had she

 8  been told to go on?  Do you remember?

 9        A.    I honestly -- I can't remember that.

10        Q.    Had the Defendant been cooperative with you up to

11  the point that you told him he was going to go to jail?

12        A.    From what I remember, just having him in the

13  backseat of the car, yes.

14        Q.    You didn't have any trouble getting him to sit back

15  there?

16        A.    No, just -- just had him sit back there, like I

17  said, while we were separating everybody.

18        Q.    And you said when you opened the door to tell him he

19  was being arrested on warrants --

20        A.    Yes.

21        Q.    -- he --

22        A.    Basically came charging out of the car trying to get

23  away while we're standing -- had the back door open, he shot --

24  tried to shoot in between both of us to exit the vehicle.

25        Q.    What did you do?
```

```
 1        A.    Grabbed ahold of him and tried to place him into
 2   custody.
 3        Q.    You and Officer Ehrman --
 4        A.    Yes.
 5        Q.    -- trying to -- did he have handcuffs on at that
 6   time?
 7        A.    No.
 8        Q.    Because prior to this, he was just sitting in the
 9   backseat?
10        A.    Right.
11        Q.    What -- what kind of a struggle, if any, did he put
12   up with you and Officer Ehrman?
13        A.    It was a pretty good struggle.  We wound up
14   wrestling on the ground.  He bit me.  He bit Officer Ehrman.
15   We then pepper sprayed him, trying to gain control.  Still
16   couldn't.  We wound up utilizing our police issued batons,
17   striking, you know, across -- by his legs and we were finally
18   able to get handcuffs on him, place him in custody.
19        Q.    You said he bit you.  Where did he bite you?
20        A.    He bit me on the arm.
21        Q.    And do you remember where he bit Officer Ehrman?
22        A.    On his arm, also.  Bit his watch off -- broke his
23   watch.
24        Q.    He bit his watch off?
25        A.    Right.  Bit through his watch, bit his arm.
```

```
 1        Q.    How bad was the bite on your arm?

 2        A.    It was open.  I had -- we went to the hospital and

 3   had to get, you know, cleaned up and get tetanus shots.

 4        Q.    You finally got him in custody, I assume?

 5        A.    Yes.

 6        Q.    And took him to jail?

 7        A.    Yes.

 8        Q.    Was he charged with resisting arrest?

 9        A.    Yes.

10        Q.    And you said that offense date was May 31st, 1994?

11        A.    Yes, ma'am.

12              MS. MOSELEY:  Darline, I'm on 189, I think.  I

13   know I haven't marked them.

14        Q.    (BY MS. MOSELEY)   Now, I'm showing you State's

15   Exhibit 189.  It's a certified document from the Clerk's

16   Office.  Does this record indicate that it pertains to Matthew

17   Lee Johnson?

18        A.    Yes.

19        Q.    With date of birth 9-17-75?

20        A.    Yes.

21        Q.    And offense date of May 31st, 1994?

22        A.    Yes.

23        Q.    And does this indicate that the Defendant pled

24   guilty to a charge of resisting arrest on that date?

25        A.    Yes, ma'am.
```

```
 1        Q.    That occurred on that date at least?

 2        A.    Yes.

 3        Q.    And received probation, 12 months?

 4        A.    Yes.

 5        Q.    And then that probation was later revoked on

 6   August 11th of 1995, and he was sentenced to 365 days in jail?

 7        A.    Yes.

 8        Q.    And this relates to the offense you're discussing

 9   where he bit you and Officer Ehrman?

10        A.    Yes, ma'am.

11              MS. MOSELEY:  I'd offer State's Exhibit 189.

12              (State's Exhibit 189 offered.)

13              MS. MULDER:  Your Honor, we re-urge our

14   objection -- prior objections to State's Exhibits 166, 167,

15   168, insufficient identifying information, no judgement and

16   sentence.

17              THE COURT:  Thank you.  Objection is overruled.

18   Document is admitted.

19              (State's Exhibit 189 admitted.)

20        Q.    (BY MS. MOSELEY)   And also those records indicate

21   that the Defendant pleaded guilty to that charge, correct?

22        A.    Yes.

23        Q.    And you never had to come to court and testify back

24   then?

25        A.    No, ma'am.
```

117

```
 1        Q.    Obviously, you made a report about it, and that
 2   helped you remember the incident and the exact details?
 3        A.    Yes.
 4        Q.    Do you know if on that date back in 1994, whether or
 5   not the Defendant was intoxicated?  Was he high or on drugs or
 6   intoxicated with alcohol?
 7        A.    From what I remember, no.
 8        Q.    You didn't put anything in your report regarding
 9   that?
10        A.    No.
11        Q.    Would it have mattered?  Would you have arrested him
12   anyway?
13        A.    Yes.
14        Q.    Is that the only time you've ever dealt with the
15   Defendant?
16        A.    No.
17        Q.    Tell the ladies and gentlemen of the jury when --
18   when was the next time you saw him?
19        A.    The next time was about a year ago, when I got sent
20   out to a disturbance at a motel in Garland.
21        Q.    On April 20th, 2012.  Does that sound about right?
22        A.    Yes.
23        Q.    Back at the Express Inn in Garland?
24        A.    Yes.
25        Q.    And I said April the 20th -- actually April 26th is
```

```
 1   the correct date.  I don't -- you made a report that day or --

 2        A.    Officer Delmar made the report.

 3        Q.    One of the other officers.  What was the nature of

 4   the call you received to the Express Inn?

 5        A.    If I remember the call-outs, it was -- came out like

 6   as like a sexual assault -- possible sexual assault.

 7        Q.    That requires more than one officer to respond, I

 8   assume?

 9        A.    Yes.

10        Q.    How many officers ended up responding?

11        A.    Total of three.  It was myself, Officer Delmar, and

12   his rookie that he was training, so they were riding two man.

13        Q.    Those two officers, one is a training officer, and

14   one was a new officer?

15        A.    Yes.

16        Q.    Do you remember his name?

17        A.    Kohls.

18        Q.    Kohls?

19        A.    Uh-huh.

20        Q.    K-o-h-l-s?

21        A.    Yes.

22        Q.    Were you the first officer that arrived, or did you

23   come after?

24        A.    Honestly, I can't remember right offhand.  I mean,

25   we got there pretty much about the same time.  Wasn't too much
```

```
 1   time difference.

 2        Q.    Do you speak Spanish?

 3        A.    Yes.

 4        Q.    And did you speak with the victim in that call,

 5   Carina Pinzon?

 6        A.    Yes.

 7        Q.    Was she able to tell you what happened?

 8        A.    Yes.

 9        Q.    Can you describe for the members of the jury how

10   she -- what was her demeanor?  How was she acting?

11        A.    She was very upset.  She was crying uncontrollably.

12   You could see she was visibly shaken and just -- she couldn't

13   really speak.  We had to sit there and talk to her for a while

14   to get her to calm down and try to get the information from

15   her.

16        Q.    Once she was able to tell you what had happened, and

17   she gave you a description of the person?

18        A.    Yes.

19        Q.    Did you work with the manager to see if you could

20   figure out whether the person who had done this was staying

21   there in the motel?

22        A.    Yes.

23        Q.    Were y'all able to narrow the list down?

24        A.    Yes.  We just basically gave a description of what

25   we had and asked how many people he had on the registry staying
```

```
 1  at the motel.  And he said these might fit the description, so
 2  he gave us some names to check, some rooms.
 3       Q.    And did y'all go to some rooms to see if anyone was
 4  there that matched the description?
 5       A.    Yes.
 6       Q.    When you went to Room 219, who answered the door?
 7       A.    Mr. Johnson.
 8       Q.    Did you know who he was when you saw him?
 9       A.    Yes.
10       Q.    You still remembered him from that incident, 10
11  years --
12       A.    Twenty years ago.
13       Q.    Twenty years?
14       A.    Almost 20 years ago, yes.
15       Q.    I assume that's not the only resisting arrest charge
16  you've ever filed?
17       A.    No.
18       Q.    Not the only time somebody has been uncooperative?
19       A.    No.
20       Q.    But this one stood out?
21       A.    Yes.
22       Q.    Why?
23       A.    Probably because I was brand new.  Probably been
24  there -- as far as being on the streets, you know, just about a
25  year or so.
```

1       Q.    When you saw him, did you say you remembered him?

2  Did you say something to him?

3       A.    Yes, I said, Matthew Lee Johnson.  I said, I

4  remember you.

5       Q.    Did you tell him how you remembered him?

6       A.    We just kind of -- I don't think I did.  I just

7  said, I remember you, and we just kind of went from there.

8       Q.    How was -- how did he appear to you when he answered

9  the door?

10      A.    Calm, like no big deal, nothing was going on,

11 relaxed.

12      Q.    Was there anything about his appearance, his

13 clothing that caught your attention?

14      A.    Right off the bat, no, he was kind of sitting -- he

15 was eating a hamburger and kind of invited us in the room, so

16 we just began talking to him, making casual conversation,

17 noticed that his clothing was wet.

18      Q.    Did you inquire of him if he knew why you were

19 there?

20      A.    Yes.

21      Q.    And what did he say?

22      A.    First he said he didn't, said he didn't know what

23 was going on.  And, you know, the more we began talking, he

24 told us that he had been staying there at the room, and said he

25 had been smoking crack all night.  And so then I kind of began

1  asking him if he had anything illegal in the room, and he said

2  he probably had a crack pipe or something somewhere in the

3  room.  And I asked him if we could look.  He said, sure, so we

4  started looking through the room.  He actually started kind of

5  pointing to stuff, you might want to look over here, check

6  here, kind of helping us out as far as trying to look.

7       Q.    He was -- he was cooperative with you?

8       A.    Yes.

9       Q.    And you said at first he didn't tell you anything --

10 he said he didn't know why you were there?

11      A.    Right.

12      Q.    At some point did he change that story?

13      A.    Yes, I informed him, I said, you know why we're

14 here.  I kind of brought the situation, and then he said he was

15 just trying to drop off some towels to the room.

16      Q.    Did he appear to you to be intoxicated at the time

17 you were talking to him?

18      A.    No.

19      Q.    But he told you he had been smoking crack all night

20 the night before?

21      A.    Right.

22      Q.    And at this time it's, what, around 11:30 in the

23 morning?

24      A.    Correct.

25      Q.    Did you ever find a crack pipe?

```
1        A.    No.

2        Q.    Did you find any drugs at all?

3        A.    No.

4        Q.    Were you looking for a crack pipe?

5        A.    I was looking because we even tore the -- I tore the

6   garbage bag open trying to find anything in there, if I could

7   find any type of paraphernalia, you know, whether it be a crack

8   pipe or anything associated with smoking crack.

9        Q.    Did the Defendant appear to be intoxicated on

10  alcohol?  Did you smell any alcohol?

11       A.    No.

12       Q.    Did you see any evidence of any of that in the room?

13       A.    No.

14       Q.    No residue, no marijuana, no nothing in the room?

15       A.    Nothing.

16       Q.    Did you -- did you notice anything at some point

17  during this about what he was wearing?

18       A.    Yes.  Like I was saying, just wearing his clothes,

19  he didn't have -- have his shoes on.  He had on -- like I said,

20  he had -- I started to pat him down basically for officer

21  safety.  I noticed he had some wet like insoles -- shoe insoles

22  and a sock and his shirt was wet -- clothing was wet.

23       Q.    And did that mean anything to you based on what you

24  had heard from Ms. Pinzon?

25       A.    Yes.  Basically she told us that she threw water on
```

1   the subject.

2        Q.    Did you ask Ms. Pinzon if she recognized the

3   Defendant as the one who had done this?

4        A.    Yes.

5        Q.    And she told you that he was?

6        A.    Yes.

7        Q.    Did you arrest him?

8        A.    No.

9        Q.    Tell the jury why he wasn't arrested for this.

10       A.    Well, he was not arrested -- like I said, this was

11   Officer Delmar's call and I was his backup.  Basically he felt

12   that this -- due to the complainant's story as far as she

13   telling us it happened so quick, she couldn't tell, you know,

14   what happened, that he just felt he didn't have a good enough

15   case as far as -- he wanted to write him a ticket for

16   reckless -- I'm sorry, I can't remember if it was --

17       Q.    Exposure?

18       A.    -- exposure, I'm sorry, yes.  And so we was going to

19   ask him -- basically make him leave the hotel room.  I said,

20   well, if we're going to make him leave, we're going to -- I

21   said, he's not going to stay here, so I went and talked to the

22   manager and informed her what we had, and the manager was going

23   to make him leave, give him his money back.  And I told him we

24   were going to issue him a trespass from the property, also, so

25   he would have to leave and not hang around.

```
 1        Q.    And if we're being honest with the jury, you and

 2   Officer Delmar did not agree on how that call re -- resolved

 3   itself?

 4        A.    No.

 5        Q.    You wanted to take him to jail?

 6        A.    Yes.

 7        Q.    Did you do -- do -- were field sobriety tests

 8   performed on the Defendant?

 9        A.    Yes.

10        Q.    To see if he was intoxicated?

11        A.    Yes.

12        Q.    What was the purpose for that?

13        A.    Because if he was intoxicated, he wasn't going to be

14   allowed to stay there.  He was going to be out in public, so he

15   was going to be placed in custody for public intoxication.

16        Q.    Had he been intoxicated, would you have arrested him

17   for that?

18        A.    Yes.

19        Q.    Was he?

20        A.    No.

21        Q.    Did he pass your field sobriety tests?

22        A.    Yes.

23        Q.    And was he issued a citation?

24        A.    Yes.

25        Q.    And a criminal trespass warning?
```

```
 1        A.    Yes, ma'am.

 2        Q.    Telling him he couldn't come back to the motel?

 3        A.    Correct.

 4        Q.    And that was on April 26th of 2012?

 5        A.    Correct.

 6        Q.    About a month before this offense?

 7        A.    Yes, ma'am.

 8              MS. MOSELEY:  I'll pass the witness.

 9                     CROSS-EXAMINATION

10   BY MS. MULDER:

11        Q.    Good morning, Officer Mendoza.

12        A.    Good morning.

13        Q.    My name is Nancy Mulder.  I'm going to ask you some

14   questions about these events.  If at any time you don't

15   understand me, just let me know and I can rephrase them.

16        A.    Okay.

17        Q.    Now, first of all, have you refreshed your memory

18   with the police report?

19        A.    Which one?

20        Q.    I'm sorry, I'm talking about the 2012 incident.

21        A.    No, I have not.  Not recently, I haven't.

22        Q.    Well, what's recently to you?  In the last hour?  In

23   the last few weeks?

24        A.    Couple of months, when we had our interview, before

25   the trial.
```

```
 1        Q.    Okay.

 2              MS. MULDER:  Do y'all have a hard copy?

 3              MS. MOSELEY:  I don't.

 4        Q.    (BY MS. MULDER)  We're going to print one out real

 5  quick.

 6        A.    Okay.

 7        Q.    Let me ask you this.  I'm going to -- now, I --

 8  since we're going to print that out, I'm going to go back to

 9  the incident in 1994.

10        A.    Okay.

11        Q.    Did you have to get any stitches for your body?

12        A.    No, ma'am.

13        Q.    It just broke the skin?

14        A.    Yes.

15        Q.    Okay.  He didn't take a chunk out of your arm?

16        A.    No.

17        Q.    And in 1994, what was Matthew Johnson's age, if you

18  recall?

19        A.    I could not tell you.

20        Q.    Eighteen.  Would that sound about right?

21        A.    Probably.

22        Q.    Okay.  If he's 38 sitting here right now, then 20

23  years ago he would have been 18?

24        A.    Twenty years ago, yes.

25        Q.    And that's when the bite incident happened?
```

128

```
 1        A.    Yes.

 2              MS. MULDER:  May I approach the witness, Your

 3   Honor?

 4              THE COURT:  Yes, ma'am.

 5        Q.    (BY MS. MULDER)  Officer Mendoza, I'm showing you

 6   the first two pages of the 2012 report.  If you would refresh

 7   your recollection with -- with that report -- the first two

 8   pages, please.

 9        A.    Okay.

10        Q.    Thank you, Officer.  I'll leave it here in case you

11   need -- actually, you know what, I'm going to take it with me.

12        A.    No problem.

13        Q.    First, when you're talking to Ms. Pinzon in Spanish,

14   so there was nothing lost in translation.  Would you agree?

15        A.    Agreed.

16        Q.    Okay.  When you first talked to her before talking

17   to Matt Johnson, she couldn't tell you if -- what the man was

18   doing with his penis or whether it was erect or flaccid or

19   what.  That was part of the problem that Officer Delmar had

20   with filing a case?

21        A.    Correct.

22        Q.    Okay.  So I just want to be clear.  Ms. Pinzon tells

23   you -- told you that she could not tell if the man's penis was

24   erect or flaccid or what it was doing or --

25        A.    No.  She said she couldn't tell if it was erect or
```

```
 1  if he was masturbating.

 2       Q.   Or what?

 3       A.   Right.

 4       Q.   Okay.  And then when you knocked on Room 219, what

 5  was the first thing you noticed when Matt Johnson opened the

 6  door?

 7       A.   After I read the report, the -- the smell of

 8  marijuana.

 9       Q.   And you actually wrote pungent?

10       A.   Well, I didn't.  That was Officer Delmar's report.

11       Q.   Okay.  Officer Delmar wrote pungent odor of

12  marijuana?

13       A.   Right.

14       Q.   And marijuana has an identifiable smell?

15       A.   Yes.

16       Q.   It's one that you know.  Would you agree?

17       A.   Yes.

18       Q.   Because you're a police officer, you come across it?

19       A.   Yes.

20       Q.   Okay.  And did it seem as though -- at least in the

21  last -- at some point that morning Matthew Johnson had smoked

22  marijuana in that room?

23       A.   I don't know about the morning, but there was a

24  smell, yes.

25       Q.   Okay.  And Officer Delmar described it as pungent?
```

1       A.    Yes, in his report.

2       Q.    Okay.  And Matthew Johnson tells you he had drank

3  some beers?

4       A.    Correct.

5       Q.    And he said he had been smoking marijuana?

6       A.    Correct.

7       Q.    And been smoking -- that he spent all night smoking

8  crack cocaine?

9       A.    Yes.

10      Q.    Okay.  And he gives you permission to look around

11  the room?

12      A.    Yes.

13      Q.    And fair to say that you all thought he probably had

14  some drugs in the room?

15      A.    Yes.

16      Q.    Okay.  But it was all used up?

17      A.    Nothing in there.

18      Q.    Nothing in there.  And today you're telling us to

19  you he didn't seem intoxicated?

20      A.    No.

21      Q.    And the field sobriety test you performed on him was

22  the HGN?

23      A.    That would be Officer Delmar and his rookie.

24      Q.    What is the HGN?

25      A.    Horizontal nystagmus gaze.

```
 1        Q.    Or horizontal H --

 2        A.    Yes.

 3        Q.    -- horizontal gaze nystagmus?

 4        A.    Yes.

 5        Q.    And that is -- is when the police officer holds the

 6   pen and looks at somebody's eyes?

 7        A.    Yes.

 8        Q.    Okay.  And that test solely is to see if there is

 9   any alcohol in somebody's system?

10        A.    No, not -- not alcohol.

11        Q.    Are you a drug recognition expert?

12        A.    No, ma'am.

13        Q.    But Officer Delmar felt that Matthew Johnson was not

14   a threat and gave him a couple of tickets and sent him on his

15   way?

16        A.    Not a threat of what?

17        Q.    That he didn't have a reason to arrest him?

18        A.    Right.  He issued him a citation.

19        Q.    Class C?

20        A.    Yes.

21        Q.    Offense of touching?

22        A.    Yes.

23        Q.    And criminal trespass --

24        A.    Yes, ma'am.

25        Q.    -- warning, I guess, to keep him off the property?
```

```
 1          A.    Yes, ma'am.

 2          Q.    And he had actually -- when he opened the door, he

 3    actually had two pairs of pants on?

 4          A.    He may have had a pair of sweatpants on.  I can't

 5    remember.  It was a pair of shorts or something under his

 6    pants.

 7                MS. MULDER:  May I approach the witness, Your

 8    Honor?

 9                THE COURT:  You may.

10          Q.    (BY MS. MOSELEY)  If you would, Officer Mendoza,

11    just -- just look at the portion I've underlined.  Does that

12    refresh your recollection as to whether he was wearing two

13    pairs of pants?

14          A.    Yes.

15          Q.    And he actually had one pair of pants on over the

16    jeans?

17          A.    Different pair of pants on over blue jeans.

18          Q.    Okay.  Thank you.

19                MS. MULDER:  I'll pass the witness.

20                MS. MOSELEY:  I have nothing further.

21                THE COURT:  Thank you, sir.  You may stand down,

22    and you're excused.

23                MS. MOSELEY:  Is he permanently excused?

24                MS. MULDER:  No objection.

25                THE COURT:  Ladies and gentlemen, let's go ahead
```

```
 1   and take a lunch recess.  It's 12:15.  If you'll be back in the
 2   jury room at 1:15, please.
 3                    THE BAILIFF:  All rise.
 4                    (Jury excused from courtroom.)
 5                    THE COURT:  Gallery may be seated.
 6                    (Recess.)
 7                    THE BAILIFF:  All rise.
 8                    (Jury returned to courtroom.)
 9                    THE COURT:  Please be seated.
10                    Will the State call its next witness, please?
11                    MS. MOSELEY:  The State calls Detention Officer
12   Pyburn.
13                    (Witness brought forward.)
14                    THE COURT:  Good afternoon.
15                    THE WITNESS:  Jennifer Pyburn.  Oh, I thought
16   you said say your name.
17                    (Witness sworn.)
18                    THE WITNESS:  Yes.
19                    THE COURT:  Thank you.
20                         JENNIFER PYBURN,
21   was called as a witness by the State, and after having been
22   first duly sworn, testified as follows:
23                    DIRECT EXAMINATION
24   BY MS. MOSELEY:
25        Q.   Now it's time to state your name for the record.
```

```
 1        A.    Jennifer Pyburn.

 2        Q.    And spell your last name for the court reporter?

 3        A.    P-y-b-u-r-n.

 4        Q.    And, Ms. Pyburn, I assume by this uniform you're

 5   wearing, you're a detention officer?

 6        A.    Yes.

 7        Q.    You work where?

 8        A.    At North Tower -- Lew Sterrett Jail, North Tower.

 9        Q.    Okay.  And you're not used to testifying, I assume?

10        A.    No.

11        Q.    Are you a little nervous about it today?

12        A.    Somewhat.

13        Q.    All right.  Well, it shouldn't take long.  It should

14   be pretty easy, okay?  So just take a deep breath.

15              How long have you worked for the jail?

16        A.    Ten years -- a little over 10 years.

17        Q.    And have you been assigned over here at Lew Sterrett

18   for all of those 10 years?

19        A.    Lew Sterrett, North Tower, different shifts, but the

20   same jail.

21        Q.    And what are your responsibilities as a detention --

22   is it Detention Services Officer?

23        A.    It's Detention Training Officer.

24        Q.    You're a DTO?

25        A.    Yes.
```

1      Q.    Detention Training Officer?

2      A.    Yes.

3      Q.    What are your responsibilities in that position?

4      A.    We -- to train new hires.  I mean, let them know

5 what their responsibility is, based on the inmates themselves

6 and others.  We basically just supervise the inmates in their

7 housing area -- housing where they live.

8      Q.    And can you explain for the jurors just briefly kind

9 of how the North Tower is set up where -- where you work, in

10 terms of there's a place where they sleep, the day room.  Just

11 explain for the jurors how that's set up.

12     A.    There is -- well, their tank is consisted of two

13 outer doors.  You walk through one door, and then there's

14 another door that leads to a day room.  There's a day room with

15 a television and the telephones is.  Then we have downstairs

16 two -- two rooms -- it can be set up different.  There's large

17 tanks and small tanks.  The smaller tanks will have four cells,

18 six inmates sleep to each cell.  Some of them have seven

19 inmates to each cell.  It just depends on how they've sectioned

20 them off.  The larger cells can have -- can house up to 34 or

21 30 inmates, so --

22     Q.    And -- and there's basically bunks in there, an

23 upper bunk and a lower bunk?

24     A.    Yes.

25     Q.    And you said in the smallest tank there's six

```
 1   inmates in each tank?

 2        A.    Yes.  In each cell, yes.

 3        Q.    In each cell?

 4        A.    Yes.

 5        Q.    And then do they share that day room with a bunch of

 6   cells, or is it just those six inmates that share the same day

 7   room?

 8        A.    No, it's all 24 inmates share the same day room.

 9        Q.    Okay.  And there's phones in there.  Are they

10   allowed to use the telephones?

11        A.    Yes.

12        Q.    Do they get to use the phone anytime they want, or

13   are there certain hours for that?

14        A.    Certain hours.

15        Q.    As far as being able to leave their cell where they

16   sleep and go to the day room, when are they allowed to do that?

17        A.    It's during -- each shift has different times.  We

18   have rack off time.  We have count time.  So it's just

19   different -- throughout the day there's different times they

20   can go into the day room.

21        Q.    And you said there's TVs.  Do they sometimes play

22   cards or dominoes or other things to entertain themselves over

23   there?

24        A.    Yes.

25        Q.    Do you recognize the Defendant in the courtroom,
```

137

```
 1   Matthew Lee Johnson?

 2        A.    Yes.

 3        Q.    And for a time in the jail, did you supervise him?

 4        A.    Yes.

 5        Q.    He was assigned to one of the cells that you were in

 6   charge of?

 7        A.    One of the tanks, yes.

 8        Q.    And what shift did you work?

 9        A.    Second watch.

10        Q.    Which is what hours?

11        A.    6:00 a.m. to 2:30 p.m.

12        Q.    And generally speaking, that's 6:00 a.m. to

13   2:30 p.m., are the inmates generally up and moving about, or

14   are they usually asleep or what?

15        A.    Usually around approximately -- approximately around

16   7:00 a.m., they're up.

17        Q.    And they get breakfast.  Do they eat there in their

18   cell, or do they go to a lunchroom?

19        A.    Breakfast is before my shift.

20        Q.    What time is breakfast?

21        A.    Around 4:30, around that time, if I'm not mistaken.

22   That's a different shift from mine.

23        Q.    That happens before you?

24        A.    Uh-huh.  But they eat lunch at 11:00.

25        Q.    Lunch at 11:00?
```

```
 1        A.    11:00 a.m.
 2        Q.    And do you all bring them trays, or do they go to a
 3  cafeteria, or how does that work?
 4        A.    They come to the day room, the second -- you know
 5  the door I said there was one door to enter, the door that's
 6  actually to their tank, has a little feeder port -- has a
 7  little opening that we unlock and the trays are handed through
 8  by the trusties.
 9        Q.    And trusties are inmates that are, I guess, lower
10  risk or lesser offenses that are allowed to kind of help out
11  with the staff?
12        A.    Yes.
13        Q.    When the -- when they're in their cell, are they
14  locked in their cell most of the day, or is that open most of
15  the day on your shift?
16        A.    On my shift most -- most of the day, yes, unless
17  there's some type of incident that causes us to rack them off,
18  then it is open most of the day.
19        Q.    And they are able to sit in the cell and read or --
20        A.    Do whatever they -- they want that's within the
21  rules.
22        Q.    In their cell.  Or they can come out and go into the
23  day room --
24        A.    Yes.
25        Q.    -- if they want to go in the day room?
```

1    A.    Yes.

2    Q.    And they pretty much have free access to do that

3  during your shift generally?

4    A.    Yes.

5    Q.    Is it -- how many -- how many of you guys -- how

6  many detention officers are on duty on your shift in that area

7  you're working?

8    A.    Depends on how many inmates are assigned to the

9  floor.  The ratio is one officer to 48 inmates.

10    Q.    So one officer for every 48 inmates?

11    A.    Yes.  Normally it's five to six.

12    Q.    And is it possible for you -- detention officers to

13  see everything that's going on in that tank or in that day room

14  or in the cell?

15    A.    To see everything, no.  We can only see what --

16  unless we're in there with them, that's the only way we can see

17  everything.  We can only see -- we do the walk-throughs.  On

18  the inside we can see what they're doing.  If they're on the

19  outside, we can only see -- because the doors have -- the

20  glass, but the glass is probably about like this.  And then

21  there's metal around it, so there's things that we can't see at

22  all times.

23    Q.    So it's a metal door and it's got a glass window.

24  What, about maybe one and a half feet square?

25    A.    Uh-huh.

1      Q.    Yes?

2      A.    About like -- yes, about like this.

3      Q.    I'm not good with measurements.  So you can look in

4  the glass and see in, but you can't really see everything if

5  they're in their cells or they're gathered around?

6      A.    Right.

7      Q.    Do you know in the 10 years that you've worked over

8  there in the jail, do people get tattoos in the jail?

9      A.    Yes.

10     Q.    Inmates get tattoos in the jail?

11     A.    Yes.

12     Q.    Are they -- is that a violation of the rules?

13     A.    Yes.

14     Q.    How do they -- how do they get tattoos?  I assume

15  y'all don't provide them with the needles and the ink to do

16  that?

17     A.    No, ma'am.  Usually out of contraband or some type

18  of commissary.  Usually what I've seen is like the candy

19  Skittles has color to it.  There's some way that they break

20  those down and make ink out of it.

21     Q.    So they're making ink out of the candies that they

22  can get from the commissary?

23     A.    Yes.

24     Q.    How do they get the needle or whatever is needed to

25  puncture the skin for it to stay?

```
 1         A.    That's either a staple or -- which is usually out of

 2    some type of paperwork that they receive, or just -- just

 3    really anything that -- not anything that we provide to them.

 4    It has to be -- because we usually try to take all the staples

 5    out of the paperwork, things like that.  So I really couldn't

 6    tell you exactly what they get it from, because I don't try to

 7    make stuff with the tattoos.  I'm sorry, y'all, I'm nervous.

 8    But a lot of the stuff, it's made like from the communication.

 9    Like we have an intercom that we speak to them through.  A lot

10    of times that's taken apart and broken down some type of way to

11    make the machine to do the tattooing with.

12         Q.    Okay.  So they get pretty creative on how they're

13    going to accomplish that because it's against the rules.  Y'all

14    don't allow it?

15         A.    Right.

16         Q.    And you're not going to give them the equipment with

17    which to do it?

18         A.    No, ma'am.

19         Q.    How is it possible that they can get a whole tattoo

20    and not one of the guards sees that going on?

21         A.    From what I would assume, they -- they work in

22    groups as far as lookouts, she's coming or he's coming or

23    they're coming.  And they can just stop because all we do is

24    like a quick walk-through, so --

25         Q.    And, obviously, there's nobody standing over the
```

1  inmates all the time watching them?

2      A.    No, ma'am.

3      Q.    When you worked in the tank where the Defendant,

4  Matthew Johnson, was assigned, did you ever have any problems

5  with him?

6      A.    Generally, not -- not as much as a regular inmate.

7  We've -- that I can really -- I talk to all the inmates on my

8  floor, daily, so to really -- and there's things I tell them

9  daily, but I can remember two -- two incidents where I've had

10 to over talk (sic) to someone where it would stick -- to talk

11 to him where it would stick in my head.

12     Q.    And when you say you talk to all of them daily --

13     A.    Uh-huh.

14     Q.    -- are there certain things that the average inmate

15 does on a regular basis that you expect, like they -- they keep

16 their -- that head cover -- do-rag, I think, they call it, and

17 you've got to tell them to take that off?

18     A.    Yes.  They sit on the tables, wear do-rags.  They

19 don't wear their uniforms or their property isn't in their

20 bags.  Those are things that we have to make sure that -- well,

21 the do-rags they can't do.  They can't sit on the tables.

22 Those things we have to make sure they can't do -- that they

23 don't do.  And the -- oh, Lord, I just -- I just -- this is

24 just too much for me, but -- I'm sorry, it is.  Because I take

25 my time to try to really talk to the inmates every day and

1  explain to them how important all of this is.  And me to have

2  to come and sit here today is very -- it's moving to me, but,

3  yes, I talk to them daily about respecting the rules so I won't

4  have to be put in this place.

5       Q.    Right.

6       A.    Because this is serious.

7       Q.    So you don't have to be brought down to court?

8       A.    Yes.

9       Q.    You talk to them and you try to talk to them about

10  how important the rules are and explain to them why they need

11  to follow the rules?

12      A.    Yes.

13      Q.    Ms. Pyburn, are you one of the -- are you familiar

14  with the notion that some detention officers let people get

15  away with some stuff over there?

16      A.    I'm familiar.

17      Q.    So it happens some detention officers are a little

18  less strict about the rules, might let them come out with the

19  do-rag on or might let them sit on the table?

20      A.    Yes.

21      Q.    Some of them might not make them put their shirts on

22  when they go in the day room?

23      A.    Yes.

24      Q.    Are you one of those officers?

25      A.    No.  And it makes it hard for me, because I -- I be

1   the one that they call.  They think that I'm picking on them

2   because I'm always saying, you can't do that, you can't do

3   that, and that makes my job very hard.

4       Q.    And why are the rules so important?  Why is it that

5   you take it so seriously and make them follow each and every

6   rule?

7       A.    Because some -- some things just as simple as

8   wearing a do-rag, let's say there's a fight in the day room.

9   I'm on the outside.  Let's say there's two inmates that have

10  the same type of hair, but they tied it up some kind of way,

11  and -- or put the do-rag on.  So when they have the fight and

12  go, I don't see any hair with the do-rag on.  They running to

13  the cell, take it off, they have hair, there's no way for us to

14  identify them.  And then when they sit on the tables, when

15  you're looking into an area where people sit on the tables, say

16  their backs are there, and someone is on the other side doing

17  something.  As far as tattooing, you can't see on the other

18  side, so things that simple may seem like nothing to them, but

19  it's something to us doing our job, and for their safety.

20      Q.    Right.  So it's important to the security of the

21  jail?

22      A.    Yes.

23      Q.    Now, you said you remember two incidents with the

24  Defendant?

25      A.    Yes.

1     Q.   Tell me about the first incident.

2     A.   The first incident, he was called out for a visit.

3 He was walking to his visit, and I was walking somewhere else

4 behind him.  And he -- he turned around and he was like, I

5 ought to just pull you in here, which is like the visitation

6 door.  He didn't say it in a mean -- mean way or anything like

7 that, he just said it with a smile on his face, and I said, no,

8 you're not.  And so he went on to his visit, and I went on to

9 the restroom.  So I went and spoke with my coworkers which are

10 males.  And I advised them of the incident.  And after his

11 visit, they pulled him out and they talked to him about it.

12 And he -- he explained to me that he would never do anything to

13 hurt me.  And he wouldn't, you know, have any more -- he

14 wouldn't speak to me anymore.  You know, he was -- he would

15 just leave me alone, don't have anything else to do with me,

16 and that was fine.

17     Q.   Let me -- let me stop you real quick.  When he said,

18 I ought to just pull you in here --

19     A.   Uh-huh.

20     Q.   -- you said he didn't say it mean.  What did --

21 how -- why did you think it was important to go tell somebody

22 about it?  What did -- what did you take it to mean?

23     A.   At no time should an inmate think they can put their

24 hands on you.  Sometimes when an inmate has been housed in the

25 facility for a long time, they become comfortable with you.

```
 1  And as I said, Mr. Johnson, he -- he did not give us any
 2  problems, so he was one that if we asked him to do something,
 3  he would do it.  So by them being there for a long time,
 4  sometimes they form other types of, you know, well, I don't
 5  ever do nothing, so she -- you know, she trusts me or whatever.
 6  I don't know what the case may have been, but him saying that
 7  to me was not appropriate.
 8       Q.   You felt -- did you feel like it was just a little
 9  too familiar?
10       A.   Yes.  Yes.  It was just -- it was out of place, and
11  I just wanted him to know that it wasn't right for him to say
12  to me, and --
13       Q.   Did you write it up?
14       A.   No.
15       Q.   Why didn't you write it up?
16       A.   Just for the reason I explained.  He never gave me
17  any problems, therefore, I gave him the chance to just be
18  spoken to and correct the issue, and that's it.
19       Q.   Okay.  And you said that some of your male coworkers
20  went and talked to him?
21       A.   Yes.
22       Q.   And then you talked to the Defendant after that, or
23  did he talk -- did he come to you or did you go to him?
24       A.   No.  We -- they spoke with him, and I stood back.
25  And when -- at times I put my little insert in (sic) and that
```

1  was -- that was it.

2      Q.    And he told -- and the Defendant told you, man, I

3  wouldn't -- I wouldn't try to hurt you or anything?

4      A.    Right.  He said he would never try to harm me.  He

5  was just -- he would never -- I don't know, he just said he

6  would never try to harm me.

7      Q.    What was his demeanor like when he said -- when you

8  were talking to him then?

9      A.    He was -- he seemed -- seemed like he really meant

10  what he was saying.  He didn't want to harm me.  I don't -- I

11  don't even know why he would say it.  He just -- he felt like

12  he didn't want to harm me.  He seemed remorseful for saying it.

13      Q.    And then a month or so after that, did you have

14  another encounter with him?

15      A.    Yes.  When we do the walk-throughs every morning,

16  when we come in, we're supposed to check their area for

17  cleanliness.  And we give them the -- all the -- like the mop

18  bucket, dust pan, toothbrushes, things that they need to clean

19  the housing area with.  So we come through, we do a

20  walk-through to see if it's clean.  So when we got to the

21  shower.  It was me and another trainee, DSO Battee (phonetic).

22  When we got there, she told him that the shower wasn't clean.

23  And he said, that's the way -- you know, that's the way he

24  cleaned it.  So she pointed out some areas.  And he said, well,

25  I've cleaned it.  So then I was trying to give her an

1  opportunity to have interaction with an inmate, so -- but she

2  didn't, you know, clearly advise him that she wanted him to

3  come back and clean it.

4      Q.    Okay.  Let me slow you down so I make sure I'm

5  following you.  The inmates are supposed to clean their own

6  cells and their own bathrooms?

7      A.    Yes.

8      Q.    And you all provide them with the materials that

9  they need to use to do that?

10     A.    Yes.

11     Q.    And then after they're supposed to have cleaned

12 everything, you guys come through to inspect?

13     A.    Yes.

14     Q.    And this is done for all kinds of reasons.

15 Obviously, there are health reasons that --

16     A.    Yes.

17     Q.    -- this -- cells need to be cleaned?

18     A.    Yes.

19     Q.    Y'all also get inspections periodically?

20     A.    Yes.

21     Q.    And it's important that when they come to inspect,

22 that the place is clean and sanitary?

23     A.    Yes.

24     Q.    And I guess on this particular day, you all went

25 through and the cell wasn't clean, the bathroom wasn't clean --

```
 1        A.    The shower --

 2        Q.    -- the shower, the way it should have been; is that

 3   right?

 4        A.    There's a -- we put a broom in there, but you're not

 5   supposed to use the broom to clean the showers because the

 6   bristles will not clean across the bottom of the shower.  So

 7   she puts two different color brushes in, one of them is red and

 8   white, one of them is blue and black.  One of them is for the

 9   toilet.  One of them is for the shower.  Or sometimes they can

10   receive the same two colors, but one of them is supposed to be

11   used for the shower.

12        Q.    And they know that?

13        A.    Yes.  And so across the bottom there's like -- I

14   guess where they've -- they're still showers, so it's a way for

15   them to connect the showers at the bottom.  So she gives

16   this -- she is our captain, I'm sorry.  She orders these

17   different type of brushes that will clean across the bottom.

18   So I instructed him to use that brush to clean it, and he was

19   -- and he told me that we do not pay him enough to clean the

20   shower.

21        Q.    Okay.

22        A.    So --

23        Q.    And did -- when he told you that y'all don't pay him

24   enough -- I mean y'all don't pay him for anything, right?

25        A.    No.
```

1    Q.    I mean, inmates don't get paid for keeping their

2  space clean?

3    A.    No.

4    Q.    And he just was refusing to clean with the brush?

5    A.    He.  Yes, with that particular brush, he would

6  have -- if -- he wanted to use the broom.  That's what he used.

7  He did not want to use that particular brush, because it

8  required -- it's a shorter handle, so it requires them to do a

9  little bit more work.

10    Q.    And when you told -- did you have a conversation

11  with him after that, or did you just walk away when he said he

12  didn't want to use the brush because y'all don't pay him

13  enough?

14    A.    We continued to do the walk-through, because that

15  conversation was in front of a lot of -- the rest of the

16  inmates in the tank, so --

17    Q.    Why is that a problem?

18    A.    Why is that a problem, to say no?

19    Q.    Why is it a problem that there were other inmates

20  around?

21    A.    Because if we're -- that's their area to keep clean.

22  We -- we want them to know that this is something that you have

23  to do.  So for you to just say, no, I'm not going to do it in

24  front of everyone else, then if everybody refuses to clean,

25  then we have other issues.  So I went ahead and continued my

1    walk-through, through the rest of the tanks.  And when we got

2    out, we pulled him out to talk to him one-on-one.

3          Q.    And how did that conversation go?

4          A.    He still was not going to clean with the brush, but

5    I advised him, if you don't want to clean, then let -- don't

6    even attempt to start to clean.  Let another inmate clean,

7    because they'll clean it correctly because we do -- if you

8    don't clean, then the -- well, first of all, when the mop

9    buckets come in, we're supposed to turn the TVs off and

10   everything -- the telephones, everything is supposed to be off

11   until everything is clear.  Sometimes the TVs go off.

12   Sometimes they don't.  It just depends on who's working the

13   control center and how dirty the area is.  So it just depends

14   on those situations.  This particular day, I can't recall if

15   their stuff was already off or on, but we went ahead and pulled

16   him out.  We talked to him.  Once we got out there, he still

17   just did not want to see it the way that we wanted him to see

18   it, that it has to be cleaned correctly.  So we -- so I made

19   the choice to go ahead and move him, based on this being the

20   second incident, him being just so strong -- strong-minded

21   saying he's not going to follow the jail rules, and I just

22   thought he was just too familiar with our floor, so he needed

23   to move -- familiar with our floor and me, so I just said it's

24   just -- that was enough of that.

25          Q.    And so at that point, for purposes of just making

1   the institution continue to run the way it should, you moved

2   him to another tank so he wasn't going to be around you?

3       A.    Right.  He just -- he was moved off the floor,

4   period, off of 5 East.  There's like -- 5 East or 5 West.  We

5   just put in a transfer.  I don't know where.  We don't know

6   where they go to.  They just move off that floor.

7       Q.    Okay.  And just so that we're clear, this incident

8   that we're talking about with the -- with the showers and him

9   refusing to clean with the brush, was in August of this year,

10  August 25th of this year?

11      A.    Yes.

12      Q.    And the other incident that we talked about was just

13  a month or two before that?

14      A.    Approximately around that time.

15      Q.    You didn't write that one down?

16      A.    No.

17      Q.    But you did write up a report on the shower cleaning

18  incident?

19      A.    Yes.  In order to move someone, that's procedure.

20  We have to notify a supervisor and explain everything to them,

21  and if they agree, then we move them.

22      Q.    And -- but once again, you didn't write up a

23  disciplinary report or anything like that for his refusing to

24  order -- to obey the order?

25      A.    No.

```
 1        Q.   And why didn't you write him up the second time?

 2        A.   Because each -- each person, their -- their

 3   demeanor, like -- he wasn't -- writing up -- that sends him

 4   like to single cell.  They receive single cell time.  And the

 5   shower area, that's not really -- to me, I could have another

 6   inmate to clean it -- you know, to clean it, which would have

 7   been fine.  So I just -- I just believed every time that my

 8   contact with him -- every time I would ask him something, it

 9   would seem he was taking it too personal.  He was -- it would

10   be just like I was picking on him, so it was just time for me

11   to ask for him to be moved, so he can deal with someone else.

12   Because I didn't want any problems.

13        Q.   And I don't think I asked you, but you -- you told

14   me you saw him in the courtroom.  Can you identify what he's

15   wearing today?

16        A.   Black suit.

17        Q.   Wearing glasses?

18        A.   Yes, glasses.

19             MS. MOSELEY:  May the record reflect the witness

20   identified the Defendant.

21             THE COURT:  The record will reflect.

22        Q.   (BY MS. MOSELEY)  And you haven't had any contact

23   with him since that day, since he got moved?

24        A.   No.

25             MS. MOSELEY:  I'll pass the witness, Judge.
```

CROSS-EXAMINATION

BY MS. BERNHARD:

    Q.   Officer, approximately how long did you supervise Mr. Johnson?

    A.   I would say around maybe seven or eight or more months.  I wouldn't know all the way --

    Q.   And you said that by and large he didn't give you much trouble?

    A.   No.

    Q.   In fact, I think you said that he was easier to deal with than most of the other inmates?

    A.   He -- he would not give -- not most -- there is -- all the inmates do not act up.  He -- my contact with him, mostly, all -- it was just those two incidents where I could say that he was not acting appropriate.  Those two incidents.

    Q.   But the rest of the time he didn't give you any trouble?

    A.   Not any trouble that I could -- trouble, no, no trouble, no, not other than those two.

    Q.   And the incident where he said, I ought to pull you in here --

    A.   Uh-huh.

    Q.   -- he -- you said he didn't say that in a mean way or anything like that, you just thought it was too familiar?

    A.   Yes.

```
 1        Q.    And he apologized after that?

 2        A.    Yes.

 3        Q.    And the shower incident, it wasn't that he was

 4   refusing to clean, was it?

 5        A.    He was refusing to clean the bottom area, the way

 6   that -- clean the soap scum off the bottom area.

 7        Q.    He was just using the wrong brush; is that right?

 8        A.    He used a broom and he refused to go back and use

 9   the smaller brush to clean the bottom of the shower.

10        Q.    Do -- are inmates required to clean, or is that

11   something they volunteer for?

12        A.    Their -- their tank is required to clean their tank.

13        Q.    But an individual inmate --

14        A.    No.

15        Q.    -- is not necessarily required to clean?

16        A.    No.

17        Q.    So --

18        A.    The whole -- every inmate in there is responsible

19   for their tank.

20        Q.    Okay.

21        A.    So --

22        Q.    But sometimes you have inmates that just don't

23   clean, and they leave it for the rest of the other members of

24   the tank to clean; is that fair to say?

25        A.    That's -- I guess that could be -- I mean, if they
```

```
 1  work it out that way, then, yes, ma'am.

 2       Q.   Okay.  So you don't have a requirement that each

 3  individual --

 4       A.   No, we don't --

 5       Q.   -- has this job to do and -- and everybody has a

 6  different job?

 7       A.   No, ma'am.

 8                 (Discussion among Defense counsel.)

 9       Q.   (BY MS. BERNHARD)  In the grand scheme of inmates

10  that you supervise, would you say that Matthew Johnson gave you

11  less trouble than -- than other inmates?

12       A.   No.  No, because on a -- every inmate does not give

13  problems, so with him, I wouldn't say he gave me less, no.

14       Q.   Okay.  But he wasn't -- he wasn't somebody that you

15  would call a problem inmate?

16       A.   Just on those two occasions.  I would say he was

17  causing a problem on those two occasions.

18                 MS. BERNHARD:  I'll pass the witness.

19                 MS. MOSELEY:  Nothing further.

20                 THE COURT:  Thank you, ma'am.

21                 MS. MOSELEY:  May she be excused?

22                 THE COURT:  She may.

23                 THE WITNESS:  Thank y'all.

24                 MS. MOSELEY:  The State calls David Contente.

25                 (Witness brought forward.)
```

```
 1                    THE COURT:  Raise your right hand.
 2                    (Witness sworn.)
 3                    THE WITNESS:  I do.
 4                    THE COURT:  Thank you.
 5                         DAVID CONTENTE,
 6  was called as a witness by the State, and after having been
 7  first duly sworn, testified as follows:
 8                    DIRECT EXAMINATION
 9  BY MS. MOSELEY:
10       Q.   Now, you have kind of a quiet voice, so we're
11  probably going to have to ask you to speak close to the
12  microphone.
13       A.   Okay.
14       Q.   It will move; the chair obviously doesn't move very
15  well, but that will move toward you.
16            Can you introduce yourself to the members of the
17  jury?
18       A.   My name is David Contente.  My last name is spelled
19  C-o-n-t-e-n-t-e.
20       Q.   And, Mr. Contente, where do you work?
21       A.   I own Kwik Kar Oil & Wash in Mesquite.
22       Q.   And that's where at in Mesquite?
23       A.   On Belt Line and 80, 2122 North Belt Line Road.
24       Q.   Maybe back just a little.  Now, I think -- this
25  microphone has been kind of crazy all week, but we can hear you
```

```
 1  pretty good now, I think.
 2              You said you own that Kwik Kar there?
 3      A.   Yes, I do.
 4      Q.   And it's near Sunnyvale, right, kind of in that
 5  area?
 6      A.   Yes.
 7      Q.   Do you work at that location, as well as own it?
 8      A.   Yes.
 9      Q.   In other words, you don't just turn it over to
10  somebody else.  You actually go in about every day and work?
11      A.   Yeah, I'm there most days.
12      Q.   Is your store located in Dallas County, Texas?
13      A.   Yes.
14      Q.   Do you know the Defendant, Matthew Lee Johnson?
15      A.   Yes, I do.
16      Q.   Do you see him in the courtroom?
17      A.   Yes.
18      Q.   Can you tell us what he's wearing today?
19      A.   Got a suit and tie on, wearing glasses.
20              MS. MOSELEY:  May the record reflect that the
21  witness identified the Defendant.
22              THE COURT:  The record will reflect.
23      Q.   (BY MS. MOSELEY)  And how do you know him?
24      A.   He worked for me.
25      Q.   When did -- when did he start working for you?
```

159

```
 1        A.    December 2010.
 2        Q.    And did he just come and apply for a job, or did
 3   you -- how did you meet him?
 4        A.    Yeah, he just walked in, applied for a job.
 5        Q.    And what job did he apply for?
 6        A.    Well, I had a state inspection opening.
 7        Q.    You had an opening for someone to do state
 8   inspections there?
 9        A.    Yes.
10        Q.    Does that job require some kind of skills or license
11   or something to do?
12        A.    Yeah.  He has to have a license by the State, and I
13   told him if he went and got that license, that I'd possibly
14   hire him.
15        Q.    And this particular day when he came in, what was
16   your general impression of him?
17        A.    Good.
18        Q.    Did he seem eager to go to work?
19        A.    Yeah, very eager.  Yeah, he went down and got the
20   job -- the license within just a few days.
21        Q.    So he did go and was able to -- do you know
22   what's -- what's required of someone to get that license?
23        A.    Yeah, they are given instruction from the book, and
24   then they're tested.
25        Q.    So you have --
```

```
 1        A.    And if they pass that, then they go to physically do
 2   an inspection, and then I believe they're tested on that.
 3        Q.    And then they receive a license from the state that
 4   allows them to perform these state inspections?
 5        A.    Yes.
 6        Q.    And operate that equipment that you guys have?
 7        A.    Yes.
 8        Q.    I guess for emissions and all of that?
 9        A.    Yes.
10        Q.    And you said he did go and get that.  He took the
11   course and -- and took the test and passed it and came back
12   with his license in just a few days?
13        A.    Yes.
14        Q.    When he came back, were you kind of surprised?
15        A.    Yes, and impressed, that he was a go-getter.
16        Q.    Did -- did he fill out an application there at your
17   place?
18        A.    Yes.
19        Q.    Did you know at that time that he had recently been
20   released from the penitentiary?
21        A.    Not recently, but I knew he had a criminal past.
22        Q.    He told you that?
23        A.    Yes.
24        Q.    Do you remember what he told you about his criminal
25   past?
```

1      A.    Vaguely.  He got in into it with somebody over a

2  car, and that's about all I knew.

3      Q.    And did you decide to just overlook that and give

4  him a chance because he had really showed that he wanted to

5  work?

6      A.    Yes.

7      Q.    And you hired him?

8      A.    Yes.

9      Q.    You said that was in December of 2010.  What -- what

10  kind of job responsibilities did you give him when he started

11  there?

12      A.    He started out doing state inspections only and

13  helping out in the shop.  And then we moved him to cashiering

14  and state inspecting, but primarily a cashier.

15      Q.    So he did the state inspections, and you said he

16  helped out in the shop.  I guess you guys do oil changes and --

17  and minor air filters and things of that nature?

18      A.    Yes, preventative maintenance.

19      Q.    Was he a good employee when he was doing the state

20  inspections?

21      A.    Yes.

22      Q.    Did he show up when he was supposed to?

23      A.    Yes.

24      Q.    Did he ever come to work high or drunk or anything

25  like that?

1      A.    No.

2      Q.    Is this cashier position -- I don't want to say a

3  promotion because you told me everybody is kind of on the same

4  level.

5      A.    Yeah.

6      Q.    You're the only boss in the place?

7      A.    Yes.

8      Q.    But is it more responsibility to be a cashier?

9      A.    Well, it's a key position because he's with the

10  customer, dealing with the customer, where the others are not

11  so much.  They're focused on the vehicles, the mechanical part.

12      Q.    And I assume as a cashier, you not only deal with

13  the customers, but you deal with the money?

14      A.    Yes.

15      Q.    And how did he perform in -- in that capacity as a

16  cashier?

17      A.    Good, no -- no problems.

18      Q.    Did he always handle the customers like you

19  instructed?

20      A.    Yes.  You know, we -- he needed coaching just like

21  most people do, but he handled them good.

22      Q.    If a customer had a problem with the service or had

23  some complaints or whatnot, did you have any concerns about the

24  Defendant's ability to handle that?

25      A.    Yes.  I instructed him to help the customer, but if

163

1  there was no resolution, just give them what they wanted.  Most

2  of what we do at the store is not real expensive, and we could

3  just take the loss.

4      Q.   You probably shouldn't advertise that.  But

5  generally speaking, your theory is -- as most business owners,

6  if you can't resolve it, the customer is right, just give them

7  what they want to make them happy?

8      A.   Well, he wasn't good with conflict.  The customer

9  would be angry because they sensed he didn't care.  He was too

10  rigid, in our rules, you know.  And for that reason, it was

11  best just to satisfy them, you know, find out what would make

12  them happy and just give it to them, even if they weren't in

13  the right.

14      Q.   Other than that, he came to work, and -- and did

15  what you asked of him?

16      A.   Yes.

17      Q.   Now, on November 14th of 2011, early that morning,

18  did you get a call from the Defendant?

19      A.   Yes.

20      Q.   And was that a Monday morning?

21      A.   Yes.

22      Q.   What time did you normally go to work on a Monday

23  morning?

24      A.   Six o'clock, 7 o'clock, something like that.

25      Q.   And what time would the shop open?

```
 1        A.    Eight.

 2        Q.    So you normally got there early?

 3        A.    Yes.

 4        Q.    Did the Defendant as part of his job of being a

 5   cashier have keys to the business?

 6        A.    Yes.

 7        Q.    For what purpose?

 8        A.    Basically if I or Jose, who also had keys, weren't

 9   there, then he could close.

10        Q.    So he needed keys to lock up the shop at the end of

11   the day?

12        A.    Yes.

13        Q.    And you said there's another employee that also had

14   keys?

15        A.    Yes.

16        Q.    That morning when -- when he called, what did he say

17   to you?

18        A.    He said I needed to come down to the store so he

19   could talk to me and that he had done a bad thing.

20        Q.    And about what time was that, do you remember?

21        A.    5:00 a.m., sometime around there, maybe a little

22   before that.

23        Q.    And does your shop have a security alarm?

24        A.    Yes.

25        Q.    And did he have the code to turn that alarm on and
```

1  off as part of having to close the shop sometimes?

2      A.    Yes.

3      Q.    Do you have a surveillance system in -- in the

4  store?

5      A.    Yes.

6      Q.    Were both of those things working in November

7  of 2011?

8      A.    Yes.

9      Q.    When he called you, how did he sound, what -- can

10  you describe how he sounded?

11      A.    He sounded normal.

12      Q.    You didn't detect anything unusual in his tone?

13      A.    No.

14      Q.    What did you do after he told you he needed you to

15  come down there?

16      A.    I went to my cameras at the house and looked at them

17  and could see that a camera had been blacked out.

18      Q.    And you say you looked at the cameras at your house.

19  You mean the -- you have a monitor at home?

20      A.    Yeah, I have a computer that can tie into the

21  store's camera system.

22      Q.    Okay.  And that enables you at any time when you're

23  at home to look on the cameras and see what's going on if

24  you -- if you want to?

25      A.    Yes.

```
 1        Q.    And why did you look at the monitor?

 2        A.    Well, I was concerned about the -- the call was

 3   unusual at that time and then he said he did a bad thing, so I

 4   did what I could to investigate what's going on.  And I wanted

 5   to look at those cameras.

 6        Q.    And you said you saw that one of the cameras was

 7   blacked out?

 8        A.    Yes.

 9        Q.    What -- if you're -- let's say you're looking

10   through that camera.  What part of your shop did that camera

11   show?

12        A.    Part of the office and part of the lobby.

13        Q.    And where are those cameras mounted in the store?

14        A.    On the roof.

15        Q.    On the ceiling?

16        A.    The ceiling, I'm sorry.

17              MS. MOSELEY:  May I approach this witness,

18   Judge?

19              THE COURT:  You may.

20        Q.    (BY MS. MOSELEY)  I'm showing you what I've marked

21   for identification as State's Exhibits 175 through 178.  Are

22   those pictures that you took of the camera that we're talking

23   about?

24        A.    Yes.

25        Q.    And this will help explain to the jury what the
```

1    camera looked like and how it's set up?

2        A.    Yes.

3        Q.    Now, I've got -- maybe that's upside down.  Up on

4    the ceiling it's mounted?

5        A.    Yes.

6        Q.    Okay.

7                MS. MOSELEY:  I'd offer State's Exhibits 175,

8    176, 177, and 178.

9                (State's Exhibits 175 through 178 offered.)

10                MR. WEATHERSPOON:  No objection.

11                THE COURT:  Admitted.

12                (State's Exhibits 175 through 178 admitted.)

13                MS. MOSELEY:  Permission to publish.

14                THE COURT:  You may.

15        Q.    (BY MS. MOSELEY)  There on the screen next to you,

16    might be a little easier to see.  Do you see that screen on

17    your left?

18        A.    Yes.

19        Q.    That's the camera that you said when you looked at

20    your monitor was blacked out?

21        A.    Yes.

22        Q.    Now, it's mounted on the ceiling.  Is that something

23    that is easily reached, or do you have to stand on a ladder or

24    something to get to it?

25        A.    You have to get on the stairs, and you could -- you

1  could reach it.

2      Q.    But it's not like something you could bump your head

3  on as you're coming down the stairs or anything?

4      A.    No, you'd have to try to -- to hit it.

5      Q.    And we can -- I don't know how great this photo is

6  to show it, but it looks like there's kind of a -- a silver

7  area or a different tone to the glass around that camera in

8  certain spots.  Do you see what I mean?

9      A.    Yes.

10     Q.    How does that camera work?

11     A.    Well, what you're describing is the window for the

12  camera.  And if you turn that, it -- you can block it.  The

13  rest is like plastic.

14     Q.    So that -- that dome, that glass or plastic part

15  will actually rotate around?

16     A.    Yeah, if you loosened the nut -- that bigger black

17  area, the collar looking thing, if you loosened that, you could

18  turn the dome.

19     Q.    And here we can see what looks like a red dot.  Is

20  that the camera we're looking at?

21     A.    Yes.

22     Q.    So if this photograph in State's Exhibit 175 is

23  taken, you could actually get a view through that camera?

24     A.    Yes.

25     Q.    And then in State's Exhibit Number 176, has that

 1  been turned like we're describing?

 2       A.   Yes.

 3       Q.   And there on the right side of that glass or plastic

 4  dome, you can see where the camera should be pointing through

 5  it?

 6       A.   Yes.

 7       Q.   As it's shown in State's Exhibit 176, if it's turned

 8  like this, can you see through the camera?  Can the camera see

 9  through that?

10       A.   No.

11       Q.   And is that the way that it was when you got to the

12  store that morning?

13       A.   Yes.

14       Q.   And just for purposes of better description, State's

15  Exhibit 177, is that the photograph of -- without the dome?

16       A.   Yes.

17       Q.   And it will actually come all the way off if you

18  unscrew it?

19       A.   Yes.

20       Q.   Does it come off easily, or do you have --

21       A.   Yeah.

22       Q.   Does it take effort?

23       A.   It takes a little effort to -- you've got to take at

24  least one turn of the collar.

25       Q.   One full turn?

1   A. Yeah.

2   Q. And then State's Exhibit Number 178, you actually

3 took all of those parts down?

4   A. Yes.

5   Q. And they're sitting on a step stool to show how it

6 looks when it's taken apart?

7   A. Yes.

8   Q. And the camera would still be up there, if all of

9 this had come down -- once all this is taken off?

10   A. Yes.

11   Q. Okay.  Would the camera still function?

12   A. Yes.

13   Q. Now, you said that you looked and saw that it was

14 blacked out.  What did you do then?

15   A. Then I went to the police department and asked a

16 policeman to go down there with me.

17   Q. Was it your understanding that the Defendant was

18 there at the shop waiting for you when he called?

19   A. Yes.

20   Q. He told you that?

21   A. Yes.

22   Q. And why would you go to the police department if you

23 had an employee that you trusted for 11 months working that

24 called you and said he needed to talk to you?

25   A. Well, I just thought the worst, you know, with the

171

 1  criminal background and being unusual -- getting a call that

 2  early and then being told I did a bad thing and then that

 3  camera being blocked out, I thought the worst.

 4      Q.   And that camera had not been blocked out before that

 5  morning?

 6      A.   No.

 7      Q.   When you got to the Mesquite Police Department, did

 8  they agree to send some officers out there with you?

 9      A.   Yes.

10      Q.   And when you got there, was the Defendant there?

11      A.   Yes.

12      Q.   Did you see him that morning?

13      A.   Yes.

14      Q.   Did -- did the officers talk to him, or did you sit

15  and have a conversation with him or both?

16      A.   The officers talked to him.  All I did was ask for

17  his keys.

18      Q.   Did you get those back from him there at the shop

19  that morning?

20      A.   Yes.

21      Q.   Did he say anything to you?

22      A.   He asked if he was fired, and I responded that I

23  wouldn't decide that right now.

24      Q.   And why did you say that?  Why did you respond like

25  that?

1      A.    I saw no reason to make a decision on that.  I

2  didn't want to anger him or cause any issue.

3      Q.    What did you see when you -- I mean, we know that

4  the camera cover -- the dome was turned on the camera, but

5  aside from that, what else was -- what condition did you find

6  the shop in?

7      A.    I couldn't find anything wrong.

8      Q.    Did you go upstairs?

9      A.    Yes.

10     Q.    And what did you find upstairs?

11     A.    That three state inspection books were gone and

12  cash.

13     Q.    And where were those things kept?

14     A.    In a safe.

15     Q.    And is it a safe that has a key or a safe that has a

16  combination, or what?

17     A.    A combination.

18     Q.    Did he have the combination to the safe?

19     A.    Yes.

20     Q.    And you said there were three books of inspection

21  stickers.  What's the value of those inspection stickers,

22  approximately?

23     A.    2136.

24     Q.    $2100?

25     A.    Yeah.

1    Q.    And how much cash did you keep in the safe?

2    A.    325.

3    Q.    Dollars?

4    A.    Yes.

5    Q.    And that was for opening?

6    A.    That was for an opening till.  If I forgot to open

7    the till, put the correct amount in there, the guys would

8    always have that to open the day.

9    Q.    And how many people had a combination to the safe?

10    A.    Three.  One was me, Matthew, and Jose.

11    Q.    What about the monitor?  Was the monitor missing

12    that morning?

13    A.    Yes.

14    Q.    The monitor that you kept in the office, where

15    you --

16    A.    Where the cameras were viewed.

17    Q.    Okay.  Also upstairs in the office, you had a

18    monitor where you could watch the cameras and see -- if you

19    were up there, you could see what was going on downstairs?

20    A.    Yes.

21    Q.    And that was gone?

22    A.    Yes.

23    Q.    You said that you didn't really want to make the

24    decision to fire the Defendant that day.  Were you considering

25    allowing him to continue working there?

```
 1        A.    No.

 2        Q.    You just didn't want to tell him?

 3        A.    Yeah, not that day, that minute, I saw no reason

 4   to -- to make a decision on that.

 5        Q.    Did you watch -- these cameras that you said you

 6   were able to see what's going on in the store, does that

 7   equipment record what's going on in the store?

 8        A.    Yes.

 9        Q.    Did you go back and watch that footage?

10        A.    Yes.

11        Q.    Did you see the Defendant come into the -- to the

12   store?

13        A.    Yes.

14        Q.    That Saturday night?

15        A.    Yes.

16        Q.    Was he supposed to be there that Saturday night?

17        A.    No.

18        Q.    Did you also see him come in that morning -- that

19   early morning before he called you?

20        A.    Yes.

21        Q.    And obviously, he didn't normally get to work that

22   early, either, did he?

23        A.    No.

24        Q.    Were you able to see that he was carrying -- and let

25   me ask you, I guess, did he return that monitor that morning?
```

```
 1        A.    Yes.

 2        Q.    The monitor that had been taken from the office?

 3        A.    Yes.

 4        Q.    Could you see him come in on the screen with that

 5   monitor when he came -- when he came in on that Monday morning?

 6        A.    I think so.  I don't remember.

 7        Q.    Okay.  Did you give me a copy -- a disk that had

 8   those -- actually several disks that contain the footage from

 9   each of those cameras?

10        A.    Yes.

11        Q.    And --

12              MS. MOSELEY:  May I approach, Your Honor?

13              THE COURT:  You may.

14        Q.    (BY MS. MOSELEY)  And from that disk, did we make

15   basically a video from all of those cameras that showed the

16   events that Saturday night when the Defendant came in?

17        A.    Yes.

18        Q.    Did you get an opportunity to look at that?

19        A.    Yes.

20        Q.    And I know it's just a CD, but if I told you that

21   this is the CD you watched, you did watch that footage?

22        A.    Yes.

23        Q.    And nothing about that had been changed or altered

24   in any material way from the footage you gave me; is that

25   right?
```

```
 1         A.    No.

 2         Q.    We didn't add anything or take anything away.  We

 3   just focused on the cameras that had activity?

 4         A.    No changes made.

 5         Q.    Okay.  And in State's Exhibit 174, is that the disk

 6   of the second time when he came in that Monday morning, showing

 7   him coming back into the shop to meet you?

 8         A.    Yes.

 9         Q.    And does it also show that camera being covered?

10         A.    Yes.

11         Q.    And were any changes made to that disk other than

12   just taking those cameras and kind of blending them together

13   into one video?

14         A.    No.

15               MS. MOSELEY:  I'd offer State's Exhibits 173 and

16   174.

17               (State's Exhibits 173 and 174 offered.)

18               MR. WEATHERSPOON:  No objection.

19               THE COURT:  Admitted.

20               (State's Exhibits 173 and 174 admitted.)

21               MS. MOSELEY:  Permission to publish.

22               THE COURT:  You may.

23         Q.    (BY MS. MOSELEY)  And this first video that we're

24   going to watch is State's Exhibit 173, the day that he came

25   into the store that Friday -- or that Saturday night.
```

```
 1                    (Exhibit published.)

 2        Q.    (BY MS. MOSELEY)  Now, Mr. Contente, if I can stop

 3   the video here for a second, this door to the upper right of

 4   the screen, is that where the stairs are leading to the office?

 5        A.    Yes.

 6        Q.    And is that where that camera is that we were just

 7   talking about?

 8        A.    Yes.

 9        Q.    That first view we saw of the Defendant coming in

10   the front door, was that from that camera?

11        A.    Yes.

12        Q.    This is that camera?

13        A.    Yes.

14                    (Video continued playing.)

15        Q.    (BY MS. MOSELEY)  Is that your monitor?

16        A.    Yes.

17                    (Video continued playing.)

18        Q.    (BY MS. MOSELEY)  And this video is from the morning

19   of November 14th, about 4:51, according to that time stamp?

20        A.    Yes.

21        Q.    Is that the monitor under his arm?

22        A.    Yes.

23        Q.    And we see him there in that doorway?

24        A.    Yes.

25        Q.    And that's when the lights come on, after -- after
```

```
 1  we see that camera turned, black out, and then --

 2       A.    Yeah.

 3       Q.    -- he goes and turns the lights on?

 4       A.    Yeah, he turned on the lobby lights.

 5             MS. MOSELEY:  Thank you, Judge.

 6       Q.    (BY MS. MOSELEY)  Was the Defendant arrested that

 7  morning?

 8       A.    Yes.

 9       Q.    And did you provide the detectives with the

10  information about the value of the items that the Defendant had

11  taken?

12       A.    Yes.

13       Q.    And did you tell them that you did want to press

14  charges?

15       A.    Yes.

16       Q.    After -- did the Defendant ever contact you after

17  that?

18       A.    Yes.  He wanted his last paycheck.

19       Q.    Did you ever get your inspection stickers back?

20       A.    No.

21       Q.    Did he ever pay for those?

22       A.    No.

23       Q.    Did he ever return the cash that he took from you?

24       A.    No.

25       Q.    Did you give him his last paycheck?
```

1       A.    Yes.

2       Q.    Did you fire him?

3       A.    Yes.

4       Q.    Did he file for unemployment?

5       A.    Yes.

6       Q.    Did you respond to that request from the Texas

7    Workforce Commission about the unemployment?

8       A.    Yes.

9       Q.    What did you do?

10      A.    I sent them a form about our theft policy that he

11   had signed when -- when he was hired.

12      Q.    Did you send them a copy of the police report?

13      A.    Yes.

14      Q.    Do you know if the Texas Workforce Commission denied

15   his claim for unemployment?

16      A.    Yes, they denied it.

17      Q.    Did he appeal the denial?

18      A.    Yes.

19      Q.    And did you have to then follow up and prepare for a

20   hearing to prevent him from getting unemployment benefits from

21   your company?

22      A.    Yes.

23      Q.    How likely are you now, Mr. Contente, to hire

24   someone who's been -- who has a criminal record?

25      A.    Not likely.

```
 1              MS. MOSELEY:  Thank you.  I'll pass the witness.
 2                       CROSS-EXAMINATION
 3   BY MR. WEATHERSPOON:
 4       Q.   Mr. Contente, my name is Kenneth Weatherspoon.  I
 5   have just a couple of questions to ask you.  If I ask you
 6   anything you don't understand or can't hear me, just ask me to
 7   repeat myself.
 8              Now, you said when you first met Mr. Johnson you
 9   were very impressed with him?
10       A.   Yes.
11       Q.   Okay.  Why was that?
12       A.   He -- he immediately went out and got the license,
13   the state inspection license on his own accord in just a matter
14   of a couple of days, no hesitation, and seemed like he was
15   ready to work.
16       Q.   In the first couple of months he worked for you --
17   the first, let's say two, three months he worked for you, how
18   would you characterize him as an employee?
19       A.   Good or very good.
20       Q.   Okay.  How many hours a day was he working?
21       A.   Ten hours.
22       Q.   And how many days a week?
23       A.   Six days a week.  Oh, I'm sorry, five days a week.
24       Q.   Okay.  So for the first couple of months, he was
25   working five days a week, 10 hours a day, correct?
```

```
 1       A.    Yes.

 2       Q.    Always on time?

 3       A.    Yes.

 4       Q.    Appeared to be very good at his job?

 5       A.    Yes.

 6       Q.    Very conscientious at his job?

 7       A.    Yes.

 8       Q.    Now, you testified that you thought he was a little

 9  rigid in the rules; is that correct?

10       A.    Yes.

11       Q.    And that was in terms of him dealing with the

12  customers?

13       A.    Yes, handling conflicts.

14       Q.    And one way to interpret that, he was -- he was

15  willing to try to defend the money or the reputation of the

16  business, as opposed to just giving it back; is that correct?

17       A.    Yes.

18       Q.    So he was more apt to try to maintain your money

19  than you were -- than you would have been?

20       A.    I wouldn't say that.  I told him to just give them

21  what they wanted, because I was getting complaints and -- and

22  the customers were -- were angry at him the way he was handling

23  it, than whatever they were originally upset about.

24       Q.    But now, you would agree that he was following the

25  rules that you had set forth?
```

```
 1        A.    Well, the customer -- there were no real rules.  The
 2   customers had a complaint, were upset for whatever reason, and
 3   he -- he didn't show them that he cared about them.  He was
 4   rigid.  He -- you know, in most cases they were incorrect.
 5   They were emotional, and he would not, you know, give in to
 6   them at all.  He -- he would just not bend, just absolutely
 7   not.
 8        Q.    Now, would it be fair to say that when he first
 9   started working for you, he did not have keys to the building?
10        A.    Yes.  He did not have keys to the building.
11        Q.    And he did not work the cash register; is that
12   correct?
13        A.    Not in the beginning.
14        Q.    And is that something where someone has to build up
15   your trust before you entrust them with those responsibilities?
16        A.    Yes.
17        Q.    And based on his job performance, you began to trust
18   him; is that fair to say?
19        A.    Yes.
20        Q.    And how long had he worked at the building -- at the
21   business before you provided him with keys to the building, if
22   you recall?
23        A.    I do not recall.
24        Q.    Would it be fair to say that it was more than just a
25   month or two?
```

```
 1        A.    Yes.

 2        Q.    Okay.  And how long had he worked at the business

 3   before you allowed him to work the cash register?

 4        A.    I'm going to say three months.

 5        Q.    And from the point that he started working the cash

 6   register, did he -- other than the conflict with the customers,

 7   did he do that well?

 8        A.    Yes.

 9        Q.    Okay.  Now, you and Mr. Johnson, besides just

10   talking about business, you all from time to time would talk

11   about politics and the stock market and things like that; is

12   that correct?

13        A.    Yes.

14        Q.    So you all, would it be fair to say, had a pretty

15   good rapport?

16        A.    Yes.

17        Q.    Now, when you found out or when he contacted you on

18   the morning of November the 14th, and you found out he had done

19   what he had done, did that come as a surprise to you?

20        A.    Yes.

21        Q.    Because at that point you felt like he was a very

22   good employee and you trusted him?

23        A.    Yes.

24        Q.    Now, without saying what was said, did you come to

25   learn that he gave a full confession?
```

```
 1                  MS. MOSELEY:  Judge, I'm going to object.  This
 2   is improper.  It's obviously based on hearsay.
 3                  THE COURT:  Sustained.
 4        Q.   (BY MR. WEATHERSPOON)  Well, were you ever called to
 5   testify in a trial?
 6        A.   No.
 7        Q.   Do you know the outcome of the case that was filed
 8   in regard to your business against Mr. Johnson?
 9        A.   No.
10        Q.   Now, was some of the property that was taken
11   returned to you?
12        A.   Yes, he returned the monitor.
13        Q.   Were any of the inspection stickers or part of one
14   of the books of the inspection stickers returned to you?
15        A.   Yes, one safety book.
16        Q.   Do you remember the value of the safety book that
17   was returned to you?  Do you remember what that value was?
18        A.   I forget what those sell for.
19        Q.   Now, when you -- did you and the police officers
20   arrive at the shop at the same time that morning after you had
21   contacted the police?
22        A.   They might have been there a few minutes before me.
23        Q.   What was going on when you arrived?  Were they
24   already in the building?
25        A.   Yes.
```

```
 1        Q.    Okay.  And they were talking to Mr. Johnson?

 2        A.    Yes.

 3        Q.    At that point when you arrived at the building, did

 4   you know exactly what had gone on?

 5        A.    When I first arrived there?

 6        Q.    When you first arrived there.

 7        A.    No.

 8        Q.    So when you -- when Mr. Johnson told you he had done

 9   something bad or he had done a bad thing, up until the point

10   that you got to the store, you didn't know exactly what he had

11   done?

12        A.    No.

13        Q.    And no alarm or anything ever went off that brought

14   the police to your establishment; is that correct?

15        A.    No.

16        Q.    No, that's not correct, or, no, an alarm had never

17   went off?

18        A.    The alarm had never gone off.

19              COURT REPORTER:  Mr. Weatherspoon, can you give

20   me just one minute?

21              MR. WEATHERSPOON:  I sure can.

22              (Pause.)

23        Q.    (BY MR. WEATHERSPOON)  So, Mr. Contente, would it be

24   fair to say that Mr. Johnson was the person who alerted you and

25   the police to what he had done?
```

```
 1        A.    Yes.

 2              MR. WEATHERSPOON:  I'll pass the witness.

 3                    REDIRECT EXAMINATION

 4  BY MR. WEATHERSPOON:

 5        Q.    Just -- just a couple of questions.  I want to make

 6  sure that I can clear it up.  The safe -- where is the safe

 7  kept in the store?

 8        A.    The store has an upstairs, and it's in that office.

 9        Q.    Are there any cameras upstairs in the office?

10        A.    No.

11        Q.    So we don't ever see the Defendant actually go into

12  the safe because there's no camera up there; is that right?

13        A.    No, we didn't see him going in the safe.

14        Q.    And I'm talking about on the video.

15        A.    Yeah.  No, we didn't see that.  There's no camera up

16  there.

17        Q.    And the monitor was kept up there, as well?

18        A.    Yes.

19        Q.    I want to make sure -- that morning when we see on

20  that second video, the Defendant turning that camera -- or at

21  least messing with the camera and then it goes dark, that was

22  before he called you, or do you know for sure?

23        A.    I don't know.

24        Q.    You just know when you got off the phone with him

25  and looked at your monitor, it was blocked?
```

```
 1      A.   Correct.

 2            MS. MOSELEY:  That's all I have.  Thank you,

 3   Judge.

 4            MR. WEATHERSPOON:  Nothing further, Your Honor.

 5            THE COURT:  Thank you.

 6            Thank you, sir.  You may stand down, and you are

 7   excused.

 8            MS. MOSELEY:  Is he permanently excused, Judge?

 9            THE COURT:  Any objection?

10            MR. WEATHERSPOON:  No objection.

11            THE COURT:  Yes, ma'am.

12            MS. MOSELEY:  Thank you.  And the State calls

13   Lisa Ann Parker.

14            (Witness brought forward.)

15            THE COURT:  Please raise your right hand, ma'am.

16            (Witness sworn.)

17            THE WITNESS:  Yes, ma'am.

18            THE COURT:  True.

19                 LISA PARKER,

20   was called as a witness by the State, and after having been

21   first duly sworn, testified as follows:

22                 DIRECT EXAMINATION

23   BY MS. MOSELEY:

24      Q.   Good afternoon.

25      A.   Good afternoon.
```

188

```
 1        Q.    Sorry we've kept you waiting here a long time today.
 2        A.    That's okay.
 3        Q.    Would you introduce yourself to the members of the
 4   jury?
 5        A.    Yes, my name is Lisa Parker.
 6        Q.    I think we can get you a little bit further back.
 7        A.    Okay.
 8        Q.    It seems to really be working today.
 9        A.    Okay.  I'm Lisa Parker, and I'm a licensed clinical
10   social worker, accredited case manager, Presbyterian Hospital
11   of Dallas, emergency room.
12        Q.    How long have you worked as a social worker in the
13   emergency room at Presbyterian?
14        A.    Four and a half years.
15        Q.    Did you work somewhere before that?
16        A.    Yes, ma'am.
17        Q.    Where was that?
18        A.    Well, I've worked as an independent contractor,
19   doing home health and hospice.  I've also done inpatient and
20   outpatient psychiatric care.  Mainly my experience lies with
21   medical social work.
22        Q.    And how long have you been a social worker
23   altogether?
24        A.    Since 1990.
25        Q.    As a social worker assigned to the ER at
```

1    Presbyterian, what are your daily responsibilities and duties?

2         A.    Okay.  Generally speaking, we work 12-hour shifts,

3    and when we come in to start our shift, we -- we can see all of

4    the patients that are currently in the emergency room on our

5    screen.  And we do proactive screening.  So that anytime we see

6    a patient comes in, say, with some type of alcohol

7    intoxication, altered mental status, psyche eval, those are

8    things that we -- we practically screen for.  We are also

9    consulted by the physicians and the nurses there in the ER.

10    And so we do -- we work with a variety of different patients

11    and a multitude of different problems and concerns.

12         Q.    And do you also get involved, for instance, if

13    there's a suspected abuse situation?  If a woman comes in, for

14    instance, with physical abuse signs, would you be called in to

15    kind of counsel with or talk to that patient, as well?

16         A.    Yes, I would.

17         Q.    Now, on a regular basis at the Presbyterian -- and

18    where is Presbyterian located?

19         A.    We are located right down from the intersection of

20    75 North and Walnut Hill Lane in Dallas, Texas.

21         Q.    Do people come into the hospital on --

22    unfortunately, a regular basis under the influence of drugs

23    and/or alcohol?

24         A.    Unfortunately, yes, they do.

25         Q.    Is that something that you're familiar with,

190

```
 1   basically on sight?

 2        A.   Yes, ma'am.

 3        Q.   Are you regularly trying to assess whether someone

 4   is intoxicated or maybe have signs of mental illness and trying

 5   to distinguish those?

 6        A.   Yes, we do that.  Yes, ma'am.

 7        Q.   Would you say that happens pretty much on a daily

 8   basis?

 9        A.   Yes, ma'am, on a daily basis.

10        Q.   Are there occasions when the police escort someone

11   into the emergency room because they are intoxicated to the

12   point that they're a danger to themselves and their -- their

13   health is in danger?

14        A.   Yes.

15        Q.   Were you working in the emergency room on April 15th

16   of 2012, around 5:30 in the morning?

17        A.   Yes, ma'am.

18        Q.   What shift do you normally work?

19        A.   I usually work the night shift, which is 7:00 p.m.

20   to 7:30 a.m.

21        Q.   So you would have been a couple of hours short of

22   getting off work that morning?

23        A.   Correct, correct.

24        Q.   Do you recall a patient by the name of Matthew Lee

25   Johnson being brought into the ER by the Dallas Police
```

1  Department and paramedics?

2      A.    Yes.

3      Q.    That morning?

4      A.    Yes, ma'am.

5      Q.    And I know that's been a year and a half ago.  How

6  many patients have you seen since then?

7      A.    Hundreds.  Hundreds.

8      Q.    Do you -- do you remember the incident?  Do you

9  remember him being brought in?

10     A.    Yes, I do remember that particular incident.

11     Q.    And you make notes regarding patient care.  Anytime

12 you're in contact with a patient, do you write in the medical

13 records that are kept at Presbyterian for purposes of being

14 able to go back and refresh your memory, as well as just to

15 document a person's medical and mental health care?

16     A.    Yes, we do.  We document clinical notes on each

17 case.

18     Q.    And that's every case?

19     A.    Every case.

20     Q.    Even if they're not brought in by the police and

21 paramedics?

22     A.    Yes, ma'am, every case.

23     Q.    In this particular case, have you reviewed the

24 medical records?

25     A.    I did.

1          Q.    Of Matthew Lee Johnson?

2          A.    Yes, ma'am.

3          Q.    And you say you do have an independent recollection

4     of this morning and the events of that morning?

5          A.    I recollect it because when I read my clinical note

6     that I documented, I remembered the incident because it -- it

7     stood out in my mind because of the way that it occurred.

8                    MS. MOSELEY:  May I approach the witness?

9                    THE COURT:  You may.

10         Q.    (BY MS. MOSELEY)  I'm showing you what's been marked

11    for identification as State's Exhibit 188.  Are these the

12    medical records?  If you'll just kind of glance.  I know this

13    first page is -- is the custodian of records affidavit.  Do

14    these appear to be the records, including your notes, on

15    Matthew Lee Johnson from that morning?

16         A.    Yes, ma'am.  These appear to be them.

17                    MS. MOSELEY:  I'd offer State's Exhibit 188 at

18    this time.  They are accompanied by an affidavit from the

19    custodian of records, and they have been on file with the Court

20    for the requisite amount of time.

21                    (State's Exhibit 188 offered.)

22                    MS. BERNHARD:  No objections.

23                    THE COURT:  Admitted.

24                    (State's Exhibit 188 admitted.)

25         Q.    (BY MS. MOSELEY)  As a social worker, what are your

1  responsibilities to the patient when they are brought in by

2  police and paramedics, and we'll just narrow it down to that?

3      A.    Okay.  Well, first and foremost, the patient's

4  safety is -- is priority, their medical safety, and that of the

5  staff, as well.  And so we have to assess what their medical

6  condition is, as much as possible when they come in.  If the

7  patient is altered mentally, then the social worker -- as a

8  social worker, my role would be to be assist in hopefully

9  trying to contact some family members, if it's a situation

10  where we need additional medical information, or -- and -- and

11  so that would be my role is to talk with -- try to talk with

12  the patient.  If they're not able to converse with me and

13  answer the questions appropriately, then I would try to find

14  family to help, just to find out what the medical history is,

15  do they have allergies, do they have any medical diagnoses we

16  need to know about, what medications are they on, and this is

17  all -- it's an ancillary role to the nurse and physicians, so

18  we're trying to help them because their priority is making sure

19  that patient is medically stable.  So as support staff, then I

20  would do the other -- the other roles.

21      Q.    And are you trained in dealing with people who have

22  altered mental states?

23      A.    Yes, ma'am.

24      Q.    As opposed to a nurse or physician who is really

25  more focused on the medical needs, you have some different

1    training that maybe makes it easier for you to talk to people,

2    know how to talk to people who are in those states?

3         A.    Yes, ma'am.  My training is different, yes.

4         Q.    And when the Defendant came in, can you describe for

5    the members of the jury how he was acting?  What was his

6    behavior like?

7         A.    Well, he was accompanied by -- I want to say two or

8    three other officers.  As I recall, he was in handcuffs.  He

9    was very highly agitated.  He was somewhat combative.  And

10   so -- so when he came in, our job was obviously to try to get

11   him calmed down as quickly as possible, so that we could

12   evaluate him properly -- medically and mentally to see what we

13   needed to do to help this person.

14        Q.    And when you say he was fairly -- I think it was --

15   your word -- combative, was he really more than fairly

16   combative?

17        A.    Well, yes, I would say so.  And I think that's why

18   this case stands out in my mind because, as I recall, we placed

19   him in Room 31, and it took approximately eight to nine staff

20   members and police officers to hold him down on the bed.  And

21   we unfortunately, had to body net the patient.

22        Q.    What is a body net?

23        A.    Which a body net is used -- it is -- it's actually a

24   net, and it has four points, and we actually lay it over the

25   patient and we attach it to the bed.  And it's basically to

```
 1  protect them.  And it's also to protect the staff because the

 2  patient was so mentally altered and so upset and agitated, that

 3  he did not want to be cooperative at that time -- or at least

 4  it appeared so.  And so we could not calm him verbally, so

 5  therefore, we had to use -- and we call those behavioral

 6  restraints, somewhat like handcuffs or kind of behavior

 7  restraint.  We use what we call two-point or four-point

 8  restraints which we would secure the arms and legs.  And if

 9  needed, then we have to use the body net.  And he was a very,

10  very strong individual, and so that's why we did have to use

11  the body net.

12         Q.    And you had described for me previously how he was

13  trying to get up from the table, even though all of you were

14  holding him down.  Can you tell the members of the jury about

15  that?

16         A.    Yes, unfortunately, you know, obviously the more we

17  tried to hold him down and calm him, then the more agitated it

18  made him because he was confused and kind of out of it.  So

19  it -- if I recall correctly, there was a police officer that

20  stood at the head of the bed and literally laid the top of his

21  body over the patient's forehead to hold him down so that we

22  could get the body net secured.

23         Q.    Was the Defendant still getting up?

24         A.    Trying to get up, yes.

25         Q.    And were you able to determine, once he was secured
```

1    in the -- in the net, whether this was some sort of mental

2    problem or substance induced?

3        A.    At that time we could not definitively tell if it

4    was substance induced or some type of psychiatric, such as a

5    psychotic break or if it was a substance induced -- I'm sorry,

6    substance induced psychosis.

7        Q.    It's hard to tell in the beginning because they look

8    very similar?

9        A.    Correct.

10       Q.    Do you remember him making any statements while all

11   this was going on?

12       A.    Yes.  We did try to talk with him, ask him

13   questions, you know, do you have any medical conditions?  Do

14   you have any allergies?  Just the typical questions we would

15   ask.  Unfortunately, he was so confused and agitated and

16   psychotic that you could not carry on a reasonable conversation

17   with him.  And when we would ask him a question, his answer

18   would be totally unrelated to the question being asked.

19       Q.    And your notes -- in the medical records, did you

20   write down some of the things that he said while all this

21   was --

22       A.    Yes.  Yes, ma'am, I do.  We try to use direct quotes

23   so that when we have -- ever have to come back and look at this

24   chart to -- to see if we can determine -- you know, best

25   determine what the patient's condition was at that time.

```
 1                    MS. MOSELEY:  Your Honor, may I publish the

 2    first page of these medical records that have just been

 3    offered?

 4                    THE COURT:  You may.

 5         Q.   (BY MS. MOSELEY)  Now -- all right, and this second

 6    page where you wrote -- these are your notes?

 7         A.   Yes, ma'am, those are my notes.

 8         Q.   And you mention in here that he was placed in a body

 9    net and two-point restraints?

10         A.   Yes, ma'am.

11         Q.   And that that was done to protect the patient and

12    staff and the officers from physical injury?

13         A.   Correct.

14         Q.   You said he was confused, rambling, and making

15    statements such as, I hope they're getting this on TV, God is

16    watching all of this, XLT and divorce is a bad thing, and I'm

17    going to grab your gun.

18         A.   Yes.

19         Q.   Those are statements that he made, and you wrote

20    them shortly after all of this happened?

21         A.   Yes.

22         Q.   While your memory was still fresh?

23         A.   Correct.

24         Q.   And I assume that's while all this struggling is

25    going on and trying to get him calmed down and medicated?
```

1        A.    Yes, ma'am.

2        Q.    Did he end up having to be medicated?

3        A.    If I recall correctly, we did -- we did medicate him

4   in -- I believe the record will show it was Geodon which is an

5   excellent antipsychotic medication that we use.

6        Q.    And you said further in your notes, although the

7   patient required frequent redirection, he was able to provide

8   what seems to be accurate information, that he has HTN.  What

9   is that?

10       A.    Hypertension or high blood pressure.

11       Q.    High blood pressure and takes medication for that?

12       A.    This is after he had -- we had medicated him and he

13  was subdued, he was more calm.  And we went back in, you know,

14  to try and talk with him further.

15       Q.    And this is sometime between 5:30 when he came in

16  and 7:30 when you get off, he's already kind of calming down

17  and able to communicate?

18       A.    Yes.

19       Q.    You said he reported he had been smoking crack

20  cocaine, ice, and marijuana laced with PCP?

21       A.    Yes.

22       Q.    He told you he was married with children and had a

23  job.  And you said, no additional social work needs or concerns

24  are noted or reported.  What does that mean?

25       A.    That means that at that time, that I'm -- in that

1  particular intervention, at that time I'm seeing no additional

2  needs or concerns.  It doesn't mean that he doesn't -- there's

3  no more needs for this ER visit.  It just means there's nothing

4  in addition, like there's not a medical crisis going on or

5  there's no other things going on that would complicate the

6  situation.

7       Q.   By the time the medication is working and you're

8  able -- he's calmed down, you're able to talk to him, is it

9  clear to you by then that this was drug induced and not some

10  mental break?

11       A.   It appeared so because -- like I said, I also asked

12  him once he calmed down, you know, have you been doing any

13  drugs tonight?  And that's when he told us what he had been --

14  had been doing.

15       Q.   Do you ask about any mental health issues, if he's

16  schizophrenic or bipolar or any mental diagnoses?

17       A.   Yes, we typically do.

18       Q.   And had he told you that he had a mental health

19  concern, would you have made note of that?

20       A.   Yes.  I would have -- I would have noted that.

21       Q.   If he had told you he had severe depression or

22  bipolar disorder or anything of that nature, that would have

23  been important?

24       A.   Oh, absolutely.

25       Q.   And you would have made note of that?

200

 1      A.    Right.

 2      Q.    Would you have considered that, in fact, something

 3 that might need additional social work attention?

 4      A.    Yes.

 5      Q.    And then you noted that you'll continue throughout

 6 his stay -- or at least social worker will, but your shift came

 7 to an end?

 8      A.    Yes, ma'am.

 9      Q.    By the time your shift came to an end, was he coming

10 off of these drugs and kind of resting more calmly?

11      A.    Yes, ma'am.  He was no longer struggling against the

12 restraints.  He was calm.  He was lying in bed and just -- you

13 know, just resting -- resting.

14      Q.    And you turned the case over then to your

15 replacement on the next shift?

16      A.    Yes, ma'am.

17      Q.    And who was that?

18      A.    Julie Fitzgerald.

19      Q.    And Julie Fitzgerald then would have been involved

20 with his discharge and -- and whatnot?

21      A.    Correct.

22      Q.    As a general rule, when a patient likes this who

23 comes in and -- and the determination is made that this is

24 strictly a substance induced episode, are there procedures that

25 the social worker would follow in terms of giving information

1    about treatment or giving advice about where you can go to get

2    help and things of that nature?

3         A.    Yes, ma'am.  That's standard protocol for us.

4    That's part of our role is to advocate for the patient and the

5    family, to provide resources, where necessary, appropriate to

6    the problem or concern.  And so that would have been something

7    that would have been offered at the appropriate time, when he

8    was -- when we knew that he was completely clear and could

9    understand the information being provided.

10        Q.    And by that time, you were already done for the day?

11        A.    I was already done.

12        Q.    And Ms. Fitzgerald would have been responsible for

13   that?

14        A.    Yes, ma'am.

15             MS. MOSELEY:  Thank you, ma'am.  That's all I

16   have.  I'll pass the witness.

17                        CROSS-EXAMINATION

18   BY MS. BERNHARD:

19        Q.    Ms. Parker, what -- what is psychosis?

20        A.    Well, psychosis is when a person is not in touch

21   with reality.

22        Q.    And when Mr. Johnson first came into the ER that

23   morning, you noted in your records that -- that he was

24   suffering from psychosis?

25        A.    Yes, ma'am.

```
 1        Q.    And you mentioned that it can be substance induced

 2   psychosis or a mental illness; is that right?

 3        A.    Yes, ma'am.

 4        Q.    Do the symptoms as far as what the patient is

 5   experiencing and what other people around him are experiencing,

 6   is there a difference?

 7        A.    No, I don't believe so.  They can present as -- you

 8   know, the same.

 9        Q.    Okay.  So there's the break with reality?

10        A.    Yes, ma'am.

11        Q.    And it can be substance induced or it can be mental

12   illness?

13        A.    Yes, ma'am.  And sometimes it can be medically

14   induced, even.

15        Q.    Okay.

16        A.    So psychiatrically, medically, or substance.

17        Q.    How do you tell the difference?

18        A.    Well, how we would do that in the emergency room

19   setting would obviously be -- we're going to be -- objectively

20   viewing the patient.  We're going to be asking questions.

21   We're going to be doing lab tests.  We're going to try to be

22   getting collateral information, if possible, from family or

23   friends.  So we use all of those type things to try to -- to

24   narrow down and see exactly what their problem is with the

25   patient so we can appropriately apply interventions to help
```

1   them through whatever is going on.

2        Q.    Now, is it possible for a person to have mental

3   illness and substance abuse at the same time?

4        A.    Absolutely.  Absolutely.

5        Q.    How do you tell the difference then?

6        A.    You know, unfortunately, sometimes you can't always

7   tell the difference if there is a -- what we call a dual

8   diagnosis, which means that person has a substance abuse

9   problem in addition to a mental health problem.  Sometimes you

10  can't tell, you know, what the origin of the psychosis is.

11       Q.    And you not -- you're not spending days or weeks or

12  really even hours with these patients, are you?

13       A.    No, ma'am.

14       Q.    You're making quick assessments?

15       A.    Yes, ma'am.

16       Q.    Based on the information you have in front of you

17  and a limited amount of time?

18       A.    Right.

19       Q.    And if somebody tells you that they had been using

20  substances, does that lead you to the conclusion that it's

21  perhaps substance abuse psychosis, rather than a mental

22  illness?

23       A.    I would say, yes, I would -- I would -- because

24  typically in my experience I've found that when my patients

25  come into the ER and they tell me they've been using drugs,

204

```
 1   99 percent of the time, it is -- it's true, it's correct, you
 2   know, their -- their tests will show that -- will confirm that.
 3   And so that's how we -- you know, we wouldn't -- I wouldn't --
 4   like I said -- like I told the ADA, I would not just assume
 5   when he came in in handcuffs that night that he had been using
 6   drugs and was psychotic based on that, because I didn't have
 7   enough information at the time to determine that.
 8        Q.    But once he told you that he had been doing drugs,
 9   then that was the logical conclusion?
10        A.    That was the logical conclusion, but that didn't
11   necessarily mean that he did not have a dual diagnosis or -- or
12   a comorbidity which would have been, you know, a possible
13   mental health problem.
14        Q.    And you really don't spend enough time with them to,
15   you know, fully diagnose whether it's comorbidity or a dual --
16        A.    Yes, actually we do.  We do.  Yes, we -- we spend as
17   much time as the -- as the situation warrants.  I've had some
18   patients, I'm in and out in 15 minutes.  I've had others I'm in
19   there for an hour with them.  And then there's other situations
20   where I'm in and out of the patient's room all night long,
21   talking with family, the patient.  And, again, it depends on
22   what the condition of the patient warrants.
23        Q.    But in this case, when Mr. Johnson came in, it was
24   5:30 in the morning and you only had two hours left on your
25   shift?
```

1          A.    Correct.

2          Q.    You didn't stay late or anything on that shift?

3          A.    I did stay late on that shift.

4          Q.    How long did you stay?

5          A.    My last entry on that note, I believe, was 08:30 if

6    I recall correctly.

7                MS. MOSELEY:  It's up there.

8          Q.    (BY MS. BERNHARD)  So you stayed for an extra hour?

9          A.    An extra hour, yes, ma'am.

10         Q.    Now, you weren't present when Mr. Johnson was

11   ultimately discharged, were you?

12         A.    No, ma'am.

13         Q.    But he was given certain instructions on discharge,

14   as is typical?

15         A.    Yes, ma'am, that's our typical protocol.

16         Q.    And --

17               MS. MOSELEY:  You just have to switch it to dot

18   cam.

19         Q.    (BY MS. BERNHARD)  And are these part of the

20   instructions that -- that -- oops -- that a patient may be

21   given --

22         A.    Yes.

23         Q.    -- on discharge?

24         A.    Yes, that looks like that would be -- that looks

25   like that is the instructions that would have been provided by

```
 1    the nurse.

 2         Q.    And it goes on for one page, and it continues on to

 3    the next page; is that right?

 4         A.    Typically, yes, ma'am.  Yes, ma'am.  Yes.

 5         Q.    And it specifically tells them that alcoholism and

 6    addiction has little to do with willpower, correct?  I mean,

 7    that's what it says right there --

 8         A.    You --

 9         Q.    -- right under treatment.  Can you read that?

10         A.    I'm trying.

11         Q.    Is it on the monitor right next to you.  You

12    might --

13                   THE COURT:  If you look to your left.

14                   THE WITNESS:  Oh, yes.  Thank you.  Much better.

15         A.    Where are you seeing that?

16         Q.    (BY MS. BERNHARD)  Right where it says treatment,

17    that first line?

18         A.    Oh, okay.  Yes, that's what it says.

19         Q.    Has little to do with willpower, and alcoholics and

20    addicts have an uncontrollable need for alcohol and/or drugs

21    that overrides their ability to stop drinking or using.  The

22    need can be as strong as the need for food or water.  Is that

23    -- that's the information that you give them?

24         A.    That's the information.

25         Q.    And that's the medically -- the medical mind, I
```

1  guess, on addiction; is that correct?

2      A.    My personal experience is -- I don't know that I

3  would phrase it that way, because -- because then that seems to

4  give the person no hope for recovery which there always is

5  hope.  There's always a way.  I don't ever want to take that

6  hope away from my patients, so I would not -- if I were

7  counseling with a patient, I would not phrase it in that

8  particular way.

9      Q.    Okay.  So you -- you would write it a little

10 differently?

11     A.    Yes, ma'am.

12     Q.    But basically if a person is addicted, it's not like

13 they can just stop?

14     A.    Yes, ma'am.  There is physiological, as well as a

15 psychological craving for that substance.

16     Q.    And do people -- does a person who's addicted -- do

17 addicts frequently resist treatment?

18     A.    Sometimes they do, yes, ma'am.

19     Q.    I mean, they basically have to get a point -- get to

20 a point where they're willing to get treatment?

21     A.    That is correct.

22     Q.    But a big part of addiction is denial that you have

23 a problem and -- and resistance to treatment?

24     A.    Correct.

25     Q.    And if that weren't the case, then addiction

208

```
 1  wouldn't probably be the issue that it is in our society?

 2       A.    Right.

 3       Q.    Now, you said that Mr. Johnson did not report any

 4  mental health concerns to you, correct?

 5       A.    Correct.  Yes, if he had, I would have documented

 6  that in my note.

 7       Q.    Is it also, based on your experience, rather common

 8  for people with mental illnesses to deny that they have them?

 9       A.    Sometimes.

10       Q.    So just the fact that somebody says they don't have

11  a mental illness, that doesn't mean it's not there?

12       A.    Correct.

13             MS. BERNHARD:  I pass the witness.

14                     REDIRECT EXAMINATION

15  BY MS. MOSELEY:

16       Q.    Did you -- did you find it significant that as soon

17  as the drugs wore off, he didn't seem to have any mental

18  problems?

19       A.    Yes, I would find that significant.

20       Q.    And to be fair --

21             MS. MOSELEY:  May I approach, Your Honor?

22             THE COURT:  You may.

23       Q.    (BY MS. MOSELEY)  -- these instructions from the

24  nurse regarding addiction --

25       A.    Uh-huh.
```

1    Q.    -- go on to say that although some people are able

2  to recover from alcoholism or addiction without help, most need

3  help.  Do you offer them a list of services, places that they

4  can go to get help before you just put them back out on the

5  street?

6    A.    Oh, absolutely.

7    Q.    And that's done every time?

8    A.    Every single time.

9    Q.    And you didn't do that with the Defendant because

10  your shift ended before he was discharged?

11    A.    Correct.  And it would -- due to him not being

12  completely mentally clear when I passed the case, I did not

13  feel it would be appropriate for me to go over those at the

14  time, so when I passed the case to my coworker, I reinforced,

15  you know, I have not given him the resources for substance

16  abuse treatment and you would need to go over that with him

17  prior to discharge.

18    Q.    If a patient says, I need help, can I get some drug

19  help, do y'all just give them a sheet of paper and send them on

20  their way, or would you assist them in trying to get in some

21  kind of treatment program or do something to help?

22    A.    Yes.  Sometimes depending on what the patient

23  desires, we'll even help them maybe place a phone call to one

24  of the agencies to see, because a lot of the agencies have

25  intake hours that are specific to that agency.  And so we might

210

```
 1   go over a few -- say if the patient stated that they wanted to
 2   go that very day and to get some help, then I've even picked up
 3   the phone and said, well, let's call one of the agencies and
 4   see if we can get you in today, or possibly the next day.  Some
 5   patients would go directly from the ER to a drug treatment
 6   facility if they needed detox first.
 7         Q.   The list of resources that the social workers at
 8   Presbyterian provide, do they include resources that come at no
 9   cost to the patient?
10         A.   Yes.  There are some there that are on the list that
11   there's no -- there's no cost incurred by the patient.
12         Q.   There are free drug treatment and alcohol treatment
13   programs available to people in the Dallas County area?
14         A.   Correct.  You know, just to name a few, there's
15   Alcoholics Anonymous, Narcotics Anonymous.  There are support
16   groups.  One thing that comes to mind is North Star, which is
17   also called Value Options, and they are the mental health
18   authority, I guess you could say, for Dallas County.  And they
19   do accept people who are not funded or they are uninsured.  And
20   there is a means test -- financial means test that they have to
21   apply for, but a lot of my patients receive mental health and
22   substance abuse intervention through the North Star program.
23   And if they're not already hooked up in that program, we give
24   them the information and sometimes even we'll help them right
25   there apply for the program.
```

1                   MS. MOSELEY:  Thank you.  I'll pass the witness.

2                        RECROSS-EXAMINATION

3    BY MS. BERNHARD:

4         Q.    Ms. Parker, you weren't present when Mr. Johnson was

5    discharged from Presbyterian?

6         A.    No, ma'am.

7         Q.    So you don't know what, if any, conversations he may

8    have about treatment or -- or --

9         A.    Yes, all I would know is what --

10        Q.    -- how that would happen?

11        A.    Well, all I would know is what would be reflected in

12   the record.

13        Q.    And if it didn't get in the records, we have no

14   idea?

15        A.    Yes, ma'am.

16                   MS. BERNHARD:  I'll pass the witness.

17                   MS. MOSELEY:  I have nothing further, Your

18   Honor.

19                   THE COURT:  Thank you, ma'am.  You may stand

20   down, and you are excused.

21                   THE WITNESS:  Thank you.

22                   MS. MOSELEY:  Is she finally excused?

23                   THE COURT:  Yes, ma'am.

24                   MS. MOSELEY:  Your Honor, ladies and gentlemen,

25   the State rests on punishment.

```
 1                    (State rests.)

 2                    THE COURT:  All right.  Members of the jury, the

 3    State has rested its case in chief on punishment.  We are in

 4    recess for the weekend.  We'll see you Monday morning at 8:45.

 5    Have a good weekend.

 6                    THE BAILIFF:  All rise.

 7                    (Jury excused from courtroom.)

 8                    (Recess of proceedings.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    Reporter's Certificate

 2   THE STATE OF TEXAS:

 3   COUNTY OF DALLAS:

 4       I, Darline King LaBar, Official Court Reporter in and for

 5   the 363rd District Court of Dallas County, State of Texas, do

 6   hereby certify that the above and foregoing volume constitutes

 7   a true, complete and correct transcription of all portions of

 8   evidence and other proceedings requested in writing by counsel

 9   for the parties to be included in the Reporter's Record, in the

10   above-styled and numbered cause, all of which occurred in open

11   court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if any,

14   admitted by the respective parties.

15       WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16   on the 25th day of February, A.D., 2014.

17

18

19
                         \s\Darline LaBar
20                       DARLINE KING LABAR
                         Official Court Reporter
21                       363rd Judicial District Court
                         Dallas County, Texas
22                       hpdkfaith@msn.com
                         (214) 653-5893
23

24
     Certificate No:  1064
25   Expiration Date:  12/31/2014
```