REPORTER'S RECORD

VOLUME 49 OF 5 VOLUMES

TRIAL COURT CAUSE NO. F12-23749-W

COURT OF CRIMINAL APPEALS NUMBER: AP-77,030

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE 363RD JUDICIAL |
| VS. | : | DISTRICT COURT OF |
| MATTHEW LEE JOHNSON | : | DALLAS COUNTY, TEXAS |

**PUNISHMENT PHASE BY JURY**

\* \* \* \* \* \* \* \* \* \*

On the 4th day of November, 2013, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Tracy Holmes, Judge Presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by machine shorthand computer assisted transcription.

```
 1  A P P E A R A N C E S:

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
          Crowley Criminal Courts Building
 3        133 North Riverfront Boulevard
          Dallas, Dallas County, Texas 75207
 4        Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
          MS. ELAINE EVANS, A.D.A., SBOT # 24032880
 6        MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724
          MS. CHRISTINE WOMBLE, A.D.A., SBOT # 24035991

 7
                 FOR THE STATE OF TEXAS;
 8

 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
          P.O. Box 2817
11        Red Oak, Texas 75154
          Phone:  972-617-5548
12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13        325 North St. Paul Street, Suite 2475
          Dallas, Texas 75201
14        Phone:  214-922-0212

15  MS. NANCY MULDER, Attorney at Law, SBOT # 00792971
          2214 Main Street
16        Dallas, Texas 75201
          Phone:  214-764-7246

17
                 FOR THE DEFENDANT.
18

19

20

21

22

23

24

25
```

**INDEX VOLUME 49**

| | | | |
|---|---|---|---|
| November 4th, 2013 | | PAGE | VOL. |

PUNISHMENT PHASE BY JURY:

Proceedings.......................................... 6    49

| DEFENSE WITNESSES | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| MATTHEW JOHNSON | 7, 84 | 90 | 83, 87 | 49 |
| DANNY MULLINS | 137 | 147 | | 49 |
| BRENDA TAYLOR | 148, 154 | 153 | | 49 |
| CHARLES TAYLOR | 156 | 159 | | 49 |
| DOROTHY GUINN | 160 | 166 | | 49 |
| MONICA CAJAS | 169 | 178 | | 49 |
| DAPHNE JOHNSON | 184, 242 | 216 | | 49 |

Reporter's Certificate............................. 246    49


**ALPHABETICAL WITNESS INDEX**

| | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| MONICA CAJAS | 169 | 178 | | 49 |
| DOROTHY GUINN | 160 | 166 | | 49 |
| DAPHNE JOHNSON | 184, 242 | 216 | | 49 |
| MATTHEW JOHNSON | 7, 84 | 90 | 83, 87 | 49 |
| DANNY MULLINS | 137 | 147 | | 49 |
| BRENDA TAYLOR | 148, 154 | 153 | | 49 |
| CHARLES TAYLOR | 156 | 159 | | 49 |

**EXHIBIT INDEX**

| STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 179 | Photograph | 130 | 131 | 49 |
| 180 | Photograph | 130 | 131 | 49 |
| 181 | Photograph | 130 | 131 | 49 |
| 182 | Photograph | 130 | 131 | 49 |
| 183 | Photograph | 130 | 131 | 49 |
| 184 | Photograph | 130 | 131 | 49 |
| 185 | Photograph | 130 | 131 | 49 |
| 186 | Photograph | 130 | 131 | 49 |
| 190 | CD Jail Calls | 125 | 126 | 49 |
| 192 | Parol Board Letter | 111 | 112 | 49 |
| 193 | Protective Order App. | 222 | 222 | 49 |
| 196 | CD Jail Calls | 241 | 241 | 49 |
| DEFENDANT'S | | OFFERED | ADMITTED | VOL. |
| 3 | Certificates | 68 | 68 | 49 |
| 4 | *Letter | 183 | 183 | 49 |
| 5 | Letter | 213 | 213 | 49 |
| 6 | Letter | 213 | 213 | 49 |
| 7 | Letter | 213 | 213 | 49 |
| 8 | Letter | 213 | 213 | 49 |
| 9 | Letter | 213 | 213 | 49 |
| 10 | Letter | 213 | 213 | 49 |
| 11 | Letter | 213 | 213 | 49 |
| 12 | Photograph | 83 | 84 | 49 |

| DEFENDANT'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 13 | Photograph | 83 | 84 | 49 |
| 14 | Photograph | 83 | 84 | 49 |
| 15 | Photograph | 83 | 84 | 49 |
| 16 | Photograph | 83 | 84 | 49 |
| 17 | Photograph | 83 | 84 | 49 |
| 18 | Photograph | 83 | 84 | 49 |
| 19 | Sanden Records | 139 | 139 | 49 |
| 20 | DVD IPhone Video | 207 | 207 | 49 |

*Admitted for Record Purposes Only

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Let the record reflect that the

 3   Defense has requested that the shackles on Mr. Johnson's ankles

 4   be removed prior to the jury coming in.  The Sheriff's

 5   Department has directed the bailiffs in this court that they

 6   are under no circumstances to take the shackles off.  The Court

 7   has done the best they can to disguise the fact by placing a

 8   chair in front of the Defendant's feet.  Also, the alternate

 9   juror will not be sitting adjacent to the Defendant, but will

10   be sitting on the far side of the jury box with the other

11   alternate.

12              Anything further for the record?

13              MS. MOSELEY:  No, Your Honor.  Thank you.

14              (Jury returned to courtroom.)

15              THE COURT:  Please be seated.

16              Mr. Arras, we are going to put you down here.

17              JUROR:  Oh, are you?

18              THE COURT:  Uh-huh.

19              Good morning, ladies and gentlemen of the jury.

20   I hope that you've had a nice weekend, and we are back to work

21   this morning.

22              Will the State -- I'm sorry, the State has

23   rested its case in chief in punishment.

24              What says the Defense?

25              MS. MULDER:  The Defense calls Matthew Johnson.
```

```
 1                    THE COURT:  Let the record reflect Mr.
 2   Johnson -- I don't believe I have sworn him in.
 3                    MS. MULDER:  No, ma'am.
 4                    THE COURT:  Please raise your right hand.
 5                    (Defendant sworn.)
 6                    THE DEFENDANT:  I do.
 7                    THE COURT:  Thank you.
 8                    MS. MULDER:  May it please the Court?
 9                    THE COURT:  It may.
10                    MATTHEW JOHNSON,
11   the defendant, was called as a witness in his own behalf, and
12   after having been first duly sworn, testified as follows:
13                    DIRECT EXAMINATION
14   BY MS. MULDER:
15       Q.   Matt, I want you to take a deep breath for me, okay?
16   If you would, introduce yourself to the jury.
17       A.   My name is Matthew Lee Johnson.
18       Q.   Matt, how old are you?
19       A.   I'm 38 years old.
20       Q.   How do you feel about testifying today?
21       A.   Nervous, disgusted, remorseful.
22       Q.   Why are you disgusted?
23       A.   I put myself in a bad situation, put my family in a
24   bad situation, as well as the victim's family.  Feel like a
25   coward.  I don't feel like a man at all.  But I have my day of
```

```
 1   redemption.  I ask for forgiveness, first of all, from the

 2   victim's family, and from the Court to have mercy.

 3        Q.   Matt, how long have you been using crack cocaine?

 4        A.   Probably about 14 years.

 5        Q.   Since you were -- well, you've been in jail since

 6   this offense happened, correct?

 7        A.   Correct.

 8        Q.   So you were 36 when it happened, so basically around

 9   21, 22 years of age?

10        A.   Right around that time, yes.

11        Q.   During that 14 years, did you also use other drugs?

12        A.   Yeah.  Experimented with alcohol and PCP.

13        Q.   How would you use PCP?

14        A.   Smoke it.

15        Q.   How would you smoke it?  With what?

16        A.   Dip it -- what we call a sherm stick.

17             COURT REPORTER:  I'm sorry?

18        A.   A sherm stick.

19        Q.   (BY MS. MULDER)  What's a sherm stick?

20        A.   It's a brown cigarette, unfiltered.  We dip it in

21   formaldehyde, embalming fluid.

22        Q.   Do you wait for it to dry or do you smoke it wet?

23        A.   We smoke it wet.  That's why we call it wet.

24        Q.   That's the street name, wet?

25        A.   That's the street name, wet, juice.
```

```
 1        Q.    Juice?  How often would you smoke marijuana dipped
 2   in formaldehyde or PCP?
 3        A.    Well, I -- it was tobacco first on the sherm stick,
 4   and then I started dipping the marijuana, too.  Marijuana was
 5   my first drug of choice at the age of seven.  I've been smoking
 6   marijuana for a long time.
 7        Q.    How old were you when you started using marijuana?
 8        A.    Seven years old.
 9        Q.    The age of seven?
10        A.    Seven.
11        Q.    How -- how did a seven-year-old get ahold of
12   marijuana and -- and what made you smoke it?  How did you know
13   how to smoke it at the age of seven?
14        A.    I just seen what I seen now.  I seen so-called
15   friends doing it -- you know, I tried it.
16        Q.    What kind of neighborhood did you grow up in?
17        A.    East Garland.
18        Q.    Did you see people smoking marijuana as a child?
19        A.    All the time.
20        Q.    How did you -- how did you get marijuana as a child?
21        A.    I bought it with my -- my allowance.  Got it from
22   friends.
23        Q.    Did you continue to smoke marijuana into adulthood?
24        A.    Yes, I did.
25        Q.    How often as a child would you smoke marijuana?
```

1      A.    Maybe three or four times a week.

2      Q.    From the age of seven?

3      A.    From the age of seven.

4      Q.    Matthew, you're a married man?

5      A.    Yes, ma'am.

6      Q.    Who's your wife?

7      A.    Daphne Annette Johnson.

8      Q.    And how long have you known Daphne?

9      A.    Since we was in 5th grade.  Ever since we was 10

10 years old.

11      Q.    You married at what age?

12      A.    We got married at 18.

13      Q.    And you're still married to this day?

14      A.    Yes.

15      Q.    Has she supported you through this?

16      A.    Tremendously.

17      Q.    I want to fast forward and -- and first talk about

18 what happened the day before and the day that this offense

19 occurred, and then we'll go back and talk about your history,

20 okay?

21      A.    Yes.

22      Q.    Briefly, had you had periods where you -- where you

23 were able to stay off the drugs?

24      A.    Yeah, off and on.  I knew that there was bills to be

25 paid, and I had to take care of my children and my wife.  And

1  the little extra money that I thought I had, I thought I could

2  get high on it.

3      Q.    And you did --

4      A.    Once that was all done, I resorted to stealing.

5      Q.    Now, when this offense happened, how long had you

6  been using again?  Had it been a year or two?

7      A.    Before the offense happened?

8      Q.    Uh-huh.

9      A.    Well, I was released from prison July '09, and I

10  first relapsed in -- it was October the 1st of 2011.

11      Q.    So you actually had two years of sobriety?

12      A.    Yes.

13      Q.    So from October of 2011 to -- to May 20th of 2012,

14  you started using crack cocaine again?

15      A.    Also ice.

16      Q.    And what -- tell the jury what ice is.

17      A.    I guess it's methamphetamines.  I'm not -- not sure.

18  It's crystal like.  It's -- looked like glass -- a piece of

19  glass.  It keeps you high a lot longer than cocaine.

20      Q.    How did you ingest ice?

21      A.    I smoked it.

22      Q.    You smoke it in a pipe like crack?

23      A.    It's a different pipe from crack.  It's a bowl.

24      Q.    A bowl?

25      A.    They call it a bowl.

1      Q.    Now, from October 11th -- I'm sorry, October 1st of

2  2011, to the date of this offense, how -- were you using every

3  day or did it lead up to that, or -- or how did your relapse

4  kind of play out?

5      A.    It was the weekends.  You know, like I say, I paid

6  my bills.  The little money that I had, I thought was extra,

7  which wasn't extra because I had a family and girls, and I

8  would do it on the weekend, Friday night.  It would last

9  sometimes Saturday night or -- or Sunday night.

10     Q.    Now, where would you do this?

11     A.    In my old neighborhood.  I stayed in the south part

12  of Garland -- the east part of Garland where I grew up.

13     Q.    So you wouldn't use your drugs at home?

14     A.    Never.

15     Q.    How many daughters do you have?

16     A.    Three daughters.

17     Q.    What are their names?

18     A.    Makayi, Deja, and Matduxx.

19     Q.    How old is Makayi?

20     A.    She's 15.

21     Q.    And how old is Deja?

22     A.    She's 11.

23     Q.    And little Matduxx?

24     A.    She's two.

25     Q.    So Matduxx, you and Daphne had after you were

```
 1  released from prison?
 2       A.   Correct.
 3       Q.   Did you ever keep drugs in your home that you shared
 4  with Daphne and the girls?
 5       A.   Never.
 6       Q.   So when you would go out, would you stay gone or
 7  would you come home high?
 8       A.   I stayed gone until it's all over.
 9       Q.   When you would go to East Garland to get high, would
10  you go to drug houses?  Stay on the street?
11       A.   Yeah.  It wasn't drug houses.  It was -- it was
12  called smoke houses.
13       Q.   Okay.  What's a smoke house?
14       A.   Where a lot of crackheads smoke crack.
15       Q.   How long would you be gone?
16       A.   Depending on how much money I had, how long I can
17  make it last.
18       Q.   Whatever -- whatever you -- money you had, you used
19  it to buy drugs?
20       A.   Drugs, alcohol, ice, Xanax.
21       Q.   And you would use all those drugs until they were
22  gone?
23       A.   Until they was gone.  I used the Xanax and alcohol
24  to come down off of the ice and the cocaine.
25       Q.   When you're high on ice or crack cocaine or this
```

```
 1   wet, can you -- do you think like -- are you able to think
 2   about things the way you normally do?
 3        A.   Wasn't able to think like I'm thinking right now.
 4   It's a way of escaping reality, life's problems.
 5        Q.   Now --
 6        A.   I wouldn't say that I could think like I think right
 7   now.
 8        Q.   How -- like how does it change your thinking?
 9        A.   Everything is -- is an -- an illusion.  You know,
10   it's -- so much better than what it is when you're not high.
11        Q.   Is it like being drunk, or is it different than
12   that?
13        A.   It's a lot different.
14        Q.   How is it different than being drunk?
15        A.   It's like having an orgasm over and over and over
16   again.
17        Q.   That dramatic?
18        A.   Yes.
19        Q.   What does it feel like when you're craving it?
20        A.   It's like if you open up a bag of potato chips or
21   open up some cookies or something and try to just eat just one.
22        Q.   If you're real hungry?
23        A.   If you're real hungry.
24        Q.   Okay.  It's just like that?
25        A.   It's like that.  Intensify that by 10.
```

1    Q.    That's how bad you want it?

2    A.    That's how bad you want it.

3    Q.    Now, I want to draw your attention to the month

4 before this happened, the month of April of 2012.  You heard

5 the testimony about you being admitted into Presbyterian

6 Hospital?

7    A.    Yes.

8    Q.    Do you remember that event?

9    A.    Some of it, but not all of it.

10    Q.    Do you have any idea how you got to the hospital?

11    A.    The last thing I remember was being in the back of a

12 police car handcuffed, face down.  I was having an illusion

13 that I was in a box, handcuffed, face down, and I kept hitting

14 my head -- doing my head like that, and my head kept hitting

15 the bottom of the box, the coffin.

16    Q.    That's -- that's what you -- that's what your mind

17 was --

18    A.    That's what my mind was telling me, was showing me.

19    Q.    After that incident, when you were finally released

20 from the hospital and you made your way home to your wife and

21 daughters --

22    A.    Yes.

23    Q.    -- how did it make you feel to -- to have been able

24 to maintain sobriety, but then that you fell back into the drug

25 use, crack cocaine, wet?

```
 1        A.    It was devastating.  I could see the hurt in my
 2   wife's eyes.  She know the full extent of it.  But my children
 3   didn't.  You know, it made me lazy.  I didn't -- didn't want to
 4   play with my children, didn't want to do nothing with them.
 5   And me and my wife, we was mad at each other, so we didn't want
 6   to do anything with each other.  So I went into a deep
 7   depression.  You know, I -- we had family outings -- outings in
 8   my family house, dinners on holidays, and I wouldn't attend.  I
 9   stayed home in the dark, you know, just was embarrassed,
10   ashamed.  Didn't want to do nothing.
11        Q.    What were you ashamed of -- what were you ashamed
12   of?
13        A.    Felt dirty, felt like a failure.
14        Q.    Why, because you were using --
15        A.    Because I relapsed.
16        Q.    -- the little money you had on drugs, instead of
17   your family?
18        A.    Exactly, because I relapsed.  I chose drugs and
19   alcohol over my family.
20        Q.    Daphne is your wife.  Does Daphne have a sister?
21        A.    Yes.
22        Q.    What's her name?
23        A.    It's Courtney Johnson.
24        Q.    And Daphne and Courtney's mother is Hazel?
25        A.    Correct.
```

```
 1        Q.    Did you spend a lot of time with Courtney and Hazel?
 2        A.    Not a lot of time, but some -- some time.
 3        Q.    When you were high, did you ever go to Hazel's?
 4        A.    It was times that I called her and -- and wanted to
 5   talk.
 6        Q.    And she would kind of talk you down, talk you
 7   through it?
 8        A.    She would talk me through it.
 9        Q.    After you got out of Presbyterian Hospital, did you
10   and Courtney have an occasion to -- did she take you to the
11   Garland Police Department?  Do you remember?
12        A.    No, I don't remember that.
13        Q.    Do you have a hard time remembering things sometimes
14   as a result of your drug use or why?
15        A.    I can remember quite well right now, but when I'm up
16   under the influence, there's things that I don't remember.  I
17   don't have a recollection of what I've done.  I only remember
18   bits and pieces of it.  You know, people can tell me I done
19   this and did that.  It shocks me just as it shocks them.
20        Q.    Has that happened to you before?
21        A.    Numerous times.
22        Q.    Has -- has your wife told you, you did this and did
23   that?
24        A.    Correct.
25        Q.    And you didn't remember?
```

     1       A.    I didn't remember.  I thought she was telling a

     2   story.

     3       Q.    A story meaning you thought she was making something

     4   up?

     5       A.    Exactly.

     6       Q.    Now, let's go to the day before this happened, that

     7   Saturday.  What was that day like for you?

     8       A.    It's tough.  I remember my daughter coming in, Deja,

     9   my 11-year-old, coming in.  I got high all that week, Wednesday

    10   up until like Friday.  And that Saturday I was wiped out, and I

    11   remember her asking, daddy, let's play a game.  I didn't want

    12   to play a game with my daughter, so I told them they can go to

    13   their friend's house, if they wanted, you know, to play.  So

    14   her and my oldest went to their friend's house, and I was at

    15   home watching the Mavericks while my wife was at work.  My wife

    16   had came home and she was going to cook.  I already knew my

    17   brother, he was having a reception from his wedding.  He was

    18   having a party, and I didn't want to attend at first.  I didn't

    19   want to go around anyone.  She didn't want to go --

    20       Q.    Let me ask you this.  Why didn't you want to go to

    21   your own brother's wedding reception?

    22       A.    Ashamed.

    23       Q.    What were you ashamed of?

    24       A.    You know, my drug use, my clothing, my shoes, my

    25   hair, everything about me.  Felt like a bum.  Well, I -- when I

 1   was going to the store to get some ground meat for my wife to

 2   cook, I saw my daughters riding bicycles with another family,

 3   and it made me feel like the worst man on earth.  I sent my

 4   daughters out to play with someone else family, when I could

 5   have take the time and enjoyed that time with them.

 6        Q.   It made you feel bad?

 7        A.    It made me feel real bad.  So after I got the ground

 8   meat and stuff and I saw them on the bikes and passed on by

 9   them, blowed the horn at them, I went on by my brother's house.

10   It was a party, and everybody was happy, having a good time.

11        Q.   Anthony, your older brother?

12        A.    Anthony, my older brother.  My cousins, nephews,

13   everybody, like they was having a good time.  And I'm like --

14   it's like they were in heaven, I'm in my own personal hell, you

15   know.

16        Q.   What hell was that?

17        A.    Just down -- just felt down all the time, beat up.

18        Q.   Because you --

19        A.    Tired.

20        Q.   -- because you couldn't hold a job, because you were

21   a drug addict?

22             MS. MOSELEY:  Your Honor, I'm going to object to

23   her leading the witness.

24             THE COURT:  Sustained.

25        Q.   (BY MS. MULDER)  What was bringing you down?

1          A.    I had lost my job.  I couldn't work.  You know, I

2    kept missing work, you know, because of my drug use.  Sometimes

3    that Sunday will roll over into Monday and Tuesday, and I

4    wouldn't go to work and --

5          Q.    Did you feel like -- well, how did it make you feel

6    when you weren't going to work because of your drug use, when

7    you were using your family's money based on your -- you know,

8    just for your drug use?

9          A.    I feel like a failure, less than a man.

10         Q.    Because for you, what does it mean to be a man?

11         A.    Taking care of your responsibilities, owning up to

12   them, and don't run away from your problems.  Stand on your own

13   two feet and not depend on anyone else to take care of you.

14         Q.    You think -- you think a real man could have beaten

15   your addiction?

16         A.    Yeah.

17         Q.    Did you feel that way about yourself?

18         A.    I did.

19         Q.    When you got to Anthony's -- now, Anthony is your

20   oldest brother?

21         A.    Yes, he is.

22         Q.    How much older is he than you?

23         A.    Me and my brothers were four years apart, so Anthony

24   will be eight years older than me.

25         Q.    And who is your next sibling?

```
 1        A.    Is Timothy Johnson.

 2        Q.    And he's four years older than you?

 3        A.    He's four years older.

 4        Q.    And you were raised with, I guess, a cousin who was

 5  like a sister to you?

 6        A.    Yes, my -- she was older than Anthony.  My mother

 7  had took her in when her mother had got killed.  She was two

 8  years old, so she was raised with us.

 9        Q.    And she passed from --

10        A.    She passed from a brain aneurysm.

11        Q.    What was her name?

12        A.    It was Cheryl.

13        Q.    Cheryl?

14        A.    Cheryl -- Cheryl Mills.

15        Q.    And she has a daughter?

16        A.    Yes, actually she has two daughters and two sons.

17        Q.    Back to the point in hand, did you look up to

18  Anthony?

19        A.    I looked up -- I looked up to Anthony and Cheryl,

20  and me and Cheryl was much closer than me and Anthony was.

21        Q.    When did she die?

22        A.    She died when I was in prison in 2005.

23        Q.    Did you get to go to her funeral?

24        A.    No, I didn't.

25        Q.    How did that make you feel when you couldn't go to
```

```
1  her funeral?

2       A.   I can't even explain it.  It's unexplainable.

3       Q.   What do you mean it's unexplainable?  I mean, did --

4  who do you blame for your incarceration?

5       A.   I blame myself.

6       Q.   Did you want to be there at the funeral?

7       A.   Yes, I did.

8       Q.   Now, back to Saturday before this happened, you say

9  that you -- had you gone to the store and bought the ground

10 beef?

11      A.   Uh-huh.

12      Q.   You have to answer out loud.

13      A.   Yes, I'm sorry.

14      Q.   You -- you went to your brother Anthony's?

15      A.   Yes.

16      Q.   What did you do there?

17      A.   I spoke to everyone.  You can look in people's eyes

18 and you can kind of tell what they're thinking, you know.

19      Q.   What did you think they were thinking?

20      A.   I just thought they was thinking, just look at him.

21 He's -- he's -- I felt like a failure.  I just -- I don't know,

22 I couldn't tell you what they was thinking, because I'm not a

23 psychic, but I can just -- I was ashamed to be around family

24 because of my clothing, my hair, my facial hair.  I just didn't

25 -- I wasn't keeping myself up and I -- I keep myself up.  I
```

```
 1  take care of myself.
 2       Q.   Did you think -- I mean, were you looking like a
 3  drug addict?
 4       A.   Very much, you know.
 5       Q.   Did you think that they thought, look at that
 6  crackhead?
 7       A.   Yes.  So I spoke to everyone, I hugged everyone, and
 8  I said congratulations to my brother and his wife -- new wife.
 9       Q.   When Anthony looked at you, what did you feel?
10       A.   I felt bad.
11       Q.   I'm sorry?
12       A.   I felt bad.
13       Q.   In what way did you feel bad?
14       A.   With him trying to continuously talk to me, to help
15  pull me through this, and I -- it was in one ear and out the
16  other.
17       Q.   Your older brother had always tried -- offered help
18  to you?
19       A.   All the time.  He know exactly what it was like and
20  is like to be an addict.
21       Q.   But he recovered?
22       A.   He recovered.
23       Q.   How did that make you feel, your perception of his
24  feelings about you?
25       A.   I wanted to draw some of his strength from him, some
```

24

```
 1  of his discipline.  I just sit down and wished I could have

 2  went to the service, you know.  I could have been disciplined

 3  in the service.

 4          Q.    He had been in the military?

 5          A.    Yes, he was in the Navy.

 6          Q.    How old were you when Anthony left and went into the

 7  Navy?

 8          A.    Right around 10.

 9          Q.    And after that, he was gone?

10          A.    He was gone.

11          Q.    How long do you think you stayed at the party?

12          A.    The first time I went, I stayed about maybe 30

13  minutes to an hour.  I seen the drinks.  I didn't want what my

14  wife was cooking at home, didn't want to be there with her,

15  because walking around mad at each other, looking at each

16  other, you know, know what that was going to lead up to.  Ask

17  her -- I got home, and I asked her did she want to go.  She

18  said, no.  I'm sure she felt the same as I felt because we

19  didn't have enough money to get an outfit or get our hair done,

20  to look presentable to be at a party.

21          Q.    Now, did Daphne --

22          A.    So I brought her car home to her.

23          Q.    Let me stop you there.  Did -- did Daphne use drugs?

24          A.    No.

25          Q.    Did you all struggle financially?
```

```
 1        A.    Yes.

 2        Q.    In large part because of what?

 3        A.    Well, before it was -- she work as a cook in a

 4  middle school, and they didn't pay her during the summertime.

 5  So it was only one income coming in.  And then after, it was

 6  because of my drug use.

 7        Q.    And Daphne was aware of your drug use?

 8        A.    Yes, she was.

 9        Q.    So you got home.  Did you take her the ground beef?

10        A.    Yes.

11        Q.    She didn't want to go, you wanted to go back?

12        A.    Yes.

13        Q.    What -- what made you want to go back, the drinks?

14        A.    The drinks.  It was like they was having a good

15  time.  I just wanted to have a good time.  It's been a long

16  time since I had a good time with my family, at least about six

17  months.  I remember not going over at Easter, Thanksgiving,

18  Christmas, and Mother's Day, I think it was.  Those were all

19  the times that I just stayed at home, and my family went.

20        Q.    Well, let me ask you this.  I mean, you were getting

21  high so often, wasn't that a good time?

22        A.    Yeah, my own good time at the beginning, until it

23  was all done, and then that's when I got depressed.

24        Q.    Because when the high is over --

25        A.    The party is over.
```

```
 1        Q.    And when the party is over, how do you feel?

 2        A.    Beat up, broke down.

 3        Q.    Did you ever feel like a failure?

 4        A.    All the time.

 5        Q.    What time did you go back to Anthony's?

 6        A.    After my wife had cooked, I had ate a little bit of

 7   it.  It was around, I want to say 9 o'clock or so, I -- like I

 8   said, I left her car at home.  Mine wasn't operating.  So I

 9   walked to my brother's house.  He stayed on Broadway.

10        Q.    Tell the jury why your car wasn't working.  Tell --

11   tell them what happened.

12        A.    I'm a mechanic.  I started working on cars when I

13   was like 15, 16 years old.  My car ran out of gas.  I got a gas

14   can that was outside, probably been raining, and water was in

15   the gas can.  I put that gas in my vehicle.  It wouldn't crank.

16        Q.    Because -- let me ask you this.  When you put that

17   gas in your gas tank, were you sober?

18        A.    Yes, I was sober.  It was stupid.

19        Q.    Does water mix with gas?

20        A.    Huh-uh.

21        Q.    I'm sorry?

22        A.    Yes, water mixed with gas.

23        Q.    Why do you think you did that?

24        A.    I have no idea.  That's what I was explaining.  I'm

25   a mechanic, and I know that -- I know that if you mix water and
```

```
 1  gas and put it in your gas tank, it's going to eventually mess
 2  up the motor.  There was a sign right there, you know, I was --
 3       Q.    You were what?
 4       A.    I was drifting.
 5       Q.    Drifting?
 6       A.    Drifting off.
 7       Q.    What does drifting off mean?
 8       A.    Just losing my mind.
 9       Q.    What do you mean losing your mind?
10       A.    I wasn't thinking.  I wasn't -- I didn't have any
11  snap.  When I say snap, I'm not thinking like I'm thinking now,
12  being able to respond to your questions, processing
13  information.
14       Q.    Okay.
15       A.    Giving a response.
16       Q.    You said you went back to Anthony's about 9:00 p.m.?
17       A.    Correct.
18       Q.    How long did you stay at Anthony's?
19       A.    About two -- about two or three hours.  So about --
20  probably around about 12:00, I talked to my cousin.  He also
21  was an addict, Johnny Johnson.  And I was telling him about
22  what I was going through, and I told him what I did with my
23  vehicle.  And it was like -- he offered -- he said, here, man,
24  just -- here, try this.  Try this, you know.  And I'll get you
25  a fuel filter or whatever you need to do.  He gave me like $30,
```

28

```
 1  and when I was up on -- when I was up under the influence of
 2  alcohol, me with $30 in my pocket, I didn't think about that
 3  car.
 4       Q.   What did you think?
 5       A.   I wanted to get high.
 6       Q.   How much alcohol do you think you drank at that
 7  point?
 8       A.   I drank pretty much.  I drank enough to get drunk.
 9  Not drunk falling down drunk, but I was drunk.  So I left -- I
10  left walking.
11       Q.   But where did you go after Anthony's?
12       A.   I left walking, and I was heading to the east side
13  of Garland.
14       Q.   Going to where?
15       A.   To buy some crack.
16       Q.   Did you buy some?
17       A.   Yes, I did.
18       Q.   Did you smoke it?
19       A.   Yes, I did.
20       Q.   During those early morning hours from midnight on,
21  did you continue to use drugs, or did you just smoke what you
22  had and then go home or what did you do?
23       A.   Continued to smoke, sell a little bit, smoke, sell a
24  little bit, smoke.
25       Q.   Why did you --
```

```
 1        A.    All the way up until right around 3 or 4 o'clock.
 2        Q.    Let me ask you this.  Why were you selling a little
 3   bit?
 4        A.    So I can keep going.
 5        Q.    That's right, because if you want to get some,
 6   you've got to sell some to make money?
 7        A.    Correct.
 8        Q.    Were you just smoking crack cocaine, or were you
 9   smoking other stuff or ice or whatever else it was?
10        A.    At that time I was just smoking crack cocaine, but I
11   had got a pill of Xanax to use for later on when I was --
12   because I knew I had to go back home.  My wife had to be at
13   work that morning, and I knew I had to watch my daughter.  So I
14   used that to come down so I can get some rest.
15        Q.    Did you take the Xanax?
16        A.    Right around 4 or 5 o'clock.
17        Q.    Where were you smoking your crack that night?
18        A.    In the smoke house.
19        Q.    In East Garland?
20        A.    Yes.
21        Q.    Do you remember where that was?
22        A.    In East Garland.
23        Q.    What did you do around 4 or 5 o'clock?  Do you
24   remember?
25        A.    Well, I remember I -- taking that pill, of course,
```

1    the Xanax pill.  And I had -- just sitting around the smoke

2    house for a little while.  Everything was all gone.  So I took

3    off walking home, and I made it to my brother house along the

4    way, right around 6 o'clock, around that time, I guess.  And

5    I -- I'm rattling on the patio, you know, after everything --

6    it wasn't -- it wasn't cleaned up, so, you know, it was stuff

7    all out, and I stumbled up on a bottle of Moscato -- a bottle

8    of Moscato.

9         Q.    What is Moscato?

10        A.    I guess it's wine, and I drunk the whole bottle.  I

11   sat there, and I just drunk the bottle.

12        Q.    What did you do after that?  Can you remember?

13        A.    I wanted money.  I wanted to get high on crack.  So

14   I saw a bottle -- a plastic bottle -- water bottle, and I put

15   lighter fluid in it.

16        Q.    Let me stop you there.  What was -- when you think

17   to yourself, I want money because you want to buy more crack,

18   did you have a thought in your head about what you were going

19   to do?

20        A.    At that time, yes.

21        Q.    Tell the jury what was in your head at that time.

22        A.    Just going to take it and scare the person.

23        Q.    Did you have --

24        A.    Pour it on her.

25        Q.    Pour it on.  Did you have any kind of gun or knife

```
 1  or any other kind of other weapon?

 2       A.   No, I didn't.

 3       Q.   So you wanted to use the lighter fluid as what?

 4       A.   A scare tactic.

 5       Q.   So had you planned to go stop at the Whip-in or --

 6  or had you -- did you know --

 7       A.   I didn't know where I was going.  I just put the

 8  lighter fluid in there, and I just went across the street.

 9       Q.   Did -- did you put the paper towel in the water

10  bottle, do you recall?

11       A.   That, I don't remember.  I just picked up a bottle,

12  a water bottle, and put fluid in it.

13       Q.   Where did you get the lighter fluid from?

14       A.   Off my brother's patio.

15       Q.   Where did you go after that?

16       A.   I walked across the street to the Fina.

17       Q.   Now, you said you wanted to use it as a scare

18  tactic.  I mean, did you go in there without -- I mean, did you

19  go in there planning on -- on setting Nancy Harris on fire?

20       A.   It was not my intentions.

21       Q.   What was your intention?

22       A.   Just to scare the person.  I didn't know who was in

23  the store.

24       Q.   You didn't --

25       A.   I just -- I just walked in the store.
```

```
 1       Q.    You didn't know her?

 2       A.    I didn't know her.

 3       Q.    There -- it could have been a -- would you have done

 4  the same thing if it had been a guy?

 5       A.    Yes.

 6       Q.    What was your purpose in going in the Fina store

 7  that day, that morning?

 8       A.    Just to get the money and leave.

 9       Q.    Did you have any thought in your head that it might

10  be dangerous to pour lighter fluid on a person?

11       A.    Not at that time.  I can't say that I was thinking.

12  I had a one track mind.  It was to go in and rob the store.

13       Q.    Did you have a -- did you have that -- a lighter

14  with you?

15       A.    I don't remember having one, but I could have

16  possibly had one.

17       Q.    Well, you know they found the old orange one in your

18  pocket.  Do you remember that lighter?  Do you remember how you

19  got it, that you had it?

20       A.    I don't remember.  I don't recall.

21       Q.    But you know you had to have a lighter to smoke

22  crack?

23       A.    Yes, I had to have a lighter.

24       Q.    Okay.  You just don't recall?

25       A.    I don't recall where I got the lighter, but I --
```

1  it's a possibility I did have it.

2      Q.   When you went into the store, what did do you?

3      A.   First, I just walked behind the counter, and I -- I

4  saw a lady.  She was getting the mop bucket ready.  I guess she

5  was fixing to clean up, she was opening up the store.  I paid

6  no mind to her.  I just walked behind the counter.  And I

7  remember her walking behind the counter and telling me that I

8  don't supposed to be behind this counter.  And when she came

9  close to me, I just poured the fluid over her head.  At that

10 time I remember she was -- started trembling.

11     Q.   She was scared?

12     A.   Yes.  I asked her just open the safe, I wanted the

13 money.

14     Q.   The safe or --

15     A.   The cash register.

16     Q.   Okay.

17     A.   And she began to open it.

18     Q.   And what did you do?

19     A.   I remember taking a lighter off the counter, and I

20 took some cigarettes.

21     Q.   Now, you -- did you watch the video that they played

22 in court?

23     A.   I watched the video, and I couldn't believe that I

24 took her ring off her finger.  I don't remember doing that.

25     Q.   You don't remember doing that?

```
 1        A.    No, I don't.

 2        Q.    Had you seen that video before?

 3        A.    No, I haven't.  When she took the money out -- well,

 4   when she opened it up, she moved away from the register, and I

 5   was taking the money out.  And I remember coming back towards

 6   me, and I told her stand back, I had a lighter in my hand.  And

 7   I -- I flipped it once to try to scare her, but that didn't

 8   stop her.  She reached across me.  I didn't know what she was

 9   doing and it spooked me and I did it again.

10        Q.    You --

11        A.    And that's when she lit.

12        Q.    You flicked it again?

13        A.    I flicked it again, twice, hoping that she would

14   move back.

15        Q.    You realize by doing that to a person who is covered

16   with lighter fluid is what?

17        A.    It's dangerous.  I didn't -- I didn't realize that

18   it was -- it would have lit -- I didn't know it was that

19   flammable.

20        Q.    Well -- I mean, are you talking about you didn't

21   realize that because of why?

22        A.    It was lighter fluid.  It wasn't gasoline.  And I

23   thought by her smelling that lighter fluid, she would smell it

24   and then me with this lighter, she would comply.  And she did,

25   but she came back.
```

1      Q.    Well, are you saying it's her fault?

2      A.    It's not her fault at all.  I shouldn't have been

3  there in the first place.

4      Q.    Whose fault is it?

5      A.    It's my fault for striking that lighter.  I should

6  have just left, but it spooked me.  I didn't know what she was

7  reaching for.

8      Q.    Where did -- where did the lighter touch her?

9      A.    It had to touch her -- her sleeve or -- it had to be

10  one -- a piece of her clothing, because I remember her arm

11  going across me and I did like that (indicating).  And she did

12  not move.  She just was determined to do whatever she was going

13  to do -- she set out to do.  And I guess when I struck it that

14  second time, it lit her clothes.

15      Q.    I mean, did you have -- were you touching her when

16  you lit it the second time?

17      A.    I was close to her, yes.

18      Q.    Well, close to her or touching her?

19      A.    I was close to her, close enough to where it lit.

20      Q.    When you went in that store, did you -- did you even

21  think that what you were doing could result in somebody's

22  death?

23      A.    Would you repeat the question?

24      Q.    When you went into that store, did -- did you think

25  that by pouring lighter fluid on the clerk and grabbing a

```
 1  lighter and lighting it, I mean, did -- were you think -- were

 2  you thinking about the fact that that was dangerous or lethal?

 3       A.    I can't say that I was thinking at all at the time.

 4       Q.    Why weren't you thinking?

 5       A.    I was intoxicated.

 6       Q.    How much crack had you smoked that night?

 7       A.    Close to a hundred dollars worth.

 8       Q.    And how many rocks of crack is a hundred dollars

 9  worth?

10       A.    About 10.

11       Q.    Okay.  Were you still -- at that time, when you were

12  intoxicated, you had also drank that bottle of wine?

13       A.    Moscato and took that Xanax pill.

14       Q.    And when Ms. Harris ignited, what do you remember

15  thinking?

16       A.    I needed to leave.  I had done a bad thing.

17       Q.    Did you -- did you at any time stop to think that

18  maybe you could help her, help put her out?

19       A.    I have to be honest and say no.

20       Q.    You weren't thinking at all, were you?

21       A.    I wasn't thinking at all.

22       Q.    How do you remember leaving the store?  What --

23       A.    I remember -- I remember running out and just

24  running, jumping the fences.  I jumped in a trash can.

25       Q.    Was that Mr. --
```

```
 1        A.    I guess so, yes.

 2        Q.    Mr. Medley's, the older white male?

 3        A.    Yeah, because it had brick in the bottom of the

 4  trash can.  I had scratched myself all up.  My shirt was all

 5  dirty and sweaty, so I took it off.

 6        Q.    Now, I want to backtrack a little bit.  You've seen

 7  the video of you in the Fina station when Ms. Harris is

 8  literally on fire, and you said in your mind you remember

 9  running out, but you've seen the video?

10        A.    Yes.

11        Q.    What -- how do you leave the store?

12        A.    Like I just casually walked out.

13        Q.    Because that's what you did?

14        A.    Yes.

15        Q.    How do you remember it, though?

16        A.    I remember running.

17        Q.    That's what you remember?

18        A.    That's what I remember.

19        Q.    Matthew, if you had been in your right mind, if you

20  had not been under the influence of drugs or alcohol, would you

21  have gone in to rob the Fina station?

22        A.    I would have helped her mop that floor and open up

23  the store.  I helped elderly people all the time.

24        Q.    Let me ask you this.

25        A.    It wouldn't have even been a thought.
```

```
 1        Q.    If you had not been under the influence of drugs,
 2   would you ever pour lighter fluid over somebody and hold an
 3   open flame close to them?
 4        A.    Never, no.  Wouldn't have even been a thought.
 5        Q.    How do you feel about what you've done?
 6        A.    I feel -- I feel bad.  I feel worse than I felt that
 7   day when I was walking into my brother's house and looking at
 8   everybody look at me.  I feel even worse now.  I have to live
 9   with this for the rest of my life, if I'm able to live.  I
10   feel --
11        Q.    What is it you --
12        A.    -- like the lowest scum of the earth.
13        Q.    What is it that make -- why do you feel like the
14   lowest scum of the earth?
15        A.    Because I hurt an innocent woman.  I took a human
16   being's life.  I was the cause of that.  It was not my
17   intentions to -- to kill her or to hurt her, but I did.
18        Q.    Did you see the pictures of her injuries?
19        A.    I couldn't look at those pictures.
20        Q.    Why not?
21        A.    Too horrible, too hurtful, because I can't imagine
22   how the family feels.
23        Q.    Well, you know Ms. Harris's family is right there.
24   What is it --
25        A.    Yes.
```

```
 1        Q.    Do you have anything you want to say to them?

 2              THE DEFENDANT:   I'm sorry.  I ask for y'all

 3   forgiveness, for mercy.   Not for the sake of me, for the sake

 4   of my children and my wife.   If it was just me, I would want

 5   the same thing to be done to me, or hung.

 6        Q.    (BY MS. MULDER)  What do you mean, Matthew?  What

 7   are you talking about right now?  What do you mean the same --

 8        A.    If it was just me and I didn't have a wife and

 9   children, I would want the same thing to happen to me.

10        Q.    What happen?

11        A.    To die.

12        Q.    That's how you feel?

13        A.    That's how I feel.

14        Q.    You have that -- you feel you deserve that?

15        A.    Yes, I do.  I have a mother myself.  She's 72.  If

16   someone had did that to my mother --

17              MS. MOSELEY:  I'm going to object to the

18   narrative.

19              THE COURT:  Sustained.

20        Q.    (BY MS. MULDER)  How -- how is your mom doing right

21   now, Ms. Alma?

22        A.    She's sick.

23        Q.    She recently had a heart attack?

24        A.    Yes.

25        Q.    So she's unable to come to court?
```

```
 1        A.    Correct.

 2        Q.    You talked about your wife and your daughters.  Do

 3   they come to see you in jail?

 4        A.    Often.

 5        Q.    And write you letters?

 6        A.    Yes.

 7        Q.    You write them, talk to them on the phone?

 8        A.    Yes.

 9        Q.    Matthew, you heard the witnesses come and testify

10   about, you know, you running around that neighborhood after

11   this happened.  Do you -- do you remember taking off your shirt

12   or what happened to your glasses or anything?

13        A.    Like I say, I remember taking my shirt off because

14   it was dirty and it was sweaty and it was -- had particles of

15   rock on it from that bottom of that trash can.  I think I

16   was -- had scratched my body up.  I was bleeding, so I took it

17   off.

18        Q.    So that's where the blood on the shirt came from,

19   was from you?

20        A.    Correct.

21        Q.    I mean, did you -- were you trying to hide?  Were

22   you trying to run away?

23        A.    Of course, yes.  I knew I had did a bad thing, so I

24   just -- I just ran.  I hid in some bushes at first.  You know,

25   I was -- I remember taking out one of the cigarettes and
```

```
 1  smoking it.  And I got tired of laying in those bushes, so when

 2  I came out, that's when I saw the police car parked at the end

 3  of the street and I started running again.  I ran and I -- I

 4  fell several times, got tired of running and falling.  So I --

 5  when I ran around the corner, I just sat on the porch and just

 6  waited for them to come.

 7      Q.    Well, do you remember trying to get into Mr.

 8  Marecle's house?

 9      A.    Yes, I remember having an encounter with him, and I

10  remember us tussling and he fell backwards into the house.  And

11  I seen that I had done that, because I remember asking him for

12  his keys to his car and he told me, no, get out.

13      Q.    Uh-huh.

14      A.    And so I seen him fall.  That's when I turn around,

15  and I kept on running.  And then that's when I hid in those

16  bushes.

17      Q.    The third man, Mr. Denson, do you remember him at

18  all?

19      A.    I don't remember him at all.

20      Q.    Do you remember -- do you remember the bicycle at

21  all?

22      A.    I remember the bicycle.  It was one of the patios I

23  went on, and I had saw the bike.  That was before I took -- I

24  jumped in that trash can, because -- actually it was after,

25  because when I got on that bicycle, I remember riding it and
```

```
 1   the chain had came off.  And I left it on the side of the
 2   street, and that's when I ran and hid in those bushes.
 3        Q.    Okay.  Do you remember talking to Mr. Denson at all,
 4   telling him that you were --
 5        A.    I don't --
 6        Q.    -- in a bad way?
 7        A.    -- I don't remember him.  I don't remember a dog
 8   chasing me.  There wasn't a dog chasing me.
 9        Q.    You don't remember that at all?
10        A.    No, I don't.
11        Q.    Do you remember everything that happened or -- or
12   some parts of it --
13        A.    Some parts of it.
14        Q.    Do you remember riding -- taking the police car ride
15   that the jury saw the video of with you in the back of the
16   squad car?
17        A.    I don't remember that at all.  That was a short ride
18   to me.
19        Q.    Do you remember it being a short ride?
20        A.    Very short.  Seemed like I -- when we left the
21   scene, the police station was very short.  It was like I just
22   closed my eyes and opened my eyes and I was there.
23        Q.    But based on that video that you've now seen in
24   court, you know it was longer than that?
25        A.    A lot longer.
```

```
 1        Q.    Do you remember trying to talk to Officer Coffey,

 2   chat him up?

 3        A.    Not at all.

 4        Q.    Do you think at that time you had -- well, let me

 5   ask you this.  At that time did you have an understanding of

 6   what you had done?

 7        A.    From the time in the police car?

 8        Q.    Yeah.

 9        A.    Or the time --

10        Q.    In the police car?  Did you have an understanding of

11   what you had done?

12        A.    Not at that time, I didn't.

13        Q.    When you got to the police station, you spoke with

14   the detectives?

15        A.    Yes, I remember it being two of them.  They had me

16   in a room for about a couple of hours before they came in and

17   actually talked to me.  I do remember two officers standing

18   outside the -- the room.

19        Q.    Do you remember Detective Tooke reading you your

20   rights and you agreeing to waive them and talk to him?

21        A.    I remember that, yes.

22        Q.    Do you remember your demeanor when you talked to

23   him?

24        A.    Some of it, some of it I don't.

25        Q.    Do you remember what you said to him?
```

```
 1        A.    Some of it I do.

 2        Q.    At that time -- well, let me ask you this.  Because

 3   you've told us a lot more detail today than you did the

 4   detectives.  Why is that?

 5        A.    I'm being tried for my life.

 6        Q.    Did you over the last year and a half -- have you

 7   been able to remember more, or is it just that you didn't want

 8   to tell them?

 9        A.    I've been able to remember more.  It's been coming

10   back to me.  You know, I've been able to reflect on a lot of

11   things, and I've had a lot of time to -- to think.

12        Q.    What have you reflected on?

13        A.    The extent of what I have done.

14        Q.    And what have -- and what conclusion have you come

15   to after your reflection?

16        A.    I want to live long enough to see my girls grow up.

17        Q.    Matthew, were you a religious man --

18        A.    Very.

19        Q.    -- before this?

20        A.    Very.

21        Q.    You would talk about scripture?

22              MS. MOSELEY:  Objection, leading.

23              THE COURT:  Sustained.

24        Q.    (BY MS. MULDER)  Would you talk about the Bible and

25   scripture with people before this happened?
```

```
 1        A.    Yes, I would.

 2        Q.    How do you come to terms with what you've done?

 3   Have you come to terms with what you've done?

 4        A.    I ask for forgiveness from my higher power, to help

 5   me through this.  I ask for forgiveness, the healing of the

 6   victim's family and my family.  And he's given me the

 7   unbelievable strength to want to live through this.  It's hard

 8   to live every day, but I come to realize that it's not all

 9   about me anymore.  It's about the ones that's behind me, the

10   ones that's coming up.

11        Q.    What do you mean by that, the ones that are behind

12   you, the ones that are coming up?

13        A.    All the young men that's coming in and out of this

14   jailhouse, in and out of prison, all the young men who's

15   deciding to choose drugs in order to medicate those feelings,

16   using drugs to -- to -- to make money because they think that's

17   the only way out.

18        Q.    Have you talked to young men like that in jail?

19        A.    Hundreds of them.

20        Q.    What did you tell them?  I mean --

21        A.    My testimony.

22        Q.    I mean just briefly.

23        A.    My story.

24        Q.    Your story.  You call it your testimony?

25        A.    My testimony.
```

```
 1        Q.    What drugs have led you to?

 2        A.    Correct.  And the lack of education.

 3        Q.    Well, you -- how old were you when you dropped out

 4   of high school?

 5        A.    I was in the 11th grade.

 6        Q.    I want to backtrack a little bit more and talk about

 7   your personal history.  You said you started smoking marijuana

 8   at the age of seven?

 9        A.    Correct.

10        Q.    You -- your mom and dad were married?

11        A.    Yes.

12        Q.    Did they work?

13        A.    Seemed like all the time.

14        Q.    Did you -- did they work during the day or at night

15   or what?

16        A.    They worked during the day.  My father, he worked in

17   night.  He worked at Schepps Dairy for like 30 something years.

18   He worked the night shift, but when he came home in the

19   mornings, he stayed up to about 8 or 9 o'clock, and he slept

20   all throughout the day until 9 o'clock that night -- until he

21   can get up and go back to work.  My mother, she worked in the

22   mornings, and she got off in the evening.

23        Q.    Where did she work?

24        A.    She worked at Varo.

25        Q.    I'm sorry, at where?
```

```
 1        A.    Varo.  It's a technology.  She used to make

 2   something for the military, some kind of chips or something for

 3   the military.

 4        Q.    She was on an assembly line?

 5        A.    Yes.

 6        Q.    Did you have a lot of supervision?

 7        A.    Not a lot.  My -- like I say, Anthony, he was in

 8   prison -- I mean, he was in the Navy.  Tim -- Timothy has been

 9   in prison half his life.

10        Q.    That's your --

11        A.    That's my middle brother, Timothy.

12        Q.    And he's four years older than you?

13        A.    Correct.

14        Q.    Do you recall when he -- when he went down to

15   prison?

16        A.    (No response.)

17        Q.    How old were you?

18        A.    I think I was around 13 or 14.

19        Q.    He went down on a 15-year sentence?

20        A.    Fifteen-year sentence.  He did 11 years on it.  So

21   at that time, I didn't have really supervision.  I just had my

22   coaches.  I played basket -- I played sports, basketball, or I

23   go to a friend's house -- you know, I --

24        Q.    Let me ask you this:  Back when you were seven and

25   you were using marijuana, who did you buy it from?
```

```
 1        A.    Man, I bought it from several people.

 2        Q.    Was there -- was there one guy in particular you

 3   bought it from that something happened?

 4        A.    Yeah, he was -- he was a family friend.  He's now

 5   deceased.

 6        Q.    And he would sell you, a child, marijuana?

 7        A.    Yeah.

 8        Q.    Did something happen when -- once when you were

 9   alone with him?

10        A.    Yeah, he -- he fondled me.

11        Q.    Fondled you where?

12        A.    He pulled my penis out and wanted to suck it.

13        Q.    How old were you?

14        A.    And I let him do it for a little while, but then I

15   knew that wasn't right.  And I told him to stop, or I was going

16   to tell my brothers.

17        Q.    How old were you?

18        A.    I was around eight.

19        Q.    Okay.

20        A.    Nine, I guess.

21        Q.    Did you continue -- let me ask you this.  Did he

22   stop when you told him to stop?

23        A.    Yes, he stopped.

24        Q.    Did you continue getting drugs from him?

25        A.    Yes.  And then I had something over his head.  You
```

```
 1  know, I didn't need the money anymore.  I had that to hold over
 2  his head.  Told him I would tell my brothers, you know, and
 3  tell my sister and he gave me what I wanted.
 4        Q.    How did that make you feel when he did that?
 5        A.    Did what?
 6        Q.    When he put his mouth on your penis?
 7        A.    Touch --
 8        Q.    Yeah.
 9        A.    Made me feel uncomfortable.  I knew it wasn't right.
10  Even at that age, I knew it wasn't right.
11        Q.    Did you spend much time thinking about it?
12        A.    I spent a lot of time thinking about it, should I
13  tell someone.
14        Q.    Uh-huh.  Did you tell anybody?
15        A.    Not until I was grown.  By that time, I was ashamed
16  of it.  The guy, he had died -- he end up being with my sister,
17  and two children were born, which is my niece and my nephew.
18        Q.    He ended up marrying your sister?
19        A.    They didn't get married.
20        Q.    Okay.
21        A.    They just had children together.  He was in and out
22  of prison, and he -- I guess he -- he got AIDS and he died.
23        Q.    I want to talk about another incident that happened
24  with your cousin.  Do you remember the one I'm talking about?
25        A.    Some of it, yes.
```

```
 1        Q.    How old were you?

 2        A.    I was around five years old.

 3        Q.    Tell the jury what happened that day with your

 4   cousin.

 5        A.    I remember we was all sitting around.  We was kids,

 6   playing, and my uncle, he was right around the age of my older

 7   brother Anthony.  Anthony wasn't around.  It was just me and my

 8   other cousins.  I guess they dared him to do something to me.

 9   I was the smallest of the bunch, and I don't think -- it wasn't

10   him that did it.  It was my cousin.  Went around the back by

11   the peach tree, behind my grandmother's house, and he put his

12   penis in my mouth, peed in my mouth.  Later on that night --

13        Q.    Let me stop you there.  How old was this cousin?

14        A.    I'm not sure.  If I was -- I was five.  He -- he

15   died when I was 10, and he was 16.

16        Q.    He was 16 when he died?

17        A.    Yes, got shot and killed.

18        Q.    So he might have been around 11 or 12 years old?

19        A.    Right around that age, yeah.

20        Q.    Now, when he did this to you back at the tree behind

21   your grandma's house, were there other people there?

22        A.    Yeah, my cousins and my uncle.

23        Q.    What did they do?

24        A.    Everybody was just laughing at me, you know.

25        Q.    Because he peed in your mouth?
```

```
 1          A.    He peed in my mouth.  And that night I was wondering

 2   why it was a big fight.  My uncle and my brother was fighting.

 3   And we end up -- we moved.  We was in Rowlett -- staying in

 4   Rowlett at the time, and we moved away from Rowlett.  Well, as

 5   I got -- when I got older, I was talking to my brother about

 6   that, and I was telling him how Tracy, which was my cousin, had

 7   peed in my mouth, that did that.  He said, no, it was your

 8   uncle Sammy.  Said, no, it wasn't.

 9          Q.    The -- all the cousins had blamed it on Uncle Sammy?

10          A.    They blamed it on my Uncle Sammy.

11          Q.    And that's -- kind of caused a rift in the family,

12   didn't it?

13          A.    A big rift, yes.

14          Q.    Y'all didn't see them anymore after that?

15          A.    No.

16          Q.    How did you feel when he -- your cousin Tracy peed

17   in your mouth and your cousins and uncle and everybody laughed?

18          A.    Every time I think about it, I feel like Carrie --

19   the movie -- the horror movie Carrie that everybody is laughing

20   at you.  Felt the shame.  It was like I -- this is my fear

21   here, being put on the spot.

22          Q.    Are you worried people are going to laugh at you

23   because you're testifying?

24          A.    I have no thoughts of that.  I pray that they take

25   heed to it, change they life.
```

```
 1        Q.    Now, throughout your childhood, your teenage years,
 2   you were using marijuana?
 3        A.    Using it and selling it.
 4        Q.    Dropped out of high school.  Let me ask you this.
 5   When did you start dating Daphne?
 6        A.    It was right around 15 we started dating.  We had a
 7   long distance relationship.
 8        Q.    Long distance, how?
 9        A.    From Garland to Mesquite.  And we didn't -- her
10   parents didn't want us -- her parents didn't want her to have a
11   boyfriend at that age, so we just talked on the phone.  We
12   really didn't -- we really wasn't in a relationship
13   relationship.
14        Q.    Did you have a car to get around in?  Did she have a
15   car?  I mean, were you guys --
16        A.    Not -- not at that time.  She used to come to her
17   cousin's house, and I would see her then -- her auntie's house.
18   I would see her at the park.
19        Q.    How was it that you ended up dating Amy Armstrong?
20        A.    Well, when I dropped out of school and I ran -- I
21   ran away from home.  I was about 17.  I was -- I had lost my
22   job at Food Lion.  I was 15.  I stole a car and wrecked it and
23   I had to pay for the car.  The car ended up being my coach's
24   car at Austin Academy.  And I lost that job.  And I couldn't
25   pay her no more, so I decided I was going to leave Garland and
```

```
 1   go stay with my sister.  She stayed in North Dallas, Sundance

 2   Apartments.  And she allowed me to stay there.  Made me promise

 3   to call my mother and father and tell them where I was at.  And

 4   I did.  At that time, that's when I met Amy.

 5        Q.   You and she started dating?

 6        A.   Yes.

 7        Q.   And then you moved in with her pretty quick?

 8        A.   Yes.

 9        Q.   Did you work?

10        A.   At first, I didn't.  I sold drugs, smoked drugs,

11   until she said I needed a job if I was going to stay with her.

12   One of her father's brothers got me on at a moving service.

13        Q.   How would you describe your relationship with Amy?

14        A.   Good and bad.

15        Q.   What was the bad?

16        A.   We argued all the time.  You know, at first it

17   was -- it was happy with each other, you know.  We just had

18   episodes of just arguing, fighting, you know.

19        Q.   When you would argue and fight with her, would you

20   put hands on her?

21        A.   Yeah, I would defend myself.  She fought back, you

22   know, so we -- we fought each other.

23        Q.   Uh-huh.  But you being the man --

24        A.   Yeah, I didn't just hit her enough just to really

25   hurt her, but just enough to make her stop hitting me, you
```

1   know.

2      Q.   And the day that -- that it ended between y'all,

3   what -- what were you trying to do when you threw the burning

4   log onto her patio?

5      A.   I was trying to get her to come outside, get her to

6   let me in.  I had nowhere to go.  My sister, she works nights,

7   too.  I couldn't go to my sister's house.  My brother, he

8   worked nights.  I couldn't go to his house.  So here I was

9   outside of these apartments at 12:00, 1 o'clock in the morning,

10  with nowhere to go but Garland.  And I had no car at that time.

11  So I was trying to get in the house.

12     Q.   Were you trying to burn them up?

13     A.   No, I wasn't.  I was just trying to get her to open

14  the door.

15     Q.   Do you remember her --

16     A.   It happens -- that happened several times, her

17  putting me out and letting me back in, on and on and on.

18     Q.   Kind of the makeup --

19     A.   Makeup, breakup.

20     Q.   Breakup --

21     A.   Yeah.

22     Q.   -- makeup thing?

23     A.   Yes.

24     Q.   And you were 17 at the time?

25     A.   Yes.

```
 1          Q.    When you and Daphne married at the age of 18, how
 2   would you describe your relationship?
 3          A.    It was good at first.  You know, she was -- she was
 4   a virgin, and she was my really first love.  I was hers.  You
 5   know, until -- I wasn't in school.  She was still in school.  I
 6   used to take her to school.  At that time, I got a vehicle.
 7          Q.    She was still in high school when y'all got married?
 8          A.    She was -- she was still in high school.  I used to
 9   take her to school.  I used to hear stories from the guys that
10   went to school with her.
11                MS. MOSELEY:  Judge, I'm going to object to the
12   narrative.
13                THE COURT:  Sustained.
14          Q.    (BY MS. MULDER)  Now, Matthew, fair to say that your
15   relationship with Daphne was -- was it all peaceful?
16          A.    Not at first.  We was young, in love.
17          Q.    Did you lay hands on her?
18          A.    Lay hands on each other.
19          Q.    Okay.  Did y'all argue?
20          A.    Seemed like all the time.
21          Q.    Would she ever hit you?
22          A.    Not at first, she -- I start off, I hit her.
23          Q.    How do you feel about that now?
24          A.    Feel less than a man.
25          Q.    Why?
```

```
 1          A.    Because I put my hands on a woman.

 2          Q.    Well, y'all had a continual relationship where that

 3   kind of seemed par for the course.  Would you agree?

 4          A.    Could you repeat that?

 5          Q.    You all -- well, let me ask you this.  Were you

 6   using and selling drugs at this time?

 7          A.    Yes.

 8          Q.    The evading arrests, etcetera, you -- you accept

 9   responsibility for those?

10          A.    Total responsibility.

11          Q.    You said, I guess, about age 21 or 22 you started

12   using crack cocaine?

13          A.    Yes.  I remember I was selling it at that time.  My

14   grandmother had passed in California --

15                    MS. MOSELEY:  I'll object to the narrative.

16                    THE COURT:  Sustained.

17                    May I see the lawyers up here, please?

18                    (Sidebar conference, discussion off the record.)

19                    THE COURT:  Members of the jury, we're going to

20   take our mid-morning break.  I'm going to ask that Mr. Johnson

21   remain seated.

22                    Tim, if you'd please excuse the jury.

23                    THE BAILIFF:  All rise.

24                    (Jury excused from courtroom.)

25                    THE COURT:  It's 10:30.  If you'll be back in
```

```
 1   the jury room at 10:45, please.

 2                   (Recess.)

 3                   THE COURT:  Please be seated.

 4                   THE BAILIFF:  All rise.

 5                   (Jury returned to courtroom.)

 6                   THE COURT:  Please be seated.

 7                   Ms. Mulder, please proceed.

 8                   MS. MULDER:  Thank you, Your Honor.

 9        Q.   (BY MS. MULDER)  Matthew, I think we were talking

10   about your relationship with Daphne before the break.  I'd like

11   to continue talking about that.

12        A.   Okay.

13        Q.   Were there times when -- when your drug use was bad,

14   how would things be with Daphne?

15        A.   Argumentative -- I mean, we always argued.  She

16   hated to see me on them, you know, on drugs.

17        Q.   I'm sorry, what?

18        A.   She hated to see me on drugs.  She disliked when I

19   drank because I wasn't myself, she would say.

20        Q.   When you were on drugs and fighting, would the --

21   laying hands on her get better or worse?

22        A.   I would say it all remained the same, you know.

23   Never enough to just hurt her, just enough to back her off.

24        Q.   Well, you know she got a protective order against

25   you in 2003 or 2004?
```

1    A.    Yeah.  I imagine she was -- she was pretty hot at

2 me.

3    Q.    What do you mean?

4    A.    She was pretty mad at me.  She may have said some

5 things that -- that wasn't all the way true, but whatever she

6 said, it could have -- it could have -- it might as well been

7 true, you know --

8    Q.    Why do you say that?

9    A.    Because I don't remember a lot of things that were

10 said, a lot of things that was done.

11    Q.    Why don't you remember?

12    A.    I blacked out.  Get upset.

13    Q.    Were you under the influence of drugs or alcohol?

14    A.    Possibly at that time, yes.

15    Q.    Is it hard to remember?

16    A.    A little bit, yes.

17    Q.    Do you remember a company called Sanden?

18    A.    Yes.

19    Q.    How long did you work at Sanden?

20    A.    I was employed there for about five years or so.

21    Q.    From 1997 until --

22    A.    It was right around '96 until 2002, right around

23 that time.

24    Q.    Did you quit or were you fired?

25    A.    I was fired.

1          Q.    For what?

2          A.    Missing too many days.  Sanden had a point system.

3    I couldn't get my points down.

4          Q.    Why were you missing so many days?

5          A.    Using those weekends to get high.  And like I said,

6    it carried on until the Mondays and the Tuesdays, you know,

7    where I wasn't capable of doing my job.

8          Q.    What was your job at Sanden?

9          A.    It started off I was in the -- I was assembly line,

10   temporary.  And they moved me up -- in four years, I got four

11   promotions.  Until that last promotion, they gave me a position

12   as a repairman.

13         Q.    What does Sanden manufacture, or what did they

14   manufacture at that time?

15         A.    They make air conditioner compressors for cars.

16         Q.    After you're fired from Sanden, where did you go?

17         A.    I admitted myself into Green Oaks Hospital.

18         Q.    What is Green Oaks?

19         A.    It's a rehabilitation center, I guess, a drug -- for

20   drug abuse.

21         Q.    Had you ever gotten treatment before?

22         A.    No.

23         Q.    Well, you had been on probation before, correct?

24         A.    Yes.  And I had got dirty UA's, and they sent me

25   to -- to Addicare.  It was more by force than it was by choice,

1    so I just faked it until I made it during that time.

2         Q.    During that time when you were a -- when you were a

3    teenager?

4         A.    On probation, yes.  But as I got older, I knew that

5    I needed some help.

6         Q.    So when -- when you checked yourself into Green

7    Oaks, how long were you there?

8         A.    What I remember, I was there for about a week, and

9    they said that I -- dual diagnosed me or something with

10   depression --

11        Q.    Uh-huh.

12        A.    -- and something else, I forget what it was.  But

13   they decided to -- that I needed some inpatient treatment,

14   along with the outpatient.

15        Q.    So where did you go from Green Oaks?

16        A.    They sent me to Stephen -- Stephenville, Texas, at

17   Summer Sky.

18        Q.    Summer Sky?

19        A.    Yes.

20        Q.    How long were you at Summer Sky?

21        A.    I was there for 35 days.  It was a 28-day program,

22   they kept me for five more additional days until they could

23   find me a halfway house to go into.

24        Q.    And did they -- did you go through an alcohol and

25   drug treatment there?

```
 1        A.    Yes, I did.

 2        Q.    Did you complete their program?

 3        A.    Yes, I did.  I wish it was longer.

 4        Q.    Well, that's what I was just going to ask you.

 5   Were -- did you feel like you were ready to leave after 35

 6   days?

 7        A.    I wasn't ready.

 8        Q.    I'm sorry?

 9        A.    I wasn't ready, but my insurance had ran out.  I

10   didn't have any money to pay them to stay there any longer.

11        Q.    So you were able to go because you had health

12   insurance?

13        A.    Correct.

14        Q.    How long were you sober after leaving Summer Sky?

15        A.    Well, when I left Summer Sky, they found me a

16   halfway house in Brownwood, Texas.  I stayed there for about a

17   week until my wife -- she wanted me to come home, so that's

18   what I did.  I thought I was -- I thought at that time that I

19   was strong enough to -- to beat my addiction.

20        Q.    One week at Brownwood.  How long were you supposed

21   to stay at the halfway house?

22        A.    Long enough to stay clean.

23        Q.    You went back home.  How long were you able to stay

24   off of the drugs and alcohol?

25        A.    About two or three weeks.
```

```
 1        Q.    All right.  Did you go back to using crack cocaine?

 2        A.    Yes.

 3        Q.    Alcohol?

 4        A.    Yes.

 5        Q.    Marijuana?

 6        A.    All the above.

 7        Q.    Do you remember pulling the lady out of her car at

 8   6:00 a.m., stealing her truck?

 9        A.    Yes, I remember that.

10        Q.    Were you under the influence during that offense, or

11   were you sober?

12        A.    I was up under the influence.

13        Q.    What had you done?  What kind of drugs had you done

14   at that time?

15        A.    I was -- it was on like a two-day binge of smoking

16   crack and drinking alcohol.  My plans was just to get the

17   vehicle from her and sell the vehicle to buy more crack.

18        Q.    Do you remember putting hands on her?

19        A.    I remember grabbing her and pulling her out of the

20   vehicle and me jumping in and leaving in the vehicle.

21        Q.    Okay.  Do you remember wrecking out?

22        A.    I remember some of it, not all of it.  I remember

23   trying to turn that curve, and I remember running into that

24   house and me jumping out and running behind the creek area.

25        Q.    Do you remember telling the cops, just put a bullet
```

1  in my head?

2       A.   Yes, I remember -- he was beating me.  I got tired

3  of the abuse.  I told him he might as well just kill me here.

4       Q.   You went to prison?

5       A.   Correct.

6       Q.   On a five-year sentence for that offense?

7       A.   Well, actually I bonded out on that offense.

8       Q.   Sorry.

9       A.   And I got stabbed.

10      Q.   Uh-huh.

11      A.   And then when I went to court, that's when they

12  sentenced me.

13      Q.   And you got five years in the penitentiary for that?

14      A.   Correct.  And one year state jail.

15      Q.   For the evading?

16      A.   For the evading.

17      Q.   I don't want to spend a lot of time talking about

18  Carlton, the man who came and testified about the fight, but

19  when you were -- how long had you been in prison before that

20  happened, that incident?

21      A.   About six months.

22      Q.   All right.  How did that fight start?

23      A.   Well, we was cellies, bunkies, you sort of say, and

24  kind of got tired of each other.  You know, it's a -- it's a

25  closed-in spot, living quarters, as closed in as y'all are

```
 1  sitting there today.  And there's tension.  It builds tension.

 2  When I used to move his bunk to the side, his -- his foot of

 3  his bunk, not the head of his bunk.  When I got out of the

 4  shower to put my lotion, whatnot on, because my locker was

 5  right there on his bunk, I used to open and close my locker

 6  while he was asleep.  That bothered him.  I used to exercise at

 7  our bunk area.  That bothered him.

 8      Q.   So you guys just started not getting along?

 9      A.   We started not to get along, and it was -- it got to

10  the point to where we couldn't live with each other again.

11      Q.   Let me ask you this.  In prison -- or at least at

12  that time in prison, if you get challenged to a fight, what

13  would happen if you said no, if you didn't fight?

14      A.   Considered as weak.

15      Q.   And what would happen if you were considered weak?

16      A.   Other inmates could take stuff from you.  They

17  would -- they would pick at you.

18      Q.   Like literally --

19      A.   They extort you.

20      Q.   Like literally take your property?

21      A.   They would take your property, or take your -- some

22  would -- would even try to rape you.

23      Q.   Did Carlton come up to you that day of the fight

24  while you were sitting on the bunk?

25      A.   Yes, he did.  He came up while I was exercising, and
```

```
 1   he told me to be -- we needed to settle this right now.

 2         Q.    And what did you take that to mean?

 3         A.    I said I thought we had, by talking about it.

 4         Q.    Uh-huh.  And what did he say?

 5         A.    Told me to come to the back.

 6         Q.    And what does that mean when somebody says, come to

 7   the back?

 8         A.    They are challenging you to a fight.

 9         Q.    Come to the back.  You don't -- you don't say, come

10   to the back if you -- if you just want to talk it out?

11         A.    No.  You don't talk back there.

12         Q.    You took that as a challenge?

13         A.    Yes, I did.  It was a threat.

14         Q.    Did you go back there?

15         A.    Yes, I did.

16         Q.    Did you fight him?

17         A.    Yes, we fought.

18         Q.    You got written up for the fight?

19         A.    Yes, they -- yes, I did.

20         Q.    And he did, as well?

21         A.    I'm not sure.

22         Q.    And then they reclassified you?

23         A.    Yes, they put me in solitary and reclassified me.

24         Q.    The next time you were up for review for your

25   classification, what classification did they move you back to?
```

```
 1      A.    Well, after they transferred me to another unit and
 2  reclassified me, I was considered a G4.
 3      Q.    Okay.  That was right after the fight?
 4      A.    Yes.  And I spent 90 days on G4, and they moved me
 5  up to a G3.
 6      Q.    Okay.  Then they moved you to G3 or G2?
 7      A.    It was a G3.
 8      Q.    Okay.  And then did you make it back up to a G2?
 9      A.    Well, it took me about a year or so for G3, and then
10  I was qualified to be a G2, trustee.
11      Q.    Did you work while you were in prison?
12      A.    Yes, I did.
13      Q.    What job did you do?
14      A.    It started off at the commissary warehouse where I
15  picked orders and drove the stand-up forklift.  I got my OJT in
16  that.
17      Q.    What's OJT?
18      A.    It's on-job-training.  Then they promoted me to
19  community service where I went to the community and help in
20  parks and recreations, the Commerce of Scurry County, City
21  Hall, all sorts of things.
22      Q.    So you were on an outdoor work detail?
23      A.    Yes, I was.
24      Q.    After that fight with Carlton and your time spent in
25  solitary, what did you decide to do?
```

```
 1        A.    I decided I wasn't going to do my time like that,

 2   you know.

 3        Q.    How do you mean?

 4        A.    By being the G4 custody, you know, having no

 5   freedom -- some freedom that we have being a G4 -- a G3.  I

 6   wasn't able to go to school or anything, or -- you know, I

 7   couldn't make commissary like I wanted to make commissary, you

 8   know.  So I decided that I was -- get myself right and be a

 9   model inmate, I guess, what you call it.

10        Q.    You decided to -- what do you mean by do your time

11   right?

12        A.    Do it positive and rehabilitate myself, exercise, to

13   build myself spiritually, mentally, and physically.

14        Q.    And what did you do to accomplish those goals?

15        A.    I exercised.  I took Bible courses, took parenting

16   twice, I took cognitive intervention, carpentry.

17        Q.    What was that one?

18        A.    Cognitive intervention.

19        Q.    Cognitive intervention?

20        A.    Cognitive intervention.

21        Q.    Okay.

22        A.    I took carpentry, and that's when I was promoted to

23   community service.

24        Q.    And you successfully did that time until you were

25   paroled?
```

```
 1        A.    Correct.

 2        Q.    And you lived out your parole?

 3        A.    Correct.

 4              MS. MULDER:  May I approach?

 5              THE COURT:  You may.

 6        Q.    (BY MS. MOSELEY)  Matt, I'm showing you what's been

 7   marked as Defendant's Exhibit Number 3.  It's seven pages.  If

 8   you would look at these and tell me, are these certificates of

 9   completion for the Bible studies that you participated in while

10   you were in prison for the robbery?

11        A.    Correct, it is.

12              MS. MULDER:  Your Honor, at this time we'll

13   offer Defendant's Exhibit Number 3.

14              (Defendant's Exhibit 3 offered.)

15              MS. MOSELEY:  I have no objection.

16              THE COURT:  Admitted.

17              (Defendant's Exhibit 3 admitted.)

18              MS. MULDER:  Permission to publish, Your Honor?

19              THE COURT:  You may.

20              MS. MULDER:  Judge, I actually might have to do

21   that another time since we don't have our electronics up right

22   now.

23              THE COURT:  Okay.

24        Q.    (BY MS. MULDER)  After you were released from

25   prison, that was when you had the two years of sobriety?
```

1        A.    Correct.

2        Q.    Just briefly, Matthew, were these -- these were by

3    correspondence?

4        A.    Yes.

5        Q.    It's from March of '05, May of '05, August 20th of

6    '05, June 23rd of '05, April 19th of '06, June 21st of '06 --

7    and that's just a different outreach, June of '06, also.

8              Matthew, when you got out of prison, where was

9    Daphne and the two girls, Makayi and Deja, living?

10       A.    In Garland.

11       Q.    What kind of housing were they living in?

12       A.    In townhomes.

13       Q.    Were they on Section 8?

14       A.    Yes, she was.

15       Q.    Tell the jury what Section 8 is.

16       A.    It's where the government help you get housing, give

17   you food stamps.  I told my wife do what she had to do to

18   survive out there, so that's the route she took.  And I thank

19   them for it.

20       Q.    How did you feel about her being on Section 8,

21   though?

22       A.    Well, like I said, I thanked them for it, but once I

23   got out, we was able to both work.  It was time to pass that on

24   to someone who needed it.  We didn't need it any longer.  I was

25   trying to exercise some principles of buying us a home.

 1          Q.    And what did you do to -- to try and buy yourself a

 2    home?

 3          A.    I -- first of all, I -- I seen a house that I

 4    checked into it.  It's a small house.  And that's where I met

 5    my realtor, Monica Cajas, and she advised me that if I wanted

 6    to buy a home, to sign up for Habitat homes.  That's what I

 7    did.  I did everything that we needed to do, to get us a home

 8    built.

 9          Q.    But it turned out, what?

10          A.    They rejected me.  I was six months shy of working

11    at the same job.  After giving them all my information, going

12    to the seminars, they turned me down.

13          Q.    Now, you sound really bothered by that.  Were you

14    angry about that?

15          A.    I was upset.  I mean, I asked what -- what am I

16    doing it all for.  At that time, it was -- like I say, I was

17    working at Kwik Kar, had a good job, had a good boss.

18          Q.    David Contente?

19          A.    David Contente.

20          Q.    He really gave you a chance, didn't he?

21          A.    He gave me a chance, and I --

22          Q.    What did you do?

23          A.    I started giving up.  And my wife, she wasn't

24    working at the time because the summertime the school didn't

25    pay her.  They didn't have the funds at that time, Richardson

⁷¹

```
 1   ISD.  So all of the weight was on me.  I struggled from
 2   paycheck to paycheck to paycheck.
 3        Q.    Were you using at this time, or was that at the end
 4   of that sobriety?
 5        A.    That was coming to the end of my sobriety.
 6        Q.    Okay.
 7        A.    Allowed the pressure to -- to build up.  I was
 8   talking to him, thinking I could do it on my own like I did it
 9   in prison.  With the arguments, financial, felt like I wasn't
10   doing enough for my family.
11        Q.    So what did you do?
12        A.    I decided I was going to sell drugs again.
13        Q.    Now, you've never been charged or convicted of
14   selling drugs, have you?
15        A.    Not selling drugs, no, but I have possession of it.
16        Q.    You have possession of marijuana?
17        A.    Yes.
18        Q.    What -- so, I mean, that's something you could have
19   kept to yourself?
20        A.    Yeah, but I chose to -- it's the truth.  I mean, I'm
21   laying it out on the table here.  It's my life.
22        Q.    What kind of drugs were you selling?
23        A.    Crack cocaine.
24        Q.    Okay.  And when you started selling crack cocaine,
25   what happened?
```

```
 1        A.   I start started making money.

 2        Q.   When you had a lot of money in your pocket, what did

 3   do you?

 4        A.   I blew it.

 5        Q.   How did you blow it?

 6        A.   Spent it on my woman.  I spent it on myself, bought

 7   me a car, got me an apartment.  I was living.

 8        Q.   And when you say your woman, what woman?

 9        A.   My wife.

10        Q.   Daphne?

11        A.   Yes.  Spent it on my children, you know.  I was

12   working, too.  I knew I couldn't spend all my time selling

13   drugs.  I had to work, as well.  Had to be something -- that

14   money had to be accounted for, so --

15        Q.   Well, what happened that made you start using again?

16        A.   I was on probation.  My drug of choice was, like I

17   said, PCP and marijuana, alcohol.  I fooled myself into doing

18   cocaine.  I said, well, I know I have to take a urinalysis test

19   in the parole -- probation office, so I -- if I smoke this

20   marijuana, it's going to stay in there about 30, 45 days.  If I

21   do this cocaine, it will stay in there about three -- three

22   days or probably a week.  Thought I was strong enough to try it

23   and to handle it, and I couldn't.

24        Q.   Are you talking about when you were on probation in

25   the 90's?
```

1       A.    In '96, '95.

2       Q.    Okay.  I'm sorry.  I'm talking about after you got

3  out of prison and when you were working at Kwik Kar, what led

4  to you using again?

5       A.    I decided I was going to sell crack cocaine.

6       Q.    Okay.  And when you started selling it, what

7  happened?

8       A.    Started drinking.  And the next thing you know, I

9  tried it, I did it again, I relapsed.

10      Q.    Whose responsibility was that relapse?

11      A.    It was my responsibility.  I should have never even

12 put myself in that position.  Should have continued on working

13 on my second job, like to say, I used to get my lawn mower,

14 weed eater, and all that at my brother's.  I went around the

15 neighborhood.  I made me business cards up, and I worked around

16 the neighborhood, trying to make a little extra money.

17      Q.    So you were working at Kwik Kar?

18      A.    At Kwik Kar and working on my own on the weekend.

19      Q.    Lawn business?

20      A.    For myself on the weekend, yes.

21      Q.    Let me ask you this.  When you were a child and your

22 dad would come home, what would he do on the weekends?

23      A.    My daddy, he used to like to work on cars, and he

24 drinked alcohol.

25      Q.    Was your dad an alcoholic?

1        A.    You could say that, yes.

2        Q.    Did your dad have any other things he'd like to do

3   to excess?

4        A.    He had a gambling problem.

5        Q.    You were working for Kwik Kar.  You've got your own

6   lawn business on the weekends.  What happened?

7        A.    It wasn't enough.  I was too kindhearted to my

8   clientele.  You know, I did a lot of hard work.  I got paid

9   little, and it wasn't enough, you know.  And my wife, she

10  didn't agree with it.  I stayed gone all day.  Wasn't spending

11  any time with her and the girls, but like I explained to her, I

12  had to do that to pay the rent, to pay the bills.  You know, I

13  can't --

14       Q.    All right.  You're selling the crack cocaine, you

15  start using again?

16       A.    Correct.

17       Q.    You said that was about October 1st of 2011?

18       A.    Well, actually, I successfully did it, like I say,

19  for about two weeks prior to October 1st.  So right around

20  September -- it was right after my -- my 36th birthday.

21       Q.    All right.  While you were working with David

22  Contente, was he a -- a good boss?

23       A.    He was a great boss.  He taught me a lot, politics,

24  stock market.

25       Q.    Things like that, you guys would talk about that?

```
 1        A.    All the time.

 2        Q.    Fair to say that you earned his trust?

 3        A.    Yes.

 4        Q.    That November, when you used your keys to break in,

 5   were you sober when you did that?  Were you under the influence

 6   of anything?

 7        A.    I was -- I was coming down off of it.

 8        Q.    Coming down off of what?

 9        A.    Crack cocaine.

10        Q.    And what was your purpose in going to the Kwik Kar?

11        A.    To get some money.

12        Q.    What did you take?

13        A.    I took the till money out the safe, I took three

14   inspection books, and his TV monitor -- his computer monitor.

15        Q.    The -- what was the purpose of taking the inspection

16   stickers?

17        A.    I was going to sell them on the street.

18        Q.    Did you end up selling them on the street?

19        A.    For a little of nothing.  I couldn't get the numbers

20   that supposed to go on the inspections, and I was a state

21   inspector.  I knew that.  But I didn't -- I wasn't in my right

22   mind.

23        Q.    Did you mess with the video camera?

24        A.    That night when I walked in, I -- I remember

25   knocking it down, and then --
```

1       Q.    What part did you knock down?

2       A.    The -- the glass part of it.

3       Q.    The clear part?

4       A.    The clear part.

5       Q.    Okay.

6       A.    And I was coming downstairs with the monitor, I

7  knock -- I remember knocking it down, and that's when I left

8  the building.

9       Q.    When you came back -- well, let me ask you this.

10 What made you decide to come back that -- in the early morning

11 hours, that 5:00 a.m. on that Monday?

12      A.    Well, my thoughts was that he would have helped me.

13 I -- being a shop foreman, we wasn't getting along.  He had

14 been -- the shop foreman had been with him for like 13 years,

15 and we was having a conversation about him.

16      Q.    That was Jose?

17      A.    That was Jose.  And he said he had offered to help

18 to Jose, so I figured I could get that same help.

19      Q.    Uh-huh.

20      A.    I knew I had to open the business up that Monday

21 morning, and I knew what I had done, so I called him and asked

22 him could I talk to him, I did something bad.

23      Q.    Let me ask you this.  When you went back in there

24 that Monday morning, what did you -- what did you take with

25 you?

```
 1        A.    I had one of the inspection books and his monitor.

 2        Q.    And why did you take those back?

 3        A.    I wanted to make right of what I wronged.

 4        Q.    You wanted to make right.  Did you do anything with

 5   that camera?

 6        A.    Well, when I walked in, I saw it on the stairway, so

 7   I picked it up and I put it -- screwed it back up there.  Me

 8   not knowing, I didn't know until we saw the video that it has a

 9   window in it, and I guess when I screwed it on there, it

10   blocked it.

11        Q.    I mean, was your plan -- were you somehow planning

12   to lure David Contente down there so you could rob him?

13        A.    Only way -- the only thing I wanted David to come

14   down to was to talk to him and I could explain to him what I

15   had done and to ask for some help so I could continue on with

16   my job, so I can take care of my family.

17        Q.    What kind of help did you want from him?

18        A.    Whatever he offered.

19        Q.    What did you want help with?

20        A.    My drug problem.  I didn't have any insurance.  I

21   knew I couldn't go to a rehabilitation center.

22        Q.    Why couldn't you go to a rehab center?

23        A.    The last one I went to, I know that I need

24   insurance, and that was my knowledge of it.

25        Q.    And you didn't -- you didn't have any?
```

```
 1        A.    I didn't have any knowledge of it at that time.

 2        Q.    Did you try to go to Narcotics Anonymous or AA?

 3        A.    No.  I felt like it wasn't helpful enough.  You

 4   know, I needed some -- some treatment center like I did at

 5   Summer Sky, you know, something to get me back on track.

 6        Q.    Let me ask you this, Matthew.  When you were using

 7   and abusing drugs, did you ever lie?

 8        A.    I lied all the time.

 9        Q.    Why?

10        A.    To get what I want.

11        Q.    What was that?

12        A.    Money.

13        Q.    Money for what?

14        A.    For drugs.

15        Q.    Did you lie to Daphne?

16        A.    All the time.

17        Q.    Did you lie to your mother?

18        A.    All the time.

19        Q.    Did you lie to your girls?

20        A.    Yes.

21        Q.    Did you lie to your bosses?

22        A.    I did.  I had a criminal history, so I couldn't tell

23   them everything or they wouldn't give me a job.

24        Q.    During that time period, who did you lie to most?

25        A.    I lied to myself.
```

```
 1        Q.    How so?

 2        A.    That I could handle it, I can -- I can continue

 3   working and -- and -- and using recreational and take care of

 4   my family and be a loving father and husband, be a man of God,

 5   which I wasn't.

 6        Q.    Matthew, after you were arrested for this offense,

 7   do you remember the first time you spoke to Daphne?

 8        A.    Some of it I do.

 9        Q.    Do you remember how many days it was after this

10   offense?

11        A.    Possibly one or two, I'm not real sure.

12        Q.    Were you -- fair to say she was pretty upset with

13   you?

14        A.    Oh, yeah.  Yes, ma'am.

15        Q.    And you are aware they record all of your phone

16   calls from the jail?

17        A.    Yes, ma'am.

18        Q.    They read all your mail?

19        A.    Yes.

20        Q.    How did you feel when you were talking to her that

21   first time?

22        A.    At that time?

23        Q.    Uh-huh.

24        A.    Disappointed, ashamed, scared.

25        Q.    Did you want to tell her what you had done?
```

80

```
 1        A.    I didn't know what I had done at that time.

 2        Q.    You couldn't remember?

 3        A.    I couldn't remember what I had done.

 4        Q.    Just bits and pieces?

 5        A.    Little bits and pieces of it.

 6        Q.    Earlier you said that you had written to Daphne and

 7   the girls, and they had written to you?

 8        A.    Yes.

 9              MS. MULDER:  May I approach the witness, Your

10   Honor?

11              THE COURT:  You may.

12        Q.    (BY MS. MULDER)  Matthew, I'm showing you some

13   letters marked Defendant's Exhibits 4 through 11.  Have you

14   seen these letters?

15        A.    Yes.

16        Q.    Number 4 is a letter you sent to Daphne?

17        A.    Correct.

18        Q.    And you had -- you looked through them all just

19   yesterday?

20        A.    I did.

21        Q.    When you would send letters to Daphne, would you

22   include letters to other people?

23        A.    My daughters.

24        Q.    Makayi and Deja?

25        A.    Makayi and Deja, yes.
```

```
 1        Q.    And Defendant's Exhibits 5 through 11, these are all

 2   letters that Daphne and the girls sent you?

 3        A.    Correct.

 4        Q.    Matthew, when Matduxx was born, who did she look

 5   like?

 6        A.    Me and my wife.

 7        Q.    Well, she actually favors you quite a bit, doesn't

 8   she?

 9              MS. MOSELEY:  I'll object to the leading and the

10   relevance.

11              THE COURT:  Sustained.

12        Q.    (BY MS. MULDER)  Do you remember Matduxx's first

13   birthday?

14        A.    Some of it, yes.

15              MS. MULDER:  May I approach the witness, Your

16   Honor?

17              THE COURT:  You may.

18        Q.    (BY MS. MULDER)  Matthew, I'm showing you what's

19   been marked as Defendant's Exhibit 12.  Do you recognize that

20   picture?

21        A.    Yes, ma'am.

22        Q.    Did you take that picture?

23        A.    Yes.

24        Q.    What is it a picture of?

25        A.    On her first birthday.
```

```
 1                    COURT REPORTER:  I can't hear you, sir.
 2         Q.    (BY MS. MULDER)  You have to speak up.
 3         A.    It's a picture of her on her first birthday.
 4         Q.    And Defendant's Exhibit 13, what is that a picture
 5    of?
 6         A.    Me holding my baby.
 7                    THE COURT:  Speak up, please.
 8         A.    Me holding my baby.
 9         Q.    (BY MS. MULDER)  Was that also on her birthday?
10         A.    It was.
11         Q.    And Defendant's Exhibit 14, that's also on her
12    birthday?
13         A.    Yes, it is.
14         Q.    Defendant's Exhibit 15, who is that a picture of?
15         A.    It's a picture of my two oldest.
16         Q.    Makayi and Deja?
17         A.    Makayi and Deja, yes.
18         Q.    And Defendant's Exhibits 16 and 17, do you remember
19    that day?
20         A.    Yes, I do.
21         Q.    What was -- what was going on that day that's
22    depicted in State's Exhibits 16 and 17?
23         A.    My babies was playing in the snow.
24                    THE COURT:  Sir, I can't hear you.
25         A.    My babies was playing in the snow.
```

```
 1        Q.    (BY MS. MULDER)  And you took -- you went out there

 2   with them?

 3        A.    I took -- I went out there with them and took

 4   pictures of them.

 5        Q.    And Defendant's Exhibit 18, is that also another

 6   picture of Matduxx?

 7        A.    Yes, that's my baby.

 8              MS. MULDER:  At this time we'll offer

 9   Defendant's Exhibits 12 through 18.

10              (Defendant's Exhibits 12 through 18 offered.)

11              MS. MOSELEY:  May I briefly take the witness on

12   voir dire?

13              THE COURT:  You may.

14              MS. MOSELEY:  May I approach?

15              THE COURT:  You may.

16                      VOIR DIRE EXAMINATION

17   BY MS. MOSELEY:

18        Q.    Defense Exhibit 16 and 17, Daphne actually has taken

19   those -- took those while you were in jail, didn't she?

20        A.    No, I took those pictures with my iPhone.

21        Q.    These were taken before you went jail?

22        A.    Those were after I got out of jail.

23        Q.    After you got out of jail when?

24        A.    After I got out of prison in '09.  It was right

25   around October or December, I guess, when it snowed, of '09.
```

```
 1        Q.    Of 2009?

 2        A.    Yes.

 3                  MS. MOSELEY:  I have no objection to these.

 4                  THE COURT:  Admitted.

 5                  (Defendant's Exhibits 12 through 18 admitted.)

 6                  CONTINUED DIRECT EXAMINATION

 7   BY MS. MULDER:

 8        Q.    That's little Matduxx?

 9        A.    Yes.

10        Q.    And who is that hiding behind Matduxx?

11        A.    That's my wife, Daphne.

12        Q.    Who is in this picture, Defendant's Exhibit 13?

13                  THE COURT:  Sir?

14        A.    That's me and my baby.

15        Q.    (BY MS. MULDER)  That's you and Matduxx on her

16   birthday?

17        A.    Correct.

18        Q.    And Defendant's Exhibit Number 14?

19        A.    It's my baby.

20        Q.    It's on her birthday, also?

21        A.    Correct.

22        Q.    How about these girls?

23        A.    It's Makayi on the left and Deja on the right.

24        Q.    That's Makayi and Deja?

25        A.    Correct.
```

```
 1        Q.    This was -- I -- I remember this day.  Two years in
 2  a row we had snow?
 3        A.    It had snowed, and it snowed real bad that -- that
 4  year, ice.
 5        Q.    Y'all went out and played?
 6        A.    Yeah, I allowed them to go outside and play.
 7        Q.    Were y'all -- what were y'all doing out in the snow?
 8        A.    Well, they was just throwing snowballs at each
 9  other.
10        Q.    Who is that?
11        A.    That's Makayi.
12        Q.    In the white coat, and then who is the little one?
13        A.    That's Deja.
14        Q.    These photographs you took of them having their
15  snowball fight?
16        A.    Correct.
17        Q.    Who is that?
18        A.    That's my baby Matduxx.
19        Q.    Matthew, how do you feel about what this has done to
20  your daughters?
21        A.    They don't deserve this.
22        Q.    I'm sorry?
23        A.    They don't deserve this, what I've been putting them
24  through.  It's painful.
25        Q.    How is it painful?
```

```
  1        A.   The knowledge of me knowing that I will never be out

  2   there with my children again.

  3                  MS. MULDER:  Can we have a moment, Judge?

  4                  THE COURT:  Anything further?

  5                  MS. MULDER:  Briefly, Your Honor.

  6        Q.   (BY MS. MULDER)  Matthew, is there -- is there

  7   anything you want the jury to know about you that we haven't

  8   talked about yet?

  9                  MS. MOSELEY:  Objection, calls for narrative.

 10                  THE COURT:  Sustained.

 11        Q.   (BY MS. MULDER)  Is there anything else you'd like

 12   to say to Ms. Harris's family?

 13                  MS. MOSELEY:  Objection -- same objection.

 14                  THE COURT:  Sustained.

 15                  MS. MULDER:  Pass the witness.

 16                  THE COURT:  Let me see the lawyers, please.

 17                  (Sidebar conference, discussion off the record.)

 18                  THE COURT:  All right.  Ladies and gentlemen,

 19   we're going to go ahead and take our noon recess.  It's a

 20   little bit after 11:30.  If you'll be back in the jury room at

 21   1 o'clock, please.

 22                  THE BAILIFF:  All rise.

 23                  THE COURT:  Mr. Johnson, remain seated, please.

 24                  (Jury excused from courtroom.)

 25                  THE COURT:  The Court is in recess until
```

```
 1   1 o'clock.

 2                    (Recess.)

 3                    THE COURT:  Okay.  We're on the record outside

 4   the presence of the jury.

 5                    (Outside the presence of the jury.)

 6                    MS. MOSELEY:  Judge, I anticipate getting into

 7   some excerpts from calls that were recorded that the Defendant

 8   has made from jail, and I think in an effort to save time we

 9   can ask the Defendant now outside the presence of the jury if

10   he recognizes the voices and can identify the voices on these

11   calls that he made.

12                    THE COURT:  All right.

13                    MS. MOSELEY:  I have the call -- the excerpts

14   from those calls marked State's Exhibit 190 for the record.

15   And the first call is one from March 18th of 2013.

16                    (Exhibit published.)

17                    VOIR DIRE EXAMINATION

18   BY MS. MOSELEY:

19        Q.   Do you recognize the voice on that call?

20        A.   Yes.  That's me and my wife talking.

21        Q.   And this one is --

22                    MS. MOSELEY:  Judge, this one, for the record,

23   is April the 2nd, 2013.

24                    (Exhibit published.)

25        Q.   (BY MS. MOSELEY)  Who is that?
```

```
 1        A.    That's me and my daughter Makayi.

 2              (Exhibit published.)

 3        Q.    (BY MS. MOSELEY)  Who is the female voice there?

 4        A.    That's my niece, Lashawn (phonetic) Mills.

 5              COURT REPORTER:  Who?

 6        A.    Lashawn Mills.

 7              (Exhibit published.)

 8        Q.    (BY MS. MOSELEY)  That's not Daphne?

 9        A.    Could you play it again?  I couldn't understand it.

10              (Exhibit published.)

11        Q.    (BY MS. MOSELEY)  Is that Daphne or Lashawn?

12        A.    I can't recognize the female voice, but every time I

13   talked about -- anything about my hygiene or anything like

14   that, it would have been my wife, Daphne --

15        Q.    And you don't call --

16        A.    -- or my niece Lashawn.

17        Q.    You don't call Lashawn "baby," do you?

18        A.    No, I don't.  That must -- it would have to be my

19   wife, then, but that voice didn't sound like my wife.

20              MS. MOSELEY:  Judge, this call is from

21   April 19th of this year.

22              (Exhibit published.)

23        A.    That's my mother.

24        Q.    (BY MS. MOSELEY)  That's you talking to your mom?

25        A.    Yes, sir -- yes, ma'am.
```

89

```
 1                        (Exhibit published.)

 2        Q.   (BY MS. MOSELEY)  Who's that talking?

 3        A.    Possibly me -- it was me and my wife.

 4             MS. MOSELEY:  This one is from August 4th of

 5   2012.

 6                        (Exhibit published.)

 7        Q.   (BY MS. MOSELEY)  Who's that?

 8        A.    That was me and my brother talking, Anthony Johnson.

 9                        (Exhibit published.)

10        Q.   (BY MS. MOSELEY)  Who you talking to there?

11        A.    It's my wife.

12             MS. MOSELEY:  This is from September 5th of this

13   year.

14                        (Exhibit published.)

15        Q.   (BY MS. MOSELEY)  Is that you and your wife?

16        A.    Yes.

17             MS. MOSELEY:  And from September 21st of 2012.

18                        (Exhibit published.)

19        Q.   (BY MS. MOSELEY)  Is that you and your mom?

20        A.    Yes.

21             MS. MOSELEY:  That's all of them, Judge.

22             THE COURT:  All right.  Are we ready for the

23   jury?

24             Please get the jury.

25             THE BAILIFF:  Yes.
```

```
 1                    (Brief pause.)

 2                    THE BAILIFF:  All rise.

 3                    (Jury returned to courtroom.)

 4                    THE COURT:  Please be seated.

 5                    Ms. Moseley.

 6                    CROSS-EXAMINATION

 7   BY MS. MOSELEY:

 8        Q.   If you don't understand a question that I ask, just

 9   ask me to repeat it and I will.  Sound fair?

10        A.   Yes, ma'am.

11        Q.   I want to start with your background and your

12   childhood.  You admit that you come from a good family, right?

13        A.   Yes, I do.

14        Q.   Mom and dad both in the house?

15        A.   Yes.

16        Q.   They taught you right from wrong?

17        A.   Correct.

18        Q.   They took you to church?

19        A.   Yes.

20        Q.   Your mom taught you about the word of God?

21        A.   Correct.

22        Q.   You never mentioned in any of the records that you

23   had any childhood abuse or sexual abuse until today; is that

24   right?

25        A.   I spoke with my defense team about it.
```

1      Q.    Right.  I'm talking about all the other times, every

2  time you went to jail, every time you went to the hospital, in

3  the penitentiary records, you never told any of them about any

4  childhood abuse, did you?

5      A.    That was irrelevant at the time.  I felt like it

6  was.

7      Q.    Because that certainly didn't make you set Ms.

8  Harris on fire, did it?

9      A.    No, it had nothing to do with it.  My drug abuse did

10  it.

11      Q.    You didn't take any special education classes, you

12  were in regular classes in school?

13      A.    Actually I was in basic classes.

14      Q.    But it wasn't special ed?

15      A.    It wasn't special ed.  It was close to it.  It

16  wasn't regular.  At the time when I was going to school, it was

17  regular and honors, but I was in basic.

18      Q.    Right.  They also had special education then, didn't

19  they?

20      A.    That was the lowest, yes.

21      Q.    You took some college courses at Richland College,

22  didn't you?

23      A.    Auto body technology.  Yes, I took hands-on.

24      Q.    And we heard yesterday or last week from Mr.

25  Contente who said you were able to go and take a course and

1  pass a test that the State offered for the state inspection

2  without any problem, right?

3       A.    Correct.

4       Q.    So you're not here to tell this jury you have any

5  learning or intellectual problems, right?

6       A.    I have no learning disabilities.  I just learn at a

7  slow pace.

8       Q.    But you didn't learn at a slow pace when you took

9  that class for state inspection?

10      A.    It's a very slow pace class.  It's a two-day class.

11      Q.    You dropped out of high school to sell drugs; is

12  that right?

13      A.    Correct.

14      Q.    You wanted the fast life?

15      A.    I did.

16      Q.    Your parents both worked hard and did everything

17  they could to raise you right?

18      A.    They did.

19      Q.    And every time you've gotten in trouble and lost a

20  job, you've been able to find another job pretty quick; isn't

21  that right?

22      A.    Wouldn't say quick.  It took a lot of effort.  Each

23  one of my bosses that I talked with, I explain my situation to

24  them, not in depth, but I did explain my situation and my

25  background to them.

```
 1        Q.    You told them you had been to the penitentiary, but
 2   you didn't really tell the truth about what had happened?
 3        A.    Correct.
 4        Q.    But you were able to get a job despite that?
 5        A.    I was.
 6        Q.    And even after you got fired from Kwik Kar for
 7   stealing from Mr. Contente, you were able to go out and get
 8   another job, were you not?
 9        A.    With the help of my -- my realtor.
10        Q.    Monica Cajas or Cajas?
11        A.    Correct.
12        Q.    She knew Gioconda Verdaguer?
13        A.    Correct.
14        Q.    And she called in a favor to get you a job at XLC?
15        A.    She did.
16        Q.    And you were able to go and work at XLC; is that
17   right?
18        A.    I was.
19        Q.    Until you decided to use drugs again --
20        A.    Yes.
21        Q.    -- and you got fired from that job?
22        A.    I didn't actually get fired.  I went in and told
23   them I couldn't perform my job duties because I had been
24   binging over the weekend and I asked could they help me.
25        Q.    And they told you they would hold your job for you
```

1  for three months if you would just go get some help; isn't that

2  right?

3       A.    That's right, correct.

4       Q.    And Gio -- is that what they call her?

5       A.    Yes.

6       Q.    Gio actually went through the trouble to look up

7  some information about drug treatment programs that were near

8  you that wouldn't cost you any money and told you about those,

9  didn't she?

10       A.    Actually she -- she told me about them, but she

11  never did follow up and give me the information on it.

12       Q.    Did you follow up with her and ask for it?

13       A.    Well, she told me to come back in three months, and

14  I lost my phone, I lost my vehicle.  At that time I was --

15  pretty much given up.

16       Q.    I'm asking you if you followed up on the drug

17  rehabilitation that she talked about?

18       A.    No, I didn't.

19       Q.    It's not her responsibility to get you --

20       A.    Not hers at all.  It was my responsibility.

21       Q.    And, in fact, even though you had gone off and used

22  drugs and she couldn't keep you on, she was willing to bring

23  you back, if you would just get some help?

24       A.    Correct.

25       Q.    But you didn't go get any help?

```
 1      A.    I --

 2      Q.    That's a yes or a no.

 3      A.    Yes.

 4      Q.    You did go get help?

 5      A.    No, I didn't.  I kept calling --

 6            MS. MOSELEY:  Judge, I'm going to object,

 7   nonresponsive.

 8            THE COURT:  Sustained.

 9      Q.    (BY MS. MOSELEY)  If it's a yes or a no, you have to

10   answer it yes or no.

11      A.    Yes.

12      Q.    You didn't go get any help after you got -- after

13   Ms. Verdaguer told you to go get some help?

14      A.    No, I didn't.

15      Q.    And, in fact, when you were off -- when you were on

16   probation, you were sent to drug rehabilitation classes,

17   weren't you?

18      A.    Yes, I was.

19      Q.    And you went to those and you completed drug

20   treatment and that was back in about 1998, 1999?

21      A.    Correct.

22      Q.    And you also were sent to anger management classes.

23   You did that, correct?

24      A.    Correct.

25      Q.    And you did all of that through Addicare in Garland?
```

```
 1        A.    Correct.

 2        Q.    And when you went to Green Oaks, you talked about

 3   that earlier, that you checked yourself into Green Oaks for

 4   drug treatment, correct?

 5        A.    Correct.

 6        Q.    And you were actually referred there by somebody at

 7   Addicare?

 8        A.    That's incorrect.

 9        Q.    You didn't get that -- if your records at Green Oaks

10   indicate that you were referred by Addicare, that's not true?

11        A.    I don't remember fully.  From my recollection, I

12   looked in the phone book and -- and looked up Green Oaks.

13        Q.    And who did you have insurance through at that time?

14        A.    It was a PPO, through Sanden, when I was working

15   through Sanden International.

16        Q.    But you weren't working at Sanden when all of this

17   happened?

18        A.    I just left.  I was still paying my insurance,

19   though.

20        Q.    So you went -- when you were out after you got out

21   of prison, you went to Parkland for treatment for your high

22   blood pressure, didn't you?

23        A.    Correct.

24        Q.    And that didn't cost you any money, did it?

25        A.    No, it didn't.
```

1      Q.    Did you -- were you asked there and did you tell

2 them if you had drug treatment -- if you needed drug treatment

3 or you had a drug problem?

4      A.    I didn't have a drug problem at that time.  I was

5 just released from prison.

6      Q.    So you didn't need any help?

7      A.    I didn't need any help at that time.  I was clean

8 and just out of prison.

9      Q.    And what about in 2011, you were still clean and

10 didn't need any help?

11      A.    October 1st, 2011, was when I relapsed.

12      Q.    And you weren't getting treatment for your high

13 blood pressure anymore?

14      A.    They were giving me medication, but I couldn't

15 follow up with the doctors because I was working and couldn't

16 take off.

17      Q.    When you went to Presbyterian Hospital in April

18 of 2012, do you remember talking to the social worker before

19 you left?

20      A.    No, I don't.

21      Q.    You don't remember her giving you a list of

22 treatment options?

23      A.    She gave me two pieces of paper with -- with

24 treatments on them.

25      Q.    Do you remember what was on that list?

1      A.   Some of them.  Some of them I called.  Some of them

2  I didn't.

3      Q.   But you're certainly not here to tell this jury that

4  there wasn't any drug treatment available to you?

5      A.   There was drug treatment available to me, but I

6  needed insurance and I didn't have any insurance.

7      Q.   There wasn't any free drug treatment available to

8  you?

9      A.   Not the ones that I called, no, there wasn't.

10     Q.   You didn't call all of them?

11     A.   I didn't call all of them, no, I didn't.

12     Q.   You were selective -- how did you decide which ones

13  you wanted to call?

14     A.   I just went down the list and I called them and

15  after a few, I gave up.

16     Q.   And the first one on that list -- do you remember

17  who that was?

18     A.   I don't.

19          MS. MOSELEY:  May I approach?

20          THE COURT:  You may.

21     Q.   (BY MS. MOSELEY)  I'm showing you what I've marked

22  as State's Exhibit 191.  If you'll take a look at that, tell

23  the jury if that's what Ms. Fitzgerald gave you were let --

24  when you were let go from Presbyterian.

25     A.   No, this is not what she gave me.  It was just one

 1    piece of paper.

 2        Q.    So if she says this is what she gave you, she

 3    wouldn't be telling the truth?

 4        A.    That's correct.

 5        Q.    Did you ever call Parkland where you were receiving

 6    your other free treatment?

 7        A.    For my high blood pressure or for my drug abuse?

 8        Q.    Did you ever call Parkland and tell them that you

 9    were having some issues with drugs and needed help?

10        A.    I didn't know that Parkland offered that.

11        Q.    So that's a no?

12        A.    That's a no.

13        Q.    Now, every time you've gotten in trouble, you're

14    telling this jury it's because you were using drugs?

15        A.    That's correct.

16        Q.    This doesn't have anything to do with depression

17    then.  It's about you using drugs?

18        A.    And depression.

19        Q.    And you're depressed because you can't stop using

20    drugs?

21        A.    I'm depressed because I couldn't do more for my

22    family and myself.

23        Q.    Because you were using drugs?

24        A.    Correct.

25        Q.    When you were talking to your lawyer, y'all talked

1    about a few of your brushes with the law, a few of your

2    criminal convictions, activities.  How many times would you

3    tell this jury you've been in the backseat of a squad car?

4         A.    Numerous times.  I can't give you an accurate

5    number, but it's been numerous times.

6         Q.    Twenty, 25?

7         A.    That would be -- that would be correct.

8         Q.    And every single one of those is because you were

9    using drugs?

10        A.    That's correct.

11        Q.    Let's talk about September 15th of 1991.  Do you

12   remember being arrested that night with Gene Gathright, Manuel

13   Turner, and Andre Howard?

14        A.    I remember I was 15 years old.

15        Q.    You were driving a stolen car?

16        A.    I was.

17        Q.    And you were high then, I assume?

18        A.    I was high, drunk, all of the above.

19        Q.    And February 4th of 1992, you were arrested after

20   pushing a police officer.  Do you remember that?

21        A.    I do.

22        Q.    December 9th, 1992, arrested for theft?  Do you

23   remember that?

24        A.    That's correct, yes.

25        Q.    August 13th of 1993, you were arrested for

101

```
 1  assaulting Amy Armstrong?

 2       A.    Correct.

 3       Q.    I assume that's because she hit you first?

 4       A.    We hit each other.  We argued.

 5       Q.    You said that earlier.  I'm asking you if you hit

 6  her or if she hit you?

 7       A.    We hit each other.

 8       Q.    Okay.

 9       A.    We argued, and, yes, I -- I put my hands on her.  I

10  did.

11       Q.    And I guess you felt like less of a man when you did

12  that?

13       A.    Of course I did.

14       Q.    But didn't stop you, on September 7th, less than a

15  month later, from being arrested and charged with assaulting

16  her again?

17       A.    That's correct.

18       Q.    But the drugs made you do that?

19       A.    And the arguing and the depression.

20       Q.    Oh, depression?

21       A.    The pressure.  I was 17 at the time.

22       Q.    And then you said that on September 8th, 1993, when

23  you threw the burning object onto her porch, you weren't really

24  trying to set anything on fire?

25       A.    No, I wasn't.
```

102

```
 1        Q.    You knew her children were in there?

 2        A.    Correct.

 3        Q.    But she wouldn't open the door?

 4        A.    Correct.

 5        Q.    And because you didn't have anyplace to go, you

 6   threw a burning object onto her porch?

 7        A.    That's correct.

 8        Q.    September 9th of 1993, you were arrested for

 9   possession of marijuana.  That's the only drug charge you've

10   ever had, isn't it?

11        A.    That's correct.

12        Q.    You've never been caught with drugs anytime other

13   than 1993?

14        A.    That's correct.

15        Q.    When you were, what, 18 years old?

16        A.    Yes.

17        Q.    February 8th of 1994, three months after that, you

18   got arrested because you had warrants out of DPD for those

19   assaults on Amy.  You remember that?

20        A.    Yes.

21        Q.    Two months later on April 16th, you were arrested on

22   the possession of marijuana warrant because I guess you didn't

23   go to court, right?

24        A.    That's correct.

25        Q.    You bonded out of jail?
```

```
 1        A.    Yes.

 2        Q.    Who bonded you out?

 3        A.    I don't remember.

 4        Q.    May 31st of 1994, again, you were arrested on those

 5   same assault warrants and that's the day you bit Officers

 6   Mendoza and Ehrman.  Do you remember doing that?

 7        A.    Yes, I do.

 8        Q.    You don't deny to this jury that you bit those two

 9   officers, do you?

10        A.    No, I don't deny it.  I was 18 at the time.

11        Q.    Most 18-year-olds, you would agree, don't bite

12   police officers, right?

13        A.    I can only speak for myself, Ms. Moseley.

14        Q.    And you bit them because you were 18?

15        A.    I bit them because I was upset.

16        Q.    July 23rd of 1994 was the day that Daphne was

17   driving you and you told her to run from the police, not to

18   stop.  You remember that?

19        A.    I told her just to go ahead and park at my house.

20        Q.    Not to stop?

21        A.    Not to stop, just park at my house so they wouldn't

22   tow my car.  I didn't have any tags or any driver's license.

23        Q.    You weren't driving.

24        A.    She didn't have any driver's license.

25        Q.    August 7th of 1995.  Let's talk about that day.  You
```

```
 1   were arrested and charged for aggravated assault on Courtney

 2   Johnson, your wife's sister.  Now, you claim, I assume, that

 3   you didn't do that?  You just took probation to get out of

 4   jail?

 5        A.   Correct.

 6        Q.   Tell -- you pled guilty?

 7        A.   I did.

 8        Q.   She called the police that night and told the police

 9   that you had pointed a gun at her.  Do you remember that?

10        A.   I did.

11        Q.   And you know that's what she told them?

12        A.   I remember that, but that ain't what happened.

13        Q.   You got five years of probation?

14        A.   I did.

15        Q.   That was felony probation.  Your first felony

16   charge?

17        A.   Yes, ma'am.

18        Q.   And it was during that probation you were doing

19   pretty good for a while and then you decided to start using

20   drugs, right?

21        A.   Correct.

22        Q.   And you went back and forth to the jail because you

23   were testing positive for drugs?

24        A.   Correct.

25        Q.   But every single one of those times that you went to
```

1    jail, the judge gave you another chance and sent you to drug

2    treatment, right?

3        A.    Correct.

4        Q.    And you were on probation from 1995 to about 2000,

5    right?  September 27th of 2000, you completed your probation?

6        A.    Yes, that's correct.

7        Q.    And then June 9th of 2002, you were issued a Class C

8    assault citation for hitting your wife.  You remember that?

9        A.    I do.

10        Q.    And then about a month later you checked into Green

11    Oaks, and you checked yourself in for drug treatment, correct?

12        A.    Correct.

13        Q.    But that didn't work either, did it?

14        A.    No, ma'am.

15        Q.    October 9th of 2002, about two and a half months

16    after you got out of Summer Sky, you were arrested for evading

17    arrest from Officer Steadman.  You saw Officer Steadman in

18    here?

19        A.    Yes.

20        Q.    You remember running from him that night?

21        A.    I don't remember that incident.

22        Q.    Because you were on drugs?

23        A.    Yes.

24        Q.    November 15th of 2002, a month after running from

25    Officer Steadman, you were arrested for assaulting Daphne

```
 1  again.  Do you remember that?

 2       A.   Correct.

 3       Q.   You don't deny assaulting your wife, do you?

 4       A.   Not at all.

 5       Q.   You talk about it like we fought each other, but the

 6  truth of the matter is you were assaulting your wife; isn't

 7  that right?

 8       A.   We argued, we fought.  Yes, that's correct.

 9       Q.   And that's generally the way it works, only

10  generally men don't hit their wives.

11       A.   I can't speak for all men, but I did it.

12       Q.   You hit your wife?

13       A.   I did.

14       Q.   On July 3rd of 2003, Daphne was driving her aunt's

15  car.  Do you remember that?

16       A.   I do.

17       Q.   Aunt Sherry?

18       A.   Yes.

19       Q.   And do you remember her being in the drive-through

20  at Braum's --

21       A.   No.

22       Q.   -- when you approached her and hit her?

23       A.   I don't remember that.

24       Q.   Do you deny approaching her in the drive-through at

25  Braum's and hitting her?
```

```
 1        A.    I don't deny it.  I just don't remember it.

 2        Q.    You don't remember pulling her out of the car and

 3   taking off in the car either?

 4        A.    No, I don't.

 5        Q.    September 7th of 2003, again, you're arrested for

 6   assaulting your wife.  Do you remember that?

 7        A.    Correct.

 8        Q.    Jan -- January 5th, 2004, you were arrested with --

 9   for theft?

10        A.    Correct.

11        Q.    February 1st, 2004, you started another job, Classic

12   BMW?

13        A.    Correct.

14        Q.    And you made it until June 19th, 2004, when you were

15   arrested for robbing Digna Salmeron?

16        A.    Correct.

17        Q.    And then wrecking her truck?

18        A.    Correct.

19        Q.    She didn't put up any fight, did she?

20        A.    Not that I can remember.

21        Q.    Who posted your bond to get out of jail that day?

22        A.    My wife.

23        Q.    And then September 13th of 2004 -- let me back up.

24   After you got out of jail on the robbery, your wife posted that

25   bond?
```

1       A.    Correct.

2       Q.    I assume y'all didn't have a lot of money then,

3  either, right?

4       A.    No, we didn't.  I guess she borrowed it.  I'm not

5  sure how she got the money.

6       Q.    After you got out of jail, you said you were

7  stabbed?

8       A.    I was.

9       Q.    And you went to the hospital.  Paramedics took you

10  to Parkland?

11       A.    Correct.

12       Q.    You told them you fell on a knife, it was an

13  accident.

14       A.    Correct.

15       Q.    You were out of the hospital the next day, and I

16  think you -- you forgot when you were talking to your lawyer

17  about September 13th, 2004, and that violation of protective

18  order.  You knew Daphne had gotten a protective order?

19       A.    I knew she had a protective order.

20       Q.    I think you told the jury earlier she probably lied

21  about some stuff because she was just mad?

22       A.    I'm not sure if I said she lied or not.  She

23  probably stretched the truth a bit because she was mad.

24       Q.    She was mad.  She told them that you assaulted her

25  on a regular basis.  That's true, isn't it?

```
 1        A.    Correct.
 2        Q.    And were you aware that she wasn't able to go to
 3   work because of the bruises that you had left on her?
 4        A.    Later I learned that.
 5        Q.    She didn't make that up?
 6        A.    No, she didn't.
 7        Q.    And I assume at that time she was the only one
 8   working?
 9        A.    Yes, she was.
10        Q.    And she had posted a bond to get you out of jail?
11        A.    Correct.
12        Q.    But you went to the apartment, your two children are
13   inside the apartment, right?
14        A.    Correct.
15        Q.    And you're kicking at the front door telling her
16   you're going to come in and get some money?
17        A.    Money that I had left, yes, correct.
18              COURT REPORTER:  I'm sorry, what --
19        A.    Money that I had left in there, and she wouldn't let
20   me in to get it.
21        Q.    (BY MS. MOSELEY)  That was your money?
22        A.    It was my money.  Her money is my money.  My money
23   is her money.
24        Q.    So you were kicking the door.  You would agree that
25   she was scared that night?
```

1      A.    Yes.

2      Q.    And your children were scared that night?

3      A.    Possibly, yes.

4      Q.    That was on September 13th.  You went to jail for

5    violation of a protective order, and then on September 30th is

6    when you got five years in the penitentiary?

7      A.    Correct.

8      Q.    While you were in the penitentiary, we saw you were

9    taking advantage of some of the courses that they offered?

10      A.    I tried.

11      Q.    You were doing what you could to get yourself

12    straightened out?

13      A.    Yes, ma'am.

14      Q.    But that didn't work either, did it?

15      A.    It worked.

16      Q.    Well, it didn't work very long, did it?

17      A.    Not very long, no.

18      Q.    Now, you were sentenced to five years in prison, and

19    you spent four years and almost 10 months of that five-year

20    sentence; is that right?

21      A.    That's right.

22      Q.    You didn't get any good time?

23      A.    I had got good time taken away from me when I had a

24    fight with Mr. Jenkins.

25      Q.    That was six months after you got put in.  What

1  happened after that?  You didn't earn any good time?

2       A.    Possibly, yes.  I earned -- I earned good time, but

3  I just -- they just paroled me after four years and 10 months.

4       Q.    So when your lawyer asked you if you successfully

5  completed parole, the truth of the matter is you only had two

6  months on parole anyway, right?

7       A.    Correct.

8       Q.    You reported once to parole when you got out?

9       A.    Once, yes.  And then I had the leg monitor on, and I

10  was going to drug classes at the time.

11       Q.    And then you were discharged?

12       A.    And then I was discharged.

13       Q.    Those drug classes didn't work either, did they?

14       A.    No, they didn't.  I didn't need them -- I felt like

15  I didn't need them at that time.  I was clean.

16                 MS. MOSELEY:  May I approach the witness?

17                 THE COURT:  You may.

18       Q.    (BY MS. MOSELEY)  Showing you State's Exhibit 192.

19  Look at that and see if that's a letter you wrote to the parole

20  board while you were in prison.

21       A.    Yes, I wrote this.

22                 MS. MOSELEY:  I'd offer State's 192.

23                 (State's Exhibit 192 offered.)

24                 MS. MULDER:  No objection, Your Honor.

25                 THE COURT:  Admitted.

```
 1                    (State's Exhibit 192 admitted.)

 2               MS. MOSELEY:  Permission to publish?

 3               THE COURT:  You may.

 4          Q.   (BY MS. MOSELEY)  This is dated December 28th of

 5     2006.  You hadn't been in prison very long at that point,

 6     correct?

 7          A.   That's correct.

 8          Q.   And you wrote to the parole board basically telling

 9     them that you wanted to get released on parole, right?

10          A.   Correct.

11          Q.   You said you accept full responsibility, you have

12     nowhere else to lay any blame; is that right?

13          A.   That's my handwriting.

14          Q.   That's the truth, wasn't it?  You didn't have

15     anybody to blame for where you were?

16          A.   That's correct.

17          Q.   You said you've made a sincere and conscientious

18     effort to change your thinking and your behavior, your

19     actions -- my actions of the past not only affected myself but

20     my family, as well.  My actions have caused me to be away from

21     my family during times when I was really needed.  This is lost

22     time.  It can never be replaced or made up, but the time spent

23     away from my family members has been well spent, given me the

24     opportunity to take time out and assess my future, as well as

25     analyze my past.  I can truly say that the past is behind me.
```

```
 1                   That's what you told them then?

 2        A.    Correct.

 3        Q.    You didn't mention anything about your victim in

 4   this, right, Digna Salmeron?

 5        A.    No, I didn't.

 6        Q.    Because you said your actions affected you and your

 7   family, but you didn't say anything about Ms. Salmeron, right?

 8        A.    No, I didn't.

 9        Q.    And this is a four-page letter, and you don't

10   mention your victim once in here, do you?

11        A.    No, I don't.

12        Q.    And the truth is that all those actions weren't

13   behind you, right, because when you got out of prison, you

14   decided you could go back to using drugs, didn't you?

15        A.    After two years.

16        Q.    When you got out of prison, it only took you three

17   months to get a job at Meineke?

18        A.    Correct.

19        Q.    And you worked there until Meineke closed in

20   November of 2010, right?

21        A.    That's correct.  They laid me off.

22        Q.    In December of 2010, you started working for David

23   Contente at Kwik Kar?

24        A.    That's correct.

25        Q.    He gave you a chance?
```

```
 1        A.    Yes, he did.

 2        Q.    You realize now that he's never going to give any

 3   other ex-con a chance, right?

 4        A.    And I'm sorry for that.

 5        Q.    You've ruined that opportunity for everybody that

 6   comes behind you.

 7        A.    I hope he changes his mind in the future.

 8        Q.    But you don't blame him for not?

 9        A.    I don't blame him at all.

10        Q.    And you told this jury this morning that you went

11   back there that day because you wanted him to help you?

12        A.    Correct.

13        Q.    You were actually surprised when you found out that

14   he wanted to prosecute you for that theft, weren't you?

15        A.    I was very surprised.

16        Q.    Because you didn't think he would mind you having

17   gone in and stolen from him?

18        A.    I thought he would help me.  I thought he was a

19   friend, as well as my boss.

20        Q.    And after you stole from him, you thought he would

21   still feel that way?

22        A.    Correct.  I went in to pay him back everything that

23   I tooken from him.

24        Q.    But you didn't, did you?

25        A.    I didn't.  He didn't --
```

```
 1        Q.    And not only did you not pay him back, you actually

 2   went back after you got out of jail and asked him for your last

 3   paycheck?

 4        A.    Correct.

 5        Q.    Despite the fact that you owed him the money back

 6   that you had stolen?

 7        A.    Correct.

 8        Q.    And he gave it to you, didn't he?

 9        A.    He did.

10        Q.    And then you filed for unemployment benefits.

11        A.    I did.

12        Q.    Because you thought you were entitled to that?

13        A.    I did.

14        Q.    Even though you had stolen?

15        A.    Yes, ma'am.

16        Q.    And when you filed for unemployment benefits with

17   the Texas Workforce Commission, you actually told them that

18   something came up missing and you got blamed?

19        A.    Correct.

20        Q.    That's not what happened, is it?

21        A.    No.

22        Q.    And you knew that if you told them that you had

23   stolen, you wouldn't get benefits?

24        A.    Correct.

25        Q.    Who posted your bond to get out of jail after you
```

1    stole from Mr. Contente?

2        A.    My wife.

3        Q.    You felt bad for stealing from him?

4        A.    Of course.

5        Q.    So you got out of jail two days after you committed

6    that crime, November 15th of 2011?

7        A.    Correct.

8        Q.    And then January 10th of 2012, Monica got you the

9    job at XLC?

10       A.    Correct.

11       Q.    And you made it until April 13th of 2012, before you

12   went off on your drug binge again?

13       A.    Correct.

14       Q.    And then two days after you were let go from XLC,

15   you were taken to Presbyterian Hospital because you were high

16   on drugs?

17       A.    Correct.

18       Q.    Not because you had any mental problems, but because

19   you had gotten yourself high on drugs?

20       A.    Along with the mental problem, the depression.

21       Q.    Oh, the depression, too?

22       A.    Correct.

23       Q.    That's why you went to Presbyterian?

24       A.    Both my drug use and my depression.

25       Q.    You never had any of these depression issues before

```
 1   when you weren't using drugs, right?

 2        A.    It had them all the time.

 3        Q.    They took you to the hospital for your depression?

 4        A.    No, they didn't.

 5        Q.    Yeah, you didn't find yourself in the back of a

 6   squad car because you were depressed, right?

 7        A.    Correct.

 8        Q.    And while you were there at the hospital, you

 9   threatened to take an officer's gun.  Do you remember that?

10        A.    I don't remember that.

11        Q.    Do you remember talking about how everybody's

12   watching this and we're on TV?

13        A.    I don't remember that.

14        Q.    And you don't remember Julie Fitzgerald giving you

15   that list of treatment options either, right?

16        A.    I remember someone giving me a sheet of paper with

17   some rehabilitation centers on it, and I called a few of those.

18   And after a few, I gave up.

19        Q.    Now, when Daphne bonded you out of jail, did you

20   consider just staying there because you would be better off

21   locked up where you couldn't get to drugs?

22        A.    Could you repeat that?

23        Q.    Did you consider just staying in jail when you got

24   arrested for stealing from David Contente?

25        A.    Did I consider it?
```

```
 1        Q.    Right.  Why didn't you just stay in jail?  Look, I'm
 2   better off in jail.
 3        A.    I wish that I would have.
 4        Q.    But you didn't.  You wanted out, right?
 5        A.    They got me out.  I didn't ask them to.
 6        Q.    About a week, 10 days after you got out of
 7   Presbyterian Hospital, you were at the Express Inn in Garland,
 8   right?
 9        A.    Correct.
10        Q.    And you saw and you heard Carina Pinzon come in here
11   and say what you did to her that day.  Do you remember that?
12        A.    I don't remember that.
13        Q.    You remember her testifying, but you don't remember
14   doing it?
15        A.    I remember her testifying, but I don't remember
16   doing that.
17        Q.    You're not saying she's lying?
18        A.    Not at all.
19        Q.    You know how your shoes got wet?
20        A.    I'm not sure.
21        Q.    And when Officer Mendoza said he wanted to take you
22   to jail and he was looking for a reason, there wasn't one
23   because you weren't high, right?
24        A.    I was very intoxicated.
25        Q.    Oh, you were?
```

 1          A.    Yes, I was.

 2          Q.    So when Officer Mendoza said that they gave you

 3     field sobriety tests and you passed, that's not true?

 4          A.    They clearly stated that I was intoxicated and told

 5     me that I had to leave the premises.  I told him that I had a

 6     vehicle out back, and they said I couldn't drive up under the

 7     influence.  I left the premises and went and got me something

 8     to eat.  And when I came back --

 9                MS. MOSELEY:  Judge, I'm going to object to the

10     non-response.

11                THE COURT:  Sustained.

12                THE WITNESS:  I was answering the question.

13          Q.    (BY MS. MOSELEY)  No.  It was a yes or a no.  We had

14     that talk earlier.

15          A.    Could you repeat the question, please?

16          Q.    You were given field sobriety tests, yes?

17          A.    Yes.

18          Q.    And you're saying that when Officer Mendoza

19     testified that you were not intoxicated, he lied?

20          A.    Correct.

21          Q.    And then just less than a month after that incident,

22     you set a 76-year-old woman on fire?

23          A.    Correct.

24          Q.    And you told this jury that the reason you set her

25     on fire is because she was coming at you?

1      A.    Correct.

2      Q.    When you went to jail in Garland on May 20th of

3  2012, do you remember the -- the detention officers asking you

4  some questions about your history, your medical history?

5      A.    I don't.

6      Q.    Wouldn't -- wouldn't surprise you to know that they

7  wrote on there that you had high blood pressure.  They would

8  have gotten that from you, correct?

9      A.    Correct.

10      Q.    And if they wrote on here -- on this form that you

11  admitted that you had cocaine yesterday and two beers, that

12  that's all you admitted, would that be true?

13      A.    Possibly, yes.

14      Q.    That's what you told them?

15      A.    Correct.

16      Q.    You didn't say anything about that bottle of

17  Moscato?

18      A.    No, I didn't.

19      Q.    You didn't say anything about the Xanax?

20      A.    No, I didn't.

21      Q.    You just told them cocaine yesterday and two beers?

22      A.    It was irrelevant.  I was intoxicated.

23      Q.    In your mind it was irrelevant.

24      A.    Correct.

25      Q.    And when -- when you talked to Detective Tooke, you

```
 1  wanted him to believe you were remorseful; is that right?

 2       A.   Correct.

 3       Q.   The same way you were remorseful for stealing from

 4  David Contente?

 5       A.   Correct.

 6       Q.   And the same way you were remorseful for exposing

 7  yourself to Carina Pinzon -- or are you not remorseful for

 8  that?

 9       A.   If she say I done that, I'm very remorseful for it,

10  because not only did I disrespect her, I disrespected myself.

11       Q.   You're remorseful for exposing yourself to that

12  18-year-old prison guard?

13       A.   Correct.

14       Q.   You're remorseful for stealing Digna Salmeron's

15  truck?

16       A.   I am.

17       Q.   You remorseful for beating your wife for years?

18       A.   Correct.

19       Q.   You're remorseful for hitting Amy Armstrong?

20       A.   Correct.

21       Q.   You're remorseful for throwing fire on her porch?

22       A.   Yes, I am.

23       Q.   But none of that remorse has ever changed your

24  behavior, has it?

25       A.   Yes, it has.
```

1      Q.    Since you've been in jail, you have called home

2  three or four times a week on average?

3      A.    One time a week.

4      Q.    One time a week?

5      A.    Correct.

6      Q.    You believe you've only called once a week?

7      A.    It might have been two sometimes, but just one time

8  a week that I called.

9      Q.    So you get to talk to your family -- we'll go with

10 yours, twice a week -- let's say twice a week.

11     A.    That's correct.

12     Q.    Fifteen minutes each call, right?

13     A.    That's correct.

14     Q.    And you've done that since you've been in jail about

15 18 months?

16     A.    Correct.

17     Q.    And in all of those calls and all of that time, up

18 until a week before your trial, you never mentioned the victim;

19 isn't that right?

20     A.    Don't remember everything that I spoke on.

21     Q.    Well, you certainly didn't talk about the victim or

22 the victim's family, the Harris family, did you?

23     A.    I'm not sure.

24     Q.    Would it surprise you -- you know they're recorded,

25 right?

1      A.   I do.

2      Q.   And you know I've been listening to them, no doubt?

3      A.   I do.

4      Q.   If I said you didn't mention the victim's family or

5 the victim until a week before your trial, you're not saying

6 I'm lying?

7      A.   I believe you.

8      Q.   But suddenly a week before the trial you start

9 talking about how you're praying for the victim's family?

10     A.   Correct.

11     Q.   And prior to that, every time you talked to your

12 wife, you do -- you do two things.  You say, I need money on my

13 books, or, I'm almost out of money for calls, right?

14     A.   That would be correct.

15     Q.   And you talk about, pray for me.  Pray for daddy,

16 you tell your kids, over and over again, don't you?

17     A.   Correct.

18     Q.   You don't ask them to pray for the victim's family?

19     A.   They do that.  They do -- they do that anyway.

20     Q.   When you talk on the jail calls, you remember all

21 the conversations you've had about how you've forgiven yourself

22 for what you've done?

23     A.   I don't remember all the calls, Ms. Moseley.

24     Q.   Do you -- have you forgiven yourself?

25     A.   Of course.  I have to live with myself.

```
 1        Q.    You believe God sent you to jail to protect you?

 2        A.    It's the reason for it.

 3        Q.    All of this --

 4        A.    That's the reason for everything.

 5        Q.    -- all of this was in God's plan?

 6        A.    Possibly.

 7        Q.    Well, that's what you said, isn't it?

 8        A.    I'm God's child.

 9        Q.    Was Ms. Harris God's child?

10        A.    Of course.  She's in heaven.

11        Q.    When you talk to your wife and your children on the

12   phone, you realize that they're struggling financially, right?

13        A.    They are.

14        Q.    And they -- Daphne, your wife, can't even afford

15   their own place right now; isn't that true?

16        A.    That's correct.

17        Q.    She's living with your mother?

18        A.    Correct, for the time being.

19        Q.    And your children, they obviously need things,

20   correct?

21        A.    Correct.

22        Q.    Your oldest daughter would like a gym membership so

23   that she can exercise and join track, right?

24        A.    Correct.

25        Q.    She can't afford that, can she?
```

```
 1        A.    Probably not.

 2        Q.    And that doesn't stop you from continually asking

 3   for money from Daphne, does it?

 4        A.    No, it don't.

 5        Q.    You know your children don't have everything that

 6   they want, but you expect your wife to put money on your books?

 7        A.    If you listen carefully, I explain to her that her

 8   and my children come first.  I'm okay.

 9        Q.    Do you remember making a phone call on August 4th of

10   2012 where you talked to another man about wanting to live to

11   an old age?  You heard it before the jury came in.  You

12   remember that?

13        A.    I do.  Now that I remember that you brought it up,

14   it was --

15              MS. MOSELEY:  I'm going to object at this point,

16   Judge.

17        A.    I was just answering your question, ma'am.

18              MS. MOSELEY:  Judge, at this time I'd offer into

19   evidence State's Exhibit 190.  It contains excerpts from eight

20   calls that the Defendant has made from jail and he has

21   previously identified the voices on these calls.

22              (State's Exhibit 190 offered.)

23              THE COURT:  I'm sorry, you're offering them?

24              MS. MOSELEY:  Offering State's 190.

25              THE COURT:  Objections?
```

```
 1                MS. MULDER:  No, Your Honor.

 2                THE COURT:  Admitted.

 3                (State's Exhibit 190 admitted.)

 4                MS. MOSELEY:  Permission to publish, Your Honor,

 5   the call from August the 4th, 2012?

 6                THE COURT:  You may.

 7                (Exhibit published.)

 8        Q.   (BY MS. MOSELEY)  You think this decision that the

 9   jury is going to make is what's best for you.  Is that yes or

10   no?

11        A.   I was talking to my niece's husband boyfriend.  He

12   has a drug problem.

13                MS. MOSELEY:  I'll object.  That's

14   nonresponsive.

15                THE COURT:  Sustained.  Please answer the

16   question, sir.

17        A.   Could you please repeat the question, please?

18        Q.   (BY MS. MOSELEY)  Do you believe that this jury's

19   decision that they have to make is all about what's best for

20   you?

21        A.   It's best -- it's what's best for the victim's

22   family.  It's not about me.

23        Q.   That call was all about what you want, though, isn't

24   it?

25        A.   Could you repeat that?
```

1       Q.    That -- that conversation we just heard was all

2  about you wanting to live to be 75?

3       A.    Correct.

4       Q.    So that you can communicate with your family?

5       A.    Correct.

6       Q.    Nothing about how Ms. Harris's family can't

7  communicate with her?

8       A.    And I'm sorry for that.  I'm very remorseful.

9       Q.    Just like you've been remorseful every other time?

10      A.    Correct.

11           MS. MOSELEY:  Your Honor, I'd like to publish

12  the call from April 12th -- I'm sorry, April 2nd, 2013, on the

13  same disk.

14           (Exhibit published.)

15      Q.    (BY MS. MOSELEY)  Now, that's where you said, you

16  tell her, take care of y'all first, but then you remind her

17  again at the end, you only got one call left.  And that's

18  because she has to put money not only on your books -- what do

19  you spend your money on when she puts it on the books?

20      A.    My hygiene products.

21      Q.    Don't they give you toothpaste in the jail?

22      A.    No, they don't.

23      Q.    They don't give you any toothpaste?

24      A.    If you're indigent, toothpaste and -- and deodorant

25  that don't work.

```
 1        Q.    They give you --

 2        A.    A comb and shampoo.

 3        Q.    So they'll give you shampoo and toothpaste, a comb,

 4   and deodorant, but it's not the kind that you like?

 5        A.    Correct.

 6        Q.    So you ask your wife to put money on your books so

 7   that you can get the stuff that you like?

 8        A.    Correct.

 9        Q.    And then you buy food with it, correct?

10        A.    I do.

11        Q.    They give you three meals in jail, don't they?

12        A.    Correct.

13        Q.    But you want extra food?

14        A.    I do.

15        Q.    Different food?

16        A.    I do.

17        Q.    And you heard that first girl that we heard on that

18   call was Makayi, your oldest daughter?

19        A.    She was.

20        Q.    She was mad because she didn't have enough money to

21   get some chips?

22        A.    Correct.

23        Q.    And you told her, maybe you don't need chips?

24        A.    Correct.

25              MS. MOSELEY:  Your Honor, I'm going to request
```

129

```
 1  permission to publish the call from April 21st of 2013.

 2                  THE COURT:  Granted.

 3                  (Exhibit published.)

 4      Q.   (BY MS. MOSELEY)  That's you talking to Daphne?

 5      A.   That's correct.

 6      Q.   And you told her that God knew exactly what you

 7  needed, so he put you behind bars to keep you safe, to protect

 8  you?

 9      A.   I believe that, and to preach the word to younger

10  men.

11      Q.   You remember in September of this year, just a

12  little over -- well, I guess a little more than two months ago,

13  Daphne burned her hand at work?

14      A.   Correct.

15      Q.   You remember the conversation you and Daphne had

16  about the burn and whether it was a bad burn and it hurt?

17      A.   Correct.

18      Q.   And how she was having trouble with it because she

19  had to put gloves on and it really hurt, this burn on her hand?

20      A.   Correct.

21      Q.   Did y'all ever talk about Ms. Harris during that

22  call?

23      A.   No, we didn't.

24      Q.   You talked about that burn and how bad a burn hurts,

25  but you didn't mention the victim that you had set on fire?
```

```
 1        A.    I won't ever talk about my case over the phone.

 2        Q.    Do you think it would be bad to say you felt sorry

 3   for what you did, remorseful?

 4        A.    I'm not sure what it would make me look like, but I

 5   just never talk about it.

 6        Q.    Until a week before your trial, then it was okay to

 7   talk about it?

 8        A.    I'm not sure if I did or if I didn't.  If I did, I

 9   talked about it.

10                MS. MOSELEY:  May I approach the witness?

11                THE COURT:  You may.

12        Q.    (BY MS. MOSELEY)  Show you some photographs and take

13   a look at those and see if those are photographs of you.

14        A.    That's my body.

15        Q.    State's Exhibits 179 through 186, these photographs

16   are all photos that were taken of you here in the holdover; is

17   that right?

18        A.    Correct.

19        Q.    At the court?

20        A.    Correct.

21                MS. MOSELEY:  I'd offer State's Exhibits 179

22   through 186.

23                (State's Exhibits 179 through 186 offered.)

24                MS. MULDER:  No objection.

25                THE COURT:  Admitted.
```

```
 1                    (State's Exhibits 179 through 186 admitted.)

 2                    MS. MOSELEY:  Permission to publish?

 3                    THE COURT:  You may.

 4          Q.   (BY MS. MOSELEY)  These are photographs of the

 5    tattoos on your body, correct?

 6          A.    That's correct.

 7          Q.    Some of those tattoos you've had for a long time?

 8                    THE COURT:  We're not getting anything on the

 9    monitors, Ms. Moseley.

10                    MS. MOSELEY:  Okay.

11          A.    I had them awhile, yes.

12                    MS. MOSELEY:  Judge, I'll use the doc cam.

13    Apparently I haven't set this thing up yet.

14          Q.   (BY MS. MOSELEY)  Now, we can see on the right side

15    of your chest, there's a photograph here, a picture, I guess

16    tattooed on you.  Who is that?

17          A.    That's my wife on both sides.

18          Q.    How long had you have those?

19          A.    I got those in prison.

20          Q.    You got them in prison?

21          A.    Yes, about '05, '06.

22          Q.    Do they allow tattoos in prison?

23          A.    No, they don't.

24          Q.    So you violated rules.  You didn't caught for that,

25    though, I guess?
```

1     A.    No, I didn't.

2     Q.    You didn't get caught?

3     A.    No.

4     Q.    What about this tattoo here around your collarbone?

5  What does that say?

6     A.    I just got that in Dallas County Jail.  It says:

7  Gift from God.  That's my name, Matthew.

8     Q.    You got -- you got Gift from God tattooed on your

9  chest since you've been in jail?

10     A.    Correct, 10 months ago.

11     Q.    And, again, you didn't get caught for that, but

12  that's a violation of the rules, too, isn't it?

13     A.    Yes and no.

14     Q.    Yes and no?

15     A.    Could you repeat that question.

16     Q.    It's a violation of the Dallas County Jail rules to

17  be tattooing, isn't it?

18     A.    Correct.

19     Q.    But you didn't get caught for that, either?

20     A.    No, I didn't.

21     Q.    You don't have any tattoos on your back, right?

22     A.    No, I don't.

23     Q.    What about this tattoo, State's Exhibit 181, that's

24  on your arm, right?

25     A.    Correct.

```
 1        Q.    And what is that DJ?

 2        A.    It's my wife and my daughter's initials.

 3        Q.    When did you get that?

 4        A.    In '95, '96 possibly.

 5        Q.    In prison?

 6        A.    In Dallas County Jail.

 7        Q.    In Dallas County Jail.  Before you went to prison?

 8        A.    Way before, it was in '95.

 9        Q.    In '95.  And that's just a close-up of that picture

10   there on your chest, right?

11        A.    Correct.

12        Q.    And a close-up of the other side.  You said both of

13   those are from pictures of your wife?

14        A.    Correct.

15        Q.    And then this one around your collarbone, you got

16   that done after you got arrested for this capital murder?

17        A.    Correct.

18        Q.    While you've been waiting on this trial?

19        A.    Correct.

20        Q.    Now, what about this one?  It says:  Break bread.

21   And it's a fist holding two money bags.  When did you get that?

22        A.    I got that in prison, along with the big picture of

23   my wife.

24        Q.    You got that in prison?

25        A.    Yes, in '05.
```

1      Q.    What does that -- what does that represent?

2      A.    Break bread, like Jesus did, his disciples.  That's

3   what I do.  Anything that I have, I share.

4      Q.    Including money?

5      A.    If I have it.

6      Q.    You got -- you got a hand holding two bags of money?

7      A.    That would be changed into a loaf of bread.

8      Q.    That would -- that would be changed into a loaf of

9   bread?

10     A.    Correct.

11     Q.    But you don't have any loaves of bread tattooed on

12  you, do you?

13     A.    No, I don't.

14     Q.    What is that tattoo?

15     A.    It's a double-barrel shotgun.  I got that in '95, as

16  well.

17     Q.    And what's the -- what is that, a Roman Numeral II

18  equals B, double barrel?

19     A.    Yes.

20     Q.    And where is that on your body?

21     A.    It's on my left arm.

22     Q.    Now, why would you get a tattoo of a double-barrel

23  shotgun on your arm?

24     A.    Foolish, young.

25     Q.    That's what was important to you at the time?

```
 1        A.    I was 18.  I was foolish and young.

 2        Q.    Where were you getting your drugs in East Garland?

 3        A.    At a drug house.

 4        Q.    I got that part.  Where?

 5        A.    In East Garland.

 6        Q.    Who's selling them to you?

 7        A.    I can't testify to that.  The reason of

 8   incriminating anyone else.  Whatever I did here is my fault,

 9   not anyone else's.

10        Q.    You don't want to be a snitch?

11        A.    I don't want to tell on anyone.  I'll leave that

12   burden up to the State.

13        Q.    You always get them at the same place, no doubt?

14        A.    Different places.

15        Q.    You didn't get them from Anthony, did you?

16        A.    No, never.

17        Q.    You said Anthony straightened -- did Anthony

18   straighten himself up on his own?

19        A.    I guess.

20        Q.    He didn't go to a treatment facility, right?

21        A.    Not to my -- not to my knowledge.

22        Q.    You talked about prison and the fact that you got

23   into a fight with Carlton Jenkins, who you would certainly

24   agree is weaker than you, correct?

25        A.    He's a man.
```

```
 1        Q.    Is he smaller than you?

 2        A.    Not at that time, he wasn't.  We were the same size.

 3        Q.    I mean, we could see the picture of him.  You saw

 4   that offered into evidence, right?

 5        A.    I did.

 6        Q.    And you were working out a lot in the penitentiary,

 7   right?

 8        A.    Not a lot, but I was working out.

 9        Q.    You said that y'all live in tight quarters?

10        A.    Correct.

11        Q.    And that there's a lot of stress related to that,

12   right?

13        A.    Correct.

14        Q.    You know that the prison is still like that, right?

15        A.    In some units.  In transfer units, yes, they are.

16              MS. MOSELEY:  That's all I have, Judge.

17              MS. MULDER:  Nothing further, Your Honor.

18              THE COURT:  All right.  Ladies and gentlemen,

19   let's take a recess.  It's 20 after 2:00.  If you'll be back in

20   the jury room at 2:35, please.

21              THE BAILIFF:  All rise.

22              (Jury excused from courtroom.)

23              THE COURT:  Please be seated.

24              (Recess.)

25              THE BAILIFF:  All rise.
```

```
 1                    (Jury returned to courtroom.)

 2                    THE COURT:  Please be seated.

 3                    (Witness brought forward and sworn.)

 4                    THE WITNESS:  I do.

 5                    THE COURT:  Thank you.

 6                    MS. MULDER:  May it please the Court.

 7                    THE COURT:  Yes, ma'am.

 8                         DANNY MULLINS,

 9   was called as a witness by the Defendant, and after having been

10   first duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12   BY MS. MULDER:

13        Q.   Sir, would you state your name and -- and spell it

14   for the record, please.

15        A.   Sure, it's Danny Mullins, M-u-l-l-i-n-s.

16        Q.   Sir, what do you for a living?

17        A.   I work at Sanden International.  I'm production

18   control manager over facilities -- production -- production

19   facility in Wylie, Texas.

20        Q.   Have you ever testified before?

21        A.   No.

22        Q.   How long have you worked at Sanden?

23        A.   Since 1989.

24        Q.   Do you know Matthew Johnson?

25        A.   I do.
```

1      Q.   And how do you know him?

2      A.   Matthew was a worker on the line when I was

3 supervisor, from -- I think 2002 to about 2004, when I was a

4 supervisor on the line.

5           MS. MULDER:  May I approach the witness, Your

6 Honor?

7           THE COURT:  You may.

8      Q.   (BY MS. Mulder)  Mr. Mullins, I'm showing you what's

9 been marked as Defendant's Exhibit Number 19.  If you would,

10 those are records I had you review while you were waiting to

11 testify.

12     A.   Yes.

13     Q.   And what are these records of?

14     A.   These are the HR records for Matthew Johnson.

15     Q.   Would it refresh your recollection as far as when he

16 worked at Sanden to -- to take a look again?

17     A.   Yeah.  I looked at it fairly closely, as much as I

18 could.  Yeah, '97 to 2002 was his actual dates of working

19 there.

20     Q.   And does Defendant's Exhibit 19, these human

21 resources records, just reflect his employment history while

22 Matthew Johnson was at Sanden?

23     A.   Just in kind of a summary.  From the records that I

24 reviewed --

25     Q.   I'm not asking you for a summary right now.

```
 1        A.    Oh.

 2        Q.    I'm asking if -- if these records accurately reflect

 3   his --

 4        A.    Yes.  Yes, these are the actual HR records for

 5   Matthew, and they reflect his progress and -- and issues that

 6   he may have had while he was working there.

 7              MS. MULDER:  At this point, Your Honor, we'll

 8   offer Defendant's Exhibit 19.  I do have them flagged for my

 9   use, which I will be taking off and they won't go back to the

10   jury like that.

11              (Defendant's Exhibit 19 offered.)

12              MS. MOSELEY:  I have no objection.

13              THE COURT:  Admitted.

14              (Defendant's Exhibit 19 admitted.)

15        Q.    (BY MS. MULDER)  In 1997, when Matthew started, what

16   kind of job did he have?

17        A.    It was entry level assembler.  I think he was

18   considered an Assembler C.

19        Q.    This was his application and some prior work

20   experience?

21        A.    Yeah.  It looked like he was working some temp

22   service.

23        Q.    And Dairy Queen and --

24        A.    Uh-huh.

25        Q.    -- and I guess Food Lion?
```

1                   What does an assembler do?

2          A.    An assembler is responsible for basically -- there

3    are several tasks, but they're putting small components

4    together on an assembly line.  Just depending on what part of

5    the line it is would be what component, but a compressor has

6    probably over 100 components inside it, and we -- we assemble

7    them on the line at about 3 to 4,000 a day.

8          Q.    And are these for car manufacturers?

9          A.    Yes, it's an automotive air conditioner for car

10   manufacturers, yes.

11         Q.    And what companies do -- does Sanden make air

12   compressors for?

13         A.    Sanden makes air compressors for Honda, for

14   Volkswagon, for most of the heavy road truck equipment, freight

15   liner, Peterbilt, Caterpillar, off road, agricultural and

16   construction equipment, things like that.

17         Q.    And in Matthew Johnson's application, he had listed

18   whether or not he had ever been convicted of a felony, and he

19   said yes.  He said, me and my sister-in-law got into an

20   argument.  She put a false case on me.  I got probation for it,

21   five years?

22         A.    Yeah.

23         Q.    And y'all hired him despite that?

24         A.    That's correct.

25         Q.    How did Mr. Johnson do at work?

1      A.    Yeah, that's what I was saying earlier.  From --

2   from all of the records that I saw, he was hired in '97.  It

3   looked like basically every year he had gotten some raise, a

4   couple of promotions, fairly common.  I mean, someone that's

5   doing a good job and fulfilling what we ask of them, with --

6   willing to learn, and he -- he was able to do all of those.

7   He -- he moved up to a Operator A and then a Repair Person A,

8   which is, I guess, one step below a -- like a lead person.  He

9   was responsible for doing all the line repairs.  If something

10  falls or -- or fails in through the line, we have a repair loop

11  and so they have to have knowledge of pretty much the whole

12  compressor to be able to do that.

13      Q.    And he worked his way up to that position?

14      A.    He did.

15      Q.    And the repairman is -- if one of those compressors

16  doesn't end up working right, then it goes to him?

17      A.    Yes.  It goes to a repair loop, and then they'll

18  analyze it.  They have equipment to tell if it's leaking, where

19  at, and if it needs to be torn down or it can be repaired,

20  so --

21      Q.    And that's what Matthew Johnson had worked his way

22  up to?

23      A.    That's correct.

24      Q.    Did you have much contact with him?

25      A.    Not directly.  I mean, most of my contact had been

 1   as a supervisor with the corrective actions that -- I think --

 2   from looking at it, I think I had three on there that I

 3   performed from March through July.

 4        Q.    What were your corrective actions that you had to

 5   perform on Mr. Johnson?

 6        A.    Attendance.  They were all attendance related.

 7   Matthew's biggest problem -- the only problem I saw from the

 8   records that I -- I reviewed were his attendance and repeated

 9   attendance problems.

10        Q.    He was actually demoted for attendance problems?

11        A.    Yes.  Was -- I think demoted maybe in March, and

12   then given a final warning was maybe May or June.  And then

13   final departure was July.

14        Q.    So he was fired in July of '02?

15        A.    Yes.

16        Q.    And so it would be, I guess, March of '02 --

17        A.    Uh-huh.

18        Q.    -- where his attendance problems have caused a need

19   to return him to Assembler A?

20        A.    Right.  That was the demotion, uh-huh.

21        Q.    But up until that point, he had, in the years prior,

22   gotten good reviews?

23        A.    Yeah, I mean, all the reviews that I looked at were

24   well above average, but they all seemed to have attendance

25   problems on them.

1        Q.    Competent skill knowledge, does more than expected,

2    careful, accurate, no problems in work, generally observes

3    safety rules, just your typical --

4        A.    Uh-huh.

5        Q.    -- he was doing a good job and he was able to work

6    his way up?

7        A.    Right.

8        Q.    Until these attendance problems ultimately resulted

9    in him getting fired?

10       A.    Yes, exactly.

11       Q.    And he had some disciplinary action as a result of

12   that.  What were -- what was that disciplinary action?

13       A.    I saw one of them.  He'd had a -- a three-day

14   suspension with no pay earlier.  I'm not sure what time that

15   was.  It was another supervisor before me that had done that.

16       Q.    Did you ever have any problems with Matthew Johnson

17   being aggressive in any way at work?

18       A.    No, not to my knowledge at all.

19       Q.    Did Matthew Johnson ever steal from Sanden, to your

20   knowledge?

21       A.    No.

22       Q.    Did he ever cause problem with -- problems with

23   co-workers?

24       A.    Not -- not to my knowledge, no.

25       Q.    So these are just some of his reviews.  He got a

1    good review.  Here's one from '98, great job.

2                   When was the last time you saw Matthew Johnson?

3         A.    It must have been when I let him -- the day that I

4    released him.

5         Q.    So I mean, part of your job as a supervisor was to

6    fire people?

7         A.    Yes, it is.

8         Q.    Did you ever have people who got upset at being

9    fired?

10        A.    Yeah.  I mean, I've -- I've known of people that

11   have gotten very upset.  I haven't personally had that issue,

12   but through the years, yes, I've known of a few that have had

13   some pretty -- screaming matches, throwing -- one threw a lock

14   at a window or something, I think, but --

15        Q.    Whenever you had talks with Matthew Johnson about

16   his attendance or ultimately when you fired him, what was his

17   demeanor like?

18        A.    I think from -- from my memory -- I mean, that was a

19   long time ago, but from my memory, he was understanding.  He

20   knew that he had an attendance problem and -- and didn't really

21   have any -- I mean, we had given him a warning just probably a

22   month or so before, so I think he knew it was coming.  And, you

23   know, it was -- kind of my hands were tied.  I was following

24   company policy.  It wasn't anything personal.  It was -- it was

25   the attendance that was an issue, and I think that was -- it

1  was accepted and that was pretty much it.  I don't recall

2  anything outstanding on it.

3       Q.   So he never gave you any problems, verbally or

4  otherwise?

5       A.   No.

6       Q.   You never had any complaints about him from any of

7  the women that worked at Sanden?

8       A.   No, I -- I don't recall any.  I don't remember that

9  at all.

10       Q.   Certainly would be in his --

11       A.   It would be in his HR records if it was -- if it

12  was, you know, brought up.

13       Q.   If there had been any complaints about him, it would

14  be in those records that you looked at today?

15       A.   Yes.

16       Q.   Was there anything in those records today?

17       A.   Not that I saw.  I didn't see anything that

18  indicated anything like that.

19       Q.   And just briefly, how big a company is Sanden?

20       A.   Sanden is -- we have right now, I think, about 650

21  employees.  I think at that time we may have had actually more.

22  I was a supervisor over probably close to a hundred -- hundred

23  employees at that time.

24       Q.   When did you learn about this offense and that

25  Matthew Johnson had been arrested and charged with it?

1      A.    Honestly, I didn't realize -- I think I probably

2   heard of the incident and -- and -- when it had happened

3   through the news, but didn't realize it was Matthew until the

4   prosecutor in the DA's office came and interviewed me.

5      Q.    And when they told you it was Matthew Johnson, what

6   did you think?

7              MS. MOSELEY:  Objection, relevance.

8              THE COURT:  Sustained.

9      Q.    (BY MS. MULDER)  And you understand what the

10  allegations are in this case?

11     A.    Yes, I do.  I do.

12     Q.    Does that seem out of character for Matthew Johnson

13  that you knew?

14     A.    Yes.  From what I knew, yeah, I wouldn't have

15  suspected that.

16     Q.    Anytime you spoke with Matthew Johnson at work, was

17  he high or on drugs that you knew?

18     A.    No, not to my knowledge.

19     Q.    If he had seemed high or on drugs, would you have

20  taken action?

21     A.    Yeah.  Company policy is that if we suspect or have

22  reason to believe that someone is under the influence, that we

23  send them out for a drug test.

24              MS. MULDER:  Pass the witness.

25              MS. MOSELEY:  Just briefly, Judge.

147

```
 1                          CROSS-EXAMINATION

 2   BY MS. MOSELEY:

 3       Q.    Mr. Mullins, basically I think what -- what I

 4   understand is that he was a good employee when he came to work?

 5       A.    Yes.

 6       Q.    But there were too many times where he just decided

 7   he wasn't coming?

 8       A.    He had a repeat offense of not coming to work, yes.

 9       Q.    And is that calling in sick and not coming or just

10   not showing up or either?

11       A.    I would say for the most part, it's calling in sick

12   because not showing up and not calling is usually a more severe

13   punishment and usually can be terminated at that point.

14       Q.    So fair to say that Sanden worked with him,

15   counseled him, gave him opportunities to correct the problem

16   before firing him?

17       A.    Yeah, I think I counted eight different corrective

18   actions for attendance on there, roughly.

19       Q.    Eight times he had been counseled about attendance

20   issues, and ultimately that's what got him fired?

21       A.    That's true.

22       Q.    This is a good job he had with benefits, I assume --

23   with insurance?

24       A.    Yes, uh-huh.  Yes.

25       Q.    A regular steady paycheck?
```

```
 1        A.    Forty hours a week, plus overtime, fairly
 2   frequently, yeah.
 3        Q.    And the opportunity to move up and advance?
 4        A.    Yeah, definitely is a good growth potential.
 5              MS. MOSELEY:  Thank you.  That's all I have,
 6   Judge.
 7              MS. MULDER:  Nothing further.
 8              THE COURT:  Thank you, sir.  You may stand down,
 9   and you are excused.
10              THE WITNESS:  All right.  Thank you.
11              (Witness brought forward.)
12              THE COURT:  Let the record reflect this witness
13   has been sworn.
14              MS. MULDER:  May it please the Court.
15              THE COURT:  Yes, ma'am.
16                    BRENDA TAYLOR,
17   was called as a witness by the Defendant, and after having been
18   first duly sworn, testified as follows:
19                    DIRECT EXAMINATION
20   BY MS. MULDER:
21        Q.    Would you state your name and spell your last for
22   the record?
23        A.    Brenda Taylor, T-a-y-l-o-r.
24        Q.    Ms. Taylor, are you married?
25        A.    Yes.  Yes, ma'am.
```

```
 1        Q.    And what's your husband's name?

 2        A.    Charles Taylor.

 3        Q.    Now, I want to draw your attention back to many

 4   years ago, from 1997 to 2002.  Did you ever work at a company

 5   called Sanden?

 6        A.    Yes, ma'am.

 7        Q.    When did you work for Sanden?

 8        A.    It's been awhile.  It's been about 16 years, but I

 9   think I left like in '99, 2000, 2001, something like that.

10        Q.    Okay.  While you worked there, did you know a man

11   named Matthew Johnson?

12        A.    Yes, ma'am.

13        Q.    Do you see him in court here today?

14        A.    Yes, ma'am.

15        Q.    Can you point him out and describe what he's

16   wearing?

17        A.    Right there.

18              MS. MULDER:  Let the record reflect this witness

19   has identified the Defendant.

20              THE COURT:  The record will reflect.

21        Q.    (BY MS. MULDER)  How was it that you came to know

22   Matthew at Sanden?

23        A.    He was a coworker of mine.  We worked on the same

24   line together.

25        Q.    And what does that mean you worked on the same line?
```

```
 1        A.    Like, we had the ESM line and the TR line, and I
 2   worked with him on two lines.
 3        Q.    Side by side?
 4        A.    From like me to you maybe --
 5        Q.    Okay.
 6        A.    -- uh-huh.
 7        Q.    Did you talk to him every day?
 8        A.    He spoke to me every morning, good morning, how are
 9   you, very polite.
10        Q.    During the time that you worked there, did you all
11   become work friends?
12        A.    Coworkers, yes, ma'am.
13        Q.    What was Matthew's personality like while he was at
14   work?
15        A.    He was very friendly.  Someone that just wanted to
16   get a paycheck basically like the rest of us.
17        Q.    How would you describe him if -- to the jury during
18   that time?
19        A.    Very friendly, outgoing guy.  He basically spoke to
20   everybody, good morning, how are you, have a good weekend, you
21   know, things like that.
22        Q.    Would you ever talk about anything other than hello,
23   how are you?
24        A.    Maybe football.
25        Q.    Talk about the Cowboys?
```

```
 1        A.    Yeah, so-so.

 2        Q.    How about his kids?

 3        A.    When I left Sanden, he was having his first child,

 4   and I didn't get to see her because I was already gone.

 5   Uh-huh.

 6        Q.    Did he seem excited about that?

 7        A.    Yes.

 8        Q.    Proud?

 9        A.    Yes.

10        Q.    Did you -- did Matthew Johnson ever behave

11   aggressively toward you?

12        A.    No, ma'am.

13        Q.    Did you ever see him behave aggressively to any of

14   your coworkers?

15        A.    Not at Sanden, no, ma'am.

16        Q.    Did he ever ask to borrow money from you?

17        A.    No, ma'am.

18        Q.    Did he ever seem like he was trying to sponge off of

19   people?

20        A.    Not that I saw.

21        Q.    Did he ever behave inappropriately with you as a

22   female?

23        A.    No.

24        Q.    Never made any suggestive comments or anything like

25   that?
```

152

```
 1        A.    No, ma'am.

 2        Q.    Was always respectful?

 3        A.    Yes, ma'am.

 4        Q.    When was the last time you saw Matthew Johnson?

 5        A.    Probably when he was -- like I said, having his

 6  first child.  I seen him every now and then at Wal-Mart, but I

 7  never, you know, saw his child.  I just knew that he was having

 8  one.

 9        Q.    I'm sorry, you said that you saw him at Wal-Mart?

10        A.    Every now and then I would see him, hey, what's up,

11  you know, I would see him at the store.

12        Q.    And you worked side-by-side with him for at least

13  two years, '97 to '99?

14        A.    Probably the whole time he was there, because we all

15  did work third shift at one time, and we were all part of that

16  group, too.

17        Q.    Okay.  What was the third shift?

18        A.    11:00 to 7:00.

19        Q.    11:00 p.m.?

20        A.    Uh-huh, to 7:00 a.m.

21        Q.    That was the night shift?

22        A.    Yes, ma'am.

23        Q.    How many of y'all together would you say worked the

24  night shift back in 1998, '97?

25        A.    Maybe 30 on that line, maybe.
```

```
 1          Q.    Did everybody know each other?

 2          A.    Well, we all came from different shifts, but there's

 3    three shifts out there.  I guess most of us volunteered to do

 4    it.

 5          Q.    Well, how many of you worked that particular shift?

 6          A.    On that line?

 7          Q.    Uh-huh.

 8          A.    Probably about 30, uh-huh.

 9          Q.    You know why Matthew Johnson is here today.  You

10    know what the allegations are?

11          A.    Yes, ma'am.

12          Q.    How did you find out about it?

13          A.    Just on television.

14          Q.    What ran through your mind when you heard the name

15    Matthew Johnson?

16          A.    I -- I couldn't believe it.

17          Q.    Why couldn't you believe it?

18          A.    Because I just couldn't believe the person I knew

19    that -- would do something like that.

20          Q.    That's not the Matthew Johnson that you knew?

21          A.    No.

22                MS. MULDER:  I'll pass the witness.

23                        CROSS-EXAMINATION

24    BY MS. MOSELEY:

25          Q.    The Matthew Johnson that you knew, you didn't know
```

154

```
 1  him to use drugs?
 2       A.   No, ma'am.
 3       Q.   He never told you he used crack?
 4       A.   No, ma'am.
 5       Q.   He never told you that he was suffering from
 6  depression?
 7       A.   No, ma'am.
 8       Q.   He didn't seem like a depressed person, did he?
 9       A.   No, ma'am.
10       Q.   He was outgoing and friendly?
11       A.   Yes, ma'am.
12       Q.   Really nothing out of the ordinary about him at all?
13       A.   No, ma'am.
14       Q.   You didn't socialize with him outside of the office?
15       A.   No, ma'am.
16       Q.   You would also be surprised to know he beat his
17  wife?
18       A.   I wouldn't have known that either, no, ma'am.
19       Q.   That would surprise you?
20       A.   Yes, ma'am.
21            MS. MOSELEY:  Thank you.  That's all I have.
22                      REDIRECT EXAMINATION
23  BY MS. MULDER:
24       Q.   Mrs. Taylor, did the third shift pay more because it
25  was the night shift?
```

```
 1        A.    Yes, ma'am.

 2        Q.    And did you volunteer for that shift because of

 3   that?

 4        A.    No, I was on -- doing different things, and they

 5   asked me to do it because it was something I was doing on a

 6   different line.

 7        Q.    Did you know if Matthew Johnson volunteered for that

 8   shift because it paid more?

 9        A.    That, I don't know.

10              MS. MULDER:  Nothing further, Your Honor.

11              MS. MOSELEY:  I have no further questions.

12              THE COURT:  Thank you, ma'am.  You may stand

13   down.

14              Call your next witness.

15              MS. MULDER:  I call Charles Taylor.

16              May this witness be finally excused?

17              THE COURT:  She may.

18              Let the record reflect this witness has also

19   been sworn.

20              (Witness brought forward, previously sworn.)

21              MS. MULDER:  May it please the Court.

22              THE COURT:  Yes, ma'am.

23                    CHARLES TAYLOR,

24   was called as a witness by the Defendant, and after having been

25   first duly sworn, testified as follows:
```

<pre>
  1                         DIRECT EXAMINATION

  2   BY MS. MULDER:

  3        Q.    Would you state your name and spell your last name

  4   for the record, please?

  5        A.    Charles Taylor, T-a-y-l-o-r.

  6        Q.    Mr. Taylor, how old a man are you?

  7        A.    I'm 42 years old.

  8        Q.    And you're married to Brenda Taylor?

  9        A.    Yes.

 10        Q.    Back in the -- well, let me ask you this.  Who do

 11   you work for?

 12        A.    Sanden International.

 13        Q.    How long have you worked for Sanden?

 14        A.    Twenty-one years.

 15        Q.    Now, I want to draw your attention back to 1997 to

 16   2002.  Did you know a man that worked there named Matthew

 17   Johnson?

 18        A.    Yes.

 19        Q.    Do you see him in the courtroom here today?

 20        A.    Yes.

 21        Q.    Is he the man sitting to my right?

 22        A.    Yes.

 23        Q.    Wearing what color coat?

 24        A.    It looks black.

 25               MS. MULDER:  Let the record reflect this witness
</pre>

1    has identified Matthew Johnson in open court.

2             THE COURT:  The record will reflect.

3        Q.   (BY MS. MULDER)  How did you get to know Matthew

4    Johnson?

5        A.   We worked on the same assembly line.

6        Q.   The same one with Brenda?

7        A.   Yes.

8        Q.   What was Matthew Johnson like?

9        A.   He was a good worker, friendly.

10       Q.   Personable?

11       A.   Excuse me?

12       Q.   Was -- did he talk to people?

13       A.   Yes.

14       Q.   How long did you work on the line with him?

15       A.   I don't remember.

16       Q.   Let me ask you this.  Did you ever see Matthew

17   Johnson behave aggressively toward you or anyone else?

18       A.   No.

19       Q.   Did Matthew Johnson ever ask to borrow money from

20   you?

21       A.   No.

22       Q.   Did he ever -- did you ever see him asking to borrow

23   money or sponging off of people at work?

24       A.   No.

25       Q.   Did you ever see him behaving inappropriately with

```
 1   the women at work?

 2        A.   No.

 3        Q.   And when was the last time you saw Matthew Johnson?

 4        A.   I can't remember.

 5        Q.   It's been awhile?

 6        A.   It's been awhile.

 7        Q.   And when Matthew Johnson was at work, he was a good

 8   worker?

 9        A.   Yes, real good worker.

10        Q.   No problems?

11        A.   No.

12        Q.   Did he seem like a regular guy?

13        A.   Yes.

14        Q.   And you know why we're here now?

15        A.   Yes.

16        Q.   And you know the facts of the case?

17        A.   Yes.

18        Q.   How did you find out about that -- this case?

19        A.   It was on the news when it first happened.

20        Q.   When they said the name Matthew Johnson, what did

21   you think?

22             MS. MOSELEY:  I'm going to object again, Your

23   Honor.  I'm sorry, this just isn't relevant.

24             THE COURT:  Sustained.

25        Q.   (BY MS. MULDER)  The Matthew Johnson you knew, would
```

```
 1  it be fair to say that committing an offense like capital

 2  murder would be totally out of character?

 3       A.   Right.  Correct.

 4            MS. MULDER:  I'll pass the witness, Your Honor.

 5                      CROSS-EXAMINATION

 6  BY MS. MOSELEY:

 7       Q.   Would you think, sir -- is it Mr. Taylor?

 8       A.   Yes, ma'am.

 9       Q.   Would you think it would be entirely out of his

10  character to have been arrested some 25 or 26 times in his

11  life?

12       A.   I can't answer that.

13       Q.   Would that surprise you?

14       A.   Yeah, it would surprise me.

15       Q.   Would it surprise you that he physically assaulted

16  his wife?

17       A.   Yes.

18       Q.   Okay.  Thank you.

19            MS. MOSELEY:  Nothing further.

20            MS. MULDER:  Nothing further.

21            THE COURT:  Thank you, sir.  You may stand down,

22  and you are excused.

23            MS. MULDER:  May this witness be excused?

24            Oh, I'm sorry, Judge, excuse me.

25            Defense calls Dorothy Guinn.
```

```
 1                        (Witness brought forward.)

 2                   MS. MULDER:  Go ahead and have a seat.

 3                   That's the Judge.  She's going to swear you in.

 4                   (Witness brought forward and sworn.)

 5                   THE WITNESS:  I do.

 6                   THE COURT:  You're going to need to keep your

 7     voice up for me, please.

 8                   THE WITNESS:  Okay, I'm sorry.

 9                        DOROTHY GUINN,

10     was called as a witness by the Defendant, and after having been

11     first duly sworn, testified as follows:

12                      DIRECT EXAMINATION

13     BY MS. MULDER:

14        Q.   Ms. Guinn, you can pull that microphone closer to

15     you.  You're a soft spoken lady.

16                   Would you please introduce yourself to the jury

17     and spell your last name for the court reporter.

18        A.   Dorothy Guinn, G, like in girl, u-i-n-n.

19        Q.   Ms. Guinn, what do you do for a living?

20        A.   I work for Sanden International.

21        Q.   And how long have you worked for Sanden?

22        A.   Almost 17 years.

23        Q.   I want to draw your attention back to the years 1997

24     to 2002.  Did you know a man that worked there named Matthew

25     Johnson?
```

1      A.    Yes, ma'am.

2      Q.    Do you see Matthew Johnson in court today?

3      A.    Yes, ma'am.

4      Q.    Could you please identify him for us?  Just describe

5  what he's wearing.

6      A.    Right next to you in the black suit.

7            MS. MULDER:  Let the record reflect this witness

8  has identified the Defendant in open court.

9            THE COURT:  The record will reflect.

10     Q.    (BY MS. MULDER)  How -- how did you first meet

11  Matthew Johnson at Sanden?

12     A.    We actually worked together on the line.

13     Q.    Did you work the -- the night shift, the 11:00 p.m.

14  to 7:00?

15     A.    That's correct.

16     Q.    How closely did y'all work together?

17     A.    We worked closely together.  We were both indirects,

18  meaning we didn't work directly on the line.

19            COURT REPORTER:  We were both what?

20     A.    Indirects, meaning we didn't work directly on the

21  line.  We -- we assisted.

22     Q.    (BY MS. MULDER)  Was that when he had the title of

23  repairman?

24     A.    Yes.  Yes, ma'am.

25     Q.    Okay.  And what was -- what was your duty, I guess,

1  to float around?

2      A.   Relief person.  That was -- that was the duties,

3  yes.

4      Q.   Did you get to know Matthew Johnson?

5      A.   I did.

6      Q.   If you would, describe for the jury what kind of

7  personality he has.

8      A.   Usually quiet, but friendly, good guy, nice to get

9  to know, never had any problems.

10     Q.   Did you ever have occasion to spend time talking

11 with him?

12     A.   Sometimes we would -- the indirects would run the

13 line through break, and then we would go to break when everyone

14 came back.  And Matthew and I had a few visits.  And then

15 sometimes I would go help him in his area and we were able to

16 chat, talk.

17     Q.   What kinds of things would you guys talk about?

18     A.   Family, life.  We -- our shifts started on Sunday

19 night, so he often asked did I go to church that Sunday

20 morning.  Yes, I did.  A couple of times he asked about my

21 husband, did he -- did he make sure everybody got to church,

22 just things going on.  We both had kids.  Mine were a bit

23 older, but we both had kids, but he loved to talk about his

24 daughter.

25     Q.   He was a proud daddy?

163

1    A.    Yes.

2    Q.    And that was his daughter Makayi?

3    A.    Yes.  I only knew about the one.  I understand there

4  are two more now, but just the one.

5    Q.    How long -- how much a period of time would you say

6  that you worked with him and -- and would take breaks with him

7  and -- and visit with him?

8    A.    I'm horrible with numbers.  I would -- a matter of

9  months, not a year.  I don't think he worked with us a year,

10  but for a long time I really got to know him and enjoyed his

11  company and considered him a friend.

12    Q.    Did Matthew ever behave aggressively with you or

13  with anyone else that you saw?

14    A.    No, ma'am, never.

15    Q.    Did he ever ask to borrow money from you?

16    A.    No.

17    Q.    Did he ever ask to borrow money from any coworkers

18  that you saw?

19    A.    Not that I was aware of.

20    Q.    Did he ever behave inappropriately with you as far

21  as like a man to a woman?

22    A.    No.

23    Q.    Was he always respectful to you?

24    A.    Yes.

25    Q.    Did he ever make inappropriate comments to you?

1      A.    No.

2      Q.    And you were -- you were still working at Sanden --

3  obviously, you were, but you were still part of the line and

4  part of the shift you worked when he was ultimately fired?

5      A.    Yes.

6      Q.    Can you describe for the jury -- did you notice a

7  change in Matthew over those last few months?

8      A.    At the end, the attendance was slipping which was

9  ultimately the reason that Danny had to let him go.

10     Q.    Uh-huh.

11     A.    Attitude, maybe.  It's hard to -- to stay positive,

12  I guess, when, you know, you're on the edge, losing your job,

13  maybe, but not personally, nothing.  Not aggressive, just -- I

14  could see -- I could see it was slipping at work, that he

15  didn't seem to be bothered as much by Sanden.

16     Q.    How do you mean he wasn't bothered as much by

17  Sanden?

18     A.    Not showing up was the biggest thing.  He had a

19  very -- he was in a role that you need to know someone who

20  would be there every day and you could count on that.  And it

21  seemed not as important that he be there.

22     Q.    Did he withdraw at all?

23     A.    Some, maybe -- still -- still friendly on a personal

24  level, but at work, maybe, yeah, some.

25     Q.    During the talks you had with him when -- when

 1  things were better, before he was let go, did y'all ever talk

 2  about religion?

 3      A.    Some.  He knew I went to church.  It would come up

 4  some.  It wasn't -- we didn't sit down with our Bible every day

 5  and discuss it, but it would come up some.

 6      Q.    You would talk about, what?

 7      A.    God, how he forgives, how he can make things better,

 8  faith.

 9      Q.    And actually after you knew that Matthew was going

10  to be fired or -- or was in line to be fired, did you ever do

11  anything to try and help him?

12      A.    Well, Danny did discuss it with -- Charles was our

13  line leader.  I was the relief, and he said, you know, he's

14  been warned.  He's still -- it's not getting better.  We're

15  probably going to -- I did ask him was there any way, one more

16  chance, he's a good -- a great worker when he was there and he

17  was a friend so I hated to see him lose his job, but we had

18  rules, and so it had to be done.

19      Q.    And you went to bat for him?

20      A.    I tried.

21      Q.    And you know why we're here today?

22      A.    Yes, ma'am.

23      Q.    And you understand the nature of the charges against

24  him and what he's been convicted of?

25      A.    Yes, ma'am.

```
 1        Q.    How did you find out about the case?

 2        A.    At work.  Originally I tried to stay away from it,

 3   and I didn't -- actually I thought you guys had the wrong man

 4   in the beginning.

 5        Q.    Why is that?

 6        A.    Because that's just not Matthew.  I just couldn't

 7   imagine him doing that.

 8        Q.    So the man that you knew --

 9        A.    Could never have even planned that.

10        Q.    Wouldn't have done that?

11        A.    No, ma'am.

12        Q.    Now, you and I spoke about Matthew's history, his

13   criminal history specifically.  You have to answer out loud.

14        A.    Yes.  Sorry.

15        Q.    Was -- and you didn't know any of that --

16        A.    No, ma'am.

17        Q.    -- prior to, did you?

18        A.    No.

19        Q.    Does any of that change your opinion about the

20   Matthew that you knew and was your friend?

21        A.    No, not at all.

22        Q.    When was the last time you saw Matthew?

23        A.    When he was dismissed from Sanden.

24              MS. MULDER:  I'll pass the witness.

25                        CROSS-EXAMINATION
```

167

```
 1   BY MS. MOSELEY:
 2        Q.    The Matthew Johnson you knew, I assume you would be
 3   surprised to -- to learn that he was also the kind of guy who
 4   would pull a tiny woman out of a pickup truck and steal it from
 5   her?
 6        A.    Yes, ma'am, I would.
 7        Q.    And you'd be surprised that he was the kind of guy
 8   that would physically beat his wife?
 9        A.    Yes, ma'am, I would.
10        Q.    Those would be two different people in your mind?
11        A.    That's just not the Matthew that I knew.
12        Q.    And you saw him from 11:00 p.m. to 7:00 a.m., five
13   days a week?
14        A.    Correct.  Five to six.
15        Q.    Did you ever socialize with him outside?
16        A.    No, ma'am.
17        Q.    And you never saw him after he left?
18        A.    No, ma'am.
19        Q.    Did he seem like he was seriously depressed?
20        A.    No, ma'am, not -- not in the beginning.  I think at
21   the end when he thought he was going to lose his job, things
22   were changing, but, no, not -- not early on.
23        Q.    Did he ever talk to you about why he was missing
24   work, why he had attendance problems?
25        A.    No, ma'am.
```

```
 1        Q.    So he'd just come back and not really have any
 2   excuse for it?
 3        A.    That would have been handled with our supervisor.
 4        Q.    But the two of you didn't talk about it?
 5        A.    No, ma'am.  Occasionally the daughter was sick, but
 6   on -- for the most part, no.
 7        Q.    You never saw him high or on drugs?
 8        A.    No, ma'am.
 9        Q.    Would that surprise you if he was using drugs?
10        A.    Yes, it would have.
11             MS. MOSELEY:  Thank you, ma'am.  That's all I
12   have, Judge.
13             THE COURT:  Thank you, ma'am.  You may stand
14   down, and you are excused.
15             MS. MULDER:  The Defense calls Monica Cajas.
16             (Witness brought forward.)
17             THE COURT:  Ma'am, would you please raise your
18   right hand?
19             You can return to your seat, Ms. Mulder.
20             MS. MULDER:  Yes, ma'am.
21             (Witness sworn.)
22             THE WITNESS:  Yes, ma'am.
23                    MONICA CAJAS,
24   was called as a witness by the Defendant, and after having been
25   first duly sworn, testified as follows:
```

<u>DIRECT EXAMINATION</u>

BY MS. MULDER:

Q.    Ms. Cajas, you can make yourself comfortable in that chair if you want to.

A.    Thank you.

Q.    Would you please introduce yourself to the jury and spell your last name for the court reporter.

A.    Monica Cajas, C-a-j-a-s.

Q.    Okay.  And you can back up a little bit off the microphone.  It's working really good now.

A.    Okay.

Q.    Ms. Cajas, you live in Garland?

A.    No, ma'am, I live in Rowlett.

Q.    What do you do for a living?

A.    I'm a real estate agent, and I do some contract work for some offices, too.

Q.    How long have you been a real estate agent?

A.    Ten years.

Q.    I want to draw your attention to the house on a street called -- do you know Matthew Johnson?

A.    Yes, ma'am, I do.

Q.    Do you see him in the courtroom?

A.    Yes, ma'am, I see him.

Q.    Can could you please point him out and describe what he's wearing?

```
 1        A.    He's wearing a suit and a tie, and -- and sitting

 2   right there next to you.

 3              MS. MULDER:  Let the record reflect this witness

 4   has identified the Defendant in open court.

 5              THE COURT:  The record will reflect.

 6        Q.    (BY MS. MULDER)  How do you know Matthew Johnson?

 7        A.    I managed several properties for rent and the

 8   property was vacated and we were working on it.  If I recall,

 9   my brother was working on that house, and he let me know that

10   Matthew was asking for the rental property, asking for the

11   price and asking when it was available.

12        Q.    And this was a house on what street?

13        A.    925 Waikiki.

14        Q.    About what year was this, if you recall?

15        A.    I think it was either 2009 or 2010.  I don't recall

16   exactly.  I manage several properties.

17        Q.    But roughly 2009, 2010?

18        A.    Yes, ma'am.

19        Q.    And did Matthew Johnson get in touch with you --

20        A.    Yes.

21        Q.    -- to rent the house?

22        A.    Yes, ma'am.

23        Q.    When did you first meet him?

24        A.    After we talk on the phone and I -- I asked him to

25   please go to my office, which was pretty close to the house, to
```

1  explain to him, you know, what is needed and to fill out an

2  application.

3        Q.    Now, the house on Waikiki, who owned that house?

4        A.    It's -- it belongs to one of my uncles.  I manage

5  his property.

6        Q.    And is that actually a house that you drove past

7  every day during that time?

8        A.    That is -- that -- Waikiki hits Rose Meadow which is

9  the same street where my office is located, so that was my way

10  to go back and forth to my house every day.

11       Q.    Fair to say that you and -- and Matthew Johnson

12  became friends?

13       A.    Yeah, because, you know, sometimes when you are

14  renting properties, there are issues that arise with the

15  properties.  Sometimes things get broken.  And because this

16  belongs to one of my relatives, I always was checking to -- you

17  know, how it was kept up.

18       Q.    Did Matthew and his family move into that house?

19       A.    Yes, ma'am, they did.

20       Q.    Did Matthew Johnson pay his rent?

21       A.    Yes, ma'am, he did.

22       Q.    Did he ever pay it late?

23       A.    Just on one occasion.  He advised -- he called me

24  and let me know that he would be a little bit behind, probably

25  one or two days.  I told him that it was okay.  He met me to

```
 1  make the payment the day that he promised to make the payment.

 2  I got a call.  Don't recall exactly what day.  He wanted to let

 3  me know that he had lost his job and that he was not going to

 4  be able to pay December's rent.

 5       Q.    And this is -- he called you in November of 2011?

 6       A.    I don't recall exactly what day, but it was before

 7  the rent was due.

 8       Q.    For December 2011?

 9       A.    For December.

10       Q.    Now, at this point had you gotten to know his wife,

11  Daphne, and the girls?

12       A.    Yes, ma'am, I did.

13       Q.    Let me ask you this.  Whenever you had dealings with

14  Matthew Johnson, what was his personality like at that time?

15       A.    Very gentle, very soft spoken, respectful, very

16  nice.  He was always nice with me, always very -- very

17  respectful.

18       Q.    And since you drove past the house every day, how

19  did it look from the outside?

20       A.    From the outside, it looks pretty good.  I remember

21  seeing him once in a while working on the yard, keeping it up

22  and watering the front yard.

23       Q.    Took care of it?

24       A.    Took care of it, yes, ma'am.

25       Q.    And was there once a problem with the air
```

173

 1   conditioner unit?

 2        A.   Yes, ma'am.

 3        Q.   And tell the jury about that, if you would.

 4        A.   The unit is pretty old.  It's an old house, and

 5   the -- the unit broke down.  He called me.  I normally have a

 6   handyman that I always use, but he was not available, so I sent

 7   someone else.  The person came with a really high quote on the

 8   repair.  I asked -- I called Matthew and I say to please give

 9   me a few days.  I know -- I knew it was hot, but I needed to --

10   to find a means to fix the air conditioner because it was

11   really high.  He asked me to allow his brother to go to the

12   house because he had work in air conditioning.  And a few hours

13   later, he called me back -- I guess when his brother was out of

14   work, to let me know that there was not a real problem with the

15   air conditioner.  It was only a battery and the thermostat.  I

16   asked if I owed something to his brother, and he said, no, that

17   it was nothing.

18        Q.   When he called and told you he couldn't pay the rent

19   in December of 2011, what did he tell you about his -- his job?

20        A.   He told me that he had lost his job, that he was not

21   able to make the December payment, that to please give him a

22   few days to find another place where he can move with his

23   family.  By then, I knew him and his wife and the kids.  I

24   called my uncle and told him the situation.  Since we have his

25   deposit, the owner told me to let him stay until the end of

1  December.

2      Q.    Because of Christmas?

3      A.    Because it was Christmas, and we didn't want to have

4  the kids outside on the streets in those days.

5      Q.    Fair to say that you -- you liked him and his girls

6  and his wife?

7      A.    Yes, I did.  I do.

8      Q.    And you know now that he was actually fired from

9  that job in November of 2011 for stealing from his boss?

10      A.    I found out that just recently.

11      Q.    When the DA came to talk to you?

12      A.    Yes, ma'am.

13      Q.    What else did you do to help them out?  Now, you

14  didn't let them stay because Matthew Johnson asked you.  You --

15  you did that because you're a really nice lady?

16      A.    Matthew did not ask me to let him stay in the house.

17  Since the owner is my uncle, I -- I have a conversation with my

18  uncle to -- to kind of let him know that we didn't -- I mean,

19  we were not losing the money because we have the deposit, and I

20  also talked to Matthew and his wife, to ask them to let me show

21  the property in the meantime, so it will be in transition.

22      Q.    Did you notice a change in his demeanor at that

23  time?

24      A.    He become sadder.  He was just very sad.

25      Q.    How could you tell that he was sad?

```
 1         A.    From the moment I rent the house until he lost his
 2   job, he was always very -- he always have a smile on his face.
 3   And after that, you could see that he had a -- he was -- he was
 4   sad.  He was gloomy.  You can tell that right away.
 5         Q.    Did you ever know that at that time and throughout
 6   his adult life that Matthew had a problem with drug addiction?
 7         A.    No, ma'am.
 8         Q.    You never saw him high or drunk?
 9         A.    No, ma'am.
10         Q.    And at that time you didn't know that he had been
11   fired, so what did you do to try and help him?
12         A.    For all the time that he was renting the property,
13   he seemed to be a very good tenant, always paid on time,
14   keeping up the house.  I happened to be twice inside the
15   property when something broke, and I was surprised how clean
16   the house was.  My background is human resources before it was
17   a realtor.  I was human resources.  And I mean, this is not
18   something that I didn't -- every time I know somebody is
19   missing a job, I normally contact my friends to see if there is
20   anything out there for somebody in need.  So I called a few
21   people and asked them -- to see if anybody has a job for my
22   tenant.
23         Q.    And that's how he got the referral to XLC?
24         A.    I think that's the name of the company, yes, ma'am.
25         Q.    Did you ever have the opportunity to see Matthew
```

1  with his daughters?

2      A.   Yeah, a few times, when I went to the house to --

3  for repairs.  My handyman does not speak English very well, so

4  I have to be there to translate.

5      Q.   What kind of dad was he?

6      A.   Very warm.  Every time I went there, he was holding

7  his little one.  The kids seemed to be pretty happy and well

8  taken care of.

9      Q.   Do you recall telling me about a day that he came up

10 and was upset and talking about Daphne?

11     A.   I will say that the house --

12          MS. MOSELEY:  I'm sorry, ma'am.  I'm going to

13 have to object to hearsay if she's going to testify to

14 something that the Defendant told her.

15          THE COURT:  Sustained.

16     Q.   (BY MS. MULDER)  Did you ever have a conversation

17 with the Defendant -- without telling us what was said -- where

18 he cried?

19     A.   He was really sad.

20     Q.   When was that?

21     A.   I don't recall the exact date, but it was before

22 Christmas.

23     Q.   How long did the Johnson's rent that house on

24 Waikiki?

25     A.   I don't recall exactly, you know, with so many

1    houses.

2         Q.    Ultimately they moved out in January?

3         A.    Yes.  He called me to let me know that he was moving

4    out because they couldn't afford the rent anymore.

5         Q.    Did you see him after that?

6         A.    Yes.

7         Q.    When was the last time you saw him?

8         A.    I think it was January.  I cannot remember.

9         Q.    Did Matthew Johnson ever behave aggressively toward

10   you or to anyone else that you saw?

11        A.    No, ma'am.

12        Q.    Did he ever ask to borrow money from you?

13        A.    No, ma'am.

14        Q.    Did you feel taken advantage of?

15        A.    No, ma'am.

16        Q.    Now that you know that he lied about losing his job,

17   that he was actually fired, and now you know why we're here for

18   this case?

19        A.    Yes, ma'am.

20        Q.    And we've talked about his criminal history?

21        A.    Yes, ma'am.

22        Q.    The Matthew Johnson that you knew -- the Matthew

23   Johnson that you knew, does this capital murder case seem out

24   of character for him?

25        A.    To the best of my experience, yes.  He was not the

1    same person.

2        Q.    Did you know that he had physically abused Daphne at

3    times?

4        A.    No, ma'am.

5        Q.    And you were not aware of his drug problem?

6        A.    No, ma'am.

7        Q.    Did he ever behave inappropriately with you as far

8    as like a man to a woman?

9        A.    No, ma'am.

10        Q.    He never came on to you or said suggestive things?

11        A.    No, ma'am.

12        Q.    We talked about his criminal history with regard to

13    the fact that he did penitentiary time for carjacking,

14    etcetera?

15        A.    Yes, ma'am.

16        Q.    Does any of that change your opinion of the Matthew

17    Johnson that you knew?

18        A.    I can only talk of my experience with him.  I cannot

19    talk about anything else.  I knew him before, and I had no idea

20    of what happened until things came on the news.

21                MS. MULDER:  I'll pass the witness.

22                MS. MOSELEY:  Just a couple of questions, Judge.

23                    CROSS-EXAMINATION

24    BY MS. MOSELEY:

25        Q.    Ma'am, you and I have met before?

1          A.    Yes, ma'am.

2          Q.    It's -- is it fair to say that you were pretty

3    generous with your -- maybe not always money, but with your

4    assistance for the Defendant and his family?

5          A.    That's not uncommon for me.  I normally help

6    everybody that I can.

7          Q.    You're a very generous and giving woman?

8          A.    I try to be.

9          Q.    And sometimes, in fact, your husband isn't so happy

10   with how generous you are with your time, your trusting?

11         A.    I don't think he's -- I think he's concerned, but I

12   don't think he's mad at me.

13         Q.    Right.  I didn't mean mad at you, but you are a very

14   trusting lady?

15         A.    In general, yes.  I see the good in people.

16         Q.    And you -- you actually not only allowed the

17   Defendant -- talked to your uncle about allowing his family to

18   stay in the house in December without paying?

19         A.    He did not ask me.

20         Q.    He didn't ask.  You did that on your own?

21         A.    Yes, ma'am.

22         Q.    You gave them money to help buy gifts for the

23   children for Christmas?

24         A.    I asked him if he had found a job, and he said no.

25   And just like I do -- I normally adopt an angel or two at

```
 1   Christmas, and it was my decision to help a little bit.
 2        Q.   Right.  And -- and so you did do that for the
 3   family?
 4        A.   A little bit, yes, ma'am.
 5        Q.   You actually helped him get a car.  Your brother had
 6   a car for sale?
 7        A.   Yes, ma'am.
 8        Q.   And you asked your brother if you could get -- if he
 9   would let the Defendant pay that out, make the payments out
10   because he didn't have the money up front?
11        A.   He found a job, and he didn't have transportation.
12        Q.   And he found a job because you helped him find a
13   job?
14        A.   Just like I would do for anybody else that needed
15   help.
16        Q.   After all of this, did you -- did you question your
17   judge -- your ability to judge character?
18        A.   After that, I'm sad what happened, but I try not to
19   let that experience change what I am and who I am.
20                  MS. MOSELEY:  Thank you, ma'am.
21                  That's all I have, Judge.
22                  MS. MULDER:  Nothing further, Your Honor.
23                  THE COURT:  Thank you, ma'am.  You may stand
24   down, and you're excused.
25                  May I see the lawyers?
```

```
 1                    (Sidebar conference, discussion off the record.)

 2                    THE COURT:  All right.  Members of the jury,

 3    we're going to take an afternoon break.  It's 3:37.  We'll say

 4    3:40.  If you'll be back in the jury room a little bit before

 5    4:00.

 6                    THE BAILIFF:  All rise.

 7                    (Jury excused from courtroom.)

 8                    (Recess.)

 9                    THE COURT:  Can we get Mr. Johnson, please?

10                    All right.  We're on the record outside the

11    presence of the jury.

12                    MS. MULDER:  Your Honor, at this time during

13    Daphne Johnson's testimony, we will offer Defendant's Exhibits

14    4 through 11.  These are the letters previously identified by

15    the Defendant as one of the letters -- Defendant's Exhibit

16    Number 4 as being from -- written to him -- to Daphne Johnson

17    and his daughters.  The rest of the letters will be identified

18    -- I'll make this proffer, by Daphne Johnson as letters written

19    to the Defendant from herself and her daughters'.  And, Your

20    Honor, she will testify that this does aid the jury and

21    describe the nature of her relationship and the daughters --

22    the minor children's relationship with their father, Matthew

23    Johnson.

24                    MS. MOSELEY:  And, Your Honor, we're going to

25    object that those letters are hearsay.  And if they're not
```

```
 1  being offered for the truth of the writings themselves, they're

 2  irrelevant.  This witness can testify that they do write back

 3  and forth.  That's already in evidence in front of the jury

 4  through the Defendant's testimony, but the content of any of

 5  those writings would either be hearsay or if not offered for

 6  the truth of what's said, they're irrelevant to this and

 7  unnecessary.

 8          MS. BERNHARD:  And, Your Honor, in response to

 9  that, we would argue that they're not hearsay because they're

10  not being offered for the truth of the matter.  And to prohibit

11  their admission violates Mr. Johnson's rights under the Fifth,

12  Sixth, Eighth and Fourteenth Amendment, particularly his right

13  to present a defense and his right to present relevant

14  mitigating evidence.

15          THE COURT:  All right.  Defense -- the State's

16  objection is overruled.  I'll allow them.

17          MS. MOSELEY:  I don't know that I've seen these,

18  Your Honor.  If I can look at the contents.

19          THE COURT:  Sure.

20          MS. MOSELEY:  It may take a little while.

21          MS. BERNHARD:  We got them in discovery.

22          MS. MOSELEY:  Oh, you did?  These are the ones

23  that we gave y'all?

24          MS. MULDER:  Yes.

25          MS. MOSELEY:  And, Your Honor -- I assume that
```

```
 1   you're offering this, as well, for the letters that the -- that
 2   the Defendant wrote?  He had the opportunity to testify about
 3   his relationship with these children.  I don't --
 4                  You're -- you're overruling my objection?
 5                  THE COURT:  Okay.  I'll reverse -- I'll reverse
 6   my -- my ruling on that.  That -- that exhibit -- is that 4?
 7                  MS. MULDER:  Yes, Judge.  He identified as a
 8   letter he wrote to his wife and that it helped define their
 9   relationship.
10                  THE COURT:  Okay.  He was on the stand for three
11   hours this morning, so I'm going to -- I'm going to sustain
12   your objection as to Defendant's Exhibit 4.
13                  MS. BERNHARD:  We would offer it for record
14   purposes.
15                  (Defendant's Exhibit 4 offered.)
16                  THE COURT:  Admitted for record purposes.
17                  (Defendant's Exhibit 4 admitted.)
18                  THE COURT:  All right.  Let's get the jury,
19   please.
20                  THE BAILIFF:  All rise.
21                  (Jury returned to courtroom.)
22                  THE COURT:  Please be seated.
23                  Ma'am, would you raise your right hand, please.
24                  (Witness sworn.)
25                  THE WITNESS:  Yes.
```

```
 1                    THE COURT:  Thank you.

 2                    MS. MULDER:  May it please the Court.

 3                    THE COURT:  Yes, ma'am.

 4                         DAPHNE JOHNSON,

 5  was called as a witness by the Defendant, and after having been

 6  first duly sworn, testified as follows:

 7                    DIRECT EXAMINATION

 8  BY MS. MULDER:

 9       Q.    Would you please state your name for the jury?

10       A.    Yes.  Daphne Johnson.

11                    THE COURT:  Ms. Johnson, I'm going to ask you to

12  lean into that microphone and keep your voice up for me,

13  please.

14       Q.    (BY MS. MULDER)  Daphne, you can pull that

15  microphone closer to you.  Daphne, how old are you?

16       A.    I'm 36.

17       Q.    And how do you know Matthew Johnson?

18       A.    He's my husband.

19       Q.    How long have you and Matthew Johnson been married?

20       A.    Almost 19 years.

21       Q.    How do you know -- when did you first meet Matthew

22  Johnson?  How do you know each other?

23       A.    From elementary school when we were younger.

24       Q.    In grade school you knew him?

25       A.    Uh-huh.
```

```
 1              THE COURT:  You have to say yes or no, ma'am.

 2       A.   Yes.

 3       Q.   (BY MS. MULDER)  Are you nervous?

 4       A.   Yes.

 5       Q.   Let's take a deep breath.  When did you and Matthew

 6  start dating?

 7       A.   I think I was 15.

 8       Q.   High school?

 9       A.   Middle school -- middle school going into high

10  school.

11       Q.   While you were dating Matthew, what kind of guy was

12  he?

13       A.   He was a good boyfriend.

14       Q.   You're smiling.  How was he a good boyfriend?

15       A.   Just because I was kind of spoiled, and I always

16  knew what I wanted.

17       Q.   Who spoiled you?

18       A.   My husband -- my then boyfriend.

19       Q.   How old were you when you got married?

20       A.   Let's see, 18.

21       Q.   Pretty young?

22       A.   Yes.

23       Q.   How was your relationship when you got married at

24  18?

25       A.   It was difficult because we were still -- we were
```

```
 1  very young.
 2        Q.    And how was it difficult?
 3        A.    Because we were, you know, very immature and didn't
 4  realize the impact of being married, you know, finalizing it in
 5  that way.  It was totally different just from dating.
 6        Q.    What were some of the difficulties you all had?
 7        A.    Like financially and communication.
 8        Q.    And when you -- when you say communication, what do
 9  you mean?
10        A.    Learning -- being able to talk to each other instead
11  of at each other.
12        Q.    Did y'all argue?
13        A.    Yes.
14        Q.    Did your arguments ever become physical?
15        A.    Yes.
16        Q.    How did they become physical?
17        A.    Well, that's basically what the arguments led up to.
18  Both of us -- you know, either one or the other was ticked off
19  about it and thought that was the proper way to solve it.
20        Q.    Well, what would happen?
21        A.    We would fight.
22        Q.    Physically?
23        A.    Yes.
24        Q.    Was this a situation where Matthew beat up on you?
25        A.    Yes.
```

187

```
 1        Q.    Did you ever hit him?

 2        A.    Yes.

 3        Q.    Now, when you married Matthew, did you know that he

 4   used and abused marijuana?

 5        A.    No, I didn't know at first.

 6        Q.    When did you find out, if you can recall?

 7        A.    I'm not for sure how long, you know, before our

 8   entire relationship that I knew.

 9        Q.    How about other drugs?  When did you become aware

10   that -- if he was ever using any other kinds of drugs?

11        A.    I think it was when his grandmother had passed.

12        Q.    When was that?

13        A.    I'm not for sure of the year because it was -- it

14   was awhile back.

15        Q.    And how did you find out that he was using different

16   drugs?

17        A.    Because he told me.

18        Q.    What did he come home and tell you?

19        A.    That he -- he was upset and crying and he told me

20   what he had did.  And I asked him why.

21        Q.    What did he tell you he did?

22        A.    He told me that he had smoked crack.

23        Q.    And when you asked him why, did he have a reason?

24        A.    I don't remember.  I just remember him being upset.

25        Q.    About how old were y'all at that time, if you can
```

```
 1  recall?
 2       A.    I think we were probably in our late 20s.
 3       Q.    That's what you remember?
 4       A.    Yes.
 5       Q.    Could it have been earlier?
 6       A.    Possibly, but I'm not for sure.
 7       Q.    After that first time that Matthew told you he
 8  smoked crack, how did your relationship go after that?  How
 9  were things?
10       A.    It was basically the same because he -- I mean, he
11  still worked and everything.  Nothing really changed.
12       Q.    Ultimately did it change?
13       A.    Yes.
14       Q.    How did it change?
15       A.    Because when he relapsed, it, you know, kind of made
16  it worse, you know.
17       Q.    Well, I'm talking about the time period before
18  Matthew went to prison.  Is that the time period you're
19  referring to?
20       A.    I'm not understanding.  Like the drug use before?
21       Q.    Yes, before he went to prison.  Was there a time
22  period where it increased or --
23       A.    Yes.
24       Q.    What would happen when his drug use would increase?
25       A.    He would go off on binges.
```

189

```
1         Q.    And what do you mean by go off on binges?  Do you
2    know where he went?
3         A.    No.
4         Q.    How long would he be gone?
5         A.    Maybe one or two days.
6         Q.    When did he start going off on binges -- like how
7    old were you, if you recall?  Was this after Makayi was born or
8    before?
9         A.    No, it was around when Makayi was born.
10        Q.    Do you recall how old you were or how old he was?
11        A.    I think we were like in our late 20s.
12        Q.    When Matthew would go off on these binges and come
13   home, what would you do?
14        A.    Well, I mean, I would still do my everyday routine
15   and try to figure -- we would both try to figure out how we
16   were going to get through the coming days.
17        Q.    Would -- would he call during the two-day -- one or
18   two days he would be gone?
19        A.    Yes.
20        Q.    And when he would come home after going on a drug
21   binge, did you just open up the door and smile and say, welcome
22   home, or did you -- did it bother you?
23        A.    No, I definitely wasn't smiling.  I was pretty
24   pissed.
25        Q.    Understandably so.  What would you do or say to
```

```
 1  Matthew?
 2        A.    Well, I would say some not so nice things.
 3        Q.    Would you yell at him?
 4        A.    Yes.  And curse.
 5        Q.    Did you ever kick him out?
 6        A.    Yes.
 7        Q.    About how many times would you say you kicked him
 8  out from then until now?
 9        A.    Between four to six times, probably.
10        Q.    And during those times, what would that entail when
11  you kicked him out?
12        A.    As far as him just not being there?
13        Q.    Well, what would you do with his stuff?
14        A.    Well, if I was still mad about it, I would put his
15  stuff, too, or either -- sometimes I would leave it there, just
16  depending on how ticked off I was at the time.
17        Q.    You would throw his clothes out?
18        A.    Yes.
19        Q.    Did you ever --
20        A.    All of his stuff.
21        Q.    All of his stuff you would throw in the front yard?
22        A.    Yes.
23        Q.    Do you remember the one time -- I think it was back
24  in '03 when you were arguing and Matthew left the house and you
25  followed him in the car?
```

191

```
 1        A.    Uh-huh.

 2        Q.    You were pretty mad that night?

 3        A.    Yeah.  I was kind of beyond mad.

 4        Q.    What were you doing with his clothes?

 5        A.    Throwing them out of the car while I was driving.

 6        Q.    And did you see him walking on the road?

 7        A.    Yes.

 8        Q.    And what did you do?

 9        A.    I hit him with the car.

10        Q.    Did he get hurt?  Or did -- you didn't stay to find

11  out if he was --

12        A.    I -- I don't remember if he did or not.

13        Q.    Were you trying to kill him?

14        A.    No.

15        Q.    I mean, fair to say that your relationship was

16  volatile?

17        A.    Yes.

18        Q.    And during that time period, he put his hands on

19  you?

20        A.    Yes.

21        Q.    And was abusive to you?

22        A.    Yes.

23        Q.    Why did you stay with him if he was abusive to you

24  and you knew he was using drugs and be gone for a day or two at

25  a time and then come home?  Why would you stay with him?  Why
```

192

 1  did you stay with him?

 2      A.   Because that was when he was doing drugs.  When he

 3  was not doing drugs, he was my husband, he was himself, and I

 4  just wasn't going to give up that easy because we're married.

 5      Q.   You weren't going to give up?

 6      A.   No, because if I thought it would be that easy, I

 7  would have never married him.

 8      Q.   You love your husband?

 9      A.   I do.

10      Q.   Still to this day?

11      A.   I do.

12      Q.   What kind of father was Matthew?

13      A.   My husband was an awesome father.

14      Q.   And you have three girls?

15      A.   Yes, we have three daughters.

16      Q.   What kinds of things would he do with Makayi and

17  Deja when they were little girls?

18      A.   Well, there's nothing he wouldn't do with them.  I

19  mean, he -- he's -- he's a great father, taking them places and

20  doing things with them because they like outside, just like he

21  does.  That's where they get it from.  You know, taking us to

22  the park and having picnics and flying kites.  I mean, we

23  just -- when we had our family time, it was -- it was great.

24      Q.   If he was going somewhere to the store, would he

25  take one or both of them with him?

1      A.    Yes.

2      Q.    It's not easy having small children in the grocery

3  store when you're trying to buy what's on your list, is it?

4      A.    No, because they would come back with other things,

5  as well.

6      Q.    When did it start to get bad in your mind, prior to

7  him going to prison at that point in time?

8      A.    I want to say -- I think around November or

9  December.  I'm not for sure of the year.  I just remember it

10  was getting cold, and that's when it kind of -- things kind of

11  started going downhill.

12     Q.    What was it -- do you remember a particular

13  conversation that you told me about that seemed to bother him a

14  lot?

15     A.    Yes.

16     Q.    Describe that conversation to the jury if you would.

17     A.    Okay.  We were at home watching TV, and we were

18  talking about coats.  He was saying that we needed coats

19  because it was getting cold.  And I remember telling him that I

20  could just go to the Friendship House and see if they could

21  help us get coats.

22     Q.    Coats for who?

23     A.    Myself and our girls.  Because we didn't just have

24  the money to go out and buy coats at the time.

25     Q.    How old were the girls at this time?

```
 1        A.    I think Matduxx was one.

 2        Q.    Okay.  Well, this was after he went to prison?

 3        A.    Yes.

 4        Q.    Okay.  Matduxx was one?

 5        A.    Uh-huh.  And Deja was 10, and Makayi was -- oh -- 12

 6   or 13.

 7        Q.    You all were struggling financially?

 8        A.    Yes.

 9        Q.    And when you talked about going -- what is the

10   Friendship House?

11        A.    It's like a -- like a charity place -- like help you

12   with donations and like kind of outreach center, I guess it's

13   called.

14        Q.    You thought you could go there and get the girls

15   some coats?

16        A.    Uh-huh.

17        Q.    You have to answer out loud.

18        A.    Oh, yes, I'm sorry.

19        Q.    How did Matthew -- what was Matthew's reaction to

20   that?

21        A.    I could tell it was something he wanted to do

22   himself, for us.

23        Q.    Did it bother him at all?

24        A.    Yes, it did.

25        Q.    How could you tell?
```

1      A.    I could tell because he became uneasy about it, you

2  know, when I was saying that.  And -- and I don't remember what

3  or how we ended the conversation, but I remember he had left.

4  I don't know if he went to the store or I don't remember if he

5  was telling me he was going to the store afterwards, but he

6  didn't come right back.

7      Q.    Did he leave and go on a binge?

8      A.    Well, he left that day and I want to say came back

9  the next morning.  I think it was like around 3:00 or 4:00 in

10 the morning.

11     Q.    During the course of your relationship when Matthew

12 would come back after being gone for two days, would you talk

13 with him about where he had been and what he had been doing?

14     A.    Well, not right off I wouldn't because I would still

15 be upset about it, so -- either if I did say something about

16 it, it was in a mean way, you know, kind of tearing him down

17 about leaving and not coming back like he said or -- I wouldn't

18 just, you know, spark up a conversation about it.

19     Q.    Were there times when you did talk to Matthew about

20 the drugs?

21     A.    Yes.

22     Q.    When he was sober, how did he act when y'all talked

23 about the drug problem?

24     A.    Well, he always -- you know, how can I say it?

25 Trying stop doing it on his own, by himself.

1      Q.    How did that work?

2      A.    Well, it -- it was just up and down because I could

3 tell he would be struggling with it because he would try and

4 find and do things around the house or things to keep him busy.

5      Q.    Did -- did Matthew ever bring drugs into your home,

6 to your knowledge?

7      A.    Yes.

8      Q.    When was that?

9      A.    I want to say one incident.  I think the girls and I

10 had left or either I had left and I came back home, and he

11 wouldn't let me in the house.

12     Q.    And this was when Makayi was a baby?

13     A.    No, because we had both -- I think we had both of

14 our daughters.  They were small then.

15     Q.    Please go on.  What happened?

16     A.    And so I know that's what he was up there doing

17 because he wouldn't open the door.  You know, why wouldn't he

18 open the door when we were out there?  I'm at the door, ringing

19 the doorbell, and use the key to open the door and there was a

20 latch on there.  Even if the door is unlocked, you have to

21 physically take it off to open the door, and it was on there.

22 So I kind of -- I just knew.

23     Q.    I want to take you back to an incident that happened

24 when Makayi was an infant.  Where -- y'all were living in

25 either an apartment or a townhome at that time?

197

```
 1         A.    In -- was it in North Dallas?

 2         Q.    The incident where -- when you came home and you

 3   couldn't get in and you got the maintenance man?

 4         A.    Uh-huh.

 5         Q.    You remember that incident?

 6         A.    Yes.

 7         Q.    Okay.  This was when Makayi was an infant, a baby?

 8         A.    I think she was probably one or two.

 9         Q.    What happened -- tell the jury what happened that

10   day.

11         A.    Well, I couldn't get in the house, and I got the

12   maintenance guy to open the door.  And when I went in, he and I

13   got into an altercation.

14         Q.    Well, you actually -- did you go in through a

15   window?

16         A.    Uh-huh, through the window.  I had to break the

17   window.

18         Q.    You ended up breaking the window to get in?

19         A.    Yes.

20         Q.    And you -- the police were called?

21         A.    Yes, they were.

22         Q.    And you wrote a report?

23         A.    Yes.

24         Q.    Do you remember what you alleged in that report?

25         A.    Yes, about how we fought.
```

```
 1        Q.    Did he hit you?

 2        A.    Yes, he did.

 3        Q.    Pull you by your hair?

 4        A.    Yes.

 5        Q.    When the police would come out, would they ever give

 6   you a blue card for family violence?

 7        A.    Yes.

 8        Q.    And did you ever make use of any battered women

 9   shelters or anything like that?

10        A.    No, I didn't.

11        Q.    Why not?

12        A.    Well, because -- I mean, the incidents that

13   happened, it was when he was doing drugs.

14        Q.    It was when he was high?

15        A.    Uh-huh.

16        Q.    You have to answer out loud.

17        A.    Oh, I'm sorry, yes.

18        Q.    So he would get physical when he was high?

19        A.    Yes.

20        Q.    He never was physical with you when he was sober?

21        A.    No.

22        Q.    Was there ever a point where you said, you know

23   what, I'm done with this.  I'm done with this drug problem.

24   I'm done with you?

25        A.    Yes.
```

199

```
 1        Q.    And what did you do?

 2        A.    I got a restraining order.

 3        Q.    That was in 2003, 2004, you got a protective order?

 4        A.    Yes, I think it was 2003.

 5        Q.    And you came to the DA's office to get that?

 6        A.    Yes.

 7        Q.    And you filled out the paperwork?

 8        A.    Yes.

 9        Q.    You and I reviewed that?

10        A.    Yes.

11        Q.    And in reviewing that paperwork, what went through

12   your mind about what you had written and said?

13        A.    Well, some of it I was -- well, first, when I read

14   it, I noticed I didn't read all of it at the very top portion

15   of it.  I just circled what was on there, you know.  I remember

16   I was upset when I filled it out and crying and everything

17   else.

18        Q.    Well, I mean, I'm trying to get a picture of your

19   marriage with Matthew Johnson.  Was it a situation where he

20   would, you know, talk down to you every day and be mean to you

21   every day and hit you and be mean?

22        A.    No.  And that -- from my understanding when I did

23   it, it was pertaining to the incidents that were on there, not

24   an everyday -- everyday thing.

25        Q.    Because it -- because it sounds bad.  You agree?
```

1      A.    Yes.

2      Q.    But for you, you were just answering the questions

3  with regard to whenever you all had incidents, meaning whenever

4  he came home or was high?

5      A.    Yes.

6      Q.    But was it like that -- I mean, were you -- did you

7  stay -- I mean, was it like that?  Did he come home and hit you

8  or was he mean to you or -- was he like that on a daily basis?

9      A.    No.

10      Q.    What was he like on a daily basis?

11      A.    He would go to work and come home and I mean,

12  just -- just a normal family life.  It wasn't, you know,

13  anything -- I mean, we had arguments like every married couple,

14  but it was nothing, you know, physical.  Sometimes within a

15  couple of hours, we would be okay or the next day we would be

16  fine.

17      Q.    Was he affectionate?

18      A.    Yes.

19      Q.    With you?

20      A.    Yes.

21      Q.    With the girls?

22      A.    Yes.

23      Q.    How often would Matthew go out on these binges where

24  he would be gone for 24 to 48 hours?  Did it vary?

25      A.    Yes, it did.

```
 1      Q.    Well, let's talk about back in 2003 when things got
 2  bad.  How often was he going out on binges?
 3      A.    It was quite often.  Because I think around that
 4  time I was staying in our townhome, and it would just be mainly
 5  me and the girls there.
 6      Q.    He was gone most of the time?
 7      A.    Yes.
 8      Q.    He wasn't contributing --
 9      A.    No.
10      Q.    -- money monetarily?
11      A.    No.
12      Q.    And you always worked?
13      A.    Yes.
14      Q.    But y'all always struggled for -- for money to make
15  ends meet?
16      A.    Yes, because it was either -- you know, when I was
17  working, I wasn't making a lot.  And so I mean, it helped some,
18  but not the way that it could have helped.
19      Q.    Now, Daphne, I want to delve a little bit into your
20  history.  Your mom's name is Hazel?
21      A.    Yes.
22      Q.    And what was your father's name?
23      A.    John.
24      Q.    And he has passed?
25      A.    My dad?
```

```
 1        Q.    Uh-huh.

 2        A.    Uh-huh.  Yes, he has.

 3        Q.    How did he pass?

 4        A.    He was killed.

 5        Q.    He was shot?

 6        A.    Uh-huh, yes.

 7        Q.    How old were you when he was shot and killed?

 8        A.    I think I was 14 -- 14 or 15.

 9        Q.    Was your father -- did he use or abuse drugs or

10   alcohol?

11        A.    He did.

12        Q.    Both?

13        A.    Yes.

14        Q.    And was he ever physically -- did he ever lay hands

15   on your mother, where you saw?

16        A.    Yes.

17        Q.    So for you during this early years of your marriage

18   to Matthew, would you say that -- that you had some growth and

19   maturing to do also and learning how to -- what you deserved --

20        A.    Yes, I did.

21        Q.    -- as a wife?  And were you and Matthew on that

22   journey together?

23        A.    Yes, we were.

24        Q.    Did he ever apologize for -- for putting hands on

25   you?
```

```
 1        A.    Yes.

 2        Q.    What would he say?

 3               MS. MOSELEY:  Objection, hearsay.

 4               THE COURT:  Sustained.

 5        Q.    (BY MS. MULDER)  Did he ever apologize for using

 6   drugs like he did?

 7        A.    Yes.

 8        Q.    And there were times when -- when Matthew would hit

 9   you, and you would call the police?

10        A.    Yes.

11        Q.    I think there was just one other time when you were

12   18 that you put hands on Matthew and he called the police?

13        A.    Yes.

14        Q.    When did you find out that Matthew had been arrested

15   for the robbery, the carjacking of the truck?

16        A.    I don't know if it was the -- it may have been the

17   next day because I don't remember it being the same day.

18        Q.    You bonded him out?

19        A.    Yes.

20        Q.    And why did you do that?

21        A.    Because I didn't want him to be in jail.

22        Q.    Why didn't you want him in jail?  Because you know

23   in jail he wouldn't be using?

24        A.    Yes.  I just didn't want him in there.

25        Q.    That's just what a good wife does, so to speak?
```

1    A.    Yes.

2    Q.    At that point how old was Deja?

3    A.    I think she was two.

4    Q.    Matthew ended up pleading guilty, and he got the

5  five-year sentence on the robbery?

6    A.    Yes.

7    Q.    When he was in prison, did you keep in contact with

8  him?

9    A.    Yes, we did.

10    Q.    How often did you get to go see him?

11    A.    It was -- we made a -- I'm not for sure like the

12  month span or whatever, but we would -- like during the year,

13  like yearly?

14    Q.    Yes.

15    A.    Maybe three or four times during the year.

16    Q.    Would you ever talk on the phone with him?

17    A.    Yes.

18    Q.    How often would y'all talk on the phone?

19    A.    Maybe between every two and three months, because we

20  wrote each other in between then.

21    Q.    Did y'all write a lot?

22    A.    Yes.

23    Q.    Now, Daphne, what was it -- I mean, this is your

24  husband.  He's abusing drugs.  He just got sentenced to five

25  years for robbery.  Why did you -- why did you stand by him?

```
 1   Why did you stay with him?  Why not get a divorce and move on

 2   and --

 3        A.    Well, because it's not that easy.  You love someone

 4   and you know that what they did at that time, he wasn't himself

 5   and if he wasn't doing drugs, he wouldn't have done that.

 6        Q.    What is Matthew like when he's not on drugs?

 7        A.    He's great.

 8        Q.    How is he great?

 9        A.    He's just -- he's a good husband.  He's --

10        Q.    What does he do or say that makes him a good husband

11   when he's sober?

12        A.    Takes care of us and provides for us.  And I mean,

13   he would always work on the weekends, even finding just like

14   handyman jobs to have extra money to do things for us and take

15   us places.  Even though it wasn't probably, you know, the

16   places that he wanted to be -- it was somewhere because we --

17   we appreciated that.  And I mean, cooking for us and cleaning

18   the house and doing laundry.

19        Q.    He would do all those things?

20        A.    Uh-huh.

21        Q.    You have to answer out loud.

22        A.    Yes, he would.  And yard work and -- just everything

23   he would do.

24        Q.    Did you feel -- I mean, when he was sober, did he

25   try to control you or tell you what you could or couldn't do?
```

```
 1       A.    No.

 2       Q.    He wasn't like that?

 3       A.    No.

 4       Q.    I want to talk about when -- when Matthew got out of

 5  prison --

 6       A.    Okay.

 7       Q.    -- and he came home.  You were -- how was that?

 8       A.    It was a great day.

 9       Q.    And for two years after he was released from prison,

10  how were things?

11       A.    They were good.  It started off a little slow

12  because, you know, he jumped in and wants to find a job.  I

13  mean, if he could have got one the same day that he came home,

14  he would have.  You know, and I told him, just have a little

15  patience and pace yourself and, you know, you'll get a job, you

16  know, and that's what he did from day one.

17       Q.    He worked?

18       A.    Yes, from day one he started looking and kept --

19  continued looking until he found a job.

20       Q.    And he -- most importantly he was sober?

21       A.    Yes.

22       Q.    And you became pregnant with your third child,

23  Matduxx?

24       A.    Yes, I did.

25       Q.    At what point did you realize that Matthew had
```

207

```
 1  relapsed?

 2       A.   It was -- it was awhile after.  It was some years

 3  after.  It wasn't anything that was immediate.

 4                 MS. MULDER:  May I approach the witness, Your

 5  Honor?

 6                 THE COURT:  You may.

 7       Q.   (BY MS. MULDER)  Daphne, I'm showing you a disk that

 8  has been marked as Defendant's Exhibit 20.  Is this a copy of

 9  an iPhone video that shows Matthew feeding Matduxx when she was

10  a little baby?

11       A.   Yes.

12       Q.   And would that be helpful in describing and showing

13  the jury the kind of dad that he was?

14       A.   Yes.

15                 MS. MULDER:  We'll offer Defendant's Exhibit

16  Number 20.

17                 (Defendant's Exhibit 20 offered.)

18                 MS. MOSELEY:  No objection.

19                 THE COURT:  Admitted.

20                 (Defendant's Exhibit 20 admitted.)

21                 MS. MULDER:  Permission to publish?

22                 THE COURT:  You may.

23       Q.   (BY MS. MULDER)  Well, before we watch the video --

24  oh, yeah --

25                 (Exhibit published.)
```

```
 1      Q.    (BY MS. MULDER)  He was patient with your girls?

 2      A.    Very patient.

 3      Q.    Took care of them?

 4      A.    Yes.

 5      Q.    Who does Matduxx look like?

 6      A.    Her dad.

 7      Q.    She looks just like him, doesn't she?

 8      A.    She does.

 9      Q.    She's three now?

10      A.    Yes.

11      Q.    Did she and Matthew have a special bond?

12      A.    Yes.

13      Q.    Describe that bond for the jury, please.

14      A.    Well, like, for instance, it would be a certain way
```
he would sit on the couch with her in his lap and watch TV, or
look at his iPhone and she would -- I mean, it was just their
own little thing that they had.  She would sit there and watch
TV with him, but if I were to sit with her that way and hold
her that way, it wasn't the same.  You know, she would be
squirming, but when her dad would do it, I mean, it was just
their -- their own little connection that they have.
```
22      Q.    Daphne, how did you find out about the theft from
```
the Kwik Kar?  Did Matthew tell you about that?
```
24      A.    Yes, he did.

25      Q.    At what point in the spring of 2012 did things get
```

209

```
 1   bad, if they did at all?

 2        A.   Was that incident at Kwik Kar, was that during

 3   that -- was that --

 4        Q.   That would have been November of 2011.

 5        A.   Okay.

 6        Q.   I'm kind of pushing us through to the spring of 2012

 7   before the May that this happened.

 8        A.   Yes, it had -- kind of had got worse, his drug use.

 9        Q.   How -- what was happening?

10        A.   He was staying gone more and took things from our

11   house.

12        Q.   What things would he take from the house?

13        A.   I know once before there was clothes, I know for

14   sure, but I don't remember anything else.  You know, I think it

15   was probably some of his things.

16        Q.   Let me ask you this.  In the 18 years you've been

17   with Matthew, did he ever seem to suffer from depression at

18   all?

19        A.   Yes.

20        Q.   And how could you tell that he suffered from that?

21        A.   Because he would get in the -- he would just like

22   isolate himself.

23        Q.   How would he isolate himself?

24        A.   He would kind of --

25        Q.   It makes you sad?
```

```
 1        A.    He would just kind of be withdrawn from us.

 2        Q.    When did that start?

 3        A.    It came -- it was more frequent after the incident

 4   at Kwik Kar.

 5        Q.    Now, had he suffered from depression throughout your

 6   marriage or just this time?

 7        A.    No, it was -- honestly, I think throughout our whole

 8   marriage.

 9        Q.    Throughout that -- your whole marriage, would he

10   just fall into depression or how would it happen?

11        A.    I mean, there would be times when I would be at

12   work, and I would come home and it would be dark in our house.

13        Q.    Was he there?

14        A.    He would -- yeah, he was there or either he would --

15   he wouldn't know what day it was, like -- I remember one time

16   it was -- it was Thursday, and he thought it was Tuesday.  It

17   would always be just dark in the house.  I would walk in the

18   house.  I would -- I would open the blinds, would be at home

19   for a few minutes before --

20        Q.    Before what?

21        A.    I would have to go and pick our daughters up from

22   school, and Matduxx, she was -- she would stay with her dad at

23   home sometimes -- well, a good majority of the times.

24        Q.    Because he worked the night shift?

25        A.    Uh-huh.
```

```
 1          Q.    Well, I guess at that point he was working at Kwik

 2   Kar?

 3          A.    Well, I just knew it was -- it was something because

 4   it would -- like Deja, she was asking him to do something one

 5   day.  I don't know if it was -- I think we were watching TV.

 6   She wanted him to watch something with us.  I'm not really for

 7   sure, but he was just -- just off to himself.  He started

 8   sitting on the -- we had two couches in our living room, and he

 9   and I always sit next to each other, always.  And I noticed he

10   started sitting on the other couch by himself.  He would hardly

11   talk anymore.  He would just be there.

12          Q.    Did he engage in this kind of behavior even in the

13   time before he went to prison on the robbery?

14          A.    Yes.  But it wasn't -- it don't seem like he was as

15   bad.

16          Q.    Daphne, how did you find out about what happened at

17   the Fina station?

18          A.    He called me from jail.

19          Q.    And that's the -- when you found out that something

20   had gone on?

21          A.    Yes, but I didn't know for sure what it was, but I

22   just knew something had happened.

23          Q.    And he didn't want to tell you, did he?

24          A.    No, because I think I was yelling at him, and I was

25   asking him what did he do.
```

```
 1        Q.    How often would Matthew talk about wanting to get
 2   off the drugs?
 3        A.    All the time.
 4        Q.    Did you ever try to find him rehabilitation
 5   services?
 6        A.    Yes.
 7        Q.    How many times did you try and find something for
 8   him?
 9        A.    It was quite a few times.
10        Q.    Did -- did y'all have money and could you afford an
11   inpatient rehabilitation facility?
12        A.    No.
13        Q.    Did -- other than the time he worked at Sanden, did
14   you all have insurance that would pay for it?
15        A.    No.  I think that was the only time that we've ever
16   had --
17        Q.    Insurance?
18        A.    Yes.
19              MS. MULDER:  May I approach the witness, Your
20   Honor?
21              THE COURT:  You may.
22        Q.    (BY MS. MULDER)  Daphne, since Matthew's been in
23   jail, you've talked to him on the phone?
24        A.    Yes.
25        Q.    Written him letters?
```

1          A.    Yes.

2          Q.    And I want to show you what's been marked as

3    Defendant's Exhibits 5 through 11.  Are these the letters I had

4    you take a look at to see if these were letters that you and

5    the girls wrote to Matthew?

6          A.    Yes.

7          Q.    You recognize the handwriting?

8          A.    Uh-huh.  I do.

9          Q.    And you've already read the letters and verified

10   that these are the letters that you and the girls had sent?

11         A.    Yes, they are.

12         Q.    And would these aid you in describing the kind of

13   relationship that you have with Matthew and the kind of

14   relationship that your daughters have with Matthew?

15         A.    Yes.

16              MS. MULDER:  Your Honor, at this time we offer

17   Defendant's Exhibits 5 through 11.

18              (Defendant's Exhibits 5 through 11 offered.)

19              MS. MOSELEY:  I would renew my previous

20   objection.

21              THE COURT:  Admitted.

22              (Defendant's Exhibits 5 through 11 admitted.)

23              THE COURT:  May I see the lawyers up here?

24              (Sidebar conference, discussion off the record.)

25         Q.   (BY MS. MULDER)  Whose handwriting is this?

1      A.    Makayi.

2      Q.    And she's just talking about working on her algebra.

3  She's just writing to tell you how her day was, love you?

4      A.    Yes.

5      Q.    And that's the letter from you.  Would you put all

6  the letters into one envelope and send them in the mail?

7      A.    Yes, the majority of the time I would.

8      Q.    And a letter from Deja?

9      A.    Yes.

10     Q.    And then this letter written on May 1st of this

11  year, you said, thanks for the Bible verse.  That's what I'll

12  read before bed tonight.  He had sent you a Bible verse in the

13  mail?

14     A.    I think so, or either we had talked about it and I

15  asked him -- I had asked him which one, because he was telling

16  me about one he read, and I was asking him which one was it so

17  that I can go back and read it.

18     Q.    Throughout your marriage were -- were you religious?

19     A.    Yes.

20     Q.    How often -- I mean, did you go to church or read

21  the Bible or how would that manifest itself?  How would that

22  come about that y'all were religious?

23     A.    Reading my Bible and my husband would read his

24  Bible.  He went to my mother-in-law's church.

25     Q.    What church was that?

```
 1        A.    I think it was El Bethel.

 2        Q.    And whose handwriting is that?

 3        A.    That is -- I think that's Deja's.

 4        Q.    How have the girls been doing since this happened?

 5        A.    Well, they have -- they have their good and bad

 6   days, but for the majority of the time, they've been doing

 7   good.

 8        Q.    Do you bring them to see their daddy?

 9        A.    Yes, I do.

10        Q.    Do they get excited to see him?

11        A.    Yes.

12        Q.    And do they talk with him during visitation?

13        A.    Yes.

14        Q.    At the Dallas County Jail is that contact?  Can they

15   hug and love on him, or is it just on the phone with the glass?

16        A.    No, it's just on the phone.

17        Q.    And who's that one from?

18        A.    From Matduxx.

19        Q.    When Matthew talks to the girls on the phone, does

20   he parent them on the phone or does he just visit with them?

21        A.    Both.

22        Q.    So he's still parenting them even though he's in

23   jail?

24        A.    Yes.

25        Q.    And with regard to the phone calls between you and
```

```
 1   Matthew, what did the three of us attorneys tell you about

 2   talking about the case on the phone?

 3                   MS. MOSELEY:  Objection, hearsay and relevance.

 4                   THE COURT:  Sustained.

 5                   MS. MULDER:  We'll pass the witness, Your Honor.

 6                   MS. MOSELEY:  Do you want me to start, Judge?  I

 7   know we're --

 8                   THE COURT:  Yes, I do.

 9                   MS. MOSELEY:  Okay.

10                   THE COURT:  We need to get through this witness

11   today.

12                   MS. MOSELEY:  Okay.

13                         CROSS-EXAMINATION

14   BY MS. MOSELEY:

15       Q.   Ms. Johnson, first, I want to say that I certainly

16   recognize that this is difficult for you and your children.

17   You and I have spoken previously; is that right?

18       A.   Yes.

19       Q.   Not because you wanted to, but because you were

20   subpoenaed to testify at the Grand Jury, right?

21       A.   Yes.

22       Q.   And since then, you and I have not spoken?

23       A.   No.

24       Q.   Going back to your history with the Defendant, when

25   we first spoke in the Grand Jury, you said he was not abusive
```

217

1   toward you.  But today you admit that he was; is that right?

2        A.   No, I don't remember saying that he wasn't.

3        Q.   Well, I think what you told me was we hit each

4   other?

5        A.   Yes, but I didn't say that we -- that it didn't

6   happen.

7        Q.   Are you telling the members of the jury today that

8   it was more of him hitting you than it was you hitting him?

9        A.   It was a combination of the both.

10       Q.   When you would call the police and tell the police

11  that he had hit you, you weren't lying about that?

12       A.   No.

13       Q.   You remember the police coming to your house and you

14  not wanting to talk to them because you had told them that if

15  he came back, he would beat you again, he had done it before?

16       A.   I don't remember telling the police that.

17       Q.   You're not saying the police would lie about that,

18  you just don't remember it?

19       A.   No, I don't remember.

20       Q.   Where were your children when he hit you?

21       A.   Well, one incident they were there.

22       Q.   Just one?

23       A.   I'm not for sure, but I know one incident they were

24  there.

25       Q.   I want to talk a little bit about that aggravated

```
 1   assault case where your sister was the victim.  You remember
 2   that?
 3        A.   Yes.
 4        Q.   And you were there at your sister's house when the
 5   Defendant came over looking for you?
 6        A.   Do you know what address that was?
 7        Q.   I don't have it in front of me.  You know which
 8   night I'm talking about?
 9        A.   I'm not for sure, but I mean, it would be easy for
10   me to remember if I knew the address.
11        Q.   Do you remember the Defendant coming over and there
12   being an argument that escalated and your sister calling the
13   police and saying he pointed a gun at her?
14        A.   No.
15        Q.   Did that -- did that happen more than once, or you
16   don't know which incident I'm talking about?
17        A.   No, that didn't happen more than once because my
18   husband never pointed a gun at me.
19        Q.   I said at Courtney.  You don't -- do you --
20   certainly you talked to your sister about what she told the
21   police, right?
22        A.   I don't remember talking to her that day about what
23   she told them because I'm not for sure when that happened.
24        Q.   Do you remember her intervening between you and the
25   Defendant and an argument at her apartment?
```

219

```
 1        A.    Was this the same day?

 2        Q.    Yes, I'm talking about the same incident.

 3        A.    I don't remember.

 4        Q.    That would have been back in 1995, August 7th of

 5   1995, where he kept calling repeatedly throughout the night and

 6   making threats and was finally arrested at his mom's house.

 7   None of that rings a bell?

 8        A.    I think I remember when he got arrested, but I don't

 9   remember him calling or anything.

10        Q.    You don't remember reporting to the police that he

11   was calling and threatening you?

12        A.    I reported that or my sister reported it?

13        Q.    You did.

14        A.    No.

15        Q.    And you don't remember the incident that started all

16   of that, him threatening Courtney?

17        A.    No, I don't.

18        Q.    You know he got put on probation for that charge?

19        A.    Yes.

20        Q.    And are you saying that that never happened?

21        A.    I can't say because I don't remember him -- my

22   husband didn't even own a gun.

23        Q.    Do you remember the argument that started at your

24   sister's house where the Defendant was arguing with you and

25   Courtney tried to step in?
```

```
 1        A.    No, I do not.

 2        Q.    That started all of this, going into the night where

 3   he got arrested?

 4        A.    I do not remember the argument.

 5        Q.    You -- did he just get arrested for nothing?  Or do

 6   you know?

 7        A.    I do not remember the argument.

 8        Q.    And you knew Courtney had called the police?

 9        A.    I mean, if I was there, I knew that she called the

10   police.

11        Q.    I'm asking today, right now as you sit here, you

12   know Courtney was the one that called the police that resulted

13   in him getting that aggravated assault charge?

14        A.    Yes.

15        Q.    And Courtney and the Defendant, your husband, are

16   very close, are they not?

17        A.    Yes.

18        Q.    And were they close back then in 1995?

19        A.    Yes.

20        Q.    Would you agree it would be unusual for her to just

21   make something up to get him in trouble?

22        A.    I can't speak for what she felt or what she said.

23        Q.    She's actually been helping you put money on his

24   books and keeping him happy in jail this time?

25        A.    Yes.
```

1      Q.    And been visiting him when she can?

2      A.    Yes.

3      Q.    I want to talk to you about that protective order.

4            MS. MOSELEY:  May I approach the witness, Judge?

5            THE COURT:  You may.

6      Q.    (BY MS. MOSELEY)  I'm showing you what I've marked

7  as State's Exhibit 193.  If you'll take a look at those.  I

8  think it's three pages.

9      A.    Yes.

10      Q.    That is -- the first page of that is kind of a -- an

11  inventory, a work sheet, some questions asked of you that you

12  circled the appropriate answers.  I think you said you and the

13  lawyer had spoken about that, correct?

14      A.    Yes.

15      Q.    And you actually did that in your handwriting?

16      A.    Yes.

17      Q.    And then that second page is the affidavit, a sworn

18  statement by you regarding the prior abuse by your husband?

19      A.    Yes.

20      Q.    And the last page contains your signature.  And

21  these documents resulted in you obtaining a protective order

22  from a judge, correct?

23      A.    Yes.

24            MS. MOSELEY:  I'd offer State's Exhibit 193 into

25  evidence.

```
 1                      (State's Exhibit 193 offered.)

 2                      MS. MULDER:  Your Honor, we object at this time,

 3    hearsay.

 4                      MS. MOSELEY:  It's prior inconsistent statement,

 5    Your Honor.

 6                      THE COURT:  Overruled.  Admitted.

 7                      (State's Exhibit 193 admitted.)

 8                      MS. MOSELEY:  Permission to publish?

 9                      THE COURT:  You may.

10        Q.    (BY MS. MOSELEY)  Now, this first page, you were

11    asked a series of questions about some behaviors from -- from

12    the person you're seeking the protective order on.

13                      (Discussion off the record.)

14        Q.    (BY MS. MOSELEY)  So how often these things happen,

15    and 1 is never; 2 is rarely; 3, occasionally; 4, frequently;

16    and 5, very frequently.  Called you names or criticized you,

17    you circled 5, right?

18        A.    Yes.

19        Q.    Tried to keep you from doing something, going out

20    with friends, going to meetings, you circled 5.  Gave you angry

21    looks or stares, preventing you from having money for your own

22    use, ended discussion with you and made the decisions himself,

23    threatened to hit or throw something at you, pushed, grabbed or

24    shoved you, put down your family and friends -- on all of those

25    you circled 5, didn't you?
```

223

```
 1        A.    Yes.

 2        Q.    Accused you of paying too much attention to someone

 3  or something else.  You said frequently.  Put you on an

 4  allowance and used your children to threaten you.  You said

 5  never, he had never done that, correct?

 6        A.    Yes.

 7        Q.    Going on down to the 14th question there:  Slapped,

 8  hit, or punched you.  You circled 5, which meant very

 9  frequently.  Threatened you with a knife, gun, or other weapon,

10  down there Number 20, you circled 1, he had never done that,

11  correct?

12        A.    Yes.

13        Q.    Now, when you filled this out, you did so

14  understanding that the District Attorney's Office was trying to

15  get an idea of how much danger you were in, correct?

16        A.    Yes.

17        Q.    In terms of getting the protective order you were

18  asking for?

19        A.    Yes.

20        Q.    And in your affidavit, you discuss the -- the

21  incidents leading up to this protective order request that --

22  where the Defendant had assaulted you, correct?

23        A.    Yes.

24        Q.    And you said on or about December 9th, 2003, my

25  husband assaulted me.  He became angry and punched me in the
```

224

```
 1   face.  I was in a chair.  It caused me to fall back so hard, it
 2   broke the chair.  He acted like he was going to hit me again,
 3   but stopped when my children started crying.  Your children
 4   were home on that incident, weren't they?
 5        A.   Yes.
 6        Q.   And on or about November of 2003, Matthew assaulted
 7   me.  He came home very late.  I had locked the door and didn't
 8   want to let him in.  He started beating and banging on the
 9   door, so I let him in.  When he got inside, he pushed me.
10             And October of 2003, you said he assaulted you
11   again.  He had gone out so you locked the door.  When he came
12   home, he kicked in the door.  He came at me and started
13   punching me in the face and the chest.  The Garland police were
14   called, and he was arrested.  I had a black eye, scratches on
15   my face and neck, soreness and pain.  Due to my injuries, I did
16   not go to work for about two weeks.  Over the last nine years,
17   Matthew has been physically violent and abusive to me.  He has
18   hit me, punched me, slapped me, kicked me once, strangled me,
19   pushed me and shoved me and thrown me around.  I've had
20   bruises, black eyes, a bloody nose, a busted lip, scratches,
21   soreness, swelling, and pain.  He told me that if I left and
22   then came back, he would beat me.  He told me that if he found
23   out I was cheating, he would beat me.  I took his threats
24   seriously.
25             And you knew when you said all of that, that
```

1    that was a sworn affidavit.  In other words, it was under oath?

2        A.    Yes, but to my -- what I understood was it was

3    pertaining to those incidents.

4        Q.    But the things you put in this affidavit are true,

5    are they not?

6        A.    Yes.

7        Q.    That's a little more than we just had an argument

8    and we both hit each other, isn't it?

9        A.    Well, we did have an argument and hit each other.

10        Q.    Did he miss work because of black eyes and bloody

11    noses?

12        A.    No.

13        Q.    When he was in the penitentiary -- well, let me back

14    up just real quick.  Now, the protective order came in -- in

15    2004, correct?

16        A.    Yes.

17        Q.    That's what the date was on that?  Now, he got

18    arrested June 19th of 2004 for the robbery, right?

19        A.    I'm not for sure of the date.

20        Q.    The summer of 2004?  And you said he called you from

21    the jail the next day?  Or do you know -- how did you find out

22    about the robbery?

23        A.    Because he called me.  But I'm not for sure if it

24    was the -- I think it was the next day.  I don't think it was

25    the same day.

```
 1        Q.    But he called you from jail and told you he had been

 2   arrested?

 3        A.    Yes.

 4        Q.    And the protective order was pending then, correct?

 5   You had already gotten the protective order?

 6        A.    I don't remember.

 7              MS. MOSELEY:  May I approach, Your Honor?

 8              THE COURT:  You may.

 9        A.    Are you saying when he got in trouble for the

10   robbery, this was -- and that was at the same time?

11        Q.    (BY MS. MOSELEY)  You swore out this affidavit

12   December 11th of 2003, and the protective order came after

13   that, right?

14        A.    Yes.

15        Q.    The Judge issued the protective order after you

16   filled that affidavit out?

17        A.    Yes, but I'm not for sure of the date.

18        Q.    And you don't know if that protective order was

19   valid when he was arrested for the robbery?

20        A.    No, I don't know.

21        Q.    Well, you posted his bond to get out of jail,

22   correct?

23        A.    Yes.

24        Q.    And you knew that he had been using drugs?

25        A.    Yes.
```

```
 1        Q.    And you knew that when he used drugs, he was violent

 2  with you?

 3        A.    Yes.

 4        Q.    But you still posted the bond?

 5        A.    Yes, I did.

 6        Q.    Did he come home and live with you?

 7        A.    I don't remember if he came home that -- that

 8  incident.  I'm not for sure.

 9        Q.    After you -- after you posted his bond, you don't

10  know where he went?

11        A.    I don't remember if he came home that -- right then.

12  I don't remember.

13        Q.    And then less than three months later, on

14  September 13th, he was arrested after the police found him, you

15  had called the police saying he was trying to kick in the door.

16  Do you remember that?

17        A.    And that was one of the -- on the protective order?

18        Q.    That was for violating that protective order.

19        A.    Okay.  I mean, if they say that I did, but I don't

20  remember when I called the police.

21        Q.    And you don't remember him being arrested again

22  after you posted the bond for the robbery?

23        A.    No.

24        Q.    You do remember him getting sentenced to prison?

25        A.    Yes.
```

228

```
 1         Q.    And you know he was in jail when that happened?

 2         A.    Yes.

 3         Q.    But you don't know why he went back to jail?

 4         A.    Well, apparently because I called the police, but

 5    I'm not for sure of the dates.

 6         Q.    You do remember him being arrested over back in the

 7    back of your apartment complex, back by Courtney's apartment,

 8    in 2004, after the robbery, but before he went prison?

 9         A.    Okay.  My sister never lived in the back of my

10    complex.

11         Q.    So that didn't happen?

12         A.    My sister never lived in the back of my complex.

13         Q.    Do you remember him being arrested?  You pointing to

14    the police back around there and him getting arrested after

15    trying to kick in your door?

16         A.    Yes.  And was that at our -- when I lived in the

17    townhomes?

18         Q.    I'm just -- I don't know where you were living.  I

19    mean, I could pull all of these reports out, but we're going to

20    be here all day.  I'm asking you if you remember him being

21    arrested for trying to kick in your door?

22         A.    Yes.

23         Q.    And that was after you posted his bond for the

24    robbery, but before he went prison, or you don't know that?

25         A.    I'm not for sure.
```

229

```
 1          Q.    When he went prison for the robbery, you told the
 2    Defense attorney that you stood by him, right?
 3          A.    Yes.
 4          Q.    And you wrote letters to the parole board, correct?
 5          A.    Yes.
 6          Q.    And you were convinced in your mind that he had
 7    changed, weren't you?
 8          A.    Yes.
 9          Q.    That he had decided he didn't want to live like
10    this, that he wanted to be out with you and your girls?
11          A.    Yes.
12          Q.    And, in fact, you wrote letters to the parole board
13    to tell them about that, didn't you?
14          A.    Yes, I did.
15                MS. MOSELEY:  May I approach?
16                THE COURT:  You may.
17          Q.    (BY MS. MOSELEY)  Take a look at these letters and
18    see if those are letters that you wrote back in early 2006.
19          A.    Yes.  Yes, they are.
20          Q.    And in these letters, Ms. Johnson, you spend a lot
21    of time going into quite a good bit of detail about how good
22    your husband really is when he's not using drugs, right?
23          A.    Yes.
24          Q.    And about how he realizes now that this isn't --
25    that this isn't the way that he wants to live, right?
```

1        A.    Yes.

2        Q.    And that he had taken responsibility for the things

3   he did?

4        A.    Yes.

5        Q.    But you also talk about how often you tried to get

6   him to change before he went to prison, right?

7        A.    I don't remember if I put that in there.

8        Q.    And you believed that the drugs were behind him and

9   that he realized the error of his ways and was going to be on

10  the straight and narrow when he got out, correct?

11       A.    Yes.

12       Q.    But then when he got out, you said -- certainly it

13  wasn't in 2006, right?  They kept him a lot longer than you

14  expected them to keep him, didn't they, in the prison?

15       A.    I don't understand what you mean.

16       Q.    Well, you wrote this letter January 20th of 2006,

17  and this one -- I don't know what date you wrote it, but it was

18  received by the parole board March 29th of 2006, and he didn't

19  get out until 2009, right?

20       A.    Yes.

21       Q.    And you said you kept in contact with him when he

22  was there?

23       A.    Yes.

24       Q.    You put money on his books when he was in the

25  penitentiary, I'm sure?

1    A.    Yes.

2    Q.    And he got out and for a couple of years he was

3    good, you said?

4    A.    Yes.

5    Q.    Did everything that you expected him to do?

6    A.    Yes.

7    Q.    He worked?

8    A.    Yes.

9    Q.    He was able to find a job pretty quickly after

10    getting out of prison, right?

11    A.    Yes.

12    Q.    That was when he went to work at Meineke?

13    A.    Yes, it was.

14    Q.    And then after he got let go from Meineke, it wasn't

15    too long after that that Mr. Contente at Kwik Kar hired him,

16    right?

17    A.    Yes.

18    Q.    And that was a good job, as well, wasn't it?

19    A.    Yes.

20    Q.    Now, the night that the defendant decided to go on

21    the crack binge in November of 2011 when he stole from Mr.

22    Contente, do you remember that time period?

23    A.    I'm not for sure of the date, but I do remember

24    that.

25    Q.    And you and the Defendant had had the conversation

232

```
 1   about buying coats for the girls?

 2        A.   Yes.

 3        Q.   Well, he didn't buy any coats for the girls that

 4   weekend, did he?

 5        A.   No, because we didn't have the money to.  That's

 6   what we were discussing.

 7        Q.   I'm talking about after he stole the money from Mr.

 8   Contente.

 9        A.   No.

10        Q.   He didn't use that money to buy coats for the girls,

11   did he?

12        A.   No.

13        Q.   And then when he got arrested, you went and bonded

14   him out again, didn't you?

15        A.   Yes, I did.

16        Q.   And where did you get the money to bond him out of

17   jail?

18        A.   I don't remember if I borrowed it from someone or

19   not.

20        Q.   But you couldn't borrow it for coats?

21        A.   Well, because we were getting help with the coats,

22   but I don't remember who I got the money from.

23        Q.   But you borrowed money to get him out of jail on the

24   theft case, right?

25        A.   Yes.
```

233

```
 1        Q.    And then while he was out on that theft case, was he
 2   living with you?
 3        A.    Yes.
 4        Q.    While he was out on bond?
 5        A.    Yes.
 6        Q.    Now, you and I spoke previously about what was going
 7   on in early 2012 after he got out of jail and started working
 8   for XLC.  You remember that time period?
 9        A.    Yes.
10        Q.    You know he was let go from XLC because he was using
11   drugs again.  He was living at your house?
12        A.    Yes, at our house.
13        Q.    Did you know he was using drugs again?
14        A.    Yes.
15        Q.    Did you try to get him any help then?
16        A.    Yes.  He tried to get help himself.  That's why he
17   was let go from there, because he went there to ask them for
18   help and they laid him off from work.
19        Q.    Did you know that Gio -- had you ever met Gioconda
20   Verdaguer, the lady that worked there at the store and that
21   gave him the job at XLC?
22        A.    No.
23        Q.    Did you know that she told him some places he could
24   get help that were near your home?
25        A.    No, I didn't know that.
```

```
 1        Q.   But he went to his employer to try to get help for

 2   the drug problem?

 3        A.   Yes.

 4        Q.   And you know they couldn't let him keep working

 5   there, right, if he was using drugs?

 6        A.   Well, I didn't know what they expect.  I just

 7   thought it was a good idea for him to go there, so that they

 8   could help him.

 9        Q.   You get -- you get help for your family through

10   Social Services on occasion, right?

11        A.   Yes.

12        Q.   You -- you're aware of Section 8 and other

13   government assistance, correct?

14        A.   Yes.

15        Q.   But you've never heard of assistance for drug

16   treatment?

17        A.   Through the government?

18        Q.   Salvation Army.  Ever try the Salvation Army?

19        A.   No, I don't think I called them, but I called

20   several places.

21        Q.   Did you call Parkland?

22        A.   No, I didn't know that they offered anything like

23   that.

24        Q.   Did you call Addicare where he had gotten treatment

25   before when he was on probation?
```

```
 1        A.    I went to one facility, but I don't remember if that

 2   was the name of it.  But it wasn't a -- it was like a

 3   counseling -- like where they counseled you.

 4        Q.    And you don't think counseling would have helped?

 5        A.    No.

 6        Q.    That wasn't worth a shot?

 7        A.    No, because I know that he needed more, and he know

 8   that he needed something more.

 9        Q.    Right.  So it was -- if you could get him in

10   counseling or Narcotics Anonymous, Alcoholics Anonymous, you

11   know those were available, correct?

12        A.    Uh-huh.

13        Q.    Yes?

14        A.    I knew that the ones that I went to were available.

15   I didn't know about every one that existed.

16        Q.    But you couldn't get him in inpatient, so you

17   decided, forget it, we'll just do nothing?

18        A.    No.  I decided to continue looking because I knew

19   that he needed something more than just to go to a place to sit

20   there and be counseled.  He needed more than that.

21        Q.    When he was taken by the Dallas police to

22   Presbyterian Hospital in April of that year shortly after he

23   got let go from XLC, where were you?

24        A.    I was at home.

25        Q.    And you got -- you were made aware, I guess, the
```

```
 1  next day that he had been released from the hospital?

 2       A.   Yes.

 3       Q.   Do you remember him coming home with a list of

 4  resources?

 5       A.   Yes.

 6       Q.   And you said you called those and none of them would

 7  give you any help?

 8       A.   The ones that I did call, they wanted you to have

 9  insurance.  And we didn't have insurance and we didn't have the

10  money to pay out of pocket for it.

11       Q.   The ones you did call, did you call every one of

12  them?

13       A.   No, I didn't.

14       Q.   And on April 26th of 2012, when he exposed himself

15  to Carina Pinzon at the Express Inn, where were you?

16       A.   I was at home.

17       Q.   You didn't know he was staying at the Express Inn?

18       A.   No.

19       Q.   Did you ever know about that?

20       A.   I think he had told me, but I don't recall going

21  into depth about it.  I don't think I even asked.

22       Q.   When do you think he told you?

23       A.   I don't remember.

24       Q.   You didn't know anything about it when you testified

25  at the Grand Jury after this crime, right?
```

```
 1        A.    No, I think that he did tell me, but I don't
 2   remember the detail of it.  I don't think it was told to me
 3   that way.  I'm not for sure.  I honestly don't remember.
 4        Q.    He wasn't living at your house then, when that
 5   happened?
 6        A.    I'm pretty sure that he was.
 7        Q.    Was he living at your house on May 20th when he
 8   committed this crime?
 9        A.    Yes.
10        Q.    Have you watched the video of this crime?
11        A.    Yes, I have.
12        Q.    And what do you think about it?
13        A.    It's pretty horrible.
14        Q.    And you keep repeating over and over on the calls
15   that you've made to the Defendant when you -- when he calls you
16   from the jail and y'all talk, that wasn't you that did that,
17   right?
18        A.    Yes.
19        Q.    You don't believe that that was your husband that
20   did that?
21        A.    I don't believe that he was himself when did he
22   that.  I mean, of course it was my husband because he was
23   there.
24        Q.    And you understand that the -- he says he's sorry
25   every time he does something, doesn't he?
```

238

```
 1        A.    No, not every time.

 2        Q.    He's not sorry every time he commits a crime and

 3   gets arrested?

 4        A.    He's not sorry every time he -- he what?

 5        Q.    Every time he commits a crime or gets arrested?

 6        A.    Okay.  But what did you say before that?

 7        Q.    He's not sorry?

 8        A.    That's -- I mean, that's two different things.  He

 9   can be sorry about one thing, but not for another.  It just --

10   it depends on what it was regarding.

11        Q.    He told you he was remorseful for robbing the lady

12   of her truck, right?

13        A.    Yes.

14        Q.    And when he was in the penitentiary, you believed

15   that he was remorseful, correct?

16        A.    Yes.

17        Q.    You would agree that remorseful means more than just

18   saying you're sorry, right?

19        A.    Yes.

20        Q.    That there are actions that have to follow up with

21   that, correct?

22        A.    Yes.

23        Q.    And he's remorseful every time, isn't he?

24        A.    I can't speak for him.  I can only go by what he

25   confides in me.
```

```
 1        Q.    And he doesn't tell you he's remorseful?

 2        A.    Yes, he tells me a lot of things, and that is one of

 3   them.

 4        Q.    When -- you said he called you when he got arrested

 5   for this capital murder.  He called you from the Garland jail?

 6        A.    Yes.

 7        Q.    But when you talked to him, that wasn't the first

 8   time he had called the house, was it?

 9        A.    I'm not for sure because I was at work.

10        Q.    You were aware when you got home that your daughters

11   had already known what happened, right?

12        A.    No, they didn't know what happened.  They just know

13   that he had called from jail.  I don't know if they -- I don't

14   remember asking them what they -- what they knew regarding it.

15        Q.    He had left a message on the answering machine?

16        A.    Yes.

17        Q.    And then he called back, and you talked to him,

18   right?

19        A.    Yes.

20        Q.    Did he tell you what he had done?

21        A.    I don't remember if he said what he did or not

22   because I think I --

23        Q.    You've had an opportunity -- you've had an

24   opportunity to listen to that call?

25        A.    No.
```

```
 1        Q.    The Defense attorney didn't let you listen to the

 2  phone call between you and your husband?

 3        A.    No.

 4              MS. MOSELEY:  Judge, I think we'll need a quick

 5  break.

 6              THE COURT:  All right.  Members of the jury,

 7  let's take a quick recess.  I'm sorry to keep you this late,

 8  but we need to get through this so that we'll try to be on

 9  schedule.  So if you'll just take about a 10-minute break,

10  please.

11              THE BAILIFF:  All rise.

12              (Jury excused from courtroom.)

13              (Exhibit published.)

14        Q.    (BY MS. MOSELEY)  Is that your husband's voice?

15        A.    Yes.

16        Q.    And your voice, he's calling you?

17        A.    Yes.

18        Q.    And is that the call that you were referring to when

19  you were speaking to the Defense attorney when the Defendant

20  called you and talked to you from the jail?

21        A.    I'm not for sure which time you're talking about.

22        Q.    Is this the call he made to you from the Garland

23  jail after this crime happened?

24        A.    Yes.

25              MS. MOSELEY:  Judge, I do intend to offer this
```

```
 1   call -- this recording, and I don't know if the Defense is
 2   going to have an objection to it.
 3                   THE COURT:  Well, let's go ahead and get on the
 4   record with regard to that.  We're on the record outside the
 5   presence of the jury.
 6                   MS. MOSELEY:  Your Honor, as State's Exhibit
 7   Number 196, I intend to offer the phone call where the
 8   Defendant calls this witness, his wife, from the Garland jail
 9   after this crime.
10                   MS. MULDER:  No objection.
11                   THE COURT:  Admitted.
12                   THE BAILIFF:  All rise.
13                   (Jury returned to courtroom.)
14                   THE COURT:  Please be seated.
15                   Ms. Moseley.
16                   MS. MOSELEY:  Your Honor, I would offer State's
17   Exhibit 196.
18                   (State's Exhibit 196 offered.)
19                   THE COURT:  Admitted.
20                   (State's Exhibit 196 admitted.)
21                   MS. MOSELEY:  And permission to publish?
22                   THE COURT:  You may.
23       Q.   (BY MS. MOSELEY)  Ms. Johnson, this call that's
24   recorded on State's Exhibit 196 is the call that the Defendant
25   made to you on May the 20th after he got arrested for this
```

242

```
1    capital murder; is that right?

2        A.    Yes.

3        Q.    And he called you from the Garland jail?

4        A.    Yes.

5              (Exhibit published.)

6        Q.    (BY MS. MOSELEY)  Ms. Johnson, the Defendant was

7    supposed to be at home that morning to baby-sit the kids while

8    you went to work at your second job; isn't that right?

9        A.    Yes.

10       Q.    Yes?

11       A.    Yes.

12       Q.    And at that time you were working two jobs to

13   support the family?

14       A.    I just worked on the weekend to compensate.

15       Q.    You had a weekend job, and then you had a job during

16   the week, right?

17       A.    Yes.

18             MS. MOSELEY:  I'll pass the witness.

19                    REDIRECT EXAMINATION

20   BY MS. MULDER:

21       Q.    Just a couple of questions, Daphne.  Is your husband

22   somebody that shows his emotions?

23       A.    No.

24       Q.    Now, I've -- you and I watched together the video of

25   the -- in the store.  And watching Matthew walk into that
```

243

```
 1  store, what, if anything, is different about him?  What can you

 2  tell about him?

 3       A.    His facial expression and the way he was walking.

 4       Q.    What did his facial expression and the way he was

 5  walking mean to you?

 6       A.    He was just -- he was different.

 7       Q.    What did you think when you saw that?

 8       A.    That he wasn't himself.

 9       Q.    And what do you mean by wasn't himself?

10       A.    (No response.)

11       Q.    I know this is hard, Daphne, but we've got to get

12  through it.

13       A.    Everything was different, the way he walked, the way

14  he was doing his hands, his -- his body language.  It was just

15  different.

16       Q.    Do you have an opinion as to whether or not he

17  looked high in that video?

18       A.    Yes, he did.

19       Q.    Or under the influence?  I'm sorry?

20       A.    He did.

21       Q.    You and I watched -- also watched the in-car video

22  that shows your husband when he's being taken to jail.  What --

23       A.    Yes.

24       Q.    -- could you tell from that?

25       A.    That he was extremely high on there.
```

1      Q.    And why do you say that?

2      A.    Because he could barely hold his head up, and when

3  he did, his eyes were bulging.

4      Q.    Daphne, you understand that there's only two options

5  in this case?

6      A.    I do.

7      Q.    And with either one, your husband is never coming

8  home.  You understand?

9      A.    I do.

10     Q.    Is there anything else you'd like to say to the

11 jury?

12            MS. MOSELEY:  Objection, calls for narrative.

13            THE COURT:  Sustained.

14            MS. MULDER:  Nothing further, Your Honor.

15            MS. MOSELEY:  Nothing further.

16            THE COURT:  All right.  Thank you, ma'am.  You

17 may stand down.

18            MS. BERNHARD:  May we approach real quick?

19            THE COURT:  Yeah.

20            (Sidebar discussion, discussion off the record.)

21            THE COURT:  Sorry, we're trying to get

22 scheduling going.

23            I'm sorry to keep you so late, ladies and

24 gentlemen.  We are going to stand in recess for the day.  We'll

25 see you tomorrow morning at 8:45.

1            THE BAILIFF:  All rise.

2            (Jury excused from courtroom.)

3            (Recess of proceedings.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           Reporter's Certificate

2    THE STATE OF TEXAS:

3    COUNTY OF DALLAS:

4        I, Darline King LaBar, Official Court Reporter in and for

5    the 363rd District Court of Dallas County, State of Texas, do

6    hereby certify that the above and foregoing volume constitutes

7    a true, complete and correct transcription of all portions of

8    evidence and other proceedings requested in writing by counsel

9    for the parties to be included in the Reporter's Record, in the

10   above-styled and numbered cause, all of which occurred in open

11   court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if any,

14   admitted by the respective parties.

15       WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16   on the 25th day of February, A.D., 2014.

17

18

19
                              \s\Darline LaBar
20                            DARLINE KING LABAR
                              Official Court Reporter
21                            363rd Judicial District Court
                              Dallas County, Texas
22                            hpdkfaith@msn.com
                              (214) 653-5893
23

24
     Certificate No:  1064
25   Expiration Date:  12/31/2014


                    Darline King LaBar, Official Reporter