REPORTER'S RECORD

VOLUME 50 OF 57 VOLUMES

TRIAL COURT CAUSE NO. F12-23749-W

COURT OF CRIMINAL APPEALS NUMBER:  AP-77,030

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE 363RD JUDICIAL |
| VS. | : | DISTRICT COURT OF |
| MATTHEW LEE JOHNSON | : | DALLAS COUNTY, TEXAS |

**<u>PUNISHMENT PHASE BY JURY</u>**

\*\*\*\*\*\*\*\*\*\*\*

On the 5th day of November, 2013, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable Tracy Holmes, held in
Dallas, Dallas County, Texas:

Proceedings reported by machine shorthand computer
assisted transcription.

```
 1  A P P E A R A N C E S:

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
            Crowley Criminal Courts Building
 3          133 North Riverfront Boulevard
            Dallas, Dallas County, Texas 75207
 4          Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
         MS. ELAINE EVANS, A.D.A., SBOT # 24032880
 6       MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724
         MS. CHRISTINE WOMBLE, A.D.A., SBOT # 24035991
 7
                FOR THE STATE OF TEXAS;
 8

 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
            P.O. Box 2817
11          Red Oak, Texas 75154
            Phone:  972-617-5548
12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13          325 North St. Paul Street, Suite 2475
            Dallas, Texas 75201
14          Phone:  214-922-0212

15  MS. NANCY MULDER, Attorney at Law, SBOT # 00792971
            2214 Main Street
16          Dallas, Texas 75201
            Phone:  214-764-7246
17
                FOR THE DEFENDANT.
18

19

20

21

22

23

24

25
```

1                            **INDEX VOLUME 50**

2 November 5th, 2013                                     PAGE  VOL.

3 PUNISHMENT PHASE BY JURY:

4 Proceedings........................................ 5    50

| 5 DEFENSE WITNESSES | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| 6 JOHN ROACHE | 5 | 12 | | 50 |
| 7 JOHN ROACHE | 26, 52 | 44 | | 50 |
| 8 TIMOTHY JOHNSON | 66 | 83 | | 50 |
| 9 HAZEL JOHNSON | 88 | | | 50 |
| 10 FRANCES WILSON | 99 | 108 | | 50 |
| 11 COURTNEY JOHNSON | 110 | 127 | | 50 |
| 12 FRANK AU BUCHON | 132 | 137 | | 50 |
| 13 FRANK AU BUCHON | 142, 163 | 155, 164 | | 50 |
| 14 VALERIE BRAZIEL | 167 | | | 50 |

15 Reporter's Certificate............................. 180   50

16

17                         **ALPHABETICAL WITNESS INDEX**

| 18 | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| 19 FRANK AU BUCHON | 132 | 137 | | 50 |
| 20 FRANK AU BUCHON | 142, 163 | 155, 164 | | 50 |
| 21 VALERIE BRAZIEL | 167 | | | 50 |
| 22 COURTNEY JOHNSON | 110 | 127 | | 50 |
| 23 HAZEL JOHNSON | 88 | | | 50 |
| 24 TIMOTHY JOHNSON | 66 | 83 | | 50 |
| 25 JOHN ROACHE | 5 | 12 | | 50 |

1                    **ALPHABETICAL WITNESS INDEX**

2                       DIRECT          CROSS          VD          VOL.

3    JOHN ROACHE          26, 52          44                        50

4    FRANCES WILSON       99              108                       50

5

6                         **EXHIBIT INDEX**

7    DEFENDANT'S                   OFFERED          ADMITTED          VOL.

8     21    Dr. John Roache CV      6, 28            6, 28            50

9     22    Green Oaks Records      52               52               50

10    23    Parkland Jail Records  59               59               50

11    24    Frank Au Buchon CV     133, 143         133, 143         50

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2              THE COURT:  Please raise your right hand.

3              (Witness sworn.)

4              THE WITNESS:  Yes, I do.

5              THE COURT:  Thank you very much.

6              Please proceed.

7              (Outside the presence of the jury.)

8                    JOHN ROACHE,

9   was called as a witness by the Defendant, and after having been

10  first duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12  BY MS. BERNHARD:

13       Q.    State your name.

14       A.    John Roache.

15       Q.    And how are you employed?

16       A.    I'm a professor of psychiatry and pharmacology at

17  the University of Texas Health Science Center at San Antonio.

18       Q.    And could you briefly give us what kind of

19  educational background you have in order to do that?

20       A.    I am a Ph.D. pharmacologist who has specialized in

21  the area of addiction science for 30 years.  I've conducted a

22  lot of research, funded by the National Institute of Drug

23  Abuse, National Institute on Alcohol Abuse and Alcoholism, and

24  more recently the Department of Defense related to addiction

25  science, how drugs work, why people do it, and what are the
```

```
 1   consequences of doing it.

 2                   MS. BERNHARD:  And may I approach?

 3                   THE COURT:  You may.

 4        Q.   (BY MS. BERNHARD)  I'm showing you here -- do you

 5   recognize this?

 6        A.   Yes, that appears to be my curriculum vita.

 7        Q.   And this -- basically it includes all your

 8   accomplishments and experience and publications and --

 9        A.   Yes.

10        Q.   -- and the things you have done in your field?

11        A.   Yes.

12                   MS. BERNHARD:  We'd offer Defendant's

13   Exhibit 21.

14                   (Defendant's Exhibit 21 offered.)

15                   MS. MOSELEY:  I have no objection.

16                   THE COURT:  Admitted.

17                   (Defendant's Exhibit 21 admitted.)

18                   MS. MOSELEY:  Judge, I don't have any objection

19   to his being qualified as an expert in his field.  I think the

20   purpose of this is 705, not 702.

21                   THE COURT:  Okay.

22                   MS. MOSELEY:  Just to speed this up.

23        Q.   (BY MS. BERNHARD)  Dr. Roach, I've asked you to come

24   today to offer some opinions; is that --

25        A.   Yes.
```

1      Q.    -- fair?  And one of the opinions or one of the

2  things you're going to talk about is addiction?

3      A.    Yes.

4      Q.    And let me back up a minute.  I sent you several

5  records related to Matthew Johnson to review; is that right?

6      A.    Yes.

7      Q.    Do you happen to have a list of those records with

8  you?

9      A.    I do.  I left it at the back of the chair, but from

10  memory, I think I saw two police interviews, one from the

11  arrest of the murder and one from a previous theft.

12      Q.    Would it help if I sent -- if I brought this stuff

13  up to you?

14      A.    Yeah.  Sorry.

15            THE WITNESS:  Apologize, Your Honor.

16            THE COURT:  No problem.

17      A.    I have my notes here.  So two DVDs, one from

18  November 14th of 2011 regarding a theft from an employer, and

19  then the police interrogation of May 20th, 2012, on the day of

20  the arrest for this cause.  And then I also saw a DVD with a

21  number of hospital records, significantly from Green Oaks

22  Hospital, Parklawn (sic) -- Green Oaks Hospital from 2002,

23  Parklawn from 2004, Presbyterian emergency room visit in 2012,

24  and then there was a few other records from Parklawn in the

25  past.

```
 1        Q.    (BY MS. BERNHARD)  Did that also include Matthew
 2   Johnson's records from the Dallas -- medical records from the
 3   Dallas County Jail?
 4        A.    Yes, it did.  I'm sorry, I apologize for that.
 5   It --
 6        Q.    That's okay.
 7        A.    -- it did include that.
 8        Q.    And you just briefly also reviewed an in-car video
 9   of Mr. Johnson?
10        A.    You showed it to me just now before we came in.
11        Q.    In the back of a -- of a police car?
12        A.    Yes.
13        Q.    Let me just make sure if there wasn't anything else.
14   Did you also review a notice of extraneous offenses that I sent
15   to you that was filed by the State that detailed various
16   incidents?
17        A.    I -- I - I have in my notes that I received it, but
18   I'm -- I'm -- I think I -- the only thing I'm aware of in my
19   mind at the moment is some arrests for theft and a stolen car.
20        Q.    Evading arrest?
21        A.    Yes.
22        Q.    Maybe?
23        A.    Yes.
24        Q.    Some domestic violence assaults.  Does that ring a
25   bell?
```

```
 1        A.    I apologize, I don't --

 2        Q.    Okay.

 3        A.    -- have that.

 4        Q.    But you have in your notes that you did review it at

 5   some point?

 6        A.    Yes.

 7        Q.    Now, one of the opinions that you're prepared to

 8   talk about today is the physiological effects of addiction; is

 9   that --

10        A.    Yes.

11        Q.    -- correct?

12        A.    Yes.

13        Q.    And without, you know, going through your testimony

14   line-by-line, what can you tell the jury or what can you

15   educate the jury with, about addiction that they may not know?

16        A.    Well, that there's a -- a number of causes and

17   consequences.  There are both environmental and, you know, sort

18   of nurturing upbringing causes, environmental factors,

19   parenting, and -- and psychosocial environment.  And there are

20   a number of biologic causes, including genetic and the direct

21   actions of the pharmacological effects of drug use.  So when

22   drugs are used, they activate brain circuitry involved in the

23   learning -- basic learning and the motivational circuitry for

24   reward, and -- and commonly described as pleasure centers.  And

25   so the brain reward circuitry is activated by drugs of abuse,
```

```
 1   simply taken captive by the pharmacological actions of drug

 2   use.  And when -- when repeated use occurs, then it changes the

 3   brain and the brain circuitry involved in impulse control,

 4   decisional capacity, and -- and then it impairs -- it trains

 5   memory for the taking of drugs and the use of drugs, in order

 6   to experience the effects of the drugs, but it also then

 7   impairs the cognitive capacity to think about what's going on

 8   around you or make logical long-term decisions.  It's --

 9   impulse control becomes the problem.

10        Q.   Okay.  So -- and you were also going to talk about

11   the impulse control of an intoxicated individual; is that --

12        A.   Yes.  So --

13        Q.   -- fair?

14        A.   -- there's impulse control prior to intoxication in

15   the addict, and then there's -- it's exacerbated by the drug

16   intoxication state.

17        Q.   And is it unusual for an addict to deny that they

18   have a problem?

19        A.   No.

20        Q.   Is it unusual for an addict to think that I can just

21   quit and make, you know, very sincere promises to do that?

22        A.   No.

23        Q.   And then not follow through with that?

24        A.   Correct.

25        Q.   And is that the nature of addiction?
```

1      A.    It is -- I mean, it's very common.

2      Q.    And you mentioned that there was a genetic component

3  to substance abuse?

4      A.    Yes.

5      Q.    And you're prepared to talk about that, as well?

6      A.    Yes, I can.

7      Q.    And you have reviewed the records of Matthew

8  Johnson, and based on -- on the records that you reviewed, does

9  that -- do his records appear to be consistent with somebody

10  who has an addiction problem?

11      A.    Yes.

12      Q.    Long-standing?

13      A.    Absolutely.  Well, the -- the records I saw went

14  back to 2004.  And then -- I mean, those are the records I

15  specifically looked at.  I --

16      Q.    Well, actually I think the Green Oaks records which

17  you said you reviewed were 2002?

18      A.    Two -- 2002, yes, I'm sorry.  And they made

19  reference to his history in those records.

20      Q.    And in those records it -- they appear to say that

21  he had been using for many years --

22      A.    Yes.

23      Q.    -- at that point?

24      A.    Yes.

25      Q.    And you are also prepared to talk about the effects

```
 1   of some of the drugs that we have heard about in testimony,

 2   namely crack cocaine, Xanax, PCP, ice --

 3       A.    Alcohol.

 4       Q.    -- alcohol --

 5       A.    Yes.

 6       Q.    -- and marijuana?

 7       A.    Yes.

 8       Q.    And you can talk about the effects of those drugs

 9   individually and in certain combinations?

10       A.    Yes.

11             MS. BERNHARD:  I'll pass the witness.

12                       CROSS-EXAMINATION

13   BY MS. MOSELEY:

14       Q.    You stated, Doctor, that you reviewed the police

15   interviews of the Defendant?

16       A.    Yes.

17       Q.    Those two?

18       A.    Yes.

19       Q.    And then some medical records.  Just this morning

20   reviewed the video.  I assume you didn't watch the entire video

21   of the transport on May the 20th?

22       A.    We watched maybe three or four minutes of it.

23       Q.    And the Defense attorney asked you about whether you

24   reviewed the notice of extraneous offenses that I filed in this

25   case.  You indicated that you received that?
```

```
 1        A.    My -- I must apologize to the Court.  My notes

 2   indicate that I received it, but I -- I -- I don't feel very

 3   comfortable being able to testify to the details of it.

 4        Q.    That would have outlined prior criminal activity?

 5        A.    I observed that there was such, and I guess I tended

 6   to dismiss it as very common in these cases, and I didn't know

 7   that that was the point of my testimony.

 8        Q.    His criminal record isn't really significant then in

 9   your opinions that you're here to offer?

10        A.    I fully believe and accept that he probably has a

11   criminal history, because many addicts like this case do.

12        Q.    Did you interview anyone related to this case?

13        A.    No.

14        Q.    You didn't speak to the Defendant?

15        A.    No.

16        Q.    You didn't speak to his family?

17        A.    No.

18        Q.    Have you reviewed any records of the Defendant's

19   family members?

20        A.    No.

21        Q.    You indicated that genetics and biological factors

22   may come into play for addiction?

23        A.    Yes.

24        Q.    But you don't have any information about his

25   genetics or family history, do you?
```

```
 1        A.    The only family history I'm aware of is what was

 2  noted by the health care providers in the medical record and

 3  some comments made by the Defense attorney.

 4        Q.    But as it relates to the records you reviewed, you

 5  don't have any information other than -- well, did you see any

 6  family history in his medical records?

 7        A.    Yes.  It was noted in the medical records that he --

 8  that he -- so first of all, they -- they noted that he had

 9  antisocial personality, which means that he had a history in

10  his childhood of -- of anti -- you know, antisocial

11  characteristics.  That can be acting out, getting in trouble,

12  including criminal activity.

13              Green Oaks Hospital noted that he had a family

14  history positive for his brothers, cousins, and father.

15        Q.    For drug abuse?

16        A.    For chemical dependence.

17        Q.    Right.  No mental history, no mental illness in his

18  family?

19        A.    There's plenty of records that Mr. Johnson had

20  depression.

21        Q.    Which -- which records indicate that?

22        A.    Well, the jail records, he was treated for it.

23        Q.    Do they -- did they diagnose him with depression in

24  the jail?

25        A.    Well, let's see.  I mean, they were treating him for
```

```
 1  it.
 2        Q.    Was it a diagnosis?
 3        A.    I'm pretty sure it was, but I guess I'm less than
 4  100 percent whether it says that or not, because I didn't write
 5  down -- I didn't quote the medical record.  I wrote down my
 6  opinions of having looked at it.  That he -- that he had
 7  diagnosable depression, was being treated for it in the jail,
 8  as well as he had suicide -- in Green Oaks, he was identified
 9  as a suicide risk.
10        Q.    That was 2002?
11        A.    Yes.  And that's associated with depression.  And
12  further, that his stay there was extended for a period of time
13  because of treatment for depression.
14        Q.    Right.  So in -- in the Green Oaks records, he
15  actually was diagnosed with a polysubstance dependence and
16  depression, correct, in that order?
17        A.    I have written major depression, cocaine dependence,
18  and alcohol dependence, suicide risk.
19        Q.    And did you get that from the records themselves?
20        A.    Yes.
21        Q.    You don't have those with you, though, I assume?
22        A.    No.
23        Q.    And you said that it's your understanding --
24        A.    Actually I have the disks, but I don't have hard
25  copies.
```

```
 1        Q.   It's your understanding from your recollection that

 2   in the Dallas County Jail records, he was diagnosed with

 3   depression?

 4        A.   Yes.  Well, I mean -- you know, I -- the way you're

 5   wording the question, I'm having trouble answering it,

 6   because --

 7        Q.   Well, you understand what a diagnosis is, don't you?

 8        A.   Yes, I do.

 9        Q.   And --

10        A.   Yes, I do.

11        Q.   -- and you understand the difference between being

12   diagnosed with depression and not being diagnosed with

13   depression?

14        A.   Well, Green Oaks Hospital diagnosed him.  The jail

15   treated him.

16        Q.   We've already established that.

17        A.   Okay.

18        Q.   Would it surprise you to know that in the Parkland

19   jail records, the current records regarding his incarceration

20   and previous incarcerations, he has not been diagnosed with

21   depression.  Instead, he's been diagnosed with polysubstance

22   abuse and substance abuse -- and substance-induced mood

23   disorder.

24        A.   No, it wouldn't surprise me.

25        Q.   But not depression.  It would surprise you to know
```

```
 1   that he has not been diagnosed with depression in the jail?
 2        A.   Could you rephrase the question, please?
 3        Q.   Would it surprise you to know that he has not been
 4   diagnosed with depression by the jail psychiatrists?
 5        A.   No.
 6        Q.   And it wouldn't be unusual, I assume, for someone to
 7   be receiving depression medication when they're facing the
 8   death penalty?
 9        A.   I -- it wouldn't be unusual for them to receive
10   depression medication without a formal diagnosis.
11        Q.   That happens a lot in the jail, does it not, or do
12   you know?
13        A.   I can't testify for how frequent it is in the jail.
14        Q.   And with regard to the substances that the
15   Defendant -- you said his records indicate he has used, those
16   would all come from him reporting that?
17        A.   And the observations of trained health care
18   providers who know how to recognize that -- that.
19        Q.   As it relates to a history of mental illness in his
20   family, there isn't any in the records that you observed,
21   correct?
22        A.   Nothing that I've seen.
23        Q.   And so as it relates to his genetics and background,
24   all of the information about his family members and his family
25   history also comes from the Defendant?
```

```
 1        A.    I don't -- haven't seen a lot of psychosocial

 2   history.  I haven't seen a lot of records related to that.

 3   I've not been given that information.

 4        Q.    So you can't really testify to any --

 5        A.    In this case.

 6        Q.    -- history of his family, other than what he said?

 7        A.    And what the Defense attorney has told me.

 8        Q.    And is -- the repeated use changes the brain.  You

 9   testified you're prepared to tell the jury that repeated use of

10   drugs changes the brain chemistry?

11        A.    Yes.  Its structure.

12        Q.    How do you define repeated?

13        A.    So as happens with addiction, it's repeated use over

14   periods of time.  According to the American Psychiatric

15   Association, this has to persist for at least a period of one

16   month in order to be diagnosable.  In his -- in the records

17   that I've seen, it went on for years.

18        Q.    And when you -- when you say it has to go on for a

19   month, do you mean I have to use it once a month or I have to

20   use it daily for a month, or --

21        A.    So the -- the di -- according to the American

22   Psychiatric Association, the diagnosis is frequent -- frequent

23   use for a period of at least a month.  And during that time,

24   there is evidence of either loss of control of use, and/or

25   physiological tolerance and withdrawal because of the fre --
```

1  frequent use.

2      Q.    And those are the brain changes that you're talking

3  about?

4      A.    That's the definition of an addiction.  The brain

5  changes are being observed through both preclinical research in

6  animals, as well as brain imaging in human brains.  And you can

7  see structural changes and activity changes in the brain.

8      Q.    And how much drug use does it take to see these

9  changes in the brain structure and the brain --

10     A.    Seemingly not that much because under the acute

11 influence of a single use of drugs, the brain is being affected

12 by the drug.

13     Q.    Right.  That's --

14     A.    With repeat -- with repeated use, the brain adapts

15 to those changes.  And if you're trying to get an exact

16 quantity on how much use and in what time period, it kind of

17 depends on what you're talking about.  But the more you use and

18 the longer time, the greater the level of change.

19     Q.    And if someone was able to use drugs, let's say, you

20 know, over the course of a month, you said that would be

21 considered an addiction -- repeated use over a month is the

22 definition?

23     A.    It's -- it's not just use.  It's use with the

24 presence of harmful consequences of that use and an inability

25 to stop, and/or with physiological tolerance and withdrawal

1   when you do.

2       Q.   And so if someone were to use for a while and then

3   be able to stop for five years, hold down a job, go to work

4   every day, would that surprise you?

5       A.   No.   The National Institute on Drug Abuse defines

6   addiction as a chronically and relapsing disorder.   Former

7   addicts are at risk for relapse.   The longer they maintain

8   abstinence, the -- the less likely that is, but it's a

9   probabilistic statement.

10      Q.   And use on weekends, not a big deal, able to go to

11  work on Monday?

12      A.   There are plenty of functional addicts who maintain

13  jobs.

14      Q.   And don't commit violent offenses?

15      A.   Sure.

16      Q.   You also said that you were going to testify about

17  the effects of crack cocaine, Xanax, PCP, ice, alcohol, and

18  marijuana.

19      A.   I'm -- I'm able to comment on that if asked those

20  questions.

21      Q.   You -- and you expect to be asked that, I assume,

22  since the attorney brought it up?

23      A.   I guess so.

24      Q.   And then not only the use of those by themselves.

25  Well, let me ask you.   What are the effects of crack cocaine

1    while you're intoxicated?

2          A.    The intoxication from crack cocaine, it's a

3    stimulant.  It produces arousal and wakefulness.  It produces

4    intense euphoria, exhilaration.  There's generally a sense of

5    empowerment, sometimes characterized as superhuman, feeling,

6    you know, unusual capacity and ability and strength and zeal.

7    And then also under the influence of cocaine, you are very

8    focused on your feeling state and how it feels.  And it

9    doesn't -- while there's a sense of hyperacuity, it's --

10   there's also a focus on your drug intoxicated state and not

11   necessarily paying a lot of attention to what going on around

12   you or the reality of the situation.

13         Q.    And how about Xanax?  What are the effects of Xanax?

14         A.    Xanax is a sedative.  It's used to treat anxiety.

15   It has hypoarousal effects.  It decreases over --

16                    COURT REPORTER:  Hyper?

17                    THE WITNESS:  Hypo.

18                    COURT REPORTER:  Hypo.

19         A.    It decreases the overall brain activity and

20   awareness of things going on around you.  It's sedating.  It's

21   often used in combination with cocaine to try to take the edge

22   off the hyperarou -- hyperarousal from cocaine.  And it also

23   produces addiction and dependence, and there are withdrawal

24   reactions in chronic users.

25         Q.    And how about ice?

1       A.    Ice is methamphetamine.  Methamphetamine is also a

2  stimulant.  It's chemically different than cocaine, but it

3  produces some very similar effects on brain action and

4  intoxication and brain chemistry.  There are some subtle

5  differences in its pharmacology, the way it works in the brain,

6  but it's activating the pleasure and rewards circuits, and

7  produces similar senses of exhilaration and empowerment and

8  euphoria.

9       Q.    And marijuana?

10      A.    So marijuana is from -- the active ingredient is

11  Delta-9 THC.  It's -- there's other ingredients in Cannabis, as

12  well, but that's considered the main active ingredient and --

13  and -- that increases the intoxication and the addiction.  And

14  it's acting on what are called cannabinoid receptors.  They're

15  distributed throughout the body and the brain.  Marijuana

16  intoxication, it's considered a mild hallucinogen.  That is, it

17  -- it alters the sensory state in ways that things feel

18  different, sound different, look different than usual.  And it

19  -- it tends -- it tends to be both a relaxant and a stimulant

20  at the same time.  So it can produce some calming like effects.

21  At the same time, you're being hyperaroused to the sensory

22  environment around you, sight, sounds.

23      Q.    And are you here to tell the jury that the Defendant

24  was, in fact, intoxicated at the time he committed this capital

25  murder?

```
 1        A.    Yes, I believe he was.

 2        Q.    And on what basis do you form that opinion?

 3        A.    His statements, his appearance.  It's entirely

 4  consistent with a -- a night of cocaine use and -- and during

 5  the police videos I've observed, both a crash, as well as a

 6  sobering.

 7        Q.    You didn't watch the offense video?  You know

 8  there's a surveillance video of him setting --

 9        A.    No, I didn't see that.

10        Q.    -- of him setting a woman on fire?

11        A.    I didn't see that.

12        Q.    And you didn't watch that?

13        A.    I was not given it.

14        Q.    But you're going to express an opinion that he was

15  high at that moment?

16        A.    He looked like he was crashing in the back of the

17  police vehicle, which I understand was relatively proximate to

18  the event.

19        Q.    What is your understanding of how proximate it was?

20        A.    It was like at 8:40 a.m., I believe I was told.

21        Q.    And when was the crime?

22        A.    About an hour and a half earlier.

23        Q.    And it's -- you can look at his transport from

24  the --

25        A.    It's consistent with a night of binge of cocaine,
```

1    what I observed.

2        Q.    But you don't know if he was intoxicated at

3    7:00 a.m.?

4        A.    He would have been -- his -- his self report to the

5    police said that he had been using all night.  What I observed

6    was consistent with use all night.

7        Q.    If -- have you been shown the booking information

8    for the Defendant when he was booked into the Garland jail that

9    morning?

10        A.    No.

11        Q.    So would it surprise you to know that he reported to

12    the detention officer that he had had cocaine and two beers the

13    night before?

14        A.    It would not surprise me that he said that.

15        Q.    Because it wouldn't surprise you that he would lie

16    to them about what he had used?

17        A.    Yes.

18        Q.    Even if that was inconsistent with what he had told

19    the detective, per your recollection of the video?

20        A.    Yes.

21        Q.    Can you tell by watching that transport video what

22    drugs he was using?

23        A.    Not explicitly.  What I observed was an individual

24    who appeared to be intoxicated by -- I would say from seeing

25    somebody like that, in other patients like that, where we know

```
 1  their exact state, that alcohol was involved, and he appeared

 2  to have been up all night, which is common in cocaine.

 3       Q.    And --

 4       A.    And he appeared to be crashing from cocaine.

 5       Q.    Also consistent with just having been up all night,

 6  correct?

 7       A.    So one of the things that happens with cocaine use

 8  is sleep deprivation.  One of the things that happens with

 9  sleep deprivation is, you know -- you know, a cloudiness of

10  logical thinking and your ability to express yourself.

11       Q.    This is going to go a lot faster if you listen to my

12  questions and answer what I'm asking, particularly in front of

13  the jury.  I asked you was it also consistent with someone who

14  had just flat been up all night?

15       A.    Yes.

16       Q.    So if I understand, just to summarize, you're going

17  to tell the jury the consequences and causes of addiction, that

18  repeated use of drugs changes your brain, impairs your impulse

19  control and cognitive abilities, that it's not unusual for an

20  addict to deny their addiction, that it's not unusual for them

21  to think they can just quit?

22       A.    Yes.

23       Q.    And you're going to testify about the effects of

24  these listed drugs, as well as alcohol?

25       A.    Yes.
```

```
 1        Q.    And when we talk about the effects, are you talking

 2   about the intoxicating effects, or are you talking about

 3   long-term brain change effects?

 4        A.    Well, both are important in an addict.

 5        Q.    So you're going to testify to both?

 6        A.    I presume so.

 7                  MS. MOSELEY:  That's all I have, Judge.

 8                  THE COURT:  Anything further?

 9                  MS. BERNHARD:  Nothing further.

10                  THE COURT:  All right.  If we can get the jury,

11   please.

12                  THE BAILIFF:  All rise.

13                  (Jury returned to courtroom.)

14                  THE COURT:  Please be seated.

15                  Will the Defense call its next witness, please?

16                  MS. BERNHARD:  The Defense will call Dr. Roache.

17                  THE COURT:  Let the record reflect this witness

18   has been sworn.

19                            JOHN ROACHE,

20   was called as a witness by the Defendant, and after having been

21   first duly sworn, testified as follows:

22                       DIRECT EXAMINATION

23   BY MS. BERNHARD:

24        Q.    Will you state your name?

25        A.    John Roache.
```

```
 1                  MS. BERNHARD:  And may I approach?

 2                  THE COURT:  You may.

 3        Q.    (BY MS. BERNHARD)  And, Dr. Roache, how are you

 4   employed?

 5        A.    I am a professor of psychiatry and pharmacology at

 6   the University of Texas Health Science Center at San Antonio.

 7   I'm also the Chief of the Division of Alcohol and Drug

 8   Addiction.

 9        Q.    And what sort of educational background do you have

10   in order to do what you do?

11        A.    I'm a Ph.D. pharmacologist who studied the -- the

12   effects of drugs of abuse and why people use drugs and what

13   it -- what are the consequences of drug use.  And I've been

14   doing research for 30 years, funded by the National Institute

15   on Drug Abuse, the National Institute of Alcohol Abuse and

16   Alcoholism, and more recently, the Department of Defense.

17        Q.    And do you teach classes?

18        A.    I teach a little bit, mainly students interested in

19   research.  And -- and more recently psychiatrists,

20   psychologists interested in treating drug abuse, but mainly I'm

21   a researcher.

22        Q.    And do you publish your research?

23        A.    Oh, yes.

24                  MS. BERNHARD:  And may I approach?

25                  THE COURT:  You may.
```

1    Q.    (BY MS. BERNHARD)  I'm showing you Defendant's

2  Exhibit Number 21, and I'll ask if you recognize that?

3    A.    Yes, that is my curriculum vita.

4    Q.    And does this basically contain a listing of your

5  published research, your experience, your accomplishments in

6  the field of --

7    A.    Yes.

8    Q.    -- we call it the field of psychopharmacology?

9    A.    Correct.

10        MS. BERNHARD:  We'd offer Defense Exhibit 21.

11        (Defendant's Exhibit 21 offered.)

12        MS. MOSELEY:  I have no objection.

13        THE COURT:  Admitted.

14        (Defendant's Exhibit 21 admitted.)

15    Q.    (BY MS. BERNHARD)  And you've been doing this how

16  long?

17    A.    Thirty years.

18    Q.    So that's why that's a thick CV?

19    A.    Yes.

20    Q.    Now, there are other people in your field who do the

21  same thing; is that fair to say?

22    A.    Sure.

23    Q.    The National Institute on Drug Abuse, do you work

24  with them or study their research?

25    A.    Yes.  They're -- they're part of the National

```
 1  Institutes of Health.  That's one of the institutes, and their

 2  purpose is to promote research in drug abuse, its causes,

 3  consequences, and cures.

 4      Q.    And you've also studied and participated in research

 5  on drug abuse, and impulsivity?

 6      A.    Yes.

 7      Q.    And how that relates?

 8      A.    Yes.

 9      Q.    Now, you reviewed several records in this case; is

10  that correct?

11      A.    Yes.

12      Q.    Can you give us a brief rundown of what records you

13  reviewed?

14      A.    I've seen a police interview of --

15      Q.    A recorded interview?

16      A.    -- DVD, video record of a -- a theft that occurred

17  in November of 2011, the arrest on -- for murder on May 20th of

18  2012.

19      Q.    And that was also a recorded interview?

20      A.    Right.  And I --

21      Q.    With Mr. Johnson?

22      A.    Yes.

23      Q.    Do you recognize Mr. Johnson from the man who

24  appeared in those videos?

25      A.    Yes.
```

1     Q.    And is -- can you identify him in the courtroom?

2     A.    On the left, far -- to the far left, your right.

3     Q.    And did you also review some written records?

4     A.    Yes.  It was also a DVD -- a disk that had PDF files

5  of hospital records.  Those hospital records were from the

6  Dallas County Jail, from Green Oaks Hospital from 2002,

7  Parkland Hospital from 2004, Presbyterian emergency room from

8  2012, and a few other records from the -- the Dallas Police

9  Department and Parkland.

10    Q.    And did you also review a detective's -- pages from

11 a detective's file that contained a summary of this offense?

12    A.    Yes.

13    Q.    And based on your review of those records and

14 viewing the videos -- and did you also briefly watch an in-car

15 video that -- that showed Mr. Johnson in the back of a police

16 car?

17    A.    Yes.

18    Q.    And based on your review of those records, do you

19 have some opinions, based on your knowledge of addiction and --

20 and psychopharmacology that would be helpful to this jury in

21 understanding those concepts?

22    A.    I believe so.

23    Q.    What is addiction?

24    A.    So addiction is a process -- it's a -- it's a

25 learning process that happens with repeated use of drugs of

```
 1   abuse.  Certain drugs have a potential for abuse and addiction.
 2   And when those drugs are used repeatedly, addiction is the
 3   process of -- it's -- it's a learned behavior because the drugs
 4   act on the basic brain learning mechanism, the motivational
 5   circuits.  They're often called the brain reward system, so
 6   when anybody -- any person learns a behavior, a child or an
 7   adult, this system is being activated and -- and -- and the
 8   process of learning is engaging in motivational circuits to
 9   determine whether that's a good behavior to repeat in the
10   future.
11              And the drugs of abuse, unfortunately,
12   chemically activate the circuitry in ways that kind of take
13   control of it.  So this is why certain drugs have particular
14   potential for abuse, because in directly activating the
15   learning and motivational circuitry called reward, it's also
16   been called the pleasure centers.  But what happens with that
17   addiction process is the use of drugs becomes a primary
18   motivating factor and it's repeatedly done over and over again,
19   unfortunately, to the neglect of other responsibilities and in
20   ways that have harmful consequences.
21              MS. BERNHARD:  May I approach?
22              THE COURT:  You may.
23   Q.   (BY MS. BERNHARD)  Doctor, once a person becomes
24   addicted, is it a matter of just saying no?
25   A.   So what happens in the process of addiction is a
```

1    loss of ability to control oneself, particularly related to

2    drug use.  You know, they'd like to quit.  They want to quit.

3    They've tried to quit and been unsuccessful.

4        Q.    Does an addict have to use every day to be an

5    addict?

6        A.    No.

7        Q.    Is it common or uncommon for somebody to go through

8    periods of maybe even years without using and then succumb

9    again?

10        A.    The National Institute on Drug Abuse has defined

11    drug addiction as a chronically relapsing disorder.  Once

12    addicted, you are always at a heightened risk for relapse.

13    It's not uncommon for people to go through periods of

14    abstinence and then to relapse and to return to drug addiction

15    again.

16        Q.    Now, Doctor, you have reviewed the records of Mr.

17    Johnson from Presbyterian Hospital, correct?

18        A.    Yes.

19        Q.    And for the record, I'm referring to State's

20    Exhibit 188.  And in those records -- these are some of the --

21    I guess, the discharge instructions that -- that are given to a

22    patient, but you see where it says treatment there in those

23    records, and I think that shows up on the screen right next to

24    you.  It might be easier to see.

25        A.    Oh, yeah, this one I can read.

1        Q.   You see where it says treatment kind of in the

2   middle of that page?

3        A.   Yes.

4        Q.   And it says that alcoholism and addiction has little

5   to do with willpower.  Alcoholics and addicts have an

6   uncontrollable need for alcohol and/or drugs that overrides

7   their ability to stop drinking or using.  This need can be as

8   strong as the need for food or water.  Do you disagree with

9   that?

10       A.   No, not at all.

11       Q.   Is that a fair assessment of just how powerful

12   addiction is?

13       A.   Yes, it is.

14       Q.   It's not something that somebody can just wake up

15   and say, I'm not going to do anymore, and be successful?

16       A.   Correct.  It takes more than that.

17       Q.   Now, are you also familiar with drugs, such as crack

18   cocaine?

19       A.   Yes.

20       Q.   What does crack cocaine do to a person's mind?

21       A.   So cocaine is a stimulant.  It acts on the brain

22   reward circuitry.  It acts on the neurochemical dopamine which

23   is the chemical in the brain involved in this learning

24   motivational circuitry that we're talking about.  And cocaine

25   enhances the actions of this neurochemical in the brain in its

1    normal activity, which then thereby enhances the -- the

2    experience of reward and -- and in motivation to continue to do

3    that again.  The direct effects of cocaine in the body, it's --

4    it's a stimulant.  It's stimulating.  It's arousing.  It

5    increases a sense of wakefulness and vigilance, even to the

6    point of feeling powerful and special.  It's described as

7    intense euphoria, feeling really, really good, really, really

8    alert and zealous and ready to go, motivated.  And it also has

9    cardiac effects to enhance the heart rate and the blood

10   pressure and creates overall arousal.  That's the effect of

11   cocaine intoxication.

12       Q.   What about the effects of something like marijuana?

13       A.   So marijuana, of course, is a plant.  It has a

14   number of chemicals in it, but the main ingredient that is

15   thought to be responsible for intoxication and addiction is

16   Delta-9 THC.  And that acts on things called cannabinoid

17   receptors which are found throughout the body and the brain and

18   involved in a lot of processes regulating the overall chemical

19   transmission of activity in the brain, for example.

20            The marijuana intoxication state is called a

21   mild hallucinogen.  It alters your -- your senses, particularly

22   sight and hearing.  Things sound different, look different,

23   they feel different.  You experience the world differently in

24   the marijuana intoxicated state.  It has a combination of some

25   sedative effects tending to be relaxing and stimulant effects

1  because you're hypervigilant to the senses and sensations going

2  on around you.

3        Q.    And, Doctor, are you familiar with PCP?

4        A.    Yes.

5        Q.    What is that?

6        A.    That's phencyclidine.  It actually was developed to

7  be used as a -- an anesthetic tranquilizer.  It's -- it's an

8  illegal substance.  It has psychomimetic effects.  It acts on a

9  different part of the brain chemistry, but still activating the

10  same brain reward circuit.  There are a lot of chemicals

11  involved there.  And what PCP does -- it's a -- it's called a

12  hallucinogen.  It produces alterations, large -- much more than

13  marijuana, and your sensory perceptions -- there's -- there's a

14  sense of time distortion, spatial distortion.

15              Under PCP intoxication, the user feels

16  superhuman empowered.  There have been cases of where, you

17  know, people have injured themselves trying to like go through

18  a wall, or do something superhuman in capacity.  It also has

19  the potential of producing what are called psychotic like

20  effects, where you can have hallucinations, paranoia, and

21  extreme agitation.

22        Q.    And what about ice, are you familiar with that?

23        A.    Yes.

24        Q.    What is that?

25        A.    Ice is methamphetamine.  Methamphetamine is a

1    particular chemical cousin to amphetamine.  Probably heard that

2    term.  It's a stimulant.  It produces many similar effects to

3    cocaine.  Pharmacologically and in the brain mechanism it's

4    slightly different, but it's activating and enhancing this

5    brain dopamine in the brain reward circuitry and producing some

6    similar kinds of intoxication, usually longer lasting than

7    crack cocaine would be.  It's longer duration, but the sense of

8    exhilaration and euphoria and alert -- awake, you know,

9    arousal, would be similar.

10        Q.    And what about Xanax?

11        A.    Xanax is a benzodiazepine.  It's a sedative.  It's

12   used to treat anxiety.  It -- it'll produce a lowering of the

13   brain activity and the sens -- sensations around you, so you're

14   less aware, less aroused, and less responsive.  It's sedative

15   so you feel kind of drowsy and sedated in -- in an intoxicated

16   state.  And it also produces addiction and dependence and

17   withdrawal syndrome.

18        Q.    Doctor, are some drugs more addictive than others?

19        A.    Yes.

20        Q.    What about crack, is that --

21        A.    It's one of the most addictive.

22        Q.    And how do we know that?

23        A.    Well, through behavioral science research in -- in

24   several forms.  One is the basic preclinical animal research

25   that's done -- done in experimental laboratories.  Also based

1  upon clinical observations where, you know, patients come in

2  contact -- what is the likelihood somebody that has used crack

3  cocaine, going on and progressing into an addictive behavior.

4  As compared to alcohol, it's higher in prevalence, and so

5  the -- the basic definition of strong addiction is continued

6  and persistent use despite other consequences --

7       Q.    And is it --

8       A.    -- at a high cost.

9       Q.    -- and is it common for an addict to sometimes use

10 multiple substances?

11      A.    It's common.  It is common.

12      Q.    Do they have a name for that?

13      A.    Polysubstance dependence -- polysubstance abuse.

14      Q.    What does -- if a person is intoxicated, let's say

15 on crack cocaine, alcohol, and Xanax, what does that do to a

16 person's impulse control?

17      A.    So impulse control is a -- is a key feature of

18 addiction.  First of all, people who are more impulsive to

19 begin with are at higher risk of becoming addicted.  Secondly,

20 under the influence of many of these drugs, there's evidence

21 that you're more impulsive under the influence.  The common

22 experience is the disinhibitory effects of alcohol, that people

23 drinking alcohol, even socially at low doses, you start getting

24 silly and doing things you wouldn't normally do.  That's the

25 drug intoxicated state.  And then more importantly, in the

```
 1   process of addictive behavior, the -- the addict becomes more
 2   driven for the immediate consequences of the drug experience
 3   and less thoughtful or conscientious or cognitively decisive
 4   about longer term consequences.  So the focus becomes on the
 5   immediate here and now and less about long-term consequences.
 6       Q.    When you say the focus is on the immediate here and
 7   now, is that -- are you talking about getting the next hit or
 8   what are we talking about?
 9       A.    Right.  So with an addict, they would be very
10   focused on procuring a supply for use to maintain their
11   addiction.  And -- and the basis for that is that their brain
12   reward circuitry and their motivation has been entrained,
13   entrenched, automatized on a sort of subconscious level of a --
14   of a need to seek and procure more drug.
15       Q.    And you said that they're not really thinking in
16   terms of long-term consequences.  What do you mean by that?
17       A.    So, I -- I think this would be a good point to -- to
18   elaborate that we're talking about certain brain areas.  So
19   the -- the brain reward circuitry is on a subconscious level.
20   There's also conscious brain, the higher cortical centers where
21   you think about things and you make decisions and you reason to
22   yourself.  That's -- that's -- in particular, the frontal
23   cortex is involved in decisional capacity and -- and impulse
24   control.  And normally the frontal cortex has thought and
25   reasoning and cognitive process, decision making that can
```

1  control the subcortical areas of the unconscious brain which is

2  that basic drive and motivation.  And what happens with

3  addiction is the frontal cortical logical control processes

4  diminish, and the subcortical, subconscious impulsive part of

5  the drive centers enhance.  And that has been shown in

6  structural changes in the brain, in humans and animals, and in

7  chemical changes in the brain activity in those areas.

8      Q.    Do drugs also have a different effect on an immature

9  or young brain than they do on an older brain?

10     A.    So, the National Institute on Drug Abuse has

11  emphasized this point, that the risk for using drugs -- it's an

12  adolescent onset condition in most cases.  And one of the

13  reasons for that is, in fact, that child and adolescent people

14  don't have that -- those parts of their brain fully developed

15  yet.  You can actually see structural changes in the brain

16  through child development, growing into adulthood, where the

17  frontal cortical logical reasoning part of the brain hasn't

18  fully developed yet, and it develops typically reaching an age

19  of maturity in the mid-20s.

20             And this is thought to explain why -- why

21  children do silly things and illogical things and have trouble

22  understanding long-term consequences.  They're -- they're kind

23  of impulsive and without a lot of logical reasoning.  And so

24  that happens in the part of normal human development of every

25  child.  And so what -- what we're really describing is that the

1  brain of an addict is more childlike in that character.

2      Q.    And if a person is, say, seven years old at the time

3  that they decide to start using a drug like marijuana, is that

4  a rational, intelligent choice, or is it a voluntary choice?

5  Is their brain developed enough really to make that choice?

6      A.    Seven-year-olds don't have the -- the physical

7  structures of the brain mature enough to be very logical and

8  reasonable in the -- in the adult sense of the word.

9      Q.    When a person becomes intoxicated and after they, I

10  guess, sober up, can intoxication have effects on a person's

11  memory?

12      A.    Yes.

13      Q.    What sort of effects?

14      A.    So different drugs differ on this point, but alcohol

15  and Xanax, in particular, are notable for producing memory

16  impairment that you don't remember things that happened while

17  you were under the influence of those drugs.

18      Q.    Do sometimes the more -- as more time passes,

19  does -- can the memory improve?  In other words, can you kind

20  of, oh, yeah, now I -- now I'm remembering this or now I'm

21  remembering that?  Does it come back in stages?  Or can it?

22      A.    Yes, it can.

23      Q.    So that would not be inconsistent with a person

24  who's intoxicated to over a period of time recall more and more

25  details about what happened when they were intoxicated?

 1      A.    That would not -- I -- I'm having trouble with the

 2  double negative there.  Could you restate it?

 3      Q.    Let me try that again.  Would it be uncommon for a

 4  person who was intoxicated, after they sobered up, to as time

 5  passes, recall more details about what happened when they were

 6  intoxicated?

 7      A.    No.

 8      Q.    That at first you might not recall much of anything?

 9      A.    Correct.

10      Q.    And as time passes, that memory can improve?

11      A.    Yes.

12      Q.    Is there a genetic component to addiction?

13      A.    Yes.

14      Q.    If a person has a family history, let's say their

15  father was perhaps an alcoholic, does that increase the

16  person's chances of themselves having an addiction issue?

17      A.    Yes, absolutely.

18      Q.    Doctor, you're familiar with different types and

19  forms of drug treatment?

20      A.    Yes.

21      Q.    And do some forms of treatment work for some addicts

22  and some not?

23      A.    No one treatment works for everybody, but different

24  treatments work for different people.  The current state of the

25  science is we're trying to understand better how to predict

1  that.

2      Q.   If someone has a -- an addiction that say runs 20,

3  30 years of crack cocaine abuse, bingeing for days on -- days

4  at a time, two or three days, and then coming back to their

5  life, what sort of treatment would that person need?

6      A.   So the best known treatment -- there is not a

7  medication approved by the Food & Drug Administration for

8  20-year cocaine addiction.  The treatment approach that would

9  be recommended would be psychosocial in nature which means that

10  some of the best validated methods have been what's called

11  cognitive behavioral therapy where you help the individual to

12  understand and have insight into their behavior and its

13  consequences and the risk factors for use and to try to teach

14  them strategies to avoid, prevent, compensate without using

15  drugs, but do -- engage in other activities instead.

16          Then the data are -- that it's very important

17  for that person to be in a good supportive environment that's

18  going to support their sobriety, you know, and -- and where

19  there are alternative lifestyle opportunities, employment, the

20  people that you're -- live with or hang around, you know, are

21  not drug using themselves, that sort of thing.

22          There -- there are some medications that have

23  been variously shown to possibly benefit a cocaine addict, but

24  as yet none of them are FDA approved for that purpose.

25      Q.   Are some addicts -- I mean, think you've already

1 mentioned that all addicts don't necessarily use every day, but

2 can some addicts be what we might call a functioning addict and

3 go to work and maintain a job for periods of time?

4    A.   Yes.  It's actually more common that than being

5 completely unemployed.

6    Q.   Does that mean they're not an addict?

7    A.   No.

8    Q.   So they still have the same addiction, they just

9 somehow have learned to manage it or manage their life?

10   A.   Right, right.  And, you know, it's likely that

11 over -- over time, you know, they could escalate and become

12 worse if they continue in that pattern.  But there's a staging

13 where even the more -- the most severe addicts usually and very

14 commonly went through the process of being more functional at

15 an earlier stage.

16   Q.   And kind of along those same lines, is it common or

17 uncommon for a person who's an addict to maybe go for periods

18 of several years without using, and then, I guess, fall off the

19 wagon again and have a problem?

20   A.   I believe I stated before, the National Institute on

21 Drug Abuse defines it as a chronically relapsing condition.

22 It's very common for individuals with an addiction to go

23 through periods of being relatively successful at quitting and

24 then relapsing again.  And I don't know that I could cite a

25 specific -- a number for the percentages of who would go five

```
 1  years and then relapse, because the -- the longer abstinent,

 2  the more likely you are to not relapse.  But that assumption

 3  and those data indicate that what the main determiner of that

 4  is the environment and -- and alternative lifestyle you've

 5  developed in the -- in the meantime during that five-year

 6  sobriety.

 7              MS. BERNHARD:  I'll pass the witness.

 8                       CROSS-EXAMINATION

 9  BY MS. MOSELEY:

10       Q.   Dr. Roache, you said you reviewed a number of

11  records related to the Defendant starting with the Green Oaks

12  records from 2002?

13       A.   Yes.

14       Q.   And in those records they indicate that the

15  Defendant checked himself in because he had depression related

16  to his inability to quit using drugs?  Do you recall that?

17       A.   The records indicated that he had major depression,

18  cocaine dependence, and alcohol dependence.

19       Q.   That didn't answer the question.  He checked himself

20  in there because he couldn't quit using drugs and was depressed

21  about it, correct?

22       A.   I believe so.

23       Q.   And you also reviewed the Defendant's records from

24  Parkland Hospital, including the records related to his

25  treatment while he's been incarcerated pending this trial,
```

1    correct?

2        A.    Yes.

3        Q.    And in those records he's not diagnosed with

4    depression, is he?

5        A.    I believe that's correct.

6        Q.    He's diagnosed with polysubstance abuse and

7    substance-induced mood disorder, correct?

8        A.    Yes.

9        Q.    Related to his addiction and the use of drugs?

10       A.    Yes.

11       Q.    You told us before that you were prepared to testify

12   to this jury that the Defendant, in your opinion, was

13   intoxicated at the time he committed this crime?

14       A.    Yes.

15       Q.    The Defense attorney didn't ask you that, but that's

16   still your opinion?

17       A.    Yes.

18       Q.    And you didn't even watch the video of the offense,

19   did you?

20       A.    I was not presented with it, no.

21       Q.    So you -- did you even know there was a video of the

22   crime itself occurring?

23       A.    I was aware there was such.  The Defense didn't ask

24   me to view it.

25       Q.    And you don't think that would be important before

```
 1   coming in here and testifying that in your opinion he was
 2   intoxicated?
 3        A.    I believe from the --
 4        Q.    That's a yes or a no, Doctor.  It's not important to
 5   see the crime occur and see the person before saying in your
 6   opinion he was intoxicated?
 7        A.    It's not necessary.
 8        Q.    And you stated that you watched the video of him
 9   being transported to the Garland jail, correct?  In the
10   backseat of the squad car?
11        A.    Yes.
12        Q.    And your opinion is that he looked like he was
13   coming down from drugs?
14        A.    Yes.
15        Q.    Do you know what drug?
16        A.    It's consistent with a night of a cocaine binge, and
17   there -- and typically it's consistent with concurrent use of
18   alcohol or other sedatives.
19        Q.    And if one witness after the other testified that
20   they were in the Defendant's presence -- close presence and did
21   not smell any alcohol, would that surprise you?
22        A.    No.
23        Q.    Because, in fact, if he had been drinking alcohol
24   and was under the influence of alcohol, you would expect to
25   smell it, wouldn't you?
```

```
 1        A.    Depends on when he last drank because alcohol is

 2   short acting and eliminated from the body fairly quickly.

 3        Q.    If he was under the influence of alcohol, you would

 4   expect to smell it, wouldn't you?

 5        A.    If he was under the influence, yes.

 6        Q.    And did you find it interesting or something worth

 7   noting that the Defendant was able to remember the names of the

 8   two police officers that arrested him just shortly before that

 9   video you watched?

10        A.    Could -- could you restate the question?  You ask

11   it -- would that surprise me?

12        Q.    Yes, that he noted their names and was able to

13   remember those and, in fact, refer to them on the way to jail?

14        A.    No.

15        Q.    That -- that doesn't seem surprising to you,

16   considering this loss of memory or lack of memory or problems

17   with memory that you've discussed?

18        A.    No.

19        Q.    You also testified earlier that the Defendant had

20   been diagnosed with antisocial personality disorder?

21        A.    Yes, that was in one of the records here.  It was at

22   Green Oaks Hospital in 2002.  It was in the record.

23        Q.    And you're not a psychologist, correct?

24        A.    My formal training as -- is as a pharmacologist.

25   I'm not a licensed psychologist, but I work with psychologists
```

1    and do psychological research.

2        Q.    Can you tell the members of the jury what the DSM-IV

3    says an antisocial personality disorder is?

4        A.    Yes.

5        Q.    Why don't you tell them.

6        A.    So it's -- it's -- it's diagnosed in adulthood based

7    upon the -- the observations and reports of antisocial

8    behaviors in your childhood, antisocial behaviors being getting

9    in trouble at school, with the law, breaking rules, engaging in

10   criminal activity.  That's the basis for the diagnosis.

11       Q.    But there's actually a list of character traits of a

12   person who is diagnosed as antisocial, correct?  You just

13   testified about when it started, but there is a list of traits?

14       A.    The -- the -- the traits are that you've engaged in

15   antisocial behaviors.

16       Q.    So basically it's a criminal diagnosis, right?  You

17   don't follow --

18       A.    It doesn't -- it's -- I don't think -- the word

19   "criminal" could be involved, but the word "criminal" isn't

20   necessary for the diagnosis.  I mean, you know, a child can

21   disrupt class and that's not called criminal, to my knowledge.

22       Q.    And it also wouldn't make you antisocial, would it?

23   Just because you disrupt classes as a child doesn't make you

24   antisocial?

25       A.    No.

1      Q.    I mean, it goes just beyond poor behavior as a

2   child, does it not?

3      A.    It's repeated patterns.

4      Q.    Into adulthood?

5      A.    Yes.

6      Q.    Not being able to conform your behavior to those

7   expected of people in society?

8      A.    Yes.

9      Q.    And you're not here to tell the members of the jury

10  that assuming the Defendant was intoxicated, that that caused

11  him to set woman on fire, are you?

12      A.    I -- I have trouble answering that as a yes or no

13  question.

14      Q.    Well, drugs didn't make him commit this crime, did

15  they?

16      A.    No.  Well, my -- my -- the records I reviewed,

17  including his interview with the police, said the -- he was

18  seeking money for drugs, and that is entirely common and

19  typical in an addict.

20      Q.    And entirely common and typical for them to break

21  into a car to get that money, correct?

22      A.    Sure.

23      Q.    Or to break into somebody's home to get the money,

24  correct?

25      A.    Yes.

```
 1        Q.    Many other ways besides violent activity, correct?

 2        A.    Sure.

 3        Q.    Drugs don't make a person violent, do they?

 4        A.    There is increase -- this emotional brain that is

 5  not under proper frontal executive control is tending to be

 6  more emotional and can be more aggressive as a consequence of

 7  that.

 8        Q.    And I believe, Doctor, you -- this isn't the first

 9  time you've testified in Dallas County, is it?

10        A.    No.

11        Q.    And you've testified in these capital cases --

12  always in a capital case, correct?

13        A.    I've testified in non-capital cases before, but I've

14  been --

15        Q.    In Dallas County?

16        A.    No.

17        Q.    Every time you've been called in, it's been in a

18  case where the State of Texas is seeking the death penalty,

19  correct --

20        A.    Yes.

21        Q.    -- in Dallas County?

22        A.    Yes.

23        Q.    And you've testified a number of times that drugs

24  like PCP can exacerbate an underlying violent tendency, but

25  they don't make someone violent, correct?
```

```
 1        A.    Yes.

 2        Q.    So the drug itself does not make a person violent.

 3   A person -- just because they smoke crack cocaine, doesn't mean

 4   they're going to be violent, correct?

 5        A.    Correct.

 6        Q.    It depends on what their underlying potential is,

 7   correct?

 8        A.    Yes.

 9        Q.    So if a violent person smokes crack cocaine or takes

10   PCP, it's likely that they will be violent while high, correct?

11        A.    Yes.

12        Q.    If a non-violent person smokes crack cocaine, it's

13   just as likely that they will be non-violent while high,

14   correct?

15        A.    Yes.

16        Q.    And you didn't interview the Defendant before you

17   came to testify?

18        A.    No, I did not.

19        Q.    You just weren't asked to do that?

20        A.    Correct.

21        Q.    You don't think that would be important?

22        A.    It would provide additional information I don't have

23   currently.

24        Q.    So it could be important?

25        A.    I don't know what I don't know.
```

```
 1              MS. MOSELEY:  That's all I have.

 2              MS. BERNHARD:  May I approach?

 3              THE COURT:  You may.

 4                   REDIRECT EXAMINATION

 5    BY MS. BERNHARD:

 6        Q.   Doctor, I'm showing you what's been marked as

 7    Defendant's Exhibit 22, and ask if you recognize that.

 8        A.   It looks like many of the records I reviewed.

 9        Q.   And specifically, I know it's kind of hard to see

10    under the clips, would these be the records from Green Oaks?

11        A.   Yes.

12              MS. BERNHARD:  At this time we'd offer

13    Defendant's Exhibit 22.

14              (Defendant's Exhibit 22 offered.)

15              MS. MOSELEY:  I have no objection.

16              THE COURT:  Admitted.

17              (Defendant's Exhibit 22 admitted.)

18        Q.   (BY MS. BERNHARD)  And, Doctor, contained in these

19    records that you reviewed from Green Oaks -- if you can see

20    that on the screen.

21        A.   Yes.

22        Q.   These records indicated that -- that Matthew Johnson

23    admitted himself because of severe depression; is that right?

24        A.   It's what it says.

25        Q.   And that also he had a problem with addiction to
```

1  cocaine and alcohol?

2       A.    Yes.

3       Q.    That he was not able to stop?

4       A.    Yes.

5       Q.    And, in fact, did they actually do any testing of

6  him?

7       A.    They did a urine drug screen.

8       Q.    And what were the results of that?

9       A.    It was positive for cocaine and marijuana.

10      Q.    So that would indicate that when he checked himself

11  in to Green Oaks, he had recently used cocaine?

12      A.    Yes.

13      Q.    How long does cocaine stay in a person's system

14  typically?

15      A.    In the urine, it will show up for one to three days

16  after a single use.

17      Q.    And in the discharge instructions, they note that he

18  was profoundly depressed because of his inability to stop doing

19  drugs.  Do you see that?

20      A.    Yes.

21      Q.    And that he was going through a lot of stressors in

22  his life, including loss of job, family, financial, and it says

23  clearly his self esteem?

24      A.    Yes.

25      Q.    Do those sort of things contribute to a person's

1    drug problems?

2        A.    Yes.

3        Q.    And he stayed at Green Oaks for several days; is

4    that correct?

5        A.    I have it -- my records show from July 16th to

6    July 25th.

7        Q.    In fact, I think it's up at the top of that.  So

8    that was, what, nine days, something like that?

9        A.    Yes.

10       Q.    And toward the end of his stay, the records note

11   that he was somewhat better, yet he was so adamant about

12   further treatment, that he said he would hurt or cause some

13   damage if that was what was required for him to remain in the

14   hospital or to be in a safe place where he could not use drugs.

15   Is that fair to say?

16       A.    Yes.

17       Q.    So, I mean, that's what the records reflected that

18   was the case?

19       A.    Yes.

20       Q.    Would that indicate that he wanted to get help and

21   wanted to stop using drugs at that time?

22       A.    Yes.

23       Q.    And is that just something one can stop because you

24   don't want to do it anymore?

25       A.    No, it takes more than will.

```
 1          Q.    And they actually discharged him with some

 2  medications; is that right?

 3          A.    Yes.

 4          Q.    Are you familiar with Celexa and Trazodone?

 5          A.    Yes.

 6          Q.    What are those given for?

 7          A.    Celexa is an antidepressant, and Trazodone is also

 8  described as an antidepressant, but it's primarily used for its

 9  sedative properties and help sleep.

10          Q.    And it also seems to indicate that he was discharged

11  to Summer Sky.  Are you familiar with Summer Sky?

12          A.    Not in detail that I can testify to.  I believe they

13  are a drug rehab facility of some kind.

14          Q.    Would it surprise you to know that that's like a

15  28-day program?

16          A.    No, that wouldn't surprise me.

17          Q.    And they also -- even knowing that he's going to

18  Summer Sky, his prognosis is guarded; is that correct?

19          A.    Yes.

20          Q.    And back to the Green Oaks records where they --

21  they do his discharge diagnosis.  They don't actually diagnose

22  him with antisocial personality disorder, do they?

23          A.    No, that's not what that says.

24          Q.    They just note that he has antisocial traits?

25          A.    Yes.
```

1          Q.    And is that different from a full-blown diagnosis?

2          A.    Well, it's -- it's listed in Axis II which is the --

3     the personality diagnosis spectrum.  It says he's dependent,

4     and what that means is dependent personality disor --

5          Q.    And what does that mean?

6          A.    A -- a dependent personality is one who's

7     susceptible to be responsive to others, to be more needy, and

8     constantly requiring help and assistance and attention from

9     others.

10         Q.    And can that make it hard for a person to beat

11    addiction?

12         A.    I'm -- I'm not sure I know the answer to that

13    question.

14         Q.    Okay.  Because, again, you're not a psychologist,

15    correct?

16         A.    Because there isn't a lot of research that has

17    identified dependent personality as a predictor of outcome.

18         Q.    And when he first presents at some -- at Green Oaks,

19    they kind of take his history of present illness.  Do you see

20    that?

21         A.    Yes.

22         Q.    And he tells them that he's having problems with

23    substance abuse and depression, and for the last several years

24    he has been drinking six to 12 beers a day, using 50 to a

25    hundred dollars of cocaine daily for the past year, smoking

1  marijuana several times a week, and smoking PCP several times a

2  week?

3       A.    Correct.

4       Q.    And he indicates that that has been going on for

5  some time?

6       A.    Yes.

7       Q.    And that the last time he had a drink was the night

8  before he checked himself into -- to Green Oaks?

9       A.    Yes.

10      Q.    And he indicates that that's been going on for

11 several years?

12      A.    Yes.

13      Q.    And this is back in 2002?

14      A.    Yes.

15      Q.    And it also indicates that at that point he's 26?

16      A.    Yes.

17      Q.    And also in these Green Oaks records -- I guess this

18 is a little intake assessment that's, I'm assuming, filled out

19 by the doctor.  Looks like a doctor's handwriting.  And they

20 ask him at that point -- I'm looking in the middle of the page

21 there.  What is the longest period of sobriety, and he tells

22 them a couple of hours.

23      A.    That's what it says.

24      Q.    And on the next page, again, as part of this intake,

25 they ask him about chemical dependency in the family, don't

1  they?

2      A.    Yes.

3      Q.    There kind of at the top.  And he tells them

4  brothers -- and I'm not sure what that CD -- that looks like CD

5  to me.

6      A.    My notes -- my notes of previously reviewing these

7  records said brothers, cousins, father.

8      Q.    Both sides -- chemical dependency, that's what it

9  means, okay.

10     A.    Yeah.

11     Q.    So his brothers have problems with it, his cousins

12 on both sides have problems with it, and then I think it says

13 his father out to the side there?

14     A.    Yes.

15     Q.    And that's consistent with what we know about

16 genetic aspects of substance abuse, isn't it?

17     A.    Yes.

18             MS. BERNHARD:  May I approach?

19             THE COURT:  You may.

20     Q.    (BY MS. BERNHARD)  And, Doctor, I'm showing you

21 what's been marked as Defendant's Exhibit 23, and ask if that

22 looks familiar?

23     A.    Yeah, looks like the Parkland records.

24     Q.    These appear to be Mr. Johnson's records from the

25 jail?  And those records --

```
 1        A.    Yes.

 2        Q.    -- came in kind of multiple sets, didn't they?

 3        A.    Yes.

 4        Q.    You recall that?

 5        A.    Yes.

 6        Q.    And this is -- this is, I believe, the first set?

 7        A.    Okay.

 8        Q.    Does that look familiar?

 9        A.    Yes.

10              MS. BERNHARD:  At this time we'd offer

11   Defendant's Exhibit 23.

12              (Defendant's Exhibit 23 offered.)

13              MS. MOSELEY:  I have no objection.

14              THE COURT:  Admitted.

15              (Defendant's Exhibit 23 admitted.)

16        Q.    (BY MS. BERNHARD)  And, Doctor, you also reviewed

17   these records; is that --

18        A.    Yes.

19        Q.    -- correct?  And this appears to be the Central

20   Health Intake Screening at the Dallas County Jail?

21        A.    Yes.

22        Q.    And the date of this would be May 21st, 2012, at

23   18:32, I believe?

24        A.    Yes.

25        Q.    If the offense happened on May 20th at say 7 o'clock
```

```
 1  in the morning, this would be toward the end of the next day?

 2       A.    Yes.

 3       Q.    And he tells them when he comes into jail that he

 4  suffers from depression, correct?

 5       A.    Yes.

 6       Q.    And that he also has some substance abuse issues?

 7       A.    Yes.

 8       Q.    Now, he says he's not currently going through

 9  withdrawal.

10       A.    Yes.

11       Q.    If somebody had been intoxicated, that's not quite

12  48 hours, but say they were intoxicated at 7:00 a.m. the

13  previous day, now we're talking 18 -- that's, what time,

14  6 o'clock in the evening?

15       A.    Yes.

16       Q.    Would that be uncommon for them to not be in

17  withdrawal at that point?

18       A.    Correct, not uncommon.

19       Q.    If they last used sometime in the early morning

20  hours of May 20th, and now we're talking about 6:00 p.m.,

21  May 21st --

22       A.    Correct.

23       Q.    -- that doesn't mean they weren't intoxicated --

24       A.    No, it does not.

25       Q.    -- a day ago?
```

```
 1                  Now, he also is evaluated by somebody there.
 2    This appears to be June 6th of 2012, after he's been in jail
 3    for a couple of weeks, I guess at this point.  And he tells
 4    them that he's suffering from depression.  He tells them that
 5    before I committed my crime, I isolated myself from my family.
 6    I didn't have no energy.  I used to sit in the dark at home
 7    because I felt bad.  I had lost my job.  I had lost my car.  I
 8    don't want to be with anyone.  I argued with my wife.  I yelled
 9    at my children for no reason.  This crime that I committed is
10    eating me up every day.  I have a lot of remorse over what I
11    have done.  And they -- they asked him how long he had been
12    feeling this, and he said it began November 2011.  He said he
13    had a low appetite.  He was stressed.  He was sleeping more
14    than usual.  And he's -- and he -- ever -- I cry ever since I
15    have been locked up.
16         A.    It's what it says.
17         Q.    He also reported recent use of cocaine, PCP, weed,
18    and Xanax?
19         A.    Yes.
20         Q.    And he tells them this is off and on for 30 years.
21         A.    Yes.
22         Q.    And if this is a person who at the time is 36,
23    that's a very young age to begin using drugs, is it not?
24         A.    Yes.
25         Q.    And he also tells them that he was previously
```

1  diagnosed with depression, but he only took his medication for

2  about six weeks, down there at the bottom?

3       A.    Yes.

4       Q.    And in this same assessment, they talk about he

5  admitted to being dependent on cocaine, PCP, marijuana, and to

6  a lesser extent, alcohol and Xanax.  They also note that he

7  seems to be remorseful of his alleged crime, and he was

8  passionate in his description in request for help?

9       A.    Yes.

10      Q.    And they diagnosed him at that point as

11 polysubstance dependent?

12      A.    Yes.

13      Q.    And they note that that includes cocaine, Cannabis,

14 PCP, alcohol, sedatives hypnotic.

15      A.    Yes.

16      Q.    What is sedatives hypnotic?

17      A.    I'm pretty sure that's referring to Xanax.

18      Q.    And they also --

19      A.    Xanax is that type of drug.

20      Q.    Okay.  And they also diagnosed substance in --

21 induced mood disorder?

22      A.    Yes.

23      Q.    What is substance abuse -- induced mood disorder?

24      A.    So when depression is characterized by a sad,

25 hopeless, depressed mood, associated with various signs and

1  symptoms, and the American Psychiatric Association only permits

2  a diagnosis of depression when or if you can rule out other

3  causes for those feelings and conditions.  And one of the

4  things we know is that substance -- substance abuse and

5  substance use can cause those symptoms.

6      Q.   So it causes depression?

7      A.   Yes.

8      Q.   If a person starts using drugs at the age of seven,

9  are you ever going to be able to rule that out, the substance

10 -- the mood-induced substance disorder?

11     A.   It would be very difficult, if not impossible,

12 depending on time course.  Like if there were periods of

13 abstinence when he was still depressed or less depressed, that

14 sort of thing, but it would be difficult.

15     Q.   Because in order to rule that out, you would have to

16 have somebody who wasn't using drugs; is that correct?

17     A.   Right.

18     Q.   And in order to rule that out, he would, I guess,

19 have to have been diagnosed with depression before the age of

20 seven?

21     A.   Not necessarily.  No, I don't think that's a logical

22 conclusion.  You have to have -- so the American Psychiatric

23 Association says you have to be able to rule out other causes.

24 The only way you can do that through temporal course is if --

25 if you had separate and distinct episodes of depressed mood or

1   substance use that were not overlapping.

2        Q.    And as the far --

3               COURT REPORTER:  I'm sorry?

4               THE WITNESS:  Not overlapping.

5        Q.    (BY MS. BERNHARD)  As the far -- as far as the

6   symptoms of substance abuse mood disorder and depression, is

7   there a difference?

8        A.    It can be.  And the -- the big differences would be

9   other -- other effects of the substance use itself.

10       Q.    Such as?

11       A.    So you could -- I mean, it depends on the substance.

12  You're asking me to make some real generalizations, but -- so

13  you can have sad mood, hopeless future, constantly bothered by

14  mood disturbance, interfering with your sleep and your behavior

15  and your ability to function.  So all of those things are still

16  true, but then with the substance use, depending what the

17  substance is.  So with cocaine, you can have totally sleepless

18  nights followed by crash period -- episode of extreme

19  depression.  So you go between exhilaration to depression.  So

20  that kind of thing is what I mean.

21       Q.    For an addict who's been using for say, 30 years, is

22  the decision to use a voluntary one?

23       A.    Not in the way that word is normally intended.

24  It --

25       Q.    Because it has nothing to do with it?

```
 1        A.   The National Institute of Drug Abuse defines the

 2   initial -- the initial use might have been voluntary, and there

 3   are certainly decisions and -- that get made along the way, but

 4   the disorder is characterized by a loss of control, ability to

 5   choose and decide.  And it goes to the issue of what I was

 6   talking about earlier, that -- the subcortical non-conscious

 7   urge impulse.  It's not a thoughtful process.

 8        Q.   So it has nothing to do with willpower?

 9        A.   You can have a lot of willpower and still have

10   difficulty controlling oneself.

11                MS. BERNHARD:  I'll pass the witness.

12                MS. MOSELEY:  Nothing further.

13                THE COURT:  Thank you, sir.  You may stand down,

14   and you are excused.

15                May I see the lawyers?

16                (Sidebar conference, discussion off the record.)

17                THE COURT:  All right.  Members of the jury,

18   let's take our break.  It's 10:09.  If you'll be back in the

19   jury room at 10:25, please.

20                THE BAILIFF:  All rise.

21                (Jury excused from courtroom.)

22                THE COURT:  Okay.  Please be seated.

23                (Recess.)

24                THE BAILIFF:  All rise.

25                (Jury returned to courtroom.)
```

```
  1                    THE COURT:  Please be seated.

  2                    Please call your next witness.

  3                    MS. BERNHARD:  The Defense calls Timothy

  4  Johnson.

  5                    THE COURT:  Please raise your right hand, sir.

  6                    (Defendant witness sworn.)

  7                       TIMOTHY JOHNSON,

  8  was called as a witness by the Defendant, and after having been

  9  first duly sworn, testified as follows:

 10                       DIRECT EXAMINATION

 11  BY MS. BERNHARD:

 12       Q.   State your name.

 13       A.   Timothy Johnson.

 14       Q.   Mr. Johnson, do you know Matthew Johnson?

 15       A.   Yes.

 16       Q.   How do you know him?

 17       A.   It's my little brother.

 18       Q.   And do you recognize him in the courtroom?

 19       A.   Yes, ma'am.

 20       Q.   Can you point to something he's wearing?

 21       A.   Wearing the jacket -- the black jacket.

 22                    MS. BERNHARD:  Let the record reflect he's

 23  identified the Defendant.

 24                    THE COURT:  The record will reflect.

 25       Q.   (BY MS. BERNHARD)  You said he was your little
```

```
 1  brother.  How much older are you?

 2       A.    Four years.  He 38, and I'm 42.

 3       Q.    Okay.  Now, obviously, we can all see that you're

 4  wearing jail attire?

 5       A.    Yes.

 6       Q.    Probably wouldn't be your choice of what to wear,

 7  correct?

 8       A.    Correct.

 9       Q.    And you're currently serving a sentence in TDC; is

10  that right?

11       A.    Yes.

12       Q.    Or TDCJ?

13       A.    Yes.

14       Q.    In fact, in 19 -- that was from 19 -- I mean, I'm

15  sorry, 2004, you were convicted of theft from a person and

16  assault on a public servant and received a 40-year sentence?

17       A.    Yes, ma'am.

18       Q.    And prior to that, back in 1989, you were also

19  convicted of theft of a person and robbery?

20       A.    Yes.

21       Q.    Correct?  And in 1990, you got another conviction

22  for robbery and theft of -- from a person?

23       A.    Yes.

24       Q.    And then in 1991, you had two more robbery

25  convictions?
```

```
 1        A.    Yes.

 2        Q.    And since then, you've also been convicted of

 3   possession of a controlled substance in a penal institution?

 4        A.    Yes.

 5        Q.    And received a three-year sentence for that?

 6        A.    Yes.

 7        Q.    Now, let's talk about growing up.  Who were your

 8   parents?

 9        A.    Imogene Johnson and Ulrich Johnson.

10        Q.    Can you spell Ulrich?

11        A.    U-l-r-i-c-h.

12        Q.    And those were your parents?

13        A.    Yes.

14        Q.    They were married?

15        A.    Yes.

16        Q.    Where did you live?

17        A.    First we lived on 821 June in Garland, Texas.  Then

18   we moved to 1909 Curtis Drive, same, Garland, Texas.

19        Q.    And you have an older brother Anthony; is that

20   right?

21        A.    Yes.

22        Q.    How much older is Anthony?

23        A.    He was born in '66, so that would make him like five

24   years older.

25        Q.    Okay.  So there are three brothers.
```

```
 1        A.    Yes.

 2        Q.    Was there also someone that was raised as a sister

 3   with you?

 4        A.    Yes.

 5        Q.    Who was that?

 6        A.    Her name was Cheryl, Lashonda Cheryl Gibbs.

 7              COURT REPORTER:  I'm sorry, one more time.

 8        A.    Cheryl Lashonda -- Lacheryl Mills.

 9        Q.    (BY MS. BERNHARD)  And how old was she?

10        A.    She was born in '64, so that would make her --

11        Q.    Was she older than Anthony?

12        A.    Yes, she was two years older than Anthony.

13        Q.    Okay.  And so it was the four of y'all being raised

14   together?

15        A.    Yes.

16        Q.    And did your parents work?

17        A.    Yes.

18        Q.    What did your mother do?

19        A.    My mother worked at Varo during the day, and my

20   father worked at Schepps Dairy during the night.

21        Q.    Okay.  Do you know -- do you remember like what time

22   your mother would go to work or --

23        A.    Sometime she'll leave like about 6:00 in the

24   morning.  She got off at like at 4:00.

25        Q.    So she would leave before you would leave for
```

```
 1  school?

 2       A.   Yes.

 3       Q.   How long did she have that job at Varo?

 4       A.   I can't recall because the company she worked for,

 5  it went out of business.  I mean -- from what I understand, and

 6  she got laid off.

 7       Q.   When was that?

 8       A.   It was in the 90's.

 9       Q.   Okay.  But for most of when you were growing up, was

10  she working?

11       A.   Yes.

12       Q.   And she would leave, you said at 6 o'clock in the

13  morning?

14       A.   Yes.

15       Q.   When would you leave for school, do you remember?

16       A.   I would leave like 7:00.

17       Q.   Okay.  And you said your father was working the

18  night shift.  What kind of hours did he work?

19       A.   He worked from like 10:00 at night to about 6:00,

20  7:00, something like that -- 10:00 to 7:00, something like

21  that.

22       Q.   And what would he do during the day?

23       A.   Most of the time, he'll be just resting up.

24       Q.   Sleeping?

25       A.   Yes, getting ready for the night.
```

```
 1          Q.   Where did you go to school?

 2          A.   Elementary I went to Kimberly Elementary, and middle

 3   school, I went to Memorial Middle School.  Then I went to

 4   Lakeview High.

 5          Q.   Did you participate in any after school activities?

 6          A.   Yes.  I played football, basketball, soccer.

 7          Q.   And did you have games?

 8          A.   Yes.

 9          Q.   Were your parents able to come to your games?

10          A.   Not all of them.  They came to probably a few of

11   them.

12          Q.   Would they be working?

13          A.   Correct.

14          Q.   Or sleeping and getting ready to go to work?

15          A.   Yeah, really resting.

16          Q.   So when you would come home from school, would there

17   be a parent home?

18          A.   Yes.

19          Q.   Who would that be?

20          A.   Most of the time, both of them would be there when I

21   came home.

22          Q.   When did you come home?

23          A.   I usually came home like 5:00, 6:00, different

24   times.

25          Q.   So later in the evening?
```

```
 1        A.    Right.

 2        Q.    Do you know where Matthew went to school?

 3        A.    I know he went to -- elementary, he went to

 4   Hillside.  That's like right down the street from the house.

 5   And middle school, he went to Austin Middle -- Middle School.

 6        Q.    Do you know what time he would come home from

 7   school?

 8        A.    No, I really don't.

 9        Q.    Would he usually be home when you got home?

10        A.    No.

11        Q.    Where would he be?

12              MS. MOSELEY:  Objection, calls for speculation.

13              THE COURT:  Sustained.

14        Q.    (BY MS. BERNHARD)  If you know.  Do you know where

15   he would be if he wasn't home?

16        A.    No, I really don't.

17        Q.    Can you describe what Matthew was like as a -- as a

18   kid?

19        A.    I mean, the time that I -- that we was together, he

20   was the kind of person -- I mean, he -- I guess you could say

21   he didn't know how to express his feelings, and he would keep

22   stuff inside of him.

23        Q.    Did he keep to himself?

24        A.    Yes, he did.  All of us did.  I mean, he --

25   especially him.
```

```
 1        Q.    Okay.  So there wasn't a lot of talking about
 2   feelings or things like that --
 3        A.    We were brothers --
 4        Q.    -- fair to say?
 5        A.    -- I mean, we didn't do that.
 6        Q.    Were your parents expressive?
 7        A.    Of course.  You know, we got punished.  We got
 8   whippings when we messed up, all of that.  They taught us right
 9   from wrong, but, you know, in one ear and out the other, you
10   know.  I have to say they -- they -- they taught us what not to
11   do.
12        Q.    Okay.  Did they give you a lot of praise or support
13   for doing the right thing?
14        A.    Yes, they did.
15        Q.    Now, you have had -- I mean, we've heard your
16   criminal history, right?  And you've also had problems with
17   addiction?
18        A.    Yes.
19        Q.    When did you start using drugs?
20        A.    I would say right about the time I was playing
21   football, high school, and I started smoking marijuana.
22        Q.    Were you ever aware that Matthew was doing drugs at
23   a young age?
24        A.    Yes.
25        Q.    How did you become aware of that?
```

```
 1        A.    Because the dude down the street used to give him
 2   marijuana.
 3        Q.    Who's the dude down the street?
 4        A.    Arthur Miller.  He's deceased right now.  But he
 5   used to give marijuana, and me and Anthony used to take it from
 6   him sometime because he would come home with it.
 7        Q.    Take it from Matthew, you mean?
 8        A.    Yes.
 9        Q.    Did you ever do drugs with Matthew?
10        A.    No.
11        Q.    And your brother Anthony also had some substance
12   abuse problems, didn't he?
13        A.    Yes.
14        Q.    Do you know if he ever did drugs with Matthew?
15        A.    I can honestly say I don't know.
16        Q.    So -- but Matthew -- I mean, Anthony was
17   significantly older than Matthew, wasn't he?
18        A.    Yes.
19        Q.    Did Matthew -- I mean, did Anthony go into the Navy?
20        A.    Yes.
21        Q.    Do you know how old you were when that happened?
22        A.    I was around 15 -- 14, 15.
23        Q.    So Matthew would have been around 10?
24        A.    Yes.
25        Q.    Something like that?
```

```
 1        A.    Yes.

 2        Q.    And you never did drugs with Matthew?

 3        A.    No.

 4        Q.    You said that you would try -- when you found him

 5   with marijuana, you would try to take it away from him?

 6        A.    I took it.

 7        Q.    On more than one occasion?

 8        A.    Probably I would say twice.

 9        Q.    Would Matthew try to hide his drug use from you?

10        A.    Yes.  But you can tell the way his eyes was red, I

11   knew he was high.

12        Q.    Even when he was little?

13        A.    Yes.

14        Q.    How old was Matthew the first time you realized he

15   was doing drugs?

16        A.    I say about the same age, 15, 16.

17        Q.    That was how old Matthew was?

18        A.    That's how old I was.

19        Q.    That's how old you were?

20        A.    Yes.

21        Q.    So when you first realized it, he would have been

22   about 10, 11?

23        A.    Yes.

24        Q.    Did -- did you as a -- did your family have

25   activities together?  Did you ever go places together?  Was
```

```
 1   there a lot of that kind of thing?

 2        A.   We used to go to get-togethers at our mother's house

 3   in Rowlett.  We used to go to the fair together.  I say we

 4   did -- we did family stuff together.

 5        Q.   And would Matthew participate in those?

 6        A.   Yes, he did.

 7        Q.   Now, your mother -- describe your mother's current

 8   health state.

 9        A.   Well, she just had a heart attack about three weeks

10   ago.

11        Q.   And does she -- has he had health problems before

12   the heart attack?

13        A.   Yes, she had diabetes.  She had to have a toe cut

14   off.  She had diabetes -- she got diabetes.  She had other

15   issues, but she don't tell me that while I'm down there.  She

16   don't want me to worry down there, but I know about the --

17   getting the toe cut off.

18        Q.   Do you know if she gets around easily or --

19        A.   No, she don't -- she don't get around too easy.  I

20   haven't got a visit down there in a while, so --

21        Q.   And the heart attack was just a few weeks ago?

22        A.   Yes.

23        Q.   Your father is deceased; is that correct?

24        A.   Yes.

25        Q.   When did he die?
```

1        A.    Died in 2003.

2        Q.    And what did he die of?

3        A.    He had cancer on his rib, and they couldn't operate.

4   It spread.

5        Q.    And were you out of prison when he died?

6        A.    Yes.

7        Q.    And I mean, obviously, the death of a parent is --

8   is hard on any -- any child.  Did it seem to affect Matthew

9   particularly?

10       A.    I say it affected him the most because he was -- he

11  used to say some stuff like it was some things he didn't get to

12  tell him before he passed away.  I mean, he made that statement

13  one time.

14       Q.    Matthew did?

15       A.    Yes.  And I would say it affected him the most out

16  of all of us -- I mean --

17       Q.    Did you ever see Matthew cry after your father died?

18       A.    Yeah.  I think him and Anthony was the only one that

19  cried, you know.  Of course, I was gone about 11 years

20  throughout that, and I came home, you know, and it affected him

21  because you could tell that like after the funeral, he was like

22  off by his self and there was some pictures taken, and I got

23  one down there and he was -- like with his head down while

24  everybody was laughing and getting along.  So after I looked at

25  that picture, I could see that he was kind of like in a

```
 1   depressed mode, but I didn't pay attention to that.

 2       Q.   Was that the first time you had ever seen that type

 3   of behavior --

 4       A.   The first time, you know.  Yeah, that was the first

 5   time.

 6       Q.   Did Matthew ever talk to you about his addiction and

 7   how to get help or how to stop or anything like that?

 8       A.   No, he didn't.  I mean, it was -- one episode where

 9   he wanted me to go to a meeting with him, and I didn't have

10   time to go with him.  I think that kind of like hurt him -- I

11   mean --

12       Q.   What kind of time frame are you talking about, just

13   roughly?

14       A.   That could have been right around the time I got out

15   in 2002.

16       Q.   Were you aware that he had gone to Green Oaks and

17   then to Summer Sky?

18       A.   Yes.

19       Q.   Did you talk to him during that time frame?

20       A.   The only time I talked to him was -- is when he

21   wanted me to come pick him up.  It was some place in

22   Brownsville.  That was the only time I talked to him.

23       Q.   Was that after he had gone through that rehab

24   program?

25       A.   Yes, the 28-day program.  If I'm not mistaken, 28
```

```
 1  days.

 2      Q.   Were you around Matthew much after he finished that

 3  program?

 4      A.   No, because I was -- I was living with Anthony, and

 5  he was living at the house, so we wasn't really around each

 6  other.

 7      Q.   Do you know Daphne?

 8      A.   Yes.

 9      Q.   Were you around when Matthew and Daphne got

10  pregnant -- I mean, when Matthew and Daphne got married?

11      A.   No, I wasn't.  I was incarcerated.

12      Q.   Okay.  But they've been married now for almost 20

13  years; is that right?

14      A.   Wow --

15      Q.   Does that sound right?

16      A.   Yeah.

17      Q.   I mean, do you -- do you recall how old Matthew was

18  when they got married?

19      A.   I know he was young, but I don't know exactly how

20  old he was.  But he was young.

21      Q.   During the times when you haven't been incarcerated,

22  did you ever spend time with Matthew and Daphne?

23      A.   No.  I mean, when they was living with mom, you

24  know, when I go over there, that will be the time we spent

25  together.  But as far like on an everyday basis, no.
```

```
 1        Q.    Okay.  How many kids does Matthew have?

 2        A.    He have three.

 3        Q.    And you've met them?

 4        A.    Yes.

 5        Q.    Have you ever seen Matthew with his kids?

 6        A.    Yes.

 7        Q.    What kind of father is he?

 8        A.    When -- I remember he was living at some

 9 apartments -- I think on Northwest Highway, and when he was

10 babysitting he would take care of them like any father, change

11 their diapers and feed them, you know.  At that time, you know,

12 he was a good father, in my eyes.

13        Q.    Are you aware that Daphne and Matthew had what could

14 be described as a volatile relationship?

15        A.    I wouldn't say volatile.  I would say -- as far as

16 not coming to agreements and having spats and fights, that's

17 what I was told.  You know, I wouldn't say it was violent.

18        Q.    You weren't present for any of that, were you?

19        A.    Ma'am?

20        Q.    Were you ever present --

21        A.    No.

22        Q.    -- when he and Daphne fought?

23        A.    No.

24        Q.    So you wouldn't have any -- any personal knowledge

25 about any kind of physical fights they may have had?
```

```
 1      A.    One episode where they had got into a fight.

 2      Q.    In front of you?

 3      A.    Yes, I broke it up.

 4      Q.    Was it a physical fight?

 5      A.    No, it was just a punch thrown, and I intervened.

 6      Q.    A punch thrown by Matt?

 7      A.    It really wasn't a punch.  It was like try to slap.

 8      Q.    Okay.  And that was Matthew?

 9      A.    Yes.

10      Q.    What happened when you intervened?

11      A.    Me and him had a fight -- a tussle.

12      Q.    Where was this, do you remember?

13      A.    This is in the house -- in mother's house.

14      Q.    In your mother's house?

15      A.    Yes.

16      Q.    Was your mother there?

17      A.    Yes.

18      Q.    What happened after you and Matthew tussled?

19      A.    He left.  And I followed him, just to see where he

20 would go.

21      Q.    And did you catch up with him?

22      A.    I caught up with him.

23      Q.    Did y'all have some more words?

24      A.    Yeah, I wanted to fight again.  And if he wanted to

25 fight somebody, fight me, but he didn't want to fight no more.
```

1   He was really -- he was basically trying to get away from me.

2   But I was -- followed him to try to keep an eye on him.

3       Q.    Could you tell anything about his -- about whether

4   or not he was intoxicated at that time?

5       A.    I think he was.

6       Q.    What makes you --

7       A.    I think he was because he wasn't strong like a

8   person would be.  He was -- I mean, he was big and I'm smaller

9   and I handled him -- I mean, real easy.  And when a person

10  under the influence like that, they have really no motor skills

11  like that.  So I handled him real easy.  And I can tell his

12  actions, that something was wrong with him.  You know, he

13  wasn't in his right mind then.

14      Q.    Is that the only time you've seen Matthew

15  intoxicated?

16      A.    That's the only time like that.

17      Q.    Okay.  But you're aware that he was using drugs and

18  getting intoxicated --

19      A.    Yes.

20      Q.    -- you just weren't around?

21      A.    Yes.

22      Q.    When Matthew would use drugs or when you were

23  around, would he stay with -- at home with Daphne or would he

24  leave or what did you observe?

25              MS. MOSELEY:  Judge, I'm going to object.  I

```
 1  think he just testified he had only seen him intoxicated once.

 2  Anything else would be speculative.

 3                  THE COURT:  Well, if you will rephrase.

 4                  MS. BERNHARD:  Your Honor, I think --

 5      Q.   (BY MS. BERNHARD)  You knew, even though you didn't

 6  actually see him intoxicated, you knew that Matthew was -- was

 7  using?

 8      A.   Correct.

 9      Q.   Would he leave the house for periods of time, or

10  would he use while he was at home or do you know?

11                  MS. MOSELEY:  Judge, that would have to be based

12  on hearsay.

13                  THE COURT:  Sustained.

14                  MS. BERNHARD:  I'll pass the witness.

15                     CROSS-EXAMINATION

16  BY MS. MOSELEY:

17      Q.   Just a few questions.  Can you give us an idea, Tim,

18  exactly when you were in prison?  In 1990, you got a five-year

19  sentence for robbery; is that right?

20      A.   Yes.

21      Q.   How long did you serve on that?

22      A.   I served about -- not even a year, about nine

23  months, something like that.

24      Q.   And you went to prison and were paroled after nine

25  months after a five-year robbery sentence?
```

```
 1        A.    Yes.

 2        Q.    So then you got back out.  Was it still 1990 when

 3   you got back out?

 4        A.    Yes.

 5        Q.    And then in November of 1990, you committed another

 6   crime and got 15 years for theft --

 7        A.    Yes.

 8        Q.    -- right?  And so how long did you serve on that

 9   theft -- that 15-year sentence for theft?

10        A.    Eleven years and about four months, I think, and I

11   went to a drug program.

12        Q.    You went to a drug program?

13        A.    Yes.

14        Q.    Was that in a halfway house?

15        A.    No.  It was like a therapeutic community in Kyle,

16   Texas.

17        Q.    In Kyle?

18        A.    In Kyle, Texas.  And then after Kyle, I went to a

19   halfway house.

20        Q.    Okay.  And so you were on parole for a little while?

21        A.    Yes.

22        Q.    Did you do okay while you were on parole, or did you

23   get in trouble right away again?

24        A.    After about a year -- a year and some months,

25   started using again and got some trouble.
```

```
 1        Q.    So you stayed clean about a year, a little more than

 2   a year?

 3        A.    Yes.

 4        Q.    And then was that when you got the charges for theft

 5   from a person and assault on a police officer?

 6        A.    Yes.

 7        Q.    And that was in 2004?

 8        A.    Yes.

 9        Q.    So you were home between 2002 and 2004?

10        A.    Yes.

11        Q.    And prior to that, you had basically been gone since

12   the Defendant was, what, 15 years old?

13        A.    Yes.

14        Q.    You went to prison when he was about 15, and were

15   gone 11 years?

16        A.    Yes.

17        Q.    And then you came home for a couple of years and

18   then went back?

19        A.    Yes.

20        Q.    And in 2004, you got a 40-year sentence, right?

21        A.    Yes.

22        Q.    Actually two 40-year sentences.  Tell the members of

23   the jury about whether you can get drugs in prison.

24        A.    Yes, you can get drugs in prison.

25        Q.    All kinds of drugs in prison?
```

```
 1      A.    All kinds of drugs in prison.

 2      Q.    There's violence in prison, isn't there?

 3      A.    Yes.

 4      Q.    There are also people down there just trying to do

 5 their time and not get in any trouble and get out as quick as

 6 they can?

 7      A.    Yes.

 8      Q.    Some people follow the rules and some don't?

 9      A.    Yes.

10      Q.    And it's up to that individual whether they decide

11 to follow the rules or not follow the rules?

12      A.    Correct.

13      Q.    Prison can't control everything that a person wants

14 to do, can they?

15      A.    You have to control what you want to do.

16      Q.    Right.  It's up to the inmate?

17      A.    Yes.

18      Q.    And you actually -- this -- this possession of a

19 controlled substance in a penal institution, you got -- you got

20 marijuana in prison, didn't you?

21      A.    Yes.

22      Q.    You got it from a prison guard?

23      A.    Yes.

24      Q.    And you got caught with it?

25      A.    Yes.
```

```
 1        Q.    And you got another three-year sentence.  That was

 2   in 2007?

 3        A.    Yes.

 4        Q.    And you've been in fights in prison, haven't you?

 5        A.    A couple of fights.

 6        Q.    I mean, that happens?

 7        A.    Yes.

 8        Q.    Prison is a dangerous place?

 9        A.    Basically.

10        Q.    Would you agree?

11        A.    Yes.

12                  MS. MOSELEY:  I'll pass the witness.

13                  MS. BERNHARD:  Nothing further.

14                  THE COURT:  Thank you.  May I see the lawyers up

15   here?

16                  (Sidebar conference, discussion off the record.)

17                  THE COURT:  Thank you, sir.  You may stand down.

18                  Please call your next witness.

19                  MS. MULDER:  Call Hazel Mills.

20                  Go ahead and have a seat.

21                  (Witness brought forward.)

22                  THE COURT:  Would you please raise your right

23   hand, ma'am?  Ma'am?

24                  THE WITNESS:  Oh, yes, ma'am.

25                  THE COURT:  Your right hand.
```

```
 1                      THE WITNESS:  I can't hear good.

 2                      (Witness sworn.)

 3                      THE WITNESS:  Yes, ma'am.

 4                      THE COURT:  Thank you.

 5                            HAZEL JOHNSON,

 6   was called as a witness by the Defendant, and after having been

 7   first duly sworn, testified as follows:

 8                       DIRECT EXAMINATION

 9   BY MS. MULDER:

10        Q.    Ma'am, would you state your name and spell your last

11   name for the court reporter, please.

12        A.    J-o-h-n-s-o-n.

13        Q.    You go by Johnson?

14        A.    Yes, ma'am.

15        Q.    Okay.  I'm sorry.  Was your maiden name Mills?

16        A.    Yes, ma'am.

17        Q.    Ma'am, how old a lady are you?

18        A.    How old am I?

19        Q.    Yes, ma'am.

20        A.    Fifty-five.

21        Q.    Do you know Matthew Johnson?

22        A.    Yes, ma'am.

23        Q.    And how do you know Matthew Johnson?

24        A.    It's my son-in-law.

25        Q.    You're Daphne's mother?
```

<sup>89</sup>

```
 1        A.    Yes, ma'am, uh-huh.

 2        Q.    How long have you known Matthew Johnson?

 3        A.    Oh, that's -- for years.  Even in pre-K -- I mean,

 4   when they were going to school together.

 5        Q.    You knew him in elementary school?

 6        A.    Uh-huh.  Yes, ma'am.  Uh-huh.

 7        Q.    Do you see Matthew Johnson in the courtroom today?

 8        A.    Yes.  Yes, ma'am.

 9        Q.    Can you point him out and describe what he's

10   wearing?

11        A.    The black suit, glasses.

12              MS. MULDER:  Let the record reflect this witness

13   has identified the Defendant in open court.

14              THE COURT:  The record will reflect.

15        Q.    (BY MS. MULDER)  When Matthew was growing up, at

16   some point did he and Daphne start dating?

17        A.    Yes.

18        Q.    What was -- they got married when they were 18?

19        A.    Yes, young -- pretty young.

20        Q.    Would you say you have a close relationship with

21   Matthew or a distant one?

22        A.    Excuse me, I didn't -- I didn't hear the question.

23        Q.    That's okay.  Did you have a close relationship with

24   Matthew or a distant one?

25        A.    Close, yes, ma'am.
```

```
 1        Q.    Throughout the years that they've been married, how

 2   often would you see or talk to Matthew?

 3        A.    Quite a bit.  I don't know how -- you want me to

 4   give a number?

 5        Q.    Well, would you talk to him or see him once a week,

 6   twice a week, once a month?

 7        A.    Mostly -- mostly, I guess, like -- like two weeks or

 8   something like that.

 9        Q.    Once every two weeks?

10        A.    Not every day every two weeks, but quite often, yes.

11   Yes, ma'am.

12        Q.    Okay.  Tell the jury what Matthew was like, what his

13   personality is like.

14        A.    He have a good personality, and he's -- he's a good

15   person.  He'll try to help anybody or anything.  He's a good

16   person.

17        Q.    Now, ma'am, you've had some tragedy in your own

18   life?

19        A.    Uh-huh.  Yes.  Yes, ma'am.

20        Q.    Daphne and her sister Courtney's father was

21   murdered?

22        A.    Yes, ma'am.  Uh-huh.

23        Q.    And how old, if you recall, were Daphne and Courtney

24   when that happened?

25        A.    I think like around about 11, and -- maybe 13 or
```

```
 1  something.

 2       Q.   They were young?

 3       A.   Pretty young, yes.

 4       Q.   Excuse me.  Did your husband have a -- a problem

 5  with drug addiction, Daphne's dad?  Excuse me.

 6       A.   Yes.

 7       Q.   What was his drug of choice, if you knew?

 8       A.   That, I can't recall exactly what it was.  But, yes.

 9       Q.   While you were married before your husband was

10  murdered, did you have to deal with him when he was high on --

11  on drugs or alcohol?

12       A.   Daphne -- I mean, Daphne's and them dad?

13       Q.   Yeah.

14       A.   Yes.

15       Q.   Now, were you aware that between the time when

16  Daphne and Matthew got married to when he went off to prison

17  for the robbery case, were you aware that -- that they had a

18  volatile physical relationship, that they would fight?

19       A.   No.

20       Q.   Did -- did you ever see Matthew put his hands on

21  Daphne?

22       A.   No.

23       Q.   What kind of dad is Matthew?

24       A.   I didn't hear the question.

25       Q.   What kind of father was Matthew?
```

```
 1        A.    A very good father.

 2        Q.    What made him a good father?

 3        A.    What made him a good father?  He just a good person,

 4   period, and he love his kids very much.

 5        Q.    At some point during your relationship with Matthew,

 6   did you come to realize that he was using and abusing drugs and

 7   alcohol?

 8        A.    Yes.

 9        Q.    And when was that?

10        A.    It's been quite a -- it's been a couple of -- it's

11   been years, yes, ma'am.

12        Q.    Would -- a lot of years?

13        A.    Yes.

14        Q.    Since he was -- how old would you say, according to

15   what you remember?

16        A.    At a very young age, I just -- I can't recall the

17   age.

18        Q.    Did you -- obviously, you lived in the same

19   neighborhood that Daphne and Matthew grew up in?

20        A.    Yes.  Yes, ma'am.

21        Q.    Were -- were drugs common in that neighborhood?

22        A.    In the area?

23        Q.    Uh-huh.

24        A.    Yes, ma'am.  Uh-huh.

25        Q.    Would you ever see or talk to Matthew when he was
```

```
 1  high under the influence of drugs or alcohol?

 2      A.    Yes, ma'am.

 3      Q.    How would that come about that you would have

 4  contact with him when he was high?

 5      A.    Not -- not -- no -- well, I -- I take that back, but

 6  I just talk -- I just talked to him.

 7      Q.    Was -- were you one of the people he would go to

 8  when he was coming down off of his high?

 9      A.    I talked to him a lot because he would be real

10  stressed out, and it kind of help -- I just talked to him.

11      Q.    What was he stressed out about, if you know?

12      A.    About, you know, not finding a job and just -- just

13  was stressing.

14      Q.    Stressing about money?

15      A.    Yes.  Yes, ma'am.  Uh-huh.

16      Q.    Now, I want to draw your attention to -- to the

17  months before this offense happened.

18      A.    Uh-huh.

19      Q.    Do you recall that time period?

20      A.    Yes, ma'am.

21      Q.    During that time period, how was Matthew doing?

22      A.    He was very stressed.

23      Q.    Did you talk to him?

24      A.    Yes, ma'am.

25      Q.    What did y'all talk about?
```

```
 1                    MS. MOSELEY:  Objection, hearsay.

 2                    THE COURT:  Sustained.

 3                    THE WITNESS:  I talked to him about --

 4         Q.   (BY MS. MULDER)  Well, hold on.

 5                    THE COURT:  You can't answer.

 6         Q.   (BY MS. MULDER)  That means you can't answer.  I

 7    have to ask a better question.  Okay.

 8         A.   Okay.

 9         Q.   How often did you see him high during that time

10    period, or did you talk to him when he was high?

11         A.   How often?

12         Q.   Yes, ma'am.

13         A.   Not -- not that often.

14         Q.   You said that Matthew was stressed out.  Did he ever

15    seem depressed?

16         A.   Uh-huh.  Yes, ma'am.

17         Q.   How did you -- what would he do that you could tell

18    he was depressed?

19         A.   Well, because I talked to him.  He come over.  He

20    used to come over to the house when he was stressed out and

21    stuff, and I tell him to pray about it and, you know, just

22    believe in God and just -- I just talked to him.

23         Q.   Did y'all talk about religion?

24         A.   Oh, yes, ma'am.  Uh-huh.

25         Q.   And about Jesus?
```

```
 1        A.    Yes, ma'am.  Uh-huh.

 2        Q.    Did Matthew have a lot of faith as a Christian?

 3        A.    Yes, ma'am.

 4        Q.    And y'all would pray?

 5        A.    I would pray.  And I'd tell him to pray about it.

 6        Q.    During the spring, were you ever worried that

 7   Matthew's depression got worse?

 8        A.    I worry about him all the time because he -- yes.

 9   Yes, ma'am.

10        Q.    Okay.  You have a sister named Frances?

11        A.    Yes, ma'am.

12        Q.    Is she older or younger than you?

13        A.    I'm the oldest.

14        Q.    Of how many?

15        A.    Huh?

16        Q.    Of how many brothers and sisters do you have?

17        A.    I have eight, and two brothers -- eight girls and --

18   eight sisters and two brothers.

19        Q.    What would you do when you were worried about

20   Matthew?

21        A.    I would talk to him on the phone or most of the time

22   go -- talk to him at home.

23        Q.    Did y'all ever go looking for him?

24        A.    Yes, ma'am.

25        Q.    Who would you go looking for him with?
```

```
 1        A.    With my daughter.

 2        Q.    Which one?

 3        A.    Courtney.

 4        Q.    Not Daphne, but you would go with Courtney?

 5        A.    Yes, ma'am.

 6        Q.    And would Ms. Frances come along, too?

 7        A.    Yes, ma'am.  Uh-huh.

 8        Q.    Where would y'all go?

 9        A.    Just around the neighborhood close by where we, you

10   know, thought he may be.

11        Q.    Because you knew he was using drugs?

12        A.    Yes, ma'am.

13        Q.    Did you ever go to the smoke house to see if he was

14   there?

15        A.    Yes, ma'am.

16        Q.    How often in the time period -- excuse me, how often

17   in the time period before this happened did you go looking for

18   Matthew?

19        A.    It's like about four, five times.

20        Q.    Why -- and was it during the day, in the night, in

21   the evening, when?

22        A.    At night, day, yes, ma'am.

23        Q.    Why would y'all go looking for Matthew?

24        A.    Because we loved him and concerned about him.

25        Q.    What were you worried about?
```

1        A.    We were worried about because he wasn't in his right

2    state of mind at the time.

3        Q.    What would you -- what were you worried might could

4    happen because he wasn't in his right state of mind?

5        A.    Anything.

6        Q.    When you would go to the smoke house, would y'all go

7    in or would y'all wait outside or how would that work?

8        A.    We didn't go -- well, I didn't go -- you know, I

9    didn't go in.  I would stay in the car and just watch and see

10    if he come out and, you know, like that.

11        Q.    Would he come out sometimes?

12        A.    When he come out, we -- we talk to him, yes, ma'am.

13        Q.    Would he -- would he go with you?

14        A.    He would leave and stuff, and we'd try to follow him

15    and stuff, like that to make sure -- you know, try to make him

16    go home.

17        Q.    When he would leave the smoke house, was he under

18    the influence of drugs or alcohol?

19        A.    Yes, ma'am.

20        Q.    He would be high?

21        A.    Yes, ma'am.

22        Q.    You say that Matthew was a good father?

23        A.    Yes, a very good father.

24        Q.    How do you feel about Matthew?

25        A.    I didn't hear the question.

1        Q.    I'm sorry.  How do you feel about Matthew?

2        A.    How I feel about him?  I love Matthew.  I love him

3   with all my heart, and he's a good person.

4        Q.    You know why he's here today, what he did?

5        A.    Yes, ma'am.

6        Q.    The Matthew that -- that did that, is that

7   completely out of character for the Matthew that you've known

8   and loved since he was 18?

9        A.    Of course, yes.  Yes, ma'am.

10        Q.    When Matthew would talk to you when you were -- when

11   he was upset, what was he most stressed about?

12            MS. MOSELEY:  I'll object.  That's hearsay.

13            THE COURT:  Sustained.

14            MS. MULDER:  Pass the witness.

15            MS. MOSELEY:  I have no questions for Ms.

16   Johnson.

17            THE COURT:  Thank you, ma'am.  You may stand

18   down, and you're excused.

19            THE WITNESS:  Thank you.

20            MS. MULDER:  Call Frances Wilson.

21            (Witness brought forward.)

22            MS. MULDER:  Go ahead and go up to the witness

23   stand.

24            THE COURT:  Please raise your right hand.

25            (Witness sworn.)

```
 1                    THE WITNESS:  Yes, ma'am.

 2                    THE COURT:  Thank you.

 3                         FRANCES WILSON,

 4  was called as a witness by the Defendant, and after having been

 5  first duly sworn, testified as follows:

 6                    DIRECT EXAMINATION

 7  BY MS. MULDER:

 8      Q.   Would you state your name and spell your last name

 9  for the record, please.

10      A.   Frances Wilson, W-i-l-s-o-n.

11      Q.   Was your maiden name Mills?

12      A.   Johnson.

13      Q.   Johnson, sorry.

14                    THE COURT:  What is that noise?

15                    THE BAILIFF:  It's the chair.

16                    MS. BERNHARD:  It's the witness chair.

17                    THE COURT:  Oh, okay.

18      Q.   (BY MS. MOSELEY)  Ms. Frances, do you know Matthew

19  Johnson?

20      A.   Yes, ma'am.

21      Q.   How do you know Matthew Johnson?

22      A.   He's my nephew by marriage and Daphne Johnson.

23      Q.   How long have you known Matthew Johnson?

24      A.   Nineteen years.

25      Q.   Do you see him in the courtroom today?
```

```
 1        A.    Yes, ma'am.

 2        Q.    Could you please point him out for us and describe

 3   what he's wearing?

 4        A.    He's wearing a suit with glasses.

 5              MS. MULDER:  Let the record reflect this witness

 6   has identified the Defendant.

 7              THE COURT:  The record will reflect.

 8        Q.    (BY MS. MULDER)  In knowing Matthew for 19 years,

 9   can you describe for the jury, you know, how much time you've

10   spent with Matthew during that time?

11        A.    Maybe every -- kind of every day.  Well, I talk to

12   him every day, almost.  Once a week.

13        Q.    You talk to him once a week?

14        A.    Yes, ma'am.

15        Q.    How was it that y'all became close?

16        A.    Ever since he married my niece, we've been close

17   with him.

18        Q.    When did you become aware, if at all, that Matthew

19   might have a drug problem?

20        A.    Maybe five years into his marriage.

21        Q.    When he was about 22 years old?

22        A.    Yes, ma'am.

23        Q.    Were you aware that during that time in their

24   marriage, Matthew would put hands on Daphne?

25        A.    No, ma'am.
```

```
 1        Q.    You were not aware of that?

 2        A.    No.

 3        Q.    Would you say they had a volatile relationship?

 4        A.    Explain that.

 5        Q.    Did they have a relationship where they fought?

 6   Have spats?

 7        A.    No.

 8        Q.    Not that you saw?

 9        A.    No.

10        Q.    And not that he told you?

11        A.    No.

12        Q.    Would Matthew talk to you about his drug addiction,

13   or did that come later?

14        A.    It came later.  He used to call me and talk --

15              MS. MOSELEY:  Judge, I'm sorry.  Again, I'm

16   going to have to object.  She can't ask her questions about

17   what he said.

18              THE COURT:  Sustained.

19        Q.    (BY MS. MULDER)  About what year was it when --

20   without telling us what he said, when did -- when did you start

21   talking to Matthew about his drug addiction?

22        A.    2012.

23        Q.    And what was going on -- tell the jury what

24   happened -- about what, if you recall, month was it in 2012

25   where he started talking to you about his drug addiction?
```

```
 1        A.    June.

 2        Q.    Was that before -- oh, I'm sorry.  Before this

 3   offense happened, did Matthew Johnson talk to you about his

 4   drug addiction?

 5        A.    Yes.

 6        Q.    How often would y'all talk about it?

 7        A.    Once a week.

 8        Q.    Since you've been knowing Matthew and been knowing

 9   about his drug addiction since he was 22, has Matthew ever

10   seemed depressed to you?

11        A.    Yes.

12        Q.    When did you first notice signs of depression in

13   Matthew?

14        A.    In June of 2012.

15        Q.    Well, in June of 2012 he was already in jail for

16   this offense because this offense happened in May of 2012.  I

17   kind of misspoke earlier.

18        A.    Okay.

19        Q.    Did you mean June of 2011, before this offense

20   happened?

21        A.    Yes, ma'am.

22        Q.    Well, I think I brought up 2012, so I apologize.  I

23   directed you to the wrong year.  Okay.  So we're talking about

24   2011?

25        A.    Yes, ma'am.
```

1      Q.   What were the signs of depression, if any, that you

2  saw in Matthew?

3      A.   He'd always try to get help.  He was depressed.  I

4  used to talk to him and calm him down.  I was to calm him down.

5  He even talk about hurting himself.

6      Q.   How do you mean hurting himself?

7              MS. MOSELEY:  Again, Your Honor, this is

8  hearsay.

9              THE COURT:  Sustained.

10     Q.   (BY MS. MULDER)  Were you ever worried that Matthew

11 might do harm to himself?

12     A.   Yes.

13     Q.   Were you worried -- was suicide ever a concern?

14     A.   Yes.

15     Q.   During that time period when suicide was a concern,

16 what -- what did you and Ms. Hazel and Ms. Courtney do?

17     A.   We tried to help him to get help, but we couldn't.

18 It's hard.

19     Q.   How is it hard?

20     A.   Because we didn't have the funds to help him.

21     Q.   Did y'all ever go looking for Matthew?

22     A.   Yes.

23     Q.   And why would you -- why would y'all go looking for

24 him?

25     A.   Because we were concerned about him and his health.

104

```
1        Q.    And when you say his health, what do you mean?

2        A.    About him hurting himself.

3        Q.    Were you ever afraid during that time that -- I'll

4   rephrase that.

5              I want to draw your attention to the spring of

6   2012, before this offense happened.  Did you and Ms. Courtney

7   and Ms. Hazel ever go looking for Matthew?

8        A.    Yes, we did.

9        Q.    Where would y'all go look at?

10       A.    We would go in Garland off of Richard Street.

11       Q.    Was that where the smoke house was?

12       A.    Yes, ma'am.

13       Q.    Would -- would you go in the day, in the evening, in

14  the night?

15       A.    In the night.

16       Q.    Like early morning?

17       A.    Between 11:00 and 12:00 p.m.

18       Q.    Well, 11:00 to 12:00 p.m. would be in the afternoon.

19  Do you remember a.m.?

20       A.    A.m., right.

21       Q.    That's all right.  Have you ever testified before?

22       A.    No, ma'am.

23       Q.    And what kind of job do you do?

24       A.    I do assembly.  I do periscopes for the military.

25       Q.    And how long have you held that position?
```

1     A.    Fifteen years.

2     Q.    And you're a married lady?

3     A.    Yes, ma'am.

4     Q.    Children of your own?

5     A.    Yes, ma'am.

6     Q.    So you worked -- you work every day?

7     A.    Yes, ma'am.

8     Q.    Five days a week?

9     A.    Yes, ma'am.

10    Q.    Monday through Friday?

11    A.    Yes, ma'am.

12    Q.    And you would go and -- in the middle of the night

13 and go look for Matthew?

14    A.    Yes.

15    Q.    With Ms. Courtney --

16    A.    Yes.

17    Q.    -- and Ms. Hazel?  When -- when y'all would get to

18 the smoke house, what would you do?

19    A.    We would try to get him to come out.

20    Q.    And how would you do that?  I mean, is this -- is

21 this where you can just like go in and kind of wave the smoke

22 out of the way and walk up to him and say, come on out, or --

23 or do you have to wait outside?  Or how does that work?

24    A.    We tried to wait outside for him to come out.  We

25 had someone -- the people there, they knew him.  We had been

```
 1   trying to get them to bring him out, but he wouldn't come out.

 2   So we would wait out there for them to try -- to catch him

 3   coming out, but he never did.

 4        Q.   Did he ever come out and talk to y'all and then go

 5   back in?

 6        A.   No.

 7        Q.   Not that you recall?

 8        A.   No.

 9        Q.   Do you recall the time period when Matthew got out

10   of prison and he was sober?

11        A.   Yes.

12        Q.   Did you see him on family holidays and things like

13   that?

14        A.   No.

15        Q.   Did you talk to him on the phone during that time?

16        A.   Yes.

17        Q.   What was his personality like then, when he was

18   sober?

19        A.   He is a sweet person, really good person, totally

20   different.

21        Q.   Did you ever have occasion to see him with his

22   daughters?

23        A.   Yes.  He loved his daughters, very much.  And he was

24   a good father.

25        Q.   What made him a good father?
```

```
 1        A.    He would take care of his children.  He would take

 2   them to the park.  He takes care of them.  He talks to them.

 3   Tell them to do the right thing.  He love his girls.

 4        Q.    How did it end up that Matthew ended up talking to

 5   you about drugs?

 6        A.    Because he can.  He can talk to me anytime -- any

 7   time, any day.

 8        Q.    Did you ever see him high?

 9        A.    No, I didn't.

10        Q.    And you know why we're here?

11        A.    Yes, ma'am.

12        Q.    And what he's been convicted of?

13        A.    Yes, ma'am.

14        Q.    The Matthew that -- that you know and love, does it

15   seem out of character for him to have committed such a crime?

16        A.    Yes, it does.

17        Q.    In the spring before this happened, how long of a

18   time period were you worried that Matthew might hurt himself in

19   some way or commit suicide?

20        A.    All during that time.

21        Q.    That whole spring?

22        A.    Yes.

23        Q.    How had Matthew changed from the happy man you spoke

24   to when he was sober to the spring before this happened?  How

25   had his personality changed?
```

```
 1        A.    Repeat it again.

 2        Q.    Well, in the spring before this happened, was

 3   Matthew as talkative as he had been when -- before he had

 4   relapsed on drugs?

 5        A.    Yes.

 6        Q.    Had you ever been worried about Matthew like that

 7   before, since knowing him since he had been 18?

 8        A.    Yes.

 9        Q.    When had you been worried about him before this time

10   period, before this case?

11        A.    Because he always had --

12        Q.    Well, you can't say what he said.

13        A.    I can't?

14        Q.    No.  What time period had you been worried about him

15   before, like how old was he?

16        A.    Twenty-one.

17        Q.    So this had been an ongoing fight for Matthew?

18        A.    Yes.

19        Q.    For almost 20 years?

20        A.    Yes.

21              MS. MULDER:  I'll pass the witness.

22                    CROSS-EXAMINATION

23   BY MS. MOSELEY:

24        Q.    Ma'am, you were never aware that -- that the

25   Defendant had hit your niece?
```

```
1       A.    No.

2       Q.    She never confided in you about that?

3       A.    No.

4       Q.    Does that change your opinion about him if he

5  actually physically assaulted your niece?

6       A.    No.

7       Q.    And do you think that a good father assaults the

8  mother in the presence of the children?

9       A.    I have no comment.

10      Q.    He never has attempted suicide, has he?

11      A.    I have no comment.

12      Q.    You have to answer the question.  Are you aware of

13 whether he's ever attempted suicide?

14            THE COURT:  Answer the question, ma'am.

15      A.    Could you repeat it?

16      Q.    (BY MS. MOSELEY)  He's never attempted suicide, has

17 he?

18      A.    Not that I'm aware of.

19            MS. MOSELEY:  That's all I have, Judge.

20            THE COURT:  Thank you.

21            MS. MOSELEY:  Thank you.

22            MS. MULDER:  Nothing further.

23            THE COURT:  Thank you, ma'am.  You may stand

24 down.

25            MS. MULDER:  Your Honor, may we approach?
```

```
 1                    THE COURT:  Yes.

 2                    (Sidebar conference, discussion off the record.)

 3                    THE COURT:  Please raise your right hand, ma'am.

 4                    (Witness sworn.)

 5                    THE WITNESS:  Yes, ma'am.

 6                    THE COURT:  Thank you.

 7                         COURTNEY JOHNSON,

 8    was called as a witness by the Defendant, and after having been

 9    first duly sworn, testified as follows:

10                        DIRECT EXAMINATION

11    BY MS. MULDER:

12        Q.   Would you state your name and spell your last name

13    for the record, please.

14        A.   Courtney Johnson, J-o-h-n-s-o-n.

15        Q.   And, Ms. Johnson, how old a lady are you?

16        A.   I'm sorry?

17        Q.   How old of a lady are you?

18        A.   I'm 35.

19        Q.   Are you related to Daphne Johnson?

20        A.   Yes, ma'am.

21        Q.   How?

22        A.   She's my sister.

23        Q.   How is it that -- that you and Daphne both have the

24    same name, last name Johnson?

25        A.   We both have the same mother and father.
```

1      Q.    Okay.  Your -- Daphne's maiden name was Johnson,

2  also?

3      A.    Yes.

4      Q.    Okay.  I just wanted to clear that up real quick

5  because we hadn't talked about that.  Is Daphne older or

6  younger than you?

7      A.    Older.

8      Q.    How much older?

9      A.    Two years.

10     Q.    When -- do you know Matthew Johnson?

11     A.    Yes, ma'am.

12     Q.    And how do you know Matthew Johnson?

13     A.    He's my brother-in-law.

14     Q.    How long have you known Matthew?

15     A.    Mostly all my life.

16     Q.    Do you see him in the courtroom here today?

17     A.    Yes, ma'am.

18     Q.    Could you please tell us where he's sitting and what

19  he's wearing?

20     A.    He's right there.  He's wearing a black suit.

21            MS. MULDER:  Let the record reflect this witness

22  has identified the Defendant in open court.

23            THE COURT:  The record will reflect.

24     Q.    (BY MS. MULDER)  And when you say all your life, did

25  you go through middle school and high school knowing Matthew?

```
 1        A.    Yes, ma'am.

 2        Q.    How often would you and Matthew and Daphne spend

 3   time together from the age of 18 on -- from when you were 16?

 4        A.    A lot.

 5        Q.    How much is a lot?

 6        A.    I mean, like three or four times out of a week.

 7        Q.    Would you say that you and Matthew became close?

 8        A.    Yes, ma'am.

 9        Q.    Did you ever talk to Matthew?

10        A.    Yes, ma'am.

11        Q.    During the time period that you spent with Matthew

12   and Daphne, did you have a chance to observe their

13   relationship?

14        A.    Yes, ma'am.

15        Q.    If you would describe that relationship to the jury.

16        A.    They just had a normal relationship, just like any

17   other married couple would have.

18        Q.    Now, did you ever see Matthew put his hands on

19   Daphne?

20        A.    No, I haven't seen it, to my knowledge.

21        Q.    Were you aware that he would at times?

22        A.    I mean, I would hear stuff from my sister.

23        Q.    Okay.  But you never saw them fight together?

24        A.    No, ma'am.

25        Q.    What is your sister's personality like?
```

```
 1        A.    She's -- I mean, she's an outgoing person, but she's
 2   not very like social, social.
 3        Q.    What about Matthew, what was -- what's his
 4   personality like?
 5        A.    Most of the time he's happy and outgoing, just likes
 6   to be outside -- I mean, positive person.
 7        Q.    Were there times when he wasn't positive?
 8        A.    Yes.
 9        Q.    Did you ever come to know that Matthew had a drug
10   addiction problem?
11        A.    Yes, ma'am.
12        Q.    When did you become aware of that?
13        A.    It's been a couple of years.  I can't remember
14   exactly how long, but it's been a couple of years.
15        Q.    Did you know that he was using when he was in his
16   20s, before he went to prison?
17        A.    Yes.
18        Q.    Were you and Matthew close then?
19        A.    Yes.
20        Q.    Did you ever have an occasion to see him when he was
21   under the influence, either then or since he's been out of
22   prison?
23        A.    Yes, ma'am.
24        Q.    How was it that you had occasion to see him when he
25   was under the influence of drugs or alcohol?
```

```
 1        A.    Sometimes he would call me and he would tell me to

 2   come and get him.  And when he say come and get him and I asked

 3   him where he was at, that's when I knew he was on drugs.

 4        Q.    Why did that tip you off?

 5        A.    Because he would tell me like he's at the lake or

 6   come and pick him up at White Rock Lake or something like that,

 7   and that's how I knew.

 8        Q.    So he would -- how often did you go pick him up at

 9   White Rock Lake?

10        A.    Plenty of times.

11        Q.    What would he be doing there?

12        A.    He would just be standing in front of the water.

13        Q.    And what did you think when you saw him standing in

14   front of the water?

15        A.    To be honest, I was scared.  I don't really know

16   what I was thinking.

17        Q.    Did you ever have a concern that Matthew might do

18   harm to himself?

19        A.    To his self?

20        Q.    Yes.

21        A.    When he was like standing in front of the water, I

22   felt like it.

23        Q.    What ran through your mind?

24        A.    That he was going to jump inside of the lake.

25        Q.    Did you ever have occasion to -- I mean, was he
```

```
 1   fully dressed when he was standing there, or would he be

 2   missing clothing?

 3        A.    No, he was fully dressed.

 4        Q.    Did -- were -- was he ever missing his shoes?

 5        A.    I mean, he wasn't missing his shoes, but his shoes

 6   would be like -- you could tell he had walked so much that the

 7   sole would be off the bottom of them.

 8        Q.    And he walked a lot, didn't he?

 9        A.    Yes.

10        Q.    Do you recall the last incident when you went to

11   pick him up at White Rock Lake?

12        A.    Yes, ma'am.

13        Q.    About when was that, if you recall?

14        A.    I don't remember exactly when, but I do recall it.

15        Q.    Okay.  Was it before this offense, obviously?

16        A.    Yes, ma'am, way before.

17        Q.    Okay.  When you picked him up at White Rock, at that

18   time was he happy and outgoing or was he under the influence of

19   drugs and alcohol?

20        A.    He was under the influence of drugs.

21        Q.    How did he act when he was under the influence?

22        A.    I mean, he would talk so fast sometimes where I

23   couldn't understand him, and he was just like depressed.  He

24   wasn't himself.

25        Q.    How do you mean -- what was it that showed he wasn't
```

1  himself?

2      A.    Because like he would say something.  He was like,

3  come and get me, or he would just say it so fast and then when

4  I come and get him, I would ask him if he was okay.  He would

5  just be quiet and really not his self, just not talkative or

6  happy.

7      Q.    Did he ever say anything that made you think he was

8  depressed?

9      A.    Yes.

10      Q.    What did he say?

11              MS. MOSELEY:  I'll object.  That's hearsay.

12              THE COURT:  Sustained.

13      Q.    (BY MS. Mulder)  During the spring before this

14  offense happened, were you worried about Matthew?

15      A.    Yes, ma'am.

16      Q.    What were you worried about him?

17      A.    That he was going to get into some trouble.

18      Q.    Did you ever worry that he would be doing harm to

19  himself?

20      A.    In a way.

21      Q.    During the spring before this happened, did you ever

22  go out looking for Matthew?

23      A.    Yes, ma'am, I did.

24      Q.    Describe for the jury how it would end up that you

25  would go out looking for him.

```
 1        A.    He would call me and he was like, sister-in-law,

 2   come and get me.  And I would ask him, where's he at.

 3   Sometimes I would go to a location where he was.  He wasn't

 4   there.  Like I would just ride around and ride around for him.

 5   He would tell me he's one place, and he's not there.  I mean, I

 6   just -- I went plenty of times on very many trips and he

 7   wouldn't be at the location where he would tell me.

 8        Q.    Did you ever go looking for him at the dope house or

 9   the smoke house or places like that?

10        A.    Yes, ma'am, I did.

11        Q.    Did you go with Ms. Hazel and Ms. Frances?

12        A.    Yes, ma'am.

13        Q.    Why did the three of you get together and go out to

14   look for him?

15        A.    Because we were all concerned.

16        Q.    What were you concerned about?

17        A.    That they were giving him drugs and -- because he --

18   I knew he would be over there, and I knew that's where he was

19   getting his drugs at.

20        Q.    And how would that work when you would go to the

21   smoke house to try and find him?  Would y'all go in, or what

22   would happen?

23        A.    I wouldn't go in because people wouldn't let me in,

24   but every time they see my face, they would all just get very

25   upset because I told them that I was calling the police, so
```

1  they felt like I was a snitch.

2       Q.   Did you ever have words with the people that sold

3  drugs to Matthew?

4       A.   Yes, ma'am, I did.

5       Q.   What did you tell the drug dealers?

6       A.   I told them if they kept giving my brother-in-law

7  drugs, that I was calling the police.  I called the police

8  several times to come out.  They didn't come out.  And I told

9  the people I was calling the police, and they was telling me to

10  get from their property.  And I was telling them that all I

11  wanted was my brother-in-law to come out this house.

12       Q.   And Matthew would call you for help with this, not

13  Daphne?

14       A.   Yes, ma'am.

15       Q.   Do you remember the time period when Matthew got out

16  of prison, that he was sober?

17       A.   Yes, ma'am.

18       Q.   What was he like then?

19       A.   When he was sober, he was very family-oriented when

20  he was sober.  He was a real good father and husband to my

21  sister and his kids.

22       Q.   What made him a good father and good husband during

23  that time period?

24       A.   Because he would go to work.  He would come home,

25  take care of his kids, take his kids places, do stuff with the

119

```
 1  girls.  He would even do more than what my sister used to do
 2  with the girls, a lot more.
 3       Q.   Did you and Matthew ever talk about money?
 4       A.   As far as -- what do you mean?
 5       Q.   Would Matthew give you his money when he started
 6  using again?
 7       A.   Yeah, he would like hold it because he didn't want
 8  to spend his money.  He was trying to better himself without
 9  giving the drug dealers his money.
10       Q.   So when he was using again, he actually would give
11  you his cash money?
12       A.   Yes.
13       Q.   How much would he give you to hold?
14       A.   Like two or $300.
15       Q.   Now, when he would call and ask for it, what would
16  you do?
17       A.   I would just gradually give him some, but not all.
18       Q.   And what help did you think that was, if any?
19       A.   To keep him from going to the drug house and giving
20  them his money.
21       Q.   Kind of keep him from bingeing?
22       A.   Yes.
23       Q.   And blowing it all in one or two nights?
24       A.   Yes, ma'am.
25       Q.   How long did that go on?
```

```
 1        A.    About a couple of months.

 2        Q.    And when was that?

 3        A.    Like last year.

 4        Q.    Before this happened?

 5        A.    Yes, ma'am.

 6        Q.    How close to May of 2012 when this happened was

 7   that?

 8        A.    Probably like six months before that.

 9        Q.    Ms. Courtney, if you could back off the microphone

10   just a little bit.  Thank you.  It's working really well today.

11              Did you ever have an occasion to go to the Kwik

12   Kar where Matthew worked?

13        A.    Yes, ma'am, I did.

14        Q.    And when was that that you went there?

15        A.    When he called me.

16        Q.    And when he called you, when was this?

17        A.    I don't remember the exact date, but I know it's the

18   day he got in trouble.

19        Q.    The day that -- that he got in trouble?

20        A.    Yes, ma'am.

21        Q.    Describe for the jury what you did that day.

22        A.    I went to Kwik Kar because he had called me and told

23   me that he was going to his job because he did something wrong.

24   And I was like what did you do?  And he said that he had some

25   inspection stickers from his job.  And then I was like, well,
```

```
 1   oh, my gosh, so what are you going to do?  And he was like,
 2   well, I'm going to talk to my boss and I'm going to go turn
 3   myself in.  And I asked him -- I was like, are you sure that's
 4   what you want to do?  And he was like, yes.  And so we just
 5   waited for the police to come up there, and his manager and the
 6   police asked him what did he do and he said he wanted to turn
 7   his self in.
 8        Q.   So you actually took him up to the Kwik Kar?
 9        A.   Yes, ma'am, I did.
10        Q.   And you were -- did you go in the Kwik Kar with him?
11        A.   Yes, because he wanted to talk to his boss and tell
12   his boss and so I went in there with him, to talk.
13        Q.   And that was very early in the morning?
14        A.   Yes, ma'am.
15        Q.   Ms. Courtney, with regard to the Kwik Kar, are you
16   sure that you went in, or could you be mistaken about that?
17        A.   I went up there with him, and I did talk to the
18   supervisor.
19        Q.   But you could be wrong about going into the store?
20        A.   I could be, but I know I was there.  And I did go up
21   there with him.
22        Q.   Did Matthew ever talk with you about his drug
23   problem?
24        A.   Yes, ma'am.
25        Q.   Without telling us what he said, how often would he
```

```
 1  talk to you about it?

 2       A.   A lot.

 3       Q.   Every day, once a week, once a month?

 4       A.   Only when he had started using again.

 5       Q.   And when y'all were in your 20s, did he talk to you

 6  about his drug problem?

 7       A.   Not as much.

 8       Q.   But you were aware of it?

 9       A.   Yes, ma'am.

10       Q.   Without telling us what he said, did he ever talk to

11  you about how he felt about his drug problem?

12       A.   Yes, ma'am.

13       Q.   And what would his demeanor be like?

14       A.   Like he needed some help.

15       Q.   Is Matthew kind of a happy-go-lucky guy when -- or

16  -- or is he a guy that puts pressure on himself?

17       A.   He puts pressure on his self when things are not

18  going right.

19       Q.   Would you say he's hard on himself?

20       A.   Most of the time.

21       Q.   About a week before this offense happened, did you

22  have an occasion to go with Matthew to Garland Police Station?

23       A.   Yes, ma'am.

24       Q.   If you would, tell the jury about what happened a

25  week before this incident happened when y'all went to the
```

123

```
 1   Garland Police Station.
 2        A.    He would just ask them to, you know, lock him up
 3   because he needed help and, you know, he was on drugs.  He was
 4   trying to, I guess, prevent himself from getting in trouble.
 5        Q.    Well, now hold on.  How was it that you -- that you
 6   ended up taking him to the Garland Police Station that day?
 7        A.    Because I went and got him.
 8        Q.    Got him from where?
 9        A.    From home.
10        Q.    And he wanted to go up to the police station?
11        A.    Yes.
12        Q.    And did he tell you why?
13        A.    He just said he needed some help and he -- I guess
14   he didn't know anyone else to help him, so he wanted to get
15   locked up to try to get some help.
16        Q.    Which police station or substation did you take him
17   to?
18        A.    The one on -- I believe it's Avenue D.
19        Q.    Did you go inside the police station with him?
20        A.    No.  I talked to the officer that came out.
21        Q.    Did the officer -- well, let me ask you this.  Did
22   Matthew go in, or was he talking to an officer that came out?
23        A.    No, I was talking to him and stuff because he was
24   there, and he wanted to get some help and, you know, asked them
25   to help him.
```

```
 1        Q.    Did the police run him to see if he had warrants?

 2        A.    Yes, they did run his name, and that's why they said

 3   there's nothing they could do because he didn't have any

 4   warrants out so they wasn't going to take him in.

 5        Q.    Was Matthew upset at that time?

 6        A.    I believe he was depressed.

 7        Q.    And what makes you think he was depressed at that

 8   time?

 9        A.    Because they was just struggling real hard.

10        Q.    What did Matthew say to the police?

11              MS. MOSELEY:  I'll object, Your Honor.  It's

12   hearsay.

13              THE COURT:  Sustained.

14        Q.    (BY MS. MULDER)  How long did you spend up at the

15   police station?

16        A.    Not long.

17        Q.    Ten minutes, 30 minutes?

18        A.    Maybe about 15 minutes.

19        Q.    Were they receptive to trying to help Matthew?

20        A.    No, not when they ran his name and see that he

21   didn't have any warrants.

22        Q.    They just sent him on his way?

23        A.    Yes, ma'am.

24        Q.    And you know what Matthew's been convicted of?

25        A.    Yes, ma'am, I do.
```

```
 1          Q.    The Matthew that you've known almost all your life,

 2   does it seem out of character that he would have committed this

 3   kind of offense?

 4          A.    Yes, ma'am.

 5          Q.    Now, Ms. Courtney, I want to talk a little bit --

 6   excuse me, about your personal history, starting with when you

 7   were a little girl, you were misfortunate enough to have

 8   witnessed your father's shooting?

 9          A.    Yes, ma'am.

10          Q.    And that caused you a lot of pain in your life?

11          A.    Yes, ma'am.

12          Q.    And you've had some problems with the law yourself?

13          A.    Yes, ma'am.

14          Q.    I'm just going to briefly go through, so just bear

15   with me.  January 14th of 1999, you were convicted of -- let me

16   see here, I've got -- my notes are making me confused --

17   forging a check, which you had gotten probation for.  You got

18   revoked and ended up doing six months on?

19          A.    Yes, ma'am.

20          Q.    And that was actually -- I'm sorry, two cases of

21   check forgery?

22          A.    Yes, ma'am.

23          Q.    In November of 1997, you got 90 days for theft 50,

24   which was a shoplifting case?

25          A.    Yes, ma'am.
```

```
 1        Q.    Which how old were you at that time?  I guess you
 2   were 19?
 3        A.    What year was that?
 4        Q.    '97.
 5        A.    Yes, ma'am.
 6        Q.    And on August 24th of 2001, you pled guilty and got
 7   seven years on a revocation for aggravated assault with a
 8   deadly weapon?
 9        A.    Yes, ma'am.
10        Q.    And four years on a -- I think it was another credit
11   card abuse case?
12        A.    Yes, ma'am.
13        Q.    February of 2007, you were convicted of misdemeanor
14   offense theft and got 45 days?
15        A.    Yes, ma'am.
16        Q.    And March of that year, you were -- had another
17   misdemeanor theft 500 where you got 90 days?
18        A.    Yes, ma'am.
19        Q.    And then in 2001 in August, you had a fraud writing
20   case that you pled guilty and got 45 days in jail on?
21        A.    Yes.
22        Q.    Do you recall the incident where you and Daphne were
23   fighting, or -- and you called the police and made an
24   allegation that he had pointed a gun at you?  Do you have any
25   recollection of that?
```

```
 1        A.    No, ma'am, I don't.

 2        Q.    Did -- did you have any recollection that he pled

 3   guilty and got probation for that and lived it out?

 4        A.    No, ma'am, I don't.

 5        Q.    Do you ever recall him pulling a gun on you in 1995?

 6        A.    He's never had a gun, not to my knowledge.

 7              MS. MULDER:  I'll pass the witness.  Well, hold

 8   on, Ms. Courtney.  Ms. Moseley has to ask you some questions.

 9              THE COURT:  The State might have some questions.

10              MS. MOSELEY:  I do, Your Honor.  Thank you.

11                      CROSS-EXAMINATION

12   BY MS. MOSELEY:

13        Q.    You -- I guess you told jury that you don't remember

14   August 7th of 1995 when the Garland police officers came to

15   your apartment?

16        A.    No, ma'am, I don't remember.

17        Q.    At 12:42 a.m., at 413 Gatewood?

18        A.    I don't remember that.

19        Q.    You lived at 413 Gatewood, didn't you?

20        A.    Yes, ma'am.

21        Q.    And you don't remember the Defendant coming over

22   there, looking for Daphne?

23        A.    No, ma'am, I don't.

24        Q.    You -- you don't remember calling the police at all?

25        A.    Not at all.
```

128

```
 1        Q.   And you don't remember them coming to your
 2   apartment?
 3        A.   No, ma'am, I don't.
 4        Q.   Do you remember coming down here to the District
 5   Attorney's Office and trying to drop those charges later?
 6        A.   No, ma'am, I do not remember that.  Where year was
 7   that?
 8        Q.   In 1995, testifying in front of the Grand Jury.  You
 9   don't remember that?
10        A.   No, ma'am.
11        Q.   And you certainly don't remember then telling the
12   police that he pointed a gun at you?
13        A.   No, ma'am, I don't.
14        Q.   Do you remember him going to jail?
15        A.   No, I don't.
16        Q.   Or being in jail?  None of this rings a bell at all?
17        A.   I don't remember it at all.
18        Q.   You're not saying it didn't happen, you're just
19   saying you don't remember?
20        A.   I don't remember the incident.
21        Q.   And you were actually on probation.  You got
22   probation November 6th of 2008, for a felony theft.  Do you
23   remember that?
24        A.   Yes, ma'am.
25        Q.   And you were actually discharged from that probation
```

129

1    two days before this crime; is that right?

2        A.    I know I was discharged from probation, but I don't

3    remember about the crime.

4        Q.    May 18th, 2012, was when you got finished with your

5    probation.

6        A.    I don't remember the dates.

7        Q.    Did you ever ask your probation officer whether

8    there was any drug treatment help for your brother-in-law?

9        A.    No, I didn't.

10       Q.    You're certainly aware that probation -- through the

11   Probation Department they have services that help people with

12   drug problems, right?

13       A.    Well, I don't know because I've never had a drug

14   problem.

15       Q.    All these crimes you committed, you did without

16   drugs?

17       A.    Yes, ma'am.

18       Q.    Now, you also said that you went Kwik Kar with the

19   Defendant when he went to turn himself in, you said?

20       A.    Yes, ma'am.

21       Q.    You know there's a video inside that store, right?

22       A.    Yes, ma'am.

23       Q.    And you're not on that video.

24       A.    Well, I was there.  I can't remember if I went in,

25   but I know I was there.

```
 1          Q.    Did -- did you know that the police called Daphne to
 2   come pick up his car from Kwik Kar?
 3          A.    Well, he had his car already sitting up there, but I
 4   took him up there.
 5          Q.    He left his car at Kwik Kar and -- and went home?
 6          A.    I took him up there.  I don't know if his car was
 7   already there, but I took him up there.
 8          Q.    You just said it was already there?
 9          A.    It had to be.
10          Q.    Why?
11          A.    Because he went with me.
12          Q.    And you left -- you left before the police got
13   there?
14          A.    No, I left -- I left when the -- when the police
15   left.
16          Q.    And you talked to a police officer, is what you're
17   telling them?
18          A.    He talked to a police officer.
19          Q.    But you didn't?
20          A.    No, I didn't.
21          Q.    You just sat in the car while he went inside and
22   turned on all the lights and waited for a half hour or so for
23   the manager, the owner and the police to get there?
24          A.    I didn't turn on any lights.
25          Q.    No, he did while you sat outside?
```

```
 1        A.    I just waited on the officer.

 2        Q.    Did you know a police officer was coming?

 3        A.    Yes, I did.

 4        Q.    How did you know a police officer was coming?

 5        A.    Because he called -- he called the police.

 6        Q.    He called the police?

 7        A.    And I called the police, yes.

 8        Q.    And you called the police?

 9        A.    Yes.

10              MS. MOSELEY:  I don't have any other questions.

11              THE COURT:  Anything further?

12              MS. MULDER:  Nothing further.

13              THE COURT:  Step down, ma'am.  You are excused.

14              Members of the jury, let's take our noon recess.

15  It's 12:15.  If you'll be back in the jury room at 1:30,

16  please.

17              THE BAILIFF:  All rise.

18              (Jury excused from courtroom.)

19              (Recess.)

20              THE COURT:  Please proceed.

21              MS. BERNHARD:  Are we ready?

22              THE COURT:  We're ready.

23              MS. BERNHARD:  The State would call Frank Au

24  Buchon.

25              (Witness sworn.)
```

```
 1                    THE WITNESS:  Yes.

 2                    THE COURT:  Thank you.

 3                         FRANK AU BUCHON,

 4   was called as a witness by the Defendant, and after having been

 5   first duly sworn, testified as follows:

 6                    DIRECT EXAMINATION

 7   BY MS. BERNHARD:

 8        Q.    State your name.

 9        A.    Frank Au Buchon.

10        Q.    Mr. Au Buchon, just briefly, did you used to work

11   for TDCJ?

12        A.    Yes, ma'am.

13        Q.    And how many years?

14        A.    Twenty-six and a half.

15        Q.    Can you spell your last name for the court reporter?

16        A.    Yes, it's A-u, capital B-u-c-h-o-n.

17        Q.    And in your capacity in TDCJ, just very briefly,

18   what sort of things did you do?

19        A.    I worked as a correctional officer, as a supervisor

20   of correctional officers, as a lieutenant, as a unit

21   classification case manager, as the chief of unit

22   classification for the Huntsville Walls Unit, then in different

23   administrative positions within classification and records

24   headquarters.

25        Q.    And did you actually play a role in the
```

133

```
 1   classification of inmates?

 2        A.   Yes, ma'am.

 3        Q.   And their custody status?

 4        A.   Yes, ma'am.

 5        Q.   And I'm showing you what's been marked as

 6   Defendant's Exhibit Number 24, and ask if you recognize that?

 7        A.   Yes, I do.

 8        Q.   Does that appear to be a copy of your CV or resume?

 9        A.   Yes, it is.

10             MS. BERNHARD:  And we'd offer Defense Exhibit

11   24.

12             (Defendant's Exhibit 24 offered.)

13             MS. MOSELEY:  Judge, I have no objection.

14             THE COURT:  Admitted.

15             (Defendant's Exhibit 24 admitted.)

16        Q.   (BY MS. BERNHARD)  Mr. Au Buchon, I have asked you

17   to provide certain opinions and -- and share some knowledge

18   with the jury today.  And is one of those things to generally

19   explain the classification system?

20        A.   Yes.

21        Q.   And by that, I mean the G1 through G5 classification

22   system.

23        A.   Yes, ma'am.

24        Q.   And you're prepared to offer testimony on that?

25        A.   Yes.
```

1      Q.    And you're prepared to offer at the time about how

2  somebody who is convicted of capital murder and receives life

3  without parole, how they are classified?

4      A.    Yes.

5      Q.    And what sort of housing they might be placed in?

6      A.    Yes.

7      Q.    And you can also describe the typical TDCJ unit

8  where G3s would be housed?

9      A.    Yes, ma'am.

10     Q.    And you also have reviewed Matthew Johnson's -- some

11  records of his?

12     A.    Yes, I have.

13     Q.    Can you tell us what you reviewed?

14     A.    I reviewed his entire central classification file

15  from the TDCJ headquarters in Huntsville.

16     Q.    And is this something that you had to get a court

17  order?

18     A.    Yes, I did.

19     Q.    And go in there and say, hey, I'm here to look at

20  records?

21     A.    Yes.

22     Q.    And do they have records that they keep in TDCJ that

23  sometimes cannot even be obtained by subpoena?

24     A.    There would be certain records in the office of the

25  Inspector General that has some type of -- you know, law

```
 1  enforcement exception to where they may or may not be

 2  available.  With your normal subpoena action, though, it's --

 3  you typically only get what you ask for, so you have to really,

 4  really know how to write a subpoena to get everything you need

 5  from -- from TDCJ.

 6       Q.   And you have to know where all the records are kept?

 7       A.   And -- and -- yes, ma'am.  Not only that, but not

 8  only what -- what records are on paper, but also what records

 9  are computerized that the court order also gets me access to.

10       Q.   Okay.  So did you get access to all of the records

11  that TDCJ has on Matthew Johnson?

12       A.   As far as classification and records office, yes.

13       Q.   Right.  You didn't review medical records or

14  anything like that?

15       A.   No, ma'am, nor the many, many other offices within

16  TDCJ that have records on offenders.

17       Q.   But you were able to review everything that

18  classification has?

19       A.   That is correct.

20       Q.   And you also -- you reviewed some records that I

21  sent you, Matthew Johnson's parole records?

22       A.   Yes, ma'am.

23       Q.   And actually I believe I did send you his TDCJ

24  medical records?

25       A.   Yes, you did.
```

```
 1        Q.    And something called TDCJ Emergency Action Center?

 2        A.    Yes, ma'am.

 3        Q.    And something that was entitled Use of Force

 4   Affidavit?

 5        A.    Yes.

 6        Q.    And I also sent you some pages from the offense

 7   report for this offense?

 8        A.    Yes, ma'am.

 9        Q.    So you were able to review the -- the basic facts of

10   this offense?

11        A.    I know the basic facts of the offense, yes.

12        Q.    And did you also review a State's Notice of

13   Extraneous Offenses?

14        A.    Yes, I did.

15        Q.    And you also reviewed some photos of Mr. Johnson's

16   tattoos?

17        A.    Yes.

18        Q.    And you reviewed some records from the Dallas County

19   Jail?

20        A.    That's correct.

21        Q.    Am I missing anything?

22        A.    The only thing I can think of, and I did this on my

23   own, was Google -- did a Google search, and I saw a brief video

24   clip from inside the convenience store.

25        Q.    Okay.  And that would probably be about all the
```

```
 1  records you reviewed pertaining to this case?

 2       A.   Yes, ma'am.

 3       Q.   And are you prepared to testify what characteristics

 4  or what -- what sort of things TD -- TDCJ looks at in

 5  determining how they classify an inmate?

 6       A.   Yes, ma'am.

 7       Q.   And you are also -- I think I asked you this.

 8  You're prepared to testify about how inmates are housed, based

 9  on their classification?

10       A.   Yes, ma'am.

11       Q.   And are you also prepared to offer an opinion, based

12  on review of the records in this case and your knowledge of

13  TDCJ classification, whether or not you think that Matthew

14  Johnson can be controlled by TDCJ?

15       A.   Yes.

16            MS. BERNHARD:  I'll pass the witness.

17                     CROSS-EXAMINATION

18  BY MS. MOSELEY:

19       Q.   I have just a few -- first of all, you have that

20  central classification file with you, the Defendant's central

21  classification file?

22       A.   Yes.

23       Q.   May I see it -- you've reviewed that, right?

24       A.   Yes, ma'am, I have reviewed it.

25            MS. MOSELEY:  Judge, may I approach the witness?
```

```
 1                    THE COURT:  You may.

 2                    THE WITNESS:  Let me -- let me make sure I don't

 3  have anything else in here.  There you are, ma'am.

 4       Q.   (BY MS. MOSELEY)  Did you make any notes about any

 5  of -- any of the documents you've reviewed or anything?

 6       A.   Just very brief notes.

 7                    MS. MOSELEY:  Judge, if I may have just a few

 8  minutes to see what he's reviewed?

 9                    THE COURT:  Sure.

10                    MS. MOSELEY:  May I approach?

11                    THE COURT:  You may.

12                    MS. MOSELEY:  Thank you.

13       A.   Yes, ma'am.

14       Q.   (BY MS. MOSELEY)  Now, Mr. Au Buchon, you said when

15  the Defense attorney was going to -- was asking you questions,

16  that you were prepared to discuss where the Defendant would be

17  placed, which classification he would receive in the prison?

18       A.   Yes, ma'am.

19       Q.   And that's G3, right?

20       A.   Yes, ma'am.

21       Q.   And are you familiar with -- you haven't been with

22  TDC since 2007, right?

23       A.   Correct.

24       Q.   Or TDCJ.  Are you familiar with the classification

25  boundaries of a G3 now?
```

1    A.    Yes, ma'am.

2    Q.    So you keep up with the changing in the -- in the

3  rules?

4    A.    Yes, ma'am.

5    Q.    Since 2007, there have been a number of changes to

6  the classification rules with regard to life without parolers?

7    A.    Since 2005, actually.

8    Q.    Since 2005?

9    A.    Yes, ma'am.

10    Q.    So those were in place before you left?

11    A.    Yes, ma'am, they were.

12    Q.    And you are familiar then with the types of

13  privileges and freedoms that a person in G3 would be eligible

14  for?

15    A.    Yes, ma'am.

16    Q.    And you looked at his parole records?

17    A.    Yes, ma'am.

18    Q.    He was on parole two months, right?

19    A.    I -- I don't recall how long he was on parole.

20    Q.    Did that factor at all into your opinions in this

21  case, the parole records?

22    A.    No, ma'am, not really, not a whole lot.

23    Q.    Basically you're going to testify that he will be

24  placed in as a G3, and you said you're going to talk about what

25  types of housing a G3 is eligible for?

1          A.    Yes, ma'am.

2          Q.    And what's your opinion on that?

3          A.    G3s are to primarily be housed in cell block housing

4    on the Level 5 maximum security prison.  Under certain

5    circumstances on -- a handful of very specific units that house

6    G3s, based upon the construction of those facilities, some G3s

7    may be allowed housing in a dormitory.

8          Q.    So it is possible for a G3 to be housed in a

9    dormitory?

10         A.    Under those limited restrictions that I just went

11   over, yes, ma'am.

12         Q.    And basically would depend on which unit he got

13   assigned to?

14         A.    That is correct.

15         Q.    And you don't know that as you sit here today?

16         A.    I know it would be one of two designs, but which

17   design, no, ma'am, I do not know.

18         Q.    You're not able to predict where he will be sent?

19         A.    Not to -- down to the specific prison unit, but I

20   can as to the type of prison unit.

21         Q.    Right.  But you don't know if it will be a cell

22   block or it will be one of those units that would house a G3 in

23   dormitory?

24         A.    Any unit he goes to will primarily be cell block

25   housing.  There could be some dormitory housing available.

 1      Q.   But you can't tell this jury that this Defendant
 2 won't be housed in a dormitory?
 3      A.   No.
 4      Q.   And as it relates to whether this Defendant can be
 5 controlled by TDCJ, you hesitated for a while about whether you
 6 had an opinion of that.  On what would you base your opinion,
 7 about whether he can be --
 8      A.   I was -- I was contemplating the word "control" is
 9 why I hesitated there.
10      Q.   And -- and what is your opinion about that?
11      A.   About can TDC manage Matthew Johnson; is what you're
12 asking me?
13      Q.   Or control -- whatever -- right.
14      A.   Use the word "control."  Okay.  Yes.
15      Q.   And upon what do you base that?
16      A.   My years of experience and the knowledge of TDCJ's
17 security practices and how they -- how they manage offenders
18 and -- just how they manage offenders and -- and how
19 effectively they can manage offenders.
20      Q.   TDC is pretty good?
21      A.   Yes.
22      Q.   But there's also a bit of violence in prison, yes?
23      A.   No one is perfect.
24      Q.   And you haven't met with this Defendant; is that
25 right?

```
 1          A.    No, ma'am, I have not.

 2                  MS. MOSELEY:  That's all I have, Judge.

 3                  THE COURT:  All right.  If we can get the jury

 4   lined up, please.

 5                  THE BAILIFF:  All rise.

 6                  (Jury returned to courtroom.)

 7                  THE COURT:  Please be seated.

 8                  Would Defense call its next witness, please?

 9                  MS. BERNHARD:  The Defense would call Frank Au

10   Buchon.

11                  THE COURT:  Let the record reflect this witness

12   has been sworn.

13                        FRANK AU BUCHON,

14   was called as a witness by the Defendant, and after having been

15   first duly sworn, testified as follows:

16                      DIRECT EXAMINATION

17   BY MS. BERNHARD:

18        Q.    State your name.

19        A.    Frank Au Buchon.

20        Q.    And, Mr. Au Buchon, what do you do?

21        A.    I'm retired from the Texas prison system, TDCJ, and

22   I work part-time as a consultant with primarily criminal

23   defense attorneys.

24        Q.    And you said you were -- you were retired from TDCJ?

25        A.    Yes, ma'am.
```

1      Q.    How long were you there, and what did you do there?

2      A.    I was there 26 and a half years.  I worked as a

3  correctional officer, a supervisor of correctional officers, a

4  unit classification officer, the chief unit classification

5  officer for the Huntsville Walls Unit, and then in -- went to

6  the prison headquarters, was promoted there in different

7  administrative functions within the classification and records

8  office.

9      Q.    And did you --

10            MS. BERNHARD:  May I approach?

11            THE COURT:  You may.

12      Q.    (BY MS. BERNHARD)  I'm showing you Defendant's

13  Exhibit Number 24, and ask if you recognize that?

14      A.    Yes, ma'am.

15      Q.    Is that a copy of your resume or CV?

16      A.    Yes, ma'am, it is.

17      Q.    And that details the various jobs that you have held

18  within TDCJ that qualify you to testify here today?

19      A.    Yes, ma'am.

20            MS. BERNHARD:  We'd offer Defense Exhibit 24.

21            (Defendant's Exhibit 24 offered.)

22            MS. MOSELEY:  No objection.

23            THE COURT:  Admitted.

24            (Defendant's Exhibit 24 admitted.)

25      Q.    (BY MS. BERNHARD)  Now, during your 26 -- 26 and a

1   half?

2       A.    Yes, ma'am.

3       Q.    -- during your 26 and a half years at TDCJ, did you

4   play a role in the classification of inmates?

5       A.    Yes, I did.

6       Q.    What sort of role did you play?

7       A.    I -- I started off as representing inmates before

8   unit classification committees, was one of my first jobs in

9   classification.  And then I later managed the unit

10  classification staff, and for several years sat as a voting

11  member on the unit classification committee.  And then later on

12  in my career as -- as an administrator, one of my job

13  responsibilities was revising -- reviewing, revising, and

14  update the TDCJ classification plan and all of the unit

15  classification procedures used statewide.

16      Q.    Okay.  So as part of your job at TDCJ, you actually

17  played a role in classifying inmates?

18      A.    Yes, ma'am.

19      Q.    And how long do you think you did that?

20      A.    At the unit level, for about five or six years, and

21  then 15 and a half years at the administrative level.

22      Q.    And what's the difference between the unit level

23  and -- and what the administrative level does?

24      A.    The unit level is hands on, more hands on with the

25  offenders.  At the administrative level it's more policy and

1  procedure driven, hiring -- hiring the staff, promoting the

2  staff on the units that actually will perform these functions

3  and writing their procedures and rules to follow, and also

4  going out and auditing all of these people to make sure that

5  they are, in fact, following the rules and procedures.

6      Q.    And to prepare for -- for your testimony here today,

7  did you review certain records of Matthew Lee Johnson?

8      A.    Yes, ma'am.

9      Q.    Can you briefly summarize what records you reviewed?

10     A.    I reviewed his entire TDCJ central classification

11  file.  That's -- there are two files kept on prisoners.

12  There's one at the unit level.  There's one at the headquarters

13  level.  Once an offender is released from TDC, some of the

14  documents at the unit level are sent to the headquarters to be

15  incorporated into the master file.  So I went to the TDCJ

16  classification headquarters, reviewed those records, and

17  computerized records, got a copy of those records.  And then

18  there was some other records from various other divisions,

19  departments within TDCJ that you provided me that I reviewed.

20     Q.    And you also reviewed some information about the

21  offense --

22     A.    Yes, right.

23     Q.    -- that Matthew Johnson has been convicted of?

24     A.    Yes, ma'am, off -- offense summary.

25     Q.    And you also reviewed some documentation on some --

1   what we call extraneous offenses?

2        A.   Yes, ma'am.

3        Q.   And you -- and you also reviewed Matthew Johnson's

4   records from the Dallas County Jail?

5        A.   Yes, I did.

6        Q.   Now, we've heard a little bit about the

7   classification or the custody classification system at TDCJ --

8   in other words, the G1 through G5 designations.  Could you

9   briefly explain that for the jury?

10       A.   Sure.  The letter G stands for general population.

11  There are two sep -- two separate housing areas within the --

12  most of the Texas prisons, general population where you live --

13  live in a cell or dormitory with another person.  You have

14  freedom to come out of that cell or dormitory to go to work,

15  school, to recreation, things of that nature.  The other form

16  of housing is administrative segregation, commonly referred to

17  as solitary confinement.  That's where the individual is locked

18  in a cell by themselves 24 hours a day.  They're in restraints

19  anytime they're out -- let out of that cell and escorted by a

20  correctional officer or officers every time they're out of the

21  cell.  So the G would be the majority of the prisoners that

22  live in population, general population.  One through 5

23  indicates their -- you can call it their custody level, or it

24  is what level of supervision or what level of security does

25  this person require.  So a G1 is the type of offender that

1  requires the least amount of supervision, the least amount of

2  security.  G5 is the fellow in general population who has

3  caused you so many discipline problems, that you have to watch

4  him very, very closely and his access is -- is limited and his

5  privileges are limited because of his behavior.  Typically for

6  a guy in G5, his -- his misbehavior has been violent and/or

7  aggressive in nature, as opposed to just general, you know, not

8  -- not following the rules type of fellow.

9       Q.    And for the G1s -- which is the best level; is that

10 correct?

11      A.    Yes, ma'am.

12      Q.    They're actually allowed outside of the prison

13 perimeter; is that correct?

14      A.    That's -- well, their function is to be able to work

15 outside the -- the prison fence with direct unarmed

16 supervision.  These are the guys -- they're truck drivers,

17 they're tractor drivers, outside maintenance.  They could be on

18 a community service squad, building houses for Habitat for

19 Humanity.  They could be out working at a local food bank.

20      Q.    Now, for somebody who is convicted of capital murder

21 and sentenced to life without parole, I think we've heard that

22 the best they can ever be is a G3?

23      A.    That is the least restrictive custody level that

24 they could be -- ever be in is G3.

25      Q.    And that is generally how they are classified when

1  they are received by TDCJ?

2      A.    It depends on the individual and the

3  characteristics.  Each individual will be evaluated based on

4  what risks do they -- what risks do they bring with them, as

5  far as institutional violence, institutional aggression,

6  history of escapes, membership in a security threat group,

7  hostage taking, things of -- things of that nature.  So it's

8  not auto -- nothing's automatic.  It's not automatically they

9  go to G3, but depending upon the total characteristics of that

10 offender, they could very well start at G3 and never get any

11 better than G3.

12     Q.    And those are the things -- the things that you

13 mentioned are things that -- that TDCJ, through their

14 experience and -- and years of doing this, those are the things

15 that they think affect whether or not somebody is going to be a

16 problem?

17     A.    That -- that is the basis of the classification

18 system.  The classification system -- actually it's two parts.

19 There is a computer program where you can -- you can type in

20 all this objective criteria, what has he done, this type of

21 incident within what time frame, within what setting, what

22 characteristics does this person have, and the computer will

23 spit out a recommended custody.  Then that offender will go

24 before either the State classification committee for unit

25 assignment or at the unit level appear before the unit

149

     1    classification committee.  They're going to look at the
     2    computer recommended custody for the guy based on a host of
     3    characteristics, and they're going to look at the guy or gal,
     4    talk with them, and then collectively as a committee decide
     5    what custody that that person goes in.
     6         Q.   Now, for somebody who is a G3, are there
     7    particular -- describe what their typical custody would be.  Is
     8    there a level of -- of custody that a G3 is going to be in?
     9         A.   Well, G3 is the custody level.
    10         Q.   Okay.  Well, let me ask -- let me ask it this way.
    11    Is there a particular unit design or a particular setting where
    12    they -- where most of the G3s are housed?
    13         A.   Yes, ma'am.
    14         Q.   Could you describe that?
    15         A.   Okay.  Well, let me start with -- within -- within
    16    TDCJ there are essentially five different security levels of
    17    prisons.  A Level 1 would be the -- an outside trustee camp
    18    where G1 offenders live -- it's a -- metal dormitories outside
    19    the big prison fence.  There's no guard towers around it.
    20    There's no fence, very minimal supervision.  At the other
    21    extreme, you have units like the Polunsky Unit where death row
    22    is housed.  The Eastham, Ellis Units, which are older, max --
    23    maximum security facilities.  Those are called a Level 5.
    24         Q.   So certain --
    25         A.   For the most -- the most maximum secure that they

1  have, and if a G3 has to go to a Level 5, the most -- the most

2  secure facility.

3      Q.   Okay.  So all the -- I think we -- we've heard

4  there's something like 109 different units of TDCJ?

5      A.   That's a moving target.  I would say between 100 and

6  105.

7      Q.   And they're not all designed the same, are they?

8      A.   Oh, absolutely not.  That's why we -- when I was on

9  that committee where we established five different levels.

10      Q.   So a person's custody status or their G

11  determination, based on that, they may go to a differently

12  designed prison unit?

13      A.   They can.  Well, like, for example, every unit,

14  irrespective of what design means, a certain number of G1 and a

15  certain number of G2 offenders just to function, just to

16  operate the facility.  Somebody has to do the maintenance.

17  Somebody has to cook the food.  Somebody has to wash the

18  clothes, mow the grass, you know, do -- do the work that

19  taxpayers expect prisoners to have to do.  So all -- all of

20  these facilities could have -- have to have some number of good

21  inmates.

22      Q.   Okay.

23      A.   Then as they -- the G3, 4, and 5 are restricted to

24  the more secure facilities, as far as what type of fencing,

25  what type of perimeter guard towers, the physical structure of

151

1  the facility, and does it -- is it primarily cell block housing

2  versus dormitory housing.

3       Q.    And for somebody who is G3 or worse -- and by that I

4  mean G4, G5 -- what type of prison design would they go to?

5       A.    They would go to the -- the Level 5 which is the

6  most -- the most secure.  It's -- the buildings are going to be

7  constructed out of either concrete or brick.  They won't be

8  metal dormitory or metal storage buildings, kind of what the

9  Hutchins State Jail up the road looks like.  They will be

10 concrete, steel.  They will be primarily cell block housing,

11 two -- two-person cells, some number of one person cells.  All

12 the fixtures within the cells are made of steel or concrete.

13 There's -- you know, there's bars on the doors.  There's two

14 perimeter fences.  Not one, but there's two perimeter fences,

15 Concertina wire, which is a real, real sharp razor wire wrapped

16 around the top of the fences.  There will be guard towers on --

17 guard towers around the perimeter of the prison.  There will be

18 motion sensors on the fences.  There will be 24-hour-a-day

19 perimeter security, an officer in a car or in a vehicle of some

20 type, constantly driving around the facility.  So it's -- it's

21 the most secure facility that the State of Texas has.

22      Q.    Now, in your review of Matthew Johnson's prior

23 prison records, you know that he was in -- in TDCJ for a period

24 of, I think, about five years?

25      A.    Yes, he was.

1          Q.    From your review of his records, how was he

2    initially classified?

3          A.    He was initially G2.

4          Q.    And that was when he first went into TDCJ?

5          A.    That was at the Middleton, right, the Middleton

6    Transfer Facility, initially classified him as G2.

7          Q.    And I believe he -- he went in sometime in -- in

8    2005?

9          A.    That sounds -- yeah -- yeah, late '04 or -- or in

10   '05.

11         Q.    Let me --

12         A.    I think maybe the sentence was in '04.

13         Q.    Okay.

14         A.    Because his discharge date was '09.

15         Q.    Okay.  And the records that you reviewed, sometime

16   in '05 -- I believe it was in July of '05, did his custody

17   status get changed to G4?

18         A.    Yes, ma'am.  He was -- he was transferred off the

19   Jim Rudd Transfer Facility, which is a Level 2 type prison

20   unit, very minimum security.  They only house G1 and G2

21   offenders.  Matthew got into a disciplinary incident where the

22   Rudd Unit classification committee reduced his custody from G2

23   to G4, and they recommended that he be transferred.  As a

24   result of that, he was brought to the Diagnostic Unit in

25   Huntsville, processed from being in a transfer facility status

```
 1   into a prison status and assigned to the Dalhart Unit.  It's
 2   way up in the -- way up in the -- not Dalhart -- I'm sorry, the
 3   Daniel Unit.
 4        Q.   And that was based on -- the disciplinary incident
 5   that you referred to was basically a fist fight with another
 6   inmate; is that correct?
 7        A.   Yes, yes.
 8        Q.   There were no weapons involved?
 9        A.   No.
10        Q.   But it was fist fight that resulted in injuries that
11   required more than first aid?
12        A.   That is correct.
13        Q.   And as a result of that, his -- his status was --
14   was changed to G4?
15        A.   The Rudd Unit recommended him for G4.  He came to
16   Huntsville.  The State classification committee sent him to the
17   Daniel Unit as a G4.  The Daniel Unit, upon receiving him,
18   their unit classification committee exercised their option to
19   override his custody and overrid -- overrid -- overrode his
20   custody from G4 to G2.
21        Q.   How does that work?
22        A.   That is something -- that's a discretion that each
23   unit classification committee has.  You can take the
24   recommended custody or you can look at other -- what are the
25   other factors.  Based on my experience, there was -- there's
```

```
 1   certain -- you know, each prison unit is used to dealing with
 2   what -- their type of prisoner.  You have a facility like the
 3   Rudd Transfer Facility, you get basically guys with short
 4   sentence G1, G2 custody, fairly low behavior -- not real long
 5   sentences.  If they mess up there, they get rid of them real
 6   quick.  Because they just don't want to have to deal with
 7   problem inmates, and they're really not designed to deal with
 8   problem inmates.  So when an offender gets assigned into a --
 9   for lack of a better term, they call it a real prison unit,
10   like the Daniel was or an IV facility, well, they look at this
11   guy and they say, well, he only -- yeah, he had an incident
12   and, yeah, it was bad, but he's only done it one time.  There's
13   no pattern of this.  This is not repetitive over and over.
14   We're going to -- based on the makeup of our population and the
15   type of inmate we're used to dealing with, we think he needs to
16   be in G2 custody, not in G4 custody with our knuckleheads.
17       Q.   And after Matthew Johnson became a G2, did that
18   remain his custody status or did it change again?
19       A.   No.  After -- oh, six or so months after he was
20   assigned to the Daniel Unit, the Daniel Unit recommended to the
21   State classification committee that he be reviewed for outside
22   trustee or G1 status, and the State classification committee
23   promoted him to G1 custody and made him an outside trustee.
24       Q.   Do you recall from your review of the records when
25   that was?
```

155

```
 1        A.   I can tell you real fast.  That was December the
 2   13th, 2006.
 3        Q.   And so in 2000 -- in December of 2006, he became a
 4   G1; is that correct?
 5        A.   Yes, ma'am, after being -- after being on the Daniel
 6   Unit looks like for about a year and a half.
 7        Q.   And he was in TDC until 2009, correct?
 8        A.   That is -- that is correct.  He did his whole
 9   sentence.
10        Q.   Does his -- did his -- after being --
11        A.   Almost -- I'm sorry.  He did almost his whole
12   sentence before he was paroled.
13        Q.   After being classified in 2006 as a G1, did that
14   custody status ever change again?
15        A.   No, ma'am.  He remained at G1 for the rest of his
16   incarceration period.
17        Q.   So all through 2007 and all through 2008, until his
18   release in 2009, he was a G1?
19        A.   That is correct.
20             MS. BERNHARD:  I'll pass the witness.
21                         CROSS-EXAMINATION
22   BY MOSELEY:
23        Q.   You just discussed the -- what Defense counsel
24   referred to as a fight.  It was an assault -- according to the
25   disciplinary records, it was an assault requiring more than
```

```
 1  first aid or something along those lines, correct?

 2       A.   It was -- based on my review of the records -- and

 3  actually there were -- there were quite a few records on -- on

 4  that incident.  It was an altercation -- a fist fight between

 5  two offenders.  None of the records indicate who was the

 6  instigator or the aggressor.  And in TDCJ's world, that really

 7  didn't make any difference, but one of the -- Matthew got in a

 8  fight with another offender.  The other offender had a

 9  laceration, I think on his -- somewhere on -- on the scalp or

10  somewhere on his head that required either 11 sutures or 11

11  staples to -- to close up the laceration.

12       Q.   So, again, what was the title of the charge that the

13  Defendant got?

14       A.   Fighting.

15       Q.   Requiring more than first aid?

16       A.   The -- the injuries required more than first aid,

17  that is correct.

18       Q.   On the other guy?

19       A.   On the other guy, that is correct.

20       Q.   That's not the only disciplinary problem that he

21  had, is it, in your review of these records?

22       A.   No, ma'am.

23       Q.   And what were some of the other problems he had?

24       A.   There was a -- let me see here, there were two minor

25  disciplinary infractions.  I think one was for refusing to obey
```

157

```
 1   an order.  The other one -- off the top of my head, I don't

 2   know, and it's not in these records because -- some of those

 3   records that are destroyed at the -- at the prison unit level.

 4        Q.   So refusing to obey an order could be refusing to go

 5   to work?

 6        A.   It could be -- right, it could be anything, refusing

 7   to do any thing.

 8        Q.   And the other one was a masturbation.  You --

 9        A.   It was --

10        Q.   -- remember that?

11        A.   Yes, it was.

12        Q.   And did you review the records showing what the

13   Defendant's excuse was for that infraction?

14        A.    I believe he -- his -- basically said he didn't do

15   it.

16        Q.   Right.  Now, based on your review of the records,

17   it's your opinion, Mr. Au Buchon, that he's going to go in as a

18   G3; is that right?

19        A.   Based on -- yes, ma'am.  Yes.

20        Q.   And as a G3, that means he can be housed either in a

21   dormitory or in a cell block, but it is going to be in a high

22   security unit?

23        A.   Yes.

24        Q.   And you don't know whether he's going to be one of

25   those that's assigned to a dormitory or whether he'll be in a
```

```
 1  two-man cell, correct?

 2       A.    That is correct.

 3       Q.    And when he got into that altercation on the Daniel

 4  Unit, he was in -- or, I'm sorry, on the Rudd Unit, he was in a

 5  dormitory setting, was he not?

 6       A.    That is correct.

 7       Q.    As a G3 inmate, you get certain privileges that you

 8  don't get, for instance, on death row, correct?

 9       A.    Yes.

10       Q.    And some of those would include contact visits?

11       A.    Yes.

12       Q.    Tell the jury what a contact visit is.

13       A.    It's what it sounds like.  There's a visitation area

14  where there are tables, picnic type tables in an open -- big

15  common open area.  The offender sits on one side of the picnic

16  table.  The visitors sit on the other side of the picnic table.

17  At the beginning and end of the visit, they can briefly hug,

18  embrace, kiss their -- the loved ones that come to see them.

19       Q.    And this is done in kind of a big room where other

20  inmates would be visiting their families?

21       A.    That is correct.

22       Q.    And there's nothing separating any of these people

23  from one another, other than these tables?

24       A.    That is correct.

25       Q.    They may -- a G3 may be eligible for consideration
```

1   for an emergency absence?

2       A.   A G3, yes; a life without parole, no.

3       Q.   And where is that written in the guidelines?

4       A.   I can show you.

5            MS. MOSELEY:  May I approach?

6            THE COURT:  You may.

7       A.   This is the form where -- while Matthew was

8   previously incarcerated, there was a request made for him to

9   have emergency -- or request for an emergency absence to go to

10  a funeral or hospital visit or whatever of a loved one.  This

11  is the criteria that must -- must be met before an offender can

12  be approved, okay?  And if you'll see right here, on 7(e)

13  parole eligibility date not within 12 months.

14      Q.   (BY MS. MOSELEY)  And that wasn't checked on his

15  because he actually was within his parole eligibility?

16      A.   At that time.  But as a life without parole, he'll

17  never be -- a G3 can, that is a correct statement.  But a G3

18  life without parole, cannot.

19      Q.   Cannot ever be considered for an emergency absence?

20      A.   That's correct.

21      Q.   And that would mean being able to go home and -- to

22  a funeral?

23      A.   That is correct.  Or a hospital.  You know,

24  bedside -- death -- death visit type thing.

25      Q.   And a G3, including a life without parole, has the

1    opportunity to work within the prison?

2         A.    Yes.

3         Q.    And they can, in fact, hold any job as long as it's

4    not a job that would give them access to multiple buildings on

5    the unit?

6         A.    That's not entirely accurate.

7         Q.    Tell me how that's not accurate.

8         A.    Okay.  They also are restricted into -- they can't

9    work in an area where there are loading docks or gates, where

10   there's any ingress or exits -- in/out of -- of the facilities.

11   If their offense involved -- was a sexual nature of any kind,

12   they couldn't work in a job like in the infirmary or in the

13   school where there are free world female employees.

14        Q.    There are free world female employees in the

15   infirmaries in general, correct?

16        A.    In general, yeah -- oh, absolutely, employees, yes.

17        Q.    So a life without paroler can't work there if it's a

18   sex related offense?

19        A.    Right.

20        Q.    Which we're not dealing with here, correct?

21        A.    That is correct.

22        Q.    So technically, the Defendant goes in as a G3, if he

23   gets life without parole, and he could work in the infirmary as

24   long as it's not on the perimeter -- near a perimeter fence,

25   correct?

```
 1        A.    Possibly.

 2        Q.    And that would be around civilian female employees?

 3        A.    Yes.

 4        Q.    And he could work in the kitchen?

 5        A.    Yes.

 6        Q.    He would be allowed four hours on weekdays for

 7   recreation?

 8        A.    Yes.

 9        Q.    And seven hours on the weekends for recreation?

10        A.    Yes.

11        Q.    That recreation would be in and amongst other

12   prisoners, correct?

13        A.    Yes, ma'am.

14        Q.    Including G2s?

15        A.    Could very well, yes.

16        Q.    Allowed to go to commissary?

17        A.    If they have money, yes, ma'am.

18        Q.    Keeping personal property items?

19        A.    To a limit, yes.

20        Q.    And all of these are freedoms that the Defendant

21   would have should this jury sentence him to life without

22   parole?

23        A.    As long as he behaved himself.

24        Q.    And you mentioned that he did almost his whole

25   sentence before he was paroled the last time?
```

```
 1        A.    Yes, ma'am.

 2        Q.    Is that unusual, if you know, for a unaggravated

 3   non-3(g) offense like robbery?

 4        A.    No, ma'am, that's not uncommon.

 5        Q.    They're keeping them their whole time?

 6        A.    Or very close to it, yes, ma'am.

 7        Q.    So all this stuff we hear about people being

 8   released out of prison, for instance, after serving nine months

 9   of a five-year sentence doesn't happen?

10        A.    It could happen.  It's not -- it's not as common as

11   it once was.

12        Q.    And these prisons that you talk about with fences

13   and Concertina wire and guard -- what did you call them?

14        A.    Guard towers or --

15        Q.    Guard towers?

16        A.    -- or pickets is what TDC calls them.

17        Q.    And then the guard driving around the perimeter.

18   There have been escapes from those prisons, haven't there?

19        A.    Yes, ma'am.

20        Q.    And there are fights inside those prisons, right?

21        A.    Yes, ma'am.

22        Q.    And assaults on guards?

23        A.    Yes, ma'am.

24        Q.    There are prisoners who choose to do their time

25   peacefully and not cause any problems?
```

163

```
 1        A.    Yes.
 2        Q.    And there are prisoners who don't choose to do their
 3   time that way.  They choose to cause problems, correct?
 4        A.    That's right.  They're in the minority, but there
 5   are some that are like that.
 6        Q.    And TDC can't control all of that, can they?
 7        A.    It depends what you mean by control.
 8        Q.    Well, I mean --
 9        A.    If you mean -- if you mean stop -- okay, I'm sorry.
10   You're supposed to ask the questions.
11        Q.    If there's a fight, that means they didn't control
12   all of the behavior, correct?
13        A.    Yes.
14        Q.    There's not a guard standing there watching what
15   everybody does, correct?
16        A.    Not always.
17        Q.    Now, for instance, let's talk just -- tattooing,
18   that's against the rules, isn't it?
19        A.    Yes, it is.
20        Q.    And -- and TDC doesn't do a very good job of
21   controlling that, do they?
22        A.    No, ma'am.
23             MS. MOSELEY:  That's all I have, Judge.
24                       REDIRECT EXAMINATION
25   BY MS. BERNHARD:
```

```
 1        Q.    Does TDCJ -- since G1 classification -- custody

 2   classification people are allowed outside the unit, do they put

 3   a lot of effort and take a lot of care in who they designate as

 4   a G1?

 5        A.    Yes, ma'am.

 6        Q.    Because that obviously has implications for public

 7   safety?

 8        A.    Absolutely.

 9        Q.    And free world safety?

10        A.    Absolutely.  That's the first consideration.

11        Q.    And that's something they take very seriously?

12        A.    Yes, ma'am.

13             MS. BERNHARD:  I'll pass the witness.

14                      RECROSS-EXAMINATION

15   BY MS. MOSELEY:

16        Q.    Just real briefly.  They put him as a G1 after he

17   had gotten in a fight, yes?

18        A.    Yes.

19        Q.    And after he had exposed himself and masturbated to

20   an 18-year-old female prison guard, right?

21        A.    Yes.

22        Q.    And after he had at a minimum failed to obey orders

23   from a guard?

24        A.    Yes.

25        Q.    And that's how they're careful?
```

```
1         A.    Based on his record and -- and whatever their needs

2    were at that time, a member of the State classification

3    committee felt comfortable in taking that risk with that

4    offender and apparently it was successful.

5         Q.    You think that classification board would be

6    surprised that he set a 76-year-old woman on fire five years

7    later, two years, three years later?

8         A.    I can't answer that.  I don't know.

9         Q.    How much did you get paid to come and testify?

10        A.    I -- I don't have the total amount yet.  I don't

11   know.

12        Q.    Any idea -- what are you charging?

13        A.    A hundred and 50 an hour.

14        Q.    How many hours have you put in?

15        A.    I haven't totaled that up yet.

16        Q.    Approximately?

17        A.    Maybe 30, 35.

18             MS. MOSELEY:  I'll pass the witness.

19                      FURTHER DIRECT EXAMINATION

20   BY MS. BERNHARD:

21        Q.    Mr. Au Buchon, are there times when you're hired by

22   the Defense that you don't end up testifying?

23        A.    Yes.

24        Q.    And you're paid for your time, not what you're

25   saying?
```

```
 1        A.   I'm paid for my time and my expertise.  I'm not paid

 2   for my testimony.

 3                  MS. BERNHARD:  That's all I have.

 4                  MS. MOSELEY:  Nothing further.

 5                  THE COURT:  Thank you, sir.  You may stand down.

 6                  THE WITNESS:  Am I finally excused?

 7                  THE COURT:  You are, sir.

 8                  THE WITNESS:  Thank you.

 9                  MS. BERNHARD:  May we approach?

10                  THE COURT:  You may.

11                  (Sidebar conference, discussion off the record.)

12                  THE COURT:  Ladies and gentlemen, we're going to

13   take a very short recess, about five minutes.

14                  THE BAILIFF:  All rise.

15                  (Jury excused from courtroom.)

16                  THE COURT:  All right.  If we can get the jury,

17   please.

18                  THE BAILIFF:  All rise.

19                  (Jury returned to courtroom.)

20                  THE COURT:  Please be seated.

21                  Please call your next witness.

22                  MS. MULDER:  The Defense calls Valerie Braziel.

23                  (Witness brought forward.)

24                  THE COURT:  Ma'am, would you raise your right

25   hand?
```

```
 1                    (Witness sworn.)

 2                    THE WITNESS:  Yes.

 3                    THE COURT:  Thank you.

 4                         VALERIE BRAZIEL,

 5   was called as a witness by the Defendant, and after having been

 6   first duly sworn, testified as follows:

 7                    DIRECT EXAMINATION

 8   BY MS. MULDER:

 9        Q.    Ma'am, would you introduce yourself to the jury,

10   please?

11        A.    I am Matthew's youngest child's godmother.

12        Q.    Let me stop you there.  What's your name?

13        A.    My name is Valerie Braziel.

14        Q.    How do you spell your last name?

15        A.    B-r-a-z-i-e-l.

16        Q.    And I see you -- you didn't stand up when the jury

17   came in, and you've got a cane?

18        A.    I had knee surgery.  I had knee surgery.

19        Q.    When was that?

20        A.    Two weeks ago.

21        Q.    Have you ever testified in court before?

22        A.    Once, very long ago.

23        Q.    If you would just wait until I'm totally finished

24   with my question and then answer because the court reporter

25   can't take us both down at the same time.
```

```
 1                    Do you know Daphne Johnson?

 2        A.    Yes.

 3        Q.    When did you meet Daphne Johnson about?  Do you

 4   remember the month and year?

 5        A.    It was July of 2007.

 6        Q.    How did you meet her?

 7        A.    We worked at Target in Rowlett.  They opened the

 8   store.  We went to the hiring thing, got hired, and we actually

 9   worked in the same department together.

10        Q.    Did you and Daphne become friends?

11        A.    Fast -- fast friends.

12        Q.    And are you still friends?

13        A.    Beyond that.

14        Q.    Beyond friends?

15        A.    Beyond friends.

16        Q.    Best friends?

17        A.    Family.

18        Q.    Family.  How often since 2007 -- how often do you

19   talk to Daphne?

20        A.    We talk two to three times a week.

21        Q.    How often do you see Daphne?

22        A.    Maybe once every other week.  If I need her, she

23   comes, so -- but normally once every other week or so.

24        Q.    And if you need her, does she come?

25        A.    Immediately.
```

```
 1        Q.   And you said earlier you are godmother to the
 2   youngest?
 3        A.   Matduxx, uh-huh.
 4        Q.   If you would, just please wait until I'm totally
 5   done asking the question and then answer for me, okay?
 6        A.   Okay.
 7        Q.   Thank you, ma'am.  I know, we -- in real life,
 8   people talk over each other because we know where we're going,
 9   but in court we have to wait.  Thank you.
10             Now, at the time when you and Daphne became
11   friends, did she talk about her husband?
12        A.   Yes.
13        Q.   Where was her husband at that time?
14        A.   In jail.
15        Q.   At that time did you know what for?
16        A.   No.
17        Q.   Did you ask?
18        A.   No.
19        Q.   Why not?
20        A.   It wasn't my business.
21        Q.   At some point did you meet Matthew Johnson?
22        A.   Yes.
23        Q.   Do you recall when you met him?
24        A.   It was sometime in 2009.
25        Q.   How long after his release from prison, would you
```

```
 1   say you met him?
 2         A.    Within that month.
 3         Q.    And did you become friends with Matthew?
 4         A.    Yes.
 5         Q.    How often since 2009 to 2012, would you say that you
 6   spoke to Matthew?
 7         A.    Often.
 8         Q.    Well, what -- is that once, twice a week --
 9         A.    Once every couple of weeks -- once -- yeah.
10         Q.    From 2009 to roughly October 2011, did you spend
11   time with Matthew?
12         A.    Yes.
13         Q.    What was his personality like?
14         A.    Matthew is a kind, giving, loving individual.  We
15   talked about our relationship with God.  We talked about what
16   it was like to grow up in the 60's.  We talked about the
17   children.  He's a wonderful father.
18         Q.    Let me stop you right there.  What is it that makes
19   Matthew a wonderful father?
20         A.    You have to see him with the girls.  They are all
21   over him.
22         Q.    Uh-huh.
23         A.    He doesn't have to yell.  He just looks at them, and
24   they're like, okay.  Loving, touching, especially with the
25   baby.
```

```
 1        Q.    Would he play with his girls?

 2        A.    Yes.  I saw him with the baby all the time.

 3        Q.    And Makayi and Deja, also?

 4        A.    Yes.

 5        Q.    Even though they're a little bit older?

 6        A.    Uh-huh.

 7        Q.    You have to answer yes or no.

 8        A.    Yes.

 9        Q.    And as Matduxx's godmother, did she have a special

10   bond with her daddy?

11        A.    Yes.

12        Q.    Describe that bond to the jury, if you would.

13        A.    She's daddy's girl.  We spent Christmases together,

14   and totally -- I mean, she looks just like her father, and

15   totally connected to each one of those children, but Matduxx

16   and he had a very strong relationship.  All she -- all he had

17   to do was say come here and she'd get up on his lap, lay back,

18   start rubbing that ear, and she totally out.  Nobody else could

19   get her to do that, even me, though I tried.

20        Q.    She's an exuberant child?

21        A.    Oh, yes.  That's a good word.  That's a good word.

22        Q.    She talks a lot, doesn't she?

23        A.    Uh-huh, yes, she does.

24        Q.    And she likes to -- and she's at that age between

25   two and three where she wants to have it her way?
```

```
1        A.    Oh, there is no other way, except Mattie's way.

2        Q.    Okay.

3        A.    Yeah.

4        Q.    But when Matthew was at home, I mean, who -- and

5   when she was a baby, I mean, who would she reach for first?

6        A.    Her father.

7        Q.    Not -- not her mother?

8        A.    Not necessarily her mother, her father, yeah.  If

9   they were together in the same room, Matduxx was reaching for

10  daddy.

11       Q.    Over mom?

12       A.    Over mommy.  If mommy and daddy were in the same

13  room, yes.

14       Q.    And over you?

15       A.    Yes.  Even over me, yes.

16       Q.    But he was the one that -- and he could get her to

17  just calm down?

18       A.    Yes.

19       Q.    Now, during -- let me ask you this.  Did you trust

20  Matthew?

21       A.    With my life.

22       Q.    Did he ever have the keys to your apartment?

23       A.    Yes.

24       Q.    When was that?

25       A.    Must have been late 2011, early 2012, he -- I asked
```

1  him to come over and paint my bathroom.  He had my keys.  I

2  trust Matthew with my life.  I sent him to my parents' home to

3  get a piece of furniture, and my mother fell in love with him.

4  And that isn't easy for her.

5       Q.   He didn't steal anything from your apartment?

6       A.   Not a crumb.  Nothing was missing.

7       Q.   You said that you and he would talk about the Word

8  or God?

9       A.   Yes.

10      Q.   Was -- was Matthew a religious man?

11      A.   He believes in God, yes.  He reads the Bible, yes.

12      Q.   Did Daphne ever tell you that --

13           MS. MOSELEY:  I'm going to object to hearsay.

14           THE COURT:  Sustained.

15      Q.   (BY MS. MULDER)  Were you ever aware of domestic

16  violence between Daphne and her husband?

17      A.   No.

18      Q.   In the early years of their marriage?

19      A.   No.

20      Q.   If you had heard or found out that there was

21  domestic violence, that Matthew put his hands on Daphne, does

22  that change your opinion of him?

23      A.   No.

24      Q.   Do you have experience with depression?

25      A.   I do.

1      Q.   And what is that experience?

2      A.   I have suffered from depression since I was 13 or 14

3  years old and have been medicated throughout my life.

4      Q.   During the years that you knew Matthew, did you ever

5  see signs of depression in him?

6      A.   Yes.

7      Q.   What -- if you would, describe those instances for

8  the jury, please.

9      A.   He was withdrawn, leading -- I guess in the time

10  coming up to the incident, I'd go over and there wasn't a lot

11  of banter, just more quiet than usual.  No eye contact, which

12  was totally unlike our relationship.  I thought that there was

13  something wrong, and -- but we didn't have the kind of

14  relationship that he would explain or say that to me, but I

15  definitely feel like he was very depressed.  It was hard.

16      Q.   Did you try to engage him in conversation during

17  those times?

18      A.   Yes.  And he answered my questions, but there wasn't

19  any give and take.  It was just answering my questions and

20  responding to me.

21      Q.   Did you have any idea that he suffered from drug

22  addiction?

23      A.   None.

24      Q.   So you never saw him high or under the influence?

25      A.   Never.

```
 1        Q.   When you were with Matthew, was he ever aggressive
 2   to you?
 3        A.   Never.
 4        Q.   Did he ever try to borrow money from you?
 5        A.   Never.
 6        Q.   Did -- was he ever inappropriate or say
 7   inappropriate things like from a man to a woman like, make --
 8   make a suggestive comment or anything?
 9        A.   Never.
10        Q.   Did you ever see him do those things with anyone
11   else, any other women?
12        A.   No.
13        Q.   Did you ever see him be mean to his children?
14        A.   Never.
15        Q.   You made a comment to me the other day, I just want
16   to draw your attention to it because -- well, let me backtrack
17   a little bit.  When did you become aware that Matthew had been
18   arrested and charged with capital murder?
19        A.   Six weeks after the incident.
20        Q.   You had no idea?
21        A.   I didn't have TV, and --
22        Q.   You had Netflix?
23        A.   I had Netflix.  I still do.  Don't have TV.  I
24   didn't have television, and I noticed in my conversations with
25   Daphne that there -- she wasn't talking about Matt.
```

176

```
 1        Q.    And you ultimately asked her about Matt?

 2        A.    I did.  I said -- I asked her.

 3        Q.    And did it upset you that she hadn't told you?

 4        A.    Yes.

 5        Q.    Did you kind of understand why she waited awhile?

 6        A.    I did -- I totally understood.

 7        Q.    And you have been there to support Daphne during

 8   this time?

 9        A.    Every day.

10        Q.    And you'll continue to do so?

11        A.    Every day that I breathe.

12        Q.    And Matduxx?

13        A.    My baby, yes.

14        Q.    You and I spoke last Sunday.  You made a comment to

15   me about seeing Matt's picture on TV when he was in the back of

16   a squad car?

17        A.    After I got off the phone with Daphne, she couldn't

18   explain to me what happened.  She just said, mom, it's bad.

19   And --

20        Q.    Now, let me stop you there.  She calls you mom?

21        A.    Yes, she does.

22        Q.    And how old a lady are you?

23        A.    I'm 64.

24        Q.    Please continue.  What did you do after --

25        A.    She said, you have to go on the Internet, I can't
```

```
 1  tell you.  So I did.  And they had a picture that I --
 2  subsequently then saw on television at my parents' house of
 3  Matt.  And I would -- didn't know who that person was.  I
 4  didn't -- I would never if they had -- even when they said
 5  Matthew Johnson, I did not connect the picture with my Matt.
 6        Q.   What was different?
 7        A.   He -- the look in his eye.  He -- that just wasn't
 8  the person that I knew.  And then they showed him in the back
 9  of the squad car.  And I -- I didn't know that person either at
10  all.  It didn't look like him to me.  I just -- if his name
11  hadn't been connected with that information, I would never have
12  connected it with Matt.
13        Q.   What was different about him in the back of the
14  squad car?
15        A.   I just couldn't imagine someone having that kind of
16  attitude after doing something like that.  And I just couldn't
17  put those two things in my mind together and come up with
18  Matthew Johnson.
19        Q.   The Matthew Johnson that you had come to know, spend
20  time with, committing this kind of offense, would you say it
21  was completely out of character?
22        A.   Totally.
23        Q.   Well, you say that without hesitation.
24        A.   Totally.
25        Q.   And you understand what Matthew has been convicted
```

 1  of?

 2        A.    Yes.

 3        Q.    And the charges, what he did?

 4        A.    Yes.

 5        Q.    Does that change your opinion with regard to whether

 6  or not this offense was out of character for him?

 7        A.    It was totally out of character.  Again, I can't

 8  reconcile what happened to the man that I know.

 9        Q.    Since Matduxx had such a special bond with her dad,

10  how has her behavior been since he's been incarcerated?

11        A.    My baby is out of control.  She is.  She's something

12  else.  I think not having daddy there to discipline her is --

13  is not a good thing.  She -- she needs it.

14        Q.    And if you could, relate for the jury what

15  happened -- do Anthony and Matthew resemble each other?

16        A.    Yes.

17        Q.    If you would, describe what Matduxx did awhile after

18  he had been incarcerated.

19        A.    Daphne told me that she took the children to Matt's

20  mother -- Matt's mother's house, and Anthony was there.  And

21  Matduxx became hysterical.  She wanted to be picked up by

22  Anthony and even though he had her, she said she wasn't getting

23  any comfort.  She twisted and turned and screamed and she threw

24  a fit, quote, unquote.

25        Q.    And she's old enough -- was old enough to know that

 1  that was her Uncle Anthony?

 2      A.    Yes.   Yes, she was.   She was not -- she was

 3  inconsolable -- yeah, inconsolable.

 4              MS. MULDER:   At this time I'll pass the witness.

 5  Ms. Moseley will have some questions for you.

 6              MS. MOSELEY:   Actually I don't.   Thank you,

 7  ma'am.

 8              No questions, Judge.

 9              THE COURT:   Thank you, ma'am, you may stand

10  down.

11              MS. MULDER:   Can I help her, Your Honor?

12              THE COURT:   Sure.

13              MS. MULDER:   Watch out, there's a step there.

14              MS. BERNHARD:   May we approach?

15              THE COURT:   Yes, ma'am.

16              (Sidebar conference, discussion off the record.)

17              THE COURT:   All right.   Ladies and gentlemen of

18  the jury, the good news is we're in recess for the day.   You

19  can get out and vote, and we'll see you tomorrow morning at

20  8:45.

21              THE BAILIFF:   All rise.

22              (Jury excused from courtroom.)

23              (Recess of proceedings.)

24

25

```
 1                    Reporter's Certificate

 2  THE STATE OF TEXAS:

 3  COUNTY OF DALLAS:

 4       I, Darline King LaBar, Official Court Reporter in and for

 5  the 363rd District Court of Dallas County, State of Texas, do

 6  hereby certify that the above and foregoing volume constitutes

 7  a true, complete and correct transcription of all portions of

 8  evidence and other proceedings requested in writing by counsel

 9  for the parties to be included in the Reporter's Record, in the

10  above-styled and numbered cause, all of which occurred in open

11  court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if any,

14  admitted by the respective parties.

15       WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16  on the 25th day of February, A.D., 2014.

17

18

19
                     \s\Darline LaBar
20                   DARLINE KING LABAR
                     Official Court Reporter
21                   363rd Judicial District Court
                     Dallas County, Texas
22                   hpdkfaith@msn.com
                     (214) 653-5893
23

24
    Certificate No:  1064
25  Expiration Date:  12/31/2014
```