1           REPORTER'S RECORD

2         VOLUME 51 OF 57 VOLUMES

3      TRIAL COURT CAUSE NO. F12-23749-W

4    COURT OF CRIMINAL APPEALS NUMBER:  AP-77,030

5 THE STATE OF TEXAS          :          IN THE 363RD JUDICIAL

6 VS.                         :          DISTRICT COURT OF

7 MATTHEW LEE JOHNSON         :          DALLAS COUNTY, TEXAS

8

9

10              **PUNISHMENT PHASE BY JURY**

11

12

13

14

15              * * * * * * * * * * *

16

17

18

19

20      On the 6th day of November, 2013, the following

21 proceedings came on to be heard in the above-entitled and

22 numbered cause before the Honorable Tracy Holmes, held in

23 Dallas, Dallas County, Texas:

24      Proceedings reported by machine shorthand computer

25 assisted transcription.

```
 1  A P P E A R A N C E S:

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
          Crowley Criminal Courts Building
 3        133 North Riverfront Boulevard
          Dallas, Dallas County, Texas 75207
 4        Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
          MS. ELAINE EVANS, A.D.A., SBOT # 24032880
 6        MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724
          MS. CHRISTINE WOMBLE, A.D.A., SBOT # 24035991

 7
               FOR THE STATE OF TEXAS;
 8


 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
          P.O. Box 2817
11        Red Oak, Texas 75154
          Phone:  972-617-5548

12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13        325 North St. Paul Street, Suite 2475
          Dallas, Texas 75201
14        Phone:  214-922-0212

15  MS. NANCY MULDER, Attorney at Law, SBOT # 00792971
          2214 Main Street
16        Dallas, Texas 75201
          Phone:  214-764-7246

17
               FOR THE DEFENDANT.
18

19

20

21

22

23

24

25
```

1                    <u>**INDEX VOLUME 51**</u>

2  November 6th, 2013                                    PAGE  VOL.

3  PUNISHMENT PHASE BY JURY:

4  Proceedings.......................................... 5    51

5  DEFENSE WITNESSES  DIRECT          CROSS        VD        VOL.

6  JONATHAN SORENSEN   5              10                     51

7  JAMES AIKEN         15             20                     51

8  JONATHAN SORENSEN  22, 53          49                     51

9  JAMES AIKEN         54             61                     51

10 Defense rests........................................ 67   51

11 STATE WITNESSES    DIRECT          CROSS        VD        VOL.

12 KELLEY NELSON       71                                    51

13 ANTHONY SIMON       78                                    51

14 JEROME HOBBS        82                                    51

15 State rests.......................................... 89   51

16 Defense closes....................................... 89   51

17 State closes......................................... 89   51

18 Objections to the charge............................ 91   51

19 Reporter's Certificate.............................. 108  51

20

21                 <u>**ALPHABETICAL WITNESS INDEX**</u>

22                    DIRECT          CROSS        VD        VOL.

23 JAMES AIKEN         15             20                     51

24 JAMES AIKEN         54             61                     51

25 JEROME HOBBS        82                                    51

1                    **ALPHABETICAL WITNESS INDEX**

2                      DIRECT        CROSS         VD         VOL.

3   KELLEY NELSON        71                                    51

4   ANTHONY SIMON        78                                    51

5   JONATHAN SORENSEN    5            10                       51

6   JONATHAN SORENSEN  22, 53         49                       51

7

8                       **EXHIBIT INDEX**

9   STATE'S                   OFFERED        ADMITTED       VOL.

10  187    DVD In-Car Video    69, 81        69, 81         51

11  DEFENDANT'S               OFFERED        ADMITTED       VOL.

12   25    John Sorensen CV     6, 24         7, 24         51

13   26    PP Risk Assessment CD  54          54            51

14   27    James Aiken CD       17, 58        17, 58        51

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURT:  All right.  We're on the record

 3    outside the presence of the jury.

 4              Ms. Bernhard.

 5              MS. BERNHARD:  The Defense would call John

 6    Sorenson.

 7              THE COURT:  Mr. Sorenson, would you raise your

 8    right hand, please?

 9              (Witness sworn.)

10              THE WITNESS:  Yes.

11              THE COURT:  Thank you.

12              (Outside the presence of the jury, defendant
                  present.)
13

14                    JONATHAN SORENSEN,

15    was called as a witness by the Defendant, and after having been

16    first duly sworn, testified as follows:

17                    DIRECT EXAMINATION

18    BY MS. BERNHARD:

19         Q.   State your name.

20         A.   Jonathan Sorensen.

21         Q.   And how are you employed?

22         A.   I'm a professor at East Carolina University.

23         Q.   And what is your area of expertise?

24         A.   Corrections and, in particular, capital punishment,

25    prison violence.
```

 1        Q.    And do you conduct research and -- and review

 2   studies and that sort of thing as it relates to prison violence

 3   and corrections?

 4        A.    Yes.

 5                MS. BERNHARD:  May I approach?

 6                THE COURT:  You may.

 7        Q.    (BY MS. BERNHARD)  I'm showing you what's been

 8   marked as Defendant's Exhibit Number 25, and ask if you

 9   recognize that?

10        A.    Yes.

11        Q.    What is that?

12        A.    It's my resume.

13        Q.    And does this basically summarize some of your

14   experience and qualifications to do what it is that you do?

15        A.    Yes.

16        Q.    And it also has a listing of a number of

17   publications in the area; is that correct?

18        A.    Yes.

19        Q.    And grants and awards and that sort of thing?

20        A.    Yes.

21        Q.    And publications?

22        A.    Yes.

23                MS. BERNHARD:  We'd offer Defendant's

24   Exhibit 25.

25                (Defendant's Exhibit 25 offered.)

```
 1                   MS. MOSELEY:  No objection.

 2                   THE COURT:  Admitted.

 3                   (Defendant's Exhibit 25 admitted.)

 4        Q.   (BY MS. BERNHARD)  Now, Dr. Sorensen, you're here

 5   today to present certain testimony about what you call a

 6   violence risk assessment; is that correct?

 7        A.   Yes.

 8        Q.   And in order to -- well, prior to your testimony

 9   today, have you reviewed certain records relating to Matthew

10   Johnson and his case?

11        A.   Yes, I have.

12        Q.   Could you tell us what you reviewed?

13        A.   Mainly records related to previous offenses in the

14   community.

15        Q.   Okay.

16        A.   So the prior --

17        Q.   You -- you reviewed some extraneous offense

18   reports --

19        A.   Yes.

20        Q.   -- correct?  And did I also send you the State's

21   Notice of Extraneous Offenses?

22        A.   Yes.

23        Q.   And you also reviewed some offense reports

24   pertaining to the offense for which Matthew Johnson has been

25   convicted?
```

1          A.    Yes.

2          Q.    And you have reviewed Matthew Johnson's prior prison

3    records?

4          A.    Yes.

5          Q.    And you've reviewed his records while he's been

6    incarcerated in the Dallas County Jail?

7          A.    Yes.

8          Q.    And you've reviewed his educational records?

9          A.    Yes.

10         Q.    Am I missing anything?

11         A.    There were some medical records and other things

12    that are less pertinent, but I looked through them.

13         Q.    Okay.  And were those the medical records while he

14    was confined in -- in prison -- his TDCJ records?

15         A.    I believe so, yes.

16         Q.    And you also reviewed his TDCJ parole records?

17         A.    Yes, and probation records, too.

18         Q.    And disciplinary rec -- records from TDCJ?

19         A.    Yes.

20         Q.    Anything else?

21         A.    Not that I can think of.

22         Q.    And based on your review and based upon the research

23    that you do and are familiar with, are you prepared to offer an

24    opinion about whether or not Matthew Johnson poses a risk in

25    the prison environment?

1      A.    Yes.

2      Q.    And is this just a theory of yours, or is this based

3  on scientific research and -- and how do you determine this?

4      A.    It's based on years of research by myself and

5  others -- colleagues and other researchers in the area.

6      Q.    And does this sort of -- I think you call it a

7  violence risk assessment is the term that you use; is that

8  correct?

9      A.    Yes.

10     Q.    And has this research and -- and this methodology

11 been subject to peer review?

12     A.    Yes.

13     Q.    And, in fact, have you published different articles

14 and peer review publications on this particular topic?

15     A.    Yes.

16     Q.    And you're prepared to explain to the jury how you

17 go about determining whether or not somebody is going to be a

18 risk in prison; is that correct?

19     A.    Yes.

20     Q.    And you're prepared to explain the studies that you

21 rely on?

22     A.    Yes, ma'am.

23     Q.    And you're also prepared to talk about the

24 particulars of Matthew Johnson that relate positively and

25 negatively to his risk of violence in prison?

```
 1        A.    Yes.

 2        Q.    And you've prepared a little PowerPoint presentation

 3   that details some of these things; is that correct?

 4        A.    Yes.

 5              MS. BERNHARD:  I'll pass the witness.

 6                      CROSS-EXAMINATION

 7   BY MS. MOSELEY:

 8        Q.    Just -- just real briefly.  What dates were these

 9   studies done?

10        A.    The studies have been completed since -- are you

11   looking at the time of completion, or the time -- the time

12   frame of the -- the data that was incorporated?

13        Q.    The data that was gathered.

14        A.    The data that was gathered from the 1960's through

15   2009, 2010.

16        Q.    2009, 2010?

17        A.    In Texas, yeah.  But I'm incorporating, obviously,

18   even more recent data that -- I don't have particular slides

19   for -- from other states and the federal government.

20        Q.    And I'm -- I'm going to ask you specifically about

21   Texas data.  The latest data you collected from the Texas

22   penitentiaries regarding life without parole offenders serving

23   life without parole was 2010?

24        A.    2008.

25        Q.    2008.
```

Darline King LaBar, Official Reporter

1       A.    FY 2008.

2       Q.    And that was then fiscal year 2008, meaning 2008

3  into 2009 or 2007 into 2008?

4       A.    2007 into 2008.

5       Q.    Okay.  So ending in what month in 2008?

6       A.    August.

7       Q.    And we didn't have life without parole until 2005 --

8  September of 2005?

9       A.    Correct.

10       Q.    So really we're talking about three years that would

11  be relevant to life without parole?

12       A.    In Texas, yes, that would be true.

13       Q.    What risks are you -- tell us with respect to this

14  Defendant what you're prepared -- what opinions you're prepared

15  to offer this jury as to his risk of violence.

16       A.    That his likelihood of violence would be lower than

17  that of the typical capital offender entering Texas Department

18  of Corrections.

19       Q.    Likelihood of violence is lower than the typical.

20  Where do you get this typical capital murder defendant?

21       A.    It's a base rate that I've -- from the data that I

22  collected in FY 2008 and from other studies of this sort.

23       Q.    And what is -- I assume you're prepared to put a

24  number on this risk?

25       A.    That's -- the number is less important than the

1  relative risk, but -- I mean, we use numbers, but the main

2  thing is to show that he's less likely than other types of

3  similarly situated offenders.

4       Q.   So you're not prepared to tell this jury what his

5  risk is?

6       A.   I'm prepared to tell them lower than average, and

7  some of the slides show that.  But as far as giving an exact

8  number, that -- that's a no.

9       Q.   I mean, you've done that before?

10      A.   Yes.

11      Q.   But you weren't asked to do that in this case?

12      A.   No.

13      Q.   Have you calculated what that risk would be, the

14  number?

15      A.   I mean, there -- there are several different studies

16  that we use, so the numbers would vary.  What -- what the

17  collectivity of those studies show is what's more important.

18  In previous cases, I've been asked to sometimes use one study

19  that has specific numbers.  I do that as a confirmation here,

20  but that's only as a confirmation, not --

21      Q.   And you did do that.  I guess the question was a yes

22  or a no.  Did you, in preparing for your testimony, actually

23  come up with that percentage of risk that I've seen you come up

24  with in previous cases?

25      A.   Yes.

1    Q.    And what is it?

2    A.    That's only over the course of one year, and it's

3  about five percent, depending on which measure you use.  If

4  it's serious injury, it's zero percent.

5              MS. BERNHARD:  Judge, I'm going to object to

6  this because he's testified that he's not here to offer a

7  percentage.  He's here to talk in general terms about the

8  factors that make a person dangerous or not dangerous in prison

9  and as they relate to this Defendant.  We're not here to say

10  there's an X percent chance of anything.

11              MS. MOSELEY:  He's done it in previous cases,

12  Judge, and I'm just -- I'm entitled to ask him what his opinion

13  would be.

14              MS. BERNHARD:  If he's not done it in this case,

15  then it's irrelevant to his testimony in this case.

16              THE COURT:  Overruled.

17    Q.    (BY MS. MOSELEY)  You said you did do it, didn't

18  you?

19    A.    I calculated a percentage only to show that he would

20  be lower than the base rate.  The percentage is somewhat -- how

21  would you state -- because it was only a one-year period, I

22  don't -- I don't have a percentage likelihood over the next 40

23  years or anything like that which is what I've been asked to

24  calculate sometimes in previous studies.

25    Q.    And you, I assume, were still going to testify to

1  the jury that the best predictor of violence in prison is the

2  age of the offender?

3       A.   Yes.

4       Q.   And, also, a contemporaneous robbery, along with the

5  murder, would increase that person's risk?

6       A.   Yes.

7       Q.   As well as a prior incarceration --

8       A.   Yes, ma'am.

9       Q.   -- in the penitentiary would increase the person's

10 risk?

11      A.   Yes.

12      Q.   And prior violence in prison would increase that

13 risk?

14      A.   Yes.

15      Q.   And I assume you would agree that a -- an assault

16 requiring more than first aid would be considered the kind of

17 violence you included in your study?

18      A.   Yes.

19      Q.   And you didn't interview the Defendant in

20 preparation for your testimony?

21      A.   No.

22      Q.   But you're still going to say he's a lower risk than

23 the average going in?

24      A.   Yes.

25           MS. MOSELEY:  That's all I have.

```
 1                    THE COURT:  All right.  If we can get the jury

 2  lined up, please.

 3                    MS. BERNHARD:  Judge, I do have another expert,

 4  I don't know if we want to do that --

 5                    THE COURT:  Okay.  Yeah, let's go ahead and do

 6  that now.

 7                    MS. BERNHARD:  You can stand down.

 8                    (Witness brought forward and sworn.)

 9                    THE WITNESS:  So help me God, yes.

10                    THE COURT:  Thank you, sir.

11                              JAMES AIKEN,

12  was called as a witness by the Defendant, and after having been

13  first duly sworn, testified as follows:

14                          DIRECT EXAMINATION

15  BY MS. BERNHARD:

16       Q.    State your name.

17       A.    My name is James Evans Aiken, A-i-k-e-n.

18       Q.    And, Mr. Aiken, how are you -- what do you do?

19       A.    I'm currently president of James E. Aiken &

20  Associates, Inc.

21                    COURT REPORTER:  Of James --

22       A.    James E. Aiken & Associates, Inc.

23       Q.    (BY MS. BERNHARD)  And what do you do in that

24  capacity?

25       A.    It's a prison/jail consulting concern.  I provide
```

1  expert testimony, as well as other issues as it relates to

2  prison management, security, every aspect of prison or jail on

3  a daily system.

4                MS. BERNHARD:  And may I approach?

5                THE COURT:  You may.

6      Q.   (BY MS. BERNHARD)  What, briefly, is your experience

7  to do what you do?

8      A.   Well, I started in this business in 1971.  I worked

9  in a medium security prison as an administrative assistant to

10 the warden.  Prior to that, I was a social worker in a

11 substance abuse program.  Administrative assistant to the

12 warden which at that time gave me an opportunity to work as a

13 correctional officer basically back in those days.  From there,

14 I promoted to the rank of deputy warden of that same facility,

15 interpreting policies, security issues, every aspect of

16 security and delivery system program, delivery system and

17 administrative delivery system.  And this is a medium security

18 prison.  From -- from there, I was promoted to deputy warden of

19 the State Penitentiary in South Carolina.  That was the

20 largest, oldest, and most -- housed the most dangerous inmates

21 within the South Carolina criminal justice system, to include

22 inmates and pre-adjudicated status that -- that counties could

23 not adequately provide the necessary security.

24      Q.   And, Mr. Aiken, if I could just interrupt briefly.

25 Do you recognize what's been marked as Defendant's Exhibit

```
 1   Number 27?
 2        A.   Yes, this is a copy of my background materials and
 3   resume, yes.
 4        Q.   Okay.  And you've talked about your experience in
 5   the South Carolina prison institute.
 6             MS. BERNHARD:  We'd offer Defendant's
 7   Exhibit 27.
 8             (Defendant's Exhibit 27 offered.)
 9             MS. MOSELEY:  No objection.
10             THE COURT:  Admitted.
11             (Defendant's Exhibit 27 admitted.)
12        Q.   (BY MS. BERNHARD)  Does your experience extend
13   beyond the State of South Carolina?
14        A.   Yes, it does.
15        Q.   What's your experience with other states?
16        A.   I was Commissioner of Corrections for the State of
17   Indiana.  I was Director of Corrections for the United States
18   Virgin Islands, and I've provided expert technical assistance
19   in just about every jurisdiction in every aspect of prison,
20   jail, delivery for the U.S. Justice Department National
21   Institute of Corrections.  Also, I was appointed by Congress on
22   the Prison Rape Elimination Commission.
23             COURT REPORTER:  On prison what?
24        A.   Prison Rape Elimination Commission that was signed
25   into law by President Bush.  As it relates to reducing or
```

1  eliminating prison rape in jail, prisons throughout the United

2  States.

3      Q.    (BY MS. BERNHARD)  And what is your experience or

4  familiarity with Texas Department of Criminal Justice?

5      A.    Well, serving on that commission, we have public

6  hearings as it relates to the justice system or prisons within

7  the Texas jurisdiction.  Also, when I was providing expert

8  technical assistance, I do remember having people from the

9  Texas Department of Corrections to attend the seminars.

10     Q.    And have you testified before as an expert in

11 regards to prison risk in the Texas prisons?

12     A.    Yes, I have.

13     Q.    On how many occasions, do you think?

14     A.    On at least two occasions, if I recall.  And I've

15 also been qualified on the federal level in civil proceedings,

16 if I'm not mistaken.

17     Q.    Now, did you review certain records pertaining to

18 Matthew Johnson in this case?

19     A.    Yes, I did.

20     Q.    Could you give us a summary of what you reviewed?

21     A.    Yes.  His jail prison records, the overview of the

22 current offense, his previous interactions with the criminal

23 justice system here in Texas, as well as medical history.

24     Q.    And you reviewed his -- his -- you mentioned his

25 prison records and his jail records?

1       A.    That is correct.

2       Q.    And medical records.  Am I missing anything?

3       A.    I don't think so.

4       Q.    And based on your review and your knowledge of -- of

5    risk -- I mean, do you have experience and knowledge of -- of

6    risk assessment in -- in prisons?

7       A.    Yes.  That's commonly called classification, and I

8    have classified literally thousands and thousands of inmates,

9    as well as managed that inmate population, as well as

10   developed, monitored, and evaluated classification systems

11   throughout the United States.

12      Q.    And are you prepared to offer an opinion based on

13   your review of the things -- the records that you reviewed that

14   pertain to Matthew Johnson as to what factors make a person

15   dangerous in prison and whether or not Matthew Johnson has

16   those characteristics?

17      A.    That is correct.

18      Q.    And just in -- in summary, what is your opinion on

19   Matthew Johnson's risk assessment in prison?

20      A.    He can be confined for an extended period to include

21   the remainder of his life without causing any undue risk of

22   harm to staff, inmates, or the general public.

23      Q.    In the Texas Department of Criminal Justice?

24      A.    That is correct.

25            MS. BERNHARD:  I'll pass the witness.

CROSS-EXAMINATION

BY MS. MOSELEY:

    Q.   Did you talk to him before you came to that conclusion?

    A.   No, I did not.

    Q.   I assume that you're -- you were sitting in here when you just heard Dr. Sorenson testify?

    A.   That's correct, ma'am.

    Q.   And your opinion would be basically the same as his?

    A.   Basically, but from a different perspective.  I don't approach it from an academic perspective, but operational hands-on continual process that I've been involved in for over 40 years.

    Q.   And you've never worked in a Texas prison; is that right?

    A.   That's correct, ma'am.

    Q.   You would -- I guess, based on your experience, would you agree that all of the -- while there are some similarities, each state -- each correctional community, if you will, would have different rules and different ways that they manage offenders and ways they classify and -- and contain offenders?

    A.   Many of them are basically the same, and there are a few nuances, but basically they have the core things that I need to look at in relation to future dangerousness or

1    adaptability.

2         Q.   For instance, a Super-Max facility -- you're

3    familiar with that term?

4         A.   Yes.  In fact, I taught wardens to -- wardens of

5    Super-Max at ADX, which is the most secure prison in the world.

6         Q.   And we don't have that here in the Texas system; is

7    that right?

8         A.   As I understand, you have administrative segregation

9    which is basically the same, even though you may not call it

10   Super-Max, but it is a very high secured institution that

11   manages disruptive -- potentially disruptive and predator

12   inmate population.

13              COURT REPORTER:  And predator --

14        A.   Predator inmate population.

15        Q.   (BY MS. MOSELEY)  But you do realize that this

16   Defendant isn't going to administrative segregation if he

17   receives a life sentence?

18        A.   That is basically correct, unless his behavior

19   changed, but I don't foresee that.

20              MS. MOSELEY:  That's all I have.

21              THE COURT:  Thank you, sir.  You may stand down.

22              THE WITNESS:  Very well, Your Honor.

23              THE COURT:  Can we get the jury lined up,

24   please?

25              THE BAILIFF:  All rise.

Darline King LaBar, Official Reporter

```
 1                    (Jury returned to courtroom.)

 2                    THE COURT:  Good morning, ladies and gentlemen.

 3   Please be seated.

 4                    Will Defense call its next witness, please.

 5                    MS. BERNHARD:  The Defense will call John

 6   Sorensen.

 7                    THE COURT:  Please let the record reflect this

 8   witness has been sworn.

 9                    (Inside the presence of the jury.)

10                         JONATHAN SORENSEN,

11   was called as a witness by the Defendant, and after having been

12   first duly sworn, testified as follows:

13                         DIRECT EXAMINATION

14   BY MS. BERNHARD:

15        Q.   State your name.

16        A.   Jonathan Sorensen.

17        Q.   And what do you do?

18        A.   Teach criminal justice.

19        Q.   Where do you teach?

20        A.   East Carolina University.

21        Q.   And what is your experience that lets you do what

22   you do?

23        A.   I've completed research on prison violence, capital

24   punishment since I was a graduate student at Sam Houston in

25   1986.
```

```
 1        Q.    And have you taught in various other universities?

 2        A.    Yes.

 3        Q.    Where all have you taught?

 4        A.    My longest stretches were at University of Texas Pan

 5   American in Edinburg, Texas, for nine years, and then Prairie

 6   View A&M University outside of Houston, and -- for 10 years,

 7   also.

 8        Q.    And what sort of topics did you teach?

 9        A.    Mainly, I was a methodologist.  I teach research

10   methods and criminological theory.  I also teach a lot of

11   policy classes.  At Prairie View I mainly talked to doctoral

12   students, so I -- it was more like one-on-one and kind of

13   working them through the research process and doing a lot of

14   work on their dissertations and publishing and that sort of

15   thing.  The undergraduates, just a variety of courses,

16   corrections classes, that sort of thing.

17        Q.    And what would you say that your primary research or

18   specialty topic would be?

19        A.    Corrections, but specifically prison violence and

20   capital punishment.

21        Q.    And have you conducted numerous studies which have

22   been published --

23        A.    Yes.

24        Q.    -- in this field?

25              MS. BERNHARD:  May I approach?
```

```
 1                    THE COURT:  You may.

 2        Q.    (BY MS. BERNHARD)  I'm showing you Defendant's

 3   Exhibit Number 25, and ask if you recognize that?

 4        A.    Yes, that's my resume.

 5        Q.    And does this list basically your previous

 6   employment and your education?  What is -- what is your

 7   educational background?

 8        A.    I have a Bachelor's degree from Pan American

 9   University, as it was called then, a Masters and a Ph.D. from

10   Sam Houston State University, all in criminal justice

11   criminology.

12        Q.    And does this list numerous publications in the

13   field of criminal justice and -- and risk assessment and your

14   specialty area?

15        A.    Yes.

16        Q.    And these are published in mainstream peer reviewed

17   journals and -- and publications in your field?

18        A.    Yes.

19              MS. BERNHARD:  We'd offer Defendant's Exhibit

20   Number 25.

21              (Defendant's Exhibit 25 offered.)

22              MS. MOSELEY:  No objection.

23              THE COURT:  Admitted.

24              (Defendant's Exhibit 25 admitted.)

25        Q.    (BY MS. BERNHARD)  Now, Dr. Sorenson, have you
```

1  reviewed certain records prior to your testifying in this case

2  today?

3      A.    Yes.

4      Q.    And can you briefly summarize for us what records

5  you've reviewed?

6      A.    I've reviewed prison records, jail records, to

7  include disciplinary reports.  I've reviewed the -- the

8  situation surrounding the current crime.  I reviewed --

9      Q.    And these are -- these are Mr. Johnson -- Matthew

10  Johnson's records?

11      A.    Yes, ma'am, and prior extraneous offenses that

12  occurred in the community.

13      Q.    And you've reviewed his educational records?

14      A.    Yes, educational records, medical records, probation

15  and parole records.

16      Q.    And his prior prison records?

17      A.    Yes.

18      Q.    Disciplinary records?

19      A.    Yes.

20      Q.    Offense reports related to what we call extraneous

21  offenses?

22      A.    Yes.

23      Q.    And an offense report related to the offense for

24  which he's been convicted?

25      A.    Yes.

1          Q.    Now, you're prepared here today to give us an idea

2     of how Matthew Johnson is likely to adjust to life in prison;

3     is that correct?

4          A.    Yes.

5          Q.    And are there factors that we need to look at that

6     would help us to make that assessment?

7          A.    Yes.

8          Q.    And is this -- are these factors based on some sort

9     of scientific methodology or research data?

10         A.    Yes.  There are factors that come up time and time

11    again in the -- in the literature -- the scholarly literature

12    on prison violence.

13         Q.    And these are some of the studies and -- and things

14    that you conduct and reviewed?

15         A.    Yes, both.

16         Q.    And where does this research data that you look at

17    come from?

18         A.    My primary research data that -- that I look at

19    besides the published articles are various State Department of

20    Corrections, the Federal Bureau of Prisons.

21         Q.    Are the factors that you look at in making these --

22    I guess we call them risk assessments, are these things looked

23    at and -- and generally accepted by other experts or other

24    people in your field?

25         A.    Yes.

1        Q.   And you've prepared a little PowerPoint to help us

2   kind of explain some of this; is that right?

3        A.   Yes.

4        Q.   Now, I want to kind of talk about the methodology or

5   the science, or how do you go about determining that a capital

6   defendant will be violent in prison.

7        A.   Well, it's -- basically what we do is an analysis

8   that's kind of like what an insurance company does.  It's

9   called an actuarial analysis.  And we look at certain risk

10  factors and we ask the questions that you can see on the

11  screen, what -- what type of violence are we interested in,

12  what's the probability of that violence occurring over what

13  time period and in what context.

14       Q.   And is this the type of thing that -- that you

15  publish papers in?

16       A.   Yes.

17       Q.   And when you say actuarial assessment, can you tell

18  us what you mean by that?

19       A.   It's very similar to the type of analyses that are

20  done by insurance companies when they set rates for life

21  insurance or car insurance and they look at a large group of

22  people, and they look at the base rates of let's say car

23  accidents or deaths for a variety of reasons, and then they

24  look at the characteristics that make a person more likely to

25  get into an accident, the kind of proven track record of large

1  groups of people over a period of time.  Then they apply that

2  data to individuals.

3      Q.    And those are some of the questions that you've

4  addressed in -- in this slide, one pertaining to, I guess,

5  automobile and insurance rates and the other violence in

6  prison; is that right?

7      A.    Yes, very similar.  It's used -- actuarial

8  predictions -- risk assessments are used throughout the

9  criminal justice system in terms of setting levels of

10  supervision on community supervision and -- and in the

11  Correctional Department for the purposes of classification.

12     Q.    And you mentioned the questions that insurance

13  companies look at when assessing what -- what rate of

14  insurance, I guess, to give a driver and you have those listed

15  up there.  What sort of factors do you look at to assess

16  whether or not somebody is going to be a risk in prison?

17     A.    There are numerous factors, but the factors -- I

18  tend to look at the factors that come up consistently and are

19  most strongly related to prison violence that come up over and

20  over again.  Like the age of a person as being, I guess, the

21  most important one, just like it is for drivers.  Being

22  adversely related, the older a person is, the less likely they

23  are to be involved in accidents and that sort of thing.  There

24  are many others, some of which are listed on the slides.

25     Q.    Okay.  Are there other means, other than this

1    actuarial method, of assessing somebody's risk?

2        A.    Yes.  And the next slide kind of goes through some

3    of those.  It's a summary slide from -- from two very well

4    respected researchers in this area.  What they did is they

5    looked at different methods of prediction and found those which

6    they considered -- well, which are generally considered the

7    strongest of -- most successful, effective forms of prediction

8    and those which are least effective.  And you can see from the

9    slide that that -- that group statistical methods are the most

10   commonly used at this point in time and they are the most

11   successful in actually predicting the success rates.

12       Q.    And that's like the actuarial method that insurance

13   companies use?

14       A.    Yes, but there are others also.  The pattern of the

15   person, and, then, of course, clinical evaluations like those

16   that are completed by psychologists and psychiatrists.

17       Q.    Okay.  And what about the hypothetical inference?

18       A.    Hypothetical inference is something that's not

19   really used any longer.  It's something that -- you know, that

20   was ancient people's -- you know, that things they couldn't

21   understand or explain would use to -- you know, to try and

22   predict events that were occurring, like in the natural world.

23       Q.    And this is basically research that -- that's

24   supported by -- by people who do this kind of research --

25       A.    Yes.

```
 1        Q.    -- is that right?

 2              Now, I want to kind of talk about Matthew

 3   Johnson in particular.  I asked you to review the records and

 4   make an assessment of how Matthew is going to fare if he's

 5   sentenced to life in prison in Texas -- in the Texas Department

 6   of Criminal Justice, and do you have an opinion on this?

 7        A.    Yes, I do.

 8        Q.    And what is that?

 9        A.    That he will fare better than the average incoming

10   capital offender.

11        Q.    Okay.

12        A.    He will not --

13        Q.    And why is that?

14        A.    Because he has certain characteristics that make him

15   less likely to be violent in the future.

16        Q.    And are those characteristics that we're seeing on

17   the screen there?

18        A.    Yes.

19        Q.    Age?  He's 38?

20        A.    Yes.

21        Q.    And how -- how does age factor?

22        A.    Age is the Number 1 factor that studies of this type

23   have found to be related to all sorts of risk taking and

24   behavior and self control and lack thereof.

25        Q.    And you also think it's significant, a person's
```

```
 1  educational attainment?

 2       A.   Yes.

 3       Q.   And security threat group status.  What does that

 4  mean?

 5       A.   In prison right now, I have a slide that shows --

 6  for instance, in Texas, and this is true throughout the United

 7  States, that the most troublesome inmates are inmates that have

 8  joined inmate gangs.

 9       Q.   And that's what security group status means?

10       A.   Yes.

11       Q.   Security threat group status?

12       A.   Yes.

13       Q.   And you also mentioned serving life without parole

14  is a factor?

15       A.   Yes.

16       Q.   I think we'll get to an explanation of that in a

17  little bit because it seems kind of counterintuitive, but it is

18  a factor that you look at as -- as a positive; is that correct?

19       A.   Yes.

20       Q.   And also past behavior in -- in jail and in prison?

21       A.   Yes.

22       Q.   Now, let's talk about age.  Why is age important?

23       A.   Age is important because, like I said, throughout

24  industries and especially in corrections and the community, the

25  older a person is, generally the less likely they are to be
```

```
 1  violent.

 2       Q.    So younger inmates tend to be more violent?

 3       A.    Absolutely, yes.  And older inmates, it's the

 4  opposite.  The older -- the longer they age and the longer that

 5  they're in, the less likely they are to commit disciplinary

 6  infractions of any sort, violent in particular.

 7       Q.    Okay.  And this is based on -- on studies that you

 8  and others have conducted; is that right?

 9       A.    Yes.

10       Q.    And can you explain the -- the graph there that

11  you've got?

12       A.    This graph, in particular, comes from data that we

13  collected from Texas.  It shows two downward sloping lines.

14  The bottom part of the slide shows the age, and then you can

15  see going up the left-hand side is the rate.  And there's two

16  different lines there.  One of the lines represents homicides.

17  That's -- that's the lower line, and that's the rate of

18  homicides per 100,000 inmates annually.

19       Q.    And that was based on -- I mean, how did you

20  determine that?  Is that based on particular data?

21       A.    Yeah, we collected data from the Texas Department of

22  Corrections from 2000 to 2008 on inmate homicides.

23       Q.    Okay.  So that graph right there is -- is particular

24  to TDCJ?

25       A.    Yes.
```

```
 1        Q.   And you also have the red line or that -- that top
 2   line reflects injur -- injurious staff assaults?
 3        A.   Yes.  Those are staff assaults that are -- that
 4   warrant -- well, there's one type.  Yes, it's beyond -- some
 5   kind of harm beyond first aid, and those are injuries, staff
 6   assaults, and up in what they call the EAC office, the
 7   emergency action center reports, and we went through those
 8   reports and studied those for FY 2008.
 9        Q.   Okay.  And Matthew Johnson, at the age of 38, kind
10   of falls in the middle there of that graph; is that right?
11        A.   Well, yes, but I would say more in terms of the
12   levels of violence, if you -- you know, if you cluster them,
13   he's certainly toward the latter part of the graph.
14        Q.   And certainly he's going to be moving toward the
15   lower end of that as he ages?
16        A.   Yes.
17        Q.   Now, you talked about, on this slide, the rate of
18   inmate homicide and staff assaults.  And is that looking at all
19   TDCJ offenders?
20        A.   Yes.
21        Q.   Now, did you look at specifically capital murder
22   offenders or life sentence capital murder offenders?
23        A.   Yes.  On several different occasions, and this is
24   one particular study --
25        Q.   Can you explain what we're looking at there?
```

```
 1        A.    Yep.   This is -- actually this is also data from the
 2  FY 2008 series in Texas Department of Criminal Justice.   And
 3  what it shows is that regardless of how you define future
 4  dangerousness or future criminal violence, probability of
 5  future violence, all of those things decrease with age from the
 6  less serious forms of violations to the very serious forms of
 7  violations.
 8        Q.    Okay.   What are -- what are the differences between
 9  the three lines you've got there, the dangerous, the
10  assaultive, and the injurious?
11        A.    Dangerous violations include all of what TDCJ calls
12  Level 1 violations, which they've deemed to be of those types
13  of offenses -- disciplinary offenses that are dangerous to the
14  institution in terms -- it could be a violent offense, it could
15  be an assault on a guard, another inmate -- another inmate, if
16  it results in serious harm.   It includes rioting, hostage
17  taking, escape, and attempted escape, actual homicides,
18  attempted homicides, all the way down to possession of a cell
19  phone.
20        Q.    Those would all be included in the dangerous
21  violations?
22        A.    Yes, threatening an officer.
23        Q.    What about the assaultive?  How is that different?
24        A.    In there, I just included offenses that weren't
25  potentially assaultive, like -- and dangerous violations
```

1    includes possession of a weapon because, obviously, it could be

2    used.  Assaultive violations includes only those offenses that

3    involve an actual physical assault.

4        Q.    And then how is that different from the injurious

5    violations?

6        A.    Injurious violations are assaults that actually

7    result in harm, as TDCJ defines it, beyond first aid.

8        Q.    Okay.  And, again, all of those pretty rapidly

9    decrease once one passes 30?

10       A.    Yes.

11       Q.    Is that --

12       A.    Yes, that's true.

13       Q.    Is that fair to say?

14       A.    Yes, ma'am.  It's harder to see on the lower two

15   lines, but because of the rate or the scale, but like you saw

16   on the previous slide, those are very steeply downward sloping.

17       Q.    And this particularly related to people who were

18   serving life sentences for capital murder?

19       A.    Yes.

20       Q.    Do -- are -- are capital murderers or murderers, I

21   guess, are they not -- are they more violent than other

22   prisoners?

23       A.    No.  As you might expect, they -- you would think

24   that they probably would be having committed that type of act

25   previously, but when we look at -- here again, the same data

1    from -- from Texas prisons, the FY 2008 data, what you see

2    is -- and this has been replicated many times -- is that

3    murderers make up about 14.5 percent of the Texas Department of

4    Corrections prison population, and they account for about 14.8

5    percent of the dangerous rule violations that we just talked

6    about.  So they -- they commit a proportionate share of the

7    violent acts in prison.

8         Q.    Okay.  When you say convicted murderers in that

9    graph, does that include capital murder and regular -- what we

10   call regular murder, for lack of a better word?

11        A.    Yes, all the way -- all the way down to -- included

12   would be even second-degree murderers and -- and man -- those

13   convicted of manslaughter.

14        Q.    Okay.  Is there some kind of theory or basis or

15   model that kind of explains why -- well, let me ask you this.

16   Is it -- are people -- is people's risk of violence the same in

17   prison as it is in the free world, or is there a difference?

18        A.    There's a difference.

19        Q.    And do we have some idea about what factors account

20   for that difference or -- or model to kind of explain why

21   they're not the same?

22        A.    Yes.  If you would pull up the next slide.

23        Q.    The next slide.  Oops.

24        A.    As you note there, violence involves not only the

25   person but also the interaction and the context.  So it's very

1  important to look at not only what the person has done in the

2  past, but the type of interactions that they may have in the

3  future and the context in order to predict how likely they are

4  to be violent in the future.

5      Q.    And that's going to be different whether you're in

6  the free world versus in a prison environment?

7      A.    Absolutely, because context changes, obviously, if

8  you're in a prison environment and interactions also change.

9      Q.    And how are these things different in prison?

10      A.    In prison, you don't have a lot of -- a lot of

11  potentially -- potential victims, let's put it that way.  You

12  have staff members who are trained to be vigilant.  You have

13  other inmates who automatically sort of look out for

14  themselves, and you have other sorts of precautions that are

15  not -- that don't exist in the free world.  You also lack all

16  the sort of normal precursors to violence, such as the avail --

17  easy availability of deadly weapons, specifically firearms, and

18  also the lack of stimulants, in terms of like drugs and alcohol

19  and that sort of thing.

20      Q.    You're not saying that there aren't drugs and

21  alcohol occasionally found in prison, are you?

22      A.    Occasionally found in prison, but it's -- it's much,

23  much more difficult, let's say, to become intoxicated in prison

24  than it is in the free world.

25      Q.    I mean, certainly the levels are going to be

```
 1  different versus -- in prison versus free society?

 2       A.   Absolutely.

 3       Q.   And you say that actually the levels of violence in

 4  prison are lower than they are in the free world; is that what

 5  you're saying?

 6       A.   These days, yes.

 7       Q.   How do we account for that?

 8       A.   In the graph, you'll see that there's various -- or,

 9  sorry, the figure that you see, there's various sorts of

10  preventative measures in prison.  You're dealing with a

11  population of young -- mostly young violence prone males and --

12  but the prison sort of overrides that.  They've become very

13  sophisticated in recent years at, you know, doing what they

14  have to do to prevent violence among the inmates and protect

15  the staff.

16       Q.   Let's talk a little bit about how education factors

17  into risks for violence.  What can you tell us about that?

18       A.   Inmates that have higher levels of education tend to

19  be less violent.

20       Q.   And you know from your review of the records that

21  Matthew Johnson obtained his GED?

22       A.   Yes.

23       Q.   Does that count as something that factors toward a

24  lower rate of violence?

25       A.   Yes.
```

1      Q.    And that's what the studies show?

2      A.    Yes.

3      Q.    And you cite a particular study there at the bottom,

4  I think it's M.D., is it Harer?

5      A.    Yes.

6      Q.    And N.P Langan?

7      A.    Yes.

8      Q.    Where -- do you know what they studied or what that

9  study was based on?

10      A.    That was a study that was based on inmates in the

11  Federal Bureau of Prisons.  Miles Harer was a researcher with

12  the Federal Bureau of Prisons at that time, so he looked at the

13  entire population of the Federal Bureau of Prisons.

14      Q.    And do his findings hold true in other populations?

15      A.    Yes, in other studies.

16      Q.    In other studies?

17      A.    Yes.

18      Q.    This next table, what are -- what are -- can you

19  explain what we're looking at there?

20      A.    That's just sort of some evidence among many types

21  of evidence that inmates who obtain a GED or who are at higher

22  levels of educational attainment are less likely to be violent

23  in prison.  That particular study is out of Missouri, out of

24  the Potosi Correctional Facility, but it just confirms what --

25  you know, what all the studies in this area show, and that's

1  that the higher the educational level, the less likely the

2  person is to commit -- commit violent acts in a prison

3  environment.

4       Q.    Now, the little highlighted line you have there says

5  more than 12 years of education.  How would a GED fall in that?

6       A.    It's -- it's the same.  We -- we've tried to parse

7  it out, and there's no difference, so it's a GED and/or 12 --

8  high school diploma.  And the actual exponent of B over toward

9  the end is .56 which tells you that even controlling for all

10 those other factors, inmates in Potosi Correctional Facility

11 during that period of time are about -- if they have a GED or a

12 12th grade educational level, they're about half as likely to

13 commit violent acts.

14      Q.    And does that hold true in other -- in other

15 populations that have been studied?

16      A.    Absolutely.  We -- in fact, with a student at

17 Prairie View, I did -- a doctoral student, we did a

18 meta-analysis of the literature, looked at all the studies that

19 have been done to date on prison violence, and the -- it was

20 significant overall.

21      Q.    Security threat group membership.  You said before

22 that that meant gang membership; is that right?

23      A.    Yes.

24      Q.    And how does that relate to a person's risk for

25 violence in prison?

1      A.    Security threat group membership or whatever you

2  call them, you know, nationwide, disruptive group members or

3  they -- they shy away from the term "gangs" because street

4  gangs can, you know, be non-violent in prison, but it's the

5  groups that cause trouble in prison.  And those groups are the

6  ones that commit a -- a huge portion of the violent acts in

7  prison.

8      Q.    And I think your -- your next slide kind of talks to

9  that.

10     A.    Yeah, this slide looks just like the one that I put

11 up for the murderers.  What it shows in the first barrel is

12 that security threat group members make up a very similar

13 portion of the population as murderers -- actually about

14 14.5 percent in the Texas Prison System, and they account --

15 yet they account for about 32 percent of serious assaults on

16 guards and over half of the inmate homicides, and those are

17 from the studies that I discussed previously in the FY 2008

18 data.

19     Q.    So whether or not somebody is a gang member seems to

20 be more important than -- than whether they're a convicted

21 murderer, would you agree?

22     A.    Oh, abso -- yeah, absolutely.

23     Q.    As far as their risk for violence?

24     A.    Yes.

25     Q.    And based on review of Matthew Johnson's records,

1    does he have any affiliation or any record of any kind of

2    affiliation with any security threat group or gang?

3        A.    No.  In fact, there's a confirmation in there from

4    somebody in the offices at TDCJ that -- that say that he's --

5    he is not a member or has not been a member of a security

6    threat group.

7        Q.    Okay.  Let's talk about life without parole being a

8    factor because that seems kind of counterintuitive, would you

9    agree?

10        A.    Yes.

11        Q.    Because I think the common sense thinking is that if

12    you don't have the possibility of parole, why in the world

13    would you behave?

14        A.    Yeah, that's true.  Most people think that.  You've

15    got nothing to lose if you're a life without parole inmate, but

16    the fact is that we've done studies in Florida, Missouri, the

17    federal system, Oregon, Indiana, and other places that have had

18    life without parole for some period of time, and what we've

19    found consistently is that their behavior is right on par with

20    other capital murderers and other murderers in the general

21    population.  They actually do have a lot to lose in the sense

22    that they have many privileges.  And what we find is that

23    inmates serving life or life without parole tend to sort of

24    understand that prison is going to be their life and they kind

25    of settle in.  They dig in.  And they want to make themselves

1    as comfortable as possible as you can in that environment, and

2    committing a violent offense, disciplinary infractions would

3    decrease their level of comfort seriously.

4          Q.   And would make for a miserable life?

5          A.   Yes.

6          Q.   And studies, I guess, support this; is that fair to

7    say?

8          A.   Yes, absolutely.

9          Q.   What does this chart tell us?

10          A.   This is just -- this is just one study of federal

11    life without parole inmates from '91 to 2006.  And what it

12    shows you is that their likelihood of violence is -- is

13    quite -- it shows two things.  One is, depending on how you

14    define the violence or dangerous rule violations, it decreases

15    as the level of harm becomes more serious.  When you start with

16    any violation, of course, most inmates are involved in some

17    sort of disciplinary violation.  And then as you move down to

18    assaults with major injuries, we actually didn't have any

19    inmates out of that 145 life without parole inmates that

20    committed an infraction that -- an assault that resulted in

21    major injuries during that time period -- so about 17 years --

22    and average time served is six years.

23                   And then we compared it in the second column to

24    all USPs -- United States penitentiaries.  Those are the

25    more -- most secure facilities in the United States prison

```
 1  system, with -- with the exception of Admax, ADX, which is the
 2  complete and total lockdown.  And what you see is that their --
 3  they correspond very well.  And it's -- they're -- they're --
 4  capital murders are just hard to believe, but we show time and
 5  time and time again, they are typical inmates in a high
 6  security setting.
 7       Q.   And finally, I think we have past behavior in jail
 8  and prison as being a factor that you look at.
 9       A.   Yes.  And that's a factor that's secondary generally
10  to your group statistical method, but you always want to look
11  at how the person has behaved, if they have a track record in
12  prison.
13       Q.   And as it relates to Matthew Johnson, those are some
14  factors that you have noted from his records?
15       A.   Yeah.  First, I noted that he had qualified
16  previously for the lower custody levels.
17       Q.   And that would be G1?
18       A.   Yes, I -- I believe so.
19       Q.   Okay.  And you reviewed the record, though -- and it
20  says up there, involved in -- in one fight while he was
21  incarcerated, and you reviewed that record?
22       A.   Yes.
23       Q.   Fight with another inmate that was a fist fight, no
24  weapons, but the other inmate did hit his head on the concrete
25  or metal and received some injuries?
```

1      A.    Yes.

2      Q.    And those are all factors that you took into account

3  in making an assessment of whether or not you think Matthew

4  Johnson is -- is going to be dangerous?

5      A.    Yes.

6      Q.    Now, taking these -- all these things that you look

7  at and that you've studied into account, what does -- what does

8  that tell us about Matthew Johnson?

9      A.    He has certain factors that would make him -- would

10  increase his level of risk.  We have certain factors that would

11  decrease his level of risk over what we call the base rate

12  which is his sort of average likelihood of capital murderers

13  coming into prison.  And really, as you've seen from the

14  graphs, your general high security prison population.

15      Q.    So the fact that he's got assaults -- assaultive

16  behavior in the community?

17      A.    Yes.  That would increase his level of risk.

18      Q.    And that was based on your review of the records

19  of -- of assaults and domestic violence and -- and the things

20  you reviewed in his past; is that right?

21      A.    Yes.  Yes, and compared, of course, the literature

22  and the studies that we've completed.

23      Q.    And contemporaneous robbery.  What do you mean by

24  that?

25      A.    That's a robbery contemporaneous with the current

1  offense.  These are capital murderers who rob and then kill

2  someone.

3      Q.   As opposed to other ways of con -- committing

4  capital murder --

5      A.   Yes.

6      Q.   -- is that right?  And the fact that he's been to

7  prison before?

8      A.   Yes.

9      Q.   And then on the factors that we look at that

10 decrease his risk, you've got his age, which we've talked

11 about, and his educational attainment.  In other words, the

12 fact that he has a GED.  The fact he's not a gang member.  And

13 the fact that he's going to be serving life without parole and

14 his past behavior.  Those are all things that decrease his

15 risk?

16     A.   Yes.

17     Q.   So based on all those factors, is Matthew Johnson's

18 risk of -- of violence in prison greater or less than your

19 average inmate?

20     A.   Less.

21     Q.   And this is based on studies and -- and predicting

22 violence in prison?

23     A.   Yes.

24     Q.   What does this slide tell us?

25     A.   It's just sort of a summary -- summary slide that

1    kind of explains what we find as researchers -- or in science,

2    we know sometimes this is different from legal definitions, but

3    what we know is -- and it's noted by everyone time and again --

4    that prison violence rates are very low in prison.  So what we

5    end up doing usually is comparing somebody to other inmates and

6    trying to determine whether they're more or less likely than

7    those other inmates to commit acts of violence.  So we

8    generally look at very -- varying levels of improbability.

9    Even if a person is two or three times as likely as -- as

10   another -- as your average inmate, it still might not be more

11   likely than not.  That's the point we're trying to make.

12        Q.    Okay.  Now, what does -- what does this tell us?

13        A.    This is just some data from the -- the FY 2008 data,

14   again, and what we did as sort of a confirmation and -- is sort

15   of look at the average or base rate, and then we compared -- we

16   got a comparison group like the -- like the insurance industry

17   might and looked at match comparison group.  With Mr. Johnson,

18   age 38, inmates who served time in 2008 -- FY 2008, capital

19   murderers, and this similar group, age 38 and older, with an

20   above average educational equivalency score -- a TAB of greater

21   than 9, we used that instead of whether they had a high school

22   diploma or GED because it's a more reliable measure.  It shows

23   up with all the inmate files as opposed to the others, which

24   are of self reported, with no confirmed security group threat

25   status and -- and I forgot the last one.

1        Q.    Do I need to back up?

2        A.    Yeah.

3        Q.    Oops.  There we are.

4        A.    I'm sorry.  And a prior prison sentence.  So we

5   looked at that group, and out of the 1962 people, there were

6   eight that sort of met this -- matched this group.  And then we

7   looked at their levels of violence during that year versus --

8   versus the entire group of people to try and place Mr. Johnson

9   above or below the base rate.

10        Q.    And is that what this graph sort of shows us?

11        A.    Yes.  So we use the -- the three different

12   definitions, potential violence or -- we also sometimes call

13   that dangerous violations, assaultive infractions, and

14   infractions resulting in injuries.  The blue bar is the base

15   rate for that group of 2,000 capital murderers.  And the red

16   bars are the group of inmates that share Mr. Johnson's

17   characteristics.

18        Q.    And all this is based on studies that have been done

19   by you and numerous other people in this field?

20        A.    Overall, yes.  And this is the one particular data

21   set that we collected from Texas.  The other data sets from

22   Missouri and various places would confirm the same.

23        Q.    Does there seem to be any difference between states

24   or -- state versus federal or --

25        A.    No, ma'am, not across states or studies.  These --

1  these are factors that are found again and again and again to

2  predict future violence.  They're used in classification

3  systems and whatnot.

4              MS. BERNHARD:  I'll pass the witness.

5                    CROSS-EXAMINATION

6  BY MS. MOSELEY:

7      Q.    You -- you testified that the best predictor of

8  violence in prison is the age of the Defendant, correct?

9      A.    Yes.

10      Q.    And I assume people in their 30s are less likely to

11  be violent -- a lower risk for violence than people in their

12  20s?

13      A.    Yes.

14      Q.    And you realize that when the Defendant was in

15  prison the last time and he had that assault that resulted in

16  more than first aid, that he was in his 30s?

17      A.    Yes.

18      Q.    He would have been a lower risk then for violence?

19      A.    That's true, yes.

20      Q.    And he was not a member of a security threat group

21  then, correct?

22      A.    Yes.

23      Q.    And he had his GED then?

24      A.    Yes.

25      Q.    And you, I think, just told the jury that past

1  behavior in -- is it past behavior in prison is secondary to

2  these general characteristics, or past behavior in the

3  community?

4       A.   Past behavior in prison and certainly past behavior

5  in the community would be secondary to those other

6  characteristics.

7       Q.   So a person's -- their personal history of violence

8  in the community, violence in the penitentiary, rule

9  infractions in the penitentiary, is less instructive than the

10 fact that he's 38?

11      A.   Yes.

12      Q.   You didn't interview the Defendant before you

13 decided he was a lower risk?

14      A.   No, ma'am.

15      Q.   Have you ever testified that anybody is a high risk?

16      A.   No, because, obviously, the Defense attorneys

17 would -- would not have me testify if I make that

18 determination.

19      Q.   And you don't testify for the prosecution?

20      A.   Never asked me.

21      Q.   A contemporaneous robbery -- in other words, robbery

22 plus murder being the -- the means of committing the capital

23 murder, which is what we're dealing with here, correct?

24      A.   Yes.

25      Q.   Makes you a higher risk for violence in the

```
 1  penitentiary?

 2       A.   Yes.

 3       Q.   And the fact that the Defendant was in his 30s the

 4  last time he went to prison doesn't affect you telling this

 5  jury that -- that him being 38 now means he's a lower risk?

 6       A.   No, it does not.

 7       Q.   You would have said he was a low risk the last time

 8  he went to the prison, wouldn't you?

 9       A.   I haven't studied robbery defendants, specifically,

10  and their characteristics that are likely to make them more or

11  less violent.

12       Q.   You're not here to tell this jury that people who

13  are serving life without parole don't commit violent offenses

14  in the Texas penitentiary, are you?

15       A.   Oh, no, absolutely not.

16       Q.   I mean, that happens, doesn't it?

17       A.   Yes.

18       Q.   And, in fact, a life without parole defendant

19  serving life without parole for capital murder committed a

20  murder of his cellmate last year, didn't he?

21            MS. BERNHARD:  Your Honor, I'm going to object

22  to any individual specific acts of violence.  And they're not

23  particularized to this Defendant and irrelevant.

24            MS. MOSELEY:  Your Honor, he has testified to

25  this jury that people serving life without parole for capital
```

```
 1  murder are lower risk of violence in the pen.  That door is

 2  open.

 3              MS. BERNHARD:  The specifics of what any

 4  particular inmate may have done is not relevant to this

 5  Defendant -- this Defendant, and violates his Eighth Amendment

 6  right to particularized and individualized sentencing.

 7              THE COURT:  All right.  Objection sustained.

 8              MS. MOSELEY:  Your Honor, he just testified that

 9  he's compare -- he's saying this Defendant is a low risk based

10  on what other capital murderers do.

11              MS. BERNHARD:  Well, and he -- and he's

12  testified about other capital murderers in general, but any

13  specifics of any particular inmate is not admissible.

14              THE COURT:  Okay.  My ruling stands.  Please

15  proceed.

16      Q.   (BY MS. MOSELEY)  There are weapons in the

17  penitentiary, yes?

18      A.   Yes.

19      Q.   And there are drugs in the penitentiary, yes?

20      A.   Yes.

21      Q.   If there is testimony that -- that a capital murder

22  defendant who's going to be serving life without parole, if the

23  jury makes that decision, is violent when he uses drugs, would

24  the fact that drugs are available in the penitentiary change

25  your assessment of his risk?
```

```
 1        A.    No, it would not.

 2        Q.    How much have you been paid for your work on this

 3   case?

 4        A.    I'm paid $150 an hour.

 5        Q.    And how many hours are you going to bill the Defense

 6   for?

 7        A.    I'm not certain.  Depends on when I get home.

 8        Q.    Can you give us an estimate?

 9        A.    Between 20 and 30, probably.

10        Q.    And plus travel, I assume?

11        A.    That's counting travel.

12        Q.    That's counting travel?

13        A.    Yes, ma'am.

14        Q.    So 20 to 30 hours?

15        A.    Yes.

16        Q.    At $150 an hour?  Yes?

17        A.    Yes.

18              MS. MOSELEY:  That's all I have.

19                     REDIRECT EXAMINATION

20   BY MS. BERNHARD:

21        Q.    Dr. Sorensen, are you paid for your testimony or

22   your time?

23        A.    Paid for my time.

24        Q.    And you have conducted assessments in other cases

25   where you did not testify; is that fair?
```

```
 1        A.    Yes.

 2                    MS. BERNHARD:  Nothing further.

 3                    MS. MOSELEY:  I have no further questions.

 4                    THE COURT:  Thank you, sir.  You may stand down,

 5   and you are excused.

 6                    THE WITNESS:  Thank you.

 7                    MS. BERNHARD:  We would offer Defendant's

 8   Exhibit 26 which is just a CD of the PowerPoint.

 9                    (Defendant's Exhibit 26 offered.)

10                    MS. MOSELEY:  I have no objections, Judge.

11                    THE COURT:  Admitted.

12                    (Defendant's Exhibit 26 admitted.)

13                    THE COURT:  Please call your next witness.

14                    MS. BERNHARD:  The Defense would call James

15   Aiken.

16                    THE COURT:  Let the record reflect this witness

17   has been sworn.

18                    Please proceed.

19                        JAMES AIKEN,

20   was called as a witness by the Defendant, and after having been

21   first duly sworn, testified as follows:

22                    DIRECT EXAMINATION

23   BY MS. BERNHARD:

24        Q.    State your name.

25        A.    My name is James Evans Aiken, A-i-k-e-n.
```

1      Q.    And, Mr. Aiken, what do you do?

2      A.    I'm President of James E. Aiken & Associates, Inc.

3      Q.    And what is -- what is James E. Aiken & Associates?

4      A.    It is a jail, prison, criminal justice consultant

5   concern.

6      Q.    And how long have you been doing that?

7      A.    Well, I've been in the prison and jail business for

8   approximately 40 years.  I started in 1971.

9      Q.    And what experience do you have in the -- the prison

10  industry, I guess?

11     A.    I'll be as quick as I can.  I began working -- the

12  South Carolina Department of Corrections at a medium

13  security --

14               COURT REPORTER:  I'm sorry, sir, I didn't hear

15  you.

16     A.    The South Carolina Department of Corrections at a

17  mini correctional institution which was a minimum security

18  prison.  I served in the capacity of a counselor in the

19  substance abuse program.  From there, I was promoted to the

20  rank of administrative assistant to the warden.  Back in those

21  days, people didn't know what an administrative assistant was

22  so they used me as an extra correctional officer.

23     Q.    What -- what was back in those days?  Can you give

24  us a time frame?

25     A.    1971, '72.

1      Q.    Okay.

2      A.    Many years ago.  From there, I was promoted to the

3   rank of deputy warden of that same facility.  I was in charge

4   of classification, security of inmates, interpreting policy,

5   implementing policy, literacy response, contraband control,

6   breaking up fights, disciplinaries, classification of inmate

7   population, emergency response, etcetera.  From there, I was

8   promoted to the rank of deputy warden of the State Penitentiary

9   in South Carolina.  This was the largest institution that

10  housed the most dangerous predatory inmate population within

11  the South Carolina criminal justice system, to include inmate

12  population that were pre-adjudicated, but the jails could not

13  provide the necessary security for that particular inmate.

14              It also housed death row population.  I was in

15  charge of interpreting policy, all aspects of the security

16  delivery system within the maximum and super maximum security

17  environment, as well as every aspect of administration and

18  discipline and classification of inmate population.  From

19  there, I was promoted to the rank of warden of the women's

20  prison in South Carolina.  I was the chief executive officer of

21  that facility in charge of classification, emergency response,

22  problematic delivery, administrative assistant, and all aspects

23  of a security delivery system of prison.  From there, I was

24  promoted back to the State Penitentiary as the warden.  I was

25  the chief executive officer of the prison there that I shared

1    with you a few moments ago, being the most dangerous predator

2    inmate population.

3                  Also, in that facility, it housed death row

4    population.  It was my responsibility to manage death row, as

5    well as carry out executions for -- against inmates as

6    prescribed by law.  I put two inmates to death personally in

7    that --

8         Q.    Mr. Aiken, does your experience also extend beyond

9    South Carolina?

10        A.    Yes.  I ran the Indiana correctional system.  That

11   included a juvenile and adults.  I was a member of the

12   governor's executive staff or cabinet as it relates to

13   operating that adult facility.  Also, I was Director of

14   Corrections for the United States Virgin Islands.  There was --

15   the systems that were diminished somewhat, and I was the fix it

16   guy to go in and change those systems around.

17        Q.    And do you have any particular knowledge or -- or

18   experience or familiarity with the Texas Department of Criminal

19   Justice?

20        A.    Yes, I do.  I was -- also served from 1985 until

21   about 1999, I guess, as a consultant with the U.S. Justice

22   Department National Institute of Corrections which provides

23   technical assistance to correctional professionals throughout

24   the United States and the agencies that they represent.  I

25   remember providing expert technical assistance to members of

1    the Texas Department of Corrections.  I also was appointed by

2    Congress for law that was passed, the Prison Rape Elimination

3    Commission, that it was signed into law by President George

4    Bush.  And I was one of nine members to which we held public

5    hearings and established standards.  One of the public hearings

6    that we held was -- was here in the state of Texas.

7                    MS. BERNHARD:  And may I approach?

8                    THE COURT:  You may.

9        Q.    (BY MS. BERNHARD)  I'm showing you Defendant's

10   Exhibit 27, and ask if you recognize that?

11       A.    Just looking over it, it represents my resume and

12   background materials.

13       Q.    And this basically summarizes and -- and gives even

14   more detail about some of the things you just shared with us?

15       A.    Yes, it does.

16                    MS. BERNHARD:  We would offer Defendant's

17   Exhibit 27.

18                    (Defendant's Exhibit 27 offered.)

19                    MS. MOSELEY:  I have no objection.

20                    THE COURT:  Admitted.

21                    (Defendant's Exhibit 27 admitted.)

22       Q.    (BY MS. BERNHARD)  Mr. Aiken, is it fair to say that

23   you have over a period of, I guess, 40 years a significant

24   amount of experience in prisons and assessing -- or classifying

25   inmates and -- and assessing risks of violence?

1        A.    That is correct.  I've managed -- I've classified

2   thousands and thousands of inmates, developed classification

3   systems, improved existing classification systems, as well as

4   to manage very disruptive predator inmate population.

5        Q.    Now, I also -- you also reviewed some -- some

6   records that particularly related to Matthew Johnson in this

7   case; is that correct?

8        A.    That is correct.

9        Q.    Can you just summarize what you reviewed in this

10  case?

11       A.    I evaluated his jail records, his prison records,

12  some information related to previous convictions or criminal

13  activity in the community, as well as a brief overview of the

14  current proceeding.

15       Q.    Mr. Aiken, based on your experience, what factors

16  make an inmate dangerous?

17       A.    Looking at his age is very important.

18       Q.    How is that important?

19       A.    Well, I use myself as an example.  I'm not the

20  person I was when I was 17 years old.  As an inmate, a person

21  ages faster in this abnormal environment we call a prison.  And

22  based on thousands and thousands of evaluations I've conducted

23  on the management of high security inmates, I found that the

24  drop-off is about mid-30s, early 30s that a person begins to

25  become more compliant, so age is a very important --

1     Q.   What else is a factor?

2     A.   Involvement in to STGs, which is security threat

3 groups, is a very important aspect of it.

4     Q.   Is that what we commonly refer to as gangs?

5     A.   Yes.  As well as a person's educational level,

6 previous criminal history, as well as previous adjustment in

7 the abnormal environment we call jail or prison, that behavior.

8     Q.   Now, you have reviewed Matthew Johnson's records

9 relating to all those factors?

10    A.   That is correct.

11    Q.   And how does he fare on -- on those factors?

12    A.   He fares low on the factors of providing unusual

13 risk to staff, inmates, or the general public.

14    Q.   Now, you're aware that in his records when he had a

15 prior prison stay back in 2005, he was involved in a fist fight

16 that resulted in rather serious injuries to the other inmate?

17    A.   If I recall correctly, there was a fist fight

18 between the two and there were stitches that were received,

19 yes.

20    Q.   Does that not tell you he's going to be violent in

21 the future?

22    A.   Not necessarily, because you have to look at the

23 number of them, the intensity of it, and other factors that are

24 involved, such as whether weapons were involved, whether this

25 was a gang issue, whether it was a fight over contraband,

1  etcetera, or is it sexual intercourse or sexual involvement

2  within a prison environment.  Those are many factors that you

3  have to consider as a warden to determine whether or not this

4  person can adequately be managed.

5       Q.   And you didn't see any of those factors that would

6  indicate that -- the fight was -- was problematic as far as his

7  risk for violence in the future?

8       A.   That is correct, not only from the fight itself, but

9  also the nature of the response.

10      Q.   And did you also see in -- in reviewing Mr.

11  Johnson's records that after that fight, did he have any other

12  serious disciplinary problems in prison?

13      A.   No, he did not.  And you may say a fight is serious,

14  yes, it's serious, but there can be more intensive issues that

15  occur within a correctional environment to which I've had to

16  manage before, much more.

17           MS. BERNHARD:  I'll pass the witness.

18                    CROSS-EXAMINATION

19  BY MS. MOSELEY:

20      Q.   Sir, you've never worked in a Texas prison; is that

21  right?

22      A.   That's correct.

23      Q.   And -- but you certainly are aware that violence

24  occurs in prison?

25      A.   That is correct.

1      Q.    There are weapons in prison available to the

2   inmates, they make them?

3      A.    That is correct.

4      Q.    Escapes happen, even in high security prisons?

5      A.    That is correct.

6      Q.    You, I'm certain, would agree that a person who's

7   been in a fight in a prison setting previously would be more

8   likely to get in a fight in a prison setting in the future?

9      A.    Not necessarily so.  They may get in a fight in the

10  future.  Also, they may be victimized in the future, depending

11  on who they fight with, for example.

12     Q.    Which is a security concern in the penitentiary, in

13  general, isn't it?

14     A.    Always a concern.  And if anyone tells me that they

15  don't have any escapes, don't have any weapons, don't have any

16  contraband in their institutions, I'm not going in those

17  institutions.  I'm never satisfied that their institution's

18  eradicated of those issues.  The minute that you believe that

19  they are, is you open up yourself for a critical event.

20     Q.    Right, because prison -- prisons do the best job

21  they can to control violence, correct?

22     A.    And they do a good job at it, yes.

23     Q.    But it certainly doesn't mean that -- that prison

24  violence doesn't exist?

25     A.    And the potential for that does not exist.  I agree

```
 1   with you.

 2        Q.    And, in fact, murders happen in prison?

 3        A.    That's correct.

 4        Q.    Even though the guards are doing their best to

 5   prevent it?

 6        A.    Corrections staff is constantly involved with

 7   eradication and prevention of critical events.  Just look at

 8   the magnitude of people that are incarcerated and the offenses

 9   that occur in the community and compare it to their behavior in

10   a prison setting, it's fairly minuscule.

11        Q.    They find drugs in prison on a daily basis, don't

12   they?

13        A.    And when they don't, I'm not satisfied.

14        Q.    I guess that's a yes, they do?

15        A.    Yes, they do.  Yes, and --

16        Q.    And they find weapons on a daily basis in the

17   penitentiary?

18        A.    That is correct.  And if they don't, I'm upset.

19        Q.    And cell phones are found on a daily basis?

20        A.    That's correct.

21        Q.    You're just here, I guess, to tell the jurors that

22   this Defendant can be controlled and won't be one of those

23   people that has drugs or cell phones or -- or commits violence

24   in prison?

25        A.    He's at the lowest end of the people that I've
```

1  classified and managed over the last 40 years.  He doesn't fit

2  anywhere near the medium or the high level that I would be

3  evaluating in managing the type of offenders such as that.

4       Q.   Have you ever testified that a defendant on trial

5  would be a high risk that the prison couldn't control him?

6       A.   Believe it or not, yes, I have.  I had one case in

7  which -- I don't know why the lawyer said it.  I told them that

8  this person is the highest level of causing a critical event in

9  a prison setting, that correctional staff would manage him, if

10 necessary, to include the application of lethal force.  And he

11 let me testify.  There are many other -- or should I say there

12 are other attorneys that I have given my opinion and they told

13 me, don't come to the courthouse.

14      Q.   So you -- you testified -- I want to make sure I

15 understand -- that the person was a high risk and could not be

16 controlled by the prison or could be controlled?

17      A.   I think my exact words, and I stand corrected, is

18 he's at the highest risk of a probability of causing a critical

19 event.

20      Q.   But could be controlled by the penitentiary?

21      A.   Had to be controlled obviously, but he was at a very

22 high risk.

23      Q.   And certainly -- who was that?  Do you remember who

24 that was?

25      A.   I don't remember the name.

1     Q.    What was it about that person that made him the

2   highest risk?

3     A.    If I remember correctly, within a brief period

4   before his trial he had taken hostages.

5     Q.    And hostage taking is obviously a risk?

6     A.    It's a risk.  I've been in hostage situations

7   before.  In fact, I've ordered a sniper to kill an inmate in a

8   hostage situation, and the inmate was killed.

9     Q.    But you can't testify to this jury that Matthew

10  Johnson won't be taking hostages, can you?

11    A.    I don't have a crystal ball, but looking at his

12  record and based on classifying thousands and thousands of

13  inmates, I don't see anything necessarily pointing to that.  On

14  top of that, the correctional system can anticipate and manage

15  this behavior if it is ever demonstrated.

16    Q.    Right.  So once it happens, the prison would respond

17  appropriately?

18    A.    Well, we -- we are more proactive than that.  We

19  look at a person's previous record.  We look at the behavior

20  patterns, and we are just people in their security envelope, as

21  I call it, for that.  For him, he's a convicted murderer.  He's

22  going to always be -- the first thing you look at is what he

23  did when you classify him, and that will be with him as long as

24  he lives and that places him in the high security envelope.

25    Q.    You're familiar with G3 versus ad seg?

```
 1        A.    Ad seg or G5, yes, generally speaking.

 2        Q.    You understand that this Defendant, there's been

 3   testimony in front of the jury that he -- assuming he receives

 4   a life sentence, would go in as a G3?

 5        A.    Well, he -- he would probably be a G3, a G4, or G5,

 6   depending on his behavior, but the point is that there's a

 7   difference between --

 8              MS. MOSELEY:  Judge, I'm going to object as

 9   nonresponsive.

10              THE COURT:  Sustained.

11        Q.    (BY MS. MOSELEY)  There's been testimony he'll go in

12   as a G3 and he'll remain a G3 unless and until he does

13   something that requires a higher classification?

14        A.    And I don't necessarily just agree with that.

15        Q.    A warden of a Texas penitentiary who is currently

16   working in the Texas system would certainly know more about

17   that than you would?

18        A.    Well, generally speaking, for that particular aspect

19   of it, but what I am saying to you is behavior dictates --

20              MS. MOSELEY:  Judge, I'm sorry.  Again, I'm

21   going to ask --

22              THE COURT:  Sustained.

23              THE WITNESS:  Okay.  I'm sorry.

24        Q.    (BY MS. MOSELEY)  You're just going to have

25   to answer the question.
```

1          A.    I thought I did, but --

2          Q.    You did.  A warden would know better than you would

3    about where somebody would go and the conditions upon which

4    they would serve that sentence?

5          A.    I wouldn't have a disagreement with them, him being

6    a G3 based on his behavior.

7                    MS. MOSELEY:  That's all I have.

8                    THE COURT:  Thank you, sir.  You may -- any more

9    questions, Ms. Bernhard?

10                   MS. BERNHARD:  Nothing further.

11                   THE COURT:  Thank you, sir.  You may stand down,

12   and you are excused.

13                   THE WITNESS:  Thank you, Your Honor.

14                   THE COURT:  May I see the lawyers.

15                   (Sidebar conference, discussion off the record.)

16                   THE COURT:  Will the Defense please call their

17   next witness?

18                   MS. BERNHARD:  Ladies and gentlemen of the jury,

19   the Defense rests.

20                   (Defense rests.)

21                   THE COURT:  All right.  Members of the jury,

22   we're going to take our mid-morning recess.  I'm hoping that

23   we'll be ready to go at 10:15, but it may be a little bit later

24   than that.

25                   THE BAILIFF:  All rise.

```
 1                    (Jury excused from courtroom.)

 2                    THE COURT:  Please be seated.

 3                    (Recess.)

 4                    THE COURT:  All right.  We're on the record

 5    outside the presence of the jury.

 6                    The State intends to offer the in-car video of

 7    the deceased in this case and the subsequent interview of her

 8    by one of the patrol officers.

 9                    What says the Defense about that?

10                    MS. BERNHARD:  Your Honor, we would object to

11    that as -- first off, it's not in rebuttal to anything that we

12    have presented in our case-in-chief, so we would argue it's

13    improper rebuttal.

14                    We would further argue that her statements are

15    hearsay and violate the right to confrontation.  We would

16    object to the relevance of it at this point.  And furthermore,

17    under Rule 403, we would object.

18                    THE COURT:  Ms. Moseley.

19                    MS. MOSELEY:  Your Honor, this is proper

20    rebuttal.  There has been at least a day and a half of

21    testimony from the Defendant and his family about the impact

22    this crime and the potential sentence will have on him and his

23    family.  And I believe under the law, we're entitled to present

24    victim impact testimony so that the jury has something to weigh

25    as it relates to Special Issue 2 and the mitigation.  The
```

```
 1  question is, is it sufficiently mitigating, and the impact on

 2  the victim is certainly relevant to that.

 3              I would also argue as to the hearsay objection

 4  that it is a dying declaration, and that by the Defendant

 5  setting her on fire and causing her death, he's waived a

 6  confrontation argument.

 7              And as to 403, I think the Court should watch

 8  the video, but it would be -- certainly before making the

 9  ruling, we would ask the Judge to watch the video to make that

10  determination, but there's nothing more probative as to the

11  impact of this crime on the victim than the jury being able to

12  see it themselves.

13              THE COURT:  All right.  Are you prepared to show

14  the videotape?

15              MS. MOSELEY:  Yes, Your Honor.

16              (Discussion of the record.)

17              MS. MOSELEY:  And just so the record is clear,

18  this is marked as State's Exhibit 187.

19              (State's Exhibit 187 offered.)

20              MS. BERNHARD:  And if I -- if I could just

21  respond.  As far as any victim impact arguments, we would refer

22  the Court to our pretrial motion and the constitutional and

23  statutory objections contained in that motion.

24              THE COURT:  Thank you.

25              MS. MOSELEY:  Are you ready, Judge?
```

```
 1                   THE COURT:  Yes, ma'am.

 2                   MS. MOSELEY:  Judge, this is the second video

 3   that plays at the end, and it does not have sound.  It is

 4   strictly audio.  For whatever reason, the sound wasn't working

 5   in this car, so it's a very short video, just of them pulling

 6   in.

 7                   (Exhibit published.)

 8                   MS. MOSELEY:  I suppose there is sound on this

 9   video, and I had forgotten it.  The reason that this video is

10   on here is because in the first video you're not able to see

11   the victim and the condition she was when she was standing on

12   the porch.

13                   THE COURT:  All right.  After reviewing the

14   video, the Defendant's objections are overruled.  The videotape

15   is admitted.

16                   (State's Exhibit 187 admitted.)

17                   MS. BERNHARD:  And for the record, the pretrial

18   motion that I referenced regarding victim impact, I believe,

19   was Motion Number 51.

20                   THE COURT:  Thank you.

21                   MS. BERNHARD:  And our objection would apply to

22   both videos.

23                   THE COURT:  Thank you.

24                   All right.  If we can get the jury lined up,

25   please.
```

```
 1                    MS. MOSELEY:  I think my first witness, Your
 2   Honor, has maybe just run to the restroom.  She should be right
 3   back, though.
 4                    THE COURT:  Okay.
 5                    THE BAILIFF:  All rise.
 6                    (Jury returned to courtroom.)
 7                    THE COURT:  Please be seated.
 8                    Please proceed.
 9                    MS. MOSELEY:  Your Honor, in rebuttal the State
10   would call Kelley Nelson.
11                    THE COURT:  Please raise your right hand.
12                    (Witness sworn.)
13                    THE WITNESS:  Yes.
14                    THE COURT:  Thank you.
15                         KELLEY NELSON,
16   was called as a witness by the State, and after having been
17   first duly sworn, testified as follows:
18                    DIRECT EXAMINATION
19   BY MS. MOSELEY:
20       Q.   Ma'am, will you please introduce yourself to the
21   members of the jury?
22       A.   I'm Kelley Nelson.
23       Q.   And your first name, spell that for the court
24   reporter.
25       A.   K-e-l-l-e-y.
```

```
 1        Q.    And Nelson is N-e-l-s-o-n?

 2        A.    Yes.

 3        Q.    What do you do for a living?

 4        A.    I'm a registered nurse.

 5        Q.    How long have you been a registered nurse?

 6        A.    A little over three years.

 7        Q.    Where do you work now?

 8        A.    I work in Minneapolis at a Children's Hospital in

 9   the Pediatric ICU.

10        Q.    And before that, where did you work?

11        A.    I worked at Parkland Hospital in the Burn Intensive

12   Care Unit.

13        Q.    How long did you work in the Burn Intensive Care

14   Unit?

15        A.    Two years.

16        Q.    Just very briefly, as a nurse in the Burn Unit --

17   and we'll kind of shorten it to Burn Unit -- what were your

18   responsibilities?

19        A.    We would monitor critically ill burned victims,

20   monitor vital signs, monitor the vital organ functions, we'd do

21   wound cares, administer medications, and use interventions to

22   help support the body, such as ventilator support, medications

23   that can support your blood pressure, a number of different --

24        Q.    Did you -- when you were working at the Burn Unit,

25   how many patients did you -- were you responsible for at a
```

1    time?

2        A.    One or two.

3        Q.    These are patients generally that need a lot of

4    attention one-on-one from a nurse?

5        A.    Yes.

6        Q.    Were you involved in treating Nancy Harris while she

7    was at Parkland?

8        A.    I was.

9        Q.    And was that a one-on-one kind of care?

10       A.    Yes.

11       Q.    As a nurse, do you also concern yourself with kind

12   of comforting the patient, sitting with the patient, talking to

13   them?

14       A.    Absolutely.  In the Burn Unit, there are really

15   strict regulations on visiting hours, so a lot of the time

16   you're the only person in the room with the patient.  And

17   there's a lot going on with ICU status patients, so it's pretty

18   much a continual presence.

19       Q.    And while she was there in the hospital, is it safe

20   to say that there was a lot -- there were lots of monitors and

21   equipment she was hooked up to, to kind of keep track of her

22   condition?

23       A.    Yep, we were continuously monitoring all of her

24   vital signs.  She was ventilated.  And she was receiving

25   intensive care measures.

1      Q.    Were you -- were you responsible for kind of

2   monitoring her pain?

3      A.    Yes.

4      Q.    And -- and part of your job is to keep the patient

5   as comfortable as you can; is that fair?

6      A.    Yes.

7      Q.    Was she in pain?

8      A.    Yes, at times.  It's inevitable burn patients feel

9   pain.  We do our best to try to control it, but it's

10  unfortunately something that -- that she did experience.

11     Q.    She was not able to talk to you; is that right?

12     A.    No, she had a -- a breathing tube in.

13     Q.    How -- how could she communicate with you -- how did

14  you know if she was in pain?

15     A.    We use scales in nursing like a non-verbal pain

16  scale where we can kind of score pain based on how the patient

17  is acting or like body language, emotion.  We also -- with Ms.

18  Harris specifically, I was able to ask her yes or no questions

19  and she was able to respond to me appropriately to -- questions

20  that she would know the answer to, so I knew that she was

21  cognizant, and I would be able to ask her yes or no if she was

22  in pain or not.

23     Q.    So she -- she was intellectually, at least, aware of

24  her surroundings?

25     A.    Yes, she was.

1    Q.   And able to communicate with you with hand signals

2  and --

3    A.   Yes.

4    Q.   -- and nods?

5    A.   Yes.

6    Q.   I'm going to take you back to May 23rd of 2012.  You

7  were caring for her that day, that was your shift?

8    A.   Yes.

9    Q.   What -- how was her condition that day?

10    A.   She was in critical condition.

11    Q.   Did -- did she express any concerns to you about her

12  prognosis?

13    A.   She did.  She attempted to communicate to me by

14  using her finger and writing in the air, and she spelled out

15  the word die, d-i-e.  I clarified that that's what she had

16  spelled out to me, and she nodded, yes.  I then asked her a

17  series of questions just trying to figure out what she was

18  getting at.  And she was nodding yes or no.  She nodded yes to

19  the question, are you wondering if you are going to die.

20    Q.   And she said what?

21    A.   And she nodded yes to that question.  And from

22  there, I responded by explaining what we were doing to help

23  support her body, that we were -- she had a tube going into her

24  airway to help her breathe, that we were giving her medications

25  to help keep her blood pressure elevated.  It had been low

 1   without it.  We were giving her continuous insulin infusions to

 2   control her blood sugar, and just various measures and why we

 3   were doing that, the reasoning behind it.

 4       Q.    And did she respond to you when you indicated what

 5   all you were doing to try to help?

 6       A.    Yeah.  While I was explaining the intervention, she

 7   was shaking her head no.  And I asked her if she was having

 8   concerns about us providing these interventions for her, based

 9   on her -- her living will out of the hospital, and she nodded

10   yes.  And so I responded back telling her that we were aware

11   that she had a living will outside of the hospital.  We were

12   waiting on some family to arrive from, I believe, out of state.

13   And we were still working on coordinating a care conference

14   between Dr. Hunt, the burn team, her family, and herself where

15   we could discuss that option.

16       Q.    And after that -- I call it a conversation.  She

17   wasn't able to speak, but she was communicating with you?

18       A.    Yes, she was.

19       Q.    You -- you understood that to mean that she wanted

20   her do not resuscitate -- her living will to be abided by?

21       A.    Yeah.  It appeared to me she didn't want all the

22   interventions that we were providing for her.

23       Q.    And were you on duty when Ms. Harris finally passed

24   away?

25       A.    No.

```
 1        Q.    Your shift had ended?

 2        A.    Yes.

 3        Q.    These -- this conversation that you've told us about

 4   today and your recollection, you -- you made notes of that in

 5   her medical record?

 6        A.    Yes.

 7        Q.    And those records are in evidence.

 8              MS. MOSELEY:  Thank you, ma'am.  That's all I

 9   have.  I'll pass the witness.

10              MS. BERNHARD:  No questions.

11              THE COURT:  Thank you, ma'am.  You may stand

12   down, and you are excused.

13              MS. MOSELEY:  Finally excused?

14              THE COURT:  Yes, ma'am.

15              MS. MOSELEY:  The State calls Officer Simon.

16              (Witness brought forward and sworn.)

17              THE COURT:  Sir, have you testified previously

18   in this trial?

19              THE WITNESS:  No, ma'am.

20              THE COURT:  Please raise your right hand.

21              (Witness sworn.)

22              THE WITNESS: Yes, I do.

23              THE COURT:  Thank you.

24                    ANTHONY SIMON,

25   was called as a witness by the State, and after having been
```

```
 1  first duly sworn, testified as follows:

 2                      DIRECT EXAMINATION

 3  BY MS. MOSELEY:

 4      Q.    Would you please introduce yourself to the members

 5  of the jury once you're in that chair?

 6      A.    Officer Anthony Simon.

 7      Q.    You work for the Garland Police Department?

 8      A.    Yes, ma'am.

 9      Q.    How long have you worked for them?

10      A.    Twenty years.

11      Q.    As a patrol officer all those 20 years?

12      A.    Yes.

13      Q.    And the jury has already heard from Officer Coffey

14  who testified last week.  Were you working with Officer Coffey

15  on the morning of May 20th, 2012?

16      A.    Yes, I was.

17      Q.    And were you the officer that was sitting across the

18  street with him by what we've called the plasma center?

19      A.    Yes, ma'am.

20      Q.    While you and Officer Coffey were sitting over there

21  at the plasma center, I guess, discussing the alarms that had

22  been going off in the area --

23      A.    Yes.

24      Q.    -- what did you see?

25      A.    We saw what appeared to be a fire in the gas station
```

1  across the street from where we were at, and it flickered and

2  moved.

3        Q.    Did you and Officer Coffey kind of discuss that very

4  briefly?

5        A.    Yes, we did.

6        Q.    And then --

7        A.    We drove to the store to see what it was.

8        Q.    And you're in two separate cars?

9        A.    Yes, ma'am.

10       Q.    Both of your cars had cameras in them?

11       A.    Yes.

12       Q.    And those cameras not only are capable of recording

13 but, in fact, did record what you saw, what you observed, and

14 what you heard when you pulled into that parking lot?

15       A.    Yes, ma'am, they did.

16       Q.    And you've had an opportunity to watch the videos --

17 the recordings from both your car, as well as Officer Coffey's

18 car?

19       A.    Yes, ma'am.

20       Q.    And those recordings are accurate as to what you

21 saw?

22       A.    Yes, they are.

23       Q.    And heard?

24       A.    Yes, ma'am.

25       Q.    When you pulled into the -- were you the -- were you

```
 1  the car in front or the car behind at the light?

 2      A.    Behind.  It was the second car.

 3      Q.    And those overhead lights, when you turn on the red

 4  and blue lights on the top of the car, that's what signals the

 5  camera to come on?

 6      A.    Yes, ma'am.

 7      Q.    When you got into the parking lot, did you make

 8  contact with Ms. Harris?

 9      A.    Yes, I did.

10      Q.    And we are going to watch those videos and listen to

11  the sound.  That's your voice we hear communicating with Ms.

12  Harris about what had happened to her?

13      A.    Yes, ma'am.

14      Q.    Did you stay with Ms. Harris there talking to her

15  until the paramedics arrived and took her to the hospital?

16      A.    Yes, ma'am, I did.

17      Q.    Did you assist in trying to locate the Defendant

18  who's been convicted of her capital murder?

19      A.    By way of gathering information through Ms. Harris.

20            MS. MOSELEY:  May I approach the witness, Your

21  Honor?

22            THE COURT:  You may.

23      Q.    (BY MS. MOSELEY)  I'm showing you what's marked for

24  identification as State's Exhibit 187.  Is that the video that

25  you watched earlier that we just talked about?
```

1        A.    Yes, ma'am.

2        Q.    And no changes have been made to this from what

3    actually happened that day?

4        A.    No, ma'am.

5                    MS. MOSELEY:  I'd offer State's Exhibit 187.

6                    (State's Exhibit 187 offered.)

7                    MS. BERNHARD:  Subject to our previous

8    objections.

9                    THE COURT:  Admitted.

10                    (State's Exhibit 187 admitted.)

11                    MS. MOSELEY:  Permission to publish to the jury,

12    Your Honor?

13                    THE COURT:  You may.

14                    (Exhibit published.)

15        Q.    (BY MS. MOSELEY)  Officer, this is the video from

16    your car or Officer Coffey's car that we're looking at now?

17        A.    Officer Coffey.  He's the first car.

18                    MS. MOSELEY:  I'll pass the witness.

19                    MS. BERNHARD:  No questions.

20                    THE COURT:  Thank you, sir.  You may stand down,

21    and you are excused.

22                    MS. MOSELEY:  The State calls Elizabeth Harris.

23                    MS. BERNHARD:  Your Honor, we're going to object

24    to the testimony based on the basis of Pretrial Objection 51.

25                    THE COURT:  Your objection is overruled.

```
 1                    MS. MOSELEY:  She's in the restroom.  She should
 2   be on her way.
 3                    THE COURT:  All right.
 4                    (Witness brought forward.)
 5                    THE COURT:  Ma'am, would you raise your right
 6   hand.
 7                    (Witness sworn.)
 8                    THE WITNESS:  Yes, ma'am.
 9                    THE COURT:  Thank you.
10                    ELIZABETH HARRIS,
11   was called as a witness by the State, and after having been
12   first duly sworn, testified as follows:
13                    DIRECT EXAMINATION
14   BY MS. MOSELEY:
15        Q.    Would you please introduce yourself to the members
16   of the jury?
17        A.    My name is Elizabeth Harris, H-a-r-r-i-s, and Nancy
18   was my mother-in-law.
19        Q.    Your mother-in-law?
20        A.    Yes.
21        Q.    Who are you married to?
22        A.    I'm married to her youngest son, Chris.
23        Q.    And he's here?
24        A.    Yes.  He's in the blue polo shirt, there.
25        Q.    Can you just briefly tell the members of the jury
```

1  who else is here from Ms. Harris's family?

2      A.   Yes.  Starting on the second row, we have Caleb and

3  Shelby, who are Scot's -- well, Shelby is Scot's daughter and

4  then Chris, my husband.  And then my mom is on the very end.

5  And then Jennifer, who is John's daughter.  Brianna and her

6  husband, who are Scot's daughter and son-in-law.  And Brian.

7  And then John and his wife Marie.

8      Q.   And Brian is another son of Ms. Harris?

9      A.   Yes, Brian is the middle son.  Well, there's three

10  and there's 13 years and then it's my husband.  So it's -- he's

11  the middle son.

12      Q.   And you said that there were three -- Ms. Harris had

13  three sons?

14      A.   Yes.

15      Q.   And then there was how much age difference?

16      A.   Thirteen years, and then my husband was born.

17      Q.   How long -- how long did you know Ms. Harris?

18      A.   Well, let's see, this year is going to be 2013, so

19  I've been married for 13 years, and I've known her for about

20  three years before that, so about 16 -- 15, 16 years.

21      Q.   Did you and Ms. Harris have a close relationship?

22      A.   Yes, very close.  She actually frequently joked

23  that -- my husband joked that she liked me better than him, so

24  I got very big Easter baskets and he got tiny little puny ones.

25      Q.   You and Ms. Harris probably spent more time with

```
 1  each other than she did with her sons?
 2       A.   Frequently, yes.  I would call him up and say, call
 3  your mother.  We spent a lot of time together.  We lived at her
 4  house for a period of time.
 5       Q.   How many children do you have?
 6       A.   I have three girls.
 7       Q.   What are their names?
 8       A.   Lorelei is about to be 12.  Hanna just turned 10,
 9  and Olivia is six and a half.
10       Q.   Do you and Chris and your daughters live near where
11  Ms. Harris lived?
12       A.   We live in Mesquite, about 15 minutes away.
13       Q.   And did your children spend a lot of time with their
14  grandmother?
15       A.   Every Friday for the most part they would have Mimi
16  day, and she would pick them up from preschool.  It started at
17  -- and then she would pick them up.  I would drop them off
18  after school and they would -- well, they would always go to
19  Dollar Tree and they would always go to McDonald's and she let
20  them get Happy Meals.  I never did.  And she would get them
21  Happy Meals, and then they'd go back to the house and just talk
22  and watch TV.  They'd do crafts.  She'd push them on the swing
23  forever, so --
24       Q.   Was she a good grandmother?
25       A.   She was amazing.
```

1        Q.    Do your children miss her?

2        A.    Yes, quite a bit.  My daughter told me in the car on

3   Monday, she missed her Mimi a lot, and my little one just -- I

4   don't think she understands how much -- I mean, she misses her.

5        Q.    Are they aware of what happened?

6        A.    Yeah.  The oldest one, Lorelei, she knows.  She

7   knows a lot about it.  The youngest who we told them very

8   briefly that she was really hurt and that there wasn't anything

9   they could do to help her, so they know, yeah.

10       Q.    How did you find out what happened to Ms. Harris?

11       A.    Well, my kids also spent the night at my mom's house

12  on either Friday or Saturday.  And sometimes I'd pick them up

13  from my mother-in-law, Nancy's house, and I would take them to

14  my mom's house and they could spend Friday.  But on this

15  particular one they had spent Sunday at my -- or Saturday

16  night, I'm sorry, with my mom.  And I had to go pick them up so

17  that she could go to work.  And so at the time Chris was

18  working very -- he was working two jobs.  He was working at a

19  movie theater so he would get home at 3:00 or 4:00 in the

20  morning.

21             So I would -- I got up in the morning and I went

22  to go pick them up and I got a call from my sister who's

23  hysterical.  And my sister doesn't cry, ever.  And she said:

24  Where is Nancy?  I said:  She's at work.  Why?  You need to

25  call her.  I know she's not going to answer the phone because

```
 1    she doesn't.  She would very rarely answer the phone when she
 2    was at work.  And I said -- she said, you need -- you need to
 3    find her.  And I said:  Okay.  What's going on?  She said that
 4    her husband had come on shift for the Garland Fire Department
 5    and gotten -- he had heard a call and he couldn't remember --
 6    about what had happened and he had no idea which fire station
 7    she worked at -- gas station she worked at, so I came.  I
 8    called my mom, and I was very alerted because my sister never
 9    cries.  So I called my mom, and I said, watch the kids or get
10    my dad to watch the kids, take them grocery shopping, if
11    necessary.  I don't care.
12                 So I drove to her station, and as soon as I came
13    over the hill on Broadway, there was fire trucks and
14    ambulances.  Just the sirens everywhere.  And so I pulled up
15    and I jumped out of my car and I demanded to know -- and I
16    don't even remember which officer was there, but that's how I
17    found out.  And they told me that -- well, at first, I thought
18    it was okay because they said, oh, she's walking and talking
19    and will go -- you can go to Parkland.  It's no big deal.  And
20    the reason they told me that is because they didn't want me to
21    get in a wreck and panic on the way.
22         Q.    So she had already been taken to Parkland?
23         A.    She was gone when I got there.  I would guess it was
24    9:30, but I couldn't tell for sure.  I had no idea.
25         Q.    This was early on a Sunday morning?
```

```
 1        A.    Early on a Sunday morning.
 2        Q.    You said your husband at that time was working two
 3   jobs?
 4        A.    Yeah.
 5        Q.    Did you go to Parkland?
 6        A.    I went straight to Parkland.
 7        Q.    I assume you tried to contact other family members?
 8        A.    I called everybody whose phone number I had.  I
 9   called Scot, Shelby.  I called John, Maureen, what I thought
10   was Jennifer's number; I called my husband, but he had turned
11   his phone off, so he didn't hear.  So I called my kids' soccer
12   coach, and I said, I need you to bang on the door as hard as
13   you can.
14        Q.    To wake your husband up?
15        A.    Uh-huh.
16        Q.    Yes?
17        A.    Yes, ma'am.  I'm sorry.  And then they couldn't wake
18   him up.  After about two hours, I called my sister and I said,
19   break the door down if you have to, I don't care.  Break it
20   down.  That was after I got to Parkland.
21        Q.    When you got to Parkland, were you the first family
22   member there?
23        A.    Yes.
24        Q.    Were you able to see your mother-in-law?
25        A.    No.  They were still working on her at the time.
```

```
 1        Q.    How long was it before you were able to see her?
 2        A.    Well, about an hour, hour and a half after I got
 3   there, they said that we could see her.  But by that time all
 4   the family was there.  And so honestly, I didn't want to see
 5   her because I already heard the descriptions from the doctor,
 6   and so I let all of them go first so that I could wait and see.
 7   I waited for them to go.  Some of the grandkids had come by
 8   that point.  She has a lot of older grandkids.
 9        Q.    She has great grandchildren?
10        A.    Yeah, she does.  She didn't -- she didn't get to
11   meet -- they came from California and moved back.  She didn't
12   get to see them -- but the twins, she didn't get to see them.
13        Q.    Did you ever get to talk to her again?
14        A.    No, not that she could respond.
15        Q.    We've heard that there was a family discussion, a
16   meeting with the doctors and a decision to discontinue the
17   treatment?
18        A.    Yeah.
19        Q.    Is that what she would have wanted?
20        A.    Yeah, we had multiple discussions.  That would be
21   about 12 -- no, about 10 years ago, she -- she was doing her
22   will and her DNR order, and we had multiple discussions.  She
23   didn't -- she did not want to be suffering.  And actually when
24   I first saw her, I said, she's going to be so mad.  She doesn't
25   have her teeth in.  She's going to be furious, because she
```

```
 1  wouldn't want to be seen without her hair done and her makeup
 2  on and her teeth in and she would not want that.  It's just not
 3  her.
 4         Q.   Do you miss her?
 5         A.   Yes.  She was a good -- she was a great person.  She
 6  was there when my oldest was born.  We were all in the room
 7  reading books while I was in labor with her.  She watched
 8  Hanna -- I mean, she watched Lorelei when I went to the
 9  hospital with Hanna.  And the day I had Olivia she was watching
10  Lorelei and Hanna when my water broke and she -- I called her
11  up and I said, I'm sorry, you have to watch them a little bit
12  longer.  I have to go to the hospital, and she said, oh, yay,
13  I'm so excited.
14                 MS. MOSELEY:  I'll pass the witness.
15                 MS. BERNHARD:  No questions.
16                 THE COURT:  Thank you, ma'am.  You may stand
17  down.
18                 MS. MOSELEY:  The State rests.
19                 (State rests.)
20                 THE COURT:  What says the defense?
21                 MS. BERNHARD:  Defense closes.
22                 (Defense closes.)
23                 MS. MOSELEY:  Close.
24                 (State closes.)
25                 THE COURT:  All right.  May I see the lawyers,
```

```
 1  please?
 2                  (Sidebar conference, discussion off the record.)
 3                  THE COURT:  All right.  Ladies and gentlemen,
 4  we're going to be in recess for the day.  The lawyers and I are
 5  going to prepare the Court's charge that I will read to you
 6  tomorrow morning.  You'll hear arguments of counsel again, and
 7  then you will retire to deliberate.
 8                  You are not going to be allowed to separate, so
 9  just to be completely cautious, we're going to ask you to bring
10  an overnight bag, so that we can take you to a hotel where you
11  will stay for the night if you don't reach a verdict
12  tomorrow -- by tomorrow.  At the end of the business day
13  tomorrow, and -- off the record.
14                  (Discussion off the record.)
15                  THE COURT:  Okay.  If you would wait around so
16  we find out how we're going to facilitate that, I'd appreciate
17  it.  We'll see you in the morning at 8:45, and please be
18  prepared to spend the night.
19                  THE BAILIFF:  All rise.
20                  (Jury excused from courtroom.)
21                  THE COURT:  The gallery may be seated.
22                  (Discussion off the record.)
23                  THE COURT:  Okay.  We're on the record outside
24  the presence of the jury.
25                  The State has prepared a Court's charge.
```

```
 1                   Has the Defense had an opportunity to review the

 2   Court's charge?

 3                   MS. BERNHARD:  We have.

 4                   THE COURT:  And what are your objections?

 5                   (Objections to the charge.)

 6                   MS. BERNHARD:  The second paragraph of the

 7   charge, we would ask that it -- that confinement in the

 8   Institutional Division of the Texas Department of Criminal

 9   Justice for life without parole be before death, since that is

10   the presumption.

11                   THE COURT:  Okay.  That's granted.

12                   MS. BERNHARD:  We would -- on page 3 of 7, the

13   fifth paragraph under instructions regarding both special

14   issues, we would object to that final sentence:  You may and

15   should deliberate for as long as you feel is necessary.  We'd

16   object to that.

17                   MS. WOMBLE:  Would you be able to state why you

18   object to that?

19                   MS. BERNHARD:  Because I think it's unduly

20   coercive, and -- and it's -- it doesn't have a real basis in

21   the law at this point.

22                   THE COURT:  All right.  That's granted.

23                   MS. BERNHARD:  Then we would object to that next

24   paragraph:  You are not to be swayed by mere sentiment,

25   etcetera, that whole sentence, as violating Mr. Johnson's
```

1 Fifth, Sixth, Eighth, and Fourteenth Amendments in that it

2 inhibits the jurors' ability to consider proper mitigating

3 evidence.

4                MS. WOMBLE:  The State would object to removing

5 that.  It was in the guilt/innocence charge, and it goes along

6 with the instructions that instruct the jury to follow the law.

7 And mitigating evidence has to be based on the evidence, not on

8 emotion, so we would object to removing that passage.

9                THE COURT:  All right.  That objection is

10 overruled.

11                MS. BERNHARD:  Then we would direct the Court's

12 attention to Pretrial Motion Number 63, paragraph one of that.

13 We waive, with the exception of the second paragraph of the

14 bold language that states:  Furthermore if you find the

15 Defendant committed one or more unadjudicated extraneous

16 offenses --

17                THE COURT:  I'm sorry.  I don't know where you

18 are.

19                MS. BERNHARD:  I'm sorry.

20                MS. WOMBLE:  She's on the actual motion itself.

21                MS. BERNHARD:  Motion Number 63.

22                THE COURT:  Oh, oh, oh.

23                MS. BERNHARD:  Do you -- I have a copy you can

24 look at.

25                THE COURT:  Okay.  That would be great.

```
 1                  MS. BERNHARD:  As long as I can kind of read

 2    along.

 3                  We would waive Roman numeral I with the

 4    exception of that one paragraph that states:  Furthermore, if

 5    you find that the Defendant committed one or more unadjudicated

 6    extraneous offenses, you must not consider that fact in

 7    deciding whether he committed other unadjudicated extraneous

 8    offenses alleged by the State.

 9                  THE COURT:  You want that in?

10                  MS. BERNHARD:  We would request that.

11                  THE COURT:  Okay.  And where does that go?

12                  MS. WOMBLE:  We -- yeah, I think that's

13    confusing, and we've already put in the standard instruction

14    under general instructions --

15                  THE COURT:  Could you --

16                  MS. WOMBLE:  -- on page 4.

17                  THE COURT:  -- could you tell me where that is?

18                  MS. WOMBLE:  Page 4 --

19                  THE COURT:  Oh, I see.

20                  MS. WOMBLE:  It's immediately under that.

21                  Do you have any law that says that you would be

22    entitled to that particular paragraph?

23                  MS. BERNHARD:  We would just urge that we're

24    entitled to it under his Fifth, Sixth, Eighth, and

25    Fourteenth Amendments.
```

```
1                    THE COURT:  May I --
2                    COURT REPORTER:  I'm sorry, Judge, I didn't hear
3  you.
4                    THE COURT:  I said, may I see the paragraph
5  again.
6                    (Brief pause.)
7                    THE COURT:  All right.  I think it's
8  complicated, but I'm going to put it in -- I mean, I think it's
9  confusing.  Where do you want it?
10                   MS. BERNHARD:  After the instruction on
11 extraneous.
12                   THE COURT:  Before the failure to testify?
13                   MS. BERNHARD:  Well, failing -- failure to
14 testify is coming out.
15                   MS. WOMBLE:  Yeah, I have to take that part out.
16                   THE COURT:  Right.
17                   MS. BERNHARD:  Okay, yes.
18                   MS. WOMBLE:  But it's just that:  Furthermore,
19 if you find -- excuse me -- that the Defendant committed one or
20 more unadjudicated extraneous offenses, you must not consider
21 that fact in determining -- in deciding whether he committed
22 other unadjudicated extraneous offenses --
23                   COURT REPORTER:  Other unadjudicated offenses
24 what?
25                   MS. WOMBLE:  Other unadjudicated extraneous
```

```
1   offenses --

2               MS. BERNHARD:  I would ask that that say any

3   other, if that makes it clear.

4               COURT REPORTER:  I'm sorry, I'm having trouble

5   understanding y'all over there.  If you could keep your voice

6   up.

7               MS. BERNHARD:  I would ask that that say any

8   other.

9               MS. WOMBLE:  Any other unadjudicated extraneous

10  offenses alleged by the State?

11              MS. BERNHARD:  Yeah.  Yes.

12              THE COURT:  Okay.  Anything further from the

13  Defense?

14              MS. BERNHARD:  We would urge the rest of the

15  requests in Pretrial Motion Number 63, as well as the -- as

16  Pretrial Motion Number 64, with the exception of Number 16 on

17  page 4 of Motion Number 64.

18              THE COURT:  So you want all of the language in

19  Motion Number 63?

20              MS. BERNHARD:  We are requesting that, yes.

21              MS. WOMBLE:  The State has objections to each

22  and every one of those.

23              THE COURT:  Okay.  That's -- yeah --

24              MS. WOMBLE:  I can go through each one

25  individually if that would be helpful.
```

```
 1                    THE COURT:  Okay.

 2                    MS. WOMBLE:  Okay.  Roman Numeral Number II, I

 3  see that you want special verdict forms requiring the jurors to

 4  specify whether they unanimously find each and every

 5  unadjudicated offense to have occurred.  I just want to make

 6  sure I'm stating them correctly.

 7                    THE COURT:  Well, let me read them.

 8                    MS. WOMBLE:  Sure.

 9                    THE COURT:  All right.  What is your argument

10  with regard to Number 2?

11                    MS. WOMBLE:  That we object, that the jurors do

12  not have to agree on unadjudicated offenses.  They just have to

13  agree on the answers to the special issues.  I can give you a

14  case that says that there is no error in refusing to submit

15  special verdict forms specifying -- that's --

16                    THE COURT:  Thank you.  That's -- Number 2 is

17  denied.

18                    MS. WOMBLE:  Number 3, they want a special

19  verdict form listing all possible mitigating factors, and they

20  want the jurors to list the factors that they can consider in

21  answering the mitigation special issue.

22                    THE COURT:  That's denied.

23                    MS. WOMBLE:  Number 4, instruction that the

24  jurors must consider any and all mitigating factors established

25  by the evidence.  We would object.  The instructions already
```

```
 1  tell them to consider the evidence.
 2              THE COURT:  Where is that in this -- in your
 3  charge?
 4              MS. WOMBLE:  I did not put that in there.
 5  That's -- that's their -- they want an instruction that puts
 6  that in there.
 7              THE COURT:  Do you have anything about
 8  mitigating evidence in your charge right now?
 9              MS. WOMBLE:  I -- I do -- well, I have what's in
10  the statute.
11              THE COURT:  Okay.  That's what I wanted you to
12  cite me to.
13              MS. WOMBLE:  Sure.  At the top of page 3, it
14  says:  In arriving at your answer, you shall consider
15  mitigating evidence to be evidence that a juror might regard as
16  reducing the defendant's blameworthiness.  That's -- that's the
17  statute.  There's also immediately above that -- it says:
18  Members of the jury need not agree on what particular evidence
19  supports an affirmative answer to Special Issue Number 2.
20              THE COURT:  Okay.  I'm going to give the Defense
21  Number 4, but not the italics -- not the italics, just the --
22  just regular type.
23              MS. WOMBLE:  But it's -- Judge, we --
24              MS. BERNHARD:  Judge, must consider is -- is the
25  italics in that.
```

```
 1                    THE COURT:  I know.

 2                    MS. BERNHARD:  If you delete that, it doesn't

 3  read -- there's no verb.

 4                    MS. MULDER:  She's not deleting the word --

 5                    MS. WOMBLE:  And it's also --

 6                    MS. BERNHARD:  Oh, okay.

 7                    MS. WOMBLE:  -- it's also up to the jurors to

 8  decide what is or isn't mitigating.  I think this would really

 9  confuse the issue for them and it strays from the statute which

10  has the potential to inject error into this charge.

11                    (Discussion off the record.)

12                    MS. MOSELEY:  Judge, it would be my position

13  that it would be improper for the charge to instruct the jury

14  to consider all mitigating evidence, as opposed to just

15  strictly telling them to consider all the evidence.  It

16  would -- it would tend to be a comment on which evidence they

17  should consider and maybe which they shouldn't.

18                    THE COURT:  Okay.  I'm going to reverse my

19  ruling on that and deny that.

20                    Number 5?

21                    MS. WOMBLE:  Number 5, it is an instruction that

22  in answering mitigation special issue, you can't consider the

23  future dangerous special issue for any purpose.  That's --

24  we -- I would object, as that is a misstatement of the law.

25  2(e)(1) says to consider all of the evidence.
```

```
 1                THE COURT:  Okay.  Denied.

 2                MS. WOMBLE:  Number 6 is an instruction that

 3    it's the State's burden to prove the aggravating factors, and

 4    the Defendant does not have to disprove the aggravating

 5    factors.  We would object.  This is unnecessary.  The burden of

 6    proof is already in the charge as to the special issues.

 7                THE COURT:  Number 6 is denied.

 8                MS. WOMBLE:  Number 7 is an instruction that

 9    mitigating is any evidence that may serve as the basis for a

10    sentence less than death, that they want something that states

11    that it's mitigating even if it doesn't go to moral

12    blameworthiness.  We object again.  This is also a misstatement

13    of the law.  2(f)(4) says, quote, "mitigating evidence is

14    evidence that a juror might regard as reducing a Defendant's

15    moral blameworthiness."

16                THE COURT:  Okay.  Seven is denied.

17                MS. WOMBLE:  Number 8 is a 10/12 failure to

18    agree instruction.  Again, we object.  37.0712(a)(1) provides

19    that the Court, the attorney representing the State, the

20    Defendant, the Defendant's counsel may not inform a juror or

21    prospective juror of the effective failure of a jury to agree

22    on issues submitted under Subsection (c) or (e).

23                THE COURT:  Eight is denied.

24                MS. WOMBLE:  Number 9 is an instruction that

25    drug addiction or mental health testimony may only be
```

1  considered in mitigation.  We again object.  Raby v. State, 970

2  S.W.2d 1, Texas Court of Criminal Appeals 1998.  I'm sorry, the

3  Court of Criminal Appeals said that to include this type of an

4  instruction would be a misstatement of the law.

5                    THE COURT:  Nine is denied.

6                    MS. WOMBLE:  Number 10 is an instruction that

7  victim impact -- as I understood it, Ms. Harris can only be

8  considered as to mitigation in special issue.  We again object.

9  We don't want to put in any instructions regarding the jurors

10  not considering any evidence.  We think that the instructions

11  are fine as is.

12                    THE COURT:  All right.  Ten is denied.

13                    MS. WOMBLE:  Number 11 is an instruction that

14  victim impact for extraneous complainants cannot be considered

15  as to either special issue.  We again object.  This is

16  unnecessary.  This also may confuse the jury as to -- into not

17  considering the extraneous offenses.

18                    THE COURT:  All right.  Eleven is denied.

19                    MS. WOMBLE:  Number 12 is another mitigation

20  instruction.  This is -- we again object.  This is not what's

21  in the statute.  It takes out the quote "sufficiently

22  mitigating."

23                    THE COURT:  Twelve is denied.

24                    MS. WOMBLE:  Thirteen is another mitigation

25  issue.  This one concerns factors.  We again object.  It seems

```
 1  the Defense is attempting to sort of redefine mitigation.  It

 2  softens the language and dilutes the instruction.

 3              THE COURT:  Thirteen is denied.

 4              MS. WOMBLE:  Fourteen is an instruction that,

 5  quote, "regardless of your feelings on the other issues, you

 6  are always free to afford the Defendant mercy in these

 7  proceedings and sentence him to life imprisonment."  We object.

 8  This is instructing the jurors not to follow the law.

 9              THE COURT:  Fourteen is denied.

10              MS. WOMBLE:  Number 15 is an instruction

11  regarding requesting an objection -- instruction regarding

12  future dangerousness.  We object.  Probability is not defined.

13  Substantially is not the standard regarding probability.

14  Criminal acts of violence isn't defined in the statute, so we

15  shouldn't include a definition that's not in the statute.

16              THE COURT:  All right.  Fifteen is denied.

17              And I'm assuming the State doesn't have any

18  objections or request for additions since you prepared the

19  charge?

20              MS. WOMBLE:  I'm sorry?

21              THE COURT:  I'm assuming you don't have any

22  objections or requests for additions since you prepared the

23  charge?

24              MS. WOMBLE:  No, Your Honor.  And I will be

25  removing and fixing what we've discussed.
```

```
 1                    THE COURT:  Okay.  And if you could do that --
 2                    MS. WOMBLE:  I'll do it over the lunch break.
 3                    MS. BERNHARD:  Judge, we do have an additional
 4   Motion 64.
 5                    THE COURT:  Okay.
 6                    MS. BERNHARD:  Do you need a copy of that?
 7                    THE COURT:  Please.  Well, I guess I can find
 8   it.
 9                    MS. BERNHARD:  I've got one.  And we would --
10   with the exception of Number 16 of that motion on page 4 --
11                    THE COURT:  You're asking for everything but 16?
12                    MS. BERNHARD:  Correct.
13                    THE COURT:  All right.  Thank you.
14                    Ms. Womble, do you have a copy of this motion?
15                    MS. WOMBLE:  I do, Judge.
16                    THE COURT:  Okay.  All right.  Number 1 is
17   denied.  So is Number 1 that you want it -- you want them to
18   think it's 95 percent, and Number 2 is that you want them to
19   think it's 90 percent?  Is that the difference?
20                    MS. BERNHARD:  Yeah.  Number 2 is if you deny
21   Number 1, then we ask for Number 2 and so on.
22                    THE COURT:  Okay.  And that's denied.
23                    Three is denied.  Four is denied.  Five is
24   denied.  Six is denied.  Seven is denied.  Eight is denied.
25                    MS. WOMBLE:  I believe all of them are asking
```

1  for additions that are not in the statute.

2                  THE COURT:  Okay.  And Nine is denied.  Ten is

3  denied.  Eleven is denied.  Ten is -- or twelve is denied.

4  Thirteen is denied.  Fourteen is denied.  Fifteen is denied.

5  Sixteen is not considered.  Seventeen is denied.  Eighteen is

6  denied.  Nineteen is denied.  Twenty is denied.  Twenty-one is

7  denied.  Twenty-two is denied.  Twenty-three is denied.

8  Twenty-four is denied.  Twenty-five is denied.  Twenty-six is

9  denied.  Twenty-seven is denied.  Twenty-eight is denied.

10  Twenty-nine is denied.  Twenty -- Thirty is denied.  Thirty-one

11  is denied.  Thirty-two is denied.  Thirty-three is denied.

12                  All right.  Off the record.

13                  (Discussion off the record.)

14                  THE COURT:  Thirty-four is denied.

15                  COURT REPORTER:  Back on the record, Judge?

16                  THE COURT:  Yes, I'm sorry, back on the record.

17                  Thirty-four is denied.  Thirty-five is denied.

18  Thirty-six is denied.  Thirty-seven is denied.  Thirty-eight is

19  denied.  Thirty-nine is denied.  Forty is denied.

20                  Forty-one, the proposed charge instructs the

21  jury to consider all the evidence that militates for the

22  imposition of the death penalty.  It doesn't say that in the

23  charge, does it?

24                  MS. WOMBLE:  It says:  You shall consider all

25  evidence admitted during the guilt or innocence stage, and the

```
 1  punishment stage, including evidence of the Defendant's
 2  background or character or the circumstances of the offense
 3  that militates or mitigates against the imposition of the death
 4  penalty.
 5                  THE COURT:  I'm sorry.  Would you cite me to
 6  that, Christine, on your charge?
 7                  MS. WOMBLE:  Page 2.
 8                  COURT REPORTER:  Page what?
 9                  MS. WOMBLE:  Page 2.  I'm sorry.
10                  THE COURT:  Oh, okay, that's denied.
11                  COURT REPORTER:  Oh, I'm sorry, Judge, what did
12  you say?
13                  THE COURT:  Forty-one is denied.  Forty-two is
14  denied.  Forty-three is denied.  Forty-four is denied.
15  Forty-five is denied.  Forty-six is denied.  Forty-seven is
16  denied.  Forty-eight is denied.
17                  I don't understand Number Forty-nine.
18                  MS. WOMBLE:  I think that's --
19                  MS. BERNHARD:  It's --
20                  MS. WOMBLE:  -- urging on the 10/12 rule.
21                  COURT REPORTER:  The what?
22                  MS. WOMBLE:  The 10/12 rule.  Basically telling
23  them that if they don't unanimously agree, it's the same thing
24  as a yes or no.  We would argue that that's a misstatement of
25  the law.
```

```
 1                  THE COURT:  Okay.  I'm sorry, I'm not getting
 2   that.  I mean, how can it have the same dignity and respect as
 3   a yes or a no?  I don't understand that.  Maybe I'm just -- off
 4   the record.
 5                  (Discussion off the record.)
 6                  THE COURT:  Back on the record.  Forty-nine is
 7   denied.
 8                  And Fifty is denied.  Fifty-one is denied.
 9   Fifty-two is denied.  Fifty-three is denied.  Fifty-four is
10   denied.  Fifty-five is denied.  Fifty-six is denied.
11   Fifty-seven is denied.  Fifty-eight is denied.  Fifty-nine is
12   denied.  Sixty is denied.  Sixty is denied.
13                  COURT REPORTER:  You just said 60, Judge.
14                  THE COURT:  I did?
15                  COURT REPORTER:  Yes, ma'am.
16                  THE COURT:  Oh, that was a continuation.
17                  And Sixty-one is denied.
18                  MS. WOMBLE:  Judge, may I just clarify for -- so
19   that I can get this done at the lunch hour?
20                  THE COURT:  Sure.
21                  MS. WOMBLE:  The only things to be changed out
22   of the existing charge are Number 1 on page 1, switching
23   confinement and death.
24                  THE COURT:  Yes.
25                  MS. WOMBLE:  Number 2 on page 3, removing the
```

```
 1   you may deliberate for as long as you feel necessary.
 2                   THE COURT:  Yes.
 3                   MS. WOMBLE:  Remove that.
 4                   THE COURT:  Page 4, you'll insert the paragraph
 5   that begins furthermore.
 6                   MS. WOMBLE:  Okay.  And then remove the --
 7                   THE COURT:  And remove the -- the failure to
 8   testify.
 9                   MS. WOMBLE:  The failure to testify.  And then I
10   told Catherine I'd put Special Issue Number 2 on the second
11   page so that way it's on the verdict form.
12                   THE COURT:  Okay.
13                   MS. WOMBLE:  And that's all I'm going to do.
14                   THE COURT:  All right.
15                   MS. WOMBLE:  And then I'll e-mail it to all
16   parties.
17                   THE COURT:  Thank you.  Do we need to do
18   anything else before tomorrow morning?  No?
19                   How long do y'all want to argue?
20                   MS. JONES:  That's what I was going to ask you.
21                   THE COURT:  How long do y'all need to argue?
22   Who is arguing?
23                   MS. MOSELEY:  I would ask for an hour.  It's
24   going to be split, and I probably won't take that long, but on
25   the safe side, I'd ask --
```

```
 1                    THE COURT:  Who's opening for you?

 2                    MS. MOSELEY:  Elaine.

 3                    THE COURT:  Okay.  So you want an hour total?

 4                    MS. MOSELEY:  Yes, ma'am.

 5                    THE COURT:  And Ms. Bernhard?  Is part of

 6    your -- is part of your Defense team gone?

 7                    MR. WEATHERSPOON:  We don't know.

 8                    MS. BERNHARD:  We all three are going to be

 9    arguing.  I'm not sure how long Ms. Mulder wants.  If we have

10    an hour --

11                    THE COURT:  Where is she?

12                    MR. WEATHERSPOON:  She's out doing some

13    investigation.

14                    THE COURT:  Okay.  No, we're off the record.

15                    (Discussion off the record.)

16                    (Recess of proceedings.)

17

18

19

20

21

22

23

24

25
```

```
 1                        Reporter's Certificate

 2   THE STATE OF TEXAS:

 3   COUNTY OF DALLAS:

 4        I, Darline King LaBar, Official Court Reporter in and for

 5   the 363rd District Court of Dallas County, State of Texas, do

 6   hereby certify that the above and foregoing volume constitutes

 7   a true, complete and correct transcription of all portions of

 8   evidence and other proceedings requested in writing by counsel

 9   for the parties to be included in the Reporter's Record, in the

10   above-styled and numbered cause, all of which occurred in open

11   court or in chambers and were reported by me.

12        I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if any,

14   admitted by the respective parties.

15        WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16   on the 25th day of February, A.D., 2014.

17

18

19
                         \s\Darline LaBar
20                       DARLINE KING LABAR
                         Official Court Reporter
21                       363rd Judicial District Court
                         Dallas County, Texas
22                       hpdkfaith@msn.com
                         (214) 653-5893
23

24
     Certificate No:  1064
25   Expiration Date:  12/31/2014
```

Darline King LaBar, Official Reporter