1          REPORTER'S RECORD

2        VOLUME 52 OF 57 VOLUMES

3      TRIAL COURT CAUSE NO. F12-23749-W

4     COURT OF CRIMINAL APPEALS NUMBER:  AP-77,030

5  THE STATE OF TEXAS          :          IN THE 363RD JUDICIAL

6  VS.                         :          DISTRICT COURT OF

7  MATTHEW LEE JOHNSON         :          DALLAS COUNTY, TEXAS

8

9

10              **PUNISHMENT PHASE BY JURY**

11

12

13

14

15              * * * * * * * * * * *

16

17

18

19

20      On the 7th day of November, 2013, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable Tracy Holmes, Judge

23  Presiding, held in Dallas, Dallas County, Texas:

24      Proceedings reported by machine shorthand computer

25  assisted transcription.

```
 1  A P P E A R A N C E S:

 2  HONORABLE CRAIG WATKINS, Criminal District Attorney
          Crowley Criminal Courts Building
 3        133 North Riverfront Boulevard
          Dallas, Dallas County, Texas 75207
 4        Phone:  214-653-3600

 5  BY:  MS. ANDREA MOSELEY, A.D.A., SBOT # 24007211
          MS. ELAINE EVANS, A.D.A., SBOT # 24032880
 6        MS. RAQUEL "ROCKY" JONES, A.D.A., SBOT # 24004724
          MS. CHRISTINE WOMBLE, A.D.A., SBOT # 24035991

 7
                FOR THE STATE OF TEXAS;
 8

 9

10  MS. CATHERINE BERNHARD, Attorney at Law, SBOT # 02216575
          P.O. Box 2817
11        Red Oak, Texas 75154
          Phone:  972-617-5548
12
    MR. KENNETH WEATHERSPOON, Attorney at Law, SBOT #21004100
13        325 North St. Paul Street, Suite 2475
          Dallas, Texas 75201
14        Phone:  214-922-0212

15  MS. NANCY MULDER, Attorney at Law, SBOT # 00792971
          2214 Main Street
16        Dallas, Texas 75201
          Phone:  214-764-7246

17
                FOR THE DEFENDANT.
18

19

20

21

22

23

24

25
```

1                          **INDEX VOLUME 52**

2   November 7th, 2013                                    PAGE   VOL.

3   PUNISHMENT PHASE BY JURY:

4   Proceedings........................................... 4    52

5   Charge of the Court read.............................. 4    52

6   Argument by Ms. Evans................................. 6    52

7   Argument by Ms. Mulder............................... 27    52

8   Argument by Mr. Weatherspoon......................... 34    52

9   Argument by Ms. Bernhard............................. 40    52

10  Argument by Ms. Moseley.............................. 51    52

11  Reporter's Certificate............................... 60    52

12

13                          **EXHIBIT INDEX**

14  STATE'S                  OFFERED        ADMITTED        VOL.

15   197   PP Pun Argument CD    59              59          52

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2              THE COURT:  All right.  If you'd line them up,
3  please.
4              THE BAILIFF:  Yes, ma'am.
5              (Pause.)
6              THE BAILIFF:  All rise.
7              (Jury returned to courtroom.)
8              THE COURT:  We need another chair over there for
9  Mr. Arras.
10             MR. ARRAS:  No, ma'am.
11             THE COURT:  You have one?
12             MR. ARRAS:  Yes.
13             THE COURT:  Please be seated.
14             Good morning, ladies and gentlemen.  I'm now
15 going to read to you the Court's charge.
16             Court's charge:  Members of the jury, by your
17 verdict in this case, you have found the Defendant, Matthew Lee
18 Johnson, guilty of the offense of capital murder, alleged to
19 have been committed on or about the 20th day of May 2012 in
20 Dallas County, Texas.
21             (Charge of the Court read.)
22             THE COURT:  It is signed by me, Tracy Holmes,
23 Judge of the 363rd Judicial District Court, and the two
24 remaining pages are the special issues.
25             Special Issue Number 1 is set out with a blank
```

1 for the answer.  If it's unanimous, the presiding juror signs

2 here.  If it's not unanimous, the 10 jurors sign here.  If your

3 answer to Special Issue Number 1 is yes, then you shall proceed

4 to Special Issue Number 2.  If your answer to Special Issue

5 Number 1 is no, you shall cease your deliberations.  If your

6 answer to Special Issue Number 1 is no and is not unanimous,

7 you need to have 10 jurors sign.

8           Special Issue Number 2.  Do you find, taking

9 into consideration all of the evidence, including the

10 circumstances of the offense - I'm sorry, I need to read that.

11           Special Issue Number 1.  Do you find from the

12 evidence beyond a reasonable doubt that there is a probability

13 that the Defendant, Matthew Lee Johnson, would commit criminal

14 acts of violence that would constitute a continuing threat to

15 society.  And, again, if you have a unanimous yes, the

16 presiding juror only needs to sign.  If you have 10 who vote

17 no, all 10 need to sign.

18           Special Issue Number 2.  Do you find, taking

19 into consideration all of the evidence, including the

20 circumstances of the offense, the Defendant's character and

21 background, the personal moral culpability of the Defendant,

22 there is -- that there is sufficient mitigating circumstance or

23 circumstances that a life -- that a sentence of life

24 imprisonment without parole, rather than a death sentence, be

25 imposed -- and there's, again, a line for a unanimous answer by

```
 1  the presiding juror and if -- unanimous no.  And if your answer
 2  is yes, 10 or more sign.
 3               All right.  Ms. Evans.
 4               (Argument by Ms. Evans.)
 5               MS. EVANS:  May it please the Court.
 6               Counsel.
 7               Members of the jury, you have been operating
 8  under a specific set of instructions that you've not been
 9  permitted to talk about the facts of this case until the close
10  of trial.  I submit to you that the trial will close and you
11  will be released from those instructions and you'll be
12  permitted to talk about your experience over these last two
13  weeks, if you choose to.  You'll be able to talk amongst your
14  family, your friends, and your coworkers about what it was you
15  sat and listened to over the course of these last two weeks.
16  And I think you might find it difficult to describe the
17  experience you've had because there are simply no words.  No
18  words to describe what you have seen, what you have heard, or
19  what you have likely felt during the course of these last two
20  weeks.
21               And I'm not going to take you back through those
22  photographs of Ms. Harris, and I'm not going to play that video
23  for you again where you can hear her screams and her cries for
24  help on that day.  You don't need to be reminded of that.
25  That's something that's going to be implanted in your memory
```

1  for a lifetime, as right it should.  Because that is very

2  disturbing.

3          And there are absolutely no words to describe it

4  because you see, the actions of Matthew Lee Johnson on

5  May 20th, 2012, are completely indescribable.  Maybe we could

6  call it inhumane at best.  You know, several of you jurors --

7  several of you, whenever we talked to you back on voir dire,

8  said that if somebody has a total disregard for the life of

9  another, total disregard for their life, why should we regard

10  theirs.  Folks, that's what you're going to be called upon to

11  answer today based on the evidence in this case and based on

12  the special issues and how you answer those.  You're going to

13  determine literally whether this man lives or dies based on the

14  evidence and based on how you answer those special issues.

15          And so I want to take you back to when we first

16  met, back June 21st, that morning down in the Central Jury Room

17  on a Friday.  When you got here, you probably had no idea that

18  you would sit up there and fill out an 18-page questionnaire

19  where we were asking you to detail your thoughts and feelings

20  regarding something like the death penalty.  Probably had no

21  clue.  But the 14 of you were very thoughtful and considerate

22  and took the time to answer those questions and tell us how you

23  really felt about the death penalty and when it was deserving

24  and when it was appropriate and what factors might be important

25  to you in deciding that.  And remember, every seat was filled

1  in there that morning, and remember we told you back whenever

2  we talked to you individually, that we had the same number of

3  people come that afternoon and yet we are down to the 14 of

4  you, because not everyone can sit and judge another and not

5  everyone could answer those special issues based on the

6  evidence and based on the facts and the circumstances because

7  of their beliefs and because they couldn't participate in this

8  process.  But the 14 of you could.

9                In fact, when we brought you down for individual

10  voir dire, myself and Andrea and Rocky talked to each of you.

11  I personally think I talked to six of the 14 of you, and each

12  of you at that time took an oath to tell the truth.  That's all

13  we were asking you at that time.  We were talking to you about

14  the stuff you put in the questionnaire.  We were asking you if

15  you could follow the law.  And unfortunately, we had to keep

16  you in a vacuum and we couldn't talk to you about the facts of

17  this case and what you would hear, because it was improper

18  under the law.  And I can remember many of you sitting there

19  very uncomfortable because you're thinking, well, I don't know,

20  I don't know, because you couldn't sit there and contemplate

21  and think of a situation where you may or may not be able to do

22  something.  But the 14 of you were qualified and you guaranteed

23  us that under the proper set of facts and the proper set of

24  circumstances, if we proved to you beyond a reasonable doubt

25  Special Issue Number 1, and you went on to consider Special

1   Issue Number 2 and didn't find based on the evidence anything

2   sufficiently mitigating you could and you would answer those

3   special issues yes and no, that would result in the death of

4   this man by lethal injection.  Each of the 14 of you guaranteed

5   us that you could, in fact, participate in this process.  And

6   I'm going to take you at your word that obviously because of

7   your well-thought-out answers in the questionnaire and at the

8   time of that interview, that you were being honest with us and

9   that you were telling us the truth and that you are going to

10  base your verdict on the two things, the two things only that

11  your verdict can be based on, and that is the law as it's given

12  to you by the Court -- and that's the charge that you can take

13  back with you -- and the evidence as you've heard it in this

14  case.

15               But you see, whenever I tell you that we were

16  talking in a vacuum, you were at a disadvantage at that time.

17  You didn't know the things that the State of Texas knew.  You

18  didn't know the things that my boss, Craig Watkins, took into

19  consideration when he was deciding that, yes, the State of

20  Texas is going to seek the death penalty against this man.  You

21  didn't know that back when we talked to you.  And that was the

22  reason we let you know what our goal was because we knew.  We

23  knew you were going to hear the type and the quality and the

24  quantity of evidence that was going to leave you as jurors no

25  other choice but to answer those special issues yes and no.

1                    Now you know.  Now you've heard it.  Now you

2    know everything that the State of Texas knew in making that

3    decision to seek the death penalty, and we've proven it to you

4    beyond a reasonable doubt.

5                    And so I'm going to take you at your word

6    whenever you said that you were giving us true answers at that

7    time, when you guaranteed us.  And, you know, we had to look

8    over at this man, because it's not something -- it was very

9    much of a process.  Remember, we told you this is a process.

10   It's all part of the process.  We had to look at this man and

11   let you realize that we're talking about a living, breathing

12   human being that puts his pants on like everybody else and he

13   has family that loves him because we anticipated that you might

14   hear from some of those family members.  We anticipated them.

15                   But, you know, that doesn't change the evidence

16   and that doesn't change the law.  And that's why each of the 14

17   of you are jurors in this case, because I tell you, most of the

18   people came down, the vast majority could not participate in

19   this process for one reason or another, but you could, even

20   after looking over at this man and realizing the significance

21   of what we were asking you to play a part in.  And so I'll take

22   you at your word that you can do that.

23                   Now, let's talk more about what it is that we

24   discussed in voir dire and what it is the State of Texas has

25   proven to you beyond a reasonable doubt since last Thursday in

1    the punishment phase of this trial.  You'll recall Special

2    Issue Number 1:  Do you find from the evidence beyond a

3    reasonable doubt there is a probability -- that it is more

4    likely than not -- that this Defendant over here would commit

5    criminal acts of violence that would constitute him being a

6    continuing threat to society.

7              Now, I looked back over your questionnaires and

8    the things that were going to be important to you, and I looked

9    back at the notes that we took when we were talking to you in

10   voir dire and most every one of you said the facts of the

11   instant offense were going to be most important to you in

12   making that determination.  All of you said the facts of the

13   offense for which the Defendant was on trial.  The facts which

14   you have found this Defendant guilty of, the capital murder

15   offense, was going to be an important factor to you in

16   determining if he's more likely than not going to be a future

17   danger even in prison.

18             Now, several of you also said that, hey, a

19   person's past is a good predictor of the future.  So you get to

20   look at all that.  You get to look at everything that you heard

21   back in the guilt/innocence phase of this trial, exactly how

22   this crime was committed, the before, the during, and the after

23   actions of this Defendant in making the determination.  Not

24   only that, you get to look at the entire case, the life history

25   that goes back -- we talked back all the way to when he was 15

1  years old when this behavior started.  He's 38 now, and it's

2  only gotten worse.  But each of the 14 of you said that you

3  could follow the law and you did understand that the law allows

4  you to answer Special Issue Number 1 yes based solely on the

5  facts of the offense for which you found the Defendant guilty

6  of.  And do you understand now why the law is the way that it

7  is?  Because most of you said important factors in looking at

8  the facts of the case that would lead you to a determination of

9  yes in Special Issue Number 1 is how severe the offense was,

10  how heinous the offense was, how horrific it was, how violent

11  the offense was, and the pain and suffering that the victim

12  went through at the hands of this man.  Those were things that

13  were important to you, and rightly so.  Didn't you see that

14  from the action of this Defendant on May 20th, 2012?

15          Now, let's first look at his history because

16  you've heard a lot of it since last Thursday.  You know, I said

17  it dated back to when he was 15 years old.  He was already

18  driving around in a stolen car with his buddies getting

19  arrested.  He's already pushing uniformed police officers at a

20  very early age.  And, of course, he's stealing.  And, of

21  course, he's laying his hands on women.

22          Amy Armstrong.  And that was a very short

23  relationship.  Do you recall how she described to you after he

24  hit her and his hand had grazed the child, the two-year-old

25  child that she was holding at the time that he assaulted her.

1  That she said, that's it, my kids are all that I have and she

2  put him out and she locked him out.  He wasn't going to stand

3  for that, was he?  Doesn't that tell you a lot about the

4  character of a man and character of this person on trial when

5  they don't go away that easily?  What did he do?  She said he

6  came back to the door and tried to ask nicely to come back in.

7  But remember, he doesn't have anywhere else to go.  How dare

8  her put him out.  Where was he supposed to go now?  Well, maybe

9  try not hitting her.  You think that might be a start?  But he

10  asked nicely at first because that's what he does, right?  He

11  manipulates.  And when that doesn't work, when he doesn't get

12  his way because it's all about him, he resorts to more

13  violence.  He starts kicking in that door.

14              Sound familiar?  He did that later, too, with

15  Daphne, did he not?  He starts kicking in that door.  Not only

16  is he kicking in the door, he's beating on the windows of the

17  child -- the children's bedroom, those three children in there.

18  Beating on their windows to the point that she puts mattresses

19  up to barricade them in and barricades the door because he's

20  kicking it so hard, she's thinking he's going to kick it in.

21  The children are hiding in the closet, and she's laying in wait

22  with the Defendant's gun.  Did you think she knew he was going

23  to be a future danger that night?  Can you imagine laying there

24  in wait for this man to come in?  But he brought her out,

25  didn't he?  He resorted to fire, early on.  He threw an object

1    up on her porch to draw her out because she wouldn't open the

2    door, right?  That would bring her out.  And so she told you it

3    was over after that.  She was smart enough to know and realize

4    what this man is and who he was.  It was over after that.

5                    So the assaults on Amy for a short period of

6    time and then the only drug possession case that he has in his

7    criminal history, the possession of marijuana.  Remember

8    whenever he put the blunt out on the back of his neck with

9    Officer Oliver?  He was arrested for that in 1993.

10                   Continuing on, he was arrested for the assault

11   warrants.  He's arrested on the possession of -- possession of

12   marijuana warrants.  And remember, he told you -- or he agreed

13   that he's been in the back of a squad car some 25 to 26 times.

14   Do you think it's just going to stop all of a sudden, his

15   violence?  You know, he does the resisting arrest when he's 18

16   years old, whenever he bit -- they're taking him in on warrants

17   and he's not going down easily.  They're having to use pepper

18   spray to get control of him and the baton to try to get control

19   of him.  And what does he tell you?  Yeah, I bit them because I

20   was angry, angry at the two uniformed officers.

21                   So an 18-year-old man is going to bite both of

22   the officers so hard that they have to go to the hospital.  And

23   remember he bit Officer Ehrman's watch completely off.  He

24   didn't just bite the watch.  He bit the skin to the point where

25   he had to go to the hospital, as well.  Two uniformed officers,

1  because he was angry at the age of 18.

2              And we know that he evades from the police every

3  time that he's about to get caught or something is about to go

4  down, he runs, does he not?  He ran from Officer Ralston.  And

5  remember, that's the time that he drug Daphne into his criminal

6  ways.  She's driving the car and he's pointing to her and

7  Officer Ralston's saying he can see this passenger, this

8  Defendant, pointing to go, go, go, and she goes.  And what does

9  she do?  She gets a criminal case because he's telling her to

10 go and park at the house, all because he tells you he didn't

11 want the car to get towed.  But he didn't stop there once he

12 got to the house, did he?  He bailed out on foot.  And Officer

13 Ralston told you that, no, he didn't go easily, that he had to

14 use muscling techniques to get him to comply and to get him

15 under arrest.

16             And then you have the aggravated assault with a

17 deadly weapon against Courtney.  Is it any wonder that

18 Courtney, who's close with him -- you heard her testify -- is

19 not going to remember him pointing the gun at her on that

20 night?  And Daphne is going to sit and tell you, no, I don't

21 remember that.  He was on felony probation for five years and

22 arrested that night after you heard repeated threats all

23 throughout the night going down after he pointed the gun at

24 Courtney, but yet, Daphne and Courtney aren't willing to tell

25 you that they remember that one.

1           Why not?  Well, aggravated assault with a deadly

2   weapon where you're pointing a gun at someone, you think that

3   might -- that past conduct might be a pretty good predictor of

4   the future, the future dangerousness of this man?  Absolutely.

5   So they are not willing to tell you the five years he was on

6   probation for that offense, but he told you, yeah, he was.

7           And then if any -- if you needed to know any

8   more about his mind-set on that evening, when Officer Clark

9   goes to arrest him -- remember, Officer Clark tells you that he

10  tells him, you'll get yours when you get back on the street.

11  Threatens the uniformed officer after he's placed under arrest.

12  Officer, you'll get yours when you get back on the street.

13          Future danger?  You know he was.  And that was

14  back in 1995.  And it continues from there.  He starts

15  assaulting Daphne multiple times.  You heard about the time

16  where he beat her so bad that she had the bruises on her face

17  and couldn't go to work for a period of two weeks because of

18  the beatings at the hands of this man.  And, of course, he's

19  still running from the police.

20          You remember the one with Officer Steadman and

21  Officer Lacey when they responded to the hit-and-run and he

22  runs throughout the neighborhood, and Officer Steadman finally

23  gets him to place him under arrest.

24          And then he has another theft, and then you'll

25  recall that Daphne finally gets enough of it and you have her

1  affidavit that she filed where she details the behavior of this

2  Defendant and what he had put her through.  She finally says

3  she's going to put a stop to it.  Did that stop him?  She

4  thought maybe he wasn't going to be a future danger to her and

5  her kids anymore because she got that sheet of paper.  She came

6  down here and asked for protection.  She got that protective

7  order.  Did that stop him?  Did that keep him from being a

8  future danger to Daphne?

9           And remember he told you, yeah, the kids were

10 scared at times.  He said he could remember at least one

11 occasion when the kids were present whenever he was giving her

12 her beating.  That didn't stop him.  You heard he violated that

13 protective order.  Remember kicking the door?  The officers

14 caught him there behind the residence.

15          But before he violates that protective order,

16 you'll recall the robbery.  You know, when other people --

17 other productive members of our society are up trying to get

18 ready for work and go to work so that they can provide for

19 their families and their children, this man is out placing his

20 hands on another woman, dragging her out of her own truck,

21 throwing her out after he's laying on top of her to try to get

22 control of it, and he ends up wrecking that truck out.  Future

23 danger?

24          He's laid his hands, you've heard now, on three

25 women up to this point in 2004.  Drug her out of a truck, and

```
 1  it didn't stop there.  Remember after he wrecked the truck out,

 2  he places Officer St. Clair in danger of his livelihood, as

 3  well, because Officer St. Clair has taken off after him, after

 4  he's fleeing and wrecked out this truck, and he ends up

 5  stepping in a hole and breaking his ankle that day.  And

 6  Officer St. Clair kept going, trying to protect the members of

 7  our society, the members of this community, against this man

 8  because he didn't stop there.  He kept trying to climb a fence.

 9  That was the offense in 2004.  And then he finally got sent to

10  prison for a period of five years.

11             And so remember back on voir dire, we told you

12  that what we were asking you to do is essentially take out a

13  crystal ball and try to predict what someone might do in the

14  future based on the facts of the offense for which you found

15  him guilty and based on their past conduct that you've heard.

16  Well, you don't have to get out your crystal ball anymore

17  because we know how he acts once he's in prison.  You know how

18  he responds to that type of life, and you heard from

19  detective -- or Warden Nelson that if he receives a life

20  sentence, he's going back to that same environment.  He's going

21  back to general population, the same place where if he gets

22  tired of living with you in these close surroundings and close

23  quarters, he will split your head wide open because that's how

24  he resolves his differences.  Picked Carlton Jenkins up and

25  slammed him to the ground.  He was reclassified at that point,
```

1  but you heard once he got transferred to the other unit,

2  somehow he manipulated his way back to G2 again and then they

3  let him be an outside trusty.  Folks, they were wrong about

4  him, were they not?

5              Then you hear -- or he tells you from the stand

6  that, you know what, when I was reclassified and became a G4,

7  it was my job then to be a model inmate.  After I got put in

8  that solitary confinement, I was going to change.  I had a

9  purpose and I was going to Bible study and I was going to this

10 and going to that and receiving these certificates and I was

11 exercising and working out and I was going to be the model

12 inmate.  I was the model inmate.  Remember him telling you that

13 after getting placed in solitary confinement following that

14 fight, that his whole attitude on things changed.  Really?  The

15 model inmate is masturbating and grinning to 18-year-old

16 Correctional Officer Ashley Villegas.  You heard from Warden

17 Nelson about why inmates do that.  It's all another form of

18 manipulation, seeing how much you can get away with, how much

19 they'll tolerate so that you can push the envelope further.

20 Intimidation tactics and manipulation tactics.  That's your

21 model inmate in 2006.

22             Their own witness told you he had refusing to

23 obey orders in his records, and he had something else that the

24 witness couldn't recall.  And he told you that a lot of those

25 minor disciplinary actions, they get discarded -- their own

1  witness, after several years have passed.  But you heard he

2  wasn't going to work.  He wasn't going to school.  Sound

3  familiar?  He was doing that with Amy Armstrong, whenever she

4  was providing for him, he didn't even have a key there because

5  he wasn't providing for them.  He wasn't working.  He wasn't

6  going to school then.  Did anything change once he got to

7  prison?  No.  You don't change the character of a man.  You

8  know who you have before you today.

9             Not only is he doing that, you know, he got

10  those tattoos -- several of his tattoos in prison.  He wants to

11  lead you to believe that the money bags with the fist gripping

12  it means that he's breaking bread, much like the Lord's Supper,

13  that he's sharing, he's willing to share everything he has.

14  Really?  He's willing to take and resort to robbery and laying

15  his hands on innocent defenseless victims to do so, is he not?

16  And when you put a tattoo on your body, where he's got his

17  wife's face and picture and he's got his wife's initials and

18  his daughters' initials on him, he also has a double barrel

19  shotgun.  Don't you know that you tattoo things of importance

20  to you on your body?  Double barrel shotgun and a money bag.

21  You know what this man is about, and that doesn't change.

22             And prison didn't change him.  You heard that

23  Ashley Villegas told you that he was what was considered a high

24  profile inmate.  We talked back in voir dire about you've got

25  those offenders in there that are literally trying to do their

1    time peacefully, trying to earn their good time credit, just

2    trying to do their time and then get out and get released.

3    That wasn't this Defendant.  She didn't even know the names of

4    some inmates, but she knew his.  Why?  She said it wasn't just

5    her, but the other guards, as well, considered him a high

6    profile inmate because he was always running his mouth.  You

7    think that's going to be a problem in a correctional

8    institution?  Do you think that that could lead to him more

9    likely than not committing criminal acts of violence that are

10   going to constitute him being a continuing threat to society

11   even there in prison?  Absolutely.  You know how he behaves.

12   You don't have to guess.

13              So he's released from prison July of '09, and

14   you might think that prison might be an eye-opening experience

15   and a waking experience, but was it for this Defendant?

16   Absolutely not.

17              He progressed.  You know, Mr. Contente gives him

18   every chance in the world.  Of course, the Defendant told him

19   he'd been in prison.  He didn't give him all the details, did

20   he?  Why would that matter?  It's all part of his manipulation,

21   right?  But he got the job.  He had a good job.  He had

22   everything in the world going for him.  Have you ever heard of

23   a man with more of a support system than what Matthew Lee

24   Johnson had?  He had people right under his -- right under his

25   thumb.  He had Mr. Contente entrusting him with the keys to the

1  Kwik Kar and trusting him with the money there at that

2  business, and he stole essentially from the hand that was

3  feeding him and his family.  Not a care in the world.  And how

4  dare him, how dare Mr. Contente want to prosecute and have the

5  police there, right?  He was my friend.  No, I thought he would

6  help me.  That's what he thought because it's all about that me

7  mentality, is it not?  It was all about him.  I should be able

8  to steal from him.  He's my friend and he should just

9  understand.  Really?

10         Not only that, I guess whenever he didn't

11  understand, when Mr. Contente did involve the police and when

12  the Defendant does have that case pending, remember he files

13  for unemployment and he doesn't give them the full truth

14  either, does he?  He tells them that some money came up

15  missing, and I got blamed.  Really?  It's all about character,

16  folks.  You know who you're dealing with.  He's manipulating to

17  get money from the system because he didn't get his way.  He

18  didn't get to steal the money and have his job and that was in

19  2011.

20         Then you heard he was taken to Presbyterian

21  Hospital by the Dallas Police officers and you heard it took

22  grown men laying on him on April 15th, 2012, to try to get him

23  under control and try to get him restrained and that net over

24  him to calm him down.  That is how violent he was being that

25  day.  You heard him making remarks like I ought to just steal

1    your gun or I can take your gun.  Future danger?

2                    And you heard from several witnesses, including

3    the Defendant's own brother.  Drugs in prison?  Absolutely.

4    Absolutely.

5                    And that was on April 15th, 2012.  And then he

6    goes out to the Express Inn where he's staying and he exposes

7    himself to Carina Pinzon.  He lays his hands on yet another

8    female.  Remember, he grabbed her by her wrist.  Luckily she

9    had that bucket of water that she was able to throw and get

10   away.  Remember how nonchalant he was about that when the

11   officers came?  He was eating a hamburger like it was just

12   another day.  What does that say about the man that you have

13   before you today?

14                   And then that leads up to May 20th, 2012.  And

15   again, the 14 of you said the facts of the offense for which

16   you found the Defendant guilty of would be most important to

17   you in determining whether someone received a life sentence or

18   a death sentence, most important to you in answering Special

19   Issue Number 1 yes.

20                   But we know that that wasn't all.  Because if

21   there was ever a time where you might be down on your knees,

22   asking for forgiveness, just waiting peacefully doing your time

23   before you literally go on trial for your life, that might be a

24   time where you're able and willing to behave and control

25   yourself.  But we know that wasn't the case.  This Defendant is

1  in there still getting tattoos, because you know he's a gift

2  from God.  That's insulting.  Nancy Harris is dead and her

3  family is hurting, and he's getting Gift from God tattooed on

4  him over in our jail.  Really?

5           And then, DSO Pyburn comes in and tells you that

6  she has to move him off the floor because she's concerned

7  because he's getting a little bit too familiar with the things

8  he's saying.  Whenever he's saying to her, I ought to just pull

9  you in here.  Future danger?  Threat to the security of our

10  jail?  Absolutely.  And then whenever he's telling her, you

11  don't pay me enough money to clean the shower.  What do you

12  think that's going to lead to?  Remember, that's when the fight

13  started there with Carlton Jenkins.  It was right after

14  cleaning.  He doesn't like to be told what to do, does he?

15  Future danger?

16           He's telling you what he was about to do right

17  there in the Dallas County Jail, but luckily she transferred

18  him off the floor before the situation got out of control

19  because it was all too familiar to her, what she was looking at

20  and the type of person she was dealing with.  She knew.  She

21  told you.

22           Let's talk about the facts of this offense

23  because that is what you found him guilty of, an intentional

24  killing in the course of a robbery.  You know back before you

25  knew the facts of the case, whenever we just asked you, how you

 1  felt about capital murder, an intentional killing in the course

 2  of a robbery, most every one of you again said something to the

 3  effect of, well, if you've got to do that crime, meaning the

 4  robbery, but you don't -- I think one of you put that in

 5  parenthesis -- but you don't, but if you've got to do it, why

 6  do you have to kill, as well?

 7                    THE COURT:  You've used 30 minutes.

 8                    MS. EVANS:  Thank you, Your Honor.

 9                    Look at the facts of the offense.  He goes in

10  there with a plan.  He told you from this stand that he filled

11  it with the lighter fluid and he went in there to rob because

12  he wanted more money to get high.  It's all about him.  He

13  lights her on fire after he gets everything he wants.  And

14  could anything be more personal than him removing that ring and

15  then licking his fingers standing over her.  You saw that.

16  Could anything be more vile and disgusting and while she's

17  trembling because he's already poured the lighter fluid on her,

18  remember?  As soon as he walked in and got behind the counter,

19  he lights her head on fire on the way out, and walks out.  What

20  does that tell you about the man that you have before you

21  today?  And then you get to look at what he did in the

22  neighborhood afterwards.  He commits another assault right

23  there in the neighborhood behind him by pushing Ken Marecle

24  down and taking his glasses and he's dumping evidence along the

25  way.

 1                   And, folks, many of you were concerned about if
 2     you were going to see any level of remorse.  You got to hear
 3     that call between he and his wife, same day immediately
 4     following this.  Take a listen to that again.  What's he
 5     concerned about?  When she's telling the truth of it, you had
 6     every opportunity and your selfishness led to this.  He's
 7     telling her, I got to go or let me talk to the kids.  He
 8     doesn't want to hear it.
 9                   If you add all that up, the answer to Special
10     Issue Number 1 is a resounding yes.
11                   Special Issue Number 2.  There's absolutely
12     nothing sufficiently mitigating based on the evidence that
13     you've heard in this case.  The answer to Special Issue Number
14     2 is no.  He told you that he came from a good family.  They
15     took him to church.  They were hard working parents, but what
16     excuse, what cop-out does he want to give you?  The drugs made
17     me do it.  Folks, that was his excuse every time.  Every time.
18     Is it a viable one?  No.  Nothing makes you do the type of
19     offense that this Defendant did on May 20th, 2012.  There is
20     nothing that rises to that level of being sufficiently
21     mitigating to warrant answering this anything but no.
22                   So the answer to 1 is yes.  The answer to 2 is
23     no.  And I'll leave you with this.
24                   If we've come a point -- to a point in our
25     society here in 2013 where you can intentionally take the life

1    of a 76-year-old woman, defenseless woman who has given you

2    everything that you want, including the ring off her hand, if

3    you can do that intentional killing in the course of a robbery,

4    the facts of this case, given his criminal history and then

5    result -- and that result in a life sentence rather than a

6    death sentence, based on the facts and the evidence in this

7    case and based on your answers to these special issues, I

8    submit to you that we need to look at our whole system and our

9    whole statute on capital punishment and the death penalty

10   again.  It needs to be revamped, because this one is severe,

11   it's horrific, it's heinous, it was violent, and the suffering

12   of Nancy Harris was insurmountable.

13              We ask you to answer Special Issue Number 1,

14   yes, and Special Issue Number 2, no, because that is the only

15   just and right verdict based on the law and the evidence in

16   this case.  Thank you.

17              THE COURT:  Ms. Evans.

18              Ms. Mulder.

19              (Argument by Ms. Mulder.)

20              MS. MULDER:  Ladies and gentlemen, good morning.

21   There's something that Ms. Evans said that I want you to

22   remember.  You get to look at the before, during, and after

23   this offense.  Oh, but wait.  No, you don't get to see the

24   whole after, because why?  Because despite what they told you

25   on voir dire, they have withheld evidence from you in this

1   capital murder case.  You know that Matthew Johnson got -- two

2   hours after this happened, was read his Miranda warnings,

3   agreed to waive them, and spoke with who, Detective Tooke.

4   He's been here every day.  I know he's here somewhere.  At any

5   point during this case they could have brought you his words,

6   and they have withheld that from you.  We don't get to offer

7   that.  The Judge cannot make them offer that.  It is their

8   choice.  They are standing before you asking you to make what

9   will probably be the most important decision of your life, the

10  death of another human being, and they are asking you to do it

11  without all the evidence.  That should appall you.  That should

12  frighten you.

13              They're asking you to make a decision about this

14  man's life, despite the fact they have not brought you

15  everything you deserve to know.  They have brought you

16  everything else from the time he was 15 and when he was a dumb

17  kid of 18, getting that shotgun tattoo.  They brought you

18  everything else.  Oh, oh, but, you know, they're not going to

19  bring you his words two hours after this happened.  Why?  You

20  know if it helped them, like I said before, it would be on all

21  three screens.  That should appall you.  They said during voir

22  dire they would bring you every piece of evidence in this case,

23  and they have not.  That in and of itself is reasonable doubt

24  with regard to Special Issue Number 1.

25              Have they proven beyond a reasonable doubt that

1    he's a future danger in prison?  Absolutely not.  Absolutely

2    not.  The benefit of the doubt goes to who?  In every case, in

3    every situation, Matthew Johnson.

4              Matthew Johnson testified to you that he doesn't

5    feel like a man, that he does feel remorseful, and during that

6    phone conversation, he asked, is she dead.  And he got off the

7    phone because he was upset.  You could hear it in the gargle of

8    his voice.  Absolutely, he has remorse.

9              Remember during voir dire we talked to you about

10   mitigation, and all of you said remorse was the most important

11   factor with regard to mitigation.  And he is remorseful, as he

12   told you.  You know they want to paint a picture that he's some

13   stone cold, sober killer, because remember, during

14   guilt/innocence what did -- what did they assert to you?  That

15   he was sober during the commission of this offense.  What do

16   you know now?  The same thing they do.  At the time that they

17   were telling you he was sober, that he has a 20-year history of

18   drug abuse, had a psychotic break a month before this happened.

19             MS. MOSELEY:  Objection, that's outside the

20   evidence.

21             THE COURT:  Sustained.

22             MS. MULDER:  That he was admitted to

23   Presbyterian Hospital under the influence of crack cocaine,

24   PCP, and ice, methamphetamine, so much so that he didn't know

25   where he was or what he was doing or who he was talking to,

 1  according to their witness.  No, but at that time they wanted

 2  you to think he was sober when this happened, that he's a stone

 3  cold killer.  You know now he's not.  And the reason I say that

 4  is because they're trying to paint a picture of him that

 5  doesn't match the facts of this case.

 6            The fact is that Matthew Johnson is a deeply

 7  flawed man, with a horrible drug addiction.  And they would

 8  have you believe and Matthew Johnson believes and his family

 9  believes that he came from a good family.  Now, he came from a

10  religious family, but I'm sorry, you know, I have a

11  seven-year-old at home.  What mother or father doesn't smell

12  marijuana in the hair or clothes of their seven-year-old?  What

13  mother or father doesn't smell marijuana in the hair or clothes

14  of their eight-year-old or when he's nine or when he's 10.  He

15  loves his parents and he's not going to say a word against

16  them, but come on, this man had no supervision.  And once he's

17  smoking marijuana at the age of seven, his brain doesn't have a

18  chance.  Truly.  He is a deeply flawed man.  He is not a stone

19  cold killer if it weren't for the drugs.  And he's not using

20  that as an excuse.

21            He told you, he takes responsibility for his

22  actions and he feels incredibly guilty about what this has done

23  to the Harris family.  You saw him apologize to them.  And to

24  his own family.

25            And you know what was interesting, too, is that

1    I believe during Ms. Moseley's closing arguments in the

2    guilt/innocence phase, she said, you know, he's not wearing a

3    mask because that's how you know he went in and planned the

4    thing and that's how you know he meant to kill her.  Well, no,

5    you know he didn't wear a mask because he's so high at the time

6    he commits the offense, he's not thinking.  He's not thinking

7    about any consequences at all because his brain is addled by

8    drugs and alcohol.

9            Just because they say it doesn't make it true.

10   You have a right to have all the evidence before you in a case

11   where they are asking you to take a man's life, and they have

12   withheld it.  They have withheld it, and I believe -- I

13   anticipate the State will stand up and say, you are the

14   stewards of the community, you will decide the message you're

15   going to send to the community.  And Ms. Evans said, you know,

16   if this isn't a case where you -- where the result is the death

17   penalty, I don't know what is, and our law is wrong.

18           Well, you know what, you are the stewards of the

19   community, and you will be telling the people whether or not in

20   Dallas, Texas, a man can get the death penalty when evidence

21   has been withheld.  You will be telling everyone in this

22   community if a man can get the death penalty when evidence has

23   been withheld.  And they'll tell you, they may get up here and

24   tell you, I don't know, well, it's not important or we don't

25   want to confuse the issue.  Well, if it's not important, why

1  not bring it?  They brought you everything else.  They're not

2  bringing it because it's important.  And if it scares them that

3  much, then they should rethink what they're asking you to do.

4  It is that important.

5          What Matthew Johnson did was horrible, and he

6  understands that.  And he knows.  He knows.  He will die in

7  prison, absolutely.  Your verdict has assured that.  You know,

8  when you think about the kind of person Matthew Johnson is -- I

9  mean, he is flawed.  He has made mistakes.  He also held a job

10 at Sanden International.  His coworkers liked him.  He was a

11 normal guy, because when he's sober, he is.  When he's sober,

12 he can function.

13         And we brought you all of the letters from his

14 family.  You know when he was in prison, he was trying to

15 better himself -- I mean, he did -- all the Bible completion,

16 all the Bible schools he completed by correspondence.  That

17 takes effort, time, and thought.  When he's sober, he can

18 function.  I mean, that man is not a stone cold killer.  He's a

19 deeply flawed man with a horrible drug addiction during which

20 he committed an absolutely horrific and horrible crime.

21         But he is loved, absolutely.  And we brought you

22 all of his letters, and please go back and read them.  We

23 didn't want to take up too much of your time, but please go

24 back and read them.  He is beloved by Daphne, and there is

25 absolutely no evidence that since he has been released from

1  prison he has done anything physical toward her.  There is not

2  one single piece of evidence in front of you that says that he

3  has been violent with her since he got out of prison -- since

4  before prison.

5            Dear daddy, stay strong and remember no matter

6  what happens, we'll all still be here.  From Makayi, his

7  14-year-old.  And we aren't going to drag these children in to

8  testify before you.  That's not something we're going to do.

9  From Deja, hey, daddy, are you good, I hope.  That was funny.

10  I know you used to ask me who is daddy's big girl.  I love you

11  a lot and hope to write again soon.

12            THE COURT:  You've used 12 minutes.

13            MS. MULDER:  Thank you, Your Honor.

14            Hi, daddy, how are you doing?  It's my first day

15  of school.  It was so fun.  We're still getting new people.  I

16  just wanted to say hi, and I love you so much.  Bye daddy, love

17  and take care, Deja.

18            Please read these letters.  Please.

19            This little girl deserves to know her daddy, and

20  these two girls do, as well.

21            Now, I know and anticipate the prosecution will

22  stand up and say, well, Ms. Harris's grandchildren didn't have

23  a choice.  Their grandmother and great grandmother was taken

24  away, and absolutely it is horrible what he did and wrong.  And

25  I anticipate they'll stand up and say, you know, all they get

1    to do is go to a cold cemetery and lay flowers on a sterile

2    grave.  That's the only visitation they'll get with Nancy

3    Harris.  And, unfortunately, that's true.  And we can't deny

4    that.  But two wrongs don't make a right, do they?  Two wrongs

5    don't make a right.

6                    THE COURT:  Thank you.

7                    Mr. Weatherspoon.

8                    MR. WEATHERSPOON:  May it please the Court.

9                    THE COURT:  Thank you, sir.

10                   (Argument by Mr. Weatherspoon.)

11                   MR. WEATHERSPOON:  Good morning.

12                   Ladies and gentlemen of the jury, I want to take

13   you back to what we talked about in voir dire.  And if you look

14   at Special Issue Number 1, the State has to prove to you beyond

15   a reasonable doubt, which we explained to you was the highest

16   standard in law.  We talked about preponderance of the

17   evidence.  We talked about clear and convincing.  And we talked

18   about beyond a reasonable doubt.  They have to prove to you

19   that there is a probability, more likely than not, that Matthew

20   Lee Johnson would commit criminal acts that would constitute a

21   continuing threat to society.

22                   In voir dire we talked about what his society

23   would be.  His society will be the Texas Department of Criminal

24   Justice, prison.  And one thing I do agree with Ms. Evans about

25   is sometimes past behavior is indicative of future behavior.

1  In the four years and 10 months that he was in the Texas

2  Department of Corrections, one fight.  That's the only act of

3  violence that they could bring you.  And remember, they have

4  the burden of proof to prove it to you beyond a reasonable

5  doubt.  So in four years and 10 months, he was involved in one

6  fight.  And there is a dispute as to who initiated the fight,

7  whether it was Mr. Jenkins or whether it was Mr. Johnson.  One

8  fight.

9            In 18 months in the Dallas County Jail, did you

10  hear any evidence of any violence, of him being involved in any

11  physical -- excuse me, confrontation?  No.  They have to prove

12  to you that he will be a threat while incarcerated.  And in two

13  instances of his being incarcerated, you only heard about one

14  fight.  That's it.  That's all.

15            Now, they can say -- and I'll agree, he

16  disobeyed some rules, he got some tattoos when he wasn't

17  supposed to.  But is that an act of violence?  Does that cause

18  a continuing threat?  That's what you need to focus on.

19            And you know we told you in voir dire that we

20  didn't have any burden of proof in Special Issue Number 1.  The

21  law presumes the correct punishment is life without parole.

22  The burden is on them, but even though we didn't have any

23  burden, we brought you evidence.  We brought you three experts.

24            Let's talk about Mr. Au Buchon.  Over 25 years

25  experience in the Texas Department of Criminal Justice.  And he

1    told you about the classifications from G1 to G5, and what do

2    we know about Matthew Lee Johnson?  He arrived as a G3, he

3    worked his way up to a G2.  He got into a fight.  He went down

4    to a G4.  He worked his way back up to a G2.  And then

5    eventually to a G1, the least restrictive situation.  The Texas

6    Department of Criminal Justice, who has experience in

7    evaluating this, who it is their job to evaluate this, who it

8    is their responsibility to evaluate this, they had Matthew

9    Johnson at a G1 for three years out of the four years and 10

10   months he was in the Texas Department of Criminal Justice.  He

11   was a G1 for three years.  He was allowed work detail outside

12   the prison walls.  Did you hear any evidence of any violence,

13   any inappropriate behavior, him doing anything wrong while he

14   was at a Level G1?  He successfully completed -- completed his

15   prison sentence as a G1.

16              Then you heard from Dr. Sorensen, and what did

17   he tell you?  He brought you all of the data, the research.  He

18   gave you the five factors that listed -- that are listed in the

19   literature to determine future dangers.  He talked to you about

20   it -- age, education, membership in a gang, criminal -- the

21   offense you're in custody for.  He listed all the things that

22   are used to evaluate whether an inmate will be dangerous in the

23   future.  He showed you the statistics.  He had a PowerPoint

24   presentation.  He put it up there.  And what did he tell you?

25   Based on all the research, all the records that are Matthew Lee

1  Johnson's, he would not commit criminal acts in the future that

2  would a threat to society.  That's what his testimony was.

3  With his 20 some odd years of experience, Mr. Au Buchon, he

4  would not be a threat in TDC.

5              MS. MOSELEY:  I object.  That's a misstatement

6  of the evidence.

7              THE COURT:  Sustained.

8              MR. WEATHERSPOON:  Your Honor, I obviously

9  disagree with Ms. Moseley.

10             If you -- you -- if there's a disagreement

11 between you all, you all can ask for it to re -- be read back.

12 If you all think there's a disagreement in testimony, and I'll

13 ask you to, because Ms. Moseley is incorrect.

14             THE COURT:  The jury will recall the testimony

15 as they heard it.

16             MS. WEATHERSPOON:  Mr. Au Buchon told you what

17 he thought.

18             And then you heard from Mr. Aiken, over 40 years

19 in the profession.  This is a man who was hired by the United

20 States Congress to evaluate prisons in this country for

21 legislation that was signed by President George Bush.  This is

22 a man of national stature, and he reviewed all the records, all

23 the information on Matthew Lee Johnson, and he told you, based

24 on his 40 years of experience, that Matthew Lee Johnson would

25 not constitute a continuing threat.

```
 1                    We brought you three experts to tell you this
 2   man would not constitute a continuing threat.  And you know
 3   what's -- what's as important as that?  It's not just what you
 4   heard from us.  It's what you didn't hear from them.  Don't you
 5   think that if she could have brought you one witness to say the
 6   methodology was incorrect, the analysis was incorrect, the
 7   conclusion was incorrect, don't you think that if the State had
 8   someone who could tell you Dr. Sorensen was incorrect, Mr.
 9   Aiken was incorrect, the type of analysis that they did was
10   incorrect, don't you think that person would have been on the
11   witness stand?  You know they knew it was coming, because when
12   Ms. Moseley cross examined Mr. Sorensen -- excuse me, Dr.
13   Sorensen and Mr. Au Buchon, she referenced -- part of her
14   question was, when you've testified in the past, so she knew
15   what their past testimony had been.  She knew what was coming.
16   And if she had something that would disprove what they said,
17   something that would contradict what they said, don't you think
18   you would have heard it on the witness stand?  But you didn't.
19   And I submit to you there's a reason why you didn't.  Because
20   all the experts who looked at the data, experts we brought you
21   came to the same conclusion, that this man would not constitute
22   a continuing threat in the Texas Department of Criminal
23   Justice.
24                    Now, as Ms. Mulder told you, we're not going to
25   sit here and tell you Matthew Lee Johnson is a saint.  We're
```

1  not going to sit here and tell you he did things that weren't
2  good, but even remember some of the things you heard.  Remember
3  Amy Armstrong who he had a volatile physical relationship with
4  when he was 18 years old, and the police asked her, did you
5  want to file kidnapping charges on him when he took her child.
6  And what did she tell you?  No, because he would never harm my
7  child, that he was good with my children, that he loved my
8  children.  Throughout their tumultuous relationship, Amy
9  Armstrong still told you that she had no question in her mind
10  that this man would not harm her children.
11          THE COURT:  You've used 10 minutes, Mr.
12  Weatherspoon.
13          MR. WEATHERSPOON:  Thank you, Your Honor.
14          When you heard Officer Pyburn testify, she told
15  you she had a dispute with him about cleaning the shower.  He
16  didn't do what he was supposed to do cleaning the shower.  But
17  did you hear anybody from the Dallas County Jail say he had
18  done anything physical or violent in his 18 months in the
19  Dallas County Jail?  No.  While he's been in custody, whether
20  it's the Dallas County Jail or the Texas Department of Criminal
21  Justice, you've only heard about one fight with one inmate and
22  that's it.  No gang affiliation.  He's never been caught with
23  any contraband, any drugs in prison or the Dallas County Jail,
24  any weapons in prison or the Dallas County Jail.  None of that.
25          As Ms. Mulder told you, while in custody, he

1  attended Bible classes or completed Bible courses.  Texas

2  Department of Criminal Justice was satisfied that he should be

3  at a Level G1, the lowest level of security.  That's the

4  evidence.

5          The professional -- every professional in the

6  field who's testified in this case has told you the same thing.

7  If they had had any evidence to contradict that, you would have

8  heard it from the witness stand.  So when you go back to

9  deliberate, remember what the experts told you.  The people

10  who've evaluated Matthew Lee Johnson's records, who've worked

11  in the Texas Department of Criminal Justice, because remember,

12  their witness, Warden Nelson, she said -- I don't think she

13  testified to any of that.  So remember the expert testimony you

14  heard.

15          And if you do, the appropriate sentence, the

16  sentence the law presumes is the correct sentence, is a life

17  sentence without the possibility of parole.

18          THE COURT:  Thank you, Mr. Weatherspoon.

19          Ms. Bernhard.

20          (Argument by Ms. Bernhard.)

21          MS. BERNHARD:  May it please the Court.

22          We can't change what happened to Nancy Harris,

23  and I'm not going to sit up here and tell you that that was in

24  any way okay or in any way not horrific.  We can't change that.

25  I wish we could.

1          And most importantly, Matthew Johnson wishes

2   that we could.  You heard that from him.  But we can't, and

3   your verdict can't.

4          What you have to do is base your verdict on the

5   law and the evidence, just like Ms. Evans told you.  We agree

6   on that.

7          Now, the State of Texas would have you believe

8   that life without parole is a walk in the park, that that's not

9   punishment at all.  You know differently.  Common sense tells

10   you differently.  And by your verdict, convicting him of

11   capital murder, you have assured that Matthew Lee Johnson is

12   going to die in the Texas Department of Criminal Justice,

13   period.  It's just a matter of how.  You know that life without

14   parole is a serious punishment.

15          Nowhere in the special issues, nowhere in the

16   jury charge that the Judge read to you and that you're going to

17   take back to that jury room, nowhere in there does it ask you

18   does he deserve death.  And we talked about that in voir dire,

19   that that's not how the State of Texas determines who lives and

20   who dies.  We answer very specific special issues.  We base it

21   on future conduct -- future conduct in prison.

22          We brought you evidence that told you beyond a

23   reasonable doubt that Matthew Lee Johnson is not going to be a

24   danger in prison.  We brought you the evidence.  We brought you

25   the experts, including Warden Nelson who told you what factors

1    make a person dangerous in prison.

2                    Professor Sorensen brought you the data, the

3    studies.  Your membership in a gang, your education level, your

4    age.  And you can tell that by looking at his criminal history.

5    A lot of stuff when he's young and stupid.  But as the years go

6    by, as he gets older, there's less and less.  Common sense

7    tells you that as people get older, they get less stupid, they

8    get less dangerous, and that's what the experts told you.

9                    Professor Sorensen also told you that the fact

10   that somebody is serving life without parole makes a person

11   less dangerous.  And I asked him, I said, well, that seems a

12   little strange.  That seems counterintuitive, but he said

13   that's what the data showed because people who are serving life

14   without parole know that they're going to be there for the rest

15   of their life and they're going to do what they can to make

16   that life as tolerable as it possibly can be.  It makes them

17   less dangerous.

18                   And you also heard from Professor Sorensen that

19   one's -- that past behavior in the free world does not compare

20   to behavior in prison.  It's like comparing apples and oranges.

21   And that makes sense.  Prison is not like our day-to-day life

22   out in the free world.  Prison is a hard, difficult, ugly

23   place, and you can't look at somebody's behavior in the free

24   world and say that translates into his behavior in prison.

25   Because professor told -- Professor Sorensen told you the data

1    doesn't support that.  The studies don't support that.  It's

2    simply not true.

3                But when you look at Matthew Johnson's behavior

4    in prison, as Mr. Weatherspoon pointed out, we have almost six

5    years of incarceration between prison and the Dallas County

6    Jail, not to mention all the other times that he's been in

7    jail.  And what did they bring you?  They bring you one fist

8    fight with a convicted child molester, one.  And, yes, Carlton

9    Jenkins was seriously injured.  That's because when he fell

10   down, he hit his head on concrete and steel because prisons are

11   literally hard places.  There are no soft landings when you

12   fall in prison.  And that's it.  That's all the violence that

13   they brought you in all the time that he has been in prison.

14   That's it.

15               Now, the State of Texas wants you to believe

16   that TDCJ is run by a bunch of morons and imbeciles who just

17   let the inmates run wild, just let the drugs flow freely and

18   the weapons and everything else.  They have no control over

19   anybody.  You heard Warden Nelson.  You saw Warden Nelson.  Do

20   you think she lets anybody get away with anything?  I think

21   Warden Nelson and the other wardens like her that run TDCJ can

22   very easily control the likes of Matthew Lee Johnson.  That's

23   what they do.  They put a lot of effort into how we go about

24   controlling people, how we go about keeping people safe.  And

25   they do a good job.  Warden Nelson told you that, that TDCJ is

1  a very well run prison.

2              Frank Au Buchon told you that, after almost 30

3  years working there.

4              And Mr. Aiken, with his 40 years in the

5  industry, told you that TDCJ was a well-run prison and that

6  they can control the likes of Matthew Lee Johnson.  That's what

7  the evidence tells you.  What the State brings you and what

8  they're arguing to you are possibilities.  Well, yeah, anything

9  is possible.  But that's not what the law says.  That's not

10  what the special issue says.  And we talked about that in voir

11  dire.  Probability does not mean a possibility.  It means

12  evidence showing you more likely than not.  And that's what

13  they haven't brought you, because it's not there.  Because when

14  you look at the characteristics of Matthew Lee Johnson, when

15  you look at the factors that make a person dangerous in prison,

16  he doesn't fit the bill.  Prison can control him.  That's what

17  all the witnesses told you.

18              Now, in regard to his disciplinary record,

19  Warden Nelson told you, well, not everybody gets written up for

20  everything, and sometimes some records get destroyed when a

21  person leaves prison.  Possibilities, ladies and gentlemen.

22  They want you to speculate, oh, well, he must have had all

23  these other disciplinaries that somehow got destroyed or the

24  guards just ignored it.  That's not evidence.  That's not a

25  probability.  Because Warden Nelson also told you that if it

1  was something that was important, if it was something that

2  would reflect on his behavior in prison, it did not get

3  destroyed.  Things like fights, things like possession of

4  contraband, those don't get destroyed.  He didn't have any

5  possession cases when he was in prison, not even possession of

6  a few too many stamps.  He can be controlled in prison, where

7  he will be for the rest of his life.

8              Now, I want to talk a little bit about

9  mitigation and the second special issue.

10             Now, we brought you evidence about Matthew Lee

11 Johnson's character and his background and his addiction and

12 mental illness and his struggles, not to excuse what he did,

13 not even to explain what he did, because there is no good

14 explanation.  But you all told us in voir dire that if you're

15 going to decide whether or not somebody lives or dies, you want

16 to know everything there is to know.  That's why we brought you

17 that evidence.

18             And what do we have in the way of Matthew Lee

19 Johnson's life and in the way of mitigation that you have to

20 consider in this case?  The law requires that you consider

21 mitigation.

22             First and foremost, you know that he was

23 addicted, and you know that he had an addiction issue for

24 probably 30 years of his 38-year life, maybe even 31.  That's

25 something that he has struggled with repeatedly throughout his

life, because that's the nature of addiction.  Addiction is a
cold, cruel mistress, and he tried and he tried and he tried,
but he never got away from it.

            And the State wants to tell you, well, he wasn't
intoxicated on this -- in this offense.  And even if he was,
well, you know, he can -- he can still get drugs in prison.
It's a possibility.  It's not a probability.  They didn't bring
you any evidence of that.

            You know that he had a problem with addiction
because not only does Matthew Lee Johnson tell you that, but
the records tell you that.  We know that as early as 2002, he
admits himself to Green Oaks Hospital when he's 26 years old.
And he tells them for the last several years he's been drinking
six to 12 beers a day, using 50 to a hundred dollars of crack
cocaine daily for the past year, smoking marijuana several
times a week and smoking PCP several times a week.  This is way
back in 2002.  You know he's got a problem.  You know he's
struggling with addiction.

            And you also heard from Dr. Roache that drugs
change a person's brain.  You also heard from Dr. Roache that
addiction can be genetic, that there's a strong genetic factor.
And you also know that from the records.  You know that of the
Johnson boys, all three of them had problems with substance
abuse.  Matthew Lee Johnson started smoking marijuana at the
age of seven -- seven.  And he wanted that marijuana badly

1  enough that he subjected himself to sexual abuse in order to

2  get it.  That's not a voluntary act.  That's a disease.

3              We also know that he had substance abuse issues

4  when a month before this offense he's taken to Presbyterian

5  Hospital and he's psychotic.  Lisa Ann Parker, the social

6  worker, told you that.  And she told you that psychosis is a

7  break with reality.  So they want to say, oh, he's struggling

8  and -- and fighting the officers because he's an evil man.

9  He's an addict who's having a break with reality.  He tells

10  them he's been smoking crack cocaine, ice, and marijuana laced

11  with PCP.  We know he has addiction issues.  It's not just what

12  he's saying.  The records reflect that.  The trained

13  professionals recognize it and identify it.

14              We also know that's the case from the Dallas

15  County Jail records where he tells them and they note, cocaine,

16  PCP, weed, Xanax.  That's what the records tell us.  It's not

17  just Matthew Lee Johnson saying, oh, I have a drug problem.

18              We also know from his records in the Dallas

19  County Jail that Matthew Lee Johnson is remorseful.  The State

20  wants to get up here and argue that he's not remorseful for

21  this offense.  He told you he was.  And I'm sure they're going

22  to say, oh, well, you can't believe him because he's the

23  Defendant, he's trying to save his own life.  He didn't know

24  the jail people are going to write that down.  These are

25  trained professionals who deal with inmates every single day.

1   They noted remorse.  He told you he was remorseful.  He told

2   you he deserved the death penalty.  He told you that he

3   deserved to be set on fire.  And the only reason he was asking

4   you to spare his life is because of his daughters, because of

5   Makayi, Deja, and little Matduxx.  That's mitigation.  That's

6   all you need.

7                As Ms. Mulder pointed out, the State of Texas

8   never showed you the interview that was conducted with police

9   officers two hours after the offense happened.  You have to ask

10  yourself why not?  Because you know if he denied the offense,

11  they would have played that to impeach his testimony.  You know

12  that if he said anything about he wasn't remorseful in that

13  interview, they would have played it to impeach his testimony.

14  So what does that tell you that that interview showed?  That

15  tells you that when he spoke with the police two hours after

16  this offense, that Matthew Lee Johnson was remorseful and sorry

17  and horrified by what he had done.  That's what that tells you.

18  So don't let them convince you that he didn't have remorse,

19  because you heard it from him and you can deduct it from the

20  records that you didn't see.  He told you he was horrified.

21               Now, the jail records also diagnose him as

22  polysubstance dependent and with substance-induced mood -- mood

23  disorder.  And you also heard some records, particularly the

24  Green Oaks records back in 2002, that diagnosed him with severe

25  depression.  The State wants to say, well, he didn't have

1  mental illness, he just was depressed because he was using

2  drugs.  When you start smoking marijuana at the age of seven,

3  does it really matter whether you're depressed or whether

4  you're polysubstance mood disorder?  The symptoms are the same.

5  The agony is the same.  It doesn't matter.  It's like the

6  chicken and the egg, which came first.  When you start smoking

7  marijuana at the age of seven, that tells you something.  That

8  tells you a lot.

9            And you know that Matthew Johnson has struggled,

10  and he's tried to beat this habit.  He has periods of time

11  where he holds a job, loves his family, takes care of his

12  family, does what he's supposed to do, and then that addiction

13  raises its ugly head again and he can't say no.  And Dr. Roache

14  told you it's not a matter of just saying no.

15            The discharge material that he gets from Green

16  Oaks says it has nothing to do with willpower.  It's more

17  powerful than the need for food or water.  He struggles with

18  it.  And they want to try to tell you that, well, every time,

19  you know, if he's in jail, you know, he can get his hands on

20  drugs and -- and he'll be violent in prison.  But that's not

21  what the evidence tells you.  That's not what his record tells

22  you.  That tells you that TDCJ can confine him, and they can do

23  so without him being a continuing threat.  That's what our

24  prisons are for.  To control people.  To control people who

25  have criminal proclivities, to control people who break our

1 laws.  And there are a lot of people that work in the prison

2 industry and devote their entire lives to making sure that

3 prisons can control people.  And for the most part, they do it

4 very well.  Yes, there are possibilities.  Anything is

5 possible.

6            But that's not what that special issue asks you

7 to do.  That special issue asks you whether or not the State of

8 Texas proves it to you beyond a reasonable doubt.  And a

9 probability is not a possibility.  The evidence isn't there

10 that he's going to be a continuing threat.

11            When you were sworn in jurors -- as jurors in

12 this case, you took an oath to base your verdict on the law and

13 the evidence.  The law in the punishment phase of a capital

14 murder trial doesn't ask you about possibilities.  Doesn't ask

15 you to speculate about what might happen.  It asks you what the

16 State has proven to you can happen.  And what the evidence

17 proves to you is that Matthew Lee Johnson can be very well

18 controlled in prison.  That's what our prisons are for.

19 Matthew Lee Johnson can serve the rest of his life in prison.

20 He can die in prison.

21            He can't change what happened to Nancy Harris,

22 and you can't change what happened to Nancy Harris.  But each

23 and every one of you can go back into that jury room and make a

24 personal moral judgement as to whether or not Matthew Lee

25 Johnson lives or dies, but you have to base your verdict on the

1  evidence.  And the evidence that you heard in this case does

2  not tell you that Matthew Lee Johnson meets the criteria for

3  somebody that we need to execute because he can be controlled

4  in prison and that's what they're for.

5              Follow your oath, follow the law, and answer

6  those questions in such a way that Matthew Lee Johnson spends

7  his life in prison where he will be controlled.  Thank you.

8              THE COURT:  Thank you, Ms. Bernhard.

9              Ms. Moseley.

10             (Argument by Ms. Moseley.)

11             MS. MOSELEY:  Matthew Lee Johnson has been

12 indulged during this trial.  He's been given all his

13 constitutional rights.  We have made sure that all of his

14 rights have been protected.  He's had perfectly good lawyers to

15 come in here and tell you exactly what we knew they would tell

16 you.  He won't be a future danger.  You can ignore all of those

17 prior violent acts.  You can ignore his character.  You can

18 ignore who he is and have mercy on him, I guess.  They're

19 asking you to sentence him to life because life in prison is so

20 horrible.  It's such a terrible punishment.  Life in prison

21 where he can have contact visitation.  Life in prison where he

22 can continue to call home and ask them to put money on his

23 books.

24             We need to remember what this case is about and

25 why we're here.  And we're here because of what he did to Nancy

 1  Harris, a 76-year-old great grandmother.  Drugs didn't do that

 2  to her.  Matthew Lee Johnson did that to her.

 3                  Their own expert, Dr. Roache, told you drugs

 4  don't make people violent.  Drugs exacerbate an underlying

 5  violent character, and that's what we have here.  That's what

 6  we've got.

 7                  Your character is defined not by your words, but

 8  by your deeds.  Look at his deeds over the past 20 years.  Look

 9  at that, and you'll know who he is.  You heard a day and a half

10  of woman after woman after woman coming in here and telling you

11  he's a good man, he's a good father, he's a good husband.  That

12  is offensive to everyone who has a good father, a good husband,

13  or a good man in their lives.  It's offensive.  Good men don't

14  hit women.  Good men don't rob women.  Good men don't

15  masturbate in front of 18-year-old women who are just trying to

16  earn a living.  And remember who's working in the prison when

17  you go back there and decide whether he's a future danger,

18  because you heard who's working in there.  You saw who works in

19  there.  Ashley Villegas, that's who's working there.

20                  The Texas prisons do a good job.  They do the

21  best they can do.  But as Warden Nelson sat up here and told

22  you, she does the best she can do and she tries to run a

23  well-run prison, but they find weapons every day, they find

24  drugs, they find cell phones.  They're short prison guards.

25  These guys get away with a lot, and they certainly have the

1  opportunities.  His own brother told you it's up to the person

2  to decide.

3          There are people in there, believe it or not, in

4  the Dallas County Jail and in the penitentiary, who don't have

5  one single disciplinary violation.  They are there to do their

6  time.  That's not who he is.  That's not who he is.

7          Don't be fooled by his words.  Remorse is more

8  than saying you're sorry.  He would have you believe that he

9  had remorse every time he hit his wife, but remember he doesn't

10  even really accept that responsibility, does he?  For remorse

11  to be genuine, don't you have to first accept your

12  responsibility?  Well, I never hit anybody to hurt them.  I

13  didn't hit her to hurt her.  I didn't hit Amy to hurt her.  I

14  didn't hit Daphne to hurt her.  I just wanted to keep them off

15  of me.

16          I didn't -- I didn't mean to hurt David

17  Contente.  I just needed help.  I just needed help.

18          I didn't mean to hurt anybody.  I only set Ms.

19  Harris on fire because she was coming at me.  Can there be

20  anything more repulsive or more despicable than that?  And then

21  say you're sorry.  And you know how you know he's not sorry?

22  Because the one woman who knows him better than anybody, his

23  wife, Daphne, told him on that call.  You heard him.  Well, I'm

24  sorry.  No, you're not, Matthew.  No, you're not.  You had

25  every opportunity to get help.  You didn't want it.  You chose

1   drugs.  You're not sorry.  Because you know -- all of you know

2   that a person who says they're sorry and continues to do the

3   same thing over and over again isn't truly remorseful, because

4   for true remorse, you have to feel bad about what you did and

5   you have to try to change the behavior.  You have to accept

6   responsibility, and you have to try to make amends.  And he

7   hasn't done any of that in his life.

8                    He was remorseful when he stole from David

9   Contente, so remorseful that he went and asked for his last

10  paycheck and then filed for unemployment benefits and then

11  appealed the denial of the unemployment benefits.  He does what

12  works for him.  He's not sorry.

13                   He admitted that he didn't even mention Ms.

14  Harris's family in a single call until the week before his

15  trial.  He is sad because of what this has done to him.  And no

16  real man, no real father stands behind their children and says,

17  have mercy on me because of them.  Because you know he's

18  worried about him.  When he's talking to Makayi on the phone

19  and she's upset because she didn't have enough money for chips.

20  And he says, well, you probably didn't need them anyway.  And

21  30 seconds later tells Daphne, I need more money on my books.

22  That tells you what he's about, who he is.

23                   And when we ask you to decide what would be

24  important to you in answering that question about will somebody

25  more likely than not be a threat in the future, the facts of

1  the crime, the person's character, and their background, we

2  brought you all of that.  You didn't need to see a videotape of

3  this Defendant who got caught red-handed in the neighborhood,

4  identified on video saying he was real sorry.  We bring you

5  evidence that matters, and him saying he's sorry one more time,

6  him saying the drugs did it one more time is not necessary.

7  You heard that.  And it's not credible.

8          You know who he is.  You know what he is.  You

9  know what he did, and yesterday you learned a little bit about

10  who Ms. Harris is, who she was, and what she meant to her

11  family.  The last time that her family saw her.  I want y'all

12  to think about that and think about what that call must have

13  been like that the family received, her sons.  One of her sons,

14  a real man, worked two jobs to support his family, trying to

15  sleep on Sunday morning because he had worked Saturday night,

16  having to be woken up and told you got to go to Parkland to see

17  your mom because Matthew Lee Johnson had a drug problem.  You

18  ask yourselves when you watch that video, did he look like he

19  was high to you?  That description you saw in Presbyterian

20  records, is that what you saw?  Absolutely not.  He wasn't

21  high.  He wasn't high.  He may have been coming down.  He may

22  have been using crack the night before, but he wasn't high when

23  he committed that crime.  He was cold and calculated.

24          He picked two packages of cigarettes apparently

25  by brand, very carefully chosen.  He tried to get the ring off.

1    He had to think about what can I do to make that come off a

2    little easier.  And he licked his fingers as he stood over her.

3    He set her on fire, walked around her, grabbed candy off the

4    counter, and walked out.  And you know after having heard her

5    screams yesterday on that video, you know he heard that.  Is

6    that remorse?  You know he heard it.  While he was getting rid

7    of the evidence and trying to get away with his crime, you know

8    he heard it.

9            When he's in the backseat of that car and

10   calling the officer by name, was he high then?  When he told

11   Officer Perez, what took y'all so long, y'all are getting slow.

12   Was that remorse?  He's sorry because he got caught, and I know

13   that we're asking you to make a decision that's going to result

14   in his eventual execution.  And I know that that is a heavy

15   burden on a person.  You all told us that that was a burden you

16   could accept and that you would do it in an appropriate case.

17   And when you go back there and think about who he is, what he

18   is, what he's done over and over again and you think about all

19   of the people who thought he wouldn't be a threat in the

20   future, who thought he had learned his lesson, who thought he

21   wouldn't do it again, ask yourselves if you want to be wrong

22   about that.  Ask yourselves if you want to be another person

23   that he has convinced that he won't do it again.

24            Following your oath, the answers to these

25   questions are very clear.  He's never been held accountable by

1 anyone.  Now is the time for you all to hold him accountable

2 and to protect people from him.  It is a heavy burden, but he

3 has to be held accountable and it can't be easy on those kids

4 at home.  It can't be easy, but they need to know that there

5 are consequences for behavior.  And some day they'll understand

6 that, but having three children who love you is not mitigation.

7 It does not lessen his moral blameworthiness.  If anything, it

8 increases his moral blameworthiness.  You all are not doing

9 anything to him or his children.  He did it.  He brought that.

10 He is the cause of all of this.

11              But you have the burden of following the law,

12 following your oath, and answering those questions in a way

13 that will ensure that we'll be protected, that people in the

14 future will be protected from this Defendant, and that there

15 will be justice served for Nancy Harris.  Let's not lose sight

16 of that.  When you're deliberating your verdict, you think

17 about the vulnerable and who his victims have always been,

18 weaker than him, and how he doesn't accept responsibility.  And

19 it's always somebody else.

20              Well, Mr. Marecle fell.  Carlton Jenkins fell.

21 I didn't mean to hurt -- I didn't hit anybody to hurt them.

22 Ms. Harris came at me.  You know who he is and you know what

23 you have to do.  It may not be easy, but you can't walk out of

24 this process knowing you didn't follow the law and knowing you

25 didn't follow your oaths.  That's why you're all here.  That's

1  why the 14 of you are sitting in these seats, because we knew

2  that you could do the tough job, that you could -- that you

3  could follow your oaths, and that you would make sure that the

4  laws in the State of Texas are upheld, and that people who

5  attack the vulnerable and the weak will face justice.

6              Him coming in here and asking for mercy after

7  having subjected you all to the evidence that you've heard,

8  after having to listen to Ms. Harris cry, God, help me, God,

9  help me, and to come in here and see that he has tattooed on

10 his chest, Gift from God, if there is anything that speaks

11 about what he thinks or about who he is, that does.  He thinks

12 God put him in jail to protect him.  Hold him accountable.

13 Protect our community and protect society, protect the weak

14 from Matthew Johnson.  Follow your oaths and answer yes to

15 Special Issue Number 1, because he has proven to you that he

16 will more likely than not continue that behavior.  And no to

17 Special Issue 2 because there can never be anything -- anything

18 sufficiently mitigating to warrant a life sentence after doing

19 what he did to Ms. Harris and after living the life he's led.

20             I know you'll take your job seriously.  We thank

21 you for your attention, and we ask you to follow your oaths and

22 do the right thing.  Thank you.

23             THE COURT:  Thank you, Ms. Moseley.

24             Members of the jury, we're going to go ahead and

25 recess now for you to begin deliberations.

```
 1                  Gentlemen, you will need to remain at the
 2   courthouse and be sequestered tonight, if necessary, until a
 3   verdict is rendered.  The jury will be eating lunch in the
 4   cafeteria.  For those of you who brought food, I'm not sure if
 5   there's a microwave in the cafeteria where you'll be eating, so
 6   you'll probably need to heat your food up here if you brought
 7   it.  Those of you who brought food will need to take it to the
 8   cafeteria and eat with those of you who haven't.  And we'll
 9   break for lunch when you -- when you request it.  You are -- we
10   are in recess, and you will begin deliberations.
11                  THE BAILIFF:  All rise.
12                  (Jury excused from courtroom.)
13                  THE COURT:  We stand in recess.
14                  MS. MOSELEY:  Judge, before we break, I'd like
15   to offer the PowerPoint that we used during the punishment,
16   just for the record.
17                  (State's Exhibit 197 offered.)
18                  MS. BERNHARD:  No objection.
19                  THE COURT:  Admitted for the record.
20                  (State's Exhibit 197 admitted.)
21                  (Recess of proceedings.)
22
23
24
25
```

```
 1                    Reporter's Certificate
 2  THE STATE OF TEXAS:
 3  COUNTY OF DALLAS:
 4      I, Darline King LaBar, Official Court Reporter in and for
 5  the 363rd District Court of Dallas County, State of Texas, do
 6  hereby certify that the above and foregoing volume constitutes
 7  a true, complete and correct transcription of all portions of
 8  evidence and other proceedings requested in writing by counsel
 9  for the parties to be included in the Reporter's Record, in the
10  above-styled and numbered cause, all of which occurred in open
11  court or in chambers and were reported by me.
12      I further certify that this Reporter's Record of the
13  proceedings truly and correctly reflects the exhibits, if any,
14  admitted by the respective parties.
15      WITNESS MY OFFICIAL HAND this the Reporter's Certificate
16  on the 25th day of February, A.D., 2014.
17
18
19
                    \s\Darline LaBar
20                  DARLINE KING LABAR
                    Official Court Reporter
21                  363rd Judicial District Court
                    Dallas County, Texas
22                  hpdkfaith@msn.com
                    (214) 653-5893
23
24
   Certificate No:  1064
25 Expiration Date:  12/31/2014
```