# CLERK'S SUMMARY SHEET FOR
# POSTCONVICTION APPLICATIONS FOR WRIT OF HABEAS CORPUS
# UNDER CODE OF CRIMINAL PROCEDURE, ARTICLES 11.07 AND 11.071

## Application for Writ of Habeas Corpus

Ex Parte Matthew Johnson                     from Dallas County
*(Name of Applicant)*

BEST COPY AVAILABLE                          363rd JUDICIAL DISTRICT COURT

TRIAL COURT WRIT NO. W12-23749-W

APPLICANT'S NAME *(As reflected in judgment)*: Matthew Johnson

OFFENSE *(As reflected in judgment)*: Capital Murder

CAUSE NO. *(As reflected in judgment)*: F12-23749-W

PLEA: _____ GUILTY ✓ NOT GUILTY                RECEIVED IN

SENTENCE: Death                     DATE: 11/8/20 COURT OF CRIMINAL APPEALS
*(Terms of years reflected in judgment)*

TRIAL DATE: 11/8/2013                           APR 22 2019

TRIAL JUDGE'S NAME *(Judge presiding at trial)*: Judge Tracy Holmes

APPEAL NO. *(If applicable)*: AP-77,030

CITATION TO OPINION *(If applicable)*: __N/A_ S.W.3d _N/A__     Deana Williamson, Clerk

HEARING HELD: ✓ YES _____ NO
*(Pertaining to the application for writ of habeas corpus)*

FINDINGS & CONCLUSIONS ENTERED BY HABEAS JUDGE: ✓ YES _____ NO
*(Pertaining to the application for writ of habeas corpus)*

RECOMMENDATION: _____ GRANT ✓ DENY _____ DISMISS _____ NONE
*(Habeas judge's recommendation regarding application for writ of habeas corpus)*

HABEAS JUDGE'S NAME: Judge Tracy Holmes
*(Judge presiding over habeas corpus proceeding)*

NAME OF HABEAS COUNSEL IF APPLICANT IS REPRESENTED: Carlotta Lepingwell

I certify that all applicable requirements of Texas Rule of Appellate Procedure 73.4 have been complied with in this habeas proceeding, including the requirement to serve on all the parties in the case any objections, motions, affidavits, exhibits, proposed findings of fact and conclusions of law, findings of fact and conclusions of law, and any other orders entered or pleadings filed in the habeas case.

_____ by: Regina Taylor     Deputy          4/2/2019
Signature of District Clerk or Clerk's Representative              Date Signed

Misc. Docket No. 18-025                              digitized by 538/16/2018

THE STATE OF TEXAS                    *Cause No.* W12-23749-W (A)

*VS.*                                 IN THE 363RD JUDICIAL DISTRICT COURT

MATTHEW JOHNSON                       DALLAS COUNTY, TEXAS

## "INDEX"
## (VOL.2)

---

| | |
|---|---|
| Cover | VOL. 2-538 |
| Index | VOL. 2-539 |
| Writ Letter 5-28-2015 | VOL. 2-541 |
| Waiver 5-28-2015 | VOL. 2-542 |
| State Original Answer To Application for Writ Of Habeas Corpus 11-23-2015 | VOL. 2-543 |
| Order Designating Issues 12-11-2015 | VOL. 2-555 |
| Order Setting 11.071 Hearing 5-2-2017 | VOL. 2-557 |
| State's Motion For Disclosure Of Applicant's Trial Files 6-7-2017 | VOL. 2-558 |
| State's Motion For Disclosure Of Expert Witnesses 6-9-2017 | VOL. 2-574 |
| Response In Opposition To State's Motion For Disclosure Of Applicant's Trial Files 6-5-2017 | VOL.2-578 |
| Applicant's List Of Expert witnesses, 8-17-2017 | VOL. 2-594 |
| Motion For The Dallas County District Attorney's Office To Be Recused Of Disqualified From This Matter 8-25-2017 | VOL.2-597 |
| State Response 8-28-2017 | VOL. 2-618 |
| Deputy Reporter Statement 8-29-2017 | VOL.2-626 |
| Deputy Reporter Statement 8-30-2017 | VOL. 2-627 |

539

Motion For All Substantive Article 11.071 Proceedings To Occur On The Record 11-9-2017 — VOL. 2-628

Motion For Transcript Of Proceedings 11-9-2017 — VOL. 2-637

State's Motion For Examination Of Applicant By The State's Expert For Rebuttal Testimony 1-24-2018 — VOL. 2-648

Order 3-12-2018 — VOL. 2-656

Motion To Prelude The State's Irrelevant, Unreliable And Prejudicial Expert Testimony 6-27-2018 — VOL. 2-657

State's Response To Applicant's Motion To Preludes Testimony 7-18-2018 — VOL. 2-666

Motion To Continue Applicant's Sur-Rebuttal To State's Rebuttal 7-19-2018 — VOL. 2-676

Order For Disclosure Of Raw Test Data 8-21-2018 — VOL. 2-685

Order 8-30-2018 — VOL. 2-686

Applicant's Supplementary List Of Expert Witnesses 9-28-2018 — VOL. 2-687

Motion For Short Continuance Of Evidentiary Hearing 10-4-2018 — VOL. 2-690

Motion To Exclude State's Expert Witness Dr. Randall Price 10-15-2018 — VOL. 2-732

Mr. Johnson's Proposed Findings Of Fact And Conclusion Of Law 1-7-2019 — VOL. 2-739

Findings Of Fact And Conclusions Of Law 3-26-2019 — VOL. 2-872

Certificate Of Service — VOL.2-1004

Clerk Summary — VOL.2-1005

Clerk Certificate — VOL.2-1006



FELICIA PITRE
DALLAS COUNTY DISTRICT CLERK


*Date:*    **May 28, 2015**

*RE:*    **W-1223749 W(A)**


*Ex Parte:*    **MATTHEW JOHNSON**


Dear Mr./MS **JOHNSON**


The application for Writ in the above styled cause has been referred to the  **363rd JUDICIAL District Court, Dallas County, Texas** for processing. Please be advised that all future

Correspondence should indicate the above listed cause number.


Sincerely



FELICIA PITRE
District Clerk
Dallas County, Texas

By:

Deputy/**COLEMAN**


133 North Riverfront Blvd. LB 12 – Dallas, Texas  75207 – (214) 653-5973
FAX (214) 653-5986 - e-mail: Sylvia.Medrano@DallasCounty.org
Web Site. www.dallascounty.org/department/districtclerk/districtclerk_index.html


541

**EX PARTE:**

**WRIT NO: W-1223749 W(A)**

*IN THE 363rd JUDICIAL COURT DISTRICT*

*COURT OF DALLAS COUNTY, TEXAS*

**MATTHEW JOHNSON**

### WAIVER OF SERVICE

Now comes Susan Hawk, Criminal District Attorney of Dallas County, Texas and hereby acknowledges that she has, this **28th** day of **MAY, 2015**, received from the District Clerk, a copy of the Petition for Writ of Habeas Corpus filed in the above entitled and numbered cause and he hereby waives delivery to him of said Petition by certified mail.

It is further acknowledged that the answer to this Petition, if any, will be filed within 15 days from this date.

**Susan Hawk**
**Criminal District Attorney**
**Dallas County, Texas**

By: _____
**Deputy**

542

No. W12-23749-W(A)

*FILED*
*2015 NOV 23 PM 2:27*
*FELICIA PITRE*
*DISTRICT CLERK*
*DALLAS CO., TEXAS*
*P. C.* _____ *DEPUTY*

IN THE 363RD JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

---

## EX PARTE MATTHEW LEE JOHNSON

---

STATE'S ORIGINAL ANSWER
TO APPLICATION FOR WRIT OF HABEA CORPUS
IN DEATH PENALTY CASE

---

**Susan Hawk**
**Criminal District Attorney**
Dallas County, Texas

*Counsel of Record:*

**Christine Womble**
**Assistant District Attorney**
State Bar No. 24035991
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*
CWomble@dallascounty.org

*Attorneys for the State of Texas*

543

**TO THE HONORABLE COURT:**

Respondent, the State of Texas, files this original answer to Matthew Lee Johnson's application for writ of habeas corpus filed pursuant to article 11.071 of the Texas Code of Criminal Procedure.

## I.

## PROCEDURAL HISTORY

Matthew Lee Johnson (hereinafter, "Applicant") is confined pursuant to the judgment and sentence of the 363rd Judicial District Court of Dallas County, Texas. Applicant was convicted of the capital murder of Nancy Harris. In accordance with the jury's answers to the special issues, this Court sentenced Applicant to death on November 8, 2013. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(g). On November 18, 2015, the Court of Criminal Appeals affirmed Applicant's conviction on direct appeal. *See Johnson v. State,* No. AP-77, 030 (Tex. Crim. App. Nov. 18, 2015) (not designated for publication).

Applicant filed his original application for writ of habeas corpus on May 28, 2015. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 4. The State received notice of the issuance of the writ on May 28, 2015. *See id.* art. 11.071, § 6. The State requested and received a 60-day extension from the trial court, making its answer due November 24, 2015. *See id.* art. 11.071, § 7(a).

1

## II.

## FACTUAL SUMMARY

On May 20, 2012, 76-year-old great-grandmother Nancy Judith Harris went to her job as a clerk at the Fina Whip-In (hereinafter, "the Whip-In") convenience store. (RR44:23; RR46:10; SX#2, 25). At 7:07[1] a.m., Applicant entered the store carrying a lighter and a clear plastic bottle filled with lighter fluid. (RR44:50, 230; SX#17, 79, 83, 85). Once inside, Applicant walked straight to the sales counter, then around and behind and into the area reserved for employees. (RR44:43; SX#17). Nancy was standing behind the counter. (SX#17). She tried to push Applicant back. (SX#17). Applicant poured the contents of the plastic bottle over Nancy's head. (SX#17).

Applicant stood behind Nancy and watched as she tried to open the cash register. (SX#17). He took two lighters from a display to the right of the register. (RR44:231; SX#17, 85). Then, he took two packages of cigarettes from an overhead dispenser. (RR44:231; SX#17, 87, 88). He tried to remove Nancy's ring from her right finger. (RR44:231; SX#17, 89, 90). The ring did not come off easily; Applicant licked his fingers to help slide it off. (RR44:232; SX#17, 90,

---

[1] The surveillance video is time stamped 6:07 a.m. (RR44:49; SX#17). Anna Lunceford, the manager of the Whip-In, testified that the time was off by one hour; at the time she had not realized she would have to manually change the time following the time change. (RR44:35, 49-50; SX#17).

2

545

91).    Nancy finally got the register open[2] and Applicant took all of the cash from the cash tray. (RR44:232; SX#17, 96, 97).    Then, he removed the cash tray out of the drawer and took some of the coins. (SX#17).

Almost immediately after Applicant took the money from the register, flames are reflected on the screen above the cash register. (RR44:232; SX#17, 97). Nancy, engulfed in flames from her shoulders up, ran out from behind the counter. (RR44:233; SX#17, 98).    Applicant followed close behind. (RR44:233; SX#17). Nancy ran to a nearby sink and leaned over to put out the flames.    (SX#17). Applicant calmly walked out of the store with his bottle, stopping only to take a few pieces of candy and stuff them in his pocket. (RR44:233-34; SX#17, 98, 99, 100).

Nancy bent over the sink, trying to put out the flames consuming the upper portion of her body.  (SX#17).  She stopped to pull her shirt over her head and dropped it on the floor.  (SX#17).  As Nancy leaned back over the sink, her shirt, which was still burning on the floor, lit her left leg on fire.  (SX#17).    Unable to put out all of the flames, Nancy, still on fire, walked outside and waited for help. (SX#17).

---

[2] Nancy opened the register for a no sale transaction at 7:10:54 a.m.  (RR44:54, 128-29; SX#19, 20).

3

On the morning of the offense, Garland Police Officers Billy Coffey and Simon were dispatched to "the 3300 block of Broadway at the Soulman's Bar-B-Que and also at the plasma center." (RR44:62, 64). Police had received calls regarding an audible alarm. (RR44:62). When the officers arrived at the plasma center, they found the area secure. (RR44:64). They got back into their squad cars and began to proceed to Soulman's when Simon noticed flames across the street inside the Whip-In. (RR44:62, 65-66; SX#24). Concerned, the officers made their way to the Whip-In. (RR44:66). At that point, they had no idea what was on fire. (RR44:83). Coffey was at the red light, waiting to turn into the Whip-In, when he saw "the flames move across the inside of the building." (RR44:66). Now, it was an emergency situation. (RR44:84). Coffey turned on his lights and sirens and hurried into the parking lot. (RR44:66).

By the time the officers pulled into the parking lot, Nancy was standing outside. (RR44:84; SX#17). She was still on fire. (RR44:68; SX#17). Coffey retrieved a fire extinguisher from the trunk of his patrol vehicle, ran up, and extinguished the remaining flames. (RR44:68, 84-85; SX#17). Nancy was "screaming for help." (RR44:69). She told the officers that a man had robbed her and poured something on her. (RR44:69). She gave a description of the robber: a "heavy-set black male with blue jeans . . . and a T-shirt." (RR44:70).

4

547

Garland firefighter and paramedic William Crews was in the area on an unrelated call when a police officer flagged him down for help. (RR44:89, 92). Crews pulled up to the Whip-In in the ambulance and began to treat Nancy. (RR44:93). "She was in a lot of pain. She was very worried." (RR44:93). She had "first, second, and third degree burns to her face, her shoulders, her abdomen, both of her upper arms, and to her - - her legs." (RR44:93). Crews loaded Nancy into the ambulance and left for the hospital.[3]  (RR44:94).   At first, Nancy was conscious and able to provide her name and history. (RR44:98).   As they drove, her airway began to close and she had a harder time communicating. (RR44:98).

At the hospital, Nancy was still conscious and able to speak. (RR45:80-81). April Gradel, a trauma nurse clinician in the burn unit, gave police a few minutes to speak with Nancy. (RR45:85, 172, 178; SX#143).   Nancy had "at minimum second to third-degree burns over her entire head, including her face, her neck, her upper torso, and both of her arms." (RR45:174).   Given the location of Nancy's burns, Gradel knew that she was going to have to be intubated.   (RR45:175). Gradel saw a police officer in the hallway and told him that if he was going to speak with Nancy, it had to be immediately. (RR45:175).   Gradel was "quite convinced it would be [Nancy's last opportunity to speak]." (RR45:176).   Nancy

---

[3] Crews was familiar with Nancy. He had "made runs on her before" and was aware of her diabetes, high blood pressure and the fact that she had a pacemaker. (RR44:94, 97, 102). He and his fellow firefighters also patronized the Whip-In. (RR44:94, 101-02).

5

548

told Officer Larry Wilson that "a man she described as a black male, heavy-set, short dark hair, and a chubby face, came into the store and demanded money from her. She advised he took the money and then he poured something on her. She didn't know what - - what it was, and then he lit her on fire." (RR45:82).

Dr. John Hunt was also involved in Nancy's care in the Burn Unit. (RR46:5). Dr. Hunt testified when an individual is on fire, the mechanism of injury is the heat. (RR46:7). "Heat destroys." (RR46:7). Dr. Hunt described the three types of burns:

> The way I usually tell it to family is if the skin is an inch thick, a sunburn is a first-degree burn, and let's say hypothetically that's 1/16th of an inch. So you've got, you know, 15/16ths of an inch left, and that's not injured and it heals very quickly. A third-degree burn goes through that entire inch of skin. Now, the skin is not an inch thick, but just vision [sic] it as it would be. When that inch of skin is destroyed, that is a third-degree burn. By definition, it destroys any potential for that area that's third-degree to heal on its own. So a second-degree is anyplace between that sunburn which is 1/16th and that total inch, which is third-degree, in between. So potentially second-degree burns will heal, depends on how deep they are and how long it takes. But the skin elements are there in a second-degree burn, and potentially it will heal. A third-degree, it will not.

(RR46:8-9). There is also a fourth-degree burn. (RR46:17). This type of burn does not stop at the underside of the skin; it goes all the way through the skin into the fat. (RR46:17).

Dr. Hunt testified that Nancy had burns over 40% of her body. (RR46:10). The burns to Nancy's upper body and face were third and fourth-degree burns.

(RR46:18; SX#146).   The burns to her left arm and hand were second and third-degree burns.  (RR46; SX#147).   The burns to her right shoulder and breast were third and fourth-degree.  (RR46:19; SX#148).  The lower portion of her right arm and hand were second and third-degree burns.  (RR46:19; SX#148).   The burns to the top of her head were third-degree.  (RR46:19-20; SX#149).

Because Nancy's injuries were to her face and neck, she was intubated and placed on a ventilator.  (RR46:11).   Her face was swollen and her eyes were shut. (RR46:14).   She was able, however, to nod her head and gesture with her hands. (RR46:14).

Nancy's treatment team determined that Nancy was not going to survive her injuries and that treatment would be futile.  (RR44:31; RR46:23).   Prior to the instant offense, Nancy executed a DNR, a do-not-resuscitate order.[4]  (RR44:30-31; SX#8).   On May 25, 2012, given the severity and the extent of Nancy's injuries and in accordance with her DNR, the decision was made to discontinue life support, and Nancy passed away.  (RR46:23-24).

Dr. Tracy Dyer, a medical examiner with the Dallas County Medical Examiner's Office, performed Nancy's autopsy.  (RR46:25, 29-30; SX#9, 151-59). During the autopsy, Dr. Dyer observed "significant serious burns that involved her entire head, chest, portions of the upper back, and portions of, I believe, it was the

---

[4] Nancy's DNR is dated May 17, 2002.  (SX#8).

7

550

left lower extremity or left thigh and leg." (RR46:32). Her hands and palms were completely burned, destroying Nancy's fingerprints. (RR46:32). On the back of her left hand, there were "some areas of skin slippage"; the thermal injuries caused loosening under the layers of Nancy's skin, causing it to peel off. (RR46:36; SX#155, 156). Nancy's right hand was more severely affected. (RR46:37). On that hand, "the superficial layers of the skin are gone, and what you have is that reddened deep tissue in this case, underneath." (RR46:37; SX#157). Dr. Dyer observed skin slippage on Nancy's left leg and thighs. (RR46:37; SX#158).

Nancy's injuries were consistent with flame burns. (RR46:38). Fire was a deadly weapon in this case. (RR46:38). The cause of Nancy's death was thermal injury. (RR46:34, 39). The manner of her death was homicide. (RR46:39).

### III.

### GENERAL DENIAL

The State generally denies Applicant's allegations in their entirety. Applicant has not provided sufficient proof to merit consideration of his claims. In any post-conviction collateral attack, Applicant bears the burden of proving, by a preponderance of the evidence, facts that would entitle him to relief. *Ex parte Richardson*, 70 S.W.3d 865, 870 (Tex. Crim. App. 2002) (citing *Ex parte Morrow*, 952 S.W.2d 530, 534 (Tex. Crim. App. 1997)). Applicant has failed to prove by a preponderance of the evidence any facts that would entitle him to relief. He has

8

551

also failed to prove by a preponderance of the evidence that there are controverted, previously unresolved factual issues material to the legality of his confinement. *See* Tex. Code Crim. Proc. Ann. art. 11.071, §§ 8(a), 9(a).

## HEARING ON INEFFECTIVE ASSISTANCE CLAIMS

In the interests of justice, the State agrees to further factual investigation into Applicant's allegations of ineffective assistance of counsel. Therefore, the State requests that this Court issue an order designating Issues 1, 2, 3, 4, and 5 for a hearing and designating Applicant's trial counsel (Catherine Bernhard, Kenneth Weatherspoon, and Nancy Mulder) as witnesses on those issues.

9

## IV.

## PRAYER

Applicant has not yet provided this Court with any legal reason justifying the granting of this writ. Pending production of evidence substantiating Applicant's claims, the State submits that this application is without merit and relief should be denied.

Respectfully submitted,

*Chrsf Womble*

**Christine Womble**
**Assistant District Attorney**
State Bar No. 24035991
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

**Susan Hawk**
**Criminal District Attorney**
Dallas County, Texas

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document contains 2,155 words, inclusive of all content.

*Chrsf Womble*

Christine Womble

553

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing brief was served on served on counsel for Matthew Lee Johnson: Derek VerHagen, Office of Capital Writs, 1700 N. Congress Ave, Suite 460, Austin, Texas 78701, Derek.VerHagen@ocw.texas.gov, via email on November 23, 2015.

Christine Womble

11

554

## CAUSE NO. W12-23749-W(A)

| | | |
|---|---|---|
| EX PARTE | § | IN THE 363rd JUDICIAL |
| MATTHEW LEE JOHNSON, | § | DISTRICT COURT |
| Applicant | § | DALLAS COUNTY, TEXAS |

## ORDER DESIGNATING ISSUES FOR AN 11.071 WRIT HEARING

Applicant, Matthew Lee Johnson, has filed an Application for Writ of Habeas Corpus with the Court pursuant to Article 11.071 of the Code of Criminal Procedure. After considering the Application and the State's response thereto, the Court finds the following controverted, previously unresolved factual issues material to Applicant's confinement exist which require an evidentiary hearing:

1. Did Applicant's trial counsel (1) fail to properly prepare for and conduct Dr. John Roache's testimony at trial and (2) fail to investigate and present expert testimony to explain the availability of mental health care and substance abuse treatment?

2. Did Applicant's trial counsel fail to investigate and present lay and expert testimony regarding Applicant's social history?

3. Were Applicant's trial counsel ineffective for failing to preserve error during voir dire regarding Prospective Jurors Boulos, McDaniel, Plank, and Stanmore?

4. Were Applicant's trial counsel ineffective for failing to request a change of venue?

The Court shall conduct an evidentiary hearing to resolve the issues designated herein. The hearing will be scheduled at a date agreed to by the Court and the parties.

Signed the ___11___ day of December, 2015.


_____
TRACY HOLMES, JUDGE
363RD JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

**Cause No. W12-23749-W(A)**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 363rd JUDICIAL** |
| | § | |
| **MATTHEW LEE JOHNSON** | § | **DISTRICT COURT** |
| | § | |
| | § | **DALLAS COUNTY, TEXAS** |

## ORDER SETTING 11.071 HEARING

A jury convicted Applicant Matthew Lee Johnson of capital murder. Pursuant to the jury's answers to the special issues, the Court sentenced Johnson to death on November 8, 2013.

Johnson's Application for Writ of Habeas Corpus is pending before the Court. Pursuant to this Court's prior Order determining that unresolved factual issues exist, the Court hereby sets this case for a hearing on **Monday, July 17, 2017, at 9:00 a.m.**

SIGNED AND ENTERED this ___ day of _____, 2017.

_____
Judge Tracy Holmes
363rd Judicial District Court
Dallas County, Texas

557

Cause No. W12-23749-W(A)

FILED
6/7/2017 3:03:24 PM
3:03 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS, CO., TX
CH DEPUTY

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 363rd JUDICIAL** |
| | § | |
| **MATTHEW LEE JOHNSON,** | § | **DISTRICT COURT** |
| Applicant | § | |
| | § | **DALLAS COUNTY, TEXAS** |

## STATE'S MOTION FOR DISCLOSURE OF APPLICANT'S TRIAL FILES

Respondent in this matter, the State of Texas, through the Criminal District Attorney of Dallas County, respectfully asks this Court to order the disclosure of Applicant Matthew Lee Johnson's trial files in order for the State to defend against Johnson's claims of ineffective assistance of counsel.

## I.

## Procedural History

In October 2013, a jury convicted Johnson of capital murder for intentionally causing the death of Nancy Harris, a 76-year-old convenience store clerk, by setting her on fire while he was robbing or attempting to rob her. Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071, §§ 2(b) and 2(e), this Court sentenced Johnson to death. The Court of Criminal Appeals affirmed this Court's judgment and sentence of death.

1

Johnson has filed a post-conviction application for writ of habeas corpus challenging his conviction and death sentence. Johnson is represented by the Office of Capital and Forensic Writs (OCFW).

This Court has set an evidentiary hearing in this case for July 17, 2017.

## II.

### Johnson's Representation at Trial

Johnson was represented at trial by Catherine Bernhard, Kenneth Weatherspoon, and Hon. Nancy Mulder. With Johnson's authorization, trial counsel tendered Johnson's original trial file to OCFW. *See generally In re McCann*, 422 S.W.3d 701, 704–05 (Tex. Crim. App. 2013) (explaining that the contents of the trial file belong to the defendant in the underlying case).

## III.

### Issues Raised in Johnson's Application

In his application for habeas relief, Johnson accuses his trial counsel of performing ineffectively during the pretrial investigation, jury selection, guilt phase, and punishment phase of his proceedings. Specifically, Johnson alleges that trial counsel rendered ineffective assistance in the following ways:

- failing to properly prepare for and conduct Dr. Roache's testimony;

- failing to hire an expert to explain the lack of availability of mental-health care and substance-abuse treatment;

2

559

- failing to develop and present readily available lay-witness testimony;

- failing to present an expert to explain the impact of Johnson's social history;

- failing to preserve errors during jury selection for direct appeal;

- failing to request a change of venue; and

- cumulative deficient performance over the course of trial.

In all, the ineffective-assistance allegations make up five out of nine of Johnson's claims for relief.

## IV.

## Summary of the Argument

By accusing his trial counsel of ineffectiveness, Johnson has made communications between himself and his counsel as well as his counsels' impressions of his case relevant to this proceeding. By making this choice, he waived any attorney–client or work-product privileges covering the files to the extent that the files contain information relevant to his claims. Most of the contents of Johnson's trial files should be discoverable here.

## V.

## Johnson has made the contents of his trial file relevant.

Johnson's ineffectiveness allegations cover defense counsels' pretrial mitigation investigation through the punishment phase. *See* Application at 1–4. In case Johnson's

specific grounds were not enough, he also includes a catchall: that his counsels' "cumulative deficient performance over the course of trial" prejudiced him. *See id.* at 4. Because Johnson's allegations touch every part of his counsels' representation, this Court should rule that the contents of his trial file are relevant and, therefore, discoverable.

In any post-conviction collateral attack, the burden of proof is on the applicant to allege and prove sufficient facts, which if true, would entitle him to relief. *See Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985). Capital cases are no different. *See, e.g., Ex parte Richardson*, 70 S.W.3d 865, 870 n.16 (Tex. Crim. App. 2002) (citing *Maldonado*, 688 S.W.2d at 116). When writ counsel is appointed to represent a person sentenced to death, counsel "shall investigate expeditiously . . . the factual and legal grounds for the filing of an application for a writ of habeas corpus." Tex. Code Crim. Proc. Ann. art. 11.071, § 3(a) (West 2016). Counsel must then file a writ application raising the factual and legal grounds that counsel finds to be of merit. *See id.* at § 4(a).

When the applicant decides what to include in his writ application, he also decides what facts will be relevant to determining his application. Evidence is relevant if (1) it has any tendency to make a fact more or less probable than it would be without the evidence and (2) the fact is of consequence in determining the matter. *See* Tex. R. Evid 401. Under this two-prong test, the contents of Johnson's trial file are relevant.

4

Regarding the second prong, Johnson relies heavily on his counsels' alleged ineffectiveness in his attempt to get habeas relief. As discussed above, his sweeping allegations touch upon every part of their representation. This means that every part of their representation will provide facts of consequence in determining this matter. *See* Tex. R. Evid 401(b).

And regarding the first prong, Johnson attacks his counsels' preparations, strategy, and performance—to name a few. His trial file almost certainly includes a record of counsels' thoughts and actions from appointment all the way through the death sentence itself. So it is hard to imagine how Johnson's trial file would not have at least *some* tendency to support or refute the claim that trial counsel was ineffective. *See* Tex. R. Evid 401(a).

By choosing what to include in the writ application, Johnson also chose what evidence would be relevant to deciding his application. And here, the contents of Johnson's trial file are relevant to his complaints of ineffective assistance of trial counsel.

## VI.

### The attorney–client and work-product privileges do not apply.

Even when evidence is relevant, a party may be able to prevent disclosure of that evidence if it is subject to some privilege. *See generally* Tex. R. Evid. 503–10. Two such privileges are the attorney–client and the work-product privileges, but neither of

5

562

them apply to Johnson's trial file. *See In re Harris*, 491 S.W.3d 332, 335 (Tex. Crim. App. 2016) (citing *In re Medina*, 475 S.W.3d 291, 302 (Tex. Crim. App. 2015)).

The attorney–client privilege is about communications. It protects confidential communications between a client and his lawyer, or their representatives, made for the purpose of obtaining legal services. *See* Tex. R. Evid. 503(b)(1). As a general rule, the client has the privilege to refuse to disclose and to prevent any other person from disclosing communications that are covered by the privilege. *See id.* The work-product privilege, as it applies in criminal cases, is closely related. *See generally Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007) (citing Tex. R. Evid. 503(b)(2)). It provides that a client has a privilege to prevent a lawyer or lawyer's representative from disclosing any fact that came to their knowledge by reason of the attorney–client relationship. *See id.* (citing Tex. R. Evid. 503(b)(2)).

As an exception, however, these privileges do not extend to communications "relevant to an issue of breach of duty by the lawyer to the client . . . ." *See* Tex. R. Evid. 503(d)(3). As this language would suggest, a person's claim that his counsel rendered ineffective assistance is just the kind of breach of duty that waives these privileges. *See Harris*, 491 S.W.3d at 335 n.8 (citing Tex. R. Evid. 503(d)(3)).

In the past two years, the Court of Criminal Appeals has reaffirmed this rule on two occasions—both of which, as it happens, arose from capital cases in Dallas County. In one of these cases, *In re Medina*, the Court explained the rule like this:

6

[A] defendant waives the attorney–client privilege when he argues that his sentence should be overturned because his counsel was constitutionally ineffective. The rationale behind this rule was best explained by the Texas Supreme Court.... According to our sister court, "[a] plaintiff cannot use one hand to seek affirmative relief in court and with the other hand lower an iron curtain of silence against otherwise pertinent and proper questions which may have a bearing upon his right to maintain his action."

*Medina*, 475 S.W.3d at 302 (quoting *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 108 (1985)) (internal citation omitted).

And applying this rule in *In re Harris* (the second case), the Court held that when an applicant "chooses to bring claims alleging that his trial counsel were constitutionally ineffective, he waives his claim to privilege as to those materials that are relevant and responsive to the ineffective assistance claims he raised." *Harris*, 491 S.W.3d at 335. As *Harris* recognized, the very Rule of Evidence that provides for the attorney–client and work-product privileges also states those privileges do not apply in a proceeding like this.

## VII.

### This Court should rule that relevant contents of Johnson's trial file are discoverable.

This Court should exercise its discretion over the factfinding in these proceedings and order the disclosure of relevant items in Johnson's trial file.

In capital writ proceedings, the trial court's role is to be "the collector of the evidence, the organizer of the materials, the decisionmaker as to what live testimony

7

may be necessary, the factfinder who resolves disputed factual issues, the judge who applies the law to the facts, enters specific findings of fact and conclusions of law, and may make a specific recommendation to grant or deny relief." *Id.* at 335–36 (quoting *Ex parte Simpson*, 136 S.W.3d 660, 668 (Tex. Crim. App. 2004)). The trial court, therefore, enjoys discretion in managing the factfinding process in a capital writ proceeding. *See id.* at 336.

The mutual disclosure of trial files in capital writ proceedings has become routine in Dallas County. The Dallas County District Attorney's Office discloses essentially its entire trial file under its post-conviction, open-file policy. And, in large part, OCFW has agreed to do the same. In three cases, *Ex parte Medina* (W07-32923-S(A)), *Ex parte Green* (W09-59380-S(A)), and *Ex parte Lizcano* (W05-59563-S(A)), OCFW agreed to do so. In *Medina*, it disclosed the entire trial file; in *Green*, it turned over portions of the file and provided a privilege log of excepted items; and in *Lizcano*, it agreed to disclose the file, although the trial court substituted other counsel before the release actually occurred.

But in a fourth case, *Ex parte Harris* (W09-00409-Y(A)), OCFW declined to disclose the file. *Harris*, 491 S.W.3d at 333–34. The trial court eventually ordered OCFW to disclose relevant parts of the file along with "a privilege log describing and categorizing any non-responsive items." *Id.* at 334. OCFW then filed a motion for leave to file an application for a writ of prohibition and an application for a writ of prohibition in the Court of Criminal Appeals. *Id.* OCFW claimed that it could not be

8

required to turn over any part of the trial file, including parts relevant to the applicant's ineffective-assistance claims. *Id.* at 333–34. As described above, however, the Court of Criminal Appeals disagreed. The Court noted the trial court's statutory authority to regulate the factfinding process in capital writ proceedings and that Harris had waived any attorney–client and work-product privileges as to materials relevant to his ineffective-assistance claims. *Id.* at 335–36. The Court concluded, then, that OCFW had not demonstrated that Harris was entitled to a writ of prohibition. *Id.* at 366.

This Court should reach the same decision that the trial court did in *Harris.* In order for these proceedings to unfold as fairly and efficiently as possible, this Court should direct Johnson to disclose items in his trial file that are relevant to the claims he raises in his writ application. The disclosure could easily occur at the same time the State discloses its own trial file to Johnson. To the extent that any items are not relevant, Johnson may still be able to assert the attorney–client or work-product privilege over those items, and he should maintain a privilege log listing what he withholds.

9

566

## VIII.

## Conclusion

This Court should order Johnson to disclose his trial file to the State and to maintain a privilege log of any withheld items.

Respectfully submitted,

*Brian P. Higginbotham*

FAITH JOHNSON
Criminal District Attorney
Dallas County, Texas

BRIAN P. HIGGINBOTHAM
Assistant Criminal District Attorney
State Bar No. 24078665
Frank Crowley Courts Building
133 N. Riverfront Boulevard, LB-19
Dallas, Texas 75207-4399
(214) 653-3625 | (214) 653-3643 *fax*
brian.higginbotham@dallascounty.org

## Certificate of Service

I certify that a true copy of this document was served on Benjamin Wolff as counsel for Applicant. Service was made by email to Benjamin.Wolff@ocfw.texas.gov on June 7, 2017.

*Brian P. Higginbotham*

Brian P. Higginbotham

10

567

491 S.W.3d 332
Court of Criminal Appeals of Texas.

In re Roderick Harris, Relator

NO. WR–80,923–02
|
MAY 25, 2016.

## Synopsis

**Background:** State habeas petitioner, whose conviction for capital murder was affirmed on appeal, 2014 WL 2155395, moved for leave to file an application for a writ of prohibition or an injunction to prevent the ordered disclosure of his trial files, as they related to his claim of ineffective assistance of counsel, to the State.

**[Holding:]** The Court of Criminal Appeals held that petitioner sought relief that was not positively commanded and was not so plainly prescribed under law.

Motion denied.

Alcala, J., filed dissenting opinion in which Johnson, J., joined.

Meyers and Newell, JJ., dissented.

*333 ON MOTION FOR LEAVE TO FILE EMERGENCY APPLICATION FOR WRIT OF PROHIBITION AND EMERGENCY APPLICATION FOR WRIT OF PROHIBITION; REQUEST FOR INJUNCTION IN CAUSE

NO. W09–00409–Y(A) IN CRIMINAL DISTRICT COURT NO. 7 DALLAS COUNTY

**Attorneys and Law Firms**

Benjamin Wolff, Office of Capital Writs, Austin, TX, for Applicant.

Shelly O'Brien Yeatts, Assistant District Attorney, Dallas, TX, Lisa C. McMinn, State's Attorney, Austin, for the State.

## *ORDER*

Per curiam.

We have before us a motion for leave to file an application for a writ of prohibition and an application for a writ of prohibition. In May 2012, a jury convicted relator of the offense of capital murder. The jury answered the special issues submitted pursuant to Article 37.071,[1] and the trial court, accordingly, set punishment at death. This Court affirmed relator's conviction and sentence on direct appeal. *Harris v. State,* No. AP–76,810, 2014 WL 2155395 (Tex.Crim.App. May 21, 2014)(not designated for publication). With relator's authorization, the lead trial attorney tendered relator's original trial files to habeas counsel, the Office of Capital and Forensic Writs (OCFW). Trial counsel did not retain a copy of the files. OCFW filed an initial writ of habeas corpus application in the trial court on relator's behalf on June 11, 2014. Five of his six claims for relief alleged ineffective assistance of counsel, including allegations of deficient performance during

pretrial investigation, at the guilt/innocence phase of trial, and at the punishment phase of trial. The trial judge signed an order designating issues designating all of relator's ineffective assistance of counsel claims for further fact finding. The judge subsequently set relator's habeas application for an evidentiary hearing to be held starting on May 18, 2015.

Prior to the evidentiary hearing, the State moved that the trial judge order the disclosure of relator's trial files in order for the State to defend against relator's claims of ineffective assistance of counsel. Relator's counsel objected to the disclosure. The judge held a hearing on March 26, 2015, in which she entertained oral argument on the State's motion for disclosure. At the hearing, the trial judge asked the State's attorneys whether they would be satisfied if OCFW provided to them only the materials that OCFW thought were relevant to the ineffective assistance claims, rather than the whole file. The State agreed to this suggestion with the proviso that OCFW also provide a log of what they had classified as privileged under the attorney-client and work product privileges. OCFW objected to "turning over any materials to the State."

*334 On April 10, 2015, the trial judge granted the State's motion for disclosure of relator's trial files and ordered OCFW (the order uses the term "appellate counsel") to disclose to the State "only the parts of [the defense] file relevant to ineffective assistance of counsel." OCFW did not comply and filed with this Court on April 21, 2015, an "Emergency Application for Writ of Prohibition; Request for Injunction" and a motion for leave to file the same on behalf of relator. Subsequently, on April 24th, the trial judge signed an amended order granting the State's motion, ordering that OCFW shall "disclose only the part of [relator's] files that are relevant to ineffective assistance of Counsel" and provide the State with the relevant portions of the files "via electronic copy by May 1, 2015, along with a privilege log describing and categorizing any non-responsive items."

Relator then filed an "Emergency Motion for Stay" of the trial judge's order requiring him to disclose the defense trial file to the State. The State filed a motion asking that this Court stay the habeas evidentiary hearing during the pendency of the writ of prohibition arguing that the State could not "be prepared for the writ hearing without access to the trial files," which "may contain evidence refuting" relator's ineffective assistance of counsel claims.

This Court entered an order on April 30, 2015, granting the parties' motions for stay of enforcement of the discovery order and any scheduled hearing on the habeas application, pending further order from this Court. We invited the State and the trial judge, the Honorable Elizabeth Frizell, to file responses to relator's application for writ of prohibition within 30 days of the date of our order. *In re Harris,* No. WR–80–923–02, 2015 WL 1970305 (Tex.Crim.App. April 30, 2015) (not designated for publication). We received a response from the State on June 1, 2015. We have not received a response from Judge Frizell.

**[1]  [2]   [3]** In *In re McCann*,[2] this Court been assessed.[6]
set out the requirements for mandamus and
prohibition relief:

> Mandamus relief may be granted if a
> relator shows that: (1) the act sought to
> be compelled is purely ministerial, and
> (2) there is no adequate remedy at law.
> With respect to the requirement that the
> act sought is purely ministerial, the relator
> must have a "clear right to the relief
> sought," meaning that the merits of the
> relief sought are "beyond dispute." To
> show "a clear right to the relief sought,"
> a relator must show that the facts and
> circumstances of the case "dictate but
> one rational decision 'under unequivocal,
> well-settled ... and clearly controlling legal
> principles.' " However, we have also noted
> that, although an issue may be one of first
> impression, it does not necessarily follow
> that the law is not well-settled. It is a small
> step then to hold that, this Court may
> grant relief in a mandamus case based on
> a well-settled, but rarely litigated point of
> law.[3]

"A ministerial act, by its nature, does
not involve the use of judicial discretion;
it must be positively commanded and so
plainly prescribed under the law as to be
free from doubt."[4] A writ of prohibition
**\*335** must meet the same standards as a
writ of mandamus; the former being used
to "prevent the commission of a future
act whereas the latter operates to undo
or nullify an act already performed."[5] A
mandamus or prohibition action is properly
filed directly in this Court in a capital-

murder case in which the death penalty has

**[4]** In the instant case, the parties agree
that there is no adequate remedy at law
for relator. The parties do not agree as to
whether the trial court's action at issue is
purely ministerial, in other words, whether
the relator has a "clear right to the relief
sought."

Relator concedes that a constructive waiver
of the attorney-client and work product
privileges occurred when he advanced his
claims of ineffective assistance of counsel,
but argues that this waiver did not "bestow
upon the State a discovery tool giving
them access to defense counsel's files." He
further asserts that the State has cited no
"binding authority" for the proposition that
the State's attorney is entitled to access his
trial files through his habeas counsel. He
contends that trial counsel should make the
decisions about how to defend themselves
from these claims and which items from the
files will be produced.

This Court has held that the trial file belongs
to the defendant, not his trial attorney.[7]
Also, we recently explained:

> [A] defendant waives the attorney-
> client privilege when he argues that his
> sentence should be overturned because his
> counsel was constitutionally ineffective.
> The rationale behind this rule was best
> explained by the Texas Supreme Court
> in *Ginsberg v. Fifth Court of Appeals,* ...
> According to our sister court, "[a] plaintiff
> cannot use one hand to seek affirmative

relief in court and with the other hand lower an iron curtain of silence against otherwise pertinent and proper questions which may have a bearing upon his right to maintain his action." [8]

Thus, when relator chooses to bring claims alleging that his trial counsel were constitutionally ineffective, he waives his claim to privilege as to those materials that are relevant and responsive to the ineffective assistance claims he raised.

[5] We have acknowledged the "discretion of the trial court in matters of discovery." [9] Further, we have noted that, in a capital writ proceeding, Article 11.071 makes the habeas judge "the collector of the evidence, the organizer of the materials, the decisionmaker as to what live testimony may be necessary, the factfinder who resolves disputed factual issues, the judge who applies the law to the facts, enters specific findings of fact and conclusions of law, and may make a specific *336 recommendation to grant or deny relief." [10] Hence, our precedent allots the trial judge a measure of discretion in managing the process of fact-finding in a capital writ proceeding.

However, appellate courts have also held that trial judges have overstepped their authority to order pretrial discovery in situations where they have required a party to create a document that did not exist at the time of the discovery order. [11] Nevertheless, relator has not referred us to any statute or other authority that applies that holding to collateral proceedings under Article 11.071 or expressly prohibits the trial judge from

ordering that habeas counsel disclose the portions of trial counsel's files that are responsive to relator's ineffective assistance of counsel claims. [12]

In sum, relator has not demonstrated that, under the facts and circumstances present in this case, the relief he seeks is "positively commanded and so plainly prescribed under the law as to be free from doubt." His motion for leave to file an application for a writ of prohibition is denied and the stays are lifted.

IT IS SO ORDERED THIS THE 25th DAY OF MAY, 2016.

ALCALA, J., filed a dissenting opinion in which JOHNSON, J. joined. MEYERS and NEWELL, JJ., dissented.

Alcala, J., dissenting

I respectfully dissent from this Court's order that denies the motion for leave to file an application for a writ of prohibition filed by Roderick Harris, relator. In his instant pleadings, relator seeks to prohibit the trial-court judge from requiring his post-conviction habeas counsel to turn over trial counsel's files to the State for the State to use in contesting relator's ineffective-assistance-of-trial-counsel claims. Rather than deny leave to file, I would file and set this application to determine whether relator is entitled to prohibition relief under these circumstances.

There is no precedent from this Court that directly applies to the situation presented in

this case. As a general matter, this Court has recently said that, for a relator to be entitled to mandamus or prohibition relief, the act sought to be compelled or prohibited must be purely ministerial. *In re McCann,* 422 S.W.3d 701, 704 (Tex. Crim. App. 2013). A " 'ministerial' act is one which is accomplished without the exercise of discretion or judgment" and, "[i]f there is any discretion or judicial determination attendant to the act, it is not ministerial in nature." *State ex rel. Curry v. Gray,* 726 S.W.3d 125, 128 (Tex. Crim. App. 1987). In this case, on the one hand, the habeas judge may have been properly exercising her reasonable discretion and judgment in ordering habeas counsel to produce only the portions of trial counsel's files relevant to relator's ineffective-assistance-of-counsel claims, in which case this situation would not be amenable to a writ of prohibition. On the other hand, it is not *337 entirely clear that the habeas judge actually had the discretion to order discovery outside the items and methods enumerated in the capital habeas-corpus statute. *See* TEX.CODE CRIM. PROC. art. 11.071.

In a recent case in which little precedent existed governing the propriety of a trial judge's actions, this Court held that mandamus relief should not issue because "a mandamus proceeding is not the appropriate place to interpret statutory language, clarify this Court's precedent, or create law where there is none." *In re Allen,* 462 S.W.3d 47, 52–53 (Tex. Crim. App. 2015) ("If the law surrounding a court's action is unclear, mandamus relief may not issue despite how unwise we think the action may have been.").

Nevertheless, we have also recently stated that, if a trial judge lacks authority or jurisdiction to take a particular action, then the judge has a "ministerial duty to refrain from taking that action, to reject or overrule requests that he take such action, and to undo the action if he has already taken it." *In re Medina,* 475 S.W.3d 291, 298 (Tex. Crim. App. 2015) (citations omitted). Thus, even though the questions presented in this case appear to be matters of first impression, this Court could still grant relief if it were to find that the habeas judge had a ministerial duty to refrain from ordering habeas counsel to provide access to portions of trial counsel's file to the State. *See In re State ex rel. Weeks,* 391 S.W.3d 117, 122 (Tex. Crim. App. 2013) (explaining that an "issue of first impression can sometimes qualify" for extraordinary relief "when the factual scenario has never been precisely addressed but the principle of law has been clearly established"). In that event, prohibition would be appropriate only if the principle of law upon which relator relies is "positively commanded and so plainly prescribed under the law as to be free from doubt." *Medina,* 475 S.W.3d at 298 (citations omitted).

For the above reasons, I would file and set this matter to address relator's contention that he is entitled to prohibition relief under these circumstances. In light of the ubiquity of ineffective-assistance-of-counsel claims in habeas proceedings, and in light of the fact that such claims are often based on habeas counsel's review of the trial attorney's files, the situation presented here will almost certainly arise in many other cases, and it would be beneficial for this Court to clarify

these issues. Because this Court instead denies relator leave to file, I respectfully dissent.

**All Citations**

491 S.W.3d 332

## Footnotes

1    This and all subsequent citations to articles refer to the Texas Code of Criminal Procedure.

2    *In re McCann,* 422 S.W.3d 701 (Tex. Crim. App. 2013).

3    *Id.,* 422 S.W.3d at 704 (internal citations omitted).

4    *In re Medina,* 475 S.W.3d 291, 298 (Tex. Crim. App. 2015) ("While this case does present an issue of first impression, relator is entitled to relief only if the principle of law he relies upon is 'positively commanded and so plainly prescribed under the law as to be free from doubt' "), citing *In re Allen,* 462 S.W.3d 47, 50 (Tex. Crim. App. 2015).

5    *Medina,* 475 S.W.3d at 297, citing *State ex rel. Wade v. Mays,* 689 S.W.2d 893, 897 (Tex. Crim. App. 1985).

6    Compare *McCann,* 422 S.W.3d at 704.

7    See *McCann,* 422 S.W.3d at 710 (client owns his or her trial file and former attorney is obligated to follow client's last known wishes for handling the file).

8    *Medina,* 475 S.W.3d at 302 (internal citations omitted); *see also State v. Thomas,* 428 S.W.3d 99, 106 (Tex. Crim. App. 2014) (attorney-client privilege waived by ineffective assistance of counsel claims); *Occidental Chem. Corp. v. Banales,* 907 S.W.2d 488, 490 (Tex. 1995) (work product privilege may be waived under the offensive-use doctrine); TEX.R. EVID. 503(d)(3).

9    *State v. Dittman (In re Dist. Attorney's Office of the 25th Judicial Dist.),* 358 S.W.3d 244, 246 (Tex. Crim. App. 2011).

10   *Ex parte Simpson,* 136 S.W.3d 660, 668 (Tex. Crim. App. 2004).

11   See, e.g., *In re Watkins,* 369 S.W.3d 702, 706 (Tex.App.–Dallas 2012, no pet.), citing *In re Stormer,* No. WR–66865–01, 2007 WL 1783853 (Tex.Crim.App. June 20, 2007) (not designated for publication) (holding former Article 39.14 does not give trial court authority to order State to create and produce a document that does not currently exist).

12   The trial judge's amended discovery order in the instant case stated that OCFW must create a "privilege log" and provide this log to the State. Applicant has not brought any complaint for our review about the "privilege log" in his application for writ of prohibition or any other pleading received by this Court.

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

FILED
8/21/2017 12:34 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
JP DEPUTY
JP

Cause No. W12-23749-W(A)

| | | |
|---|---|---|
| EX PARTE | § | IN THE 363RD JUDICIAL |
| | § | |
| MATTHEW LEE JOHNSON, | § | DISTRICT COURT |
| Applicant | § | |
| | § | DALLAS COUNTY, TEXAS |

## STATE'S MOTION FOR DISCLOSURE OF EXPERT WITNESSES

The State of Texas, Respondent, respectfully moves this Court to order the
disclosure of expert witnesses that Matthew Lee Johnson, Applicant, intends to call at
the hearing on his application for writ of habeas corpus.

JP

## I.
## Background

This habeas matter is set for a contested hearing beginning on Monday, July 17,
2017. In support of his application for writ of habeas corpus, Applicant filed affidavits
authored by the following individuals, among others:

1. King Davis, Ph.D., a professor and social worker;

2. Celeste Henery, Ph.D., a cultural anthropologist; and

3. John Roache, Ph.D., a professor of psychiatry and pharmacology.

In addition, this Court's order has designated the following four matters requiring an
evidentiary hearing:

1. Whether trial counsel:

   a. failed to properly prepare for and conduct Dr. John Roache's
      testimony at trial; and

574

    b. failed to investigate and present expert testimony to explain the availability of mental health care and substance abuse treatment?

2. Whether trial counsel failed to investigate and present lay and expert testimony regarding Applicant's social history?

3. Whether trial counsel was ineffective for failing to preserve error during the voir dire of certain prospective jurors?

4. Whether trial counsel was ineffective for failing to request a change of venue?

Based on Applicant's affidavits and the designated issues, it is almost certain that Applicant intends to offer expert testimony on these subjects at the hearing.

## II.
### The Rules of Evidence apply, and this Court has wide discretion in the management of habeas proceedings.

Article 11.071, Code of Criminal Procedure, governs habeas proceedings in death penalty cases, and the Rules of Evidence apply. *See* Tex. Code Crim. Proc. art. 11.071 § 10. Under these rules, an adverse party in a criminal case must be permitted to examine the expert about the facts or data underlying the expert's opinion. Tex. R. Evid. 705(b). If the underlying facts or data do not provide a sufficient basis for the opinion, the expert's opinion is inadmissible. Tex. R. Evid. 705(c).

In addition, Texas courts enjoy wide discretion in managing the factfinding process in habeas proceedings. *See Ex Parte Harris*, 491 S.W.3d 332, 335 (Tex. Crim. App. 2016). As a practical matter, the pretrial exchange of the names of experts, the nature of their opinions, and that facts and data that support them, could only lead to a smoother and more efficient live hearing. To this end, the State agrees to disclose its

575

experts—if it decides to call any—together with their names and underlying data not otherwise privileged upon receipt of the same from Applicant.

## III.
## Prayer

Wherefore, the State prays this Court order Applicant to disclose to the State, in writing, the names and addresses of the expert witnesses he intends to call at the hearing, together with all non-privileged facts and data supporting each opinion that each expert intends to offer, no later than 20 days before the hearing commences.

Respectfully submitted,

FAITH JOHNSON
Criminal District Attorney
Dallas County, Texas

JUSTIN JOHNSON
Assistant Criminal District Attorney
SBN 24054522
133 N. Riverfront Blvd., LB-19
Dallas, TX 75207-4399
(214) 653-3604 | (214) 653-3643 *fax*
justin.johnson@dallascounty.org

### Certificate of Service

I certify that a true copy of this motion was or will be served on counsel for Applicant Benjamin Wolff, Director, Office of Capital Writs, 1700 N. Congress Avenue, Suite 460, Austin, Texas 78701, by electronic service and/or email to Benjamin.Wolff@ocfw.texas.gov, on June 9, 2017

JUSTIN JOHNSON

576

**Cause No. W12-23749-W(A)**

| | | |
|---|---|---|
| EX PARTE | § | IN THE 363RD JUDICIAL |
| | § | |
| MATTHEW LEE JOHNSON, | § | DISTRICT COURT |
| Applicant | § | |
| | § | DALLAS COUNTY, TEXAS |

## ORDER TO DISCLOSE EXPERT WITNESSES

AND NOW, having considered the State's Motion for Disclosure of Expert Witnesses, it is ORDERED that Applicant disclose to the State, in writing, no later than 20 days before the hearing in this habeas matter commences, the names and addresses of the expert witness(es) it intends to call, together with their general opinions and any unprivileged underlying facts and data supporting those opinions.

Upon receipt of Applicant's disclosure, the State is ORDERED to provide Applicant with its disclosure.

This the _____ day of _____, 2017.

_____
HON. TRACY HOLMES
DISTRICT JUDGE

577

FILED
8/15/2019 4:27 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
FL DEPUTY

FL

## IN THE 363RD DISTRICT COURT
## DALLAS COUNTY, TEXAS

|  |  |
|---|---|
| **EX PARTE** | ) |
| **Matthew Lee Johnson,** | ) |
| **APPLICANT** | ) |
|  | ) |
|  | ) |

**Cause No.**
**W12-23749-W(A)**

## RESPONSE IN OPPOSITION TO STATE'S MOTION FOR DISCLOSURE
## OF APPLICANT'S TRIAL FILES

OFFICE OF CAPITAL AND FORENSIC WRITS
Benjamin B. Wolff (No. 24091608)
Director, Office of Capital & Forensic Writs
(E-mail: Benjamin.Wolff@ocfw.texas.gov)
Erin Eckhoff (No. 24090910)
(E-Mail: Erin.Eckhoff@ocfw.texas.gov)
Carlotta Lepingwell (No. 24097991).
(E-mail: Carlotta.Lepingwell@ocfw.texas.gov)
1700 North Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

*Post-Conviction Attorneys for Applicant*

1

578

IN THE 363RD DISTRICT COURT
DALLAS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Cause No. |
| Matthew Lee Johnson, | ) | W12-23749-W(A) |
| APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |

## RESPONSE IN OPPOSITION TO STATE'S MOTION FOR DISCLOSURE OF APPLICANT'S TRIAL FILES

Matthew Lee Johnson, through his attorneys the Office of Capital and Forensic Writs (OCFW), requests that this Court deny the State's Motion for Disclosure of Applicant's Trial Files wherein the State seeks an order that the OCFW, as Mr. Johnson's agents, disclose "relevant" privileged and confidential items from his trial file and maintain a privilege log of withheld items. Although allegations of ineffective assistance of counsel may effect a limited waiver of otherwise privileged and confidential information, the issue is not yet ripe. To the extent that this Court ultimately sanctions a waiver of certain aspects of the duty of loyalty and confidentiality—duties that are otherwise the heart of the attorney-client relationship—the scope of any such limited waiver dictates that disclosure of confidential and privileged information may: (1) only be made by Mr. Johnson's trial counsel; (2) only to the extent they believe reasonably necessary to defend

2

themselves; and (3) only with judicial oversight. ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Opinion 10-456 (2010).

Consequently, neither Mr. Johnson's post-conviction counsel nor the State have standing to determine what information from the trial file, if any, is relevant to trial counsel's defense. Rather, it is trial counsel's determination of what otherwise privileged and confidential information they may need to defend themselves against Mr. Johnson's claims that drives the relevance determination for disclosure of any such information. Indeed, to require the OCFW to comply with the State's discovery request would force Mr. Johnson's post-conviction counsel into the untenable position of attempting to identify which privileged information or materials, if any, *trial counsel* would deem reasonably necessary to disclose for their defense against Mr. Johnson's claims—a feat of supposition the OCFW cannot reasonably undertake. Moreover, the State seeks to arrogate a right of discovery by the mere fact of an ineffective assistance of counsel claim, an entitlement without foundation in either the Texas Disciplinary Rules of Professional Conduct or the Texas Code of Criminal Procedure. The State's discovery request must therefore be denied.

# I.

## RELEVANT BACKGROUND

In his Initial Application for habeas relief, Mr. Johnson raised allegations of ineffective assistance of trial counsel. This Court designated several issues of controverted fact within Mr. Johnson's ineffective assistance of counsel claim to be

3

580

resolved via an evidentiary hearing, including the presentation of live testimony. Subsequently, the State filed a motion seeking disclosure of Mr. Johnson's case files created by his trial counsel. Mr. Johnson files this response in opposition.

## II.

## ARGUMENT

When a former client raises a claim of ineffective assistance of trial counsel, a limited waiver of the attorney-client privilege may result so as to allow trial counsel—who are witnesses in these post-conviction proceedings—to defend themselves in their testimony from such claims by using otherwise privileged information. That is, Mr. Johnson's trial counsel may have the right to disclose attorney-client privileged information for the narrowly circumscribed purpose of defending themselves against Mr. Johnson's claims. But trial counsel's limited right to disclose privileged information in their defense does not create a discovery mechanism for the State to access trial counsel's files through current post-conviction counsel. *See In re Harris*, 491 S.W.3d 332, 336 (Tex. Crim. App. 2016). Here, the State is seeking to improperly extend a limited waiver applicable only to trial counsel into a broad discovery tool.

4

### A. Mr. Johnson Owns His Trial File, Which Is Confidential and Covered by Attorney-Client and Work-Product Privileges

As the Court of Criminal Appeals has made clear, "the client's file belongs to the client." *In re McCann*, 422 S.W.3d 701, 704 (Tex. Crim. App. 2013); *accord Spivey v. Zant*, 683 F.2d 881 (5th Cir. 1982) (holding the view that the client was not entitled to his own case file as "untenable"). Under the Texas Disciplinary Rules of Professional Conduct, counsel is obligated to keep the client's interest foremost in handling the client's file. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.15(d); TEX. COMM. ON PROF'L ETHICS, Op. 657, 2016 WL 3771107 (May 2016). The trial file created by Mr. Johnson's trial counsel belongs to Mr. Johnson, not to any of his current or former lawyers, and continues to be covered by trial counsel's duty of confidentiality, attorney-client privilege between Mr. Johnson and his former counsel, and the work-product privilege. The OCFW holds Mr. Johnson's file only as his agent, and Mr. Johnson does not wish the OCFW to disclose the contents of his trial file to the State.

Confidential information includes both privileged information and unprivileged client information. TEX. R. DISCIPLINARY P. 1.05(a). Unprivileged information includes "all information relating to a client or furnished by the client, other than privileged information, acquired by the lawyer during the course of or by reason of the representation of the client." *Id.* With few exceptions, attorneys are required to maintain all information that was acquired in the course of representing

5

a former client as confidential. *Id.* at R. 1.05(b)(3), (4). All of Mr. Johnson's file falls into this category.

Under the Texas Rules of Evidence, confidential communications between a client and his attorney, with the attorney's representative, or between the client's representatives, fall under the attorney-client privilege. TEX. R. EVID. 503(b)(1) ("A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client . . . between the client . . . and the client's lawyer."). In a criminal case, a client has a privilege to prevent a lawyer "from disclosing any other fact that came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship." *Id.* at § (b)(2). The privileged nature of communications between client and attorney remains intact, even upon the termination of the attorney-client relationship. *See Maryland Am. Gen. Ins. Co. v. Blackmon*, 639 S.W.2d 455, 458 (Tex. 1982).

The "work product privilege is broader than the attorney-client privilege[.]" *In re Bexar Cty. Criminal Dist. Attorney's Office*, 224 S.W.3d 182, 186 (Tex. 2007). It covers "more than just documents: it extends to an attorney's mental impressions, opinions, conclusions, and legal theories, as well as the selection and ordering of documents." *Id.* The purpose of the work product privilege "is to shelter the mental processes, conclusions, and legal theories of the attorney, providing a privileged area

6

583

within which the lawyer can analyze and prepare his or her case." *Owens–Corning Fiberglas Corp. v. Caldwell*, 818 S.W.2d 749, 750 (Tex.1991) (orig. proceeding) (citing *Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 554 (Tex.1990)). Work product privilege continues "indefinitely beyond the litigation for which the materials were originally prepared." *Bexar County Criminal Dist. Attorney's Office*, 224 S.W.3d at 186. In addition to being confidential, Mr. Johnson's file also falls within the scope of the attorney-client and work-product privileges.

### B. Any Waiver of Mr. Johnson's Privileges from Raising Ineffective Assistance of Trial Counsel Claims Are Narrowly Limited in Scope

Mr. Johnson's raised the issue of his trial counsel's performance in his initial application. In doing so, Mr. Johnson may have made a limited waiver of his attorney-client and work-product privileges *but only* to the extent necessary for trial counsel to defend themselves. Any additional disclosure beyond that limitation—by trial counsel or subsequent counsel—is not permitted under the law, including through discovery.

The circumstances under which an attorney is permitted to reveal a former client's confidential, privileged, or work-product information differ slightly depending on the type of information that is at issue. Disclosure of confidential but unprivileged information may be permitted when "the lawyer has reason to believe it is *necessary* to do so in order to . . . respond to allegations in any *proceeding* concerning the lawyer's representation of the client[.]" *Id.* at R. 1.05(d)(2)(iii)

7

(emphasis added). That is, Mr. Johnson's trial counsel, if they believe it *necessary* to respond, may do so by disclosing confidential information that is not under the attorney-client privilege within a judicial proceeding.

The permissible disclosure of information that falls within the attorney-client privilege is even more limited. Under the Disciplinary Rules, the disclosure of privileged information may only be done in a narrow set of circumstances. TEX. R. DISCIPLINARY P. 1.05(c). The relevant circumstance here is in Rule 1.05(b), Sections 4 and 5. Section 4 permits the lawyer to disclose information, "[w]hen the lawyer has reason to believe it is *necessary*" to comply with a court order or as required by law. *Id.* at R. 1.05(c)(4) (emphasis added). Though Section 5 permits disclosure to "the extent reasonably necessary to enforce a claim or establish a defense on behalf of the lawyer in a controversy between the lawyer and the client," *id.* at R. 1.05(c)(5), Mr. Johnson's post-conviction proceedings do not constitute "a controversy between the lawyer and the client" because the respondent in these proceedings is the State. The State does not represent Mr. Johnson's trial counsel. And Mr. Johnson's trial counsel are the ones who may or may not be compelled by court order or by law to disclose privileged information, if they believe that disclosure is necessary to comply with the law or court order.

Though privilege between attorney and client is not absolute and courts have found that a defendant's ineffective assistance of counsel claim against a former

8

585

attorney may result in a limited waiver of attorney-client privilege, courts have consistently held that the waiver only applies to information necessary to the resolution of the ineffective assistance of counsel claim. That is, courts have consistently limited the scope of these waivers, permitting disclosure of only those confidential communications that are "*necessary* to prove or disprove [the client's] claims." *United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009) (emphasis added). Only Mr. Johnson's trial counsel—not post-conviction counsel or the State—are in position to determine what disclosure, if any, of privileged information is necessary for their defense of those claims.[1] Indeed, it is entirely conceivable that trial counsel may determine that they need not reveal client confidences or privileged information in response to Mr. Johnson's claims.

Predecessor counsel's duty to limit disclosure to information relevant to the claim of ineffective assistance also flows from counsel's continuing duty to the former client. Both the *ABA Guidelines* and the *Texas Guidelines* stipulate that, "[i]n accordance with professional norms, all persons who are or have been members of the defense team have a continuing duty to safeguard the interests of the client." *ABA Guidelines*, Guideline 10.13; *Texas Guidelines*, Guideline 11.8. ABA Formal

---

[1] This is not to say, however, that current counsel for Mr. Johnson are abdicating their role in the determination of the extent to which privileged is waived. Rather, once trial counsel for Mr. Johnson seek to reveal otherwise privileged information, it will be incumbent on post-conviction counsel to represent Mr. Johnson's interests in determining the contours of any waiver asserted.

9

Opinion 10-456 states that, in the context of an ineffective assistance of counsel claim, lawyers may disclose information "reasonably necessary" for resolution of the ineffectiveness claim. *ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Opinion 10-456*, at 5 (2010). Moreover, the Opinion notes that disclosure of privileged information "outside the context of a formal proceeding" is improper, for it "eliminat[es] the former client's opportunity to object and obtain a judicial ruling." Am. Bar Ass'n Standing Comm. on Ethics & Prof'l Responsibility, Formal Opinion 10–456, at 2 (2010).

Mr. Johnson does not dispute that his claims of ineffective assistance of counsel may operate as a limited waiver of privilege; rather, the dispute between Mr. Johnson and the State involves the scope of this limited waiver and how it operates.

## C. The Attorney-Client Privilege and Work-Product Privilege Concern the Scope of Trial Counsel's Testimony and Do Not Create a Right to Discovery

Both the attorney-client privilege and the work-product privileges are evidentiary privileges. They provide the permissible scope of a lawyer's testimony. They do not create a discovery mechanism.

The Disciplinary Rules are clear: the State has no standing to assert the limited waiver on behalf of trial counsel, or to insert itself into the question of attorney-client privilege and the confidentiality of communications under Rule 1.05. The duty imposed by Rule 1.05 is personal to trial counsel; they can only disclose privileged

10

information when reasonably necessary. In the event that they testify at an evidentiary hearing, any limited waiver would then apply so as to allow their testimony to the extent reasonably necessary to defend themselves. But the State has no entitlement to the information before such testimony takes place. The State suggests that this waiver allows them access to trial counsel's files through current post-conviction counsel; however, this limited waiver allows only trial counsel to use the otherwise privileged information to defend themselves against ineffective assistance of counsel claims. *See, e.g.*, ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Opinion 10-456. The State seeks to take a narrow and limited waiver allowing trial counsel to defend themselves against a claim of ineffectiveness and turn it into a broad discovery tool that the State would never otherwise have. The State is seeking pre-hearing discovery that is not contemplated by the Texas Code of Criminal Procedure or any other statutory source.

The State does not represent Mr. Johnson's trial counsel. Trial counsel are witnesses, not parties. How trial counsel chooses to respond to Mr. Johnson's claims, and the extent to which the limited waiver of privileged information will be effectuated, is a decision for trial counsel, not the State, to make.

### D. The State's Reliance on *In re Roderick Harris* Is Inappropriate

The State's reliance on *In re Roderick Harris* for the proposition that it is entitled to discovery of trial counsel's files is misplaced. *In re Roderick Harris* is a

11

decision of the Court of Criminal Appeals (CCA) disposing of a motion for leave to file a petition for writ of prohibition. 491 S.W.3d 332 (Tex. Crim. App. 2016). Writs of prohibition do not create new law. *See In re Medina*, 475 S.W.3d 291, 303 n.9 (Tex Crim. App. 2015) (denying a writ of prohibition because the law was unclear or unsettled). The question before the CCA in *Roderick Harris* was not the propriety of the trial court's order for discovery of trial counsel's files but whether the trial court's order was "purely ministerial" and whether the relator was entitled under the procedural posture to file a writ of prohibition. *See In re Roderick Harris* at 334. The CCA did not hold that the trial court's ruling was proper and, in fact, suggested otherwise, noting situations in which "appellate courts have also held that trial judges have overstepped their authority to order pretrial discovery[.]" *Id.* at 336. The CCA's decision regarding the *nature* of the order, not its propriety, rested on the absence of clear law either permitting or prohibiting what the trial court had done. *Id.* The fact that the CCA ultimately found that the trial court's action was not purely ministerial and that the relator was thus not entitled to file a writ of prohibition does not support the State's proposition that it is entitled to discovery of trial counsel's files. Instead, *In re Roderick Harris* established that there is *no* authority in Texas to support the State's request. *Id.*

Notably, in the aftermath of *In re Roderick Harris*, trial courts have continued to deny State motions seeking to require the OCFW to be responsible for making the

12

relevance determination and disclosing otherwise privileged and confidential information from trial counsel files. In one case, a Dallas County District Court denied a Dallas County District Attorney request that mirrored the one made here. *See* Writ Hearing Transcript at 25-26, *Ex parte Tyrone Cade*, W11-33962-R(A) (265th Dist. Ct. [Dallas Cty.] Feb. 10, 2016) ("After careful consideration, the Court's going to deny the State's request to disclose the defense teams or writ teams trial files.").[2] Rather, the trial court agreed that Mr. Cade's trial counsel should determine what information from the trial file, if any, was relevant to their defense to Mr. Cade's claims. Similarly, a Brazoria County District Court, in response to a State motion for access to the defense trial file, entered an order recognizing that trial counsel—not the OCFW—are responsible for identifying what otherwise privileged and confidential information from the trial file, if any, would be relevant to their defense against ineffective assistance of counsel claims. *See* Order, *Ex parte James Harris, Jr.*, No. 67063 (149th Dist. Ct. [Brazoria Cty.] March 16, 2017).[3]

---

[2] Although that court's determination was made while *In re Roderick Harris* was pending in the CCA, the State reurged its motion for disclosure after the opinion in *In re Roderick Harris* was issued. The trial court did not grant the State's reurged motion, and the OCFW did not make the disclosures requested by the State.

[3] Moreover, to satisfy the requirement that any disclosures under this limited waiver of privilege be subjected to judicial oversight, the trial court also established a process dictating that any disclosures by trial counsel, and any objections to them by the OCFW, would be reviewed by the court before being made to the State. *Id.*

13

Finally, just as *In re Roderick Harris* fails to establish any Texas authority for the State's request for disclosure by the OCFW, the State similarly provided no Texas authority to support its request that the Court order the OCFW to maintain a privilege log should its discovery request be granted. *See* State's Motion for Disclosure of Applicant's Trial Files at 9. Because, as noted above, trial counsel have not yet asserted any waiver of attorney-client privilege, it is premature and impossible for post-conviction counsel to maintain such a log at the present junction. By contrast, however, the State is well-suited at the present juncture to prepare a privilege log of all materials it seeks to withhold from disclosure, since the work product privilege, unlike the duty of confidentiality and loyalty, can be readily determined. Consequently, Mr. Johnson requests that this Court order the State to maintain a privilege log listing any items the State withholds from its disclosure to the OCFW.

### III.

### CONCLUSION

The State's request for discovery is inappropriate and unsupported by law. Mr. Johnson owns his case file. His current and former counsel have an ongoing duty to maintain the confidentiality of his file as well as any other information learned or obtained in the course of representing him. Though a claim of ineffective assistance of trial counsel may effectuate a limited waiver of the attorney-client and work-product privileges, any such limited privilege waiver would simply permit trial

14

counsel to respond to the extent they believe reasonably necessary. Because any such disclosure by trial counsel must be subject to judicial oversight, the limited waiver does not apply until trial counsel testifies and the scope of any waiver is adjudicated. It does not create a discovery right for the State.

For the foregoing reasons, Mr. Johnson requests that this Court deny the State's Motion for Disclosure of Applicant's Trial Files and grant Mr. Johnson's request that the State maintain a privilege log of items it withholds from disclosure.

Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

DATED:   June 15, 2017          By _____
                                   Erin M. Eckhoff
                                   Post-Conviction Attorney

15

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing upon:

Dallas County District Attorney
Attn: Shelly Yeatts
133 N. Riverfront Boulevard
LB19
Dallas, Texas 75207
(One copy)

Matthew Lee Johnson
TDCJ No. 999586
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, Texas 77351
(One copy)

Judge Tracey Holmes
363rd District Court
Dallas County Courthouse
133 N. Riverfront Boulevard
5th Floor
Dallas, Texas 75207
(One copy)

This certification is executed on June 15, 2017, in Austin, Texas.

Erin M. Eckhoff

16

593

FILED
3/12/2016 4:48 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
FL DEPUTY

## IN THE 363RD DISTRICT COURT
## DALLAS COUNTY, TEXAS

FL

|  |  |
|---|---|
| EX PARTE ) | Cause No. |
| Matthew Lee Johnson, ) | W12-23749-W(A) |
| APPLICANT ) | |
| ) | |
| ) | |

## APPLICANT'S LIST OF EXPERT WITNESSES

The Applicant, MATTHEW LEE JOHNSON, by and through undersigned counsel, submits his list of expert witnesses which may be offered at an evidentiary hearing in this cause. Mr. Johnson respectfully requests leave to amend the list prior to, or during, the evidentiary hearing, as justice may so require. The expert witnesses which may be offered are as follows:

Alicia Amezcua-Rodriguez, 1100 Daylily Loop, Georgetown, TX 78626

King Davis, 18416 Woodson's Mill Road, Beaverdam, VA 23015

Celeste Henery, 210 W. 24th Street, Austin, TX 78712

Antionette McGarrahan, 12820 Hillcrest Road, Dallas, TX 75230

John D. Roache, 7703 Floyd Curl Drive, San Antonio, TX 78229

Bert Rothenbach, 194 North Maple St, Florence, MA 01062

Jennifer Sapia, 4320 Southport Supply Rd., Southport, NC 28461

1

594

James Underhill, 1702-A West 6th Street, Austin, TX 78702

DATED:     August 17, 2017

Respectfully submitted,

CARLOTTA LEPINGWELL
Post-Conviction Attorney
Office of Capital and Forensic Writs
Texas Bar No. 24097991

ERIN ECKHOFF
Post-Conviction Attorney
Texas Bar No. 24090910

Office of Capital and Forensic Writs
1700 Congress, Suite 460
Austin, TX 78701
Telephone: (512) 463-8500
Facsimile: (512) 463-8590
carlotta.lepingwell@ocfw.texas.gov

ATTORNEYS FOR MR. JOHNSON

2

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing was served by

eFiling to the following on this 17th day of August, 2017.


District Clerk, Writ Desk
133 N. Riverfront Blvd.
Lock Box 12
Dallas, Texas 75207

Dallas County District Attorney
ATTN: Jaclyn Lambert-O'Connor
133 N. Riverfront Blvd.
Dallas, Texas 75207

Judge Tracey Holmes
363rd District Court
133 N. Riverfront Blvd.
Lock Box 36
Dallas, TX 75207


This certification is executed on August 17, 2016, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of
my knowledge.


CARLOTTA LEPINGWELL
Post-Conviction Attorney
Office of Capital and Forensic Writs
Texas Bar No. 24097991

2

596

Case 3:19-cv-02310-E    Document 36-13    Filed 05/11/21    Page 60 of 469    PageID 2909

FILED
8/25/2020 1:41 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
RT DEPUTY

# IN THE 363rd DISTRICT COURT
# DALLAS COUNTY, TEXAS

| | |
|---|---|
| | ) |
| EX PARTE ) | Cause No. |
| Matthew Lee Johnson, ) | W12-23749-W(A) |
| APPLICANT ) | |
| ) | |
| ) | |

## MOTION FOR THE DALLAS COUNTY DISTRICT ATTORNEY'S
## OFFICE TO BE RECUSED OR DISQUALIFIED FROM THIS MATTER

OFFICE OF CAPITAL AND FORENSIC WRITS
Carlotta Lepingwell (No. 24097991)
Carlotta.Lepingwell@ocfw.texas.gov
Erin Eckhoff (No. 24090910)
Erin.Eckhoff@ocfw.texas.gov
1700 North Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

*Post-Conviction Attorneys for Mr. Johnson*

597

## IN THE 363RD DISTRICT COURT
## DALLAS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Cause No. |
| MATTHEW LEE JOHNSON, | ) | W12-23749-W(A) |
| APPLICANT | ) |  |
|  | ) |  |

## MOTION FOR THE DALLAS COUNTY DISTRICT ATTORNEY'S OFFICE TO BE RECUSED OR DISQUALIFIED FROM THIS MATTER

Matthew Lee Johnson, through his attorneys, the Office of Capital and Forensic Writs (OCFW), files this Motion to Request that the Dallas County District Attorney's Office Voluntarily Recuse Itself or Be Ordered Disqualified. The Dallas County District Attorney's Office should recuse itself or be disqualified because of a conflict of interest arising from its employment of Tim Freeman, the lead investigator retained by Mr. Johnson's defense team at trial. Alternatively, Mr. Johnson requests that this Court issue an order for an evidentiary hearing to determine whether sufficient screening mechanisms are in place at the Dallas County District Attorney's Office to ensure that the sanctity of Mr. Johnson's confidential, protected, and privileged relationship with Mr. Freeman remains secure and inviolate. In support thereof, Mr. Johnson respectfully shows the following:

1

598

## SUMMARY OF ARGUMENT

Tim Freeman, now an investigator with the Dallas County District Attorney's Office, was previously retained by Mr. Johnson's trial counsel as the lead fact investigator in the underlying case. As a member of Mr. Johnson's trial team, Mr. Freeman has knowledge of, and access to, privileged and confidential information related to Mr. Johnson's Initial Application for Writ of Habeas Corpus (Initial Application) challenging Mr. Johnson's conviction and sentence, which is pending before this Court. Furthermore, Mr. Freeman is a material witness necessary to Mr. Johnson's claims, which is scheduled for an evidentiary hearing commencing on August 29, 2017. Consequently, the Dallas Country District Attorney's Office has a conflict of interest, which under the facts presented, rises to the level of a due process violation that prejudices Mr. Johnson. Accordingly, Dallas Country District Attorney's Office should recuse itself or be disqualified.

## RELEVANT BACKGROUND

Mr. Johnson's Initial Application, filed under Article 11.071 of the Texas Code of Criminal Procedure, is currently pending and is set for evidentiary hearing on August 29, 2017.

On June 5, 2017, Mr. Johnson, through his counsel, learned that Tim Freeman, the lead fact investigator in Mr. Johnson's trial for capital murder, was possibly

2

employed as an investigator by the Dallas County District Attorney's Office. On June 8, 2017, Mr. Johnson's attorney's submitted a Public Information Act request for Mr. Freeman's employment records in an effort to confirm that information. The Dallas County District Attorney's Office refused to provide them until it received an opinion from the Texas Attorney General. On June 13, 2017, opposing counsel represented to Mr. Johnson's attorneys that that Mr. Freeman has been employed as an investigator for the Dallas County District Attorney's Office since April 2015, at least one month before Mr. Johnson's Initial Application was filed. On August 22, 2017, Mr. Johnson's counsel received records confirming Mr. Freeman's employment with the Dallas County District Attorney's Office pursuant to the Texas Attorney General's opinion dated August 16, 2017.

As the lead fact investigator and a member of Mr. Johnson's defense team, Mr. Freeman has privileged and confidential knowledge about Mr. Johnson and his trial team's trial strategy. Upon information and belief, Mr. Freeman worked closely with mitigation specialist Brendan Ross in collecting records and speaking with witnesses. At a minimum, Mr. Freeman had access to all of Mr. Johnson's medical records, school records, work records, and the attorneys' and mitigation specialist's work product.

Claim Two in the Initial Application alleges that Mr. Johnson's trial counsel were ineffective for failing to investigate and present lay witness and expert

3

600

testimony regarding Mr. Johnson's social history. *See* Initial Application, Claim Two. This claim is based at least in part on trial counsel's lack of investigation and presentation of lay witnesses that were readily available had they conducted a proper investigation. *See* Initial Application, Claim Two. As the lead fact investigator for Mr. Johnson's capital murder trial, Mr. Freeman worked closely with trial counsel— and at their direction—in locating and speaking with witnesses for Mr. Johnson's defense. Mr. Freeman has firsthand knowledge of witnesses trial counsel did and did not pursue on Mr. Johnson's behalf. Thus, Mr. Freeman is a witness to controverted, material issues of fact related to Mr. Johnson's claim for relief in the same proceeding in which his employer—the Dallas County District Attorney's Office— is prosecuting Mr. Johnson.

## LEGAL STANDARD

Legal disqualification refers to the ineligibility to act as the prosecutor in a particular case. *Coleman v. State*, 246 S.W.3d 76, 81 (Tex. Crim. App. 2008). A trial court may disqualify the district attorney where his former representation of the defendant prejudices the defendant's rights or deprives him of his right to due process. *State ex rel. Hill v. Pirtle,* 887 S.W.2d 921, 927 (Tex. Crim. App. 1994); *see also State ex rel. Eidson v. Edwards*, 793 S.W.2d 1, 6 (Tex. Crim. App. 1990); *Ex parte Garza,* 2006 WL 2520258 (Tex. Crim. App. 2006) (unpublished). In fact, the Texas Code of Criminal Procedure is clear: a district attorney may not prosecute

4

persons with whom he or she previously represented. *See* TEX. CODE CRIM. PROC. ANN. art. 2.01.

Where the prior representation of a district attorney is in the "same" criminal matter as that currently being prosecuted, he or she is statutorily disqualified. *Id.* In such situations, the "conflict of interest is both obvious and actual." *Landers v. State,* 256 S.W.3d 295, 304 (Tex. Crim. App. 2008). As the Court of Criminal Appeals has long counseled,

> When a district attorney prosecutes someone whom he previously represented in the same case, the conflict of interest is obvious and the integrity of the prosecutor's office suffers correspondingly. Moreover, there exists the very real danger that the district attorney would be prosecuting the defendant on the basis of the facts acquired by him during the existence of his former professional relationship with the defendant. Use of such confidential knowledge would be a violation of the attorney-client relationship and would be clearly prejudicial.

*Ex parte Spain*, 589 S.W.2d 132, 134 (Tex. Crim. App. 1979).

The authority of a trial court comes from the court's duty to protect the defendant's constitutional due-process rights. *Ex parte Morgan*, 616 S.W.2d 625, 626 (1981) (orig. proceeding). In fact, the Texas Code of Criminal Procedure specifically contemplates the appointment of a prosecutor pro tempore when a district attorney is disqualified. *See* TEX. CODE CRIM. PROC. ANN. art. 2.07 ("Whenever an attorney for the state is disqualified to act in any case or proceeding, ... the judge of the court in which he represents the state may appoint any competent

attorney to perform the duties of the office during the absence or disqualification of the attorney for the state.").

A party seeking disqualification must show the existence of a prior attorney-client relationship "in which factual matters were so related to the facts in the pending litigation that it creates a genuine threat that confidences that were revealed to the former attorney will be revealed by that attorney to the present adversary." *In re Cap Rock Elec. Coop., Inc.*, S.W.3d 222, 230 (Tex. App. – Texarkana, 2000, orig. proceeding). As the Court held in *Pirtle*, a disqualification should occur when "(1) the underlying proceeding is so substantially related to real and actual disclosures (as opposed to theoretical discussions) that occurred during the previous attorney-client relationship, *and* (2) there exists a genuine threat that disclosure of these confidential communications will either materially advance the State's case or drastically undermine the accused's ability to mount a defense – such that this advancement or undermining rises to the level of a due-process violation." *Id.* at 927.

Lawyers are not the only personnel who, by virtue of changing employers, can cause a client's confidential information to move from a law firm representing a client to a government entity prosecuting the same client in the same or a substantially related matter. The movement of nonlawyers can also jeopardize a client's confidential and privileged information. *See In re American Home Products Corp.*, 985 S.W. 2d 68 (Tex. 1998), *Grant v. Thirteenth Court of Appeals*, 888 S.W.

6

603

2d 466 (Tex. 1994). *Phoenix Founders, Inc. v. Marshall,* 887 S.W.2d 831 (Tex. 1994). It is well established that the Texas Disciplinary Rules of Professional Conduct apply to the nonlawyer employee who switches sides during litigation, as well as to lawyers. *Phoenix Founders,* 887 S.W.2d at 85.

A prosecutor must be disqualified in circumstances where her objectivity and impartiality may reasonably be questioned to avoid offending due process. This is because "[b]oth the accused and the public have a legitimate expectation that the prosecutor's zeal will be objective and impartial in each individual case." *State v. Cope,* 50 P.3d 513, 515 (Kan. App. Ct. 2002) (citing *People v. Eubanks,* 927 P.2d 310 (Cal. 1996)); *see also In re Ligon,* 408 S.W.3d 888, 889 (Tex. App.—Beaumont 2013) (per curiam) (holding that trial court reasonably concluded under the circumstances that disqualification of the district attorney was "required by due process of law"). Furthermore, a disqualifying conflict exists where representation "reasonably appears to be or become adversely limited ... by the lawyer's or law firm's own interests." TEX. DISC. R. PROF'L CONDUCT 1.06(b)(2); *accord* ABA Model Rule 1.7(a) ("A lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if ... there is a significant risk that the representation ... will be materially limited ... by a personal interest of the lawyer."); *see also Cone v. Bell,* 556 U.S. 449, 470 n.15

7

604

(2009) (citing the ABA Standards for Criminal Justice and Model Rules with approval in assessing prosecutor's role in ensuring due process in a capital case).

## ARGUMENT & AUTHORITIES

Mr. Johnson now moves to disqualify the Dallas County District Attorney's office because:

- a member of Mr. Johnson's trial team, Mr. Freeman, a nonlawyer employee of the Dallas County District Attorney's Office, has knowledge of, and access to, privileged and confidential information regarding Mr. Johnson's case;

- Mr. Freeman's involvement as a member of Mr. Johnson's trial team as an investigator means that he is a witness with respect to controverted, material issues of fact in the same proceeding in which his employer—the Dallas County District Attorney's Office—is the prosecutor;

- long-standing constitutional principles, require the Dallas County District Attorney's Office's recusal or disqualification; and

- if the Dallas County District Attorney's Office does not voluntarily recuse itself, this Court has the authority and obligation to order disqualification as a means to ensure the fundamental fairness of this post-conviction proceeding.

Because of due process concerns suggested by a structural conflict of interest, the Dallas County District Attorney's Office should either voluntarily recuse itself or the Court should disqualify the entire Dallas County District Attorney's Office and order it to be walled off from those representing the State in this proceeding.

8

605

I. **As a Witness in Mr. Johnson's Evidentiary Hearing, Mr. Freeman Is Required to Participate in a Matter that Is Substantially Related to Mr. Freeman's Involvement in Mr. Johnson's Representation**

In *Buntion v. State*, the Court of Criminal Appeals reaffirmed its previous rulings in *Landers v. State* and *Ex parte Spain*, that when a "district attorney prosecutes someone whom he previously represented in the same case, the conflict of interest is obvious and the integrity of the prosecutor's office suffers accordingly." *See Buntion*, 482 S.W.3d 58 (Tex. Crim. App. 2016), citing *Ex parte Spain*, 589 S.W. 2d 132, 134 (Tex. Crim. App. 1979); *see also Landers*, 256 S.W. 3d 295 (Tex. Crim. App. 2008). A "matter" includes "any adjudicatory proceeding, application, request for a rule or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other similar, particular transaction involving a specific party or parties." Tex. Disc. R. Prof'l Conduct 1.10(f)(1). There is no question that the evidentiary hearing on Mr. Johnson's application for writ of habeas corpus is substantially related to Mr. Johnson's trial, which Mr. Freeman worked on. Now, as a former member of Mr. Johnson's trial team, Mr. Freeman, an employer of the entity defending Mr. Johnson's death sentence, is a material witness to Mr. Johnson's claim of ineffective assistance of counsel at the evidentiary hearing scheduled on July 17, 2017.

9

606

II.   **This Court Has the Authority and the Obligation to Order the Disqualification of the Dallas County District Attorney's Office as a Means to Ensure the Fundamental Fairness of This Post-Conviction Proceeding.**

A court has the inherent power to manage the integrity of its proceedings. *See In re Guerra*, 235 S.W.3d at 415. Moreover, disqualification is a long-standing common-law remedy. *See* Hazard & Hodes, THE LAW OF LAWYERING, § 14.2. If the Dallas County District Attorney's Office declines to voluntarily recuse itself and agree to be walled off from those representing the State in this matter, then the Court can and must order that the Dallas County District Attorney's Office be disqualified because the conflict of interest in this case rises to the level of a due process violation. *See State v. Pirtle,* at 927; *see also Landers v. State,* 256 S.W.3d 295, 304–06 (Tex.Crim.App.2008).

Of course, this Court presumes no misconduct on the part of the Dallas County District Attorney's Office or Mr. Freeman's simply because Mr. Johnson has alleged a conflict of interest. But the fact that this Court has, at this juncture, only been presented with allegations does not eliminate the structural conflict and the obstacle to due process posed by the Dallas County District Attorney's Office's ongoing participation in this proceeding. The constitutional guarantee of due process preserves the appearance ***and*** the reality of fundamental fairness. *See, e.g., Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248-50 (1980) (explaining that, although prosecutors "are necessarily permitted to be zealous in their enforcement of the law[,]" due

10

607

process imposes limits). When a structural conflict is actual and obvious, as it is here, the "potential for misconduct is deemed intolerable"; in such circumstances, no showing of specific prejudice is necessary to require disqualification. *See Young v. United States ex rel Vuitton et Fils*, 481 U.S. 787, 807 n.18 (1987) (explaining that determining whether a prosecutor has an actual conflict of interest is "distinct from the determination whether that conflict resulted in any actual misconduct"); *see also Ex parte Spain*, 589 S.W.2d 132, 134 (Tex. Crim. App. 1979) (noting that the "duty to avoid a conflict of interest has long been imposed on the prosecutors of this State").

When a state elects to entertain collateral challenges to criminal judgments in its own judicial forums, as the State of Texas has done, the Supreme Court has made clear that the procedures the state uses must comport with due process. *See Panetti v. Quarterman*, 551 U.S. 930, 949 (2007). Admittedly, "[a] criminal defendant proved guilty after a [presumably] fair trial does not have the same liberty interests as a free man," *District Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009); but states are not free to disregard the "fundamental requisite of due process of law [that] is the opportunity to be heard." *Ford v. Wainwright*, 477 U.S. 399, 413 (1986); *see also id.* at 424. In other words, when a state authorizes a process, that process must permit fair play and afford due process to those who play

11

608

by its rules. Otherwise, the game itself is a sham and those induced to play, based on false expectations of fairness, have a constitutional right to cry "foul."

Because the State of Texas has established a forum in which to test the legality of Mr. Johnson's death sentence, he is entitled to a forum that is fair. The fair adjudication of Mr. Johnson's habeas claims requires that the Dallas County District Attorney's Office be walled off from representing the State in this post-conviction proceeding because her employee, Mr. Freeman, a former agent of Mr. Johnson's legal team, is a material witness and because a structural/actual conflict of interest exists if the Dallas County District Attorney's Office continues to serve as an advocate here. Mr. Freeman will be called as a fact witness with regards to a claim based on ineffective assistance of counsel, while he remains employed by the office that seeks to defend Mr. Johnson's sentence. The inherent bias based on the conflict in which Mr. Freeman finds himself—as a former agent of Mr. Johnson and now an employee of the D.A. who defends Mr. Johnson's death sentence—is prejudicial to Mr. Johnson and, therefore, violates Mr. Johnson's right to due process. *Goodman v. State,* 302 S.W.3d 462, 467 (Tex. App.-Texarkana 2009, pet. ref'd) (citing *Landers,* 256 S.W.3d at 304–05).

Furthermore, any "wall-off procedure" that the State represents to have put into place on June 13, 2016 does not cure the conflict presented in this case. While the plurality in *Eidson* held that when an individual attorney (and by extension

12

609

employee) has been separated from matters affecting the former client, "vicarious disqualification [of the entire office] is not necessary," the scenario presented in this case is different than any scenario presented to the Court of Criminal Appeals. 793 S.W.2d at 6. Not only is Mr. Freeman a former representative of Mr. Johnson in a related matter, but he is a material witness in an upcoming hearing in that matter. Thus, it is impossible to wall Mr. Freeman off from these proceedings in entirety. The dissenting opinion in *Eidson* expressed skepticism that a "Chinese Wall" could be successfully erected in a District Attorney's Office. *Id.* at 14. The Court of Criminal Appeals has never had to address the issue of a "The Chinese Wall Defense" (*see In re Simon*, 2016 WL 3517889 (Tex. App.--Austin 2016) (unpublished), but this is not a case where a wall would resolve the conflict of interest.

### III.    Rule 1.06 *et seq.* of the Texas Disciplinary Rules of Professional Conduct Apply to Nonlawyer Employees

Under Rule 1.06(b)(2) of The Texas Disciplinary Rules of Professional Conduct, a lawyer shall not represent a person if the representation of that person "reasonably appears to be or become adversely limited ... by the lawyer's or law firm's own interests." Tex. Disc. R. Prof'l Conduct 1.06(b)(2). This principle extends to representing a party adverse to a former client in a "same or substantially related matter." Tex. Disc. R. Prof'l Conduct 1.06(b)(2) and 1.09(a)(3).

13

610

Texas Courts have repeatedly recognized that Rules 1.06 and 1.09 of Texas Disciplinary Rules of Professional Conduct apply to nonlawyers, such as paralegals, as agents of the attorney by whom they were employed. *Phoenix Founders, Inc. v. Marshall,* 887 S.W.2d 831, 85 (1994) (holding that a paralegal who has worked on a case is subject to a rebuttable presumption that confidences were imparted during the course of the paralegal's work on the case); *see also In re Columbia Valley Healthcare Systems, L.P.,* 320 S.W. 3d 819 (Tex. 2010); *In re Guaranty Insurance Services, Inc.,* 343 S.W.3d 130 (Tex. 2011). As an investigator for the Dallas County District Attorney's Office, Mr. Freeman is the District Attorney's nonlawyer employee. V.T.C.A., Government Code § 41.102(a).

While Rule 1.09 of The Texas Disciplinary Rules of Professional Conduct establishes the general rule about conflicts of interest arising in matters related to a former client, Rule 1.10 of The Texas Disciplinary Rules of Professional Conduct creates a narrow exception for successive government and private employment. TEX. DISC. R. PROF'L CONDUCT 1.09(b). Rule 1.10(e)(1) provides that "a lawyer serving as a public officer or employee shall not... [p]articipate in a matter involving a private client when the lawyer had represented that client in the same matter while in private practice...." TEX. DISC. R. PROF'L CONDUCT 1.10(e)(1). In *Ex parte Garza,* the Court of Criminal Appeals considered the disqualification of Bexar County District Attorney due to a conflict of interest arising from the work of two D.A.

14

investigators. *Ex parte Garza*, No. WR-65537-01 (2006) (not published). While the majority denied the writ of prohibition for unrelated reasons, *Ex parte Garza* sheds light on whether district courts have the authority to disqualify a District Attorney based on conflicted investigators. *Id.* The CCA's consideration is premised on the fact that conflicts of interest and attendant due process violations apply to District Attorney investigators. Thus, Rule 1.10(e)(1) of the Texas Disciplinary Rules of Professional Conduct applies to Mr. Freeman as an employee and investigator for the Dallas County District Attorney's Office.

**IV.   The Dallas County District Attorney's Office Is No Mere Advocate But a Prosecutor with Special Duties and Obligations to Protect the Integrity of the Judicial Proceeding.**

The Dallas County District Attorney's Office is a prosecutor, not just an ordinary advocate. Therefore, the structural conflict at issue in this proceeding has constitutional implications.

In the vast majority of cases that might qualify as capital murders, the death penalty is not sought, let alone imposed—even in Texas. In most death-penalty jurisdictions, district attorneys have virtually unbridled discretion in deciding whether to seek the death penalty in a particular capital-qualifying case. *See, e.g., In re Horan*, 271 Va. 258, 264 (2006). Prosecutorial discretion has resulted in notable geographical disparities in death sentences *within* death-penalty jurisdictions,

15

including Texas.[1] Less than half of Texas's 254 counties account for all of its death sentences. *See* Tex. Dep't Crim. Justice, *County of Conviction for Offenders on Death Row*.[2] Four counties—Harris, Dallas, Bexar, and Tarrant—account for over 50 percent of those sentences. *See* Tex. Dep't Crim. Justice, *County of Conviction for Executed Offenders*.[3] Nearly 84% of Texas's counties have sentenced someone to death three times or fewer—or not at all. *See* Tex. Dep't Crim. Justice, *Total Number of Offenders Sentenced to Death from Each County*.[4]

Multiple studies conducted throughout the country have identified intra-state geographic discrepancies in the imposition of the death penalty that can be attributed to the exercise of prosecutorial discretion.[5] The fact of extreme geographical

---

[1] These observations are distinct from the *inter*-state geographic discrepancies in the imposition of the death penalty. *See* Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL RTS. J. 345, 386-87 (1998) ("Because each jurisdiction creates its own death penalty statute, each statute is unique. The result is that—not only does punishment differ between death penalty jurisdictions and jurisdictions without the death penalty—significant discrepancies exist among the death penalty jurisdictions.").

[2] *Available at* https://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited August 3, 2017).

[3] *Available at* https://www.tdcj.state.tx.us/death_row/dr_county_conviction_executed.html (last visited August 3, 2017).

[4] *Available at* http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited August 3, 2017).

[5] *See, e.g.*, Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIV. RTS. L. REV. 389 (2010) (discussing studies

16

disparities—attributable to prosecutorial discretion—is one of several aspects of the current application of the death penalty in America that recently prompted Supreme Court Justice Stephen Breyer, joined by Justice Ginsburg, to urge his colleagues to reconsider the constitutionality of the penalty. *See Glossip v. Gross*, 135 S.Ct. 2726, 2761 (2015) (Breyer, J. dissenting) (noting that "*within* a death penalty state, the imposition of the death penalty heavily depends on the county in which the defendant is tried").

Justice Breyer's recent expression of concern about pronounced geographical disparities arising from the exercise of prosecutorial discretion is part of a larger concern: that over forty years of experimentation has not resulted in a penalty that is less arbitrary in application since the days when it was temporarily struck down in *Furman v. Georgia*, 408 U.S. 238, 239 (1972) (per curiam); *see also id.* at 309 (Stewart, J., concurring) (likening imposition of a death sentence to "being struck by lightning"). That is, the practical consequence of prosecutorial discretion has ***not*** been to narrow the field of death-eligible defendants to the most serious and heinous cases. Instead, factors such as ideology, experience litigating capital cases, resource

---

in Arizona, Missouri, New Mexico, Pennsylvania, and South Carolina); Adam Gershowitz, *Statewide Capital Punishment: The Case For Eliminating Counties' Role in the Death Penalty*, http://works.bepress.com/adam_gershowitz/5 (2009); Katherine Barnes, *et al.*, *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305, 309-11 (2009).

availability, and personal relationships with surviving victims seem to exert significant influence on prosecutors' decisions to seek the death penalty. *See* Gershowitz at 11-15.

In short, the Dallas County District Attorney's Office's conflict is constitutionally concerning because the office is an advocate for a sovereign—the State of Texas. That role is characterized by distinct ethical obligations. A prosecutor "is the representative not of any ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). Due process, not just the ethics rules, require her recusal or disqualification.

## PRAYER FOR RELIEF

For the foregoing reasons, Mr. Johnson respectfully asks that this Court:

(1) GRANT the instant motion;

(2) ORDER that, if the Dallas County District Attorney's Office declines to voluntarily recuse itself, it is disqualified from representing the State;

(3) ORDER that Mr. Freeman be walled off from those representing the State in this matter;

(4) In the event that this Court does not determine outright that the Dallas County District Attorney's Office should be disqualified in this post-conviction proceeding, GRANT an evidentiary hearing to determine the sufficiency of screening mechanisms, if any, to ensure the sanctity of Mr. Johnson's attorney-client relationship with Mr. Freeman; and

(5) GRANT Mr. Johnson any further relief to which he shows he is justly entitled.

Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

Carlotta Lepingwell (No. 24097991)
Carlotta.Lepingwell@ocfw.texas.gov
Erin Eckhoff (No. 24090910)
Erin.Eckhoff@ocfw.texas.gov
Office of Capital and Forensic Writs
1700 North Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

***Post-Conviction Attorneys
for Mr. Johnson***

19

616

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing upon:

District Clerk, Writ Desk
Dallas County, Texas
133 N. Riverfront Blvd.
Lock Box 12
Dallas, Texas 75207

Judge Tracy Holmes
363rd District Court
133 N. Riverfront Boulevard
Lock Box 36
Dallas, TX 75207

Dallas County District Attorney
c/o Shelly Yeatts
133 N. Riverfront Blvd.
Lock Box 19
Dallas, TX 75207-4399

This certification is executed on August 25th, 2017, in Austin, Texas.

Carlotta Lepingwell

20

617

FILED
7/28/2017 3:55 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
FL DEPUTY

**W12-23749-W(A)**

|                          |   |                                    |
|--------------------------|---|------------------------------------|
|                          |   | FL                                 |
| **EX PARTE**             | § | **IN THE 363rd JUDICIAL**          |
|                          | § | **DISTRICT COURT**                 |
| **MATTHEW LEE JOHNSON**  | § | **DALLAS COUNTY, TEXAS**           |

## STATE'S RESPONSE TO DEFENDANT'S MOTION FOR THE DALLAS COUNTY DISTRICT ATTORNEY'S OFFICE TO BE RECUSED OR DISQUALIFIED

COMES NOW, the State of Texas, and files this response to Applicant Matthew Lee Johnson's motion for the Dallas County District Attorney's Office to be recused or disqualified as the prosecuting authority in this matter.

### I.

Tim Freeman was retained by the defense team prior to applicant's capital murder trial to assist Paula Cook as a fact investigator on applicant's case. Applicant was convicted of capital murder and sentenced to death on November 8, 2013. Mr. Freeman subsequently became employed by the Dallas County District Attorney's Office as a peace officer in April 2015. Applicant now claims that Mr. Freeman's current employment at the office is grounds for disqualification or recusal of the entire Dallas County District Attorney's Office in this post-conviction habeas proceeding. His contentions are wholly without merit.

1

618

## II.

## <u>DISQUALIFICATION</u>

### *Applicable Law*

In Texas, the elected district attorney shall represent the State in all criminal cases in the district courts of her district and in appeals therefrom. *See* Tex. Code Crim. Proc. Ann. art. 2.01 (West 2017). The office of a district attorney is constitutionally created and protected; thus, the district attorney's authority "cannot be abridged or taken away." *See Landers v. State*, 256 S.W.3d 295, 303-04 (Tex. Crim. App. 2008) (citing *State ex rel. Eidson v. Edwards*, 793 S.W.2d 1, 4 (Tex. Crim. App. 1990)); Tex. Const. art. V, § 21.

There are, however, a few instances in which the district attorney is legally disqualified from acting. *Coleman v. State*, 246 S.W.3d 76, 81 (Tex. Crim. App. 2008). For example, under Article 2.01 of the Code of Criminal Procedure, a district attorney is disqualified from representing the State in cases where she has been, before her election, employed adversely. Tex. Code Crim. Proc. Ann. art. 2.01; *see also Landers*, 256 S.W.3d at 304 (both the Texas Legislature and the Texas courts have held that a prosecuting attorney who has formerly represented the defendant in the same criminal matter as that currently being prosecuted is statutorily disqualified). Under Article 2.08, district attorneys "shall not be of

2

counsel adversely to the State in any case, in any court." Tex. Code Crim. Proc. Ann. art. 2.08(a); *see Holland v. State*, 729 S.W.2d 366, 368 (Tex. App.—Beaumont 1987, no pet.) (noting that article 2.08 "disqualifies former prosecuting attorneys from switching sides in cases where they have been of counsel for the state."). Article 2.08 also provides that a district attorney may be disqualified if she is the subject of a criminal investigation for an offense that is within the attorney's authority to prosecute. *See* id. art. 2.08(b).

In addition to these statutory provisions, a trial court has limited authority to disqualify a district attorney or her staff on the basis of a conflict of interest, but only if that conflict rises to the level of a due-process violation. *Landers*, 256 S.W.3d at 304 (citing *State ex rel. Hill v. Pirtle*, 887 S.W.2d 921, 927 (Tex. Crim. App. 1994) (orig. proceeding)). A due-process violation occurs only when the defendant can establish "actual prejudice," not just the threat of possible prejudice to his rights. *Id.* at 304-05. Actual prejudice would occur, for example, if the prosecuting attorney had previously represented the defendant in the same matter or in a substantially-related matter and in that representation had obtained confidential information and used it to the defendant's disadvantage. *Id.* at 305; *In re Cox*, 481 S.W.3d 289 (Tex. App.—Fort Worth 2015, orig. proceeding) (reh'g en banc). The movant has the burden of producing sufficient evidence

3

showing a basis for disqualification. *In re Goodman*, 210 S.W.3d 805, 808 (Tex. App.—Texarkana 2006, orig. proceeding) (citing *In re Cap Rock Elec. Coop., Inc.*, 35 S.W.3d 222, 230 (Tex. App.--Texarkana 2000, orig. proceeding)).

### There is No Legal Basis for Disqualifying the Dallas County District Attorney's Office

District Attorney Faith Johnson was not employed adversely in these cases prior to her appointment. She has never previously represented the defendant in any criminal matter, nor have any of the attorneys she employs. As such, no ground for disqualification exists.

The defendant attempts to equate Mr. Freeman's role as an investigator in applicant's case to that of an attorney who previously represented him. In support of his argument, he cites to various Texas cases, the Texas Disciplinary Rules of Professional Conduct, and the American Bar Association's Model Rules of Professional Conduct pertaining to confidentiality and conflict issues that arise from a former attorney-client relationship. *See* Tex. Disciplinary Rules Prof'l Conduct R. 1.06, 1.10; Model Rules of Prof'l Conduct R. 1.7. However, Mr. Freeman was not applicant's attorney. There is no former attorney-client relationship at issue. To date, no Texas court has extended the holdings regarding disqualification of a prosecuting attorney beyond the prior-representation

4

621

scenario. *In re Simon*, No. 03-16-00090-CV, 2016 WL 3517889, 2016 Tex. App. LEXIS 6562 (Tex. App.—Austin June 22, 2016, orig. proceeding).

Not only has applicant failed to show a conflict, he also has failed to show actual prejudice. Applicant has not shown that Mr. Freeman possesses any privileged or confidential information that is not a matter of public record or was not brought out during applicant's trial. And even if he did possess privileged information about the investigation of applicant's case in preparation for trial, such information is no longer privileged or protected from disclosure. Applicant has filed a writ application attacking the investigation that was conducted by his trial defense team. Shortly thereafter, this Court entered an order designating all of these issues for resolution and setting the matter for a live evidentiary hearing, making any individual who possesses relevant information relating to the designated issues a witness that can be questioned about such information by either party. Additionally, this Court has ordered applicant's current attorneys to turn over to the State everything in the defense team's trial files that is relevant to the claims raised. Any information known by Mr. Freeman regarding the trial defense team's investigation is also likely contained in the files. Thus, in this post-conviction proceeding, any information that Mr. Freeman learned during his work on the case is no longer protected. Applicant has put this very information at

5

622

issue and made it discoverable by raising the claims contained in his writ application.

In any event, no information has been disclosed by Mr. Freeman or used to applicant's detriment. The fact of Mr. Freeman's previous work on applicant's case was brought to the State's attention on June 12, 2017 by applicant's current counsel at the Office of Capital and Forensic Writs. Since beginning employment at the Dallas County District Attorney's Office, Mr. Freeman has not spoken with anyone at the office about his previous work on applicant's case (other than to say that he does not remember the case) and has not performed any work on applicant's post-conviction proceeding in his capacity as an investigator for the office. Once it was brought to the State's attention that Mr. Freeman did previously work on applicant's case while in private practice, Mr. Freeman was informed that he was being screened from participation in this matter. Mr. Freeman does not have access to the State's files and has not participated in any way in this case. This precaution makes disqualification of the entire office wholly unnecessary. *See, e.g., Eidson*, 793 S.W.2d at 6 (noting that when an individual attorney is separated from any participation on matters affecting his former client, vicarious disqualification of the entire office or government department is not necessary or wise).

6

623

Under these circumstances, applicant has not, and cannot, demonstrate actual prejudice implicating his due process rights.

### III.

### RECUSAL

In the alternative to disqualification, the applicant asks the Dallas County District Attorney's Office to recuse itself from these cases. Recusal refers to the voluntary removal of oneself as a prosecutor because of a conflict of interest or for other good cause. Tex. Code Crim. Proc. Ann. art. 2.07(b-1). The responsibility for making the decision to recuse is on the district attorney herself; the trial court cannot require her recusal. *Coleman*, 246 S.W.3d at 81. Once the trial court approves a district attorney's voluntary recusal, the district attorney is deemed "disqualified." Tex. Code Crim. Proc. Ann. art. 2.07(b-1). As demonstrated herein, there is no conflict of interest or other good cause justifying recusal of the district attorney or her entire office in these cases. Further, the office has acted in an abundance of caution and screened Mr. Freeman from participation in these cases, thereby making recusal entirely unnecessary.

7

624

## V.

## CONCLUSION

Based on the foregoing, the State respectfully requests that applicant's Motion for the Dallas County District Attorney's Office to be Recused or Disqualified be denied.

Respectfully submitted,

FAITH JOHNSON
Criminal District Attorney
Dallas County, Texas

JACLYN O'CONNOR LAMBERT
State Bar No. 24049262
JUSTIN JOHNSON
State Bar No. 24054522
Frank Crowley Courts Bldg.
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

## CERTIFICATE OF SERVICE

A copy of the foregoing pleading was served on applicant's attorneys, Carlotta Lepingwell, carlotta.lepingwell@ocfw.texas.gov, and Erin Eckhoff, Erin.Eckhoff@ocfw.texas.gov, by utilizing the service function in the Texas courts eFiling system on August 28, 2017.

JACLYN O'CONNOR LAMBERT

8

625

CAUSE NO. _W12 - 23749 - W_

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT OF |
| | ) | |
| VS. | ) | DALLAS COUNTY, TEXAS |
| _Matthew Lee_ | ) | |
| _Johnson_ | ) | _363rd_ JUDICIAL DISTRICT |

## DEPUTY REPORTER STATEMENT

Pursuant to Rule 13.5 of the Texas Rules of Appellate Procedure, Appointing Deputy Reporter, I hereby certify the following:

A. The judge of the above-named trial court designated the undersigned as the deputy reporter in the above cause(s).

B. I, the undersigned deputy reporter, worked the following date in the above court and on the above cause.

SIGNED on this the _29th_ day of _August_, 20_17_.

_Janessa Thornell_

Janessa Thornell
CSR #: 8843 Expires: 12/31/2017
P.O. Box 1194
Forney, Texas 75126
(214) 773-4888
JanessaThornell@gmail.com

626

CAUSE NO. W12-23749-W (A)

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT OF |
| | ) | |
| VS. | ) | DALLAS COUNTY, TEXAS |
| Matthew Lee | ) | |
| Johnson | ) | 363rd JUDICIAL DISTRICT |

## DEPUTY REPORTER STATEMENT

Pursuant to Rule 13.5 of the Texas Rules of Appellate Procedure, Appointing Deputy Reporter, I hereby certify the following:

A. The judge of the above-named trial court designated the undersigned as the deputy reporter in the above cause(s).

B. I, the undersigned deputy reporter, worked the following date in the above court and on the above cause.

SIGNED on this the 30th day of August, 2017.

Janessa Thornell

Janessa Thornell
CSR #: 8843 Expires: 12/31/2017
P.O. Box 1194
Forney, Texas 75126
(214) 773-4888
JanessaThornell@gmail.com

627

FILED
01/22/2020 3:51 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
RT DEPUTY

**IN THE 363ʳᵈ JUDICIAL DISTRICT COURT**
**DALLAS COUNTY, TEXAS**

|  |  |
|---|---|
| _____ )<br><br>**EX PARTE** )<br>**MATTHEW LEE JOHNSON,** )<br>**APPLICANT** )<br> )<br>_____ ) | **Cause No.**<br>**W12-23749-W(A)** |

## MOTION FOR ALL SUBSTANTIVE ARTICLE 11.071 PROCEEDINGS TO OCCUR ON THE RECORD

Matthew Lee Johnson, by and through undersigned counsel, files this motion requesting that all substantive motions and requests of the Court, and any arguments in support thereof, in his post-conviction proceedings under Code of Criminal Procedure Article 11.071 be conducted either by oral motion in the Reporter's Record, or by written motion in Clerk's Record. In support of this motion, Mr. Johnson respectfully states the following:

Mr. Johnson is confined under a sentence of death pursuant to the judgment of this Court, which was rendered on November 8, 2013. Mr. Johnson filed his Initial Application for Writ of Habeas Corpus on May 28, 2015. The State filed its Answer on November 23, 2015. This Court subsequently presided over four days of testimonial evidence from August 29-31, 2017, and on November 1, 2017.

1

628

On November 1, 2017, the State moved for the evaluation of Mr. Johnson by State psychologist, Dr. Timothy J. Proctor. Over Mr. Johnson's objection, this Court granted the State's motion for the evaluation of Mr. Johnson. However, this Court agreed with undersigned counsel that the parties must submit briefing regarding the extent of Dr. Proctor's evaluation and testing of Mr. Johnson.

The State subsequently forwarded to the Court and undersigned counsel an email from Dr. Proctor "summarizing his proposed evaluation procedure" in this case. *See* Exhibit A. Citing Dr. Proctor's email, the State requested—via email— that the Court grant the State full access to Mr. Johnson and allow Dr. Proctor to conduct any testing he sees fit, and do so without requiring the State to provide Mr. Johnson with any advance notice of what testing Dr. Proctor intended to administer. *See id.* In response, undersigned counsel requested that substantive discussion of this unresolved legal issue—namely, the extent to which the State should be allowed access to Mr. Johnson—be conducted on-the-record via motion by the State, and a response from Mr. Johnson. *See id.* Thus, undersigned counsel files this motion to request that all further substantive requests or motions by either party to this proceeding be made as part of the record for future transmittal to the Court of Criminal Appeals (CCA).

Counsel has a duty to ensure that a complete record is before the reviewing court, since the moving party must present the appellate tribunal with the record

2

necessary to establish a right to relief. *Newman v. State*, 331 S.W.3d 447, 450 (Tex.

Crim. App. 2011) (holding that an appellant who presented no record of a hearing

concerning his speedy trial claim should have lost in court of appeals). This duty is

especially critical in a capital case:

> Counsel must recognize that errors are often committed by the clerk in
> preparation of the clerk's transcript, and by the court reporter in
> compiling the reporter's transcript, therefore counsel must ensure the
> record is true, correct and complete in all respects. If errors or omissions
> are found, objections to the record must be immediately filed with the
> trial or appellate courts, to obtain corrections or hearing to insure[]
> reliability of the record.

*Guidelines and Standards for Texas Capital Counsel*, Texas Bar Journal 966-82

(November 2006) at Guideline 12.2.A.7; *see also, id.* at Guideline 11.1.C ("Counsel

at every stage have an obligation to satisfy themselves independently that the official

record of the proceedings is complete and to supplement as appropriate."). A

complete and accurate record is especially critical in light of the Eighth

Amendment's requirement of heightened reliability in cases in which the death

penalty may be imposed. *See Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) (holding

that, in a case in which the death penalty may be imposed, the "Eighth Amendment

requires a greater degree of accuracy and factfinding than would be true in a

noncapital case"); *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (holding

that the death penalty process must be "rationally reviewable"); *see also Monge v.*

*California*, 524 U.S. 721, 732 (1998) (reaffirming the "acute need for reliability in

capital sentencing proceedings"); *accord Deck v. Missouri*, 544 U.S. 622, 632-33 (2005).

For the foregoing reasons, Mr. Johnson respectfully asks that the Court order both parties to conduct all further substantive proceedings in Mr. Johnson's Article 11.071 proceedings on the record.

Respectfully submitted,

Benjamin B. Wolff, Director
OFFICE OF CAPITAL AND FORENSIC WRITS
Texas Bar No. 24091608
*Benjamin.Wolff@ocfw.texas.gov*

Carlotta Lepingwell
Texas Bar No. 24097991
*carlotta.lepingwell@ocfw.texas.gov*
Erin Eckhoff
Texas Bar No. 24090910
*Erin.eckhoff@ocfw.texas.gov*
1700 Congress, Suite 460
Austin, TX 78701
Telephone: (512) 463-8566
Facsimile: (512) 463-8590

ATTORNEYS FOR MR. JOHNSON

4

631

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing upon:

Dallas County District Attorney
ATTN: Jaclyn Lambert
133 N. Riverfront Blvd.
Dallas, Texas 75207

Judge Tracy Holmes
363rd District Court
133 N. Riverfront Blvd.
5th Floor
Dallas, TX 75207

This certification is executed on November 9, 2017, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Carlotta Lepingwell
Post-Conviction Attorney
Texas Bar No. 24097991

5

632

# EXHIBIT A

633

**Carlotta Lepingwell**

| | |
|---|---|
| **From:** | Jaclyn OConner <Jaclyn.OConnor@dallascounty.org> |
| **Sent:** | Thursday, November 09, 2017 12:01 PM |
| **To:** | Carlotta Lepingwell; Tracy Holmes; Christina O'Neil; Erin Eckhoff |
| **Cc:** | Justin Johnson; Benjamin Wolff |
| **Subject:** | RE: Matthew Johnson Evaluation Procedures |

We asserted an oral *Lagrone* motion at the hearing on the record. There is no requirement that it be in writing. It was my understanding that the motion was granted and the only unresolved issue that was being considered by the Court was what testing procedures would be permitted.
That said, I am happy to file a written motion if that is what the Court prefers. Judge Holmes, please let me know if that is what you would like the State to do.

**From:** Carlotta Lepingwell [mailto:Carlotta.Lepingwell@ocfw.texas.gov]
**Sent:** Tuesday, November 07, 2017 11:20 AM
**To:** Jaclyn OConnor; Tracy Holmes; Christina O'Neil; Erin Eckhoff
**Cc:** Justin Johnson; Benjamin Wolff
**Subject:** RE: Matthew Johnson Evaluation Procedures

Good morning, Judge Holmes,

We ask that the State put their request for access to and any testing of Mr. Johnson in a written motion, as it is our understanding that the Court agreed that this issue must be briefed. Indeed, due process requires that any request for experts and testing of Mr. Johnson be made by motion to this Court, with proper notice to Mr. Johnson, and that Mr. Johnson be afforded an opportunity to respond and be heard by this Court. *Cleveland Bd. Of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985); *see also generally* Amendments Five and Fourteen to the U.S. Constitution. Because this is a death penalty case which will be closely scrutinized by the CCA, this is not an issue that can be resolved by off-the-record email correspondence.

To properly brief this issue, we suggest that both parties get a transcript of Dr. Sapia's testimony. Perhaps then the State will understand the nature of her testimony and tailor their request accordingly, as Dr. Proctor's email indicates that State has either misunderstood Dr. Sapia's testimony, or has poorly summarized her testimony for Dr. Proctor. Dr. Sapia did not opine that Mr. Johnson has psychological difficulties stemming from developmental experiences, as understood by Dr. Proctor. Rather, Dr. Sapia testified about two topics: trauma generally as an educational expert, including what it is and the effects it can have, and to events in Mr. Johnson's life that were traumatic events or adverse experiences. She did not conduct the type of "forensic psychological evaluation" that the State is requesting. Did she not do any testing at all. Nor did she diagnose him, as the State is asking Dr. Proctor to do. Dr. Sapia merely interviewed Mr. Johnson about his life experiences and provided her expertise on trauma as an educational expert. The Court of Appeals has clearly held that rebuttal testimony by a State's expert is limited to the psychiatric issues raised by the defense expert. *Soria v. State*, 933 S.W.2d 46, 57-58 (Tex. Crim. App. 1996); *See also Williams v. Lynaugh*, 809 F.2d 1063, 1068 (5th Cir. 1987)(recognizing that when defendant introduces psychiatric evidence on a critical issue the State's use of psychiatric testimony must be properly limited to the issue raised by the defense.)

We continue to maintain the position that the State must cite some authority for their request to go beyond the nature and scope of Dr. Sapia's interview of Mr. Johnson in a written motion that is filed in the record. We will then respond accordingly.

Thank you.

1

**634**

Carlotta Lepingwell
Post-Conviction Attorney
Office of Capital & Forensic Writs
1700 Congress Avenue, Suite 460
Austin, Texas 78701
512.463.8566
carlotta.lepingwell@ocfw.texas.gov



Office of Capital and Forensic Writs

**From:** Jaclyn OConnor [mailto:Jaclyn.OConnor@dallascounty.org]
**Sent:** Monday, November 06, 2017 1:49 PM
**To:** Tracy Holmes <TRACY.HOLMES@dallascounty.org>; Christina O'Neil <Christina.O'Neil@dallascounty.org>; Carlotta Lepingwell <Carlotta.Lepingwell@ocfw.texas.gov>; Erin Eckhoff <Erin.Eckhoff@ocfw.texas.gov>
**Cc:** Justin Johnson <Justin.Johnson@dallascounty.org>
**Subject:** FW: Matthew Johnson Evaluation Procedures

Below is an email from Dr. Proctor summarizing his proposed evaluation procedure in Ex parte Matthew Johnson. He has not listed the specific tests he will perform because he makes that decision at the time of the evaluation depending on what he learns from interviewing Johnson, how Johnson presents, and the results of initial testing.

It is the State's proposal that Dr. Proctor be allowed to evaluate Johnson in whatever manner he feels is necessary based on his training and experience. If OCFW feels that there is a legal basis for objecting to the admissibility of particular tests performed and/or opinions offered, they can make those when we reconvene for testimony. If OCFW plans to send another expert in to evaluate Johnson and conduct similar testing, we would be amenable to exchanging expert reports and data prior to the hearing.

**From:** Timothy J. Proctor [mailto:tproctor@priceproctor.com]
**Sent:** Friday, November 03, 2017 9:14 PM
**To:** Jaclyn OConnor
**Subject:** Matthew Johnson Evaluation Procedures

The purpose of this email is to describe my proposed evaluation procedures for this case. To assess for the presence of psychological difficulties stemming from developmental experiences, which I understand an expert retained by the defense opined to be present, I plan to conduct a thorough forensic psychological evaluation that includes clinical history interview, behavioral observation, mental status examination, and psychological testing. Regarding the latter, given the issues at hand, I will include measures that assess his approach to the evaluation (i.e., the extent to which he responds to the evaluation/reports symptoms in an open and forthright manner) as well as the presence of psychological difficulties (e.g., depression, anxiety, psychosis, personality disturbance, substance use issues).

Sincerely,

635

Tim Proctor



Timothy J. Proctor, Ph.D., ABPP | *Price, Proctor & Associates, LLP*
Fellowship Trained & Board Certified in Forensic Psychology
phone *972-644-8686*
fax *972-644-8688*
web *www.priceproctor.com*
email *tproctor@priceproctor.com*

This electronic mail message and any attached files contain information intended for the exclusive use of the intended addressee and may contain personal, medical, or other legally protected or confidential information. If you received this email in error, please notify the sender and delete the original message without making copies. No waiver of any privileges is intended. Thank you

3

636

FILED
9/20/19 4:23 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
RT DEPUTY

# IN THE 363rd DISTRICT COURT
## DALLAS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE ) | Cause No. |
| MATTHEW LEE JOHNSON, ) | W12-23749-W(A) |
| APPLICANT ) | |
| ) | |
| ) | |

## MOTION FOR TRANSCRIPT OF PROCEEDINGS

Matthew Lee Johnson, by and through his attorneys the Office of Capital and
Forensic Writs (OCFW), respectfully asks that this Court authorize funding for the
court reporter to prepare and provide to Mr. Johnson transcripts of the November 1,
2017 evidentiary hearing conducted in the instant proceedings at no cost to him. In
support of this request, Mr. Johnson shows the following:

### RELEVANT BACKGROUND

Mr. Johnson is confined under a sentence of death pursuant to the judgment
of this Court, which was rendered on November 8, 2013. That same day, this Court
entered an order finding Mr. Johnson indigent and appointing the OCFW to
represent him in his Article 11.071 proceedings.

This Court recently presided over four days of testimonial evidence from
August 29-31, 2017, and on November 1, 2017. Applicant presented the testimony
of a psychologist, Dr. Jennifer Sapia. On November 1, 2017, the State moved for the

637

evaluation of Mr. Johnson by the State's expert, Dr. Timothy J. Proctor. Over Mr. Johnson's objection, this Court granted the State's motion for the evaluation of Mr. Johnson. However, this Court agreed with undersigned counsel that the parties must submit briefing regarding the extent of Dr. Proctor's evaluation and testing of Mr. Johnson.

## ARGUMENT & AUTHORITIES

The Court of Appeals, has in *Chamberlain v. State*, 998 S.W.2d 310, 233 (Tex. Crim. App. 1999), stated that "the essential principles at work in *Lagrone* and *Soria* are waiver and *parity*" (emphasis added). That is, rebuttal testimony by a State's expert is limited to the psychiatric issues raised by the defense expert. *See Soria v. State*, 933 S.W.2d 46, 57-58 (Tex. Crim. App. 1996). Indeed, what limitations, if any, apply to Dr. Proctor's evaluation and rebuttal is exactly the issue that Mr. Johnson requested the opportunity to brief for the Court, and the Court agreed.

As evidenced by the email exchange attached as Exhibit A, Mr. Johnson has raised serious concerns, based on Dr. Proctor's stated referral question in his email, that the State (1) lacks understanding about the nature of Dr. Sapia's testimony; (2) has been unable to adequately convey the nature of Dr. Sapia's testimony to Dr. Proctor; or (3) is mischaracterizing the nature of Dr. Sapia's testimony to support its effort to place no limits on Dr. Proctor's evaluation. In any case, production of a transcript of Dr. Sapia's testimony is necessary to move forward. If the issue is the

2

638

State's understanding or ability to effectively communicate with its expert, the transcript will aid their efforts to understand or effectively communicate. If the issue is that the State is mischaracterizing Dr. Sapia's testimony to obtain its desired result, Mr. Johnson will need to refer to a transcript of Dr. Sapia's testimony to argue to this Court the limits imposed by parity. Thus, it is imperative that Mr. Johnson obtain transcripts of Dr. Sapia's testimony before responding to any request by the State for unlimited access to Mr. Johnson.

In proceedings under Article 11.071, the court reporter is required to prepare a transcript of the proceedings, which is made part of the record to be sent to the Court of Criminal Appeals once the trial court has entered findings of fact and conclusions of law. *See* TEX. CODE CRIM. PROC. Art. 11.071 §9(f)(1)(C). Thus, the court reporter is required to prepare a transcript of all proceedings in this case, whether or not a transcript is requested by Mr. Johnson.

A complete and accurate appellate record is especially critical in light of the Eighth Amendment's requirement of heightened reliability in cases in which the death penalty may be imposed. *See Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) (holding that, in a case in which the death penalty may be imposed, the "Eighth Amendment requires a greater degree of accuracy and factfinding than would be true in a noncapital case"); *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (holding that the death penalty process must be "rationally reviewable"); *see also*

3

639

*Monge v. California*, 524 U.S. 721, 732 (1998) (reaffirming the "acute need for reliability in capital sentencing proceedings"); *accord Deck v. Missouri*, 544 U.S. 622, 632-33 (2005).

Moreover, the Supreme Court has held that indigent defendants must be afforded access to transcripts in the same manner "as defendants who have enough money to buy transcripts." *Griffin v. Illinois*, 351 U.S. 12, 19 (1956); *Eskridge v. Wash. State Bd. of Prison Terms and Paroles*, 357 U.S. 214, 216 (1958); *Williams v. Oklahoma City*, 395 U.S. 458, 460 (1969); *see also Ward v. State*, 740 S.W.2d 794, 796 (Tex. Crim. App. 1987) ("It is well established that an indigent defendant is entitled to an adequate record on appeal." (citing *Griffin*, 351 U.S. at 18-19)); *McGee v. State*, 711 S.W.2d 257, 259-60 (Tex. Crim. App. 1986) ("[W]e find that an indigent defendant need not establish harm before he or she is entitled to the entire transcript upon proper request. . . .[T]he trial court erred by refusing to order the court reporter to transcribe all of the material requested by appellant."); *Abdnor v. State*, 712 S.W.2d 136, 139 (Tex. Crim. App.) ("[A] Texas trial judge has a duty under the federal and state constitutions to provide an indigent defendant with an adequate record on appeal." (citing *Griffin*, 351 U.S. at 12)); *Ex parte Contreras*, 586 S.W.2d 550, 551 (Tex. Crim. App. 1979) ("The trial court has a duty under the Texas and United States Constitutions to provide an indigent defendant with an adequate record on appeal."); *Guillory v. State*, 557 S.W.2d 118, 120 (Tex. Crim.

4

640

App. 1977); *Bush v. State*, 557 S.W.2d 772, 773 (Tex. Crim. App. 1977); *Curry v. State*, 488 S.W.2d 100, 102 (Tex. Crim. App. 1972). The principle that indigent defendants are entitled to transcripts "also applies to state collateral proceedings." *Lane v. Brown*, 372 U.S. 477, 484 (1963). Because he is indigent, Mr. Johnson is entitled to transcripts of the instant proceedings at no cost to him.

CONCLUSION

For the foregoing reasons, Mr. Johnson respectfully asks that this Court order the court reporter to prepare and provide to Mr. Johnson transcripts of all hearings conducted in the instant proceedings at no cost to him, and that he receive said transcripts in advance of responding to any request by the State for access to Mr. Johnson.

5

Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

DATED: November 9, 2017

Benjamin B. Wolff (No. 24091608)
Director, Office of Capital & Forensic Writs
 (E-mail: Benjamin.Wolff@ocfw.texas.gov)
CARLOTTA LEPINGWELL
(No. 24097991)
(E-Mail:
Carlotta.lepingwell@ocfw.texas.gov)
Erin Eckhoff (No. 24090910)
(E-mail: Erin.Eckhoff@ocfw.texas.gov)
Office of Capital and Forensic Writs
1700 North Congress Avenue, Suite 460
Austin, Texas  78701
(512) 463-8566
(512) 463-8590 (fax)

*Post-Conviction Attorneys
for Applicant*

6

642

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing upon:

Dallas County District Attorney
ATTN: Jaclyn Lambert
133 N. Riverfront Blvd.
Dallas, Texas 75207

Judge Tracy Holmes
363rd District Court
133 N. Riverfront Blvd.
5th Floor
Dallas, TX 75207

This certification is executed on November 9, 2017, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Carlotta Lepingwell
Post-Conviction Attorney
Texas Bar No. 24097991

7

643

# EXHIBIT A

**Carlotta Lepingwell**

| | |
|---|---|
| **From:** | Jaclyn OConnor <Jaclyn.OConnor@dallascounty.org> |
| **Sent:** | Thursday, November 09, 2017 12:01 PM |
| **To:** | Carlotta Lepingwell; Tracy Holmes; Christina O'Neil; Erin Eckhoff |
| **Cc:** | Justin Johnson; Benjamin Wolff |
| **Subject:** | RE: Matthew Johnson Evaluation Procedures |

We asserted an oral *Lagrone* motion at the hearing on the record. There is no requirement that it be in writing. It was my understanding that the motion was granted and the only unresolved issue that was being considered by the Court was what testing procedures would be permitted.
That said, I am happy to file a written motion if that is what the Court prefers. Judge Holmes, please let me know if that is what you would like the State to do.

**From:** Carlotta Lepingwell [mailto:Carlotta.Lepingwell@ocfw.texas.gov]
**Sent:** Tuesday, November 07, 2017 11:20 AM
**To:** Jaclyn OConnor; Tracy Holmes; Christina O'Neil; Erin Eckhoff
**Cc:** Justin Johnson; Benjamin Wolff
**Subject:** RE: Matthew Johnson Evaluation Procedures

Good morning, Judge Holmes,

We ask that the State put their request for access to and any testing of Mr. Johnson in a written motion, as it is our understanding that the Court agreed that this issue must be briefed. Indeed, due process requires that any request for experts and testing of Mr. Johnson be made by motion to this Court, with proper notice to Mr. Johnson, and that Mr. Johnson be afforded an opportunity to respond and be heard by this Court. *Cleveland Bd. Of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985); *see also generally* Amendments Five and Fourteen to the U.S. Constitution. Because this is a death penalty case which will be closely scrutinized by the CCA, this is not an issue that can be resolved by off-the-record email correspondence.

To properly brief this issue, we suggest that both parties get a transcript of Dr. Sapia's testimony. Perhaps then the State will understand the nature of her testimony and tailor their request accordingly, as Dr. Proctor's email indicates that State has either misunderstood Dr. Sapia's testimony, or has poorly summarized her testimony for Dr. Proctor. Dr. Sapia did not opine that Mr. Johnson has psychological difficulties stemming from developmental experiences, as understood by Dr. Proctor. Rather, Dr. Sapia testified about two topics: trauma generally as an educational expert, including what it is and the effects it can have, and to events in Mr. Johnson's life that were traumatic events or adverse experiences. She did not conduct the type of "forensic psychological evaluation" that the State is requesting. Did she not do any testing at all. Nor did she diagnose him, as the State is asking Dr. Proctor to do. Dr. Sapia merely interviewed Mr. Johnson about his life experiences and provided her expertise on trauma as an educational expert. The Court of Appeals has clearly held that rebuttal testimony by a State's expert is limited to the psychiatric issues raised by the defense expert. *Soria v. State*, 933 S.W.2d 46, 57-58 (Tex. Crim. App. 1996); *See also Williams v. Lynaugh*, 809 F.2d 1063, 1068 (5th Cir. 1987)(recognizing that when defendant introduces psychiatric evidence on a critical issue the State's use of psychiatric testimony must be properly limited to the issue raised by the defense.)

We continue to maintain the position that the State must cite some authority for their request to go beyond the nature and scope of Dr. Sapia's interview of Mr. Johnson in a written motion that is filed in the record. We will then respond accordingly.

Thank you.

1

645

Carlotta Lepingwell
Post-Conviction Attorney
Office of Capital & Forensic Writs
1700 Congress Avenue, Suite 460
Austin, Texas 78701
512.463.8566
carlotta.lepingwell@ocfw.texas.gov



Office of Capital and Forensic Writs

**From:** Jaclyn OConnor [mailto:Jaclyn.OConnor@dallascounty.org]
**Sent:** Monday, November 06, 2017 1:49 PM
**To:** Tracy Holmes <TRACY.HOLMES@dallascounty.org>; Christina O'Neil <Christina.O'Neil@dallascounty.org>; Carlotta Lepingwell <Carlotta.Lepingwell@ocfw.texas.gov>; Erin Eckhoff <Erin.Eckhoff@ocfw.texas.gov>
**Cc:** Justin Johnson <Justin.Johnson@dallascounty.org>
**Subject:** FW: Matthew Johnson Evaluation Procedures

Below is an email from Dr. Proctor summarizing his proposed evaluation procedure in Ex parte Matthew Johnson. He has not listed the specific tests he will perform because he makes that decision at the time of the evaluation depending on what he learns from interviewing Johnson, how Johnson presents, and the results of initial testing.

It is the State's proposal that Dr. Proctor be allowed to evaluate Johnson in whatever manner he feels is necessary based on his training and experience. If OCFW feels that there is a legal basis for objecting to the admissibility of particular tests performed and/or opinions offered, they can make those when we reconvene for testimony. If OCFW plans to send another expert in to evaluate Johnson and conduct similar testing, we would be amenable to exchanging expert reports and data prior to the hearing.

**From:** Timothy J. Proctor [mailto:tproctor@priceproctor.com]
**Sent:** Friday, November 03, 2017 9:14 PM
**To:** Jaclyn OConnor
**Subject:** Matthew Johnson Evaluation Procedures

The purpose of this email is to describe my proposed evaluation procedures for this case. To assess for the presence of psychological difficulties stemming from developmental experiences, which I understand an expert retained by the defense opined to be present, I plan to conduct a thorough forensic psychological evaluation that includes clinical history interview, behavioral observation, mental status examination, and psychological testing. Regarding the latter, given the issues at hand, I will include measures that assess his approach to the evaluation (i.e., the extent to which he responds to the evaluation/reports symptoms in an open and forthright manner) as well as the presence of psychological difficulties (e.g., depression, anxiety, psychosis, personality disturbance, substance use issues).

Sincerely,

Tim Proctor



**Timothy J. Proctor, Ph.D., ABPP | *Price, Proctor & Associates, LLP***
Fellowship Trained & Board Certified in Forensic Psychology
phone *972-644-8686*
fax *972-644-8688*
web *www.priceproctor.com*
email *tproctor@priceproctor.com*

This electronic mail message and any attached files contain information intended for the exclusive use of the intended addressee and may contain personal, medical, or other legally protected or confidential information. If you received this email in error, please notify the sender and delete the original message without making copies. No waiver of any privileges is intended. Thank you

3

647

FILED
11/24/2020 4:58 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
BV DEPUTY

**W12-23749-W(A)**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 363rd JUDICIAL** |
| | § | **DISTRICT COURT** |
| **MATTHEW LEE JOHNSON** | § | **DALLAS COUNTY, TEXAS** |

### STATE'S MOTION FOR EXAMINATION OF APPLICANT BY THE STATE'S EXPERT FOR REBUTTAL TESTIMONY

COMES NOW, the State of Texas, and requests an order requiring the applicant to submit to an examination for use by the State in rebutting expert testimony presented by the applicant during his writ proceedings. In support of this motion, the State would show the following:

**I.**

During the evidentiary hearing in this case, the applicant presented live testimony from two experts, Dr. John Roache and Dr. Jennifer Sapia. Both of these experts interviewed the applicant and relied on the information obtained from him, in addition to other information, to form the expert opinions they testified to in this case. (WRR3: 4; WRR: 14, 23).[1] On the last day of the evidentiary hearing, the State made an oral motion requesting that the State's expert be given equal access to the applicant for the purpose of presenting rebuttal testimony in

---

[1] "WRR-" refers to the reporter's record from the writ proceedings.

1

648

accordance with *Lagrone*. *See Lagrone v. State*, 942 S.W.2d 602, 609-612 (Tex. Crim. App. 1997). The State now files this written motion requesting the same.

## II.

Texas law is clear that when a defendant introduces or plans to introduce testimony based on an examination by his own expert, the State is entitled to compel the defendant to undergo an examination by the State's expert for rebuttal purposes. *See Lagrone*, 942 S.W.2d at 609-612 (citing *Soria v. State*, 933 S.W.2d 46, 57-59 (Tex. Crim. App. 1996)); *see also In re Medina*, 475 S.W.3d 291, 302 (Tex. Crim. App. 2015) ("When a defendant presents evidence through a psychological expert who has examined him, the government is likewise permitted to use the only effective means of challenging that evidence: testimony from an expert who has examined him.").

The holding of *Lagrone* is governed by the principle that, if a defendant breaks his silence to speak to his own expert and introduces testimony which is based on such interview, he has constructively taken the stand and waived his Fifth Amendment right to refuse to submit to a State expert. *Chamberlain v. State*, 998 S.W.2d 230, 234 (Tex. Crim. App. 1999). The Court of Criminal Appeals explained that "[o]ur sense of justice will not tolerate allowing criminal defendants to testify through the defense expert and then use the Fifth

2

Amendment privilege against self-incrimination to shield themselves from cross-examination on the issues which they have put in dispute." *Lagrone*, 942 S.W.2d at 611.

Although the ruling in *Lagrone* applied to future dangerousness expert testimony, the operative principles are waiver and parity. *Lagrone*, 942 S.W.2d at 611-12. As such, the holding of *Lagrone* is not limited to the factual context of rebutting expert testimony from the defense with respect to future dangerousness. Indeed, the Court of Criminal Appeals has extended the principle of *Lagrone* to other areas of expert testimony and held that the rule is applicable even if the defendant introduces his evidence only in rebuttal. *See Chamberlain*, 998 S.W.2d at 230 (holding *Lagrone* rule applicable even if the defendant plans to present expert testimony only in rebuttal); *Lizcano v. State*, No. AP-75,879, 2010 WL 1817772, at *8 (Tex. Crim. App. May 5, 2010) (not designated for publication) (holding *Lagrone* applicable to psychological examinations of the defendant on the issue of mental retardation); *Ward v. State*, No. AP-74,695, 2007 WL 1492080, *6-7 (Tex. Crim. App. May 23, 2007) (not designated for publication) (holding *Lagrone* applicable to psychological examinations of the defendant for the development of mitigating evidence). As these cases demonstrate, the precise nature or timing of the expert testimony is immaterial – "that it is being

3

650

presented by the defendant is enough to trigger the rule." *Ward*, 2007 WL 1492080, at *7.

Regarding the scope of the State's examination conducted pursuant to *Lagrone*, the Court of Criminal Appeals has held that a defendant may not prevent the State's expert from interviewing him on the issue of future dangerousness even if the defendant's expert intends to testify only on mitigation issues. *Davis v. State*, 313 S.W.3d 317, 351-52 (Tex. Crim. App. 2010). In *Davis*, the Court of Criminal Appeals explained:

> [T]he subject matter of the defense psychiatrist's interview— "diminished capacity at the time [of the offense], mitigating factors that are now relevant in terms of the effects of drugs taken, remorse, and adjustment to incarceration"—are factors that could be taken into account in determining future dangerousness. Appellant's attempt to draw a hairsplitting distinction between these topics and a State expert's ultimate opinion as to future dangerousness is untenable and conflicts with the underlying rationale for the *Lagrone* rule: "[I]f a defendant breaks his silence to speak to his own psychiatric expert and introduces that testimony which is based on such interview, he has constructively taken the stand and waived his fifth amendment right to refuse to submit to the State's psychiatric experts. The focus is the defendant's choice to break his silence."

*Id*. at 352.

The court may exclude the defendant's expert testimony if he refuses to submit to a State-sponsored examination. *Chamberlain*, 998 S.W.2d at 234; *see also Ward*, 2007 WL 1492080, at *7 (principles of fairness allow a trial court to

4

651

compel a defendant to submit to examination by the State's expert as a condition

of allowing that defendant to present testimony by his own expert).

### III.

The State's expert, Timothy Proctor, proposes to conduct his examination

of applicant in the following manner:

> To assess for the presence of psychological difficulties stemming
> from developmental experiences, which I understand an expert
> retained by the defense opined to be present, I plan to conduct a
> thorough forensic psychological evaluation that includes clinical
> history interview, behavioral observation, mental status examination,
> and psychological testing. Regarding the latter, given the issues at
> hand, I will include measures that assess his approach to the
> evaluation (i.e., the extent to which he responds to the
> evaluation/reports symptoms in an open and forthright manner) as
> well as the presence of psychological difficulties (e.g., depression,
> anxiety, psychosis, personality disturbance, substance use issues).[2]

The State requests that the Court allow the State's expert to conduct an

examination of the applicant in the manner described above for rebuttal purposes

in accordance with *Lagrone*.

Applicant has suggested that the State's examination should be limited to

the same areas the defense experts covered during their testimony. However, the

defense experts were not limited in their access to the applicant or in the topics

they were allowed to discuss during their interviews of him. Under the *Lagrone*

---

[2] Dr. Proctor's proposed evaluation procedure was also summarized in an email exchange
between the parties in November 2017.

5

652

principles of waiver and parity, the State should be given the same opportunity. *See Davis*, 313 S.W.3d at 352.

Moreover, asking the court to limit the parameters of the State's *Lagrone* examination at this point is premature and impractical. It is impossible for the trial court to determine the relevance and admissibility of the results of the State's *Lagrone* examination without a record showing the expert's actual findings and the State's purported use of those findings. *See, e.g., Saldano v. State*, 232 S.W.3d 77, 90 (Tex. Crim. App. 2007) (appellate review of a trial court's ruling not limiting the State's *Lagrone* examination is practically impossible without a record showing the State's actual use of the results of the *Lagrone* examination). The proper procedure is for applicant to submit to the *Lagrone* examination and then make his objections, if any, at the time the objectionable evidence is offered by the State. This provides the trial court with the information necessary to make a ruling. It also preserves the issue for review should applicant wish to challenge the trial court's ruling. *See id.* at 90; *see also Hernandez v. State*, 390 S.W.3d 310, 322 (Tex. Crim. App. 2012) (in order for a court to review a complaint that the State's *Lagrone* examination was not limited to the same areas examined by the defense expert, the defendant is required to submit to the *Lagrone* examination and suffer any actual use by the State of the results of this examination).

6

653

**IV.**

WHEREFORE, PREMISES CONSIDERED, the State requests that the Court order the applicant to submit to an examination by the State's expert as described herein.

Respectfully submitted,

FAITH JOHNSON
Criminal District Attorney
Dallas County, Texas

JACLYN O'CONNOR LAMBERT
State Bar No. 24049262
JUSTIN JOHNSON
State Bar No. 24054522
Frank Crowley Courts Bldg.
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625

## CERTIFICATE OF SERVICE

A copy of the foregoing pleading was served on applicant's attorneys, Carlotta Lepingwell, carlotta.lepingwell@ocfw.texas.gov, and Erin Eckhoff, Erin.Eckhoff@ocfw.texas.gov, by email and by utilizing the service function in the Texas courts eFiling system on January 24, 2018.

JACLYN O'CONNOR LAMBERT

7

654

**W12-23749-W(A)**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 363rd JUDICIAL** |
| | § | **DISTRICT COURT** |
| **MATTHEW LEE JOHNSON** | § | **DALLAS COUNTY, TEXAS** |

## ORDER

Having considered the State's Motion for Examination of Applicant by the State's Expert for Rebuttal Testimony, it is hereby  GRANTED / DENIED.

Signed this _____ day of _____, 2018.

_____
Judge Tracy Holmes

8

655

Writ Number:  W12-23749-W(A)

| | | |
|---|---|---|
| EX PARTE | § | IN THE 363RD JUDICIAL |
| | § | DISTRICT COURT |
| MATTHEW LEE JOHNSON | § | DALLAS COUNTY, TEXAS |

## ORDER

Having considered the State's Motion for Examination of Applicant by the State's Expert for Rebuttal Testimony, it is hereby **GRANTED**.

**It is ORDERED** the State's expert shall make the raw test data and notes from their evaluations, assessments, and tests of the Applicant, Matthew Lee Johnson, available to counsel for Applicant prior to the State's expert testifying.

**It is further ORDERED** if any further evaluations, assessments, or tests of Applicant, Matthew Lee Johnson, are conducted by the Applicant's expert(s), the raw test data and notes from those evaluations, assessments, or tests shall be provided to the State prior to the Applicant's expert testifying.

The Clerk of this Court is directed to forward a copy of this order to counsel for the Applicant, Erin M. Eckhoff, 1700 North Congress Avenue, Suite 460, Austin, Texas 78701. The Clerk of this Court is also directed to forward a copy of this order to counsel for the State, Jaclyn O'Connor Lambert, Appellate Division, Dallas County District Attorney's Office.

**SIGNED** this _____ day of March, 2018.

_____
**TRACY HOLMES, JUDGE**
**363RD JUDICIAL DISTRICT COURT**
**DALLAS COUNTY, TEXAS**

656

Case 3:19-cv-02310-E    Document 36-13    Filed 05/11/21    Page 120 of 469    PageID 6989

FILED
6/27/2019 9:34 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
VP DEPUTY

IN THE 363RD DISTRICT COURT
DALLAS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE<br>Matthew Lee Johnson,<br>APPLICANT | ) Cause No.<br>) W12-23749-W(A)<br>)<br>)<br>)<br>) |

## MOTION TO PRECLUDE THE STATE'S IRRELEVANT, UNRELIABLE AND PREJUDICIAL EXPERT TESTIMONY

Matthew Lee Johnson, through his attorneys the Office of Capital and Forensic Writs (OCFW), files this motion to preclude the State's expert, Dr. Timothy Proctor, from testifying to irrelevant, unreliable, and prejudicial information. Specifically, Mr. Johnson requests that the Court preclude Dr. Proctor from testifying to his administration of the Hare Psychopathy Checklist-Revised, including any results he ascribes to Mr. Johnson. In support of this motion, Mr. Johnson respectfully states the following:

### RELEVANT PROCEDURAL BACKGROUND

Mr. Johnson is confined under a sentence of death pursuant to a judgment of this Court, which was rendered on November 8, 2013. On December 11, 2015, this Court designated Claims One through Four of Mr. Johnson's Initial Application for Writ of Habeas Corpus to be resolved at an evidentiary hearing. The evidentiary

1

hearing was held from August 29 to August 31, 2017, then recessed until it resumed on November 1, 2017. The hearing again was recessed and is scheduled to resume on August 1, 2018.

During this hearing, counsel presented mitigation evidence that Mr. Johnson grew up exposed to horribly traumatic events and experiences, including sexual abuse, neglectful caregivers, and rampant addiction, that completely characterized his development. Counsel presented this trauma-filled social history through a psychologist, Dr. Sapia, who testified as a mitigation expert. Dr. Sapia's opinions were based on interviews with family members, friends, and Mr. Johnson himself, and on a review of thousands of pages of records, including affidavits, trial testimony, medical records, institutional records, and other life history records. She neither performed testing nor offered a diagnostic impression. Nonetheless, on November 1, 2017, following Dr. Sapia's testimony, the State moved for the evaluation of Mr. Johnson by the State's expert, Dr. Timothy J. Proctor.

Prior to granting the State's request for expert examination of Mr. Johnson, this Court allowed briefing from both parties. In his *Response in Opposition to State's Motion for Expert Examination*, Mr. Johnson's counsel argued that the State's "proposal that Dr. Proctor be allowed to evaluate Johnson in whatever manner he feels is necessary based on his training and experience," (*see* Exhibit A, November 6, 2017 email from ADA Jaclyn O'Connor) was not limited to the

2

658

psychiatric issues raised by Mr. Johnson. Without further information about Dr.
Proctor's intended evaluation, Mr. Johnson could not raise specific or meaningful
objections to the State's expert examination. Over Mr. Johnson's objection, this
Court granted the State's expert unfettered access to Mr. Johnson.

On April 9, 2018, Dr. Proctor met with Mr. Johnson at the Dallas County Jail.
During his meeting with Mr. Johnson, Dr. Proctor did not administer any mental
health screeners, psychological assessments, or neuropsychological testing. Instead,
Dr. Proctor administered three personality tests—the Personality Assessment
Inventory (PAI), the Minnesota Multiphasic Personality Inventory (MMPI) and the
Hare Psychopathy Checklist-Revised (PCL-R).[1] Mr. Johnson now moves to
preclude this irrelevant and improper rebuttal testimony.

---

[1] These assessments purport to identify personality or behavioral disorders. As
argued in Mr. Johnson's *Response in Opposition to State's Motion for Expert
Examination of Mr. Johnson and Motion for Discovery of State Expert's
Examination Results and Report in Advance of Mr. Johnson's Opportunity for
Rebuttal* filed on February 2, 2018, and as addressed in testimony at this hearing by
Dr. Jennifer Sapia, any effort by the State to ascribe Mr. Johnson a personality or
behavioral disorder is not only irrelevant to the claims raised in Mr. Johnson's case,
but any diagnosis of such disorder would be unreliable given Mr. Johnson's long
history of substance abuse, intoxication, depression, and trauma. *See* 4 EHRR 105,
171, 173; *see also Diagnostic and Statistical Manual of Mental Disorders*, at 645
(5th ed. 2012). Mr. Johnson continues to object to any testimony by Dr. Procter
regarding these assessments, and the fact that this Motion focuses on the PCL-R in
particular should not be construed as waiving that objection.

3

659

## ARGUMENT

During this evidentiary hearing, Mr. Johnson has presented the testimony of Dr. Jennifer Sapia, a psychologist with expertise in trauma. Although Dr. Sapia is a psychologist by training, she was retained as an expert to evaluate Mr. Johnson's biopsychosocial history, including his substance abuse history and his adverse experiences, and to explain the potential traumatic experiences that may have affected Mr. Johnson's development and behavior. 4 EHRR 25-26. Similarly, Mr. Johnson presented the testimony of Dr. John Roache, an expert in pharmacology and drug addiction. 3 EHRR 72. Dr. Roache testified regarding drug addiction and the effects of addiction on the brain. Both experts—primarily using records, testimony, and signed statements equally available to the State—opined on the roles that traumatic experiences, drug use and addiction played in Mr. Johnson's life history.

Rebuttal testimony by a State's expert must be limited to the psychiatric issues raised by the defense expert. *Soria v. State*, 933 S.W.2d 46, 57-58 (Tex. Crim. App. 1996); *see also Williams v. Lynaugh*, 809 F.2d 1063, 1068 (5th Cir. 1987) (recognizing that when defendant introduces psychiatric evidence on a critical issue the State's use of psychiatric testimony by the State's own expert must be properly limited to the issue raised by the defense); *Brown v. United States*, 356 U.S. 148 at 154-155 (1958) (stating that the "breadth of his waiver is determined by the scope of relevant cross-examination" and a defendant "determines the area of disclosure

4

and therefore the inquiry"); and *Lizcano v. State*, No. AP-75879, 2010 WL 181772, at *8 (Tex. Crim. App. May 5, 2010) ("We hold that when the defense demonstrates the intent to introduce evidence of defendant's mental retardation through psychological examinations conducted by defense experts, the trial court may order the defendant to submit to an independent, state-sponsored psychological examination *on the issue of mental retardation*."(emphasis added)) (unpublished opinion). However, upon receiving Dr. Proctor's testing results, it is evident that the State's rebuttal testimony will focus on the results of three personality tests, none of which are probative to the issues raised—namely, whether Mr. Johnson's brain was impacted by traumatic experiences, drug use, and addiction.

In particular, the PCL-R is a prejudicial and unreliable test with no probative value. The PCL-R is a 20-item checklist of a prototypically psychotic traits and antisocial/criminal history variables that typically is scored based on a semi-structured interview and review of available collateral information. Examinees can receive a score ranging from 0 (zero) to 40, with higher scores indicating that they are being rated as more psychopathic.

The PCL-R purports to assess "psychopathy." Psychopathy is a concept or construct; it is not a diagnosis. It is not recognized as an official diagnostic category in any edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM). Indeed, despite ardent advocacy by proponents of the psychopathy construct to

5

include it in the DSM-IV, those efforts were rejected following its poor performance in field trials. *See* AM. PSYCHIATRIC ASS'N, RATIONALE FOR THE PROPOSED CHANGES TO THE PERSONALITY DISORDERS CLASSIFICATION IN DSM-5, at 1 (2012), *available at* https://www.yumpu.com/en/document/view/8702305/ rationale-for-the-proposed-changes-to-the-personality-dsm-5; *see generally* AM. PSYCHIATRIC ASS'N, DSM-IV SOURCEBOOK (Thomas A. Widiger et al. eds., 1998).

Although psychopathy is not a diagnosis, the State typically attempts to introduce PCL-R results, portraying them as a predictor of future dangerousness. Studies have shown that State expert testimony regarding PCL-R is highly prejudicial to capital defendants—jurors rely heavily on the characterization in their effort to assess future dangerousness.[2] However, there is little evidence to support the assertion that psychopathy scores from the PCL-R have any bearing on a convicted capital defendant's potential for future violent acts.[3]

Moreover, a growing body of scientific research indicates that PCL-R scores are highly *unreliable* in "real world" legal cases because they are so subjective in nature.[4] Studies have shown that even examiners who are employed or retained by

---

[2] Edens, J. F., Clark, J., Smith, S. T., Cox, J., & Kelley, S. (2013). Bold, smart, dangerous and evil: Perceived correlates of core psychopathic traits among jury panel members. *Personality and Mental Health, 7*, 143-153.

[3] Guy, L. S., Edens, J. F., Anthony, C., & Douglas, K. S. (2005). Does psychopathy predict institutional misconduct among adults? A meta-analytic investigation. *Journal of Consulting and Clinical Psychology, 73*, 1056-1064.

[4] Edens, J. F. (2006). Unresolved controversies concerning psychopathy: Implications for clinical and forensic decision-making. *Professional Psychology: Research and Practice, 37*, 59-65.

the same "side" of a case (and examiners who are independently appointed) may give markedly different scores on the PCL-R, indicating that the scores themselves are to some extent a function of the expert conducting the assessment rather than simply being an objective assessment of the "true" level of psychopathy exhibited by the defendant. It has been estimated that over 30% of the variability in PCL-R scoring across contested legal cases is explained by the examiners who are conducting the evaluation rather than a reflection of genuine differences in the defendants who are being assessed. Simply put, approximately a third of any given defendant's PCL-R score in criminal cases does not represent his actual level of "psychopathic traits" but instead reflects the idiosyncratic scoring approach of the person performing the evaluation.[5]

Given the lack of probative value, the prejudicial nature, and the unreliability of PCL-R scores, it is wholly unclear how the results of the PCL-R would do anything to rebut or discount Dr. Sapia's testimony or to negate the effects the traumatic experiences and the history of substance abuse and addiction Mr. Johnson experienced may have had on him. Furthermore, Mr. Johnson's request to limit Dr. Proctor's testimony is well within the discretion of this Court. For instance, in *Davis*, the defense objected to the State conducting any psychological testing of the

---

[5] Boccaccini, M.T., Turner, D.T. & Murrie, D.C. (2008). Do some evaluators report consistently higher or lower scores on the PCL-R?: Findings from a statewide sample of sexually violent predator evaluations. *Psychology, Public Policy, and Law, 14,* 262–283.

7

663

defendant because the defense expert had conducted no testing. *Davis v. State*, 313 S.W.3d 317 (Tex. Crim. App. 2010). After receiving argument, the trial court granted the State's examination, but with limits: State's psychiatrist was not allowed to conduct administer the Hare Psychopathy Checklist on the defendant. *Id.* As in *Davis*, the results of the PCL-R here go far beyond the scope of relevant rebuttal in this case. Thus, Mr. Johnson moves to preclude any expert testimony regarding the results of the PCL-R administered by Dr. Proctor.

## CONCLUSION

For the foregoing reasons, Mr. Johnson requests that this Court grant his Motion to Preclude the State's Irrelevant and Prejudicial Testimony.

DATED:    June 27, 2018    Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

*/s/ Carlotta Lepingwell*
Erin Eckhoff
Texas State Bar No. 24090910
*erin.eckhoff@ocfw.texas.gov*
Carlotta Lepingwell
Texas Bar No. 24097991
*carlotta.lepingwell@ocfw.texas.gov*
1700 Congress, Suite 460
Austin, TX 78701
Telephone: (512) 463-8566
Facsimile: (512) 463-8590

***Post-Conviction Attorneys for Matthew Johnson***

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing via eFile upon:

Dallas County District Attorney
Attn: Shelly Yeatts
133 N. Riverfront Boulevard
LB19
Dallas, Texas 75207

Judge Tracey Holmes
363rd District Court
Dallas County Courthouse
133 N. Riverfront Boulevard
5th Floor
Dallas, Texas 75207

This certification is executed on June 27, 2018, in Austin, Texas.

*/s/ Carlotta Lepingwell*
Carlotta Lepingwell

9

665

FILED
7/18/2018 2:42 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
VP DEPUTY

### Cause No. W12-23749-W(A)

| | |
|---|---|
| EX PARTE | IN THE 363RD JUDICIAL |
| | DISTRICT COURT |
| MATTHEW LEE JOHNSON | DALLAS COUNTY, TEXAS |

---

## STATE'S RESPONSE TO APPLICANT'S MOTION TO PRECLUDE TESTIMONY

---

Applicant and his writ counsel have stumbled into the *Lagrone*[1] quagmire that trial counsel strategically—and successfully—avoided. They now ask this Court to rescue them from their plight, presumably so they may resume criticizing trial counsel for succeeding exactly where they have failed. This Court should not intervene on their behalf.

### 1. Background

Claim One of Applicant's writ application alleges that trial counsel failed to properly prepare for Dr. Roache's testimony.[2] Central to this claim is that "[t]rial counsel prevented Dr. Roache from interviewing [Applicant] even after Dr. Roache informed them that it was important for him to do so[.]"[3] But trial counsel explained her strategic choice in this writ proceeding:

> I did not want anybody to interview [Applicant], because I didn't want the State to bring in their expert to interview [Applicant]. Because they would have brought in Dr. Proctor, who would have said he wasn't addicted, he's just a psychopath, or whatever he wanted to call him.[4]

---

[1] *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997).
[2] *See* writ app. at 26.
[3] Writ app. at 28. *See also* Affidavit of John D. Roache at ¶ 8.
[4] RR1: 101.

---

*Ex parte Matthew Lee Johnson* | No. W12-23749-W(A)    Page 1 of 10
State's Response to Applicant's Motion to Preclude Testimony

666

Trial counsel added, "I know Dr. Proctor. I know he testifies very well in front of juries, and his testimony can be very damaging to the Defense."[5]

In claim two, Applicant alleges that trial counsel was ineffective for failing to present a social historian such as Dr. Celeste Henery—or, presumably, Jennifer Sapia.[6] Again, trial counsel explained why she did not consider using such a witness:

> I'm frankly not aware of any cases where that has been really effective in front of a jury. I think a lot of that is really dry and academic. And I'm not sure how well that goes over with jurors. You know, so, no, that wasn't something that occurred to me to do.[7]

Trial counsel's decisions on these matters are at the heart of this writ proceeding.

### 2. Dr. Proctor's opinions about Applicant's psychopathy vindicate trial counsel's strategic choices.

Trial counsel considered the possibility that Dr. Proctor would testify that Applicant is "just a psychopath" and that his testimony could be damaging, so she made strategic choices to avoid the damage. Now her choices are under attack. Dr. Proctor's testimony about Applicant's psychopathy is therefore relevant.

Evidence is relevant if 1) it has any tendency to make a fact more or less probable than it would be without the evidence, and 2) the fact is of consequence in determining the action.[8] In this proceeding, the facts of consequence are 1) whether trial counsel rendered deficient performance, and 2) if so, whether her deficient

---

[5] RR1: 155.
[6] Writ app. at 91–112.
[7] RR1: 162.
[8] Tex. R. Evid. 401.

*Ex parte Matthew Lee Johnson* | No. W12-23749-W(A)                    Page 2 of 10
State's Response to Applicant's Motion to Preclude Testimony

667

performance prejudiced Applicant.[9] Dr. Proctor's testimony is relevant to both facts of consequence. Dr. Proctor's testimony about Applicant's psychopathy and personality disorders will support trial counsel's strategic decisions, making deficient performance less likely than it would be without his testimony. And it will make prejudice to the Applicant less likely, because it will show that Applicant's jury would have heard unfavorable information about him, had trial counsel made different strategic choices.

Writ counsels' palpable alarm at the mere prospect of this Court hearing from Dr. Proctor about Applicant's psychopathy proves the point. It vindicates trial counsel's strategy all along, it shows that the jury would not have answered the special issue questions any differently, and it will assist this Court in making its findings. This Court should hear what Dr. Proctor has to say.

### 3. Dr. Proctor's psychopathy testimony rebuts Applicant's evidence of prejudice and is within the scope of his *Lagrone* waiver.

Applicant has claimed, in essence, that trial counsel should have presented more evidence about his addiction and social history. Dr. Proctor's testimony in this proceeding will be relevant to the prejudice prong of that inquiry. It will show that, had trial counsel presented social-history testimony, it would not have changed the outcome, because there would have been no net gain. The applicant would have gotten in his social-history testimony, to be sure, but it would have been offset by testimony that he shows signs of psychopathy, whatever his social history might be.

---

[9] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

*Ex parte Matthew Lee Johnson* | No. W12-23749-W(A)                    **Page 3 of 10**
State's Response to Applicant's Motion to Preclude Testimony

668

Contrary to Applicant's assertions, psychopathy evidence is not outside the scope of his *Lagrone* waiver. Dr. Sapia and Dr. Roache have both, at OCFW's request, interviewed Applicant and proffered poor childhood development and addiction as mitigating factors. This Court need not split hairs over the subject matter of Dr. Sapia's or Dr. Roache's testimony because *Lagrone's* "focus is the defendant's choice to break his silence."[10]

In *Davis v. State*, the defendant engaged a psychiatrist to testify about diminished capacity, mitigating factors, drug use, remorse, and "adjustment to incarceration," based in part on an interview with the defendant.[11] He argued that, because his expert intended to testify only about mitigation issues, the State could not interview him about future dangerousness.[12] The Court of Criminal Appeals characterized his complaint about the scope of the examination as an "attempt to draw a hairsplitting distinction between these topics."[13] After all, as the court pointed out, the defendant's mitigation factors were also "factors that could be taken into account in determining future dangerousness."[14]

Here, Applicant called Drs. Sapia and Roache to testify about drug use and childhood trauma, ostensibly to explain Applicant's poor life choices—and thus meet *Strickland's* prejudice requirement. OCFW asked Dr. Sapia to "look at [Applicant's] background, his upbringing, his family dynamics, his experiences and how they could

---

[10] *Davis v. State*, 313 S.W.3d 317, 352 (Tex. Crim. App. 2010).
[11] *Id.* at 351–52.
[12] *Id.* at 351.
[13] *Id.* at 352.
[14] *Id.*

*Ex parte Matthew Lee Johnson* | No. W12-23749-W(A)                          Page 4 of **10**
State's Response to Applicant's Motion to Preclude Testimony

669

have affected his development."[15] She testified that chronic stress "adversely affects brain development," and "can affect people's ability to regulate their emotions and their behavior."[16] And she went to great lengths to tie Applicant's behavior to drug use, as opposed to a personality disorder:

> Q: He has failed to maintain steady employment throughout his life?
>
> A: That's correct. When using drugs, he wasn't able to.
>
> Q: Would you agree that he has showed—has shown reckless disregard for the safety of others?
>
> A: I think acting impulsively under the influence, absolutely.
>
> Q: Is it enough for you to say that that's a pattern that you've seen throughout his life?
>
> A: I think that that is a pattern, and I also think it's a pattern that goes along and hand-in-hand with the substance abuse.[17]

Dr. Sapia opined that "when you're looking at behaviors from a substance abuse perspective, the behaviors that you're using to justify the diagnosis can't be based on what somebody does while intoxicated or in their pursuit of drugs[.]"[18]

But Applicant set an elderly woman on fire for no reason. His offense was extraordinary, and psychopathy explains the offense better than addiction or a bad

---

[15] RR4: 12–13.
[16] RR4: 30.
[17] RR4: 170–71.
[18] RR4: 173.

*Ex parte Matthew Lee Johnson* | No. W12-23749-W(A)    Page **5** of **10**
State's Response to Applicant's Motion to Preclude Testimony

670

childhood. This Court should, as in *Davis*, reject Applicant's attempt to draw hairsplitting distinctions between topics.[19]

Moreover, the cases that Applicant cites do not support precluding any testimony here. For example, Applicant cites *Soria v. State*[20] for the proposition that "[r]ebuttal testimony by a State's expert must be limited to the psychiatric issues raised by the defense expert."[21] And in a trial setting, that would certainly be true. But in this writ proceeding, Dr. Proctor's testimony is not *just* rebuttal testimony—it is directly relevant to 1) trial counsel's strategic decisions, and 2) whether Applicant suffered any prejudice from those decisions. The other cases Applicant cites are inapposite for the same reason.

Applicant's citation to *Lizcano* is particularly misplaced for two reasons.[22] First, it is an unpublished opinion that may not be cited as legal authority.[23] Second, Applicant omitted this sentence: "The precise nature of the psychological testimony to be presented is immaterial; that it is being presented by the defendant is enough to trigger the [*Lagrone*] rule."[24] By presenting Dr. Sapia—by all accounts, a psychologist—and by asking her the following questions—

   1) "Is a mention of traits considered a diagnosis?"[25]

---

[19] *See id.* at 352.
[20] *Soria v. State*, 933 S.W.2d 46 (Tex. Crim. App. 1996).
[21] Motion to preclude at 4.
[22] *Lizcano v. State*, No. AP-75,879, 2010 WL 1817772 (Tex. Crim. App. May 5, 2010) (not designated for publication).
[23] Tex. R. App. P. 77.3.
[24] *Lizcano*, 2010 WL 1817772, at *8.
[25] RR4: 103.

---

*Ex parte Matthew Lee Johnson* | No. W12-23749-W(A)    **Page 6 of 10**
State's Response to Applicant's Motion to Preclude Testimony

671

2) "Can you provide some examples of what might be considered an antisocial trait?"[26]

3) "Is substance abuse an antisocial trait, or might it be considered an antisocial trait?"[27]

4) "And to be clear, Matthew has, from your review of the records, no prior diagnosis of antisocial personality disorder,"[28]

—Applicant triggered the rule.

Similar to Dr. Sapia, Dr. Roache—having now interviewed Applicant—has opined that 1) Applicant has a history of addictive behavior, 2) cocaine and alcohol addiction affect behavior, 3) cocaine addiction can lead to aggression, including inflicting harm or injury on others, and 4) Applicant was intoxicated at the time he set Nancy Harris on fire.[29] This, Applicant will presumably argue, is mitigating.

But what if there was another explanation? Dr. Roache's own testimony reveals that, at any moment in time, 8–10% of the U.S. population suffers from addiction.[30] That means, according the Dr. Roache and the United States Census Bureau, that 27 million people suffer from addiction in the United States.[31] And yet, the intentional immolation of convenience store clerks is uncommon. Applicant's attempt to blame Nancy Harris's death on addiction falls short, demonizes all who struggle with addiction, and requires rebuttal.

---

[26] RR4: 103.

[27] RR4: 104.

[28] RR4: 105–06.

[29] RR3: 86, 91, 123–25, 127.

[30] RR3: 89–90.

[31] https://www.census.gov/quickfacts/fact/table/US/PST045217.

---

*Ex parte Matthew Lee Johnson* | No. W12-23749-W(A)                    Page 7 of 10
State's Response to Applicant's Motion to Preclude Testimony

Applicant notes that "Psychopathy is a concept or construct; it is not a diagnosis."[32] Of course it's not—but the same can be said for childhood trauma. Or "mitigation." And yet no one disputes the admissibility of data supporting those concepts. Evidence of psychopathy will rebut Dr. Sapia's suggestion that only addiction is to blame for Applicant's behavior. It would also rebut Dr. Roache's suggestion that cocaine caused Applicant's aggression. And had trial counsel blundered into *Lagrone* waiver as writ counsel has, the jury would have heard all about it. This Court should too.

### 4. Applicant's concerns about tests and methods may be addressed in a *Daubert* hearing or developed on cross-examination.

The balance of Applicant's motion is an attack on the Hare Psychoopathy Checklist, or PCL-R.[33] Applicant argues that "the PCL-R is a prejudicial and unreliable test with no probative value."[34]

If Applicant believes that to be true, then his remedy is to attempt to prove it in a *Daubert* hearing—not to pre-emptively seek wholesale exclusion. The PCL-R has, in any event, survived *Daubert*, and other, challenges. In *United States v. Barnette*, the Fourth Circuit found that the Psychopathy Checklist Revised meets the *Daubert* standard of admissibility.[35] In *Martinez v. Dretke*, the Fifth Circuit held that the introduction of the Hare psychopathy test did not violate a defendant's due process

---

[32] Motion to Preclude at 5.
[33] Motion to Preclude at 5–8.
[34] Motion to Preclude at 5.
[35] *United States v. Barnette*, 211 F.3d 803, 815–16 (4th Cir. 2000).

*Ex parte Matthew Lee Johnson* | No. W12-23749-W(A)    Page **8** of **10**
State's Response to Applicant's Motion to Preclude Testimony

673

rights.[36] And the Eighth Circuit has held that psychopathy evidence is admissible in general to prove future dangerousness.[37] There is no reason that this kind of evidence should be categorically excluded here.

### 5. Conclusion

By introducing two metal health experts, both of whom have interviewed him, Applicant has opened the door to testimony concerning his psychological make-up.[38] This Court should reject his attempt to present a one-sided perspective.[39] Applicant's motion to preclude Dr. Proctor's testimony should be denied.

Respectfully submitted,

FAITH JOHNSON
*Criminal District Attorney*
Dallas County, Texas

JUSTIN JOHNSON
*Assistant Criminal District Attorney*
SBN 24054522
133 N. Riverfront Blvd., LB-19
Dallas, TX 75207
(214) 653-3604
(214) 653-3643 *fax*
justin.johnson@dallascounty.org

---

[36] *Martinez v. Dretke,* 99 F. App'x 538, 543–44 (5th Cir. 2004).
[37] *United States v. Lee,* 274 F.3d 485, 495 (8th Cir. 2001).
[38] *See Lee,* 274 F.3d at 495.
[39] *See Kansas v. Cheever,* 571 U.S. 87, 94 (2013).

*Ex parte Matthew Lee Johnson* | No. W12-23749-W(A)                    Page **9** of **10**
State's Response to Applicant's Motion to Preclude Testimony

674

## Certificate of Service

I certify that a true and correct copy of this document has been or will be served on Erin Eckhoff, and Carlotta Lepingwell, attorneys for Matthew Lee Johnson, applicant, by electronic service to erin.eckhoff@ocfw.texas.gov, and carlotta.lepingwell@ocfw.texas.gov, on Wednesday, July 18, 2018.



JUSTIN JOHNSON

*Ex parte Matthew Lee Johnson* | No. W12-23749-W(A)    Page **10** of **10**
State's Response to Applicant's Motion to Preclude Testimony

675

FILED
9/19/2018 9:49 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
VP DEPUTY

## IN THE 363RD DISTRICT COURT
## DALLAS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE | ) | Cause No. |
| Matthew Lee Johnson, | ) | W12-23749-W(A) |
| APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |

## MOTION TO CONTINUE APPLICANT'S SUR-REBUTTAL
## TO STATE'S REBUTTAL

Matthew Lee Johnson, through his attorneys the Office of Capital and Forensic Writs (OCFW), files this motion for a continuance to present live testimony in sur-rebuttal to the State's rebuttal expert witness, Dr. Timothy Proctor. In support of this motion, Mr. Johnson respectfully states the following:

### RELEVANT PROCEDURAL BACKGROUND

Mr. Johnson is confined under a sentence of death pursuant to a judgment of this Court, which was rendered on November 8, 2013. On December 11, 2015, this Court designated Claims One through Four of Mr. Johnson's Initial Application for Writ of Habeas Corpus to be resolved at an evidentiary hearing. The evidentiary hearing began on August 29, 2017, and continued to August 31, 2017. The hearing was recessed until it resumed on November 1, 2017.

1

676

On November 1, 2017, the Applicant presented the testimony of a psychologist, Dr. Sapia, who testified as a mitigation expert. Dr. Sapia's opinions were based on interviews with family members, friends and Mr. Johnson, and reviewing thousands of pages of records, including affidavits, trial testimony, medical records, institutional records. She did not perform any testing, or offer any diagnostic impression. Nonetheless, after Dr. Sapia's testimony, on November 1, 2017, the State moved for the evaluation of Mr. Johnson by the State's expert, Dr. Timothy J. Proctor. The Court ordered that both parties submit briefing regarding the State's proposed evaluation of Mr. Johnson by Dr. Proctor. 4 EHRR 201-2.[1]

The State filed its Motion for Examination of Applicant by the State's Expert for Rebuttal Testimony on January 24, 2018. Mr. Johnson's attorneys filed a Response in Opposition on February 2, 2018. This Court granted the State's motion on March 12, 2018. *See* Exhibit A.

Following the Court's Order, Dr. Proctor examined Mr. Johnson on April 9, 2018. On April 10, 2018, the State informed Mr. Johnson's attorneys that they would be presenting the testimony of Dr. Proctor in rebuttal to Dr. Sapia's testimony. *See* Exhibit B.

---

[1] Citations to "EHRR" are the Reporter's Record for this writ proceeding. For example, "4 EHRR 201" refers to Volume 4 (November 1, 2017), page 201 for this writ proceeding.

2

677

On May 4, 2018, Mr. Johnson, through his attorneys, filed a motion for expert funding for sur-rebuttal witness, Dr. Leslie Rosenstein. The Court granted that motion on May 16, 2018. On May 22, 2018, Mr. Johnson's attorneys wrote the State asking that Dr. Proctor forward his data and testing results to Dr. Rosenstein. *See* Exhibit C. Upon information and belief, Dr. Rosenstein received the testing results and raw data from Dr. Proctor nearly one month after Mr. Johnson requested it, on June 18, 2018.

Following Dr. Rosenstein's review of Dr. Proctor's test results and raw data, on June 27, 2018, undersigned counsel filed a Motion to Preclude the State's Irrelevant, Unreliable, and Prejudicial Expert Testimony related to the results of the Hare Psychopathy Checklist-Revised (PCL-R) administered by Dr. Proctor. On June 28, 2018, Mr. Johnson also filed an *ex parte* motion under seal asking for, in the alternative, additional funding for an expert on the PCL-R to assist counsel in evaluating Dr. Proctor's administration of the PCL-R and prepare for any sur-rebuttal related to the PCL-R test results.

On July 18, 2018, the State filed its Response to Applicant's Motion to Preclude Testimony. This Court has yet to rule on Applicant's Motion to the State's Irrelevant, Unreliable, and Prejudicial Expert Testimony or Applicant's *ex parte* motion for additional expert funding.

3

678

·The hearing is currently scheduled to resume in less than two weeks, on August 1, 2018. Upon information and belief, the State's expert witness, Dr. Proctor, is not available to testify until August 2, 2018.

## ARGUMENT AND AUTHORITIES

For each and all of the following reasons, the interests of justice warrant a continuance of the evidentiary hearing in this cause.

I.    Mr. Johnson's Right to Due Process and the Interests of Justice Warrant a Continuance

In his Response in Opposition to State's Motion for Expert Examination of Mr. Johnson and Motion for Discovery of State Expert's Examination Results and Report in Advance of Mr. Johnson's Opportunity for Rebuttal, Mr. Johnson argued for the need to limit the scope of the State's expert examination to the scope of Dr. Sapia's interview of Mr. Johnson. Instead, the Court issued an order allowing the State full access to Mr. Johnson. Subsequently, the State elected to retain Dr. Proctor, a psychologist, and directed him to conduct whatever psychological testing he deemed necessary. It was only after Dr. Proctor conducted his examination of Mr. Johnson that the OCFW learned that Dr. Proctor conducted only personality testing and, in particular, administered the PCL-R.

In the State's Response to Applicant's Motion to Preclude Testimony, the State highlighted the importance of the results, in their opinion, of the PCL-R test to

4

their rebuttal of Mr. Johnson's claims of ineffective assistance of counsel. The State has argued that the PCL-R results "vindicate[] trial counsel's strategy all along, it shows that the jury would not have answered the special issues questions any differently, and it will assist this Court in making its findings." *See* State's Response to Applicant's Motion to Preclude Testimony at 3. Furthermore, the State argues that "psychopathy explains the offense better than addiction or a bad childhood." *Ibid.* at 5-6.

Mr. Johnson must be afforded the opportunity to prove his ineffective assistance of counsel claims by rebutting these claims and Dr. Proctor's testimony. PCL-R results are highly subjective and prejudicial—the very basis of Mr. Johnson's argument that Dr. Proctor's testimony regarding the PCL-R should be precluded. To the extent that the Court denies Mr. Johnson's motion to preclude, Mr. Johnson must be afforded to the opportunity to rebut the State's expert and his administration of the PCL-R. However, Mr. Johnson cannot rebut the results of the PCL-R without a forensic psychologist familiar with the PCL-R who can interpret the results of the PCL-R, consult with counsel and conduct any additional testing that is necessary to rebut the results of Dr. Proctor's assessment. Thus, due process requires, that Mr. Johnson be granted adequate time and opportunity to consult with an expert forensic psychologist familiar with the PCL-R to present a full rebuttal of Dr. Proctor's testimony. Less than two weeks is not adequate time.

5

II.     Counsel's Workload Warrants a Continuance

The OCFW is the Texas public defender for capital post-conviction matters and is funded through general appropriations. *See generally* TEX. GOV'T. CODE § 78.054. With a small staff of 16, including just 8 staff attorneys, the OCFW represents approximately 75% of death-sentenced individuals in post-conviction proceedings pending in courts throughout Texas. The undersigned two attorneys, in this small office, represent 25% of our lawyers. In addition to the investigation and drafting of post-conviction applications, and appellate briefing before both the Court of Criminal Appeals and the Supreme Court, the OCFW currently represents clients in 13 cases at the hearing stage, where an evidentiary hearing has been ordered but not yet concluded.

More specifically, in addition to a substantial caseload consisting of matters in different procedural postures, Ms. Eckhoff, who is charged with representing Mr. Johnson, is presently preparing for another live evidentiary hearing in a death penalty case in Hunt County, *Ex parte Micah Brown*, in the 354th District Court, the Honorable J. Andrew Bench presiding. Evidence will be presented from July 23-27, 2018 and possibly continue into the week of July 30, 2018. In addition, Ms. Eckhoff recently conducted an evidentiary hearing in Harris County in May, *Ex parte Juan Balderas*, for which she filed proposed findings of fact and conclusions of law on July 12, 2018.

Similarly, in addition to her litigation in this case, Ms. Lepingwell is lead counsel in *Ex parte Areli Escobar*, a capital post-conviction proceeding scheduled for an evidentiary proceeding commencing on September 6, 2018 in Travis County; and *Ex parte John Theusen*, a capital post-conviction proceeding scheduled for an evidentiary proceeding commencing on September 24, 2018 in Brazos County.

In sum, Ms. Eckhoff is starting another evidentiary hearing next week in Hunt County and Ms. Lepingwell has two others set to commence in the near term. These challenges are compounded by other deadlines for proposed findings of fact and conclusions of law, appellate briefs, pre-filing investigation, and post-filing litigation in other cases. The demands of this workload warrant a continuance in this matter.

## PRAYER FOR RELIEF

For the foregoing reasons, Mr. Johnson respectfully asks that this Court allow the State to present Dr. Proctor's testimony on August 2, 2018 and grant Mr. Johnson's request for a continuance to present sur-rebuttal expert testimony to a later date agreeable to all parties.

Respectfully submitted,


OFFICE OF CAPITAL AND FORENSIC WRITS


DATED:   July 19, 2018          By /s/ C. Lepingwell
                                      Carlotta Lepingwell
                                      Post-Conviction Attorney

OFFICE OF CAPITAL AND FORENSIC WRITS
Benjamin B. Wolff (No. 24091608)
Director, Office of Capital & Forensic Writs
(E-mail: Benjamin.Wolff@ocfw.texas.gov)
Erin Eckhoff (No. 24090910)
(E-Mail: Erin.Eckhoff@ocfw.texas.gov)
Carlotta Lepingwell (No. 24097991)
(E-mail:
Carlotta.Lepingwell@ocfw.texas.gov)
1700 North Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

**Post-Conviction Attorneys for Applicant**

8

683

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing via eFile upon:

Dallas County District Attorney
Attn: Shelly Yeatts
133 N. Riverfront Boulevard
LB19
Dallas, Texas 75207

Judge Tracey Holmes
363rd District Court
Dallas County Courthouse
133 N. Riverfront Boulevard
5th Floor
Dallas, Texas 75207

This certification is executed on July 19, 2018, in Austin, Texas.

*/s/ C. Lepingwell*
Carlotta Lepingwell

684

**W12-23749-W(A)**

| EX PARTE | § | IN THE 363rd JUDICIAL |
|---|---|---|
|  | § | DISTRICT COURT |
| MATTHEW LEE JOHNSON | § | DALLAS COUNTY, TEXAS |

## ORDER FOR DISCLOSURE OF RAW TEST DATA

Applicant Matthew Lee Johnson was previously evaluated by Dr. Antoinette McGarrahan. The Court ORDERS Dr. Antoinette McGarrahan to provide the raw data and notes from her evaluation to Dr. Timothy Proctor, the State's expert in this proceeding.

SIGNED this _21_ day of August, 2018.

Judge Tracy Holmes
363rd Judicial District Court
Dallas County, Texas

685

**IN THE 363rd DISTRICT COURT**
**DALLAS COUNTY, TEXAS**

EX PARTE
MATTHEW LEE JOHNSON JR.,
APPLICANT

)
)
)
)
)
)
)

Cause No.
W12-23749-W(A)

**ORDER**

On this date, the Court considered Applicant's Motion to Preclude the State's

Irrelevant, Unreliable and Prejudicial Evidence. After due consideration, the Applicant's

Motion is DENIED.

ORDERED AND SIGNED on this _____ day of _____, 2018.

_____
The Honorable Tracy Holmes
Presiding Judge,
363rd District Court

686

FILED
7/28/2015 3:20 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
VP DEPUTY

## IN THE 363RD DISTRICT COURT
## DALLAS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE | ) Cause No. |
| Matthew Lee Johnson, | ) W12-23749-W(A) |
| APPLICANT | ) |
|  | ) |

### APPLICANT'S SUPPLEMENTARY LIST OF EXPERT WITNESSES

The Applicant, MATTHEW LEE JOHNSON, by and through undersigned counsel, submits his supplementary list of expert witnesses which may be offered at the continuation of his evidentiary hearing in this cause. Mr. Johnson respectfully requests leave to amend the list prior to, or during, the evidentiary hearing, as justice may so require. The expert witnesses which may be offered are as follows:

Antionette McGarrahan, 12820 Hillcrest Road, Dallas, TX 75230

John Edens, 4325 TAMU, College Station, TX 77843

Leslie Rosenstein, 5323 Harry Hines Blvd., Houston, TX 75390

1

687

DATED:     September 28, 2018

Respectfully submitted,

*/s/C. Lepingwell*
CARLOTTA LEPINGWELL
Post-Conviction Attorney
Office of Capital and Forensic Writs
Texas Bar No. 24097991
1700 Congress, Suite 460
Austin, TX 78701
Telephone: (512) 463-8566
Facsimile: (512) 463-8590
carlotta.lepingwell@ocfw.texas.gov

ATTORNEY FOR MR. JOHNSON

688

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing was served by

eFiling to the following on this 28th day of September, 2018.


District Clerk, Writ Desk
133 N. Riverfront Blvd.
Lock Box 12
Dallas, Texas 75207

Dallas County District Attorney
ATTN: Jaclyn Lambert-O'Connor
133 N. Riverfront Blvd.
Dallas, Texas 75207

Judge Tracy Holmes
363rd District Court
133 N. Riverfront Blvd.
Lock Box 36
Dallas, TX 75207


This certification is executed on September 28, 2018, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of
my knowledge.


/s/C. Lepingwell
CARLOTTA LEPINGWELL
Post-Conviction Attorney
Office of Capital and Forensic Writs
Texas Bar No. 24097991


3

689

FILED
07/11/2018 10:58 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
VP DEPUTY

## IN THE 363RD DISTRICT COURT
## DALLAS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Cause No. |
| Matthew Lee Johnson, | ) | W12-23749-W(A) |
| APPLICANT | ) | |
|  | ) | |
|  | ) | |

## MOTION FOR SHORT CONTINUANCE OF EVIDENTIARY HEARING

Matthew Lee Johnson, through his attorneys the Office of Capital and Forensic Writs (OCFW), files this motion for a short adjournment to present live testimony in sur-rebuttal to the State's expert witness, Dr. Timothy Proctor. Specifically, Mr. Johnson is requesting to present part of his sur-rebuttal on October 18, and then adjourn to the afternoon of November 1, 2018 to present the testimony of expert Antoinette McGarrahan, Ph.D. In support of this motion, Mr. Johnson respectfully states the following:

### RELEVANT PROCEDURAL BACKGROUND

Mr. Johnson is confined under a sentence of death pursuant to a judgment of this Court, which was rendered on November 8, 2013. On December 11, 2015, this Court designated Claims One through Four of Mr. Johnson's Initial Application for Writ of Habeas Corpus to be resolved at an evidentiary hearing. The evidentiary hearing began on August 29, 2017 and continued to August 31, 2017. The hearing

1

690

was recessed until it resumed on November 1, 2017. On that date, the Applicant presented the testimony of a psychologist, Dr. Sapia, who testified as a mitigation expert. When Mr. Johnson rested, the State asked for a continuance to present expert testimony in rebuttal.

On August 1, 2018, the State presented the expert testimony of Dr. Proctor. Dr. Proctor testified that Mr. Johnson has anti-social personality disorder. He made this diagnosis after administering only three personality tests following and a two-and-a-half-hour interview of Mr. Johnson. Dr. Proctor did not review Dr. Antoinette McGarrahan's notes, raw data or test results from the neuropsychological testing she performed on Mr. Johnson in 2012. Following undersigned counsel's cross-examination of Dr. Proctor, the State asked that counsel for Mr. Johnson arrange for Dr. McGarrahan to forward her notes, raw data and test results to Dr. Proctor. The State suggested that Dr. Proctor's testimony would resume if his opinion changes based on Mr. McGarrahan's testing.

The hearing is currently scheduled to resume in two weeks, on October 18, 2018. Following Dr. Proctor's testimony, counsel for Mr. Johnson contacted Dr. McGarrahan about the possibility of testifying in sur-rebuttal. Dr. McGarrahan is not available to testify on October 18-19 because she will be out of state. However, she is available on November 1, 2018.

2

691

## ARGUMENT AND AUTHORITIES

In his Response in Opposition to State's Motion for Expert Examination of Mr. Johnson and Motion for Discovery of State Expert's Examination Results and Report in Advance of Mr. Johnson's Opportunity for Rebuttal, Mr. Johnson argued for the need to limit the scope of the State's expert examination to the scope of Dr. Sapia's interview of Mr. Johnson. Instead, the Court issued an order allowing the State full access to Mr. Johnson. Subsequently, the State elected to retain Dr. Proctor, a psychologist, and directed him to conduct whatever psychological testing he deemed necessary. It was only after Dr. Proctor conducted his examination of Mr. Johnson that the OCFW learned that Dr. Proctor conducted only personality testing and, in particular, administered the PCL-R. When the hearing resumed on August 1, 2018, Dr. Proctor testified that Mr. Johnson has anti-social personality disorder. He also opined that anti-social personality disorder is a better explanation for Mr. Johnson's behavior than childhood abuse and neglect and a substance abuse history dating back to age 7. Dr. Proctor reached these opinions while ignoring the lay testimony of Mr. Johnson's family members and childhood friends and the results of Dr. McGarrahan's neuropsychological testing from the time of trial. Following cross-examination, the State requested for the first time that Dr. Proctor have access to Dr. McGarrahan's notes, raw data and test results.

3

Mr. Johnson must be afforded the opportunity to prove his ineffective assistance of counsel claims by rebutting Dr. Proctor's opinions. Now that Dr. Proctor has access to the interview and neuropsychological testing conducted by Dr. McGarrahan's, she is the best witness to fully rebut Dr. Proctor's assertions.

Mr. Johnson is not requesting to vacate October 18 to resume the hearing. Rather, he is seeking the opportunity to present expert testimony from Dr. McGarrahan on a date that she is available. Mr. Johnson estimates that the direct and cross-examination of Dr. McGarrahan will take no longer than half a day.

693

## PRAYER FOR RELIEF

For the foregoing reasons, Mr. Johnson respectfully asks that this Court to

grant Mr. Johnson's request to finish the State's case, present some sur-rebuttal

evidence on October 18 and then adjourn the hearing to the afternoon of November

1, 2018 to present Dr. McGarrahan's testimony.

Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

DATED:    October 4, 2018      /s/ C. Lepingwell
Carlotta Lepingwell
Post-Conviction Attorney
OFFICE OF CAPITAL AND FORENSIC WRITS
Carlotta Lepingwell (No. 24097991)
(E-mail:
Carlotta.Lepingwell@ocfw.texas.gov)
1700 North Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

***Post-Conviction Attorneys for Applicant***

5

694

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing via eFile upon:

Dallas County District Attorney
Attn: Jaclyn Lambert
133 N. Riverfront Boulevard
LB19
Dallas, Texas 75207

Judge Tracy Holmes
363rd District Court
Dallas County Courthouse
133 N. Riverfront Boulevard
5th Floor
Dallas, Texas 75207

This certification is executed on October 4, 2018, in Austin, Texas.

/s/ C. Lepingwell
Carlotta Lepingwell

6

695

# EXHIBIT A

**Cause No. W12-23749-W(A)**

| | | |
|---|---|---|
| EX PARTE | § | IN THE 363RD JUDICIAL |
| | § | |
| MATTHEW LEE JOHNSON, | § | DISTRICT COURT |
| Applicant | § | |
| | § | DALLAS COUNTY, TEXAS |

## STATE'S MOTION FOR DISCLOSURE OF EXPERT WITNESSES

The State of Texas, Respondent, respectfully moves this Court to order the disclosure of expert witnesses that Matthew Lee Johnson, Applicant, intends to call at the hearing on his application for writ of habeas corpus.

### I.
### Background

This habeas matter is set for a contested hearing beginning on Monday, July 17, 2017. In support of his application for writ of habeas corpus, Applicant filed affidavits authored by the following individuals, among others:

1. King Davis, Ph.D., a professor and social worker;

2. Celeste Henery, Ph.D., a cultural anthropologist; and

3. John Roache, Ph.D., a professor of psychiatry and pharmacology.

In addition, this Court's order has designated the following four matters requiring an evidentiary hearing:

1. Whether trial counsel:

   a. failed to properly prepare for and conduct Dr. John Roache's testimony at trial; and

697

    b. failed to investigate and present expert testimony to explain the availability of mental health care and substance abuse treatment?

2. Whether trial counsel failed to investigate and present lay and expert testimony regarding Applicant's social history?

3. Whether trial counsel was ineffective for failing to preserve error during the voir dire of certain prospective jurors?

4. Whether trial counsel was ineffective for failing to request a change of venue?

Based on Applicant's affidavits and the designated issues, it is almost certain that Applicant intends to offer expert testimony on these subjects at the hearing.

## II.
### The Rules of Evidence apply, and this Court has wide discretion in the management of habeas proceedings.

Article 11.071, Code of Criminal Procedure, governs habeas proceedings in death penalty cases, and the Rules of Evidence apply. *See* Tex. Code Crim. Proc. art. 11.071 § 10. Under these rules, an adverse party in a criminal case must be permitted to examine the expert about the facts or data underlying the expert's opinion. Tex. R. Evid. 705(b). If the underlying facts or data do not provide a sufficient basis for the opinion, the expert's opinion is inadmissible. Tex. R. Evid. 705(c).

In addition, Texas courts enjoy wide discretion in managing the factfinding process in habeas proceedings. *See Ex Parte Harris*, 491 S.W.3d 332, 335 (Tex. Crim. App. 2016). As a practical matter, the pretrial exchange of the names of experts, the nature of their opinions, and that facts and data that support them, could only lead to a smoother and more efficient live hearing. To this end, the State agrees to disclose its

698

experts—if it decides to call any—together with their names and underlying data not otherwise privileged upon receipt of the same from Applicant.

### III.
### Prayer

Wherefore, the State prays this Court order Applicant to disclose to the State, in writing, the names and addresses of the expert witnesses he intends to call at the hearing, together with all non-privileged facts and data supporting each opinion that each expert intends to offer, no later than 20 days before the hearing commences.

Respectfully submitted,

FAITH JOHNSON
Criminal District Attorney
Dallas County, Texas

JUSTIN JOHNSON
Assistant Criminal District Attorney
SBN 24054522
133 N. Riverfront Blvd., LB-19
Dallas, TX 75207-4399
(214) 653-3604 | (214) 653-3643 *fax*
justin.johnson@dallascounty.org

### Certificate of Service

I certify that a true copy of this motion was or will be served on counsel for Applicant Benjamin Wolff, Director, Office of Capital Writs, 1700 N. Congress Avenue, Suite 460, Austin, Texas 78701, by electronic service and/or email to Benjamin.Wolff@ocfw.texas.gov, on June 9, 2017

JUSTIN JOHNSON

699

**Cause No. W12-23749-W(A)**

| | | |
|---|---|---|
| EX PARTE | § | IN THE 363RD JUDICIAL |
| | § | |
| MATTHEW LEE JOHNSON, | § | DISTRICT COURT |
| Applicant | § | |
| | § | DALLAS COUNTY, TEXAS |

## ORDER TO DISCLOSE EXPERT WITNESSES

AND NOW, having considered the State's Motion for Disclosure of Expert Witnesses, it is ORDERED that Applicant disclose to the State, in writing, no later than 20 days before the hearing in this habeas matter commences, the names and addresses of the expert witness(es) it intends to call, together with their general opinions and any unprivileged underlying facts and data supporting those opinions.

Upon receipt of Applicant's disclosure, the State is ORDERED to provide Applicant with its disclosure.

This the _____ day of _____, 2017.

<br>

_____
HON. TRACY HOLMES
DISTRICT JUDGE

700

# EXHIBIT B

```
 1               REPORTER'S RECORD
                CAUSE NO. W12-23749-W(A)
 2

 3   EX PARTE                    )   IN THE 363RD
                                 )
 4                               )   JUDICIAL DISTRICT COURT
                                 )
 5   MATTHEW JOHNSON             )   DALLAS COUNTY, TEXAS

 6

 7

 8

 9

10

11                  HEARING ON MOTIONS

12

13

14

15

16

17

18

19          On the 27th day of June, 2017, the above-styled

20   and numbered cause came on for hearing, and the

21   following proceedings were had before the Honorable

22   Tracy Holmes, Judge presiding, held in Dallas, Dallas

23   County, Texas:

24

25          Proceedings reported by machine shorthand.
```

PATRICIA HOLT, CSR          972/741-7086          DALLAS, TEXAS

```
 1              A P P E A R A N C E S

 2

 3   REPRESENTING THE STATE OF TEXAS:

 4   MR. BRIAN HIGGINBOTHAM
     Assistant District Attorney
 5   SBOT #: 24078665

 6       -AND-

 7   JUSTIN JOHNSON
     Assistant District Attorney
 8   SBOT #: 24054522

 9       -AND-

10   MS. JACLYN LAMBERT
     Assistant District Attorney
11   SBOT #:  24049262
     133 North Riverfront Boulevard
12   LB 19
     Dallas, Texas  75207
13   214/653-3600

14

15   REPRESENTING THE DEFENDANT:

16   MS. CARLOTTA LEPINGWELL
     Office of Capital and Forensic Writs
17   SBOT #: 24097991
     1700 North Congress Street
18   Austin, Texas  78701
     214/234-5678
19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2            (June 27, 2017; 1:37 p.m.)
 3            THE COURT:  We're on the record in Cause
 4   No. W12-23749-W(A), Ex parte Matthew Lee Johnson.  The
 5   parties are before the court for a -- it's the State's
 6   motion, right?
 7            MR. HIGGINBOTHAM:  Among other things, Your
 8   Honor, yes.
 9            THE COURT:  So first we'll take up the
10   State's motion.  I don't have a copy of the motion on
11   the bench.
12            MS. LEPINGWELL:  And, Your Honor, if I may
13   briefly --
14            THE COURT:  Can I have counsel, please,
15   identify themselves for the record.
16            MS. LEPINGWELL:  For Mr. Matthew Lee
17   Johnson, the Office of Capital and Forensic Writs,
18   Carlotta Lepingwell.
19            THE COURT:  Thank you.  Good afternoon,
20   ma'am.
21            MR. HIGGINBOTHAM:  And for The State of
22   Texas, I'm Brian Higginbotham.
23            MR. JOHNSON:  I'm Justin Johnson.
24            MS. LAMBERT:  And Jaclyn Lambert.
25            THE COURT:  So I guess we'll begin with the
```

```
 1   State's motion for disclosure of the applicant's trial
 2   file.  Did you want to argue about that?
 3               MR. HIGGINBOTHAM:  Yes, Your Honor, if the
 4   Court would permit it.
 5               THE COURT:  Yes, sir.
 6               MR. HIGGINBOTHAM:  So while in the course
 7   of a general matter, a trial file is going to be covered
 8   by the attorney/client work product privileges, as
 9   described by Rule of Evidence 503.  We are not in that
10   situation anymore.  What has happened is that
11   Mr. Johnson has alleged in an application for a writ of
12   habeas corpus that his counsel was constitutionally
13   ineffective.  That raises a whole host of issues.  He
14   raises five grounds that are related to his trial
15   counsel's performance, one of which is that cumulative
16   performance over the course of trial would have
17   prejudiced him --
18               THE COURT:  I'm sorry, say that again.
19               MR. HIGGINBOTHAM:  Yes, Your Honor.  So the
20   broadest of his grounds for relief is that cumulative
21   deficient performance by his three-member trial counsel
22   team prejudiced him and he's seeking relief on that.  So
23   it is now Mr. Johnson himself by filing this application
24   that has brought these communications and made them
25   relevant to this court proceeding.
```

```
 1              Earlier we were talking about the
 2   attorney/client or work product privilege, and we know
 3   that they don't apply here because under Rule 503(d)(3),
 4   we see that if a communication is relevant to an issue
 5   of breach of duty by a lawyer to the client or by a
 6   client to a lawyer, then the attorney/client privileges
 7   and work product privileges don't apply.
 8              And then, of course, as we outlined in our
 9   motion, Your Honor, the Court of Criminal Appeals has
10   revisited this issue two times in the last two years in
11   Dallas County capital cases, most recently just last
12   year in Harris.  In Harris we were in a similar position
13   to the one that we are in now where the State was
14   disclosing its trial file under the open file policy,
15   and the Office of Capital and Forensic Writs wasn't
16   going to agree to do the same thing --
17              THE COURT:  I'm sorry, I was interrupted.
18   You're going to have to start again.  I am trying to
19   follow this, and I need to pay attention.
20              MR. HIGGINBOTHAM:  Of course, Your Honor.
21              In In Re Harris, which was just decided
22   last year, the Dallas County district attorney's office
23   disclosed its trial file under its open file policy, and
24   the Office of Capital and Forensic Writs decided that it
25   would not do the same for Roderick Harris's file.  The
```

```
 1  trial court, the Criminal District Court No. 7,
 2  eventually ordered the Office of Capital and Forensic
 3  Writs to do so under its authority under Article 11.071
 4  of the Code of Criminal Procedure, which enables the
 5  trial court, a convicting court in a capital case, to
 6  exercise discretion, generally speaking, over the
 7  factfinding process whenever an application for writ of
 8  habeas corpus is filed.
 9            Now, the Office of Capital and Forensic
10  Writs has agreed with that decision and it ultimately
11  brought a petition for a writ of prohibition in the
12  Court of Criminal Appeals.  The Court of Criminal
13  Appeals took about a year to ultimately decide the
14  issue, but it ultimately decided that no writ of
15  prohibition would be issued.
16            That's because, first of all, by raising
17  his trial counsel's performance, Mr. Harris made their
18  communications and their strategy and all of the things
19  that were going to be reflected in their trial file, he
20  made it relevant to those proceedings, and when he did
21  that, he also broke the attorney/client and work product
22  privileges.  So on the one hand, he made something
23  relevant, and on the other hand, he neutralized any sort
24  of privilege that would prevent this relevant
25  information from being discoverable.  And in the end,
```

1  the court decided that the Criminal District Court No. 7
2  did not act in such a way that was outside of the bounds
3  of law such that the writ of prohibition should be
4  issued.
5           Now -- and this court should do the same
6  thing that the Criminal District Court No. 7 did.  Only
7  the relevant contents of Johnson's file should be
8  discoverable.  The State completely agrees with that.
9  If there are any portions of Johnson's trial file that
10 are not relevant, then we would certainly invite the
11 Office of Capital and Forensic Writs to maintain a
12 privileged log of those items, and if indeed they are
13 not relevant to anything that's going on in these
14 proceedings, then the State doesn't need to see it.
15          Now, in their response, the Office of
16 Capital and Forensic Writs response, I think there are a
17 few legal points that I have written out.  First of all,
18 a lot of their response seems to cite and does cite the
19 Rule of Professional Conduct 1.05, which is very much
20 about what a lawyer, himself or herself, can communicate
21 regarding the things they discover during
22 representation.  But that's not exactly what we have at
23 issue here.
24          What we have at issue here is trying to
25 access a trial file and the information that is

1  contained there.  This motion is not about compelling
2  either the Honorable Nancy Mulder or Kenneth
3  Weatherspoon or Catherine Bernhard to tell us things
4  that they are not willing to do.  This is about
5  accessing a trial file that belongs to Mr. Johnson and
6  that is in the possession of his current counsel, the
7  Office of Capital and Forensic Writs and also is
8  something that he himself has deemed relevant to these
9  proceedings.

10            Also, a lot of the response seems to be
11  premised on the fact that this information is privileged
12  and that it is privileged today.  However, as we see in
13  In Re Harris and in Rule 503, whenever the application
14  was filed raising these issues and making these issues
15  themselves relevant, that privilege was broken.

16            Finally, another point is that it seems to
17  be privileged on the fact that his trial counsel should
18  be the one who decides what they are going to share with
19  the State and what they are not going to share with the
20  State, and if trial counsel wants to give over the file,
21  it seems to me, in the response, that trial counsel
22  should be the one to make those decisions.

23            But it really is not for trial counsel to
24  decide what is in the writ application.  It's not them
25  who decided what is relevant in these exact proceedings.

1  That was Mr. Johnson himself by raising the issues in
2  the application. And, moreover, just as the trial file
3  has always been Mr. Johnson's property, it remains so
4  today, and once Mr. Johnson decided to raise these
5  issues, he removed any privilege that he had covering it
6  to the extent that there are any relevant items in that
7  file.

8          Finally, Your Honor, it is our
9  understanding that it is the Office of Capital and
10 Forensic Writ's current procedure to, whenever they are
11 appointed to represent an applicant, they go and
12 physically take the files away from trial counsel. They
13 are well within their rights to do that. After all,
14 these files belong to Mr. Johnson. So we are currently
15 in a point, if our understanding is correct, where the
16 original trial files are in the possession of the Office
17 of Capital and Forensic Writs and only them, and there
18 is the only place that we can go to get it.

19          So we would ask the Court to grant the
20 State's motion to the extent that there are any relevant
21 items in Mr. Johnson's trial file, and that if there are
22 not relevant items that are privileged, law be
23 maintained.

24          THE COURT: Thank you. Ms. Lepingwell.
25          MS. LEPINGWELL: Yes, Your Honor. While

PATRICIA HOLT, CSR        972/741-7086        DALLAS, TEXAS

1  Mr. Johnson has raised ineffective assistance of counsel

2  claims, ineffective assistance of counsel claims operate

3  only as a limited waiver as to information that is

4  relevant to that particular claim of ineffectiveness,

5  and that waiver is held by trial counsel.

6          What the State is asking us to do is to put

7  ourselves in the shoes of trial counsel and determine

8  which of Mr. Johnson's privileged information --

9  privileged under attorney/client privilege and

10 privileged under the Fifth Amendment -- information is

11 relevant to them defending themselves against this

12 claim, and we are certainly not in the position to do

13 that, Your Honor.

14          Yes, we have access to trial counsel's

15 files, but it is trial counsel who needs to make a

16 determination based on the claims.  It is they that need

17 to defend themselves, not the State that needs to defend

18 them and not us to step into the role in determining

19 what they need to defend themselves with.  It is they

20 that need to make that determination, and they need to

21 determine whether there is anything in their original

22 file that they need to use and they need to disclose for

23 these claims.

24          And, again, Your Honor, it's really only to

25 the extent that trial counsel believes it's necessary

1  for them to defend themselves.  The State doesn't have
2  standing, and they have cited no case law indicating
3  that they have standing to assert this on behalf of
4  trial counsel.

5         Now, the State has cited In Re Roderick
6  Harris, and, Your Honor, what I would say with that is
7  that In Re Roderick Harris only decided one issue.  It
8  decided whether the trial court's order was purely
9  ministerial and whether the Office of Capital Writs had
10 standing to file a writ of prohibition.  That did not
11 determine whether the Office of Capital Writs should be
12 handing over trial counsel's file to the State.  In
13 fact, it didn't determine that issue at all.

14         What we have seen over and over again and
15 what the Rules of Professional Conduct do say is that
16 courts have limited the scope of these waivers
17 permitting disclosure only of those confidential
18 communications that are necessary to prove or disprove a
19 client's claims.  And, again, that belongs to trial
20 counsel.

21         Your Honor, with regards to the issue of
22 privileged log, I would like to note that In Re Cade,
23 when our office asked the State to create a privileged
24 log of the documents that they were withholding as work
25 product, when we had last requested open file discovery,

1  they said -- and I actually have the transcript here and

2  I can read directly from the transcript.

3              They said that:  It's a tedious task.  It's

4  also very difficult to be specific enough in the list

5  without actually identifying what the item is.  It kind

6  of defeats the purpose of withholding the information in

7  the first place.

8              So what we're being asked to do is to step

9  in the role of trial counsel, determine what it is that

10  they need to -- they need to assert their defense

11  against the ineffective assistance of counsel claim,

12  create a privileged log in determining what we think

13  should be withheld, and in that tedious task of creating

14  a privilege log, disclose what it is that we are

15  withholding.  So, essentially, informing the State with

16  all the information that's in trial counsel's file and

17  waiving this right on behalf of Mr. Johnson, who is not

18  consenting to the release of his file to the State.

19              So what I propose and what we proposed in

20  our response to the State's motion is that trial counsel

21  needs to determine what it is that needs to be turned

22  over.  And what actually happened in Cade was they were

23  not required to turn anything over and that trial

24  counsel was -- my understanding -- sorry, not in Cade,

25  in another case, in James Harris, which was in another

```
 1  county, where a court did agree with us on this issue
 2  that trial counsel got the file, they went through the
 3  file, and they showed to the court first and the court,
 4  as the trier of fact, made a determination what was
 5  relevant to the ineffective assistance of counsel claims
 6  before the State got their hands on it.
 7              So just in closing, Your Honor, we ask that
 8  you deny the State's motion because, again, we can't
 9  make this waiver on behalf of trial counsel.
10  Mr. Johnson is not allowing us or consenting us for us
11  to turn over the file.  And at no point, just by filing
12  ineffective assistance of counsel claim, are we waiving
13  Mr. Johnson's attorney/client privilege information or
14  the Fifth Amendment.
15              THE COURT:  I'm ordering your office to
16  turn over all portions of the trial counsel's file that
17  is related to the ineffective assistance claims, and
18  anything else, you'll need to make a privilege log.
19              MS. LEPINGWELL:  Your Honor, in light of
20  that, as the State's own office has indicated, that is a
21  tedious task to do.  We are asking for an extension.  I
22  did speak with the State about this before coming on the
23  record today.
24              It's not just that.  I'm not sure if Your
25  Honor is aware, I'm new to the Office of Capital and
```

```
 1   Forensic Writs and I'm new to this case, and the only
 2   other counsel on this case has just returned from
 3   maternity leave.  We have been working very hard to get
 4   ready for this hearing, but having to go through this
 5   file now, create a privilege log, and also be ready in
 6   July is just not possible.
 7              THE COURT:  Do y'all have an objection to
 8   continuance?
 9              MR. HIGGINBOTHAM:  If I may briefly recount
10   the discussions we had off the record for the record?
11              THE COURT:  Sure.
12              MR. HIGGINBOTHAM:  So whenever we were
13   talking about this, Ms. Lepingwell and the State
14   beforehand, we said that our schedules on the weeks of
15   August 14th and the week of August 21 could accommodate,
16   if the court's schedule would allow that, but beyond
17   that, our three schedules get very chaotic so we would
18   have a very hard time agreeing to anything beyond the
19   week of August 21.
20              THE COURT:  Okay.
21              MS. LEPINGWELL:  And the week of August 21
22   is good for our office, Your Honor.  At least to start
23   the hearing.
24              THE COURT:  How long do we anticipate the
25   hearing is going to take?
```

```
 1              MS. LEPINGWELL:  I would say a minimum of
 2    three days.  A minimum.
 3              MS. LAMBERT:  Judge, we kind of also talked
 4    about maybe coming up with a scheduling order by
 5    agreement kind of disclosing our witnesses so we don't
 6    waste the court's time.
 7              MS. LEPINGWELL:  Let me just put a caveat
 8    on that.  We will certainly inform them, as is required
 9    by the rules, what our witness list is but as we
10    determine it.  I can't say that it won't be -- that it
11    won't change before that date.
12              THE COURT:  So we're going to have this
13    hearing the week of August the 21st.  Should we schedule
14    it for Monday -- is August the 21st a Monday?
15              MS. LAMBERT:  Yes, Judge.
16              MS. LEPINGWELL:  Yes.  Is there any chance
17    we can move it to the 22nd and go through the rest of
18    the week?
19              MS. LAMBERT:  Okay.
20              THE COURT:  So 8/22.  Would you like to
21    start at 9:00 or 1:30?
22              MS. LEPINGWELL:  We will be here.
23              THE COURT:  Let's start in the morning
24    then.
25              MR. HIGGINBOTHAM:  We can bring a proposed
```

```
 1  order to the court for the Court's signature, if that
 2  would make things convenient.
 3              THE COURT:  All right.  Thank you
 4  everybody.
 5              MS. LAMBERT:  Your Honor, could we get a
 6  deadline on disclosure of the trial files?
 7              MS. LEPINGWELL:  Which remind me, also,
 8  Your Honor, we are requesting -- we did put this in our
 9  motion.  Given that Your Honor is requiring us to create
10  a privilege log of information we are withholding, we
11  are also asking that the State create a privilege log as
12  to what information they are withholding from their
13  file.  They do have obligations under The Michael Morton
14  Act that we don't have.
15              MS. LAMBERT:  We just note for the record
16  Michael Morton doesn't apply because this offense
17  occurred prior to January 1, 2014.  But I have processed
18  the trial files.  They are ready for review by the
19  Office of Capital Writs.  There are eight boxes, and I
20  have created a privilege log.
21              And the only items I pulled were criminal
22  histories, like TCIC, AIS, JIC, things that I can't
23  disclose, work product, but I did leave in handwritten
24  notes from witness interviews.
25              THE COURT:  Great.
```

 1                    MS. LAMBERT:  Do we want to get a deadline,
 2  or do you have an estimate --
 3                    MS. LEPINGWELL:  Would it be fair to pick
 4  our previous hearing date of July 17th?
 5                    THE COURT:  Good.  Thank you.
 6                    MR. JOHNSON:  Your Honor, the State would
 7  also file a motion to disclose expert witnesses.  We're
 8  asking to be noticed of their experts 20 days before the
 9  hearing.
10                    MS. LEPINGWELL:  There is really no
11  authority for 20 days before the hearing.  They already
12  have the information as to who was -- as to the experts
13  that were used in the filing of the application.  What I
14  would say is that when we are sure of who we're calling
15  as experts, we will let the prosecution know.
16                    THE COURT:  Okay.
17                    MR. JOHNSON:  In response to that, Your
18  Honor, I would just say in the Cade matter, some experts
19  ended up testifying who did not prepare affidavits that
20  were attached to the writ application, so we're trying
21  to prevent a situation where we kind of are surprised at
22  the last minute by who shows up to testify.
23                    THE COURT:  Okay.
24                    MS. LEPINGWELL:  And as far as it's
25  necessary, for the record, we of course object to Your

1  Honor's ruling as to us having to turn over trial
2  counsel's file.
3          THE COURT:  Thank you.
4          MS. LAMBERT:  Judge, are you holding a
5  ruling on our motion or -- the motion for the disclosure
6  of experts?  Are you going to wait and rule on them --
7          THE COURT:  Well, when can you have your
8  experts disclosed?
9          MS. LEPINGWELL:  Your Honor, actually, it
10 is a work in progress, so as I said, when we know who we
11 are calling.  There is nothing in the rules that
12 requires us to tell them 20 days in advance, so when we
13 know who we're calling -- and I cannot say that won't
14 change between August 1st and August 21st.
15         MR. JOHNSON:  And they can error on the
16 side of over inclusion, Your Honor.
17         THE COURT:  Okay.  All right.  So how soon
18 before the hearing will you know who your experts are?
19         MS. LEPINGWELL:  A week before.
20         THE COURT:  Then the week of the 14th,
21 please disclose the experts to the State.
22         MS. LEPINGWELL:  Yes.  Thank you, Judge.
23         THE COURT:  Thank you.
24         MS. LAMBERT:  Could we say Monday, August
25 14th?

1          THE COURT:  Yes, Monday, August 14th.

2          MS. LEPINGWELL:  That's fine.  And, of

3   course, if the State is planning on calling anyone, we

4   would ask for reciprocity.

5          MR. JOHNSON:  We agree to that.  I'll

6   represent to the Court and opposing counsel, at this

7   time we are not planning on calling anybody, but if

8   anything changes, we will.

9          THE COURT:  I am going to put on the docket

10  sheet that each side is going to disclose experts on the

11  Monday, the 14th of August.

12          MR. JOHNSON:  Very well.

13          MS. LEPINGWELL:  Thank you.

14          THE COURT:  Thank you.

15          (Proceedings adjourned at 1:58 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1  THE STATE OF TEXAS)
 2  COUNTY OF DALLAS)
 3      I, Patricia Holt, Official Court Reporter in and for
 4  the 363rd Judicial District Court, Dallas County, State
 5  of Texas, do hereby certify that the above and foregoing
 6  contains a true and correct transcription of all
 7  portions of evidence and other proceedings requested in
 8  writing by the counsel for the parties to be included in
 9  this volume of the Reporter's Record, in the above-
10  styled and -numbered cause.
11      I further certify that this Reporter's Record of the
12  proceedings truly and correctly reflects the exhibits,
13  if any, admitted by the respective parties.
14      I further certify that the total cost for the
15  preparation of this Reporter's Record is $100.00 and
16  will be paid by Dallas County.
17      Witness my official signature and certified to by me
18  this 24th day of July, 2017.
19
20                      /S/Patricia Holt
                        PATRICIA HOLT, Texas CSR 7974
21                      Expiration Date: 12/31/18
22                      Official Court Reporter
                        363rd Judicial District Court
23                      133 North Riverfront Boulevard
                        Dallas, Texas  75207
24                      214/741-7086
25
```

PATRICIA HOLT, CSR          972/741-7086          DALLAS, TEXAS

# EXHIBIT C

FILED
8/28/2013 3:20 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
VP DEPUTY

## IN THE 363RD DISTRICT COURT
## DALLAS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| | ) | **Cause No.** |
| **EX PARTE** | ) | **W12-23749-W(A)** |
| **Matthew Lee Johnson,** | ) | |
| **APPLICANT** | ) | |
| | ) | |
| | ) | |

## APPLICANT'S SUPPLEMENTARY LIST OF EXPERT WITNESSES

The Applicant, MATTHEW LEE JOHNSON, by and through undersigned counsel, submits his supplementary list of expert witnesses which may be offered at the continuation of his evidentiary hearing in this cause. Mr. Johnson respectfully requests leave to amend the list prior to, or during, the evidentiary hearing, as justice may so require. The expert witnesses which may be offered are as follows:

Antionette McGarrahan, 12820 Hillcrest Road, Dallas, TX 75230

John Edens, 4325 TAMU, College Station, TX 77843

Leslie Rosenstein, 5323 Harry Hines Blvd., Houston, TX 75390

DATED:        September 28, 2018

                                    Respectfully submitted,


                                    /s/C. Lepingwell
                                    CARLOTTA LEPINGWELL
                                    Post-Conviction Attorney
                                    Office of Capital and Forensic Writs
                                    Texas Bar No. 24097991
                                    1700 Congress, Suite 460
                                    Austin, TX 78701
                                    Telephone: (512) 463-8566
                                    Facsimile: (512) 463-8590
                                    carlotta.lepingwell@ocfw.texas.gov

                                    ATTORNEY FOR MR. JOHNSON

2

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing was served by

eFiling to the following on this 28th day of September, 2018.


District Clerk, Writ Desk
133 N. Riverfront Blvd.
Lock Box 12
Dallas, Texas 75207

Dallas County District Attorney
ATTN: Jaclyn Lambert-O'Connor
133 N. Riverfront Blvd.
Dallas, Texas 75207

Judge Tracy Holmes
363rd District Court
133 N. Riverfront Blvd.
Lock Box 36
Dallas, TX 75207


This certification is executed on September 28, 2018, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of
my knowledge.


/s/C. Lepingwell
CARLOTTA LEPINGWELL
Post-Conviction Attorney
Office of Capital and Forensic Writs
Texas Bar No. 24097991

3

725

# EXHIBIT D

**Carlotta Lepingwell**

| | |
|---|---|
| **From:** | Carlotta Lepingwell |
| **Sent:** | Thursday, October 04, 2018 10:23 AM |
| **To:** | 'Jaclyn OConnor'; Justin Johnson |
| **Subject:** | Ex parte Matthew Johnson |

Hi Jaclyn and Justin,

I'm writing to let you know that I'm going to ask for an adjournment to call Dr. McGarrahan to testify. She's not available the week of October 15.

Also, I'm wondering whether you intend to call Dr. Proctor back to the stand. I ask because I don't expect to need both October 18 and 19 to present our other sur-rebuttal experts. If you agree that one day would be enough, we could let the Court know so she can schedule something else for either October 18 or 19.

Thanks,

Carlotta Lepingwell
Training Director, Office of Capital & Forensic Writs
1700 Congress Avenue, Suite 460
Austin, Texas 78701
512.463.8566
carlotta.lepingwell@ocfw.texas.gov



Office of Capital and Forensic Writs

# EXHIBIT E

**Carlotta Lepingwell**

| | |
|---|---|
| **From:** | Jaclyn OConnor <Jaclyn.OConnor@dallascounty.org> |
| **Sent:** | Monday, October 15, 2018 11:08 AM |
| **To:** | Carlotta Lepingwell |
| **Cc:** | Justin Johnson |
| **Subject:** | RE: Johnson Hearing Schedule |

Dr. Proctor will be in Houston on Thursday, but Dr. Price is coming in his place so I think we should be able to wrap up on Thursday and not come back Friday.

-----Original Message-----
From: Carlotta Lepingwell [mailto:Carlotta.Lepingwell@ocfw.texas.gov]
Sent: Sunday, October 14, 2018 10:15 PM
To: Jaclyn OConnor
Cc: Justin Johnson
Subject: Re: Johnson Hearing Schedule

Thank you. She'll appreciate that.

Judge Holmes had said at the last appearance that she'd let us do arguments at the time of FFCL. Not sure if her email was indicating she had changed her mind.

Is Dr. Proctor coming on Thursday? If not, is he available to come back on Friday?


> On Oct 14, 2018, at 10:04 PM, Jaclyn OConnor <Jaclyn.OConnor@dallascounty.org> wrote:
>
> No, we don't object to Daphne being there.
> I'm not sure about the argument & FOF. Muhammad and Johnson are running together in my mind, so I cannot remember if we have discussed that with the court or not.
>
> Regards,
>
> Jaclyn O'Connor Lambert
> Assistant District Attorney
> Appellate Division
> Dallas County, Texas
> 214.653.3640
> _____
> From: Carlotta Lepingwell [Carlotta.Lepingwell@ocfw.texas.gov]
> Sent: Saturday, October 13, 2018 2:27 PM
> To: Jaclyn OConnor
> Cc: Justin Johnson
> Subject: RE: Johnson Hearing Schedule
>
> I have yet another question about Thursday. Do you object to Daphne Johnson sitting in the courtroom? Before she takes the day off, I want to make sure it's worth it for her.
> Thanks.
>

1

729

> -----Original Message-----
> From: Jaclyn OConnor <Jaclyn.OConnor@dallascounty.org>
> Sent: Friday, October 12, 2018 4:22 PM
> To: Carlotta Lepingwell <Carlotta.Lepingwell@ocfw.texas.gov>
> Cc: Justin Johnson <Justin.Johnson@dallascounty.org>
> Subject: RE: Johnson Hearing Schedule
>
> We are fine with Thursday. Let's start in the morning and wrap it up that day.
>
> Regards,
>
> Jaclyn O'Connor Lambert
> Assistant District Attorney
> Appellate Division
> Dallas County, Texas
> 214.653.3640
> _____
> From: Carlotta Lepingwell [Carlotta.Lepingwell@ocfw.texas.gov]
> Sent: Friday, October 12, 2018 11:11 AM
> To: Tracy Holmes
> Cc: Jaclyn OConnor; Justin Johnson
> Subject: Re: Johnson Hearing Schedule
>
> I'm sorry, I wrote yesterday evening indicating our expert isn't available on Friday. She had set aside Thursday. She's seeing patients on Friday. Could we do Thursday? Or alternatively start Thursday afternoon to accommodate her schedule and finish Friday morning if we need additional time?
>
>
> On Oct 12, 2018, at 10:56 AM, Tracy Holmes
> <TRACY.HOLMES@dallascounty.org<mailto:TRACY.HOLMES@dallascounty.org>> wrote:
>
> Friday is fine
> _____
> From: Carlotta Lepingwell [Carlotta.Lepingwell@ocfw.texas.gov<mailto:Carlotta.Lepingwell@ocfw.texas.gov>]
> Sent: Thursday, October 11, 2018 11:10 AM
> To: Tracy Holmes
> Cc: Jaclyn OConnor; Justin Johnson
> Subject: Johnson Hearing Schedule
>
> Good morning, all,
>
> In the interest of saving the Court time next week, I feel confident we can accomplish our sur-rebuttal testimony in one day. I'm not sure if the State plans to call Dr. Proctor to testify again before they rest. If not, may I suggest that we present testimony on either October 18 or October 19, and free the Court's calendar for the second day we had set aside? Please advise.
>
> Thank you,
>
> Carlotta Lepingwell
> Training Director, Office of Capital & Forensic Writs
> 1700 Congress Avenue, Suite 460
> Austin, Texas 78701

2.

730

> 512.463.8566
> carlotta.lepingwell@ocfw.texas.gov<mailto:carlotta.lepingwell@ocfw.texas.gov>
>
> <image001.jpg>
>

3

FILED
5/11/2021 4:44 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
VP DEPUTY

## IN THE 363RD DISTRICT COURT
## DALLAS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| ——————————— | ) | **Cause No.** |
| **EX PARTE** | ) | **W12-23749-W(A)** |
| **Matthew Lee Johnson,** | ) | |
| **APPLICANT** | ) | |
| | ) | |
| ——————————— | ) | |

## MOTION TO EXCLUDE STATE'S EXPERT WITNESS
## DR. RANDALL PRICE

Matthew Lee Johnson, through his attorneys the Office of Capital and

Forensic Writs (OCFW), files this motion to exclude the State's expert, Dr. Randall

Price, from testifying at his hearing on October 18, 2018. The State failed to provide

timely notice of Dr. Randall Price, therefore violating this Court's June 27, 2017

order requiring eight days' notice of expert witnesses. In support of this motion, Mr.

Johnson respectfully states the following:

### RELEVANT PROCEDURAL BACKGROUND

Mr. Johnson is confined under a sentence of death pursuant to a judgment of

this Court, which was rendered on November 8, 2013. On December 11, 2015, this

Court designated Claims One through Four of Mr. Johnson's Initial Application for

Writ of Habeas Corpus to be resolved at an evidentiary hearing.

1

In advance of the evidentiary hearing, the State filed *State's Motion for Disclosure of Expert Witnesses* on June 9, 2017. *See* Ex. A. At the hearing on discovery held on June 27, 2017, the State re-urged their motion. This Court ruled that both parties must provide expert witness notice eight days in advance of the hearing. *See* June 27, 2017 Transcript at 18-19, attached as Exhibit B. There have been no changes to the Court's scheduling order.

The evidentiary hearing was held from August 29 to August 31, 2017, then recessed until it resumed on November 1, 2017. On that date, the Applicant presented the testimony of a psychologist, Dr. Sapia, who testified as a mitigation expert. When Mr. Johnson rested, the State asked for a continuance to present expert testimony in rebuttal.

On August 2, 2018, the State presented the expert testimony of Dr. Proctor. Following undersigned counsel's cross-examination of Dr. Proctor, the State asked that counsel for Mr. Johnson arrange for Dr. McGarrahan to forward her raw data and test results to Dr. Proctor from her neuropsychological evaluation of Mr. Johnson in January 2013. The State suggested that Dr. Proctor's testimony would resume if his opinion changes based on Dr. McGarrahan's testing. On September 6, 2018, undersigned counsel notified the State that she asked Dr. McGarrahan to forward the requested materials to Dr. Proctor earlier that week.

2

The hearing is currently scheduled to resume in three days, on October 18, 2018. On September 28, 2018, Mr. Johnson filed an updated expert witness list. *See* Exhibit C. Undersigned counsel then emailed the State on October 4, 2018, asking if Dr. Proctor would return to testify on October 18. *See* Exhibit D. When the State did not reply, undersigned counsel emailed the Court and the State about scheduling for the hearing and mentioned that the State had yet to indicate whether Dr. Proctor would be testifying at the upcoming hearing date. *See* Exhibit E at 2. On Sunday, October 14, 2018, undersigned counsel emailed the State again asking if Dr. Proctor would be testifying on October 18. *See* Exhibit E at 3. October 15, 2018, just three days before the hearing, the State finally responded that they will be presenting the expert testimony of Dr. Randall Price, and not Dr. Proctor. *See* Exhibit E at 3. Prior to this date, Mr. Johnson had received no notice of the possibility that Dr. Price would be testifying in these proceedings.

## ARGUMENT

The addition of an expert witness at this late date constitutes unfair surprise and prejudices Mr. Johnson's ability to adequately prepare for Thursday's hearing. Rule 193.6 of the Texas Rules of Civil Procedure prohibits the admission of the testimony from an untimely designated witness unless the court finds good cause or lack of unfair surprise. TEX. R. CIV. P. 193.6; *see also, Perez v. Embree Constr. Group, Inc.*, 228 S.W. 3d 875, 884 (Tex. App. – Austin 2007, pet. denied) (Where

3

the plaintiffs failed to follow the court's scheduling order, it was held that exclusion of an untimely designated expert's testimony is mandatory where the plaintiff cannot establish good cause for late designation or lack of unfair surprise or prejudice). Although the Texas Rules of Civil Procedure do not typically apply in this context, nothing in the Texas Code of Criminal Procedure prevents this Court from looking to these rules to determine how to proceed in a manner that is efficient, equitable, and fair to all parties.

There is no justification or good cause that the State could offer for adding an expert witness at this late date. The State has had more than two months to determine whether to retain a neuropsychologist to review Dr. McGarrahan's testing data and results. State's expert Dr. Proctor has been in possession of Dr. McGarrahan's raw data and test results since September. The State has known since September 28 that Mr. Johnson designated two neuropsychologists as testifying experts for the upcoming hearing date of October 18. Furthermore, there has been no amendment to the Court's original expert witness designation order from June 2017, ordering both parties to give eight days' notice of expert witnesses.

Now, a mere four days before the resumption of the hearing, the State informed Mr. Johnson via email that they will present testimony from a brand new, previously non-disclosed expert witness. Had the Court denied the State's overreaching *Lagrone* request and had the hearing consequently been concluded in

4

November 2017 or August 2018, Dr. Price could not have testified. Now the State seeks to secure an unfair advantage from continuances that have been sought based on their decision to raise *Lagrone* at the close of Mr. Johnson's case-in-chief.

This unfair surprise prejudices the ability of Mr. Johnson to adequately prepare for the hearing. In the preceding weeks, undersigned counsel has been required to carefully manage her time to balance the preparation needed for this hearing with the deadlines and obligations arising in other cases. The cross-examination of another expert witness adds significantly to undersigned counsel's responsibilities in preparing for the hearing; this inequitable hardship arises from this morning's untimely email response. This late notice precludes adequate preparation and any meaningful response to this additional expert. This is exacerbated by the fact that undersigned counsel has been forced to spend significant time researching and drafting the instant motion.

## CONCLUSION

Given the facts and law, Mr. Johnson objects to the State's eleventh-hour attempt to designate a new expert, and Mr. Johnson respectfully asks this Court to exclude expert Dr. Price's testimony.

DATED:    October 15, 2018         Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

*/s/ Carlotta Lepingwell*
Carlotta Lepingwell
Texas Bar No. 24097991
*carlotta.lepingwell@ocfw.texas.gov*
1700 Congress, Suite 460
Austin, TX 78701
Telephone: (512) 463-8566
Facsimile: (512) 463-8590 ·

***Post-Conviction Attorneys for Matthew Johnson***

6

737

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing via eFile upon:

Dallas County District Attorney
Attn: Jaclyn O'Connor Lambert
133 N. Riverfront Boulevard
LB19
Dallas, Texas 75207

Judge Tracey Holmes
363rd District Court
Dallas County Courthouse
133 N. Riverfront Boulevard
5th Floor
Dallas, Texas 75207

This certification is executed on October 15, 2018, in Austin, Texas.

*/s/ Carlotta Lepingwell*
Carlotta Lepingwell

7

738

FILED
7/20/15 3:38 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
TC DEPUTY

IN THE 363rd DISTRICT COURT
DALLAS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| ———————— | ) | Writ Cause No. |
| EX PARTE | ) | W12-23749-W(A) |
| Matthew Johnson, | ) | |
| APPLICANT | ) | |
| | ) | |
| ———————— | ) | |

## MR. JOHNSON'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

OFFICE OF CAPITAL & FORENSIC WRITS

BENJAMIN B. WOLFF, Director
(No. 24091608)
(E-mail: Benjamin.Wolff@ocfw.texas.gov)

CARLOTTA LEPINGWELL
(No. 24097991)
(E-mail: carlotta.lepingwell@ocfw.texas.gov)

1700 North Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

*Attorneys for Matthew Johnson*

126

739

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. I

TABLE OF AUTHORITIES ........................................................................... III

I.   FINDINGS OF FACT REGARDING PROCEDURAL HISTORY ................. 2

II. FINDINGS OF FACT REGARDING MATERIALS CONSIDERED AND
CREDIBILITY DETERMINATIONS ........................................................ 5

III. FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING MR.
JOHNSON'S TRIAL REPRESENTATION .................................................. 6

A. Findings of Fact Regarding the Trial Team .................................... 6

B. Findings of Fact Regarding the Standard of Care in Mitigation Investigation
.......................................................................................................... 11

C. Findings of Fact Regarding the Trial Team's Division of Labor and
Communication ............................................................................... 16

D. Findings of Fact Regarding Trial Counsel's Relationship with Mr. Johnson
.......................................................................................................... 18

E. Findings of Fact Regarding Trial Counsel's Mitigation Investigation ......... 21

   i.  Findings of Fact Regarding Ms. Ross's Failed Investigation Methods ... 21

   ii. Findings of Fact Regarding the Selection and Preparation of Expert
   Witnesses ....................................................................................... 31

   iii. The Trial Team Had No Credible "Strategic" Reason for Failing to
   Develop a Complete Picture of Mr. Johnson's Social History through an
   Independent Investigation, Starting with His Drug Use at Age Seven and
   Ending at His Arrest for This Offense ............................................ 43

F. Findings of Fact Regarding Punishment-Phase Representation .................. 52

   i.  Trial Counsel Failed to Investigate and Present Mr. Johnson's Full Life
   Story ............................................................................................... 53

   ii. Trial Counsel Failed to Properly Prepare and Present Dr. John Roache's
   Testimony and Testimony About the Availability of Substance Abuse
   Treatment or the Lack Thereof ....................................................... 84

G. Findings of Fact Regarding Change of Venue ............................... 96

H. Findings of Fact Regarding Guilt-Phase Representation ................ 100

I. Conclusions of Law Regarding the Legal Standard Governing Mr. Johnson's Trial Representation ..................................................................................................103

J. Conclusions of Law Regarding Mr. Johnson's Trial Representation ..........106

V. FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING TRIAL COUNSEL'S FAILURE TO PROPERLY PRESERVE TRIAL COURT ERRORS FOR DIRECT APPEAL ........................................................................................108

A. Findings of Fact Regarding Failure to Preserve Error at Jury Selection.....108

B. Conclusions of Law ....................................................................................112

VI. FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE PROHIBITION ON TELLING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE ........................................................114

A. Findings of Fact Regarding the "10-12 Rule" Jury Instructions .................114

B. Conclusions of Law ....................................................................................115

VII. FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PUNISHMENT PHASE JURY INSTRUCTION RESTRICTING EVIDENCE THE JURY COULD HAVE FOUND MITIGATING.................................................116

A. Findings of Fact Regarding Jury Instruction Limiting Potentially Mitigating Evidence......................................................................................................116

B. Conclusions of Law ....................................................................................119

VIII. FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING TEXAS'S SYSTEM OF ADMINISTERING THE DEATH PENALTY.............121

A. Findings of Fact ..........................................................................................121

B. Conclusions of Law.....................................................................................123

VIII. CONCLUSION...............................................................................................126

CERTIFICATE OF SERVICE ............................................................................126

741

# TABLE OF AUTHORITIES

**Federal**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007)...............................................119

*Barefoot v. Estelle*, 463 U.S. 880, 930 (1983).......................................121

*Caro v. Calderon*, 65 F.3d 868 (9th Cir. 2001) .....................................32

*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011)........................................103

*Duncan v. Louisiana*, 391 U.S. 145 (1968) .................................... 99, 107

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) .......................................119

*Ford v. Wainwright*, 477 U.S. 399 (1986)..........................................123

*Furman v. Georgia*, 408 U.S. 238 (1972)..................................... 123, 124

*Gregg v. Georgia*, 428 U.S. 153 (1976) ..............................................123

*Harrington v. Richter*, 131 S. Ct. 770 (2011).......................................103

*Irvin v. Dowd*, 366 U.S. 717 (1961)......................................................98

*Lizcano v. State*, No. AP-75879, 2010 WL 181772 ...............................46

*Lockett v. Ohio*, 438 U.S. 586 (1978) ......................................... 11, 118

*McCleskey v. Kemp*, 481 U.S. 279 (1987)............................................120

*McKoy v. North Carolina*, 494 U.S. 433 (1990) ...................................115

*Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005)...................................104

*Mills v. Maryland*, 486 U.S. 367 (1988)..............................................115

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ...............................................7

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ..............................................119

*Rompilla v. Beard*, 545 U.S. 374 (2005) ....................................... passim

*Sears v. Upton*, 561 U.S. 945 (2010) ....................................................12

*Sheppard v. Maxwell*, 384 U.S. 333 (1966).................................... 99, 107

*Strickland v. Washington*, 466 U.S. 668 (1984) ................. 6, 39, 103, 104

*Tennard v. Dretke*, 542 U.S. 274 (2004) ............................................120

*Uttecht v. Brown*, 551 U.S. 1 (2007) ...................................................113

*Wiggins v. Smith*, 539 U.S. 510 (2003)........................................... 11, 28

*Williams v. Taylor*, 529 U.S. 362 (2000).................................................11

**State**

*Chamberlain v. State*, 998 S.W.2d 230 (Tex. Crim. App. 1999) ...........46

*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010).......................31

*Davis v. State*, 313 S.W.3d 317 (Tex. Crim.App.2010) ........................46

*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006)..... 105, 106

*Franklin v. State*, 138 S.W.3d 351 (Tex. Crim. App. 2004)................112

*Henley v. State*, 576 S.W.2d 66 (Tex. Crim. App. 1978) ......................98

*Hernandez v. State*, 390 S.W.3d 310 (Tex. Crim. App. 2012)...............46

*Johnson v. State*, AP-77,030 (Tex. Crim. App. 2015)..............................4

*Jones v. State*, 223 S.W.3d 379 (Tex. Crim. App. 2007) ....................112

*Salazar v. State*, 38 S.W.3d 141 (Tex. Crim. App. 2001) ....................................... 98
*Soria v. State*, 933 S.W.2d 46 (Tex. Crim. App. 1996) ........................................... 46

## Statutes
Tex. Code Crim. Proc. art 31.03. .................................................................. 99, 107
Tex. Code Crim. Proc. art. 37.071 ............................................... 116, 117, 120, 121
Tex. Disciplinary Rules Prof'l Conduct, R. 1.06 ..................................................... 10

## Other Authorities
ABA, *ABA Standards for Criminal Justice* (3d ed. 1993) ............................... passim
ABA Death Penalty Due Process Review Project, *Evaluating Fairness and Accuracy
    in State Death Penalty Systems: The Texas Capital Punishment Assessment
    Report*, (September 2013) ("ABA Texas Assessment Report") ........................ 123
*ABA Guidelines* ................................................................................................... 8
ABA, *Guidelines for the Appointment and Performance of Defense Counsel in
    Death Penalty Cases*, 31 HOFSTRA L. REV. 913 (2003) ............................... passim
Christina Studebaker & Steven Penrod, *Pretrial Publicity: The Media the Law, and
    Common Sense*, 3 PSYCHOL. PUB. POL'Y & L. 428 (1997) ........................... 97
Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment:
    The Rosenthal Era*, 50 HOUS. L. REV. 131 (2012) ....................................... 122
Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUS. L.
    REV. 807 (2008) ............................................................................................ 122
State Bar of Tex., *Guidelines and Standards for Texas Capital Counsel*, 69 TEX.
    B.J. 966 (2006) ................................................................................................. 7
State Bar of Tex., *Supplementary Guidelines and Standards for the Mitigation
    Function of Defense Teams in Death Penalty Cases* (2015) ....................... passim

iv

743

IN THE 363rd DISTRICT COURT
DALLAS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| | ) | Writ Cause No. |
| EX PARTE | ) | W12-23749-W(A) |
| Matthew Johnson, | ) | |
| APPLICANT | ) | |
| | ) | |
| | ) | |

## MR. JOHNSON'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Matthew Johnson, through his attorneys, the Office of Capital and Forensic Writs (OCFW), files these Proposed Findings of Fact and Conclusions of Law.

The Court, having considered Matthew Johnson's Initial Application for Writ of Habeas Corpus (Initial Application), filed under Article 11.071 of the Texas Code of Criminal Procedure, the State's Answer, briefing and exhibits from both parties, and having heard evidence and argument offered by the parties at an evidentiary hearing, makes the following Findings of Fact and Conclusions of Law, as directed by Article 11.071, Section 7.

1

744

# I.
## FINDINGS OF FACT REGARDING PROCEDURAL HISTORY

1. Matthew Lee Johnson is confined under a sentence of death pursuant to the judgment of the 363rd District Court, Dallas County, trial cause number F1223749, which was rendered on November 8, 2013. CR 4526-27.[1]

2. On June 4, 2012, this Court appointed Catherine Bernhard to represent Mr. Johnson during his capital trial. CR 29. Kenneth Weatherspoon was previously appointed to Mr. Johnson's case. 2 EHRR 141. Later, this Court also appointed Nancy Mulder as counsel for Mr. Johnson.[2]

3. On June 21, 2012, a grand jury indicted Mr. Johnson with capital murder for intentionally causing the death of Nancy Harris in the course of committing or attempting to commit a robbery. CR 30.

4. On July 9, 2012 and July 17, 2012, this Court received letters from Mr. Johnson's wife, Daphne Johnson, and from Mr. Johnson, respectively, asking that Mr.

---

[1] All references to "CR" are to the Clerk's Record. All references to "RR" are to the Reporter's Record filed on June 4, 2013. References to "EHRR" are to the evidentiary hearing record of post-conviction proceedings held between December 12, 2016 and October 18, 2018. All references to "DX" are to the Applicant's Hearing Exhibits. References to "SX" are to the State's post-conviction Exhibits.

[2] Neither the Reporter's Record nor the Clerk's Record indicate the appointment date of either Kenneth Weatherspoon or Nancy Mulder. Billing records and notes indicate attorney Weatherspoon did not bill for any time prior to voir dire commencing in July 2013. DX 64. Attorney Mulder started working on the case in September 2012. DX 72.

745

Weatherspoon be removed from Mr. Johnson's case due to a conflict of interest. CR 35-36. Those letters were not addressed on the record. On March 28, 2013, trial counsel filed two volumes of pretrial motions. CR 167-841. These included a motion to exclude evidence of an illegal identification and a motion to suppress Mr. Johnson's statements. CR 462, 813. Trial counsel did not seek a hearing or ruling on either of those motions. 4 EHRR 54-55.

5.   Voir dire commenced on June 21, 2013 and concluded on October 14, 2013. 4 RR 10; 43 RR 23.

6.   Mr. Johnson waived arraignment and a plea of not guilty was entered on his behalf on October 28, 2013. 44 RR 9. The guilt/innocence phase of Mr. Johnson's trial began that same day. *Id.* 16. Defense counsel waived opening statements. 44 RR 21. On October 30, 2013, the State rested its case. 46 RR 42. The defense presented no witnesses at the guilt/innocence phase. *Id.* The case was submitted to the jury for guilt/innocence determination, and that same day a verdict of guilt was returned. *Id.* 69.

7.   The punishment phase began on October 31, 2013, with both sides presenting opening statements. 47 RR 13-17. The State presented its case over the course of two days. *Id.* 17 to 48 RR 212. The defense presented its punishment case over the course of two and a half days and rested on November 6, 2013. 49 RR 7 to 51 RR 67. That same day the State presented three rebuttal witnesses and rested. *Id.* 71-

3

89. Both sides presented closing arguments on November 7, 2013. 52 RR 6-58. Jury deliberations commenced, and the jury returned the verdict answering "Yes" to Special Issue One and "No" to Special Issue Two. 53 RR 4-8. Mr. Johnson was formally sentenced to death on November 8, 2013. *Id.* 8.

8.   On August 13, 2013, this Court had appointed John Tatum to represent Mr. Johnson for purposes of filing a direct appeal. CR 980. That order was confirmed on October 28, 2013. CR 4532. On November 26, 2013, a Motion for New Trial was filed on Mr. Johnson's behalf. CR 4577. On August 1, 2014, Mr. Tatum filed an opening brief on appeal, *Matthew Lee Johnson v. The State of Texas*, in the Court of Criminal Appeals ("CCA"), cause number AP-77,030. Mr. Tatum filed an amended brief on August 21, 2014. The State's brief in response was filed on January 13, 2015. On November 18, 2015 the CCA affirmed Mr. Johnson's conviction and sentence. *Johnson v. State*, AP-77,030 (Tex. Crim. App. 2015).

9.   On November 8, 2013, this court appointed the Office of Capital and Forensic Writs ("OCFW")[3] to represent Mr. Johnson in his post-conviction habeas litigation, pursuant to Article 11.071, section 2 of the Code of Criminal Procedure. CR 4531. The OCFW filed Mr. Johnson's Initial Application on May 28, 2015, and the State filed its Answer on August 28, 2015.

---

[3] On September 1, 2015, the Office of Capital Writs was renamed the Office of Capital and Forensic Writs. S.B. 1743, 84th Leg., Reg. Sess. (Tex. 2015).

747

10.   Thereafter, this Court designated issues of fact regarding Mr. Johnson's trial representation that needed to be resolved by testimony at an evidentiary hearing. *See Order Designating Issues for an 11.071 Writ Hearing.*

11.   On August 25, 2017, the OCFW filed a Motion to Recuse or Disqualify the Dallas County District Attorney's Office because of a conflict of interest arising from its employment of Tim Freeman, the lead investigator retained by Mr. Johnson's defense team at trial on the basis that Mr. Freeman was a material witness in Mr. Johnson's writ proceedings. That motion was denied on August 30, 2018.

12.   An evidentiary hearing was held on August 29, 30, 31 and November 1, 2017. Mr. Johnson rested on November 1, 2017. The State then sought leave for a State's expert to examine Mr. Johnson pursuant to *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997). On March 12, 2018, this Court granted that request. The evidentiary hearing resumed on August 1, 2018 and concluded on October 18, 2018.

## II.
## FINDINGS OF FACT REGARDING MATERIALS CONSIDERED AND CREDIBILITY DETERMINATIONS

13.   This Court has considered all exhibits filed with Mr. Johnson's Initial Application, the State's Answer, supplemental briefing, hearing exhibits, arguments, testimony, and proffers submitted by the parties. This Court has accepted all exhibits presented in the pleadings and at the evidentiary hearing as substantive evidence. Unless otherwise noted herein, this Court finds the above evidence to be credible.

5

748

## III.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING MR. JOHNSON'S TRIAL REPRESENTATION

### A. Findings of Fact Regarding the Trial Team

14.   Mr. Johnson was represented at trial by Catherine Bernhard, Kenneth Weatherspoon and Nancy Mulder. CR 29; DX 62-65, 70-74. Ms. Bernhard was lead counsel, Mr. Weatherspoon was second chair and Judge Mulder was third chair.[4] The trial team consisted of two fact investigators, Paula Cook and Timothy Freeman, CR 40, 958, and a mitigation specialist, Brendan Ross. *Id.* 44.

15.   As counsel in a death penalty case, Mr. Johnson's lead counsel and his agents were obligated to perform reasonably within the prevailing professional norms governing death penalty representation at the time of Mr. Johnson's trial, as delineated by the United States Supreme Court. *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

16.   The Supreme Court has recognized that the sources of the prevailing professional norms for attorney performance are reflected in publications such as the ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913 (2003) ("*ABA Guidelines*"), and the ABA *Standards for Criminal Justice* (3d ed. 1993) ("*ABA Standards*"), as well as

---

[4] Nancy Mulder was elected and took the bench in County Criminal Court No. 4 in January 2015. At the time of her testimony she was the presiding judge in County Criminal Court No. 4. She will be referred to as "Judge Mulder" throughout these findings.

6

749

publications such as the National Legal Aid and Defender Association's *Performance Guidelines for Criminal Defense Representation*, law review articles, Department of Justice's *Compendium of Standards for Indigent Defense Systems*, and defense bar publications like THE CHAMPION. *See Padilla v. Kentucky*, 559 U.S. 356, 367 (2010).

17.  The *ABA Guidelines*, the State Bar of Texas *Guidelines and Standards for Texas Capital Counsel* (herein "*Texas Guidelines*"), and the *Supplementary Guidelines and Standards for the Mitigation Function of Defense Teams in Texas Death Penalty Cases* (herein "*Texas Supplementary Guidelines*") encapsulate the prevailing professional norms that the United States Supreme Court and the Sixth Amendment require defense counsel in capital cases to abide by. The *Texas Guidelines* and the *ABA Guidelines* provide evidence of reasonable attorney performance in death penalty cases. *See, e.g., Ex parte Van Alstyne*, 239 S.W.3d 815, 822 (Tex. Crim. App. 2007) (citing the ABA and Texas Guidelines as persuasive authority for standard of care in capital cases).

18.  Ms. Bernhard testified that she is familiar with the *ABA Guidelines*. She agreed that the *ABA Guidelines* represent the professional norms for representing defendants in capital punishment proceedings. She does not view the *ABA Guidelines* as being aspirational. 2 EHRR 41. Ms. Bernhard views the *Texas Guidelines* as being

aspirational, 2 EHRR 42, but agrees that the guidelines should be followed when they are "relevant and helpful." *Id.*

19.   The constitutional requirements for effective assistance of counsel do not vary depending on the location of the trial; the objective measure of what should happen in the defense of a capital case is a national standard. *See ABA Guidelines*, Guideline 1.1(A). *Compare ABA Guidelines with Texas Guidelines.*

20.   Lead counsel bears overall responsibility for the performance of the entire defense team. *ABA Guidelines*, Guideline 10.4(B). *See also Texas Guidelines*, Guideline 10.1(A). As such, it is the responsibility of lead counsel to ensure that each team member is suitably trained and qualified to fulfill the duties of his or her respective role as the case progresses. *ABA Guidelines*, at Guideline 4.1 cmt.

21.   Lead counsel must assemble a team of at least one other lawyer trained and experienced in capital defense, a fact investigator, and a mitigation specialist "as soon as possible after designation[.]" *ABA Guidelines*, Guidelines 4.1(A)(1), 10.4(C); *see also Texas Guidelines*, Guideline 10.1(B)(2). Providing high quality legal representation in capital cases requires unique skills. *See ABA Guidelines*, at Guideline 1.1 cmt. Accordingly, the standard of practice requires that counsel have received comprehensive specialized training before being qualified to undertake representation in a death penalty case and that they then continue to receive formal training in order to stay abreast of the developments in the field. *Id.* at Guidelines

8

751

8.1(B) and (C). *See also id.*, at Guideline 8.1 cmt.; *Texas Guidelines*, Guideline 7.1.

22.     At the time of Mr. Johnson's trial, Mr. Weatherspoon had not attended a continuing legal education course on death penalty representation since 2004. 2 EHRR 196; DX 96.

23.     A capital client is also entitled to a mitigation specialist who is qualified in conducting a sensitive and emotional investigation into particularly painful, embarrassing, and often involving tightly-guarded family secrets spanning generations. *See, e.g., ABA Guidelines* at Guideline 4.1 cmt. ("Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together[.]"); *see also Supplementary Guidelines*, Guideline 5.1; *Texas Guidelines*, Guideline 3.1.

24.     The defense team must include a fact investigator. *See ABA Guidelines,* at Guideline 4.1(A)(1); *Texas Guidelines*, Guideline 3.1. The fact investigator is separate from the mitigation specialist, and a capital client is entitled to both. The fact investigator's role is to conduct a thorough and independent investigation relating to the issues of both guilt and penalty, regardless of any admission or statement by

9

the client, or overwhelming evidence of guilt. *ABA Guidelines*, at Guidelines

10.7(A)(1) and (A)(2).

25. Although in some cases, life history witnesses may also be fact witnesses to the

capital offense or extraneous aggravating bad acts, they must be interviewed by a

mitigation specialist, not the fact investigator. Mitigation interviews should be

conducted by a mitigation specialist with the training and experience to build

rapport with and extract sensitive life history information from witnesses. 3 EHRR

132-133; *see also ABA Guidelines*, Guideline 4.1 cmt.; *see also Supplementary*

*Guidelines*, Guideline 5.1(C).

26. Lead counsel must ensure that the defense team does not labor under a conflict of

interest that could interfere with the representation. See, e.g., Tex. Disciplinary

Rules. Prof'l Conduct, R. 1.06, cmt. ("Loyalty is an essential element in the

lawyer's relationship to a client. . . . If [an impermissible conflict of interest] arises

after representation has been undertaken, the lawyer must take effective action to

eliminate the conflict, including withdrawal if necessary to rectify the situation.").

If a potential conflict of interest is discovered, it is the job of lead counsel to inquire

into the facts, determine whether a conflict of interest exists or might exist in the

future, and take remedial action. That may require removing a member of the team

and seeking for the appointment of another person in his or her place to prevent a

conflict of interest from interfering in the client's representation, or, in some

10

circumstances, obtaining a waiver of the conflict of interest if it is in the best interests of the client.

### B. Findings of Fact Regarding the Standard of Care in Mitigation Investigation

27.    The Sixth Amendment requires the lawyers in a capital case to conduct a thorough investigation for mitigating evidence. Mitigating evidence is defined as "anything about the defendant's background, character, or the circumstances of the offense that would support a punishment less than death." *Lockett v. Ohio*, 438 U.S. 586 (1978). Jurors in a death penalty trial must make an individualized determination of the appropriate sentence to comport with the Eighth Amendment.

28.    It is well established that a defendant in a capital case is constitutionally entitled to have the jury consider all relevant extant mitigating evidence. *See, e.g., Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Williams v. Taylor*, 529 U.S. 362 (2000). The defense investigation must endeavor to find and develop such evidence. To do so, counsel must understand the full range of facts, use them to meaningfully consult with relevant experts, and at least consider presenting those mitigating facts to a jury.

29.    Conducting interviews of relevant people who knew the defendant, and consulting experts who evaluated the defendant, is not constitutionally sufficient if counsel overlooks available evidence and fails to thoroughly explore circumstances that would lead to discovery of relevant mitigating circumstances. Counsel must seek

11

circumstances, obtaining a waiver of the conflict of interest if it is in the best interests of the client.

### B. Findings of Fact Regarding the Standard of Care in Mitigation Investigation

27. The Sixth Amendment requires the lawyers in a capital case to conduct a thorough investigation for mitigating evidence. Mitigating evidence is defined as "anything about the defendant's background, character, or the circumstances of the offense that would support a punishment less than death." *Lockett v. Ohio*, 438 U.S. 586 (1978). Jurors in a death penalty trial must make an individualized determination of the appropriate sentence to comport with the Eighth Amendment.

28. It is well established that a defendant in a capital case is constitutionally entitled to have the jury consider all relevant extant mitigating evidence. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Williams v. Taylor*, 529 U.S. 362 (2000). The defense investigation must endeavor to find and develop such evidence. To do so, counsel must understand the full range of facts, use them to meaningfully consult with relevant experts, and at least consider presenting those mitigating facts to a jury.

29. Conducting interviews of relevant people who knew the defendant, and consulting experts who evaluated the defendant, is not constitutionally sufficient if counsel overlooks available evidence and fails to thoroughly explore circumstances that would lead to discovery of relevant mitigating circumstances. Counsel must seek

11

Moreover, the professional guidelines at the time of trial regarding the duty to investigate "described the obligation in terms no one could misunderstand." *Id.* 387.

31.   Mental health issues are pervasive in capital cases. It is common to require the assistance of separate, non-testifying consulting mental health experts. *ABA Guidelines,* at Guideline 10.4 cmt. ("[B]ecause mental health issues pervade capital cases, a psychologist or other mental health expert may well be a needed member of the defense team [and] will almost always be necessary for an effective defense."); *see also id.* at Guideline 4.1 cmt. ("Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process; *Texas Guidelines*, Guideline 10.1(B)(2)(b)-(c). Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans . . . and consultation with additional mental health specialists may also be necessary."). Likewise, counsel cannot rely on his or her own observations of the client's mental status, as such observation "can hardly be expected to be sufficient to detect the array of conditions . . . that could be of critical importance." *Id.* In the mitigation investigation of a capital case, defense counsel must pursue all red flags of mental illness, developmental disabilities, trauma, substance use, and other mitigating circumstances. *See, e.g., Rompilla*, 545 U.S. at 381. Red flags might include memory loss, adverse childhood experiences, social

13

difficulties, poor academic performance, and descriptions of a client and family members that include reliance on illicit substances to endure anxiety and stress. Defense counsel cannot permit unanswered questions regarding the source of such troubling information in a mitigation investigation. *See ABA Supplementary Guidelines*, Guideline 10.11; *see also Ex parte Gonzales*, 204 S.W.3d 391, 401 (Tex. Crim. App. 2006) (Cochran, J., concurring).

32.   Due to the sensitive nature of mitigation investigation, a mitigation specialist will often get only one chance to interview a witness; it is therefore crucial that a trained mitigation specialist be the person conducting the first interview. Indeed, if an untrained interviewer makes the initial approach, valuable information can be lost, as the witness becomes reluctant to share sensitive details with someone who does not understand how to establish rapport and tease out deeply embarrassing and personal histories. 3 EHRR 132-133, 153-156; *see also ABA Supplementary Guidelines*, Guideline 5.1(C) (Mitigation specialists "must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information[…]."). Establishing rapport is such a crucial part of mitigation investigation that it is risky to send a fact investigator to speak with a mitigation witness. Fact investigators do not have the requisite training to conduct sensitive mitigation interviews. This can scare off witnesses, possibly causing

14

irreparable damage or, at a minimum, creating more work for the mitigation specialist. 3 EHRR 132-133.

33. In order to be helpful, experts must be thoroughly familiar with the mitigation investigation. Defense counsel cannot abdicate his or her duty to thoroughly develop the defense by simply employing an expert to find out whatever information might be relevant to the defense. *See Texas Guidelines*, Guideline 10.1(A) ("Lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with these Guidelines."). A primary purpose of a mitigation specialist is to "provid[e] social history information to experts to enable them to conduct competent and reliable evaluations . . . work[ing] with the defense team and experts to develop a comprehensive and cohesive case in mitigation." *ABA Guidelines*, Guideline 4.1, cmt. (citation omitted). The decision to test a client for mental impairment must be informed by thorough mitigation investigation and adequate consultation with the defense team and consulting experts. Without a thorough mitigation investigation and social history through which to understand the testing results, psychological testing may appear irrelevant or unhelpful.

34. Finally, lead counsel must ensure that a relationship of rapport is established with his or her client. *See ABA Guidelines*, Guideline 1.1, cmt. The mitigation specialist can "assist counsel in establishing a rapport with the client," such as when

communication with the client or client's family becomes strained or can assist with positive legal outcomes. *Id.* However, the mitigation specialist does not relieve lead counsel of the duty to establish an ongoing relationship with the client.

### C. Findings of Fact Regarding the Trial Team's Division of Labor and Communication

35.    Ms. Bernhard testified that the ultimate decision-making on case strategies was left to her as lead counsel. 2 EHRR 49-50. This Court finds that Ms. Bernhard bore ultimate responsibility for decision-making on the case as lead counsel, with the exception of the decision of whether or not to plead guilty and whether or not Mr. Johnson should testify.

36.    Prior to Mr. Johnson's case, Mr. Weatherspoon and Judge Mulder had never tried a death penalty case. 2 EHRR 44-45, 198, 223. Mr. Weatherspoon was not certified for appointment on death penalty cases at any point during the pendency of Mr. Johnson's case. 2 EHRR 44, 193. Ms. Bernhard, Mr. Weatherspoon and Judge Mulder had never worked as co-counsel before. 2 EHRR 45.

37.    Ms. Bernhard was the only lawyer on the defense team who was qualified as lead counsel on a death penalty case under the *ABA Guidelines*, the *Texas Guidelines*, and Article 26.052 of the Texas Code of Criminal Procedure. As lead counsel and the only first-chair qualified member of the defense team, it was Ms. Bernhard's obligation to supervise the work of the other members of the capital trial team.

16

38. Prior to Mr. Johnson's case, Ms. Bernhard had not tried a death penalty case through punishment phase since 1999, the case of Bruce Williams. 2 EHRR 35.

39. Ms. Bernhard divided the labor among the team members while maintaining final say over the decisions. 2 EHRR 45-46, 197. Mr. Weatherspoon was primarily responsible for handling the guilt phase of the trial. 2 EHRR 46, 197. Judge Mulder was responsible for preparing Mr. Johnson to testify and maintaining contact with Mr. Johnson's family and friends. 2 EHRR 46, 251. Judge Mulder testified that she is not familiar with the *ABA Guidelines* or the *Supplementary Guidelines*. 2 EHRR 223-224. Ms. Bernhard did not participate in preparing Mr. Johnson to testify, nor did she maintain contact with Mr. Johnson's family. 2 EHRR 50-51.

40. Ms. Bernhard had final say on the mitigation presentation. She also responded to the State's objections at trial, filed and argued the motions *in limine* and conducted almost all communication with retained defense experts. 2 EHRR 46-48. The record reflects that she was also responsible for the State's extraneous offense witnesses and all defense expert testimony. *See* 47-51 RR.

41. Brendan Ross was responsible for the mitigation investigation. 2 EHRR 46. Ms. Ross's role was to find and talk with witnesses. Ms. Bernhard did not have that information. *Id.* 128-129. Ms. Bernhard relied on Ms. Ross to tell her about which witnesses she spoke with and her assessment of the witnesses. *Id.* 51-52. Ms. Bernhard had never worked with Ms. Ross before, but she trusted Ms. Ross to take

17

760

the mitigation investigation where she thought it needed to go and to contact witnesses in whatever way Ms. Ross wanted. 2 EHRR 129-130.

42.  Paula Cook was hired as a fact investigator in June 2012. DX 77. According to Ms. Cook's billing records, she did not interview witnesses. Ms. Cook mostly conducted background checks on jurors. DX 77-81; 2 EHRR 48, 64. Mr. Freeman was hired as a second fact investigator in May 2013. 2 EHRR 48. His job was to locate witnesses and assist Ms. Ross with record collection. 2 EHRR 63-65.

43.  This Court finds that as lead counsel, Ms. Bernhard was ultimately responsible for assigning tasks and supervising the work of Mr. Weatherspoon, Judge Mulder, Ms. Ross, Ms. Cook and Mr. Freeman. Ms. Bernhard failed to supervise their work as closely as she should have, given that she was the only qualified lead death penalty attorney on the case and that she had never worked with Mr. Weatherspoon, Ms. Mulder or Ms. Ross before this case.

### D. Findings of Fact Regarding Trial Counsel's Relationship with Mr. Johnson

44.  Trial counsel had a duty to maintain a relationship of trust and ongoing communication with Mr. Johnson throughout the representation.

45.  Ms. Bernhard testified that she had settled on remorse as the theory of defense in this case from the first day that she met Mr. Johnson. In order to convey Mr. Johnson's remorse, trial counsel decided very early on that Mr. Johnson would need to testify. Mr. Johnson was very emotionally distraught and depressed by his crime.

18

761

Ms. Ross took on the role of providing counseling to Mr. Johnson so that he could get to a place where he could testify. 2 EHRR 71-72.

46.  Judge Mulder was responsible for preparing Mr. Johnson to testify. 2 EHRR 50. In the three months leading up to Mr. Johnson's trial, Ms. Bernhard had just three half-hour-long meetings with Mr. Johnson. DX 67.  None of those meetings involved preparing Mr. Johnson to testify. Ms. Bernhard was never present for any of Judge Mulder's preparation sessions with Mr. Johnson. 2 EHRR 50-51, 234.

47.  This Court finds lead counsel's lack of supervision of Judge Mulder's preparation of Mr. Johnson fell below prevailing professional norms.

48.  Mr. Johnson testified at the punishment phase of his trial. Mr. Johnson's testimony opened the door to his jail calls. The State used that opportunity to introduce excerpts from eight of Mr. Johnson's jail calls. *See* trial SX 190; 49 RR 125-130. In one of those calls, Mr. Johnson asks for money on his books after telling his daughter not to complain about not getting chips. *Id.* 128. The State also suggested through cross-examination of Mr. Johnson that he did not express remorse in any of the calls until a week before trial. *Id.* 130. With the jail calls, the State presented Mr. Johnson as an unremorseful, manipulative person. *See* 52 RR 53-54.

49.  Although the decisions about whether or not to plead guilty and testify belongs to the client, lead counsel is obligated to counsel their client about the case and what is in the client's best interests, especially when a client has dementia, cognitive

762

deficits or borderline deficient intellectual functioning. 7 EHRR 33-38. Ms. Bernhard, however, decided that Mr. Johnson would have to testify the first time she met him, well before she had the opportunity to consider Mr. Johnson's low IQ and neuropsychological dysfunction. 2 EHRR 71.

50.   Ms. Bernhard testified that she was aware that Dr. McGarrahan's neuropsychological testing of Mr. Johnson revealed signs of brain damage related to his long-term substance abuse. 2 EHRR 97, 113-114. Ms. Bernhard was also aware that Mr. Johnson has borderline intellectual functioning. SX 3; SX 4. Dr. McGarrahan had also explained to Ms. Bernhard the need to repeat important information to get through to Mr. Johnson. SX 3.

51.   Judge Mulder testified that she believed that Mr. Johnson was not an emotive person and had flat affect. 2 EHRR 233. She testified that she thought the reason why she had to spend a lot of time preparing Mr. Johnson to testify was because of his demeanor and because they were asking him to testify about his sexual abuse. *Id.* 233-234. Judge Mulder was not present for the only meeting with Dr. McGarrahan, where she would have learned about Mr. Johnson's substance abuse-related brain damage, borderline intellectual function, or other cognitive impairments. SX 3; SX 4; 2 EHRR 222-223, 234.

52.   This Court finds that trial counsel failed to counsel Mr. Johnson in his best interest when it came to testifying. Because of Mr. Johnson's low IQ, dementia and

20

cognitive deficits, this Court finds that had trial counsel advised him appropriately,

Mr. Johnson would have chosen not to testify.

**E. Findings of Fact Regarding Trial Counsel's Mitigation Investigation**

53.     Lead counsel was responsible for ensuring that a mitigation investigation that

complied with the prevailing professional norms was conducted. *ABA Guidelines,*

Guideline 10.4(B). The prevailing professional norms require a mitigation

investigation into every aspect of a client's character, history, record and any

circumstances of the offense. The investigation is ongoing and must be exhaustive

and independent from the records received in discovery from the prosecution. *ABA*

*Supplementary Guidelines,* Guideline 10.11(B).

54.     An essential source of information regarding a client's life are in-person, face-to-

face, one-on-one interviews with the client's family and other witnesses who are

familiar with the client's life history or family history. In order to develop useful

mitigating information from a witness interview, it is necessary to build rapport

with the witness. That is typically accomplished over the course of more than one

in-person interview. *ABA Supplementary Guidelines,* Guideline 10.11(C); 3 EHRR

153-156.

i.     Findings of Fact Regarding Ms. Ross's Failed Investigation Methods

55.     Brendan Ross was appointed as the mitigation specialist for Mr. Johnson's case on

July 9, 2012. CR 51. Ms. Bernhard had never worked with Ms. Ross before Mr.

Johnson's case. When Ms. Ross was first retained, Ms. Bernhard told her to find

mitigation witnesses. According to Ms. Bernhard, she did not tell Ms. Ross which ones to find, as it was Ms. Ross's role to identify witnesses and speak with them. Ms. Bernhard trusted Ms. Ross to find and speak with witnesses in whichever way she wished. She did not manage how Ms. Ross chose to contact witnesses. 2 EHRR 128-130, 132. Ms. Bernhard also trusted Ms. Ross to take the mitigation investigation where she thought it needed to go. 2 EHRR 130.

56.  Ms. Bernhard was aware that Ms. Ross contacted witnesses and interviewed them over the phone, rather than doing in-person face-to-face interviews, and would send fact investigator Timothy Freeman to make initial contact with mitigation witnesses. 2 EHRR 131-132. Ms. Bernhard also knew that Ms. Ross's secretarial assistant, Debbie Sumi, who was untrained in mitigation investigation, conducted phone interviews of witnesses for Ms. Ross. 2 EHRR 134; 3 EHRR 39, 42-43, 74.

57.  Rather than meet in person, Ms. Ross and Ms. Sumi telephoned hostile witnesses, such as Amy Armstrong and David Contente, who ultimately provided testimony for the State's case in aggravation. Those phone calls did not go well. 3 EHRR 38-39.

58.  Ms. Ross's deficient investigation techniques were detrimental to trial counsel's investigation related to at least four mitigation witnesses – Derrick Mills, Timothy Johnson, Michael Henry and Anthony Johnson.

59.    Derrick Mills, a cousin to Mr. Johnson, witnessed Mr. Johnson's sexual trauma. 2

EHRR 80-81; 4 EHRR 23. Mr. Mills also witnessed Mr. Johnson's substance abuse.

4 EHRR 35-36. Mr. Johnson and Mr. Mills grew up together and remained close as

adults. At the time of Mr. Johnson's trial, Mr. Mills was in custody at the Dallas

County jail on a probation violation, awaiting transportation to TDCJ. 2 EHRR 80-

81. Rather than walk from the courthouse next-door to the Lew Sterrett Jail to

interview Mr. Mills, Ms. Ross's assistant Debbi Sumi sent an email to Mr. Mills's

attorney with confidential information about Mr. Johnson and the investigation of

his case. In the email, Ms. Sumi asked Mr. Mills's attorney to ask Mr. Mills whether

he would meet with Mr. Johnson's legal team. 2 EHRR 83-84. She revealed that

Mr. Mills might have knowledge about Mr. Johnson being sexually assaulted. *Id.*

89,90.

60.    Unsurprisingly, Mr. Mills had no interest in sharing confidential information about

Mr. Johnson with the attorney that just represented him in an unrelated matter. 2

DX 103, 104. This botched attempt at scheduling a meeting with Mr. Mills through

his attorney foreclosed an opportunity to find a witness who could corroborate Mr.

Johnson's testimony about being sexually traumatized at age five. Furthermore, the

trial team made no efforts to follow up with Mr. Mills after that. 2 EHRR 84-85.

Mr. Mills has since passed away, 3 EHRR 241, foreclosing the opportunity present

his testimony in the writ proceedings.

61. This Court finds that trial counsel's method of contacting Mr. Johnson's brother, Timothy Johnson, shows a lack of understanding of the professional norms for mitigation investigation. Mr. Johnson has two older brothers – Timothy Johnson and Anthony Johnson.[5] At the time of Mr. Johnson's trial, Timothy was incarcerated at the Michael Unit in Tennessee Colony serving a forty-year sentence. 3 EHRR 211, 243-244. Rather than drive two hours to Tennessee Colony to speak with Timothy in person, Ms. Ross mailed him two letters, one on December 6, 2012 and the other on January 7, 2013. In each letter, Ms. Ross asked Timothy to sign a release for his own confidential records. DX 103 and 104. No one explained to Timothy how his background information could assist Mr. Johnson, and understandably, Timothy did not feel comfortable sharing his social security number with a stranger. So, he never responded. 3 EHRR 214. Ms. Bernhard testified that she was unaware that Ms. Ross was seeking confidential information via mail, because Ms. Ross was not reporting her every move to Ms. Bernhard. 2 EHRR 132. This was a failure of supervision.

62. Apart from these two letters containing legal releases, no one from Mr. Johnson's trial team attempted to contact Timothy before Mr. Johnson's October 2013 trial. 2 EHRR 135. Instead of driving to the Michael Unit to speak with Timothy and

---

[5] To avoid confusion between Matthew Johnson and his brothers Timothy and Anthony Johnson, Timothy Johnson and Anthony Johnson will be referred to by their first names.

24

767

without any knowledge of what Timothy would say about his brother, trial counsel bench-warranted Timothy to Dallas County on October 2013 as a witness. 2 EHRR 135-136. No one from the trial team gave Timothy notice that he was being bench-warranted for his brother's trial. 3 EHRR 218. Unsurprisingly, he was angry when he met with Ms. Bernhard. 2 EHRR 135-136. Ms. Bernhard met with him Timothy for one half hour on October 18, 2013. 2 EHRR 136; DX 67. This Court finds that one 30-minute conversation with an angry witness was not sufficient to uncover mitigating information or to prepare Timothy to testify.

63. Timothy was not the only witness that Ms. Ross contacted via mail. On October 9, 2013, Ms. Ross sent a letter to Mr. Johnson's childhood best friend, Michael "Myke Myke" Henry. 3 EHRR 43; DX 101. At the time of Mr. Johnson's trial, Mr. Henry was serving two life sentences at the McConnell Unit in Beesville, TX. 3 EHRR 176; DX 101. One week later, Mr. Henry wrote back to Ms. Ross explaining that he had been lifelong friends with Mr. Johnson. DX 102; 2 EHRR 178-179. Mr. Johnson's trial team, however, failed to follow up with Mr. Henry, or initiate any further contact. As a result, trial counsel failed to learn relevant information that Mr. Henry had about Mr. Johnson's life history as a lifelong friend.

64. Trial counsel also failed develop a relationship with key mitigation witness Anthony Johnson. As Mr. Johnson's oldest brother, Anthony had significant information about their childhood, their family history and Mr. Johnson's substance

25

abuse. 4 EHRR 11-48; DX 7. Moreover, Mr. Johnson told Anthony that he had been sexually abused contemporaneously. 2 EHRR 76-77.

65.    Ms. Ross had one in-person meeting with Anthony on March 13, 2013 that lasted just an hour and a half. 3 EHRR 35, 82. This was the only in-person meeting that any trial team member had with Anthony prior to Mr. Johnson's trial. Ms. Ross's billing records indicate that she had just two phone calls with Anthony throughout the pendency of the case. DX 56-60.

66.    Trial counsel gave contradictory reasons for why they believed, without spending very much time with him, Anthony would not be a good witness. Ms. Bernhard never spoke with Anthony herself. She thought Anthony was hostile from what Ms. Ross and Mr. Weatherspoon (who had one 15-minute phone conversation with Anthony before trial) told her. 2 EHRR 179-180, 185. Mr. Weatherspoon claimed that Anthony would have been a bad witness because he thought Mr. Johnson should have been able to get his life together. 2 EHRR 209. Ms. Ross claimed that Anthony did not have much information about the Johnsons' family life that could counterbalance his hostility. 3 EHRR 67, 69. Ms. Ross, however, did not document anything about Anthony being hostile to the defense or Mr. Johnson in the interview memorandum she prepared following her meeting with him. SX 6 at 7078-7079. Judge Mulder testified that Anthony was distraught over the media coverage related to the case. 2 EHRR 240. Notwithstanding these offered rationales, trial counsel

26

769

subpoenaed Anthony nonetheless, and he came to court prepared to testify on Mr. Johnson's behalf. 2 EHRR 239.

67.    The Court finds that Anthony was credible in his explanation of his interactions with the trial team. Anthony explained that at the end of his meeting with Ms. Ross, they had agreed to meet again to discuss the trial strategy and review the discovery. That follow-up meeting never happened. Anthony testified that he was concerned about his mother's safety, but not about testifying on Mr. Johnson's behalf. 4 EHRR 11-16.

68.    This Court finds that the trial team's antiquated and unconventional witness contact and interviewing techniques foreclosed opportunities for mitigating information that was relevant and crucial for Mr. Johnson's case. Unless a mitigation specialist has a prior relationship with the witness, interviews are best conducted in person and unannounced. It is easier to build rapport when meeting with a witness in person. One interview with a witness is generally not enough to develop the kind of rapport necessary to develop reliable and valuable information. 3 EHRR 153-156. *See also ABA Supplementary Guidelines*, Guideline 10.11(C).

69.    Ms. Ross admitted that even she no longer uses these techniques for interviewing witnesses. She prefers to interview witnesses in person now. 3 EHRR 49. This Court finds that the techniques that Ms. Ross used for contacting and interviewing

27

770

witnesses in Mr. Johnson's case did not comply with the prevailing professional norms at the time of his trial.

70.    According to Ms. Bernhard's billing records, she interviewed three witnesses throughout the entire pendency of the case. DX 67. Instead she relied on Ms. Ross's judgment about which witnesses to call to testify. 2 EHRR 46-50, 52. As lead counsel, Ms. Bernhard was responsible for mitigation investigation and presentation. This Court finds that Ms. Bernhard failed to supervise Ms. Ross's mitigation investigation even though she was aware that Ms. Ross was calling and writing witnesses instead of conducting in-person investigation.

ii.    Findings of Fact Regarding the Failure to Develop a Social History

71.    A thorough social history investigation is the primary tool that defense counsel relies on for developing a case for life instead of death. 3 EHRR 123-124. Prevailing professional norms require that the mitigation specialist provides counsel with documentary evidence of the investigation in the form of genealogies, social history reports, chronologies and "reports on relevant subjects including... cultural, socioeconomic, environmental, racial, and religious issues in a client's life." *ABA Supplementary Guidelines*, Guideline 10.11(D); *see also Wiggins*, 539 U.S. at 521; *Rompilla*, 545 U.S. at 377. A social history report is a summary of the social history in a format that is usable for trial preparation. 3 EHRR 141.

28

771

72.  Getting a command of the social history investigation and mitigation themes is a necessary step to identifying appropriate experts. 3 EHRR 136. Completing a comprehensive social history before jury selection is also imperative. To conduct effective jury selection, trial counsel needs to be able to question prospective jurors with their mitigation themes and theories in mind. 3 EHRR 141.

73.  The social history in this case was not prepared until two weeks before trial. 2 RR 34. At that point, the social history had little utility. 3 EHRR 141-142.

74.  Mr. Johnson's trial began on October 21, 2013. Ms. Ross was still conducting initial interviews of close family members and developing Mr. Johnson's social history in the month and weeks immediately preceding this date. According to her billing records, Ms. Ross's second and final call to Anthony Johnson took place on October 7, 2013. That same day, she reached out to Derrick Mills's attorneys for the first time and requested Mr. Johnson's high school records. Two days later, on October 9 and 10, 2013, Ms. Ross reached out to another prospective witness, Durien Allen, for the first time. Her initial and only interviews with Mr. Johnson's co-workers were the following week, on October 14, 2013. Ms. Ross first contacted Mr. Johnson's cousin, Lashan Mills, on October 16, 2013. She also met with Timothy Johnson, the only blood-relative that testified at Mr. Johnson's trial, for the very first time on October 21, 2013 – just one week before the trial began on October 28, 2013. DX 60.

29

772

75.  Because it was prepared so late, without the benefit of more time, the social history painted a decidedly incomplete picture of the biological, social, cognitive and psychological influences on Mr. Johnson. By way of illustration, among the elements missing from the social history was a genogram. 3 EHRR 53; SX 6 7284. Ms. Ross never charted the number of people who were close to Mr. Johnson that died before his arrest. 3 EHRR 53. Nor does the social history report include information about the number of relatives and close friends Mr. Johnson had that were serving extensive sentences. SX 6. Yet, Ms. Ross agreed that the number of deaths of close family members or friends and the number of close family members or friends that were serving life sentences were relevant to understanding Mr. Johnson's lack of a support system. 3 EHRR 53. The report also lacks other relevant mitigation information, such as Mr. Johnson's exposure to violence and gang-activity and the ease of access to drugs in the neighborhood where he grew up. SX 6.

76.  It is likely that Ms. Ross's mitigation investigation did not result in this relevant social history information because Ms. Ross did not spend sufficient time working on Mr. Johnson's case. While working on Mr. Johnson's case, Ms. Ross was simultaneously handling at least two other death penalty cases that went to trial during the pendency of Mr. Johnson's case, the case of Tyrone Allen and another case in Fort Worth. 3 EHRR 8-9. In over 15 months, Ms. Ross completed less than

30

425 hours of work on Mr. Johnson's case. 3 EHRR 8; DX 56-60. Prevailing norms suggest that a mitigation specialist would work in the range of 1,000 hours on a mitigation investigation – more than twice the number worked by Ms. Ross. 3 EHRR 139.

77.    This court credits Judge Mulder's testimony regarding Ms. Ross's incomplete mitigation investigation. Judge Mulder testified that there was so much more information in the writ application about Mr. Johnson's childhood and his family members than what trial counsel had learned and presented in Mr. Johnson's trial. 2 EHRR 252. Trial counsel were responsible for investigating and presenting that additional information, but failed to follow up on the red flags about Mr. Johnson's social, developmental and mental health history.

iii. Findings of Fact Regarding the Selection and Preparation of Expert Witnesses

78.    Expert witness testimony is one of the most powerful tools at an attorney's disposal to present a compelling claim. *See, e.g., Coble v. State*, 330 S.W.3d 253, 281 (Tex. Crim. App. 2010). Prevailing norms require that counsel in a death penalty case consider presenting expert witnesses "to provide medical, psychological, sociological, cultural and other insights into the client's mental and/or emotional state and life history that may explain or the lessen the client's culpability for the underlying offense(s)" in the punishment phase of trial. *ABA Guidelines*, Guideline 10.11(F)(2). Counsel should choose experts that are tailored to the needs of the case,

31

774

not an "all-purpose" expert. *Id.* at Guideline 10.11 cmt; *see also Caro v. Calderon,* 65 F.3d 868 (9ᵗʰ Cir. 2001). At trial, counsel should use lay witnesses as much as possible as the factual foundation for the expert's conclusions. *ABA Guidelines* at Guideline 10.11 cmt. Expert testimony is persuasive when it is tied into other evidence presented in the case.

79.    Ms. Bernhard maintained responsibility for the selection of and communication with expert witnesses. 2 EHRR 47.

80.    On January 7, 2013, trial counsel sought appointment of Dr. Antoinette McGarrahan, a neuropsychologist with forensic experience. CR 132. Dr. McGarrahan was retained to conduct a neuropsychological assessment of Mr. Johnson because, as Ms. Bernhard explained, "you should always do that in a death penalty case." 2 EHRR 111. Ms. Bernhard hoped that Dr. McGarrahan would identify potential issues that would help tell the trial team "determine next steps." 2 EHRR 146.

81.    Dr. McGarrahan completed her psychological assessment of Mr. Johnson on January 29, 2013. Ms. Bernhard and Ms. Ross then met with her to discuss the assessment on March 15, 2013. 2 EHRR 111-113.

82.    Ms. Bernhard testified that because Mr. Johnson's medical records showed he had diagnoses for drug addiction and depression, she decided not to present an expert who had evaluated Mr. Johnson. 2 EHRR 116-117, 147. Ms. Bernhard further

32

775

testified that she feared that an expert who had evaluated Mr. Johnson would allow the State's expert access to Mr. Johnson. 2 EHRR 147-148. The court finds this explanation is unpersuasive for several reasons.

83.    First, Dr. McGarrahan uncovered more mitigating evidence than just the diagnoses of drug addiction and depression included in Mr. Johnson's medical records. She informed Ms. Bernhard and Ms. Ross that Mr. Johnson grew up in poverty around gang activity (something Mr. Johnson's team otherwise failed to identify). Dr. McGarrahan recognized that Mr. Johnson suffers from post-traumatic stress syndrome, likely from his sexual trauma. Her assessment showed Mr. Johnson has memory deficits and showed signs of brain damage from drug use. 2 EHRR 113-116; SX 3; SX 4. Dr. McGarrahan also explained that Mr. Johnson has a full-scale IQ of 81, which is borderline intellectual functioning on the cusp of intellectual disability. 2 EHRR 116-117; SX 3 and 4; 6 EHRR 150. Overall, the results of the psychological assessment were favorable for Mr. Johnson's mitigation case.

84.    Notably, Dr. McGarrahan did not diagnose Mr. Johnson with anti-social personality disorder. This was supported by the results of the Personality Assessment Inventory that she administered to Mr. Johnson on January 29, 2013. SX 12. Ms. Bernhard agreed that, had the State's expert diagnosed Mr. Johnson with anti-social personality disorder, Dr. McGarrahan would have been able to provide reasonable alternative explanations for any otherwise antisocial traits. Those alternative

33

776

explanations would have included Mr. Johnson's substance abuse, long-term incarceration, the environment in which he was raised, and the cognitive deficits that affect his executive functioning. 2 EHRR 117-118; 7 EHRR 35-36.

85.    After identifying Mr. Johnson's trauma, cognitive limitations, and brain damage, Dr. McGarrahan recommended that Ms. Bernhard retain a neuropharmacologist, such as Dr. Lipman or Dr. Roache, to explain drug addiction and the pattern of Mr. Johnson's drug use. SX 3; SX 4. Ms. Bernhard ultimately retained Dr. Roache. Dr. McGarrahan also recommended that Ms. Bernhard retain another psychologist to evaluate Mr. Johnson's mental state at the time of the offense so that there would be a separate expert who could opine about guilt-phase issues, and she could focus on mitigation evidence. 2 EHRR 116-117. There is no evidence in the record that Ms. Bernhard ever did that.

86.    After meeting with her just once, on April 10, 2013, the trial team informed Dr. McGarrahan that they were not going to use her at Mr. Johnson's trial. 2 RR 118. Notably, the trial team made this assessment in the absence of anything resembling a full social history investigation; their social history investigation did not conclude until six months later, on the eve of trial.

87.    Because trial counsel had not developed a social history or mitigation themes prior to retaining Dr. McGarrahan, they were unable to determine the value of Dr. McGarrahan's testimony. 3 EHRR 148. Consequently, the relevance of Dr.

34

777

McGarrahan's opinions was limited to the information that was gathered at the time of her evaluation of Mr. Johnson.

88.  Dr. Leslie Rosenstein, a board-certified neuropsychologist with the Department of Psychiatry at UT Southwestern Medical Center, reviewed Dr. McGarrahan's raw data and results from her evaluation of Mr. Johnson. 7 EHRR 8, 15-16. Based on her review of the test data and voluminous records, Dr. Rosenstein provided additional evidence of Mr. Johnson's intellectual and cognitive functioning, which the jury did not hear. 7 EHRR 15-20; DX 188.

89.  Dr. Rosenstein testified that Mr. Johnson functions below average in most areas of neuropsychological functioning, such as problem solving and memory functioning. Mr. Johnson has numerous risk factors that could be contributing to his below-normal functioning, such as genetics, an early and continued history of substance abuse, lack of a stimulating home environment, hypertension, a prior heart attack and head injuries. 7 EHRR 23-24, 27, 44-45, 47-48, DX 191.

90.  Dr. Rosenstein explained that Mr. Johnson's score on the full-scale IQ test was 81, which qualifies as borderline deficient intelligence. His score places Mr. Johnson in the 10th percentile, meaning that 90% of the population has a higher IQ score than Mr. Johnson. 7 EHRR 32-33. This conclusion was corroborated by the State's expert, Dr. Proctor. 6 EHRR 150. Mr. Johnson's academic and job performance show that Mr. Johnson has been functioning below average his entire life. 3 EHRR

778

43-44. Mr. Johnson's intellectual deficiencies likely limited his job and educational opportunities and his ability to manage his finances and his health. 7 EHRR 33-34.

91.    Dr. Rosenstein also explained that Dr. McGarrahan's testing showed signs of frontal lobe impairment and significant memory impairment. 7 EHRR 35-36. Those impairments make it difficult for him to problem-solve on a daily basis and remember to do basic things, like pay the bills and tasks at work. 7 EHRR 24, 36-38. Based on Dr. McGarrahan's testing, Dr. Rosenstein testified that Mr. Johnson meets diagnostic criteria for least mild cognitive impairment, amnestic type, and possibly even major neurocognitive disorder, also known as dementia. 7 EHRR 38.

92.    Trial counsel misapprehended the testing and data from Dr. McGarrahan; they testified that they concluded that Dr. McGarrahan could only offer that Mr. Johnson suffered from addiction and depression. 2 EHRR 118, 147. Had trial counsel understood the value of Dr. McGarrahan's testimony in relation to his complete social history, they would have been able to make an informed decision about whether to have her testify or not. Instead, trial counsel based their decision on a limited understanding of the data. Thus, trial counsel had no strategic reason for failing to use an expert such as Dr. McGarrahan, who had evaluated Mr. Johnson and could explain his neuropsychological impairments, at trial.

93.    The trial team ultimately retained two experts to testify about issues related to Mr. Johnson's moral culpability in the punishment phase. Dr. Kristi Compton was

36

779

retained to explain the "psychological effects" of Mr. Johnson's childhood to the jury. 2 EHRR 85; 5 EHRR 132. Dr. John Roache was retained as an educational expert about drug addiction and the physiological effects of certain drugs, like PCP and cocaine. 50·RR 27-43.

94.    The Court finds that there was some confusion among the trial team members over the role that Dr. Compton was to play at trial. Judge Mulder believed that Dr. Compton evaluated Mr. Johnson for his score on the Hare-Psychopathy Checklist. 2 RR 235. Ms. Ross testified that she had never worked with Dr. Compton before and did not know whether she was actually an expert in trauma. She testified that she could only speculate as to what Dr. Compton's purpose was, as she had not recommended hiring Dr. Compton. Ms. Ross thought that perhaps Dr. Compton was retained to do a competency evaluation or an evaluation of Mr. Johnson for depression. 3 EHRR 22. An email between Ms. Ross and Ms. Bernhard indicates that Ms. Bernhard planned to use Dr. Compton to "talk about the significance of the sex abuse." DX 95.

95.    Regardless of the true purpose of her role, trial counsel only had a single one-hour meeting with Dr. Compton on October 21, 2013, just 10 days before the guilt phase of Mr. Johnson's trial began. 5 EHRR 131-132; DX 75. Dr. Compton never met with Mr. Johnson. 2 EHRR 87. While Dr. Compton was provided with Mr. Johnson's criminal records, medical records and videos related to this offense, she

37

failed to speak with any of Mr. Johnson's friends or family members. 3 EHRR 24.

Ms. Bernhard could not recall whether she provided Dr. Compton with any other of

Mr. Johnson's life history and family history records. 5 EHRR 131-132. Nor did

Dr. Compton speak with Ms. Ross about Mr. Johnson's childhood or social history.

2 EHRR 25.

96. Because Dr. Compton did not testify at Mr. Johnson's trial, the jury did not receive any evidence explaining the impact of childhood sexual trauma on Mr. Johnson's emotional or neuropsychological development. 2 EHRR 86.

97. Ms. Bernhard claimed that Dr. Compton did not testify out of fear that the State would call Dr. Proctor, or another expert, in rebuttal. 2 EHRR 155-156. This Court does not find that explanation persuasive. The Court also finds that explanation is based in a misunderstanding of the law. *See Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997) and its progeny.

98. Because Dr. Compton did not evaluate Mr. Johnson, she could not offer any diagnosis. 2 EHRR 87. Rather, counsel intended her to be an educational expert, like Dr. Roache. 2 EHRR 155-156. Trial counsel knew from conversations with Dr. Compton that Dr. Proctor would need to conduct testing in order to make a diagnosis of Mr. Johnson. 2 EHRR 100-101. Because Dr. Compton did not evaluate Mr. Johnson, Dr. Proctor would not have been able to evaluate Mr. Johnson either.

38

781

Nor could Dr. Proctor diagnose Mr., Johnson without an evaluation. 6 EHRR 15; *see also Lagrone,* 942 S.W.2d at 602.

99.    This Court finds that trial counsel made the decision not to call Dr. Compton as a witness based on lack of knowledge of relevant case law, and not based on any strategic reason. This Court finds that a single one-hour meeting with Dr. Compton was not sufficient time to prepare her testimony for trial. This Court further finds that trial counsel failed to provide Dr. Compton with relevant mitigating evidence, such as Mr. Johnson's social history, that would have been necessary for Dr. Compton to testify about the psychological significance of Mr. Johnson's life experiences. 2 EHRR 25; 3 EHRR 25; DX 75.

100.    In addition, trial counsel failed to retain an expert who could explain to the jury how certain cultural factors in Mr. Johnson's childhood impacted his life trajectory and informed his lifelong addiction. Not a single expert was called at trial who could speak to Mr. Johnson's life history outside of prison. Considering the complexity of Mr. Johnson's family dynamics and lifelong struggle with drug abuse tracing back to early childhood, trial counsel's failure to call a social history expert fell below the prevailing norms for capital trial counsel. *See Strickland v. Washington* 466 U.S. at 688 (1984).

101.    Mitigation specialist Ms. Ross, however, recognized the cultural implications of Mr. Johnson's life and the need for an expert who could explain his social history,

39

and the dangerous environment that Mr. Johnson survived. She conceded that she lacked the cultural competence to do this herself. 2 EHRR 18-20; DX 95; DX 98. The need for a culturally competent expert in Mr. Johnson's case was particularly imperative, given that Ms. Ross was unfamiliar with the unique traumas Mr. Johnson faced, growing up as a black man in Garland, Texas. DX 179A; 2 EHRR 17.

102.  In recognizing her deficits in understanding and unfamiliarity with this area of mitigation, Ms. Ross did an hour and 45 minutes of internet research on the inherent trauma that results from growing up black, poor, drug addicted and neglected, like Mr. Johnson. Ms. Ross also reached out to a professor at UT-Arlington for a referral a social worker who could consult with the defense team about the cultural, social and economic impacts of growing up black and poor. 3 EHRR 18-20; DX 98. Ms. Ross recognized that the members of Mr. Johnson's team did not have the necessary competency in those issues as they related to Mr. Johnson. Yet, no one from the team ultimately consulted with such an expert. 2 EHRR 20-21.

103.  Ms. Ross also recognized the need for a social history expert to testify at Mr. Johnson's trial. Ms. Ross had used one in other cases and, where the trial team had not used one, it had been raised as a post-conviction issue. In an email exchange dated September 23-24, 2013, Ms. Ross wrote Ms. Bernhard about the benefit of having an expert who could explain the mitigating elements of Mr. Johnson's life

history to the jury. 3 EHRR 23-24; DX 95. Ms. Ross recognized the gap between the lay witness testimony and Dr. Roache's testimony about drug addiction.

104. When Ms. Bernhard failed to understand the issue, Ms. Ross further explained, "I'm referring to discussing the mitigation" and "tying up the different precipitators to the following actions and results" (referring to the crime). Ms. Ross lists a number of mitigating factors from Mr. Johnson's life history, some of which were never presented or explained to the jury. DX 95. There's discussion of Ms. Compton playing this role, but as Ms. Ross testified, Ms. Compton was never provided with Mr. Johnson's social history. 3 EHRR 25; DX 95.

105. This Court agrees with Judge Mulder that the trial team should have called an expert to discuss Mr. Johnson's upbringing, his childhood and the neighborhood he was raised in. That was important information for the jury to hear. Judge Mulder had not considered this before trial, not having been privy to the conversation between Ms. Ross and Ms. Bernhard. 2 EHRR 220, 222.

106. Trial counsel's failure to understand the relevance of and retain an expert to explain the mitigating elements of Mr. Johnson's life history fails to meet professional norms. Most critically, as a matter of clearly established federal constitutional law, a decision not to present evidence cannot be "strategic" if it was made without the benefit of a thorough investigation. *See Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003) (clarifying that courts may not indulge "post hoc rationalization" for

41

counsel's decision-making that contradicts the available evidence of counsel's actions). No one on the defense team spoke with an expert about explaining Mr. Johnson's social history, even though the team's mitigation specialist Ms. Ross recommended they do so. 2 EHRR 222; DX 95. The Court finds and concludes that the team could not have made a reasonable decision to not present this expert testimony because they had not first consulted with an appropriate expert about what such an expert might have to offer.

107.  For each of these reasons, the Court finds and concludes that the members of Mr. Johnson's trial team were not credible with respect to their explanation for failing to investigate and present evidence of Mr. Johnson's cognitive deficits and his social history, including his childhood trauma, drug addiction and the effects of long term drug use on the developing brain, and other mitigating evidence. There was no "strategic" basis for failing to investigate and present this evidence through expert testimony. Further, trial counsel were deficient in their failure to develop this information and retain and prepare appropriate expert witnesses to present this information at Mr. Johnson's trial.

42

iv.   The Trial Team Had No Credible "Strategic" Reason for Failing to Develop a
Complete Picture of Mr. Johnson's Social History through an Independent
Investigation, Starting with His Drug Use at Age Seven and Ending at His
Arrest for This Offense.

108.   Trial counsel failed to present the totality of evidence related to Mr. Johnson's drug

addiction, the long-term developmental effects of his drug use, his inability to get

treatment and his intoxication at the time of the crime. Trial counsel also failed to

present the mitigating circumstances of Mr. Johnson's life history, including the

lack of supervision and affection in his home, the poor role modeling of his brothers

and father, his exposure to violence and drugs in his neighborhood and the easy

access to drugs from early childhood.

109.   There was some confusion about whether addiction was, in fact, a theory at

punishment. In regard to the totality of evidence related to Mr. Johnson's drug

addiction, the long-term developmental effects of his drug use, his inability to get

treatment, and his intoxication at the time of the crime, Ms. Bernhard claimed that

she was "not trying an addiction case." She ultimately conceded that Mr. Johnson's

intoxication at the time of the offense was an important theme at trial, although not

the overarching theory. 2 EHRR 60-61. Mr. Weatherspoon testified that a theme of

the entire trial from guilt through punishment was that Mr. Johnson was intoxicated

at the time of the offense. 2 EHRR 198-199. In direct contradiction to Ms. Bernhard,

Judge Mulder testified that the goal in guilt was to establish that Mr. Johnson was

43

786

intoxicated at the time of the crime in order to set up the addiction theory for the

punishment phase. 2 EHRR 232. That strategy would have been consistent with the

*ABA Guidelines. See, e.g., ABA Guidelines,* Guideline 10.10.1 ("Counsel should

seek a theory that will be effective in connection with both guilt and penalty, and

should seek to minimize any inconsistencies."). Both Judge Mulder and Ms.

Bernhard argued in closing argument that Mr. Johnson's addiction was mitigating

evidence related to this offense. 52 RR 27-34, 44-51. However, Ms. Bernhard

insisted that the theory of defense in the punishment phase was remorse and not a

lack of future dangerousness. 2 EHRR 61.

110.    This court finds that trial counsel's *post hoc* explanation for failing to explore,

develop, or present available mitigating evidence of the brain-damaging effects Mr.

Johnson's lifelong history of drug abuse had on his brain and entire life, from the

age of seven all the way up to his intoxication at the very time of this offense, is

unpersuasive. Trial counsel made the decision to present testimony regarding Mr.

Johnson's medical records and addiction, testimony that Mr. Johnson had been

using drugs since he was child, and testimony about the effects of those drugs. 2

EHRR 173. As demonstrated at the evidentiary hearing through the testimony of

Dr. Roache, Dr. Sapia, and Dr. Rosenstein, there was significantly more

information that trial counsel failed to investigate and present at Mr. Johnson's trial.

Although there was some evidence presented at trial, Mr. Johnson was deprived of

an adequate defense because the jury did not see the full picture regarding Mr. Johnson's long-term substance abuse, the effects that had on his brain, his inability to get treatment and his intoxication at the time of the offense. Trial counsel's failure to present this mitigating evidence was based on a failure to investigate and learn the information, not on a strategic decision not to present the information.

111. Regarding the failure to present a trauma expert or mental health expert who could explain the mitigating circumstances of Mr. Johnson's social history, Ms. Bernhard stated that she did not want to present an expert who had evaluated Mr. Johnson. She testified that she feared that, if she did, Dr. Proctor would say Mr. Johnson was not an addict and that Mr. Johnson is a psychopath. 2 EHRR 101. Ms. Bernhard believed that it was better to keep Dr. Proctor's opinions out rather than to be forced to refute them in front of the jury. 2 EHRR 102. Ms. Bernhard also claimed that the reason for not calling Dr. Compton, who did not evaluate Mr. Johnson, was that Dr. Proctor was sitting in the courtroom prepared to rebut her testimony. 2 EHRR 155, 174. This court finds these explanations unpersuasive for several reasons.

112. First, trial counsel has a duty to file motions in limine to ensure that the defense case is not constricted in the penalty phase by fear of opening the door to otherwise inadmissible aggravating evidence. *ABA Guidelines*, Guideline 10.11(G). If counsel fears that the court will allow excessive rebuttal evidence, counsel also has a duty

45

788

to make a full record of this issue in order to support any challenges to the court's rulings. *Id.*

113. Mr. Johnson's trial counsel failed to file a motion in limine seeking a ruling from this Court based on *Lagrone v. State* and its progeny. *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997). By failing to litigate the issue in advance of trial, trial counsel made their decisions regarding expert testimony based on a fear rather than knowledge. 2 EHRR 176. The case law based on *Lagrone* and its progeny is complex enough that is important for trial counsel to get a ruling about the scope.

114. The Court of Criminal Appeals has been unequivocal that an essential principle at work in *Lagrone* and *Soria v. State*, 933 S.W.2d 46 (Tex. Crim. App. 1996) is parity, *Chamberlain v. State*, 998 S.W.2d 230, 234 (Tex. Crim. App. 1999), and has recognized that there is a limit as to what is relevant and admissible evidence under *Lagrone*. *See Davis*, 313 S.W.3d at 351-52; *see also Lizcano v. State*, No. AP-75879, 2010 WL 181772, at *8 (Tex. Crim. App. May 5, 2010) (limiting the scope of a *Lagrone* examination to the specific issue raised by the defense expert, intellectual disability) (unpublished); *Hernandez v. State*, 390 S.W.3d 310, 322 (Tex. Crim. App. 2012) (holding that the scope of an overly broad *Lagrone* examination may be reviewed on appeal).

115. Had trial counsel filed a motion in limine seeking to limit the scope of the State's rebuttal evidence pursuant to *Lagrone*, this Court would have been obligated to

46

789

make a determination of the scope of Dr. Proctor's testimony. Dr. Proctor's

testimony would have been limited to the evidence presented by Dr. Compton or

any other expert. *Soria v. State*, 933 S.W.2d 46, 57-58 (Tex. Crim. App. 1996). As

Ms. Bernhard herself noted, Dr. Proctor could not offer any diagnosis for Mr.

Johnson without conducting a psychological assessment. 2 EHRR 87; 6 EHRR 15.

The parity that *Lagrone v. State* and its progeny contemplate is that the State could

not introduce a diagnosis in rebuttal, if the defense's expert did not first provide a

diagnosis. Dr. Proctor acknowledged this in these writ proceedings. 6 EHRR 14-15.

Thus, testimony summarizing a defendant's life history would not have opened the

door to a diagnosis of psychopathy from the prosecution's expert, as Ms. Bernhard

feared. 2 EHRR 101-102.

116. Moreover, Ms. Bernhard testified that had Dr. Proctor been allowed to testify that

Mr. Johnson has anti-social personality disorder, there was plenty of evidence to

refute that opinion. 2 EHRR 102. Ms. Bernhard could have presented evidence that

Mr. Johnson's behavior was more likely related to his environment, substance abuse

or his long-term incarceration than a diagnosis of antisocial personality disorder. 2

EHRR 118. There are also neuropsychological explanations for Mr. Johnson's

behavior that were evident from Dr. McGarrahan's evaluation of Mr. Johnson back

in January 2013. *See* 7 EHRR 31-37.

47

790

117. Post-conviction counsel for Mr. Johnson presented the testimony of Dr. Jennifer Sapia, a psychologist with expertise in trauma. Although Dr. Sapia is a psychologist by training, she was retained as an expert to evaluate Mr. Johnson's biopsychosocial history, including his substance abuse history and his adverse childhood experiences, and to explain how the traumatic experiences may have affected Mr. Johnson's development and behavior. 5 EHRR 25-26. In that role, she reviewed thousands of pages of Mr. Johnson's life history records, including records relating to his education, employment, medical history, criminal history, incarceration history, family criminal history and death records. She also reviewed the trial testimony of numerous witnesses, including Mr. Johnson and his friends and family. She conducted life history interviews with numerous individuals and further reviewed many sworn statements provided by lay and expert witnesses regarding Mr. Johnson's life history. DX 117 to DX 186.

118. Similarly, Mr. Johnson presented the testimony of Dr. John Roache, an expert in pharmacology and drug addiction. 4 EHRR 72. Dr. Roache testified as an expert at Mr. Johnson's trial and was retained in these post-conviction proceedings to expand on the testimony that he previously provided at trial regarding drug addiction and the effects of addiction on the brain. In that role, Dr. Roache, like Dr. Sapia, reviewed hundreds of pages of Mr. Johnson's life history records, including records relating to his education, employment history, medical history, criminal

48

791

history, incarceration history, and video evidence. DX 1, DX 4-14, DX 34-55, and DX 82-88. He also interviewed Mr. Johnson in order to obtain social history and drug use information. 4 EHRR 86.

119. This Court allowed the State's expert, Dr. Proctor, to examine Mr. Johnson and testified in these habeas proceedings over Mr. Johnson's objection. This Court now finds that the vast majority of what Dr. Proctor testified to, namely the results of psychological testing that was not performed by either of Mr. Johnson's experts, would not have been admissible at trial as it was beyond the scope of *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997).

120. This Court finds that, even had Dr. Proctor been allowed to testify similarly at trial, he is not a persuasive rebuttal expert. Dr. Proctor testifies overwhelmingly for the State in capital cases, making him appear biased. 6 EHRR 66-67. Unlike Dr. Sapia and Dr. Roache, Dr. Proctor is not an expert in child development, trauma or drug addiction. He does not conduct research or treat patients in a clinical setting. SX 9; 6 EHRR 56-66. Additionally, Dr. Proctor reached his conclusions without considering the totality of the evidence. The State did not request access to Dr. McGarrahan's test data and results, nor did they show Dr. Proctor trial counsel's notes regarding the results of those tests. Dr. Proctor also failed to review the affidavits and hearing testimony of Mr. Johnson's family and friends, which

49

provide relevant and important information about Mr. Johnson's life history. 6
EHRR 12, 146-147, 172-173.

121.  Much of what Dr. Proctor testified to corroborates Dr. Sapia's and Dr. Roache's
testimony. For instance, Dr. Proctor stated that Mr. Johnson has serious drug and
alcohol issues dating back to his childhood that have impacted his life and that Mr.
Johnson suffers from depression. 6 EHRR 24, 33, 93-95, ·129-130. Dr. Proctor
agreed that Mr. Johnson is introverted and shy, as many of his siblings and friend,
Michael Henry, testified to in these writ proceedings. 2 EHRR 25, 28. Dr. Proctor
conceded that Mr. Johnson's criminal behavior and drug use are interlinked. 6
EHRR 43. Dr. Proctor testified that Mr. Johnson is motivated for treatment. 6 EHRR
94-95. Dr. Proctor also testified that long-term drug use can cause brain damage,
such as memory loss, problems with executive functioning, and increased
impulsivity. 6 EHRR 72-73.

122.  With regards to the trauma research and Mr. Johnson's life history, Dr. Proctor
agreed that there is research showing that trauma affects brain development. For
instance, Dr. Proctor testified that childhood trauma is linked to neurocognitive
deficits and brain impairment. Dr. Proctor also agreed that Mr. Johnson suffered at
least four adverse childhood experiences, placing him in the minority as compared
to the population, and at a heightened risk for suffering associated consequences.
Dr. Proctor agreed that the greater the number of adverse childhood experiences a

793

person has, the higher the probability that those experiences affected the person long-term. 6 EHRR 72-79.

123.  The most damaging opinion Dr. Proctor offered – that Mr. Johnson suffers from antisocial personality disorder – was offered by the defense's own witness, Dr. Roache, at trial. 6 EHRR 33; 50 RR 47-48. Antisocial disorder being a manageable and common diagnosis, where up to 75 percent of the prison population suffers from it, would likely not have persuaded the jury to discount the overwhelming amount of mitigating evidence that trial counsel failed to present. 6 EHRR 35, 144. Dr. Proctor also testified that Mr. Johnson does not suffer from psychopathy, thus negating Ms. Bernhard's number one fear about putting on an expert to testify about Mr. Johnson's social history. 6 EHRR 40.

124.  Regardless of the relative value of Dr. Proctor's testimony and whether a defense expert might have opened the door to Dr. Proctor's testimony, no one on the defense team ever spoke with an expert who had the ability to explain the significance of the mitigating evidence in Mr. Johnson's life history, even after the team's mitigation specialist, Ms. Ross, recommended they do so. 3 EHRR 23-24; DX 95. The Court finds and concludes that the team could not have made a reasonable decision not to present expert testimony about Mr. Johnson's social history, without first consulting with an appropriate expert about what they could offer. 2 EHRR 222. This Court further finds that Dr. Compton was not such an expert, as she had

51

not been provided with Mr. Johnson's social history or given the opportunity to speak with any of Mr. Johnson's family members or friends. 3 EHRR 25.

125. This Court finds that lead counsel's misunderstanding of the requirement of the defense team to investigate and present mitigating evidence, such as the expert testimony of Dr. Sapia, Dr. Roache, Dr. Henery or Dr. Davis, fails to comport with the prevailing professional norms that were applicable at the time of Mr. Johnson's trial.

### F. Findings of Fact Regarding Punishment-Phase Representation

126. In this writ proceeding, multiple witnesses presented credible, unimpeached evidence regarding mitigating events in Mr. Johnson's life that trial counsel could have presented to the jury had counsel performed the constitutionally required investigation. By presenting these witnesses, relying on the voluminous supporting documentation developed during the post-conviction investigation, the jury would have heard and been able to give meaningful effect to the following narrative, and there is a reasonable probability that at least one juror would have voted to spare Mr. Johnson's life.

127. The post-conviction investigation revealed that Matthew Johnson's childhood family has been mired in dysfunction, poverty, and extreme trauma since well before he was born. Glimpses of this childhood and his resulting drug abuse were presented to the jury—mostly through his own testimony – but devoid of context

52

about the long-term effects it had on his cognitive functioning. Because the mitigation investigation was haphazard and last-minute, the social history that pulled together Mr. Johnson's social history was incomplete and too late to be useful. According to the ABA Guidelines this is not reasonable. *See ABA Guidelines*, Guideline 10.7 at cmt.; 4 EHRR 189. Key records were never utilized; many others were never acquired. Many witnesses with highly relevant information were never interviewed; others were summarily interviewed but not utilized at trial. And, the few family members who did testify were ultimately handicapped by a lack of preparation. *See* DX 4-15, DX 85-88, DX 113.

i.  Trial Counsel Failed to Investigate and Present Mr. Johnson's Full Life Story

128.  The State's case portrayed Mr. Johnson as a manipulative, drug abuser deserving of death. Mr. Johnson was portrayed as an inherently devious person, who emerged from an otherwise wholesome family and neighborhood. The State argued, "[Mr. Johnson] came from a good family. They took him to church. They were hard working parents." 52 RR 26. But had trial counsel investigated and presented Mr. Johnson's social history through the lay testimony of his family and friends, the jury would have seen that this is not an accurate portrayal of Mr. Johnson's history.

129.  Mr. Johnson was born in 1975 to Ulrich and Alma Johnson, and he had two older brothers, Anthony and Timothy, in addition to a cousin whom he regarded as a sister, Cheryl. Alma took custody of niece after her sister was shot and killed. DX

6 2-3; 4 EHRR 8, 17, 19. Struggling to provide for four children, Ulrich worked nights at a dairy mill and Alma worked the day shift at an area factory, leaving them largely unavailable and disinterested in the children's upbringing. 3 EHRR 224-225. The couple offered little support or time to their children, and the family rarely, if ever, sat down at the kitchen table to share a meal. *Id.* Ulrich, however, did manage to find a considerable amount of time to gamble, at times blowing his entire paycheck and leaving the family with no money to pay the bills. 4 EHRR 20. Even after his friend was killed over a gambling debt, and he got shot at the "game room," Ulrich continued to gamble. DX 6. Sometimes Alma would send the kids out with their father to keep him from gambling, believing the presence of his children would keep him from gambling, but Ulrich still succumbed to the urge. He would shoot dice until he ran out of money, leaving the kids alone in a back room and occasionally resurface to reward them with snacks for "staying out of the way." 4 EHRR 20. Ulrich's indifference to his addiction and spending habits was the source of contentious and extensive fighting, oftentimes in front of the children. *Id.* In addition to his gambling addiction, Mr. Johnson's father was a "functional alcoholic" who maintained a job but drank heavily throughout the day. 3 EHRR 226-227; *Id.* 181. As a means of additional income, he took on the role of neighborhood bootlegger, spending the proceeds from his "side business" on lottery tickets. *Id.* 226; DX 12 at 2.

54

797

130. Other than the basic expectation they had for their children to attend school, Mr. Johnson's parents were largely absent and uninvolved throughout his childhood and gave him free rein to roam the streets of East Garland, Texas. 3 EHRR 224-225. Even as a young child in elementary school, Mr. Johnson was only subject to a loosely enforced 10:00 p.m. curfew, and was otherwise unsupervised in his comings and goings. If Mr. Johnson did not arrive home by his curfew time, Alma would lock the doors. To get in, Mr. Johnson would sneak through a window. *Id.* 228. During one of these nightly excursions, Mr. Johnson met who would become his lifelong best friend, Michael "Myke Myke" Henry. They were seven years-old, and the pair quickly bonded and soon became inseparable. *See* 4 EEHR 25. Michael lived with his mother and grandmother on the same street as Mr. Johnson and had just as much freedom, if not more, than did Mr. Johnson. 3 EHRR 176-77. Michael never really got to know Alma and Ulrich because they were not very social, but Mr. Johnson did develop a "friendship" with Michael's mother, Shirley Henry. *Id.* 179. The boys spent so much time together that Shirley and Mr. Johnson became quite close. She took them to and from school regularly, yet the extent of her interaction with Alma and Ulrich was when she would see Ulrich sitting in the driveway drinking beer as she drove by their house. DX 86.

131. The unfettered freedom afforded to Mr. Johnson gave him access to drugs and alcohol that most children would never have and at only seven years old he began

798

drinking, smoking cigarettes and using marijuana. Dealers living in the area had no reservations about selling to seven-year old's; for only $2.00, Mr. Johnson and Michael would purchase a joint and take it down by the creek smoke. 3 EHRR 207, 234; 4 EHRR 53. If the boys couldn't come up with any money they would just steal marijuana from Shirley's stash. 3 EHRR 180. Shirley was troubled by the fact that the boys were taking her marijuana, but more so that at such a young age, they were smoking an entire bag in one sitting. DX 86 at 2. Alma too admits she was worried about Mr. Johnson smoking marijuana at such a young age, however she never intervened and only spoke to him about it after he and Daphne were married. DX 6 at 4. In elementary school, Mr. Johnson smoked marijuana several times a week, if not every day. At around age ten, Mr. Johnson's marijuana use didn't escape the attention of his brothers. Tim found marijuana in Mr. Johnson's room. 3 EHRR 231. Around the same time, Anthony caught him with a joint. 4 EHRR 25. Anthony confiscated the marijuana, but never told his parents. *Id.*

132. That same year, Mr. Johnson started drinking beer and wine few times a week "to catch a buzz." If he and Michael could not obtain the alcohol from family members or neighborhood bootleggers, they stole it from the trunk of Ulrich's car. 3 EHRR 181. By the time Mr. Johnson was in his early teens, he was drinking daily. *Id.* 180-181; DX 5 at 12; DX 12 at 8. Once Mr. Johnson got to middle school, he and Michael were staying out late into the night. While Mr. Johnson still had his 10 p.m.

56

799

curfew, he regularly stayed out drinking and smoking until after midnight. DX at 5

11; DX 13 at 3; 4 EHRR 206-207.

133. Around this time, the police started to bring Mr. Johnson home for trouble he got

into outside of the house. On one occasion, police caught Matthew smoking

marijuana with Michael; another time he gave the police a fake name; and yet

another time he and Michael stole their teacher's car and took it for a joy ride until

it ran out of gas. Each time the police told Alma that she needed to teach Matthew

a lesson or else he was going to jail the next time the police caught him. In each

case, Alma failed to act. *See* DX 6 at 15.

134. During the early 1980's, when Mr. Johnson was six years old East Garland, where

he grew up, was a fairly safe and pleasant place to live. Community leaders threw

"block parties" and people mostly socialized in front of the Neighborhood Service

Center which helped residents find work. 4 EEHR 53; *Id*. 24; 3 EHRR 184; 5 EHRR

59. However, beginning in around 1986, crack came to the neighborhood. The drug

epidemic devastated Mr. Johnson's East Garland neighborhood, and kids growing

up in that area found themselves surrounded by illegal and highly dangerous

activity—people selling and doing drugs, engaging in prostitution, robbing, and

killing. Gang violence grew as the wave of crack cocaine swept through East

Garland, and street gangs like the "Crips" were rampant in Mr. Johnson's

neighborhood. 4 EHRR 58; 5 EHRR 59, 114. Together, this highly-addictive,

57

800

easily-accessed drug produced crack addicts that were so numerous the rate of crime dramatically increased as a result. *Id.* 26; *see* DX 179A.

135.  Less than 100 yards away from the recreation center where Mr. Johnson and Michael played basketball, the Rainbow Apartment complex was the epicenter of East Garland's drug trade. Overrun by substance use, theft, prostitution and violence, even the police seemed intimidated by the level of crime there. In the years to come, conditions worsened. 4 EHRR 56-57. As a child, Michael witnessed a man fire four bullets into a stranger's head for "stepping on his shoes." 3 EHRR 185. After Anthony left Garland to join the Navy, Tim started to spend a lot of time at the Rainbow Apartments with Anthony's good friend, Anthony Grimes, and he began using crack cocaine. *Id.* 57; DX 7 at 18; 3 EHRR 233. As his crack use escalated to the point of addiction, Tim began selling it to support his habit and by the 10th grade he had quit the football team and dropped out of high school. *Id.* 234. Alma and Ulrich, seemingly disinterested in the trajectory of their children's lives, never made any effort to get him back in school, nor did they attempt to get him any form of substance abuse treatment. *Id.*

136.  Alma and Ulrich's emphasis was on work rather than education, and raised in the era of Jim Crow and segregation, their educational opportunities and economic and geographic mobility were limited. Neither of Matthew's parents nor his immediate family members achieved more than a high school degree. *See* DX 2.

58

801

137. Mr. Johnson's record of poor academic performance was, in part, the result of his below average cognitive functioning. 7 EHRR 23. Several risk factors likely contributed to his below-normal functioning, including but not limited to genetics, growing up in a non-intellectually stimulating environment and his history of very early and chronic substance abuse. *Id.* Mr. Johnson never took any honors classes and across the board consistently struggled to meet even the most basic educational milestones. *Id.* 40. In the early years, Mr. Johnson predominantly earned S's and S-minuses and between the 3rd and 4th grade he appeared to be an average student. *Id.* 39.

138. In the 5th grade Mr. Johnson was administered a standardized cognitive abilities test and his performance was shockingly low. On the verbal portion of the exam he scored in the 11th percentile, with 89% of test takers achieving a higher score, indicating he was borderline deficient in his cognitive verbal learning abilities. As for the non-verbal portion of the test, Mr. Johnson scored in the seventh percentile, also indicating a borderline deficiency but approaching the mildly impaired range. *Id.* 40-41. That same year, Mr. Johnson took the state mandated Texas Assessment of Knowledge and Skills test, TAKS, and failed to meet minimum standards in both reading and writing. *Id.* He was administered the same test in the 9th and 11th grade and did not meet the minimum standard of competence in any areas (mathematics, reading and writing) and by the 11th grade he dropped out of high school. Later, Mr.

59

Johnson enrolled in community college and while he took mostly technical classes, he continued to perform poorly. *Id.* 42-43. For a long time, Mr. Johnson functioned in the below average range and unsurprisingly this low level of educational attainment put him at risk for multiple potentially negative outcomes such as "lower income, higher unemployment, higher incarceration rates, and higher rates of mental and physical health problems." *Id.*; *See* DX 179A at 8.

139.   Mr. Johnson was an extremely withdrawn and isolated child who "hardly ever spoke" and was eager to please. 3 EHRR 177; 4 EHRR 32; 5 EHRR 45; DX 86. He had difficulty expressing himself and often just "could not find the words to share how he was feeling." DX 7 at 9. While family members wondered whether he was struggling with depression, they did little to reach him, and Alma admits not paying "too much attention to how quiet [Mr. Johnson] was as young child" because she assumed he just didn't want to talk to her. DX 6 at 2. Even the police who brought Mr. Johnson home suggested that he needed more supervision, or he would wind up incarcerated. Alma and Ulrich, however, continued to ignore his behavior. *Id.* 11.

140.   Because he grew up virtually unsupervised and unattended, Mr. Johnson replaced this lack of physical and emotion support with animals. 3 EHRR 230, 4 EHRR 22; 5 EHRR 111.  But even Mr. Johnson's pets fell victim to the violence and the chaos of his neighborhood. Teddy was Mr. Johnson's dog and his best friend and they

were always together. On a day they happened to be apart, Mr. Johnson came home

to the devastating news that Teddy was shot and killed. Making matters worse, Mr.

Johnson's cousins also killed the rabbits his grandmother gave him while he was

away. *Id.* Instead of pets who might be killed, Mr. Johnson sought comfort in

inanimate objects. Desperately seeking reassurance, Mr. Johnson became extremely

attached to what his family described as an "old, stinky pillow." He kept that pillow

all the way until his freshman year in high school and sniffed it when he felt anxious.

It was like his "super strength" and Mr. Johnson intensely guarded that pillow, he

did not anyone to touch it and he certainly did not want it cleaned. 3 EHRR 230; 5

EHRR 159. Once, Alma tried to take the pillow to wash it and Mr. Johnson "went

crazy," so instead, she tossed it in the trash and he quickly retrieved it. *See* 4 EHRR

23.

141. Daphne, Mr. Johnson's high school sweetheart, was one of the only pillars of

support throughout his life. She continues to be today. They met in elementary

school and began dating in middle school. At age nineteen, Mr. Johnson and

Daphne got married. DX 47 at 2; DX 50 at 2. They have three daughters, Makayi,

Deja, and Mattduxx, whom Mr. Johnson loves dearly. He was described as a "great

father" to them during periods of his sobriety. DX 47 at 8, 10. Although Daphne

recognized that Mr. Johnson's family dynamics seemed "dysfunctional and not very

close-knit," she could only support him to a certain extent. DX 9 at 7. While his

addiction was destructive to their relationship, it was also familiar to Daphne because of her own father's drug addiction; this familiarity likely contributed to her ability to overlook and enable Mr. Johnson's behavior for many years. *See* DX 50 at 3-4.

142.  Mr. Johnson was raised by older siblings, relatives, and peers who went on to serve countless years in prison for robberies, aggravated sexual assaults, possession and distribution of narcotics, assaults against police officers, murder, and even capital murder. These were Mr. Johnson's peers and his role models. DX 3 38; *see e.g.*, DX 4 at 9; DX 5 at 17; DX 6 at 4-6; DX 7 at 21; DX 12 at 18, 23-24; DX 14 at 11, 13-14. The nature of East Garland's drug and gang economy gave Mr. Johnson's potential male role models little incentive to take an alternative route.

143.  Anthony, Mr. Johnson's older brother by 12 years, received a "less than honorable" discharge from the navy for failing a drug test and returned to Garland permanently when Mr. Johnson was about 16 years old. 4 EHRR 28; 5 EHRR 58. Soon thereafter, Anthony began selling drugs and using cocaine and PCP. Unlike Mr. Johnson, fortunately, for Anthony, resiliency enabled his recovery from substance abuse and addiction. Now Anthony is the successful owner of an HVAC company. *Id.* 28-29. Perhaps today, Anthony would illustrate a solid role model for Mr. Johnson, but during his formative years, their age difference and the exposure to

violence and drugs allowed Mr. Johnson to observe unhealthy and risky behavior. *See* 5 EHRR 63.

144. Timothy is five years older than Mr. Johnson and is currently serving a 40-year sentence for robbery and assault on an officer. 3 EHRR 211-212. He went to prison for robbery when Mr. Johnson was 14 years old, and again two years later for theft of a person and robbery. *See* 3 EHRR 235. Timothy still lived with Alma and Ulrich during the earlier stages of his addiction, as did Mr. Johnson, and when he "ran out of options" he would return home to steal things that he could sell to support his cocaine habit. *See Id.* Timothy stole electronics from Alma's house and when she caught him stealing money out of her purse she kicked him out of the house. DX 12 at 11.

145. Anthony Grimes is older than Mr. Johnson's eldest brother, however he and Mr. Johnson became friends because he spent a significant amount of time with Timothy. Grimes was addicted to crack and introduced Timothy to the drug. DX 7 at 8. His addiction left him deeply involved with gang and criminal. 4 EHRR 51.

146. Numerous of Mr. Johnson's extended family members have been, or are currently, incarcerated or addicted to drugs and/or alcohol. 3 EHRR 240, 248; 5 EHRR 108. Mr. Johnson's cousins, Derrick (deceased); Stetron Mills (spent over a decade in prison on multiple charges); Tracy Spencer (killed) and Willie Mills were all heavily involved in drug abuse and criminal activity. 4 EHRR 36; DX 88 at 3-4; *Id.*

63

806

241; DX 4 at 7. Mr. Johnson's uncles, Dave Spencer (serving a life sentence for murder) and Sammy Ray Jeans were also addicts. 3 EHRR 240, 241; 4 EHRR 24.

147. The adult figures around Mr. Johnson failed to provide him with a positive model to mirror because they normalized violence and substance abuse and, like many of those closest to him, by his late teens Mr. Johnson was using crack cocaine and PCP. DX 87 at 2; DX 88 at 3-4.

148. In 2003, Ulrich passed away from cancer. Following the death of their father, Anthony, Tim, and Mr. Johnson decided they would go to school to start an air-conditioning business. Anthony and Tim studied Heating, Ventilation, and Air Conditioning (HVAC); Mr. Johnson, meanwhile, took courses in Automotive Body Repair because he hoped to emulate the success that Daphne's father had in the business. DX 12 at 21-22; DX 8 at 9; DX 10 at 5. While they were all enrolled, however, Mr. Johnson continued to smoke crack and use PCP. Unable to escape the grips of addiction, Mr. Johnson and Timothy eventually dropped out. 5 EHRR 110; 3 EHRR 238; DX 12 at 21-22. Anthony was the only brother to successfully complete the program. *See* 4 EHRR 9; DX 12.

149. By the mid-1990s, many of Mr. Johnson's closest friends and relatives began to realize his drug problem was serious. Alma was aware he was smoking marijuana in middle school but didn't realize he had a drug problem until he was in his twenties. DX 6 at 16; DX 7 at 22. Anthony first grasped the severity of his addiction

807

when Michael called him to tell him he had to "tie [Mr. Johnson] up" because he

had smoked PCP was "acting crazy." On the way to Michael's, Anthony stopped to

purchase some milk because he had heard that "milk would neutralize" the drug and

when he arrived Mr. Johnson drank it and "came down" around 30 minutes later. 4

EHRR 29. When he was back to normal, Anthony untied his brother, took him

home, and put him to bed. DX 7 at 22. A few years after this incident, Michael was

convicted of capital murder and sentenced to life in prison. 3 EHRR 175. As Mr.

Johnson's drug use intensified, he would go on "crack binges" for days at a time

leaving Daphne and the children home alone, which often resulted in fighting and

separations. 3 EHRR 190-191; DX 47 at 5-7.

150.   In 2009, Mr. Johnson was released from prison after serving a five-year sentence

for a robbery he committed while high on drugs, and he was determined to maintain

his sobriety and make up for the years he was gone by providing for his family. DX

9 at 22-23. Mr. Johnson was highly motivated to secure steady employment and

walked three miles to the bus stop, each way, just so he had transportation to look

for work outside the confines of his neighborhood. Mr. Johnson eventually found a

job, started doing lawn care service on the side, and less than a year later he was

able to move his family out of Section 8 housing. 4 EHRR 33. When Mr. Johnson

was sober and employed, he passed the time fishing and exercising with Anthony,

doing household chores and flying kites at the park with his daughters. *Id.* 34; DX

47 at 22. In 2011, Mr. Johnson and Daphne bought their first home on Waikiki Lane. DX 7 at 32; DX 9 at 24; DX 15 at 4. Despite their new found financial stability, Daphne was hesitant to buy the house because she worried that the added financial pressure would worsen Mr. Johnson's depression and drug use. Just as the bills started to pile up, Daphne lost her job at Target and couldn't find another one. DX 9 at 25. The fall of that same year, when it started to get colder, Daphne told Mr. Johnson that the girls needed winter coats and suggested that they go to the Friendship House, a local charity, to get them for free. Frustrated that he could not provide his family with its most basic needs, Mr. Johnson told Daphne he was going to the store, but instead relapsed on drugs. DX 47 at 10-11. His decline was rapid after the relapse. DX 7 at 36.

151.  Mr. Johnson lost his job at Kwik Kar Lube for stealing from the owner while high on crack. 49 RR 74-77. He found another position with XLC Services shortly before having an episode at a local convenience that left him strapped down to a bed at Presbyterian Hospital and treated for a drug-induced psychosis. DX 9 at 32. Following that incident, Mr. Johnson asked his supervisors to assist him in finding treatment, rather than helping him, they suspended his employment and told him he could return to work only after he had cleaned up. See DX 18 at 15, 17. According to Daphne, this was Mr. Johnson's breaking point. DX 9 at 34. .

809

152. Rochelle Cooper, Michael's cousin, regularly smoked crack with Mr. Johnson and he often expressed to her how desperately he wanted to "get off the dope," but could not find a treatment center willing to take him without insurance. DX 87 at 2; *see* 4 EHRR 31. Rochelle on the other hand would go to a "free, women-only, 30-day drug facility" when she wanted to get sober, albeit she used the moment she got out. *Id.*

153. Presbyterian Hospital provided Mr. Johnson with a list of treatment centers upon his discharge and Daphne called several, but they all required health insurance or the ability to pay out of pocket. They had neither, and were struggling to pay for their most basic needs. DX 9 at 34. In addition to calling the centers on the list, Mr. Johnson and Daphne visited some treatment centers in person, but they either exclusively treated women and minors or only offered short-term treatment. *Id.* Defeated and ashamed, Mr. Johnson isolated himself from the rest of his family and fell deeper into the throes of addiction, and when Anthony could no longer reach Mr. Johnson on the phone, he assumed he had relapsed. 4 EHRR 30. Later, Anthony's suspicions were confirmed when he discovered that his little brother was the neighborhood "Meat Man," stealing meat from the grocery store and then trading it in for drugs. *Id.* 30-31. Despite having reached an all-time low, a couple of weeks before the crime Mr. Johnson was still looking for opportunities to work

810

and provide for his family and even asked Michael's brother, Sheldon, for help. DX 86 at 3.

154. At the time of the offense, Mr. Johnson had been drinking alcohol, using cocaine, and smoking PCP for at least 72 straight hours and was "completely high out of his mind." DX 113 at 2-3. The night before the incident, Demone Crow and Mr. Johnson had been getting high together for hours and when they ran out of drugs, they drove around the city trying to find ways to make money to buy more. Demone stopped by a friend's house and when he came back outside he discovered Mr. Johnson was gone. He never saw him again. *Id.* The same evening, Anthony had a wedding reception at his house and, among many other guests in attendance were his cousins Charlotte and Johnnie. Mr. Johnson showed up to the party around 1:00 a.m., seemingly intoxicated, and talked to Charlotte about his daughters, how they did not have food to eat at home, and how he felt like a "failure because he couldn't provide more for his wife and daughters." DX 85. No one in Mr. Johnson's family saw him again that night; the following morning he committed the crime for which he currently faces execution.

155. Had counsel elicited this additional testimony and fully embraced Mr. Johnson's chaotic and drug-filled childhood, they could have fully explained how it is that a seven-year-old child comes to smoke marijuana, how a ten-year-old child develops a drinking problem, and how a teenager develops a devastating addiction to crack

811

cocaine. With this testimony, counsel would have made clear to the jury that Mr.

Johnson had little chance to be anything other than a lifelong addict.

156.    This Court finds that trial counsel's failure to provide this full and true explanation

of Mr. Johnson's background constituted deficient performance and prejudiced Mr.

Johnson's punishment phase in violation of his Sixth Amendment right to counsel.

There is a reasonable probability that had this evidence been presented to the jury

at least one juror would have voted for a sentence of life in prison without parole.

As such, this Court recommends that punishment phase relief be granted to Mr.

Johnson in the form of a new trial regarding punishment.

   ii. <u>A Qualified Mental Health Expert Such as Jennifer Sapia Could Have Provided
      Essential Perspective on Mr. Johnson's Social History and How the Trauma
      Adversely Effected His Development</u>

157.    As demonstrated by the social history recounted above, Matthew Johnson was

exposed to numerous adverse childhood experiences starting in his early childhood.

A clinical psychologist with an expertise in childhood development and trauma,

such as Dr. Jennifer Sapia, could have provided trial counsel and the jury with an

assessment of the scope and intensity of the adverse childhood events considered

clinically "traumatic" that Mr. Johnson sustained and could have explained the

various effects of his exposure on his development and subsequent behavior. *See* 5

EHRR 8-197.

158.  Dr. Sapia is a developmental psychologist who runs a private clinical practice, Sapia

Psychological Associates, where she oversees several clinicians and provides

assessment and therapy services to patients at every stage of life. 5 EEHR 10; DX

116. Dr. Sapia works as a forensic consultant on criminal, noncriminal and family

court cases. She also works with various agencies, such a fire and police

departments and the Department of Defense, where she performs specialty

evaluations for security clearances. Dr. Sapia is also a child forensic examiner and

she serves as an aeromedical psychologist in the National Guard. 5 EHRR 10-11.

She completed all of her education and training at the State University of New York

at Buffalo receiving a bachelor's degree in psychology and social sciences, a

master's degree in psychology, and a Ph.D. in school and counseling psychology.

*Id*. 9-10. She has been in practice since 2005. 5 EHRR 11.

159.  This Court credits Dr. Sapia as an expert psychologist qualified to evaluate Mr.

Johnson's biopsychosocial history, including his substance abuse history, his

adverse experiences and the impacts of those experiences on his development and

behavior. 5 EHRR 24-25. This Court finds that Dr. Sapia was a credible witness.

160.  To form her opinions, Dr. Sapia conducted a comprehensive review of Mr.

Johnson's biopsychosocial history. She explained that a biopsychosocial history is

multi-generational in nature, and explains the biological, psychological,

environmental, and social influences that affect a person's development, cognition,

70

813

psychology, and behavior. A biopsychosocial history is relied on when evaluating a trauma history. 5 EHRR 19. She reviewed Mr. Johnson's medical, educational, work, criminal and institutional records. She conducted in-person interviews of Mr. Johnson and his mother (Alma Johnson), his wife (Daphne Johnson), his brothers (Anthony and Timothy Johnson) and his childhood best friend (Michael Henry). She reviewed volumes of transcripts from the trial and writ proceedings. She also watched all videos related to the crime. 5 EHRR 13, 19-20, 22-23.

161. Dr. Sapia defined trauma as an experience that is extremely stressful and overwhelming from a psychological perspective. Trauma can be defined as a single event, such as a natural disaster. It is also defined as personal or chronic stressful events, such as sexual abuse, physical abuse, emotional neglect, exposure to domestic and community violence, other forms of maltreatment and loss of a loved one. While the DSM-V defines trauma and defines different trauma-related disorders, an individual's trauma experience does not have to meet the diagnostic criteria to be debilitating. 5 EHRR 27-30.

162. Dr. Sapia explained that chronic exposure to trauma adversely affects brain, social and psychological development. Moreover, multiple traumatic experiences over time or prolonged stress can have an additive value. 5 EHRR 29-30.

163. Dr. Sapia testified that experiencing trauma as a child can be much more debilitating than experiencing it as an adult. Children's brains are still developing and children

71

lack adaptive coping strategies, like the ability to talk about their feelings or seek out support. As a result, children who have experienced trauma and then have additional traumatic experiences throughout their life are at greater risk of developing mental health disorders like depression and anxiety. 4 EHRR 31-32.

164. To explain trauma and its long-term effects, Dr. Sapia used the Adverse Childhood Experiences ("ACEs") model, which was developed by the Center for Disease Control and Prevention in the Kaiser Permanente Health Systems, which correlates childhood abuse and maltreatment (ACEs) to later-in-life outcomes. 5 EHRR 33. ACEs are broadly divided into three categories: abuse, neglect, and household dysfunction. These categories include ten sub-type experiences, such as physical and emotional neglect, sexual abuse and substance abuse in the home.

165. Dr. Sapia testified that while the list of ACEs is a useful tool for categorizing experiences, it is not an exhaustive list of the potential adverse events or traumas that a person might endure. Additional ACEs, such as poverty and exposure to community violence, can be equally detrimental to a child as those specifically listed. 5 EHRR 35.

166. Dr. Sapia explained that trauma and adverse child experiences can physically affect a person's brain by interrupting or delaying proper brain development. During the first three years of life, the brain is in the process of developing an intricate system of neuro-pathways and connections. 4 EHRR 37. The frontal lobes, which control

72

executive functioning, are not fully developed until a person is his or her early 20's. 4 EHRR 38. The disruption that trauma causes to the brain impacts cognition, learning, and emotional functioning, such as impulse control, judgment, decision-making, and rational thinking. *Id.* 37-38. Research has shown that the higher the number of ACEs or the more profound the ACE, the more likely the ACEs are to impair brain development. *Id.* However, any one ACE can negatively impact brain development. *Id.* 128.

167. Research has shown that, because of the damage they cause, adverse childhood experiences are predictive of long-term psychological, physical and emotional problems. In terms of psychological effects, ACEs can lead to substance abuse, heightened suicide risk and other risky behaviors. 5 EHRR 35-36. Responses to adverse childhood experiences also vary. Some children externalize the stress by acting out in school. Other children internalize their emotions, shut down and become depressed. 4 EHRR 39-41. As the number of adverse childhood experiences increases, so will the risk for more negative outcomes. 5 EHRR 35-36.

168. After reviewing voluminous records and interviewing Mr. Johnson and his family members, Dr. Sapia identified that Mr. Johnson suffered from six of the ten "ACEs 1) sexual abuse; 2) emotional neglect; 3) multiple parental separations; 4) incarcerated relatives; 5) substance abuse in the home; and 6) physical abuse. 5

73

816

EHRR 106-109, 186-187; DX 182. Only 12.4 percent of respondents to the study experienced four or more ACEs. 5 EHRR 36, 109.

169.  Dr. Sapia testified about two instances of significant sexual trauma that Mr. Johnson suffered when he was a child. 5 EHRR 80-85. The first occurred when Mr. Johnson was five years old. He was at a family gathering with several cousins, when he was bullied into a sexual encounter with a much older cousin who convinced Mr. Johnson to put his penis in his mouth. When Mr. Johnson complied, the older cousin urinated in Mr. Johnson's mouth.  Rather than intervene, Mr. Johnson's other cousins stood around, watching and laughing. 5 EHRR 80. Dr. Sapia explained that this was a humiliating and traumatic experience for Mr. Johnson because it involved people that he trusted. *Id.* 25.

170.  When Mr. Johnson was seven years old, he was buying drugs from a neighborhood dealer nearly three times his age, Arthur Miller. During one drug transaction, Mr. Miller propositioned Mr. Johnson to give him oral sex in exchange for marijuana. Mr. Johnson complied for a moment, before quickly leaving. 49 RR 47-48; 5 EHRR 82. According to numerous lay witnesses, Mr. Johnson's cousin and close confidant, Cheryl, had an intimate relationship and a child with Mr. Miller. 3 EHRR 232. Dr. Sapia explained that Cheryl's relationship with the man who sexually abused Mr. Johnson further impeded what very little access Mr. Johnson had to a support system. 5 EHRR 84.

817

171. Dr. Sapia explained that these events are still very difficult for Mr. Johnson to talk about. He continually struggles to understand and process the shame and humiliation he feels. Sexual abuse at the hand of a family member can be far more damaging than sexual abuse inflicted by someone wholly unrelated. The victim is forced to remember and relive the traumatic events when he is exposed to the offending family member. Given Mr. Johnson was so young at the time, he had minimal coping strategies. He also lacked the support necessary to process and understand these experiences. This resulted in devastating consequences. For instance, Mr. Johnson developed low self-esteem and self-confidence. 5 EHRR 80-85; *see also* SX 3 and 4.

172. Dr. Sapia explained that Alma and Ulrich were hard-working parents who had opposite schedules. Ulrich worked the night shift at Schepps Dairy. When he came home, he drank beer, sold alcohol out of the trunk of his car, and slept. 5 EHRR 48-50. Alma worked the opposite shift at a factory. When she came home, she cooked, cleaned, and sewed as an additional source of income until she fell asleep in front of the television. It was difficult for them to make ends meet. 4 EHRR 50.

173. Dr. Sapia testified that there was no physical affection in the Johnson home. Mr. Johnson does not recall ever being hugged. He never observed his parents being affectionate toward each other. 4 EHRR 51, 196. This is consistent with what Mr. Johnson told Dr. McGarrahan and Ms. Ross before trial. SX 2-4. As Dr. Sapia

75

818

explained, trauma is multi-generational, and the effects persist generations. The trauma that Alma and Ulrich experienced, even before Mr. Johnson was born, likely affected their ability to parent, raise their children, and offer affection. Parents bring their own experiences into their parenting practices. 4 EHRR 32.

174. Dr. Sapia explained that Alma and Ulrich also failed to provide Mr. Johnson and his brother, Timothy, the necessary emotional support and guidance that would have kept them away from the drugs that were so easily accessible in their neighborhood. Both sons started doing drugs at a young age and dropped out of high school. Their parents did not intervene to get them back into school or into substance abuse treatment. 4 EHRR 63-67, 107. This lack of intervention left Mr. Johnson exposed to age-inappropriate behavior from the age of seven. 5 EHRR 107.

175. Dr. Sapia testified that Mr. Johnson's parents separated multiple times. 5 EHRR 107. At least one period of separation lasted a year. Each time, Alma moved all three sons out of the home. Although the couple eventually reconciled, there were significant periods of time when they were not living together. *Id.* 53, 152. This sort of instability can have a longstanding impact on children.

176. Dr. Sapia discussed the high number of incarcerated family members in the Johnson family. 5 EHRR 70-72; 107-108. Mr. Johnson was 14 years-old when his brother Timothy was incarcerated for the first time. *Id.* 65. During that period, Mr. Johnson's oldest brother, Anthony, was away serving in the Navy. 5 EHRR 58.

76

819

After he was discharged, Anthony was later arrested for murder, when his ex-wife shot a person who had come into their home to steal the drugs that Anthony was dealing. *Id.* 65. During his adolescence, Mr. Johnson's closest uncles and cousins were also incarcerated. *Id.* 70-71;107-108; DX 185. Mr. Johnson's best friend, Michael Henry, also went to prison for capital murder in 2000. 4 EHRR 72.

177.   In addition to Mr. Johnson's male role models being in prison, all the men in Mr. Johnson's life engaged in excessive substance abuse, whether inside or outside of the home. His father was a bootlegger and an alcoholic, who drank every morning after his shift. 5 EHRR 50, 109.  By the time Mr. Johnson was 10 years old, his brother Timothy was already addicted to marijuana and crack cocaine. *Id.* 64. When his brother Anthony left for the Navy, Anthony's best friend, Anthony Grimes, became heavily engaged in drug distribution. 4 EHRR 64.  When Anthony returned from his naval station in California, he also developed a substance abuse issue. 4 EHRR 108-109. Mr. Johnson's close cousins, Stretron Mills and Derrick Mills, both also had a history of drug addiction.  4 EHRR 71-72.

178.   Dr. Sapia testified that there was also evidence of physical violence in the home. In her conversation with Anthony, he revealed that his grandmother, father and mother would "whoop" the children with a belt. 4 EHRR 143-144, 186-187.

179.   Dr. Sapia explained that not all people respond to the sort of trauma that Mr. Johnson endured in the same way, because some people are more resilient than

77

others. 4 EHRR 41. Research has shown that a person's resiliency is based on their
protective factors. Protective factors are mitigating factors that buffer the impact of
adverse childhood experiences. 5 EHRR 42. Examples of protective factors include
having a high IQ or high verbal ability, the presence of supportive relationships,
stability in the home, a stable parent who is emotionally available to intervene,
support in the educational system and community, and access to treatment and
evaluation services. 5 EHRR 42-43. Dr. Sapia explained that, while a two-parent
household can be a protective factor, it only acts as one if those parents are modeling
pro-social behavior. *Id.* 193-195. The act of experiencing less trauma is itself a
protective factor that helps a child build resiliency to future adverse experiences. 5
EHRR 43-44, 124. The age of the child, severity of the abuse and duration of the
trauma also affect a person's ability to build resiliency. 5 EHRR 43-44. These
protective factors were absent from Mr. Johnson's life.

180. Dr. Sapia explained that Mr. Johnson did not have even the minimal protective
factors necessary to overcome his adverse childhood experiences. 5 EHRR 123.
Mr. Johnson lacked access to basic social support from immediate and other
extended family members. When Mr. Johnson was in elementary school, he was
poorly monitored. The only household rule was a 10:00 p.m. curfew. None of the
Johnson sons reported receiving help with their homework. They came in, ate
dinner, watched TV and went about their business. 5 EHRR 51-52,196; SX 3 and

821

4. Despite the presence and best efforts of Alma and Ulrich, Mr. Johnson's parents were emotionally unavailable and navigating devastating addictions and their own trauma, so were ill-equipped to protect Mr. Johnson. 5 EHRR 151-152. *See also* 5 EHRR 67 (Alma and Ulrich were poor role models and emotionally unsupportive.).

181.    Dr. Sapia testified that Mr. Johnson's history of multiple trauma exposures, particularly while his brain was developing, likely hindered his ability to establish adaptive coping mechanisms and problem-solving strategies that could have been protective factors. 5 EHRR 123-125. Instead, at an early age, Mr. Johnson started mirroring the behavior around him and relied on maladaptive coping strategies, like avoidance through substance abuse. This reliance on maladaptive coping strategies ultimately developed into an additional risk factor. 5 EHRR 32.

182.    Dr. Sapia also explained that Mr. Johnson lacked community support. The neighborhood dynamics and Mr. Johnson's exposure to community violence created additional risk factors. 5 EHRR 123. While Mr. Johnson was growing up in the 1980s and 1990s, his neighborhood was an epicenter of the crack epidemic. Drug use, drug distribution, crime and prostitution were common. Inadequate education, high unemployment rates and poverty plagued Mr. Johnson's Garland neighborhood. 5 EHRR 54, 161, 190-191; DX 179-A. There was nowhere for a child like Mr. Johnson to turn for support.

183. Mr. Johnson did not have the inherent protective factors of a high IQ or high verbal abilities. The school records and Mr. Johnson's Beta IQ score from his TDCJ records that Dr. Sapia reviewed indicate that he lacks high verbal abilities. 5 EHRR 78-80, 124. Mr. Johnson's neuropsychological testing confirmed this. 7 EHRR 32. Dr. Sapia explained, and Dr. Proctor corroborated, that Mr. Johnson's exposure to trauma in childhood could have impaired the development of his brain, affecting his cognitive functioning and ability. 5 EHRR 38; 6 EHRR 74.

184. Had trial counsel consulted with an expert like Dr. Sapia, they would have learned that, like anyone, Mr. Johnson's trauma responses were unique to him. Due to resiliency factors, some people are capable of normalizing their traumatic experiences, while others are not. Thus, it is irrelevant whether Anthony's description of his childhood varied from Mr. Johnson's. Nine years Mr. Johnson's senior, Anthony's experience as a child was different. Additionally, Anthony had the positive experience of escaping to join the Navy, when Mr. Johnson was still very young. 5 EHRR 57, 146-147.

185. Had trial counsel consulted with an expert like Dr. Sapia they would have learned that an adequate trauma inquiry involves gathering information from multiple, objective sources to account for these differences. 5 EHRR 147. Anthony was likely more resilient than Mr. Johnson. His relative success in adulthood illustrates his

80

ability to adapt and "bounce back" from his own substance use in a way that Mr. Johnson was not able to do. 5 EHRR 41.

186. Given Mr. Johnson's social history, Dr. Sapia testified that it is no surprise that he turned to drugs when things got difficult. 4 EHRR 128. She specifically testified about four factors from Mr. Johnson's social history that contributed to his substance abuse and debilitating addiction.

187. First, Mr. Johnson's history of substance abuse and addictive behavior were likely related to his early childhood trauma. It is common for those with extensive trauma histories to have comorbid substance abuse disorders. This is because traumatized individuals turn to substances in attempts to alleviate negative emotions. 5 EHRR 98.

188. Second, people who experience trauma are also more likely to suffer from depression. Simultaneously, depression and substance abuse disorder are commonly comorbid—meaning occurring at the same time—as well. Mr. Johnson has a long history of depression. His medical records indicate that when his depression was severe, he spent a lot of time in isolation and felt tired, hopeless, helpless and worthless. When Mr. Johnson was down, he would turn to drugs. 5 EHRR 90, 99-101; DX 44. Mr. Johnson was also described as a withdrawn and introverted child, indicating that he was already suffering from depression in childhood. 5 EHRR 102.

189. Third, Mr. Johnson was genetically predisposed to substance abuse and addiction. Mr. Johnson's father, brothers, male uncles, and male cousins all engaged in addictive behavior and substance abuse. 5 EHRR 18, 88. Lastly, Mr. Johnson's environment placed him at high risk for substance abuse. He was exposed to drugs and alcohol at a very young age, drugs were easily accessible, and all his male role models were engaging in addictive behavior. 5 EHRR 127-128.

190. Had trial counsel retained an expert such as Dr. Sapia, they could have rebutted the State's assertion that Mr. Johnson willingly chose to be a drug user.

191. Dr. Sapia explained that Mr. Johnson's substance abuse is a disease – not something he chose. According to his discharge notes from the Green Oaks treatment facility, Mr. Johnson was "extremely committed to sobriety yet was painfully aware of his inability to stop [using] without help." 5 EHRR 90; DX 44. Mr. Johnson's medical records clearly indicate his desire for treatment and his recognition of his inability to manage it on his own. Mr. Johnson's disease was so overwhelming that he even contemplated suicide. 5 EHRR 90; DX 44.

192. Dr. Sapia explained that, while Mr. Johnson sought help, the programs he attended, like Green Oaks and Summer Sky, provided only for the very initial stages of treatment. Residential and long-term treatment is vital to success. An individual struggling with addiction must learn how to change their environment, not respond

82

825

to triggers, and adapt to stress in healthier ways. 5 EHRR 94-95. Mr. Johnson did

not have access to long-term treatment like that. 5 EHRR 96-98.

193.   Dr. Sapia further explained that Mr. Johnson's failure to maintain his sobriety after

he attended 10 days of treatment was unsurprising. While the discharge notes

described his condition as improved, he had a Global Assessment of Function

("GAF") score of 40 on a scale of zero to 100. Any score below a 50 is concerning;

having a GAF of 40 shows that, even after treatment, Mr. Johnson still had

significant impairment. This was a troubling prognosis given his lack of access to

additional treatment. 5 EHRR 91.

194.   Dr. Sapia explained that, even with positive help-seeking behavior, Mr. Johnson's

poor environmental support led to his eventual relapse. 5 EHRR 92. Multiple

attempts at sobriety and relapse are common in the face of environmental stressors

and lack of additional support. *Id.* 94-95.

195.   Trial counsel failed to provide the jury with critical information about Mr.

Johnson's social history through a qualified psychologist like Dr. Sapia with the

ability to assess and explain how traumatic childhood experiences adversely impact

mental and physical health, the ability to make rational judgments, and the power

to control impulsivity as an adult.

83

826

iii. Trial Counsel Failed to Properly Prepare and Present Dr. John Roache's Testimony and Testimony About the Availability of Substance Abuse Treatment or the Lack Thereof.

196. Trial counsel presented only one expert witness at trial related to Mr. Johnson's brain functioning, and only related to the narrow issue of neuropharmacology. They presented Dr. John Roache, a neuropharmacologist. 2 EHRR 95-96. According to Ms. Bernhard, Dr. Roache was not retained to testify that Mr. Johnson was intoxicated at the time of the offense. Rather, Dr. Roache was hired to explain addiction and the diagnoses in Mr. Johnson's medical records. 2 EHRR 90, 102. This Court is not persuaded by this *post hoc* explanation.

197. In a letter to Dr. Roache from July 2013[6], Ms. Bernhard wrote, "I would like for you to assess his addiction problem and help explain to the jury its effects on his behavior and mental state." SX 8. The letter enclosed copies of Mr. Johnson's medical records, along with the police report and Mr. Johnson's videotaped interviews with the police. Ms. Bernhard also showed Dr. Roache a video taken of Mr. Johnson in the police car after his arrest. SX 8; 2 EHRR 98-99.

198. Mr. Weatherspoon testified that a goal at trial was to establish that Mr. Johnson was intoxicated at the time of the offense. Intoxication was a defense theme from the

---

[6] The letter is dated July 7, 2017. Presumably that is a typo, as the letter references a pending trial date of October 28, 2013.

guilt phase through the punishment phase. 2 EHRR 198. That is confirmed by the above-mentioned email exchange. SX 8.

199.   Ms. Bernhard complained that Dr. Roache did not understand the purpose of his own testimony. 2 EHRR 156. This Court finds it was Ms. Bernhard's responsibility, as lead counsel on Mr. Johnson's case, to ensure that Dr. Roache understood the scope of his testimony and to prepare him to testify. 2 EHRR 174.

200.   Despite his request to meet with Mr. Johnson, trial counsel did not allow Dr. Roache to meet with him before testifying. Dr. Roache was not shown the video of the crime, and Mr. Johnson's social history was not prepared in time to be shared with Dr. Roache. 50 RR 45; 2 EHRR 100-101, 159. And, Dr. Roache was not given access to Mr. Johnson's family members. 2 EHRR 105.

201.   Dr. Roache and Ms. Bernhard had only two telephone conversations before he testified. In the first conversation Ms. Bernhard spoke with Dr. Roache about retaining him on Mr. Johnson's case. In the second conversation, they spoke in general terms about addiction and the biology of addiction. No member of the trial team met with Dr. Roache in person to prepare his testimony before trial. 2 EHRR 98, 100.

202.   Trial counsel's lack of preparation was evidenced by their failure to timely provide Dr. Roache with all the materials trial counsel deemed relevant for his review. Just before he took the stand to testify, Ms. Bernhard had Dr. Roache view—for the first

time—only a few minutes of a 20-minute video of Mr. Johnson being transported

to jail after his arrest. Ms. Bernhard did not realize that Dr. Roache had not seen

the video until she asked him a question about it just before he took the stand. 2

EHRR 157; DX 3 10. Given trial counsel's last-minute production of this video to

Dr. Roache, he did not have enough time to contextualize and reflect upon its

significance or develop a fully-informed opinion related to it. DX 3 10. This video

was one of the first items of discovery the State provided to trial counsel, on October

18, 2012, over a year before Dr. Roache saw it. CR 124-26.

203.   During the direct examination, lack of preparation left Ms. Bernhard ill-equipped

to conduct direct examination on basic aspects of Dr. Roache's expertise. And, her

questioning did not allow Dr. Roache to adequately explain complex topics like

addiction and the effects of drug use on brain function and development in an

understandable way to the jury. DX 3 at 11. Mr. Weatherspoon corroborated Dr.

Roache's impression when he testified that Dr. Roache's testimony seemed to catch

Ms. Bernhard off guard. 2 EHRR 206.

204.   On cross-examination, Dr. Roache was vulnerable because he had not seen the

video of the crime or met with Mr. Johnson. 2 EHRR 108; 50 RR 45-46, 51.

205.   Because defense counsel failed to discuss Mr. Johnson's medical history with Dr.

Roache in advance of trial, as a result of questioning from the State and without

objection from the defense, Dr. Roache testified that Mr. Johnson was diagnosed

with antisocial personality disorder. 50 RR 47-48. This was a mischaracterization of Mr. Johnson's medical records. Mr. Johnson had never been diagnosed with antisocial personality disorder. 2 EHRR 106-107; DX 44. Dr. Roache is not a psychologist and, therefore, could not competently diagnose Mr. Johnson with antisocial personality disorder. 2 EHRR 107.

206. Because trial counsel presented cursory evidence of Mr. Johnson's drug addiction through lay witnesses and did not properly prepare Dr. Roache to testify about that addiction, the State was able to frame Mr. Johnson's ongoing addiction as his failure to take advantage of readily available opportunities. The State presented testimony that Mr. Johnson was provided with a list of substance abuse treatment programs at Presbyterian Hospital, including a place called NorthSTAR Behavioral Health Authority. 48 RR 188-210. The State also highlighted that Mr. Johnson's employer, XLC Services, gave him the opportunity to return to work if he completed drug treatment. 49 RR 94.

207. In closing argument during the punishment phase of trial, the prosecution made three arguments about Mr. Johnson's drug use: 1) Mr. Johnson's drug use does not explain his criminal behavior; 2) Mr. Johnson would have access to drugs which could make him violent in prison; and 3) Mr. Johnson chose drugs over the opportunity to seek treatment for his addiction. *See* State's Closing Argument, 52 RR 13-18, 49, 54.

208.  Had Dr. Roache been asked to do more by trial counsel and been given more

materials, he could have provided a wealth of additional relevant evidence for the

jury to consider. Dr. Roache testified during the evidentiary hearing in this writ

proceeding about what he could have offered. *See* 4 EHRR 72-130.[7] The Court

accepted Dr. Roache as an expert qualified to opine about drug addiction and

pharmacology. 4 EHRR 72. The Court finds that Dr. Roache was a credible witness.

209.  In these writ proceedings, Dr. Roache testified that Mr. Johnson is a drug addict. 4

EHRR 91. To understand the seriousness of being an addict, Dr. Roache explained

addiction and the impact that drug use has on the brain.

210.  Dr. Roache testified that drug use leads to addiction. Addiction is a disease that,

after reaching a level of repeated and chronic drug use, is diagnosable as a disorder

under the DSM-5. Once drug use reaches the level of addiction, continued drug use

is likely to cause impairments in social functioning. Addiction causes medical harm

to the addict, which is characterized by an apparent loss of control over the drug use

and its consequences. 4 EHRR 89.

211.  Dr. Roache explained that the pharmacological drugs which Mr. Johnson used

before his arrest – cocaine, marijuana, PCP and methamphetamines – are called

"drugs of abuse" because they cause drug dependence and addiction. 4 EHRR 92.

---

[7] Mr. Johnson also offered Dr. Roache's report into evidence and was admitted as
DX 3.

212. Dr. Roache explained that these drugs of abuse enter and act on specific brain areas and specific neurotransmitter systems. Neurotransmitters are neurochemicals found in the brain that modulate the neural activity of their respective neural networks. All drugs of abuse activate and alter the same neurocircuitry of the brain – the brain reward system.4 EHRR 91-92, 95; DX 115 (for demonstrative purposes).

213. Dr. Roache used a short slideshow of pictures showing the neurocircuitry of the human brain to explain how continued substance use results in neuro-adapting and change over time so that the brain's reward system becomes altered and inherently seeks drugs. 4 EHRR 92-93; DX 115 (for demonstrative purposes). The brain reward system is a motivational activation circuit that is involved in all forms of learned behaviors. Dr. Roache explained that drug addiction involves learned behavior: a person learns to use drugs under certain circumstances and expects an intoxication consequence. 4 EHRR 94-95. Executive control circuits are also involved and activated as part of the overall brain-reward-motivated behavior. This is because drug use also affects the frontal cortex, responsible for impulse control, and the amygdala and hippocampus, which control memory. 4 EHRR 97-98. During intoxication, drugs also affect the higher cortical and subcortical areas of the brain. The higher cortical areas of the brain are responsible for conscious thought. The subcortical areas of the brain are responsible for subconscious actions and body

89

movements. If a person is a chronic drug user, those areas of the brain are affected often. This causes long-term changes in the user's behavior. 4 EHRR 96-97.

214. Dr. Roache explained that with prolonged drug use, the brain circuitry shifts from the non-addicted, healthy condition, where a person has inhibitory control, to the addicted brain where inhibitory control is diminished, emotionality and reward salience is elevated, and the overall drive is drug-seeking. If drugs are used repeatedly, the brain physically changes. These motivational learning circuits become accustomed to drug stimulation, and individuals are motivated towards the pursuit of the drug reward. Repeated drug use essentially trains the brain to depend on the use of drugs. 4 EHRR 101-102; DX 3 at 8.

215. Dr. Roache explained how the subcortical and high cortical areas of the brain develop at different points in life. For instance, the subcortical and higher cortical centers do not reach full maturity until a person is in their mid-20s. For example, children cannot make adult-like decisions because their higher cortical centers have not yet developed. 4 EHRR 103-104. Because of his early childhood drug use, Mr. Johnson's brain developed under the influence of marijuana, alcohol, and cocaine. Dr. Roache opined that this likely caused the development of impulsive and emotional subcortical brain circuits, while also impairing the development of higher cortical centers. 4 EHRR 103-104; DX 3 at 11. Essentially, Mr. Johnson's early

90

childhood drug use caused the "want" part of the brain to develop, while the logical,
reasoned, decision-making part of the brain did not. 4 EHRR 104-106.

216.  Dr. Roache testified that a child who grows up under the influence of drugs or is
exposed to drug-taking behavior is more likely to automatize that drug use behavior.
4 EHRR 106-107.  While the brain is adaptive and modifiable, it is also growing
and maturing throughout childhood. Therefore, if a child's brain is being triggered
to act on these impulses, and at the same time the higher cortical centers responsible
for inhibition and impulse control are not being developed, the subsequent brain
impairment can last through adulthood. 5 EHRR 107.

217.  Dr. Roache explained that addictive behavior was extremely prevalent in Mr.
Johnson's family and certainly provided a model and environment conducive to
drug abuse. Mr. Johnson's brothers and cousins used drugs and engaged in criminal
activity to support their drug habits. That was the behavior that was modeled for
Mr. Johnson. Modeling is a key way that children learn. Dr. Roache explained that
because Mr. Johnson did not have any positive male role models to imitate, it was
more likely that he, too, would turn to drugs. 4 EHRR 121-122.

218.  Dr. Roache also testified that it is highly likely that Mr. Johnson inherited addictive
traits from his father, Ulrich. Dr. Roache explained that the effects of childhood
drug use and exposure can be further impacted by genetics. A genetic predisposition

91

834

to substance abuse significantly impacts the development of addiction and may exacerbate any impairment in brain connectivity. 4 EHRR 119-120.

219. Research shows a high rate of father-to-son transmission of addiction. Mr. Johnson's father, both of his older brothers, and many of his cousins had problems with alcohol and illicit substance abuse. As a result of this extensive family history of drug and alcohol use and addiction, Mr. Johnson was likely born with a vulnerability to addiction, which was exacerbated by the environment he grew up in. 4 EHRR 121; DX 3 at 12-13.

220. Dr. Roache testified that modern psychiatry is keyed into the issue that trauma can lead to the development of substance abuse and addition. Data shows that childhood trauma is a strong predictor of mental illness, depression, anxiety and substance abuse later in life. 4 EHRR 122. Furthermore, Dr. Roache explained how people with comorbid depression and substance abuse problems escape their feelings of worthlessness and social withdrawal through drug use. About 20 to 30 percent of depressed patients also have substance abuse problems. 4 EHRR 123.

221. At trial, Dr. Roache opined that Mr. Johnson was intoxicated at the time of the offense. The State attacked his opinion by pointing to the fact that Dr. Roache had not seen the video of the crime. After having the opportunity to view that video, Dr. Roache confirmed his opinion. He explained that the video is consistent with Mr.

92

Johnson having a single-minded motivation – to obtain drugs to get high. 4 EHRR 127-128.

222.   Dr. Roache further explained that some people are more vulnerable to drug-induced aggression than others. Where this vulnerability exists, the use of stimulant drugs, such as cocaine, increases the likelihood of aggressive behaviors and intensifies the aggressive behaviors themselves. 5 EHRR 125-126. During a period of abstinence from use, however, the drug-induced aggression goes away. 4 EHRR 126.

223.   Dr. Roache testified that Mr. Johnson went through two treatment programs and relapsed each time. Dr. Roache was not surprised that Mr. Johnson relapsed after treatment and explained that, even with treatment, relapse is common. The risk of relapse is even higher when a person returns to the same environment and is surrounded by the same people. The drugs are easily accessible and there is little reward for engaging in non-drug use in an addict's environment. Furthermore, addicts return to the daily stressors, which increase the odds of relapse. For drug-addicted people, drugs are a form of treatment for anxiety. 4 EHRR 117-119.

224.   In his affidavit, Dr. Roache explained that, just prior to his relapse, Mr. Johnson was experiencing financial difficulties, familial stress, and feelings of discouragement that created a high-risk scenario for his relapse into drug use. DX 3 at 52. His compulsion to use drugs and his diminished capacity to decide not to act on this compulsion, were the consequences of Mr. Johnson's disease. Like many

93

diseases, addiction has both biological and lifestyle components. An individual suffering from addiction cannot simply "will it away." However, there are treatments that can help addicts regain a measure of control and begin to recover. *Id.* 7. Dr. Roache explained that a major issue with treatment is that good treatment is hard to find. One of the common barriers to treatment is economic. Treatment that is available to the poor is brief and ineffective. Even if a person has medical insurance, there are still economic barriers to treatment. Insurance companies regulate what treatments they will or will not cover. Frequently, medical insurance only covers ten one-hour sessions with a therapist. That kind of treatment is not successful. 4 EHRR 114-116. Effective treatment costs money and skilled addiction psychologists and psychiatrists in Dallas run cash-only businesses. 4 EHRR 116-117.

225. Dr. King Davis, an expert in mental health policy, further explained in his affidavit that public services for drug treatment are simply not an option for someone without insurance, like Mr. Johnson. In fact, the NorthSTAR Behavioral Health Authority that the State's witness Lisa Parker testified about was not an option for Mr. Johnson because the legislature restricted services starting in 2003. DX 1 at 12-15.

226. Dr. Roache testified that in-patient admission, incarceration, or a few years of sobriety alone are insufficient treatment for addiction. In those protected and controlled environments, an addict does not learn how to go through day-to-day life

or deal with life stressors without resorting to drug use. 5 EHRR 109-110. For someone like Mr. Johnson, struggling with mental illness and impulse control issues, it would be extremely difficult to engage in the self-discipline necessary to locate a therapist and obtain treatment. *Id.* 117. Setting a feasible and realistic plan to procure additional resources to pay for treatment, such as locating additional sources of income or a higher paying job, requires a level of intellectual and executive capacity that Mr. Johnson does not have. Further, Mr. Johnson lacked the social support networks and role models that could model successful behaviors and illustrate for him a path to success and opportunity. *Id.* 114-115. The easier response for someone like Mr. Johnson is to say, "oh, forget it, and relapse." 5 EHRR 113-114.

227.  This Court finds that had trial counsel properly prepared Dr. Roache, allowed him to interview Mr. Johnson and provided him with all requested materials, he could have fully explained the debilitating nature of Mr. Johnson's drug addiction to the jury dating back to his developmental years as a child. Dr. Roache could have also explained Mr. Johnson's predisposition to drug addiction and the barriers he faced to accessing treatment. Furthermore, Dr. Roache's testimony regarding Mr. Johnson's intoxication at the time of the offense would have been more persuasive.

228.  Ms. Bernhard testified that it had not occurred to her to explain how Mr. Johnson's brain was affected by his long-term drug abuse. Ms. Bernhard also conceded that

95

she should have discussed the effects of this drug abuse on child brain development. This was particularly crucial, given that Mr. Johnson had been using drugs since he was seven years old. 2 EHRR 104-106. This Court finds that Mr. Johnson's trial counsel had no strategic reason for failing to investigate and present that information through Dr. Roache. Trial counsel's performance failed to meet professional norms when they neglected to consider, develop, and present that aspect of Dr. Roache's testimony.

229. This Court also finds that had trial counsel properly prepared Dr. Roache or retained an expert like Dr. Davis, they would have been able to address the obvious question of why Mr. Johnson was unable to secure treatment his addiction. The testimony of experts such as Dr. Roache and Dr. Davis could have countered the State's narrative that Mr. Johnson simply lacked the desire to beat his addiction. The jury would have also better understood that removing Mr. Johnson from an environment that allowed easy access to drugs—like sending him to prison—would likely prevent him from posing a future danger.

### G. Findings of Fact Regarding Change of Venue

230. Mr. Johnson's case received extensive negative, prejudicial publicity before the trial. Many Dallas area media outlets—including CBS 11, NBC 5, CW 33, News 8, FOX 4, and Good Day—covered the crime, Mrs. Harris's hospitalization and subsequent death, and Mr. Johnson's arrest in great detail. These news outlets aired

at least forty-five reports relating to the crime and Mrs. Harris's death within the first two weeks of Mr. Johnson's arrest. Media coverage continued as the trial approached. *See, e.g.,* DX 19.

231. The media coverage was also inflammatory, covering in graphic detail the injuries sustained by the victim. Several media outlets aired emotional interviews with friends of the victim and customers of the gas station where the crime occurred. Those interviews described the victim as "everyone's grandma," explaining that she had "blocks and blocks of grandchildren." (*See id.* [NBC5 News at 5 P.M. 05-21-12].) One of Mrs. Harris's neighbors was quoted as stating: "You don't expect somebody to set somebody's grandma on fire, and that's what she was—the neighborhood grandma." *Id.*

232. Media coverage also suggested that the community was united in its opinion as to the verdict. (*See, e.g.,* DX 19 [NBC5 News at 5 P.M. 05- 21-12, CBS 11 News at 6 P.M. 05-23-12, CBS 11 News at 6 P.M. 05-23-12].) Reports aired interviews where people expressed their opinion, for example, that Mr. Johnson should "get what he deserves" (*see id.* [NBC5 News at 5 P.M. 05- 21-12]), and that "whatever they do to him won't be near enough. And, he should get the same treatment that he did to this lady as far as I'm concerned." (*See id.* [CBS 11 News at 6 P.M. 05-23-12].).

233. Lead counsel was aware of the negative publicity but did not think it was out of the ordinary. 2 EHRR 165; 240.

97

840

234. Prejudicial pre-trial publicity has been found to influence evaluations of the defendant's likability, sympathy for the defendant, perceptions of the defendant as a "typical" criminal, pre-trial judgments of the defendant's guilt, and in some cases, final verdicts. Christina Studebaker & Steven Penrod, *Pretrial Publicity: The Media the Law, and Common Sense*, 3 PSYCHOL. PUB. POL'Y & L. 428, 433 (1997). Here, a significant amount of information about Mr. Johnson, the crime, and his history was disseminated to the general public before he was even indicted on capital murder charges. This information portrayed Mr. Johnson as a "sick" and "heartless" man with a lengthy criminal history who committed an unspeakable and horrible crime against the "neighborhood grandmother." DX 19

235. Lead counsel was aware of the possibility of asking for a change of venue yet made no effort to do so. 3 EHRR 165. Mr. Weatherspoon testified that there was no reason to file a motion for the court to a change venue, because he felt jury selection was going well, even after the visiting judge conducting voir dire made racially insensitive remarks. 3 EHRR 212.

236. The Constitution guarantees the right to a fair trial by an impartial jury, and the United States Supreme Court has expanded this right to include not only impartial but also "indifferent" jurors. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (remanding where adverse pre-trial publicity likely tainted the jury pool). A change of venue motion will be granted if pre-trial publicity is "pervasive, inflammatory, and

841

prejudicial." *See Salazar v. State*, 38 S.W.3d 141, 150 (Tex. Crim. App. 2001). In determining whether a change of venue is appropriate, a court must consider "whether the outside influences affecting the community's climate of opinion as to a defendant is inherently suspect." *Henley v. State*, 576 S.W.2d 66, 72 (Tex. Crim. App. 1978) (internal citations omitted). Because of the inflammatory pre-trial publicity surrounding the victim's hospitalization and subsequent death and Mr. Johnson's arrest, the "outside influences affecting the community's climate of opinion" regarding Mr. Johnson and the crime are "inherently suspect." *See Id.* 72. Mr. Johnson was entitled to trial by an impartial jury free from outside influences such as prejudicial pretrial publicity. *See, e.g., Duncan v. Louisiana*, 391 U.S. 145, 148-54 (1968); *Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966). *Cf.* Tex. Code Crim. Proc. art 31.03.

237.    Trial counsel were responsible for protecting Mr. Johnson from the constitutional effects of the inflammatory pre-trial publicity by seeking a change of venue. Trial counsel failed to recognize this responsibility and failed to file a motion to request a change of venue. Thus, trial counsel failed to preserve the issue for appeal. Their failure to do so was inconsistent with prevailing professional norms.

238.    Trial counsel had a duty to protect Mr. Johnson's right to a fair trial and an impartial jury. This Court finds that Ms. Bernhard, as lead counsel, was required to make the ultimate strategic decision about whether to seek a change of venue.

842

239. If defense counsel had requested a change of venue, this Court could have granted that motion. In the alternative, this Court finds that venue should have been granted; thus, were a motion for change of venue filed and denied, the issue would have been preserved for appeal for the Court of Criminal Appeals to uphold the important constitutional right to a fair trial upon review of the conviction.

### H. Findings of Fact Regarding Guilt-Phase Representation

240. Lead counsel had a duty to investigate and rebut the State's evidence and theories of capital murder. Even if there is no affirmative defense regarding guilt, capital defense counsel must conduct a thorough investigation of the criminal offense and prepare for a cohesive case that will work across both phases of the trial. *See ABA Guidelines*, Guideline 10.10.1 ("Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."). Counsel also has a duty to consider and assert all legal claims. This includes a duty to ensure that a full record is made of all legal proceedings that are made in connection with each claim. *See ABA Guidelines*, Guidelines 10.8(B) and (C).

241. Ms. Bernhard testified that she was aware that the defense should have a theory of defense that is effective in both the guilt and punishment phases. 2 EHRR 42. The defense that trial counsel advanced during the guilt phase was that Mr. Johnson did not intend to kill Ms. Harris. Ms. Bernhard developed that theory the first day she

spoke with Mr. Johnson, before the team had done any investigation. 2 EHRR 52-53. Ms. Bernhard felt that the evidence did not show Mr. Johnson had the requisite intent. 2 EHRR 60.

242.  Ms. Bernhard delegated the guilt phase of the trial to Mr. Weatherspoon because of—not despite—his lack of capital experience. 2 EHRR 142. Mr. Weatherspoon testified that a trial theme was intoxication at the time of the offense. 2 EHRR 198. Judge Mulder also testified that the overall strategy in the guilt phase of trial was to establish that Mr. Johnson was intoxicated "to set up his addiction story for punishment." 2 EHRR 232.

243.  Although Ms. Bernhard claimed that intoxication was not a theory of the case at the guilt or the punishment phase, she agreed that it was important for the jury to know that Mr. Johnson was intoxicated at the time of the offense. 2 EHRR 61. In fact, Mr. Weatherspoon elicited testimony from eyewitness Kenneth Marecle that Mr. Johnson appeared intoxicated when they met immediately after the offense. 2 EHRR 61; 198. Mr. Weatherspoon testified that he was trying to develop the idea that Mr. Johnson was intoxicated at the time of the crime because it was relevant to their mitigation case. 2 EHRR 198-200. Trial counsel acknowledged that they would have used additional evidence that Mr. Johnson was intoxicated at the time of the crime had they had it. 2 EHRR 62, 200.

844

244. One way of developing evidence that Mr. Johnson was intoxicated at the time of the crime would have been to fully litigate the motions to suppress statements and identification that trial counsel filed on March 28, 2013. CR 462, 813. Mr. Johnson made three statements while in police custody – one when he was seized and arrested, one when he was transported in the back of the police car, and one when he was interrogated at the police station. The State introduced two of those statements at trial. Ms. Bernhard filed a motion to suppress those statements, but never sought a hearing. 2 EHRR 53-55. Litigating a suppression motion by seeking an evidentiary hearing provides counsel an opportunity to cross-examine the State's witnesses in advance of trial. This can lead to helpful discovery that the defense otherwise would not have prior to trial. In this case, trial counsel had the opportunity to try to develop evidence that Mr. Johnson was intoxicated through questioning of the State's witnesses at a hearing, which they then could have presented to the trial jury. They failed to do so. Furthermore, by forfeiting rulings on the motions, trial counsel failed to preserve the issues for appeal.

245. Minimal efforts were made to investigate whether there was further evidence that Mr. Johnson was intoxicated at the time of the crime. Mr. Freeman was the only person on the trial team who attempted to speak with the lay witnesses who encountered Mr. Johnson immediately following the offense. But according to his testimony and billing records, Mr. Freeman spent just one hour in the "area of the

crime attempting to contact witnesses" on July 22, 2013. He then returned to the area on July 26, 2013 for a second and final attempt to locate the witnesses. Although he was unsuccessful both times, Mr. Freeman failed to make another attempt to speak with any of the eyewitnesses who encountered Mr. Johnson the morning of the incident at any point in the remaining three months before trial. 3 EHRR 96-98; DX 76.

246. This Court finds that there is no strategic reason for the trial team to cease all efforts to speak with the eyewitnesses to Mr. Johnson's behavior in the time between the crime and his arrest after only two unsuccessful interview attempts. This Court further finds that this failure to conduct any guilt phase investigation fails to meet professional norms for death penalty representation.

## I. Conclusions of Law Regarding the Legal Standard Governing Mr. Johnson's Trial Representation

247. Mr. Johnson was entitled to the effective assistance of counsel under the Sixth Amendment. An ineffective assistance of counsel claim has two components: counsel's performance was deficient, and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

248. To establish deficiency, Mr. Johnson must show his counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The Supreme Court has reiterated that it applies a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient

103

under *Strickland.*" *Rompilla v. Beard*, 545 U.S. 374, 393-94 (2005) (O'Connor, J., concurring) (citing *Strickland*, 466 U.S. 668).

249. Deficient performance is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, 563 U.S. 170, at 196 (2011). At the time of Mr. Johnson's trial, his attorneys' obligations were governed by the "prevailing professional norms," even if those norms did not align with the "most common custom[s]." *Harrington v. Richter*, 562 U.S. 86, at 105 (2011). The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Strickland*, 466 U.S. at 688.

250. It is not sufficient for counsel to claim that a decision was based on "strategy"; counsel's decisions and subsequent conduct must be the product of *reasonable* professional judgment. *See id.* at 690. Reasonable strategic decisions can only be made after thorough investigation of the law and facts relevant to each decision. *Id.* at 690-91.

251. Trial counsel have a duty to make reasonable investigations or to make a reasonable decision that makes further pursuit of particular investigations unnecessary. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. "[The] Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death

penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7. Pursuant to the *ABA Guidelines*, counsel were required to conduct "thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7. A court must consider, not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *Wiggins*, 539 U.S. at 521. When trial counsel is not aware of the relevant mitigating evidence, the relevant "issue is not whether he was ineffective for failing to present [the] evidence. . . , but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence." *Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006).

252. Similarly, the *ABA Standards* state that counsel "should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty." *ABA Standards*, Standard 4-4.1; *Texas Guidelines*, Guideline 11.1. Most significantly, "[t]he duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id.* Similarly, the duty to investigate may exist despite the accused's failure to mention potentially mitigating evidence or the accused's affirmative denial that such evidence exists. *Rompilla*, 545 U.S. at 377; *Ex parte Gonzales*, 204 S.W.3d at 396.

penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7. Pursuant to the *ABA Guidelines*, counsel were required to conduct "thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7. A court must consider, not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *Wiggins*, 539 U.S. at 521. When trial counsel is not aware of the relevant mitigating evidence, the relevant "issue is not whether he was ineffective for failing to present [the] evidence. . . , but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence." *Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006).

252. Similarly, the *ABA Standards* state that counsel "should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty." *ABA Standards*, Standard 4-4.1; *Texas Guidelines*, Guideline 11.1. Most significantly, "[t]he duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id.* Similarly, the duty to investigate may exist despite the accused's failure to mention potentially mitigating evidence or the accused's affirmative denial that such evidence exists. *Rompilla*, 545 U.S. at 377; *Ex parte Gonzales*, 204 S.W.3d at 396.

848

performance. Counsel's deficient performance undermines confidence in the outcome of Mr. Johnson's trial.

257. This Court finds that lead counsel's failure to conduct a mitigation investigation in line with the prevailing professional norms at the time of Mr. Johnson's trial constituted deficient performance. Counsel's deficient performance undermines confidence in the outcome of Mr. Johnson's trial.

258. This Court finds that lead counsel's failure to retain and prepare expert witnesses was based in their failure to investigate mitigating evidence and their lack of understanding of capital defense. This failure was not in line with the prevailing professional norms in place at the time of Mr. Johnson's trial and, therefore, constituted deficient performance. Counsel's deficient performance undermines confidence in the outcome of Mr. Johnson's trial.

259. This Court finds that lead counsel's failure to conduct pretrial litigation in line with the prevailing professional norms in place at the time of Mr. Johnson's trial, namely the failure to litigate the scope of expert testimony pursuant to *Lagrone v. State* and its progeny, constituted deficient performance. Counsel's deficient performance undermines confidence in the outcome of Mr. Johnson's trial.

260. Mr. Johnson was entitled to trial by an impartial jury free from outside influences such as prejudicial pretrial publicity. *Duncan v. Louisiana*, 391 U.S. 145, 148-54 (1968); *Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966). Mr. Johnson was

entitled to seek a change of venue to protect his right to a fair trial. *See* TEX. CODE CRIM. PROC. art 31.03. In Mr. Johnson's case, the requirement for a change of venue was met by the circumstances surrounding his trial. Lead counsel's failure to request a change of venue constituted deficient performance. Defense counsel's deficient performance undermines confidence in the outcome of Mr. Johnson's trial.

261.    Taken together, the multiple instances of trial counsel's deficient performance create a reasonable probability that Mr. Johnson's trial would have had a different result if he had been afforded the constitutionally effective representation to which he was entitled under the Sixth Amendment. This Court has found sufficient facts to support a grant of relief. The Court therefore recommends that Mr. Johnson's conviction and sentence be reversed.

## V.
## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING TRIAL COUNSEL'S FAILURE TO PROPERLY PRESERVE TRIAL COURT ERRORS FOR DIRECT APPEAL

### A. Findings of Fact Regarding Failure to Preserve Error at Jury Selection

262.    During jury selection in Mr. Johnson's case, the trial court improperly granted the State's challenges for cause against four prospective jurors—Boulos, McDaniel, Plank, and Stanmore—over trial counsel's objection and without providing trial counsel an opportunity to question them on voir dire. *See* 11 RR 20, 122; 12 RR 30; 32 RR 78.

851

263.  On direct appeal, appellate counsel raised the issue of the trial court's erroneous

denial of trial counsel's right to question prospective jurors on voir dire, as well as

the trial court's erroneous excusal of those prospective jurors as unqualified. In

response, the State argued that trial counsel did not preserve these issues because

they failed to (1) expressly request the opportunity to question prospective jurors

Boulos and McDaniel, and (2) renew requests to question prospective jurors Plank

and Stanmore or make a proffer of such questioning.

264.  On November 18, 2015, the Court of Criminal Appeals affirmed Mr. Johnson's

judgment finding, in part, that "appellant failed to properly preserve his complaint

for appellate review concerning [jurors] Boulos and McDaniel because the record

shows that trial counsel did not ask to question them. Regarding Plank and

Stanmore, we conclude that any error by the trial court in denying appellant the

opportunity to question them was harmless because it did not affect appellant's

substantial rights." *Johnson v. State*, AP-77,030 (Tex. Crim. App. 2015). As to lead

counsel's explanation for failing to ask for the opportunity to rehabilitate Juror

Boulos, she testified that, "I didn't like her to begin with. So[,] I didn't really want

her rehabilitated." 3 EHRR 164. However, this court finds that Ms. Bernhard did

in fact have objections to the State's challenge for cause. She argued, "We do have

objections. I don't think [Juror Boulos] said that—that her feelings would impair

109

852

her ability to answer the questions and follow the law." RR 11 19-20. Ms. Bernhard
also objected to the State's challenge for cause as to Juror McDaniel. *Id.* 122.

265.    Judge Mulder conceded that the trial team should have made a record regarding the
jurors excused for cause. 3 EHRR 221. Because trial counsel objected to the trial
court's grant of a State's challenge for cause where the defense was not allowed to
question the prospective juror on voir dire, they were clearly aware of the trial
court's errors.  Yet, they failed to adequately preserve them for later review. Had
trial counsel been allowed to question these prospective jurors, they likely would
have been able to rehabilitate at least some of them.

266.    Indeed, when granted the opportunity, trial counsel successfully rehabilitated at
least two other prospective jurors whom the State described as "vacillating" and
challenged for cause. 8 RR 225-28; 20 RR 165-67. Thus, there was a distinct
possibility that trial counsel may have been able to rehabilitate these prospective
jurors during proffered questioning, and that the trial court may have qualified them
for the jury pool. If so, the jury selection process in Mr. Johnson's case likely would
have proceeded very differently and the State undoubtedly would have had to alter
its strategy for using peremptory challenges.

267.    Because the trial court granted the State's premature challenges for cause, the State
was able to avoid using four of its fifteen peremptory challenges on these potential
jurors. Thus, the trial court's errors effectively provided the State with up to four

additional peremptory strikes that they otherwise would not have had. Trial counsel's two additional peremptory strikes were not sufficient to counter the four additional strikes the State gained from the trial court's erroneous grant of these challenges for cause.

268. If trial counsel had properly preserved the trial court's errors—by making a clear record of their objections to both the State's challenge for cause and the denial of their right to question the prospective jurors on voir dire, and requesting the opportunity to make a proffer of such questioning—then the CCA would have considered them on direct appeal and found in Mr. Johnson's favor. Moreover, had trial counsel explicitly clarified the error to the trial court and examined the prospective jurors about their views in a proffer, the trial court may have reconsidered its rulings during jury selection and qualified the four prospective jurors for the jury pool. Had these prospective jurors been qualified for the jury pool, Mr. Johnson likely would have avoided the addition of objectionable jurors Jenkins and Adams.

269. Juror Jenkins believed in "an eye for an eye" and trial counsel explained that they found Juror Jenkins to be objectionable "primarily because she had indicated that she was a victim of family violence or domestic violence." 38 RR 107; 43 RR 17-18, 23. During voir dire, trial counsel requested that Juror Adams be excused for multiple reasons, including: (1) she would follow Biblical law if it conflicted with

the trial court's instructions; (2) she found police officers to be automatically more credible; and (3) she would be mitigation challenged. 39 RR 99. The trial court denied the challenge. *Id.* Given trial counsel's obvious objections to Juror Adams and their efforts to have her excused on a challenge for cause, trial counsel clearly would have used a peremptory strike to remove her from the jury if possible.

270. Because trial counsel had no additional peremptory strikes available and the trial court denied their requests for additional strikes, Mr. Johnson was forced to accept two demonstrably objectionable jurors sitting in judgment of his life.

271. For all of the reasons stated above, this Court finds trial counsel were ineffective in violation of Mr. Johnson's rights under state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. His conviction should be reversed.

### B. Conclusions of Law

272. The Sixth Amendment to the U.S. Constitution and Article I, Section 10, of the Texas Constitution guarantee a defendant's right to question prospective jurors on voir dire. *See, e.g., Franklin v. State*, 138 S.W.3d 351, 354, 357 (Tex. Crim. App. 2004) ("[W]e have consistently held that essential to the Sixth Amendment guarantees of the assistance of counsel and trial before an impartial jury is the right to question veniremembers in order to intelligently exercise peremptory challenges and challenges for cause." (internal quotation omitted)); *Jones v. State*, 223 S.W.3d

379, 381-82 (Tex. Crim. App. 2007) ("[T]he Texas constitutional right entailed permitting counsel... to ask any proper question he wished of any individual venireman so long as the voir dire examination was within reasonable limits." (internal quotations omitted)).

273. Moreover, the trial court's grants of the State's challenges for cause, which were on the basis that the four prospective jurors were unqualified due to their views of the death penalty, were in error. None of the four prospective jurors stated or indicated that, if selected to serve on the jury, they would not follow the law. *See, e.g., Uttecht v. Brown*, 551 U.S. 1, 22 (2007) ("Capital defendants have the right to be sentenced by an impartial jury. The State may not infringe this right by eliminating from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties.").

274. Trial counsel have a duty to object to erroneous trial court procedures and rulings and establish a record reflecting adverse rulings by the court. *See ABA Guidelines*, Guideline 10.8, cmt. ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review."); ABA Standards for Criminal Justice, *Defense Function*, 4-7.1(d) ("defense counsel has a duty to have the record reflect adverse rulings"). Trial counsel were ineffective for failing to preserve their objections and the record for appellate review.

856

275.  The trial court's errors in denying trial counsel the opportunity to question prospective jurors on voir dire before excusing them in response to a State challenge should have been resolved in Mr. Johnson's favor on direct appeal. They were not, because trial counsel were ineffective in failing to properly preserve the trial record for appeal. As such, trial counsel's performance was deficient. Because Mr. Johnson was prejudiced by trial counsel's failures, he was denied the effective assistance of counsel during jury selection and is entitled to a new trial.

## VI.
## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE PROHIBITION ON TELLING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE

### A. Findings of Fact Regarding the "10-12 Rule" Jury Instructions

276.  Under Texas law, two special issues are submitted to the jury during the sentencing phase of a capital trial: whether there is a probability that the defendant constitutes a continuing threat to society, and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death. TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1)-(2), (e)(1). On March 28, 2013, Mr. Johnson's trial counsel filed a Motion To Preclude The Death Penalty As A Sentencing Option-"10/12 Rule" Unconstitutional [8] arguing that this statutory rule would mislead the jury, the trial court instructed the jury in accordance with the requirements of the statute. CR 342. They were further instructed: "If your answer

---

[8] The Court denied this motion on November 6, 2013. 51 RR 99.

to Special Issue Number 1 is yes, then you shall proceed to Special Issue Number 2. If your answer to Special Issue Number 1 is no, you shall cease your deliberations. If your answer to Special Issue Number 1 is no and is not unanimous, you need to have 10 jurors sign." *Id.* 5. Following deliberations, the jury returned unanimous answers of "Yes" to the continuing threat question and "No" to the mitigating circumstances question. 53 RR 5.

277.   If any juror answers "No" to the first special issue or a "Yes" to the second special issue, then the court must sentence the defendant to life imprisonment without parole. TEX. CODE CRIM. PROC. art. 37.071, § 2(g). However, Article 37.071 prevents the court and the parties from informing the jurors of the effect of the failure to agree on the special issues. *Id.* at § 2. The instructions given to Mr. Johnson's jury were misleading.

278.   Mr. Johnson's jurors were not informed of the effect of one juror disagreeing with the other eleven jurors on the outcome of the sentence. One juror could have held out to vote "No" to the future dangerousness question and "Yes" to the mitigating circumstances special issues, had she been informed of the effect of her vote.

   **B. Conclusions of Law**

279.   Two Supreme Court cases—*Mills v. Maryland,* 486 U.S. 367 (1988), and *McKoy v. North Carolina,* 494 U.S. 433 (1990)—stand for the proposition that a capital

sentencing scheme cannot unduly burden a sentencer before he finds the presence of a mitigating circumstance.

280.  Jury instructions that place an undue burden on the sentencer before finding mitigating circumstances are unconstitutional. *See Mills v. Maryland*, 486 U.S. 367 (1988) (holding that a requirement that jurors unanimously agree on mitigating factors violated the Eighth Amendment); *see also McKoy v. North Carolina*, 494 U.S. 433 (1990) (invalidating the requirement that required a unanimous finding of mitigating factors, which prevented jurors from considering all mitigating evidence).

281.  The instruction given in Mr. Johnson's case, that at least ten jurors had to agree on either the future dangerousness or mitigating circumstances special issue to sentence Mr. Johnson to life, constituted an undue burden on Mr. Johnson's jurors.

282.  This Court has found sufficient facts to support the granting of relief. This Court therefore recommends that Mr. Johnson's sentence be reversed.

## VII.
## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PUNISHMENT PHASE JURY INSTRUCTION RESTRICTING EVIDENCE THE JURY COULD HAVE FOUND MITIGATING

### A. Findings of Fact Regarding Jury Instruction Limiting Potentially Mitigating Evidence

283.  Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries. The statute requires a trial court to submit at least two

116

859

issues to the jury: (1) whether there is a probability that the defendant constitutes a

continuing threat to society; (2) and whether, considering all the evidence, there are

sufficient mitigating circumstances to warrant a sentence of life imprisonment

without parole. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1) & (e)(1). With respect

to the mitigating circumstances special issue, the court must instruct the jury that,

if it answers that a circumstance warrants a sentence of life imprisonment without

parole rather than a sentence of death, the defendant will receive a life sentence and

will not be ineligible for parole. *Id.* at § 2(e)(2)(A)-(B).

284.  Further, the court must instruct the jury to answer this special issue "Yes" or "No,"

that it may not answer "No" unless by unanimous agreement, that it may not answer

"Yes" unless ten or more jurors agree, and that the jurors need not agree on which

evidence, in particular, is mitigating. *Id.* at § 2(f)(1)-(3). In addition to these

procedural instructions, Texas law requires the court to instruct the jury that it "shall

consider mitigating evidence to be evidence that a juror might regard as reducing

the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071, §

2(f)(4) (emphasis added). No definition of "moral blameworthiness" is provided,

nor are additional instructions given as to the relationship between this instruction

and the demands of the special issue itself.

285.  The trial court in Mr. Johnson's case gave the statutorily required instructions

during the punishment phase of trial and before the jury retired to deliberate. CR

860

4514-19. In particular, the court's charge included the following: Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the defendant, Matthew Lee Johnson, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed? *Id.* at 4514. Continuing to track Article 37.071, the charge included the following paragraph: "In arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." *Id.* at 4516 (emphasis added).

286. At the punishment phase, Mr. Johnson presented evidence that bore no relationship to his legal or moral blameworthiness for the capital crime. For example, several of Mr. Johnson's in-laws and friends testified that Johnson was a family-oriented, warm, and "wonderful" father who loved his daughters and was excited to talk about them with others. 49 RR 151, 162, 175-76, 192; 50 RR 80, 97, 106, 118, 170-71. Mr. Johnson's family, friends, and former coworkers also provided testimony describing him as a "good guy," and, among other things, sweet, polite, friendly, gentle, soft-spoken, kind, loving, not aggressive, and a good co-worker. 49 RR 143, 150, 157, 162, 172; 50 RR 90, 106, 113, 170.

287.    This evidence, though unrelated to Mr. Johnson's legal or moral blameworthiness
for the crime, strengthened the argument that Mr. Johnson nevertheless was a
valuable person undeserving of a death sentence.

### B. Conclusions of Law

288.    "[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the
rarest kind of capital case, not be precluded from considering, as a mitigating factor,
any aspect of a defendant's character or record and any of the circumstances of the
offense that the defendant proffers as a basis for a sentence less than death." *Lockett
v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original), aff'd,
*Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). The *Lockett* Court's decision
was animated by "the risk that the death penalty will be imposed in spite of factors
which may call for a less severe penalty," and it accordingly found unconstitutional
a state statute that "prevent[ed] the sentencer in all capital cases from giving
independent mitigating weight to aspects of the defendant's character and record
and to circumstances of the offense proffered in mitigation." *Id.* at 605.

289.    Texas's statute governing capital trials gives rise to this risk by expressly limiting
the evidence that a jury may consider mitigating, in violation of the Eighth and
Fourteenth Amendments. Such evidence is meaningful for jurors as background and
character evidence when deciding whether to impose a sentence of death. *See Penry
v. Lynaugh I*, 492 U.S. 302, 327 (1989) ("[S]o long as the class of murderers subject

119

to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

290.   The Supreme Court requires that a jury "be permitted to 'consider fully' [] mitigating evidence" that provides a basis for a sentence of life rather than death." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007). "[S]uch consideration," the Court has explained, "would be meaningless unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Id.* (internal quotations omitted). Each juror is entitled to broad discretion in assessing the import of that mitigating evidence which the defense proffers; at the same time, the State may not limit this evidence to those categories which the State deems as mitigating *Tennard v. Dretke*, 542 U.S. 274, 285 (2004). As stated by the Court in *Tennard*: "[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." *Id.* (internal quotations omitted). *See also McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

291.   Texas's statutorily-mandated instruction fatally undermines the jury's capacity to give effect to this broader type of mitigating evidence by calling upon jurors to

120

863

"consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071 § 2(f)(4) (emphasis added). *See also* CR 968. This instruction precluded jurors from considering mitigating evidence unrelated to Mr. Johnson's "moral blameworthiness," a limitation wholly at odds with three decades of U.S. Supreme Court precedent.

292.    Mr. Johnson's sentence therefore violates his applicable rights under the Texas and United States Constitutions, as well as state statutory law and United State Supreme Court case law and state case law. Accordingly, Mr. Johnson's sentence should be vacated.

## VIII.
## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING TEXAS'S SYSTEM OF ADMINISTERING THE DEATH PENALTY

### A. Findings of Fact

293.    The decision about whether to seek the death penalty in Texas is made by the district attorney in each county. At trial, jurors determine eligibility for capital murder at the guilt/innocence stage and narrow the class of individuals who are sentenced to death by answering special issues at the sentencing phase. Factors unrelated to the seriousness of the crime contribute to the likelihood that a Texas defendant will be sentenced to death.

121

864

294.  This unique sentencing scheme requires the jury to predict "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071 § 2(b)(1). The American Bar Association ("ABA") has long recognized the problems with this first special issue. *See Barefoot v. Estelle*, 463 U.S. 880, 930 (1983) (Blackmun, J., dissenting) (citing the ABA amicus brief for the claim that jurors are not well-suited to predict the probability of a defendant committing criminal acts of violence in the future).

295.  In addition, few of the murders that occur in Texas actually result in death sentences. For example, in 2011, there were 1,089 murders in the state of Texas. Tex. Dep't of Pub. Safety, Index Crime Analysis 2011, http://www.txdps.state.tx.us/crimereports/11/citCh3.pdf.  In 2013, when Mr. Johnson was sentenced, only 7 other death sentences were assessed by Texas juries. http://www.tdcj.state.tx.us/death_row/dr_offenders_on_dr.html. The number of death sentences assessed throughout the state has declined significantly over the last several decades. *Id.*

296.  Geographic disparities exist in Texas death sentences. Fewer than half of Texas's counties have ever handed out a death sentence. *Id.* Four counties (Dallas, Tarrant, Harris, and Bexar) account for nearly sixty percent of all the offenders currently housed on death row and almost fifty percent of those who have been executed. *Id.*

122

865

In the thirty-seven years preceding Mr. Johnson's Initial Application, eighty-five percent of Texas counties have had three or fewer death sentences. Of this vast majority (215 of 254 counties), some have sentenced no one to death at all. *Id.*

297. Racial disparities also exist in Texas death sentences. Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUS. L. REV. 807 (2008) (finding prosecutors more likely to seek death for white victims than for black victims); Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 HOUS. L. REV. 131 (2012).

### B. Conclusions of Law

298. Article 37.071, section 2(b)(1) of the Texas Code of Criminal Procedure is unconstitutionally vague in that it fails to define any of the key terms in the first special issue. As a result, "[j]urors are left to comprehend [these terms] so broadly that a death sentence would be deemed warranted in virtually every capital murder case." ABA Death Penalty Due Process Review Project, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report*, at viii, xxxix (September 2013) ("ABA Texas Assessment Report"). The Supreme Court has long held that juror discretion must be channeled in capital cases. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (citing *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam) ("Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life

123

should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action).

299.    The Supreme Court has long held that proceedings surrounding the imposition of a death sentence must meet a "heightened standard of reliability" because of the severe and irreversible nature of the death penalty. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("This special concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different."). The Court briefly suspended the death penalty in *Furman v. Georgia* during the 1970s based on this heightened standard. *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam). The Court rested its decision on the basis that the lack of guidance and narrowing considerations in a jury's decision of who was to receive the death penalty created an arbitrariness too cruel and unusual to withstand constitutional scrutiny. *Id.* at 309 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.").

300.    The Texas death penalty scheme does not protect defendants against the arbitrary assignment of death consistent with the violations of Mr. Johnson's Eighth and Fourteenth Amendment rights as articulated in Supreme Court doctrine. The first special issue is unconstitutionally vague, fails to narrow the class of death-eligible defendants, leads to the arbitrary and capricious imposition of the death penalty,

867

and limits the jury's ability to give full consideration to evidence that may serve as a basis for a sentence less than death. As such, Johnson's death sentence was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights and United States Supreme Court and state case law. This Court has found sufficient facts to support the granting of relief. The Court therefore recommends that Mr. Johnson's sentence be reversed.

868

# VIII.
## CONCLUSION

301. This Court has found sufficient facts to support the granting of relief in accordance with the United States Constitution, the Texas Constitution, state statutory law, and United States Supreme Court and state case law. The Court therefore recommends that Mr. Johnson's conviction and sentence be reversed.

Dated: December 7, 2019    Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

Benjamin B. Wolff, Director
Texas State Bar No. 24091608

_____

Carlotta Lepingwell
*carlotta.lepingwell@ocfw.texas.gov*
Texas State Bar No. 24097991
1700 Congress, Suite 460
Austin, TX 78701
Telephone: (512) 463-8566
Facsimile: (512) 463-8590

***Post-Conviction Attorney for Matthew Johnson***

869

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing motion and proposed order to:

Dallas County District Attorney
Attn: Justin Johnson
133 N. Riverfront Boulevard
LB19
Dallas, Texas 75207

Judge Tracey Holmes
363rd District Court
Dallas County Courthouse
133 N. Riverfront Boulevard
5th Floor
Dallas, Texas 75207

This certification is executed on January 7, 2019, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Carlotta Lepingwell

870

IN THE 363rd DISTRICT COURT
DALLAS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| | ) | Writ Cause No. |
| EX PARTE | ) | W12-23749-W(A) |
| Matthew Johnson, | ) | |
| APPLICANT | ) | |
| | ) | |
| | ) | |

## ORDER ADOPTING MR. JOHNSON'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND FORWARDING THE CASE TO THE COURT OF CRIMINAL APPEALS

The Court adopts and incorporates herein Applicant's proposed findings of fact and conclusions of law in this cause.

The Clerk is hereby ORDERED to prepare a transcript of all papers in Cause No. W12-23749-W(A) and transmit the same to the Court of Criminal Appeals as provided by Article 11.071 of the Code of Criminal Procedure.

The Clerk is further ORDERED to send a copy of the Court's Findings of Fact and Conclusions of Law, including this Order, to Applicant's counsel and to counsel for the State.

ORDERED AND SIGNED on this _____ day of _____, 20____.


_____
The Honorable Tracy Holmes
Presiding Judge, 363rd District Court

2

871

No. W12-23749-W(A)

In the
363rd Judicial District Court
Dallas County, Texas

FILED

2019 MAR 26  PH 12:53

FELICIA PITRE
DISTRICT CLERK
DALLAS CO.. TEXAS
DEPUTY



EX PARTE
MATTHEW LEE JOHNSON

*On Application for Writ of Habeas Corpus*

FINDINGS OF FACT
*and*
CONCLUSIONS OF LAW

# Table of Contents

THE OFFENSE ............................................................................................ 4

PUNISHMENT ........................................................................................... 7

DESIGNATED ISSUES ................................................................................. 29

GENERAL FINDINGS .................................................................................. 30

    GROUND ONE ..................................................................................... 40

    GROUND TWO ..................................................................................... 61

    GROUND THREE ................................................................................. 102

    GROUND FOUR ................................................................................... 111

    GROUND FIVE .................................................................................... 114

    GROUND SIX ...................................................................................... 121

    GROUND SEVEN ................................................................................. 124

    GROUND EIGHT ................................................................................. 126

    GROUND NINE ................................................................................... 127

ALL OTHER CLAIMS .................................................................................. 129

THE RECUSAL MATTER .............................................................................. 130

CONCLUSION ........................................................................................... 131

873

## Record References

The following abbreviations will be used to refer to the record:

**RR**      Reporter's record from trial
**CR**      Clerk's record from trial
**SX**      State's exhibit from trial
**DX**      Defense exhibit from trial

**WRR** Reporter's record from writ hearing

    **WRR1**      Writ hearing of August 29, 2017
    **WRR2**      Writ hearing of August 30, 2017
    **WRR3**      Writ hearing of August 31, 2017
    **WRR4**      Writ hearing of November 1, 2017
    **WRR5**      Writ hearing of August 2, 2018
    **WRR6**      Writ hearing of October 18, 2018

**SWE** State's writ exhibit
**AWE** Applicant's writ exhibit

3

874

### THE OFFENSE

Seventy-six-year-old Nancy Harris worked as a clerk at the Fina Whip-In, a Garland convenience store.[1] Matthew Lee Johnson, hereinafter "Applicant," entered the Whip-In carrying a clear plastic bottle filled with lighter fluid.[2] He walked straight to the sales counter, then went behind it into the area reserved for employees.[3] Nancy was standing behind the counter, where Applicant poured the lighter fluid over her head.[4]

Applicant stood behind Nancy and watched as she tried to open the cash register.[5] He tried to remove Nancy's ring from her right finger, but it did not come off easily, so he licked his fingers to help slide it off.[6] Nancy finally opened the register and Applicant took the money out.[7]

The in-store video shows Nancy bursting into flames just after Applicant took the last of the coins out of the cash tray.[8] Nancy, engulfed in flames from her shoulders up, ran out from behind the counter to a sink to put out the flames.[9] Applicant left her there, stuffed some candy in his pocket, and walked out of the store with his bottle.[10] After setting Nancy on fire and fleeing, Applicant hid in some

---

[1] RR44:23; RR46:10; SX 2, 25.
[2] RR44:50, 230; SX 17, 79, 83, 85.
[3] RR44:43; SX 17.
[4] SX 17.
[5] SX 17.
[6] SX 17, 89, 90; RR44: 231–32.
[7] SX 17, 19, 96, 97; RR44: 54, 128–29, 232.
[8] SX 17, 97; RR44: 232.
[9] SX 17, 98; RR44: 233.
[10] SX 17, 98, 99, 100; RR44: 233–34.

4

875

bushes, smoked a cigarette, ran from police, sat on someone's porch, fought with the homeowner, and stole a bicycle.[11]

Meanwhile, Garland Police Officers noticed flames inside the Whip-In.[12] By the time the officers pulled into the parking lot, Nancy was outside, still on fire.[13] Officer Coffey found a fire extinguisher and put out the flames.[14] Nancy was "screaming for help," and told the officers that a "heavy-set black male with blue jeans ... and a t-shirt" had robbed her and poured something on her.[15]

Garland firefighter and paramedic William Crews was in the area on an unrelated call when a police officer flagged him down for help.[16] Crews pulled up to the Whip-In in the ambulance and began to treat Nancy.[17] "She was in a lot of pain. She was very worried."[18] She had first, second, and third degree burns to her face, shoulders, abdomen, arms, and legs.[19] Crews loaded Nancy into the ambulance and left for the hospital.[20] At first, Nancy was conscious and able to provide her name and history, but as they drove, her airway began to close and she had a harder time communicating.[21]

---

[11] RR49: 40–42.
[12] SX 24; RR44: 62, 65–66.
[13] SX 17; RR44: 84.
[14] SX 17; RR44: 68, 84–85.
[15] RR44: 69–70.
[16] RR44: 89, 92.
[17] RR44: 93.
[18] RR44: 93.
[19] RR44: 93.
[20] RR44: 94.
[21] RR44: 98.

5

Nancy was nevertheless conscious and able to speak at the hospital.[22] April Gradel, a trauma nurse, was so convinced that it would be Nancy's last opportunity to speak that she found a police officer in the hallway and told him that if he was going to speak with Nancy, it had to be done immediately.[23] Nancy told the officer that a heavy-set black male with a chubby face came in the store and demanded money from her, took the money, poured something on her, and lit her on fire.[24]

Dr. John Hunt treated Nancy in the Burn Unit.[25] Dr. Hunt testified that Nancy had burns over 40% of her body.[26] She had third- and fourth-degree burns on her face, head, upper body, right shoulder, and breast.[27] A fourth degree burn is one that goes into the fat below the skin.[28]

Nancy's treatment team determined that Nancy was not going to survive her injuries and that treatment would be futile.[29] Nancy had executed a DNR, a do-not-resuscitate order.[30] In light of the DNR, and given the severity of Nancy's injuries, her family decided to discontinue life support, and Nancy died.[31]

Not long after police arrived at the Whip-In, calls started coming in about a man hiding in the alleys and between the homes in the neighborhood behind the

---

[22] RR45: 80–81.
[23] SX 143; RR45: 85, 172, 176, 178.
[24] RR45: 82.
[25] RR46: 5.
[26] RR46: 10.
[27] RR46: 10–11, 18–19.
[28] RR46: 17.
[29] RR44: 31; RR46: 23.
[30] SX 8; RR44: 30–31.
[31] RR46: 23–24.

877

store.[32] An officer noticed a "heavy-set black male, no shirt, with dark pants" in an alley.[33] At trial, the officer identified the man as Applicant.[34] Applicant took off running.[35] After a foot chase, the officer found Applicant's leg sticking out from under a bush.[36] "He was laid back, kind of leaning against the wall with one leg out."[37] Applicant asked the officers, "What took you so long[?] Y'all are getting slow."[38] In a search incident to arrest, officers found three lighters, a gold ring, coins, and cash.[39]

## PUNISHMENT

### Future Danger

At punishment, the State presented evidence of Applicant's criminal history and bad behavior while in prison.

### 1993

In 1993, Applicant lived with his girlfriend, Amy Armstrong Franks, and three of her children.[40] He was 17 and she was 23.[41] Applicant was good to the children,

---

[32] RR44: 70, 86.
[33] RR44: 178, 181–82.
[34] RR44: 182–83.
[35] RR44: 182–83.
[36] RR44: 184–85.
[37] RR44: 185.
[38] RR44: 186.
[39] SX 6, 26, 28–30, 59, 60; RR44: 75–78.
[40] RR47: 35–37.
[41] RR47: 38.

7

but over time, he and Franks started fighting.[42] Applicant "put his hands on [Franks]" and would grab her and hit her, and she would fight back.[43]

On one occasion, after a fight, Franks left the apartment and went to a friend's apartment upstairs.[44] She left her two-year-old daughter downstairs.[45] While Franks was gone, Applicant took Franks' two-year-old and left.[46] He eventually returned, and he and Franks reconciled.[47]

The last straw for Franks was when, during another fight, Applicant hit Franks while she was holding her daughter.[48] Her daughter "caught the back part of his hand."[49] When Applicant left, Franks locked him out and refused to let him back in her apartment.[50] She called the police and told them what had happened.[51] Applicant returned after the police left but Franks refused to let him in.[52] She told him that their relationship was over.[53] Applicant banged on the door and threatened to kick it in.[54] He threatened to beat her.[55] Franks barricaded the door and blocked the windows with mattresses and a bunk bed.[56]

---

[42] RR47: 37, 39.
[43] RR47: 40, 68.
[44] RR47: 41.
[45] RR47: 41.
[46] RR47: 41.
[47] RR47: 42.
[48] RR47: 42.
[49] RR47: 42.
[50] RR47: 42.
[51] RR47: 44.
[52] RR47: 45.
[53] RR47: 46.
[54] RR47: 46.
[55] RR47: 70, 75.
[56] RR47: 46, 51.

879

So, Applicant set her patio on fire.[57] Franks saw the flames and went outside.[58] She shot at Applicant as he fled, and then put out the fire.[59]

Also in 1993, Garland Police Investigator Berry Oliver saw Applicant walking down the street smoking a joint.[60] When Applicant saw Oliver, he attempted to conceal the joint by "stick[ing] it down the back of his neck and then [he] immediately starts trying to get into the trunk of the car[.]"[61] Oliver stopped Applicant and patted him down.[62] He found the joint and a bag of marijuana.[63] Oliver arrested Applicant for possession of marijuana and an outstanding warrant.[64] Applicant pleaded guilty and received six months' probation.[65] His probation was subsequently revoked and he was sentenced to 30 days in jail.[66]

### 1994

On May 31, 1994, Officer Mendoza and his partner, Officer Ehrman, were dispatched to the scene of a man and woman fighting on the side of the road.[67] Upon arrival, the officers separated Applicant from the woman and ran a check for outstanding warrants.[68] They seated Applicant in the patrol car and, when Officer Mendoza opened the door to notify Applicant that he would be arrested on a

---

[57] RR47: 46, 49.
[58] RR47: 50.
[59] RR47: 50–51, 73.
[60] RR47: 101, 104–07.
[61] RR47: 104–05.
[62] RR47: 105.
[63] RR47: 105, 107.
[64] RR47: 105, 108.
[65] SX 167; RR47: 109–10.
[66] SX 167; RR47: 110.
[67] RR48: 111–12.
[68] RR48: 112.

9

880

warrant, he "came charging out of the back [of the] squad car, like trying to get away, and we began wrestling with him."[69] Applicant put up "a pretty good struggle," bit two police officers on the arm, and even bit through one officer's watch.[70] Applicant later pleaded guilty to resisting arrest and received twelve months' probation, but he was sentenced to a year in jail when his probation was later revoked.[71]

   Also in 1994, Garland Police Officer Blaine Ralston ran a routine check of a license plate on a black four-door Cadillac to check for outstanding warrants.[72] There was an outstanding warrant on the vehicle, so Ralston attempted to initiate a traffic stop.[73] He activated his red and blue lights, but the vehicle did not stop; it "just continue[d] to roll down the road."[74] Ralston could see there were two people in the vehicle.[75] The female driver made eye contact via the rear view mirror.[76] Ralston activated his siren but the vehicle still did not stop.[77] The vehicle ran a stop sign, and Ralston could see the male passenger motioning for the driver to ignore Ralston.[78] The vehicle "started to slow roll" at which point Applicant jumped out, ran toward a house, and ignored commands to stop.[79] When Ralston and his

---

[69] RR48: 113.
[70] RR48: 114.
[71] SX 189; RR48: 115–16.
[72] RR47: 116–17.
[73] RR47: 117–18.
[74] RR47: 118.
[75] RR47: 118.
[76] RR47: 118, 102.
[77] RR47: 119.
[78] RR47: 119–21.
[79] RR47: 122–23.

10

partner apprehended him, he told the officers "he had told [the driver, his wife Daphne Johnson] to continue to go and not stop because he had warrants for his arrest."[80] Applicant was later convicted of evading arrest and given one year of probation.[81] His probation was subsequently revoked and he was sentenced to 180 days in jail.[82]

### *1995*

By 1995, Applicant's crimes had escalated. In August of that year, Applicant was wanted for aggravated assault with a deadly weapon against Courtney Johnson.[83] Garland Police Officer M.G. Clark was dispatched to locate Applicant; throughout the night, he made threatening phone calls and police had received a tip he was at a particular location.[84] Clark found him and arrested him for outstanding warrants plus the aggravated assault case.[85] At the jail, Applicant threatened Clark so Clark filed a retaliation case against him, primarily for record purposes.[86] Applicant was later convicted of the aggravated assault and sentenced to ten years in prison, probated for five years.[87] As a condition of probation, Applicant was required to submit to a drug and alcohol evaluation and submit to random urinalysis.[88] His probation was later modified to require he attend

---

[80] RR47: 123–25.
[81] SX 168; RR47: 127–28.
[82] SX 168; RR47: 128.
[83] SX 169; RR47: 132–33, 143.
[84] RR47: 133–34.
[85] RR47: 134–37.
[86] RR47: 138–40.
[87] SX 169; RR47: 140–41, 143.
[88] SX 169.

Alcoholic/Narcotics Anonymous meetings, obtain a sponsor, and submit to intensive outpatient alcohol and drug treatment.[89]

## 2002

In 2002, Garland Police Officers Clay Lacey and Gary Steadman responded to a hit-and-run call.[90] Lacy and Steadman searched the area and apprehended Applicant, who repeatedly ignored their commands to stop running and get on the ground.[91] Steadman tackled Applicant and arrested him for evading arrest.[92] Applicant was convicted of the offense and sentenced to 75 days in jail.[93]

## 2003

In an application for protective order, Daphne alleged that on December 9, 2003, Applicant "became angry and punched [her] in the face."[94] She also wrote that Applicant "very frequently" called her names, criticized her, tried to keep her from her friends, gave her angry looks, withheld money, pushed, grabbed, and shoved her, put down her family and friends, threatened her, and pushed, grabbed, slapped, hit and punched her.[95]

In her affidavit, Daphne detailed Applicant's prior assaults.[96] In October 2003, Daphne locked the door when Applicant went out.[97] When he came home,

---

[89] SX 169 (RR55: 158).
[90] RR47: 147, 155.
[91] RR47: 150–51, 155–58.
[92] RR47: 158–60.
[93] SX 170; RR47: 160–61.
[94] SX 193; RR49: 223.
[95] SX 193; RR49: 222.
[96] SX 193; RR49: 223–24.
[97] RR49: 224.

12

he kicked in the door and punched her in the face and chest.[98] She suffered a black eye, scratches on her face and neck, and soreness and pain.[99] She could not work for two weeks.[100]

A similar thing happened the next month. In November 2003, Daphne locked Applicant out when he stayed out late.[101] He beat and banged on the door when he came home.[102] When Daphne finally let him in, he pushed her.[103] Daphne summarized years of abuse in her affidavit in these words:

> Over the last nine years, [Applicant] has been physically violent and abusive to me. He has hit me, punched me, slapped me, kicked me once, strangled me, pushed and shoved me, and thrown me around. I've had bruises, black eyes, a bloody nose, a busted lip, scratches, soreness, swelling and pain.[104]

### 2004

In 2004, Applicant told Daphne Johnson that "he was coming over to get some money and that he would kick in the door if he had to."[105] True to his word, he tried to kick in the door.[106] There were two children in the apartment as he did

---

[98] RR49: 224.
[99] RR49: 224.
[100] RR49: 224.
[101] RR49: 224.
[102] RR49: 224.
[103] RR49: 224.
[104] SX 193.
[105] RR47: 84.
[106] RR47: 79–80, 85.

so.[107] There was also a protective order in place; Applicant was convicted of violating that protective order and sentenced to 330 days jail.[108]

On June 14, 2004, Applicant carjacked Digna Salmeron as she was on her way to work.[109] He "just went at [her]," wrested her keys away, threw her into the yard, stole her truck and later wrecked it into a wall, some parked cars, and a house.[110] But, before he wrecked Salmeron's truck, Applicant led Garland police on a high-speed chase through some neighborhoods.[111] Applicant was convicted of robbery and evading arrest and sentenced to five years in prison.[112]

### 2005

Carlton Jenkins was incarcerated with Applicant for two months in 2005, and at first, they had "a decent relationship."[113] But, Applicant "stopped going to work . . . [and] was confined to the housing unit[.]"[114] Applicant was unable to buy groceries from the commissary, so Jenkins shared some of his food with him.[115] Their relationship began to change.[116] Jenkins saw Applicant sitting on the head of

---

[107] RR47: 87.
[108] SX 166; RR47: 97.
[109] RR47: 182–97; RR49: 121.
[110] RR47: 168, 170, 183–84, 186, 188, 197.
[111] RR47: 166–67.
[112] SX 171; RR47: 175–76.
[113] RR47: 201, 203, 205, 238.
[114] RR47: 207.
[115] RR47: 210, 211.
[116] RR47: 214.

14

is bed—a sign of disrespect—and Applicant's "demeanor went south."[117] Applicant "quit school, too."[118] Jenkins tried to talk to him but it "went bad."[119]

July 25, 2005 "was GI day," when "everybody cleans the dorm."[120] Afterwards, Applicant "was sitting on [Jenkins'] bunk."[121] Jenkins told him that they needed to talk because he wanted him to stop showing disrespect.[122] The men went to the back of the dorm, where Applicant hit Jenkins in the head.[123] Applicant grabbed Jenkins below his knees and flipped him, causing him to split his head open on the concrete floor.[124] Jenkins required nine staples in his head.[125] Applicant went to solitary confinement.[126] He served four years and ten months of his five-year sentence.[127]

## 2006

Splitting Jenkins's head open was not the last of Applicant's prison disciplinary infractions. In February of 2006, he masturbated in front of a female prison guard.[128] He looked at her, grinned as if he thought it was funny, and continued.[129] The guard perceived it as disrespectful and knew that he did it on

---

[117] RR47: 214, 215.
[118] RR47: 216.
[119] RR47: 219.
[120] RR47: 220.
[121] RR47: 222.
[122] RR47: 223, 247.
[123] RR47: 223, 224, 248.
[124] RR47: 226, 227, 233.
[125] SX 172; RR47: 230–31.
[126] RR47: 230.
[127] RR49: 110–11.
[128] RR47: 256, 263–64.
[129] RR47: 263–64, 266.

purpose.[130] She wrote a disciplinary report, which upset Applicant, and he developed a bad attitude.[131] All of the correctional officers knew who Applicant was—and not in a good way.[132]

### 2010–2011

Despite his criminal history, Applicant found a job working for David Contente, who owned a Kwik Kar oil change facility in Mesquite.[133] Applicant worked for Contente in 2010 and 2011, performing state inspections, helping out in the shop, and serving as a cashier.[134] He worked hard—50 hours a week—was reliable, and was given a set of keys to the business.[135] He was always on time, was good at his job, and seemed conscientious.[136] Contente came to trust him, and the two developed a good rapport, even discussing politics and the stock market.[137] But, Applicant did not handle conflict well, and he was described as "too rigid" about the rules.[138]

In late 2011, Applicant called Contente at 5:00 in the morning and said that he had done a bad thing and needed to speak with Contente.[139] Contente went to his computer and tried to access the surveillance cameras at the store, but the

---

[130] RR47: 264.
[131] RR47: 266, 270.
[132] RR47: 271.
[133] RR4: 157.
[134] RR48: 158–61, 183.
[135] RR48: 162, 164, 180.
[136] RR48: 181.
[137] RR48: 183.
[138] RR48: 163.
[139] RR48: 163–64.

887

camera was blacked out.[140] Thinking "the worst," Contente "went to the police department and asked a policeman to go down there with me."[141] There, Contente discovered that three state inspection booklets valued at $2,100 and $325 in cash were missing from the safe.[142] Footage from a surveillance camera showed Applicant in the store earlier that morning and that Saturday night, when he was not supposed to be there.[143]

Applicant was arrested that morning.[144] Later, he called Contente and said that he wanted his last check.[145] He even filed for unemployment.[146]

### 2012

In the early morning hours of April 15, 2012, Dallas police and paramedics brought Applicant to the Presbyterian emergency room.[147] He was agitated, combative, and handcuffed.[148] He was also in the midst of substance-induced psychosis, and it took eight or nine people to hold him down on the bed.[149] Eventually, the staff resorted to a "body net," which is a four-point restraint that was used to hold Applicant to the bed.[150] Applicant said, "I'm going to grab your gun," among other things.[151]

---

[140] SX 175–78; RR48: 165, 166.
[141] RR48: 170–71.
[142] RR48: 172–73.
[143] SX 173, 174; RR48: 174.
[144] RR48: 178.
[145] RR48: 178.
[146] RR48: 179.
[147] SX 188; RR48: 188, 190–91.
[148] RR48: 194.
[149] RR48: 194, 202–03.
[150] RR48: 194–95.
[151] RR48: 197.

17

Once Applicant was medicated, he calmed down and reported that he had been smoking crack cocaine, ice, and marijuana laced with PCP.[152] He did not report any mental health concerns.[153] Per hospital protocol, Applicant was offered information and resources regarding drug treatment.[154] He called some, but not all, of the listed treatment providers.[155]

On the morning of April 26, 2012, Applicant exposed his erect penis to a housekeeper at a Garland inn.[156] The housekeeper threw a bucket of water at him and ran away.[157] Her manager called the police.[158] The police found Applicant, wet and smelling of marijuana, in a motel room.[159] He said that he had been smoking crack all night, but he did not appear intoxicated.[160] He received a criminal trespass warning and was ordered to leave the motel.[161]

Jennifer Pyburn is a detention officer at the Lew Sterrett Jail.[162] At one time, Applicant was under her supervision.[163] One time, Pyburn was escorting Applicant, and he turned around and said "I ought to just pull you in here."[164] Applicant "didn't say it in a mean ... way;" he was smiling and later apologized.[165]

---

[152] RR48: 198.
[153] RR48: 199–200, 208.
[154] RR48: 200–01, 205, 208–09.
[155] RR49: 97–98.
[156] RR48: 101–04, 108, 124.
[157] RR48: 105.
[158] RR48: 105–06.
[159] RR48: 120, 121, 123, 129.
[160] RR48: 121, 123, 130.
[161] RR48: 124–25.
[162] RR48: 134.
[163] RR48: 137.
[164] RR48: 145.
[165] RR48: 145, 155.

18

On another occasion, Pyburn observed an interaction between Applicant and another detention officer when Applicant was disrespectful.[166] The officer told Applicant the shower that he was supposed to be cleaning was not clean enough.[167] When Pyburn instructed Applicant how to clean the shower, he told her that he was not paid enough to clean the shower.[168]

## Mitigation

At age seven, Applicant began smoking marijuana that he bought with his allowance money.[169] Along the way, he experimented with alcohol and PCP, and, at the time of trial, had been using crack cocaine for about 14 years.[170]

### *Applicant's testimony*

Applicant testified regarding his upbringing, drug use and the instant offense. He testified he has been using crack cocaine for "about 14 years[ ]" and has experimented with alcohol and PCP.[171]

Applicant testified he was released from prison in July 2009 and relapsed in October of 2011.[172] He started smoking crack and "ice."[173] It made him lazy and he fell into a deep depression.[174]

---

[166] RR48: 147–48.
[167] RR48: 147.
[168] RR48: 149.
[169] RR49: 9.
[170] RR49: 8.
[171] RR49: 8.
[172] RR49: 11.
[173] RR49: 11.
[174] RR49: 16.

19

On the night before the offense, Applicant went alone to his brother Anthony's wedding reception, where he stayed for one hour.[175] Applicant had lost his job because of his drug use, and also felt ashamed of his appearance.[176] He felt like he was in his own personal hell, but everyone else was happy and having a good time.[177]

At about 6 o'clock in the morning, Applicant walked back to his brother's house.[178] He drank an entire bottle of wine.[179] He "wanted money" so he could "get high on crack."[180] He saw a plastic water bottle and put lighter fluid in it so he could "take it and scare [a] person."[181] He planned to "[p]our it on her" as a "scare tactic."[182] Although he did not remember having a lighter, he acknowledged he would have needed one to smoke crack.[183]

Applicant walked across the street to the Whip-In and "saw a lady" getting the mop bucket ready.[184] He walked behind the counter; Nancy followed him and told him he was not supposed to be there.[185] When she got close to him, he poured the fluid over her head and she started "trembling."[186]

---

[175] RR49: 19, 24.
[176] RR49: 20, 22.
[177] RR49: 19–20.
[178] RR49: 30.
[179] RR49: 30.
[180] RR49: 30.
[181] RR49: 30.
[182] RR49: 30–31.
[183] RR49: 32.
[184] RR49: 31, 33.
[185] RR49: 33.
[186] RR49: 33.

Applicant wanted money so he told Nancy to open the cash register.[187] While she did so, Applicant took a lighter and some cigarettes.[188] Nancy opened the register for him and moved away.[189] Applicant took the money and warned Nancy to stand back because he had a lighter.[190] Applicant claimed that he "flipped [the lighter] once to try to scare her but that didn't stop her."[191] He claimed that *he* was "spooked," so he flicked the lighter "again, twice, hoping that she would move back."[192] Nancy's clothes ignited and Applicant fled.[193]

Applicant testified that he set Nancy on fire because she was coming at him. He acknowledged he told arresting officers that he had cocaine and two beers before the offense.

### Applicant's childhood

Applicant's parents were married and employed throughout his childhood.[194] His mother worked during the day and his father worked at night.[195] By Applicant's own account, they took him to church and taught him right from wrong.[196]

Applicant testified that, when he was five years old, a cousin put his penis into Applicant's mouth and "peed" in it, in full view of Applicant's other cousins and

---

[187] RR49: 33.
[188] RR49: 33.
[189] RR49: 34.
[190] RR49: 34.
[191] RR49: 34.
[192] RR49: 34.
[193] RR49: 35, 41.
[194] RR49: 46, 90.
[195] RR49: 46.
[196] RR49: 90.

21

uncle who, witnessing this, laughed at him.[197] When Applicant was eight, the family friend he bought drugs from fondled him.[198] According to Applicant, "[h]e pulled my penis out and wanted to suck it."[199] Applicant "let him do it for a little while, but then [he] knew that wasn't right."[200] He told him to stop, but still bought drugs from him.[201] Applicant leveraged the fondling incident "to hold over [the friend's] head;" he threatened to tell, so the man "gave [him] what [he] wanted."[202]

Applicant testified when he dated Amy Armstrong they fought and he hit her, but "just enough to make her stop hitting me[.]"[203] He threw a burning log on her patio "to get her to come outside, get her to let me in."[204]

Applicant married Daphne Johnson when they were 18.[205] They have three daughters. Applicant admitted that he used to hit Daphne—but "just enough to back her off."[206]

Applicant dropped out of school when he was in eleventh grade.[207] He was never in special education classes.[208] He took courses in auto body technology at

---

[197] RR49: 50. Applicant testified he never said anything about childhood sexual abuse prior to counsel on the instant offense. (RR49:91). He never mentioned it during previous incarcerations or when he was hospitalized because he thought it "was irrelevant at the time." (RR49:91). Writ counsel engaged the services of a social historian, but she was unable to interview anyone who witnessed the incident that Applicant described. (WRR4: 157).

[198] RR49: 48.

[199] RR49: 48.

[200] RR49: 48.

[201] RR49: 48–49.

[202] RR49: 49.

[203] RR49: 53–54.

[204] RR49: 54.

[205] RR49: 52, 55.

[206] RR49: 55, 57.

[207] RR49: 46.

[208] RR49: 91.

22

893

Richland College.[209] Applicant testified he "learn[s] at a slow pace[,]" but he does not have a learning disability.[210]

Applicant worked at a company called Sanden from 1997 until 2002.[211] He was promoted four times, but eventually fired for missing too many days of work.[212] At the time, his weekend drug use "carried on until the Mondays and Tuesdays[.]"[213] After he was fired, he checked himself into Green Oaks Hospital to be treated for drug abuse.[214] He was there for a week and was diagnosed with depression.[215] From there, he went to Summer Sky in Stephenville for further inpatient drug treatment.[216] He was at Summer Sky for over a month.[217] He "wasn't ready [to leave], but [his] insurance ran out."[218] He spent a week in a halfway house, then returned home to his wife.[219] Upon his return home, he stayed sober for a few weeks, then returned to alcohol, marijuana, and crack.[220]

Applicant testified he was "under the influence[ ]" when he carjacked Dinga Salmeron's truck and was "coming down" when he committed the Kwik Kar theft.[221] He testified he did not remember his indecent exposure with Pinzon.[222]

---

[209] RR49: 91.
[210] RR49: 92.
[211] RR49: 58.
[212] RR49: 58–59.
[213] RR49: 59.
[214] RR49: 59.
[215] RR49: 60.
[216] RR49: 60.
[217] RR49: 60.
[218] RR49: 61.
[219] RR49: 61.
[220] RR49: 61–62.
[221] RR49: 62, 65.
[222] RR49: 118.

Every time Applicant has been in trouble, it was, according to him, because of drugs and depression.[223] He was depressed "because I couldn't do more for my family and myself."[224] He confirmed his criminal history:

| Date | Offense description | Record cite |
|------|---------------------|-------------|
| 9/15/1991 | Driving a stolen car | RR49: 100 |
| 2/4/1992 | Pushing a police officer | RR49: 100 |
| 12/9/1992 | Theft | RR49: 100 |
| 8/13/1993 | Assaulting Amy Armstrong | RR49: 100–01 |
| 9/8/1993 | Throwing a burning object onto Armstrong's patio | RR49: 101 |
| 9/9/1993 | Possession of marijuana | RR49: 102 |
| 2/8/1994 | Outstanding warrants | RR49: 102 |
| 4/16/1994 | Outstanding warrant on the marijuana charge | RR49: 102 |
| 5/31/1994 | Assault warrants; biting Officers Mendoza and Ehrman | RR49: 103 |
| 7/23/1994 | Evading arrest in a motor vehicle (as a party) | RR49: 103 |
| 8/7/1995 | Aggravated assault against Courtney Johnson | RR49: 104 |
| 6/9/2002 | Assaulting Daphne (class C) | RR19:105 |
| 10/9/2002 | Evading arrest | RR49: 105 |
| 11/15/2002 | Assaulting Daphne | RR49: 105 |
| 7/3/2003 | Assaulting Daphne at Braums | RR49: 47, 106 |
| 9/7/2003 | Assaulting Daphne | RR49: 107 |
| 1/5/2004 | Theft | RR49: 107 |
| 6/19/2004 | Carjacking Salmeron | RR49: 107 |
| 9/13/2004 | Violation of a protective order | RR49: 108 |

Photographs of Applicant's tattoos were admitted into evidence.[225] He got several of them while he was in prison and acknowledged that he was never caught for those rule violations.[226] While incarcerated for this capital murder, he had "Gift

---

[223] RR49: 99–100.
[224] RR49: 99.
[225] SX 179–186; RR49: 130–33.
[226] RR49: 132.

from God" tattooed around his collarbone.[227] He was never caught for this violation, either.[228]

Applicant's supervisor from Sanden testified that he was a good worker whose only problem was attendance.[229] Several co-workers testified that Applicant was polite and friendly.[230] They testified this offense was out-of-character.[231]

### Daphne Johnson

Daphne Johnson testified that she and Applicant were immature when they married.[232] They struggled financially, they did not communicate well, they argued, and they hit each other.[233]

Daphne was unaware of Applicant's drug use until after his grandmother died.[234] He "would go off on binges" and disappear for a day or two.[235] Daphne kicked him out of the house four to six times.[236] She tried to talk to him about his drug use, and he tried to stop using on his own.[237] In her opinion, he was high at the time of the offense.[238] She testified that he "was an awesome father" to their three daughters.[239]

---

[227] RR49: 132, 133.
[228] RR49: 132.
[229] RR49: 137–38, 141, 142.
[230] RR49: 149–50, 157, 162.
[231] RR49: 153, 158–59, 166.
[232] RR49: 184, 186.
[233] RR49: 186, 217.
[234] RR49: 187.
[235] RR49: 188.
[236] RR49: 190.
[237] RR49: 195.
[238] RR49: 243.
[239] RR49: 192.

25

*John Roache, Ph.D.*

Pharmacologist Dr. John Roache testified as a drug addiction expert.[240] He testified that addiction is "a learning process that happens with repeated use of drugs of abuse."[241]

Dr. Roache explained for the jury the effects of cocaine, marijuana, PCP, methamphetamine, and Xanax.[242] He explained that addicts commonly use multiple substances and that when an individual is under the influence, he may be more impulsive.[243] "[T]he addict becomes more driven for the immediate consequences of the drug experience and less thoughtful or conscientious or cognitively decisive about longer term consequences."[244] Addicts often relapse after periods of sobriety.[245]

Roache agreed that when Applicant checked himself into the hospital in 2002, he was depressed because he was unable to quit using drugs.[246] Indeed, the discharge instructions indicate "The patient was profoundly depressed because of his inability to stop doing drugs, and having observed his many losses, including job, family, financial, and clearly self-esteem."[247]

Dr. Roache did not review the surveillance video of this offense, but nevertheless opined that Applicant was intoxicated at the time of the offense.[248]

---

[240] RR50: 27.
[241] RR50: 30–31.
[242] RR50: 33–36.
[243] RR50: 37.
[244] RR50: 37–38.
[245] RR50: 43.
[246] RR50: 44.
[247] DX 22; RR50: 53.
[248] RR50: 45.

26

897

He further testified that it was "not necessary" for him to review the surveillance video.[249] Roache did not interview Applicant.

### Timothy Johnson

Applicant's older brother Timothy[250] testified about their family and their history of drug use. All three brothers used drugs.[251] Timothy knew that Applicant used drugs at a young age.[252] Twice, he took away Applicant's marijuana.[253]

Timothy went to prison when Applicant was 15 years old and was gone for eleven years.[254] Timothy returned home for a couple of years, then went back to prison on two 40-year sentences.[255]

### Hazel Johnson

Applicant's mother-in-law, Hazel Johnson, testified that Applicant is a good person and a good father, but was stressed and depressed in the month before the offense.[256]

### Frances Wilson

Daphne's aunt, Frances Wilson, started talking to Applicant about his drug problem in 2011.[257] He was depressed and Wilson worried that he would harm

---

[249] RR50: 45–46.
[250] At the time of trial, Timothy was serving a 40-year sentence for a 2004 conviction for theft of a person and assault on a public servant. (RR50:67).
[251] RR50: 74.
[252] RR50: 73.
[253] RR50: 75.
[254] RR50: 85.
[255] RR50: 85.
[256] RR50: 88, 90, 92–94.
[257] RR50: 100–02.

27

himself.[258] Wilson was not aware of any physical abuse between Applicant and Daphne.[259]

*Courtney Johnson*

Daphne's sister Courtney Johnson testified that Applicant and Daphne's relationship was "a normal relationship, just like any other married couple would have."[260] She never saw Applicant physically abuse Daphne, but she "hear[d] stuff from [her] sister."[261] Courtney knew of Applicant's drug problem and has seen him under the influence.[262] But, she could not recall much else. For example:

- She did not recall an August 7, 1995 incident when Garland police were called to her apartment.

- She did not recall telling police that Applicant pointed a gun at her.

- She did not recall trying to drop charges with the district attorney's office.

- And she did not recall that Applicant pleaded guilty to that offense and was placed on probation.[263]

A week before setting Nancy Harris on fire, Courtney went with him to the Garland Police Station when he asked them to "lock him up" because he was on

---

[258] RR50: 103.
[259] RR50: 100.
[260] RR50: 111–12.
[261] RR50: 112.
[262] RR50: 113.
[263] RR50: 126–28.

899

drugs and wanted to avoid getting into trouble.[264] Without any active warrants, the police could not arrest him.[265]

### Valerie Braziel

Valerie Braziel met Applicant in 2009 after his release from prison.[266] They became friends.[267] In the time leading up to this offense, Applicant was withdrawn and Braziel felt as though he was depressed.[268] She knew nothing of his drug addiction.[269]

## DESIGNATED ISSUES

Applicant was convicted of capital murder and sentenced to death. The Court of Criminal Appeals affirmed his conviction and sentence on direct appeal.[270]

Applicant filed an application for writ of habeas corpus in this Court, and the State filed a general denial. This Court designated the following issues:

1. Did Applicant's trial counsel (1) fail to properly prepare for and conduct Dr. John Roache's testimony at trial, and (2) fail to investigate and present expert testimony to explain the availability of mental health care and substance abuse treatment?

2. Did Applicant's trial counsel fail to investigate and present lay and expert testimony regarding his social history?

---

[264] RR50: 123.

[265] RR50: 124.

[266] RR50: 169–70.

[267] RR50: 170.

[268] RR50: 174.

[269] RR50: 174.

[270] See *Johnson v. State*, No. AP-77,030, 2015 WL 7354609 (Tex. Crim. App. Nov. 18, 2015) (not designated for publication).

29

900

3. Were Applicant's trial counsel ineffective for failing to preserve error during voir dire regarding prospective jurors Boulous, McDaniel, Plank, and Stanmore?

4. Were Applicant's trial counsel ineffective for failing to request a change of venue?

This Court heard live testimony and now makes these findings of fact and conclusions of law. These findings are based on the trial record and writ record where indicated, and on the Court's own recollection.

## GENERAL FINDINGS

The Court takes judicial notice of the trial record and writ file. As shown more fully below, this Court concludes that Applicant has not been denied any right guaranteed him by the United States Constitution or by the Texas Constitution. This Court, therefore, concludes that Applicant's Application for Writ of Habeas Corpus is without merit and should be DENIED.

### APPLICANT'S TRIAL TEAM

#### *Catherine Bernhard*

Catherine Bernhard was Applicant's first-chair counsel.[271] She has been a licensed attorney since 1987.[272] From 1987 to 1990, she served as a staff attorney for the Dallas County District Judges.[273] From 1990 to 2002, she worked for the Dallas County Public Defender's Office.[274] She handles exclusively adult felony

---

[271] WRR1: 227.
[272] WRR1: 30.
[273] WRR1: 138–39.
[274] WRR1: 139.

30

criminal matters, including trials, appeals, and post-conviction matters.[275] The various district courts of Dallas County sometimes appoint Bernhard as a writ master.[276] She is board certified in both criminal law and criminal appellate law.[277]

At the time of Applicant's trial, Bernhard had tried three death penalty cases to verdict as first or second chair.[278] She had handled one death penalty direct appeal, and multiple article 11.071 writ proceedings.[279] She typically attends death penalty trainings, seminars, and CLEs once or twice a year.[280] She is familiar with the ABA guidelines for representing defendants in death penalty cases.[281]

This Court finds that Catherine Bernhard was well qualified to represent Applicant. Bernhard testified at the writ hearing and was a credible witness. The Court accepts her testimony as true.

### Kenneth "Spoon" Weatherspoon

Kenneth "Spoon" Weatherspoon served as second chair counsel.[282] He has been a licensed attorney since 1986.[283] He practices primarily in Dallas County, but also in surrounding counties and in federal court.[284] He has tried 15 to 20 non-death penalty capital murder cases and about 25 first-degree murder cases.[285]

---

[275] WRR1: 31.
[276] WRR1: 31.
[277] WRR1: 171.
[278] WRR1: 33–34.
[279] WRR1: 139.
[280] WRR1: 139–40.
[281] WRR1: 40.
[282] WRR1: 44, 196.
[283] WRR1: 190.
[284] WRR1: 191–92.
[285] WRR1: 206.

31

902

Weatherspoon and Bernhard had known each other for many years.[286] Weatherspoon is known around the courthouse and in the legal community as "Spoon." Any reference to "Spoon" in the record is a reference to Mr. Weatherspoon.

This Court finds that Kenneth Weatherspoon was well qualified to handle the guilt phase of Applicant's trial. Weatherspoon testified in this writ proceeding and was a credible witness. This Court accepts his testimony as true.

*Nancy Mulder*

Nancy Mulder sat third chair.[287] She was licensed to practice law in 1995.[288] At the time of Applicant's trial, she practiced criminal defense and handled only adult felony cases.[289] She had eight years of criminal defense experience at the time, plus 12 years' experience as an assistant district attorney in Dallas.[290] Mulder left the DA's office in March of 2007 as a felony chief.[291] At the time of Applicant's trial, she was qualified to sit second chair in capital cases.[292]

She had previously represented multiple family members of Applicant in their own criminal cases, and had apparently done so successfully, as they attempted to hire her to represent Applicant in this case.[293] Mulder informed Applicant's family that they did not have "that kind of money," so she asked this

---

[286] WRR1: 44.
[287] WRR1: 44, 141, 217.
[288] WRR1: 243.
[289] WRR1: 219.
[290] WRR1: 217, 219.
[291] WRR1: 243, 244.
[292] WRR1: 223.
[293] WRR1: 141, 237–38.

32

903

Court to appoint her third chair, and this Court did so.[294]

Because Mulder already enjoyed a good working relationship with Applicant's family, she served as the primary liaison between the family and the trial team, and it was her job to prepare them to testify in the punishment phase.[295] She also prepared Applicant to testify in the punishment phase.[296]

This Court finds that Nancy Mulder was well qualified to serve in her role. Mulder testified in this writ proceeding and was a credible witness. This Court accepts her testimony as true, but to the extent that her testimony conflicts with the testimony of Catherine Bernhard's testimony on matters related to mitigation experts (including but not limited to Dr. Roache), this Court finds that Bernhard's memory was more accurate and reliable because mitigation experts were Bernhard's responsibility. This Court, therefore, resolves any conflict in the testimony in favor of Bernhard's testimony.

### Brendan Ross

The trial team's mitigation specialist was Brendan Ross.[297] Ross has a bachelor's degree in psychology and human development and a master's degree in social work.[298] She began working as a mitigation specialist in 2003 and has worked on "a hundred" death penalty cases, including "quite a few" in Dallas County.[299] In

---

[294] WRR1: 141–42.
[295] WRR1: 229–30.
[296] WRR1: 230, 246.
[297] WRR2: 6.
[298] WRR2: 56.
[299] WRR2: 56–57.

33

904

three of the Dallas County cases, her client received a life sentence.[300] This Court is personally aware of one of them because it was tried in the 363rd Judicial District Court and Ross and the defense team obtained a life sentence in that case. This Court finds that Brendan Ross was well qualified to serve as mitigation specialist in Applicant's case.

Ross regularly attends training on how to work as a mitigation specialist in capital cases twice a year when possible, and holds herself to higher standards than the ABA requires.[301] She summarized her work in this case as follows:

> First and foremost is getting to know the defendant, getting his assessment done, his background history, just immediate things, guidelines to show me where I need to go. Once I do the assessment, we start requesting records. I make—contact immediate family. And I—then we start—again, when we receive records, we start branching out and calling people from there. Of course there's the team meetings and—and trying to decide what kind of theme we can go—what—you know, where we can go with that.

> And it's not all tedious. It's record collection. It's going to the jails. It's going to libraries and getting old records that we can find.

All of the information she gathers is compiled into a social history, the goal of which is "to put the jury in the client's shoes. I want to humanize 'em."[302] The social history in this case was "quite voluminous."[303]

---

[300] WRR2: 58.
[301] WRR2: 58–59.
[302] WRR2: 60.
[303] WRR2: 61; SWE 6.

34

905

Ross met with Daphne, Applicant, Alma Johnson, and other family members many times and was in frequent contact with the attorneys.[304]

Bernhard knew that Brendan Ross "was an experienced mitigation investigator who had worked numerous capital cases."[305] Ross "came recommended from a mitigation investigator that [Bernhard] had worked with before and thought the world of;" Bernhard trusted Ross and allowed her to take the mitigation investigation wherever she thought it needed to go.[306]

Brendan Ross had free reign to locate witnesses relevant to mitigation.[307] Her role was to find witnesses and speak with them.[308] Brendan Ross spoke with everyone, or almost everyone, she was able to find.[309] She explained her method of conducting a mitigation investigation as "I just go until I can't go anymore," and Ross felt as if she did that in this case.[310] Ross found that, for the most part, Applicant's family members were not good historians.[311]

Ross would meet with prospective witnesses in person, by phone, and would sometimes attempt unannounced visits at homes.[312] In this case, when Ross would attempt an unannounced visit, "doors were not opened."[313] Because not everything makes it into a billing record, Ross's billing records cannot be relied

---

[304] WRR2: 62.
[305] WRR1: 129.
[306] WRR1: 129.
[307] WRR1: 128–29; WRR2: 15. .
[308] WRR1: 129–30.
[309] WRR1: 51.
[310] WRR2: 10, 65.
[311] WRR2: 64.
[312] WRR2: 49–50.
[313] WRR2: 49–50.

upon to show the totality of her work on this case.[314] Ross prepared a social history and provided it to the attorneys.[315]

Ross worked on other cases at the same time, but Bernhard did not perceive that they detracted from what she was able to do on Applicant's case.[316]

Ross has (and had) a trusted assistant—Debbie Sumi—with extensive experience working on death penalty cases.[317] Sumi would, from time to time, help to make initial contact with prospective witnesses.[318]

Despite Ross's efforts, Ross "didn't feel like there was much mitigation" in this case.[319] Applicant was not bullied.[320] He was not brutalized.[321] He grew up in a two-parent household.[322] And, she felt that the video of Applicant setting Nancy Harris on fire "was insurmountable."[323] But, she never said that the video limited her ability to do a mitigation investigation in this case.[324]

This Court finds that Brendan Ross was qualified to serve as Applicant's mitigation specialist. Ross testified in this writ proceeding and was a credible witness. This Court accepts her testimony as true.

---

[314] WRR2: 72–73.
[315] WRR2: 34; SWE 6.
[316] WRR1: 134.
[317] WRR2: 74.
[318] WRR2: 74.
[319] WRR2: 54–55.
[320] WRR2: 55.
[321] WRR2: 55.
[322] WRR2: 55.
[323] WRR2: 55.
[324] WRR2: 55–56.

907

*Dr. McGarrahan*

Trial counsel researched long-term drug addiction and brain effects and consulted with Dr. Antoinette McGarrahan, a neuropsychologist and mental health expert.[325] Trial counsel had worked with Dr. McGarrahan many times before, and this Court is familiar with Dr. McGarrahan and knows her to be a competent forensic neuropsychologist.[326] Trial counsel's decision to consult Dr. McGarrahan was a reasonable one.

Dr. McGarrahan performed a neuropsychological assessment of Applicant.[327] She reported to the trial team that Applicant has post-traumatic stress syndrome and memory deficits possibly related to his long-term drug use.[328] The "bottom line" that trial counsel got from Dr. McGarrahan's evaluation was that Applicant had addiction and depression problems, which was consistent with the diagnoses that already existed in available records.[329] Dr. McGarrahan did not diagnose any severe mental illness other than depression and addiction.[330]

Ultimately, trial counsel decided that the benefits of calling Dr. McGarrahan as a witness did not outweigh the negatives.[331] Trial counsel was concerned that, if she called a witness who had examined Applicant, "then the State would bring in somebody who was going to examine [Applicant]."[332]

---

[325] WRR1: 104, 110–11.
[326] WRR1: 111–12, 146.
[327] WRR1: 111.
[328] WRR1: 113.
[329] WRR1: 116–17.
[330] WRR1: 147.
[331] WRR1: 147.
[332] WRR1: 147–48. *See Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997) (allowing trial

908

### Dr. Compton

Trial counsel hired Dr. Kristi Compton, a forensic psychologist, to testify in the punishment phase of trial.[333] She was to testify about the significance of childhood trauma, and "just kind of tie it all up and explain the psychological significance" of Applicant's life experiences "and how it got him to where he was."[334]

This Court is familiar with Dr. Compton. She is a well-respected forensic psychologist in the local legal community, and this Court has appointed her in other cases as the Court's own expert. Trial counsel's decision to hire Dr. Compton was imminently reasonable.

### The division of labor

Bernhard "more or less" divided the responsibilities amongst the members of the trial team.[335] Bernhard was responsible for motions, objections, and communicating with expert witnesses.[336] Weatherspoon was primarily responsible for the guilt/innocence phase of trial.[337] Nancy Mulder was largely responsible for preparing Applicant and lay witnesses to testify and serving as the trial team's liaison with Applicant's family and friends.[338]

---

courts to order criminal defendants to submit to state-sponsored psychiatric exams when the defense introduces, or plans to introduce, evidence stemming from its own psychiatric examination).

[333] WRR1: 85.
[334] WRR1: 85.
[335] WRR1: 45.
[336] WRR1: 46–47.
[337] WRR1: 46, 52, 142, 197.
[338] WRR1: 46, 51.

909

This Court finds that each member of the defense team was well qualified to fill his or her particular role.

### Tim Freeman and Paula Cook

The trial team had two investigators, Tim Freeman and Paula Cook.[339] Cook's primary responsibility was to conduct jury research and summarize jail calls.[340] Freeman was primarily responsible for working with Ross to locate and meet with prospective witnesses and to subpoena records.[341] Freeman and Ross worked closely together, and he was willing to do "pretty much anything" Ross asked.[342]

### The defensive theory

The defensive theory in the guilt phase of trial was that Applicant did not intend to kill Nancy Harris, as that was the best theory available.[343] Applicant's state of intoxication, if any, at the time of the offense, was not a primary theme.[344] The guilt-phase goal was "to get a possible lesser included—the lesser included of murder."[345] The trial team presented evidence of addiction as part of the story, but was "not trying an addiction case."[346] The primary theme in the punishment phase was remorse, and trial counsel felt they had remorse "in spades."[347]

---

[339] WRR1: 48, 62–63.
[340] WRR1: 64, 73.
[341] WRR1: 64–65; WRR2: 94.
[342] WRR2: 37.
[343] WRR1: 52, 59.
[344] WRR1: 60.
[345] WRR1: 198.
[346] WRR1: 61, 88, 172.
[347] WRR1: 61, 173.

910

# APPLICANT'S GROUNDS FOR RELIEF

## LAW GOVERNING INEFFECTIVE ASSISTANCE CLAIMS

An applicant claiming ineffective assistance of counsel must show: 1) that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and 2) that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[348] An applicant bears the burden of proving his claim by a preponderance of the evidence.[349]

A record that does not explain trial counsel's decisions will not show deficient performance "unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'"[350]

When the claim involves error preservation, the applicant must show that he would likely have been successful on appeal had error been preserved.[351] This, in turn, requires a showing that the trial court abused its discretion in some way.[352]

## GROUND ONE

1. SUBSTANCE ABUSE AND MENTAL HEALTH EXPERTS

   1.1. Applicant's first ground for relief comes in two parts. First, Applicant argues that trial counsel were ineffective for failing to properly prepare for and conduct Dr. Roache's testimony.[353] Second, he argues that trial counsel were ineffective for failing to present an expert to explain the lack

---

[348] *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).
[349] *Id.* at 813.
[350] *See Nava v. State*, 415 S.W.3d 289, 308 (Tex. Crim. App. 2013) (quoting *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012)).
[351] *Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013).
[352] *See id.*
[353] Writ app. at 26–51.

40

of available mental health care and substance abuse treatment.[354]

GROUND ONE, PART I: DR. ROACHE

1.2. The Court finds that Applicant failed to prove by a preponderance of the evidence any deficiency in trial counsel's preparation and presentation of Dr. Roache's testimony.

1.3. Even assuming counsel's preparation and presentation was deficient, the Court finds that Applicant failed to demonstrate by a preponderance of the evidence that counsel's deficient preparation or presentation resulted in any prejudice.

### Background

1.4. Dr. Roache is a neuropharmacologist with expertise in drug addiction and brain development.[355] Trial counsel engaged Dr. John Roache "primarily to talk about addiction and help explain the medical records and the diagnoses" that already existed.[356] Trial counsel sent Dr. Roache videos of Applicant's statements, the in-car video, and other records.[357]

1.5. Trial counsel had at least two telephone conversations with Dr. Roache before he testified.[358] They spoke in general terms about the biology of addiction, including "the factors about addiction that make it a disease," and "[t]he effect it has on the brain and the reward center."[359]

1.6. Trial counsel intended to use Dr. Roache to educate the jury on addiction and address the observations and diagnoses that the available records already contained.[360]

---

[354] Writ app. at 52–64.
[355] WRR1: 95–96.
[356] WRR1: 90.
[357] WRR1: 91.
[358] WRR1: 98.
[359] WRR1: 103–04.
[360] WRR1: 156.

### The decision not to allow Dr. Roache to interview Applicant

1.7. As a part of his first ground for relief, Applicant argues that trial counsel's decision not to allow Dr. Roache to interview Applicant was deficient.[361]

1.8. Trial counsel's decision not to allow Dr. Roache to interview Applicant was a strategic choice. Trial counsel did not hire Dr. Roache to diagnose Applicant or testify about whether or not he was intoxicated at the time of the offense.[362] Trial counsel explained her strategic choice in these terms:

> I did not want anybody to interview [Applicant], because I didn't want the State to bring in their expert to interview [Applicant]. Because they would have brought in Dr. Proctor, who would have said he wasn't addicted, he's just a psychopath, or whatever he wanted to call him.[363]

1.9. Moreover, trial counsel explained to Dr. Roache that she "had legal strategy reasons" for not wanting him to interview Applicant.[364]

1.10. This Court further finds that trial counsel's testimony to be credible and the decision not to allow Dr. Roache to interview Applicant was an informed one. Trial counsel had Dr. Antoinette McGarrahan, a neuropsychologist, perform a psychological assessment of Applicant and, after hearing the results of her examination, "made the decision not to put on somebody that had actually examined him."[365] The "bottom line" that trial counsel got from Dr. McGarrahan was that Applicant "has addiction problems and he has depression problems," but those diagnoses already existed in available records.[366]

1.11. This Court is familiar with Dr. McGarrahan. She is a forensic neuropsychologist. Bernhard's decision to consult with Dr. McGarrahan and rely upon her insight and opinions was reasonable.

---

[361] *See* Writ app. at 28.
[362] WRR1: 90.
[363] WRR1: 101.
[364] WRR1: 160.
[365] WRR1: 111, 116.
[366] WRR1: 116–17.

1.12. The State had noticed Dr. Proctor as an expert in forensic psychology.[367] This Court is also familiar with Dr. Proctor, and knows that he is an effective witness.

1.13. Although trial counsel felt that there were things she could do to refute Dr. Proctor's testimony, it was her thinking and strategy that it would be preferable to avoid Dr. Proctor's testimony altogether rather than having to refute it.[368] Applicant has failed to rebut the presumption that trial counsel employed a reasonable strategy in this regard.

1.14. In this writ proceeding, Dr. Proctor opined that Applicant has antisocial personality disorder.[369] Dr. Proctor would have given that opinion at trial, had trial counsel given him the opportunity to do so by triggering *Lagrone*. Dr. Proctor's opinions in this writ proceeding were rational and supported by the evidence, and a jury could have believed Dr. Proctor particularly where, as here, Dr. Rosenstein could not disagree with him.[370]

1.15. Antisocial personality disorder was as persuasive an explanation for Applicant's criminal lifestyle as any other. For example, Applicant's long history of domestic violence shows that he is prone to violence even when he is not in the pursuit of drugs. Rather than trying to counter Dr. Proctor with less persuasive alternatives, trial counsel was right to avoid the jury hearing from him in the first place.

1.16. Dr. Roache's affidavit on this point is not credible. In it, he states, "Specifically, I was prevented for interviewing the defendant despite my suggestion that this is important; such an interview could have helped me to identify issues that would have enhanced the impact of my testimony by showing how those issues apply in Mr. Johnson's case."[371]

1.17. But this was not the impression that Dr. Roache gave at trial:

Q:   And you didn't interview the Defendant before you came to testify?

A:   No, I did not.

---

[367] CR: 4471.

[368] WRR1: 102.

[369] WRR5: 33.

[370] WRR6: 66–67.

[371] Affidavit of Dr. John R. Roache, ⊠ 8.

Q:    You just weren't asked to do that?

A:    Correct.

Q:    You don't think that would be important?

A:    It would provide additional information I don't have currently.

Q:    So it could be important?

A:    I don't know what I don't know.[372]

1.18.  When Dr. Roach was asked at trial whether it *could* be important to interview Applicant, he was noncommittal. Now he claims that he suggested to trial counsel that it *was* important. Dr. Roache has now made two statements under oath that are difficult to reconcile. This Court, therefore, gives little weight to his affidavit and his testimony.

1.19.  Applicant has not rebutted the presumption of sound legal strategy with respect to disallowing an interview with Applicant.

### Materials Provided to Dr. Roache

1.20.  Applicant argues that trial counsel were ineffective for failing to give Dr. Roache a copy of Applicant's social history.[373]

1.21.  Trial counsel strategically chose not to give Dr. Roache a copy of Applicant's social history.[374] She explained her choice in this writ proceeding:

> I wasn't asking him to diagnose [Applicant], and I wasn't asking him to talk about whether or not he was intoxicated at the time of the offense. I was asking him to explain the diagnoses that we already had in the records.
>
> We had a very unique situation in this case, and this is why I made the decision not to put on somebody who had

---

[372] RR50: 51.

[373] Writ app. at 28–29.

[374] WRR1: 102.

44

interviewed him. Because we had medical records that were, like, I think, a month or two before the offense that diagnoses addiction, that diagnosed depression, records made before [Applicant] had any kind of motivation to exaggerate or lie about his symptoms. So I thought that was—that was a gift. That was a gold mine, because that enabled me to get addiction and depression out without actually having somebody come in and talk to [Applicant]. And that way we—we could keep the State from talking to [Applicant].[375]

1.22. Trial counsel expounded on cross-examination. When asked "what was your strategic reason for not giving [the social history] to [Dr. Roache]," she answered: "

> Well, number one, we didn't have it prepared until right before the trial. We didn't get the final version. And, number two, I'm always reluctant to turn over the social history to experts because I like it to be compiled with the good, the bad, and the ugly. And if I give it to him, I'm basically giving it to the State. So, I usually prefer to orally tell them the information that I think is important to what they're doing rather than actually giving them a document that then just goes to the prosecutor.[376]

1.23. Trial counsel's explanation not to provide the social history to be credible.

1.24. Instead, trial counsel gave Dr. Roache an oral summary of Applicant's social history, including "[t]hat [Applicant] had ... been addicted from a very—or been using drugs from a very early age, that his family used drugs, that he had relatives who were addicted, and a father who was an alcoholic."[377]

1.25. Applicant has not rebutted the presumption of sound legal strategy with respect to trial counsel's providing only an oral social history.

---

[375] WRR1: 102–03.
[376] WRR1: 159.
[377] WRR1: 105.

916

1.26. In this writ proceeding, Applicant also inquired about whether trial counsel gave Dr. Roache a copy of the police car video.[378]

1.27. When Dr. Roache appeared to testify, trial counsel was surprised to learn that he had not seen the video of Applicant in the police car.[379] The video "was clearly listed among the things" that trial counsel sent him.[380] Indeed, in a letter to Dr. Roache dated July 7, 2017, Bernhard listed "a DVD with video taken in the police car after [Applicant] was arrested for the capital murder" amongst the enclosures.[381] Further, Dr. Roache never informed trial counsel that the video was missing.[382] This Court credits Bernhard's recollection of the event, particularly because it is supported by State's Exhibit 8. This Court finds that Bernhard sent Dr. Roache the video in question.

1.28. Nevertheless, Dr. Roache states that he appeared at trial without having seen the video.[383] Trial counsel allowed him to watch a portion of the video, and audio was available.[384] Moreover, Dr. Roach never indicated to Bernhard that he was unable to hear the video.[385]

1.29. Dr. Roache states in his affidavit that "[m]inutes before I was called to testify, trial counsel showed me a two to four minute clip of the video of [Applicant] in the back of the police car following the May 2012 incident. The clip did not have audio. This was the first time I had seen this video."[386]

1.30. Applicant has not shown by a preponderance of the evidence that trial counsel failed to provide Dr. Roache with the police car video.

1.31. Applicant notes that "[t]rial counsel did not allow Dr. Roache to view an in-store video of [Applicant] at the time of the incident that Dr. Roache

---

[378] WRR1: 98.

[379] WRR1: 98.

[380] WRR1: 98; SX 8.

[381] SWE 8.

[382] WRR1: 99.

[383] Affidavit of Dr. John Roache, ⊠ 10.

[384] WRR1: 99–100.

[385] WRR1: 99–100.

[386] Affidavit of Dr. John Roache, ⊠ 10.

knew existed.[387]

1.32. Bernhard testified that, had Dr. Roache wished to see the in-store video of the offense taking place, she would have allowed him to see it.[388] This Court credits Bernhard's testimony over Dr. Roache's.

### Presentation of Dr. Roache's testimony

1.33. Applicant argues that trial counsel did not elicit sufficient information from Dr. Roache.[389]

1.34. During trial, trial counsel "wanted to get [Dr. Roache] off the stand pretty quickly."[390] He had a flight to catch, and, in addition, trial counsel felt that his testimony was "kind of dry and academic," and she "didn't really feel the jury responding to it."[391] Therefore, trial counsel did not "go into more detail on a lot of things."[392] Furthermore, once Dr. Roache mentioned antisocial personality disorder, trial counsel wanted to "get him off the stand."[393] This was a reasonable strategic decision.

1.35. Further, this Court agrees with Bernhard's assessment that Dr. Roache's testimony was dry and academic, and concludes that Applicant would not have benefitted from the additional testimony that Dr. Roache gave in this writ proceeding. For example, in this writ proceeding, Dr. Roache testified as follows:

> Okay. So, it's—this is the same sort of clay model of the brain with the red arrows you're still seeing there. But because these—the brain—the neurocircuits of the brain are interconnected, there are other areas of the brain that are involved and activated as part of the overall pattern of brain-reward-motivated behavior and what's called executive control circuits. Executive control refers

---

[387] Writ app. at 28.
[388] WRR1: 100.
[389] Writ app. at 32–38.
[390] WRR1: 172.
[391] WRR1: 172.
[392] WRR1: 172.
[393] WRR1: 175.

918

to the logical, reasonable reason—reasoned decision-making processes. And that's coming from the higher cortical centers. And so shown here in this picture is the—the interaction of some of these different circuits that are all variously involved in addiction. And, again, this picture comes from the National Institute on Drug Abuse in their public education website. So what's involved in this process is you have the inhibitory control from the higher cortical centers, the prefrontal cortex, and through—and that's called the PFC—and the anterior cingulate gyrus. That's called the ACG. And those are where you might have an urge or an impulse to do something, but you know you shouldn't, you decide not to do it, and you inhibit and control that urge or impulse. That's emanating from those areas of the higher cortical conscious brain. Below that, you see the motivational drive. That's the orbital frontal cortex, OFC. And the area of the brain termed SCC—I'm blanking on that—what that stands for at that moment—but that's subcortical, subconscious, sort of the urge or impulse. And then there's memory learning circuits that are important, and that's the amygdala and hippocampus. And that's shown on the diagram as A-m-y-g and H-i-p-p. And those are—in trying—the brain, trying to decide should I or shouldn't I, you know, in any moment in time is getting inputs from all these different brain areas in either activating or inhibiting the go or no-go.[394]

1.36. Trial counsel were not ineffective for declining to elicit this kind of testimony.

1.37. Applicant has not shown that trial counsel were ineffective for failing to elicit additional testimony from Dr. Roache.

1.38. In any event, addiction was not the predominant defensive theme. Most of Applicant's criminal history is comprised of assaultive offenses, not

---

[394] WRR3: 97–98.

drug offenses.[395] Applicant testified at length about his criminal history comprised of the following instances:

| Date | Offense description | Record cite |
|------|---------------------|-------------|
| 9/15/1991 | Driving a stolen car | RR49: 100 |
| 2/4/1992 | Pushing a police officer | RR49: 100 |
| 12/9/1992 | Theft | RR49: 100 |
| 8/13/1993 | Assaulting Amy Armstrong | RR49: 100–01 |
| 9/8/1993 | Throwing a burning object onto Armstrong's patio | RR49: 101 |
| 9/9/1993 | Possession of marijuana | RR49: 102 |
| 2/8/1994 | Outstanding warrants | RR49: 102 |
| 4/16/1994 | Outstanding warrant on the marijuana charge | RR49: 102 |
| 5/31/1994 | Assault warrants; biting Officers Mendoza and Ehrman | RR49: 103 |
| 7/23/1994 | Evading arrest in a motor vehicle (as a party) | RR49: 103 |
| 8/7/1995 | Aggravated assault against Courtney Johnson | RR49: 104 |
| 6/9/2002 | Assaulting Daphne (class C) | RR19:105 |
| 10/9/2002 | Evading arrest | RR49: 105 |
| 11/15/2002 | Assaulting Daphne | RR49: 105 |
| 7/3/2003 | Assaulting Daphne at Braums | RR49: 47, 106 |
| 9/7/2003 | Assaulting Daphne | RR49: 107 |
| 1/5/2004 | Theft | RR49: 107 |
| 6/19/2004 | Carjacking Salmeron | RR49: 107 |
| 9/13/2004 | Violation of a protective order | RR49: 108 |

1.39.  If crack cocaine and PCP were the source of Applicant's problems, one would expect that he would have possessed some at least once in his many encounters with law enforcement and been charged with possession of a controlled substance, penalty group 1. Applicant was only caught with drugs once—and it was marijuana. Remorse was equally, if not more, appropriate for a case theme as addiction. Trial counsel was correct not to overemphasize addiction, through either Dr. Roache or any other witness.

---

[395] WRR4: 165–66.

### Dr. Proctor
(*i.e.*, the testimony that Catherine Bernhard avoided)

1.40. As noted above, trial counsel's strategic reason for preventing Dr. Roache from interviewing Applicant was to avoid triggering *Lagrone* and giving Dr. Proctor, the State's expert, access to Applicant.

1.41. Dr. Proctor sat through most, if not all, of the punishment phase of trial.[396]

1.42. Trial counsel's strategic choice worked. Dr. Proctor did not get to interview Applicant at the time of the trial.[397] He understood—accurately—that he "didn't have access to him because the defense did not put on an expert witness in mental health who had evaluated him."[398] Because he had not interviewed Applicant, he could not make any diagnosis, so there was not much that he could address in his testimony.[399] In the end, the State did not call Dr. Proctor to testify at trial.[400]

1.43. Dr. Proctor was unable to interview Applicant until April 9, 2018, in connection with this writ proceeding.[401] By that point, *writ counsel* triggered *Lagrone*, and the State rehired Dr. Proctor.[402]

1.44. Writ counsel instructed Applicant not to discuss the offense with Dr. Proctor, even though this Court placed no such restriction on Dr. Proctor's interview.[403] Dr. Proctor explained that:

> ...in understanding him and even completing, you know, an assessment diagnostically, some of the things that happened at the time of [the offense] may very well be relevant. In terms of understanding why he did what he did, how he feels about what

---

[396] WRR5: 21.
[397] WRR5: 14–15.
[398] WRR5: 15.
[399] WRR5: 15–16.
[400] WRR5: 15.
[401] WRR5: 17.
[402] WRR5: 71.
[403] WRR5: 18–19.

50

921

> he did, how substance use was or wasn't related, all that is, you
> know, potentially relevant to diagnosis, to understanding why
> he did what he did and to understanding kind of how he got to
> that place.[404]

1.45. This Court finds that Applicant waived his Fifth Amendment right to remain silent by speaking to Dr. Sapia and by calling Dr. Sapia as a witness.[405] This Court further finds that having done so, the State was entitled to have its own forensic psychologist interview Applicant without limitation. By refusing to discuss the offense with candor—or at all— Applicant thwarted Dr. Price's evaluation and this Court's order. The Court infers that the information that Applicant withheld from Dr. Proctor was unfavorable.

1.46. Dr. Proctor did not call Applicant "a psychopath," as Bernhard feared, but he did diagnose Applicant with antisocial personality disorder.[406]

1.47. Dr. Proctor administered two personality tests—the Personality Assessment Inventory ("PAI") and the Minnesota Multiphasic Personality Inventory, Second Edition ("MMPI-2")—and the Hare psychopathy checklist to assess personality and substance abuse.[407] Applicant was calm, cooperative, and pleasant.[408] Dr. Proctor thought that Applicant was honest "overall" and that his answers were "pretty credible."[409]

1.48. Although the PAI and the MMPI-2 are often called "personality tests," and have three purposes: 1) to assess how the person approaches the test, i.e. test for exaggeration, minimization, and honesty; 2) determine what kind of psychological problems the person may have, e.g. depression, anxiety, and mania; and 3) to assess personality traits and disorders.[410]

---

[404] WRR5: 19.

[405] *See Lagrone*, 942 S.W.2d at 612.

[406] WRR5: 33.

[407] WRR5: 17, 22, 80–81, 83.

[408] WRR5: 19.

[409] WRR5: 20.

[410] WRR5: 22–23.

51

922

1.49. The PAI indicated "serious drug and alcohol issues that have impacted his life," and "mild anxiety and mild or transient depression."[411] Applicant acknowledged, in connection with the PAI "issues with his temper, being quick-tempered, quick to anger, easily provoked, [and] some history of transient thoughts of self-harm[.]"[412] Overall, Applicant would not qualify for a DSM diagnosis of major depressive disorder.[413] Applicant's depression and anxiety stems in part from the capital murder he committed.[414]

1.50. Dr. Proctor also administered the MMPI-2.[415] "The MMPI-2 is probably the most commonly used psychological test, regardless of setting."[416] The MMPI-2 results suggested that Applicant tried to present himself as more moral than is likely the case, but otherwise showed no indications of exaggeration.[417]

1.51. Applicant's MMPI-2 score was elevated on scales three and four.[418] A scoring manual used by practitioners to explain particular scores contains this explanation of a three/four code type:

> The most salient characteristic of the three/four, four/three persons is chronic and tense anger. They harbor hostile and aggressive impulses, but they are unable to express their negative feelings appropriately.
>
> ***
>
> Prisoners with the three/four code type often have histories of violent crimes. In some rare instances, individuals with the three/four-four/three code type successfully disassociate themselves from their aggressive acting out behavior. Individuals with this code type lack insight into the origins and consequences of

---

[411] WRR5: 7, 25.
[412] WRR5: 25.
[413] WRR5: 26.
[414] WRR5: 166–67.
[415] WRR5: 7.
[416] WRR5: 8.
[417] WRR5: 27.
[418] WRR5: 30.

923

their behavior. They tend to be extra punitive, blaming other people for their difficulties.

***

Histories of excessive use of alcohol and other substances frequently are associated with this code type. Many of the difficulties of persons with the three/four-four/three code type may stem from deep chronic feelings of hostility towards family members. They demand attention and approval from others. They tend to be cynical and suspicious of others. They are sensitive to rejection and they become hostile when criticized.

Although outwardly they appear to be socially conforming, inwardly they are quite rebellious. They may be sexually maladjusted, and marital instability and sexual promiscuity are common. Suicidal thoughts and attempts are characteristic of individuals the three/four-four-three code type. These are most likely to follow episodes of excessive drinking and acting out behavior.

Personality disorder diagnoses, especially passive aggressive, often are associated with the three/four-four/three code type, and substance abuse, slash, dependence diagnoses may also be a sign.[419]

1.52. Dr. Proctor found this description to be "very accurate" based on what he knew about Applicant from his interview and the evidence.[420] Dr. Proctor believes that Applicant meets the diagnostic criteria for antisocial personality disorder and substance use problems.[421]

1.53. The Court takes judicial notice that the diagnostic criteria for antisocial personality disorder is as follows:

---

[419] WRR5: 30–32.
[420] WRR5: 32.
[421] WRR5: 33.

A. A pervasive pattern of disregard for and violation of the rights of others, occurring since age 15 years, as indicated by three (or more) of the following:

1. Failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest.

2. Deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure.

3. Impulsivity or failure to plan ahead.

4. Irritability and aggressiveness, as indicated by repeated physical fights or assaults.

5. Reckless disregard for safety of self or others.

6. Consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations.

7. Lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

B. The individual is at least age 18 years.

C. There is evidence of conduct disorder with onset before age 15 years.

D. The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or bipolar disorder.[422]

1.54.  Personality disorders are incurable, but sometimes a person becomes less antisocial with age.[423]

1.55.  A jury could well have found Dr. Proctor credible. He testifies almost equally for the State and the defense, although more for the State in

---

[422] DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-5 659 (2013).
[423] WRR5: 42–43.

54

925

death-penalty cases.[424] Moreover, an objective comparison between the evidence in this case and the diagnostic criteria for antisocial personality disorder reveals no reason to doubt Dr. Proctor's diagnosis. This Court finds that trial counsel's plan to avoid Dr. Proctor's diagnosis and testimony was more plausible than trying to rebut it.

1.56.  As for psychopathy, Applicant scored a 26 out of a possible 40 on the Hare psychopathy checklist, and the cutoff is 30.[425] Compared to other inmates, that puts Applicant in the 67th percentile for psychopathy.[426] Dr. Proctor "wouldn't say he has psychopathy," but noted that, "it is an elevated score" that "highlights numerous antisocial personality traits, which are consistent with antisocial personality disorder."[427]

1.57.  Dr. Sapia resisted the diagnosis of anti-social personality disorder.[428] She argued that "the behaviors that you're using to justify the diagnosis can't be based on what somebody does while intoxicated or in their pursuit of drugs[.]"[429] But, the diagnostic criteria excludes behavior occurring "exclusively during the course of schizophrenia or bipolar disorder"—not in the pursuit of drugs.[430] Dr. Proctor's diagnosis of anti-social personality disorder was more reasonable than Dr. Sapia's attempt to dismiss it.

1.58.  Dr. Proctor acknowledged that Applicant's criminal behavior, drug use, and personality are "very much interlinked."[431] "[H]is criminal behavior is not solely driven by his drug use. His antisocial personality drives a lot of the decisions he makes, in terms of breaking rules, thrill seeking, need for stimulation, being bored, being willing to take actions that are potentially harmful to himself or others, including substance use."[432] In other words, some of Applicant's behavior is related to his substance abuse disorder,

---

[424] WRR5: 13–14, 66.
[425] WRR5: 39.
[426] WRR5: 39.
[427] WRR5: 40.
[428] WRR4: 169–73.
[429] WRR4: 173.
[430] *See* DSM-5 at 659.
[431] WRR5: 43.
[432] WRR5: 43.

926

but not all of it is.[433] Indeed, there is no evidence that, when Applicant physically abused Daphne, he did so in pursuit of drugs.

1.59. The fact that Applicant's rule breaking behavior has continued despite his substance abuse remission due to incarceration supports Dr. Proctor's opinion that Applicant's behavior is driven by more than drug use.[434]

1.60. Indeed, writ counsel was unable to rebut Dr. Proctor's diagnosis. Writ counsel engaged Dr. Rosenstein after Dr. Proctor testified and called her in rebuttal in this writ proceeding. But, as shown below, Dr. Rosenstein was unable to rebut Dr. Proctor's testimony.

### Dr. Rosenstein

1.61. Dr. Rosenstein does only "very sporadic" forensic work and has testified only twice in death penalty cases.[435] She did not meet with Applicant, thus, her testimony was supported only by records.[436] She reviewed the neuropsychological testing that Dr. McGarrahan performed before trial.[437]

1.62. Dr. Rosenstein did not critique the tests that Dr. McGarrahan used or the manner in which she scored them.[438]

1.63. Dr. Rosenstein did not form an opinion regarding antisocial personality disorder.[439] Dr. Proctor's opinion that Applicant has antisocial personality disorder, therefore, stands as the only opinion in the record on that point.

1.64. Dr. Rosenstein sat through Dr. Proctor's testimony and did not believe that her testimony conflicted with his.[440]

1.65. Writ counsel was unable to effectively rebut Dr. Proctor's testimony with Dr. Rosenstein's testimony. The testimony of Dr. Rosenstein shows that

---

[433] WRR5: 116–17.
[434] WRR5: 163–64.
[435] WRR6: 9, 13.
[436] WRR6: 14, 16.
[437] WRR6: 16, 37–38, 55.
[438] WRR6: 55.
[439] WRR6: 67–69.
[440] WRR6: 66–67.

927

trial counsel was ultimately correct when she decided that it was better to avoid Dr. Proctor's testimony altogether than to attempt to rebut it.

1.66. It is significant to the Court that Dr. Proctor testified in this writ proceeding on August 2, 2018, and Dr. Rosenstein testified on October 18, 2018. In other words, writ counsel could not effectively rebut Dr. Proctor, even after a two-month recess. Trial counsel should not have been expected to do any better given the short time frame she would have faced at trial.

1.67. Nothing about Dr. Rosenstein's testimony shows, that trial counsel were ineffective.

### Nancy Mulder

1.68. The Court notes that Nancy Mulder expressed concern with the allegations in the writ application pertaining to Dr. Roache.[441]

1.69. By all accounts, though, Bernhard was the primary person making decisions regarding strategy as it related to the expert witnesses.[442]

1.70. Nancy Mulder testified that she did not read John Roache's affidavit, but "[i]f what he alleges we didn't give him is true, then I think that's a problem."[443] Mulder, however, was not tasked with preparing or presenting Dr. Roache—Bernhard was. Moreover, Mulder was not present in court to hear Bernhard's explanation for handling Dr. Roache in the way that she did. To the extent of any conflict, this Court credits Bernhard's explanation, because Bernhard was in a better position to know and remember what the strategy was with respect to the punishment-phase experts. Further, Mulder had not read Dr. Roache's affidavit to know what, exactly, he alleged he did not get.

1.71. Indeed, Mulder acknowledged that she "was not involved with the selection of ... the expert witnesses or working with them to prepare their testimony."[444] "I had nothing to do with the expert witnesses or giving

---

[441] WRR1: 220.

[442] WRR1: 47–48, 49, 205, 221, 228, 234–35, 247–48; WRR4: 135.

[443] WRR1: 220.

[444] WRR1: 221.

them any kind of discovery," she explained.[445] Further, Mulder acknowledged that Bernhard was in charge of legal research and that they relied on her interpretation of the law.[446] For these reasons, Bernhard would have been more aware of the *Lagrone* implications of having Dr. Roache interview Applicant, so this Court credits Bernhard's explanation with respect to Dr. Roache and expert witnesses over Mulder's occasionally contrary opinions.

1.72. Mulder was not present for the conversation wherein it was decided not to call Dr. Compton as a witness.[447]

1.73. Mulder did not concede that applicant's defense team was ineffective.[448] She testified that "I think there [were] some really important points in the writ that gave me pause, personally."[449] "But what gives me pause is wondering if I failed in my responsibility to defend him adequately with regard to doing more to present information about his childhood and his family members, witness testimony."[450]

1.74. The Court notes that this was the only capital trial that Mulder had tried to punishment; therefore Applicant is the only one of her clients ever sentenced to death.[451] She did not want him to receive the death penalty.[452] She was, and remains, close to Applicant's wife Daphne.[453]

1.75. Based on the foregoing, the Court finds that counsel were not deficient, and Applicant was not prejudiced by counsel's preparation for or presentation of Dr. Roache's testimony.

## GROUND ONE, PART II: DR. DAVIS

1.76. Dr. Davis did not testify in this writ proceeding.

---

[445] WRR1: 248.
[446] WRR1: 228–29.
[447] WRR1: 249.
[448] WRR1: 249.
[449] WRR1: 249.
[450] WRR1: 251.
[451] WRR1: 223, 253.
[452] WRR1: 251.
[453] WRR1: 217, 250.

929

1.77. The Court finds that Applicant failed to prove by a preponderance of the evidence that trial counsel were deficient in failing to call Dr. King Davis or a similar expert.

1.78. Trial counsel's decision not to call Dr. King Davis, or a similar expert, did not fall outside professional norms. Trial counsel had spoken to Dr. Roache about being able to testify about treatment availability.[454] During Dr. Roache's testimony, however, trial counsel made the strategic choice to get him off the witness stand quickly. Her strategic choice was not unreasonable.

1.79. Again, trial counsel explained that she was not trying "an addiction case."[455] Her theme was remorse. The information in Dr. Davis's affidavit would not have furthered trial counsel's chosen theme. The information in his affidavit has little to do with Applicant, at least directly.

1.80. Mitigating evidence must relate to the defendant's *own* circumstances and personal moral culpability.[456] Evidence about the percentage of the Texas population that was uninsured, the availability or unavailability of public services, the effect of House Bill 2292, and the level of health literacy in particular demographic segments would have had little to do with Applicant's *own* circumstances.[457]

1.81. Dr. Davis's affidavit has little to say about Applicant's own circumstances. For example, Dr. Davis ignores that Applicant went to an inpatient drug and alcohol treatment program at Summer Sky for 35 days.[458] This is despite the fact that the list of materials that Dr. Davis reviewed includes "Summer Sky Certificate."[459] Whether or not residential drug-treatment was widely available, Applicant got it.

---

[454] WRR1: 161.

[455] WRR1: 60–61.

[456] *See Tennard v. Dretke*, 542 U.S. 274, 284 (2004); *see also Joubert v. State*, 235 S.W.3d 729, 734 (Tex. Crim. App. 2007).

[457] *See* Affidavit of Dr. King Davis, ☒☒ 11–15, 18–20.

[458] *Compare* Affidavit of Dr. Roache with testimony of Applicant, RR50: 60–61 (describing Summer Sky).

[459] *See* Affidavit of Dr. King Davis, Attachment B, under "Records."

59

930

1.82. Dr. Davis also omitted Applicant's probation history. In September of 1995, as a term and condition of probation, Applicant was ordered to submit to a drug and alcohol evaluation and submit to random urinalysis.[460]

1.83. In July of 1999, as terms and conditions of felony probation, Applicant was additionally court-ordered to: 1) attend Alcoholic/Narcotics Anonymous meetings 120 times in 120 days beginning 5/28/99 and obtain a sponsor by 8/1/99; and 2) submit to intensive outpatient alcohol/drug treatment on or before 6/15/99 and comply with all rules and regulations and faithfully participate in all sessions until released by the Court.[461]

1.84. Between Summer Sky and felony probation, Applicant had drug treatment opportunities that Dr. Davis does not acknowledge. This undermines the credibility of his affidavit.

1.85. Even assuming counsel's failure to call Dr. Davis or a similar expert was deficient, Applicant failed to demonstrate by a preponderance of the evidence that any prejudice resulted.

1.86. Testimony from Dr. King Davis, or a similar expert, would not have changed the outcome here. The size of the uninsured population, general levels of health literacy, and the impact of House Bill 2292 would not likely have constituted "a sufficient mitigating circumstance or circumstances" in the eyes of the jury.[462]

1.87. The court finds that trial counsel were not deficient, and Applicant was not prejudiced, by counsel's failure to present an expert to explain the availability of mental health care and substance abuse treatment.

1.88. The Court concludes that Applicant's first claim is without merit and should be denied.

---

[460] SX 169 (RR55: 166).

[461] SX 169 (RR55: 158).

[462] *See* Tex. Code Crim. Proc. art. 37.0711, § 3(e).

931

## GROUND TWO

2. SOCIAL HISTORY THROUGH LAY AND EXPERT WITNESSES

2.1. In his second ground for relief, Applicant claims that trial counsel were ineffective for failing to investigate and present lay and expert testimony regarding Applicant's social history.[463]

2.2. Applicant failed to demonstrate by a preponderance of the evidence any deficiency in trial counsel's investigation and presentation of his social history.

2.3. Even assuming counsel's investigation and presentation of mitigating evidence was deficient, Applicant failed to demonstrate by a preponderance of the evidence that any prejudice resulted.

### Dr. Kristi Compton

2.4. Trial counsel had Dr. Kristi Compton available to testify as a social historian, or in a similar role.[464] Trial counsel had listed Dr. Compton as a potential expert witness.[465] Dr. Compton's CV is in the clerk's record.[466] Dr. Compton "was going to discuss the psychological significance of [Applicant's] history."[467] To do so, trial counsel provided Dr. Compton with Applicant's medical records, jail records, and police interviews—everything Bernhard "thought was relevant to what she was hired to look at."[468]

2.5. Bernhard and Dr. Compton had a good working relationship, and had worked together before, and if Dr. Compton needed additional information, she would have been comfortable asking for it.[469] Further, Bernhard would have provided anything that Compton asked for that was pertinent to her role in the case.[470]

---

[463] Writ App. at 64–111.
[464] WRR1: 183.
[465] CR: 4474.
[466] CR: 4555–57.
[467] WRR4: 130.
[468] WRR4: 130–31.
[469] WRR4: 133–34.
[470] WRR4: 134.

61

932

*Social history investigation*

2.6.  Trial counsel's social history investigation was adequate. Brendan Ross prepared a written social history for the trial team.[471] It was thorough, and covered Applicant's family and social history, Applicant's birth and development, education, relationships, work history, mental and physical health history, TDCJ/Institutional history, and future dangerousness.[472]

2.7.  Applicant has not shown that his trial team was unaware of any significant facet of his social history.

2.8.  Brendon Ross at one point suggested using a social historian to Bernhard.[473] She suggested it partially because she had used one before, and partially because it had become an issue post-conviction when she had not used one.[474]

2.9.  The ABA guidelines do not require that a defendant's social history be presented through expert testimony. They provide that "[e]xpert witnesses may be useful for this purpose and may assist the jury in understanding the significance of the observations."[475] The guidelines also state that counsel should use lay witnesses as much as possible to provide the factual foundation for the expert's conclusions.[476] *Id.*

2.10. There is a disadvantage to using a social history expert. Information that the social history expert gathers and reviews will, at some point, become known to the State.[477] In addition, a social history expert would have to acknowledge the bad with the good.[478] Lay witnesses do not present this risk to the same degree.

---

[471] *See* SWE 6.

[472] SWE 6.

[473] AWE 98; WRR2: 22.

[474] WRR2: 22–23.

[475] *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.11, Commentary (2003).

[476] *See id.*

[477] *See* Tex. R. Evid. 705(a) & (b).

[478] WRR4: 142.

2.11. By opting not to present a social historian, counsel necessarily prevented the disclosure of additional aggravating information that could be used against Applicant by the State.

*Dr. Celeste Henery*

2.12. Applicant claims in his writ application that trial counsel should have called Dr. Celeste Henery, or a similar expert, to testify at trial.[479] This Court notes that Applicant did not call Dr. Henery to testify in this writ proceeding, leaving this Court only with her affidavit.

2.13. Dr. Celeste Henery is a "cultural anthropologist."[480] It does not appear from any evidence in the record that she is qualified to opine on matters of forensic psychology, as Dr. Compton could have.

2.14. The Court finds that Dr. Compton was equally, if not more qualified, to testify about the impact of Applicant's social history and childhood trauma as Dr. Henery.

2.15. Further, nothing in Henery's affidavit undermines trial counsel's explanation for refraining from presenting a social historian who had interviewed Applicant.

2.16. Applicant has not shown that trial counsel were ineffective for failing to call Celeste Henery, or a similar expert.

2.17. Further, Applicant has not shown that he was prejudiced by trial counsel's failure to call Celeste Henery, or a similar expert.

2.18. To the extent that Applicant's second ground for relief rests on trial counsel's failure to call Celeste Henery, it should be denied.

*Jennifer Sapia*

2.19. Instead of calling Celeste Henery in this writ proceeding to provide

---

[479] Writ App. at 94–112.
[480] Affidavit of Celeste Henery, ⁋ 3.

Applicant's social history, Applicant called Dr. Jennifer Sapia to do so.

2.20. Dr. Sapia has a Ph.D. in counseling and school psychology, has a clinical and forensic psychological practice in North Carolina, and serves as an aeromedical psychologist in the North Carolina Army National Guard.[481]

2.21. Dr. Sapia interviewed Applicant in preparation for this writ hearing, which triggered *Lagrone*.[482]

2.22. According to Dr. Sapia, Applicant's father was physically, if not emotionally, present, his mother cooked, both parents worked and were not drug addicts, the children did not go hungry, there was no physical abuse, and Applicant did not grow up witnessing physical domestic violence.[483] Applicant's high school attendance was not bad but not perfect.[484]

2.23. Dr. Sapia did not interview anyone who actually witnessed anyone urinate in Applicant's mouth.[485]

2.24. Applicant did not prove by a preponderance of the evidence that, had trial counsel called Dr. Sapia as a social history expert, the outcome would have been different here. Dr. Sapia most recently testified in a North Carolina death penalty case—also a convenience store robbery and murder—about childhood trauma and social history, and that case ended with a death sentence.[486]

2.25. Dr. Sapia did not uncover any significant aspect of Applicant's social history of which trial counsel were unaware.

2.26. Nothing in Dr. Sapia's testimony undermined trial counsel's legal reasons for refraining from presenting a social historian or other expert who had

---

[481] AWE 116.
[482] RR4: 23, 117–20.
[483] WRR4: 152–53.
[484] WRR4: 154.
[485] WRR4: 157.
[486] WRR4: 137–38.

935

interviewed Applicant.

2.27. Trial counsel's reasons for declining to call certain lay witnesses were valid and strategic. Trial counsel discovered that there were witnesses who had both positive and negative information.[487]

### Amy Armstrong

2.28. Amy Armstrong, also known as Amy Franks, is Applicant's ex-girlfriend; she testified as a witness for the State at trial.[488]

2.29. Applicant's trial team worked to find Amy Armstrong "from the get-go," but without success.[489] Freeman and Ross were able to reach Armstrong on the telephone, but Armstrong hung up on Ross as soon as Ross identified herself.[490] Armstrong did not testify in the writ hearing and did not provide an affidavit.

2.30. Armstrong testified that she did not want to be involved in the trial or be present at the trial, and that the State had to find her and have her sworn in before the Court to ensure her appearance.[491]

2.31. The Court finds that Amy Armstrong was uncooperative with trial counsel. Counsel cannot be faulted for failing to call witnesses that cannot be found.[492]

2.32. Nevertheless, Armstrong testified, and provided some testimony favorable to Applicant. For example, she testified that:

- Applicant "was sweet" and loved her kids;[493]

---

[487] WRR1: 247.
[488] RR47: 29–30, 35–36.
[489] WRR1: 65.
[490] WRR2: 38, 95–96.
[491] RR47: 31, 62.
[492] See *Ex parte Scott*, 541 S.W.3d 104, 117 (Tex. Crim. App. 2017) ("Counsel cannot be faulted for failing to call family members to testify about Scott's good character when they refused to appear.").
[493] RR47: 37–38.

- Applicant was nice to her "at first"[494]

- She did not have a grudge against Applicant;[495]

2.33.  On cross-examination, Applicant elicited from Armstrong that:

- Applicant worked and contributed to the family;[496]

- He would love her kids and be good to them;[497]

- He was a good father figure, played with her kids, and was patient with them;[498]

- He handled fatherhood well for an 18-year old;[499]

- She knew that he would not hurt her "baby girl;"[500]

- Applicant did not intentionally hit her daughter;[501]

2.34.  This Court finds that trial counsel were able to effectively elicit favorable testimony from Armstrong, despite not having an opportunity to interview her before trial.

*Alma Johnson*

2.35.  Alma Johnson is Applicant's mother.

2.36.  Alma Johnson's impression was that she provided a good life for her children.[502]

2.37.  According to Dr. Sapia, Alma described Applicant as a quiet but otherwise

---

[494] RR47: 38.
[495] RR47: 62.
[496] RR47: 64.
[497] RR47: 64.
[498] RR47: 65.
[499] RR47: 66.
[500] RR47: 66.
[501] RR47: 71.
[502] WRR2: 34–35.

937

normal boy who played sports.[503]

2.38. Alma Johnson had heart surgery three weeks before trial and was at home on bedrest.[504] She would have been available only by deposition.[505] When it became apparent that she would be unable to testify, trial counsel decided not to call her.[506] The affidavit that she provided in support of the writ application shows that she could have testified about general family background, but her knowledge of Applicant's drug use is limited, and her knowledge of his sexual abuse non-existent. Further, her affidavit shows that she disciplined Applicant, set a curfew, and prohibited alcohol and gambling in the house. Moreover, trial counsel did not find Alma to be a good historian.[507] Applicant has not shown that, had Alma Johnson testified by deposition or otherwise, that the result of the proceeding might have been different.

2.39. Alma's affidavit is not compelling. She considered Applicant's early childhood "to be relatively normal" until he started spending time with Myke Myke.[508] She set a curfew for her children, and punished them for breaking it.[509] According to her, she would "cut their bottoms with a leather strap."[510] Her depiction of harsh discipline, however, is at odds with information in other affidavits.[511]

2.40. Alma's description of Applicant's obsession with a pillow is not particularly compelling, especially in light of testimony from Dr. Jennifer Sapia, who Applicant presumably would also have presented to a jury, that children commonly take "comfort items" such as a pillow.[512]

---

[503] WRR4: 148.

[504] WRR1: 77; WRR3: 12–13, 42–43.

[505] *See* Affidavit of Alma Johnson, ▯ 22.

[506] WRR1: 78.

[507] WRR1: 185.

[508] Affidavit of Alma Johnson, ▯ 10.

[509] Affidavit of Alma Johnson, ▯ ▯10, 11.

[510] Affidavit of Alma Johnson, ▯ 11.

[511] *Cf.* Affidavit of Timothy Johnson, ▯ 7 (describing the punishment for a curfew violation as simply being locked out of the house).

[512] WRR4: 157–58.

938

2.41. Alma's affidavit undercuts Applicant's claim that he started using marijuana in elementary school. In her affidavit, Alma states that:

> I first learned that Matt was smoking marijuana when he was in *middle school*. He came home a few times with bloodshot eyes and appeared to be high. I knew that red, glossy eyes usually meant someone was high because I had seen what Anthony and Tim, and other people, looked like after they smoked marijuana. When this happened, I realized Matt was hanging out with friends when I thought he was at school.[513]

2.42. Had this information been presented to a jury, the jury would have been entitled to infer that, had Applicant started smoking marijuana in elementary school—as some have claimed—that his mother would have discovered it then instead of in middle school. The Court finds that Alma's affidavit casts considerable doubt on the notion that Applicant smoked marijuana in elementary school.

### Anthony Grimes

2.43. Anthony Grimes was a childhood friend of Applicant's. He did not testify at trial. He testified in this writ proceeding and provided an affidavit.

2.44. Anthony Grimes was able to provide corroborating information about the changes in Garland, the Rainbow Apartments, and the crack epidemic, but like many others, he did not see Applicant doing crack cocaine.[514] The most he could say was that he saw Applicant "smoking weed."[515]

2.45. Grimes was an addict, but heard about a rehab facility while he was on probation; Grimes went there and, between prayer and rehab, got clean.[516]

2.46. Grimes's affidavit does not reveal any material, new information. On the one

---

[513] Affidavit of Alma Johnson, ¶ 14 (emphasis added).
[514] WRR3: 57.
[515] WRR3: 57.
[516] WRR3: 60–61, 62.

68

939

hand, it reveals that Grimes is about ten years older than Applicant is and Applicant "was quiet and mainly kept to himself."[517] On the other hand, it says that "We"—without identifying who "we" includes—"bought marijuana from drug dealers at the Rainbow Apartments in East Garland."[518]

*Anthony Johnson*

2.47. Anthony Johnson is Applicant's oldest brother. He did not testify at trial, but testified in this writ proceeding and provided an affidavit.

2.48. Anthony was discharged from the Navy under less-than-honorable conditions and later arrested for murder.[519] He was, however, in some ways, a good role model for Applicant—he was able to go to school and start his own business, even after being involved in drugs.[520]

2.49. Anthony reported to Dr. Sapia they they had "a pretty good lifestyle" in a welcoming family and that they had all that they needed, if not all that they wanted.[521] Anthony described to Dr. Sapia a family that administered discipline.[522] Anthony reported that Applicant had friends, preferred to hang out with his two closest friends, and was bullied once or twice.[523]

2.50. Anthony heard from Brendan Ross "a little after" Applicant's arrest, in about March of 2013.[524] They met at a Starbucks, and Anthony felt that the meeting went well.[525]

2.51. Ross met Anthony Johnson at least once, and had at least two telephone calls with him.[526] The trial team chose not to call Anthony because they "felt he would be absolutely hostile and not have much information to

---

[517] Affidavit of Anthony Grimes, ⁇⁇ 4–5.
[518] Affidavit of Anthony Grimes, ⁇⁇ 6.
[519] WRR4: 58, 62–63.
[520] WRR4: 63.
[521] WRR4: 143.
[522] WRR4: 143–44.
[523] WRR4: 145.
[524] WRR3: 10.
[525] WRR3: 10–11.
[526] WRR2: 35–36.

940

offer in exchange for ... his hostility."[527] Anthony was angry with Applicant at the time of trial and blamed him for their mother's health problems.[528] Anthony was also concerned about threats that his mother had received.[529] He voiced his concerns "over and over" to Ross.[530] Trial counsel was concerned that his hostility would come across to the jury if he testified as a witness.[531]

2.52.   Moreover, Anthony was not a good historian, and he reported that "childhood was great, Mom was always there, [and] went to all the games."[532] Weatherspoon did not think his testimony would have been beneficial.[533]

2.53.   Ross agreed. According to her view, Anthony's position was that he had a good upbringing with two parents and had nothing to complain about.[534] This Court finds that the decision not to call Anthony Johnson was reasonable.

2.54.   Even in this writ proceeding, Anthony Johnson seemed to hold the opinion that he and Applicant had good childhoods.[535] Anthony testified to the following:

- Their mother "was pretty strict."[536]
- They "grew up in church."[537]
- Their mother "sewed a lot of our clothes and stuff."[538]
- They "got the things that they needed," and "had pretty decent holidays."[539]

---

[527] WRR1: 151; WRR2: 67.
[528] WRR1: 152.
[529] WRR3: 12.
[530] WRR3: 43.
[531] WRR1: 152.
[532] WRR1: 185.
[533] WRR1: 201.
[534] WRR2: 69.
[535] WRR1: 153.
[536] WRR3: 16.
[537] WRR3: 16.
[538] WRR3: 16.
[539] WRR3: 16.

941

- Applicant went to church.[540]
- Their mother was hard-working.[541]
- Their mother would clean the house and cook dinner.[542]
- Their father worked nights and "did mechanic work on the side, you know, for extra income."[543]
- Their father had a gambling addiction which caused financial and marital problems.[544]
- His parents "were making ends meet but barely."[545]
- They had a roof over their heads and never went hungry.[546]
- Applicant "was a typical child" from age three to five.[547]
- Applicant had toys and a dog.[548]
- Applicant started making friends in middle school.[549]
- He did not know Applicant and Myke Myke to smoke marijuana, but he caught them with it "a time or two" and took it away.[550]

2.55. Indeed, Anthony described having a "pretty close" family. He painted a picture of a supportive family. At the writ hearing, he testified "I mean, everybody did what they could. You know, we don't have any—anyone in our family that's well-off or anything. They struggle. You know, if the kids need anything, you know, if they needed help paying some bills, yes, he got that kind of help."

2.56. In sum, Anthony testified that Applicant had a poor but otherwise unremarkable childhood. Anthony left for the military when Applicant was about 10.[551]

---

[540] WRR3: 17.
[541] WRR3: 18.
[542] WRR3: 18.
[543] WRR3: 19.
[544] WRR3: 20–21.
[545] WRR3: 21.
[546] WRR3: 21.
[547] WRR3: 22.
[548] WRR3: 22.
[549] WRR3: 22.
[550] WRR3: 25.
[551] WRR3: 25.

942

2.57. Anthony established that Applicant made money selling stolen meat, and that his nickname was "the meat man."[552] Trial counsel successfully kept the jury from hearing about this additional criminal conduct.

2.58. Anthony established that Applicant lived in section 8 housing.[553]

2.59. Further, Anthony appeared to be of the opinion that Applicant was sober at the wedding reception before the offense.[554] The most he could say was that he saw Applicant drinking a margarita.[555]

2.60. Anthony established that, unlike Applicant, both he and his brother Timothy got "clean" through "responsibilities," "discipline," and the like.[556]

2.61. Furthermore, Anthony had had "some problems in his life, and he felt like that if he could get his life together, that [Applicant] should have been able to get his life together.[557] Trial counsel was of the opinion that, if Anthony was of that mindset, that it would not be a good idea to put him on the witness stand.[558] This was not unreasonable.

2.62. The information in Anthony's affidavit is not compelling. In paragraph five of his affidavit, he states that he "wanted to testify on [his] brother's behalf because [he] knew that if Matt had been sober he would not have done what he did, and [he] did not believe he deserved the death penalty for something he did while intoxicated and not in his right mind." In all likelihood, Anthony would not have been able to testify to that because Anthony's belief about what Applicant deserved was not relevant to any special issue.

2.63. Anthony left for the Navy in 1985 and would have had little personal knowledge of events in the home after that.[559] For example, Anthony would not have been able to testify from personal knowledge that anyone

---

[552] WRR3: 30–31.
[553] WRR3: 32.
[554] WRR3: 39.
[555] WRR3: 39.
[556] WRR3: 45–46.
[557] WRR1: 208–09.
[558] WRR1: 215.
[559] Affidavit of Anthony Johnson, ⊠ 8.

"had put his penis in [Applicant's] mouth and peed in it," because it was something that "came to [his] attention" after the fact.[560]

2.64.  Similarly, Anthony states in his affidavit "even though I did not learn until years later that [Arthur] Miller had sexually abused [Applicant], I believe it is true. I also believe that it is possible that [Applicant] was sexually abused by someone close to or within our family. I have always believed in my heart that [Applicant's] drug use was an effort to hide demons in his past."[561] This is speculation based on hearsay. Moreover, a witness is not allowed to testify whether he believes an allegation of sexual abuse to be true.[562]

2.65.  After Anthony's stint in the Navy, he lived in the Los Angeles area.[563]

2.66.  Anthony would probably not have been allowed to testify that "friends told [him] about a guy they called 'Meat Man' [who] traded stolen steaks for drugs," or that he "later discovered" that the Meat Man was Applicant. First, Anthony's knowledge appears to be based on hearsay. More importantly, though, trial counsel would properly have been disinclined to present to the jury evidence of additional and ongoing criminal conduct committed by their client.

2.67.  In his affidavit, Anthony states:

> ...Derrick called me because [Applicant] was acting crazy and was trying to choke him. When Derrick said he was about to call the police, I knew [Applicant] must be acting very crazy, as calling the police would be a pretty extreme thing for Derrick to do. I immediately went to Derrick's house. When I arrived, the Rowlett police were already there. [Applicant] was standing in the middle of the street with his shirt off and yelling about how he was going to break our brother Tim out of prison.[564]

---

[560] Affidavit of Anthony Johnson, ¶ 11.
[561] Affidavit of Anthony Johnson, ¶ 16.
[562] See Schutz v. State, 957 S.W.2d 52 (Tex. Crim. App. 1997).
[563] Affidavit of Anthony Johnson, ¶ 18.
[564] Affidavit of Anthony Johnson, ¶ 34.

944

Trial counsel were not ineffective for not presenting this additional episode of violent and erratic behavior committed by their client.

### Courtney Johnson

2.68. Courtney Johnson is Applicant's sister-in-law. Courtney Johnson testified in the punishment phase of trial.[565] She was a terrible witness. First, she fabricated that she went into the Kwik Kar the day that Applicant got fired and surprised Applicant's own counsel with her testimony:

Q:   Did you ever have an occasion to go to the Kwik Kar where [Applicant] worked?

A:   Yes, ma'am, I did.

Q:   And when was that that you went there?

A:   When he called me.

Q:   And when he called you, when was this?

A:   I don't remember the exact date, but I know it's the day he got in trouble.

Q:   The day that—that he got in trouble?

A:   Yes, ma'am.

Q:   Describe for the jury what you did that day.

A:   I went to Kwik Kar because he had called me and told me that he was going to his job because he did something wrong. And I was like what did you do? And he said that he had some inspection stickers

---

[565] RR51: 110–31.

74

945

from his job. And then I was like, well, oh, my gosh, so what are you going to do? And he was like, well, I'm going to talk to my boss and I'm going to go turn myself in. And I asked him—I was like, are you sure that's what you want to do? And he was like, yes. And so we just waited for the police to come up there, and his manager and the police asked him what did he do and he said he wanted to turn his self [sic] in.

Q:    So you actually took him up to the Kwik Kar?

A:    Yes, ma'am, I did.

Q:    And you were—did you go in the Kwik Kar with him?

A:    Yes, because he wanted to talk to his boss and tell his boss and so I went in there with him, to talk.

Q:    And that was very early in the morning?

A:    Yes, ma'am.

Q:    Ms. Courtney, with regard to the Kwik Kar, are you sure that you went in, or could you be mistaken about that?

A:    I went up there with him, and I did talk to the supervisor.

Q:    But you could be wrong about going into the store?

A:    I could be, but I know I was there. And I did go up there with him.[566]

2.69.    Next, Courtney Johnson denied calling the police and alleging that Applicant had pointed a gun at her:

Q:    Do you recall the incident where you and Daphne were fighting, or—and you called the police and made an allegation that he had

---

[566] RR50: 120–21.

pointed a gun at you? Do you have any recollection of that?

A:    No, ma'am, I don't.

Q:    Did—did you have any recollection that he pled guilty and got probation for that and lived it out?

A:    No, ma'am, I don't.

Q:    Do you ever recall him pulling a gun on you in 1995?

A:    He's never had a gun, not to my knowledge.[567]

2.70.   On cross-examination, Courtney Johnson's memory failed her:

Q:    You—I guess you told [the] jury that you don't remember August 7th of 1995 when the Garland police officers came to your apartment?

A:    No, ma'am, I don't remember.

Q:    At 12:42 a.m., at 413 Gatewood?

A:    I don't remember that.

Q:    You lived at 413 Gatewood, didn't you?

A:    Yes, ma'am.

Q:    And you don't remember the Defendant coming over there, looking for Daphne?

A:    No, ma'am, I don't.

Q:    You—you don't remember calling the police at all?

---

[567] RR50: 126–27.

76

947

A:    Not at all.

Q:    And you don't remember them coming to your apartment?

A:    No, ma'am, I don't.

Q:    Do you remember coming down here to the District Attorney's Office and trying to drop those charges later?

A:    No, ma'am, I do not remember that. Where [sic] year was that?

Q:    In 1995, testifying in front of the Grand Jury. You don't remember that?

A:    No, ma'am.

Q:    And you certainly don't remember then telling the police that he pointed a gun at you?

A:    No, ma'am, I don't.

Q:    Do you remember him going to jail?

A:    No, I don't.

Q:    Or being in jail? None of this rings a bell at all?

A:    I don't remember it at all.[568]

2.71.  The jury likely found Courtney Johnson not credible. This Court finds that more testimony from Courtney Johnson would not have benefitted Applicant. Further, this Court finds her affidavit is not credible because she is not a credible person.

2.72.  Courtney Johnson is not credible for other reasons. She makes statements in her affidavit that contradict her testimony. For example, at

---

[568] RR50: 127–28.

948

trial, when asked about Applicant's personality, Courtney said, "[m]ost of the time he's happy and outgoing, just likes to be outside—I mean, positive person."[569] In her affidavit, Courtney claims that "As long as I have known Matt, he has been very quiet and one to stick to himself."[570] In the next paragraph, she said, "Matt was a loner."[571] These statements are difficult to reconcile.

2.73. In paragraph 6 of her affidavit, Courtney talks about Applicant asking her for money. She states that "Matt started asking me for me for [sic] money and I would give it to him to help him but his requests for money became more frequent and I started to wonder where the money was going."[572] But she testified at trial to quite the opposite:

Q:    Did you and [Applicant] ever talk about money?

A:    As far as—what do you mean?

Q:    Would [Applicant] give you his money when he started using again?

A:    Yeah, he would like hold it because he didn't want to spend his money. He was trying to better himself without giving the drug dealers his money.

Q:    So when he was using again, he actually would give you his cash money?

A:    Yes.

Q:    How much would he give you to hold?

A:    Like two or $300.

---

[569] RR50: 113.
[570] Affidavit of Courtney Johnson, ⊠ 4.
[571] Affidavit of Courtney Johnson, ⊠ 5.
[572] Affidavit of Courtney Johnson, ⊠ 6.

Q:   Now, when he would call and ask for it, what would you do?

A:   I would just gradually give him some, but not all.

Q:   And what help did you think that was, if any?

A:   To keep him from going to the drug house and giving them his money.

2.74. Thus, in her testimony, Courtney said that Applicant would give her money and she knew where the money was (otherwise) going. In her affidavit, she said he would take money and that she did *not* know where the money was going. All of her sworn statements on the matter cannot be true.

2.75. In her affidavit, Courtney states that, had she been asked, she would have testified that "Daphne often criticized Matt for not earning enough money," and that the couple had financial problems.[573] But Courtney had an opportunity to tell the jury all about it—she just did not do so:

Q:   During the time period that you spent with [Applicant] and Daphne, did you have a chance to observe their relationship?

A:   Yes, ma'am.

Q:   If you would describe that relationship to the jury.

A:   They just had a normal relationship, just like any other married couple would have.[574]

2.76. Furthermore, Courtney says in her affidavit that, had she been asked, she would have testified that when she "was fifteen years old, [she] witnessed [her] father being shot and killed."[575] But she *did* testify about that, in front of the jury:

---

[573] Affidavit of Courtney Johnson, 2, 9.
[574] RR50: 112.
[575] Affidavit of Courtney Johnson, ¶¶ 2–3.

79

950

Q:   Now, Ms. Courtney, I want to talk a little bit—excuse me, about your personal history, starting with when you were a little girl, you were misfortunate enough to have witnessed your father's shooting?

A:   Yes, ma'am.

Q:   And that caused you a lot of pain in your life?

A:   Yes, ma'am.[576]

2.77.  For all of these reasons, this Court discounts entirely the affidavit of Courtney Johnson.

2.78.  Trial counsel were not ineffective for failing to present more testimony from Courtney Johnson.

### *Charlotte Johnson*

2.79.  Charlotte Johnson is Applicant's cousin. She did not testify at trial or in this writ proceeding.

2.80.  Charlotte Johnson executed a written declaration.[577] In paragraphs 2 and 4, she states that, the night before the offense, she saw Applicant at the wedding reception, she saw him drinking beer, and he stayed at the wedding reception until the early morning hours.

2.81.  In paragraph 3, Charlotte recites statements that Applicant said to her at the wedding reception. This would have been inadmissible hearsay if offered at trial. Also in paragraph 3, Charlotte describes Applicant's love for his daughters. The Court finds that this testimony would have been cumulative with other testimony presented to the jury.

2.82.  Trial counsel were not ineffective for failing to present the testimony of Charlotte Johnson.

---

[576] RR50: 125.
[577] *See* AWE 85.

## D'Andre Howard

2.83. D'Andre Howard executed a written declaration.[578] Perhaps the most significant information is that he, Applicant, and others "were even doing cocaine together in our teens."[579] However, this would seem to contradict Applicant's own trial testimony that he had been using crack cocaine for about 14 years.[580]

2.84. Howard describes his own struggle with addiction and states that he "was sent to prison and placed in rehab."[581] He states that "the rehab was good and it helped."[582] This contradicts Applicant's position that good, free rehab was unavailable to him.

2.85. Paragraph 12 contains hearsay statements from Applicant that would have been inadmissible at trial. Further, Howard's belief as to the veracity of a sexual abuse outcry would have been inadmissible under *Schutz*.[583]

2.86. Paragraph 14 is based on Applicant's inadmissible hearsay.

2.87. The admissible portion of Howard's affidavit would not have impacted the outcome of trial.

2.88. Trial counsel were not ineffective for failing to present the testimony of D'Andre Howard.

## Demone Crow

2.89. Demone Crow provided a handwritten declaration.[584] He described growing up in a rough neighborhood and Applicant's drug use. The Court finds this information is cumulative and would not have changed the outcome at trial.

---

[578] AWE 88.

[579] AWE 88, ▢ 6.

[580] RR49: 8.

[581] AWE 88, ▢ 10.

[582] AWE 88, ▢ 10.

[583] *See Schutz v. State*, 957 S.W.2d 52 (Tex. Crim. App. 1997).

[584] *See* AWE 113.

952

2.90. Trial counsel were not ineffective for failing to present the testimony of Demone Crow.

### Daphne Johnson

2.91. Daphne Johnson, Applicant's wife, testified at trial, but did not testify in this writ proceeding.

2.92. The jury heard much of the information in Daphne Johnson's affidavit. For example, Daphne's affidavit states that, had she been asked, she would have testified that 1) she has known Applicant since they were in the fifth grade, 2) they started out as friends but began dating when they were in middle school, in their early teens, and 3) they got married in 1994, when they were both nineteen years old.[585]

2.93. In fact, Daphne testified to all of that. She testified that they knew each other from elementary school, they started dating in middle school, and she was 18 when they got married.[586] Her testimony about the age at which she got married was inconsistent, but the jury heard the substance of their relationship history.

2.94. In her affidavit, Daphne writes that, had she been asked, she would have testified about Applicant's pattern of leaving the house and going on drug binges.[587] Contrary to her affidavit, trial counsel did ask her about it, and she described it for the jury:

Q:    What would happen when his drug use would increase?

A:    He would go off on binges.

Q:    And what do you mean by go off on binges? Do you know where he went?

A:    No.

---

[585] Affidavit of Daphne Johnson, ¶¶ 5–6.
[586] RR49: 184–85.
[587] See Affidavit of Daphne Johnson, ¶ 20.

Q:   How long would he be gone?

A:   Maybe one or two days.

\* \* \*

Q:   When [Applicant] would go off on these binges and come home, what would you do?

A:   Well, I mean, I would still do my everyday routine and try to figure—we would both try to figure out how we were going to get through the coming days.

Q:   Would—would he call during the two-day—one or two days he would be gone?

A:   Yes.

Q:   And when he would come home after going on a drug binge, did you just open up the door and smile and say, welcome home, or did you—did it bother you?

A:   No, I definitely wasn't smiling. I was pretty pissed.[588]

2.95.  In her affidavit, Daphne writes that, had she been asked, she would have testified about the letters that she and her daughters wrote to and received from Applicant when he was in prison.[589] Contrary to her affidavit, she testified about sending and receiving letters from Applicant and his daughters at trial.[590] This Court admitted some of these letters into evidence at trial over the State's objection.[591] Trial counsel was not ineffective for failing to present more evidence of correspondence to the jury.

2.96.  Daphne, in her affidavit, states that, had she been asked, she would have testified that:

---

[588] RR49: 188–89.

[589] *See* Affidavit of Daphne Johnson, ▯ 22.

[590] RR49: 212–13.

[591] RR49: 213; DX 4–11.

In the fall of 2011, when it started to get colder, I told
Matt that our daughters needed winter coats and I
suggested that we go to Friendship House, a local charity,
to get free coats. [Applicant] did not want our daughters
... to get free coats; he wanted to buy coats for the girls
himself.[592]

2.97.   In fact, Daphne did testify about the winter coats:

A:   Okay. We were at home watching TV, and we were talking about
coats. He was saying that we needed coats because it was getting
cold. And I remember telling him that I could just go to the
Friendship House and see if they could help us get coats.

Q:   Coats for who?

A:   Myself and our girls. Because we didn't just have the money to go
out and buy coats at the time.

Q:   How old were the girls at this time?

A:   I think Matduxx was one.

* * *

A:   And Deja was 10, and Makayi was—oh—12 or 13.

Q:   You all were struggling financially?

A:   Yes.

Q:   And when you talked about going—what is the Friendship House?

A:   It's like a—like a charity place—like help you with donations and like
kind of outreach center, I guess it's called.

Q:   You thought you could go there and get the girls some coats?

---

[592] Affidavit of Daphne Johnson, ¶¶ 5, 27.

955

A:  Uh-huh.

Q:  You have to answer out loud.

A:  Oh, yes, I'm sorry.

Q:  How did [Applicant]—what was [Applicant]'s reaction to that?

A:  I could tell it was something he wanted to do himself, for us.

Q:  Did it bother him at all?

A:  Yes, it did.

Q:  How could you tell?

A:  I could tell because he became uneasy about it, you know, when I was saying that. And—and I don't remember what or how we ended the conversation, but I remember he had left. I don't know if he went to the store or I don't remember if he was telling me he was going to the store afterwards, but he didn't come right back.

Q:  Did he leave and go on a binge?

A:  Well, he left that day and I want to say came back the next morning. I think it was like around 3:00 or 4:00 in the morning.

2.98. Contrary to Daphne's affidavit, the jury heard about Applicant's desire to provide winter coats to his daughters. The Court finds that Applicant would not have benefitted from additional testimony on this topic.

2.99. Further, the Court finds that the coats episode is not particularly mitigating. Applicant did not intend to buy winter coats with the money that he stole from Nancy Harris.

2.100. Trial counsel would likely not have been able to elicit all of the information in Daphne's affidavit. For example, in paragraph 9 of her affidavit, Daphne writes, "Ulrich died of cancer in 2003, and I think his heavy drinking throughout his life was a factor in his death." That statement is speculation.

956

2.101. Similarly, the statement "For as long as we have been together, I have believed that Matt is deeply ashamed about something in his past," is also speculation.[593]

2.102. Daphne's affidavit also contains objectionable hearsay. For example, she states that "Around 2010, Matt and I were watching television one night when he told me about the time Arthur Miller molested him when he was a child."[594] Daphne would not have been able to repeat to the jury something that Applicant had told her—at least not for the truth of the matter asserted.

2.103. "Matt called me from a motel and kept repeating that he could not stop doing crack" is also hearsay, and would not likely have been heard by the jury.[595]

2.104. "I learned that Matt had an outburst in the parking lot of a convenience store and police officers took him to Presbyterian Hospital, where he was diagnosed with some kind of drug-induced psychosis" is also largely based on hearsay.

2.105. Paragraphs 15 and 16 are littered with speculation:

- "*I believe* one reason [Applicant] refused to talk about the sexual abuse was because he was afraid that I would use it against him at a later time."

- "...I had *always suspected* it and *believed* it was why he carried so much shame."

- "I also *believe* [Applicant's] family knew about the sexual abuse..."

- "I *believe* that [Applicant] being sexually abused as a child was

---

[593] *See* Affidavit of Daphne Johnson, ☐ 13.
[594] *See* Affidavit of Daphne Johnson, ☐ 14
[595] *See* Affidavit of Daphne Johnson, ☐ 29.

957

one of the main reasons he was protective of our daughters."

2.106. Daphne's affidavit contradicts other evidence. In paragraph 24 of her affidavit, Daphne asserts that she "fought against the idea that we should buy a home because [she] worried about the higher bills that came with home ownership and how the added financial pressure would affect Matt's depression and drug use, but [she] went along with it because [she] knew how much Matt wanted our daughters to have their own backyard to play in."[596] This directly contradicts Courtney Johnson's affidavit, wherein she states that "Daphne was adamant about Matt buying them a newer and bigger house even though they could barely afford the one they had."[597]

2.107. To the extent that the information in Daphne's affidavit is additional to what the jury heard, it would not have made a difference in the outcome.

2.108. Trial counsel was not ineffective for failing to elicit additional testimony from Daphne Johnson.

### *Durien Allen*

2.109. Durien Allen did not testify in this writ proceeding.

2.110. Ross recalled wanting to speak with Durien Allen, but recalled little else about him.[598] Debbie Sumi had telephone conversations with Allen.[599]

2.111. Applicant has not shown that Durien Allen had favorable or mitigating evidence to give.

2.112. Trial counsel was not ineffective for failing to present testimony from Durien Allen.

---

[596] Affidavit of Daphne Johnson, ⊠ 24.
[597] Affidavit of Courtney Johnson, ⊠ 9.
[598] WRR2: 41, 42.
[599] WRR2: 42–43.

958

## Francis Wilson

2.113. Frances Wilson is Daphne Johnson's aunt. She testified at trial; she did not testify in this writ proceeding.[600]

2.114. At trial, Wilson testified generally that she knew about Applicant's drug problem, she noticed signs of depression in 2011, she was concerned about suicide, they tried to help him but did not have funds, and Applicant loved his daughters and was a good father.

2.115. The information in Francis Wilson's affidavit shows generally that Francis Wilson encouraged Applicant to stop using drugs and that she was financially and emotionally supportive of him.[601] This is mostly cumulative with her trial testimony.

2.116. To the extent Wilson's affidavit contains additional information, that additional information tends to contradict the portrayal of Applicant as a drug addict with no support. The additional information would not have been helpful to Applicant at trial.

2.117. Further, a large swath of Wilson's affidavit recites things that Applicant told her, which would have been inadmissible hearsay.[602]

2.118. Trial counsel were not ineffective for failing to develop or elicit additional information from Francis Wilson.

## Hazel Mills Johnson

2.119. Hazel Johnson (elsewhere Hazel Mills) is Applicant's mother-in-law. She testified at Applicant's trial, but not in this writ proceeding.[603]

2.120. Hazel Johnson generally testified that she had a close relationship with Applicant, that he has a good personality, that he was stressed about

---

[600] RR50: 99–109.
[601] See Affidavit of Francis Wilson, ☐☐ 3–7.
[602] See Affidavit of Francis Wilson, ☐☐ 5–7.
[603] RR50: 87–98.

959



money, and that he is a good person and that she loves him.[604] She also
testified that her father had a problem with drug addiction, and that she
saw and spoke with Applicant when he was high.[605]

2.121. Hazel did not testify in this writ proceeding; her affidavit is largely
cumulative with her testimony and other testimony presented at trial. It
does, however, provide additional information that Applicant stole things
from her house.[606] Trial counsel successfully kept the jury from learning
of this additional criminal conduct.

2.122. Trial counsel were not ineffective for failing to elicit more testimony from
Hazel Mills Johnson.

### Lashan Mills

2.123. Lashan Mills is Applicant's cousin. She did not testify at trial or in this writ
proceeding.

2.124. Ross contacted and met with Lashan Mills.[607] Mills proved to be
unreliable by not showing up for a meeting with the attorneys.[608]

2.125. Lashan Mills would not have been able to testify to much of the
information in her affidavit. Her affidavit is replete with sentences that
include "I believe," "I think," "it seemed," and "I thought."[609] Elsewhere,
she describes something that Alma told her, which would be hearsay.[610]
Whatever might be admissible in Lashan's affidavit is not compelling, and
would not have changed the outcome.

2.126. Trial counsel were not ineffective for declining to present speculative
testimony from an individual who would not meet with them.

---

[604] RR50: 90–98.
[605] RR50: 91–93.
[606] Affidavit of Hazel Johnson, ⊠ 3.
[607] WRR2: 52.
[608] WRR2: 69.
[609] *See* Affidavit of Lashan Mills, ⊠⊠ 4, 7, 10, 13, 14.
[610] *See* Affidavit of Lashan Mills, ⊠ 9.

## Makayi, Deja, and Mattduxx Johnson

2.127. Applicant's daughters (Makayi, Deja, and Mattduxx) did not testify at trial or in this writ proceeding.

2.128. Applicant presented an affidavit from Applicant's daughter Makayi. In it, she describes watching movies and cartoons with Applicant, and what he told her about avoiding drugs. She also writes that she could tell that Applicant was dealing with depression. "I wanted to testify at my dad's trial to talk about what he means to our family—that I want him to live so he can be there for me as I grow up. I wanted to tell the jury that my dad is not a bad person, even though he did a terrible thing."[611]

2.129. The mitigation special issue is premised on the belief that a defendant whose criminal acts are attributable to such factors as a disadvantaged background, or to emotional or mental problems, "may be less culpable than defendants who have no such excuse."[612] To the extent applicant is claiming that Makayi should have testified about Applicant's character as a good father, such testimony was irrelevant to applicant's moral blameworthiness for robbing and murdering Nancy Harris by setting her on fire and leaving her to burn to death.

2.130. To the extent applicant is claiming that Makayi should have been allowed to testify about her love for him and her desire for him to live, such testimony was also inadmissible.

2.131. Mitigating evidence must relate to the defendant's own circumstances and personal moral culpability.[613] The effect of applicant's sentence on Makayi pertains solely to her circumstances. It does not relate to Applicant's own personal moral culpability and is, thus, irrelevant to mitigation.[614]

---

[611] Affidavit of Makayi Johnson, ⁋ 6.

[612] *Rhoades v. State*, 934 S.W.2d 113, 126 (Tex. Crim. App. 1996).

[613] *See Tennard v. Dretke*, 542 U.S. 274, 284 (2004); *see also Joubert v. State*, 235 S.W.3d 729, 734 (Tex. Crim. App. 2007).

[614] *See, e.g., Gallo v. State*, 239 S.W.3d 757, 778–79 (Tex. Crim. App. 2007) (holding that evidence of the impact of the defendant's execution on his family and friends is not relevant to mitigation); *Fuller v. State*, 827 S.W.2d 919, 935–36 (Tex. Crim. App. 1992) (rejecting defendant's complaint

2.132. Furthermore, evidence that depends on mere sympathy or emotional response should not be considered in the jury's determination of the defendant's deathworthiness.[615]

2.133. Counsel was not deficient for failing to offer inadmissible evidence.

2.134. Further, presenting Applicant's daughter as a witness could have backfired. A jury could have viewed it as nothing more than a plea for sympathy. Refraining from calling Applicant(s) daughters was within the realm of sound trial strategy.

2.135. Trial counsel considered calling Applicant's daughters, but Applicant opposed it, Deja backed out, and trial counsel was concerned about what the State would argue in response.  Further, trial counsel made their presence known to the jury without actually calling them as witnesses.

2.136. Applicant has not shown that trial counsel were ineffective for refraining from presenting testimony from Applicant's daughters.

### Michael "Myke Myke" Henry

2.137. Michael "Myke Myke" Henry is a childhood friend of Applicant's. He did not testify at trial; he did testify in this writ proceeding.

2.138. Ross reached out to Michael Henry by mail because he was in prison.[616] Henry responded to Ross by mail.[617] Ross did not meet Henry in person.[618] Henry expressed his willingness to help Applicant, but the defense team decided not to call Michael "Myke Myke" Henry in large part because of his own conviction for capital murder.[619] Trial counsel considered "the fact that he had been convicted of capital murder which lets the State say

---

that character evidence from relatives concerning their love for him and their desire to see him live constitute mitigating evidence).

[615] *Prystash v. State*, 3 S.W.3d 522, 534 (Tex. Crim. App. 1999).

[616] AWE 101; WRR2: 43–44.

[617] AWE 102; WRR2: 44–45.

[618] WRR2: 45.

[619] WRR1: 186; WRR2: 45.

birds of a feather."[620] Trial counsel did not feel that his testimony would have been beneficial to Applicant.[621] Moreover, Ross got the impression, right or wrong, that Henry wanted something for his help.[622]

2.139. The information in Myke Myke's affidavit is not compelling. The last time he saw Applicant was in 2000.[623] As children, they drank alcohol together, but "only sometimes smoked marijuana together."[624]

2.140. Myke Myke's testimony presented at the writ hearing was also less than compelling. He testified that Applicant is his best friend, but that they had had no contact since Myke Myke went to prison—in 2000.[625] They last time they saw each other, they were "getting high."[626] On direct examination, Myke Myke testified that, as a child, Applicant sometimes seemed "down," "quiet," and "preoccupied."[627] On cross, however, he acknowledged that there were times when Applicant was happy.[628] He considered Applicant's parents to be "strict."[629]

2.141. Myke Myke testified that he and Applicant would drink and get high off marijuana at a young age.[630] He established that Applicant would obtain alcohol by stealing it from his father.[631]

2.142. Myke Myke acknowledged that, at first, he and Applicant grew up in a good neighborhood.[632]

2.143. He established that, in high school, Applicant would visit the Rainbow Apartments where "partying, drinking, prostitution, drug selling, [and]

---

[620] WRR1: 187.
[621] WRR1: 187.
[622] WRR2: 81.
[623] Affidavit of Michael Henry, ▢ 17.
[624] Affidavit of Michael Henry, ▢ 10.
[625] WRR2: 175, 176.
[626] WRR2: 192.
[627] WRR2: 177.
[628] WRR2: 198.
[629] WRR2: 178.
[630] WRR2: 179–80.
[631] WRR2: 180–81.
[632] WRR2: 184, 200.

963

drug using" took place.[633] Around the age of 18 and 19, the two of them would "smoke, drink, party, [and] have women over."[634]

2.144. At some point, Myke Myke saw someone get shot, but Applicant was not there, did not witness it, and had nothing to do with it.[635] This incident does not relate to Applicant's own moral blameworthiness and is irrelevant.

2.145. When Applicant was around 19 or 20 and started smoking crack, Myke Myke asked him to stop.[636]

2.146. In a letter to Brendan Ross, Myke Myke described their drug use as "dibbling and dabbling."[637] He also said that he felt "real fucked up" that Applicant had not written him in prison, which bothered him.[638]

2.147. On cross-examination, Myke Myke acknowledged, "there was some amount of supervision" in Applicant's household while he grew up, and Myke Myke disagreed with the idea that Applicant's parents were "inattentive."[639]

2.148. Myke Myke and Applicant only went on a couple of multi-day drug binges together.[640]

2.149. Myke Myke said that he "would have gave [sic] [Applicant] every—every little help he can have" to quit crack, and he believed that others would have helped Applicant quit crack as well.[641]

2.150. Myke Myke acknowledged that he had two capital murder convictions— one for killing a man and a woman, and one for killing a child under six.[642]

---

[633] WRR2: 186–87.
[634] WRR2: 187.
[635] WRR2: 184–85, 201.
[636] WRR2: 188–89.
[637] WRR2: 196.
[638] WRR2: 197.
[639] WRR2: 199.
[640] WRR2: 199–200.
[641] WRR2: 201.
[642] SWE 7; WRR2: 204, 205.

2.151. Applicant has not shown that trial counsel were ineffective for failing to develop or present testimony from Myke Myke.

*Rochelle Cooper*

2.152. Rochelle Cooper is one of Applicant's childhood acquaintances. She executed a written declaration.[643] She writes that "Myke Myke and [Applicant] started smoking marijuana when they were very young, and I would smoke marijuana with them back then," but she does not even estimate an age or a timeframe to put these events in context.[644]

2.153. In paragraph 7, she describes things that Applicant would tell her.[645] This would have been inadmissible as hearsay.

2.154. To the extent that the information in Cooper's declaration was admissible and relevant at trial, it would not have changed the outcome.

2.155. Trial counsel were not ineffective for failing to present the testimony of Rochelle Cooper.

*Shirley Henry*

2.156. Shirley Henry is Myke Myke's mother. She did not testify at trial or in this hearing, but she executed a written declaration.[646]

2.157. In paragraph 6, she writes she kept marijuana in her house, that she would smoke a little bit at night after work. She further states that she discovered her son Myke Myke and Applicant stole her marijuana around the age of seven or eight and "would smoke a whole bag of marijuana in one sitting." "This troubled me," she claims.[647]

2.158. If Shirley was a casual user of marijuana, as she claims, she would surely notice an entire bag of it going missing, such that the scenario would not repeat itself—especially if it "troubled" her, as she also claims.

---

[643] AWE 87.
[644] AWE 87, ⊠4.
[645] AWE 87, ⊠7.
[646] *See* AWE 86.
[647] AWE 86, ⊠ 6.

94

965

2.159. Paragraph 7 contains hearsay from Myke Myke that would not have been admissible at trial.

2.160. Paragraph 8 does not pertain to Applicant and is irrelevant.

2.161. Paragraph 9 contains inadmissible hearsay.

2.162. To the extent that the information in Shirley's declaration would have been admissible at trial, it would have had no impact on the outcome.

2.163. Trial counsel was not ineffective for failing to present the testimony of Shirley Henry.

*Stetron Mills*

2.164. Stetron Mills did not testify at trial or in this writ proceeding.

2.165. Stetron Mills' affidavit supports the idea that Applicant was introduced to marijuana at around the age of seven, which could have been helpful.[648]

2.166. Beyond that, though, his affidavit is not particularly compelling. Paragraphs 4, 5, 9, and 13 are not about Applicant, but about Stetron Mills and others.[649] Paragraph 12 is speculation.[650]

2.167. Further, Stetron Mills was in prison at the time of Applicant's trial.[651] Had he testified, he would likely have been impeached with one or more felony convictions.[652] The jury would have been entitled to assess his credibility accordingly.

2.168. Overall, the admissible information in Stetron Mills's affidavit would not have impacted the outcome.

---

[648] *See* Affidavit of Stetron Mills, ⁊ 7.
[649] *See* Affidavit of Stetron Mills, ⁊⁊ 4, 5, 9, 13.
[650] *See* Affidavit of Stetron Mills, ⁊ 12 ("I believe [Applicant's] drinking and drug use around this time was driven by stress and depression.").
[651] *See* Affidavit of Stetron Mills, ⁊ 13.
[652] *See* Tex. R. Evid. 609(a).

95

2.169. Trial counsel were not ineffective for failing to develop and present the testimony of Stetron Mills.

### Timothy Johnson

2.170. Timothy Johnson, Applicant's brother, testified at trial and in this writ proceeding.

2.171. Before trial, Ross reached out to Timothy Johnson in two letters, as he was incarcerated in the Texas Department of Criminal Justice at the time, but Timothy did not respond to Ross.[653] Ross initially testified in this writ proceeding that she went to visit Timothy in the Michaels Unit, but later remembered that the first time she met him was in the Dallas County jail after he arrived on a bench warrant.[654] Regardless of the facility in which their first meeting took place, this Court finds that Ross met with Timothy before trial.

2.172. Timothy Johnson arrived in Dallas angry, but he was angry at multiple things, most of which were beyond trial counsel's control.[655] He was angry that he was bench-warranted without explanation, even though this is common.[656] "He was angry that nobody had told him about their mother being sick, and that Anthony wasn't stepping up to do things that he thought Anthony should be doing. He was just angry."[657]

2.173. Despite his initial anger, trial counsel felt his testimony was necessary because he was "a little more honest" about the parenting style under which Applicant and his brothers grew up.[658]

2.174. For example, Timothy explained at trial that Applicant kept to himself as a child, that the family did not talk about their feelings, and that Applicant

---

[653] AWEX 103, 104; WRR2: 46–48.
[654] WRR2: 48–49.
[655] WRR1: 136.
[656] WRR2: 245.
[657] WRR1: 136.
[658] WRR2: 68.

used marijuana at a young age.[659]

2.175. In this writ proceeding, Timothy testified that he signed a release for writ counsel to obtain his medical, prison, and similar records.[660] The record, however, does not reveal whether any information contained in the records obtained post-conviction would have been helpful to Applicant.

2.176. In this writ proceeding, Timothy Johnson testified that:

- Their mother worked in a factory and sewed to make money on the side;[661]
- Their father worked nights at a dairy and sold beer on the side;[662]
- Their parents asked about their activities, but they "never told the truth."[663]
- Their parents set a 10:00 curfew;[664]
- Their mother cooked and left food on the stove;[665]
- Although they were poor, their parents made sure they had clothes and school supplies.[666]
- Their mother was a caring and generous woman.[667]
- Their mother encouraged school and sports, and would have helped her sons continue on the right path in any way she knew how.[668]

2.177. Timothy Johnson could only testify to seeing Applicant change diapers once and feed his daughters once.[669] He never saw Applicant using crack or PCP, and only saw him "high" three or four times.[670] Timothy would have done anything that he could to help Applicant with his substance

---

[659] RR50: 72–75.
[660] WRR2: 216–17.
[661] WRR2: 224–25.
[662] WRR2: 226–27.
[663] WRR2: 227–28.
[664] WRR2: 228.
[665] WRR2: 228, 248.
[666] WRR2: 229.
[667] WRR2: 247.
[668] WRR2: 250.
[669] WRR2: 242–43.
[670] WRR2: 250–51.

968

abuse problem.[671]

2.178. Despite having access to drugs, Timothy quit using drugs because he got tired of it.[672] Thus, the additional information solicited from Timothy at this writ hearing was not beneficial and would not have changed the outcome.

2.179. Much of the information in Timothy Johnson's affidavit pertains to Timothy Johnson, and not to Applicant. For example, paragraphs 8, 9, 10, 11, 12, 14, 18, and 24 are about people other than Applicant.[673] While some of the information in those paragraphs might have been admissible as background information, it would not have constituted significant mitigating evidence.

2.180. Other portions of Timothy Johnson's affidavit contain, or are based on, inadmissible hearsay that the jury likely would not have heard. For example, things that Applicant told Timothy Johnson and things that "people from the neighborhood" said to Timothy would have been inadmissible hearsay.[674]

2.181. To the extent that the information contained in the affidavit was admissible and not presented at trial, it would not have changed the outcome. Trial counsel were not ineffective in their preparation and presentation of Timothy Johnson's testimony.


*Kristi Compton*

2.182. As noted above, trial counsel had Kristi Compton, Ph.D., a forensic psychologist, on standby to testify in the punishment phase of trial about childhood trauma that Applicant experienced.[675] Trial counsel envisioned using Dr. Compton "to just kind of tie it all up and explain the psychological significance, I guess, of [Applicant]'s life experiences and

---

[671] WRR2: 251.

[672] WRR2: 252.

[673] *See* Affidavit of Timothy Johnson, ¶¶ 8, 9, 10, 11, 12, 14, 18, 24.

[674] *See* Affidavit of Timothy Johnson, ¶¶ 13, 20.

[675] WRR1: 85.

how it got him to where he was."[676] She would have testified about the relationship of sexual trauma to depression and drug addiction.[677]

2.183. Dr. Compton is known to the Court as a qualified and experienced forensic psychologist who testifies well in front of juries. This Court engaged the services of Dr. Compton as the Court's expert in an unrelated death penalty case. The Court of Criminal Appeals has found Dr. Compton to be credible in yet another death penalty case.[678]

2.184. Dr. Compton never met with Applicant, which would have made her unable to give him a diagnosis.[679] This was a sound strategy, as it would have eliminated any possibility of the State eliciting a diagnosis of antisocial personality disorder-—or any other personality disorder—on cross-examination.

2.185. Nevertheless, trial counsel ultimately chose not to call Dr. Compton to testify.[680] When trial counsel was asked in this writ proceeding why she decided not to call Dr. Compton to testify, she explained: "Because Timothy Proctor was sitting in the front row and had been there throughout the punishment phase with his boxes of records that he had reviewed. I know Dr. Proctor. I know he testifies very well in front of juries, and his testimony can be very damaging to the Defense. And I had a very intense, heated conversation with Dr. Compton and Brendan Ross in the hallway about whether or not it—we got more out of putting Compton on than we would lose by them putting Proctor on. Because we had the belief, nobody ever said so, but we had the belief that if we didn't put on Compton, the State wasn't going to put on Proctor. And we were ultimately right in that."[681]

2.186. Indeed, trial counsel was correct. The State did not call Dr. Proctor at Applicant's trial. Dr. Proctor did not testify until these writ proceedings commenced, and the opinions that Dr. Proctor gave would have been

---

[676] WRR1: 85.

[677] WRR1: 86.

[678] See Ex parte Moore, 548 S.W.3d 552, 562–63 (Tex. Crim. App. 2018).

[679] WRR1: 87.

[680] WRR1: 86.

[681] WRR1: 154–55.

970

damaging to Applicant had he testified at trial.

2.187. Trial counsel's decision not to call Dr. Compton was strategic and reasonable.

2.188. Trial counsel's reasons for not calling a social historian other than Kristi Compton were strategic and reasonable.

*Amy Nguyen*

2.189. Early on in her representation of Applicant, Bernhard consulted with Amy Nguyen about the possibility of preparing maps and providing expert testimony about the demographics of Applicant's childhood neighborhood.[682] Nguyen did not testify at trial, however.

2.190. Amy Nguyen had availability problems due to a scheduled back surgery, and Bernhard was unaware of another capital-specific mapper in the country.[683]

2.191. Even if Amy Nguyen has presented the demographic evidence, it would not have been compelling. According to the 1980 and 1990 census, in terms of poverty, Garland was better off than Dallas County as a whole, better off than Texas as a whole, and better off than the United States as a whole.[684] In terms of education, according to the 1990 census, Garland was better off than Dallas County as a whole, better off than Texas as a whole, and better off than the United States as a whole.[685] According to the 1980 and 1990 census, in terms of household income for African American households, Garland was better off than Dallas County as a whole, better off than Texas as a whole, and better off than the United States as a whole.[686] According to the 1980 and 1990 census, in terms of unemployment, Garland was equal to Dallas County as a whole, better off than Texas as a whole, and better off than the United States as a whole.[687] Although Applicant's specific neighborhood did not fare as well, the

---

[682] WRR1: 119–20.
[683] SWE 1; WRR1: 120–23.
[684] WRR4: 160.
[685] WRR4: 160–61.
[686] WRR4: 161–62.
[687] WRR4: 162.

demographic evidence does not paint a picture of widespread poverty in Garland, Texas, in the 1980s and 1990s.[688]

2.192. Trial counsel were not ineffective for failing to present the testimony of Amy Nguyen or a similar mapping expert.

2.193. Applicant has not shown that Amy Nguyen's testimony would have any likelihood of changing the outcome.

### Conclusion

2.194. Trial counsel presented lay and expert testimony about Applicant's social history—just in a different way than writ counsel did. The use of a social historian such as Dr. Celeste Henery, Dr. Jennifer Sapia, or someone similarly qualified would not have produced a different outcome. Dr. Kristi Compton was prepared to testify in a similar capacity, and trial counsel made a valid and strategic decision not to call her.

2.195. In sum, trial counsel were not ineffective for failing to call additional witnesses. They were not ineffective for failing to elicit additional testimony from the witnesses that they did call. In addition, they were not ineffective for choosing to present the witnesses that they presented. All such choices were within the realm of reasonable representation.

2.196. The record does not support a finding that Ross or the trial team consciously chose not to speak to a prospective witness or knowledgeable person.

2.197. The record does not support a finding that any uncalled witness had significant mitigating evidence to offer.

2.198. Further, the Court finds that Applicant's conviction and death sentence were inevitable. The result would have been the same had trial counsel made different strategic choices.

2.199. Applicant has failed to prove by a preponderance of the evidence that trial counsel were ineffective for failing to investigate and present lay and expert testimony about Applicant's social history.

---

[688] WRR4: 190–91.

2.200. Claim two should be denied.

## GROUND THREE

### 3. PRESERVATION OF ERROR IN JURY SELECTION

3.1. In his third issue, Applicant claims that "trial counsel were ineffective at jury selection for failing to properly preserve trial court errors for direct appeal."[689] Specifically, he claims that the trial court improperly granted the State's challenges for cause with respect to prospective jurors Boulos, McDaniel, Plan, and Stanmore; that the trial court violated his rights under the Sixth Amendment of the U.S. Constitution and Article I, § 10 of the Texas Constitution; and that trial counsel were ineffective for failing to object and preserve error.[690]

3.2. When an ineffective-assistance claim involves error preservation, Applicant must show that he likely would have been successful on appeal had error been preserved.[691] This, in turn, requires a showing that the trial court abused its discretion.[692]

#### No deficient performance

3.3. At the outset, this Court notes that the Court of Criminal Appeals found that "[t]he record includes sufficient evidence to support the trial court's rulings on the State's challenges to Boulos, McDaniel, Plank, and Stanmore."[693] As a matter of law, then, there was no abuse of discretion and no ineffective assistance with respect to those prospective jurors.

3.4. Applicant fails to demonstrate by a preponderance of the evidence any deficiency in his counsel's conduct, much less any resulting prejudice.

3.5. A judge must excuse a juror if (1) he possesses a bias or prejudice against the defendant or the law on which either party is entitled to rely, and (2) the

---

[689] Writ app. at 112.

[690] Writ. App. at 112–27.

[691] See Ex parte Moore, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013).

[692] Id.

[693] Johnson v. State, No. AP-77,030, 2015 WL 7354609, at *16 (Tex. Crim. App. Nov. 18, 2015) (not designated for publication).

102

973



bias or prejudice would impair the juror's ability to carry out his oath and instructions in accordance with the law.[694]

3.6. A prospective juror may be excluded for cause when her views on capital punishment are such that they would prevent or substantially impair the performance of her duties as a juror.[695] A defendant has no right to have a particular individual serve on his jury.[696] A defendant's only substantial right is that the jurors who do serve be qualified.[697]

3.7. Additionally, trial counsel had valid strategic reasons not to request further voir dire of the relevant prospective jurors. Bernhard testified in this proceeding that "[t]he ones that I didn't specifically ask to have an opportunity to rehabilitate, I know on one of them, I didn't like her to begin with. So I didn't really want her rehabilitated. I think that was Ms. Boulos or something[.]"[698]

3.8. Bernhard had a valid, strategic reason not to question the remaining prospective jurors as well. She testified in this proceeding that "the others just made it really pretty clear in the little bit of time they were on the stand that they were not going to be rehabilitated. And it just wasn't going to be— it—there was no reason to try to do it because they made it very clear that they were not going to be qualified."[699]

3.9. This Court credits Bernhard's explanation with respect to the prospective jurors at issue.

3.10. Applicant has not overcome the strong presumption of sound trial strategy.

3.11. Applicant has not shown by a preponderance of the evidence that trial counsel were ineffective for failing to preserve error in jury selection.

---

[694] *Comeaux v. State*, 445 S.W.3d 745, 749 (Tex. Crim. App. 2014).

[695] *Mathis v. State*, 67 S.W.3d 918, 922 (Tex. Crim. App. 2002).

[696] *See Jones v. State*, 982 S.W.2d 386, 393–94 (Tex. Crim. App. 1998).

[697] *Id.* at 393.

[698] WRR1: 164.

[699] WRR1: 165.

974

*Mary Boulos*

3.12. Prospective Juror Boulos indicated on her questionnaire that she had moral, religious, or personal beliefs that would prevent her from sitting in judgment of another human being.[700] In response to a later question, Boulos wrote, "still don't have the right to judge whether someone lives or dies."[701] This Court finds that this constituted an independent and valid reason to excuse her from jury service.

3.13. Later in her questionnaire, Prospective Juror Boulos indicated that she might move out of Dallas County.[702] This Court finds that this constituted an independent and valid reason to excuse her from jury service.

*Judith McDaniel*

3.14. Judith McDaniel indicated on her questionnaire that she holds a moral, religious, or personal belief that would prevent her from returning a verdict, which would result in the execution of another human being.[703] This Court finds that Applicant was not entitled to have her serve on the jury.

*Terry Plank*

3.15. The State challenged Prospective Juror Plank for cause, and trial counsel objected both to the challenge and "to not being able to rehabilitate him."[704]

3.16. On appeal, the Court of Criminal Appeals reached the merits with regard to Prospective Juror Plank and held that any error in denying Applicant the opportunity to question him was harmless.[705]

3.17. Trial counsel was not ineffective for failing to lodge objections with

---

[700] Questionnaire of Mary Boulos, q. 4.
[701] Questionnaire of Mary Boulos, q. 10.
[702] Questionnaire of Mary Boulos, q. 137, 140.
[703] Questionnaire of Judith McDaniel, q. 5.
[704] RR12: 29–30.
[705] *Johnson v. State*, No. AP-77,030, 2015 WL 7354609, at *17 (Tex. Crim. App. Nov. 18, 2015) (not designated for publication).

respect to Prospective Juror Plank.

### Floyd Stanmore

3.18. The State challenged Prospective Juror Stanmore for cause, and trial counsel objected to both the challenge and "his being excused without the opportunity to question him."[706]

3.19. On appeal, the Court of Criminal Appeals reached the merits with regard to Prospective Juror Stanmore and held that any error in denying Applicant the opportunity to question him was harmless.[707]

3.20. Trial counsel was not ineffective for failing to lodge objections with respect to Prospective Juror Stanmore.

### No prejudice

3.21. Applicant argues that he was prejudiced because Jurors Jenkins and Adams were seated.[708] He claims that "although trial counsel would have exercised peremptory strikes had any remained, [Applicant] was forced to accept objectionable jurors Jenkins and Adams being seated on his jury."[709] However, he did not elicit testimony in this writ proceeding from trial counsel that they would have exercised peremptory strikes had any remained. He, therefore, failed to prove prejudice, as alleged in his writ application, by a preponderance of the evidence.

3.22. In jury selection, the parties agreed, before speaking to any of the prospective jurors, that they would not voir dire "any of the [prospective] jurors that indicated that they were a Number 1 or a Number 4 or 5 on the ... question in the questionnaire about whether or not they believe in the death penalty and could assess that sentence."[710]

3.23. The relevant question was this:

---

[706] RR32: 78–79.

[707] *Johnson*, 2015 WL 7354609, at *17.

[708] Writ app. at 127–31.

[709] Writ app. at 127.

[710] RR43: 7.

976

With reference to the death penalty, which of the following statements best represents your feelings?

1. I believe that the death penalty is appropriate in all murder cases.

2. I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty.

3. Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances.

4. I believe that the death penalty is appropriate in some murder cases, but I could never return a verdict which assessed the death penalty.

5. I could never, under any circumstances, return a verdict which assessed the death penalty.

3.24. As a result of this agreement, the parties automatically eliminated prospective jurors with strong or extreme views on the death penalty.

3.25. This Court finds that Applicant was not required to accept any prospective juror who held a strong or extreme view on the death penalty.

3.26. Further, Applicant requested two additional peremptory strikes, and this Court granted both requests.[711] This Court denied Applicant's request for a third additional peremptory strike.[712]

### Shonquidria Jenkins

3.27. On her questionnaire, Juror Jenkins indicated that the best argument for the death penalty is "proving the person meant to do it and has no feeling

---

[711] RR43: 16–17.
[712] RR43: 17.

106

977

about what he/she has done."[713] Juror Jenkins indicated that the best argument against the death penalty is "it was an accident."[714] This shows that Jenkins would likely have been receptive to Applicant's stated defensive theory that he did not intend to kill Nancy Harris.[715]

3.28.   When asked "What would be important to you in deciding whether a person received a death sentence rather than a life sentence in a capital murder case," Jenkins wrote, "1) Was it an accident, 2) did they show any feeling about what they have done."[716] This shows that she would have been receptive to both Applicant's lack-of-intent defensive theory and overall theme of remorse.[717]

3.29.   Applicant claims that Jenkins was objectionable because she had experienced family violence.[718] The State asked her about that in voir dire; she explained that it was something that had happened once, she sought a protective order but "that was it," and that it would not affect her evaluation of the case.[719]

3.30.   Jenkins also indicated that she has visited someone in prison.[720] She further indicated that her brother was in "Lew Sterrett" at that very moment.[721] This Court takes judicial notice that "Lew Sterrett" is the Dallas County Jail.

3.31.   Jenkins further indicated that her other brother was on probation for burglary.[722]

3.32.   Jenkins indicated that she would presume Applicant innocent, that she would require the State to prove the first special issue beyond a reasonable doubt, and that she would still consider mitigation even if the

---

[713] Questionnaire of Shonquidria Jenkins, q. 7.
[714] Questionnaire of Shonquidria Jenkins, q. 8.
[715] See WRR1: 59–60, 198.
[716] Questionnaire of Shonquidria Jenkins, q. 18.
[717] See WRR1: 71–72, 148.
[718] See writ app. at 128.
[719] RR38: 100, 103.
[720] RR38: 88, 100–01.
[721] RR38: 101–02.
[722] RR38: 103.

978

State did so.[723]

3.33. Jenkins explicitly indicated that she would be interested in remorse—Applicant's stated theme—in assessing the death penalty.[724]

3.34. Jenkins indicated that the objectives of sentencing should be rehabilitation first, punishment second, and deterrence third.[725]

3.35. Overall, the record shows Jenkins to be a fair-minded juror who would likely have been receptive to Applicant's case. The record does not reveal Jenkins to be a biased, unfair, or unsuitable juror.

3.36. Applicant has failed to prove by a preponderance of the evidence that he was prejudiced by having Jenkins on the jury.

*Jerri Adams*

3.37. Applicant additionally claims that he was prejudiced by having Jerri Adams on the jury.[726]

3.38. Although Juror Adams rated her belief in the death penalty at 10 out of 10, she simultaneously indicated that she did not believe in "an eye for an eye" because "vengeance is implied in that statement."[727] Further, in voir dire, she said that she understood that a life sentence would be appropriate in some cases and that she would not automatically apply the death penalty.[728] She explained that, when she rated herself a 10 on the death penalty, "I guess I put a 10 thinking, I could make up my mind on it. Not a 5, and I'm going to be on the fence and not be able to make a decision based on what we hear."[729]

3.39. Indeed, the indictment was read to Juror Adams in voir dire; she "thought it was terrible," but "didn't decide, yes, that deserves the death

---

[723] RR38: 108, 113, 114–16.
[724] RR38: 116.
[725] RR38: 123.
[726] Writ app. at 128–30.
[727] Questionnaire of Jerri Adams, q. 14, 15.
[728] RR39: 10.
[729] RR39: 59.

979

penalty."[730]

3.40.  Juror Adams also indicated that she agreed that evidence of intoxication may be considered in mitigation of punishment.[731] Similarly, she said that she would not automatically hold it against someone if alcohol or drugs had been part of his or her life.[732]

3.41.  Juror Adams indicated that she could consider five years as a valid punishment for murder.[733]

3.42.  Juror Adams indicated in voir dire that police officers are "just like everyone else" and that she would wait to hear what they had to say and assess their credibility like anyone else.[734]

3.43.  Juror Adams indicated that, because death is final, that she must be absolutely sure that it is an appropriate penalty for the crime.[735]

3.44.  To the extent that Juror Adams indicated that she would follow scripture over the law, the record suggests, but is not conclusive, that she was referring to her views on abortion, not the death penalty:

> When I wrote this, I meant in the bigger picture, that the laws of the land have to be followed or should be followed [ ] without contradiction to scripture. Not specifically to this case, not specifically to anything in particular. I think what I think of in that type of thing is, you know—well, this will get into my views on abortion and those kinds of things [ ] If the law says you can do it I still don't think you can do it, because I believe it's against scripture. That type of thing.[736]

3.45.  In other words, it appears that Juror Adams might, based on scripture, refrain from doing some things that the law permits, as opposed to doing

---

[730] RR39: 58–59.
[731] Questionnaire of Jerri Adams, q. 65.
[732] RR39: 50.
[733] RR39: 27.
[734] RR39: 29–30.
[735] RR39: 31–32.
[736] RR39: 62.

things that the law prohibits. She elaborated in these words:

> The law may allow you to do things. Like I'll go back to the abortion example. May allow you to do that, but I don't believe it's right. So I don't think that it's right for people to do that kind of thing. I wasn't saying that I was going to ignore the law[.][737]

3.46. Further, Juror Adams testified that she "can't imagine" a scenario in which she would follow, or would be required to follow, Biblical scripture if it contradicted the law.[738] Ultimately, Juror Adams testified that she would follow the laws that a jury would use in a death penalty case.[739]

3.47. Applicant has not shown by a preponderance of the evidence that Juror Adams had a bias or prejudice against him or a bias or prejudice against any of the law applicable to the case upon which Applicant was entitled to rely.[740]

3.48. Applicant has failed to prove by a preponderance of the evidence that he was prejudiced by having Juror Adams on the jury.

3.49. This Court finds that in no event was Applicant prejudiced by having Jurors Jenkins and Adams on the jury.

3.50. Trial counsel were not ineffective in jury selection. They had strategic reasons to refrain from attempts to rehabilitate the prospective jurors at issue and, in any event, the record supported the trial court's rulings.

3.51. Applicant's third claim for relief should be denied.

---

[737] RR39: 64.

[738] RR39: 65.

[739] RR39: 68.

[740] *See* Tex. Code Crim. Proc. art. 36.16(a)(9) & (c)(2).

# GROUND FOUR

4. CHANGE OF VENUE

4.1. In his fourth claim, Applicant argues that trial counsel were ineffective for failing to request a change of venue on account of media coverage of Applicant's crime.[741]

4.2. When pretrial publicity is at issue, the defendant must show that the publicity was pervasive, prejudicial, and inflammatory.[742] Widespread publicity by itself is not considered inherently prejudicial.[743] Indeed, even extensive knowledge of the case or defendant in the community as a result of pretrial publicity is not sufficient if there is not also some showing of prejudicial or inflammatory coverage.[744]

4.3. News stories, be it from print, radio, or television, that are accurate and objective in their coverage, are generally considered by the Court of Criminal Appeals not to be prejudicial or inflammatory.[745]

4.4. The mere fact that a case has been publicized by the news media does not, by itself, establish prejudice or require a change of venue.[746] A defendant seeking a change of venue based on media reports and publicity has the burden of showing prejudice such "that the likelihood of obtaining a fair and impartial jury is doubtful."[747]

4.5. Applicant has not shown that any of the media coverage was inaccurate or unfairly inflammatory.

---

[741] Writ app. at 131–38.

[742] *Salazar v. State*, 38 S.W.3d 141, 149–50 (Tex. Crim. App. 2001).

[743] *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007).

[744] *Id.*

[745] See *Bell v. State*, 938 S.W.2d 35, 46 (Tex. Crim. App. 1996); *Willingham v. State*, 897 S.W.2d. 351, 357 (Tex. Crim. App. 1995); *Johnson v. State*, 773 S.W.2d 322, 324-25 (Tex. Crim. App. 1989); see also *Patton v. Yount*, 467 U.S. 1025, 1033-1034, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984).

[746] *Garcia v. State*, 513 S.W.2d 82 (Tex. Crim. App. 1974).

[747] *Nethery v. State*, 692 S.W.2d 686, 694 (Tex. Crim. App. 1985).

111

982

4.6. Bernhard explained that she considered a motion for change of venue "[f]or maybe all of maybe five seconds. I mean, maybe a little longer than that. But I think on a death penalty case, your jury pool in Dallas County is going to be as good as, if not better than, anywhere else in the state of Texas."[748] The Court credits trial counsel's explanation.

4.7. Trial counsel was able, through questioning and questionnaires, to identify prospective jurors who had been influenced by media coverage.[749]

4.8. Applicant would have been tried by a death-qualified jury in any county.

4.9. Weatherspoon has experience trying cases in Dallas, Denton, Collin, Rockwall, Tarrant, Hamilton, and Harris Counties.[750] He was of the opinion that Applicant would likely have been worse off trying the case in another county in Texas.[751] This Court credits his opinion and finds it to be reasonable.

4.10. Trial counsel liked the jury panel that they had.[752] According to Weatherspoon, "[t]hey seemed like they would keep an open mind."[753] Refraining from seeking a change of venue was, thus, a valid, strategic choice.

4.11. In fact, trial counsel had an opportunity to begin jury selection anew with a different panel and, after consulting with Applicant, chose not to do so.[754]

4.12. The Court takes judicial notice that the media coverage of this case extended well beyond Dallas and surrounding counties.

4.13. Trial counsel had enjoyed success in getting the prospective jurors struck for cause that they wanted, and felt like jury selection had gone quite well for Applicant.[755] Thus, they had no reason to want to change venue.

---

[748] WRR1: 165.
[749] WRR1: 166.
[750] WRR1: 191–92.
[751] WRR1: 210.
[752] WRR1: 210–11.
[753] WRR1: 211.
[754] SWE 5; WRR1: 211–12.
[755] WRR1: 212.

4.14.  The Court does not recall significant difficulty selecting a jury on account of the media coverage in this case.

4.15.  The trial court and the parties in this case used a 19-page supplemental jury questionnaire with 140 questions. Prospective jurors were asked to complete the questionnaire and sign it underneath a declaration under penalty of perjury that the answers were true and correct.

4.16.  The supplemental jury questionnaire contained questions designed to identify prospective jurors who had been exposed to pre-trial publicity about this case.

4.17.  Specifically, the questionnaire contained the following questions:

> In this case, the defendant is accused of robbing or attempting to rob a convenience store and causing the death of a store employee by setting her on fire.
>
> **If you think you have heard, read, or know anything about this case, do not discuss your recollections with anyone, including fellow prospective jurors, family members, or co-workers. Do not attempt to research any information on the case, whether by internet, newspaper, or any other means.**
>
> 124. Other than what you have heard in court, have you read, seen, or heard anything from any source about this case? [  ] YES  [  ] NO If yes, please tell us what you know and the source of the information.
>
> _____
>
> _____
>
> _____
>
> 756

4.18.  Further, the questionnaire contained the following "catch-all" question:

> 140. Is there anything not mentioned in this questionnaire that you want the Court and the parties to know about you in making a decision as to whether or not you will be selected as a juror in this

---

[756] Supplemental Jury Questionnaire, p. 16, q. 124.

case?
[ ] YES  [ ] NO
If yes, please explain.

_____

_____

_____

757

4.19.  This Court finds that it used adequate screening measures to identify prospective jurors who had been exposed to pre-trial publicity.

4.20.  Applicant has failed to rebut the presumption of reasonable legal strategy in not filing a motion for change of venue.

4.21.  Applicant has failed to prove by a preponderance of the evidence any likelihood that a death-qualified jury in another county would have (1) acquitted him or convicted him of a lesser-included offense or (2) answered the punishment special issues any differently.

4.22.  Trial counsel were not ineffective for failing to request a change of venue. Trial counsel had strategic reasons for wanting to keep the trial in Dallas County, and Applicant did not show any probability that a change of venue would have benefitted him.

4.23.  Applicant's fourth claim should be denied.

## GROUND FIVE

5.  CUMULATIVE INEFFECTIVE ASSISTANCE OF COUNSEL

5.1.  In his fifth ground for relief, Applicant claims that trial counsel's cumulative deficient performance over the course of the trial prejudiced him.[758] He does not allege any additional instances of deficient performance; he merely repeats claims 1 through 4.

5.2.  This Court has resolved claims 1 through 4 against Applicant.

---

[757] Supplemental Jury Questionnaire, p. 18, q. 140.
[758] Writ app. at 139–41.

114

985

5.3. Nevertheless, during this writ proceeding, writ counsel inquired of additional circumstances that might arguably present instances of ineffective assistance.

### Plea negotiations/Mitigation Pitch

5.4. Applicant would have pleaded guilty in exchange for a life sentence, and trial counsel conveyed that to the prosecutor multiple times.[759]

5.5. According to Bernhard, the trial prosecutor's response to the life offer was that "[s]he wanted him to die."[760]

5.6. Trial counsel chose not to have a formal mitigation "pitch" with the prosecutor.[761] As noted above, the prosecutor was adamant that she wanted a death sentence.[762] Trial counsel decided that having a formal mitigation pitch and showing her hand would have been "a disaster."[763] In light of the prosecutor's stated position, trial counsel's decision was reasonable.

### Not giving an opening statement

5.7. Weatherspoon did not give an opening statement in the guilt phase of trial.

5.8. Weatherspoon testified that "80 percent of the time [he does] not give an opening statement" and he did not give one in this case in part because "it ... would have given the State a roadmap of where we were going."[764]

5.9. Weatherspoon further testified that "[o]ne of the reasons that ... a defense attorney may not give an opening statement is when you give an opening statement, you lock yourself into a certain set of facts. And if you give an opening statement to a certain set of facts and something comes up during the trial or you have to change gears during the trial, then that

---

[759] WRR1: 136–37, 171.
[760] WRR1: 171.
[761] WRR1: 137, 171.
[762] WRR1: 171.
[763] WRR1: 171.
[764] WRR1: 200.

puts you at a disadvantage."[765]

5.10. The Court accepts Weatherspoon's explanation for not giving an opening statement as valid and finds that counsel's choice not to give an opening statement was a reasonable, strategic choice.

*Withholding objection to the State's guilt-phase closing argument*

5.11. During this writ proceeding, Applicant appeared to take the position that trial counsel should have objected to the State's guilt-phase closing argument.[766]

5.12. Proper forms of jury argument include summation of the evidence, reasonable deductions from the evidence, answers to the argument of opposing counsel, and pleas for law enforcement.[767]

5.13. In the guilt phase of trial, Nancy Mulder argued as follows:

> And remember in voir dire the prosecutor said they would bring y'all the evidence, didn't they? Well, let's talk about that. You know that after Mr. Johnson's caught, and he's— Officer Coffey—and you've seen the video of him in the squad car. He takes him down where? To the Garland police jail to where? An interview room. You know—and Detective Tooke testified. He read [Applicant] his Miranda warnings, that [Applicant] waived those warnings and spoke with him. And that [Applicant]—his interview with [Applicant] is videotaped and recorded. Wouldn't that be helpful evidence for you to see? We can't offer that, the Defense. But that is evidence they can offer, and they chose not to. Why? Why are they withholding that evidence from you? The Defendant's interviewed two hours after the offense. Wouldn't his behavior, demeanor, words be helpful in you making the decision? You know, the prosecutors aren't the judge and jury. We have a Judge, and you are the jury. You decide

---

[765] WRR1: 208.

[766] WRR1: 242.

[767] *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008).

116

987

what is important in this case. You decide what evidence
you need to make a decision.

It's a reasonable deduction from the evidence that not
offering his statement—that they're not offering it
because it helps him. I guarantee you, if it hurt him, it
would have been on all three screens, just like all those
horrible God awful pictures of Nancy Harris.[768]

5.14.  Mulder returned to this theme in her closing argument in the
punishment phase of trial:

Ladies and gentlemen, good morning. There's something
that Ms. Evans said that I want you to remember. You get
to look at the before, during, and after this offense. Oh,
but wait. No, you don't get to see the whole after,
because why? Because despite what they told you on voir
dire, they have withheld evidence from you in this capital
murder case. You know that [Applicant] got—two hours
after this happened, was read his Miranda warnings,
agreed to waive them, and spoke with who, Detective
Tooke. He's been here every day. I know he's here
somewhere. At any point during this case they could have
brought you his words, and they have withheld that from
you. We don't get to offer that. The Judge cannot make
them offer that. It is their choice. They are standing
before you asking you to make what will probably be the
most important decision of your life, the death of another
human being, and they are asking you to do it without all
the evidence. That should appall you. That should
frighten you.

They're asking you to make a decision about this man's
life, despite the fact they have not brought you
everything you deserve to know. They have brought you
everything else from the time he was 15 and when he was

---

[768] RR46: 55–56.

a dumb kid of 18, getting that shotgun tattoo. They brought you everything else. Oh, oh, but, you know, they're not going to bring you his words two hours after this happened. Why? You know if it helped them, like I said before, it would be on all three screens. That should appall you. They said during voir dire they would bring you every piece of evidence in this case, and they have not. That in and of itself is reasonable doubt with regard to Special Issue Number 1.[769]

5.15. In response, the prosecutor argued:

And when we ask you to decide what would be important to you in answering that question about will somebody more likely than not be a threat in the future, the facts of the crime, the person's character, and their background, we brought you all of that. You didn't need to see a videotape of this Defendant who got caught red-handed in the neighborhood, identified on video saying he was real sorry. We bring you evidence that matters, and him saying he's sorry one more time, him saying the drugs did it one more time is not necessary. You heard that. And it's not credible.[770]

5.16. Applicant did not object to the State's argument.[771]

5.17. In this writ proceeding, writ counsel asked Mulder about this:

Q:    You recall a moment in closing arguments in the guilt phase when ADA Moseley argued that the State didn't introduce [Applicant's] testimony because it wasn't persuasive?

A:    Yes. The—they didn't produce or show the interview of him immediately after his arrest.

---

[769] RR52: 27–28.
[770] RR52: 54–55.
[771] RR54: 55.

118

989

Q: And then in closing argument, she argued that it was because—that the State chose not to introduce that because it was not persuasive?

A: Because she found it not persuasive. And, yes, because I had argued you can't give somebody death when the State is withholding evidence from you.

Q: And you'd agree with me that her argument was not a valid, legal argument?

A: Correct.

Q: And you'd agree with me that [Applicant's] trial team failed to object to that argument?

A: Yes.[772]

5.18. Two interpretations of the State's argument are possible, depending on what *it* refers to in "it's not credible." *It* could mean the evidence that was not admitted, in which case the argument was the prosecutor's personal opinion about something outside the record, which would not be proper. Or, *it* could have referred to the evidence that the jury heard, which would have been a proper argument.

5.19. Because of the proximity of "You heard that" and "it's not credible," the more reasonable interpretation is that the prosecutor meant that the evidence of remorse and "him saying the drugs did it" that the jury heard was not credible—a proper argument.

5.20. Applicant has not shown by a preponderance of the evidence that the argument was improper. Therefore, no objection on behalf of Applicant was necessary.

5.21. Trial counsel was not ineffective for failing to object to the argument.

---

[772] WRR1: 242.

119

990

5.22. Moreover, "[c]losing arguments involve inherently tactical decisions that must be tailored to the strategy of the defense based on events that transpired during trial. Accordingly, deference to counsel's strategic decisions during closing arguments is particularly important because of the wealth of legitimate strategies that can be employed, and those decisions will be second-guessed only if there is no plausible basis for the attorney's actions."[773]

5.23. Thus, "[e]ven though the State's argument [may be] improper, that does not inexorably lead to the conclusion that trial counsel was deficient for not objecting because counsel may have had a strategic reason for not doing so."[774]

5.24. In this case, the legal basis for an objection was questionable because the State's argument was ambiguous. Trial counsel might have chosen not to object so as not to draw attention to the argument.[775] Or, counsel might have chosen not to object because the prosecutor was spending her time arguing something that had little to do with the special issues before the jury. In sum, withholding objection was a valid, strategic choice.

5.25. Further, Applicant has not shown prejudice. Applicant is entitled to relief only if there is a reasonable probability that, but for counsel's deficiency, the result of the proceeding would have been different.[776]

5.26. The evidence of guilt and future danger were overwhelming. There is no chance that the jury would have spared Applicant's life had trial counsel only objected to this portion of the prosecutor's closing argument.

5.27. Likewise, there no chance that Applicant's sentence would have been reversed on direct appeal had trial counsel only objected to the argument. Improper argument is non-constitutional in nature, and a non-constitutional error that does not affect substantial rights must be

---

[773] *Ex parte Scott*, 541 S.W.3d 104, 119 (Tex. Crim. App. 2017) (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

[774] *Id.* at 120.

[775] *See, e.g., id.* at 122.

[776] *See Thompson*, 9 S.W.3d at 812 (explaining the standard under *Strickland*).

disregarded.[777] To determine whether substantial rights were affected, courts balance the severity of the misconduct, any curative measures, and the certainty of conviction absent the misconduct.[778] Courts evaluate the severity of the misconduct by determining whether, in light of the entire record of final arguments, the improper jury argument was extreme, manifestly improper, or calculated to deny a fair and impartial trial.[779]

5.28. Assuming for the sake of argument that the prosecutor's argument was improper, Applicant has not shown that it was extreme, manifestly improper, or calculated to deny him a fair trial. Further, a death sentence was almost certain, even without the argument. The argument would, therefore, have been disregarded on appeal, even had trial counsel objected.[780]

5.29. Applicant has failed to prove by a preponderance of the evidence that trial counsel were ineffective for failing to object to the State's punishment-phase closing argument.

5.30. Applicant has failed to prove by a preponderance of the evidence that trial counsel were ineffective in any other regard.

5.31. The Court finds that trial counsel were not cumulatively ineffective.

5.32. Applicant's fifth ground should be overruled.

## GROUND SIX

### 6. THE 10-12 RULE

6.1. In claim six, Applicant challenges the constitutionality of what is commonly called the "10-12 rule."[781]

6.2. Applicant claims that "[a]s a result [of this rule], jurors remain free to speculate—or to be persuaded to make assumptions by their peers equally

---

[777] *Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008) (citing Tex. R. App. P. 44.2(b)).

[778] *Brown*, 270 S.W.3d at 572–73.

[779] *Id.* at 573.

[780] *See* Tex. R. App. P. 44.2(b).

[781] Writ app. at 142–48. *See* Tex. Code Crim. Proc. art. 37.071, § 2(d)(2), (f)(2) (allowing jurors to answer a special issue in defendant's favor if 10 jurors agree).

ignorant as to the law's requirements—that a failure to answer a special issue will produce a mistrial."[782]

6.3. In support of his argument, Applicant posits the following hypothetical:

> Jurors One through Five initially would answer "No" to the future dangerousness special issue but, fearing a mistrial, they change their votes to "Yes," while Jurors Six through Ten initially would answer "Yes" to the mitigating circumstances special issue but, also fearing a mistrial, they change their votes to "No." At each stage of the deliberations, both minorities-of-five are well short of the ten votes needed to reach a life sentence, yet together they constitute ten votes in favor of a life sentence.[783]

6.4. Applicant has not produced evidence showing any probability that this hypothetical actually occurred in his trial.

6.5. The Court finds that the jury was instructed, in part, as follows:

> During your deliberations upon the special issues, you must not consider, discuss, nor relate any matters not in evidence before you. You shall not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.
>
> In arriving at the answers to the special issues, it will not be proper for you to fix the same by lot, chance, or any other method other than by a full, fair, and free exchange of the opinion of each individual juror.
>
> You are not to be swayed by mere sentiment, conjecture, sympathy, passions, prejudices, public opinion, or public feeling in considering all the evidence before you and in answering the special issues.

---

[782] Writ app. at 143.
[783] Writ app. at 145.

993

6.6. Thus, the jury was instructed not to consider or discuss what would happen in the event of an 11-1 vote. They were instructed not to answer the questions by any method other than a full and fair vote. They were instructed not to be swayed by conjecture. Applicant has produced no evidence to rebut the presumption that the jurors acted in accordance with their instructions.

6.7. The Court finds that Applicant requested a "10/12 failure to agree instruction" at trial; this Court denied that request.[784] As provided by statute, this was a proper ruling.[785]

6.8. The Court finds that, during punishment deliberations, the jury sent out four notes; none of them inquired about what would happen in the event of an 11-1 vote, or what would happen in any other scenario.[786]

6.9. The Court finds that the jury never sent out a note inquiring about a mistrial.

6.10. The Court finds that the jury never sent out a note indicating that they were hung or in any kind of disagreement.

6.11. Moreover, Applicant's constitutional complaint about the 10-12 Rule has been repeatedly rejected by the Court of Criminal Appeals.[787]

6.12. Applicant presents no evidence or arguments that merit reconsideration of this well-settled area of law.

6.13. The Court finds that the 10-12 rule is not unconstitutional.

6.14. The Court finds that Applicant was not prejudiced by the 10-12 rule.

6.15. The Court finds that the 10-12 rule did not violate Applicant's constitutional rights.

---

[784] RR51: 99.

[785] *See* Tex. Code Crim. Proc. art. 37.071, § 2(a)(1).

[786] CR: 4251, 4523–25.

[787] *See, e.g., Luna v. State,* 268 S.W.3d 594, 609 (Tex. Crim. App. 2008); *Russeau v. State,* 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *Sells v. State,* 121 S.W.3d 748, 768-69 (Tex. Crim. App. 2003); *Prystash v. State,* 3 S.W.3d 522, 536 (Tex. Crim. App. 1999); *Williams v. State,* 937 S.W.2d 479, 490 (Tex. Crim. App. 1996); *Draughon v. State,* 831 S.W.2d 331, 338 (Tex. Crim. App. 1992).

6.16. The Court finds that the punishment jury instructions were not unconstitutional.

6.17. Applicant's sixth claim should be denied.

### GROUND SEVEN

7. THE MITIGATION JURY INSTRUCTION

7.1. In ground 7, Applicant contends that the statutory mitigation instruction found in article 37.071, Code of Criminal Procedure, was unconstitutional because it limited the categories of evidence that the jury might find mitigating.[788]

7.2. Article 37.071 requires the Court to instruct the jury that, if the jury answers the future-dangerousness issue affirmatively, it shall answer the following issue: "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."[789]

7.3. The Court is also required to instruct the jury that in answering this issue, it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."[790] The punishment-phase jury charge contained the required instruction.[791]

7.4. Applicant claims the foregoing instruction is unconstitutional because no definition of "moral blameworthiness" is provided and because the avenues of mitigation are unconstitutionally "limited to evidence that relates solely to the defendant's culpability, the nature of his crime, [and] what the crime says about [the] defendant."[792] Applicant further argues that the statutory

---

[788] Writ app. at 148–53.
[789] Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).
[790] *See* Tex. Code Crim. Proc. art. 37.071, § 2(f)(4).
[791] CR14: 4516.
[792] App. at 151.

124

995

instructions "precluded jurors from considering mitigating evidence unrelated to [his] 'moral blameworthiness,' a limitation wholly at odds with three decades of Supreme Court precedent."[793]

7.5. The Court of Criminal Appeals has repeatedly rejected these complaints about the statutory mitigation instruction.[794]

7.6. Applicant has presented no new evidence or arguments that merit reconsideration of this well-settled area of law.

7.7. Applicant objected at trial and requested an instruction "that states that it's mitigating even if it doesn't go to moral blameworthiness."[795] This Court denied the requested instruction.[796]

7.8. This Court finds that Applicant would not have benefitted from a different mitigation jury instruction.

7.9. To the extent that there was mitigating evidence, the jury was allowed to consider it. This Court finds that the jury was instructed, in part, as follows:

> In arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.[797]

> * * *

> In determining your answers to the special issues, you shall consider all the evidence submitted to you in this whole trial, which includes that phase of the trial wherein you were called upon to determine the guilt or innocence of the defendant, and this punishment phase of the trial where you are now called upon to determine the answers

---

[793] App. at 152.

[794] See, e.g., Lucero v. State, 246 S.W.3d 86, 89 (Tex. Crim. App. 2008); King v. State, 953 S.W.2d 266, 274 (Tex. Crim. App. 1997); Shannon v. State, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996).

[795] RR51: 99.

[796] RR51: 99.

[797] CR: 4516.

125

996

to the special issues submitted to you by the court.[798]

7.10. Applicant has not shown that any part of the punishment-phase jury instructions were unconstitutional.

7.11. Applicant has not shown that he was harmed by any punishment phase jury instruction.

7.12. Additionally, the Court finds that Applicant raised three points of error on direct appeal raising 76 challenges to the punishment charge.[799] The Court of Criminal Appeals rejected all of them.[800] Therefore, his duplicative challenge(s) are not cognizable here.[801]

7.13. The Court finds that the punishment jury instructions were not unconstitutional.

7.14. Claim 7 should be denied.

## GROUND EIGHT

8. THE FUTURE DANGER JURY INSTRUCTION

8.1. In ground 8, Applicant contends that the first special issue is unconstitutionally vague because it fails to define key terms and thus narrow the class of death-eligible defendants.[802]

8.2. Applicant's complaint has been rejected repeatedly by the Court of Criminal Appeals.[803]

---

[798] CR: 4516–17.

[799] See Johnson v. State, No. AP-77,030, 2015 WL 7354609, at *36 (Tex. Crim. App. Nov. 18, 2015) (not designated for publication).

[800] Id.

[801] Ex parte Acosta, 672 S.W.2d 470, 472 (stating that issues which have been raised and rejected on direct appeal are not cognizable on habeas review).

[802] App. at 154–58.

[803] See, e.g., Saldano v. State, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007) (holding it has previously rejected the claim that the future-dangerousness special issue is unconstitutionally vague).

997

8.3. This Court finds Applicant requested extra-statutory definitions in the punishment jury charge and this Court denied that request.[804]

8.4. This Court finds Applicant raised multiple constitutional challenges to article 37.071, in points of error 54 through 64 on direct appeal. The Court of Criminal Appeals rejected each of his constitutional challenges.[805] Therefore, his duplicative constitutional challenge(s) to article 37.071 are not cognizable in this writ proceeding.[806]

8.5. The Court finds there was abundant evidence supporting the jury's determination that there is a probability Applicant will commit criminal acts of violence that would constitute a continuing threat to society.

8.6. The Court finds Applicant would not have benefitted from additional definitions in the punishment jury charge.

8.7. The Court finds the punishment jury instructions were not unconstitutional.

8.8. Applicant's eighth claim should be denied.

## GROUND NINE

9. THE TEXAS DEATH PENALTY SCHEME

9.1. In Applicant's ninth and final claim, he argues that his death sentence is unconstitutional because the Texas death penalty scheme is arbitrary based on geography and race.[807]

9.2. Applicant claims the discretion afforded to prosecutors has resulted in a system in which the death penalty is arbitrarily sought throughout the state of Texas. In support of this argument, applicant points out that the number of death penalty cases in this state varies from county to county. He also cites to studies that purportedly show that the race of both the defendant and the victim is a motivating factor behind jury verdicts, as opposed to

---

[804] RR51: 101.

[805] See Johnson v. State, No. AP-77,030, 2015 WL 7354609, at *36 (Tex. Crim. App. Nov. 18, 2015) (not designated for publication).

[806] See Ex parte Acosta, 672 S.W.2d 470, 472 (stating that issues which have been raised and rejected on direct appeal are not cognizable on habeas review).

[807] App. at 155–68.

998

prosecutorial decisions.

9.3. The constitutionality of the State's discretionary authority to seek the death penalty in capital-murder cases is well established.[808] Texas' death penalty statute has been upheld by the United States Supreme Court.[809]

9.4. The Texas Court of Criminal Appeals has repeatedly upheld the prosecutorial discretion established under Texas' system and rejected the argument that a disparity in death-penalty decision making from county to county violates the U.S. Constitution.[810]

9.5. Applicant's argument about the disparities in the imposition of the death penalty among the various Texas counties has previously been rejected by the Court of Criminal Appeals.[811]

9.6. Applicant offers no new evidence or arguments that merit reconsideration of this well-settled area of law.

9.7. Moreover, applicant's argument about racial disparities pertains to jury verdicts; it has nothing to do with the prosecutor's discretion to seek death.

9.8. Applicant presents no novel argument or reason to justify a departure from precedent.

9.9. The Court finds the Texas death penalty scheme is not unconstitutional.

9.10. Applicant committed a heinous capital murder and has a long history of committing violent acts. The Court finds that the prosecutor's decision to seek death in this case was not arbitrary.

9.11. Ground nine should be denied.

---

[808] *See, e.g., McClesky v. Kemp*, 481 U.S. 279, 311-13 (1987) (discussing the "fundamental" need for prosecutorial discretion in the capital-punishment system); *McFarland v. State*, 928 S.W.2d 482, 510 (Tex. Crim. App. 1996) ("[I]t is well settled that the discretion afforded the State to seek the death penalty is not unconstitutional . . . .").

[809] *See Jurek v. Texas*, 428 U.S. 262, 273-74 (1976).

[810] *See, e.g., Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007); *Crutsinger v. State*, 206 S.W.3d 607, 611-13 (Tex. Crim. App. 2006); *Threadgill v. State*, 146 S.W.3d 654, 672 (Tex. Crim. App. 2004); *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003).

[811] *See, e.g., Threadgill v. State*, 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004).

## ALL OTHER CLAIMS

10. ALL RESIDUAL CLAIMS ARE PROCEDURALLY BARRED.

10.1. Under article 11.071, § 4(a), applicant was required to file his original habeas application "not later than the 180th day after the date the convicting court appoints counsel under Section 2 or not later than the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals, whichever date is later."[812] An applicant may obtain one 90-day extension from the trial court for good cause shown.[813] Any grounds available to an applicant before the deadline for the original application that are not raised until after the deadline are considered waived.[814]

10.2. This Court appointed OCFW as Applicant's writ counsel on November 8, 2013.

10.3. The State filed its brief on direct appeal on January 13, 2015, making the application due on February 27, 2015.

10.4. OCFW filed an unopposed motion for a 90-day extension on January 27, 2015, which was granted by this Court, and which made the application due on May 28, 2015.

10.5. The application was timely filed on May 28, 2015.

10.6. Any claim that was asserted in this proceeding that was not raised in Applicant's original habeas application would constitute a subsequent writ that must meet the requirements of article 11.071, § 5.

10.7. Unless and until Applicant obtains review pursuant to § 5, any such claims are procedurally barred and should be dismissed.

---

[812] Tex. Code Crim. Proc. Ann. art. 11.071, § 4(a) (West Supp. 2016).
[813] Tex. Code Crim. Proc. Ann. art. 11.071, § 4(b) (West Supp. 2016).
[814] Tex. Code Crim. Proc. Ann. art. 11.071, § 4(e) (West Supp. 2016).

1000

## THE RECUSAL MATTER

After Applicant's trial, Tim Freeman went to work as an investigator for the Dallas County Criminal District Attorney's Office.[815] He worked there from April 2015 to August 2017 and was assigned to the family violence division.[816]

The State learned of Freeman's previous work on Applicant's case on June 12, 2017, from Applicant's writ counsel. Shortly after learning of it, Jaclyn Lambert contacted Freeman and directed him not to talk to anyone at the district attorney's office about Applicant's case.[817] Lambert and Freeman did not discuss the substance of the case.[818] Prior to that, Freeman did not recall speaking to anyone at the district attorney's office about Applicant's case.[819] Freeman did not volunteer any information about the case to anyone, and was not involved in this post-conviction proceeding in any capacity other than as a witness to testify related to Applicant's motion to recuse the District Attorney's Office.[820]

Freeman and Bernhard had worked together on another case—Jose Lozano—and Bernhard brought it to the attention of the District Attorney's Office when she learned of the conflict.[821] The District Attorney's Office recused itself from that case.[822]

---

[815] WRR1: 48.
[816] WRR2: 89.
[817] WRR2: 90.
[818] WRR2: 99.
[819] WRR2: 91.
[820] WRR2: 99–100.
[821] WRR1: 49.
[822] WRR1: 49.

The Lozano case, however, was procedurally different from this one. Lozano's case was reversed on appeal and remanded for a new trial.[823] By the time of the remand, Freeman worked for the District Attorney's Office and possessed confidential information.[824] Applicant in this case was not facing a retrial where confidential information could possibly be used to his detriment.

. Tim Freeman testified in this writ proceeding. This Court finds that he was a credible witness who, unfortunately, now suffers from a failing memory. The Court finds nothing in the record showing that Freeman revealed confidential information to any member of the District Attorney's Office. Thus, Applicant has not shown a due process violation related to Mr. Freeman's employment with the District Attorney's Office. Applicant's motion to recuse the District Attorney's Office was, and remains, DENIED.

## Conclusion

Applicant has failed to prove any claim. All relief should be DENIED.

---

[823] WRR1: 170. *See Lozano v. State*, No. 05-14-00593-CR, 2016 WL 2756438 (Tex. App.—Dallas May 9, 2016, no pet.) (mem. op., not designated for publication).
[824] WRR1: 170.

131

1002

The Clerk is ORDERED to prepare a transcript of all papers in cause number W12-23749-W(A) and to transmit the same to the Texas Court of Criminal Appeals in Austin, Texas, as provided by article 11.071, Texas Code of Criminal Procedure. The transcript shall include certified copies of the following documents:

1. Applicant's Original Application for Writ of Habeas Corpus and any other pleadings filed by Applicant, including exhibits;

2. The State's Answer to Applicant's Original Writ Application;

3. Any other pleadings filed by the State;

4. Any proposed findings of fact and conclusions of law filed by the State and Applicant;

5. This Court's findings of fact and conclusions of law and this order;

6. Any and all orders issued by the Court;

7. The indictment, judgment, sentence, docket sheet, and appellate record, unless they have previously been forwarded to the Court of Criminal Appeals.

The Clerk is further ORDERED to send a copy of this Court's findings of fact and conclusions of law, including its order, to Applicant's counsel, the Office of Capital and Forensic Writs (Benjamin Wolff and Carlotta Leppingwell), at 1700 N. Congress Ave., Suite 460, Austin, TX 78701, and to counsel for the State, Dallas County Assistant District Attorney Justin Johnson, at Frank Crowley Courts Building, 133 N. Riverfront Blvd., LB-19, Dallas, TX 75207.

Signed on this the 26 day of March, 2019.

JUDGE TRACY HOLMES
363RD JUDICIAL DISTRICT COURT

132

1003

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Findings of Fact was served to **Carlotta Lepongwell, 1700 Congress, suite 460 Austin, TX 78701 by** via email Carlotta.lepingwell@ocfw, on **April 2, 2019**.

**GIVEN UNDER MY HAND AND SEAL** at my office in Dallas County, Texas, on this **April 2, 2019**.



Clerk Signature: _Regina Taylor_

Name          · _Regina Taylor_
                 Deputy District Clerk

1004



**FELICIA PITRE**
**DALLAS COUNTY DISTRICT CLERK**

April 2, 2019

**To: Court of Criminal Appeals**
**Deana Williamson, Clerk**
**P.O. Box 12308**
**Capitol Station**
**Austin, Texas 78711-2308**

**Clerk's Summary of Document Notification on 11.07 Writs**

**Ex Parte:** <u>Matthew Johnson</u>
**Trial Court Writ No:** <u>W12-23749-W (A)</u>
**Case Number:** <u>F12-23749-W</u>

Below is a list of documents in which the designated parties on the 11.07 writ case were notified, per the requirements of Texas Rule of Appellate Procedure 73.4.

| Document | Date Filed | Date Mailed | Parties Notified | Clerk |
|---|---|---|---|---|
| Application/Memorandum | 5/28/15 | 4/2/19 | Applicant Attorney | Regina Taylor |
| State's Response | 11/23/15 | 4/2/19 | Applicant Attorney | Regina Taylor |
| Findings of Facts | 3/26/19 | 4/2/19 | Applicant attorney | Regina Taylor |
| Waiver | 5/28/15 | 4/2/19 | Applicant Attorney | Regina Taylor |
| Writ Letter | 5/28/15 | 4/2/19 | Applicant Attorney | Regina Taylor |
| Order Designating Issues | 5/28/19 | 4/2/19 | Applicant Attorney | Regina Taylor |
| Complete On Base Print screen list of | | 4/2/19 | Applicant Attorney | Regina Taylor |
| All documents included in record has been | | | | |
| Emailed to Attorney | | | | |
| | | | | |
| | | | | |

Sincerely,

Felicia Pitre
Dallas County District Clerk



Given under my hand and seal:
By: _Regina Taylor_
Regina Taylor/Deputy District Clerk

133 N. Riverfront, LB 12 DALLAS, TEXAS  75207
web site: www.dallascounty.org/distclerk/index.html

1005

## CLERK'S CERTIFICATION

I, Felicia Pitre, Clerk of the District Courts of Dallas County, Texas do hereby certify that the documents contained in this record to which this certification is attached are all of the document specified by Texas Rule of Appellate Procedure 34.5(a) or Code of Criminal Procedure Section 11.07(3)(a) including all other documents timely requested by a party to this proceeding under Texas Rule of Appellate Procedure 34.5(b). and that have been filed with the trial court clerk, and unless otherwise indicated in this record.

GIVEN UNDER MY HAND AND SEAL at my office in Dallas County, Texas on this: **APRIL 2, 2019**



Clerk Signature: _Regina Taylor_

Name: **Regina Taylor**