UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MATTHEW JOHNSON,                    §
                                    §
            Petitioner,             §
                                    §
v.                                  §        Civil Action No. 3:19-CV-2310-E
                                    §
BOBBY LUMPKIN, Director,            §
                                    §
            Respondent.             §

## MEMORANDUM OPINION AND ORDER

Petitioner Matthew Johnson filed this federal habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his October 2013 Dallas County conviction for capital murder and sentence of death. For the reasons set forth below, Johnson is not entitled to federal habeas corpus relief or a Certificate of Appealability from this court. Johnson's motions for recusal will likewise be denied.

## I. MOTIONS FOR RECUSAL

On February 28, 2022, Johnson filed an original and an amended motion for recusal (ECF nos. 41 & 42), arguing that this court's denials of his motions for modification of the scheduling order and denials of his motion for stay and abeyance revealed disqualifying judicial bias.

Judicial rulings such as this court's denials of Johnson's motion asking for an indefinite stay of these proceedings until the end of the current Covid-19 epidemic (i.e., his motion for modification of the scheduling order) and his motions requesting a stay and abeyance are the type of rulings which almost never constitute a valid basis for a bias or partiality motion. *Liteky v. United States*, 510 U.S. 540, 555 (1994). They may be proper grounds for appeal but not for recusal. *Id.* Procedural rulings made by a trial judge and even admonishments of a party and its counsel do not ordinarily furnish a basis for recusal. *Id.*, at 556; *Garcia v. City of Laredo, Tex.*,

702 F.3d 788, 794 (5th Cir. 2012) (citing *Liteky*, 510 U.S. at 555-56); *Wang v. Holder*, 569 F.3d 531, 540-41 (5th Cir, 2009) (critical, disapproving, or even hostile comments made during trial do not ordinarily furnish a basis for recusal under 28 U.S.C. § 455).

Johnson's request for an indefinite stay of all proceedings in this case until such time as Johnson subjectively believed the current respiratory virus pandemic reached sufficient level of control to permit litigation of Johnson's federal habeas corpus claims was rejected by this court for many of the same reasons Judge Sam Lindsay rejected a remarkably similar open-ended motion for an indefinite stay in *Brown v. Lumpkin*, 2021 WL 3847491, cause no. 3:19CV2301 (N.D. Tex. Aug. 27, 2021). As was true in *Brown*, Johnson cited no governing legal authority recognizing an absolute right on his part to wait until the final day of the applicable one-year statute of limitations established by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), before filing his original federal habeas corpus petition. A federal habeas petitioner possesses no right to wait until the very last day of the applicable one-year statute of limitations before filing his initial federal habeas corpus petition.[1] Such an interpretation of the AEDPA would be inconsistent with the congressional intent underlying its passage. The Supreme Court has recognized the AEDPA was enacted to advance the finality of state court criminal judgments, streamline federal habeas proceedings, and reduce delays in the execution of state and federal criminal sentences, particularly

---

[1] Furthermore, for a number of reasons such a practice is short sighted and potentially self-defeating for federal habeas petitioners. It is often the case that the filing of the respondent's answer or other responsive pleading may reveal that a federal habeas claim has been improperly framed legally or factually. Alternatively, the facts alleged in the respondent's answer may reveal the existence of a potential federal claim the petitioner omitted from his original federal habeas petition. In either case, waiting until the final day of the AEDPA's limitations period to file an initial federal habeas corpus petition deprives the petitioner of the opportunity to file an amended petition prior to the expiration of the applicable limitations period. This problem is unfortunately not uncommon, particularly in the pro se context. For example, federal habeas litigants often file claims premised upon alleged violations of the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83 (1963), only to be met with answers from the respondent alleging the material allegedly withheld by the prosecution was, in fact, made available to defense counsel through the prosecution's open file policy. In such situations, the petitioner's claim was more properly framed as one of ineffective assistance by his trial counsel (in failing to adequately review the prosecution's file) rather than as a *Brady* claim. If the petitioner has waited too late within the limitations period to file an amended petition, he or she faces an uphill battle to assert the proper constitutional claim.

in capital cases. *Mayle v. Felix*, 545 U.S. 644, 662 (2005); *Rhines v. Weber*, 544 U.S. 269, 276 (2005); *Woodford v. Garceau*, 538 U.S. 202, 206 (2003).   Given the limitations on the scope of federal habeas corpus claims available under the AEDPA, this court's refusal to indefinitely stay all proceedings in this cause may furnish Johnson with a basis for appeal but it does not furnish a basis for recusal. *Liteky*, 510 U.S. at 555-56.  Likewise, this court's denial of Johnson's motion for stay and abeyance does not furnish a basis for recusal under 28 U.S.C. § 455. *Id.*

This court's admonishment to Johnson's counsel of the responsibilities imposed by Rule 11, FED.R.CIV.P. also does not furnish a basis for recusal. *Liteky*, 510 U.S. at 556; *Garcia*, 702 F.3d at 794. This court's warning to Johnson's federal habeas counsel regarding Rule 11 was no different from Judge David Godbey's warning to federal habeas counsel in *Williams v. Lumpkin*, 339 F.R.D. 383, 386-91 (N.D. Tex. 2021), that asserting claims (challenges to the validity of the Texas capital sentencing statute) which have routinely been rejected on the merits by federal district courts and consistently held to be unworthy of a Certificate of Appealability by the Fifth Circuit could give rise to the imposition of sanctions under Rule 11. It is perfectly legitimate, and consistent with Rule 11, for counsel to raise legal arguments which they know are foreclosed by applicable Circuit authority; in doing so, however, counsel are obligated under Rule 11 to acknowledge the existence of adverse governing Circuit authority. *Id.*

For example, in *Gamboa v. Davis*, 2016 WL 4413280, cause no. SA-15-CA-113 (W.D. Tex. Aug. 4, 2016), *CoA denied*, 728 F. App'x 297 (5th Cir. Aug. 1, 2019), a federal habeas petitioner presented many of the same clearly meritless challenges to the constitutionality of the Texas capital sentencing statute raised by Johnson in his pleadings in this case. Unlike Johnson's pleadings, however, Gamboa's federal habeas pleadings candidly admitted that governing Fifth Circuit authority foreclosed those claims. More recently, in *United States v. Lindsey*, 2022 WL

3

458385 (5th Cir. Feb. 15, 2022), Lindsey's counsel acknowledged that one of his claims on appeal was foreclosed by the holding in *United States v. Herrell*, 941 F.3d 172, 182 (5th Cir. 2019) (en banc). Lindsey explained, however, that he was raising the issue to preserve it for further review. Unlike Gamboa and Lindsey, Johnson's federal habeas pleadings do not acknowledge the existence of governing Fifth Circuit authority adverse to Johnson's challenges to the Texas capital sentencing statute. Nor have Johnson's federal habeas counsel explained they raised his claims challenging the Texas capital sentencing statute for the sole purpose of preserving legal challenges for further review. Therefore, this court's reiteration of Judge Godbey's warning regarding Rule 11 was fully appropriate and does not furnish an arguable basis for recusal under Section 455.

## II. BACKGROUND

### A. The Offense

The grim facts of Johnson's capital offense are not in genuine dispute. They were recorded on a store surveillance camera and played for the jury at Johnson's capital murder trial. In May 2012, Johnson entered a convenience store and poured a bottle of what was later determined to be lighter fluid over the head of 76-year-old store clerk Nancy Harris. Johnson then demanded money. As Harris attempted to open the cash register, Johnson took two cigarette lighters, two packages of cigarettes, and a ring from Harris' finger. Once Harris opened the cash register, Johnson took the money and then set Harris aflame. As Harris frantically attempted to extinguish herself and her clothing, the Texas Court of Criminal Appeals' opinion accurately described the video as showing Johnson "calmly" walk out of the store. *Ex parte Johnson*, WR-87,574-01, 2019 WL 4317046 (Tex. Crim. App. Sept. 11, 2019).[2] Police officers arrived at the convenience store

---

[2] The Texas Court of Criminal Appeals' opinion reciting the facts of Johnson's capital offense does not even begin to capture the horrific images contained on the video-only store surveillance video recording (State Trial Exhibit 17), especially those showing Harris's efforts to remove her flaming blouse while her entire torso was engulfed in flame and her stunned demeanor as she wandered out the front door of the store with her chest and pants leg still

very quickly and used a fire extinguisher to put out the flaming Harris, who died five days later from her burns.  A little more than an hour after setting Harris afire, Johnson was arrested shirtless carrying two new cigarette lighters, two packages of cigarettes, and Harris' ring.  Police noted his unusually calm demeanor during his transport to the police station, corroborated by a video which was also played for the jury.

## B.  Indictment

On June 21, 2012, a Dallas County grand jury indicted Johnson on one count of capital murder, i.e., intentionally causing the death of Nancy Harris, on or about May 20, 2012, by setting Harris on fire using a deadly weapon, to wit fire and an accelerant, while in the course of committing and attempting to commit the robbery of Harris.[3]

---

aflame.  What is likewise not captured by the TCCA's description of the offense is the fact that Johnson was in close proximity to Harris for some time after he poured the flammable liquid over her head, including while she struggled to open the cash register and Johnson, first standing directly behind her and then after pushing her aside, carefully removed the cash from the drawer and then removed the drawer to look for more cash beneath the drawer.  It was only after Johnson secured all the money from the register that he set Harris afire and then walked casually out of the store. How Johnson managed to set Harris afire while he was in close proximity to her without setting himself on fire remains a mystery.  What is not a mystery is why the devastating nature of the video of Johnson's offense led Johnson's own defense team to acknowledge during their testimony at Johnson's state habeas corpus hearing that they felt certain they could not avoid a guilty verdict at the guilt-innocence phase of trial.  Johnson's own testimony further refuted the argument that he was so intoxicated during his offense that he did not know what he was doing.  Johnson admitted candidly during his trial testimony that, after he decided to rob the convenience store where Harris worked, he found a container of lighter fluid, poured a considerable amount into another container, carried it approximately a hundred yards from his brother Anthony's residence to the store, poured the fluid over Harris's head, and forced her to open the cash register.  Johnson did not challenge the accuracy of the video recording of his offense, which clearly showed that (1) he set Harris afire only *after* she fully cooperated with his request that she open the cash register and he had secured all the cash from the register and (2) he casually fled the scene after setting Harris afire without making any effort to lend assistance to her or to call for help on her behalf.  The jury also saw and heard a separate video recording (State Trial Exhibit 31) showing a shirtless Johnson in the back seat of a patrol car claiming to be unaware of his capital offense and taunting the police with offers to tell them everything they wanted to know if they would just engage him in conversation.

[3] A copy of Johnson's indictment appears among the state court records filed in this court at ECF no. 36-12, at p. 4 of 537.  An enhancement paragraph in Johnson's indictment alleged that he had previously been convicted in Dallas County on September 30, 2004 of the offense of robbery.

## C.  Guilt-Innocence Phase of Trial

The guilt-innocence phase of Johnson's capital murder trial began on October 28, 2013. The jury watched the video-only portion of the store surveillance video-recording of Johnson's offense and the video and audio of Johnson's post-arrest ride in a patrol car.  Harris' store manager testified that Harris had been trained to cooperate with robbers and that after viewing the store video, it appeared to her that Harris had complied with all of Johnson's requests before Johnson set her afire.[4]  Harris's son identified a ring found in Johnson's possession at the time of his arrest as belonging to Harris and testified that Harris was diabetic and had a pacemaker.[5]  A resident of the neighborhood where the robbery took place testified that, on the morning of the robbery, he observed a shirtless man pushing a bicycle which was later abandoned on a street corner and he also found a tee shirt inside a garbage bin.[6]

A homeowner testified that minutes after the robbery, Johnson knocked on his front door and then unsuccessfully attempted to force his way inside the man's home.[7]  Another local homeowner testified that he encountered Johnson, who was shirtless and wearing glasses, trying to get inside his gate on the morning of the robbery; he retreated inside his home when Johnson approached; and when another person inside his home came to the door, Johnson turned and ran off.[8]  A number of police officers and fire personnel testified about their response to Harris exiting

---

[4] Testimony of Anna Lunceford, Statement of Facts from Johnson's trial (henceforth "S.F. Trial"), Volume 44/57, at 35-58.

[5] Testimony of Scott Harris, S.F. Trial, Vol. 44/57, at 22-32.

[6] Testimony of Jim Medley, S.F. Trial, Vol. 44/57, at 142-54.

[7] Testimony of Ken Marecle, S.F. Trial, Vol. 44/57, at 155-71.  Marcele testified that Johnson attempted to force his way inside Marecle's home and in the process, Johnson lost his glasses and knocked Marcele backwards and down.

[8] Testimony of Lawrence Denson, S.F. Trial, Vol. 45/57, at 7-22.

her store while aflame and their efforts to chase and arrest Johnson as he attempted to flee from the scene with a bicycle and then on foot.[9]  Laboratory examination of the tee shirt recovered by law enforcement officers from a garbage can just blocks from the crime scene revealed that it contained traves of a medium petroleum distillate consistent with charcoal lighter fluid.[10]

---

[9] More specifically, a Garland Police Officer testified that he observed Harris exit the convenience store on fire, screaming for help; he grabbed his fire extinguisher and put out the fires burning on her, then entered the store and put out burning clothing lying on the floor; Harris informed police that a black man in blue jeans and a tee shirt robbed her and then set her on fire; half an hour later, he assisted a fellow officer in arresting Johnson; and he then transported Johnson to the police station.  Testimony of Billy Coffey, S.F. Trial, Vol. 44/57, at 60-88.  Officer Coffey also testified that while Johnson appeared to be acting erratically, he did not believe Johnson was intoxicated.  *Id.*, at 79-80, 87.

A fire fighter and paramedic testified that he treated Harris at the scene for his burn injuries; she appeared pale and panicked; Harris was in a lot of pain with first, second, and third degree burns to her face, shoulders, abdomen, both upper arms, and her legs; Harris suffered from diabetes and high blood pressure; he left the scene within about two minutes after his arrival; despite her injuries, Harris was conscious and able to furnish her medical history; once fluids were administered to Harris, her trachea began to swell and she began to experience upper airway obstruction; she was transported to Parkland Hospital.  Testimony of William Crews, S.F. Trial 44/57, at 89-103.

Another fire fighter to make the scene testified that he assisted in getting Harris into the ambulance; he assisted in setting up a fan to vent fumes from inside the store; and he found a Gatorade bottle containing traces of lighter fluid behind the store in the grass.  Testimony of Gary Church, S.F. Trial, Vol. 44/57, at 105-15.

An arson investigator testified the clear plastic bottle containing the traces of lighter fluid also contained a wet paper towel or napkin similar to a wick; oily spots were found inside the store on a counter and underneath a floor mat.  Testimony of Nancy Carpenter, S.F. Trial, Vol. 45/57, at 43-75.

The law enforcement officer who arrested Johnson testified that he arrived at the crime scene and helped secure the scene; later that morning he responded to 9-11 calls regarding a black male who was attempting to break into homes in the neighborhood; he located a bicycle; he spotted a shirtless Johnson, who made eye contact with him and then ran off as soon as he yelled at Johnson; he took off in pursuit on foot; Johnson displayed no signs of intoxication while he attempted to run away; and when he finally caught and arrested him, Johnson casually stated "Y'all ar getting slow.  What took you so long."  Testimony of Rafael Perez, S.F. Tr4ial, Vol. 44/57, at 172-90.

A police detective testified that he secured the store surveillance video; he verified the accuracy of a number of still photographs taken from the surveillance video; he testified that Johnson was initially charged with attempted capital murder but, when Harris died five days later, the charge was upgraded to capital murder.  Testimony of Stacy Tooke, S.F. Trial, Vol. 44/57, at 213-39.

A law enforcement officer who photographed Johnson on the day of his arrest and who inventoried Johnson's possessions at the time of his arrest testified Johnson was carrying multiple lighters, coins totaling $16.25, and cash consisting of one ten-dollar bill, seven five-dollar bills, and twenty one-dollar bills.  Testimony of James Rogers, S.F. Trial, Vol. 45/57, at 22-43.

A police detective who followed the ambulance containing Harris to the hospital testified that he interviewed Harris at the hospital prior to her being intubated; she described a heavy-set black male with short hair and a chubby face the person who demanded money from her, then poured something over her head and face, and then lit her on fire; he collected Harris' burned slacks and shoes.  Testimony of Larry Wilson, S.F. Trial, Vol. 45/57, at 76-86.

[10] Testimony of Cheryl Norvile, S.F. Trial, Vol. 45/57, at 86-105; Testimony of Kelly Walters, S.F. Trial, Vol. 45/57, at 105-19.  Examination of the DNA found on the tee shirt revealed that multiple males contributed to the DNA on the shirt.  Testimony of Alexander Nham, S.F. Trial, Vol. 45/57, at 120-41; Testimony of Courtney Ferrara, S.F. Trial, Vol. 45/57, at 141-69.

A nurse and a physician who treated Harris at Parkland Hospital testified that she was in a great deal of pain when she arrived at the hospital and for days thereafter; Harris suffered extensive second and third degree burns over her head and face, neck, shoulders, upper arms, and leg; Harris was intubated within fifteen minutes of her arrival at the hospital due to swelling in her airway and later was placed on a ventilator; Harris was heavily medicated; she also had a do not resuscitate order on file; Harris died on May 25, 2012 after she was removed from her ventilator.[11]   The medical examiner who performed Harris's autopsy testified Harris died due to her thermal injuries, i.e., she suffered serious burns to her entire head, chest, portions of her upper back, and portions of her left leg; she became septic; and she passed away when infection set in.[12]

The defense presented no witnesses or evidence at the guilt-innocence phase of trial.

On October 30, 2013, the jury unanimously found Johnson guilty of capital murder.[13]

## D. Punishment Phase of Trial

The punishment phase of Johnson's capital murder trial commenced October 31, 2013.

### 1. Prosecution's Evidence

At the punishment phase of trial, the prosecution presented extensive evidence showing Johnson's prior criminal history.   More specifically, a law enforcement officer and former paramour of Johnson both testified about an incident in September 1993 in which Johnson attempted to break into an apartment where his girlfriend and her children were living and, when

---

[11] Testimony of April Gradel, S.F. Trial, Vol. 45/67, at 170-80; Testimony of Dr. John Hunt, S.F. Trial, Vol. 46/57, at 5-24.

[12] Testimony of Dr. Tracy Dyer, S.F. Trial, Vol. 46/57, at 24-40.

[13] S.F. Trial, Vol. 46/57, at 69.   The jury charge from the guilt-innocence phase of Johnson's capital murder trial appears at ECF no. 34-4, at pp. 53-60 of 135.   The verdict form from the guilt-innocence phase of trial appears at ECF no. 34-4, at p. 61 of 135.

he failed to do so, Johnson set a fire on the back porch of the apartment.[14]   Another law enforcement officer testified about a separate incident in November 1993 in which he arrested Johnson for outstanding warrants and possession of marijuana.[15]   A law enforcement officer testified about an incident in May 1994 in which he was dispatched to a scene where a man and woman were arguing by the side of a road and, when Johnson was advised that he was under arrest for outstanding warrants, Johnson violently resisted arrest, which led to Johnson receiving a probated sentence for resisting arrest – which probation was later revoked.[16]   A law enforcement officer testified about a July 1994 incident in which Johnson leaped from a moving vehicle during a traffic stop, ran from police, and violently resisted arrest.[17]   A law enforcement officer testified about an August 1995 incident in which, after Johnson was arrested for threatening his wife and outstanding warrants for theft, evading arrest, and aggravated assault with a deadly weapon, Johnson verbally threatened the arresting officer.[18]   Two law enforcement officers testified about an October 2002 incident in which Johnson was arrested and later convicted for evading arrest.[19]

A middle-aged woman testified about an incident in June 2004 in which Johnson forced her from her pickup truck, threw her to the ground, and drove off.[20]   Two law enforcement officers testified about the injuries observed on the carjacking victim, as well as the high speed chase

---

[14] Testimony of Eric Hagen, S.F. Trial, Vol. 47/57, at 17-28; Testimony of Amy Franks, S.F. Trial, Vol. 47/57, at 28-75.

[15] Testimony of Berry Oliver, S.F. Trial, Vol. 47/57, at 101-12.

[16] Testimony of Mark Mendoza, S.F. Trial, Vol.48/57, at 109-33.

[17] Testimony of Blaine Ralston, S.F. Trial, Vol. 47/57, at 114-31.

[18] Testimony of M.G. Clark, S.F. Trial, Vol. 47/57, at 131-45.

[19] Testimony of Clay Lacey, S.F. Trial, Vol. 47/57, at 145-53; Testimony of Gary Steadman, S.F. Trial, Vol. 47/57, at 153-63.

[20] Testimony of Digna Salmeron, S.F. Trial, Vol. 47/57, at 179-93.

through a residential neighborhood which ensured in which Johnson crashed the badly damaged pickup truck and then led police on a chase on foot and which eventually resulted in Johnson's arrest and conviction on a charge of robbery.[21]  Another law enforcement officer testified about a September 2004 incident in which Johnson, who was at that time the subject of a protective order, was arrested for attempting to kick in the door of his wife's residence.[22]

One of Johnson's fellow Texas Department of Criminal Justice ("TDCJ") inmates testified Johnson frequently refused to go to his work assignment, refused to go to class, and grew more belligerent during their time as bunk mates, which eventually led to Johnson getting a lot of disciplinary cases and later assaulting him.[23]  A female former TDCJ correctional officer testified about an incident in February 2006 in which Johnson exposed himself and masturbated in front of her, which led to her writing a disciplinary case against him.[24]

A TDCJ Warden testified about the TDCJ's inmate classification system, the conditions under which TDCJ inmates are housed, the availability of contraband (including weapons) inside TDCJ units, and differences between inmates housed on death row and in the general population.[25]

One of Johnson's former employers testified that in November 2011 Johnson stole a computer monitor, cash, and several state automobile inspection books worth in excess of two thousand dollars from his oil change business; Johnson was caught on the store's surveillance cameras; he fired Johnson; and following Johnson's arrest, Johnson filed for unemployment

---

[21] Testimony of Matthew St. Clair, S.F. Trial, Vol. 47/57, at 163-78; Testimony of Pedro Barineau, S.F. Trial, Vol. 47/57, at 193-97.

[22] Testimony of John Spera, S.F. Trial, Vol. 47/57, at 76-100.

[23] Testimony of Carlton Jenkins, S.F. Trial, Vol. 47/57, at 198-253.

[24] Testimony of Ashley Villegas, S.F. trial, Vol. 47/57, at 255-75.

[25] Testimony of Melodye Nelson, S.F. Trial, Vol. 48/57, at 17-99.

benefits.[26]  A hospital social worker testified about an incident in mid-April 2012 in which Johnson was brought into the hospital in handcuffs in a highly confused and agitated state and it took eight or nine staff to hold Johnson down so that a body net could be secured to keep Johnson from harming himself.[27]  A hotel maid testified about an incident in late-April 2012 in which Johnson exposed himself to her.[28]  A female Dallas County jail detention officer testified that during Johnson's pretrial detention he threatened her, refused to clean a shower, and was eventually moved to another part of the jail.[29]

### 2.  The Defense's Evidence

The defense presented an extensive case in mitigation.  Johnson himself was the defense's first witness.  He testified that he drank a bottle of wine, took a Xanax, and smoked one-hundred dollars' worth of crack the night before the robbery; he put lighter fluid in a water bottle; he poured it over Harris's head to force her to comply with his directive to open the cash register; after she complied, he struck the lighter twice; but he did not intend to set Harris on fire because he did not know the lighter fluid was flammable.[30]  Johnson also testified extensively concerning his difficult childhood, his long history of abusing drugs and alcohol, and his addiction to drugs.[31]  In addition,

---

[26] Testimony of David Contente, S.F. Trial, Vol. 48/57, at 157-87.

[27] Testimony of Lisa Parker, S.F. Trial, Vol. 48/57, at 187-211.

[28] Testimony of Carina Pinzon, S.F. Trial, Vol. 48/57, at 100-09.

[29] Testimony of Jennifer Pyburn, S.F. Trial, Vol. 48/57, at 133-56.

[30] Testimony of Matthew Johnson, S.F. Trial, Vol. 49/57, at 27-36.

[31] *Id.*, at 7-87.  More specifically, Johnson testified that (1) he smoked pot three or four times a week beginning at age seven; (2) he had been using crack for about fourteen years at the time of his capital offense; (3) he had also experimented with PCP and methamphetamine and smoked marijuana cigarettes dipped in formaldehyde; (4) his father was a gambler and an alcoholic; (5) he used drugs as a way of escaping life's difficulties; (6) his drug use was mostly confined to the weekends; (7) he never used drugs or kept drugs in his home; (8) he was able for most of his adult life to hold a job and provide for his family; (9) he was sober for about two years following his release from prison but relapsed in October 2011 after he lost his job, which sent him into a spiral of depression; (10) he felt devastated and ashamed after he relapsed and wound up in the hospital in April 2012; (11) on one occasion after he

Johnson testified he was molested on two occasions as a child, once by a family friend and once by a relative.[32]  Johnson also admitted to committing a number of criminal offenses, including stealing a car and wrecking it at age seventeen; assaulting his girlfriend; assaulting his wife; stealing a truck, selling drugs, and robbing his employer.[33]

On cross-examination, Johnson admitted he came from a good family in which both his parents were gainfully employed; he dropped out of high school to sell drugs; he has no learning disabilities; his criminal history included arrests for pushing a police officer, multiple assaults, multiple thefts, violating a protective order, driving a stolen car, throwing a burning object on his girlfriend's porch, possession of marijuana, and biting two police officers during an arrest; he pleaded guilty to aggravated assault for pointing a gun at his sister-in-law Courtney Johnson; while incarcerated, he got into a fight with another inmate which resulted in his loss of good time credits; he got a tattoo while in prison in violation of prison rules; and he got a tattoo while in jail awaiting trial in violation of jail rules.[34]

A quartet of Johnson's former co-workers at a company that assembled compressors each testified that Johnson was a good coworker who nonetheless suffered from attendance problems which led to his dismissal.[35]  A Rowlett real estate agent and friend of Johnson's wife testified that

---

was fired from his job for missing work, he voluntarily entered into a residential drug rehabilitations program but left after his insurance ran out; (12) he remained sober for about two-to-three weeks before he resumed using crack, alcohol, and pot; (13) during his time in the TDCJ, he completed parenting, carpentry, and forklift courses and worked outside the prison; and (14) he was using crack cocaine when he robbed his employer in October 2011.

[32] *Id.*, at 48-52.

[33] *Id.*, at 11, 52-57, 62, 71-72, 75-77.

[34] *Id.*, at 89-136.

[35] Testimony of Danny Mullins, S.F. Trial, Vol. 49/57, at 137-48; Testimony of Brenda Taylor, S.F. Trial, Vol. 49/57, at 148-55; Testimony of Charles Taylor, S.F. Trial, Vol. 49/57, at 154-59; and Testimony of Dorothy Guinn, S.F. Trial, Vol. 49/57, at 160-68.  These witnesses also denied any knowledge of Johnson's drug problems and opined that they could not believe Johnson had committed his capital offense.  *Id.*

she helped Johnson get a car and find a job; she opined that Johnson was good with his daughters, never aggressive, and a good tenant.[36]

Johnson's wife Daphne testified she had known Johnson since they were in elementary school; they married at age eighteen; their relationship was volatile and they were often violent with each other, especially when Johnson was high on drugs; she was aware of Johnson's marijuana use from an early age but did not become aware Johnson was smoking crack until he confessed same to her around 2003; thereafter Johnson went on increasing drug binges in which he would disappear for one to two days; she locked him out of their home four-to-six times when he was on crack binges; on one occasion, Johnson broke a window to gain entrance to their home; on another occasion, Johnson got their maintenance man to open the door for him; Johnson was only violent when on drugs; at one point, she obtained a restraining order against Johnson; when sober, Johnson was affectionate with her and their daughters; Johnson stayed sober for about two years after he returned home from prison in 2009; Johnson became depressed and returned to drug abuse in the Fall of 2011 after he lost his job; and they were unable to get Johnson into a residential drug treatment program because they lacked insurance.[37]

Dr. John Roache, an expert on addiction and pharmacology, testified that addiction is a learning process which happens with the repeated use of drugs leading to the activation of circuits within the brain in ways that take control of the brain until use of drugs becomes a primary motivating factor with harmful consequences; addiction is a chronically relapsing disorder consisting of periods of abstinence followed by relapse; crack cocaine is a neuro-stimulant;

---

[36] Testimony of Monica Cajas, S.F. Trial, Vol. 49/57, at 168-80.  Cajas also testified that she was unaware that Johnson had drug problems.  *Id.*

[37] Testimony of Daphne Johnson, S.F. Trial, Vol. 49/57, at 184-244.  Daphne also insisted that in the video showing Johnson's capital offense, Johnson's gait and demeanor indicated that he was "not himself" at the time of his offense and the video of Johnson in the patrol car following his arrest showed Johnson was high.  *Id.*, at 243.

Johnson's medical records reveal that he is depressed and addicted to crack cocaine; cocaine tends to make one more aggressive; the video of Johnson in the patrol car shows Johnson coming down from drugs and is consistent with Johnson being on a cocaine binge at the time of his capital offense; it takes more than will power to end addiction; there is no medication available to treat long-term cocaine addiction; a family history of drug and alcohol addiction increases a person's chance of becoming an addict; and he believed Johnson was intoxicated at the time of his capital offense.[38]

Johnson's older brother Timothy testified that he was then serving a sentence for robbery; Johnson kept things to himself as a child; Timothy started using drugs in high school; he observed Johnson with red eyes from marijuana use at age ten or eleven; their diabetic mother suffered a heart attack only a few weeks before trial and was not available to testify; their father died in 2003, which profoundly affected Johnson; Johnson and Daphne had married young; Johnson was a good father; and he once broke up a fight between Johnson and Daphne.[39]

Johnson's mother-in-law testified that she had known Johnson since he was in elementary school with her daughter; Johnson and Daphne were married at age eighteen; Daphne's father was a drug addict wo was murdered; she was unaware that Johnson and Daphne had ever been violent with each other; Johnson was a good person and a very good father; Johnson was stressed and depressed in the months before the murder due to being out of a job; and Johnson was a faithful Christian.[40]

---

[38] Testimony of Dr. John Roache, S.F. Trial, Vol. 50/57, at 26-65.

[39] Testimony of Timothy Johnson, S.F. Trial, Vol. 50/57, at 66-87.

[40] Testimony of Hazel Johnson, S.F. Trial, Vol. 50/57, at 88-98.

14

The aunt of Johnson's wife testified that Johnson was kind and sweet when sober; Johnson was a good father who loved his daughters; she first noticed signs of Johnson's depression in 2011; thereafter Johnson would go out at night and not return; she and other members of the family would go out looking for Johnson; she was concerned Johnson might be suicidal; despite the foregoing she had never seen Johnson high and was unaware of any violence between Johnson and his wife.[41]

The sister of Johnson's wife testified that she had known Johnson for most of her life but had only been aware of Johnson's drug addiction in recent years; she was unaware that Johnson and his wife were ever violent with each other; when Johnson was high he would sometimes call her to come pick him up; Johnson was depressed and possibly suicidal; Johnson often spoke with her regarding his drug problems and gave her his money so he would not spend it on drugs; a week before his capital offense, Johnson turned himself into police and asked to be locked up because he needed help; and Johnson was depressed when police refused to arrest him.[42]

A former TDCJ employee testified regarding the TDCJ's inmate classification system, discussed Johnson's disciplinary case history and classification status during his prior incarceration, and explained Johnson had left the TDCJ as a class G-1 inmate.[43]

A co-worker of Johnson's wife and self-described youngest godmother of Johnson testified that Johnson spoke with her often during the 2009-12 timeframe; she believed Johnson was a wonderful and loving father; she was unaware of any violence between Johnson and his wife;

---

[41] Testimony of Frances Wilson, S.F. Trial, Vol. 50/57, at 99-109.

[42] Testimony of Courtney Johnson, S.F. Trial, Vol. 50/57, at 110-31. Curiously, despite the fact that Johnson had admitted during his testimony that he had pleaded guilty to pointing a gun at her, Courtney denied any knowledge of that incident. *Id.*, at 129.

[43] Testimony of Frank AuBuchon, S.F. Trial, Vol. 50/57, at 142-66.

Johnson was never aggressive toward her and she was unaware of any signs of Johnson's drug use; and Johnson's capital offense was inconsistent with Johnson's character.[44]

A researcher in prison violence testified that he had performed a risk assessment on Johnson and, based upon his evaluation of Johnson's educational background, prior prison record, and other factors (including Johnson's lack of gang membership), he believed Johnson posed less of a risk of future violence inside prison than most capital offenders.[45]  A former prison warden testified that, based on his assessment of Johnson's background (including his prior criminal history) and prison record, he believed Johnson posed a low risk of violence if incarcerated.[46]

### 3.  Prosecution's Rebuttal Evidence

The prosecution called three rebuttal witnesses.  A nurse who worked in the burn ward at Parkland Hospital testified about Harris' difficulties after her admission to the hospital.[47]  One of the police officers who saw Harris aflame in the parking lot of the convenience store where she worked testified about his communications with her once the fires on her had been extinguished.[48] Harris' daughter-in-law testified about the impact of Harris' murder on her family.[49]

### 4.  The Verdict

On November 8, 2013, the jury returned its verdict at the punishment phase of Johnson's capital murder trial, finding (1) unanimously and beyond a reasonable doubt that there was a

---

[44] Testimony of Valerie Braziel, S.F. Trial, Vol. 50/57, at 167-79.

[45] Testimony of John Sorenson, S.F. Trial, Vol. 51/57, at 22-54.

[46] Testimony of James Aiken, S.F. Trial, Vol. 51/57, at 54-67.

[47] Testimony of Kelley Nelson, S.F. Trial, Vol. 51/57, at 71-77.

[48] Testimony of Anthony Simon, S.F. Trial, Vol. 51/57, at 77-81.

[49] Testimony of Elizabeth Harris, S.F. Trial, Vol. 51/57, at 82-89.

probability Johnson would commit criminal acts of violence that constituted a continuing threat to society and (2) taking into consideration all of the evidence, including the defendant's character, background, and personal moral culpability, there was not a sufficient mitigating circumstance to warrant that a sentence of life imprisonment without parole be imposed.[50]

## E.  Direct Appeal

Johnson appealed, asserting 65 points of error.[51]  The Texas Court of Criminal Appeals affirmed Johnson's conviction and sentence.  *Johnson v. State*, AP-77,030, 2015 WL 7354609 (Tex. Crim. App. Nov. 18, 2015), *cert. denied*, 136 S. Ct. 2509 (2016).

## F.  State Habeas Proceeding

Johnson filed his state habeas corpus application on May 28, 2015, asserting multiple ineffective assistance claims, multiple constitutional challenges to the Texas capital sentencing statutes and its special issues, and a claim arguing the Texas capital sentencing scheme results in arbitrary application of the death penalty.[52]  The state habeas trial court held evidentiary hearings

---

[50] ECF no. 36-12, pp. 7-8 of 587.  The jury charge from the punishment phase of Johnson's capital murder trial appears at ECF no. 34-4, at pp. 63-55 of 135.  The verdict form from the punishment phase of trial appears at ECF no. 34-4, at pp. 67-68.

[51] Johnson's 182-page appellant's brief, filed August 1, 2014 by attorney John Tatum, appears at ECF no. 33-13.  Among his points of error on direct appeal, Johnson's appellate brief asserted seven points of error complaining about prosecution peremptory strikes to members of the jury venire in violation of *Batson*; fourteen points the state trial court erred in granting prosecution challenges for cause to venire members; ten points the state trial court erred in denying the defense's challenges for cause  to venire members;  two points arguing the jury was biased against the defense; one point challenging the legal sufficiency of the evidence supporting the jury's verdict of capital murder; fifteen points challenging state court evidentiary rulings; six points challenging trial court rulings on the defense's objections to the jury charge and judgment; eleven points challenging the constitutionality of the Texas capital sentencing statute and special issues; one point challenged the sufficiency of the evidence supporting the jury's affirmative answer to the future dangerousness special issue; and one poins urging cumulative error.  On August 20, 2014, attorney Tatum filed an amended appellant's brief asserting the same points of error summarized above.  The amended appellant's brief appears at ECF no. 33-16.

[52] Johnson's state habeas corpus application, filed by the Office of Capital Writs, appears at ECF no. 36-12, pages 26-168 of 537.  More specifically, Johnson's state habeas application argued that (1) his trial counsel rendered ineffective assistance by failing to (a) properly prepare Dr. Roache to testify at trial (including by failing to have Dr. Roache evaluate Johnson); (b)present expert testimony regarding the lack of availability of mental health care and substance abuse treatment; (c) present lay and expert testimony regarding Johnson's social history; (d) preserve errors committed during jury selection; and (e) request a change of venue; (2) the cumulative effect of the foregoing

---

on Johnson's state habeas claims on June 27, 2017, August 30-31, 2017, November 1, 2017, August 2, 2018, and October 18, 2018.[53]  On March 26, 2019, the state habeas trial court issued its findings of fact and conclusions of law and recommendation that Johnson's state habeas corpus application be denied.[54]  The Texas Court of Criminal Appeals subsequently denied Johnson's application for state habeas corpus relief.  *Ex parte Johnson*, WR-87,574-01, 2019 WL 4317046 (Tex. Crim. App. Sept. 11, 2019).

## G.  Proceedings in this Court

On September 11, 2020, Johnson filed his original federal habeas corpus petition, asserting five groups of claims for relief, including claims that (1) his trial counsel rendered ineffective assistance by failing to (a) adequately investigate Johnson's background and present available mitigating evidence; (b) present other available mitigating evidence, including Johnson's social history; (c) prepare Dr. Roache to testify at trial (specifically failing to allow Dr. Roache to evaluate Johnson); (d) retain an expert to testify regarding the lack of availability of mental health care and substance abuse treatment; and (e) explain the difficulties Johnson faced in accessing

---

ineffective assistance deprived Johnson of a fair trial; (3) the trial court was prohibited from advising the jury of the effect of a single hold-out juror; (4) the jury charge contained a restrictive definition of mitigating evidence; (5) the future dangerousness special issue was unconstitutionally vague; and (6) the Texas capital sentencing scheme results in the death penalty being applied in a racially arbitrary manner.  Johnson attached more than thirty exhibits to his state habeas corpus application, including affidavits from fifteen witnesses.  The exhibits to Johnson's state habeas corpus application appear at ECF no. 36-12, at pp. 188-531 of 537.

[53] The record from the evidentiary hearing held in Johnson's state habeas corpus proceeding appears at ECF no. 36-16 (proceedings June 27, 2017 – testimony of Catherine Bernhard, Kenneth Weatherspoon, and Nancy Mulder in S.F. State Habeas Hearing, Vol. 3/10); ECF no. 36-17 (proceedings Aug. 30, 2017 – testimony of defense witnesses Brendan Ross, Timothy Freeman, Alicia Amezcua-Rodriguez, Michael Henry, and Timothy Johnson in S.F. State Habeas Hearing, Vol. 4/10); ECF no. 36-18 (proceedings Aug. 31, 2017 – testimony of defense witnesses Anthony Johnson, Anthony Wayne Grimes, and Dr. John Roache in S.F. State Habeas Hearing, Vol. 5/10);  ECF no. 36-19 (proceedings Nov. 1, 2017 – testimony of defense witness Dr. Jennifer Sapia in S.F. State Habeas Hearing, Vol. 6/10); ECF no. ECF no. 36-20 (proceedings Aug. 2, 2018 – testimony of prosecution witness Dr. Timothy Proctor in S.F. State Habeas Hearing, Vol. 7/10) ; ECF no. 36-21 (proceedings Oct. 18, 2018 -testimony of defense witness Dr. Leslie Rosenthal in S.F. State Habeas Hearing, Vol. 8/10).

[54] The state habeas trial court's findings, conclusions, and recommendation appear at ECF no. 36-13, at pp. 335-446 of 469.

mental health and substance abuse treatment; (2) the Texas capital sentencing statute's future dangerousness special is unconstitutionally vague because it contains multiple undefined terms, predictions of future dangerousness are inherently unreliable, and Johnson's non-violent post-conviction conduct while on death row proves his jury was wrong about his propensity for future violence; (3) the Texas mitigation special issue is unconstitutional because the burden is not imposed on the prosecution to disprove the presence of adequate mitigating circumstances to warrant a life sentence; (4) Johnson's jury was misled by his jury charge regarding the impact of a single hold-out juror in violation of the holding in *Simmons v. South Carolina*; and (5) Johnson's death sentence was arbitrary and the product of geographic and racial factors (ECF no. 21).

On April 9, 2021, Respondent filed an answer arguing (1) the state habeas court reasonably rejected Johnson's ineffective assistance claims on the merits; (2) Johnson's challenges to the constitutionality of the Texas capital sentencing special issues were reasonably rejected by the TCCA during Johnson's direct appeal; and (3) Johnson's complaint about the alleged arbitrariness of his capital sentence was unsupported by any allegation or evidence showing that his sentence flowed from any consideration of an improper factor such as race or religion and was reasonably rejected by the state habeas court (ECF no. 29).

On May 10, 2021, Johnson filed his reply brief arguing, in part, for a holistic approach to his ineffective assistance claim (ECF no. 32).

### III. STANDARD OF REVIEW

Because Johnson filed this federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), this Court's review of his claims for federal habeas corpus relief is governed by AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot grant Johnson federal habeas corpus relief

in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite Supreme Court authority does not, per se, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable

application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins*, 539 U.S. at 520-21.  The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").  "Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter,* 562 U.S. 86, 101 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

AEDPA also significantly restricts the scope of federal habeas review of state court fact findings.  Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *Wood v. Allen*, 558 U.S. 290, 301(2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.").  Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination.  *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, § 2254(e)(1) provides that a federal habeas petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).  It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2).  *See Wood*, 558 U.S. at 300-01 (choosing not

to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

The deference to which state-court factual findings are entitled under AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Absent a showing that there is an absence of available state corrective process or that circumstances exist that render such process ineffective to protect the rights of a petitioner, this Court is statutorily precluded from granting federal habeas corpus relief on any claim that has not been fairly presented to the state courts. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (the exhaustion requirement is designed to avoid the unseemly result of a federal court upsetting a state court conviction without first affording the state courts an opportunity to correct a constitutional violation); 28 U.S.C. § 2254(b)(1). Nonetheless, this Court is authorized to deny federal habeas relief on the merits notwithstanding a petitioner's failure to exhaust available state court remedies. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005) (a federal habeas court abuses its discretion if it grants a petitioner a stay when his unexhausted claims are plainly meritless); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

In those instances in which the state courts failed to adjudicate a claim on the merits that Johnson presents to this Court (such as claims (1) the state courts summarily dismissed under the

Texas writ-abuse statute or other Texas rules of procedural default or (2) which Johnson failed to fairly present to the state courts), this Court's review of the un-adjudicated claim is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (de novo review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U.S. at 534 (same).

## IV. CONSTITUTIONALITY OF THE FUTURE DANGEROUSNESS SPECIAL ISSUE

### A. The Claim

In his second claim for federal habeas corpus relief, Johnson argues (1) the Texas capital sentencing statute's future dangerousness special issue is unconstitutionally vague because of the failure of the Texas statute and Texas courts to define key terms therein, including "probability," and "criminal acts of violence"; (2) jury predictions of future dangerousness are inherently unreliable; and (3) Johnson's jury was wrong when it predicted he would be violent in the future, as demonstrated by Johnson's non-violent record while on death row (ECF no. 21, at 70-82).

### B. State Court Disposition

Johnson presented the first of these three arguments as his fifty-ninth point of error on direct appeal. Appellant's Brief, at 140 [ECF no. 33-13, at p. 175 of 182]. The TCCA rejected this argument on the merits. *Johnson v. State*, AP-77,030, 2015 WL 7354609, *36.

In his eighth claim in his state habeas application Johnson again argued key terms in the Texas capital sentencing statute's future dangerousness special issue were unconstitutionally vague and also argued predictions of future violence are inherently unreliable. State Habeas

Application, at 154-58 [ECF no. 36-12, at pp. 164-67 of 537]. The state habeas trial court found the TCCA rejected Johnson's constitutional challenge to the future dangerousness special issue on direct appeal; found there was abundant evidence to support the jury's verdict that there was a probability Johnson would commit criminal acts of violence that would constitute a continuing threat to society; and concluded Johnson's constitutional challenge to the future dangerousness special issue was without merit. Findings of Fact, Conclusions of Law, and Recommendation (henceforth "FCR"), at 126-27 [ECF no. 36-13, at pp. 160-61 of 469]. The TCCA expressly adopted the foregoing findings and conclusions when it denied Johnson's state habeas application. *Ex parte Johnson*, WR-86,571-01, 2019 WL 4317046, *3.

Johnson failed to fairly present the state courts with his third assertion outlined above, i.e., his argument that his good behavior while on death row somehow negates the jury's affirmative answer to the Texas capital sentencing statute's future dangerousness special issue.

**C. Clearly Established Federal Law**

Johnson's constitutional challenges to the validity of the Texas capital sentencing statute's future dangerousness special issue ignore clearly established Supreme Court precedent.

In *Tuilaepa v. California*, 512 U.S. 967 (1994), the Supreme Court explained that the Eighth Amendment addresses two different, but related, aspects of capital sentencing: the eligibility decision and the selection decision. *Tuilaepa*, 512 U.S. at 971. The Supreme Court's analysis of those two aspects of capital sentencing provided the first comprehensive system for analyzing Eighth Amendment claims that a clear majority of the Supreme Court had ever offered:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravating circumstance may be contained in the definition of the crime or in a

separate sentencing factor (or both).    As we have explained, the aggravating circumstance must meet two requirements.  First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder.  Second, the aggravating circumstance may not be unconstitutionally vague.  * * *

We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.  "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime."  That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa*, 512 U.S. at 971-73 (citations omitted).

The Supreme Court clearly declared its view that States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion.  *Id.*, at 974.  The Supreme Court also concluded, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Id.*, at 978.

In *Loving v. United States*, 517 U.S. 748, 755 (1996), the Supreme Court described the first part of the *Tuilaepa* analysis, *i.e.,* the eligibility decision, as follows:

The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'"  Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance.  The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process." (citations omitted).

The Supreme Court subsequently elaborated on the distinction between the narrowing function or "eligibility decision" and the "selection phase" of a capital sentencing proceeding in *Buchanan v. Angelone*, 522 U.S. 269, 275-277 (1998) (citations omitted):

> Petitioner initially recognizes, as he must, that our cases have distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase. In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant. Petitioner concedes that it is only the selection phase that is at stake in his case. He argues, however, that our decisions indicate that the jury at the selection phase must both have discretion to make an individualized determination and have that discretion limited and channeled. He further argues that the Eighth Amendment therefore requires the court to instruct the jury on its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State.

> No such rule has ever been adopted by this Court. While petitioner appropriately recognizes the distinction between the eligibility and selection phases, he fails to distinguish the differing constitutional treatment we have accorded those two aspects of capital sentencing. It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination.

> In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. Thus, in *Boyde v. California,* we held that the standard for determining whether jury instructions satisfy these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."

> But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible.

### D.  AEDPA Analysis of Exhausted Claims

The allegedly vague terms in the Texas capital sentencing statute's future dangerousness special issues identified by Johnson in his second claim for federal habeas relief both contain a commonsense core of meaning which do not require further definition. *See James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993) ("To the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system....  The answer is that such words, often of great consequence, do have a common understanding in the sense that they ultimately mean what the jury says by their verdict they mean." (*quoting Milton v. Procunier*, 744 F.2d 1091, 1096 (5th Cir. 1984)).

The Fifth Circuit has repeatedly rejected the same void-for-vagueness challenge to the key terms within the Texas capital sentencing statute's future dangerousness special issue raised by Jonson. *See e.g.*, *Sprouse v. Stephens*, 748 F.3d  609, 622-23 (5th Cir. 2014) (denying Certificate of Appealability ("CoA") on complaints about the lack of definitions of "probability," "criminal acts of violence," and "continuing threat to society" in a Texas capital sentencing jury charge); *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (holding the terms "probability," "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself"); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007) (rejecting claims that the terms "probability," "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence); *Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and

"continuing threat to society").  Thus, Johnson's argument that the Texas capital sentencing statute's future dangerousness special issue is unconstitutionally vague lacks any arguable merit.

Moreover, as this court has previously explained, insofar as Johnson argues that his post-conviction good behavior in prison somehow negates the jury's affirmative finding of future dangerousness, his reliance on the Supreme Court's decision in *Johnson v. Mississippi*, 486 U.S. 578 (1988), is misplaced.  In *Johnson*, a Mississippi state court employing a weighing capital sentencing scheme sentenced the defendant to death in 1982 citing his 1963 New York felony conviction for assault with intent to commit rape as one of three aggravating factors supporting the sentence.[55]  The prosecution presented no evidence about the conduct underlying the prior New York conviction but relied instead on a single authenticated copy of a document indicating the conviction.  *Johnson*, 486 U. S. at 586 ("[T]he jury was not presented with any evidence describing that conduct − the document submitted to the jury proved only the facts of conviction and confinement, nothing more.").  The prosecution repeatedly referred to that limited evidence of the New York conviction in the Mississippi sentencing hearing.  *Id.*, 486 U. S. at 581 (quoting the prosecutor at trial as saying "I say that because of having been convicted of second-degree assault with intent to commit first degree rape and capital murder that Samuel Johnson should die").  "Thus, the death sentence [in *Johnson*] relied on the mere fact of conviction."  *Spivey v. Head*, 207 F.3d 1263, 1281 (11th Cir. 2000).  After his Mississippi conviction and sentence, Johnson's attorneys successfully prosecuted a post-conviction proceeding in New York in which they argued Johnson had been denied his right to appeal in connection with his New York conviction; in the

---

[55] More specifically, the *Johnson* jury found the following aggravating circumstances: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person of another; (2) the defendant committed capital murder for the purpose of avoiding arrest or effecting an escape from custody; and (3) the capital murder was especially heinous, atrocious, and cruel.  *Johnson v. Mississippi*, 486 U.S. at 581 n.1.

course of his subsequent appeal, the New York appellate court reversed Johnson's conviction. *Johnson*, 486 U. S. at 582. The Mississippi Supreme Court denied Johnson post-conviction relief. The United States Supreme Court reversed, holding that allowing the Mississippi death sentence to stand although based in part on a reversed New York conviction violated the Eighth Amendment. *Id.*, 486 U. S. at 586 ("The prosecution repeatedly urged the jury to give it [Johnson's prior conviction] weight in connection with its assigned task of balancing aggravating and mitigating circumstances 'one against the other.'").

The fundamental problem with Johnson's attempt to apply the holding in *Johnson v. Mississippi* to his Texas capital murder trial is that, unlike the subsequently invalidated aggravating factor involved in the Mississippi case, i.e., the prior New York conviction, the Texas capital sentencing special issues are not aggravating factors and do not serve the narrowing function mandated by the Supreme Court's Eighth Amendment jurisprudence. *See, e.g., Lowenfield v. Phelps*, 484 U.S. 231, 242-47 (1988) (holding the Texas capital sentencing special issues do not function as aggravating factors and, thus, do not require further definitions); *Jurek v. Texas*, 428 U.S. 262, 270-73 (1976) (plurality) (holding the Texas capital sentencing statute requires a finding of aggravating circumstances through its narrow statutory definition of capital murder and recognizing that it permits consideration of a wide range of potentially mitigating evidence); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996) (explaining that the Texas capital sentencing scheme accomplishes the constitutionally required narrowing function at the guilt-innocence phase of trial by virtue of the statutory definition of capital murder and that further narrowing is not constitutionally necessary; and also holding that, therefore, there is no need for definitions of terms such as "probability," "criminal acts of violence," or "continuing threat to society").

Moreover, Matthew Lee Johnson's proposed new Eighth Amendment rule allowing invalidation of a jury's unanimous finding of a probability of future dangerousness by a showing that the defendant subsequently did not commit any acts of criminal violence while housed on Texas' death row misconstrues the Supreme Court's holding in *Johnson v. Mississippi* (which involved a jury's consideration of a subsequently invalidated aggravating factor) with the Texas capital sentencing scheme's future dangerousness special issue (which exclusively addressed the selection phase of capital sentencing). The Texas capital sentencing scheme's future dangerousness special issue plays no role part in the constitutionally mandated narrowing or "eligibility" function. *Lowenfield*, 484 U.S. at 242-47; *Woods*, 75 F.3d at 1033-34.

Texas, unlike Mississippi, is not a "weighing jurisdiction where capital sentencing juries must weigh "aggravating" versus "mitigating" factors before rending a verdict at the punishment phase of a capital murder trial. *See Hughes v. Johnson*, 191 F.3d 607, 621-23 (5th Cir. 1999) (holding no Eighth Amendment violation resulted from Texas Court of Criminal Appeals' refusal to engage in proportionality review of capital sentencing jury's answer to mitigation special issue because Texas is a non-weighing jurisdiction); *James*, 987 F.2d at 1120 (Texas is a "non-weighing" state). Rather, the Texas capital sentencing scheme performs the constitutionally mandated narrowing function, i.e., the process of making the "eligibility decision" discussed in *Tuilaepa*, at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital murder in Section 19.03 of the Texas Penal Code. *See Johnson v. Texas*, 509 U.S. 350, 362 (1993) (holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Lowenfield*, 484 U.S. at 243-47 (comparing the Louisiana and Texas

capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek*, 428 U.S. at 268-75 (*plurality opinion* recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty).

The Texas capital sentencing scheme under which Matthew Lee Johnson was tried, convicted, and sentenced performed the constitutionally required narrowing function discussed in *Tuilaepa* and *Loving* at the guilt-innocence phase of his trial. *See Sonnier v. Quarterman*, 476 F.3d 349, 365-67 (5th Cir. 2007) (recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh*, 548 U.S. 163 (2006), performs the constitutionally required narrowing function through its statutory definition of capital murder).

Johnson's attempt to apply the holding in *Johnson v. Mississippi* to his jury's verdict at the punishment phase of his trial constitutes an effort to apply a new rule of constitutional criminal procedure in the context of a federal habeas corpus proceeding.  This is forbidden by the holding in *Teague v. Lane*, 489 U.S. 288 (1989), which forecloses adoption of the new principles of federal constitutional criminal procedure in federal habeas corpus proceedings.  Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review.  *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994).  A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final.  *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction

became final").  Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review.  *Id.*

A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires.  *Caspari*, 510 U.S. at 390.  Johnson's conviction became final for *Teague* purposes no later than June 27, 2016, i.e., the date the United States Supreme Court denied his petition for writ of certiorari following the Texas Court of Criminal Appeals' affirmation of his conviction and sentence.  *See Beard v. Banks*, 542 U.S. 406, 411-12 (2004) (recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari*, 510 U.S. at 390 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.").

*Teague* remains applicable after the passage of AEDPA.  *See Horn v. Banks*, 536 U.S. 266, 268-72 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir. 2003) (recognizing the continued vitality of the *Teague* nonretroactivity doctrine under AEDPA).  As of the date Johnson's conviction and sentence became final for *Teague* purposes no federal court had ever held a Texas capital murder jury's affirmative answer to the Texas capital sentencing scheme's future dangerousness special could be invalidated based upon the defendant's conduct after the date of trial.  Likewise, as of the same date, no federal court had ever held that a

33

defendant's post-trial conduct could render a Texas capital sentencing jury's affirmative answer to the future dangerousness special issue constitutionally invalid.

Furthermore, such a new rule defies logic. Johnson's capital sentencing jury was asked, as part of the selection process of capital sentencing, whether there was a *probability* that he would commit criminal acts of violence that would constitute a continuing threat to society, not whether there was a *certainty* he would do so. Moreover, Johnson cites to no legal authority establishing that Texas' inclusion of its future dangerousness special issue as part of the selection phase in its capital sentencing process violates any constitutional provision, including the Eighth and Fourteenth Amendments. Instead, Johnson relies primarily upon articles by academics in social science, political science, psychological, legal, and other professional journals arguing for the lack of efficacy in jury predictions of future dangerousness. Such public policy arguments are more properly addressed to the Texas Legislature than the courts. Because the Texas capital sentencing scheme performs the constitutionally required narrowing function at the guilt-innocence phase of a capital murder trial, Johnson's arguments do not invoke any constitutional concerns.

Predictions of future dangerousness are inherent in a wide range of decisions rendered by state and federal courts, ranging from questions of whether to release pretrial detainees on bond in criminal cases to whether to issue protective orders in domestic relations cases. The reality that human foresight is far from perfect does not render inherently unconstitutional a court or jury's determination that a particular individual poses a threat to the community. Appellate review of the evidentiary sufficiency for those findings ordinarily suffices to satisfy most constitutional requirements. The Texas Court of Criminal Appeals routinely conducts just such review in capital murder cases. *See, e.g., Hall v. State*, ___ S.W.2d ___, ___, 2021 WL 5823345, *4 (Tex. Crim. App. Dec. 8, 2021) (conducting review of sufficiency of the evidence supporting a jury's

affirmative finding on the future dangerousness special issue and holding a jury may consider a variety of factors in determining whether a capital defendant will prove a continuing threat to society, including (1) the circumstances of the capital offense, such as the defendant's state of mind and whether he was acting alone or with others; (2) the calculated nature of the defendant's acts; (3) the forethought and the deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record; (5) the defendant's age and personal circumstances at the time of the capital offense; (6) whether the defendant was acting under duress or the dominion of another at the time of the commission of the crime; (7) psychiatric evidence; and (8) character evidence (quoting *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987)); *Daniel v. State*, 485 S.W.3d 24, 31-33 (Tex. Crim. App. 2016) (holding evidence sufficient to support affirmative finding on future dangerousness under *Keeton* factors); *Buntion v. State*, 482 S.W.3d 58, 65-68 (Tex. Crim. App. 2016) (holding evidence sufficient under *Keeton* factors to support affirmative finding on future dangerousness special issue).

For the foregoing reasons, the Texas Court of Criminal Appeals' rejections on the merits (during both Johnson's direct appeal and state habeas corpus proceeding) of Johnson's challenges to the constitutionality of the Texas capital sentencing statute's future dangerousness special issue were  neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Johnson's trial, direct appeal, and state habeas corpus proceedings.

**E.  De Novo Review of Unexhausted Claim**

Johnson failed to fairly present the state court with his new argument that his good behavior while on death row somehow established that his jury was "wrong" when it answered the future

dangerousness special issue affirmatively.  Title 28 U.S.C. § 2254(b)(1) prohibits a federal district court from granting habeas corpus relief based upon an unexhausted claim except in circumstances inapplicable to Johnson's unexhausted challenge to the future dangerousness special issue.  Section 2254(b)(2), however, permits a federal district court to deny relief on the merits notwithstanding a petitioner's failure to exhaust available state remedies.  Because Johnson chose not to present his claim premised upon his good behavior in prison to the state courts during either his direct appeal or state habeas corpus proceeding, this Court's review of that claim is necessarily de novo.  *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (holding de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (holding de novo review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (holding the same).  This unexhausted claim is, therefore, subject to de novo review by this court.

Insofar as Johnson argues that his post-conviction good behavior while on death row somehow invalidates the jury's answer to the future dangerousness special issue, Johnson cites no legal authority supporting his contention other than the Supreme Court's holding in *Johnson v. Mississippi*.  As explained above, however, the Supreme Court's holding in *Johnson v. Mississippi* is inapplicable to Matthew Lee Johnson's capital murder case.  Furthermore, Texas courts have rejected the notion that a "pristine" prison record somehow trumps a jury's finding of future dangerousness.  *See Devoe v. State*, 354 S.W.2d 457, 468 (Tex. Crim. App. 2011) (holding that while good behavior in prison is a factor to consider, it does not preclude a finding of future dangerousness); *Emery v. State*, 881 S.W.2d 702, 707 (Tex. Crim. App. 1994) (holding neither

evidence showing the defendant's eight and a half years of good behavior in prison nor expert psychiatric testimony that the defendant was not a continuing threat to society undermined the validity of the jury's finding of future dangerousness).  Neither the Supreme Court nor the Fifth Circuit has ever ruled to the contrary.

Moreover, the fact Johnson has not committed any more acts of criminal violence while housed on death row (and subject to 23-hour-a-day lockdown conditions) proves nothing of consequence.  Experts for both the prosecution and defense testified during Johnson's trial and state habeas corpus proceedings that the conditions under which TDCJ inmates are housed while on Texas' death row are considerably more restrictive than those experienced by TDCJ inmates serving life sentences without the possibility of parole in the general TDCJ population.

Finally, the new rule urged by Johnson in his third and unexhausted challenge to the Texas capital sentencing statute's future dangerousness special issue is not merely unsupported by any relevant legal authority; it is also barred by the holding in *Teague*.

For the foregoing reasons, Johnson's unexhausted argument in his second federal habeas claim that his good behavior while on death row somehow negates the jury's affirmative answer to the Texas capital sentencing statute's future dangerousness special issue does not warrant federal habeas relief under a de novo standard of review.

## F. Conclusions

All aspects of Johnson's second claim for federal habeas relief lack any arguable merit. This Court denies relief on this claim.

### V.  ABSENCE OF A BURDEN OF PROOF ON MITIGATION SPECIAL ISSUE

#### A.  The Claim

In his third claim for federal habeas relief, Johnson argues the Supreme Court's holdings in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), mandate that a burden of proof beyond a reasonable doubt be imposed on the prosecution in connection with the Texas capital sentencing statute's mitigation special issue (ECF no. 21, at 82-85).

#### B.  State Court Disposition

Johnson raised an expanded version of this same argument in his fifty-fifth, fifty-sixth, fifty-seventh, and sixty-first points of error on direct appeal.  Appellant's Brief, at 137-39, 141 [ECF no. 33-13, at pp. 172-74, 176 of 182].  The TCCA rejected this argument on the merits. *Johnson v. State*, AP-77,030, 2015 WL 7354609, *36.

#### C.  Clearly Established Federal Law

In *Apprendi v. New Jersey*, the Supreme Court struck down on due process grounds a state scheme that permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent.  *Apprendi*, 530 U.S. at 497.  The Supreme Court's opinion in *Apprendi* emphasized it was merely extending to the state courts the same principles discussed in Justice Stevens' and Justice Scalia's concurring opinions in *Jones v. United States*, 526 U.S. 227, 252-53 (1999): other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.  *Apprendi*, 530 U.S. at 490.  Put more simply, the Supreme Court held in

*Apprendi* (1) it was unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed and (2) all such findings must be established beyond a reasonable doubt. *Id.*, 530 U.S. at 490.

Two years later, in *Ring v. Arizona*, the Supreme Court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of pre-meditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual* determinations that (1) the offense was committed in expectation of receiving something of pecuniary value (*i.e.,* the fatal shooting of an armored van guard during a robbery) and (2) the foregoing aggravating factor out-weighed the lone mitigating factor favoring a life sentence (*i.e.*, the defendant's minimal criminal record).[56] *Ring*, 536 U.S. at 609. The Supreme Court emphasized, as it had in *Apprendi*, the dispositive question "is not one of form, but of effect": [i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt." *Id.*, at 602. "A defendant

---

[56] The Arizona trial judge instructed Ring's jury on alternative theories of premeditated murder and felony murder. *Ring v. Arizona*, 536 U.S. at 591. The jury deadlocked on premeditated murder but convicted Ring of felony murder occurring in the course of armed robbery. *Id.* The trial court also instructed Ring's jury in accordance with Arizona law that (1) a person commits first-degree murder if, acting either alone or with one or more other persons, the person commits or attempts to commit one of several enumerated felonies including robbery and, in the course of and furtherance of the offense or immediate flight from the offense, the person or another person causes the death of any person and (2) a conviction for felony murder did not require a specific mental state other than what is required for the commission of the enumerated felonies. *Id.* (*citing* Ariz.Rev.Stat.Ann. § 13-1105(A) and (B) (West 2001)). At the guilt-innocence phase of Ring's trial, there was no evidence presented showing Ring participated in the planning of the robbery or expected the killing of the armored car guard. *Id.*, 536 U.S. at 592-93. Between the guilt-innocence phase of trial and Ring's sentencing hearing, however, one of his accomplices entered into a plea agreement and agreed to testify at Ring's sentencing hearing. *Id.*, 536 U.S. at 593. At the sentencing hearing, the accomplice identified Ring as the primary planner of the robbery and the person who actually shot the guard. *Id.*

The Arizona trial judge found a second aggravating factor applied in Ring's case, *i.e.,* Ring's comments after the fatal shooting in which he chastised his co-conspirators for their failure to praise Ring's marksmanship rendered his offense "especially heinous, cruel, or depraved." The Arizona Supreme Court later held there was insufficient evidence to support the trial judge's finding of depravity but nonetheless re-weighed the remaining aggravating factor against the lone mitigating factor and affirmed Ring's death sentence. *Ring v. Arizona*, 536 U.S. at 595-96.

may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.*, at 602 (*quoting Apprendi*, 530 U.S. at 483). Because Ring would not have been subject to the death penalty under Arizona law based solely upon the jury's verdict (and but for the trial judge's factual determination as to the existence of an aggravating factor), the Supreme Court declared Ring's death sentence violated the right to trial by jury protected by the Sixth Amendment. *Id.*, at 609.

In *Blakely v. Washington*, 542 U.S. 296, (2004), the Supreme Court struck down as a violation of the Sixth Amendment's right to jury trial a judge-imposed sentence of imprisonment that exceeded by more than three years the state statutory maximum of 53 months. *Blakely v. Washington*, 542 U.S. at 303-04. In so ruling, the Supreme Court relied upon its prior holding in *Apprendi,* 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). In *Blakely*, the Supreme Court also relied upon its prior opinion in *Ring v. Arizona*, *supra*, for the principle "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely v. Washington*, 542 U.S. at 303.

In *Hurst v. Florida*, 577 U.S. 92 (2016), the Supreme Court struck down as a violation of the principles announced in *Apprendi* and *Ring* a death sentence imposed by a Florida judge after the jury at the guilt-innocence phase of Hurst's trial convicted him of first-degree murder but failed to specify which of the two theories of murder submitted (*i.e.,* premeditated murder or felony murder for an unlawful killing during a robbery) it believed. *Hurst*, 477 U.S. at 95-96. The Florida felony murder statute at the time of Hurst's trial, as was true for Arizona's felony murder statute

40

at the time of Ring's trial, did not require a jury finding of the specific intent to kill.[57]  Consistent with Florida's hybrid capital sentencing scheme, the sentencing court held an evidentiary hearing before the jury, and the jury recommended a sentence of death.  After the Florida Supreme Court vacated Hurst's first sentence, the sentencing judge conducted a new evidentiary hearing, instructing the jury it could recommend a death sentence if it found at least one aggravating circumstance beyond a reasonable doubt, *i.e.,* either the murder was especially heinous, atrocious, or cruel, or the murder was committed while Hurst was committing a robbery.  At the conclusion of the second sentencing hearing the jury recommended death by a vote of 7 to 5.  In her sentencing order, the trial judge relied upon her independent determination that the evidence established statutory aggravating factors of (1) the capital felony was especially heinous, atrocious, or cruel and (2) the capital felony was committed while the defendant was engaged, or was an accomplice, in the commission or an attempt to commit, or flight after committing or attempting to commit any robbery, *i.e.,* Fla. Stat. § 921.141(6)(d) & (h) (2010).  The Supreme Court held the Sixth Amendment and Due Process Clause jointly require that each element of a crime be proved to a jury beyond a reasonable doubt.  *Hurst*, 577 U.S. at 97-98.  The Supreme Court described its prior holding in *Apprendi* as follows: "any fact that 'exposes the defendant to a greater punishment *than that authorized by the jury's guilty verdict'* is an 'element' that must be submitted to a jury."  *Id.*, at 97 (*emphasis added*).  The Supreme Court concluded Hurst's death sentence was invalid because the sentencing judge, not a jury, found the aggravating circumstance necessary for the imposition of the death penalty under Florida law.  *Id.*, at 98-99.

---

[57] Florida law provided at the time of Hurst's murder trial that first degree murder consisted of the unlawful killing of a human being (1) when perpetuated from a premeditated design to effect the death of the person killed or any human being, (2) when committed by a person engaged in the perpetuation of, or in the attempt to perpetuate any of nineteen listed felonies (including robbery and kidnaping), or (3) which resulted from the unlawful distribution of any controlled substance identified in the statute, when such drug is proven to be the proximate cause of the death of the user.  Fla. Stat. § 782.04(1) (2010).

## D. AEDPA Review

Neither the Supreme Court's opinion in *Apprendi* nor any of the Supreme Court's subsequent opinions construing its holding in *Apprendi* mandate imposition of a burden of proof on the prosecution with regard to the Texas capital sentencing statute's mitigation special issue. *Kansas v. Carr*, 577 U.S. 108, 119-22 (2016). In fact, the Supreme Court has expressly recognized the lack of efficacy in selection phase jury instructions addressing mitigating evidence:

> [W]e doubt whether it is even possible to apply a standard of proof to the mitigating-factor determination (the so-called "selection phase" of a capital-sentencing proceeding). It is possible to do so for the aggravating-factor determination (the so-called "eligibility phase"), because that is a purely factual determination. The facts justifying death set forth in the Kansas statute either did or did not exist—and one can require the finding that they did exist to be made beyond a reasonable doubt. Whether mitigation exists, however, is largely a judgment call (or perhaps a value call); what one juror might consider mitigating another might not. And of course the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy—the quality of which, as we know, is not strained. It would mean nothing, we think, to tell the jury that the defendants must deserve mercy beyond a reasonable doubt; or must more-likely-than-not deserve it. It *would* be possible, of course, to instruct the jury that *the facts establishing* mitigating circumstances need only be proved by a preponderance, leaving the judgment whether those facts are indeed mitigating, and whether they outweigh the aggravators, to the jury's discretion without a standard of proof. If we were to hold that the Constitution requires the mitigating-factor determination to be divided into its factual component and its judgmental component, and the former to be accorded a burden-of-proof instruction, we doubt whether that would produce anything but jury confusion. In the last analysis, jurors will accord mercy if they deem it appropriate, and withhold mercy if they do not, which is what our case law is designed to achieve.

*Kansas v. Carr*, 577 U.S. at 119.

Furthermore, the Fifth Circuit has repeatedly rejected the arguments underlying Johnson's call for imposing a burden of proof on the mitigation special issue. *See, e.g., Blue v. Thaler*, 665 F.3d 647, 668 (5th Cir. 2011) ("No Supreme Court or Circuit precedent constitutionally requires that Texas' mitigation special issue be assigned a burden of proof."); *Druery v. Thaler*, 647 F.3d

535, 546 (5th Cir. 2011) ("In *Avila v. Quarterman*, this court rejected a petitioner's argument 'that allowing a sentence of death without a jury finding beyond a reasonable doubt that there were no mitigating circumstances sufficient to warrant a sentence of life imprisonment violated his Sixth and Fourteenth Amendment right to due process and a fair trial.' 560 F.3d 299, 315 (5th Cir.2009). Other decisions have likewise rejected the argument that failure to instruct the jury that the State has the burden of proof beyond a reasonable doubt on the mitigation issue is unconstitutional."); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006) ("'[N]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof.'" (quoting *Rowell v. Dretke,* 398 F.3d 370, 378 (5th Cir. 2005)).  Johnson makes no good faith effort to distinguish any of the foregoing Supreme Court or Fifth Circuit authorities.

Moreover, as Respondent correctly points out, adoption of the new rule advocated by Johnson in his third claim for federal habeas relief is foreclosed by the non-retroactivity principle of *Teague.*

The Texas Court of Criminal Appeals' rejection on the merits during Johnson's direct appeal of his points of error about the absence of a burden of proof in the mitigation special issue was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Johnson's trial and direct appeal.

**E. Conclusions**

Johnson's third claim for federal habeas relief lacks any arguable legal merit.  This Court denies relief on this claim.

## VI. LACK OF A HUNG JURY INSTRUCTION

### A.  The Claim

In his fourth claim for federal habeas relief, Johnson argues the Texas capital sentencing statute's co-called twelve/ten rule violates the Supreme Court's holding in *Simmons v. South Carolina*, 512 U.S. 154 (1994), by failing to advise a Texas capital sentencing jury of the effect of a single hold-out juror (ECF no. 21, at 85-88).

### B.  State Court Disposition

Johnson did not raise this complaint on direct appeal.  He did include a variation on this argument as his sixth ground for state habeas relief (i.e., Johnson argued the Texas twelve/ten rule violated the Supreme Court's holdings in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990)).  State Habeas Application, at 142-48 [ECF no. 36-12, at pp. 152-58 of 537].  The state habeas trial court found Johnson's jury was correctly instructed not to consider the impact of a hung jury; found there was no factual basis for believing there was any confusion among Johnson's jury as to the effect of a hung jury; concluded Johnson's constitutional challenge to his punishment phase jury instruction was without merit; and recommended denial on the merits.  FCR, at 121-24 [ECF no. 36-13, at pp. 455-58 of 469].  The TCCA concluded Johnson's sixth ground for state habeas relief was procedurally barred because it could have been raised on direct appeal but was not.  *Ex parte Johnson*, WR-86,571-01, 2019 WL 4317046, *2. Additionally, the TCCA also expressly adopted the state habeas trial court's findings and conclusions regarding Johnson's sixth ground for state habeas relief. *Ex parte Johnson*, WR-86,571-01, 2019 WL 4317046, *3.

**C.  De Novo Review**

Out of an abundance of caution, this Court will undertake de novo review of Johnson's fourth claim for federal habeas relief.  Johnson's fourth claim for federal habeas corpus relief is without arguable merit.  The Supreme Court has implicitly rejected Johnson's arguments underlying his fourth claim. *See Jones v. United States* 527 U.S. 373, 382 (1999) (holding the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death).  Likewise, on numerous occasions, the Fifth Circuit has expressly rejected the legal premise underlying Johnson's fourth claim, i.e., the argument a Texas capital murder defendant is constitutionally entitled to have his punishment-phase jury instructed regarding the consequences of a hung jury or a single holdout juror. *See, e.g., Young v. Davis*, 835 F.3d 520, 528 (5th Cir. 2016) ("the Supreme Court has never suggested that *Simmons* requires informing jurors of the consequences of a breakdown in deliberations."); *Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005) (holding the same arguments underlying Johnson's fourth claim herein were so legally insubstantial as to be unworthy of a certificate of appealability); *Alexander v. Johnson*, 211 F.3d 895, 897-98 (5th Cir. 2000) (holding the *Teague v. Lane* non-retroactivity doctrine precluded applying such a rule in a federal habeas context); *Davis v. Scott*, 51 F.3d 457, 466-67 (5th Cir. 1995) (holding the same); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994) (rejecting application of the Supreme Court's holding in *Mills* to a Texas capital sentencing proceeding).

Johnson also cannot rely on the Supreme Court's holding in *Caldwell v. Mississippi,* 472 U.S. 320 (1985), to support his fourth claim.  In *Caldwell*, the Supreme Court addressed an instance in which a capital murder prosecutor's jury argument suggested, in an erroneous and misleading manner, the jury was *not* the final arbiter of the defendant's fate.[58]  To establish a *Caldwell* violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407 (1989).  The Fifth Circuit has repeatedly rejected efforts to shoehorn the Supreme Court's holding in *Caldwell*, into the wholly dissimilar context of a Texas capital trial. *See, e.g., Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. 2007) (recognizing Fifth Circuit precedent forecloses arguments the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandate jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict); *Alexander*, 211 F.3d at 897 n.5 (holding the same).

Johnson's reliance upon the Supreme Court's holdings in *McKoy* and *Mills* is unpersuasive. Johnson's argument that the Texas twelve-ten rule violates the due process principles set forth in these opinions has repeatedly been rejected by the Fifth Circuit.  *See Blue v. Thaler*, 665 F.3d 647, 669-70 (5th Cir. 2011) (rejecting an Eight Amendment challenge to the Texas twelve-ten rule); *Alexander*, 211 F.3d at 897 (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas twelve-ten rule in the course of affirming this Court's rejection of claims virtually identical to those raised by Johnson herein); *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th

---

[58] In *Caldwell*, the Supreme Court held the following statement by the prosecution during its closing argument undermined reliable exercise of jury discretion:

> Now, [the defense] would have you believe that you're going to kill this man and they know--they know that your decision is not the final decision.  My God, how unfair can they be?  Your job is reviewable.  They know it.

*Caldwell v. Mississippi*, 472 U.S. at 325 & 329.

Cir. 2000) (holding *Mills* inapplicable to a Texas capital sentencing proceeding); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996) (holding the same); *Hughes v. Johnson*, 191 F.3d 607, 628-29 (5th Cir. 1999) (holding both *Mills* and *McKoy* inapplicable to the Texas capital sentencing scheme); *Jacobs*, 31 F.3d at 1328-29 ("Under the Texas system, all jurors can take into account any mitigating circumstance.  One juror cannot preclude the entire jury from considering a mitigating circumstance.  Thus, *Mills* is inapplicable.").

Johnson's reliance upon the Supreme Court's holding in *Simmons v. South Carolina*, 512 U.S. 154 (1994), is likewise unpersuasive.  In *Simmons*, a South Carolina capital sentencing jury was not informed that the defendant would be ineligible for release on parole if sentenced to a term of life imprisonment.  In sharp contrast, at the punishment phase of trial, the trial court instructed Johnson's capital sentencing jury in conjunction with the mitigation special issue as follows:

> If you answer that a circumstance or circumstances warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed, the court will sentence the defendant to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life without parole.
> A defendant sentenced to confinement for life without parole is ineligible for release on parole.[59]

Thus, the Supreme Court's holding in *Simmons* is inapposite to Johnson's case.  Johnson's jury was accurately instructed as to the impact of its answers to the Texas capital sentencing special issues and specifically instructed on the meaning of a sentence of life imprisonment without the possibility of parole.

The Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents

---

[59] ECF no. 34-4, at p. 64 of 135.

the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions. *See Weeks v. Angelone*, 528 U.S. 225, 226 (2000) (emphasizing the *Boyde* test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); *Jones v. United States*, 527 U.S. 373, 390 & n.9 (1999) (holding the same); *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (holding the same); *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998) (holding the same); *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (holding *Boyde* requires a showing of a reasonable likelihood the jury interpreted the jury instructions so as to preclude it from considering relevant mitigating evidence).

This "reasonable likelihood" standard does not require the petitioner to prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility" of an impermissible interpretation. *Johnson*, 509 U.S. at 367; *Boyde*, 494 U.S. at 380. This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge. *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would--with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson*, 509 U.S. at 368; *Boyde*, 494 U.S. at 381.

Nothing in Johnson's punishment-phase jury charge can reasonably be construed as foreclosing his jury's consideration of any of the potentially mitigating evidence actually presented during his capital murder trial. None of his jurors could rationally have been led to believe by his punishment-phase jury charge that either (1) they lacked the authority to answer either of the Texas

48

capital special issues in a manner consistent with their conscience and the evidence regardless of the votes of other jurors or (2) their determination to vote in a manner inconsistent with other jurors would have no legal impact.  Thus, there is no reasonable likelihood any of Johnson's jurors construed their punishment phase jury instructions in a manner which prevented them from considering or giving effect to any constitutionally relevant mitigating evidence.

Likewise, nothing in Johnson's punishment-phase jury charge misled his capital sentencing jury regarding its role as the ultimate arbiter of Johnson's fate.  Insofar as Johnson complains that his jury was not specifically instructed that a failure by the jury to answer either of Texas capital sentencing issues (based upon the jury's inability to reach unanimity in favor of answers favorable to the prosecution or to marshal at least ten votes for answers favorable to the defense), that argument is foreclosed by both Supreme Court and Fifth Circuit precedent recognizing there is no constitutional right to jury instructions instructing individual jurors how they can achieve a "hung jury." *See Jones*, 527 U.S. at 382 (the Eighth Amendment does *not* require a capital sentencing be instructed as the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death); *Young*, 835 F.3d at 528 ("the Supreme Court has never suggested that *Simmons* requires informing jurors of the consequences of a breakdown in deliberations."); *Druery*, 647 F.3d at 544 (holding an argument that a Texas capital defendant had a constitutional right to an instruction informing the jury of the impact of a hung jury barred under the non-retroactivity doctrine of *Teague*); *Turner*, 481 F.3d at 300 (recognizing Fifth Circuit precedent foreclosed arguments the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the

effect of a capital sentencing jury's failure to reach a unanimous verdict); *Barrientes v. Johnson*, 221 F.3d 741, 776-78 (5th Cir. 2000) (holding trial court's voir dire instructions informing jury the court would impose sentence, not the jury, but specifically explaining how the jury's answers to the capital sentencing special issues would require the court to impose either a sentence of life or death did not result in a *Caldwell* violation); *Hughes*, 191 F.3d at 618 (holding voir dire explanations to potential jurors of the impact of affirmative answers to the Texas capital sentencing special issues were sufficient to avoid any possibility the jurors misunderstood their role or the effect of their punishment-phase verdict); *Alexander*, 211 F.3d at 897 n.5 (holding the same).

## D. Conclusions

Even when viewed under a de novo standard of review, Johnson's fourth claim for federal habeas relief lacks any arguable legal merit. This Court denies relief on this claim.

## VII. ARBITRAY IMPOSITION OF THE DEATH PENALTY

### A. The Claim

In his fifth claim for federal habeas relief, Johnson argues that his death sentence resulted from an arbitrary application of capital punishment, was premised on race and geography, and did not adequately account for the egregiousness of his capital offense (ECF no. 21, at 88-99).

### B. State Court Disposition

Johnson did not present this same claim as a point of error on direct appeal. Johnson did present a similar complaint about the alleged arbitrariness of the Texas capital sentencing system as his ninth claim for state habeas relief. State Habeas Application, at 159-68 [ECF no. 36-12, at pp. 169-78 of 537]. The state habeas trial court found the Texas Court of Criminal Appeals had previously rejected Johnson's complaint about alleged disparities between counties in application of the death penalty; found Johnson had furnished no new evidence to support his complaints about

the allegedly arbitrary application of the death penalty in Texas; found the Texas death penalty scheme is not unconstitutional; found Johnson committed a heinous capital murder and had a history of committing violent acts; and recommended denial of Johnson's ninth ground for relief. FCR, at 127-28 [ECF no. 36-13, at pp. 461-62 of 469]. The TCCA concluded Johnson's ninth ground for state habeas relief was procedurally barred because it could have been raised on direct appeal but was not. *Ex parte Johnson*, WR-86,571-01, 2019 WL 4317046, *2. Additionally, the TCCA also expressly adopted the state habeas trial court's findings and conclusions regarding Johnson's ninth ground for state habeas relief. *Ex parte Johnson*, WR-86,571-01, 2019 WL 4317046, *3.

**C.  De Novo Review**

Out of an abundance of caution, this Court will undertake de novo review of Johnson's fifth claim for federal habeas relief. For several equally compelling reasons, Johnson's fifth claim for federal habeas corpus relief is without arguable merit.

First, insofar as Johnson argues that his prosecution for capital murder and death sentence resulted from improper consideration of geography and his race, his assertion that most capital murder prosecutions and death sentences in Texas originate in the State of Texas's four most populous counties is probative of nothing. It is hardly surprising that the four most populous counties in this State (Dallas, Tarrant, Harris, and Bexar) were the sites of a majority of Texas' violent crimes in any given time period. Likewise, Johnson's assertion that more than eleven hundred murders in the State of Texas in 2013 resulted in less than a dozen prosecutions for capital murder proves nothing of consequence. That prosecutors in Texas choose to charge only the most heinous of murders as capital offenses in which they sought the death penalty implicitly suggests the death sentence is not being applied capriciously across the State. Johnson has failed to allege

specific facts showing that his prosecutors acted with racial animus. *See Broadnax v. Lumpkin*, 987 F.3d 400, 414 (5th Cir. 2021) (statistical evidence alone will not suffice to establish that prosecutors in a particular defendant's case acted with a racially discriminatory purpose (citing *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)).

Second, Johnson makes no effort to break down the ethnicity of the perpetrators or victims of those murders, to identify how many of those murders could have been charged as capital offenses under the Texas Penal Code, or to identify how many of the capital murder charges filed in Texas also involved cases in which prosecutors sought the death penalty. Nor does Johnson identify any statistics showing how many times, *after* convicting a criminal defendant of capital murder, Texas juries failed to answer the Texas capital sentencing special issues in a manner mandating imposition of the death penalty. In short, conclusory statistical summaries such as those offered by Johnson lend little to an intelligent discussion of the trends in capital murder across this State. Johnson's statistics do not begin to establish that the death penalty is "arbitrarily" applied in Texas within any reasonable interpretation of the meaning of that adverb. *Id.*

Finally, as Judge Godbey explained for this court in an opinion subsequently affirmed by the Fifth Circuit and in which the Supreme Court recently denied certiorari review, complaints of alleged racial discrimination in the decision to prosecute a criminal defendant for capital murder and in the decision to impose a sentence of death are essentially complaints of selective prosecution. *Broadnax v. Davis*, 3:15-CV-1758, 2019 WL 3302840, *14 (N.D. Tex. July 23, 2019):

> Selective prosecution claims are disfavored because they (1) call for the imposition of judicial review upon the usually unfettered discretion exercised by the executive authority responsible for prosecuting criminal offenses and (2) necessarily begin with a presumption of good faith and constitutional compliance by prosecutors. *United States v. Armstrong*, 517 U.S. 456, 463-64 (2006); *Reno v. American-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 489 (1999); *In re United*

*States*, 397 F.3d 274, 284 (5th Cir. 2005).  In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."  *United States v. Armstrong*, 517 U.S. at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)); *In re United States*, 397 F.3d at 284.

Nonetheless, a prosecutor's discretion is subject to constitutional constraints, including equal protection principles.  *United States v. Armstrong*, 517 U.S. at 464; *In re United States*, 397 F.3d at 284.  That is, the decision to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification.  *United States v. Armstrong*, 517 U.S. at 464.  To dispel the presumption that a prosecutor has not violated equal protection principles, a defendant must present clear evidence showing that the prosecutor's decisions had both a discriminatory effect and a discriminatory motive or purpose.  *United States v. Armstrong*, 517 U.S. at 465; *In re United States*, 397 F.3d at 284.  To establish discriminatory effect in a race case, a defendant must show that similarly situated individuals of a different race were not prosecuted.  *United States v. Armstrong*, 517 U.S. at 465; *In re United States*, 397 F.3d at 284.

Despite the statistical evidence cited by Johnson, he has failed to identify a single individual of another race who was "similarly situated" to him in one critical regard: the grisly details of Johnson's capital offense and its aftermath were caught on Harris's store surveillance camera and the video camera in the patrol car used to transport Johnson to jail; both were played for the jury at the guilt-innocence phase of Johnson's capital murder trial.  That video in question and other testimony at trial established beyond any doubt that (1) Johnson set his elderly victim on fire *after* she fully cooperated with his demands that she open her cash register and allow him to remove its contents; (2) Harris also offered no resistance while Johnson removed her ring from her finger while she was attempting to open her cash register; (3) Harris suffered horrifically for several minutes after Johnson casually strolled out of her store as Harris attempted without success to extinguish the fire engulfing her head and entire upper torso, pulled her burning blouse off over her head, and then wandered out the door to call for help with her leg and chest still aflame; (4) the uncontradicted medical testimony established that the still-conscious Harris also suffered great pain for many hours after her burning head, leg, and torso were extinguished and she was

transported to the hospital; (5) Johnson admitted during his own trial testimony that he had to flick his lighter more than once before he managed to set Harris aflame; and (6) Johnson taunted the police officer transporting him following his arrest, denying any knowledge of his attempted murder of Harris and offering to tell the officer anything he wanted to know if the officer would converse with him.

Johnson has failed to identify any offender of a different race who committed a capital offense similar enough to Johnson's that they are similarly situated and whom a Texas prosecutor failed to charge with capital murder or against whom a Texas prosecutor failed to seek a death sentence. *Broadnax*, 987 F.3d at 414. Likewise, Johnson's suggestion that his capital offense was insufficiently egregious to warrant a death penalty, and therefore arbitrary, is without arguable merit. If Johnson's heinous offense does not warrant the ultimate punishment, then no such crime exists. Johnson has failed to allege any facts showing that a criminal defendant of another race who was genuinely "similarly situated" to Johnson was not prosecuted for capital murder or that Dallas County prosecutors brought a capital murder prosecution against but did not seek the death sentence for such a nonexistent offender. *Id.* For that reason, under a de novo standard of review, Johnson's geographic-and-race-based selective prosecution claims fails.

## D.  Conclusions

Even when viewed under a de novo standard of review, Johnson's conclusory fifth claim for federal habeas relief lacks any arguable legal merit. This Court denies relief on this claim.

## VIII.  INEFFECTIVE ASSISTANCE CLAIMS

## A.  Overview of Claims

In his first claim for federal habeas relief, Johnson argues that his state trial counsel rendered ineffective assistance by failing to (1) adequately investigate his background and present

available mitigating evidence, including failing to (a) present expert testimony such as Dr. Celeste Henery's opinions regarding the social and cultural aspects of Johnson's social environment; (b) properly prepare Dr. Roache to testify by allowing Dr. Roache to evaluate Johnson and furnishing Dr. Roache with a complete social history for Johnson; (c) present expert testimony showing the larger context of Johnson's social history; (d) present evidence showing Johnson's early drug and alcohol abuse; (e) present evidence showing Johnson's wife Daphne attempted to express remorse to Harris' family; (f) present evidence showing Johnson was unsupervised as a young child living in Rowlett; (g) present evidence showing Johnson was bullied as a child; (h) present evidence showing Johnson's father was an alcoholic and a gambler; (i) present evidence showing Johnson's abuse of crack cocaine began when he was in middle school; (j) present evidence showing Johnson was addicted to drugs and depressed until his incarceration in 2004; (k) present evidence showing that following his five-year prison sentence, Johnson remained sober for two years before he relapsed; and (l) present evidence showing Johnson was refused admission to drug treatment programs and treated for drug-induced psychosis shortly before he committed his capital offense; (2) allow Dr. Roache to evaluate Johnson, provide Dr. Roache with Johnson's full social history, allow Dr. Roache to examine the video of Johnson's capital offense and the entirety of Johnson's police-transport video, and allow Dr. Roache to testify that Johnson's addiction was a disease which affected Johnson's brain development; (3) present expert testimony showing the unavailability of mental health care and substance abuse treatment for persons such as Johnson; and (4) present evidence showing the difficulty Johnson experienced accessing mental health care and substance abuse treatment because of the tendency of African-Americans to seek such care from friends and family rather than public services (ECF no. 21, at 8-70).

## B.  State Court Disposition

In his first two claims for state habeas relief, Johnson argued that his trial counsel rendered ineffective assistance by failing to (1) properly prepare Dr. Roache to testify; (2) present evidence showing addiction is a disease; (3) present expert and lay testimony regarding the availability of mental health care and substance abuse treatment; and (4) present lay and expert testimony showing Johnson's complete social history.  State Habeas Application, at 26-112 [ECF no. 36-12, at pp. 28-122 of 537].  Johnson's state habeas counsel presented extensive evidence in support of Johnson's ineffective assistance claims, particularly Johnson's *Wiggins* claim.  Johnson's state habeas counsel attached numerous exhibits to Johnson's state habeas application, including (1) a dozen affidavits or sworn statements from Johnson's relatives and friends[60]; (2) the affidavit from

---

[60] The affidavit of Johnson's childhood friend Anthony Wayne Grimes appears at ECF no. 36-12, at pp. 330-32 of 537.  Grimes asserted that he met Johnson in 1980; Johnson smoked pot and drank alcohol at age seven; early in the 1990's Johnson became lost in his addiction to crack and looked like a bum; he last saw Johnson in 2012 when Johnson looked tired and worn out; when sober, Johnson would not have committed his capital offense.

The affidavit of Johnson's childhood friend Michael Henry appears at ECF no. 36-12, at pp. 324-28 of 537.  Henry stated in his affidavit that Johnson was isolated and depressed as a young child; Johnson's father was an alcoholic; Johnson had free reign as a child; Johnson smoked pot and drank alcohol in elementary school; Johnson later abused crack and PCP; he last saw Johnson in 2000 and was shocked by Johnson's capital offense.

Johnson's mother Alma Johnson's affidavit appears at ECF no. 36-12, at pp. 329-34 of 537.  Mrs. Johnson stated in her affidavit that her husband was an alcoholic and a "bootlegger"; she moved to Rowlett when Johnson was two years old and her husband did not immediately follow them there; Johnson had a relatively normal childhood until age 6; she learned Johnson was smoking pot when Johnson was in middle school; she learned Johnson had a drug problem when he was in his twenties; she told him to get help; she was aware when he relapsed in 2011.

Johnson's oldest brother Anthony Johnson's affidavit appears at ECF no. 36-12, at pp.336-44 of 537.  Anthony stated that he was not called to testify at Johnson's capital murder trial; their father stopped gambling when they moved to Garland and their mother put her foot down; Arthur Miller sexually abused Johnson when he was a boy; Anthony joined the Navy and left Garland in 1985 when Johnson was ten years old; Anthony was discharged for positive drug tests; he returned in Garland around 1991 by which time Johnson's addiction was out of control; he was aware Johnson had a serious drug problem during the 1994-95 time frame; Johnson stopped using drugs in 2000; Johnson was depressed and addicted and too proud to ask for help; Johnson left prison in 2009 determined to stay sober but relapsed after about two years; he warned Johnson to get help.

Johnson's sister-in-law Courtney Johnson's affidavit appears at ECF no. 3612, at pp. 346-50 of 357.  Courtney stated that Johnson struggled with depression as a child; she was aware Johnson was using drugs in 2001; she learned in 2009 that Johnson had been sexually abused as a child; Johnson's own family did not support him; and she denied Johnson had ever threatened her with a gun.

Johnson's wife Daphne Johnson's affidavit appears at ECF no. 36-12, at pp. 352-63 of 357.  Daphne stated that Johnson's family was verbally and emotionally abusive toward him; Johnson was uncommunicative with his family and withdrawn emotionally; in 2010, Johnson confessed to her that Arthur Miller had sexually abused him as a child; she knew Johnson smoked pot and drank alcohol, was depressed and addicted; in 2000 Johnson's crack binges began; Johnson got out of prison in 2009 but relapsed in 2011 after they got their first home.

an expert in mental health and social welfare policy (Dr. King Davis), who opined as to the impact of Johnson's ethnicity and culture on the availability of mental health and substance abuse treatment services [ECF no. 36-12, at pp. 188-97 of 537]; (3) the affidavit of a cultural anthropologist (Dr. Celeste S. Henery) who opined as to the impact of various social and cultural factors on Johnson's childhood and social development as well as the impact of Johnson's long history of drug abuse and addiction on his behavior as an adult [ECF no. 36-12, at pp. 239-59 of 537]; and (4) the affidavit of trial witness Dr. John Roache regarding the additional opinions he could have furnished at trial had he been afforded the opportunity to evaluate Johnson and to examine the video recordings of Johnson's capital offense and patrol-car transport in their entirety [ECF no. 36-12, at pp. 269-90 of 537].

---

Johnson's mother-in-law Hazel Johnson's affidavit appears at ECF no. 36-12, at pp. 365-76 of 537. Hazel stated that Johnson's father was an addict; Johnson sought treatment for depression and drug addiction in 2000; Johnson relapsed after he was out of prison; and when sober Johnson was a different person from the one who committed capital murder.

Johnson's oldest daughter Makayi's affidavit appears at ECF no. 36-12, at pp. 369-70 of 537. Makayi stated that Johnson became depressed when stressed and was depressed at the time of his offense.

Johnson's older brother Timothy Johnson's affidavit appears at ECF no. 36-12, at pp. 372-77 of 537. Timothy stated that he has been incarcerated since 2004; he testified at Johnson's capital murder trial; he dropped out of school in tenth grade to use drugs and steal; he refused to sign releases when requested to do so by Johnson's trial counsel.

Johnson's cousin Lashan Mills' affidavit appears at ECF no. 36-12, at pp. 379-82 of 537. Lashan stated that she is the daughter of Cheryl Mills, who was raised with Johnson; she was born in 1983 and is eight years younger than Johnson; Johnson shut down emotionally as a teenager and acted aloof; Johnson became depressed when Timothy went to prison; thereafter Johnson acted tough to impress others; it was apparent to her by 2000 that Johnson was using drugs because Johnson was dirty and stole money from his own mother.

Johnson's older cousin Stetron Mills' affidavit appears at ECF no. 36-12, at pp. 384-87 of 537. Stetron stated that he was born in 1968 and is seven years older than Johnson; Johnson and his brothers received little supervision as children and were undisciplined; Johnson stole beer from adults and used pot as a child; Johnson became interested in crack and PCP in his late teens; Johnson was stressed and depressed, which led to his drug abuse; Stetron was in prison from 2000 to 2012 and was released shortly after Johnson's capital offense.

Daphne Johnson's aunt Frances Wilson's affidavit appears at ECF no. 36-12, at pp. 389-91 of 537. Mrs. Wilson stated that she is Hazel's Johnson's sister; Johnson was depressed in 2009 after he was released from prison; a month before Johnson's capital offense he was suicidal; Johnson was different when sober than when he was using drugs.

In addition, the state habeas trial court heard live testimony presented by Johnson's state habeas counsel from (1) all three of Johnson's state trial counsel (Attorneys Catherine Bernhard, Kenneth Weatherspoon, and Nancy Mulder)[61]; (2) the defense team's mitigation specialist

---

[61] Attorney Bernhard's testimony during Johnson's state habeas evidentiary hearing appears at Statement of Facts State Habeas Hearing (henceforth "S.F. State Habeas Hearing"), Vol. 3/10 [ECF no. 36-19], at 29-189 and S.F. State Habeas Hearing, Vol. 6/10 [ECF no. 36-19], at 126-32.  Attorney Bernhard testified in pertinent part that the defense's mitigation specialist Brendan Ross spoke with every potential mitigation witness the defense could find; co-counsel Nancy Mulder took the lead in contacting Johnson's family because she had a prior relationship with some of Johnson's family; the defense's theory at the guilt-innocence phase of trial was that Johnson had not intended to kill Harris; the defense sought initially to exclude Johnson's pretrial statements but later decided not to challenge their admission; while the defense introduced evidence to show Johnson's addiction as part of his life history, the defense's focus was on Johnson's remorse for his crime; she believed Johnson was horrified by what he had done and she believed Johnson could communicate that to the jury and apologize to the victim's family; the defense presented e3vidence showing Johnson had been sexually abused as a child on multiple occasions and was intoxicated at the time of his offense, as well as emotionally distraught and depressed; the defense team hired mental health experts Dr. Annette McGarrahan and Dr. Kristi Compton to advise the team regarding Johnson's mental health but chose not to present either of them as witnesses because the defense did not want to open the door to Johnson's examination by prosecution expert Dr. Timothy Proctor; the defense presented testimony from Johnson's family and friends showing that his capital offense was out of character for him; the defense chose to employ Dr. Roache not to personally evaluate or diagnose Johnson (for the same reasons the defense did not call its other mental health experts to testify at trial) but to explain Johnson's addiction based upon Johnson's medical records and the other evidence; the defense wanted to keep out the testimony of possible prosecution expert Dr. Proctor because the defense believed Dr. Proctor would testify Johnson was not an addict but a psychopath; The defense chose to have Dr. Roache explain the diagnoses already in Johnson's medical records, not make an independent evaluation of Johnson, because those records showed Johnson was depressed and addicted; the defense made a conscious decision not to furnish Dr. Roache with a complete record of Johnson's social history because everything Dr. Roache examined before testifying would be discoverable by the prosecution; the defense was aware before calling Johnson's brother Timothy and cousin Cortney to testify at trial that both of then had long criminal histories; Dr. McGarrahan did not diagnose Johnson with any severe mental illness other than depression and addiction; the defense called three different experts on future dangerousness to testify at trial; the defense chose not to call Johnson's brother to testify at trial because Anthony was hostile toward the defense in part because Anthony felt the defense team had threatened the health of his mother; the Mills members of Johnson's family refused to cooperate with the defense team when it came time to testify at trial; Johnson was opposed to having his daughters testify at his trial; Bernard was unaware of any capital murder trial in which a social historian had proved effective in obtaining a life sentence because such witnesses tend to be too academic and dry for the jury; the defense did not seek a change of venue because the jury pool in Dallas County was as good as it could get in Texas in terms of capital sentencing.

Attorney Weatherspoon's testimony during Johnson's state habeas hearing appears at S.F. State Habeas Hearing, Vol. 3/10 [ECF no. 36-16], at 189-216.  Attorney Weatherspoon testified in part that the defense's strategy at the guilt-innocence phase of trial was to seek a conviction on a lesser-included offense such as ordinary murder and to show Johnson was intoxicated at the time of his capital offense; the defense chose not to give an opening statement to avoid showing the prosecution where the defense intended to go and because giving an opening statement locks you into a particular strategy and set of facts; Weatherspoon spoke with Anthony in an attempt to calm Anthony down and concluded that Anthony's testimony would not be favorable to the defense; Dallas County was the best venue from a defense perspective for a capital trial than any of the surrounding counties.

Attorney Mulder's testimony appears at S.F. State Habeas Hearing, Vol. 3/10 [ECF no. 36-16], at 217-54.  Attorney Mulder testified in part that she prepared Johnson, Daphne, and Johnson's other family members to testify; the defense fully expected a guilty verdict based upon the video of the crime; Johnson's testimony reflected his remorse for his offense as best he was capable of communicating it; Dr. Compton was not called to testify by the defense to avoid having the State's expert diagnose Johnson as a psychopath; Courtney Johnson's trial testimony was

Brendan Ross[62]; (3) the defense team's fact investigator Timothy Freeman[63]; (4) an attorney and mitigation specialist familiar with capital cases involving Mexican nationals tried in the United States (Alicia Amezcua-Rodriguez)[64]; (5) Johnson's older brothers Anthony and Timothy[65]; (6)

---

problematic because she fabricated irrelevant things; she felt good about the quality of Brendan Ross's mitigation investigation.

[62] Mitigation specialist Ross's testimony appears at S.F. State Habeas Hearing, Vol. 4/10 [ECF no. 36-17], at 6-87. Ross testified, in part that investigator Freeman was sent out to initially locate potential witnesses and she did most of the interviews of potential witness with assistance from Debbie Sumi; Johnson's brother Timothy was incarcerated at the time of trial; she interviewed Timothy at the jail prior to his trial testimony; Johnson's brother Anthony was openly hostile to the defense, particularly in connection with his mother's health; the defense chose not to call Anthony to testify because of his hostility; she completed a lengthy social history of Johnson (well in excess of one hundred fifty pages) shortly before the date of trial; Johnson's family were not good historians; she made an effort to interview everyone mentioned by Johnson or his family; some of the witnesses she interviewed were not called to testify at trial because they had harmful information or had criminal records; Michael Henry was serving a life sentence for capital murder and wanted something in exchange for his testimony; Anthony Johnson was "absolutely hostile" and unhelpful to the defense; Johnson's mother Alma was in ill health and unable to testify at trial; Alma and Anthony both took the position that Johnson's childhood had been good; Johnson was not evaluated by any testifying defense expert to avoid having the prosecution's expert evaluate Johnson.

[63] Freeman's testimony appears at S.F. State Habeas Hearing, Vol. 4/10 [ECF no. 36-17], at 88-103.

[64] Attorney Amezcua-Rodriguez's testimony appears at S.F. State Habeas Hearing, Vol. 4/10 [ECF no. 36-17], at 118=73. She testified in part that she had worked as a mitigation specialist in a number of capital murder cases across the country involving Mexican nationals; it is important for a mitigation specialist to develop a multi-generational social history for the defendant and to speak with anyone who knows the client; typically thousands of hours of work is involved in developing mitigating evidence in a capital trial; typically continuance and up to three years can be necessary to properly develop a case in mitigation; cultural competence is necessary for a mitigation specialist and defense team; defense experts should not be curtailed out of fear of what prosecution experts might say; trauma – sexual, physical, emotional – is a common theme in mitigating evidence; lengthy, often multiple, interviews are often necessary to develop rapport with witnesses and find evidence; she did not believe the number of hours reported by mitigation specialist Ross was sufficient to develop a mitigation case for Johnson.

[65] Timothy Johnson's state habeas testimony appears at S.F. State Habeas Hearing, Vol. 4/10 [ECF no. 36-17], at 211-54. Timothy Johnson testified he was serving a forty-year sentence for robbery and assault on an officer; drugs and violence are present in jail; he did not respond when he received letters from Johnson's trial counsel because he believed his testimony would hurt Johnson; he even wrote a letter to a judge stating that he did not want to testify at Johnson's trial; despite the foregoing, after visiting with Johnson's trial counsel he did testify at Johnson's trial; he felt unprepared when he testified; his mother worked all the time when he was growing up; his father worked the night shift and drank heavily; his father sold cans of beer out of an ice chest in the back of his car in otherwise dry Garland; his father also was addicted to gambling; Johnson had a normal childhood and did what other kids did; Johnson had a dog and liked to drag an old pillow around when he was a child; Timothy was smoking crack and pot when his older brother Anthony left for the Navy; crack destroyed Timothy's life; when Anthony returned from the Navy, Timothy lived with him, partying and using drugs; many people in his family are addicted to drugs; when he saw Johnson's crime on television, Timothy did not believe it was his brother; their mother took in their cousin Cheryl after Cheryl's parents died and later raised Cheryl's children after Cheryl died; Timothy has seen Johnson high only three or four times; Timothy has spoken with Johnson about his drug use; Timothy stopped using drugs in 2004.

Anthony Johnson's testimony appears at S.F. State Habeas Hearing, Vol. 5/10 [ECF no. 36-18], at 8-49. Anthony testified that he is ten years older than Johnson; he now owns an HVAC business; he was concerned for his mother's health and safety at the time of Johnson's trial; his mother was strict when he was growing up; money was

Johnson's childhood friends Michael Henry and Anthony Wayne Grimes[66]; (7) pharmacologist Dr. John Roache, who opined about the impact of Johnson's long term drug abuse on Johnson's brain functioning[67]; (8) a psychologist (Dr. Jennifer Sapia) regarding the impact of genetic

---

[66] tight in their family when they lived in Oak Cliff; his mother worked eight-to-ten hour shifts five days a week and did sewing for extra income; his father worked at a Dairy; his father passed away shortly after Cheryl, who had been close with Johnson; his father gambled with dice, was addicted to gambling, and sometimes lost his paycheck; as a young child Johnson often played by himself and listened alone to music; in middle school Johnson became more outspoken; Anthony heard Johnson had been sexually abused as a child; Anthony was gone for about ten years after he joined the Navy; when Anthony returned to Garland in 1993, it was worse – drug houses were everywhere; Anthony heard that Johnson's friend Michael Henry sold drugs; Henry once called Anthony to tell him Johnson was acting irrationally after smoking pot and PCP so Henry tied Johnson up; Johnson stole from stores to get money for drugs; Anthony spoke with Johnson about drug use; Johnson fought often with his wife; Johnson often disappeared for two or three days at a time; after getting out of prison in 2009, Johnson did great for a time but later relapsed; on one occasion, Anthony took Johnson home when Johnson was high on PCP; Johnson was completely sober when he arrived at Anthony's house the night before the capital murder; their parents were good parents who did the best they could; Anthony has been clean for fifteen-to-twenty years and got clean through discipline; their family did not have the money to send Johnson to an in-patient treatment facility.

[66] Michael Henry's testimony appears at S.F. State Habeas Hearing, Vol. 4/10 [ECF no. 36-17], at 174-208. Henry testified that he was serving a life sentence without parole for two capital murders; he was Johnson's best friend as a child; Johnson seemed down as a child, pre-occupied, quiet, laid back, and chronically depressed; he and Johnson hung out at Henry's grandmother's place when they were children; they smoked cigarettes and pot and drank alcohol as children; they later went to different high schools and did not hang out together in their twenties because Johnson was married by then; at that time, Henry was getting high and running the streets; crack came to their neighborhood in the eighties and the tenor of the community changed – people stopped partying and started killing each other; Henry smoked pot with crack crushed in it and sold crack; Johnson was also using crack, pot, PCP, and alcohol; Henry tried to encourage Johnson to stop smoking crack; Johnson's relationship with Daphne was rough – they had many fights and altercations; Henry does not believe Johnson would have done his capital offense if sober; Henry had no contact with Johnson after 2000; Johnson's parents were strict when he was a child; there were times Henry and Johnson would smoke crack for days at a time; drugs are freely available in prison; their neighborhood in Garland was poor.

Anthony Wayne Grimes' testimony appears at S.F. State Habeas Hearing, Vol. 5/10 [ECF no. 36-18], at 50-63. Grimes testified that he is twelve years older than Johnson but they were childhood friends; crack came to their Garland neighborhood in the 1986-88 time frame; when crack arrived, the neighborhood changed and there was lots of guns and violence thereafter; he once saw Johnson on a drug binge; Grimes got clean after going to an in-patient treatment facility for four months and through prayer and rehabilitation.

[67] Dr. Roache's state habeas hearing testimony appears at S.F. State Habeas Hearing, Vol. 5/10 [ECF no. 36-18], at 70-129. Dr. Roache testified in part that Johnson's trial counsel did not allow him to listen to the testimony of Johnson's family and friends and did not furnish him with much information about Johnson's social history; instead, Johnson's trial counsel wanted him to testify about the effects of certain drugs on the brain and behavior and to explain what addiction looks like and how addiction affects the brain; he felt unprepared when he testified at Johnson's trial; eight-to-twelve percent of the U.S. population is addicted to something; Johnson experienced alcohol and drug intoxication as a child; Johnson's drug abuse affected his brain development, altering the reward/learning systems in the brain and negatively affecting Johnson's inhibitory controls, self-awareness, and conscious thoughts; the human brain is not fully developed until the mid-twenties; Johnson's drug use negatively affected Johnson's ability to hold a job, maintain social functioning, deal with stress, deal with problems; incarceration and even years of forced sobriety are not sufficient to treat addiction; in-patient treatment programs are often insufficient to treat addiction; long-term therapy is the best course for treating addiction; economic barriers exist to finding effective treatment programs; persons with mental disease or poor impulse control have a hard time self-discipling; it is vital to replace addictive

predisposition and stress and trauma (including Johnson's multiple instances of childhood sexual abuse) on Johnson's behavior both as a child and adult[68]; and (9) a neuropsychologist (Dr. Leslie Rosenstein) regarding the effects of Johnson's history of head injuries, hypertension, and drug abuse, i.e., they resulted in Johnson displaying mild cognitive impairment and memory dysfunction.[69]

---

behavior with socially responsible behavior; trauma is a huge predictor of substance abuse as well as related problems such as depression, feelings of hopelessness, and impaired cognitive processes; Johnson's addiction played a role in Johnson's capital offense.

[68] Dr. Sapia's testimony appears at S.F. State Habeas Hearing, Vol. 6/10 [ECF no. 36-19], at 8-111 & 132-92. Dr. Sapia testified in part that prolonged stress in childhood negatively affects brain development, detrimentally impacting a person's ability to regulate their emotions and behavior; adverse childhood experiences, such as abuse and neglect, household dysfunction, and emotional neglect harm development; Johnson experienced at least six adverse childhood experiences including emotional neglect, a lack of good role models, little supervision, unstable family life, a violent neighborhood, and a family history of substance abuse and incarceration; emotional unavailability of parents is as dangerous as physical abuse; people often respond to trauma with anxiety, depression, aggression, and irritability; Johnson was often described by those who knew him as a child as a loner or withdrawn; Johnson's father was a gambler and alcoholic; Johnson's mother was a factory worker, housekeeper, and care giver who was often tired; Johnson's family was not physically affectionate; Johnson's parents were neglectful and not strict; Johnson's parents often separated; Johnson had an older sister who died shortly after she was born and this negatively affected Johnson's family; Johnson's brother Anthony was discharged from the Navy when Johnson was ten years old; Anthony returned home and began dealing drugs; Anthony was once arrested for murder; Johnson's brother Timothy hung out with Anthony's friends and got involved with drugs after Anthony joined the Navy; Timothy dropped out of school in tenth grade because he was addicted to crack; Johnson's parents raised his cousin Cheryl after Cheryl's parents died and then raised Cheryl's two children after Cheryl died in 2005; Johnson's cousins Stetron and Derrick Mills and Johnson's childhood friend Michael Henry were all drug addicts serving time in prison for criminal offenses; Johnson's cousin Tracy Spencer was murdered at age sixteen; Tracy Spencer's brother Dave was serving time in prison for murder for avenging Tracy's murder; at age seventeen Johnson was involved in a romantic relationship with an older woman named Amy Armstrong; Armstrong was a drug addict and Johnson's relationship with her was volatile and violent; Johnson was married at age nineteen to Daphne and their relationship was violent; Johnson turned to aggressive/violent behavior as a coping mechanism when he was a teenager; Johnson was in regular classes in school; Johnson's grades in school were low to average and he struggled in language-based courses until he dropped out in grade eleven but later earned a GED; Johnson was unable to complete his education due to his drug use; the two instances of sexual abuse Johnson suffered as a child affected his self-esteem and self-confidence, caused him to develop trust issues, and led to Johnson's drug use; Johnson's drug abuse affected his brain development and led to his history of self-medicating and addictive behavior; Johnson was diagnosed with major depressive disorder and substance abuse shortly before his capital offense; children were whipped with a belt in Johnson's family; Anthony encouraged Johnson to fight as a child; and Johnson modeled maladaptive behaviors.

On cross-examination, Dr. Sapia admitted that she had done no testing of Johnson and had conducted only a single two-hour non-clinical interview of Johnson; Anthony Johnson told Dr. Sapia that the Johnson family was open and welcoming and the Johnson children were disciplined; Anthony Johnson also told her that Johnson had a lot of friends as a child; Johnson's mother Alma described him as a normal child; Alma made dinner for the family every night and there was no physical abuse during Johnson's childhood; Johnson never witnessed his father strike his mother; Johnson's parents did not teach him to steal or use drugs; most of Johnson's criminal behavior was assaultive in nature; but she denied that Johnson qualified for a diagnosis of antisocial personality disorder.

[69] Dr. Rosenstein's testimony appears at S.F. State Habeas Hearing, Vol. 8/10 [ECF no. 36-21], at 7-72. Dr. Rosenstein testified in part that Johnson functions below average in most areas of neuropsychological functioning

The state called psychologist Dr. Timothy Proctor, who opined after conducting a clinical interview of Johnson that he believed Johnson displayed anti-social personality disorder, Johnson also demonstrated aggression and chronic hostility toward family, and personality disorders are life-long disorders and not curable.[70]

including intellectual, problem-solving, and memory; Johnson has many risk factors for below averaging functioning, including a history of early substance abuse, hypertension, head injuries; Johnson possesses a below normal ability to solve problems and ranks below the fiftieth percentile cognitively; Johnson exhibits impaired executive functioning, specifically in planning, organizing, attention, problem solving, and tracking; Johnson's low intellectual functioning likely had a genetic component and his early substance abuse contributed as well; Johnson reported to Dr. McGarrahan that he was home alone a lot and did not receive much affection as a child; Johnson's early pot, alcohol, cocaine, and amphetamine abuse contributed to his cognitive impairment; Johnson's IQ is in the lowest ten percentile; Johnson scored at the ninth grade reading level and in the tenth and eleventh percentiles in memory function; Johnson reported multiple head injuries involving loss of consciousness, including a 1998 head injury and seizure and a 2000 cocaine-related heart attack; Dr, Rosenstein's diagnosis of Johnson was mild cognitive impairment with memory dysfunction.

Despite the foregoing, on cross-examination, Dr. Rosenstein did not disagree with Dr. Proctor's diagnosis of antisocial personality disorder, stating that diagnosis was "outside my field of expertise." Dr. Rosenthal also agreed that Johnson met the diagnostic criteria for dementia. Dr. Rosenstein testified that, absent a clinical interview, it was not possible to diagnose Johnson more fully.

[70] Dr. Proctor's testimony appears at S.F. State Habeas Hearing, Vol. 7/10 [ECF no. 36-20], at 5-175. Dr. Proctor also testified in pertinent part that he is a forensic psychologist who had testified about half the time for the defense and half the time for the prosecution in criminal cases; he reviewed voluminous records and attended the punishment phase of Johnson's capital murder trial; he interviewed and tested Johnson for a total of six hours on April 9, 2018; Johnson was instructed by his state habeas counsel not to discuss his capital offense or mental health problems but was otherwise cooperative; Johnson's serious drug and alcohol issues have impacted Johnson's life and resulted in mild anxiety, chronic transient mild depression, and a preoccupation with health problems; Johnson is distant in his personal relationships, quick-tempered, and pessimistic; he diagnosed Johnson with adjustment disorder with depressed mood and anxiety, a reaction to his current situation; Johnson does not suffer from any psychotic disorders; Johnson's MMPI results indicate he suffers from chronic and tense anger and aggression, especially toward his family; Johnson is cynical, suspicious, and demands attention from others, hostile to criticism, sensitive to rejection, inwardly rebellious, and passive aggressive; Johnson meets the criteria for Antisocial Personality Disorder ("ASPD"); the hallmark of ASPD is that Johnson does not follow the rules and is impulsive, irresponsible, aggressive, and dishonest, all character traits amply demonstrated by Johnson's life history; Johnson scored a 26 out of 40 on a scale of psychopathy, which requires a score of 30 for a finding that an individual is a psychopath; with intense work and therapy, there can be some change in personality as a person ages but generally speaking personality disorders such as ASPD are not curable; Johnson's criminal behavior is not solely driven by substance abuse but is a function of his ASPD; Johnson did not report to Dr. Proctor the constant parental turmoil reported to Dr. Sapia; Johnson's father sold beer from the back of his car and was not a "bootlegger" as reported by Dr. Sapia; he disagreed with Dr. Sapia that Johnson had a profoundly debilitating childhood; not all serious childhood trauma lead to dysfunctional behavior; there is no indication Johnson suffers from neuropsychological issues in the areas of memory, concentration or attention and there is no indication Johnson suffers from a serious mental illness; he was unable to follow up on Johnson's comments indicating remorse because of the limitations imposed by Johnson's state habeas counsel; Johnson did not appear to be malingering; Johnson's polysubstance abuse caused disruptions in his social relationships; Johnson scored a 78 – above average - on the depression scale of the MMPI; some symptoms of a personality disorder can be treated but that will still not make the disorder go away; like the psychopathy checklist used by Dr. Proctor, the adverse childhood experience factors relied upon by Dr. Sapia are not in the DSM-V;; Johnson has a full scale IQ of 81 and does not suffer from Post-Traumatic Stress Disorder ("PTSD").

The state habeas trial court issued its findings of fact and conclusions of law regarding Johnson's ineffective assistance claims; in pertinent part it (1) found "an objective comparison between the evidence in this case and the diagnostic criteria for antisocial personality disorder reveals no reason to doubt Dr. Proctor's diagnosis"[71]: (2) found Dr. Proctor's diagnosis of ASPD was more reasonable than Dr. Sapia's attempt to dismiss it[72]; (3) found Dr. Rosenstein was unable to rebut Dr. Proctor's diagnosis[73]; (4) concluded Johnson's trial counsel were ultimately correct and objectively reasonable when they decided it was better to avoid Dr. Proctor's testimony than to attempt to rebut it[74]; (5) found evidence such as that offered by Dr. King Davis in his affidavit regarding treatment availability was not linked to Johnson personally, found Dr. Davis omitted from is affidavit critical facts regarding Johnson's prior experience with drug treatment programs, and concluded Johnson's trial counsels' decision not to present additional mitigating evidence regarding limitations on treatment availability was objectively reasonable[75]; (6) found Johnson's trial counsel reasonably limited the scope of Dr. Roache's testimony at trial, found Dr. Roache's testimony at the state habeas hearing was dry and academic and would not have helped Johnson, concluded Johnson's trial counsel reasonably chose to focus not on addiction at the punishment phase of trial but on Johnson's remorse, and concluded Johnson was not prejudiced by this strategy[76]; and (7) found the social history investigation undertaken by Johnson's defense team

---

[71] FCR, at 55, Finding 1.55, ECF no. 36-13, at p. 389 of 469.

[72] *Id.*, Finding 1.57, ECF no. 36-13, at p. 389 of 469.

[73] FCR, at 56, Findings 1.60, 1.63, & 1.64, ECF no. 36-13, at p. 390 of 469.

[74] FCR, at 57, Finding 1.65, ECF no. 36-12, at p. 391 of 469.

[75] FCR, 59-60, Findings 1.77 through 1.88, ECF no. 36-13, at pp. 393-94 of 469.

[76] FCR, 47-49, 58, Findings 1.34 through 1.39 & 1.75, ECF no. 36-13, at pp. 381-83 & 392 of 469.

was adequate, found Johnson's defense team was not unaware of any significant aspect of Johnson's social history, concluded the failure of Johnson's defense team to call Dr. Celeste Henery or a similarly qualified social historian was neither objectively unreasonable nor prejudicial to Johnson, found Dr. Sapia did not uncover any significant aspect of Johnson's social history of which Johnson's defense team was unaware, found Amy Armstrong testified for the prosecution at trial and refused to cooperate with Johnson's defense team, found the affidavit of Johnson's mother Alma undercut several of Johnson's punishment-phase arguments – including Johnson's assertion of early drug abuse, found attorney Weatherspoon and  mitigation specialist Ross reasonably believed Anthony Johnson's testimony would not have been helpful to Johnson at trial, found the other affidavits and testimony presented during Johnson's state habeas corpus proceeding offered in support of Johnson's claim failed to present any new mitigating evidence or presented double-edged evidence, concluded Johnson failed to prove any deficiency in the performance of his trial counsel regarding the investigation of Johnson's background and the presentation of social history evidence and concluded Johnson failed to demonstrate prejudice resulted therefrom.[77]  The TCCA adopted the foregoing findings and conclusions when it denied Johnson's state habeas corpus application on the merits.  *Ex parte Johnson*, WR-86,571-01, 2019 WL 4317046, *3.

## C.  Clearly Established Federal Law

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the

---

[77] FCR, 61-102, Findings 2.1 through 2.200, ECF no. 36-13, at pp. 395-436 of 469.

defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant has the burden of proof and must overcome a strong presumption that the conduct of his trial counsel "falls within [a] wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (quoting *Strickland*, 466 U.S. at 688-89). Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *See Wiggins*, 539 U.S. at 523; *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland*, 466 U.S. at 694.

In instances where the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which the petitioner failed to fairly present to the state courts), this Court's review of the un-

65

adjudicated prong is de novo.  *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005).

Under the AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review.  The AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  *Burt v. Titlow,* 571 U.S. 12, 19 (2013).  Under § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *White v. Wheeler,* 136 S. Ct. 456, 460 (2015) (quoting *White v. Woodall,* 572 U.S. 415, 419-20 (2014)); *Harrington v. Richter,* 562 U. S. 86, 103 (2011).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland's* standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision.  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.   "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington*, 562 U. S. at 101 (citations omitted).

The Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence - such as mental illness or a history of childhood abuse - may be available.  *See, e.g., Porter v. McCollum*, 558 U.S. 30, 39-40 (2009) (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's competency evaluation suggesting possible mitigating evidence - including evidence of mental illness - could be gleaned from investigation into the defendant's family background and military service); *Wiggins v. Smith*, 539, U.S. 510, 524-26 (2003) (counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (counsel failed to conduct even a cursory investigation into the defendant's background which would have shown the defendant's parents had been imprisoned for the criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his parents' custody after they were released from prison).  Such claims are commonly referred to as *Wiggins* claims.

With regard to the prejudice prong of *Strickland*, the Supreme Court held the petitioners in *Wiggins*, *Porter*, and *Williams* were prejudiced by the failure of their trial counsel to fully investigate, develop and present available mitigating evidence.  More specifically, the Supreme Court found in *Wiggins* that his trial counsel failed to discover, develop, and present available mitigating evidence showing:

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother.  He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care.  The time Wiggins spent homeless, along with his diminished mental

> capacities, further augment his mitigation case. Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

*Wiggins,* 539 U.S. at 253.

In *Porter*, the new mitigating evidence undiscovered and undeveloped by trial counsel included lay and expert testimony showing (1) Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child; (2) Porter's father was violent every weekend and Porter was his father's favorite target, particularly when Porter tried to protect his mother; (3) on one occasion, Porter's father shot at him for coming home late but missed and beat Porter instead; (4) Porter attended classes for slow learners until he left school at age 12 or 13; (5) to escape his horrible family life, Porter enlisted in the Army at age 17 and fought in the Korean War; (6) Porter suffered a gunshot wound to the leg yet fought heroically through two battles; (7) after the war, Porter suffered dreadful nightmares and would attempt to climb his bedroom walls at night with knives; (8) Porter developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all; (9) Porter suffered from brain damage that could manifest in impulsive, violent behavior; (10) at the time of the capital offense, Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance; and (11) Porter had substantial difficulties with reading, writing, and memory. *Porter*, 558 U.S. at 449-51.

Prejudice was established in *Williams* through testimony showing trial counsel failed to discover and develop available mitigating evidence showing (1) Williams experienced a nightmarish childhood; (2) Williams' parents had been imprisoned for criminal neglect of Williams and his siblings; (3) Williams had been severely beaten by his father, committed to the custody of the social services bureau for two years during his parents' incarceration, and then

returned to his parents after they were released from prison; (4) Williams was borderline mentally retarded and did not advance beyond the sixth grade in school; (5) Williams received commendations for helping to crack a prison drug ring and for returning a guard's missing wallet; (6) Williams was among the inmates least likely to act in a violent, dangerous or provocative way; (7) Williams seemed to thrive in a more regimented and structured environment; and (8) Williams earned a carpentry degree while in prison. *Williams,* 529 U.S. at 395-96.

## D.  AEDPA Analysis

### 1.  No Deficient Performance

The state habeas court reasonably concluded that Johnson's trial counsel adopted an objectively reasonable trial strategy designed to keep the prosecution's mental health expert, Dr. Proctor, off the stand during the punishment phase of Johnson's capital murder trial.  As explained in detail in Section VIII.B. above, Dr. Proctor furnished the state habeas court with compelling and convincing testimony establishing that Johnson exhibits ASPD and that Johnson's violent criminal behavior flows as much from Johnson's ASPD as it does from Johnson's drug abuse. Contrary to the testimony of Johnson's family and friends at trial and during Johnson's state habeas corpus proceeding, the record before the state habeas court was clear that Johnson had engaged in an escalating pattern of violence culminated in his immolation-murder of Nancy Harris and that many of those episodes of violence (including Johnson's assault on another inmate during incarceration) could not be attributed solely to Johnson's drug use.  The efforts of Johnson's own testifying mental health experts, i.e., Dr. Roache, Dr. Sapia, and Dr. Rosenstein, to rebut Dr. Proctor's diagnosis of ASPD varied from the irrelevant to the inane.   Unlike Dr. Proctor, Neither Dr. Sapia nor Dr. Rosenstein conducted a clinical interview of Johnson. Dr. Roache is not trained as a psychologist or psychiatrist; he is a pharmacologist.

Johnson's trial counsel consistently testified without contradiction that they were aware of Dr. Proctor's reputation and prior testimony during capital murder trials.  They did not wish to open the door to Dr. Proctor's evaluation of Johnson and expert opinion testimony at trial.  Having a defense mental health expert who had evaluated Johnson take the stand at the punishment phase of Johnson's capital murder trial would have necessarily mandated having Johnson submit to a much more expansive interview than the one to which Johnson submitted during his state habeas proceeding (when Johnson refused to speak with Dr. Proctor regarding his capital offense or his mental health issues).  It is well-established that when a criminal defendant seeks to introduce mental health evidence through a psychological expert who has evaluated the defendant, the prosecution is entitled to have its own expert examine and evaluate the defendant.  *Kansas v. Cheever*, 571 U.S. 87, 94 (2013).  Based upon his testimony before Johnson's state habeas corpus court, Dr. Proctor's trial testimony would most likely have proven devastating to the efforts of Johnson's trial counsel to secure a life sentence for Johnson.    Under such circumstances, it was objectively reasonable for Johnson's trial counsel to adopt a strategy that prevented Dr. Proctor from evaluating Johnson and opining at trial that Johnson exhibited ASPD.  *Smith v. Davis*, 927 F.3d 313, 337 (5th Cir. 2019) (defense counsel acted reasonably in choosing not to present mental health evidence because doing so could have opened the door to evidence showing the defendant displayed antisocial personality disorder and had confessed to feigning mental illness while incarcerated).

Insofar as Johnson complains that his defense team failed to present Dr. Roache with all the social history and background information on Johnson that Dr. Roache testified he reviewed prior to his testimony at Johnson's state habeas hearing, the state habeas court reasonably concluded that alleged deficiency in his trial counsels' performance was neither objectively

unreasonable nor prejudicial to Johnson within the meaning of *Strickland*. Despite reviewing substantially more evidence than he had prior to his trial testimony, Dr. Roache's testimony during Johnson's state habeas corpus proceeding was not significantly different from his testimony during Johnson's trial. The fact Dr. Roache labeled addiction a "disease" during his state habeas testimony did not significantly alter the gist or thrust of his trial testimony, in which he explained in what the state habeas trial court accurately described as "dry, academic, terms" how substance abuse can lead to developmental changes in the way the brain processes information and make the craving for an addictive substance so powerful as to override a person's free will. The practical problem with this argument from a "prejudice" standpoint is that several of Johnson's friends and relatives (including both of Johnson's brothers and his childhood friend Michael Henry - who testified he encouraged Johnson to stop smoking crack) testified during Johnson's state habeas hearing that they managed to get clean of their own drug addiction through discipline, prayer, and other means aside from the type of intensive in-patient residential therapy described by Dr. Roache and Johnson's childhood friend Anthony Wayne Grimes.

Another practical problem with Johnson's attempt during his state habeas proceeding to blame all of his criminal misbehavior on his drug addiction is that both at trial and during his state habeas corpus hearing many of Johnson's closest family and friends denied any knowledge of his drug problems until his relapse shortly before his capital offense. Many of these same individuals also denied any knowledge of Johnson's lengthy criminal record of demonstrated propensity for violence, especially with regard to his romantic relationships. Likewise, Johnson's behavior during a lengthy term of incarceration prior to his capital offense was described by at least one prosecution witness as aggressive, if not threatening.

The state habeas court likewise reasonably concluded the scope of the investigation conducted by Johnson's defense team into Johnson's background was itself objectively reasonable. Johnson furnished the state habeas court with no significant new mitigating evidence of which his trial team was unaware. Johnson's defense team knew Johnson had twice been sexually abused as a child. His trial counsel presented the jury with that evidence through Johnson's own trial testimony. It was likewise clear from the testimony presented at trial that Johnson grew up in a family in which both of his parents worked but his mother worked long hours and his father worked the late shift, which gave Johnson and his brother ample opportunity to abuse drugs and get into trouble during their teen years. Johnson's jury was also aware through the testimony of Amy Armstrong and Daphne Johnson of Johnson's romantic relationships during his teen years and the volatile nature of those relationships. At the same time, however, the defense also presented the jury with multiple witnesses who described the adult Johnson as a capable co-worker and a caring parent.

Establishing deficient performance under *Strickland* requires more, however, than a mere showing that a criminal defendant's trial counsel could have done more investigation or presented additional mitigating evidence. *See Thomas v. Lumpkin*, 995 F.3d 432, 454 (5th Cir. 2021) ("Our concern is not whether counsel at trial could have done more. This is often, almost always, the case."). Rather the evaluation of trial counsel's performance turns on the objective reasonableness of the scope of said counsel's investigation, which in turn depends to a great extent upon the information furnished to trial counsel by the defendant himself, information furnished by those family members and other individuals who knew the defendant and whom the defendant's defense team interviewed, and the information contained in the defendant's school, medical, employment, and institutional records obtained by the defense team prior to trial. *See Burger v. Kemp*, 483 U.S.

776, 795 (1987) ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." (quoting *Strickland*, 466 U.S. at 691)). Moreover, the fact that a particular strategic approach to presenting mitigating evidence ultimately proved unsuccessful does not render it unreasonable. *Thomas*, 995 F.3d at 455 (citing *Strickland*, 466 U.S. at 689).

The additional testimony and affidavits Johnson presented to the state habeas court detailing Johnson's history of long-term drug and alcohol abuse was largely cumulative of the extensive testimony presented during the punishment phase of Johnson's trial. A failure to present cumulative testimony cannot be the basis of a claim of ineffective assistance. *Howard v. Davis*, 959 F.3d 168, 173 (5th Cir. 2020) (citing *Richards v. Quarterman*, 566 F.3d 553, 568 (5th Cir. 2009)); *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016) (defendant was not prejudiced by failure of counsel to present cumulative evidence).

Moreover, the additional details of Johnson's long-term drug and alcohol abuse furnished during Johnson's state habeas proceeding were, at best, double-edged in nature. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (mitigating evidence is "double-edged" when it might permit an inference that the defendant is not as morally culpable for his behavior but also might suggest that, as the product of his environment, the defendant is likely to continue to be dangerous in the future); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) ("Although the evidence of Ladd's inadequate supervision as a child might permit an inference that he is not as morally culpable for his behavior, it also might suggest Ladd, as a product of his environment, is likely to continue to be dangerous in the future."). Failure to present evidence that is double-edged in nature

generally lies within the discretion of trial counsel.  *See Ayestes v. Davis*, 933 F.3d 384, 392 (5th Cir. 2019) ("this Court has repeatedly denied claims of ineffective assistance of counsel for failure to present 'double edged' evidence where counsel has made an informed decision not to present it." (quoting *Hopkins v. Cockrell* 325 F.3d 579, 586 (5th Cir. 2003)).

Likewise, the state habeas court reasonably concluded Johnson's trial counsel acted in an objectively reasonable manner when they chose not to present expert testimony from anthropologists and academics such as Dr. Henery and Dr. King addressing the historical and cultural barriers to seeking mental health care and substance abuse treatment within the black community.  At least one of the defense's new witnesses (Anthony Wayne Grimes) testified during Johnson's state habeas hearing that he sought and obtained treatment for his own substance abuse problems.  Johnson's brothers testified during Johnson's state habeas hearing that they both managed to get clean of their own crack addictions without the necessity of entering into a long-term residential treatment facility.  Both Johnson and his wife Daphne testified at trial that the reason Johnson did not seek residential drug treatment or therapy after his relapse was that they had lost their insurance when Johnson was fired from his job and they could not afford it.  Thus, it was economic reasons, not cultural or anthropological reasons, which Johnson claimed kept him from seeking drug treatment after his 2011 relapse.

The state habeas court reasonably concluded that Johnson's trial counsel adopted an objectively reasonable trial strategy at the punishment phase of trial which (1) kept Dr. Proctor off the witness stand, (2) presented evidence of Johnson's history of addiction and its consequences, but (3) emphasized Johnson's remorse.  Relying exclusively or primarily on Johnson's addiction (as Johnson's federal habeas counsel now urges) could have opened the door to prosecution

74

arguments that Johnson was attempting to excuse his criminal misbehavior without accepting responsibility for his actions.

### 2. No Prejudice

The leading Supreme Court decisions addressing trial counsels' failures to adequately investigate a defendant's background and present available mitigating evidence involved situations far more extreme than those at Johnson's capital murder trial.  Unlike the situations in *Williams*, *Porter*, and *Wiggins*, as explained at length in Section II.D.2. above, Johnson's trial counsel presented an extensive case in mitigation, including testimony from numerous co-workers, friends, and family members, as well as testimony from numerous experts on future dangerousness, and an addiction expert.

Also explained in Section II.D.2. above, Johnson's trial counsel used Johnson's own testimony to present a nearly comprehensive account of Johnson's background, troubles with drugs, and criminal history.  The state habeas court found that almost all of the "new" mitigating evidence identified by Johnson in his voluminous state habeas application and exhibits, and the testimony of Johnson's state habeas witnesses, actually had been presented in one form or another during the punishment phase of Johnson's trial.  This Court has undertaken a careful review of the entire record from Johnson's trial and state habeas corpus proceedings.  The state habeas court's finding on this subject was fully supported by the evidence before that court.  Johnson's trial counsel cannot reasonably be faulted for failing to present cumulative mitigating evidence. *Howard*, 959 F.3d at 173; *Norman*, 817 F.3d at 233.  Nor was Johnson prejudiced within the meaning of *Strickland* by his trial counsels' failure to present cumulative evidence.

Johnson was not prejudiced within the meaning of *Strickland* by his trial counsels' decision to refrain from presenting expert mental health testimony predicated upon a mental health

evaluation of Johnson.  Dr. Proctor was literally sitting in the courtroom watching the punishment phase of Johnson's capital murder trial.  The defense team was well aware of Dr. Proctor's penchant for evaluating convicted capital murderers as displaying psychopathic traits.  Had Johnson's trial counsel chosen the path now advocated by Johnson's federal habeas counsel, Dr. Proctor's devastating opinion testimony before Johnson's state habeas court would have been admissible during the punishment phase of Johnson's trial.  There is not even a scintilla of a possibility, much less a reasonable probability, that Johnson's trial counsel and their mental health experts could have rebutted Dr. Proctor's diagnosis of ASPD sufficiently to alter the outcome of the jury's answers to Johnson's capital sentencing special issues.

Johnson himself and his family and friends did far more to undermine the efficacy of his defense team's case in mitigation than his trial counsel.  Johnson candidly admitted during his cross-examination that he had a lengthy history of substance abuse and violent criminal behavior, including assaultive conduct against a former girlfriend, his own wife, and a former fellow prison inmate.  Yet when called by the defense at trial, Johnson's family and friends consistently denied any knowledge of Johnson's drug abuse until Johnson's 2011 relapse.  They also denied any knowledge that Johnson had ever been violent toward his wife.  Thus, Johnson's family and friends undermined the credibility of Johnson's admissions.

Johnson admitted during his punishment phase trial testimony that he located a container of lighter fluid, poured it into a plastic bottle, carried the bottle into the convenience store, and poured its contents over Harris's head.[78]  He admitted that he did so because he wanted Harris to be sufficiently frightened to do his bidding.[79]  He admitted that Harris opened her cash register at

---

[78] Testimony of Matthew Lee Johnson, S.F. Trial, Vol. 49/59, at 30-34.

[79] *Id.*

his direction.[80]  Yet in virtually the next breath, Johnson claimed that he did not know the *lighter fluid* he had poured over Harris's head and shoulders was flammable.[81]  He likewise offered no rational explanation for why he set Harris afire *after* she had fully complied with his demands. The video tape of Johnson's capital offense belied his contention that Harris made any effort to interfere with Johnson's robbery or escape.  The jury was thus left to draw the reasonable inference that Johnson set Harris on fire for the purpose of preventing her from later testifying against him.

The state habeas court reasonably concluded that Johnson's complaints about the performance of his trial counsel did not satisfy the prejudice prong of *Strickland.*

## E.  Conclusions

The TCCA's denial on the merits of Johnson's claims of ineffective assistance in the course of Johnson's state habeas corpus proceeding (including the TCCA's express conclusions that Johnson's ineffective assistance claims all failed to satisfy either prong of *Strickland*) was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Johnson's trial and state habeas corpus proceeding.

Johnson's first claim for federal habeas relief lacks any arguable legal merit.  This Court denies relief on this claim.

## IX.  REQUEST FOR FEDERAL EVIDENTIARY HEARING

Johnson requests this Court hold an evidentiary hearing if necessary to resolve his claims. ECF no. 21, at p. 99.

---

[80] *Id.*, at 34.

[81] *Id.*

77

Insofar as Johnson's claims in this federal habeas corpus proceeding were disposed of on the merits during the course of his direct appeal or state habeas corpus proceedings, he is not entitled to a federal evidentiary hearing to develop new evidence attacking the state appellate or state habeas court's resolution of his claims.  Under AEDPA, the proper place for development of the facts supporting a federal habeas claim is the state court.  *See Harrington*, 562 U. S. at 103 ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding AEDPA clearly places the burden on a federal habeas petitioner to raise and litigate as fully as possible his federal claims in state court).  Where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, 563 U. S. 170, 181-82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.  Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law.  This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

Thus, Johnson is not entitled to a federal evidentiary hearing on any of his claims which were rejected on the merits by the state courts, either on direct appeal or during his state habeas corpus proceedings.  *See Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." (quoting *Cullen*, 563 U.S. at 185)), *cert. denied*, 140 S. Ct. 167 (2019).

With regard to any new factual allegations, new evidence, or new legal arguments Johnson presents in support of any of the claims for which this Court has undertaken de novo review (i.e., Johnson's fourth claim, fifth claim, and the unexhausted portion of Johnson's second claim), he is likewise not entitled to an evidentiary hearing.  In the course of conducting de novo review of those claims, except for those assertions that are refuted by the state courts records now before this Court, this Court has assumed the factual accuracy of (1) all the specific facts alleged by Johnson in support of his second, fourth, and fifth claims for relief and (2) any documents he has presented in support of those claims.  Even when the truth of all of Johnson's new factual allegations supporting those claims is assumed, his claims do not warrant federal habeas relief.  *See Schriro v. Landrigan*, 550 U. S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").  Thus, Johnson is not entitled to an evidentiary hearing in this Court with regard to any of his claims for which this Court has undertaken de novo review.

## X. CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under § 2254, the petitioner must obtain a Certificate of Appealability ("CoA").  *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. § 2253(c)(2).  Likewise, under AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted.  *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted).  In other words, a CoA is granted or denied

on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted. *Crutcher*, 301 F.3d at 658 n.10; 28 U.S.C. § 2253(c)(3).

A CoA will not be granted unless a petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard*, 542 U.S. at 282; *Miller-El*, 537 U.S. at 336. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484). In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA

may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).  This court did not dispose of any of Johnson's federal habeas corpus claims on procedural grounds.  This court addressed the merits of all of Johnson's claims.

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor.  *Thompson v. Davis*, 916 F.3d 444, 453 (5th Cir. 2019); *Halprin*, 911 F.3d at 255.  Nonetheless, a CoA is not automatically granted in every death penalty habeas case.  *See Miller-El*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course.").  The deferential standard of review applied to claims of ineffective assistance adjudicated on the merits in the state courts has particular bite in evaluating the appealability of ineffective assistance claims—the Supreme Court requires that federal courts "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt,* 571 U.S. at 15.

Reasonable minds could not disagree with this Court's conclusions that (1) the TCCA reasonably concluded that all of Johnson's complaints of ineffective assistance by his trial counsel fail to satisfy both prongs of *Strickland*; (2) the TCCA reasonably rejected Johnson's challenges to the constitutionality of the Texas capital sentencing statute and its special issues; (3) Johnson's challenges to the constitutionality of the Texas capital sentencing statute and its special issues have been repeatedly rejected by the Fifth Circuit, are without arguable legal merit, frivolous, and foreclosed by the nonretroactivity principle of *Teague*; (4) Johnson's challenges to the constitutionality of the state-wide application of capital sentencing in Texas and his allegedly selective prosecution both lack arguable merit; (5) Johnson is not entitled to have the undersigned

judicial officer recused based upon rulings this Court has made on motions filed in this case; and (6) Johnson is not entitled to a federal evidentiary hearing in this Court.

It is hereby ORDERED that:

1.  Johnson's motions for recusal, filed February 28, 2022 (ECF nos. 41 & 42), are DENIED.

2.  All relief requested in Johnson's federal habeas corpus petition, filed September 11, 2020 (ECF no. 21), as supplemented by Johnson's reply brief, filed May 21, 2021 (ECF no. 32), is DENIED.

3.  Johnson's request for an evidentiary hearing in this Court is DENIED.

4.  Johnson is DENIED a Certificate of Appealability on all his claims.

**SIGNED March 23, 2022.**

_____
**ADA BROWN**
**UNITED STATES DISTRICT JUDGE**